## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| CAMELOT EVENT DRIVEN FUND, A SERIES OF FRANK FUNDS TRUST, Individually, and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>     vs.<br><br>ALTA MESA RESOURCES, INC. f/k/a SILVER RUN ACQUISITION CORPORATION II, HARLAN H. CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER, MICHAEL A. MCCABE, WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J. WALTERS, and RIVERSTONE INVESTMENT GROUP LLC,<br><br>                    Defendants. | Civil Action No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT FOR VIOLATION
## OF THE FEDERAL SECURITIES LAWS

Plaintiff Camelot Event Driven Fund, a Series of Frank Funds Trust ("Plaintiff"), by and through its undersigned counsel, for its complaint against Defendants (as defined herein), alleges upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II ("Silver Run II" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Silver Run II; and (c) review of other publicly available information concerning Silver Run II.

## NATURE OF THE ACTION AND OVERVIEW

1.     The action is brought on behalf of all persons or entities who purchased or otherwise acquired Silver Run II securities between March 24, 2017 and February 25, 2019, both dates inclusive (the "Class Period"), against Silver Run II and the Officer Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.     Plaintiff also brings claims on behalf of investors who held Silver Run II Class A common stock as of the record date on January 22, 2018 (the "Record Date") and were entitled to vote with respect to Silver Run II's acquisition of Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream LLC ("Kingfisher") (the "Acquisition"), against Silver Run II, Riverstone Investment Group LLC ("Riverstone"), and the Individual Defendants (as defined herein) (collectively, the "Section 14(a) Defendants") for violations of Sections 14(a) and 20(a) of the Exchange act, and Rule 14a-9 promulgated thereunder.

3.     Under Section 14(a) of the Exchange Act, the Section 14(a) Defendants are strictly liable for the material misstatements in the proxy materials related to the Acquisition. The claims under Section 14(a) of the Exchange Act also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless conduct.

4.     Silver Run II was formed in 2016 as a blank check company organized under the laws of Delaware.  Blank check companies do not have established businesses or operations, but rather, are formed for the purpose of effectuating a merger or acquisition with another firm or business entity.  Stockholders in blank check companies depend on management to honestly provide accurate information about any contemplated transactions.

5.     On or about March 24, 2017, Silver Run II carried out an initial public offering, selling 103.5 million ownership units to investors for gross proceeds of $1.035 billion (the "IPO").  Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share.  The IPO was sponsored by Riverstone, a New York-based energy sector private equity firm.

6.     Defendant James T. Hackett ("Hackett") served as the Chief Executive Officer ("CEO") of Silver Run II and a member of the Board at the time of the IPO (replaced by Defendant Harlan H. Chappelle ("Chappelle") post-Acquisition).  He was also a Senior Advisor to Riverstone at the time.  Other members of Silver Run II's management team also concurrently served as Riverstone executives, including the Company's Chief Financial Officer ("CFO"), Defendant Thomas J. Walker ("Walker") (replaced by Defendant Michael A. McCabe ("McCabe") post-Acquisition), and its Corporate Secretary, Stephen S. Coats ("Coats").

7.      While Silver Run II did not identify any target companies at the time of the IPO, the offering materials stated that the Company planned to pursue an acquisition that would "capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns."  The IPO offering materials also represented that Silver Run II would leverage its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered Silver Run II investors attractive investment returns.

8.      Pursuant to the IPO prospectus, Silver Run II was required to acquire a target business with an aggregate fair market value of at least 80 percent of the assets held in trust from the IPO proceeds.  In addition, Silver Run II was obligated to redeem 100 percent of its outstanding public shares if it failed to complete the business combination within two years of the March 2017 IPO.  Shareholders also had the right at the time of the initial business combination to either approve the initial business combination or redeem their shares on a pro rata basis.

9.      In August 2017, Silver Run II announced that it had entered into an agreement, subject to shareholder approval, to merge with two privately held companies, Alta Mesa and Kingfisher, in a deal initially valued at $3.8 billion.  Alta Mesa was an oil and gas exploration and production company operating in the STACK play in the Anadarko Basin area of Oklahoma. Kingfisher specialized in the gathering, processing, and marketing of hydrocarbons from oil and gas producers.  The two companies were closely related and shared overlapping and affiliated owners.  Kingfisher had been built to service Alta Mesa, and nearly 97 percent of Kingfisher's revenues derived from production out of wells operated by Alta Mesa for the year ended December 31, 2016.

10.     On January 19, 2018, in order to secure shareholder support for the Acquisition, Silver Run II issued a materially false and misleading Definitive Merger Proxy Statement pursuant to Section 14(a) of the Exchange Act (the "Proxy").  The Proxy, which recommended that Silver Run II's shareholders vote in favor of the Acquisition, included false and/or misleading statements of fact and omitted facts necessary to make the statements made therein not false or misleading in contravention of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

11.     Among other misrepresentations, the Proxy materially overstated the value of the assets to be acquired via the Acquisition and claimed that both Alta Mesa and Kingfisher were poised for substantial near-term growth.  For example, the Proxy failed to disclose operational setbacks, customer uncertainty and predictable well shutdowns as a result of planned projects commenced in late 2017, while representing: (i) that Alta Mesa was positioned to achieve a 2018 average net daily production of 38.51 MBOE/d,[1] an 85 percent increase over its estimated 2017 net daily production of 20.84 MBOE/d, and a 2018 adjusted EBITDA(X)[2] of $358 million, a 131 percent increase over Alta Mesa's 2017 estimated adjusted EBITDA(X) of $155 million; and (ii) that Kingfisher was positioned to achieve 2018 adjusted EBITDA[3] of $185 million, a 340 percent increase over Kingfisher's 2017 estimated adjusted EBITDA of $42 million.

12.     As a result of the false and misleading Proxy, which was used to induce stockholder action and resulted in substantial harm to Plaintiff and Silver Run II's other

---

[1] MBOE/d stands for one thousand barrels of oil equivalent ("BOE") per day.

[2] EBITDA(X) is an indicator of financial performance used by oil and gas exploration companies.  The acronym stands for Earnings before Interest, Taxes, Depreciation (or Depletion), Amortization, and Exploration expenses.

[3] EBITDA is a widely used indicator of financial performance used by companies across all sectors.  The acronym stands for Earnings before Interest, Taxes, Depreciation, and Amortization.

shareholders on the Record Date, Silver Run II shareholders were prevented from making an informed decision on whether or not to redeem their shares and voted in favor of the Acquisition on February 6, 2018.  The redeemable Class A common shares were valued at approximately $10 per share at the time of the Acquisition.

13.     On February 9, 2018, Silver Run II issued a release announcing that the Acquisition had closed.

14.     Unbeknownst to Silver Run II shareholders on the Record Date, as well as subsequent purchasers of Silver Run II securities, however, the true quality of the assets acquired in the Acquisition were vastly lower than touted by Silver Run II in the Proxy.  The fraudulently undisclosed actual value of these assets (or complete lack thereof) would be only revealed over the Company's next several reporting periods, sending the value of Silver Run II securities into free fall, thereby seriously harming investors.

15.     On March 29, 2018, less than two months after the closing of the Acquisition, Silver Run II issued a release announcing that the EBITDA and production estimates provided in the Proxy were materially overstated.  The release stated that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, 46 percent below the 2018 EBITDA estimate of $185 million provided in the Proxy.  Similarly, Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8 percent below the production figures provided in the Proxy.

16.     Chappelle, the new CEO of the combined business (and former CEO of Alta Mesa), stated during a conference call to discuss Silver Run II's results that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed the Company's timeline for growing its pipeline business back by six months and a possible public

offering of the asset "perhaps" into 2019.  Even though the setbacks had not been disclosed in the Proxy, Chappelle admitted that these "setbacks" began in "late 2017."  Despite revealing these dire setbacks, Chappelle stated that: "our vision for growth remains strong . . . .  We believe our margins are going to continue to expand . . . ."

17.     On this news, Silver Run II Class A common stock fell from its March 29, 2019 closing price of $8.00, to close at $7.36 on the following trading day, April 2, 2018, a decline of 8 percent.  The stock continued to decline for the following two days, closing at $6.99 on April 4, 2018.  Altogether, this represented a 16.6 percent decline from the stock's closing price of $8.38 on March 28, 2018.

18.     On May 14, 2018, the Company disclosed that net production was still languishing at 24 MBOE/d, *37 percent* below the Company's 2018 projections.  During the Company's accompanying conference call with investors, however, Chappelle again attempted to falsely assuage investor concern: "We are reaffirming our FY 2018 guidance.  We have confidence in presenting operating results, such as production, revenue, expenses as those numbers will not change."

19.     On August 14, 2018, Silver Run II provided its second quarter 2018 financial results, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  Rather than the hyperbolic growth portrayed in the Proxy, Silver Run II revealed that Alta Mesa's oil production had actually declined sequentially during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22 percent below the estimates provided in the Proxy.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered

6

from repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

20.     On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "back in the fourth quarter of '17," which problems "linger[ed] into the first quarter of '18."  Notwithstanding the fact that these projects were planned and implemented prior to the Acquisition, their adverse effects were omitted from the Proxy.  Furthermore, Silver Run II revealed that its Kingfisher operations were not on track to achieve even the drastically reduced March 2018 guidance.  Notably, Silver Run II refused to provide any revised guidance for Kingfisher during the call, an indication that third-party producers had largely abandoned the use of Kingfisher's pipeline services.  The Proxy had valued the consideration to be paid for Kingfisher at over $1.4 billion (including $800 million in cash) based, in part, on a 2018 EBITDA estimate of $185 million.  Kingfisher, however, actually generated only $9.2 million of EBITDA in the first six months of 2018, which implied a full-year EBITDA of only $18.4 million, more than 90 percent below the estimate provided in the Proxy.

21.     On this news, the price of Silver Run II Class A common stock fell from its August 13, 2018 closing price of $6.00, to close at $4.77 on August 14, 2018, a decline of 21 percent.  The stock continued to decline on the following trading day, closing at $4.34 on August 15, 2018.  Altogether, this represented a decline of 28.6 from the stock's August 13, 2018 closing price.

22.     On November 13, 2018, Silver Run II issued a release providing its third quarter 2018 financial results.  Production would still languish at 33.4 MBOE/d, and the Company would only report consolidated EBIDTAX of $83.8 million—well below the estimates in the

Proxy.  The release also stated that McCabe, the Company's post-Acquisition CFO, was retiring.
In the accompanying conference call with investors, however, Chappelle continued to tout the
"quality" of Silver Run II's assets.

23.    On this news, the price of Silver Run II Class A common stock fell from its
November 13, 2018 closing price of $2.82, to close at $2.40 on November 14, 2018, a decline of
15 percent.  Over the next several trading days, the stock continued to decline, closing at $2.18
on November 16, 2018.  Altogether, this representing a decline of  22.7 percent from the stock's
November 13, 2018 closing price.

24.    Approximately one month later, on or about December 27, 2018, Silver Run II
announced the sudden resignation of Chappelle, and Michael E. Ellis ("Ellis"), Vice President
and Chief Operating Officer-Upstream.

25.    Finally, on February 25, 2019 Defendants announced that they would delay the
announcement of Silver Run II's full year 2018 financial results due to a determination that the
Company had ineffective control over financial reporting due to an identified material weakness
in both the design of its controls and the execution of its control procedures.  The Company also
announced that it expected to record material, non-cash asset impairment charges to both its
upstream and midstream segments in the fourth quarter of 2018, totaling $3.1 billion—triple the
value of the Company at the time of the IPO, and nearly the entire value of the $3.8 billion
Acquisition.  In addition, the Company projected that 2019 production estimates would be on
average of 30.5 MBOE/d—over 100 percent below the estimates of 68.9 MBOE/d as contained
in the Proxy.  Finally, the Company announced that it had "reduced [its] active rig count to zero
by the end of January."

26.     On this news, the price of Silver Run II Class A common stock fell from its February 25, 2019 closing price of $0.91, to close at $0.24 on February 26, 2019, a decline of 63 percent.  The stock continued to decline on the following trading day, closing at $0.23 on February 27, 2019.  Altogether, this represented a decline of 75 percent from the February 25, 2019 closing price.

27.     The value of the Silver Run II securities held by Plaintiff and other members of the Class (as defined below) declined substantially in value subsequent and due to the approval of the Acquisition, causing economic loss and damages as the truth about Alta Mesa and Kingfisher and the Defendant's false and misleading statements, including those in the Proxy, were revealed slowly over time.  By February 2019, the price of Silver Run II Class A common stock had fallen astronomically from a Class Period high of $10.73 per share, trading at well below $.50  per share.  This number also represents over a 95 percent decline from the price shareholders would have received had they redeemed their shares instead of approving the Acquisition.

28.     This action seeks damages on behalf of Silver Run II's stockholders incurred as a result of defendants' materially misleading Proxy disseminated in contravention of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Silver Run II was headquartered in this District throughout the Class Period, and a significant portion of the Defendant's actions, and the subsequent damages, took place within this District.

31.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities, excluding defendants and their affiliates, who purchased or otherwise acquired Silver Run II securities between March 24, 2017 and February 25, 2019, both dates inclusive, and/or investors who held Silver Run II Class A common stock at the close of business on January 22, 2018, (collectively, the "Class").  This action is properly maintainable as a class action for the reasons set forth below.

33.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy, there were approximately 103.5 million public shares of Silver Run II Class A common stock issued and outstanding at the time of the Acquisition.  In addition, according to the Company's latest 10-Q filing with the SEC dated November 14, 2018, there were approximately 175.9 million public shares of Silver Run Class A common stock outstanding. Therefore, Company securities were likely held by thousands of persons.

34.     There are questions of law and fact that are common to the Class, including:

(a)     whether defendants violated Section 10(b) of the Exchange Act by making material misrepresentation or omissions throughout the Class Period;

(b)     whether defendants violated Section 14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

(c)     whether the named defendants herein are liable as "controlling persons" under Section 20(a) of the Exchange Act for underlying violations of Sections 10(b) and/or 14(a) of the Exchange Act; and

(d)     whether Plaintiff and the other members of the Class were injured as a result of defendants' misconduct.

35.     Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff is not subject to any atypical claims or defenses.

36.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

## BACKGROUND FOR ALL CLAIMS ASSERTED HEREIN

37.     Silver Run II was formed in 2016 as a blank check company for the specific purpose of acquiring economically sound assets in the energy sector that offered attractive risk-adjusted returns for investors.

38.     On or about March 24, 2017, Silver Run II completed its IPO, selling 103.5 million ownership units to investors for gross proceeds of $1.035 billion.  Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share.  The IPO was sponsored by Riverstone, a New York-based energy sector private equity firm.

39.     Hackett served as CEO and a member of the Board of Silver Run II at the time of the IPO (replaced by Chappelle post-Acquisition).  Hackett is the former Chairman and CEO of

11

the Anadarko Petroleum Corporation and, at the time of the IPO, served as a Senior Advisor to

Riverstone.  Other members of Silver Run II's management team also concurrently served as

Riverstone executives.  For example, the Company's CFO, Walker, was a Partner at Riverstone

and served as its CFO (replaced by McCabe post-Acquisition).  Likewise, Coats, the Corporate

Secretary of Silver Run II, was a Partner at Riverstone and served as its General Counsel.

40.     Pursuant to the IPO prospectus, Silver Run II was required to acquire a target

business with an aggregate fair market value of at least 80 percent of the assets held in trust from

the IPO proceeds and to do so within two years of the March 2017 IPO.  In the event Silver Run

II did not complete an initial business combination, the Company was obligated to redeem 100

percent of its outstanding public shares.  Moreover, shareholders could redeem their shares at the

time of the initial business combination if they did not want to retain a continuing interest in the

business after the transaction.  If enough shareholders redeemed their shares, a deal would not be

economically feasible.

41.     On August 16, 2017, Silver Run II announced that it had entered into a

preliminary agreement, subject to shareholder approval, to merge with Alta Mesa and Kingfisher

in a deal initially valued at $3.8 billion.  Alta Mesa and Kingfisher were closely related and

shared overlapping and/or affiliated owners.  Alta Mesa was an oil and gas exploration and

production company operating in the STACK play in the Anadarko Basin area of Oklahoma, and

Kingfisher specialized in the gathering, processing and marketing of hydrocarbons from oil and

gas producers.  Nearly 97 percent of Kingfisher's revenue derived from production out of wells

operated by Alta Mesa for the year ended December 31, 2016.

42.     In the Acquisition, Silver Run II, Riverstone and the owners of Kingfisher and

Alta Mesa, through certain affiliates and investment vehicles, would each receive common units

in a newly formed operating subsidiary, SRII Opco, LP ("SRII Opco"), pursuant to various contribution agreements (the "SRII Units"). Each contributor other than Silver Run II would also receive corresponding shares of newly created Class C common stock, which entitled its holders to vote on par with Class A and Class B shares but provided no economic interest in Silver Run II.

43.    Specifically, under the contribution agreement that Silver Run II entered into with Alta Mesa, Alta Mesa's owners would receive 220 million SRII Units (and a corresponding number of Class C shares), subject to certain adjustments, and the right to receive an aggregate of up to $800 million in additional earn-out compensation. Silver Run II also agreed to contribute $400 million in cash to Alta Mesa. The preliminary purchase price consideration for Alta Mesa was estimated in the Proxy to be approximately **1.864 billion**.

44.    Under the contribution agreement that Silver Run II entered into with Kingfisher, Kingfisher's owners would receive 55 million SRII Units (and a corresponding number of Class C shares), $800 million in cash, and the right to receive an aggregate of up to $200 million in additional earn-out compensation. As detailed in the Proxy, the owners of Kingfisher (who largely overlapped with Alta Mesa's owners) had insisted on receiving a large cash payout from the Acquisition rather than taking additional equity in the surviving business. The preliminary purchase price consideration for Kingfisher was estimated in the Proxy to be approximately **1.439 billion**.

45.    Following the Acquisition, the owners of Kingfisher and Alta Mesa would collectively own 50.7 percent of the voting shares in Silver Run II and 50.7 percent of the SRII Units. Certain of these owners and their affiliates would also retain a 10 percent interest in the general partner of Alta Mesa and receive shares of newly issued Series A Securities entitling

them to collectively nominate and elect up to four directors to the Board.  The Board,

meanwhile, would be expanded to eleven members.

46.     In the Acquisition, Riverstone was to receive 20 million SRII Units (and a

corresponding number of Class C shares) pursuant to a separate contribution agreement it had

entered into with Silver Run II, in addition to the ownership and voting rights it had secured in

the IPO.  In total, Riverstone and its affiliates would receive approximately 22.3 percent of the

voting interest and 38.9 percent of the economic interest in Silver Run II, minus certain interests

held by the non-employee members of the Board through their ownership of Class B shares.  In

addition, Riverstone would receive a 5.2 percent interest in SRII Opco and one share of newly

issued Series B Securities entitling it to nominate and elect up to three directors to the Board.

Riverstone also caused Silver Run II to enter into a Tax Receivables Agreement that entitled

Riverstone and the owners of Alta Mesa to receive cash payments from Silver Run II equal to 85

percent of the amount of tax savings realized by the Company in certain circumstances.

47.     Silver Run II, meanwhile, would contribute the proceeds from the IPO to the

business and, in exchange, receive a 44.1 percent limited partner interest in SRII Opco, control

over the general partner of SRII Opco, and a 90 percent interest in the general partner for Alta

Mesa.  Immediately following the Acquisition, the existing public shareholders of Silver Run II

would hold only 26.9 percent of the voting stock in Silver Run II and the ability to elect a

minority of the Board.  Despite their lack of control over the Company, Silver Run II's

shareholders would be exposed to 61.1 percent of its economic risk.

48.     Riverstone's and Silver Run II's officers and directors were incentivized to close

the Acquisition.  If they failed to secure an initial business combination by March 29, 2019,

according to the Proxy, "[Riverstone and our] officers and directors will lose their entire

investment."  Instead, Silver Run II would be wound up and Riverstone would be obligated to

redeem 100 percent of the Company's public shares at a per share price, payable in cash.

Negotiations regarding the Acquisition had been ongoing since at least March 2017—the month

of the IPO—and, according to the Proxy, involved the consideration of "multiple alternative

target opportunities."  Given the extended duration of these negotiations, and the fact that

Riverstone purportedly found all of the alternatives it considered to be unsuitable for an initial

business combination, it is unlikely that Riverstone would have been able to complete an

alternative business combination within the requisite time period if shareholders did not vote to

approve the Acquisition.

     49.     Under the terms of the Acquisition, the corporate structure of Silver Run II would

be as follows upon its closing:



**Organizational Structure**

The following diagram illustrates our ownership structure immediately following the Closing.

(1)   Includes (x) shares of Class C Common Stock, one share of Series B Preferred Stock owned by the Riverstone Contributor and a 5.2%
      limited partner interest in SRII Opco and (y) shares of Class A Common Stock owned by Fund VI Holdings.
(2)   Includes shares of Class A Common Stock issued upon conversion of the founders shares to our Sponsor and independent directors.
(3)   The Series A Preferred Stock and the Series B Preferred Stock will not have any voting rights (other than the right to nominate a certain
      number of directors for election to our board of directors as described herein) or rights with respect to dividends but are entitled to preferred
      distributions in liquidation in the amount of $0.0001 per share.
(4)   Certain existing owners of Alta Mesa, including Harlan H. Chappelle, our Chief Executive Officer and a director, Michael E. Ellis, our Chief
      Operating Officer, Upstream and a director, and certain affiliates of Bayou City and HPS, own an aggregate 10% voting interest in Alta Mesa
      GP. These existing owners are a party to a voting agreement with SRII Opco and the existing owners will agree to vote their interests in Alta
      Mesa GP as directed by SRII Opco.

50.     On January 19, 2018, Silver Run II issued a Definitive Merger Proxy Statement to its shareholders on Schedule 14A in connection with the efforts of Silver Run II, the Board and Riverstone to secure shareholder support for the Acquisition.  The Proxy recommended that Silver Run II's shareholders vote in favor of the Acquisition while omitting and misrepresenting material information concerning core aspects of Alta Mesa and Kingfisher that diminished their future expected cash flows.  In addition, Class A common stockholders of record were given the right to redeem their shares prior to the Acquisition, with each share being valued at $10 in the Proxy.

51.     Silver Run II stockholders voted in favor of the Acquisition at a special shareholders meeting held in New York City on February 6, 2018.  Of shareholder votes cast, over 98 percent voted in favor of the Acquisition.

52.     On February 9, 2018 the Company announced that the Acquisition had closed. Upon the closing of the Acquisition, Silver Run II changed its name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc."  In addition, the Company's Class A common stock and warrants, trading on the NASDAQ under the respective tickers "SRUN" and "SRUNW," were relisted on the NASDAQ under the respective tickers "AMR" and "AMRW." Finally, the Company's units, trading under the ticker "SRUNU," representing one share of Class A common stock and one third of a warrant, were separated into their separate component securities, and ceased to trade entirely.

### CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT

#### Parties

53.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Silver Run II stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

54.     Defendant Silver Run II is an oil and natural gas company incorporated in Delaware focused on the acquisition, development, exploration and exploitation of unconventional onshore oil and natural gas reserves in the eastern portion of the Anadarko Basin in Oklahoma.  Its Class A common shares trade in New York on the NASDAQ under the symbol "AMR" and its public warrants trade in New York on the NASDAQ under the symbol "AMRWW."  Prior to the Acquisition, Silver Run II's Class A stock traded under the symbol "SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

55.     Defendant Chappelle was the CEO of Alta Mesa prior to the Acquisition, and became CEO of Silver Run II after the Acquisition closed up until his resignation in December 2019.

56.     Defendant Hackett was the CEO and a director of Silver Run II prior to the Acquisition and became Executive Chairman of the Board after the initial business combination. He was appointed Interim CEO of Silver Run II after the resignation of Chappelle.  He was also the Chief Operating Officer ("COO") of Silver Run II's Midstream business immediately following the Acquisition, and in April 2018 became Kingfisher's President and CEO.  Hackett spent decades as an oil executive before joining Riverstone in 2013 and was a Riverstone Senior Advisor at the time of the Acquisition.

57.     Defendant  McCabe served as the CFO of Silver Run II after the Acquisition.

58.     Defendant Walker served as the CFO of Silver Run II prior to the Acquisition.  At the time, Walker was also the CFO and a Partner of Riverstone.  He was replaced as CFO of Silver Run II by McCabe following the Acquisition.

17

59.     For the purposes of Plaintiff's Claims under Section 10(b) of the Exchange Act, defendants named in ¶¶ 55–58 are referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Silver Run II's reports to the SEC, press releases, and presentations to Securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Officer Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

60.     For the purposes of Plaintiff's Claims under Section 10(b) of the Exchange Act, Silver Run II and the Officer Defendants are collectively referred to herein as the "Section 10(b) Defendants."

## Materially False and Misleading Statements

61.     While Silver Run II did not identify any target companies at the time of its March 24, 2017 IPO, the IPO offering materials stated that the Company planned to pursue an acquisition that would "***capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may***

*provide opportunities for attractive risk-adjusted returns*."[4]  The IPO offering materials

repeatedly stated that Silver Run II would leverage its industry experience and insider knowledge

to acquire "*fundamentally sound*" assets that were underpriced and offered attractive investment

returns.

62.     The "acquisition criteria" for Silver Run II provided in its IPO offering materials

included investing in companies or assets that:

> can utilize the extensive networks and insights we have built in the
> energy industry;
>
> are *at an inflection point*, such as requiring additional
> management expertise, are able to innovate through new
> operational techniques, or where we believe we can *drive
> improved financial performance*;
>
> are *fundamentally sound companies* that are underperforming
> their potential;
>
> *exhibit unrecognized value* or other characteristics, *desirable
> returns on capital*, and a need for capital to achieve the company's
> growth strategy, that we believe have been *misevaluated by the
> marketplace based on our analysis and due diligence review*; and
>
> *will offer an attractive risk-adjusted return for our stockholders*.
> We will seek to acquire the target on terms and in a manner that
> leverages our management team's experience investing within the
> energy industry. Potential upside from growth in the target
> business and an improved capital structure will be weighed against
> any identified downside risks.

63.     On May 10, 2017, Silver Run II reported its financial results for the first quarter

of 2017 for its first time as a public company following the IPO.  In its filing, the Company

reiterated its strict acquisition criteria as contained in its IPO materials.  In addition, Silver Run II

also stated that "*there [had] been no change in [its] internal control over financial reporting.*"

---

[4] Emphasis added throughout, unless otherwise noted.

64.     The above SEC filing also contained signed certifications by Hackett and Walker pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

65.     On August 11, 2017, Silver Run II reported its financial results for the second quarter of 2017.  In its filing, the Company reiterated its strict acquisition criteria as contained in its IPO materials.  In addition, Silver Run II also stated that "***there [had] been no change in [its] internal control over financial reporting***."

66.     The above SEC filing also contained signed certifications by Hackett and Walker pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

67.     On August 16, 2017, Silver Run II announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with Alta Mesa and Kingfisher in a deal initially valued at **$3.8 billion**.  In the accompanying press release, Hackett was quoted touting the strategic benefits of the Acquisition:

> We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform. ***The combination of Alta Mesa and Kingfisher is a perfect strategic match for our desired integrated platform***.  Alta Mesa's highly contiguous core acreage position in Northeast Kingfisher County has among the ***lowest breakevens in the U.S.*** at around $25 per barrel.  Kingfisher adds a highly strategic and synergistic midstream subsidiary with ***significant additional third party growth potential***.  We are excited about the possibilities for the combined company, including a potential future midstream IPO.  Importantly, the current owners of Alta Mesa and Kingfisher are investing alongside Silver Run II's stockholders by committing to hold significant amounts of equity in the combined company.  I am very

20

excited about the opportunity to work alongside Hal Chappelle, Mike Ellis, Mike McCabe and the Alta Mesa team in this pure-play STACK upstream and midstream company. It is the first of its kind in the public markets, and **_we believe it creates significant advantages for both organic and inorganic growth for our stockholders_**.

68.     In connection with the announcement of the Acquisition, Silver Run II stated that negotiations had been ongoing since *at least* March 2017—the month of the IPO—and involved the consideration of "multiple alternative target opportunities."

69.     On November 13, 2017, Silver Run II reported its financial results for its third quarter 2017. In its report, Silver Run II again stated that that "**_there [had] been no change in [its] internal control over financial reporting._**"

70.     The above SEC filing also contained signed certifications by Hackett and Walker pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

71.     On January 19, 2018, Silver Run II issued a Definitive Merger Proxy Statement to its shareholders pursuant to Section 14(a) of the Exchange Act in connection with the efforts of Silver Run II, the Board and Riverstone to secure shareholder support for the Acquisition.

72.     The Proxy stated that Alta Mesa and Kingfisher satisfied the acquisition criteria outlined in the IPO offering materials. The Proxy further stated that Riverstone and Silver Run II had considered, and rejected, "multiple alternative target opportunities" because of a variety of factors, and provided reasons for shareholders to approve the Acquisition, including, *inter alia*, that "Alta Mesa and Kingfisher were of **_superior quality_**" and that "the **_alternative options did not entirely fit the investment criteria_** of Silver Run" or the "**_valuation expectations_**" of Hackett and Riverstone. Thus, the Proxy represented that the Acquisition fit all of the investment criteria

outlined in the IPO offering materials and that Alta Mesa and Kingfisher offered significant

value and high quality assets to shareholders of Silver Run II with attractive risk-adjusted

returns.

73.     The Proxy stated that the Board had considered "a wide variety of factors in

connection with its evaluation of the business combination" and had determined that the

following factors, among others, supported its recommendation that shareholders vote in favor of

the Acquisition:

> *Alta Mesa's Highly Contiguous Acreage in the STACK*. Alta Mesa
> has approximately 130,000 highly contiguous acres in the up-dip
> oil window of the STACK, one of the most active and prolific
> stacked pay basins in North America.  In addition, Alta Mesa's
> deep inventory includes over 4,000 primary gross locations and
> over 12,000 possible locations from down spacing, as well as
> additional zone penetration.

> *World Class Asset with Attractive Geology*.  Alta Mesa's oil-
> weighted resource features high margins, low break-even
> commodity prices, and single-well rates of return in excess of 85%.
> Silver Run and Alta Mesa's management believe there are *further
> opportunities for improving efficiencies through technology and
> optimizing well design*.

> *Top-Tier Operator with Substantial STACK Expertise and Highly
> Consistent Well Results*.  Alta Mesa's management has over 30
> years' of experience operating in the STACK, and Silver Run
> believes that *this experience provides Alta Mesa with a
> competitive advantage*.  As of September 30, 2017, Alta Mesa has
> drilled more than 220 horizontal STACK wells, and currently has a
> multi-rig program, averaging six rigs in 2017.  *Of the 220 wells
> drilled, over 183 were on production, and of that number, about
> 116 had sufficient production history to give Alta Mesa's
> management confidence that Alta Mesa's type well EUR is
> greater than 650 MBOE*.

> *Highly Strategic and Synergistic Midstream Platform*.
> Kingfisher's midstream assets overlay Alta Mesa's contiguous
> acreage in the STACK, and afford Alta Mesa with a purpose-built
> system to handle larger volumes in an efficient processing system.
> Kingfisher's system allows Alta Mesa to access Midwest and Gulf
> Coast markets through the Panhandle Eastern Pipeline, as well as

western interstate markets through OGT. ***In addition to serving Alta Mesa, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications. Silver Run believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering***.

*Strong Liquidity Profile*. After giving effect to the business combination, Silver Run expects to have ***sufficient liquidity and financial flexibility to fund Alta Mesa's and Kingfisher's development projects and pursue opportunistic acquisitions***.

*Terms of the Contribution Agreement*. Silver Run's board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the ***product of arm's-length negotiations among the parties***.

74.     The Proxy also emphasized several characteristics of Alta Mesa and Kingfisher, including that:

(i)     ***Alta Mesa had assembled an attractive, large, contiguous position*** in the up- dip, naturally-fractured oil portion of the STACK, one of the most active and prolific basins in North America, (ii) ***Alta Mesa had a large, highly economic horizontal drilling inventory across multiple pay zones with low oil price breakevens***, (iii) ***Alta Mesa had an experienced management team with proven horizontal drilling expertise and technical acumen in the STACK,*** (iv) ***Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines***, (v) ***Kingfisher was well-positioned to benefit from increasing upstream development activity*** in an active and prolific basin with upside potential from further expansion projects, (vi) ***Kingfisher would serve as a natural complement to Alta Mesa*** given the relationship between the two businesses, and (vii) there was ***significant upside*** in the completion of the Kingfisher system and ***the potential for a subsequent midstream initial public offering***.

75.     In addition, the Proxy stated that Alta Mesa "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017."

23

76.     The Proxy further stated that Alta Mesa and Kingfisher were poised for accelerating growth immediately following the Acquisition.  For example, the Proxy stated that Alta Mesa had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

77.     In addition, the Proxy stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

78.     Likewise, the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

79.     The Proxy provided the following charts, which contained key historical operational and financial metrics for 2017 and represented that Alta Mesa and Kingfisher were generating strong 2018 growth rates in both adjusted EBITDA and CapEx, stating:

**Alta Mesa Projections**

|  | Year Ending December 31, | | |
| --- | --- | --- | --- |
|  | 2017E | 2018E | 2019E |
|  | | ($ in millions) | |
| Average Net Daily Production (Boe/d) | 20,841 | 38,510 | 68,900 |
| Adjusted EBITDAX | $   155 | $   358 | $   701 |
| Capital Expenditures | $   349 | $   552 | $   611 |
| Free Cash Flow | $   (237) | $   (233) | $   51 |

\*          \*          \*

**Kingfisher Projections**

|  | Year Ending December 31, | | |
| --- | --- | --- | --- |
|  | 2017E | 2018E | 2019E |
|  | | ($ in millions) | |
| Adjusted EBITDA | $   42 | $   185 | $   318 |
| Capital Expenditures | $   124 | $   373 | $   174 |
| Free Cash Flow | $   (83) | $   (189) | $   144 |

(Footnotes omitted.)

24

80.     Notably, the Proxy stated that these "***financial projections were prepared on a reasonable basis***" and "***reflected the best currently available estimates and judgments*** of Alta Mesa and Kingfisher, as applicable."  Moreover, the Proxy represented that these financial figures "presented, to the best of their knowledge and belief, the ***expected course of action and the expected future financial performance of Alta Mesa and Kingfisher***, respectively."

81.     The statements in ¶¶ 61–80 were materially misleading when made.  Specifically, the statements omitted and/or misrepresented the material information set forth below in contravention of Sections 10(b), and 20(a) of the Exchange Act and SEC Rules 10b-5:

(a)     That Alta Mesa and Kingfisher did not possess "superior quality" and "[w]orld [c]lass" assets as compared to other operators in the oil and gas industry;

(b)     That Alta Mesa faced significant operational setbacks;

(c)     That several major oil producers had steered assets away from production in the STACK region;

(d)     Kingfisher and Alta Mesa were not on track to achieve the earnings and production estimates provided in the Proxy and defendants had no reasonable basis to believe and did not believe that Kingfisher and Alta Mesa would achieve these estimates;

(e)     That the Officer Defendants had not sought a deal in the best interests of Silver Run II's public shareholders and in accord with the acquisition criteria outlined in the IPO offering materials, but rather to serve their own financial interests;

(f)     That Silver Run II lacked adequate internal controls over its financial reporting; and

(g)     That, as a result of (a)-(f) above, Kingfisher and Alta Mesa were not on track to achieve the earnings and production estimates and defendants had no reasonable basis to believe and did not believe that Kingfisher and Alta Mesa would achieve these estimates.

### The Truth is Slowly Revealed

82.     On March 29, 2018, *less than two months* after the Acquisition closed on February 9, 2018, Silver Run II issued a release announcing dismal 2017 financial results. The release disclosed that EBITDA and production estimates provided in the Proxy had been dramatically reduced. The release revealed that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, ***46 percent below the 2018 EBITDA estimate of $185 million provided in the Proxy***. In addition, the release revealed that Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8 percent below the production figures provided in the Proxy.

83.     Additionally in its report, Silver Run II again stated that that "***there [had] been no change in [its] internal control over financial reporting.***"

84.     The above SEC filing also contained signed certifications by Chappelle and McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

85.     During the accompanying conference call to discuss the Company's results, Chappelle stated that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed Silver Run II's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher "perhaps" into 2019. ***Even though they had not been disclosed in the Proxy***, Chappelle admitted that these "setbacks" began in "late 2017."

86.     Chappelle, however, would also attempt to falsely assuage investor concern, stating in part: "So despite setbacks in late 2017 and early 2018, with regard to [Kingfisher], *our vision for growth remains strong* . . . .  *We believe our margins are going to continue to expand* as we build up critical infrastructure and expand production on existing wells . . . ."

87.     Chappelle would also assure investors that production capacity would soon reach 2018 projections as contained in the Proxy: "*I think our expectations peg the 38,000 barrel a day, 2018, but we see ourselves being there really in the first quarter—early first quarter next year, and possibly as early as this year* . . . ."

88.     On this news, Silver Run II Class A common stock fell from its March 29, 2019 closing price of $8.00, to close at $7.36 on the following trading day, April 2, 2018, a decline of 8 percent.  The stock continued to decline for the following two days, closing at $6.99 on April 4, 2018.  Altogether, this represented a 16.6 percent decline from the stock's closing price of $8.38 on March 28, 2018.

89.     On May 14, 2018, Silver Run II reported its financial results for its first quarter 2018.  In the Company's release announcing results for the first quarter of 2018—less than two months after Chappelle told investors that the Company would achieve production capacity of 38 MBOE/d—the Company revealed that net production was still languishing at 24 MBOE/d, *37 percent* below the Company's 2018 projections.

90.     During the Company's accompanying May 14, 2018 conference call with investors, however, Chappelle again attempted to falsely assuage investor concern: "*We are reaffirming our FY 2018 guidance.  We have confidence in presenting operating results, such as production, revenue, expenses as those numbers will not change*."

91.     Additionally in its quarterly filings with the SEC dated May 21, 2018, Silver Run II again stated that that aside from changes related to the Acquisition, "*there [had] been no change in [its] internal control over financial reporting.*"

92.     The above SEC filing also contained signed certifications by Chappelle and McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

93.     On August 14, 2018, Silver Run II provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  The Company revealed that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, *22 percent below the estimates* provided in the Proxy and previous quarter guidance.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated shut-ins averaging the loss of thousands of BOE every day and that the adverse trend had been worsening.

94.     The Company again affirmed that aside from changes related to the Acquisition, "*there [had] been no change in [its] internal control over financial reporting.*"

95.     The above SEC filing also contained signed certifications by Chappelle and McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

96.     On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "*back in the fourth*

*quarter of '17*," which problems had "*linger[ed] into the first quarter of '18*."  Despite resulting

from work that pre-dated the Acquisition, these adverse effects were omitted from the Proxy.

Moreover, Silver Run II revealed that its Kingfisher operations were not on track to achieve even

the drastically reduced March 2018 guidance.  Indeed, the Company refused to provide *any*

revised guidance for Kingfisher, indicating that third-party producers had largely abandoned the

use of its pipeline services.  Kingfisher—an asset that the Proxy had valued at over $1.4 billion

based, in part, on a 2018 EBITDA estimate of $185 million and for which shareholders had paid

$800 million in cash—had generated only *$9.2 million* in EBITDA during the first six months of

2018.

97.     Chappelle, however, assured investors that despite Silver Run II missing estimates

yet again, that the Company still "*offer[ed] compelling long-term returns to [its] shareholders.*"

98.     On this news, the price of Silver Run II Class A common stock fell from its

August 13, 2018 closing price of $6.00, to close at $4.77 on August 14, 2018, a decline of 21

percent.  The stock continued to decline on the following trading day, closing at $4.34 on August

15, 2018.  Altogether, this represented a decline of 28.6 from the stock's August 13, 2018

closing price.

99.     On November 13, 2018, Silver Run II issued a release providing its third quarter

2018 financial results.  The release stated that the McCabe, was retiring.

100.     In addition, on this same date, the Company reported its financial results for  its

third quarter of 2018.  Production was still languishing at 33.4 MBOE/d , and the Company

would only report consolidated EBIDTAX of $83.8 million—well below the estimates in the

Proxy.

101.    With regard to the Company's internal controls, Silver Run II's financial

statement for the second quarter 2018 stated, in pertinent part:

> As discussed in this quarterly report, on February 9, 2018, we
> completed the acquisition of Alta Mesa and Kingfisher.  We are
> currently integrating these acquisitions into our control
> environment.  In executing this integration, we are analyzing,
> evaluating and, where appropriate, making changes in controls and
> procedures in a manner commensurate with the size, complexity
> and scale of operations subsequent to the acquisitions.  We expect
> to complete the Kingfisher integration in fiscal year 2019 and
> consequently expect to exclude Kingfisher from our assessment of
> internal control over financial reporting as of December 31, 2018.
> The evaluation of internal controls over financial reporting for the
> Company has required and will continue to require significant time
> and resources from management and other personnel.
>
>                                * * *
>
> ***Other than the changes described above, there have been no
> changes in our internal control over financial reporting during
> the three months ended September 30, 2018 that have materially
> affected, or are reasonably likely to materially affect, our internal
> control over financial reporting***.

102.    The above SEC filing also contained signed certifications by Chappelle and

McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal control over financial reporting,

and the disclosure of all fraud.

103.    On the accompanying conference call with investors, however, Chappelle

continued to tout Silver Run II's value proposition: "***Our consistent growth over several years in***

***production demonstrates the quality of the assets*** and the cost control we have been able to

achieve allows us to have consistently profitable wells."

104.    On this news, the price of Silver Run II Class A common stock fell from its

November 13, 2018 closing price of $2.82, to close at $2.40 on November 14, 2018, a decline of

15 percent.  Over the next several trading days, the stock continued to decline, closing at $2.18

on November 16, 2018.  Altogether, this representing a decline of  22.7 percent from the stock's

November 13, 2018 closing price.

105.    Approximately one month later, on or about December 27, 2018, Silver Run II

announced the sudden resignation of Chappelle, and Ellis, Vice President and COO-Upstream.

106.    As a result of the abrupt management changes, coupled with management's

failure to achieve operational goals, in December 2019 S&P Global Ratings downgraded the

Company from B to CCC+.

### The True Extent of the Fraud is Finally Revealed

107.    The true value of the Acquisition, or lack thereof, would only truly be revealed on

February 25, 2019.  On this date, Defendants filed SEC Form 8-K, announcing that they would

be forced to delay the announcement of Silver Run II's full year 2018 financial results because of

a determination that the Company had ineffective control over financial reporting due to an

identified material weakness in both the design of its controls and the execution of its control

procedures.

108.    The Company also announced that it expected to record material, non-cash asset

impairment charges to both its upstream and midstream segments in the fourth quarter of 2018,

totaling **$3.1 billion**—triple the value of the Company at the time of the IPO, and nearly the

entire value of the Acquisition.

109.    In addition, the Company projected that 2019 production would be on average of

30.5 MBOE/d—*over 100 percent* below the 2019 estimates of 68.9 MBOE/d as contained in the

Proxy.

110.    Finally, the Company announced that it had "reduced [its] active rig count to zero

by the end of January" 2019.

111.    On this news, the price of Silver Run II Class A common stock fell from its February 25, 2019 closing price of $0.91, to close at $0.24 on February 26, 2019, a decline of 63 percent.  The stock continued to decline on the following trading day, closing at $0.23 on February 27, 2019.  Altogether, this represented a decline of 75 percent from the February 25, 2019 closing price.

112.    By February 2019, the price of Silver Run II Class A common stock had fallen astronomically from a Class Period high of $10.73 per share, trading at well below $1.00  per share.  Additionally, as of March 11, 2019, the Company's market capitalization has dwindled to well below $100 million—a far cry from the projected $3.8 billion at the time of the Acquisition.

113.    This action seeks damages on behalf of Silver Run II's stockholders incurred as a result of the defendants' dissemination of the materially misleading statements in contravention of Sections 10(b), and 20(a) of the Exchange Act.

## UNDISCLOSED ADVERSE FACTS

114.    The market for Silver Run II securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Silver Run II's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Silver Run II securities relying upon the integrity of the market price of the Company's securities and market information relating to Silver Run II, and have been damaged thereby.

115.    During the Class Period, the Section 10(b) Defendants materially misled the investing public, thereby inflating the price of Silver Run II securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make the Section 10(b) Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose

material adverse information and/or misrepresented the truth about Silver Run II's business, operations, and prospects as alleged herein.

116.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, the Section 10(b) Defendants made, or caused to be made a series of materially false and/or misleading statements about Silver Run II's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  The Section 10(b) Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

117.    During the Class Period, as alleged herein, the Officer Defendants acted with scienter in that the Officer Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

118.    The Officer Defendants permitted Silver Run II to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

33

119.    As set forth herein, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Silver Run II, their control over, receipt, and/or modification of Silver Run II's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Silver Run II, participated in the fraudulent scheme alleged herein.

120.    The Officer Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Silver run II securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Silver Run II's business, operations, and management and the intrinsic value of Silver Run II and caused Plaintiff and members of the Class to purchase Silver Run II securities at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

121.    During the Class Period, as detailed herein, the Section 10(b) Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Silver Run II securities, and operated as a fraud or deceit on Class Period purchasers of Silver Run II securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when the Section 10(b) Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Silver Run II securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Silver Run II securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal Securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

122.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    The Section 10(b) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Securities; and

(e)    Plaintiff and other members of the Class purchased Silver Run II securities between the time the Section 10(b) Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)    At all relevant times, the markets for Silver Run II securities were efficient for the following reasons, among others:

(g)    as a regulated issuer, Silver Run II filed periodic public reports with the SEC;

(h)    Silver Run II regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(i)    Silver Run II was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

        (j)     Silver Run II stock was actively traded in an efficient market.  After the acquisition of Alta Mesa and Kingfisher, its Class A common shares trade in New York on the NASDAQ under the symbol "AMR" and its public warrants trade in New York on the NASDAQ under the symbol "AMRWW."  Prior to the Acquisition, Silver Run II's Class A stock traded under the symbol "SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

123.    As a result of the foregoing, the market for Silver Run II securities promptly digested current information regarding silver Run II from all publicly available sources and reflected such information in Silver Run II's stock price.  Under these circumstances, all purchasers of Silver Run II securities during the Class Period suffered similar injury through their purchase of Silver Run II securities at artificially inflated prices and the presumption of reliance applies.

124.    Further, to the extent that the defendants under Section 10(b) of the Exchange Act concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

125.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Section 10(b) Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Silver Run II who knew that the statement was false when made.

## COUNT  I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Section 10(b) Defendants

126.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.    During the Class Period, the Section 10(b) Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    The Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Silver Run II securities during the Class Period.

129.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Silver Run II securities.  Plaintiff and the Class would not have purchased Silver Run II securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Section 10(b) Defendants' misleading statements.

130.    As a direct and proximate result of these Section 10(b) Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Silver Run II securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled

person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

133.    The Officer Defendants were controlling persons of Silver Run II within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Silver Run II, the Officer Defendants had the power and ability to control the actions of Silver Run II and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT

### Parties

134.    Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Silver Run II stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

135.    Defendant Silver Run II is an oil and natural gas company incorporated in Delaware focused on the acquisition, development, exploration and exploitation of unconventional onshore oil and natural gas reserves in the eastern portion of the Anadarko Basin in Oklahoma.  Its Class A common shares trade in New York on the NASDAQ under the symbol "AMR" and its public warrants trade in New York on the NASDAQ under the symbol "AMRWW."  Prior to the Acquisition, Silver Run II's Class A stock traded under the symbol "SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

136.    Defendant Hackett was the CEO and a director of Silver Run II prior to the Acquisition and became Executive Chairman of the Board after the initial business combination. He was appointed Interim CEO of Silver Run II after the resignation of Chappelle.  He was also

the Chief Operating Officer ("COO") of Silver Run II's Midstream business immediately

following the Acquisition, and in April 2018 became Kingfisher's President and CEO.  Hackett

spent decades as an oil executive before joining Riverstone in 2013 and was a Riverstone Senior

Advisor at the time of the Acquisition.

137.    Defendant Walker served as the CFO of Silver Run II prior to the Acquisition.  At

the time, Walker was also the CFO and a Partner of Riverstone.  He was replaced as CFO of

Silver Run II by McCabe following the Acquisition.

138.    Defendant William Gutermuth ("Gutermuth") served as a member of the Board at

the time of the Acquisition.

139.    Defendant Jeffrey H. Tepper ("Tepper") served as a member of the Board at the

time of the Acquisition.

140.    Defendant Diana J. Walters ("Walters") served as a member of the Board at the

time of the Acquisition.

141.    The for the purposes of Plaintiff's claims under Section 14(a) of the Exchange

Act, defendants named in ¶¶ 136–140 are referred to herein as the "Individual Defendants."  The

Individual Defendants, because of their positions with the Company, possessed the power and

authority to control the contents of Silver Run II's reports to the SEC, press releases, and

presentations to Securities analysts, money portfolio managers and institutional investors, *i.e.*,

the market.  The Individual Defendants were provided with copies of the Company's reports and

press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

positions and access to material non-public information available to them, the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to, and were

being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

142.    Defendant Riverstone is a private equity firm focused on the energy sector. It sponsored the IPO and the Acquisition through various related affiliates and investment vehicles.

143.    Each of the defendants participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein. The Individual Defendants abdicated their duty to file and distribute to plaintiff and the Class a Proxy that was not misleading.

144.    The for the purposes of Plaintiff's claims under Section 14(a) of the Exchange Act, Silver Run II, Riverstone, and the Individual Defendants, are collectively referred to herein as the "Section 14(a) Defendants."

### Statements Leading up to the False and Misleading Proxy

145.    While Silver Run II did not identify any target companies at the time of the March 24, 2017 IPO, the IPO offering materials stated that the Company planned to pursue an acquisition that would "*capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns*." The IPO offering materials repeatedly stated that Silver Run II would leverage its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered attractive investment returns.

146.    The "acquisition criteria" for Silver Run II provided in its IPO offering materials included investing in companies or assets that:

41

can utilize the extensive networks and insights we have built in the energy industry;

are *at an inflection point*, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can *drive improved financial performance*;

are *fundamentally sound companies* that are underperforming their potential;

*exhibit unrecognized value* or other characteristics, *desirable returns on capital*, and a need for capital to achieve the company's growth strategy, that we believe have been *misevaluated by the marketplace based on our analysis and due diligence review*; and

*will offer an attractive risk-adjusted return for our stockholders*. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry.  Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

147.    On August 16, 2017, Silver Run II announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with Alta Mesa and Kingfisher in a deal initially valued at **$3.8 billion**.  In the accompanying press release, Hackett was quoted touting the strategic benefits of the Acquisition:

We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform.  *The combination of Alta Mesa and Kingfisher is a perfect strategic match for our desired integrated platform*.  Alta Mesa's highly contiguous core acreage position in Northeast Kingfisher County has among the *lowest breakevens in the U.S.* at around $25 per barrel.  Kingfisher adds a highly strategic and synergistic midstream subsidiary with *significant additional third party growth potential*.  We are excited about the possibilities for the combined company, including a potential future midstream IPO.  Importantly, the current owners of Alta Mesa and Kingfisher are investing alongside Silver Run II's stockholders by committing to hold significant amounts of equity in the combined company.  I am very excited about the opportunity to work alongside Hal Chappelle, Mike Ellis, Mike McCabe and the Alta Mesa team in this pure-play

STACK upstream and midstream company.  It is the first of its kind in the public markets, and ***we believe it creates significant advantages for both organic and inorganic growth for our stockholders***.

148.     In connection with the announcement of the Acquisition, Silver Run II stated that negotiations had been ongoing since *at least* March 2017—the month of the IPO—and, according to the Proxy, involved the consideration of "multiple alternative target opportunities."

### The False and Misleading Proxy

149.     On January 19, 2018, Silver Run II issued a Definitive Merger Proxy Statement pursuant to Section 14(a) of the Exchange Act in connection with the efforts of Silver Run II, the Board and Riverstone to secure shareholder support for the Acquisition.

150.     The Proxy stated that Alta Mesa and Kingfisher satisfied the acquisition criteria outlined in the IPO offering materials.  The Proxy further stated that Riverstone and Silver Run II had considered, and rejected, "multiple alternative target opportunities" because a variety of factors, and provided reasons for shareholders to approve the Acquisition, including, *inter alia*, that "Alta Mesa and Kingfisher were of ***superior quality***" and that "the ***alternative options did not entirely fit the investment criteria*** of Silver Run" or the "***valuation expectations***" of Hackett and Riverstone.  Thus, the Proxy represented that the Acquisition fit all of the investment criteria outlined in the IPO offering materials and that Alta Mesa and Kingfisher offered significant value and high quality assets to shareholders of Silver Run II with attractive risk-adjusted returns.

151.     Similarly, the Proxy stated that the Board's recommendation that shareholders vote "FOR" the business combination was based on "careful consideration" and extensive due diligence.  The Proxy stated that the Board had considered "a wide variety of factors in connection with its evaluation of the business combination" and had determined that the

following factors, among others, supported its recommendation that shareholders vote in favor of

the Acquisition:

> *Alta Mesa's Highly Contiguous Acreage in the STACK*.  Alta Mesa has approximately 130,000 highly contiguous acres in the up-dip oil window of the STACK, one of the most active and prolific stacked pay basins in North America.  In addition, Alta Mesa's deep inventory includes over 4,000 primary gross locations and over 12,000 possible locations from down spacing, as well as additional zone penetration.

> *World Class Asset with Attractive Geology*.  Alta Mesa's oil-weighted resource features high margins, low break-even commodity prices, and single-well rates of return in excess of 85%.  Silver Run and Alta Mesa's management believe there are ***further opportunities for improving efficiencies through technology and optimizing well design***.

> *Top-Tier Operator with Substantial STACK Expertise and Highly Consistent Well Results*.  Alta Mesa's management has over 30 years' of experience operating in the STACK, and Silver Run believes that ***this experience provides Alta Mesa with a competitive advantage***.  As of September 30, 2017, Alta Mesa has drilled more than 220 horizontal STACK wells, and currently has a multi-rig program, averaging six rigs in 2017.  ***Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that Alta Mesa's type well EUR is greater than 650 MBOE***.

> *Highly Strategic and Synergistic Midstream Platform*.  Kingfisher's midstream assets overlay Alta Mesa's contiguous acreage in the STACK, and afford Alta Mesa with a purpose-built system to handle larger volumes in an efficient processing system.  Kingfisher's system allows Alta Mesa to access Midwest and Gulf Coast markets through the Panhandle Eastern Pipeline, as well as western interstate markets through OGT.  ***In addition to serving Alta Mesa, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications.  Silver Run believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering***.

*Strong Liquidity Profile*. After giving effect to the business combination, Silver Run expects to have **sufficient liquidity and financial flexibility to fund Alta Mesa's and Kingfisher's development projects and pursue opportunistic acquisitions**.

*Terms of the Contribution Agreement*.  Silver Run's board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the **product of arm's-length negotiations among the parties**.

152.     The Proxy also emphasized several characteristics of Alta Mesa and Kingfisher, including that:

(i)      **Alta Mesa had assembled an attractive, large, contiguous position** in the up- dip, naturally-fractured oil portion of the STACK, one of the most active and prolific basins in North America, (ii) **Alta Mesa had a large, highly economic horizontal drilling inventory across multiple pay zones with low oil price breakevens**, (iii) **Alta Mesa had an experienced management team with proven horizontal drilling expertise and technical acumen in the STACK,** (iv) **Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines**, (v) **Kingfisher was well-positioned to benefit from increasing upstream development activity** in an active and prolific basin with upside potential from further expansion projects, (vi) **Kingfisher would serve as a natural complement to Alta Mesa** given the relationship between the two businesses, and (vii) there was **significant upside** in the completion of the Kingfisher system and **the potential for a subsequent midstream initial public offering**.

153.     In addition, the Proxy stated that Alta Mesa "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017."

154.     The Proxy further stated that Alta Mesa and Kingfisher were poised for accelerating growth immediately following the Acquisition.  For example, the Proxy stated that Alta Mesa had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and

was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

155. In addition, the Proxy stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

156. Likewise, the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

157. The Proxy provided the following charts, which contained key historical operational and financial metrics for 2017 and represented that Alta Mesa and Kingfisher were generating strong 2018 growth rates in both adjusted EBITDA and CapEx, stating:

**Alta Mesa Projections**

| | Year Ending December 31, | | |
| | 2017E | 2018E | 2019E |
| --- | --- | --- | --- |
| | | ($ in millions) | |
| Average Net Daily Production (Boe/d) | 20,841 | 38,510 | 68,900 |
| Adjusted EBITDAX | $ 155 | $ 358 | $ 701 |
| Capital Expenditures | $ 349 | $ 552 | $ 611 |
| Free Cash Flow | $ (237) | $ (233) | $ 51 |

\*            \*            \*

**Kingfisher Projections**

| | Year Ending December 31, | | |
| | 2017E | 2018E | 2019E |
| --- | --- | --- | --- |
| | | ($ in millions) | |
| Adjusted EBITDA | $ 42 | $ 185 | $ 318 |
| Capital Expenditures | $ 124 | $ 373 | $ 174 |
| Free Cash Flow | $ (83) | $ (189) | $ 144 |

(Footnotes omitted.)

158. Notably, the Proxy stated that these "*financial projections were prepared on a reasonable basis*" and "*reflected the best currently available estimates and judgments* of Alta Mesa and Kingfisher, as applicable." Moreover, the Proxy represented that these financial

46

figures "presented, to the best of their knowledge and belief, the ***expected course of action and the expected future financial performance of Alta Mesa and Kingfisher***, respectively."  In other words, the Proxy represented to investors that the estimates and projections contained therein were based on observable trends and capabilities and economically justified assumptions regarding the expected cash flows of Alta Mesa and Kingfisher.  The Proxy further stated that "the Silver Run board of directors used the . . . projections as a tool in evaluating the business combination."  The Proxy also stated that, after using this evaluation "tool," the Board had recommended that Silver Run II stockholders "vote 'FOR' the Business Combination Proposal."

159.    The statements in ¶¶ 145–158 contained in the Proxy were materially misleading when made.  Specifically, the Proxy omitted and/or misrepresented the material information set forth below in contravention of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9:

(a)    That Alta Mesa and Kingfisher did not possess "superior quality" and "[w]orld [c]lass" assets as compared to other operators in the oil and gas industry;

(b)    That Alta Mesa faced significant operational setbacks;

(c)    That several major oil producers had steered assets away from production in the STACK region;

(d)    Kingfisher and Alta Mesa were not on track to achieve the earnings and production estimates provided in the Proxy and defendants had no reasonable basis to believe and did not believe that Kingfisher and Alta Mesa would achieve these estimates;

(e)    That the Officer Defendants had not sought a deal in the best interests of Silver Run II's public shareholders and in accord with the acquisition criteria outlined in the IPO offering materials, but rather to serve their own financial interests;

(f)     That, as a result of (a)-(e) above, Kingfisher and Alta Mesa were not on track to achieve the earnings and production estimates provided in the Proxy and defendants had no reasonable basis to believe and did not believe that Kingfisher and Alta Mesa would achieve these estimates; and

(g)     That, as a result of (a)-(e) above, the Board's purported reasons for shareholders to vote "FOR" the Acquisition provided in the Proxy omitted material facts necessary to make the statements made therein not false or misleading.

160.    As a result of the materially misleading Proxy, Silver Run II stockholders voted in favor of the Acquisition at a special shareholders meeting held in New York City on February 6, 2018.  Of shareholder votes cast, over 98 percent voted in favor of the Acquisition.  These shareholders were also prevented from the fully informed opportunity to redeem their shares as was their right.  The shares subject to redemption were valued in the Proxy at approximately $10 per share.

161.    The false and misleading Proxy induced stockholder action that resulted in substantial harm to plaintiff and Silver Run II's other shareholders.  Specifically, the material misrepresentations and omissions in the Proxy were an essential link in the approval of the Acquisition, and the Class A common stock held by plaintiff and other Class members declined substantially in value subsequent and due to the approval of the Acquisition, causing economic loss and damages.

162.    After the stockholder vote, on February 9, 2018, Silver Run II issued a release announcing that the Acquisition had closed.

**Events Following the False and Misleading Proxy**

48

163.     On March 29, 2018, *less than two months* after the Acquisition closed, Silver Run II issued a release announcing its 2017 financial results.  The release disclosed that EBITDA and production estimates provided in the Proxy had been dramatically reduced.  The release revealed that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, ***46 percent below the 2018 EBITDA estimate of $185 million provided in the Proxy***.  In addition, the release revealed that Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8 percent below the production figures provided in the Proxy.

164.     During a conference call to discuss the results, Chappelle, the CEO of the combined business (and former CEO of Alta Mesa), stated that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed Silver Run II's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher "perhaps" into 2019.  ***Even though they had not been disclosed in the Proxy***, Chappelle admitted that these "setbacks" began in "late 2017."

165.     On May 14, 2018, Silver Run II reported its financial results for its first quarter 2018.  In the Company's release announcing results for the first quarter of 2018—less than two months after Chappelle told investors that the Company would achieve production capacity of 38 MBOE/d—the Company revealed that net production was still languishing at 24 MBOE/d, ***37 percent*** below the Company's 2018 projections.

166.     On August 14, 2018, Silver Run II provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  The Company revealed that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, ***22 percent below the estimates*** provided in the

49

Proxy and previous quarter guidance.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated shut-ins averaging the loss of thousands of BOE every day and that the adverse trend had been worsening.

167.     On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "***back in the fourth quarter of '17***," which problems had "***linger[ed] into the first quarter of '18***."  Despite resulting from work that pre-dated the Acquisition, these adverse effects were omitted from the Proxy.  Moreover, Silver Run II revealed that its Kingfisher operations were not on track to achieve even the drastically reduced March 2018 guidance.  Indeed, the Company refused to provide ***any*** revised guidance for Kingfisher, indicating that third-party producers had largely abandoned the use of its pipeline services.  Kingfisher—an asset that the Proxy had valued at over $1.4 billion based, in part, on a 2018 EBITDA estimate of $185 million and for which shareholders had paid $800 million in cash—had generated only ***$9.2 million*** in EBITDA during the first six months of 2018.

168.     On November 13, 2018, Silver Run II issued a release providing its third quarter 2018 financial results. The release stated that the McCabe, was retiring.

169.     In addition, on this same date, the Company reported its financial results for its third quarter of 2018.  Production was still languishing at 33.4 MBOE/d , and the Company would only report consolidated EBIDTAX of $83.8 million—well below the estimates in the Proxy.

170.     Approximately one month later, on or about December 27, 2018, Silver Run II announced the sudden resignation of Chappelle, and Ellis, Vice President and COO-Upstream.

171.     The true value of the Acquisition, or lack thereof, would only truly be revealed on February 25, 2019.  On this date, Defendants filed SEC Form 8-K, announcing that they would be forced to delay the announcement of Silver Run II's full year 2018 financial results because of a determination that the Company had ineffective control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures.

172.     The Company also announced that it expected to record material, non-cash asset impairment charges to both its upstream and midstream segments in the fourth quarter of 2018, totaling **$3.1 billion**—triple the value of the Company at the time of the IPO, and nearly the entire value of the Acquisition.  In addition, the Company projected that 2019 production estimates would be on average of 30.5 MBOE/d—*over 100 percent* below the estimates of 68.9 MBOE/d as contained in the Proxy.

173.     Finally, the Company announced that it had "reduced [its] active rig count to zero by the end of January" 2019.

174.     Subsequent to, and due to, the closing of the Acquisition, the price of Silver Run II Class A common stock declined precipitously as the truth about Alta Mesa and Kingfisher and the Proxy's false and misleading nature were revealed over time.  By March, 2019, the price of Silver Run II Class A common stock was trading at well below $1 per share, over 90 percent below the price shareholders would have received if they had redeemed their shares instead of approving the Acquisition less than one year earlier.

175.     This action seeks damages on behalf of Silver Run II's stockholders incurred as a result of the defendants' dissemination of the materially misleading Proxy in contravention of Sections 14(a) and 20(a) of the Exchange Act.

## COUNT  I

### For Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### Promulgated Thereunder Against the Section 14(a) Defendants

176.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

177.     This Count does not sound in fraud.  Plaintiff does not allege that defendants had scienter or fraudulent intent as they are not elements of a Section 14(a) Exchange Act claim.

178.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

179.     The Section 14(a) Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

180.     By virtue of their positions within Silver Run II and their due diligence regarding the Acquisition, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by Silver Run II, the Board and Riverstone.  The Proxy misrepresented and/or omitted material facts, as detailed above.  The Section 14(a) Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

181.     As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy was an essential link in the consummation of the Acquisition.  The defendants also failed to correct the Proxy prior to the Acquisition and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

182.     As a direct result of the Section 14(a) Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, plaintiff and the Class were precluded from exercising their right to seek redemption of their Silver Run II shares prior to the Acquisition on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Acquisition.  The false and misleading Proxy used to obtain shareholder approval of the Acquisition deprived plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Silver Run II shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning the true value of Alta Mesa and Kingfisher, which was far below the assets that shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy the Section 14(a) Defendants used to obtain shareholder approval of and thereby consummate the Acquisition, plaintiff and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

183.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on

the Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

184.    By reason of the foregoing, defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

<b>COUNT  II</b>

<b>For Violation of Section 20(a) of the Exchange Act<br>Against Riverstone and the Individual Defendants</b>

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder. Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

187.    Riverstone and the Individual Defendants were controlling persons of Silver Run II within the meaning of Section 20(a) of the Exchange Act.

188.    By reason of the allegations herein, Riverstone and the Individual Defendants violated Section 14(a) of the Exchange Act by issuing and publishing the IPO Materials and Proxy, which contained untrue statements of material fact concerning the Acquisition and omitted to state material facts concerning the Acquisition necessary in order to make the statements made in the Proxy not misleading.

54

189.    The Individual Defendants, by virtue of their high-level positions as officers and/or directors of Silver Run II, participated in the operation and management of Silver Run II, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Silver Run II. The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Silver Run II, including the identification of target companies to be acquired by Silver Run II, the evaluation of Alta Mesa and Kingfisher, and the content and dissemination of the Proxy, which plaintiff contends was false and misleading. As stated in the Proxy, Silver Run II "is, and after the Closing [of the Acquisition] will continue to be, managed by its board of directors," which included all of the Individual Defendants except Walker (Silver Run II's then-CFO and CFO of Riverstone).

190.    Likewise, Riverstone, as the private equity sponsor of the IPO and the Acquisition, and due to its influence and control over the Board, ownership of Silver Run II shares and historical relationships with Silver Run II's management, exercised general control over the operations of the Company and its business affairs.  Riverstone, either directly or indirectly through its affiliates, established Silver Run II, selected Silver Run II's management and the members of the Board, granted itself substantial benefits in the IPO and the Acquisition, participated in the identification of target companies to be acquired by Silver Run II, evaluated Alta Mesa and Kingfisher, and influenced and controlled the drafting of the Proxy, which plaintiff contends was false and misleading.

191.    Riverstone and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Silver Run II, had the power or ability to control the issuance, publication and contents of the Proxy.  Riverstone and the Individual Defendants were each

55

involved in negotiating, reviewing and approving the Acquisition.  The Proxy purports to describe the various issues and information that Riverstone and the Individual Defendants reviewed and considered concerning the Acquisition.

192.    Riverstone and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Silver Run II, had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of Section 14(a) of the Exchange Act.

193.    By virtue of the foregoing, Riverstone and the Individual Defendants violated Section 20(a) of the Exchange Act, and plaintiff is entitled to relief.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 14, 2019                                  Respectfully submitted,

                                                        */s/ Thomas R. Ajamie*

                                                        **AJAMIE LLP**
                                                        Thomas R. Ajamie
                                                        Texas Bar No. 00952400
                                                        S.D. Tex. No. 6165
                                                        Pennzoil Place – South Tower
                                                        711 Louisiana, Suite 2150
                                                        Houston, Texas 77002
                                                        Telephone: (713) 860-1600
                                                        Facsimile: (713) 860-1699
                                                        tajamie@ajamie.com

                                                        **LABATON SUCHAROW LLP**
                                                        Christopher J. Keller
                                                        Eric J. Belfi
                                                        David Schwartz
                                                        Francis P. McConville
                                                        140 Broadway
                                                        New York, New York 10005
                                                        Telephone: (212) 907-0700
                                                        Facsimile: (212) 818-0477
                                                        ckeller@labaton.com
                                                        ebelfi@labaton.com
                                                        dschwartz@labaton.com
                                                        fmcconville@labaton.com

                                                        *Counsel for Camelot Event Driven Fund, a*
                                                        *Series of Frank Funds Trust*

## CERTIFICATION

I, Brian J. Frank, as President and Trustee of the Frank Funds Trust, of which Camelot

Event Driven Fund is a Series (together "Camelot"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of

Camelot. I have reviewed a complaint prepared against Alta Mesa Resources, Inc. f/k/a Silver Run

Acquisition Corporation II ("Alta Mesa") alleging violations of the federal securities laws;

2.      Camelot did not purchase or otherwise acquire securities of Alta Mesa at the

direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Camelot is willing to serve as a lead plaintiff and representative party in this matter,

including providing testimony at deposition and trial, if necessary;

4.      Camelot's transactions in Alta Mesa securities during the Class Period are reflected in

Exhibit A, attached hereto;

5.      Camelot has not sought to serve as a lead plaintiff in any class action filed under the

federal securities laws during the last three years;

6.      Beyond its pro rata share of any recovery, Camelot will not accept payment for

serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement

of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this $15$ day of March, 2019.

Brian J. Frank
*President and Trustee of the Frank Funds Trust, of which Camelot Event Driven Fund is a Series*

2

## EXHIBIT A

## TRANSACTIONS IN ALTA MESA RESOURCES, INC. F/K/A / SILVER RUN ACQUISITION CORPORATION II

| Security Name | Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|---|
| Common Stock | Buy | 03/24/17 | 11,400 | $10.00 | ($114,000.00) |
| Common Stock | Buy | 03/24/17 | 11,400 | $10.00 | ($114,000.00) |
| Common Stock | Sell | 04/30/18 | -22,800 | $7.49 | $170,724.12 |
| | | | | | |
| Warrant | Warrant Entitlement | 03/24/17 | 7,600 | $1.75 | ($13,300.00) |
| Warrant | Sell | 04/30/18 | -7,600 | $1.55 | $11,780.00 |