**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 <br><br> **CLASS ACTION** <br><br> JURY TRIAL DEMANDED |

**CONSOLIDATED AMENDED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 2

II. JURISDICTION AND VENUE ..................................................................... 10

III. PARTIES ....................................................................................................... 10

    A.  Plaintiffs .............................................................................................. 10

    B.  Proxy Defendants ................................................................................ 12

    C.  Management Defendants ..................................................................... 13

    D.  Board Defendants ................................................................................ 14

    E.  Control Entity Defendants .................................................................. 15

    F.  Relevant Non-Parties ......................................................................... 16

IV. BACKGROUND FACTS ............................................................................... 17

    A.  Blank Check Companies ..................................................................... 17

    B.  Defendant Riverstone Forms Alta Mesa ........................................... 19

    C.  Riverstone and Alta Mesa Identify AMH and Kingfisher As Acquisition
        Targets ................................................................................................. 23

    D.  Defendants Mislead Investors as a Pretext to Obtaining Shareholder
        Approval for the Business Combination .............................................. 27

    E.  Riverstone and Alta Mesa Conceal Alta Mesa's Operational Problems and
        Setbacks In Advance of the Shareholder Vote ................................... 32

    F.  Defendants Successfully Close the Business Combination ................ 37

    G.  Defendants Release Poor Results While Continuing to Reassure Investors
        During the First Half of 2018 ............................................................. 42

    H.  The Truth Concerning Alta Mesa's Business is Further Revealed Through
        a Series of Additional Partial Corrective Disclosures ......................... 45

    I.  Alta Mesa's Accounting Problems Lead To Delayed SEC Filings and an
        SEC Investigation ............................................................................... 49

    J.  Post-Class Period Alta Mesa Files For Bankruptcy Just 19 Months After
        The $3.8 Billion Business Combination .............................................. 52

K. The Control Entity Defendants Maintained Significant Control Over Alta Mesa Before, During and After the Class Period ................................... 53

V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ....................................... 56

 A. Defendants' Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act ........................................................ 56

  1. Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2017 ...................................... 56

  2. Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2018 ...................................... 59

 B. Defendants' Acted with Scienter When They Made or Caused to Be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act ........................................................................................... 79

  1. Defendants Had Direct Knowledge of All Alleged Undisclosed Facts ........................................................................................ 79

  2. Alta Mesa's Well Production Just Did Not "STACK" Up ...................... 83

  3. Defendants Knew They Had Drilled Alta Mesa Wells Too Densely ....... 83

  4. Defendants Knew That ESPs Were Futile, Costly, and Unreliable ......... 85

  5. Defendants Knowingly Drilled Wellbores That Inevitably Trapped Vast Reserves .......................................................................... 86

  6. Riverstone and Hackett Were Financially Motivated to Commit Fraud ........................................................................................ 89

 C. Material Misstatements and Omissions in the Proxy in Violation of the Section 14(a) of the Exchange Act ....................................................... 90

VI. LOSS CAUSATION ........................................................................................ 93

 A. March 29, 2018 Disclosures ................................................................. 94

 B. August 14, 2018 Disclosures ................................................................ 97

 C. November 13, 2018 Disclosures ........................................................... 100

 D. February 29, 2019 Disclosures ............................................................ 102

 E. May 17, 2019 Disclosures Reveal the Full Truth ................................. 103

VII. PRESUMPTION OF RELIANCE .................................................................... 105

VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
        BESPEAKS CAUTION DOCTRINE ............................................................. 107

IX.     CLASS ACTION ALLEGATIONS ............................................................. 108

X.      FRAUD CLAIMS ............................................................................... 109

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
        Promulgated Thereunder Against the Management Defendants and Board
        Defendants ...................................................................................... 109

COUNT II For Violations of Section 20(a) of the Exchange Act Against All Defendants........ 111

XI.     PROXY CLAIMS ............................................................................... 111

COUNT III For Violations of Section 14(a) of the Exchange Act Against the Proxy
        Defendants and Riverstone ................................................................. 114

COUNT IV For Violations of Section 20(a) of the Exchange Act Against the Proxy
        Defendants and Control Entity Defendants .............................................. 116

XII.    PRAYER FOR RELIEF ....................................................................... 117

XIII.   JURY DEMAND ............................................................................... 118

APPENDIX A TABLE OF KEY TERMS ............................................................. 120

Court-appointed Lead Plaintiffs, FNY Partners Fund LP, FNY Managed Accounts, LLC, Paul J. Burbach, and Plumbers and Pipefitters National Pension Fund (collectively, "Lead Plaintiffs"), along with Camelot Event Driven Fund, a series of Frank Funds Trust, (together with Lead Plaintiffs, "Plaintiffs"), bring this class action (the "Action") for violations of:

(i)     Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (the "Proxy Claims") on behalf of themselves and other shareholders of Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II ("Alta Mesa" or the "Company")[1] as of the January 22, 2018 record date (the "Record Date") that were entitled to vote on Alta Mesa's proposed transaction (the "Business Combination") to acquire Alta Mesa Holdings, LP ("AMH") and Kingfisher Midstream LLC ("Kingfisher"), and

(ii)    Sections 10(b) and 20(a) of the Exchange Action (the "Fraud Claims") on behalf of themselves and all other persons or entities, excluding Defendants, that purchased or otherwise acquired Alta Mesa securities during the period from August 16, 2017 through May 17, 2019, inclusive (the "Class Period"), and were damaged thereby.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things a review of:  (i) Alta Mesa's filings with the U.S. Securities and Exchange Commission ("SEC"), including the Definitive Merger Proxy Statement issued to the Company's shareholders on Schedule 14A, dated January 19, 2018 (the "Proxy"); (ii) research reports by securities and financial analysts; (iii) transcripts of Alta Mesa's conference calls with analysts and investors; (iv) Alta Mesa's presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of Alta Mesa securities; (vii) consultations with relevant experts; (viii) information provided by former Alta Mesa employees; (viii) the publicly filed documents, transcripts and exhibits from the bankruptcy proceedings captioned *In re: Alta Mesa Resources, Inc. and Alta Mesa Holdings, LP*, Case No. 19-35133-H1-

---

[1] A glossary of key terms in this complaint is attached hereto as Appendix A.

11 (S.D. Tex. Bankr.); and (ix) other material and data concerning the Company, as identified herein.

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

1.    On August 16, 2017 (the first day of the Class Period), Alta Mesa announced the Business Combination pursuant to which Alta Mesa – a "blank check" company created by private equity giant Riverstone Holdings LLC ("Riverstone") to purchase energy companies and funded largely by public investors – would acquire AMH and Kingfisher for $3.8 billion.  This federal securities Action arises from materially false and misleading statements and omissions of material fact by (i) the Proxy Defendants' in the Proxy Statement for the Business Combination; and (ii) the Management Defendants and Board Defendants in other public filings and statements concerning AMH and Kingfisher through May 17, 2019 (the end of the Class Period), the day Alta Mesa announced that the SEC had opened an investigation into the Company's financial reporting.

2.    Specifically, these Defendants made materially false and misleading statements and omissions prior to and following the Business Combination, including in the January 2018 Proxy, concerning, among other things:

- AMH's oil reserves;

- The reasonableness of the Company's 2018 and 2019 projected earnings for Kingfisher and AMH;

- The Company's ability to sustain growth;

- The Company's undisclosed strategic decisions to temporarily inflate oil production rates at the expense of the long-term viability of its operations; and

- The Company's internal controls over financial reporting.

3.    At the time these statements were made, these Defendants knew, but failed to disclose to the investing public, among other things, that:

- The results from Alta Mesa's wells in the second half of 2017 – before the Proxy and Business Combination – were below the levels projected to investors;

- In order to inflate its claimed oil reserves, Alta Mesa drilled too many wells per pad and drilled them too close together, resulting in a phenomenon known as well interference;

- As well results continued to disappoint, Alta Mesa, contrary to the advice of its engineers, employed unreliable and costly electronic pumps known as ESPs that temporarily inflated well results;

- Alta Mesa was drilling S-shaped wellbores to drive short term results that undermined the long-term viability of its wells; and

- Alta Mesa had material weaknesses in its internal controls over financial reporting.

4.    In March 2018, less than *two months* after shareholders voted to approve the Business Combination, Alta Mesa adjusted the Kingfisher and AMH earnings estimates downward 46% and 8%, respectively, thereby causing Alta Mesa's stock to lose 16.5% of its value in the ensuing four trading days.  Remarkably, Alta Mesa later conceded that the conditions that led to these adjustments began in 2017 – *i.e.*, *before* the January 2018 Proxy for the proposed Business Combination was issued.

5.    Equally as stunning, Alta Mesa was required to take a *$3.1 billion* write down in February 2019 – just one year after the $3.8 billion Business Combination closed.  The Company and its affiliated entities were ultimately forced to file for Chapter 11 bankruptcy protection on September 11, 2019 (the "Chapter 11 Proceedings").  Less than two years after the Business Combination, Alta Mesa's common stock price had fallen over 99%, costing investors more than $1 billion in losses.

3

6.     Defendants' misconduct was not accidental.  As demonstrated herein, Defendants were highly motivated to make false and misleading statements and omissions leading up to the Business Combination.  As a "blank-check" company formed for the purpose of acquiring energy assets, Alta Mesa was required by the terms of its formation to complete a qualifying transaction within two years of its March 2017 initial public offering (the "IPO").  Without such a transaction, Alta Mesa would be forced to repurchase all of Alta Mesa's common stock from shareholders and Riverstone and would lose its entire investment.

7.     Likewise, the other Control-Entity Defendants (*i.e.*, Bayou City Energy LLC, HPS Investment Partners, LLC, and ARM Energy Holdings LLC) were highly motivated to mislead investors because they stood to profit enormously from the Business Combination (as detailed below, they collectively received over $1.3 billion from the transaction).  Defendants Riverstone, Bayou City and HPS also hoped to further profit through their carried interests in the newly combined Alta Mesa entity, as the Company planned to promptly spin off Kingfisher through its own initial public offering.

\*       \*       \*

8.     Defendant Riverstone created Alta Mesa in 2016 expressly for the purpose of merging with or acquiring an as-yet-unidentified energy business.  As a so-called "blank check" company, Alta Mesa did not have any established business or operations.  Rather, it raised funds from investors who expected to benefit from Riverstone's putative expertise in identifying undervalued companies in the energy sector for a proposed merger or acquisition.

9.     Pursuant to the offering materials for its March 2017 IPO – which generated $1.035 billion from public investors – Alta Mesa was required to acquire a target business in the energy industry with an aggregate fair market value of at least 80% of the assets held in trust from the

offering proceeds.  If it failed to complete such a transaction within two years of the IPO, Alta Mesa was obligated to redeem 100% of its outstanding public shares – *i.e.*, return the $1.035 billion to investors.

10.    Motivated to effectuate a transaction before the two year deadline passed, in August 2017 Alta Mesa announced it had entered into an agreement, subject to shareholder approval, to acquire AMH and Kingfisher, two private companies partially owned and controlled by non-party High Mesa and control-entity Defendants HPS, Bayou City and ARM Energy (together with Riverstone, the "Control Entity Defendants").

11.    AMH was an oil and gas exploration and production company (known as an "upstream company")[2] operating in the STACK (Sooner Trend (oil field), Anadarko (Basin), Canadian and Kingfisher (counties)) play in Oklahoma.  Kingfisher was a midstream company[3] that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers in the same Oklahoma basin.  The two companies not only had overlapping owners, but Kingfisher's business was primarily transporting gas and oil developed by AMH (which accounted for over 85% of Kingfisher's revenues).

12.    Unfortunately for Alta Mesa's shareholders, AMH and Kingfisher were not remotely as valuable as they were portrayed by Alta Mesa beginning in August 2017 and continuing through the January 2018 Proxy issued to convince shareholders to vote in favor of the proposed Business Combination.  Moreover, as detailed below, even after the Business Combination closed in February 2018, Alta Mesa continued to issue false and misleading

---

[2] An "upstream company" deals primarily with the exploration and initial production stages of the oil and gas industry.

[3] A "midstream company" deals primarily with the processing, storing, transporting and marketing of oil and gas.

statements to prop up Alta Mesa's share price.  Defendants later acknowledged that problems at

AMH and Kingfisher began in 2017, ***before*** the Proxy and Business Combination.

13.     The Class Period begins with the Company's August 16, 2017 announcement of

the proposed Business Combination.  From the Company's initial announcement through the

February 2018 closing of the Business Combination, Defendants overstated the value of the assets

being acquired in order to induce shareholders to vote in favor of the transaction.  Among other

things, Defendants touted that AMH expected Estimated Ultimate Recovery ("EURs") at year end

to exceed 650,000 barrels of oil equivalent ("BOEs") per well, that AMH and Kingfisher were

poised for substantial near-term growth and that Kingfisher would be spun off through a profitable

IPO as soon as 2019.

14.     However, Defendants failed to disclose in the Proxy or otherwise that:

- Results from AMH's recently drilled wells were significantly worse than expected;

- AMH implemented numerous strategic tactics, including drilling too many wells per "pad"[4] and employing expensive pumps known as ESPs,[5] to temporarily inflate short-term production data to be in line with the BOE number represented to investors;

- The Control-Entity Defendants and senior management of AMH and Kingfisher were taking extreme measures to push oil through Kingfisher in order to increase the proposed combined entity's valuation, even though they knew those decisions would undermine long-term production potential;

- Predicable well shut-ins (closing off a well to halt production) and other operational setbacks started in 2017 as a result of AMH's strategic short-term focused decisions; and

---

[4] A drilling "pad" is a platform, typically about 2-5 acres and made of concrete or asphalt, that houses the wellheads for a number of horizontally drilled wells.

[5] An "ESP" is an electrical submersible pump that is an efficient and reliable artificial-lift method for lifting moderate to high volumes of fluids from wellbores.

- The poor performance of AMH's wells and related customer uncertainty in the STACK and SCOOP[6] areas diminished Kingfisher's growth potential.

15.    Defendants also failed to disclose significant material weaknesses in connection with the Company's internal controls over financial reporting.

16.    On March 29, 2018, less than two months after the close of the Business Combination, Alta Mesa issued a press release announcing that the EBITDA and production estimates it had provided to investors prior to the close of the Business Combination were materially overstated.   CEO of the post-transaction Alta Mesa – Defendant Harlan H. Chappelle ("Chappelle"), who, significantly, was the former CEO of AMH – admitted during Alta Mesa's fourth quarter earnings call that the Company **had started suffering from "setbacks" beginning in "late 2017"**[7] that were adversely impacting the Company.   These defects – which Chappelle **admitted were known prior to issuance of the Proxy and the Business Combination vote** – included the fact that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher.   The Company subsequently acknowledged that such delays pushed back the timeline for growing its pipeline business by six months and for a possible public offering of the Kingfisher midstream asset "perhaps" into 2019.

17.    On August 14, 2018, Alta Mesa provided its second quarter 2018 financial results, disclosing more disappointing numbers – again admitting that it did not meet its recently reduced projections because of defects that began "**back in the fourth quarter of '17**."   Rather than the proven reserves and positive growth portrayed to investors before closing the Business Combination, Alta Mesa revealed that AMH's oil production had actually declined sequentially

---

[6] SCOOP is "South Central Oklahoma Oil Province," an oil exploration area in a specific geographical location of the Anadarko Basin area of Oklahoma.

[7] All emphasis is added unless otherwise noted.

during the quarter. This was largely because the Company's wells had suffered from repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE. Defendant Chappelle conceded that the "shut-ins" resulted from work done in 2017 and the problems "linger[ed] into the first quarter of '18."

18.     While announcing these previously known-but-undisclosed defects in March and August 2018, Alta Mesa repeatedly characterized the problems as merely temporary delays and continued to advertise that the Company was poised for substantial growth. However, in truth Alta Mesa was drilling too many wells and deploying expensive ESP pumps to temporarily inflate its short-term oil production because it knew the Company's acreage could not produce the advertised amounts of oil in the long term.

19.     While Defendants' undisclosed drilling methods did temporarily inflate short-term oil production, and their public statements also temporarily alleviated investor concerns and continued to artificially inflate the price of Alta Mesa securities, the truth about Alta Mesa's problems continued to be revealed through a series of disclosures in late 2018 and early 2019.

20.     On November 13, 2018, Alta Mesa released its third quarter 2018 financial results. Incredibly, the Company now projected 2018 EBITDA for Kingfisher to be only $36-38 million – a far cry from the $185 million it had estimated for investors just 10 months prior. Alta Mesa's pitch to investors in August 2017 and the Proxy both relied on Kingfisher's EBITDA growth as a key factor in the valuation and rationale for the Business Combination.

21.     The Company also announced the departure of key executives, including that Michael A. McCabe ("McCabe"), the Company's Chief Financial Officer ("CFO"), was retiring that month. Approximately one month later, in December 2018, Alta Mesa announced the sudden

resignations of its CEO, Defendant Chappelle, and Defendant Michael E. Ellis, the Company's Vice President and Chief Operating Officer for the upstream (AMH) division.

22.     The extent of Alta Mesa's defects was further revealed on February 25, 2019, when the Company announced it was unable to timely file its 2018 annual report because of a ***"material weakness" in its financial reporting***.  Because of this material weakness, Alta Mesa revealed that it was taking a ***$3.1 billion write down***.  Moreover, despite estimates in the January 2018 Proxy that the Company would increase its average active rig count to 11 rigs in 2019, Alta Mesa announced that by the end of January 2019 the Company ***had reduced its active rig count to zero***.

23.     On May 17, 2019, Alta Mesa announced that the SEC had opened ***a formal investigation regarding the Company's internal controls over financial reporting***.  On this date, Alta Mesa, which was still unable to file its 2018 annual report because of its financial reporting problems, also announced that it had retained financial advisors and was evaluating filing for Chapter 11 bankruptcy protection (Alta Mesa eventually filed the Chapter 11 Proceedings on September 11, 2019).

24.     The value of Alta Mesa's securities held by Plaintiffs and other members of the Class declined substantially as a result of these disclosures.  Specifically, during the 21-month Class Period ***the price of the Company's common stock fell approximately 99%*** from $10.19 per share to $0.13 per share.

25.     Moreover, holders of Class A common stock on the January 22, 2018 Record Date were fraudulently induced by the misleading Proxy to vote in favor of the Business Combination. At the time of the vote, investors could have voted against the Business Combination and redeemed their shares for approximately $10 per share.  The Company's shares are now essentially worthless.

26.     On January 29, 2020, Defendant Bayou City (in a partnership with an independent oil and gas exploration company) repurchased Alta Mesa's assets in an auction conducted through the Chapter 11 Proceedings for $320 million – a far cry from the purported $3.8 billion valuation of Alta Mesa when trading began after the Business Combination.

## II.     JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Alta Mesa had its headquarters in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material fact, occurred in this District.

29.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

30.     Lead Plaintiff FNY Partners Fund LP is a Delaware limited partnership that invests in equity securities.  As set forth in the certification attached hereto as Exhibit 1, FNY Partners Fund LP purchased shares of Alta Mesa Class A common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.  Lead Plaintiff FNY Partners Fund LP held Alta Mesa Class A common stock as of the January 22, 2018

Record Date for the Business Combination and was entitled to vote on the Business Combination at the special meeting.

31.     Lead Plaintiff FNY Managed Accounts, LLC is a Delaware limited liability company that invests in equity securities.  As set forth in the certification attached hereto as Exhibit 2, FNY Managed Accounts, LLC purchased shares of Alta Mesa Class A common stock during the Class Period and suffered damages due to Defendants' violations of the Exchange Act alleged herein.

32.     Lead Plaintiff Paul J. Burbach is an individual investor residing in Milwaukee, Wisconsin.  As set forth in the certification attached hereto as Exhibit 3, Paul J. Burbach purchased shares of Alta Mesa Class A common stock and Alta Mesa warrants during the Class Period and suffered damages due to Defendants' violations of the Exchange Act alleged herein.

33.     Lead Plaintiff Plumbers and Pipefitters National Pension Fund is a pension fund based in Alexandria, Virginia.  As set forth in the certification attached hereto as Exhibit 4, Plumbers and Pipefitters National Pension Fund is a holder of record of Alta Mesa Class A common stock as of the January 22, 2018 Record Date for the Business Combination and was entitled to vote on the Business Combination at the special meeting.  Plumbers and Pipefitters National Pension Fund suffered damages due to Defendants' violations of the Exchange Act alleged herein.

34.     Plaintiff Camelot Event Driven Fund, a Series of Frank Funds Trust, is a mutual fund.  As set for in the certification attached hereto as Exhibit 5, Camelot Event Driven Fund purchased shares of Alta Mesa Class A common stock and Alta Mesa warrants during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

### B.    Proxy Defendants

35.     Defendant James T. Hackett was the CEO and a director of Alta Mesa prior to the Business Combination and became Executive Chairman of the Alta Mesa Board of Directors (the "Board") following the Business Combination.  Defendant Hackett was also the Chief Operating Officer ("COO") of Kingfisher and became Interim CEO of Alta Mesa following Defendant Chappelle's December 26, 2018 resignation.  At the time of the Business Combination, Defendant Hackett was a Partner at Riverstone and co-head of Riverstone's Houston office.  Prior to joining Riverstone in 2013, Hackett served as Chairman and CEO of Anadarko Petroleum Corporation. Defendant Hackett signed Alta Mesa's Proxy and the March 29, 2018 Form 10-K and spoke on Alta Mesa's behalf during numerous investor earnings calls.

36.     Defendant Thomas J. Walker served as the CFO and a member of the Board of Directors of Alta Mesa prior to the Business Combination.  At the time, Walker was also the CFO and a Partner of Defendant Riverstone.  Defendant Walker signed Alta Mesa's August 7, 2017 Form 8-K and November 13, 2017 Form 10-Q.

37.     Defendant William Gutermuth served as a member of Alta Mesa's Board of Directors at the time of the Business Combination.  Defendant Gutermuth signed Alta Mesa's March 29, 2018 Form 10-K.

38.     Defendant Jeffrey H. Tepper served as a member of Alta Mesa's Board of Directors at the time of the Business Combination.  Defendant Tepper signed Alta Mesa's March 29, 2018 Form 10-K.

39.     Defendant Diana J. Walters served as a member of Alta Mesa's Board of Directors at the time of the Business Combination.  Defendant Walters signed Alta Mesa's March 29, 2018 Form 10-K.

40.     Defendant Stephen Coats served as a member of Alta Mesa's Board of Directors at the time of the Business Combination.  Defendant Coats was Alta Mesa's corporate secretary prior to the Business Combination.   Defendant Coats is a Partner, General Counsel and Chief Administrative Officer at Defendant Riverstone.

41.     The above-named individual defendants are collectively referred to herein as the "Proxy Defendants."   Each of the Proxy Defendants was a member of Alta Mesa's Board of Directors at the time the Proxy was issued.  The Proxy was issued "By Order of the Board of Directors" and the Board recommended "that Silver Run [*i.e.*, Alta Mesa] stockholders vote FOR each of the Proposals."  Each of the Proxy Defendants is named as a defendant in Counts III and IV herein.  As alleged below, certain of the Proxy Defendants are also named in additional counts.

### C.     Management Defendants

42.     Defendant Harlan H. Chappelle was the Chief Executive Officer ("CEO") of the combined Alta Mesa entity following the Business Combination, as well as a member of Alta Mesa's Board of Directors.  Defendant Chappelle had previously served as AMH's CEO since 2004.  Defendant Chappelle resigned from Alta Mesa effective December 26, 2018.  Defendant Chappelle signed Alta Mesa's March 29, 2018 Form 10-K, May 21, 2018 From 10-Q, August 15, 2018 Form 10-Q and November 14, 2018 Form 10-Q, as well as spoke on numerous earnings calls.

43.     Defendant Michael E. Ellis was a Silver Run Vice President and Chief Operating Officer – Upstream following the Business Combination, and a member of Alta Mesa's Board of Directors.  Defendant Ellis signed Alta Mesa's March 29, 2018 Form 10-K.  Defendant Ellis resigned from Alta Mesa effective December 26, 2018.

44.     Defendant Ronald Smith was the Chief Accounting Officer for Alta Mesa during a significant portion of the Class Period.  Defendant Smith signed Alta Mesa's March 29, 2018 Form

10-K.  Defendant Smith resigned from his role at Alta Mesa in July 2019 in the midst of the SEC's investigation into the Company's accounting practices.

45.     Defendants Chappelle, Ellis and Smith are referred to collectively herein as the "Management Defendants."  Each of the Management Defendants is named in Counts I and II herein.

### D.     Board Defendants

46.     Defendant David M. Leuschen served as a member of Alta Mesa's Board of Directors during the Class Period.  Defendant Leuschen is a Founder of Defendant Riverstone and has been a Senior Managing Director at Riverstone since 2000.  Defendant Leuschen signed Alta Mesa's March 29, 2018 Form 10-K.

47.     Defendant Pierre F. Lapeyre Jr. served as a member of Alta Mesa's Board of Directors during the Class Period.  Defendant Lapeyre is a Founder of Defendant Riverstone and has been a Senior Managing Director at Riverstone since 2000.  Defendant Lapeyre signed Alta Mesa's March 29, 2018 Form 10-K.

48.     Defendant William W. McMullen served as a member of Alta Mesa's Board of Directors following the Business Combination.   Defendant McMullen is the Founder and Managing Partner of Defendant Bayou City Energy.  Defendant McMullen signed Alta Mesa's March 29, 2018 Form 10-K.

49.     Defendant Don Dimitrievich served as a member of Alta Mesa's Board of Directors following the Business Combination.   Defendant Dimitrievich is a Managing Director at Defendant HPS Investment Partners, LLC.  Defendant Dimitrievich signed Alta Mesa's March 29, 2018 Form 10-K.

50.     Defendant Donald Sinclair served as a member of Alta Mesa's Board of Directors following the Business Combination.  Defendant Sinclair signed Alta Mesa's March 29, 2018 Form 10-K.

51.     The above-named Defendants – Leuschen, Lapeyre, McMullen, Dimitrievich and Sinclair – along with Defendants Hackett, Walker, Gutermuth, Tepper and Walters, are referred to collectively as the "Board Defendants."  Each of the Board Defendants is named in Counts I and II herein.

### E.     Control Entity Defendants

52.     Defendant Riverstone is a private equity firm focused on the energy sector and is comprised of, as relevant hereto, Riverstone Holdings, LLC, Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP.  Defendant Riverstone and its affiliates created Alta Mesa, and sponsored the IPO and the Business Combination through various related affiliates and investment vehicles.  Prior to the Business Combination, all of Alta Mesa's management was employed by Riverstone.  Following the Business Combination, Riverstone appointed three directors to Alta Mesa's Board of Directors – Defendants Hackett, Leuschen and Lapeyre.

53.     Defendant Bayou City Energy LLC ("Bayou City") is an energy-focused private equity firm based in Houston, Texas.  Bayou City has been involved with AMH since at least January 2016, when it entered into a joint development agreement with AMH to fund a portion of AMH's drilling operations.  Bayou City also owns approximately 40% of relevant non-party High Mesa (the owner of AMH prior to the Business Combination and a partial owner of Alta Mesa following the Business Combination).  Bayou City has two members on High Mesa's board of directors and also appointed its founder and managing partner William McMullen to the Alta Mesa Board of Directors.

54.     Defendant HPS Investment Partners, LLC ("HPS") is a global investment firm. HPS was formerly affiliated with J.P. Morgan Asset Management and was known as Highbridge Principal Strategies.  HPS owns a significant portion of Alta Mesa and appointed one of its managing directors, Don Dimitrievich, to the Alta Mesa Board of Directors.

55.     Defendant ARM Energy Holdings LLC ("ARM Energy") is a producer services firm active in all major North American oil and gas basins.  Prior to the Business Combination, ARM was the majority owner of Kingfisher.  ARM continued to be a shareholder of Alta Mesa following the closing of the Business Combination.

56.     Defendants Riverstone, Bayou City, HPS and ARM Energy are collectively referred to herein as the "Control Entity Defendants."  Each of the Control Entity Defendants is named in Counts II and IV herein.  Defendants Bayou City, HPS and ARM Energy provided the operational information contained in the Proxy and were unjustly enriched when they received over $1.3 billion from the Business Combination.  Riverstone is also named in Count III.

**F.     Relevant Non-Parties**

57.     Alta Mesa was an oil and gas company with its principal place of business at 15021 Katy Freeway, Suite 400, Houston, Texas 77094.  The Company was incorporated in Delaware and was focused on oil and gas exploration and production in the Anadarko Basin of Oklahoma. Prior to its bankruptcy filing on September 11, 2019, its Class A common shares traded on the NASDAQ under the symbol "AMR" and its public warrants traded under the symbol "AMRWW." Prior to the closing of the Business Combination in February 2018, Alta Mesa was a "blank check" company named Silver Run Acquisition Corporation II and its Class A stock traded on the NASDAQ under the symbol "SRUN," its public warrants traded under the symbol "SRUNW,"

16

and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

58.     High Mesa Holdings GP, LLC and High Mesa Holdings, LP (together, "<u>High Mesa</u>" or "<u>HMI</u>") were the owners and general partner of AMH prior to the Business Combination, and continued to own and control a portion of Defendant Alta Mesa and SRII Opco following the Business Combination.  High Mesa also was a partial owner of Kingfisher prior to the Business Combination.  Defendant Bayou City owns approximately 40% of High Mesa and appointed two members to High Mesa's board of directors (Mark Stoner and Defendant McMullen).  Defendant Chappelle is also affiliated with High Mesa.  High Mesa filed for Chapter 7 bankruptcy protection on January 24, 2020.

## IV.     BACKGROUND FACTS

### A.     Blank Check Companies

59.     A "blank check" company is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person.

60.     One type of "blank check" company is a "special purpose acquisition company," or "SPAC."  A SPAC is a publicly-traded company created specifically to pool funds through an initial public offering for the purpose of completing an acquisition or other business combination with an existing company.  Generally, SPACs are founded by public companies or private asset managers.  Since 2014, there has been a resurgent interest in SPAC initial public offerings, and over $10 billion in total funds were raised towards SPACs in 2017.

61.     In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-market the investment offering to interested investors.  A target company

cannot be identified before the SPAC initial public offering is completed.  Once capital is raised

through the initial public offering, at least 90% of the proceeds must be deposited into a trust

account, and any interest is paid to the investors.  An appointed management team (typically the

SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which

to identify an appropriate target to complete the merger or acquisition.  NASDAQ rules dictate the

initial business combination must be with one or more target businesses that together have a fair

market value equal to 80% of the balance in the SPAC trust account.  Although the only purpose

of a SPAC is to acquire a target company, SPACs generally have corporate governance structures

similar to other operating companies.

62.     Typically, common stockholders of the SPAC are granted voting rights to approve

or reject the business combination proposed by the management team.   Thus, when the

management team identifies a target, a merger proxy statement must be distributed to all SPAC

stockholders, which includes the target company's complete audited financials and the terms of

the proposed business combination.  To this end, stockholders in SPACs depend on management

to honestly provide accurate information about any contemplated transactions.  In anticipation of

the shareholder vote, each SPAC shareholder has three options, they can:  (i) approve the

transaction by voting in favor of it; (ii) elect to sell their shares in the open market; or (iii) vote

against the transaction and redeem their shares for a pro-rata share of the trust account.

63.     If a merger or acquisition is successfully made within the allocated time frame,

shareholders and management of the SPAC can profit through their ownership of the common

stock and any related securities (it is common for SPAC initial public offerings to include "units"

consisting of both stock and out-of-the-money warrants).  However, if an acquisition is not

completed within the time period specified when the SPAC is organized, then the SPAC is

automatically dissolved and the money held in trust is returned back to investors.  No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.   Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.

64.     Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised *no matter what* so they can collect fees and pay themselves in salary and stock options at the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."   In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to not waste the significant time and financial resources they expended upfront on legal and financial advisors to set up the investment vehicle.

65.     As set forth herein, Alta Mesa exemplified the problem with SPACs.   The Defendants here were incentivized to, and did, consummate the Business Combination that was not in the best interests of public investors, to whom they made material misstatements and omissions about AMH and Kingfisher while actively implementing practices to artificially inflate results.

**B.     Defendant Riverstone Forms Alta Mesa**

66.     Defendant Riverstone formed Alta Mesa (then known as Silver Run II Acquisition Corporation II) in 2016 as a SPAC for the purpose of effecting a business combination in the energy sector.  Alta Mesa's Chief Executive Officer was Defendant James T. Hackett, a partner at

Riverstone since 2013 and the former Chairman and Chief Executive Officer of Anadarko Petroleum Corporation (Anadarko is a former oil giant that was acquired in 2019 by Occidental Petroleum in a transaction valued at approximately $57 billion).

67.    While forming Alta Mesa, Riverstone sold itself cheap "founder" shares in order to maximize its upside from the SPAC.  Specifically, on November 21, 2016, Riverstone acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share.  These founder shares of Class B common stock would automatically convert into shares of Class A common stock at the time of Alta Mesa's initial business combination

68.    In March 2017, Alta Mesa effected stock dividends with respect to its Class B common stock of 14,375,000 additional shares thereof, resulting in Riverstone holding an aggregate of 25,875,000 founder shares.  These founder shares represented 20% of the outstanding shares following Alta Mesa's IPO.  Accordingly, Riverstone collectively owned approximately 20% of Alta Mesa's issued and outstanding shares after the IPO.  Riverstone also transferred 33,000 founder shares in March 2017 to each of its independent director nominees (Defendants Gutermuth, Tepper and Walters) at their original purchase price.

69.    Notably, pursuant to a letter agreement between Riverstone, its director nominees and Alta Mesa, the founder shares did not have rights to liquidating distributions if Alta Mesa failed to complete its initial business combination within 24 months of the IPO.  Put simply, Riverstone and its directors' 20% collective stake in Alta Mesa would be worthless if Alta Mesa did not complete a business transaction within 24 months.

70.    Also in March 2017, Riverstone (specifically, Riverstone VI SRII Holdings, L.P.) entered into a forward purchase agreement with Alta Mesa pursuant to which Riverstone agreed to purchase an aggregate of up to 40,000,000 shares of Alta Mesa's Class A common stock, plus

an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400 million (the "Forward Purchase Agreement").

71.    On or about March 24, 2017, Alta Mesa completed its IPO, sponsored by Defendant Riverstone.  Alta Mesa sold 103.5 million shares of common units to investors for gross proceeds of $1.035 billion, as well as a private placement of 15,133,33 warrants to Riverstone.  Each common unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Alta Mesa Class A common stock at $11.50 per share.

72.    Citigroup Global Markets Inc., Credit Suisse Inc., Deutsche Bank Securities Inc., and Goldman, Sachs & Co. acted as joint book-running managers for the IPO (together, the "Underwriters").  For their work in connection with the IPO, the Underwriters were entitled to underwriting discounts and commissions of 5.5% of the total proceeds.  Of this amount, 2.0% ($20,700,000) was paid at the closing of the Public Offering and 3.5% ($36,225,000) was a deferred discount (the "Deferred Discount") to be paid upon Alta Mesa's completion of an initial business combination.  If no business combination was completed within 24 months of the public offering, the Underwriters would not receive the Deferred Discount.

73.    At the time of the IPO, "all members of [Alta Mesa's] management team [were] employed by Riverstone" and the Board was closely affiliated with and controlled by Defendant Riverstone.  Specifically, at the time of the IPO, (i) Defendant Hackett, Alta Mesa's CEO and Chairman of the Board, was a Partner at Riverstone and co-head of its Houston office; (ii) Alta Mesa's CFO, Defendant Walker, was a Partner at Riverstone and served as its CFO; and (iii) Stephen S. Coats, the Corporate Secretary of Alta Mesa, was a Riverstone Partner and served as

its General Counsel.  In addition, Riverstone founders Defendants David Leuschen and Pierre Lapeyre later became directors of Alta Mesa.

74.     Alta Mesa's IPO offering materials stated that the Company planned to pursue an acquisition that would capitalize on Riverstone's expertise in the energy industry by leveraging its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered attractive investment returns.

75.     The "acquisition criteria" that Alta Mesa stated in its IPO offering materials included a business combination with companies that:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound . . . [and] . . . are underperforming their potential; exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders.  We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry.  Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

76.     In the prospectus for the Alta Mesa IPO, Riverstone detailed its extensive process of evaluating business targets, which included "meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us.  We will also utilize our operational and capital allocation experience."

77.     Pursuant to the IPO prospectus, Alta Mesa was required to enter into a transaction with a target business having an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds.  The Company was also required to do so within two years of the March 2017 IPO.

78.     This requirement created significant pressure on Alta Mesa, which was controlled and managed by Defendant Riverstone, to quickly find, obtain approval for and close a transaction. In the event Alta Mesa did not complete an initial business combination within the required time period, the Company was obligated to redeem 100% of its outstanding public shares and Riverstone's holdings in Alta Mesa would be worthless.  Shareholders also had the right to redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.

**C.     Riverstone and Alta Mesa Identify AMH and Kingfisher As Acquisition Targets**

79.     Following the IPO, Defendant Riverstone and Alta Mesa developed a list of 50 potential targets, including AMH and Kingfisher.  According to the Proxy, on March 31, 2017 – just one week after the IPO – Defendant McMullen, Founder & Managing Partner of Defendant Bayou City, and Defendant Hackett of Riverstone were introduced via email and agreed to meet in person to discuss Bayou City's investment in upstream company AMH.  On April 3, 2017, Defendant Hackett met with AMH CEO Defendant Chappelle in Houston, and by mid-May 2017 Alta Mesa proposed to acquire AMH and its related midstream business, Kingfisher.

80.     AMH was formed in 1987 and was a privately held oil and gas exploration and production company (known as an "upstream" company) focused on the development and acquisition of unconventional oil and natural gas reserves in the eastern portion of the Oklahoma Anadarko Basin referred to as the STACK (<u>S</u>ooner <u>T</u>rend (oil field), <u>A</u>nadarko (Basin) <u>C</u>anadian

and Kingfisher (counties)).  In addition to STACK being an acronym for the location of the basin, STACK also refers to the fact that the structures in the area are multiple, "stacked" productive formations.  According to AMH, the STACK is a prolific hydrocarbon system with high oil and liquids-rich natural gas content, multiple horizontal target horizons, extensive production history and historically high drilling success rates.

81.     Prior to the closing of the Business Combination, AMH (including both AMH Holdings, LP and its parent company, AMH Investment Holdings, Inc.) was controlled by High Mesa, Inc.  Notably, on March 25, 2014, AMH was recapitalized by a $350 million investment from Highbridge Principal Strategies, LLC, now Defendant HPS.

82.     In January 2016, AMH's subsidiary, Oklahoma Energy Acquisitions, LP ("Oklahoma Energy"), entered into a joint development agreement with BCE-STACK Development LLC, a fund advised by Defendant Bayou City Energy, to pay for  a portion of AMH's drilling operations and to allow AMH to accelerate development of its STACK acreage (the "Bayou City JDA").  The Bayou City JDA provided for the development of two tranches of 20 wells each (40 total wells) and was subsequently amended on December 31, 2016 to add a third and fourth tranche of wells making the agreement govern a total of 80 wells.

83.     Under the agreement, Bayou City committed to fund 100% of AMH's working interest share up to the maximum of $3.2 million in drilling and complete costs per well ($64 million per tranche) in exchange for an 80% working interest in each well.  Bayou City's working interest would be incrementally reduced once Bayou City achieved certain internal rate of return benchmarks for each tranche of wells.  AMH was responsible for any drilling and completion costs exceeding the $3.2 million per well limit.

84.     Defendant Bayou City invested further in AMH through the entity High Mesa, Inc. On September 12, 2016, Bayou City announced it completed the purchase of preferred stock in High Mesa, a privately held Delaware corporation., High Mesa's common stock is owned by management of High Mesa, and its preferred stock was now owned by Defendant Bayou City and Defendant HPS.  According to Bayou City's press release, High Mesa "has interests in oil and gas assets, most notably AMH Holdings, LP."  On November 10, 2016, AMH announced that High Mesa contributed a $300 million equity investment to AMH, which was derived from the sale of preferred equity to Bayou City Energy for a minority interest in High Mesa.

85.     On December 31, 2014, AMH sold its interests in a partially constructed pipeline and gas processing plant to Northwest Gas Processing, LLC ("NWGP"), a subsidiary of High Mesa, for $34 million.  In 2015, these midstream assets would become Kingfisher, a midstream company focused on providing crude oil gathering, gas gathering, and processing and marketing to producers of natural gas, natural gas liquids ("NGLs"), crude oil and condensate in the STACK play.

86.      On August 31, 2015, AMH's subsidiary Oklahoma Energy entered into a Crude Oil Gathering Agreement and Gas Gathering and Processing Agreement with Kingfisher, which gave Oklahoma Energy the oil and natural gas production from AMH's acreage that was not otherwise committed to Kingfisher.  Under these agreements, Oklahoma Energy dedicates and delivers to Kingfisher crude oil and natural gas and associated natural gas liquids produced from present and future wells located in Kingfisher, Logan, Canadian, Blaine and Garfield Counties in Oklahoma.  These agreements will remain in effect for a primary term of 15 years from the in-service date of July 1, 2016.  After the primary term, the agreements are extended for as long as there are wells connected to the system that continue to produce crude oil or gas in commercial

paying quantities.  In other words, AMH contracted to provide significant business to Kingfisher for the duration of AMH's operations in the STACK basin.

87.     Prior to the Business Combination, as illustrated below, Kingfisher had overlapping owners with AMH.  Kingfisher was owned by Defendant ARM Energy, Defendant HPS and non-party High Mesa.   In addition to their overlapping owners, AMH and Kingfisher were interconnected from an operational perspective.   Indeed, in 2016 nearly 97% of Kingfisher's revenues were derived from wells operated by AMH, and today over 80% of Kingfisher's revenues are from contracts with AMH.

**Illustrative AMH and Kingfisher Ownership Structure**



88.     In summary, Defendants Bayou City, HPS and ARM Energy owned and controlled AMH and Kingfisher prior to the Business Combination.  As detailed below, these Defendants continued to maintain significant control over, and interest in, Alta Mesa following the Business Combination.

**D.      Defendants Mislead Investors as a Pretext to Obtaining Shareholder Approval for the Business Combination**

89.      The Class Period begins on August 16, 2017, when Alta Mesa announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with AMH and Kingfisher.  The proposed transaction was valued at approximately $3.8 billion.

90.      Defendant Riverstone and Alta Mesa's officers and directors were incentivized to quickly agree to, obtain shareholder approval for, and close this transaction.  If Alta Mesa failed to secure an initial business combination by March 29, 2019, according to the Proxy, "[Riverstone and our] officers and directors will lose their entire investment."  In such case, Alta Mesa would be wound up and Defendant Riverstone would be obligated to redeem 100% of the Company's public shares at a per share price payable in cash.  Moreover, Defendant Riverstone's founder shares, which accounted for approximately 20% interest in Alta Mesa, would be worthless (the founder shares were not redeemable for cash).

91.      The former owners and executives of AMH were also highly motivated to quickly close the Business Combination.  Not only were AMH's owners set to receive over $500 million from the proposed Business Combination, but at the time of the acquisition AMH's management had publicly stated it hoped to transition from a "de-risk" strategy to developing its wells, which required significant liquidity.  In this regard, AMH had planned to raise funds through an initial public offering and had submitted a confidential draft registration statement to the SEC prior to being approached by Riverstone about a potential transaction with Alta Mesa.  Riverstone's transaction offered an alternative source of funds for AMH – *i.e.*, those raised from members of the Class through the Alta Mesa IPO.

92.      Similarly, Kingfisher's owners would receive over $800 million from the Business Combination, as well as a continuing interest in the new combined entity.  From a business

27

perspective, Kingfisher stated it required additional liquidity for several planned development projects.

93.     According to the Proxy issued by Alta Mesa (which was signed by Defendant Hackett and issued by order of the Board), negotiations regarding the Business Combination had been ongoing since at least March 2017 – shortly after the Alta Mesa IPO – and involved the consideration of "multiple alternative target opportunities."  Given the extended duration of these negotiations, and the fact that Riverstone purportedly found all alternatives to be unsuitable for an initial business combination, Riverstone was unlikely to complete another business combination within the requisite time period if Alta Mesa shareholders did not vote to approve the Business Combination.

94.     Accordingly, because the Business Combination was likely Riverstone's last chance to retain its investment, Riverstone and Alta Mesa's executives started to "sell" the Business Combination to investors.  For example, during a presentation to investors announcing the Business Combination on August 17, 2017, Defendants touted that Kingfisher had a "leading position in the STACK play" and was "uniquely positioned to capitalize on the increasing development in the STACK."  Defendants projected that Kingfisher's 2019 EBITDA would be $318 million.  Defendants also stated that Alta Mesa had "about 4,200 gross identified drilling locations."

95.     Likewise, during AMH's third quarter 2017 earnings call on November 14, 2017, Defendant Chappelle advertised AMH's new wells and its "strong production growth."  At no time in 2017 did Defendant Chappelle disclose the operational "setbacks" that, by his own admission, started in "late 2017," nor that AMH's recent drilling results were disappointing and it was taking actions to temporarily inflate production at the expense of its long-term operations.

96.     On January 19, 2018, Alta Mesa issued the definitive Proxy to its shareholders on Schedule 14A in connection with the efforts by Alta Mesa, the Board and Riverstone to secure shareholder support for the Business Combination.  The Proxy recommended that Alta Mesa's shareholders vote in favor of the Business Combination, while continuing to omit and misrepresent material information concerning core issues at AMH and Kingfisher that diminished their future expected cash flows.

97.     The Proxy stated that AMH and Kingfisher satisfied the acquisition criteria outlined in the IPO offering materials.  The Proxy further stated that Riverstone and Alta Mesa believed "[AMH] and Kingfisher were of superior quality" and offered significant value and high-quality assets to shareholders of Alta Mesa with attractive risk-adjusted returns.

98.     Similarly, the Proxy stated that the Alta Mesa Board's recommendation that shareholders vote "FOR" the business combination was based on "careful consideration" and extensive due diligence.  The Proxy represented that the Board had considered "a wide variety of factors in connection with its evaluation of the business combination" and had determined that the following factors, among others, supported its recommendation that shareholders vote in favor of the Business Combination:

- *AMH's Highly Contiguous Acreage in the STACK*.  AMH has approximately 130,000 highly contiguous acres in the up-dip oil window of the STACK, one of the most active and prolific stacked pay basins in North America.  In addition, AMH's deep inventory includes over 4,000 primary gross locations and over 12,000 possible locations from down spacing, as well as additional zone penetration.

- *World Class Asset with Attractive Geology*.  AMH's oil-weighted resource features high margins, low break-even commodity prices, and single-well rates of return in excess of 85%.  [Alta Mesa] and AMH's management believe there are further opportunities for improving efficiencies through technology and optimizing well design.

- *Top-Tier Operator with Substantial STACK Expertise and Highly Consistent Well Results*.  AMH's management has over 30 years' of experience operating in the STACK, and [Alta Mesa] believes that this experience provides AMH with a competitive advantage.  As of September 30, 2017, AMH has drilled more than 220 horizontal STACK wells, and currently has a multi-rig program, averaging six rigs in 2017.  Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give AMH's management confidence that AMH's type well EUR is greater than 650 MBOE.

- *Highly Strategic and Synergistic Midstream Platform*.  Kingfisher's midstream assets overlay AMH's contiguous acreage in the STACK, and afford AMH with a purpose-built system to handle larger volumes in an efficient processing system.  Kingfisher's system allows AMH to access Midwest and Gulf Coast markets through the Panhandle Eastern Pipeline, as well as western interstate markets through OGT.  In addition to serving AMH, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications. [Alta Mesa] believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering.

- *Strong Liquidity Profile*.  After giving effect to the business combination, [Alta Mesa] expects to have sufficient liquidity and financial flexibility to fund AMH's and Kingfisher's development projects and pursue opportunistic acquisitions.

- *Terms of the Contribution Agreement*.  [Alta Mesa's] board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the product of arm's-length negotiations among the parties.

99.   The Proxy especially focused on the potential opportunities relating to Kingfisher. For example, the Proxy noted that Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines.  The Proxy further indicated that Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects.  In addition, the Proxy stated that there was

significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering.  However, in truth Kingfisher knew that third party operators had delayed drilling on the STACK acreage that it served, which would significantly undermine its earnings and growth.

100.    Notably, with respect to AMH, the Proxy stated it "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017."  The Proxy also represented that AMH expected to increase the average number of rigs in operation to 10 in 2018, and to 11 in 2019.

101.    The Proxy likewise stated that AMH and Kingfisher were poised for accelerating growth immediately following the Business Combination.  For example, the Proxy indicated  that AMH had achieved an estimated 2017 average net daily production of 20.8 thousand barrels of oil equivalent per day ("MBOE/d"), and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

102.    The Proxy also included positive EBITDA projections.  It stated that AMH had achieved 2017 adjusted EBITDAX (*i.e.*, earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses) of $155 million, and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.  In addition, the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.  Notably, these projections matched the estimates provided during the August 2017 investor presentation announcing the proposed Business Combination.

103.    The Proxy went to great lengths to justify these projections.  For example, the Proxy stated that these "financial projections were prepared on a reasonable basis" and "reflected the best

currently available estimates and judgments of [AMH] and Kingfisher, as applicable." Further, the Proxy represented that these financial figures "presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of [AMH] and Kingfisher, respectively." The Proxy also represented to investors that the estimates and projections contained therein were based on observable trends and capabilities, as well as economically justified assumptions regarding the expected cash flows of AMH and Kingfisher.

104.   In addition, the Proxy included extensive statements regarding the quality of AMH's internal controls over oil and gas reserve estimates. For example, the Proxy stated that

> AMH's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers.

The Proxy further stated that AMH's internal control "methodologies include reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis."

105.   The Board recommended in the Proxy that Alta Mesa stockholders "vote 'FOR' the Business Combination Proposal," based, in part, on the above projections. Accordingly, the projections provided in the Proxy, were used to induce Alta Mesa shareholders to vote in favor of the Business Combination and to forgo redeeming their shares.

### E.   Riverstone and Alta Mesa Conceal Alta Mesa's Operational Problems and Setbacks In Advance of the Shareholder Vote

106.   As Alta Mesa would later admit, AMH and Kingfisher began suffering numerous "setbacks" in the fourth quarter of 2017. Many of the setbacks were the result of Defendants'

desire to cause the proposed AMH and Kingfisher combined entity to appear more valuable in the short term in advance of the vote on the Business Combination, and in order to inflate Kingfisher's value so it could quickly be spun off in an initial public offering following the Business Combination. These "setbacks" were in no way disclosed to investors in the Proxy and were not fully revealed until the end of the Class Period.

107.  First, AMH drilled more wells than was justified by the geology of its STACK acreage in an effort to create the appearance that its acreage had more oil reserves than it had in reality. As background, oil field development typically follows a progression whereby a couple of wells are first drilled on each pad (to preserve rights under state drilling leases). Additional wells are later added to the pads to determine whether there are incremental increases in production from the additional wells. The goal is to determine the optimal number of wells per pad to maximize production and profits. For example, adding an additional well to a pad might increase production significantly, but it is also possible that the same amount of overall production per pad might be obtained using fewer wells.

108.  AMH touted a high-density drilling strategy of eight to ten wells per pad or more. But the Company knew from early estimates that this strategy was proven wrong. According to CW1 (a former Production Engineer employed by AMH from June 2018 to February 2019), it was well known within the Company, including by Defendants Chappelle and Ellis, that only four to six wells per pad were needed on AMH's STACK acreage. Adding additional wells per pad did not increase production in a sustainable volume to justify the expense of additional wells. These wells increased the Company's cost of developing the land, and would not generate sufficient additional production to cover that increased cost.

109.    Instead of revising their estimates disclosed to the public, AMH intentionally drilled more wells than necessary because the number of wells they originally projected were used to calculate the Company's reported oil reserves.  According to CW1, oil reserves were generally calculated by multiplying the average forecasted production of Alta Mesa's current wells with the number of wells the Company claimed could be supported by its acreage.  By proceeding as if the Company could sustainably drill eight to ten wells per pad instead of the more optimal four or five wells per pad, AMH was able to claim purported  reserves that were ***double*** the actual recoverable reserves.  Revising the drilling program to fewer wells per section would have reduced the volume of the reserves and thus the value of the Company.

110.    According to CW1, it was "commonsense" to everyone at the Company that the STACK acreage could only support four to five wells per pad, but management wanted to ramp up its targeted well density to show the public there was "more [oil] down there" than was realistically recoverable.

111.    <u>Second</u>, AMH drilled its wells too close together in a further effort to quickly increase the number of wells it was drilling, and to save costs relating to moving its drilling rigs.  However, this practice undermined the long-term sustainability and profitability of AMH's acreage in the STACK.  As explained by CW1, because AMH's wells were drilled too close to each other, the Company was forced to drill S-shaped wells instead of the typical L-shaped wells to prevent the wells from running into each other.

112.    This S-shaped drilling technique compromised AMH's ability to extract oil from its STACK acreage.  After the initial production from an oil well (during the first several months to a year), which is made possible initially by natural pressurization and then gas lift technology, oil operators use a "rod-lift" to pump during the mature phase of the oil well.  AMH was not able

to use a rod-lift, or any other available extraction methods, because of its S-shaped wells (running rods requires the well to be straight – *i.e.*, L-shaped).  As a result of its S-shaped wells, the lifespan of AMH's wells were shortened.  Accordingly, AMH's desire to quickly drill too many wells (which inflated its total claimed oil reserves in the short term) resulted in undermining the long-term viability and oil production from those wells.

113.    AMH also drilled its wells too close together to justify its prior representations that the acreage could support a tremendous quantity of oil wells.  For example, when announcing the Business Combination on August 16, 2017, the press release indicated Alta Mesa has "about 4,200 gross identified drilling locations."  However, according to CW2 (a former Senior Production Engineer at AMH from 2012 to 2020) there was "no way" that the field could support four thousand wells.  Indeed, CW2 said their team "fell out of our chairs laughing" and were "absolutely flabbergasted" and "astonished" when they heard AMH's claim to investors that it had identified 4,200 drilling locations.  Notably, CW2 stated that the 4,200 figure was a "top-down number," and not based on the analysis of Alta Mesa engineers.

114.    <u>Third</u>, AMH used expensive electrical submersible pumps ("<u>ESPs</u>") to accelerate oil production and temporarily inflate revenue and production figures.  While using ESPs temporarily increased production rates at certain wells, they shortened the overall lifespan of the wells and ***caused production to immediately drop at adjacent wells by nearly the same volume of additional oil lifted at the ESP well***.  The ESPs were also very expensive to purchase and operate.  Overall, AMH's use of ESPs was an effort to temporarily inflate production in a manner Defendants knew would undermine the long-term viability of the Company's wells.  According to CW1, the Company used ESPs because management was "desperate to make numbers."

35

115.    Defendant Chapelle's admission that Alta Mesa's "setbacks" began in the fourth quarter of 2017 is also corroborated by internal Company emails disclosed during the January 21-23, 2020 Sale Hearing held in the AMH Bankruptcy Proceedings.  These internal documents confirm that as of at least November 2017 AMH was inflating short term profits at the expense of the longevity of its drilling program out of fear that the proposed Business Combination would not be approved by Alta Mesa shareholders.

116.    In this regard, AMH and the Control Entity Defendants attempted to push EBITDA to Kingfisher to increase the overall valuation of the proposed combined entity.  Increasing the EBITDA at Kingfisher was important to the overall value of the Business Combination because midstream companies are valued at higher multiples than upstream companies.  For example, an internal AMH email from Vice President of Corporate Development Tim Turner to, among others, Defendant Chappelle, dated November 29, 2017 stated: "Whether its stage spacing gallons per food or my all-time favorite pounds per food, companies get valued higher if they're pumping more.  It doesn't matter if it's economic waste!"  Another internal email from Alta Mesa's CFO McCabe to Defendant Chappelle in August 2018 confirmed this notion, stating Alta Mesa's "desire was to get EBITDA into KFM since it all rolls up to AMR."

117.    The Control Entity Defendants were highly motivated to inflate Kingfisher's apparent growth – even if it cost AMH – because Kingfisher's more favorable valuation multiple allowed these Defendants to (i) receive nearly $1.3 billion combined through the closing of the Business combination, and (ii) increase the value of their continued stake in Alta Mesa.  The Control Entity Defendants were further motivated to inflate Kingfisher's purported growth because they and the other Defendants intended to spin off Kingfisher through an initial public offering shortly after the Business Combination.  This public offering would be extremely lucrative to

Defendants and allow them to push the risk of Alta Mesa's undisclosed production shortfalls onto the investing public.

### F.     Defendants Successfully Close the Business Combination

118.     As a result of Defendants' rosy picture of the proposed Business Combination in the Proxy (and failure to disclose the above-mentioned short-term focused operational decisions and related setbacks that started in the fourth quarter of 2017), Alta Mesa stockholders voted in favor of the transaction at a special shareholders meeting on February 6, 2018.  The false and misleading Proxy induced stockholder action that resulted in substantial harm to Plaintiffs and Alta Mesa's other shareholders.  Specifically, the material misrepresentations and omissions in the Proxy were an essential link in the approval of the Business Combination, and the Class A common stock held by Plaintiffs and other Class members declined substantially in value due to approval of the Business Combination, causing economic loss and damages.

119.     After the stockholder vote, on February 9, 2018, Alta Mesa issued a press release announcing that the Business Combination had closed.  Following the closing, the Company changed its name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc."[8] and continued listing its Class A Common stock and Public Warrants on NASDAQ under the new symbols "AMR" and "AMRWW," respectively.

120.     Significant funds and ownership interests changed hands in connection with the Business Combination.  As an initial matter, the Business Combination created the entity SRII Opco, which was created to own the full economic interest in AMH and Kingfisher.

121.     Alta Mesa also issued 40 million shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to an affiliate of Riverstone for $400

---

[8] For consistency and to minimize confusion, this complaint refers to "Silver Run Acquisition Corporation II" and "Alta Mesa Resources, Inc." as "Alta Mesa."

million pursuant to the Forward Purchase Agreement.  Those proceeds, along with the $1.006 billion remaining in the trust account from the IPO, were contributed to SRII Opco in exchange for Alta Mesa receiving 44.2% of the limited partner units in SRII Opco.  Following the closing of the transaction, Alta Mesa's "only significant asset" was  its ownership of 42.4% of the economic interest in SRII Opco.

122.    In exchange for selling its interest in AMH, AMH's prior owner, High Mesa (which is owned and controlled by Defendants HPS and Bayou City, as well as certain of the Management Defendants), received a 36.2% economic interest in SRII Opco as well as $554.2 million in cash. A portion of that cash (approximately $145 million) went to pay off AMH Holding's senior secured revolving credit facility.  A subsidiary of High Mesa also received AMH's non-STACK oil and gas assets.

123.    In exchange for selling their interest in Kingfisher, Kingfisher's prior owners – *i.e.*, High Mesa and Control Entity Defendants ARM Energy and HPS – received $814.8 million in cash, as well as approximately a 14.4% economic interest in SRII Opco.

124.    As additional consideration, the prior owners of AMH and Kingfisher received the rights to earn-out payments whereby they would receive additional SRII Opco Common Units worth up to $800 million and $200 million, respectively (the "Earn-Out Payments").  The Earn-Out Payments would be received if the 20-day value weighted average price ("VWAP") of Alta Mesa's Class A Common Stock equals or exceeds specified prices as follows:

| 20-Day VWAP | Earn-Out Consideration Payable to Former AMH Owners | Earn-Out Consideration Payable to Former Kingfisher Owners |
|---|---|---|
| $14.00 | 10,714,285 SRII Opco Common Units | 7,142,857 SRII Opco Common Units |
| $16.00 | 9,375,000 SRII Opco Common Units | 6,250,000 SRII Opco Common Units |
| $18.00 | 13,888,889 SRII Opco Common Units | N/A |
| $20.00 | 12,500,000 SRII Opco Common Units | N/A |

125. Affiliates of Defendant Riverstone also contributed $200 million to the combined entity in exchange for a 5.2% economic stake in SR II Opco.

126. In summary, following the Business Combination, SRII Opco, which owned the full economic interests in AMH and Kingfisher, was owned by the below entities in the indicated economic proportions:

| Entity / Group | Direct Economic Interest in SRII Opco | Voting Interest in Alta Mesa and SRII Opco |
|---|---|---|
| Alta Mesa Acquisition Corporation | 42.2% | 26.9% |
| Defendant Riverstone | 5.2% | 22.3% |
| Kingfisher Contributor (Defendant ARM and High Mesa) | 14.4% | 14.3% |
| AMH Contributor (High Mesa, Defendants HPS and Bayou City Energy) | 36.2% | 36.4% |

127.     Notably, in addition to Defendant Riverstone's direct 5.2% LP economic interest in SRII Opco, it owned a significant financial interest in SRII Opco through its ownership of Alta Mesa.  Specifically, Riverstone owns approximately 39.9% of the economic interest in Alta Mesa, through its ownership of 33 million Founders Shares and 92,242,666 million shares of Alta Mesa stock.

128.     Control Entity Defendants Bayou City and HPS had a significant financial incentive to see the value of SRII Opco units increase through their direct economic interests, the Earn-Out Payments, and their collective control with Defendant Riverstone of over 73.1% of the voting rights in Alta Mesa and SRII Opco.

129.     In addition to their significant economic and voting interests in Alta Mesa, the Control Entity Defendants appointed the majority of Alta Mesa's Board of Directors.  As part of the Business Combination, Alta Mesa's board of directors was expanded from four directors to 11 directors, including one director appointed by Defendant Bayou City (Defendant William W. McMullen), one director appointed by Defendant HPS (Defendant Don Dimitrievich), two directors appointed by High Mesa/AMH's pre-business combination management (Defendants Harlan Chappelle and Michael Ellis), and three directors appointed by Defendant Riverstone (Defendants James T. Hackett, David M. Leuschen and Pierre F. Lapeyre, Jr.).  A summary of the Alta Mesa Board composition post-Business Combination is set forth below:

**Post-Business Combination Composition of Alta Mesa Board of Directors**

| Name | Appointed By |
|---|---|
| James T. Hackett (Chairman) | Riverstone |
| David M. Leuschen | Riverstone |
| Pierre F. Lapeyre, Jr. | Riverstone |
| Harlan H. Chappelle (CEO) | AMH Management |
| Michael E. Ellis (CFO) | AMH Management |

| Name | Appointed By |
|------|-------------|
| William W. McMullen | Bayou City |
| Don Dimitrievich | HPS |
| William Gutermuth | Independent |
| Jeffrey Tepper | Independent |
| Diana Walters | Independent |
| Donald Sinclair | Independent |

130.    As a result of the Business Combination, the public shareholders of Alta Mesa prior to the transaction – *i.e.,* the Class – held only 26.9% of the voting stock in Alta Mesa and the ability to elect a minority of the Board (4 of 11 directors).  However, despite their lack of control over the Company, Alta Mesa's shareholders were exposed to approximately 60% of the economic risk.

131.    The following chart illustrates Alta Mesa's ownership structure following the Business Combination:



G.     **Defendants Release Poor Results While Continuing to Reassure Investors During the First Half of 2018**

132.   The truth began to emerge *less than two months following the close of the Business Combination*.  On March 29, 2018, Alta Mesa issued an earnings release announcing its 2017 financial results, filed its Form 10-K and held an earnings call.  The earnings release disclosed that the EBITDA and production estimates provided in the Proxy had been dramatically reduced.  Specifically, the release revealed that Kingfisher was expected to post only $95 to $110 million in EBITDA at the midpoint of 2018, *46% below the 2018 EBITDA estimate of $185 million*

42

*provided in the January 19, 2018 Proxy*.  In addition, the release revealed that AMH was expected to post an average net daily production of only 33 to 38 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy.

133.   During a conference call with investors and analysts to discuss the results, Defendant Chappelle, the CEO of the combined business (and former CEO of AMH), stated that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed Alta Mesa's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher "perhaps" into 2019.  Even though they had not been disclosed in the Proxy (filed on January 19, 2018), *Defendant Chappelle admitted that these "setbacks" began in "late 2017."*

134.   Following the March 29, 2018 announcement, AMH's stock price fell from $8.38 per common share at close on March 28, 2018 to $8.00 per common share at close on March 29, 2018.  The stock price further fell to $7.06 per common share at close on April 3, 2018 as investors further digested the news the following week.

135.   While the March 29, 2018 announcements partially revealed the truth about the misleading projections issued by Defendants during 2017, Defendants continued to conceal the reality of the Company's struggling operations, business prospects and controls.  Indeed, during the fourth quarter earnings call Defendant Chapelle told investors that Kingfisher's reduced guidance was simply due to "delayed drilling" and that the Company expected it would only be a "six months' shift" from the previous estimates.  Chapelle further stated that despite the "setbacks," Kingfisher's "vision for growth remain[s] strong" and that management has a lot of "transparency" into future performance and "clearly we're in control of how we manage."

136. Defendant Chappelle's statements assuring investors were false and misleading. Indeed, according to CW2, following the poor results in early 2018, Chappelle scrambled and ordered his team to immediately identify 25 wells that were candidates for deploying additional ESPs. CW2 stated that, based on his 40+ years of experience in the industry, including being a subject matter expert on ESPs at a large oil corporation, ESPs would not be an effective or economical solution for Alta Mesa's wells. Despite CW2's repeated warnings on this point to management – who "didn't want to hear it" – over 90 ESPs were deployed at Alta Mesa wells.

137. On the March 29, 2018 earnings call, Chappelle also reiterated Defendants' plan to spin off Kingfisher into an independent public company. Chappelle stating that "the vision remains the same and that would really suggest that we have to be very, very attuned to what the market is looking for from a midstream IPO." Aware of the ongoing drilling problems, Defendants were hoping to profit from the Kingfisher spin off as soon as possible, and Chappelle went as far as telling investors that "perhaps that IPO happens in 2019."

138. In response to a question about the reduced projections, Defendant Chappelle stated that with regard to AMH's upstream business, the problems were temporary and are only about a "two-month shift in the calendar" from projections on a production basis. Chapelle further stated Alta Mesa expected to be on track "early first quarter next year, and possibly as early as this year." He reiterated that the midstream Kingfisher business was only a "six-month shift in the calendar" from previous estimates. However, as detailed herein, Alta Mesa was taking significant undisclosed measures to inflate its oil production in the short-term that it knew undermined the long-term viability of its operations. Defendant Chappelle's statements partially alleviated investors' concerns and maintained the artificial inflation in the price of Alta Mesa securities.

Indeed, the analyst who asked Chappelle the question, Irene Haas from Imperial Capital, responded that Chappelle's response was "really reassuring."

139.    Defendants continued to hide the ball during the Company's first quarter earnings call on May 14, 2018.  Instead of revealing Alta Mesa's drastically diminishing business prospects, Defendant Chapelle stated that the Company has "strong confidence in the long term economic productivity" from the STACK and was "reaffirming our FY '18 guidance."  With respect to Kingfisher, Chapelle stated that "recent operating and strategic highlights by Kingfisher Midstream continue to support the long-term vision[.]" Chapelle also confirmed there is "no change from before" regarding the Company's plan to be self-funding by the end of 2019.

140.    Defendant Chapelle's statements during the fourth quarter 2017 and first quarter 2018 earnings calls assuring investors that the Company's problems were merely temporary further artificially inflated the price of Alta Mesa securities.

**H.    The Truth Concerning Alta Mesa's Business is Further Revealed Through a Series of Additional Partial Corrective Disclosures**

141.    On August 14, 2018, Alta Mesa provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook due to numerous operational setbacks.  The Company revealed that AMH's oil production – instead of being "de-risked" and continuing to grow as advertised in 2017 and early 2018 – had actually *declined* sequentially during the quarter. It now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, ***22% below the estimates provided in the Proxy***.  Far from the reliable and consistent well production represented to investors in 2017 and early 2018, Alta Mesa revealed that throughout 2018, AMH's wells had suffered from repeated shut-ins, causing an average loss of thousands of BOE every day.  Moreover, despite its prior assurances the problems were merely temporary delays, Alta Mesa revealed the adverse drilling trends had been worsening.

142.    On an earnings call to discuss the results, Defendant Chappelle revealed that the shut-ins resulted from work done or planned *"back in the fourth quarter of 2017,"* which had "linger[ed] into the first quarter of 2018."  Despite arising from work that predated the Business Combination, these adverse effects were not disclosed to investors in the Proxy or otherwise prior to the vote on the Business Combination.

143.    The truth regarding the Company's Kingfisher midstream business was also partially revealed during the August 14, 2018 announcement.  Despite the Proxy's $185 million 2018 EBITDA forecast for Kingfisher, Kingfisher only had $6.1 million in EBITDA during the second quarter.

144.    Following the announcement of Alta Mesa's second quarter results, the Company's stock price fell over 21% from $6.08 per share at close on August 13, 2018 to $4.77 per share at close on August 14, 2018.

145.    While the truth was partially revealed during the second quarter earnings announcements, Defendants continued to represent that the problems were temporary and that a turnaround was imminent.  For instance, the Company's investor presentation stressed that its "production trajectory remains strong."  Defendant Chappelle explained on the Company's earning call that the dip in production was merely due to "short term logistics" and not "from a change in perspectivity of a low cost high return acreage position and the resource underlying it."

146.    Alta Mesa also attempted to express optimism by announcing a share buyback program.  As Defendant Chappelle explained on the earnings call, the Board instituted the buyback because they believed the Company's opportunities had "strengthened" and the Company was continuing to "grow production."  Defendant Chappelle also continued to tout Alta Mesa's value proposition, stating:  *"Our consistent growth over several years in production demonstrates the*

*quality of the assets* and the cost control we have been able to achieve allows us to have consistently profitable wells."

147.    These efforts to downplay concerns partially succeeded in maintaining the artificial inflation in the price of Alta Mesa's securities.  For example, during the earnings call, analyst Derrick Whitfield from Stifel stated that the Company did a "nice job" of "conveying" the setbacks and "alleviat[ing] . . . concerns."

148.    However, despite Chappelle's reassurances, Alta Mesa was forced to further reveal the truth when it released its third quarter 2018 financial results on November 13, 2018.  Alta Mesa's abysmal results were highlighted by the even further reduced EBITDA guidance for Kingfisher.  A far cry from the $185 million 2018 EBITDA guidance just 10 months prior, the Company now projected Kingfisher's 2018 EBITDA to be only $36-$38 million.  In other words, **Kingfisher's projected 2018 EBITDA was almost 80% less than the projections in the Proxy issued less than 10 months earlier**.

149.    On the third quarter earnings call, Defendant Hackett blamed the Company's poor performance on "significant headwinds" and other "technical challenges."   As Chappelle has conceded, the Company had been aware of these "setbacks" since "late 2017" – well before the issuance of the Proxy and the misleading statements throughout the first half of 2018.

150.    However, in truth, Alta Mesa's problems had been known to Defendants since at least the fall of 2017, when Defendants, in order to close the Business Combination:  (i) drilled too many wells to inflate the Company's claimed reserves; (ii) cut corners by drilling wells too close together, undermining the long-term production from the wells; and (iii) used ESPs to temporarily boost short term production.   Indeed, Alta Mesa's internal documents demonstrate that the Management Defendants and Control Entity Defendants tried to "push" EBITDA to Kingfisher to

inflate the valuation of the proposed combined business in order to take home over $1.3 billion from the Business Combination.

151.    In connection with the release of the third quarter results, Alta Mesa also announced its CFO, Michael McCabe, was retiring.

152.    Following the announcement of the Company's third quarter results, Alta Mesa's share price fell nearly 15% from $2.82 per common share at close on November 13, 2018 to $2.40 per common share at close on November 14, 2018.  The Company's share price fell an additional 5% to close at $2.29 per share on November 15, 2018.

153.    Approximately one month later, in December 2018, Alta Mesa announced the sudden resignation its CEO, Defendant Chappelle, as well as its Vice President and COO of Upstream, Michael Ellis.

154.    On February 25, 2019, the Company announced in a press release that it "had an *ineffective internal control over financial reporting* due to an identified material weakness in both the design of its controls and the execution of its control procedures."  The Company further disclosed it "expect[ed] to record material, non-cash asset impairment charges" of approximately $3.1 billion (approximately $2.0 billion for the upstream segment and $1.1 billion for the midstream segment).  In other words, *Alta Mesa took a $3.1 billion write down less than twelve months after the Business Combination that was valued at $3.8 billion,* all but conceding the acquired assets were nearly worthless.  Alta Mesa also announced that as a result of the material weaknesses, it would be filing a Form 12b-25, Notification of Late Filing, indicating a delay in the filing of its Annual Report.

155.    Moreover, the Company announced on February 25, 2019 that it "entered 2019 with six rigs actively working but *reduced the active reg count to zero* by the end of January."  Alta

Mesa further disclosed that in 2019 it only intended to drill "an additional 16" wells and that it will only drill "four to five wells per section."  Alta Mesa's cost projection for these wells was $3.2 to $3.5 million per well, and it explained that the "lower costs compared to 2018 will be driven by returning to gas lift as the primary lift method, reverting to a completions design more in line with our 2017 well designs."  In other words, Alta Mesa was lowering costs by halting its practice of drilling too many wells per pad and using ESPs to temporarily inflate its production data (i.e. the practices the Control Entity Defendants and Alta Mesa used before and after the Business Combination to artificially increase reserves and increase revenue for Kingfisher).

156.    With respect to Kingfisher, Alta Mesa announced its outlook was based on the expected activities of AMH and third-party customers already under contract, which third parties are expected to utilize an average of "two to three rigs on the dedicated acreage."  In addition, Alta Mesa announced that it decided to "suspend future investments in Cimarron Express Pipeline, LLC" because the "project economics, do not support additional investment [] at this time."

157.    Alta Mesa also disclosed that it was laying off 58 employees, approximately 30% of its workforce.

158.    Following these disclosures, Alta Mesa's common share price fell over 63% from $0.91 per common share at close on February 25, 2019 to $0.34 per common share at close on February 26, 2019.

**I.      Alta Mesa's Accounting Problems Lead To Delayed SEC Filings and an SEC Investigation**

159.    On March 4, 2019, Alta Mesa filed a Form NT 10-K notifying the SEC and investors that it was unable to timely file its annual report because "the Company expects to report material weakness in its internal control over financial reporting in the 2018 Form 10-K" and was continuing to evaluate the accuracy of its 2018 financial information.  Alta Mesa reiterated that it

"currently expects to report a net loss of $3.1 billion for the year ended December 31, 2018, as compared to a net loss of $14.9 million for the year ended December 31, 2017. The primary drivers of the net loss were non-cash impairment expenses attributable to the Company's oil and gas properties, intangible assets, goodwill and an equity method investment totaling $3.1 billion . . ."

160.   On March 22, 2019, Alta Mesa announced the sudden departure of its Vice President and Chief Operating Officer Crag W. Collins by stating that it "came to a mutual understanding with respect to" his separation from the Company.

161.   Alta Mesa received a letter from The NASDAQ Stock Market LLC ("NASDAQ") on April 2, 2019, notifying the Company that it was not in compliance with the NASDAQ listing rules because it did not timely file its 2018 annual report. On April 3, 2019 the Company received a second letter from NASDAQ notifying the Company "that for the previous 30 consecutive business days the bid price of the Company's common stock had closed below the $1.00 per share requirement for continued inclusion on NASDAQ."

162.   The Company continued to be unable to file its financial statements during the first half of 2019. For instance, on May 13, 2019, Alta Mesa filed a Form NT 10-Q indicating that the filing of its first quarter 2019 Form 10-Q would be delayed as the Company is still "finalizing its year-end financial statements and related disclosures and its assessment of the effectiveness of its internal control over financial reporting, which is expected to result in the report of material weaknesses." The next day, on May 14, 2019, the Company received another letter from NASDAQ indicating that it was not in compliance with the NASDAQ listing rules because it did not timely file its first quarter quarterly report.

163.   On May 17, 2019, Alta Mesa disclosed that the SEC is investigating its lack of internal controls. According to Alta Mesa's announcement, "***The SEC is conducting a formal***

*investigation into, among other things, the facts involved in the material weakness in our internal controls over financial reporting and the impairment charge disclosed previously and in this annual report.*"  Alta Mesa's announcement continued that "If the SEC determines that violations of the federal securities laws have occurred, the agency has a broad range of civil penalties and other remedies available, some of which, if imposed on us, could be material to our business, financial condition or results of operations."

164.    With respect to the internal controls itself,  Alta Mesa stated that it "continues to make progress in finalizing its Form 10-K as well the first quarter 2019 Forms 10-Q for both AMH Resources and AMH Upstream but is unable to estimate the date at which these filings will be completed."

165.    Alta Mesa also disclosed on May 17, 2019 that the estimate of proved reserves it released on February 25, 2019 was overstated.  Specifically, on February 25, 2019, "AMH Upstream provided an initial estimate of 158 MMBoe for December 31, 2018 proved reserves" – numbers still based on falsely inflated well and production numbers.  However,, "[b]ased on its April 2019 assessment of its ability to continue as a going concern and the uncertainty of funding the related development costs, [AMH] Upstream removed a total of 89 MMBoe of proved undeveloped ("PUD") reserves.  As a result, at December 31, 2018, [AMH] Upstream had 69 MMBoe of proved developed reserves."

166.    Finally, on May 17, 2019, Alta Mesa disclosed that it had retained advisors and was evaluating filing for Chapter 11 bankruptcy protection.

167.    As a result of these disclosures, Alta Mesa's stock price fell 25.1% from $0.176 per share at close on Friday, May 17, 2019 to $0.131 per share at close on Monday, May 20, 2019.

168.    Subsequent, and due to, the closing of the Business Combination, the price of Alta Mesa Class A common stock declined precipitously as the truth about AMH and Kingfisher and

the Proxy's false and misleading statements were revealed over time.  By May 2019, the price of Alta Mesa Class A common stock was trading below $0.14 per share, 98% below the price shareholders would have received if they had redeemed their shares instead of approving the Business Combination approximately one year earlier.

**J.     Post-Class Period Alta Mesa Files For Bankruptcy Just 19 Months After The $3.8 Billion Business Combination**

169.    Alta Mesa's failure continued following the end of the Class Period.  As detailed below, this included further delays in Alta Mesa's SEC filings, additional executive departures, and the Company officially declaring bankruptcy.

170.    On July 2, 2019, Alta Mesa announced that it "came to a mutual understanding with respect" to Vice President and Chief Accounting Officer Ronald J. Smith's separation from the Company.

171.    On August 12, 2019, Alta Mesa announced that it was unable to timely filed its second quarter 2019 quarterly report.  Indeed, at this time, Alta Mesa still had not completed the filing of its 2018 annual report or its quarterly report on Form 10-Q for the first quarter of 2019.  Again, Alta Mesa stated that it is "finalizing its year-end financial statements and related disclosures and its assessment of the effectiveness of its internal control over financial reporting, which is expected to result in the reporting of material weakness."  On August 27, 2018, Alta Mesa finally filed its Form 10-K for the year ended December 31, 2018.

172.    Less than 20 months after the Business Combination, on September 11, 2019, AMH Resources, Inc. (f/k/a Alta Mesa), AMH Holdings, LP, AMH Holdings GP, LLC, OEM GP, LLC, AMH Finance Services Corp., AMH Services, LP and Oklahoma Energy Acquisitions, LP (the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern

District of Texas (the "Bankruptcy Court").  *See In re: AMH Resources, Inc. and AMH Holdings, LP*, Case No. 19-35133-H1-11 (S.D. Tex. Bankr.).  Alta Mesa also announced that Defendant Hackett resigned as Interim Chief Executive Officer as of September 10, 2019.

173.    On September 24, 2019, trading of Alta Mesa's common stock and warrants was suspended, and the securities were delisted from the NASDAQ.   Alta Mesa's common stock and warrants continued to be traded over the counter under the symbol "AMRQ" and "AMRWWQ", respectively.

174.    In late January 2020, dozens of Alta Mesa subsidiaries entered into Chapter 7 bankruptcy.  Non-party High Mesa Inc. also filed for Chapter 7 bankruptcy on January 27, 2020.

175.    During the bankruptcy proceedings, BCE-Mach III, a partnership between Defendant Bayou City and Mach Resources LLC, an Oklahoma-based oil and gas exploration company, purchased substantially all of Alta Mesa's upstream and midstream assets for approximately $320 million.   Following the acquisition, Defendant McMullen, founder of Defendant Bayou City, stated that "We know these particular assets well and are confident that the Mach team will be able to operate them in a manner suitable to the current macro environment, focused on maximizing free cash flow generation and delivering a sustainable, conservatively leveraged return to our investors."

### K.    The Control Entity Defendants Maintained Significant Control Over Alta Mesa Before, During and After the Class Period

176.    The Control Entity Defendants – Defendants Riverstone, Bayou City, HPS and ARM Energy – maintained and exerted significant control over Alta Mesa at all times during and after the Class Period.

177.    As an initial matter, as discussed above, Defendant Bayou City entered into a joint development agreement with AMH long before the Class Period that provided Bayou City with

partial control over AMH's drilling strategy and an economic interest in up to eighty AMH wells. Moreover, Riverstone formed and ran blank check company Alta Mesa, sponsored the IPO, and fully managed the Company through the negotiation and agreement to acquire AMH and Kingfisher. Further, as a result of its ownership of founders shares, Riverstone at all times during the Class Period owned a significant direct interest in Alta Mesa and appointed three members to the Alta Mesa Board of Directors (including the Chairman, Defendant Hackett). Indeed, Defendants Bayou City, HPS and ARM Energy provided the operational information contained in the Proxy and were unjustly enriched when they received over $1.3 billion from the Business Combination..

178.    The Control Entity Defendants continued to have significant control over Alta Mesa following the Business Combination. As summarized in the graph below, Defendants Riverstone, HPS and Bayou City each owned a substantial economic interest in SRII Opco, which in turn owned all of AMH and Kingfisher.



179.    The Control Entity Defendants also continued to maintain control over Alta Mesa through their significant positions on the Alta Mesa Board (only 4 of the 11 Board members were independent), and through their holding of over 73% of the voting rights in Alta Mesa and SRII Opco:



180.    During the Class Period, the Board was intimately involved in the strategy for AMH's drilling program.  For example, testimony during the Sales Hearing held in the AMH Bankruptcy Proceedings in January 2020 showed that Riverstone and its expert were involved in designing and analyzing AMH's 2018 drilling program.  Moreover, by August 2018 many members of the Alta Mesa Board of Directors retained their own experts to advise them on potential ways for them to exercise control to save the failing Company.

181.    The Board Defendants further exercised control over the Company during the Class Period through their roles on the Board's various standing committees.  Following the Business Combination, Alta Mesa's Board maintained three standing committees, the Audit Committee (Defendants Gutermuth, Tepper and Walters), Compensation Committee (Defendants Sinclair, Tepper and Walters) and Nominating and Corporate Governance Committee (Defendants Sinclair,

Tepper and Walters).  The committees had significant responsibilities, including but not limited to, retaining and overseeing auditors, reviewing and approving internal control procedures, reviewing and approving the Company's corporate goals and objectives, and implementing and administering equity-based compensation plans.

182.    Even after Alta Mesa filed for bankruptcy in September 2019, representatives of the Control Entity Defendants attended the Company's board meetings.  For instance, at a Kingfisher Midstream, LLC board meeting on September 3, 2019, not only were the Control Entity Defendants represented by Defendants McMullen, Dimitrievich, Lapeyre and Leuschen, but the following additional representatives of the Control Entity Defendants were in attendance:  Steve Coats (Riverstone), Rajen Mahagaokar (Riverstone), Robert Tichio (Riverstone), Dan Wallit (HPS) and Mark Stoner (Bayou).

## V.    DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A.    Defendants' Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act

#### 1.    Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2017

183.    On August 16, 2017, after the markets had closed, Alta Mesa issued a press release announcing that it had entered into a definitive agreement to combine with AMH and Kingfisher. Defendants Hackett and Chappelle were quoted in the press release.  Defendant Hackett stated: "*We formed [Alta Mesa] with the objective of acquiring-low breakeven, stacked-pay, oil-weighted assets, preferably with an integrated midstream platform*."   Defendant Chappelle stated:  "*We see this as a tremendous way to continue our evolution as a low-cost, high-value producer in the STACK.*"  Alta Mesa's press release announcing the Business Combination further stated that AMH had identified "about 4,200 gross identified drilling locations" and based on its currently producing wells AMH "*expects EURs at year end to exceed 650 MBOE per well*."

184.     Hackett and Chappelle's August 16, 2017 statements regarding being a low cost or low-breakeven producer in the STACK were materially false and misleading when made because they failed to disclose that nearly 90% of all STACK wells operating at this time had improperly drilled vertical bores – including S-curved well bores – which literally made it impossible to economically extract oil using rod-lift capability.  ¶¶269-275, *infra*.  The non-industry standard curving of the vertical bore would dramatically increase AMH's costs to extract oil at the STACK, and eliminate up to 33% of the well's revenue generating capabilities over the course of its life.  ¶273, *infra*.  In addition, the Company's statement concerning 650 MBOE per well guidance was further misleading because it was artificially inflated by as much as 40% due to Alta Mesa's erroneous assumptions for optimal well-spacing and number of wells per pad, in conjunction with limitations imposed by S-curved vertical bores.  ¶¶261-264, 269-275 *infra*.

185.     On August 17, 2017, Alta Mesa and AMH conducted a conference call for analysts and investors to discuss the merger with AMH and Kingfisher.  Defendants Hackett, Chappelle and Alta Mesa CFO McCabe participated in the call.  During the call, Hackett stated in his opening remarks:  "***First, we'll talk about the introduction.  When we went out to look for targets for [Alta Mesa], we had laid out investment criteria that are shown on slide 5.  And both individually as an Upstream and Midstream company and collectively as an integrated platform, this transaction satisfies those criteria***."   Slide 5 of the PowerPoint presentation that Hackett had referred to stated, *inter alia*, that the STACK was a "***[h]igh margin core basin with low field break-events [with] deep inventory***."

186.     Hackett's August 17, 2017 statement and related slide presentation were materially misleading when made for the same reasons stated in ¶184.

187.   During the August 17, 2017 conference call, Defendant Chappelle made the following statement concerning the STACK:

> *We have over 200 wells that we've drilled here and we've demonstrated the value, and we have confidence in the upside.  As an illustration of that, at the end of the second quarter [of 2017], we drilled on the order of 200 wells; of those, over 160 were on production. And of that number, about 114 had sufficient production history to give us confidence that at the end of this year, our year-end reserves will reflect better than 650,000 BOE.*

188.   Chappelle's August 17, 2017 statement regarding year-end reserves reflecting better than 650,000 BOE was materially false and misleading when made for the same reasons stated in ¶184.  The statement was materially false and misleading when made for the additional reason that by August 17, 2017, well data produced from a large number of wells in the field with sufficient production data showed that Defendants' assumptions regarding the number of wells to be drilled per pad to reach the 650,000 BOE number – *i.e.,* 8 to 12 – was erroneous.  ¶¶261-264, 269-275, *infra*.  In fact, the Company's data at this time indicated that 4 to 6 wells per pad was the optimal number and that the child wells were not producing as much oil volume as the parent wells.  ¶261, *infra*.

189.   Alta Mesa's presentation on August 17, 2017 also stated that Kingfisher was "***rapidly expanding***" and "***positioned to capture volume growth from the STACK***."  In addition, the Company represented that Kingfisher was "well positioned to serve other operators" and take advantage of the "***[e]xpansion opportunities in [the] rapidly growing basin***."  Alta Mesa also touted that there was an opportunity to monetize Kingfisher and fund upstream capital needs through spinning off Kingfisher as a master limited partnership (MLP) IPO.  The presentation further stated that ***Kingfisher*** was estimated to have achieved $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

190.     The statements in ¶189 were materially false and misleading and omitted material facts when made.  Among other things, by this time it was clear Alta Mesa's wells could not produce the advertised amount of oil (as discussed at ¶¶261-264, 269-275, *infra*) and that beginning in 2017 Kingfisher knew that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher because those operators also realized the STACK play was not as lucrative as anticipated.  Both of these reasons undermined Kingfisher's advertised timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted.

### 2.     Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2018

#### a)     Proxy Statement

191.     On January 19, 2018, Alta Mesa (then still named Silver Run Acquisition Corporation II) filed with the SEC the  Form DEFA14A definitive Proxy relating to the Business Combination.  The Proxy Defendants caused Alta Mesa to file the Proxy with the SEC and had ultimate control over the contents contained in the document.  The Proxy contained numerous statements and projections that it claimed were "financial projections . . . prepared on a reasonable basis" and "reflected the best currently available estimates and judgments of [AMH] and Kingfisher, as applicable."  Further, the Proxy represented that its financial figures "presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of Alta Mesa and Kingfisher, respectively."

192.     Regarding the STACK, the Proxy said: "***Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that [AMH's] type well EUR is greater than 650 MBOE***."

193.     The Proxy's statement regarding management's confidence that year-end reserves were greater than 650,000 BOE was materially misleading when made for the same reasons stated in ¶184.  The statement was materially false and misleading when made for the additional reason that by the end of September 2017, well data produced from a large number of wells in the field with sufficient production data showed that Defendants' assumptions regarding the number of wells to be drilled per pad to reach the 650,000 BOE number – *i.e.,* 8 to 12 – was erroneous.  ¶¶261-264, 269-275, *infra*.  In fact, by this time the Company already knew that 4 to 6 wells per pad was the optimal number and that the child wells were not producing similar oil volumes as the parent wells.  ¶261, *infra*.  As a result, the well and reserve estimates were knowingly overstated.

194.     In addition, the Proxy stated that AMH had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was ***expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d***.

195.     This statement from the Proxy was materially false and misleading for the same reasons stated in ¶184.

196.     The Proxy was materially false and misleading for the additional reason that it failed to disclose that its wells had been suffering from decreased production due to increased shut-ins.  As admitted by Defendants on August 14, 2018, the increased shut-ins resulted from work that had been done at the STACK in late 2017, and which lingered during 1Q18.  During that time period, the wells on the STACK experienced higher-than-expected shut-ins because Alta Mesa drilled too many wells, drilled those wells too close together and overused ESPs.

197.     Alta Mesa's presentation also stated that Kingfisher was "***rapidly expanding***" and "***positioned to capture volume growth from the STACK***."  In addition, the Company represented that Kingfisher was "***well positioned to serve other operators***" and take advantage of the

"*[e]xpansion opportunities in [the] rapidly growing basin*."  Alta Mesa further touted that there

was an opportunity to monetize Kingfisher and fund upstream capital needs through spinning off

Kingfisher as a master limited partnership (MLP) IPO.   The presentation also stated that

***Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to***

***increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.***

198.    The statements in ¶197 were materially false and misleading and omitted material

facts when made.  Among other things, by this time it was clear Alta Mesa's wells could not

produce the advertised amount of oil (as discussed at ¶¶258-275, *infra*).  Moreover, as admitted

by Defendants in March 2018, beginning in 2017 multiple "large third-party producers" had

delayed drilling on acreage served by Kingfisher because those operators also realized the STACK

play was not as lucrative as anticipated.  Both of these reasons undermined Kingfisher's advertised

timeline for growing its pipeline business and, as a result, the Company's cash flow would be

adversely impacted.

199.    The Proxy provided the following charts, which contained key historical

operational and financial metrics for 2017 and projections for the rest of the year (as the fourth

quarter financials had not yet been prepared), as well as projections for 2018 and 2019.  The chart

represented that AMH and Kingfisher were generating strong 2018 growth rates in both adjusted

EBITDA and CapEx, stating:

**Alta Mesa Projections**

| | Year Ending December 31, | | |
|---|---|---|---|
| | **2017E** | **2018E** | **2019E** |
| | | ($ in millions) | |
| Average Net Daily Production (Boe/d) | 20,841 | 38,510 | 68,900 |
| Adjusted EBITDAX | $    155 | $    358 | $    701 |
| Capital Expenditures | $    349 | $    552 | $    611 |
| Free Cash Flow | $    (237) | $    (233) | $    51 |

*          *          *

**Kingfisher Projections**

| | Year Ending December 31, | | |
|---|---|---|---|
| | **2017E** | **2018E** | **2019E** |
| | ($ in millions) | | |
| Adjusted EBITDA | $ 42 | $ 185 | $ 318 |
| Capital Expenditures | $ 124 | $ 373 | $ 174 |
| Free Cash Flow | $ (83) | $ (189) | $ 144 |

200.     Notably, the Proxy stated that these "***financial projections were prepared on a reasonable basis***" and "***reflected the best currently available estimates and judgments*** of Alta Mesa and Kingfisher, as applicable."  Moreover, the Proxy represented that these financial figures "presented, to the best of their knowledge and belief, the ***expected course of action and the expected future financial performance of Alta Mesa and Kingfisher***, respectively."

201.     These statements from the Proxy were materially misleading for the same reasons stated in ¶184.  As detailed herein, the projections were not reasonable because Defendants knew AMH's wells were underperforming and the company's strategy was temporarily inflating results.  Indeed, AMH's management had already taken significant steps to temporarily inflate its well production by utilizing S-curved vertical well-bores, over-use of ESPs, and drilling wells too densely together at the expense of the long-term viability of its operations in future years.  ¶¶258-275, *infra*.

> b)     February 21, 2018 Statements at EnerCom Dallas Conference

202.     On February 21, 2018, Defendant Chappelle participated in the ENERCOM Dallas conference and made a presentation to the public about, *inter alia*, the STACK.  During the presentation, Chappelle showed participants a PowerPoint presentation addressing the STACK and stated:

> "***2012-2017 Execution and Results De-Risk [the] Investment***"

> "***Multi-well development projects initiated in 2017***; ***previous pattern tests validate approach***"

"*Consistency and geographic breadth of well results underscores repeatable development*"

"*Spacing test pilots establish basis for development approach*"

203.     Defendant Chappelle's February 21, 2018 statements regarding the STACK play were materially false and misleading when made for the same reasons stated in ¶¶184, 261-264, 269-275.

c)     <u>2017 Form 10-K and Related Earnings Call</u>

204.     During the trading day on March 29, 2018, the Company issued a press release announcing its Fourth Quarter 2017 and fiscal year 2017 financial results.  In the press release, Defendant Chappelle stated:

> 2017 was a year of significant progress for our company marked by several important milestones that we believe has set us up for success in 2018 and beyond. We achieved year-over-year growth in our production, reserves and EBITDAX; *we have de-risked our acreage with over 250 operated horizontal wells and a comprehensive scientific and engineering effort to begin systematic development with multi-well patterns*.  Creating Alta Mesa Resources with the upstream assets of [AMH] and midstream assets of Kingfisher, we believe we have a strong balance sheet that will allow us to execute on our vision for years to come.

> In the March 29, 2018 press release, the Company added:

> In AMHLP's STACK play, the company has assembled a highly contiguous leasehold position of over 130,000 net acres.  In the fourth quarter of 2017, AMHLP completed 36 horizontal wells in the Osage and Meramec formations.  AMHLP had 43 horizontal wells in progress as of the end of the fourth quarter, 22 of which were on production subsequent to the end of the quarter.  AMHLP currently has seven rigs operating in the STACK play, with a contracted eighth rig arriving in April and plans to maintain this level for the balance of 2018.  In total, AMHLP plans to drill between 170 and 180 gross wells during the year.  We expect drilling and completion costs on these wells to average $3.8 million and *our type curve has been approximately 650 MBOE per well*.

205.     The Company's March 29, 2018 press release statements regarding *de-risking* the STACK play and claiming a 650 MBOE per well production rate, as well as suggesting that an 8-

63

to-10 well density was optimal for STACK, were materially false and misleading for the same reasons stated in ¶¶184, 261-264, 269-275.

206.     Also during the trading day on March 29, 2018, the Company hosted a conference call for analysts and investors to discuss, *inter alia*, Fourth Quarter 2017 financial and operational results.  Defendant Chappelle participated in the conference call and made the following statement during his opening remarks: "***During [2017 and early 2018] we … further de-risked and delineated our Kingfisher County acreage [in STACK].… We have transitioned from spacing tests to development patterns.***"

207.     During the March 29, 2018 conference call, Chappelle also showed participants a PowerPoint presentation.  Slide 6 of the presentation suggested that an ***8-to-10 well density per section was optimal for the STACK***.



208.   Chappelle's March 29, 2018 conference call statements regarding de-risking the STACK play and claiming a 650 MBOE per well production rate were materially false and misleading for the same reasons stated in ¶¶184, 261-264, 269-275.  The slide presentation indicating that an 8-to-10 well density per section was optimal for the STACK was also materially misleading for these same reasons.

209.   With respect to its Kingfisher midstream business, Alta Mesa stated that "despite setbacks in late 2017 and early 2018, with regard to [Kingfisher], **_our vision for growth remain [sic] strong . . . . We believe our margins are going to continue to expand_** as we build up critical infrastructure and expand production on existing wells . . . ."

210.    Alta Mesa further represented as a Risk Factor that, "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

211.    The statements in ¶¶209-210 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that AMH's wells were not profitable (despite efforts to temporarily inflate production) and other "large third-party producers" had encountered similar problems drilling on acreage in the STACK.  As a result of AMH's failure and the overall problems in the STACK, Kingfisher would not be able to significantly grow its pipeline business as represented and, as a result, the Company's cash flow would be adversely impacted.

212.    In Alta Mesa's 2017 Form 10-K, which was signed by Defendants Hackett, Chappelle, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Sinclair, Tepper, Walters and Smith, also discussed its disclosure controls and internal controls in Item 4 Controls and Procedures.  Specifically, Alta Mesa again stated that that "***there [had] been no change in [its] internal control over financial reporting***."

213.    The 2017 Form 10-K also contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of the Sarbanes Oxley Act of 2002 ("SOX").  These SOX certificationsattested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

214.     These sections of the Form 10-K were materially false and misleading and omitted material facts, as Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

d)     April 9, 2018 IPAA-OGIS Conference

215.     On April 9, 2018, Defendant Chappelle presented at the Oil & Gas Investment Symposium (OGIS) in New York City, hosted by the Independent Petroleum Association of America (IPAA).   During the conference, and with regard to utilizing ESPs in the STACK, Chappelle stated, "***Now, here's one simple example of a well that we optimized with an ESP, obviously a very good outcome if you're producing on the order of 800 barrels a day…. But the point is there are opportunities like this***.   We've got a lot of effort focused on that."

216.     Chappelle's April 9, 2018 statement regarding ESPs was materially misleading when made because the marginal costs of ESPs exceeded their marginal revenue generating abilities in the STACK region.   ¶¶264-268, *infra*.   Specifically, the Company's production team had repeatedly informed the Management Defendants that the increased volume produced by installing an ESP at a certain well was generally offset by loss in production volume in wells immediately adjacent to the ESP well.   ¶¶266-268, *infra*.

217.     During the April 9, 2018 conference, Chappelle also showed participants a PowerPoint presentation.   Slide 8 of the presentation stated the STACK was generating "***[c]onsistent [w]ell [r]esults [with] [d]urable economics over time across acreage position***." Slide 9 of the presentation touted ESP utilization as a method to "***maximize ROI, EBITDA and optimize reserves***:"







218.    Defendant Chappelle's April 9, 2018 statement and related presentation were materially false and misleading when made for the same reasons stated in ¶184.  Indeed, by April 8, 2018, Defendants knew that their statements would mislead becaue they had not disclosed that on the STACK Alta Mesa had drilled wells too densely (¶¶261-63), grossly overutilized ESPs (¶¶264-268) and improperly utilized S-curved vertical well bores (¶¶269-275).

e)      First Quarter 2018 Earnings Call, Investor
        Presentation and Form 10-Q

219.    During the trading day on May 14, 2018, the Company hosted a conference call for analysts and investors to discuss, *inter alia*, its First Quarter 2018 financial and operational results. Defendants Hackett and Chappelle participated in the conference call.  During the call, the Company published a PowerPoint presentation, which included statements regarding the STACK.

Slide 6 of the presentation stated: "***Multi-well development pattern results across field are favorable***." Slide 9 of the presentation showed a well life-cycle implying that ***ESPs added to the STACK net daily production numbers and that utilization of ESPs continued to make economic sense***. When Chappelle showed this slide to investors, he stated: "I'd like to refer you to Slide 9 in our presentation for three recent examples of the gains we've seen in that lift optimization."



**Production Optimization**
*Key driver to maximize ROI, EBITDA and optimize reserves*

**Improved Base Production:**
**Key to Long-Term Value**

- Disciplined internal artificial lift review process
- Every well reviewed daily by artificial lift team, lift parameters adjusted or lift method changed
- Gathering system pressure reduction in assessment with KFM
- Initial results reflect base decline rate mitigation
- Excellent early results from first 5 wells in an initial 25 well program, range 200-700 BOPD rate increase





220.     Defendant Chappelle also stated: "***We are reaffirming our FY '18 guidance. We have confidence in presenting operating results such as production, revenue, expenses as those numbers will not change***."

221.     The above statements on May 14, 2018 were materially false and misleading when made for the same reasons stated in ¶184. Indeed, by April 8, 2018, Defendants knew that their

statements would mislead becaue they had not disclosed that on the STACK Alta Mesa had drilled wells too densely (¶¶261-263), grossly overutilized ESPs (¶¶264-268) and improperly utilized s-curved vertical well bores (¶¶269-275).

222.     On May 21, 2018, Alta Mesa filed with the SEC its Form 10-Q for the quarter ending March 31, 2018, incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K.  This included the Company's assertion that its business "***involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application***" and that its business "***depend[s] on successful exploration, exploitation, development and acquisitions to maintain reserves and revenue in the future.***"

223.     The statements in ¶222 were materially false and misleading and omitted material facts when made for the same reasons stated in ¶¶184, 258-275.  In particular, the S-shaped drilling technique and ESPs were not the "latest available horizontal drilling, completion and production technology."  ¶¶264-275, *infra*.  They were, instead, workarounds the Company was compelled to use in light of the consequences of its over drilling and its desire to inflate production statistics.  They were employed with knowledge not that they carried "risks and uncertainties," butthat they were likely to undermine the long-term viability and oil production from the wells.

224.     With respect to its Kingfisher midstream business, Alta Mesa incorporated the Risk Factors from its 2017 Form 10-K, including that "***If*** third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

225.    The statements in ¶224 were materially false and misleading and omitted material facts when made.  Among other things, it was clear Alta Mesa's wells were not producing as much oil as expected (¶¶258-275) and likewise, beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage in the STACK because of poor results, both of which would undermine the Company's advertised timeline for growing its pipeline business and, as a result, the Company's cash flow would be significantly impacted.

226.    The 2018 First Quarter Form 10-Q also discussed the Company's disclosure controls and internal controls in Item 4 Controls and Procedures.  Item 4 again represented that the Company's internal controls over financial reporting were effective and required no change.

227.    Those statements concerning Alta Mesa's internal controls over financial reporting were materially false and misleading and omitted material facts, as Defendants  did not disclose that Alta Mesa  had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

228.    The Form 10-Q also contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX.  These SOX cerifications again attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

229.    These certifications were materially false and misleading and omitted material facts, as Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

f)      Second Quarter Earnings Calls, Investor
Presentation and Form 10-Q

230.    During the trading day on August 14, 2018, the Company hosted a conference call

for analysts and investors to discuss, *inter alia*, its Second Quarter 2018 financial and operational

results.  Defendants Hackett and Chappelle participated in the conference call.  During the call,

the Company published the following statement in Slide 9 of the PowerPoint presentation made

available for all participants:  "***Multi-well development pattern results continue to be favorable***."

Slide 17 of the presentation showed a well life-cycle implying that ***ESPs added to the STACK's***

***net daily production numbers and that utilization of ESPs continued to make economic sense:***







231.    The above statements in the August 14, 2018 PowerPoint presentation were

materially misleading when made for the same reasons stated in ¶¶184, 258-275.

232.    On August 15, 2018, Alta Mesa filed with the SEC its Form 10-Q for the quarter ended June 31, 2018, incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K.  This included the assertion that Alta Mesa's business "***involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application***" and that its business "***depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future***."

233.    The statements in ¶232 were materially false and misleading and omitted material facts when made for the same reasons stated in ¶¶184, 258-275.  In particular, the S-shaped drilling technique and ESPs were not the "latest available horizontal drilling, completion and production technology."  ¶¶264-275, *infra*.  They were , instead, workarounds the Company was compelled to use in light of the consequences of its over drilling and its  desire to inflate production statistics.  They were employed with knowledge not that they carried "risks and uncertainties," but that they were likely to undermine the long-term viability and oil production from the wells.

234.    With respect to its Kingfisher midstream business, Alta Mesa incorporated the "Risk Factors" section from its 2017 Form 10-K.  This included the Company's assertion that "***If*** third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

235.    Despite Kingfisher only achieving $9.2 million in EBITDA during the first six months of 2018 (compared to the Proxy's projection of $185 million for 2018), Defendant Chappelle, assured investors that although Alta Mesa missed estimates yet again, the Company still "***offer[ed] compelling long-term returns to [its] shareholders***."

236.     The statements in ¶235 were materially false and misleading and omitted material facts when made for the same reasons stated in ¶¶258-275.  Defendants, moreover, continued to tell investors that Kingfisher's success was merely delayed, but, in reality, Alta Mesa knew it was taking significant steps to temporarily inflate its short-term oil production at the expense of its long-term viability and, as a result, Kingfisher had little if any chance to succeed.

237.     The Company also discussed its disclosure controls and internal controls in Item 4 Controls and Procedures in the 2018 Second Quarter Form 10-Q.  This section of the Form 10-Q was materially false and misleading and omitted material facts, as Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

238.     The Company again falsely affirmed that aside from changes related to the Business Combination, "***there [had] been no change in [its] internal control over financial reporting***."

239.     The Form 10-Q also contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

240.     Once again, the Company's assertion about its internal controls and signed SOX certifications were materially false and misleading and omitted material facts.  They failed to disclose that Alta Mesa had ineffective internal control over financial reporting, which would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

g)   Barclays CEO Energy-Power Conference

241.   On September 6, 2018, Defendant Chappelle participated in the Barclays CEO Energy-Power Conference in New York City.   During the conference, Chappelle made the following statements during his prepared remarks:

> During that 5-year period that preceded our becoming a public company, combining earlier this year with Kingfisher and [Alta Mesa], we drilled about 250 wells and we went through 4 generations of completions.   We also engaged in 7 pattern tests.   *That period established the basis for the development drilling with multi-well pads that we're engaged in today*.
>
> *       *       *
>
> Now with regard to our future development, I just showed 5 years of progressive definition and delineation. We've got a large resource. It's in the normally pressured, naturally fractured Black-Oil Window.  We've applied engineering and science in a very intensive way to affirm the multi-billion barrel resource that we have.  We drilled over 250 wells, defined a mean well result for an original DSU well, in other words, the first well in the pattern being -- a lot of people would use the word the parent well.   *During that period of time, we performed 7 pattern tests that gave us insight into the intensive multi-well patterns that we see as being necessary to produce all the economic oil that we have here*.
>
> *       *       *
>
> We found that 1,500 feet spacing between wells is a good base case from which to start.  We tested the boundaries of those as well, and we had as narrow as 660 feet within a given bench or 330 feet, if you will, as you look at the staggered spacing between multiple benches.  That literally would have been -- *that would infer 24 wells per section*.  We're not going with that, *but it does illustrate the potential for down spacing, and in fact, it gave us a lot of confidence because one of our strategic anchors is that we need to limit our downside*.  That boundary condition of 660-foot spacing still gave us an economic pattern.   So that gave us the confidence to move forward with this base case of 1,500-foot spacing.

242.   Defendant Chappelle's September 6, 2018 statements regarding the number and spacing of wells on each section was materially misleading when made for the same reasons stated in ¶¶184, 261-275.  Specifically, with regard to the STACK, Defendants knew that Alta Mesa had already drilled too densely, had over-utilized expensive ESPs and S-curving of bore holes for the purpose of artificially inflating reserve estimates made to market participants.

243.     During the CEO Energy-Power Conference, Chappelle also published slides from a PowerPoint presentation.  Slide 21 showed a STACK well life-cycle implying that *ESPs added to the STACK's net daily production numbers and that utilization of ESPs continued to make economic sense:*



244.     Defendant Chappelle's September 6, 2018 statements at the Barclays CEO Energy-Power Conference were materially misleading when made for the same reasons stated in ¶¶184, 258-275.  Specifically, with regard to the STACK, Defendants knew that Alta Mesa had already drilled too densely, had over-utilized expensive ESPs and S-curving of bore holes for the purpose of artificially inflating reserve estimates made to market participants.

h)    Third Quarter Form 10-Q and Related Earnings Call

245.    On November 14, 2018, Alta Mesa filed its Form 10-Q with the SEC for the quarter ending September 31, 2018, incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K, including that its business "***involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application***" and that its business "***depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future***."

246.    The statements in ¶245 were materially false and misleading and omitted material facts when made for the same reasons stated in ¶¶184, 258-275.  In particular, the S-shaped drilling technique and ESPs were  not the "latest available horizontal drilling, completion and production technology."  ¶¶264-275, *infra*.  They were , instead, workarounds the Company was compelled to use in light of the consequences of its over drilling and its  desire to inflate production statistics. They were employed with knowledge not that they carried "risks and uncertainties," but that they were likely to undermine the long-term viability and oil production from the wells.

247.    With respect to its Kingfisher midstream business, Alta Mesa incorporated the "Risk Factors" from its 2017 Form 10-K.  This included the Company's assertion that "***If*** third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

248.    The statements in ¶247 were materially false and misleading and omitted material facts when made.  Among other things, by this time it was clear Alta Mesa's wells could not produce the advertised amount of oil (as discussed at ¶¶258-275, *infra*), and that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher

because those operators also realized the STACK play was not as lucrative as anticipated.  Both

of these reasons undermined Kingfisher's advertised timeline for growing its pipeline business

and, as a result, the Company's cash flow would be adversely impacted..

249.    With regard to the Company's internal controls, Alta Mesa's financial statement

for the second quarter 2018 stated, in pertinent part:

> As discussed in this quarterly report, on February 9, 2018, we completed
> the acquisition of Alta Mesa and Kingfisher.  We are currently integrating
> these acquisitions into our control environment.   In executing this
> integration, we are analyzing, evaluating and, where appropriate, making
> changes in controls and procedures in a manner commensurate with the size,
> complexity and scale of operations subsequent to the acquisitions.  We
> expect to complete the Kingfisher integration in fiscal year 2019 and
> consequently expect to exclude Kingfisher from our assessment of internal
> control over financial reporting as of December 31, 2018.  The evaluation
> of internal controls over financial reporting for the Company has required
> and  will  continue  to  require  significant  time  and  resources  from
> management and other personnel.
>
> * * *
>
> ***Other than the changes described above, there have been no changes in
> our internal control over financial reporting during the three months
> ended September 30, 2018 that have materially affected, or are reasonably
> likely to materially affect, our internal control over financial reporting.***

250.    The Form 10-Q also contained signed certifications by Defendant Chappelle and

Alta Mesa's CFO McCabe pursuant to Section 302 of SOX.  These SOX certifications attested to

the accuracy of financial reporting, the disclosure of any material changes to the Company's

internal control over financial reporting, and the disclosure of all fraud.

251.    Those statements regarding Alta Mesa's internal controls over financial reporting

were materially false and misleading and omitted material facts, as Alta Mesa did not disclose that

it had ineffective internal control over financial reporting, which, as announced on February 25,

2019, would cause the Company to record material, non-cash asset impairment charges totaling

$3.1 billion.

B.   **Defendants' Acted with Scienter When They Made or Caused to Be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act**

1.   Defendants Had Direct Knowledge of All Alleged Undisclosed Facts

252.   The public statements by the Management Defendants and Board Defendants further indicate their knowledge of undisclosed facts.  These Defendants spoke to investors and analysts prior to and throughout the Class Period regarding the STACK play and Kingfisher. Defendants' communications with the public regarding the STACK play and Kingfisher were detail-laden, reflecting that the Management Defendants and Board Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding the STACK play and Kingfisher operations, whether disclosed to the investing public or not.

253.   For instance, on August 11, 2016, Defendant Chappelle and CFO McCabe participated in AMH's 2016 earnings conference call with analysts and investors.  During the call, Chappelle made it clear that he was "focused" on the operational intricacies of the STACK play:

> So now, let's move over to the STACK play in Kingfisher County, Oklahoma, where we have over 90,000 net acreage within a footprint of over 140,000 gross acres. As we concentrate our capital in the STACK, we've also deployed over $40 million year to date in expanding our leasehold position.
>
> In the second quarter, the [AMH] team delivered solid operational results, good financial performance, and notable drilling outcomes, resulting from ***our focus*** on continuous improvement in cost reductions.
>
> Six-plus quarters into this downturn and we're still achieving quarter-on-quarter improvements to cost and operations in the Sooner Trend STACK area.  We're optimizing the cost of drilling and completing wells in our STACK play, which we believe are at or near best-in-class on a cost per lateral foot basis.
>
> We're drilling and completing our STACK wells for about $3.1 million per well, having cut our drilling time from over 30 days in 2014 to an average of less than 15 days, spud to rig release is the measure during the past few years.  Much of the decrease in our average well cost since 2014 has come from design and efficiency improvements.

> ***We're focused*** on the continued definition of a large-scale program of horizontal drilling and multistage hydraulic fracturing to develop the Mississippian age section within our acreage, which is primarily Osage and Meramec.  It also includes Manning and Chester in a material part of our footprint.  In addition to this, we're also developing the Pennsylvanian age Oswego line, as well as other formations.

254.   On November 10, 2016, Defendant Chappelle and CFO McCabe participated in AMH's 3Q16 earnings conference call with analysts and investors.  During the call, Chappelle engaged in the following colloquy with Sean Sneeden, an Oppenheimer equity analyst, demonstrating his acute focus on the company's drilling strategy and experience:

> [SNEEDEN]:  Okay, helpful.  I guess just given over operationally, LOEs jumped on a unit basis pretty high in the quarter, was that just driven by some of the shut-ins in the STACK or what was the driver behind that?

> [CHAPPELLE]:  We're looking up, Sean, give us a minute…. So, actually, our LOE for the quarter is just under $10 when you include all of the – when you include all-in, service tax, the whole nine yards in the Sooner Trend area, including all-in, it's $5.38 per barrel, and if you look at the direct costs in Sooner Trend or the STACK, it's I believe … just over $4.20 per barrel.

> So, we've actually made pretty good strides in our LOE there. You may be looking at a year-to-date, which would have taken into account of first half of the year, in which we had – and we've discussed this before, we had made a choice to continue drilling, recognizing back in late 2015, early 2016, as we awaited new infrastructure to come into the field in Oklahoma.

> We made that choice because we thought there was so much more to gain in terms of holding acreage, continuing our learning curve, profiting from our operations, and capturing acreage as a result of our being able to drill.

> And as a result of that, many of those wells did not have ready access to the infrastructure that we now have in place, and the impact of that was [ph] quarrying (16:38) of wells and also artificial lift methods, primarily jet pump, which are not optimal and which are much more expensive.

> So as a simple example if you're flaring, you have to have a person on site to manage and watch that, and that's going to add a couple of hundred thousand dollars to your monthly costs. So, I think that might be what you're referring to, Sean.

255.    During the same call, Defendant Chappelle engaged in the following colloquy with David Silverstein, a securities analyst for Coban, during which Chappelle stated he would only provide EUR guidance if he had sufficient data from wells:

> [SILVERSTEIN]:  Hi, guys. Actually thanks for the answer on Ravi's question on the type curve. I'm just wondering if you could compare that with what we're seeing with another player in there, specifically Chesapeake. Now, they're targeting looks like mostly the more shallow area of the play in that Northeastern Kingfisher County [indiscernible] (28:57).  And they are suggesting much higher type curves. And I was wondering if that corroborates much higher than the 50% that you suggested, but if that corroborates with your views of the play? And then maybe if you can just differentiate, because they're only going after let's say the more shallow wells if that is making a difference on returns or not?

> [CHAPPELLE]:  Yeah. So it is two different formations, the of Pennsylvanian-age, Limestone, if you were to look in Chesapeake's most recent Analyst Day material which is quite data rich, a lot of good content in there. If you look at the map of the Oswego, and I think it was probably in the Oswego 3 and Oswego 4 outline there, the polygons on that map of that part of Kingfisher Counties are large secondary recovery units that we are the principal working interest owner and operator of. And so we have a very large Oswego position within that focus area that their material describes.

> So, with that, we have a good view of the Oswego in terms of its oil and gas productivity and its possibilities.  We're also a non-operating working interest owner in a couple of wells with Chesapeake and we've been pleased with their results.  We furthermore have drilled, let's say three Oswego horizontal wells and we have additional plans to drill Oswego wells into 2017 and beyond, so we see a lot of opportunity there. I really – I don't want to comment on their view of the EURs for the Oswego and frankly, *for us to take a view on an EUR, we have to have a statistically significant amount of data to say that*.  *For example, the type curve that we described to you is based on 59 wells that had sufficient data – sufficient production data and history and had commonality in terms of the targeted zone and completion of its*.  So that I really can't say much more other than it looks their production results look very, very good.  The well cost they report publicly seem to be in line with what we see as a non-operating working interest owner and we're just as encouraged about the Oswego as they are.

256.    On March 30, 2017, Defendant Chappelle and McCabe participated in AMH's 4Q16 earnings conference call.  Again, Chappelle exhibited his precise knowledge of the STACK operations, as well as how the Company purportedly maximized production – during his prepared opening statement:

Our completion practices in the STACK it progressed through four major generations in completion hardware, hydraulic fractures stage facing, fluid selection and proppant loading in order to optimize our single well returns. From our first generation to the most recent generation of completion practices we've increased our frac stages from over 250 feet or 12 stages to about a 150 foot spacing or an average of about 32 stages.

We continue to seek solutions to maximize stimulated rock volumes in our naturally fractured resource. As I said earlier, we've drilled over 150 wells and the meanwhile results since 2014 has exceeded 600,000 BOE EUR based on a two stream assessment and an approximate 4800 foot lateral.

We've been able to maximize single well returns in the STACK by optimizing drilling and completion techniques to the experience and expertise of our operating team. A key element in cost reduction has been efficiency gains in drilling time, improving from an average of over 40 days from wells that were spud in late 2012 to an average of 15 days in 2016.

In 2017, we plan to drill and complete up to a 150 gross wells in the STACK, which is inclusive of about 42 gross wells that will be funded with our joint development partner Bayou City Energy.

257. The allegations contained in this paragraph and in paragraphs 260-275 are based on information obtained from CW1. The allegations contained at ¶259 are based on information from CW2, and CW2's information was consistent with CW1's information at ¶¶257 (regarding meetings during which STACK issues were discussed), ¶261 (wells drilled too densely/optimal number of wells per pad), ¶¶266-267 (ESPs), and ¶275 (optimal number of wells per pad). Prior to and throughout the Class Period, the Company conducted Monday morning meetings ("Monday Meetings") at Alta Mesa's headquarters in Houston, TX. Personnel attending the Monday Meetings included mid- and senior-management from the following Alta Mesa functional groups: (a) drilling/engineering; (b) completions; (c) production; and (d) facilities. Defendants Chappelle, Ellis and Hackett regularly attended the Monday Meetings. The topics covered during the Monday Meetings included actual and projected production data of the Company's STACK wells, ESP implementation, water handling, and any element or topic that could materially affect production

projections.   The issues alleged at ¶¶261-263, 264-268, and 271-275 were addressed during meetings with Alta Mesa senior management.

### 2.   Alta Mesa's Well Production Just Did Not "STACK" Up

258.   Throughout the Class Period, the Management Defendants and Board Defendants knew, but failed to disclose to investors several factors undermining Alta Mesa's ability to exploit the STACK play.

259.   Indeed, these Defendants took active steps to portray oil reserves as larger than Alta Mesa's own experts had calculated.  A senior reservoir engineer at Alta Mesa initially provided management with internal EUR estimates, *i.e.*, the estimated recoverable reserves of an average Company oil well over its lifetime.  But, unhappy with these numbers, Alta Mesa management pressured the reservoir engineer to provide higher EUR estimates.  After the engineer refused to do so, management removed them from the task of generating EUR estimates and reduced their job responsibilities.

260.   Moreover, Alta Mesa was developing its STACK wells in ways that did not conform with industry norms.  These practices included, *inter alia*, over-use of ESPs to boost oil-production numbers in the short-term at the expense of long-term production, squeezing too many wells on each section or well-pad, improper vertical boring on wells, and adding secondary horizontal shafts on the same well.  These non-industry standard drilling practices allowed the Company to make immediate production numbers at quarter end, but the hidden short-term drilling tactics materially affected long-term production capability.

### 3.   Defendants Knew They Had Drilled Alta Mesa Wells Too Densely

261.   The "optimal production" for the STACK play was four to six wells per pad. Adding even more wells in a "high density" drilling strategy would add considerable expense, but not more commensurate production.  Defendants knew that the high density strategy was a failure

in or around September 2017.  Prior to that date, Alta Mesa based its long-term reserve projections upon drilling and fracking anywhere from 8 to 12 wells per pad, which resulted in the volume of oil appearing to be higher than was actually the case.  This approach was based on the erroneous math that as more wells were dug in the areas where there was already a producing well, the new wells ("child" wells) would act like the original "parent" well in the same square-mile territory known as a "section."  Defendants knew this was false from their long experience in the industry, from viewing the results in the STACK, and from repeated warnings given to them by production staff.

262.    The child wells in the STACK, in fact, generally did not produce as much as the parents because the parent wells had drained more oil from the fractures.  In addition, even the parent wells  were not producing as prolifically as they previously had once the child wells began producing.  If a parent well had already been producing for several months, there was a likelihood that the child wells would not produce as much as the parent.  In that regard, production from any unconventional well follows a fairly similar trajectory in that the first six months of production are always the best.  However, over a period of time, that production slowly and irrevocably declines, as was the case in the STACK.

263.    When fracking a well, the fracking water (a salt solution with additives) is pumped through the perforations in the horizontal wellbore which shatters the rock; the water cracks open the fracture, and then sand is added to prop open the fracture.  The water that has been pumped in must blow back, and the sand left behind keeps the frack open.  When wells are drilled too close to existing wells in production, however, the water from the new well that is being fractured can flow to adjacent wells that are already in production.  This can result in as many as four months when the new wells will just be producing water, and the old wells need to be shut down.  But

even after the water is no longer coming out, those older wells may never recover to their prior levels of oil production.  Defendants knew these facts but misrepresented and/or failed to disclose them when making statements about the STACK play during the Class Period.

> 4.      Defendants Knew That ESPs Were Futile, Costly, and Unreliable

264.    The interruptions in production from draining the water meant that the Company's production goals would have fallen short, so to compensate it would be necessary to drill still more wells.  In an effort to increase the production from these wells after the water had come out, Alta Mesa had employed so-called ESPs and, in fact, the oil did come back.  However, the question asked internally by Alta Mesa engineers was: "At what cost?"

265.    An ESP can cost anywhere from $225,000 to $250,000 per machine, but its actual installation and operation increased the per-pump cost to $400,000 to $415,000.  This was in addition to the expensive monthly electricity costs required to run an ESP.  Further, increasing the production by way of the ESPs did not mean that overall production from the well was going to increase.  Rather, the available production from the well was only being extracted faster.

266.    Another issue was the "time value" if more overall production was not being derived but considerable investment in the "very expensive" ESPs continued and the accelerated production did not last.  A key geological fact that militated against deploying the ESPs was that the STACK had a higher-than-normal sand content, and ESPs are easily clogged by sand and break down, requiring frequent repair and refurbishment.  As such, this could drive up the cost of deploying an ESP potentially to $800,000 per unit and by mid-2018, Alta Mesa deployed around 80-90 ESPs.

267.    Alta Mesa management knew that if ESPs were deployed on all of the STACK wells more oil would be produced on a short-term basis.  During Monday Morning meetings, Alta Mesa's senior management, including the Management Defendants, was repeatedly informed that

the use of ESPs was not prudent for the long-term.  The Company had been focusing on a single-well's production that was inflated because of the use of an ESP, and falsely reassured investors that equal production boosts would result from wide-spread use of ESPs.  However, it was first necessary to model the deployment of ESPs to see if the strategy was worth the investment.  Alta Mesa management was informed that deploying more ESPs was not appropriate because wells adjacent to the wells using an ESP were generating less oil than previously because the ESP was drawing oil from the adjacent wells.  Other companies in the STACK region had also tried ESPs, but abandoned this practice because they were not helping overall production and the useable lives of the ESPs were shortened by their deployments.

268.    While an ESP would allow a well to produce more, the increased production was a short-term anomaly because many wells were close to a large fracture or swarms of fractures, allowing the ESP to pull production from other areas (and possibly from the layers beneath the target zone).  Production personnel at Alta Mesa believed that the Company's ESP strategy was "robbing Peter to pay Paul" because it did not represent an incremental volume increase or worthwhile investment.  Alta Mesa nonetheless proceeded with deploying around 80 ESPs in the STACK.

5.    Defendants Knowingly Drilled Wellbores That Inevitably
Trapped Vast Reserves

269.    As a well goes through its production curve, the pressure from the underlying gas that helps lift the oil through the vertical wellbore diminishes and it is then necessary to deploy "artificial lift."  There are several types of artificial lift available based on the variables of the well, including the ratio of gas and liquid.  For unconventional wells (such as Alta Mesa's wells in the STACK) the most efficient and economical artificial lift is known as "rod lift."

270.     Rod lift utilizes a long series of rods (upwards of 5,000 feet or more) that go to the bottom of the vertical wellbore where there is a displacement pump.  When the pump is activated, the rod system plunges further into the wellbore to stimulate oil from the reservoir to flow through the well and up to the surface.  Rod lift is the oldest and most common type of artificial lift.

271.     Companies in the oil exploration and production industry, including Defendants, know it is critical that vertical wellbores are drilled as straight as possible to enable rod lift during the mature phase of a well's life span.  If the wellbore is crooked, the rods will eventually break, or there will be "pinch points" against which the rods will rub and can create holes in the wellbore, allowing oil to drop back to the bottom of the well rather than be lifted to the top.

272.     From the outset of its drilling program both prior to and throughout the Class Period, Alta Mesa did not drill straight wellbores.  In a peculiar attempt to reach more lateral fracture points, Defendants drilled highly curved bore holes.  Production personnel consistently warned the Management Defendants, including during Monday Meetings, about how Alta Mesa had drilled the wellbores in the STACK in violation of industry norms in a manner that would preclude rod lift technology.

273.     Industry practice involves moving the drilling rig a reasonable distance on the pad when drilling on a new well commences.  However, to save money, Alta Mesa did not sufficiently move the rigs across the pad, but rather "walked" them a short distance to the new drilling location.  This was not far enough.  Accordingly, to avoid contact between these wellbores, many of Alta Mesa's wells had the upper vertical portions of their bores drilled in an unusual "S"-shape.  This "S" shape undermined the child wells' extraction potential at the later stage of its production by precluding rod lift.  This was not normal industry practice.  The consequence of the S-shaped wells was that Alta Mesa was knowingly sacrificing one-quarter to one-third of the lifetime output of

over 90% of its wells.  Despite repeated complaints to Alta Mesa's senior management, including the Management Defendants, the Company stuck to this short-sighted practice.  As a result, the Defendants knew the Company's 650 MBOE/d reserve estimates were wildly and knowingly exaggerated.

274.    Refusing to acknowledge this reality, Defendant Ellis stated during an internal meeting that an unspecified, nonexistent artificial lift technology in the future would become available to address the infeasibility of rod lift for an S-shaped well.  But over the past century of research and development in the field of artificial lift, the oil industry has not invented anything that could provide a reasonable substitute for rod-lift, and Ellis was informed of this fact. Defendant Ellis was also told that companies were not even investing in research and development for such technology at this time.  Indeed, Ellis knew in no uncertain terms that the technology would not come online, and there would be no way to sustain production during the mature phase of the well without rod lift.

275.    The Management Defendants were also repeatedly told that the optimal number of oil wells on each pad was between 4 to 6, versus the 8 to 15 wells per pad Alta Mesa used in building out its production and reserve projections.  By September 2017, virtually all of Alta Mesa's well production data demonstrated that 4 to 6 wells per pad was optimal.  Defendants possessed and had access to such data and were quickly informed about how additional wells impacted the production of nearby wells.  For example, Defendants knew that frack water was returning through existing wells adjacent to new well bores within 12 hours (as opposed to days). Together, the curved vertical wellbore issue and the false assumption that 8 to 15 wells per pad was optimal, led to a 650 MBOE reserve projection that was knowingly overstated by nearly 40%.

6.     Riverstone and Hackett Were Financially Motivated to
       Commit Fraud

276.     In November 2016, Silver Run II obtained 11,500,000 founder shares of Alta Mesa for $25,000, or approximately $0.002 per share.    In March 2017, Silver Run Sponsor II, LLC ("Sponsor") (an affiliate of Defendant Riverstone), obtained an additional 14,375,000 founder shares as a result of a stock dividend.  At the same time, the Sponsor transferred a total of 99,000 founder shares to the Company's independent board members.  Accordingly, as of March 2017, Riverstone controlled 25,776,000 founder shares, with a cost basis of $25,000 (or, $0.00096 per share).   Moreover, in March 2017, the Sponsor transferred 33,000 founder shares each to Gutermuth, Tepper and Walters, at a cost basis of $0.00.  According to the Company's regulatory filings, each founder share is the equivalent of one share of Alta Mesa's Class A common stock. Further, on February 9, 2018, all founder shares were converted to shares of Alta Mesa Class A common stock on a one-for-one basis.

277.     In February 2018, the Company began the process of offering Alta Mesa securities in a secondary offering.  As part of the offering, Riverstone, Hackett, Gutermuth, Tepper and Walters, through the Sponsor, had the opportunity to sell all of their founder shares provided certain sales restrictions were met.  Namely, they could sell their founder shares if and when the sale price of the Company's Class A common stock exceeded $12.00 per share for any 20 trading days within any 30-day trading period commencing at least 150 days after the closing date of the Silver Run and Alta Mesa merger (alternatively, 150 days following February 9, 2018).

278.     Riverstone, Hackett, Gutermuth, Tepper and Walters, therefore, had the motivation to mislead (as well as cause others to mislead) about the potential of Alta Mesa, the STACK play and Kingfisher.  Had Alta Mesa's stock price met the founder stock sale restriction – hypothetically traded at just $12.01 per share for 20 days within a 30-day trading period – and they sold that stock

for $12.01 per share, Riverstone, Hackett, Gutermuth, Tepper and Walters had the opportunity to unlawfully profit by over ***$301 million*** on investments that carried a mere cost basis of $25,000.

279.    Likewise, Control Entity Defendants Bayou City and HPS were incentivized to mislead investors.  First, these defendants received part of the $1.3 billion paid to the prior owners of AMH and Kingfisher through the Business Combination.  Second, in order to inflate Alta Mesa's stock price following the transaction to receive the Earn-Out Payments of up to $1 billion worth of SRII Opco Common Units if Alta Mesa's 20-day VWAP exceeded various thresholds ranging from $14.00 per share to $20.00 per share.

### C.    Material Misstatements and Omissions in the Proxy in Violation of the Section 14(a) of the Exchange Act

280.    Defendants Hackett, Walker, Gutermuth, Tepper, Walters and Riverstone participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein.  The Proxy Defendants abdicated their duty to file and distribute a Proxy that was not misleading to Plaintiffs and the Class.

281.    On January 19, 2018, Alta Mesa issued the definitive Proxy to its shareholders on Schedule 14A in connection with the efforts of Alta Mesa, the Board and Riverstone to secure shareholder support for the merger with AMH and Kingfisher.  The Proxy recommended that Alta Mesa shareholders vote in favor of the merger while omitting and misrepresenting material information concerning core aspects of AMH and the capabilities of the STACK.

282.    Regarding the STACK, the January 19, 2018 Proxy said:  "*Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that Alta Mesa's type well EUR is greater than 650 MBOE*."

283.    In addition, the Proxy stated that AMH had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was ***expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d***.

284.    The above quoted statements in the January 19, 2018 Proxy were materially false and misleading when made because nearly 90% of all STACK wells operating at this time had improperly curved vertical bores – including S-curved well bores – which literally made it impossible to economically extract oil using rod-lift capability.  ¶¶269-275.   The non-industry standard curving of the vertical bore would dramatically increase AMH's costs to extract oil at the STACK, and eliminate up to 33% of the well's revenue generating capabilities over the course of its life.  *Id*.

285.    In addition, the Company's forecasted production numbers, *i.e*., 650 MBOE for the STACK in total, and 38.5 or 68.9 MBOE per day for each single well in the STACK, were materially misleading when made because they were based on a number of erroneous assumptions – including that the optimal wells per pad per section was from 8 to 12.  ¶¶261-263, 275.  That assumption was subsequently proven incorrect because by September 2017, the Company had already concluded that the optimal number of wells per pad per section was between 4 and 6.

286.    The Proxy further included extensive explanations regarding the quality of AMH's internal controls over oil and gas reserve estimates.  For instance, the Proxy stated that:

> AMH's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers.

The Proxy further represented that AMH's internal control "methodologies include reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis."

287.     These statements were materially false and misleading when made because AMH's practices regarding its internal controls over recording and estimating reserves was not based on established industry practice.  Rather, AMH's estimates were based on non-standard drilling methods designed to inflate short-term results at the expense of the long-term viability of the reserves.   Thus, the practices at AMH did not ensure or promote the accuracy of its financial reporting or projections.

288.     As a result of the materially misleading Proxy, Alta Mesa stockholders voted in favor of the merger at a special shareholders meeting held in New York City on February 6, 2018. Of the shareholder votes cast, over 98% voted in favor of the Business Combination.   These shareholders were also prevented from the fully informed opportunity to redeem their shares as was their right.  The shares subject to redemption were valued in the Proxy at approximately $10 per share.

289.     The materially false and misleading Proxy induced stockholder action that resulted in substantial harm to Plaintiffs and the Class.  Specifically, the material misrepresentations and omissions in the Proxy were an essential link in the approval of the Business Combination.  The Class A common stock held by Plaintiffs and other Class members declined substantially in value subsequent, and due to the approval of the Business Combination, causing economic loss and damages.

290.     After the stockholder vote, on February 9, 2018, Silver Run II issued a press release announcing that the merger had closed.

291.    On March 29, 2018, Alta Mesa issued a press release announcing its 2017 financial results.  The release disclosed that the EBITDA and production estimates provided in the Proxy had been dramatically reduced.  The release revealed that AMH was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, *8% below* the production figures provided in the Proxy.

292.    On August 14, 2018, Alta Mesa provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  The Company revealed that AMH's oil production had actually ***declined sequentially*** during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, ***22% below the estimates provided in the Proxy***.

293.    Subsequent, and due to, the closing of the merger, the price of Alta Mesa class A common stock declined precipitously as the truth about AMH and Kingfisher and the Proxy's false and misleading nature were revealed over time.  By December 2018, the price of the Company's class A common stock was trading below $1 per share, 90% below the price shareholders would have received if they had redeemed their shares instead of approving the merger less than one year earlier.

## VI.    LOSS CAUSATION

294.    Because loss causation is not an element of Plaintiffs' Proxy Claims, the allegations set forth in this section pertain only to Plaintiffs' Fraud Claims.

295.    During the Class Period, as detailed herein, the Management Defendants and Board Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Alta Mesa common stock and warrants.  Their conduct operated as a fraud or deceit on Class Period purchasers of Alta Mesa common stock and warrants by failing

to disclose and misrepresenting the adverse facts relating to the Company's business, growth prospects and compliance with GAAP accounting that are detailed herein.  By presenting a misleading picture of Alta Mesa's business and prospects, the Management Defendants and Board Defendants' false and misleading statements had the intended effect of causing Alta Mesa's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $12.89 per share on January 29, 2018.

296.    The price of Alta Mesa common stock and warrants fell precipitously, as the prior artificial inflation dissipated each time the Management Defendants and Board Defendants' prior misrepresentations and material facts were at least partially disclosed or became apparent to the market, and/or the risks concealed by their misconduct at least partially materialized.

### A.    March 29, 2018 Disclosures

297.    On March 29, 2018, *less than two months* after the acquisition of AMH and Kingfisher closed on February 9, 2018, Alta Mesa filed its 2017 Form 10-K and issued a press release announcing its 2017 financial results.  These documents reflected EBITDA and production results that were dramatically reduced from the estimates provided in the Proxy.  The release revealed that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the Proxy.  In addition, the release revealed that AMH was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8 percent below the production figures for that year provided in the Proxy.

298.    Following these revelations, the price of Alta Mesa common stock fell from $8.38 per common share at close on March 28, 2018 to $8.00 per common share at close on March 29, 2018.  This was a decline of 4.5%, while on the same day the S&P 500 Index ("SPX") rose 1.38%, and a comparable industry index, the S&P Commodity Producers Oil & Gas Exploration &

Production Total Return Index ("SPCPGT"), rose 1.98%.  The Company's stock price continued to decline the following trading day, as the market further absorbed the adverse news, closing at $7.36 per share on Monday, April 2, 2018.  This was an additional 8% decline, while the S&P declined by only 2.23% and the SPCPOGT by 2.62%.  Altogether, the Company's common stock price fell by an approximate aggregate 12% in value.

299.    The Management Defendants and Board Defendants, however, claimed the problems were temporary and continued to make positive statements about Alta Mesa's expected growth, including providing assurances that the Company would soon reach the 2018 projections contained in the Proxy.  At an earnings call on March 29, 2018 (the same day the press release was disseminated and the 2017 Form 10-K was filed), Defendant Chappelle attributed the material reduction in guidance regarding  Kingfisher's 2018 prospects to "delayed drilling on dedicated acreage" by "large third-party producers."  But, he assured investors, "these customers have begun to shift their activity to acreage we serve."  As a result, Chappelle represented, the delay in reaching original estimates would only be "on the order of a six-month shift."  He emphasized that "despite setbacks" by Kingfisher, "our vision for growth remains strong," later repeating that any problems would  cause "perhaps a six-month shift in the calendar, but the vision remains the same."  He further reaffirmed the Company's expectation that Kingfisher would "earn growing third-party business" consistent with continued plans to spin it off as "an independent public company."

300.    As to the upstream AMH business, Defendant Chappelle was even more encouraging, representing that it was delayed by a shorter period of time:  "[R]eally if you look at where we are on production basis, it's perhaps a two-month shift in the calendar."  He claimed that upstream would meet 2018 production estimates by "early first quarter next year and possibly as early as this year."

301.    In summarizing his representations, Chappelle stated that the Company "expected to deliver strong growth that will be reflected in [adjusted] EBIDTA" such that it would generate "positive cash flow in the fourth quarter of 2019".

302.    As to all of these representations, an analyst on the call, Irene Haas of Imperial Capital reacted by saying "Great this is really reassuring".

303.    Another analyst, Zach Pancratz of DePrince, Race & Zollo, Inc. (DRZ), noted that the Company had previously provided "some pretty aggressive 2019 guidance."   He  asked if Defendants still stood by one aspect of that guidance, "ramping potentially 10 rigs exit this year, 10 to 12 next year."   Defendant Chappelle responded unequivocally, saying "We do, Zach…". Chapelle then expanded that affirmation to all aspects of the prior "aggressive" guidance, saying that 2019 "is going to look a lot like what we described when we talked with investors last year….[o]ur outlook for 2019 is reasonably within the same window…as what we've talked about before."

304.    Further, in its 2017 Form 10-K financial statements, Alta Mesa stated that "there [had] been no change in [its] internal control over financial reporting."   This SEC filing contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

305.    As a result of the false and misleading assurances the Management Defendants and Board Defendants provided, as specified above, the market price for Alta Mesa common stock and warrants remained artificially inflated..

306.    The Management Defendants and Board Defendants thereafter continued to maintain the artificial inflation in Alta Mesa common stock and warrants with the disclosure of

the Company's 2018 first quarter results on May 14, 2018.  On this day, Defendants disseminated a press release titled "Alta Mesa Provides Operations Update and Reaffirms Guidance."  During an earnings call on the same day, rather than disclose ongoing strategic operational decisions aimed at temporarily inflating production, Defendant Chappelle reiterated twice that "[w]e are reaffirming our FY '18 guidance" and the Company's "previously provided upstream and midstream guidance for the year remains unchanged."  He also reiterated that the Company would be "self-funding," *i.e.*, it would have positive free cash flows by the end of 2019.

307.    Defendant Chappelle further represented that "[r]ecent operating and strategic highlights by Kingfisher Midstream continue to support the [the Company's] long-term vision" for the entire business.  When asked, as to Kingfisher, "have you seen operator activity levels pick up, given oil's in the 70['s] now?" Craig Collins, Kingfisher's Vice President and Chief Operating Officer, responded that while the increase in oil prices had "not directly manifested itself in increased activity levels from those producers," nonetheless, "we anticipate that that activity level will increase."

308.    In an analyst report dated the next day, May 15, 2018, Imperial Capital rated the Company outperform, noting that Alta Mesa "reiterated 2018 guidance for both the midstream and the upstream" businesses.

### B.    August 14, 2018 Disclosures

309.    On August 14, 2018, Alta Mesa filed its 2018 Second Quarter Form 10-Q and issued a press release announcing its second quarter 2018 financial results.  Once again, the Company posted disappointing news, contrary to the representations and guidance the Defendants made in both the Proxy and the reassurances they provided after the unexpectedly dismal results announced two months thereafter.  The Company revealed that it now expected to achieve average daily net production of only 30.0 MBOE per day at the midpoint for the full year of 2018, 22%

below the estimates provided in the Proxy and previous quarter guidance. As of the end of the second quarter, net production actually reported was still languishing at 25,600 BOE per day, 33% below those estimates.

310.    Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Business Combination, Alta Mesa further revealed that throughout 2018 AMH's wells had suffered from repeated shut-ins averaging a loss of thousands of BOE every day and that the adverse trend had been worsening.

311.    In addition, Alta Mesa further revealed that its Kingfisher midstream business had earned only $6.1 million adjusted EBITDA during the second quarter – significantly short of the pace required to meet the $185 million 2018 adjusted EBITDA forecast for Kingfisher in the Proxy.

312.    Following the announcement of Alta Mesa's second quarter results, the Company's stock price fell over 21% from $6.08 per share at close on August 13, 2018 to $4.77 per share at close on August 14, 2018.  There was very heavy Alta Mesa trading volume during that period, approximately seven times the average daily trading volume in the stock since the closing of the Business Combination.  In comparison, on the same day the SPX increased by 0.64% and the SPCPOGT increased by 0.89%.  Once again, on the next trading day, as the market continued to absorb the disclosures alleged above, the Company's common stock price tumbled another 9.1%, to $4.34 per share, on similar heavy trading of over 6.5 times average daily trading volume.  In contrast, the SPX decreased by a de minimis .76% and the SPCPOGT by 4.49% - about half the Company's stock price fall. Over the two-day period, the common stock of Alta Mesa declined by over 28.6%.

313.     However, notwithstanding Alta Mesa's continued failure to meet its prior estimates provided to investors, upon which the market had relied in pricing Alta Mesa common stock and warrants, Defendant Chappelle again assured investors during the second quarter earnings call that any problems were temporary, and mere "timing delays."  He further asserted that the Company still "offer[ed] compelling long-term returns to [its] shareholders."  Indeed, explaining away the Company's operational difficulties, Chappelle exclaimed "let's be clear.  The reason we shut-in the production offsetting these wells was exactly to create more value.  It had a short-term reduction impact, but our long-term present value [was not] affect[ed]."  More specifically, he stated:

> We think it's important for investors to realize that the Q2 production while increasing from Q1 was impacted from **short term logistics** of multi well pad development **not from a change in the prospectivity of a low cost high return acreage position** and the resource underlying it.  In anticipation of continuing to add rigs over the course of the next rig here, we have expanded our drill ready inventory across the four acreage footprint to allow for the smooth integration of planned additional rigs and to mitigate the potential product impact on offset wells.

As such, he claimed "[t]remendous opportunities in front of us and we are positioned to deliver significant shareholder value."

314.     These repeated efforts to calm investor nerves had some success, with analyst Derrick Whitfield of Stifel complimenting the Company on doing a "nice job" of both "conveying the shut-in impacts" but also "alleviat[ing[ pattern productivity concerns".

315.     With respect to the significantly low reported Kingfisher EBIDTA, particularly in light of the substantially different guidance provided in the Proxy, Defendant Chappelle attributed it to merely "the timing of our customers' production ramp" being "slower than anticipated." Listing prospective increases in Kingfisher's business footprint, including the commercialization of water processing assets for both the Company and third-party customers, Chappelle provided

the following reassurance:  "[W]e are seeing continued opportunity for business expansion, given the strong fundamentals of STACK and Northwest STACK".

316.     Finally, the Second Quarter 2018 Form 10-Q financial statements stated that "there [had] been no change in [its] internal control over financial reporting."  This SEC filing contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

317.     As a result of the false and misleading assurances Defendants provided, as specified above, the market price for Alta Mesa common stock and warrants remained artificially inflated, as not all of it had dissipated.

### C.     November 13, 2018 Disclosures

318.     On November 13, 2018, Alta Mesa filed its 2018 Third Quarter Form 10-Q and issued a press release announcing its third quarter 2018 financial results.  The news continued to be disappointing, and was contrary to prior representations and assurances.  Among other things, the Company disclosed that it would only report consolidated EBIDTAX of $83.8 million—well below the estimate of $358 million in the Proxy.  It further significantly reduced its estimate of Kingfisher's 2018 EBITDA to only $36--$38 million, an approximate 80% reduction from what was represented to investors just 10 months earlier in the Proxy.

319.     Following the announcement of Alta Mesa's third quarter results, the Company's stock price fell from its November 13, 2018 closing price of $2.82 per share, to close at $2.40 per share on November 14, 2018.  This was a decline of 15% on almost 4 times average daily trading volume.  By contrast, on the same day the SPX fell only 0.76% and the SPCPOGT fell by just 0.14%.  Once again, the market continued to react to the adverse news on the following trading day, with the Company's common stock price falling to $2.285 per share, another 4.8% drop, on

more than twice average daily trading volume.  In contrast, the SPX increased 1.06%  and the SPCPOGT increased 1.68% on the same day.  Altogether over the two-day trading period, the common stock of Alta Mesa fell by almost 19%.

320.    Notwithstanding the disclosures causing this stock drop, it was tempered by continued reassurances that the Management Defendants and Board Defendants provided to the market.  At the earnings call scheduled for the day these disclosures were made, Kingfisher's COO, Craig Collins, announced the completion of a transfer of water disposal assets from AMH to Kingfisher.  Collins proclaimed that "This transaction establishes Kingfisher Midstream as a truly full service midstream provider for producers in the STACK with opportunity to pursue growth in each of the gas gathering and processing, crude oil gathering and transportation, and produced water gathering and disposal segments."  He concluded by saying that "The long-term outlook for Kingfisher Midstream is strong."  More generally, with respect to the entire enterprise, Defendant Chappelle stated that "Our consistent growth over several years and production demonstrates the quality of the assets and the cost control we've been able to achieve allows us to have consistently profitable wells."

321.    With regard to the Company's internal controls, Alta Mesa's third quarter 2018 Form 10-Q financial statement stated, in pertinent part:

> As discussed in this quarterly report, on February 9, 2018, we completed the acquisition of AMH and Kingfisher.  We are currently integrating these acquisitions into our control environment.  In executing this integration, we are analyzing, evaluating and, where appropriate, making changes in controls and procedures in a manner commensurate with the size, complexity and scale of operations subsequent to the acquisitions.  We expect to complete the Kingfisher integration in fiscal year 2019 and consequently expect to exclude Kingfisher from our assessment of internal control over financial reporting as of December 31, 2018.  The evaluation of internal controls over financial reporting for the Company has required and will continue to require significant time and resources from management and other personnel.

* * *

Other than the changes described above, ***there have been no changes in our internal control over financial reporting*** during the three months ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

322.     The Form 10-Qalso contained signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

323.     As a result of the false and misleading assurances the Management Defendants and Board Defendants provided the market price for Alta Mesa common stock and warrants remained artificially inflated.

### D.     February 29, 2019 Disclosures

324.     On February 25, 2019 the Management Defendants and Board Defendants filed with the SEC on behalf of the Company a Form 8-K, announcing that they would be forced to delay the announcement of Alta Mesa's full year 2018 financial results because it "had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures."

325.     The Company further disclosed that it "expect[ed] to record material, non-cash asset impairment charges" of approximately $3.1 billion (approximately $2.0 billion for the upstream segment and $1.1 billion for the midstream segment) – triple the value of the Company at the time of the IPO, and nearly the entire value of the Business Combination.

326.     The Company also projected that 2019 production would be on average 30.5 MBOE/d—less than half the 2019 estimates of 68.9 MBOE/d contained in the Proxy.

327.     Finally, the Company announced that while it had entered 2019 with six rigs actively working, it nonetheless "reduced [its] active rig count to zero by the end of January" 2019.

328.     Based on all of these disclosures, the price of Alta Mesa Class A common stock fell

from its February 25, 2019 closing price of $0.91 per share, to close at $0.24 per share on February

26, 2019, a hefty decline of 63% on almost 22 times average daily trading volume.  On the same

day, the SPX fell only 0.08%, and the SPCPOGT fell by 0.67%.  The stock price continued to

decline on the following trading day, closing at $0.23 per share on February 27, 2019, another

32.5% drop, while the SPX fell only 0.05% and the SPCPOGT increased by 0.49%.  Altogether,

this represented a decline of 75% from the February 25, 2019 closing price.

### E.     May 17, 2019 Disclosures Reveal the Full Truth

329.     The true value of the Company, or lack thereof, would only truly be revealed on

May 17, 2019.  On that day, among other things, Alta Mesa disclosed that "[t]he SEC is conducting

a formal investigation into, among other things, the facts involved in the material weakness in our

internal controls over financial reporting and the impairment charge disclosed previously and in

this annual report."   Alta Mesa's announcement continued that "If the SEC determines that

violations of the federal securities laws have occurred, the agency has a broad range of civil

penalties and other remedies available, some of which, if imposed on us, could be material to our

business, financial condition or results of operations."

330.     With respect to the internal controls over financial reporting itself,  Alta Mesa stated

that it "continues to make progress in finalizing its Form 10-K as well the first quarter 2019 Forms

10-Q for both AMH Resources and AMH Upstream but is unable to estimate the date at which

these filings will be completed."

331.     Alta Mesa also disclosed on May 17, 2019 that the estimate of proved reserves it

released on February 25, 2019 was overstated.  Specifically, on February 25, 2019, "AMH

Upstream provided an initial estimate of 158 MMBoe for December 31, 2018 proved reserves"

but "based on its April 2019 assessment of its ability to continue as a going concern and the

uncertainty of funding the related development costs, AMH Upstream removed a total of 89 MMBoe of proved undeveloped ("PUD") reserves.  As a result, at December 31, 2018, AMH Upstream had 69 MMBoe of proved developed reserves."

332.    Finally, and perhaps most importantly, on May 17, 2019, Alta Mesa disclosed that it had retained advisors and was evaluating filing for Chapter 11 bankruptcy protection.

333.    As a result of these disclosures, Alta Mesa's stock price fell 25.1% from $.0176 per share at close on Friday, May 17, 2019 to $0.131 per share at close on Monday, May 20, 2019.

334.    The Defendants wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.  Had the Defendants disclosed complete, accurate and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Alta Mesa's securities, or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also entirely foreseeable to the Management Defendants and Board Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Alta Mesa securities and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Alta Mesa securities to decline.

335.    The precipitous declines in the price of Alta Mesa common stock on March 29, 2018, August 14, 2018, November 5, 2018, February 25, 2019 and May 17, 2019 were a direct result of the nature and extent of the Management Defendants and Board Defendants' fraud partially and then finally being revealed to investors and the market, and/or the materialization of the risk that they concealed by their misconduct.  The timing and magnitude of the decline in the price of Alta Mesa common stock, particularly when compared to the movements of a general

stock index and an appropriate industry index, negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

336.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the price of Alta Mesa common stock and the subsequent significant decline in the value of Alta Mesa common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed and/or the risks that they concealed by such misconduct materialized.

## VII.   PRESUMPTION OF RELIANCE

337.   The market for Alta Mesa securities was open, well-developed, and efficient at all relevant times.  As a result of the Management Defendants and Board Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Alta Mesa. Plaintiffs and Class members have been damaged thereby.

338.   During the Class Period, the artificial inflation of the value of Alta Mesa securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members.  As alleged herein, during the Class Period, the Management Defendants and Board Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's securities,

causing Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

339.    At all relevant times, the market for Alta Mesa common stock was an efficient market for the following reasons, among others:

> (a) Alta Mesa common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;
>
> (b) as a regulated issuer, Alta Mesa filed periodic public reports with the SEC and the NASDAQ;
>
> (c) Alta Mesa regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d) Alta Mesa was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

340.    Based on the foregoing, during the Class Period, the market for Alta Mesa securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Alta Mesa securities.  Under these circumstances, the market for Alta Mesa securities was efficient during the Class Period and, therefore, investors' purchases of Alta Mesa securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

341.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.  These omissions concealed, among other things, and as alleged more fully above, operational setbacks, short-term focused strategic decisions, predictable well shutdowns as a result of planned projects commenced in 2017, and material issues with respect to internal control over financial reporting,

such that Defendants' reports as to the value of the AMH and Kingfisher assets were at best unreliable, and were done  to create the appearance of financial health and the likely prospect of increasing revenues for Alta Mesa.

## VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

342.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Alta Mesa's business prospects and internal controls.

343.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted the statements by the Management Defendants and Board Defendants regarding Alta Mesa's operations, prospects and controls, among others.  Given the then-existing facts contradicting the statements by the Management Defendants and Board Defendants, any generalized risk disclosures made by Alta Mesa were not sufficient to insulate the Management Defendants and Board Defendants from liability for their materially false and misleading statements.

344.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Management Defendants and Board Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false

107

forward-looking statement was authorized and approved by an executive officer of Alta Mesa who knew the statement was false when made.

## IX.   CLASS ACTION ALLEGATIONS

345.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf individuals or entities who purchased or otherwise acquired securities of Alta Mesa between August 16, 2017 and May 17, 2019, inclusive, and were damaged thereby, excluding Defendants, Alta Mesa, High Mesa and each of their affiliates.

346.   The Class is so numerous that joinder of all members is impracticable.   For example, at the time of the Proxy dated January 12, 2018, there were approximately 103.5 million public shares of Alta Mesa Class A stock issued and outstanding, likely held by thousands of persons.

347.   There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members include:

       (a)   whether the Management Defendants and Board Defendants misrepresented material facts;

       (b)   whether the Management Defendants and Board Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

       (c)   whether the prices of Alta Mesa's securities were artificially inflated;

       (d)   whether the Proxy Defendants violated §14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

       (e)   whether the Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

       (f)   whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

348. Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs are not subject to any atypical claims or defenses.

349. Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

350. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.   FRAUD CLAIMS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against the Management
### <u>Defendants and Board Defendants</u>

351. Plaintiffs repeat and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

352. During the Class Period, the Management Defendants and Board Defendants each carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Alta Mesa securities at artificially inflated prices.

353. The Management Defendants and Board Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alta Mesa's

securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

354.    During the Class Period, the Management Defendants and Board Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

355.    The Management Defendants and Board Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Management Defendants and Board Defendants engaged in this misconduct to conceal Alta Mesa's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

356.    The Management Defendants and Board Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

357.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Alta Mesa's securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Alta Mesa's securities had been artificially inflated by the Defendants' fraudulent course of conduct.

358.    As a direct and proximate result of the Management Defendants and Board Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic

loss and damages in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Alta Mesa's securities was removed over time.

359.     By virtue of the foregoing, the Management Defendants and Board Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the**
**Exchange Act Against All Defendants**

360.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above (other than disclaimers of fraud claims) as if fully set forth herein.

361.     As alleged above, Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

362.     Defendants each acted as controlling persons of Alta Mesa within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Alta Mesa during the Class Period, Defendants had the power and ability to control the actions of the Management Defendants, Board Defendants, Alta Mesa, and the Company's employees.  By reason of such conduct, Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

## XI.     PROXY CLAIMS

363.     Plaintiffs' Proxy Claims do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their Proxy Claims. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Proxy Claim, which do not

have scienter, fraudulent intent or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

364.    As alleged herein at ¶¶281-289, Riverstone and the Proxy Defendants made a series of materially untrue statements and omissions of material facts in Alta Mesa's Proxy.  Those statements were misleading for the reasons stated in ¶¶258-275.  Riverstone and each of the Proxy Defendants participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein.  ¶¶35-41.  Riverstone and the Proxy Defendants abdicated their duty to file and distribute to Plaintiff and the Class a Proxy that was not misleading.  Accordingly, the Proxy Defendants violated §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

365.    As a direct result of the Proxy Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, plaintiff and the Class were precluded from exercising their right to seek redemption of their Silver Run II shares prior to the Business Combination on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Business Combination.  The false and misleading Proxy used to obtain shareholder approval of the acquisition deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Silver Run II shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, the Proxy Defendants were aware of and/or had access to the true facts concerning the true value of Alta Mesa and Kingfisher, which was far below the assets that shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy the Proxy Defendants used to obtain shareholder approval of and thereby consummate the Business

Combination, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

366.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Business Combination.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

367.    The Proxy's untrue statements of material fact included, among other things, that:

- Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines and that Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects.

- There was significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering.

- AMH "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017."   The Proxy also stated that AMH planned to increase the average number of rigs in operation to 10 in 2018, and to 11 in 2019.

- AMH had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

- AMH had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

- Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.  Notably, these projections matched the estimates provided during the August 2017 investor presentation announcing the proposed transaction.

- The financial projections in the Proxy were prepared on a "reasonable basis" and "reflected the best currently available estimates and judgments of AMH

113

and Kingfisher, as applicable." That these financial figures "presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of AMH and Kingfisher, respectively."

368.    Defendants' representations were untrue and omitted material facts when made, including that:

- Alta Mesa knew that AMH was making decisions to temporarily inflate the short-term productivity of its wells that would undermine the long-term viability of those wells.

- Alta Mesa knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE, which would significantly impact its growth and earnings.

- Alta Mesa knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay Company's timeline for growing its pipeline business and as a result the Company's cash flow would be adversely impacted.

- Alta Mesa knew the Company suffered from material weaknesses over its financial reporting, which would lead to a significant write down.

369.    The extent of Alta Mesa's problems were partially revealed on March 29, 2018, August 14, 2018, November 13, 2018, February 25, 2019 and May 17, 2019. In total, the disclosures caused the price of Alta Mesa's securities to fall by over 98% from the date of the shareholder vote on the Business Combination.

### COUNT III
### For Violations of Section 14(a) of the Exchange Act
### Against the Proxy Defendants and Riverstone

370.    Plaintiffs repeat and reallege the allegations in ¶¶ 1-182, 280-293, 345-350, 363-369 as if set forth fully herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

371.   The Proxy documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

372.   The Proxy Defendants and Riverstone, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and Supplement.

373.   Alta Mesa is an issuer of the Proxy Statement and Supplement.

374.   Alta Mesa permitted the use of its name in the Proxy Statement and Supplement by allowing the Proxy to represent, among other things, that the proposed Business Combination was expected to generate positive returns and was in the best interest of shareholders.

375.   Defendant Hackett signed the cover letters for the Proxy, and otherwise permitted the use of his name in the Proxy.

376.   The Proxy was issued "By Order of the Board of Directors" and "as part of the solicitation of proxies by [the Company's] board of directors."  Moreover, the Proxy Defendants permitted the use of their names by, among other things, allowing the Proxy Statement and Supplement to represent that they recommended the Business Combination.

377.   Riverstone was Alta Mesa's sponsor.  At the time the Proxy was issued "all members of [Alta Mesa's] management team [were] employed by Riverstone" and the Board was closely affiliated with and controlled by Riverstone.

378.   By means of the Proxy and documents attached thereto or incorporated by reference therein, the Proxy Defendants and Riverstone sought to secure Plaintiffs' and other Class members' approval of the Business Combination, and solicited proxies from Plaintiffs and other members of the Class.

379.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material information which arose after the dissemination of these statements and before the vote on the Business Combination.

380.    The solicitations described herein were essential links in the accomplishment of the Business Combination.   As a result of these solicitations, the Alta Mesa shareholders approved the Business Combination.

381.    Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

382.    This claim is brought within the applicable statute of limitations.

383.    By reason of the foregoing, the Proxy Defendants and Riverstone violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

### COUNT IV
### For Violations of Section 20(a) of the Exchange Act
### Against the Proxy Defendants and Control Entity Defendants

384.    Plaintiffs repeat and reallege the allegations in ¶¶1-182, 280-293, 345-350, 363-369, 370-383 as if set forth fully herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely in negligence.

385.    As alleged above, the Proxy Defendants and Control Entity Defendants violated Section 14(a) of the Exchange Act by their  acts and omissions as alleged in this Complaint.

386.     Each of the Proxy Defendants and Control Entity Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their ownership interest, high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, control over material operational data and/or intimate knowledge of the Company's actual performance, and their power to control the Proxy, the Proxy Defendants and Control Entity Defendants had the power and ability to control the information contained in the Proxy.  Indeed, Defendants Bayou City, HPS and ARM Energy provided the operational information contained in the Proxy and were unjustly enriched when they received over $1.3 billion from the Business Combination.  By reason of such conduct, the Proxy Defendants and Control Entity Defendants are liable pursuant to Section 20(a) of the Exchange Act.

387.     Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

388.     This claim is brought within the applicable statute of limitations.

389.     By reason of the foregoing, the Proxy Defendants and Control Entity Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## XII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.       Awarding compensatory damages in favor of Plaintiffs and other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

D.       Awarding such equitable/injunctive or other further relief (including, but not

limited to, rescission) as the Court may deem just and proper.

## XIII.   JURY DEMAND

390.    Plaintiffs hereby demand a trial by jury.

DATED: March 16, 2020

Respectfully submitted,

| | |
|---|---|
| */s/ Andrew J. Entwistle* | */s/ Trig Smith* |
| Andrew J. Entwistle | Trig Smith (*pro hac vice*) |
| (Texas Bar No. 24038131) | Debashish Bakshi (*pro hac vice*) |
| Attorney-in-charge | **ROBBINS GELLER RUDMAN** |
| **ENTWISTLE & CAPPUCCI LLP** | **& DOWD LLP** |
| 500 W. 2nd Street, Suite 1900-16 | 655 West Broadway, Suite 1900 |
| Austin, TX 78701 | San Diego, CA 92101 |
| Telephone:  (512) 710-5960 | Telephone: (619) 231-1058 |
| | |
| -and- | *Court-Appointed Co-Lead Counsel* |
| | |
| Joshua K. Porter (*pro hac vice*) | |
| Andrew M. Sher (*pro hac vice*) | |
| **ENTWISTLE & CAPPUCCI LLP** | |
| 299 Park Avenue, 20th Floor | |
| New York, New York 10171 | |
| Telephone:  (212) 894-7200 | |
| | |
| *Court-Appointed Co-Lead Counsel* | |
| | |
| Ira A. Schochet (*pro hac vice*) | |
| David Schwartz (*pro hac vice*) | |
| **LABATON SUCHAROW LLP** | |
| 140 Broadway | |

New York, NY 10005
Telephone:  (212) 907-0650

*Counsel for Plaintiff Camelot Event Driven*
*Fund, A Series of Frank Funds Trust*

## APPENDIX A
## TABLE OF KEY TERMS

| Defined Term | Description |
|---|---|
| Alta Mesa | Alta Mesa Resources, Inc., formed as Silver Run Acquisition Corporation II, the Company formed as a SPAC to acquire energy assets and which caused damages to the class of public investors when its common stock lost 99% of its value |
| AMH | Alta Mesa Holdings, LP, an oil exploration company that Alta Mesa purchased in February 2018 pursuant to the Proxy |
| ARM Energy | ARM Energy Holdings LLC, a Control-Entity Defendant which owned Kingfisher prior to the Business Combination and remained a major shareholder of Alta Mesa during the Class Period |
| Bayou City | Bayou City Energy LLC, a Control-Entity Defendant which owned AMH prior to the Business Combination, remained a major shareholder of Alta Mesa during the Class Period and appointed its Managing Partner to the Alta Mesa Board of Directors |
| BOE | Abbreviation for "barrels of oil equivalent," an energy industry term used to summarize the amount of energy that is equivalent to the amount of energy found in a barrel of crude oil |
| Business Combination | Alta Mesa's February 2018 purchase of AMH and Kingfisher pursuant to the Proxy |
| Child Well | Subsequent wells drilled on a drilling Pad surrounding the initial Parent Well |
| Class Period | August 16, 2017, the day Alta Mesa announced the proposed Business Combination, through May 17, 2019, the date Alta Mesa announced that the United States Securities and Exchange Commission had opened a formal investigation regarding the Company's internal controls over financial reporting |
| CW1 | A former Production Engineer employed by AMH from June 2018 to February 2019 |
| CW2 | A former Senior Production Engineer employed by AMH from October 2012 through February 2020 |
| Control-Entity Defendants | ARM Energy, Bayou City, HPS and Riverstone, the entities that controlled Alta Mesa during the Class Period through controlling 73% of the voting power and four seats on the Board of Directors |
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting moderate to high volumes of fluids from wellbores |

| Defined Term | Description |
|---|---|
| EUR | Abbreviation for "Estimated Ultimate Recovery," an energy industry term for the approximation of the quantity of oil or gas that is potentially recoverable or has already been recovered from a reserve or well |
| HPS | HPS Investment Partners, LLC, a Control-Entity Defendant who was a major shareholder of Alta Mesa during the Class Period and appointed one of its Managing Directors to Alta Mesa's Board of Directors |
| Kingfisher | Kingfisher Midstream LLC, a company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that Alta Mesa purchased in February 2018 pursuant to the Proxy |
| Pad | Short for a "drilling pad," an energy industry term for a platform, typically about 2-5 acres and made of concrete or asphalt, that houses the wellheads for horizontally drilled wells |
| Parent Well | The initial well drilled by an operator on a drilling Pad |
| Proxy | Alta Mesa's Definitive Merger Proxy Statement issued to the Company's shareholders on Schedule 14A, dated January 19, 2018, in connection with the Business Combination, and all supplements thereto |
| Riverstone | Riverstone Holdings LLC, a Control-Entity Defendant that created Alta Mesa, was a major shareholder of Alta Mesa during the Class Period, and appointed three of its Partners/Managing Directors to the Alta Mesa Board of Directors |
| SCOOP | Abbreviation for "South Central Oklahoma Oil Province," an oil exploration area in a specific geographical location of the Anadarko Basin area of Oklahoma |
| SPAC | Abbreviation for "special purpose acquisition company" – also known as a "blank check" company – formed to acquire or merge with other companies |
| SRII Opco | The operating company formed in connection with the Business Combination to own the full economic interest in AMH and Kingfisher, which was majority owned by the Control-Entity Defendants and 42% owned by Alta Mesa |
| STACK | Abbreviation for an oil exploration area in a specific geographical area in the Anadarko Basin area of Oklahoma, derived from "Sooner Trend (oil field), Anadarko (basin), Canadian and Kingfisher (counties)" |