United States District Court
Southern District of Texas
**ENTERED**
April 14, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CAMELOT EVENT DRIVEN FUND, A SERIES OF FRANK FUNDS TRUST, *et al*, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:19-CV-957 |
| ALTA MESA RESOURCES, INC.; fka SILVER RUN ACQUISITION CORPORATION II, *et al*, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This is a consolidated securities class action arising out of the financial collapse of Alta Mesa Resources, Inc. ("Alta Mesa"), which culminated in not only this lawsuit but a bankruptcy proceeding and an ongoing investigation by the Securities and Exchange Commission ("SEC"). The plaintiffs are: FNY Partners Fund LP; FNY Managed Accounts, LLC; Paul J. Burbach; Plumbers and Pipefitters National Pension Fund; and Camelot Event Driven Fund, a series of Frank Funds Trust (collectively "Plaintiffs"). Plaintiffs have filed a consolidated class action complaint alleging claims under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934.

Alta Mesa was a company that was created by a "blank check" merger, also known as a "special purpose acquisition company" merger or a "SPAC" merger. Plaintiffs allege that the defendants "made materially false and misleading statements and omissions prior to and following" the merger regarding the value and financial health of

the acquired companies and of Alta Mesa. (Dkt. 69 at pp. 6–8). Plaintiffs bring claims under Sections 14(a) and 20(a) on behalf of themselves and other Alta Mesa shareholders who were entitled to vote on the merger. (Dkt. 69 at p. 5). Plaintiffs bring claims under Sections 10(b) and 20(a) on behalf of themselves and other Alta Mesa shareholders who acquired Alta Mesa securities during the period from August 16, 2017 to May 17, 2019, inclusive. (Dkt. 69 at p. 5).

Plaintiffs have sued eighteen defendants. Twelve of those defendants were Alta Mesa executives or board members, and two of the defendants were executives at the special purpose acquisition company that became Alta Mesa; the remaining four defendants are related "control entities." (Dkt. 69 at pp. 16–20). The defendants have, between them, filed eight motions to dismiss Plaintiffs' live complaint under Federal Rule of Civil Procedure 12(b)(6). The motions (Dkts. 116, 119, 120, 125, 126, 127, 128, 129) are **DENIED**.

## BACKGROUND

The pertinent factual allegations, drawn from Plaintiffs' live complaint and taken as true for the purposes of these motions, are as follows. Alta Mesa began as a special purpose acquisition company called Silver Run Acquisition Corporation II ("Silver Run"). (Dkt. 69 at p. 20). A special purpose acquisition company is essentially a shell company that exists solely to raise funds through an initial public offering ("IPO") that are then used to acquire another company. (Dkt. 69 at p. 21). *See, e.g., In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 527 (D. Del. 2012); *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 280, 288 (S.D.N.Y. 2012). The target company

cannot be identified before the special purpose acquisition company completes its IPO. (Dkt. 69 at pp. 21–22). At least 90% of the capital raised in the IPO must be deposited into a trust account, with the interest paid to the investors. (Dkt. 69 at p. 22). The special purpose acquisition company's management team must identify and acquire a target company within a specified time period, typically between 18 and 24 months. (Dkt. 69 at p. 22). Under NASDAQ rules, the target company must have a fair market value equal to 80% of the balance in the special purpose acquisition company's trust account. (Dkt. 69 at p. 22). If the special purpose acquisition company's management team fails to acquire a target company within the specified time period, then the special purpose acquisition company is dissolved and the IPO proceeds are returned to the investors. (Dkt. 69 at pp. 22–23). "No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination." (Dkt. 69 at p. 23).[1]

### The Merger

The general terms summarized above applied to Silver Run's IPO, which was completed in March of 2017 and sponsored by Defendant Riverstone Holdings LLC ("Riverstone"), "a private equity firm focused on the energy sector[.]" (Dkt. 69 at pp. 19, 24–27). Silver Run sold 103.5 million shares of common units to investors at $10 a share for gross proceeds of $1.035 billion. (Dkt. 69 at p. 25). Under the terms of the IPO

---

[1] A recent article in the Harvard Business Review further explains that special purpose acquisition companies "are a form of reverse merger"—a term used when "a successful private company merges with a listed empty shell to go public without the paperwork and rigors of a traditional IPO." Ivana Naumovska, *The SPAC Bubble is About to Burst*, HARVARD BUSINESS REVIEW, Feb. 18, 2021, https://hbr.org/2021/02/the-spac-bubble-is-about-to-burst.

prospectus, Silver Run had two years to identify and acquire a target business or target businesses having an aggregate fair market value of at least 80% of the IPO proceeds held in trust. (Dkt. 69 at p. 27). The "IPO offering materials stated that [Silver Run] planned to pursue an acquisition that would capitalize on Riverstone's expertise in the energy industry by leveraging its industry experience and insider knowledge to acquire 'fundamentally sound' assets that were underpriced and offered attractive investment returns." (Dkt. 69 at p. 26).

Silver Run's management team decided to target two oil-and-gas companies, an upstream company called Alta Mesa Holdings, LP ("AMH") and a midstream company called Kingfisher Midstream LLC ("Kingfisher"). (Dkt. 69 at p. 27). AMH "focused on the development and acquisition of unconventional oil and natural gas reserves" in Oklahoma's STACK[2] shale play. (Dkt. 69 at pp. 27–28). Kingfisher "focused on providing crude oil gathering, gas gathering, and processing and marketing to producers of natural gas, natural gas liquids, . . . crude oil and condensate in the STACK play." (Dkt. 69 at p. 29). The two companies, though nominally separate, were deeply intertwined. "Kingfisher had overlapping owners with AMH . . . , [and] AMH and Kingfisher were interconnected from an operational perspective." (Dkt. 69 at p. 30). In 2016, the year before Silver Run's IPO, "nearly 97% of Kingfisher's revenues were

---

[2] STACK is an acronym that stands for "Sooner Trend (oil field) Anadarko (Basin) Canadian and Kingfisher (counties)." (Dkt. 69 at pp. 27–28). The STACK play is located in the eastern portion of Oklahoma's Anadarko basin. (Dkt. 69 at pp. 27–28).

derived from wells operated by AMH[.]" (Dkt. 69 at p. 30).[3] Silver Run's management saw the "synergistic" relationship between AMH and Kingfisher as an asset; they emphasized in "a press release on SEC Form 8-K" that they had chosen to target AMH and Kingfisher in part because the two companies provided "a perfect strategic match for [Silver Run's] desired integrated platform" and an opportunity to create a "pure-play STACK upstream and midstream company" that would be "the first of its kind in the public markets[.]" (Dkt. 69 at p. 60); *see also* Silver Run Form 8-K dated August 16, 2017.[4] Silver Run's management further stated that AMH's "core acreage position . . . ha[d] among the lowest breakevens[5] in the U.S. at around $25 per barrel" and that Kingfisher had acreage dedication contracts with "five . . . third party customers" apart from AMH. *See* Silver Run Form 8-K dated August 16, 2017. Silver Run's management saw big things for Kingfisher: on account of Kingfisher's "significant additional third party growth potential[,]" Silver Run's management intended to "spin off" Kingfisher in "a potential future midstream IPO." (Dkt. 69 at p. 40); *see also* Silver Run Form 8-K dated August 16, 2017.

---

[3] The companies remain closely connected. As of the filing of Plaintiffs' complaint, "over 80% of Kingfisher's revenues are from contracts with AMH." (Dkt. 69 at p. 30).

[4] The Court takes judicial notice of the August 16, 2017 Form 8-K filing, as well as the other SEC filings referenced in this opinion. *Izadjoo v. Helix Energy Solutions Group, Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017) (J. Rosenthal) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

[5] In this context, the term "breakeven" refers to the "breakeven price—the price of oil needed to profitably drill a new well[.]" Michael D. Plante and Kunal Patel, *Breakeven Oil Prices Underscore Shale's Impact on the Market*, FEDERAL RESERVE BANK OF DALLAS: DALLAS FED ECONOMICS, May 21, 2019, https://www.dallasfed.org/research/economics/2019/0521.

On August 16, 2017, Silver Run announced that it had entered into a preliminary agreement to merge with AMH and Kingfisher. (Dkt. 69 at p. 31). The proposed transaction, valued at $3.8 billion, was subject to approval by Silver Run's shareholders. (Dkt. 69 at p. 31). Silver Run shareholders who did not want to retain a continuing interest in the business after the merger had the right to redeem their shares at the time of the merger. (Dkt. 69 at p. 27).

Silver Run issued a Definitive Merger Proxy Statement to its shareholders on January 19, 2018 ("the Proxy"). (Dkt. 69 at p. 33). In the Proxy, Alta Mesa's board of directors recommended that Silver Run's shareholders approve the merger with AMH and Kingfisher. (Dkt. 69 at p. 33). The Proxy "stated that AMH and Kingfisher were poised for accelerating growth immediately following the [merger.]" (Dkt. 69 at p. 35). Like the August 16, 2017 8-K filing, the Proxy emphasized the "low break-even commodity prices" of AMH's acreage and further indicated that Kingfisher had "long-term acreage dedication contracts from multiple active producers" and "firm takeaway contracts on key pipelines" and "was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects." (Dkt. 69 at pp. 33–35). The Proxy "indicated that AMH had achieved an estimated 2017 average net daily production of 20.8 thousand barrels of oil equivalent per day ("MBOE/d"), and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d." (Dkt. 69 at p. 35). The Proxy also "stated that AMH had achieved 2017 adjusted

EBITDAX[6] . . . of $155 million, and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million." (Dkt. 69 at p. 35). As for Kingfisher, "the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million." (Dkt. 69 at p. 35)

The Proxy "represented to investors that the estimates and projections contained therein were based on observable trends and capabilities, as well as economically justified assumptions regarding the expected cash flows of AMH and Kingfisher." (Dkt. 69 at p. 36). "In addition, the Proxy included extensive statements regarding the quality of AMH's internal controls over oil and gas reserve estimates[,]" among them a statement that:

> AMH's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers.
> Dkt. 69 at p. 36.

According to the Proxy, AMH's internal control methodologies included "reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis." (Dkt. 69 at p. 36).

---

[6] EBITDAX is an acronym that stands for "earnings before interest, taxes, depreciation, depletion, amortization, and exploration expenses." EBITDA is an acronym that stands for "earnings before interest, taxes, depreciation, and amortization."

Silver Run's shareholders voted to approve the merger on February 6, 2018. (Dkt. 69 at p. 41). The merger with AMH and Kingfisher closed on February 9, 2018. (Dkt. 69 at p. 41). At that point, the new combined company became known as Alta Mesa, and AMH and Kingfisher were subsidiaries of Alta Mesa. (Dkt. 69 at p. 41); *see also* Alta Mesa Form 10-K dated March 29, 2018.

### *Alta Mesa's Financial Disclosures*

Less than two months after the merger closed, on March 29, 2018, Alta Mesa filed its first 10-K with the SEC, issued an earnings release, and held an earnings call. (Dkt. 69 at p. 46). "The earnings release disclosed that the EBITDA and production estimates provided in the Proxy had been dramatically reduced." (Dkt. 69 at p. 46). Nevertheless, Alta Mesa's executives denied that the announcement indicated that AMH and Kingfisher had been overvalued in the Proxy.

According to the March 29, 2018 release, "Kingfisher was expected to post only $95 to $110 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the January 19, 2018 Proxy." (Dkt. 69 at pp. 46–47). In its SEC filings, Alta Mesa explained the swift revision to Kingfisher's earnings estimate by saying that, "[i]n late 2017 and early 2018, drilling and completions by third party E&P operators under contract with Kingfisher slowed considerably." *See* Alta Mesa Form 8-K dated March 29, 2018. Alta Mesa's CEO, Defendant Harlan Chappelle ("Chappelle"), echoed that explanation in the earnings call, telling investors and analysts that "multiple 'large third-party producers' had delayed drilling on acreage served by Kingfisher, which pushed Alta Mesa's timeline for growing its pipeline business back by

six months and a possible public offering of Kingfisher 'perhaps' into 2019." (Dkt. 69 at p. 47). "Chappelle admitted that these 'setbacks' began in 'late 2017.'" (Dkt. 69 at p. 47). The release also revised AMH's production estimates downward, stating that "AMH was expected to post an average net daily production of only 33 to 38 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy." (Dkt. 69 at p. 47). Chappelle reassured investors and analysts on the earnings call that "the problems were temporary" and that the revised estimates only represented a "two-month shift in the calendar" for AMH and a "six-month shift in the calendar" for Kingfisher. (Dkt. 69 at p. 48).

Alta Mesa's share price dropped after the March 29, 2018 announcements. (Dkt. 69 at p. 47). After closing at $8.38 per share on March 28, 2018, Alta Mesa's stock closed at $8.00 per share on March 29, 2018 and then $7.06 per share on April 3, 2018. (Dkt. 69 at p. 47).

Alta Mesa again posted disappointing news in its financial disclosures for the second quarter of 2018, but its executives "continued to represent that the problems were temporary and that a turnaround was imminent." (Dkt. 69 at p. 50). In its second-quarter 2018 financial disclosures, Alta Mesa announced a further downward adjustment in AMH's production estimate. (Dkt. 69 at p. 49). AMH "now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22% below the estimates provided in the Proxy." (Dkt. 69 at p. 49); *see also* Alta Mesa Form 8-K dated August 14, 2018. Alta Mesa attributed the diminished production estimate to "offset well shut-ins for fracture stimulation effectiveness." (Dkt. 69 at p. 49); *see also* Alta Mesa

Form 8-K dated August 14, 2018. On an earnings call, Chappelle explained that the well shut-ins resulted from work done or planned in the fourth quarter of 2017 that had lingered into the first quarter of 2018. (Dkt. 69 at p. 50). Alta Mesa's second-quarter 2018 financial disclosures also showed that Kingfisher, which the Proxy had estimated would have 2018 EBITDA of $185 million, had only $6.1 million in EBITDA for the quarter. (Dkt. 69 at p. 50); *see also* Alta Mesa Form 8-K dated August 14, 2018. Chappelle claimed on the second-quarter 2018 earnings call that "the dip in production was merely due to 'short term logistics' and not 'from a change in perspectivity of a low cost high return acreage position and the resource underlying it.'" (Dkt. 69 at p. 50).

Alta Mesa's share price fell over 21% on the second-quarter 2018 news, from $6.08 a share at close on August 13, 2018 to $4.77 a share at close on August 14, 2018. (Dkt. 69 at p. 50).

In its disclosures for the third quarter of 2018, Alta Mesa updated its 2018 EBITDA estimate for Kingfisher to "$36 to $38 million." (Dkt. 69 at p. 51); *see also* Alta Mesa Form 8-K dated November 13, 2018. Kingfisher's projected 2018 EBITDA was now "almost 80% less than the projections in the Proxy issued less than 10 months earlier." (Dkt. 69 at p. 51). On an earnings call discussing the third-quarter 2018 numbers, the Executive Chairman of Alta Mesa's Board of Directors, Defendant James Hackett ("Hackett"), "blamed [Alta Mesa's] poor performance on 'significant headwinds' and other 'technical challenges.'" (Dkt. 69 at p. 51). Alta Mesa's CFO, Michael McCabe ("McCabe"), retired. (Dkt. 69 at p. 52). Alta Mesa's share price declined by nearly 15% between close on November 13, 2018 and close on November 14, 2018. (Dkt. 69 at p.

52). The share price then dropped another 5% the next day. (Dkt. 69 at p. 52). Alta Mesa's stock closed at $2.29 a share on November 15, 2018. (Dkt. 69 at p. 52). One month later, on December 26, 2018, two more Alta Mesa executives—Chappelle and Defendant Michael Ellis ("Ellis"), Vice President and COO–Upstream—resigned. (Dkt. 69 at pp. 17, 52).

On February 25, 2019, Alta Mesa announced in a filing with the SEC that it would not be able to file a timely annual report for 2018 and would be filing for an extension of its deadline. (Dkt. 69 at p. 52); *see also* Alta Mesa Form 8-K dated February 25, 2019. Alta Mesa had "determined that it had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures." (Dkt. 69 at p. 52); *see also* Alta Mesa Form 8-K dated February 25, 2019. The company also announced that it "expect[ed] to record material, non-cash asset impairment charges to both of its upstream and midstream segments in the fourth quarter of 2018." (Dkt. 69 at p. 52); *see also* Alta Mesa Form 8-K dated February 25, 2019. The impairment charges would be "approximately $2.0 billion for the upstream segment [AMH] and approximately $1.1 billion for the midstream segment [Kingfisher]." (Dkt. 69 at p. 52); *see also* Alta Mesa Form 8-K dated February 25, 2019. The write-downs totaled $3.1 billion and came "less than twelve months after the [merger] that was valued at $3.8 billion, all but conceding the acquired assets were nearly worthless." (Dkt. 69 at p. 52). Alta Mesa also disclosed that it was laying off "approximately 30% of its workforce." (Dkt. 69 at p. 53). The company's share price fell

over 63% after the disclosures; after closing at $0.91 a share on February 25, 2019, Alta

Mesa's stock closed at $0.34 a share on February 26, 2019. (Dkt. 69 at p. 53).

A week later, on March 4, 2019, Alta Mesa confirmed to the SEC and investors in

a formal Notification of Late Filing that it was unable to file its annual report on time

because it "expect[ed] to report material weakness in its internal control over financial

reporting in the 2018 Form 10-K" and "need[ed] additional time to ensure accuracy of its

2018 financial information[.]" (Dkt. 69 at p. 53); *see also* Alta Mesa Form NT 10-K

dated March 4, 2019. Alta Mesa also confirmed that it "expect[ed] to report a net loss of

$3.1 billion for the year ended December 31, 2018" because of the write-down that it had

disclosed a week earlier. (Dkt. 69 at pp. 53–54); *see also* Alta Mesa Form NT 10-K dated

March 4, 2019. On March 22, 2019, another Alta Mesa executive, Crag Collins

("Collins"), resigned. (Dkt. 69 at p. 54).

The delay in filing its annual report jeopardized Alta Mesa's listing on the

NASDAQ. In April of 2019, Alta Mesa received two notices from NASDAQ indicating

that the company was not in compliance with NASDAQ listing rules because it did not

timely file its 2018 annual report and because its stock closed below $1.00 a share for

thirty consecutive business days. (Dkt. 69 at p. 54); *see also* Alta Mesa Form 8-K dated

April 8, 2019.

Despite NASDAQ's warning, Alta Mesa continued to fall behind in its financial

reporting obligations. On May 13, 2019, the company filed another formal Notification of

Late Filing, this time relating to its quarterly report for the quarter ending on March 31,

2019. (Dkt. 69 at p. 54); *see also* Alta Mesa Form NT 10-Q dated May 13, 2019. It was

clear, though, that the financial news would not be good: Alta Mesa disclosed in its formal Notification of Late Filing that it "ha[d] determined that there [wa]s substantial doubt about its ability to continue as a going concern[.]" *See* Alta Mesa Form NT 10-Q dated May 13, 2019. Alta Mesa's failure to file its quarterly report on time drew another delisting warning from NASDAQ. (Dkt. 69 at p. 54).

On May 17, 2019, Alta Mesa indicated that it had "ma[de] progress in finalizing" its two delinquent reports "but [wa]s unable to estimate the date at which [those] filings w[ould] be completed." (Dkt. 69 at p. 55); *see also* Alta Mesa Form 8-K dated May 17, 2019. AMH, the upstream subsidiary, *was* able to file a 2018 annual report on May 17, 2019, however, and in that report AMH revealed that "[t]he SEC [wa]s conducting a formal investigation into, among other things, the facts involved in the material weakness in our internal controls over financial reporting and the impairment charge disclosed previously and in this annual report."[7] (Dkt. 69 at pp. 54–55); *see also* AMH Form 10-K dated May 17, 2019. AMH's 2018 annual report also disclosed that AMH was considering filing for Chapter 11 bankruptcy protection. (Dkt. 69 at p. 55); *see also* AMH Form 10-K dated May 17, 2019.

AMH's troubles led Alta Mesa to disclose a downward revision in a previously released estimate of its proved reserves and caused a 25% drop in Alta Mesa's stock price, from $0.176 a share on Friday, May 17, 2019 to $0.131 a share on Monday, May 20, 2019. (Dkt. 69 at p. 55); *see also* Alta Mesa Form 8-K dated May 17, 2019. On July

---

[7] AMH accounted for $2 billion of Alta Mesa's previously discussed $3.1 billion write-down. *See* AMH Form 10-K dated May 17, 2019.

2, 2019, another Alta Mesa executive, Vice President and Chief Accounting Officer Ronald Smith, resigned. (Dkt. 69 at p. 56).

On August 9, 2019, Alta Mesa filed yet another formal Notification of Late Filing, this time relating to its quarterly report for the quarter ending on June 30, 2019. (Dkt. 69 at p. 56); *see also* Alta Mesa Form NT 10-Q dated August 9, 2019. The company explained that it was unable to compile the quarterly report because it was "finalizing its year-end financial statements and related disclosures and its assessment of the effectiveness of its internal control over financial reporting, which [wa]s expected to result in the reporting of material weakness." (Dkt. 69 at p. 56); *see also* Alta Mesa Form NT 10-Q dated August 9, 2019. That expectation was confirmed in Alta Mesa's 2018 annual report, which was filed two weeks later, on August 26, 2019.

Alta Mesa's 2018 annual report contained a report from the company's independent accounting firm in which the accounting firm concluded that Alta Mesa "ha[d] not maintained effective internal control over financial reporting as of December 31, 2018[.]" *See* Alta Mesa Form 10-K dated August 26, 2019. The accounting firm's report identified sixteen "material weaknesses"[8] in Alta Mesa's internal control over financial reporting, including "[i]neffective controls over the identification and processing of relevant and reliable information[;]" "[i]neffective controls over the financial statement close and disclosure process, including the completeness, existence

---

[8] "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." *See* Alta Mesa Form 10-K dated August 26, 2019.

and accuracy of the financial information[;]" and "[i]neffective management review controls over various complex accounting estimates[.]" *See* Alta Mesa Form 10-K dated August 26, 2019. Alta Mesa's 2018 annual report also echoed AMH's 2018 annual report in disclosing that "[t]he SEC is conducting a formal investigation into, among other things, the facts involved in the material weakness in our internal controls over financial reporting and the impairment charge disclosed elsewhere in our financial statements." *See* Alta Mesa Form 10-K dated August 26, 2019. The SEC's investigation is ongoing.

Two weeks after Alta Mesa filed its 2018 10-K, its interim CEO, Hackett, resigned. (Dkt. 69 at p. 57). Alta Mesa and several related entities filed for Chapter 11 bankruptcy protection on September 11, 2019. (Dkt. 69 at pp. 56–57). Alta Mesa's securities have been delisted from the NASDAQ and are now traded over the counter. (Dkt. 69 at p. 57). During the bankruptcy proceedings, Alta Mesa's upstream and midstream assets sold for $320 million—less than 10% of Alta Mesa's claimed post-merger value of $3.8 billion. (Dkt. 69 at p. 57).[9]

### Plaintiffs' Allegations Regarding the Value of AMH and Kingfisher

The SEC filings and other disclosures summarized above indisputably show that Alta Mesa experienced a massive drop in value during its brief time on the NASDAQ, to the point where the company wrote down over 80% of its market value after its first year

---

[9] Plaintiffs plead that the sale price for the assets was $320 million. (Dkt. 69 at p. 57). However, it appears from the transcript of an April 8, 2020 hearing before Judge Marvin Isgur that the sale price was actually considerably lower—"$220 million for all of the assets of Alta Mesa and Kingfisher[,]" with a possible adjustment upward to $240 million or downward to $200 million based on the price of oil at closing. *See* Southern District of Texas bankruptcy case number 19-35133 at docket entry 1534, page 14. The original $320 million deal evidently had to be renegotiated. *See* Southern District of Texas bankruptcy case number 19-35133 at docket entry 1534, page 13.

in existence and where assets valued at $3.8 billion at the time of the special purpose acquisition company merger sold for, at most, $320 million in a bankruptcy proceeding two years afterward. It is also indisputable that, toward the end of its short lifespan, Alta Mesa acknowledged serious, systemic deficiencies in its financial reporting that created "a reasonable possibility that a material misstatement of the company's annual or interim financial statements" would not have been "prevented or detected on a timely basis." Those reporting deficiencies triggered an ongoing SEC investigation.

Plaintiffs allege that the steady stream of bad financial news disclosed by Alta Mesa after the special purpose acquisition company merger, and Alta Mesa's ultimate collapse into bankruptcy, were the fallout not from mistaken assumptions about the value of the assets acquired in the merger but from an intentional overstatement of that value that began before the merger. At bottom, Plaintiffs allege that the defendants knew that the assets never should have been valued as highly as they were at the time of the special purpose acquisition company merger. Rather, according to Plaintiffs, the defendants used misleading reserve and financial projections to overstate the value of AMH and Kingfisher before the merger in order to secure the approval of Silver Run's shareholders. (Dkt. 69 at pp. 36–37). The defendants then continued to mislead investors after the merger "to inflate Kingfisher's value" in the hopes that Kingfisher could quickly be spun off in an IPO. (Dkt. 69 at pp. 36–37).

Plaintiffs allege that the defendants manipulated the reserve and financial projections by using drilling techniques that fell outside the industry standard. According to Plaintiffs' complaint, before the merger, the defendants used unconventional,

unsustainable, and undisclosed drilling techniques to "inflat[e] short term profits at the expense of the longevity of [the] drilling program out of fear that the proposed [merger] would not be approved by [Silver Run] shareholders." (Dkt. 69 at p. 40). Plaintiffs support these allegations with the accounts of two confidential witnesses who worked as production engineers at AMH. (Dkt. 69 at pp. 36–39). The engineers claim that AMH departed from industry standards by: (1) drilling more wells per well pad than was optimal for AMH's acreage; (2) drilling its wells too close together, which required the use of S-shaped rather than L-shaped wells; and (3) using electronic pumps that temporarily increased wells' production rates but shortened the wells' lifespans. (Dkt. 69 at pp. 36–39). The departures from industry standards were "not based on the analysis of [AMH's] engineers" and were imposed by management in "an effort to create the appearance that its acreage had more oil reserves than it had in reality" and to "temporarily inflate production in a manner Defendants knew would undermine the long-term viability of [AMH's] wells." (Dkt. 69 at pp. 36–39). In one engineer's words, "management was 'desperate to make numbers.'" (Dkt. 69 at p. 39). An email sent by an AMH executive to Chappelle after the merger was announced but before the shareholder vote seems to confirm this view: the executive told Chappelle, who was the CEO of AMH and would become the CEO of Alta Mesa, that "companies get valued higher if they're pumping more. It doesn't matter if it's economic waste!" (Dkt. 69 at p. 40). Instead of disclosing that AMH's reserve and financial projections were based on departures from industry standards, the Proxy stated that AMH's estimates followed SEC

regulations and established industry practices. (Dkt. 69 at p. 36); *see also* Alta Mesa Form DEFM14A dated January 19, 2018.

The departures from industry standards not only continued but expanded after the merger. As previously noted, Alta Mesa's first financial disclosures, filed in March of 2018, "dramatically reduced" the Proxy's EBITDA and production estimates. (Dkt. 69 at pp. 46–47). According to Plaintiffs, rather than disclosing the distorting effect of the company's unconventional drilling practices on earlier projections, Chappelle, then Alta Mesa's CEO, reassured analysts and investors on an earnings call that "the problems were temporary" and that the revised estimates only represented a "two-month shift in the calendar" for AMH and a "six-month shift in the calendar" for Kingfisher. (Dkt. 69 at p. 48). Alta Mesa then doubled down and continued to "tak[e] significant undisclosed measures to inflate its oil production in the short-term that it knew undermined the long-term viability of its operations." (Dkt. 69 at p. 48). According to an Alta Mesa production engineer, "following the poor results in early 2018, Chappelle scrambled and ordered his team to immediately identify 25 wells that were candidates for deploying additional [electronic pumps,]" despite the engineer's repeated warnings that the electronic pumps were not "an economical or effective solution for Alta Mesa's wells." (Dkt. 69 at p. 48).

Plaintiffs allege that Alta Mesa never disclosed the aberrant drilling practices or their distorting effects because the defendants were trying to prop up Alta Mesa's stock price in order to salvage their plans to spin off Kingfisher. (Dkt. 69 at pp. 12, 48, 60–82). Kingfisher's profitability was tied to AMH's production, and—despite what the Proxy said—Kingfisher had few prospects for diversification even before the merger;

"beginning in 2017 Kingfisher knew that multiple 'large third-party producers' had delayed drilling on acreage served by Kingfisher because those operators also realized the STACK play was not as lucrative as anticipated." (Dkt. 69 at p. 63). Alta Mesa's first Form 10-K did not disclose that the company's reserve and financial projections were based on departures from industry standards. The filing stated that Alta Mesa's CEO and CFO had determined that the company's financial "disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were effective" and that there had been "no change in [the company's] internal control over financial reporting that ha[d] materially affected, or [wa]s reasonably likely to materially affect, [the company's] internal control over financial reporting." (Dkt. 69 at p. 70); *see also* Alta Mesa Form 10-K dated March 29, 2018. Plaintiffs allege that "[t]hese sections of the Form 10-K were materially false and misleading and omitted material facts, as Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause [Alta Mesa] to record material, non-cash asset impairment charges totaling $3.1 billion." (Dkt. 69 at p. 71).

## LEGAL STANDARDS

### *Rule 12(b)(6)*

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v.*

*United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

### *Section 10(b) of the Securities Exchange Act of 1934*

Section 10(b) of the Securities Exchange Act of 1934 states that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 then implements Section 10(b), disallowing the making of an "untrue statement of material fact" or the omission of any material fact "necessary in order to

make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal quotation marks and citations omitted). Omissions are material for purposes of the second element when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). The third element, scienter, requires "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC,* 401 F.3d at 643). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id*. (quotation marks omitted).

The Private Securities Litigation Reform Act ("the PSLRA") and Federal Rule of Civil Procedure 9(b) impose a heightened pleading requirement for the misrepresentation and scienter elements of a Section 10(b) claim. *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). Rule 9(b),

which applies where there are allegations of fraud, requires the pleading party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a strong inference of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254. The PSLRA "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002).

### Section 14(a) of the Securities Exchange Act of 1934

Section 14(a) prohibits false statements in proxy solicitations associated with registered securities. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9. The elements of a section 14(a) claim are: (1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions. *In re Browning-Ferris Indus., Inc. S'holder Derivative*

*Litig.*, 830 F. Supp. 361, 365 (S.D. Tex. 1993). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976). Plaintiffs in Section 14(a) actions are not required to comply with the PSLRA's scienter pleading requirement, but they must comply with the PSLRA's particularity requirement. *Hulliung v. Bolen*, 548 F.Supp.2d 336, 341 n.4 (N.D. Tex. 2008).

### Section 20(a) of the Securities Exchange Act of 1934

Section 20(a) of the Exchange Act imposes derivative liability upon any person who indirectly controlled any entity that committed securities fraud in violation of the Exchange Act. *See* 15 U.S.C. § 78t(a); *see also One Longhorn Land I, L.P. v. Defendant FF Arabian, LLC*, No. 4:15-CV-203, 2015 WL 7432360, at *2 (E.D. Tex. Nov. 23, 2015); *Trendsetter Inv'rs, LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL 172627, at *15 (S.D. Tex. Jan. 18, 2007). The statutory language identifies two components to a control-person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant. *Trendsetter*, 2007 WL 172627 at *15. The SEC defines the term "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405(f). Control can also "arise from business relationships, interlocking directors, family relationships and a myriad of other factors." *One Longhorn Land*, 2015 WL 7432360 at *3 (quotation marks omitted).

"Courts in the Fifth Circuit apply a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *Id.* at *2 (quotation marks omitted). At the pleading stage, "a plaintiff need only allege that [the defendant] possessed the power to control the primary violator, not that control was exercised." *Id.* at *3. The PSLRA's heightened pleading standard does not apply to claims under Section 20(a). *Id.* at *2.

## ANALYSIS

Plaintiffs have sued twelve defendants who were Alta Mesa executives or board members; two defendants who were executives at Silver Run; and four business entities that Plaintiffs deem "control entities." The Alta Mesa executive and board member defendants are:

(1) Hackett—CEO and a director of Silver Run; the Executive Chairman of the Alta Mesa Board of Directors; the COO of Kingfisher; interim CEO of Alta Mesa after Chappelle resigned; partner at Riverstone and co-head of Riverstone's Houston office.

(2) Chappelle—CEO of Alta Mesa; member of the Alta Mesa Board of Directors; CEO of AMH.

(3) William Gutermuth—member of the Alta Mesa Board of Directors.

(4) Jeffrey Tepper—member of the Alta Mesa Board of Directors.

(5) Diana Walters—member of the Alta Mesa Board of Directors.

(6) Ellis—founder of AMH; Vice President and COO–Upstream of Alta Mesa.

(7) Smith—Chief Accounting Officer of Alta Mesa.

(8) Don Dimitrievich—member of the Alta Mesa Board of Directors; Managing Director at Defendant HPS Investment Partners, LLC.

(9) Pierre Lapeyre—member of the Alta Mesa Board of Directors; founder of Riverstone.

(10)   David Leuschen—member of the Alta Mesa Board of Directors; founder of Riverstone.

(11)   William McMullen—member of the Alta Mesa Board of Directors; founder of Defendant Bayou City Energy Management, LLC.

(12)   Donald Sinclair—member of the Alta Mesa Board of Directors.

The Silver Run executive defendants are:

(1) Stephen Coats—Silver Run's corporate secretary; partner, general counsel, and Chief Administrative Officer at Riverstone.

(2) Thomas Walker—CFO of Silver Run; partner at Riverstone.

The four "control entity" defendants are:

(1) Riverstone—sponsored Silver Run and appointed Hackett, Lapeyre, and Leuschen to the Alta Mesa Board of Directors.

(2) ARM Energy Holdings LLC—the majority owner of Kingfisher prior to the merger.

(3) Bayou City Energy Management, LLC—appointed McMullen to the Alta Mesa Board of Directors; had a joint development agreement with AMH and was an indirect owner of AMH and Kingfisher through another company called High Mesa.

(4) HPS Investment Partners, LLC—had an ownership interest in AMH and Kingfisher prior to the merger; appointed Dimitrievich to the Alta Mesa Board of Directors.

Plaintiffs have detailed numerous statements by various defendants from SEC filings, press releases, conferences, and earnings calls. The circumstances surrounding the company's financial reporting, which the Court has summarized above, are alone enough to entitle Plaintiffs to discovery.

***Plaintiffs have pled sufficient facts to establish a claim under Section 10(b) against Defendants.***

Plaintiffs base their Section 10(b) claims in this case in part on Alta Mesa's first 10-K and the subsequent write-down. The 12 Alta Mesa executive and board member defendants all signed Alta Mesa's first 10-K, which was filed on March 29, 2018, less than two months after the special purpose acquisition company merger closed. *See* Alta Mesa Form 10-K dated March 29, 2018. Less than a year after that 10-K was filed, Alta Mesa disclosed a $3.1 billion dollar write-down, equivalent to more than 80% of the company's value. (Dkt. 69 at p. 52); *see also* Alta Mesa Form 8-K dated February 25, 2019. Alta Mesa further disclosed that it was unable to file its annual report on time because it "expect[ed] to report material weakness in its internal control over financial reporting in the 2018 Form 10-K" and "need[ed] additional time to ensure accuracy of its 2018 financial information[.]" (Dkt. 69 at p. 53); *see also* Alta Mesa Form NT 10-K dated March 4, 2019. Alta Mesa also confirmed that it "expect[ed] to report a net loss of $3.1 billion for the year ended December 31, 2018" because of the write-down. (Dkt. 69 at pp. 53–54); *see also* Alta Mesa Form NT 10-K dated March 4, 2019. Under the circumstances, the enormity of the write-down over such a short period of time is enough for the case against these defendants to proceed.

"A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10–K, regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under § 10(b) for

making a false statement." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 587 (S.D. Tex. 2003) (citing cases). "[W]hile a restatement of financials by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, a restatement can satisfy the pleading requirement[.]" *Id.* at 625 n.55 (citing cases).

Plaintiffs have presented other allegations sufficient to satisfy the pleading requirement. Among other things, here, the write-down constituted over 80% of Alta Mesa's value and was disclosed a year after the special purpose acquisition company merger. *Cf. Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 839–40 (N.D. Ill. 2000) (finding that the plaintiffs had adequately pled scienter when the improper accounting mischaracterized 20% of the company's total assets over a two-year period). The write-down came simultaneously with the news that Alta Mesa's accounting firm identified sixteen "material weaknesses" in Alta Mesa's internal control over financial reporting, including "[i]neffective controls over the identification and processing of relevant and reliable information[;]" "[i]neffective controls over the financial statement close and disclosure process, including the completeness, existence and accuracy of the financial information[;]" and "[i]neffective management review controls over various complex accounting estimates[.]" *See* Alta Mesa Form 10-K dated August 26, 2019. The SEC is investigating the write-down and Alta Mesa's accounting practices. *See* AMH Form 10-K dated May 17, 2019; *see also* Alta Mesa Form 10-K dated August 26, 2019. *Washtenaw County Emps. Ret. Sys. v. Avid Technology, Inc.*, 28 F. Supp. 3d 93, 114–15 (D. Mass. 2014) ("Here, the government investigation can be seen as one more piece of the puzzle,

a series of circumstances that add up to a strong inference of scienter."). Finally, Plaintiffs, relying on the accounts of two production engineers, allege that AMH and Alta Mesa clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates both before and after the merger. (Dkt. 69 at pp. 36–39, 48).

Plaintiffs have pled facts sufficient to show that the defendants who signed the March 29, 2018 10-K acted with the requisite severe recklessness under Section 10(b). The same circumstances also satisfy the pleading standard for claims related to the Proxy under Section 14(a); those claims are brought against Hackett, Gutermuth, Tepper, Walters, and Riverstone, who according to Plaintiffs "participated in the preparation, review and dissemination" of the Proxy. (Dkt. 69 at p. 94).

### *Plaintiffs have pled sufficient facts to establish a claim under Section 20(a).*

Plaintiffs' Section 20(a) claims involve allegations against the so-called "control entities." Two individual defendants and three entities—Stephen Coats, Thomas Walker, ARM Energy Holdings, Bayou City Energy, and HPS Investment Partners— have been sued by Plaintiffs solely under Section 20(a). As to Section 20(a), Plaintiffs have alleged a complex web of securities ownership, contracts, business relationships, interlocking directors, and other factors that satisfies the "relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *One Longhorn Land*, 2015 WL 7432360 at *2–3 (quotation marks omitted).

In the end, "[t]he PSLRA was enacted, in part, to compensate for the perceived inability of Rule 9(b) to prevent abusive, frivolous strike suits." *Tchuruk*, 291 F.3d at

354. Having considered Plaintiffs' allegations, the judicially noticeable SEC filings, and the applicable law, the Court cannot conclude that this lawsuit is an impermissible "strike suit." The Court cannot opine at this point whether Plaintiffs' claims will survive a motion for summary judgment, but Plaintiffs have established an entitlement to discovery.

## CONCLUSION

The defendants' motions to dismiss (Dkts. 116, 119, 120, 125, 126, 127, 128, 129) are **DENIED**. Discovery in this case may proceed.

SIGNED at Houston, Texas, this 14th day of April, 2021.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE