# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 449
FILED SEPTEMBER 28, 2023**

## CLASS PLAINTIFFS' OPPOSITION TO WILLIAM MCMULLEN'S
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING ........................................................... 1

APPLICABLE LEGAL STANDARD .................................................................................. 2

SUMMARY OF ARGUMENT............................................................................................. 2

    A.    McMullen and BCE's Investments in and Operational Control of AMH Leading up to the de-SPAC ................................................................. 3

    B.    Spacing Risks with AMH Wells Identified by McMullen and BCE Before the de-SPAC ..................................................................................... 5

    C.    McMullen and BCE's Diligence of KFM Prior to the de-SPAC ................. 7

    D.    The 2017 10-K and Decreased EBITDA Guidance ...................................... 8

    E.    Issues with Financial Planning or Financial Modeling ................................. 9

    F.    AMH's Limited Options to Go Public and the Benefits to McMullen if it Did So ................................................................................................... 10

ARGUMENT ....................................................................................................................... 10

I.    LEGAL STANDARD ................................................................................................ 10

II.    A REASONABLE JURY COULD CONCLUDE MCMULLEN ACTED WITH SCIENTER................................................................................................... 13

    A.    McMullen Had a Front Row Seat to Alta Mesa's Consistently Underwhelming Production ........................................................................ 13

    B.    McMullen Simply Rolled the Dice on KFM Despite His Concerns About KFM's Valuation and Internal Controls .......................................... 15

    C.    McMullen's Motive Further Supports the Existence of a Genuine Issue of Material Fact as to His Scienter...................................................... 19

III.    AS A SIGNATORY TO ALTA MESA'S 2017 10-K, MCMULLEN IS A "MAKER" OF THE ALLEGED MISSTATEMENTS CONTAINED THEREIN AND HIS ARGUMENTS REGARDING THE FALSE AND MISLEADING RISK FACTORS AND INTERNAL CONTROLS STRAIN CREDIBILITY ......................................................................................... 22

IV.   SUBSTANTIAL EVIDENCE SHOWS MCMULLEN IS A CONTROL
      PERSON WITH 20(a) LIABILITY ........................................................................ 24

CONCLUSION ............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................. 11

*Brody v. Zix Corp.*,
    C.A. No. 3:04-CV1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26,
    2006) ...................................................................................................................... 25

*Cooper Tire & Rubber Co. v. Farese*,
    423 F.3d 446 (5th Cir. 2005) ................................................................................ 11

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ................................................................................ 11

*Goldstein v. MCI Worldcom*,
    340 F.3d 238 (5th Cir. 2003) ................................................................................ 11

*In re Alstom SA Sec. Litig.*,
    454 F. Supp. 2d 187 (S.D.N.Y. 2006) .................................................................. 25

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    610 F. Supp. 2d 600 (S.D. Tex. 2009) ................................................................. 11

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................... 22, 25

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) .................................................................. 21

*In re Veon Ltd. Sec. Litig.*,
    No. 15-cv-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ............. 22

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................... 20

*Jaffe v. Bosco*,
    No. 3:96-CV-2064-X, 1996 WL 727981 (N.D. Tex. Sept. 26, 1996) .................. 25

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006) ................................................................ 25

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................................ 23

*N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013) ................................................................. 22

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) .............................................................................. 11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ....................................................................... 11, 19

*Petrie v. Elec. Game Card Inc.*,
    No. SACV 10–00252 DOC (RNBx), 2011 WL 165402 (C.D. Cal. Jan.
    12, 2011) ........................................................................................................... 22

*Royal Surplus Lines Ins. Co. v. Brownsville Indep. Sch. Dist.*,
    404 F. Supp. 2d 942 (S.D. Tex. 2005) .................................................................. 2

*Ryder v. Union Pac. R.R. Co.*,
    945 F.3d 194 (5th Cir. 2019) ............................................................................... 2

*S.E.C. v. Seghers*,
    298 F. App'x 319 (5th Cir. 2008) ...................................................................... 10

*S.E.C. v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ......................................................................... 20

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................................................ 22

*Stahl v. Novartis Pharm. Corp.*,
    283 F.3d 254 (5th Cir. 2002) ............................................................................... 2

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ......................................................................................... 19

*Trust Co. of Louisiana v. N.N.P. Inc.*,
    104 F.3d 1478 (5th Cir. 1997) .......................................................................... 11

## NATURE AND STAGE OF THE PROCEEDING

This is a certified class action pursuant to the Securities and Exchange Act of 1934 Sections 10(b), 14(a), and 20(a). (Dkt. 241). The dispute arose in the wake of the catastrophic collapse of Alta Mesa Resources, Inc. within a year after it was taken public on February 9, 2018, at a valuation of $3.8 billion by way of a SPAC named Silver Run Acquisition Corp. II ("Silver Run" or the "SPAC").[1]  The class includes shareholders who were entitled to vote on the de-SPAC transaction, as well as persons and entities who bought shares in the public SPAC or the successor entity, Alta Mesa Resources, Inc. ("AMR" or "Alta Mesa").  McMullen now moves for summary judgment on substantially identical grounds to those previously rejected by the Court on his motion to dismiss related to two materially false and misleading statements made in AMR's 2017 10-K, filed with the SEC on March 29, 2018.[2]  (Dkts. 157 and 160). For the reasons explained below, McMullen's motion should be denied.

## STATEMENT OF ISSUES TO BE RULED UPON

Have Class Plaintiffs adduced sufficient evidence to raise a genuine issue of material fact concerning McMullen's scienter on March 29, 2018 and that he was a

---

[1] A Glossary of defined terms and the names of individuals and entities referenced herein is attached as Appendix 1 for the Court's convenience. References to exhibits are designated "PX __" and are attached to the declaration of Andrew J. Entwistle (Dkt. 444).

[2] McMullen's Motion ("Dkt. 427" or "Motion") is silent regarding additional statements over which Plaintiffs allege he exercised control pursuant to Section 20(a).  *See* Complaint (Dkt. 218 ¶¶ 190, 192, 194, 196, 209, 211, 213, 216, 219, 221-222, 226-227, 229, 231, 233, 235, 237, 239, 241, 244-246, 248, 250, 252-254, 256, and Count II (p.113)).  Accordingly, those statements are not at issue on this motion and McMullen has conceded he is bound for trial regarding those claims.

"maker" of those misstatements for purposes of Section 10(b)?  Is McMullen entitled to summary judgment on the control person claims asserted against him for the misstatements in the 2017 10-K under Exchange Act Section 20(a)?

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the plaintiff, "the non-moving party can point to nothing in the record supporting its claim." *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).

## SUMMARY OF ARGUMENT

The motion should be denied. As the Court has already ruled, Class Plaintiffs state a Section 10(b) claim against McMullen both as a maker of two materially false and misleading statements made in AMR's 2017 10-K, and under Section 20(a) of the Exchange Act for his control over primary defendants who knowingly or recklessly made false and misleading statements before and after the de-SPAC. There is no occasion for the Court to revisit its decision on the sufficiency of the pleading as the Moving Defendants wrongly suggest; summary judgment concerns the sufficiency of the evidence. *Id.*

McMullen also summarily argues that Plaintiffs have not adduced evidence supporting their claims that he was a maker of the statements in AMR's 10-K, had the scienter necessary to support Section 10(b) liability, or that he was a control person for purposes of Section 20(a), a disfavored practice. *See Royal Surplus Lines Ins. Co. v. Brownsville Indep. Sch. Dist.*, 404 F. Supp. 2d 942, 948 (S.D. Tex. 2005) ("[T]he concept of a 'no evidence' summary judgment neither accurately describes federal law nor has any

particular import in the vernacular of federal summary judgment procedure."). However, the record developed in discovery amply demonstrates that McMullen "made" the statements in the 10-K and, both from his own involvement and through others at BCE, the entity he founded, had direct knowledge of the false statements of AMR and its CEO, Defendant Chappelle. McMullen and BCE had and exerted control through their ownership interests, board seats, and operational and financial relationships—including through BCE's joint operation with AMR of many of the subject wells through a joint development agreement ("JDA").

## **FACTS**

Class Plaintiffs dispute McMullen's statement that post-de-SPAC BCE "received around 14 percent of the economic interest in SRII Opco" as a result of the de-SPAC (Dkt. 427 at 5).  McMullen admitted BCE's equity interest in the go-forward entity was nearly 18%.  (Dkt. 428-4 at 10).  Otherwise, McMullen's Statement of Facts is largely devoid of citations to the record and instead relies principally on citing to the TAC, which offers him no support here. In addition to the facts described below, Class Plaintiffs incorporate by reference the facts set forth in their contemporaneously filed opposition (Dkt. 445 pp. 3-10) to the joint motion of HPS, BCE and ARM for summary judgment.

### A.   McMullen and BCE's Investments in and Operational Control of AMH Leading up to the de-SPAC

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Both before and after the de-SPAC closed in February 2018, the JDA wells made up a significant proportion of Alta Mesa's total on-production STACK wells.

Over the course of the following quarter, nearly half of all new AMH wells were JDA wells (13 of 28 wells in 1Q 2018).  (PX 166 at 48).

4

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████     McMullen became a member of the board of AMR with the closing of the

de-SPAC.  (PX 104 at 233/396).

In attending High Mesa/AMH/AMR board meetings, ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

**B.**     **Spacing Risks with AMH Wells Identified by McMullen and BCE**
            **Before the de-SPAC**

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

5

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ At least by June 2017, McMullen and BCE ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ In February 2018, less than two weeks after the de-SPAC closed, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

      ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ The Company had consistently said just the

opposite. (PX 51 at -377; PX 117 at 3██████████████████████

████████████████████████████████

**C.** **McMullen and BCE's Diligence of KFM Prior to the de-SPAC**

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

[REDACTED]

[REDACTED]

### D.    The 2017 10-K and Decreased EBITDA Guidance

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Alta Mesa was forced to reduce KFM 2018 EBITDA guidance by nearly half (from $185 million as disclosed in the Proxy to between $95 and $110 million) when it released its 2017 10-K on March 29, 2018.  (PX 104 at 195/396; PX 133).  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

McMullen signed the 2017 10-K.  (PX 162, Response No. 6).  The March 28, 2018 board meeting minutes reflect: [REDACTED]

[REDACTED]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

**E.    Issues with Financial Planning or Financial Modeling**

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

As noted above, McMullen and his BCE team also observed serious well production problems that contradicted Defendants' pre and post de-SPAC statements (*see supra* at Part B). ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

### F.    AMH's Limited Options to Go Public and the Benefits to McMullen if it Did So

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

## **ARGUMENT**

## I.    **LEGAL STANDARD**

"Scienter may be found if a reasonable jury can conclude that the defendant knew his statements were false when made." *S.E.C. v. Seghers*, 298 F. App'x 319, 333 (5th Cir. 2008).  But "[s]trict intentional misconduct is not required to show scienter[;] it is sufficient to prove conduct that is an extreme departure from the standards of ordinary care and presents a danger of misleading buyers of sellers, as well as either knowledge of that

10

danger, or a danger so obvious that the actor must be aware of it." *Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 1997) (emphasis added); *see also* MTD Order (Dkt. 160 at 21) (quoting *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)). Courts in the Fifth Circuit consider "whether the transaction at issue was critical to the company's continued vitality"; "whether the misrepresented information would have been readily apparent to the speaker"; and "whether the defendant's statements were internally inconsistent with one another." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023). "The Fifth Circuit allows a party to allege and prove scienter with direct and/or circumstantial evidence." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 610 F. Supp. 2d 600, 627 n.27 (S.D. Tex. 2009).

"[S]ummary judgment should be used sparingly when motive and intent are factors." *Id.* at 298; *see also Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005) ("[D]eterminations which involve the summary judgment movants' state of mind, are particularly ill-suited for summary judgment."). "[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury **could** return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) ("It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b-5 . . . ."); *Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003) (same).

McMullen already argued that Plaintiffs did not plead scienter or his Section 20(a) control – twice.  (Dkt. 129 at 9-14; Dkt. 264 at 5-8).  He lost – twice.  (Dkt. 160 at 26-27; Dkt. 343).  He did not move the Court to reconsider either of those orders, and he may not do so now.  *See* Fed. R. Civ. P. 60(c).  The same result should obtain here.  As Class Plaintiffs point out in their Opposition to Defendant Dimitrievich's Motion for Summary Judgment (Dkt. 446), which they hereby incorporate by reference herein, the PSLRA's pleading standard for scienter is ***more strict*** than the standard at summary judgment.

McMullen also fails to meet his initial burden to come forth with evidence refuting his scienter in moving for summary judgment and his motion should be denied on that basis alone. *See S.E.C. v. Blackburn*, No. 2015 WL 4876008, at *4 (E.D. La. Aug. 12, 2015) (denying summary judgment where the movant failed in its initial burden under Rule 56 because "'the motion failed to raise any factual issues at all, other than in the most conclusory terms'") (quoting *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir.1993)).  His argument concerning his lack of knowledge or recklessness is limited to a single paragraph that cites no evidence in the record except for a few selective quotations from his deposition transcript.  (Dkt. 427 at 16).  And the fact McMullen quotes or cites only to snippets of documents, ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

## II.     A REASONABLE JURY COULD CONCLUDE MCMULLEN ACTED WITH SCIENTER

### A.     McMullen Had a Front Row Seat to Alta Mesa's Consistently Underwhelming Production

Pre and post de-SPAC, McMullen and BCE had significant operational control over the JDA wells, ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████     *See supra*, Facts at Parts A-B; ██████████     ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Tellingly, just two days after the de-SPAC on February 20, 2018,

Those

production issues formed the basis for Alta Mesa's publicly stated reserve estimates and production goals – facts that were never disclosed to investors and that McMullen had knowledge of before signing the 2017 10-K.

**B.     McMullen Simply Rolled the Dice on KFM Despite His Concerns About KFM's Valuation and Internal Controls**

███████████████████████████████████████████████████████

██████████████████████████████████████████   ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

Nevertheless, on August 22, 2017, just a few days after the business combination

was announced, ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

      █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████      These various issues certainly implicated Alta Mesa's internal controls over

financial reporting, and they were, at least, recklessly ignored by McMullen when he

signed the 2017 10-K that identified no change in internal controls at AMR.  Indeed, less

than a year after the de-SPAC, Alta Mesa announced that it expected to record impairment

charges (write down) of its non-cash assets of approximately $3.1 billion and announced

16

that its internal controls were exposed to numerous material weaknesses.  (PX 154; *see also* MTD Opinion, Dkt. 160 at 26-28 (fact of write down and identification of material weaknesses so soon after the de-SPAC closed support strong inference that McMullen acted with scienter)).

McMullen argues that he was "'surprised' after seeing new Kingfisher EBITDA projections in March 2018 that differed from those presented to investors in the roadshow." (Dkt. 427 at 16).  The record contradicts this.  In addition to all of the above, as soon as the de-SPAC closed, ████████████████████████████████████████

████████████████████████████████████████████████

The underlying production metrics fared no better.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██ ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████

McMullen claims that his reliance on Riverstone's due diligence and valuation of KFM prior to the de-SPAC negates his scienter (Dkt. 427 at 16).  But that argument fails because ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

<hr>

[3] ████████████████████████████████████████████████████████████████████████████████████████

Furthermore, McMullen approved the 2017 10-K, including the KFM risk

disclosure, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ And, here, McMullen's post-

Class Period admissions regarding that matter are damning. ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ As

the Fifth Circuit has recently noted, "[t]he fact that a gamble – concealing bad news in the

hope that it will be overtaken by good news – fails is not inconsistent with its having been

a considered, though because of the risk a reckless, gamble." *Six Flags*, 58 F.4th at 215.

### C.     McMullen's Motive Further Supports the Existence of a Genuine Issue of Material Fact as to His Scienter

Facts demonstrating a speaker's motive or incentive to commit fraud are not

necessary to establish scienter (*see, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551

U.S. 308, 325 (2007)), and all of the above more than establishes a genuine issue of material

fact as to McMullen's scienter.  Nothing about McMullen's motive (or, as he suggests, lack

thereof) should change this result.  *Ryder*, 945 F.3d at 199.  This is particularly so, where

McMullen already futilely argued that his lack of motive required dismissal of the case

under Rule 12(b)(6), and the Court denied that motion applying a standard where it had to

19

weigh the competing inferences of scienter.  Dkt. 160 at 28; *see Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Tellingly, McMullen fails to cite a single case where a lack of motive alone, when juxtaposed against a wealth of evidence suggesting his deliberate deceit, was enough to warrant summary judgment on the issue of scienter.[4]

Nevertheless, McMullen had a significant incentive to engage in the fraud.  First,

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Second, his own deceitful conduct further ensured that Alta Mesa's share price would remain inflated long enough for BCE to exit that investment.  McMullen argues that he and BCE walked away from the de-SPAC with no cash, (Dkt. 427 at 12), but this does not mean that McMullen didn't have a motive or incentive to defraud, only that the scheme didn't work.  ████████████████████████████████████████████████████████

████████████████

Prior to the de-SPAC, McMullen found his company heavily invested in a private company with thin prospects and few avenues to exit the investment.  ██████████████

██████████████████████████████████████████████████████████████

---

[4] Like with his other arguments, McMullen merely recycles the same distinguishable out-of-circuit cases that failed to convince this Court at motion to dismiss that he lacked scienter.  *Compare* Dkt. 427 at 13-15 *with* Dkt. 129 at 14.  For example, the benefits received by McMullen and BCE, here, are far different from those in *Wet Seal* where there was no merger or acquisition facilitated by the defendants' misstatements, and, as well, no earnout opportunities afforded by an inflated stock price as here (as described, *supra*).  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007).  For similar reasons, *Steadman* is not a useful comparison.  *S.E.C. v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ McMullen

himself may have received no equity in the business combination, but BCE, the company

he founded and managed, was heavily invested and owned nearly 18% of Alta Mesa after

the business combination.  (Dkt. 428-4 at 10).

Further, as McMullen acknowledges (Dkt. 427 at 13), BCE's investment included

significant earn-outs, which were only available at certain per-share thresholds above the

original issuance price.  ███████████████████████████████

██████████████████████████████████████ Further, given

the initial investment cost to BCE and the number of shares it received in the de-SPAC,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ The fact that ████████████

████████████████████████████████████████████████████████

██████████████████████████████████ is unsurprising and

does not negate scienter as McMullen wrongly suggests. *See In re MF Glob. Holdings Ltd.*

*Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013).

The fact McMullen and BCE may have had differing investment theses is likewise

unavailing—particularly where, as here, McMullen and BCE's insider knowledge allowed

BCE and a partner to buy the assets of AMH and KFM out of bankruptcy for $225,225,000,

just 5.9% of the $3.8 billion dollar value of the business combination reflected in the Proxy.

*See In re: Alta Mesa Resources, Inc., et al.*, No. 19-35133 (MI) (S.D. Tex. Bankr.) ECF 1868-4 at 168; 1868-5 at 98.

### III.   AS A SIGNATORY TO ALTA MESA'S 2017 10-K, MCMULLEN IS A "MAKER" OF THE ALLEGED MISSTATEMENTS CONTAINED THEREIN AND HIS ARGUMENTS REGARDING THE FALSE AND MISLEADING RISK FACTORS AND INTERNAL CONTROLS STRAIN CREDIBILITY

McMullen signed Alta Mesa's 2017 10-K, filed with the SEC on March 29, 2018; about that fact, there is no dispute.  McMullen admits as much.  (PX 162, Response No. 6).  Thoughtful legal analysis of McMullen's "maker" argument ends here, as courts in the Fifth Circuit and throughout the country have regularly and repeatedly held, "A corporate official . . . who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under §10(b) for making a false statement."  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) ("*Enron II*") (collecting cases); *N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 744 (N.D. Tex. 2013) (same).  McMullen's own authority is in agreement.  *See Petrie v. Elec. Game Card Inc.*, No. SACV 10–00252 DOC (RNBx), 2011 WL 165402, at *3 (C.D. Cal. Jan. 12, 2011); *In re Veon Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2018 WL 4168958, at *15 (S.D.N.Y. Aug. 30, 2018); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).  McMullen does not seem to disagree with any of the above.  His argument regarding whether he was a 'maker' is largely focused on unidentified statements made by others (Dkt. 427 at 17-18), but

Plaintiffs only allege Section 20(a) liability as to those statements -- which McMullen did not otherwise address in his Motion.

McMullen also futilely attempts to Trojan Horse the same falsity and materiality arguments that failed at the motion to dismiss stage into his "maker" argument, arguing that Alta Mesa's false statements regarding the risk factor "could not possibly be material." Dkt. 427 at 19. ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Likewise unavailing is AMR's March 2018 press conference statement attributing decreased revenue guidance at KFM to "delayed drilling" by third parties, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *Supra* at §II.A-B; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) (risk factor statements that "continually skew[] the mix of information by omitting the known severe risks . . . even as they recognize[] signs that those risks had already materialized" are plainly false and misleading); ████████████████████████████████████████████████████

McMullen's internal control arguments likewise strain credibility. McMullen argues that the internal control statement is not false and misleading because the statement refers only to Silver Run II's internal controls, rather than Alta Mesa's or KFM's. (Dkt. 427 at 20). This argument fails with any plain reading of the 10-K and the internal logic

therein, which makes clear that the statement is referring to the internal controls of the predecessor operating companies, AMH and/or KFM, not Silver Run II.  (PX 131 at 54).  For example, Chappelle's and McCabe's SOX certifications regarding internal controls included with the 10-K could only have been made for AMH and KFM—not Silver Run II which had no operating business and for which they had no role in at the time (Q4 2017) — making it clear that the internal controls statement concerns AMH and KFM.  (PX 131, Ex. 31.1 & 31.2).  McMullen's argument regarding the first page of the 10-K is equally unavailing insofar as the annual report is chock full of details of Alta Mesa and KFM, including two dozen pages "Related to our E&P Business."  (PX 131 at 13-36).  It is the details about Alta Mesa and KFM that are reported in the 10-K in the first person ("we," "our," or "us"), just as the internal control statement is in the first person. (*See, e.g.*, PX 131 at 3). Indeed, the 10-K specifically defines "we," "our," or "us" to include, depending on the context, Alta Mesa and KFM prior to the de-SPAC.  (*Id.* at ii).

## IV.   SUBSTANTIAL EVIDENCE SHOWS MCMULLEN IS A CONTROL PERSON WITH 20(a) LIABILITY

Defendant McMullen makes only a cursory, conclusory effort to argue that he is not liable under §20(a); his effort merely joins the arguments of his co-defendants,[5] and repeats his errant "maker" arguments. ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5] These arguments fail for the reasons stated in Class Plaintiffs' opposition (Dkt. 445) to joint motion of HPS, BCE and ARM for summary judgment.

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ The facts discussed above regarding McMullen's knowledge, his and BCE's direct involvement in AMH and AMR operations through the JDA pre and post de-SPAC, his role as a board member of AMH/High Mesa and KFM investor pre de-SPAC, his membership on the AMR board post de-SPAC, ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████ and the fact he signed the 10-K are all more than sufficient for the question of his control to go to the jury. *See, e.g.*, *Enron II*, 258 F. Supp. 2d at 598 (outside director that signed false registration statement was a control person); s*ee also Brody v. Zix Corp.*, C.A. No. 3:04-CV1931-K, 2006 WL 2739352, at *9 (N.D. Tex. Sept. 26, 2006) (same); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 665–66 (W.D. Tex. 2006) (same); *Jaffe v. Bosco*, No. 3:96-CV-2064-X, 1996 WL 727981, at *6 (N.D. Tex. Sept. 26, 1996) (same). And Plaintiffs are permitted to present theories of Section 20(a) and Section 10(b) liability in the alternative as they have done here. *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 211-12 (S.D.N.Y. 2006).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant McMullen's motion for summary judgment (Dkt. 427) in its entirety.

Dated:  September 21, 2023                Respectfully submitted,


/s/ Andrew J. Entwistle                     /s/ Trig Smith
Andrew J. Entwistle (attorney-in-charge)    Trig Smith (*pro hac vice*)
State Bar No. 24038131                       Sean McGuire (*pro hac vice*)
Callie Crispin                               Lonnie Browne (*pro hac vice*)
State Bar No. 24104231                       John Kelley (*pro hac vice*)
Sal H. Lee (*pro hac vice*)

**ROBBINS GELLER RUDMAN &**
**ENTWISTLE & CAPPUCCI LLP**               **DOWD LLP**
500 West 2nd Street, Suite 1900            655 West Broadway, Suite 1900
Austin, TX 78701                           San Diego, CA 92101
Telephone: (512) 710-5960                  Telephone: (619) 231-1058
Facsimile: (212) 894-7278                  Facsimile: (619) 231-7423

-and-                                      *Court-Appointed Co-Lead Counsel*


Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*


Ira A. Schochet (*pro hac vice*)
David Saldamando (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven*
*Fund, A Series of Frank Funds Trust*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on September 21, 2023.

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle

# APPENDIX 1

## GLOSSARY OF KEY TERMS, ENTITIES AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|------|-------------|
| AMR | Alta Mesa Resources, Inc., the publicly traded post-de-SPAC company. |
| AMH | Alta Mesa Holdings, LP, the private pre-de-SPAC company. |
| Alta Mesa | Refers to AMR (post de-SPAC) and/or AMH (pre de-SPAC). |
| AM Management | AM Equity Holdings Inc., an entity owned by Defendants Chappelle and Ellis. |
| ARM or ARM Energy | Moving Defendant ARM Energy Holdings LLC. |
| BCE or Bayou City | Moving Defendant Bayou City Energy Management LLC. |
| Bullis-Coleman | A ten well pattern spacing test conducted by AMH. |
| Chappelle | Defendant Hal Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Citi | Citigroup Global Markets Inc., advisor to Silver Run II. |
| Child Well | Subsequent wells drilled in a section surrounding the initial Parent Well. |
| Class Plaintiffs | Plaintiffs in the TAC and Court-appointed Class Representatives (Dkt. 241): FNY Partners Fund, LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (formerly Plumbers and Pipefitters National Pension Fund) and Camelot Event Driven Fund, a Series of Frank Funds Trust. |
| Chisholm | Upstream company in the STACK and Kingfisher customer. |
| Christopher | Michael Christopher, CFO at Moving Defendant ARM Energy during the relevant period. |
| Collins | Craig Collins, VP and COO of Kingfisher from April 2018 to April 2019. |
| Complaint or TAC | The Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 6, 2021 (Dkt. 218). |

| **Term** | **Description** |
|---|---|
| Cusimano | Catherine Cusimano, associate at Moving Defendant HPS on the Energy and Power team during the relevant period. |
| Dimitrievich | Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| De-SPAC or Business Combination | The merger of Silver Run II with Kingfisher and AMH on February 9, 2018. |
| Downspacing | The drilling of additional wells in an already developed area. |
| Drainage | The syphoning off of oil either between fractured layers of rock or because of downspacing. |
| Dunne | Charles "Bo" Dunne, VP Finance at ARM Energy. |
| EBITDA | An acronym for the financial metric "Earnings Before Interest, Taxes, Depreciation and Amortization." |
| EHU | East Hennessey Unit. A five well pattern spacing test conducted by AMH. |
| Ellis | Defendant Mike Ellis, COO of AMH and later AMR until December 2018. |
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting fluids from wellbores. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the anticipated total quantity of oil or gas that is potentially recoverable or has already been recovered from a reserve or well. |
| Exchange Act | The Securities and Exchange Act of 1934. |
| Gastar | Upstream company in the STACK and Kingfisher customer. |
| Hackett | Defendant James Hackett, a Riverstone Partner, CEO of Silver Run II prior to the de-SPAC and Executive Chairman of the Board of Directors of AMR. |
| High Mesa | High Mesa, Inc., a now bankrupt entity owned by BCE, HPS and AM Management that prior to the de-SPAC owned AMH and approximately one-third of Kingfisher. |
| Hostettler | Jeffrey Hostettler, Managing Director at HPS. |
| HPS | Moving Defendant HPS Investment Partners, LLC. |

| Term | Description |
|---|---|
| Huntsman | A four well pattern spacing test conducted by AMH. |
| Javanmardi | Eliot Javanmardi, an employee of Moving Defendant HPS. |
| JDA | The 2016 Joint Drilling Agreement between AMH and Bayou City, where Bayou City funded the development of 40 wells. The JDA was later expanded to 80 wells. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with Silver Run II in the de-SPAC. |
| McClure | David McClure, Vice President of Infrastructure & Midstream at AMH and AMR during the relevant period. |
| McMullen | Defendant William McMullen, founder and Managing Partner of Moving Defendant BCE. |
| Meramec | One of the two STACK formations that Alta Mesa planned to target in its base case development plan. |
| Moving Defendants | ARM Energy Holdings LLC, Bayou City Energy Management LLC and HPS Investment Partners, LLC. |
| Parent Well | The initial well drilled by an operator in a section. |
| PIPE | Stands for "private investment in public equity," a method of bringing additional outside funding into a transaction. |
| Project Rugby | Internal name for the Kingfisher transaction process. |
| Proxy | The Definitive Merger Proxy Statement issued to Silver Run II's shareholders on Schedule 14A, dated January 19, 2018, and all supplements and amendments thereto.  The Proxy is PX 104 attached to the Declaration of Andrew J. Entwistle. |
| Riverstone | Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP, a Defendant that was the sponsor of Silver Run II. |
| Silver Run II, Silver Run or SR II | The SPAC entity created by Riverstone that merged with KFM and AMH. |
| SPAC | Acronym for "special purpose acquisition company," also called "blank check company." |

3

| **Term** | **Description** |
| --- | --- |
| Opco | The operating company formed in connection with the de-SPAC to own the full economic interest in AMH and Kingfisher. |
| Operator Agreement | Second Amended and Restated Operating and Construction Management Agreement, dated August 4, 2017, between Kingfisher and ARM Energy. |
| Section | A 640-acre land area established by the State of Oklahoma for purposes of dividing oil and gas drilling. |
| Smith | Defendant Ronald Smith, Chief Accounting Officer at AMR for portion of the relevant record. |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Stoner | Mark Stoner, Partner at Moving Defendant BCE. |
| TSA | Operating Transition Services Agreement, dated February 9, 2018, between ARM Energy and Kingfisher that replaced the pre-SPAC Operator Agreement. |
| Type Curve | A projection of the expected EUR of a well based on a statistical average of similar wells within the same reservoir. |
| WPS | Wells per section. |