# PX 41

REDACTED IN ITS ENTIRETY

# PX 42

REDACTED IN ITS ENTIRETY

# PX 43

EX-99.1 2 a17-20303_1ex99d1.htm EX-99.1

**Exhibit 99.1**

FOR IMMEDIATE RELEASE

### Silver Run Acquisition Corporation II to Merge with Alta Mesa and Kingfisher Midstream to Form a Combined Company Valued at Approximately $3.8 Billion

**HOUSTON, TX, August 16, 2017** — Silver Run Acquisition Corporation II ("Silver Run II") (NASDAQ: SRUN, SRUNU, SRUNW) today announced that, subject to certain conditions, it has entered into definitive agreements to combine with Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream, LLC ("Kingfisher"). Alta Mesa is an independent exploration and production company with assets located in the STACK play in Oklahoma. Kingfisher is a company engaged in the gathering, processing, and marketing of hydrocarbons in the STACK play (collectively, the "business combination").

Founded in 1987 by Michael E. Ellis and based in Houston, Texas, Alta Mesa is a leading pure-play exploration and production company focused on the prolific STACK play in the Anadarko Basin. With approximately 120,000 contiguous net acres and about 4,200 gross identified drilling locations, Alta Mesa is among the largest and most active operators in the STACK. Since 2012, Alta Mesa has drilled to total-depth 205 STACK horizontal wells, in order to further delineate and de-risk its approximate 300 square mile position in the up-dip oil window of the STACK. To date, Alta Mesa has completed 173 of these wells, with 167 on production. Based upon production through the second quarter of 2017, Alta Mesa expects EURs at year end to exceed 650 MBOE per well or approximately 140 BOE per foot of lateral.

Kingfisher Midstream is a private midstream company with a leading position in the STACK play, with Alta Mesa serving as its anchor producer. Kingfisher's assets include over 300 miles of pipeline, 50 thousand barrels of crude storage capacity, and 60 MMcf/d of gas processing capacity with an additional 200 MMcf/d cryogenic plant expansion expected to commence operations in the fourth quarter of 2017. With approximately 300,000 gross dedicated acres from Alta Mesa and five other third party customers, Kingfisher is uniquely positioned to capitalize on the increasing development activity in the STACK.

At consummation of the transaction, Silver Run II is expected to be renamed Alta Mesa Resources, Inc. and trade on the NASDAQ stock exchange under the ticker symbol "AMR". James T. Hackett, Chairman and Chief Executive Officer of Silver Run II, will serve as Executive Chairman following the consummation of the business combination, while Harlan H. Chappelle, Michael E. Ellis, and Michael A. McCabe will continue as Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Alta Mesa Resources, Inc., respectively.

Mr. Hackett commented, "We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform. The combination of Alta Mesa and Kingfisher is a perfect strategic match for our desired integrated platform. Alta Mesa's highly contiguous core acreage position in Northeast Kingfisher County has among the lowest breakevens in the U.S. at around $25 per barrel. Kingfisher adds a highly strategic and synergistic midstream subsidiary with significant additional third party growth potential. We are excited about the possibilities for the combined company, including a potential future midstream IPO. Importantly, the current owners of Alta Mesa and Kingfisher are investing alongside Silver Run II's stockholders by committing to hold significant amounts of equity in the combined company. I am very excited about the opportunity to work alongside Hal Chappelle, Mike Ellis, Mike McCabe and the Alta Mesa team in this pure-play STACK upstream and midstream company. It is the first of its kind in the public markets, and we believe it creates significant advantages for both organic and inorganic growth for our stockholders."

1

**Exhibit
CP- 0104**

3/1/2023
Cole

Mr. Chappelle stated, "We see this as a tremendous way to continue our evolution as a low-cost, high-value producer in the STACK. We have been fortunate to have strong financial partners in HPS Investment Partners and Bayou City Energy during a pivotal stage of growth, and we are well-positioned for this next stage. Mike Ellis and I are excited about the opportunity to work with Jim Hackett, Silver Run II, and Riverstone to continue building a great enterprise. Kingfisher Midstream is a creative addition, as it has been an important factor in our growth, providing effective gathering, efficient processing, and assurance that our production will continue to flow as the activity in the basin expands."

Zach Lee, Chief Executive Officer of ARM Energy Holdings, LLC ("ARM"), the operator of Kingfisher's assets and an equity owner of Kingfisher, noted, "We are very pleased by the success that Kingfisher has garnered. ARM's downstream intelligence and in-depth fundamentals analysis identified the STACK play early as a rapidly growing region in need of midstream infrastructure and proactively solved for a takeaway solution for its producer partners, chief among them Alta Mesa as one of the most active and successful drillers

in the play. We have experienced firsthand the production growth Alta Mesa has been able to achieve and are pleased to be a shareholder and continue our partnership with our existing financial partner, HPS Investment Partners, as well as Silver Run II, Riverstone, and Alta Mesa."

Alta Mesa Resources will have an aggregate market capitalization of approximately $3.8 billion. At $10.00 per share, the combined company would represent a valuation of 7.1x FV/2018E EBITDA. Alta Mesa would represent 6.1x FV/2018E EBITDA, and Kingfisher would represent 7.3x FV/2018E EBITDA. Riverstone and Alta Mesa management will collectively own a significant portion of the combined company, representing approximately 34% of the pro-forma market capitalization.

The transaction is subject to the approval of Silver Run II stockholders and the satisfaction or waiver of other customary closing conditions, including the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. The transaction is expected to close in the fourth quarter of 2017.

The description of the business combination and related transactions contained herein is only a summary and is qualified in its entirety by reference to the related contribution agreements and other related agreements.

**Advisors**

Citigroup acted as capital markets advisor to Silver Run II, Tudor, Pickering, Holt & Co. acted as financial advisor to Silver Run II, and Latham & Watkins LLP acted as its legal counsel.

Citigroup acted as sole financial advisor and lead capital markets advisor to Alta Mesa. Goldman Sachs and Morgan Stanley also acted as capital markets advisors to Alta Mesa. Haynes & Boone LLP acted as legal advisor to Alta Mesa.

JP Morgan served as lead financial advisor and Barclays acted as co-financial advisor to Kingfisher. Bracewell LLP acted as legal advisor to HPS Investment Partners and Kingfisher, Durham, Jones & Pinegar acted as legal advisor to ARM and Kirkland & Ellis LLP represented Bayou City Energy.

**Investor Call and Presentation Information**

A pre-recorded conference call offering commentary from management of Silver Run II and Alta Mesa on the transaction details will be made available to all investors on August 17, 2017 at 5:00 a.m. Central time (6:00 a.m. Eastern time). The pre-recorded remarks can be accessed via webcast by visiting the following website: www.altamesa.net. In addition, an investor presentation will be filed with the Securities and Exchange Commission (the "SEC") on August 17, 2017, which can be viewed on the SEC website at www.sec.gov.

2

---

**About Silver Run Acquisition Corporation II**

Silver Run Acquisition Corporation II is an energy-focused special purpose acquisition company formed by Riverstone Holdings LLC ("Riverstone") for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. The company's strategy is to identify, acquire and, after its business combination, build a company in the energy industry that complements the experience of its management team and can benefit from their operational experience and expertise.

**About Alta Mesa Resources, Inc.**

Alta Mesa Resources is an independent exploration and production company focused on the development and acquisition of unconventional oil and natural gas reserves in the Anadarko Basin.

**About Kingfisher Midstream, LLC**

Kingfisher was formed by HPS Investment Partners and ARM to provide midstream energy services, including crude oil gathering, gas gathering and processing and marketing to producers of natural gas, natural gas liquids ("NGLs"), crude oil and condensate.

**About ARM Energy Holdings, LCC**

ARM Energy Holdings, LLC ("ARM") is a private, Delaware limited liability company. ARM is a producer services company operating in the physical marketing, trading and midstream sectors. Additionally, ARM provides hedging advisory services to over 130 upstream companies.

**About Riverstone Holdings, LLC**

Riverstone Holdings LLC is an energy and power-focused private investment firm founded in 2000 by David M. Leuschen and Pierre F. Lapeyre, Jr. with over $37 billion of capital raised. Riverstone conducts buyout and growth capital investments in the exploration & production, midstream, oilfield services, power, and renewable sectors of the energy industry. With offices in New York, London, Houston, and Mexico City, Riverstone has committed over $35 billion to more than 130 investments in North America, Latin America, Europe, Africa, Asia, and Australia.

**About Bayou City Energy Management LLC**

Bayou City Energy Management LLC ("BCE") is a private equity firm founded in 2015 to focus on making investments in the North American upstream oil and gas sector. BCE targets privately negotiated investments through two complementary strategies: providing buyout and growth equity capital for operators with current production and exploitable upside, and partnering with operators to provide dedicated drilling capital in off-balance sheet structures. The BCE team, combined with the firm's Advisory Board and strategic relationship with Argus Energy Managers, provides operators access to expertise, capital, and trusted partnership.

3

**About HPS Investment Partners, LLC**

HPS Investment Partners, LLC ("HPS") is a leading global investment firm with a focus on non-investment grade credit. Established in 2007, HPS has approximately 100 investment professionals and over 200 total employees, and is headquartered in New York with ten additional offices globally. HPS was originally formed as a unit of Highbridge Capital Management, LLC, a subsidiary of J.P. Morgan Asset Management, and formerly known as Highbridge Principal Strategies, LLC. In March 2016, the principals of HPS acquired the firm from J.P. Morgan, which retained Highbridge's hedge fund strategies. As of June 2017, HPS had approximately $41 billion of assets under management and since inception has invested over $4 billion in the energy and power industries.

**Forward-Looking Statements**

This communication includes certain statements that may constitute "forward-looking statements" for purposes of the federal securities laws. Forward-looking statements include, but are not limited to, statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements may include, for example, statements about: the parties' ability to effect the business combination; the benefits of the business combination; the future financial performance of Silver Run II following the business combination; and changes in Alta Mesa's and Kingfisher's strategy, future operations, financial position, estimated revenues, and losses, projected costs, prospects, plans and objectives of management. These forward-looking statements are based on information available as of the date of this press release, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing Silver Run II's or Alta Mesa's views as of any subsequent date, and Silver Run II and Alta Mesa do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. You should not place undue reliance on these forward-looking statements. As a result of a number of known and unknown risks and uncertainties, Silver Run II's actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include: (i) the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the definitive agreements relating to the business combination; (ii) the outcome of any legal proceedings that may be instituted against Silver Run II following announcement of the business combination; (iii) the inability to complete the business combination due to the failure to obtain approval of the stockholders of Silver Run II, or other conditions to closing in the definitive agreements relating to the business combination; (iv) the risk that the proposed business combination disrupts current plans and operations of Silver Run II, Alta Mesa or Kingfisher as a result of the announcement and consummation of the business combination; (v) Silver Run II's ability to realize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of Silver Run II to grow and manage growth profitably following the business

combination; (vi) costs related to the business combination; (vii) changes in applicable laws or regulations; and (viii) the possibility that Silver Run II, Alta Mesa or Kingfisher may be adversely affected by other economic, business, and/or competitive factors.

4

## No Offer or Solicitation

This communication is for informational purposes only and shall not constitute an offer to sell or the solicitation of an offer to buy any securities pursuant to the proposed business combination and other transactions described herein or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

## Important Information For Investors and Stockholders

In connection with the proposed business combination, Silver Run II intends to file a proxy statement with the SEC. The definitive proxy statement and other relevant documents will be sent or given to the stockholders of Silver Run II and will contain important information about the proposed business combination and related matters. **Silver Run II stockholders and other interested persons are advised to read, when available, the proxy statement in connection with Silver Run II's solicitation of proxies for the meeting of stockholders to be held to approve the proposed business combination because the proxy statement will contain important information about the transaction**. When available, the definitive proxy statement will be mailed to Silver Run II stockholders as of a record date to be established for voting on the proposed business combination. Stockholders will also be able to obtain copies of the proxy statement, without charge, once available, at the SEC's website at www.sec.gov.

## Participants in the Solicitation

Silver Run II and its directors and officers may be deemed participants in the solicitation of proxies of Silver Run II stockholders in connection with the proposed business combination. Silver Run II stockholders and other interested persons may obtain, without charge, more detailed information regarding the directors and officers of Silver Run II in its Registration Statement on Form S-1 initially filed with the SEC on March 2, 2017. Additional information will be available in the definitive proxy statement when it becomes available.

## Reserves

Estimated Ultimate Recoveries, or "EURs," refers to estimates of the sum of total gross remaining proved reserves per well as of a given date (SEC pricing) and cumulative production prior to such given date for developed wells. EURs of horizontal wells will vary depending upon many factors, including, without limitation, lateral lengths, spacing and number of fracing stages, and quality of the penetrated formation. These quantities do not necessarily constitute or represent reserves as defined by the SEC and are not intended to be representative of anticipated future well results of all wells drilled on Alta Mesa's STACK acreage.

## Contact:

Silver Run Acquisition Corporation II
Jeffrey Taufield / Daniel Yunger
Kekst
(212) 521-4800

Alta Mesa Holdings, LP
Lance L. Weaver
(281) 943-5597
lweaver@altamesa.net

SOURCE: Silver Run Acquisition Corporation II and Alta Mesa Holdings, LP

5

# PX 44

## REDACTED IN ITS ENTIRETY

# PX 45

## REDACTED IN ITS ENTIRETY

# PX 46

## REDACTED IN ITS ENTIRETY

# PX 47

EX-2.1 2 a17-20303_2ex2d1.htm EX-2.1

**Exhibit 2.1**

Execution Version

**CONTRIBUTION AGREEMENT**

by and among

HIGH MESA HOLDINGS, LP

HIGH MESA HOLDINGS GP, LLC,

ALTA MESA HOLDINGS, LP,

ALTA MESA HOLDINGS GP, LLC,

SILVER RUN ACQUISITION CORPORATION II,

solely for purposes of Section 6.7, Section 10.3 and Section 11.13,

the Contributor Owners party hereto,

and, also for purposes of Section 6.6(j),

Michael E. Ellis

Dated as of August 16, 2017

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| ARTICLE I DEFINITIONS AND CONSTRUCTION |  |  | 2 |
| | 1.1 | Definitions | 2 |
| | 1.2 | Rules of Construction | 22 |
| ARTICLE II CONTRIBUTION AND CLOSING |  |  | 23 |
| | 2.1 | Buyer Contribution | 23 |
| | 2.2 | Contributor's Contributions | 23 |
| | 2.3 | Closing | 24 |
| | 2.4 | Closing Deliveries by the Contributor | 24 |
| | 2.5 | Closing Deliveries by Buyer | 25 |
| | 2.6 | Contribution Price Adjustments | 26 |
| | 2.7 | Earn-Out Consideration | 28 |
| | 2.8 | Withholding | 29 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING THE CONTRIBUTOR |  |  | 30 |
| | 3.1 | Organization | 30 |
| | 3.2 | Authority | 30 |
| | 3.3 | No Conflicts; Consents and Approvals | 30 |
| | 3.4 | Governmental Approvals | 30 |
| | 3.5 | Title to Interests | 31 |
| | 3.6 | Legal Proceedings | 31 |

PLAINTIFFS_AMR_00000243

| | | |
|---|---|---|
| 3.7 | Contributor Benefit Plans | 31 |
| 3.8 | Brokers | 31 |
| 3.9 | Accredited Investor; Investment Intent | 31 |
| 3.10 | Tax Matters | 32 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES REGARDING THE ALTA MESA ENTITIES**   32

| | | |
|---|---|---|
| 4.1 | Organization | 32 |
| 4.2 | Authorization | 32 |
| 4.3 | No Conflicts; Consents and Approvals | 33 |
| 4.4 | No Defaults | 33 |
| 4.5 | Governmental Approvals | 33 |
| 4.6 | Capitalization; Rights to Acquire Equity | 34 |
| 4.7 | Subsidiaries | 35 |
| 4.8 | Insurance | 35 |
| 4.9 | Legal Proceedings | 35 |
| 4.10 | Compliance with Laws and Orders | 36 |
| 4.11 | Anti-Corruption and Sanctions | 36 |
| 4.12 | Financial Statements | 37 |
| 4.13 | Absence of Certain Changes or Events | 37 |
| 4.14 | No Undisclosed Liabilities | 37 |

i

| | | |
|---|---|---|
| 4.15 | Taxes | 38 |
| 4.16 | Material Contracts | 39 |
| 4.17 | Alta Mesa Real Property | 41 |
| 4.18 | Oil and Gas Matters | 43 |
| 4.19 | Personal Property | 45 |
| 4.20 | Permits | 45 |
| 4.21 | Environmental Matters | 45 |
| 4.22 | Compensation; Benefits | 46 |
| 4.23 | Employees and Labor Matters | 47 |
| 4.24 | Related Party Transactions | 48 |
| 4.25 | Brokers | 48 |
| 4.26 | Alta Mesa SEC Documents | 48 |
| 4.27 | Information Supplied | 49 |
| 4.28 | Preferential Rights | 49 |
| 4.29 | Credit Support Instruments | 49 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER**   49

| | | |
|---|---|---|
| 5.1 | Organization | 50 |
| 5.2 | Authorization | 50 |
| 5.3 | No Conflicts | 50 |
| 5.4 | Governmental Approvals | 51 |
| 5.5 | Capital Structure | 51 |
| 5.6 | Capitalization of the General Partner and the Partnership | 52 |
| 5.7 | No Undisclosed Liabilities | 52 |
| 5.8 | Buyer SEC Documents | 53 |
| 5.9 | Legal Proceedings | 54 |
| 5.10 | Compliance with Laws and Orders | 54 |
| 5.11 | Brokers | 54 |
| 5.12 | Trust Account | 54 |
| 5.13 | Information Supplied; Proxy Statement | 54 |
| 5.14 | Absence of Certain Changes or Events | 55 |
| 5.15 | No Default | 55 |
| 5.16 | Listing | 55 |

PLAINTIFFS_AMR_00000244

| | | |
|---|---|---:|
| 5.17 | Financial Resources | 55 |
| 5.18 | Investment Company | 55 |
| 5.19 | Accredited Investor; Investment Intent | 55 |
| 5.20 | Opportunity for Independent Investigation | 56 |

**ARTICLE VI COVENANTS**　　　　56

| | | |
|---|---|---:|
| 6.1 | Regulatory and Other Approvals | 56 |
| 6.2 | Access | 57 |
| 6.3 | Conduct of Business | 59 |
| 6.4 | Certain Restrictions | 59 |
| 6.5 | D&O Indemnity | 62 |
| 6.6 | Tax Matters | 63 |
| 6.7 | Public Announcements; Confidentiality | 66 |
| 6.8 | [Reserved] | 67 |

ii

| | | |
|---|---|---:|
| 6.9 | The Proxy Statement and the Special Meeting | 67 |
| 6.10 | Cooperation on Financing Matters | 69 |
| 6.11 | Further Assurances | 70 |
| 6.12 | Exclusivity | 71 |
| 6.13 | Notice of Certain Events | 72 |
| 6.14 | Pre-Closing Reorganization | 72 |
| 6.15 | Kingfisher Contribution Agreement and Riverstone Contribution Agreement | 72 |
| 6.16 | Reasonable Best Efforts | 72 |
| 6.17 | Treatment of Certain Alta Mesa Group Plans | 73 |
| 6.18 | Founder Notes | 73 |
| 6.19 | LTIP Plan | 73 |

**ARTICLE VII BUYER'S CONDITIONS TO CLOSING**　　　　74

| | | |
|---|---|---:|
| 7.1 | Contributor Representations and Warranties | 74 |
| 7.2 | Representations and Warranties of Alta Mesa Parties | 74 |
| 7.3 | Performance | 74 |
| 7.4 | No Material Adverse Effect | 74 |
| 7.5 | Orders and Laws | 74 |
| 7.6 | HSR Act | 75 |
| 7.7 | Stockholder Approval | 75 |
| 7.8 | Concurrent Closing of Kingfisher Contribution Agreement | 75 |
| 7.9 | Partnership Leverage Ratio | 75 |
| 7.10 | NASDAQ Listing | 75 |
| 7.11 | Consents | 76 |
| 7.12 | Founder Notes | 76 |
| 7.13 | Completed Pre-Closing Reorganization | 76 |

**ARTICLE VIII CONTRIBUTOR'S CONDITIONS TO CLOSING**　　　　76

| | | |
|---|---|---:|
| 8.1 | Representations and Warranties | 76 |
| 8.2 | Performance | 76 |
| 8.3 | Orders and Laws | 76 |
| 8.4 | HSR Act | 76 |
| 8.5 | Concurrent Closing of Kingfisher Contribution Agreement | 76 |
| 8.6 | Partnership Leverage Ratio | 77 |
| 8.7 | Class B Waiver | 77 |
| 8.8 | Stockholder Approval | 77 |
| 8.9 | NASDAQ Listing | 77 |

PLAINTIFFS_AMR_00000245

ARTICLE IX TERMINATION                                                          77

    9.1    Termination                                                           77
    9.2    Effect of Termination                                                 78
    9.3    Specific Performance                                                  78

ARTICLE X WAIVERS; LIMITATIONS ON LIABILITY                                     78

    10.1   Waivers of other Representations                                      78
    10.2   Waiver of Remedies                                                    80

iii

    10.3   Waiver of Claims                                                      80
    10.4   Access to Information                                                 81

ARTICLE XI MISCELLANEOUS                                                        82

    11.1   Notice                                                                82
    11.2   Entire Agreement                                                      82
    11.3   Expenses                                                              82
    11.4   Disclosure                                                            82
    11.5   Waiver                                                                83
    11.6   Amendment                                                            83
    11.7   No Third Party Beneficiary                                            83
    11.8   Assignment; Binding Effect                                            84
    11.9   Headings                                                              84
    11.10  Invalid Provisions                                                    84
    11.11  Counterparts; Facsimile                                              84
    11.12  Governing Law; Venue; and Jurisdiction                               84
    11.13  Trust Account Waiver                                                  85

iv

EXHIBITS
    Exhibit A              Form of A&R LP Agreement
    Exhibit B              Form of A&R Alta Mesa GP LLC Agreement
    Exhibit C              Form of Alta Mesa GP Voting Agreement
    Exhibit D              Form of Alta Mesa Partnership Agreement
    Exhibit E              Form of Alta Mesa Reorganization Agreements
    Exhibit F              Form of Management Services Agreement
    Exhibit G              Form of Registration Rights Agreement
    Exhibit H              Form of Tax Receivables Agreement
    Exhibit I              Form of Preferred Stock Designation
    Exhibit J              Form of A&R Certificate of Incorporation

SCHEDULES
    Schedule 1.1 —Budget        Budget
    Schedule 1.1-K(a)           Contributor Knowledge Individuals
    Schedule 1.1-K(b)           Alta Mesa Parties Knowledge Individuals
    Schedule 1.1-K(c)           Buyer Knowledge Individuals
    Schedule 1.1-PL             Permitted Liens
    Schedule 3.3                No Conflicts — Contributor
    Schedule 3.4                Governmental Approvals — Contributor
    Schedule 3.5                Title to Interests — Contributor
    Schedule 4.1(c)             Qualifications and Licenses

PLAINTIFFS_AMR_00000246

| Schedule 4.3 | No Conflicts — Alta Mesa Parties |
| Schedule 4.5 | Governmental Approvals — Alta Mesa Parties |
| Schedule 4.6(a) | Outstanding Interests — Alta Mesa |
| Schedule 4.6(c) | Outstanding Interests — Alta Mesa GP |
| Schedule 4.7 | Subsidiaries |
| Schedule 4.8 | Insurance |
| Schedule 4.9 | Legal Proceedings |
| Schedule 4.10 | Compliance with Laws and Orders |
| Schedule 4.12 | Financial Statements |
| Schedule 4.14 | No Undisclosed Liabilities |
| Schedule 4.15 | Taxes |
| Schedule 4.16(a) | Material Contracts |
| Schedule 4.16(c) | Material Contract Exemptions |
| Schedule 4.16(d) | Material Breach or Default |
| Schedule 4.17(a) | Alta Mesa Real Property |
| Schedule 4.17(b) | Material Defaults |
| Schedule 4.17(d) | Easements |
| Schedule 4.18(g) | Oil and Gas Properties Compliance with Laws and Orders |
| Schedule 4.18(h) | Oil and Gas Expenditures |
| Schedule 4.21(a) | Environmental Matters |
| Schedule 4.22(b) | Material Benefit Plans |
| Schedule 4.23(e) | Employees |
| Schedule 4.24 | Related Party Transactions |
| Schedule 4.29 | Credit Support Instruments |
| Schedule 5.4 | Governmental Approvals — Buyer |

v

| Schedule 6.3 | Conduct of Business |
| Schedule 6.4(a) | Restrictions — Contributor |
| Schedule 6.4(b) | Exceptions to Contributor's Restrictions |
| Schedule 7.11 | Consents |
| Schedule 11.1 | Notice Addresses |

vi

## CONTRIBUTION AGREEMENT

This Contribution Agreement dated as of August 16, 2017 (this "***Agreement***") is made and entered into by and among High Mesa Holdings, L.P., a Delaware limited partnership (the "***Contributor***"), High Mesa Holdings GP, LLC., a Texas limited liability company ("***GP Holdings***"), Alta Mesa Holdings, LP, a Texas limited partnership ("***Alta Mesa***"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and general partner of Alta Mesa ("***Alta Mesa GP***" and, collectively with Alta Mesa, the "***Alta Mesa Parties***"), Silver Run Acquisition Corporation II, a Delaware corporation ("***Buyer***"), solely for purposes of <u>Section 6.7</u>, <u>Section 10.3</u> and <u>Section 11.13</u>, the Contributor Owners (as defined herein) and also for purposes of <u>Section 6.6</u>(j), Michael E. Ellis, an individual residing in the State of Texas ("***Ellis***"). Each of the parties to this Agreement is sometimes referred to individually in this Agreement as a "***Party***," and all of the parties to this Agreement are sometimes collectively referred to in this Agreement as the "***Parties***."

## RECITALS

WHEREAS, the Contributor owns, directly or indirectly, (i) 100% of the limited partner interests in Alta Mesa (the "***Contributed AM Interests***") and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP (the "***Contributed AMGP Interests***" and, together with the Contributed AM Interests, the "***Contributed Interests***");

WHEREAS, the Contributor Owners own a noneconomic 10% voting interest in Alta Mesa GP (the "***GP Voting Interests***");

PLAINTIFFS_AMR_00000247

WHEREAS, for purposes of completing the Transactions (as defined below), Buyer formed SRII Opco GP, LLC, a Delaware limited liability company (the "**General Partner**"), and Buyer owns 100% of the issued and outstanding limited liability company interests in the General Partner;

WHEREAS, immediately following the Execution Date (as defined below), Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "**Riverstone Contributor**") shall contribute $200,000,000 to Alta Mesa pursuant to the Alta Mesa Partnership Agreement (as defined below) in exchange for limited partner interests in Alta Mesa;

WHEREAS, for purposes of completing the Transactions, the General Partner and Buyer formed SRII Opco, LP, a Delaware limited partnership (the "**Partnership**"), and Buyer owns 100% of the outstanding limited partner interests in the Partnership, and the General Partner has been designated as a non-economic general partner of the Partnership; and

WHEREAS, subject to the terms and conditions of this Agreement, Buyer desires to make the Buyer Contribution (as defined below) to the Partnership, and the Contributor desires to make the Contributor's Contributions (as defined below) to the Partnership, in each case in exchange for the consideration specified in this Agreement.

---

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION

1.1     *Definitions*. As used in this Agreement, the following capitalized terms have the meanings set forth below:

"***1933 Act***" has the meaning given to it in Section 3.9.

"***20-Day VWAP***" means, as of a particular date, the average of the per share volume-weighted average price as displayed under the heading Bloomberg VWAP on the Bloomberg page applicable to the Buyer Class A Common Stock (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by Buyer) in respect of the period from the open of trading on the relevant trading day until the close of trading on such trading day for the 20 trading day period ending on the trading day immediately prior to such date (or, if such volume-weighted average price is unavailable, the market price of one share of such security on such trading day determined, using a volume-weighted average method, by a nationally recognized investment banking firm (unaffiliated with Buyer) retained for such purpose by Buyer).

"***A&R Alta Mesa GP LLC Agreement***" means the Sixth Amended and Restated Limited Liability Company Agreement of Alta Mesa Holdings GP, LLC, in substantially the form attached hereto as Exhibit B.

"***A&R LP Agreement***" means the First Amended and Restated Agreement of Limited Partnership of the Partnership, in substantially the form attached hereto as Exhibit A.

"***Accounting Principles***" means, with respect to the calculation of any amount hereunder, that such amount was calculated in accordance with GAAP, applied in a manner consistent with the principles, practices, assumptions, policies and methodologies used by Alta Mesa in the preparation of the audited financial statements described in Section 4.12.

"***Acquisition***" means, with respect to any Person, any transaction, or any series of related transactions, consummated prior to the Closing Date, by which such Person or any of its Subsidiaries (a) acquires any going business (including a working interest in Oil and Gas Properties) or all or substantially all of the assets of any firm, corporation, general partnership, limited liability partnership or limited liability company, or division thereof, whether through the purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the securities of a corporation which have ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency) or a majority (by percentage or voting power) of the outstanding ownership interests of a partnership or limited liability company.

"***Adjustment Amount***" has the meaning given to it in Section 2.6(d).

PLAINTIFFS_AMR_00000248

2

"**Adjustment Determination Date**" has the meaning given to it in Section 2.6(d).

"**Advisor Expenses**" means all fees, costs, expenses (to the extent unpaid as of the Closing Date) incurred by or on behalf of the Alta Mesa Parties or their Subsidiaries in connection with the negotiation, documentation and consummation of the Transactions, including all of the fees and expenses of legal, accounting, tax, financial and other advisors (and all Taxes payable in connection with such amounts), including the Banking Fees.

"**Affiliate**" means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by contract or otherwise. Notwithstanding the foregoing, for purposes of this Agreement, (a) prior to Closing, Alta Mesa shall not constitute an Affiliate of any Person other than a Contributor Owner and Alta Mesa GP and, from and after Closing, Alta Mesa shall constitute an Affiliate of Buyer and Alta Mesa GP, (b) prior to Closing, Alta Mesa GP shall not constitute an Affiliate of any Person other than a Contributor Owner and Alta Mesa and, from and after Closing, Alta Mesa GP shall constitute an Affiliate of Buyer and Alta Mesa, (c) no Contributor Owner shall be deemed to be an Affiliate of any other Contributor Owner, (d) each Contributor Owner shall be deemed an Affiliate of the Contributor, (e) no Contributor Owner or their respective Subsidiaries shall be deemed to be an Affiliate of Bayou City or any of its Affiliates; and (f) no Contributor Owner or their respective Subsidiaries shall be deemed to be an Affiliate of Highbridge or any of its Affiliates.

"**Agreement**" has the meaning given to it in the introduction to this Agreement.

"**Alta Mesa**" has the meaning given to it in the introduction to this Agreement.

"**Alta Mesa Entities**" means Alta Mesa GP, Alta Mesa and their respective Subsidiaries after giving effect to the Pre-Closing Reorganization as if such Pre-Closing Reorganization had taken place prior to the date hereof.

"**Alta Mesa Fundamental Representations**" means those representations and warranties set forth in Section 4.1, Section 4.2, Section 4.3(a), Section 4.3(e), Section 4.6, Section 4.13(a) and Section 4.25.

"**Alta Mesa GP**" has the meaning given to it in the introduction to this Agreement.

"**Alta Mesa GP LLC Agreement**" means the Fifth Amended and Restated Limited Liability Company Agreement of Alta Mesa Holdings GP, LLC, dated the Execution Date.

"**Alta Mesa GP Voting Agreement**" means the Amended and Restated Voting Agreement to be entered into among Buyer, the Contributor Owners and Alta Mesa GP, in substantially the form attached hereto as Exhibit C.

"**Alta Mesa Group Plan**" means any Benefit Plan sponsored, maintained or contributed to by any of the Alta Mesa Entities, to which any of the Alta Mesa Entities is a party, to which

3

any of the Alta Mesa Entities is obligated to contribute to, or with respect to which any of the Alta Mesa Entities has any liability (including contingent liability).

"**Alta Mesa Parties**" has the meaning given to it in the introduction to this Agreement.

"**Alta Mesa Partnership Agreement**" means the Sixth Amended and Restated Agreement of Limited Partnership of Alta Mesa, dated as of the Execution Date, in substantially the form attached hereto as Exhibit D.

"**Alta Mesa Real Property**" has the meaning given to it in Section 4.17(a).

"**Alta Mesa Released Claims**" has the meaning given to it in Section 10.3(b).

PLAINTIFFS_AMR_00000249

"*Alta Mesa Reorganization Agreements*" means the Assignment Agreements to be entered into in substantially the forms attached hereto as <u>Exhibit E</u>, pursuant to which the Pre-Closing Reorganization will be effected.

"*Alta Mesa Representative*" has the meaning given to it in <u>Section 4.11(a)</u>.

"*Alta Mesa SEC Documents*" has the meaning given to it in <u>Section 4.26(a)</u>.

"*A&R Certificate of Incorporation*" has the meaning given to it in <u>Section 7.7</u>.

"*Ancillary Agreements*" means the Closing Certificates, the A&R LP Agreement, the Alta Mesa Partnership Agreement, the A&R Certificate of Incorporation, the Alta Mesa GP Voting Agreement, the Preferred Stock Designation, the Tax Receivables Agreement, the Registration Rights Agreement, the Management Services Agreement, the Joinder Agreement, and any and all additional agreements, certificates, documents and instruments that may be executed or delivered by any Party at or in connection with Closing.

"*Anti-Corruption Laws*" means all laws, rules and regulations of the United States, the United Nations, the United Kingdom, the European Union or any other Governmental Authority from time to time concerning or relating to bribery, money laundering, or corruption, including the UK Bribery Act and the FCPA.

"*Assets*" of any Person means all assets, rights, Claims, Contracts, interests and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person; <u>provided</u>, that Assets of the Alta Mesa Entities shall give effect to the Pre-Closing Reorganization as if such Pre-Closing Reorganization had taken place prior to the date hereof.

"*Available Funds*" means the amount in the Trust Account on the Closing Date <u>plus</u> the proceeds of the Forward Purchase Agreements, <u>minus</u> the amount to be paid to holders of Buyer Class A Common Stock that timely exercise and do not waive their Buyer Stockholder Redemption Right in respect of any of the Transactions, the transactions contemplated by the Kingfisher Contribution Agreement or the transactions contemplated by the Riverstone

<center>4</center>

Contribution Agreement <u>minus</u> the amount of any deferred underwriting commissions payable by Buyer to the underwriters in the IPO.

"*Balance Sheet Date*" has the meaning given to it in <u>Section 4.12(a)</u>.

"*Banking Fees*" means an amount equal to the fees due by the Alta Mesa Entities under the Engagement Letters.

"*Bayou City*" means Bayou City Energy Management, LLC, a Delaware limited liability company.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Benefit Plan*" means (a) any "employee benefit plan," as such term is defined in Section 3(3) of ERISA, (b) any plan that would be an "employee benefit plan" if it was subject to ERISA, such as foreign plans and plans for directors, (c) any equity bonus, equity ownership, equity option, equity purchase, equity appreciation rights, phantom equity, or other equity plan (whether qualified or nonqualified), (d) each bonus, deferred compensation or incentive compensation plan, (e) any personal, vacation, holiday and sick or other leave policy, and (f) any other plan, policy, Contract, program or arrangement (whether written or unwritten) providing compensation or benefits to any employee or other individual service provider.

"*Budget*" means the budgeted capital expenditures set forth in <u>Schedule 1.1-Budget</u>.

"*Business Combination*" has the meaning set forth in the Prospectus.

PLAINTIFFS_AMR_00000250

"*Business Day*" means a day other than Saturday, Sunday or any day on which banks located in Houston, Texas are authorized or obligated to close.

"*Buyer*" has the meaning given to it in the introduction to this Agreement.

"*Buyer Acquisition Proposal*" has the meaning given to it in Section 6.12(c).

"*Buyer Board*" means the Board of Directors of Buyer.

"*Buyer Board Recommendation*" has the meaning given to it in Section 6.9(d).

"*Buyer Class A Common Stock*" means the Class A common stock, par value $0.0001 per share, of Buyer.

"*Buyer Class B Common Stock*" means the Class B common stock, par value $0.0001 per share, of Buyer.

<div align="center">5</div>

"*Buyer Class C Common Stock*" means the Class C common stock, par value $0.0001 per share, of Buyer.

"*Buyer Common Stock*" means the Buyer Class A Common Stock and Buyer Class B Common Stock.

"*Buyer Contribution*" has the meaning given to it in Section 2.1.

"*Buyer Fundamental Representations*" means those representations and warranties set forth in Section 5.1, Section 5.2, Section 5.3(a), Section 5.5, Section 5.6 and Section 5.11.

"*Buyer Material Adverse Effect*" means, any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, condition (financial or otherwise) or results of operations of Buyer and its Subsidiaries taken as a whole or (ii) prevents, materially delays or materially impairs the ability of Buyer to perform its obligations under this Agreement or to consummate the Transactions.

"*Buyer Preferred Stock*" has the meaning given to it in Section 5.5.

"*Buyer Public Securities*" has the meaning given to it in Section 5.16.

"*Buyer Related Persons*" has the meaning given to it in Section 10.3(b).

"*Buyer SEC Documents*" has the meaning given to it in Section 5.8(a).

"*Buyer Series A Preferred Stock*" means the three shares of Series A preferred stock, par value $0.0001 per share, of Buyer.

"*Buyer Series B Preferred Stock*" means the Series B preferred stock, par value $0.0001 per share, of Buyer.

"*Buyer Stockholder Redemption Right*" means the right held by holders of the shares of Buyer Class A Common Stock to redeem all or a portion of their shares of Buyer Class A Common Stock upon the consummation of a Business Combination, for a per share redemption price of cash equal to (a) the aggregate amount then on deposit in the Trust Account as of two (2) Business Days prior to the consummation of the Business Combination, including interest earned on the funds held in the Trust Account and not previously released to Buyer to pay certain Taxes, divided by (b) the number of then outstanding shares of Buyer Class A Common Stock issued in connection with the IPO.

"*Buyer Warrants*" has the meaning given to it in Section 5.5.

"*Calculation Period*" means the four quarter period most recently ended as of the last Business Day of the calendar quarter ending prior to (or on) the Closing Date.

<div align="center">6</div>

PLAINTIFFS_AMR_00000251

"**Capital Leases**" means, as applied to any Person, any lease of any property by such Person or any of its Subsidiaries as lessee that would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"*Cash*" means, with respect to any Person, the cash and cash equivalents of such Person and its Subsidiaries determined in accordance with GAAP.

"**Cash Consideration**" has the meaning given to it in Section 2.2(a)(iii).

"*Claim*" means any demand, claim, action, investigation, Proceeding (whether at law or in equity) or arbitration by or before any Governmental Authority or arbitrator.

"*Closing*" means the consummation of the Transactions.

"**Closing Certificates**" means the officer's certificates referenced in Section 2.4(h), Section 2.4(i) and Section 2.5(h).

"**Closing Date**" means the date on which Closing occurs.

"**Closing Date Statement**" has the meaning given to it in Section 2.6(c).

"**Closing Debt**" means the Indebtedness of the Alta Mesa Entities as of the Closing.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"**Common Units**" has the meaning given to it in Section 2.1.

"**Confidential Information**" means any and all confidential, proprietary or otherwise non-public information that (i) pertains to the Alta Mesa Entities or their respective Assets, Liabilities, personnel or businesses or (ii) pertains to Buyer or any Affiliate or Representative of Buyer.

"**Confidentiality Agreement**" means that certain confidentiality agreement between High Mesa, Inc. and Riverstone Investment Group LLC, dated as of April 9, 2017.

"*Consent*" means any consent, approval, order, authorization, license, franchise, waiver or permit of or by, or notice to, or filing or registration with, any Person.

"**Consolidated Net Income**" means, with respect to any Person and its Subsidiaries, for any period, the net income (or loss) for such period after taxes, as determined in accordance with GAAP, excluding, however, (a) extraordinary items, including (i) any net non-cash gain or loss during such period arising from the sale, exchange, retirement or other disposition of capital assets (such term to include all fixed assets and all securities) other than in the ordinary course of business and (ii) any write-up or write-down of assets and (b) the cumulative effect of any change in GAAP.

"*Contract*" means any agreement, contract, lease, sublease, license, evidence of indebtedness for borrowed money, mortgage, indenture, credit or sale-leaseback, guaranty of any

7

---

obligation, note, franchise, purchase order, binding bid, bond, letter of credit, instrument, security agreement, or any other undertaking, obligation or commitment to which a Person is bound, including any Oil and Gas Contracts.

"**Contributed AM Interests**" has the meaning given to it in the recitals to this Agreement.

"**Contributed AMGP Interests**" has the meaning given to it in the recitals to this Agreement.

"**Contributed Interests**" has the meaning given to it in the recitals to this Agreement.

"**Contribution Price**" has the meaning given to it in Section 2.2.

PLAINTIFFS_AMR_00000252

"*Contributor*" has the meaning given to it in the introduction to this Agreement.

"*Contributor Adjustment Amount*" has the meaning given to it in Section 2.6(d).

"*Contributor Benefit Plan*" has the meaning given to it in Section 3.7.

"*Contributor Fundamental Representations*" means those representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3(a), Section 3.5, and Section 3.8.

"*Contributor Owners*" means, collectively, (i) at the Execution Date, High Mesa, Inc., a Delaware corporation, Alta Mesa Resources, LP, a Texas limited partnership, Galveston Bay Resources Holdings, LP, a Texas limited partnership, Petro Acquisitions Holdings, LP, a Texas limited partnership, Petro Operating Company Holdings, Inc., a Florida corporation, Harlan H. Chappelle, an individual residing in the State of Texas, Dale Hayes, an individual residing in the State of Texas, and Management and (ii) at the Closing Date, each of the parties listed in (i) plus Ellis.

"*Contributor Released Claims*" has the given to it in Section 10.3(a).

"*Contributor's Appointees*" means all current and former officers, managers, directors and similar persons of any Alta Mesa Entity that are or were employees of any Contributor or any of their respective Affiliates.

"*Contributor's Contributions*" has the meaning given to it in Section 2.2.

"*Debt*" means, with respect to any Person, without duplication (i) indebtedness of such Person and its Subsidiaries for borrowed money, including, without limitation, obligations under letters of credit (but only to the extent drawn); (ii) obligations of such Person and its Subsidiaries evidenced by bonds, debentures, notes or other similar instruments; (iii) obligations of such Person and its Subsidiaries to pay the deferred purchase price of property or assets (whether real, personal, or mixed, tangible or intangible) or services (including, without limitation, obligations that are non-recourse to the credit of such Person and its Subsidiaries but are secured by the assets of such Person or any of its Subsidiaries, but excluding trade accounts payable); (iv) obligations of such Person or any of its Subsidiaries as lessee under Capital Leases and obligations of such Person or any of its Subsidiaries in respect of synthetic leases; (v) obligations

8

of such Person or any of its Subsidiaries under any Hedge Contract; (vi) any obligations of such Person or any of its Subsidiaries owing in connection with any volumetric or production prepayments; (vii) obligations of such Person or any of its Subsidiaries under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person or any of its Subsidiaries to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (vi) above; and (viii) indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) secured by any Lien on or in respect of any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person or any of its Subsidiaries.

"*Debt Estimate*" has the meaning given to it in Section 2.6(a).

"*Deferred Compensation Plans*" has the meaning given to it in Section 6.17.

"*Derivative Transaction*" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, catastrophe events, weather-related events, credit-related events or conditions or any indexes, or any other similar transaction (including any option with respect to any of these transactions) or combination of any of these transactions, including collateralized mortgage obligations or other similar instruments or any debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions.

"*Disposition*" means any sale, lease, transfer, assignment, farm-out, conveyance, or other disposition of any Property (including any working interest, overriding royalty interest, production payments, net profits interest, royalty interest, or mineral fee interest).

"*Earn-Out Consideration*" has the meaning given to it in Section 2.7(a)(iii).

PLAINTIFFS_AMR_00000253

"*Earn-Out Payment*" has the meaning given to it in Section 2.7(a)(iii).

"*EBITDAX*" means without duplication, for any Person and its Subsidiaries for any period, (a) Consolidated Net Income for such period *plus* (b) to the extent deducted in determining (i) Consolidated Net Income, Interest Expense, income taxes, depreciation, amortization, and exploration expenses, (ii) unrealized losses on Hedge Contracts and losses on Disposition of assets (including hedge monetizations) for such period outside the ordinary course of business (other than monetization of Hedge Contracts which would have otherwise been recognized within the 12-month period immediately following such period as a result of scheduled monthly settlements within such 12- month period), and (iii) other non-cash charges for such period, including non-cash losses under ASC 815 as a result of changes in the fair market value of derivatives but excluding, in any event, to the extent that such non-cash charges are reserved for cash charges to be taken in the future, *minus* (c) to the extent included in determining Consolidated Net Income, non-cash income for such period, including non-cash income under ASC 815 as a result of changes in the fair market value of derivatives, *minus* (d) to the extent included in determining Consolidated Net Income, the following gains or credits: unrealized gains on Hedge Contracts and gains on Disposition of assets (including hedge

<center>9</center>

monetizations) outside the ordinary course of business; provided that, such EBITDAX shall be subject to pro forma adjustments for Acquisitions and Dispositions occurring during the Calculation Period assuming that such Acquisitions and/or Dispositions had occurred on the first day of the Calculation Period.

"*Ellis*" has the meaning given to it in the introduction to this Agreement.

"*Emergency*" means taking any and all actions and making repairs, including implementing an emergency shutdown of any or all of the Assets, that are required or appropriate to avoid, prevent or mitigate (a) imminent harm to persons or property, including injury, illness or death or damage to the Assets or an environmental condition; (b) violation of any applicable Law that could reasonably be expected to result in a material loss or liability to the Alta Mesa Entities; or (c) curtailment of service on the Assets.

"*Engagement Letters*" means (i) the engagement letter dated July 5, 2017, by and between High Mesa, Inc. and Citigroup Global Markets Inc., (ii) the engagement letter dated August 15, 2017, by and between Alta Mesa Holdings LP and Morgan Stanley & Co. LLC and (iii) the engagement letter dated August 16, 2017, by and between Alta Mesa Holdings LP and Goldman Sachs & Co LLC.

"*Environmental Claim*" means any Claim or Loss arising out of or related to any violation of Environmental Law.

"*Environmental Law*" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; and all similar Laws of any Governmental Authority having jurisdiction over the Assets in question addressing pollution or protection of the environment, natural resources, or human health and safety (to the extent arising from exposure to Hazardous Materials), each as amended on or prior to the Closing Date.

"*Equity Consideration*" has the meaning given to it in Section 2.2(a)(ii).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Adjustment Amount*" has the meaning given to it in Section 2.6(b).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Execution Date*" means the date on which the last of the Parties executes this Agreement.

"*Existing Alta Mesa Partnership Agreement*" means the Fifth Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP, dated February 24, 2017.

<center>10</center>

PLAINTIFFS_AMR_00000254

"*FCPA*" means the United States Foreign Corrupt Practices Act of 1977.

"*Final Closing Debt*" has the meaning given to it in <u>Section 2.6(c)</u>.

"*Final Transaction Expenses*" has the meaning given to it in <u>Section 2.6(c)</u>.

"*Financial Statements*" has the meaning given to it in <u>Section 4.12</u>.

"*Forward Purchase Agreements*" means (i) the Forward Purchase Agreement between the Buyer and Riverstone VI SR II Holdings, L.P., dated as of March 17, 2017 pursuant to which Riverstone VI SR II Holdings, L.P. agreed to purchase an aggregate of up to 40,000,000 shares of the Buyer Class A Common Stock <u>plus</u> an aggregate of up to 13,333,333 warrants for an aggregate purchase price of up to $400,000,000 or $10.00 per unit and (ii) the Forward Purchase Agreement between the Buyer and Riverstone VI SR II Holdings, L.P., dated as of the Execution Date pursuant to which Riverstone VI SR II Holdings, L.P. agreed to purchase an aggregate of up to 20,000,000 shares of the Buyer Class A Common Stock for an aggregate purchase price of up to $200,000,000 or $10.00 per unit.

"*Founder Notes*" means (i) the Second Amended and Restated Promissory Note, dated as of March 25, 2014, made by Galveston Bay Resources, LP in favor of Ellis in the original principal amount of $345,523.89, (ii) the Second Amended and Restated Promissory Note, dated as of March 25, 2014, made by Alta Mesa in favor of Ellis in the original principal amount of $11,561,550.87, and (iii) the Second Amended and Restated Promissory Note, dated as of March 25, 2014, made by Petro Acquisitions, LP in favor of Ellis in the original principal amount of $178,278.21, in each case, as in effect on the Execution Date and as it may be amended, restated, transferred, assigned or otherwise supplemented, replaced or refinanced in accordance with the terms hereof.

"*Founder Registration Rights Agreement*" has the meaning given to such term in the Registration Rights Agreement.

"*Fraud*" means an actual and intentional misrepresentation or omission of a material fact which constitutes common law fraud. For the avoidance of doubt, "Fraud" expressly excludes constructive fraud, equitable fraud and promissory fraud.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" has the meaning given to it in the recitals to this Agreement.

"*Governmental Approval*" means any declaration or notification to, filing or registration with, or order, authorization, consent, clearance or approval of, any Governmental Authority.

"*Governmental Authority*" means any court, tribunal, arbitrator, authority, agency, commission, regulatory body, official instrumentality of the United States or any other nation, or any tribal, state, county, city, local or other political subdivision or similar governing entity.

"*GP Voting Interests*" has the meaning given to it in the recitals to this Agreement.

<div align="center">11</div>

"*Hazardous Material*" means and includes each substance regulated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant, or toxic substance, or otherwise under any Environmental Law, including any Hydrocarbons, explosives, radioactive materials, asbestos in any form, or polychlorinated biphenyls.

"*Hedge Contract*" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, deferred premium commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master.

PLAINTIFFS_AMR_00000255

"**Highbridge**" means HPS Investment Partners, LLC, a Delaware limited liability company

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Hydrocarbons**" means oil, gas and other hydrocarbons produced or processed in association therewith, or any combination thereof, and any minerals produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane and gasoline) of any type or composition.

"**Income Tax**" means any U.S. federal, state or local or foreign income Tax or Tax based on profits, net profits, margin, revenues, gross receipts or similar measure.

"**Indebtedness**" means, with respect to any Person and without duplication, (i) all indebtedness for borrowed money of such Person and all other indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is liable, (ii) all indebtedness secured by any Lien on property owned subject to such Lien whether or not the indebtedness secured has been assumed, (iii) any liabilities in respect of any lease of real or personal property (or a combination thereof), which liabilities are required to be classified and accounted for under GAAP as a capital lease, (iv) all obligations in respect of letters of credit, to the extent drawn; (v) all obligations of such Person to pay the deferred purchase price of property, equipment or services (other than accounts payable in the ordinary course of business); (vi) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired; (vii) all guarantees with respect to liabilities of another Person of a type described in any of clauses (i) through (vi) above for the payment of which such first Person may be liable and (viii) any accrued interest, premiums, penalties and

12

other fees and expenses that are required to be paid by such Persons in respect of obligations referred to in clauses (i) through (vii) of this definition (excluding prepayment penalties under capital leases to the extent such capital leases are not required to be repaid in connection with the Transactions).

"**Independent Accounting Firm**" means KPMG LLP, or, if such firm declines to act as the Independent Accounting Firm, an independent accounting firm of national reputation that is selected by mutual agreement of the Contributor and Buyer or, if the Contributor and Buyer do not reach mutual agreement on the independent accounting firm to be selected within five (5) days after either Party first receives written notice from the other requesting such mutual agreement in connection with a requirement for such Independent Accounting Firm under this Agreement, then Buyer shall designate one firm of independent public accountants of good standing and the Contributor shall designate another firm of independent public accountants of good standing, and the representatives of such firms shall select a third firm of independent public accountants of good standing, which third firm shall serve as the independent accounting firm for purposes of this Agreement.

"**Independent Petroleum Engineers**" has the meaning given to it in Section 4.18(a).

"**Inorganic Acquisition CapEx**" means capital expenditures used for acquisitions (by merger, consolidation, or acquisition of stock or assets or otherwise) of any corporation, partnership, limited liability company, or other business organization or division thereof or any Oil and Gas Properties, by purchase, lease or otherwise, of more than $1.0 million in a single transaction or series of related transactions in the following counties located in the State of Oklahoma: Kingfisher, Garfield, Canadian, Blaine, Major, Dewey, Woodward, Logan and Oklahoma, where Alta Mesa does not at the Execution Date have an existing Hydrocarbon interest of 25% or more in any of the direct or indirect target properties. Add-on acquisitions to post-July 1, 2017 acquisitions for which Inorganic Acquisition CapEx was expended shall also constitute Inorganic Acquisition CapEx.

"**Insurance Policies**" has the meaning given to it in Section 4.8.

"**Interest**" means, with respect to any Person: (a) capital stock, membership interests, partnership interests, other equity interests, rights to profits or revenue and any other similar interest of such Person; (b) any security or other interest convertible into or exchangeable or exercisable for any of the foregoing; and (c) any right (contingent or otherwise) to acquire any of the foregoing.

"**Interest Expense**" means, for any Person and its Subsidiaries for any period, total interest, letter of credit fees, and other fees and expenses incurred in connection with any Debt for such period, whether paid or accrued, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Interest Hedge Agreements, all as determined in conformity with GAAP.

PLAINTIFFS_AMR_00000256

"*Interest Hedge Agreement*" mean, with respect to any Person, a Hedge Contract between such Person or any of its Subsidiaries, on the one hand, and one or more financial

13

institutions, on the other hand, providing for the exchange of nominal interest obligations between such Person or any of its Subsidiaries and such financial institution or the cap of the interest rate on any Debt of such Person or any of its Subsidiaries.

"*Interim Financials*" has the meaning given to it in Section 4.12(b).

"*Interim Period*" has the meaning given to it in Section 6.2(a).

"*IPO*" has the meaning given to it in Section 11.13.

"*IRS*" means the Internal Revenue Service.

"*Joinder Agreement*" means that Joinder Letter dated as of the Execution Date by Silver Run Sponsor, LLC, Thomas J. Walker, Stephen S. Coats, James T. Hackett, William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters in favor of Kingfisher Holdco, LLC and the Contributor concerning the Support Letter described therein.

"*Kingfisher*" means Kingfisher Midstream, LLC, a Delaware limited liability company.

"*Kingfisher Closing*" means the "Closing" as defined in the Kingfisher Contribution Agreement.

"*Kingfisher Contribution Agreement*" means that certain Contribution Agreement, dated as of the Execution Date, by and among Kingfisher Midstream, LLC, the Kingfisher Contributor, Buyer and, solely for limited purposes set forth therein, the equity holders of the Kingfisher Contributor.

"*Kingfisher Contributor*" has the meaning given to the term "Contributor" in the Kingfisher Contribution Agreement.

"*Knowledge*" means, (a) when used in a particular representation or warranty in this Agreement with respect to any Contributor, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(a) and (b) when used in a particular representation or warranty in this Agreement with respect to the Alta Mesa Parties, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(b) and (c) when used in a particular representation or warranty in this Agreement with respect to Buyer, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(c).

"*Laws*" means all laws (including common law), statutes, rules, regulations, ordinances, and orders of any Governmental Authority.

"*Leverage Ratio*" shall mean, with respect to a particular Person, as of a certain date, the ratio of (a) all Debt (other than obligations under Hedge Contracts) of such Person and its Subsidiaries (net of any Cash of such Person and its Subsidiaries) as of such date to (b) EBITDAX of such Person and its Subsidiaries for the Calculation Period.

14

"*Liabilities*" of any Person means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement, whether accrued, absolute, contingent, matured, unmatured or other.

"*Lien*" means any mortgage, pledge, security interest, lien or other similar encumbrance.

"*Liquidity Event*" means:

(a)    The consummation of any merger, reorganization, business combination or consolidation of the Buyer that results in any Person (other than an Affiliate of the Contributor, which for purposes of the definition of Liquidity Event, shall not give effect to

PLAINTIFFS_AMR_00000257

the last sentence of the definition of Affiliate) becoming the Beneficial Owner of more than fifty percent (50%) of the combined voting power of the voting securities of the Buyer or the surviving company or the parent of such surviving company;

(b)       The consummation of a sale or disposition by the Buyer of all or substantially all of the Buyer's assets, other than a sale or disposition if the holders of the voting securities of the Buyer outstanding immediately prior thereto hold securities immediately thereafter which represent more than fifty percent (50%) of the combined voting power of the voting securities of the acquiror, or parent of the acquiror, of such assets, or the stockholders of the Buyer approve a plan of complete liquidation or dissolution of the Buyer; or

(c)       The consummation of any transaction described in the foregoing clauses (a) or (b) following which the voting securities of the Buyer outstanding immediately prior thereto are no longer traded on a national securities exchange or registered under Section 12(b) or (g) under the Exchange Act.

"***Loss***" means any and all judgments, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other Proceedings or of any claim, default or assessment).

"***Management***" means AM Equity Holdings, LP, a Texas limited partnership.

"***Management Services Agreement***" means the Management Services Agreement to be entered into among Alta Mesa and High Mesa Inc. in substantially the form attached hereto as Exhibit F, pursuant to which Alta Mesa will provide management services to the Contributor with respect to the assets distributed in the Pre-Closing Reorganization.

"***Material Adverse Effect***" means any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, Assets, condition (financial or otherwise) or results of operations on the Alta Mesa Entities taken as a whole or (ii) prevents, materially delays or materially impairs the ability of the Contributor or the Alta Mesa Parties from performing their obligations under this Agreement or to consummate the Transactions; provided, however, in no event shall any of the following, either alone or in combination with any other occurrence, condition, change, development, event, circumstance or effect, constitute a Material Adverse Effect pursuant to clause (i) only: any occurrence, condition, change,

15

development, event, circumstance or effect directly or indirectly resulting from (a) any change in economic conditions generally, including any change in markets for, or prices of, Hydrocarbons, or other commodities or supplies; (b) any change in general regulatory, social or political conditions, including any acts of war, sabotage or terrorist activities; (c) any change affecting the industry in which the Alta Mesa Entities conduct their business; (d) any change in the financial, banking, credit, securities or capital markets (including any suspension of trading in, or limitation on prices for, securities on any stock exchange or any changes in interest rates) or any change in the general national or regional economic or financial conditions; (e) any change in any Laws (including Environmental Laws) or GAAP; (f) any effects of weather (including any impact on customer use patterns), geological or meteorological events or other natural disaster; (g) any actions to be taken pursuant to the express terms of this Agreement, or taken at the request of or with the consent of Buyer; (h) the announcement or pendency of the Transactions; and (i) any failure by Alta Mesa  to meet internal or published projections, forecasts, estimates or predictions in respect of revenues, earnings or other financial or operating metrics for any period (but not the events contributing to or causing such failure) provided further, however, that any occurrence, condition, change, development, event, circumstance or effect referred to in clauses (a), (b), (c), (d), (e) or (f) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such occurrence, condition, change, development, event, circumstance or effect has a disproportionate effect on the business, Assets, conditions (financial or otherwise) or results of operations of the Alta Mesa Entities compared to other participants in the industries in which such affected Person conducts their businesses.

"***Material Contracts***" has the meaning given to it in Section 4.16(a).

"***NASDAQ***" means the NASDAQ Capital Market.

"***Notice***" has the meaning given to it in Section 11.1(a).

"***OFAC***" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

PLAINTIFFS_AMR_00000258

"**Oil and Gas Contracts**" means any of the following types of Contracts (other than, in each case, an Oil and Gas Lease): all farm-in and farm-out agreements,  areas of mutual interest agreements, joint venture agreements, development agreements, production sharing agreements, operating agreements, unitization, pooling and communitization agreements, declarations and orders, division orders, transfer orders, oil and gas sales agreements, exchange agreements, gathering and processing contracts and agreements, drilling, service and supply contracts, geophysical and geological contracts, land broker, title attorney and abstractor contracts, leases of personal property used or held for use primarily in connection with Oil and Gas Properties and all other contracts relating to Hydrocarbons, revenues therefrom or operations with respect thereto and all claims and rights thereto, and, in each case, all rights, titles and interests thereunder.

"**Oil and Gas Leases**" means all leases, subleases, licenses or other occupancy or similar agreements under which a Person leases, subleases or licenses or otherwise acquires or obtains operating rights in and to Hydrocarbons.

16

"**Oil and Gas Properties**" means all interests in and rights with respect to (a) oil, gas, mineral, and similar properties of any kind and nature, including working, leasehold and mineral interests and operating rights and royalties, overriding royalties, production payments, net profit interests and other non-working interests and non-operating interests (including all rights and interests derived from Oil and Gas Leases, operating agreements, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, and in each case, interests thereunder), fee interests, reversionary interests, back-in interests, reservations and concessions and (b) all wells located on or producing from such leases and properties described in clause (a).

"**Order**" means any writ, judgment, decree, injunction or award issued, or otherwise put into effect by or under the authority of any court, administrative agency, or other Governmental Authority (in each such case whether preliminary or final).

"**Organic CapEx**" means capital expenditures used for (a) drilling, completions, infrastructure and other capital projects of Alta Mesa in the normal course of business or (b) acquisitions (by merger, consolidation, or acquisition of stock or assets or otherwise) of any corporation, partnership, limited liability company, or other business organization or division thereof or any Oil and Gas Properties, by purchase, lease or otherwise, in the following counties located in the State of Oklahoma: Kingfisher, Garfield, Canadian, Blaine, Major, Dewey, Woodward, Logan and Oklahoma, where Alta Mesa currently has an existing Hydrocarbon interest in such target properties.

"**Organizational Documents**" means with respect to any Person, the articles or certificate of incorporation, formation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, and such other organizational documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person or which establish the legal personality of such Person.

"**Outside Date**" has the meaning given to it in Section 9.1(d).

"**PARs**" has the meaning given to it in Section 6.17(a).

"**PARs Plan**" has the meaning given to it in Section 6.17(a).

"**Partnership**" has the meaning given to it in the recitals to this Agreement.

"**Partnership Warrants**" means warrants exercisable for Common Units on the terms and conditions identical to warrants to purchase Buyer Class A Common Stock outstanding on the Execution Date.

"**Party**" or "**Parties**" has the meaning given to it in the introduction to this Agreement.

"**Permits**" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, waivers, exemptions, franchises and similar consents granted by a Governmental Authority.

17

"**Permitted Lien**" means (a) any Lien for Taxes, impositions, assessments, fees, rents or other governmental charges levied or assessed or imposed (i) not yet due or delinquent or (ii) being contested in good faith by or on behalf of any Alta Mesa Entity by

PLAINTIFFS_AMR_00000259

appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP, (b) any statutory or other Lien arising in the ordinary course of business by operation of Law with respect to a liability that is not yet due or delinquent or which is being contested in good faith by or on behalf of any Alta Mesa Entity, (c) all matters, both general and specific, that are disclosed (whether or not subsequently deleted or endorsed over) on any survey or in any title policies insuring an Alta Mesa Real Property or any commitments therefor that have been made available to Buyer prior to the Execution Date or obtained by or on behalf of Buyer, (d) purchase money Liens arising in the ordinary course of business, (e) any other imperfection or irregularity of title and other Liens that would not reasonably be expected to materially interfere with or impair the use of the property burdened thereby, (f) zoning, planning, regulatory and other similar limitations and restrictions, all rights of any Governmental Authority to regulate the Alta Mesa Real Property, and all matters of record, none of which, individually or in the aggregate, materially impairs the continued use and operation of the Alta Mesa Real Property to which they relate in the conduct of the Alta Mesa Entities' business as presently conducted thereon, (g) the terms and conditions of the Permits of any Alta Mesa Entity or the Contracts listed on <u>Schedule 4.17(a)</u>, (h) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws, (i) Liens expressly identified in the Financial Statements and (j) the matters identified on <u>Schedule 1.1-PL</u>.

"***Person***" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"***Pre-Closing Reorganization***" has the meaning given to it in <u>Section 6.14</u>.

"***Pre-Closing Tax Period***" means any Tax period ending before the Closing Date and that portion of any Straddle Period ending at the end of the day immediately prior to the Closing Date.

"***Preferred Stock Designation***" has the meaning given to it in <u>Section 2.5(g)</u>.

"***Proceeding***" means any complaint, lawsuit, action, suit, claim (including claim of a violation of Law) or other proceeding at Law or in equity or Order or ruling, in each case by or before any Governmental Authority or arbitral tribunal.

"***Production Burdens***" means any royalties (including lessor's royalties), overriding royalties, production payments, net profit interests or other burdens upon, measured by or payable out of oil, gas or mineral production.

"***Property***" of any Person means any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person.

"***Prospectus***" has the meaning given to it in <u>Section 11.13</u>.

<div align="center">18</div>

"***Proxy Statement***" has the meaning given to it in <u>Section 6.9(a)</u>.

"***Public Official***" has the meaning given to it in <u>Section 4.11(a)</u>.

"***Real Property Leases***" has the meaning given to it in <u>Section 4.17(a)</u>.

"***Records***" means the Alta Mesa Parties' books, records and files, including all Contracts and any and all title, Tax, financial, technical, engineering, environmental and safety records and information; <u>provided</u> that the foregoing shall expressly exclude any records or other information relating to bids received from others in connection with the Transactions and information and analysis (including financial analysis) relating to such bids.

"***Registration Rights Agreement***" means the Registration Rights Agreement to be entered into among Buyer, the Contributor, the Kingfisher Contributor and the Riverstone Contributor, in substantially the form attached hereto as <u>Exhibit G</u>.

"***Related Party Transaction***" has the meaning given to it in <u>Section 4.24</u>.

"***Related Persons***" has the meaning given to it in <u>Section 10.3(a)</u>.

"***Release***" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, injecting, escaping, leaching, dumping, or disposing.

PLAINTIFFS_AMR_00000260

"*Representatives*" means, as to any Person, its officers, directors, employees, managers, members, partners, shareholders, owners, counsel, accountants, financial advisers and consultants.

"*Reserve Report*" has the meaning given to it in Section 4.18(a).

"*Reserved Units*" means 1,000,000 of the Common Units and 1,000,000 of the shares of Buyer Class C Common Stock received by the Contributor pursuant to Section 2.2(a)(i) and Section 2.2(b), respectively.

"*Restrictive Legend*" has the meaning given to it in Section 2.2(c).

"*Riverstone Closing*" means the "Closing" as defined in the Riverstone Contribution Agreement.

"*Riverstone Contribution Agreement*" means that certain Contribution Agreement, dated as of the Execution Date, by and between the Riverstone Contributor and Buyer.

"*Riverstone Contributor*" has the meaning given to it in the recitals to this Agreement.

"*Sanctioned Entity*" means (a) an agency of the government of, (b) an organization directly or indirectly owned or controlled by, or (c) an individual that acts on behalf of, a country or territory that is subject to, or the target of, Sanctions, including a sanctions program identified on the list maintained by OFAC and available at

19

http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time, to the extent that such program administered by OFAC is applicable to any such agency, organization or person.

"*Sanctioned Person*" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time or any other Sanctions-related list maintained by an applicable Governmental Authority.

"*Sanctions*" means any sanctions imposed, administered or enforced from time to time by any applicable Governmental Authority, including those administered by OFAC, the U.S. Department of State, Her Majesty's Treasury, the United Nations, the European Union, or any agency or subdivision of any of the foregoing, including any regulations, rules, and executive orders issued in connection therewith.

"*Schedules*" means the schedules attached to this Agreement.

"*SEC*" means the Securities and Exchange Commission.

"*Special Meeting*" has the meaning given to it in Section 6.9.

"*Stockholder Proposals*" has the meaning given to it in Section 7.7.

"*Straddle Period*" has the meaning given to it in Section 6.6(a).

"*Subsidiary*" means, with respect to a Person, any Person, whether incorporated or unincorporated, of which (a) at least 50% of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, (b) a general partner interest or (c) a managing member interest, is directly or indirectly owned or controlled by the subject Person or by one or more of its respective Subsidiaries.

"*Tax*" or "*Taxes*" means any federal, state, local or foreign income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, by Contract or otherwise.

"*Tax Allocation Statement*" has the meaning given to it in Section 6.6(h).

PLAINTIFFS_AMR_00000261

"*Tax Matter*" has the meaning given to it in Section 6.6(d)(i).

"*Tax Proceeding*" means any audit, litigation or other Proceeding with respect to Taxes.

"*Tax Return*" means any return, declaration, report, claim for refund or information return or statement of any kind relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, filed or required to be filed with any Taxing Authority.

"*Taxing Authority*" means, with respect to any Tax, the Governmental Authority that imposes or purports to impose such Tax, and the agency (if any) charged with collection of such Tax for such Governmental Authority.

"*Tax Receivables Agreement*" means the Tax Receivables Agreement to be entered into among Buyer and the Contributor, in substantially the form attached hereto as Exhibit H.

"*Transaction Confidentiality Agreement*" has the meaning given to it in Section 6.12(a).

"*Transaction Expenses*" means without duplication, (i) all Advisor Expenses, minus the lesser of (A) $10,000,000 or (B) 50% of such Advisor Expenses, (ii) all fees, costs, expenses (to the extent unpaid as of the Closing Date) incurred by or on behalf of the Alta Mesa Parties or their Subsidiaries in connection with or incidental to preparing for the potential initial public offering of Alta Mesa Resources, Inc. or any other affiliates or successors of the Alta Mesa Parties, including all of the fees and expenses of legal, accounting, tax, financial and other advisors (and all Taxes payable in connection with such amounts), (iii) to the extent not satisfied in full prior to or contemporaneously with the Closing (provided that Cash Consideration is not used to fund any such obligation), any sale, "stay-around," retention, change of control or transaction bonuses, severance payments, commission or other similar bonuses or payments payable to current or former employees, directors or consultants of the Alta Mesa Entities as a result of or in connection with the Transactions; (iv) to the extent not satisfied in full prior to the Closing, all employer-side employment, social insurance and other Taxes related to payments made in respect of any of the foregoing; and (v) to the extent not satisfied in full prior to or contemporaneously with the Closing (provided that Cash Consideration is not used to fund any such obligation), any outstanding obligations and liabilities relating to PARs, the PARs Plan and the Deferred Compensation Plans, including the employer portion of any related Taxes.

"*Transaction Expenses Estimate*" has the meaning given to it in Section 2.6(a).

"*Transactions*" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"*Transfer Taxes*" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, transfer, conveyance, registration, and other similar Taxes, duties, fees or charges incurred in connection with this Agreement and the Transactions.

"*Trust Account*" means that certain trust account at J.P. Morgan Chase Bank, N.A. established by Buyer into which a portion of the proceeds received by Buyer from its IPO have been deposited for the benefit of Buyer's public stockholders.

"*Trust Agreement*" means the Investment Management Trust Agreement dated as of March 23, 2017, by and between Buyer and the Trustee.

"*Trustee*" means Continental Stock Transfer & Trust Company, acting as trustee of the Trust Account.

"*UK Bribery Act*" means the United Kingdom Bribery Act 2010.

"*Willful and Material Breach*" shall mean a material breach that is a consequence of an act undertaken by the breaching Party with the actual knowledge and intent that the taking of such act would constitute a breach of this Agreement.

PLAINTIFFS_AMR_00000262

[PAGES OMITTED]

6.7    *Public Announcements; Confidentiality*.

(a)    No Party shall make any public announcement or issue any public communication regarding this Agreement or the Transactions without first obtaining the prior written consent of the other Party, except if such announcement or other communication is required by applicable Law (including in the Alta Mesa SEC Documents and in connection with the preparation and filing of the Proxy Statement and any offering or other documents prepared in connection with any financing by Buyer or the Alta Mesa Parties) or the rules of any stock exchange upon which such Party's capital stock is traded, in which case, to the extent permitted by Law, the disclosing Party shall use its commercially reasonable efforts to coordinate or communicate such announcement or communication with the other Party prior to announcement or issuance; provided, however that no provision of this Agreement shall be deemed to restrict in any manner (i) any Party's ability to communicate with its employees or equity holders or (ii) the ability of Buyer and the Alta Mesa Parties to communicate with their financial and legal advisors, lenders, underwriters or financing sources.

66

(b)    From the Closing Date and for a period of five (5) years following the Closing Date, Buyer, each Contributor and each Contributor Owner will, and will cause their respective Affiliates and use commercially reasonable efforts to cause their respective Representatives to, (i) maintain the strict confidentiality of any and all Confidential Information and (ii) not disclose such Confidential Information to any Person other than any of its respective Affiliates or Representatives, except (x) to the extent required by Law (provided that if required by Law, each party agrees, to the extent legally permissible, to give the others prior written notice of such disclosure in sufficient time to permit the others to seek a protective order should it so determine) or (y) in a Claim brought by such party in the pursuit of its remedies under this Agreement. Each Party shall (1) notify all Persons to whom Confidential Information is disclosed of the confidential nature of the materials disclosed and the provisions of this Agreement; and (2) ensure that all Persons to whom the terms of this Agreement or the Confidential Information is disclosed keep such information confidential and do not disclose or divulge such information to any unauthorized Person in each case in accordance with this Agreement.

6.8    *[Reserved*.]

6.9    *The Proxy Statement and the Special Meeting*.

(a)    As promptly as reasonably practicable after the Execution Date, but in any event within 10 Business Days following the date on which Buyer has received written notice from Alta Mesa and Kingfisher that Alta Mesa and Kingfisher believes that the information required to be provided by the Alta Mesa Entities hereunder and Kingfisher pursuant to the Kingfisher Contribution Agreement has been delivered to Buyer, Buyer will prepare and file with the SEC a proxy statement containing the information specified in Schedule 14A of the Exchange Act with respect to the transactions contemplated by this Agreement, the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement (the "***Proxy Statement***") in preliminary form; provided, however, that such 10 Business Day period shall not elapse if Buyer provides a reasonably detailed written notice to Alta Mesa or Kingfisher regarding information that is required but has not yet been received by Buyer from Alta Mesa or Kingfisher for the Proxy Statement, in which case the 10 Business Day period shall re-commence after Buyer receives such information from Alta Mesa or Kingfisher, as appropriate. Buyer shall as promptly as practicable notify the Contributor and the Alta Mesa Entities of the receipt of any oral or written comments from the SEC relating to the Proxy Statement and any request by the SEC for any amendment to the Proxy Statement or for additional information. Buyer shall cooperate and provide the Contributor and the Alta Mesa Entities with a reasonable opportunity to review and comment on the Proxy Statement (including each amendment or supplement thereto) and all responses to requests for additional information by and replies to comments of the SEC and give due consideration to all comments reasonably proposed by the Contributor and the Alta Mesa Entities in respect of such documents and responses prior to filing such with or sending such to the SEC, and the Parties will provide each other with copies of all such filings made and correspondence with the SEC. The Buyer Board Recommendation shall be included in the Proxy Statement. Buyer will use its commercially reasonable efforts to respond promptly to any comments made by the SEC with respect to the Proxy Statement. Buyer will cause the Proxy Statement to be transmitted to the holders of Buyer Common Stock as promptly as practicable, but in any event within 5 Business Days, following the date on which the SEC confirms it has no further comments on the Proxy Statement.

67

(b)    The Contributor and the Alta Mesa Entities acknowledge that a substantial portion of the Proxy Statement and other filings to be made by Buyer with the SEC shall include disclosure regarding the Contributor, the Alta Mesa Entities and their management, operations and financial condition. Accordingly, the Contributor and the Alta Mesa Entities will, as promptly as reasonably practicable after the Execution Date, use their respective commercially reasonable efforts to provide Buyer with all

PLAINTIFFS_AMR_00000294

[PAGES OMITTED]

counties, in each case, in the State of Oklahoma are transferred from the Alta Mesa Entities in a manner that (a) does not create a Tax liability for Buyer, the General Partner, the Partnership or the Alta Mesa Entities and (b) complies with applicable Laws (the "***Pre-Closing Reorganization***") in accordance with the Alta Mesa Reorganization Agreements.

6.15    ***Kingfisher Contribution Agreement and Riverstone Contribution Agreement***. Subject to the terms and conditions of this Agreement, Buyer shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by the Kingfisher Contribution Agreement and the transactions contemplated by the Riverstone Contribution Agreement.

6.16    ***Reasonable Best Efforts***. Except to the extent that the Parties' obligations are specifically set forth elsewhere herein, upon the terms and subject to the conditions set forth in this Agreement, each Party shall use commercially reasonable efforts to take, or cause to be

<div align="center">72</div>

taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transaction.

6.17    ***Treatment of Certain Alta Mesa Group Plans.***

(a)    Prior to the Closing, the Alta Mesa Parties shall take all actions necessary and appropriate to vest and payout as of the Closing all performance appreciation rights then outstanding ("***PARs***") under the Alta Mesa Holdings, L.P. Performance Appreciation Rights Plan (the "***PARs Plan***") and to terminate the PARs Plan as of the Closing, provided that, as permitted under the PARs Plan, payment with respect to any PARs payable hereunder shall be subject to the PAR holder's execution and delivery prior to the Closing (and non-revocation) of a general release of claims against the Alta Mesa Entities, the form and substance of which release shall be subject to review and approval by Buyer (not to be unreasonably withheld or delayed). At least three (3) Business Days prior to the Closing Date, the Alta Mesa Parties shall deliver to Buyer documents reasonably satisfactory to Buyer evidencing the vesting and payout of the PARs and termination of the PARs Plan as provided under this Section 6.17(a).

(b)    Prior to the Closing, the Alta Mesa Parties shall take all actions necessary and appropriate to vest and payout as of the Closing all account balances under the Alta Mesa Holdings, L.P. Deferred Compensation Incentive Plan and the Alta Mesa Holdings, L.P. Supplemental Executive Retirement Plan (together, the "***Deferred Compensation Plans***"), and to terminate the Deferred Compensation Plans as of the Closing. At least three (3) Business Days prior to the Closing Date, the Alta Mesa Parties shall deliver to Buyer documents reasonably satisfactory to Buyer evidencing the vesting, payout and termination of the Deferred Compensation Plans as provided under this Section 6.17(b).

(c)    For the avoidance of doubt, termination of the PARs Plan and the Deferred Compensation Plans in accordance with this Section 6.17 shall (i) in all respects, be in a manner that is compliant with Section 409A of the Code and (ii) include the payout and satisfaction of all liabilities incurred by the Alta Mesa Entities with respect to such PARs Plan and Deferred Compensation Plans through the Closing.

6.18    ***Founder Notes***. Prior to Closing, the Contributor shall cause the Founder Notes to be exchanged for equity interests in the Contributor, and Ellis shall become a Contributor Owner in a manner reasonably acceptable to Buyer. The Parties acknowledge and agree that Ellis may transfer or assign the Founders Notes to a third party and such transferee will become a Contributor Owner hereunder in a manner reasonably acceptable to Buyer; provided that no such transfer shall relieve Ellis of any of his obligations hereunder.

6.19    ***LTIP Plan***. Buyer shall cause the proposals at the Special Meeting submitted for approval by the holders of the shares of Buyer Class A Common Stock and Buyer Class B Common Stock to include a proposal requesting those stockholders to adopt and approve a new equity incentive plan for the Buyer (the "***LTIP Proposal***").

<div align="center">73</div>

<div align="center">

**ARTICLE VII**
**BUYER'S CONDITIONS TO CLOSING**

</div>

PLAINTIFFS_AMR_00000298

[PAGES OMITTED]

# PX 48

EX-2.2 3 a17-20303_2ex2d2.htm EX-2.2

Exhibit 2.2

Execution Version

# CONTRIBUTION AGREEMENT

by and among

KFM HOLDCO, LLC,

KINGFISHER MIDSTREAM, LLC

SILVER RUN ACQUISITION CORPORATION II

and, solely for purposes of Sections 10.9 and 11.13, the Contributor Members party hereto

Dated as of August 16, 2017

---

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| **ARTICLE I DEFINITIONS AND CONSTRUCTION** | | 1 |
| 1.1 | *Definitions* | 1 |
| 1.2 | *Rules of Construction* | 21 |
| **ARTICLE II CONTRIBUTION AND CLOSING** | | 22 |
| 2.1 | *Buyer Contribution* | 22 |
| 2.2 | *Contributor's Contribution and Consideration* | 22 |
| 2.3 | *Closing* | 23 |
| 2.4 | *Closing Deliveries by Contributor* | 23 |
| 2.5 | *Closing Deliveries by Buyer* | 24 |
| 2.6 | *Contribution Price Adjustments* | 25 |
| 2.7 | *Earn-Out Consideration* | 27 |
| 2.8 | *Withholding* | 28 |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING CONTRIBUTOR** | | 29 |
| 3.1 | *Organization* | 29 |
| 3.2 | *Authority* | 29 |
| 3.3 | *No Conflicts; Consents and Approvals* | 29 |
| 3.4 | *Governmental Approvals* | 29 |
| 3.5 | *Title to Interests* | 30 |
| 3.6 | *Legal Proceedings* | 30 |
| 3.7 | *Contributor Benefit Plans* | 30 |
| 3.8 | *Brokers* | 30 |
| 3.9 | *Accredited Investor; Investment Intent* | 30 |
| 3.10 | *Tax Matters* | 30 |
| **ARTICLE IV REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY** | | 31 |
| 4.1 | *Organization* | 31 |
| 4.2 | *Authorization* | 31 |
| 4.3 | *No Conflicts; Consents and Approvals* | 31 |
| 4.4 | *No Defaults* | 32 |
| 4.5 | *Governmental Approvals* | 32 |

PLAINTIFFS_AMR_00000176

| | | |
|---|---|---|
| 4.6 | *Capitalization; Rights to Acquire Equity* | 32 |
| 4.7 | *Insurance* | 32 |
| 4.8 | *Legal Proceedings* | 33 |
| 4.9 | *Compliance with Laws and Orders* | 33 |
| 4.10 | *Anti-Corruption and Sanctions* | 33 |
| 4.11 | *Financial Statements* | 34 |
| 4.12 | *Absence of Certain Changes or Events* | 34 |

i

| | | |
|---|---|---|
| 4.13 | *No Undisclosed Liabilities; Indebtedness* | 34 |
| 4.14 | *Taxes* | 35 |
| 4.15 | *Material Contracts* | 36 |
| 4.16 | *Company Real Property; Company Assets* | 39 |
| 4.17 | *Permits* | 40 |
| 4.18 | *Environmental Matters* | 40 |
| 4.19 | *Employees and Labor Matters* | 40 |
| 4.20 | *Employee Benefits* | 41 |
| 4.21 | *Regulatory Status* | 41 |
| 4.22 | *Capital Commitments* | 41 |
| 4.23 | *Related Party Transactions* | 42 |
| 4.24 | *Brokers* | 42 |
| 4.25 | *Credit Support Instruments* | 42 |
| 4.26 | *Parachute Payments* | 42 |
| 4.27 | *Information Supplied* | 42 |

| | | |
|---|---|---|
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER | | 42 |
| 5.1 | *Organization* | 42 |
| 5.2 | *Authority* | 42 |
| 5.3 | *No Conflicts* | 43 |
| 5.4 | *Governmental Approvals* | 43 |
| 5.5 | *Capital Structure* | 44 |
| 5.6 | *Capitalization of the General Partner and the Partnership* | 44 |
| 5.7 | *No Undisclosed Liabilities* | 45 |
| 5.8 | *SEC Documents; Controls* | 45 |
| 5.9 | *Legal Proceedings* | 46 |
| 5.10 | *Compliance with Laws and Orders* | 46 |
| 5.11 | *Brokers* | 46 |
| 5.12 | *Trust Account* | 46 |
| 5.13 | *Tax Matters* | 47 |
| 5.14 | *Information Supplied; Proxy Statement* | 47 |
| 5.15 | *Absence of Certain Changes or Events* | 47 |
| 5.16 | *No Default* | 47 |
| 5.17 | *Listing* | 47 |
| 5.18 | *Investment Company* | 48 |
| 5.19 | *Accredited Investor; Investment Intent* | 48 |
| 5.20 | *Opportunity for Independent Investigation* | 48 |

| | | |
|---|---|---|
| ARTICLE VI COVENANTS | | 49 |
| 6.1 | *Regulatory and Other Approvals* | 49 |
| 6.2 | *Access of Buyer* | 50 |
| 6.3 | *Conduct of Business* | 51 |
| 6.4 | *Certain Restrictions* | 51 |
| 6.5 | *Termination of Operator Agreement* | 54 |
| 6.6 | *D&O Indemnity* | 54 |
| 6.7 | *Tax Matters* | 55 |

PLAINTIFFS_AMR_00000177

ii

| 6.8 | *Public Announcements; Confidentiality* | 59 |
| 6.9 | *Use of Certain Names* | 59 |
| 6.10 | *Distributions* | 59 |
| 6.11 | *Support Obligations* | 60 |
| 6.12 | *The Proxy Statement and the Special Meeting* | 60 |
| 6.13 | *Cooperation on Financing Matters* | 62 |
| 6.14 | *Further Assurances* | 63 |
| 6.15 | *Buyer Employees and Related Benefits* | 63 |
| 6.16 | *Exclusivity* | 65 |
| 6.17 | *Notice of Certain Events* | 66 |
| 6.18 | *Reasonable Best Efforts* | 67 |
| 6.19 | *Engagement Letters* | 67 |

ARTICLE VII BUYER'S CONDITIONS TO CLOSING　　67

| 7.1 | *Contributor's Representations and Warranties* | 67 |
| 7.2 | *Company Representations and Warranties* | 67 |
| 7.3 | *Performance* | 68 |
| 7.4 | *No Material Adverse Effect* | 68 |
| 7.5 | *Orders and Laws* | 68 |
| 7.6 | *HSR Act* | 68 |
| 7.7 | *Stockholder Approval* | 68 |
| 7.8 | *Concurrent Closing of Alta Mesa Contribution Agreement* | 68 |
| 7.9 | *NASDAQ Listing* | 68 |
| 7.10 | *Consents* | 69 |
| 7.11 | *Leverage Ratio* | 69 |

ARTICLE VIII CONTRIBUTOR'S CONDITIONS TO CLOSING　　69

| 8.1 | *Representations and Warranties* | 69 |
| 8.2 | *Performance* | 69 |
| 8.3 | *Orders and Laws* | 69 |
| 8.4 | *HSR Act* | 70 |
| 8.5 | *Stockholder Approval* | 70 |
| 8.6 | *Concurrent Closing of Alta Mesa Contribution Agreement* | 70 |
| 8.7 | *NASDAQ Listing* | 70 |
| 8.8 | *Minimum Cash Consideration* | 70 |

ARTICLE IX TERMINATION　　70

| 9.1 | *Termination* | 70 |
| 9.2 | *Effect of Termination* | 71 |
| 9.3 | *Specific Performance* | 71 |

ARTICLE X INDEMNIFICATION; WAIVERS; LIMITATIONS ON LIABILITY　　71

| 10.1 | *Indemnity* | 71 |
| 10.2 | *Limitations of Liability* | 72 |
| *10.3* | *Waivers of Representations* | 74 |

iii

| *10.4* | *Waiver of Remedies* | 75 |

PLAINTIFFS_AMR_00000178

| 10.5 | *Procedure with Respect to Third-Party Claims* | 76 |
| 10.6 | *Procedure with Respect to Direct Claims* | 77 |
| 10.7 | *Payments of Indemnity Amounts* | 77 |
| 10.8 | *Exclusive Remedy* | 79 |
| 10.9 | *Waiver of Claims* | 79 |
| 10.10 | *Access to Information* | 80 |

ARTICLE XI MISCELLANEOUS 80

| 11.1 | *Notice* | 80 |
| 11.2 | *Entire Agreement* | 81 |
| 11.3 | *Expenses* | 81 |
| 11.4 | *Disclosure* | 81 |
| 11.5 | *Waiver* | 82 |
| 11.6 | *Amendment* | 82 |
| 11.7 | *No Third Party Beneficiary* | 82 |
| 11.8 | *Assignment; Binding Effect* | 82 |
| 11.9 | *Headings* | 82 |
| 11.10 | *Invalid Provisions* | 82 |
| 11.11 | *Counterparts; Facsimile* | 83 |
| 11.12 | *Governing Law; Venue; and Jurisdiction* | 83 |
| 11.13 | *Trust Account Waiver* | 83 |
| 11.14 | *Attorney Waiver* | 84 |

iv

EXHIBITS

| Exhibit A | Form of A&R LP Agreement |
| Exhibit B | Form of Restrictive Covenant Agreement |
| Exhibit C | Form of Operating Transition Services Agreement |
| Exhibit D | Form of Amended and Restated Certificate of Incorporation |
| Exhibit E | Form of Registration Rights Agreement |
| Exhibit F | Form of Escrow Agreement |

SCHEDULES

| Schedule 1.1 —CapEx | CapEx Budget |
| Schedule 1.1-K(a) | Contributor Knowledge Individuals |
| Schedule 1.1-K(b) | Company Knowledge Individuals |
| Schedule 1.1-K(c) | Buyer Knowledge Individuals |
| Schedule 1.1-NWC | Net Working Capital Sample Calculation |
| Schedule 1.1-PL | Permitted Liens |
| Schedule 3.3 | No Conflicts — Contributor |
| Schedule 3.4 | Governmental Approvals — Contributor |
| Schedule 3.5 | Title to Interests |
| Schedule 4.3 | No Conflicts — Company |
| Schedule 4.5 | Governmental Approvals — Company |
| Schedule 4.6 | Contributed Interests |
| Schedule 4.7 | Insurance |
| Schedule 4.8 | Legal Proceedings |
| Schedule 4.9 | Compliance with Laws and Orders |
| Schedule 4.11 | Financial Statements |
| Schedule 4.13(a) | No Undisclosed Liabilities |
| Schedule 4.14 | Taxes |
| Schedule 4.15(a) | Material Contracts |
| Schedule 4.15(c) | Enforceability of Material Contracts |
| Schedule 4.15(d) | Breaches or Defaults of Material Contracts |

PLAINTIFFS_AMR_00000179

| | |
|---|---|
| Schedule 4.16(a) | Company Real Property |
| Schedule 4.16(b) | Default of Real Property Lease |
| Schedule 4.16(d) | Easements |
| Schedule 4.17 | Permits |
| Schedule 4.18 | Environmental Matters |
| Schedule 4.19(a) | Available Employees |
| Schedule 4.19(c) | Employee Claims and Proceedings |
| Schedule 4.21 | Regulatory Status |
| Schedule 4.22 | Capital Commitments |
| Schedule 4.23 | Related Party Transactions |
| Schedule 4.25 | Credit Support Instruments |
| Schedule 5.4 | Governmental Approvals — Buyer |
| Schedule 6.3 | Conduct of Business |
| Schedule 6.4(a) | Certain Restrictions - Contributor |
| Schedule 6.4(b) | Certain Restrictions — Company |
| Schedule 6.11 | Support Obligations |
| Schedule 6.15(e) | Retention Bonus Agreements |

v

| | |
|---|---|
| Schedule 7.10 | Consents |
| Schedule 11.1 | Notice Addresses |

vi

## CONTRIBUTION AGREEMENT

This Contribution Agreement dated as of August 16, 2017 (this "*Agreement*") is made and entered into by and among KFM Holdco, LLC, a Delaware limited liability company ("*Contributor*"), Kingfisher Midstream, LLC, a Delaware limited liability company (the "*Company*"), Silver Run Acquisition Corporation II, a Delaware corporation ("*Buyer*"), and, solely for purposes of Sections 10.9 and 11.13, the Contributor Members (as defined below). Each of the parties to this Agreement is sometimes referred to individually in this Agreement as a "*Party*," and all of the parties to this Agreement are sometimes collectively referred to in this Agreement as the "*Parties*."

## RECITALS

WHEREAS, Contributor owns all of the issued and outstanding Interests in the Company (collectively with any other Interests issued after the date hereof in accordance with Section 6.4(b)(ii)), the "*Contributed Interests*");

WHEREAS, for purposes of completing the Transactions (as defined below), Buyer formed SRII Opco GP, LLC, a Delaware limited liability company (the "*General Partner*"), and Buyer owns 100% of the issued and outstanding limited liability company interests in the General Partner;

WHEREAS, for purposes of completing the Transactions, the General Partner and Buyer formed SRII Opco, LP, a Delaware limited partnership (the "*Partnership*"), and Buyer owns 100% of the outstanding limited partner interests in the Partnership, and the General Partner has been designated as a non-economic general partner of the Partnership; and

WHEREAS, subject to the terms and conditions of this Agreement, Buyer desires to make the Buyer Contribution (as defined below) to the Partnership, and Contributor desires to make the Contributor's Contribution (as defined below) to the Partnership, in each case in exchange for the consideration specified in this Agreement.

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

PLAINTIFFS_AMR_00000180

# ARTICLE I
## DEFINITIONS AND CONSTRUCTION

1.1    **Definitions**.  As used in this Agreement, the following capitalized terms have the meanings set forth below:

"**1933 Act**" means the Securities Act of 1933, as amended.

"**20-Day VWAP**" means, as of a particular date, the average of the per share volume-weighted average price as displayed under the heading Bloomberg VWAP on the Bloomberg page applicable to the Buyer Class A Common Stock (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by Buyer) in respect of the period from the open of trading on the relevant trading day until the close of trading on such trading day for the 20 trading day period ending on the trading day immediately prior to such date (or, if such volume-weighted average price is unavailable, the market price of one share of such security on such trading day determined, using a volume-weighted average method, by a nationally recognized investment banking firm (unaffiliated with Buyer) retained for such purpose by Buyer).

"**A&R LP Agreement**" means that certain First Amended and Restated Agreement of Limited Partnership of the Partnership, in substantially the form attached hereto as Exhibit A.

"**Accounting Principles**" means, with respect to the calculation of any amount hereunder, that such amount was calculated in accordance with GAAP, applied in a manner consistent with the principles, practices, assumptions, policies and methodologies used by the Company in the preparation of the audited financial statements described in Section 4.11.

"**Acquisition**" means, with respect to any Person, any transaction, or any series of related transactions, consummated prior to the Closing Date, by which such Person or any of its Subsidiaries (a) acquires any going business or all or substantially all of the assets of any firm, corporation, general partnership, limited liability partnership or limited liability company, or division thereof, whether through the purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the securities of a corporation which have ordinary voting power for the election of directors (other than securities having such power only by reason of the happening of a contingency) or a majority (by percentage or voting power) of the outstanding ownership interests of a partnership or limited liability company.

"**Additional Common Units**" means that number of Common Units equal to the quotient obtained by dividing (x) the Cash Consideration (before giving effect to the proviso set forth in the second sentence of Section 2.2) minus the Available Funds, by (y) $10.00.

"**Adjustment Amount**" has the meaning given to it in Section 2.6(d).

"**Affiliate**" means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by contract or otherwise.  Notwithstanding the foregoing, for purposes of this Agreement: (i) prior to Closing, the Company shall not constitute an Affiliate of any Person other than Contributor and the Contributor Members; (ii) from and after Closing, the Company shall constitute an Affiliate of Buyer; (iii) no Contributor Member shall be deemed to be an Affiliate of any other Contributor Member; and (iv) each Contributor Member shall be deemed an Affiliate of Contributor.

"**Agreement**" has the meaning given to it in the introduction to this Agreement.

2

"**Alta Mesa**" means Alta Mesa Holdings, LP, a Texas limited partnership.

"**Alta Mesa Cash Consideration**" means the "Cash Consideration" as defined in the Alta Mesa Contribution Agreement.

"**Alta Mesa Closing**" means the "Closing" as defined in the Alta Mesa Contribution Agreement.

PLAINTIFFS_AMR_00000181

"**Alta Mesa Contribution Agreement**" means that certain Contribution Agreement, dated as of the date hereof, by and among Buyer, High Mesa Holdings, LP, High Mesa Holdings GP, LLC, Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC and the other parties thereto.

"**Alta Mesa Contributor**" means "Contributor" as such term is defined in the Alta Mesa Contribution Agreement.

"**Amended and Restated Certificate of Incorporation**" has the meaning given to it in Section 7.7 .

"**Ancillary Agreements**" means the Closing Certificates, the Escrow Agreement, the A&R LP Agreement, the Partnership Warrant Agreement, the Amended and Restated Certificate of Incorporation, the Registration Rights Agreement, the Operating Transition Services Agreement, the Restrictive Covenant Agreement and any and all additional agreements, certificates, documents and instruments that may be executed or delivered by any Party at or in connection with Closing.

"**Anti-Corruption Laws**" means all laws, rules and regulations of the United States, the United Nations, the United Kingdom, the European Union or any other Governmental Authority from time to time concerning or relating to bribery, money laundering, or corruption, including the UK Bribery Act and the FCPA.

"**ARM**" means ARM-M I, LLC, a Delaware limited liability company.

"**Assets**" of any Person means all assets, rights, Claims, Contracts, interests and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether owned or leased and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person.

"**Available Employees**" means those Operator Employees listed on Schedule 4.19(a).

"**Available Funds**" means (a) the amount in the Trust Account on the Closing Date, plus the proceeds of the Forward Purchase Agreements, minus the amount to be paid to holders of Buyer Class A Common Stock that timely exercise and do not waive their Buyer Stockholder Redemption Right in respect of any of the Transactions, the transactions contemplated by the Alta Mesa Contribution Agreement or the transactions contemplated by the Riverstone Contribution Agreement, minus the amount of any deferred underwriting commissions payable by Buyer to the underwriters in the IPO, less (b) the Alta Mesa Cash Consideration.

"**Balance Sheet Date**" has the meaning given to it in Section 4.11(a).

3

"**Banking Fee Estimate**" has the meaning given to it in Section 2.6(a)

"**Banking Fees**" means an amount equal to the fees due by the Company under the Engagement Letters.

"**Benefit Plan**" means (a) any "employee benefit plan," as such term is defined in Section 3(3) of ERISA, (b) any plan that would be an "employee benefit plan" if it was subject to ERISA, such as foreign plans and plans for directors, (c) any equity bonus, equity ownership, equity option, equity purchase, equity appreciation rights, phantom equity, or other equity plan (whether qualified or nonqualified), (d) each bonus, deferred compensation or incentive compensation plan, (e) any personal, vacation, holiday and sick or other leave policy, and (f) any other plan, policy, Contract, program or arrangement (whether written or unwritten) providing compensation or benefits to any employee or other individual service provider.

"**Business Combination**" has the meaning set forth in the Prospectus.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in Houston, Texas are authorized or obligated to close.

"**Buyer**" has the meaning given to it in the introduction to this Agreement.

"**Buyer Board**" means the board of directors of Buyer.

"**Buyer Board Recommendation**" has the meaning given to it in Section 6.12(d).

"**Buyer Class A Common Stock**" means the Class A common stock of Buyer, par value $0.0001 per share.

PLAINTIFFS_AMR_00000182

"***Buyer Class B Common Stock***" means the Class B common stock of Buyer, par value $0.0001 per share.

"***Buyer Class C Common Stock***" has the meaning given to it in <u>Section 2.2</u>.

"***Buyer Common Stock***" means the Buyer Class A Common Stock and Buyer Class B Common Stock.

"***Buyer Contribution***" has the meaning given to it in <u>Section 2.1</u>.

"***Buyer Employer***" has the meaning given to it in <u>Section 6.15(a)</u>.

"***Buyer Fundamental Representations***" means those representations and warranties set forth in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.3</u>, <u>5.4</u>, <u>5.5</u>, <u>5.6</u> and <u>5.11</u>.

"***Buyer Indemnified Parties***" has the meaning given to it in <u>Section 10.1(a)</u>.

"***Buyer Material Adverse Effect***" means, any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, condition (financial

<div align="center">4</div>

or otherwise) or results of operations of Buyer and its Subsidiaries taken as a whole or (ii) prevents, materially delays or materially impairs the ability of Buyer to perform its obligations under this Agreement or to consummate the Transactions.

"***Buyer Preferred Stock***" has the meaning given to it in <u>Section 5.5</u>.

"***Buyer Public Securities***" has the meaning given to it in <u>Section 5.17</u>.

"***Buyer Series A Preferred Stock***" means the three shares of Series A preferred stock, par value $0.0001 per share, of Buyer.

"***Buyer Series B Preferred Stock***" means the Series B preferred stock, par value $0.0001 per share, of Buyer.

"***Buyer Related Persons***" has the meaning given to it in <u>Section 10.9(b)</u>.

"***Buyer Stockholder Redemption Right***" means the right held by holders of the shares of Buyer Class A Common Stock to redeem all or a portion of their shares of Buyer Class A Common Stock upon the consummation of a Business Combination, for a per share redemption price of cash equal to (a) the aggregate amount then on deposit in the Trust Account as of two (2) Business Days prior to the consummation of the Business Combination, including interest earned on the funds held in the Trust Account and not previously released to Buyer to pay certain Taxes, divided by (b) the number of then outstanding shares of Buyer Class A Common Stock issued in connection with the IPO.

"***Buyer Warrants***" has the meaning given to it in <u>Section 5.5</u>.

"***Calculation Period***" means the four quarter period most recently ended as of the last Business Day of the calendar quarter ending prior to (or on) the Closing Date.

"***Cap Amount***" has the meaning given to it in <u>Section 10.2(d)</u>.

"***CapEx Amount***" means the amount paid by the Company or any of its Subsidiaries, during the period beginning on the Execution Date and ending on the Closing Date, with regards to the construction of midstream assets, including assets relating to the gathering, compression, collection, storage, processing, treating, dehydration or transportation of Hydrocarbons.

"***CapEx Budget***" means the budgeted capital expenditures set forth in <u>Schedule 1.1-CapEx</u>.

"***CapEx Credit Agreement***" means that certain Credit Agreement, dated August 8, 2017, by and among the Company (as borrower), ABN AMRO Capital USA LLC (as administrative agent and LC issuer) and certain other financial institutions (as lenders).

PLAINTIFFS_AMR_00000183

"*CapEx Estimate*" has the meaning given to it in Section 2.6(a).

"*Capital Leases*" means, as applied to any Person, any lease of any property by such Person or any of its Subsidiaries as lessee that would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"*Cash*" means, with respect to any Person, the cash and cash equivalents of such Person and its Subsidiaries determined in accordance with GAAP.

"*Cash Consideration*" has the meaning given to it in Section 2.2.

"*Change in Recommendation*" has the meaning given to it in Section 6.12(d).

"*Claim*" means any demand, claim, action, investigation, Proceeding (whether at law or in equity) or arbitration by or before any Governmental Authority or arbitrator.

"*Claiming Party*" has the meaning given to it in Section 10.5(a).

"*Closing*" means the consummation of the Transactions.

"*Closing Certificates*" means the officer's certificates referenced in Sections 2.4(e), 2.4(f), and 2.5(h).

"*Closing Date*" means the date on which Closing occurs.

"*Closing Date Statement*" has the meaning given to it in Section 2.6(c).

"*Closing Debt*" means the Indebtedness of the Company and its Subsidiaries as of the Closing.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Common Units*" has the meaning given to it in Section 2.1.

"*Company*" has the meaning given to it in the introduction to this Agreement.

"*Company Fundamental Representations*" means those representations and warranties set forth in Sections 4.1, 4.2, 4.3(a), 4.3(c) 4.6, 4.12(a) and 4.24.

"*Company LLC Agreement*" means the Third Amended and Restated Liability Company Agreement of the Company, dated August 4, 2017.

"*Company Real Property*" means (i) all real property and interests in real property, including any fee interests, owned by the Company, (ii) all leases, subleases or other similar instruments of real property ("*Real Property Leases*") in which the Company holds a lease hold or similar interest and (iii) the Easements.

"*Company Related Party Transaction*" means any agreement, arrangement or other transaction that if in effect on the date hereof would be required to be disclosed on Schedule 4.23.

"*Company Released Claims*" has the meaning given it in Section 10.9(b).

"*Confidential Information*" means any and all confidential, proprietary or otherwise non-public information that (i) (x) became known by or was in the possession of Contributor on or prior to Closing and (y) pertains to the Company and its

PLAINTIFFS_AMR_00000184

Subsidiaries or their respective Assets, Liabilities, personnel or businesses or (ii) (x) has been disclosed to, become known by or made available to Contributor on or prior to the Closing and (y) pertains to Buyer or any Affiliate or Representative of Buyer.

"*Confidentiality Agreement*" means that certain confidentiality agreement between the Company and Riverstone Investment Group LLC, dated as of April 10, 2017.

"*Consolidated Net Income*" means, with respect to any Person and its Subsidiaries, for any period, the net income (or loss) for such period after taxes, as determined in accordance with GAAP, excluding, however, (a) extraordinary items, including (i) any net non-cash gain or loss during such period arising from the sale, exchange, retirement or other disposition of capital assets (such term to include all fixed assets and all securities) other than in the ordinary course of business and (ii) any write-up or write-down of assets and (b) the cumulative effect of any change in GAAP.

"*Contract*" means any agreement, contract, lease, sublease, license, evidence of indebtedness for borrowed money, mortgage, indenture, note, purchase order, binding bid, letter of credit, instrument, security agreement, undertaking, obligation or commitment to which a Person is bound, whether oral or written.

"*Contributed Interests*" has the meaning given to it in the recitals to this Agreement.

"*Contribution Price*" has the meaning given to it in Section 2.2.

"*Contributor*" has the meaning given to it in the introduction to this Agreement.

"*Contributor 401(k) Plan*" has the meaning given to it in Section 6.15(e).

"*Contributor Adjustment Amount*" has the meaning given to it in Section 2.6(d).

"*Contributor Appointees*" means all current and former officers, managers, directors and similar persons of the Company that are or were employees of Contributor or any of its Affiliates.

"*Contributor Fundamental Representations*" means those representations and warranties set forth in Sections 3.1, 3.2, 3.3, 3.4, 3.5, and 3.8.

"*Contributor Indemnified Parties*" has the meaning given to it in Section 10.1(b).

"*Contributor Members*" means each of (a) ARM — M I, LLC, a Delaware limited liability company, (b) HMS Kingfisher HoldCo, LLC, a Delaware limited liability company, (c) Mezzanine Partners II Delaware Subsidiary, LLC (f/k/a Highbridge Principal Strategies — Mezzanine Partners II Delaware Subsidiary, LLC), a Delaware limited liability company, (d)

<div align="center">7</div>

KFM Offshore, LLC, a Delaware limited liability company, (e) KFM Institutional, LLC, a Delaware limited liability company, (f) AP Mezzanine Partners II, L.P. (f/k/a Highbridge Principal Strategies — AP Mezzanine Partners II, L.P.), a Delaware limited partnership, and (g) Jade Real Assets Fund, L.P. (f/k/a Highbridge Principal Strategies — Jade Real Assets Fund, L.P.), a Delaware limited partnership.

"*Contributor Released Claims*" has the meaning given to it in Section 10.9.

"*Contributor Taxes*" means (i) any Taxes of the Company or any of its Subsidiaries with respect to any Pre-Closing Tax Period; (ii) Taxes of Contributor or the Contributor Members (including capital gains Taxes arising as a result of the transactions contemplated by this Agreement) or any of their Affiliates (excluding the Company and its Subsidiaries) for any Tax period; (iii) Taxes for which the Company or any of its Subsidiaries (or any predecessor of the foregoing) is held liable under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) by reason of such entity being included in any consolidated, affiliated, combined or unitary group at any time before the Closing Date; (iv) Taxes imposed on or payable by third parties with respect to which the Company or any of its Subsidiaries has an obligation to indemnify such third party pursuant to a transaction consummated prior to the Closing Date; and (v) any withholding Taxes imposed with respect to payments to Contributor pursuant to this Agreement.

"*Contributor's Contribution*" has the meaning given to it in Section 2.2.

PLAINTIFFS_AMR_00000185

"**Contributor's Marks**" has the meaning given to it in Section 6.9.

"**Current Assets**" means the current assets of the Company, including cash, cash equivalents, and cash deposited by the Company in any reserve account (but excluding cash collateral posted as credit support by the Company), in each case, as determined in accordance with the Accounting Principles.

"**Current Liabilities**" means the current liabilities of the Company, as determined in accordance with the Accounting Principles; provided, however, that, for the purpose of determining Current Liabilities, any current portion of any Indebtedness shall be excluded from the definition of Current Liabilities.

"**D&O Cap Amount**" has the meaning given to it in Section 6.6.

"**De Minimis Threshold**" has the meaning given to it in Section 10.2(b).

"**Debt**" means, with respect to any Person, without duplication (i) indebtedness of such Person and its Subsidiaries for borrowed money, including, without limitation, obligations under letters of credit (but only to the extent drawn); (ii) obligations of such Person and its Subsidiaries evidenced by bonds, debentures, notes or other similar instruments; (iii) obligations of such Person and its Subsidiaries to pay the deferred purchase price of property or assets (whether real, personal, or mixed, tangible or intangible) or services (including, without limitation, obligations that are non-recourse to the credit of such Person and its Subsidiaries but are secured by the assets of such Person or any of its Subsidiaries, but excluding trade accounts payable); (iv) obligations of such Person or any of its Subsidiaries as lessee under Capital Leases and

8

obligations of such Person or any of its Subsidiaries in respect of synthetic leases; (v) obligations of such Person or any of its Subsidiaries under any Hedge Contract; (vi) any obligations of such Person or any of its Subsidiaries owing in connection with any volumetric or production prepayments; (vii) obligations of such Person or any of its Subsidiaries under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person or any of its Subsidiaries to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (vi) above; and (viii) indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) secured by any Lien on or in respect of any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person or any of its Subsidiaries.

"**Debt Estimate**" has the meaning given to it in Section 2.6(a).

"**Deductible Amount**" has the meaning given to it in Section 10.2(c).

"**Direct Claim**" has the meaning given to it in Section 10.6.

"**Disposition**" means any sale, lease, transfer, assignment, farm-out, conveyance, or other disposition of any Property (including any working interest, overriding royalty interest, production payments, net profits interest, royalty interest, or mineral fee interest).

"**Earn-Out Consideration**" has the meaning given to it in Section 2.7(a)(ii).

"**Earn-Out Payment**" has the meaning given to it in Section 2.7(a)(ii).

"**Easements**" has the meaning given to it in Section 4.16(d).

"**EBITDAX**" means without duplication, for any Person and its Subsidiaries for any period, (a) Consolidated Net Income for such period plus (b) to the extent deducted in determining Consolidated Net Income, (i) Interest Expense, income taxes, depreciation, amortization, and exploration expenses, (ii) unrealized losses on Hedge Contracts and losses on Disposition of assets (including hedge monetizations) for such period outside the ordinary course of business (other than monetization of Hedge Contracts which would have otherwise been recognized within the 12-month period immediately following such period as a result of scheduled monthly settlements within such 12- month period), and (iii) other non-cash charges for such period, including non-cash losses under ASC 815 as a result of changes in the fair market value of derivatives but excluding, in any event, to the extent that such non-cash charges are reserved for cash charges to be taken in the future, minus (c) to the extent included in determining Consolidated Net Income, non-cash income for

PLAINTIFFS_AMR_00000186

such period, including non-cash income under ASC 815 as a result of changes in the fair market value of derivatives, minus (d) to the extent included in determining Consolidated Net Income, the following gains or credits: unrealized gains on Hedge Contracts and gains on Disposition of assets (including hedge monetizations) outside the ordinary course of business; <u>provided</u> that, such EBITDAX shall be subject to pro forma adjustments for Acquisitions and Dispositions occurring during the Calculation Period assuming that such Acquisitions and/or Dispositions had occurred on the first day of the Calculation Period.

<div align="center">9</div>

"*Emergency*" means taking any and all actions and making repairs, including implementing an emergency shutdown of any or all of the Assets, that are required or appropriate to avoid, prevent or mitigate (a) imminent harm to persons or property, including injury, illness or death or damage to the Assets or a material environmental condition; (b) violation of any applicable Law that could reasonably be expected to result in a material loss or liability to the Company; or (c) curtailment of service on the Assets.

"*Engagement Letters*" means (i) that certain engagement letter dated February 27, 2017, by and between J.P. Morgan Securities LLC and the Company, as amended on May 19, 2017, and (ii) that certain engagement letter dated February 27, 2017, by and between Barclays Capital Inc. and the Company.

"*Environmental Claim*" means any Claim or Loss arising out of or related to any violation of Environmental Law.

"*Environmental Law*" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 <u>et seq.</u>; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 <u>et seq.</u>; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 <u>et seq.</u>; the Clean Air Act, 42 U.S.C. § 7401 <u>et seq.</u>; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 <u>et seq.</u>; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 <u>et seq.</u>; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; and all similar Laws of any Governmental Authority having jurisdiction over the Assets in question addressing pollution or protection of the environment, natural resources, or human health and safety (to the extent arising from exposure to Hazardous Materials), each as amended on or prior to the Closing Date.

"*Equity Consideration*" has the meaning given to it in <u>Section 2.2</u>.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means, with respect to any entity, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes such first entity, or that is a member of the same "controlled group" as such first entity pursuant to Section 4001(a)(14) of ERISA.

"*Escrow Account*" means the account established by the Escrow Agent pursuant to the Escrow Agreement.

"*Escrow Agent*" means IberiaBank Corporation.

"*Escrow Agreement*" has the meaning given to it in <u>Section 2.4(c)</u>.

"*Escrow Amount*" has the meaning given to it in <u>Section 2.2</u>.

"*Escrow Funds*" means, at any given time after Closing, any funds deposited into the Escrow Account.

"*Estimated Adjustment Amount*" has the meaning given to it in <u>Section 2.6(b)</u>.

<div align="center">10</div>

"*Excess Adjustment Amount*" has the meaning given to it in <u>Section 2.6(d)</u>.

"*Excess Escrow Amount*" has the meaning given to it in <u>Section 2.6(d)</u>.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Execution Date*" means the date on which the last of the Parties executes this Agreement.

PLAINTIFFS_AMR_00000187

"*Expiration Date*" has the meaning given to it in Section 10.2(a).

"*FCPA*" means the United States Foreign Corrupt Practices Act of 1977.

"*FERC*" has the meaning given to it in Section 4.21.

"*Final Banking Fees*" has the meaning given to it in Section 2.6(c).

"*Final CapEx Amount*" has the meaning given to it in Section 2.6(c).

"*Final Closing Debt*" has the meaning given to it in Section 2.6(c).

"*Final NWC*" has the meaning given to it in Section 2.6(c).

"*Final Transaction Expenses*" has the meaning given to it in Section 2.6(c).

"*Financial Statements*" has the meaning given to it in Section 4.11.

"*Forward Purchase Agreements*" means (i) the Forward Purchase Agreement between the Buyer and Riverstone VI SR II Holdings, L.P., dated as of March 17, 2017, pursuant to which Riverstone VI SR II Holdings, L.P. agreed to purchase an aggregate of up to 40,000,000 shares of the Buyer Class A Common Stock plus an aggregate of up to 13,333,333 warrants for an aggregate purchase price of up to $400,000,000 or $10.00 per unit and (ii) the Forward Purchase Agreement between the Buyer and Riverstone VI SR II Holdings, L.P., dated as of the Execution Date (the "*Execution Date Forward Purchase Agreement*"), pursuant to which Riverstone VI SR II Holdings, L.P. agreed to purchase an aggregate of up to 20,000,000 shares of the Buyer Class A Common Stock for an aggregate purchase price of up to $200,000,000 or $10.00 per unit.

"*Fraud*" means an actual and intentional misrepresentation or omission of a material fact which constitutes common law fraud. For the avoidance of doubt, "Fraud" expressly excludes constructive fraud, equitable fraud and promissory fraud.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" has the meaning given to it in the recitals to this Agreement.

"*Governmental Approval*" means any declaration or notification to, filing or registration with, or order, authorization, consent, clearance or approval of, any Governmental Authority.

11

"*Governmental Authority*" means any court, tribunal, arbitrator, authority, agency, commission, regulatory body, official instrumentality of the United States or any other nation, or any tribal, state, county, city, local or other political subdivision or similar governing entity.

"*Hazardous Material*" means and includes each substance regulated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant, toxic substance, or similarly-regulated material under any Environmental Law, including any Hydrocarbons, explosives, radioactive materials, asbestos in any form, or polychlorinated biphenyls.

"*Hedge Contract*" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, deferred premium commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master; excluding in the case of (a) and (b) any physical commodity purchase contracts described on Schedule 4.15.

PLAINTIFFS_AMR_00000188

"*High Mesa Holdings*" means High Mesa Holdings, L.P., a Delaware limited partnership.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*Hydrocarbons*" means oil, gas and other hydrocarbons produced or processed in association therewith, or any combination thereof, and any minerals produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane and gasoline) of any type or composition.

"*Income Tax*" means any U.S. federal, state or local or foreign income Tax or Tax based on profits, net profits, margin, revenues, gross receipts or similar measure.

"*Indebtedness*" means, with respect to any Person, and without duplication, (i) all indebtedness for borrowed money of such Person and all other indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is liable, including pursuant to the CapEx Credit Agreement or any other financing the proceeds of which are intended to fund capital expenditures of the Company; (ii) all indebtedness secured by any Lien on property owned subject to such Lien whether or not the indebtedness secured has been assumed; (iii) any liabilities in respect of any lease of real or personal property (or a combination thereof), which liabilities are required to be classified and accounted for under GAAP as a capital

<div align="center">12</div>

lease; (iv) all obligations in respect of letters of credit, to the extent drawn; (v) all obligations under forward currency exchanges, interest rate protection agreements, swap agreements and hedging arrangements; (vi) all obligations of such Person to pay the deferred purchase price of property, equipment or services (other than accounts payable in the ordinary course of business); (vii) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired; (viii) all guarantees with respect to liabilities of another Person of a type described in any of clauses (i) through (vii) above for the payment of which such first Person may be liable and (ix) any accrued interest, premiums, penalties and other fees and expenses that are required to be paid by such Persons in respect of obligations referred to in clauses (i) through (viii) of this definition (excluding prepayment penalties under capital leases to the extent such capital leases are not required to be repaid in connection with the Transactions).

"*Indemnitee*" has the meaning given to it in Section 10.5(a).

"*Indemnity Claim*" means any claim for indemnification under this Agreement.

"*Independent Accounting Firm*" means KPMG LLP, or, if such firm declines to act as the Independent Accounting Firm, an independent accounting firm of national reputation that is selected by mutual agreement of Contributor and Buyer or, if Contributor and Buyer do not reach mutual agreement on the independent accounting firm to be selected within five (5) days after either Party first receives written notice from the other requesting such mutual agreement in connection with a requirement for such Independent Accounting Firm under this Agreement, then Buyer shall designate one firm of independent public accountants of good standing and Contributor shall designate another firm of independent public accountants of good standing, and the representatives of such firms shall select a third firm of independent public accountants of good standing, which third firm shall serve as the independent accounting firm for purposes of this Agreement.

"*Intellectual Property*" means the following intellectual property rights, both statutory and under common law, if applicable: (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (c) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"*Interest*" means, with respect to any Person: (a) capital stock, membership interests, partnership interests, other equity interests, rights to profits or revenue and any other similar interest of such Person; (b) any security or other interest convertible into or exchangeable or exercisable for any of the foregoing; and (c) any right (contingent or otherwise) to acquire any of the foregoing.

"*Interest Expense*" means, for any Person and its Subsidiaries for any period, total interest, letter of credit fees, and other fees and expenses incurred in connection with any Debt

PLAINTIFFS_AMR_00000189

for such period, whether paid or accrued, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Interest Hedge Agreements, all as determined in conformity with GAAP.

"***Interest Hedge Agreement***" mean, with respect to any Person, a Hedge Contract between such Person or any of its Subsidiaries, on the one hand, and one or more financial institutions, on the other hand, providing for the exchange of nominal interest obligations between such Person or any of its Subsidiaries and such financial institution or the cap of the interest rate on any Debt of such Person or any of its Subsidiaries.

"***Interim Financials***" has the meaning given to it in Section 4.11(b).

"***Interim Period***" has the meaning given to it in Section 6.2(a).

"***IPO***" has the meaning given to it in Section 11.13.

"***IRS***" means the Internal Revenue Service.

"***Knowledge***" means, (a) when used in a particular representation or warranty in this Agreement with respect to Contributor, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(a), (b) when used in a particular representation or warranty in this Agreement with respect to the Company, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(b) and (c) when used in a particular representation or warranty in this Agreement with respect to Buyer, the actual knowledge after reasonable inquiry of the individuals listed on Schedule 1.1-K(c).

"***Laws***" means all laws (including common law), statutes, rules, regulations, ordinances and orders of any Governmental Authority.

"***Leave Employee***" has the meaning given to it in Section 6.15(b).

"***Leverage Ratio***" shall mean, with respect to a particular Person, as of a certain date, the ratio of (a) all Debt (other than obligations under Hedge Contracts) of such Person and its Subsidiaries (net of any Cash of such Person and its Subsidiaries) as of such date to (b) EBITDAX of such Person and its Subsidiaries for the Calculation Period.

"***Liabilities***" of any Person means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement, whether accrued, absolute, contingent, matured, unmatured or other.

"***Lien***" means any mortgage, pledge, security interest, lien or other similar encumbrance.

"***Liquidity Event***" means:

(a) The consummation of any merger, reorganization, business combination or consolidation of Buyer that results in any Person (other than an Affiliate of Contributor, which for purposes of the definition of Liquidity Event, shall not give effect to the last sentence of the definition of Affiliate) becoming the Beneficial Owner of more than fifty percent (50%) of the

14

combined voting power of the voting securities of Buyer or the surviving company or the parent of such surviving company;

(b)       The consummation of a sale or disposition by Buyer of all or substantially all of the Buyer's assets, other than a sale or disposition if the holders of the voting securities of Buyer outstanding immediately prior thereto hold securities immediately thereafter which represent more than fifty percent (50%) of the combined voting power of the voting securities of the acquiror, or parent of the acquiror, of such assets, or the stockholders of Buyer approve a plan of complete liquidation or dissolution of the Buyer; or

PLAINTIFFS_AMR_00000190

(c)　　The consummation of any transaction described in the foregoing clauses (a) or (b) following which the voting securities of Buyer outstanding immediately prior thereto are no longer traded on a national securities exchange or registered under Section 12(b) or (g) under the Exchange Act.

"**_Liquidity Event Consideration_**" has the meaning given to it in Section 2.7(d).

"**_Loss_**" means any and all judgments, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other Proceedings or of any claim, default or assessment). For all purposes of this Agreement, the term "**_Losses_**" shall not include any Non-Reimbursable Damages.

"**_Material Adverse Effect_**" means any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, Assets, condition (financial or otherwise) or results of operations of the Company and its Subsidiaries taken as a whole or (ii) prevents, materially delays or materially impairs the ability of Contributor or the Company from performing its obligations under this Agreement or to consummate the Transactions; provided, however, in no event shall any of the following, either alone or in combination with any other occurrence, condition, change, development, event, circumstance or effect, constitute a Material Adverse Effect pursuant to clause (i) only: any occurrence, condition, change, development, event, circumstance or effect directly or indirectly resulting from (a) any change in economic conditions generally, including any change in markets for, or prices of, Hydrocarbons, or other commodities or supplies; (b) any change in general regulatory, social or political conditions, including any acts of war, sabotage or terrorist activities; (c) any change affecting any of the Hydrocarbon transportation, distribution, storage, processing or sales industries, generally, or the target markets or systems of the Company in particular; (d) any change in the financial, banking, credit, securities or capital markets (including any suspension of trading in, or limitation on prices for, securities on any stock exchange or any changes in interest rates) or any change in the general national or regional economic or financial conditions; (e) any change in any Laws (including Environmental Laws) or GAAP; (f) any effects of weather (including any impact on customer use patterns), geological or meteorological events or other natural disaster; (g) any actions to be taken pursuant to the express terms of this Agreement, or taken at the request of or with the consent of Buyer; (h) the announcement or pendency of the Transactions; and (i) any failure by the Company to meet internal or published projections, forecasts, estimates or predictions in respect of revenues, earnings or other financial or operating metrics for any period

15

(but not the events or circumstances contributing to or causing such failure); provided further, however, that any occurrence, condition, change, development, event, circumstance or effect referred to in clauses (a), (b), (c), (d), (e) or (f) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such occurrence, condition, change, development, event, circumstance or effect has a disproportionate effect on the business, Assets, condition (financial or otherwise) or results of operations of the Company or any of its Subsidiaries compared to other participants in the industries in which such affected Person conducts its businesses.

"**_Material Contracts_**" has the meaning given to it in Section 4.15(a).

"**_NASDAQ_**" means the NASDAQ Capital Market.

"**_Net Working Capital_**" means, with respect to the Company, as of the close of business on the day immediately prior to the Closing Date, the Current Assets minus the Current Liabilities, as determined in accordance with the accounting policies, practices, procedures, methods, categorizations and techniques as were used in the preparation of Schedule 1.1-NWC (sample calculation of Net Working Capital), and in accordance with the Accounting Principles.

"**_Non-Reimbursable Damages_**" has the meaning given to it in Section 10.4(b).

"**_Notice_**" has the meaning given to it in Section 11.1(a).

"**_NWC Estimate_**" has the meaning given to it in Section 2.6(a).

"**_NWC Target_**" shall mean $0.

"**_OFAC_**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

PLAINTIFFS_AMR_00000191

"*Oil and Gas Leases*" means all leases, subleases, licenses or other occupancy or similar agreements under which a Person leases, subleases or licenses or otherwise acquires or obtains operating rights in and to Hydrocarbons.

"*Oil and Gas Properties*" means all interests in and rights with respect to (a) oil, gas, mineral, and similar properties of any kind and nature, including working, leasehold and mineral interests and operating rights and royalties, overriding royalties, production payments, net profit interests and other non-working interests and non-operating interests (including all rights and interests derived from Oil and Gas Leases, operating agreements, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, and in each case, interests thereunder), fee interests, reversionary interests, back-in interests, reservations and concessions and (b) all wells located on or producing from such leases and properties described in clause (a).

"*Operating Transition Services Agreement*" has the meaning given to it in Section 2.4(i).

"*Operator*" means Asset Risk Management, LLC.

16

"*Operator Agreement*" means that certain Amended and Restated Operating and Construction Management Agreement dated December 22, 2016 by and between the Company and the Operator.

"*Operator Employees*" means those individuals who are providing services to the Assets of the Company pursuant to the Operator Agreement.

"*Order*" means any writ, judgment, decree, injunction or award issued, or otherwise put into effect by or under the authority of any court, administrative agency, or other Governmental Authority (in each such case whether preliminary or final).

"*Organizational Documents*" means with respect to any Person, the articles or certificate of incorporation, formation or organization and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement, and such other organizational documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person or which establish the legal personality of such Person.

"*Outside Date*" has the meaning given to it in Section 9.1(d).

"*Partnership*" has the meaning given to it in the recitals to this Agreement.

"*Partnership Warrants*" means warrants exercisable for Common Units on the terms and conditions identical to warrants to purchase Buyer Class A Common Stock outstanding on the date hereof.

"*Party*" or "*Parties*" means each of Buyer, the Company and Contributor.

"*Pending Claim*" has the meaning given to it in Section 10.7(c).

"*Permits*" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, waivers, exemptions, franchises and similar consents granted by a Governmental Authority.

"*Permitted Lien*" means (a) any Lien for Taxes, impositions, assessments, fees, rents or other governmental charges levied or assessed or imposed (i) not yet due or delinquent or (ii) being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP, (b) any statutory or other Lien arising in the ordinary course of business by operation of Law with respect to a liability that is not yet due or delinquent or which is being contested in good faith by or on behalf of the Company, (c) all matters, both general and specific, that are disclosed (whether or not subsequently deleted or endorsed over) on any survey or in any title policies insuring a Company Real Property or any commitments therefor that have been made available to Buyer prior to the Execution Date or obtained by or on behalf of Buyer, (d) purchase money Liens arising in the ordinary course of business, (e) any other imperfection or irregularity of title and other Liens that would not reasonably be expected to materially interfere with or impair the use of the property burdened thereby, (f) zoning, planning, regulatory and other similar limitations and restrictions, all rights of any Governmental Authority to regulate the Company Real Property, and all matters of

17

PLAINTIFFS_AMR_00000192

record, none of which, individually or in the aggregate, materially impairs the continued use and operation of the Company Real Property to which they relate in the conduct of the Company's or an of its Subsidiaries' business as presently conducted thereon, (g) the terms and conditions of the Permits of the Company or the Contracts listed on <u>Schedule 4.15(a)</u>, (h) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws, (i) Liens expressly identified in the Financial Statements and (j) the matters identified on <u>Schedule 1.1-PL</u>.

"*Person*" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental Authority.

"*Pre-Closing Tax Period*" means any Tax period ending before the Closing Date and that portion of any Straddle Period ending at the end of the day immediately prior to the Closing Date.

"*Proceeding*" means any complaint, lawsuit, action, suit, claim (including claim of a violation of Law) or other proceeding at Law or in equity or order or ruling, in each case by or before any Governmental Authority or arbitral tribunal.

"*Property*" of any Person means any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person.

"*Prospectus*" has the meaning given to it in <u>Section 11.13</u>.

"*Proxy Statement*" has the meaning given to it in <u>Section 6.12(a)</u>.

"*Real Property Leases*" has the meaning given to it in the definition of Company Real Property.

"*Records*" means the Company's books, records and files, including all Contracts and any and all title, Tax, financial, technical, engineering, environmental and safety records and information; provided that the foregoing shall expressly exclude any records or other information relating to bids received from others in connection with the Transactions and information and analysis (including financial analysis) relating to such bids.

"*Registration Rights Agreement*" means the Registration Rights Agreement by and between Contributor, the Alta Mesa Contributor, the Riverstone Contributor, Buyer and the other parties thereto, in substantially the form attached hereto as <u>Exhibit E</u>.

"*Related Persons*" has the meaning given to it in <u>Section 10.9</u>.

"*Release*" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, injecting, escaping, leaching, dumping, or disposing.

<div align="center">18</div>

"*Representatives*" means, as to any Person, its officers, directors, employees, managers, members, partners, shareholders, owners, counsel, accountants, financial advisers and consultants.

"*Reserved Units*" has the meaning given to it in <u>Section 10.7(c)</u>.

"*Responding Party*" has the meaning given to it in <u>Section 10.5(a)</u>.

"*Restrictive Covenant Agreement*" means an agreement between Buyer and Operator in the form attached as <u>Exhibit B</u>.

"*Restrictive Legend*" has the meaning given to it in <u>Section 10.7(c)</u>.

"*Riverstone Closing*" means the "Closing" as defined in the Riverstone Contribution Agreement.

"*Riverstone Contribution Agreement*" means that certain Contribution Agreement, dated as of the Execution Date, by and between the Riverstone Contributor and Buyer.

"*Riverstone Contributor*" means the "Contributor" as defined in the Riverstone Contribution Agreement.

PLAINTIFFS_AMR_00000193

"*Sanctioned Entity*" means (a) an agency of the government of, (b) an organization directly or indirectly owned or controlled by, or (c) an individual that acts on behalf of, a country or territory that is subject to, or the target of, Sanctions, including a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ ofac/programs, or as otherwise published from time to time, to the extent that such program administered by OFAC is applicable to any such agency, organization or person.

"*Sanctioned Person*" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ ofac/sdn/index.html, or as otherwise published from time to time or any other Sanctions-related list maintained by an applicable Governmental Authority.

"*Sanctions*" means any sanctions imposed, administered or enforced from time to time by any applicable Governmental Authority, including those administered by OFAC, the U.S. Department of State, Her Majesty's Treasury, the United Nations, the European Union, or any agency or subdivision of any of the foregoing, including any regulations, rules, and executive orders issued in connection therewith.

"*Schedules*" means the schedules attached to this Agreement.

"*SEC*" means the Securities and Exchange Commission.

"*SEC Documents*" has the meaning given to it in Section 5.8(a).

"*Special Meeting*" has the meaning given to it in Section 6.12(c).

19

"*Stockholder Proposals*" has the meaning given to it in Section 7.7.

"*Straddle Period*" has the meaning given to it in Section 6.7(a).

"*Subsidiary*" means, with respect to a Person, any Person, whether incorporated or unincorporated, of which (a) at least 50% of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, (b) a general partner interest or (c) a managing member interest, is directly or indirectly owned or controlled by the subject Person or by one or more of its respective Subsidiaries.

"*Support Obligations*" has the meaning given to it in Section 6.11.

"*Tax*" or "*Taxes*" means any federal, state, local or foreign income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, by Contract or otherwise.

"*Tax Allocation Statement*" has the meaning given to it in Section 6.7(i).

"*Tax Matter*" has the meaning given to it in Section 6.7(e)(i).

"*Tax Participation Period*" means the period during which the unpaid indemnity obligations of Contributor under this Agreement with respect to a Tax Return, Tax Matter or Tax Proceeding does not exceed the value of the Reserved Units available to satisfy such indemnity obligation pursuant to Section 10.7(c).

"*Tax Proceeding*" means any audit, litigation or other Proceeding with respect to Taxes.

"*Tax Return*" means any return, declaration, report, claim for refund or information return or statement of any kind relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, filed or required to be filed with any Taxing Authority.

PLAINTIFFS_AMR_00000194

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority that imposes or purports to impose such Tax, and the agency (if any) charged with collection of such Tax for such Governmental Authority.

"**Third Party Claim**" has the meaning given to it in Section 10.5(a).

"**Transaction Confidentiality Agreement**" has the meaning given to it in Section 6.16(a).

"**Transaction Expenses**" means without duplication, (i) all fees, costs, expenses (to the extent unpaid as of the Closing Date) incurred by or on behalf of the Company or its Subsidiaries in connection with the negotiation, documentation and consummation of the Transactions,

20

including all of the fees and expenses of Bracewell LLP (and all Taxes payable in connection with such amounts); (ii) all sale, "stay-around," retention, change of control or transaction bonuses, severance payments, commission or other similar bonuses or payments payable to current or former employees, directors or consultants of the Company or any of its Subsidiaries as a result of or in connection with the Closing or as a result of any termination of employment occurring prior to the Closing (together with the amount of all employer-side employment, social insurance and other Taxes payable in connection therewith); and (iii) all employer-side employment, social insurance and other Taxes related to payments made in respect of any of the foregoing; provided, however, that the Banking Fees shall not be deemed Transaction Expenses.

"**Transaction Expenses Estimate**" has the meaning given to it in Section 2.6(a).

"**Transactions**" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"**Transfer Date**" has the meaning given to it in Section 6.15(b).

"**Transfer Taxes**" means all transfer, sales, use, goods and services, value added, documentary, stamp duty, transfer, conveyance, registration, and other similar Taxes, duties, fees or charges incurred in connection with this Agreement and the Transactions.

"**Transferred Employee**" has the meaning given to it in Section 6.15(a).

"**Trust Account**" means that certain trust account at J.P. Morgan Chase Bank, N.A. established by Buyer into which a portion of the proceeds received by Buyer from its IPO have been deposited for the benefit of Buyer's public stockholders.

"**Trust Agreement**" means the Investment Management Trust Agreement dated as of March 23, 2017, by and between Buyer and the Trustee.

"**Trustee**" means Continental Stock Transfer & Trust Company, acting as trustee of the Trust Account.

"**UK Bribery Act**" means the United Kingdom Bribery Act 2010.

"**Valuation Date**" has the meaning given to it in Section 10.7(b).

"**Willful and Material Breach**" shall mean a material breach that is a consequence of an act undertaken by the breaching Party with the actual knowledge and intent that the taking of such act would constitute a breach of this Agreement.

1.2     **Rules of Construction**.

(a)     All article, section, subsection, schedules and exhibit references used in this Agreement are to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified. The exhibits and schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

21

PLAINTIFFS_AMR_00000195

[PAGES OMITTED]

2/6/2020

Case 4:19-cv-00957-Document 462-3 Filed on 09/28/23 in TXSD Page 59 of 179

Buyer acknowledges that it, its Subsidiaries and, from and after Closing, the Company have no rights whatsoever to use Contributor's Marks.

6.10    **Distributions**.  Notwithstanding anything in this Agreement to the contrary, Contributor shall have the right to cause the Company to pay cash dividends, and/or make cash distributions to Contributor or its Affiliates at any time prior to Closing; provided such distributions do not result in any Liability to the Company.

59

6.11    **Support Obligations**.  Prior to Closing, Buyer shall replace or post, as applicable, effective as of Closing, any outstanding credit support obligations provided by Contributor or any of its Affiliates with respect to the Company or the Assets of the Company set forth on Schedule 6.11 ("**Support Obligations**"), including by providing at the Closing replacement bonds, guaranties, letters of credit, and/or cash collateral, as needed, to effect the replacement or posting of such Support Obligations at Closing; provided that if Buyer is unable to replace or post a Support Obligation at Closing, such existing Support Obligation shall remain in place and Buyer will indemnify Contributor or its Affiliates, as applicable, for any Losses resulting from payment such Person is required to make under such Support Obligation.  If Buyer or any of its Subsidiaries intends to participate in any meeting or discussion with any Governmental Authority with respect to such replacement or posting of Support Obligations, Buyer shall give Contributor reasonable notice of, and an opportunity to participate in, such meeting or discussion prior to Closing. During the Interim Period, except in connection with funding capital expenditures in accordance with the CapEx Budget, the Company and Contributor will not enter into any bond, guarantee, letters of credit or cash collateral arrangement similar to any Support Obligation without the prior written consent of Buyer.

6.12    **The Proxy Statement and the Special Meeting**.

(a)    As promptly as reasonably practicable after the Execution Date, but in any event within 20 Business Days following the date on which Buyer has received written notice from the Company and Alta Mesa that the Company and Alta Mesa each believes the information required to be provided by the Company hereunder and by Alta Mesa pursuant to the Alta Mesa Contribution Agreement has been delivered to Buyer, Buyer will prepare and file with the SEC a proxy statement containing the information specified in Schedule 14A of the Exchange Act with respect to the transactions contemplated by this Agreement, the Alta Mesa Contribution Agreement and the Riverstone Contribution Agreement (the "**Proxy Statement**") in preliminary form; provided, however, that such 20 Business Day period shall not elapse if Buyer provides a reasonably detailed written notice to the Company or Alta Mesa regarding information that is required but has not yet been received by Buyer from the Company or Alta Mesa for the Proxy Statement, in which case the 20 Business Day period shall re-commence after Buyer receives such information from the Company or Alta Mesa, as applicable. Buyer shall as promptly as practicable notify Contributor and the Company of the receipt of any oral or written comments from the SEC relating to the Proxy Statement and any request by the SEC for any amendment to the Proxy Statement or for additional information.  Buyer shall cooperate and provide Contributor and the Company with a reasonable opportunity to review and comment on the Proxy Statement (including each amendment or supplement thereto) and all responses to requests for additional information and by replies to comments of the SEC and give due consideration to all comments reasonably proposed by Contributor and the Company in respect of such documents and responses prior to filing such with or sending such to the SEC, and the Parties will provide each other with copies of all such filings made and correspondence with the SEC. The Buyer Board Recommendation shall be included in the Proxy Statement. Buyer will use its reasonable best efforts to respond promptly to any comments made by the SEC with respect to the Proxy Statement.  Buyer will cause the Proxy Statement to be transmitted to the holders of Buyer Common Stock as promptly as practicable, but in any event within 5 Business Days, following the date on which the SEC confirms it has no further comments on the Proxy Statement.

60

(b)    Contributor and the Company acknowledge that a substantial portion of the Proxy Statement and other filings to be made by Buyer with the SEC shall include disclosure regarding Contributor, the Company and the Company's management, operations and financial condition. Accordingly, Contributor and the Company will as promptly as reasonably practicable after the Execution Date, use their respective reasonable best efforts to provide Buyer with all information concerning the Company, the operations of the Company's business and the Company's management and operations and financial condition, in each case, required to be included in the Proxy Statement or such other filings, including the required financial statements of the Company prepared in accordance with Regulation S-X and a related consent from the Company's independent public accountants. Without limiting the generality of the foregoing, Contributor and the Company shall use their respective reasonable best efforts to cooperate with Buyer in connection with the preparation for inclusion in the Proxy Statement of pro forma financial statements that comply with the requirements of Regulation

https://www.sec.gov/Archives/edgar/data/1690769/000110465917052334/a17-20303_2ex2d2.htm                    47/67

PLAINTIFFS_AMR_00000222

[PAGES OMITTED]

pursuant to this Section 6.17 shall limit or otherwise affect any of the representations, warranties, covenants, obligations or conditions contained in this Agreement.

6.18    *Reasonable Best Efforts*. Except to the extent that the Parties' obligations are specifically set forth elsewhere herein, upon the terms and subject to the conditions set forth in this Agreement, each Party shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transactions.

6.19    *Engagement Letters*. Immediately after Closing and at all times thereafter, Buyer shall cause the Company to pay all fees and expense reimbursements as and when due and payable under the Engagement Letters to the extent such fees and expenses were taken into account in calculating the Estimated Adjustment Amount and the Adjustment Amount.

## ARTICLE VII
## BUYER'S CONDITIONS TO CLOSING

The obligation of Buyer to consummate Closing is subject to the fulfillment of each of the following conditions (except to the extent waived in writing by Buyer in its sole discretion, to the extent permitted by applicable Law) as of the Closing:

7.1    *Contributor's Representations and Warranties*. The Contributor Fundamental Representations shall (i) be true and correct in all respects on and as of the Closing Date as though made on and as of the Closing Date (other than those Contributor Fundamental Representations expressly made as of an earlier date) and (ii) in the case of Contributor Fundamental Representations expressly made as of an earlier date, be true and correct in all respects as of such earlier date. The representations and warranties made by Contributor in Article III (other than the Contributor Fundamental Representations) shall, without giving effect to any materiality or Material Adverse Effect qualifier contained therein, (a) be true and correct in all respects on and as of the Closing Date as though made on and as of the Closing Date (other than those representations and warranties expressly made as of an earlier date) and (b) in the case of representations and warranties expressly made as of an earlier date, be true and correct in all respects as of such earlier date, except in the case of clauses (a) and (b) where the failure to be true and correct would not have a Material Adverse Effect.

7.2    *Company Representations and Warranties*. The Company Fundamental Representations shall (i) be true and correct in all respects on and as of the Closing Date as though made on and as of the Closing Date (other than those Company Fundamental Representations expressly made as of an earlier date) and (ii) in the case of Company Fundamental Representations expressly made as of an earlier date, be true and correct in all respects as of such earlier date. The representations and warranties made by the Company in Article IV (other than the Company Fundamental Representations) shall, without giving effect to

67

any materiality or Material Adverse Effect qualifier contained therein, (a) be true and correct in all respects on and as of the Closing Date as though made on and as of the Closing Date (other than those representations and warranties expressly made as of an earlier date) and (b) in the case of representations and warranties expressly made as of an earlier date, be true and correct in all respects as of such earlier date, except in the case of clauses (a) and (b) where the failure to be true and correct would not have a Material Adverse Effect.

7.3    *Performance*. Contributor and the Company shall have performed and complied, in all material respects, with all covenants and agreements to be performed or complied with by them under this Agreement prior to or at Closing.

7.4    *No Material Adverse Effect*. Since the Execution Date, there shall not have been a Material Adverse Effect.

7.5    *Orders and Laws*. There shall not be any Law or Order of any Governmental Authority having jurisdiction (except for any such Order issued in connection with a Proceeding instituted by Buyer or its Subsidiaries) restraining, enjoining or otherwise prohibiting or making illegal the consummation of the Transactions.

7.6    *HSR Act*. The applicable waiting period under the HSR Act (and any extensions thereof) shall have expired or been terminated.

7.7    *Stockholder Approval*. At the Special Meeting, the holders of a majority of the shares of Buyer Class A Common Stock and Buyer Class B Common Stock, voting together as a single class, shall have (1) approved and adopted this Agreement, the Alta Mesa Contribution Agreement and the Riverstone Contribution Agreement and the transactions contemplated hereby and thereby; (2) approved and adopted the amendments to Buyer's amended and restated certificate of incorporation attached hereto as Exhibit D

PLAINTIFFS_AMR_00000227

[PAGES OMITTED]

# PX 49

EX-99.1 6 a17-20303_2ex99d1.htm EX-99.1

**Exhibit 99.1**

Alta Mesa Resources
Pure-Play STACK Enterprise
August 2017

Exhibit
CP 172
3/9/2023
Jackson



# Disclaimer

**FORWARD-LOOKING STATEMENTS**

The information in this presentation and the oral statements made in connection therewith include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this presentation, regarding Silver Run II's proposed business combination with Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream, LLC ("KFM"), Silver Run II's ability to consummate the business combination, the benefits of the business combination and Silver Run II's future financial performance following the business combination, as well as Alta Mesa's and KFM's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this presentation, including any oral statements made in connection therewith, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations and assumptions about future events and are based on currently available information as to the outcome and timing of future events. Except as otherwise required by applicable law, Silver Run II, Alta Mesa and KFM disclaim any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this presentation. Silver Run II cautions you that these forward-looking statements are subject to all of the risks and uncertainties, most of which are difficult to predict and many of which are beyond the control of Silver Run II, Alta Mesa and KFM, incident to the development, production, gathering and sale of oil, natural gas and natural gas liquids. These risks include, but are not limited to, commodity price volatility, low prices for oil and/or natural gas, global economic conditions, inflation, increased operating costs, lack of availability of drilling and production equipment, supplies, services and qualified personnel, processing volumes and pipeline throughput, uncertainties related to new technologies, geographical concentration of Alta Mesa's and KFM's operations, environmental risks, weather risks, security risks, drilling and other operating risks, regulatory changes, the uncertainty inherent in estimating oil and natural gas reserves and in projecting future rates of production, reductions in cash flow, lack of access to capital, Alta Mesa's and KFM's ability to satisfy future cash obligations, restrictions in existing or future debt agreements of Alta Mesa or KFM, the timing of development expenditures, managing Alta Mesa's and KFM's growth and integration of acquisitions, failure to realize expected value creation from property acquisitions, title defects and limited control over non-operated properties. Should one or more of the risks or uncertainties described in this presentation and the oral statements made in connection therewith occur, or should underlying assumptions prove incorrect, Silver Run II's, Alta Mesa's and KFM's actual results and plans could differ materially from those expressed in any forward-looking statements.

**RESERVE INFORMATION**

Reserve engineering is a process of estimating underground accumulations of hydrocarbons that cannot be measured in an exact way. The accuracy of any reserve estimate depends on the quality of available data, the interpretation of such data and price and cost assumptions made by reserve engineers. In addition, the results of drilling, testing and production activities may justify revisions of estimates that were made previously. If significant, such revisions could impact Alta Mesa's strategy and change the schedule of any further production and development drilling. Accordingly, reserve estimates may differ significantly from the quantities of oil and natural gas that are ultimately recovered. Estimated Ultimate Recoveries, or "EURs," refers to estimates of the sum of total gross remaining proved reserves per well as of a given date and cumulative production prior to such given date for developed wells. These quantities do not necessarily constitute or represent reserves as defined by the Securities and Exchange Commission (the "SEC") and are not intended to be representative of anticipated future well results of all wells drilled on Alta Mesa's STACK acreage.

**USE OF PROJECTIONS**

This presentation contains projections for Alta Mesa and KFM, including with respect to their EBITDA, net debt to EBITDA ratio and capital budget, as well as Alta Mesa's production and KFM's volumes, for the fiscal years 2017, 2018 and 2019. Neither Silver Run II's nor Alta Mesa's and KFM's independent auditors or Alta Mesa's independent petroleum engineering firm have audited, reviewed, compiled, or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation, and accordingly, none of them expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results.

In this presentation, certain of the above-mentioned projected information has been repeated (in each case, with an indication that the information is subject to the qualifications presented herein), for purposes of providing comparisons with historical data. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if our assumptions and estimates are correct, projections are inherently uncertain due to a number of factors outside our control. Accordingly, there can be no assurance that the projected results are indicative of the future performance of Silver Run II, Alta Mesa or KFM or the combined company after completion of any business combination or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person that the results contained in the projected information will be achieved.

**USE OF NON-GAAP FINANCIAL MEASURES**

This presentation includes non-GAAP financial measures, including EBITDA and Adjusted EBITDAX of Alta Mesa. Please refer to the Appendix for a reconciliation of Adjusted EBITDAX to net (loss) income, the most comparable GAAP measure. Silver Run II, Alta Mesa and KFM believe EBITDA and Adjusted EBITDAX are useful because they allow Silver Run II, Alta Mesa and KFM to more effectively evaluate their operating performance and compare the results of their operations from period to period and against their peers without regard to financing methods or capital structure. The computations of EBITDA and Adjusted EBITDAX may not be comparable to other similarly titled measures of other companies. Alta Mesa excludes the items listed in the Appendix from net (loss) income in arriving at Adjusted EBITDAX because these amounts can vary substantially from company to company within its industry depending upon accounting methods and book values of assets, capital structures and the method by which the assets were acquired. Adjusted EBITDAX should not be considered as an alternative to, or more meaningful than, net income as determined in accordance with GAAP or as an indicator of Alta Mesa's operating performance or liquidity. Certain items excluded from Adjusted EBITDAX are significant components in understanding and assessing a company's financial performance, such as a company's cost of capital and tax structure, as well as the historic costs of depreciable assets, none of which are components of Adjusted EBITDAX. Alta Mesa's presentation of Adjusted EBITDAX should not be construed as an inference that its results will be unaffected by unusual or non-recurring items.

**INDUSTRY AND MARKET DATA**

This presentation has been prepared by Silver Run II and includes market data and other statistical information from sources believed by Silver Run II, Alta Mesa and KFM to be reliable, including independent industry publications, government publications or other published independent sources. Some data is also based on the good faith estimates of Alta Mesa and KFM, which are derived from their review of internal sources as well as the independent sources described above. Although Silver Run II, Alta Mesa and KFM believe these sources are reliable, they have not independently verified the information and cannot guarantee its accuracy and completeness.

**TRADEMARKS AND TRADE NAMES**

Alta Mesa and KFM own or have rights to various trademarks, service marks and trade names that they use in connection with the operation of their respective businesses. This presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this presentation is not intended to, and does not imply, a relationship with Silver Run II, Alta Mesa or KFM, or an endorsement or sponsorship by or of Silver Run II, Alta Mesa or KFM. Solely for convenience, the trademarks, service marks and trade names referred to in this presentation may appear without the ®, TM or SM symbols, but such references are not intended to indicate, in any way, that Alta Mesa or KFM will not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to these trademarks, service marks and trade names.

2

# Table of Contents

I.    Introduction

II.   Company Overview

III.  Our Upstream Assets

IV.   Our Midstream Assets

V.    Financial Summary

VI.   Valuation and Timeline

Appendix

3





Introduction

# Silver Run II Delivering on Investment Criteria

## Upstream

✓ Assets economic well below current oil price

✓ High margin core basin with low field break-evens, deep inventory

✓ Multiple Stacked Pays

✓ High-quality assets with significant unbooked resource potential

✓ Opportunities to improve costs through technology

✓ Opportunity to expand through technology and acquisitions



## Midstream

✓ Competitively-positioned assets that benefit from strong supply/demand fundamentals

✓ Expansion opportunities in rapidly growing basin

✓ Locked-in base returns through stable fee-based contracts

✓ Assets with return asymmetry from incremental volumes, moderate margin exposure, and/or organic growth projects

✓ Synergy with existing upstream portfolio

*Combined upstream and midstream company allows for significant value uplift from financial optimization*

5



# Pure Play STACK Company
## *Premier liquids upstream growth with value-enhancing midstream*

- World class asset with attractive geology
    - Highly contiguous ~120,000 acres with substantial infrastructure in core of STACK
    - Oil-weighted resource with $25/BBL breakeven; >85% single-well rate of return
    - 4,200+[1] gross primary locations; 12,000+[1] possible through down-spacing and additional zones
- Top-tier operator with substantial in-basin expertise and highly consistent well results
    - 200+ horizontal STACK wells drilled across entirety of Kingfisher acreage maximizes confidence in type well EUR
    - Consistency and geographic breadth of well results affirms repeatability
    - Oil-weighted production in early well life maximizes near-term oil-based revenue (first month 2-stream production at 82% oil with 57% of the type well EUR oil produced in the first five years); consistent GOR profile
    - Industry-leading growth potential; 2-year expected EBITDA CAGR of 128%
    - Demonstrated ability to manage a large development program – average of 6 rigs running in 2017
    - Robust acquisition pipeline coupled with track record as an aggregator
- Highly strategic and synergistic midstream subsidiary with Kingfisher Midstream
    - Flow assurance de-risks production growth
    - Purpose built system designed to accommodate third party volumes – currently 6 contracted customers with approximately 300,000 gross dedicated acres
    - Strategic advantage supporting acquisition of new upstream assets
    - Future opportunity to monetize Kingfisher Midstream through an IPO, and fund upstream capital needs through proceeds of an IPO, drop downs, and GP / IDR distributions
- Financial strength and flexibility to execute business plan through the cycle; cash flow positive in 2019
    - Team has demonstrated the discipline to survive and grow through cyclical downturns

[1] Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in Major, Blaine and Kingfisher counties in July 2017, as described in further detail on page 27 (the "Major County Acquisition").

6

# Transaction Overview



- Jim Hackett and Riverstone raised ~$1 billion through Silver Run Acquisition Corporation II ("Silver Run II") IPO to invest in a market leading company which could generate significant potential return

- Silver Run II has agreed to merge with Alta Mesa ("Alta Mesa") and Kingfisher Midstream ("KFM"), collectively renamed as Alta Mesa Resources, Inc. ("AMR") at the closing of the contemplated transaction. The existing Silver Run II public stockholders and Riverstone will collectively hold a 49% interest in the combined Company1

- Pursuant to the contemplated transaction, the combined Company implied Firm Value ("FV") will be ~$3.8 billion at $10 per share, representing the following acquisition metrics:

| | AMR | KFM | Total |
|---|---|---|---|
| FV / 2018E EBITDA | 6.1x | 7.3x | 7.1x |
| FV / 2019E EBITDA | 3.1 | 4.2 | 3.8 |

- Existing owners of Alta Mesa will roll 100% of their equity into Silver Run II; owners of KFM will retain significant equity stakes

- Riverstone and related investment vehicles will invest at least $600 million of cash[2]

- Anticipated closing of the transaction in 4Q 2017

[1] Assumes no Silver Run II public stockholders elect to have their shares of Class A common stock redeemed in connection with the closing of the transaction.
[2] Includes $400 million of shares of Class A Common Stock and warrants to be purchased from Silver Run II under the forward purchase agreement dated as of March 17, 2017. Does not include additional $200 million commitment from Riverstone under a forward purchase agreement entered into in connection with the proposed transaction.

7



# Transaction Summary

## Sources & Uses ($ MM)

| Sources | |
|---|---|
| Legacy Owners' Rollover Equity | $1,993 |
| Silver Run II Cash Investment | 999[1] |
| Riverstone Cash Investment [2] | 600 |
| **Total Sources** | **$3,591** |
| **Total Cash Sources** | **$1,599** |

| Uses | |
|---|---|
| Legacy Owners' Rollover Equity | $1,993 |
| Cash to KFM Owners | 813 |
| Cash to Alta Mesa Balance Sheet & Interim Capex Funding | 786 |
| **Total Uses** | **$3,591** |
| **Total Cash Uses** | **$1,599** |

## Implied Firm Value



| ($ millions) | |
|---|---|
| Shares Outstanding | 388.6 |
| Share Price | $10.00 |
| **Equity Value** | **$3,886** |
| Less: Cash | (551) |
| Plus: Debt | 500 |
| **Firm Value** | **$3,836** |



| Transaction Multiples | |
|---|---|
| FV / 2018E EBITDA ($543) | 7.1x |
| FV / 2019E EBITDA ($1019) | 3.8x |

## Post-Transaction Ownership[3]



## Pro Forma Organizational Structure



Note: Sources & Uses includes estimates of transaction fees, debt at close, and other transaction closing adjustments, and is subject to change.
[1] SPAC capital net of deferred underwriting expense.
[2] Reflects Riverstone and related investment vehicles, and includes $400 million of shares of Class A Common Stock and warrants to be purchased from Silver Run II under the forward purchase agreement dated as of March 17, 2017. Does not include additional $200 million commitment from Riverstone under a forward purchase agreement entered into in connection with the proposed transaction.
[3] Assumes none of legacy Silver Run II owners exercise their stockholder redemption rights and does not give effect to any shares of Class A Common Stock that may be acquired by the Alta Mesa or KFM sellers in connection with certain earn-out provisions in the applicable contribution agreements.

8



Company Overview

# Alta Mesa Overview
## Focused on development and acquisition in the STACK



| Upstream Metrics | |
|---|---|
| Net STACK Surface Acres | ~120,000 |
| Current Production (BOE/D) | ~20,000 |
| % Liquids | 69% |
| Proved Reserves (MMBOE) | 144 |
| Resource Potential (MMBOE)[1] | >1,000 |
| Estimated Potential Gross Identified Locations[1] | 4,196 |
| Estimated Total Gross Locations[1,2] | 12,133 |
| Gross Stack Wells Producing / Horizontal Operated STACK Wells Drilled[3] | 167 / 205 |
| 2017 Average Rigs | 6 |

| Midstream Metrics | |
|---|---|
| Natural Gas Processing Current / YE 2017 | 60 / 340[4] MMCF/D |
| Pipelines | 300+ miles |
| Dedicated Acreage | ~300,000 gross acres |
| Storage Capacity | 50 MBBL with 6 loading LACTs[5] |

### Contiguous Core Position in STACK Oil Window

Legend:
- Nemaha Ridge Uplift
- Alta Mesa Kingfisher Acreage
- Alta Mesa Major County Acquisition
- Updip Oil - API Gravity = 40-42, GOR = ~500-750 scf/bbl
- Oil - API Gravity = 42-45, GOR, 750-1,500 scf/bbl
- Volatile Oil - API Gravity = 45-50, GOR 1,500-5,000 scf/bbl
- Wet Gas - API Gravity = 50-60, GOR = 5,000-15,000 scf/bbl
- Dry Gas - API Gravity 60+, GOR = >15,000 scf/bbl

Legend
- Existing KFM Plant
- Compressor Station
- Kingfisher Midstream System

Source: Public Filings, Investor Relations.
Note: All reserve figures per NYMEX strip pricing as of 12/31/2016 close; represents acreage as of 7/20/2017.
[1] Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.
[2] Includes additional locations from downspacing in the Oswego, Meramec, Lower and Upper Osage formations as well as additional locations in the Big Lime, Cherokee, Manning, Chester, Woodford and Hunton formations.
[3] Horizontal wells drilled as of 8/14/17
[4] Includes 80 MMCF/D offtake processing expected 3Q 2017.
[5] Lease Automatic Custody Transfer units.

10



# High Caliber STACK Operating Team
## Cohesive, tenured, scalable team producing world class results

| Name | Position | Years at AMR | Years Experience |
|---|---|---|---|
| Hal Chappelle | President and CEO | 13 | 30+ |
| Mike Ellis | Founder and Chief Operating Officer | 30 | 30+ |
| Mike McCabe | VP and Chief Financial Officer | 11 | 25+ |
| Gene Cole | VP and Chief Technical Officer | 10 | 25+ |
| Kevin Bourque | VP, Mid Continent Operations | 10 | 20+ |
| David McClure | VP, Facilities and Midstream | 7 | 15+ |
| Tim Turner | VP, Corporate Planning and Reserves | 4 | 30+ |
| Dave Smith | VP, Geology, Geophysics & Exploration | 18 | 30+ |
| Ron Smith | VP and Chief Accounting Officer | 10 | 30+ |
| David Murrell | VP, Land | 10 | 25+ |

### Robust Capabilities, Organizational Scale, Public Company Processes to Drive Long-Term Success

| Operations (60 Employees) (40 Contractors) | Engineering & Geology (45 Employees) | Land (25 Employees) | Corporate / Finance & Accounting (50 Employees) |
|---|---|---|---|

### Relentless focus on technological advancements and continuous learning

11



# Optimization, Delineation and Expansion
## Systematic horizontal development and growth of contiguous acreage



**1992 - 2013**

**40,000+ Net Acres**

**1987**
- Founded by Mike Ellis with ~$200K

**1991**
- Initial Sooner Trend acreage acquired from Conoco/Exxon/Texaco-operated units

**2007-2012**
- Drilled 27 vertical stratigraphic delineation wells within legacy acreage; defined robust Osage prospectivity in vertical wells
- Spud first two operated HZ STACK wells in December 2012



**2014 - 2015**

**73,000+ Net Acres**

**2013**
- Progressed through first two completion designs (Gen 1.0 and Gen 1.5)

**2014-2015**
- Commenced aggressive STACK leasing/acquisition and accelerated STACK development, increasing from 4 operated rigs (37% of capex budget) to 70% of total capex budget
- Built STACK acreage from 40K to 70K+ acres through bolt-on acquisitions



**2016 & 2017 Plan**

**120,000+ Net Acres**

**Legend**
- Existing KFM Plant
- Compressor Station
- Kingfisher Midstream System
- 2017 Development Plan Wells
- Alta Mesa Kingfisher Acreage
- Alta Mesa Major County Acquisition

**2016**
- Production reached ~20 MBOE/D
- Drilled 100th STACK HZ well & first Gen 2.5 well
- DrillCo JV started, accelerated STACK drilling with 5 operated rigs
- Phase I of Kingfisher Midstream completed, with 60 MMCF/D processing plant, crude and gas gathering, transmission pipelines, 50,000 BBL/D crude terminal, and field compression

**2017**
- Increased to 6 STACK operated rigs (95% of capex budget)
- Phase II of KFM expected to be complete, which includes 200MMCF/D cryo plant expansion, gas gathering pipelines, field compression and high-pressure gas transmission pipelines

12



# Alluring Macroeconomic Fundamentals
*High quality rock drives compelling returns, robust rig activity*



Source: BakerHughes, Wall Street Research.
[1] Based on 15% IRR hurdle. Assumes gas price deck of 2017: $3.10/mcf; 2018: $2.99/mcf; 2019: $2.83/mcf; 2020: $2.82/mcf; thereafter: $2.83/mcf.
[2] AMR breakeven price company prepared. Based on AMR 651 MBOE mean type curve.
[3] Osage type curves assume 17% royalty burden and $3.2mm D&C well cost. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.
[4] NYMEX strip pricing as of 8/0/2017 close until 2021 and held flat thereafter.
[5] Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf; 2018: $54.90/bbl / $3.14/mcf; 2019: $58.00/bbl / $3.05/mcf and held flat thereafter).
[6] Not inclusive of producer customers' entire gross acreage position; additional gross acreage proximate to KFM available for gathering and processing services. Includes additional acreage to come and/or under negotiation.
[7] Percentage of Phase I & II shown.

13





# Asset Value of AMR's STACK Position

*~$7B PV-10 Value from Identified Gross Locations before downspacing*

Note: PV-10 figures as of 7/1/2017. Reflects Generation 2.0 Type Curve. Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf, 2018: $54.90/bbl / $3.14/mcf, 2019: $58.00/bbl / $3.05/mcf and held flat thereafter). Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition. Adjusted for transportation costs paid to KFM; excludes $1.25 / bbl oil transportation costs ("KFM Margin Uplift").

[1] Illustrative midstream uplift value assumes 2018E EBITDA valued at 13.7x.

[2] Low Risk downspacing of Osage to 11 WPS (966 locations), Meramec to 5 WPS (318 locations), and Oswego to 4 WPS (516 locations).

[3] Additional downspacing of Osage to 15 WPS (1,288 locations) and Meramec to 8 WPS (964 locations).

[4] Assumes 2018E Upstream G&A capitalized at 7.5x.

[5] Assumes pro forma net debt at transaction close based on Alta Mesa Q2 2017 revolver balance outstanding.

[6] Additional Formations include Big Lime, Manning, Hunton, Woodford, Cherokee, and Chester.

Our Upstream Assets



# Significant Activity in Alta Mesa "Neighborhood"
## Prominent operators active in Updip Oil Window adjoining Alta Mesa

Source: IHS Enerdeq, HPDI.
Note: Represents a combination of current and recent rig activity.
[1] Operators with 2 rigs or fewer running.

16



# Alta Mesa Vision
*Rigorous development and balance sheet to consolidate regional assets*

## Existing Asset Value

- Early phase of systematic Meramec/Osage, and Oswego development
- Our goal: maximize discounted cash flow
    - Improve drilling efficiencies through technology and pad drilling
    - Continually optimize well density, stage spacing, pump rates, fluids, proppant, hydraulics
- Delineate and develop other horizons
    - Established productive zones – Big Lime, Manning, Cherokee sands, Woodford, Hunton
    - Untested zones – Chester Shale

## STACK Enterprise Expansion

- Consolidate acreage where we can be best-in-class Operator



Alta Mesa Position in Expanding STACK/MERGE/SCOOP Area

Note: Wells drilled map as of August 2017.

17



# Progressive Increase in Completion Intensity
*Alta Mesa leadership in operational advancements*

## Completion Summary By Generation

- Alta Mesa has proactively advanced completion designs with each generation – leading to improved well response and economics:
  - Number of stages increases with each generation as stage spacing decreases
  - Average sand per stage has increased with each generation
  - Total fluid per stage increases with each generation
- Continuously optimizing completions designs through reduced frac stage spacing for increased formation stimulation

| Design Parameters | Gen 1.0 | Gen 1.5 | Gen 2.0 | Gen 2.5 | Current | Future |
|---|---|---|---|---|---|---|
| Avg Frac Stages | 12 | 18 | 24 | 32 | 35 | |
| Avg. Stage Spacing (Ft.) | 340 | 256 | 194 | 150 | 140 | |
| Slickwater - Avg Total (BBLS/Ft.) | 29 | 42 | 56 | 66 | 75 | Further Improvement |
| Sand - Total Avg. (Lbs/Ft.) | 317 | 457 | 677 | 1,193 | 1,500 | |
| Frac Design Type | Packer/Sleeve | Hybrid | Plug/Perf | Plug/Perf | Plug/Perf | |
| Flow Design Type | Slickwater | Slickwater | Slickwater | Slickwater | Slickwater | |
| Packers Type | Mechanical | Hybrid | Swell | Swell | Swell | |
| Well Count[1] | 7 | 6 | 59 | 94 | -- | |

## Current Type Curve – Gen 2.0



Flowback Rate-Controlled In Early Periods

[1] Wells completed as of 8/16/17

18

# Average Well Results
## Results as of YE 2016 with early-stage Gen 2.5 forecasts

### Average EUR by Generation[1]




■ MBO  ■ MBOE

| | Average Generation 1.0 | Average Generation 1.5 | Average Generation 2.0 | Expected Generation 2.5 | Beyond Generation 2.5 |
|---|---|---|---|---|---|
| MBOE | 149 | 472 | 598 | | |
| MBO | 71 | 183 | 247 | | |
| # of Wells | 7 | 6 | 50 | | |

### Optimizing Stimulated Reservoir Volume

- Financial goal: maximize discounted cash flow

- Well design goal: optimize stimulated reservoir volume
  - Well spacing
  - Proppant loading
  - Fluid rates
  - Landing zones

### Oil and Liquids Content Over Time[2]



— Cumulative % MBOE (2-Stream)  — Oil % (2-Stream)
— % Liquids (3-Stream)  — GOR (MCF/BBL)

GOR (MCF/BBL)

Months

### Oil-Weighting Over Time

- Approximately 57% of the oil, 50% of the natural gas liquids, and 38% of the natural gas are produced in the first five years thereby enhancing the early revenue per unit and the resulting economics

- The GOR increases over time with month one approximately 1 Mcf/Bbl, month twelve approximately 5 Mcf/Bbl, month sixty approximately 8 Mcf/Bbl.

- In month one, 2-stream production from the well is 82% oil and 3-stream production is 86% liquids

- In year one, 2-stream production from the well is 66% oil and 3-stream production is 74% liquids

- The well breaches the 2-stream 50% oil point near the end of year 2 and 3-stream production remains above 50% liquids point for the life of the well

Source: Ryder Scott-audited Reserve Report, Company data.
[1] Based on Ryder Scott-audited Reserve Report. Excludes 9 wells with circumstances that will not be repeated due to unacceptable results: i) 4 wells with 660' spacing in a high porosity area, ii) 3 child wells drilled between 2 parent wells without injecting water into the parent wells prior to frac, iii) 1 well which were shut in for more than 90 days after frac, iv) 1 well that fraced into a vertical well and the vertical well was not plugged in the Osage/Meramec.
[2] LNU17N06W02A Miss well (Ryder Scott-audited Reserve Report).

19



# Cost-Advantaged Asset Base

*Infrastructure and basic well design mitigate cost inflation*

| Advantage | Why It Matters |
|---|---|
| 1 Shallower Targets | ■ Allows for the elimination of additional strings of casing, liner tie-back, and reduces horsepower used during stimulation<br>■ Reduced drilling time and costs per well enhances capital flexibility and efficiencies |
| 2 One-mile Laterals | ■ Reduces mechanical risk of completions vs two-mile<br>■ Use less steel by utilizing smaller diameter pipe program<br>■ Lower cost per foot to execute drilling and completions |
| 3 Naturally Fractured Formation | ■ Heavier proppant loads not required<br>■ Flexibility to use more commoditized proppant |

Gross D&C[1] ($MM)
Lat. Length: 4.8k 4.8k 4.8k 5.0k 4.8k 5.0k 9.6k 9.8k 9.6k 10.0k
$ 12.0
$ 10.0
$ 8.0
$ 6.0
$ 4.0
$ 2.0
$ 0.0
AMR - MRMC/OSAGE (Gen 2.0)
AMR - MRMC/OSAGE (Gen 2.5)
CHK - OSWEGO
DVN - MRMC SLNP
MRO - MRMC
DVN - UPPR MRMC
NFX - MRMC SXL
CLR - MRMC
MRO - MRMC
XEC - MRMC

## STACK Regional Stratigraphy

Penn
Mississippian
Updip Oil Window
Oswego
Pre-Pennsylvanian Unconformity
Chester Shale
Meramec
Osage
Woodford Shale
Hunton
Sylvan Shale
STACK PLAY TESTED HORIZONTAL TARGETS
Cross Section Location Map
Osage/Meramec True Dip 1 degree SW

[1] AMR Pad Drilling D&C only and does not include $300k of allocated facilities cost.

20

# Alta Mesa: Low Cost Operator
*Peer leader in operating cost and capital efficiency*

## SEC Future Development Cost Per Proved Undeveloped BOE ($ / BOE)[1]

| AMR | XEC | CLR | PE | FANG | RSPP | NFX | MRO[2] | DVN[2] |
|-----|-----|-----|-----|------|------|-----|-----|-----|
| $5.62 | $7.96 | $8.53 | $8.77 | $8.89 | $9.37 | $10.02 | $13.78 | $24.21 |

## Recycle Ratio[3]

Illustrative KFM Margin Uplift

| CLR | AMR | FANG | PE | RSPP | XEC | NFX | MRO | DVN |
|-----|-----|------|-----|------|-----|-----|-----|-----|
| 4.0x | 3.7x | 3.4x | 3.2x | 3.1x | 1.8x | 1.7x | 1.1x | 0.8x |

## Q1 2017 LTM LOE ($ / BOE)[4]

| XEC | NFX | CLR | AMR[5] | PE | MRO | RSPP | FANG | DVN |
|-----|-----|-----|--------|-----|-----|------|------|-----|
| $2.99 | $3.58 | $3.66 | $3.70 | $3.87 | $4.81 | $4.98 | $5.10 | $6.39 |

Legend: Alta Mesa · STACK Peers · Permian Peers

Source: Public Filings as of 4Q 2016.
[1] Calculated as future development costs divided by proved undeveloped reserves. Shown as of 12/31/2016.
[2] MRO and DVN PUD F&D evaluated based on US assets only.
[3] Calculated as 4Q16 unhedged EBITDAX/BOE divided by organic F&D. Includes Q4 acquired BCE wells in calculation. Organic F&D defined as Future Development Costs / PUD volumes per SEC filings and excludes reserves added through acquisitions.
[4] Does not include gathering & transportation.
[5] LTM 3/31/2017 excluding legacy vertical and waterflood-related production.

21

# Solid Results Affirm De-Risked Acreage Position
*Representative wells across 11 townships*



**Notable 2017 Alta Mesa Wells**

| Well | Target | IP30 (BOE/D) |
|---|---|---|
| Aces High 1606 4-11MH | Osage | 923 |
| Coleman 1706 6A-9MH | U Osage/L Meramec | 514 |
| Dalehenna 1805 1-31MH | Osage | 702 |
| Fazio 1705 1-13MH | Osage | 909 |
| Hasley 1605 1-29MH | Osage | 549 |
| Huntsman 1506 2-23MH | Meramec | 598 |
| Macallan 1606 4-17MH | Osage | 643 |
| Odie 1606 1-12MH | U Osage/L Meramec | 849 |
| Peat 1606 1-36MH | Osage | 522 |
| Pollard 1805 3-2MH | Osage | 507 |
| Red Queen 1606 1-1MH | Osage | 509 |
| Shear 1906 1-3MH | Osage | 505 |
| Speyside 1606 1-27MH | Osage | 997 |
| Yellowstone 1505 4-8MH | Osage | 740 |

**Legend**

- Notable Horizontal Wells
- Horizontal Wells
- Notable 2017 Wells
- Updip Oil
- Oil
- Volatile Oil
- Wet Gas
- Fieldwide Units
- Alta Mesa Kingfisher Acreage
- Alta Mesa Major County Acquisition
- Osage Structure
- Nemaha Ridge Uplift

| Well Name[1] | Lateral Length | EUR (MBOE)[2] | EUR/000 Lateral ft[2] | IP90 (BOE/D) | IP90 % Oil | IP90/000 Lateral ft |
|---|---|---|---|---|---|---|
| **Operated** | | | | | | |
| Barbara 1706 3-22MH | 4,812 | 579 | 120 | 348 | 82% | 72 |
| Beyer 4-8H | 4,452 | 863 | 194 | 505 | 75% | 113 |
| Boecher 1706 4-19MH | 4,832 | 574 | 119 | 560 | 72% | 116 |
| Bollenbach 1705 4-21MH | 4,820 | 994 | 206 | 195 | 55% | 38 |
| Bollenbach 1705 6-30MH | 4,795 | 1,190 | 250 | 436 | 92% | 91 |
| Brown 1708 6-27MH | 4,850 | 838 | 173 | 316 | 76% | 65 |
| Clark 1705 5-12MH | 4,657 | 827 | 179 | 615 | 85% | 132 |
| Cleveland 1805 2-28MH | 4,645 | 686 | 148 | 451 | 77% | 97 |
| Dixon 1505 3-16MH | 4,658 | 657 | 135 | 325 | 81% | 67 |
| EHU 219H | 4,950 | 790 | 160 | 123 | 88% | 25 |
| EHU 225H | 3,651 | 678 | 186 | 216 | 91% | 59 |
| EHU 229H | 5,300 | 559 | 106 | 357 | 89% | 67 |
| Evelyn 1706 5-18MH | 4,857 | 575 | 118 | 621 | 87% | 128 |
| Francis 1706 5-8MH | 4,956 | 664 | 137 | 349 | 69% | 72 |
| Gilbert 1706 6-21MH | 4,738 | 590 | 125 | 409 | 59% | 86 |
| Hawk 1906 7-18MH | 4,813 | 540 | 112 | 216 | 80% | 45 |
| Helen 1605 5-33MH | 4,620 | 652 | 141 | 331 | 77% | 72 |
| Hoskins 1705 2-9MH | 4,693 | 932 | 199 | 507 | 85% | 108 |
| James 1706 5-26MH | 4,748 | 736 | 155 | 352 | 79% | 74 |
| Lankard 1708 6-34MH | 4,955 | 847 | 174 | 1,291 | 58% | 260 |
| LNU 16-2H | 4,788 | 873 | 182 | 282 | 89% | 59 |
| LNU 49-4H | 4,518 | 758 | 167 | 518 | 79% | 115 |
| Mad Hatter 1506 2-34MH | 4,670 | 832 | 135 | 294 | 90% | 63 |
| Martin 1505 4-8MH | 4,795 | 620 | 129 | 278 | 64% | 58 |
| Matheson 1705 5-23MH | 4,765 | 729 | 153 | 448 | 79% | 94 |
| Mitchell 1806 3B-27MH | 4,598 | 646 | 140 | 311 | 81% | 68 |
| Oak Tree 1605 3-30MH | 4,744 | 813 | 171 | 634 | 69% | 134 |
| Oltmanns 1805 6-14MH | 4,930 | 822 | 167 | 631 | 70% | 128 |
| Oswald 1705 6-29MH | 4,815 | 1,144 | 238 | 278 | 66% | 58 |
| Pinehurst 1705 5-5MH | 5,081 | 672 | 133 | 672 | 75% | 113 |
| Redbreast 1505 4-7MH | 4,709 | 655 | 139 | 251 | 73% | 53 |
| Rigdon 17015 6-11MH | 4,827 | 725 | 150 | 697 | 82% | 144 |
| Rudd 1805 2A-5MH | 4,010 | 520 | 130 | 489 | 59% | 122 |
| Three Wood 1505 4-17MH | 4,634 | 629 | 136 | 321 | 76% | 69 |
| Todd 1706 6-4MH | 5,019 | 946 | 188 | 599 | 60% | 119 |
| Vadder 1805 2-12MH | 4,504 | 669 | 148 | 542 | 63% | 120 |
| Wakeman 1706 6-25MH | 4,642 | 925 | 191 | 787 | 62% | 182 |
| Weber 1808 3-22MH | 4,797 | 646 | 135 | 112 | 75% | 23 |
| White Rabbit 1506 2-27MH | 4,811 | 633 | 132 | 428 | 91% | 89 |
| **Non-Operated** | | | | | | |
| Deep River 30-1MH | 5,586 | NA | 89 | 324 | 41% | 58 |
| Holiday Road 2-1H | 5,100 | NA | 87 | 153 | 65% | 30 |
| King Koopa 1609 2UMH-22 | 4,691 | NA | 83 | 380 | 60% | 81 |
| OOD 1OH-24 | 5,357 | 1,459 | 272 | 533 | 68% | 99 |
| Post 1706 1-30MH | 4,919 | 456 | 93 | 461 | 66% | 90 |
| Ruzek 1H-3X | 6,872 | 498 | 72 | 688 | 67% | 100 |
| Trifecta 1807 20H-14-1 | 4,346 | 682 | 152 | 555 | 92% | 128 |

Source: Alta Mesa Year-End Reserve Report. For non-Alta Mesa operated wells, IHS Enerdeq.
Note: EURs based on NYMEX 2016 pricing. Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.
[1] Includes 7 wells not operated by Alta Mesa. Includes wells operated by Chaparral, GST, MRO and NFX.
[2] 3-Stream EUR assuming 75.4 BBL/MMCF NGL yield and 15.9% shrink.

22

# Alta Mesa STACK Development
*Moving into development mode on de-risked Kingfisher acreage*

## Base Case Development Plan For AMR



Oswego/
Big Lime

Meramec

Osage

## 2017 Development Plan



## Alta Mesa Development Strategy

- Near term development plan focuses on continued optimization of frac stage spacing, transitioning to development mode, delineating Oswego performance, and accelerating infrastructure investments
- Delineate and de-risk recently acquired Major County Acquisition acreage
- All wells in inventory are planned as single-section laterals
- Transition to primarily pattern development in 2017
- Average of 6 rigs running in 2017

23



# STACK: A Significant Petroleum System
*Additional development potential in multiple stacked pay zones*

## Alta Mesa Existing Development

- Existing spacing tests at 660' show full development potential
- 660' spacing tests have more than 200 days of online production
- Over 800 days of strong well performance at spacing of 1,200'
- Three target zones in Osage/Meramec, which represents a continuous 550' section and one additional in Oswego

## Additional Zones

- Eight zones have proven hydrocarbon production from vertical wells
- Chester Shale offers added potential
- AMR and others have already drilled successful Oswego, Meramec, Osage, Woodford, and Hunton horizontal wells
- Additional formations, including Big Lime and Red Fork, have horizontal permits and strong vertical production
- Drilling days expected to remain similar across the various formations
- AMR drilling Manning Limestone in 2017

Note: Actual Alta Mesa log above displays productive formations.

## Potential 55 Wells per Section

| Type Log | Formation | Targeted | Down-spacing | Additional Formations | Total |
|---|---|---|---|---|---|
| | **Big Lime** | | | 4 | 4 |
| | **Oswego** | 2 | 2 | | 4 |
| | **Cherokee Shale**<br>Prue Sand<br>Skinner Sand<br>Red Fork Sand | | | 4 | 4 |
| | **Manning Lime** | | | 4 | 4 |
| | **Chester Shale** | | | 4 | 4 |
| | **Meramec** | 4 | 4 | | 8 |
| | **Osage** | 4 | 3 | | 7 |
| | | 4 | 4 | | 8 |
| | **Woodford Shale** | | | 8 | 8 |
| | **Hunton Lime** | | | 4 | 4 |
| | **Total** | 14 | 13 | 28 | 55 |

24





# Progressive Execution
## Track record of growth in production, reserves, acreage position





- Acreage has grown from ~40,000 net acres to ~120,000 net acres since 2013

- Disciplined acreage aggregation focused primarily on "bolt-on" acquisitions to systematically increase contiguous position

- July 2017 added ~20,000 net acres in Major, Blaine, and Kingfisher; geologic character similar to central-eastern Kingfisher acreage

Source: Company data, Public Filings, IHS Herolds, RigData.
[1] Inclusive of Net Production from Bayou City JV. 2012 and 2013 data reflects occurrence date and not accounting date LOS, due to the reasoning that occurrence date method incorporated a change in NGL accounting; whereas accounting date LOS does not.
[2] YE 2016 proved reserves as of 12/31/2016 close.
[3] YE12-15 proved reserves based on NYMEX pricing.

26



## Near Term Consolidation Opportunity
*Play is expanding and significant acreage could change hands*

**Legend:**
- Nemaha Ridge Uplift
- Alta Mesa Kingfisher Acreage
- Alta Mesa Major County Acquisition

**Actionable Acreage**
- Private Equity Backed/Private Company (~2.1 MM Gross Acres)
- Public Company (~0.5 MM Gross Acres)
- Public Company / Private Equity Backed/Private Company Overlap
- Alta Mesa Overlap

Source: Investor Presentations, 1Derrick

27





# Our Midstream Assets

# KFM is Value Accretive to Alta Mesa
## Vertical integration yields substantial strategic and financial benefits

| | |
|---|---|
| **Rapidly Expanding G&P Complex in the Heart of the STACK** | • KFM is positioned to capture volume growth from the STACK<br>• Acreage dedications / resource allocations of ~300,000 gross acres |
| **Gathering, Processing and Market Access Support Production Growth** | • Total processing capacity is expected to be 340 MMCF/D in 4Q 2017, including 80 MMCF/D of additional offtake<br>• Substantial firm transport to support future growth |
| **Bundled Natural Gas Residue Solution Enhances Marketability** | • KFM capable of providing takeaway solutions to end-markets today<br>• KFM has secured firm takeaway capacity on PEPL and OGT |
| **Competitive Advantage in Acquisitions** | • KFM well positioned to serve other operators; major gas pipeline projects recently announced by others will be more costly and less timely<br>• Modern processing recoveries and priority residue access to premium markets should result in higher netbacks |
| **KFM's Expansion Offers Complementary, High-Growth Development Project** | • Expansion focused on the next stage of STACK development<br>• Limited G&P infrastructure provides opportunity for KFM expansion<br>• KFM involved in negotiations with anchor customers |
| **Midstream Business Can Support Future Capital Needs** | • Volumetric growth from third-party development provides upside<br>• Attractive trading multiples and GP/IDR optionality / currency<br>• Future opportunity to monetize KFM and fund upstream capital needs through an MLP IPO, drop downs, and GP / IDR distributions |

29



# Market Multiples for Midstream Higher than Upstream
## Alta Mesa owners to capture GP / IDR cash flow / multiple arbitrage

## Valuation Arbitrage

- Likely valuation uplift (multiple arbitrage vs. traditional peer group)



| | AMGP | EQGP | EOM | AM | HESM | NBLX | DVN | XEC | CLR | NFX |
|---|---|---|---|---|---|---|---|---|---|---|
| FV / 2018E EBITDA | 26.8x | 23.8x | 13.8x | 13.8x | 13.6x | 12.3x | 7.9x | 7.7x | 7.3x | 5.9x |
| Upstream Multiple | | | 4.8x | 6.1x | 8.1x | 6.3x | | | | |

GP Median: 25.3x
Midstream Median: 13.7x
Upstream Median: 7.5x

■ Midstream  ▨ GP  ■ Upstream

## Illustrative Value Accretion from GP Structure

- Potential to continue to benefit from cash flows through retained LP, GP, and IDR ownership interest

| | Upstream | Midstream | GP | |
|---|---|---|---|---|
| EBITDA | $1.0 | $1.0 | $1.0 | |
| Splits | 100% | 100% | 75% | 25% |
| Multiple | 7.5x | 13.7x | 13.7x | 25.3x |
| Implied Value | $7.5 | $13.7 | $10.3 | $6.3 |
| Uplift | -- | 1.8x | 2.2x | |

## Illustrative Midstream Value Creation[1]

($ in millions)



| Value of Margin in Upstream | MLP Multiple Expansion | MLP Value | Multiple Expansion | Potential Midstream Value (MLP + GP) |
|---|---|---|---|---|
| $2,390 | $1,960 | $4,350 | $924 | $5,275 |

[1] Illustrative KFM future value expansion assuming KFM 2019E EBITDA of $318mm.

30

## Kingfisher Midstream Summary
### Existing Infrastructure



Cushing ~60 mi.

| Natural Gas Processing | • Current processing capacity of 60 MMCF/D<br>• Second 200 MMCF/D plant under construction<br>• 80 MMCF/D offtake processing expected 3Q 2017<br>• 1,200 BBL/D condensate stabilizer |
|---|---|
| Low Pressure Pipeline | • 223 miles[1] of low-pressure crude and gas gathering lines<br>  – Natural gas gathering: 6"-16" pipeline<br>  – Crude gathering: 6"-8" pipeline |
| High Pressure Pipeline | • 98 miles[2] of 4" to 16" rich gas transportation pipeline<br>  – Average operating pressure of 1,100 psig<br>    and piggable<br>• 4 miles of 16" residue gas pipeline with 230 MMCF/D of<br>  capacity to PEPL<br>• 5 miles of 16" residue gas pipeline connecting KFM to<br>  OGT in service October 2017<br>• 4 miles of 6" NGL Y-grade pipeline, with 10,000 BBL/D<br>  capacity to Chisolm Pipeline |
| Compression Facilities | • Field Compression<br>  – 3 CAT 3516s at Lincoln South Location<br>    (4,140 total horse power)<br>  – 3 CAT 3516s at WSOR Location<br>    (4,140 total horse power)<br>  – 1 CAT 3516, 1 CAT 3306 at Garfield Compressor Site<br>  – 1 CAT 3508 at Snowden Compressor Site<br>  – 1 CAT 3516 at West Kingfisher Compressor Site<br>  – 1 CAT 3508 at Great Divide Compressor Site<br>• Inlet Compression – 6x CAT 3606s<br>  (10,650 total horse power)<br>• Residue Compression - 3x CAT 3516s<br>  (4,140 total horse power) |
| Other Infrastructure | • 50,000 BBL crude storage with 6 truck loading LACTS<br>• 3 NGL bullet tanks: 90,000 gallon capacity |
| Producer Connections | • 54 central delivery point receipt connections serve<br>  188 units |

Note: Represents multiple lines in ditch
[1] Includes 16 miles under construction
[2] Includes 20 miles under construction

31

# KFM Midstream Takeaway Overview

| Pipeline | | Description | Current Takeaway Capacity | Expansion Projects | Commentary |
|---|---|---|---|---|---|
| Natural Gas | | • Connected to PEPL – owned and operated by Energy Transfer<br>• PEPL consists of four large diameter pipelines extending approximately 1,300 miles throughout Mid-Continent and other market centers<br>• KFM will connect to OGT Q3 2017<br>• OGT services local Oklahoma gas demand, but via on expansion will begin to deliver gas to WAHA in Q2 2018 | • 100,000/day FT on PEPL<br>• 50,000/day FT on OGT, expanding to 125,000/day June 2018<br>  &minus; 25,000 Dth/d for 4 years<br>  &minus; 100,000 Dth/d for 10 years | • KFM in discussion with all proximate outlet pipelines looking to expand out of the basin | • Gas takeaway is functionally full creating a constrained environment for some producers.  KFM's residue position provides flow assurance and better netbacks for KFM producer clients<br>• Residue gas is split connect between PEPL and OGT, and under long term agreements insuring that KFM producer customers can flow out of the basin<br>• Capacity rates are low compared to new rates that will be needed to solidify new capacity out of the basin creating better netbacks for KFM producers dedicated to the system |
| NGL | | • Connected to Chisholm Pipeline - operated by Phillips 66<br>• Delivers NGLs to Conway | • Operational capacity of ~41,000 Bbls/d on existing Chisholm line<br>• Currently under a 3 year contract extendable for 2 1-year terms with shipper history | • Opportunity to tie into other NGL pipelines in the area<br>• Volumes could warrant expansion or new build to Mt. Belvieu | • Connected to P66's Chisolm Y-grade pipeline that takes Y-grade to Conway, KS for fractionation<br>• Multiple NGL lines within 7 miles of plant to further diversify Y-Grade options when needed<br>• KFM Y-grade optionality will allow producers to capture netback uplift between Conway, KS and Mt Belvieu |
| Crude | | • Crude gathered to a central delivery point at the plant site<br>• Six truck bays for LACT loading and unloading<br>• Multiple pipeline connection options | • Not currently committed | • Long haul pipeline opportunities to Cushing and other demand sources in the area | • Crude system is focused around keeping Alta Mesa barrels and future third party barrels clean to market, producing better netbacks<br>• Proximity to Cushing provides market optionality between in-state and the Gulf Coast refineries.<br>• No long terms commitments provide KFM the option to build out long-haul crude pipelines enhancing drop down inventory |

32

# KFM Phase III Expansion Overview

- Recent Major county acquisition adds scale through ~20,000 acre dedication

- Offset operator activity in the Western STACK reflects compelling economics driving producer interest and investment

- KFM has identified and plans to capitalize on this midstream opportunity and is rapidly commercializing this growth initiative

- KFM is in the process of securing acreage dedications and other resource allocations in the Western STACK



33





# Financial Summary

# Financial Strategy and Pro Forma Financial Impacts

**Significant Financial Flexibility**

- Demonstrated trajectory to positive free cash flow with near-term development funded with transaction proceeds
- Secure robust liquidity to fund development, with near-term production growth ensured by KFM takeaway capacity
- Pro forma for this transaction, financial flexibility in place to pursue opportunistic acquisitions with a goal toward consolidation of the STACK region

**Maintain Conservative Balance Sheet**

- Maintain conservative credit metrics of < 2.0x leverage through the cycle
- Preserve an optimal debt maturity profile
- Maintain simplified balance sheet

**Protect Cash Flow**

- Prudent capital budget focused on securing leasehold and developing existing acreage
- Ensure capital budget is flexible to future changes in commodities and/or service costs
- Continued rolling hedge strategy to protect revenues and support development program

## Capitalization at Announcement

| ($ in millions, unless specified) | Current Alta Mesa | KFM | Adjustments | Pro Forma |
|---|---|---|---|---|
| Cash and Cash Equivalents | $5 | $28 | $517[1] | $551 |
| | | | | |
| Revolving Credit Facility | 269[2] | $0 | (269)[3] | 0 |
| 7.875% Senior Notes due 2024 | 500 | | | 500[3] |
| **Total Debt** | $769 | $0 | ($269) | $500 |
| Net Debt | 763 | $0 | ($269) | (51) |
| | | | | |
| **Financial and Operating Statistics** | | | | |
| 2017E EBITDA | $155 | $42 | | $197 |
| 2018E EBITDA | 358 | 184 | | 543 |
| 2019E EBITDA | 701 | 318 | | 1,019 |
| | | | | |
| **Credit Metrics** | | | | |
| Net Debt / | | | | |
| 2017E EBITDA | | | | NM |
| 2018E EBITDA | | | | NM |
| 2019E EBITDA | | | | NM |
| | | | | |
| **Liquidity** | | | | |
| Expected Borrowing Base | $315 | $200 | | $515 |
| Less: Amount Drawn | 269 | | (269) | 0 |
| **Expected Borrowing Base Availability** | $46 | | | $515 |
| Plus: Cash and Cash Equivalents | 5 | | | 551 |
| Liquidity | $52 | | | $1,066 |

[1] Cash to balance sheet includes funding for interim cash needs until closing.
[2] Current revolving credit facility balance as of 8/10/2017 does not include approximately $5mm of letters of credit.
[3] Change of control not triggered for 2024 Senior Notes upon execution of transaction.

35

# 2017 Capital Budget and Hedge Position

## Commentary

*Alta Mesa*

- Alta Mesa's 2017 net capital budget is estimated to be $349MM, ~11% higher than capital expenditures of $316MM in 2016
- Alta Mesa estimates that ~$108MM of the FY 2017 capital budget will be funded by Bayou City per the JV agreement
- Alta Mesa's total 2017 capital budget is estimated to be $458MM, including the Bayou City Energy JV
- FY 2017 acquisition (including leaseholds) capex spending expected to total $85MM, or ~19% of the total deployed budget (including Bayou City Energy JV)
- Expect 10-Rig program in the STACK by YE18
- Continue growth and efficiency gains in the STACK while maintaining conservative Leverage Ratio

*Kingfisher Midstream*

- KFM's 2017 net capital budget is estimated to be $251MM
- Growth capital categorized through processing, pipeline, high / low pressure well connects, compression lease principal payments and compression lease interest expense items

## 2017E Capital Budget by Quarter ($MM) – Excl. Acquisitions[1]



## Oil Hedged (BBL/D) – as of 6/30/17



| | Jul-Dec'17 | 2018 | 2019 |
|---|---|---|---|
| Average Floor Price ($/BBL) | $49.55 | $51.67 | $50.00 |

## Gas Hedges (MCF/D) – as of 6/30/17



| | Aug-Dec'17 | 2018 |
|---|---|---|
| Average Floor Price ($/BBL) | $3.18 | $4.43 |

**Disciplined management protects future revenues and preserves asset value by hedging large percentage of proved-developed and prompt-year production. Currently hedge WTI (oil), Henry Hub (gas), Conway (propane), and Mid-Con gas basis.**

[1] Does not include Bayou City Energy JV.

36





Valuation and Timeline

# Summary Financial Projections



($ in millions unless otherwise noted)

Note: Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf; 2018: $54.90/bbl / $3.14/mcf; 2019: $58.00/bbl / $3.05/mcf and held flat thereafter).
[1] DrillCo Funds is Bayou City JV deal.
[2] Phase I & II capex includes planned, non-optional Phase III capex.
[3] Assumes borrowing base increase from $515mm to $665mm in 2018 and includes funding for interim cash needs until closing and KFM revolving credit facility. Assumes combined FCF deficit of ($155)mm from current until year-end 2017.

38

2/28/23, 6:28 PM Case 4:19-cv-00957 Document 462-3 Filed on 09/26/23 in TXSD Page 102 of 179
https://www.sec.gov/Archives/edgar/data/1690769/000110465917052334/a17-20303_2ex99d1.htm



# Valuation Benchmarking

($ in millions unless otherwise noted)

**Firm Value / 2018E EBITDA**

MTDR 7.9x, DVN 7.9x, LPI 7.7x, XEC 7.7x, RSPP 7.6x, CLR 7.3x, CPE 6.5x, AMR 6.1x, NFX 5.9x

**Firm Value / 2019E EBITDA**

DVN 6.6x, LPI 6.4x, MTDR 6.1x, XEC 6.1x, CLR 6.0x, RSPP 5.3x, NFX 4.7x, CPE 4.3x, AMR 3.1x

**Adjusted Firm Value¹ / Net Acres**

GPOR / Vitruvian² $30,011; DVN / Felix² $22,063; AMR³ $14,180

**2017E – 2019E Production CAGR**

AMR 82%, CPE 43%, RSPP 32%, EQT 21%, MTDR 21%, AR 19%, CLR 18%, NFX 15%, CNX 15%, DVN 6%

¹ PDP value adjusted at $30,000 / BOE/D unless otherwise noted.
² PDP value adjusted at $15,000 / BOE/D.
³ Alta Mesa PDP value assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf, 2018: $54.90/bbl / $3.14/mcf, 2019: $58.00/bbl / $3.05/mcf and held flat thereafter). Excluding the Major County acreage, our adjusted $ / net acre is $17,158 / acre. 39



# Benchmarking KFM Against High Growth G&P Peers

($ in millions unless otherwise noted)

## Firm Value / 2018E EBITDA

## Firm Value / 2019E EBITDA

## Midstream 2017E – 2019E EBITDA CAGR

## Consolidated 2017E – 2019E EBITDA CAGR

**Integrated Upstream/Midstream Peers**

[1] Includes midstream Firm Value only.

40



# Anticipated Transaction Timeline

| Date | Event |
|------|-------|
| Weeks of September 4th – September 29th | • Transaction marketing |
| Mid-September 2017 | • File preliminary proxy statement / marketing materials with the SEC |
| Mid/Late-November 2017 | • Anticipated close |

41



# Pure Play STACK Company
*Premier liquids upstream growth with value-enhancing midstream*

- World class asset with attractive geology

- Top-tier operator with substantial in-basin expertise

- Industry-leading growth potential; 2-year expected EBITDA CAGR of 128%

- Highly strategic and synergistic midstream subsidiary with Kingfisher Midstream

- Financial strength and flexibility to execute business plan through the cycle; cash flow positive in 2019

42





Case 4:19-cv-00957 Document 462-3 Filed on 09/28/23 in TXSD Page 106 of 179

# Alta Mesa Management

## Jim Hackett
*Executive Chairman and COO of Midstream*

- Jim Hackett is a Partner at Riverstone and became a director of Silver Run II in 2017

- Prior roles include:
  - Chairman and CEO of Anadarko
  - President and COO of Devon Energy
  - Chairman, President and CEO of Ocean Energy
  - President of several midstream companies, as well as responsible for DCP Midstream and Western Gas Resources

- Director of Enterprise Products Holdings, Fluor Corporation, National Oilwell Varco, Sierra Oil & Gas, and Talen Energy

- Former Chairman of the Board of the Federal Reserve Bank of Dallas

- Holds a B.S. from the University of Illinois and a MBA/MTS from Harvard University

## Hal Chappelle
*President and Chief Executive Officer*

- Hal Chappelle joined Alta Mesa as President and CEO in 2004 and became a director in 2004

- Developed Alta Mesa into a premier STACK operator, building a strong management and technical team

- Successfully navigated Alta Mesa through significant industry cycles, building the Company's oil assets in 2009-2010 and divesting of the company's gas assets in 2014-2016

- Over 30 years of industry experience in field operations, engineering, management, trading, acquisitions and divestitures, and field re-development

- Previously held roles at Louisiana Land & Exploration, Burlington Resources, Southern Company and Mirant

- Holds a Bachelor of Chemical Engineering from Auburn University and an M.S. in Petroleum Engineering from the University of Texas

## Michael McCabe
*Vice President and Chief Financial Officer*

- Michael McCabe joined Alta Mesa in 2006 and became a director in 2014

- Raised private equity capital for Alta Mesa from Denham Capital in 2006, HPS Investment Partners in 2013, and Bayou City in 2015; successfully navigated Alta Mesa through two industry cycles

- Has over 25 years of corporate finance experience with a focus on the energy industry

- Previous management experience includes serving as President and sole owner of Bridge Management Group, Inc., a private consulting firm

- Mr. McCabe's leadership experience also spans senior positions with Bank of Tokyo, Bank of New England and Key Bank

- Holds a B.S. in Chemistry and Physics from Bridgewater State University, an M.S. in Chemical Engineering from Purdue University, and an MBA from Pace University

44

# Alta Mesa Management

## Michael Ellis

*Founder and COO of Upstream Operations*

- Michael Ellis founded Alta Mesa in 1987 after beginning his career with Amoco
- Served as Chairman and COO as well as Vice President of Engineering and has over 30 years of experience in management, engineering, exploration, and acquisitions and divestitures
- Built Alta Mesa's asset base by starting with small earn-in exploitation projects, then growing with successive acquisitions of fields from major oil companies
- Holds a B.S. in Civil Engineering from West Virginia University

## Gene Cole

*VP and Chief Technical Officer*

- Gene Cole has served in the position of Vice President and Chief Technical Officer since 2015 and became a director in 2015
- Over 25 years of extensive domestic and international oilfield experience in management, well completions, well stimulation design and execution
- Started his career with Schlumberger Dowell as a field engineer and served in numerous increasingly responsible positions from 1986 to 2007
- Holds a B.S. in Petroleum Engineering from Marietta College

## David Murrell

*VP, Land and Business Development*

- David Murrell has served as Vice President, Land and Business Development since 2006
- Over 25 years of experience in Gulf Coast leasing, exploration and development programs, contract management and acquisitions and divestitures
- Created a structured land management system for Alta Mesa and built a team of lease analysts, landmen, and field representatives to facilitate Alta Mesa's growth
- Holds a B.B.A in Petroleum Land Management from the University of Oklahoma

## Kevin Bourque

*VP, Operations*

- Kevin Bourque progressed through several roles to the position of Vice President of Mid-Continent Operations in 2012 when we began STACK horizontal drilling program
- He joined Alta Mesa as a field engineer in 2007
- Led the growth of our mid-continent drilling and production program as we expanded our presence in Oklahoma
- 10+ years of E&P operational experience with Alta Mesa
- 10+ years of project management and business management experience as the owner of his own company

## Tim Turner

*VP, Corporate Development*

- Tim Turner joined Alta Mesa as Vice President of Corporate Development in 2013
- Over 30 years of industry experience including various operations, reservoir engineering and managerial roles with Sun Oil, Santa Fe Minerals, Fina Oil & Chemical, Total, Newfield Exploration, and Quantum Resources
- Led multi-disciplined A&D and asset teams
- Managed corporate reserves and planning functions
- Led business development and new ventures teams
- Holds a B.S. in Petroleum Engineering from the University of Texas and an MBA in Finance from Oklahoma City University

## David McClure

*VP, Facilities & Midstream*

- David McClure has served as Vice President of Facilities and Midstream Operations since 2016
- From 2010 to 2016, he was Vice President for Louisiana Operations, leading a multi-disciplined team of engineers, regulatory, land, geoscience, and operations personnel in development of the Weeks Island field
- Previously held roles at ExxonMobil Production Company and Tetra Technologies
- Over 15 years of industry experience in field operations, facilities and subsea engineering, pipelines, and management
- Holds a B.S. in Chemical Engineering from Auburn University

45



# Jim Hackett's Track Record

**Under Mr. Hackett's leadership as Chairman, President, and/or CEO of Anadarko from 2003 to 2013, Anadarko was transformed into one of the largest U.S. oil and gas producers, growing its market cap from approximately $12 billion to over $43 billion. Prior to Anadarko, Mr. Hackett was also a key contributor to the market outperformance of Devon Energy.**



**Strategic Thought Leader**

- Created new mission for Anadarko in 2003, upgraded corporate leadership capabilities, rationalized and refocused the portfolio, improved technical and financial risk management tools and processes, and generated success through expansion into unconventional onshore and conventional offshore assets
- Applied leading-edge technology and processes in drilling, completions, and production
- Dynamic leader for years serving as President and COO of Devon Energy, Chairman, President and/or CEO of Ocean Energy, president of several midstream companies, responsible for Duke Energy and PanEnergy's midstream and upstream businesses, and drove Anadarko's midstream business consolidation and MLP/GP IPO – Western Gas Partners and Western Gas Resources

**Benchmark for Operational Excellence and Execution**

- Premier operator with some of the best production metrics in U.S. onshore, U.S. Gulf of Mexico, and offshore East Africa

Source: FactSet.
Note: An investment in Silver Run Acquisition Corporation II is not an investment in Anadarko or Devon. The results of Anadarko or Devon are not necessarily indicative of the future performance of Silver Run Acquisition Corporation II.
[1] Chart displays Ocean share price performance until merger with Devon completed. Thereafter, chart shows Devon performance on a per-Ocean share basis.

46











# Well Spacing Optimization on De-Risked Acreage

*DVN, CLR, MRO, NFX and AMR aggressively defining optimum spacing*

## Alta Mesa is the Leader in the Oil Window with Successful Long Life Spacing Tests

- Newfield—Stark Pilot, 10-well Spacing Test Upper/Lower Meramec
- Newfield—Raptor-X Pilot, 6-well Spacing Test 880' Upper/Lower Meramec
- Continental—Ludwig Pilot, 8-well Spacing Test (74%oil) 1,320' Upper/Lower Meramec
- Continental—Blurton STACK Pilot, 8-well Meramec/4-well Woodford Test 1,320' Upper/Lower Meramec
- Continental—Bernhardt STACK Pilot, 8-well Meramec/4-well Woodford Test 1320' Upper/Lower Meramec
- Continental—Verona STACK Pilot, 8-well Meramec/4-well Woodford Test 1,320' Upper/Lower Meramec
- Newfield—Dorothy Pilot, 5-well Spacing Test 1,050' Upper/Lower Meramec
- Continental—Gillilan STACK Pilot, 8-well Meramec/4-well Woodford Test 1,320' Upper/Lower Meramec
- Devon—Born Free, 13-well Spacing Test 400' Upper/Lower Meramec
- Cimarex—Gundy, Future 10-well Spacing in Meramec/9-well Spacing in Woodford 550' Upper/Lower Meramec

- Alta Mesa—4-well Spacing Test EHU 237, 239, 240, 241 S9-19N 6W Lower/Middle Osage, 1,500'
- Alta Mesa—4-well Spacing Test EHU 230, 231, 232, 233 S6-18N 6W Lower/Middle Osage, 660'
- Alta Mesa—5-well Spacing Test LNU 15-4, 15-5, 16-2, 16-3, 16-4 Lower (1,320')/Middle (1,200') Osage
- Alta Mesa—10-well Spacing Test Bullis – Coleman Pattern S9 17N 6W Lower/Middle (932') Osage; Lower Meramec
- Alta Mesa—3-well Spacing Test Borelli – Dodd Pattern S8-17N 5W Lower/Middle (1,500') Osage
- Alta Mesa—3-well Spacing Test Oswald Pattern S28-17N 6W Lower/Middle (1,500') Osage
- Newfield—Chlober, 5-well Spacing Test 1,050' Upper/Lower Meramec
- Marathon—Yost, 6-well infill Spacing Test Meramec
- Devon - Pump House, 7-well Spacing Test 2,200 lbs/ft proppant, 4,700' laterals Upper Meramec
- Alta Mesa – 4 Well Spacing Test Huntsman Pattern S23-15N 6W 1,200 ft. spacing Osage and Meramec
- Devon—Alma, 5-well Spacing Test IP60 1,300boed, Upper/Lower Meramec

Source: 1Derrick, IHS, Drilling Info and Company Presentations.

# Completion Design

*Focus on increasing stimulated reservoir volume*

## STACK Well Completion Strategy

- Progressed through testing multiple generations
- Highly fractured area benefits from "open-hole" design
- Targeting average lateral length of 4,800ft (one-mile)
- Drilling N–S orientation to intersect natural fractures
- Controlled flowback rate to optimize conductivity
- Generation 2.5 proppant loading is optimum at an average of 1,400 lb/ft; tested up to 2,100 lb/ft

## Current Completion Design Targets

- 7" intermediate casing + 4.5" liner in lateral
- Open-hole swell packers; proppant loading of 1,400 lbs/ft
- 3 joints (casing) between packers defines 150ft stages
- 10,000 bbls of slick water per stage
- 100 bbl/min total fluid injection rate
- Cap flowback rate at 100 bbl/hr of total fluid

## Total D&C Cost ($MM)

| Avg. Days Spud to TD | 2012 | 2013 | 2014 | 2015 | 2016 | Target Pad Drilling |
|---|---|---|---|---|---|---|
| | 46 | 34 | 25 | 17 | 13 | 13 |

## D&C Cost / Lateral Foot

## Averages by Completion Generation

### Stage Spacing

### Proppant

### Fluid

Source: Company Data

48

Multiple Long Term Density Pattern Tests
Density Patterns Test Horizontal and Vertical Spacing
Spacing Pattern
Pattern Results
1,320ft spacing / 2 benches
Section 29 18N 5W
Implies 12 wells per section
Cum 622 MBOE – 780 days
Cum BO - 5 Wells
Mean - 5 x 250 MBO
1,500ft spacing / 2 benches
Section 8 17N 5W
Implies 12 wells per section
Cum 663 MBOE – 660 days
Cum BO - 3 Wells
Mean - 3 x 250 MBO
1,500ft spacing / 2 benches
Section 28 17N 5W
Implies 12 wells per section
Cum 480 MBOE – 540 days
Cum BO - 3 Wells
Mean - 3 x 250 MBO
660ft spacing / 2 benches
Section 31 19N 6W
Implies 24 wells per section
Cum 319 MBOE – 360 days
Cum BO - 4 Wells
Mean - 4 X 250 MBO
1,000ft spacing / 3 benches
Section 9 & 10 17N 6W
Implies 18 wells per section
Cum 348 MBOE – 56 days
Cum BO - 10 Wells
Mean - 10 X 250 MBO
1,200ft spacing / 2 benches
Section 23 15N 6W
Implies 12 wells per section
Cum 12 MBOE – 19 days
Cum BO - 4 Wells
49

# NAV Model Assumptions

| Area | Operated | | | Other |
|---|---|---|---|---|
| | Osage | Meramec | Oswego | DrillCo |
| **Pricing & Discount Assumptions** | | | | |
| Gas Differential (% of HH) | 95% | 95% | 95% | 95% |
| Oil Differential (% of WTI) | 94% | 94% | 94% | 94% |
| NGL Realization (% of WTI) | 45% | 45% | 45% | 45% |
| **Drilling Assumptions** | | | | |
| Number of Drilling Locations | 2,388 | 1,264 | 484 | 60 |
| Working Interest - Operated (%) | 72% | 74% | 75% | 57% |
| Working Interest - Other (%) | 15% | 15% | 13% | -- |
| NRI - Operated (%) | 60% | 61% | 62% | 47% |
| NRI - Other (%) | 12% | 12% | 11% | -- |
| Fixed Operating Cost ($k/well/month) | $9.7 | $9.7 | $9.7 | $9.7 |
| Variable LOE ($ / bbl of oil) | $2.23 | $2.23 | $2.23 | $2.23 |
| Gas Marketing & Transportation ($ / mcf of gas) - Until 2021 | $0.35 | $0.35 | $0.35 | $0.35 |
| Gas Marketing & Transportation ($ / mcf of gas) - Thereafter | $0.35 | $0.35 | $0.35 | $0.35 |
| Initial Production Tax - Oil (%) | 2.1% | 2.1% | 2.1% | 2.1% |
| Initial Production Tax - Gas/NGLs (%) | 2.1% | 2.1% | 2.1% | 2.1% |
| Severance Holiday (months) | 36 | 36 | 36 | 36 |
| Production Tax - Oil (%) | 7.1% | 7.1% | 7.1% | 7.1% |
| Production Tax - Gas/NGLs (%) | 7.1% | 7.1% | 7.1% | 7.1% |
| Ad Valorem Tax (%) | 0.0% | 0.0% | 0.0% | 0.0% |
| Drilling & Completion Cost ($mm)[1] | $3.5 | $3.5 | $2.5 | $0.3 |
| **EUR Assumption** | | | | |
| **Gross EUR** | | | | |
| Gross Sales Gas EUR (MMcf) | 1,571 | 1,425 | 168 | 1,571 |
| Gross NGL EUR (Mbbl) | 141 | 128 | 15 | 141 |
| Gross Oil EUR (Mbbl) | 250 | 249 | 200 | 250 |
| Total Gross EUR (Mboe) | 652 | 615 | 243 | 652 |
| **Type Curve Assumptions** | | | | |
| **Oil** | | | | |
| IP, 24-hr (Bbl/d) | 200 | 170 | 320 | 200 |
| Duration of Incline (Months) | 2 | 2 | -- | 2 |
| Peak Rate (Bbl/d) | 350 | 500 | 320 | 350 |
| B Factor | 1.20 | 1.20 | 1.20 | 1.20 |
| Di-Continuous (Nominal) Decline (%) | 73% | 80% | 72% | 73% |
| Terminal Decline (%) | 7% | 7% | 7% | 7% |
| **Natural Gas** | | | | |
| IP, Unshrunk, 24-hr (Mcf/d) | 500 | 296 | 320 | 500 |
| Duration of Incline (Months) | 4 | 2 | -- | 4 |
| Peak Rate (Mcf/d) | 900 | 1,250 | 320 | 900 |
| B Factor | 1.50 | 1.50 | 1.20 | 1.50 |
| 1-Di-Continuous (Nominal) Decline (%) | 41% | 56% | 72% | 41% |
| Terminal Decline (%) | 5% | 5% | 7% | 5% |
| NGL Yield (bbls/MMcf) | 75 | 75 | 75 | 75 |
| % Gas Shrink | 15.9% | 16.1% | 15.9% | 15.9% |

DrillCo includes all Osage Wells

Note: Assumes 4,800 lateral length for all type curves.
[1] D&C shown including PAD D&C facilities costs.

50

2/28/23, 6:28 PM    Case 4:19-cv-00957 Document 462-3 https://www.sec.gov/Archives/edgar/data/1690769/000110465917052334/a17-20303_2ex99d1.htm Filed on 09/26/23 in TXSD Page 114 of 179

# Osage Type Curve

## Summary

- 118 Generation 2.0+ wells with production history
- Average Generation 2.5 lateral length of 4,612'; Generation 2.0+ 4,767'
- Type Curve average 30-day IP 0.3 MBOE/D
- Type Curve average 180-day cumulative production of 75 MBOE
- Generation 2.5 Type Curve
  - 622 MBOE 2-Stream EUR; 714 MBOE 3-Stream EUR
  - 303 MBO, 1.6 BCF residue, 144 MB NGL
- Generation 2.0 Type Curve
  - 561 MBOE 2-Stream EUR; 652 MBOE 3-Stream EUR
  - 250 MBO, 1.6 BCF residue, 141 MB NGL
- Type Curves assume 16% Shrink and 75 bbl/MMcf NGL yield

### Average Type Curve Cumulative Production



## Average Type Curve



| Key Statistics | | |
|---|---|---|
| | Gen 2.5 | Gen 2.0 |
| Initial Rate (BO/D / MCF/D) | 200 / 500 | 200 / 500 |
| Incline Period (oil / gas) | 2 months / 4 months | 2 months / 4 months |
| Peak Rate (BO/D / MCF/D) | 400 / 900 | 350 / 900 |
| b factor (oil / gas) | 1.2 / 1.5 | 1.2 / 1.5 |
| Initial Decline (oil / gas) | 71% / 41% | 72.6% / 41.2% |
| Lateral Length | 4,800 | 4,800 |
| Type Well IRR %[1] | 89.7% | 71.2% |

Note: Production data normalized for 4,800' lateral length.
[1] NYMEX Strip as of 8/0/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

51

# Meramec Type Curve

## Summary

- Over 100 wells drilled in the Meramec by Newfield, Devon, Marathon, Gastar, and Chaparral
- Alta Mesa is beginning to drill Meramec wells with performance expectations similar to the Osage
- Alta Mesa will be joint developing the Meramec with Osage stack and staggered well tests
- Majority of active rigs in the STACK play are targeting the Meramec to the southwest
- Average Type Curve Results
  - 532 MBOE 2-Stream EUR; 615 MBOE 3-Stream EUR
  - 249 MBO, 1.4 BCF residue, 128 MB NGL
- Type Curve assumes 16% Shrink and 75 bbl/MMcf NGL yield

## Average Type Curve



| Key Statistics | |
|---|---|
| Initial Rate (BO/D / MCF/D) | 170 / 296 |
| Incline Period (oil / gas) | 2 months / 2 months |
| Peak Rate (BO/D / MCF/D) | 500 / 1250 |
| b factor (oil / gas) | 1.2 / 1.5 |
| Initial Decline (oil / gas) | 80% / 56% |
| Lateral Length | 4,800 |
| Type Well IRR %[2] | 81.1% |

## Average Type Curve Cumulative Production

Note: Production data normalized for 4,800' lateral length.
[1] Offset results based on Meramec wells drilled in the Updip Oil window of Kingfisher County since 2014.
[2] NYMEX Strip as of 8/3/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

52

# Oswego Type Curve

## Summary

- Chesapeake, Chaparral, Cimarex, Gastar, and Longfellow are actively targeting the Oswego
- Other operators have future plans to develop the Oswego as a cheaper/shallower target
- IP rates are typically lower than Osage/Meramec wells, but decline rates are shallower
- With drilling and completion costs cheaper for the Oswego, well results do not have to be as strong as the headline STACK formations to make economic wells
- Average Type Curve Results
  - 233 MBOE 2-Stream EUR; 243 MBOE 3-Stream EUR
  - 200 MBO, 0.2 BCF residue, 15 MB NGL
- Type Curve assumes 16% Shrink and 75 bbl/MMcf NGL yield

## Average Type Curve Cumulative Production



## Average Type Curve



Note: Production data normalized for 4,800' lateral length.
[1] Offset results based on Oswego wells drilled in the Updip Oil window of Kingfisher County since 2014.
[2] NYMEX Strip as of 8/3/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

53

# Substantial Inventory of Drilling Locations

| | Identified Drilling Locations | | Prospective Drilling Locations | | | | Combined |
|---|---|---|---|---|---|---|---|
| | Locations | Average Working Interest (%) | Other Formations Locations | Downspacing Locations | Total Locations | Average Working Interest (Including Downspacing Locations) (%) | Total Locations |
| Operated: | | | | | | | |
| Osage | 1,196 | 72% | -- | 1,141 | 1,141 | 73% | 2,337 |
| Meramec | 676 | 74% | -- | 676 | 676 | 74% | 1,352 |
| Oswego | 203 | 75% | -- | 206 | 206 | 81% | 409 |
| Manning | -- | -- | 168 | -- | 168 | 75% | 168 |
| Other Formations | -- | -- | 1,327 | -- | 1,327 | 70% | 1,327 |
| Total Operated | 2,075 | 73% | 1,495 | 2,023 | 3,518 | 73% | 5,593 |
| Drilling Inventory (Years) | 14.4 | -- | 10.4 | 14.0 | 24.4 | -- | 38.8 |
| Other: | | | | | | | |
| Osage | 1,252 | 15% | -- | 1,113 | 1,113 | 15% | 2,365 |
| Meramec | 588 | 15% | -- | 596 | 596 | 15% | 1,184 |
| Oswego | 281 | 13% | -- | 310 | 310 | 14% | 591 |
| Manning | -- | -- | 316 | -- | 316 | 14% | 316 |
| Other Formations | -- | -- | 2,084 | -- | 2,084 | 55% | 2,084 |
| Total Other | 2,121 | 15% | 2,400 | 2,019 | 4,419 | 28% | 6,540 |
| Total Gross Locations | 4,196 | | 3,895 | 4,042 | 7,937 | | 12,133 |

Note: Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.

54





# Stacked Pay: Oswego, Osage/Meramec Prominent
*Oswego, Osage, and Meramec consistent east to west*

56



# Significant Oswego, Osage/Meramec Section

*Consistent thickness east to west*

57





# Significant Oswego, Osage/Meramec

*Osage prominent throughout, thickening to the north*

58

## Top Cumulative Producing STACK Wells
### Alta Mesa wells among top producers



**Cumulative Osage/Meramec STACK Producing Wells Drilled by Operator (2012-2016)[1]**



**Number of Top 100 Wells in the Oil and Updip Oil Windows by Operator, Measured by 60-Day Cumulative Oil Production[2]**

Source: Company data, HPDI, IHS Herolds.
Note: Publicly disclosed Alta Mesa well / permits include those assigned to Oklahoma Energy Acquisitions LP and Hinkle Oil & Gas Inc.
[1] Based on publicly disclosed data for wells producing in Kingfisher, Blaine, Canadian, and S. Garfield counties. Excludes wells for which Woodford is primary target.
[2] Top Osage/Meramec wells (excluding Mississippian Lime) in Updip Oil and Oil window based on 60-Day Cumulative Oil Production (BBLS) per 1,000 Ft. of Lateral.
[3] Operators with 2 wells or fewer, except for Longfellow (6).

59



2/28/23, 6:28 PM Case 4:19-cv-00957 Document 462-3 Filed on 09/26/23 in TXSD Page 124 of 179
https://www.sec.gov/Archives/edgar/data/1690769/000110465917052334/a17-20303_2ex99d1.htm



# DrillCo JV
## Pivotal relationship with Bayou City Energy

### Parameters

- Entered into joint development agreement with Houston-based private equity firm, Bayou City Energy, in January 2016

- Bayou City Energy primarily targets small operators with current production and focuses on off-balance sheet structures

- DrillCo funds 100% D&C cost, capped at average of $3.2MM/well

- DrillCo gains 80% working interest in wellbore until 20-well tranche earns 15% IRR, 20% working interest until 25% IRR, then 12.5% working interest

- Specific wells pre-agreed for each tranche

### Strengths for Alta Mesa

- Cash flow

- Grow reserves

- Continue resource definition

- Continue pace up learning curve(s)

- Capture, hold acreage

- Maintain people/crews

### 2017 Alta Mesa Estimated Capital Expenditures





61



# One Mile Laterals Optimum for Up-Dip STACK
*Alta Mesa and other efficient operators adopt fit-for-purpose solutions*

**~5,000' laterals used for multi-faceted benefits: drilling, completions, production operations, land and legal**

| Consideration | Commentary |
|---|---|
| **Spacing** | One-mile lateral fits into a single section; two-mile laterals require establishing a "Multi-Unit spacing" |
| **Drilling** | Ability to use lower cost water-based muds and reduced time spent drilling helps to reduce drilling risk and control costs associated to high levels of natural fractures |
| **Completions** | Less proppant, fluids, and pumping time per well, more simplified design, lower friction while pumping all help to reduce costs of optimized completions |
| **Mineral Owner Relations** | Working with mineral owners across one-section (versus two-sections for longer laterals) allows for more seamless and confident development program planning |

62



# Alta Mesa Summary STACK Pro Forma Financials

| ($ in millions, unless specified) | Three Months Ended | | Years Ended December 31, | | |
|---|---|---|---|---|---|
| | March 31, 2017 | December 31, 2016 | 2016 | 2015 | 2014 |
| **Production** | | | | | |
| Oil (MBBLS) | 942.0 | 989.1 | 3,057.2 | 2,006.1 | 1,071.6 |
| Natural Gas (MMCF) | 3,116.0 | 3,088.9 | 9,110.2 | 4,272.6 | 2,083.0 |
| NGLs (MBBLS) | 275.0 | 280.4 | 901.0 | 499.4 | 315.6 |
| Total Production (MBOE) | 1,736.3 | 1,784.3 | 5,476.6 | 3,217.6 | 1,734.4 |
| Daily Production (BOE/D) | 19,292.6 | 19,394.7 | 15,004.3 | 8,815.3 | 4,751.7 |
| | | | | | |
| **Statement of Operations** | | | | | |
| Revenue | $63.6 | $61.7 | $166.4 | $133.6 | $117.3 |
| Operating Expenses (Cash Items) | 17.2 | 16.2 | 51.6 | 34.7 | 24.6 |
| Exploration Costs (Cash Item) | 5.0 | 7.5 | 17.2 | 9.8 | 11.8 |
| Operating Expenses (Non-Cash) | 20.2 | 23.8 | 63.3 | 80.3 | 29.4 |
| General and Administrative[1] | 9.7 | 8.7 | 40.5 | 37.9 | 68.4 |
| Interest Expense[1] | 12.3 | 1.4 | 43.4 | 62.5 | 55.8 |
| | | | | | |
| **Other Financial Data** | | | | | |
| Adjusted EBITDAX[2] | $36.7 | $36.8 | $74.3 | $61.0 | $24.3 |
| % Margin[2] | 57.7% | 59.6% | 44.7% | 45.7% | 20.7% |

Note: This historical pro forma financial information is unaudited and gives effect to (i) the expected disposition of Alta Mesa's non -STACK assets and operations prior to the closing of the business combination as if such transaction occurred on January 1, 2014 and (ii) the contribution to Alta Mesa of interests in 24 producing wells that were drilled under the BCE joint development agreement and purchased by High Mesa from BCE on December 31, 2016, as if such transaction occurred on January 1, 2016.
[1] General and administrative expense and interest expense for the total company.
[2] Adjusted EBITDAX is a Non-GAAP financial measure. See reconciliation to the nearest comparable GAAP measure in the appendix to this presentation.

63

# Reconciliation of Adjusted EBITDAX to Net Income



| ($ in millions, unless specified) | Three Months Ended | | Years Ended December 31, | | |
|---|---|---|---|---|---|
| | March 31, 2017 | December 31, 2016 | 2016 | 2015 | 2014 |
| Net Income (Loss) | ($0.8) | $4.1 | ($49.6) | ($91.6) | ($72.7) |
| Adjustments: | | | | | |
| Interest expense | 12.3 | 1.4 | 43.4 | 62.5 | 55.8 |
| Exploration expense | 5.0 | 7.5 | 17.2 | 9.8 | 11.8 |
| Depreciation, depletion and amortization expense | 18.9 | 23.7 | 62.6 | 61.3 | 29.1 |
| Impairment expense | 1.2 | 0.0 | 0.4 | 18.8 | 0.0 |
| Accretion expense | 0.1 | 0.1 | 0.3 | 0.2 | 0.3 |
| **Adjusted EBITDAX[1]** | **$36.7** | **$36.8** | **$74.3** | **$61.0** | **$24.3** |

Note: This historical pro forma financial information is unaudited and gives effect to (i) the expected disposition of Alta Mesa's non -STACK assets and operations prior to the closing of the business combination as if such transaction occurred on January 1, 2014 and (ii) the contribution to Alta Mesa of interests in 24 producing wells that were drilled under the BCE joint development agreement and purchased by High Mesa from BCE on December 31, 2016, as if such transaction occurred on January 1, 2016.
[1] Does not include non-cash items - provision for income taxes, loss on extinguishment of debt, unrealized loss (gain) on oil and gas hedges and (gain)/loss on sale of assets.

64

# PX 50

REDACTED IN ITS ENTIRETY

# PX 51

8-K 1 a17-20303_28k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

### CURRENT REPORT

---

### PURSUANT TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **August 17, 2017 (August 16, 2017)**

# SILVER RUN ACQUISITION CORPORATION II
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-38040** | **81-4433840** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1000 Louisiana Street, Suite 1450**
**Houston, TX, 77002**
(address of principal executive offices)
(zip code)

**(713) 357-1400**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Exhibit
CP- 0716
6/28/2023
Walker

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).   Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 1.01 Entry into a Material Definitive Agreement**

**Contribution Agreements**

On August 16, 2017, Silver Run Acquisition Corporation II, a Delaware corporation (the "**Company**"), entered into the following agreements:

- a Contribution Agreement (the "**AM Contribution Agreement**") with High Mesa Holdings, LP, a Delaware limited partnership (the "**AM Contributor**"), High Mesa Holdings GP, LLC, a Texas limited liability company and the sole general partner of the AM Contributor, Alta Mesa Holdings, LP, a Texas limited partnership ("**Alta Mesa**"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and the sole general partner of Alta Mesa ("**Alta Mesa GP**"), and, solely for certain provisions therein, the equity owners of the AM Contributor, pursuant to which the Company will acquire from the AM Contributor (i) all of its limited partner interests in Alta Mesa and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP, on the terms and subject to the conditions set forth therein (the "**AM Contribution**"");

- a Contribution Agreement (the "**KFM Contribution Agreement**") with KFM Holdco, LLC, a Delaware limited liability company (the "**KFM Contributor**"), Kingfisher Midstream, LLC, a Delaware limited liability company ("**Kingfisher**"), and, solely for certain provisions therein, the equity owners of the KFM Contributor, pursuant to which the Company will acquire 100% of the outstanding membership interests in Kingfisher (the "**KFM Contribution**"); and

- a Contribution Agreement (the "**RS Contribution Agreement**" and, together with the AM Contribution Agreement and the KFM Contribution Agreement, the "**Contribution Agreements**") with Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "**RS Contributor**"), pursuant to which the Company will acquire from the RS Contributor all of its limited partner interests in Alta Mesa.

Pursuant to the Contribution Agreements, the Company will contribute cash to SRII Opco, LP, a Delaware limited partnership and wholly owned subsidiary of the Company ("**SRII Opco**"), in exchange for (a) a number of common units representing limited partner interests in SRII Opco (the "**Common Units**") equal to the number of shares of the Company's Class A common stock, par value $0.0001 per share (the "**Class A Common Stock**"), outstanding as of the Closing (as defined herein), and (b) a number of SRII Opco warrants exercisable for Common Units equal to the number of the Company's warrants outstanding as of the Closing. Following the Closing, the Company will control SRII Opco through its ownership of SRII Opco GP, LLC, the sole general partner of SRII Opco.

The acquisition of Alta Mesa and Kingfisher pursuant to the Contribution Agreements is referred to herein as the "**business combination**" and the transactions contemplated by the Contribution Agreements are referred to herein as the "**Transactions**."

**Alta Mesa Consideration**

Pursuant to the AM Contribution Agreement, at the closing of the Transactions (the "**Closing**"), the AM Contributor will receive consideration consisting of 220,000,000 Common Units, as adjusted (i) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per Common Unit), (ii) downward for the $200 million to be contributed by the RS Contributor to Alta Mesa during the interim period (based on a value of $10.00 per Common Unit) as described in further detail below and (iii) downward for debt and transaction expenses.

The AM Contributor will also purchase from the Company a number of newly issued shares of non-economic capital stock of the Company, designated as Class C common stock, par value $0.0001 per share (the "*Class C Common Stock*") corresponding to the number of Common Units received by the AM Contributor at the Closing.

2

In addition to the above, for a period of seven years following the Closing, the AM Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of Common Units (and acquire a corresponding number of shares of Class C Common Stock) as specified below if the 20-day volume-weighted average price ("*20-Day VWAP*") of the Class A Common Stock equals or exceeds the following prices (each such payment, an "*Earn-Out Payment*"):

| 20-Day VWAP | Earn-Out Consideration |
|---|---|
| $14.00 | 10,714,285 Common Units |
| $16.00 | 9,375,000 Common Units |
| $18.00 | 13,888,889 Common Units |
| $20.00 | 12,500,000 Common Units |

The AM Contributor will not be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-day VWAP entitles the AM Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the AM Contributor will be entitled to receive each such Earn-Out Payment. The AM Contributor will be entitled to the earn-out consideration described above in connection with certain liquidity events of the Company, including a merger or sale of all or substantially all of the Company's assets, if the consideration paid to holders of Class A Common Stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

The Company will also contribute $400 million in cash to Alta Mesa at the Closing.

*Kingfisher Consideration*

Pursuant to the KFM Contribution Agreement, at the Closing, the KFM Contributor will receive consideration consisting of:

- 55,000,000 Common Units; and

- subject to the KFM Contributor's election to receive additional Common Units as described below, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees.

The KFM Contributor will also purchase from the Company a number of shares of Class C Common Stock corresponding to the number of Common Units received by the KFM Contributor at the Closing.

If the Company does not have cash on hand at the Closing necessary to pay the cash consideration to the KFM Contributor, the KFM Contributor has the option to receive any deficit in the form of Common Units (and acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per Common Unit.  At the Closing, $5 million of the cash consideration to be received by the KFM Contributor will be funded into escrow to satisfy any post-Closing purchase price adjustments.  If such escrowed amount is insufficient to satisfy any post-Closing adjustment, then the KFM Contributor will transfer to the Company a number of Common Units (not to exceed 16,000,000 Common Units), and a corresponding number of shares of Class C Common Stock, with a value equal to the deficiency.

In addition to the above, for a period of seven years following the Closing, the KFM Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of Common Units (and acquire a corresponding number of shares of Class C Common Stock) as specified below if the 20-Day VWAP equals or exceeds the following prices:

| 20-Day VWAP | Earn-Out Consideration |
|---|---|
| $14.00 | 7,142,857 Common Units |
| $16.00 | 6,250,000 Common Units |

3

The terms of the payment of the earn-out consideration, including in connection with a liquidity event of the Company, are substantially similar to the terms of the payment of the earn-out consideration to the AM Contributor described above under "—Alta Mesa Consideration."

*RS Contributor Investment in Alta Mesa and RS Contributor Consideration*

In connection with the execution of the RS Contribution Agreement, the RS Contributor will make a $200 million capital contribution to Alta Mesa, in exchange for limited partner interests in Alta Mesa. Alta Mesa may use such capital to fund its capital expenditures during the interim period.  Pursuant to the RS Contribution Agreement, at the Closing, the RS Contributor will receive 20,000,000 Common Units in exchange for the RS Contributor's limited partner interests in Alta Mesa and will acquire a corresponding number of shares of Class C Common Stock from the Company.

*Exchange or Redemption of Common Units*

Beginning 90 days after Closing, the KFM Contributor will have the right to redeem 39,000,000 Common Units for shares of Class A Common Stock or cash (at the Company's election) (such right, the "*Redemption Right*").  Beginning 180 days after Closing, the KFM Contributor will have the Redemption Right with respect to its remaining Common Units and the AM Contributor and the RS Contributor will have the Redemption Right with respect to all of their Common Units.  Upon any redemption of Common Units by the AM Contributor, the KFM Contributor and the RS Contributor, a corresponding number of shares of Class C Common Stock owned by such party will be cancelled.

*Issuance of Preferred Stock*

Upon the Closing, the Company will issue to each of Bayou City Energy Management, LLC, a Delaware limited liability company ("*Bayou City*"), HPS Investment Partners, LLC, a Delaware limited liability company ("*Highbridge*"), and AM Equity Holdings, LP, a Texas limited partnership ("*Management*"), one newly issued share of its Series A preferred stock, par value $0.0001 per share (the "*Series A Preferred Stock*").  In addition, the Company will issue to the RS Contributor one share of its Series B preferred stock, par value $0.0001 per share (the "*Series B Preferred Stock*" and, together with the Series A Preferred Stock, "*Preferred Stock*").  The shares of Preferred Stock will entitle Bayou City, Highbridge, Management and the RS Contributor to nominate and elect directors to the Company's Board of Directors (the "*Board*") for a period of five years following the Closing based on their and their affiliates' beneficial ownership of Class A Common Stock as follows:

| Holder / Beneficial Ownership and Other Requirements | Designation Right |
|---|---|
| *Bayou City and its affiliates* | |
| • at least 10% | one director who must be independent for purposes of the listing rules of The NASDAQ Capital Markets ("*NASDAQ*") |
| *Highbridge and its affiliates* | |
| • at least 10% | one director who must be independent for purposes of the listing rules of NASDAQ |
| *Management and its affiliates* | |
| • at least 10% | two directors who need not be independent for purposes of the listing rules of NASDAQ |
| • less than 10% but at least 5% and either Hal Chappelle or Michael Ellis is a member of the Company's management | one director who need not be independent for purposes of the listing rules of NASDAQ |

4

*RS Contributor and its affiliates*

- at least 15%
- less than 15% but at least 10%
- less than 10% but at least 5%

three directors (one of whom will be the Chairman)

two directors (one of whom will be the Chairman)

one director (who may be the Chairman if such person is Jim Hackett)

### Representations, Warranties and Covenants

Each of the Contribution Agreements contains customary representations and warranties by the parties thereto.  The representations and warranties of the AM Contributor and the RS Contributor included in the AM Contribution Agreement and RS Contribution Agreement, respectively, do not survive the Closing, whereas the representations and warranties of the KFM Contributor and Kingfisher survive for 18 months post-Closing.

Each of the Contribution Agreements also contains customary pre-closing covenants of the parties, including the obligation of Alta Mesa and Kingfisher to conduct their respective businesses in the ordinary course consistent with past practice and to refrain from taking certain specified actions, subject to certain exceptions, without the prior written consent of the Company.  Additionally, each of Alta Mesa and Kingfisher has agreed not to directly or indirectly solicit, negotiate or enter into any agreement with any other person relating to an acquisition of any interests in such party or all or substantially all of such party's assets.  Similarly, the Company has agreed not to solicit, negotiate or enter into any agreement with any person (other than Alta Mesa or Kingfisher, as applicable) relating to the Company's acquisition of such other person.

Under the Alta Mesa Contribution Agreement, Alta Mesa has also agreed to transfer to its existing owners all of the assets and liabilities related to its oil and gas properties located outside of Oklahoma (the "non-STACK assets") prior to Closing, and such existing owners will indemnify Alta Mesa for any losses relating to employment, environmental and tax liabilities of such non-STACK assets.

### Conditions to the Parties' Obligations to Consummate the Transactions

Under each of the Contribution Agreements, the obligations of the applicable parties to consummate the transactions contemplated thereby are subject to a number of customary conditions, including, among others, the following: (i) the absence of specified adverse laws or orders, (ii) if applicable, the expiration of the waiting period (or extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (iii) the representations and warranties of the other party being true and correct, subject to the materiality standards contained in the applicable Contribution Agreement, (iv) material compliance by the other parties with their respective covenants, (v) no material adverse effect having occurred with respect to Alta Mesa or Kingfisher, as applicable, since the signing of the applicable Contribution Agreement, (vi) the approval for listing on the NASDAQ of the shares of Class A Common Stock issuable to the AM Contributor, the KFM Contributor and the RS Contributor and (vii) the approval of the business combination and the Transactions by the Company's stockholders.  The closing of the transactions contemplated under each of the Contribution Agreements is also conditioned upon the closing of the transactions contemplated by the other Contributions Agreements.

In addition to the above conditions, under the AM Contribution Agreement, it is a condition to each party's obligation to consummate the AM Contribution that SRII Opco's leverage ratio is less than 1.5x on a pro forma, last twelve months (LTM) basis (the "**Leverage Ratio Condition**").  Under the AM Contribution Agreement, the satisfaction of the Leverage Ratio Condition is a condition to only the Company's obligations to consummate the KFM Contribution. The KFM Contribution Agreement also provides that, subject to the KFM Contributor electing to receive additional Common Units as described above under "— Kingfisher Consideration," the KFM Contributor's obligation to consummate the KFM Contribution is conditioned upon the Company having available funds to pay the cash consideration.

### Termination Rights

Each of the Contribution Agreements contains certain customary termination rights, including, among others, the following: (i) if the closing of the applicable transaction is not consummated by February 28, 2018 (the "**Outside Date**"); (ii) upon the applicable parties' mutual written consent; (iii) if the consummation of the applicable transaction is prohibited by law; (iv) breach of a representation, warranty, covenant or other agreement by a party

5

which has not been cured by the earlier of (x) 30 days following written notice from the other party of such breach and (y) the Outside Date; (v) in the case of the Alta Mesa Contribution Agreement, by either party if the KFM Contribution Agreement has been terminated in accordance with its terms or (vi) if the AM Contributor if the Board has changed its recommendation for the Company's stockholders to approve the business combination or (vi) in the case of the KFM Contribution Agreement, by either party if the AM Contribution Agreement has been terminated in accordance with its terms.

None of the parties to the Contribution Agreements is required to pay a termination fee or reimburse any other party for its expenses as a result of a termination of the applicable Contribution Agreement.

### Indemnification under the KFM Contribution Agreement

Under the KFM Contribution Agreement, the KFM Contributor will indemnify the Company for any losses relating to (i) a breach of any representation, warranty or covenant of the KFM Contributor or Kingfisher; (ii) pre-Closing taxes; (iii) obligations under Kingfisher's engagement letters with its financial advisors and (iv) indemnification claims made by Asset Risk Management, LLC ("**ARM**") against Kingfisher after Closing under an existing operator agreement.  Additionally, the Company will indemnify the KFM Contributor for any losses relating to a breach of any of its representations, warranties or covenants.

The indemnification obligations of the KFM Contributor and the Company are subject to a de minimis threshold of $250,000, a deductible of $40 million and a cap equal to the value of the Reserved Units (as defined herein).  The KFM Contributor has agreed that it will not transfer 16,000,000 Common Units (and a corresponding number of shares of Class C Common Stock) received as consideration (the "**Reserved Units**") and, subject to the removal of such transfer restriction as described herein, such Reserved Units will be available to satisfy any indemnification obligations of the KFM Contributor.  The transfer restriction relating to 8,000,000 Reserved Units will be removed on the first anniversary of the Closing and the transfer restriction relating to any remaining Reserved Units will be removed 18 months after Closing.  The value of the Reserved Units will be based on the volume-weighted average price of the Class A Common Stock for the 20 trading days immediately prior to the applicable valuation date.

### Other Ancillary Agreements

The Contribution Agreements contemplate the execution by the parties of various agreements at the Closing, including, among others, (i) a registration rights agreement relating to the resale of the shares of Class A Common Stock issuable to the AM Contributor, the KFM Contributor and the RS Contributor, (ii) a transition services agreement with respect to Kingfisher's midstream assets, (iii) a management services agreement pursuant to which Alta Mesa's management will perform certain services for High Mesa, Inc., a current affiliate of Alta Mesa, (iv) a partnership agreement of SR II Opco defining the rights of the parties thereto, including the Company, (v) a tax receivable agreement, pursuant to which the Company will agree to pay the AM Contributor and the RS Contributor 85% of the cash tax savings realized as a result of tax benefits created upon the exchange of their common units and (vi) a restrictive covenant agreement pursuant to which ARM will agree not to conduct certain midstream services in Kingfisher, Garfield, Major, Blaine and Logan Counties, Oklahoma and certain townships in Canadian County, Oklahoma.

The AM Contribution Agreement, the KFM Contribution Agreement and the RS Contribution Agreement are filed as Exhibits 10.1, 10.2 and 10.3, respectively, to this Current Report on Form 8-K (this "**Current Report**"), and the foregoing descriptions thereof are qualified in their entirety by reference to such exhibits. The Contribution Agreements are filed herewith to provide investors with information regarding their respective terms, and are not intended to provide any other factual information about the parties. In particular, the assertions embodied in the representations and warranties contained in the Contribution Agreements were made as of the date of the Contribution Agreements only and are qualified by information in confidential disclosure schedules provided by the parties to each other in connection with the signing of the Contribution Agreements. These disclosure schedules contain information that modifies, qualifies and creates exceptions to the representations and warranties set forth in the Contribution Agreements. Moreover, certain representations and warranties in the Contribution Agreements may have been used for the purpose of allocating risk between the parties rather than establishing matters of fact.

6

Accordingly, you should not rely on the representations and warranties in the Contribution Agreements as characterizations of the actual statements of fact about the parties.

### Forward Purchase Agreement

In connection with the execution of the Contribution Agreements, on August 16, 2017, the Company entered into a forward purchase agreement (the "**Forward Purchase Agreement**") with Riverstone VI SR II Holdings, L.P., a Delaware limited partnership ("**Riverstone**"), pursuant to which the Company has agreed to sell at the Closing, and Riverstone has agreed to purchase, up to $200 million of shares of Class A Common Stock at a purchase price of $10.00 per share.  The number of shares of Class A Common Stock to be sold by the Company, and purchased by Riverstone, will equal that number which, after payment of the aggregate purchase price paid by Riverstone under the Forward Purchase Agreement, will result in gross proceeds to the Company in an aggregate amount necessary to satisfy any exercise of rights of the public stockholders in connection with the business combination or determined by the Company and Riverstone to be necessary for general corporate purposes of the Company in connection with or following consummation of the business combination, but in no event will the number of shares of Class A Common Stock purchased exceed 20,000,000 shares.

**Item 3.02 Unregistered Sales of Equity Securities**

In connection with the Closing, and as described in more detail above in Item 1.01 of this Current Report, the Company expects to issue (i) shares of Class C Common Stock to the AM Contributor, the KFM Contributor and the RS Contributor, (ii) shares of Series A Preferred Stock to certain affiliates of the AM Contributor and (iii) one share of Series B Preferred Stock to the RS Contributor. The shares of Class C Common Stock, Series A Preferred Stock and Series B Preferred Stock to be issued will not be registered under the Securities Act of 1933, as amended (the "***Securities Act***"), in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act. The disclosure set forth above in Item 1.01 of this Current Report is incorporated by reference herein.

**Item 8.01 Other Events**

On August 17, 2017, the Company provided information regarding the proposed business combination in an investor presentation, a copy of which is furnished as Exhibit 99.1 hereto.

On August 17, 2017, the Company provided information regarding the proposed business combination in a pre-recorded webcast. A copy of the transcript of the pre-recorded webcast is furnished as Exhibit 99.2 hereto.

**Item 9.01 Financial Statements and Exhibits**

**(d) Exhibits. The following exhibits are filed with this Form 8-K:**

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 2.1* | Contribution Agreement, dated as of August 16, 2017, among High Mesa Holdings, LP, High Mesa Holdings GP, LLC, Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, Silver Run Acquisition Corporation II and, solely for certain provisions therein, the Contributor Owners party thereto. |
| 2.2* | Contribution Agreement, dated as of August 16, 2017, among KFM Holdco, LLC, Kingfisher Midstream, LLC, Silver Run Acquisition Corporation II and, solely for certain provisions therein, the Contributor Members party thereto. |
| 2.3* | Contribution Agreement, dated as of August 16, 2017, between Riverstone VI Alta Mesa Holdings, L.P. and Silver Run Acquisition Corporation II. |
| 10.1 | Forward Purchase Agreement, dated as of August 16, 2017, between Silver Run Acquisition Corporation II and Riverstone VI SR II Holdings, L.P. |
| 99.1 | Investor Presentation dated August 17, 2017. |

7

| | |
| --- | --- |
| 99.2 | Transcript of Investor Webcast dated August 17, 2017. |

*Certain schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule or exhibit will be furnished supplementally to the SEC upon request.

**Legend Information**

**Forward-Looking Statements**

This communication includes certain statements that may constitute "forward-looking statements" for purposes of the federal securities laws. Forward-looking statements include, but are not limited to, statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements may include, for example, statements about the Company's ability to effect the business combination; the benefits of the business combination; the future financial performance of the Company following the business combination; changes in Alta Mesa's and Kingfisher's strategy, future operations, financial position, estimated revenues, and losses, projected costs, prospects, plans and objectives of management. These forward-looking statements are based on information available as of the date of this Current Report on Form 8-K, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing the Company's views as of any subsequent date, and the Company does not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. You should not place undue reliance on these forward-looking statements. As a result of a number of known and unknown risks and uncertainties, the Company's actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include: (i) the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the Contribution Agreements; (ii) the outcome of any legal proceedings that may be instituted against the Company following announcement of the Transactions; (iii) the inability to complete the business combination due to the failure to obtain approval of the stockholders of the Company, or other conditions to closing in the Contribution Agreements; (iv) the risk that the proposed business combination disrupts current plans and operations of the Company, Alta Mesa or Kingfisher as a result of the announcement and consummation of the Transactions; (v) the Company's ability to realize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of the Company to grow and manage growth profitably following the business combination; (vi) costs related to the business combination; (vii) changes in applicable laws or regulations; and (viii) the possibility that the Company, Alta Mesa or Kingfisher may be adversely affected by other economic, business, and/or competitive factors.

**No Offer or Solicitation**

This Current Report is for informational purposes only and shall not constitute an offer to sell or the solicitation of an offer to buy any securities pursuant to the proposed business combination or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act.

**Important Information For Investors and Stockholders**

In connection with the proposed business combination, the Company intends to file a proxy statement with the SEC. The definitive proxy statement and other relevant documents will be sent or given to the stockholders of the Company and will contain important information about the proposed business combination and related matters. The Company stockholders and other interested persons are advised to read, when available, the proxy statement in

8

connection with the Company's solicitation of proxies for the meeting of stockholders to be held to approve the business combination because the proxy statement will contain important information about the proposed business combination. When available, the definitive proxy statement will be mailed to the Company stockholders as of a record date to be established for voting on the business combination. Stockholders will also be able to obtain copies of the proxy statement, without charge, once available, at the SEC's website at www.sec.gov.

**Participants in the Solicitation**

The Company and its directors and officers may be deemed participants in the solicitation of proxies of the Company's stockholders in connection with the proposed business combination. The Company stockholders and other interested persons may obtain, without charge, more detailed information regarding the directors and officers of the Company in the Company's Registration Statement on Form S-1 initially filed with the SEC on March 2, 2017. Additional information will be available in the definitive proxy statement when it becomes available.

9

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Silver Run Acquisition Corporation II

| | | |
|---|---|---|
| Date: August 17, 2017 | By: | /s/ Thomas J. Walker |
| | Name: | Thomas J. Walker |
| | Title: | Chief Financial Officer |

10

EXHIBIT INDEX

| Exhibit No. | Description of Exhibits |
|---|---|
| 2.1* | Contribution Agreement, dated as of August 16, 2017, among High Mesa Holdings, LP, High Mesa Holdings GP, LLC, Alta Mesa Holdings, LP, Alta Mesa Holdings GP, LLC, Silver Run Acquisition Corporation II and, solely for certain provisions therein, the Contributor Owners party thereto. |
| 2.2* | Contribution Agreement, dated as of August 16, 2017, among KFM Holdco, LLC, Kingfisher Midstream, LLC, Silver Run Acquisition Corporation II and, solely for certain provisions therein, the Contributor Members party thereto. |
| 2.3* | Contribution Agreement, dated as of August 16, 2017, between Riverstone VI Alta Mesa Holdings, L.P. and Silver Run Acquisition Corporation II. |
| 10.1 | Forward Purchase Agreement, dated as of August 16, 2017, between Silver Run Acquisition Corporation II and Riverstone VI SR II Holdings, L.P. |
| 99.1 | Investor Presentation dated August 17, 2017. |
| 99.2 | Transcript of Investor Webcast dated August 17, 2017. |

*Certain schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule or exhibit will be furnished supplementally to the SEC upon request.

11

EX-99.1 6 a17-20303_2ex99d1.htm EX-99.1

**Exhibit 99.1**



## Disclaimer

**FORWARD-LOOKING STATEMENTS**

The information in this presentation and the oral statements made in connection therewith include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this presentation, regarding Silver Run II's proposed business combination with Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream, LLC ("KFM"), Silver Run II's ability to consummate the business combination, the benefits of the business combination and Silver Run II's future financial performance following the business combination, as well as Alta Mesa's and KFM's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this presentation, including any oral statements made in connection therewith, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations and assumptions about future events and are based on currently available information as to the outcome and timing of future events. Except as otherwise required by applicable law, Silver Run II, Alta Mesa and KFM disclaim any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this presentation. Silver Run II cautions you that these forward-looking statements are subject to all of the risks and uncertainties, most of which are difficult to predict and many of which are beyond the control of Silver Run II, Alta Mesa and KFM, incident to the development, production, gathering and sale of oil, natural gas and natural gas liquids. These risks include, but are not limited to, commodity price volatility, low prices for oil and/or natural gas, global economic conditions, inflation, increased operating costs, lack of availability of drilling and production equipment, supplies, services and qualified personnel, processing volumes and pipeline throughput, uncertainties related to new technologies, geographical concentration of Alta Mesa's and KFM's operations, environmental risks, weather risks, security risks, drilling and other operating risks, regulatory changes, the uncertainty inherent in estimating oil and natural gas reserves and in projecting future rates of production, reductions in cash flow, lack of access to capital, Alta Mesa's and KFM's ability to satisfy future cash obligations, reductions in existing or future debt agreements of Alta Mesa or KFM, the timing of development expenditures, managing Alta Mesa's and KFM's growth and integration of acquisitions, failure to realize expected value creation from property acquisitions, title defects and limited control over non-operated properties. Should one or more of the risks or uncertainties described in this presentation and the oral statements made in connection therewith occur, or should underlying assumptions prove incorrect, Silver Run II's, Alta Mesa's and KFM's actual results and plans could differ materially from those expressed in any forward-looking statements.

**RESERVE INFORMATION**

Reserve engineering is a process of estimating underground accumulations of hydrocarbons that cannot be measured in an exact way. The accuracy of any reserve estimate depends on the quality of available data, the interpretation of such data and price and cost assumptions made by reserve engineers. In addition, the results of drilling, testing and production activities may justify revisions of estimates that were made previously. If significant, such revisions could impact Alta Mesa's strategy and change the schedule of any further production and development drilling. Accordingly, reserve estimates may differ significantly from the quantities of oil and natural gas that are ultimately recovered. Estimated Ultimate Recoveries, or "EURs," refers to estimates of the sum of total gross remaining proved reserves per well as of a given date and cumulative production prior to such given date for a developed well. These quantities do not necessarily constitute or represent reserves as defined by the Securities and Exchange Commission (the "SEC") and are not intended to be representative of anticipated future well results of all wells drilled on Alta Mesa's STACK acreage.

**USE OF PROJECTIONS**

This presentation contains projections for Alta Mesa and KFM, including with respect to their EBITDA, net debt to EBITDA ratio and capital budget, as well as Alta Mesa's production and KFM's volumes, for the fiscal years 2017, 2018 and 2019. Neither Silver Run II's nor Alta Mesa's and KFM's independent auditors or Alta Mesa's independent petroleum engineering firm have audited, reviewed, compiled, or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation, and accordingly, none of them expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results.

In this presentation, certain of the above-mentioned projected information has been repeated (in each case, with an indication that the information is subject to the qualifications presented herein), for purposes of providing comparisons with historical data. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if our assumptions and estimates are correct, projections are inherently uncertain due to a number of factors outside our control. Accordingly, there can be no assurance that the projected results are indicative of the future performance of Silver Run II, Alta Mesa or KFM or the combined company after completion of any business combination or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person that the results contained in the projected information will be achieved.

**USE OF NON-GAAP FINANCIAL MEASURES**

This presentation includes non-GAAP financial measures, including EBITDA and Adjusted EBITDA of Alta Mesa. Please refer to the Appendix for a reconciliation of Adjusted EBITDA to net (loss) income, the most comparable GAAP measure. Silver Run II, Alta Mesa and KFM believe EBITDA and Adjusted EBITDA are useful because they allow Silver Run II, Alta Mesa and KFM to more effectively evaluate their operating performance and compare the results of their operations from period to period and against their peers without regard to financing methods or capital structure. The computations of EBITDA and Adjusted EBITDA may not be comparable to other similarly titled measures of other companies. Alta Mesa excludes the items listed in the Appendix from net (loss) income in arriving at Adjusted EBITDA because these amounts can vary substantially from company to company depending upon accounting methods and book values of assets, capital structures and the method by which the assets were acquired. Adjusted EBITDA should not be considered as an alternative to, or more meaningful than, net income as determined in accordance with GAAP or as an indicator of Alta Mesa's operating performance or liquidity. Certain items excluded from Adjusted EBITDA are significant components in understanding and assessing a company's financial performance, such as a company's cost of capital and tax structure, as well as the historic costs of depreciable assets, none of which are components of Adjusted EBITDA. Alta Mesa's presentation of Adjusted EBITDA should not be construed as an inference that its results will be unaffected by unusual or non-recurring items.

**INDUSTRY AND MARKET DATA**

This presentation has been prepared by Silver Run II and includes market data and other statistical information from sources believed by Silver Run II, Alta Mesa and KFM to be reliable, including independent industry publications, government publications or other published independent sources. Some data is also based on the good faith estimates of Alta Mesa and KFM, which are derived from their review of internal sources as well as the independent sources described above. Although Silver Run II, Alta Mesa and KFM believe these sources are reliable, they have not independently verified the information and cannot guarantee its accuracy and completeness.

**TRADEMARKS AND TRADE NAMES**

Alta Mesa and KFM own or have rights to various trademarks, service marks and trade names that they use in connection with the operation of their respective businesses. This presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this presentation is not intended to, and does not imply, a relationship with Silver Run II, Alta Mesa or KFM, or an endorsement or sponsorship by or of Silver Run II, Alta Mesa or KFM. Solely for convenience, the trademarks, service marks and trade names referred to in this presentation may appear without the ®, TM or SM symbols, but such references are not intended to indicate, in any way, that Alta Mesa or KFM will not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to these trademarks, service marks and trade names.

2

## Table of Contents

I.    Introduction

II.   Company Overview

III.  Our Upstream Assets

IV.   Our Midstream Assets

V.    Financial Summary

VI.   Valuation and Timeline

Appendix

3



Introduction

## Silver Run II Delivering on Investment Criteria

### Upstream

 Assets economic well below current oil price

 High margin core basin with low field break-evens, deep inventory

 Multiple Stacked Pays

 High-quality assets with significant unbooked resource potential

✓ Opportunities to improve costs through technology

✓ Opportunity to expand through technology and acquisitions



### Midstream

✓ Competitively-positioned assets that benefit from strong supply/demand fundamentals

✓ Expansion opportunities in rapidly growing basin

✓ Locked-in base returns through stable fee-based contracts

✓ Assets with return asymmetry from incremental volumes, moderate margin exposure, and/or organic growth projects

✓ Synergy with existing upstream portfolio

**Combined upstream and midstream company allows for significant value uplift from financial optimization**

5

## Pure Play STACK Company
*Premier liquids upstream growth with value-enhancing midstream*



- World class asset with attractive geology
  - Highly contiguous ~120,000 acres with substantial infrastructure in core of STACK
  - Oil-weighted resource with $25/BBL breakeven; >85% single-well rate of return
  - 4,200+[1] gross primary locations; 12,000+[1] possible through down-spacing and additional zones
- Top-tier operator with substantial in-basin expertise and highly consistent well results
  - 200+ horizontal STACK wells drilled across entirety of Kingfisher acreage maximizes confidence in type well EUR
  - Consistency and geographic breadth of well results affirms repeatability
  - Oil-weighted production in early well life maximizes near-term oil-based revenue (first month 2-stream production at 82% oil with 57% of the type well EUR oil produced in the first five years); consistent GOR profile
  - Industry-leading growth potential; 2-year expected EBITDA CAGR of 128%
  - Demonstrated ability to manage a large development program – average of 6 rigs running in 2017
  - Robust acquisition pipeline coupled with track record as an aggregator
- Highly strategic and synergistic midstream subsidiary with Kingfisher Midstream
  - Flow assurance de-risks production growth
  - Purpose built system designed to accommodate third party volumes – currently 6 contracted customers with approximately 300,000 gross dedicated acres
  - Strategic advantage supporting acquisition of new upstream assets
  - Future opportunity to monetize Kingfisher Midstream through an IPO, and fund upstream capital needs through proceeds of an IPO, drop downs, and GP / IDR distributions
- Financial strength and flexibility to execute business plan through the cycle; cash flow positive in 2019
  - Team has demonstrated the discipline to survive and grow through cyclical downturns

[1] Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in Major, Blaine and Kingfisher counties in July 2017, as described in further detail on page 27 (the "Major County Acquisition").

6

## Transaction Overview

- Jim Hackett and Riverstone raised ~$1 billion through Silver Run Acquisition Corporation II ("Silver Run II") IPO to invest in a market leading company which could generate significant potential return

- Silver Run II has agreed to merge with Alta Mesa ("Alta Mesa") and Kingfisher Midstream ("KFM"), collectively renamed as Alta Mesa Resources, Inc. ("AMR") at the closing of the contemplated transaction. The existing Silver Run II public stockholders and Riverstone will collectively hold a 49% interest in the combined Company1

- Pursuant to the contemplated transaction, the combined Company implied Firm Value ("FV") will be ~$3.8 billion at $10 per share, representing the following acquisition metrics:

|                 | AMR  | KFM  | Total |
|-----------------|------|------|-------|
| FV / 2018E EBITDA | 6.1x | 7.3x | 7.1x  |
| FV / 2019E EBITDA | 3.1  | 4.2  | 3.8   |

- Existing owners of Alta Mesa will roll 100% of their equity into Silver Run II; owners of KFM will retain significant equity stakes

- Riverstone and related investment vehicles will invest at least $600 million of cash2

- Anticipated closing of the transaction in 4Q 2017

1 Assumes no Silver Run II public stockholders elect to have their shares of Class A common stock redeemed in connection with the closing of the transaction.
2 Includes $400 million of shares of Class A Common Stock and warrants to be purchased from Silver Run II under the forward purchase agreement dated as of March 17, 2017. Does not include additional $200 million commitment from Riverstone under a forward purchase agreement entered into in connection with the proposed transaction.

7

## Transaction Summary





Note: Sources & Uses includes estimates of transaction fees, debt at close, and other transaction closing adjustments, and is subject to change.
1 SPAC capital net of deferred underwriting expense.
2 Reflects Riverstone and related investment vehicles, and includes $400 million of shares of Class A Common Stock and warrants to be purchased from Silver Run II under the forward purchase agreement dated as of March 17, 2017. Does not include additional $200 million commitment from Riverstone under a forward purchase agreement entered into in connection with the proposed transaction.
3 Assumes none of legacy Silver Run II owners exercise their stockholder redemption rights and does not give effect to any shares of Class A Common Stock that may be acquired by the Alta Mesa or KFM sellers in connection with certain earn-out provisions in the applicable contribution agreements.

8



## Alta Mesa Overview
### Focused on development and acquisition in the STACK



| Upstream Metrics | |
|---|---|
| Net STACK Surface Acres | ~120,000 |
| Current Production (BOE/D) | ~20,000 |
| % Liquids | 69% |
| Proved Reserves (MMBOE) | 144 |
| Resource Potential (MMBOE)[1] | >1,000 |
| Estimated Potential Gross Identified Locations[1] | 4,196 |
| Estimated Total Gross Locations[1,2] | 12,133 |
| Gross Stack Wells Producing / Horizontal Operated STACK Wells Drilled[3] | 167 / 205 |
| 2017 Average Rigs | 6 |

| Midstream Metrics | |
|---|---|
| Natural Gas Processing Current / YE 2017 | 60 / 340[4] MMCF/D |
| Pipelines | 300+ miles |
| Dedicated Acreage | ~300,000 gross acres |
| Storage Capacity | 50 MBBL with 6 loading LACTs[5] |

Source: Public Filings; Investor Relations.
Note: All reserve figures per NYMEX strip pricing as of 12/31/2016 close; represents acreage as of 7/20/2017.
[1] Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.
[2] Includes additional locations from downspacing in the Oswego, Meramec, Lower and Upper Osage formations as well as additional locations in the Big Lime, Cherokee, Manning, Chester, Woodford and Hunton formations.
[3] Horizontal wells drilled as of 6/14/17
[4] Includes 60 MMCF/D offtake processing expected 3Q 2017.
[5] Lease Automatic Custody Transfer units.

10

## High Caliber STACK Operating Team
*Cohesive, tenured, scalable team producing world class results*

| Name | Position | Years at AMR | Years Experience |
|------|----------|--------------|------------------|
| Hal Chappelle | President and CEO | 13 | 30+ |
| Mike Ellis | Founder and Chief Operating Officer | 30 | 30+ |
| Mike McCabe | VP and Chief Financial Officer | 11 | 25+ |
| Gene Cole | VP and Chief Technical Officer | 10 | 25+ |
| Kevin Bourque | VP, Mid Continent Operations | 10 | 20+ |
| David McClure | VP, Facilities and Midstream | 7 | 15+ |
| Tim Turner | VP, Corporate Planning and Reserves | 4 | 30+ |
| Dave Smith | VP, Geology, Geophysics & Exploration | 18 | 30+ |
| Ron Smith | VP and Chief Accounting Officer | 10 | 30+ |
| David Murrell | VP, Land | 10 | 25+ |

### Robust Capabilities, Organizational Scale, Public Company Processes to Drive Long-Term Success

| Operations (60 Employees) (40 Contractors) | Engineering & Geology (45 Employees) | Land (25 Employees) | Corporate / Finance & Accounting (50 Employees) |
|---|---|---|---|

**Relentless focus on technological advancements and continuous learning**

11

## Optimization, Delineation and Expansion
*Systematic horizontal development and growth of contiguous acreage*









**1992 - 2013** | **2014 - 2015** | **2016 & 2017 Plan**

**40,000+ Net Acres** | **73,000+ Net Acres** | **120,000+ Net Acres**

**1987**
- Founded by Mike Ellis with ~$200K

**1991**
- Initial Sooner Trend acreage acquired from Conoco/Exxon/Texaco-operated units

**2007-2012**
- Drilled 27 vertical stratigraphic delineation wells within legacy acreage; defined robust Osage prospectivity in vertical wells
- Spud first two operated HZ STACK wells in December 2012

**2013**
- Progressed through first two completion designs (Gen 1.0 and Gen 1.5)

**2014-2015**
- Commenced aggressive STACK leasing/acquisition and accelerated STACK development, increasing from 4 operated rigs (37% of capex budget) to 70% of total capex budget
- Built STACK acreage from 40K to 70K+ acres through bolt-on acquisitions

**2016**
- Production reached ~20 MBOE/D
- Drilled 100° STACK HZ well & first Gen 2.5 well
- DrillCo JV started, accelerated STACK drilling with 5 operated rigs
- Phase I of Kingfisher Midstream completed, with 60 MMCF/D processing plant, crude and gas gathering, transmission pipelines, 50,000 BBL/D crude terminal, and field compression

**2017**
- Increased to 6 STACK operated rigs (95% of capex budget)
- Phase II of KFM expected to be complete, which includes 200MMCF/D cryo plant expansion, gas gathering pipelines, field compression and high-pressure gas transmission pipelines

12







# Alluring Macroeconomic Fundamentals

***High quality rock drives compelling returns, robust rig activity***

**Major U.S. Oil Plays – Breakeven Prices ($/BBL)[1]**

**Alta Mesa Type Well IRR[3]**

**KFM Acreage Dedications / Resource Allocations Breakdown[6]**

**KFM Gas Inlet Volumes by Producer (MMCF/D)**

Source: BakerHughes, Wall Street Research.

[1] Based on 15% IRR hurdle. Assumes gas price deck of 2017: $3.10/mcf; 2018: $2.99/mcf; 2019: $2.83/mcf; 2020: $2.82/mcf; thereafter: $2.83/mcf.

[2] AMR breakeven price company prepared. Based on AMR 651 MBOE mean type curve.

[3] Osage type curves assume 17% royalty burden and $3.2mm D&C well cost. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

[4] NYMEX strip pricing as of 8/3/2017 close until 2021 and held flat thereafter.

[5] Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf; 2018: $54.90/bbl / $3.14/mcf; 2019: $58.00/bbl / $3.05/mcf and held flat thereafter).

[6] Not inclusive of producer customers' entire gross acreage position; additional gross acreage proximate to KFM available for gathering and processing services. Includes additional acreage to come and/or under negotiation.

[7] Percentage of Phase I & II shown.

# Asset Value of AMR's STACK Position

***~$7B PV-10 Value from Identified Gross Locations before downspacing***

**Alta Mesa's 4,196 Identified Gross Drilling Locations are the primary focus of the near-term development plan**

Note: PV-10 figures as of 7/1/2017. Reflects Generation 2.0 Type Curve. Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf, 2018: $54.90/bbl / $3.14/mcf, 2019: $58.00/bbl / $3.05/mcf and held flat thereafter). Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition. Adjusted for transportation costs paid to KFM; excludes $1.25 / bbl oil transportation costs ("KFM Margin Uplift").

[1] Illustrative midstream uplift value assumes 2018E EBITDA valued at 13.7x.

[2] Low Risk downspacing of Osage to 11 WPS (966 locations), Meramec to 5 WPS (318 locations), and Oswego to 4 WPS (516 locations).

[3] Additional downspacing of Osage to 15 WPS (1,288 locations) and Meramec to 8 WPS (954 locations).

[4] Assumes 2018E Upstream G&A capitalized at 7.5x.

[5] Assumes pro forma net debt at transaction close based on Alta Mesa Q2 2017 revolver balance outstanding.

[6] Additional Formations include Big Lime, Manning, Hunton, Woodford, Cherokee, and Chester.

## Significant Activity in Alta Mesa "Neighborhood"

*Prominent operators active in Updip Oil Window adjoining Alta Mesa*

Source: IHS Enerdeq, HPDI.
Note: Represents a combination of current and recent rig activity.
[1] Operators with 2 rigs or fewer running.

## Alta Mesa Vision
*Rigorous development and balance sheet to consolidate regional assets*

### Existing Asset Value

- Early phase of systematic Meramec/Osage, and Oswego development
- Our goal: maximize discounted cash flow
  - Improve drilling efficiencies through technology and pad drilling
  - Continually optimize well density, stage spacing, pump rates, fluids, proppant, hydraulics
- Delineate and develop other horizons
  - Established productive zones – Big Lime, Manning, Cherokee sands, Woodford, Hunton
  - Untested zones – Chester Shale

### STACK Enterprise Expansion

- Consolidate acreage where we can be best-in-class Operator



**Alta Mesa Position in Expanding STACK/MERGE/SCOOP Area**

Note: Wells drilled map as of August 2017.

17

## Progressive Increase in Completion Intensity
*Alta Mesa leadership in operational advancements*

**Completion Summary By Generation**

- Alta Mesa has proactively advanced completion designs with each generation – leading to improved well response and economics:
  - Number of stages increases with each generation as stage spacing decreases
  - Average sand per stage has increased with each generation
  - Total fluid per stage increases with each generation
- Continuously optimizing completions designs through reduced frac stage spacing for increased formation stimulation

| Design Parameters | Gen 1.0 | Gen 1.5 | Gen 2.0 | Gen 2.5 | Current | Future |
|---|---|---|---|---|---|---|
| Avg Frac Stages | 12 | 18 | 24 | 32 | 35 | |
| Avg. Stage Spacing (Ft.) | 340 | 256 | 194 | 150 | 140 | |
| Slickwater - Avg Total (BBLS/Ft.) | 29 | 42 | 56 | 66 | 75 | |
| Sand - Total Avg. (Lbs/Ft.) | 317 | 457 | 677 | 1,193 | 1,500 | |
| Frac Design Type | Packer/Sleeve | Hybrid | Plug/Perf | Plug/Perf | Plug/Perf | |
| Flow Design Type | Slickwater | Slickwater | Slickwater | Slickwater | Slickwater | Further Improvement |
| Packers Type | Mechanical | Hybrid | Swell | Swell | Swell | |
| Well Count[1] | 7 | 6 | 59 | 94 | -- | |

**Current Type Curve – Gen 2.0**



Flowback Rate-Controlled In Early Periods

[1] Wells completed as of 8/16/17

18

# Average Well Results
## Results as of YE 2016 with early-stage Gen 2.5 forecasts

### Average EUR by Generation[1]



Legend: MBO, MBOE

| | Average Generation 1.0 | Average Generation 1.5 | Average Generation 2.0 | Expected Generation 2.5 | Beyond Generation 2.5 |
|---|---|---|---|---|---|
| MBOE | 149 | 472 | 598 | | |
| MBO | 71 | 183 | 247 | | |
| # of Wells | 7 | 6 | 50 | | |

### Optimizing Stimulated Reservoir Volume

- Financial goal: maximize discounted cash flow
- Well design goal: optimize stimulated reservoir volume
  - Well spacing
  - Proppant loading
  - Fluid rates
  - Landing zones

### Oil and Liquids Content Over Time[2]



Cumulative % MBOE (2-Stream), Oil % (2-Stream), % Liquids (3-Stream), GOR (MCF/BBL)

### Oil-Weighting Over Time

- Approximately 57% of the oil, 50% of the natural gas liquids, and 38% of the natural gas are produced in the first five years thereby enhancing the early revenue per unit and the resulting economics
- The GOR increases over time with month one approximately 1 Mcf/Bbl, month twelve approximately 5 Mcf/Bbl, month sixty approximately 8 Mcf/Bbl.
- In month one, 2-stream production from the well is 82% oil and 3-stream production is 86% liquids
- In year one, 2-stream production from the well is 66% oil and 3-stream production is 74% liquids
- The well breaches the 2-stream 50% oil point near the end of year 2 and 3-stream production remains above 50% liquids point for the life of the well

Source: Ryder Scott-audited Reserve Report, Company data
[1] Based on Ryder Scott-audited Reserve Report. (Excludes 9 wells with circumstances that will not be repeated due to unacceptable results: i) 4 wells with 660' spacing in a high porosity area, ii) 3 child wells drilled between 2 parent wells without injecting water into the parent wells prior to frac, iii) 1 well which were shut in for more than 90 days after frac, iv) 1 well that fraced into a vertical well and the vertical well was not plugged in the Osage/Meramec.
[2] LNU17N08W02A Miss well (Ryder Scott-audited Reserve Report)

19

# Cost-Advantaged Asset Base
## Infrastructure and basic well design mitigate cost inflation



| Advantage | | Why It Matters |
|---|---|---|
| 1 | Shallower Targets | ■ Allows for the elimination of additional strings of casing, liner tie-back, and reduces horsepower used during stimulation<br>■ Reduced drilling time and costs per well enhances capital flexibility and efficiencies |
| 2 | One-mile Laterals | ■ Reduces mechanical risk of completions vs two-mile<br>■ Use less steel by utilizing smaller diameter pipe program<br>■ Lower cost per foot to execute drilling and completions |
| 3 | Naturally Fractured Formation | ■ Heavier proppant loads not required<br>■ Flexibility to use more commoditized proppant |

### Gross D&C[1] ($MM)

### STACK Regional Stratigraphy

[1] AMR Pad Drilling D&C only and does not include $500k of allocated facilities cost

20





# Alta Mesa: Low Cost Operator

*Peer leader in operating cost and capital efficiency*

## SEC Future Development Cost Per Proved Undeveloped BOE ($ / BOE)[1]

## Recycle Ratio[3]

## Q1 2017 LTM LOE ($ / BOE)[4]

Alta Mesa | STACK Peers | Permian Peers

Source: Public Filings as of 4Q 2016.
[1] Calculated as future development costs divided by proved undeveloped reserves. Shown as of 12/31/2016.
[2] MRO and DVN PUD F&D evaluated based on US assets only.
[3] Calculated as 4Q16 unhedged EBITDAX/BOE divided by organic F&D. Includes Q4 acquired BCE wells in calculation. Organic F&D defined as Future Development Costs / PUD volumes per SEC filings and excludes reserves added through acquisitions.
[4] Does not include gathering & transportation.
[5] LTM 3/31/2017 excluding legacy vertical and waterflood-related production.

# Solid Results Affirm De-Risked Acreage Position

*Representative wells across 11 townships*

| Notable 2017 Alta Mesa Wells | | |
|---|---|---|
| Well | Target | IP30 (BOE/D) |
| Aces High 1606 4-11MH | Osage | 823 |
| Coleman 1706 6A-9MH | U Osage/L Meramec | 514 |
| Dalwhinnie 1605 1-31MH | Osage | 702 |
| Fazio 1705 1-13MH | Osage | 909 |
| Hasley 1605 1-28MH | Osage | 549 |
| Huntsman 1506 2-23MH | Meramec | 598 |
| Macallan 1806 4-17MH | Osage | 643 |
| Odie 1606 1-12MH | U Osage/L Meramec | 849 |
| Peat 1606 1-26MH | Osage | 522 |
| Pollard 1805 3-2MH | Osage | 507 |
| Red Queen 1506 1-1MH | Osage | 509 |
| Shiner 1505 1-3MH | Osage | 585 |
| Speyside 1606 1-27MH | Osage | 997 |
| Yellowstone 1505 4-8MH | Osage | 740 |

| # | Well Name[1] | Lateral Length | EUR (MBOE)[2] | EUR/'000 Lateral ft[2] | IP90 (BOE/D) | IP90 % Oil | IP90/'000 Lateral ft |
|---|---|---|---|---|---|---|---|
| | ***Operated*** | | | | | | |
| 1 | Barbara 1706 3-22MH | 4,812 | 579 | 120 | 346 | 82% | 72 |
| 2 | Beyer 4-6H | 4,452 | 863 | 194 | 505 | 75% | 113 |
| 3 | Boecher 1706 4-19MH | 4,832 | 574 | 119 | 560 | 72% | 116 |
| 4 | Bollenbach 1705 4-21MH | 4,820 | 994 | 206 | 185 | 55% | 38 |
| 5 | Bollenbach 1705 6-30MH | 4,795 | 1,198 | 250 | 436 | 92% | 91 |
| 6 | Brown 1706 6-27MH | 4,850 | 839 | 173 | 316 | 76% | 65 |
| 7 | Clark 1705 5-12MH | 4,657 | 827 | 178 | 615 | 85% | 132 |
| 8 | Cleveland 1805 2-26MH | 4,645 | 686 | 148 | 451 | 77% | 97 |
| 9 | Dixon 1505 3-16MH | 4,858 | 657 | 135 | 325 | 81% | 67 |
| 10 | EHU 219H | 4,950 | 790 | 160 | 123 | 88% | 25 |
| 11 | EHU 220H | 3,651 | 678 | 186 | 216 | 91% | 59 |
| 12 | EHU 235H | 5,300 | 559 | 106 | 357 | 89% | 67 |
| 13 | Evelyn 1706 5-18MH | 4,857 | 575 | 118 | 621 | 87% | 128 |
| 14 | Francis 1706 5-8MH | 4,856 | 664 | 137 | 349 | 69% | 72 |
| 15 | Gilbert 1706 6-21MH | 4,738 | 590 | 125 | 409 | 59% | 86 |
| 16 | Hawk 1906 7-13MH | 4,813 | 540 | 112 | 216 | 80% | 45 |
| 17 | Helen 1605 5-33MH | 4,620 | 652 | 141 | 331 | 77% | 72 |
| 18 | Hoskins 1705 2-9MH | 4,693 | 932 | 199 | 507 | 85% | 108 |
| 19 | James 1706 5-26MH | 4,748 | 738 | 155 | 352 | 79% | 74 |
| 20 | Lankard 1706 6-34MH | 4,855 | 847 | 174 | 1,291 | 58% | 266 |
| 21 | LNU 16-2H | 4,788 | 873 | 182 | 282 | 89% | 59 |
| 22 | LNU 49-4H | 4,518 | 756 | 167 | 518 | 79% | 115 |
| 23 | Mad Hatter 1506 2-34MH | 4,670 | 632 | 135 | 294 | 90% | 63 |
| 24 | Martin 1505 4-9MH | 4,795 | 620 | 129 | 278 | 64% | 58 |
| 25 | Matheson 1705 5-10MH | 4,765 | 729 | 153 | 448 | 79% | 94 |
| 26 | Mitchell 1806 2B-27MH | 4,598 | 646 | 140 | 311 | 81% | 68 |
| 27 | Oak Tree 1605 2-30MH | 4,744 | 813 | 171 | 634 | 69% | 134 |
| 28 | Oltmanns 1805 6-14MH | 4,930 | 822 | 167 | 631 | 70% | 128 |
| 29 | Oswald 1705 6-28MH | 4,815 | 1,144 | 238 | 278 | 66% | 58 |
| 30 | Pinehurst 1706 5-5MH | 5,061 | 672 | 133 | 572 | 75% | 113 |
| 31 | Redbreast 1505 4-7MH | 4,709 | 655 | 139 | 251 | 73% | 53 |
| 32 | Rigdon 17015 6-11MH | 4,827 | 725 | 150 | 697 | 82% | 144 |
| 33 | Rudd 1605 2A-5MH | 4,010 | 520 | 130 | 489 | 58% | 122 |
| 34 | Three Wood 1505 4-17MH | 4,634 | 629 | 136 | 321 | 76% | 69 |
| 35 | Todd 1706 6-4MH | 5,019 | 946 | 188 | 599 | 68% | 119 |
| 36 | Vadder 1805 2-12RMH | 4,504 | 669 | 148 | 542 | 63% | 120 |
| 37 | Wakeman 1706 6-25MH | 4,842 | 925 | 191 | 787 | 62% | 162 |
| 38 | Weber 1806 3-22MH | 4,797 | 646 | 135 | 112 | 75% | 23 |
| 39 | White Rabbit 1506 2-27MH | 4,811 | 633 | 132 | 428 | 91% | 89 |
| | ***Non-Operated*** | | | | | | |
| 40 | Deep River 30-1MH | 5,586 | NA | 89 | 324 | 41% | 58 |
| 41 | Holiday Road 2-1H | 5,100 | NA | 67 | 153 | 85% | 30 |
| 42 | King Koopa 1606 2UMH-22 | 4,691 | NA | 83 | 380 | 60% | 81 |
| 43 | OOID 1OH-24 | 5,357 | 1,459 | 272 | 533 | 88% | 99 |
| 44 | Post 1706 1-30MH | 4,919 | 456 | 93 | 461 | 66% | 90 |
| 45 | Ruzek 1H-3X | 6,872 | 498 | 72 | 688 | 67% | 100 |
| 46 | Trifecta 1807 20H-14-1 | 4,346 | 662 | 152 | 555 | 92% | 128 |

Source: Alta Mesa Year-End Reserve Report. For non-Alta Mesa operated wells, IHS Enerdeq.
Note: EURs based on NYMEX 2016 pricing. Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.
[1] Includes 7 wells not operated by Alta Mesa. Includes wells operated by Chaparral, GST, MRO and NFX.
[2] 3-Stream EUR assuming 75.4 BBL/MMCF NGL yield and 15.9% shrink.

## Alta Mesa STACK Development
*Moving into development mode on de-risked Kingfisher acreage*

### Base Case Development Plan For AMR



### 2017 Development Plan



### Alta Mesa Development Strategy

- Near term development plan focuses on continued optimization of frac stage spacing, transitioning to development mode, delineating Oswego performance, and accelerating infrastructure investments
- Delineate and de-risk recently acquired Major County Acquisition acreage
- All wells in inventory are planned as single-section laterals
- Transition to primarily pattern development in 2017
- Average of 6 rigs running in 2017

23

## STACK: A Significant Petroleum System
*Additional development potential in multiple stacked pay zones*

### Alta Mesa Existing Development

- Existing spacing tests at 660' show full development potential
- 660' spacing tests have more than 200 days of online production
- Over 800 days of strong well performance at spacing of 1,200'
- Three target zones in Osage/Meramec, which represents a continuous 550' section and one additional in Oswego

### Additional Zones

- Eight zones have proven hydrocarbon production from vertical wells
- Chester Shale offers added potential
- AMR and others have already drilled successful Oswego, Meramec, Osage, Woodford, and Hunton horizontal wells
- Additional formations, including Big Lime and Red Fork, have horizontal permits and strong vertical production
- Drilling days expected to remain similar across the various formations
- AMR drilling Manning Limestone in 2017

Note: Actual Alta Mesa log above displays productive formations.

### Potential 55 Wells per Section

| Type Log | Formation | Targeted | Down-spacing | Additional Formations | Total |
|---|---|---|---|---|---|
| | Big Lime | | | 4 | 4 |
| | Oswego | 2 | 2 | | 4 |
| | Cherokee Shale<br>Prue Sand<br>Skinner Sand<br>Red Fork Sand | | | 4 | 4 |
| | Manning Lime | | | 4 | 4 |
| | Chester Shale | | | 4 | 4 |
| | Meramec | 4 | 4 | | 8 |
| | Osage | 4 | 3 | | 7 |
| | | 4 | 4 | | 8 |
| | Woodford Shale | | | 8 | 8 |
| | Hunton Lime | | | 4 | 4 |
| | Total | 14 | 13 | 28 | 55 |

24













# Deep Drilling Inventory

*4,196 Identified Gross Locations represent 14+ years of inventory*

Note: Identified locations based on AMR interest in 320 Meramec/Osage and 257 Oswego sections; excludes additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.
[1] Low Risk downspacing of Osage to 11 WPS (966 locations), Meramec to 5 WPS (318 locations), and Oswego to 4 WPS (516 locations).
[2] Additional downspacing of Osage to 15 WPS (1,288 locations) and Meramec to 8 WPS (954 locations).
[3] Other Formations include Cherokee and Chester.

# Progressive Execution

*Track record of growth in production, reserves, acreage position*

**Alta Mesa Footprint**

- Acreage has grown from ~40,000 net acres to ~120,000 net acres since 2013
- Disciplined acreage aggregation focused primarily on "bolt-on" acquisitions to systematically increase contiguous position
- July 2017 added ~20,000 net acres in Major, Blaine, and Kingfisher; geologic character similar to central-eastern Kingfisher acreage

Source: Company data, Public Filings, IHS Herolds, RigData.
[1] Inclusive of Net Production from Bayou City JV. 2012 and 2013 data reflects occurrence date and not accounting date LOS, due to the reasoning that occurrence date method incorporated a change in NGL accounting; whereas accounting date LOS does not.
[2] YE 2016 proved reserves as of 12/31/2016 close.
[3] YE12-15 proved reserves based on NYMEX pricing.

# Near Term Consolidation Opportunity

*Play is expanding and significant acreage could change hands*

Source: Investor Presentations, 1Derrick.

# Our Midstream Assets

## KFM is Value Accretive to Alta Mesa
*Vertical integration yields substantial strategic and financial benefits*

| | |
|---|---|
| **Rapidly Expanding G&P Complex in the Heart of the STACK** | • KFM is positioned to capture volume growth from the STACK<br>• Acreage dedications / resource allocations of ~300,000 gross acres |
| **Gathering, Processing and Market Access Support Production Growth** | • Total processing capacity is expected to be 340 MMCF/D in 4Q 2017, including 80 MMCF/D of additional offtake<br>• Substantial firm transport to support future growth |
| **Bundled Natural Gas Residue Solution Enhances Marketability** | • KFM capable of providing takeaway solutions to end-markets today<br>• KFM has secured firm takeaway capacity on PEPL and OGT |
| **Competitive Advantage in Acquisitions** | • KFM well positioned to serve other operators; major gas pipeline projects recently announced by others will be more costly and less timely<br>• Modern processing recoveries and priority residue access to premium markets should result in higher netbacks |
| **KFM's Expansion Offers Complementary, High-Growth Development Project** | • Expansion focused on the next stage of STACK development<br>• Limited G&P infrastructure provides opportunity for KFM expansion<br>• KFM involved in negotiations with anchor customers |
| **Midstream Business Can Support Future Capital Needs** | • Volumetric growth from third-party development provides upside<br>• Attractive trading multiples and GP/IDR optionality / currency<br>• Future opportunity to monetize KFM and fund upstream capital needs through an MLP IPO, drop downs, and GP / IDR distributions |

29

## Market Multiples for Midstream Higher than Upstream
*Alta Mesa owners to capture GP / IDR cash flow / multiple arbitrage*





30

## Kingfisher Midstream Summary
### Existing Infrastructure



Cushing ~60 mi.

| | |
|---|---|
| Natural Gas Processing | • Current processing capacity of 60 MMCF/D<br>• Second 200 MMCF/D plant under construction<br>• 80 MMCF/D offtake processing expected 3Q 2017<br>• 1,200 BBL/D condensate stabilizer |
| Low Pressure Pipeline | • 225 miles[1] of low-pressure crude and gas gathering lines<br>  – Natural gas gathering: 6"-16" pipeline<br>  – Crude gathering: 6"-8" pipeline |
| High Pressure Pipeline | • 98 miles[2] of 4" to 16" rich gas transportation pipeline<br>  – Average operating pressure of 1,100 psig and piggable<br>• 4 miles of 16" residue gas pipeline with 230 MMCF/D of capacity to PEPL<br>• 5 miles of 16" residue gas pipeline connecting KFM to OGT in service October 2017<br>• 4 miles of 6" NGL Y-grade pipeline, with 10,000 BBL/D capacity to Chisolm Pipeline |
| Compression Facilities | • Field Compression<br>  – 3 CAT 3516s at Lincoln South Location (4,140 total horse power)<br>  – 3 CAT 3516s at WSOR Location (4,140 total horse power)<br>  – 1 CAT 3516, 1 CAT 3306 at Garfield Compressor Site<br>  – 1 CAT 3508 at Snowden Compressor Site<br>  – 1 CAT 3516 at West Kingfisher Compressor Site<br>  – 1 CAT 3508 at Great Divide Compressor Site<br>• Inlet Compression – 6x CAT 3606s (10,650 total horse power)<br>• Residue Compression - 3x CAT 3516s (4,140 total horse power) |
| Other Infrastructure | • 50,000 BBL crude storage with 6 truck loading LACTS<br>• 3 NGL bullet tanks: 90,000 gallon capacity |
| Producer Connections | • 54 central delivery point receipt connections serve 188 units |

Note: Represents multiple lines in ditch.
[1] Includes 16 miles under construction
[2] Includes 20 miles under construction

31

## KFM Midstream Takeaway Overview



| | Pipeline | Description | Current Takeaway Capacity | Expansion Projects | Commentary |
|---|---|---|---|---|---|
| Natural Gas | | • Connected to PEPL – owned and operated by Energy Transfer<br>• PEPL consists of four large diameter pipelines extending approximately 1,300 miles throughout Mid-Continent and other market centers<br>• KFM will connect to OGT Q3 2017<br>• OGT services local Oklahoma gas demand, but via on expansion will begin to deliver gas to WAHA in Q2 2018 | • 100,000/day FT on PEPL<br>• 50,000/day FT on OGT, expanding to 125,000/day June 2018<br>  – 25,000 Dth/d for 4 years<br>  – 100,000 Dth/d for 10 years | • KFM in discussion with all prominate outlet pipelines looking to expand out of the basin | • Gas takeaway is functionally full creating a constrained environment for some producers. KFM's residue position provides flow assurance and better netbacks for KFM producer clients<br>• Residue gas is split conned between PEPL and OGT, and under long term agreements insuring that KFM producer customers can flow out of the basin<br>• Capacity rates are low compared to new rates that will be needed to solidify new capacity out of the basin creating better netbacks for KFM producers dedicated to the system |
| NGL | | • Connected to Chisolm Pipeline - operated by Phillips 66<br>• Delivers NGLs to Conway | • Operational capacity of ~41,000 Bbls/d on existing Chisholm line<br>• Currently under a 3 year contract extendable for 2 1-year terms with shipper history | • Opportunity to tie into other NGL pipelines in the area<br>• Volumes could warrant expansion or new build to Mt. Belvieu | • Connected to P66's Chisolm Y-grade pipeline that takes Y-grade to Conway, KS for fractionation<br>• Multiple NGL lines within 7 miles of plant to further diversify Y-grade options when needed<br>• KFM Y-grade optionality will allow producers to capture netback uplift between Conway, KS and Mt Belvieu |
| Crude |  | • Crude gathered to a central delivery point at the plant site<br>• Six truck bays for LACT loading and unloading<br>• Multiple pipeline connection options | • Not currently committed | • Long haul pipeline opportunities to Cushing and other demand sources in the area | • Crude system is focused around keeping Alta Mesa barrels and future third party barrels clean to market, producing better netbacks<br>• Proximity to Cushing provides market optionality between in-state and the Gulf Coast refineries.<br>• No long terms commitments provide KFM the option to build out long-haul crude pipelines enhancing drop down inventory |

32

# KFM Phase III Expansion Overview

- Recent Major county acquisition adds scale through ~20,000 acre dedication

- Offset operator activity in the Western STACK reflects compelling economics driving producer interest and investment

- KFM has identified and plans to capitalize on this midstream opportunity and is rapidly commercializing this growth initiative

- KFM is in the process of securing acreage dedications and other resource allocations in the Western STACK



33



Financial Summary



# Financial Strategy and Pro Forma Financial Impacts

| **Significant Financial Flexibility** | • Demonstrated trajectory to positive free cash flow with near-term development funded with transaction proceeds<br>• Secure robust liquidity to fund development, with near-term production growth ensured by KFM takeaway capacity<br>• Pro forma for this transaction, financial flexibility in place to pursue opportunistic acquisitions with a goal toward consolidation of the STACK region |
| **Maintain Conservative Balance Sheet** | • Maintain conservative credit metrics of < 2.0x leverage through the cycle<br>• Preserve an optimal debt maturity profile<br>• Maintain simplified balance sheet |
| **Protect Cash Flow** | • Prudent capital budget focused on securing leasehold and developing existing acreage<br>• Ensure capital budget is flexible to future changes in commodities and/or service costs<br>• Continued rolling hedge strategy to protect revenues and support development program |

### Capitalization at Announcement

| ($ in millions, unless specified) | Current | | | |
| --- | --- | --- | --- | --- |
| | Alta Mesa | KFM | Adjustments | Pro Forma |
| Cash and Cash Equivalents | $5 | $28 | $517[1] | $551 |
| | | | | |
| Revolving Credit Facility | 269[2] | $0 | (269) | 0 |
| 7.875% Senior Notes due 2024 | 500 | | | 500[3] |
| Total Debt | $769 | $0 | ($269) | $500 |
| Net Debt | 763 | | | (51) |
| | | | | |
| **Financial and Operating Statistics** | | | | |
| 2017E EBITDA | $155 | $42 | | $197 |
| 2018E EBITDA | 358 | 184 | | 543 |
| 2019E EBITDA | 701 | 318 | | 1,019 |
| | | | | |
| **Credit Metrics** | | | | |
| Net Debt / | | | | |
| 2017E EBITDA | | | | NM |
| 2018E EBITDA | | | | NM |
| 2019E EBITDA | | | | NM |
| | | | | |
| **Liquidity** | | | | |
| Expected Borrowing Base | $315 | $200 | | $515 |
| Less: Amount Drawn | 269 | | (269) | 0 |
| Expected Borrowing Base Availability | $46 | | | $515 |
| Plus: Cash and Cash Equivalents | 5 | | | 551 |
| Liquidity | $52 | | | $1,066 |

[1] Cash to balance sheet includes funding for interim cash needs until closing.
[2] Current revolving credit facility balance as of 6/10/2017 does not include approximately $5mm of letters of credit.
[3] Change of control not triggered for 2024 Senior Notes upon execution of transaction

35

---

# 2017 Capital Budget and Hedge Position

### Commentary

**Alta Mesa**
• Alta Mesa's 2017 net capital budget is estimated to be $349MM; ~11% higher than capital expenditures of $316MM in 2016
• Alta Mesa estimates that ~$108MM of the FY 2017 capital budget will be funded by Bayou City per the JV agreement
• Alta Mesa's total 2017 capital budget is estimated to be $458MM, including the Bayou City Energy JV
• FY 2017 acquisition (including leaseholds) capex spending expected to total $85MM, ~ ~19% of the total deployed budget (including Bayou City Energy JV)
• Expect 10-Rig program in the STACK by YE18
• Continue growth and efficiency gains in the STACK while maintaining conservative Leverage Ratio

**Kingfisher Midstream**
• KFM's 2017 net capital budget is estimated to be $251MM
• Growth capital categorized through processing, pipeline, high / low pressure well connects, compression lease principal payments and compression lease interest expense items

### 2017E Capital Budget by Quarter ($MM) – Excl. Acquisitions[1]



### Oil Hedged (BBL/D) – as of 6/30/17



| | Jul-Dec'17 | 2018 | 2019 |
| --- | --- | --- | --- |
| Average Floor Price ($/BBL) | $49.55 | $51.67 | $50.00 |

### Gas Hedges (MCF/D) – as of 6/30/17



| | Aug-Dec'17 | 2018 |
| --- | --- | --- |
| Average Floor Price ($/BBL) | $3.18 | $4.43 |

**Disciplined management protects future revenues and preserves asset value by hedging large percentage of proved-developed and prompt-year production.  Currently hedge WTI (oil), Henry Hub (gas), Conway (propane), and Mid-Con gas basis.**

[1] Does not include Bayou City Energy JV.

36



Valuation and Timeline



## Summary Financial Projections

($ in millions unless otherwise noted)

| Average Net Daily Production (BOE/D) | EBITDA(X) | Capital Expenditures (excl. DrillCo Funds)[1] |
|---|---|---|

Average Net Daily Production (BOE/D) — 82% CAGR

- 2017: 20,841 (Alta Mesa 20,292; Drill Co 549)
- 2018: 38,510 (Alta Mesa 36,812; Drill Co 1,698)
- 2019: 68,900 (Alta Mesa 66,897; Drill Co 2,003)

EBITDA(X) — 128% CAGR

- 2017: $197 ($4 KFM; $38 Alta Mesa $155)
- 2018: $543 ($44 KFM Phase III; $141 KFM Phases I&II; $358 Alta Mesa)
- 2019: $1,019 ($63 KFM Phase III; $255 KFM Phases I&II; $701 Alta Mesa)

Capital Expenditures (excl. DrillCo Funds)[1]

- 2017: $601 ($178 KFM Phases I&II; $349 Alta Mesa)
- 2018: $761 ($62 KFM Phase III; $147 KFM Phases I&II; $552 Alta Mesa)
- 2019: $837 ($137 KFM Phase III; $611 Alta Mesa)

| Free Cash Flow[2] | Liquidity[3] | Forecast Total Wells by Year |
|---|---|---|

Free Cash Flow[2]

- 2017: ($237) / ($210) / ($447)
- 2018: ($233) / ($257) / ($24)
- 2019: $142 / $92 / $51

Liquidity[3]

- 2017: $910
- 2018: $803
- 2019: $945

Forecast Total Wells by Year

- 2017: 120
- 2018: 207
- 2019: 239

Avg. Rigs: 2017: 6; 2018: 10; 2019: 11

Note: Assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.18/mcf; 2019: $54.90/bbl / $3.14/mcf; 2019: $59.00/bbl / $3.05/mcf and held flat thereafter).
[1] DrillCo Funds is Bayou City JV deal.
[2] Phase I & II capex includes planned, non-optional Phase III capex.
[3] Assumes borrowing base increase from $515mm to $685mm in 2018 and includes funding for interim cash needs until closing and KFM revolving credit facility. Assumes combined FCF deficit of $155mm from current until year-end 2017.

38





## Valuation Benchmarking

($ in millions unless otherwise noted)





[1] PDP value adjusted at $30,000 / BOE/D unless otherwise noted)
[2] PDP value adjusted at $15,000 / BOE/D.
[3] Alta Mesa PDP value assumes Broker Consensus Price Deck (2017: $51.16/bbl / $3.16/mcf, 2018: $54.90/bbl / $3.14/mcf, 2019: $55.00/bbl / $3.05/mcf and held flat thereafter). Excluding the Major County acreage, our adjusted $ / net acre is $17,159 / acre. 39



## Benchmarking KFM Against High Growth G&P Peers

($ in millions unless otherwise noted)









[a] Includes midstream Firm Value only.                                    40

## Anticipated Transaction Timeline

| Date | Event |
|---|---|
| Weeks of September 4th – September 29th | • Transaction marketing |
| Mid-September 2017 | • File preliminary proxy statement / marketing materials with the SEC |
| Mid/Late-November 2017 | • Anticipated close |

41

## Pure Play STACK Company
### Premier liquids upstream growth with value-enhancing midstream

• World class asset with attractive geology

• Top-tier operator with substantial in-basin expertise

• Industry-leading growth potential; 2-year expected EBITDA CAGR of 128%

• Highly strategic and synergistic midstream subsidiary with Kingfisher Midstream

• Financial strength and flexibility to execute business plan through the cycle; cash flow positive in 2019

42



## Alta Mesa Management

### Jim Hackett
*Executive Chairman and COO of Midstream*

- Jim Hackett is a Partner at Riverstone and became a director of Silver Run II in 2017
- Prior roles include:
  - Chairman and CEO of Anadarko
  - President and COO of Devon Energy
  - Chairman, President and CEO of Ocean Energy
  - President of several midstream companies, as well as responsible for DCP Midstream and Western Gas Resources
- Director of Enterprise Products Holdings, Fluor Corporation, National Oilwell Varco, Sierra Oil & Gas, and Talen Energy
- Former Chairman of the Board of the Federal Reserve Bank of Dallas
- Holds a B.S. from the University of Illinois and a MBA/MTS from Harvard University

### Hal Chappelle
*President and Chief Executive Officer*

- Hal Chappelle joined Alta Mesa as President and CEO in 2004 and became a director in 2004
- Developed Alta Mesa into a premier STACK operator, building a strong management and technical team
- Successfully navigated Alta Mesa through significant industry cycles, building the Company's oil assets in 2009-2010 and divesting of the company's gas assets in 2014-2016
- Over 30 years of industry experience in field operations, engineering, management, trading, acquisitions and divestitures, and field re-development
- Previously held roles at Louisiana Land & Exploration, Burlington Resources, Southern Company and Mirant
- Holds a Bachelor of Chemical Engineering from Auburn University and an M.S. in Petroleum Engineering from the University of Texas

### Michael McCabe
*Vice President and Chief Financial Officer*

- Michael McCabe joined Alta Mesa in 2006 and became a director in 2014
- Raised private equity capital for Alta Mesa from Denham Capital in 2006, HPS Investment Partners in 2013, and Bayou City in 2015; successfully navigated Alta Mesa through two industry cycles
- Has over 25 years of corporate finance experience with a focus on the energy industry
- Previous management experience includes serving as President and sole owner of Bridge Management Group, Inc., a private consulting firm
- Mr. McCabe's leadership experience also spans senior positions with Bank of Tokyo, Bank of New England and Key Bank
- Holds a B.S. in Chemistry and Physics from Bridgewater State University, an M.S. in Chemical Engineering from Purdue University, and an MBA from Pace University

44

# Alta Mesa Management

## Michael Ellis
*Founder and COO of Upstream Operations*

- Michael Ellis founded Alta Mesa in 1987 after beginning his career with Amoco
- Served as Chairman and COO as well as Vice President of Engineering and has over 30 years of experience in management, engineering, exploration, and acquisitions and divestitures
- Built Alta Mesa's asset base by starting with small earn-in exploitation projects, then growing with successive acquisitions of fields from major oil companies
- Holds a B.S. in Civil Engineering from West Virginia University

## Gene Cole
*VP and Chief Technical Officer*

- Gene Cole has served in the position of Vice President and Chief Technical Officer since 2015 and became a director in 2015
- Over 25 years of extensive domestic and international oilfield experience in management, well completions, well stimulation design and execution
- Started his career with Schlumberger Dowell as a field engineer and served in numerous increasingly responsible positions from 1986 to 2007
- Holds a B.S. in Petroleum Engineering from Marietta College

## David Murrell
*VP, Land and Business Development*

- David Murrell has served as Vice President, Land and Business Development since 2006
- Over 25 years of experience in Gulf Coast leasing, exploration and development programs, contract management and acquisitions and divestitures
- Created a structured land management system for Alta Mesa and built a team of lease analysts, landmen, and field representatives to facilitate Alta Mesa's growth
- Holds a B.B.A in Petroleum Land Management from the University of Oklahoma

## Kevin Bourque
*VP, Operations*

- Kevin Bourque progressed through several roles to the position of Vice President of Mid-Continent Operations in 2012 when we began STACK horizontal drilling program
- He joined Alta Mesa as a field engineer in 2007
- Led the growth of our mid-continent drilling and production operations as we expanded our presence in Oklahoma
- 10+ years of E&P operational experience with Alta Mesa
- 10+ years of project management and business management experience as the owner of his own company

## Tim Turner
*VP, Corporate Development*

- Tim Turner joined Alta Mesa as Vice President of Corporate Development in 2013
- Over 30 years of industry experience including various operations, reservoir engineering and managerial roles with Sun Oil, Santa Fe Minerals, Fina Oil & Chemical, Total, Newfield Exploration, and Quantum Resources
- Led multi-disciplined A&D and asset teams
- Managed corporate reserves and planning functions
- Led business development and new ventures teams
- Holds a B.S. in Petroleum Engineering from the University of Texas and an MBA in Finance from Oklahoma City University

## David McClure
*VP, Facilities & Midstream*

- David McClure has served as Vice President of Facilities and Midstream Operations since 2016
- From 2010 to 2016, he was Vice President for Louisiana Operations, leading a multi-disciplined team of engineers, regulatory, land, geoscience, and operations personnel in development of the Weeks Island field
- Previously held roles at ExxonMobil Production Company and Tetra Technologies
- Over 15 years of industry experience in field operations, facilities and subsea engineering, pipelines, and management
- Holds a B.S. in Chemical Engineering from Auburn University

45

---

# Jim Hackett's Track Record

*Under Mr. Hackett's leadership as Chairman, President, and/or CEO of Anadarko from 2003 to 2013, Anadarko was transformed into one of the largest U.S. oil and gas producers, growing its market cap from approximately $12 billion to over $43 billion. Prior to Anadarko, Mr. Hackett was also a key contributor to the market outperformance of Devon Energy.*



Anadarko Public Market Outperformer (2003 – 2013)



Ocean (Devon)† Public Market Outperformer (1999 – 2003)

**Strategic Thought Leader**

- Created new mission for Anadarko in 2003, upgraded corporate leadership capabilities, rationalized and refocused the portfolio, improved technical and financial risk management tools and processes, and generated success through expansion into unconventional onshore and conventional offshore assets
- Applied leading-edge technology and processes in drilling, completions, and production
- Dynamic leader for years serving as President and COO of Devon Energy, Chairman, President and/or CEO of Ocean Energy, president of several midstream companies, responsible for Duke Energy and PanEnergy's midstream and upstream businesses, and drove Anadarko's midstream business consolidation and MLP/GP IPO – Western Gas Partners and Western Gas Resources

**Benchmark for Operational Excellence and Execution**

- Premier operator with some of the best production metrics in U.S. onshore, U.S. Gulf of Mexico, and offshore East Africa

Source: FactSet
Note: An investment in Silver Run Acquisition Corporation II is not an investment in Anadarko or Devon. The results of Anadarko or Devon are not necessarily indicative of the future performance of Silver Run Acquisition Corporation II.
† Chart displays Ocean share price performance until merger with Devon completed. Thereafter, chart shows Devon performance on a per-Ocean share basis.

46









# Well Spacing Optimization on De-Risked Acreage

*DVN, CLR, MRO, NFX and AMR aggressively defining optimum spacing*

**Alta Mesa is the Leader in the Oil Window with Successful Long Life Spacing Tests**

Source: 1Derrick, IHS, Drilling Info and Company Presentations.

# Completion Design

*Focus on increasing stimulated reservoir volume*

**STACK Well Completion Strategy**

- Progressed through testing multiple generations
- Highly fractured area benefits from "open-hole" design
- Targeting average lateral length of 4,800ft (one-mile)
- Drilling N–S orientation to intersect natural fractures
- Controlled flowback rate to optimize conductivity
- Generation 2.5 proppant loading is optimum at an average of 1,400 lb/ft; tested up to 2,100 lb/ft

**Current Completion Design Targets**

- 7" intermediate casing + 4.5" liner in lateral
- Open-hole swell packers; proppant loading of 1,400 lbs/ft
- 3 joints (casing) between packers defines 150ft stages
- 10,000 bbls of slick water per stage
- 100 bbl/min total fluid injection rate
- Cap flowback rate at 100 bbl/hr of total fluid

**Total D&C Cost ($MM)**

**D&C Cost / Lateral Foot**

**Averages by Completion Generation**

**Stage Spacing**

**Proppant**

**Fluid**

Source: Company Data

# Multiple Long Term Density Pattern Tests
*Density Patterns Test Horizontal and Vertical Spacing*

| | 1,320ft spacing / 2 wells<br>Section 29 18N 5W | 1,500ft spacing / 2 benches<br>Section 8 17N 5W | 1,500ft spacing / 2 benches<br>Section 28 17N 5W |
|---|---|---|---|
| Spacing Pattern | <br>Implies 12 wells per section<br>Cum 622 MBOE ~ 780 days | <br>Implies 12 wells per section<br>Cum 663 MBOE ~ 660 days | <br>Implies 12 wells per section<br>Cum 480 MBOE ~ 540 days |
| Pattern Results | |  |  |

| | 660ft spacing / 2 benches<br>Section 31 19N 6W | 1,000ft spacing / 3 benches<br>Section 9 & 10 17N 6W | 1,200ft spacing / 2 benches<br>Section 23 15N 6W |
|---|---|---|---|
| Spacing Pattern | Implies 24 wells per section<br>Cum 319 MBOE ~ 360 days | Implies 18 wells per section<br>Cum 348 MBOE ~ 56 days | Implies 12 wells per section<br>Cum 12 MBOE ~ 19 days |
| Pattern Results | | | |

49

# NAV Model Assumptions

| Area | Operated | | | Other |
|---|---|---|---|---|
| | Osage | Meramec | Oswego | DrillCo |
| **Pricing & Discount Assumptions** | | | | |
| Gas Differential (% of HH) | 95% | 95% | 95% | 95% |
| Oil Differential (% of WTI) | 94% | 94% | 94% | 94% |
| NGL Realization (% of WTI) | 45% | 45% | 45% | 45% |
| **Drilling Assumptions** | | | | |
| Number of Drilling Locations | 2,388 | 1,264 | 484 | 60 |
| Working Interest - Operated (%) | 72% | 74% | 75% | 57% |
| Working Interest - Other (%) | 15% | 15% | 13% | -- |
| NRI - Operated (%) | 60% | 61% | 62% | 47% |
| NRI - Other (%) | 12% | 12% | 11% | -- |
| Fixed Operating Cost ($/well/month) | $9.7 | $9.7 | $9.7 | $9.7 |
| Variable LOE ($ / bbl of oil) | $2.23 | $2.23 | $2.23 | $2.23 |
| Gas Marketing & Transportation ($ / mcf of gas) - Until 2021 | $0.35 | $0.35 | $0.35 | $0.35 |
| Gas Marketing & Transportation ($ / mcf of gas) - Thereafter | $0.35 | $0.35 | $0.35 | $0.35 |
| Initial Production Tax - Oil (%) | 2.1% | 2.1% | 2.1% | 2.1% |
| Initial Production Tax - Gas/NGLs (%) | 2.1% | 2.1% | 2.1% | 2.1% |
| Severance Holiday (months) | 36 | 36 | 36 | 36 |
| Production Tax - Oil (%) | 7.1% | 7.1% | 7.1% | 7.1% |
| Production Tax - Gas/NGLs (%) | 7.1% | 7.1% | 7.1% | 7.1% |
| Ad Valorem Tax (%) | 0.0% | 0.0% | 0.0% | 0.0% |
| Drilling & Completion Cost ($mm)[1] | $3.5 | $3.5 | $2.5 | $0.3 |
| **EUR Assumption** | | | | |
| **Gross EUR** | | | | |
| Gross Sales Gas EUR (MMcf) | 1,571 | 1,425 | 168 | 1,571 |
| Gross NGL EUR (Mbbl) | 141 | 128 | 15 | 141 |
| Gross Oil EUR (Mbbl) | 250 | 249 | 200 | 250 |
| Total Gross EUR (Mboe) | 652 | 615 | 243 | 652 |
| **Type Curve Assumptions** | | | | |
| **Oil** | | | | |
| IP, 24-hr (Bbl/d) | 200 | 170 | 320 | 200 |
| Duration of Incline (Months) | 2 | 2 | -- | 2 |
| Peak Rate (Bbl/d) | 350 | 500 | 320 | 350 |
| B Factor | 1.20 | 1.20 | 1.20 | 1.20 |
| Di-Continuous (Nominal) Decline (%) | 73% | 80% | 72% | 73% |
| Terminal Decline (%) | 7% | 7% | 7% | 7% |
| **Natural Gas** | | | | |
| IP, Unshrunk, 24-hr (Mcf/d) | 500 | 296 | 320 | 500 |
| Duration of Incline (Months) | 4 | 2 | -- | 4 |
| Peak Rate (Mcf/d) | 900 | 1,250 | 320 | 900 |
| B Factor | 1.50 | 1.50 | 1.20 | 1.50 |
| 1-Di-Continuous (Nominal) Decline (%) | 41% | 56% | 72% | 41% |
| Terminal Decline (%) | 5% | 5% | 7% | 5% |
| NGL Yield (bbls/MMcf) | 75 | 75 | 75 | 75 |
| % Gas Shrink | 15.9% | 16.1% | 15.9% | 15.9% |

DrillCo includes all Osage Wells

Note: Assumes 4,800 lateral length for all type curves.
[1] D&C shown including PAD D&C facilities costs.

50

# Osage Type Curve

## Summary

- 118 Generation 2.0+ wells with production history
- Average Generation 2.5 lateral length of 4,612'; Generation 2.0+ 4,767'
- Type Curve average 30-day IP 0.3 MBOE/D
- Type Curve average 180-day cumulative production of 75 MBOE
- Generation 2.5 Type Curve
  - 622 MBOE 2-Stream EUR; 714 MBOE 3-Stream EUR
  - 303 MBO, 1.6 BCF residue, 144 MB NGL
- Generation 2.0 Type Curve
  - 561 MBOE 2-Stream EUR; 652 MBOE 3-Stream EUR
  - 250 MBO, 1.6 BCF residue, 141 MB NGL
- Type Curves assume 16% Shrink and 75 bbl/MMcf NGL yield

### Average Type Curve

**Key Statistics**

| | Gen 2.5 | Gen 2.0 |
|---|---|---|
| Initial Rate (BOD / MCFD) | 200 / 500 | 200 / 500 |
| Incline Period (oil / gas) | 2 months / 4 months | 2 months / 4 months |
| Peak Rate (BOD / MCFD) | 400 / 900 | 350 / 800 |
| b factor (oil / gas) | 1.2 / 1.5 | 1.2 / 1.5 |
| Initial Decline (oil / gas) | 71% / 41% | 72.8% / 41.2% |
| Lateral Length | 4,800 | 4,800 |
| Type Well IRR %[2] | 88.7% | 71.2% |

### Average Type Curve Cumulative Production



Note: Production data normalized for 4,800' lateral length.
[2] NYMEX Strip as of 8/6/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

51

---

# Meramec Type Curve

## Summary

- Over 100 wells drilled in the Meramec by Newfield, Devon, Marathon, Gastar, and Chaparral
- Alta Mesa is beginning to drill Meramec wells with performance expectations similar to the Osage
- Alta Mesa will be joint developing the Meramec with Osage stack and staggered well tests
- Majority of active rigs in the STACK play are targeting the Meramec to the southwest
- Average Type Curve Results
  - 532 MBOE 2-Stream EUR; 615 MBOE 3-Stream EUR
  - 249 MBO, 1.4 BCF residue, 128 MB NGL
- Type Curve assumes 16% Shrink and 75 bbl/MMcf NGL yield

### Average Type Curve

**Key Statistics**

| | |
|---|---|
| Initial Rate (BOD / MCFD) | 170 / 296 |
| Incline Period (oil / gas) | 2 months / 2 months |
| Peak Rate (BOD / MCFD) | 500 / 1250 |
| b factor (oil / gas) | 1.2 / 1.5 |
| Initial Decline (oil / gas) | 80% / 55% |
| Lateral Length | 4,800 |
| Type Well IRR %[2] | 81.1% |

### Average Type Curve Cumulative Production



Note: Production data normalized for 4,800' lateral length.
[1] Offset results based on Meramec wells drilled in the Updip Oil window of Kingfisher County since 2014.
[2] NYMEX Strip as of 8/6/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

52



















# Oswego Type Curve

## Summary

- Chesapeake, Chaparral, Cimarex, Gastar, and Longfellow are actively targeting the Oswego
- Other operators have future plans to develop the Oswego as a cheaper/shallower target
- IP rates are typically lower than Osage/Meramec wells, but decline rates are shallower
- With drilling and completion costs cheaper for the Oswego, well results do not have to be as strong as the headline STACK formations to make economic wells
- Average Type Curve Results
  - 233 MBOE 2-Stream EUR; 243 MBOE 3-Stream EUR
  - 200 MBO, 0.2 BCF residue, 15 MB NGL
- Type Curve assumes 16% Shrink and 75 bbl/MMcf NGL yield

## Average Type Curve Cumulative Production

## Average Type Curve

| Key Statistics | |
|---|---|
| Initial Rate (BO/D / MCF/D) | 320 / 320 |
| Incline Period (oil / gas) | none |
| Peak Rate (BO/D / MCF/D) | 320 / 320 |
| b factor (oil / gas) | 1.2 / 1.2 |
| Initial Decline (oil / gas) | 72% / 72% |
| Lateral Length | 4,800 |
| Type Well IRR %[2] | 59.3% |

Note: Production data normalized for 4,800' lateral length.
[1] Offset results based on Oswego wells drilled in the Updip Oil window of Kingfisher County since 2014.
[2] NYMEX Strip as of 8/3/2017. Does not include $300k PAD D&C facilities costs. Adjusted for transportation costs paid to KFM. Excludes $1.25 / bbl oil transportation costs.

# Substantial Inventory of Drilling Locations

| | Identified Drilling Locations | | Prospective Drilling Locations | | | | Combined |
|---|---|---|---|---|---|---|---|
| | Locations | Average Working Interest (%) | Other Formations Locations | Downspacing Locations | Total Locations | Average Working Interest (Including Downspacing Locations) (%) | Total Locations |
| Operated: | | | | | | | |
| Osage | 1,196 | 72% | -- | 1,141 | 1,141 | 73% | 2,337 |
| Meramec | 676 | 74% | -- | 676 | 676 | 74% | 1,352 |
| Oswego | 203 | 75% | -- | 206 | 206 | 81% | 409 |
| Manning | -- | -- | 168 | -- | 168 | 75% | 168 |
| Other Formations | -- | -- | 1,327 | -- | 1,327 | 70% | 1,327 |
| Total Operated | 2,075 | 73% | 1,495 | 2,023 | 3,518 | 73% | 5,593 |
| Drilling Inventory (Years) | 14.4 | -- | 10.4 | 14.0 | 24.4 | -- | 38.8 |
| Other: | | | | | | | |
| Osage | 1,252 | 15% | -- | 1,113 | 1,113 | 15% | 2,365 |
| Meramec | 588 | 15% | -- | 596 | 596 | 15% | 1,184 |
| Oswego | 281 | 13% | -- | 310 | 310 | 14% | 591 |
| Manning | -- | -- | 316 | -- | 316 | 14% | 316 |
| Other Formations | -- | -- | 2,084 | -- | 2,084 | 55% | 2,084 |
| Total Other | 2,121 | 15% | 2,400 | 2,019 | 4,419 | 28% | 6,540 |
| Total Gross Locations | 4,196 | | 3,895 | 4,042 | 7,937 | | 12,133 |

Note: Does not include additional resource potential or undeveloped locations on ~20,000 net acres recently acquired in the Major County Acquisition.

## Significant Oswego, Osage/Meramec Section

*Consistent thickness east to west*

57

## Significant Oswego, Osage/Meramec

*Osage prominent throughout, thickening to the north*

58

## DrillCo JV
### Pivotal relationship with Bayou City Energy

| Parameters |
|---|

- Entered into joint development agreement with Houston-based private equity firm, Bayou City Energy, in January 2016
- Bayou City Energy primarily targets small operators with current production and focuses on off-balance sheet structures
- DrillCo funds 100% D&C cost, capped at average of $3.2MM/well
- DrillCo gains 80% working interest in wellbore until 20-well tranche earns 15% IRR, 20% working interest until 25% IRR, then 12.5% working interest
- Specific wells pre-agreed for each tranche

| Strengths for Alta Mesa |
|---|

- Cash flow
- Grow reserves
- Continue resource definition
- Continue pace up learning curve(s)
- Capture, hold acreage
- Maintain people/crews



2017 Alta Mesa Estimated Capital Expenditures

61

## One Mile Laterals Optimum for Up-Dip STACK
### Alta Mesa and other efficient operators adopt fit-for-purpose solutions



~5,000' laterals used for multi-faceted benefits: drilling, completions, production operations, land and legal

| Consideration | Commentary |
|---|---|
| Spacing | One-mile lateral fits into a single section; two-mile laterals require establishing a "Multi-Unit spacing" |
| Drilling | Ability to use lower cost water-based muds and reduced time spent drilling helps to reduce drilling risk and control costs associated to high levels of natural fractures |
| Completions | Less proppant, fluids, and pumping time per well, more simplified design, lower friction while pumping all help to reduce costs of optimized completions |
| Mineral Owner Relations | Working with mineral owners across one-section (versus two-sections for longer laterals) allows for more seamless and confident development program planning |

62

# Alta Mesa Summary STACK Pro Forma Financials



| ($ in millions, unless specified) | Three Months Ended | | Years Ended December 31, | | |
| | March 31, 2017 | December 31, 2016 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| **Production** | | | | | |
| Oil (MBBLS) | 942.0 | 989.1 | 3,057.2 | 2,006.1 | 1,071.6 |
| Natural Gas (MMCF) | 3,116.0 | 3,088.9 | 9,110.2 | 4,272.6 | 2,083.0 |
| NGLs (MBBLS) | 275.0 | 280.4 | 901.0 | 499.4 | 315.6 |
| Total Production (MBOE) | 1,736.3 | 1,784.3 | 5,476.6 | 3,217.6 | 1,734.4 |
| Daily Production (BOE/D) | 19,292.6 | 19,394.7 | 15,004.3 | 8,815.3 | 4,751.7 |
| | | | | | |
| **Statement of Operations** | | | | | |
| Revenue | $63.6 | $61.7 | $166.4 | $133.6 | $117.3 |
| Operating Expenses (Cash Items) | 17.2 | 16.2 | 51.6 | 34.7 | 24.6 |
| Exploration Costs (Cash Item) | 5.0 | 7.5 | 17.2 | 9.8 | 11.8 |
| Operating Expenses (Non-Cash) | 20.2 | 23.8 | 63.3 | 80.3 | 29.4 |
| General and Administrative[1] | 9.7 | 8.7 | 40.5 | 37.9 | 68.4 |
| Interest Expense[1] | 12.3 | 1.4 | 43.4 | 62.5 | 55.8 |
| | | | | | |
| **Other Financial Data** | | | | | |
| Adjusted EBITDAX[2] | $36.7 | $36.8 | $74.3 | $61.0 | $24.3 |
| % Margin[2] | 57.7% | 59.6% | 44.7% | 45.7% | 20.7% |

Note: This historical pro forma financial information is unaudited and gives effect to (i) the expected disposition of Alta Mesa's non-STACK assets and operations prior to the closing of the business combination as if such transaction occurred on January 1, 2014 and (ii) the contribution to Alta Mesa of interests in 24 producing wells that were drilled under the BCE joint development agreement and purchased by High Mesa from BCE on December 31, 2016, as if such transaction occurred on January 1, 2016.
[1] General and administrative expense and interest expense for the total company.
[2] Adjusted EBITDAX is a Non-GAAP financial measure. See reconciliation to the nearest comparable GAAP measure in the appendix to this presentation.

63

# Reconciliation of Adjusted EBITDAX to Net Income

| ($ in millions, unless specified) | Three Months Ended | | Years Ended December 31, | | |
| | March 31, 2017 | December 31, 2016 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| Net Income (Loss) | ($0.8) | $4.1 | ($49.6) | ($91.6) | ($72.7) |
| Adjustments: | | | | | |
| Interest expense | 12.3 | 1.4 | 43.4 | 62.5 | 55.8 |
| Exploration expense | 5.0 | 7.5 | 17.2 | 9.8 | 29.1 |
| Depreciation, depletion and amortization expense | 18.9 | 23.7 | 62.6 | 61.3 | 29.1 |
| Impairment expense | 1.2 | 0.0 | 0.4 | 18.8 | 0.0 |
| Accretion expense | 0.1 | 0.1 | 0.3 | 0.2 | 0.3 |
| **Adjusted EBITDAX[1]** | **$36.7** | **$36.8** | **$74.3** | **$61.0** | **$24.3** |

Note: This historical pro forma financial information is unaudited and gives effect to (i) the expected disposition of Alta Mesa's non-STACK assets and operations prior to the closing of the business combination as if such transaction occurred on January 1, 2014 and (ii) the contribution to Alta Mesa of interests in 24 producing wells that were drilled under the BCE joint development agreement and purchased by High Mesa from BCE on December 31, 2016, as if such transaction occurred on January 1, 2016.
[1] Does not include non-cash items - provision for income taxes, loss on extinguishment of debt, unrealized loss (gain) on oil and gas hedges and (gain)/loss on sale of assets.

64

EX-99.2 7 a17-20303_2ex99d2.htm EX-99.2

**Exhibit 99.2**



**Alta Mesa Holdings, LP**

**August 17, 2017**

**C O R P O R A T E   P A R T I C I P A N T S**

**James Hackett,** *Chief Executive Officer, Silver Run II*

**Harlan Chappelle,** *President and Chief Executive Officer, Alta Mesa Holdings, LP*

**Michael McCabe,** *Vice President and Chief Financial Officer, Alta Mesa Holdings, LP*

**P R E S E N T A T I O N**

**James Hackett:**

Hello, everyone.  I'm Jim Hackett.  Hal Chappelle and I are very excited to be here today to talk about a compelling investment opportunity.  I'll walk through an introduction of the company, as well as a brief overview of the transaction.  Hal will come in and speak about the Upstream and Midstream assets.  Then he'll turn it over to Mike McCabe, the CFO, to talk about the financial overview.  Finally, I'll finish with some comments about valuation and timeline going forward.  Hal?

**Harlan Chappelle:**

Thanks, Jim, and hello.  We cannot be more excited than to work with Jim Hackett and Silver Run II to build upon the value we've created and the progress that we've made in the STACK.  We look forward to walking through this material with you today.  Jim?

**James Hackett:**

Thanks, Hal.  First, we'll talk about the introduction.  When we went out to look for targets for Silver Run II, we had laid out investment criteria that are shown on Slide 5.  Both individually as an Upstream and Midstream Company, and collectively as an integrated platform, this transaction satisfies those criteria.

Turning to Slide 6, this is the first pure-play publicly traded STACK company, which is I, think, very exciting for the investor community.  It has everything we desired in terms of highly contiguous oil weighted acreage, 120,000 acres in the core of the STACK, at very attractive breakeven prices, as you can see on the top of Slide 6.  We have 4,000-plus primary gross locations based on what we are currently doing.  As a drilling and a completion strategy, we have over 12,000 possible locations from down spacing, as well as additional zone penetration.  Hal will go through more of that with you in a minute.

We have here a very seasoned cohesive, very experienced team in terms of what they've been doing for over a decade.  This is unlike almost any other private company you can name.  They have drilled over 200 horizontal STACK wells, they've survived several commodity cycles, they have industry-leading growth potential at approximately 130%.  By virtue of combining the Midstream and Upstream, we have both flow assurance for constraining periods of time on all three liquids that we produce.  We also produce better net backs because of that position, and, importantly, the purpose-built system that

ViaVid has made considerable efforts to provide an accurate transcription.  There may be material errors, omissions, or inaccuracies in the reporting of the substance of the conference call.  This transcript is being made available for information purposes only.

1-888-562-0262   1-604-929-1352   www.viavid.com

accommodates Alta Mesa also accommodates third-party volumes.  We have 300,000 gross acres dedicated to that system in addition to the 120,000 acres that Alta Mesa has committed to this system.

We have, I think, tremendous advantages in terms of strategic positioning for consolidation down the road and a future opportunity to restructure the Midstream business into an MLP IPO, which I'll cover later in the presentation.

Finally, Mike McCabe will talk more about the financial strength and flexibility, and we're very excited about the position we've put ourselves in with regard to the balance sheet.

Turning to Slide 7, in the middle of that slide you'll see the multiples that we anticipate for the firm value relative to the EBITDAs for 2018 and 2019.  A little later in the presentation I'll show you competitive data that indicates these are highly attractive multiples for each of the individual businesses.  Importantly, to Investors, the existing owners of Alta Mesa will roll 100% of their equity position in Alta Mesa into this combination and are on the same side of the table as all of us, as well as the other owners of KFM are retaining significant equity stakes in the combined entity going forward.  Riverstone and its affiliates will invest at least $600 million of additional cash into the business, and the anticipated closing is the fourth quarter of 2017.  We'll talk more about that timeline in a minute.

On Slide 8, we have the Transaction Summary we've arrayed for you in the upper left portion the Sources and Uses statement.  In the middle on the top is the implied firm value at 3.836 billion dollars.  And on the post transaction ownership is on the upper right portion.  It's the legacy Alta Mesa owners you can see in the orange there at 37%, Riverstone in Green at 22%, the rollover equity for the KFM owners is 14%.  And then the Legacy Silver Run II owners are at 27%.  So there is a major commitment here from the sellers to the future of the organization.  The bottom is a proforma organizational chart. You can see that Hal and I are joined at the top.  I will be Executive Chairman, he'll be the CEO.  I'll also report to Hal running the Midstream business as COO because we'll be losing that team after a transition period and we'll be building a team there to replace them.  And then Mike Ellis will remain as COO of the Upstream business.  Mike will be stepping down as Chairman of the combined Company.

**Harlan Chappelle:**

Thanks, Jim.  I'll be going over the Upstream and Midstream assets of this Enterprise.  Let's start on Page 10.  As you can see on the map on the right, we've got a highly blocked up contiguous acreage position in the up-dip oil window of the STACK.

We have a durable asset.  Not only do we have a resource that has three zones that we have de-risked and delineated, but we have a complete petroleum system of over a billion barrels of resource in the area.  This is a redevelopment of the Sooner Trend field that we get to be a part of.  Not only that, but we have infrastructure—water, gas, oil, salt water disposal—and so we have an opportunity to be very systematic in development of this acreage.

We've got a team that has been executing on this for quite a number of years together, as Jim indicated earlier.  We now have a multi-rig program we've averaged six rigs through the bulk of this year, and we can scale up with confidence because we have the discipline processes, both on the front end of drilling in terms of getting the land position together, in terms of defining where we want to drill, but then also in executing on that.

We have over 200 wells that we've drilled here and we've demonstrated the value and we have confidence in the upside.  As an illustration of that, at the end of the second quarter, we had drilled on the order of 200 wells.  Of those, over 160 were on production, and of that number, about 114 had sufficient

2

production history to give us confidence that at the end of this year, your year-end reserves will reflect better than 650,000 BOE.  Since our average lateral length is just under 4,700 feet, that equates to about 140 BOE per lateral foot.  That's an important metric as we look and try to compare this asset to others in the basin, which very typically denominate their results in terms of a normalized 10,000-foot of lateral.

Let's move on to Page 11.  I talked about the team.  The character of this team is we have major league players with relevant experience who have worked together for a considerable amount of time.  We have capabilities in all assets of the operation and we've got disciplined processes.  Among those processes are the public company processes that are necessary, the disciplines, if you will, the accountability of being a public company.  For the last almost seven years, we've been a public reporter because of the bonds that we have issued, and then we also issued new bonds last year.  So, we're very comfortable with that and we're confident that we can execute in all aspects of this Enterprise.

How did we get here?  Page 12 is a history, if you will, in pictures.  Mike Ellis founded our Company in 1987, and early in the 1990s he was acquiring various pieces of acreage.  In 1992 he was able to start the acquisition of large production units in the eastern side of Kingfisher County, which Conoco, Texaco, and Exxon had been operating but were exiting North America at the time in favor of other places.  We entered in 1992.  Through the next couple of decades there's been a stewardship that's occurred.  In the mid-2000s we began a program while we were producing about a thousand barrels a day.  We went through the process of drilling about 27 vertical wells so that we could delineate those zones, either shallower or deeper, that could be prospective and could be the target of additional development, whether horizontal or vertical at the time.  Consistently, as we drilled those wells, we found that the Osage and the Meramec were prospective and productive in a commercial way.

By the time we got into this decade, in 2012, we had a high level of confidence that we could begin horizontal drilling and in 2012 we spud our first two wells.  By the end of 2013, we had 13 wells that had flowed back and we had gone through two generations of well designs, starting with 12 stages of fracks, to 18 stages, and from one completion configuration to a more advanced one.  We learned a lot during that period, such that by 2014 we had confidence that this was a scalable program and so we began a process of acquiring additional acreage all around our initial footprint.  You can see that by the end of 2015 we had acquired over 70,000 net acres to our interest.

By 2016, we had hit our stride in terms of having a de-risked and delineated acreage position, in our view, and we had disciplines in place and processes that allowed us to scale and operate in a development mode.

Let's move on to Page 13 so we can look at basically the economics of this.  I talked about how many wells we've drilled, our expectations of those, and our confidence in those.  On the upper left-hand part of this page you can see the breakevens.  We're below $30 per barrel, and that's to achieve a 15% internal rate of return in terms of breakeven price.  On the upper right-hand side you can see the individual well returns, depending on which price deck that you might want to use, that generate about 85% internal rate return, as of a NYMEX strip.

Now, other STACK operators have achieved good well head returns here as well, and so there's been an enormous investment in drilling capital in the basin.  This, in turn, as well as our development, became an ideal backdrop for the growth of the Kingfisher Midstream operation.  To date, as you can see on the lower left-hand side of the page, Kingfisher Midstream has acreage dedications of about 300,000 gross acres with a line of sight to over 500,000 gross acres.  Now, this also has provided the opportunity for a substantial growth in third-party volumes which Kingfisher Midstream has been able to begin and continue to grow.

3

Finally, when it comes to the importance of Kingfisher Midstream to Alta Mesa, it's simply a strategic competitive advantage for us.  We've got a purpose-built system that allows us to operate confidently in a multi-well development mode, we've got efficient processing, and we have access that's assured to the interstate markets during a time where there could be periodic constraints due to the large-scale growth in the area.

How does this all build up?  Let's summarize the overview here.  On Slide 14, you can see the NAV build-up to about $7 billion based on 4,200 identified gross drilling locations that we'll describe.  It's broken up so that we can distinctly illustrate to you the Upstream and the Midstream value components, and you can see this here on the page.

On the right side of the page you can see the growth opportunities that we see from additional down spacing and other opportunities that Kingfisher could have through additional third-party development.

Finally, we did make an acquisition—about a month ago we closed on it—and we have not included any of the locations that we believe could be drilled there in our tallies that show up on these pages, so we simply show you on the right-hand side of the page that that represents some upside.

Let's move on and focus down now on the Upstream a little bit more.  First on Page 16, simply, we're in a neighborhood where there's a lot of activity going on, vigorous drilling around us, and even within our footprint, targeting both Oswego and the Mississippian-age, Osage and Meramec.

On Page 17, you get a maybe even better sense of how well-established in a short period of time this play has gotten.  Not too many years ago, what you see on this map in Northwestern Canadian County, as listed as the Cana-Woodford, was really the biggest extend of activity.  In the time since then, a lot of drilling has occurred by Devon, Continental, Newfield, now Marathon, and certainly by Alta Mesa and some of the other private companies in the area, so it's a large density of wells here.  We've only drilled 200 wells, though, so far, and there's a lot of room to run.

Let's move on to Slide 18.  This shows the progress in mean well results that we've been able to achieve in a very short period of time by drilling intensely and purposely across about a 300 square mile area here in Easter Kingfisher County.  We focused on a couple of keys.  The first is isolation between stages.  Our first well design was a sliding sleeve configuration and we found that to be very ineffective and we had very good science behind our assessment of those wells.  We've gone to a plug-and-perf, open-hole design, and now we have high confidence in a very effective frack job.  The next key is a landing.  We look for mechanical rock properties and reservoir properties that give us the best opportunity to find the most attractive reservoir and get a very effective frack job off.

Then, finally, the way that we steer our wells is very, very important.  We have a dedicated team of geo-steerers that assure to the best of their ability that we stay within the zone that we're targeting, and that's given us a big part of the reason that we have been able to get consistent well results.

You see here on this page that we've gone through generations, beginning with 12 stages, going on to 18, 24, and then 32 to 36, depending on how long the lateral is, and our next-generation design is likely to be 100-foot frack stage spacing, meaning on the order of 45 to 48 stages for a one-mile, lateral, if you will, 4,800-foot lateral would be the typical target.

On Page 19, there's some more detail here for you that shows you first the progress of well completions on the upper left; second, very importantly, the consistent production characteristics of our wells.  We're in an area with hundreds of vertical wells that give us solid data upon which we can base our projections and our understanding of the Meramec and Osage system, as well as the Oswego above that.  In the Meramec and Osage, as shown here on the lower left, we have early flow back, which is almost entirely

4

oil in terms of the hydrocarbons—would be flowing back water from the frack, obviously—and then the GOR climbs over time.  These production characteristics, with the oil waiting being biased to the early years of the well, give us good economics as well.

Let's move on to Page 20 where—let's talk about our cost structure in some more detail.  Relative to what our competitors in the area have published is shown here.  We have a fairly low cost per well.  First, we have geologic advantages.  We're shallow, we're naturally fractured, we have a simple well design.  Second, we have a legacy infrastructure for water supply, water disposal, access to well sites, access to services.  All those things combined together to give us a very good drilling time, and when we couple that with consistent deployment of rigs over a period of time, we can get efficiencies of process that we're taking advantage of today.

We think there's upside in our drilling and completion costs in terms of the opportunity to cut our costs because we're going into more of the development mode and we'll be drilling multi-well pads where there are shared services, there's less mobilization time associated with that, and the other advantages of scale.

Let's move on with just a little bit more specificity on the cost structure.  On Page 21, this shows the effects of our costs.  First on the top, future development cost per PUD barrel, is shown here as very low, and we compare it to what others have published.  Probably the most important measure on this page is the recycle ratio.  You can see how we measure up compared to our competitors and the peers that we think are relevant, as well as showing you what that additional benefit that will come to us from having an integrated midstream operation as part of the enterprise.

Finally, on the lower right you can see where LOE per barrel ranks.  Now, we see some tremendous upside in our ability to cut costs, our LOE costs as well, from the same points that I made earlier about F&D costs.  The bottom line of our cost structure here is we've got durable operations, low F&D, high capital efficiency, and low lease operating expenses, with the opportunity to cut those costs with scale, very much a factor of robust infrastructure that we have.  This goes back to one of the first points I made.  We have highly contiguous acreage here where we can scale with confidence and manage across a larger acreage footprint than simply one drilling unit at a time.

Now, let's talk about results.  I describe them in terms of the type curve we expected at the end of last year, and I showed you other results earlier, but on Page 22, one of the things we think is very important to communicate is how pervasive and extensive over this large area in the up-dip oil window, we have good well results.  This table on the right-hand side of the page is meant to help you with that and it shows you a number of wells.  We highlight some key wells here as well.  While we don't have audited reserves for our newer wells, we did think it relevant to give you some information in terms of the IP 30s of some recent wells, and so that's also shown on this page.

Let's move on to Page 23 now.  Those good well results, the very, very good cost structure, our confidence in the geology and our ability to execute, all boil down to our ability to take on the development program that's shown here in a base case, if you will.

The graphic on the left side shows our base development plan.  We've performed 11 spacing tests across our footprint.  Continental, Newfield, Devon, Marathon have all described their spacing tests in the STACK as well.  We have 11 spacing tests, 7 of which are on flow back, some of which for an extended period of time.  These have given us insights that give us the confidence in a base case shown here.  In this 550-foot plus or minus interval of the Meramec Osage, there would be three benches, each bench would have four wells landed in them, so spacing of about what you might call 160 acres or 1,500 feet between the laterals.

5

Ultimately, we seek to maximize discounted cash flow and we believe that this is going to be achieved with a combination of either further down spacing and/or optimized completion techniques where we can get more of this at a more valuable basis.

How do we put this in perspective?  One of the things that's helpful—there's on the other order of 33 to 35 million barrels of oil in place in the Meramec and Osage, on average within a drilling unit across—or a section, a square mile—across our acreage position.  This based development plan in the Osage Meramec recovers about 8% of that oil in place.  That should be a good measure and a comparator to some of the other resource plays.  It also gives us confidence that that combination of optimized well completions and/or additional wells—in other words, down spacing—will be profitable to undertake.

Finally, we show the Oswego as a zone in which we have immense confidence of the development capability here.  We show only two wells per drilling unit—in other words, a section square-mile—although there are other operators within our footprint who are developing the Oswego with four wells per section.

The bigger picture really here is shown on Page 24.  I described this earlier when I talked about the 1,100-foot thick section that's a major part of this petroleum system that is the Sooner Trend field area.  Each of these zones that are listed here are commercially productive from vertical wells within our footprint, with the one exception of the Chester Shale, which we believe could be a horizontal target but which has not been, to our knowledge, a successful vertical target in time.  We tried to provide you with a grid here.  It shows you how many wells in this hand per section could be prospective in these various zones.

Finally, this log that's on the left-hand side of the graphic is a well log from a continuous section from a log in the northern part of our acreage, and it actually has some of the Manning Limestone that does show here.  That's important since we are flowing back our first Manning horizontal after having over 200 Manning vertical wells that have produced.

The bottom line on this slide is it's a petroleum system that works.  There's a focus on an 1,100-foot thick multi-STACK pay area.  The three zones that we have the most confidence in are the Osage, Meramec, and Oswego at this point in time, but we see every one of these zones as a potential target.

This could be described in terms of the drilling inventory on page 25 to which I referred earlier.  On the left side of this page you can see the approximate forty-two hundred locations were identified in Meramec, Osage and Oswego.  The middle of the page reflects the potential for down spacing and/or increased effectiveness of completions.  The right hand side is our way of showing you the potential for further development of additional zones that we believe are prospective within our acreage footprint.  Now we can define the optimum opportunity in terms of this drilling inventory because of our demonstrated ability to execute.  Turning now to slide 26, we illustrate our growth in net acreage, net production and proved reserves since we began horizontal development of our STACK position.  Please note the map on the right side of this slide shows a recent acquisition in Major and Blaine counties.  Our goal in acquisitions is to control good acreage of scale.  Summarizing, the growth we've achieved gives us confidence in the continued execution and expected growth that we project.

Turning to Page 27, in the broader STACK area there is significant acreage that could be consolidated by operators such as ourselves.  We believe that this combination with Jim positions us to compete effectively for good opportunities.  We have the advantage of a solid operations base, a scalable team with years of experience, a low cost structure and the expertise to determine value in this area.

Now moving on to Page 29 to discuss the midstream assets.  Kingfisher Midstream is an important part of our operation today and will be increasingly so in the combined enterprise.  For want of capital, we

6

would have built this ourselves a few years ago due to the growing functional constraints and inherent inefficiencies of older legacy processing and gathering, as well as concerns that this basin may experience, periodic and near-term limitations to residue gas takeaway, particularly to interstate markets.  Kingfisher affords us and other nearby operators with a purpose-filled system to handle the larger volumes associated with multiple wells sold back from single pads and to do so in a more efficient processing system giving us lower shrink, higher yields and better economics.  As I alluded a moment ago, Kingfisher gives us flow assurance.  It is physically positioned to connect directly to interstate markets by Panhandle Eastern to access Midwest and Gulf Coast markets as well as OGT for access to western interstate markets.  Importantly, we have firm transport rights on both of these interstate systems.  Which also makes us more competitive as we consider potential acquisitions.  Since commissioning just a year ago, Kingfisher has systematically grown its customer base to include several other operators besides Alta Mesa, and we believe this will be an increasingly important and valuable part of the midstream business.  Let me now turn this over for a moment to Jim so he can discuss the broader vision for our midstream operations.  Jim…

**James Hackett:**

On slide 30, we just are trying to portray here the valuation arbitrage that exists between the margin that is in KFM within the E&P business as a combined entity, and then eventually as an MLP Entity restructured out of the E&P entity where we control the GP interest.  And what is very familiar to all of you is that the multiple step up that you get from the upstream median at 7 ½X to midstream medians of 13.7X EBITDA and eventually to the GP interest at 25.3X EBITDA.

On the lower left we've just taken an illustrative EBITDA, call it 1.0 dollars and just showing that step up in terms of the multiples applied to that investment or that value — that implied value — on those various multiples.  And so we take the KFM EBITDA projection in 2019, estimated at $318 million, and we roll that over to the right under the illustrative midstream value creation, and you have the value of that EBITDA in the margin in the upstream of $2.4 billion increasing by $1.96 billion with the MLP issuance, which is currently anticipated in the first part of 2019, to create an MLP value fully distributed at $4.35 billion.  And then eventually several years later issuing a GP into a public entity and getting an uplift of some $924 million and that amounts to a total of $5.275 billion for the value of that total margin.  Comparing that against the $2.39 billion that is within the combined entity at the beginning, you can see the uplift represents nearly $3 billion, and that is approximately 80% of the combined purchase price of these entities at $3.8 billion, essentially paying for a large portion of the merger.

**Harlan Chappelle:**

Thanks, Jim.  On Slide 31 you can see the existing infrastructure.  Kingfisher Midstream today has 60 million cubic feet a day of processing in the center of our acreage.  It's currently undergoing an expansion of 200 million a day for a total of 260 million a day of processing.  That'll be done by the end of this year.  There's about 250 miles of low-pressure gathering line and about 75 miles of high-pressure gathering line here.  We have significant deal compression and there's crude storage in the middle of the field here.

On Page 32, there's even more detail for you to refer to here on natural gas, NGLs, and crude aspects of this Kingfisher Midstream enterprise.  You can see, in terms of takeaway on the gas side, we have 120 a day of FT on Panhandle Eastern and 50 million a day of FT on OGT.  That 50 million a day is going to increase to 125 million a day in June of next year.  For NGLs there's about 41,000 barrels of capacity on the Chisholm line.  For crude, today we're trucking our crude from the central gathering system to Cushing, but we have several opportunities to interconnect to pipelines direct into Cushing, which gives us additional advantages in terms of both net back price and in terms of reliability.

7

Finally on Page 33, Kingfisher Midstream is well-positioned to gather and process increasing volumes from the play as it moves to the West.  Notably, as we move to the West in this play, gas volumes do increase.

Let me turn it over now to Mike McCabe, our CFO, as he goes through the finances of this new enterprise.

**Mike McCabe:**

Turning to Page 35, obviously this would become a major de-leveraging event for Alta Mesa Resources. It will create a zero-net debt on our balance sheet and provide us with excellent pro forma liquidity to execute the development plan in the STACK and Kingfisher County.  Our intent is to manage to a 1.0X debt to EBITDA tax ratio with 1.5-2.0X guardrails on a situational basis.  This will allow Alta Mesa Resources to have positive cash flow from Operations as early as 2019 and to continue to maintain a simplified balance sheet with our revolver and senior unsecured bonds.  Turning to Page 36, our 2017 Capex budget is $458 million which includes $108 million of funds from Bayou City Drilling JV.  KFM will complete the expansion of its facility to $260 million a day capacity which is included in their $120 million capex budget remaining for 2017.  And we will expect to grow from currently at 6 rigs to 10 rigs by the end of 2018.  Also, our hedges are summarized at the bottom of Page 36. We will continue to be disciplined, but active, in our hedge program and protecting our revenues going forward.

Turning to Page 38, which is a summary of financial objectives for the future, we are expecting a 3X growth in net daily production to approximately 65K BOE per day in 2019, and a 5X growth in EBITDAX over the same period.  And again we will go positive free cash flow from operations in 2019 while we create and maintain sufficient liquidity to fund our development plan as summarized in the middle section of the bottom bar on Page 38.

**James Hackett:**

On Slide 39, we have the first of two valuation pages.   This is just for the upstream portion of the merger.  And you can see in the upper left the firm value is a multiple of 2018 EBITDA, and of course, it looks very attractive relative to the peer group.  And then 2019 gets even better and that's because the growth rate in the lower right portion of this slide.  And then if you look in the bottom left portion all we've done here is try to give you comparables for the Anadarko Basin for acquisitions on a net acreage basis.

Turning to Page 40, we've done the same for KFM.  If you look at the Midstream multiples of 2018 and 2019 EBITDA, the firm value for this transaction is highly attractive relative to those entities on the lower left portion of the graph.  Then when you take the combined companies, both Upstream and Midstream, you can see that that growth rate, not surprisingly, captures both of these slides in terms of combining the two, and matches what we had told you earlier in the presentation.

On Slide 41, we are showing the anticipated transaction timeline.

On Page 42, just to summarize, what we see in this opportunity in front of us for a pure-play STACK company is a world-class asset.  We've got great rocks, we've got great technical tools, great people, and a great track record with high growth in front of us.  We've put together a Midstream business that provides us defensive and offensive capabilities in terms of both internally growing our business, as well

8

as consolidating those around us, and a potential financial restructuring of that Midstream business, that I've spoken to you earlier about, is incredibly compelling in terms of the upside for our Investors.

We'll have financial strength and flexibility to execute the business plan through this current down cycle, and we'll still end up being positive cash flow-wise in 2019.

With that, I'll end the pro forma presentation.  Hal and I will look forward to seeing all of you in the near future.  We couldn't be more excited about this opportunity in front of us.  Thank you.

9

# PX 52

REDACTED IN ITS ENTIRETY

# PX 53

REDACTED IN ITS ENTIRETY

# PX 54

REDACTED IN ITS ENTIRETY

# PX 55

## REDACTED IN ITS ENTIRETY

# PX 56

## REDACTED IN ITS ENTIRETY

# PX 57

## REDACTED IN ITS ENTIRETY

# PX 58

REDACTED IN ITS ENTIRETY

# PX 59

REDACTED IN ITS ENTIRETY

# PX 60

## REDACTED IN ITS ENTIRETY