# PX 101

REDACTED IN ITS ENTIRETY

# PX 102

REDACTED IN ITS ENTIRETY

# PX 103

REDACTED IN ITS ENTIRETY

# PX 104

DEFM14A 1 d510702ddefm14a.htm DEFM14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

---

Filed by the Registrant ☒          Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

**Exhibit CP- 0053**
2/9/2023
McClure

# Silver Run Acquisition Corporation II
### (Name of Registrant as Specified In Its Charter)

**N/A**
### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

☒    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

_____

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

**Table of Contents**

## PROXY STATEMENT FOR SPECIAL MEETING OF STOCKHOLDERS
## OF SILVER RUN ACQUISITION CORPORATION II

Dear Stockholders of Silver Run Acquisition Corporation II:

You are cordially invited to attend the special meeting of stockholders of Silver Run Acquisition Corporation II ("Silver Run," "we," "our" or "us"). At the special meeting, Silver Run stockholders will be asked to consider and vote on proposals to:

(1) approve and adopt each of the following contribution agreements and the acquisitions and other transactions contemplated thereby (the "business combination" and such proposal, the "Business Combination Proposal"):

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Alta Mesa Contribution Agreement"), among High Mesa Holdings, LP, a Delaware limited partnership (the "Alta Mesa Contributor"), High Mesa Holdings GP, LLC, a Texas limited liability company and the sole general partner of the Alta Mesa Contributor, Alta Mesa Holdings, LP, a Texas limited partnership ("Alta Mesa"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and sole general partner of Alta Mesa ("Alta Mesa GP"), Silver Run and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor, pursuant to which Silver Run will acquire from the Alta Mesa Contributor (i) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP;

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Kingfisher Contribution Agreement"), among KFM Holdco, LLC, a Delaware limited liability company (the "Kingfisher Contributor"), Kingfisher Midstream, LLC, a Delaware limited liability company ("Kingfisher"), Silver Run and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which Silver Run will acquire 100% of the outstanding membership interests in Kingfisher; and

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Riverstone Contribution Agreement" and, together with the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, the "Contribution Agreements"), between Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "Riverstone Contributor" and, together with the Alta Mesa Contributor and the Kingfisher Contributor, the "Contributors"), and Silver Run, pursuant to which Silver Run will acquire from the Riverstone Contributor all of the limited partner interests in Alta Mesa held by the Riverstone Contributor;

(2) approve and adopt amendments to Silver Run's amended and restated certificate of incorporation (the "Charter") to create a new class of capital stock designated as Class C Common Stock, par value $0.0001 per share (the "Class C Common Stock" and such proposal, the "Class C Charter Proposal");

(3) approve and adopt amendments to the Charter to increase the number of authorized shares of Silver Run's Class A Common Stock, par value $0.0001 per share (the "Class A Common Stock"), from 400,000,000 shares to 1,200,000,000 shares (the "Authorized Share Charter Proposal");

(4) approve and adopt amendments to the Charter to adopt Delaware as the exclusive forum for certain stockholder litigation (the "Exclusive Forum Charter Proposal"); and

(5) approve and adopt amendments to the Charter eliminating provisions in the Charter relating to our initial business combination that will no longer be applicable to us following the closing of the business combination (the "Closing") (the "Additional Charter Proposal" and, together with the Class C Charter Proposal, the Authorized Share Charter Proposal and the Exclusive Forum Charter Proposal, the "Charter Proposals");

Table of Contents

(6)   approve, for purposes of complying with applicable listing rules of The NASDAQ Capital Market ("NASDAQ"), (a) the issuance of shares of Class C Common Stock to the Contributors in connection with the business combination, which number of shares will equal 275,000,000 and be subject to upward or downward adjustment at Closing pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, (b) the issuance of up to 59,871,031 shares of Class C Common Stock that may be issued to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in the accompanying proxy statement is issued to the Alta Mesa Contributor or the Kingfisher Contributor, (c) the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class C Common Stock issued to the Contributors, which shares of Class A Common Stock are issuable in the future to the Contributors in connection with the future redemption or exchange of their common units representing limited partner interests (the "SRII Opco Common Units") in SRII Opco, LP, a Delaware limited partnership ("SRII Opco"), in accordance with the amended and restated agreement of limited partnership of SRII Opco, (d) the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") pursuant to the terms of that certain Forward Purchase Agreement, dated as of March 17, 2017 (the "IPO Forward Purchase Agreement"), by and between Silver Run and Fund VI Holdings and (e) the issuance of up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to the terms of that certain Forward Purchase Agreement, dated as of August 16, 2017 (the "Business Combination Forward Purchase Agreement" and, together with the IPO Forward Purchase Agreement, the "Forward Purchase Agreements"), by and between Silver Run and Fund VI Holdings (the "NASDAQ Proposal");

(7)   approve and adopt the Alta Mesa Resources, Inc. 2018 Long Term Incentive Plan (the "LTIP") and material terms thereunder (the "LTIP Proposal"); and

(8)   approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal (the "Adjournment Proposal" and, together with the Business Combination Proposals, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal, the "Proposals").

Each of the Proposals is more fully described in the accompanying proxy statement, which each Silver Run stockholder is encouraged to review carefully.

Silver Run's Class A Common Stock and warrants, which are exercisable for shares of Class A Common Stock under certain circumstances, are currently listed on the NASDAQ under the symbols "SRUN" and "SRUNW," respectively. Certain of our shares of Class A Common Stock and warrants currently trade as units consisting of one share of Class A Common Stock and one-third of one warrant, and are listed on the NASDAQ under the symbol "SRUNU." The units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security. Upon the Closing, we intend to change our name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc.," and we have applied to continue the listing of our Class A Common Stock and warrants on the NASDAQ under the symbols "AMR" and "AMRRW," respectively.

Pursuant to our Charter, we are providing the holders of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering, which closed on March 29, 2017 (the "IPO" and such holders, the "public stockholders"), with the opportunity to redeem, upon the Closing, shares of Class A Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account (the "Trust Account") that holds the proceeds (including interest but net of franchise and income taxes payable) from the IPO and a concurrent private placement of warrants to Silver Run Sponsor II, LLC (our "Sponsor"). For illustrative purposes, based on the fair value of marketable securities held in the Trust Account as of September 30, 2017 of approximately

Table of Contents

$1,039 million, the estimated per share redemption price would have been approximately $10.00. Public stockholders may elect to redeem their shares even if they vote for the Business Combination Proposal. Notwithstanding the foregoing, a holder of the public shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold." Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Holders of Silver Run's outstanding warrants sold in the IPO, which are exercisable for shares of Class A Common Stock under certain circumstances, do not have redemption rights in connection with the business combination. Our Sponsor, officers and directors have agreed to waive their redemption rights in connection with the consummation of the business combination with respect to any shares of Class A Common Stock they may hold, and the founder shares will be excluded from the pro rata calculation used to determine the per share redemption price. Currently, our Sponsor, officers and directors own all of our outstanding founder shares, and collectively own approximately 20% of our outstanding Class A Common Stock and Class B Common Stock. Our Sponsor, officers and directors have agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of each of the Proposals.

Silver Run is providing this proxy statement and accompanying proxy card to its stockholders in connection with the solicitation of proxies to be voted at the special meeting and any adjournments or postponements thereof. **Your vote is very important. Whether or not you plan to attend the special meeting in person, please submit your proxy card without delay.**

**We encourage you to read this proxy statement carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page 43 of this proxy statement.**

**Silver Run's board of directors recommends that Silver Run stockholders vote FOR each of the Proposals. When you consider the recommendation of Silver Run's board of directors in favor of each of the Proposals, you should keep in mind that certain of Silver Run's directors and officers have interests in the business combination that may conflict with your interests as a stockholder. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Interests of Certain Persons in the Business Combination."**

Approval of the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal requires the affirmative vote (in person or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon at the special meeting, voting as a single class. Approval of the Charter Proposals requires the affirmative vote (in person or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class.

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the Proposals presented at the special meeting. If you fail to return your proxy card or fail to submit your proxy by telephone or over the Internet, or fail to instruct your bank, broker or other nominee how to vote, and do not attend the special meeting in person, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the special meeting and, if a quorum is present, will have no effect on the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal or the Adjournment Proposal, but will have the same effect as a vote AGAINST the Charter Proposals. If you are a stockholder of record and you attend the special meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST ELECT TO HAVE SILVER RUN REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO SILVER RUN'S TRANSFER AGENT AT LEAST TWO (2) BUSINESS DAYS PRIOR TO THE VOTE AT THE SPECIAL MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY

Table of Contents

DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

Thank you for your consideration of these matters.

Sincerely,

*James T. Hackett*

James T. Hackett
*Chief Executive Officer and Director*
Silver Run Acquisition Corporation II

**Whether or not you plan to attend the special meeting of Silver Run stockholders, please submit your proxy by signing, dating and mailing the enclosed proxy card in the pre-addressed postage paid envelope or by using the telephone or Internet procedures provided to you by your broker or bank.** If your shares are held in an account at a brokerage firm or bank, you must instruct your broker or bank on how to vote your shares or, if you wish to attend the special meeting of Silver Run stockholders and vote in person, you must obtain a proxy from your broker or bank.

**Neither the Securities and Exchange Commission nor any state securities commission has passed upon the adequacy or accuracy of this proxy statement. Any representation to the contrary is criminal offense.**

This proxy statement is dated January 19, 2018 and is first being mailed to Silver Run stockholders on or about January 22, 2018.

**Table of Contents**

# SILVER RUN ACQUISITION CORPORATION II

**1000 Louisiana Street, Suite 1450**
**Houston, Texas 77002**

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
## OF SILVER RUN ACQUISITION CORPORATION II

### To Be Held On February 6, 2018

To the Stockholders of Silver Run Acquisition Corporation II:

NOTICE IS HEREBY GIVEN that the special meeting of stockholders of Silver Run Acquisition Corporation II ("Silver Run," "we," "our" or "us") will be held at 9:00 a.m., local time, on February 6, 2018, at the offices of Latham & Watkins LLP, 885 3rd Avenue, New York, New York 10022 for the following purposes:

1. The Business Combination Proposal—To consider and vote upon a proposal to approve and adopt each of the following contribution agreements and the business combination and the other transactions contemplated thereby (the "business combination" and such proposal, the "Business Combination Proposal"):

   • the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Alta Mesa Contribution Agreement"), among High Mesa Holdings, LP, a Delaware limited partnership (the "Alta Mesa Contributor"), High Mesa Holdings GP, LLC, a Texas limited liability company and the sole general partner of the Alta Mesa Contributor, Alta Mesa Holdings, LP, a Texas limited partnership ("Alta Mesa"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and general partner of Alta Mesa ("Alta Mesa GP" and, collectively with Alta Mesa, the "Alta Mesa Parties"), Silver Run and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor pursuant to which Silver Run will acquire from the Alta Mesa Contributor (i) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP;

   • the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Kingfisher Contribution Agreement"), among KFM Holdco, LLC, a Delaware limited liability company (the "Kingfisher Contributor"), Kingfisher Midstream, LLC, a Delaware limited liability company ("Kingfisher"), Silver Run and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which Silver Run will acquire 100% of the outstanding membership interests in Kingfisher; and

   • the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Riverstone Contribution Agreement" and, together with the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, the "Contribution Agreements"), between Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "Riverstone Contributor" and, together with the Alta Mesa Contributor and the Kingfisher Contributor, the "Contributors"), and Silver Run, pursuant to which Silver Run will acquire all of the limited partner interests in Alta Mesa held by the Riverstone Contributor.

   Copies of the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement are attached to the accompanying proxy statement as *Annexes A*, *B* and *C,* respectively.

2. The Class C Charter Proposal—To consider and vote upon a proposal to approve and adopt amendments to Silver Run's amended and restated certificate of incorporation (the "Charter") to create a new class of capital stock designated as Class C Common Stock, par value $0.0001 per share (the "Class C Common Stock" and such proposal, the "Class C Charter Proposal"). A copy of our second amended and restated certificate of incorporation (the "Second A&R Charter") reflecting the proposed amendments pursuant to the Class C Charter Proposal is attached to the accompanying proxy statement as *Annex D*.

Table of Contents

3.    **The Authorized Share Charter Proposal**—To consider and vote upon a proposal to approve and adopt an amendment to the Charter to increase the number of authorized shares of Silver Run's Class A Common Stock, par value $0.0001 per share (the "Class A Common Stock"), from 400,000,000 shares to 1,200,000,000 shares (the "Authorized Share Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendment pursuant to the Authorized Share Charter Proposal is attached to the accompanying proxy statement as *Annex D*.

4.    **The Exclusive Forum Charter Proposal**—To consider and vote upon a proposal to approve and adopt an amendment to the Charter to adopt Delaware as the exclusive forum for certain stockholder litigation (the "Exclusive Forum Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Exclusive Forum Charter Proposal is attached to the accompanying proxy statement as *Annex D*.

5.    **The Additional Charter Proposal**—To consider and vote upon a proposal to approve and adopt amendments to the Charter eliminating provisions in the Charter relating to our initial business combination that will no longer be applicable to us following the closing of the business combination (the "Closing") (the "Additional Charter Proposal" and, together with the Class C Charter Proposal, the Authorized Share Charter Proposal and the Exclusive Forum Charter Proposal, the "Charter Proposals"). A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Additional Charter Proposal is attached to the accompanying proxy statement as *Annex D*.

6.    **The NASDAQ Proposal**—To consider and vote upon a proposal to approve, for purposes of complying with applicable listing rules of The NASDAQ Capital Market, (a) the issuance of shares of Class C Common Stock to the Contributors in connection with the business combination, which number of shares will equal 275,000,000 and be subject to upward or downward adjustment at Closing pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, (b) the issuance of up to 59,871,031 shares of Class C Common Stock that may be issued to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in the accompanying proxy statement is issued to the Alta Mesa Contributor or the Kingfisher Contributor, (c) the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class C Common Stock issued to the Contributors, which shares of Class A Common Stock are issuable in the future to the Contributors in connection with the future redemption or exchange of their common units representing limited partner interests (the "SRII Opco Common Units") in SRII Opco, LP, a Delaware limited partnership ("SRII Opco"), in accordance with the amended and restated agreement of limited partnership of SRII Opco, (d) the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") pursuant to the terms of that certain Forward Purchase Agreement, dated as of March 17, 2017 (the "IPO Forward Purchase Agreement"), by and between Silver Run and Fund VI Holdings and (e) the issuance of up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to the terms of that certain Forward Purchase Agreement, dated as of August 16, 2017 (the "Business Combination Forward Purchase Agreement" and, together with the IPO Forward Purchase Agreement, the "Forward Purchase Agreements"), by and between Silver Run and Fund VI Holdings (the "NASDAQ Proposal").

7.    **The LTIP Proposal**—To consider and vote upon a proposal to approve and adopt the Alta Mesa Resources, Inc. 2018 Long Term Incentive Plan (the "LTIP") and material terms thereunder (the "LTIP Proposal"). A copy of the LTIP is attached to the accompanying proxy statement as *Annex G*.

8.    **The Adjournment Proposal**—To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal, the "Proposals").

Table of Contents

Only holders of record of Silver Run's Class A Common Stock and Class B Common Stock at the close of business on January 22, 2018 are entitled to notice of the special meeting and to vote at the special meeting and any adjournments or postponements thereof. A complete list of Silver Run's stockholders of record entitled to vote at the special meeting will be available for 10 days before the special meeting at Silver Run's principal executive offices for inspection by stockholders during ordinary business hours for any purpose germane to the special meeting.

Pursuant to our Charter, we are providing the holders of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering, which closed on March 29, 2017 (the "IPO" and such holders, the "public stockholders"), with the opportunity to redeem, upon the Closing, shares of Class A Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account (the "Trust Account") that holds the proceeds (including interest but net of franchise and income taxes payable) from the IPO and a concurrent private placement of warrants to Silver Run Sponsor II, LLC (our "Sponsor"). For illustrative purposes, based on the fair value of marketable securities held in the Trust Account as of September 30, 2017 of approximately $1,039 million, the estimated per share redemption price would have been approximately $10.00. Public stockholders may elect to redeem their shares even if they vote in favor of the Business Combination Proposal. Notwithstanding the foregoing, a holder of the public shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold." Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Holders of Silver Run's outstanding warrants sold in the IPO, which are exercisable for shares of Class A Common Stock under certain circumstances, do not have redemption rights in connection with the business combination. Our Sponsor, officers and directors have agreed to waive their redemption rights in connection with the consummation of the business combination with respect to any shares of Class A Common Stock they may hold, and the founder shares will be excluded from the pro rata calculation used to determine the per share redemption price. Currently, our Sponsor, officers and directors own all of our outstanding founder shares, and collectively own approximately 20% of our outstanding Class A Common Stock and Class B Common Stock. Our Sponsor, officers and directors have agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of each of the Proposals.

The Closing is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting. The Charter Proposals and the LTIP Proposal are conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal. The Adjournment Proposal is not conditioned on the approval of any other Proposal set forth in the accompanying proxy statement.

If you have any questions or need assistance voting your shares, please call our proxy solicitor, Morrow Sodali LLC, toll free at (800) 662-5200 banks and brokers call collect at (203) 658-9400.

January 19, 2018
By Order of the Board of Directors

James T. Hackett
*Chief Executive Officer and Director*

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be held on February 6, 2018:** This notice of meeting and the related proxy statement will be available at http://www.cstproxy.com/silverrunacquisitioncorp/sm2018.

Table of Contents

# TABLE OF CONTENTS

| | |
|---|---|
| CERTAIN DEFINED TERMS | ii |
| SUMMARY TERM SHEET | v |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR SILVER RUN STOCKHOLDERS | 1 |
| SUMMARY OF THE PROXY STATEMENT | 18 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF SILVER RUN | 35 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF ALTA MESA | 36 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF KINGFISHER | 39 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 42 |
| RISK FACTORS | 43 |
| UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED FINANCIAL INFORMATION OF SILVER RUN | 97 |
| COMPARATIVE SHARE INFORMATION | 124 |
| CAPITALIZATION | 125 |
| SPECIAL MEETING OF SILVER RUN STOCKHOLDERS | 126 |
| PROPOSAL NO. 1—THE BUSINESS COMBINATION PROPOSAL | 131 |
| PROPOSAL NO. 2—THE CLASS C CHARTER PROPOSAL | 187 |
| PROPOSAL NO. 3—THE AUTHORIZED SHARE CHARTER PROPOSAL | 189 |
| PROPOSAL NO. 4—THE EXCLUSIVE FORUM CHARTER PROPOSAL | 190 |
| PROPOSAL NO. 5—THE ADDITIONAL CHARTER PROPOSAL | 192 |
| PROPOSAL NO. 6—THE NASDAQ PROPOSAL | 193 |
| PROPOSAL NO. 7—THE LTIP PROPOSAL | 195 |
| PROPOSAL NO. 8—THE ADJOURNMENT PROPOSAL | 202 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF SILVER RUN | 203 |
| BUSINESS OF SILVER RUN | 206 |
| OFFICERS AND DIRECTORS OF SILVER RUN | 209 |
| EXECUTIVE COMPENSATION | 214 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF ALTA MESA | 226 |
| BUSINESS OF ALTA MESA | 257 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF KINGFISHER | 291 |
| BUSINESS OF KINGFISHER | 305 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 317 |
| HOUSEHOLDING INFORMATION | 321 |
| SUBMISSION OF STOCKHOLDER PROPOSALS | 321 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 322 |
| INDEX TO FINANCIAL STATEMENTS | Fin-i |
| ANNEX A: ALTA MESA CONTRIBUTION AGREEMENT | A-1 |
| ANNEX B: KINGFISHER CONTRIBUTION AGREEMENT | B-1 |
| ANNEX C: RIVERSTONE CONTRIBUTION AGREEMENT | C-1 |
| ANNEX D: FORM OF SECOND A&R CHARTER | D-1 |
| ANNEX E: FORM OF CERTIFICATE OF DESIGNATION (SERIES A PREFERRED) | E-1 |
| ANNEX F: FORM OF CERTIFICATE OF DESIGNATION (SERIES B PREFERRED) | F-1 |
| ANNEX G: FORM OF LTIP | G-1 |
| ANNEX H: RESERVE REPORT | H-1 |
| ANNEX I: GLOSSARY OF OIL AND NATURAL GAS TERMS | I-1 |

i

Table of Contents

## CERTAIN DEFINED TERMS

Unless the context otherwise requires, references in this proxy statement to:

- "Alta Mesa" are to Alta Mesa Holdings, LP, a Delaware limited partnership;

- "Alta Mesa Contribution Agreement" are to the Contribution Agreement, dated as of August 16, 2017, among the Alta Mesa Contributor, High Mesa GP, the sole general partner of the Alta Mesa Contributor, Alta Mesa, Alta Mesa GP, Silver Run and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor, as the same may be amended from time to time;

- "Alta Mesa Contributor" are to High Mesa Holdings, LP, a Delaware limited partnership;

- "Alta Mesa GP" are to Alta Mesa Holdings GP, LLC, a Texas limited liability company and sole general partner of Alta Mesa;

- "Alta Mesa Parties" are to Alta Mesa and Alta Mesa GP;

- "business combination" are to the transactions contemplated by the Contribution Agreements;

- "Business Combination Forward Purchase Agreement" are to the Forward Purchase Agreement, dated as of August 16, 2017, by and between Silver Run and Fund VI Holdings;

- "Class A Common Stock" are to our Class A Common Stock, par value $0.0001 per share;

- "Class B Common Stock" are to our Class B Common Stock, par value $0.0001 per share;

- "Class C Common Stock" are to our Class C Common Stock, par value $0.0001 per share;

- "Closing" are to the closing of the business combination;

- "Closing Date" are to the date on which the Closing occurs;

- "Contribution Agreements" are to the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement, collectively;

- "Contributors" are to the Alta Mesa Contributor, the Kingfisher Contributor and the Riverstone Contributor, collectively;

- "Forward Purchase Agreements" are to the IPO Forward Purchase Agreement and the Business Combination Forward Purchase Agreement, collectively;

- "founder shares" are to shares of our Class B Common Stock initially purchased by our Sponsor in a private placement prior to our IPO;

- "Fund VI Holdings" are to Riverstone VI SR II Holdings, L.P., a Delaware limited partnership;

- "High Mesa GP" are to High Mesa Holdings GP, LLC, a Texas limited liability company;

- "Initial Limited Partners" are to the Alta Mesa Contributor and the Riverstone Contributor;

- "inorganic acquisition capital expenditures" are capital expenditures used by Alta Mesa for acquisitions of oil and gas properties, by purchase, lease or otherwise, of more than $1.0 million in a single transaction or a series of related transactions in the following counties located in the State of Oklahoma: Kingfisher, Garfield, Canadian, Blaine, Major, Dewey, Woodward, Logan and Oklahoma, where Alta Mesa does not have an existing hydrocarbon interest of 25% or more;

- "Initial Business Combination" are to our initial merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses;

- "initial stockholders" are to holders of our founder shares prior to the IPO, including our Sponsor and our independent directors;

- "IPO" are to our initial public offering of units, which closed on March 29, 2017;

ii

Table of Contents

- "IPO Forward Purchase Agreement" are to the Forward Purchase Agreement, dated as of March 17, 2017, by and between Silver Run and Fund VI Holdings;

- "Kingfisher" are to Kingfisher Midstream, LLC, a Delaware limited liability company;

- "Kingfisher Contribution Agreement" are to the Contribution Agreement dated as of August 16, 2017, among the Kingfisher Contributor, Kingfisher, Silver Run and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, as the same may be amended from time to time

- "Kingfisher Contributor" are to KFM Holdco, LLC, a Delaware limited liability company;

- "management" or our "management team" are to our officers and directors;

- "non-STACK assets" are to assets of Alta Mesa other than its oil and gas assets located in the STACK;

- "organic capital expenditures" are to capital expenditures used by Alta Mesa for (a) drilling, completions, infrastructure and other capital projects of Alta Mesa in the normal course of business or (b) acquisitions of any oil and gas properties, by purchase, lease or otherwise, in the following counties located in the State of Oklahoma: Kingfisher, Garfield, Canadian, Blaine, Major, Dewey, Woodward, Logan and Oklahoma, where Alta Mesa has an existing hydrocarbon interest in such target properties;

- "Preferred Stock" are to our Series A Preferred Stock and Series B Preferred Stock;

- "private placement warrants" are to the warrants issued to the Sponsor in a private placement simultaneously with the closing of our IPO;

- "public shares" are to shares of our Class A Common Stock sold as part of the units in the IPO (whether they were purchased in the IPO or thereafter in the open market);

- "public stockholders" are to the holders of our public shares;

- "public warrants" are to the warrants sold as part of the units in the IPO;

- "Riverstone" are to Riverstone Investment Group LLC and its affiliates, including our Sponsor, Fund VI Holdings and the Riverstone Contributor, collectively;

- "Riverstone Contribution Agreement" are to the Contribution Agreement, dated as of August 16, 2017, between the Riverstone Contributor and Silver Run;

- "Riverstone Contributor" are to Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership;

- "Series A Preferred Stock" are to our Series A Preferred Stock, par value $0.0001 per share;

- "Series B Preferred Stock" are to our Series B Preferred Stock, par value $0.0001 per share;

- "Silver Run," "we," "our" or "us" are to Silver Run Acquisition Corporation II;

- "Sponsor" are to Silver Run Sponsor II, LLC, a Delaware limited liability company and an affiliate of Riverstone;

- "SRII Opco" are to SRII Opco, LP, a Delaware limited partnership;

- "SRII Opco Common Units" are to common units representing limited partner interests in SRII Opco;

- "units" are to our units sold in our IPO, each of which consists of one share of Class A Common Stock and one-third of one public warrant; and

- "voting common stock" are to our Class A Common Stock and Class B Common Stock prior to the consummation of the business combination, and to our Class A Common Stock and Class C Common Stock following the consummation of the business combination.

For additional defined terms commonly used in the oil and natural gas industry and used in this proxy statement, please see "Glossary of Oil and Natural Gas Terms" set forth in *Annex I*.

iii

**Table of Contents**

Unless otherwise specified, the voting and economic interests of Silver Run stockholders set forth in this proxy statement do not take into account the private placement warrants, public warrants or warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement that will remain outstanding following the business combination and may be exercised at a later date and assume the following:

(i)　at Closing, the Alta Mesa Contributor receives 139,800,000 SRII Opco Common Units (and acquires 139,800,000 shares of Class C Common Stock), based on (x) no estimated inorganic acquisition capital expenditures invested by Alta Mesa, (y) the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements, and (z) $602 million in purchase price adjustments under the Alta Mesa Contribution Agreement relating to estimated debt and transaction expenses,

(ii)　at Closing, Silver Run has cash on hand necessary to pay the cash consideration to the Kingfisher Contributor and, accordingly, the Kingfisher Contributor receives 55,000,000 SRII Opco Common Units (and acquires 55,000,000 shares of Class C Common Stock),

(iii)　no public stockholders elect to have their public shares redeemed and, accordingly, no shares of Class A Common Stock are issued to Fund VI Holdings pursuant to the terms of the Business Combination Forward Purchase Agreement,

(iv)　40,000,000 shares of Class A Common Stock are issued to Fund VI Holdings for an aggregate purchase price of $400 million pursuant to the terms of the IPO Forward Purchase Agreement,

(v)　none of Silver Run's existing stockholders or the parties to the Contribution Agreements or Forward Purchase Agreements, who will become stockholders of Silver Run at the Closing, purchase shares of Class A Common Stock in the open market, and

(vi)　there are no other issuances of equity interests of Silver Run prior to or in connection with the Closing.

iv

**Table of Contents**

**SUMMARY TERM SHEET**

This Summary Term Sheet, together with the sections entitled "Questions and Answers About the Proposals for Silver Run Stockholders" and "Summary of the Proxy Statement," summarizes certain information contained in this proxy statement, but does not contain all of the information that is important to you. You should read carefully this entire proxy statement, including the attached annexes, for a more complete understanding of the matters to be considered at the special meeting of Silver Run stockholders.

- Silver Run is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (an "Initial Business Combination").

- There are currently 129,375,000 shares of our Class A Common Stock and our Class B Common Stock issued and outstanding, consisting of 103,500,000 public shares and 25,875,000 founder shares. In addition, there are currently 49,633,333 warrants of Silver Run outstanding, consisting of 34,500,000 public warrants and 15,133,333 private placement warrants. Each whole warrant entitles the holder to purchase one whole share of Class A Common Stock for $11.50 per share. The warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination and 12 months following the closing of our IPO and will expire five years after the completion of an Initial Business Combination or earlier upon redemption or liquidation. Once the warrants become exercisable, we may redeem the outstanding warrants in whole and not in part, at a price of $0.01 per warrant, if the last sale price of our Class A Common Stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third business day before we send the notice of redemption to the warrant holders. The private placement warrants, however, are non-redeemable so long as they are held by our Sponsor or its permitted transferees. For more information about Silver Run, see the sections entitled "Business of Silver Run" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of Silver Run."

- Alta Mesa has been engaged in onshore oil and natural gas acquisition, exploration and production in the United States since 1987. Alta Mesa is primarily focused on the development and acquisition of unconventional oil and natural gas reserves in the eastern portion of the Anadarko Basin (the "STACK") and, prior to the Closing, will distribute the non-STACK assets to its owners (other than the Riverstone Contributor). For more information about Alta Mesa, see the sections entitled "Business of Alta Mesa" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa." The Alta Mesa Contributor and the Riverstone Contributor own all of the outstanding limited partner interests in Alta Mesa and Alta Mesa GP owns all of the outstanding general partner interests in Alta Mesa.

- Kingfisher is engaged in the acquisition, development and operation of midstream oil and gas assets. Kingfisher primarily focuses on providing crude oil gathering, gas gathering and processing and marketing to producers of natural gas, NGLs, crude oil and condensate in the STACK play. For more information about Kingfisher, see the sections entitled "Business of Kingfisher" and "Management's Discussion and Analysis of Financial Condition and Results of Operation of Kingfisher." The Kingfisher Contributor owns all of the outstanding membership interest in Kingfisher.

- On August 16, 2017, we entered into the following contribution agreements:

  - the Alta Mesa Contribution Agreement with the Alta Mesa Contributor, High Mesa GP, the Alta Mesa Parties, and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor, pursuant to which we will acquire from the Alta Mesa Contributor (i) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP, on the terms and subject to the conditions set forth therein;

v

**Table of Contents**

- the Kingfisher Contribution Agreement with the Kingfisher Contributor, Kingfisher, and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which we will acquire 100% of the outstanding membership interests in Kingfisher; and

- the Riverstone Contribution Agreement pursuant to which we will acquire from the Riverstone Contributor all of the limited partner interests in Alta Mesa held by the Riverstone Contributor.

Copies of the Contribution Agreements are attached to this proxy statement as *Annexes A*, *B* and *C*, respectively.

- Pursuant to the terms of the Alta Mesa Contribution Agreement, at the Closing, the Alta Mesa Contributor will receive consideration consisting of 220,000,000 SRII Opco Common Units, as adjusted (i) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit), (ii) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit), and (iii) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit). In addition, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-day volume-weighted average price ("20-Day VWAP") of the Class A Common Stock equals or exceeds specified prices as more fully described below. Silver Run will also contribute $400 million in cash to Alta Mesa at the Closing. For more information about the Alta Mesa Contribution Agreement, the specific consideration to be received by each Contributor and the business combination generally, see the section entitled "Proposal No. 1—The Business Combination Proposal."

- Pursuant to the terms of the Kingfisher Contribution Agreement, at the Closing, the Kingfisher Contributor will receive consideration of 55,000,000 SRII Opco Common Units and, subject to the Kingfisher Contributor's election to receive additional SRII Opco Common Units as set forth herein, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees. If Silver Run does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per SRII Opco Common Unit. In addition, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as more fully described below.

- Pursuant to the terms of the Riverstone Contribution Agreement, at the Closing, the Riverstone Contributor will receive consideration of 20,000,000 SRII Opco Common Units.

- Silver Run will also issue to each of the Contributors a number of shares of Class C Common Stock equal to the number of the SRII Opco Common Units received by such Contributor at the Closing. After the Closing, holders of Class C Common Stock, together with holders of Class A Common Stock, voting as a single class, will have the right to vote on all matters properly submitted to a vote of the stockholders, but holders of Class C Common Stock will not be entitled to any dividends or liquidating distributions from Silver Run. After a specified period of time after Closing, the Contributors will generally have the right to cause SRII Opco to redeem all or a portion of their SRII Opco Common Units in exchange for shares of our Class A Common Stock or, at SRII Opco's option, an equivalent amount of cash; provided that we may, at our option, effect a direct exchange of cash or Class A Common Stock for such SRII Opco Common Units in lieu of such a redemption by SRII Opco. There is no impact on the Contributors, Silver Run or the public stockholders if we elect to effect a direct exchange of cash or Class A Common Stock in lieu of a redemption by SRII Opco. Upon the future

vi

Table of Contents

redemption or exchange of SRII Opco Common Units held by a Contributor, a corresponding number of shares of Class C Common Stock will be cancelled. For more information about the Class C Common Stock, see the section entitled "Proposal No. 2—The Class C Charter Proposal—Description of Class C Common Stock."

- In connection with the Closing, we will also issue (i) one share of Series A Preferred Stock to each of Bayou City Energy Management, LLC, a Delaware limited liability company ("Bayou City"), HPS Investment Partners, LLC, a Delaware limited liability company ("HPS"), and AM Equity Holdings, LP, a Texas limited partnership ("AM Management") and (ii) one share of Series B Preferred Stock to the Riverstone Contributor. None of the holders of the Series A Preferred Stock or Series B Preferred Stock will be entitled to any dividends from Silver Run related to such Preferred Stock, but such holders will be entitled to preferred distributions in liquidation in the amount of $0.0001 per share of Preferred Stock, and will have limited voting rights as described below. Shares of Preferred Stock will be redeemable for the par value thereof by us upon the earlier to occur of (1) the fifth anniversary of the Closing, (2) the optional redemption of such Preferred Stock at the election of the holder thereof or (3) upon a breach by the holder of the transfer restrictions applicable to such Preferred Stock. For so long as the Series A Preferred Stock or Series B Preferred Stock remains outstanding, as applicable, the holders thereof will be entitled to nominate and elect directors to Silver Run's board of directors for a period of five years following the Closing based on their and their affiliates' beneficial ownership of Class A Common Stock. For more information about the Series A Preferred Stock and Series B Preferred Stock, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Series A Certificate of Designation" and "Proposal No. 1 —The Business Combination Proposal—Related Agreements—Agreements Related to the Riverstone Contribution Agreement—Series B Certificates of Designation."

- Unless waived by the parties to the Contribution Agreements, the Closing is subject to a number of conditions set forth in the Contribution Agreements, including, among others, receipt of the requisite stockholder approval of the Contribution Agreements and the business combination as contemplated by this proxy statement. For more information about the closing conditions to the business combination, see the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements—Conditions to Closing of the Business Combination."

- The Contribution Agreements may be terminated at any time prior to the consummation of the business combination upon agreement of the parties thereto, or for other reasons in specified circumstances. For more information about the termination rights under the Contribution Agreements, see the section entitled "Proposal No. 1—The Business Combination Proposal—Termination."

- The proposed business combination involves numerous risks. For more information about these risks, please read "Risk Factors."

- Under our Charter, in connection with the business combination, holders of our public shares may elect to have their shares redeemed for cash at the applicable redemption price per share calculated in accordance with our Charter. As of September 30, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises its redemption rights, then such holder will be exchanging its public shares for cash and will no longer own shares of Silver Run following the completion of the business combination and will not participate in the future growth of Silver Run, if any. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our transfer agent at least two business days prior to the special meeting. See the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights."

- Pursuant to the terms of the IPO Forward Purchase Agreement, Fund VI Holdings has agreed to purchase from Silver Run up to 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock, for an aggregate purchase price of $400 million, if Silver Run's cash on hand (after giving effect to the release of funds from the Trust Account) would not be sufficient to consummate the business combination. Fund VI Holdings also agreed to purchase up to an

vii

Table of Contents

additional 20,000,000 shares of Class A Common Stock from Silver Run pursuant to the terms of the Business Combination Purchase Agreement, for an aggregate purchase price of $200 million, if such proceeds are necessary to satisfy any exercise of redemption rights of the public stockholders in connection with the business combination or determined by Silver Run and Fund VI Holdings to be necessary for general corporate purposes of Silver Run in connection with or following consummation of the business combination.

- Our Charter includes a conversion adjustment which provides that the founder shares will automatically convert at the time of the business combination into a number of shares of Class A Common Stock such that the holders of the founder shares will continue to own, in the aggregate, 20% of our issued and outstanding shares of common stock. However, this conversion adjustment has been waived, and, upon conversion of the founder shares at the Closing, the holders thereof will instead receive one share of Class A Common Stock for each founder share.

- It is anticipated that, upon the Closing, the ownership of Silver Run will be as follows:

  - the public stockholders will own 103,500,000 shares of our Class A Common Stock, representing an approximate 61.1% economic interest and an approximate 26.9% voting interest;

  - the holders of our founder shares, including our Sponsor and independent directors, will own 25,875,000 shares of our Class A Common Stock, representing an approximate 15.3% economic interest and an approximate 6.7% voting interest;

  - the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 36.4% voting interest;

  - the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 14.3% voting interest;

  - the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 5.2% voting interest; and

  - Fund VI Holdings will own 40,000,000 shares of our Class A Common Stock, representing a 23.6% economic interest and a 10.4% voting interest.

Our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will own an approximate 38.9% economic interest and an approximate 22.3% voting interest in Silver Run upon the Closing.

Additionally, Bayou City, HPS and AM Management will each own one share of our Series A Preferred Stock, and the Riverstone Contributor will own one share of our Series B Preferred Stock. The Preferred Stock will not have an economic interest and will provide the holders thereof limited voting rights as described herein.

The number of shares and the economic and voting interests set forth above are based upon the assumptions set forth under "Certain Defined Terms." If the actual facts are different than our assumptions, the economic and voting interest set forth above will be different. For example, if we assume that all outstanding 34,500,000 public warrants, 15,133,333 private placement warrants and the 13,333,333 warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement were exercisable and exercised following completion of the business combination, then the ownership of Silver Run's Class A Common Stock and Class C Common Stock would be as follows:

- the public stockholders and holders of the public warrants will own 138,000,000 shares of our Class A Common Stock, representing an approximate 59.4% economic interest and an approximate 30.9% voting interest;

- the holders of our founder shares and the private placement warrants, including our Sponsor and independent directors, will own 41,008,333 shares of our Class A Common Stock, representing an approximate 17.7% economic interest and an approximate 9.2% voting interest;

viii

**Table of Contents**

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 31.3% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 12.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 4.5% voting interest; and

- Fund VI Holdings will own 53,333,333 shares of our Class A Common Stock, representing an approximate 23.0% economic interest and an approximate 11.9% voting interest.

In this scenario, our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 40.7% economic interest and an approximate 25.6% voting interest in Silver Run upon the Closing.

The public warrants and private placement warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination and 12 months following the closing of the IPO and will expire five years after the completion of an Initial Business Combination or earlier upon their redemption or liquidation.

In addition, if public stockholders elect to have their public shares redeemed in connection with the business combination, Fund VI Holdings has agreed to offset up to $200 million of such redemptions through the purchase of 20,000,000 additional shares of Class A Common Stock from Silver Run at $10.00 per share. In such a case, the economic and voting interests of the public stockholders will decrease, and the economic and voting interests of Fund VI Holdings will increase, accordingly, but the economic and voting interests of the holders of our founder shares and the Contributors will not be affected.

Please see the section entitled "Summary of the Proxy Statement—Impact of the Business Combination on Silver Run's Public Float" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

- Pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, for a period of seven years following the Closing, the Alta Mesa Contributor and the Kingfisher Contributor may be entitled to receive additional SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) as earn-out consideration if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as follows (each such payment, an "Earn-Out Payment"):

| 20-Day VWAP | Earn-Out Consideration Payable to Alta Mesa Contributor | Earn-Out Consideration Payable to Kingfisher Contributor |
|---|---|---|
| $14.00 | 10,714,285 SRII Opco Common Units | 7,142,857 SRII Opco Common Units |
| $16.00 | 9,375,000 SRII Opco Common Units | 6,250,000 SRII Opco Common Units |
| $18.00 | 13,888,889 SRII Opco Common Units | — |
| $20.00 | 12,500,000 SRII Opco Common Units | — |

Neither the Alta Mesa Contributor nor the Kingfisher Contributor will be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-Day VWAP entitles the Alta Mesa Contributor or the Kingfisher Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the Alta Mesa Contributor and/or the Kingfisher Contributor will be entitled to receive each such Earn-Out Payment. The Alta Mesa Contributor and the Kingfisher Contributor will be entitled to the earn-out consideration described above in connection with certain liquidity events of Silver Run, including a merger or sale of all or substantially all of our assets, if the consideration paid to holders of Class A Common Stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

ix

Table of Contents

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, public warrants and warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement remain outstanding and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated in the preceding bullet and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1)(2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 25.7% | 6.4% | 37.4% | 15.5% | 5.0% | 10.0% |
| $16.00 | 24.8% | 6.2% | 38.3% | 16.3% | 4.8% | 9.6% |
| $18.00 | 23.9% | 6.0% | 40.3% | 15.9% | 4.6% | 9.3% |
| $20.00 | 23.3% | 5.8% | 42.0% | 15.4% | 4.5% | 9.0% |

(1)  Includes our Sponsor and independent directors.
(2)  Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 21.4% voting interest at $14.00; (b) an approximate 20.6% voting interest at $16.00; (c) an approximate 19.9% voting interest at $18.00; and (d) an approximate 19.3% voting interest at $20.00.

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, the public warrants and the warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement are exercised and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated in the preceding bullet and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1)(2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 29.7% | 8.8% | 32.4% | 13.4% | 4.3% | 11.5% |
| $16.00 | 28.7% | 8.5% | 33.3% | 14.2% | 4.2% | 11.1% |
| $18.00 | 27.9% | 8.3% | 35.1% | 13.8% | 4.0% | 10.8% |
| $20.00 | 27.2% | 8.1% | 36.7% | 13.5% | 3.9% | 10.5% |

(1)  Includes our Sponsor and independent directors.
(2)  Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 24.6% voting interest at $14.00; (b) an approximate 23.8% voting interest at $16.00; (c) an approximate 23.1% voting interest at $18.00; and (d) an approximate 22.5% voting interest at $20.00.

Please see the section entitled "Summary of the Proxy Statement—Impact of the Business Combination on Silver Run's Public Float" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

•   Our board of directors considered various factors in determining whether to approve the Contribution Agreements and the business combination. For more information about the board's decision-making process, see the section entitled "Proposal No. 1—The Business Combination Proposal—Silver Run's Board of Directors' Reasons for the Approval of the Business Combination."

•   In connection with the business combination, Alta Mesa will enter into a tax receivable agreement (the "Tax Receivable Agreement") with SRII Opco, the Alta Mesa Contributor and the Riverstone

x

Table of Contents

Contributor. This agreement generally provides for the payment by Silver Run of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that it actually realizes (or is deemed to realize in certain circumstances) in periods after the business combination as a result of (i) certain tax basis increases resulting from the exchange of SRII Opco Common Units for Class A Common Stock (or, under certain circumstances, cash) pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA, other than such tax basis increases allocable to assets held by Kingfisher or otherwise used in Kingfisher's midstream business, and (ii) interest paid or deemed to be paid by us as a result of, and additional tax basis arising from, any payments we make under the Tax Receivable Agreement. Silver Run will retain the benefit of the remaining 15% of these cash savings. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement."

Pursuant to the terms of the Tax Receivable Agreement, if the agreement terminates early (at our election or as a result of our material breach), we would be required to make a substantial, immediate lump-sum payment based upon the present value of hypothetical tax benefits that could be derived by us based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement.

- In addition to voting on the proposal to approve and adopt the Contribution Agreements and the business combination (the "Business Combination Proposal") at the special meeting, Silver Run's stockholders will also be asked to vote on:

  - amendments to our Charter to create the Class C Common Stock (the "Class C Charter Proposal");

  - an amendment to our Charter to increase the number of authorized shares of Class A Common Stock from 400,000,000 shares to 1,200,000,000 shares (the "Authorized Share Charter Proposal");

  - amendments to our Charter to adopt Delaware as the exclusive forum for certain stockholder litigation (the "Exclusive Forum Charter Proposal");

  - amendments to our Charter eliminating provisions in the Charter relating to an Initial Business Combination that will no longer be applicable to us following the Closing (the "Additional Charter Proposal" and, together with the Class C Charter Proposal, the Authorized Share Charter Proposal and the Exclusive Forum Charter Proposal, the "Charter Proposals");

  - approval, for purposes of complying with applicable listing rules of The NASDAQ Capital Market (the "NASDAQ Proposal"), of:

    - the issuance of shares of Class C Common Stock to the Contributors in connection with the business combination, which number of shares will equal 275,000,000 and be subject to upward or downward adjustment at Closing pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement;

    - the issuance of up to 59,871,031 shares of Class C Common Stock that may be issued to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements" is issued to the Alta Mesa Contributor or the Kingfisher Contributor;

    - the issuance of a number of shares of Class A Common Stock, equal to the number of shares of Class C Common Stock issued to the Contributors, which shares of Class A Common Stock are issuable in the future to the Contributors in connection with the future redemption or exchange of their SRII Opco Common Units in accordance with the amended and restated agreement of limited partnership of SRII Opco, as described in the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Amended and Restated

xi

Table of Contents

Agreement of Limited Partnership of SRII Opco—SRII Opco Common Unit Redemption Right";

- the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") pursuant to the terms of that certain Forward Purchase Agreement, dated as of March 17, 2017 (the "IPO Forward Purchase Agreement"), by and between Silver Run and Fund VI Holdings; and

- the issuance of up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to the terms of that certain Forward Purchase Agreement, dated as of August 16, 2017 (the "Business Combination Forward Purchase Agreement" and, together with the IPO Forward Purchase Agreement, the "Forward Purchase Agreements"), by and between Silver Run and Fund VI Holdings.

- approval and adoption of the Alta Mesa Resources, Inc. 2018 Long Term Incentive Plan the ("LTIP") and material terms thereunder (the "LTIP Proposal"); and

- approval of the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of any of the proposals presented at the special meeting (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal, the "Proposals").

For more information, see the sections entitled "Proposal No. 2—The Class C Charter Proposal," "Proposal No. 3—The Authorized Share Charter Proposal," "Proposal No. 4—The Additional Charter Proposal," "Proposal No. 5—The Exclusive Forum Charter Proposal," "Proposal No. 6—The NASDAQ Proposal," "Proposal No. 7—The LTIP Proposal" and "Proposal No. 8—The Adjournment Proposal."

xii

**Table of Contents**

**QUESTIONS AND ANSWERS ABOUT THE PROPOSALS**
**FOR SILVER RUN STOCKHOLDERS**

*The following questions and answers briefly address some commonly asked questions about the proposals to be presented at the special meeting of stockholders of Silver Run Acquisition Corporation II ("Silver Run," "we," "our" or "us"), including the proposed business combination. The following questions and answers do not include all the information that is important to Silver Run stockholders. We urge Silver Run stockholders to read carefully this entire proxy statement, including the annexes and other documents referred to herein.*

**Q: Why am I receiving this proxy statement?**

**A:** Silver Run stockholders are being asked to consider and vote upon, among other things, a proposal to approve and adopt each of the following contribution agreements and the acquisitions and other transactions contemplated thereby (the "business combination" and such proposal, the "Business Combination Proposal"):

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Alta Mesa Contribution Agreement"), among High Mesa Holdings, LP, a Delaware limited partnership (the "Alta Mesa Contributor"), Alta Mesa Holdings, LP, a Texas limited partnership ("Alta Mesa"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and general partner of Alta Mesa ("Alta Mesa GP"), Silver Run and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor pursuant to which Silver Run will acquire from the Alta Mesa Contributor (x) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (y) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP;

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Kingfisher Contribution Agreement"), among KFM Holdco, LLC, a Delaware limited liability company (the "Kingfisher Contributor"), Kingfisher Midstream, LLC, a Delaware limited liability company ("Kingfisher"), Silver Run and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which Silver Run will acquire 100% of the outstanding membership interests in Kingfisher; and

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Riverstone Contribution Agreement" and, together with the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, the "Contribution Agreements"), between Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "Riverstone Contributor"), and Silver Run, pursuant to which Silver Run will acquire all of the limited partner interests in Alta Mesa held by the Riverstone Contributor.

Copies of the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement are attached to this proxy statement as *Annexes A, B and C*, respectively. This proxy statement and its annexes contain important information about the proposed business combination and the other matters to be acted upon at the special meeting. You should read this proxy statement and its annexes carefully and in their entirety.

Your vote is important. You are encouraged to submit your proxy as soon as possible after carefully reviewing this proxy statement and its annexes.

**Q: What is being voted on at the special meeting?**

**A:** Below are the proposals on which Silver Run stockholders will vote at the special meeting.

1. The Business Combination Proposal—To consider and vote upon a proposal to approve and adopt each of the Contribution Agreements and the business combination and the other transactions contemplated thereby.

1

Table of Contents

2.　The Class C Charter Proposal—To consider and act upon a proposal to approve and adopt amendments to Silver Run's amended and restated certificate of incorporation (the "Charter") to create a new class of capital stock designated as Class C Common Stock, par value $0.0001 per share (the "Class C Common Stock" and such proposal, the "Class C Charter Proposal"). A copy of our second amended and restated certificate of incorporation (the "Second A&R Charter") reflecting the proposed amendments pursuant to the Class C Charter Proposal is attached to this proxy statement as *Annex D*.

3.　The Authorized Share Charter Proposal—To consider and act upon a proposal to approve and adopt an amendment to the Charter to increase the number of authorized shares of Silver Run's Class A Common Stock, par value $0.0001 per share (the "Class A Common Stock"), from 400,000,000 shares to 1,200,000,000 shares (the "Authorized Share Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendment pursuant to the Authorized Share Charter Proposal is attached to this proxy statement as *Annex D*.

4.　The Exclusive Forum Charter Proposal—To consider and act upon a proposal to approve and adopt an amendment to the Charter to adopt Delaware as the exclusive forum for certain stockholder litigation (the "Exclusive Forum Charter Proposal") A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Exclusive Forum Charter Proposal is attached to this proxy statement as *Annex D*.

5.　The Additional Charter Proposal—To consider and act upon a proposal to approve and adopt amendments to the Charter eliminating provisions in the Charter relating to an Initial Business Combination (as defined herein) that will no longer be applicable to us following the Closing (the "Additional Charter Proposal" and, together with the Class C Charter Proposal, the Authorized Share Charter Proposal and the Exclusive Forum Charter Proposal, the "Charter Proposals"). A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Additional Charter Proposal is attached to this proxy statement as *Annex D*.

6.　The NASDAQ Proposal—To consider and vote upon a proposal to approve, for purposes of complying with applicable listing rules of The NASDAQ Capital Market, (a) the issuance of shares of Class C Common Stock to the Contributors in connection with the business combination, which number of shares will equal 275,000,000 and be subject to upward or downward adjustment at Closing pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, (b) the issuance of up to 59,871,031 shares of Class C Common Stock that may be issued to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements" is issued to the Alta Mesa Contributor or the Kingfisher Contributor, (c) the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class C Common Stock issued to the Contributors, which shares of Class A Common Stock are issuable in the future to the Contributors in connection with the future redemption or exchange of their common units representing limited partner interests (the "SRII Opco Common Units") in SRII Opco, LP, a Delaware limited partnership ("SRII Opco"), in accordance with the amended and restated agreement of limited partnership of SRII Opco, (d) the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") pursuant to the terms of that certain Forward Purchase Agreement, dated as of March 17, 2017 (the "IPO Forward Purchase Agreement"), by and between Silver Run and Fund VI Holdings and (e) the issuance of up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to the terms of that certain Forward Purchase Agreement, dated as of August 16, 2017 (the "Business Combination Forward Purchase Agreement" and, together with the IPO Forward Purchase Agreement, the "Forward Purchase Agreements"), by and between Silver Run and Fund VI Holdings (the "NASDAQ Proposal").

2

Table of Contents

7.  The LTIP Proposal—To consider and vote upon a proposal to approve and adopt the Alta Mesa Resources, Inc. 2018 Long Term Incentive Plan (the "LTIP") and material terms thereunder (the "LTIP Proposal"). A copy of the LTIP is attached to this proxy statement as *Annex G*.

8.  The Adjournment Proposal—To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the Preferred Stock Designation Proposal, the NASDAQ Proposal and the LTIP Proposal (the "Adjournment Proposal" and, together with the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal, the "Proposals").

**Q: Are the proposals conditioned on one another?**

**A:** Yes. The Closing is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting. The Charter Proposals and the LTIP Proposal are conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal. The Adjournment Proposal is not conditioned on the approval of any other proposal set forth in this proxy statement.

**Q: Why is Silver Run providing stockholders with the opportunity to vote on the business combination?**

**A:** Under our Charter, we must provide all holders of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering, which closed on March 29, 2017 (the "IPO" and such shares and holders, the "public shares" and "public stockholders," respectively), with the opportunity to have their public shares redeemed upon the consummation of an Initial Business Combination either in conjunction with a tender offer or in conjunction with a stockholder vote. For business and other reasons, we have elected to provide our stockholders with the opportunity to have their public shares redeemed in connection with a stockholder vote rather than a tender offer. Therefore, we are seeking to obtain the approval of our stockholders of the Business Combination Proposal in order to allow our public stockholders to effectuate redemptions of their public shares in connection with the Closing combination. The approval of our stockholders of the Business Combination Proposal is also a condition to closing in the Contribution Agreements.

**Q: What will happen in the business combination?**

**A:** At the Closing, we will acquire (i) 100% of the limited partner interests in Alta Mesa, (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP and (iii) 100% of the outstanding membership interests in Kingfisher pursuant to the terms and conditions of the Contribution Agreements.

Pursuant to the terms of the Alta Mesa Contribution Agreement, at the Closing, the Alta Mesa Contributor will receive consideration consisting of 220,000,000 SRII Opco Common Units, as adjusted (i) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit), (ii) downward for the $200 million contributed by the Riverstone Contributor to Alta Mesa following the execution of the Riverstone Contribution Agreement (based on a value of $10.00 per SRII Opco Common Unit) and (iii) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit). In addition, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-day volume-weighted average price ("20-Day VWAP") of the Class A Common Stock equals or exceeds specified prices as more fully described below. Silver Run will also contribute $400 million in cash to Alta Mesa at the Closing.

3

Table of Contents

Pursuant to the terms of the Kingfisher Contribution Agreement, at the Closing, the Kingfisher Contributor will receive consideration of 55,000,000 SRII Opco Common Units and, subject to the Kingfisher Contributor's election to receive additional SRII Opco Common Units as set forth herein, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees. If Silver Run does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per SRII Opco Common Unit. In addition, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as more fully described below.

Pursuant to the terms of the Riverstone Contribution Agreement, at the Closing, the Riverstone Contributor will receive consideration of 20,000,000 SRII Opco Common Units.

The Contributors will also acquire a number of shares of Class C Common Stock equal to the number of SRII Opco Common Units issued to such Contributor. After the Closing, holders of Class C Common Stock, together with holders of Class A Common Stock voting as a single class, will have the right to vote on all matters properly submitted to a vote of the stockholders, but holders of Class C Common Stock will not be entitled to any dividends or liquidating distributions from Silver Run. After a specified period of time after the Closing, the Contributors will generally have the right to cause SRII Opco to redeem all or a portion of their SRII Opco Common Units in exchange for shares of our Class A Common Stock or, at SRII Opco's option, an equivalent amount of cash; provided that we may, at our option, effect a direct exchange of such cash or Class A Common Stock for such SRII Opco Common Units in lieu of such a redemption by SRII Opco. Upon the future redemption or exchange of SRII Opco Common Units held by a Contributor, a corresponding number of shares of Class C Common Stock will be cancelled. For more information about the Class C Common Stock, see the section entitled "Proposal No. 2—The Class C Charter Proposal—Description of Class C Common Stock."

In connection with the Closing, we will also issue (i) one share of our Series A Preferred Stock, par value $0.0001 per share (the "Series A Preferred Stock") to each of Bayou City Energy Management, LLC, a Delaware limited liability company ("Bayou City"), HPS Investment Partners, LLC, a Delaware limited liability company ("HPS"), and AM Equity Holdings, LP, a Texas limited partnership ("AM Management"), and (ii) one share of our Series B Preferred Stock, par value $0.0001 per share (the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Preferred Stock") to the Riverstone Contributor. None of the holders of the Series A Preferred Stock or Series B Preferred Stock will be entitled to any dividends from Silver Run related to such Preferred Stock, but such holders will be entitled to preferred distributions in liquidation in the amount of $0.0001 per share of Preferred Stock, and will have limited voting rights as described below. Shares of Preferred Stock will be redeemable for the par value thereof by us upon the earlier to occur of (1) the fifth anniversary of the Closing Date, (2) the optional redemption of such Preferred Stock at the election of the holder thereof or (3) upon a breach by the holder of the transfer restrictions applicable to such Preferred Stock. For so long as the Series A Preferred Stock or Series B Preferred Stock remains outstanding, as applicable, the holders thereof will be entitled to nominate and elect directors to our board of directors for a period of five years following the Closing based on their and their affiliates, beneficial ownership of Class A Common Stock. Copies of the Certificates of Designation for the Series A Preferred Stock and the Series B Preferred Stock are attached to this proxy statement as *Annexes E* and *F*, respectively. For more information about the Preferred Stock, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Certificates of Designation."

4

Table of Contents

**Q:** **What conditions must be satisfied to complete the business combination?**

**A:** There are a number of closing conditions in the Contribution Agreements, including the approval by our stockholders of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal. For a summary of the conditions that must be satisfied or waived prior to completion of the business combination, see the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements—Conditions to Closing of the Business Combination."

**Q:** **How will SRII Opco and Silver Run be managed and governed following the business combination?**

**A:** Following the consummation of the business combination, Silver Run will hold approximately 44.1% of the limited partner interests in SRII Opco and will own the sole general partner of SRII Opco. SRII Opco will hold 100% of the economic equity interests in Alta Mesa and Kingfisher. As such, we, through our directors and officers, will be responsible for all operational and administrative decisions of SRII Opco and the day-to-day management of SRII Opco's business. Silver Run does not currently have any management-level employees, other than James T. Hackett, our Chairman of the board of directors and Chief Executive Officer, and Stephen Coats, our Secretary. Following the consummation of the business combination, Mr. Hackett will become Executive Chairman of our board of directors and Chief Operating Officer —Midstream, while Harlan H. Chappelle, Michael E. Ellis and Michael A. McCabe will become our Chief Executive Officer, Chief Operating Officer—Upstream, and Chief Financial Officer, respectively.

Silver Run is, and after the Closing will continue to be, managed by its board of directors. Following the completion of the business combination, the size of our board of directors will be expanded from four directors to 11, including one director appointed by Bayou City and its affiliates, one director appointed by HPS and its affiliates and two directors appointed by AM Management and its affiliates, as the holders of our Series A Preferred Stock, and three directors appointed by the Riverstone Contributor and its affiliates, as the holder of our Series B Preferred Stock.

Please see the section entitled "Officers and Directors of Silver Run."

**Q:** **What is Alta Mesa's relationship with Bayou City, HPS, AM Management and their affiliates?**

**A:** In connection with the Closing, Bayou City, HPS and AM Management will each own one share of our Series A Preferred Stock, providing the holders thereof limited voting rights as described herein. Bayou City, HPS and AM Management and their affiliates indirectly own all of the equity interests in Alta Mesa. Additionally, Don Dimitrievich, a managing director at HPS, serves on the board of directors of Alta Mesa GP as the director nominee for HPS, and William McMullen and Mark Stoner, partners at Bayou City, serve on the board of directors of Alta Mesa GP as the director nominees for Bayou City. AM Management is owned by Michael E. Ellis, Alta Mesa's Chief Operating Officer, Vice President of Engineering and Chairman of the board of directors of Alta Mesa GP, and Harlan H. Chappelle, Alta Mesa's President and Chief Executive Officer.

**Q:** **What is Kingfisher's relationship with HPS, ARM Midstream, LLC, AM Management and their affiliates?**

**A:** HPS and its affiliates, ARM Midstream, LLC and Alta Mesa's parent company each own an approximately one-third interest in the Kingfisher Contributor.

**Q:** **Will Silver Run obtain new financing in connection with the business combination?**

**A:** Silver Run will not obtain new debt financing to fund any portion of the cash consideration to be paid to the Kingfisher Contributor or contributed to Alta Mesa in the business combination. However, prior to the consummation of the business combination, the parties intend to amend Alta Mesa's and Kingfisher's credit agreements to permit the business combination. We expect that outstanding indebtedness of Alta Mesa and Kingfisher under their respective credit facilities will be repaid at Closing. As of November 15, 2017, Alta

5

Table of Contents

Mesa had outstanding borrowings of approximately $142.1 million under its credit agreement and, as of November 20, 2017, Kingfisher had outstanding borrowings of approximately $30.0 million under its credit facility.

Pursuant to the terms of the IPO Forward Purchase Agreement, Fund VI Holdings has agreed to purchase from Silver Run up to 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock, for an aggregate purchase price of $400 million, if Silver Run's cash on hand (after giving effect to the release of funds from the Trust Account) would not be sufficient to consummate the business combination. Fund VI Holdings also agreed to purchase up to an additional 20,000,000 shares of Class A Common Stock from Silver Run pursuant to the terms of the Business Combination Purchase Agreement, for an aggregate purchase price of $200 million, if such proceeds are necessary to satisfy any exercise of redemption rights of the public stockholders in connection with the business combination or determined by Silver Run and Fund VI Holdings to be necessary for general corporate purposes of Silver Run in connection with or following consummation of the business combination.

**Q: Are there any arrangements to help ensure that Silver Run will have sufficient funds, together with the proceeds in its Trust Account, to fund the cash consideration to be paid to the Kingfisher Contributor?**

**A:** Pursuant to the Kingfisher Contribution Agreement, if Silver Run does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units and to acquire a corresponding number of shares of Class C Common Stock.

Also, as discussed above, pursuant to the IPO Forward Purchase Agreement, Fund VI Holdings has agreed to purchase from Silver Run up to 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock, for an aggregate purchase price of $400 million, if Silver Run's cash on hand (after giving effect to the release of funds from the Trust Account) would not be sufficient to consummate the business combination. Also, Fund VI Holdings as agreed to purchase up to an additional 20,000,000 shares of Class A Common Stock from Silver Run pursuant to the terms of the Business Combination Forward Purchase Agreement, for an aggregate purchase price of $200 million, if such proceeds are necessary to satisfy any exercise of redemption rights of the public stockholders in connection with the business combination or determined by Silver Run and Fund VI Holdings to be necessary for general corporate purposes of Silver Run in connection with or following consummation of the business combination.

**Q: What equity stake will current Silver Run stockholders, the holders of our founder shares and the Contributors hold in Silver Run following the consummation of the business combination?**

**A:** It is anticipated that, upon completion of the business combination and based on the assumptions set forth in "Certain Defined Terms," the ownership of Silver Run will be as follows:

- the public stockholders will own 103,500,000 shares of our Class A Common Stock, representing an approximate 61.1% economic interest and an approximate 26.9% voting interest;

- the holders of our founder shares, including our Sponsor and independent directors, will own 25,875,000 shares of our Class A Common Stock, representing an approximate 15.3% economic interest and an approximate 6.7% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 36.4% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 14.3% voting interest;

6

Table of Contents

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 5.2% voting interest; and

- Fund VI Holdings will own 40,000,000 shares of our Class A Common Stock, representing a 23.6% economic interest and a 10.4% voting interest.

Our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 38.9% economic interest and an approximate 22.3% voting interest in Silver Run upon the Closing.

Additionally, Bayou City, HPS and AM Management will each own one share of our Series A Preferred Stock and the Riverstone Contributor will own one share of our Series B Preferred Stock. The Preferred Stock will not have an economic interest and will provide the holders thereof limited voting rights as described herein.

If the actual facts are different than the assumptions set forth in "Certain Defined Terms," the economic and voting interest set forth above will be different. For example, if we assume that all outstanding 34,500,000 public warrants, 15,133,333 private placement warrants and 13,333,333 warrants purchased by Fund VI Holdings under the IPO Forward Purchase Agreement were exercisable and exercised following completion of the business combination, then the ownership of Silver Run's Class A Common Stock and Class C Common Stock would be as follows:

- the public stockholders and holders of the public warrants will own 138,000,000 shares of our Class A Common Stock, representing an approximate 59.4% economic interest and an approximate 30.9% voting interest;

- the holders of our founder shares and the private placement warrants, including our Sponsor and independent directors, will own 41,008,333 shares of our Class A Common Stock, representing an approximate 17.7% economic interest and an approximate 9.2% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 31.3% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 12.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 4.5% voting interest; and

- Fund VI Holdings will own 53,333,333 shares of our Class A Common Stock, representing an approximate 23.0% economic interest and an approximate 11.9% voting interest.

In this scenario, our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 40.7% economic interest and an approximate 25.6% voting interest in Silver Run upon the Closing.

The warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination and 12 months following the closing of the IPO and will expire five years after the completion of an Initial Business Combination or earlier upon their redemption or liquidation.

In addition, if public stockholders elect to have their public shares redeemed in connection with the business combination, Fund VI Holdings has agreed to offset up to $200 million of such redemptions through the purchase of 20,000,000 additional shares of Class A Common Stock from Silver Run at $10.00 per share. In such a case, economic and voting interests of the public stockholders will decrease, and the economic and voting interests of Fund VI Holdings will increase, accordingly, but the economic and voting interests of the holders of our founder shares and the Contributors will not be affected.

Please see the section entitled "Summary of the Proxy Statement—Impact of the Business Combination on Silver Run's Public Float" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

7

Table of Contents

**Q: How will the payment of the earn-out consideration to the Alta Mesa Contributor and the Kingfisher Contributor affect the equity stake that the current Silver Run stockholders, the holders of our founder shares and the Contributors will have in Silver Run?**

**A:** Pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, for a period of seven years following the Closing, the Alta Mesa Contributor and the Kingfisher Contributor may be entitled to receive additional SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) as earn-out consideration if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as follows (each such payment, an "Earn-Out Payment"):

| 20-Day VWAP | Earn-Out Consideration Payable to Alta Mesa Contributor | Earn-Out Consideration Payable to Kingfisher Contributor |
|---|---|---|
| $14.00 | 10,714,285 SRII Opco Common Units | 7,142,857 SRII Opco Common Units |
| $16.00 | 9,375,000 SRII Opco Common Units | 6,250,000 SRII Opco Common Units |
| $18.00 | 13,888,889 SRII Opco Common Units | — |
| $20.00 | 12,500,000 SRII Opco Common Units | — |

Neither the Alta Mesa Contributor nor the Kingfisher Contributor will be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-Day VWAP entitles the Alta Mesa Contributor or the Kingfisher Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the Alta Mesa Contributor and/or the Kingfisher Contributor will be entitled to receive each such Earn-Out Payment. The Alta Mesa Contributor and the Kingfisher Contributor will be entitled to the earn-out consideration described above in connection with certain liquidity events of Silver Run, including a merger or sale of all or substantially all of our assets, if the consideration paid to holders of Class A Common Stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, public warrants and warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement remain outstanding and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated in the preceding question and answer and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1) (2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 25.7% | 6.4% | 37.4% | 15.5% | 5.0% | 10.0% |
| $16.00 | 24.8% | 6.2% | 38.3% | 16.3% | 4.8% | 9.6% |
| $18.00 | 23.9% | 6.0% | 40.3% | 15.9% | 4.6% | 9.3% |
| $20.00 | 23.3% | 5.8% | 42.0% | 15.4% | 4.5% | 9.0% |

(1)   Includes our Sponsor and independent directors.

(2)   Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 21.4% voting interest at $14.00; (b) an approximate 20.6% voting interest at $16.00; (c) an approximate 19.9% voting interest at $18.00; and (d) an approximate 19.3% voting interest at $20.00.

Table of Contents

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, the public warrants and the warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement are exercised and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated in the preceding question and answer and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1)(2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 29.7% | 8.8% | 32.4% | 13.4% | 4.3% | 11.5% |
| $16.00 | 28.7% | 8.5% | 33.3% | 14.2% | 4.2% | 11.1% |
| $18.00 | 27.9% | 8.3% | 35.1% | 13.8% | 4.0% | 10.8% |
| $20.00 | 27.2% | 8.1% | 36.7% | 13.5% | 3.9% | 10.5% |

(1)　Includes our Sponsor and independent directors.

(2)　Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 24.6% voting interest at $14.00; (b) an approximate 23.8% voting interest at $16.00; (c) an approximate 23.1% voting interest at $18.00; and (d) an approximate 22.5% voting interest at $20.00.

Please see the section entitled "Summary of the Proxy Statement—Impact of the Business Combination on Silver Run's Public Float" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

**Q:**　**Why is Silver Run proposing the amendments to the Charter set forth in the Charter Proposals?**

**A:**　The proposed amendments to the Charter that Silver Run is asking its stockholders to approve in connection with the business combination provide for, among other things, the creation of the Class C Common Stock that will be issued to the Contributors at the Closing, as well as the elimination of certain provisions relating to an initial merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (an "Initial Business Combination") that will no longer be applicable to us following the Closing. In addition, Silver Run is asking its stockholders to approve an amendment to increase the number of authorized shares of Class A Common Stock from 400,000,000 to 1,200,000,000 and to adopt Delaware as the exclusive forum for certain stockholder litigation. Stockholder approval of the Charter Proposals are required under our Charter. See the sections entitled "Proposal No. 2—The Class C Charter Proposal," "Proposal No. 3—The Authorized Share Charter Proposal," "Proposal No. 4—The Exclusive Forum Charter Proposal" and "Proposal No. 5—the Additional Charter Proposal" for additional information.

**Q:**　**Why is Silver Run proposing the NASDAQ Proposal?**

**A:**　Silver Run is proposing the NASDAQ Proposal in order to comply with NASDAQ Listing Rules, which require stockholder approval of certain transactions that result in the issuance of 20% or more of a company's outstanding voting power or shares of common stock outstanding before the issuance of stock or securities. We will issue 275,000,000 shares of Class C Common Stock to the Contributors. We may also issue up to 275,000,000 shares of Class A Common Stock to the Contributors upon the future redemption or exchange of their SRII Opco Common Units in accordance with the SRII Opco LPA (as defined herein), which number of shares may be subject to adjustment based on the number of SRII Opco Common Units issued pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement. We will also issue 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Fund VI Holdings pursuant to the terms of the IPO Forward Purchase Agreement and up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to

9

Table of Contents

the terms of the Business Combination Forward Purchase Agreement. Because Silver Run will issue 20% or more of its outstanding voting power and outstanding common stock in connection with the business combination, it is required to obtain stockholder approval of such issuances pursuant to NASDAQ Listing Rules. Stockholder approval of the NASDAQ Proposal is also a condition to closing in the Contribution Agreements. See the section entitled "Proposal No. 6—The NASDAQ Proposal" for additional information.

**Q: What happens if I sell my shares of Class A Common Stock before the special meeting?**

**A:** The record date for the special meeting is earlier than the date that the business combination is expected to be completed. If you transfer your shares of Class A Common Stock after the record date, but before the special meeting, unless the transferee obtains from you a proxy to vote those shares, you will retain your right to vote at the special meeting. However, you will not be able to seek redemption of your shares of Class A Common Stock because you will no longer be able to deliver them for cancellation upon consummation of the business combination in accordance with the provisions described herein. If you transfer your shares of Class A Common Stock prior to the record date, you will have no right to vote those shares at the special meeting or redeem those shares for a pro rata portion of the proceeds held in the Trust Account.

**Q: What vote is required to approve the Proposals presented at the special meeting?**

**A:** Approval of the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal requires the affirmative vote (in person or by proxy) of the holders of the majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon at the special meeting, voting as a single class. Approval of the Charter Proposals requires the affirmative vote (in person or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class.

**Q: May our Sponsor, directors, officers, advisors or their affiliates purchase shares in connection with the business combination?**

**A:** In connection with the stockholder vote to approve the proposed business combination, our Sponsor, directors, officers, or advisors or their respective affiliates may privately negotiate transactions to purchase shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with a proxy solicitation pursuant to the proxy rules for a per share pro rata portion of the Trust Account. None of our Sponsor, directors, officers or advisors or their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller. Such a purchase would include a contractual acknowledgement that such stockholder, although still the record holder of our shares, is no longer the beneficial owner thereof and, therefore, agrees not to exercise its redemption rights, and could include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser. In the event that our Sponsor, directors, officers or advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. Any such privately negotiated purchases may be effected at purchase prices that are below or in excess of the per share pro rata portion of the Trust Account.

**Q: How many votes do I have at the special meeting?**

**A:** Silver Run's stockholders are entitled to one vote at the special meeting for each share of Class A Common Stock or Class B Common Stock held of record as of January 22, 2018, the record date for the special meeting. As of the close of business on January 18, 2018, there were a combined 129,375,000 outstanding shares of Class A Common Stock and Class B Common Stock.

10

Table of Contents

**Q:**    **What constitutes a quorum at the special meeting?**

**A:**    Holders of a majority in voting power of Class A Common Stock and Class B Common Stock issued and outstanding and entitled to vote at the special meeting, present in person or represented by proxy, constitute a quorum. In the absence of a quorum, the chairman of the meeting has the power to adjourn the special meeting.

**Q:**    **How will Silver Run's Sponsor, directors and officers vote?**

**A:**    In connection with the IPO, we entered into an agreement with our Sponsor and each of our directors and officers, pursuant to which each agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of the Business Combination Proposal. Currently, our Sponsor, directors and officers own approximately 20% of our issued and outstanding shares of Class A Common Stock and Class B Common Stock, in the aggregate, including all of the founder shares.

**Q:**    **What interests do the current officers and directors have in the business combination?**

**A:**    In considering the recommendation of our board of directors to vote in favor of the business combination, stockholders should be aware that, aside from their interests as stockholders, our Sponsor and certain of our directors and officers have interests in the business combination that are different from, or in addition to, those of other stockholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the business combination, and in recommending to stockholders that they approve the business combination. Stockholders should take these interests into account in deciding whether to approve the business combination. These interests include, among other things:

- the fact that our Sponsor holds private placement warrants that would expire worthless if a business combination is not consummated;

- the fact that our Sponsor, officers and directors have agreed not to redeem any of the shares of Class A Common Stock held by them in connection with a stockholder vote to approve the business combination;

- the fact that our Sponsor paid an aggregate of $25,000 for its founder shares and such securities will have a significantly higher value at the time of the business combination, which if unrestricted and freely tradable would be valued at approximately $262,399,680 based on the closing price of our Class A Common Stock on January 18, 2018;

- if the Trust Account is liquidated, including in the event we are unable to complete an Initial Business Combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser amount per public share as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continuation of James T. Hackett as a director of Silver Run and becoming the Executive Chairman of the board of directors and Chief Operating Officer—Midstream and the Riverstone Contributor's right to nominate up to three directors to our board of directors for a period of five years following the Closing based on its and its affiliates' beneficial ownership of our Class A Common Stock in accordance with the terms of its Series B Preferred Stock;

- the fact that each of our independent directors owns 33,000 founder shares that were purchased from our Sponsor at $0.002 per share, which if unrestricted and freely tradeable would be valued at approximately $335,940 based on the closing price of our Class A Common Stock on January 18, 2018;

11

Table of Contents

- the fact that our Sponsor, officers and directors may not participate in the formation of, or become a director or officer of, any other blank check company until we have entered into a definitive agreement regarding an Initial Business Combination or fail to complete an Initial Business Combination by March 29, 2019;

- the fact that our Sponsor, officers and directors will lose their entire investment in us if an Initial Business Combination is not completed; and

- that we are a party to a registration rights agreement with our Sponsor and certain of our directors, which provides for registration rights to such parties.

**Q:**    **What is our relationship with Riverstone and its affiliates, including our Sponsor and Fund VI Holdings?**

**A:**    Riverstone Global Energy and Power Fund VI, L.P. ("Fund VI") is an investment vehicle for which Riverstone serves as investment manager, together with its parallel funds and any of its co-investment vehicles and other intermediate investment vehicles. Each of Fund VI Holdings and the Riverstone Contributor is an investment vehicle controlled by Riverstone in which Fund VI, its parallel funds and one or more co-investment vehicles participate, directly or indirectly, through intermediate investment vehicles. Fund VI Holdings is the sole manager of our Sponsor, which owns shares of Class B Common Stock that are convertible on a one-for-one basis into shares of Class A Common Stock at the Closing. Please see the sections entitled "Summary of the Proxy Statement—Organizational Structure—Following the Business Combination" and "Beneficial Ownership of Securities."

**Q:**    **What happens if I vote against the Business Combination Proposal?**

**A:**    Under our Charter, if the Business Combination Proposal is not approved and we do not otherwise consummate an alternative business combination by March 29, 2019, we will be required to dissolve and liquidate the Trust Account by returning the then-remaining funds in such account to our public stockholders.

**Q:**    **Do I have redemption rights?**

**A:**    If you are a holder of public shares, you may elect to have your public shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by dividing (a) the aggregate amount on deposit in the Trust Account as of two (2) business days prior to the consummation of the business combination, including interest not previously released to Silver Run to pay its franchise and income taxes, by (b) the total number of shares of Class A Common Stock included as part of the units sold in the IPO; provided that Silver Run will not redeem any public shares to the extent that such redemption would result in Silver Run having net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of less than $5,000,001. Notwithstanding the foregoing, a holder of the public shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold." Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Unlike some other blank check companies, other than the net tangible asset requirement and the 20% threshold described above, Silver Run has no specified maximum redemption threshold and there is no other limit on the amount of public shares that you can redeem. Our Sponsor, directors and officers have agreed to waive their redemption rights with respect to any shares of Silver Run's capital stock they may hold in connection with the consummation of the business combination, and the founder shares will be excluded from the pro rata calculation used to determine the per share redemption price. For illustrative purposes, based on the fair value of marketable securities held in the Trust

12

Table of Contents

Account as of September 30, 2017 of approximately $1,039 million, the estimated per share redemption price would have been approximately $10.00. Additionally, shares properly tendered for redemption will only be redeemed if the business combination is consummated; otherwise holders of such shares will only be entitled to a pro rata portion of the Trust Account (including interest but net of franchise and income taxes payable) in connection with the liquidation of the Trust Account or if we subsequently complete a different business combination on or prior to March 29, 2019.

**Q:   Will how I vote affect my ability to exercise redemption rights?**

**A:**   No. You may exercise your redemption rights whether you vote your shares of Class A Common Stock for or against or abstain from voting on the Business Combination Proposal or any other proposal described in this proxy statement. As a result, the business combination can be approved by stockholders who will redeem their shares and no longer remain stockholders.

**Q:   How do I exercise my redemption rights?**

**A:**   In order to exercise your redemption rights, you must (i) if you hold your shares of Class A Common Stock through units, elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares, (ii) check the box on the enclosed proxy card marked "Shareholder Certification," and (iii) prior to 5:00 p.m., Eastern Time, on February 2, 2018 (two (2) business days before the special meeting), tender your shares physically or electronically and submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent, at the following address:

Continental Stock Transfer & Trust Company
1 State Street—30th Floor
New York, New York 10004
Attention: Mark Zimkind
Email: mzimkind@continentalstock.com

Please check the box on the enclosed proxy card marked "Stockholder Certification" if you are not acting in concert or as a "group" with any other stockholder with respect to shares of Class A Common Stock or Class B Common Stock. Notwithstanding the foregoing, a holder of the public shares, together with any affiliate or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold". Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Stockholders seeking to exercise their redemption rights and opting to deliver physical certificates should allot sufficient time to obtain physical certificates from the transfer agent and time to effect delivery. It is Silver Run's understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, Silver Run does not have any control over this process and it may take longer than two weeks. Stockholders who hold their shares in street name will have to coordinate with their bank, broker or other nominee to have the shares certificated or delivered electronically.

Holders of outstanding units of Silver Run must separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If you hold units registered in your own name, you must deliver the certificate for such units to Continental Stock Transfer & Trust Company with written instructions to separate such units into public shares and public warrants. This must be completed far enough in advance to permit the mailing of the public share certificates back to you so that you may then exercise your redemption rights upon the separation of the public shares from the units.

If a broker, dealer, commercial bank, trust company or other nominee holds your units, you must instruct such nominee to separate your units. Your nominee must send written instructions by facsimile to

13

Table of Contents

Continental Stock Transfer & Trust Company. Such written instructions must include the number of units to be split and the nominee holding such units. Your nominee must also initiate electronically, using the Depository Trust Company's (the "DTC") DWAC (deposit withdrawal at custodian) system, a withdrawal of the relevant units and a deposit of an equal number of public shares and public warrants. This must be completed far enough in advance to permit your nominee to exercise your redemption rights upon the separation of the public shares from the units. While this is typically done electronically on the same business day, you should allow at least one full business day to accomplish the separation. If you fail to cause your public shares to be separated in a timely manner, you will likely not be able to exercise your redemption rights.

Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the vote is taken with respect to the business combination. If you delivered your shares for redemption to the transfer agent and decide within the required timeframe not to exercise your redemption rights, you may request that the transfer agent return the shares (physically or electronically). You may make such request by contacting our transfer agent at the phone number or address listed under the question "Who can help answer my questions?" below.

**Q:    What are the U.S. federal income tax consequences of exercising my redemption rights?**

**A:**    Whether the redemption is subject to U.S. federal income tax depends on your particular facts and circumstances. See the section entitled "Proposal No. 1—The Business Combination Proposal—Certain United States Federal Income Tax Considerations." We urge you to consult your tax advisors regarding the tax consequences of exercising your redemption rights.

**Q:    Are there any other material U.S. federal income tax consequences to Silver Run that are expected to result from the business combination?**

**A:**    If the business combination is effected, we expect that we will be treated as a U.S. real property holding corporation for U.S. federal income tax purposes. If you are a Non-U.S. holder (defined below in the section entitled "Proposal No. 1—The Business Combination Proposal—Certain United States Federal Income Tax Considerations"), we urge you to consult your tax advisors regarding the tax consequences of such treatment.

**Q:    If I am a warrant holder, can I exercise redemption rights with respect to my warrants?**

**A:**    No. The holders of our warrants have no redemption rights with respect to our warrants.

**Q:    Do I have appraisal rights if I object to the proposed business combination?**

**A:**    No. There are no appraisal rights available to holders of Class A Common Stock or Class B Common Stock in connection with the business combination.

**Q:    What happens to the funds deposited in the Trust Account after consummation of the business combination?**

**A:**    If the Business Combination Proposal is approved, Silver Run intends to use a portion of the funds held in the Trust Account to pay (i) a portion of Silver Run's aggregate costs, fees and expenses in connection with the consummation of the business combination, (ii) tax obligations and deferred underwriting commissions from the IPO and (iii) for any redemptions of public shares. The remaining balance in the Trust Account, together with proceeds received from the Forward Purchase Agreements, will be contributed to SRII Opco to be paid to the Kingfisher Contributor and to Alta Mesa in connection with the business combination. See the sections entitled "Proposal No. 1—The Business Combination Proposal" for additional information.

14

**Q:**    **What happens if the business combination is not consummated or is terminated?**

**A:**    There are certain circumstances under which the Contribution Agreements may be terminated. See the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements—Termination" for additional information regarding the parties' specific termination rights. In accordance with our Charter, if an Initial Business Combination is not consummated by March 29, 2019, Silver Run will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter subject to lawfully available funds therefor, redeem 100% of the public shares in consideration of a per share price, payable in cash, equal to the quotient obtained by dividing (A) the aggregate amount then on deposit in the Trust Account, including interest not previously released to Silver Run to pay its franchise and income taxes (less up to $100,000 of such net interest to pay dissolution expenses), by (B) the total number of then outstanding public shares, which redemption will completely extinguish rights of the public stockholders as stockholders of Silver Run (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under the Delaware General Corporation Law (the "DGCL") to provide for claims of creditors and other requirements of applicable law.

     Silver Run expects that the amount of any distribution its public stockholders will be entitled to receive upon its dissolution will be approximately the same as the amount they would have received if they had redeemed their shares in connection with the business combination, subject in each case to Silver Run's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law. Holders of our founder shares have waived any right to any liquidating distributions with respect to those shares.

     In the event of liquidation, there will be no distribution with respect to Silver Run's outstanding warrants. Accordingly, the warrants will expire worthless.

**Q:**    **When is the business combination expected to be consummated?**

**A:**    It is currently anticipated that the business combination will be consummated promptly following the special meeting of Silver Run stockholders to be held on February 6, 2018, provided that all the requisite stockholder approvals are obtained and other conditions to the consummation of the business combination have been satisfied or waived. For a description of the conditions for the completion of the business combination, see the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements—Conditions to Closing of the Business Combination."

**Q:**    **What do I need to do now?**

**A:**    You are urged to read carefully and consider the information contained in this proxy statement, including "Risk Factors" and the annexes, and to consider how the business combination will affect you as a stockholder. You should then vote as soon as possible in accordance with the instructions provided in this proxy statement and on the enclosed proxy card or, if you hold your shares through a brokerage firm, bank or other nominee, on the voting instruction form provided by the broker, bank or nominee.

**Q:**    **How do I vote?**

**A:**    If you were a holder of record of Class A Common Stock or Class B Common Stock on January 22, 2018, the record date for the special meeting of Silver Run stockholders, you may vote with respect to the proposals in person at the special meeting or by completing signing, dating and returning the enclosed proxy card in the postage-paid envelope provided. If you hold your shares in "street name," which means your shares are held of record by a broker, bank or other nominee, you should follow the instructions provided by

Table of Contents

your broker, bank or nominee to ensure that votes related to the shares you beneficially own are properly counted. In this regard, you must provide the record holder of your shares with instructions on how to vote your shares or, if you wish to attend the special meeting and vote in person, obtain a proxy from your broker, bank or nominee.

**Q:**    **What will happen if I abstain from voting or fail to vote at the special meeting?**

**A:**    At the special meeting, Silver Run will count a properly executed proxy marked "ABSTAIN" with respect to a particular proposal as present for purposes of determining whether a quorum is present. For purposes of approval, failure to vote or an abstention will have no effect on the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal or the Adjournment Proposal, but will have the same effect as a vote AGAINST each of the Charter Proposals.

**Q:**    **What will happen if I sign and submit my proxy card without indicating how I wish to vote?**

**A:**    Signed and dated proxies received by Silver Run without an indication of how the stockholder intends to vote on a proposal will be voted "FOR" each proposal presented to the stockholders.

**Q:**    **If I am not going to attend the special meeting in person, should I submit my proxy card instead?**

**A:**    Yes. Whether you plan to attend the special meeting or not, please read the enclosed proxy statement carefully, and vote your shares by signing, dating and returning the enclosed proxy card in the postage-paid envelope provided.

**Q:**    **If my shares are held in "street name," will my broker, bank or nominee automatically vote my shares for me?**

**A:**    No. Under the rules of various national and regional securities exchanges, your broker, bank, or nominee cannot vote your shares with respect to non-discretionary matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank, or nominee. Silver Run believes the proposals presented to the stockholders will be considered non-discretionary and therefore your broker, bank, or nominee cannot vote your shares without your instruction. Your bank, broker, or other nominee can vote your shares only if you provide instructions on how to vote. You should instruct your broker to vote your shares in accordance with directions you provide.

**Q:**    **May I change my vote after I have submitted my executed proxy card?**

**A:**    Yes. You may change your vote by sending a later-dated, signed proxy card to Silver Run's secretary at the address listed below so that it is received by our secretary prior to the special meeting or attend the special meeting in person and vote. You also may revoke your proxy by sending a notice of revocation to Silver Run's secretary, which must be received prior to the special meeting.

**Q:**    **What should I do if I receive more than one set of voting materials?**

**A:**    You may receive more than one set of voting materials, including multiple copies of this proxy statement and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date and return each proxy card and voting instruction card that you receive in order to cast your vote with respect to all of your shares.

16

Table of Contents

**Q:   Who can help answer my questions?**

**A:**   If you have questions about the proposals or if you need additional copies of the proxy statement or the enclosed proxy card you should contact:

Silver Run Acquisition Corporation II
1000 Louisiana Street, Suite 1450
Houston, Texas 77002
Attention: Secretary

You may also contact our proxy solicitor at:

Morrow Sodali LLC
470 West Avenue
Stamford, Connecticut 06902
Telephone: (800) 662-5200
(banks and brokers call collect at: (203) 658-9400)
Email: SRUN.info@morrowsodali.com

To obtain timely delivery, our stockholders must request the materials no later than five (5) business days prior to the special meeting.

You may also obtain additional information about Silver Run from documents filed with the United States Securities and Exchange Commission (the "SEC") by following the instructions in the section entitled "Where You Can Find More Information."

If you intend to seek redemption of your public shares, you will need to send a letter demanding redemption and deliver your stock (either physically or electronically) to our transfer agent at least two business days prior to the special meeting in accordance with the procedures detailed under the question "How do I exercise my redemption rights?" If you have questions regarding the certification of your position or delivery of your stock, please contact:

Continental Stock Transfer & Trust Company
1 State Street—30th Floor
New York, New York 10004
Attention: Mark Zimkind
Email: mzimkind@continentalstock.com

**Q:   Who will solicit and pay the cost of soliciting proxies?**

**A:**   Silver Run will pay the cost of soliciting proxies for the special meeting. Silver Run has engaged Morrow Sodali LLC ("Morrow Sodali"), to assist in the solicitation of proxies for the special meeting. Silver Run has agreed to pay Morrow Sodali a fee of $25,000, plus disbursements. Silver Run will reimburse Morrow Sodali for reasonable out-of-pocket expenses and will indemnify Morrow Sodali and its affiliates against certain claims, liabilities, losses, damages and expenses. Silver Run will also reimburse banks, brokers and other custodians, nominees and fiduciaries representing beneficial owners of shares of Class A Common Stock and Class B Common Stock for their expenses in forwarding soliciting materials to beneficial owners of Class A Common Stock and Class B Common Stock and in obtaining voting instructions from those owners. Our directors, officers and employees may also solicit proxies by telephone, by facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies.

17

**Table of Contents**

**SUMMARY OF THE PROXY STATEMENT**

*This summary highlights selected information from this proxy statement and does not contain all of the information that is important to you. To better understand the business combination and the proposals to be considered at the special meeting, you should read this entire proxy statement carefully, including the annexes. See also the section entitled "Where You Can Find More Information."*

*This proxy statement includes certain terms commonly used in the oil and natural gas industry, which are defined elsewhere in this proxy statement in "Glossary of Oil and Natural Gas Terms" set forth in Annex I.*

**Parties to the Business Combination**

**Silver Run Acquisition Corporation II**

Silver Run Acquisition Corporation II ("Silver Run," "we," "our" and "us") is a Delaware blank check company formed on November 16, 2016 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving Silver Run and one or more businesses. Upon the Closing, we intend to change our name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc."

Our Class A common stock, par value $0.0001 per share (the "Class A Common Stock"), warrants and units, consisting of one share of Class A Common Stock and one-third of one warrant ("units"), are traded on The NASDAQ Capital Market ("NASDAQ") under the ticker symbols "SRUN," "SRUNW" and "SRUNU," respectively. We have applied to continue the listing of our Class A Common Stock and warrants on NASDAQ under the symbols "AMR" and "AMRRW," respectively, upon the Closing. The units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security.

The mailing address of Silver Run's principal executive office is 1000 Louisiana Street, Suite 1450 Houston, Texas 77002.

**Alta Mesa Holdings LP**

Founded in 1987, Alta Mesa is an independent exploration and production company focused on the development and acquisition of unconventional oil and natural gas reserves in the eastern portion of the Anadarko Basin referred to as the STACK. The STACK is an acronym describing both its location—Sooner Trend Anadarko Basin Canadian and Kingfisher County—and the multiple, stacked productive formations present in the area. The STACK is a prolific hydrocarbon system with high oil and liquids-rich natural gas content, multiple horizontal target horizons, extensive production history and historically high drilling success rates. As of September 30, 2017, Alta Mesa had assembled a highly contiguous position of approximately 130,000 net acres largely in the up-dip, naturally-fractured oil portion of the STACK in eastern Kingfisher County, Oklahoma. As of December 31, 2016, Alta Mesa had 4,196 identified gross horizontal drilling locations, 2,075 of which it expects to operate. These drilling locations are in Alta Mesa's primary target formations comprised of the Osage, Meramec and Oswego. Alta Mesa continues to opportunistically acquire acreage in its non-operated locations with the goal of operating wells in these locations. As of September 30, 2017, Alta Mesa was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017.

The mailing address of Alta Mesa's principal executive office is 15021 Katy Freeway, Suite 400, Houston, Texas 77094.

18

**Table of Contents**

For more information about Alta Mesa, see the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa" and "Business of Alta Mesa."

**Kingfisher Midstream, LLC**

Kingfisher is a Delaware limited liability company formed on January 30, 2015 by ARM Midstream, LLC, affiliates of HPS and HMS Kingfisher Holdco, LLC for the purpose of acquiring, developing and operating midstream oil and gas assets. Kingfisher primarily focuses on providing crude oil gathering, gas gathering and processing and marketing to producers of natural gas, NGLs, crude oil and condensate in the STACK play. Kingfisher's midstream energy asset network includes approximately 308 miles of existing low and high pressure pipelines, a 60 MMcf/d cryogenic natural gas processing plant, 10 MMcf/d in offtake processing, compression facilities, crude storage, NGL storage and purchasing and marketing capabilities.

The mailing address of Kingfisher's principal executive office is 20329 State Highway 249, Suite 450, Houston, Texas 77070.

For more information about Kingfisher, see the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations of Kingfisher" and "Business of Kingfisher."

**The Business Combination**

On August 16, 2017, Silver Run entered into the Contribution Agreements to acquire from the Contributors (i) 100% of the limited partner interests in Alta Mesa, (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP and (iii) all of the membership interests of Kingfisher, on the terms and subject to the conditions set forth therein. Pursuant to the Contribution Agreements, Silver Run will contribute cash to SRII Opco, in exchange for (i) a number of SRII Opco Common Units equal to the number of shares of Class A Common Stock outstanding as of the Closing, and (ii) a number of SRII Opco warrants exercisable for SRII Opco Common Units equal to the number of Silver Run's warrants outstanding as of the Closing. Following the Closing, Silver Run will control SRII Opco through its ownership of SRII Opco GP, LLC, the sole general partner of SRII Opco.

Pursuant to the terms of the Alta Mesa Contribution Agreement, at the Closing, the Alta Mesa Contributor will receive consideration consisting of 220,000,000 SRII Opco Common Units, as adjusted (i) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit), (ii) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit), and (iii) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit). In addition, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as more fully described in "— Impact of the Business Combination on Silver Run's Public Float—Impact of the Earn-out Consideration." Silver Run will also contribute $400 million in cash to Alta Mesa at the Closing.

Pursuant to the terms of the Kingfisher Contribution Agreement, at the Closing, the Kingfisher Contributor will receive consideration of 55,000,000 SRII Opco Common Units and, subject to the Kingfisher Contributor's election to receive additional SRII Opco Common Units as described below, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees. If Silver Run does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units (and

19

Table of Contents

acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per SRII Opco Common Unit. In addition, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as more fully described in "—Impact of the Business Combination on Silver Run's Public Float—Impact of the Earn-out Consideration."

In connection with the execution of the Riverstone Contribution Agreement, the Riverstone Contributor made a $200 million capital contribution to Alta Mesa, in exchange for limited partner interests in Alta Mesa. Alta Mesa may use such capital to fund its capital expenditures during the interim period. Pursuant to the Riverstone Contribution Agreement, at the Closing, the Riverstone Contributor will receive 20,000,000 SRII Opco Common Units in exchange for the Riverstone Contributor's limited partner interests in Alta Mesa and will acquire a corresponding number of shares of Class C Common Stock from Silver Run.

At the Closing, Silver Run will also issue to the Contributors a number of shares of our Class C Common Stock, par value $0.0001 per share (the "Class C Common Stock"), equal to the number of SRII Opco Common Units issued to such Contributors pursuant to the Contribution Agreements. After a specified period of time after Closing, the Contributors will generally have the right to cause SRII Opco to redeem all or a portion of their SRII Opco Common Units in exchange for shares of our Class A Common Stock or, at SRII Opco's option, an equivalent amount of cash; provided that we may, at our option, effect a direct exchange of such cash or Class A Common Stock for such SRII Opco Common Units in lieu of such redemption by SRII Opco. Upon the future redemption or exchange of SRII Opco Common Units held by a Contributor, a corresponding number of shares of Class C Common Stock will be cancelled. For more information about the Class C Common Stock, see the section entitled "Proposal No. 2—The Class C Charter Proposal—Description of Class C Common Stock."

In connection with the Closing, we will also issue (i) one share of Series A Preferred Stock to each of Bayou City, HPS, and AM Management, and (ii) one share of Series B Preferred Stock to the Riverstone Contributor. None of the holders of the Series A Preferred Stock or Series B Preferred Stock will be entitled to any dividends from Silver Run related to such Preferred Stock, but such holders will be entitled to preferred distributions in liquidation in the amount of $0.0001 per share of Preferred Stock, and will have limited voting rights as described below. Shares of the Preferred Stock will be redeemable for the par value thereof by us upon the earlier to occur of (1) the fifth anniversary of the Closing Date, (2) the optional redemption of such Preferred Stock at the election of the holder thereof or (3) upon a breach by the holder of the transfer restrictions applicable to such Preferred Stock. For so long as the Series A Preferred Stock or Series B Preferred Stock remains outstanding, as applicable, the holders thereof will be entitled to nominate and elect directors to Silver Run's board of directors for a period of five years following the Closing based on their and their affiliates' beneficial ownership of Class A Common Stock. For more information about the Series A Preferred Stock, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Certificates of Designation."

For more information about the Contribution Agreements and the business combination and other transactions contemplated thereby, see the section entitled "Proposal No. 1—The Business Combination Proposal."

**Conditions to the Closing**

Under each of the Contribution Agreements, the obligations of the applicable parties to consummate the transactions contemplated thereby are subject to a number of customary conditions, including, among others, the following: (i) the absence of specified adverse laws or orders, (ii) if applicable, the expiration of the waiting period (or extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (iii) the representations and warranties of the other party being true and correct, subject to the

20

Table of Contents

materiality standards contained in the applicable Contribution Agreement, (iv) material compliance by the other parties with their respective covenants, (v) no material adverse effect having occurred with respect to Alta Mesa or Kingfisher, as applicable, since the signing of the applicable Contribution Agreement, (vi) the approval for listing on the NASDAQ of the shares of Class A Common Stock issuable to the Alta Mesa Contributor, the Kingfisher Contributor and the Riverstone Contributor and (vii) the approval of the business combination by Silver Run's stockholders. The closing of the transactions contemplated under each of the Contribution Agreements is also conditioned upon the closing of the transactions contemplated by the other Contributions Agreements.

In addition to the above conditions, under the Alta Mesa Contribution Agreement, it is condition to each party's obligation to consummate the Alta Mesa Contribution that SRII Opco's leverage ratio is less than 1.5x on a pro forma, last 12 months (LTM) basis (the "Leverage Ratio Condition"). Under the Kingfisher Contribution Agreement, the satisfaction of the Leverage Ratio Condition is a condition to only Silver Run's obligations to consummate the Kingfisher Contribution. The Kingfisher Contribution Agreement also provides that, subject to the Kingfisher Contributor electing to receive additional SRII Opco Common Units as described above under "—The Business Combination," the Kingfisher Contributor's obligation to consummate the Kingfisher Contribution Agreement is conditioned upon Silver Run having available funds to pay the cash consideration.

### Regulatory Matters

To complete the business combination, Silver Run and the Contributors must obtain approvals or consents from, or make filings with certain U.S. federal authorities. The business combination is subject to the requirements of the HSR Act, which prevents Silver Run and the Contributors from completing the business combination until required information and materials are furnished to the Antitrust Division of the Department of Justice (the "DOJ") and the Federal Trade Commission (the "FTC") and specified waiting period requirements have been satisfied. On September 7, 2017, Silver Run filed a Premerger Notification and Report Form pursuant to the HSR Act with the DOJ and FTC. On September 18, 2017, the DOJ and the FTC granted early termination of the waiting period under the HSR Act.

For more information, see the section entitled "Proposal No. 1—The Business Combination Proposal—Regulatory Matters."

### Termination Rights

Each of the Contribution Agreements contains certain customary termination rights, including, among others, the following: (i) if the closing of the applicable transaction is not consummated by February 28, 2018 (the "Outside Date"); (ii) upon the applicable parties' mutual written consent; (iii) if the consummation of the applicable transaction is prohibited by law; (iv) breach of a representation, warranty, covenant or other agreement by a party which has not been cured by the earlier of (x) 30 days following written notice from the other party of such breach and (y) the Outside Date; (v) in the case of the Alta Mesa Contribution Agreement, by either party if the Kingfisher Contribution Agreement has been terminated in accordance with its terms or by the Alta Mesa Contributor if our board of directors has changed its recommendation for our stockholders to approve the business combination; or (vi) in the case of the Kingfisher Contribution Agreement, by either party if the Alta Mesa Contribution Agreement has been terminated in accordance with its terms.

None of the parties to the Contribution Agreements is required to pay a termination fee or reimburse any other party for its expenses as a result of a termination of the applicable Contribution Agreement. For more information, see the section entitled "Proposal No. 1—The Business Combination Proposal—The Contribution Agreements—Termination."

21

Table of Contents

**Indemnification under the Kingfisher Contribution Agreement**

Under the Kingfisher Contribution Agreement, the Kingfisher Contributor will indemnify Silver Run for any losses relating to (i) a breach of any representation, warranty or covenant of the Kingfisher Contributor or Kingfisher; (ii) pre-Closing taxes; (iii) obligations under Kingfisher's engagement letters with its financial advisors; and (iv) indemnification claims made by Asset Risk Management, LLC ("ARM") against Kingfisher after Closing under the Second Amended and Restated Operating and Construction Management Agreement, dated August 4, 2017, by and between Kingfisher and ARM (the "Operator Agreement"). Additionally, Silver Run will indemnify the Kingfisher Contributor for any losses relating to a breach of any of Silver Run's representations, warranties or covenants.

The indemnification obligations of the Kingfisher Contributor and Silver Run set forth above are subject to a de minimis threshold of $250,000, a deductible of $40 million and a cap equal to the value of the Reserved Units (as defined herein). The Reserved Units serve as the sole source of recovery for any indemnification claim, except in the event of fraud. The Kingfisher Contributor has agreed that it will not transfer 16,000,000 SRII Opco Common Units (and a corresponding number of shares of Class C Common Stock) received as consideration (the "Reserved Units") and, subject to the removal of such transfer restriction as described herein, such Reserved Units will be available to satisfy any indemnification obligations of the Kingfisher Contributor. The transfer restriction relating to 8,000,000 Reserved Units will be removed on the first anniversary of the Closing and the transfer restriction relating to any remaining Reserved Units will be removed 18 months after Closing. The value of the Reserved Units for purposes of satisfying any indemnity claim will be based on the volume-weighted average price of the Class A Common Stock for the 20 trading days immediately prior to the applicable valuation date.

**Other Agreements**

*Agreements Related to the Contribution Agreements*

*Forward Purchase Agreement.* In connection with the execution of the Contribution Agreements, on August 16, 2017, Silver Run entered into a forward purchase agreement (the "Business Combination Forward Purchase Agreement") with Riverstone VI SR II Holdings, L.P., a Delaware limited partnership ("Fund VI Holdings"), pursuant to which Silver Run has agreed to sell at the Closing, and Fund VI Holdings has agreed to purchase, up to $200 million of shares of Class A Common Stock at a purchase price of $10.00 per share. The number of shares of Class A Common Stock to be sold by us, and purchased by Fund VI Holdings, will equal that number which, after payment of the aggregate purchase price paid by Fund VI Holdings under the Business Combination Forward Purchase Agreement, will result in gross proceeds to us in an aggregate amount necessary to satisfy any exercise of rights of the public stockholders in connection with the business combination or determined by us and Fund VI Holdings to be necessary for general corporate purposes in connection with or following consummation of the business combination, but in no event will the number of shares of Class A Common Stock purchased exceed 20,000,000 shares. For more information about the Forward Purchase Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Contribution Agreements."

*Amended and Restated Limited Partnership Agreement of SRII Opco.* Following completion of the business combination, we will operate our business through SRII Opco and its subsidiaries, including Alta Mesa and Kingfisher. At the Closing, we and the Contributors will enter into a second amended and restated agreement of limited partnership of SRII Opco (the "SRII Opco LPA"), which will set forth, among other things, the rights and obligations of the holders of SRII Opco Common Units. For more information about the SRII Opco LPA, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Contribution Agreements—Amended and Restated Agreement of Limited Partnership of SRII Opco."

22

Table of Contents

*Registration Rights Agreement.* In connection with the Closing, we and the Contributors will enter into a Registration Rights Agreement (the "Registration Rights Agreement"), pursuant to which we will be required to register for resale shares of Class A Common Stock issuable upon the future redemption or exchange of SRII Opco Common Units by the Contributors (collectively, "Registrable Securities"). The Registration Rights Agreement will also provide for certain rights of the Contributors to request the resale of their Registrable Securities in an underwritten offering and for piggyback rights. For more information about the Registration Rights Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Contribution Agreements—Registration Rights Agreement."

*Second Amended and Restated Charter.* Pursuant to the terms of the Contribution Agreements, upon the Closing, we will amend and restate our Charter to, among other things, (a) create a new class of capital stock, the Class C Common Stock, to be issued to the Contributors at the Closing, (b) adopt Delaware as the exclusive forum for certain stockholder litigation and (c) eliminate certain provisions in the Charter relating to an initial merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (an "Initial Business Combination") that will no longer be applicable to us following the Closing. In addition, we will amend our Charter to increase the number of authorized shares of our Class A Common Stock from 400,000,000 to 1,200,000,000. For more information about the amendments to our Charter, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Contribution Agreements—Second Amended and Restated Charter."

### Agreements Related to the Alta Mesa Contribution Agreement

*Series A Certificate of Designation.* Upon the Closing, we will file with the Secretary of State of the State of Delaware the Certificate of Designation of Series A Preferred Stock of Silver Run Acquisition Corporation II (the "Series A Certificate of Designation"), which will set forth the terms, rights, obligations and preferences of the Series A Preferred Stock, a share of which will be issued to each of Bayou City, HPS and AM Management at the Closing. A copy of the Series A Certificate of Designation is attached to this proxy statement as *Annex E*. For more information about the Series A Certificate of Designation and the terms, rights, obligations and preferences of the Series A Preferred Stock, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Series A Certificate of Designation"

*Management Services Agreement.* In connection with the Closing, Alta Mesa will enter into a management services agreement (the "Management Services Agreement") with High Mesa, Inc., a limited partner of the Alta Mesa Contributor ("High Mesa"). Under the Management Services Agreement, during the 180-day period following the Closing, Alta Mesa will provide certain administrative, management and operational services necessary to manage the business of High Mesa and its subsidiaries (the "Services"), in each case, subject to and in accordance with the approved budget. For a period of 60 days following the expiration of the term, Alta Mesa is obligated to assist High Mesa with the transition of the Services from Alta Mesa to a successor service provider. As compensation for the Services, including during any transition to a successor service provider, High Mesa will pay Alta Mesa each month (i) a management fee of $10,000, (ii) an amount equal to Alta Mesa's costs and expenses incurred in connection with providing the Services as provided for in an approved budget and (iii) an amount equal to Alta Mesa's costs and expenses incurred in connection with any emergency. For more information about the Management Services Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Management Services Agreement."

*Tax Receivable Agreement.* In connection with the business combination, Alta Mesa will enter into a tax receivable agreement (the "Tax Receivable Agreement") with SRII Opco and the Initial Limited Partners. This agreement generally provides for the payment by Silver Run of 85% of the amount of cash savings, if any, in

23

Table of Contents

U.S. federal, state and local income tax that it actually realizes (or is deemed to realize in certain circumstances) in periods after the business combination as a result of (i) certain tax basis increases resulting from the exchange of SRII Opco Common Units for Class A Common Stock (or, under certain circumstances, cash) pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA, other than such tax basis increases allocable to assets held by Kingfisher or otherwise used in Kingfisher's midstream business, and (ii) interest paid or deemed to be paid by us as a result of, and additional tax basis arising from, any payments we make under the Tax Receivable Agreement. Silver Run will retain the benefit of the remaining 15% of these cash savings.

Pursuant to the terms of the Tax Receivable Agreement, if the agreement terminates early (at our election or as a result of our material breach), we would be required to make a substantial, immediate lump-sum payment based upon the present value of hypothetical tax benefits that could be derived by us based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement."

*Pre-Closing Assignment Agreement*. Prior to the Closing, Alta Mesa will enter into an assignment agreement (the "Assignment Agreement") to transfer to its existing owners (other than the Riverstone Contributor) its non-STACK assets pursuant to the terms of the Alta Mesa Contribution Agreement, and such existing owners will indemnify Alta Mesa for any losses relating to employment, environmental and tax liabilities of such non-STACK assets.

*Voting Agreement*. Certain existing owners of Alta Mesa, including Mr. Chappelle, Mr. Ellis and certain affiliates of Bayou City and HPS, own an aggregate 10% voting interest in Alta Mesa GP and will continue to own such interest following the Closing. These existing owners are a party to a voting agreement with the Alta Mesa Contributor and Alta Mesa GP, pursuant to which they have agreed to vote their interests in Alta Mesa GP as directed by the Alta Mesa Contributor. In connection with the Closing, the parties will amend and restate the voting agreement to include SRII Opco as a party and the existing owners will agree to vote their interests in Alta Mesa GP as directed by SRII Opco. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Voting Agreement."

### Agreements Related to the Kingfisher Contribution Agreement

*Restrictive Covenant Agreement.* Upon the Closing, we will enter into a Restrictive Covenant Agreement with ARM, the current operator of Kingfisher's assets, pursuant to which ARM will agree to not conduct certain midstream services in Kingfisher, Garfield, Major, Blaine and Logan Counties, Oklahoma and certain townships in Canadian County, Oklahoma. For more information about the Restrictive Covenant Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Kingfisher Contribution Agreement—Restrictive Covenant Agreement."

*Transition Services Agreement*. In connection with the Closing, Kingfisher will enter into an operating transition services agreement (the "Transition Services Agreement") with ARM. Under the Transition Services Agreement, during the six-month period following the Closing, ARM will provide certain operational services with respect to certain gas gathering and processing systems and crude oil gathering facilities that are owned, or may be acquired, by Kingfisher in Kingfisher County, Oklahoma (the "TSA Services"), in each case, subject to and in accordance with an approved budget. As compensation for the TSA Services, Kingfisher will pay ARM each month (i) a management fee of $10,000, (ii) an amount equal to ARM's costs and expenses incurred in connection with providing the TSA Services as provided for in the approved budget and (iii) an amount equal to

24

Table of Contents

ARM's costs and expenses incurred in connection with any emergency. For more information about the Transition Services Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Kingfisher Contribution Agreement—Transition Services Agreement."

*Agreements Related to the Riverstone Contribution Agreement*

*Series B Certificate of Designation.* Upon the Closing, we will file with the Secretary of State of the State of Delaware the Certificate of Designation of Series B Preferred Stock of Silver Run Acquisition Corporation II (the "Series B Certificate of Designation"), which will set forth the terms, rights, obligations and preferences of the Series B Preferred Stock, a share of which will be issued to the Riverstone Contributor at the Closing. A copy of the Series B Certificate of Designation is attached to this proxy statement as *Annex F*. For more information about the Series B Certificate of Designation and the terms, rights, obligations and preferences of the Series B Preferred Stock, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Riverstone Contribution Agreement—Series B Certificate of Designation."

### Interests of Certain Persons in the Business Combination

In considering the recommendation of our board of directors to vote in favor of the business combination, stockholders should be aware that, aside from their interests as stockholders, our Sponsor and certain of our directors and officers have interests in the business combination that are different from, or in addition to, those of other stockholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the business combination, and in recommending to stockholders that they approve the business combination. Stockholders should take these interests into account in deciding whether to approve the business combination. These interests include, among other things:

- the fact that our Sponsor holds private placement warrants that would expire worthless if a business combination is not consummated;

- the fact that our Sponsor, officers and directors have agreed not to redeem any of the shares of Class A Common Stock held by them in connection with a stockholder vote to approve the business combination;

- the fact that our Sponsor paid an aggregate of $25,000 for its founder shares and such securities will have a significantly higher value at the time of the business combination, which if unrestricted and freely tradable would be valued at approximately $262,399,680 based on the closing price of our Class A Common Stock on January 18, 2018;

- if the Trust Account is liquidated, including in the event we are unable to complete an Initial Business Combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser amount per public share as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continuation of James T. Hackett as a director of Silver Run and becoming the Executive Chairman of the board of directors and Chief Operating Officer—Midstream and the Riverstone Contributor's right to nominate up to three directors to our board of directors for a period of five years following the Closing based on its and its affiliates' beneficial ownership of our Class A Common Stock in accordance with the terms of its Series B Preferred Stock;

25

Table of Contents

- the fact that each of our independent directors owns 33,000 founder shares that were purchased from our Sponsor at $0.002 per share, which if unrestricted and freely tradeable would be valued at approximately $335,940 based on the closing price of our Class A Common Stock on January 18, 2018;

- the fact that an affiliate of our Sponsor invested $200 million in equity in Alta Mesa upon the execution of the Contribution Agreements and will not have any public market in which to sell that investment if the Closing does not occur;

- the fact that our Sponsor, officers and directors may not participate in the formation of, or become a director or officer of, any other blank check company until we have entered into a definitive agreement regarding an Initial Business Combination or fail to complete an Initial Business Combination by March 29, 2019;

- the fact that our Sponsor, officers and directors will lose their entire investment in us if an Initial Business Combination is not completed; and

- that we are a party to a registration rights agreement with our Sponsor and certain of our directors, which provides for registration rights to such parties.

### Reasons for the Approval of the Business Combination

After careful consideration, the Silver Run board of directors recommends that Silver Run stockholders vote "FOR" each Proposal being submitted to a vote of the Silver Run stockholders at the Silver Run special meeting.

For a description of Silver Run's reasons for the approval of the business combination and the recommendation of the Silver Run board of directors, see the section entitled "Proposal No. 1—The Business Combination Proposal—Silver Run's Board of Directors' Reasons for the Approval of the Business Combination."

### Redemption Rights

Under our Charter, holders of our Class A Common Stock may elect to have their shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by dividing (a) the aggregate amount on deposit in the Trust Account as of two (2) business days prior to the consummation of the business combination, including interest (which interest shall be net of taxes payable), by (b) the total number of shares of Class A Common Stock issued in the IPO; provided that Silver Run will not redeem any public shares to the extent that such redemption would result in Silver Run having net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) of less than $5,000,001. As of September 30, 2017, this would have amounted to approximately $10.00 per share. Under our Charter, in connection with an Initial Business Combination, a public stockholder, together with any affiliate or any other person with whom such stockholder is acting in concert of as a "group" (as defined under Section 13(d)(3) of the Exchange Act), is restricted from seeking redemption rights with respect to more than 20% of the public shares.

If a holder exercises its redemption rights, then such holder will be exchanging its shares of Class A Common Stock for cash and will no longer own shares of Class A Common Stock and will not participate in the future growth of Silver Run, if any. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to Silver Run's transfer agent in accordance with the procedures described herein. See the section entitled "Special Meeting of Silver Run Stockholders— Redemption Rights" for the procedures to be followed if you wish to redeem your shares for cash.

https://www.sec.gov/Archives/edgar/data/1690769/000119312518014904/d510702ddefm14a.htm

**Table of Contents**

**Impact of the Business Combination on Silver Run's Public Float**

It is anticipated that, upon the Closing, the ownership of Silver Run will be as follows:

- the public stockholders will own 103,500,000 shares of our Class A Common Stock, representing an approximate 61.1% economic interest and an approximate 26.9% voting interest;

- the holders of our founder shares, including our Sponsor and independent directors, will own 25,875,000 shares of our Class A Common Stock, representing an approximate 15.3% economic interest and an approximate 6.7% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 36.4% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 14.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 5.2% voting interest; and

- Fund VI Holdings will own 40,000,000 shares of our Class A Common Stock, representing a 23.6% economic interest and a 10.4% voting interest.

Our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 38.9% economic interest and an approximate 22.3% voting interest in Silver Run upon the Closing.

Additionally, Bayou City, HPS and AM Management will each own one share of our Series A Preferred Stock and the Riverstone Contributor will own one share of our Series B Preferred Stock. The Preferred Stock will not have an economic interest and will provide the holders thereof limited voting rights as described herein.

If the actual facts are different than the assumptions set forth in "Certain Defined Terms," the economic and voting interest set forth above will be different. For example, if we assume that all outstanding 34,500,000 public warrants, 15,133,333 private placement warrants and 13,333,333 warrants purchased by Fund VI Holdings under the IPO Forward Purchase Agreement were exercisable and exercised following completion of the business combination, then the ownership of Silver Run's Class A Common Stock and Class C Common Stock would be as follows:

- the public stockholders and holders of the public warrants will own 138,000,000 shares of our Class A Common Stock, representing an approximate 59.4% economic interest and an approximate 30.9% voting interest;

- the holders of our founder shares and the private placement warrants, including our Sponsor and independent directors, will own 41,088,333 shares of our Class A Common Stock, representing an approximate 17.7% economic interest and an approximate 9.2% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 31.3% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 12.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 4.5% voting interest; and

- Fund VI Holdings will own 53,333,333 shares of our Class A Common Stock, representing an approximate 23.0% economic interest and an approximate 11.9% voting interest.

27

Table of Contents

In this scenario, our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will own collectively an approximate 40.7% economic interest and an approximate 25.6% voting interest in Silver Run upon the Closing.

The warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination and 12 months following the closing of the IPO and will expire five years after the completion of an Initial Business Combination or earlier upon their redemption or liquidation.

In addition, if public stockholders elect to have their public shares redeemed in connection with the business combination, Fund VI Holdings has agreed to offset up to $200 million of such redemptions through the purchase of 20,000,000 additional shares of Class A Common Stock from Silver Run at $10.00 per share. In such a case, economic and voting interests of the public stockholders will decrease, and the economic and voting interests of Fund VI Holdings will increase, accordingly, but the economic and voting interests of the holders of our founder shares and the Contributors will not be affected.

Please see the section entitled "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

### Impact of the Earn-out Consideration

Pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, for a period of seven years following the Closing, the Alta Mesa Contributor and the Kingfisher Contributor may be entitled to receive additional SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) as earn-out consideration if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices as follows (each such payment, an "Earn-Out Payment"):

| 20-Day VWAP | Earn-Out Consideration Payable to Alta Mesa Contributor | Earn-Out Consideration Payable to Kingfisher Contributor |
|---|---|---|
| $14.00 | 10,714,285 SRII Opco Common Units | 7,142,857 SRII Opco Common Units |
| $16.00 | 9,375,000 SRII Opco Common Units | 6,250,000 SRII Opco Common Units |
| $18.00 | 13,888,889 SRII Opco Common Units | — |
| $20.00 | 12,500,000 SRII Opco Common Units | — |

Neither the Alta Mesa Contributor nor the Kingfisher Contributor will be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-Day VWAP entitles the Alta Mesa Contributor or the Kingfisher Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the Alta Mesa Contributor and/or the Kingfisher Contributor will be entitled to receive each such Earn-Out Payment. The Alta Mesa Contributor and the Kingfisher Contributor will be entitled to the earn-out consideration described above in connection with certain liquidity events of Silver Run, including a merger or sale of all or substantially all of our assets, if the consideration paid to holders of Class A Common Stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

28

Table of Contents

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, public warrants and warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement remain outstanding and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated above and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1)(2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 25.7% | 6.4% | 37.4% | 15.5% | 5.0% | 10.0% |
| $16.00 | 24.8% | 6.2% | 38.3% | 16.3% | 4.8% | 9.6% |
| $18.00 | 23.9% | 6.0% | 40.3% | 15.9% | 4.6% | 9.3% |
| $20.00 | 23.3% | 5.8% | 42.0% | 15.4% | 4.5% | 9.0% |

(1)    Includes our Sponsor and independent directors.
(2)    Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 21.4% voting interest at $14.00; (b) an approximate 20.6% voting interest at $16.00; (c) an approximate 19.9% voting interest at $18.00; and (d) an approximate 19.3% voting interest at $20.00.

Assuming that the earn-out consideration were payable at Closing, the private placement warrants, the public warrants and the warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement are exercised and based upon the other assumptions set forth under "Certain Defined Terms," the ownership of the economic interests in Silver Run would remain the same as illustrated above and the ownership of the voting interests in Silver Run would be as follows:

| 20-Day VWAP | Public Stockholders | Holders of Founder Shares(1)(2) | Alta Mesa Contributor | Kingfisher Contributor | Riverstone Contributor(2) | Fund VI Holdings(2) |
|---|---|---|---|---|---|---|
| $14.00 | 29.7% | 8.8% | 32.4% | 13.4% | 4.3% | 11.5% |
| $16.00 | 28.7% | 8.5% | 33.3% | 14.2% | 4.2% | 11.1% |
| $18.00 | 27.9% | 8.3% | 35.1% | 13.8% | 4.0% | 10.8% |
| $20.00 | 27.2% | 8.1% | 36.7% | 13.5% | 3.9% | 10.5% |

(1)    Includes our Sponsor and independent directors.
(2)    Assuming the earn-out consideration is received by the Alta Mesa Contributor and the Kingfisher Contributor at each applicable hurdle, our affiliates, which include the holders of our founder shares, the Riverstone Contributor and Fund VI Holdings, would collectively have: (a) an approximate 24.6% voting interest at $14.00; (b) an approximate 23.8% voting interest at $16.00; (c) an approximate 23.1% voting interest at $18.00; and (d) an approximate 22.5% voting interest at $20.00.

Please see the section entitled "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

29

Table of Contents

**Organizational Structure**

*Prior to the Business Combination*

The following diagram illustrates the ownership structure of Silver Run prior to the business combination.



(1)    Includes founder shares held by our Sponsor and independent directors.
(2)    The economic and voting interests set forth above do not account for private placement warrants and public warrants that will remain outstanding following the business combination and may be exercised at a later date.

*Following the Business Combination*

The diagram below illustrates the ownership structure of Silver Run immediately following the business combination. The voting and economic interests set forth in the diagram do not take into account the private placement warrants, public warrants or warrants to be purchased by Fund VI Holdings under the IPO Forward Purchase Agreement that will remain outstanding following the business combination and may be exercised at a later date and assume the following:

- at Closing, the Alta Mesa Contributor receives 139,800,000 SRII Opco Common Units (and acquires 139,800,000 shares of Class C Common Stock), based on (x) no estimated inorganic acquisition capital expenditures invested by Alta Mesa, (y) the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements, and (z) $602 million in purchase price adjustments under the Alta Mesa Contribution Agreement relating to estimated debt and transaction expenses,

- at Closing, Silver Run has cash on hand necessary to pay the cash consideration to the Kingfisher Contributor and, accordingly, the Kingfisher Contributor receives 55,000,000 SRII Opco Common Units (and acquires 55,000,000 shares of Class C Common Stock),

- no public stockholders elect to have their public shares redeemed and, accordingly, no shares of Class A Common Stock are issued to Fund VI Holdings pursuant to the terms of the Business Combination Forward Purchase Agreement,

- 40,000,000 shares of Class A Common Stock are issued to Fund VI Holdings for an aggregate purchase price of $400 million pursuant to the terms of the IPO Forward Purchase Agreement,

30

**Table of Contents**

- none of Silver Run's existing stockholders or the parties to the Contribution Agreements or Forward Purchase Agreements, who will become stockholders of Silver Run at the Closing, purchase shares of Class A Common Stock in the open market, and

- there are no other issuances of equity interests of Silver Run prior to or in connection with the Closing.



_____

(1) Includes (x) shares of Class C Common Stock, 1 share of Series B Preferred Stock owned by the Riverstone Contributor and a 5.2% limited partner interest in SRII Opco and (y) shares of Class A Common Stock owned by Fund VI Holdings.

(2) Includes shares of Class A Common Stock issued upon conversion of the founders shares to our Sponsor and independent directors.

(3) The Series A Preferred Stock and the Series B Preferred Stock will not have any voting rights (other than the right to nominate a certain number of directors for election to our board of directors as described herein) or rights with respect to dividends but will be entitled to preferred distributions in liquidation in the amount of $0.0001 per share.

(4) Certain existing owners of Alta Mesa, including Mr. Chappelle, Mr. Ellis and certain affiliates of Bayou City and HPS, own an aggregate 10% voting interest in Alta Mesa GP and will continue to own such interest following the Closing. These existing owners are a party to a voting agreement with the Alta Mesa Contributor and Alta Mesa GP, pursuant to which they have agreed to vote their interests in Alta Mesa GP as directed by the Alta Mesa Contributor. In connection with the Closing, the parties will amend and restate the voting agreement to include SRII Opco as a party and the existing owners will agree to vote their interests in Alta Mesa GP as directed by SRII Opco. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Voting Agreement."

(5) The general partner interest in Alta Mesa owned by Alta Mesa GP will represent 0.18% of the total partnership interests in Alta Mesa.

(6) The limited partner interest in Alta Mesa owned by SRII Opco will represent 99.82% of the total partnership interests in Alta Mesa.

31

Table of Contents

### Board of Directors of Silver Run Following the Business Combination

Upon consummation of the business combination, we anticipate expanding the size of our board of directors from four directors to 11, including one director appointed by Bayou City and its affiliates, one director appointed by HPS and its affiliates and two directors appointed by AM Management and its affiliates, as the holders of our Series A Preferred Stock, and three directors appointed by the Riverstone Contributor and its affiliates, as the holder of our Series B Preferred Stock.

### Accounting Treatment

Silver Run will account for the acquisition of Alta Mesa and Kingfisher under the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, respectively, pursuant to the guidance in Financial Accounting Standards Board ("FASB") Accounting Standard Codification ("ASC") 805, Business Combinations ("ASC 805"), using the acquisition method of accounting with Silver Run as the acquirer. Under the acquisition method of accounting, Alta Mesa's and Kingfisher's assets and liabilities will be recorded at their fair values measured as of the acquisition date. The excess of the purchase price over the estimated fair values of Alta Mesa's and Kingfisher's net assets acquired, if applicable, will be recorded as goodwill.

### Appraisal Rights

Appraisal rights are not available to Silver Run stockholders in connection with the business combination.

### Other Proposals

In addition to the Business Combination Proposal, Silver Run stockholders will be asked to vote on the Charter Proposals, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal. For more information about the Charter Proposals, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal see the sections entitled "Proposal No. 2—The Class C Charter Proposal," "Proposal No. 3—The Authorized Share Charter Proposal," "Proposal No. 4—The Exclusive Forum Charter Proposal," "Proposal No. 5—The Additional Charter Proposal," "Proposal No. 6—The NASDAQ Proposal," "Proposal No. 7—The LTIP Proposal" and "Proposal No. 8—The Adjournment Proposal."

### Date, Time and Place of Special Meeting

The special meeting will be held at 9:00 a.m., local time, on February 6, 2018, at the offices of Latham & Watkins LLP, 885 3rd Avenue, New York, New York 10022, or such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals.

### Voting Power; Record Date

You will be entitled to vote or direct votes to be cast at the special meeting if you owned shares of Class A Common Stock or Class B Common Stock at the close of business on January 22, 2018, which is the record date for the special meeting. You are entitled to one vote for each share of Class A Common Stock or Class B Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. As of January 18, 2018, there were 129,375,000 shares of Class A Common Stock and Class B Common Stock outstanding in the aggregate, of which 103,500,000 are public shares and 25,875,000 are founder shares held by the Sponsor and our independent directors.

### Proxy Solicitation

Proxies may be solicited by mail. Silver Run has engaged Morrow Sodali to assist in the solicitation of proxies. If a stockholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the

32

Table of Contents

special meeting. A stockholder may also change its vote by submitting a later-dated proxy as described in the section entitled "Special Meeting of Silver Run Stockholders—Revoking Your Proxy."

### Quorum and Required Vote for Proposals for the Special Meeting

A quorum of Silver Run stockholders is necessary to hold a valid meeting. Holders of a majority in voting power of Class A Common Stock and Class B Common Stock issued and outstanding and entitled to vote at the special meeting, present in person or represented by proxy, constitute a quorum. Abstentions will count as present for the purposes of establishing a quorum.

The approval of the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Class A Common Stock and Class B Common Stock represented in person or by proxy and entitled to vote thereon and actually cast at the special meeting, voting as a single class. Approval of the Charter Proposals requires the affirmative vote of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock represented in person or by proxy and entitled to vote thereon at the special meeting, voting as a single class. Accordingly, if a valid quorum is otherwise established, a stockholder's failure to vote by proxy or to vote in person at the special meeting will have no effect on the outcome of any vote on the Business Combination Proposal, NASDAQ Proposal, the LTIP Proposal or the Adjournment Proposal, but will have the same effect as a vote AGAINST the Charter Proposals.

### Recommendation to Silver Run Stockholders

Our board of directors believes that each of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal is in the best interests of Silver Run and its stockholders and recommends that its stockholders vote "FOR" each of the Proposals to be presented at the special meeting.

When you consider the recommendation of the board of directors in favor of approval of these Proposals, you should keep in mind that the Sponsor, members of the board of directors and officers have interests in the business combination that are different from or in addition to (and which may conflict with) your interests as a stockholder. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Interests of Certain Persons in the Business Combination."

### Risk Factors

In evaluating the proposals set forth in this proxy statement, you should carefully read this proxy statement, including the annexes, and especially consider the factors discussed in the section entitled "Risk Factors."

### Summary Historical Reserve and Operating Data of Alta Mesa

The following tables present, for the periods and as of the dates indicated, summary data with respect to the estimated net proved reserves for Alta Mesa (which includes non-STACK assets) and for Alta Mesa's STACK assets and operating data. In connection with the Alta Mesa Contribution Agreement, Alta Mesa will distribute all of the non-STACK assets to its owners (other than the Riverstone Contributor) immediately prior to Closing.

The reserve estimates attributable to Alta Mesa's properties as of December 31, 2016 presented in the table below are based on a reserve report prepared by Alta Mesa's internal engineers and audited by Ryder Scott Company, L.P. ("Ryder Scott"), Alta Mesa's independent petroleum engineer (such report the "2016 Reserve Report"). A copy of the 2016 Reserve Report is attached to this proxy statement as *Annex H*. All of these reserve

33

Table of Contents

estimates were prepared in accordance with the SEC's rules regarding oil and natural gas reserve reporting that are currently in effect. The following tables also contain summary unaudited information regarding production and sales of oil, natural gas and natural gas liquids with respect to such properties.

    See the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa" and "Business of Alta Mesa—Alta Mesa's Oil and Natural Gas Reserves" in evaluating the material presented below.

| | Alta Mesa | | STACK Assets | |
| | Oil and Natural Gas Liquids (MBbls) | Gas (MMcf) | Oil and Natural Gas Liquids (MBbls) | Gas (MMcf) |
|---|---|---|---|---|
| **Proved Reserves(1)** | | | | |
| Developed | 24,809 | 93,361 | 20,951 | 72,951 |
| Undeveloped | 61,280 | 222,644 | 59,589 | 221,308 |
| Total Proved | 86,089 | 316,005 | 80,540 | 294,259 |

(1)    Alta Mesa's proved reserves as of December 31, 2016 were calculated using oil and natural gas price parameters established by current SEC guidelines and accounting rules based on unweighted arithmetic average prices as of the first day of each of the 12 months ended on such date. For December 31, 2016, these average prices were $42.75 per Bbl for oil and $2.49 per MMBtu for natural gas. Pricing was adjusted for basis differentials by field based on our historical realized prices. The estimated realized prices for natural gas liquids using a $42.75 per Bbl benchmark and adjusted for average differentials were $15.18. Natural gas liquid prices vary depending on the composition of the natural gas liquids basket and current prices for various components thereof, such as butane, ethane, and propane, among others.

| | | Nine Months Ended September 30, 2017 | | Year Ended December 31, 2016 |
|---|---|---|---|---|
| **Net production:** | | | | |
| Oil (MBbls) | | 3,533 | | 4,001 |
| Natural gas (MMcf) | | 14,073 | | 13,959 |
| Natural gas liquids (MBbls) | | 995 | | 956 |
|     Total (MBOE) | | 6,873 | | 7,284 |
|     Total (MMcfe) | | 41,237 | | 43,702 |
| **Average sales price per unit before hedging effects:** | | | | |
| Oil (per Bbl) | $ | 48.01 | $ | 40.91 |
| Natural gas (per Mcf) | | 2.68 | | 2.22 |
| Natural gas liquids (per Bbl) | | 22.93 | | 16.38 |
| Combined (per BOE) | | 33.49 | | 28.87 |
| Combined (per MMcfe) | | 5.58 | | 4.81 |
| **Average sales price per unit after hedging effects:** | | | | |
| Oil (per Bbl) | $ | 48.25 | $ | 61.53 |
| Natural gas (per Mcf) | | 2.81 | | 2.68 |
| Natural gas liquids (per Bbl) | | 22.14 | | 16.04 |
| Combined (per BOE) | | 33.75 | | 41.05 |
| Combined (per MMcfe) | | 5.63 | | 6.84 |
| **Average costs per BOE:** | | | | |
| Lease and plant operating expense | $ | 7.25 | $ | 7.81 |
| Marketing and transportation expense | | 3.14 | | 1.83 |
| Production and ad valorem taxes | | 1.28 | | 1.48 |
| Workover expense | | 0.74 | | 0.65 |

Table of Contents

## SELECTED HISTORICAL FINANCIAL INFORMATION OF SILVER RUN

The following table shows selected historical financial information of Silver Run for the periods and as of the dates indicated. The selected historical financial information of Silver Run as of December 31, 2016 and for the period from November 16, 2016 (inception) to December 31, 2016 was derived from the audited historical financial statements of Silver Run included elsewhere in this proxy statement. The selected historical interim financial information of Silver Run as of September 30, 2017 and for the nine months ended September 30, 2017 was derived from the unaudited interim financial statements of Silver Run included elsewhere in this proxy statement. The following table should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations of Silver Run" and our historical financial statements and the notes and schedules related thereto, included elsewhere in this proxy statement.

| | Nine Months Ended September 30, 2017 (unaudited) | | Period from November 16, 2016 (date of inception) to December 31, 2016 |
|---|---|---|---|
| **Statement of Operations Data:** | | | |
| Revenue | $ — | $ | — |
| General and administrative expenses | (1,546,928) | | (2,000) |
| Franchise taxes | (90,000) | | — |
| Other income—investment income on Trust Account | 3,946,417 | | — |
| Provision for income taxes | (1,349,746) | | — |
| Net income (loss) attributable to common shares | $ 959,743 | $ | (2,000) |
| Weighted average number of common shares outstanding: | | | |
| Basic (excluding shares subject to possible redemptions) | 28,577,517 | | 25,875,000 |
| Diluted | 129,375,000 | | 25,875,000 |
| Net income per common share—basic | $ 0.03 | $ | (0.00) |
| Net income per common share—diluted | $ 0.01 | $ | (0.00) |

| | As of September 30, 2017 (unaudited) | | As of December 31, 2016 |
|---|---|---|---|
| **Balance Sheet Data:** | | | |
| Total assets | $1,039,615,166 | $ | 395,052 |
| Total liabilities | $ 39,164,746 | $ | 372,052 |
| Value of Class A Common Stock that may be redeemed in connection with an Initial Business Combination ($10.00 per share) | $ 995,450,410 | $ | — |
| Total Stockholders' equity | $ 5,000,010 | $ | 23,000 |

35

Table of Contents

## SELECTED HISTORICAL FINANCIAL INFORMATION OF ALTA MESA

The following table shows selected historical financial information of Alta Mesa for the periods and as of the dates indicated. The selected historical consolidated financial information of Alta Mesa as of December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014 was derived from the audited historical consolidated financial statements of Alta Mesa included elsewhere in this proxy statement. The selected historical interim condensed consolidated financial information of Alta Mesa as of September 30, 2017 and for the nine months ended September 30, 2017 and 2016 was derived from the unaudited interim condensed consolidated financial statements of Alta Mesa included elsewhere in this proxy statement.

Alta Mesa's historical results are not necessarily indicative of future operating results. In addition, the selected historical financial information below includes the results of operations from Alta Mesa's non-STACK assets, which Silver Run will not acquire in the business combination. The selected consolidated and combined financial information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa," as well as the historical consolidated and combined financial statements of Alta Mesa and accompanying notes included elsewhere in this proxy statement.

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 | 2014 |
| | (Unaudited) | | (in thousands) | | |
| **Statement of Operations Data:** | | | | | |
| Operating Revenues and Other: | | | | | |
| Oil | $169,611 | $ 115,778 | $ 163,677 | $ 199,799 | $347,842 |
| Natural gas | 37,780 | 20,277 | 30,953 | 30,621 | 65,002 |
| Natural gas liquids | 22,814 | 10,109 | 15,663 | 10,864 | 18,281 |
| Other revenues | 274 | 358 | 415 | 682 | 1,003 |
| Total operating revenues | 230,479 | 146,522 | 210,708 | 241,966 | 432,128 |
| Gain on sale of assets | — | 3,723 | 3,542 | 67,781 | 87,520 |
| Gain on acquisition of oil and natural gas properties | 6,893 | — | — | — | — |
| Gain (loss) on derivative contracts | 38,024 | (23,970) | (40,460) | 124,141 | 96,559 |
| Total operating revenues and other | 275,396 | 126,275 | 173,790 | 433,888 | 616,207 |
| Operating expenses: | | | | | |
| Lease and plant operating expense | 49,836 | 45,222 | 56,893 | 67,706 | 64,686 |
| Marketing and transportation expense | 21,566 | 8,140 | 13,326 | 4,030 | 9,134 |
| Production and ad valorem taxes | 8,812 | 8,021 | 10,750 | 15,131 | 28,214 |
| Workover expense | 5,112 | 3,242 | 4,714 | 6,511 | 8,961 |
| Exploration expense | 19,930 | 15,304 | 24,777 | 42,718 | 61,912 |
| Depreciation, depletion, and amortization expense | 80,082 | 66,857 | 92,901 | 143,969 | 141,804 |
| Impairment expense | 29,206 | 14,238 | 16,306 | 176,774 | 74,927 |
| Accretion expense | 1,447 | 1,615 | 2,174 | 2,076 | 2,198 |
| General and administrative expenses | 35,534 | 32,909 | 41,758 | 44,454 | 69,198 |
| Total operating expenses | 251,525 | 195,548 | 263,599 | 503,369 | 461,034 |
| Income (loss) from operations | 23,871 | (69,273) | (89,809) | (69,481) | 155,173 |
| Other income (expense): | | | | | |
| Interest expense | (39,069) | (52,253) | (60,884) | (62,473) | (55,812) |
| Interest income | 880 | 672 | 894 | 723 | 15 |
| Loss on extinguishment of debt | — | — | (18,151) | — | — |
| Total other income (expense) | (38,189) | (51,581) | (78,141) | (61,750) | (55,797) |
| Income (loss) before state income taxes | (14,318) | (120,854) | (167,950) | (131,231) | 99,376 |
| Provision (benefit) for state income taxes | 285 | 107 | (29) | 562 | 176 |
| Net income (loss) | $(14,603) | $(120,961) | $(167,921) | $(131,793) | $ 99,200 |

36

Table of Contents

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| | 2017 | 2016 | 2016 | 2015 | 2014 |
| | (Unaudited) | | (in thousands) | | |
| **Cash Flow Data:** | | | | | |
| Net cash provided by operating activities | $ 55,516 | $ 7,473 | $ 131,376 | $ 143,978 | $ 184,884 |
| Net cash used in investing activities | (301,059) | (147,774) | (224,298) | (105,815) | (189,721) |
| Net cash provided by (used in) financing activities | 242,098 | 139,636 | 91,238 | (30,643) | (351) |
| **Other Supplementary Data:** | | | | | |
| Adjusted EBITDAX(1) | $ 112,274 | $ 133,499 | $ 172,850 | $ 211,806 | $ 261,443 |

| | September 30, 2017 | December 31, | | |
| | | 2016 | 2015 | 2014 |
| | (Unaudited) | (in thousands) | | |
| **Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ 4,913 | $ 7,618 | $ 8,974 | $ 25,142 |
| Other current assets | 81,945 | 58,624 | 114,095 | 139,254 |
| Total current assets | 86,858 | 66,242 | 123,069 | 164,396 |
| Total property and equipment, net | 954,006 | 721,893 | 537,039 | 697,681 |
| Other long-term assets | 43,032 | 25,716 | 62,417 | 49,048 |
| Total assets | $ 1,083,896 | $813,851 | $ 722,525 | $911,125 |
| Current liabilities | $ 200,520 | $152,403 | $ 84,731 | $118,696 |
| Revolving credit facility | 75,065 | 40,622 | 152,000 | 319,520 |
| Senior notes and Term Loan, net of unamortized deferred financing costs | 490,182 | 489,283 | 565,775 | 441,622 |
| Other long-term liabilities | 100,626 | 99,437 | 97,068 | 92,733 |
| Total liabilities | 866,393 | 781,745 | 899,574 | 972,571 |
| Owners' equity | 217,503 | 32,106 | (177,049) | (61,446) |
| Total liabilities and owners' equity | $ 1,083,896 | $813,851 | $ 722,525 | $911,125 |

(1) Adjusted EBITDAX is a non-GAAP financial measure. For a definition of Adjusted EBITDAX and a reconciliation of Adjusted EBITDAX to net income, see "—Non-GAAP Financial Measure" below.

## Non-GAAP Financial Measure

Adjusted EBITDAX is a non-GAAP financial measure and should not be considered as a substitute for net income (loss), operating income (loss) or any other performance measure derived in accordance with United States generally accepted accounting principles ("GAAP") or as an alternative to net cash provided by operating activities as a measure of Alta Mesa's profitability or liquidity. Alta Mesa's management believes Adjusted EBITDAX is useful because it allows external users of its consolidated financial statements, such as industry analysts, investors, lenders and rating agencies, to more effectively evaluate its operating performance, compare the results of its operations from period to period and against Alta Mesa's peers without regard to Alta Mesa's financing methods, hedging positions or capital structure and because it highlights trends in Alta Mesa's business that may not otherwise be apparent when relying solely on GAAP measures. Alta Mesa presents Adjusted EBITDAX because it believes Adjusted EBITDAX is an important supplemental measure of its performance that is frequently used by others in evaluating companies in its industry. Because Adjusted EBITDAX excludes some, but not all, items that affect net income (loss) and may vary among companies, the Adjusted EBITDAX Alta Mesa presents may not be comparable to similarly titled measures of other companies. Alta Mesa defines Adjusted EBITDAX as net income (loss) before interest expense, loss on extinguishment of debt, exploration expense, depletion, depreciation and amortization, impairment expense, accretion expense, provision (benefit) for income taxes, (gain)/loss on sale of assets and (gain)/loss on derivative contracts.

37

Table of Contents

The following table presents a reconciliation of Adjusted EBITDAX to net income (loss), Alta Mesa's most directly comparable financial measure calculated and presented in accordance with GAAP.

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 | 2014 |
| | | | (in thousands) | | |
| Net income (loss) | $(14,603) | $(120,961) | $(167,921) | $(131,793) | $ 99,200 |
| Interest expense | 39,069 | 52,253 | 60,884 | 62,473 | 55,812 |
| Loss on extinguishment of debt | — | — | 18,151 | — | — |
| Exploration expense | 19,930 | 15,304 | 24,777 | 42,718 | 61,912 |
| Depreciation, depletion and amortization | 80,082 | 66,857 | 92,901 | 143,969 | 141,804 |
| Impairment expense | 29,206 | 14,238 | 16,306 | 176,774 | 74,927 |
| Accretion expense | 1,447 | 1,615 | 2,174 | 2,076 | 2,198 |
| Provision (benefit) for state income taxes | 285 | 107 | (29) | 562 | 176 |
| (Gain) on sale of asset | — | (3,723) | (3,542) | (67,781) | (87,520) |
| (Gain) on acquisition of oil and natural gas properties | (6,893) | — | — | — | — |
| (Gain)/loss on derivative contracts(1) | (36,249) | 107,809 | 129,149 | (17,192) | (87,066) |
| Adjusted EBITDAX | $ 112,274 | $ 133,499 | $ 172,850 | $ 211,806 | $261,443 |

(1)   Net of cash settlements and which includes (i) $0.9 million and $58.4 million related to settlements of oil and natural gas derivative contracts prior to contract expiry for the nine months ended September 30, 2017 and 2016, respectively, and (ii) $64.0 million, $41.6 million and $0.3 million related to settlements of oil and natural gas derivative contracts prior to contract expiry for the years ended December 31, 2016, 2015 and 2014, respectively.

38

**Table of Contents**

## SELECTED HISTORICAL FINANCIAL INFORMATION OF KINGFISHER

The following table shows selected historical financial information of Kingfisher for the periods and as of the dates indicated. The selected historical financial information of Kingfisher as of December 31, 2016 and 2015 and for the year ended December 31, 2016 and the period from Kingfisher's inception (January 30, 2015) through December 31, 2015 was derived from the audited historical financial statements of Kingfisher included elsewhere in this proxy statement. The selected historical financial information of Kingfisher as of September 30, 2017 and for the nine months ended September 30, 2017 and 2016 was derived from the unaudited interim condensed financial statements of Kingfisher included elsewhere in this proxy statement.

Kingfisher's historical results are not necessarily indicative of its future operating results. The selected financial information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations of Kingfisher," as well as the historical financial statements of Kingfisher and accompanying notes included elsewhere in this proxy statement.

| | Nine Months Ended September 30, | | Year Ended December 31, 2016 | Period from January 30, 2015 (Inception) through December 31, 2015 |
|---|---|---|---|---|
| | 2017 | 2016 | | |
| | (Unaudited) | | | |
| | | | (in thousands) | |
| **Statement of Operations Data:** | | | | |
| Total operating revenues | $ 91,472 | $ 6,367 | $ 15,178 | $ — |
| Operating expenses: | | | | |
|     Cost of natural gas and NGLs | 64,539 | 1,907 | 4,014 | — |
|     Operation and maintenance | 4,532 | 1,722 | 3,417 | — |
|     General and administrative | 5,509 | 2,059 | 3,778 | 1,436 |
|     Depreciation and amortization | 6,893 | 2,201 | 3,752 | — |
|       Total operating expenses | 81,473 | 7,889 | 14,961 | 1,436 |
| Interest expense | 132 | — | — | — |
| Net income (loss) | $ 9,867 | $ (1,521) | $ 217 | $ (1,436) |
| **Cash Flow Data:** | | | | |
| Net cash provided by (used in) operating activities | $ 6,786 | $ (6,632) | $ (634) | $ (1,116) |
| Net cash (used in) investing activities | (60,416) | (92,679) | (123,460) | (46,858) |
| Net cash provided from financing activities | 24,365 | 67,567 | 104,650 | 108,404 |
| **Other Financial Data:** | | | | |
| Adjusted EBITDA(1) | $ 16,892 | $ 679 | $ 3,969 | $ (1,436) |

39

**Table of Contents**

|  | September 30, 2017 (Unaudited) | December 31, 2016 | 2015 |
|---|---|---|---|
|  |  | (dollars in thousands) |  |
| **Balance Sheet Data:** |  |  |  |
| Current assets: |  |  |  |
| Cash and cash equivalents | $ 11,722 | $ 40,987 | $ 60,430 |
| Accounts receivable | 5,231 | 137 | — |
| Accounts receivable from affiliates | 10,028 | 6,237 | — |
| Prepaid expenses | 780 | — | — |
| Total current assets | 27,761 | 47,361 | 60,430 |
| Noncurrent assets: |  |  |  |
| Land | 587 | 567 | 415 |
| Property, plant, and equipment, net | 158,364 | 96,291 | — |
| Other noncurrent assets | 72,673 | 79,990 | 49,511 |
| Total noncurrent assets | 231,624 | 176,848 | 49,926 |
| Total assets | $ 259,385 | $224,209 | $110,356 |
| Current liabilities: |  |  |  |
| Accounts payable | 3,559 | 10,333 | 3,068 |
| Payable to affiliates | 6,569 | 2,041 | 321 |
| Total current liabilities | 10,128 | 12,374 | 3,389 |
| Noncurrent liabilities | — | — | — |
| Total liabilities | 10,128 | 12,374 | 3,389 |
| Members' equity | 249,257 | 211,835 | 106,967 |
| Total liabilities and members' equity | $ 259,385 | $224,209 | $110,356 |

(1)   Adjusted EBITDA is a non-GAAP financial measure. For a definition of Adjusted EBITDA and a reconciliation of Adjusted EBITDA to net income, see "—Non-GAAP Financial Measure" below.

**Non-GAAP Financial Measure**

Adjusted EBITDA is a supplemental non-GAAP financial measure that is used by Kingfisher's management and external users of Kingfisher's financial statements, such as industry analysts, investors, lenders and rating agencies. Kingfisher defines Adjusted EBITDA as net income (loss) before interest expense, income taxes, depreciation and amortization, acquisition and divestiture transaction expense and impairments. Adjusted EBITDA is not a measure of net income as determined by GAAP.

Kingfisher's management believes Adjusted EBITDA is useful because it allows them to more effectively evaluate the operating performance of Kingfisher and compare the results of its operations from period to period and against its peers without regard to Kingfisher's financing methods or capital structure. Adjusted EBITDA should not be considered as an alternative to, or more meaningful than, net income (loss) as determined in accordance with GAAP or as an indicator of Kingfisher's operating performance or liquidity. Certain items excluded from Adjusted EBITDA are significant components in understanding and assessing a company's financial performance, such as a company's cost of capital and tax structure, as well as the historic costs of depreciable assets, none of which are components of Adjusted EBITDA. Kingfisher's presentation of Adjusted EBITDA should not be construed as an inference that its results will be unaffected by unusual or non-recurring items. Kingfisher's computations of Adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

40

Table of Contents

The following table presents a reconciliation of Adjusted EBITDA to net income, Kingfisher's most directly comparable financial measure calculated and presented in accordance with GAAP.

| | Nine Months Ended September 30, | | Year Ended December 31, 2016 | Period from January 30, 2015 (Inception) through December 31, 2015 |
|---|---|---|---|---|
| | 2017 | 2016 | | |
| | (dollars in thousands) | | | |
| **Adjusted EBITDA reconciliation to net income:** | | | | |
| Net income (loss) | $ 9,867 | $(1,521) | $ 217 | $ (1,436) |
| Interest expense | 132 | — | — | — |
| Income tax (benefit) expense | — | — | — | — |
| Depreciation expense | 6,893 | 2,200 | 3,752 | — |
| Divestiture transaction expense | — | — | — | — |
| Adjusted EBITDA | $16,892 | $  679 | $ 3,969 | $ (1,436) |

41

**Table of Contents**

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this proxy statement may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this proxy statement may include, for example, statements about:

- our ability to consummate the business combination;

- the benefits of the business combination;

- the future financial performance of Silver Run following the business combination;

- changes in Alta Mesa's and Kingfisher's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans; and

- expansion plans and opportunities.

These forward-looking statements are based on information available as of the date of this proxy statement, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

You should not place undue reliance on these forward-looking statements in deciding how to grant your proxy or instruct how your vote should be cast on the proposals set forth in this proxy statement. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the Contribution Agreements;

- the outcome of any legal proceedings that may be instituted against Silver Run following announcement of the proposed business combination and transactions contemplated thereby;

- the inability to complete the business combination due to the failure to obtain approval of the stockholders of Silver Run, or other conditions to closing in the Contribution Agreements;

- the risk that the proposed business combination disrupts current plans and operations of Alta Mesa or Kingfisher as a result of the announcement and consummation of the transactions described herein;

- our ability to recognize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of Silver Run to grow and manage growth profitably following the business combination;

- costs related to the business combination;

- changes in applicable laws or regulations;

- the possibility that Silver Run, Alta Mesa or Kingfisher may be adversely affected by other economic, business, and/or competitive factors; and

- other risks and uncertainties indicated in this proxy statement, including those under the section entitled "Risk Factors."

42

**Table of Contents**

**RISK FACTORS**

*The following risk factors apply to the business and operations of Alta Mesa and Kingfisher and will also apply to our business and operations following the completion of the business combination. These risk factors are not exhaustive and investors are encouraged to perform their own investigation with respect to the business, financial condition and prospects of Alta Mesa and Kingfisher and our business, financial condition and prospects following the completion of the business combination. You should carefully consider the following risk factors in addition to the other information included in this proxy statement, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements." We may face additional risks and uncertainties that are not presently known to us, or that we currently deem immaterial, which may also impair our business or financial condition. The following discussion should be read in conjunction with our, Alta Mesa's and Kingfisher's financial statements and notes to the financial statements included herein.*

**Risks Related to the Alta Mesa Business**

***Oil and natural gas prices are highly volatile and depressed prices can significantly and adversely affect Alta Mesa's financial condition and results of operations.***

Alta Mesa's revenue, profitability and cash flows depend upon the prices for oil, natural gas and natural gas liquids. The prices Alta Mesa receives for oil and natural gas production are volatile and a decrease in prices can materially and adversely affect Alta Mesa's financial results and impede its growth, including its ability to maintain or increase its borrowing capacity, to repay current or future indebtedness and to obtain additional capital on attractive terms. Changes in oil and natural gas prices have a significant impact on the value of Alta Mesa's reserves and on its cash flows.

Historically, world-wide oil and natural gas prices and markets have been subject to significant change and may continue to change in the future. In particular, the prices of oil and natural gas declined dramatically after the second half of 2014. Oil prices continued to fluctuate during 2016. Based on daily settlements of monthly contracts traded on the NYMEX, the average price for the 12 months ended December 31, 2016 for a barrel of oil ranged from a high of $52.17 in December 2016 to a low of $30.62 in February 2016, and the price for an MMBtu of natural gas ranged from a high of $3.23 in December 2016 to a low of $1.71 in March 2016. Based on daily settlements of monthly contracts traded on the NYMEX, the average price for the 12 months ended September 30, 2017 for a barrel of oil ranged from a high of $53.46 in February 2017 to a low of $45.20 in June 2017, and the price for an MMBtu of natural gas ranged from a high of $3.93 in January 2017 to a low of $2.63 in March 2017.

Continued fluctuations in oil and natural gas prices, further price declines or any other unfavorable market conditions could have a material adverse effect on Alta Mesa's financial condition and on the carrying value of its proved reserves. The average realized price, excluding hedge settlements, at which Alta Mesa sold oil from the STACK in the nine months ended September 30, 2017 was $47.97 per barrel compared to $38.75 per barrel in the nine months ended September 30, 2016. The average realized price, excluding hedge settlements, at which Alta Mesa sold oil from the STACK in the year ended December 31, 2016 was $41.16 per barrel compared to $45.90 per barrel in the year ended December 31, 2015. The average realized price, excluding hedge settlements, at which Alta Mesa sold oil from the STACK in the year ended December 31, 2015 was $45.90 per barrel compared to $89.34 per barrel in 2014.

Because the oil price Alta Mesa is required to use to estimate its future net cash flows is the average first day of the month price over the 12 months prior to the date of determination of future net cash flows, the full effect of falling prices may not be reflected in its estimated net cash flows for several quarters. Alta Mesa reviews the carrying value of its properties on a quarterly basis and once incurred, a write-down in the carrying value of its properties is not reversible at a later date, even if prices increase.

43

Table of Contents

Prices for oil and natural gas may fluctuate widely in response to relatively minor changes in supply and demand, market uncertainty and a variety of additional factors that are beyond Alta Mesa's control, such as:

- the domestic and foreign supply of and demand for oil and natural gas;

- the price and quantity of foreign imports of oil and natural gas;

- recent changes in federal regulations removing decades-old prohibition of the export of crude oil production in the U.S.;

- federal regulations applicable to exports of liquefied natural gas ("LNG"), including the recent export of the first quantities of LNG liquefied from natural gas produced in the lower 48 states of the U.S.;

- recent actions taken by members of the Organization of Petroleum Exporting Countries and other oil producing nations in connection with their arrangements to maintain oil price and production controls;

- the level of consumer product demand;

- weather conditions;

- domestic and foreign governmental regulations, including environmental initiatives and taxation;

- overall domestic and global economic conditions;

- the value of the dollar relative to the currencies of other countries;

- stockholder activism or activities by non-governmental organizations to restrict the exploration, development and production of oil and natural gas in order to minimize emissions of carbon dioxide, a greenhouse gas ("GHG");

- political and economic conditions and events in foreign oil and natural gas producing countries, including embargoes, continued hostilities in the Middle East and other sustained military campaigns, conditions in South America, Central America, China and Russia and acts of terrorism or sabotage;

- the proximity and capacity of natural gas pipelines and other transportation facilities to Alta Mesa's production;

- technological advances affecting energy consumption;

- the price and availability of alternative fuels; and

- the impact of energy conservation efforts.

Substantially all of Alta Mesa's production is sold to purchasers under contracts with market-based prices. Continued lower oil and natural gas prices will reduce Alta Mesa's cash flows and may reduce the present value of its reserves.

***Alta Mesa's exploration, exploitation, development and acquisition operations will require substantial capital expenditures. Alta Mesa may be unable to obtain needed capital or financing on satisfactory terms, which could lead to a decline in its production and reserves.***

The oil and natural gas industry is capital intensive. Alta Mesa has made and expects to continue to make substantial capital expenditures in its business for the exploration, exploitation, development and acquisition of oil and natural gas reserves. Alta Mesa's STACK capital expenditures for 2016 totaled $209 million, including $11 million for acquisitions. Alta Mesa's STACK capital expenditures for 2015 totaled $179 million, including $48 million for acquisitions. Alta Mesa has funded development and operating activities primarily through equity capital raised from its affiliates, through borrowings, through the issuance of debt and through internal operating cash flows. Alta Mesa intends to finance its future capital expenditures predominantly with cash flows from operations and with the proceeds its receives in the business combination.

44

Table of Contents

If necessary, Alta Mesa may also access capital through proceeds from potential asset dispositions, borrowings under its senior secured revolving credit facility and the future issuance of debt and/or equity securities. Alta Mesa's cash flow from operations and access to capital are subject to a number of variables, including:

- the estimated quantities of its proved oil and natural gas reserves;

- the amount of oil and natural gas Alta Mesa produces from existing wells;

- the prices at which Alta Mesa sells its production; and

- Alta Mesa's ability to acquire, locate and produce new reserves.

If Alta Mesa's revenues or the borrowing base under its senior secured revolving credit facility decrease as a result of lower commodity prices, operating difficulties, declines in reserves or for any other reason, Alta Mesa may have limited ability to obtain the capital necessary to conduct its operations at expected levels. Alta Mesa's senior secured revolving credit facility may restrict its ability to obtain new debt financing. If additional capital is required, Alta Mesa may not be able to obtain debt and/or equity financing on terms favorable to it, or at all. If cash generated by operations or available under Alta Mesa's senior secured revolving credit facility is not sufficient to meet its capital requirements, the failure to obtain additional financing could result in a curtailment of Alta Mesa's operations relating to development of its prospects, which in turn could lead to a decline in its reserves and production and could adversely affect Alta Mesa's business, results of operations, financial conditions and ability to make payments on its outstanding indebtedness.

External financing may be required in the future to fund Alta Mesa's growth. Alta Mesa may not be able to obtain additional financing, and financing under its senior secured revolving credit facility may not be available in the future. Without additional capital resources, Alta Mesa may be unable to pursue and consummate acquisition opportunities as they become available, and may be forced to limit or defer its planned oil and natural gas development program, which will adversely affect the recoverability and ultimate value of Alta Mesa's oil and natural gas properties, in turn negatively affecting its business, financial condition and results of operations.

***Alta Mesa's business strategy involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application.***

Alta Mesa's operations involve the use of the latest horizontal drilling, completion and production technologies, as developed by Alta Mesa and its service providers, in an effort to improve efficiencies in recovery of hydrocarbons. Use of these new technologies may not prove successful and could result in significant cost overruns or delays or reduction in production, and in extreme cases, the abandonment of a well. The difficulties Alta Mesa faces drilling horizontal wells include:

- landing its wellbore in the desired drilling zone;

- staying in the desired drilling zone while drilling horizontally through the formation;

- running its production casing the entire length of the wellbore; and

- running tools and other equipment consistently through the horizontal wellbore.

The difficulties that Alta Mesa faces while completing its wells include the following:

- designing and executing the optimum fracture stimulation program for a specific target zone;

- running tools the entire length of the wellbore during completion operations; and

- cleaning out the wellbore after completion of the fracture stimulation.

In addition, certain of the new techniques Alta Mesa is adopting may cause irregularities or interruptions in production due to offset wells being shut in and the time required to drill and complete multiple wells before any

45

Table of Contents

such wells begin producing. Furthermore, the application of technology developed in drilling, completing and producing in one productive formation may not be successful in other prospective formations with little or no horizontal drilling history. If Alta Mesa's use of the latest technologies does not prove successful, its drilling and production results may be less than anticipated or it may experience cost overruns, delays in obtaining production or abandonment of a well. As a result, the return on Alta Mesa's investment will be adversely affected, it could incur material write-downs of unevaluated properties or undeveloped reserves and the value of its undeveloped acreage and reserves could decline in the future.

*Alta Mesa's producing properties are located in a limited geographic area, making it vulnerable to risks associated with having geographically concentrated operations.*

Alta Mesa's producing properties are geographically concentrated in the STACK. Because of this concentration, the success and profitability of its operations may be disproportionately exposed to regional factors relative to its competitors that have more geographically dispersed operations. These factors include, among others: (i) the prices of crude oil and natural gas produced from wells in the region and other regional supply and demand factors, including gathering, pipeline and rail transportation capacity constraints; (ii) the availability of rigs, equipment, oil field services, supplies and labor; (iii) the availability of processing and refining facilities; and (iv) infrastructure capacity. In addition, Alta Mesa's operations in the STACK may be adversely affected by severe weather events such as floods, ice storms and tornadoes, which can intensify competition for the items described above during months when drilling is possible and may result in periodic shortages. The concentration of Alta Mesa's operations in a limited geographic area also increases its exposure to changes in local laws and regulations, certain lease stipulations designed to protect wildlife and unexpected events that may occur in the regions such as natural disasters, seismic events, industrial accidents or labor difficulties. Any one of these events has the potential to cause producing wells to be shut-in, delay operations, decrease cash flows, increase operating and capital costs and prevent development of lease inventory before expiration. Any of the risks described above could have a material adverse effect on Alta Mesa's financial condition, results of operations and cash flows.

*Alta Mesa's identified drilling locations are scheduled over many years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling. In addition, Alta Mesa may not be able to raise the substantial amount of capital that would be necessary to drill such locations.*

Alta Mesa's management team has specifically identified and scheduled certain drilling locations as an estimation of its future multi-year drilling activities on its existing acreage. These locations represent a significant part of Alta Mesa's growth strategy. Alta Mesa's ability to drill and develop identified locations depends on a number of uncertainties, including oil, natural gas and natural gas liquids prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, drilling results, lease expirations, gathering system and pipeline transportation constraints, access to and availability of water sourcing and distribution systems, regulatory approvals and other factors. Because of these uncertainties, Alta Mesa does not know if the potential well locations it has identified will ever be drilled or if it will be able to produce natural gas or oil from these or any other locations. In addition, unless production is established within the spacing units covering the undeveloped acres on which some of the potential locations are located, the leases for such acreage will expire. As such, Alta Mesa's actual drilling activities may materially differ from those presently identified.

Furthermore, Alta Mesa's estimate of the number of its net drilling locations is based on a number of assumptions, which may prove to be incorrect. For example, Alta Mesa has estimated the number of net drilling locations based on its expected working interests in each gross drilling location based on its existing working interest associated with its acreage applicable to such drilling location and any assumed dilution of such working interest based on any expected unitization of such acreage with adjacent properties controlled by third parties. Alta Mesa's assumptions regarding the impact on any such unitization on its working interest in its gross drilling locations may be incorrect and may result in more dilution of its working interest than anticipated, which would result in a reduction of Alta Mesa's net drilling locations.

46

Table of Contents

In addition, Alta Mesa will require significant additional capital over a prolonged period in order to pursue the development of these locations, and we may not be able to raise the capital required. Any drilling activities Alta Mesa is able to conduct on these potential locations may not be successful or allow Alta Mesa to add additional proved reserves to its overall proved reserves or may result in a downward revision of its estimated proved reserves, which could have a material adverse effect on its future business and results of operations.

***Certain of Alta Mesa's undeveloped leasehold assets are subject to leases that will expire over the next several years unless production is established on units containing acreage.***

Leases on oil and natural gas properties typically have a term of three to five years, after which they expire unless, prior to expiration, a well is drilled and production of hydrocarbons in paying quantities is established. Although the majority of Alta Mesa's reserves are located on leases that are held by production, Alta Mesa does have provisions in some of its leases that provide for the lease to expire unless certain conditions are met, such as drilling having commenced on the lease or production in paying quantities having been obtained within a defined time period. If commodity prices remain low or Alta Mesa is unable to fund its anticipated capital program, there is a risk that some of its existing proved reserves and some of its unproved inventory could be subject to lease expiration or a requirement to incur additional leasehold costs to extend the lease. The cost to renew such leases may increase significantly, and Alta Mesa may not be able to renew such leases on commercially reasonable terms or at all. This could result in a reduction in Alta Mesa's reserves and its growth opportunities (or the incurrence of significant costs). Although Alta Mesa seeks to actively manage its undeveloped properties, its drilling plans for these areas are subject to change based upon various factors, including drilling results, oil and natural gas prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals.

***Alta Mesa depends on successful exploration, exploitation, development and acquisitions to maintain reserves and revenue in the future.***

In general, the volume of production from oil and natural gas properties declines as reserves are depleted, with the rate of decline depending on each reservoir's characteristics. Except to the extent that Alta Mesa conducts successful exploration and development activities or acquires properties containing proved reserves, or both, Alta Mesa's proved reserves will decline as reserves are produced. Alta Mesa's future oil and natural gas production is, therefore, highly dependent on its level of success in finding or acquiring additional reserves. Additionally, the business of exploring for, developing or acquiring reserves is capital intensive. Recovery of Alta Mesa's reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations. To the extent cash flow from operations is reduced and external sources of capital become limited or unavailable, Alta Mesa's ability to make the necessary capital investment to maintain or expand its asset base of oil and natural gas reserves would be impaired. In addition, Alta Mesa is dependent on finding partners for its exploratory activity. To the extent that others in the industry do not have the financial resources or choose not to participate in Alta Mesa's exploration activities, it may be adversely affected.

***Lower oil, natural gas and natural gas liquids prices may cause Alta Mesa to record non-cash write-downs, which could negatively impact its results of operations.***

Accounting rules require that Alta Mesa periodically review the carrying value of its properties for possible impairment. Based on prevailing commodity prices and specific market factors and circumstances at the time of prospective impairment reviews and the continuing evaluation of development plans, production data, economics and other factors, Alta Mesa may be required to write down the carrying value of its properties. A write-down constitutes a non-cash charge to earnings. For the year ended December 31, 2016, Alta Mesa recognized impairment expense related to its assets in the STACK of approximately $0.4 million as a result of lower forecasted commodity prices. Alta Mesa recognized impairment expense related to the STACK for the 12 months ended December 31, 2015 of $15.7 million as a result of lower forecasted commodity prices.

47

Table of Contents

In the future, Alta Mesa may recognize significant impairments of proved oil and gas properties and impairments of unproved oil and gas properties as a result of lower forecasted commodity prices and changes to its drilling plans. At December 31, 2016, Alta Mesa's estimate of undiscounted future cash flows attributable to a certain depletion group with a net book value related to the STACK of approximately $463.2 million indicated that the carrying amount was expected to be recovered; however, this depletion group may be at risk for impairment if oil and natural gas prices decline by 10%. Alta Mesa estimates that, if this depletion group becomes impaired in a future period, it could recognize non-cash impairments related to the STACK in that period in excess of $1.3 million. It is also reasonably foreseeable that prolonged low or further declines in commodity prices, further changes to Alta Mesa's drilling plans in response to lower prices or increases in drilling or operating costs could result in other additional impairments.

***Alta Mesa's estimated proved oil and natural gas reserve quantities and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or the underlying assumptions will materially affect the quantities and present value of Alta Mesa's reserves.***

Numerous uncertainties are inherent in estimating quantities of oil and natural gas reserves. Alta Mesa's estimates of its proved reserve quantities are based upon its estimated net proved reserves as of December 31, 2016. The process of estimating oil and natural gas reserves is complex, requiring significant decisions and assumptions in the evaluation of available geological, engineering and economic data for each reservoir, and these reports rely upon various assumptions, including assumptions regarding future oil and natural gas prices, production levels and operating and development costs. As a result, estimated quantities of proved reserves and projections of future production rates and the timing of development expenditures may prove to be inaccurate. Over time, Alta Mesa may make material changes to reserve estimates taking into account the results of actual drilling and production. Any significant variance in Alta Mesa's assumptions and actual results could greatly affect its estimates of reserves, the economically recoverable quantities of oil and natural gas attributable to any particular group of properties, the classifications of reserves based on risk of recovery and estimates of the future net cash flows. Specifically, future prices received for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. Sustained lower prices will cause the 12 month weighted average price to decrease over time as the lower prices are reflected in the average price, which may result in the estimated quantities and present values of Alta Mesa's reserves being reduced.

***The present value of future net revenues from Alta Mesa's proved reserves or "PV-10" will not necessarily be the same as the current market value of its estimated proved oil and natural gas reserves.***

It should not be assumed that the present value of future net revenues from Alta Mesa's proved reserves is the current market value of its estimated oil and natural gas reserves. In accordance with SEC requirements, Alta Mesa based the estimated discounted future net cash flows from its proved reserves on the 12-month unweighted arithmetic average of the closing prices on the first day of each month for the preceding 12 months from the date of the report without giving effect to derivative transactions. Actual future net cash flows from Alta Mesa's oil and natural gas properties will be affected by factors such as:

- actual prices it receives for crude oil and natural gas;

- actual cost of development and production expenditures;

- the amount and timing of actual production;

- transportation and processing; and

- changes in governmental regulations or taxation.

The timing of both Alta Mesa's production and its incurrence of expenses in connection with the development and production of its oil and natural gas properties will affect the timing and amount of actual future net revenues from proved reserves and thus their actual present value. In addition, the 10% discount factor

48

Table of Contents

Alta Mesa uses when calculating the PV-10 value may not be the most appropriate discount factor based on interest rates in effect from time to time and risks associated with Alta Mesa or the oil and natural gas industry in general. Actual future prices and costs may differ materially from those used in the present value estimate. If oil and natural gas prices decline by 10%, then Alta Mesa's NYMEX PV-10 value for the STACK as of December 31, 2016 would decrease by approximately $290 million to $909 million.

***SEC rules could limit Alta Mesa's ability to book additional PUDs in the future.***

The SEC rules require that, subject to limited exceptions, PUDs may only be booked if they relate to wells scheduled to be drilled within five years after the date of booking. This requirement has limited and may continue to limit Alta Mesa's ability to book additional PUDs as it pursues its drilling program. Moreover, Alta Mesa may be required to write down its PUDs if it does not drill or plans on delaying those wells within the required five-year timeframe.

***Approximately 74% of Alta Mesa's total estimated SEC net proved reserves in the STACK at December 31, 2016 were PUDs requiring substantial capital expenditures and may ultimately prove to be less than estimated.***

Recovery of PUDs requires significant capital expenditures and successful drilling operations. At December 31, 2016, approximately 96.5 MMBOE (74%) of Alta Mesa's STACK total estimated SEC net proved reserves were undeveloped. The reserve data included in Alta Mesa's 2016 Reserve Report assumes that substantial capital expenditures will be made to develop non-producing reserves. The calculation of Alta Mesa's estimated STACK net proved reserves as of December 31, 2016 assumed that Alta Mesa would spend $606 million, including plugging and abandonment costs, to develop its estimated PUDs, including an estimated $181 million during 2017. Although cost and reserve estimates attributable to Alta Mesa's oil and natural gas reserves have been prepared in accordance with industry standards, it cannot be sure that the estimated costs are accurate. Alta Mesa may need to raise additional capital in order to develop its estimated PUDs over the next five years and Alta Mesa cannot be certain that additional financing will be available to it on acceptable terms, if at all. Additionally, continued declines in commodity prices will reduce the future net revenues of Alta Mesa's estimated PUDs and may result in some projects becoming uneconomical. As a result of depressed oil and natural gas prices, Alta Mesa reduced the budgeted capital expenditures for the development of undeveloped reserves in 2016. These delays in the development of reserves could force Alta Mesa to reclassify certain of its proved reserves as unproved reserves. Further, Alta Mesa's drilling efforts may be delayed or unsuccessful and actual reserves may prove to be less than current reserve estimates, which could have a material adverse effect on Alta Mesa's financial condition, results of operations and future cash flows.

As part of Alta Mesa's exploration and development operations, it has expanded, and expects to further expand, the application of horizontal drilling and multi-stage hydraulic fracture stimulation techniques. The utilization of these techniques requires substantially greater capital expenditures as compared to the completion cost of a vertical well. The incremental capital expenditures are the result of greater measured depths and additional hydraulic fracture stages in horizontal wellbores.

***Alta Mesa may experience difficulty in achieving and managing future growth.***

Alta Mesa believes that its future success depends on its ability to manage the growth that it has experienced and the demands from increased responsibility on management personnel. The following factors could present difficulties:

- increased responsibilities for Alta Mesa's executive level personnel;

- increased administrative burden;

- increased capital requirements; and

- increased organizational challenges common to large, expansive operations.

49

**Table of Contents**

Alta Mesa's operating results could be adversely affected if it does not successfully manage these potential difficulties.

Additionally, future growth may place strains on Alta Mesa's resources and cause it to rely more on project partners and independent contractors, possibly negatively affecting its financial condition and results of operations. Alta Mesa's ability to grow will depend on a number of factors, including:

- the results of its drilling program;

- hydrocarbon prices;

- its ability to develop existing prospects;

- its ability to obtain leases or options on properties for which is has 3-D seismic data;

- its ability to acquire additional 3-D seismic data;

- its ability to identify and acquire new exploratory prospects;

- its ability to continue to retain and attract skilled personnel;

- its ability to maintain or enter into new relationships with project partners and independent contractors; and

- its access to capital.

***Alta Mesa depends upon several significant purchasers for the sale of most of its oil and natural gas production. The loss of one or more of these purchasers could, among other factors, limit Alta Mesa's access to suitable markets for the oil, natural gas and natural gas liquids it produces.***

The availability of a ready market for any oil, natural gas and natural gas liquids Alta Mesa produces depends on numerous factors beyond the control of its management, including but not limited to the extent of domestic production and imports of oil, the proximity and capacity of pipelines, the availability of skilled labor, materials and equipment, the effect of state and federal regulation of oil and natural gas production and federal regulation of oil and gas sold in interstate commerce. In addition, Alta Mesa depends upon several significant purchasers for the sale of most of its oil and natural gas production. While Alta Mesa believes that it would be able to locate alternative purchasers, Alta Mesa cannot assure you that it will continue to have ready access to suitable markets for its future oil and natural gas production.

***Alta Mesa will rely on drilling to increase its levels of production. If Alta Mesa's drilling is unsuccessful, its financial condition will be adversely affected.***

The primary focus of Alta Mesa's business strategy is to increase production levels by drilling wells. Although Alta Mesa was successful in drilling in the past, it cannot provide assurance that it will continue to maintain production levels through drilling. Alta Mesa's drilling involves numerous risks, including the risk that Alta Mesa will not encounter commercially productive oil or natural gas reservoirs. Alta Mesa must incur significant expenditures to drill and complete wells. The costs of drilling and completing wells are often uncertain, and it is possible that Alta Mesa will make substantial expenditures on drilling and not discover reserves in commercially viable quantities.

***Alta Mesa may be unable to make attractive acquisitions or successfully integrate acquired businesses, and any inability to do so may disrupt its business and hinder its ability to grow.***

Alta Mesa has made and may in the future make acquisitions of businesses or properties that complement or expand its current business. Alta Mesa may not be able to identify attractive acquisition opportunities. Even if Alta Mesa does identify attractive acquisition opportunities, it may not be able to complete the acquisition or do

50

Table of Contents

so on commercially acceptable terms. Alta Mesa may not be able to obtain contractual indemnities from sellers for liabilities incurred prior to its purchase of the business or property. No assurance can be given that Alta Mesa will be able to identify additional suitable acquisition opportunities, negotiate acceptable terms, obtain financing for acquisitions on acceptable terms or successfully acquire identified targets. In the course of Alta Mesa's due diligence, it may not inspect every aspect of a business it acquires and Alta Mesa cannot necessarily observe structural and environmental problems, such as pipe corrosion or groundwater contamination, when an inspection is made.

The success of any completed acquisition will depend on Alta Mesa's ability to integrate effectively the acquired business into its existing operations. The process of integrating acquired businesses may involve unforeseen difficulties and may require a disproportionate amount of Alta Mesa's managerial and financial resources. Alta Mesa's failure to achieve consolidation savings, to incorporate the acquired businesses and assets into its existing operations successfully or to minimize any unforeseen operational difficulties could have a material adverse effect on its financial condition and results of operations.

In addition, Alta Mesa's senior secured revolving credit facility and the indenture governing its 7.875% senior unsecured notes due December 15, 2024 (the "2024 Notes") impose certain limitations on its ability to enter into mergers or combination transactions. Alta Mesa's senior secured revolving credit facility and the indenture governing its 2024 Notes also limit Alta Mesa's ability to incur certain indebtedness, which could indirectly limit its ability to engage in acquisitions of businesses.

***Alta Mesa's business is subject to operational risks that will not be fully insured, which, if they were to occur, could adversely affect its financial condition or results of operations.***

Alta Mesa's business activities are subject to operational risks, including:

- damages to equipment caused by natural disasters such as earthquakes and adverse weather conditions, including tornadoes and flooding;

- facility or equipment malfunctions;

- pipeline or tank ruptures or spills;

- surface fluid spills, produced water contamination and surface or groundwater contamination resulting from petroleum constituents or hydraulic fracturing chemical additions;

- fires, blowouts, craterings and explosions; and

- uncontrollable flows of oil or natural gas or well fluids.

In addition, a portion of Alta Mesa's natural gas production is processed to extract natural gas liquids at processing plants that are owned by others. If these plants were to cease operations for any reason, Alta Mesa would need to arrange for alternative transportation and processing facilities. These alternative facilities may not be available, which could cause Alta Mesa to shut in its natural gas production. Further, such alternative facilities could be more expensive than the facilities Alta Mesa currently uses.

Any of these events could adversely affect Alta Mesa's ability to conduct operations or cause substantial losses, including personal injury or loss of life, damage to or destruction of property, natural resources and equipment, pollution or other environmental contamination, loss of wells, regulatory penalties, suspension or termination of operations and attorney's fees and other expenses incurred in the prosecution or defense of litigation.

As is customary in the industry, Alta Mesa maintains insurance against some, but not all, of these risks. Additionally, Alta Mesa may elect not to obtain insurance if it believes that the cost of available insurance is excessive relative to the perceived risks presented. Losses could therefore occur for uninsurable or uninsured

51

Table of Contents

risks or in amounts in excess of existing insurance coverage. The occurrence of an event that is not fully covered by insurance could have a material adverse impact on Alta Mesa's business activities, financial condition and results of operations.

***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect Alta Mesa's business, financial condition or results of operations.***

Alta Mesa's future financial condition and results of operations will depend on the success of its development, acquisition and production activities, which are subject to numerous risks beyond its control, including the risk that drilling will not result in commercially viable oil and natural gas production.

Alta Mesa's decisions to develop or purchase prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. For a discussion of the uncertainty involved in these processes, see "—Alta Mesa's estimated proved oil and natural gas reserve quantities and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or the underlying assumptions will materially affect the quantities and present value of Alta Mesa's reserves."

Any material inaccuracies in reserve estimates or underlying assumptions will materially affect the quantities and present value of Alta Mesa's reserves. In addition, Alta Mesa's cost of drilling, completing and operating wells is often uncertain.

Further, many factors may curtail, delay or cancel Alta Mesa's scheduled drilling projects, including the following:

- delays imposed by or resulting from compliance with regulatory requirements, including limitations resulting from wastewater disposal;

- regulation limiting the emission of GHGs and limitations on hydraulic fracturing;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel or in obtaining water for hydraulic fracturing activities;

- equipment failures, accidents or other unexpected operational events;

- lack of available gathering facilities or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines;

- adverse weather conditions;

- issues related to compliance with environmental regulations;

- environmental hazards, such as oil and natural gas leaks, oil spills, pipeline and tank ruptures and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;

- declines in oil and natural gas prices;

- limited availability of financing at acceptable terms;

- title problems; and

- limitations in the market for oil and natural gas.

52

Table of Contents

*Alta Mesa's hedging activities could result in financial losses or could reduce its net income.*

To achieve more predictable cash flows and to reduce its exposure to fluctuations in the prices of oil and natural gas, Alta Mesa has entered and may continue to enter into hedging arrangements for a significant portion of its production. As of September 30, 2017, Alta Mesa has hedged approximately 73% of its total company-forecasted PDP production through 2019 at weighted average annual floor prices ranging from $3.18 per MMBtu to $4.43 per MMBtu for natural gas and $50.00 per Bbl to $51.37 per Bbl for oil, with the majority of the hedged volumes in 2017. If Alta Mesa experiences a sustained material interruption in its production, Alta Mesa might be forced to satisfy all or a portion of its hedging obligations without the benefit of the cash flows from its sale of the underlying physical commodity, resulting in a substantial diminution of Alta Mesa's liquidity. Lastly, an attendant risk exists in hedging activities that the counterparty in any derivative transaction cannot or will not perform under the instrument and that Alta Mesa will not realize the benefit of the hedge.

Alta Mesa's ability to use hedging transactions to protect it from future price declines will be dependent upon prices at the time it enters into future hedging transactions and its future levels of hedging and, as a result, Alta Mesa's future net cash flows may be more sensitive to commodity price changes.

Alta Mesa's policy has been to hedge a significant portion of its near-term estimated production. However, Alta Mesa's price hedging strategy and future hedging transactions will be determined at its discretion. Alta Mesa is not under an obligation to hedge a specific portion of its production. The prices at which Alta Mesa hedges its production in the future will be dependent upon commodities prices at the time it enters into these transactions, which may be substantially higher or lower than current prices. Accordingly, Alta Mesa's price hedging strategy may not protect it from significant declines in prices received for its future production. Conversely, Alta Mesa's hedging strategy may limit its ability to realize cash flows from commodity price increases. It is also possible that a substantially larger percentage of Alta Mesa's future production will not be hedged as compared with the next few years, which would result in Alta Mesa's oil and natural gas revenues becoming more sensitive to commodity price fluctuations.

*Alta Mesa's hedging transactions expose it to counterparty credit risk.*

Alta Mesa's hedging transactions expose it to risk of financial loss if a counterparty fails to perform under a derivative contract. This risk of counterparty non-performance is of particular concern given the disruptions that have occurred in the financial markets and the significant decline in oil and natural gas prices which could lead to sudden changes in a counterparty's liquidity and impair their ability to perform under the terms of the derivative contract. Alta Mesa is unable to predict sudden changes in a counterparty's creditworthiness or ability to perform. Even if Alta Mesa does accurately predict sudden changes, its ability to negate the risk may be limited depending upon market conditions. Furthermore, the bankruptcy of one or more of Alta Mesa's hedge providers or some other similar proceeding or liquidity constraint might make it unlikely that Alta Mesa would be able to collect all or a significant portion of amounts owed to it by the distressed entity or entities.

During periods of falling commodity prices, Alta Mesa's hedge receivable positions increase, which increases its exposure. If the creditworthiness of Alta Mesa's counterparties deteriorates and results in their nonperformance, Alta Mesa could incur a significant loss.

*Alta Mesa's use of 2-D and 3-D seismic data is subject to interpretation and may not accurately identify the presence of hydrocarbons, which could adversely affect the results of its drilling operations.*

Even when properly used and interpreted, 2-D and 3-D seismic data and visualization techniques are only tools used to assist geoscientists in identifying subsurface structures and hydrocarbon indicators and do not enable geoscientists to know whether hydrocarbons are, in fact, present in those structures and the amount of hydrocarbons. Alta Mesa is employing 3-D seismic data technology with respect to certain of its projects. The use of 2-D and 3-D seismic data and other advanced technologies requires greater pre-drilling expenditures than

53

Table of Contents

traditional drilling strategies, and Alta Mesa could incur greater drilling and testing expenses as a result of such expenditures, which may result in a reduction in Alta Mesa's returns or losses. As a result, Alta Mesa's drilling activities may not be successful or economical, and its overall drilling success rate or its drilling success rate for activities in a particular area could decline.

Alta Mesa often gathers 2-D and 3-D seismic data over large areas. Alta Mesa's interpretation of seismic data delineates those portions of an area that it believes are desirable for drilling. Therefore, Alta Mesa may choose not to acquire option or lease rights prior to acquiring seismic data, and, in many cases, Alta Mesa may identify hydrocarbon indicators before seeking option or lease rights in the location. If Alta Mesa is not able to lease those locations on acceptable terms, it will have made substantial expenditures to acquire and analyze 2-D and 3-D seismic data without having an opportunity to attempt to benefit from those expenditures.

*Competition in the oil and natural gas industry is intense, making it more difficult for Alta Mesa to acquire properties, market oil or natural gas and secure trained personnel.*

Alta Mesa's ability to acquire additional properties and to discover reserves in the future will be dependent upon its ability to evaluate and select suitable properties to consummate transactions in a highly competitive market. Alta Mesa's competitors may be able to pay more for oil and natural gas properties and evaluate, bid for and purchase a greater number of properties than Alta Mesa's financial or human resources permit. In addition, the oil and natural gas industry has periodically experienced shortages of drilling rigs, equipment, pipe and personnel, which has delayed development drilling and other exploitation activities and has caused significant price increases. Competition has been strong in hiring experienced personnel, particularly in the engineering and technical, accounting and financial reporting, tax and land departments. Alta Mesa's inability to compete effectively with its competitors could have a material adverse impact on its business activities, financial condition and results of operations.

*Alta Mesa may not be able to keep pace with technological developments in the oil and natural gas industry.*

The oil and natural gas industry is characterized by rapid and significant technological advancements and introductions of new products and services using new technologies. As others use or develop new technologies, Alta Mesa may be placed at a competitive disadvantage or competitive pressures may force it to implement those new technologies at substantial costs. In addition, other oil and natural gas companies may have greater financial, technical and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before Alta Mesa can. Alta Mesa may not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost. If one or more of the technologies Alta Mesa uses now or in the future were to become obsolete or if Alta Mesa is unable to use the most advanced commercially available technology, its business, financial condition and results of operations could be materially adversely affected.

*Deficiencies of title to Alta Mesa's leased interests could significantly affect its financial condition.*

If an examination of the title history of a property reveals that an oil or natural gas lease or other developed rights has been purchased in error from a person who is not the owner of the mineral interest desired, Alta Mesa's interest would substantially decline in value. In such cases, the amount paid for such oil or natural gas lease or leases or other developed rights would be lost. It is the practice of Alta Mesa's management, in acquiring oil and natural gas leases or undivided interests in oil and natural gas leases or other developed rights, not to incur the expense of retaining lawyers to examine the title to the mineral interest to be acquired. Rather, Alta Mesa relies upon the judgment of oil and natural gas lease brokers or landmen who perform the fieldwork in examining records in the appropriate governmental or county clerk's office before attempting to acquire a lease or other developed rights in a specific mineral interest.

Prior to drilling an oil or natural gas well, however, it is the normal practice in the oil and natural gas industry for the person or company acting as the operator of the well to obtain a preliminary title review of the

54

Table of Contents

spacing unit within which the proposed oil or natural gas well is to be drilled to ensure there are no obvious deficiencies in title to the well. Frequently, as a result of such examinations, certain curative work must be done to correct deficiencies in the marketability of the title, such as obtaining affidavits of heirship or causing an estate to be administered. Such curative work entails expense, and it may happen, from time to time, that the operator may elect to proceed with a well despite defects to the title identified in the preliminary title opinion. Alta Mesa's failure to obtain perfect title to its leasehold may adversely impact its ability in the future to increase production and reserves.

***Alta Mesa's operations are substantially dependent on the availability of water. Restrictions on Alta Mesa's ability to obtain water may have an adverse effect on its financial condition, results of operations and cash flows.***

Water is an essential component of shale oil and natural gas exploration and production during both the drilling and hydraulic fracturing processes. Historically, Alta Mesa has been able to purchase water from local land owners and other sources for use in its operations. However, Alta Mesa's access to such water supplies may be adversely affected due to reasons such as periods of extended drought, private, third-party competition for water in localized areas or the implementation of local or state governmental programs to monitor or restrict the beneficial use of water subject to their jurisdiction for hydraulic fracturing to assure adequate local water supplies. If Alta Mesa is unable to obtain sufficient amounts of water to use in its operations from local sources, Alta Mesa's ability to perform hydraulic fracturing operations could be restricted or made more costly, or it otherwise may be unable to economically produce oil and natural gas, which could have an adverse effect on Alta Mesa's financial condition, results of operations and cash flows.

***Alta Mesa's operations may be adversely affected if it incurs costs and liabilities due to a failure to comply with environmental laws or regulations or a release of hazardous substances or other wastes into the environment.***

Alta Mesa may incur significant costs and liabilities as a result of environmental requirements applicable to the operation of its wells, gathering systems and other facilities. These costs and liabilities could arise under a wide range of federal, state and local environmental laws and regulations, including, for example, the following federal laws and their state counterparts, as amended from time to time:

- the Clean Air Act ("CAA"), which restricts the emission of air pollutants from many sources, imposes various pre-construction, monitoring and reporting requirements and is relied upon by the U.S. Environmental Protection Agency ("EPA") as authority for adopting climate change regulatory initiatives relating to GHG emissions;

- the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), which regulates discharges of pollutants from facilities to state and federal waters and establishes the extent to which waterways are subject to federal jurisdiction and rulemaking as protected waters of the United States;

- the Oil Pollution Act ("OPA"), which imposes liabilities for removal costs and damages arising from an oil spill into waters of the United States;

- the Safe Drinking Water Act ("SDWA"), which ensures the quality of the nations' public drinking water through adoption of drinking water standards and control over the subsurface injection of fluids into belowground formations;

- the Resource Conservation and Recovery Act ("RCRA"), which imposes requirements for the generation, treatment, storage, transport disposal and cleanup of non-hazardous and hazardous wastes;

- the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which imposes liability on generators, transporters and arrangers of hazardous substances at sites where hazardous substance releases have occurred or are threatening to occur as well as imposes liability on

55

Table of Contents

present and certain past owners and operations of sites were hazardous substance releases have occurred or are threatening to occur;

- the Emergency Planning and Community Right to Know Act, which requires facilities to implement a safety hazard communication program and disseminate information to employees, local emergency planning committees and response departments about toxic chemical uses and inventories;

- the Endangered Species Act ("ESA"), which restricts activities that may affect federally identified endangered and threatened species or their habitats through the implementation of operating limitations or restrictions or a temporary, seasonal or permanent ban on operations in affected areas; and

- the National Environmental Policy Act ("NEPA"), which requires federal agencies to evaluate major agency actions having the potential to impact the environment and that may require the preparation of environmental assessments or environmental impact statements.

These U.S. laws and their implementing regulations, as well as state counterparts, generally restrict the level of pollutants emitted to ambient air, discharges to surface water, and disposals or other releases to surface and below-ground soils and ground water. Failure to comply with these laws and regulations may result in the assessment of sanctions, including administrative, civil and criminal penalties, the imposition of investigatory, remedial and corrective actions obligations, the incurrence of capital expenditures, the occurrence of delays in the permitting, development or expansion of projects and the issuance of orders enjoining some or all of Alta Mesa's future operations in a particular area. Certain environmental laws and analogous state laws and regulations impose strict joint and several liability, without regard to fault or legality of conduct, for costs required to clean up and restore sites where hazardous substances or other wastes have been disposed of or otherwise released. Moreover, it is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by the release of hazardous substances, wastes or other materials into the environment. The trend in environmental regulation is to place more restrictions and limitations on activities that may affect the environment and more stringent laws and regulations may be adopted in the future. Historically, Alta Mesa's environmental compliance costs have not had a material adverse effect on its results of operations; however, there can be no assurance that such costs will not be material in the future or that such future compliance will not have a material adverse effect on Alta Mesa's business and operating results.

***Changes in the legal and regulatory environment governing the oil and natural gas industry, particularly changes in the current Oklahoma forced pooling system, could have a material adverse effect on Alta Mesa's business.***

Alta Mesa's business is subject to various forms of extensive government regulation, including laws and regulations concerning the location, spacing and permitting of the oil and natural gas wells Alta Mesa drills and the disposal of saltwater produced from such wells, among other matters. Changes in the legal and regulatory environment governing Alta Mesa's industry, particularly any changes to Oklahoma statutory forced pooling procedures that make forced pooling more difficult to accomplish, could result in increased compliance costs and adversely affect Alta Mesa's business and operating results.

***Alta Mesa may have difficulty maintaining its historic levels of success in using the current Oklahoma forced pooling process to increase its interest in wells it proposes to drill on its STACK acreage due to changes in third-party interest owners' ability or desire to participate in Alta Mesa's wells or possible future regulatory changes.***

In the past Alta Mesa has used, and it expects to continue to use, the Oklahoma "forced pooling" process to increase its working interest in drilling units for wells it proposes to drill as operator on its STACK acreage, which could lead to a proportionate increase in Alta Mesa's share of the production and reserves associated with any such successfully drilled well. In recent years, the collective working interest of third-party owners of mineral rights in Alta Mesa's drilling units who have elected to participate in Alta Mesa's wells has been

56

Table of Contents

relatively low, which Alta Mesa believes could largely be attributed to the absence of available capital following the substantial oil and gas price downturns that commenced in late 2014. Due to the increased interest in the STACK as an economic oil and gas play in the current price and cost environment and the resultant consolidation of acreage in producers with greater access to capital, Alta Mesa believes that third-party interest holders may be more likely to bear their share of the costs of the proposed future wells Alta Mesa proposes to drill on its acreage. Thus, Alta Mesa's ability to use Oklahoma forced pooling procedures to increase its working interest in proposed wells may be more difficult to accomplish. In addition, future changes in laws and regulations in Oklahoma affecting the forced pooling process could result in changes in economics and the level of participation in drilling by third-party interest owners and adversely affect Alta Mesa's ability to increase its interest in wells that it proposes.

***The adoption of derivatives legislation and regulations by the U.S. Congress related to derivative contracts could have an adverse impact on Alta Mesa's ability to hedge risks associated with its business.***

Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") establishes federal oversight and regulation of over-the-counter ("OTC") derivatives and requires the Commodity Futures Trading Commission (the "CFTC") and the SEC to enact further regulations affecting derivative contracts, including the derivative contracts Alta Mesa uses to hedge its exposure to price volatility through the OTC market. Although the CFTC and the SEC have issued final regulations in certain areas, final rules in other areas and the scope of relevant definitions and/or exemptions still remain to be finalized.

In one of its rulemaking proceedings still pending under the Dodd-Frank Act, the CFTC issued on December 5, 2016 a re-proposed rule imposing position limits for certain futures and option contracts in various commodities (including natural gas) and for swaps that are their economic equivalents. Under the proposed rules on position limits, certain types of hedging transactions are exempt from these limits on the size of positions that may be held, provided that such hedging transactions satisfy the CFTC's requirements for certain enumerated "bona fide hedging" transactions or positions. A final rule has not yet been issued. Similarly, on December 2, 2016, the CFTC has re-issued a proposed rule regarding the capital a swap dealer or major swap participant is required to set aside with respect to its swap business, but the CFTC has not yet issued a final rule.

The CFTC issued a final rule on margin requirements for uncleared swap transactions on January 6, 2016, which includes an exemption from any requirement to post margin to secure uncleared swap transactions entered into by commercial end-users in order to hedge commercial risks affecting their business. In addition, the CFTC has issued a final rule authorizing an exemption from the otherwise applicable mandatory obligation to clear certain types of swap transactions through a derivatives clearing organization and to trade such swaps on a regulated exchange, which exemption applies to swap transactions entered into by commercial end-users in order to hedge commercial risks affecting their business. The mandatory clearing requirement currently applies only to certain interest rate swaps and credit default swaps, but the CFTC could act to impose mandatory clearing requirements for other types of swap transactions. The Dodd-Frank Act also imposes recordkeeping and reporting obligations on counterparties to swap transactions and other regulatory compliance obligations.

All of the above regulations could increase the costs to Alta Mesa of entering into financial derivative transactions to hedge or mitigate its exposure to commodity price volatility and other commercial risks affecting its business. While it is not possible at this time to predict when the CFTC will issue final rules applicable to position limits or capital requirements, depending on Alta Mesa's ability to satisfy the CFTC's requirements for a commercial end-user using swaps to hedge or mitigate its commercial risks, these rules and regulations may require Alta Mesa to comply with position limits and with certain clearing and trade-execution requirements in connection with its financial derivative activities. When a final rule on capital requirements for swap dealers is issued, the Dodd-Frank Act may require Alta Mesa's current swap dealer counterparties to post additional capital as a result of entering into uncleared financial derivatives with Alta Mesa, which capital requirements rule could increase the costs to Alta Mesa of future financial derivatives transactions. The "Volcker Rule" provisions of the Dodd-Frank Act may also require Alta Mesa's current bank counterparties that engage in financial derivative

57

Table of Contents

transactions to spin off some of their derivatives activities to separate entities, which separate entities may not be as creditworthy as the current bank counterparties. Under such rules, other bank counterparties may cease their current business as hedge providers. These changes could reduce the liquidity of the financial derivatives markets thereby reducing the ability of entities like Alta Mesa, as commercial end-users, to have access to financial derivatives to hedge or mitigate Alta Mesa's exposure to commodity price volatility.

As a result, the Dodd-Frank Act and any new regulations issued thereunder could significantly increase the cost of derivative contracts (including through requirements to post cash collateral), which could adversely affect Alta Mesa's capital available for other commercial operations purposes, materially alter the terms of future swaps relative to the terms of Alta Mesa's existing bilaterally negotiated financial derivative contracts and reduce the availability of derivatives to protect against commercial risks Alta Mesa encounters.

If Alta Mesa reduces its use of derivative contracts as a result of the new requirements, its results of operations may become more volatile and cash flows less predictable, which could adversely affect Alta Mesa's ability to plan for and fund capital expenditures. Finally, the legislation was intended, in part, to reduce the volatility of oil, natural gas and natural gas liquids prices, which some legislators attributed to speculative trading in derivatives and commodity instruments related to oil, natural gas and natural gas liquids. Alta Mesa's revenues could therefore be adversely affected if a consequence of the legislation and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on Alta Mesa's consolidated financial condition, results of operations or cash flows.

***Alta Mesa is subject to complex federal, state, local and other laws and regulations that could adversely affect the cost, manner or feasibility of conducting its operations.***

Alta Mesa's exploration and production operations are subject to complex and stringent laws and regulations. In order to conduct its operations in compliance with these laws and regulations, Alta Mesa must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. Failure or delay in obtaining regulatory approvals or drilling permits could have a material adverse effect on Alta Mesa's ability to develop its properties, and receipt of drilling permits with onerous conditions could increase Alta Mesa's compliance costs. In addition, regulations regarding conservation practices and the protection of correlative rights affect Alta Mesa's operations by limiting the quantity of oil and natural gas it may produce and sell.

Alta Mesa is subject to federal, state and local laws and regulations as interpreted and enforced by governmental authorities possessing jurisdiction over various aspects of the exploration, production and transportation of oil and natural gas. The possibility exists that new laws, regulations or enforcement policies could be more stringent and significantly increase Alta Mesa's compliance costs. If Alta Mesa is not able to recover the resulting costs through insurance or increased revenues, its financial condition could be adversely affected.

Alta Mesa's access to transportation options can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. Various proposals and proceedings that might affect the petroleum industry are pending before the U.S. Congress ("Congress"), the Federal Energy Regulatory Commission, ("FERC"), various state legislatures and the courts. The industry historically has been heavily regulated and Alta Mesa cannot provide assurance that the less stringent regulatory approach recently pursued by FERC and Congress will continue nor can Alta Mesa predict what effect such proposals or proceedings may have on its operations.

Fuel conservation measures, alternative fuel requirements, increasing consumer demand for alternatives to oil and natural gas, technological advances in fuel economy and energy generation devices could reduce demand for oil and natural gas. The impact of the changing demand for oil and natural gas may have a material adverse effect on Alta Mesa's business, financial condition, results of operations and cash flows.

58

Table of Contents

***Should Alta Mesa fail to comply with all applicable statutes, rules, regulations and orders administered by the CFTC or FERC, it could be subject to substantial penalties and fines.***

Under the Energy Policy Act of 2005 ("EPAct"), FERC has been given greater civil penalty authority under the Natural Gas Act ("NGA"), including the ability to impose penalties of up to $1 million per day for each violation and disgorgement of profits associated with any violation. While Alta Mesa's operations have not been regulated by FERC as a natural gas company under the NGA, FERC has adopted regulations that may subject certain of Alta Mesa's otherwise non-FERC jurisdictional operations to FERC annual reporting and posting requirements. Alta Mesa also must comply with the anti-market manipulation rules enforced by FERC under the NGA. Under the Commodity Exchange Act (as amended by the Dodd-Frank Act) and regulations promulgated thereunder by the CFTC, the CFTC has also adopted anti-market manipulation, fraud and market disruption rules relating to the prices of commodities, futures contracts, options on futures, and swaps. Additional rules and legislation pertaining to those and other matters may be considered or adopted by Congress, FERC, or the CFTC from time to time. Failure to comply with those statutes, regulations, rules and orders could subject Alta Mesa to civil penalty liability.

***Climate change legislation or other regulatory initiatives restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas Alta Mesa produces.***

Climate change continues to attract considerable public and scientific attention. As a result, numerous proposals have been made and may continue to be made at the international, national, regional and state levels of government to monitor and limit emissions of GHGs. These efforts have included consideration of cap-and-trade programs, carbon taxes, GHG reporting and tracking programs and regulations that directly limit GHG emissions from certain sources. At the federal level, no comprehensive climate change legislation has been implemented to date. The EPA has, however, adopted regulations under the CAA that, among other things, establish Potential for Significant Deterioration ("PSD") construction and Title V operating permit reviews for GHG emissions from certain large stationary sources that are already potential sources of significant, or criteria, pollutant emissions. Sources subject to these permitting requirements must meet "best available control technology" standards for those GHG emissions. Additionally, the EPA has adopted rules requiring the monitoring and annual reporting of GHG emissions from specified GHG emission sources in the United States, including, among others, onshore and offshore oil and gas production, processing, transmission, storage and distribution facilities, which include certain of Alta Mesa's operations.

Federal agencies also have begun directly regulating emissions of methane, a GHG, from oil and natural gas operations. In June 2016, the EPA published New Source Performance Standards ("NSPS"), known as Subpart OOOOa, that require certain new, modified or reconstructed facilities in the oil and natural gas sector to reduce these methane gas and volatile organic compound emissions. These Subpart OOOOa standards will expand previously issued NSPS published by the EPA in 2012 and known as Subpart OOOO, by using certain equipment-specific emissions control practices. Moreover, in November 2016, the EPA issued an Information Collection Request ("ICR") seeking information about methane emissions from facilities and operations in the oil and natural gas industry, but on March 2, 2017 the EPA announced that it was withdrawing the ICR so that the agency may further assess the need for the information that it was collecting through the request. Additionally, in December 2015, the United States joined the international community at the 21st Conference of the Parties of the United Nations Framework Convention on Climate Change in Paris, France that prepared an agreement requiring member countries to review and "represent a progression" in their intended nationally determined contributions, which set GHG emission reduction goals every five years beginning in 2020. This "Paris Agreement" was signed by the United States in April 2016 and entered into force in November 2016. The United States is one of more than 120 nations having ratified or otherwise consented to the agreement; however, this agreement does not create any binding obligations for nations to limit their GHG emissions but, rather, includes pledges to voluntarily limit or reduce future emissions. With the change in Presidential administration, the ongoing commitment of the United States to the Paris Agreement is unclear. On June 1, 2017, President Trump announced that the United States planned to withdraw from the Paris Agreement and to seek negotiations either

59

Table of Contents

to reenter the Paris Agreement on different terms or establish a new framework agreement. The Paris Agreement provides for a four-year exit process beginning in November 2016, which would result in an effective exit date of November 2020. The United States' adherence to the exit process is uncertain, and the terms on which the United States may reenter the Paris Agreement or a separately negotiated agreement, if it chooses to do so, are unclear at this time.

The adoption and implementation of any international, federal or state legislation, regulations or other regulatory initiatives that requires reporting of GHGs or otherwise restricts emissions of GHGs from Alta Mesa's equipment and operations could require Alta Mesa to incur increased operating costs, such as costs to purchase and operate emissions control systems, acquire emissions allowances or comply with new regulatory or reporting requirements, including the imposition of a carbon tax, which one or more developments could have an adverse effect on Alta Mesa's business, financial condition and results of operations. Moreover, such new legislation or regulatory programs could also increase the cost to the consumer, and thereby reduce demand for oil and gas, which could reduce the demand for the oil and natural gas Alta Mesa produces and lower the value of its reserves.

Finally, it should be noted that increasing concentrations of GHGs in the Earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, floods and other climatic events. If such effects were to occur, Alta Mesa's development and production operations have the potential to be adversely affected. Potential adverse effects could include damages to Alta Mesa's facilities from powerful winds or rising waters in low lying areas, disruption of Alta Mesa's production activities because of climate related damages to its facilities, its costs of operations potentially arising from such climatic effects, less efficient or non-routine operating practices necessitated by such climate effects, or increased costs for insurance coverage in the aftermath of such effects. Significant physical effects of climate change could also have an indirect effect on Alta Mesa's financing and operations by disrupting the transportation or process-related services provided by midstream companies, service companies or suppliers with whom it has a business relationship. At this time, Alta Mesa has not developed a comprehensive plan to address the legal, economic, social or physical impacts of climate change on its operations.

***Federal, state and local legislation and regulatory initiatives relating to hydraulic fracturing could increase Alta Mesa's costs of doing business, impose additional operating restrictions or delays and adversely affect its production.***

Hydraulic fracturing is an essential and common practice used to stimulate production of oil and natural gas from dense subsurface rock formations, such as shales. Alta Mesa routinely applies hydraulic fracturing techniques in many of its operations to stimulate production of hydrocarbons, particularly natural gas. The process involves the injection of water, sand and additives under pressure into a targeted subsurface formation to fracture the surrounding rock and stimulate production.

Hydraulic fracturing (other than that using diesel) is currently generally exempt from regulation under the SDWA's Underground Injection Control ("UIC") program and is typically regulated by state oil and natural gas commissions or similar agencies. However, several federal agencies have asserted regulatory authority or pursued investigations over certain aspects of the process. For example, in December 2016, the EPA released its final report on the potential impacts of hydraulic fracturing on drinking water resources, concluding that "water cycle" activities associated with hydraulic fracturing may impact drinking water resources "under some circumstances," including water withdrawals for fracturing in times or areas of low water availability; surface spills during the management of fracturing fluids, chemicals or produced water; injection of fracturing fluids into wells with inadequate mechanical integrity; injection of fracturing fluids directly into groundwater resources; discharge of inadequately treated fracturing wastewater to surface waters; and disposal or storage of fracturing wastewater in unlined pits. In other examples, in June 2016, the EPA published an effluent limit guideline final rule prohibiting the discharge of wastewater from onshore unconventional oil and natural gas extraction facilities to publicly owned wastewater treatment plants and, in 2014, the EPA asserted regulatory authority pursuant to

60

Table of Contents

the UIC program over hydraulic fracturing activities involving the use of diesel and issued guidance covering such activities. Also, in 2015, the Bureau of Land Management ("BLM") published a final rule that established new or more stringent standards relating to hydraulic fracturing on federal and American Indian lands, which has been challenged in court. However, the BLM is in the process of rescinding the 2015 rule.

Additionally, in 2014, the EPA published an advanced notice of public rulemaking regarding Toxic Substances Control Act ("TSCA") reporting of the chemical substances and mixture used in hydraulic fracturing. From time to time, Congress has introduced, but not adopted, legislation to provide for federal regulation of hydraulic fracturing and to require disclosure of chemicals used in the fracturing process.

In addition, some states, including Oklahoma where Alta Mesa operates, have adopted, and other states are considering adopting, regulations that restrict or could restrict hydraulic fracturing in certain circumstances and that require the disclosure of the chemicals used in hydraulic fracturing operations. States could elect to prohibit high-volume hydraulic fracturing altogether, following the approach taken by the State of New York in 2015. In addition to state laws, local land use restrictions, such as city ordinances, may restrict drilling in general and/or hydraulic fracturing in particular, although Oklahoma has taken steps to limit the authority of local governments to regulate oil and natural gas development. The issuance of any laws, regulations or other regulatory initiatives that impose new obligations on, or significantly restrict hydraulic fracturing, could make it more difficult or costly for Alta Mesa to perform hydraulic fracturing activities and thereby affect its production and increase its cost of doing business. Such increased costs and any delays or curtailments in Alta Mesa's production activities could have a material adverse effect on its business, prospects, financial condition, results of operations and liquidity.

***Legislation or regulatory initiatives intended to address seismic activity could restrict Alta Mesa's ability to dispose of produced water gathered from its drilling and production activities, which could have a material adverse effect on Alta Mesa's business.***

Alta Mesa disposes of produced water gathered from its operations pursuant to permits issued to it or third-party vendors by governmental authorities overseeing such disposal activities. While these permits are issued pursuant to existing laws and regulations, these legal requirements are subject to change, which could result in the imposition of more stringent permitting or operating constraints or new monitoring and reporting requirements owing to, among other things, concerns of the public or governmental authorities regarding such disposal activities.

One such concern relates to recent seismic events near underground injection wells used for the disposal of produced water resulting from oil and natural gas activities. When caused by human activity, such events are called induced seismicity. Developing research suggests that the link between seismic activity and wastewater disposal may vary by region, and that only a very small fraction of the tens of thousands of injection wells have been suspected to be, or have been, the likely cause of induced seismicity. In March 2016, the United States Geological Survey identified six states with the most significant hazards from induced seismicity, including Oklahoma, where Alta Mesa operates. In response to these concerns, regarding induced seismicity, regulators in some states, including Oklahoma, have imposed, and other states are considering imposing, additional requirements in the permitting of produced water injection wells or otherwise to assess any relationship between seismicity and the use of such wells. For example, Oklahoma issued new rules for injection wells in 2014 that imposed certain permitting and operating restrictions and reporting requirements on injection wells in proximity to faults and also, from time to time, developed and implemented plans directing certain wells where seismic incidents have occurred to restrict or suspend injection well operations. The Oklahoma Corporation Commission ("OCC") has implemented the National Academy of Science's "traffic light system," in determining whether new injection wells should be permitted, permitted only with special restrictions, or not permitted at all. In addition, the OCC has established rules requiring operators of certain produced water injection wells in seismically-active areas, or Areas of Interest, within the Arbuckle formation of the state to, among other things, conduct mechanical integrity testing or make certain demonstrations of such wells' depth that, depending on the depth, could require

61

Table of Contents

the plugging back of such wells and/or the reduction of volumes disposed in such wells. As a result of these measures, the OCC from time to time has developed and implemented plans calling for injection wells within Areas of Interest where seismic incidents have occurred to restrict or suspend disposal operations in an attempt to mitigate the occurrence of such incidents. More recently, in December 2016, the OCC Oil and Gas Conservation Division and the Oklahoma Geological Survey released well completion seismicity guidance, which requires operators to take certain prescriptive actions, including an operator's planned mitigation practices, following certain unusual seismic activity within 1.25 miles of hydraulic fracturing operations. In addition, in February 2017, the OCC's Oil and Gas Conservation District issued an order limiting future increases in the volume of oil and natural gas wastewater injected belowground into the Arbuckle formation in an effort to reduce the number of earthquakes in the state.

Also, ongoing lawsuits allege that injection well disposal operations have caused damage to neighboring properties or otherwise violated state and federal rules governing waste disposal. These developments could result in additional regulation and restrictions on the use of injection wells. Increased regulation and attention given to induced seismicity could lead to greater opposition, including litigation, to oil and natural gas activities utilizing injection wells for produced water disposal. Evaluation of seismic incidents and whether or to what extent those events are induced by the injection of produced water into disposal wells continues to evolve, as governmental authorities consider new and/or past seismic incidents in areas where produced water injection activities occur or are proposed to be performed. Court decisions or the adoption of any new laws, regulations or directives that restrict Alta Mesa's ability to dispose of produced water generated by production and development activities, whether by plugging back the depths of disposal wells, reducing the volume of produced water disposed in such wells, restricting injection well locations or otherwise or by requiring Alta Mesa to shut down injection wells, could significantly increase Alta Mesa's costs to manage and dispose of this produced water, which could have a material adverse effect on its financial condition and results of operations.

***Laws and regulations pertaining to threatened and endangered species or protective of environmentally sensitive areas could delay or restrict Alta Mesa's operations and cause Alta Mesa to incur significant costs.***

Alta Mesa's operations may be adversely affected by seasonal or permanent restrictions or costly mitigation measures imposed under various federal and state statutes in order to protect endangered or threatened species and their habitats, migratory birds, wetlands and natural resources. Federal statutes, as amended from time to time, that are protective of these species, birds and environmentally sensitive areas include the ESA, the Migratory Bird Treaty Act (the "MBTA"), the CWA, the CERCLA and the OPA. For example, to the extent that species are listed under the ESA or similar state laws and live in areas where Alta Mesa's oil and natural gas exploration and production activities are conducted, Alta Mesa's ability to conduct or expand operations and construct facilities could be limited or it could be forced to incur material additional costs. Moreover, Alta Mesa's operations may be delayed, restricted or precluded in protected habitat areas or during certain seasons, such as breeding and nesting seasons.

Additionally, the U.S. Fish and Wildlife Service ("FWS") may designate new or increased critical habitat areas that it believes are necessary for survival of threatened or endangered species, which designation could result in material restrictions to federal land use and private land use and could delay or prohibit land access or oil and natural gas development. As a result of one or more settlements approved by the federal government, the FWS must make determinations on the listing of numerous specified species as endangered or threatened under the ESA pursuant to specified timelines. The designation of previously unidentified endangered or threatened species could indirectly cause Alta Mesa to incur additional costs, cause Alta Mesa's operations to become subject to operating restrictions or bans, and limit future development activity in affected areas. If harm to protected species or damages to wetlands, habitat or natural resources occur or may occur, government entities or, at times, private parties may act to prevent oil and natural gas exploration or development activities or seek damages for harm to species, habitat or natural resources resulting from drilling or construction or releases of oil, wastes, hazardous substances or other regulated materials, and, in some cases, may seek criminal penalties. The designation of previously unprotected species as threatened or endangered in areas where Alta Mesa conducts

62

Table of Contents

operations could cause Alta Mesa to incur increased costs arising from species protection measures or time delays or limitations on Alta Mesa's operations.

***Alta Mesa could experience periods of higher costs if oil and natural gas prices rise or as drilling activity otherwise increases in Alta Mesa's area of operations. Higher costs could reduce Alta Mesa's profitability, cash flow and ability to pursue its drilling program as planned.***

Historically, Alta Mesa's capital and operating costs typically rise during periods of sustained increasing oil, natural gas and natural gas liquid prices. These cost increases result from a variety of factors beyond Alta Mesa's control as drilling activity increases, such as increases in the cost of electricity, tubular goods, water, sand and other disposable materials used in fracture stimulation and other raw materials that Alta Mesa and its vendors rely upon; and the cost of services and labor, especially those required in horizontal drilling and completion. Since late 2014, oil and natural gas prices declined substantially resulting in decreased levels of drilling activity in the U.S. oil and natural gas industry, including in Alta Mesa's area of operations. This led to significantly lower costs of some drilling and completion equipment, services, materials and supplies. As commodity prices rise or stabilize or drilling activity otherwise increases in Alta Mesa's area of operations, these lower cost levels may not be sustainable over long periods. Recently, there has been increased drilling activity in the STACK. As a result, such costs may rise thereby negatively impacting Alta Mesa's profitability, cash flow and causing Alta Mesa to possibly reconfigure or reduce its drilling program.

***The third parties on whom Alta Mesa relies for gathering and transportation services are subject to complex federal, state and other laws that could adversely affect the cost, manner or feasibility of conducting Alta Mesa's business.***

The operations of the third parties on whom Alta Mesa relies for gathering and transportation services are subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third-party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that Alta Mesa pays for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom Alta Mesa relies could have a material adverse effect on Alta Mesa's business, financial condition and results of operations. See "Business of Alta Mesa—Environmental and Occupational Safety and Health Matters" and "Business of Alta Mesa—Other Regulation of the Oil and Natural Gas Industry" for a description of the laws and regulations that affect the third parties on whom Alta Mesa relies.

***Alta Mesa has limited control over activities on properties it does not operate, which could reduce its production and revenues.***

Alta Mesa has limited control over properties which it does not operate or does not otherwise control operations. If Alta Mesa does not operate or otherwise control the properties in which it owns an interest, it does not have control over normal operating procedures, expenditures or future development of the underlying properties. The failure of an operator of Alta Mesa's wells to adequately perform operations, an operator's financial difficulties, including as a result of price volatility or an operator's breach of the applicable agreements could reduce Alta Mesa's production and revenues. The success and timing of Alta Mesa's drilling and development activities on properties operated by others, therefore, depends upon a number of factors outside of its control, including the operator's timing and amount of capital expenditures, expertise and financial resources, inclusion of other participants in drilling wells and use of technology.

***Oil and gas exploration and production activities are complex and involve risks that could lead to legal proceedings resulting in the incurrence of substantial liabilities.***

Like many oil and gas companies, Alta Mesa is from time to time involved in various legal and other proceedings in the ordinary course of its business, such as title, royalty or contractual disputes, regulatory

63

Table of Contents

compliance matters and personal injury or property damage matters. Such legal proceedings are inherently uncertain and their results cannot be predicted. Regardless of the outcome, such proceedings could have an adverse impact on Alta Mesa because of legal costs, diversion of management and other personnel and other factors. In addition, it is possible that a resolution of one or more such proceedings could result in liability, penalties or sanctions, as well as judgments, consent decrees or orders requiring a change in Alta Mesa's business practices, which could materially and adversely affect its business, operating results and financial condition. Accruals for such liabilities, penalties or sanctions may be insufficient, and judgments and estimates to determine accruals or range of losses related to legal and other proceedings could change from one period to the next, and such changes could be material.

*Alta Mesa depends on key personnel, the loss of any of whom could materially adversely affect future operations.*

Alta Mesa's success will depend to a large extent upon the efforts and abilities of its executive officers and key operations personnel. The loss of the services of one or more of these key employees could have a material adverse effect on Alta Mesa. Alta Mesa does not maintain key-man life insurance with respect to any of its employees. Alta Mesa's business will also be dependent upon its ability to attract and retain qualified personnel. Acquiring and keeping these personnel could prove more difficult or cost substantially more than estimated. This could cause Alta Mesa to incur greater costs or prevent it from pursuing its development and exploitation strategy as quickly as Alta Mesa would otherwise wish to do.

*Alta Mesa operates in an area of high industry activity, which may affect its ability to hire, train or retain qualified personnel needed to manage and operate its assets.*

Alta Mesa's operations and drilling activity are concentrated in the STACK, an area in which industry activity has increased rapidly. As a result, demand for qualified personnel in this area, and the cost to attract and retain such personnel, has increased over the past few years due to competition and may increase substantially in the future. Moreover, Alta Mesa's competitors may be able to offer better compensation packages to attract and retain qualified personnel than Alta Mesa is able to offer.

Any delay or inability to secure the personnel necessary for Alta Mesa to continue or complete its current and planned development activities could result in oil and gas production volumes being below its forecasted volumes. In addition, any such negative effect on production volumes, or significant increases in costs, could have a material adverse effect on Alta Mesa's results of operations, liquidity and financial condition.

*Alta Mesa may encounter obstacles to marketing its oil and natural gas, which could adversely impact its revenues.*

The marketability of Alta Mesa's production will depend in part upon the availability and capacity of natural gas gathering systems, pipelines and other transportation facilities owned by third parties. Transportation space on the gathering systems and pipelines Alta Mesa utilizes is occasionally limited or unavailable due to repairs or improvements to facilities or due to space being utilized by other companies that have priority transportation agreements. Additionally, new fields may require the construction of gathering systems and other transportation facilities. These facilities may require Alta Mesa to spend significant capital that would otherwise be spent on drilling.

The availability of markets is beyond Alta Mesa's control. If market factors dramatically change, the impact on Alta Mesa's revenues could be substantial and could adversely affect its ability to produce and market oil and natural gas.

64

Table of Contents

***Alta Mesa's senior secured revolving credit facility and the indenture governing its 2024 Notes have restrictive covenants that could limit its growth, financial flexibility and its ability to engage in certain activities.***

Alta Mesa's senior secured revolving credit facility and the indenture governing its 2024 Notes have restrictive covenants that could limit its growth, financial flexibility and its ability to engage in activities that may be in Alta Mesa's long-term best interests. Alta Mesa's senior secured revolving credit facility and the indenture governing its 2024 Notes also contain covenants, that, among other things, limit Alta Mesa's ability to:

- incur additional indebtedness;

- sell assets;

- guaranty or make loans to others;

- make investments;

- enter into mergers;

- make certain payments and distributions;

- enter into or be party to hedge agreements;

- amend its organizational documents;

- incur liens; and

- engage in certain other transactions without the prior consent of its lenders.

In addition, Alta Mesa's senior secured revolving credit facility requires Alta Mesa to maintain certain financial ratios or to reduce Alta Mesa's indebtedness if it is unable to comply with such ratios, which may limit Alta Mesa's ability to obtain future financings to withstand a future downturn in its business or the economy in general or to otherwise conduct necessary corporate activities. Alta Mesa may also be prevented from taking advantage of business opportunities that arise because of these limitations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa—Senior Notes" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa—Senior Secured Revolving Credit Facility."

Alta Mesa's failure to comply with these covenants could result in an event of default that, if not cured or waived, could result in the acceleration of all of its indebtedness. If that occurs, Alta Mesa may not be able to make all of the required payments or borrow sufficient funds to refinance such indebtedness. Even if new financing were available at that time, it may not be on terms that are acceptable to Alta Mesa.

***Any significant reduction in Alta Mesa's borrowing base under its senior secured revolving credit facility as a result of the periodic borrowing base redeterminations or otherwise may negatively impact Alta Mesa's ability to fund its operations, and Alta Mesa may not have sufficient funds to repay borrowings under its senior secured revolving credit facility if required as a result of a borrowing base redetermination.***

Availability under Alta Mesa's senior secured revolving credit facility is currently subject to a borrowing base of $315.0 million. See "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa—Senior Secured Revolving Credit Facility." The borrowing base is subject to scheduled semiannual and other elective unscheduled borrowing base redeterminations and is based on the value of Alta Mesa's oil and natural gas reserves as determined by the lenders under its senior secured revolving credit facility and other factors deemed relevant by its lenders. Declines in prices for oil and natural gas may cause Alta Mesa's banks to reduce the borrowing base under its senior secured revolving credit facility. Any significant reduction in Alta Mesa's borrowing base as a result of such borrowing base redeterminations or otherwise may negatively impact its liquidity and its ability to fund its operations and, as a result, may have a material adverse effect on Alta Mesa's financial condition, results of operations and cash flows. Further, if the outstanding

65

Table of Contents

borrowings under Alta Mesa's senior secured revolving credit facility were to exceed the borrowing base as a result of any such redetermination, Alta Mesa would be required to repay the excess. Alta Mesa may not have sufficient funds to make such repayments. If Alta Mesa does not have sufficient funds and it is otherwise unable to negotiate renewals of its borrowings or arrange new financing, it may have to sell significant assets. Any such sale could have a material adverse effect on Alta Mesa's business and financial results.

### If Alta Mesa is unable to comply with the restrictions and covenants in its debt agreements, there could be a default under the terms of such agreements, which could result in an acceleration of repayment.

If Alta Mesa is unable to comply with the restrictions and covenants in its debt agreements, there could be a default under the terms of these agreements. Alta Mesa's ability to comply with these restrictions and covenants, including meeting financial ratios and tests, may be affected by events beyond its control. As a result, Alta Mesa cannot assure that it will be able to comply with these restrictions and covenants or meet such financial ratios and tests.

If Alta Mesa is unable to generate sufficient cash flow and is otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on its indebtedness, or if Alta Mesa otherwise fails to comply with the various covenants, including financial and operating covenants in the instruments governing its indebtedness (including covenants in its senior secured revolving credit facility or the indenture governing the 2024 Notes), Alta Mesa could be in default under the terms of the agreements governing such indebtedness. In the event of such a default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, the lenders under Alta Mesa's senior secured revolving credit facility could terminate their commitments to lend, cease making further loans and institute foreclosure proceedings against its assets, and Alta Mesa could be forced into bankruptcy or liquidation. Borrowings under other debt instruments that contain cross-acceleration or cross-default provisions may also be accelerated and become due and payable. If any of these events occur, Alta Mesa's assets might not be sufficient to repay in full all of its outstanding indebtedness and Alta Mesa may be unable to find alternative financing. Even if Alta Mesa could obtain alternative financing, it might not be on terms that are favorable or acceptable to Alta Mesa. Additionally, Alta Mesa may not be able to amend its debt agreements or obtain needed waivers on satisfactory terms.

### Alta Mesa's borrowings under its senior secured revolving credit facility expose it to interest rate risk.

Alta Mesa's earnings are exposed to interest rate risk associated with borrowings under its senior secured revolving credit facility. Alta Mesa's senior secured revolving credit facility carries a floating interest rate based upon short-term interest rate indices. If interest rates increase, so will Alta Mesa's interest costs, which may have a material adverse effect on its financial condition and results of operations. Alta Mesa may use interest rate hedges in an effort to mitigate this risk, but those efforts may not prove successful.

### To service its indebtedness, Alta Mesa require a significant amount of cash, and Alta Mesa's ability to generate cash will depend on many factors beyond its control.

Alta Mesa's ability to make payments on and to refinance its indebtedness and to fund planned capital expenditures depends in part on its ability to generate cash in the future. This ability is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond its control. Alta Mesa cannot provide assurance that it will generate sufficient cash flow from operations, that it will realize operating improvements on schedule or that future borrowings will be available to it in an amount sufficient to enable Alta Mesa to service and repay its indebtedness or to fund its other liquidity needs. If Alta Mesa is unable to satisfy its debt obligations, Alta Mesa may have to undertake alternative financing plans, such as:

- refinancing or restructuring its debt;

- selling assets;

66

Table of Contents

- reducing or delaying capital investments; or

- seeking to raise additional capital.

However, any alternative financing plans that Alta Mesa undertakes, if necessary, may not allow Alta Mesa to meet its debt obligations.

Alta Mesa cannot provide assurance that any refinancing or debt restructuring would be possible, that any assets could be sold or that, if sold, the timing of the sales and the amount of proceeds realized from those sales would be favorable to Alta Mesa or that additional financing could be obtained on acceptable terms. Alta Mesa's inability to generate sufficient cash flows to satisfy its debt obligations, or to obtain alternative financing, could materially and adversely affect its business, financial condition, results of operations and prospects.

### Concerns over general economic, business or industry conditions may have a material adverse effect on Alta Mesa's results of operations, liquidity and financial condition.

Concerns over global economic conditions, energy costs, geopolitical issues, inflation, the availability and cost of credit, the European, Asian and the United States financial markets have contributed to increased economic uncertainty and diminished expectations for the global economy. In addition, continued hostilities in the Middle East and the occurrence or threat of terrorist attacks in the United States or other countries could adversely affect the global economy. These factors, combined with volatility in commodity prices, business and consumer confidence and unemployment rates, have precipitated an economic slowdown. Concerns about global economic growth have had a significant adverse impact on global financial markets and commodity prices. If the economic climate in the United States or abroad deteriorates, worldwide demand for petroleum products could diminish further, which could impact the price at which Alta Mesa can sell its production, affect the ability of its vendors, suppliers and customers to continue operations and ultimately adversely impact Alta Mesa's results of operations, liquidity and financial condition.

### There are inherent limitations in all control systems, and misstatements due to error or fraud that could seriously harm Alta Mesa's business may occur and not be detected.

Alta Mesa's management, including its Chief Executive Officer and Chief Financial Officer, do not expect that Alta Mesa's internal controls and disclosure controls will prevent all possible error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, an evaluation of controls can only provide reasonable assurance that all material control issues and instances of fraud, if any, in Alta Mesa have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by the individual acts of some persons or by collusion of two or more persons. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected. A failure of Alta Mesa's controls and procedures to detect error or fraud could seriously harm its business and results of operations.

### Cyber-attacks targeting systems and infrastructure used by the oil and gas industry may adversely impact Alta Mesa's operations.

Alta Mesa's business has become increasingly dependent on digital technologies to conduct certain exploration, development, production and financial activities. Alta Mesa depends on digital technology to estimate quantities of oil and gas reserves, process and record financial and operating data, analyze seismic and

67

Table of Contents

drilling information and communicate with its employees and third-party partners. Unauthorized access to Alta Mesa's seismic data, reserves information or other proprietary information could lead to data corruption, communication interruption or other operational disruptions in its exploration or production operations. Also, computers control nearly all of the oil and gas distribution systems in the United States and abroad, which are necessary to transport Alta Mesa's production to market. A cyber-attack directed at oil and gas distribution systems could damage critical distribution and storage assets or the environment, delay or prevent delivery of production to markets and make it difficult or impossible to accurately account for production and settle transactions. While Alta Mesa has not experienced cyber-attacks, there is no assurance that it will not suffer such attacks and resulting losses in the future. Further, as cyber-attacks continue to evolve, Alta Mesa may be required to expend significant additional resources to continue to modify or enhance its protective measures or to investigate and remediate any vulnerability to cyber-attacks.

*Loss of Alta Mesa's information and computer systems could adversely affect its business.*

Alta Mesa is heavily dependent on its information systems and computer based programs, including its well operations information, seismic data, electronic data processing and accounting data. If any such programs or systems were to fail or create erroneous information in Alta Mesa's hardware or software network infrastructure, possible consequences include Alta Mesa's loss of communication links, inability to find, produce, process and sell oil and natural gas and inability to automatically process commercial transactions or engage in similar automated or computerized business activities. Any such consequence could have a material adverse effect on Alta Mesa's business.

### Risks Related to the Business of Kingfisher

*Because Kingfisher has a limited operating history and has generated minimal revenues and operating cash flows, it may be difficult to evaluate Kingfisher's business and its ability to successfully implement its business strategy.*

Because of Kingfisher's limited operating history, the operating performance of its assets and business strategy are not yet proven. Kingfisher does not present any historical financial statements with respect to periods prior to January 30, 2015, and Kingfisher has only generated minimal revenues and operating cash flows since such time. As a result, it may be difficult for you to evaluate Kingfisher's business and results of operations to date and to assess its future prospects.

In addition, Kingfisher may encounter risks and difficulties experienced by companies whose performance is dependent upon newly constructed assets, such as Kingfisher's assets failing to function as expected, higher than expected operating costs, equipment breakdown or failures and operational errors. Kingfisher may be less successful in achieving a consistent operating level capable of generating cash flows from its operations as compared to a company whose major assets have had longer operating histories. In addition, Kingfisher may be less equipped to identify and address operating risks and hazards in the conduct of its business than those companies whose major assets have had longer operating histories.

*All of Kingfisher's operations are located in the STACK play, making Kingfisher vulnerable to risks associated with having revenue-producing operations concentrated in one geographic area.*

Kingfisher's revenue-producing operations are geographically concentrated in the STACK play, causing it to be disproportionally exposed to risks associated with regional factors. The concentration of Kingfisher's operations in this region increases Kingfisher's exposure to unexpected events that may occur in this region such as natural disasters or labor difficulties. Any one of these events has the potential to have a relatively significant impact on Kingfisher's operations and growth plans, decrease cash flows, increase operating and capital costs and prevent development within originally anticipated time frames. Any of these risks could adversely affect Kingfisher's financial condition, results of operations or cash flows.

68

Table of Contents

***Kingfisher must continually compete for crude oil, natural gas and NGL supplies, and any decrease in supplies of such commodities could adversely affect Kingfisher's financial condition, results of operations or cash flows.***

In order to maintain or increase throughput levels in Kingfisher's gathering system and asset utilization rates at its processing plant, Kingfisher must continually contract for new product supplies. Kingfisher may not be able to obtain additional contracts for crude oil, natural gas and NGL supplies. The primary factors affecting Kingfisher's ability to connect new wells to its gathering facilities include its success in contracting for existing supplies that are not committed to other systems and the level of drilling activity near its gathering system. If Kingfisher is unable to maintain or increase the volumes on its system by accessing new supplies to offset the natural decline in reserves, its business and financial results could be adversely affected. In addition, Kingfisher's future growth will depend in part upon whether it can contract for additional supplies at a greater rate than the rate of natural decline in its current supplies.

Fluctuations in energy prices can greatly affect production rates and investments by third parties in the development of new crude oil and natural gas reserves. During 2016, Kingfisher saw lower drilling activity due to low commodity prices. Although drilling activity improved during 2016, Kingfisher could see downward pressure on future drilling activity in the STACK play if commodity prices decline below current levels, which may result in lower volumes. Tax policy changes or additional regulatory restrictions on development could also have a negative impact on drilling activity, reducing supplies of product available to Kingfisher's system and assets. Kingfisher has no control over producers and depends on them to maintain sufficient levels of drilling activity. A continued decrease in the level of drilling activity or a material decrease in production in Kingfisher's area of operation for a prolonged period, as a result of continued depressed commodity prices or otherwise, likely would adversely affect Kingfisher's financial condition, results of operations and cash flow.

***Any decrease in the volumes that Kingfisher gathers, processes, stores or transports would adversely affect its financial condition, results of operations or cash flows.***

Kingfisher's financial performance depends to a large extent on the volumes of crude oil, natural gas and NGLs gathered, processed, stored and transported on its assets. Decreases in the volumes of crude oil, natural gas and NGLs Kingfisher gathers, processes, stores or transports would directly and adversely affect its financial condition, results of operations or cash flows. These volumes can be influenced by factors beyond Kingfisher's control, including:

- environmental or other governmental regulations;

- weather conditions;

- increases in storage levels of crude oil, natural gas and NGLs;

- increased use of alternative energy sources;

- decreased demand for crude oil, natural gas and NGLs;

- continued fluctuation in commodity prices, including the prices of crude oil, natural gas and NGLs;

- economic conditions;

- supply disruptions;

- availability of supply connected to Kingfisher's systems; and

- availability and adequacy of infrastructure to gather and process supply into and out of Kingfisher's systems.

The volumes of crude oil, natural gas and NGLs gathered, processed and transported on Kingfisher's assets also depend on the production from the region that supplies its systems. Supply of crude oil, natural gas and

69

Table of Contents

NGLs can be affected by many of the factors listed above, including commodity prices and weather. In order to maintain or increase throughput levels on Kingfisher's system, Kingfisher must obtain new sources of crude oil, natural gas and NGLs. The primary factors affecting Kingfisher's ability to obtain non-dedicated sources of crude oil, natural gas, and NGLs include (i) the level of successful leasing, permitting and drilling activity in Kingfisher's areas of operation, (ii) Kingfisher's ability to compete for volumes from new wells and (iii) Kingfisher's ability to compete successfully for volumes from sources connected to other pipelines. Kingfisher has no control over the level of drilling activity in its area of operation, the amount of reserves associated with wells connected to its system or the rate at which production from a well declines. In addition, Kingfisher has no control over producers or its drilling or production decisions, which are affected by, among other things, the availability and cost of capital, levels of reserves, availability of drilling rigs and other costs of production and equipment.

***Kingfisher depends on a small number of customers for a significant portion of its gathering and processing revenues. The loss of, or reduction in volumes from, these customers could result in a decline in Kingfisher's revenues and adversely affect its financial condition, results of operations or cash flows.***

For the year ended December 31, 2016, 96.9% of Kingfisher's revenue were derived from production out of wells operated by Alta Mesa. No other customer represented greater than 10.0% of Kingfisher's revenue for fiscal year 2016. The loss of Alta Mesa as a customer could have a material impact on Kingfisher's results of operations. The loss of all or even a portion of the business from this customer, the failure to extend or replace the contracts with this customer or the extension or replacement of such contracts on less favorable terms, as a result of competition or otherwise, could adversely affect Kingfisher's financial condition, results of operations or cash flows. For the nine months ended September 30, 2017, 86.2% of Kingfisher's revenue were derived from production out of wells operated by Alta Mesa. No other customer represented greater than 10.0% of Kingfisher's revenue for nine months ended September 30, 2017. Kingfisher's concentration to Alta Mesa is expected to decrease over time as Kingfisher provides midstream services for additional producers.

***Construction of Kingfisher's Phase II assets subjects it to risks of construction delays, cost over-runs, limitations on its growth and negative effects on its financial condition, results of operations or cash flows.***

Kingfisher is engaged in the construction of its Phase II assets, including an expansion of its cryogenic processing plant, some of which will take a number of months before commercial operation. The construction of these Phase II assets are complex and subject to a number of factors beyond Kingfisher's control, including delays from third-party landowners, the permitting process, complying with laws, unavailability of materials, labor disruptions, environmental hazards, financing, accidents, weather and other factors. Any delay in the completion of the Phase II assets could adversely affect Kingfisher's financial condition, results of operations or cash flows. The construction of pipelines and gathering and processing and storage facilities requires the expenditure of significant amounts of capital, which may exceed Kingfisher's estimated costs. Estimating the timing and expenditures related to these development projects is very complex and subject to variables that can significantly increase expected costs. Should the actual costs of these projects exceed Kingfisher's estimates, its liquidity and capital position could be adversely affected. This level of development activity requires significant effort from Kingfisher's management and technical personnel. Kingfisher may not have the ability to attract and/or retain the necessary number of personnel with the skills required to bring complicated projects to successful conclusions.

***Kingfisher's construction of new assets may be more expensive than anticipated and may not result in revenue increases and may be subject to regulatory, environmental, political, legal and economic risks that could adversely affect Kingfisher's financial condition, results of operations or cash flows.***

The construction of additions or modifications to Kingfisher's existing systems and the construction of new midstream assets involves numerous regulatory, environmental, political and legal uncertainties beyond its control including potential protests or legal actions by interested third parties, and may require the expenditure of

70

Table of Contents

significant amounts of capital. Financing may not be available on economically acceptable terms or at all. If Kingfisher undertakes these projects, it may not be able to complete them on schedule, at the budgeted cost or at all. Moreover, Kingfisher's revenues may not increase due to the successful construction of a particular project. For instance, if Kingfisher expands a pipeline or constructs a new pipeline, the construction may occur over an extended period of time, and it may not receive any material increases in revenues promptly following completion of a project or at all. Moreover, Kingfisher may construct facilities to capture anticipated future production growth in a region in which such growth does not materialize. As a result, new facilities may not be able to attract enough throughput to achieve its expected investment return, which could adversely affect Kingfisher's financial condition, results of operations or cash flows. In addition, the construction of additions to Kingfisher's existing gathering and processing assets will generally require it to obtain new rights-of-way and permits prior to constructing new pipelines or facilities. Kingfisher may be unable to timely obtain such rights-of-way or permits to connect new product supplies to its existing gathering lines or capitalize on other attractive expansion opportunities. Additionally, it may become more expensive for Kingfisher to obtain new rights-of-way or to expand or renew existing rights-of-way. If the cost of renewing or obtaining new rights-of-way increases, Kingfisher's cash flows could be adversely affected.

***Kingfisher may be unable to obtain or renew permits necessary for its operations, which could inhibit its ability to do business.***

Performance of Kingfisher's operations require that it obtain and maintain a number of federal and state permits, licenses and approvals with terms and conditions containing a significant number of prescriptive limits and performance standards in order to operate. All of these permits, licenses, approval limits and standards require a significant amount of monitoring, record keeping and reporting in order to demonstrate compliance with the underlying permit, license, approval limit or standard. Noncompliance or incomplete documentation of Kingfisher's compliance status may result in the imposition of fines, penalties and injunctive relief. A decision by a government agency to deny or delay the issuance of a new or existing material permit or other approval, or to revoke or substantially modify an existing permit or other approval, could adversely affect Kingfisher's ability to initiate or continue operations at the affected location or facility and on Kingfisher's financial condition, results of operations and cash flows.

Additionally, in order to obtain permits and renewals of permits and other approvals in the future, Kingfisher may be required to prepare and present data to governmental authorities pertaining to the potential adverse impact that any proposed pipeline or processing-related activities may have on the environment, individually or in the aggregate. Certain approval procedures may require preparation of archaeological surveys, endangered species studies and other studies to assess the environmental impact of new sites or the expansion of existing sites. Compliance with these regulatory requirements is expensive and significantly lengthens the time required to prepare applications and to receive authorizations.

***Kingfisher typically does not obtain independent evaluations of hydrocarbon reserves; therefore, volumes Kingfisher services in the future could be less than anticipated.***

Kingfisher typically does not obtain, on a regular basis, independent evaluations of hydrocarbon reserves connected to its gathering systems or that it otherwise services due to the unwillingness of producers to provide reserve information as well as the cost of such evaluations. Accordingly, Kingfisher does not have independent estimates of total reserves serviced by its assets or the anticipated life of such reserves. If the total reserves or estimated life of the reserves is less than Kingfisher anticipates and it is unable to secure additional sources, then the volumes transported on Kingfisher's gathering systems or that it otherwise services in the future could be less than anticipated. A decline in the volumes could adversely affect Kingfisher's financial condition, results of operations or cash flows.

71

Table of Contents

*Restrictions in Kingfisher's credit facility could adversely affect its financial condition, results of operations or cash flows.*

Kingfisher is a party to a $200 million credit agreement that matures on August 7, 2021, with quarterly interest payments due. Kingfisher's interest rates depend upon its consolidated leverage ratio and Kingfisher can elect to borrow on a Eurodollar Loan or Base Rate Loan basis. Both the Eurodollar Loan and Base Rate Loan margins are subject to minimum rates established by third-party institutions, such as, but not limited to the Federal Reserve. For example, if Kingfisher elects to borrow a Base Rate Loan at the highest applicable pricing level, the existing annual interest rate would be 4.0%. The terms of this credit agreement limit Kingfisher's ability to, among other things:

- incur or guarantee additional debt;

- make certain investments and acquisitions;

- incur certain liens or permit them to exist;

- enter into certain types of transactions with affiliates;

- merge or consolidate with another company; and

- transfer, sell or otherwise dispose of assets.

The Kingfisher credit facility also contains covenants requiring it to maintain certain financial ratios. Kingfisher's ability to meet those financial ratios and tests can be affected by events beyond its control, and Kingfisher cannot assure you that it will meet any such ratios and tests.

The provisions of the Kingfisher credit facility may affect its ability to obtain future financing and pursue attractive business opportunities and its flexibility in planning for, and reacting to, changes in business conditions. In addition, a failure to comply with the provisions of the credit facility could result in a default or an event of default that could enable Kingfisher's lenders to declare the outstanding principal of that debt, together with accrued and unpaid interest, to be immediately due and payable. If the payment of Kingfisher's debt is accelerated, its assets may be insufficient to repay such debt in full. Please read "Management's Discussion and Analysis of Financial Condition and Results of Operations of Kingfisher—Liquidity and Capital Resources."

*Kingfisher's exposure to commodity price risk may change over time.*

Kingfisher generates substantially all of its revenues pursuant to fee-based contracts under which Kingfisher is paid based on the volumes that it gathers, processes and transports, rather than the underlying value of the commodity, in order to minimize its exposure to commodity price risk. However, Kingfisher is a party to fee-based contracts that have a small portion of percent-of-proceeds contractual mix, but the portion of percent-of-proceeds does not exceed 6.0% for any one contract. In addition, Kingfisher may acquire or develop additional midstream assets in a manner that increases its exposure to commodity price risk. Future exposure to the volatility of crude oil, natural gas and NGL prices could adversely affect Kingfisher's financial condition, results of operations or cash flows.

*If third-party pipelines or other midstream facilities interconnected to Kingfisher's gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes Kingfisher gathers, processes, stores or transports do not meet the quality requirements of the pipelines or facilities to which Kingfisher connects, Kingfisher's gross profit and cash flow could be adversely affected.*

Kingfisher's gathering, processing, storage and transportation assets connect to other pipelines or facilities owned and operated by unaffiliated third parties. The continuing operation of, and Kingfisher's continuing access to, such third-party pipelines, processing facilities and other midstream facilities is not within Kingfisher's control. These pipelines, plants and other midstream facilities may become unavailable because of testing,

72

Table of Contents

turnarounds, line repair, maintenance, reduced operating pressure, lack of operating capacity, regulatory requirements and curtailments of receipt or deliveries due to insufficient capacity or because of damage from severe weather conditions or other operational issues. In addition, if Kingfisher's costs to access and transport on these third-party pipelines significantly increase, its profitability could be reduced. If any such increase in costs occurs, if any of these pipelines or other midstream facilities become unable to receive, transport or process product, or if the volumes Kingfisher gathers or transports do not meet the product quality requirements of such pipelines or facilities, its gross profit and cash flows could be adversely affected.

***Kingfisher's industry is highly competitive, and increased competitive pressure could adversely affect its financial condition, results of operations or cash flows.***

Kingfisher competes with similar enterprises in its area of operation. The principal elements of competition are rates, terms of service and flexibility and reliability of service. Kingfisher's competitors include large crude oil and natural gas companies that have greater financial resources and access to supplies of crude oil, natural gas and NGLs than Kingfisher. Some of these competitors may expand or construct gathering, processing, transportation and storage systems that would create additional competition for the services Kingfisher provides to its customers. Excess pipeline capacity in the region served by Kingfisher's intrastate pipelines could also increase competition and adversely impact its ability to renew or enter into new contracts with respect to its available capacity when existing contracts expire. Kingfisher's ability to renew or replace existing contracts with its customers at rates sufficient to maintain or increase current revenues and cash flows could be adversely affected by the activities of its competitors and customers. Further, natural gas utilized as a fuel competes with other forms of energy available to end-users, including electricity, coal and liquid fuels. Increased demand for such forms of energy at the expense of natural gas could lead to a reduction in demand for natural gas gathering, processing, storage and transportation services. All of these competitive pressures could adversely affect Kingfisher's financial condition, results of operations or cash flows.

***If Kingfisher does not make acquisitions on economically acceptable terms or efficiently and effectively integrate the acquired assets with its existing asset base, its future growth will be limited.***

Kingfisher's ability to grow depends, in part, on its ability to make acquisitions that result in an increase in cash generated from operations. If Kingfisher is unable to make accretive acquisitions either because it is (1) unable to identify attractive acquisition candidates or negotiate acceptable purchase contracts with them, (2) unable to obtain financing for these acquisitions on economically acceptable terms or at all or (3) outbid by competitors, then its future growth will be limited.

From time to time, Kingfisher may evaluate and seek to acquire assets or businesses that it believes complement its existing business and related assets. Kingfisher may acquire assets or businesses that it plans to use in a manner materially different from its prior owner's use. Any acquisition involves potential risks, including:

- the inability to integrate the operations of recently acquired businesses or assets, especially if the assets acquired are in a new business segment or geographic area;

- the diversion of management's attention from other business concerns;

- the failure to realize expected volumes, revenues, profitability or growth;

- the failure to realize any expected synergies and cost savings;

- the coordination of geographically disparate organizations, systems and facilities;

- the assumption of unknown liabilities;

- the loss of customers or key employees from the acquired businesses; and

- potential environmental or regulatory liabilities and title problems.

73

Table of Contents

The assessment by Kingfisher's management of these risks is inexact and may not reveal or resolve all existing or potential problems associated with an acquisition. Realization of any of these risks could adversely affect Kingfisher's financial condition, results of operations and cash flows. If Kingfisher consummates any future acquisition, its capitalization and results of operations may change significantly.

***Kingfisher may not be able to retain existing customers or acquire new customers, which would reduce its revenues and limit its future profitability.***

The renewal or replacement of Kingfisher's existing contracts with its customers at rates sufficient to maintain or increase current revenues and cash flows depends on a number of factors beyond Kingfisher's control, including competition from other midstream service providers and the price of, and demand for, crude oil, natural gas and NGLs in the markets it serves. The inability of Kingfisher's management to renew or replace Kingfisher's current contracts as they expire and to respond appropriately to changing market conditions could have a negative effect on Kingfisher's profitability.

***Kingfisher is exposed to the credit risk of its customers and counterparties, and a general increase in the nonpayment and nonperformance by its customers could have an adverse effect on its financial condition, results of operations or cash flows.***

Risks of nonpayment and nonperformance by Kingfisher's customers are a concern in its business. Kingfisher is subject to risks of loss resulting from nonpayment or nonperformance by its customers and other counterparties. Any increase in the nonpayment and nonperformance by Kingfisher's customers could adversely affect its financial condition, results of operations or cash flows. Additionally, equity values for many of Kingfisher's customers continue to be low. The combination of a reduction of cash flow resulting from lower commodity prices, a reduction in borrowing bases under reserve-based credit facilities and the lack of availability of debt or equity financing may result in a significant reduction in the liquidity of Kingfisher's customers and ability to make payment or perform on its obligations to Kingfisher. Furthermore, some of Kingfisher's customers may be leveraged and subject to their own operating and regulatory risks, which increases the risk that they may default on their obligations to Kingfisher.

***Increased federal, state and local legislation and regulatory initiatives, as well as government reviews relating to hydraulic fracturing could result in increased costs and reductions or delays in crude oil and natural gas production by Kingfisher's customers, which could adversely affect its financial condition, results of operations or cash flows.***

A portion of Kingfisher's suppliers' and customers' crude oil and natural gas production is developed from unconventional sources, such as deep oil or gas shales, that require hydraulic fracturing as part of the completion process. State legislatures and agencies have enacted legislation and promulgated rules to regulate hydraulic fracturing, require disclosure of hydraulic fracturing chemicals, temporarily or permanently ban hydraulic fracturing and impose additional permit requirements and operational restrictions in certain jurisdictions or in environmentally sensitive areas. The EPA and the BLM have also issued rules, conducted studies and made proposals that, if implemented, could either restrict the practice of hydraulic fracturing or subject the process to further regulation. For instance, the EPA has issued final regulations under the CAA establishing performance standards, including standards for the capture of air emissions released during hydraulic fracturing and adopted rules prohibiting the discharge of wastewater from hydraulic fracturing operations to publicly owned wastewater treatment plants. The BLM also adopted new rules, effective on January 17, 2017, to reduce venting, flaring and leaks during oil and natural gas production activities on onshore federal and Indian leases. However, the status of recent and future rules and rulemaking initiatives under the new Trump Administration is uncertain. State and federal regulatory agencies also have recently focused on a possible connection between the operation of injection wells used for oil and gas waste waters and an observed increase in induced seismicity, which has resulted in some regulation at the state level. As regulatory agencies continue to study induced seismicity, additional legislative and regulatory initiatives could affect the injection well operations of Kingfisher's customers as well.

74

Table of Contents

Kingfisher cannot predict whether any additional legislation or regulations will be enacted and, if so, what the provisions would be. If additional levels of regulation and permits were required through the adoption of new laws and regulations at the federal or state level, that could lead to delays, increased operating costs and process prohibitions for Kingfisher's suppliers and customers that could reduce the volumes of crude oil and natural gas that move through its gathering systems which could materially adversely affect its revenue and results of operations.

***If Kingfisher's assets become subject to FERC regulation or federal, state or local regulations or policies change, Kingfisher's financial condition, results of operations and cash flows could be materially and adversely affected.***

Kingfisher believes that its gathering and transportation operations are exempt from regulation by FERC under the NGA. Section 1(b) of the NGA exempts natural gas gathering facilities from regulation by FERC under the NGA. Although FERC has not made any formal determinations with respect to any of its facilities, Kingfisher believes that the natural gas pipelines in its gathering systems meet the traditional tests FERC has used to establish whether a pipeline is a gathering pipeline not subject to FERC jurisdiction. The distinction between FERC-regulated transmission services and federally unregulated gathering services, however, has been the subject of substantial litigation, and FERC determines whether facilities are gathering facilities on a case-by-case basis, so the classification and regulation of Kingfisher's gathering facilities may be subject to change based on future determinations by FERC, the courts, or Congress. If FERC were to consider the status of an individual facility and determine that the facility or services provided by it are not exempt from FERC regulation under the NGA, the rates for, and terms and conditions of, services provided by such facility would be subject to regulation by FERC under the NGPA and the rules and regulations promulgated under those statutes. Such regulation could decrease revenue, increase operating costs, and, depending upon the facility in question, could adversely affect Kingfisher's results of operations and cash flows.

Unlike natural gas gathering under the NGA, there is no exemption for the gathering of crude oil or NGLs under the ICA. Whether a crude oil or NGL shipment is in interstate commerce under the ICA depends on the fixed and persistent intent of the shipper as to the crude oil's or NGL's final destination, absent a break in the interstate movement. Kingfisher believes that the crude oil and NGL pipelines in its gathering system meet the traditional tests FERC has used to determine that a pipeline is not providing transportation service in interstate commerce subject to FERC ICA jurisdiction. However, the determination of the interstate or intrastate character of shipments on Kingfisher's crude oil and NGL pipelines depends on the shipper's intentions and the transportation of the crude oil or NGLs outside of Kingfisher's system, and may change over time. If FERC were to consider the status of an individual facility and the character of a crude oil or NGL shipment, and determine that the shipment is in interstate commerce, the rates for, and terms and conditions of, transportation services provided by such facility would be subject to regulation by FERC under the ICA. Such FERC regulation could decrease revenue, increase operating costs, and, depending on the facility in question, could adversely affect Kingfisher's results of operations and cash flows. In addition, if any of Kingfisher's facilities were found to have provided services or otherwise operated in violation of the ICA, this could result in the imposition of administrative and criminal remedies and civil penalties, as well as a requirement to disgorge charges collected for such services in excess of the rate established by FERC.

If Kingfisher fails to comply with all the applicable FERC-administered statutes, rules, regulations and orders, it could be subject to substantial penalties and fines. Under the EPAct, for instance, FERC has civil penalty authority to impose penalties for current violations of the NGA or NGPA of up to $1,213,503 per day for each violation. The maximum penalty authority established by statute has been and will continue to be adjusted periodically for inflation. FERC also has the power to order disgorgement of profits from transactions deemed to violate the NGA and the EPAct.

Other state and local regulations also affect Kingfisher's business. Kingfisher is subject to some ratable take and common purchaser statutes in the states where it operates. Ratable take statutes generally require gatherers to

75

Table of Contents

take, without undue discrimination, natural gas production that may be tendered to the gatherer for handling. Similarly, common purchaser statutes generally require gatherers to purchase without undue discrimination as to source of supply or producer. These statutes have the effect of restricting Kingfisher's right as an owner of gathering facilities to decide with whom Kingfisher contracts to purchase or transport natural gas. Federal law leaves any economic regulation of natural gas gathering to the states, and Oklahoma has adopted complaint-based or other limited economic regulation of natural gas gathering activities.

***Kingfisher may incur significant costs and liabilities resulting from compliance with pipeline safety regulations.***

The pipelines Kingfisher owns and operates are subject to stringent and complex regulation related to pipeline safety and integrity management. For instance, the DOT, through the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), has established a series of rules that require pipeline operators to develop and implement integrity management programs for hazardous liquid (including oil) pipeline segments that, in the event of a leak or rupture, could affect high-consequence areas. PHMSA also recently proposed rulemaking that would expand existing integrity management requirements to natural gas transmission and gathering lines in areas with medium population densities. Additional action by PHMSA with respect to pipeline integrity management requirements may occur in the future. At this time, Kingfisher cannot predict the cost of such requirements, but they could be significant. Moreover, violations of pipeline safety regulations can result in the imposition of significant penalties.

Several states have also passed legislation or promulgated rules to address pipeline safety. Compliance with pipeline integrity laws and other pipeline safety regulations issued by state agencies such as the OCC could result in substantial expenditures for testing, repairs and replacement. If Kingfisher's pipelines fail to meet the safety standards mandated by the OCC or the DOT regulations, then Kingfisher may be required to repair or replace sections of such pipelines or operate the pipelines at a reduced maximum allowable operating pressure, the cost of which cannot be estimated at this time.

Due to the possibility of new or amended laws and regulations or reinterpretation of existing laws and regulations, there can be no assurance that future compliance with PHMSA or state requirements will not have a material adverse effect on Kingfisher's results of operations or financial position. Because certain of Kingfisher's operations are located around areas that may become more populated areas, such as the STACK play, Kingfisher may incur expenses to mitigate noise, odor and light that may be emitted in its operations and expenses related to the appearance of its facilities. Municipal and other local or state regulations are imposing various obligations including, among other things, regulating the location of Kingfisher's facilities, imposing limitations on the noise levels of its facilities and requiring certain other improvements that increase the cost of its facilities. Kingfisher is also subject to claims by neighboring landowners for nuisance related to the construction and operation of its facilities, which could subject it to damages for declines in neighboring property values due to Kingfisher's construction and operation of facilities.

***Failure to comply with existing or new environmental laws or regulations or an accidental release of hazardous substances, hydrocarbons or wastes into the environment may cause Kingfisher to incur significant costs and liabilities.***

Many of the operations and activities of Kingfisher's pipelines, gathering systems, processing plants and other facilities are subject to significant federal, state and DOT environmental laws and regulations, the violation of which can result in administrative, civil and criminal penalties, including civil fines, injunctions or both. The obligations imposed by these laws and regulations include obligations related to air emissions and the discharge of pollutants from Kingfisher's pipelines and other facilities and the cleanup of hazardous substances and other wastes that are or may have been released at properties currently or previously owned or operated by it or locations to which it has sent wastes for treatment or disposal. These laws may impose strict, joint and several liability for the remediation of contaminated areas. Private parties, including the owners of properties near

76

Table of Contents

Kingfisher's facilities or upon or through which its gathering systems traverse, may also have the right to pursue legal actions to enforce compliance and to seek damages for non-compliance with environmental laws for releases of contaminants or for personal injury or property damage.

Kingfisher's business may be adversely affected by increased costs due to stricter pollution control requirements or liabilities resulting from non-compliance with required operating or other regulatory permits. New environmental laws or regulations, including, for example, legislation relating to the control of greenhouse gas emissions, or changes in existing environmental laws or regulations might adversely affect Kingfisher's products and activities, including processing, storage and transportation, as well as waste management and air emissions. Federal and state agencies could also impose additional safety requirements, any of which could affect Kingfisher's profitability. Changes in laws or regulations could also limit the operation of Kingfisher's assets or adversely affect its ability to comply with applicable legal requirements or the demand for crude oil or natural gas, which could adversely affect its business and its profitability.

*Recent rules under the CAA imposing more stringent requirements on the oil and gas industry could cause Kingfisher and its customers to incur increased capital expenditures and operating costs as well as reduce the demand for its services.*

Kingfisher is subject to stringent and complex regulation under the CAA, implementing regulations, and state and local equivalents, including regulations related to controls for oil and natural gas production, pipelines, and processing operations. For instance, in 2016, the EPA issued three final rules intended to curb emissions of methane, VOCs, and toxic air pollutants (such as benzene) from new, reconstructed, and modified oil and gas sources, including the so-called OOOOa rule. In April 2017, the EPA announced its intention to reconsider certain aspects of the 2016 rules for the oil and natural gas industry in response to several petitions for reconsideration, and issued a 90-day stay of the June 3, 2017 compliance deadline for the fugitive emissions monitoring requirements in the OOOOa rule. Subsequently, on May 31, 2017, the EPA issued a 90-day stay of certain requirements under the rule, but this stay was vacated by a three-judge panel of the U.S. Court of Appeals for the D.C. Circuit on July 3, 2017 and again by an *en banc* D.C. Circuit on July 31, 2017. In the interim, on July 16, 2017, the EPA issued a proposed rule that would provide a two-year extension of the initial 90-day stay. Substantial uncertainty exists with respect to implementation of this methane rule. The BLM also adopted new rules on November 15, 2016, to reduce venting, flaring, and leaks during oil and natural gas production activities on onshore federal and Indian leases. On June 15, 2017, the BLM postponed indefinitely compliance dates for certain aspects of these rules, pending judicial review.

Additional regulation of GHG emissions from the oil and gas industry remains a possibility. These regulations could require a number of modifications to Kingfisher's operations, and its natural gas exploration and production suppliers' and customers' operations, including the installation of new equipment, which could result in significant costs, including increased capital expenditures and operating costs. The incurrence of such expenditures and costs by Kingfisher suppliers and customers could result in reduced production by those suppliers and customers and thus translate into reduced demand for its services.

*Climate change legislation and regulatory initiatives could result in increased operating costs and reduced demand for the natural gas and NGLs services Kingfisher provides.*

Congress has from time to time considered adopting legislation to reduce emissions of GHGs, and there has been a wide-ranging policy debate, both nationally and internationally, regarding the impact of these gases and possible means for their regulation. In addition, efforts have been made and continue to be made in the international community toward the adoption of international treaties or protocols that would address global climate change issues. In 2015, the United States participated in the United Nations Conference on Climate Change, which led to the adoption of the Paris Agreement. The Paris Agreement requires countries to review and "represent a progression" in their intended nationally determined contributions, which set GHG emission reduction goals, every five years beginning in 2020. The Paris Agreement was signed by the United States in

77

Table of Contents

April 2016 and entered into force in November 2016; however, the GHG emission reductions called for by the Paris Agreement are not binding. On June 1, 2017, President Trump announced that the United States plans to withdraw from the Paris Agreement and to seek negotiations either to reenter the Paris Agreement on different terms or to establish a new framework agreement. The Paris Agreement provides for a four-year exit process beginning when it took effect in November 2016, which would result in an effective exit date of November 2020. The United States' adherence to the exit process and/or the terms on which the United States may reenter the Paris Agreement or a separately negotiated agreement are unclear at this time. Moreover, at the federal regulatory level, both the EPA and the BLM have promulgated regulations for the control of methane emissions, which also include leak detection and repair requirements, from the oil and gas industry, although the current status of those regulations is uncertain given the change of Presidential administration.

In addition, many states have already taken legal measures to reduce emissions of GHGs, primarily through the planned development of GHG emission inventories and/or regional GHG cap and trade programs. Most of these cap and trade programs work by requiring either major sources of emissions, such as electric power plants, or major producers of fuels, such as refineries and NGLs fractionation plants, to acquire and surrender emission allowances with the number of allowances available for purchase reduced each year until the overall GHG emission reduction goal is achieved.

Although it is not possible at this time to predict whether future legislation or new regulations may be adopted to address GHG emissions or how such measures would impact Kingfisher's business, the adoption of legislation or regulations imposing reporting or permitting obligations on, or limiting emissions of GHGs from, its equipment and operations could require Kingfisher to incur additional costs to reduce emissions of GHGs associated with its operations, could adversely affect its performance of operations in the absence of any permits that may be required to regulate emission of GHGs or could adversely affect demand for the natural gas Kingfisher gathers, processes or otherwise handles in connection with its services.

***The ESA and the MBTA govern Kingfisher's operations and additional restrictions may be imposed in the future, which could have an adverse impact on its operations.***

The ESA and analogous state laws restrict activities that may affect endangered or threatened species or their habitats. Similar protections are offered to migratory birds under the MBTA. The U.S. Fish and Wildlife Service and state agencies may designate critical or suitable habitat areas that they believe are necessary for the survival of threatened or endangered species, which could materially restrict use of or access to federal, state and private lands. Some of Kingfisher's operations may be located in areas that are designated as habitats for endangered or threatened species or that may attract migratory birds. In these areas, Kingfisher may be obligated to develop and implement plans to avoid potential adverse impacts to protected species, and it may be prohibited from conducting operations in certain locations or during certain seasons, such as breeding and nesting seasons, when its operations could have an adverse effect on the species. It is also possible that a federal or state agency could order a complete halt to Kingfisher's activities in certain locations if it is determined that such activities may have a serious adverse effect on a protected species. In addition, the U.S. Fish and Wildlife Service and state agencies regularly review species that are listing candidates, and designations of additional endangered or threatened species, or critical or suitable habitat, under the ESA could cause Kingfisher to incur additional costs or become subject to operating restrictions or bans in the affected areas.

***Kingfisher's business involves many hazards and operational risks, some of which may not be fully covered by insurance. The occurrence of a significant accident or other event that is not fully insured could adversely affect Kingfisher's operations and financial condition.***

Kingfisher's operations are subject to the many hazards inherent in the gathering, compressing, processing, transporting and storage of crude oil, natural gas and NGLs, including:

- damage to pipelines, related equipment and surrounding properties caused by hurricanes, floods, fires and other natural disasters and acts of terrorism;

78

Table of Contents

- leaks of crude oil, natural gas, NGLs and other hydrocarbons;

- induced seismicity; and

- fires and explosions.

These risks could result in substantial losses due to personal injury and/or loss of life, severe damage to and destruction of property and equipment and pollution or other environmental damage and may result in curtailment or suspension of Kingfisher's related operations. Kingfisher is not fully insured against all risks incident to its business. In accordance with typical industry practice, Kingfisher has appropriate levels of business interruption and property insurance on its underground pipeline systems. Kingfisher is not insured against all environmental accidents that might occur. If a significant accident or event occurs that is not fully insured, it could adversely affect Kingfisher's financial condition, results of operations or cash flows.

***A failure in Kingfisher's computer systems or a terrorist or cyber-attack on Kingfisher, or third parties with whom it has a relationship, may adversely affect its ability to operate its business.***

Kingfisher is reliant on technology to conduct its business. Kingfisher's business is dependent upon its operational and financial computer systems to process the data necessary to conduct almost all aspects of its business, including operating its pipelines and gathering, processing and storage facilities, recording and reporting commercial and financial transactions and receiving and making payments. Any failure of Kingfisher's computer systems, or those of its customers, suppliers or others with whom it does business, could materially disrupt Kingfisher's ability to operate its business. Unknown entities or groups have mounted so-called "cyber-attacks" on businesses to disable or disrupt computer systems, disrupt operations and steal funds or data. Cyber-attacks could also result in the loss of confidential or proprietary data or security breaches of other information technology systems that could disrupt Kingfisher's operations and critical business functions. In addition, Kingfisher's pipeline systems may be targets of terrorist activities that could disrupt its ability to conduct its business and have a material adverse effect on its business and results of operations. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Kingfisher's insurance may not protect it against such occurrences. Any such terrorist or cyber-attack that affects Kingfisher or its customers, suppliers or others with whom it does business, could have a material adverse effect on its business, cause it to incur a material financial loss, subject it to possible legal claims and liability and/or damage its reputation.

Moreover, as the sophistication of cyber-attacks continues to evolve, Kingfisher may be required to expend significant additional resources to further enhance its digital security or to remediate vulnerabilities. In addition, cyber-attacks against it or others in its industry could result in additional regulations, which could lead to increased regulatory compliance costs, insurance coverage cost or capital expenditures. Kingfisher cannot predict the potential impact to its business or the energy industry resulting from additional regulations.

***Failure to attract and retain an appropriately qualified workforce could reduce labor productivity and increase labor costs, which could adversely affect Kingfisher's financial condition, results of operations or cash flows.***

The services that Kingfisher offers require laborers skilled in multiple disciplines, such as equipment operators, mechanics and engineers, among others. Kingfisher's business is dependent on its ability to recruit, retain and motivate employees. Certain circumstances, such as an aging workforce without appropriate replacements, a mismatch of existing skill sets to future needs, competition for skilled labor or the unavailability of contract resources may lead to operating challenges such as a lack of resources, loss of knowledge or a lengthy time period associated with skill development. Kingfisher's costs, including costs for contractors to replace employees, productivity costs and safety costs, may rise. Failure to hire and adequately train replacement employees, including the transfer of significant internal historical knowledge and expertise to the new employees, or the future availability and cost of contract labor may adversely affect Kingfisher's ability to

79

Table of Contents

manage and operate its business. If Kingfisher is unable to successfully attract and retain an appropriately qualified workforce, its financial condition, results of operations or cash flows could be adversely affected.

**Risks Related to Silver Run and the Business Combination**

***Following the consummation of the business combination, our only significant assets will be the ownership of the general partner interest and a 44.1% limited partner interest in SRII Opco, and such ownership may not be sufficient to enable us to pay any dividends on our Class A Common Stock or satisfy our other financial obligations, including under the Tax Receivable Agreement.***

Following the consummation of the business combination, we will have no direct operations and no significant assets other than the ownership of the general partner interest and a 44.1% limited partner interest in SRII Opco. We will depend on SRII Opco and its subsidiaries, including Alta Mesa and Kingfisher, for distributions, loans and other payments to generate the funds necessary to meet our financial obligations or to pay any dividends with respect to our Class A Common Stock. Subject to certain restrictions, SRII Opco generally will be required to (i) make pro rata distributions to its partners, including us, in an amount at least sufficient to allow us to pay our taxes and (ii) reimburse us for certain corporate and other overhead expenses. However, legal and contractual restrictions in agreements governing future indebtedness of SRII Opco and its subsidiaries, including Alta Mesa and Kingfisher, as well as the financial condition and operating requirements of Alta Mesa, Alta Mesa GP and Kingfisher may limit our ability to obtain cash from SRII Opco. The earnings from, or other available assets of, SRII Opco and its subsidiaries, including Alta Mesa and Kingfisher, may not be sufficient to enable us to pay any dividends on our Class A Common Stock or satisfy our other financial obligations. SRII Opco will be treated as a partnership for U.S. federal income tax purposes and, as such, will not be subject to any entity-level U.S. federal income tax. Instead, taxable income will be allocated to holders of its SRII Opco Common Units, including us. As a result, we generally will incur income taxes on our allocable share of any net taxable income of SRII Opco. Under the terms of the SRII Opco LPA, SRII Opco will be obligated to make tax distributions to holders of its SRII Opco Common Units, including us, except to the extent such distributions would render SRII Opco insolvent or are otherwise prohibited by law or any of our current or future debt agreements. In addition to tax expenses, we will also incur expenses related to our operations, our interests in SRII Opco and related party agreements, including payment obligations under the Tax Receivable Agreement, and expenses and costs of being a public company, all of which could be significant. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement." To the extent that we need funds and SRII Opco or its subsidiaries is restricted from making such distributions under applicable law or regulation or under the terms of their financing arrangements, or are otherwise unable to provide such funds, it could materially adversely affect our liquidity and financial condition, including our ability to pay our income taxes when due.

***Subsequent to the consummation of the business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

Although we have conducted due diligence on Alta Mesa and Kingfisher, we cannot assure you that this diligence revealed all material issues that may be present in the businesses of Alta Mesa or Kingfisher, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of our, Alta Mesa's or Kingfisher's control will not later arise. As a result, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and may not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about Silver Run following the completion of the business combination or our securities. In addition, charges of this nature may cause us to be unable to obtain future financing on favorable terms or at all.

80

Table of Contents

***We, Alta Mesa and Kingfisher will be subject to business uncertainties and contractual restrictions while the business combination is pending.***

Uncertainty about the effect of the business combination on employees and third parties may have an adverse effect on us, Alta Mesa and Kingfisher. These uncertainties may impair the ability of Alta Mesa or Kingfisher to retain and motivate key personnel and could cause third parties that deal with Alta Mesa or Kingfisher to defer entering into contracts or making other decisions or seek to change existing business relationships. If employees depart because of uncertainty about their future roles and the potential complexities of the business combination, our business following the business combination could be harmed.

***Our ability to successfully effect the business combination and successfully operate the business thereafter will be largely dependent upon the efforts of certain key personnel of Alta Mesa. The loss of such key personnel and our inability to hire and retain replacements could negatively impact the operations and profitability of Silver Run following the business combination.***

Our ability to successfully effect the business combination and successfully operate the business is dependent upon the efforts of certain key personnel, including the senior management of Alta Mesa. While we have scrutinized individuals who will stay with Alta Mesa following the business combination, our assessment of these individuals may not prove to be correct. These individuals may be unfamiliar with the requirements of operating a public company, which could cause us to have to expend time and resources helping them become familiar with such requirements.

***Our Sponsor, officers and directors have agreed to vote in favor of the business combination, regardless of how our public stockholders vote.***

Unlike many other blank check companies in which the founders agree to vote their founder shares in accordance with the majority of the votes cast by their public stockholders in connection with an Initial Business Combination, our Sponsor, officers and directors have agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of the business combination. As of the date hereof, our Sponsor, officers and directors own shares equal to approximately 20% of our issued and outstanding shares of Class A Common Stock and Class B Common Stock in the aggregate. Accordingly, it is more likely that the necessary stockholder approval will be received for the business combination than would be the case if our Sponsor, officers and directors agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in accordance with the majority of the votes cast by our public stockholders.

***Our Sponsor, certain members of our board of directors and our officers have interests in the business combination that are different from or are in addition to other stockholders in recommending that stockholders vote in favor of approval of the Business Combination Proposal and approval of the other Proposals described in this proxy statement.***

When considering our board of directors' recommendation that our stockholders vote in favor of the approval of the Business Combination Proposal, our stockholders should be aware that our Sponsor, certain members of our board of directors and our officers have interests in the business combination that may be different from, or in addition to, the interests of our stockholders. These interests include:

- the fact that our Sponsor holds private placement warrants that would expire worthless if a business combination is not consummated;

- the fact that our Sponsor, officers and directors have agreed not to redeem any of the shares of Class A Common Stock held by them in connection with a stockholder vote to approve the business combination;

- the fact that our Sponsor paid an aggregate of $25,000 for its founder shares and such securities will have a significantly higher value at the time of the business combination, which if unrestricted and

81

Table of Contents

freely tradable would be valued at approximately $262,399,680 based on the closing price of our Class A Common Stock on January 18, 2018;

- if the Trust Account is liquidated, including in the event we are unable to complete an Initial Business Combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per share originally sold as part of the units issued in the IPO (each, a "public share"), or such lesser amount per public share as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continuation of James T. Hackett as a director of Silver Run and becoming the Executive Chairman of the board of directors and Chief Operating Officer—Midstream and the Riverstone Contributor's right to nominate up to three directors to our board of directors for a period of five years following the Closing based on its and its affiliates' beneficial ownership of our Class A Common Stock in accordance with the terms of its Series B Preferred Stock;

- the fact that each of our independent directors owns 33,000 founder shares that were purchased from our Sponsor at $0.002 per share, which if unrestricted and freely tradeable would be valued at approximately $335,940 based on the closing price of our Class A Common Stock on January 18, 2018;

- the fact that an affiliate of our Sponsor invested $200 million in equity in Alta Mesa upon the execution of the Contribution Agreements and will not have any public market in which to sell that investment if the Closing does not occur;

- the fact that our Sponsor, officers and directors may not participate in the formation of, or become a director or officer of, any other blank check company until we have entered into a definitive agreement regarding an Initial Business Combination or fail to complete an Initial Business Combination by March 29, 2019;

- the fact that our Sponsor, officers and directors will lose their entire investment in us if an Initial Business Combination is not completed; and

- that we are a party to a registration rights agreement with our Sponsor and certain of our directors, which provides for registration rights to such parties.

***Our initial stockholders, including our Sponsor and our independent directors, hold a significant number of shares of our voting stock and warrants. They will lose their entire investment in us if we do not complete an Initial Business Combination.***

Our Sponsor and our independent directors hold all of our 25,875,000 founder shares, representing 20% of the total outstanding shares upon completion of our IPO. The founder shares will be worthless if we do not complete an Initial Business Combination by March 29, 2019. In addition, our Sponsor holds an aggregate of 15,133,333 private placement warrants that will also be worthless if we do not complete an Initial Business Combination by March 29, 2019.

The founder shares are identical to the shares of Class A Common Stock included in the units, except that (i) the founder shares and the shares of Class A Common Stock into which the founder shares convert upon an Initial Business Combination are subject to certain transfer restrictions, (ii) our Sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (a) to waive their redemption rights with respect to their founder shares and public shares owned in connection with the completion of an Initial Business Combination and (b) to waive their rights to liquidating distributions from the Trust Account with respect to their founder shares if we fail to complete an Initial Business Combination by March 29, 2019 (although they will be entitled to liquidating distributions from the Trust Account with respect to any public

82

Table of Contents

shares they hold if we fail to complete an Initial Business Combination by March 29, 2019) and (iii) the founder shares are automatically convertible into shares of our Class A Common Stock at the time of an Initial Business Combination, as described herein.

The personal and financial interests of our Sponsor, officers and directors may have influenced their motivation in identifying and selecting Alta Mesa and Kingfisher, completing the business combination with Alta Mesa and Kingfisher and influencing the operation of Silver Run following the business combination.

### *We will incur significant transaction costs in connection with the business combination.*

We have and expect to incur significant, non-recurring costs in connection with consummating the business combination. All expenses incurred in connection with the Contribution Agreements and the business combination, including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs, subject to our agreement in the Alta Mesa Contribution Agreement requiring the Alta Mesa Contributor to pay one-half of the accounting fees and other costs charged by a mutually selected independent accounting firm in connection with the Alta Mesa business combination and our agreement in the Kingfisher Contribution Agreement requiring the Kingfisher Contributor to pay one-half of the accounting fees and other costs charged by the independent accounting firm in connection with the Kingfisher business combination. Our transaction expenses as a result of the business combination are currently estimated at approximately $50 million, including approximately $36.2 million in deferred underwriting commissions to the underwriters of our IPO.

### *The unaudited pro forma condensed consolidated combined financial information included in this proxy statement may not be indicative of what our actual financial position or results of operations would have been.*

The unaudited pro forma condensed consolidated combined financial information for Silver Run following the business combination in this proxy statement is presented for illustrative purposes only and is not necessarily indicative of what our actual financial position or results of operations would have been had the business combination been completed on the dates indicated. See "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run."

### *Alta Mesa's and Kingfisher's financial projections are based on various assumptions that may not prove to be correct.*

The unaudited financial projections of Alta Mesa and Kingfisher set forth in the forecasts included under "Proposal No. 1—The Business Combination Proposal—Unaudited Financial Projections of Alta Mesa and Kingfisher" were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. In the view of Alta Mesa's management and Kingfisher's management, the financial projections were prepared on a reasonable basis, reflected the best currently available estimates and judgments of Alta Mesa and Kingfisher, as applicable, and presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of Alta Mesa and Kingfisher, respectively. However, the financial projections are not fact. Further, none of the unaudited financial projections reflect any impact of the proposed transaction and have not been updated since the date of preparation.

None of Silver Run's, Alta Mesa's or Kingfisher's independent auditors, nor any other independent auditors, have compiled, examined or performed any procedures with respect to the unaudited financial projections contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for the financial projections.

The unaudited financial projections were prepared solely for internal use to assist in the evaluation of the business combination. Such projections are inherently subjective in nature, though considered reasonable by the

83

Table of Contents

management of Alta Mesa and Kingfisher as of the date such projections were prepared, and are susceptible to interpretation and, accordingly, contemplated results may not be achieved. While presented with numerical specificity, the unaudited financial projections reflect numerous estimates and assumptions with respect to future industry performance under various industry scenarios as well as assumptions for competition, general business, economic, market and financial conditions and matters specific to the businesses of Alta Mesa and Kingfisher, all of which are difficult to predict and many of which are beyond the preparing parties' control. Accordingly, there can be no assurance that the assumptions made in preparing any particular projection will prove accurate. There will be differences between actual and forecasted results, and the differences may be material. The risk that these uncertainties and contingencies could cause the assumptions to fail to be reflective of actual results is further increased due to the length of time over which these assumptions apply. In light of the foregoing factors and the uncertainties inherent in the unaudited financial projections, the Silver Run stockholders are cautioned not to place undue reliance on the unaudited financial projections and the inclusion of the unaudited financial projections in this proxy statement should not be regarded as a representation by any person that the results contained therein will be achieved.

### We may waive one or more of the conditions to the business combination.

We may agree to waive, in whole or in part, one or more of the conditions to our obligations to complete the business combination, to the extent permitted by our Charter, bylaws and applicable laws. For example, it is a condition to our obligation to close the business combination that there be no breach of Alta Mesa's or Kingfisher's representations and warranties as of the Closing Date that would reasonably be expected to have a Material Adverse Effect (as defined in the Alta Mesa Contribution Agreement and Kingfisher Contribution Agreement). However, if our board of directors determines that any such breach is not material to the business of Alta Mesa or Kingfisher, respectively, then the board may elect to waive that condition and close the business combination. We are not able to waive the condition that our stockholders approve the business combination.

### If we are unable to complete an Initial Business Combination on or prior to March 29, 2019, our public stockholders may receive only approximately $10.00 per share on the liquidation of our Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against us that our Sponsor is unable to indemnify), and our warrants will expire worthless.

If we are unable to complete an Initial Business Combination on or prior to March 29, 2019, our public stockholders may receive only approximately $10.00 per share on the liquidation of our Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against us that our Sponsor is unable to indemnify (as described below)), and our warrants will expire worthless.

### If third parties bring claims against us, the proceeds held in our Trust Account could be reduced and the per share redemption amount received by stockholders may be less than $10.00 per share.

Our placing of funds in our Trust Account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses, including Alta Mesa and Kingfisher, or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in our Trust Account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against our Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in our Trust Account. If any third party refuses to execute an agreement waiving such claims to the monies held in our Trust Account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

84

Table of Contents

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against our Trust Account for any reason. Upon redemption of our public shares, if we are unable to complete the Initial Business Combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with the business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption.

Accordingly, the per share redemption amount received by public stockholders could be less than the $10.00 per share initially held in our Trust Account, due to claims of such creditors. Our Sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in our Trust Account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in our Trust Account as of the date of the liquidation of our Trust Account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to our Trust Account and except as to any claims under our indemnity of the underwriters of our IPO against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, our Sponsor will not be responsible to the extent of any liability for such third-party claims. We have not independently verified whether our Sponsor has sufficient funds to satisfy their indemnity obligations and believe that our Sponsor's only assets are securities of our company and, therefore, our Sponsor may not be able to satisfy those obligations. We have not asked our Sponsor to reserve for such eventuality.

***Our directors may decide not to enforce the indemnification obligations of our Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to our public stockholders.***

In the event that the proceeds in the Trust Account are reduced below the lesser of (i) $10.00 per public share or (ii) such lesser amount per share held in the Trust Account as of the date of the liquidation of the Trust Account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our Sponsor to enforce its indemnification obligations.

While we currently expect that our independent directors would take legal action on our behalf against our Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts

85

Table of Contents

received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***Even if we consummate the business combination, there is no guarantee that the public warrants will be in the money at the time they become exercisable, and they may expire worthless.***

The exercise price for our warrants is $11.50 per share of Class A Common Stock. There is no guarantee that the public warrants will be in the money following the time they become exercisable and prior to their expiration, and as such, the warrants may expire worthless.

***We have not registered the shares of Class A Common Stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis and potentially causing such warrants to expire worthless.***

We have not registered the shares of Class A Common Stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed, as soon as practicable, but in no event later than 15 business days after the closing of the Initial Business Combination, to use our best efforts to file a registration statement under the Securities Act covering such shares and maintain a current prospectus relating to the Class A Common Stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in such registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder or an exemption is available. Notwithstanding the above, if our Class A Common Stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that we are unable to register or qualify the shares underlying the warrants under applicable state securities laws. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and

86

Table of Contents

expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Class A Common Stock included in the units. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying shares of Class A Common Stock for sale under all applicable state securities laws.

***We may amend the terms of the warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of shares of our Class A Common Stock purchasable upon exercise of a warrant could be decreased, all without your approval.***

Our warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of shares of our Class A Common Stock purchasable upon exercise of a warrant.

***We may redeem unexpired warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our Class A Common Stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date we send the notice of redemption to the warrant holders. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force the warrant holders (i) to exercise their warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so, (ii) to sell their warrants at the then-current market price when they might otherwise wish to hold their warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of their warrants. None of the private placement warrants will be redeemable by us so long as they are held by our Sponsor or its permitted transferees.

***Because certain of our shares of Class A Common Stock and warrants currently trade as units consisting of one share of Class A Common Stock and one-third of one warrant, the units may be worth less than units of other blank check companies.***

Certain of our shares of Class A Common Stock and warrants currently trade as units consisting of one share of Class A Common Stock and one-third of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the public warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number the number of shares of Class A Common Stock to be issued to the warrant holder. As a result, public warrant holders who did not purchase a number of units or warrants that would convert into a whole share must sell any odd number of warrants in order to obtain full value from the fractional interest that will not be issued. This is different from other companies similar to ours whose units include one share of common stock and one warrant to purchase one whole share. This unit structure may cause our units to be worth less than if it included a warrant to purchase one whole share.

87

Table of Contents

***Warrants will become exercisable for our Class A Common Stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

We issued warrants to purchase 34,500,000 shares of Class A Common Stock as part of our IPO and prior to our IPO, we issued an aggregate of 15,133,333 private placement warrants to our Sponsor. In addition, in connection with the closing of the business combination, we expect to issue 13,333,333 warrants to Fund VI Holdings pursuant to the IPO Forward Purchase Agreement and, prior to consummating an Initial Business Combination, nothing prevents us from issuing additional securities in a private placement so long as they do not participate in any manner in the Trust Account or vote as a class with the Class A Common Stock and Class B Common Stock on a business combination. Each warrant issued is exercisable to purchase one whole share at $11.50 per whole share. To the extent such warrants are exercised, additional shares of our Class A Common Stock will be issued, which will result in dilution to the then existing holders of our Class A Common Stock and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our Class A Common Stock.

The private placement warrants (and the warrants to be issued under the IPO Forward Purchase Agreement) are identical to the warrants sold as part of the units issued in our IPO, except that, so long as they are held by our Sponsor or its permitted transferees, (i) they will not be redeemable by us, (ii) they (including the Class A Common Stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by our Sponsor until 30 days after the completion of an Initial Business Combination and (iii) they may be exercised by the holders for cash or on a cashless basis.

***A market for our securities may not continue, which would adversely affect the liquidity and price of our securities.***

Following the business combination, the price of our securities may fluctuate significantly due to the market's reaction to the business combination and general market and economic conditions. An active trading market for our securities following the business combination may never develop or, if developed, it may not be sustained. In addition, the price of our securities after the business combination can vary due to general economic conditions and forecasts, our general business condition and the release of our financial reports. Additionally, if our securities are not listed on, or become delisted from, NASDAQ for any reason, and are quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of our securities may be more limited than if we were quoted or listed on NASDAQ or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

***A significant portion of our total outstanding shares are restricted from immediate resale but may be sold into the market in the near future. This could cause the market price of our Class A Common Stock to drop significantly, even if our business is doing well.***

Sales of a substantial number of shares of Class A Common Stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our Class A Common Stock. After the business combination (and assuming no redemptions by our public stockholders of public shares and no purchase of shares of Class A Common Stock by Fund VI Holdings under the Business Combination Forward Purchase Agreement), the holders of our founder shares, which include our Sponsor and independent directors, and Fund VI Holdings will own approximately 15.3% and 23.6% of our Class A Common Stock, respectively (or 16.2% and 37.6%, respectively, assuming an illustrative redemption by our public stockholders of approximately 30,000,000 public shares and the purchase of 20,000,000 shares of Class A Common Stock by Fund VI Holdings under the Business Combination Forward Purchase Agreement). Pursuant to the terms of a letter agreement entered into at the time of the IPO, the founder shares (which will be converted into shares of Class A Common Stock at the Closing) may not be transferred until the earlier to occur of (i) one year after the Closing or (ii) the date on which

88

Table of Contents

we complete a liquidation, merger, stock exchange or other similar transaction that results in all of our public stockholders having the right to exchange their shares of Class A Common Stock for cash, securities or other property. Notwithstanding the foregoing, if the last sale price of our Class A Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and other similar transactions) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing, the shares of Class A Common Stock into which the founder shares convert will be released from these transfer restrictions.

Additionally, 90 days after Closing, the Kingfisher Contributor will have the ability to redeem or exchange up to 39,000,000 SRII Opco Common Units for shares of Class A Common Stock on a one-to-one basis, and will have this redemption or exchange right with respect to its remaining SRII Opco Common Units 180 days after Closing. The Alta Mesa Contributor and the Riverstone Contributor will also have this redemption or exchange right with respect to all of their respective SRII Opco Common Units 180 days after Closing. If the Contributors redeem or exchange all of their SRII Opco Common Units for shares of Class A Common Stock, and assuming no earn-out consideration is paid prior to such time, no public stockholders elect to have their public shares redeemed and we do not otherwise issue shares of Class A Common Stock (including to Fund VI Holdings under the Business Combination Forward Purchase Agreement), the Alta Mesa Contributor, the Kingfisher Contributor and the Riverstone Contributor will own 36.4%, 14.3% and 5.2% of our Class A Common Stock, respectively.

In connection with the closing of our IPO, we entered into a registration rights agreement with our Sponsor and certain of our directors providing for registration rights to such parties. In addition, in connection with the Closing, we will enter into a registration rights agreement with Fund VI Holdings and the Contributors, pursuant to which we will file a registration statement registering the shares of Class A Common Stock held by them for resale within 30 days following the Closing.

***If the business combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline.***

If the benefits of the business combination do not meet the expectations of investors or securities analysts, the market price of our securities prior to the Closing may decline. The market values of our securities at the time of the business combination may vary significantly from their prices on the date the Contribution Agreements were executed, the date of this proxy statement, or the date on which our stockholders vote on the business combination.

In addition, following the business combination, fluctuations in the price of our securities could contribute to the loss of all or part of your investment. Prior to the business combination, there has not been a public market for the equity securities of Alta Mesa or Kingfisher and trading in the shares of our Class A Common Stock has not been active. Accordingly, the valuation ascribed to Alta Mesa, Kingfisher and our Class A Common Stock in the business combination may not be indicative of the price that will prevail in the trading market following the business combination. If an active market for our securities develops and continues, the trading price of our securities following the business combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on your investment in our securities and our securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

Factors affecting the trading price of our securities following the business combination may include:

• actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

• changes in the market's expectations about our operating results;

• success of our competitors;

89

Table of Contents

- our operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning Silver Run or the market in general;

- operating and stock price performance of other companies that investors deem comparable to Silver Run;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving Silver Run;

- changes in our capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of our Class A Common Stock available for public sale;

- any major change in our board or management;

- sales of substantial amounts of Class A Common Stock by our directors, executive officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general and NASDAQ have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to Silver Run following the business combination could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

***Following the business combination, if securities or industry analysts do not publish or cease publishing research or reports about us, our business, or our market, or if they change their recommendations regarding our Class A Common Stock adversely, the price and trading volume of our Class A Common Stock could decline.***

The trading market for our Class A Common Stock will be influenced by the research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors. If any of the analysts who may cover Silver Run following the business combination change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, the price of our Class A Common Stock would likely decline. If any analyst who may cover Silver Run following the business combination were to cease their coverage or fail to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

***Activities taken by affiliates of Silver Run to purchase, directly or indirectly, public shares of our Class A Common Stock will increase the likelihood of approval of the Business Combination Proposal and the other Proposals and may affect the market price of our securities.***

Our Sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions either prior to or following the consummation of the business combination. None of our Sponsor, directors, officers, advisors or their affiliates will make any such purchases when such parties are in possession

90

Table of Contents

of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Although none of our Sponsor, directors, officers, advisors or their affiliates currently anticipate paying any premium purchase price for such public shares, in the event such parties do, the payment of a premium may not be in the best interest of those stockholders not receiving any such additional consideration. There is no limit on the number of shares that could be acquired by our Sponsor, directors, officers, advisors or their affiliates, or the price such parties may pay.

If such transactions are effected, the consequence could be to cause the business combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the Business Combination Proposal and the other Proposals and would likely increase the chances that such Proposals would be approved. If the market does not view the business combination positively, purchases of public shares may have the effect of counteracting the market's view, which would otherwise be reflected in a decline in the market price of our securities. In addition, the termination of the support provided by these purchases may materially adversely affect the market price of our securities.

As of the date of this proxy statement, no agreements with respect to the private purchase of public shares by Silver Run or the persons described above have been entered into with any such investor or holder. We will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or the other Proposals.

**_Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations._**

We are subject to laws, regulations and rules enacted by national, regional and local governments and NASDAQ. In particular, we are required to comply with certain SEC, NASDAQ and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations and rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations and rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

**_The recently passed comprehensive tax reform bill could adversely affect our business and financial condition._**

On December 22, 2017, President Trump signed into law the final version of the tax reform bill commonly known as the "Tax Cuts and Jobs Act," or the TCJA, that significantly reforms the Internal Revenue Code of 1986, as amended (the "Code"). The TCJA, among other things, contains significant changes to corporate taxation, including a permanent reduction of the corporate income tax rate, a partial limitation on the deductibility of business interest expense, a limitation of the deduction for net operating loss carryforwards to 80% of current year taxable income, an indefinite net operating loss carryforward, immediate deductions for certain new investments instead of deductions for depreciation expense over time, and the modification or repeal of many business deductions and credits. We continue to examine the impact this tax reform legislation may have on our business. Notwithstanding the reduction in the corporate income tax rate, the overall impact of the TCJA is uncertain and our business and financial condition could be adversely affected. The impact of this tax reform on holders of our Class A Common Stock is also uncertain and could be adverse.

**_There can be no assurance that our Class A Common Stock that will be issued in connection with the business combination will be approved for listing on NASDAQ following the Closing, or that we will be able to comply with the continued listing standards of NASDAQ._**

Our Class A Common Stock, public units and public warrants are currently listed on NASDAQ. Our continued eligibility for listing, and the approval of the Class A Common Stock to be issued in connection with

91

Table of Contents

the business combination for listing, may depend on, among other things, the number of our shares that are redeemed. If, after the business combination, NASDAQ delists our Class A Common Stock from trading on its exchange for failure to meet the listing standards, we and our stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Class A Common Stock is a "penny stock," which will require brokers trading in our Class A Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because our Class A Common Stock, units and public warrants are listed on NASDAQ, they are covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the state of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on NASDAQ, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We will be subject to income taxes in the United States, and our domestic tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

***The JOBS Act permits "emerging growth companies" like us to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

We qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we take advantage of

92

Table of Contents

certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as we continue to be an emerging growth company, including (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements and (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. As a result, our stockholders may not have access to certain information they deem important. We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year (a) following March 29, 2022, the fifth anniversary of our IPO, (b) in which we have total annual gross revenue of at least $1.07 billion or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A Common Stock that is held by non-affiliates exceeds $700 million as of the last business day of our prior second fiscal quarter, or (ii) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as we are an emerging growth company. An emerging growth company can, therefore, delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

We cannot predict if investors will find our Class A Common Stock less attractive because we will rely on these exemptions. If some investors find our Class A Common Stock less attractive as a result, there may be a less active trading market for our Class A Common Stock and our stock price may be more volatile.

### Non-U.S. holders may be subject to U.S. income tax with respect to gain on disposition of their Class A Common Stock and warrants.

We believe that we will be a U.S. real property holding corporation ("USRPHC"), following our business combination. As a result, after the business combination is effected, Non-U.S. holders (defined below in the section entitled "Proposal No. 1—The Business Combination Proposal—Certain United States Federal Income Tax Considerations") that own (or are treated as owning under constructive ownership rules) more than a specified amount of our Class A Common Stock or warrants during a specified time period may be subject to U.S. federal income tax on a sale, exchange, or other disposition of such Class A Common Stock or warrants and may be required to file a U.S. federal income tax return. If you are a Non-U.S. holder, we urge you to consult your tax advisors regarding the tax consequences of such treatment.

### Unlike some other blank check companies, Silver Run does not have a specified maximum redemption threshold. The absence of such a redemption threshold will make it easier for us to consummate the business combination even if a substantial number of our stockholders redeem.

Unlike some other blank check companies, Silver Run has no specified maximum redemption threshold, except that we will not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001. Some other blank check companies' structure disallows the consummation of a business combination if holders of Silver Run's public shares elect to redeem or convert more than a specified percentage of the shares sold in such company's initial public offering. Because we have no such maximum redemption threshold, we may be able to consummate the business combination even though a substantial number of our public stockholders have redeemed their shares.

93

Table of Contents

***We will be required to make payments under the Tax Receivable Agreement for certain tax benefits we may claim, and the amounts of such payments could be significant.***

In connection with the completion of the business combination, we will enter into the Tax Receivable Agreement with SRII Opco and the Initial Limited Partners. Pursuant to the Tax Receivable Agreement, we will be required to make cash payments to the Initial Limited Partners and their permitted transferees (together, the "TRA Holders") equal to 85% of the amount of tax benefits, if any, that we actually realize (or are deemed to realize in certain circumstances) in periods after the business combination as a result of (i) certain tax basis increases resulting from the exchange of SRII Opco Common Units for Class A Common Stock (or, under certain circumstances, cash) pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA, other than such tax basis increases allocable to assets held by Kingfisher or otherwise used in Kingfisher's midstream business, and (ii) interest paid or deemed to be paid by us as a result of, and additional tax basis arising from, any payments we make under the Tax Receivable Agreement. We will retain the benefit of the remaining 15% of these cash savings. The amount of the cash payments that we may be required to make under the Tax Receivable Agreement could be significant and is dependent upon significant future events and assumptions, including the timing of the exchanges of SRII Opco Common Units, the price of our Class A Common Stock at the time of each exchange, the extent to which such exchanges are taxable transactions and the amount of the exchanging TRA Holder's tax basis in its SRII Opco Common Units at the time of the relevant exchange. The amount of such cash payments is also based on assumptions as to the amount and timing of taxable income we generate in the future, the U.S. federal income tax rate then applicable and the portion of Silver Run's payments under the Tax Receivable Agreement that constitute interest or give rise to depreciable or amortizable tax basis. Moreover, payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, which tax reporting positions are subject to challenge by taxing authorities. We will be dependent on distributions from SRII Opco to make payments under the Tax Receivable Agreement, and we cannot guarantee that such distributions will be made in sufficient amounts or at the times needed to enable us to make our required payments under the Tax Receivable Agreement, or at all. Any payments made by us to the TRA Holders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make timely payments under the Tax Receivable Agreement for any reason, the unpaid amounts will be deferred and will accrue interest until paid by us. Nonpayment for a specified period may constitute a breach of a material obligation under the Tax Receivable Agreement, and therefore, may accelerate payments due under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are also not conditioned upon the TRA Holders maintaining a continued ownership interest in SRII Opco or us. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement" for a discussion of the Tax Receivable Agreement and the related likely benefits to be realized by us and the TRA Holders.

***In certain cases, payments under the Tax Receivable Agreement may be accelerated and/or significantly exceed the actual benefits, if any, we realize in respect of the tax attributes subject to the Tax Receivable Agreement.***

The Tax Receivable Agreement provides that if we breach any of our material obligations under the Tax Receivable Agreement or if, at any time, we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, to make payments under the Tax Receivable Agreement would accelerate and become immediately due and payable. The amount due and payable in those circumstances is determined based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

As a result of the foregoing, (i) we could be required to make cash payments to the TRA Holders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that

94

Table of Contents

are subject to the Tax Receivable Agreement, and (ii) we would be required to make a cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combination, or other changes of control due to the additional transaction costs a potential acquirer may attribute to satisfying such obligations. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

***We will not be reimbursed for any payments made to TRA Holders under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

We will not be reimbursed for any cash payments previously made to the TRA Holders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to a TRA Holder will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement and, as a result, there might not be future cash payments from which to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the Internal Revenue Service (the "IRS") or a court will not disagree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings. See "Proposal No. 1—The Business Combination Proposal —Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement" for a discussion of the Tax Receivable Agreement and the related likely benefits to be realized by us and the TRA Holders.

***Certain of the TRA Holders have substantial control over us, and their interests, along with the interests of other TRA Holders, in our business may conflict with yours.***

The TRA Holders may receive payments from us under the Tax Receivable Agreement upon any redemption or exchange of their SRII Opco Common Units, including the issuance of shares of our Class A Common Stock upon any such redemption or exchange. As a result, the interests of the TRA Holders may conflict with the interests of holders of our Class A Common Stock. For example, the TRA Holders may have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, whether and when to incur new or refinance existing indebtedness, especially in light of the existence of the Tax Receivable Agreement, and whether and when we should terminate the Tax Receivable Agreement and accelerate our obligations thereunder. In addition, the structuring of future transactions may take into consideration tax or other considerations of TRA Holders even in situations where no similar considerations are relevant to us. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement" for a discussion of the Tax Receivable Agreement and the related likely benefits to be realized by us and the TRA Holders.

**Risks Related to the Redemption**

***There is no guarantee that a stockholder's decision whether to redeem their shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.***

We can give no assurance as to the price at which a stockholder may be able to sell its public shares in the future following the completion of the business combination or any alternative business combination. Certain events following the consummation of any Initial Business Combination, including the business combination,

95

Table of Contents

may cause an increase in our share price, and may result in a lower value realized now than a stockholder of Silver Run might realize in the future had the stockholder redeemed their shares. Similarly, if a stockholder does not redeem their shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any Initial Business Combination, including the business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement. A stockholder should consult the stockholder's own tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***If our stockholders fail to comply with the redemption requirements specified in this proxy statement, they will not be entitled to redeem their shares of Class A Common Stock for a pro rata portion of the funds held in the Trust Account.***

In order to exercise their redemption rights, holders of public shares are required to submit a request in writing and deliver their stock (either physically or electronically) to our transfer agent at least two (2) business days prior to the special meeting. Stockholders electing to redeem their shares will receive their pro rata portion of the Trust Account less franchise and income taxes payable, calculated as of two (2) business days prior to the anticipated consummation of the business combination. See the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights" for additional information on how to exercise your redemption rights.

***Stockholders of Silver Run who wish to redeem their shares for a pro rata portion of the Trust Account must comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline.***

Public stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must, among other things, as fully described in the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights," tender their certificates to our transfer agent or deliver their shares to the transfer agent electronically through the DTC prior to 5:00 p.m., Eastern Time, on February 2, 2018. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, DTC and our transfer agent will need to act to facilitate this request. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, because we do not have any control over this process or over the brokers, it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, stockholders who wish to redeem their shares may be unable to obtain physical certificates by the deadline for exercising their redemption rights and thus will be unable to redeem their shares.

In addition, holders of outstanding units of Silver Run must separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If you hold units registered in your own name, you must deliver the certificate for such units to Continental Stock Transfer & Trust Company with written instructions to separate such units into public shares and public warrants. This must be completed far enough in advance to permit the mailing of the public share certificates back to you so that you may then exercise your redemption rights upon the separation of the public shares from the units.

If a broker, dealer, commercial bank, trust company or other nominee holds your units, you must instruct such nominee to separate your units. Your nominee must send written instructions by facsimile to Continental Stock Transfer & Trust Company. Such written instructions must include the number of units to be split and the nominee holding such units. Your nominee must also initiate electronically, using DTC's DWAC (deposit withdrawal at custodian) system, a withdrawal of the relevant units and a deposit of an equal number of public shares and public warrants. This must be completed far enough in advance to permit your nominee to exercise your redemption rights upon the separation of the public shares from the units. While this is typically done electronically on the same business day, you should allow at least one full business day to accomplish the separation. If you fail to cause your public shares to be separated in a timely manner, you will likely not be able to exercise your redemption rights.

96

**Table of Contents**

### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED
### FINANCIAL INFORMATION OF SILVER RUN ACQUISITION CORPORATION II

The unaudited pro forma condensed consolidated combined statements of operations of Silver Run for the nine months ended September 30, 2017 and for the year ended December 31, 2016 combine the historical statements of operations of Silver Run, the historical consolidated statements of operations of Alta Mesa and the historical statements of operations of Kingfisher, giving effect to the following transactions (for purposes of this section, collectively, the "Transactions") as if they had been consummated on January 1, 2016, the beginning of the earliest period presented:

- the acquisition by Silver Run from the Alta Mesa Contributor of (i) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP, the sole general partner of Alta Mesa, pursuant to the Alta Mesa Contribution Agreement, in exchange for the issuance by SRII Opco at Closing of 220,000,000 SRII Opco Common Units to the Alta Mesa Contributor, as adjusted (a) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit); (b) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit); and (c) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit). In addition, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-day volume-weighted average price (the "20-Day VWAP") of the Class A Common Stock equals or exceeds specified prices;

- the acquisition by Silver Run of 100% of the outstanding membership interests in Kingfisher, pursuant to the Kingfisher Contribution Agreement in exchange for (x) the payment by Silver Run at Closing of $800 million in cash to the Kingfisher Contributor, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees, and (y) the issuance by SRII Opco at Closing of 55,000,000 SRII Opco Common Units to the Kingfisher Contributor. In addition, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-Day VWAP of the Class A Common Stock equals or exceeds specified prices;

- the acquisition by Silver Run of all of the limited partner interests in Alta Mesa held by the Riverstone Contributor, pursuant to the Riverstone Contribution Agreement in exchange for the issuance by SRII Opco at Closing of 20,000,000 SRII Opco Common Units to the Riverstone Contributor;

- the conversion of 25,875,000 shares of Class B Common Stock into 25,875,000 shares of Class A Common Stock, in connection with the Closing;

- the issuance by Silver Run of a number of shares of Class C Common Stock to the Contributors equal to the number of SRII Opco Common Units issued to such Contributors in connection with the Closing;

- the issuance by Silver Run of one share of Series A Preferred Stock to each of Bayou City, HPS and AM Equity Holdings, LP in connection with the Closing;

- the issuance by Silver Run of one share of Series B Preferred Stock to the Riverstone Contributor in connection with the Closing;

- the issuance and sale by Silver Run of 40,000,000 shares of Class A Common Stock and 13,333,333 warrants to purchase shares of Class A Common Stock, for an aggregate purchase price of $400 million, to Fund VI Holdings pursuant to the terms of the IPO Forward Purchase Agreement;

97

Table of Contents

- the redemption by Silver Run of shares of Class A Common Stock held by public stockholders in connection with the business combination as more fully described below;

- the exchange of certain founder notes of Alta Mesa's subsidiaries (the "Alta Mesa Founder Notes") for equity interest of the Alta Mesa Contributor prior to Closing pursuant to the Alta Mesa Contribution Agreement; and

- the disposition by Alta Mesa of its non-STACK assets and operations as contemplated by the Alta Mesa Contribution Agreement (the "Alta Mesa non-STACK Assets Divestiture").

Additionally, the unaudited pro forma condensed consolidated combined statement of operations of Silver Run for the year ended December 31, 2016 gives effect to the following: (i) the related revenue and expenses from the interests in 24 producing wells (the "Alta Mesa JV Wells") not owned by Alta Mesa that were drilled under the joint development agreement and purchased by High Mesa from BCE-STACK Development LLC ("BCE") and contributed to Alta Mesa on December 31, 2016 (the "Alta Mesa JV Wells Contribution") and (ii) the issuance of Alta Mesa's $500 million aggregate principal amount of 7.875% senior notes due 2024 (the "2024 Notes"), the repayment of Alta Mesa's $450 million aggregate principal amount of 9.625% senior notes due 2018 (the "2018 Notes"), and the repayment in full of Alta Mesa's $125 million senior secured term loan facility on November 10, 2016 (the "2016 Refinancing"). Although the Alta Mesa JV Wells Contribution is not considered significant to Alta Mesa under SEC rules as it did not meet the three criteria of the significance test set forth in Article 11 of Regulation S-X, Silver Run's management believes the prospective results of the Alta Mesa JV Wells will have a continuing impact on Silver Run's results of operations such that the pro forma financial statements would be misleading without giving effect to this transaction.

The unaudited pro forma condensed consolidated combined balance sheet of Silver Run as of September 30, 2017 combines the historical condensed balance sheet of Silver Run, the historical condensed consolidated balance sheet of Alta Mesa and the historical condensed balance sheet of Kingfisher, giving effect to the Transactions (other than the Alta Mesa JV Wells Contribution and the 2016 Refinancing) as if they had been consummated on September 30, 2017. The contribution date fair value of the Alta Mesa JV Wells and the 2016 Refinancing are reflected in Alta Mesa's historical consolidated balance sheet as of December 31, 2016, and, therefore, the unaudited pro forma condensed consolidated combined balance sheet information of Silver Run does not give effect to the Alta Mesa JV Wells Contribution and the 2016 Refinancing.

The historical consolidated financial statements have been adjusted in the unaudited pro forma condensed consolidated combined financial statements to give pro forma effect to events that are: (i) directly attributable to the business combination; (ii) factually supportable; and (iii) with respect to the statement of operations, expected to have a continuing impact on Silver Run's results following the completion of the Transactions.

The unaudited pro forma condensed consolidated combined financial statements have been developed from and should be read in conjunction with:

- the accompanying notes to the unaudited pro forma condensed consolidated combined financial statements;

- the (i) historical audited financial statements of Silver Run as of December 31, 2016 and for the period from November 16, 2016 (date of inception) to December 31, 2016 and (ii) historical condensed unaudited financial statements of Silver Run as of and for the nine months ended September 30, 2017, included elsewhere in this proxy statement;

- the (i) historical audited consolidated financial statements of Alta Mesa as of and for the year ended December 31, 2016 and (ii) historical condensed consolidated unaudited financial statements of Alta Mesa as of and for the nine months ended September 30, 2017, included elsewhere in this proxy statement;

98

Table of Contents

- the (i) historical audited financial statements of Kingfisher as of and for the year ended December 31, 2016 and (ii) historical unaudited condensed consolidated financial statements of Kingfisher as of and for the nine months ended September 30, 2017, included elsewhere in this proxy statement; and

- other information relating to Silver Run, Alta Mesa and Kingfisher contained in this proxy statement.

Under Silver Run's Charter, public stockholders have the right to redeem, upon the closing of the business combination, shares of Class A Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the closing of the business combination) in the Trust Account. For illustrative purposes, based on the fair value of marketable securities held in the Trust Account as of September 30, 2017 of $1,038,946,417, the estimated per share redemption price would have been approximately $10.00.

The unaudited pro forma condensed consolidated combined financial statements presents two redemption scenarios as follows:

- **Assuming No Redemption:** This scenario assumes that no shares of Class A Common Stock are redeemed and, consequently, that no shares of Class A Common Stock are purchased by Fund VI Holdings pursuant to the terms of the Business Combination Forward Purchase Agreement;

- **Assuming Illustrative Redemption:** This scenario assumes that (i) 30,000,000 shares of Class A Common Stock are redeemed, resulting in an aggregate payment of $300 million from the Trust Account, and (ii) 20,000,000 shares of Class A Common Stock are purchased by Fund VI Holdings pursuant to the Business Combination Forward Purchase Agreement, for aggregate proceeds of $200 million. This redemption is the maximum allowable redemption whereby Silver Run believes it will be able to satisfy the conditions in the Contribution Agreements, including the condition that SR II Opco's leverage ratio be less than 1.5x on a pro forma, last 12 months basis (the "leverage ratio condition") and the condition included in the Kingfisher Contribution Agreement that Silver Run's available cash at closing is at least $800 million (the "minimum cash condition"). If the aggregate cash Silver Run would be required to pay for all shares of Class A Common Stock that are validly submitted for redemption results in the failure of the leverage ratio condition or the minimum cash condition and such conditions are not waived by the applicable parties, Silver Run will not complete the business combination or redeem any shares and all shares of Class A Common Stock submitted for redemption will be returned to the holders thereof.

The unaudited pro forma condensed consolidated combined financial statements have been prepared as follows:

(i)     the acquisition of Alta Mesa under the Alta Mesa Contribution Agreement and Riverstone Contribution Agreement has been accounted for as a business combination using the acquisition method of accounting in accordance with ASC 805 with Silver Run as the acquirer. Under the acquisition method of accounting, the purchase price is allocated to the underlying Alta Mesa assets acquired and liabilities assumed based on their respective fair market values; and

(ii)     the Kingfisher acquisition under the Kingfisher Contribution Agreement has been accounted for as a business combination using the acquisition method of accounting in accordance with ASC 805 with Silver Run as the acquirer. Under the acquisition method of accounting, the purchase price is allocated to the underlying Kingfisher assets acquired and liabilities assumed based on their respective fair market values.

Silver Run has not completed the detailed valuation studies necessary to arrive at the final determination of the fair value of the assets acquired, the liabilities assumed and the related allocations of the purchase price in the business combinations. As a result, the unaudited pro forma adjustments are preliminary estimates and are subject to change as additional information becomes available and as additional analyses are performed. The unaudited pro forma adjustments have been made solely for the purpose of providing the unaudited pro forma condensed consolidated combined financial statements presented below.

99

Table of Contents

Silver Run has estimated the fair value of assets acquired and liabilities assumed from Alta Mesa and Kingfisher based on discussions with members of Alta Mesa's and Kingfisher's management, preliminary valuation studies, due diligence and information presented in the financial statements and accounting records of Alta Mesa and Kingfisher. The valuation will be finalized as soon as practicable within the required measurement period, but in no event later than 12 months following completion of the business combination. Any increases or decreases in the fair value of these assets and liabilities upon completion of the final valuations will result in adjustments to the balance sheet and/or statement of operations. In addition, the final purchase price of the Alta Mesa acquisition is subject to certain adjustments for inorganic acquisition capital expenditures, debt and transaction expenses, while the final purchase price of the Kingfisher acquisition is subject to certain adjustments for net working capital, debt, transaction expenses, capital expenditures and banking fees. The final purchase price and the final purchase price allocation may be different than that reflected in the preliminary purchase price allocation presented herein, and this difference may be material.

Assumptions and estimates underlying the unaudited pro forma adjustments set forth in the unaudited pro forma condensed consolidated combined financial statements are described in the accompanying notes. The unaudited pro forma condensed consolidated combined financial statements have been presented for illustrative purposes only and are not necessarily indicative of the operating results and financial position that would have been achieved had the business combination and the other related Transactions occurred on the dates indicated. Further, the unaudited pro forma condensed consolidated combined financial statements do not purport to project the future operating results or financial position of Silver Run following the completion of the business combination and the other related Transactions. The unaudited pro forma adjustments represent management's estimates based on information available as of the date of these unaudited pro forma condensed consolidated combined financial statements and are subject to change as additional information becomes available and analyses are performed.

Following the Closing, Silver Run will retrospectively recast Alta Mesa's financial statements, together with Alta Mesa's related management's discussion and analysis of financial condition and results of operations, to report the remaining Alta Mesa non-STACK Assets Divestiture as "discontinued operations" in accordance with Accounting Standards Codification Topic 205-20, "Discontinued Operations" ("ASC 205-20").

100

**Table of Contents**

## SILVER RUN ACQUISITION CORPORATION II
### UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED BALANCE SHEET
### AS OF SEPTEMBER 30, 2017

| | Silver Run (a) | Alta Mesa Historical (b) | Alta Mesa Non-STACK Assets Divestiture (c) | Alta Mesa Post Non-STACK Assets Divestitures Subtotal | Kingfisher Historical (d) | Pro Forma Adjustments | | Pro Forma Combined (Assuming No Redemption) | Redemption Adjustment | | Pro Forma Combined (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in thousands) | | | | | |
| **ASSETS** | | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | |
| Cash and cash equivalents | $ 546 | $ 3,740 | $ (62) | $ 3,678 | $ 11,722 | $ 589,222 70,000 3,356 | (e) (y) (z) | $ 678,524 | $ (300,000) 200,000 | (u) (v) | $ 578,524 |
| Short-term restricted cash | — | 1,173 | — | 1,173 | — | — | | 1,173 | — | | 1,173 |
| Accounts receivable, net of allowance of $802 | — | 71,260 | (4,775) | 66,485 | 5,231 | — | | 71,716 | — | | 71,716 |
| Other receivables | — | 679 | (154) | 525 | — | — | | 525 | — | | 525 |
| Receivable due from affiliate | — | 839 | — | 839 | 10,028 | — | | 10,867 | — | | 10,867 |
| Prepaid expenses and other current assets | 122 | 2,215 | (1) | 2,214 | 780 | — | | 3,116 | — | | 3,116 |
| Derivative financial instruments | — | 6,952 | — | 6,952 | — | — | | 6,952 | — | | 6,952 |
| Investment held in Trust Account | 1,038,947 | — | — | — | — | (1,038,947) | (f) | — | — | | — |
| TOTAL CURRENT ASSETS | 1,039,615 | 86,858 | (4,992) | 81,866 | 27,761 | (376,369) | | 772,873 | (100,000) | | 672,873 |
| **PROPERTY AND EQUIPMENT** | | | | | | | | | | | |
| Oil and natural gas properties, successful efforts method, net | — | 944,867 | (102,254) | 842,613 | — | 2,046,559 | (aa) | 2,889,172 | — | | 2,889,172 |
| Other property and equipment, net | — | 9,139 | (2,709) | 6,430 | 228,195 | (3,392) 58,956 | (aa) (g) | 290,189 | — | | 290,189 |
| TOTAL PROPERTY AND EQUIPMENT, NET | — | 954,006 | (104,963) | 849,043 | 228,195 | 2,102,123 | | 3,179,361 | — | | 3,179,361 |
| **OTHER ASSETS** | | | | | | | | | | | |
| Investment in LLC—cost | — | 9,000 | (9,000) | — | — | — | | — | — | | — |
| Deferred financing costs, net | — | 1,943 | — | 1,943 | 3,057 | (5,000) | (h) | — | — | | — |
| Notes receivable due from affiliate | — | 12,121 | — | 12,121 | — | — | | 12,121 | — | | 12,121 |
| Deposits and other long-term assets | — | 14,686 | (1,185) | 13,501 | 372 | (3,356) | (z) | 10,517 | — | | 10,517 |
| Derivative financial instruments | — | 5,282 | — | 5,282 | — | — | | 5,282 | — | | 5,282 |
| Intangible assets | — | — | — | — | — | 267,500 | (g) | 267,500 | — | | 267,500 |
| Goodwill | — | — | — | — | — | 611,579 41,000 | (g) (aa) | 652,579 | (35,851) | (bb) | 616,728 |
| TOTAL OTHER ASSETS | — | 43,032 | (10,185) | 32,847 | 3,429 | 911,723 | | 947,999 | (35,851) | | 912,148 |
| TOTAL ASSETS | $1,039,615 | $ 1,083,896 | $ (120,140) | $ 963,756 | $ 259,385 | $ 2,637,477 | | $ 4,900,233 | $ (135,851) | | $ 4,764,382 |
| **LIABILITIES AND PARTNERS' CAPITAL MEMBERS' EQUITY AND EQUITY** | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | |
| Accounts payable and accrued liabilities | $ — | $ 144,546 | $ (5,748) | $ 138,798 | $ 3,559 | $ — | | $ 142,357 | $ — | | $ 142,357 |
| Advances from non-operators | — | 3,872 | — | 3,872 | — | — | | 3,872 | — | | 3,872 |
| Advances from related party | — | 47,794 | — | 47,794 | — | — | | 47,794 | — | | 47,794 |
| Payables to affiliates | — | — | — | — | 6,569 | — | | 6,569 | — | | 6,569 |
| Asset retirement obligations | — | 3,960 | (3,926) | 34 | — | — | | 34 | — | | 34 |
| Derivative financial instruments | — | 348 | — | 348 | — | — | | 348 | — | | 348 |
| Sponsor note | 1,500 | — | — | — | — | (1,500) | (e) | — | — | | — |
| Franchise taxes payable | 90 | — | — | — | — | — | | 90 | — | | 90 |
| Income taxes payable | 1,350 | — | — | — | — | — | | 1,350 | — | | 1,350 |
| TOTAL CURRENT LIABILITIES | 2,940 | 200,520 | (9,674) | 190,846 | 10,128 | (1,500) | | 202,414 | — | | 202,414 |

Table of Contents

| | Silver Run (a) | Alta Mesa Historical (b) | Alta Mesa Non-STACK Assets Divestiture (c) | Alta Mesa Post Non-STACK Assets Divestitures Subtotal | Kingfisher Historical (d) | Pro Forma Adjustments (in thousands) | | Pro Forma Combined (Assuming No Redemption) | Redemption Adjustment | | Pro Forma Combined (Assuming Illustrative Redemption) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LONG-TERM LIABILITIES** | | | | | | | | | | | | |
| Asset retirement obligations, net of current portion | — | 65,152 | (55,419) | 9,733 | — | — | | 9,733 | — | | 9,733 | |
| Long-term debt, net | — | 565,247 | — | 565,247 | — | — | | 690,065 | — | | 690,065 | |
| | | | | | | 70,000 | (y) | | | | | |
| | | | | | | 54,818 | (aa) | | | | | |
| Notes payable to founder | — | 27,861 | — | 27,861 | — | (27,861) | (i) | — | | | — | |
| Payables to affiliates | — | — | — | — | — | — | | — | | | — | |
| Deferred tax liability | — | — | — | — | — | 102,093 | (bb) | 102,093 | (35,851) | (bb) | 66,242 | |
| Other long-term liabilities | — | 7,613 | (2,902) | 4,711 | — | — | | 4,711 | — | | 4,711 | |
| Deferred underwriting discounts | 36,225 | — | — | — | — | (36,225) | (j) | — | | | — | |
| Series A Preferred Stock subject to redemption; 3 (at value of $0.0001 par value) | — | N/A | N/A | N/A | N/A | | (m) | | | | | |
| Series B Preferred Stock subject to redemption; 1 (at value of $0.0001 par value) | — | N/A | N/A | N/A | N/A | | (m) | | | | | |
| TOTAL LONG-TERM LIABILITIES | 36,225 | 665,873 | (58,321) | 607,552 | — | 162,825 | | 806,602 | (35,851) | | 770,751 | |
| TOTAL LIABILITIES | 39,165 | 866,393 | (67,995) | 798,398 | 10,128 | 161,325 | | 1,009,016 | (35,851) | | 973,165 | |
| Class A common stock subject to possible redemption; 99,545,041 (at redemption value of approximately $10.00 per share) | 995,450 | N/A | N/A | N/A | N/A | (995,450) | (k) | — | | | — | |
| PARTNERS' CAPITAL | — | 217,503 | (52,145) | 165,358 | — | (165,358) | (q) | — | | | — | |
| MEMBERS' EQUITY | — | N/A | N/A | N/A | 249,257 | (249,257) | (l) | — | | | — | |
| **STOCKHOLDERS' EQUITY:** | | | | | | | | | | | | |
| Class A common stock, $0.0001 par value | — | N/A | N/A | N/A | N/A | 17 | (p) | 17 | (3) | (u) | 16 | (x) |
| | | | | | | | | | 2 | (v) | | |
| Class B common stock, $0.0001 par value | 3 | N/A | N/A | N/A | N/A | (3) | (n) | — | | | — | (x) |
| Class C common stock, $0.0001 par value | — | N/A | N/A | N/A | N/A | 22 | (o) | 22 | | | 22 | (x) |
| Additional paid-in capital | 4,039 | N/A | N/A | N/A | N/A | 1,663,663 | (r) | 1,667,702 | (299,997) | (u) | 1,575,362 | |
| | | | | | | | | | 199,998 | (v) | | |
| | | | | | | | | | 7,659 | (w) | | |
| Retained earnings (accumulated deficit) | 958 | N/A | N/A | N/A | N/A | (6,249) | (s) | (5,291) | 180 | | (5,111) | |
| STOCKHOLDERS' EQUITY | 5,000 | N/A | N/A | N/A | N/A | 1,657,450 | | 1,662,450 | (92,161) | | 1,570,289 | |
| NON-CONTROLLING INTEREST | — | N/A | N/A | N/A | N/A | 2,228,767 | (t) | 2,228,767 | (7,839) | (w) | 2,220,928 | |
| TOTAL EQUITY | 5,000 | N/A | N/A | N/A | N/A | 3,886,217 | | 3,891,217 | (100,000) | | 3,791,217 | |
| **TOTAL LIABILITIES AND EQUITY** | $1,039,615 | $1,083,896 | $(120,140) | $963,756 | $259,385 | $2,637,477 | | $4,900,233 | $(135,851) | | $4,764,382 | |

See notes to the unaudited pro forma condensed consolidated combined financial statements.

102

Table of Contents

**SILVER RUN ACQUISITION CORPORATION II**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED STATEMENT OF OPERATIONS**
**FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2017**

| | Silver Run(a) | Alta Mesa Historical(b) | Alta Mesa Non-STACK Assets Divestiture(c) | Post Non-STACK Assets Divestiture Subtotal | Kingfisher Historical(d) | Pro Forma Adjustments | Pro Forma Combined (Assuming No Redemption) | Redemption Adjustment | Pro Forma Combined (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | | | |
| **Operating revenues and other** | | | | | | | | | |
| Oil, natural gas and natural gas liquids | $ — | $ 230,205 | $ (45,698) | $ 184,507 | $ 62,429 | $ — | $ 246,936 | $ — | $ 246,936 |
| Midstream revenues | — | — | — | — | 29,043 | (17,792)(e) | 11,251 | — | 11,251 |
| Other revenues | — | 274 | (274) | — | — | — | — | — | — |
| Total operating revenues | | 230,479 | (45,972) | 184,507 | 91,472 | (17,792) | 258,187 | | 258,187 |
| Gain on acquisition of oil and natural gas properties | — | 6,893 | (1,626) | 5,267 | | | 5,267 | | 5,267 |
| Gain on derivative contracts | — | 38,024 | — | 38,024 | — | | 38,024 | | 38,024 |
| Total operating revenues and other | — | 275,396 | (47,598) | 227,798 | 91,472 | (17,792) | 301,478 | — | 301,478 |
| **Operating expenses** | | | | | | | | | |
| Lease and plant operating expense | — | 49,836 | (21,944) | 27,892 | — | — | 27,892 | — | 27,892 |
| Marketing and transportation | — | 21,566 | (1,080) | 20,486 | — | (17,792)(e) | 2,694 | — | 2,694 |
| Midstream operating expense | — | — | — | — | 69,071 | — | 69,071 | — | 69,071 |
| Production and ad valorem taxes | — | 8,812 | (5,101) | 3,711 | 1,187 | — | 4,898 | — | 4,898 |
| Workover expense | — | 5,112 | (1,981) | 3,131 | — | — | 3,131 | — | 3,131 |
| Exploration expense | — | 19,930 | (8,042) | 11,888 | — | — | 11,888 | — | 11,888 |
| Depreciation, depletion, and amortization expense | — | 80,082 | (16,836) | 63,246 | 6,893 | 15,922(f) 153,613(m) | 239,674 | — | 239,674 |
| Impairment expense | — | 29,206 | (28,018) | 1,188 | — | — | 1,188 | — | 1,188 |
| Accretion expense | — | 1,447 | (1,213) | 234 | — | — | 234 | — | 234 |
| Franchise tax expense | 90 | — | — | — | — | — | 90 | — | 90 |
| General and administrative expense | 1,547 | 35,534 | (66) | 35,468 | 4,321 | — | 41,336 | — | 41,336 |
| Total operating expenses | 1,637 | 251,525 | (84,281) | 167,244 | 81,472 | 151,743 | 402,096 | — | 402,096 |
| **Income (loss) from operations** | (1,637) | 23,871 | 36,683 | 60,554 | 10,000 | (169,535) | (100,618) | | (100,618) |
| **Other income (expense)** | | | | | | | | | |
| Interest expense, net | — | (38,189) | (88) | (38,277) | (133) | 904(g) | (37,506) | | (37,506) |
| Other income—investment income of Trust Account | 3,946 | — | — | — | — | (3,946)(h) | — | | — |
| Total other income (expense) | 3,946 | (38,189) | (88) | (38,277) | (133) | (3,042) | (37,506) | | (37,506) |
| **Income (loss) before income taxes** | 2,309 | (14,318) | 36,595 | 22,277 | 9,867 | (172,577) | (138,124) | | (138,124) |
| Provision for (benefit from) state income taxes | — | 285 | (285) | — | — | (2,415)(i) | (2,415) | | (2,415) |
| Provision for (benefit from) federal income taxes | 1,350 | — | — | — | — | (21,670)(i) | (20,320) | | (20,320) |
| **Income (loss) from continuing operations** | $ 959 | $ (14,603) | $ 36,880 | $ 22,277 | $ 9,867 | $ (148,492) | $ (115,389) | | $ (115,389) |
| **Income (loss) from continuing operations attributable to non-controlling interest** | — | — | — | — | — | (64,517)(j) | (64,517) | (1,724)(k) | (66,241) |
| **Income (loss) from continuing operations attributable to the combined entity** | $ 959 | $ (14,603) | $ 36,880 | $ 22,277 | $ 9,867 | $ (83,975) | $ (50,872) | $ 1,724 | $ (49,148) |
| Weighted average number of shares outstanding | | | | | | | | | |
| Basic | 28,578 | | | | | | 169,375(l) | | 159,375(l) |
| Diluted | 129,375 | | | | | | 169,375(l) | | 159,375(l) |
| Net income (loss) per share from continuing operations | | | | | | | | | |
| Basic | $ 0.03 | | | | | | $ (0.30)(l) | | $ (0.31)(l) |
| Diluted | $ 0.01 | | | | | | $ (0.30)(l) | | $ (0.31)(l) |

See notes to the unaudited pro forma condensed consolidated combined financial statements.

103

[Table of Contents](#)

**SILVER RUN ACQUISITION CORPORATION II**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2016**

| | Silver Run(a) | Alta Mesa Historical(b) | Alta Mesa Non-STACK Assets Divestiture(c) | Alta Mesa Post Non-STACK Assets Divestiture Subtotal | Alta Mesa 2016 Refinancing Adjustment | Alta Mesa JV Wells Contribution(e) | Kingfisher Historical(f) | Pro Forma Adjustments | Pro Forma Combined (Assuming No Redemptions) | Redemption Adjustment | Pro Forma Combined (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in thousands) | | | | | |
| **Operating revenues and other** | | | | | | | | | | | |
| Oil, natural gas and natural gas liquids | $ — | $ 210,293 | $ (70,287) | $ 140,006 | $ — | $ 26,192 | $ 615 | $ — | $ 166,813 | $ — | $ 166,813 |
| Midstream revenue | — | — | — | — | — | — | 14,563 | (7,495)(g) | 7,068 | — | 7,068 |
| Other revenues | — | 415 | (214) | 201 | — | — | — | — | 201 | — | 201 |
| Total operating revenues | — | 210,708 | (70,501) | 140,207 | — | 26,192 | 15,178 | (7,495) | 174,082 | — | 174,082 |
| Gain (loss) on sale of assets | — | 3,542 | (3,539) | 3 | — | — | — | — | 3 | — | 3 |
| Gain (loss) on derivative contracts | — | (40,460) | — | (40,460) | — | — | — | — | (40,460) | — | (40,460) |
| Total operating revenues and other | — | 173,790 | (74,040) | 99,750 | — | 26,192 | 15,178 | (7,495) | 133,625 | — | 133,625 |
| **Operating expenses** | | | | | | | | | | | |
| Lease and plant operating expense | — | 56,893 | (29,474) | 27,419 | — | 3,067 | — | — | 30,486 | — | 30,486 |
| Marketing and transportation | — | 13,326 | (1,698) | 11,628 | — | 2,780 | — | (7,495)(g) | 6,913 | — | 6,913 |
| Midstream operating expense | — | — | — | — | — | — | 7,431 | — | 7,431 | — | 7,431 |
| Production and ad valorem taxes | — | 10,750 | (7,985) | 2,765 | — | 529 | 187 | — | 3,481 | — | 3,481 |
| Workover expense | — | 4,714 | (1,273) | 3,441 | — | 10 | — | — | 3,451 | — | 3,451 |
| Exploration expense | — | 24,777 | (7,547) | 17,230 | — | — | — | — | 17,230 | — | 17,230 |
| Depreciation, depletion, and amortization expense | — | 92,901 | (39,416) | 53,485 | — | 9,115 | 3,752 | 26,668(h) 189,502(n) | 282,522 | — | 282,522 |
| Impairment expense | — | 16,306 | (15,924) | 382 | — | — | — | — | 382 | — | 382 |
| Accretion expense | — | 2,174 | (1,904) | 270 | — | — | — | — | 270 | — | 270 |
| General and administrative expense | 2 | 41,758 | (1,290) | 40,468 | — | — | 3,591 | — | 44,061 | — | 44,061 |
| Total operating expenses | 2 | 263,599 | (106,511) | 157,088 | — | 15,501 | 14,961 | 208,675 | 396,227 | — | 396,227 |
| **Income (loss) from operations** | (2) | (89,809) | 32,471 | (57,338) | — | 10,691 | 217 | (216,170) | (262,602) | — | (262,602) |
| **Other income (expense)** | | | | | | | | | | | |
| Interest expense, net | — | (59,990) | (10) | (60,000) | 17,498(d) | — | — | 1,209(i) | (41,293) | — | (41,293) |
| Loss on extinguishment of debt | — | (18,151) | — | (18,151) | — | — | — | — | (18,151) | — | (18,151) |
| Total other income (expense) | — | (78,141) | (10) | (78,151) | 17,498 | — | — | 1,209 | (59,444) | — | (59,444) |

104

**Table of Contents**

| | Silver Run(a) | Alta Mesa Historical(b) | Alta Mesa Non-STACK Assets Divestiture(c) | Alta Mesa Post Non-STACK Assets Divestiture Subtotal | Alta Mesa 2016 Refinancing Adjustment | Alta Mesa JV Wells Contribution(e) | Kingfisher Historical(f) | Pro Forma Adjustments | Pro Forma Combined (Assuming No Redemptions) | Redemption Adjustment | Pro Forma Combined (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in thousands) | | | | |
| **Income (loss) before income taxes** | (2) | (167,950) | 32,461 | (135,489) | 17,498 | 10,691 | 217 | (214,961) | (322,046) | — | (322,046) |
| Provision for (benefit from) state income taxes | — | (29) | 29 | — | — | — | — | (5,537)(j) | (5,537) | — | (5,537) |
| Provision for (benefit from) federal income taxes | — | — | — | — | — | — | — | (49,694)(j) | (49,694) | — | (49,694) |
| **Income (loss) from continuing operations** | $ (2) | $ (167,921) | 32,432 | $ (135,489) | $ 17,498 | $ 10,691 | $ 217 | $ (159,730) | (266,815) | $ — | $ (266,815) |
| **Income (loss) from continuing operations attributable to non-controlling interest** | — | — | — | — | — | — | — | (149,182)(k) | (149,182) | (3,987)(l) | (153,169) |
| **Income (loss) from continuing operations attributable to the combined entity** | $ (2) | $ (167,921) | 32,432 | $ (135,489) | $ 17,498 | $ 10,691 | $ 217 | $ (10,548) | $ (117,633) | $ 3,987 | $ (113,646) |
| Weighted average number of shares outstanding Basic and diluted | 25,875 | | | | | | | | 169,375(m) | | 159,375(m) |
| Net income (loss) per share from continuing operations Basic and diluted | $ — | | | | | | | | $ (0.69)(m) | | $ (0.71)(m) |

See notes to the unaudited pro forma condensed consolidated combined financial statements.

105

**Table of Contents**

NOTES TO SILVER RUN ACQUISITION CORPORATION II
UNAUDITED PRO FORMA CONDENSED CONSOLIDATED COMBINED FINANCIAL STATEMENTS

**1. Basis of Presentation**

*Overview*

The pro forma adjustments have been prepared as if the Transactions had been consummated January 1, 2016, the beginning of the earliest period presented, in the case of the unaudited pro forma condensed consolidated combined statements of operations and on September 30, 2017 in the case of the unaudited pro forma condensed consolidated combined balance sheet.

The unaudited pro forma condensed consolidated combined financial statements have been prepared assuming the following methods of accounting in accordance with GAAP.

- Silver Run will account for the acquisition of Alta Mesa under the Alta Mesa Contribution Agreement and the Riverstone Contribution Agreement using the acquisition method of accounting with Silver Run as the acquirer. Under the acquisition method of accounting, Alta Mesa's assets and liabilities will be recorded at their fair values measured as of the acquisition date. The excess of the purchase price over the estimated fair values of Alta Mesa's net assets acquired, if applicable, will be recorded as goodwill.

- Silver Run will account for the acquisition of Kingfisher under the Kingfisher Contribution Agreement using the acquisition method of accounting with Silver Run as the acquirer. Under the acquisition method of accounting, Kingfisher's assets and liabilities will be recorded at their fair values measured as of the acquisition date. The excess of the purchase price over the estimated fair values of Kingfisher's net assets acquired, if applicable, will be recorded as goodwill.

The acquisition method of accounting is based on ASC 805, Business Combinations and uses the fair value concepts defined in ASC 820, Fair Value Measurements ("ASC 820"). ASC 805 requires, among other things, that most assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date by Silver Run, who was determined to be the accounting acquirer.

ASC 820 defines the term "fair value," sets forth the valuation requirements for any asset or liability measured at fair value, expands related disclosure requirements and specifies a hierarchy of valuation techniques based on the nature of the inputs used to develop the fair value measures. Fair value is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." This is an exit price concept for the valuation of the asset or liability. In addition, market participants are assumed to be buyers and sellers in the principal (or the most advantageous) market for the asset or liability. Fair value measurements for an asset assume the highest and best use by these market participants. Many of these fair value measurements can be highly subjective, and it is possible that other professionals, applying reasonable judgment to the same facts and circumstances, could develop and support a range of alternative estimated amounts.

Under ASC 805, acquisition-related transaction costs are not included as a component of consideration transferred but are accounted for as expenses in the periods in which such costs are incurred, or if related to the issuance of debt, capitalized as debt issuance costs. Acquisition-related transaction costs expected to be incurred as part of the Alta Mesa and Kingfisher acquisitions include estimated fees for advisory, legal and accounting fees.

The unaudited pro forma condensed consolidated combined financial statements should be read in conjunction with (i) Silver Run's historical financial statements and related notes for the period from November 16, 2016 (date of inception) to December 31, 2016 and as of and for the nine months ended September 30, 2017, as well as "Management's Discussion and Analysis of Financial Condition and Results of

106

Table of Contents

Operations of Silver Run," included elsewhere in this proxy statement, (ii) Alta Mesa historical audited consolidated financial statements and related notes for the year ended December 31, 2016 and the historical unaudited condensed consolidated financial statements as of and for the nine months ended September 30, 2017, as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations of Alta Mesa," included elsewhere in this proxy statement and (iii) Kingfisher historical audited consolidated financial statements and related notes for the year ended December 31, 2016 and the historical unaudited condensed consolidated financial statements as of and for the nine months ended September 30, 2017, as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations of Kingfisher," included elsewhere in this proxy statement.

The pro forma adjustments represent management's estimates based on information available as of the date of this proxy statement and are subject to change as additional information becomes available and additional analyses are performed. The unaudited pro forma condensed consolidated combined financial statements do not reflect possible adjustments related to restructuring or integration activities that have yet to be determined or transaction or other costs following the business combination that are not expected to have a continuing impact. Further, one-time transaction-related expenses anticipated to be incurred prior to, or concurrent with, closing the business combinations and the other related Transactions are not included in the unaudited pro forma condensed consolidated combined statements of operations. However, the impact of such transaction expenses is reflected in the unaudited pro forma condensed consolidated combined balance sheet as a decrease to retained earnings and a decrease to cash.

***Preliminary Estimated SRII Opco Common Units to be issued to the Alta Mesa Contributor***

Pursuant to the Alta Mesa Contribution Agreement, the Alta Mesa Contributor will exchange (i) all of its limited partner interests in Alta Mesa and (ii) all of its economic and voting rights (representing 100% and 90%, respectively) in Alta Mesa GP, the sole general partner of Alta Mesa, for 220,000,000 SRII Opco Common Units, as adjusted (1) upward for any inorganic acquisition capital expenditures invested by Alta Mesa (based on a value of $10.00 per SRII Opco Common Unit), (2) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit), and (3) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit).

The number of SRII Opco Common Units to be issued to the Alta Mesa Contributor was preliminary estimated as follows:

| | At September 30, 2017 (in thousands) | |
| --- | --- | --- |
| | Amount | SRII Opco Common Units |
| **Preliminary SRII Opco Common Units Issued to Alta Mesa Contributor** | | |
| Initial SRII Opco Common Units | $   — | 220,000 |
| Plus: Acquisition capital expenditure(1) | 55,000 | 5,500 |
| Less: Amount Riverstone Contributor contributed to Alta Mesa(2) | (200,000) | (20,000) |
| Less: Alta Mesa debt assumed by SRII Opco(3) | (645,000) | (64,500) |
| Less: Alta Mesa transaction expenses(4) | (12,000) | (1,200) |
| Total SRII Opco Common Units issued to the Alta Mesa Contributor | $(802,000) | 139,800 |

(1)    Represents capital expenditures used by Alta Mesa between the execution date of the Alta Mesa Contribution Agreement and Closing for acquisitions of oil and gas properties, by purchase, lease or otherwise, of more than $1.0 million in a single transaction or series of related transactions in the following counties located in the State of Oklahoma: Kingfisher, Garfield, Canadian, Blaine, Major, Dewey, Woodward, Logan and Oklahoma, where Alta Mesa does not have an existing hydrocarbon interest of 25% or more.

107

Table of Contents

(2)  Represents the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements.

(3)  Debt assumed by SRII Opco at September 30, 2017 includes Alta Mesa's 2024 Notes. Debt assumed also includes the impact of Alta Mesa's preliminary estimate on future borrowings under its secured revolving credit facility until the Closing.

(4)  Reflects the preliminary estimated transaction costs of $12.0 million, relating to banking, legal and accounting fees associated with the Transaction. See Note 2(e) for further details on the accounting treatment of the preliminary estimated transaction costs.

**Preliminary Estimated Purchase Price for Alta Mesa**

The preliminary estimated purchase price consideration for Alta Mesa is as follows:

|  | At September 30, 2017 (in thousands) |
|---|---|
| **Preliminary Purchase Consideration:(1)** |  |
| SRII Opco Common Units (159,800,000) SRII Opco Common Units value at $9.91 per unit)(2) | $ 1,583,618 |
| Estimated fair value of contingent earn-out purchase consideration(3) | 280,339 |
| Total purchase price consideration | $ 1,863,957 |

(1)  The preliminary purchase price consideration is for the acquisition of Alta Mesa's STACK Assets.

(2)  At Closing, the Riverstone Contributor will receive consideration of 20,000,000 SRII Opco Common Units and the Alta Mesa Contributor will receive consideration of 139,800,000 SRII Opco Common Units, as adjusted based on preliminary estimated inorganic acquisition expenditure, debt assumed and transactions expenses pursuant to the Alta Mesa Contribution Agreement. The adjustments are preliminary and may be subject to change. As of the date of acquisition, the estimated fair value of an SRII Opco Common Unit was $9.91 per unit, the closing traded stock price of Class A Common Stock as of November 17, 2017.

(3)  For a period of seven years following Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-day VWAP of the Class A Common Stock of Silver Run equals or exceeds specified prices pursuant to the Alta Mesa Contribution Agreement. Pursuant to ASC 805 and ASC 480, Distinguishing Liabilities from Equity ("ASC 480"), we have determined that the earn-out consideration is valued at approximately $280.3 million will be classified as equity. Therefore, at the acquisition date, the earn-out consideration will be valued at fair value and classified in stockholders' equity. The fair value of the contingent equity earn-out consideration was determined using the Monte Carlo simulation valuation method based on Level 3 inputs using the fair value hierarchy. The key inputs included the quoted market price for Class A Common Stock, market volatility of a peer group of companies similar to Silver Run (due to the lack of trading activity in the Class A Common Stock), no dividend yield, an expected life of each earn-out threshold based on the remaining contractual term of the contingent liability earn-out period and a risk free rate based on U.S. Dollars overnight indexed swaps with a maturity equivalent to the earn-out's expected life.

108

Table of Contents

*Preliminary Estimated Purchase Price Allocation for Alta Mesa*

The following table summarizes the allocation of the preliminary estimate of the purchase consideration to the assets acquired and liabilities assumed related to the Alta Mesa acquisition. The allocation is as follows:

| | At September 30, 2017 (in thousands) |
|---|---:|
| **Estimated Fair Value of Assets Acquired(1)** | |
| Cash, cash equivalents and short term restricted cash(6) | $ 74,851 |
| Accounts Receivable | 66,485 |
| Other Receivables | 525 |
| Receivables due from affiliate | 839 |
| Prepaid expenses and other current assets | 2,214 |
| Derivative financial instruments | 6,952 |
| Property and equipment:(2) | |
| Oil and natural gas properties, successful efforts | 2,889,172 |
| Other property and equipment, net | 3,038 |
| Notes receivable due from affiliate | 12,121 |
| Deposits and other long-term assets | 13,501 |
| Derivative financial instruments | 5,282 |
| Goodwill(3) | 41,000 |
| Total Assets acquired | 3,115,980 |
| **Estimated Fair Value of Liabilities Assumed(1)** | |
| Accounts payable and accrued liabilities | 138,798 |
| Advances from non-operators | 3,872 |
| Advances from related party | 47,794 |
| Asset retirement obligations | 9,767 |
| Derivative financial instruments | 348 |
| Long-term debt, net(4)(6) | 690,065 |
| Deferred tax liability | 102,093 |
| Other long-term liabilities(5) | 259,286 |
| Total Fair Value of liabilities assumed | 1,252,023 |
| Total consideration and fair value | $ 1,863,957 |

(1)    The preliminary purchase price allocation is allocated based on Alta Mesa's STACK assets.

(2)    The fair value measurements of oil and natural gas properties and asset retirement obligations are based on inputs that are not observable in the market and therefore represent Level 3 inputs. The fair values of oil and natural gas properties and asset retirement obligations were measured using valuation techniques that convert future cash flows to a single discounted amount. Significant inputs to the valuation of oil and natural gas properties include, but are not limited to recoverable reserves, production rates, future operating and development costs, future commodity prices, appropriate risk-adjusted discounts rates, and other relevant data. These inputs required significant judgments and estimates by management at the time of the valuation and are the most sensitive and may be subject to change.

(3)    Goodwill is measured as the excess of the total purchase consideration over the net acquisition date fair value of the assets acquired and liabilities assumed. Goodwill will not be amortized but will be tested for impairment at least annually or whenever certain indicators of impairment are present. If, in the future, it is determined that goodwill is impaired, an impairment charge would be recorded at that time. The factors that make up the goodwill in the preliminary purchase price allocation for Alta Mesa reflect the elimination of the intercompany relationship related to the premium portion of the contract terms between Alta Mesa and Kingfisher offset by the market valuation of the net Alta Mesa assets acquired by Silver Run.

(4)    Represents the approximate fair value of Alta Mesa's $500 million aggregate principal amount of 2024 Notes as of the acquisition date. This estimation is based on the most recent trading values of the senior notes at or near September 30, 2017, which represents a Level 1 input.

109

Table of Contents

(5) Other long-term liabilities includes $254.6 million related to a contract of the acquiree that includes a premium paid to ensure the availability of the Kingfisher plant capacity. The acquired contract is related to the pre-existing relationship between Alta Mesa and Kingfisher. Kingfisher currently provides crude oil and natural gas gathering and processing services to Alta Mesa. The terms of the arrangement between Alta Mesa and Kingfisher are at rates that are higher than the current market rates for similar arrangements. Therefore, a liability for the premium portion of the arrangement has been reflected for Alta Mesa and an asset for the premium payment terms of the arrangement has been recorded by Kingfisher for the amount of $254.6 million. The asset and liability are measured at fair value as of the acquisition date and are eliminated upon consolidation.

(6) This amount includes Alta Mesa's preliminary estimate of outstanding borrowings totaling $145 million under its secured revolving credit facility at the Closing.

**Preliminary Estimated Purchase Price for Kingfisher**

The preliminary estimated purchase price consideration for Kingfisher is as follows:

| | At September 30, 2017 |
|---|---|
| | (in thousands) |
| **Preliminary Purchase Consideration:** | |
| Cash(1) | $ 800,000 |
| SRII Opco Common Units (55,000,000 SRII Opco Common Units value at $9.91 per unit)(2) | 545,050 |
| Estimated fair value of contingent earn-out purchase consideration(3) | 93,760 |
| Total purchase price consideration | $ 1,438,810 |

(1) The cash consideration of $800 million is subject to adjustment for net working capital, debt, transaction expenses, capital expenditures and banking fees. We currently do not estimate any adjustments to the cash consideration amount and, therefore, no adjustment has been reflected herein.

(2) The Kingfisher Contributor will receive consideration of 55,000,000 SRII Opco Common Units and may, at its election to receive additional SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per SRII Opco Unit if the minimum cash condition is not satisfied and the Kingfisher Contributor waives such condition. At the date of acquisition, the estimated fair value of an SRII Opco Common Unit was assumed to be $9.91 per unit, the closing traded stock price of Silver Run's Class A Common Stock at November 17, 2017.

(3) For a period of seven years following Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) if the 20-day VWAP of the Class A Common Stock of Silver Run equals or exceeds specified prices pursuant to the Kingfisher Contribution Agreement. Pursuant to ASC 805 and ASC 480, we have determined that the earn-out consideration valued at approximately $93.8 million and will be classified as equity. Therefore at the acquisition date, the earn-out consideration will be valued at fair value and classified in stockholders' equity. The fair value of the contingent equity earn-out consideration was determined using the Monte Carlo simulation valuation method based on Level 3 inputs using the fair value hierarchy. The key inputs included the quoted market price for Class A Common Stock, market volatility of a peer group of companies similar to Silver Run (due to the lack of trading activity in the Class A Common Stock), no dividend yield, an expected life of each earn-out threshold based on the remaining contractual term of the contingent liability earn-out period and a risk free rate based on U.S. Dollars overnight indexed swaps with a maturity equivalent to the earn-out's expected life.

110

Table of Contents

**Preliminary Estimated Purchase Price Allocation for Kingfisher**

    The following table summarizes the allocation of the preliminary estimate of the purchase consideration to the assets acquired and liabilities assumed related to the Kingfisher acquisition. The allocation is as follows:

| | At September 30, 2017 (in thousands) |
|---|---:|
| **Estimated Fair Value of Assets Acquired** | |
| Cash and cash equivalents | $ 11,722 |
| Accounts Receivable | 15,259 |
| Prepaid expenses | 780 |
| Property, plant and equipment:(1) | |
|     Pipeline | 279,533 |
|     Other property, plant and equipment | 7,618 |
| Intangible assets(2) | 267,500 |
| Goodwill(3) | 611,579 |
| Other assets(4) | 254,947 |
| Total Assets acquired | 1,448,938 |
| **Estimated Fair Value of Liabilities Assumed** | |
| Accounts payable | 3,559 |
| Payable to affiliates | 6,569 |
| Total Fair Value of liabilities assumed | 10,128 |
| Total consideration and fair value | $ 1,438,810 |

(1)    The fair value measurements of crude oil, natural gas and NGL gathering, processing and storage assets are based on inputs that are not observable in the market and therefore represent Level 3 inputs. The fair values of gathering, processing and storage assets were measured using valuation techniques that convert future cash flows to a single discounted amount. These valuations required significant judgments and estimates made by management based on assumptions believed to be reasonable at the time of the valuation, but which are inherently uncertain. The estimates and assumptions are sensitive and may be subject to change.

(2)    The identifiable intangible assets acquired are primarily related to customer relationships held by Kingfisher prior to Closing. The intangible assets acquired were based upon the estimated fair value as of the acquisition date. The intangible assets have definite lives and are subject to amortization over their economic lives, currently ranging from approximately 10-15 years.

(3)    Goodwill is measured as the excess of the total purchase consideration over the net acquisition date fair value of the assets acquired and liabilities assumed. Goodwill will not be amortized but will be tested for impairment at least annually or whenever certain indicators of impairment are present. If, in the future, it is determined that goodwill is impaired, an impairment charge would be recorded at that time. The factors that make up the goodwill reflected in the preliminary purchase price allocation include expected synergies, including future cost efficiencies with continual flow of activity of Alta Mesa production into the Kingfisher processing facility as the basin expands, as well as other benefits that are expected to be generated.

(4)    Other assets includes $254.6 million related to premium payment terms of a contract of the acquiree. See footnote (5) of the preliminary estimated purchase price allocation for Alta Mesa for further details related to the premium payment terms of the contract between Alta Mesa and Kingfisher.

**2. Adjustments and Assumptions to the Unaudited Pro Forma Condensed Consolidated Combined Balance Sheet as of September 30, 2017**

    The unaudited pro forma condensed consolidated combined balance sheet as of September 30, 2017 reflects the following adjustments assuming the Transactions occurred on September 30, 2017.

a)    Represents the Silver Run unaudited historical condensed balance sheet as of September 30, 2017.

111

Table of Contents

b)    Represents the Alta Mesa unaudited historical condensed consolidated balance sheet as of September 30, 2017.

c)    Reflects Alta Mesa's assets and liabilities of the assets to be disposed of as part of the Alta Mesa non-STACK Assets Divestiture to transpire prior to the Closing.

d)    Represents the Kingfisher unaudited historical condensed balance sheet as of September 30, 2017.

e)    Represents the net adjustment to cash associated with the Transactions:

|  | At September 30, 2017 |
|---|---|
|  | (in thousands) |
| Silver Run cash previously held in Trust Account(1) | $   1,038,947 |
| Cash consideration paid to the Kingfisher Contributor(2) | (800,000) |
| Proceeds from IPO forward purchase agreement(3) | 400,000 |
| Payment of deferred underwriter fees(4) | (36,225) |
| Payment of sponsor note(5) | (1,500) |
| Payment of transaction costs(6) | (12,000) |
| Net adjustments to cash associated with the Transactions | $    589,222 |

(1)    Represents the adjustment related to the reclassification of the cash equivalents held in the Trust Account to cash and cash equivalents as described in note (f) below.

(2)    Represents the cash consideration to the Kingfisher Contributor, assuming no adjustments at Closing for net working capital, debt, transaction expenses, capital expenditures and banking fees. See Footnote 1 for further discussion of regarding the preliminary purchase price consideration for Kingfisher.

(3)    Represents aggregate proceeds of $400 million from the issuance of 40,000,000 shares of Class A Common Stock and 13,333,333 warrants to Fund VI Holdings pursuant to the IPO Forward Purchase Agreement.

(4)    Represents the payment of deferred underwriting discounts attributable to the IPO.

(5)    Represents Silver Run repayment of outstanding sponsor note at September 30, 2017.

(6)    Reflects the impact of preliminary estimated transaction costs totaling $12.0 million, for advisory, banking, legal and accounting fees that are not able to be capitalized as part of the Transactions. In accordance with ASC 805, acquisition-related transaction costs and related charges are not included as a component of consideration to be transferred but are required to be expensed as incurred. The unaudited pro forma condensed consolidated combined balance sheet reflects these costs as a reduction of cash with a corresponding decrease in retained earnings. These costs are not included in the unaudited pro forma condensed consolidated combined statement of operations as they are directly related to the business combination and will be nonrecurring.

f)    Represents the adjustment related to the reclassification of the cash equivalents held in the Trust Account in the form of investments to cash and cash equivalents to reflect the fact that these investments are available for use in connection with the Transactions.

112

Table of Contents

g)   The allocation of Kingfisher's estimated fair value of consideration transferred to Kingfisher's estimated fair value of the assets acquired and liabilities assumed resulted in the following purchase price allocation adjustments below. See Footnote 1 for further discussion regarding the preliminary purchase price consideration for Kingfisher and the preliminary purchase price allocation

| | At September 30, 2017 | Pro forma Adjustments | Preliminary Fair Value |
|---|---|---|---|
| | | (in thousands) | |
| Property, plant and equipment | | | |
| Pipeline | $     237,688 | $     41,845 | $ 279,533 |
| Other property, plant and equipment | 1,152 | 6,466 | 7,618 |
| Accumulated depreciation | (10,645) | 10,645 | — |
| Property, plant and equipment, net | $     228,195 | $     58,956 | $ 287,151 |
| Intangible assets | $     — | $ 267,500 | $ 267,500 |
| Goodwill | — | 611,579 | 611,579 |

h)   Represents the adjustments to deferred financing cost, net of approximately $1.9 million related to Alta Mesa and $3.1 million related to Kingfisher based on the preliminary purchase price allocation.

i)   Represents the exchange of Alta Mesa Founder Notes for equity interest of the Alta Mesa Contributor prior to the Closing pursuant to the Alta Mesa Contribution Agreement.

j)   Represents the payment of deferred underwriting costs of $36.2 million attributable to the IPO.

k)   Represents an adjustment to reflect that at the time of issuance, certain of Silver Run's Class A Common Stock was subject to a possible redemption and, as such, an amount of $995.5 million was classified as redeemable equity in Silver Run's historical consolidated balance sheet as of September 30, 2017. Under the assumption that none of the public stockholders elect to have Silver Run redeem these shares in connection with the business combination, the shares are no longer redeemable and have been reclassified from redeemable equity to additional paid in capital and Class A Common Stock.

l)   Represents an adjustment to eliminate Kingfisher historical members' equity in conjunction with the Closing.

m)   Represents the issuance of one redeemable share of Series A Preferred Stock issued to each of Bayou City, HPS and AM Management and one redeemable share of Series B Preferred Stock issued to the Riverstone Contributor in conjunction with the Closing. Such shares of Series A Preferred Stock and Series B Preferred Stock are redeemable at their par value of $0.0001 per share.

n)   Represents the par value of the automatic conversion of 25,875,000 shares of Class B Common Stock to Class A Common Stock on a one-for-one basis in accordance with Silver Run's Charter upon the Closing.

o)   Represents an adjustment such that the pro forma combined Class C Common Stock at par is equal to the par value of 214,800,000 shares of Class C Common Stock outstanding after Closing, as adjusted for preliminary estimated additional debt assumed until Closing and transaction related expenses. Note 2(x) below reflects the pro forma adjustments related to adjustments to Silver Run's Class C Common Stock as a result of the Transactions. The holders of Class C Common Stock will have the right to vote on all matters properly submitted to a vote of the Silver Run stockholders, but will not be entitled to any dividends or any distributions in liquidation from Silver Run. On or after 180 days after Closing (except that the Kingfisher Contributor may cause the redemption of up to 39,000,000 SRII Opco Common Units), the Contributors will generally have the right to cause Silver Run to redeem all or a portion of their SRII Opco Common Units in exchange for shares of Class A Common Stock, or at Silver Run's option, an equivalent amount of cash. Upon redemption or exchange of SRII Opco Common Units held by the Contributors, a corresponding number of shares of Class C Common Stock held by such Contributor will be cancelled.

p)   Represents an adjustment such that the pro forma combined Class A Common Stock at par is equal to the par value of 169,375,000 shares of Class A Common Stock outstanding after Closing. Note 2(x) below

113

Table of Contents

reflects the pro forma adjustments related to adjustments to Class A Common Stock as a result of the Transactions.

q)    Represents an adjustment to eliminate Alta Mesa historical partners' capital in conjunction with the Closing

r)    Represents an adjustment such that the pro forma combined Additional-paid-in-capital is equal to the amount determined as follows:

|  | At September 30, 2017 |
|---|---|
|  | (in thousands) |
| Net assets of Silver Run(1) | $    1,000,450 |
| Less: Net cash not attributable to non-controlling interest | (200,000) |
| Plus: Proceeds from the IPO Forward Purchase Agreement(2) | 400,000 |
| Plus: SRII Opco Common Units issued to the Kingfisher Contributor(3) | 545,050 |
| Plus: SRII Opco Common Units issued to Alta Mesa Contributor and Riverstone Contributor(4) | 1,583,618 |
| Less: Transaction expenses(5) | (12,000) |
| Total Pro Forma Combined Stockholders' Equity before consideration of NCI (assuming no redemption) | 3,317,118 |
| Less: Pro forma combined Class A Common Stock, $0.0001 par value(6) | (17) |
| Less: Pro forma combined Class C Common Stock, $0.0001 par value(7) | (22) |
| Less Pro forma combined Accumulated loss(8) | 5,291 |
| Less Pro forma combined Non-controlling interests(9) | (1,854,668) |
| Plus: Net cash not attributable to non-controlling interest | 200,000 |
| Pro forma combined additional-paid-in-capital (assuming no redemption) | 1,667,702 |
| Less: Silver Run additional-paid-in-capital | (4,039) |
| Total Pro forma combined additional-paid-in-capital (assuming no redemption) | $    1,663,663 |

(1)    Represents the net assets of Silver Run as of September 30, 2017.

(2)    Represents aggregate proceeds of $400 million from the issuance of 40,000,000 shares of Class A Common Stock and 13,333,333 warrants to Fund VI Holdings pursuant to the IPO Forward Purchase Agreement at Closing.

(3)    Represents the fair value of the SRII Opco Common Units issued to the Kingfisher Contributor pursuant to the Kingfisher Contribution Agreement as discussed in Note 1.

(4)    Represents the fair value of the SRII Opco Common Units issued to the Riverstone Contributor and the Alta Mesa Contributor pursuant to the Alta Mesa Contribution Agreement as discussed in Note 1.

(5)    Represents preliminary estimated transaction costs related to the Transaction described herein. See Note 2(e) above.

(6)    Represents the pro forma combined Class A Common Stock at par as discussed in Note 2(p) above.

(7)    Represents the pro forma combined Class C Common Stock at par as discussed in Note 2(o) above.

(8)    Represents the pro forma combined accumulated loss as discussed in Note 2(s) below.

(9)    Represents the pro forma combined Non-controlling interests as discussed in Note 2(t) below.

s)    The pro forma adjustment for retained earnings/accumulated loss reflects the adjustment necessary such that the pro forma combined retained earnings/accumulated loss reflects the Silver Run stockholders' share of the transaction expenses of $12.0 million multiplied by the Silver Run common stockholders economic interest in SRII Opco of 44.1%.

114

**Table of Contents**

t)   Represents the Contributor's share of the carrying amount of SRII Opco's net assets calculated as follows. The Contributors will hold a non-controlling interest ("NCI") in Silver Run comprised of 214,800,000 SRII Opco Common Units and 214,800,000 shares of Class C Common Stock that is not attributable to Silver Run stockholders with an economic interest in Silver Run.

|  | At September 30, 2017 |
| --- | --- |
|  | (in thousands) |
| Total Pro Forma Combined Stockholders' Equity (before allocation of NCI)(1) | $ 3,317,118 |
| Percent economic ownership of SRII Opco held by the Contributors (assuming no redemption)(2) | 55.912% |
|     Pro forma adjustment for Silver Run NCI (assuming no redemption) | $ 1,854,668 |
| Plus: Estimated fair value of the Kingfisher Earn-out consideration(3) | 93,760 |
| Plus: Estimated fair value of the Alta Mesa Earn-out consideration(4) | 280,339 |
|     Total Pro forma adjustment for Silver Run NCI (assuming no redemption) | 2,228,767 |

(1)   See Note 2(r) above.

(2)   Represents the percentage ownership of the SRII Opco Common Units held by the Contributors as compared to the total SRII Opco Common Units outstanding at Closing, which is calculated as the percentage of the 214,800,000 shares of Class C Common Stock outstanding at Closing divided by the total number of Class A Common Stock and Class C Common Stock assumed outstanding at Closing of 384,175,000 shares. Note 2(u) below describes the Silver Run Common Stock issued in the Transactions and outstanding following Closing.

(3)   Represents the estimated fair value of the Kingfisher earn-out as discussed in Note 1 that is not included in the calculation of economic ownership of SRII Opco held by Silver Run.

(4)   Represents the estimated fair value of the Alta Mesa earn-out as discussed in Note 1 that is not included in the calculation of economic ownership of SRII Opco held by Silver Run.

u)   Represents the illustrative redemption of 30.0 million shares of Class A Common Stock resulting in an aggregate payment of $300 million from the Trust Account at Closing.

v)   Represents the illustrative purchase of 20.0 million shares of Class A Common Stock by Riverstone pursuant to the Business Combination Forward Purchase Agreement at Closing.

115

Table of Contents

(w)   Represents an adjustment to additional-paid-in-capital, accumulated loss and NCI due to the increase in the Contributors' share of the carrying amount of SRII Opco's net assets due to a net decrease in the SRII Opco Common Units held by Silver Run calculated as follows due to the illustrative redemption scenario. The Contributors will hold an NCI in Silver Run comprised of 214,800,000 SRII Opco Common Units and 214,800,000 shares of Class C Common Stock that is not attributable to Silver Run stockholders with an economic interest in Silver Run.

|  | At September 30, 2017 |
|---|---|
|  | (in thousands) |
| **Pro forma adjustment to NCI** |  |
| Total Pro Forma Combined Stockholders' Equity before consideration of NCI (assuming no redemption)(1) | $ 3,317,118 |
| Less: Redemption of 30,000,000 shares of Class A Common Stock(2) | (300,000) |
| Plus: Fund VI Purchase of 20,000,000 shares of Class A Common Stock(2) | 200,000 |
| Total Pro Forma Combined Stockholders' Equity before consideration of NCI (assuming illustrative redemption) | 3,217,118 |
| Percent economic ownership of SRII Opco held by the Contributors (assuming illustrative redemption)(3) | 57.406% |
| Silver Run NCI (assuming illustrative redemption)(7) | 2,220,928 |
| Silver Run NCI (assuming no redemption)(4)(7) | 2,228,767 |
| Pro forma adjustment for Silver Run NCI due to illustrative redemption | $ (7,839) |

|  | At September 30, 2017 |
|---|---|
|  | (in thousands) |
| **Pro forma adjustment to Accumulated loss:** |  |
| Transaction expenses | $ (12,000) |
| Percent economic ownership of SRII Opco held by Silver Run (assuming illustrative redemption)(5) | 42.594% |
| Silver Run Accumulated loss (assuming illustrative redemption) | (5,111) |
| Silver Run Accumulated loss (assuming no redemption) (6) | (5,291) |
| Pro forma adjustment for Silver Run Accumulated loss due to illustrative redemption | $ 180 |
| **Pro forma adjustment to Additional-paid-in-capital:** |  |
| Pro forma adjustment for Silver Run NCI due to illustrative redemption | 7,839 |
| Less: Pro forma adjustment for Silver Run Accumulated loss due to illustrative redemption | (180) |
| Pro forma adjustment for Silver Run Additional-paid-in-capital due to illustrative redemption | $ 7,659 |

(1)   See Note 2(r).

(2)   Assumes illustrative redemption of 30,000,000 shares of Class A Common Stock are redeemed as described in Note 2(u) and 20,000,000 shares of Class A Common Stock are purchased by Fund VI Holdings as described in Note 2(v).

(3)   Represents the percentage ownership of the SRII Opco Common Units held by the Contributors as compared to the total SRII Opco Common Units outstanding at Closing which is calculated as the percentage of the 214,800,000 shares of Class C Common Stock outstanding at Closing divided by the total number of Class A Common Stock and Class C Common Stock assumed outstanding at Closing of 374,175,000 shares. Note 2(u) below describes the Silver Run Common Stock issued in the Transactions and outstanding following Closing.

116

Table of Contents

(4)   See Note 2(t).
(5)   Represents the percentage ownership of the SRII Opco Common Units held by Silver Run as compared to the total SRII Opco Common Units outstanding at Closing assuming the illustrative redemption.
(6)   See Note 2(s) above.
(7)   Includes the estimated fair value of the Alta Mesa and Kingfisher earn-outs as discussed in Note 1 that is not included in the calculation of economic ownership of SRII Opco held by Silver Run.

(x)   The table below reflects the authorized, issued, and outstanding shares of common and preferred stock.

| | Silver Run | Pro Forma Adjustments | Pro Forma Combined (Assuming No Redemptions) | Redemption Adjustment | Pro Forma Combined (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|
| **Liabilities and Temporary Equity:** | | | | | |
| Redeemable Preferred Stock, $0.0001 par value | | | | | |
| Series A preferred stock, $0.0001 par value | | | | | |
| Designated | — | 3(1) | 3 | — | 3 |
| Issued and outstanding | — | 3(1) | 3 | — | 3 |
| Series B preferred stock, $0.0001 par value | | | | | |
| Designated | — | 1(1) | 1 | — | 1 |
| Issued and outstanding | — | 1(1) | 1 | — | 1 |
| Class A common stock subject to possible redemption | | | | | |
| Issued (at redemption value of approximately $10.00 per share) | 99,545,041 | (99,545,041)(2) | — | — | — |
| **Stockholders' Equity** | | | | | |
| Common Stock, $0.0001 par value | | | | | |
| Class A common stock, $0.0001 par value | | | | | |
| Authorized | 400,000,000 | 800,000,000(8) | 1,200,000,000 | — | 1,200,000,000 |
| Issued and outstanding | 3,954,959 | 99,545,041(2) 25,875,000(3) 40,000,000(4) | 169,375,000 | (30,000,000)(6) 20,000,000(6) | 159,375,000 |
| Class B common stock, $0.0001 par value | | | | | |
| Authorized | 50,000,000 | (50,000,000)(3) | — | — | — |
| Issued and outstanding | 25,875,000 | (25,875,000)(3) | — | — | — |
| Class C common stock, $0.0001 par value | | | | | |
| Authorized(9) | — | | | | |
| Issued and outstanding(10) | — | 214,800,000(5) | 214,800,000 | — | 214,800,000 |
| Warrants | 49,633,333(7) | 13,333,333(4) | 62,966,666 | — | 62,966,666 |

(1)   Designation and issuance of redeemable Series A Preferred Stock and Series B Preferred Stock as described in Note 2(m) above.
(2)   Represents an adjustment to reflect that at the time of issuance, certain of the Class A Common Stock was subject to a possible redemption. See Note 2(k) for additional information.
(3)   Represents the automatic conversion of Class B Common Stock to Class A Common Stock as described in Note 2(n) above. Concurrently with such conversion, the number of authorized shares of Class B Common Stock shall be reduced to zero.

117

Table of Contents

(4) Reflects the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of warrants of Class A Common Stock to Fund VI Holdings pursuant to the IPO Forward Purchase Agreement at Closing.

(5) Represents the issuance of 139,800,000 shares of Class C Common Stock, as adjusted for preliminary estimates of additional debt to be assumed by SRII Opco and transaction related costs, to the Alta Mesa Contributor (as described in Note (k), 20,000,000 shares of Class C Common Stock to the Riverstone Contributor and 55,000,000 shares of Class C Common Stock to the Kingfisher Contributor (as described in Footnote 1).

(6) Assumes illustrative redemption of 30,000,000 shares of Class A Common Stock are redeemed as described in Note 2(u) above and 20,000,000 shares of Class A Common Stock are purchased by Fund VI Holdings as described in Note 2(v) above.

(7) Represents the warrants outstanding as of September 30, 2017, which includes 34,500,000 of Silver Run's IPO warrants and 15,133,333 private placement warrants.

(8) Assume stockholders approve to increase shares.

(9) The number of authorized shares of Class C Common Stock will be determined at Closing and will be an amount at least equal to the number of SRII Opco Common Units issued to the Contributors at Closing plus the number of SRII Opco Common Units issuable to the Alta Mesa Contributor and the Kingfisher Contributor as earn-out consideration under the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, respectively.

(10) Assumes stockholder approval to establish the Class C Common Stock. The issued and outstanding shares of Class C Common Stock will equal the number of SRII Opco Common Units issued to the Contributors at Closing.

(y) Represents Alta Mesa's preliminary estimates of additional debt to be assumed by SRII Opco until Closing. See Note 1 – preliminary estimated SRII Opco Common Units to be issued to the Alta Mesa Contributor above for further detail.

(z) Represents legal, accounting, tax, financial and other advisor expenses incurred by Alta Mesa in connection with or incidental to preparing for the potential initial public offering of Alta Mesa Resources Inc. These costs are considered as a downward adjustment to the total number of SRII Opco Common Units the Alta Mesa Contributor will receive at Closing pursuant to the Alta Mesa Contribution Agreement.

(aa) The allocation of Alta Mesa's estimated fair value of consideration transferred to Alta Mesa's estimated fair value of the assets acquired and liabilities assumed resulted in the following purchase price allocation adjustments below. See Footnote 1 for further discussion regarding the preliminary purchase price consideration for Alta Mesa and the preliminary purchase price allocation:

| | At September 30, 2017 | Pro forma Adjustments | Preliminary Fair Value |
|---|---|---|---|
| | | (in thousands) | |
| Oil and natural gas properties, successful efforts | $ 983,370 | $ 552,170 | $1,535,540 |
| Accumulated depreciation, depletion and amortization | (231,322) | 231,322 | — |
| Unproved oil and natural gas properties | 90,581 | 1,263,051 | 1,353,632 |
| Accumulated impairment of unproved properties | (16) | 16 | — |
| Total oil and natural gas properties, successful efforts | $ 842,613 | $2,046,559 | $2,889,172 |
| Other property and equipment | $ 22,332 | $ (19,294) | $ 3,038 |
| Accumulated depreciation | (15,902) | 15,902 | — |
| Total other property and equipment, net | $ 6,430 | $ (3,392) | $ 3,038 |
| Goodwill | $ — | $ 41,000 | $ 41,000 |
| Long-term debt, net | | | |
| 7.875% senior unsecured notes due 2024(1) | $ 500,000 | $ 45,000 | $ 545,000 |
| Unamortized deferred financing costs | (9,818) | 9,818 | — |
| Total long-term debt, net | $ 490,182 | $ 54,818 | $ 545,000 |

(1) The senior unsecured notes fair value as of acquisition date was based on the most recent trading values, which represents Level 1 inputs.

(bb) Reflects the deferred tax liabilities arising from temporary difference between the book basis and tax basis of Silver Run's assets and liabilities as a result of the business combinations.

118

Table of Contents

**3. Adjustments and Assumptions to the Unaudited Pro Forma Condensed Consolidated Combined Statement of Operations for the Nine Months Ended September 30, 2017**

The unaudited pro forma condensed consolidated combined statement of operations for the nine months ended September 30, 2017 reflects the following adjustments assuming the Transactions occurred on January 1, 2016:

a)     Represents the Silver Run unaudited historical condensed statement of operations for the nine months ended September 30, 2017.

b)     Represents the Alta Mesa unaudited historical condensed statement of operations for the nine months ended September 30, 2017.

c)     Reflects the operating results of the assets to be disposed of as part of the Alta Mesa non-STACK Assets Divestiture to transpire prior to the Closing.

d)     Represents the Kingfisher unaudited historical statement of operations for the nine months ended September 30, 2017.

e)     Represents intersegment eliminations as a result of the combined entities of Alta Mesa and Kingfisher in conjunction with the Closing. The amounts only relate to Alta Mesa for its share of the marketing and transportation expense. The marketing and transportation expense is based on actual invoices. The remainder of the marketing and transportation invoices are charged to other interest owners and remain in the consolidated pro forma statement of operations.

f)     Represents the adjustments to depreciation, depletion and amortization based on the preliminary purchase price allocation to the following:

      (1)     Depreciation expense was reduced by approximately $1.6 million based on the preliminary purchase price allocation to the plant, property and equipment acquired.

      (2)     Amortization expense was increased by approximately $17.5 million based on the preliminary purchase price allocation to the intangible asset assets acquired.

g)     Represents the adjustment to reduce interest expense to reflect the exchange of Alta Mesa Founder Notes for equity interest of the Alta Mesa Contributor prior to the Closing pursuant to the Alta Mesa Contribution Agreement.

h)     Represents the adjustment to eliminate historical interest income of Silver Run associated with the funds that were previously held in the Trust Account, which will be used to fund a portion of the cash consideration to the Kingfisher Contributor in the business combination.

i)     Represents the associated income tax effect of pro forma adjustments attributable to Silver Run, using an estimated combined federal and state statutory income tax rate of approximately 38.9%, which reflects the corporate rate enacted at the pro forma period dates. The Tax Cuts and Jobs Act enacted on December 22, 2017 reduced the corporate tax rate to 21% for returns filed in and following 2018. The rate utilized in the pro forma presentation has not been updated and no effects of the TCJA have been reflected in the pro forma financial statements.

j)     Represents net income attributable to the non-controlling interest based on total pro forma combined net income assuming no redemption as described herein.

k)     Represents additional net income attributable to the non-controlling interest based on total pro forma combined net income assuming illustrative redemption as described herein.

l)     Pro forma basic and diluted earnings per share was computed by dividing pro forma net loss attributable to Silver Run by the weighted average shares of Class A Common Stock, as if such shares were issued and outstanding as of January 1, 2016. The conversion of the Class C Common Stock to Class A Common Stock and warrants were excluded from the consideration of diluted earnings per share as the inclusion would have been anti-dilutive.

119

Table of Contents

m)    Represents an adjustment to increase depreciation, depletion and amortization expense based on the preliminary purchase price allocation of Alta Mesa's oil and natural gas properties.

**4. Adjustments and Assumptions to the Unaudited Pro Forma Condensed Consolidated Combined Statement of Operations for the Year Ended December 31, 2016**

The unaudited pro forma condensed consolidated combined statement of operations for the year ended December 31, 2016 reflects the following adjustments assuming the Transactions occurred on January 1, 2016:

a)    Represents the Silver Run historical condensed statement of operation for the period from November 16, 2016 (date of inception) to December 31, 2016.

b)    Represents the Alta Mesa historical condensed statement of operation for the year ended December 31, 2016.

c)    Reflects the operating results of the assets to be disposed of as part of the Alta Mesa non-Stack Assets Divestiture to transpire prior to the Closing.

d)    Interest expense reduced by approximately $7.2 million due to the decrease in the stated coupon rate of the retired 2018 Notes from 9.625% to 7.875% of the 2024 Notes. In addition, interest expense is reduced by approximately $10.3 million due to the repayment in full of Alta Mesa's $125 million senior secured term loan.

e)    Reflects the pro forma operating results from the date operations commenced of the Alta Mesa JV Wells contributed to us on December 31, 2016.

f)    Represents the Kingfisher historical statement of operation for the year ended December 31, 2016.

g)    Represents intersegment eliminations as a result of the combined entities of Alta Mesa and Kingfisher in conjunction with the Closing. The amounts only relate to Alta Mesa for its share of the marketing and transportation expense. The marketing and transportation expense is based on actual invoices. The remainder of the marketing and transportation invoices are charged to other interest owners and remain in the consolidated pro forma statement of operations.

h)    Represents the adjustments to depreciation, depletion and amortization based on the preliminary purchase price allocation to the following:

    (1)    Depreciation expense increased by approximately $3.3 million based on the preliminary purchase price allocation to the plant, property and equipment acquired.

    (2)    Amortization expense was increased by approximately $23.4 million based on the preliminary purchase price allocation to the intangible asset assets acquired.

i)    Represents the adjustment to reduce interest expense to reflect the exchange of Alta Mesa Founder Notes for equity interest of the Alta Mesa Contributor prior to the Closing pursuant to the Alta Mesa Contribution Agreement.

j)    Represents the associated income tax effect of pro forma adjustments attributable to Silver Run, using an estimated combined federal and state statutory income tax rate of approximately 38.9%, which reflects the corporate rate enacted at the pro forma period dates. The Tax Cuts and Jobs Act enacted on December 22, 2017 reduced the corporate tax rate to 21% for returns filed in and following 2018. The rate utilized in the pro forma presentation has not been updated and no effects of the TCJA have been reflected in the pro forma financial statements.

k)    Represents net loss attributable to the non-controlling interest based on total pro forma combined net loss.

l)    Represents additional net income attributable to the non-controlling interest based on total pro forma combined net income assuming illustrative redemption as described herein.

m)    Pro forma basic and diluted earnings per share was computed by dividing pro forma net loss attributable to Silver Run by the weighted average shares of Class A Common Stock, as if such shares were issued and

120

Table of Contents

outstanding as of January 1, 2016. The conversion of the Class C Common Stock to Class A Common Stock and warrants were excluded from the calculation of diluted earnings per share as the inclusion would have been anti-dilutive.

n)    Represents an adjustment to increase depreciation, depletion and amortization expense based on the preliminary purchase price allocation of Alta Mesa's oil and natural gas properties.

### 5. Supplemental Disclosure of Oil and Gas Information

The following table provides a pro forma rollforward of the total proved reserves for the year ended December 31, 2016, as well as pro forma proved developed and proved undeveloped reserves at the beginning and end of the year, as if the Alta Mesa non-STACK Assets Divestiture and the Alta Mesa JV Wells reflected occurred on January 1, 2016:

| | Alta Mesa Historical (MBOE) | Alta Mesa Non-STACK Assets Divestiture (MBOE) | Post Non-STACK Assets Divestiture Subtotal | JV Wells (MBOE) | Pro forma Adjustments (MBOE)(a) | Pro Forma (MBOE) |
|---|---|---|---|---|---|---|
| **Total Proved Reserves:** | | | | | | |
| **Balance, January 1, 2016** | 78,483 | (11,473) | 67,010 | — | — | 67,010 |
| Production | (7,284) | 2,516 | (4,768) | (709) | — | (5,477) |
| Purchases of reserves-in-place | 3,247 | — | 3,247 | — | (3,247) | — |
| Discoveries & extensions | 69,679 | (2,348) | 67,331 | 3,956 | — | 71,287 |
| Sales of reserves-in-place | (244) | 244 | — | — | — | — |
| Revisions of previous quantity | (5,124) | 1,887 | (3,237) | — | — | (3,237) |
| **Balance, December 31, 2016** | 138,757 | (9,174) | 129,583 | 3,247 | (3,247) | 129,583 |
| Proved developed reserves: | | | | | | |
| January 1, 2016 | 33,859 | (8,776) | 25,083 | — | — | 25,083 |
| December 31, 2016 | 40,371 | (7,262) | 33,109 | — | — | 33,109 |
| Proved undeveloped reserves: | | | | | | |
| January 1, 2016 | 44,624 | (2,697) | 41,927 | — | — | 41,927 |
| December 31, 2016 | 98,386 | (1,912) | 96,474 | — | — | 96,474 |

(a)    To adjust the amount of purchases of reserves representing the Alta Mesa JV Wells contribution on December 31, 2016 included in Alta Mesa's historical information.

The following pro forma standardized measure of the discounted net future cash flows and changes applicable to Alta Mesa's proved reserves reflect the effect of income taxes assuming Alta Mesa's proportionate share of its standardized measure had been subject to federal income tax as a subchapter C corporation. The future cash flows are discounted at 10% per year and assume continuation of existing economic conditions.

The standardized measure of discounted future net cash flows, in management's opinion, should be examined with caution. The basis for this table is the reserve studies prepared by independent petroleum engineering consultants, which contain imprecise estimates of quantities and rates of production of reserves. Revisions of previous year estimates can have a significant impact on these results. Also, exploration costs in one year may lead to significant discoveries in later years and may significantly change previous estimates of proved reserves and their valuation. Therefore, the standardized measure of discounted future net cash flow is not necessarily indicative of the fair value of Alta Mesa's proved oil and gas properties. The data presented should not be viewed as representing the expected cash flow from or current value of, existing proved reserves since the computations are based on a large number of estimates and arbitrary assumptions. Reserve quantities cannot be measured with precision and their estimation requires many judgmental determinations and frequent revisions. Actual future prices and costs are likely to be substantially different from the prices and costs utilized in the computation of reported amounts.

121

Table of Contents

The pro forma standardized measure of discounted estimated future net cash flows was as follows as of December 31, 2016:

| | Alta Mesa Historical | Alta Mesa Non-STACK Assets Divestiture | Post Non-STACK Assets Divestiture Subtotal | Pro Forma Adjustment | Pro Forma Adjustment (Assuming No Redemption) | Redemption Adjustment | Pro Forma Adjustment (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |
| Future cash flows | $ 3,547,130 | $ (254,652) | $ 3,292,478 | $ — | $ 3,292,478 | $ — | $ 3,292,478 |
| Future production costs | (1,811,683) | 131,610 | (1,680,073) | — | (1,680,073) | — | (1,680,073) |
| Future development costs | (709,738) | 98,334 | (611,404) | — | (611,404) | — | (611,404) |
| Future taxes on income | — | — | — | (171,674)(a) | (171,674) | 5,819(a) | (165,855) |
| Future net cash flows | 1,025,709 | (24,708) | 1,001,001 | (171,674) | 829,327 | 5,819 | 835,146 |
| Discount to present value at 10 percent per annum | (467,101) | 563 | (466,538) | 80,012 | (386,526) | (2,712) | (389,238) |
| Standardized measure of discounted future net cash flows | $ 558,608 | $ (24,145) | $ 534,463 | $ (91,662) | $ 442,801 | $ 3,107 | $ 445,908 |

(a)    Reflects the associated income tax effect of Silver Run's economic interest in SRII Opco pro forma adjustments, using an estimated combined federal and state statutory tax rate of approximately 38.9% assuming no redemption and assuming illustrative redemption.

122

Table of Contents

The changes in the pro forma standardized measure of discounted estimated future net cash flows were as follows for 2016:

| | Alta Mesa Historical | Alta Mesa Non-STACK Assets Divestiture | Post Non-STACK Assets Divestiture Subtotal | JV Wells Contribution | Pro forma Adjustments | Pro Forma Adjustment (Assuming No Redemption) | Redemption Adjustment | Pro Forma Adjustment (Assuming Illustrative Redemption) |
|---|---|---|---|---|---|---|---|---|
| | | | | | (in thousands) | | | |
| Balance, January 1, 2016 | $ 629,596 | $ (90,656) | $ 538,940 | $ — | $ — | $ 538,940 | $ — | $ 538,940 |
| Sales of oil, and natural gas, net of production costs | (124,610) | 21,683 | (102,927) | (19,806) | — | (122,733) | — | (122,733) |
| Changes in sales and transfer prices, net of production costs | (324,638) | 59,135 | (265,503) | — | — | (265,503) | — | (265,503) |
| Revisions of previous quantity estimates | (35,972) | 16,581 | (19,391) | — | — | (19,391) | — | (19,391) |
| Purchases of reserves-in-place | 40,611 | — | 40,611 | — | (40,611)(a) | — | — | — |
| Sales of reserves-in-place | 2,345 | (2,345) | — | — | — | — | — | — |
| Current year discoveries and extensions | 356,631 | (31,438) | 325,193 | 60,417 | — | 385,610 | — | 385,610 |
| Changes in estimated future development costs | 849 | 88 | 937 | — | — | 937 | — | 937 |
| Development costs incurred during the year | 8,363 | (2,027) | 6,336 | — | — | 6,336 | — | 6,336 |
| Accretion of discount | 62,960 | (9,066) | 53,894 | — | — | 53,894 | — | 53,894 |
| Net change in income taxes | — | — | — | — | (91,662)(b) | (91,662) | 3,107(b) | (88,555) |
| Change in production rate (timing) and other | (57,527) | 13,900 | (43,627) | — | — | (43,627) | — | (43,627) |
| Balance, December 31, 2016 | $ 558,608 | $ (24,145) | $ 534,463 | $ 40,611 | $ (132,273) | $ 442,801 | $ 3,107 | $ 445,908 |

(a)   To adjust the amount of purchases of reserves representing the Alta Mesa JV Wells on December 31, 2016 included in the Ata Mesa's historical information.

(b)   Reflects the associated income tax effect of Silver Run's economic interest in SRII Opco, using an estimated combined federal and state statutory tax rate of approximately 38.9% assuming no redemption and assuming illustrative redemption.

123

Table of Contents

## COMPARATIVE SHARE INFORMATION

The following table sets forth selected historical equity ownership information for Silver Run, Alta Mesa and Kingfisher and unaudited pro forma condensed consolidated combined per share ownership information of Silver Run after giving effect to the business combination, assuming two redemption scenarios as follows:

- **Assuming No Redemptions:** This scenario assumes that no shares of Class A Common Stock are redeemed from the public stockholders.

- **Assuming Illustrative Redemption:** This scenario assumes that approximately 30,000,000 shares of Class A Common Stock are redeemed (an amount such that our net tangible assets would not be less than $5,000,001), resulting in an aggregate payment of approximately $300 million out of the Trust Account. Pursuant to the Business Combination Forward Purchase Agreement, Fund VI Holdings has agreed to purchase up to an additional 20,000,000 shares of Class A Common Stock from Silver Run at $10.00 per share to offset $200 million of such redemptions.

The pro forma book value, net income (loss) and cash dividends per share information reflects the business combination as if it had occurred on September 30, 2017 and reflects pro forma income (loss) as if it occurred on January 1, 2016.

The historical information should be read in conjunction with the sections entitled "Selected Historical Consolidated Financial Information of Silver Run," "Selected Historical Financial Information of Alta Mesa" and "Selected Historical Financial Information of Kingfisher," as well as the historical consolidated and combined financial statements of Silver Run, Alta Mesa and Kingfisher and the related notes thereto included elsewhere in this proxy statement. The unaudited pro forma condensed consolidated combined per share data are presented for illustrative purposes only and are not necessarily indicative of actual or future financial position or results of operations that would have been realized if the business combination had been completed as of the date indicated or will be realized upon the completion of the business combination.

| | Silver Run | Alta Mesa | Kingfisher | Pro Forma Combined (Assuming No Redemptions) | Pro Forma Combined (Assuming Illustrative Redemptions) |
|---|---|---|---|---|---|
| | | | (in thousands, except per share amounts) | | |
| Book value per share(1) | $0.17 | $N/A | $ N/A | $ 9.82 | $ 9.85 |
| Basic net income (loss) per share for the nine months ended September 30, 2017 | $0.03 | $N/A | $ N/A | $ (0.30) | $ (0.31) |
| Diluted net income (loss) per share for the nine months ended September 30, 2017 | $0.01 | $N/A | $ N/A | $ (0.30) | $ (0.31) |
| Basic net income (loss) per share for the year ended December 31, 2016 | $N/A | $N/A | $ N/A | $ (0.69) | $ (0.71) |
| Diluted net income (loss) per share for the year ended December 31, 2016 | $N/A | $N/A | $ N/A | $ (0.69) | $ (0.71) |
| Cash dividends per share | $ — | $N/A | $ N/A | $ — | $ — |

(1)    Book value per share = (Total stockholders' equity)/shares outstanding.

124

[Table of Contents](#)

## CAPITALIZATION

The following table sets forth:

- the capitalization of each of Silver Run, Alta Mesa and Kingfisher on an unaudited, historical basis as of September 30, 2017, and

- the capitalization of Silver Run on a pro forma basis as of September 30, 2017, after giving effect to the business combination and assuming (i) that no shares of Class A Common Stock are redeemed and (ii) that approximately 30,000,000 shares of Class A Common Stock are redeemed.

Please refer to the historical financial statements of Silver Run, Alta Mesa and Kingfisher and the related notes included elsewhere in this proxy statement, as well as the section entitled "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run."

| | September 30, 2017 | | | Pro Forma Assuming No Redemptions | Pro Forma Assuming Illustrative Redemptions(1) |
|---|---|---|---|---|---|
| | Historical | | | | |
| | Silver Run (unaudited) (in thousands) | Alta Mesa | Kingfisher | | |
| Cash and cash equivalents | $ 546 | $ 3,740 | 11,722 | 678,524 | 578,524 |
| Investment held in Trust | 1,038,947 | — | — | — | — |
| | 1,039,493 | 3,740 | 11,722 | 678,524 | 578,524 |
| **Debt:** | | | | | |
| Senior secured revolving credit facility | — | 75,065(2) | — (3) | 145,000 | 145,000 |
| Senior unsecured notes, net of unamortized deferred financing costs | — | 490,182 | — | 545,000 | 545,000 |
| Founder notes | — | 27,861 | — | — | — |
| Redeemable Series A Preferred Stock | — | — | — | — | — |
| Redeemable Series B Preferred Stock | — | — | — | — | — |
| Total debt, include founder notes and redeemable preferred stock | — | 593,108 | — | 690,000 | 690,000 |
| Class A Common Stock, possible Redemption | 995,450 | — | — | — | — |
| Stockholder's equity | 5,000 | — | — | 1,662,450 | 1,570,289 |
| Partners' capital | — | 217,503 | — | — | — |
| Members' equity | — | — | 249,257 | — | — |
| Stockholders' partners' capital, member | 5,000 | 217,503 | 249,257 | 1,662,450 | 1,570,289 |
| Non-controlling interest | — | — | — | 2,228,767 | 2,220,928 |
| Total Equity' partners' capital, member | 5,000 | 217,503 | 249,257 | 3,891,217 | 3,791,217 |
| Total capitalization | $1,000,450 | 810,611 | 249,257 | 4,581,217 | 4,481,217 |

(1) Pursuant to the Business Combination Forward Purchase Agreement, Fund VI Holdings has agreed to purchase up to an additional 20,000,000 shares of Class A Common Stock from Silver Run at $10.00 per share to offset $200 million of such redemptions.

(2) As of November 15, 2017, Alta Mesa had $142.1 million of outstanding borrowings under its senior secured revolving credit facility.

(3) On August 8, 2017, Kingfisher entered into a revolving credit facility with ABN Amro Capital USA LLC. As of November 20, 2017, the outstanding borrowings under the revolving credit facility was $30.0 million and the availability under the revolving credit facility was $54.6 million.

125

Table of Contents

## SPECIAL MEETING OF SILVER RUN STOCKHOLDERS

**General**

Silver Run is furnishing this proxy statement to its stockholders as part of the solicitation of proxies by our board of directors for use at the special meeting of stockholders to be held on February 6, 2018, and at any adjournment or postponement thereof. This proxy statement is first being furnished to our stockholders on or about January 22, 2018. This proxy statement provides you with information you need to know to be able to vote or instruct your vote to be cast at the special meeting.

**Date, Time and Place**

The special meeting will be held at 9:00 a.m., local time, on February 6, 2018, at the office of Latham & Watkins LLP, 885 3rd Avenue, New York, New York 10022, or such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals.

**Voting Power; Record Date**

You will be entitled to vote or direct votes to be cast at the special meeting if you owned shares of Class A Common Stock or Class B Common Stock at the close of business on January 22, 2018, which is the record date for the special meeting. You are entitled to one vote for each share of Class A Common Stock or Class B Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. As of January 18, 2018, there were 129,375,000 shares of Class A Common Stock and Class B Common Stock outstanding in the aggregate, of which 103,500,000 were shares of Class A Common Stock and 25,875,000 were founder shares held by our Sponsor and our independent directors.

**Vote of the Sponsor, Directors and Officers of Silver Run**

In connection with our IPO, we entered into agreements with each of our Sponsor, directors and officers pursuant to which each agreed to vote any shares of Class A Common Stock or Class B Common Stock owned by them in favor of the Business Combination Proposal.

Our Sponsor, directors and officers have waived any redemption rights, including with respect to shares of Class A Common Stock purchased in our IPO or in the aftermarket, in connection with the business combination. The founder shares held by the Sponsor have no redemption rights upon Silver Run's liquidation and will be worthless if no business combination is effected by us by March 29, 2019. However, our Sponsor is entitled to redemption rights upon our liquidation with respect to any shares of Class A Common Stock it may own.

**Quorum and Required Vote for Proposals for the Special Meeting**

A quorum of Silver Run stockholders is necessary to hold a valid meeting. Holders of a majority in voting power of Class A Common Stock and Class B Common Stock issued and outstanding and entitled to vote at the special meeting, present in person or represented by proxy, constitute a quorum. Abstentions will count as present for the purposes of establishing a quorum.

The approval of the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Class A Common Stock and Class B Common Stock represented in person or by proxy and entitled to vote and actually cast thereon at the special meeting, voting as a single class. Approval of the Charter Proposals requires the affirmative vote of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common

126

Table of Contents

Stock represented in person or by proxy and entitled to vote thereon at the special meeting, voting as a single class. Accordingly, a stockholder's failure to vote by proxy or to vote in person at the special meeting will not be counted towards the number of shares of Class A Common Stock and Class B Common Stock required to validly establish a quorum, and if a valid quorum is otherwise established, it will have no effect on the outcome of any vote on the Business Combination Proposal, the NASDAQ Proposal, the LTIP Proposal or the Adjournment Proposal, but will have the same effect as a vote AGAINST the Charter Proposals.

The Closing is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting. The Charter Proposals and the LTIP Proposal are conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal. The Adjournment Proposal is not conditioned on the approval of any other proposal set forth in this proxy statement.

**Recommendation to Silver Run Stockholders**

After careful consideration, the Silver Run board of directors recommends that Silver Run stockholders vote "FOR" each Proposal being submitted to a vote of the Silver Run stockholders at the special meeting.

For a description of Silver Run's reasons for the approval of the business combination and the recommendation of the Silver Run board of directors, see the section entitled "Proposal No. 1—The Business Combination Proposal—Silver Run's Board of Directors' Reasons for the Approval of the Business Combination."

**Voting Your Shares**

Each share of Class A Common Stock and each share of Class B Common Stock that you own in your name entitles you to one vote on each of the proposals for the special meeting. Your one or more proxy cards show the number of shares of Class A Common Stock and Class B Common Stock that you own. There are several ways to vote your shares of Class A Common Stock and Class B Common Stock:

- You can vote your shares by signing, dating and returning the enclosed proxy card in the postage-paid envelope provided. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the special meeting. If you vote by proxy card, your "proxy", whose name is listed on the proxy card, will vote your shares as you instruct on the proxy card. If you sign and return the proxy card but do not give instructions on how to vote your shares, your shares of Class A Common Stock or Class B Common Stock will be voted as recommended by the board of directors. The board of directors recommends voting "FOR" the Proposals.

- You can attend the special meeting and vote in person even if you have previously voted by submitting a proxy pursuant to any of the methods noted above. You will be given a ballot when you arrive. However, if your shares of Class A Common Stock or Class B Common Stock are held in the name of your broker, bank or other nominee, you must get a proxy from the broker, bank or other nominee. That is the only way we can be sure that the broker, bank or nominee has not already voted your shares of Class A Common Stock or Class B Common Stock.

**Revoking Your Proxy**

If you give a proxy, you may revoke it at any time before the special meeting or at such meeting by doing any one of the following:

- you may send another proxy card with a later date;

127

Table of Contents

- you may notify Silver Run's secretary, in writing, before the special meeting that you have revoked your proxy; or

- you may attend the special meeting, revoke your proxy, and vote in person, as indicated above.

**No Additional Matters May Be Presented at the Special Meeting**

The special meeting has been called to consider only the approval of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal, the LTIP Proposal and the Adjournment Proposal. Under our bylaws, other than procedural matters incident to the conduct of the special meeting, no other matters may be considered at the special meeting if they are not included in this proxy statement, which serves as the notice of the special meeting.

**Who Can Answer Your Questions About Voting Your Shares**

If you have any questions about how to vote or direct a vote in respect of your shares of Class A Common Stock or Class B Common Stock, you may call Morrow Sodali, our proxy solicitor, toll free at (800) 662-5200, banks and brokerage firms, please call collect at (203) 658-9400.

**Redemption Rights**

Under our Charter, any holders of our Class A Common Stock may elect that such shares be redeemed in exchange for a pro rata share of the aggregate amount on deposit in the Trust Account, less franchise and income taxes payable, calculated as of two (2) business days prior to the consummation of the business combination. If demand is properly made and the business combination is consummated, these shares, immediately prior to the business combination, will cease to be outstanding and will represent only the right to receive a pro rata share of the aggregate amount on deposit in the Trust Account, which holds the proceeds of our IPO (calculated as of two (2) business days prior to the consummation of the business combination, less franchise and income taxes payable). For illustrative purposes, based on the fair value of marketable securities held in the Trust Account as of September 30, 2017 of approximately $1,039 million, the estimated per share redemption price would have been approximately $10.00.

In order to exercise your redemption rights, you must:

- if you hold your shares of Class A Common Stock through units, elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

- check the box on the enclosed proxy card marked "Stockholder Certification" if you are not acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act) with any other stockholder with respect to shares of Class A Common Stock;

- prior to 5:00 p.m., Eastern Time, on February 2, 2018 (two (2) business days before the special meeting), tender your shares physically or electronically and submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent, to the attention of Mark Zimkind at 1 State Street—30th Floor, New York, New York 10004, or by email at mzimkind@continentalstock.com; and

- deliver your shares of Class A Common Stock either physically or electronically through DTC to the transfer agent at least two (2) business days before the special meeting. Stockholders seeking to exercise their redemption rights and opting to deliver physical certificates should allot sufficient time to obtain physical certificates from the transfer agent and time to effect delivery. It is Silver Run's understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, Silver Run does not have any control over this process and it may

128

Table of Contents

take longer than two weeks. Stockholders who hold their shares in street name will have to coordinate with their bank, broker or other nominee to have the shares certificated or delivered electronically. If you do not submit a written request and deliver your shares of Class A Common Stock as described above, your shares will not be redeemed.

Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests (and submitting shares to the transfer agent) and thereafter, with our consent, until the vote is taken with respect to the business combination. If you delivered your shares for redemption to the transfer agent and decide within the required timeframe not to exercise your redemption rights, you may request that the transfer agent return the shares (physically or electronically). You may make such request by contacting the transfer agent at the phone number or address listed above.

Holders of outstanding units of Silver Run must separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If you hold units registered in your own name, you must deliver the certificate for such units to Continental Stock Transfer & Trust Company with written instructions to separate such units into public shares and public warrants. This must be completed far enough in advance to permit the mailing of the public share certificates back to you so that you may then exercise your redemption rights upon the separation of the public shares from the units.

If a broker, dealer, commercial bank, trust company or other nominee holds your units, you must instruct such nominee to separate your units. Your nominee must send written instructions by facsimile to Continental Stock Transfer & Trust Company. Such written instructions must include the number of units to be split and the nominee holding such units. Your nominee must also initiate electronically, using DTC's DWAC (deposit withdrawal at custodian) system, a withdrawal of the relevant units and a deposit of an equal number of public shares and public warrants. This must be completed far enough in advance to permit your nominee to exercise your redemption rights upon the separation of the public shares from the units. While this is typically done electronically on the same business day, you should allow at least one full business day to accomplish the separation. If you fail to cause your public shares to be separated in a timely manner, you will likely not be able to exercise your redemption rights.

Prior to exercising redemption rights, stockholders should verify the market price of our Class A Common Stock as they may receive higher proceeds from the sale of their Common Stock in the public market than from exercising their redemption rights if the market price per share is higher than the redemption price. Silver Run cannot assure you that you will be able to sell your shares of Class A Common Stock in the open market, even if the market price per share is higher than the redemption price stated above, as there may not be sufficient liquidity in the Class A Common Stock when you wish to sell your shares.

If you exercise your redemption rights, your shares of Class A Common Stock will cease to be outstanding immediately prior to the business combination and will only represent the right to receive a pro rata share of the aggregate amount on deposit in the Trust Account. You will no longer own those shares and will have no right to participate in, or have any interest in, the future growth of Silver Run following the business combination, if any. You will be entitled to receive cash for these shares only if you properly and timely demand redemption.

If the business combination is not approved and we do not consummate a "business combination" (as defined in the Charter) by March 29, 2019, we will be required to dissolve and liquidate our Trust Account by returning the then-remaining funds in such account to the public stockholders and our warrants will expire worthless.

**Appraisal Rights**

Appraisal rights are not available to Silver Run stockholders in connection with the business combination.

129

Table of Contents

**Proxy Solicitation Costs**

Silver Run is soliciting proxies on behalf of its board of directors. This solicitation is being made by mail but also may be made by telephone or in person. Silver Run and its directors, officers and employees may also solicit proxies in person. Silver Run will file with the SEC all scripts and other electronic communications as proxy soliciting materials. Silver Run will bear the cost of the solicitation.

Silver Run has hired Morrow Sodali to assist in the proxy solicitation process. Silver Run will pay that firm a fee of $25,000, plus disbursements. Silver Run will ask banks, brokers and other institutions, nominees and fiduciaries to forward the proxy materials to their principals and to obtain their authority to execute proxies and voting instructions. Silver Run will reimburse them for their reasonable expenses.

130

Table of Contents

## PROPOSAL NO. 1—THE BUSINESS COMBINATION PROPOSAL

We are asking our stockholders to approve and adopt the Contribution Agreements and the transactions contemplated thereby (the "business combination"). Our stockholders should read carefully this proxy statement in its entirety for more detailed information concerning the Contribution Agreements, copies of which are attached as *Annexes A, B* and *C* to this proxy statement. Please see the subsection entitled "The Contribution Agreements" below for additional information and a summary of certain terms of the Contribution Agreements. You are urged to read carefully the Contribution Agreements in their entirety before voting on this proposal.

Because we are holding a special meeting of stockholders to vote on the business combination, we may consummate the business combination only if it is approved by the affirmative vote of the holders of a majority of the shares of our Class A Common Stock and Class B Common Stock that are voted at the special meeting, voting as a single class.

### The Contribution Agreements

*This subsection of the proxy statement describes the material provisions of the Contribution Agreements, but does not purport to describe all of the terms of the Contribution Agreements. The following summary is qualified in its entirety by reference to the complete text of the Contribution Agreements, copies of which is attached as Annexes A, B and C hereto. You are urged to read the Contribution Agreements in their entirety because they are the primary legal documents that govern the business combination.*

*The Contribution Agreements contain representations, warranties and covenants that the respective parties made to each other as of the date of the Contribution Agreements or other specific dates. The assertions embodied in those representations, warranties and covenants were made and will be made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Contribution Agreements. The representations, warranties and covenants in the Contribution Agreements are also modified in important part by the underlying disclosure schedules, which we refer to as the "Schedules," which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the Schedules contain information that is material to an investment decision.*

### Silver Run Contribution

Pursuant to the Contribution Agreements, Silver Run will contribute cash to SRII Opco, in exchange for (a) a number of SRII Opco Common Units equal to the number of shares of the Company's Class A Common Stock outstanding as of the Closing (after giving effect to the conversion of shares of Class B Common Stock to Class A Common Stock) and (b) a number of SRII Opco warrants exercisable for SRII Opco Common Units equal to the number of Silver Run's warrants outstanding as of the Closing. Following the Closing, Silver Run will control SRII Opco through its ownership of SRII Opco GP, LLC, the sole general partner of SRII Opco.

### The Alta Mesa Contribution Agreement

On August 16, 2017, Silver Run entered into the Alta Mesa Contribution Agreement with the Alta Mesa Contributor, High Mesa GP, Alta Mesa, Alta Mesa GP and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor, pursuant to which Silver Run will acquire from the Alta Mesa Contributor (i) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (ii) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP, on the terms and subject to the conditions set forth therein.

Pursuant to the terms of the Alta Mesa Contribution Agreement, at the Closing, the Alta Mesa Contributor will receive consideration consisting of 220,000,000 SRII Opco Common Units, as adjusted (i) upward for any

131

Table of Contents

inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit), (ii) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit), and (iii) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit).

The Alta Mesa Contributor will also purchase from Silver Run a number of newly issued shares of Class C Common Stock corresponding to the number of SRII Opco Common Units received by the Alta Mesa Contributor at the Closing.

In addition to the above, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) as specified below if the 20-Day VWAP of the Class A Common Stock equals or exceeds the following prices (each such payment, an "Earn-Out Payment"):

| 20-Day VWAP | Earn-Out Consideration |
|---|---|
| $14.00 | 10,714,285 SRII Opco Common Units |
| $16.00 | 9,375,000 SRII Opco Common Units |
| $18.00 | 13,888,889 SRII Opco Common Units |
| $20.00 | 12,500,000 SRII Opco Common Units |

The Alta Mesa Contributor will not be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-Day VWAP entitles the Alta Mesa Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the Alta Mesa Contributor will be entitled to receive each such Earn-Out Payment. The Alta Mesa Contributor will be entitled to the earn-out consideration described above in connection with certain liquidity events of Silver Run, including a merger or sale of all or substantially all of our assets, if the consideration paid to holders of Class A Common Stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

Silver Run will also contribute $400 million in cash to Alta Mesa at the Closing.

**Alta Mesa Material Adverse Effect**

Under the Alta Mesa Contribution Agreement, certain representations and warranties of the Alta Mesa Contributor, the Alta Mesa Parties and their respective subsidiaries (the "Alta Mesa Entities") are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. Pursuant to the Alta Mesa Contribution Agreement, a "Material Adverse Effect" means, with respect to any person, any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, assets, condition (financial or otherwise) or results of operations on the Alta Mesa Entities taken as a whole or (ii) prevents, materially delays or materially impairs the ability of the Alta Mesa Contributor or the Alta Mesa Parties from performing their obligations under the Alta Mesa Contribution Agreement or to consummate the business combination; provided, however, in no event will any of the following, either alone or in combination with any other occurrence, condition, change, development, event, circumstance or effect, constitute a Material Adverse Effect pursuant to clause (i) only: any occurrence, condition, change, development, event, circumstance or effect directly or indirectly resulting from (a) any change in economic conditions generally, including any change in markets for, or prices of, hydrocarbons, or other commodities or supplies; (b) any change in general regulatory, social or political conditions, including any acts of war, sabotage or terrorist activities; (c) any change affecting the industry in which the Alta Mesa Entities conduct their business; (d) any change in the financial, banking, credit, securities or capital markets (including any suspension of trading in, or limitation on prices for, securities on any stock exchange or any changes in

132

Table of Contents

interest rates) or any change in the general national or regional economic or financial conditions; (e) any change in any laws (including environmental laws) or GAAP; (f) any effects of weather (including any impact on customer use patterns), geological or meteorological events or other natural disaster; (g) any actions to be taken pursuant to the express terms of the Alta Mesa Contribution Agreement, or taken at the request of or with the consent of Silver Run; (h) the announcement or pendency of the business combination; and (i) any failure by Alta Mesa to meet internal or published projections, forecasts, estimates or predictions in respect of revenues, earnings or other financial or operating metrics for any period (but not the events contributing to or causing such failure); provided further, however, that any occurrence, condition, change, development, event, circumstance or effect referred to in clauses (a), (b), (c), (d), (e) or (f) immediately above will be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such occurrence, condition, change, development, event, circumstance or effect has a disproportionate effect on the business, assets, conditions (financial or otherwise) or results of operations of the Alta Mesa Entities compared to other participants in the industries in which such affected person conducts their businesses.

### Conditions to Closing the Alta Mesa Contribution

*Mutual Conditions*

Under the Alta Mesa Contribution Agreement, the respective obligations of each party to consummate the transactions contemplated thereby are subject to the satisfaction at or prior to the Closing of the following conditions:

- the absence of specified adverse laws or orders;

- the expiration of the waiting period (or extension thereof) under the HSR Act;

- the representations and warranties of the other party being true and correct, subject to the materiality standards contained in the Alta Mesa Contribution Agreement;

- material compliance by the other party with its covenants;

- no material adverse effect having occurred with respect to Alta Mesa since the signing of the Alta Mesa Contribution Agreement;

- the approval for listing on the NASDAQ of the shares of Class A Common Stock issuable to the Alta Mesa Contributor;

- the approval of the business combination by Silver Run's stockholders;

- SRII Opco's leverage ratio being less than 1.5x on a pro forma, last 12 months (LTM) basis; and

- the closing of the transactions contemplated by the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement.

*Silver Run Conditions*

Silver Run's obligations to consummate the transactions contemplated by the Alta Mesa Contribution Agreement are subject to the satisfaction at or prior to the Closing of the following conditions:

- the requisite consents being obtained by Alta Mesa;

- the founder notes of Alta Mesa's subsidiaries being exchanged for equity interests in the Alta Mesa Contributor; and

- the completion of the transfer to Alta Mesa's existing owners (other than the Riverstone Contributor) of all of the assets and liabilities related to its non-STACK assets.

133

Table of Contents

*Alta Mesa Contributor Conditions*

Under the Alta Mesa Contribution Agreement the obligations of the Alta Mesa Contributor to consummate the transactions contemplated thereby are subject to the holders of founder shares having waived the conversion adjustment relating to such founder shares.

**Representations and Warranties**

The Alta Mesa Contribution Agreement contains customary representations and warranties by the parties thereto. The Alta Mesa Contributor and High Mesa GP made customary representations and warranties relating to: organization; authority; no conflicts, consents and approvals; government approvals; title to interests in Alta Mesa; legal proceedings; benefit plans; brokers; accredited investor, investment intent; and tax matters.

Under the Alta Mesa Contribution Agreement, the Alta Mesa Parties made customary representations and warranties relating to: organization; authority; no conflicts, consents and approvals; no defaults; government approvals; capitalization; rights to acquire equity; subsidiaries; insurance, legal proceedings; compliance with laws and orders; anti-corruption and sanctions; financial statements; absence of certain changes or events; no undisclosed liabilities; taxes; material contracts; real property; oil and gas matters; personal property; permits; environmental matters; compensation, benefits; employee and labor matters; related party transactions; brokers; SEC documents; information supplied; preferential rights and credit support instruments.

Silver Run also made customary representations and warranties relating to, among other things: organization; authorization; no conflicts; governmental approvals; capital structure; capitalization of SRII Opco GP and SRII Opco; no undisclosed liabilities; SEC documents, controls; legal proceedings; compliance with laws and orders; brokers; trust account; absence of certain changes or events; no default; listing; financial resources; and Investment Company Act of 1940 ("Investment Company Act") status.

**Covenants of the Parties**

*Covenants of the Alta Mesa Contributor and the Alta Mesa Parties*

The Alta Mesa Contributor and the Alta Mesa Parties made certain covenants under the Alta Mesa Contribution Agreement including, among others, the following:

- Subject to limited exceptions, during period between signing and Closing (the "interim period"), each of the Alta Mesa Parties must (a) conduct its operations in the ordinary course of business and (b) use its commercially reasonable efforts to: (i) preserve intact its present business organization, (ii) maintain in effect its material contracts and permits, (iii) retain its current officers, (iv) preserve its relationships with its key customers and suppliers, (v) preserve, maintain, and protect its material assets and (vi) maintain, with financially responsible insurance companies, insurance in such amounts and against such risks and losses as is maintained by it at signing.

- Subject to limited exceptions, during the interim period, none of the Alta Mesa Entities will:

  - amend or propose to amend the organizational documents of any Alta Mesa Entity other than in connection with the completion of the transfer to Alta Mesa's existing owners of all of the assets and liabilities related to its non-STACK assets;

  - (A) offer, issue, sell, grant or deliver, or authorize or propose to offer, issue, sell, grant or deliver, any equity interests or equity equivalents in any Alta Mesa Entity (other than to the Riverstone Contributor), or (B) amend in any material respect any of the terms of any securities of any Alta Mesa Entity outstanding as of the execution date other in connection with the transfer to Alta Mesa's existing owners of all of the assets and liabilities related to its non-STACK assets;

  - (A) split, combine, or reclassify any interests in any Alta Mesa Entity, (B) declare, set aside or pay any dividends on, or make any other distribution in respect of, any outstanding interests in any

134

Table of Contents

Alta Mesa Entity, except (x) for dividends and distributions by a direct or indirect wholly owned subsidiary of Alta Mesa to Alta Mesa or a direct or indirect wholly owned subsidiary of Alta Mesa, (y) with respect to Alta Mesa, tax distributions in the ordinary course of business and in accordance with its partnership agreement, or (z) for dividends and distributions pursuant to the transfer to Alta Mesa's existing owners of all of the assets and liabilities related to its non-STACK assets, (C) repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any interests of any Alta Mesa Entity or (D) adopt a plan of complete or partial liquidation or resolutions providing for or authorizing a liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any Alta Mesa Entity;

- except in response to an emergency, (A) create, incur, guarantee or assume any indebtedness or otherwise become liable or responsible for the obligations of any other person (other than Alta Mesa, Alta Mesa GP or any Alta Mesa Entity) that remains outstanding as of the Closing; provided, however, that the foregoing will not restrict (1) the incurrence of indebtedness under Alta Mesa's senior secured revolving credit facility, (2) any extensions, renewals or refinancing of existing indebtedness (including related premiums and expenses) so long as any such extension, renewal or refinancing is on substantially the same or more favorable terms to Alta Mesa than such existing indebtedness or (3) any indebtedness incurred by Alta Mesa that is owed to any Alta Mesa Entity or by any wholly owned subsidiary of Alta Mesa that is owed to Alta Mesa or another wholly owned subsidiary of Alta Mesa, or (B) mortgage or pledge any material assets of the Alta Mesa Entities, or create any material lien thereon that is not released at or prior to Closing, other than permitted liens or the creation of any lien to secure any indebtedness permitted to be incurred under clause (A) above;

- sell, or otherwise dispose of any material portion of its assets, except (A) pursuant to existing material contracts, (B) the sale of obsolete assets of the Alta Mesa Entities in the ordinary course of business or (C) sales of hydrocarbons from production in the ordinary course of business;

- (A) acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, limited liability company, or other business organization or division thereof other than (w) organic capital expenditures in accordance with the budget, (x) inorganic acquisition capital expenditures of up to $25 million per acquisition, (y) inorganic acquisition capital expenditures for over $25 million per acquisition, subject to the conditions contained in Alta Mesa's partnership agreement, or (z) pursuant to a contract in effect as of the execution date, (B) form any joint venture or similar arrangement or (C) make any loans, advances or capital contributions to, or investments in, any person, except for loans, advances or capital contributions in the form of trade credit granted to customers in the ordinary course of business consistent with past practice;

- change in any material respect any of the financial accounting principles, practices or methods used by any Alta Mesa Entity, except for any change required by reason of a concurrent change in GAAP or statutory accounting requirements;

- enter into any tax allocation agreement, tax sharing agreement, tax indemnity agreement or closing agreement relating to any tax other than any customary tax sharing or indemnification provisions contained in any agreement entered into in the ordinary course of business and not primarily relating to tax;

- settle or offer or propose to settle any proceeding (other than a proceeding relating to taxes) against any Alta Mesa Entity unless such settlement (A) requires the payment of less than $1.0 million, which payment is made prior to Closing, (B) involves the unconditional release of such Alta Mesa Entity with respect to the subject matter of the proceeding, (C) does not impose any material obligations on any Alta Mesa Entity after the Closing and (D) does not involve an admission of criminal wrongdoing by any Alta Mesa Entity;

135

Table of Contents

- amend in any material respect, terminate or waive any material right under any material contract, other than contracts that terminate pursuant to their terms;

- except for expenditures necessary to respond to an emergency, authorize or make capital expenditures except as set forth in the budget or in accordance with the Alta Mesa Contribution Agreement;

- amend or modify in any material respect the budget;

- (A) except consistent with past practice and in the ordinary course of business, grant any increases in the compensation (including bonuses) or benefits payable or to become payable to any of the directors, officers, employees or independent contractors of any of the Alta Mesa Entities, (B) enter into any new, or amend any existing, employment, retention, change in control or severance or termination agreement with any currently existing director, officer, employee or independent contractor, (C) terminate, establish or become obligated under any collective bargaining agreement, (D) enter into any new material, or amend any, Alta Mesa group plan or other benefit plan if such amendment would have the effect of materially enhancing any benefits or increasing the costs of providing benefits thereunder or (E) terminate the employment of any executive officer or management-level employee (except for a for-cause termination);

- take any action that would or would reasonably be expected to hinder, prevent, delay or interfere with, in any manner, the Closing and the consummation of the transactions;

- enter into or amend the terms of any related party transaction other than in connection with the transfer to Alta Mesa's existing owners of all of the assets and liabilities related to its non-STACK assets; or

- agree or commit to do any of the foregoing.

- During the interim period and in connection with any financing activities of Silver Run, the Alta Mesa Parties shall use their commercially reasonable efforts to provide to Silver Run, and shall use its commercially reasonable efforts to cause their representatives, including legal and accounting representatives, to provide, in each case at Silver Run's sole expense (with respect to reasonable out-of-pocket expenses), all cooperation reasonably requested by Silver Run that is customary in connection with completing any of its financing activities, which commercially reasonable efforts shall include, among other things, (i) furnishing Silver Run reasonably promptly following its request, with information regarding the Alta Mesa Entities (including information to be used in the preparation of one or more information packages regarding the business, operations, financial projections and prospects of the Alta Mesa Entities), to the extent reasonably available to the Alta Mesa Entities, (ii) causing the Alta Mesa Entities' senior management and other representatives with appropriate seniority and expertise of the Alta Mesa Entities to participate in a reasonable number of meetings (including customary one-on-one meetings with the parties acting as lead-arrangers, bookrunners or agents for, and prospective lenders of, such financing), presentations, due diligence sessions, drafting sessions and sessions with rating agencies in connection with such financing or maintenance activities, (iii) assisting with the preparation of materials for rating agency presentations, offering memoranda, and similar documents required in connection with any such financing or maintenance activities, (iv) using commercially reasonable efforts to obtain legal opinions, auditor comfort letters and auditor consents reasonably requested by Silver Run in order to consummate such financing or maintenance activities, (v) taking all corporate actions, subject to the occurrence of the Closing, reasonably requested by Silver Run or any future or existing financing sources of Silver Run or the Alta Mesa Entities to permit the consummation of such financing activities, (vi) assisting Silver Run with the repayment, and release of any liens upon repayment, of any outstanding indebtedness of any Alta Mesa Entity and obtaining customary payoff letters with respect thereto, and (vii) cooperating with requests for due diligence to the extent customary and reasonable; provided, however, that no obligation of the Alta Mesa Entities under any agreement, certificate, document or instrument shall be effective until the

136

Table of Contents

Closing and none of the Alta Mesa Parties or any of their representatives shall be required to pay any commitment or other fee or incur any other liability prior to Closing in connection with any financing activities (other than with respect to expenses to be reimbursed in accordance with the Alta Mesa Contribution Agreement).

- During the interim period, the Alta Mesa Parties will not, the Alta Mesa Contributor and its existing equity owners will not, and will cause the Alta Mesa Entities and any of their respective affiliates and any of their and their affiliates' representatives, not to, take any action, directly or indirectly, to initiate, solicit, facilitate or encourage, participate in any discussions or negotiations with, enter into any contract (including any letter of intent or confidentiality agreement), or furnish to any other person any information with respect to, any proposal from any person relating to an acquisition of any interests in the Alta Mesa Entities or all or substantially all of the assets of the Alta Mesa Entities. The Alta Mesa Parties and the Alta Mesa Contributor and its existing equity owners shall, and the Alta Mesa Contributor and its existing equity owners shall cause the Alta Mesa Entities, any of their respective affiliates and any of their and their affiliates' representatives to, immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any person (other than Silver Run and its affiliates) with respect to any of the foregoing.

- During the interim period, the Alta Mesa Parties shall, and the Alta Mesa Contributor shall cause the Alta Mesa Entities to, complete a reorganization pursuant to which all assets and liabilities related to any business or operations of Alta Mesa and its Subsidiaries other than the ownership and operation of assets in Kingfisher, Garfield, Major, Blaine, Logan and Canadian counties, in each case, in the State of Oklahoma are transferred from the Alta Mesa Entities in a manner that (a) does not create a tax liability for Silver Run, SRII Opco GP, SRII Opco or the Alta Mesa Entities and (b) complies with applicable laws in accordance with the Alta Mesa reorganization agreements.

The Alta Mesa Contributor and High Mesa GP made certain covenants under the Alta Mesa Contribution Agreement including, among others, the following:

- Subject to limited exceptions, during the interim period, the Alta Mesa Contributor and High Mesa GP will not: (i) create any lien (other than any lien that will be released at or prior to Closing) against any of their interests in Alta Mesa, (ii) sell, transfer, convey or otherwise dispose of any of their contributed interests or (iii) agree or commit to or permit any affiliate to do any of the foregoing.

*Covenants of Silver Run*

Silver Run made certain covenants under the Alta Mesa Contribution Agreement including, among others, the following:

- Subject to limited exceptions, during the interim period, none of Silver Run or its subsidiaries will:

  - amend or propose to amend (A) its organizational documents or any of its subsidiaries, other than in connection with the Proposals, or (B) the trust agreement or any other agreement related to the Trust Account;

  - (A) offer, issue, sell, grant or deliver, or authorize or propose to offer, issue, sell, grant or deliver, any equity interest, other than in connection with the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement, or (B) amend in any material respect any of the terms of any equity interests outstanding as of the execution date;

  - (A) split, combine, or reclassify any interests, (B) declare, set aside or pay any dividends on, or make any other distribution in respect of, any outstanding interests, (C) repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any interests, other than pursuant to an exercise of a Silver Run stockholder redemption right, or (D) adopt a plan of complete or partial liquidation or resolutions providing for or authorizing a liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization;

137

Table of Contents

- other than in connection with the transactions contemplated by the Alta Mesa Contribution Agreement, create, incur, guarantee or assume any indebtedness or otherwise become liable or responsible for the obligations of any other person;

- other than in connection with the transactions contemplated by the Alta Mesa Contribution Agreement, (A) acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, limited liability company, or other business organization or division thereof, (B) form any joint venture or similar arrangement or exercise any rights under any existing joint venture or similar agreement, or (C) make any loans, advances or capital contributions to, or investments in, any person; or

- agree or commit to do any of the foregoing.

- During the interim period, Silver Run shall not, and shall cause the Alta Mesa Entities from and after Closing not to, amend, waive or otherwise modify the organizational documents of any Alta Mesa Entity to the extent such amendment, waiver or other modification does or would reasonably be expected to reduce, limit, terminate or otherwise modify (in any manner adverse to any of the Alta Mesa Contributor's appointees, the Alta Mesa Contributor and its existing equity owners or any of their respective affiliates to the extent relating to the period prior to Closing) any obligation of Silver Run or any of its subsidiaries to indemnify pursuant to the organizational documents of the Alta Mesa Entities the Alta Mesa Contributor's appointees, the Alta Mesa Contributor or its affiliates to the extent relating to periods prior to Closing. Silver Run shall cause the Alta Mesa Entities to, effective as of the Closing Date, obtain and fully pay the premium for "tail" insurance policies that cover the existing directors and officers of the Alta Mesa Entities for a claims-reporting or discovery period of at least seven years from and after the Closing Date from an insurance carrier with the same or better credit rating as Alta Mesa's existing directors' and officers' insurance carrier and with terms, conditions, retentions and limits of liability that are no less advantageous than the coverage provided under Alta Mesa's existing policies with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against any of the Alta Mesa Contributor's appointees by reason of his or her service as an officer or director of any Alta Mesa Entity at or prior to the Closing Date (including in connection with the Alta Mesa Contribution Agreement); provided, however, that Alta Mesa may not, without Silver Run's written consent, spend more than 300% (the "D&O Cap Amount") of the last annual premium paid by Alta Mesa prior to the execution date per year for such coverage under such tail policy; provided further that if the cost of such insurance exceeds the D&O Cap Amount, and the Alta Mesa Entities elect not to spend more than the D&O Cap Amount for such purposes, then the Alta Mesa Entities shall purchase as much coverage as is obtainable for the D&O Cap Amount which shall satisfy the obligations of Silver Run and the Alta Mesa Entities.

- As promptly as reasonably practicable after the execution date, but in any event within 10 business days following the date on which Silver Run has received written notice from Alta Mesa and Kingfisher that each believes the information required to be provided by the Alta Mesa Entities hereunder and Kingfisher pursuant to the Kingfisher Contribution Agreement has been delivered to Silver Run, Silver Run will prepare and file with the SEC a proxy statement containing the information specified in Schedule 14A of the Exchange Act with respect to the transactions contemplated by the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement and the Riverstone Contribution Agreement. Silver Run will take, in accordance with applicable Law, NASDAQ rules and the organizational documents of Silver Run, all action necessary to call, hold and convene a special meeting of holders of Silver Run Common Stock to consider and vote upon the Proposals as promptly as reasonably practicable after the filing of the proxy statement in definitive form with the SEC. Silver Run's board will recommend in the proxy statement that the holders of Silver Run Common Stock approve the Proposals (the "Silver Run Board Recommendation"). Notwithstanding the foregoing, at any time prior to obtaining the required stockholder approval at the special meeting, the Silver Run board may withdraw, modify or qualify in any manner the Silver Run Board Recommendation (any such action a "Change in Recommendation") if the Silver Run Board shall have concluded in good

138

Table of Contents

faith, after consultation with its outside legal advisors and financial advisors, that a failure to make a Change in Recommendation would be inconsistent with its fiduciary duties under applicable law; provided, however, that the Silver Run board shall not be entitled to exercise its rights to make a Change in Recommendation pursuant to this sentence unless (i) such Change in Recommendation is based upon a material intervening event (specifically excluding a change in oil and gas prices) that occurred during the interim period and information not available to the Silver Run board at the execution date and (ii) Silver Run has provided to the Alta Mesa Contributor three business days' prior written notice advising the Alta Mesa Contributor that the Silver Run board intends to take such action and specifying the reasons therefor in reasonable detail.

- During the interim period, Silver Run shall immediately cease any existing discussions and negotiations with any third parties conducted prior to the date hereof with respect to any acquisition proposal. Also, Silver Run shall not directly or indirectly, through any controlled affiliate or any of its or their representatives initiate, solicit, facilitate or encourage, participate in any discussions or negotiations with, enter into any contract (including any letter of intent or confidentiality agreement), or furnish to any other person any information (other than information to or from any other person which is traditionally provided in the regular course of business to third parties where Silver Run and its controlled affiliates or their representatives have no reason to believe that such information may be utilized to evaluate any such acquisition proposal) with respect to any acquisition proposal, or agree to, approve or recommend, any contract with respect to, any acquisition proposal.

*Mutual Covenants*

Each party made certain mutual covenants under the Alta Mesa Contribution Agreement, including, among others, the following:

- Prior to Closing, each party will (and will cause its subsidiaries to) afford to the other parties and their representatives reasonable access, at reasonable times upon reasonable prior notice, to the officers, key employees, agents, properties, offices and other facilities of such party and its subsidiaries and to their books, records, contracts and documents and will furnish reasonably promptly to the other parties and its representatives information concerning its and its subsidiaries' business, properties, contracts, records and personnel as may be reasonably requested by the other parties.

- Each of the parties will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under any applicable laws to consummate and make effective the transactions contemplated by the Alta Mesa Contribution Agreement, including (i) filing any notification and report forms required for the consummation of the transactions contemplated by the Alta Mesa Contribution Agreement under the HSR Act within 15 business days after the execution date; and (ii) using commercially reasonable efforts to cause any applicable waiting period under the HSR Act with respect to the transactions contemplated by the Alta Mesa Contribution Agreement to expire or terminate at the earliest time that is reasonably practicable and shall request "early termination" with respect to the waiting period under the HSR Act.

- Each party will, and will cause its subsidiaries to, (i) promptly inform the other parties of, and supply to the other parties, any communication (or other correspondence or memoranda) from or to, and any proposed understanding or agreement with, any governmental authority in connection with the Alta Mesa Contribution Agreement or the transactions contemplated thereby; (ii) consult and cooperate in good faith with the other parties in connection with any filings, notifications, submissions, analyses, appearances, presentations, memoranda, briefs, arguments and opinions made or submitted by or on behalf of any party in connection with all meetings, actions, discussions and proceedings with governmental authorities, including, subject to applicable law, permitting the other parties to review in advance, and considering in good faith the views of the other party with respect to, any proposed written communication to any governmental authority and to promptly provide the other parties with copies of any communication to any governmental authority; (iii) use commercially reasonable efforts

139

Table of Contents

to comply, as promptly as reasonably practicable, with any requests received by a party or any of its subsidiaries under the HSR Act and any other applicable law for additional information, documents or other materials; (iv) give the other parties reasonable advance notice of its or its subsidiaries' intention to participate in any meeting or telephone or other discussion with any governmental authority with respect to the transactions or any filings, investigations or inquiries made in connection with the transactions, and an opportunity to participate in such meeting or discussion; and (v) contest and resist any proceeding instituted (or threatened in writing to be instituted) by any governmental authority challenging the transactions as being in violation of any applicable law.

- The parties will cooperate as and to the extent reasonably requested by the other parties, in connection with the filing of tax returns and any tax audit, litigation or other proceeding.

**Transaction Expenses**

Except as otherwise expressly provided in the Alta Mesa Contribution Agreement, whether or not the transactions contemplated by the Alta Mesa Contribution Agreement are consummated, each party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of the Alta Mesa Contribution Agreement and the transactions contemplated thereby.

**Survival of Representations, Warranties and Covenants**

Except for certain covenants, the representations, warranties and covenants of the parties contained in the Alta Mesa Contribution Agreement will not survive the Closing. After the Closing, no party to the Alta Mesa Contribution Agreement will have any liability to any other party, except in the case of fraud or with respect to claims related to covenants which survive the Closing.

**Release of Claims**

Under the Alta Mesa Contribution Agreement, the Alta Mesa Contributor and the equity owners of the Alta Mesa Contributor will waive and release, effective as of the Closing, on behalf of itself and each of their respective past, present and future stockholders, partners, members and representatives and each of their respective successors and assigns (collectively, its "Related Persons"), to the fullest extent permitted by law, any and all proceedings, causes of action, damages, judgments, liabilities and rights against the Alta Mesa Entities that the Alta Mesa Contributor and its equity owners or any of their Related Persons has ever had, may now or hereafter have arising from facts, occurrences or circumstances existing at or prior to the Closing, in each case, relating to the Alta Mesa Entities or their business, including pursuant to Alta Mesa's partnership agreement (and any breaches thereof), pursuant to the Alta Mesa Contribution Agreement, whether in law or in equity, in contract, in tort or otherwise, including any claims to any additional interests in the Alta Mesa Entities or any distributions or payments (as consideration of services or otherwise) from the Alta Mesa Entities by reason of any matter other than obligations arising under the covenants that expressly surviving Closing (the "Contributor Released Claims"). The Alta Mesa Contributor and its equity owners will not, and will cause its Related Persons not to, assert any proceeding against Silver Run or any of its affiliates with respect to the Contributor Released Claims.

In addition, pursuant to the Alta Mesa Contribution Agreement, Silver Run and each Alta Mesa Entity will waive and release, effective as of the Closing, on behalf of itself and its past, present and future stockholders, partners, members and representatives and each of their respective successors and assigns (collectively, their respective "Silver Run Related Persons"), to the fullest extent permitted by law, any and all proceedings, causes of action, damages, judgments, liabilities and rights against the Alta Mesa Contributor and its equity owners and their respective Related Persons that Silver Run or any Alta Mesa Entity or their respective Silver Run Related Persons has ever had, may now or hereafter have arising from facts, occurrences or circumstances existing at or prior to the Closing, in each case, relating to the ownership by the Alta Mesa Contributor and its equity owners or

140

Table of Contents

its Related Persons of an Alta Mesa Entity or the business of an Alta Mesa Entity, including pursuant to the respective organizational documents thereof or predecessor agreements thereto (and any breaches thereof), whether in law or in equity, in contract, in tort or otherwise (the "Alta Mesa Released Claims"). Silver Run and each Alta Mesa Entity each agrees not to, and to cause its respective Silver Run Related Persons not to, assert any proceeding against the Alta Mesa Contributor, its equity owners or its Related Persons with respect to the Alta Mesa Released Claims.

### Termination

The Alta Mesa Contribution Agreement may be terminated by either party upon the occurrence of the following: (i) if the closing of the applicable transaction is not consummated by February 28, 2018 (the "Outside Date"); (ii) upon the applicable parties' mutual written consent; (iii) if the consummation of the applicable transaction is prohibited by law; or (iv) if the Kingfisher Contribution Agreement has been terminated in accordance with its terms.

We can terminate the Alta Mesa Contribution Agreement if the Alta Mesa Contributor, High Mesa GP or the Alta Mesa Parties breach any of their representations, warranties, covenants or other agreements which has not been cured by the earlier of (x) 30 days following written notice from Silver Run of such breach and (y) the Outside Date.

The Alta Mesa Contributor and High Mesa GP can terminate the Alta Mesa Contribution Agreement if (i) we breach any of our representations, warranties, covenants or other agreements which has not been cured by the earlier of (x) 30 days following written notice from the Alta Mesa Contributor of such breach and (y) the Outside Date or (ii) our board of directors has changed its recommendation for our stockholders to approve the business combination.

None of the parties to the Alta Mesa Contribution Agreement is required to pay a termination fee or reimburse any other party for its expenses as a result of a termination of the Alta Mesa Contribution Agreement.

### Amendments

The Alta Mesa Contribution Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties thereto.

### The Kingfisher Contribution Agreement

On August 16, 2017, Silver Run entered into the Kingfisher Contribution Agreement with the Kingfisher Contributor, Kingfisher and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which Silver Run will acquire 100% of the outstanding membership interest in Kingfisher.

Pursuant to the Kingfisher Contribution Agreement, at the Closing, the Kingfisher Contributor will receive consideration consisting of:

- 55,000,000 SRII Opco Common Units; and

- subject to the Kingfisher Contributor's election to receive additional SRII Opco Common Units as described below, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees.

The Kingfisher Contributor will also purchase from Silver Run a number of shares of Class C Common Stock corresponding to the number of SRII Opco Common Units received by the Kingfisher Contributor at the Closing.

141

Table of Contents

If Silver Run does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) valued at $10.00 per SRII Opco Common Unit. At the Closing, $5 million of the cash consideration to be received by the Kingfisher Contributor will be funded into escrow to satisfy any post-Closing purchase price adjustments. If such escrowed amount is insufficient to satisfy any post-Closing adjustment, then the Kingfisher Contributor will transfer to Silver Run a number of SRII Opco Common Units (not to exceed 16,000,000 SRII Opco Common Units), and a corresponding number of shares of Class C Common Stock, with a value equal to the deficiency.

In addition to the above, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration to be paid in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C Common Stock) as specified below if the 20-Day VWAP equals or exceeds the following prices:

| 20-Day VWAP | Earn-Out Consideration |
|---|---|
| $14.00 | 7,142,857 SRII Opco Common Units |
| $16.00 | 6,250,000 SRII Opco Common Units |

The terms of the payment of the earn-out consideration, including in connection with a liquidity event of Silver Run, are substantially similar to the terms of the payment of the earn-out consideration to the Alta Mesa Contributor described above under "The Alta Mesa Contribution Agreement."

**Kingfisher Material Adverse Effect**

Under the Kingfisher Contribution Agreement, certain representations and warranties of the Kingfisher Contributor and Kingfisher and their respective subsidiaries are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. The material adverse effect standard in the Kingfisher Contribution Agreement is substantially similar to the terms of the material adverse effect standard in the Alta Mesa Contribution agreement described above under "The Alta Mesa Contribution Agreement—Alta Mesa Material Adverse Effect."

**Conditions to Closing of the Kingfisher Contribution**

*Mutual Conditions*

Under the Kingfisher Contribution Agreement, the respective obligations of each party to consummate the transactions contemplated thereby are subject to the satisfaction at or prior to the Closing of certain conditions which are substantially similar to those in the Alta Mesa Contribution Agreement described above under "The Alta Mesa Contribution Agreement—Conditions to Closing the Alta Mesa Contribution Agreement—Mutual Conditions" except for the following conditions which are not mutual and only Silver Run conditions:

- SRII Opco's leverage ratio being less than 1.5x on a pro forma, last 12 months (LTM) basis; and

- closing of the transactions contemplated by the Alta Mesa Contribution Agreement and the Riverstone Contribution Agreement.

*Silver Run Conditions*

Silver Run's obligations to consummate the transactions contemplated by the Kingfisher Contribution Agreement are subject to the satisfaction at or prior to the Closing of certain conditions which are substantially similar to those in the Alta Mesa Contribution Agreement described above under "The Alta Mesa Contribution Agreement—Conditions to Closing the Alta Mesa Contribution Agreement—Silver Run Conditions" except (i) as specified above in "—Mutual Conditions" and (ii) there are no conditions relating to the founder notes of

142

Table of Contents

Alta Mesa's subsidiaries being exchanged for equity interests in the Alta Mesa Contributor and the completion of the transfer to Alta Mesa's existing owners (other than the Riverstone Contributor) of all of the assets and liabilities related to its non-STACK assets.

*Kingfisher Contributor Conditions*

The Kingfisher Contributor's obligation to consummate the transactions contemplated by the Kingfisher Contribution Agreement are subject to the satisfaction at or prior to the Closing of certain conditions which are substantially similar to those of the Alta Mesa Contribution Agreement described above under "The Alta Mesa Contribution Agreement—Conditions to Closing the Alta Mesa Contribution Agreement—Alta Mesa Contributor Conditions" except (i) there is no condition relating to the holders of founder shares having waived the conversion adjustment relating to such founder shares and (ii) the available funds will not be less than the cash consideration the Kingfisher Contributor is entitled to receive at Closing.

## Representations and Warranties

The Kingfisher Contribution Agreement contains customary representations and warranties made by the parties thereto. The representations and warranties of the Kingfisher Contributor, Kingfisher and Silver Run are substantially similar to those in the Alta Mesa Contribution Agreement described above in "The Alta Mesa Contribution Agreement—Representations and Warranties" except that Kingfisher made additional representations and warranties relating to: indebtedness; regulatory status; capital commitments and parachute payments and Silver Run made additional representations and warranties relating to tax matters and opportunity for independent investigation

## Covenants of the Parties

*Covenants of the Kingfisher Contributor and Kingfisher*

The Kingfisher Contributor and Kingfisher made certain covenants under the Kingfisher Contribution Agreement including, among others, the following:

- Subject to limited exceptions, during the interim period the Kingfisher Contributor will cause Kingfisher to and Kingfisher will (a) conduct its operations in the ordinary course of business and (b) use its commercially reasonably efforts to (i) preserve intact its present business organization, (ii) maintain in effect its material contracts and permits, (iii) retain Kingfisher's current officers, (iv) preserve its relationships with its key customers and suppliers, (v) preserve, maintain, and protect its material assets and (vi) maintain, with financially responsible insurance companies, insurance in such amounts and against such risks and losses as is maintained by it at present.

- Subject to limited exceptions, during the interim period, the Kingfisher Contributor will not:

  - create any lien (other than any lien that will be released at or prior to Closing) against any of the contributed interests;

  - sell, transfer, convey or otherwise dispose of any of the contributed interests;

  - (A) increase the base salary or wage rate or target annual cash bonus amount of, or materially increase any other compensation or benefits payable to, any available employee, other than increases in welfare benefits made in the ordinary course of business that apply equally to all similarly situated employees of operator (not including increases made exclusively to the available employees), (B) terminate the employment (other than for cause) or materially modify the job duties with respect to Kingfisher's business of any available employee or (C) permit any affiliate of the Kingfisher Contributor to do any of the foregoing; or

  - agree or commit to or permit any affiliate of the Kingfisher Contributor to do any of the foregoing.

143

Table of Contents

- Subject to limited exceptions, during the interim period, Kingfisher will not, and the Kingfisher Contributor will cause Kingfisher and its subsidiaries to not:

  - amend or propose to amend the organizational documents of Kingfisher or any of its subsidiaries;

  - (A) other than in respect of equity contributions by the equity owners of the Kingfisher Contributor, offer, issue, sell, grant or deliver, or authorize or propose to offer, issue, sell, grant or deliver, any interest of Kingfisher, (B) amend in any material respect any of the terms of any securities of Kingfisher outstanding as of the execution date or (C) authorize or propose to offer, issue, sell, grant or deliver, any interest in Kingfisher or any of its subsidiaries;

  - (A) split, combine, or reclassify any interests in Kingfisher or any of its subsidiaries, (B) except as provided in the Kingfisher Contribution Agreement, declare, set aside or pay any dividends on, or make any other distribution in respect of, any outstanding interests in Kingfisher or any of its subsidiaries, (C) repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any interests of Kingfisher or any of its subsidiaries or (D) adopt a plan of complete or partial liquidation or resolutions providing for or authorizing a liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of Kingfisher or any of its subsidiaries;

  - (A) create, incur, guarantee or assume any indebtedness or otherwise become liable or responsible for the obligations of any other person (other than Kingfisher) that remains outstanding as of the Closing; provided, however, that the foregoing will not restrict the incurrence of additional indebtedness in an amount not to exceed $500,000 in the aggregate, or (B) mortgage or pledge any of its material assets, or create any material lien thereon that is not released at or prior to Closing, other than permitted liens;

  - sell, lease, license, transfer, convey, abandon, permit to lapse or expire or otherwise dispose of any of Kingfisher's assets or any of its subsidiaries' assets, except (A) pursuant to existing material contracts or (B) the sale of obsolete assets in the ordinary course of business for which the aggregate value of such assets or consideration payable (1) in any individual transaction does not exceed $500,000 or (2) in the aggregate does not exceed $1.0 million;

  - (A) acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, limited liability company, or other business organization or division thereof, in each case other than acquisitions for which the consideration (1) in any individual transaction does not exceed $500,000 or (2) in the aggregate does not exceed $1.0 million, (B) form any joint venture or similar arrangement, or (C) make any loans, advances or capital contributions to, or investments in, any person, (other than Kingfisher or any of its subsidiaries), except for loans, advances or capital contributions in the form of trade credit granted to customers in the ordinary course of business consistent with past practices;

  - change in any material respect any of the financial accounting principles, practices or methods used by Kingfisher or any of its subsidiaries, except for any change required by reason of a concurrent change in GAAP;

  - (A) make or change any material tax election; (B) settle or compromise any claim, notice, audit report or assessment in respect of taxes, except where the amount of such settlement or compromise does not exceed the lesser of 10.0% of the reserve for such matter on Kingfisher's financial statements or $500,000; (C) change any annual tax accounting period except as otherwise required by applicable laws; (D) adopt or change any material method of tax accounting except as otherwise required by applicable laws; (E) file any material amended tax return except as otherwise required by applicable laws; (F) enter into any tax allocation agreement, tax sharing agreement, tax indemnity agreement or closing agreement relating to any tax other than any customary tax sharing or indemnification provisions contained in any agreement entered into in the ordinary course of business and not primarily relating to tax; (G) surrender any right to claim a

144

Table of Contents

material tax refund; or (H) consent to any extension or waiver of the statute of limitations period applicable to any material tax claim or assessment;

- settle or offer or propose to settle any proceeding (other than a proceeding relating to taxes) against Kingfisher or any of its subsidiaries unless such settlement (A) requires the payment of less than $1.0 million by Kingfisher or any of its subsidiaries, which amount will be paid prior to Closing or included as a current liability in the calculation of net working capital, (B) involves the unconditional release of Kingfisher or such subsidiary with respect to the subject matter of the proceeding, (C) does not impose any material obligations on Kingfisher or any of its subsidiaries after the Closing and (D) does not involve an admission of criminal wrongdoing by Kingfisher or any of its subsidiaries;

- enter into, amend in any material respect or terminate any material contract other than contracts entered into after the execution date that implement and are in accordance with the capex budget;

- authorize or make capital expenditures, except for expenditures necessary to respond to an emergency;

- amend or modify in any material respect the budget (as defined in the Operator Agreement);

- hire any employees, establish, adopt or commence participation in or incur any liability under any benefit plan (other than any reimbursement obligations under the Operator Agreement incurred in the ordinary course of business, consistent with past practice, and that to the extent outstanding as of the Closing are reflected as current liabilities in the calculation of net working capital of Kingfisher);

- enter into or amend the terms of any Kingfisher related party transactions; or

- agree or commit to do any of the foregoing.

- At the Closing, the Kingfisher Contributor will terminate effective upon the Closing the Operator Agreement with no further liability to Kingfisher, as provided in the Transition Services Agreement described below.

- The Kingfisher Contributor will have the right to cause Kingfisher to pay cash dividends, and/or make cash distributions to the Kingfisher Contributor or its affiliates at any time prior to Closing; provided such distributions do not result in any liability to Kingfisher.

*Covenants of Silver Run*

Silver Run made certain covenants under the Kingfisher Contribution Agreement which are substantially similar to those in the Alta Mesa Contribution Agreement described above in "The Alta Mesa Contribution Agreement—Covenants of the Parties—Covenants of Silver Run" except that Silver Run made the following additional covenants:

- Silver Run will make or to cause its subsidiaries to make offers to employ all of the available employees. Such offers will be made within 10 days following the execution date. Each such offer (i) will provide for (A) the commencement of employment to be effective upon the applicable transfer date (as defined below), (B) an annualized base salary or base hourly pay rate, as applicable, that is not less than that received by the available employee, as applicable, immediately prior to the available employee's transfer date, and (C) a period of at least three (3) days in which such available employee may accept or reject such offer, and (ii) will be subject only to satisfaction of Silver Run's employer's (as defined below) standard lawful pre-employment screening and, with respect to a leave employee, the leave employee's return to active employment with operator within six (6) months following the Closing, or such later time as may be required by applicable law. The entity with which post-Closing employment is offered to an available employee pursuant to this section is referred to as the "Silver Run Employer." At least five (5) days prior to the anticipated Closing Date, Silver Run will deliver to

145

Table of Contents

operator a list of the available employees who have accepted employment with Silver Run Employer (each such individual who accepts such employment offers and commences employment with Silver Run Employer following the Closing is referred to as a "Transferred Employee"), and any available employee who has rejected an offer of employment. While a Transferred Employee remains employed, Silver Run Employer will not reduce any Transferred Employee's initial base salary or base hourly pay rate, as applicable, for a period of at least 12 months beginning on the Closing Date.

- Silver Run covenants that Silver Run Employer will provide to all Transferred Employees, for at least 12 months following the Closing Date, employee benefits (including severance) that are, in the aggregate, substantially comparable to those offered by Silver Run Employer to its similarly situated employees. Silver Run covenants that effective as of each Transferred Employee's transfer date, Silver Run will or will cause its subsidiaries to recognize years of service with operator (together with any predecessors thereof that previously employed such Transferred Employee and as to which operator has recognized such years of service) for purposes of determining such Transferred Employee's eligibility to participate in and vesting under any and all applicable plans or policies of Silver Run and its subsidiaries (other than any defined benefit plans and equity and incentive arrangements and severance benefit pursuant to the foregoing sentence); provided, however, that such service need not be recognized to the extent that such recognition would result in any duplication of benefits.

- To the extent Silver Run or its subsidiaries provides employee welfare benefit plans (as defined in Section 3(1) of ERISA) to similarly situated employees to the Transferred Employees, Silver Run covenants that effective as of each Transferred Employee's transfer date, Silver Run will, or cause its subsidiaries to, to the extent permitted under applicable law and the terms of the applicable employee welfare benefit plans, use commercially reasonable efforts to (A) ensure that for each Transferred Employee and any dependent thereof covered by operator's or operator's affiliates' employee welfare benefit plans, Silver Run's or its subsidiaries' welfare benefit plans will waive all coverage exclusions and limitations relating to waiting periods or pre-existing conditions to the extent any such exclusions or limitations were waived or were inapplicable under the analogous welfare benefit plan of operator or its affiliates immediately prior to the Closing Date, and (B) credit the expenses of each Transferred Employee which were credited toward deductibles, co-payments or out-of-pocket maximums for the year in which the Transferred Employee's transfer date occurs under the applicable welfare benefit plan of operator or operator's affiliates against satisfaction of any deductibles, co-payments or out-of-pocket maximums for the year in which the Transferred Employee's transfer date occurs under Silver Run's or its subsidiaries' welfare benefit plan for each Transferred Employee; provided, however, that Silver Run's obligations under this clause (B) will be subject to Silver Run's or its subsidiaries', as applicable, insurers, receipt of all necessary information, from either operator or such Transferred Employee related to such amounts.

- Prior to Closing, Silver Run will replace or post, as applicable, effective as of Closing, any outstanding credit support obligations provided by the Kingfisher Contributor or any of its affiliates with respect to Kingfisher or the assets of Kingfisher set forth in the schedules to the Kingfisher Contribution Agreement ("Support Obligations"), including by providing at the Closing replacement bonds, guaranties, letters of credit, and/or cash collateral, as needed, to effect the replacement or posting of such Support Obligations at Closing; provided that if Silver Run is unable to replace or post a Support Obligation at Closing, such existing Support Obligation will remain in place and Silver Run will indemnify the Kingfisher Contributor or its affiliates, as applicable, for any losses resulting from payment such person is required to make under such Support Obligation. If Silver Run or any of its subsidiaries intends to participate in any meeting or discussion with any governmental authority with respect to such replacement or posting of Support Obligations, Silver Run will give the Kingfisher Contributor reasonable notice of, and an opportunity to participate in, such meeting or discussion prior to Closing.

- Within 180 days following Closing, Silver Run will cause Kingfisher to cease using the words "HPS", "Highbridge", "ARM" and "Asset Risk Management" and any word or expression similar thereto or

146

Table of Contents

constituting an abbreviation, derivation or extension thereof (the "Kingfisher Contributor's Marks"), including eliminating the Kingfisher Contributor's Marks from the Kingfisher real property and the assets of Kingfisher and disposing of any unused stationery and literature of Kingfisher bearing the Kingfisher Contributor's Marks. Thereafter, Silver Run will not, and will cause Kingfisher and its affiliates not to, use the Kingfisher Contributor's Marks or any other logos, trademarks, trade names or other intellectual property belonging to Kingfisher Contributor or any affiliate thereof.

• The covenant relating to a Change in Board Recommendation is not required to be based on an intervening event.

*Mutual Covenants*

Each party made certain mutual covenants under the Kingfisher Contribution Agreement which are substantially similar to those in the Alta Mesa Contribution Agreement described above in "The Alta Mesa Contribution Agreement—Covenants of the Parties—Mutual Conditions"

**Transaction Expenses**

Except as otherwise expressly provided in the Kingfisher Contribution Agreement, whether or not the transactions contemplated by the Kingfisher Contribution Agreement are consummated, each party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of the Kingfisher Contribution Agreement and the transactions contemplated thereby.

**Survival of Representations, Warranties and Covenants**

All representations, warranties and covenants of the Kingfisher Contributor, Kingfisher and Silver Run survive for 18 months post-Closing.

**Indemnification under the Kingfisher Contribution Agreement**

Under the Kingfisher Contribution Agreement, the Kingfisher Contributor will indemnify Silver Run for any losses relating to (i) a breach of any representation, warranty or covenant of the Kingfisher Contributor or Kingfisher; (ii) pre-Closing taxes; (iii) obligations under Kingfisher's engagement letters with its financial advisors; and (iv) indemnification claims made by ARM against Kingfisher after Closing under the Operator Agreement. Additionally, Silver Run will indemnify the Kingfisher Contributor for any losses relating to a breach of any of Silver Run's representations, warranties or covenants.

The indemnification obligations of the Kingfisher Contributor and Alta Mesa set forth above are subject to a de minimis threshold of $250,000, a deductible of $40 million and a cap equal to the value of the Reserved Units (as defined herein). The Reserved Units serve as the sole source of recovery for any indemnification claim, except in the event of fraud. The Kingfisher Contributor has agreed that it will not transfer 16,000,000 SRII Opco Common Units (and a corresponding number of shares of Class C Common Stock) received as consideration (the "Reserved Units") and, subject to the removal of such transfer restriction as described herein, such Reserved Units will be available to satisfy any indemnification obligations of the Kingfisher Contributor. The transfer restriction relating to 8,000,000 Reserved Units will be removed on the first anniversary of the Closing and the transfer restriction relating to any remaining Reserved Units will be removed 18 months after Closing. The value of the Reserved Units for purposes of satisfying any indemnity claim will be based on the volume-weighted average price of the Class A Common Stock for the 20 trading days immediately prior to the applicable valuation date.

**Release of Claims**

The waiver and release of claims provisions in the Kingfisher Contribution Agreement are substantially similar to those in the Alta Mesa Contribution Agreement described above under "The Alta Mesa Contribution

147

Table of Contents

Agreement—Release of Claims" except that released claims do not include any cause of action, damage, judgment, liability or right pursuant to the Kingfisher Contribution Agreement (as provided for and limited by the Kingfisher Contribution Agreement) or in the event of fraud.

### Termination

Under the Kingfisher Contribution Agreement, the parties have termination rights that are substantially similar to those described above under "The Alta Mesa Contribution Agreement—Termination" except that the Kingfisher Contributor does not have a right to terminate the Kingfisher Contribution Agreement if our board of directors has changed its recommendation for our stockholders to approve the business combination.

None of the parties to the Kingfisher Contribution Agreement are required to pay a termination fee or reimburse any other party for its expenses as a result of a termination of the Kingfisher Contribution Agreement.

### Amendments

The Kingfisher Contribution Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties thereto.

### The Riverstone Contribution Agreement and the Riverstone Contributor's Investment in Alta Mesa

On August 16, 2017, Silver Run and the Riverstone Contributor entered into the Riverstone Contribution Agreement pursuant to which Silver Run will acquire from the Riverstone Contributor all of the limited partner interests in Alta Mesa held by the Riverstone Contributor. In connection with the execution of the Riverstone Contribution Agreement, the Riverstone Contributor made a $200 million capital contribution to Alta Mesa in exchange for limited partner interests in Alta Mesa. Alta Mesa may use such capital to fund its capital expenditures during the interim period. Pursuant to the Riverstone Contribution Agreement, at the Closing, the Riverstone Contributor will receive 20,000,000 SRII Opco Common Units in exchange for the Riverstone Contributor's limited partner interests in Alta Mesa and will acquire a corresponding number of shares of Class C Common Stock from Silver Run.

### Silver Run Material Adverse Effect

Under the Riverstone Contribution Agreement, certain representations and warranties of Silver Run are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. Pursuant to the Riverstone Contribution Agreement, a Silver Run "Material Adverse Effect" means, any occurrence, condition, change, development, event, circumstance or effect that, individually or in the aggregate, (i) is or would reasonably be expected to be materially adverse to the business, properties, condition (financial or otherwise) or results of operations of Silver Run and its subsidiaries taken as a whole or (ii) prevents, materially delays or materially impairs the ability of Silver Run to perform its obligations under the Riverstone Contribution Agreement or to consummate the transactions contemplated thereby.

### Conditions to Closing of the Riverstone Contribution

*Mutual Conditions*

Under the Riverstone Contribution Agreement, the respective obligations of each party to consummate the transactions contemplated thereby are subject to the satisfaction at or prior to the Closing of the following conditions:

- the absence of specified adverse laws or orders;
- the expiration of the waiting period (or extension thereof) under the HSR Act;

148

**Table of Contents**

- the approval of the business combination by Silver Run's stockholders;

- the closing of the transactions contemplated by the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement; and

- the approval for listing on the NASDAQ of shares of Class A Common Stock issuable to the Contributors.

**Representations and Warranties**

The Riverstone Contribution Agreement contains customary representations and warranties by the parties thereto. The Riverstone Contributor made customary representations and warranties relating to: organization; authority; no conflicts, consents and approvals; government approvals; title to interests; legal proceedings; benefit plans; brokers; accredited investor, investment intent; and tax matters.

Silver Run also made customary representations and warranties relating to, among other things: organization; authorization; no conflicts; governmental approvals; capital structure; capitalization of SRII Opco GP and SRII Opco; no undisclosed liabilities; SEC documents, controls; legal proceedings; compliance with laws and orders; brokers; trust account; tax matters; absence of certain changes or events; no default; listing; financial resources; and Investment Company Act status.

**Covenants of the Parties**

*Mutual Covenants*

Each party made certain mutual covenants under the Riverstone Contribution Agreement, including, among others, the following:

- Each of the parties will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under any applicable laws to consummate and make effective the transactions contemplated by the Riverstone Contribution Agreement, including (i) filing any notification and report forms required for the consummation of the transactions contemplated by the Riverstone Contribution Agreement under the HSR Act within 15 business days after the execution date; and (ii) using commercially reasonable efforts to cause any applicable waiting period under the HSR Act with respect to the transactions contemplated by the Riverstone Contribution Agreement to expire or terminate at the earliest time that is reasonably practicable and will request "early termination" with respect to the waiting period under the HSR Act.

- Each party will, and will cause its subsidiaries to, (i) promptly inform the other parties of, and supply to the other parties, any communication (or other correspondence or memoranda) from or to, and any proposed understanding or agreement with, any governmental authority in connection with the Riverstone Contribution Agreement or the transactions contemplated thereby; (ii) consult and cooperate in good faith with the other parties in connection with any filings, notifications, submissions, analyses, appearances, presentations, memoranda, briefs, arguments and opinions made or submitted by or on behalf of any party in connection with all meetings, actions, discussions and proceedings with governmental authorities, including, subject to applicable law, permitting the other parties to review in advance, and considering in good faith the views of the other party with respect to, any proposed written communication to any governmental authority and to promptly provide the other parties with copies of any communication to any governmental authority; (iii) use commercially reasonable efforts to comply, as promptly as reasonably practicable, with any requests received by a party or any of its subsidiaries under the HSR Act and any other applicable law for additional information, documents or other materials; (iv) give the other parties reasonable advance notice of its or its subsidiaries' intention to participate in any meeting or telephone or other discussion with any governmental authority with respect to the transactions or any filings, investigations or inquiries made in connection with the

149

Table of Contents

transactions, and an opportunity to participate in such meeting or discussion; and (v) contest and resist any proceeding instituted (or threatened in writing to be instituted) by any governmental authority challenging the transactions as being in violation of any applicable law.

- The parties will cooperate as and to the extent reasonably requested by the other parties, in connection with the filing of tax returns and any tax audit, litigation or other proceeding.

**Transaction Expenses**

Except as otherwise expressly provided in the Riverstone Contribution Agreement, whether or not the transactions contemplated by the Riverstone Contribution Agreement are consummated, each party will pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of the Riverstone Contribution Agreement and the transactions contemplated thereby.

**Survival of Representations, Warranties and Covenants**

Except for certain covenants, the representations, warranties and covenants of the parties contained in the Riverstone Contribution Agreement will not survive the Closing. After the Closing, no party to the Riverstone Contribution Agreement will have any liability to any other party, except in the case of fraud or with respect to claims related to covenants which survive the Closing.

**Termination**

The Riverstone Contribution Agreement may be terminated at any time before Closing, by the Riverstone Contributor or Silver Run, by written notice to the other party, in the event that the Alta Mesa Contribution Agreement or the Kingfisher Contribution Agreement is terminated.

**Amendments**

The Riverstone Contribution Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties thereto.

**Closing of the Business Combination**

The Closing will take place at 10:00 a.m., Houston, Texas time, on a date that is three business days after the satisfaction or (to the extent permitted by applicable law) waiver in accordance with the Contribution Agreements of all of the conditions set forth therein (other than any conditions which by their nature cannot be satisfied until after the Closing Date, which will be required to be so satisfied or (to the extent permitted by applicable law) waived in accordance with the Contribution Agreements on the Closing Date or on such other date and at such other time as we and the Contributors may agree in writing.

## Related Agreements

*This section describes the material provisions of certain additional agreements entered into or to be entered into pursuant to the Contribution Agreements, which we refer to as the "Related Agreements," but does not purport to describe all of the terms thereof. The Related Agreements (other than the Business Combination Forward Purchase Agreement" will be filed with the SEC at a future date. Stockholders and other interested parties are urged to read such Related Agreements in their entirety.*

**Agreements Related to the Contribution Agreements**

**Forward Purchase Agreement**

In connection with the execution of the Contribution Agreements, on August 16, 2017, Silver Run entered into a forward purchase agreement (the "Business Combination Forward Purchase Agreement") with Riverstone

150

Table of Contents

VI SR II Holdings, L.P., a Delaware limited partnership ("Fund VI Holdings"), pursuant to which Silver Run has agreed to sell at the Closing, and Fund VI Holdings has agreed to purchase, up to $200 million of shares of Class A Common Stock at a purchase price of $10.00 per share. The number of shares of Class A Common Stock to be sold by Silver Run, and purchased by Riverstone, will equal that number which, after payment of the aggregate purchase price paid by Fund VI Holdings under the Business Combination Forward Purchase Agreement, will result in gross proceeds to Silver Run in an aggregate amount necessary to satisfy any exercise of redemption rights of the public stockholders in connection with the business combination or determined by Silver Run and Fund VI Holdings to be necessary for general corporate purposes of Silver Run in connection with or following consummation of the business combination, but in no event will the number of shares of Class A Common Stock purchased exceed 20,000,000 shares.

### Amended and Restated Agreement of Limited Partnership of SRII Opco

Following completion of the business combination, we will operate our business through SRII Opco and its subsidiaries, including Alta Mesa and Kingfisher. At the Closing, we, SRII Opco GP, LLC, the sole general partner of SRII Opco ("SRII Opco GP"), and the Contributors will enter into the SRII Opco LPA, which will set forth, among other things, the rights and obligations of the general partner and limited partners of SRII Opco.

*General Partner.* Under the SRII Opco LPA, SRII Opco GP, a wholly owned subsidiary of Silver Run, will be the sole general partner of SRII Opco. As the sole general partner, SRII Opco GP will be able to control all of the day-to-day business affairs and decision-making of SRII Opco without the approval of any other partner, unless otherwise stated in the SRII Opco LPA. For example, SRII Opco GP cannot take any action that would result in the failure of SRII Opco to be taxable as a partnership for federal income tax purposes without the approval of the other partners. As such, SRII Opco GP, through its officers and directors, will be responsible for all operational and administrative decisions of SRII Opco and the day-to-day management of SRII Opco's business. Pursuant to the terms of the SRII Opco LPA, SRII Opco GP cannot be removed as the general partner of SRII Opco except by its election and, subject to limited exceptions, generally may only transfer or assign its general partner interest in connection with a "general partner change of control" (as defined in the SRII Opco LPA).

*Compensation; Reimbursement.* SRII Opco GP will not be entitled to compensation for its services as general partner. Both Silver Run and SRII Opco GP will be entitled to reimbursement by SRII Opco for any reasonable out-of-pocket expenses incurred on behalf of SRII Opco, including all of our fees, expenses and costs of being a public company (including public reporting obligations, proxy statements, stockholder meetings, stock exchange fees, transfer agent fees, SEC and FINRA filing fees and offering expenses) and maintaining our corporate existence.

*Distributions.* The SRII Opco LPA will allow for distributions to be made by SRII Opco to its limited partners on a pro rata basis out of "distributable cash." "Distributable cash" is defined in the SRII Opco LPA as the amount of cash that could be distributed by SRII Opco for such purposes in accordance with Alta Mesa's and Kingfisher's credit agreements and any future credit agreement of SRII Opco or any of its subsidiaries. We expect SRII Opco may make distributions out of distributable cash periodically to the extent permitted by the debt agreements of SRII Opco and necessary to enable us to cover our operating expenses and other obligations, as well as to make dividend payments, if any, to the holders of our Class A Common Stock. In addition, the SRII Opco LPA generally will require SRII Opco to (i) make pro rata distributions to its limited partners, including us, on a quarterly basis in an amount at least sufficient to allow us to pay our taxes and meet our obligations pursuant to the Tax Receivable Agreement and (ii) make tax advances to its limited partners, other than us, in certain circumstances.

*SRII Common Opco Unit Redemption Right.* The SRII Opco LPA provides a redemption right to each limited partner of SRII Opco (other than us) which entitles it to cause SRII Opco to redeem, from time to time on or after the date that is 180 days after the Closing Date (except that the Kingfisher Contributor may cause the redemption up to 39,000,000 SRII Opco Common Units (plus any "additional common units" as defined in the

151

Table of Contents

Kingfisher Contribution Agreement)) at any time that is 90 days after the Closing Date), all or a portion of their SRII Opco Common Units for, at SRII Opco's option, newly-issued shares of our Class A Common Stock on a one-for-one basis or a cash payment equal to the average of the volume-weighted closing price of one share of Class A Common Stock for the five trading days prior to the date the Contributor delivers a notice of redemption for each SRII Opco Common Unit redeemed (subject to customary adjustments, including for stock splits, stock dividends and reclassifications). In the event of a "reclassification event" (as defined in the SRII Opco LPA), the general partner is to ensure that each SRII Opco Common Unit is redeemable for the same amount and type of property, securities or cash that a share of Class A Common Stock becomes exchangeable for or converted into as a result of such "reclassification event." Upon the exercise of the redemption right, the Contributor will surrender its SRII Opco Common Units to SRII Opco for cancellation. The SRII Opco LPA requires that we contribute cash or shares of our Class A Common Stock to SRII Opco in exchange for a number of SRII Opco Common Units in SRII Opco equal to the number of SRII Opco Common Units to be redeemed from the Contributor. SRII Opco will then distribute such cash or shares of our Class A Common Stock to such Contributor to complete the redemption. Upon the exercise of the redemption right, we may, at our option, effect a direct exchange of cash or our Class A Common Stock for such SRII Opco Common Units in lieu of such a redemption. Upon the redemption or exchange of Common Units held by an Contributor, a corresponding number of shares of Class C Common Stock held by such Contributor will be cancelled.

*General Partner Change of Control.* In connection with the occurrence of a "general partner change of control" (as defined below), we have the right to require each limited partner of SRII Opco (other than us) to cause SRII Opco to redeem some or all of such limited partner's SRII Opco Common Units and a corresponding number of shares of Class C Common Stock, in each case, effective immediately prior to the consummation of the general partner change of control. From and after the date of such redemption, the SRII Opco Common Units and shares of Class C Common Stock subject to such redemption shall be deemed to be transferred to us and each such limited partner shall cease to have any rights with respect to the SRII Opco Common Units and shares of Class C Common Stock subject to such redemption (other than the right to receive shares of Class A Common Stock pursuant to such redemption). A "general partner change of control" will be deemed to have occurred if or upon: (i) the consummation of a sale, lease or transfer of all or substantially all of our assets (determined on a consolidated basis) to any person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) that has been approved by our stockholders and board of directors, (ii) a merger or consolidation of Silver Run with any other person (other than a transaction in which our voting securities outstanding immediately prior to the transaction continue to represent at least 50.01% of our or the surviving entity's total voting securities following the transaction) that has been approved by our stockholders and board of directors or (iii) subject to certain exceptions, the acquisition by any person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) of beneficial ownership of at least 50.01% of our voting securities, if recommended or approved by our board of directors or determined by our board of directors to be in our and our stockholders' best interests.

*Maintenance of One-to-One Ratios.* The SRII Opco LPA will include provisions intended to ensure that we at all times maintain a one-to-one ratio between (a) the number of outstanding shares of Class A Common Stock and the number of SRII Opco Common Units owned by Silver Run (subject to certain exceptions for certain rights to purchase Silver Run equity securities under a "poison pill" or similar stockholder rights plan, if any, certain convertible or exchangeable securities issued under Silver Run's equity compensation plans and certain equity securities issued pursuant to Silver Run's equity compensation plans (other than a stock option plan) that are restricted or have not vested thereunder) and (b) the number of outstanding shares of our Class C Common Stock and the number of SRII Opco Common Units owned by the Contributors. This construct is intended to result in the Contributors having a voting interest in Silver Run that is identical to the Contributors' economic interest in SRII Opco.

*Transfer Restrictions.* The SRII Opco LPA generally does not permit transfers of SRII Opco Common Units by limited partners, subject to limited exceptions. Any transferee of SRII Opco Common Units must assume, by operation of law or written agreement, all of the obligations of a transferring partner with respect to the transferred units, even if the transferee is not admitted as a partner of SRII Opco.

152

Table of Contents

*Dissolution.* The SRII Opco LPA will provide that the unanimous consent of all partners will be required to voluntarily dissolve SRII Opco. In addition to a voluntary dissolution, SRII Opco will be dissolved upon a change of control transaction under certain circumstances, as well as upon the entry of a decree of judicial dissolution or other circumstances in accordance with Delaware law. Upon a dissolution event, the proceeds of a liquidation will be distributed in the following order: (i) first, to pay the expenses of winding up SRII Opco; (ii) second, to pay debts and liabilities owed to creditors of SRII Opco; and (iii) third, to the limited partners pro-rata in accordance with their respective percentage ownership interests in SRII Opco (as determined based on the number of SRII Opco Common Units held by a limited partner relative to the aggregate number of all outstanding SRII Opco Common Units).

*Confidentiality.* Each partner will agree to maintain the confidentiality of SRII Opco's confidential information. This obligation excludes (i) information independently developed by the partners, (ii) information that is in the public domain or otherwise disclosed to a partner, in either such case not in violation of a confidentiality obligation owed to SRII Opco, (iii) information that is in the possession of a partner at the time of disclosure by SRII Opco or (iv) disclosures approved by our chief executive officer.

*Indemnification and Exculpation.* The SRII Opco LPA provides for indemnification of the partners and officers of SRII Opco and their respective subsidiaries or affiliates and provides that, except as otherwise provided therein, SRII Opco GP, as the general partner of SRII Opco, will have the same fiduciary duties to SRII Opco and its partners as are owed to a corporation organized under Delaware law and its stockholders by its directors.

### Registration Rights Agreement

In connection with the Closing, we and the Contributors will enter into a Registration Rights Agreement (the "Registration Rights Agreement"), pursuant to which we will be required to register for resale shares of Class A Common Stock issuable upon the future redemption or exchange of SRII Opco Common Units by the Contributors (collectively, "Registrable Securities").

We are required to, within 30 calendar days after consummation of the business combination, file a registration statement registering the resale of Registrable Securities held by the Contributors. If an underwritten offering is reasonably expected to result in gross proceeds of more than $50 million, (i) the Alta Mesa Contributor is entitled to demand six underwritten offerings, (ii) the Riverstone Contributor is entitled to demand three underwritten offerings and (iii) the Kingfisher Contributor is entitled to demand two underwritten offerings.

The holders will also have certain "piggy-back" registration rights with respect to registration statements and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. We will bear the expenses incurred in connection with the filing of any such registration statements.

### Second Amended and Restated Charter

Pursuant to the terms of the Contribution Agreements, upon the Closing, we will amend and restate our Charter (as so amended and restated, the "Second A&R Charter") to, among other things, (a) create a new class of capital stock, the Class C Common Stock, to be issued to the Contributors at the Closing and (b) provide for certain provisions described below relating to, among other things, the capital structure of Silver Run following the Closing.

*Description of Class C Common Stock.* Our Class C Common Stock will be a newly issued class of common stock, with a par value of $0.0001 per share. Shares of Class C Common Stock may be issued only to the Contributors, their respective successors and assigns, as well as any permitted transferees of the Contributors. A holder of Class C Common Stock may transfer shares of Class C Common Stock to any transferee (other than Silver Run) only if, and only to the extent permitted by the SRII Opco LPA, such holder also simultaneously

153

Table of Contents

transfers an equal number of such holder's SRII Opco Common Units to such transferee in compliance with the SRII Opco LPA. Holders of our Class C Common Stock will vote together as a single class with holders of our Class A Common Stock on all matters properly submitted to a vote of the stockholders. In addition after the Closing, holders of Class C Common Stock, voting as a separate class, will be entitled to approve any amendment, alteration or repeal of any provision of our Charter that would alter or change the powers, preferences or relative, participating, optional or other or special rights of the Class C Common Stock. Holders of Class C Common Stock will not be entitled to any dividends from Silver Run and will not be entitled to receive any of our assets in the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs.

After a specified period of time after the Closing, the Contributors will generally have the right to cause SRII Opco to redeem all or a portion of their SRII Opco Common Units in exchange for shares of our Class A Common Stock or, at the SRII's option, an equivalent amount of cash; provided that we may, at our option, effect a direct exchange of such cash or Class A Common Stock for such SRII Opco Common Units in lieu of such a redemption by SRII Opco. Upon the future redemption or exchange of SRII Opco Common Units held by a Contributor, a corresponding number of shares of Class C Common Stock will be cancelled. This construct is intended to result in the Contributors having a voting interest in Silver Run that is identical to the Contributors' economic interest in SRII Opco.

*Authorized Share Amendment.* The Second A&R Charter will increase the number of authorized shares of our Class A Common Stock from 400,000,000 shares to 1,200,000,000 shares.

*Exclusive Forum.* Our Second A&R Charter will also adopt Delaware as the exclusive forum for certain stockholder litigation

*Additional Amendments.* Our Second A&R Charter will also eliminate certain provisions relating to an Initial Business Combination that will no longer be applicable to us following the consummation of the business combination.

Please also see "Proposal No. 2—The Class C Charter Proposal", "Proposal No. 3—The Authorized Share Charter Proposal," "Proposal No. 4—The Exclusive Forum Charter Proposal," and "Proposal No. 5—The Additional Charter Proposal."

## Agreements Related to the Alta Mesa Contribution Agreement

### Series A Certificate of Designation

Upon the Closing, we will file with the Secretary of State of the State of Delaware the Certificate of Designation of Series A Preferred Stock of Silver Run Acquisition Corporation II, which will set forth the terms, rights, obligations and preferences of the Series A Preferred Stock that will be issued to Bayou City, HPS, and AM Management, at the Closing.

Our Series A Preferred Stock will be a newly issued class of preferred stock, with a par value of $0.0001 per share. Upon the Closing, Bayou City, HPS and AM Management will own the only outstanding shares of our Series A Preferred Stock, and may not transfer the Series A Preferred Stock or any rights, powers, preferences or privileges thereunder except to an affiliate (as defined in the SRII Opco LPA). The holders of the Series A Preferred Stock will not be entitled to vote on any matter on which stockholders generally are entitled to vote. In addition, the holders will not be entitled to any dividends from Silver Run but will be entitled to receive, after payment or provision for debts and liabilities and prior to any distribution in respect of our Class A Common Stock or any other junior securities, liquidating distributions in an amount equal to $0.0001 per share of Series A Preferred Stock in the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs.

The Series A Preferred Stock is not convertible into any other security of Silver Run, but will be redeemable for the par value thereof by us upon the earlier to occur of (1) the fifth anniversary of the Closing Date, (2) the

154

**Table of Contents**

optional redemption of such Series A Preferred Stock at the election of the holder thereof or (3) upon a breach of the transfer restrictions described above. For so long as the Series A Preferred Stock remains outstanding, the holders of the Series A Preferred Stock will be entitled to nominate and elect directors to Silver Run's board of directors for a period of five years following the Closing based on their and their affiliates' beneficial ownership of Class A Common Stock as follows:

| Holder / Beneficial Ownership and Other Requirements | Designation Right |
|---|---|
| ***Bayou City and its affiliates*** | |
| • at least 10% | one director who must be independent for purposes of the listing rules of NASDAQ |
| ***HPS and its affiliates*** | |
| • at least 10% | one director who must be independent for purposes of the listing rules of NASDAQ |
| ***AM Management and its affiliates*** | |
| • at least 10% | two directors who need not be independent for purposes of the listing rules of NASDAQ |
| • less than 10% but at least 5% and either Hal Chappelle or Michael Ellis is a member of the Company's management | one director who need not be independent for purposes of the listing rules of NASDAQ |

The vote of Bayou City, HPS and AM Management will be the only vote required to elect such nominees to the board of directors (each such director, in such capacity, a "Series A Director"). So long as the Series A Preferred Stock remains outstanding, vacancies on our board of directors resulting from the death, resignation, retirement, disqualification or removal of a Series A Director will be filled only by the affirmative vote of the holder of the Series A Preferred Stock. We will have the right to cause the removal of the Series A Director from our board of directors immediately upon redemption of the Series A Preferred Stock as described above.

### Management Services Agreement

In connection with the Closing, Alta Mesa will enter into a management services agreement (the "Management Services Agreement") with High Mesa. Under the Management Services Agreement, during the 180-day period following the Closing (the "Initial Term"), Alta Mesa will provide certain administrative, management and operational services necessary to manage the business of High Mesa and its subsidiaries (the "Services"), in each case, subject to and in accordance with an approved budget. Thereafter, the Management Services Agreement shall automatically renew for additional consecutive 180-day periods (each a "Renewal Term"), unless terminated by either party upon at least 90-days written notice to the other party prior to the end of the Initial Term or any Renewal Term. For a period of 60 days following the expiration of the term, Alta Mesa is obligated to assist High Mesa with the transition of the Services from Alta Mesa to a successor service provider. As compensation for the Services, including during any transition to a successor service provider, High Mesa will pay Alta Mesa each month (i) a management fee of $10,000, (ii) an amount equal to Alta Mesa's costs and expenses incurred in connection with providing the Services as provided for in the approved budget and (iii) an amount equal to Alta Mesa's costs and expenses incurred in connection with any emergency

Alta Mesa is obligated to provide the Services in accordance with reasonable and prudent practices, as relevant to the Services, of the oil and gas industry, and in material compliance with all applicable laws; provided that Alta Mesa will only be liable under the Management Services Agreement for its own gross negligence, willful misconduct and/or fraud. Alta Mesa is only obligated to provide the Services under the Management Services Agreement to the extent that High Mesa has provided the funds necessary to undertake such Services.

155

Table of Contents

Under the Management Services Agreement, High Mesa will have customary audit rights that will survive the termination or expiration of the Management Services Agreement. Each of High Mesa and Alta Mesa will have rights to terminate the Management Services Agreement prior to the expiration of the term (i) in the event of a sale or change of control of the other party, (ii) following an event related to bankruptcy of either party or (iii) following the other party's material breach. In addition, High Mesa will have the right to terminate the Management Services Agreement prior to the expiration of the term upon a sale or change of control of High Mesa.

**Tax Receivable Agreement**

As described in "Risk Factors—Risks Related to Silver Run and the Business Combination" above, in the future, each of the TRA Holders may exchange their SRII Opco Common Units for shares of our Class A Common Stock (on a one-for-one basis, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassification and other similar transactions) or for cash in certain circumstances, pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA. SRII Opco will have in effect an election under Section 754 of the Code for itself (and for each of its direct or indirect subsidiaries that is treated as a partnership for U.S. federal income tax purposes) effective for each taxable year in which an exchange of SRII Opco Common Units for shares of Class A Common Stock or cash occurs. Pursuant to this election under Section 754 of the Code, each future exchange of SRII Opco Common Units for Class A Common Stock or cash is expected to result in an adjustment to the tax basis of the tangible and intangible assets of SRII Opco, and these adjustments will be allocated to us. Adjustments to the tax basis of the tangible and intangible assets of SRII Opco described above would not have been available to us absent these exchanges of SRII Opco Common Units. The anticipated basis adjustments are expected to increase (for tax purposes) our share of the depreciation, depletion and amortization deductions of SRII Opco and may also decrease our gains (or increase our losses) on future dispositions of certain SRII Opco capital assets to the extent tax basis is allocated to those capital assets. Such increased deductions and losses and reduced gains may reduce the amount of tax that we would otherwise be required to pay in the future.

We will enter into the Tax Receivable Agreement with SRII Opco and the Initial Limited Partners. This agreement will generally provide for the payment by us of 85% of the amount of net cash savings, if any, in U.S. federal, state and local income tax that we actually realize (or are deemed to realize in certain circumstances) in periods after the business combination as a result of (i) certain tax basis increases resulting from the exchange of SRII Opco Common Units for Class A Common Stock (or, in certain circumstances, cash) pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA, other than such tax basis increases allocable to assets held by Kingfisher or otherwise used in Kingfisher's midstream business, and (ii) interest paid or deemed to be paid by us as a result of, and additional tax basis arising from, any payments we make under the Tax Receivable Agreement. We will retain the benefit of the remaining 15% of these cash savings.

The payment obligations under the Tax Receivable Agreement are our obligations and not obligations of SRII Opco, and we expect that the payments we will be required to make under the Tax Receivable Agreement may be substantial. For purposes of the Tax Receivable Agreement, cash savings in tax generally are calculated by comparing our actual tax liability to the amount we would have been required to pay had we not been entitled to any of the tax benefits subject to the Tax Receivable Agreement. In other words, we would calculate our federal, state and local income liabilities as if no tax attributes arising from a redemption or direct exchange of SRII Opco Common Units had been transferred to us. The term of the Tax Receivable Agreement will commence following the completion of the business combination and will continue until all such tax benefits have been utilized or have expired, unless we exercise our right to terminate the Tax Receivable Agreement or the Tax Receivable Agreement is otherwise terminated.

The actual increase in tax basis will vary depending upon the timing of the exchanges, the price of Class A Common Stock at the time of each exchange, the extent to which such exchanges are taxable transactions and the

156

Table of Contents

amount of the exchanging TRA Holder's tax basis in its SRII Opco Common Units at the time of the relevant exchange. The amount of such cash payments is also based on the amount and timing of taxable income we generate in the future, the U.S. federal income tax rate then applicable and the portion of Silver Run's payments under the Tax Receivable Agreement that constitute interest or give rise to depreciable or amortizable tax basis. Accordingly, we are not able to estimate the actual amount of payments that would be expected under the Tax Receivable Agreement. However, we expect that the payments that we will be required to make under the Tax Receivable Agreement could be material based on certain assumptions, including as to the matters described above. Moreover, there may be a negative impact on our liquidity if, as a result of timing discrepancies or otherwise, (i) the payments under the Tax Receivable Agreement exceed the actual benefits we realize in respect of the tax attributes subject to the Tax Receivable Agreement and/or (ii) distributions to us by SRII Opco are not sufficient to permit us to make payments under the Tax Receivable Agreement after we have paid our taxes and other obligations. Please see "Risk Factors—Risks Related to Silver Run and the Business Combination —In certain cases, payments under the Tax Receivable Agreement may be accelerated and/or significantly exceed the actual benefits, if any, we realize in respect of the tax attributes subject to the Tax Receivable Agreement." The payments under the Tax Receivable Agreement will not be conditioned upon a holder of rights under the Tax Receivable Agreement having a continued ownership interest in either SRII Opco or us.

In addition, the TRA Holders will not reimburse us for any cash payments previously made under the Tax Receivable Agreement if any tax benefits initially claimed by us are challenged by the IRS or other relevant tax authority and are ultimately disallowed, except that excess payments made to TRA Holders will be netted against payments otherwise to be made, if any, to the TRA Holders after our determination of such excess. As a result, in such circumstances, we could make payments that are greater than our actual cash tax savings, if any, and may not be able to recoup those payments, which could adversely affect our liquidity.

Additionally, if the Tax Receivable Agreement terminates early (at our election or as a result of our material breach of our obligations under the Tax Receivable Agreement, whether as a result of our failure to make any payment when due, failure to honor any other material obligation under it or by operation of law as a result of the rejection of the Tax Receivable Agreement in a case commenced under the United States Bankruptcy Code or otherwise), we would be required to make a substantial, immediate lump-sum payment. This payment would equal the present value of hypothetical future payments that could be required to be paid under the Tax Receivable Agreement (calculated using a discount rate of 18%). The calculation of the hypothetical future payments will be based upon certain assumptions and deemed events set forth in the Tax Receivable Agreement, including that (i) we have sufficient taxable income to fully utilize the tax benefits covered by the Tax Receivable Agreement, (ii) all taxable income of Silver Run is subject to the maximum applicable tax rates throughout the relevant period and (iii) certain loss or credit carryovers will be utilized through the expiration date of such carryovers.

Any payment upon early termination may be made significantly in advance of the actual realization, if any, of the future tax benefits to which the payment obligation relates. Because of the deductions and other tax incentives available to us with respect to oil and natural gas exploration and production, our ability to generate net taxable income in the future is subject to substantial uncertainty. Accordingly, our ability to use the tax benefits covered by the Tax Receivable Agreement may be significantly delayed, and such tax benefits may expire before we are able to utilize them. Except in the event of an early termination, we generally will not be obligated to make a payment under the Tax Receivable Agreement with respect to any tax benefits that we are unable to utilize.

Assuming no material changes in the relevant tax law, we expect that if the Tax Receivable Agreement was terminated immediately after the business combination, the estimated termination payments, based on the assumptions discussed herein and certain other assumptions, would be approximately $83.9 million (calculated using a discount rate equal to 18%). The foregoing amounts are merely estimates, and the actual payments could differ materially. It is possible that future transactions or events could increase or decrease the actual tax benefits realized and the Tax Receivable Agreement payments as compared to the foregoing estimates.

157

Table of Contents

Decisions we make in the course of running our business, such as with respect to mergers, asset sales, other forms of business combinations or other changes in control, may influence the timing and amount of payments that are received by the TRA Holders under the Tax Receivable Agreement. For example, the earlier disposition of assets following an exchange of SRII Opco Common Units may accelerate payments under the Tax Receivable Agreement and increase the present value of such payments, and the disposition of assets before an exchange of SRII Opco Common Units may increase the TRA Holders' tax liability without giving rise to any rights to receive payments under the Tax Receivable Agreement. Such effects may result in differences or conflicts of interest between the interests of TRA Holders and other stockholders.

Payments will generally be due under the Tax Receivable Agreement within 30 days following the finalization of the schedule with respect to which the payment obligation is calculated, although interest on such payments will begin to accrue from the due date (without extensions) of such tax return until such payment due date at a rate equal to LIBOR, plus 100 basis points. Except in cases where we elect to terminate the Tax Receivable Agreement early or we have available cash but fail to make payments when due, generally we may elect to defer payments due under the Tax Receivable Agreement if we do not have available cash to satisfy our payment obligations under the Tax Receivable Agreement or if our contractual obligations limit our ability to make these payments. Any such deferred payments under the Tax Receivable Agreement generally will accrue interest at a rate of LIBOR plus 500 basis points; provided, however, that interest will accrue at a rate of LIBOR plus 100 basis points if we are unable to make such payment as a result of limitations imposed by existing credit agreements.

Because we are a holding company with no operations of our own, our ability to make payments under the Tax Receivable Agreement is dependent on the ability of SRII Opco to make distributions to us in an amount sufficient to cover our obligations under the Tax Receivable Agreement; this ability, in turn, may depend on the ability of SRII Opco's subsidiaries to make distributions to it. The ability of SRII Opco and its subsidiaries to make such distributions will be subject to, among other things, the applicable provisions of Delaware law that may limit the amount of funds available for distribution and restrictions in relevant debt instruments issued by SRII Opco and/or its subsidiaries. To the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, such payments will be deferred and will accrue interest until paid.

**Pre-Closing Assignment Agreement**

Prior to the Closing, Alta Mesa will enter into the Assignment Agreement to transfer to its existing owners (other than the Riverstone Contributor) its non-STACK assets pursuant to the terms of the Alta Mesa Contribution Agreement, and such existing owners will indemnify Alta Mesa for any losses relating to employment, environmental and tax liabilities of such non-STACK assets.

**Voting Agreement**

Certain existing owners of Alta Mesa, including Mr. Chappelle, Mr. Ellis and certain affiliates of Bayou City and HPS, own an aggregate 10% voting interest in Alta Mesa GP and will continue to own such interest following the Closing. These existing owners are a party to a voting agreement with the Alta Mesa Contributor and Alta Mesa GP, pursuant to which they have agreed to vote their interests in Alta Mesa GP as directed by the Alta Mesa Contributor. In connection with the Closing, the parties will amend and restate the voting agreement to include SRII Opco as a party and the existing owners will agree to vote their interests in Alta Mesa GP as directed by SRII Opco and appoint SRII Opco as their respective proxy and attorney-in-fact with respect to any voting matters related to their respective interests in Alta Mesa GP. The voting agreement will continue in force until SRII Opco elects to terminate the agreement or, with respect to each existing owner individually, such existing owner no longer owns a voting interest in Alta Mesa GP.

158

Table of Contents

**Agreements Related to the Kingfisher Contribution Agreement**

**Restrictive Covenant Agreement**

Upon the Closing, we will enter into a Restrictive Covenant Agreement with ARM, the current operator of Kingfisher's assets, pursuant to which ARM will agree to not conduct certain midstream services in Kingfisher, Garfield, Major, Blaine and Logan Counties, Oklahoma and certain townships in Canadian County, Oklahoma.

**Transition Services Agreement**

Upon the Closing, Kingfisher will enter into an operating transition services agreement (the "Transition Services Agreement") with ARM. Under the Transition Services Agreement, during the six-month period following the Closing, ARM will provide certain operational services with respect to certain gas gathering and processing systems and crude oil gathering facilities that are owned, or may be acquired, by Kingfisher in Kingfisher County, Oklahoma (the "TSA Services"), in each case, subject to and in accordance with an approved budget. As compensation for the TSA Services, Kingfisher will pay ARM each month (i) a management fee of $10,000, (ii) an amount equal to ARM's costs and expenses incurred in connection with providing the TSA Services as provided for in the approved budget and (iii) an amount equal to ARM's costs and expenses incurred in connection with any emergency.

ARM is obligated to provide the TSA Services in a good and workmanlike manner, in accordance with: (i) reasonable, customary and prudent practices in the oil and gas industry for performing services similar in scope and nature to the TSA Services and (ii) all applicable laws; provided that ARM will only be liable under the Transition Services Agreement for its own gross negligence, willful misconduct and/or fraud.

Under the Transition Services Agreement, Kingfisher will have customary audit rights that will survive the termination or expiration of the Transition Services Agreement, and ARM is required to provide certain monthly reports, including unaudited financial statements and reports relative to the business of Kingfisher. Each of Kingfisher and ARM will have rights to terminate the Transition Services Agreement prior to the expiration of the term (i) in the event of an extended force majeure event or (ii) following the other party's material breach. In addition, Kingfisher will have the right to terminate the Transition Services Agreement prior to the expiration of the term upon 60 days' notice given by ARM.

**Agreements Related to the Riverstone Contribution Agreement**

**Series B Certificate of Designation**

Upon the Closing, we will file with the Secretary of State of the State of Delaware the Certificate of Designation of Series B Preferred Stock of Silver Run Acquisition Corporation II, which will set forth the terms, rights, obligations and preferences of the Series B Preferred Stock which will be issued to the Riverstone Contributor at the Closing.

Our Series B Preferred Stock will be a newly issued class of preferred stock, with a par value of $0.0001 per share. Upon the Closing, the Riverstone Contributor will own the only outstanding share of our Series B Preferred Stock, and may not transfer the Series B Preferred Stock or any rights, powers, preferences or privileges thereunder except to an affiliate (as defined in the SRII Opco LPA). The holder of the Series B Preferred Stock will not be entitled to vote on any matter on which stockholders generally are entitled to vote. In addition, the holder will not be entitled to any dividends from Silver Run but will be entitled to receive, after payment or provision for debts and liabilities and prior to any distribution in respect of our Class A Common Stock or any other junior securities, liquidating distributions in an amount equal to $0.0001 per share of Series B Preferred Stock in the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs.

The Series B Preferred Stock is not convertible into any other security of Silver Run, but will be redeemable for the par value thereof by us upon the earlier to occur of (1) the fifth anniversary of the Closing Date, (2) the

159

Table of Contents

optional redemption of such Series B Preferred Stock at the election of the holder thereof or (3) upon a breach of the transfer restrictions described above. For so long as the Series B Preferred Stock remains outstanding, the holder of the Series B Preferred Stock will be entitled to nominate and elect directors to Silver Run's board of directors for a period of five years following the Closing based on its and its affiliates' beneficial ownership of Class A Common Stock as follows:

| Holder / Beneficial Ownership and Other Requirements | Designation Right |
| --- | --- |
| *Riverstone Contributor and its affiliates* | |
| • at least 15% | three directors (one of whom will be the Chairman) |
| • less than 15% but at least 10% | two directors (one of whom will be the Chairman) |
| • less than 10% but at least 5% | one director (who may be the Chairman if such person is Jim Hackett) |

The vote of the Riverstone Contributor will be the only vote required to elect such nominees to the board of directors (each such director, in such capacity, a "Series B Director"). So long as the Series B Preferred Stock remains outstanding, vacancies on our board of directors resulting from the death, resignation, retirement, disqualification or removal of a Series B Director will be filled only by the affirmative vote of the holder of the Series B Preferred Stock. We will have the right to cause the removal of the Series B Director from our board of directors immediately upon redemption of the Series B Preferred Stock as described above.

### Background of the Business Combination

Silver Run is a blank check company that was formed in Delaware on November 16, 2016, for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. The proposed business combination with Alta Mesa and Kingfisher is the result of an extensive search for a potential transaction utilizing the global network and investing and operating experience of our management team, board of directors, and external advisors and those of Riverstone. The following is a description of the background of the negotiations of the Contribution Agreements, business combination and related transactions.

Prior to the consummation of our IPO, neither Silver Run, nor anyone on its behalf, contacted any prospective target business or had any substantive discussions, formal or otherwise, with respect to a transaction with Silver Run.

Beginning on the closing date of our IPO, Silver Run began to search for business combination candidates. As part of the search process, representatives of Silver Run and Riverstone contacted, and were contacted by, a number of individuals and entities with respect to business combination opportunities and engaged with several possible target businesses in discussions with respect to potential transactions.

Following our IPO, James Hackett, the Chairman and Chief Executive Officer of Silver Run, Stephen Coats, the Secretary of Silver Run, and representatives of Riverstone, including Robert Tichio, Olivia Wassenaar, John Staudinger, Drew Karian, Chelsea Williamson, Neil Babaria and Kevin Wang:

- developed a list of approximately 50 potential exploration and production and midstream opportunities, including Alta Mesa and Kingfisher, located in Silver Run's targeted areas— the Anadarko Basin (including the STACK), the Permian Basin, the Bakken Shale Play, the Eagle Ford Shale Play, the Montney Shale Play, the Powder River Basin shale plays, and offshore, deep water Gulf of Mexico;

- engaged in discussions with representatives of approximately 25 potential acquisition targets; and

- considered and conducted analysis of approximately 15 potential acquisition targets.

Apart from Alta Mesa and Kingfisher, Silver Run conducted due diligence with multiple alternative target opportunities. The decision to ultimately pursue Alta Mesa and Kingfisher over the alternative acquisition targets

160

Table of Contents

was generally the result of one or more of (i) Mr. Hackett and Riverstone's determination that Alta Mesa and Kingfisher were of superior quality, (ii) the alternative options did not entirely fit the investment criteria of Silver Run, (iii) a seller's unwillingness to engage in a transaction during the low-price phase of the oil and gas commodity cycle, (iv) a difference in valuation expectations between Mr. Hackett and Riverstone, on the one hand, and a seller, on the other hand, (v) a seller's unwillingness to engage with Silver Run given the timing and uncertainty of closing due to the requirement for Silver Run to obtain stockholder approval and/or (vi) Mr. Hackett and Riverstone's determination that the complexity, uncertainty, and timeline involved caused the opportunity to be too unlikely to warrant the expenditure of considerable resources.

On March 31, 2017, William McMullen, Founder & Managing Partner of Bayou City, and Mr. Hackett were introduced via email and agreed to meet in person to discuss Bayou City's investment in Alta Mesa. Following the discussion, Mr. Hackett asked to be introduced to the management teams at Alta Mesa and ARM, the operator of Kingfisher's assets. Mr. McMullen introduced Mr. Hackett to both Harlan Chappelle, Chief Executive Officer of Alta Mesa, and Zach Lee, Chief Executive Officer of ARM, via email.

On April 3, 2017, Mr. Hackett met with Mr. Chappelle at Alta Mesa's office in Houston, Texas to learn about Alta Mesa's history, planned initial public offering, for which a confidential draft registration statement had been submitted to the SEC, and future growth plans.

On April 5, 2017, Mr. Hackett met with Mr. Lee and Michael Christopher, Chief Financial Officer of ARM, at ARM's offices in Houston, Texas to discuss Kingfisher's business and, in particular, its sales process and growth opportunities.

On April 9, 2017, to facilitate discussions about a potential transaction involving Silver Run and Alta Mesa, Riverstone and an affiliate of Alta Mesa signed a confidentiality agreement.

On April 10, 2017, to facilitate discussions about a potential transaction involving Silver Run and Kingfisher, Riverstone and Kingfisher signed a confidentiality agreement.

Also on April 10, 2017, a meeting took place with the Alta Mesa management team, including Mr. Chappelle and Michael McCabe, Chief Financial Officer of Alta Mesa, and representatives of Riverstone in Houston, Texas at Alta Mesa's office. Mr. Chappelle and other members of Alta Mesa's management team provided detailed information about Alta Mesa's corporate history, acreage, production history, well performance, assets, financial results and future development plans, and they agreed to make additional information available upon request.

On April 15, 2017, Silver Run contacted Jeff Knupp, a Managing Director at Tudor, Pickering, Holt & Co. ("TPH"), to discuss TPH assisting in the technical due diligence review of Alta Mesa's acreage and reserves. Silver Run selected TPH due to TPH's upstream technical expertise and familiarity with the STACK from previous advisory assignments.

On April 20, 2017, a meeting took place among ARM, representatives of J.P. Morgan Securities LLC, financial advisor to Kingfisher ("J.P. Morgan"), Riverstone, Silver Run and TPH. J.P. Morgan and ARM presented an overview of Kingfisher's corporate history, the midstream assets, the quality of the upstream acreage, the drilling activity of upstream producers in the region, contracts with producer customers, future growth and development plans, and forecasted financials. In addition, ARM agreed to make additional diligence information available upon request.

On April 25, 2017, representatives of TPH provided a summary of its due diligence to Mr. Hackett, Mr. Coats and representatives of Riverstone, including David Leuschen and Pierre Lapeyre, at Riverstone's office in New York, New York. The due diligence summary described TPH's evaluation of the geology and petrophysics of the area in and around Alta Mesa's position as well as TPH's assessment of Alta Mesa's single

161

Table of Contents

well type curves and horizontal drilling inventory by target zone and area. The Silver Run officers and representatives of Riverstone asked TPH questions regarding its diligence and requested follow-up analysis.

On April 27, 2017, Silver Run engaged Latham & Watkins LLP ("Latham") as its legal counsel.

Following the initial meetings with Alta Mesa on April 10, 2017 and Kingfisher on April 20, 2017, Silver Run, Riverstone and their advisors continued to exchange information with Alta Mesa and Kingfisher, conducting extensive environmental, title, tax and business due diligence and evaluation of the assets based on confidential information provided as well as publicly available information. Based on Mr. Hackett's and Riverstone's review of the diligence materials, Mr. Hackett and Riverstone determined that (i) Alta Mesa had assembled an attractive, large, contiguous position in the up-dip, naturally-fractured oil portion of the STACK, one of the most active and prolific basins in North America, (ii) Alta Mesa had a large, highly economic horizontal drilling inventory across multiple pay zones with low oil price breakevens, (iii) Alta Mesa had an experienced management team with proven horizontal drilling expertise and technical acumen in the STACK, (iv) Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines, (v) Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects, (vi) Kingfisher would serve as a natural complement to Alta Mesa given the relationship between the two businesses, and (vii) there was significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering. Based upon these considerations, Mr. Hackett and Riverstone concluded that Alta Mesa and Kingfisher, together, would be an attractive target for Silver Run, subject to reaching attractive deal terms and further due diligence.

On May 2, 2017, Mr. Tichio sent an email and a non-binding term sheet to Mr. Chappelle outlining an indicative, non-binding proposal to acquire Alta Mesa through a recapitalization transaction. This initial proposal valued Alta Mesa at $2.7 billion.

On May 4, 2017, Mr. Hackett, Mr. Tichio and Ms. Wassenaar presented an overview of Alta Mesa and Kingfisher to the Investment Committee of Fund VI Holdings and updated the committee on the preliminary, non-binding proposal. Later that day, the Silver Run board of directors met via teleconference, and Mr. Hackett updated the rest of the directors on potential transactions that Silver Run management was currently evaluating, centered mainly on the Permian and Anadarko Basins. Alta Mesa and Kingfisher were mentioned as potential acquisitions of interest.

Also on May 4, 2017, Mr. Chappelle engaged Citigroup Global Markets Inc. ("Citigroup") as Alta Mesa's financial advisor in connection with a possible transaction with Silver Run. Alta Mesa selected Citigroup due to its ongoing work leading the initial public offering of an affiliate of Alta Mesa as well as work done on prior strategic advisory assignments.

On May 6, 2017, Mr. Tichio and Mr. Chappelle spoke to discuss the proposal. During the course of the call, Mr. Tichio communicated that Silver Run was prepared to offer around $1.3 billion to acquire Kingfisher and reiterated Silver Run's proposal to acquire Alta Mesa for $2.7 billion. The proposed amounts represented Silver Run's initial view of the enterprise value of Alta Mesa and Kingfisher on a debt-free and cash-free basis, and Mr. Tichio noted the consideration could consist of a combination of cash and equity. Valuation methodologies used to determine enterprise value of Alta Mesa and Kingfisher included a net asset value or discounted cash flow analysis, comparable company valuation benchmarking as well as comparable precedent transaction valuation benchmarking. Mr. Chappelle indicated that the $1.3 billion price for Kingfisher, as well as the $2.7 billion offer for Alta Mesa, was insufficient.

On May 19, 2017, Ms. Wassenaar discussed the Kingfisher proposal with Mr. Christopher, including the proposed purchase price, structure, timeline, execution steps, and outstanding due diligence items. Ms. Wassenaar and Mr. Christopher also discussed the form of consideration to be proposed to the owners of Alta Mesa and Kingfisher, including the general desire of the owners of Kingfisher to receive mostly cash consideration and the preference by the owners of Alta Mesa to receive mostly equity consideration.

162

Table of Contents

Also on May 19, 2017, Mr. Hackett sent an updated term sheet to Mr. Chappelle, which contemplated Silver Run acquiring Kingfisher for $1.4 billion in cash and Alta Mesa for $3.0 billion, the majority of which would consist of equity in a newly formed limited partnership controlled by Silver Run that would be redeemable for shares of Class A Common Stock. In determining these proposed amounts and the allocation between cash and equity, Silver Run considered (i) the preference of the Kingfisher owners for cash consideration, (ii) the preference of the Alta Mesa owners for equity consideration, (iii) the expectation that Silver Run would engage in a financing transaction that would raise approximately $500 million prior to the Closing, (iv) the approximate $1.0 billion balance in Silver Run's trust account and (v) Silver Run's desire to maintain a conservative balance sheet at the combined company following the Closing. Silver Run proposed this "Up-C" transaction structure to (i) provide the owners of Alta Mesa with interests in a pass-through entity that would defer their tax liability until they redeemed such interests for shares of Class A Common Stock and (ii) provide Silver Run with a step up in tax basis relating to the Alta Mesa assets, which would result in higher amortization and depreciation deductions at Silver Run. Because of the distinct business operations of Alta Mesa and Kingfisher, Silver Run proposed that each of Alta Mesa and Kingfisher become separate wholly owned subsidiaries of the pass-through limited partnership, which would allow Silver Run to more efficiently manage such operations following Closing.

On May 24, 2017, representatives of Riverstone, Alta Mesa, ARM, HPS, Bayou City, Citigroup and J.P. Morgan met at Citigroup's office in Houston, Texas to review several major outstanding deal items, in hopes of reaching a tentative agreement on transaction terms. During the meeting, the group made the decision that Silver Run should expedite its diligence of Kingfisher such that Kingfisher could make a determination with respect to offers from Silver Run and other parties. After the meeting, Mr. Christopher sent to Ms. Wassenaar an initial draft of the Kingfisher Contribution Agreement.

On May 26, 2017, Alta Mesa publicly announced that an affiliated entity had previously submitted a confidential draft registration statement on Form S-1 to the SEC.

On May 31, 2017, Mr. Hackett and representatives of Riverstone met with ARM at ARM's Houston, Texas office to discuss the upstream economics of Kingfisher's acreage dedications and the future growth plans for Kingfisher.

Also on May 31, 2017, Riverstone engaged Ernst & Young ("E&Y") to assist Riverstone and Silver Run on accounting and financial due diligence with respect to Alta Mesa and Kingfisher.

On June 1, 2017, Ms. Wassenaar sent a revised draft of the Kingfisher Contribution Agreement to Mr. Christopher. This revised draft, among other changes, reflected (i) a condition that Silver Run's stockholders approve the Kingfisher Contribution Agreement and related transactions, (ii) an arrangement to escrow 10% of the cash purchase price to support post-Closing indemnification claims by Silver Run and certain post-Closing purchase price adjustments, (iii) a condition that less than 2.5% of the holders of Silver Run's Class A Common Stock exercise their redemption right in connection with the business combination (the "maximum redemption condition") and (iv) the Up-C transaction structure that had been proposed in the term sheet that Mr. Hackett had previously sent to Mr. Chappelle on May 19, 2017. The revised draft of the Kingfisher Contribution Agreement also removed the requirement that Silver Run deposit into escrow 10% of the purchase price on the signing date, a concept that had been included in the initial draft.

On June 6, 2017, Latham sent an initial draft of the Alta Mesa Contribution Agreement to Alta Mesa.

On June 7, 2017, the Investment Committee of Fund VI Holdings and Mr. Hackett met again for an update and detailed review of the Alta Mesa and Kingfisher transactions. The Investment Committee of Fund VI Holdings and Mr. Hackett discussed proposing revised bids of up to $3.0 billion for Alta Mesa and up to $1.6 billion for Kingfisher, subject to negotiation of terms and completion of full due diligence.

On June 8, 2017, Mr. Hackett and representatives of Riverstone met with representatives from Alta Mesa at Alta Mesa's office in Houston, Texas to further discuss and diligence Alta Mesa's business. Also in attendance

163

**Table of Contents**

were representatives of Rock Oil, a Riverstone-backed portfolio company, and representatives of Meridian, a Riverstone-employed technical team, who were invited by Silver Run and Riverstone to assist further with technical and operational due diligence given their technical and operational experience, particularly in the Anadarko Basin.

Also on June 8, 2017, Mr. Christopher sent a revised draft of the Kingfisher Contribution Agreement to representatives of Latham and Riverstone. Among other changes, the revised draft eliminated all post-Closing indemnification remedies and re-introduced the requirement of a cash deposit, which would be funded by a Riverstone entity at the signing of the Kingfisher Contribution Agreement.

On June 11, 2017, Riverstone and Mr. Hackett communicated a revised bid of $3.0 billion for Alta Mesa and $1.6 billion for Kingfisher.

Also on June 11, 2017, Ms. Wassenaar sent a material issues list relating to the Kingfisher Contribution Agreement to representatives of ARM and Bracewell LLP, Kingfisher's legal counsel ("Bracewell").

On June 12, 2017, representatives of Riverstone, ARM, Latham and Bracewell telephonically discussed the Kingfisher Contribution Agreement and the material issues list from the previous day.

On June 13, 2017, Haynes and Boone, LLP ("Haynes and Boone"), legal counsel to Alta Mesa, sent a revised draft of the Alta Mesa Contribution Agreement to representatives of Latham, which eliminated post-closing indemnification remedies, introduced the requirement that a Riverstone entity fund a cash deposit into escrow at the signing of the Alta Mesa Contribution Agreement and deleted the purchase price adjustments for net working capital, debt and transaction related expenses, among other issues.

On June 16, 2017, Latham sent a revised draft of the Kingfisher Contribution Agreement to representatives of ARM, Kingfisher and Bracewell, reflecting the previous discussion on June 12, 2017.

On June 19, 2017, Mr. Christopher sent an issues list relating to the revised Kingfisher Contribution Agreement to representatives of Latham and Riverstone, which proposed that the parties eliminate the maximum redemption condition in the Kingfisher Contribution Agreement and instead include a condition that Kingfisher receives a minimum amount of cash consideration, which Kingfisher could waive and, in such event, accept more equity and less cash. The issues list also proposed the removal of post-Closing indemnification remedies.

On June 20, 2017, Haynes and Boone sent an issues list relating to the Alta Mesa Contribution Agreement to representatives of Latham. The material items on the issues list related to (i) the financing and maximum redemption conditions, (ii) the escrow and indemnification provisions, (iii) the restrictive covenants of Alta Mesa and Silver Run during the interim period and (iv) the working capital purchase price adjustments. In addition, the issues list proposed that Riverstone fund certain capital expenditures by Alta Mesa during the interim period in exchange for equity in Alta Mesa. Silver Run and Riverstone initially proposed such an arrangement to address Alta Mesa's prior requests for a cash deposit at signing, which Silver Run would be unable to pay due to the restrictions imposed on its trust account. The issues list also included a proposal that the Alta Mesa Contributor enter into a tax receivable agreement with Silver Run at the Closing.

On June 22, 2017, Latham sent Silver Run's responses to the Alta Mesa Contribution Agreement issues list sent by Haynes and Boone. The responses included Silver Run's rationale for a financing condition, a proposal to include a leverage ratio condition in lieu of the previously proposed maximum redemption condition and post-closing indemnification remedies limited to an escrow amount equal to 10% of the purchase price. Silver Run also confirmed Riverstone's intent to fund Alta Mesa's capital expenditures during the interim period in exchange for equity in Alta Mesa, which would remain in place even if the acquisition did not close. Mr. Lee, Mr. Christopher and representatives of HPS met with Ms. Wassenaar and Mr. Tichio at the offices of HPS in New York, New York, in order to further discuss Silver Run's responses to the Kingfisher issues list.

164

Table of Contents

Also on June 22, 2017, Ms. Wassenaar sent Silver Run's responses to the Kingfisher issues list, which included a proposal to structure the $1.6 billion purchase price as 90% cash and 10% equity in SRII Opco. The responses also included Silver Run's rationale for a financing condition, a proposal to include a leverage ratio condition in lieu of the previously proposed maximum redemption condition and reiterated the need for post-closing indemnification remedies.

On June 24, 2017, Haynes and Boone sent a revised draft of the Alta Mesa Contribution Agreement to representatives of Latham. The revised draft (i) removed the working capital and other purchase price adjustments, (ii) revised the purchase price adjustments relating to Alta Mesa's pre-Closing capital expenditures, (iii) removed the maximum redemption condition, (iv) removed the post-Closing indemnification remedies and (v) added a condition that the parties execute a tax receivable agreement.

On June 26, 2017, Latham sent an issues list relating to the Alta Mesa Contribution Agreement to representatives of Haynes and Boone. The issues list noted that Silver Run would be willing to discuss removing the post-Closing indemnification remedies since Alta Mesa had been a voluntary filer of Exchange Act reports for over six years, but Silver Run reiterated the need for a financing condition and rejected the inclusion of a tax receivable agreement in the issues list. The issues list also described in further detail Riverstone's proposed commitment to fund Alta Mesa's capital expenditures and specifically provided for a contribution of up to $200 million, in exchange for an equity interest in Alta Mesa that would be contributed to SRII Opco at the Closing for equity in SRII Opco.

On June 27, 2017, representatives of Latham, Riverstone, Silver Run, Haynes and Boone and Alta Mesa discussed the issues list relating to the Alta Mesa Contribution Agreement and Silver Run's responses. While discussing the post-Closing indemnification remedies, Silver Run agreed to eliminate the remedies from the Alta Mesa Contribution Agreement due to Alta Mesa's Exchange Act reporting history, which made the deal more akin to a public-public merger, where a buyer would not receive post-closing indemnification.

Also on June 27, 2017, Mr. Christopher sent a revised draft of the Kingfisher Contribution Agreement to representatives of Latham, Riverstone and Silver Run. The revised draft reflected, among other things, a leverage ratio condition, re-introduced a condition that the parties enter into a tax receivable agreement and restored post-closing indemnities, but limited the indemnification claims to escrowed equity in SR II Opco, which would equal 10% of the purchase price.

On July 1, 2017, Latham sent a revised issues list for the Kingfisher Contribution Agreement to representatives of Bracewell and ARM, which indicated, among other things, that Silver Run was not willing to accept the requested tax receivable agreement.

Between July 2, 2017 and July 4, 2017, representatives of Latham, Riverstone, Bracewell and ARM exchanged updated drafts of the issues list relating to the Kingfisher Contribution Agreement, which focused primarily on the survival periods and liability limitations regarding the post-Closing indemnification.

On July 8, 2017, Latham sent a revised draft of the Kingfisher Contribution Agreement to representatives of Bracewell and ARM, which reflected the agreed points from the parties' discussion of the issues list relating to the Kingfisher Contribution Agreement.

On July 11, 2017, Bracewell sent a revised draft of the Kingfisher Contribution Agreement to representatives of Latham and Riverstone.

On July 12, 2017, representatives of Latham, Riverstone, Silver Run, Bracewell and ARM met at the offices of Bracewell in Houston, Texas to discuss the latest draft of the Kingfisher Contribution Agreement. The topics discussed included, among others, the entry into a tax receivable agreement and certain covenants of Silver Run and Kingfisher.

165

Table of Contents

Over the course of June and early July, commodity prices fell materially, with crude prices dropping from over $50 per barrel to approximately $45 per barrel, and the capital markets weakened, with comparable publicly traded entities for both Alta Mesa and Kingfisher trading down. Riverstone and Mr. Hackett reviewed market conditions with both TPH and Citigroup, a financial advisor selected by Silver Run to act as placement agent if Silver Run engaged in a PIPE transaction.

On July 12, 2017, Mr. Hackett and Mr. Chappelle met at Alta Mesa's office. Mr. Hackett communicated a revised proposal with a $2.5 billion valuation for Alta Mesa, based on market conditions. The proposal also featured an earn-out that could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $600 million. The earn-out was structured such that additional SRII Opco Common Units would be issued to the Alta Mesa Contributor if the 20-day VWAP of Silver Run's Class A Common Stock exceeded certain trading thresholds from $14 to $20 per share. At that time, Riverstone did not revise its offer for Kingfisher, as the midstream business was more insulated from commodity price fluctuations.

On July 13, 2017, Latham sent a revised draft of the Kingfisher Contribution Agreement to representatives of Bracewell, ARM and Kingfisher, reflecting revisions based on the meeting from the previous day, including removing the requirement that Silver Run and the Kingfisher Contributor enter into a tax receivable agreement.

On July 14, 2017, Latham sent a revised draft of the Alta Mesa Contribution Agreement to representatives of Haynes and Boone and Alta Mesa, which reflected the $2.5 billion valuation for Alta Mesa and the earn-out consideration discussed at Alta Mesa's offices on July 12, 2017. This draft also reflected a condition that the parties execute a tax receivable agreement as proposed in the draft of the Alta Mesa Contribution Agreement sent by Haynes and Boone on June 24, 2017.

Also on July 14, 2017, Latham sent a draft of the Riverstone Contribution Agreement to representatives of Bracewell, ARM, Kingfisher, Haynes and Boone and Alta Mesa. As previously discussed among the parties, the Riverstone Contribution Agreement contemplated a Riverstone entity contributing the equity it received from Alta Mesa during the interim period to SRII Opco in exchange for SRII Opco Common Units.

Over July 15, 2017 and July 16, 2017, there were several calls between Mr. Hackett, Ms. Wassenaar, Mr. Chappelle and Mr. McCabe regarding the value and structure of the Alta Mesa earn-out consideration. After extensive discussions, on July 16, 2017 Mr. Hackett and Mr. Chappelle agreed that the earn-out consideration would be increased to a maximum of up to $700 million.

On July 16, 2017, Bracewell sent a revised draft of the Kingfisher Contribution Agreement to representatives of Latham, Riverstone and Silver Run.

On July 17, 2017, Haynes and Boone sent an issues list relating to the Alta Mesa Contribution Agreement to representatives of Latham, which rejected the concept of a debt purchase price adjustment and proposed that earn-out provisions in the Alta Mesa Contribution Agreement be revised such that the full amount of additional SRII Opco Common Units issuable pursuant to the earn-out be issued to the Alta Mesa Contributor upon a change of control of Silver Run.

Also on July 17, 2017, Bracewell sent a revised draft of the Riverstone Contribution Agreement to representatives of Latham.

On July 18, 2017, the Silver Run board of directors met via teleconference with representatives of Riverstone and Latham. Mr. Hackett discussed the opportunity, and Ms. Wassenaar presented a detailed description of the assets of Alta Mesa and Kingfisher, the due diligence results to date and a preliminary combined valuation of $4.1 billion, consisting of $2.5 billion in SRII Opco Common Units for Alta Mesa and $1.44 billion in cash and $160 million in SRII Opco Common Units for Kingfisher. Ms. Wassenaar also

166

**Table of Contents**

presented information about the earn-out for the Alta Mesa acquisition, which could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $700 million.

Also on July 18, 2017, Latham sent Silver Run's responses to the Alta Mesa issues list, as well as an issues lists relating to other transaction-related documents to representatives of Haynes and Boone and Alta Mesa. Later that day, representatives of Latham, Riverstone, Silver Run, Haynes and Boone and Alta Mesa discussed the issues list. Following the call, Haynes and Boone circulated to representatives of Latham, Riverstone and Silver Run a revised draft of the Alta Mesa Contribution Agreement, reflecting the discussions among the parties, including the removal of the financing condition.

On July 19, 2017, Silver Run's board of directors met via teleconference with TPH to discuss the technical analysis of the Alta Mesa and Kingfisher assets. Following such discussion, Mr. Knupp and Mr. Hackett addressed questions from the board members on these assets.

Also on July 19, 2017, Latham sent an issues list relating to the Alta Mesa Contribution Agreement to representatives of Haynes and Boone and Alta Mesa, noting issues relating to fundamental representations, capital expenditures, transaction expenses and the consequential damage waiver. Later that day, representatives of Latham, Riverstone, Silver Run, Haynes and Boone and Alta Mesa discussed the issues list. Among other topics, the parties discussed the financing condition in the Alta Mesa Contribution Agreement and Silver Run agreed to eliminate the financing condition given Alta Mesa's agreement to include the leverage ratio condition previously proposed by Silver Run.

Further on July 19, 2017, Latham sent a revised draft of the Kingfisher Contribution Agreement to representatives of Bracewell and ARM.

Between July 20, 2017 and July 25, 2017, the parties continued to negotiate and finalize the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement, the Riverstone Contribution Agreement and the related agreements.

On July 21, 2017, the Silver Run board of directors met via teleconference. The directors discussed the information discussed with TPH at the previous board meeting on July 19, 2017, and were satisfied with the management of Silver Run's proposed valuation for the Alta Mesa and Kingfisher assets. Mr. Hackett then discussed key features of the proposed Contribution Agreements with Alta Mesa and Kingfisher and the related agreements, respectively, and further due diligence updates. Mr. Hackett and other representatives of Riverstone answered questions about the proposed transaction. Mr. Hackett also discussed the proposed launch of a $500 million PIPE transaction to potentially fund a portion of the cash purchase price, which the Silver Run board of directors discussed and approved.

On July 25, 2017, Citigroup began confidentially reaching out to a limited number of potential investors for the contemplated PIPE transaction to potentially provide up to $500 million of the cash purchase price for the transaction.

Through August 4, 2017, members of Alta Mesa management and Mr. Hackett, along with representatives from Citigroup, met with a limited group of wall-crossed investors to discuss the proposed PIPE transaction.

On August 4, 2017, the Silver Run board of directors met via teleconference. Mr. Hackett provided an update on the PIPE transaction marketing process and explained that while overall investor engagement was positive, Citigroup believed that in this market the full $500 million Silver Run PIPE transaction would not be executable on terms acceptable to Silver Run. Mr. Hackett communicated Silver Run's proposed plan of pursuing a price reduction for both Alta Mesa and Kingfisher and a proposal that Alta Mesa and Kingfisher accept additional SRII Opco Common Units in lieu of cash.

167

Table of Contents

On August 7, 2017, Mr. Hackett communicated a revised proposal to Alta Mesa consisting of $2.1 billion in SRII Opco Common Units issuable to the Alta Mesa Contributor at Closing and an earn-out that could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $600 million. Mr. Hackett also communicated a revised proposal for Kingfisher consisting of $850 million in cash and $350 million in SRII Opco Common Units, which would be payable and issuable at Closing, and an earn-out that could result in the issuance of additional SRII Opco Common Units to the Kingfisher Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $300 million. In addition, the proposal shifted more of Kingfisher's consideration into equity. Riverstone also offered to commit to purchase up to an additional $200 million of Silver Run's Class A Common Stock pursuant to a new forward purchase agreement. The proposal was aimed at lowering the cash requirements to complete the transaction and the desired pro forma leverage level. The lower valuation also had the benefit of making the transaction more attractive to Silver Run investors.

On August 9, 2017, Mr. Chappelle of Alta Mesa and Mr. Lee of ARM put forth a joint counterproposal to Mr. Hackett that (i) valued Alta Mesa at $2.3 billion in SRII Opco Common Units issuable to the Alta Mesa Contributor at Closing with an earn-out that could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $800 million and (ii) valued Kingfisher at $1.45 billion, consisting of $1.0 billion in cash and $450 million in SRII Opco Common Units, which would be payable and issuable at Closing, with an earn-out that could result in the issuance of additional SRII Opco Common Units to the Kingfisher Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $200 million.

On August 10, 2017, Mr. Hackett communicated to Mr. Chappelle and Mr. Lee a revised proposal with an aggregate purchase price of $3.55 billion with an earn-out that could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor and the Kingfisher Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $1.0 billion, without specifying the valuation split between Alta Mesa and Kingfisher. The proposal also stipulated a larger equity component for Kingfisher in order to achieve targeted leverage levels at transaction close.

Between August 10, 2017 and August 12, 2017, Mr. Hackett and representatives from Riverstone, Alta Mesa and Kingfisher discussed Silver Run's revised offer and allocations of the aggregate purchase price and earn-outs between Alta Mesa and Kingfisher.

On August 11, 2017, the Silver Run board of directors convened telephonically for an update on the Contribution Agreements and the transactions contemplated thereby.

On August 12, 2017, Mr. Chappelle and Mr. Lee communicated to Ms. Wassenaar a joint proposal that accepted the aggregate purchase price and earn-out amounts that Mr. Hackett had proposed on August 10, 2017 and a proposed allocation of these amounts between Alta Mesa and Kingfisher. Based on that joint proposal, the Alta Mesa Contributor would receive $2.2 billion in SRII Opco Common Units issuable to the Alta Mesa Contributor at Closing and an earn-out that could result in the issuance of additional SRII Opco Common Units to the Alta Mesa Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP of Silver Run's Class A Common Stock) of up to $800 million, which would be issuable if the 20-day VWAP of Silver Run's Class A Common Stock exceeded certain trading thresholds from $14 to $20 per share. The Kingfisher Contributor would receive $800 million in cash and $550 million in SRII Opco Common Units at the Closing and an earn-out that could result in the issuance of additional SRII Opco Common Units to the Kingfisher Contributor with an aggregate value (at the time of issuance, based on the 20-day VWAP average trading price of Silver Run's Class A Common Stock) of up to $200 million, which would be issuable if the 20-day VWAP of our Class A Common Stock exceeded certain trading thresholds from $14 to $16 per share. As the aggregate purchase price and earn-out amounts corresponded to Mr. Hackett's prior proposal, and Silver Run

168

Table of Contents

viewed the allocation between Alta Mesa and Kingfisher as reasonable, Ms. Wassenaar informed Messrs. Chappelle and Lee that their joint proposal was acceptable to Silver Run.

Also on August 12, 2017, Bracewell circulated a revised draft of the Kingfisher Contribution Agreement to representatives of Silver Run and Latham, and Latham distributed a revised draft of the Alta Mesa Contribution Agreement to representatives of Haynes and Boone and Alta Mesa, each of which reflected the revised purchase price and earn-out amounts that had been discussed among Ms. Wassenaar and Messrs. Chappelle and Lee.

From August 13, 2017 to August 15, 2017, Haynes and Boone, Bracewell and Latham continued to exchange drafts of the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement and the related agreements.

On August 14, 2017, the Silver Run board of directors convened telephonically for an update on the Contribution Agreements and the transactions contemplated thereby and approved entry into the Contribution Agreements and the related agreements.

On August 16, 2017, the parties executed the Contribution Agreements and certain of the related agreements.

### Silver Run's Board of Directors' Reasons for the Approval of the Business Combination

Silver Run's board of directors considered a wide variety of factors in connection with its evaluation of the business combination. In light of the complexity of those factors, Silver Run's board of directors, as a whole, did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision. Individual members of Silver Run's board of directors may have given different weight to different factors. This explanation of Silver Run's reasons for the board of directors' approval of the business combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under "Cautionary Note Regarding Forward-Looking Statements."

Before reaching its decision, Silver Run's board of directors reviewed the results of the due diligence conducted by Riverstone, Silver Run's management, and their advisors, which included:

- research on comparable public companies within the STACK;

- research on comparable transactions within the STACK;

- extensive meetings and calls with the management teams, advisors, and owners of Alta Mesa and Kingfisher regarding operations and forecasts;

- research on the STACK, including historical well results, drilling activity and takeaway capacity;

- review of Alta Mesa's and Kingfisher's material contracts, environmental matters and labor matters and financial, tax, legal, insurance, and accounting due diligence and, with respect to Alta Mesa land and title due diligence;

- consultation with Silver Run's management and legal and financial advisors and industry experts;

- financial and valuation analysis of Alta Mesa, Kingfisher and the business combination;

- the audited and unaudited financial statements of Alta Mesa and Kingfisher;

- Alta Mesa's publicly filed reports under the Exchange Act; and

- financial projections provided by the management teams of Alta Mesa and Kingfisher.

169

Table of Contents

The factors considered by the board of directors include, but are not limited to, the following:

- *Alta Mesa's Highly Contiguous Acreage in the STACK*. Alta Mesa has approximately 130,000 highly contiguous acres in the up-dip oil window of the STACK, one of the most active and prolific stacked pay basins in North America. In addition, Alta Mesa's deep inventory includes over 4,000 primary gross locations and over 12,000 possible locations from down spacing, as well as additional zone penetration.

- *World Class Asset with Attractive Geology.* Alta Mesa's oil-weighted resource features high margins, low break-even commodity prices, and single-well rates of return in excess of 85%. Silver Run and Alta Mesa's management believe there are further opportunities for improving efficiencies through technology and optimizing well design.

- *Top-Tier Operator with Substantial STACK Expertise and Highly Consistent Well Results.* Alta Mesa's management has over 30 years' of experience operating in the STACK, and Silver Run believes that this experience provides Alta Mesa with a competitive advantage. As of September 30, 2017, Alta Mesa has drilled more than 220 horizontal STACK wells, and currently has a multi-rig program, averaging six rigs in 2017. Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that Alta Mesa's type well EUR is greater than 650 MBOE.

- *Highly Strategic and Synergistic Midstream Platform.* Kingfisher's midstream assets overlay Alta Mesa's contiguous acreage in the STACK, and afford Alta Mesa with a purpose-built system to handle larger volumes in an efficient processing system. Kingfisher's system allows Alta Mesa to access Midwest and Gulf Coast markets through the Panhandle Eastern Pipeline, as well as western interstate markets through OGT. In addition to serving Alta Mesa, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications. Silver Run believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering.

- *Strong Liquidity Profile.* After giving effect to the business combination, Silver Run expects to have sufficient liquidity and financial flexibility to fund Alta Mesa's and Kingfisher's development projects and pursue opportunistic acquisitions.

- *Terms of the Contribution Agreement.* Silver Run's board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the product of arm's-length negotiations among the parties.

- *Stockholder Approval.* The Silver Run board of directors considered the fact that in connection with the business combination Silver Run stockholders have the option to (i) remain stockholders of the combined company, (ii) sell their shares on the open market or (iii) redeem their shares for the per share amount held in the Trust Account.

- *Redemption Rights.* Pursuant to the Business Combination Forward Purchase Agreement, Fund VI Holdings has agreed to purchase up to 20,000,000 shares of Class A Common Stock at $10.00 per share to satisfy any exercise of rights of the public stockholders in connection with the business combination.

In the course of its deliberations, the Silver Run board of directors also considered a variety of uncertainties, risks and other potentially negative reasons relevant to the transaction, including the following:

- Oil, natural gas and natural gas liquids prices are volatile. A sustained decline in oil, natural gas and natural gas liquids prices could adversely affect the business, financial condition and results of operations of Alta Mesa and Kingfisher and their ability to meet their capital expenditure obligations and financial commitments.

170

Table of Contents

- Alta Mesa's and Kingfisher's development and acquisition projects require substantial capital that may be expensive or unavailable, which could lead to a decline in their ability to access or grow production and reserves.

- Alta Mesa's estimated reserves are based on many assumptions that may turn out to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present values of its reserves.

- Alta Mesa's producing properties and Kingfisher's midstream assets are located in Oklahoma, making each of them vulnerable to risks associated with a concentration of operations in a single geographic area.

- Development of Alta Mesa's PUDs may take longer and may require higher levels of capital expenditures than it currently anticipates. Therefore, Alta Mesa's estimated PUDs may not be ultimately developed or produced.

- Kingfisher's existing commercial arrangements do not provide for minimum volume commitments.

- If commodity prices decrease to a level such that Alta Mesa's future undiscounted cash flows from its properties are less than their carrying value, Alta Mesa may be required to take write-downs of the carrying values of its properties.

- Alta Mesa's future cash flows and results of operations are highly dependent on its ability to find, develop or acquire additional oil and natural gas reserves.

- Alta Mesa depends upon several significant purchasers for the sale of most of its oil, natural gas and natural gas liquids production. The loss of one or more of these purchasers could adversely affect its revenues in the short-term.

- Increasing competition in the STACK may increase the likelihood of service cost inflation and limit Alta Mesa's ability to complete opportunistic acquisitions;

- The operations of Alta Mesa and Kingfisher are subject to operational hazards for which they may not be adequately insured.

- Kingfisher's business is difficult to evaluate because it has a limited operating history, and it is susceptible to the potential difficulties associated with rapid growth and expansion.

- The operations of Alta Mesa and Kingfisher are subject to various governmental regulations that require compliance that can be burdensome and expensive and adversely affect the feasibility of conducting their respective operations.

- Any failure by Alta Mesa or Kingfisher to comply with applicable environmental laws and regulations, including, with respect to Alta Mesa, those relating to hydraulic fracturing, could result in governmental authorities taking actions that adversely affect its operations and financial condition.

- The risk that the business combination might not be consummated in a timely manner or that the Closing might not occur despite the companies' efforts, including by reason of a failure to obtain the approval of Silver Run's stockholders.

- The risk that the transactions contemplated by the Contribution Agreements would not be completed in accordance with their respective terms or at all.

- The significant fees and expenses associated with completing the business combination and the substantial time and effort of management required to complete the business combination.

After considering the foregoing potentially negative and potentially positive reasons, the Silver Run board of directors concluded, in its business judgment, that the potentially positive reasons relating to the business combination outweighed the potentially negative reasons. In connection with its deliberations, Silver Run's board of directors did not consider the fairness of the consideration to be paid by it in the business combination to any person other than Silver Run.

171

Table of Contents

### Unaudited Financial Projections of Alta Mesa and Kingfisher

Management of Alta Mesa and Kingfisher prepared prospective financial information to assist Silver Run's board of directors in evaluating Alta Mesa's and Kingfisher's operations and prospects and the potential business combination. The accompanying summary unaudited financial projections of Alta Mesa and Kingfisher were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. In the view of Alta Mesa's management and Kingfisher's management, the financial projections were prepared on a reasonable basis, reflected the best currently available estimates and judgments of Alta Mesa and Kingfisher, as applicable, and presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of Alta Mesa and Kingfisher, respectively. However, the financial projections are not fact. Further, none of the unaudited financial projections reflect any impact of the proposed transaction and have not been updated since the date of preparation.

None of Silver Run's, Alta Mesa's or Kingfisher's independent auditors, nor any other independent auditors, have compiled, examined or performed any procedures with respect to the unaudited financial projections contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for the financial projections. The reports of the independent registered public accounting firms included in this proxy statement relate to the historical financial information of Silver Run, Alta Mesa and Kingfisher, respectively. Such reports do not extend to the unaudited financial projections and should not be read to do so.

In developing the unaudited financial projections set forth below, the principal quantifiable assumptions material to such projections include the following assumptions regarding pricing of crude oil and natural gas and average number of rigs in operation:

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Price of Crude Oil (per Bbl) | $51.16 | $54.90 | $58.00 |
| Price of Natural Gas (per MMBtu) | $ 3.16 | $ 3.14 | $ 3.05 |
| Average Rigs in Operation | 6 | 10 | 11 |

The unaudited financial projections were prepared solely for internal use to assist in the evaluation of the business combination. Such projections are inherently subjective in nature, though considered reasonable by the management of Alta Mesa and Kingfisher, as of the date such projections were prepared, and are susceptible to interpretation and, accordingly, contemplated results may not be achieved. While presented with numerical specificity, the unaudited financial projections reflect numerous estimates and assumptions with respect to future industry performance under various industry scenarios as well as assumptions for competition, general business, economic, market and financial conditions and matters specific to the businesses of Silver Run, Alta Mesa and Kingfisher, all of which are difficult to predict and many of which are beyond the preparing parties' control including, among other things, the matters described in the sections entitled "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors." Accordingly, there can be no assurance that the assumptions made in preparing any particular projection will prove accurate. There will be differences between actual and forecasted results, and the differences may be material. The risk that these uncertainties and contingencies could cause the assumptions to fail to be reflective of actual results is further increased due to the length of time over which these assumptions apply. While the Silver Run board of directors used the following projections as a tool in evaluating the business combination, they did so with a thorough understanding of the foregoing limitations. In light of the foregoing factors and the uncertainties inherent in the unaudited financial projections, the Silver Run stockholders are cautioned not to place undue reliance on the unaudited financial projections and the inclusion of the unaudited financial projections in this proxy statement should not be regarded as a representation by any person that the results contained therein will be achieved.

The unaudited financial projections are not included in this proxy statement in order to induce any Silver Run stockholders to vote in favor of any of the proposals at the Silver Run special meeting.

172

Table of Contents

Certain of the measures included in the unaudited financial projections are non-GAAP financial measures, as noted below. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Alta Mesa and Kingfisher are not reported by all of their competitors and may not be comparable to similarly titled amounts used by other companies. We encourage you to review the financial statements of Alta Mesa and Kingfisher included in this proxy statement, as well as the financial information in the sections entitled "Selected Historical Financial Information of Alta Mesa," "Selected Historical Financial Information of Kingfisher" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" in this proxy statement and to not rely on any single financial measure.

Except as required by federal securities laws, Alta Mesa and Kingfisher do not intend to update or otherwise revise the unaudited financial projections to reflect circumstances existing after the date they were made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying such unaudited financial projections are no longer appropriate.

### Alta Mesa Projections

| | Year Ending December 31, | | |
|---|---|---|---|
| | 2017E | 2018E | 2019E |
| | | ($ in millions) | |
| Average Net Daily Production (Boe/d)(1) | 20,841 | 38,510 | 68,900 |
| Adjusted EBITDAX(2) | $ 155 | $ 358 | $ 701 |
| Capital Expenditures | $ 349 | $ 552 | $ 611 |
| Free Cash Flow | $ (237) | $ (233) | $ 51 |

(1)   Includes 549 boe/d, 1,698 boe/d and 2,003 boe/d for 2017, 2018 and 2019, respectively, attributable to the Bayou City DrillCo joint venture.

(2)   Alta Mesa defines Adjusted EBITDAX as net income (loss) before interest expense, loss on extinguishment of debt, exploration expense, depletion, depreciation and amortization, impairment expense, accretion expense, provision (benefit) for income taxes, (gain)/loss on sale of assets and (gain)/loss on derivative contracts. See "Selected Historical Financial Information of Alta Mesa— Non-GAAP Financial Measure."

### Kingfisher Projections

| | Year Ending December 31, | | |
|---|---|---|---|
| | 2017E | 2018E | 2019E |
| | | ($ in millions) | |
| Adjusted EBITDA(1)(2) | $ 42 | $ 185 | $ 318 |
| Capital Expenditures(2) | $ 124 | $ 373 | $ 174 |
| Free Cash Flow | $ (83) | $ (189) | $ 144 |

(1)   Kingfisher defines Adjusted EBITDA as net income (loss) before interest expense, income taxes, depreciation and amortization, acquisition and divestiture transaction expense and impairments. See "Selected Historical Financial Information of Kingfisher— Non-GAAP Financial Measure."

(2)   Adjusted EBITDA includes projected results derived from Alta Mesa's upstream development program.

173

Table of Contents

## Satisfaction of 80% Test

It is a requirement under our Charter and NASDAQ listing requirements that the business or assets acquired in our Initial Business Combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for our Initial Business Combination.

As of the date of the execution of the Contribution Agreements, the balance of the funds in the Trust Account was approximately $1,036 million (excluding approximately $36.2 million of deferred underwriting commissions and taxes payable on the income earned on the Trust Account) and 80% thereof represents approximately $828 million. In reaching its conclusion that the business combination meets the 80% asset test, the board of directors looked at the enterprise value of Alta Mesa and Kingfisher of approximately $3.55 billion implied by adding: (i) approximately $2.75 billion of equity consideration in the post-combination company to be issued to the Contributors with adjustments for Closing debt and transaction expense; (ii) $800 million of cash consideration payable to the Kingfisher Contributor at the Closing and the assumption of Closing indebtedness. In determining whether the enterprise value described above represents the fair market value of Alta Mesa and Kingfisher, our board of directors considered all of the factors described above in this section and the fact that the purchase price for Alta Mesa and Kingfisher was the result of an arm's length negotiation with the Contributors. As a result, our board of directors concluded that the fair market value of the businesses acquired was significantly in excess of 80% of the assets held in the Trust Account. In light of the financial background and experience of the members of our management team and the board of directors, our board of directors believes that the members of our management team and the board of directors are qualified to determine whether the business combination meets the 80% asset test. Our board of directors did not seek or obtain an opinion of an outside fairness or valuation advisor as to whether the 80% asset test has been met.

## Interests of Certain Persons in the Business Combination

In considering the recommendation of our board of directors to vote in favor of the business combination, stockholders should be aware that, aside from their interests as stockholders, our Sponsor and certain of our directors and officers have interests in the business combination that are different from, or in addition to, those of other stockholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the business combination, and in recommending to stockholders that they approve the business combination. Stockholders should take these interests into account in deciding whether to approve the business combination. These interests include, among other things:

- the fact that our Sponsor holds private placement warrants that would expire worthless if a business combination is not consummated;

- the fact that our Sponsor, officers and directors have agreed not to redeem any of the shares of Class A Common Stock held by them in connection with a stockholder vote to approve the business combination;

- the fact that our Sponsor paid an aggregate of $25,000 for its founder shares and such securities will have a significantly higher value at the time of the business combination, which if unrestricted and freely tradable would be valued at approximately $262,399,680 based on the closing price of our Class A Common Stock on January 18, 2018;

- if the Trust Account is liquidated, including in the event we are unable to complete an Initial Business Combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser amount per public share as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

174

Table of Contents

- the continuation of James T. Hackett as a director of Silver Run and becoming the Executive Chairman of the board of directors and Chief Operating Officer—Midstream and the Riverstone Contributor's right to nominate up to three directors to our board of directors for a period of five years following the Closing based on its and its affiliates' beneficial ownership of our Class A Common Stock in accordance with the terms of its Series B Preferred Stock;

- the fact that each of our independent directors owns 33,000 founder shares that were purchased from our Sponsor at $0.002 per share, which if unrestricted and freely tradeable would be valued at approximately $335,940 based on the closing price of our Class A Common Stock on January 18, 2018;

- the fact that an affiliate of our Sponsor invested $200 million in equity in Alta Mesa upon the execution of the Contribution Agreements and will not have any public market in which to sell that investment if the Closing does not occur;

- the fact that our Sponsor, officers and directors may not participate in the formation of, or become a director or officer of, any other blank check company until we have entered into a definitive agreement regarding an Initial Business Combination or fail to complete an Initial Business Combination by March 29, 2019;

- the fact that our Sponsor, officers and directors will lose their entire investment in us if an Initial Business Combination is not completed; and

- that we are a party to a registration rights agreement with our Sponsor and certain of our directors, which provides for registration rights to such parties.

### Potential Purchases of Public Shares

In connection with the stockholder vote to approve the business combination, our Sponsor, directors, officers, or advisors or their respective affiliates may privately negotiate transactions to purchase shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with a proxy solicitation pursuant to the proxy rules for a per share pro rata portion of the Trust Account. None of our directors, officers or advisors or their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Such a purchase would include a contractual acknowledgement that such stockholder, although still the record holder of our shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and would include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser. In the event that our Sponsor, directors, officers or advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. Any such privately negotiated purchases may be effected at purchase prices that are in excess of the per share pro rata portion of the Trust Account.

The purpose of such purchases would be to increase the likelihood of obtaining stockholder approval of the business combination or, where the purchases are made by our Sponsor, directors, officers or advisors or their respective affiliates, to satisfy a closing condition in an agreement related to the business combination.

### Total Shares to be Issued in the Business Combination

It is anticipated that, upon the Closing and based on the assumptions set forth in "Certain Defined Terms," the ownership of Silver Run will be as follows:

- the public stockholders will own 103,500,000 shares of our Class A Common Stock, representing an approximate 61.1% economic interest and an approximate 26.9% voting interest;

175

Table of Contents

- the holders of our founder shares, including our Sponsor and independent directors, will own 25,875,000 shares of our Class A Common Stock, representing an approximate 15.3% economic interest and an approximate 6.7% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 36.4% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 14.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 5.2% voting interest; and

- Fund VI Holdings will own 40,000,000 shares of our Class A Common Stock, representing a 23.6% economic interest and a 10.4% voting interest.

Our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 38.9% economic interest and an approximate 22.3% voting interest in Silver Run upon the Closing.

Additionally, Bayou City, HPS and AM Management will each own one share of our Series A Preferred Stock and the Riverstone Contributor will own one share of our Series B Preferred Stock. The Preferred Stock will not have an economic interest and will provide the holders thereof limited voting rights as described herein.

If the actual facts are different than the assumptions set forth in "Certain Defined Terms," the economic and voting interest set forth above will be different. For example, if we assume that all outstanding 34,500,000 public warrants, 15,133,333 private placement warrants and 13,333,333 warrants purchased by Fund VI Holdings under the IPO Forward Purchase Agreement were exercisable and exercised following completion of the business combination, then the ownership of Silver Run's Class A Common Stock and Class C Common Stock would be as follows:

- the public stockholders and holders of the public warrants will own 138,000,000 shares of our Class A Common Stock, representing an approximate 59.4% economic interest and an approximate 30.9% voting interest;

- the holders of our founder shares and the private placement warrants, including our Sponsor and independent directors, will own 41,008,333 shares of our Class A Common Stock, representing an approximate 17.7% economic interest and an approximate 9.2% voting interest;

- the Alta Mesa Contributor will own 139,800,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 31.3% voting interest;

- the Kingfisher Contributor will own 55,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 12.3% voting interest;

- the Riverstone Contributor will own 20,000,000 shares of our Class C Common Stock, representing a 0% economic interest and an approximate 4.5% voting interest; and

- Fund VI Holdings will own 53,333,333 shares of our Class A Common Stock, representing an approximate 23.0% economic interest and an approximate 11.9% voting interest.

In this scenario, our affiliates, which include our Sponsor, our independent directors, the Riverstone Contributor and Fund VI Holdings, will collectively own an approximate 40.7% economic interest and an approximate 25.6% voting interest in Silver Run upon the Closing.

The warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination and 12 months following the closing of the IPO and will expire five years after the completion of an Initial Business Combination or earlier upon their redemption or liquidation.

176

Table of Contents

In addition, if public stockholders elect to have their public shares redeemed in connection with the business combination, Fund VI Holdings has agreed to offset up to $200 million of such redemptions through the purchase of 20,000,000 additional shares of Class A Common Stock from Silver Run at $10.00 per share. In such a case, economic and voting interests of the public stockholders will decrease, and the economic and voting interests of Fund VI Holdings will increase, accordingly, but the economic and voting interests of the holders of our founder shares and the Contributors will not be affected.

You should read "Summary of the Proxy Statement—Impact of the Business Combination on Silver Run's Public Float" and "Unaudited Pro Forma Condensed Consolidated Combined Financial Information of Silver Run" for further information.

### Sources and Uses for the Business Combination

The following table summarizes the sources and uses for funding the business combination.

| Sources of Funds | | Uses | |
|---|---|---|---|
| | (in millions) | | |
| Alta Mesa Contributor Equity | $1,398 | Alta Mesa Contributor Equity | $1,398 |
| Kingfisher Contributor Equity | 550 | Kingfisher Contributor Equity | 550 |
| Silver Run Cash Investment(1) | 999 | Cash to Kingfisher Contributor | 800 |
| Riverstone Cash Investment(2) | 600 | Cash to Alta Mesa Balance Sheet | 799 |
| Total Sources | $3,547 | Total Uses | $3,547 |
| Total Cash Sources | $1,599 | Total Cash Uses | $1,599 |

(1)   This amount includes approximately $36.2 million in deferred underwriting commissions to the underwriters of our IPO.

(2)   Reflects (a) the Riverstone Contributor's $200 million investment in Alta Mesa and the rollover of such investment into equity of SRII Opco under the Riverstone Contribution Agreement and (b) $400 million of proceeds from the purchase by Fund VI Holdings of shares of Class A Common Stock and warrants from Silver Run under the IPO Forward Purchase Agreement, but does not include the proceeds from the purchase by Fund VI Holdings of any shares of Class A Common Stock from Silver Run under the Business Combination Forward Purchase Agreement.

### Board of Directors of Silver Run Following the Business Combination

Upon consummation of the business combination, we anticipate expanding the size of our board of directors from four directors to 11, including one director appointed by Bayou City and its affiliates, one director appointed by HPS and its affiliates and two directors appointed by AM Management and its affiliates, as the holders of our Series A Preferred Stock, and three directors appointed by the Riverstone Contributor and its affiliates, as the holder of our Series B Preferred Stock. See "—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Series A Certificate of Designation" and "—Related Agreements—Agreements Related to the Riverstone Contribution Agreement—Series B Certificate of Designation" above.

### Redemption Rights

Under our Charter, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share calculated in accordance with our Charter. As of September 30, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises its redemption rights, then such holder will be exchanging its shares of our Class A Common Stock for cash and will no longer own shares of Silver Run. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our transfer agent in accordance with the procedures described herein. Notwithstanding the foregoing, a holder of the public shares, together with any

177

Table of Contents

affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold." Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash. Each redemption of shares of Class A Common Stock by our public stockholders will decrease the amount in our Trust Account, which holds approximately $1,039 million as of September 30, 2017. In no event will we redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001. See the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights" for the procedures to be followed if you wish to redeem your shares for cash.

## Appraisal Rights

There are no appraisal rights available to our stockholders in connection with the Business Combination.

## Accounting Treatment

Silver Run will account for the acquisition of Alta Mesa and Kingfisher under the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, respectively, pursuant to the guidance in ASC 805, using the acquisition method of accounting with Silver Run as the acquirer. Under the acquisition method of accounting, Alta Mesa's and Kingfisher's assets and liabilities will be recorded at their fair values measured as of the acquisition date. The excess of the purchase price over the estimated fair values of Alta Mesa's and Kingfisher's net assets acquired, if applicable, will be recorded as goodwill.

## Certain United States Federal Income Tax Considerations

The following is a discussion of (i) certain U.S. federal income tax consequences for holders of our Class A Common Stock that elect to have their Class A Common Stock redeemed for cash if the business combination is completed and, (ii) with respect to certain Non-U.S. holders (as defined below) who continue to hold shares of our Class A Common Stock or warrants after the business combination is completed, certain U.S. federal income tax consequences related to our status as a USRPHC following the business combination. This discussion applies only to Class A Common Stock and warrants, as applicable, held as a capital asset, within the meaning of Section 1221 of the Code, for U.S. federal income tax purposes and is applicable only to holders who purchased our Class A Common stock and warrants in the IPO.

The following does not purport to be a complete analysis of all potential tax effects stemming from the completion of the business combination that are associated with certain redemptions of our Class A Common Stock or certain Non-U.S. holders who continue to hold shares of our Class A Common Stock or warrants. The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or non-U.S. tax laws are not discussed. This discussion is based on the Code, Treasury regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the IRS, in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect individuals to which this section applies. We have not sought and will not seek any rulings from the IRS regarding the matters discussed below. There can be no assurance the IRS or a court will not take a contrary position to that regarding tax consequences discussed below.

This discussion does not address all U.S. federal income tax consequences relevant to your particular circumstances, including the impact of the Medicare contribution tax on net investment income. In addition, it does not address consequences relevant to individuals subject to special rules, including, without limitation:

- U.S. expatriates and former citizens or long-term residents of the United States;

- persons subject to the alternative minimum tax;

178

Table of Contents

- persons holding our Class A Common Stock as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated transaction;

- banks, insurance companies and other financial institutions;

- brokers, dealers or traders in securities;

- "controlled foreign corporations," "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- partnerships or other entities or arrangements treated as partnerships for U.S. federal income tax purposes (and investors therein);

- tax-exempt organizations or governmental organizations;

- persons subject to special tax accounting rules as a result of any item of gross income with respect to our Class A Common Stock being taken into account in an applicable financial statement;

- tax-qualified retirement plans; and

- "qualified foreign pension funds" as defined in Section 897(l)(2) of the Code and entities all of the interests of which are held by qualified foreign pension funds.

If you are a partnership for U.S. federal income tax purposes, the tax treatment of your partners will generally depend on the status of the partners, the activities of the partnership and certain determinations made at the partner level. Accordingly, partnerships and the partners in such partnerships should consult their tax advisors regarding the U.S. federal income tax consequences to them relating to the matters discussed below.

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES OF ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.**

**Certain Considerations Related to a Redemption of Class A Common Stock**

**U.S. Holders**

This section applies to you if you are a "U.S. holder." A U.S. holder is a beneficial owner of shares of our Class A Common Stock and/or warrants, as applicable, who or that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Code) or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

*Redemption of Class A Common Stock.* In the event that a U.S. holder's Class A Common Stock is redeemed pursuant to the redemption provisions described in the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights", the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale of the Class A Common Stock under Section 302 of the Code. If the redemption qualifies as a sale or other exchange of common stock, the U.S. holder will be treated as described under "—U.S. Holders—Gain or Loss on Redemption Treated as a Sale of Class A Common Stock" below. If the redemption does not qualify as a sale of common stock, the U.S. holder will be treated as receiving a corporate distribution with the tax consequences described below under "—U.S. Holders—Taxation of Redemption Treated as a Distribution."

179

Table of Contents

Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. holder (including any stock constructively owned by the U.S. holder as a result of owning warrants) relative to all of our shares outstanding both before and after the redemption. The redemption of Class A Common Stock generally will be treated as a sale of the Class A Common Stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. holder, (ii) results in a "complete termination" of the U.S. holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder takes into account not only stock actually owned by the U.S. holder, but also shares of our stock that are constructively owned by it. A U.S. holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. holder has an interest or that have an interest in such U.S. holder, as well as any stock that the U.S. holder has a right to acquire by exercise of an option, which would generally include Class A Common Stock which could be acquired pursuant to the exercise of the warrants.

In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately following the redemption of Class A Common Stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by such U.S. holder immediately before the redemption. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of our Class A Common Stock actually and constructively owned by the U.S. holder are redeemed or (ii) all of the shares of our Class A Common Stock actually owned by the U.S. holder are redeemed, the U.S. holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. holder does not constructively own any other stock. The redemption of our Class A Common Stock will not be essentially equivalent to a dividend if a U.S. holder's redemption results in a "meaningful reduction" of the U.S. holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests are satisfied, then the redemption will be treated as a corporate distribution, and the tax effects will be as described under "—U.S. Holders—Taxation of Redemption Treated as a Distribution" below. After the application of those rules, any remaining tax basis of the U.S. holder in the redeemed Class A Common Stock will be added to the U.S. holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Gain or Loss on Redemption Treated as a Sale of Class A Common Stock.* If the redemption qualifies as a sale of Class A Common Stock, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. holder's adjusted tax basis in the Class A Common Stock. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for the Class A Common Stock so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Class A Common Stock may suspend the running of the applicable holding period for this purpose. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

Generally, the amount of gain or loss recognized by a U.S. holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition and (ii) the U.S. holder's adjusted tax basis in its Class A Common Stock so disposed of. A U.S. holder's adjusted tax basis in its Class A Common Stock generally will equal the U.S. holder's acquisition cost less, in the

180

Table of Contents

case of a share of Class A Common Stock, any prior distributions paid to such U.S. holder that were treated as a return of capital for U.S. federal income tax purposes.

A withholding tax equal to 15% of the amount realized (the "USRPHC Withholding Tax") on the redemption of our shares of Class A Common Stock (i.e., the amount of cash received by a holder pursuant to a redemption of our shares of Class A Common Stock) generally will also be required. A U.S. holder may eliminate the USRPHC Withholding Tax in respect of its receipt of cash pursuant to a redemption of our shares of Class A Common Stock by certifying in writing (under penalties of perjury) to the person required to withhold the USRPHC Withholding Tax that such holder is not a Non-U.S. holder, and providing its U.S. taxpayer identification number (social security number for individuals and U.S. employer identification number in all other cases), address and certain other information, or by providing such other information, as is satisfactory to the person required to withhold the USRPHC Withholding Tax, to establish such holder's status as a U.S. holder. If a U.S. holder fails to provide the necessary information described above to eliminate the USRPHC Withholding Tax and the amount of the USRPHC Withholding Tax withheld in respect of cash received pursuant to such redemption exceeds the U.S. holder's U.S. federal income tax liability with respect thereto, a holder may be entitled to a refund or credit against such holder's U.S. federal income tax liability, provided that certain required information is timely provided to the IRS.

*Taxation of Redemption Treated as a Distribution.* If the redemption does not qualify as a sale of Class A Common Stock, a U.S. holder will generally be treated as receiving a distribution. Such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Class A Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Class A Common Stock and will be treated as described under "U.S. Holders—Gain or Loss on Redemption Treated as a Sale of Class A Common Stock" above.

Dividends we pay to a U.S. holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Class A Common Stock described in this proxy statement may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Information Reporting and Backup Withholding.* In general, information reporting requirements may apply to dividends paid to a U.S. holder and to the proceeds of the sale or other disposition of shares of Class A Common Stock, unless the U.S. holder is an exempt recipient. Backup withholding may apply to such payments if the U.S. holder fails to provide a taxpayer identification number, a certification of exempt status or has been notified by the IRS that it is subject to backup withholding (and such notification has not been withdrawn).

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a U.S. holder's federal income tax liability, provided the required information is timely furnished to the IRS.

## Non-U.S. Holders

For purposes of this discussion, a "Non-U.S. holder" is any beneficial owner of our Class A Common Stock and/or warrants, as applicable, that is neither a U.S. holder nor an entity treated as a partnership for U.S. federal income tax purposes.

181

**Table of Contents**

*Redemption of Class A Common Stock.* The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. holder's Class A Common Stock pursuant to the redemption provisions described in the section entitled "Special Meeting of Silver Run Stockholders—Redemption Rights" generally will correspond to the U.S. federal income tax characterization of such a redemption of a U.S. holder's Class A Common Stock, as described under "U.S. Holders—Redemption of Class A Common Stock" above, and the consequences of the redemption to the Non-U.S. holder will be as described below under "Non-U.S. Holders—Gain on Redemption Treated as a Sale of Class A Common Stock" and "Non-U.S. Holders—Taxation of Redemption Treated as a Distribution," as applicable.

*Gain on Redemption Treated as a Sale of Class A Common Stock.* A Non-U.S. holder will not be subject to U.S. federal income tax on any gain realized on a redemption treated as a sale of our Class A Common Stock unless:

- the gain is effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. older maintains a permanent establishment in the United States to which such gain is attributable);

- the Non-U.S. holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the redemption and certain other requirements are met; or

- our Class A Common Stock constitutes a U.S. real property interest ("USRPI") by reason of our status as a USRPHC for U.S. federal income tax purposes and the Non-U.S. holder owns or owned more than 5% of our Class A Common Stock during the Non-U.S. holder's holding period for the Class A Common Stock.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty), which may be offset by U.S. source capital losses of the Non-U.S. holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. holder has timely filed U.S. federal income tax returns with respect to such losses.

If the third bullet point above applies to a Non-U.S. holder, gain recognized by such holder on the redemption of our Class A Common Stock will be subject to tax at generally applicable U.S. federal income tax rates. In addition, as described under "—U.S. Holders—Gain or Loss on Redemption Treated as a Sale of Class A Common Stock" above, we may be required to withhold the USRPHC Withholding Tax upon such redemption. If the USRPHC Withholding Tax withheld in respect of cash received pursuant to such redemption exceeds the holder's U.S. federal income tax liability with respect thereto, the holder may be entitled to a refund or credit against such holder's U.S. federal income tax liability, provided that certain required information is timely provided to the IRS. We will be classified as a USRPHC if the fair market value of our "U.S. real property interests" equals or exceeds 50% of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes. We believe that we will be a USRPHC on the date of the redemption.

We urge you to consult your tax advisors regarding the U.S. federal income tax consequences resulting from our belief that we will be a USRPHC on the date that the business combination is completed.

*Taxation of Redemption Treated as a Distribution.* If the redemption does not qualify as a sale of Class A Common Stock, a Non-U.S. holder will generally be treated as receiving a distribution. Such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or

182

Table of Contents

accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits, will constitute a return of capital that will be applied against and reduce (but not below zero) the Non-U.S. holder's adjusted tax basis in our Class A Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Class A Common Stock and will be treated as described under "—Non-U.S. Holders—Gain on Redemption Treated as a Sale of Class A Common Stock" above. In general, with respect to any distributions that constitute dividends for U.S. federal income tax purposes and are not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (on an IRS Form W-8BEN or W-8BEN-E or other applicable documentation). In addition, because we believe that we will be a USRPHC on the date of the redemption, we will generally withhold 15% of any distribution, see "—Non-U.S. Holders—Gain on Redemption Treated as a Sale of Class A Common Stock" above.

If dividends paid to a Non-U.S. holder are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. holder maintains a permanent establishment in the United States to which such dividends are attributable), the Non-U.S. holder will be exempt from the U.S. federal withholding tax described above. To claim the exemption, the Non-U.S. holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States.

Any such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected dividends, as adjusted for certain items. Non-U.S. holders should consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

*Information Reporting and Backup Withholding.*

Payments of dividends (including constructive dividends received pursuant to a redemption of our Class A Common Stock) on our Class A Common Stock will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder either certifies its non-U.S. status, such as by furnishing a valid IRS Form W-8BEN, W-8BEN-E or W-8ECI, or otherwise establishes an exemption. However, information returns are required to be filed with the IRS in connection with any payments of dividends on our Class A Common Stock paid to the Non-U.S. holder, regardless of whether any tax was actually withheld. In addition, proceeds of the sale or other taxable disposition of our Class A Common Stock within the United States or conducted through certain U.S.-related brokers generally will not be subject to backup withholding or information reporting, if the applicable withholding agent receives the certification described above and does not have actual knowledge or reason to know that such holder is a United States person, or the holder otherwise establishes an exemption. Proceeds of a disposition of our common stock conducted through a non-U.S. office of a non-U.S. broker generally will not be subject to backup withholding or information reporting.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

183

Table of Contents

*Additional Withholding Tax on Payments Made to Foreign Accounts.*

Withholding taxes may be imposed under Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends (including constructive dividends received pursuant to a redemption of our Class A Common Stock) on, or gross proceeds from the sale or other disposition of, our Class A Common Stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our Class A Common Stock, and will apply to payments of gross proceeds from the sale or other disposition of such stock on or after January 1, 2019. Non-U.S. holders should consult their tax advisers regarding possible implications of FATCA.

### Certain Considerations for Continuing Non-U.S. Holders in Connection With Silver Run's Expected Status as a USRPHC as a Result of the Business Combination

We believe that we will be a USRPHC at the completion of the business combination, because a significant portion of Alta Mesa's and Kingfisher's combined assets are expected to be classified as United States real property interests. As a result of our expected status as a USRPHC, as long as our Class A Common Stock continues to be regularly traded on an established securities market, only a Non-U.S. holder that actually or constructively owns, or owned at any time during the Non-U.S. holder's holding period for the Class A Common Stock, more than 5% of our Class A Common Stock will be subject to U.S. federal income tax on gain realized on the disposition of our Class A Common Stock. However, if our Class A Common Stock were not considered to be so regularly traded during the calendar year in which the relevant disposition by a Non-U.S. holder occurs, or shares of our Class A Common Stock are disposed of by a holder who owns more than 5% of our Class A Common stock at any time during the period described above, such holder generally would be subject to U.S. federal income tax on a disposition of our Class A Common Stock. In addition, if our Class A Common Stock were not considered to be so regularly traded during the calendar year in which the relevant disposition by a Non-U.S. holder occurs (regardless of the percentage of our Class A Common Stock actually or constructively owned by such holder), the USRPHC Withholding Tax generally would apply to the gross proceeds from such disposition.

If a Non-U.S. holder holds our Class A Common Stock when it is not regularly traded or the percentage of our Class A Common Stock actually or constructively owned by a Non-U.S. holder at any time during the Non-U.S. holder's holding period exceeds or exceeded 5% of the value of our Class A Common Stock, then any redemption of such Non-U.S. holder's Class A Common Stock treated as a sale or exchange for U.S. federal income tax purposes (as discussed under "—Non-U.S. Holders—Gain on Redemption Treated as a Sale of Class A Common Stock" above) and any distributions (including redemptions treated as distributions, as described under "—Non-U.S. Holders—Taxation of Redemption Treated as a Distribution" above) we make to a Non-U.S. holder that are not treated as dividends for U.S. federal income tax purposes (i.e., that are not made out

184

Table of Contents

of our current or accumulated earnings and profits) generally would be subject to the USRPHC Withholding Tax, as described under "—Non-U.S. Holders—Gain on Redemption Treated as a Sale of Class A Common Stock" above.

As a result of our expected status as a USRPHC, a Non-U.S. holder who recognizes gain from a disposition of our warrants generally will be subject to U.S. federal income tax on a net income basis at the rates and in the manner generally applicable to U.S. holders unless an applicable income tax treaty provides otherwise. However, if both our warrants and our Class A Common Stock continue to be regularly traded on an established securities market in the calendar year of such disposition, only a Non-U.S. holder that actually or constructively owns, or owned at any time during the shorter of the five-year period ending on the date of the disposition or the Non-U.S. holder's holding period for the warrants, more than 5% of our warrants generally will be subject to U.S. federal income tax on gain realized on the disposition of our warrants as a result of our status as a USRPHC. If in the calendar year of such disposition, our warrants are not considered to be so regularly traded on an established securities market, but our Class A Common Stock is, only a Non-U.S. holder whose warrants, as of the date of such Non-U.S. holder's acquisition of such warrants, have a fair market value greater than 5% of the value of our Class A Common Stock, generally will be subject to U.S. federal income tax on gain realized on the disposition of our warrants as a result of our status as a USRPHC. If our Class A Common Stock were not considered to be so regularly traded during the calendar year in which the relevant disposition by a Non-U.S. holder occurs, such holder (regardless of the percentage of our warrants owned) generally would be subject to U.S. federal income tax on a taxable disposition of our warrants, and the USRPHC Withholding Tax generally would apply to the gross proceeds from such disposition.

If the USRPHC Withholding Tax withheld with respect to a disposition of our Class A Common Stock or warrants, redemption of our Class A Common Stock or a distribution made with respect to our Class A Common Stock exceeds the Non-U.S. holder's U.S. federal income tax liability with respect to such disposition, redemption or distribution, such holder may be entitled to a refund or credit against such holder's U.S. federal income tax liability, provided that certain required information is timely provided to the IRS.

The foregoing discussion is not intended to be a comprehensive discussion of all material U.S. federal income tax consequences to a Non-U.S. holder of owning or disposing of our Class A Common Stock and/or warrants after the business combination is completed. We urge Non-U.S. holders to consult their tax advisors with respect to the consequences of ownership and disposition of our Class A Common Stock and/or warrants.

## Regulatory Matters

To complete the business combination, Silver Run and the Contributors must obtain approvals or consents from, or make filings with certain U.S. federal authorities. The business combination is subject to the requirements of the HSR Act, which prevents Silver Run and the Contributors from completing the business combination until required information and materials are furnished to the Antitrust Division of the Department of Justice (the "DOJ") and the Federal Trade Commission (the "FTC") and specified waiting period requirements have been satisfied. On September 7, 2017, Silver Run filed a Premerger Notification and Report Form pursuant to the HSR Act with the DOJ and FTC. On September 18, 2017, the DOJ and the FTC granted early termination of the waiting period under the HSR Act.

The DOJ, the FTC, state attorneys general, and others may challenge the business combination on antitrust grounds either before or after the expiration or termination of the applicable waiting period. Accordingly, at any time before or after the completion of the business combination, any of the DOJ, the FTC or others could take action under the antitrust laws, including without limitation seeking to enjoin the completion of the business combination or permitting completion subject to regulatory concessions or conditions. Silver Run does not believe that the business combination violates federal antitrust laws, but there can be no assurance that a challenge to the merger on antitrust grounds will not be made or, if such a challenge is made, that it would not be successful.

185

**Table of Contents**

**Vote Required for Approval**

The Closing is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting.

This Business Combination Proposal (and consequently, the Contribution Agreements and the business combination) will be approved and adopted only if the holders of at least a majority of the shares of our Class A Common Stock and Class B Common Stock voted at the special meeting, voting as a single class, vote "FOR" the Business Combination Proposal. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have no effect on the outcome of the vote on the Business Combination Proposal.

As of the record date, our Sponsor, directors and officers have agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of the business combination.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS
VOTE "FOR" THE BUSINESS COMBINATION PROPOSAL.**

186

**Table of Contents**

## PROPOSAL NO. 2—THE CLASS C CHARTER PROPOSAL

### Overview

Assuming the Business Combination Proposal and the NASDAQ Proposal are approved, Silver Run's stockholders are also being asked to approve amendments to the Charter to provide for the establishment of a new class of capital stock designated as Class C Common Stock, par value $0.0001 per share (the "Class C Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Class C Charter Proposal is attached to this proxy statement as *Annex D*.

### Reasons for the Amendment

In connection with the business combination and pursuant to the Contribution Agreements, the Contributors will be issued SRII Opco Common Units and will acquire an equal number of shares of Class C Common Stock. The Contributors will collectively own all of our outstanding Class C Common Stock and, following the Closing, we expect to maintain a one-to-one ratio between the number of outstanding shares of Class C Common Stock and the number of SRII Opco Common Units owned by each of the Contributors so that each of the Contributors will have a voting interest in Silver Run that is identical to their economic interest in SRII Opco. The Class C Charter Proposal will establish the terms of the Class C Common Stock.

### Description of Class C Common Stock

Our Class C Common Stock will be a newly issued class of common stock, with a par value of $0.0001 per share. Shares of Class C Common Stock may be issued only to the Contributors, their respective successors and assigns, as well as any permitted transferees. A holder of Class C Common Stock may transfer shares of Class C Common Stock to any transferee (other than Silver Run) only if, and only to the extent permitted by the SRII Opco LPA, such holder also simultaneously transfers an equal number of such holder's SRII Opco Common Units to such transferee in compliance with the SRII Opco LPA. Holders of our Class C Common Stock will vote together as a single class with holders of our Class A Common Stock on all matters properly submitted to a vote of the stockholders. In addition after the Closing, holders of Class C Common Stock, voting as a separate class, will be entitled to approve any amendment, alteration or repeal of any provision of our Charter that would alter or change the powers, preferences or relative, participating, optional or other or special rights of the Class C Common Stock. Holders of Class C Common Stock will not be entitled to any dividends from Silver Run and will not be entitled to receive any of our assets in the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs.

After a specified period of time after Closing, the Contributors will generally have the right to cause SRII Opco to redeem all or a portion of their SRII Opco Common Units in exchange for shares of our Class A Common Stock or, at SRII Opco's option, an equivalent amount of cash; provided that we may, at our option, effect a direct exchange of cash or Class A Common Stock for such SRII Opco Common Units in lieu of such a redemption by SRII Opco. Upon the future redemption or exchange of SRII Opco Common Units held by any of the Contributors, a corresponding number of shares of Class C Common Stock held by such Contributor will be cancelled.

### Vote Required for Approval

The Class C Charter Proposal is conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal at the special meeting.

The approval of the Class C Charter Proposal requires the affirmative vote (in person or by proxy) of holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have the same effect as a vote "AGAINST" this proposal.

187

**Table of Contents**

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT SILVER RUN STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE CLASS C CHARTER PROPOSAL.**

188

**Table of Contents**

## PROPOSAL NO. 3—THE AUTHORIZED SHARE CHARTER PROPOSAL

### Overview

In this Proposal No. 3, we are requesting stockholders approve and adopt an amendment to the Charter to increase the number of authorized shares of Class A Common Stock from 400,000,000 shares to 1,200,000,000 shares (the "Authorized Share Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendment pursuant to the Authorized Share Charter Proposal is attached to this proxy statement as *Annex D*.

### Vote Required for Approval

The Authorized Share Charter Proposal is conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal at the special meeting.

The approval of the Authorized Share Charter Proposal requires the affirmative vote (in person or by proxy) of holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have the same effect as a vote "AGAINST" this proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT SILVER RUN STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE AUTHORIZED SHARE CHARTER PROPOSAL.**

189

**Table of Contents**

## PROPOSAL NO. 4—THE EXCLUSIVE FORUM CHARTER PROPOSAL

### Overview

Assuming the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal are approved, our stockholders are also being asked to approve an additional amendment to the Charter, which is, in the judgment of our board of directors, necessary to adequately address the needs of the post-combination company.

The proposed amendment provides that a stockholder bringing a claim subject to the proposed Article X will be required to bring that claim in the court of chancery in the State of Delaware (the "Court of Chancery"), subject to the Court of Chancery having personal jurisdiction over the defendants. If the Court of Chancery dismisses such claim because it does not have subject matter jurisdiction over the claim, then the claim must be brought in another state court in the State of Delaware.

The post-combination company may decide that it is in the best interests of the post-combination company and its stockholders to bring an action in a forum other than the Court of Chancery (or a state court in the State of Delaware if the Court of Chancery does not have subject matter jurisdiction), and it may consent in writing to the selection of an alternative forum.

This proposal provides that any person who acquires an interest in the stock of the post-combination company will be deemed to have notice of this provision and consent to personal jurisdiction in the applicable Delaware court.

Article X would not apply to claims brought against the post-combination company except for those enumerated in Article X and, potentially, certain other related claims.

### Reasons for the Amendments

The amendment is intended to assist the post-combination company in avoiding multiple lawsuits in multiple jurisdictions regarding the same matter. The ability to require such claims to be brought in a single forum will help to assure consistent consideration of the issues, the application of a relatively known body of case law and level of expertise and should promote efficiency and cost-savings in the resolutions of such claims. Our board of directors believes that the Delaware courts are best suited to address disputes involving such matters given that the post-combination company is incorporated in Delaware, Delaware law generally applies to such matters and the Delaware courts have a reputation for expertise in corporate law matters. Delaware offers a specialized Court of Chancery to address corporate law matters, with streamlined procedures and processes which help provide relatively quick decisions. This accelerated schedule can minimize the time, cost and uncertainty of litigation for all parties. The Court of Chancery has developed considerable expertise with respect to corporate law issues, as well as a substantial and influential body of case law construing Delaware's corporate law and long-standing precedent regarding corporate governance. This provides stockholders and the post-combination company with more predictability regarding the outcome of intra-corporate disputes. In the event the Court of Chancery does not have jurisdiction, the other state courts located in Delaware would be the most appropriate forums because these courts have more expertise on matters of Delaware law compared to other jurisdictions.

In addition, this amendment would promote judicial fairness and avoid conflicting results, as well as make the post-combination company's defense of applicable claims less disruptive and more economically feasible, principally by avoiding duplicative discovery.

For these reasons, our board of directors believes that providing for Delaware as the exclusive forum for the types of disputes described above is in the best interests of the post-combination company and its stockholders.

190

Table of Contents

At the same time, our board of directors believes that the post-combination company should retain the ability to consent to an alternative forum on a case-by-case basis where the post-combination company determines that its interests and those of its stockholders are best served by permitting such a dispute to proceed in a forum other than in Delaware.

### Effect of Amendment on Silver Run Stockholders

The effect of the Exclusive Forum Charter Proposal on Silver Run stockholders is that any stockholder bringing: (i) any derivative action or proceeding brought on behalf of the post-combination company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or agent of the post-combination company to the post-combination company or the post-combination company's stockholders, creditors or other constituents, (iii) any action asserting a claim against the post-combination company or any director or officer of the post-combination company arising pursuant to any provision of the DGCL or the Charter or the Bylaws (as either may be amended from time to time) of the post-combination company, (iv) any action to interpret, apply, enforce or determine the validity of the Charter or the Bylaws of the post-combination company or (v) any action asserting a claim against the post-combination company or any director or officer of the post-combination company governed by the internal affairs doctrine, will be required to bring such claim in the Court of Chancery, subject to the Court of Chancery having personal jurisdiction over the defendants, or, if the Court of Chancery dismisses such claim because it does not have subject matter jurisdiction over the claim, in another state court in the State of Delaware.

### Vote Required for Approval

The Exclusive Forum Charter Proposal is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting.

The approval of the Exclusive Forum Charter Proposal requires the affirmative vote (in person or by proxy) of holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have the same effect as a vote "AGAINST" this proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT SILVER RUN STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE EXCLUSIVE FORUM CHARTER PROPOSAL.**

191

Table of Contents

## PROPOSAL NO. 5—THE ADDITIONAL CHARTER PROPOSAL

### Overview

Assuming the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal are approved, Silver Run's stockholders are also being asked to approve amendments to the Charter to eliminate certain provisions relating to an Initial Business Combination that will no longer be applicable to us following the consummation of the business combination (the "Additional Charter Proposal"). A copy of the Second A&R Charter reflecting the proposed amendments pursuant to the Additional Charter Proposal is attached to this proxy statement as *Annex D*.

### Vote Required for Approval

The Additional Charter Proposal is conditioned on the approval of the Business Combination Proposal, the Class C Charter Proposal and the NASDAQ Proposal at the special meeting.

The approval of the Additional Charter Proposal requires the affirmative vote (in person or by proxy) of holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have the same effect as a vote "AGAINST" this proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT SILVER RUN STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE ADDITIONAL CHARTER PROPOSAL.**

192

**Table of Contents**

## PROPOSAL NO. 6—THE NASDAQ PROPOSAL

### Overview

In connection with the business combination, we intend to effect (subject to customary terms and conditions, including the closing of the business combination) (a) the issuance of shares of Class C Common Stock to the Contributors in connection with the business combination, which number of shares will equal 275,000,000 and be subject to upward or downward adjustment at Closing pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, (b) the issuance of up to 59,871,031 shares of Class C Common Stock that may be issued to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in the accompanying proxy statement is issued to the Alta Mesa Contributor or the Kingfisher Contributor, (c) the issuance of a number of shares of Class A Common Stock equal to the number of shares of Class C Common Stock issued to the Contributors, which shares of Class A Common Stock are issuable in the future to the Contributors in connection with the future redemption or exchange of their SRII Opco Common Units in accordance with the amended and restated agreement of limited partnership of SRII Opco, (d) the issuance of 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Fund VI Holdings pursuant to the IPO Forward Purchase Agreement and (e) the issuance of up to 20,000,000 shares of Class A Common Stock that may be issued to Fund VI Holdings pursuant to the terms of the Business Combination Forward Purchase Agreement. For further information, please see the full text of the Contribution Agreements, copies of which are attached to this proxy statement as *Annexes A*, *B* and *C*, respectively. The discussion herein is qualified in its entirety by reference to such documents.

### Why Silver Run Needs Stockholder Approval

We are seeking stockholder approval in order to comply with NASDAQ Listing Rules 5635(a) and (d).

Under NASDAQ Listing Rule 5635(a), stockholder approval is required prior to the issuance of securities in connection with the acquisition of another company if such securities are not issued in a public offering and (A) have, or will have upon issuance, voting power equal to or in excess of 20% of the voting power outstanding before the issuance of common stock (or securities convertible into or exercisable for common stock); or (B) the number of shares of common stock to be issued is or will be equal to or in excess of 20% of the number of shares of common stock outstanding before the issuance of the stock or securities. Silver Run will issue shares of Class C Common Stock to the Contributors and will issue in the future shares of Class A Common Stock to the Contributors in connection with the redemption or exchange of their SRII Opco Common Units in accordance with the SRII Opco LPA.

Under NASDAQ Listing Rule 5635(d), stockholder approval is required for a transaction other than a public offering involving the sale, issuance or potential issuance by an issuer of common stock (or securities convertible into or exercisable for common stock) at a price that is less than the greater of book or market value of the stock if the number of shares of common stock to be issued is or may be equal to 20% or more of the common stock, or 20% or more of the voting power, outstanding before the issuance.

Stockholder approval of the NASDAQ Proposal is also a condition to the Closing in the Contribution Agreements.

### Effect of Proposal on Current Stockholders

If the NASDAQ Proposal is adopted, we will issue 275,000,000 shares of Class C Common Stock to the Contributors, which number of shares may be subject to adjustment pursuant to the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement. We may also issue a number of shares of Class A Common Stock equal to the number of shares of Class C Common Stock issued to the Contributors, which may

193

Table of Contents

be issued to the Contributors upon the future redemption or exchange of their SRII Opco Common Units in accordance with the SRII Opco LPA. We may also issue up to 59,871,031 shares of Class C Common Stock to the Alta Mesa Contributor and the Kingfisher Contributor if the earn-out consideration described in the accompanying proxy statement is issued to the Alta Mesa Contributor or the Kingfisher Contributor. We will also issue 40,000,000 shares of Class A Common Stock and warrants to purchase 13,333,333 shares of Class A Common Stock to Fund VI Holdings pursuant to the terms of the IPO Forward Purchase Agreement and up to 20,000,000 shares of Class A Common Stock to Fund VI Holdings pursuant to the terms of the Business Combination Forward Purchase Agreement. The issuance of such shares would result in significant dilution to Silver Run stockholders, and result in the Silver Run stockholders having a smaller percentage interest in the voting power, liquidation value and aggregate book value of Silver Run.

### Vote Required for Approval

The NASDAQ Proposal is conditioned on the approval of the Business Combination Proposal and the Class C Charter Proposal at the special meeting.

Approval of the NASDAQ Proposal requires the affirmative vote (in person or by proxy) of holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have no effect on the outcome of the vote on the NASDAQ Proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE NASDAQ PROPOSAL.**

194

**Table of Contents**

## PROPOSAL NO. 7—THE LTIP PROPOSAL

### Overview

In this Proposal No. 7, we are requesting stockholders approve and adopt the Alta Mesa Resources, Inc. 2018 Long Term Incentive Plan (the "LTIP") and the material terms thereunder. A total of 50,000,000 shares of Class A Common Stock will be reserved for issuance under the LTIP. Our board of directors approved the LTIP on January 12, 2018 subject to stockholder approval at the special meeting. If stockholders approve this Proposal No. 7, the LTIP will become effective on the consummation of an Initial Business Combination. If the LTIP is not approved by the stockholders, it will not become effective and no awards will be granted thereunder. The LTIP is described in more detail below. A copy of the LTIP is attached to this proxy statement as *Annex G*.

### The LTIP

The purpose of the LTIP is to enhance Silver Run's ability to attract, retain and motivate persons who make (or are expected to make) important contributions to Silver Run by providing these individuals with equity ownership opportunities. We believe that the LTIP is essential to our success. Equity awards are intended to motivate high levels of performance and align the interests of our directors, employees and consultants with those of our stockholders by giving directors, employees and consultants the perspective of an owner with an equity stake in Silver Run and providing a means of recognizing their contributions to the success of Silver Run. Our board of directors and management believe that equity awards are necessary to remain competitive in our industry and are essential to recruiting and retaining the highly qualified individuals who help Silver Run meet its goals.

### Background for Determining the Share Reserve Under the LTIP

In its determination to adopt and approve the LTIP, our board of directors reviewed an analysis prepared by FW Cook, its independent compensation consultant, which included an analysis of market data and trends and our anticipated equity usage. Specifically, the board considered FW Cook's review of the size of long-term incentive plan pools reserved by companies in the exploration & production industry at the time of their initial public offerings, as well as the aggregate equity usage practices for other companies in this industry. If the LTIP is approved, we estimate that the shares reserved for issuance under the LTIP would be sufficient for approximately four to six years of awards, noting that the share reserve under the LTIP could last for a longer or shorter period of time dependent upon, among other things, the competitiveness of ongoing grants, any changes in stock price and on our future equity grant practices, which we cannot predict with any degree of certainty at this time.

### Summary of the LTIP

This section summarizes certain principal features of the LTIP. The summary is qualified in its entirety by reference to the complete text of the LTIP, which is attached to this proxy statement as *Annex G*.

**Eligibility and Administration**

Our employees, consultants and directors, and employees and consultants of our subsidiaries, will be eligible to receive awards under the LTIP. As of August 31, 2017, we had zero employees and four directors. Following the business combination, Silver Run and its subsidiaries are expected to have approximately 269 employees who will be eligible to receive awards under the LTIP, in addition to its independent directors and chairman.

The LTIP will be administered by our board of directors, which may delegate its duties and responsibilities to one or more committees of our directors and/or officers (referred to collectively as the plan administrator),

195

Table of Contents

subject to the limitations imposed under the LTIP, Section 16 of the Exchange Act, stock exchange rules and other applicable laws. The plan administrator will have the authority to take all actions and make all determinations under the LTIP, to interpret the LTIP and award agreements and to adopt, amend and repeal rules for the administration of the LTIP as it deems advisable. The plan administrator will also have the authority to determine which eligible service providers receive awards, grant awards and set the terms and conditions of all awards under the LTIP, including any vesting and vesting acceleration provisions, subject to the conditions and limitations in the LTIP.

### Shares Available for Awards

An aggregate of 50,000,000 shares of Class A Common Stock will be available for issuance under the LTIP, all of which may be issued upon the exercise of incentive stock options. Shares issued under the LTIP may be authorized but unissued shares, shares purchased on the open market or treasury shares.

If an award under the LTIP expires, lapses or is terminated, exchanged for cash, surrendered, repurchased, canceled without having been fully exercised or forfeited, any unused shares subject to the award will again be available for new grants under the LTIP. However, the LTIP does not allow the shares available for grant under the LTIP to be recharged or replenished with shares that:

- are tendered or withheld to satisfy the exercise price of an option;

- are tendered or withheld to satisfy tax withholding obligations for any award;

- are subject to a stock appreciation right but are not issued in connection with the stock settlement of the stock appreciation right; or

- are purchased on the open market with cash proceeds from the exercise of options.

Awards granted under the LTIP in substitution for any options or other stock or stock-based awards granted by an entity before the entity's merger or consolidation with us (or any of our subsidiaries) or our (or any of our subsidiary's) acquisition of the entity's property or stock will not reduce the shares available for grant under the LTIP, but will count against the maximum number of shares that may be issued upon the exercise of incentive stock options.

### Awards

The LTIP provides for the grant of stock options, including incentive stock options ("ISOs") and nonqualified stock options ("NSOs"), stock appreciation rights ("SARs"), restricted stock, dividend equivalents, restricted stock units ("RSUs") and other stock or cash based awards. Certain awards under the LTIP may constitute or provide for payment of "nonqualified deferred compensation" under Section 409A of the Code. All awards under the LTIP will be set forth in award agreements, which will detail the terms and conditions of awards, including any applicable vesting and payment terms and post-termination exercise limitations. A brief description of each award type follows.

- *Stock Options and SARs.* Stock options provide for the purchase of shares of Class A Common Stock in the future at an exercise price set on the grant date. ISOs, in contrast to NSOs, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Code are satisfied. SARs entitle their holder, upon exercise, to receive from us an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The plan administrator will determine the number of shares covered by each option and SAR, the exercise price of each option and SAR and the conditions and limitations applicable to the exercise of each option and SAR. The exercise price of a stock option or SAR will not be less than 100% of the fair market value of the underlying share on the grant date (or 110% in the case of ISOs granted to certain significant stockholders), except with respect to certain substitute awards granted in connection with a corporate transaction. The term of a stock option or SAR may not be longer than 10 years (or five years in the case of ISOs granted to certain significant stockholders).

196

Table of Contents

- *Restricted Stock.* Restricted stock is an award of nontransferable shares of Class A Common Stock that remain forfeitable unless and until specified conditions are met and which may be subject to a purchase price. Upon issuance of restricted stock, recipients generally have the rights of a stockholder with respect to such shares, which generally include voting rights in such shares and the right to receive dividends and other distributions in relation to the award; however, dividends may be paid with respect to restricted stock only to the extent the vesting conditions have been satisfied and the restricted stock vests. The terms and conditions applicable to restricted stock will be determined by the plan administrator, subject to the conditions and limitations contained in the LTIP.

- *RSUs.* RSUs are contractual promises to deliver shares of Class A Common Stock in the future, which may also remain forfeitable unless and until specified conditions are met and may be accompanied by the right to receive the equivalent value of dividends paid on shares of Class A Common Stock prior to the delivery of the underlying shares (i.e., dividend equivalent rights); however, dividend equivalents with respect to an award that are based on dividends paid prior to the vesting of such award will only be paid out to the holder to the extent that the vesting conditions are subsequently satisfied and the award vests. The plan administrator may provide that the delivery of the shares underlying RSUs will be deferred on a mandatory basis or at the election of the participant. The terms and conditions applicable to RSUs will be determined by the plan administrator, subject to the conditions and limitations contained in the LTIP.

- *Other Stock or Cash Based Awards.* Other stock or cash based awards are awards of cash, fully vested shares of Class A Common Stock and other awards valued wholly or partially by referring to, or otherwise based on, shares of Class A Common Stock or other property. Other stock or cash based awards may be granted to participants and may also be available as a payment form in the settlement of other awards, as standalone payments and as payment in lieu of compensation to which a participant is otherwise entitled. The plan administrator will determine the terms and conditions of other stock or cash based awards, which may include any purchase price, performance goal, transfer restrictions, vesting conditions and payment terms.

**Performance-Based Awards**

The plan administrator may select performance criteria for an award to establish performance goals for a performance period. Performance criteria under the LTIP may include, but are not limited to, the following: net earnings or losses (either before or after one or more of interest, taxes, depreciation, amortization, and non-cash equity-based compensation expense); gross or net sales or revenue or sales or revenue growth; net income (either before or after taxes) or adjusted net income; profits (including but not limited to gross profits, net profits, profit growth, net operation profit or economic profit), profit return ratios or operating margin; budget or operating earnings (either before or after taxes or before or after allocation of corporate overhead and bonus); cash flow (including operating cash flow and free cash flow or cash flow return on capital); return on assets; return on capital or invested capital; cost of capital; return on stockholders' equity; total stockholder return; return on sales; costs, reductions in costs and cost control measures; expenses; working capital; earnings or loss per share; adjusted earnings or loss per share; price per share or dividends per share (or appreciation in or maintenance of such price or dividends); regulatory achievements or compliance; implementation, completion or attainment of objectives relating to research, development, regulatory, commercial, or strategic milestones or developments; market share; economic value or economic value added models; division, group or corporate financial goals; individual business objectives; production or growth in production; reserves or added reserves; growth in reserves per share; inventory growth; environmental, health and/or safety performance; effectiveness of hedging programs; improvements in internal controls and policies and procedures; customer satisfaction/growth; customer service; employee satisfaction; recruitment and maintenance of personnel; human resources management; supervision of litigation and other legal matters; strategic partnerships and transactions; financial ratios (including those measuring liquidity, activity, profitability or leverage); debt levels or reductions; sales-related goals; financing and other capital raising transactions; cash on hand; acquisition activity; investment sourcing activity; drilling results; proved reserves, reserve replacement, drillbit reserve replacement or reserve

197

Table of Contents

growth; exploration and development costs, capital expenditures, finding and development costs, drillbit finding and development costs, operating costs (including, but not limited to, lease operating expenses, severance taxes and other production taxes, gathering and transportation costs and other components of operating expenses), based operating costs or production costs; production volumes, production growth, or debt-adjusted production growth, which may be of oil, gas, natural gas liquids or any combination thereof; and marketing initiatives, any of which may be measured in absolute terms or as compared to any incremental increase or decrease. Such performance goals also may be based solely by reference to the company's performance or the performance of a subsidiary, division, business segment or business unit of the company or a subsidiary, or based upon performance relative to performance of other companies or upon comparisons of any of the indicators of performance relative to performance of other companies. When determining performance goals, the plan administrator may provide for exclusion of the impact of an event or occurrence which the plan administrator determines should appropriately be excluded, including, without limitation, non-recurring charges or events, acquisitions or divestitures, changes in the corporate or capital structure, events unrelated to the business or outside of the control of management, foreign exchange considerations, and legal, regulatory, tax or accounting changes.

**Prohibition on Repricing**

Under the LTIP, the plan administrator may not, except in connection with equity restructurings and certain other corporate transactions as described below, without the approval of our stockholders, authorize the repricing of any outstanding option or SAR to reduce its price per share, or cancel any option or SAR in exchange for cash or another award when the price per share exceeds the Fair Market Value (as that term is defined in the LTIP) of the underlying shares.

**Certain Transactions**

In connection with certain corporate transactions and events affecting our Class A Common Stock, including a change in control, or change in any applicable laws or accounting principles, the plan administrator has broad discretion to take action under the LTIP to prevent the dilution or enlargement of intended benefits, facilitate the transaction or event or give effect to the change in applicable laws or accounting principles. This includes canceling awards for cash or property, accelerating the vesting of awards, providing for the assumption or substitution of awards by a successor entity, adjusting the number and type of shares subject to outstanding awards and/or with respect to which awards may be granted under the LTIP and replacing awards under the LTIP. In addition, in the event of certain non-reciprocal transactions with our stockholders, the plan administrator will make equitable adjustments to the LTIP and outstanding awards as it deems appropriate to reflect the transaction.

**Provisions of the LTIP Relating to Director Compensation**

The LTIP provides that the plan administrator may establish compensation for non-employee directors from time to time subject to the LTIP's limitations. The plan administrator will from time to time determine the terms, conditions and amounts of all non-employee director compensation in its discretion and pursuant to the exercise of its business judgment, taking into account such factors, circumstances and considerations as it shall deem relevant from time to time, provided that the sum of any cash compensation or other compensation and the grant date fair value of any equity awards granted under the LTIP as compensation for services as a non-employee director during any fiscal year may not exceed $500,000. The plan administrator may make exceptions to this limit for individual non-employee directors in extraordinary circumstances, as the plan administrator may determine in its discretion, subject to the limitations in the LTIP.

**Plan Amendment and Termination**

Our board of directors may amend or terminate the LTIP at any time; however, no amendment, other than an amendment that increases the number of shares available under the LTIP, may materially and adversely affect

198

**Table of Contents**

an award outstanding under the LTIP without the consent of the affected participant and stockholder approval will be obtained for any amendment to the extent necessary to comply with applicable laws. The LTIP will remain in effect until the tenth anniversary of the earlier of (i) the date our board of directors adopted the LTIP and (ii) the date our stockholders approve the LTIP, unless earlier terminated by our board of directors. No awards may be granted under the LTIP after its termination.

**Foreign Participants, Claw-back Provisions, Transferability and Participant Payments**

The plan administrator may modify awards granted to participants who are foreign nationals or employed outside the United States or establish subplans or procedures to address differences in laws, rules, regulations or customs of such foreign jurisdictions. All awards will be subject to any company claw-back policy as set forth in such claw-back policy or the applicable award agreement. Except as the plan administrator may determine or provide in an award agreement, awards under the LTIP are generally non-transferrable, except by will or the laws of descent and distribution, or, subject to the plan administrator's consent, pursuant to a domestic relations order, and are generally exercisable only by the participant. With regard to tax withholding obligations arising in connection with awards under the LTIP, and exercise price obligations arising in connection with the exercise of stock options under the LTIP, the plan administrator may, in its discretion, accept cash, wire transfer or check, shares of Class A Common Stock that meet specified conditions, a promissory note, a "market sell order," such other consideration as the plan administrator deems suitable or any combination of the foregoing.

## Material U.S. Federal Income Tax Consequences

The following summary is based on an analysis of the Code as currently in effect, existing laws, judicial decisions, administrative rulings, regulations and proposed regulations, all of which are subject to change. Moreover, the following is only a summary of United States federal income tax consequences. Actual tax consequences to participants may be either more or less favorable than those described below depending on the participant's particular circumstances.

*ISO.* No income will be recognized by a participant for federal income tax purposes upon the grant or exercise of an ISO. The basis of shares transferred to a participant upon exercise of an ISO is the price paid for the shares. If the participant holds the shares for at least one year after the transfer of the shares to the participant and two years after the grant of the option, the participant will recognize capital gain or loss upon sale of the shares received upon exercise equal to the difference between the amount realized on the sale and the basis of the stock. Generally, if the shares are not held for that period, the participant will recognize ordinary income upon disposition in an amount equal to the excess of the fair market value of the shares on the date of exercise over the amount paid for the shares, or if less, the gain on disposition. Any additional gain realized by the participant upon the disposition will be a capital gain. The excess of the fair market value of shares received upon the exercise of an ISO over the option price for the shares is generally an item of adjustment for the participant for purposes of the alternative minimum tax. Therefore, although no income is recognized upon exercise of an ISO, a participant may be subject to alternative minimum tax as a result of the exercise.

*NSOs.* No income is expected to be recognized by a participant for federal income tax purposes upon the grant of an NSO. Upon exercise of an NSO, the participant will recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the date of exercise over the amount paid for the shares. Income recognized upon the exercise of an NSO will be considered compensation subject to withholding at the time the income is recognized, and, therefore, the participant's employer must make the necessary arrangements with the participant to ensure that the amount of the tax required to be withheld is available for payment. NSOs are designed to provide the employer with a deduction equal to the amount of ordinary income recognized by the participant at the time of the recognition by the participant, subject to the deduction limitations described below.

*SARs.* There is expected to be no federal income tax consequences to either the participant or the employer upon the grant of SARs. Generally, the participant will recognize ordinary income subject to withholding upon

199

Table of Contents

the receipt of payment pursuant to SARs in an amount equal to the aggregate amount of cash and the fair market value of any common stock received. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

*Restricted Stock.* If the restrictions on an award of shares of restricted stock are of a nature that the shares are both subject to a substantial risk of forfeiture and are not freely transferable (within the meaning of Section 83 of the Code), the participant will not recognize income for federal income tax purposes at the time of the award unless the participant affirmatively elects to include the fair market value of the shares of restricted stock on the date of the award, less any amount paid for the shares, in gross income for the year of the award pursuant to Section 83(b) of the Code. In the absence of this election, the participant will be required to include in income for federal income tax purposes on the date the shares either become freely transferable or are no longer subject to a substantial risk of forfeiture (within the meaning of Section 83 of the Code), the fair market value of the shares of restricted stock on such date, less any amount paid for the shares. The employer will be entitled to a deduction at the time of income recognition to the participant in an amount equal to the amount the participant is required to include in income with respect to the shares, subject to the deduction limitations described below. If a Section 83(b) election is made within 30 days after the date the restricted stock is received, the participant will recognize ordinary income at the time of the receipt of the restricted stock, and the employer will be entitled to a corresponding deduction, equal to the fair market value of the shares at the time, less the amount paid, if any, by the participant for the restricted stock. If a Section 83(b) election is made, no additional income will be recognized by the participant upon the lapse of restrictions on the restricted stock, but, if the restricted stock is subsequently forfeited, the participant may not deduct the income that was recognized pursuant to the Section 83(b) election at the time of the receipt of the restricted stock. No participant may make a Section 83(b) election with respect to any award granted under the LTIP without the consent of the plan administrator.

Any dividends paid to a participant holding restricted stock before the expiration of the restriction period will be additional compensation taxable as ordinary income to the participant subject to withholding, unless the participant made an election under Section 83(b). Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the dividends includible in the participant's income as compensation. If the participant has made a Section 83(b) election, the dividends will be dividend income, rather than additional compensation, to the participant.

If the restrictions on an award of restricted stock are not of a nature that the shares are both subject to a substantial risk of forfeiture and not freely transferable, within the meaning of Section 83 of the Code, the participant will recognize ordinary income for federal income tax purposes at the time of the transfer of the shares in an amount equal to the fair market value of the shares of restricted stock on the date of the transfer, less any amount paid therefore. The employer will be entitled to a deduction at that time in an amount equal to the amount the participant is required to include in income with respect to the shares, subject to the deduction limitations described below.

*RSUs.* There will be no federal income tax consequences to either the participant or the employer upon the grant of RSUs. Generally, the participant will recognize ordinary income subject to withholding upon the receipt of cash and/or transfer of shares of common stock in payment of the RSUs in an amount equal to the aggregate of the cash received and the fair market value of the common stock so transferred. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

Generally, a participant will recognize ordinary income subject to withholding upon the payment of any dividend equivalents paid with respect to an award in an amount equal to the cash the participant receives. Subject to the deduction limitations described below, the employer generally will be entitled to a corresponding tax deduction equal to the amount includible in the participant's income.

200

Table of Contents

*Limitations on the Employer's Compensation Deduction.* Section 162(m) of the Code limits the deduction certain employers may take for otherwise deductible compensation payable to certain current or former executive officers of the employer to the extent the compensation paid to such an officer for the year exceeds $1 million.

*Excess Parachute Payments.* Section 280G of the Code limits the deduction that the employer may take for otherwise deductible compensation payable to certain individuals if the compensation constitutes an "excess parachute payment." Excess parachute payments arise from payments made to disqualified individuals that are in the nature of compensation and are contingent on changes in ownership or control of the employer or certain affiliates. Accelerated vesting or payment of outstanding awards under the LTIP upon a change in ownership or control of the employer or its affiliates could result in excess parachute payments. In addition to the deduction limitation applicable to the employer, a disqualified individual receiving an excess parachute payment is subject to a 20% excise tax on the amount thereof.

*Application of Section 409A of the Code.* Section 409A of the Code imposes an additional 20% tax and interest on an individual receiving non-qualified deferred compensation under a plan that fails to satisfy certain requirements. For purposes of Section 409A, "non-qualified deferred compensation" includes equity-based incentive programs, including some stock options, SARs and RSU awards. Generally speaking, Section 409A does not apply to ISOs, non-discounted NSOs and SARs if no deferral is provided beyond exercise, or restricted stock.

The awards made pursuant to the LTIP are expected to be designed in a manner intended to comply with the requirements of Section 409A of the Code to the extent the awards granted under the LTIP are not exempt from Section 409A. However, if the LTIP fails to comply with Section 409A in operation, a participant could be subject to the additional taxes and interest.

State and local tax consequences may in some cases differ from the federal tax consequences. The foregoing summary of the income tax consequences in respect of the LTIP is for general information only. Interested parties should consult their own advisors as to specific tax consequences of their awards.

The LTIP is not subject to the Employee Retirement Income Security Act of 1974, as amended, and is not intended to be qualified under Section 401(a) of the Code.

### Plan Benefits

The benefits or amounts that may be received or allocated to participants under the LTIP will be determined at the discretion of the plan administrator and are not currently determinable.

### Vote Required for Approval

The LTIP Proposal is conditioned on the approval of the Business Combination Proposal and the NASDAQ Proposal at the special meeting.

The approval of the LTIP Proposal requires the affirmative vote (in person or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have no effect on the outcome of the vote on the LTIP Proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS
VOTE "FOR" THE APPROVAL OF THE LTIP PROPOSAL.**

201

**Table of Contents**

## PROPOSAL NO. 8—THE ADJOURNMENT PROPOSAL

### Overview

The Adjournment Proposal, if adopted, will allow our board of directors to adjourn the special meeting to a later date or dates to permit further solicitation of proxies. The Adjournment Proposal will only be presented to our stockholders in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal or the LTIP Proposal.

### Consequences if the Adjournment Proposal is Not Approved

If the Adjournment Proposal is not approved by Silver Run stockholders, the board of directors may not be able to adjourn the special meeting to a later date in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the NASDAQ Proposal and the LTIP Proposal.

### Vote Required for Approval

The Adjournment Proposal is not conditioned on the approval of any other proposal at the special meeting.

The approval of the Adjournment Proposal requires the affirmative vote (in person or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon at the special meeting, voting as a single class. Failure to vote by proxy or to vote in person at the special meeting or an abstention from voting will have no effect on the outcome of the vote on the Adjournment Proposal.

### Recommendation of the Board of Directors

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE ADJOURNMENT PROPOSAL.**

202

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
## RESULTS OF OPERATIONS OF SILVER RUN

*The following discussion and analysis should be read in conjunction with the financial statements and related notes of Silver Run included elsewhere in this proxy statement. This discussion contains forward-looking statements reflecting our current expectations, estimates and assumptions concerning events and financial trends that may affect our future operating results or financial position. Actual results and the timing of events may differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

### Overview

We are a blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. We consummated our IPO on March 29, 2017. We intend to effectuate our Initial Business Combination using cash from the proceeds of the IPO and the private placement of warrants that occurred simultaneously with the consummation of the completion of our IPO (the "private placement warrants") and from additional issuances, if any, of our capital stock, debt or a combination of cash, stock and debt.

At September 30, 2017, we had approximately $546,322 in cash and approximately $36.2 million in deferred underwriting commissions to the underwriters of our IPO. Further, we expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to complete an Initial Business Combination will be successful.

### Results of Operations for the Nine Months Ended September 30, 2017

We have neither engaged in any significant operations nor generated any operating revenue to date. Our only activities since inception relate to our formation, the IPO and efforts directed toward locating a suitable Initial Business Combination. We will not generate any operating revenue until after completion of an Initial Business Combination, at the earliest. Prior to such time, we will generate non-operating income in the form of interest income on cash and cash equivalents. We have incurred increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), and expect to incur increased expenses in the future related to the pursuit of our acquisition plans.

For the nine months ended September 30, 2017, we had net income of $959,743, which consisted primarily of interest income from the Trust Account of $3.95 million. This income was offset by general and administrative expenses of $1.49 million, accrued tax expense of $1.44 million and $60,000 of administrative fees paid to a related party.

### Liquidity and Capital Resources

Until the consummation of the IPO, our only source of liquidity was the initial sale of founder shares to the Sponsor, and the proceeds of two loans from our Sponsor, in the amounts of $300,000 and $1,500,000. The first of these two loans was repaid upon the closing of the IPO and the other will be repaid upon closing of an Initial Business Combination.

On March 29, 2017, we consummated our IPO of 103,500,000 units (the "units") (including 13,500,000 units issued pursuant to the exercise by the underwriters of their over-allotment option) at a price of $10.00 per unit, with each unit consisting of one share of Class A Common Stock and one-third of one warrant, each whole warrant entitling the holder to purchase one whole share of Class A Common Stock for $11.50 per share. The

203

Table of Contents

shares of Class A Common Stock sold as part of the units in the IPO are sometimes referred to as "public shares." The IPO generated proceeds to us of $1,035,000,000 before underwriting discounts and expenses. Simultaneously with the consummation of the IPO, we consummated the private sale to our Sponsor (the "Warrant Private Placement") of an aggregate of 15,133,333 private placement warrants, each exercisable to purchase one share of our Class A Common Stock, at an exercise price of $11.50 per share, at a price of $1.50 per private placement warrant, generating proceeds to us of $22,700,000. On the closing date of our IPO, we placed $1,035,000,000 of proceeds (including $36,225,000 of deferred underwriting discount) from the IPO and the Warrant Private Placement into the Trust Account and held $22,700,000 of such proceeds outside the Trust Account. Of the funds held outside the Trust Account, $20,700,000 was used to pay underwriting discounts in the IPO and $300,000 was used to repay loans to our Sponsor, with the balance reserved to pay accrued offering and formation costs, business, legal and accounting due diligence expenses on prospective acquisitions and continuing general and administrative expenses.

At September 30, 2017, we had cash and cash equivalents held outside the Trust Account of $546,332 and a working capital deficit of $2,270,997. At September 30, 2017, funds held in the Trust Account consisted of money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act, and that invest only in direct U.S. government obligations.

In addition, interest income on the funds held in the Trust Account may be released to us to pay our franchise and income taxes.

We intend to use substantially all of the funds held in our Trust Account, including interest (which interest shall be net of taxes payable), to fund a portion of the cash consideration in the business combination.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements as of September 30, 2017.

**Contractual Obligations**

At September 30, 2017, we did not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities. On March 24, 2017, we entered into an administrative support agreement pursuant to which we have agreed to pay an affiliate of our Sponsor a total of $10,000 per month for office space, utilities and secretarial support. Upon completion of an Initial Business Combination or our liquidation, we will cease paying these monthly fees. For the nine months ended September 30, 2017, we had paid the affiliate of our Sponsor $60,000 under the administrative support agreement.

The underwriters are entitled to underwriting discounts and commissions of 5.5%, of which 2.0% ($20,700,000) was paid at the closing of the IPO, and 3.5% ($36,225,000) was deferred. The deferred underwriting discount will become payable to the underwriters from the amounts held in the Trust Account solely in the event that we complete an Initial Business Combination, subject to the terms of the underwriting agreement. The underwriters are not entitled to any interest accrued on the deferred underwriting discounts.

204

Table of Contents

**Critical Accounting Policies**

The preparation of financial statements and related disclosures in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and income and expenses during periods reported. Actual results could materially differ from those estimates. We have identified the following as our critical accounting policies:

### *Net Income per Common Share*

Net income per common share is computed by dividing net income applicable to common stockholders by the weighted average number of common shares outstanding during the period. An aggregate of 99,545,041 shares of Class A Common Stock subject to possible redemption at September 30, 2017 have been excluded from the calculation of basic income per common share since such shares, if redeemed, only participate in their pro rata share of the trust earnings. We have not considered the effect of the warrants sold in the IPO (including the consummation of the over-allotment) and Private Placement Warrants to purchase 49,633,333 shares of Class A Common Stock in the calculation of diluted income per share, since their inclusion would be anti-dilutive.

### *Redeemable Common Stock*

All of the 103,500,000 public shares contain a redemption feature which allows for the redemption of Class A Common Stock under our liquidation or tender offer/stockholder approval provisions. In accordance with FASB ASC 480, redemption provisions not solely within our control require the security to be classified outside of permanent equity. Ordinary liquidation events, which involve the redemption and liquidation of all of the entity's equity instruments, are excluded from the provisions of FASB ASC 480. Although we have not specified a maximum redemption threshold, our Charter provides that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001. Accordingly, at September 30, 2017, 99,545,041 of the 103,500,000 shares of Class A Common Stock were classified outside of permanent equity at their redemption value.

### *Offering Costs*

We comply with the requirements of FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A—"Expenses of Offering." Offering costs of approximately $58.2 million, consisting primarily of underwriting discounts of approximately $56.9 million (including approximately $36.2 million of which is deferred), and approximately $1.3 million of professional, filing, regulatory and other costs, were charged to additional paid in capital upon the closing of the IPO on March 29, 2017.

**Recent Accounting Pronouncements**

Management does not believe that any recently issued, but not effective, accounting standards if currently adopted would have a material effect on the accompanying financial statements.

**Quantitative and Qualitative Disclosure About Market Risk**

As of September 30, 2017, we were not subject to any market or interest rate risk. The net proceeds of the IPO and the Warrant Private Placement, including amounts in the Trust Account, have been invested in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act and that invest only in direct U.S. government obligations. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

205

Table of Contents

## BUSINESS OF SILVER RUN

**Overview**

Silver Run is a newly organized blank check company incorporated as a Delaware corporation on November 16, 2016. Silver Run was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "Initial Business Combination"). Prior to and after the proposed Initial Business Combination, Silver Run's acquisition and value creation strategy is to identify, acquire and build a company in the energy industry that complements the experience of its management team and that can benefit from their operational expertise. Throughout the acquisition strategy process, Silver Run has leveraged its team's network of potential proprietary and public transaction sources where it believes a combination of its relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition. Silver Run has neither engaged in any operations nor generated any revenue to date. Based on its business activities, it is a "shell company" as defined in the Exchange Act because it has no operations and nominal assets consisting solely of cash and/or cash equivalents.

On March 29, 2017, Silver Run consummated its IPO of 103,500,000 units (the "units") (including 13,500,000 units sold pursuant to the underwriters' exercise of their over-allotment option) at $10.00 per unit, with each unit consisting of one share of Class A Common Stock and one-third of one warrant, each whole warrant entitling the holder to purchase one whole share of Class A Common Stock for $11.50 per share. The shares of Class A Common Stock sold as part of the units in the IPO are sometimes referred as "public shares." The IPO generated total gross proceeds of $1.035 billion. Prior to the consummation of the IPO, in November 2016, our Sponsor purchased 11,500,000 shares of Class B Common Stock, which are referred to herein as "founder shares," for an aggregate purchase price of $25,000, or approximately $0.002 per share. In March 2017, we effected a stock dividend with respect to our Class B Common Stock of 14,375,000 shares, resulting in the initial stockholders holding an aggregate of 25,875,000 founder shares. Also, in March 2017, our Sponsor transferred 33,000 of these founder shares to each of William D. Gutermuth, Jeffery H. Tepper and Diana J. Walters, our independent directors.

Simultaneously with the closing of the IPO on March 29, 2017, Silver Run completed the private sale of 15,133,333 warrants (the "private placement warrants") at a purchase price of $1.50 per private placement warrant, to the Sponsor, generating gross proceeds to Silver Run of $22.7 million. The private placement warrants are identical to the warrants sold as part of the units issued in the IPO, except that the Sponsor agreed not to transfer, assign or sell any of the private placement warrants (except to certain permitted transferees) until 30 days after the completion of Silver Run's Initial Business Combination. The private placement warrants are also not redeemable by Silver Run so long as they are held by the Sponsor or its permitted transferees.

A total of $1.035 billion (including approximately $36.2 million in deferred underwriting commissions to the underwriters of the IPO), which represents $1.0143 billion of the proceeds from the IPO after deducting upfront underwriting commissions of $20.7 million, and the proceeds of the sale of the private placement warrants were placed in the Trust Account maintained by Continental Stock Transfer & Trust Company, acting as trustee. These funds will not be released until the earlier of our completion of the Initial Business Combination or our liquidation, although we may withdraw the interest earned on the funds held in our Trust Account to pay franchise and income taxes.

On April 26, 2017, Silver Run announced that the holders of our units may elect to separately trade the Class A Common Stock and warrants included in the units commencing on April 26, 2017 on NASDAQ under the symbols "SRUN" and "SRUNW," respectively. Those units not separated continued to trade on NASDAQ under the symbol "SRUNU." Upon the Closing, we intend to change our name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc.," and we have applied to continue the listing of our Class A Common Stock and warrants on NASDAQ under the symbols "AMR" and "AMRRW," respectively. The units

Table of Contents

will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security.

**Initial Business Combination**

NASDAQ rules require that an initial business combination must be with one or more target businesses that together have a fair market value equal to at least 80% of the balance in the Trust Account (less any deferred underwriting commissions and taxes payable on interest earned) at the time of signing a definitive agreement in connection with an initial business combination. If Silver Run's board of directors is not able to independently determine the fair market value of the target business, Silver Run will obtain an opinion from an independent investment banking firm that is a member of the Financial Industry Regulatory Authority, Inc.

As of the date of the execution of the Contribution Agreements, the balance of the funds in the Trust Account was approximately $1,036 million (excluding approximately $36.2 million of deferred underwriting commissions and taxes payable on the income earned on the Trust Account) and 80% thereof represents approximately $828 million. In reaching its conclusion that the business combination meets the 80% asset test, the board of directors looked at the enterprise value of Alta Mesa and Kingfisher of approximately $3.55 billion implied by adding: (i) approximately $2.75 billion of equity consideration in the post-combination company to be issued to the Contributors with adjustments for Closing and debt transaction expense; (ii) $800 million of cash consideration payable to the Kingfisher Contributor at the Closing and the assumption of Closing indebtedness. In determining whether the enterprise value described above represents the fair market value of Alta Mesa and Kingfisher, our board of directors considered all of the factors described above in this section and the fact that the purchase price for Alta Mesa and Kingfisher was the result of an arm's length negotiation with the Contributors. As a result, our board of directors concluded that the fair market value of the businesses acquired was significantly in excess of 80% of the assets held in the Trust Account. In light of the financial background and experience of the members of our management team and the board of directors, our board of directors believes that the members of our management team and the board of directors are qualified to determine whether the business combination meets the 80% asset test. Our board of directors did not seek or obtain an opinion of an outside fairness or valuation advisor as to whether the 80% asset test has been met.

**Redemption Rights for Holders of Public Shares**

We are providing our public stockholders with the opportunity to elect to redeem their public shares for cash equal to a pro rata share of the aggregate amount then on deposit in the Trust Account, including interest but net of franchise and income taxes payable, divided by the number of then outstanding public shares, upon the consummation of the business combination, subject to the limitations described herein. As of September 30, 2017, the amount in the Trust Account, net of taxes payable and any interest that we may withdraw for working capital purposes, is approximately $10.00 per public share. Our Sponsor, officers and directors have agreed to waive their redemption rights with respect to the founder shares and any public shares they may hold in connection with the consummation of the business combination. The founder shares will be excluded from the pro rata calculation used to determine the per share redemption price.

**Submission of Business Combination to a Stockholder Vote**

The special meeting of Silver Run stockholders to which this proxy statement relates is to solicit your approval of the business combination. Unlike many other blank check companies, Silver Run public stockholders are not required to vote against the business combination in order to exercise their redemption rights. If the business combination is not completed, then public stockholders electing to exercise their redemption rights will not be entitled to receive such payments. Our Sponsor, directors and officers have agreed to vote any shares of Class A Common Stock and Class B Common Stock owned by them in favor of the business combination.

207

Table of Contents

**Limitation on Redemption Rights**

Notwithstanding the foregoing, a holder of the public shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to more than 20% of the shares of Class A Common Stock included in the units sold in our IPO, which we refer to as the "20% threshold." Accordingly, all public shares in excess of the 20% threshold beneficially owned by a public stockholder or group will not be redeemed for cash.

**Employees**

Silver Run currently has three officers. Members of the management team are not obligated to devote any specific number of hours to Silver Run matters but they intend to devote as much of their time as they deem necessary to Silver Run's affairs until it has completed an Initial Business Combination. Silver Run presently expects its officers to devote such amount of time as they reasonably believe is necessary to the business. Silver Run does not intend to have any full time employees prior to the closing of an Initial Business Combination.

208

**Table of Contents**

## OFFICERS AND DIRECTORS OF SILVER RUN

**Officers and Directors**

Set forth below are the names, ages and positions of each of the individuals who will serve as directors and officers of Silver Run following the business combination:

| Name | Age | Position(1) |
| --- | --- | --- |
| James T. Hackett(2) | 63 | Executive Chairman of the Board and Chief Operating Officer—Midstream |
| Harlan H. Chappelle(3) | 61 | Chief Executive Officer and Director |
| Michael E. Ellis(3) | 61 | Chief Operating Officer—Upstream and Director |
| Michael A. McCabe | 62 | Chief Financial Officer |
| David M. Leuschen(2) | 66 | Director |
| Pierre F. Lapeyre Jr.(2) | 55 | Director |
| William W. McMullen(3) | 32 | Director |
| Don Dimitrievich(3) | 46 | Director |
| William D. Gutermuth | 65 | Director |
| Jeffrey H. Tepper | 51 | Director |
| Diana J. Walters | 54 | Director |

(1)   Prior to the closing of the business combination, we expect to appoint one additional director to our board of directors.

(2)   Following the completion of the business combination, as a result of the Riverstone Contributor's ownership of our Series B Preferred Stock, the Riverstone Contributor will be entitled to nominate directors to our board of directors for a period of five years following the Closing based on its and its affiliates, beneficial ownership of our Class A Common Stock. At the Closing, the Riverstone Contributor will be entitled to nominate three directors to our board of directors, one of whom will be the chairman, for so long as it and its affiliates own at least 15% of the outstanding Class A Common Stock. The vote of the Riverstone Contributor will be the only vote required to elect such nominee to our board.

(3)   Following the completion of the business combination as a result of each of Bayou City, HPS and AM Managements owning a share of our Series A Preferred Stock, each of Bayou City, HPS and AM Management will be entitled to nominate directors to our board of directors for a period of five years following the Closing based on their and their respective affiliates, beneficial ownership of our Class A Common Stock. For so long as (i) Bayou City and its affiliates own at least 10% of the outstanding Class A Common Stock, Bayou City is entitled to nominate one director who must be independent for NASDAQ purposes, (ii) HPS and its affiliates own at least 10% of the outstanding Class A Common Stock, HPS is entitled to nominate one director who must be independent for NASDAQ purposes and (iii) AM Management and its affiliates own at least 10% of the outstanding Class A Common Stock, AM Management is entitled to nominate two directors who need not be independent for NASDAQ purposes.

**James T. Hackett** will become Silver Run's Executive Chairman of the board of directors and Chief Operating Officer—Midstream immediately following the Closing. He has previously served as our Chief Executive Officer and director since March 2017. Mr. Hackett is a partner at Riverstone. Prior to joining Riverstone in 2013, Mr. Hackett served as the Chairman of the Board from 2006 to 2013 and the Chief Executive Officer from 2003 to 2012 of Anadarko Petroleum Corporation. Before joining Anadarko, Mr. Hackett served as President and Chief Operating Officer of Devon Energy Corporation, following its merger with Ocean Energy, where he had served as Chairman, President, and Chief Executive Officer. Mr. Hackett has held senior positions at Seagull, Duke Energy, and Pan Energy. He also held positions in engineering, finance and marketing in the midstream, oil field services, and power sectors of the energy industry. Mr. Hackett serves on the Board of Directors of Enterprise Products Holdings, LLC, Fluor Corporation (NYSE: FLR), National Oilwell Varco, Inc. (NYSE: NOV), Sierra Oil and Gas and Talen Energy Corporation and Crimson Resources. Mr. Hackett is a former Chairman of the Board of the Federal Reserve Bank of Dallas. Mr. Hackett received a Bachelor of Science degree from the University of Illinois in 1975 and an MBA and MTS from Harvard Business School in

209

Table of Contents

1979 and 2016, respectively. Mr. Hackett was selected to serve on the board of directors due to his significant leadership experience and his extensive experience in the energy industry.

**Harlan H. Chappelle** will become Silver Run's Chief Executive Officer immediately following the Closing. He has previously served as the President, CEO and director of Alta Mesa since November 2004. Mr. Chappelle has over 30 years of experience in field operations, engineering, management, marketing and trading, acquisitions and divestitures and field re-development. He has worked for Louisiana Land & Exploration Company, Burlington Resources, Southern Company and Mirant. Mr. Chappelle retired as a Commander from the U.S. Navy Reserve. He has a Bachelor of Chemical Engineering from Auburn University and a Master of Science in Petroleum Engineering from The University of Texas at Austin. Mr. Chappelle's experience as Alta Mesa's Chief Executive Officer since 2004 and over 30 years of experience in the oil and gas industry uniquely qualify him to serve on our board of directors.

**Michael E. Ellis** will become Sliver Run's Chief Operating Officer—Upstream immediately following the Closing. Mr. Ellis founded Alta Mesa in 1987 after beginning his career with Amoco and previously served as Alta Mesa's Chairman and Chief Operating Officer, as well as Vice President of Engineering. Mr. Ellis managed all day-to-day engineering and field operations of Alta Mesa. He built Alta Mesa's asset base by starting with small earn-in exploitation projects, then progressively grew Alta Mesa with successive acquisitions of fields from major oil companies and consistent success in exploration and development drilling. He has over 30 years' experience in management, engineering, exploration and acquisitions and divestitures. Mr. Ellis holds a Bachelor of Science in Civil Engineering from West Virginia University. Because of his broad knowledge of, and experience with, oil and gas exploration and production, we believe Mr. Ellis is well qualified to serve on our board of directors.

**Michael A. McCabe** will become Silver Run's Chief Financial Officer immediately following the Closing. Mr. McCabe previously served as Chief Financial officer and Vice President of Alta Mesa since 2006. Mr. McCabe joined Alta Mesa in September 2006 and became a director in March 2014. Mr. McCabe has over 25 years of corporate finance experience, with a focus on the energy industry. He has served in senior positions with Bank of Tokyo, Bank of New England and Key Bank. Mr. McCabe holds a Bachelor of Science in Chemistry and Physics from Bridgewater State University, a Master of Science in Chemical Engineering from Purdue University and a Master of Business Administration in Financial Management from Pace University.

**David M. Leuschen** will become a director immediately following the Closing. Mr. Leuschen is a Founder of Riverstone and has been a Senior Managing Director since 2000. Prior to founding Riverstone, Mr. Leuschen was a Partner and Managing Director at Goldman Sachs and founder and head of the Goldman Sachs Global Energy and Power Group. Mr. Leuschen joined Goldman Sachs in 1977, became head of the Global Energy and Power Group in 1985, became a Partner of that firm in 1986 and remained with Goldman Sachs until leaving to found Riverstone in 2000. Mr. Leuschen also served as Chairman of the Goldman Sachs Energy Investment Committee, where he was responsible for screening potential capital commitments by Goldman Sachs in the energy and power industry and was responsible for establishing and managing the firm's relationships with senior executives from leading companies in all segments of the energy and power industry. Mr. Leuschen serves as a non-executive board member of Riverstone Energy Limited (LSE: REL) since May 2013, a non-executive board member of Centennial Resource Development, Inc. since October 2016 and serves on the boards of directors or equivalent bodies of a number of private Riverstone portfolio companies and their affiliates. In 2007, Mr. Leuschen, along with Riverstone and The Carlyle Group ("Carlyle"), became the subject of an industry-wide inquiry by the Office of the Attorney General of the State of New York (the "Attorney General") relating to the use of placement agents in connection with investments by the New York State Common Retirement Fund ("NYCRF") in certain funds, including funds that were jointly developed by Riverstone and Carlyle. In June 2009, Riverstone entered into an Assurance of Discontinuance with the Attorney General to resolve the matter and agreed to make a restitution payment of $30 million to the New York State Office of the Attorney General for the benefit of NYCRF. Mr. Leuschen also entered into an Assurance of Discontinuance with the Attorney General in December 2009 and agreed that Riverstone and/or Mr. Leuschen would make a restitution payment of

210

Table of Contents

$20 million to the New York State Office of the Attorney General for the benefit of NYCRF. Mr. Leuschen has received an MBA from Dartmouth's Amos Tuck School of Business and an A.B. degree from Dartmouth College. Mr. Leuschen was selected to serve on the board of directors due to his extensive mergers and acquisitions, financing and investing experience in the energy and power industry.

**Pierre F. Lapeyre Jr.** will become a director immediately following the Closing. Mr. Lapeyre is a Founder of Riverstone and has been a Senior Managing Director since 2000. Prior to founding Riverstone, Mr. Lapeyre was a Managing Director of Goldman Sachs in its Global Energy and Power Group. Mr. Lapeyre joined Goldman Sachs in 1986 and spent his 14-year investment banking career focused on energy and power, particularly the midstream, upstream and energy service sectors. Mr. Lapeyre serves as a non-executive board member of Riverstone Energy Limited (LSE: REL) since May 2013, a non-executive board member of Centennial Resource Development, Inc. since October 2016 and serves on the boards of directors or equivalent bodies of a number of private Riverstone portfolio companies and their affiliates. He has an MBA from the University of North Carolina at Chapel Hill and a B.S. in Finance and Economics from the University of Kentucky. Mr. Lapeyre was selected to serve on the board of directors due to his extensive mergers and acquisitions, financing and investing experience in the energy and power industry.

**William W. McMullen** will become a director immediately following the Closing. Mr. McMullen is the founder and managing partner of Bayou City Energy ("BCE"), an oil and gas focused private equity firm based in Houston, Texas. Mr. McMullen founded BCE in 2015 after successfully managing a smaller private equity vehicle, Bayou City Energy Partners ("BCEP"), focused on investments in the oil and gas sector. Prior to BCEP, Mr. McMullen served as Vice President at White Deer Energy, an oil and gas focused private equity firm. Before White Deer Energy, Mr. McMullen served as an Associate at Denham Capital. Prior to Denham Capital, Mr. McMullen served as an Analyst in UBS Investment Bank's Global Energy group. Mr. McMullen earned his Bachelor's degree in Economics, with Honors, from Harvard University. Because of his broad knowledge of, and experience with, oil and gas investments, we believe Mr. McMullen is well qualified to serve on our board of directors.

**Don Dimitrievich** will become a director of Silver Run immediately following the Closing. Mr. Dimitrievich is a Managing Director at HPS and is responsible for the energy and power portfolio. Prior to joining HPS in 2012, Mr. Dimitrievich was a Managing Director of Citi Credit Opportunities, a credit-focused principal investment group. At Citi Credit Opportunities, Mr. Dimitrievich oversaw the energy and power portfolio and invested in mezzanine, special situation and equity co-investments, and secondary market opportunities. Prior to joining Citi, Mr. Dimitrievich worked in the New York office of Skadden, Arps, Slate, Meagher & Flom LLP from 1998 to 2004 focusing on energy M&A and capital markets transactions. Mr. Dimitrievich has a law degree magna cum laude from McGill University in Montreal, Canada and earned a chemical engineering degree with Great Distinction from Queen's University in Kingston, Canada. Mr. Dimitrievich currently serves on the following Boards: Alta Mesa Holdings LP, Blue Ridge Mountain Resources, Inc., Expro International Group Holdings Ltd., Glacier Oil & Gas Corp., Kingfisher Midstream, LLC, Marquis Resources, LLC and Upstream Exploration LLC. Mr. Dimitrievich was selected to serve on the board of directors due to his significant mergers and acquisitions, financing and investing experience in the energy and power industry.

**William D. Gutermuth** has been a director since March 2017. Mr. Gutermuth is the Founder and Chairman of Bluegrass Capital LLC, a privately owned investment and consulting firm. Since January 1, 2015, he has devoted substantially all of his professional time and energies to Bluegrass Capital. Prior to that, Mr. Gutermuth was an equity partner at Bracewell & Giuliani LLP and its predecessor firm, Bracewell & Patterson, LLP, where he practiced corporate and transactional law for almost 35 years. Mr. Gutermuth's legal career focused principally on mergers and acquisitions, particularly in the energy industry, as well as most aspects of corporate finance and corporate governance. Mr. Gutermuth chaired Bracewell & Giuliani's worldwide Corporate and Securities Practice from 1999 to 2005 and served as a member of the Business Group Executive Committee from 2005 to 2007, as well as serving in other leadership positions within the law firm throughout his career. Mr. Gutermuth served as a director of Main Street Capital Corporation (NYSE: MAIN), a publicly traded business

211

Table of Contents

development company, from 2007 to 2012 and on the Compensation and Nominating and Governance Committees during his tenure as a director. Mr. Gutermuth also served as a director of Silver Run Acquisition Corporation (NASDAQ: SRAQ) from its inception in November 2015 until the completion of its acquisition of Centennial Resource Production, LLC in October 2016. Mr. Gutermuth holds a B.S. in Political Science from Vanderbilt University and a J.D. from Vanderbilt University School of Law. Mr. Gutermuth was selected to serve on the board of directors due to his significant leadership experience and his extensive merger and acquisition experience.

**Jeffrey H. Tepper** has been a director since March 2017. Mr. Tepper is a Founder of JHT Advisors LLC, a mergers and acquisitions advisory and investment firm. From 1990 to 2013, Mr. Tepper served in a variety of senior management and operating roles at the investment bank Gleacher & Company, Inc. and its predecessors and affiliates ("Gleacher"). Mr. Tepper is experienced in mergers and acquisitions, corporate finance, leveraged finance and asset management. Mr. Tepper was Head of Investment Banking and a member of the Management Committee while at Gleacher. Mr. Tepper led numerous investment banking transactions on behalf of clients in a variety of industries but with a specialty in financial services and asset management. Mr. Tepper also served as Gleacher's Chief Operating Officer, overseeing operations, compliance, technology and financial reporting. In 2001, Mr. Tepper co-founded Gleacher's asset management activities and served as President. Mr. Tepper served on the Investment Committees of Gleacher Mezzanine and Gleacher Fund Advisors. Between 1997 and 1999, Mr. Tepper served as Managing Director of and Chief Operating Officer of Gleacher NatWest Inc. (a predecessor to Gleacher Partners). Mr. Tepper was part of the senior management team of Gleacher NatWest with oversight responsibility for middle-market senior and subordinated debt, high-yield and equity principal activities. Between 1987 and 1990, Mr. Tepper was employed by Morgan Stanley & Co. as a financial analyst in the mergers and acquisitions and merchant banking departments. Mr. Tepper also served as a director of Silver Run Acquisition Corporation (NASDAQ: SRAQ) from its inception in November 2015 until the completion of its acquisition of Centennial Resource Production, LLC in October 2016 and has served as a director of Centennial Resource Development, Inc. (NASDAQ: CDEV) since October 2016. Mr. Tepper received an MBA from Columbia Business School and a B.S. in Economics from The Wharton School of the University of Pennsylvania with concentrations in finance and accounting. Mr. Tepper was selected to serve on the board of directors due to his significant investment and financial experience.

**Diana J. Walters** has been a director since March 2017. Ms. Walters has 30 years of experience in the natural resources sector, as an investment manager and equity investor, as an investment banker and in operating roles. Ms. Walters has been the owner and sole manager of 575 Grant, LLC, a company that provides advisory services in the field of natural resources, since 2014. She served as the President and Chief Executive Officer of Liberty Metals & Mining Holdings, LLC and a member of senior management of Liberty Mutual Asset Management from January 2010 to September 2014. She was a Managing Partner of Eland Capital, LLC, a natural resources advisory firm founded by her, from 2007 to 2010. Ms. Walters has extensive investment experience with both debt and equity through various previous leadership roles at Credit Suisse, HSBC and other firms. She also served previously as Chief Financial Officer of Tatham Offshore Inc., an independent oil and gas company with assets in the Gulf of Mexico. Ms. Walters also served as a director of Silver Run Acquisition Corporation (NASDAQ: SRAQ) from its inception in November 2015 until the completion of its acquisition of Centennial Resource Production, LLC in October 2016. Ms. Walters currently serves on the board of directors of Platinum Group Metals (NYSE: PLG) and Electrum Special Acquisition Corporation (NASDAQ: ELECU). Ms. Walters graduated with Honors from the University of Texas at Austin with a B.A. in Plan II Liberal Arts and an M.A. in Energy and Mineral Resources. Ms. Walters was selected to serve on the board of directors due to her significant investment and operating experience in the energy industry.

### Board of Directors and Terms of Office of Officers and Directors

Silver Run is managed under the direction of its board of directors. Its board of directors is divided into three classes of directors with only one class of directors being elected in each year and each class (except those directors appointed prior to Silver Run's first annual meeting of stockholders) serving a three-year term. Prior to

212

Table of Contents

the closing of the business combination, we will determine the members of each class of directors. For a period of five years following the Closing and so long as the Series A Preferred Stock and Series B Preferred Stock remain outstanding, Bayou City, HPS and AM Management, as the holders of our Series A Preferred Stock, and the Riverstone Contributor, as the holder of our Series B Preferred Stock, will be entitled to nominate and elect directors to our board of directors based on their and their affiliates' beneficial ownership of Class A Common Stock. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Certificates of Designation."

Officers are appointed by the board of directors and serve at discretion of the board, rather than for specific terms of office.

213

**Table of Contents**

# EXECUTIVE COMPENSATION

## Silver Run II

The following disclosure concerns the current compensation of Silver Run's officers and directors.

Other than as described below, none of Silver Run's officers or directors have received any cash compensation from Silver Run for services rendered to Silver Run. Since our formation, we have not granted any stock options or stock appreciation rights or any other awards under long-term incentive plans to any of our officers or directors. Commencing on March 29, 2017 through the earlier of consummation of an Initial Business Combination and Silver Run's liquidation, Silver Run has and will continue to pay an affiliate of its Sponsor a total of $10,000 per month for office space, utilities and secretarial support. This arrangement has been agreed to for our benefit and is not intended to provide compensation in lieu of a salary or other remuneration. We believe the $10,000 per month fee is at least as favorable as we could have obtained from an unaffiliated third party for the services. Other than the $10,000 per month fee to our Sponsor's affiliate, no compensation of any kind, including finder's and consulting fees, has been or will be paid to our Sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of an Initial Business Combination. However, our Sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf, such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our Sponsor, officers, directors or their affiliates. For more information about the interests of our Sponsor, directors and officers in the business combination, see the section titled "Proposal No. 1—The Business Combination Proposal—Interests of Certain Persons in the Business Combination."

## Alta Mesa

The following disclosure concerns the pre-business combination compensation of Alta Mesa's executive officers and directors and describes the material elements of compensation for Alta Mesa's named executive officers ("NEOs") for 2017. Because Alta Mesa has operated as a partnership, its operations and activities have been managed by the board of directors of its general partner, Alta Mesa GP. The board of directors of Alta Mesa GP is referred to as "Alta Mesa's Board" or "Alta Mesa's Board of Directors."

### Objectives of Alta Mesa's Compensation Program

Alta Mesa's Board of Directors is responsible for overseeing its executive remuneration programs and the fair and competitive compensation of its executive officers and meets each year to review its compensation program and to determine compensation levels for the ensuing fiscal year.

Alta Mesa's executive compensation program is intended to motivate its executive officers to achieve strong financial and operating results. In addition, Alta Mesa's program is designed to achieve the following objectives:

- attract and retain highly qualified executive officers by providing reasonable total compensation levels competitive with that of executives holding comparable positions in similarly situated organizations;

- provide total compensation that is justified by individual performance; and

- reward its executives for their contributions to its overall performance as well as for their individual performance.

### What Alta Mesa's Compensation Program is Designed to Reward

Alta Mesa's strategy is to enhance partners' value by increasing reserves, cash flow and production in an economically efficient manner by optimizing its drilling and completion techniques. Alta Mesa's compensation

214

Table of Contents

program is designed to reward performance that contributes to the achievement of its business strategy. In addition, Alta Mesa rewards qualities that it believes help achieve its strategy, such as teamwork; individual performance in light of general economic and industry specific conditions; performance that supports its core values; resourcefulness; the ability to manage its existing corporate assets; the ability to explore new avenues to increase oil and natural gas production and reserves; level of job responsibility; and tenure with Alta Mesa.

### Elements of Alta Mesa's Compensation Program and Why It Pays Each Element

To accomplish Alta Mesa's objectives, its compensation program is comprised primarily of the following elements: base salary, cash bonus, long-term incentives and benefits.

Alta Mesa pays base salary in order to recognize each executive officer's unique value and historical contributions to its success in light of salary norms in the industry and the general marketplace; to match competitors for executive talent; to provide executives with sufficient, regularly-paid income; and to reflect an executive's position and level of responsibility.

Alta Mesa includes an annual cash bonus as part of its compensation program because it believes this element of compensation helps to motivate executives to achieve key corporate objectives by providing annual recognition of achievement. The annual cash bonus also allows Alta Mesa to be competitive from a total remuneration standpoint.

Alta Mesa provides a supplemental executive retirement plan to certain key employees, including all its executive officers, to provide additional flexibility and tax planning advantages to them. In addition, the retirement benefits enhance employee compensation on a discretionary basis and encourage their continued service to Alta Mesa.

Alta Mesa grants performance appreciation rights units ("PARs") as long term compensation to certain key employees, including its executive officers, who make significant contributions to Alta Mesa. The PARs are payable on a fixed determination date which is generally between five and 10 years from the grant date of the award or in the event of a Liquidity Event (as defined in the PARs Plan), and therefore, provide the grantee with a significant interest in Alta Mesa tied to long-term performance. Following the business combination, Alta Mesa will cease issuing PARs.

Alta Mesa offers benefits such as a 401(k) plan and payment of insurance premiums in order to provide a competitive remuneration package as well as a measure of financial security to its employees. In 2013, Alta Mesa introduced a deferred compensation plan offered to all employees, to provide flexibility and tax planning advantages to them.

### How Alta Mesa Determines Each Element of Compensation

In determining the elements of compensation, Alta Mesa considers its ability to attract and retain executives as well as various measures of company and industrial performance including debt levels, revenues, cash flow, capital expenditures, reserves of oil and natural gas and costs. Alta Mesa did not retain a consultant with respect to determining 2017 compensation.

Messrs. Ellis, Chappelle, McCabe and Murrell are parties to employment agreements with Alta Mesa Services, L.P. a wholly owned subsidiary of Alta Mesa ("Alta Mesa Services"). The employment agreements automatically renew annually, subject to prior notice of cancellation by either Alta Mesa Services or the executive. These employment agreements establish minimum base salaries for each officer. On March 25, 2014, these employment agreements were amended and restated and the salaries for the officers were set at $485,000, $485,000, $435,000, and $360,000 per annum, to Messrs. Ellis, Chappelle, McCabe and Murrell, respectively, which Alta Mesa believes are competitive with other independent oil and natural gas companies with whom Alta

215

Table of Contents

Mesa competes for managerial talent. In addition, the employment agreements provide that the executives are each entitled to an annual bonus equal to a percentage of his respective annual base salary only if performance criteria set by Alta Mesa's Board for the applicable period are met. The agreements also provide for benefits such as reimbursement of business expenses and participation in employee benefit plans.

*Base salary.* In reviewing base salaries, Alta Mesa's Board takes into account a combination of subjective factors, primarily relying on their own personal judgment and experience. Subjective factors Alta Mesa's Board considers include individual achievements, Alta Mesa's performance, level of responsibility, experience, leadership abilities, increases or changes in duties and responsibilities and contributions to its performance. Mr. Ellis and Mr. Chappelle participate in and are present during the review and determination of their respective base salaries. For 2017, Alta Mesa's Board set the base salaries for Messrs. Ellis, Chappelle and McCabe at $485,000, $485,000 and $435,000, respectively, which were unchanged from their 2016 base salaries. In addition, Alta Mesa's Board determined Mr. Murrell's and Mr. Cole's salaries of $360,000 and $350,000, respectively, for 2017 were appropriate, which were unchanged from their 2016 base salaries.

*Bonus.* A portion of each executive's total compensation may be paid as bonus compensation. Alta Mesa's Board takes into consideration Alta Mesa's achievements during the year and each executive's contribution toward such achievements. While performance criteria may be set, Alta Mesa's Board takes into account subjective factors in determining if these criteria were met. Bonuses for any one year are usually determined and paid in the second or third quarter of the following year. Accordingly, bonus compensation for Alta Mesa's executive officers for 2017 has not yet been determined. No bonuses were paid in 2017 for 2016 performance. However, bonuses paid in 2016 for 2015 performance ranged from approximately 45% to 85% of base salary.

*Long-Term Incentives.* On September 23, 2014, Alta Mesa's Board of Directors approved and adopted a long-term compensation plan, the Alta Mesa Holdings, LP Performance Appreciation Rights Plan (the "PARs Plan"), as amended and restated effective September 24, 2014, to provide long-term incentive compensation to key employees and consultants who make significant contributions to Alta Mesa to align its employees with its long-term performance. The PARs Plan is administered by Alta Mesa's Board, which determines from time to time which participants will participate in the PARs Plan, the number of PARs to be granted to each participant, the stipulated initial designated value ("SIDV") of each PAR, the designated value of each PAR as of its valuation date, the vesting schedule of each PAR, and any other terms and conditions of the PAR award. Under the PARs Plan, there are special provisions for valuation and payment of a vested PAR award in the event of a Liquidity Event, which is generally defined as follows: an event that (a) satisfies the definition of "change in control" under Section 409A of the Code ("Section 409A") and (b) is (i) a sale of the all of the assets of High Mesa, (ii) a disposition of all of the equity securities of High Mesa, (iii) an initial public offering of the equity securities of High Mesa or any of its subsidiaries that hold all or substantially all of the assets or (iv) a public offering resulting in gross proceeds of at least $300 million, provided that such event also qualifies as a change in control event under Section 409A. The business combination will result in the accelerated vesting and payment of all outstanding PARs. Alta Mesa estimates that the value of the PARs that will vest upon the Closing and will be paid by High Mesa will be approximately $10.6 million. In addition, Alta Mesa will not issue any additional PARs following the business combination.

A total of 1,000,000 PARs are available for grants to participants under the PARs Plan. The aggregate designated value of all 1,000,000 PARs is approximately equal to 10% of the fair market value of the aggregate interests of all the Class A members in Alta Mesa GP.

Absent an intervening Liquidity Event, payment of a PAR award is made on the fixed determination date elected in advance by the recipient of the PAR award, with such fixed determination date occurring no earlier than April 1 of the fifth year following the year of the grant and no later than 10 years from the grant date. All payments made under the PARs Plan in any year are subject to a floating annual cap on the amount of all PAR awards paid under the PARs Plan in a given year (the "Annual Cap"). The Annual Cap is equal to 2.5% multiplied by the fair market value of the aggregate interests of all the Class A members in Alta Mesa GP minus $400 million. If the Annual Cap applies in a year, the amount payable to a PAR award holder on the fixed

216

Table of Contents

determination date is his pro-rata amount of the aggregate payments to be made on that date as adjusted for the amount of Annual Cap remaining for that year. Any amounts in excess of the Annual Cap are paid in the next following year, again subject to the Annual Cap.

Upon the occurrence of a payment event, the participant will be entitled to receive a cash amount equal to the increase, if any, between the SIDV of the PAR as of its grant date and the designated value of the PAR as of its payment valuation date. No PARs will be settled in shares; rather, all PAR exercises will be settled solely in cash. Participants will have no rights whatsoever as an equityholder of Alta Mesa GP or of a subsidiary in respect of any PARs.

In 2017 and 2016, Alta Mesa's Board awarded 20,000 PARs and 15,000 PARs, respectively, to David Murrell. The SIDV of 20,000 PARs and 15,000 PARs granted is $40 per unit and vests over a five-year period. In 2016, Alta Mesa's Board awarded 60,000 PARs to Michael A. McCabe and 40,000 PARs to Homer "Gene" Cole. The SIDV of the awards are $40 per unit and vests over a five-year period. Payout of the 2017 and 2016 PARs is based on the increase of the designated value of the PARs over the SIDV of the PARs as determined at the earlier of a Liquidity Event or at a fixed determination date which is generally at least five years from the grant date of the award. In 2015, no PARs were awarded to any of the Alta Mesa NEOs.

**Benefits.** Alta Mesa provides company benefits or perquisites that it believes are standard in the industry to all of its employees. These benefits consist of a group medical and dental insurance program for employees and their qualified dependents and a 401(k) employee savings and protection plan. The costs of these benefits are paid for entirely by Alta Mesa. Alta Mesa does not provide employee life insurance amounts surpassing the Internal Revenue Service maximum. Alta Mesa makes matching contributions to the 401(k) contribution of each qualified participant. Alta Mesa pays all administrative costs to maintain the plan. In addition, Alta Mesa provides Messrs. Ellis, Chappelle, McCabe, Murrell and Cole with company automobiles. Beginning annually in 2014, Alta Mesa also reimburses each officer, with the exception of Mr. Cole, up to $5,000 annually for tax preparation and planning.

***Nonqualified Deferred Compensation.*** Alta Mesa established a nonqualified deferred compensation plan in 2013, the Alta Mesa Holdings, L.P. Supplemental Executive Retirement Plan (the "Retirement Plan"), to provide additional flexibility and tax planning advantages to Alta Mesa's senior executives and other key highly compensated employees. The terms of such contributions may include a specified vesting schedule, intended to encourage continuous service to Alta Mesa. If no schedule is specified with the award, the Retirement Plan provides for vesting based on years of service, with full vesting at three years. Participants will receive a distribution of vested funds from the Retirement Plan in accordance with the distribution schedule established when the contributions are elected or awarded, with the option of deferring for a fixed time period or until separation from service. On January 1, 2017, Alta Mesa made elective employer contributions to be credited to the accounts of Messrs. Chappelle, Ellis, McCabe, Murrell and Cole in the amounts of $1.6 million, $0.7 million, $0.6 million, $0.3 million and $0.5 million, respectively. Alta Mesa's Board of Directors elected to make this contribution subject to a five-year vesting schedule, with 20% vested each subsequent year, with the exception of Messrs. Murrell and Cole, with none vested in year one and 25% vested each subsequent year beginning in year two of the five-year vesting schedule.

***Other Compensation***. As part of his employment agreement, Alta Mesa provided Mr. McCabe an apartment near its headquarters and paid his commuting expenses to and from his permanent home to Houston, Texas. In March 2017, Mr. McCabe moved his permanent residence to Houston, Texas. Such housing and commuting expense prior to his permanent move totaled approximately $30,652 in 2017. Alta Mesa agreed to provide these benefits to Mr. McCabe because Alta Mesa's Board believed it was necessary to retain Mr. McCabe's services despite the fact that his permanent residence was outside of the Houston, Texas area. Alta Mesa's Board of Directors considered the value of this additional compensation in evaluating Mr. McCabe's total compensation package.

217

Table of Contents

### How Elements of Alta Mesa's Compensation Program are Related to Each Other

Alta Mesa views the various components of compensation as related but distinct and emphasizes "pay for performance" with a portion of total compensation reflecting a risk aspect tied to its financial and strategic goals. Alta Mesa determines the appropriate level for each compensation component based in part, but not exclusively, on its view of internal equity and consistency, and other considerations it deem relevant, such as rewarding extraordinary performance.

### Assessment of Risk

Alta Mesa's Board takes risk into account when making compensation decisions and has concluded that the executive compensation program as it is currently structured does not encourage excessive risk or unnecessary risk-taking.

### Accounting and Tax Considerations

Under the PARs Plan, participants are granted PARs with a SIDV. The PARs vest over time (as specified in each grant, typically five years) and entitle the owner to receive a cash amount equal to the increase, if any, between SIDV and the designated value of the PAR on the payment valuation date. The payment valuation date is the earlier of a Liquidity Event (as defined in the PARs Plan), but generally can be construed in accordance with the meaning of the term "change in control event" or as a fixed determination date selected by the participant, which is no earlier than within the fifth year from the end of the year containing the grant date. In the case of a Liquidity Event, the designated value of all PARs is to be based on the net sale proceeds (as defined in the PARs Plan) resulting from the Liquidity Event. After any payment valuation date, vested PARs expire regardless of whether or not there is a payment relating thereto. Alta Mesa considers the possibility of payment at a fixed determination date absent the occurrence of a Liquidity Event to be remote as liquidity has not yet occurred. Therefore, Alta Mesa has not provided any amount for this contingent liability in its consolidated financial statements at December 31, 2017 and 2016. The business combination will result in a Liquidity Event as defined under the PARs Plan and will result in payment to the holders of PARs.

***Section 162(m) of the Code***. Generally, Section 162(m) of the Code disallows a tax deduction to any publicly-held corporation for individual compensation in excess of $1.0 million paid in any taxable year to certain of its current or former executive officers. As Alta Mesa is not currently publicly traded, Alta Mesa's Board of Directors and compensation committee have not previously taken the deductibility limit imposed by Section 162(m) into consideration in setting compensation.

***Section 409A of the Code***. Alta Mesa has structured its compensation program in a manner intended to comply with Section 409A. If an employee is entitled to nonqualified deferred compensation benefits that are subject to Section 409A, and such compensation does not comply with Section 409A, then the benefits are generally taxable to the extent they are not subject to a substantial risk of forfeiture. In such case, the employee is subject to regular federal income tax, interest and an additional federal income tax of 20% of the benefits includible in income.

All equity awards to Alta Mesa's employees, including executive officers, and to its directors will be granted and reflected in its consolidated financial statements, based upon the applicable accounting guidance, at fair market value on the grant date in accordance with FASB ASC, Topic 718, "Compensation—Stock Compensation."

### Stock Ownership Guidelines

Stock ownership guidelines have not been implemented for Alta Mesa's named executive officers or directors. Alta Mesa will continue to periodically review best practices and reevaluate its position with respect to stock ownership guidelines.

218

Table of Contents

### Securities Trading Policy

Alta Mesa's securities trading policy provides that executive officers, including the named executive officers, and its directors, may not, among other things, purchase or sell puts or calls to sell or buy its stock, engage in short sales with respect to its stock, buy its securities on margin or otherwise hedge their ownership of its stock. The purchase or sale of stock by Alta Mesa's executive officers and directors may only be made during certain windows of time and under the other conditions contained in its policy.

### Summary Compensation

The following table summarizes, with respect to Alta Mesa's NEOs, information relating to the compensation earned for services rendered in all capacities during the fiscal years ended December 31, 2017, 2016 and 2015. None of the Alta Mesa NEOs participate in a defined benefit pension plan.

| Name and Principal Position: | Year | Salary | Bonus(1) | All Other Compensation(7)(8) | Total |
|---|---|---|---|---|---|
| Harlan H. Chappelle | 2017 | $485,000 | $ — | $ 1,614,741(2) | $2,099,741 |
| President, Chief Executive Officer | 2016 | $485,000 | $ — | $ 1,423,656(2) | $1,908,656 |
| | 2015 | $485,000 | $ — | $ 42,555(2) | $ 527,555 |
| Michael E. Ellis | 2017 | $485,000 | $ — | $ 733,742(3) | $1,218,742 |
| Chief Operating Officer, Vice President of Engineering and | 2016 | $485,000 | $ — | $ 900,280(3) | $1,385,280 |
| Chairman of the Board | 2015 | $485,000 | $300,000 | $ 20,423(3) | $ 805,423 |
| Michael A. McCabe | 2017 | $435,000 | $ — | $ 718,507(4) | $1,153,507 |
| Vice President, Chief Financial Officer | 2016 | $435,000 | $ — | $ 847,348(4) | $1,282,348 |
| | 2015 | $435,000 | $300,000 | $ 126,095(4) | $ 861,095 |
| David Murrell | 2017 | $360,000 | $ — | $ 316,904(5) | $ 676,904 |
| Vice President of Land and Business Development | 2016 | $360,000 | $ — | $ 294,163(5) | $ 654,163 |
| | 2015 | $360,000 | $175,000 | $ 14,819(5) | $ 549,819 |
| Homer "Gene" Cole | 2017 | $350,000 | $ — | $ 536,965(6) | $ 886,965 |
| Vice President, Chief Technical Officer | 2016 | $344,230 | $ — | $ 479,949(6) | $ 824,179 |
| | 2015 | $300,000 | $250,000 | $ 21,279(6) | $ 571,279 |

(1)    Bonuses for 2017 have not yet been determined.

(2)    Mr. Chappelle's other compensation for the year ended December 31, 2017 consists of $1,581,250 in an elective contribution made by Alta Mesa to his Retirement Plan account, $11,192 in his matching funds to his 401(k) account, $18,825 in auto expenses, and approximately $3,474 for club membership. Mr. Chappelle's other compensation for the year ended December 31, 2016 consists of $1,375,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $11,192 in his matching funds to his 401(k) account, $32,827 in auto expenses, and approximately $4,637 for club membership. Mr. Chappelle's other compensation for the year ended December 31, 2015 consists of $8,954 in his matching funds to his 401(k) account, $30,131 in auto expenses, and approximately $3,470 for club membership.

(3)    Mr. Ellis' other compensation for the year ended December 31, 2017 consists of $706,250 in an elective contribution made by Alta Mesa to his Retirement Plan account, $13,250 in matching funds to his 401(k) account and $14,242 in auto expenses. Mr. Ellis' other compensation for the year ended December 31, 2016 consists of $875,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $13,250 in matching funds to his 401(k) account and $12,030 in auto expenses. Mr. Ellis' other compensation for the year ended December 31, 2015 consists of $10,600 in matching funds to his 401(k) account and $9,823 in auto expenses.

219

Table of Contents

(4) For the year ended December 31, 2017, Mr. McCabe's other compensation consists of $562,500 in an elective contribution made by Alta Mesa to his Retirement Plan account, $11,042 in matching funds to his 401(k) account, $13,273 in auto expenses and $30,652 in travel and living expenses, which includes $28,384 for an apartment in Houston, Texas and $2,268 for travel, which consists primarily of airfare and parking. In March 2017, Mr. McCabe moved his permanent residence to Houston, Texas. Alta Mesa paid $101,040 for relocation expenses. In 2014, an elective employer contribution was made for the account of Mr. McCabe for $3,000,000 that was fully vested and distributed in 2017. For the year ended December 31, 2016, Mr. McCabe's other compensation consists of $750,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $8,270 in matching funds to his 401(k) account, and $89,078 in travel and living expenses, which includes $41,735 for an apartment in Houston, Texas and $47,343 for travel, which consists primarily of airfare and the cost of a leased car and parking. For the year ended December 31, 2015, Mr. McCabe's other compensation consists of $8,319 in matching funds to his 401(k) account, and $117,776 in travel and living expenses, which includes $41,049 for an apartment in Houston, Texas and $76,727 for travel, which consists primarily of airfare and the cost of rental cars and parking.

(5) Mr. Murrell's other compensation for the year ended December 31, 2017 consists of $300,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $13,500 in matching funds to his 401(k) account, and $3,404 in auto expense. Mr. Murrell's other compensation for the year ended December 31, 2016 consists of $275,000 in an elective contribution made by us to his Retirement Plan account, $13,250 in matching funds to his 401(k) account, and $5,913 in auto expense. Mr. Murrell's other compensation for the year ended December 31, 2015 consists of $10,600 in matching funds to his 401(k) account and $4,219 in auto expense.

(6) Mr. Cole became an executive officer of Alta Mesa in 2015. Mr. Cole's other compensation for the year ended December 31, 2017 consists of $500,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $13,500 in matching funds to his 401(k) account, $17,724 in auto expense and $5,741 for club membership. Mr. Cole's other compensation for the year ended December 31, 2016 consists of $450,000 in an elective contribution made by Alta Mesa to his Retirement Plan account, $13,250 in matching funds to his 401(k) account and $16,699 in auto expense. Mr. Cole's other compensation for the year ended December 31, 2015 consists of $9,692 in matching funds to his 401(k) account and $10,679 in auto expense.

(7) In 2017 and 2016, the Alta Mesa Board awarded 20,000 PARs and 15,000 PARs, respectively, to David Murrell. The SIDV of 20,000 PARs and 15,000 PARs granted is $40 per unit and vests over a five-year period. In 2016, the Alta Mesa Board awarded 60,000 PARs to Michael A. McCabe and 40,000 PARs to Homer "Gene" Cole, respectively. The SIDV of the awards are $40 per unit and vests over a five-year period. Payout of the 2017 and 2016 PARs is based on the increase of the designated value of the PARs over the SIDV of the PARs as determined at the earlier of a Liquidity Event or at a fixed determination date which is generally at least five years from the grant date of the award. In 2015, no PARs were awarded to any of the Alta Mesa NEOs.

(8) Amounts provided for all other compensation that are determined based upon reimbursement of expenses to Alta Mesa's NEOs are estimates based upon requests for reimbursements submitted prior to the date of this proxy statement.

**Narrative Disclosure to Summary Compensation Table**

***Employment agreements***

*Mr. Chappelle*

Mr. Chappelle entered into an amended and restated employment agreement on March 25, 2014 that provides that he will act as President and Chief Executive Officer until March 25, 2018, subject to automatic one year renewals of the term if neither party submits a notice of termination at least 60 days prior to the end of the then-current term. This agreement may be terminated by either party, at any time, subject to severance obligations in the event Mr. Chappelle is terminated by Alta Mesa without cause or he dies or is disabled.

220

Table of Contents

Mr. Chappelle's employment agreement provides for a minimum base salary of $485,000 and an annual bonus equal to a percentage of his base salary paid during each such annual period, such percentage to be established by Alta Mesa's Board of Directors in its sole discretion.

*Mr. Ellis*

Mr. Ellis entered into an amended and restated employment agreement on March 25, 2014 that provides that he will act as Vice President and Chief Operating Officer until March 25, 2018, subject to automatic one year renewals of the term if neither party submits a notice of termination at least 60 days prior to the end of the then-current term. This agreement may be terminated by either party, at any time, subject to severance obligations in the event Mr. Ellis is terminated by Alta Mesa without cause or he dies or is disabled.

Mr. Ellis' employment agreement provides for a minimum base salary of $485,000 and an annual bonus equal to a percentage of his base salary paid during each such annual period, such percentage to be established by Alta Mesa's Board of Directors in its sole discretion.

*Mr. McCabe*

Mr. McCabe entered into an amended and restated employment agreement on March 25, 2014 that provides that he will act as Vice President and Chief Financial Officer until March 25, 2018, subject to automatic one year renewals of the term if neither party submits a notice of termination at least 60 days prior to the end of the then-current term. This agreement may be terminated by either party, at any time, subject to severance obligations in the event Mr. McCabe is terminated by Alta Mesa without cause or he dies or is disabled.

Mr. McCabe's employment agreement provides for a minimum base salary of $435,000 and an annual bonus equal to a percentage of his base salary paid during each such annual period, such percentage to be established by Alta Mesa's Board of Directors in its sole discretion.

Mr. McCabe's employment agreement also provides that he is allowed to work from his residence in Massachusetts as well as in Alta Mesa's Houston, Texas office so long as he is capable of performing his duties assigned to him. In his employment agreement, Alta Mesa also agree to provide Mr. McCabe with suitable housing (or a housing allowance) and an automobile or reimbursement for the lease of an automobile while he is in Houston. In March 2017, Mr. McCabe moved his permanent residence to Houston, Texas.

*Mr. Murrell*

Mr. Murrell entered into an amended and restated employment agreement on March 25, 2014 that provides that he will act as Vice President of Land and Business Development until March 25, 2015, subject to automatic one year renewals of the term if neither party submits a notice of termination at least 60 days prior to the end of the then-current term. This agreement may be terminated by either party, at any time, subject to severance obligations in the event Mr. Murrell is terminated by Alta Mesa without cause or he dies or is disabled.

Mr. Murrell's employment agreement provides for a minimum base salary of $360,000 and an annual bonus equal to a percentage of his base salary paid during each such annual period, such percentage to be established by Alta Mesa's Board of Directors in its sole discretion, subject to a minimum of $50,000.

*New Employment Agreements*

In connection with the Closing, Alta Mesa may enter into new employment agreements with some or all of its NEOs. The terms of such agreements have not yet been finally determined.

221

Table of Contents

**Outstanding Equity Awards Value at 2017 Fiscal Year-End**

There were no outstanding equity awards for Alta Mesa's NEOs as of December 31, 2017.

**Option Exercises and Equity Awards Vested in Fiscal Year 2017**

There were no exercises of equity awards and no vesting of equity awards for Alta Mesa's NEOs during fiscal 2017.

**Pension Benefits**

Alta Mesa does not provide pension benefits for Alta Mesa's NEOs.

**Nonqualified Deferred Compensation**

Alta Mesa established the Retirement Plan to provide additional flexibility and tax planning advantages to its senior executives and other key highly compensated employees. Alta Mesa's Board of Directors administers the Retirement Plan, and at its sole discretion, designates employees who are eligible to participate. Participants may defer up to 90% of their salary and up to 100% of their cash bonus under the Retirement Plan. Alta Mesa's Board of Directors may also, at its sole discretion, make elective employer contributions on behalf of selected participants. The terms of such contributions may include a specified vesting schedule, intended to encourage continuous service to Alta Mesa. If no schedule is specified with the award, the Retirement Plan provides for vesting based on years of service, with full vesting at three years. Participants may withdraw vested funds from the Retirement Plan in accordance with the distribution schedule established when the contributions are elected or awarded, with the option of deferring for a fixed time period or until separation from service with Alta Mesa. The Retirement Plan is an unsecured and unfunded promise to pay deferred cash compensation to its participants, who are Alta Mesa's general creditors.

The following table shows each NEO's accumulated benefits under Alta Mesa's nonqualified deferred compensation plans for 2017.

**NONQUALIFIED DEFERRED COMPENSATION**

| Name | Aggregate Balance at December 31, 2016 ($) | Executive Contributions in 2017 ($) | Company Contributions in 2017 ($)(a) | Aggregate Earnings in 2017 ($) | Aggregate Withdrawals / Distributions during 2017 ($) | Aggregate Balance at December 31, 2017 ($)(b) |
|---|---|---|---|---|---|---|
| Harlan H. Chappelle | $1,375,000 | $ — | $1,581,250(c) | $ — | $ — | $2,956,250 |
| Michael E. Ellis | 875,000 | — | 706,250(c) | — | — | 1,581,250 |
| Michael A. McCabe | 3,750,000 | — | 562,500(c) | — | (3,000,000) | 1,312,500 |
| David Murrell | 600,000 | — | 300,000(d) | — | — | 900,000 |
| Homer "Gene" Cole | 950,000 | — | 500,000(d) | — | — | 1,450,000 |

(a) The amounts shown in this column are also included in "All Other Compensation" column on the Summary Compensation Table.
(b) Certain portions shown for each Alta Mesa NEO were also reported in the Summary Compensation Table in prior years.
(c) The contributions are subject to a five-year vesting schedule, with 20% vested each subsequent year.
(d) The contributions are subject to a five-year vesting schedule, with zero vested in year one and 25% vested each subsequent year beginning in year two of the five-year vesting period.

In 2017, no amounts of salary or bonus were elected to be deferred under the Retirement Plan by any Alta Mesa NEO. In 2017, Alta Mesa made elective employer contributions to the accounts for all of its NEOs. Alta Mesa's Board elected to make the contributions for Harlan H. Chappelle, Michael E. Ellis, and Michael A. McCabe subject to a five-year vesting schedule, with 20% vested each subsequent year. The contributions for

222

Table of Contents

David Murrell and Gene Cole were subject to a five-year vesting schedule, with zero vested in year one and 25% vested each subsequent year beginning in year two of the five-year vesting period. In 2014, one elective employer contribution was made for the account of Michael A. McCabe. The elective contribution was fully vested and distributed in 2017 in accordance with the terms of the Retirement Plan.

As of fiscal year end 2017, Alta Mesa considered the possibility of payment with respect to outstanding PARs absent the occurrence of a Liquidity Event to be remote. Therefore, no accumulated benefits under the PARs Plan for 2017 has been included. For a description of the PARs Plan, please see the section above entitled "How Alta Mesa Determines Each Element of Compensation—Long-Term Incentives."

### Termination of Employment and Change-in-Control Provisions

Messrs. Chappelle, Ellis, McCabe and Murrell are parties to employment agreements that provide them with post-termination benefits in a variety of circumstances. The amount of compensation payable in some cases may vary depending on the nature of the termination, whether as a result of retirement/voluntary termination, involuntary not-for-cause termination, termination following a change of control and in the event of disability or death of the executive. The discussion below describes the varying amounts payable in each of these situations. It assumes, in each case, that the officer's termination was effective as of December 31, 2017. In presenting this disclosure, Alta Mesa describes amounts earned through December 31, 2017 and, in those cases where the actual amounts to be paid out can only be determined at the time of such executive's separation from Alta Mesa, it estimates the amounts which would be paid out to the executives upon their termination.

### Provisions under the Employment Agreements

Under the employment agreements, if the executive's employment with Alta Mesa terminates, the executive is entitled to unpaid salary for the full month in which the termination date occurred. However, if the executive is terminated for cause, the executive is only entitled to receive accrued but unpaid salary through the termination date. In addition, if the executive's employment terminates, the executive is entitled to unpaid vacation days for that year which have accrued through the termination date, reimbursement of reasonable business expenses that were incurred but unpaid as of the termination date, a pro rata portion of the annual bonus for that year and COBRA coverage as required by law. Salary and accrued vacation days are payable in cash lump sum less applicable withholdings. Business expenses are reimbursable in accordance with normal procedures. Additionally, upon termination of employment for any reason, the executive will become 100% fully vested in (1) the unvested portion of any outstanding equity grants held by the executive as of his termination date, and (2) any unvested amounts accrued under any nonqualified deferred compensation or incentive plan or program in which the executive was participating as of his termination date. Alta Mesa expects that the employment agreements will be amended in connection with Closing to remove this accelerated vesting provision.

If the executive's employment is involuntarily terminated by Alta Mesa (except for cause or due to the death of the executive) or if the executive's employment is terminated due to disability or retirement or by the executive for good reason, Alta Mesa is obligated to pay as additional compensation an amount in cash equal to two years of the executive's base salary in effect as of the termination date, or 18 months' base salary for Mr. Murrell, and two times the annual bonus paid to the executive in the prior year. Assuming termination as of December 31, 2017, for both Messrs. Chappelle and Ellis, the termination benefit would have been $970,000; for Mr. McCabe, $870,000; and for Mr. Murrell, $540,000. In addition, all vested amounts in the executive's account balance under the Retirement Plan (the "Plan") would be distributed in accordance with the Plan. Assuming termination as of December 31, 2017, Mr. Chappelle, Mr. Ellis, Mr. McCabe and Mr. Murrell would have received a distribution of $866,250, $491,250, $412,500, and $393,750, respectively. Alta Mesa's executives are each entitled under their employment agreements to continued group health plan coverage following the termination date for the executive and the executive's eligible spouse and dependents for the maximum period for which such qualified beneficiaries are eligible to receive COBRA coverage. For the first 12 months of COBRA coverage, the executive shall not be required to pay more for COBRA coverage than officers who are then in active service for Alta Mesa and receiving coverage under the plan.

223

Table of Contents

Assuming termination as of December 31, 2017, for each of Messrs. Chappelle, Ellis, McCabe, and Murrell, this amount would have been $12.00 to each. Alta Mesa's total cost of providing this benefit would have been $20,830 for Mr. Chappelle, $30,422 for Mr. Ellis, $9,510 for Mr. McCabe, and $20,830 for Mr. Murrell.

"Cause" means:

- the executive's conviction by a court of competent jurisdiction of a crime involving moral turpitude or a felony, or entering the plea of *nolo contendere* to such crime by the executive;

- the commission by the executive of a demonstrable act of fraud, or a misappropriation of funds or property, of or upon Alta Mesa or any affiliate;

- the engagement by the executive without approval of Alta Mesa and Alta Mesa's Board of Directors in any material activity which directly competes with the business of Alta Mesa or any affiliate or which would directly result in a material injury to the business or reputation of Alta Mesa or any affiliate (including the partners of Alta Mesa); or

- the breach by the executive of any material provision of the employment agreement, and the executive's continued failure to cure such breach within a reasonable time period set by Alta Mesa but in no event less than 20 calendar days after the executive's receipt of such notice.

"Good reason" means the occurrence of any of the following, if not cured and corrected by Alta Mesa or its successor, within 60 days after written notice thereof is provided by the executive to Alta Mesa or its successor:

- the demotion or reduction in title or rank of the executive, or the assignment to the executive of duties that are materially inconsistent with the executive's current positions, duties, responsibilities and status with Alta Mesa, or any removal of the executive from, or any failure to re-elect the executive to, any of such positions (other than a change due to the executive's disability or as an accommodation under the Americans with Disabilities Act), except for any such demotion, reduction, assignment, removal or failure that occurs in connection with (i) the executive's termination of employment for cause, disability or death, or (ii) the executive's prior written consent;

- the reduction of the executive's annual base salary or bonus opportunity as effective immediately prior to such reduction without the prior written consent of the executive; or

- a relocation of the executive's principal work location to a location in excess of 50 miles from its then current location.

"Retirement" means the termination of the executive's employment for normal retirement at or after attaining age 70, provided that the executive has been an active employee with Alta Mesa for at least five years.

The employment agreements do not separately provide for benefits upon a change of control.

The Retirement Plan generally defines "cause" in the same manner as above for the employment agreements. Under the terms of the Retirement Plan, separation from service for any reason other than cause would result in a distribution event for the participant's vested account balance. The terms of the Retirement Plan also include provisions whereby each participant's account balance becomes immediately fully vested if the participant (i) is terminated during the first year after a change in control event for any reason other than cause or (ii) terminates due to death or disability. Normal retirement age is defined under the Retirement Plan as 65 years of age.

### Compensation of Directors

The employee and non-employee members of the Alta Mesa Board of Directors do not receive compensation for their services as directors. However, Alta Mesa's directors may be reimbursed for their expenses in attending board meetings.

224

Table of Contents

**Compensation Committee Interlocks and Insider Participation**

Alta Mesa does not currently have a compensation committee or an equivalent committee. None of Alta Mesa's NEOs has served as a director or member of the compensation committee of any other entity whose executive officers served as a director or member of its compensation committee.

**Kingfisher**

Pursuant to the Operator Agreement, ARM provides management services to Kingfisher, including Kingfisher's executive officers. In accordance with the Operator Agreement, regarding employee expenses, Kingfisher reimburses ARM for the fully-burdened costs and expenses (as reasonably incurred by ARM) of ARM's employees who are exclusively dedicated to the provision of services to Kingfisher. None of ARM's employees who act as Kingfisher's executive officers exclusively provide services to Kingfisher. As a result, Kingfisher does not incur costs with respect to the compensation of its executive officers.

The individuals who serve on the Kingfisher board of managers do not receive compensation for acting in such capacity.

**Compensation of Executive Officer and Directors after the Business Combination**

After the completion of the business combination, directors or executive officers of Silver Run may be paid consulting, management or other fees or compensation from Silver Run. After completion of the business combination, James T. Hackett will serve as Chairman of the board of directors of Silver Run and Chief Operating Officer—Midstream, while Harlan H. Chappelle, Michael E. Ellis, and Michael A. McCabe will serve as Chief Executive Officer, Chief Operating Officer—Upstream, and Chief Financial Officer, respectively, under substantially the same terms as are provided in their current employment agreements with Alta Mesa Services or under the terms of new employment agreements to be entered into in connection with the Closing as described above. No other determinations regarding the compensation arrangements for Silver Run's directors or executive officers have been made. Our board of directors, both prior to and after the Closing, may make changes to the current compensation arrangements.

225

**Table of Contents**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF ALTA MESA**

*The following discussion and analysis should be read in conjunction with the accompanying financial statements and related notes of Alta Mesa included elsewhere in this proxy statement. The following discussion and analysis contains forward-looking statements that reflect Alta Mesa's future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside Alta Mesa's control. Alta Mesa's actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, the volatility of oil and natural gas prices, production timing and volumes, estimates of proved reserves, operating costs and capital expenditures, economic and competitive conditions, regulatory changes and other uncertainties, as well as those factors discussed below and elsewhere in this proxy statement, particularly in "Risk Factors—Risks Related to the Alta Mesa Business," and "Cautionary Note Regarding Forward-Looking Statements," all of which are difficult to predict. In light of these risks, uncertainties and assumptions, the forward-looking events discussed may not occur. The following discussion also includes information regarding Alta Mesa's non-STACK assets, which Silver Run will not acquire in the business combination.*

**Overview**

Alta Mesa has been engaged in the onshore oil and natural gas acquisition, exploitation, exploration and production business in the United States since 1987. Currently, Alta Mesa is focusing on the development and acquisition of unconventional oil and natural gas reserves in the STACK. Historically, Alta Mesa has also operated, developed and explored for conventional oil and natural gas reserves, with Alta Mesa's most significant conventional asset being the Weeks Island oil field in Iberia Parish, Louisiana. Alta Mesa maintains operational control of the majority of its properties, either through directly operating them or through operating arrangements with minority interest holders. Pursuant to the Alta Mesa Contribution Agreement, Alta Mesa will transfer to its existing owners (other than the Riverstone Contributor) its non-STACK assets prior to the Closing.

**Outlook**

Alta Mesa's revenue, profitability and future growth depend on many factors, particularly the prices of oil, natural gas and natural gas liquids, which are beyond Alta Mesa's control. The relatively low level of natural gas prices prompted Alta Mesa's shift in emphasis to oil and natural gas liquids over the past several years. Accordingly, the success of Alta Mesa's business is significantly affected by the price of oil due to its current focus on development of oil reserves. Oil prices are subject to significant changes. Beginning in the third quarter of 2014, the price for oil began a dramatic decline, and current prices for oil are significantly less than they have been over the last several years. Factors affecting oil prices include worldwide economic conditions, including the European credit markets; geopolitical activities, including developments in the Middle East, South America and elsewhere; worldwide supply conditions; weather conditions; actions taken by the Organization of Petroleum Exporting Countries; and the value of the U.S. dollar in international currency markets. Sustained low prices for oil, natural gas and natural gas liquids could have a material adverse effect on Alta Mesa's financial condition, the carrying value of its oil and natural gas properties, its proved reserves and its ability to finance operations, including the amount of Alta Mesa's borrowing base under its senior secured revolving credit facility.

During the last 12 month period ended September 30, 2017, NYMEX West Texas Intermediate ("NYMEX WTI") oil prices ranged from a high of $53.46 per Bbl in February 2017 to a low of $45.20 per Bbl in June 2017. During the third quarter of 2017, NYMEX WTI prices averaged approximately $48.20 per Bbl compared to $44.94 per Bbl for the same period of 2016. Alta Mesa received an average price of $47.20 per Bbl for the third quarter of 2017 before the effects of hedging. NYMEX Henry Hub natural gas prices ("NYMEX HH") have also been volatile and ranged from a high of $3.93 per MMBtu in January 2017 to a low of $2.63 in March 2017. During the third quarter of 2017, NYMEX HH prices averaged approximately $3.00 per MMBtu compared to $2.81 per MMBtu for the same period of 2016. Alta Mesa received an average price of $2.50 per Mcf for natural

226

Table of Contents

gas in the third quarter of 2017 before the effects of hedging. As of November 7, 2017, NYMEX WTI was $57.20 per Bbl and NYMEX Henry Hub was $3.15 per MMBtu. Commodity prices remain volatile and unpredictable but have improved during the third quarter of 2017 compared to the third quarter of 2016.

In order to mitigate the impact of changes in oil, natural gas and natural gas liquids prices on its cash flows, Alta Mesa is a party to hedging and other price protection contracts, and Alta Mesa's management intends to enter into such transactions in the future to reduce the effect of low oil, natural gas and natural gas liquids prices on its cash flows. Alta Mesa's derivative contracts are reported at fair value on its consolidated balance sheets and are sensitive to changes in the price of oil, natural gas and natural gas liquids. Changes in these derivative assets and liabilities are reported in Alta Mesa's consolidated statements of operations as gain / loss on derivative contracts, which include both the non-cash increase and decrease in the fair value of derivative contracts, as well as the effect of cash settlements of derivative contracts during the period. In the first nine months of 2017, Alta Mesa recognized a net gain on its derivative contracts of $38.0 million, which includes $1.8 million in cash settlements received on derivative contracts. In 2016, Alta Mesa recognized a net loss on its derivative contracts of $40.5 million, which includes $88.7 million in cash settlements received on derivative contracts. In 2015, Alta Mesa recognized a net gain on its derivative contracts of $124.1 million, which includes $106.9 million in cash settlements received for derivative contracts.

The objective of Alta Mesa's hedging program is that, over time, the combination of settlement gains and losses from derivative contracts with ordinary oil, natural gas and natural gas liquids revenues will produce relative revenue stability. However, in the short term, both settlements and fair value changes in Alta Mesa's derivative contracts can significantly impact its results of operations, and Alta Mesa's management expects these gains and losses to continue to reflect changes in oil and natural gas prices.

As of September 30, 2017, Alta Mesa hedged approximately 73% of its forecasted production of proved developed producing reserves through 2019 at weighted average annual floor prices ranging from $3.18 per MMBtu to $4.43 per MMBtu for natural gas and $50.00 per Bbl to $51.37 per Bbl for oil. If oil and/or natural gas prices continue to decline for an extended period of time, Alta Mesa may be unable to replace expiring hedge contracts or enter new contracts for additional oil and natural gas production at favorable prices.

Depressed oil and natural gas prices have impacted Alta Mesa's earnings by necessitating impairment write-downs in some of its properties, either directly by decreasing the market values of the properties, or indirectly, by lowering rates of return on oil and natural gas development projects and increasing the chance of impairment write-downs. Alta Mesa recorded non-cash impairment expenses of $29.2 million and $14.2 million for the nine months ended September 30, 2017 and 2016, respectively. In the first nine months of 2017 and 2016, write-downs were primarily due to downward revisions in proved reserves in some fields and the effects of decreased prices for oil, natural gas and natural gas liquids. In the first nine months of 2017, Alta Mesa's impairments were primarily related to its non-core areas. Further declines in oil and/or natural gas prices may result in additional impairment expenses. Alta Mesa recorded non-cash impairment expenses of $16.3 million, $176.8 million and $74.9 million during the years ended December 31, 2016, 2015 and 2014, respectively. The 2016 write-downs were primarily due to downward revisions in proved reserves in some fields and decreased prices for oil, natural gas and natural gas liquids. Alta Mesa's impairments were primarily related to its oil and gas properties. For further information, see "—Results of Operations: Year Ended December 31, 2016 Compared to Year Ended December 31, 2015—Impairment Expense."

The primary factors affecting Alta Mesa's production levels are capital availability, the effectiveness and efficiency of its production operations, the success of its drilling program and its inventory of drilling prospects. In addition, Alta Mesa faces the challenge of natural production declines. Alta Mesa attempts to overcome this natural decline primarily through development of its existing undeveloped reserves, enhanced completions and well recompletions and other enhanced recovery methods. Alta Mesa's future growth will depend on its ability to continue to add reserves in excess of production. Alta Mesa's ability to add reserves through drilling and other development techniques is dependent on its capital resources and can be limited by many factors, including its

227

Table of Contents

ability to timely obtain drilling permits and regulatory approvals. Any delays in drilling, completing or connecting its new wells to gathering lines will negatively affect Alta Mesa's production, which will have an adverse effect on its revenues and, as a result, cash flow from operations.

**Factors Affecting the Comparability of Future Financial Results of Silver Run Attributable to Alta Mesa to the Historical Financial Results of Alta Mesa**

The future results of operations of Silver Run attributable to Alta Mesa may not be comparable to Alta Mesa's historical results of operations for the periods presented, primarily for the reasons described below:

- The historical consolidated financial statements of Alta Mesa included in this proxy statement are based on the financial statements of Alta Mesa prior to its transfer of all its non-STACK assets and related liabilities to its existing owners (other than the Riverstone Contributor), which will occur prior to the Closing. Accordingly, these assets will not be a part of Alta Mesa following the business combination. As a result, the historical financial data may not give you an accurate indication of what Alta Mesa's actual results would have been if the transfer had been completed at the beginning of the periods presented or of what Alta Mesa's future results of operations are likely to be.

- In connection with the business combination, Alta Mesa will enter into the Tax Receivable Agreement with SRII Opco and the Initial Limited Partners. This agreement generally provides for the payment by Silver Run of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that it actually realizes (or is deemed to realize in certain circumstances) in periods after the business combination as a result of (i) certain tax basis increases resulting from the exchange of SRII Opco Common Units for Class A Common Stock (or, under certain circumstances, cash) pursuant to the redemption right or our right to effect a direct exchange of SRII Opco Common Units under the SRII Opco LPA, other than such tax basis increases allocable to assets held by Kingfisher or otherwise used in Kingfisher's midstream business, and (ii) interest paid or deemed to be paid by us as a result of, and additional tax basis arising from, any payments we make under the Tax Receivable Agreement. Silver Run will retain the benefit of the remaining 15% of these cash savings. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Agreements Related to the Alta Mesa Contribution Agreement—Tax Receivable Agreement."

- We anticipate that we will account for the effects of these increases in tax basis and payments for such increases under the Tax Receivable Agreement arising from future exchanges as follows:

  - we do not anticipate recording a liability in connection with the Tax Receivable Agreement upon completion of the business combination as we do not expect there to be any exchanges of SRII Opco Common Units at such time;

  - when future sales or exchanges occur, we will record a debit to the deferred taxes on the balance sheet for the gross amount of the income tax effect along with an offset of 85% of this liability as payable under the Tax Receivable Agreement; the remaining difference between the deferred tax and tax receivable agreement liability will be recorded as additional paid-in capital; and

  - to the extent we have recorded a deferred tax asset for an increase in tax basis to which a benefit is no longer expected to be realized due to lower future taxable income, we will reduce the deferred tax asset with a valuation allowance.

Additionally, our pro forma results of operations include the following significant adjustments related to Alta Mesa's operations as compared to the historical results of operations of Alta Mesa:

- *Operating Revenues*. Alta Mesa expects that its oil, natural gas and natural gas liquid operating revenues will initially be lower as compared to historical data, primarily due to the Alta Mesa non-STACK Assets Divestiture to transpire prior to the Closing; however, Alta Mesa anticipates the reduction to be partially offset by continued development of its STACK assets and the addition of the Alta Mesa JV Wells Contribution.

228

Table of Contents

- *Lease and Plant Operating Expense.* Alta Mesa's lease and plant operating expense will be significantly less than its historical results primarily due to the divestiture of its non-STACK assets. Alta Mesa anticipates that its future lease and plant operating expenses will remain lower than its historical operations as a result of its centralized operating area that contains new or existing efficient production infrastructure, including saltwater disposal pipelines, managed by experienced operating personnel.

- *Production and Ad Valorem Taxes.* Alta Mesa's production taxes included in our pro forma results of operations are significantly lower than the production taxes included in its historical financial statements as a result of the decline in oil, natural gas and natural gas liquids revenues. In addition, ad valorem taxes are not assessed on Alta Mesa's STACK assets.

- *Depletion, Depreciation and Amortization.* Alta Mesa's depletion, depreciation and amortization ("DD&A") included in our pro forma results of operations is significantly lower than the DD&A in its historical financial statements as a result of proportionately larger reserve volumes and longer reserve life of Alta Mesa's STACK assets than the expected production volumes as compared to its non-STACK assets.

- *Impairment Expense.* Alta Mesa's impairment expense included in our pro forma results of operations is significantly lower than the impairment expenses in its historical financial statements as almost all of the historical impairment expense was a result of a write-down of Alta Mesa's non-STACK assets, including the Weeks Island Area, located in Iberia and St. Mary Parish, Louisiana and natural gas fields in South Texas, East Texas and South Louisiana.

- *General and Administrative Expense.* We will incur certain additional general and administrative expenses ("G&A") related to being a publicly traded company. In connection with the Closing, we will enter into a management services agreement for operational, management and administrative services provided to the Alta Mesa Contributor and its affiliates for the divested non-STACK assets under which we will have the right to recoup certain actual expenses. The expense reimbursement will be recorded as an offset to G&A. We will also charge a monthly management fee of $10,000 that will be recorded as Other Revenue in our consolidated statements of operations.

- *Provision for Federal Income Taxes.* As a corporation, under the Code, we are subject to federal income taxes at a statutory rate of 35% of pretax earnings. This is a significant change from Alta Mesa's historical results since it is a limited partnership and therefore not subject to federal income taxes. We do not expect to report any income tax benefit or expense upon the consummation of the business combination. We anticipate a future increase in deferred tax liability for the flow through income from SRII Opco to us based on enacted federal and state tax rates.

## Recent Activity

### Contribution from Affiliate and Repayment of Senior Secured Term Loan Facility

On November 10, 2016, High Mesa contributed $300 million in cash from an investment from Bayou City to Alta Mesa, and Alta Mesa used such proceeds to repay (a) all amounts outstanding under its second lien senior secured term loan and (b) amounts owed under its senior secured revolving credit facility.

### Repurchase and Redemption of 9.625% Senior Notes due 2018

On November 30, 2016, Alta Mesa commenced a tender offer for any and all of its outstanding $450 million 9.625% senior notes due 2018 (the "2018 Notes"). The tender offer expired on December 7, 2016 and on December 8, 2016 Alta Mesa paid for the aggregate principal amount of the 2018 Notes validly tendered. In connection therewith, Alta Mesa caused to be deposited, with Wells Fargo Bank, National Association, the trustee for the 2018 Notes (the "Trustee"), funds sufficient to redeem any 2018 Notes that remained outstanding on December 8, 2016. On December 20, 2016, the Trustee executed a satisfaction and discharge (the

229

Table of Contents

"Satisfaction and Discharge") of the indenture relating to the 2018 Notes. The Satisfaction and Discharge, among other things, discharged the indenture and Alta Mesa's obligations thereunder. As a result of the tender offer and redemption, Alta Mesa repurchased and redeemed its $450 million outstanding 2018 Notes for an aggregate cost of $459.4 million, including accrued interest and fees, for the year ended December 31, 2016.

### Issuance of 7.875% Senior Notes due 2024

On December 8, 2016, Alta Mesa and its wholly owned subsidiary, Alta Mesa Finance Services Corp. (together with Alta Mesa, the "Issuers"), issued $500.0 million in aggregate principal amount of the 2024 Notes, which resulted in aggregate net proceeds to Alta Mesa of $491.3 million, after deducting commissions and offering expenses. Alta Mesa used the proceeds from the issuance of the 2024 Notes to fund the repurchase and redemption of the 2018 Notes as described above. The remainder of the proceeds were used to repay a portion of Alta Mesa's indebtedness under its senior secured revolving credit facility.

### Sixth Amended and Restated Agreement of Limited Partnership

On August 16, 2017, Alta Mesa GP, the Alta Mesa Contributor and the Riverstone Contributor entered into a Sixth Amended and Restated Agreement of Limited Partnership (the "Amended Partnership Agreement") of Alta Mesa Holdings, LP. The Amended Partnership Agreement reflects, among other things, certain changes in the ownership of Alta Mesa, and provides for certain preemptive rights, tag-along rights, and drag-along rights for the limited partners. In connection with Amended Partnership Agreement, the existing limited partners of Alta Mesa transferred their interests in Alta Mesa to the Alta Mesa Contributor. The Amended Partnership Agreement also reflects the admission of the Riverstone Contributor and the Alta Mesa Contributor to the partnership as limited partners, and provides for certain distribution rights for the Class A and Class B Limited Partners (as defined therein) with respect to the STACK and non-STACK assets.

The Riverstone Contributor was admitted as a limited partner in connection with its $200 million capital contribution to Alta Mesa on August 17, 2017, in exchange for limited partner interests in Alta Mesa. Alta Mesa used all of the capital contribution to pay down its senior secured revolving credit facility.

### Fifth Amended and Restated Limited Liability Company Agreement

On August 16, 2017, the owners of Alta Mesa GP entered into a Fifth Amended and Restated Limited Liability Company Agreement, which was amended to, among other things, show certain changes in the ownership of Alta Mesa GP and reflect that the holders of Class A Units (as defined therein) are entitled to 100% of the economic rights with respect to Alta Mesa GP and the holders of Class B Units (as defined therein) are entitled to 100% of the voting rights with respect to Alta Mesa GP.

## Recent Acquisitions and Divestitures

### Bayou City Joint Development Agreement

In January 2016, Alta Mesa entered into a joint development agreement with BCE, a fund advised by Bayou City, to fund a portion of Alta Mesa's drilling operations and to allow Alta Mesa to accelerate development of its STACK acreage. The drilling program will fund the development of 80 wells, in four tranches of 20 wells each.

On December 31, 2016, High Mesa purchased from BCE and contributed interests in 24 producing wells drilled under the joint development agreement. Under the joint development agreement with Alta Mesa, BCE has committed to fund 100% of Alta Mesa's working interest share up to a maximum of an average of $3.2 million in drilling and completion costs per well for any tranche. Alta Mesa is responsible for any drilling and completion costs exceeding this aggregate limit. In exchange for the payment of drilling and completion costs, BCE receives 80% of Alta Mesa's working interest in each wellbore, which BCE Interest will be reduced to 20% of Alta

230

**Table of Contents**

Mesa's initial working interest upon BCE achieving a 15% internal rate of return on the wells within in a tranche and automatically further reduced to 12.5% of Alta Mesa's initial interest upon BCE achieving a 25% internal rate of return. Following the completion of each joint well, Alta Mesa and BCE will each bear their respective proportionate working interest share of all subsequent costs and expenses related to such joint well. As of September 30, 2017, 43 additional joint wells have been drilled or spudded leaving 37 joint wells to be drilled under the joint development agreement. Of the approximately 113 gross wells Alta Mesa plans to drill in 2017, approximately 35 of such wells are expected to be drilled under the joint development agreement.

### Kingfisher County, Oklahoma, Leasehold Acquisition

On July 6, 2015, Alta Mesa acquired approximately 19,000 net acres of undeveloped leasehold interest in Kingfisher County, Oklahoma. The consideration for the purchase was approximately $46.2 million and is subject to customary purchase price adjustments. The effective date of the acquisition is April 1, 2015. The purchase was funded with borrowings under Alta Mesa's senior secured revolving credit facility.

### Alta Mesa Eagle, LLC Divestiture

On September 30, 2015, Alta Mesa closed the sale of all the membership interests in Alta Mesa Eagle, LLC that held all of Alta Mesa's remaining non-operated oil and natural gas producing properties located in the Eagle Ford shale play in Karnes County, Texas to EnerVest Energy Institutional Fund XIV-A, L.P. and EnerVest Energy Institutional Fund XIV-WIC, L.P. pursuant to a purchase and sale agreement dated September 16, 2015. The effective date of the transaction was July 1, 2015 (the "Eagle Ford Divestiture").

Pursuant to the agreement, the aggregate cash sale price was $125 million, subject to certain adjustments, consisting of a $118 million initial payment paid at closing, and additional contingent payments of approximately $7 million in the aggregate. As of December 31, 2015, Alta Mesa received net proceeds of $122 million, including $4 million of customary purchase price adjustments, and recognized a preliminary gain of approximately $67.6 million. Cash received was utilized to pay down borrowings under Alta Mesa's senior secured revolving credit facility.

As of July 1, 2015, Alta Mesa's estimated net proved reserves sold were approximately 7.8 MMBOE. As a result of the Eagle Ford Divestiture, Alta Mesa no longer owns any assets in the Eagle Ford shale play.

## Results of Operations

### Nine Months Ended September 30, 2017 Compared to Nine Months Ended September 30, 2016

The following table sets forth certain operating information with respect to Alta Mesa's oil, natural gas and natural gas liquids operations for the periods indicated:

| | Nine Months Ended | | | |
| | September 30, 2017 | September 30, 2016 | Increase (Decrease) | % Change |
|---|---|---|---|---|
| | (in thousands, except average sales prices and unit costs) | | | |
| **Summary Operating Information:** | | | | |
| **Net Production:** | | | | |
| Oil (MBbls) | 3,533 | 2,985 | 548 | 18% |
| Natural gas (MMcf) | 14,073 | 10,017 | 4,056 | 40% |
| Natural gas liquids (MBbls) | 995 | 691 | 304 | 44% |
| Total oil equivalent (MBOE) | 6,873 | 5,346 | 1,527 | 29% |
| Average daily oil production (MBOE per day) | 25.2 | 19.5 | 5.7 | 29% |

231

Table of Contents

| | Nine Months Ended | | | |
| | September 30, 2017 | September 30, 2016 | Increase (Decrease) | % Change |
|---|---|---|---|---|
| | (in thousands, except average sales prices and unit costs) | | | |
| **Average Sales Price:** | | | | |
| Oil (per Bbl) including settlements of derivative contracts | $ 48.25 | $ 64.60 | $ (16.35) | (25)% |
| Oil (per Bbl) excluding settlements of derivative contracts | 48.01 | 38.78 | 9.23 | 24% |
| Natural gas (per Mcf) including settlements of derivative contracts | 2.81 | 2.70 | 0.11 | 4% |
| Natural gas (per Mcf) excluding settlements of derivative contracts | 2.68 | 2.02 | 0.66 | 33% |
| Natural gas liquids (per Bbl) including settlements of derivative contracts | 22.14 | 14.67 | 7.47 | 51% |
| Natural gas liquids (per Bbl) excluding settlements of derivative contracts | 22.93 | 14.62 | 8.31 | 57% |
| Combined (per BOE) including settlements of derivative contracts | 33.75 | 43.02 | (9.27) | (22)% |
| Combined (per BOE) excluding settlements of derivative contracts | 33.49 | 27.34 | 6.15 | 22% |
| **Hedging Activities:** | | | | |
| Settlements of derivatives (paid) received, oil | $ 846 | $ 77,085 | $ (76,239) | (99)% |
| Settlements of derivatives (paid) received, natural gas | 1,719 | 6,724 | (5,005) | (74)% |
| Settlements of derivatives (paid), natural gas liquids | (790) | 30 | (820) | N/A |
| **Summary Financial Information** | | | | |
| *Revenues and Other* | | | | |
| Oil | $ 169,611 | $ 115,778 | $ 53,833 | 46% |
| Natural gas | 37,780 | 20,277 | 17,503 | 86% |
| Natural gas liquids | 22,814 | 10,109 | 12,705 | 126% |
| Other revenues | 274 | 358 | (84) | (23)% |
| Gain on sale of assets | — | 3,723 | (3,723) | (100)% |
| Gain on acquisition of oil and natural gas properties | 6,893 | — | 6,893 | 100% |
| Gain (loss) on derivative contracts | 38,024 | (23,970) | 61,994 | 259% |
| Total Operating Revenues and Other | 275,396 | 126,275 | 149,121 | 118% |
| *Expenses* | | | | |
| Lease and plant operating expense | 49,836 | 45,222 | 4,614 | 10% |
| Marketing and transportation expense | 21,566 | 8,140 | 13,426 | 165% |
| Production and ad valorem taxes | 8,812 | 8,021 | 791 | 10% |
| Workover expense | 5,112 | 3,242 | 1,870 | 58% |
| Exploration expense | 19,930 | 15,304 | 4,626 | 30% |
| Depreciation, depletion and amortization expense | 80,082 | 66,857 | 13,225 | 20% |
| Impairment expense | 29,206 | 14,238 | 14,968 | 105% |
| Accretion expense | 1,447 | 1,615 | (168) | (10)% |
| General and administrative expense | 35,534 | 32,909 | 2,625 | 8% |
| Interest expense, net | 38,189 | 51,581 | (13,392) | (26)% |
| Provision for state income taxes | 285 | 107 | 178 | 166% |
| Net Loss | $ (14,603) | $ (120,961) | $ 106,358 | 88% |
| **Average Unit Costs per BOE:** | | | | |
| Lease and plant operating expense | $ 7.25 | $ 8.46 | $ (1.21) | (14)% |
| Marketing and transportation expense | 3.14 | 1.52 | 1.62 | 107% |
| Production and ad valorem tax expense | 1.28 | 1.50 | (0.22) | (15)% |
| Workover expense | 0.74 | 0.61 | 0.13 | 21% |
| Exploration expense | 2.90 | 2.86 | 0.04 | 1% |
| Depreciation, depletion and amortization expense | 11.65 | 12.51 | (0.86) | (7)% |
| General and administrative expense | 5.17 | 6.16 | (0.99) | (16)% |

Table of Contents

**Revenues**

*Oil revenues*

Oil revenues in the nine months ended September 30, 2017 increased $53.8 million, or 46%, to $169.6 million from $115.8 million in the corresponding period in 2016. The increase in revenue was primarily attributable to an increase in average price as well as an increase in production. The average price of oil exclusive of derivative contract settlements increased $9.23 per Bbl, or 24%, in the first nine months of 2017 compared to the first nine months of 2016, resulting in an increase in oil revenues of approximately $32.6 million. When including the effects of derivative contract settlements, the overall price decreased 25% from $64.60 per Bbl in the first nine months of 2016 to $48.25 per Bbl in the first nine months of 2017. The overall price included settlement of oil derivative contracts prior to contract expiry of approximately $0.9 million in the first nine months of 2017 compared to $56.0 million of similar settlements of oil derivative contracts in the corresponding period in 2016. Production increased 548 MBbls, resulting in an increase of $21.2 million in oil revenues. The oil production volume increase was primarily due to new production from wells coming online in the STACK of 943 MBbls, partially offset by a decrease in production in the Weeks Island Area and other non-STACK areas of 390 MBbls due to a natural decline in production.

*Natural gas revenues*

Natural gas revenues in the nine months ended September 30, 2017 increased $17.5 million, or 86%, to $37.8 million from $20.3 million in the same period of 2016. The increase in natural gas revenue was primarily attributable to an increase in average price as well as an increase in production during the first nine months of 2017. The average price of natural gas exclusive of derivative contract settlements increased $0.66 per Mcf in the first nine months of 2017, resulting in an increase in natural gas revenues of approximately $9.3 million. When including the effects of derivative contract settlements, the overall price increased 4% from $2.70 per Mcf in the first nine months of 2016 to $2.81 per Mcf in the first nine months of 2017. The overall price in the first nine months of 2016 includes $2.4 million we received related to settlement of several of our natural gas derivative contracts prior to contract expiry. Production increased 4.1 Bcf, resulting in an increase of $8.2 million in natural gas revenues. The natural gas volume increase was primarily due to new production from wells coming online in the STACK of 5.1 Bcf as natural gas is produced in association with oil.

*Natural gas liquids revenues*

Natural gas liquids revenues increased $12.7 million, or 126%, during the first nine months of 2017 to $22.8 million from $10.1 million in the same period of 2016. The increase in natural gas liquids revenue was attributable to an increase in higher average price as well as an increase in processed volumes during the first nine months of 2017. The average price of natural gas liquids exclusive of derivative contract settlements increased $8.31 per Bbl or 57% in the first nine months of 2017 compared to the first nine months of 2016, resulting in an increase in natural gas liquids revenues of $8.3 million. The overall price including derivative contract settlements increased 51% from $14.67 per Bbl in the first nine months of 2016 to $22.14 per Bbl in the first nine months of 2017. Production increased 304 MBbls from 691 MBbls to 995 MBbls, resulting in an increase of $4.4 million in natural gas liquids revenue. The natural gas liquids volume is predominately in the STACK where natural gas liquids processed volumes increased 321 MBbls.

*Gain on sale of assets*

Gain on sale of assets was a gain of $3.7 million in the first nine months of 2016, primarily due to the sale of certain non-core assets.

*Gain on acquisition of oil and natural gas properties*

Gain on acquisition of oil and natural gas properties was a gain of $6.9 million in the first nine months of 2017, primarily related to the acquisition of STACK oil and natural gas properties. The fair market value of

233

Table of Contents

proven reserves exceeded the allocated purchase price of those assets acquired. The acquisition of Brown and Borelli, et al resulted in a bargain purchase gain of approximately $5.3 million as a result of timing from the execution of the purchase and sale agreement to the closing date of the acquisition at which time the value of the underlying properties increased substantially due to increased proved reserves. The Setanta acquisition resulted in a bargain purchase gain of approximately $1.6 million as a result of the seller's financial distress and needing to dispose of the underlying properties for cash in an expedited manner which resulted in a below market purchase price.

*Gain (loss) on derivative contracts*

Gain (loss) on derivative contracts was a gain of $38.0 million in the first nine months of 2017 as compared to a loss of $24.0 million during the same period in 2016. The fluctuation from period to period was due to the volatility of oil, natural gas and natural gas liquid prices and changes in Alta Mesa's outstanding hedge contracts during these periods. The $24.0 million loss in the first nine months of 2016 is inclusive of $83.8 million in settlements received on derivative contracts of which $58.4 million were from settlements of oil and natural gas derivative contracts prior to contract expiry. The $38.0 million gain in the first nine months of 2017 is inclusive of $1.8 million in settlements received on derivative contracts of which $0.9 million were from settlements of oil and natural gas derivative contracts prior to contract expiry.

## Expenses

*Lease and plant operating expense*

Lease and plant operating expense increased $4.6 million or 10% in the first nine months of 2017 as compared to the first nine months of 2016, to $49.8 million from $45.2 million. The increase is primarily due to an increase in compression, chemical, field services and salt water disposal fees of $4.7 million. On a per unit basis, lease and plant operating expense was $7.25 per BOE and $8.46 per BOE in the first nine months of 2017 and 2016, respectively.

*Marketing and transportation expense*

Marketing and transportation expense increased $13.4 million to $21.5 million in the first nine months of 2017 as compared to $8.1 million in the first nine months of 2016. The increase was primarily due to increased throughput for Alta Mesa's properties in the STACK at the Kingfisher processing facility commissioned during the second quarter of 2016. In addition, the increase was due to a higher marketing and transportation fee charged to provide effective gathering, efficient processing and assurance that Alta Mesa's production will continue to flow as the activity in the basin expands at the Kingfisher processing facility. On a per unit basis, marketing and transportation expense was $3.14 per BOE and $1.52 per BOE in the first nine months of 2017 and 2016, respectively.

*Production and ad valorem taxes*

Production and ad valorem taxes increased $0.8 million, or 10%, to $8.8 million in the first nine months of 2017, as compared to $8.0 million in the first nine months of 2016. The increase was primarily due to an increase in production taxes of $1.3 million as a result of the increase in oil, natural gas and natural gas liquids revenues partially offset by a decrease in ad valorem leaves $0.5 million. Production taxes increased from $6.6 million in the first nine months of 2016 to $7.9 million in the first nine months of 2017.

*Workover expense*

Workover expense increased $1.9 million during the first nine months of 2017, as compared to the first nine months of 2016. This expense varies depending on activities in the field and is attributable to several properties.

234

Table of Contents

*Exploration expense*

Exploration expense includes dry hole costs, the costs of Alta Mesa's geology department, costs of geological and geophysical ("G&G") data, expired leases, plug and abandonment expenditures, and delay rentals. Exploration expense increased $4.6 million to $19.9 million in the first nine months of 2017, as compared to $15.3 million in the first nine months of 2016. The increase was primarily due to an increase in expired leasehold and settlements of Alta Mesa's asset retirement obligation in excess of its estimate of $4.1 million, and an increase of dry hole expense of $2.0 million, partially offset by a decrease in G&G seismic expense of $1.4 million.

*Depreciation, depletion and amortization expense*

DD&A expense increased from $66.9 million in the first nine months of 2016 to $80.1 million in the first nine months of 2017. DD&A is a function of capitalized costs of proved properties, proved reserves and production by field. In addition, the impairment of proved properties in the third quarter of 2017 and in previous periods and an increase in proved reserves contributed to the lowered depletable base and rate in the first nine months of 2017.

*Impairment expense*

Impairment expense increased from $14.2 million in the first nine months of 2016 to $29.2 million in the first nine months of 2017. This expense varies with the results of exploratory and development drilling, and also with well performance, declines in commodity price and other factors that may render some fields uneconomic, resulting in impairment. Impairment expense in the first nine months of 2017 and 2016 were primarily write-downs in Alta Mesa's non-STACK areas.

*Accretion expense*

Accretion expense is related to Alta Mesa's obligation for retirement of oil and natural gas wells and facilities. Alta Mesa records these liabilities when it places the assets in service, using discounted present values of the estimated future obligation. Alta Mesa then records accretion of the liabilities as they approach maturity. Accretion expense was $1.4 million and 1.6 million in each of the first nine months of 2017 and 2016, respectively.

*General and administrative expense*

G&A expense increased $2.6 million in the first nine months of 2017 to $35.5 million from $32.9 million in the first nine months of 2016. The increase is primarily due to the non-recurring consulting fees attributable to the Alta Mesa Contribution Agreement during the first nine months of 2017 of approximately $2.5 million and settlement expense of $3.8 million. In addition, information systems maintenance fees increased $1.3 million. These increases were partially offset by a decrease in salary and benefits of $2.1 million including prior period performance bonus accrual adjustments, and a decrease in legal fees of $3.1 million. During the first nine months of 2016, legal fees included non-recurring tender offer fees of $1.8 million. On a per unit basis, general and administrative expenses were $5.17 per BOE and $6.16 per BOE in the first nine months of 2017 and 2016, respectively.

*Interest expense, net*

Interest expense, net decreased from $51.6 million in the first nine months of 2016 to $38.2 million in the first nine months of 2017. The interest on Alta Mesa's senior unsecured notes decreased $3.3 million due to the repurchase and redemption of the 2018 Notes by issuing $500 million aggregate principal amount of the 2024 Notes. In addition, interest including amortization of deferred financing cost on Alta Mesa's senior secured term loan decreased $9.2 million as Alta Mesa retired its $125 million secured term loan during the fourth quarter of 2016.

235

Table of Contents

## Results of Operations

### Year Ended December 31, 2016 Compared to Year Ended December 31, 2015

The following table sets forth certain operating information with respect to Alta Mesa's oil, natural gas and natural gas liquids operations for the periods indicated:

| | Year Ended | | Increase | % |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | (Decrease) | Change |
| | (in thousands, except average sales prices and unit costs) | | | |
| **Summary Operating Information:** | | | | |
| **Net Production:** | | | | |
| Oil (MBbls) | 4,001 | 4,203 | (202) | (5)% |
| Natural gas (MMcf) | 13,959 | 11,900 | 2,059 | 17% |
| Natural gas liquids (MBbls) | 956 | 678 | 278 | 41% |
| Total oil equivalent (MBOE) | 7,284 | 6,865 | 419 | 6% |
| Average daily oil production (MBOE per day) | 19.9 | 18.8 | 1.1 | 6% |
| **Average Sales Price:** | | | | |
| Oil (per Bbl) including settlements of derivative contracts | $ 61.53 | $ 67.73 | $ (6.20) | (9)% |
| Oil (per Bbl) excluding settlements of derivative contracts | 40.91 | 47.54 | (6.63) | (14)% |
| Natural gas (per Mcf) including settlements of derivative contracts | 2.68 | 4.43 | (1.75) | (40)% |
| Natural gas (per Mcf) excluding settlements of derivative contracts | 2.22 | 2.57 | (0.35) | (14)% |
| Natural gas liquids (per Bbl) including settlements of derivative contracts | 16.04 | 16.01 | 0.03 | N/A |
| Natural gas liquids (per Bbl) excluding settlements of derivative contracts | 16.38 | 16.01 | 0.37 | 2% |
| Combined (per BOE) including settlements of derivative contracts | 41.05 | 50.73 | (9.68) | (19)% |
| Combined (per BOE) excluding settlements of derivative contracts | 28.87 | 35.15 | (6.28) | (18)% |
| **Hedging Activities:** | | | | |
| Settlements of derivatives received, oil | $ 82,522 | $ 84,856 | $ (2,334) | (3)% |
| Settlements of derivatives received, natural gas | 6,500 | 22,093 | (15,593) | (71)% |
| Settlements of derivatives (paid), natural gas liquids | (333) | — | (333) | N/A |
| **Summary Financial Information** | | | | |
| *Operating Revenues and Other* | | | | |
| Oil | $ 163,677 | $ 199,799 | $ (36,122) | (18)% |
| Natural gas | 30,953 | 30,621 | 332 | 1% |
| Natural gas liquids | 15,663 | 10,864 | 4,799 | 44% |
| Other revenues | 415 | 682 | (267) | (39)% |
| Gain on sale of assets | 3,542 | 67,781 | (64,239) | (95)% |
| Gain (loss) on derivative contracts | (40,460) | 124,141 | (164,601) | (133)% |
|     Total Operating Revenues and Other | 173,790 | 433,888 | (260,098) | (60)% |
| *Expenses* | | | | |
| Lease and plant operating expense | 56,893 | 67,706 | (10,813) | (16)% |
| Marketing and transportation expense | 13,326 | 4,030 | 9,296 | 231% |
| Production and ad valorem taxes | 10,750 | 15,131 | (4,381) | (29)% |
| Workover expense | 4,714 | 6,511 | (1,797) | (28)% |
| Exploration expense | 24,777 | 42,718 | (17,941) | (42)% |
| Depreciation, depletion and amortization expense | 92,901 | 143,969 | (51,068) | (35)% |
| Impairment expense | 16,306 | 176,774 | (160,468) | (91)% |
| Accretion expense | 2,174 | 2,076 | 98 | 5% |
| General and administrative expense | 41,758 | 44,454 | (2,696) | (6)% |
| Interest expense, net | 59,990 | 61,750 | (1,760) | (3)% |
| Loss on extinguishment of debt | 18,151 | — | 18,151 | N/A |
| Provision for (benefit from) state income taxes | (29) | 562 | (591) | (105)% |
|     Net Loss | $(167,921) | $(131,793) | $ (36,128) | (27)% |
| **Average Unit Costs per BOE:** | | | | |
| Lease and plant operating expense | $ 7.81 | $ 9.86 | $ (2.05) | (21)% |
| Marketing and transportation expense | 1.83 | 0.59 | 1.24 | 210% |
| Production and ad valorem tax expense | 1.48 | 2.20 | (0.72) | (33)% |
| Workover expense | 0.65 | 0.95 | (0.30) | (32)% |
| Exploration expense | 3.40 | 6.22 | (2.82) | (45)% |
| Depreciation, depletion and amortization expense | 12.75 | 20.97 | (8.22) | (39)% |
| General and administrative expense | 5.73 | 6.48 | (0.75) | (12)% |

236

Table of Contents

**Revenues**

*Oil revenues*

Oil revenues for the year ended December 31, 2016 decreased $36.1 million, or 18%, to $163.7 million in 2016 from $199.8 million in 2015. The decrease in oil revenue was primarily attributable to lower prices as well as decreased production volumes. The average price of oil exclusive of settlements of derivative contracts decreased 14% in 2016 resulting in a decrease in oil revenues of approximately $26.5 million. The average price inclusive of settlements of derivative contracts decreased 9% from $67.73 per Bbl in 2015 to $61.53 per Bbl in 2016. A decrease in production of 202 MBbls, or 5% resulted in an approximate $9.6 million decrease in oil revenues. The decrease in oil volumes was primarily due to the Eagle Ford Divestiture in the third quarter of 2015 of 430 MBbls and natural production decline at the Weeks Island Area of 293 MBbls. This decrease was partially offset by new production from the STACK, which increased 564 MBbls, from 2,006 MBbls in 2015 to 2,570 MBbls in 2016.

*Natural gas revenues*

Natural gas revenues for the year ended December 31, 2016 increased $0.3 million, or 1%, to $30.9 million in 2016 from $30.6 million in 2015. The increase in natural gas revenue was attributable to increased production volumes partially offset by lower prices during 2016. An increase in production of 2.1 Bcf, or 17% resulted in an increase in natural gas revenues of approximately $5.3 million in 2016 as compared to 2015. The increase in natural gas volumes was attributable to new production from the STACK, which increased 3.9 Bcfe, from 4.3 Bcfe in 2015 to 8.2 Bcfe in 2016. This increase was partially offset by natural production decline at the Weeks Island Area of 825 MMcf and the Eagle Ford Divestiture in the third quarter of 2015 of 415 MMcf. The average price of natural gas exclusive of settlements of derivative contracts decreased 14% in 2016 resulting in a decrease in natural gas revenues of approximately $5.0 million. The average price inclusive of settlements of derivative contracts decreased 40% from $4.43 per Mcf in 2015 to $2.68 per Mcf in 2016.

*Natural gas liquids revenues*

Natural gas liquids revenues for the year ended December 31, 2016 increased $4.8 million, or 44% to $15.7 million in 2016 from $10.9 million in 2015. The increase in natural gas liquids revenue was primarily attributable to increased volumes as well as an increase in prices. An increase in volumes of 278 MBbls or 41% resulted in an increase in natural gas liquids revenue of $4.4 million in 2016 as compared to 2015. The increase in natural gas liquid volumes was due primarily to an increase in output in the STACK, which increased 324 MBbls, from 499 MBbls in 2015 to 823 MBbls in 2016. This increase was partially offset by lower volumes due to the Eagle Ford Divestiture in the third quarter of 2015 of 84 MBbls. The average price of natural gas liquids exclusive of settlements of derivative contracts increased 2%, from $16.01 per Bbl in 2015 to $16.38 per Bbl in 2016 resulting in an increase in natural gas liquids revenue of $0.4 million.

*Other revenues*

Other revenues were $0.4 million during 2016 as compared to $0.7 million during 2015. The decrease was partially the result of a decrease in income from gas processing fees, as well as a decrease in pipeline revenue.

*Gain on sale of assets*

Gain on sale of assets was a gain of $3.5 million in 2016 as compared to a gain of $67.8 million in 2015. The sale of South Louisiana properties in 2016 resulted in a gain of $3.5 million. The Eagle Ford Divestiture in the third quarter of 2015 resulted in a gain of $67.6 million.

*Gain (loss) on derivative contracts*

Gain (loss) on derivative contracts was a loss of $40.5 million inclusive of derivative settlements received of $88.7 million in 2016 as compared to a gain of $124.1 million inclusive of derivative settlements received of

237

Table of Contents

$106.9 million in 2015. The significant fluctuation from period to period is due to the volatility of oil and natural gas prices and changes in Alta Mesa's outstanding hedge contracts during these periods.

## Expenses

### Lease and plant operating expense

Lease and plant operating expense decreased $10.8 million to $56.9 million, or 16%, in 2016 as compared to $67.7 million in 2015. The decrease was primarily due to lower salt water disposal costs, and a decrease in repairs, maintenance, and field services, totaling $10.3 million. On a per unit basis, lease and plant operating expense decreased 21% from $9.86 to $7.81 per BOE for 2015 and 2016, respectively.

### Marketing and transportation expense

Marketing and transportation expense increased $9.3 million to $13.3 million in 2016 as compared to $4.0 million in 2015. The increase was primarily in the STACK due to increased throughput at the Kingfisher processing facility beginning in the second quarter of 2016. In addition, the increase was due to a higher marketing and transportation fee charged for utilizing a more efficient facility at the Kingfisher plant. On a per unit basis, marketing and transportation expense increased from $0.59 to $1.83 per BOE for 2015 and 2016, respectively.

### Production and ad valorem taxes

Production and ad valorem taxes decreased $4.4 million to $10.7 million, or 29%, for 2016, as compared to $15.1 million for 2015. Production taxes decreased $4.3 million primarily due to the decrease in oil revenues. Ad valorem taxes decreased $0.1 million. On a per unit basis, the production and ad valorem taxes decreased from $2.20 to $1.48 per BOE for 2015 and 2016, respectively.

### Workover expense

Workover expense decreased $1.8 million to $4.7 million from $6.5 million for 2016 and 2015, respectively. This expense varies depending on activities in the field and is attributable to many different properties.

### Exploration expense

Exploration expense includes the costs of Alta Mesa's geology department, costs of geological and geophysical data, delay rentals, expired leases, and dry holes. Exploration expense decreased $17.9 million to $24.8 million in 2016 from $42.7 million in 2015. The decrease in exploration expense was primarily due to decreases in dry hole expense of $22.3 million and partially offset by an increase in expired leasehold of $4.6 million. As of December 31, 2016, Alta Mesa's property, plant, and equipment balance includes $2.1 million in exploratory well costs which are deferred, pending determination of proved reserves. Such costs will be charged to exploration expense if the wells are ultimately classified as dry holes.

### Depreciation, depletion and amortization

DD&A decreased $51.1 million to $92.9 million for 2016 as compared to $144.0 million for 2015. On a per unit basis, this expense decreased 39% from $20.97 to $12.75 per BOE for 2015 and 2016, respectively. The rate is a function of capitalized costs of proved properties, proved reserves and production by field.

### Impairment expense

Impairment expense decreased $160.5 million to $16.3 million in 2016 from $176.8 million in 2015. This non-cash expense varies with the results of exploratory and development drilling, as well as with well

238

Table of Contents

performance and price declines which may render some projects uneconomic, resulting in impairment. See "Critical Accounting Policies and Estimates—Impairment" below for more details related to impairment. Certain developed fields were impaired due to downward revisions in reserves based on lower commodity prices, performance or development drilling results that were below expectations. The impairments in 2016 were primarily due to write-downs in developed fields, most notably in the Northwest, East Texas and South Louisiana, totaling $15.4 million. The impairments in 2015 were primarily due to write-downs of both unproved oil and gas costs and developed fields, primarily the Weeks Island Area, the STACK, East Texas and South Louisiana, totaling $167.8 million.

*Accretion expense*

Accretion expense is related to Alta Mesa's obligation for retirement of oil and natural gas wells and facilities. Alta Mesa records these liabilities when it places the assets in service, using discounted present values of the estimated future obligation. Alta Mesa then records accretion of the liabilities as they approach maturity. Accretion expense was $2.2 million and $2.1 million in 2016 and 2015, respectively.

*General and administrative expense*

G&A expense decreased $2.7 million to $41.8 million in 2016 from $44.5 million in 2015. The decrease was primarily due to lower litigation settlement expenses recorded in 2016 as compared to 2015 of $5.3 million, partially offset by an increase in salaries, benefits and deferred compensation of $2.6 million in 2016. On a per unit basis, G&A expenses decreased 12% from $6.48 to $5.73 per BOE for 2015 and 2016, respectively.

*Interest expense, net*

Interest expense, net decreased $1.8 million to $60.0 million in 2016 from $61.8 million in 2015. The decrease was primarily due to the repurchase and redemption of the 2018 Notes during the fourth quarter of 2016, which decreased interest costs. These decreases were partially offset by an increase in interest expense related to Alta Mesa's senior secured revolving credit facility and second lien senior secured term loan. The second lien senior secured term loan was repaid in full during the fourth quarter of 2016. Interest expense incurred on Alta Mesa's borrowings under its senior secured revolving credit facility increased $1.4 million due to an increase in average outstanding balance. Interest expense incurred on Alta Mesa's borrowing under its second lien senior secured term loan increased $3.0 million as Alta Mesa recognized almost a full year of interest expense and additional amortized deferred financing costs of $0.3 million as compared to the prior year. Alta Mesa entered into the second lien senior secured term loan during the second quarter of 2015.

*Loss on extinguishment of debt*

Loss on extinguishment of debt was $18.2 million in 2016. During the fourth quarter of 2016, Alta Mesa repurchased an aggregate principal amount of its $450.0 million outstanding 2018 Notes for an aggregate cost of $459.4 million, including accrued interest and fees. Alta Mesa recognized a loss related to the repurchase of $13.5 million, which included unamortized discount and unamortized deferred financing costs write-offs of $4.1 million. In addition, Alta Mesa repaid all amounts outstanding under the second lien senior secured term loan of $127.7 million, which includes accrued interest and a prepayment premium of $2.5 million. Alta Mesa recognized a loss related to the repayment of $4.7 million, which included unamortized deferred financing costs write-offs of $2.0 million.

239

Table of Contents

## Results of Operations

### *Year Ended December 31, 2015 Compared to Year Ended December 31, 2014*

The following table sets forth certain operating information with respect to Alta Mesa's oil, natural gas and natural gas liquids operations for the periods indicated:

| | Year Ended | | Increase | % |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | (Decrease) | Change |
| | (in thousands, except average sales prices and unit costs) | | | |
| **Summary Operating Information:** | | | | |
| **Net Production:** | | | | |
| Oil (MBbls) | 4,203 | 3,770 | 433 | 11% |
| Natural gas (MMcf) | 11,900 | 14,449 | (2,549) | (18)% |
| Natural gas liquids (MBbls) | 678 | 537 | 141 | 26% |
| Total oil equivalent (MBOE) | 6,865 | 6,715 | 150 | 2% |
| Average daily oil production (MBOE per day) | 18.8 | 18.4 | 0.4 | 2% |
| **Average Sales Price:** | | | | |
| Oil (per Bbl) including settlements of derivative contracts | $ 67.73 | $ 93.38 | $ (25.65) | (27)% |
| Oil (per Bbl) excluding settlements of derivative contracts | 47.54 | 92.27 | (44.73) | (48)% |
| Natural gas (per Mcf) including settlements of derivative contracts | 4.43 | 4.87 | (0.44) | (9)% |
| Natural gas (per Mcf) excluding settlements of derivative contracts | 2.57 | 4.50 | (1.93) | (43)% |
| Natural gas liquids (per Bbl) excluding settlements of derivative contracts(1) | 16.01 | 34.04 | (18.03) | (53)% |
| Combined (per BOE) including settlements of derivative contracts | 50.73 | 65.62 | (14.89) | (23)% |
| Combined (per BOE) excluding settlements of derivative contracts | 35.15 | 64.20 | (29.05) | (45)% |
| **Hedging Activities:** | | | | |
| Settlements of derivatives received, oil | $ 84,856 | $ 4,187 | $ 80,669 | 1,927% |
| Settlements of derivatives received, natural gas | 22,093 | 5,306 | 16,787 | 316% |
| **Summary Financial Information** | | | | |
| *Operating Revenues and Other* | | | | |
| Oil | $ 199,799 | $347,842 | $(148,043) | (43)% |
| Natural gas | 30,621 | 65,002 | (34,381) | (53)% |
| Natural gas liquids | 10,864 | 18,281 | (7,417) | (41)% |
| Other revenues | 682 | 1,003 | (321) | (32)% |
| Gain on sale of assets | 67,781 | 87,520 | (19,739) | (23)% |
| Gain on derivative contracts | 124,141 | 96,559 | 27,582 | 29% |
| Total Operating Revenues and Other | 433,888 | 616,207 | (182,319) | (30)% |
| *Expenses* | | | | |
| Lease and plant operating expense | 67,706 | 64,686 | 3,020 | 5% |
| Marketing and transportation expense | 4,030 | 9,134 | (5,104) | (56)% |
| Production and ad valorem taxes | 15,131 | 28,214 | (13,083) | (46)% |
| Workover expense | 6,511 | 8,961 | (2,450) | (27)% |
| Exploration expense | 42,718 | 61,912 | (19,194) | (31)% |
| Depreciation, depletion and amortization expense | 143,969 | 141,804 | 2,165 | 2% |
| Impairment expense | 176,774 | 74,927 | 101,847 | 136% |
| Accretion expense | 2,076 | 2,198 | (122) | (6)% |
| General and administrative expense | 44,454 | 69,198 | (24,744) | (36)% |
| Interest expense, net | 61,750 | 55,797 | 5,953 | 11% |
| Provision for state income taxes | 562 | 176 | 386 | 219% |
| Net Income (Loss) | $(131,793) | $ 99,200 | $(230,993) | (233)% |

240

Table of Contents

| | Year Ended | | Increase | % |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | (Decrease) | Change |
| | (in thousands, except average sales prices and unit costs) | | | |
| **Average Unit Costs per BOE:** | | | | |
| Lease and plant operating expense | $ 9.86 | $ 9.63 | $ 0.23 | 2% |
| Marketing and transportation expense | 0.59 | 1.36 | (0.77) | (57)% |
| Production and ad valorem tax expense | 2.20 | 4.20 | (2.00) | (48)% |
| Workover expense | 0.95 | 1.33 | (0.38) | (29)% |
| Exploration expense | 6.22 | 9.22 | (3.00) | (33)% |
| Depreciation, depletion and amortization expense | 20.97 | 21.12 | (0.15) | (1)% |
| General and administrative expense | 6.48 | 10.30 | (3.82) | (37)% |

(1)   Alta Mesa entered into derivative contracts for natural gas liquids in the fourth quarter of 2015. The derivative contracts for natural gas liquids became effective in 2016.

**Revenues**

*Oil revenues*

Oil revenues for the year ended December 31, 2015 decreased $148.0 million, or 43%, to $199.8 million from $347.8 million for 2014. The decrease in revenue was attributable to lower average prices partially offset by increased production volumes. The average price of oil exclusive of settlements of derivative contracts decreased 48% in 2015; the overall price including settlements of derivative contracts decreased 27% from $93.38 per Bbl in 2014 to $67.73 per Bbl in 2015 resulting in a decrease in oil revenues of approximately $188.0 million, partially offset by an increase in production of 433 MBbls, or 11% resulting in an approximately $40.0 million increase in oil revenues. This increase was primarily due to new production from the STACK, which increased 934 MBbls, from 1,072 MBbls in 2014 to 2,006 MBbls in 2015, partially offset by lower sales volume due to the Eagle Ford Divestiture in the third quarter of 2015 and natural production decline at Weeks Island Area.

Production from Alta Mesa's Eagleville field decreased 383 MBbls from 815 MBbls in 2014 to 432 MBbls in 2015, and its Weeks Island Area decreased 61 MBbls from 1,505 MBbls in 2014 to 1,444 MBbls in 2015.

*Natural gas revenues*

Natural gas revenues for the year ended December 31, 2015 decreased $34.4 million, or 53%, to $30.6 million from $65 million for 2014. The decrease in natural gas revenue was attributable to lower average prices during 2015 as well as decreased production volumes. The average price of natural gas exclusive of settlements of derivative contracts decreased 43% in 2015 resulting in a decrease in natural gas revenues of approximately $22.9 million. The overall price including settlements of derivative contracts decreased 9% from $4.87 per Mcf in 2014 to $4.43 per Mcf in 2015. A decrease in production of 2.5 Bcf, or 18% resulted in a decrease in natural gas revenues of approximately $11.5 million in 2015 compared to 2014. The decline was due to an emphasis on liquids-rich assets in Alta Mesa's capital spending. The decrease in production was attributable to the sale of Alta Mesa's remaining working interests in the Hilltop field in the third quarter of 2014. The Hilltop field produced 2.8 Bcf in 2014. In addition, production decreased 3.8 Bcf in East Texas and 0.6 Bcf in South Texas, partially offset by an increase in production in the STACK of 2.2 Bcf.

*Natural gas liquids revenues*

Natural gas liquids revenues decreased during 2015 to $10.9 million from $18.3 million for 2014. Alta Mesa's average price decreased by 53%, from $34.04 per Bbl in 2014 to $16.01 per Bbl in 2015, partially offset by a 26% increase in volumes from 537 MBbls in 2014 to 678 MBbls in 2015. The decline in prices was due to increased supply of natural gas liquids as a result of increased liquids-targeted drilling. The increase in volume was due primarily to an increase in production in the STACK during 2015 of 184 MBbls, partially offset by lower sales volumes due to the Eagle Ford Divestiture in the third quarter of 2015.

241

Table of Contents

*Other revenues*

Other revenues were $0.7 million during 2015 as compared to $1.0 million during 2014. The decrease was partially the result of a decrease in income from gas processing fees, as well as a decrease in pipeline revenue.

*Gain on sale of assets*

Gain on sale of assets was a gain of $67.8 million in 2015 as compared to a gain of $87.5 million in 2014. The Eagle Ford Divestiture in 2015 resulted in a gain of $67.6 million. The divestiture of a portion of Alta Mesa's oil and gas properties in Eagleville field and the divestiture of the remainder of its Hilltop Field properties during 2014 resulted in a gain of $72.5 million and $15.9 million, respectively.

*Gain on derivative contracts*

Gain on derivative contracts was a gain of $124.1 million for 2015 as compared to a gain of $96.6 million for 2014. The significant fluctuation from period to period was due to the volatility of oil and natural gas prices and changes in Alta Mesa's outstanding hedging contracts during these periods.

**Expenses**

*Lease and plant operating expense*

Lease and plant operating expense increased $3.0 million to $67.7 million in 2015 as compared to $64.7 million in 2014. On a per unit basis, lease and plant operating expense increased 2% from $9.63 to $9.86 per BOE for 2014 and 2015, respectively. The increase was primarily due to higher field services, rental equipment, and compression expense, totaling $6.9 million. The increase was partially offset by a decrease in chemical and fuel usage and salt water disposal of $3.7 million.

*Marketing and transportation expense*

Marketing and transportation expense decreased $5.1 million to $4.0 million in 2015 from $9.1 million in 2014. The decrease was primarily due to the Eagle Ford Divestiture and the divestiture of the remainder of Alta Mesa's Hilltop Field properties during 2014. Hilltop Field properties produced primarily dry gas. On a per unit basis, marketing and transportation expense decreased 57% from $1.36 to $0.59 per BOE for 2014 and 2015, respectively.

*Production and ad valorem taxes*

Production and ad valorem taxes decreased $13.1 million to $15.1 million, or 46%, for 2015, as compared to $28.2 million for 2014. Production taxes decreased $11.6 million primarily due to the decrease in oil and natural gas revenues. Ad valorem taxes decreased $1.5 million primarily due to the Eagle Ford Divestiture in the third quarter of 2015 and the sale of Alta Mesa's Hilltop field in the third quarter of 2014. On a per unit basis, the production and ad valorem taxes decreased 48% from $4.20 to $2.20 per BOE for 2014 and 2015, respectively.

*Workover expense*

Workover expense decreased $2.5 million to $6.5 million from $9.0 million for 2015 and 2014, respectively. This expense varies depending on activities in the field and is attributable to many different properties.

*Exploration expense*

Exploration expense includes the costs of Alta Mesa's geology department, costs of geological and geophysical data, delay rentals, expired leases and dry holes. Exploration expense decreased $19.2 million to

242

Table of Contents

$42.7 million for 2015 from $61.9 million for 2014. The decrease in exploration expense was primarily due to decreases in G&G seismic expenditures of $11.7 million, dry hole expense of $7.6 million and plug and abandonment expenditures of $2.2 million, partially offset by an increase in delay rentals and expired leasehold of $2.2 million. As of December 31, 2015, Alta Mesa's property, plant and equipment balance includes $6.0 million in exploratory well costs which are deferred, pending determination of proved reserves. Such costs will be charged to exploration expense if the wells are ultimately classified as dry holes.

### Depreciation, depletion and amortization

DD&A increased $2.2 million to $144.0 million for 2015 as compared to an expense of $141.8 million for 2014. On a per unit basis, this expense decreased 1% from $21.12 to $20.97 per BOE for 2014 and 2015, respectively. The rate is a function of capitalized costs of proved properties, proved reserves and production by field.

### Impairment expense

Impairment expense increased $101.9 million to $176.8 million in 2015 from $74.9 million in 2014. This non-cash expense varies with the results of exploratory and development drilling, as well as with well performance and price declines which may render some projects uneconomic, resulting in impairment. See "—Critical Accounting Policies and Estimates—Impairment" below for more details related to impairment. The increase in impairment expense was primarily due to a 47% decrease in the 12-month weighted average price for oil and a 41% decrease in the 12-month weighted average price for natural gas at December 31, 2015.

The impairments in 2015 were primarily due to write-downs of both unproved oil and gas costs and developed fields. The primary prospects impaired were in South Texas of approximately $4.1 million and Weeks Island Area of approximately $0.6 million. Several developed fields were impaired due to downward revisions in reserves based on lower commodity prices, performance or development drilling results that were below expectations. The most significant of these were in Weeks Island Area of $129.1 million, the STACK of $15.7 million, South Louisiana of $9.4 million and East Texas of $8.9 million.

### Accretion expense

Accretion expense is related to Alta Mesa's obligation for retirement of oil and natural gas wells and facilities. Alta Mesa records these liabilities when it places the assets in service, using discounted present values of the estimated future obligation. Alta Mesa then records accretion of the liabilities as they approach maturity. Accretion expense was $2.1 million and $2.2 million in 2015 and 2014, respectively.

### General and administrative expense

G&A expense decreased $24.7 million to $44.5 million in 2015 from $69.2 million in 2014. The decrease was primarily due to non-recurring capital restructuring expenditures of $13.9 million in 2014, as well as a bonus accrual reduction of $9.9 million and a decrease in deferred compensation expense of $1.8 million in 2015. This decrease was partially offset by an increase in accrued settlement expense of $2.6 million. On a per unit basis, G&A expenses decreased 37% from $10.30 to $6.48 per BOE for 2014 and 2015, respectively.

### Interest expense, net

Interest expense, net increased $6.0 million to $61.8 million in 2015 from $55.8 million in 2014. This increase was primarily due to incurred interest expense of $6.2 million and amortization of deferred financing costs of $0.5 million, related to the second lien senior secured term loan that Alta Mesa entered into during 2015. The increase in interest expense was partially offset by an increase in interest income of $0.7 million and lower interest expense of $0.1 million on Alta Mesa's senior secured revolving credit facility due to a lower average balance outstanding.

243

Table of Contents

### Liquidity and Capital Resources

Alta Mesa's principal requirements for capital are to fund its day-to-day operations, its exploration and development activities and to satisfy its contractual obligations, primarily for the payment of debt interest and any amounts owed during the period related to Alta Mesa's hedging positions.

Alta Mesa's 2016 capital budget was primarily focused on the development of its STACK and Weeks Island Area properties through exploitation and development. Alta Mesa spent approximately $226 million in 2016 for exploration and development, including acquisitions, of which over 90% was allocated to its STACK operations and the Weeks Island Areas. The revised capital expenditures for 2016 reflected Alta Mesa's plans to drill wells that were funded through the joint development agreement with BCE for the remainder of the year. Alta Mesa reduced its capital expenditures for 2016 from 2015 levels in response to the continued depressed oil prices and to preserve liquidity. Alta Mesa's future drilling plans, plans of its drilling operators and capital budgets are subject to change based upon various factors, some of which are beyond Alta Mesa's control, including drilling results, oil and natural gas prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, actions of Alta Mesa's operators, gathering system and pipeline transportation constraints and regulatory approvals. A deferral of planned capital expenditures, particularly with respect to drilling and completing new wells, could result in a reduction in anticipated production, revenues and cash flows. Additionally, if Alta Mesa curtails its drilling program, it may lose a portion of its acreage through lease expirations. However, because a large percentage of Alta Mesa's acreage is held by production, Alta Mesa has the ability to materially increase or decrease its drilling and recompletion budget in response to market conditions with decreased risk of losing significant acreage. In addition, Alta Mesa may be required to reclassify some portion of its reserves currently booked as proved undeveloped reserves to no longer be proved reserves if such a deferral of planned capital expenditures means Alta Mesa will be unable to develop such reserves within five years of their initial booking.

Alta Mesa funded its 2016 capital expenditures predominantly with cash flows from operations, drilling and completion of capital funded through its joint development agreement with BCE and capital contributions from an affiliate, supplemented by borrowings under its senior secured revolving credit facility and the issuance of the 2024 Notes. In connection with the final sale of preferred stock to Bayou City in October 2016, High Mesa contributed $300 million in cash from the Bayou City investment to Alta Mesa. In November 2016, Alta Mesa repaid all amounts outstanding under its second lien senior secured term loan agreement with such proceeds and paid down amounts owed under its senior secured revolving credit facility, providing additional liquidity. Alta Mesa strives to maintain financial flexibility and may access capital markets as necessary to facilitate drilling on its large undeveloped acreage position and permit it to selectively expand its acreage position. In the event Alta Mesa's cash flows are materially less than anticipated and other sources of capital Alta Mesa has historically utilized are not available on acceptable terms, Alta Mesa may curtail its capital spending.

Alta Mesa anticipates a capital budget for 2017 of $375.0 million, which includes acquisitions, of which over 95% is allocated to develop Alta Mesa's STACK properties. For the nine months ended September 30, 2017, Alta Mesa has been funded approximately $92.7 million from BCE under the joint development agreement. Alta Mesa's 2017 capital expenditure budget is subject to change based on various market conditions, including changes in commodities prices and drilling costs. Alta Mesa has expended approximately $299.5 million of its capital budget through September 30, 2017.

The Riverstone Contributor was admitted as a limited partner in connection with its $200 million capital contribution to Alta Mesa on August 17, 2017, in exchange for limited partner interests in Alta Mesa. Alta Mesa used all of the capital contribution to pay down its senior secured revolving credit facility. In addition, in connection with the Closing, Silver Run will contribute an additional $400 million to Alta Mesa. Alta Mesa believes its cash flows provided by operating activities, cash on hand and availability under its senior secured revolving credit facility will provide Alta Mesa with the financial flexibility and wherewithal to meet its cash requirements, including normal operating needs, and pursue its currently planned 2017 development drilling activities. However, future cash flows are subject to a number of variables, including the level of oil and natural

244

Table of Contents

gas production and prices, and significant additional capital expenditures will be required to more fully develop Alta Mesa's properties and acquire additional properties. Alta Mesa cannot provide any assurances that operations and other needed capital will be available on acceptable terms, or at all.

*Senior Notes*

On November 30, 2016, Alta Mesa commenced a tender offer for any and all outstanding 2018 Notes. The tender offer expired on December 7, 2016, and on December 8, 2016, Alta Mesa paid for the aggregate principal amount of the 2018 Notes validly tendered. In connection therewith, Alta Mesa caused to be deposited with the Trustee funds sufficient to redeem any 2018 Notes that remained outstanding on December 8, 2016. On December 20, 2016, the Trustee executed the Satisfaction and Discharge, which, among other things, discharged the indenture and Alta Mesa's obligations thereunder.

On December 8, 2016, the Issuers issued $500 million in aggregate principal amount of the 2024 Notes to Wells Fargo Securities, LLC and other initial purchasers for resale to certain qualified institutional buyers pursuant to Rule 144A under the Securities Act, and to eligible purchasers outside of the United States pursuant to Regulation S under the Securities Act.

Alta Mesa's net proceeds, after deducting offering expenses, were approximately $491 million. Alta Mesa used the net proceeds of the offering as follows:

- approximately $386 million was used to fund the payment of tendered and accepted 2018 Notes in the tender offer to purchase the $450 million aggregate principal amount of the 2018 Notes, and fees and expenses thereof;

- approximately $73 million was used to pay the redemption price of the 2018 Notes that remained outstanding after consummation of the tender offer; and

- the remainder was used to repay a portion of Alta Mesa's existing indebtedness under its senior secured revolving credit facility.

The 2024 Notes are fully and unconditionally guaranteed on a senior unsecured basis by Alta Mesa's subsidiaries (the "Subsidiary Guarantors"), and will be guaranteed by Alta Mesa's future domestic restricted subsidiaries, other than certain immaterial subsidiaries. The terms of the 2024 Notes are governed by the indenture, dated as of December 8, 2016 (the "Indenture"), by and among the Issuers, the Subsidiary Guarantors and U.S. Bank, N.A., as trustee.

The 2024 Notes will mature on December 15, 2024, and interest is payable semi-annually on June 15 and December 15 of each year, beginning June 15, 2017. At any time prior to December 15, 2019, Alta Mesa may, from time to time, redeem up to 35% of the aggregate principal amount of the 2024 Notes in an amount of cash not greater than the net cash proceeds from certain equity offerings at the redemption price of 107.875% of the principal amount, plus accrued and unpaid interest, if any, to the date of redemption, if at least 65% of the aggregate principal amount of the 2024 Notes remains outstanding after such redemption and the redemption occurs within 120 days of the closing date of such equity offering. At any time prior to December 15, 2019, Alta Mesa may, on any one or more occasions, redeem all or part of the 2024 Notes for cash at a redemption price equal to 100% of their principal amount of the 2024 Notes redeemed plus an applicable make-whole premium and accrued and unpaid interest, if any, to the date of redemption. On and after December 15, 2019, Alta Mesa may redeem the 2024 Notes, in whole or in part, at redemption prices (expressed as percentages of principal amount) equal to 105.906% for the 12-month period beginning on December 15, 2019, 103.938% for the 12-month period beginning December 15, 2020, 101.969% for the 12-month period beginning December 15, 2021 and 100.000% beginning on December 15, 2022, plus accrued and unpaid interest, if any, to the date of redemption.

245

Table of Contents

Upon the occurrence of a change of control and, in certain instances, a rating downgrade by either Moody's Investors Service, Inc. or Standard & Poor's Ratings Services within 90 days thereafter, each holder of the 2024 Notes may require Alta Mesa to repurchase all or a portion of the 2024 Notes for cash at a price equal to 101% of the aggregate principal amount of the 2024 Notes, plus accrued and unpaid interest, if any, to the date of repurchase. Because certain existing owners of Alta Mesa and SRII Opco will enter into an amended and restated voting agreement with respect to the voting interests in Alta Mesa GP, the transaction with Silver Run is not expected to constitute a change of control under the indenture governing the 2024 Notes. See "Proposal No. 1—The Business Combination Proposal—Related Agreements—Proposal Agreements Related to the Alta Mesa Contribution Agreement—Voting Agreement."

The 2024 Notes and the related guarantees are the Issuers' and the Subsidiary Guarantors' unsecured, senior obligations. Accordingly, they will rank equal in right of payment to all of Alta Mesa's existing and future senior indebtedness; senior in right of payment to all of Alta Mesa's existing and future indebtedness that is expressly subordinated to the 2024 Notes or the respective guarantees; effectively subordinated to all of Alta Mesa's existing and future secured indebtedness to the extent of the value of the collateral securing such indebtedness, including amounts outstanding under Alta Mesa's senior secured revolving credit facility; and structurally subordinated to all existing and future indebtedness and obligations of any of Alta Mesa's subsidiaries that do not guarantee the 2024 Notes.

The Indenture contains certain covenants limiting the Issuers' ability and the ability of the restricted subsidiaries to, under certain circumstances, prepay subordinated indebtedness, pay distributions, redeem stock or make certain restricted investments; incur indebtedness; create liens on the Issuers' assets to secure debt; restrict dividends, distributions or other payments; enter into transactions with affiliates; designate subsidiaries as unrestricted subsidiaries; sell or otherwise transfer or dispose of assets, including equity interests of restricted subsidiaries; effect a consolidation or merger; and change Alta Mesa's line of business.

The Indenture contains customary events of default, including:

- default in any payment of interest on the 2024 Notes when due, continued for 30 days;

- default in the payment of principal of or premium, if any, on the 2024 Notes when due;

- failure by the Issuers or any Subsidiary Guarantor to comply with its obligations under the Indenture;

- default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any indebtedness for money borrowed by the Issuers or restricted subsidiaries;

- certain events of bankruptcy, insolvency or reorganization of the Issuers or restricted subsidiaries; and

- failure by the Issuers or certain subsidiaries that would constitute a payment of final judgment aggregating in excess of $20.0 million.

### *Senior Secured Revolving Credit Facility*

Alta Mesa has a $750 million senior secured revolving credit facility currently subject to a $315.0 million borrowing base limit with Wells Fargo Bank, National Association, as the administrative agent. Alta Mesa's senior secured revolving credit facility does not permit it to borrow funds if at the time of such borrowing, after giving pro forma effect to the application of funds from the borrowing, Alta Mesa has in deposit accounts available cash in excess of $25 million. Alta Mesa's senior secured revolving credit facility also does not permit it to borrow funds if at the time of such borrowing Alta Mesa is not in pro forma compliance with its financial covenants.

As of September 30, 2017, Alta Mesa has outstanding $75.1 million of borrowings under the senior secured revolving credit facility and has $5.3 million of outstanding letters of credit reimbursement obligations.

246

Table of Contents

Principal amounts borrowed are payable on the maturity date with such borrowings bearing interest, payable quarterly. Alta Mesa has a choice of borrowing in Eurodollars or at the base rate. Eurodollar loans bear interest at a rate per annum equal to the rate appearing on the Reuters Reference LIBOR01 page as the London Interbank Offered Rate ("LIBOR"), for deposits in dollars at 11:00 a.m. (London, England time) for one, three, or six months plus an applicable margin ranging from 275 to 375 basis points if Alta Mesa's leverage ratio does not exceed 3.25 to 1.00, depending on the percentage of its borrowing base utilized, and ranging from 300 to 400 basis points if its leverage ratio exceeds 3.25 to 1.00. Base rate loans bear interest at a rate per annum equal to the greatest of (i) the agent bank's reference rate, (ii) the federal funds effective rate plus 50 basis points and (iii) the rate for one month Eurodollar loans plus 1%, plus an applicable margin ranging from 175 to 275 basis points if Alta Mesa's leverage ratio does not exceed 3.25 to 1.00, depending on the percentage of its borrowing base utilized, and ranging from 200 to 300 basis points if its leverage ratio exceeds 3.25 to 1.00. The next scheduled redetermination of Alta Mesa's borrowing base is in November 2017. Alta Mesa's borrowing base may be reduced in connection with the next redetermination of its borrowing base. The amounts outstanding under the senior secured revolving credit facility are secured by first priority liens on substantially all of Alta Mesa's oil and natural gas properties and associated assets and all of the stock of Alta Mesa's material operating subsidiaries that are guarantors of the senior secured revolving credit facility. If an event of default occurs under the senior secured revolving credit facility, the administrative agent will have the right to proceed against the pledged capital stock and take control of substantially all of Alta Mesa's and its material operating subsidiaries that are guarantors' assets.

Alta Mesa's senior secured revolving credit facility contains restrictive covenants that may limit its ability to, among other things, incur additional indebtedness, sell assets, guaranty or make loans to others, make investments, enter into mergers, make certain payments and distributions, enter into or be party to hedge agreements, amend its organizational documents, incur liens and engage in certain other transactions without the prior consent of the lenders. Alta Mesa's senior secured revolving credit facility permits it to make distributions in any fiscal quarter so long as the amount of distributions made in such fiscal quarter does not exceed its excess cash flow from the immediately preceding fiscal quarter, no event of default exists, before and after giving effect to such distribution, Alta Mesa's pro forma leverage ratio is less than 3.00 to 1.00 and before and after giving effect to such distribution the unused commitment amounts available under its senior secured revolving credit facility is at least 20% of the commitments in effect. As of September 30, 2017, the covenants of Alta Mesa's senior secured revolving credit facility prohibit Alta Mesa from making any distributions.

The senior secured revolving credit facility also requires Alta Mesa to maintain the following two financial ratios:

- a current ratio, tested quarterly, of Alta Mesa's consolidated current assets to its consolidated current liabilities of not less than 1.0 to 1.0 as of the end of each fiscal quarter; and

- a leverage ratio, tested quarterly, commencing with the fiscal quarter ended December 31, 2016, of Alta Mesa's consolidated debt (other than obligations under hedge agreements) as of the end of such fiscal quarter to its consolidated EBITDAX over the four quarter period then ended of not greater than 4.0 to 1.0.

Alta Mesa intends to amend its senior secured revolving credit facility in connection with the Closing to, among other things, permit the business combination.

### Cash Flows Provided by Operating Activities

Operating activities provided cash of $55.5 million during the nine months ended September 30, 2017 as compared to $7.5 million during the comparable period in 2016, resulting in an increase in cash of $48.0 million. The increase in operating cash flows was attributable to various factors. Cash-based items of net loss including revenues (exclusive of unrealized commodity gains or losses), operating expenses and taxes, general and administrative expenses, and the cash portion of our interest expense, resulted in a net decrease of approximately

247

Table of Contents

$10.9 million in the first nine months of 2017. Changes in restricted cash, working capital and other assets and liabilities resulted in an increase of $58.9 million in the first nine months of 2017 as compared to the corresponding period in 2016.

Operating activities provided cash of $131.4 million in 2016, as compared to $144.0 million in 2015. The $12.6 million decrease in operating cash flows was attributable to various factors. Cash-based items of net income, including revenues (exclusive of unrealized commodity gains or losses), operating expenses and taxes. G&A expenses and the cash portion of Alta Mesa's interest expense resulted in a net decrease of approximately $36.1 million in earnings and a negative impact on cash flow. The changes in Alta Mesa's working capital accounts provided $27.8 million in cash as compared to having provided $4.5 million in cash in 2015.

Operating activities provided cash of $144.0 million in 2015, as compared to $184.9 million in 2014. The $40.9 million decrease in operating cash flows was attributable to various factors. Cash-based items of net income, including revenues (exclusive of unrealized commodity gains or losses), operating expenses and taxes. G&A expenses and the cash portion of Alta Mesa's interest expense resulted in a net decrease of approximately $43.2 million in earnings and a negative impact on cash flow. The changes in Alta Mesa's working capital accounts provided $4.5 million as compared to having provided $2.2 million in cash in 2014.

### Cash Flows Provided by (Used in) Investing Activities

Investing activities used cash of $301.1 million during the nine months ended September 30, 2017 as compared to cash used by investing activities of $147.8 million during the comparable period of 2016. Capital expenditures for property and equipment, including acquisitions used cash of $299.5 million and $149.2 million in the first nine months of 2017 and 2016, respectively. Sales of properties provided proceeds of $1.4 million in the first nine months of 2016. In addition, Alta Mesa entered into an interest bearing promissory note receivable with its affiliate Northwest Gas Processing, LLC for approximately $1.5 million during the first nine months of 2017. See Note 14 to Alta Mesa's condensed consolidated financial statements entitled "Related Party Transactions."

Investing activities used cash of $224.3 million for the year ended December 31, 2016 as compared to $105.8 million for the year ended December 31, 2015. The increase in cash used in investing activities was primarily related to proceeds from the sale of property in 2015 of approximately $141.4 million. The increase in cash used for investing activities was partially offset by decreased expenditures for drilling and development and decreased acquisitions in 2016.

Investing activities used cash of $105.8 million for the year ended December 31, 2015 as compared to $189.7 million for the year ended December 31, 2014. The decrease in cash used in investing activities was primarily related to decreased expenditures for drilling and development, partially offset by lower proceeds from the sale of assets and an increase in acquisitions. In 2015, the Eagle Ford Divestiture provided net proceeds of approximately $115.0 million and the acquisition of undeveloped leasehold interests in Oklahoma resulted in a use of cash of $47.4 million. In addition, release of non-invested funds in the restricted cash account, provided cash of $24.6 million.

### Cash Flows Provided by (Used In) Financing Activities

Financing activities provided cash of $242.1 million during the nine months ended September 30, 2017 as compared to $139.6 million during the comparable period in 2016. During the first nine months of 2017, Alta Mesa increased its borrowings under its credit facility by approximately $34.4 million (net), and paid $0.2 million of deferred financing costs related to its credit facility and senior notes. In addition, Alta Mesa received approximately $7.9 million in capital contributions from High Mesa and $200 million in capital contributions from the Riverstone Contributor in connection with its admittance as a limited partner. During the first nine months of 2016, Alta Mesa drew down $141.9 million on its credit facility and deposited the cash in a controlled

248

Table of Contents

account pursuant to its credit facility. Alta Mesa paid down its credit facility by approximately $1.5 million and it paid $0.8 million of deferred financing costs related to its credit facility.

Financing activities provided cash of $91.2 million during 2016 as compared to cash used of $30.6 million during 2015, an increase of $121.8 million. During 2016, Alta Mesa used proceeds from the issuance of the 2024 Notes of $500.0 million, capital contributions from an affiliate of $303.5 million and borrowings under its senior secured revolving credit facility of $222.6 million to repay $459.4 million on the 2018 Notes, repay $127.7 million on its second lien senior secured term loan and pay down $333.9 million under its senior secured revolving credit facility. In addition, Alta Mesa incurred $13.7 million of deferred financing costs.

Financing activities used cash of $30.6 million during 2015 as compared to $0.4 million during 2014, an increase of $30.2 million. During 2015, Alta Mesa used proceeds from the Eagle Ford Divestiture of $115.0 million and proceeds from the issuance of the second lien senior secured term loan of $121.0 million, net of issuance cost, to reduce the outstanding balance under its senior secured revolving credit facility by $295.0 million. Alta Mesa received $252.5 million in proceeds from long-term debt consisting of $125.0 million under its second lien senior secured term loan and $127.5 million in borrowings under its senior secured revolving credit facility. Alta Mesa made capital distributions of $3.8 million in 2015 as compared to a capital distribution of $0.5 million in 2014. Alta Mesa received capital contributions of $20.0 million from an affiliate in 2015. No contributions were received in 2014. Alta Mesa incurred $4.3 million of deferred financing cost in 2015 related to the borrowing of the second lien senior secured term loan.

### Risk Management Activities—Commodity Derivative Instruments

Due to the risk of low oil, natural gas and natural gas liquids prices, Alta Mesa periodically enters into price-risk management transactions (e.g., swaps, collars, puts, calls and financial basis swap contracts) for a portion of its oil, natural gas and natural gas liquids production. In certain cases, this allows Alta Mesa to achieve a more predictable cash flow, as well as to reduce exposure from price fluctuations. The commodity derivative instruments apply to only a portion of Alta Mesa's production, and provide only partial price protection against declines in oil, natural gas and natural gas liquids prices, and may partially limit Alta Mesa's potential gains from future increases in prices. At December 31, 2016, commodity derivative instruments were in place covering approximately 92% of Alta Mesa's projected oil production, approximately 72% of its natural gas production and approximately 11% of its natural gas liquids production from proved developed properties for 2017.

### Contractual Obligations

The following table summarizes Alta Mesa's contractual obligations as of December 31, 2016:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | Total | 2017 | 2018-2019 | 2020-2021 | Thereafter |
| | | | (in thousands) | | |
| Debt | $567,579 | $ — | $ — | $ 67,579 | $500,000 |
| Interest(1) | 327,320 | 41,000 | 82,000 | 86,195 | 118,125 |
| Operating Leases | 11,374 | 3,956 | 2,998 | 3,213 | 1,207 |
| Drilling rigs(2) | 6,285 | 6,285 | — | — | — |
| Abandonment liabilities(3) | 61,504 | 376 | 1,094 | 6,989 | 53,045 |
| Total | $974,062 | $51,617 | $ 86,092 | $163,976 | $672,377 |

---

(1)   Interest includes interest on the outstanding balance under Alta Mesa's senior secured revolving credit facility maturing in 2020, payable quarterly; on its 2024 Notes, payable semiannually; and on the debt to its founder, which is payable with principal, at maturity in 2021. In November 2016, the debt under Alta Mesa's senior secured revolving credit facility was amended to extend the maturity from April 2018 to November 2020. The weighted average rate on Alta Mesa's outstanding borrowings as of December 31,

249

Table of Contents

2016 of 4.00% was utilized to calculate the projected interest for its senior secured revolving credit facility. Projected obligation amounts are based on the payment schedules for interest and are not presented on an accrual basis. In connection with the business combination, Alta Mesa's debt to its founder will be exchanged for equity interest in the Alta Mesa Contributor.

(2)    The drilling rigs are included at the gross contractual value. Due to Alta Mesa's various working interests where the drilling rig contracts will be utilized, it is not feasible to estimate a net contractual obligation. Net payments under these contracts are accounted for as capital additions to Alta Mesa's oil and gas properties and could be less than the gross obligation disclosed. The drillings rigs are utilized in drilling wells that may or may not be included as part of Alta Mesa's joint development agreement with BCE.

(3)    Represents estimated discounted costs to retire and remove long-lived assets at the end of their operations.

## Off-Balance Sheet Arrangements

As of December 31, 2016, Alta Mesa had no guarantees of third-party obligations. Alta Mesa's off-balance sheet obligations include the obligations under operating leases, the $2.2 million contingent properties payment for properties acquired in 2008 and prior years, and the $1.5 million contingent payment if Alta Mesa decides to forego certain drilling activities. Alta Mesa also has bonds posted in the aggregate amount of $24.0 million, primarily to cover future abandonment costs, and $7.6 million in letters of credit provided under its senior secured revolving credit facility. Alta Mesa typically enters into short-term drilling contracts which are customary in the oil and gas industry. Alta Mesa has no other off-balance sheet arrangements that are reasonably likely to materially affect its liquidity and capital resources.

Alta Mesa has no plans to enter into any additional off-balance sheet arrangements in the foreseeable future.

## Critical Accounting Policies and Estimates

The discussion and analysis of Alta Mesa's financial condition and results of operations are based upon its consolidated financial statements, which have been prepared in accordance with GAAP. As used herein, the following acronyms have the following meanings: "FASB" means the Financial Accounting Standards Board; the "Codification" refers to the Accounting Standards Codification, the collected accounting and reporting guidance maintained by the FASB; "ASC" means Accounting Standards Codification and is generally followed by a number indicating a particular section of the Codification; and "ASU" means Accounting Standards Update, followed by an identification number, which are the periodic updates made to the Codification by the FASB.

The preparation of Alta Mesa's consolidated financial statements requires it to make estimates and assumptions that affect its reported results of operations and the amount of reported assets, liabilities and proved oil and natural gas reserves. Some accounting policies involve judgments and uncertainties to such an extent that there is reasonable likelihood that materially different amounts could have been reported under different conditions or if different assumptions had been used. Actual results may differ from the estimates and assumptions used in the preparation of Alta Mesa's consolidated financial statements. Described below are the most significant policies Alta Mesa applies in preparing its consolidated financial statements, some of which are subject to alternative treatments under GAAP, as well as the most significant estimates and assumptions it makes in applying these policies.

### Use of Estimates

The preparation of consolidated financial statements in conformity with GAAP requires Alta Mesa's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period.

Reserve estimates significantly impact depreciation, depletion and amortization expense and impairments of oil and natural gas properties and are subject to change based on changes in oil and natural gas prices and trends

250

Table of Contents

and changes in estimated reserve quantities. Other significant estimates include those related to oil and natural gas reserves, the value of oil and natural gas properties (including acquisition properties), oil and natural gas revenues, bad debts, asset retirement obligations ("ARO"), derivative contracts, state taxes and contingencies and litigation. Alta Mesa bases its estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances. Alta Mesa reviews estimates and underlying assumptions on a regular basis. Actual results may differ from these estimates.

*Property and Equipment*

Oil and natural gas producing activities are accounted for using the successful efforts method of accounting. Under the successful efforts method, lease acquisition costs and all development costs, including unsuccessful development wells, are capitalized.

*Unproved Properties*—Acquisition costs associated with the acquisition of leases are recorded as unproved properties and capitalized as incurred. These consist of costs incurred in obtaining a mineral interest or right in a property, such as a lease in addition to options to lease, broker fees, recording fees and other similar costs related to activities in acquiring properties. Unproved properties are classified as unproved until proved reserves are discovered, at which time related costs are transferred to proved oil and natural gas properties.

*Exploration Expense*—Exploration expenses, other than exploration drilling costs, are charged to expense as incurred. These expenses include seismic expenditures and other geological and geophysical costs, expired leases and lease rentals. The costs of drilling exploratory wells and exploratory-type stratigraphic wells are initially capitalized pending determination of whether the well has discovered proved commercial reserves. If the exploratory well is determined to be unsuccessful, the cost of the well is transferred to expense. Exploratory well drilling costs may continue to be capitalized if the reserve quantity is sufficient to justify completion as a producing well and sufficient progress in assessing the reserves and the economic and operating viability of the project is being made.

*Proved Oil and Natural Gas Properties*—Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing oil and natural gas are capitalized. All costs incurred to drill and equip successful exploratory wells, development wells, development-type stratigraphic test wells and service wells, including unsuccessful development wells, are capitalized.

*Impairment*—The capitalized costs of proved oil and natural gas properties are reviewed at least quarterly for impairment following the guidance provided in ASC 360-10-35, Property, Plant and Equipment, Subsequent Measurement, whenever events or changes in circumstances indicate that the carrying amount of a long-lived asset or asset group exceeds its fair market value and is not recoverable. The determination of recoverability is based on comparing the estimated undiscounted future net cash flows at a producing field level to the carrying value of the assets. If the future undiscounted cash flows, based on estimates of anticipated production from proved reserves and future crude oil and natural gas prices and operating costs, are lower than the carrying cost, the carrying cost of the asset or group of assets is reduced to fair value. For its proved oil and natural gas properties, Alta Mesa estimates fair value by discounting the projected future cash flows at an appropriate risk-adjusted discount rate.

Unproved properties are assessed at least annually to determine whether they have been impaired. Individually significant properties are assessed for impairment on a property-by-property basis, while individually insignificant unproved leasehold costs may be assessed in the aggregate. If unproved leasehold costs are found to be impaired, an impairment allowance is provided and a loss is recognized in the consolidated statement of operations.

*Depreciation, Depletion and Amortization*—DD&A of capitalized costs of proved oil and natural gas properties is computed using the unit-of-production method based upon estimated proved reserves. Assets are

251

Table of Contents

grouped for DD&A on the basis of reasonable aggregation of properties with a common geological structural feature or stratigraphic condition, such as a reservoir or field. The reserve base used to calculate DD&A for leasehold acquisition costs and the cost to acquire proved properties is the sum of proved developed reserves and PUDs. The reserve base used to calculate DD&A for lease and well equipment costs, which include development costs and successful exploration drilling costs, includes only proved developed reserves.

### Revenue Recognition

Alta Mesa recognizes oil, natural gas and natural gas liquids revenues when products are delivered at a fixed or determinable price, title has transferred and collectability is reasonably assured. Alta Mesa uses the sales method of accounting for recognition of natural gas imbalances.

### Derivative Financial Instruments

Alta Mesa uses derivative contracts to hedge the effects of fluctuations in the prices of oil, natural gas and natural gas liquids. Alta Mesa accounts for such derivative instruments in accordance with ASC 815, *Derivatives and Hedging*, which establishes accounting and disclosure requirements for derivative instruments and requires them to be measured at fair value and recorded as assets or liabilities in the consolidated balance sheets.

Under ASC 815, hedge accounting is used to defer recognition of unrealized changes in the fair value of such financial instruments, for those contracts which qualify as fair value or cash flow hedges, as defined in the guidance. Historically, Alta Mesa has not designated any of its derivative contracts as fair value or cash flow hedges.

Accordingly, the changes in fair value of the contracts are included in earnings as "Gain (loss) on derivative contracts." Cash flows from settlements of derivative contracts are classified as operating cash flows.

### Income Taxes

Alta Mesa has elected under the Code provisions to be treated as individual partnerships for tax purposes. Accordingly, items of income, expense, gains and losses flow through to the partners and are taxed at the partner level. Accordingly, no tax provision for federal operations taxes is included in the consolidated financial statements.

Alta Mesa is subject to the Texas margin tax, which is considered a state income tax and is included in "Provision for state income tax" on the consolidated statement of operations. Alta Mesa records state income tax (current and deferred) based on taxable income as defined under the rules for the margin tax.

### Acquisitions

Acquisitions are accounted for as purchases using the acquisition method of accounting. Accordingly, the results of operations are included in Alta Mesa's consolidated statements of operations from the closing date of the acquisitions. Purchase prices are allocated to acquired assets and assumed liabilities based on their estimated fair value at the time of the acquisition.

### Asset Retirement Obligations

Alta Mesa estimates the present value of future costs of dismantlement and abandonment of its wells, facilities and other tangible, long-lived assets, recording them as liabilities in the period incurred. Alta Mesa follows ASC 410, *Asset Retirement and Environmental Obligations*. ASC 410 requires that an asset retirement obligation associated with the retirement of a tangible long-lived asset be recognized as a liability in the period in which it is incurred or becomes determinable (as defined by the standard), with an associated increase in the carrying amount of the related long-lived asset. The cost of the tangible asset, including the initially recognized

252

Table of Contents

asset retirement cost, is depreciated over the useful life of the asset and accretion expense is recognized over time as the discounted liability is accreted to its expected settlement value. The fair value of the ARO is measured using expected future cash outflows for abandonment discounted generally at Alta Mesa's cost of capital at the time of recognition.

*Investment*

Alta Mesa's investment consists of a 10.17% ownership interest in a drilling company, Orion Drilling Company, LLC ("Orion"). The investment is accounted for under the cost method and Alta Mesa has recorded $9.0 million of Investment in LLC on the consolidated balance sheets as of December 31, 2016 and 2015. Under this method, Alta Mesa's share of earnings or losses of the investment are not included in the consolidated statements of operations.

Distributions from Orion are recognized in current period earnings as declared.

Alta Mesa is a part owner of ARM Energy Management, LLC ("AEM") with an ownership interest of less than 10%. AEM markets Alta Mesa's oil and natural gas and sells it under short-term contracts generally with month-to-month pricing based on published regional indices, with differentials for transportation, location, and quality taken into account. AEM remits monthly collections of these sales to Alta Mesa, and receives a 1% marketing fee.

*Deferred Financing Costs*

Alta Mesa capitalizes costs incurred in connection with obtaining financing. These costs are amortized over the term of the related financing using the straight-line method, which approximates the effective interest method. The amortization expense is recorded as a component of interest expense in the consolidated statement of operations.

**Recent Accounting Pronouncements**

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers.* The update provides guidance concerning the recognition, measurement and disclosure of revenue from contracts with customers. Its objective is to increase the usefulness of information in the financial statements regarding the nature, timing and uncertainty of revenues. ASU 2014-09 is effective for annual and interim periods beginning after December 15, 2016. The standard is required to be adopted using either the full retrospective approach, with all prior periods presented adjusted, or the modified retrospective approach, with a cumulative adjustment to retained earnings on the opening balance sheet. In August 2015, the FASB issued ASU No. 2015-14, Deferral of the Effective Date ("ASU 2015-14"). ASU 2015-14 deferred the effective date of the new revenue standard by one year, making it effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Alta Mesa has not yet selected a transition method and is currently assessing the impact on the consolidated financial statements. Alta Mesa is continuing to evaluate the provisions of this ASU as it relates to certain sales contracts and in particular as it relates to disclosure requirements.

In January 2016, the FASB issued ASU No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities,* which requires that most equity instruments be measured at fair value with subsequent changes in fair value recognized in net income. ASU 2016-01 also impacts financial liabilities under the fair value option and the presentation and disclosure requirements for financial instruments. ASU 2016-01 does not apply to equity method investments or investments in consolidated subsidiaries. ASU 2016-01 is effective for fiscal years beginning after December 15, 2017, including interim periods within those years. Alta Mesa is currently evaluating the effect that adopting this guidance will have on its financial position, cash flows and results of operations.

253

Table of Contents

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842),* which supersedes ASC 840 "Leases" and creates a new topic, ASC 842 "Leases." The amendments in this update require, among other things, that lessees recognize the following for all leases (with the exception of short-term leases) at the commencement date: (1) a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and (2) a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. Lessees and lessors must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements. The amendments are effective for interim and annual reporting periods beginning after December 15, 2018. Alta Mesa does not plan to adopt the standard early. Alta Mesa enters into lease agreements to support its operations. These lease agreements are for assets such as office space, vehicles, field services and equipment. Alta Mesa continues to evaluate the impacts of the amendments to its financial statements and accounting practices for leases.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments*, which is intended to reduce diversity in practice in how certain transactions are classified in the statements of cash flows. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017, including interim periods within those years. The adoption of this guidance will not impact Alta Mesa's financial position or results of operations but could result in presentation changes on its consolidated statements of cash flows.

In October 2016, the FASB issued ASU No. 2016-17, *Consolidation: Interests Held through Related Parties That Are under Common Control.* This guidance provides an amendment to the consolidation guidance on how a reporting entity that is the single decision maker of a VIE should treat indirect interests in the entity held through related parties that are under common control with the reporting entity when determining whether it is the primary beneficiary of that VIE. Alta Mesa has adopted this ASU and there was no current impact to its consolidated financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows: Restricted Cash*, which requires an entity to explain the changes in the total of cash, cash equivalents, restricted cash, and restricted cash equivalents on the statements of cash flows and to provide a reconciliation of the totals in that statement to the related captions in the balance sheet when the cash, cash equivalents, restricted cash, and restricted cash equivalents are presented in more than one line item on the balance sheet. This ASU is effective for annual and interim periods beginning after December 15, 2017, and is required to be adopted using a retrospective approach, with early adoption permitted. The adoption of this guidance will not impact Alta Mesa's financial position or results of operations but could result in presentation changes on its consolidated statements of cash flows.

In January 2017, the FASB issued ASU No. 2017-01, *Clarifying the Definition of a Business*, which provides guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. ASU 2017-01 requires entities to use a screen test to determine when an integrated set of assets and activities is not a business or if the integrated set of assets and activities needs to be further evaluated against the framework. ASU 2017-01 is effective for fiscal years beginning after December 15, 2017, including interim periods within those years. Alta Mesa is currently evaluating the effect that adopting this guidance will have on its financial position, cash flows and results of operations.

## Quantitative and Qualitative Disclosures about Market Risk

Alta Mesa is exposed to certain market risks that are inherent in its consolidated financial statements that arise in the normal course of business. Alta Mesa may enter into derivative instruments to manage or reduce market risk, but it does not enter into derivative agreements for speculative purposes.

Alta Mesa does not designate these derivative instruments as hedges for accounting purposes. Accordingly, the changes in the fair value of these instruments are recognized currently in earnings.

254

Table of Contents

*Commodity Price Risk and Hedges*

Alta Mesa's major market risk exposure is to prices for oil, natural gas and natural gas liquids. These prices have historically been volatile. As such, future earnings are subject to change due to changes in these prices. Realized prices are primarily driven by the prevailing worldwide price for oil and regional prices for natural gas. Alta Mesa has used, and expects to continue to use, oil, natural gas and natural gas liquids derivative contracts to reduce its exposure to the risks of changes in the prices of oil, natural gas and natural gas liquids. Pursuant to its risk management policy, Alta Mesa engages in these activities as a hedging mechanism against low prices and price volatility associated with pre-existing or anticipated sales of oil, natural gas and natural gas liquids.

As of September 30, 2017, Alta Mesa has hedged approximately 73% of its forecasted production from proved developed producing reserves through 2019 at average annual floor prices ranging from $3.18 per MMBtu to $4.43 per MMBtu for natural gas and $50.00 per Bbl to $51.37 per Bbl for oil. Forecasted production from proved reserves is estimated in Alta Mesa's 2016 Reserve Report using prices, costs and other assumptions required by SEC rules. Alta Mesa's actual production will vary from the amounts estimated in the report, perhaps materially. Please read the disclosures under "Risk Factors—Risks Related to the Alta Mesa Business—Alta Mesa's estimated oil and natural gas reserve quantities and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or the underlying assumptions will materially affect the quantities and present value of Alta Mesa's reserves."

The fair value of Alta Mesa's commodity derivative contracts at September 30, 2017 was a net asset of $11.9 million. A 10% increase or decrease in oil, natural gas and natural gas liquids prices with all other factors held constant would result in a decrease or increase, respectively, in the estimated fair value (generally correlated to Alta Mesa's estimated future net cash flows from such instruments) of its commodity derivative contracts of approximately $23.1 million (decrease in value) or $21.9 million (increase in value), respectively, as of September 30, 2017.

*Counterparty and Customer Credit Risk*

Alta Mesa's derivative contracts expose it to credit risk in the event of nonperformance by counterparties. While Alta Mesa does not require counterparties to its derivative contracts to post collateral, Alta Mesa does evaluate the credit standing of such counterparties as it deems appropriate. The counterparties to Alta Mesa's derivative contracts currently in place have investment grade ratings.

Alta Mesa's principal exposures to credit risk are through receivables resulting from joint interest receivables and receivables from the sale of its oil and natural gas production due to the concentration of its oil and natural gas receivables with several significant customers. The inability or failure of Alta Mesa's significant customers to meet their obligations to Alta Mesa or their insolvency or liquidation may adversely affect Alta Mesa's financial results. However, Alta Mesa believes the credit quality of its customers is high.

Joint operations receivables arise from billings to entities that own partial interests in the wells Alta Mesa operates. These entities participate in Alta Mesa's wells primarily based on their ownership in leases on which Alta Mesa intends to drill. Alta Mesa has little ability to control whether these entities will participate in its wells.

*Interest Rates*

Alta Mesa is subject to interest rate risk on its variable interest rate borrowings. Although in the past Alta Mesa has used interest rate swaps to mitigate the effect of fluctuating interest rates on interest expense, Alta Mesa currently has no open interest rate derivative contracts. A 1% increase in interest rates would increase annual interest expense on Alta Mesa's variable rate debt by approximately $0.8 million, based on the balance outstanding as of September 30, 2017.

255

Table of Contents

*Inflation*

Inflation in the U.S. has been relatively low in recent years and did not have a material impact on Alta Mesa's results of operations for the years ended December 31, 2016 or 2015. Although the impact of inflation has been insignificant in recent years, it could cause upward pressure on the cost of oilfield services, equipment and G&A expenses.

256

Table of Contents

## BUSINESS OF ALTA MESA

*The following discussion of Alta Mesa's business should be read in conjunction with the "Selected Historical Financial Information of Alta Mesa" and the accompanying financial statements of Alta Mesa and related notes included elsewhere in this statement. The following discussion includes information regarding Alta Mesa's non-STACK assets, which will not be acquired by Silver Run in the business combination.*

*The estimated proved reserve information for Alta Mesa's properties as of December 31, 2016 and December 31, 2015 contained in this proxy statement is based on reserve reports relating to Alta Mesa's properties prepared by Alta Mesa's internal engineers and audited by Ryder Scott Company, L.P., Alta Mesa's independent petroleum engineer (such reports being referred to as the "2016 Reserve Report" and "2015 Reserve Report" and, collectively, as the "Reserve Reports"). A copy of each of the Reserve Reports is attached to this proxy statement as Annex H.*

**Overview**

Founded in 1987, Alta Mesa is an independent exploration and production company focused on the development and acquisition of unconventional oil and natural gas reserves in the eastern portion of the Anadarko Basin referred to as the STACK. The STACK is an acronym describing both its location—Sooner Trend Anadarko Basin Canadian and Kingfisher County—and the multiple, stacked productive formations present in the area. The STACK is a prolific hydrocarbon system with high oil and liquids-rich natural gas content, multiple horizontal target horizons, extensive production history and historically high drilling success rates. As of September 30, 2017, Alta Mesa had assembled a highly contiguous position of approximately 130,000 net acres largely in the up-dip, naturally-fractured oil portion of the STACK in eastern Kingfisher County, Oklahoma. As of December 31, 2016, Alta Mesa had 4,196 identified gross horizontal drilling locations, 2,075 of which it expects to operate. These drilling locations are in Alta Mesa's primary target formations comprised of the Osage, Meramec and Oswego. Alta Mesa continues to opportunistically acquire acreage in its non-operated locations with the goal of operating wells in these locations. As of September 2017, Alta Mesa was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017.

Alta Mesa intends to grow its reserves and production through the development of its multi-year inventory of identified drilling locations within the STACK. As of December 31, 2016, Alta Mesa had drilled and completed 112 gross (98.3 net) horizontal wells in the STACK and participated in an additional 70 gross (11.9 net) horizontal wells in the STACK. From 2013 to September 30, 2017, Alta Mesa increased its STACK production at a CAGR of approximately 82%. Alta Mesa increased its leasehold interests from approximately 45,000 net acres in early 2015 to approximately 130,000 net acres as of September 30, 2017 primarily through the acquisition of largely undeveloped leasehold. Alta Mesa had average daily net production in the STACK of approximately 22,300 BOE/d for the month of October 2017 (69% liquids).

Beginning in the early 1990s, Alta Mesa's STACK operations were focused on vertical wells, waterfloods and analyzing the commercial productivity of the stacked formations on its acreage. Since late 2012, however, Alta Mesa has concentrated on the horizontal development of the Mississippian-age Osage and Meramec formations, as well as the Pennsylvanian-age Oswego formation. Alta Mesa intends to expand this activity with horizontal wells to further develop other formations with demonstrated vertical production, including the Pennsylvanian-age Big Lime, Prue, Skinner, Red Fork and Cherokee Shale; Mississippian-age Manning Lime; Devonian-age Woodford Shale; and Silurian-age Hunton Lime formations.

Alta Mesa considers its operations in the STACK to be in the early phase of a systematic, long-term development program. Alta Mesa's initial focus has been to delineate the Osage, Meramec and Oswego formations through the drilling of horizontal wells in 10 contiguous townships in Kingfisher County, Oklahoma and one adjacent township in Garfield County, Oklahoma. Alta Mesa has commenced infill development with

257

Table of Contents

seven multi-well patterns of three to 10 wells each, given that it expects full development of its leasehold to require multiple wells per drilling unit to maximize economic recovery of oil and natural gas from each formation.

Alta Mesa's NYMEX net proved reserves in the STACK as of December 31, 2016 were 143.6 MMBOE, representing a 110% increase over 2015 year-end net proved reserves of 68.3 MMBOE. Alta Mesa's 2015 year-end net proved reserves represent a 147% increase over 2014 year-end net proved reserves of 27.6 MMBOE. The increase in net proved reserves has primarily been driven by continued development of Alta Mesa's properties and acquired assets that it subsequently drilled and converted into proved reserves in the STACK.

The following charts illustrate Alta Mesa's net proved reserves and production growth in the STACK for the periods indicated.

### Net Proved Reserves and Production Growth

#### SEC Net Proved Reserves



#### NYMEX Net Proved Reserves



258

Table of Contents

**Net Daily Production(1)**



(1) Production data and the CAGR for the year ended December 31, 2016 include 24 producing wells purchased by High Mesa and contributed to Alta Mesa on December 31, 2016. See "—Bayou City Joint Development Agreement" below.

(2) Gross operated production continued to grow year-to-date from the second quarter of 2017 to the third quarter of 2017. Net production in the third quarter 2017 was consistent with Alta Mesa's Unaudited Financial Projections provided to the Company. Net production remained relatively consistent between the second and third quarters of 2017, reflecting a higher proportion of wells drilled in 2017 under Alta Mesa's joint development agreement with BCE. As of early November 2017, Alta Mesa had drilled or completed 53 wells of a total of 80 contemplated under the joint development agreement with BCE, and expects to drill the remainder of these by the end of 2018. As provided under the joint development agreement, Alta Mesa gives a proportionate 80% working interest in the well bores to BCE in return for BCE funding a proportionate 100% of the drilling and completion costs. BCE's working interest will be reduced and Alta Mesa's proportionate working interest will increase upon BCE reaching certain internal rates of return on the wells.

(3) STACK production CAGR from 2013 to September 30, 2017.

259

Table of Contents

*Reserves and Inventory Details*

The information with respect to Alta Mesa's reserves has been prepared in accordance with the rules and regulations of the SEC, except with respect to the table, which provides Alta Mesa's reserves based on NYMEX forward strip prices for oil and natural gas as explained below. Alta Mesa's proved reserves as of December 31, 2016 are estimates only and are based on reserve reports prepared by Alta Mesa's internal engineers and audited by Alta Mesa's independent petroleum engineer.

*SEC Pricing*

The following table contains Alta Mesa's STACK SEC net proved reserves as of December 31, 2016 and net acreage and production as of and for the nine months ended September 30, 2017.

| | SEC Proved Reserves (MMBOE) (1) | SEC Pricing PV-10 ($ Millions) (1) | SEC Pricing % Proved Developed (2) | SEC Pricing Liquids% of Total Proved Reserves (2) | Net Acreage (3) | Net Producing Wells (4) | Average Daily Net Production (MBOE/d) |
|---|---|---|---|---|---|---|---|
| STACK (Horizontal) | 126.6 | $ 521.7 | 23.8% | 61.9% | 127,424 | 108.8 | 18.9 |
| STACK (Vertical) | 3.0 | $ 12.8 | 99.6% | 71.1% | — | 230.1 | 1.2 |
| Total | 129.6 | $ 534.5 | 25.6% | 62.2% | 127,424 | 338.9 | 20.1 |

(1)   SEC total proved reserves and PV-10 were calculated using SEC definitions and oil and natural gas price parameters established by current SEC guidelines and accounting rules based on the unweighted arithmetic average of oil and natural gas prices as of the first day of each of the 12 months ended December 31, 2016. Because Alta Mesa is a partnership and was not subject to federal income taxes, its SEC PV-10, as of December 31, 2016 is the same as its standardized measure of future net cash flows, the most comparable measure under GAAP, which is reduced for the discounted value of estimated future income taxes. Therefore, no provision for federal or state corporate income taxes has been provided because taxable income is passed through to Alta Mesa's equity holders. However, Silver Run is a corporation subject to federal income tax and its future income taxes will be dependent upon Alta Mesa's future taxable income. We estimate that the pro forma standardized measure as of December 31, 2016 would have been approximately $442.8 million, as adjusted to give effect to the present value of approximately $91.7 million, of future income taxes as a result of being treated as a corporation for federal income tax purposes. Calculation of SEC PV-10 does not give effect to derivatives transactions. The unweighted arithmetic average prices as of the first of each month during the 12 months ended December 31, 2016 were $42.75 per Bbl of oil and $2.49 per MMBtu of natural gas. The estimated realized prices for natural gas liquids using a $42.75 per Bbl benchmark and adjusted for average differentials were $15.18. Natural gas liquid prices vary depending on the composition of the natural gas liquids basket and current prices for various components thereof, such as butane, ethane, and propane, among others.

(2)   Computed as a percentage of total reserves of the area.

(3)   Includes developed and undeveloped acreage.

(4)   Net producing wells are as of December 31, 2016 and exclude 9.9 DUC wells (9.8 operated, 0.1 non-operated).

260

Table of Contents

*NYMEX Pricing*

The following table contains Alta Mesa's STACK NYMEX net proved reserves as of December 31, 2016 using NYMEX strip prices as of December 31, 2016 (as that date was Alta Mesa's year end and the date on which most key assumptions were settled on with respect to 2016 reserve estimation).

| | NYMEX Proved Reserves (MMBOE) (1) | NYMEX Pricing PV-10 ($ Millions) (1) | NYMEX % Proved Developed (2) | NYMEX Liquids% of Total Proved Reserves (2) |
|---|---|---|---|---|
| STACK (Horizontal) | 139.8 | $ 1,172.4 | 24.2% | 61.1% |
| STACK (Vertical) | 3.8 | $ 26.8 | 99.4% | 72.3% |
| Total | 143.6 | $ 1,199.2 | 26.1% | 61.4% |

(1) Alta Mesa's estimated net proved NYMEX reserves were prepared on the same basis as its SEC reserves, except for the use of pricing based on closing monthly futures prices as reported on the NYMEX for oil and natural gas on December 31, 2016 rather than using the average of the first-day-of-the-month prices for the prior 12 months in accordance with SEC guidance. The "NYMEX Pricing" proved reserves were calculated using the following prices for oil and natural gas based on average annual NYMEX forward-month contract pricing in effect on December 31, 2016 to better reflect the market expectations as of that date. For December 31, 2016, the assumed oil price was $56.20 per Bbl in 2017, $56.59 per Bbl in 2018, $56.10 per Bbl in 2019, $56.05 per Bbl in 2020, $56.21 per Bbl in 2021 and $56.51 per Bbl held constant thereafter and the assumed natural gas prices were $3.61 per MMBtu in 2017, $3.14 per MMBtu in 2018, $2.87 per MMBtu in 2019, $2.88 per MMBtu in 2020 and $2.91 per MMBtu in 2021 and $2.93 per MMBtu held constant thereafter. Pricing was adjusted for basis differentials by field based on Alta Mesa's historical realized prices. The NYMEX Strip Price Proved Reserves are intended to illustrate reserve sensitivities to market expectations of commodity prices and should not be confused with "SEC Pricing" Proved Reserves as outlined above and do not comply with SEC pricing assumptions. Ryder Scott audited Alta Mesa's reserves at December 31, 2016 in a reserves audit.

(2) Computed as a percentage of total reserves of the area.

Alta Mesa believes that the presentation of reserve volumes using NYMEX forward strip pricing is informative as they are presented based upon the prices at which the marketplace believes oil and gas will be sold in the future. The price at which Alta Mesa can sell its production in the future is the major determinant of the likely economic producibility of its reserves. Alta Mesa hedges substantial amounts of future production based upon futures prices. In addition, Alta Mesa uses such forward-looking market-based data in developing its drilling plans, assessing its capital expenditure needs and projecting future cash flows. Alta Mesa's lenders also make borrowing base determinations based upon forward strip pricing.

While NYMEX strip prices represent a consensus estimate of future pricing, such prices are only an estimate. Actual future prices may vary significantly from the NYMEX prices; therefore, actual revenue and value generated may be more or less than the amounts disclosed. See "Risk Factors — Risks Related to the Alta Mesa Business — Oil and natural gas prices are highly volatile and depressed prices can significantly and adversely affect Alta Mesa's financial condition and results of operations," "Risk Factors — Risks Related to the Alta Mesa Business — Alta Mesa's estimated proved oil and natural gas reserve quantities and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or the underlying assumptions will materially affect the quantities and present value of Alta Mesa's reserves," and "Risk Factors — Risks Related to the Alta Mesa Business — The present value of future net revenues from Alta Mesa's proved reserves or "PV-10" will not necessarily be the same as the current market value of its estimated proved oil and natural gas reserves" for more information regarding the uncertainty associated with price and reserve estimates.

261

Table of Contents

*Drilling Locations*

Alta Mesa has a significant multi-year drilling inventory across a number of historically productive formations in the STACK. The table below sets forth the gross horizontal drilling locations that Alta Mesa has identified on its leasehold in its primary target formations and its estimate of additional prospective gross horizontal drilling locations on its leasehold that Alta Mesa has identified, either under downspacing or targeting formations that it has not yet developed with horizontal drilling. However, based upon the results of Alta Mesa's drilling program and those of other offset operators, it believes significant development opportunities exist in these prospective target formations. See "—Alta Mesa's Horizontal Drilling Locations" for a more detailed description of Alta Mesa's methodology in determining its identified and prospective horizontal drilling locations.

### Gross Horizontal Drilling Locations in the STACK by Targeted Formations (1)

| | Identified Drilling Locations | | Prospective Drilling Locations | | | | Combined |
| | Locations (2)(3) | Average Working Interest (%) | Other Formations Locations (4) | Downspacing Locations (5) | Total Locations | Average Working Interest (Including Downspacing Locations) (%) | Total Locations |
|---|---|---|---|---|---|---|---|
| **Operated**(6): | | | | | | | |
| Osage | 1,196 | 72% | — | 1,141 | 1,141 | 73% | 2,337 |
| Meramec | 676 | 74% | — | 676 | 676 | 74% | 1,352 |
| Oswego | 203 | 75% | — | 206 | 206 | 81% | 409 |
| Manning | — | — | 168 | — | 168 | 75% | 168 |
| Other Formations | — | — | 1,327 | — | 1,327 | 70% | 1,327 |
| Total Operated: | 2,075 | 73% | 1,495 | 2,023 | 3,518 | 73% | 5,593 |
| Drilling Inventory (Years)(7) | 14.4 | | 10.4 | 14.0 | 24.4 | — | 38.8 |
| **Other**(6): | | | | | | | |
| Osage . | 1,252 | 15% | — | 1,113 | 1,113 | 15% | 2,365 |
| Meramec | 588 | 15% | — | 596 | 596 | 15% | 1,184 |
| Oswego | 281 | 13% | — | 310 | 310 | 14% | 591 |
| Manning | — | — | 316 | — | 316 | 14% | 316 |
| Other Formations | — | — | 2,084 | — | 2,084 | 55% | 2,084 |
| Total Other: | 2,121 | 15% | 2,400 | 2,019 | 4,419 | 28% | 6,540 |
| **Total Gross Locations** | 4,196 | | 3,895 | 4,042 | 7,937 | | 12,133 |

(1)  Lateral lengths are assumed to be 4,800 to 5,000 feet depending upon formation. For a description of Alta Mesa's methodology used in identifying its identified drilling locations and estimating the number of additional prospective drilling locations, see "—Alta Mesa's Horizontal Drilling Locations." Alta Mesa may not drill all of these identified or prospective horizontal drilling locations. See "Risk Factors—Risks Related to the Alta Mesa Business—Alta Mesa's identified drilling locations are scheduled over many years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling. In addition, Alta Mesa may not be able to raise the substantial amount of capital that would be necessary to drill such locations."

(2)  Includes 272 locations attributed to proved undeveloped reserves in Alta Mesa's 2016 Reserve Report, all of which target the Osage formation.

(3)  Assumes the following number of wells per 640 acre section that may be drilled in the following formations based on current regulations: Oswego—2; Meramec—4; Lower Osage—4; and Upper Osage—4.

262

Table of Contents

(4)   Assumes the following number of wells per 640 acre section that may be drilled in the following formations based on current regulations: Big Lime—4; Cherokee—4; Manning—4; Chester—8; Woodford—8; and Hunton—1.

(5)   Assumes drilling based upon a regulatory change to permit an increase in the number of total wells per 640 acre section that may be drilled in the following formations: Oswego—4; Meramec—8; Lower Osage—8; and Upper Osage—7. There is no assurance that Oklahoma regulations will be revised to permit downspacing or that downspacing will prove economic in providing larger ultimate recoveries from a section. Downspacing may reduce per well EURs due to potential cross drainage. Certain of these locations are subject to participation in Alta Mesa's joint development agreement. See "—Bayou City Joint Development Agreement" below.

(6)   Operatorship is not yet determined for many of Alta Mesa's locations. Based on Alta Mesa's experience, it is likely to become the operator if it has more than 240 leased acres in a 640-acre section. As of December 31, 2016, Alta Mesa has 2,075 identified gross horizontal locations and 3,518 prospective gross drilling locations which Alta Mesa classifies as operated located in sections where Alta Mesa has leased greater than 240 acres. Additionally, Alta Mesa has 2,121 identified gross horizontal locations and 4,419 prospective gross drilling locations which it classifies as other located in sections where it has leased fewer than 240 acres. However, Alta Mesa may ultimately operate in sections with fewer than 240 acres leased and may not operate in sections with more than 240 acres leased.

(7)   Years of drilling inventory is calculated assuming total gross operated wells, drilling time of 15 days per well (24 wells per year, per rig) and six concurrently operating rigs, which is the current number of rigs Alta Mesa is operating in the STACK. This is shown for illustrative purposes. Alta Mesa will not necessarily drill its entire inventory. Alta Mesa's STACK rig count may increase or decrease in the future depending on numerous factors, including changes in oil and natural gas prices, drilling costs, rig availability, drilling results, Alta Mesa's working interest in the location, offtake and water disposal and capital budget decisions.

*Market Access*

Alta Mesa has favorable access to physical markets for its crude oil, natural gas and natural gas liquids produced from its STACK leasehold. Alta Mesa's operations are located less than 60 miles from the principal North American hub for crude oil in Cushing, Oklahoma, providing access to regional and national refining and petrochemical markets.

Alta Mesa is also served by pipelines transporting natural gas liquids to processing centers and market hubs in Kansas and the Gulf Coast region. Numerous natural gas gathering systems and associated processing facilities have been in operation in proximity to Alta Mesa's STACK assets for several decades and midstream companies have recently installed more robust gathering infrastructure and modern gas processing facilities to support increasing production volumes in the area. Alta Mesa sells a portion of its natural gas to legacy gas processors, including DCP, Mustang, EnLink, MarkWest and Energy Transfer.

In the second quarter of 2016, Kingfisher commissioned a 60 MMcf/d cryogenic gas processing facility within Alta Mesa's acreage footprint. This facility receives natural gas from the Kingfisher gathering system, which (i) is designed to accommodate the anticipated larger volumes Alta Mesa expects to produce from multi-well pads and (ii) offers assurance of processing and residue capacity to support future production growth. Kingfisher has commenced a 200 MMcf/d expansion that it expects to be operational in the first quarter of 2018.

Alta Mesa has committed the oil and natural gas production from its Kingfisher County acreage, not otherwise committed to others, to Kingfisher. As part of the Kingfisher contract, Alta Mesa has secured firm processing rights of 260 MMcf/d at the expanding Kingfisher facility, which provides multiple sales outlets for marketing residue natural gas from Alta Mesa's growing STACK production volumes and minimizes the effect of future processing limitations due to overall STACK production increases. There is no minimum volume commitment associated with the Kingfisher contract. Beginning June 1, 2018, Alta Mesa's subsidiary, Oklahoma

263

Table of Contents

Energy Acquisitions, LP, will have residue natural gas firm transport along the Oneok Gas Transmission pipeline for 100,000 Dth/d.

### Bayou City Joint Development Agreement

In January 2016, Alta Mesa entered into a joint development agreement with BCE, a fund advised by Bayou City, to fund a portion of Alta Mesa's drilling operations and to allow it to accelerate development of its STACK acreage. On December 31, 2016, High Mesa purchased from BCE and contributed interests in 24 producing wells drilled under the joint development agreement to Alta Mesa. The drilling program will fund the development of 80 additional wells, in four tranches of 20 wells each. As of September 30, 2017, 43 additional joint wells have been drilled or spudded leaving 37 joint wells to be drilled under the joint development agreement. Of the approximately 113 gross wells Alta Mesa plans to drill in 2017, approximately 35 are expected to be drilled under the joint development agreement.

Under the joint development agreement, BCE has committed to fund 100% of Alta Mesa's working interest share up to a maximum of an average of $3.2 million in drilling and completion costs per well for any tranche. Alta Mesa is responsible for any drilling and completion costs exceeding this limit. In exchange for the payment of drilling and completion costs, BCE receives 80% of Alta Mesa's working interest (the "BCE Interest") in each wellbore, which BCE Interest will be reduced to 20% of Alta Mesa's initial working interest upon BCE achieving a 15% internal rate of return on the wells within in a tranche and automatically further reduced to 12.5% of Alta Mesa's initial interest upon BCE achieving a 25% internal rate of return. Following the completion of each joint well, Alta Mesa and BCE will each bear their respective proportionate working interest share of all subsequent costs and expenses related to such joint well.

### Alta Mesa's Horizontal Drilling Locations

Alta Mesa has a significant multi-year drilling inventory within a number of pay zones in its STACK acreage. Alta Mesa has estimated its drilling locations by drilling unit, reservoir, and benches within each reservoir based on pay thickness, volumetric analyses, and production results. The production results include decades of vertical well performance in and around Alta Mesa's acreage, horizontal wells it has drilled and completed since late 2012, as well as production from multi-well spacing tests Alta Mesa has conducted across its acreage. Alta Mesa has made these assumptions for the drilling units in which it operates and for those it does not operate. As of December 31, 2016, Alta Mesa has an inventory of 3,712 gross (1,636 net) identified horizontal drilling locations to develop the Osage and Meramec formations and 484 gross (190 net) identified horizontal drilling locations to develop the Oswego formation in Alta Mesa's STACK position of approximately 100,000 net acres. Included within Alta Mesa's total identified drilling locations are 272 locations associated with proved undeveloped reserves as of December 31, 2016.

Alta Mesa's identified horizontal development location count implies approximately 1,320 foot spacing between wells in the Osage formation, approximately 1,320 foot spacing between wells in the Meramec formation, and 2,640 foot spacing in the Oswego formation. The lateral length of Alta Mesa's horizontal drilling locations is between 4,800 and 5,200 feet. In addition to these identified horizontal drilling locations, Alta Mesa believes it has the potential to increase its multi-year drilling inventory through horizontal downspacing in the Osage, Meramec, and Oswego formations and from additional horizontal locations in the Big Lime, Cherokee, and Manning, Chester, Woodford, and Hunton formations.

Alta Mesa's near-term development plan focuses on continued optimization of well spacing, frac stage spacing, transitioning to development mode, delineating Oswego and Manning horizons, and accelerating infrastructure investments. All of the wells in Alta Mesa's inventory are planned as single-section laterals, and it plans to focus primarily on pattern development during 2017.

The drilling locations on which Alta Mesa actually drills will depend on the availability of capital, regulatory approvals, commodity prices, costs, actual drilling results and other factors. Any drilling activities

264

Table of Contents

Alta Mesa is able to conduct on these identified locations may not be successful and may not result in its ability to add additional proved reserves to its existing proved reserves. See "Risk Factors—Risks Related to the Alta Mesa Business—Alta Mesa's identified drilling locations are scheduled out over many years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling. In addition, Alta Mesa may not be able to raise the substantial amount of capital that would be necessary to drill such locations."

### STACK Horizontal Wells History

Alta Mesa has increased its drilling activity in the STACK, from 10 wells in 2013 to 29 wells in 2014, 28 wells in 2015 and 72 wells in 2016. Through September 30, 2017, Alta Mesa has drilled 220 wells and has completed 169 gross (125 net) horizontal wells classified as proved developed producing reserves in the Osage and Meramec formations, of which 30 gross wells were funded through Alta Mesa's development agreement. The following table sets forth Alta Mesa's horizontal wells history in the STACK as of December 31, 2016.

| Well Name | Well Count (No.) (1)(2) | Lateral ("Lt.") Length (Feet) | EUR (MBO) | EUR (MMCF) | EUR (MBOE) (3) | EUR/ Lt. Foot (MBOE/ 1,000') | EUR % Oil | 90 Day Cum (MBOE) | 90 Day Cum / Lt. Foot (MBOE/ 1,000') | 90 Day Cum % Oil | D&C ($MM) | D&C/ Lt. Foot ($/Lt. Foot) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Generation 1 Legacy Plant Well: | 7 | 4,224 | 71 | 395 | 149 | 35 | 56% | 11,709 | 2,820 | 74% | $ 4.1 | $ 974 |
| Average Generation 1.5 Legacy Plant Well: | 6 | 4,656 | 183 | 1,485 | 472 | 104 | 43% | 28,220 | 6,276 | 77% | $ 4.5 | $ 968 |
| Average Generation 2.0 Legacy Plant Well: | 30 | 4,443 | 234 | 1,589 | 543 | 121 | 45% | 27,231 | 6,077 | 79% | $ 4.3 | $ 990 |
| Average Generation 2.0 Modern Plant Well: | 20 | 4,781 | 266 | 1,927 | 682 | 142 | 40% | 24,546 | 5,115 | 79% | $ 3.3 | $ 681 |
| Average Generation 2.0 Well: | 50 | 4,578 | 247 | 1,724 | 598 | 130 | 43% | 26,157 | 5,693 | 79% | $ 3.9 | $ 866 |
| Average Generation 2.5 Legacy Plant Well: | 6 | 4,920 | 239 | 1,094 | 452 | 93 | 63% | 18,732 | 3,719 | 90% | $ 3.6 | $ 726 |
| Average Generation 2.5 Modern Plant Well: | 29 | 4,735 | 262 | 1,638 | 615 | 130 | 43% | 29,113 | 6,095 | 76% | $ 3.6 | $ 754 |
| Average Generation 2.5 Well: | 35 | 4,766 | 258 | 1,545 | 587 | 123 | 46% | 27,516 | 5,730 | 78% | $ 3.6 | $ 749 |
| Average Alta Mesa Legacy Plant Well: | 49 | 4,496 | 205 | 1,345 | 467 | 103 | 49% | 24,322 | 5,417 | 79% | $ 4.2 | $ 953 |
| Average Alta Mesa Modern Plant Well: | 49 | 4,754 | 264 | 1,756 | 642 | 135 | 42% | 26,938 | 5,629 | 77% | $ 3.4 | $ 724 |
| Average Alta Mesa Well: | 98 | 4,625 | 234 | 1,551 | 554 | 119 | 45% | 25,556 | 5,517 | 78% | $ 3.8 | $ 838 |
| Average Generation 2.0 and 2.5 Well: | 85 | 4,656 | 251 | 1,650 | 594 | 127 | 44% | 26,622 | 5,705 | 79% | $ 3.8 | $ 818 |

(1) The number of wells excludes four wells in the Oswego and Woodford formations as of December 31, 2016.

(2) Based on the 2016 Reserve Report. Excludes 10 wells with circumstances that will not be repeated due to unacceptable results: (i) four wells with very tight spacing (i.e. 660 feet in a high porosity area), (ii) three child wells drilled between two parent wells without injecting water into the parent wells prior to frac, (iii) two wells which were shut in for more than 90 days after frac and (iv) one well that fraced into a vertical well and the vertical well was not plugged in the Osage and Meramec formations. The average audited EUR for these wells is 221 MBOE per well.

(3) As used in this proxy statement, EURs per well represent the sum of total gross remaining proved reserves per well as of December 31, 2016 (SEC pricing) plus cumulative production prior to such date for developed wells. EURs of horizontal wells will vary depending upon many factors, including, without limitation, lateral lengths, spacing and number of fracing stages, and quality of the penetrated formation. These EURs are not intended to be representative of anticipated future results of all wells drilled on Alta Mesa's STACK acreage.

265

Table of Contents

*Completion Summary by Generation*

Alta Mesa has proactively modified its completion designs with each generation, which has led to improved well response and overall economics, including: (i) the number of stages increasing with each generation as stage spacing decreases, (ii) average sand per stage increasing with each generation, (iii) total fluid per stage increasing with each generation, and (iv) changes in completion hardware.

| Design Parameters | Generation 1.0 | Generation 1.5 | Generation 2.0 | Generation 2.5 |
|---|---|---|---|---|
| Average Frac Stages | 12 | 18 | 24 | 32 |
| Average Stage Spacing (Ft.) | 340 | 256 | 194 | 147 |
| Slickwater—Average Total (Bbls/Ft.) | 29 | 40 | 56 | 64 |
| Sand—Total Average (Lbs/Ft.) | 317 | 457 | 677 | 1,234 |
| Frac Design Type | Packer/Sleeve | Hybrid | Plug/Perf | Plug/Perf |
| Flow Design Type | Slickwater | Slickwater | Slickwater | Slickwater |
| Packers Type | Mechanical | Mechanical | Swell | Swell |
| Well Count(1) | 7 | 6 | 59 | 108 |

(1)    Wells completed as of September 30, 2017.

*Oil-Weighting Over Time*

The well illustrated below is a representative PUD from the 2016 Reserve Report and is considered to be a typical well in terms of rates, declines, and production ratios. The following provides a description of the well's two-stream production and three-stream production in terms of oil and liquids content, respectively. In month one, two-stream production from the well is 82% oil and three-stream production is 86% liquids. In year one, two-stream production from the well is 66% oil and three-stream production is 74% liquids. The well breaches the two-stream 50% oil point near the end of year two and the three-stream production remains above 50% liquids point for the life of the well. Approximately 57% of the oil, 50% of the natural gas liquids and 38% of the natural gas are produced in the first five years thereby enhancing the early revenue per unit and the resulting economics. The gas to oil ratio (GOR) increases over time with month one approximately 1 Mcf per Bbl, month 12 approximately 5 Mcf per Bbl, and month 60 approximately 8 Mcf per Bbl.

**Oil and Liquids Over Time(1)**



(1)    LNU17N06W02A Miss well (from the 2016 Reserve Report).

266

Table of Contents

*Capital Expenditures*

Alta Mesa anticipates a capital budget for STACK assets for 2017 of $360.0 million comprised of $216.0 million for drilling and completion, $89.0 million for leasehold and acquisitions, and $55.0 million for facilities, midstream and other expenditures. For the nine months ended September 30, 2017, Alta Mesa has been funded approximately $92.7 million from BCE under the joint development agreement. With total expected 2017 capital expenditures of $453.0 million, Alta Mesa expects to maintain 6 rigs through the end of 2017 which will result in drilling 113.0 gross wells targeting the Osage, Meramec, Oswego and Manning formations. Alta Mesa's 2017 capital expenditure budget is subject to change based on various market conditions, including changes in commodities prices and drilling costs.

In connection with the Riverstone Contribution Agreement, the Riverstone Contributor made a $200.0 million capital contribution to Alta Mesa, in exchange for limited partner interests in Alta Mesa. Alta Mesa may use such capital to fund its capital expenditures prior to the Closing.

## Alta Mesa's Oil and Natural Gas Reserves

The table below summarizes the estimated net SEC proved reserves for Alta Mesa (which includes non-STACK assets) and for Alta Mesa's STACK assets, as of December 31, 2016:

| | Alta Mesa | | STACK Assets | |
| | Oil and Natural Gas Liquids (MBbls) | Gas (MMcf) | Oil and Natural Gas Liquids (MBbls) | Gas (MMcf) |
|---|---|---|---|---|
| **Proved Reserves(1)** | | | | |
| Developed | 24,809 | 93,361 | 20,951 | 72,951 |
| Undeveloped | 61,280 | 222,644 | 59,589 | 221,308 |
| Total Proved | 86,089 | 316,005 | 80,540 | 294,259 |

(1)   Alta Mesa's proved reserves as of December 31, 2016 were calculated using oil and natural gas price parameters established by current SEC guidelines and accounting rules based on unweighted arithmetic average prices as of the first day of each of the 12 months ended on such date. For December 31, 2016, these average prices were $42.75 per Bbl for oil and $2.49 per MMBtu for natural gas. Pricing was adjusted for basis differentials by field based on Alta Mesa's historical realized prices. The estimated realized prices for natural gas liquids using a $42.75 per Bbl benchmark and adjusted for average differentials were $15.18. Natural gas liquid prices vary depending on the composition of the natural gas liquids basket and current prices for various components thereof, such as butane, ethane, and propane, among others.

The table above represents estimates only. Reserves estimates are based upon various assumptions, including assumptions required by the SEC relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. The process of estimating reserves is complex. This process requires significant decisions and assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. Furthermore, different reserve engineers may make different estimates of reserves and cash flow based on the same available data and these differences may be significant. Therefore, these estimates are not precise. Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves will most likely vary from those estimated. In addition, Alta Mesa may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond its control. Sustained lower prices will cause the unweighted arithmetic average to decrease over time as the lower prices are reflected in the average price, which may result in the estimated quantities and present values of Alta Mesa's reserves being reduced and may necessitate future write-downs.

267

Table of Contents

*Internal Controls over Reserve Estimates and Qualifications of Technical Persons*

Alta Mesa's policies and practices regarding internal controls over the recording of reserves are structured to objectively and accurately estimate its oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers. The reserve estimation process begins with Alta Mesa's Corporate Planning and Reserves department, which gathers and analyzes much of the data used in estimating reserves. Working and net revenue interests are cross-checked and verified by Alta Mesa's land department. Lease operating and capital expenses are provided by Alta Mesa's accounting department and reviewed by the Corporate Planning and Reserves department. Tim Turner, Alta Mesa's Vice President of Corporate Planning and Reserves, is the technical person primarily responsible for overseeing the preparation of Alta Mesa's reserve estimates. His qualifications include the following:

- Over 30 years of practical experience in petroleum engineering and in the estimation and evaluation of reserves;

- Bachelor of Science Degree in Petroleum Engineering from the University of Texas in 1980, Masters of Business Administration from Oklahoma City University in 1988; and

- Registered Professional Engineer in Oklahoma.

Alta Mesa's methodologies include reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis. Performance methods are preferred. Reserve estimates for developed non-producing properties and for undeveloped properties are based primarily on volumetric analysis or analogy to offset production in the same or similar fields.

Alta Mesa maintains internal controls including the following to ensure the reliability of reserves estimations:

- no employee's compensation is tied to the amount of reserves booked;

- Alta Mesa follows comprehensive SEC-compliant internal policies to determine and report proved reserves;

- reserve estimates are made by experienced reservoir engineers or under their direct supervision; and

- each quarter, Alta Mesa's Chief Operating Officer and Chief Executive Officer review all significant reserves changes and all new PUD additions.

Ryder Scott, a third-party consulting firm, audited 96.6% and 99.7% of Alta Mesa's December 31, 2016 total company and STACK proved reserves, respectively, on a 6:1 MCF/BBL conversion basis.

The qualifications of the technical persons at Ryder Scott primarily responsible for overseeing the audit of Alta Mesa's reserve estimates are set forth below.

Kevin Gangluff earned a B.S. in Chemical Engineering at the University of Notre Dame and a Masters of Business Administration at the University of Texas at Austin. Mr. Gangluff is a licensed Professional Engineer in the State of Texas. Based on his educational background, professional training and more than 30 years of practical experience in the estimation and evaluation of petroleum reserves and resources, Mr. Gangluff has attained the professional qualifications as a Reserves Estimator and Reserves Auditor set forth in Article III of the "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information" promulgated by the Society of Petroleum Engineers as of February 19, 2007.

Michael Stell earned a B.S. in Chemical Engineering at Purdue University in 1979 and a Master of Science Degree in Chemical Engineering from the University of California, Berkeley, in 1981. Mr. Stell is a licensed

268

Table of Contents

Professional Engineer in the State of Texas. Based on his educational background, professional training and over 35 years of practical experience in the estimation and evaluation of petroleum reserves, Mr. Stell has attained the professional qualifications as a Reserves Estimator and Reserves Auditor set forth in Article III of the "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information" promulgated by the Society of Petroleum Engineers as of February 19, 2007.

The reserve audits by Ryder Scott conformed to the meaning of "reserves audit" as presented in the SEC's Regulation S-K, Item 1202.

A reserves audit and a financial audit are separate activities with unique and different processes and results. These two activities should not be confused. As currently defined by the SEC within Regulation S-K, Item 1202, a reserves audit is the process of reviewing certain of the pertinent facts interpreted and assumptions underlying a reserves estimate prepared by another party and the rendering of an opinion about the appropriateness of the methodologies employed, the adequacy and quality of the data relied upon, the depth and thoroughness of the reserves estimation process, the classification of reserves appropriate to the relevant definitions used and the reasonableness of the estimated reserves quantities. A financial audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. A financial audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

### Proved Undeveloped Reserves

At December 31, 2016, Alta Mesa had PUDs of 98.4 MMBOE, or approximately 71% of total proved reserves. The PUDs are primarily in the STACK. Total PUDs at December 31, 2015 were 44.6 MMBOE or approximately 57% of total proved reserves.

The following table reflects the changes in PUDs during 2016 for Alta Mesa and for Alta Mesa's STACK Assets:

|  | Alta Mesa | STACK Assets |
|---|---|---|
|  | (MBOE) | |
| Proved undeveloped reserves, December 31, 2015 | 44,624 | 41,927 |
| Converted to proved developed | (1,509) | (843) |
| Proved undeveloped reserve extensions and discoveries | 51,306 | 51,306 |
| Proved undeveloped reserves acquired | — | — |
| Proved undeveloped reserves sold | — | — |
| Proved undeveloped reserve revisions | 3,965 | 4,084 |
| Proved undeveloped reserves, December 31, 2016 | 98,386 | 96,474 |

PUDs converted to proved developed reserves were primarily in the STACK, Alta Mesa's most active development area. During 2016, Alta Mesa incurred approximately $8.4 million in expenditures to convert the December 31, 2015 PUDs to proved developed reserves. In addition, Alta Mesa spent approximately $2.7 million to convert PUDs that were added during 2016 to proved developed reserves, a portion of these drilling costs were funded through the joint development agreement. Extensions and discoveries were due to increases in PUD reserves associated with Alta Mesa's successful drilling activity in the STACK. In 2016, Alta Mesa had positive revisions of 7,322 MBOE due to increase efficiencies of operations at the Kingfisher plant in Oklahoma, which were partially offset by negative price revisions of 3,357 MBOE. These reserves were moved out of the PUD reserve category in compliance with the SEC five- year rule. Estimated future development costs, including plugging and abandonment cost, for PUDs remaining are approximately $634.5 million at December 31, 2016.

Alta Mesa expects that approximately $255.0 million of its 2017 capital expenditure budget will be used for drilling and completion, which Alta Mesa expects to finance through cash flow from operations, Alta Mesa's

269

Table of Contents

joint development agreement with BCE, borrowings under its senior secured revolving credit facility and other sources of capital, including the capital contributed by the Riverstone Contributor in connection with the execution of the Riverstone Contribution Agreement. Based on Alta Mesa's current rig forecast, it expects that approximately $30.0 million of the 2017 drilling and completion portion of the budget will be expended to drill 20 wells to convert 5.604 net MMBOE of proved undeveloped reserves to proved developed reserves in 2017. A portion of these drilling costs were funded through the BCE joint development agreement.

Under current SEC requirements, PUD reserves may only be booked if they relate to wells scheduled to be drilled within five years of the original date of booking unless specific circumstances justify a longer time. Alta Mesa will be required to remove its PUDs if it does not drill those reserves within the required five year time frame, unless specific circumstances justify a longer time. All of Alta Mesa's PUDs as of December 31, 2016 were scheduled to be drilled within five years of the original date of booking. The future development of such proved undeveloped reserves is dependent on future commodity prices, top value projects, maximization of present value and production volumes, drilling obligations, anticipated availability of rigs, the need to hold acreage by production, costs and other economic assumptions in Alta Mesa's forecasts. Lower prices for oil and natural gas as seen in the recent decline may cause Alta Mesa to forecast less capital to be available for development of its PUDs in the future, which may cause Alta Mesa to decrease the amount of its PUDs Alta Mesa expects to develop within the five-year time frame. In addition, lower oil and natural gas prices may cause Alta Mesa's PUDs to become uneconomic to develop at future SEC pricing, which would cause Alta Mesa to remove them from the proved undeveloped category.

Alta Mesa reevaluates its five year plan supporting its year-end fiscal results annually based upon the factors listed above. However, the relative proportion of total PUD reserves that Alta Mesa develops over the next five years will not be uniform year to year, but will vary by year depending on several factors, including financial targets such as reducing debt and/or drilling within cash flow, drilling obligatory wells (wells where a third-party operator has elected to drill a well and Alta Mesa is faced with either drilling the well or incurring penalties or where Alta Mesa needs to drill or recomplete a well to preserve a lease), drilling acreage to hold it with production, and the inclusion of new acquisitions with associated PUDs. When developing its long range plan, Alta Mesa prioritizes drilling based on many factors including product prices, capital availability and expected rates of return. As a result, Alta Mesa may drill PUDs with smaller net reserves but with higher returns.

During 2016 and 2017, Alta Mesa focused on drilling wells to hold its acreage and expand its proved reserves, as opposed to drilling PUD locations for development purposes as most of Alta Mesa's PUDs are currently held by production. Alta Mesa anticipates drilling in excess of 200 wells in each of the following five years. At year-end 2016, Alta Mesa had 272 PUD locations in its inventory and, of these locations, 259 are operated by Alta Mesa. During 2018 and 2019, Alta Mesa is only required to drill 56 PUD wells and will begin pattern development as it continues to focus on drilling other wells to expand its proved reserves. By 2020 and 2021, Alta Mesa will need to have drilled 64 and 152 wells, respectively. Accordingly, Alta Mesa anticipates drilling the large majority of its currently booked PUDs in the aggregate as drilling commitments become due in 2020 and 2021.

270

**Table of Contents**

**Production, Price and Production Cost History**

The following table sets forth certain information regarding Alta Mesa's production volumes, average prices received and average production costs associated with its sale of oil, natural gas and natural gas liquids for the periods indicated below. The data below include the effects of the amounts Alta Mesa reclassified from natural gas volumes and revenues to natural gas liquids volumes and revenues for the periods indicated.

| | Nine Months Ended September 30, 2017 | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2016 | 2015 | 2014 |
| **Net production:** | | | | |
| Oil (MBbls) | 3,533 | 4,001 | 4,203 | 3,770 |
| Natural gas (MMcf) | 14,073 | 13,959 | 11,900 | 14,449 |
| Natural gas liquids (MBbls) | 995 | 956 | 678 | 537 |
| Total (MBOE) | 6,873 | 7,284 | 6,865 | 6,715 |
| Total (MMcfe) | 41,237 | 43,702 | 41,187 | 40,290 |
| **Average sales price per unit before hedging effects:** | | | | |
| Oil (per Bbl) | $ 48.01 | $ 40.91 | $ 47.54 | $ 92.27 |
| Natural gas (per Mcf) | 2.68 | 2.22 | 2.57 | 4.50 |
| Natural gas liquids (per Bbl) | 22.93 | 16.38 | 16.01 | 34.04 |
| Combined (per BOE) | 33.49 | 28.87 | 35.15 | 64.20 |
| Combined (per MMcfe) | 5.58 | 4.81 | 5.86 | 10.70 |
| **Average sales price per unit after hedging effects:** | | | | |
| Oil (per Bbl) | $ 48.25 | $ 61.53 | $ 67.73 | $ 93.38 |
| Natural gas (per Mcf) | 2.81 | 2.68 | 4.43 | 4.87 |
| Natural gas liquids (per Bbl) | 22.14 | 16.04 | 16.01 | 34.04 |
| Combined (per BOE) | 33.75 | 41.05 | 50.73 | 65.62 |
| Combined (per MMcfe) | 5.63 | 6.84 | 8.45 | 10.94 |
| **Average costs per BOE:** | | | | |
| Lease and plant operating expense | $ 7.25 | $ 7.81 | $ 9.86 | $ 9.63 |
| Marketing and transportation expense | 3.14 | 1.83 | 0.59 | 1.36 |
| Production and ad valorem taxes | 1.28 | 1.48 | 2.20 | 4.20 |
| Workover expense | 0.74 | 0.65 | 0.95 | 1.33 |

271

Table of Contents

The following table provides a summary of STACK production, average sales prices and average production costs for the STACK, which contributed approximately 93% of Alta Mesa's total proved reserves as of December 31, 2016.

| STACK Assets | Nine Months Ended September 30, 2017 | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|---|
| **Net production:** | | | | |
| Oil (MBbls) | 2,783 | 2,570 | 2,006 | 1,072 |
| Natural gas (MMcf) | 10,733 | 8,247 | 4,276 | 2,083 |
| Natural gas liquids (MBbls) | 911 | 823 | 499 | 316 |
| Total (MBOE) | 5,482 | 4,768 | 3,218 | 1,734 |
| Total (MMcfe) | 32,895 | 28,610 | 19,310 | 10,407 |
| **Average sales price per unit before hedging effects:** | | | | |
| Oil (per Bbl) | $ 47.97 | $ 41.16 | $ 45.90 | $ 89.34 |
| Natural gas (per Mcf) | 2.78 | 2.43 | 2.51 | 4.34 |
| Natural gas liquids (per Bbl) | 23.27 | 17.21 | 16.74 | 34.09 |
| Combined (per BOE) | 33.65 | 29.35 | 34.55 | 66.61 |
| Combined (per MMcfe) | 5.61 | 4.89 | 5.76 | 11.10 |
| **Average production costs per BOE:** | | | | |
| Lease and plant operating expense | $ 4.55 | $ 4.75 | $ 6.40 | $ 7.60 |
| Marketing and transportation expense | 3.74 | 2.44 | 0.49 | 0.63 |
| Production and ad valorem taxes | 0.69 | 0.58 | 0.58 | 1.45 |
| Workover expense | 0.57 | 0.72 | 0.78 | 1.49 |
| **Average production costs per Mcfe:** | | | | |
| Lease and plant operating expense | $ 0.76 | $ 0.79 | $ 1.07 | $ 1.27 |
| Marketing and transportation expense | 0.62 | 0.41 | 0.08 | 0.10 |
| Production and ad valorem taxes | 0.11 | 0.10 | 0.10 | 0.24 |
| Workover expense | 0.10 | 0.12 | 0.13 | 0.25 |

Future prices received for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. Sustained lower prices will cause the 12 month-weighted average price to decrease over time as the lower prices are reflected in the average price.

**Delivery Commitments**

As of December 31, 2016, Alta Mesa had no commitments to provide a fixed quantity of oil, natural gas or natural gas liquids.

272

Table of Contents

**Drilling Activity**

The following tables sets forth for the periods indicated below, the number of net productive and dry exploratory and developmental wells completed, regardless of when drilling was initiated. The information should not be considered indicative of future performance, nor should it be assumed that there is necessarily any correlation among the number of productive wells drilled, quantities of reserves found or economic value.

**Alta Mesa**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Development wells (net):** | | | |
| Productive | 29.9 | 34.6 | 46.6 |
| Dry | — | 2.0 | 0.1 |
| Total development wells | 29.9 | 36.6 | 46.7 |
| **Exploratory wells (net):** | | | |
| Productive | 3.0 | 3.9 | 1.0 |
| Dry | — | 4.9 | 5.6 |
| Total exploratory wells | 3.0 | 8.8 | 6.6 |

**STACK Assets**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Development wells (net):** | | | |
| Productive | 29.9 | 28.1 | 30.2 |
| Dry | — | 0 | — |
| Total development wells | 29.9 | 28.1 | 30.2 |
| **Exploratory wells (net):** | | | |
| Productive | 0 | 0 | 0 |
| Dry | 0 | 0 | 0 |
| Total exploratory wells | 0 | 0 | 0 |

*Present Activities*

As of September 30, 2017, Alta Mesa was drilling 43 gross (26.1 net) wells in progress.

273

Table of Contents

**Productive Wells**

The following table sets forth information with respect to Alta Mesa's ownership interest in productive wells as of December 31, 2016:

|  | December 31, 2016 | |
|  | Gross | Net |
|---|---|---|
| **Oil Wells:** | | |
| STACK | 435 | 319.1 |
| Weeks Island Area | 54 | 51.8 |
| Other | 73 | 26.4 |
| All properties | 562 | 397.3 |
| **Natural gas wells** | | |
| STACK | 32 | 19.8 |
| Weeks Island Area | 3 | 2.8 |
| Other | 84 | 42.2 |
| All properties | 119 | 64.8 |

Of the total well count as of December 31, 2016, 3 gross wells (2.6 net), are multiple completions.

Productive wells are producing wells, shut-in wells Alta Mesa deems capable of production, wells awaiting completion, plus wells that are drilled/cased and completed, but awaiting pipeline hook-up. A gross well is a well in which a working interest is owned. The number of net wells represents the sum of fractional working interests Alta Mesa owns in gross wells.

**Developed and Undeveloped Acreage Position**

The following table sets forth information with respect to Alta Mesa's gross and net developed and undeveloped oil and natural gas acreage under lease as of December 31, 2016, all of which is located in the United States:

|  | Developed Acres | | Undeveloped Acres | | Total Acres | |
|  | Gross | Net | Gross | Net | Gross | Net |
|---|---|---|---|---|---|---|
| Property: | | | | | | |
| STACK | 94,771 | 70,835 | 28,613 | 26,719 | 123,384 | 97,554 |
| Weeks Island Area | 9,940 | 9,940 | 2,219 | 2,219 | 12,159 | 12,159 |
| Other | 59,350 | 26,156 | 369,057 | 309,011 | 428,407 | 335,167 |
| All properties | 164,061 | 106,931 | 399,889 | 337,949 | 563,950 | 444,880 |

As is customary in the oil and natural gas industry, Alta Mesa can generally retain an interest in undeveloped acreage through drilling activity that establishes commercial production sufficient to maintain the leases, by paying delay rentals during the remaining primary term of leases, pooling process, automatic extensions or negotiated extensions of the leases, and other terms of the leases such as shut-in payments. The oil and natural gas leases in which Alta Mesa has an interest are for varying primary terms and, if production under a lease continues from developed lease acreage beyond the primary term, Alta Mesa is entitled to hold the lease for as long as oil or natural gas is produced. The oil and natural gas properties consist primarily of oil and natural gas wells and interests in leasehold acreage, both developed and undeveloped.

**Undeveloped Acreage Expirations**

The following table sets forth information with respect to Alta Mesa's gross and net undeveloped oil and natural gas acreage under lease as of December 31, 2016, all of which is located in the United States, that will

274

Table of Contents

expire over the following three years by core area unless production is established within the spacing units covering the acreage prior to the expiration dates:

| Property: | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| STACK | 5,225 | 4,415 | 7,183 | 6,739 | 6,968 | 6,151 |
| Weeks Island Area | 1,824 | 1,824 | 395 | 395 | — | — |
| Northwest | 17,331 | 11,635 | 28,903 | 19,424 | 36,507 | 24,834 |
| Other | 2,508 | 1,774 | 17,670 | 9,713 | 5,383 | 4,470 |
| All properties | 26,888 | 19,648 | 54,151 | 36,271 | 48,858 | 35,455 |

Alta Mesa has lease acreage that is generally subject to lease expirations if initial wells are not drilled within a specified period, generally a period of three to five years. As is customary in the oil and natural gas industry, Alta Mesa can retain its interest in undeveloped acreage by maintaining the lease through: (i) the commencing operations for drilling, completion and production operations, (ii) pooling process, (iii) production, (iv) automatic extensions or negotiated extensions of the leases and (v) other terms of the leases such as shut-in payments. As of December 31, 2016, the vast majority of Alta Mesa's acreage does not have associated proved undeveloped reserves, and proved undeveloped reserves attributed to acreage in which the lease expiration date precedes the scheduled initial drilling date is primarily outside the STACK and is not material. Alta Mesa's leases are mainly fee leases with primary terms of three to five years. Alta Mesa believes that its lease terms are similar to fee lease term of Alta Mesa's competitors as they relate to both primary term and royalty interests.

**Non-STACK Assets**

Alta Mesa produces oil and natural gas in the U.S. from its properties that are divided by major geographical area, including: (1) the STACK in Oklahoma, (2) the Weeks Island Area in South Louisiana and (3) Other (together with the Weeks Island Area, the "non-STACK assets"). Pursuant to the Alta Mesa Contribution Agreement, Alta Mesa will transfer to its existing owners (other than the Riverstone Contributor) its non-STACK assets and liabilities prior to the Closing. Alta Mesa's operations in the STACK differ from its operations in other areas in that (a) Alta Mesa operates the substantial majority of its STACK properties; (b) Alta Mesa's operations in the STACK consist of a large, highly contiguous acreage position with multi-year inventory of low-risk horizontal drilling locations; and (c) Alta Mesa's operations in the STACK focus on unconventional drilling techniques. The transfer of the non-STACK assets and shift to focus solely on oil and gas development in the STACK represents a strategic shift in the operations of Alta Mesa.

**Weeks Island Area, South Louisiana**

The Weeks Island Area, located in Iberia and St. Mary Parish, Louisiana, consists of the historically prolific Weeks Island and Cote Blanche Island fields. The Weeks Island field, located in Iberia Parish, Louisiana, is an oil field with 55 potential pay zones that are structurally and stratigraphically trapped around a piercement salt dome. The Cote Blanche Island field, located near Weeks Island field in St. Mary Parish, is also a salt dome structure. As of December 31, 2016, Alta Mesa had a 96% average working interest in a total of 57 gross producing wells, and had identified 7 PUD locations in the Weeks Island Area. Average daily production from the Weeks Island Area in the third quarter of 2017 was approximately 2,200 BOE per day. As of September 30, 2017, the Weeks Island Area represented approximately 7.46% of Alta Mesa's total assets and generated 12.96% of Alta Mesa's total operating revenues.

**Other Assets**

Alta Mesa conducts operations in other areas in East Texas, Florida and other fields in South Louisiana and continually evaluates the operations in these areas to determine future development, expansion, acquisition

275

Table of Contents

opportunities, and strategic divestiture plans. Average daily production from Alta Mesa's other properties in the third quarter of 2017 was approximately 2,669 BOE per day. As of September 30, 2017, Alta Mesa's other properties represented approximately 1.86% of its total assets and generated 10.77% of its total operating revenues.

## Marketing and Customers

The market for Alta Mesa's oil and natural gas production depends on factors beyond its control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, the demand for oil and natural gas, the marketing of competitive fuels and the effect of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial and individual consumers.

Alta Mesa sells the oil and natural gas from several properties it operates primarily through a marketing agreement with AEM. Alta Mesa is a part owner of AEM at less than 10%. AEM markets Alta Mesa's oil and natural gas and subsequently sells it under short-term contracts generally with month-to-month pricing based on published regional indices, with differentials for transportation, location and quality taken into account. AEM remits monthly collections of these sales to Alta Mesa and receives a 1% marketing fee. Alta Mesa's marketing agreement with AEM commenced in June 2013. The agreement will terminate in 2018, with additional provisions for extensions beyond five years and for early termination. During the second half of 2013 and throughout 2014 to 2016, AEM marketed the majority of Alta Mesa's production from operated fields. Production from non-operated fields, the most significant of which were Alta Mesa's Eagleville field in South Texas and Hilltop natural gas field in East Texas prior to their sale, was marketed on Alta Mesa's behalf by the operators of those properties. Production from Alta Mesa's interests in Eagleville was sold by the operator, Murphy Oil Corporation. Alta Mesa sold its remaining interests in Eagleville in the third quarter of 2015.

Natural gas liquids are sold under various contracts with processors typically in the vicinity of the production at spot market rates, after processing costs.

For the year ended December 31, 2016, revenues marketed by AEM were $160.7 million, or 80% of total revenue excluding hedging activities.

Alta Mesa believes that the loss of any of its significant customers, or of its marketing agent AEM, would not have a material adverse effect on Alta Mesa because alternative purchasers are readily available. Trade accounts receivable are not collateralized or otherwise secured.

## Competition

Alta Mesa encounters intense competition from other oil and natural gas companies in all areas of its operations, including the acquisition of producing properties and undeveloped acreage. Alta Mesa's competitors include major integrated oil and natural gas companies, numerous independent oil and natural gas companies and individuals. Many of Alta Mesa's competitors are large, well-established companies with substantially larger operating staffs and greater capital resources and have been engaged in the oil and natural gas business for a much longer time than Alta Mesa. These companies may be able to pay more for productive oil and natural gas properties, exploratory prospects and mineral leases and to define, evaluate, bid for and purchase a greater number of properties and prospects than Alta Mesa's financial or human resources permit. Larger competitors may be able to absorb the decline in prices for oil and natural gas and the burden of any changes in federal, state and local laws and regulations more easily than Alta Mesa can, which could adversely affect its competitive position. Alta Mesa's ability to acquire additional properties and to discover reserves in the future will be dependent upon Alta Mesa's ability to evaluate and select suitable properties and to consummate transactions in this highly competitive environment.

276

Table of Contents

Alta Mesa is also affected by competition for drilling rigs and the availability of related equipment. In the past, the oil and natural gas industry has experienced shortages of drilling rigs, equipment, pipe and personnel, which have delayed development, exploitation and exploration activities. Alta Mesa is unable to predict when, or if, such shortages may occur or how they would affect its exploitation and development program.

Alta Mesa competes for capital in the domestic financial marketplace to fund its exploration and development activities to the extent Alta Mesa's operations cannot support them at any given time. See "Risk Factors—Risks Related to the Alta Mesa Business—Alta Mesa's exploration, exploitation, development and acquisition operations will require substantial capital expenditures. Alta Mesa may be unable to obtain needed capital or financing on satisfactory terms, which could lead to a decline in its production and reserves."

**Seasonality of Business**

Weather conditions affect the demand for, and prices of, oil and natural gas. Demand for oil and natural gas is typically higher in the fourth and first quarters resulting in higher prices. Due to these seasonal fluctuations, results of operations for individual quarterly periods may not be indicative of the results that may be realized on an annual basis.

**Oklahoma Forced Pooling Process**

In the past Alta Mesa has used, and it expects to continue to use, the Oklahoma "forced pooling" process to ensure all working interest owners participate in drilling and spacing units for wells Alta Mesa proposes to drill as operator its STACK acreage. Where applicable, this process allows Alta Mesa to increase its working interest in those units. Any such increase in working interest would lead to a proportionate increase in Alta Mesa's share of the production and reserves associated with any such successfully drilled well. Under Oklahoma law, if a party proposes to drill the initial well to a particular formation in a specific drilling and spacing unit but cannot obtain the agreement of all other oil and natural gas interest holders and other leaseholders within the unit as to how the unit should be developed, the party may commence a "forced pooling" process. Under current regulations, drilling and spacing units for Alta Mesa's targeted horizons in its STACK acreage are based on drilling a maximum of four to eight horizontal wells, depending on the formation, on a land section consisting of 640 acres. In a forced pooling action, which is common in Oklahoma, the proposed operator files an application for a pooling order with the OCC and names all other persons with the right to drill the unit as respondents. The proposed operator is required to demonstrate in an administrative proceeding that it has made a good faith effort to bargain with all of the respondents prior to filing its application. The fair market value of the mineral interests in the unit is determined in the administrative proceeding by reference to market transactions involving nearby oil and natural gas rights, especially what has been paid for mineral leases in the particular drilling and spacing unit and the immediately surrounding drilling and spacing units.

Assuming the application is granted and a forced pooling order is granted, the respondents then have 20 days to elect either to participate in the proposed well or accept fair market value for their interest, usually in the form of a cash payment, an overriding royalty, or some combination, based on the fair market value established and approved through the administrative hearing. The pooling order usually also addresses the time frame for drilling the well and provides for the manner in which future wells within the unit may be drilled. The applicant for the pooling order is ordinarily designated as the operator of the wells subject to the pooling order.

The availability of forced pooling means that it normally is difficult for a small number of owners to block or delay the drilling of a particular well proposed by another interest holder. Exploration and production companies in Oklahoma often negotiate to lease as much of the mineral interests in a particular area as are readily available at acceptable rates, and then use the forced pooling process to proceed with the desired development of the well. In this manner, Alta Mesa has the ability to expand into and develop areas near its existing acreage even if it is unable to lease all of the mineral interests in those areas.

277

Table of Contents

As a result of forced pooling processes, Alta Mesa has increased its working interest in approximately 95% of the 112 total operated horizontal wells it has drilled on its STACK acreage since January 1, 2014. In those wells in which forced pooling proceedings were initiated, Alta Mesa increased its working interest by an average of approximately 15% of its initial working interest in the drilling unit. In one instance in 2016, Alta Mesa proposed and drilled a well as operator in a section where its working interest ownership was initially approximately 10%, which through the implementation of the forced pooling process increased Alta Mesa's working interest to approximately 90%. In recent years, the collective working interest of third-party owners of mineral rights in these drilling units who have elected to participate in these wells has been low, which Alta Mesa believes could largely be attributed to the absence of available capital following the substantial oil and gas price downturns that commenced in late 2014. Due to the increased interest in the STACK as an economic play in the current price and cost environment, Alta Mesa believes that third-party interest holders may be more likely to bear their share of the costs of the proposed future wells on its acreage. Nevertheless, Alta Mesa expects that forced pooling will continue to increase its leasehold interests within its STACK acreage. The successful use of forced pooling to increase Alta Mesa's working interest in proposed wells that are attributed undeveloped reserves is not reflected in Alta Mesa's Reserve Reports.

**Title to Properties**

As is customary in Alta Mesa's industry, a preliminary review of title records, which may include opinions or reports of appropriate professionals or counsel, is made at the time Alta Mesa acquires properties. Alta Mesa believes that its title to all of the various interests set forth above is satisfactory and consistent with the standards generally accepted in the oil and gas industry, subject only to immaterial exceptions that do not detract substantially from the value of the interests or materially interfere with their use in Alta Mesa's operations. The interests owned by Alta Mesa may be subject to one or more royalty, overriding royalty or other outstanding interests (including disputes related to such interests) customary in the industry. The interests may additionally be subject to obligations or duties under applicable laws, ordinances, rules, regulations and orders of arbitral or governmental authorities. In addition, the interests may be subject to burdens such as net profits interests, liens incident to operating agreements and current taxes, development obligations under oil and gas leases and other encumbrances, easements and restrictions, none of which detract substantially from the value of the interests or materially interfere with their use in Alta Mesa's operations.

**Employees**

As of September 30, 2017, Alta Mesa had 269 full-time employees. Alta Mesa is not a party to any collective bargaining agreements and has not experienced any strikes or work stoppages. Alta Mesa believes its relationships with its employees are good. From time to time, Alta Mesa utilizes the services of independent contractors to perform various field and other services.

**Insurance**

In accordance with industry practice, Alta Mesa maintains insurance against some, but not all, of the operating risks to which its business is exposed. Alta Mesa currently has insurance policies that include coverage for general liability (includes sudden and accidental pollution), physical damage to Alta Mesa's oil and gas properties, control of well, auto liability, marine liability, worker's compensation and employer's liability, among other things.

Currently, Alta Mesa has general liability insurance coverage up to $1 million per occurrence, which includes sudden and accidental environmental liability coverage for the effects of pollution on third parties arising from Alta Mesa's operations. Alta Mesa's insurance policies contain maximum policy limits and in most cases, deductibles (generally ranging from $25,000 to $1.8 million) that must be met prior to recovery. These insurance policies are subject to certain customary exclusions and limitations. In addition, Alta Mesa maintains excess liability coverage, which is in addition to and triggered if the general liability per occurrence limit is reached.

278

Table of Contents

Alta Mesa's offshore reserves are not a significant portion of its total reserves; the fields are in declining production with no drilling activity. Alta Mesa's consolidated balance sheets include asset retirement liabilities which it believes are sufficient to cover the eventual costs of dismantlement and abandonment. Alta Mesa believes that due to the nature of the operations in these fields and the limited activity, the risk of environmental damage is not as high as it would be in an actively drilling offshore field. Alta Mesa's insurance program includes property damage, pollution liability and control of well. The property damage coverage extends to total loss of the equipment (not the reserves) with replacement cost coverage retained on one of the five fields. The pollution coverage, which is applicable to both offshore and onshore events, is $10 million per incident with a $100,000 deductible.

Alta Mesa requires all of its third-party contractors, including those that perform hydraulic fracturing operations, to sign master service agreements in which they agree to indemnify Alta Mesa for injuries and deaths of the service provider's employees as well as contractors and subcontractors hired by the service provider. Similarly, Alta Mesa generally agrees to indemnify each third-party contractor against claims made by its employees and other contractors. Additionally, each party generally is responsible for damage to its own property. Alta Mesa does not currently have any insurance policies in effect that are intended to provide coverage for losses solely related to hydraulic fracturing operations.

Alta Mesa re-evaluates the purchase of insurance, coverage limits and deductibles annually. Future insurance coverage for the oil and gas industry could increase in cost and may include higher deductibles or retentions. In addition, some forms of insurance may become unavailable in the future or unavailable on terms that are economically acceptable. No assurance can be given that Alta Mesa will be able to maintain insurance in the future at rates that it considers reasonable and Alta Mesa may elect to self-insure or maintain only catastrophic coverage for certain risks in the future.

## Legal Proceedings

### Environmental Claims

Various landowners have sued Alta Mesa in lawsuits concerning several fields in which it has or historically had operations. The lawsuits seek injunctive relief and other relief, including unspecified amounts in both actual and punitive damages for alleged breaches of mineral leases and alleged failure to restore the plaintiffs' lands from alleged contamination and otherwise from Alta Mesa's oil and natural gas operations. Alta Mesa is unable to express an opinion with respect to the likelihood of an unfavorable outcome of the various environmental claims or to estimate the amount or range of potential loss should the outcome be unfavorable. Therefore, Alta Mesa has not provided any material amounts for these claims in its condensed consolidated financial statements at September 30, 2017.

Due to the nature of Alta Mesa's business, some contamination of the real estate property owned or leased by it is possible. Environmental site assessments of the property would be necessary to adequately determine remediation costs, if any. As of December 31, 2016, Alta Mesa's revised estimated remediation liability for soil contamination in Florida was approximately $0.1 million and as of December 31, 2015, Alta Mesa had estimated a liability of $1.3 million, based on its undiscounted engineering estimates. The obligations are included in accounts payable and accrued liabilities at December 31, 2016 and other long-term liabilities at December 31, 2015 in the consolidated balance sheets included in the financial statements herein. Alta Mesa's existing equity owners will assume the case and liabilities related thereto as part of the transfer of the non-STACK assets.

### Title/Lease Disputes

Title and lease disputes may arise in the normal course of Alta Mesa's operations. These disputes are usually small but could result in an increase or decrease in reserves and/or other forms of settlement, such as cash, once a final resolution to the title dispute is made.

279

Table of Contents

*Litigation*

There are no other material litigation proceedings to which Alta Mesa is a party.

*Other*

Alta Mesa is subject to legal proceedings, claims and liabilities arising in the ordinary course of business for which the outcome cannot be reasonably estimated; however, in the opinion of Alta Mesa's management, such litigation and claims will be resolved without material adverse effect on Alta Mesa's financial condition, results of operations or cash flows. Accruals for losses associated with litigation are made when losses are deemed probable and can be reasonably estimated.

**Environmental and Occupational Safety and Health Matters**

Alta Mesa's oil and natural gas exploration and production operations are subject to stringent federal, state and local laws and regulations governing occupational safety and health, the discharge of materials into the environment and environmental protection. Numerous governmental agencies, including the EPA and analogous state agencies have the power to enforce compliance with these laws and regulations and the permits issued under them, often requiring difficult and costly actions. These laws and regulations may, among other things:

- require the acquisition of various permits before drilling and other regulated activities commence;

- require the installation of pollution control equipment in connection with operations and place other conditions on Alta Mesa's operations;

- place restrictions on the use of the material based on Alta Mesa's operations and upon the disposal of waste from its operations;

- restrict the types, quantities and concentrations of various substances that can be released into the environment or used in connection with drilling, production and transportation activities;

- limit or prohibit drilling activities on lands lying within wilderness, wetlands and other protected areas;

- require remedial measures to mitigate pollution from former and ongoing operations, including site restoration, pit closure and plugging of abandoned wells; and

- impose specific safety and health criteria addressing worker protection.

These laws, rules and regulations often impose difficult and costly compliance measures that carry substantial administrative, civil and criminal penalties and may result in remedial or corrective action obligations, occurrence of delays or cancellations in the permitting, performance or expansion of projects and in issuance of orders enjoining performance in particular areas for non-compliance.

The trend in environmental regulation is to place more restrictions and limitations on activities that may affect the environment, For example, the EPA has identified environmental compliance by the energy extraction sector as one of its enforcement initiatives for fiscal years 2017 to 2019, although the outlook for this initiative remains unclear with the change in Presidential administration. Consequently, any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly well drilling, construction, completion or water management activities, or waste handling, storage transport, disposal or remediation requirements could have a material adverse effect on Alta Mesa's financial position and results of operations. Alta Mesa may be unable to pass on such increased compliance costs to its customers. Moreover, accidental releases or spills may occur in the course of Alta Mesa's operations, and it cannot assure you that it will not incur significant costs and liabilities as a result of such releases or spills, including any third-party claims for damage to property, natural resources or persons. Historically, Alta Mesa's environmental compliance costs have not had a material adverse effect on its results of operations; however, there can be no assurance that such costs will not be material in the future or that such future compliance will not have a material adverse effect on its business and operating results.

280

Table of Contents

The following is a summary of some of the more significant existing environmental and occupational safety and health laws, and regulations, as amended from time to time, to which Alta Mesa's business operations are subject.

### *Non-hazardous and Hazardous Wastes and Hazardous Substances Handling*

The federal RCRA and comparable state statutes regulate the generation, transportation, treatment, storage, disposal and cleanup of non-hazardous and hazardous wastes. Pursuant to rules issued by the EPA, the individual states administer some or all of the provisions of RCRA, sometimes in conjunction with their own, more stringent requirements. In the course of Alta Mesa's operations, it generates some amounts of ordinary industrial wastes that may be regulated as hazardous wastes. Drilling fluids, produced waters, and most of the other wastes associated with the exploration, development and production of oil or natural gas, if properly handled, are currently exempt from regulation as hazardous waste under RCRA and, instead, are regulated under RCRA's less stringent non-hazardous waste provisions, state laws or other federal laws. However, it is possible that certain oil and natural gas drilling and production wastes now classified as non-hazardous could be classified as hazardous wastes in the future. For example, following the filing of a lawsuit in the U.S. District Court for the District of Columbia in May 2016 by several non-governmental environmental groups against the EPA for the agency's failure to timely assess its RCRA Subtitle D criteria regulations for oil and gas wastes, EPA and the environmental groups entered into an agreement that was finalized in a consent decree issued by the District Court on December 28, 2016. Under the decree, the EPA is required to propose no later than March 15, 2019, a rulemaking for revision of certain Subtitle D criteria regulations pertaining to oil and gas wastes or sign a determination that revision of the regulations is not necessary. If EPA proposes a rulemaking for revised oil and gas waste regulations, the Consent Decree requires that the EPA take final action following notice and comment rulemaking no later than July 15, 2021. A loss of the RCRA exclusion for drilling fluids, produced waters and related wastes could result in an increase in Alta Mesa's costs to manage and dispose of waste, which could have a material adverse effect on Alta Mesa's financial condition and results of operations.

The federal CERCLA, also known as the Superfund law, and comparable state laws impose liability, without regard to fault or legality of conduct, on classes of persons considered to be responsible for the release of a "hazardous substance" (or in the case of state laws, other classes of materials) into the environment. Under CERCLA, such persons may be subject to joint and several, strict liability for costs of investigation and remediation and for natural resource damages without regard to fault or legality of the original conduct, on certain classes of persons with respect to the release into the environment of hazardous substances. These classes of persons, or so-called potentially responsible parties ("PRPs") include the current and past owners or operators of a site where the hazardous substance release occurred and anyone who disposed or arranged for the disposal of a hazardous substance released at the site. CERCLA also authorizes the EPA and, in some instances, third parties to take actions in response to threats to public health or the environment and to seek to recover from the PRPs the costs of such action. Many states have adopted comparable or more stringent state statutes. Alta Mesa generates materials in the course of its operations that may be regulated as hazardous substances.

Alta Mesa currently owns, leases or operates and in the past has owned, leased or operated numerous properties that have been used for oil and natural gas exploration and production for many years. Although Alta Mesa believes it has utilized operating and waste disposal practices that were standard in the industry at the time, hazardous substances, wastes or hydrocarbons may have been released on or under the properties owned or leased by Alta Mesa, or on or under other locations, including offsite locations, where such materials have been taken for treatment or disposal. In addition, some of these properties have been operated by third parties or by previous owners or so-operators whose treatment and disposal of hazardous substances, wastes, or hydrocarbons were not under Alta Mesa's control. These properties and the materials disposed or released on them may be subject to CERCLA, RCRA and analogous state laws. In the future, Alta Mesa could be required to remediate property, including groundwater, containing or impacted by previously disposed materials (including wastes disposed or released by prior owners or operators, or property contamination, including groundwater contamination by prior owners or operators) or to perform remedial plugging or pit closure operations to prevent future contamination, the costs of which could be material.

281

Table of Contents

*Water Discharges and Subsurface Injections*

The federal CWA and analogous state laws impose restrictions and strict controls with respect to the discharge of pollutants, including discharges, spills and leaks of oil and hazardous substances, into state waters and waters of the United States. The discharge of pollutants into regulated waters is prohibited, except in accordance with the terms of a permit issued by the EPA or an analogous state agency. Spill prevention, control and countermeasure plan requirements imposed under the CWA require appropriate containment berms and similar structures to help prevent the contamination of regulated waters in the event of a spill, rupture or leak. In addition, the CWA and analogous state laws require individual permits or coverage under general permits for discharges of storm water runoff from certain types of facilities.

The CWA also prohibits the discharge of dredge and fill material in regulated waters, including wetlands, unless authorized by a permit issued by the U.S. Army Corps of Engineers ("Army Corps"). The EPA has issued final rules outlining its position on the federal jurisdictional reach over waters of the United States. This interpretation by the EPA may constitute an expansion of federal jurisdiction over waters of the United States. The rule was stayed nationwide by the U.S. Sixth Circuit Court of Appeals in October 2015 as that appellate court and several other courts hear lawsuits opposing implementation of the rule. In January 2017, the United States Supreme Court accepted review of the rule to determine whether jurisdiction rests with the federal district or appellate courts. Litigation surrounding this rule is ongoing. In February 2017, President Trump signed an executive order directing the EPA and the Army Corps to begin a process to revise or rescind these rules; the agencies published a notice of intent on March 6, 2017 to review and rescind or revise the rules and the U.S. Department of Justice filed a motion with the U.S. Supreme Court on March 6, 2017 requesting a court stay of its review of the rules. The outlook for these rules is unclear. Federal and state regulatory agencies can impose administrative, civil and criminal penalties, as well as require remedial or mitigation measures, for non-compliance with discharge permits or other requirements of the CWA and analogous state laws and regulations. The primary federal law related to oil spill liability is the OPA, which amends and augments oil spill provisions of the CWA and imposes certain duties and liabilities on certain "responsible parties" related to the prevention of oil spills and damages resulting from such spills in or threatening United States waters or adjoining shorelines. A liable "responsible party" includes the owner or operator of an onshore facility, vessel or pipeline that is a source of an oil discharge or that poses the substantial threat of discharge, or in the case of offshore facilities, the lessee or permittee of the area in which a discharging facility is located. The OPA assigns joint and several liability, without regard to fault, to each liable party for oil removal costs and a variety of public and private damages. Although defenses exist to the liability imposed by the OPA, they are limited.

Alta Mesa's underground injection operations are regulated pursuant to the UIC program established under the federal SDWA and analogous state and local laws and regulations. The UIC program includes requirements for permitting, testing, monitoring, record keeping and reporting of injection well activities, as well as a prohibition against the migration of fluid containing any contaminant into underground sources of drinking water. State regulations require a permit from the applicable regulatory agencies to operate underground injection wells. Although Alta Mesa monitors the injection process of its wells, any leakage from the subsurface portions of the injection wells could cause degradation of fresh groundwater resources, potentially resulting in suspension of Alta Mesa's UIC permit, issuance of fines and penalties from governmental agencies, incurrence of expenditures for remediation of the affected resource and imposition of liability by third-parties claiming damages for alternative water supplies, property and personal injuries. A change in UIC disposal well regulations or the inability to obtain permits for new disposal wells in the future may affect Alta Mesa's ability to dispose of produced waters and other substances, which could affect its business.

Furthermore, in response to recent seismic events near underground disposal wells used for the disposal by injection of produced water resulting from oil and natural gas activities, federal and some state agencies are investigating whether such wells have caused increased seismic activity, and some states have restricted, suspended or shut down the use of such disposal wells. In response to these concerns, regulators in some states have imposed, or are considering imposing, additional requirements in the permitting of produced water disposal

282

Table of Contents

wells or otherwise to assess any relationship between seismicity and the use of such wells. For example, Oklahoma issued new rules for injection wells in 2014 that imposed certain permitting and operating restrictions and reporting requirements on disposal wells in proximity to faults and also, from time to time, has developed and implemented plans directing certain wells where seismic incidents have occurred to restrict or suspend disposal well operations. The OCC has implemented the National Academy of Science's "traffic light system," in determining whether new injection wells should be permitted, permitted only with special restrictions, or not permitted at all. In addition, the OCC has established rules requiring operators of certain produced water injection wells in seismically-active areas, or Areas of Interest, within the Arbuckle formation of the state to, among other things, conduct mechanical integrity testing or make certain demonstrations of such wells' depth that, depending on the depth, could require the plugging back of such wells and/or the reduction of volumes disposed in such wells. As a result of these measures, the OCC from time to time has developed and implemented plans calling for injection wells within Areas of Interest where seismic incidents have occurred to restrict or suspend disposal operations in an attempt to mitigate the occurrence of such incidents. More recently, in December 2016, the OCC Oil and Gas Conservation Division and the Oklahoma Geological Survey released well completion seismicity guidance, which requires operators to take certain prescriptive actions, including an operator's planned mitigation practices, following certain unusual seismic activity within 1.25 miles of hydraulic fracturing operations. In addition, in February 2017, the OCC's Oil and Gas Conservation District issued an order limiting future increases in the volume of oil and natural gas wastewater injected belowground into the Arbuckle formation in an effort to reduce the number of earthquakes in the state. Increased regulation and attention given to induced seismicity could lead to greater opposition, including litigation, to oil and natural gas activities utilizing injection wells for produced water disposal. Court decisions or the adoption of any new laws, regulations or directives that restrict Alta Mesa's ability to dispose of produced water generated by production and development activities, whether by plugging back the depths of disposal wells, reducing the volume of produced water disposed in such wells, restricting injection well locations or otherwise, or by requiring it to shut down injection wells, could significantly increase Alta Mesa's costs to manage and dispose of this produced water, which could have a material adverse effect on its financial condition and results of operations.

*Hydraulic Fracturing*

Many of Alta Mesa's development projects require hydraulic fracturing procedures to economically develop the formations. Generally, Alta Mesa performs two types of hydraulic fracturing. In the STACK play, Alta Mesa performs hydraulic fracturing in horizontally drilled wells. These procedures are more extensive, time-consuming and expensive than hydraulic fracturing of vertical wells. Alta Mesa also performs hydraulic fracturing in vertical wells in its East Texas fields, including primarily Urbana and Cold Springs (both in East Texas); among the target zones are the Wilcox and Frio formations.

Currently, most hydraulic fracturing activities are regulated at the state level, as the SDWA's UIC program exempts EPA regulation of most hydraulic fracturing except for hydraulic fracturing activities involving the use of diesel. However, several federal agencies have asserted regulatory authority or pursued investigations over certain aspects of the hydraulic fracturing process. For example, in December 2016, the EPA released its final report on the potential impacts of hydraulic fracturing on drinking water resources, concluding that "water cycle" activities associated with hydraulic fracturing may impact drinking water resources "under some circumstances," including water withdrawals for fracturing in times or areas of low water availability; surface spills during the management of fracturing fluids, chemicals or produced water; injection of fracturing fluids into wells with inadequate mechanical integrity; injection of fracturing fluids directly into groundwater resources; discharge of inadequately treated fracturing wastewater to surface waters; and disposal or storage of fracturing wastewater in unlined pits. In other examples, in June 2016, the EPA published an effluent limit guideline final rule prohibiting the discharge of wastewater from onshore unconventional oil and natural gas extraction facilities to publicly owned wastewater treatment plants and, in 2014, the EPA asserted regulatory authority pursuant to the UIC program over hydraulic fracturing activities involving the use of diesel and issued guidance covering such activities. Also, in 2015, the BLM published a final rule that established new or more stringent standards relating to hydraulic fracturing on federal and American Indian lands, which has been challenged in court. However, the

283

Table of Contents

BLM is in the process of rescinding the 2015 rule. Additionally, in 2014, the EPA published an advanced notice of public rulemaking regarding TSCA reporting of the chemical substances and mixture used in hydraulic fracturing. From time to time, Congress has introduced, but not adopted, legislation to provide for federal regulation of hydraulic fracturing and to require disclosure of chemicals used in the fracturing process.

Many states, including Oklahoma, where Alta Mesa conducts operations, and other regional and local regulatory authorities have enacted, and other states or other regional and local authorities are considering, laws or other regulatory initiatives on hydraulic fracturing, including disclosure requirements and regulations that could restrict or prohibit drilling in general or hydraulic fracturing in particular, in certain circumstances. Some states have also considered or adopted other restrictions or regulations on drilling and completion operations, including requirements regarding casing and cementing of wells; testing of nearby water wells; restrictions on access to, and usage of, water; and restrictions on the type of chemical additives that may be used in hydraulic fracturing operations. States could elect to prohibit high-volume hydraulic fracturing altogether, following the approach taken by the State of New York in 2015. In addition to state laws, local land use restrictions, such as city ordinances, may restrict drilling in general and/or hydraulic fracturing in particular, although Oklahoma has taken steps to limit the authority of local governments to regulate oil and natural gas development. The issuance of any laws, regulations or other regulatory initiatives that impose new obligations on, or significantly restrict hydraulic fracturing, could make it more difficult or costly for Alta Mesa to perform hydraulic fracturing activities and thereby affect its production and increase Alta Mesa's cost of doing business. Such increased costs and any delays or curtailments in Alta Mesa's production activities could have a material adverse effect on its business, prospects, financial condition, results of operations and liquidity.

*Air Emissions*

Alta Mesa's operations are subject to the federal CAA and comparable state laws and implementing regulations that restrict the emission of air pollutants from many sources through air emissions standards, construction and operating permit programs and the imposition of other compliance standards. These laws and regulations may require Alta Mesa to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain and strictly comply with stringent air permit requirements or utilize specific equipment or technologies to control emissions of certain pollutants. The need to obtain permits has the potential to delay Alta Mesa's projects or development of oil and natural gas projects.

Over the next several years, Alta Mesa may incur certain capital expenditures for air pollution control equipment or other air emissions related issues. For example, in October 2015, the EPA issued a final rule under the CAA, lowering the National Ambient Air Quality Standard for ground-level ozone from the current standard of 75 parts per million to 70 parts per million under both the primary and secondary standards. State implementation of these revised standards could result in stricter permitting requirements, delay or prohibit Alta Mesa's ability to obtain such permits, and result in increased expenditures for pollution control equipment, the costs of which could be significant. Also, the EPA finalized separate rules under the CAA in June 2016 regarding criteria for aggregating multiple sites into a single source for air-quality permitting purposes applicable to the oil and natural gas industry. This rule could cause small production facilities such as tank batteries and compressor stations, on an aggregate basis, to be deemed a major source, thereby triggering more stringent air permitting requirements and increasing Alta Mesa's expenditures for permitting and pollution control equipment. Additionally, the EPA issued final CAA regulations in 2012 that include NSPS for completions of hydraulically fractured natural gas wells and issued added CAA regulations in June 2016 that include new emissions standards for methane and additional standards for volatile organic compounds from certain new, modified and reconstructed equipment and processes in the oil and natural gas source category, including production activities. Compliance with these and other air pollution control and permitting requirements has the potential to delay the development of oil and natural gas projects, increase Alta Mesa's costs and reduce the demand for the oil and natural gas that it produces.

284

Table of Contents

*Climate Change Regulation and Legislation*

Climate change continues to attract considerable public and scientific attention. As a result, numerous proposals have been made and are likely to continue to be made at the international, national, regional and state levels of government to monitor and limit emissions of GHGs. These efforts have included consideration of cap-and-trade programs, carbon taxes, GHG reporting and tracking programs and regulations that directly limit GHG emissions from certain sources.

At the federal level, no comprehensive climate change legislation has been implemented to date. The EPA has, however, adopted regulations under the CAA that, among other things, establish PSD construction and Title V operating permit reviews for GHG emissions from certain large stationary sources that are already potential sources of significant, or criteria, pollutant emissions. Sources subject to these permitting requirements must meet "best available control technology" standards for those GHG emissions. Additionally, the EPA has adopted rules requiring the monitoring and annual reporting of GHG emissions from specified GHG emission sources in the United States, including, among others, onshore and offshore oil and gas production, processing, transmission, storage and distribution facilities, which include certain of Alta Mesa's operations.

Federal agencies also have begun directly regulating emissions of methane, a GHG, from oil and natural gas operations. In June 2016, the EPA published Subpart OOOOa, requirements for certain new, modified or reconstructed facilities in the oil and natural gas sector to reduce these methane gas and volatile organic compound emissions. These Subpart OOOOa standards will expand the previously issued Subpart OOOO, requirements issued in 2012 by using certain equipment-specific emissions control practices. Additionally, in December 2015, the United States joined the international community at the 21st Conference of the Parties of the United Nations Framework Convention on Climate Change in Paris, France that prepared an agreement requiring member countries to review and "represent a progression" in their intended nationally determined contributions, which set GHG emission reduction goals every five years beginning in 2020. This "Paris Agreement" was signed by the United States in April 2016 and entered into force in November 2016; however, this agreement does not create any binding obligations for nations to limit their GHG emissions but, rather, includes pledges to voluntarily limit or reduce future emissions. With the change in Presidential administration, the ongoing commitment of the United States to the Paris Agreement is unclear.

The adoption and implementation of any international, federal or state legislation, regulations or other regulatory initiatives that requires reporting of GHGs or otherwise restricts emissions of GHGs from Alta Mesa's equipment and operations could require Alta Mesa to incur additional operating costs, such as costs to purchase and operate emissions control systems, acquire emissions allowances or comply with new regulatory or reporting requirements, including the imposition of a carbon tax, which one or more developments could have an adverse effect on Alta Mesa's business, financial condition and results of operations. Moreover, such new legislation or regulatory programs could also increase the cost to the consumer, and thereby reduce demand for oil and gas, which could reduce the demand for the oil and natural gas Alta Mesa produces and lower the value of its reserves.

Finally, it should be noted that increasing concentrations of GHGs in the Earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, floods and other climatic events. If such effects were to occur, Alta Mesa's development and production operations have the potential to be adversely affected. Potential adverse effects could include damages to Alta Mesa's facilities from powerful winds or rising waters in low lying areas, disruption of its production activities because of climate related damages to its facilities, its costs of operations potentially arising from such climatic effects, less efficient or non-routine operating practices necessitated by such climate effects or increased costs for insurance coverage in the aftermath of such effects. Significant physical effects of climate change could also have an indirect effect on Alta Mesa's financing and operations by disrupting the transportation or process-related services provided by midstream companies, service companies or suppliers with whom Alta Mesa has a business relationship. At this time, Alta Mesa has not developed a comprehensive plan to address the legal, economic, social or physical impacts of climate change on its operations.

285

Table of Contents

*Activities on Federal Lands*

Alta Mesa's only activity on federal lands is on its non-STACK assets that will be transferred to the Alta Mesa Contributor. Oil and natural gas exploration and production activities on federal lands, including Indian lands, may be subject to the federal NEPA, which requires federal agencies, including the EPA, to evaluate major agency actions having the potential to significantly impact the environment. In the course of such evaluations, an agency will prepare an Environmental Assessment that assesses the potential direct, indirect and cumulative impacts of a proposed project and, if necessary, will prepare a more detailed Environmental Impact Statement that may be made available for public review and comment. All of Alta Mesa's current exploration and production activities, as well as proposed exploration and development plans, on federal lands require governmental permits that are subject to the requirements of NEPA. This process has the potential to delay or impose additional conditions and costs upon the development of oil and natural gas projects. Authorizations under NEPA are also subject to protest, appeal or litigation, any or all of which may delay or halt projects. Moreover, depending on the mitigation strategies recommended in the Environmental Assessments or Environmental Impact Statement, Alta Mesa could incur added costs, which may be significant.

*Occupational Safety and Health Matters*

Alta Mesa is subject to the requirements of the federal Occupational Safety and Health Act ("OSHA") and comparable state statutes whose purpose is to protect the health and safety of workers. In addition, the OSHA hazard communication standard, the federal Emergency Planning and Community Right-to-Know Act and comparable state statutes and any implementing regulations require that Alta Mesa organize and/or disclose information about hazardous materials used or produced in its operations and that this information be provided to employees, state and local governmental authorities and citizens.

*Other Laws and Regulations*

Alta Mesa's operations are also subject to regulations governing the handling, transportation, storage and disposal of naturally occurring radioactive materials. Furthermore, owners, lessees and operators of natural gas and oil properties are also subject to increasing civil liability brought by surface owners and adjoining property owners. Such claims are predicated on the damage to or contamination of land resources occasioned by drilling and production operations and the products derived therefrom, and are often based on negligence, trespass, nuisance, strict liability or fraud.

**Other Regulation of the Oil and Natural Gas Industry**

The oil and natural gas industry is extensively regulated by numerous federal, state and local authorities. Legislation affecting the oil and natural gas industry is under constant review for amendment or expansion, frequently increasing the regulatory burden. Also, numerous departments and agencies, both federal and state, are authorized by statute to issue rules and regulations that are binding on the oil and natural gas industry and its individual members, some of which carry substantial penalties for failure to comply. Although the regulatory burden on the oil and natural gas industry increases Alta Mesa's cost of doing business and, consequently, affects its profitability, these burdens generally do not affect it any differently or to any greater or lesser extent than they affect other companies in the industry with similar types, quantities and locations of production.

The availability, terms and cost of transportation significantly affect sales of oil and natural gas. The interstate transportation of oil and natural gas is subject to federal regulation, including regulation of the terms, conditions and rates for interstate transportation, storage and various other matters, primarily by FERC. Federal and state regulations govern the rates and other terms for access to oil and natural gas pipeline transportation. FERC's regulations for interstate oil and natural gas transmission by pipeline in some circumstances may also affect the intrastate transportation of oil and natural gas by other means.

Although oil and natural gas sales prices are currently unregulated, the federal government historically has been active in the area of oil and natural gas sales regulation. Alta Mesa cannot predict whether new legislation

286

Table of Contents

to regulate oil and natural gas sales might be proposed, what proposals, if any, might actually be enacted by Congress or the various state legislatures, and what effect, if any, the proposals might have on its operations. Sales of condensate, oil and natural gas liquids are not currently regulated and are made at market prices.

### Exports of U.S. Crude Oil Production, Natural Gas and Liquefied Natural Gas

The federal government has recently ended its decades-old prohibition of exports of oil produced in the lower 48 states of the United States. It is too recent an event to determine the impact this regulatory change may have on Alta Mesa's operations or its sales of oil. The general perception in the industry is that ending the prohibition of exports of oil produced in the United States will be positive for producers of U.S. oil. In addition, the U.S. Department of Energy (the "DOE") authorizes exports of natural gas, including exports of natural gas by pipelines connecting U.S. natural gas production to pipelines in Mexico, which are expected to increase significantly with the changes taking place in the Mexican government's regulation of the energy sector in Mexico. In addition, the DOE authorizes the export of LNG through LNG export facilities, the construction of which are regulated by FERC. In the third quarter of 2016, the first quantities of natural gas produced in the lower 48 states of the U.S. were exported as LNG from the first of several LNG export facilities being developed and constructed in the U.S. Gulf Coast region. While it is also too recent an event to determine the impact this change may have on Alta Mesa's operations or its sales of natural gas, the perception in the industry is that this will be a positive development for producers of U.S. natural gas.

### Drilling and Production

Alta Mesa's operations are subject to various types of regulation at the federal, state and local level. These types of regulation include requiring permits for the drilling of wells, drilling bonds and reports concerning operations. The state, and some counties and municipalities, in which Alta Mesa operates also regulate one or more of the following:

- the location of wells;
- the method of drilling and casing wells;
- the timing of construction or drilling activities, including seasonal wildlife closures;
- the rates of production or "allowables";
- the surface use and restoration of properties upon which wells are drilled;
- the plugging and abandoning of wells; and
- notice to, and consultation with, surface owners and other third parties.

State laws regulate the size and shape of drilling and spacing units or proration units governing the pooling of oil and natural gas properties. Some states allow forced pooling or integration of tracts to facilitate exploration while other states rely on voluntary pooling of lands and leases. In some instances, forced pooling or unitization may be implemented by third parties and may reduce Alta Mesa's interest in the unitized properties. In addition, state conservation laws establish maximum rates of production from oil and natural gas wells, generally prohibit the venting or flaring of natural gas and impose requirements regarding the ratability of production. These laws and regulations may limit the amount of oil and natural gas Alta Mesa can produce from its wells or limit the number of wells or the locations at which Alta Mesa can drill. Moreover, each state generally imposes a production or severance tax with respect to the production and sale of oil, natural gas and natural gas liquids within its jurisdiction. States do not regulate wellhead prices or engage in other similar direct regulation, but Alta Mesa cannot assure you that they will not do so in the future. The effect of such future regulations may be to limit the amounts of oil and natural gas that may be produced from Alta Mesa's wells, which could negatively affect the economics of production from these wells or to limit the number of locations it can drill.

Federal, state and local regulations provide detailed requirements for the abandonment of wells, closure or decommissioning of production facilities and pipelines and for site restoration in areas where Alta Mesa operates.

287

Table of Contents

The U.S. Army Corps of Engineers and many other state and local authorities also have regulations for plugging and abandonment, decommissioning and site restoration. Although the U.S. Army Corps of Engineers does not require bonds or other financial assurances, some state agencies and municipalities do have such requirements.

### Forced Pooling in Oklahoma

The pooling process before the OCC provides a mechanism to develop a unit when two or more of its owners cannot voluntarily agree to pool their interests for the purposes of drilling and development. This procedure, which is standard in an actively developed field in Oklahoma, is specific to a given reservoir. The parties that are the recipient of pooling applications and orders under the OCC may elect to: (i) lease their unleased minerals for stated terms; (ii) participate in the well and pay their proportionate share of costs; or (iii) be bought out for fair, just and reasonable compensation determined by the OCC. Under this process, Alta Mesa pooled 68 sections in 2016 and on average increased its interest in the 68 units by 15%.

### Natural Gas Sales and Transportation

Historically, federal legislation and regulatory controls have affected the price of the natural gas Alta Mesa produces and the manner in which Alta Mesa markets its production. FERC has jurisdiction over the transportation and sale for resale of natural gas in interstate commerce by natural gas companies under the Natural Gas Act of 1938 and the Natural Gas Policy Act of 1978 ("NGPA"). Since 1978, various federal laws have been enacted which have resulted in the complete removal of all price and non-price controls for sales of domestic natural gas sold in "first sales," which include all of Alta Mesa's sales of its own production.

Under the EPAct, Congress amended NGA to give FERC substantial enforcement authority to prohibit the manipulation of natural gas markets and enforce its rules and orders, including the ability to assess substantial civil penalties. EPAct also amended the NGA to authorize FERC to "facilitate transparency in markets for the sale or transportation of physical natural gas in interstate commerce," pursuant to which authorization FERC now requires natural gas wholesale market participants, including a number of entities that may not otherwise be subject to FERC's traditional NGA jurisdiction, to report information annually to FERC concerning their natural gas sales and purchases. FERC requires any wholesale market participant that sells 2.2 million MMBtus or more annually in "reportable" natural gas sales to provide a report, known as FERC Form 552, to FERC. Reportable natural gas sales include sales of natural gas that utilize a daily or monthly gas price index, contribute to index price formation, or could contribute to index price formation, such as fixed price transactions for next-day or next-month delivery.

FERC also regulates interstate natural gas transportation rates, terms and conditions of natural gas service, and the terms under which Alta Mesa as a shipper may use interstate natural gas pipeline capacity, which affects the marketing of natural gas that it produces, as well as the revenues it receives for sales of its natural gas and for the release of its excess, if any, natural gas pipeline capacity. Commencing in 1985, FERC promulgated a series of orders, regulations and rule-makings that significantly fostered competition in the business of transporting and marketing gas. Today, interstate pipeline companies are required to provide nondiscriminatory transportation services to producers, marketers and other shippers, regardless of whether such shippers are affiliated with an interstate pipeline company. FERC's initiatives have led to the development of a competitive, open access market for natural gas purchases and sales that permits all purchasers of natural gas to buy gas directly from third-party sellers other than pipelines. However, the natural gas industry historically has been very heavily regulated; therefore, Alta Mesa cannot guarantee that the less stringent regulatory approach currently pursued by FERC and Congress will continue indefinitely into the future nor can we determine what effect, if any, future regulatory changes might have on its natural gas related activities.

Under FERC's current regulatory regime, interstate transportation services must be provided on an open- access, non-discriminatory basis at cost-based rates or at market-based rates if the transportation market at issue is sufficiently competitive. FERC-regulated tariffs, under which interstate pipelines provide such open-access

288

Table of Contents

transportation service, contain strict limits on the means by which a shipper releases its pipeline capacity to another potential shipper, which provisions include FERC's "shipper-must-have-title" rule. Violations by a shipper (i.e., a pipeline customer) of FERC's capacity release rules or shipper-must-have-title rule could subject a shipper to substantial penalties from FERC.

Gathering service, which occurs on pipeline facilities located upstream of FERC-jurisdictional interstate transportation services, is regulated by the states onshore and in state waters. Depending on changes in the function performed by particular pipeline facilities, FERC has in the past reclassified certain FERC-jurisdictional transportation facilities as non-jurisdictional gathering facilities, and FERC has reclassified certain non-jurisdictional gathering facilities as FERC-jurisdictional transportation facilities. Any such changes could result in an increase to Alta Mesa's costs of transporting gas to point-of-sale locations.

The pipelines used to gather and transport natural gas being produced by Alta Mesa are also subject to regulation by the U.S. Department of Transportation ("DOT") under the Natural Gas Pipeline Safety Act of 1968 (the "NGPSA"), as amended, the Pipeline Safety Act of 1992, as reauthorized and amended ("Pipeline Safety Act"), and the Pipeline Safety, Regulatory Certainty and Job Creation Act of 2011 ("2011 Pipeline Safety Act"). The PHMSA has established a risk-based approach to determine which gathering pipelines are subject to regulation and what safety standards regulated gathering pipelines must meet. In March 2016, the PHMSA issued a Notice of Proposed Rulemaking proposing to revise the Pipeline Safety Regulations applicable to the safety of onshore gas transmission and gathering pipelines, including both high consequence areas ("HCAs") and non-HCAs.

### Oil and Natural Gas Liquids Sales and Transportation

Sales of oil, condensate and natural gas liquids are not currently regulated and are made at negotiated prices. Nevertheless, Congress could reenact price controls in the future.

Alta Mesa's sales of oil and natural gas liquids are also affected by the availability, terms and costs of transportation. The rates, terms and conditions applicable to the interstate transportation of oil and natural gas liquids by pipelines are regulated by FERC, as common carriers, under the Interstate Commerce Act (the "ICA"). The FERC has implemented a simplified and generally applicable ratemaking methodology for interstate oil and natural gas liquids pipelines to fulfill the requirements of Title XVIII of the Energy Policy Act of 1992 comprised of an indexing system to establish ceilings on interstate oil and natural gas liquids pipeline rates. Intrastate oil pipeline transportation rates are subject to regulation by state regulatory commissions. The basis for intrastate oil pipeline regulation, and the degree of regulatory oversight and scrutiny given to intrastate oil pipeline rates, varies from state to state. Insofar as effective interstate and intrastate rates are equally applicable to all comparable shippers, Alta Mesa believes that the regulation of oil transportation rates will not affect its operations in any materially different way than such regulation will affect the operations of Alta Mesa's competitors.

Further, interstate and intrastate common carrier oil pipelines must provide service on a non-discriminatory basis. Under this open access standard, common carriers must offer service to all shippers requesting service on the same terms and under the same rates. When oil pipelines operate at full capacity, access is governed by prorationing provisions set forth in the pipelines' published tariffs. Accordingly, Alta Mesa believes that access to oil pipeline transportation services generally will be available to it to the same extent as to its competitors.

Any transportation of Alta Mesa's crude oil, natural gas liquids and purity components (ethane, propane, butane, iso-butane and natural gasoline) by rail is also subject to regulation by the DOT's PHMSA and the DOT's Federal Railroad Administration ("FRA") under the Hazardous Materials Regulations at 49 CFR Parts 171-180, including Emergency Orders by the FRA and new regulations being proposed by the PHMSA, arising due to the consequences of train accidents and the increase in the rail transportation of flammable liquids.

289

Table of Contents

In October 2015, the PHMSA issued proposed new safety regulations for hazardous liquid pipelines, including a requirement that all hazardous liquid pipelines have a system for detecting leaks and establish a timeline for inspections of affected pipelines following extreme weather events or natural disasters.

### State Regulation

Texas regulates the drilling for, and the production, gathering and sale of, oil and natural gas, including imposing severance taxes and requirements for obtaining drilling permits. Texas currently imposes a 4.6% severance tax on oil production and a 7.5% severance tax on natural gas production. States also regulate the method of developing new fields, the spacing and operation of wells and the prevention of waste of oil and natural gas resources. States may regulate rates of production and may establish maximum daily production allowables from oil and natural gas wells based on market demand or resource conservation, or both. States do not regulate wellhead prices or engage in other similar direct economic regulation, but Alta Mesa cannot assure you that they will not do so in the future. The effect of these regulations may be to limit the amount of oil and natural gas that may be produced from Alta Mesa's wells and to limit the number of wells or locations it can drill.

Oklahoma currently imposes on all new wells, both horizontal and vertical, drilled on or after July 1, 2015, a tax 2% of gross production for the first 36 months of production and then at 7% thereafter. There will still be different treatment for a limited number of wells defined as enhanced recovery projects, production enhancement projects, inactive wells and economically at-risk oil or gas leases. Horizontal wells drilled prior to July 1, 2015, will continue to be taxed at 1% for 48 months after production commences. Deep wells drilled prior to July 1, 2015, will continue to be taxed at 4% for 48 months, while most other wells drilled prior to July 1, 2015, will be taxed at 7% throughout their productive life. In response to a recent significant earthquake, federal and Oklahoma state regulators imposed limitations on disposal of produced water in two counties. On September 12, 2016, federal and state regulators expanded and modified those emergency orders limiting disposal activity in the two-county area. Multiple wells shut down immediately after the earthquake are being allowed to resume operations with volume limits.

Louisiana severance tax laws are more complex than those of other states. Different schedules of taxes are imposed based on the different hydrocarbons produced. The basic (and highest) rate for natural gas is $0.164 per Mcf for full rate wells. The basis (and highest) rate for oil is 12.5% of value for full rate oil and condensate. There is a severance tax exemption for oil and gas produced from horizontal wells. Last year, Louisiana imposed on operators of wells a security deposit requirement for plugging and abandonment obligations. Those who own between 11 and 99 wells pay a deposit of $250,000. The fee is $500,000 for every 100 wells. Owners of single wells pay by the depth. The deposit is $7 per foot for the first 3,000 feet with lower rates the deeper the well is drilled.

The petroleum industry is also subject to compliance with various other federal, state and local regulations and laws. Some of those laws relate to resource conservation and equal employment opportunity. Alta Mesa does not believe that compliance with these laws will have a material adverse effect on it.

### Other Regulation

In addition to the regulation of oil and natural gas pipeline transportation rates, the oil and natural gas industry generally is subject to compliance with various other federal, state and local regulations and laws. Some of those laws relate to occupational safety, resource conservation and equal employment opportunity.

**Table of Contents**

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF KINGFISHER

*The following discussion and analysis should be read in conjunction with the accompanying financial statements and related notes of Kingfisher included elsewhere in this proxy statement. The following discussion contains forward-looking statements that reflect Kingfisher's future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside Kingfisher's control. Kingfisher's actual results could differ materially from those discussed in these forward-looking statements. Please read "Risk Factors—Risks Related to the Kingfisher Business" and "Cautionary Statement Regarding Forward-Looking Statements." In light of these risks, uncertainties and assumptions, the forward-looking events discussed may not occur.*

#### Overview

Kingfisher is a Delaware limited liability company formed on January 30, 2015 by ARM Midstream, LLC, HPS and HMS Kingfisher Holdco, LLC for the purpose of acquiring, developing and operating midstream oil and gas assets. Kingfisher primarily focuses on providing crude oil gathering, gas gathering and processing and marketing to producers of natural gas, NGLs, crude oil and condensate in the STACK play. Kingfisher's midstream energy asset network includes approximately 308 miles of existing low and high pressure pipelines, a 60 MMcf/d cryogenic natural gas processing plant, 10 MMcf/d in offtake processing, compression facilities, crude storage, NGL storage and purchasing and marketing capabilities. Kingfisher, currently, has approximately 68 miles of pipeline, a 200 MMcf/d cryogenic processing plant and associated equipment under construction.

#### How Kingfisher Evaluates Its Operations

Kingfisher uses a variety of financial and operational metrics to assess the performance of its operations, including:

- Throughput volumes;

- Adjusted EBITDA; and

- Operating expenses.

#### *Sources of Kingfisher's Revenues*

Kingfisher's results are driven primarily by the volume of natural gas, oil, or NGL volumes gathered and processed under its commercial agreements and the fees assessed for such services. In order to limit its direct exposure to commodity price volatility, where possible, Kingfisher seeks to enter into multi-year, fee-based contracts. The volume of oil and natural gas that Kingfisher gathers or processes depends on the level of production from its customers in the areas serviced by its assets. Kingfisher's assets have been and continue to be constructed to serve the development of the STACK play in Oklahoma. The amount of drilling and completion activity will impact Kingfisher's aggregate gathering and processing volumes since the production rate of oil and natural gas wells decline over time. Producers' willingness to engage in new drilling is determined by a number of factors, the most important of which are the prevailing and projected prices of oil, natural gas and NGLs, the cost to drill and operate a well, the availability and cost of capital, and environmental and government regulations. Kingfisher generally expects the level of drilling to positively correlate with commodity prices. Similarly, production levels nationally and regionally tend to correlate positively with drilling activity. Kingfisher believes that its midstream system is positioned in a highly attractive geologic region that is currently one of the most active plays in terms of drilling and completion investment.

Under commercial arrangements, Kingfisher typically receives fees for the following natural gas gathering and processing services: gathering, processing, dehydration, compression, high pressure gas lift, low pressure gas lift, amine treating and amine processing. For crude oil gathering services, Kingfisher customarily receives fees for gathering and injection.

291

Table of Contents

Although certain of Kingfisher's current contracts are supported by acreage dedications, Kingfisher must obtain new supplies of oil and natural gas to increase or maintain the throughput volume on its systems. Kingfisher's ability to maintain or increase existing throughput volumes and obtain new supplies of oil and natural gas is impacted by, among other things, successful drilling activity within its area of operation; the number of new pad sites within its area of operation awaiting lateral connections; the operations of third parties' pipeline systems which connect and flow gas through interconnects with its system; its ability to compete for volumes from successful new wells in the area in which it operates that are not already dedicated to it; and its ability to attract and to gather oil and natural gas that has been released from producers' commitments to its competitors.

### Operating Expenses

*Cost of Sales and Operation Expenses.* Kingfisher's operating costs and expenses are directly associated with the operations of a particular asset. Among the most significant of these costs are those associated with direct labor and supervision, property insurance, property taxes, repair and maintenance expenses, marketing, contract services and utilities. These costs are normally stable across broad volume ranges and, therefore, do not normally increase or decrease significantly in the short term with increases or decreases in the volume of natural gas, liquids, crude oil and condensate moved through or by the asset.

*Depreciation.* Depreciation is the systematic expensing of the capitalized costs incurred to acquire and develop property, plant and equipment. Kingfisher uses the straight-line method for computing depreciation of its property, plant and equipment over certain specified useful lives. Thus, the costs of such assets are expensed in uniform increments over their specified useful lives.

*General and Administrative Expenses.* Kingfisher's most significant general and administrative ("G&A") expenses include the costs of employee compensation, professional fees and travel and entertainment expenses.

### Adjusted EBITDA

Kingfisher defines Adjusted EBITDA as net income (loss) before interest expense, income taxes, depreciation and amortization, acquisition and divestiture transaction expense and impairments. Kingfisher's management believes Adjusted EBITDA is useful because it allows them to more effectively evaluate its operating performance and compare the results of its operations from period to period and against its peers without regard to its financing methods or capital structure. Adjusted EBITDA should not be considered as an alternative to, or more meaningful than, net income (loss) as determined in accordance with GAAP or as an indicator of Kingfisher's operating performance or liquidity. Certain items excluded from Adjusted EBITDA are significant components in understanding and assessing a company's financial performance, such as a company's cost of capital and tax structure, as well as the historic costs of depreciable assets, none of which are components of Adjusted EBITDA. Kingfisher's presentation of Adjusted EBITDA should not be construed as an inference that its results will be unaffected by unusual or non-recurring items. Kingfisher's computations of Adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

### Factors and Trends Impacting Kingfisher's Business

Kingfisher expects to be affected by certain key factors and trends described below. These expectations are based on assumptions made by Kingfisher and information currently available to its management. To the extent any of Kingfisher's underlying assumptions about, or interpretations of, available information prove to be incorrect, its actual results may vary materially from its expected results. Please read "Risk Factors—Risks Related to the Kingfisher Business."

### Crude Oil and Natural Gas Supply and Demand

Kingfisher currently generates substantially all of its revenues under fee-based agreements with upstream customers located in the STACK play of Oklahoma. These contracts are expected to result in cash flow

292

Table of Contents

consistency and minimize Kingfisher's direct exposure to commodity price fluctuations, since it generally does not engage in the trading of crude oil or natural gas. Commodity price variances indirectly impact Kingfisher's activities and results of operations over the long term, since prices can influence production rates and investments by third parties in the development of new crude oil and natural gas reserves. However, the majority of Kingfisher's commercial agreements have certain mechanisms that may allow fees to be adjusted to provide cash flow stability if both parties agree to the adjustment. These adjustments are intended to produce cash flow stability. Generally, drilling and production activity will increase as crude oil and natural gas prices increase. The throughput volumes at Kingfisher's assets depend primarily on the volume of crude oil and natural gas produced by third parties in the STACK play. Third-party producers' margins depend on several factors, including the price of crude oil and natural gas, operational costs and flow assurance. Commodity prices can be volatile and influenced by numerous variables beyond upstream operators' control, including the domestic and global supply of crude oil and natural gas. Flow assurance is dependent upon adequate infrastructure to meet downstream market demands. The commodities markets as well as other supply and demand factors may also influence the selling prices of crude oil and natural gas. Further, Kingfisher's ability to execute its expansion strategy in the STACK play will depend on crude oil and natural gas regional production, which is also affected by the supply and demand for crude oil and natural gas.

### *Regulatory Compliance*

The regulation of crude oil and natural gas gathering and processing by federal and state regulatory agencies has a material impact on Kingfisher's business. Kingfisher's operations are also impacted by new regulations, which have increased the time that it takes to obtain required permits.

Additionally, increased regulation of crude oil and natural gas producers in Kingfisher's areas of operation, including regulation associated with hydraulic fracturing could reduce the regional supply of crude oil and natural gas and, therefore, throughput on its infrastructure assets. Specifically, hydraulic fracturing and injection well usage in the STACK play could be impacted due to an increased amount of seismicity in recent years.

### Factors Affecting the Comparability of Future Financial Data of Silver Run Attributable to Kingfisher to the Historical Financial Results of Kingfisher's Operations

The future results of Silver Run's operations attributable to Kingfisher may not be comparable to the historical results of operations of Kingfisher for the periods presented due to the following reasons:

*Construction of Assets.* From inception to date, Kingfisher has been in the process of constructing its assets. In the first half of 2016, Kingfisher completed Phase I of its greenfield midstream infrastructure complex, which included a 60 MMcf/d cryogenic processing plant, approximately 212 miles of crude oil and natural gas gathering pipelines and a 50,000 Bbl crude oil terminal. As part of Kingfisher's Phase II development, it has constructed an additional 96 miles of pipeline and entered into a gas processing agreement with a third party that is expected to provide an incremental 80 MMcf/d of initial processing capacity. Kingfisher continues construction on its Phase II expansion project, which includes a 200 MMcf/d cryogenic processing plant expansion and additional gas gathering pipelines currently totaling 68 miles. Kingfisher expects the Phase II expansion to be completed in the first quarter of 2018.

*Operation of Assets.* Since commissioning the 60 MMcf/d cryogenic processing plant in May 2015, Kingfisher believes that the plant has operated at an efficient rate, with only standard down-time for maintenance and repairs. However, Kingfisher is subject to operational issues caused by off-specification natural gas transported to its cryogenic processing plant. Kingfisher may also be subject to inaccurate measurements provided by third party-producers, which could impact its operational and financial results.

*Throughput of Volumes.* Despite the attractive STACK producer economics, Kingfisher cannot guarantee volume throughput, and its existing commercial arrangements with producers do not provide volume

293

Table of Contents

commitments. Kingfisher believes the acreage dedications are an attractive alternative to volume commitments, due to the contiguous acreage footprint of a portion of its customers. Further, Kingfisher's customers generally have access to fixed transportation, which provides hydrocarbon flow assurance.

*Offtake Agreements.* Kingfisher may at times elect to enter into agreements that provide optionality to process Kingfisher customers' natural gas. In making these decisions, Kingfisher evaluates the quantitative and qualitative benefits of executing offtake agreements with third parties compared to the construction of additional processing capacity. Kingfisher cannot control the operation of a third-party processing plant; however, it can mitigate operational and performance risk of the third party through contractual arrangements providing for gas quality, pressure and plant product allocation specifications.

*Income Taxes.* Silver Run is a C-Corp under the Code, and, as a result, is subject to U.S. federal, state and local income taxes. Although Kingfisher is subject to franchise tax in the State of Delaware (at less than 1% of modified pre-tax earnings), as a limited liability company, it generally passes through its taxable income to its members for other income tax purposes and is not subject to U.S. federal income taxes or other state or local income taxes. Accordingly, the historical financial data of Kingfisher contains no provision for U.S. federal income taxes or income taxes in any state or locality other than franchise tax in the State of Delaware. Upon consummation of the business combination, the financial data of Kingfisher may be affected because Silver Run is subject to federal income taxes at a statutory rate of 35% of pretax earnings.

*Public Company Expenses.* Silver Run incurs, and will continue after consummation of the business combination to incur, direct, incremental G&A expense as a result of being a publicly traded company, including, but not limited to, costs associated with hiring new personnel, implementation of compensation programs that are competitive with Kingfisher's public company peer group, annual and quarterly reports to stockholders, tax return preparation, independent auditor fees, investor relations activities, registrar and transfer agent fees, incremental director and officer liability insurance costs and independent director compensation. These direct, incremental G&A expenses are not included in Kingfisher's historical financial results of operations.

294

Table of Contents

*Nine Months Ended September 30, 2017 Compared to Nine Months Ended September 30, 2016*

The following table presents selected financial data for each of the nine months ended September 30, 2017 and 2016:

|  | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
| *In thousands, except operating data* | 2017 | 2016 | Change |
| Operating Revenues: | | | |
| Natural gas, NGLs and condensate revenue | $62,429 | $ — | $62,429 |
| Gathering, processing, compression and other fee revenue | 29,044 | 6,367 | 22,677 |
| Total operating revenues | 91,473 | 6,367 | 85,106 |
| Operating Expenses: | | | |
| Cost of natural gas and NGLs | 64,539 | 1,907 | 62,632 |
| Operation and maintenance | 4,532 | 1,722 | 2,810 |
| General and administrative | 5,509 | 2,059 | 3,450 |
| Depreciation and amortization | 6,893 | 2,200 | 4,693 |
| Total operating expenses | 81,473 | 7,888 | 73,585 |
| Operating income (loss) | 10,000 | (1,521) | 11,521 |
| Interest expense | 133 | — | 133 |
| Net income (loss) | $ 9,867 | $(1,521) | $11,389 |
| Operating data: | | | |
| Average throughput volumes of natural gas (MMcf/d) | 56 | 11 | 45 |
| Average volume of processed gas (MMcf/d) | 51 | 9 | 42 |
| Average throughput volumes of crude oil (Bbls/d) | 1,271 | 0 | 1,271 |

**Revenues**

Natural gas, NGLs and condensate revenue increased by $62.4 million to $62.4 million for the nine months ended September 30, 2017, as compared to $0 for the nine months ended September 30, 2016. This increase was primarily attributed to: (i) the continued operation of the gathering and processing system resulting in increased throughput of volumes and (ii) contractual amendment resulting in Kingfisher purchasing and selling hydrocarbons and products, rather than solely charging rates for midstream services. Further, the increase in Panhandle natural gas prices supported the growth in revenues for the nine months ended September 30, 2017 compared to the nine months ended September 30, 2016.

Gathering, processing and other fee revenue is based on contractual arrangements and generates revenue for the following services: crude gathering; compression; dehydration; capital recovery; gas gathering; NGL transportation; other fees; processing; and gas transportation. Gathering, processing and other fee revenue increased by approximately $22.7 million to $29.0 million for the nine months ended September 30, 2017, as compared to $6.4 million for the nine months ended September 30, 2016. This increase reflects the throughput volume growth in gathering and processing natural gas and gathering crude oil derived from the expansion of existing contractual acreage dedications and incremental acreage dedications and resource allocations. In addition, Kingfisher reviewed contractual throughput specifications resulting in incremental revenue due to off-specification volumes from customers.

**Cost of Natural Gas and NGLs**

Cost of natural gas and NGLs is primarily comprised of the cost of natural gas, NGLs and condensate purchased. In addition, trucking fees, transportation fees and deficiency fees are included in this line-item. In circumstances where Kingfisher elects to utilize offtake agreements, it may incur gathering, compression, processing and off-specification fees.

295

Table of Contents

Cost of natural gas and NGLs increased by $62.6 million to $64.6 million for the nine months ended September 30, 2017, as compared to $1.9 million for the nine months ended September 30, 2016. This increase was primarily attributed to increases in natural gas, NGLs and condensate volumes purchased and higher natural gas prices.

**Operation and Maintenance Expense**

Operation and maintenance expense is comprised of a variety of costs, but may include the following: plant personnel wages; automotive; chemicals; compressor repairs and maintenance; contract services; electricity; field measurement and instruments; equipment rental; freight; lubricants; leases; utilities; and waste disposal.

Operation and maintenance expense increased by $2.8 million to $4.5 million for the nine months ended September 30, 2017, as compared to $1.7 million for the nine months ended September 30, 2016. This increase was driven by compressor repairs and maintenance, plant wages and chemicals increasing by $1.8 million, $0.4 million and $0.3 million, respectively. Additionally, electrical expenses and plant repair and maintenance increased by $0.4 million compared to the nine months ended September 30, 2016. These increased costs were partially offset by lower insurance and utilities expenses.

**General and Administrative Expense**

General and administrative expense increased by $3.5 million to $5.5 million for the nine months ended September 30, 2017, as compared to $2.1 million for the nine months ended September 30, 2016. Increased general and administrative expense was derived from an increase of: (i) $1.5 million in corporate wages; (ii) $0.4 million in professional fees comprised of recruiting, legal and accounting expenses; (iii) $1.2 million in taxes comprised primarily of ad valorem and sales tax; (iv) $0.3 million in insurance expenses; and (v) $0.1 million in corporate expenses. The increased general and administrative expense was partially offset by a $0.1 million decrease in travel and entertainment costs compared to the nine months ended September 30, 2016.

**Depreciation and Amortization Expense**

Depreciation and amortization expense increased by $4.7 million to $6.9 million for the nine months ended September 30, 2017, as compared to $2.2 million for the nine months ended September 30, 2016. This increase was primarily the result of placing certain assets into service as the gathering and processing system was expanded. Assets completed and placed into service include pipeline, field compression and various equipment associated with the plant site. The net increase in net property plant and equipment from September 30, 2016 to September 30, 2017 totaled $63.1 million.

296

Table of Contents

**RESULTS OF OPERATIONS**

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

The following table presents selected financial data for each of the years ended December 31, 2016 and 2015.

| *In thousands, except operating data* | Year Ended December 31, | | Change |
|---|---|---|---|
| | **2016** | **2015** | **Change** |
| Operating Revenues: | | | |
| Natural gas, NGLs and condensate revenue | $      615 | $     — | $      615 |
| Gathering, processing, compression and other fee revenue | 14,563 | — | 14,563 |
| Total operating revenues | 15,178 | — | 15,178 |
| Operating Expenses: | | | |
| Cost of natural gas and NGLs | 4,014 | — | 4,014 |
| Operation and maintenance | 3,417 | — | 3,417 |
| General and administrative | 3,778 | 1,437 | 2,341 |
| Depreciation and amortization | 3,752 | — | 3,752 |
| Total operating expenses | 14,961 | 1,437 | 13,524 |
| Operating income (loss) | 217 | (1,437) | 1,654 |
| Net income (loss) before income tax expense | 217 | (1,437) | 1,654 |
| Net income (loss) | $   217 | $(1,437) | $ 1,654 |
| Operating data: | | | |
| Average throughput volumes of natural gas (MMcf/d) | 17 | 0 | 17 |
| Average volume of processed gas (MMcf/d) | 15 | 0 | 15 |
| Average throughput volumes of crude oil (Bbls/d) | 12 | 0 | 12 |

**Revenues**

Natural gas, NGLs and condensate revenue increased by $0.6 million to $0.6 million for the year ended December 31, 2016, as compared to $0 for the year ended December 31, 2015. This increase was attributed to the initial operation of the gathering and processing system resulting in increased throughput of volumes.

Gathering, processing and other fee revenue increased by $14.6 million to $14.6 million for the year ended December 31, 2016, as compared to $0 for the year ended December 31, 2015. This increase reflects the initial throughput volume growth in gathering and processing natural gas and gathering crude oil derived from initial and expanded contractual acreage dedications and resource allocations.

**Cost of Natural Gas and NGLs**

Cost of natural gas and NGLs increased by $4.0 million to $4.0 million for the year ended December 31, 2016, as compared to $0 for the year ended December 31, 2015. This increase was attributed to commencement of operations.

**Operation and Maintenance Expense**

Operation and maintenance expense increased by $3.4 million to $3.4 million for the year ended December 31, 2016, as compared to $0 for the year ended December 31, 2015. This increase reflects (i) a $2.1 million increase in compression and plant repairs and maintenance, associated contract field services, and insurance costs and (ii) a $1.0 million increase in plant personnel wages.

297

Table of Contents

**General and Administrative Expense**

G&A expense increased by approximately $2.3 million to $3.8 million for the year ended December 31, 2016, as compared to $1.4 million for the year ended December 31, 2015. This increase was related to: (i) $1.3 million increase in personnel costs; (ii) $0.3 million increase in professional fees, comprised of recruiting, legal and accounting expenses; (iii) $0.3 million increase in travel and entertainment costs; and (iv) $0.2 million increase in property taxes.

**Depreciation and Amortization Expense**

Depreciation and amortization expense increased $3.8 million to $3.8 million for the year ended December 31, 2016, as compared to $0 for the year ended December 31, 2015. This increase was the result of placing certain assets into service. Assets completed and placed into service include pipeline, field compression and various equipment associated with the plant site. The increase in property plant and equipment from December 31, 2015 to December 31, 2016 totaled $126.9 million, of which $96.3 million was placed in to service in 2016.

**Liquidity and Capital Resources**

*Overview*

Kingfisher's development and acquisition activities require it to make significant operating and capital expenditures. Historically, Kingfisher's primary sources of liquidity have been capital contributions from its members and cash flows from operations. To date, Kingfisher's primary use of capital has been for developing and operating its assets. Kingfisher's ongoing sources of liquidity will be comprised of cash on hand, cash generated from operations and availability under the Kingfisher credit facility. These sources of liquidity are expected to be adequate to meet Kingfisher's operating needs and its planned short-term capital and debt service requirements. Kingfisher believes that future internal growth projects or potential acquisitions will be funded primarily through borrowings under its revolving credit facility or through issuances of debt and equity securities.

*Capital Requirements*

The amount and allocation of Kingfisher's future capital expenditures will depend upon a number of factors, including Kingfisher's cash flows from operating, investing and financing activities, the progression and completion of the construction of its assets, the number and size of acquisition opportunities and its ability to execute on its business strategy. Kingfisher periodically reviews its capital expenditure budget to assess changes in current and projected cash flows, debt requirements, and other factors. If Kingfisher is unable to obtain funds when needed or on acceptable terms, Kingfisher may not be able to finance the capital expenditures necessary to maintain its business as currently conducted.

Kingfisher's 2017 capital budget for costs associated with acquiring, developing and operating its assets is approximately $124.7 million. As of September 30, 2017, Kingfisher incurred capital costs of approximately $58.2 million.

*Credit Facility*

Kingfisher entered into a new $200 million revolving credit facility with a syndicate of lenders on August 8, 2017. The facility has a four year term. ABN AMRO Capital USA LLC is acting as administrative agent, initial letter of credit issuer, sole bookrunner and sole lead arranger. The credit facility includes a letter of credit sublimit of $20 million for the issuance of letters of credit. Kingfisher has the option to increase its borrowing capacity under its revolving credit facility by an amount not to exceed $50 million (for a total commitment of $250 million) subject to certain conditions including (a) a certification from Kingfisher that the representations

298

Table of Contents

and warranties contained in the credit agreement and the other loan documents are true and correct, (b) that no event of default exists, and (c) obtaining the requisite commitments from existing or new lenders. Kingfisher's revolving credit facility will be available to fund capital expenditures, working capital, general corporate purposes and to finance approved acquisitions. As of November 20, 2017, Kingfisher had $30.0 million in debt outstanding, with $54.6 million of availability.

Borrowings under the revolving credit facility will bear interest at a rate equal to an applicable margin plus, at Kingfisher's option, either an adjusted base rate or an adjusted Eurodollar rate. In the case of adjusted base rate borrowings, the revolving credit facility will bear interest at a rate equal to the highest of (a) the per annum rate of interest established by J.P. Morgan Chase Bank, N.A. (or any successor) as its prime rate or base rate for U.S. dollar loans, (b) the adjusted Eurodollar rate for a one month interest period plus 1.00%, or (c) the federal funds rate, plus 0.50% per annum. Adjusted Eurodollar rates track the reserve requirements and are determined by the administrative agent to be equal to dividing (a) the Eurodollar rate for such Eurodollar loan for such interest period by (b) 1 minus the reserve requirement for any Eurodollar loan for such interest period. In the case of Eurodollar loans, the revolving credit facility will bear interest equal to the ICE Benchmark Administration LIBOR Rate ("ICE LIBOR") as published by Reuters at approximately 11:00 a.m., London time, determined two business days prior to the commencement of the interest period for such Eurodollar loan, for Eurodollar deposits being delivered in the London interbank market for a term equivalent to the interest period selected and commencing that day; provided that the ICE LIBOR has a floor of 0.0%.

The applicable margins are dependent upon Kingfisher's leverage ratio, with the highest margins for Eurodollar loans and base rate loans being 3.25% and 2.25%, respectively. The revolving credit facility is subject to commitment fees ranging from 0.50% to 0.375% based on the leverage grid.

The revolving credit facility is subject to customary affirmative and negative covenants and events of default relating to Kingfisher. These covenants, include, among other things, limitations on incurrence of indebtedness and liens, the making of investments, the sale of assets, transactions with affiliates, merging or consolidation with another company and the making of restricted payments. The change of control provision is such that a default under the revolving credit facility will occur if (a) the equity owners cease to own 75% of the equity of Kingfisher or (b) Kingfisher is no longer controlled by the equity owners. Dividends and distributions are permitted for certain items so long as (1) no event of default has occurred and is continuing or would occur as a result of such dividend or distribution; (2) leverage ratio is below a certain threshold; and (3) availability of at least $5.0 million under the revolving credit facility.

The revolving credit facility requires Kingfisher to comply with certain financial covenants including (a) consolidated leverage ratio as of the end of each fiscal quarter (1) prior to the date that consolidated EBITDA for four fiscal quarters exceeds $75 million, of less than or equal to 4.50 to 1.00, and (2) on or after the date that the consolidated EBITDA exceeds $75 million, of less than or equal to 4.75 to 1.00, and (b) a consolidated interest coverage ratio of greater than 2.50 to 1.00 as of the end of each fiscal quarter.

Kingfisher intends to amend its revolving credit facility in connection with the Closing to, among other things, permit the business combination.

### *Working Capital*

Kingfisher's working capital, which it defines as current assets minus current liabilities, totaled $17.6 million at September 30, 2017. At December 31, 2016, it had working capital of $35.0 million, and at December 31, 2015, it had working capital of $57.0 million. Kingfisher's collection of receivables has historically been timely, and losses associated with uncollectible receivables have historically not been significant. Kingfisher's cash and cash equivalents balance totaled $11.7 million, $41.0 million and $60.4 million at September 30, 2017, December 31, 2016 and December 31, 2015, respectively.

299

Table of Contents

Kingfisher's working capital requirements have been primarily driven by the changes in accounts payable and other current liabilities related to the construction of its assets and affiliated accounts payable related to services provided by ARM, under the Operator Agreement. Kingfisher expects that its working capital requirements will continue to be driven by these changes along with future changes in accounts receivable and accounts payable, which include the timing of collections from customers and payments to suppliers, as well as the level of spending for maintenance and expansion capital expenditures when its assets become operational. A material adverse change in operations or available financing under the Kingfisher credit facility could impact Kingfisher's ability to fund its requirements for liquidity and capital resources.

## Cash Flows

The following table summarizes Kingfisher's cash flows for the periods indicated:

| (dollars in thousands) | Nine Months Ended September 30, | | Year Ended December 31, 2016 | Period from January 30, 2015 (Inception) through December 31, 2015 |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | | |
| | (Unaudited) | | | |
| Net cash provided by (used in) operating activities | $ 6,786 | $ (6,632) | $ (634) | $ (1,116) |
| Net cash (used in) investing activities | (60,416) | (92,679) | (123,460) | (46,858) |
| Net cash provided from financing activities | 24,365 | 67,567 | 104,650 | 108,404 |

### Analysis of Cash Flow Changes Between the Nine Months Ended September 30, 2017 and 2016

*Operating Activities.* In the first nine months of 2017, net cash provided by operating activities was approximately $6.8 million, compared to net cash used in operating activities of approximately $(6.6) million in the first nine months of 2016. The increase in net cash provided by operating activities for the first nine months of 2017 compared to the first nine months of 2016 was primarily due to increased earnings and non-cash depreciation expense resulting from increased natural gas throughput volumes and assets placed in service.

*Investing Activities.* In the first nine months of 2017, net cash used in investing activities included approximately $60.4 million attributable to construction work in progress and accounts receivable from affiliate of approximately $57.9 million and $2.0 million, respectively. The increase in construction work in progress comprised of low and high pressure pipelines, compression, and associated equipment. The accounts receivable from affiliate is comprised of transaction-related expenses incurred by KFM Holdco, LLC, the Kingfisher Contributor. In the first nine months of 2016, net cash used in investing activities included approximately $92.5 million attributable to construction work in progress comprised of natural gas and crude oil low and high pressure pipelines, 50,000 Bbl crude oil storage terminal and LACT units.

*Financing Activities.* Net cash provided from financing activities in the first nine months of 2017 totaled approximately $24.4 million. Financing activities were comprised of $3.2 million in deferred loan costs and $17.9 million in distributions. These outflows were offset by $45.0 million in equity contributions. Net cash provided from financing activities in the first nine months of 2016 totaled approximately $67.6 million.

### Analysis of Cash Flow Changes Between the Year Ended December 31, 2016 and the Period from January 31, 2015 through December 31, 2015

*Operating Activities.* In 2016, net cash used in operating activities was approximately $0.6 million, compared to net cash used in operating activities of approximately $1.1 million during the period from January 30, 2015 (inception) through December 31, 2015. The increase in net cash used in operating activities was primarily due to increased earnings and depreciation expense, which increased cash flows from operating activities by approximately $0.5 million. The increased earnings for the period was offset by negative changes in working capital.

300

Table of Contents

*Investing Activities.* In 2016, net cash used in investing activities included approximately $123.5 million attributable to construction and completion of the 60 MMcf/d cryogenic processing facility, NGLs bullet tanks, low pressure and high pressure pipelines, interconnects, acquisition of rights of way ("ROW"), compression and gathering equipment. During the period from January 30, 2015 (inception) through December 31, 2015, net cash used in investing activities included approximately $46.8 million primarily attributable to the acquisition of land, progress payments for the 60 MMcf/d cryogenic processing plant, acquisition of ROW and low and high pressure pipelines.

*Financing Activities.* Net cash provided from financing activities in 2016 included approximately $104.7 million of contributions from Kingfisher's members, compared to approximately $108.4 million during the period from January 30, 2015 (inception) through December 31, 2015.

## Contractual Obligations

A summary of Kingfisher's contractual obligations as of December 31, 2016 is provided in the following table.

| (dollars in thousands) | Payments Due by Period For the Year Ending December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2020 | 2021 | Thereafter | Total |
| Transportation contracts | $8,318 | $10,972 | $9,861 | $7,444 | $7,424 | $ 91,736 | $ 135,755 |
| Total | $8,318 | $10,972 | $9,861 | $7,444 | $7,424 | $ 91,736 | $ 135,755 |

## Quantitative and Qualitative Disclosure About Market Risk

Kingfisher is exposed to various market risks, including the effects of adverse changes in commodity prices, interest rate risk and credit risk as described below.

### Commodity Price Risk

Substantially all of Kingfisher's current commercial contracts are fee-based, with no direct commodity price exposure to oil, natural gas or NGLs. However, Kingfisher is exposed to adverse changes in commodity prices as a result of its percent-of-proceeds contracts. Under these contracts, Kingfisher receives a fee as a portion of the proceeds of the sale of natural gas. Therefore, Kingfisher's margins from these contracts are greater during periods of high natural gas prices. Kingfisher's margins from gathering and processing cannot become negative under percent-of-proceeds contracts, but do decline during periods of low natural gas prices. In addition, Kingfisher is indirectly exposed to adverse changes in commodity prices through its customers' economic decisions to develop and produce oil and natural gas from which it receives revenues for providing gathering and processing services.

### Interest Rate Risk

Kingfisher may or may not hedge the interest on portions of its borrowings under the Kingfisher credit facility from time-to-time in order to manage risks associated with floating interest rates.

### Credit Risk

Kingfisher is subject to risks of loss resulting from nonpayment or nonperformance by, or the insolvency or liquidation of, Kingfisher's customers. Any increase in the nonpayment and nonperformance by, or the insolvency or liquidation of, Kingfisher's customers could adversely affect its results of operations.

## Critical Accounting Policies and Estimates

The preparation of Kingfisher's financial statements in conformity with GAAP requires Kingfisher's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and

301

Table of Contents

disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from the estimates that are used.

*Cash and Cash Equivalents*

Investments in highly-liquid securities with original maturities of three months or less are considered to be cash equivalents. As of and during the years ended December 31, 2016 and 2015, Kingfisher maintained cash deposits with financial institutions in excess of the federally insured limits. Kingfisher believes the credit risk in these deposits is minimal.

*Accounts Receivable*

Accounts receivable represent valid claims against customers for services rendered. Kingfisher's management evaluates the adequacy of the allowance for doubtful accounts based on a periodic review of individual accounts. The primary factors considered in determining the amount of the allowance are collection history, the aging of the accounts, and other specific information known to Kingfisher's management that may affect collectability. As of December 31, 2016 and 2015, Kingfisher's management has determined that no allowance for doubtful accounts is necessary.

*Revenue Recognition*

Revenues are primarily generated by charging fees on a per unit basis for gathering crude oil and natural gas and processing natural gas. Kingfisher recognizes revenue when services have been rendered, the prices are fixed or determinable and collectability is reasonably assured. In addition, revenue from sales of crude oil, natural gas and NGLs is recognized when title passes to the customer, which is when risk of ownership passes to the customer and physical delivery occurs, the price of the product is fixed or determinable and collectability is reasonably assured.

*Income Taxes*

As a limited liability company, Kingfisher is not liable for federal income taxes. Income and losses of Kingfisher are reported in the income tax return of each member. Accordingly, there is no provision for federal income taxes in the financial statements of Kingfisher included elsewhere in this proxy statement. Kingfisher follows the provisions of the *Income Taxes Topic* of the FASB ASC related to uncertain tax positions. Kingfisher recognized no liability for unrecognized tax benefits and has no tax position at December 31, 2016 and 2015, for which the ultimate deductibility is highly certain, but for which there is uncertainty about the timing of such deductibility. Kingfisher recognizes interest and penalties related to uncertain tax positions in the statement of operations as interest expense and G&A expense, respectively. Kingfisher is open to audit under the statute of limitations from the date of inception January 30, 2015 and beyond.

*Property and Equipment*

Property, plant and equipment are recorded at cost, including improvements that substantially add to the productive capacity or extend the useful life of the related asset, less accumulated depreciation. Maintenance, repairs and minor renewals are expensed as incurred. During 2016, portions of Kingfisher's natural gas and crude gathering system and processing plant were placed in service as completed and operational. Depreciation is computed using the straight-line method over the following useful lives:

- Vehicles: 5 years

- Property, plant and equipment: 3-20 years

302

Table of Contents

*Asset Retirement Obligations*

Kingfisher records a liability for asset retirement obligations in the period the obligation is incurred and when management can make a reasonable estimate of the fair value of the obligation. If a reasonable estimate cannot be made at the time the liability is incurred, Kingfisher records the liability when sufficient information is available to estimate the fair value. Kingfisher has legal obligations in the form of right-of-way agreements, which require Kingfisher to remove certain assets upon termination of the agreements. However, Kingfisher intends to extend indefinitely these right-of-way agreements that include asset retirement obligations. As of December 31, 2016 and 2015, Kingfisher did not have assets that were legally restricted for purposes of settling asset retirement obligations.

*Organizational Expense*

Kingfisher expenses organizational and start-up costs as incurred.

**Recent Accounting Pronouncements**

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers.* The update provides guidance concerning the recognition, measurement and disclosure of revenue from contracts with customers. Its objective is to increase the usefulness of information in the financial statements regarding the nature, timing and uncertainty of revenues. ASU 2014-09 is effective for annual and interim periods beginning after December 15, 2016. The standard is required to be adopted using either the full retrospective approach, with all prior periods presented adjusted, or the modified retrospective approach, with a cumulative adjustment to retained earnings on the opening balance sheet. In August 2015, the FASB issued ASU No. 2015-14. ASU 2015-14 deferred the effective date of the new revenue standard by one year, making it effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Kingfisher has not yet selected a transition method and is currently assessing the impact on the consolidated financial statements. Kingfisher is continuing to evaluate the provisions of this ASU as it relates to certain sales contracts and in particular as it relates to disclosure requirements.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842),* which supersedes ASC 840 "Leases" and creates a new topic, ASC 842 "Leases." The amendments in this update require, among other things, that lessees recognize the following for all leases (with the exception of short-term leases) at the commencement date: (1) a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and (2) a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. Lessees and lessors must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements. The amendments are effective for interim and annual reporting periods beginning after December 15, 2018. Kingfisher does not plan to adopt the standard early. Kingfisher continues to evaluate the impacts of the amendments to its financial statements and accounting practices for leases.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments*, which is intended to reduce diversity in practice in how certain transactions are classified in the statements of cash flows. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017, including interim periods within those years. The adoption of this guidance will not impact Kingfisher's financial position or results of operations but could result in presentation changes on its consolidated statements of cash flows.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows: Restricted Cash*, which requires an entity to explain the changes in the total of cash, cash equivalents, restricted cash, and restricted cash equivalents on the statements of cash flows and to provide a reconciliation of the totals in that statement to the related captions in the balance sheet when the cash, cash equivalents, restricted cash, and restricted cash

303

**Table of Contents**

equivalents are presented in more than one line item on the balance sheet. This ASU is effective for annual and interim periods beginning after December 15, 2017, and is required to be adopted using a retrospective approach, with early adoption permitted. The adoption of this guidance will not impact Kingfisher's financial position or results of operations but could result in presentation changes on its consolidated statements of cash flows.

**Internal Controls and Procedures**

Kingfisher is not currently required to comply with the SEC's rules implementing Section 404 of the Sarbanes Oxley Act of 2002, and is, therefore, not required to make a formal assessment of the effectiveness of its internal control over financial reporting for that purpose.

**Inflation**

Inflation in the United States has been relatively low in recent years in the economy as a whole. The midstream natural gas industry's labor and material costs remained relatively unchanged in 2015 and 2016. Although the impact of inflation has been insignificant in recent years, it is still a factor in the United States economy and may increase the cost to acquire or replace property, plant and equipment and may increase the costs of labor and supplies. To the extent permitted by competition, regulation and Kingfisher's existing agreements, Kingfisher has and will continue to pass along increased costs to Kingfisher's customers in the form of higher fees.

**Off-Balance Sheet Arrangements**

Kingfisher's off-balance sheet arrangements are primarily comprised of contingent obligations. See "—Contractual Obligations" above. Beyond contingent obligations, at times, Kingfisher may become aware of certain adequate assurance requirements as it relates to third parties. Currently, Kingfisher is contracted to provide a letter of credit or prepayment for the benefit of ONEOK Partners, LP ("OGT") in the amount of approximately $8.2 million due on October 3, 2017. The letter of credit or prepayment will serve as credit support for the OGT fixed transportation capacity contracted by Kingfisher. OGT will reassess the credit support requirement of Kingfisher on at least an annual basis.

**Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Kingfisher had no changes in, and no disagreements with, its accountants on accounting and financial disclosure.

304

Table of Contents

## BUSINESS OF KINGFISHER

### Overview

Kingfisher is a Delaware limited liability company formed on January 30, 2015 by ARM Midstream, LLC, HPS and HMS Kingfisher Holdco, LLC for the purpose of acquiring, developing and operating midstream oil and gas assets. Kingfisher primarily focuses on providing crude oil gathering, gas gathering and processing and marketing to producers of natural gas, NGLs, crude oil and condensate in the STACK play. Kingfisher's midstream energy asset network includes approximately 308 miles of existing low and high pressure pipelines, a 60 MMcf/d cryogenic natural gas processing plant, 10 MMcf/d in offtake processing, compression facilities, crude storage, NGL storage and purchasing and marketing capabilities.

Kingfisher believes that this high quality gathering and processing system is strategically positioned for growth in the highly active STACK play, which is expected to face takeaway constraints as a consequence of increased drilling activity and improving well results. The STACK play is one of the most prolific resource basins in North America, with economic wells and continued activity despite the continuity of lower crude oil and natural gas prices.

### Recent Developments

Kingfisher entered into a gas processing agreement (the "offtake agreement") with a third-party operator for 120,000 MMBtu/d into Panhandle Eastern Pipeline Company, LP's ("PEPL") pipeline system. The offtake agreement is expected to result in 80 MMcf/d of rich natural gas priority processing capacity, post-blending. The third-party operator's 1.3 Bcf/d natural gas processing complex is located in the state of Kansas. The offtake agreement will provide (i) optionality for processing natural gas throughput volumes and (ii) Kingfisher ownership and control of an interconnect into PEPL's pipeline system.

The primary term of the offtake agreement is four years, with an option to extend for two years after the primary term. Thereafter, in the secondary term of the offtake agreement, Kingfisher has the right to renew the agreement annually.

### Kingfisher's Assets

Kingfisher's Phase I assets include a natural gas cryogenic processing plant with a current processing capacity of 60 MMcf/d and 1,200 Bbl/d condensate stabilizer. Phase I includes approximately 160 miles of low-pressure crude oil and natural gas gathering pipelines, approximately 50 miles of high pressure natural gas gathering pipelines, 15,000 horsepower of field compression and 4,000 horsepower of natural gas residue compression. Additionally, Kingfisher has fixed transportation capacity on natural gas pipelines operated by PEPL, ONEOK Gas Transportation, LLC ("ONEOK") and Superior Pipeline Company, LLC ("Superior"). Kingfisher also has fixed transportation capacity on a NGL pipeline operated by Chisholm Pipeline Company ("Chisholm") and owned by Phillips 66. Kingfisher's other assets include a 50,000 Bbl crude storage terminal with six truck loading LACTS, three NGL bullet tanks with 90,000 gallon capacity per tank and producer connections with 54 central delivery point receipt connections serving 188 units.

Kingfisher's Phase II assets include a second natural gas cryogenic processing facility, which will be located adjacent to its existing 60 MMcf/d cryogenic processing facility, with a processing capacity of 200 MMcf/d. Phase II includes approximately 96 miles of low and high-pressure pipelines primarily for natural gas gathering and transportation, 20,000 horsepower of field compression and 12,500 horsepower of natural gas residue compression. Kingfisher plans to contract for additional fixed transportation capacity on ONEOK's pipeline. Additionally, Kingfisher will install equipment for rich gas blending purposes related to the offtake capacity estimated to be 80 MMcf/d, post-blending.

305

Table of Contents

### Kingfisher's Area of Operation

Kingfisher's existing midstream infrastructure and facilities are located in Kingfisher County, Oklahoma and Garfield County, Oklahoma in the STACK play. The system was initially designed to primarily serve Alta Mesa and overlays Alta Mesa's contiguous acreage position in the up-dip oil window of the STACK play, located in Kingfisher County, Oklahoma. Kingfisher's existing infrastructure has been developed to provide crude oil gathering, natural gas gathering and processing and strategic residue takeaway optionality for third-party producers. Kingfisher has contracted long term (10-15 year) acreage dedications and wellbore commitments from six customers.

The STACK play has seen consistent growth in horizontal drilling activity over the past several years. The Anadarko basin is a prolific producer of both petroleum and natural gas. While the Devonian—Mississippian-age Woodford Shale is the most well-known source rock in the basin, other potential source rocks include the Ordovician (Simpson Group shales), Mississippian (Meramec and Springer shales), and thick, dark Pennsylvanian shales. The STACK play targets the liquids-rich, Upper Devonian-age Woodford formation. The STACK play also targets the overlying, Mississippian-age Meramec and Osage Group and underlying Hunton. The most prominent formations are the Meramec, Osage and Woodford.

Currently, Kingfisher is in the process of expanding its infrastructure to Major County, Oklahoma and Blaine County, Oklahoma. The crude oil and natural gas reservoir development of the STACK play has progressed westward, and Kingfisher expects to compete in the region for third-party volumes. Kingfisher believes that its ability to provide flow assurance through its firm residue takeaway contracts on PEPL and OGT should provide Kingfisher with a competitive advantage.

### Kingfisher's Relationship with Alta Mesa

Kingfisher has contracted to provide crude oil gathering and natural gas gathering and processing, pursuant to the acreage dedications provided by Alta Mesa. Alta Mesa's acreage dedication comprises the following Oklahoma counties: Blaine, Canadian, Garfield, Kingfisher and Logan. Further, Kingfisher anticipates that Alta Mesa will provide it with unencumbered acreage dedications derived from Alta Mesa's recently acquired Major County, Oklahoma acreage. Currently, Alta Mesa has approximately 120,000 highly contiguous acres, providing 4,200 primary drilling locations. The crude oil gathering agreement by and between Kingfisher and Alta Mesa provides for a gathering fee of $1.25 per Bbl of received crude oil for a one year period. Following the one year period, Kingfisher will charge a gathering fee of $2.00 per Bbl and $0.15 per Bbl of crude oil injected at any of Kingfisher's pipeline injection stations.

The natural gas gathering and processing agreement by and between Kingfisher and Alta Mesa provides the following fees: gathering fee of $0.64/MMBtu; processing fee of $0.45/MMBtu; dehydration fee of $0.05/MMBtu; compression fee of $0.09/MMBtu per stage of compression; facility fee of $0.15/MMBtu through 2020, at which time the facility fee is eliminated; and a buy-back service fee based volumes and the residue gas price index. Lastly, Kingfisher receives a buy-back meter fee of $250 per month.

### Other Acreage Dedications

Kingfisher has contracted to provide natural gas gathering and processing services to five other producer customers beyond Alta Mesa. Collectively, these five customers have provided Kingfisher with acreage dedications and resource allocations totaling approximately 180,000 acres. The all-in rates for these customers range from $0.42/MMBtu, plus 2.5% of proceeds to $1.05/MMBtu. The contracted rates are a result of negotiation after analysis of the expected economic returns for gathering and processing certain acreage.

### Access to Downstream Markets

Kingfisher contracted for fixed transportation of natural gas residue and NGL volumes prior to commissioning the 60 MMcf/d cryogenic processing plant. Kingfisher identified that the upstream economics of

306

Table of Contents

the STACK play were improving and that produced hydrocarbon volumes would outpace the existing takeaway capacity in the region. As such, Kingfisher acquired fixed transportation contracts at low transportation rates early in the development and expansion of the STACK play. The amount of natural gas residue and fixed transportation capacity allowed Kingfisher to provide flow assurance to producers, and, thus, Kingfisher continues to possess a strategic competitive advantage in the contracting of additional producer gas gathering and processing agreements.

In early 2016, Kingfisher entered into agreements providing for 100,000 Dth/d of natural gas residue fixed transportation capacity through 2036 on PEPL's pipeline system. PEPL is an interstate pipeline system owned by Energy Transfer Partners, LP. Kingfisher contracted for an incremental 20,000 Dth/d of fixed transportation capacity on the PEPL pipeline system beginning on August 1, 2017 for a term of one year, with a first right for annual renewal. Kingfisher also constructed an interconnect to the PEPL pipeline system, which provides access to end-user markets in the upper Midwest and West.

In early 2017, Kingfisher contracted for additional natural gas residue fixed transportation capacity providing for approximately 100,000 Dth/d on ONEOK's pipeline in the OGT system. The term of the 100,000 Dth/d begins in June 2018 and is for a term of 10 years. In June 2017, Kingfisher contracted for natural gas residue fixed transportation capacity on the OGT system for a term of five years, with first year capacity of 50,000 Dth/d, which reduces to 25,000 Dth/d for the remaining four years of the term. The OGT system is an intrastate pipeline transmission with peak capacity of 2.1 Bcf/d owned by OGT. Kingfisher has entered into a letter agreement to assign 100,000 Dth/d of the OGT capacity to Alta Mesa, subject to certain conditions. Effective September 1, 2017, Kingfisher assigned the 10-year, 100,000 Dth/d of capacity to Alta Mesa.

Kingfisher also has fixed transportation and processing capacity through Superior's pipeline for approximately 10,000 Mcf/d. Kingfisher has entered into a letter agreement to assign 5,000 Mcf/d of the Superior capacity to Alta Mesa, subject to certain conditions.

Kingfisher recognized that the natural gas takeaway market was tightening and that the intrastate pipeline market was near saturation. Currently, Kingfisher has contracted for approximately 280,000 Dth/d of natural gas residue fixed transportation capacity, which is expected to continue providing producers with a valuable egress solution.

In 2016, Kingfisher contracted for NGL fixed transportation capacity on the NGL pipeline operated by Chisholm for three years. The contracts require Kingfisher to deliver a minimum daily volume of NGLs with annual increases. The agreements also require that Kingfisher deliver 4,200 and 7,125 Bbls/d of NGLs for the 12 months ending June 30, 2018, and 2019, respectively. Kingfisher connects to Chisholm's Y-Grade system at an interconnect, which provides access to the Conway market. The capacity associated with the Chisholm pipeline provides flow assurance to producers and provides an outlet for a portion of the expected NGL volumes derived from the existing producers that have provided acreage dedications and resource allocations to producers.

**Title to Properties**

Kingfisher's interest in the real property on which its assets are located derives from leases, easements, rights-of-way, permits or licenses from landowners or governmental authorities, permitting the use of such land for its operations. Kingfisher believes that it has satisfactory interests in and to these lands. Kingfisher has leased or acquired easements, rights-of-way, permits or licenses in these lands without any material challenge known to it relating to the title to the land upon which Kingfisher's assets are located, and Kingfisher believes that it has satisfactory interests in such lands. In certain situations, Kingfisher elected to allow Alta Mesa to acquire easements, rights-of-way, permits and licenses from landowners to expedite the buildout of midstream infrastructure. Other than the aforementioned Alta Mesa real property, Kingfisher has no knowledge of any challenge to the underlying fee title of any material lease, easement, right-of-way, permit or license held by it or to its title to any material lease, easement, right-of-way, permit or lease, and Kingfisher believes that it has satisfactory title to all of its material leases, easements, rights-of-way, permits and licenses.

307

Table of Contents

**Seasonality**

While the results of gathering and processing are not materially affected by seasonality, from time to time Kingfisher's operations and construction of assets can be impacted by inclement weather.

**Competition**

The business of providing gathering, processing and marketing services for crude oil, natural gas and NGLs is highly competitive. Kingfisher faces strong competition in obtaining crude oil, natural gas and NGL volumes, including from major integrated and independent exploration and production companies, interstate and intrastate pipelines and other companies that gather, compress, treat, process, transport, store or market crude oil and natural gas. Competition for crude oil and natural gas supplies is primarily based on geographic location of facilities in relation to production or markets, the reputation, efficiency and reliability of the gatherer and the pricing arrangements offered by the gatherer. For areas where acreage is not dedicated to Kingfisher, it will compete with similar enterprises in providing additional gathering and processing services in its area of operation, which may offer more services or have strong financial resources and access to larger volumes of crude oil, natural gas and NGLs than Kingfisher does. In marketing crude oil, natural gas and NGLs, Kingfisher has numerous competitors, including marketing affiliates of interstate pipelines, major integrated oil and gas companies, and local and national oil and natural gas producers, gatherers, brokers and marketers of widely varying sizes, financial resources and experience. Local utilities and distributors of natural gas are, in some cases, engaged directly and through affiliates in marketing activities that compete with Kingfisher's marketing operations.

Kingfisher faces strong competition for acquisitions and development of new projects from both established and start-up companies. Competition increases the cost to acquire existing facilities or businesses and results in fewer commitments and lower returns for new pipelines or other development projects. Kingfisher's competitors may have greater financial resources than it possesses or may be willing to accept lower returns or greater risks. Kingfisher's competition differs by the nature of the business or the project involved.

**_Natural Gas, NGLs, Crude Oil and Condensate Supply_**

Kingfisher's gathering and transmission pipelines have connections with major intrastate and interstate pipelines, which it believes has ample natural gas and NGL supplies in excess of the volumes required for the operation of these systems. Kingfisher evaluates well and reservoir data that is either publicly available or furnished by producers or other service providers in connection with the construction and acquisition of Kingfisher's gathering systems and assets to determine the availability of natural gas, NGLs, crude oil and condensate supply for Kingfisher's systems and assets and/or obtain an minimum volume commitment from the producer that results in a rate of return on investment. Kingfisher does not routinely obtain independent evaluations of reserves dedicated to Kingfisher's systems and assets due to the cost and relatively limited benefit of such evaluations. Accordingly, Kingfisher does not have independent estimates of total reserves dedicated to its systems and assets or the anticipated life of such producing reserves.

**Credit Risk and Significant Customers**

Kingfisher is subject to risk of loss resulting from nonpayment or nonperformance by its customers and other counterparties. Kingfisher diligently attempts to ensure that it issues credit to only credit-worthy customers. The combination of a reduction of cash flow resulting from lower commodity prices, a reduction in borrowing bases under reserve-based credit facilities and the lack of availability of debt or equity financing may result in a significant reduction in the liquidity of Kingfisher's customers and their ability to make payment or perform on their obligations to Kingfisher. Furthermore, some of Kingfisher's customers may be leveraged and subject to their own operating and regulatory risks, which increases the risk that they may default on their obligations to Kingfisher.

308

Table of Contents

For the year ended December 31, 2016, 96.9% of Kingfisher's revenue were derived from production out of wells operated by Alta Mesa. No other customer represented greater than 10.0% of Kingfisher's revenue for fiscal year 2016. The loss of Alta Mesa as a customer could have a material impact on Kingfisher's results of operations if it was not able to gather and process its hydrocarbons. The concentration of Alta Mesa for fiscal year 2016 was a result of Alta Mesa being the sole customer of Kingfisher until December 2016. Kingfisher's concentration to Alta Mesa is expected to decrease over time as Kingfisher provides midstream services for additional producers. For the nine months ended September 30, 2017, 86.2% of Kingfisher's revenue were derived from production out of wells operated by Alta Mesa. No other customer represented greater than 10.0% of Kingfisher's revenue for nine months ended September 30, 2017.

**Regulation**

*Intrastate Natural Gas Pipeline Regulation*

Kingfisher's intrastate natural gas pipeline operations are subject to regulation by various state agencies. Most state agencies possess the authority to review and authorize natural gas transportation transactions and the construction, acquisition, abandonment and interconnection of physical facilities. State agencies also may regulate transportation rates, service terms and conditions and contract pricing.

*Intrastate Liquids Pipeline Regulation*

Intrastate NGL and other petroleum pipelines are subject to regulation by various agencies in the respective states where they are located. While such regulatory regimes vary, state agencies typically require intrastate NGL and petroleum pipelines to file their rates with the agencies and permit shippers to challenge existing rates or proposed rate increases.

*Gathering Pipeline Regulation*

Kingfisher is subject to some state ratable take and common purchaser statutes. The ratable take statutes generally require gatherers to take, without undue discrimination, natural gas production that may be tendered to the gatherer for handling. Similarly, common purchaser statutes generally require gatherers to purchase without undue discrimination as to source of supply or producer. These statutes are designed to prohibit discrimination in favor of one producer over another producer or one source of supply over another source of supply.

*Sales of Natural Gas and NGLs*

The prices at which Kingfisher sells natural gas and NGLs currently are not subject to federal regulation and, for the most part, are not subject to state regulation. Kingfisher's natural gas and NGL sales are affected by the availability, terms, cost and regulation of pipeline transportation.

*Employee Safety*

With respect to its workforce, Kingfisher complies with the requirements of OSHA, and comparable state laws that regulate the protection of the health and safety of workers. In addition, with respect to OSHA hazard communication standards, Kingfisher believes that its operations are in substantial compliance with the OSHA requirements, including general industry standards, record keeping requirements, and monitoring of occupational exposure to regulated substances. The OSHA hazard communication standard requires that information be maintained about hazardous materials used or produced in operations and that this information be provided to employees, state and local government authorities and citizens.

*Pipeline Safety Regulations*

Some of Kingfisher's pipelines are subject to regulation by the DOT's PHMSA pursuant to the NGPSA, with respect to natural gas, and the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"), with respect to

Table of Contents

NGLs. Both the NGPSA and the HLPSA were amended by the Pipeline Safety Act, the Accountable Pipeline Safety and Partnership Act of 1996, the Pipeline Safety Improvement Act of 2002 ("PSIA"), as reauthorized and amended by the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006, and the 2011 Pipeline Safety Act. The NGPSA and HLPSA regulate safety requirements in the design, construction, operation and maintenance of natural gas, crude oil and NGL pipeline facilities, while the PSIA establishes mandatory inspections for all U.S. crude oil, NGL and natural gas transmission pipelines in HCAs.

PHMSA has developed regulations that require pipeline operators to implement integrity management programs, including more frequent inspections and other measures to ensure pipeline safety in HCAs. The regulations require operators to:

- perform ongoing assessments of pipeline integrity;

- identify and characterize applicable threats to pipeline segments that could impact a HCA;

- improve data collection, integration and analysis;

- repair and remediate pipelines as necessary; and

- implement preventive and mitigating actions.

The 2011 Pipeline Safety Act, among other things, increased the maximum civil penalty for pipeline safety violations and directed the Secretary of Transportation to promulgate rules or standards relating to expanded integrity management requirements, automatic or remote-controlled valve use, excess flow valve use, leak detection system installation and testing to confirm the material strength of pipe operating above 30% of specified minimum yield strength in HCAs. Consistent with the act, PHMSA finalized rules that increased the maximum administrative civil penalties for violation of the pipeline safety laws and regulations to $200,000 per violation per day, with a maximum of $2.0 million for a series of violations. Effective April 27, 2017, those maximum civil penalties were increased to $209,002 per violation per day, with a maximum of $2.09 million for a series of violations, to account for inflation. The PHMSA has also issued a final rule applying safety regulations to certain rural low-stress hazardous liquid pipelines that were not covered previously by some of its safety regulations.

PHMSA regularly revises its pipeline safety regulations. For example, in March 2015, PHMSA finalized new rules applicable to gas and hazardous liquid pipelines that, among other changes, impose new post-construction inspections, welding, gas component pressure testing requirements, as well as requirements for calculating pressure reductions for immediate repairs on liquid pipelines. More recently, in October 2015, PHMSA proposed new regulations for hazardous liquid pipelines that would significantly extend and expand the reach of certain PHMSA integrity management requirements (i.e., periodic assessments, leak detection and repairs), regardless of the pipeline's proximity to a HCA. The proposal also requires new reporting requirements for certain unregulated pipelines, including all gathering lines. Additional future regulatory action expanding PHMSA jurisdiction and imposing stricter integrity management requirements is likely. For example, in December 2015, the Senate Commerce Committee approved legislation that, among other things, requires PHMSA to conduct an assessment of its inspections process and integrity management programs for natural gas and hazardous liquid pipelines. The legislation would also require PHMSA to prioritize various rulemakings required by the 2011 Pipeline Safety Act and propose and finalize the rules mandated by the act. In April 2016, pursuant to one of the requirements of the 2011 Pipeline Safety Act, PHMSA published a proposed rulemaking that would expand integrity management requirements and impose new pressure testing requirements on currently regulated gas transmission pipelines. The proposal would also significantly expand the regulation of gathering lines, subjecting previously unregulated pipelines to requirements regarding damage prevention, corrosion control, public education programs, maximum allowable operating pressure limits, and other requirements.

In addition, on January 13, 2017, PHMSA finalized new hazardous liquid pipeline safety regulations extending certain regulatory reporting requirements to all hazardous liquid gathering (including oil) pipelines.

310

Table of Contents

The final rule requires additional event-driven and periodic inspections, requires the use of leak detection systems on all hazardous liquid pipelines, modifies repair criteria, and requires certain pipelines to eventually accommodate in-line inspection tools. The effective date of this final rule is currently uncertain due to a regulatory freeze implemented by the Trump Administration on January 20, 2017.

On January 23, 2017, PHMSA published in the Federal Register amendments to the pipeline safety regulations to address requirements of the 2011 Pipeline Safety Act and to update and clarify certain regulatory requirements regarding notifications of accidents and incidents. The final rule also adds provisions for cost recovery for design reviews of certain new projects, renews existing special permits, and incorporates certain standards for in-line inspections and stress corrosion cracking assessments. The effective date of the final rule would have been March 24, 2017; however, the rule is subject to a regulatory freeze pending review by the Trump Administration.

States are largely preempted by federal law from regulating pipeline safety for interstate lines but most are certified by the DOT to assume responsibility for enforcing federal intrastate pipeline regulations and inspection of intrastate pipelines. States may adopt stricter standards for intrastate pipelines than those imposed by the federal government for interstate lines; however, states vary considerably in their authority and capacity to address pipeline safety. State standards may include requirements for facility design and management in addition to requirements for pipelines. Kingfisher believes that its pipeline operations are in substantial compliance with applicable PHMSA and state requirements; however, due to the possibility of new or amended laws and regulations or reinterpretation of existing laws and regulations, there can be no assurance that future compliance with PHMSA or state requirements will not have a material adverse effect on its financial condition, results of operations or cash flows.

## Environmental Matters

### General

Kingfisher's operations involve processing and pipeline services for delivery of hydrocarbons (natural gas, NGLs, crude oil and condensates) from point-of-origin at oil and gas wellheads operated by its suppliers to its end-use market customers. Kingfisher's facilities include natural gas processing plants, natural gas and NGL pipelines, and associated facilities. Kingfisher's operations are subject to stringent and complex federal, state and local laws and regulations relating to discharge of hazardous substances or solid wastes into the environment or otherwise relating to protection of the environment. Compliance with existing and anticipated environmental laws and regulations increases Kingfisher's overall costs of doing business, including costs of planning, constructing, and operating plants, pipelines, and other facilities, as well as capital expenditures necessary to maintain or upgrade equipment and facilities. Similar costs are likely upon changes in laws or regulations and upon any future acquisition of operating assets.

Any failure to comply with applicable environmental laws and regulations, including those relating to equipment failures, and obtaining required governmental approvals, may result in the assessment of administrative, civil or criminal penalties, imposition of investigatory or remedial activities and, in certain, less common circumstances, issuance of temporary or permanent injunctions or construction or operation bans or delays. As part of the regular evaluation of Kingfisher's operations, it routinely reviews and updates governmental approvals as necessary.

The continuing trend in environmental regulation is to place more restrictions and limitations on activities that may affect the environment, and thus there can be no assurance as to the amount or timing of future expenditures for environmental compliance or remediation, and actual future expenditures may be different from the amounts Kingfisher currently anticipates. Moreover, risks of process upsets, accidental releases or spills are associated with possible future operations, and Kingfisher cannot assure you that it will not incur significant costs and liabilities, including those relating to claims for damage to property and persons as a result of any such

311

Table of Contents

upsets, releases or spills. Kingfisher may be unable to pass on current or future environmental costs to its customers. A discharge or release of hydrocarbons, hazardous substances or solid wastes into the environment could, to the extent losses related to the event are not insured, subject Kingfisher to substantial expense, including both the cost to comply with applicable laws and regulations and to pay fines or penalties that may be assessed and the cost related to claims made by neighboring landowners and other third parties for personal injury or damage to natural resources or property. Kingfisher attempts to anticipate future regulatory requirements that might be imposed and plan accordingly to comply with changing environmental laws and regulations and to minimize costs with respect to more stringent future laws and regulations or more rigorous enforcement of existing laws and regulations.

### *Hazardous Substances and Solid Waste*

Environmental laws and regulations that relate to the release of hazardous substances or solid wastes into soils, sediments, groundwater and surface water and/or include measures to prevent and control pollution may pose the highest potential cost to Kingfisher. These laws and regulations generally regulate the generation, storage, treatment, transportation and disposal of solid wastes and hazardous substances and may require investigatory and corrective actions at facilities where such waste or substance may have been released or disposed. For instance, CERCLA, also known as the federal "Superfund" law, and comparable state laws impose liability without regard to fault or the legality of the original conduct on certain classes of persons that contributed to a release of a "hazardous substance" into the environment. Potentially responsible persons include the owner or operator of the site where a release occurred and companies that disposed or arranged for the disposal of the hazardous substances found at an off-site location, such as a landfill. Under CERCLA, these persons may be subject to joint and several liability for the costs of cleaning up and restoring sites where hazardous substances have been released into the environment and for damages to natural resources. CERCLA also authorizes the EPA and, in some cases, third parties to take actions in response to threats to public health or the environment and to seek recovery of costs they incur from the potentially responsible classes of persons. It is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by hazardous substances or solid wastes released into the environment. Although petroleum, natural gas and NGLs are excluded from CERCLA's definition of a "hazardous substance," in the course of ordinary operations, Kingfisher may generate wastes that may fall within the definition of a "hazardous substance." In addition, there are other laws and regulations that can create liability for releases of petroleum, natural gas or NGLs. Moreover, Kingfisher may be responsible under CERCLA or other laws for all or part of the costs required to clean up sites at which such substances have been disposed. Kingfisher has not received any notification that it may be potentially responsible for cleanup costs under CERCLA or any analogous federal, state, or local law.

Kingfisher also generates, and may in the future generate, both hazardous and nonhazardous solid wastes that are subject to requirements of the RCRA and/or comparable state statutes. From time to time, the EPA and state regulatory agencies have considered the adoption of stricter disposal standards for nonhazardous wastes, including crude oil, condensate and natural gas wastes. Moreover, it is possible that some wastes generated by Kingfisher that are currently exempted from the definition of hazardous waste may in the future lose this exemption and be designated as "hazardous wastes," resulting in the wastes being subject to more rigorous and costly management and disposal requirements. Additionally, the TSCA and analogous state laws impose requirements on the use, storage and disposal of various chemicals and chemical substances. Changes in applicable laws or regulations may result in an increase in Kingfisher's capital expenditures or plant operating expenses or otherwise impose limits or restrictions on its production and operations.

Solid waste disposal practices within the oil and natural gas related and NGL industries have improved over the years with the passage and implementation of various environmental laws and regulations. Nevertheless, some hydrocarbons and other solid wastes may have been released on or under various properties owned, leased or operated by Kingfisher during the operating history of those properties. In addition, a number of these properties may have been operated by third parties over whose operations and hydrocarbon and waste

312

Table of Contents

management practices Kingfisher had no control. These properties and wastes disposed thereon may be subject to the Safe Drinking Water Act, CERCLA, RCRA, TSCA and analogous state laws. Under these laws, Kingfisher could be required, alone or in participation with others, to remove or remediate previously disposed wastes or property contamination, if present, including groundwater contamination, or to take action to prevent future contamination.

*Air Emissions*

Kingfisher's current and future operations are subject to the federal CAA and regulations promulgated thereunder and under comparable state laws and regulations. These laws and regulations regulate emissions of air pollutants from various industrial sources, including Kingfisher's facilities, and impose various control, monitoring, and reporting requirements. Pursuant to these laws and regulations, Kingfisher may be required to obtain environmental agency pre-approval for the construction or modification of certain projects or facilities expected to produce air emissions or result in an increase in existing air emissions, obtain and comply with the terms of air permits, which include various emission and operational limitations, or use specific emission control technologies to limit emissions. Kingfisher likely will be required to incur certain capital expenditures in the future for air pollution control equipment in connection with maintaining or obtaining governmental approvals addressing air emission-related issues. Failure to comply with applicable air statutes or regulations may lead to the assessment of administrative, civil or criminal penalties and may result in the limitation or cessation of construction or operation of certain air emission sources or require Kingfisher to incur additional capital expenditures. Although Kingfisher can give no assurances, it believes such requirements will not have a material adverse effect on its financial condition, results of operations or cash flows, and the requirements are not expected to be more burdensome to it than to any similarly situated company.

Effective May 15, 2012, the EPA promulgated rules under the CAA that established new air emission controls for oil and natural gas production, pipelines and processing operations under the NSPS and National Emission Standards for Hazardous Air Pollutants ("NESHAPs") programs. These rules require the control of emissions through reduced emission (or "green") completions and establish specific new requirements regarding emissions from wet seal and reciprocating compressors, pneumatic controllers, and storage vessels at production facilities, gathering systems, boosting facilities, and onshore natural gas processing plants. In addition, the rules revised existing requirements for volatile organic compound ("VOC") emissions from equipment leaks at onshore natural gas processing plants by lowering the leak definition for valves from 10,000 parts per million to 500 parts per million and requiring the monitoring of connectors, pumps, pressure relief devices and open-ended lines. In October 2012, several challenges to the EPA's NSPS and NESHAPs rules for the industry were filed by various parties, including environmental groups and industry associations. In a January 16, 2013 unopposed motion to hold this litigation in abeyance, the EPA indicated that it may reconsider some aspects of the rules. The case remains in abeyance. The EPA has since revised certain aspects of the rules and has indicated that it may reconsider other aspects of the rules. Depending on the outcome of such proceedings, the rules may be further modified or rescinded or the EPA may issue new rules. Kingfisher cannot predict the costs of compliance with any modified or newly issued rules.

In partial response to the issues raised regarding the 2012 rulemaking, the EPA published new rules in June 2016 to regulate emissions of methane and VOCs from new and modified sources in the oil and gas sector. However, in April 2017, the EPA announced that it will review this rule for new, modified or reconstructed facilities and will initiate reconsideration proceedings to potentially revise or rescind portions of the rule. Subsequently, on May 31, 2017, the EPA issued a 90-day stay of certain requirements under the rule, but this stay was vacated by a three-judge panel of the U.S. Court of Appeals for the D.C. Circuit on July 3, 2017 and again by an *en banc* D.C. Circuit on July 31, 2017. In the interim, on July 16, 2017, the EPA issued a proposed rule that would provide a two-year extension of the initial 90-day stay. Substantial uncertainty exists with respect to implementation of this methane rule. The EPA has also finalized a rule regarding alternative criteria for aggregating multiple small surface sites into a single source for air quality permitting purposes. This rule could cause small facilities, on an aggregate basis, to be deemed a major source, thereby triggering more stringent air

313

Table of Contents

permitting processes and requirements across the oil and gas industry. During the Obama Administration, other federal agencies, including the BLM, PHMSA, and the Department of Energy, proposed or finalized new or more stringent regulations for the oil and gas sector in order to further reduce methane emissions. For example, the BLM adopted new rules on November 15, 2016, to reduce venting, flaring, and leaks during oil and natural gas production activities on onshore federal and Indian leases. On June 15, 2017, the BLM postponed indefinitely compliance dates for certain aspects of these rules, pending judicial review. As a result of this continued regulatory focus and other factors, additional GHG regulation of the oil and gas industry remains possible. Compliance with such rules could result in additional costs, including increased capital expenditures and operating costs for Kingfisher and for other companies in its industry. While Kingfisher is not able at this time to estimate such additional costs, as is the case with similarly situated entities in the industry, they could be significant for it. Compliance with such rules, as well as any new state rules, may also make it more difficult for Kingfisher's suppliers and customers to operate, thereby reducing the volume of natural gas transported through Kingfisher's pipelines, which may adversely affect its business. However, the status of recent and future rules and rulemaking initiatives under the new Trump Administration is uncertain.

*Climate Change*

In December 2009, the EPA determined that emissions of certain gases, commonly referred to as "greenhouse gases," present an endangerment to public health and the environment because emissions of such gases are, according to the EPA, contributing to the warming of the earth's atmosphere and other climatic changes. Based on these findings, the EPA adopted regulations under existing provisions of the CAA, that require Prevention of Significant Deterioration ("PSD") preconstruction permits, and Title V operating permits for greenhouse gas emissions from certain large stationary sources. Under these regulations, facilities required to obtain PSD permits must meet "best available control technology" standards for their greenhouse gas emissions established by the states or, in some cases, by the EPA on a case-by-case basis. The EPA has also adopted rules requiring the monitoring and reporting of greenhouse gas emissions from specified sources in the United States, including, among others, certain onshore oil and natural gas processing and fractionating facilities. In addition, efforts have been made and continue to be made in the international community toward the adoption of international treaties or protocols that would address global climate change issues. Because regulation of greenhouse gas emissions is relatively new, further regulatory, legislative and judicial developments are likely to occur. Such developments in greenhouse gas initiatives may affect Kingfisher and other companies operating in the oil and gas industry. In addition to these developments, recent judicial decisions have allowed certain tort claims alleging property damage to proceed against greenhouse gas emissions sources, which may increase Kingfisher's litigation risk for such claims. In addition, in 2015, the United States participated in the United Nations Conference on Climate Change, which led to the creation of the Paris Agreement. The Paris Agreement entered into force November 4, 2016, and requires countries to review and "represent a progression" in their intended nationally determined contributions, which set GHG emission reduction goals every five years beginning in 2020. On June 1, 2017, President Trump announced that the United States plans to withdraw from the Paris Agreement and to seek negotiations either to reenter the Paris Agreement on different terms or to establish a new framework agreement. The Paris Agreement provides for a four-year exit process beginning when it took effect in November 2016, which would result in an effective exit date of November 2020. The United States' adherence to the exit process and/or the terms on which the United States may reenter the Paris Agreement or a separately negotiated agreement are unclear at this time. Due to the uncertainties surrounding the regulation of and other risks associated with greenhouse gas emissions, Kingfisher cannot predict the financial impact of related developments on Kingfisher.

Federal or state legislative or regulatory initiatives that regulate or restrict emissions of greenhouse gases in areas in which Kingfisher conducts business could adversely affect the availability of, or demand for, the products it stores, transports and processes, and, depending on the particular program adopted, could increase the costs of its operations, including costs to operate and maintain its facilities, install new emission controls on its facilities, acquire allowances to authorize its greenhouse gas emissions, pay any taxes related to its greenhouse gas emissions and/or administer and manage a greenhouse gas emissions program. Kingfisher may be unable to

314

Table of Contents

recover any such lost revenues or increased costs in the rates it charges its customers, and any such recovery may depend on events beyond its control, including the provisions of any final legislation or regulations. Reductions in Kingfisher's revenues or increases in its expenses as a result of climate control initiatives could have adverse effects on its business, its financial condition, results of operations or cash flows.

*Hydraulic Fracturing and Wastewater*

The Federal Water Pollution Control Act, also known as the CWA, and comparable state laws impose restrictions and strict controls regarding the discharge of pollutants, including NGL-related wastes, into state waters or waters of the United States. In June 2015, the EPA and the Army Corps finalized a rule intended to clarify the meaning of the term "waters of the United States," which establishes the scope of regulated waters under the CWA (the "WOTUS rule"). The rule has been challenged and has been stayed by federal courts. In February 2017, the Trump Administration issued an Executive Order directing the EPA and the Army Corps to review and, consistent with applicable law, to initiate a rulemaking to rescind or revise the WOTUS rule. The EPA and the Army Corps published a notice of intent to review and rescind or revise the rule in March 2017. In addition, the U.S. Department of Justice filed a motion with the U.S. Supreme Court in March 2017 requesting that the U.S. Supreme Court stay the suit concerning which court should hear challenges to the rule. The U.S. Supreme Court denied the motion in April 2017. In June 2017, the EPA and the Army Corps proposed a rule that would initiate the first step in a two-step process intended to review and revise the definition of "waters of the United States" consistent with President Trump's executive order. Under the proposal, the first step would be to rescind the May 2015 final rule and put back into effect the narrower language defining "waters of the United States" under the CWA that existed prior to the rule. The second step would be a notice-and- comment rulemaking in which the agencies will conduct a substantive reevaluation of the definition of "waters of the United States." If upheld, the WOTUS rule will expand federal jurisdiction under the CWA and could significantly expand federal control of land and water resources across the U.S., triggering substantial additional permitting and regulatory requirements. Regulations promulgated pursuant to the CWA require that entities that discharge into federal and state waters obtain National Pollutant Discharge Elimination System permits and/or state permits authorizing these discharges. The CWA and analogous state laws assess administrative, civil and criminal penalties for discharges of unauthorized pollutants into waters of the U.S. and impose substantial liability for the costs of removing spills from such waters. In addition, the CWA and analogous state laws require that individual permits or coverage under general permits be obtained by covered facilities for discharges of storm water runoff. Kingfisher believes that it is in substantial compliance with CWA permitting requirements as well as the conditions imposed by its permits and that continued compliance with such existing permit conditions will not have a material effect on its financial condition, results of operations or cash flows.

It is common for Kingfisher's customers or suppliers to recover natural gas from deep shale formations through the use of hydraulic fracturing, combined with sophisticated horizontal drilling. Hydraulic fracturing is an important and commonly used process in the completion of wells by oil and gas producers. Hydraulic fracturing involves the injection of water, sand and chemical additives under pressure into rock formations to stimulate gas production. Due to public concerns raised regarding potential impacts of hydraulic fracturing on groundwater quality, legislative and regulatory efforts at the federal level and in some states and localities have been initiated to require or make more stringent the permitting and other regulatory requirements for hydraulic fracturing operations of Kingfisher's customers and suppliers. There are certain governmental reviews either underway or being proposed that focus on environmental aspects of hydraulic fracturing practices. On December 13, 2016, the EPA released a study of the potential adverse effects that hydraulic fracturing may have on water quality and public health, concluding that there is scientific evidence that hydraulic fracturing activities potentially can impact drinking water resources in the United States under some circumstances. This study or similar studies could spur initiatives to further regulate hydraulic fracturing. In June 2016, the EPA finalized rules prohibiting discharges of wastewater from hydraulic fracturing operations to publicly owned wastewater treatment plants. The EPA has also issued an advance notice of proposed rulemaking under the TSCA to gather information regarding the potential regulation of chemical substances and mixtures used in oil and gas exploration and production. Also, effective June 24, 2015, BLM adopted rules regarding well stimulation,

315

Table of Contents

chemical disclosures, water management, and other requirements for hydraulic fracturing on federal and Indian lands, which has been challenged in court. However, the BLM is in the process of rescinding the 2015 rule.

Additional regulatory burdens in the future, whether federal, state or local, could increase the cost of or restrict the ability of Kingfisher's customers or suppliers to perform hydraulic fracturing. As a result, any increased federal, state or local regulation could reduce the volumes of crude oil and natural gas that Kingfisher's customers move through its gathering and processing systems which would materially adversely affect its financial condition, results of operations or cash flows.

### Endangered Species and Migratory Birds

The ESA, the MBTA, and similar state and local laws restrict activities that may affect endangered or threatened species or their habitats or migratory birds. Some of Kingfisher's pipelines may be located in areas that are designated as habitats for endangered or threatened species, potentially exposing it to liability for impacts on an individual member of a species or to habitat. The ESA can also make it more difficult to secure a federal permit for a new pipeline.

### Employees

Kingfisher has no employees. Under the Operator Agreement, ARM operates, maintains and administers Kingfisher's operations, and ARM also provides management services to Kingfisher. Kingfisher is not party to any collective bargaining agreements, and Kingfisher has not had any significant labor disputes in the past.

### Legal Proceedings

On March 1, 2017, Mustang Gas Products, LLC ("Mustang") filed suit in the District Court of Kingfisher County, Oklahoma, against Oklahoma Energy Acquisitions, LP, a wholly owned subsidiary of Alta Mesa ("OEA"), and eight other entities, including Kingfisher. Mustang alleges that (1) Mustang is a party to gas purchase agreements with OEA containing gas dedication covenants that burden land, leases and wells in Kingfisher County, Oklahoma, and (2) OEA, in concert with the other defendants, has wrongfully diverted gas sales to Kingfisher in contravention of these agreements. Mustang asserts claims for declaratory judgment, anticipatory repudiation and breach of contract against OEA only. Mustang also claims tortious interference with contract, conspiracy, and unjust enrichment/constructive trust against all defendants, including Kingfisher. While Kingfisher may incur costs or losses in connection with this litigation, Kingfisher has not accrued a loss contingency because it is currently unable to determine the scope or merit of Mustang's claim or to reasonably estimate an amount or range of such costs or losses. Kingfisher believes that the allegations contained in this lawsuit are without merit and intends to vigorously defend itself.

From time to time, Kingfisher is party to other lawsuits arising in the ordinary course of its business. Kingfisher cannot predict the outcome of any such lawsuits with certainty, but Kingfisher's management believes it is remote that pending or threatened legal matters will have a material adverse impact on Kingfisher's financial condition.

### Price Range of Securities

Historical market price information regarding Kingfisher is not provided because there is no public market for Kingfisher's equity securities.

316

**Table of Contents**

## BENEFICIAL OWNERSHIP OF SECURITIES

The following table sets forth information known to Silver Run regarding (i) the actual beneficial ownership of our voting common stock as of the record date and (ii) the expected beneficial ownership of our voting common stock immediately following consummation of the business combination, assuming that no public shares of Silver Run are redeemed, and alternatively that approximately 30,000,000 shares of Class A Common Stock are redeemed, in each case, by:

- each person who is, or is expected to be, the beneficial owner of more than 5% of the outstanding shares of our voting common stock;

- each of our current officers and directors;

- each person who will become a named executive officer or director of Silver Run following consummation of the business combination; and

- all current officers and directors of Silver Run, as a group, and all executive officers and directors of Silver Run following consummation of the business combination, as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of our voting common stock prior to the business combination is based on 129,375,000 shares of Class A Common Stock and Class B Common Stock issued and outstanding in the aggregate as of September 15, 2017.

The expected beneficial ownership of shares of our voting common stock immediately following consummation of the business combination, assuming none of our public shares are redeemed, has been determined based upon the following assumptions: (i) no shares of Class A Common Stock are purchased by Fund VI Holdings under the Business Combination Forward Purchase Agreement, (ii) none of the investors set forth in the table below has purchased or purchases shares of Class A Common Stock in the open market, (iii) Fund VI Holdings purchases 40,000,000 shares of Class A Common Stock under the IPO Forward Purchase Agreement and (iv) there will be an aggregate of 384,175,000 shares of our voting common stock issued and outstanding at the Closing (including (w) 103,500,000 public shares, (x) 25,875,000 shares of Class A Common Stock issued upon conversion of 25,875,000 founder shares upon the Closing, (y) 40,000,000 shares of Class A Common Stock purchased by Fund VI Holdings under the IPO Forward Purchase Agreement and (z) 214,800,000 shares of Class C Common Stock issued to the Contributors in connection with the business combination).

The expected beneficial ownership of shares of our voting common stock immediately following consummation of the business combination, assuming that approximately 30,000,000 public shares have been redeemed, has been determined based on the following assumptions: (i) public stockholders have exercised their redemption rights with respect to 30,000,000 shares of our Class A Common Stock, (ii) none of the investors set forth in the table below has purchased or purchases shares of Class A Common Stock in the open market, (iii) Fund VI Holdings purchases 40,000,000 shares of Class A Common Stock under the IPO Forward Purchase Agreements and 20,000,000 shares of Class A Common Stock under the Business Combination Forward Purchase Agreement to offset $200 million of such redemptions and (iv) there will be an aggregate of 374,175,000 shares of our voting common stock at the Closing (including (w) 73,500,000 public shares, (x) 25,875,000 shares of Class A Common Stock issued upon conversion of 25,875,000 founder shares upon the Closing, (y) 60,000,000 shares of Class A Common Stock purchased by Fund VI Holdings under the Forward Purchase Agreements and (z) 214,800,000 shares of Class C Common Stock issued to the Contributors in connection with the business combination). Unless otherwise indicated, we believe that all persons named in the

317

Table of Contents

table below have sole voting and investment power with respect to all shares of voting common stock beneficially owned by them.

| | Prior to business combination | | After business combination | | | |
| | | | Assuming No Redemption | | Assuming Illustrative Redemption | |
| Name and Address of Beneficial Owners(1) | Number of Shares | % | Number of Shares | % | Number of Shares | % |
|---|---|---|---|---|---|---|
| Silver Run Sponsor II, LLC(2) | 25,755,000 | 19.9% | 25,755,000 | 6.7% | 25,755,000 | 6.9% |
| James T. Hackett | — | — | — | — | — | — |
| Thomas J. Walker | — | — | — | — | — | — |
| Stephen S. Coats | — | — | — | — | — | — |
| William D. Gutermuth | 40,000 | * | 40,000 | * | 40,000 | * |
| Jeffrey H. Tepper | 40,000 | * | 40,000 | * | 40,000 | * |
| Diana J. Walters | 40,000 | * | 40,000 | * | 40,000 | * |
| Harlan H. Chappelle | — | — | — | — | — | — |
| Michael E. Ellis(3) | — | — | — | — | — | — |
| Michael A. McCabe | — | — | — | — | — | — |
| Highfields Capital Management(4) | 11,500,000 | 8.9% | 11,500,000 | 3.0% | 11,500,000 | 3.0% |
| Orbis Allan Gray LTD(5) | 10,759,000 | 8.3% | 10,759,000 | 2.8% | 10,759,000 | 2.8% |
| Baupost Group LLC(6) | 6,615,552 | 5.1% | 6,615,552 | 1.7% | 6,615,552 | 1.7% |
| High Mesa Holdings, LP(3) | — | — | 139,800,000(10) | 36.4% | 139,800,000(10) | 37.4% |
| KFM Holdco, LLC(7) | — | — | 55,000,000(10) | 14.3% | 55,000,000(10) | 14.7% |
| Riverstone VI Alta Mesa Holdings, L.P.(8) | — | — | 20,000,000(10) | 5.2% | 20,000,000(10) | 5.3% |
| Riverstone VI SR II Holdings, L.P.(9) | — | — | 40,000,000(10) | 10.4% | 60,000,000 | 16.0% |
| All directors and executive officers, as a group (6 individuals) | 120,000 | * | 120,000 | * | 120,000 | * |

---

*   Less than one percent.

(1)   Unless otherwise noted, the business address of each of the following entities or individuals is c/o Silver Run Acquisition Corporation II, 1000 Louisiana Street, Suite 1450, Houston, TX 77002.

(2)   Silver Run Sponsor II, LLC is the record holder of the shares reported herein. David M. Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC, which is the sole stockholder of Riverstone Energy GP VI Corp, which is the sole and managing member of Riverstone Energy GP VI, LLC ("Riverstone Energy GP"), which is the general partner of Riverstone Energy Partners VI, L.P., which is the managing member of Riverstone Energy VI Holdings GP, LLC, which is the general partner of Riverstone VI SR II Holdings, L.P., which is the sole and managing member of Silver Run Sponsor II, LLC. Riverstone Energy GP is managed by a managing committee consisting of Pierre F. Lapeyre, Jr., David M. Leuschen, James T. Hackett, Michael B. Hoffman, N. John Lancaster, Mark G. Papa and, on a rotating basis, one of E. Bartow Jones, Baran Tekkora and Robert M. Tichio. As such, each of the persons and the entities named in this footnote may be deemed to have or share beneficial ownership of the Class A Common Stock held directly by Silver Run Sponsor II, LLC. Each such entity or person disclaims any such beneficial ownership. The business address of each of these entities and individuals is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

(3)   The sole general partner of the Alta Mesa Contributor is High Mesa Holdings GP, LLC ("High Mesa GP"). High Mesa, Inc. ("High Mesa") holds a majority of the outstanding limited partner interests in the Alta Mesa Contributor and all of the outstanding limited liability company interests in High Mesa GP. The interests of the Alta Mesa Contributor will be beneficially owned (either directly or through interests in High Mesa) by three groups, each consisting of affiliated parties: (i) AM MME Holdings, LP, Galveston Bay Resources Holdings, LP, Petro Acquisitions Holdings, LP, Petro Operating Company Holdings, Inc., Harlan H. Chappelle, Gene Cole, Mike McCabe and Dale Hayes (collectively, the "Management Holders"), (ii) HPS Investment Partners, LLC, Mezzanine Partners II Delaware Subsidiary, LLC, Offshore Mezzanine Partners Master Fund II, L.P., Institutional Mezzanine Partners II Subsidiary, L.P., AP Mezzanine Partners II, L.P., The Northwestern Mutual Life Insurance Company, The Northwestern Mutual Life Insurance Company for its Group Annuity Separate Account, Northwestern Mutual Capital Strategic Equity Fund III, LP, KCK-AMIH, Ltd., and United Insurance Company of America, Jade Real Assets Fund, L.P.

318

Table of Contents

(collectively, the "HPS Alta Mesa Holders") and (iii) Bayou City Energy Management, LLC, BCE-MESA Holdings LLC, and BCE-AMH Holdings, LLC (collectively, the "Bayou City Holders"). The Class C Common Stock owned by the Alta Mesa Contributor will be subject to a voting agreement pursuant to which the Alta Mesa Contributor will vote the shares of Class C Common Stock proportionately in accordance with the express direction of the HPS Alta Mesa Holders, the Bayou City Holders and the Management Holders, respectively, based upon the relative ownership in the Alta Mesa Contributor of each such group. Mr. Ellis (who will be our Chief Operating Officer—Upstream and one of our directors following the completion of the business combination), through his ownership in AM MME Holdings, LP, Galveston Bay Resources Holdings, LP, Petro Acquisitions Holdings, LP, and Petro Operating Company Holdings, Inc., will effectively control the vote of the Management Holders, and as a result, may be deemed to beneficially own the Class C Common Stock beneficially owned by each such entity. William W. McMullen (who will be one of our directors following the completion of the business combination) through his ownership of the Bayou City Holders may be deemed to beneficially own the shares beneficially owned by the Bayou City Holders. Mr. Ellis, Mr. McMullen, the Management Holders, the HPS Alta Mesa Holders and the Bayou City Holders disclaim beneficial ownership of the shares of the Alta Mesa Contributor and the other Alta Mesa Contributor holders except to the extent of their respective pecuniary interests therein.

(4)   Based on information contained in Schedule 13G filed on April 4, 2017 by Highfields Capital Management LP ("Highfields"). Highfields' address is 200 Clarendon Street, 59th Floor, Boston, Massachusetts 02116.

(5)   Based on information contained in Schedule 13G filed on April 10, 2017 by Orbis Investment Management Limited ("OIML") and Orbis Investment Management (U.S.), LLC ("OIMUS"). OIML's address is Orbis House, 25 Front Street, Hamilton Bermuda HM11 and OIMUS's address is 600 Montgomery Street, Suite 3800, San Francisco, CA 94111, USA.

(6)   Based on information contained on Form 13F filed on August 11, 2017 by Baupost Group L.L.C. ("Baupost"). Baupost's address is 10 St James Avenue, Suite 1700, Boston, MA 02116.

(7)   The members of KFM Holdco, LLC, the Kingfisher Contributor, are (i) ARM-M I, LLC, a Delaware limited liability company ("ARMMI"), (ii) HMS Kingfisher HoldCo, LLC, a Delaware limited liability company ("HMS"), and (iii) Mezzanine Partners II Delaware Subsidiary, LLC, a Delaware limited liability company, KFM Offshore, LLC, a Delaware limited liability company, KFM Institutional, LLC, a Delaware limited liability company, AP Mezzanine Partners II, L.P., a Delaware limited partnership, and Jade Real Assets Fund, L.P., a Delaware limited partnership, each of which is directly or indirectly managed by HPS Investment Partners, LLC (collectively, the "HPS Kingfisher Holders"). ARMMI, HMS and the HPS Kingfisher Holders disclaim beneficial ownership of the shares held by the Kingfisher Contributor, except to the extent of their respective pecuniary interests therein. The business address of the Kingfisher Contributor is 20329 State Highway 249, Suite 450, Houston, Texas, 77070.

(8)   The Riverstone Contributor is the record holder of the securities reported herein. David M. Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC, which is the sole shareholder of Riverstone Energy GP VI Corp, which is the sole and managing member of Riverstone Energy GP, which is the general partner of Riverstone Energy Partners VI, L.P., which is the managing member of Riverstone Energy VI Holdings GP, LLC, which is the general partner of the Riverstone Contributor. Riverstone Energy GP is managed by a managing committee consisting of Pierre F. Lapeyre, Jr., David M. Leuschen, James T. Hackett, Michael B. Hoffman, N. John Lancaster, Mark G. Papa and, on a rotating basis, one of E. Bartow Jones, Baran Tekkora and Robert M. Tichio. Each of Riverstone Energy VI Holdings GP, LLC, Riverstone Energy Partners VI, L.P., Riverstone Energy GP, Riverstone Energy GP VI Corp, Riverstone Holdings, LLC, Mr. Leuschen and Mr. Lapeyre may be deemed to have or share beneficial ownership of the securities held directly by the Riverstone Contributor. The business address for each of the entities and individuals listed in this footnote is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

(9)   Fund VI Holdings is the record holder of the securities reported herein. David M. Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC, which is the sole stockholder of Riverstone Energy GP VI Corp, which is the sole and managing member of Riverstone Energy GP, which is the general partner of Riverstone Energy Partners VI, L.P., which is the managing member of Riverstone Energy VI Holdings GP, LLC, which is the general partner of Fund VI Holdings. Riverstone Energy GP is managed by a managing committee consisting of Pierre F. Lapeyre, Jr., David M. Leuschen, James T. Hackett, Michael B. Hoffman, N. John Lancaster, Mark G. Papa and, on a rotating basis, one of E. Bartow Jones, Baran Tekkora and Robert M. Tichio. Each of Riverstone Energy VI Holdings GP, LLC, Riverstone

319

Table of Contents

Energy Partners VI, L.P., Riverstone Energy GP, Riverstone Energy GP VI Corp, Riverstone Holdings, LLC, Mr. Leuschen and Mr. Lapeyre may be deemed to have or share beneficial ownership of the securities held directly by Fund VI Holdings. The business address for each of the entities and individuals listed in this footnote is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

(10)   Reflects shares of Class C Common Stock.

320

**Table of Contents**

## HOUSEHOLDING INFORMATION

Unless Silver Run has received contrary instructions, Silver Run may send a single copy of this proxy statement to any household at which two or more stockholders reside if we believe the stockholders are members of the same family. This process, known as "householding," reduces the volume of duplicate information received at any one household and helps to reduce our expenses. However, if stockholders prefer to receive multiple sets of Silver Run's disclosure documents at the same address this year or in future years, the stockholders should follow the instructions described below. Similarly, if an address is shared with another stockholder and together both of the stockholders would like to receive only a single set of Silver Run's disclosure documents, the stockholders should follow these instructions:

- If the shares are registered in the name of the stockholder, the stockholder should contact Silver Run at its offices at Silver Run Acquisition Corporation II, 1000 Louisiana Street, Suite 1450, Houston, Texas 77002 to inform Silver Run of his or her request; or

- If a bank, broker or other nominee holds the shares, the stockholder should contact the bank, broker or other nominee directly.

## SUBMISSION OF STOCKHOLDER PROPOSALS

Silver Run's board of directors is aware of no other matter that may be brought before the special meeting. Under Delaware law, only business that is specified in the notice of special meeting to stockholders may be transacted at the special meeting.

321

**Table of Contents**

### WHERE YOU CAN FIND ADDITIONAL INFORMATION

Silver Run files reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read Silver Run's SEC filings, including this proxy statement, over the Internet at the SEC's website at *http://www.sec.gov*. You may also read and copy any document Silver Run files with the SEC at the SEC public reference room located at 100 F Street, N.E., Room 1580 Washington, D.C., 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also obtain copies of the materials described above at prescribed rates by writing to the SEC, Public Reference Section, 100 F Street, N.E., Washington, D.C. 20549.

If you would like additional copies of this proxy statement or if you have questions about the business combination or the Proposals to be presented at the special meeting, you should contact Silver Run's proxy solicitation agent at the following address and telephone number:

Morrow Sodali LLC
470 West Avenue
Stamford, Connecticut 06902
Telephone: (800) 662-5200
(banks and brokers call collect at: (203) 658-9400)
Email: SRUN.info@morrowsodali.com

**If you are a Silver Run stockholder and would like to request documents, please do so by February 2, 2018, in order to receive them before the special meeting.** If you request any documents from Silver Run, Silver Run will mail them to you by first class mail, or another equally prompt means.

All information contained in this proxy statement relating to Silver Run, Alta Mesa and Kingfisher has been supplied by Silver Run, Alta Mesa and Kingfisher, respectively. Information provided by either Silver Run, Alta Mesa or Kingfisher does not constitute any representation, estimate or projection of any other party.

This document is a proxy statement of Silver Run for the special meeting. Silver Run has not authorized anyone to give any information or make any representation about the business combination, Silver Run, Alta Mesa or Kingfisher that is different from, or in addition to, that contained in this proxy statement. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this document speaks only as of the date of this document unless the information specifically indicates that another date applies.

322

Table of Contents

# INDEX TO FINANCIAL STATEMENTS

**Silver Run Acquisition Corporation II—Unaudited Financial Statements**

| | |
|---|---|
| Condensed Balance Sheets as of September 30, 2017 and December 31, 2016 | Fin-1 |
| Condensed Statements of Operations for the Three Months and Nine Months Ended September 30, 2017 | Fin-2 |
| Condensed Statement of Changes in Stockholders' Equity for the Nine Months Ended September 30, 2017 | Fin-3 |
| Condensed Statement of Cash Flows for the Nine Months Ended September 30, 2017 | Fin-4 |
| Notes to Condensed Financial Statements | Fin-5 |

**Silver Run Acquisition Corporation II—Audited Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | Fin-17 |
| Balance Sheet as of December 31, 2016 | Fin-18 |
| Statement of Operations for the period from November 16, 2016 (date of inception) to December 31, 2016 | Fin-19 |
| Statement of Changes in Stockholders' Equity for the period from November 16, 2016 (date of inception) to December 31, 2016 | Fin-20 |
| Statement of Cash Flows for the period from November 16, 2016 (date of inception) to December 31, 2016 | Fin-21 |
| Notes to Financial Statements | Fin-22 |

**Alta Mesa Holdings, LP—Unaudited Financial Statements**

| | |
|---|---|
| Condensed Consolidated Balance Sheets as of September 30, 2017 and December 31, 2016 | Fin-30 |
| Condensed Consolidated Statements of Operations for the Nine Months Ended September 30, 2017 and 2016 | Fin-31 |
| Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2017 and 2016 | Fin-32 |
| Notes to Condensed Consolidated Financial Statements | Fin-33 |

**Alta Mesa Holdings, LP—Audited Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | Fin-51 |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | Fin-52 |
| Consolidated Statements of Operations for each of the Three Years in the Period Ended December 31, 2016, 2015 and 2014 | Fin-53 |
| Consolidated Statements of Changes in Partners' Capital (Deficit) for each of the Three Years in the Period Ended December 31, 2016, 2015 and 2014 | Fin-54 |
| Consolidated Statements of Cash Flows for each of the Three Years in the Period Ended December 31, 2016, 2015 and 2014 | Fin-55 |
| Notes to Consolidated Financial Statements | Fin-56 |

**Kingfisher Midstream, LLC—Unaudited Financial Statements**

| | |
|---|---|
| Condensed Consolidated Balance Sheets as of September 30, 2017 and December 31, 2016 | Fin-85 |
| Condensed Consolidated Statements of Operations for the Nine Months Ended September 30, 2017 and 2016 | Fin-86 |
| Condensed Consolidated Statements of Members' Equity for the Nine Months Ended September 30, 2017 and 2016 | Fin-87 |
| Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2017 and 2016 | Fin-88 |
| Notes to Condensed Consolidated Financial Statements | Fin-89 |

**Kingfisher Midstream, LLC—Audited Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | Fin-94 |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | Fin-95 |
| Consolidated Statements of Operations for the Year Ended December 31, 2016 and the Period from Inception (January 30, 2015) through December 31, 2015 | Fin-96 |

Fin-i

**Table of Contents**

Consolidated Statements of Members' Equity for the Year Ended December 31, 2016 and the Period from Inception (January 30, 2015) through December 31, 2015 — Fin-97

Consolidated Statements of Cash Flows for the Year Ended December 31, 2016 and the Period from Inception (January 30, 2015) through December 31, 2015 — Fin-98

Notes to Consolidated Financial Statements — Fin-99

Fin-ii

**Table of Contents**

## SILVER RUN ACQUISITION CORPORATION II
## CONDENSED BALANCE SHEETS

| | September 30, 2017 (Unaudited) | December 31, 2016 (Audited) |
|---|---|---|
| **ASSETS:** | | |
| Current assets: | | |
| Cash | $ 546,322 | $ 225,500 |
| Prepaid expenses | 122,427 | — |
| Total current assets | 668,749 | 225,500 |
| Investment held in Trust Account | 1,038,946,417 | |
| Deferred offering costs | — | 169,552 |
| Total assets | $1,039,615,166 | $ 395,052 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accrued expenses | $ — | $ 72,052 |
| Sponsor note | 1,500,000 | 300,000 |
| Franchise taxes payable | 90,000 | |
| Income taxes payable | 1,349,746 | — |
| Total current liabilities | 2,939,746 | 372,052 |
| Deferred underwriting discounts | 36,225,000 | |
| Total liabilities | 39,164,746 | 372,052 |
| Class A common stock subject to possible redemption; 99,545,041 (at redemption value of approximately $10.00 per share) | 995,450,410 | — |
| Stockholders' equity: | | |
| Preferred shares, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value, 400,000,000 shares authorized, 3,954,959 issued and outstanding (excluding 99,545,041shares subject to possible redemption) | 395 | — |
| Class B common stock, $0.0001 par value, 50,000,000 shares authorized, 25,875,000 shares issued and outstanding | 2,588 | 2,588 |
| Additional paid-in capital | 4,039,284 | 22,412 |
| Retained earnings (accumulated deficit) | 957,743 | (2,000) |
| Total stockholders' equity | 5,000,010 | 23,000 |
| Total liabilities and stockholders' equity | $1,039,615,166 | $ 395,052 |

See accompanying notes to unaudited condensed financial statements.

Fin-1

Table of Contents

**SILVER RUN ACQUISITION CORPORATION II**
**CONDENSED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended September 30, 2017 | Nine Months Ended September 30, 2017 |
|---|---|---|
| Revenues | $ — | $ — |
| Operating expenses: | | |
| General and administrative expenses | 1,210,075 | 1,546,928 |
| Franchise taxes | 45,000 | 90,000 |
| Total operating expenses | (1,255,075) | (1,636,928) |
| Loss from operations | (1,255,075) | (1,636,928) |
| Other income – investment income on Trust Account | 2,256,423 | 3,946,417 |
| Income before provision for income taxes | 1,001,348 | 2,309,489 |
| Provision for income taxes | 773,998 | 1,349,746 |
| Net income attributable to common shares | $ 227,350 | $ 959,743 |
| Weighted average number of shares outstanding: | | |
| Basic (excluding shares subject to possible redemption) | 29,829,959 | 28,577,517 |
| Diluted | 129,375,000 | 129,375,000 |
| Net income per share | | |
| Basic | $ 0.01 | $ 0.03 |
| Diluted | $ 0.00 | $ 0.01 |

See accompanying notes to unaudited condensed financial statements.

Fin-2

**Table of Contents**

**SILVER RUN ACQUISITION CORPORATION II**
**CONDENSED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**For the Nine Months Ended September 30, 2017**
**(Unaudited)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | |
| Balances as of December 31, 2016 | — | $ — | 25,875,000 | $ 2,588 | $ 22,412 | $ (2,000) | $ 23,000 |
| Sale of Class A Common Stock to Public | 103,500,000 | 10,350 | — | — | 1,034,989,650 | — | 1,035,000,000 |
| Underwriting discounts and offering expenses | — | — | — | — | (58,232,323) | — | (58,232,323) |
| Sale of 15,133,333 Private Placement Warrants at $1.50 per warrant | — | — | — | — | 22,700,000 | — | 22,700,000 |
| Shares subject to possible redemption | (99,545,041) | (9,955) | — | — | (995,440,455) | — | (995,450,410) |
| Net income | — | — | — | — | — | 959,743 | 959,743 |
| Balances as of September 30, 2017 | 3,954,959 | $ 395 | 25,875,000 | $ 2,588 | $ 4,039,284 | $ 957,743 | $ 5,000,010 |

See accompanying notes to unaudited condensed financial statements.

Fin-3

Table of Contents

**SILVER RUN ACQUISITION CORPORATION II**
**CONDENSED STATEMENT OF CASH FLOWS**
**For the Nine Months Ended September 30, 2017**
**(Unaudited)**

| | | |
|---|---|---:|
| Cash flows from operating activities: | | |
| Net income | $ | 959,743 |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Interest earned on investments held in Trust Account | | (3,946,417) |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses | | (122,427) |
| Franchise taxes payable | | 90,000 |
| Income taxes payable | | 1,349,746 |
| Net cash used in operating activities | | (1,669,355) |
| Cash flows from investing activities: | | |
| Cash deposited into Trust Account | | (1,035,000,000) |
| Net cash used in investing activities | | (1,035,000,000) |
| Cash flows from financing activities: | | |
| Proceeds from Public Offering | | 1,035,000,000 |
| Proceeds from sale of Private Placement Warrants | | 22,700,000 |
| Payment of underwriting discounts | | (20,700,000) |
| Payment of offering costs | | (1,209,823) |
| Payment of Sponsor note | | (300,000) |
| Net cash provided by financing activities | | 1,036,990,177 |
| Net increase in cash | | 320,822 |
| Cash at beginning of period | | 225,500 |
| Cash at end of period | $ | 546,322 |
| Supplemental disclosure of non-cash financing activities: | | |
| Deferred underwriting discounts | $ | 36,225,000 |

See accompanying notes to unaudited condensed financial statements.

Fin-4

Table of Contents

**SILVER RUN ACQUISITION CORPORATION II**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**1.**    **Description of Organization and Business Operations**

***Organization and General***

    Silver Run Acquisition Corporation II (the "**Company**") was incorporated in Delaware on November 16, 2016. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "**Business Combination**"). The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "**Securities Act**"), as modified by the Jumpstart Our Business Startups Act of 2012 (as amended, the "**JOBS Act**"). The Company's sponsor is Silver Run Sponsor II, LLC; a Delaware limited liability company (the "**Sponsor**").

    As of September 30, 2017, the Company had not engaged in any significant operations. All activity for the period from November 16, 2016 (date of inception) through September 30, 2017 relates to the Company's formation, the initial public offering ("**Public Offering**" as described below) and efforts directed towards locating and consummating a suitable initial Business Combination. The Company did not generate any operating revenues prior to September 30, 2017. The Company will generate non-operating income in the form of interest income earned on cash and cash equivalents held in trust account. The Company has selected December 31st as its fiscal year end.

***Financing***

    On March 24, 2017, the registration statement for the Public Offering was declared effective by the Securities and Exchange Commission (the "**SEC**"). On March 29, 2017 (the "**IPO Closing Date**"), the Company consummated the Public Offering of $1,035,000,000 in Units (as defined in Note 3), and the sale of $22,700,000 in warrants (the "**Private Placement Warrants**") to the Sponsor (the "**IPO Private Placement**"). On the IPO Closing Date, the Company placed $1,035,000,000 of proceeds (including the Deferred Discount (as defined in Note 3)) from the Public Offering and the IPO Private Placement into a trust account at J.P. Morgan Chase Bank, N.A. (the "**Trust Account**"). The Company intends to finance the initial Business Combination from proceeds held in the Trust Account.

    At the IPO Closing Date, the Company held $22,700,000 of proceeds from the Public Offering and the IPO Private Placement outside the Trust Account. Of these amounts, $20,700,000 was used to pay underwriting discounts in the Public Offering and $300,000 was used to repay a note payable to the Sponsor (see Note 4), with the balance reserved to pay accrued offering and formation costs, business, legal and accounting due diligence expenses on prospective acquisitions and continuing general and administrative expenses.

***Trust Account***

    The proceeds held in the Trust Account are invested in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act of 1940, as amended and that invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the initial Business Combination or (ii) the distribution of the Trust Account proceeds as described below. The remaining proceeds outside the Trust Account may be used to pay for business, legal and accounting due diligence on prospective acquisitions and continuing general and administrative expenses.

    The Company's amended and restated certificate of incorporation provides that, other than the withdrawal of interest to pay taxes, if any, none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the initial Business Combination; (ii) the redemption of any shares of Class A common

Fin-5

Table of Contents

stock included in the Units (the "**Public Shares**") sold in the Public Offering that have been properly tendered in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of its obligation to redeem 100% of such shares of Class A common stock if it does not complete the initial Business Combination within 24 months from the closing of the Public Offering; and (iii) the redemption of 100% of the shares of Class A common stock included in the Units sold in the Public Offering if the Company is unable to complete an initial Business Combination within 24 months from the closing of the Public Offering (subject to the requirements of law). The proceeds deposited in the Trust Account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

### *Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Public Offering, although substantially all of the net proceeds of the Public Offering are intended to be generally applied toward consummating an initial Business Combination. The initial Business Combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the Trust Account (excluding the deferred underwriting discounts and taxes payable on income earned on the Trust Account) at the time of the agreement to enter into the initial Business Combination. Furthermore, there is no assurance that the Company will be able to successfully effect an initial Business Combination.

The Company, after signing a definitive agreement for an initial Business Combination, will either (i) seek stockholder approval of the initial Business Combination at a meeting called for such purpose in connection with which public stockholders may seek to redeem their Public Shares, regardless of whether they vote for or against the initial Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to sell their Public Shares to the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the initial Business Combination or will allow stockholders to sell their Public Shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval, unless a vote is required by law or under NASDAQ rules. If the Company seeks stockholder approval, it will complete its initial Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial Business Combination. However, in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. In such case, the Company would not proceed with the redemption of its Public Shares and the related initial Business Combination, and instead may search for an alternate initial Business Combination.

If the Company holds a stockholder vote or there is a tender offer for Public Shares in connection with an initial Business Combination, a public stockholder will have the right to redeem its Public Shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest but less taxes payable. As a result, such shares of Class A Common Stock are recorded at redemption amount and classified as temporary equity upon the completion of the Public Offering, in accordance with the Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") 480, "Distinguishing Liabilities from Equity."

Pursuant to the Company's amended and restated certificate of incorporation, if the Company is unable to complete the initial Business Combination within 24 months from the closing of the Public Offering, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably

Fin-6

Table of Contents

possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest income but less taxes payable (less up to $100,000 of interest income to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. The Sponsor and the Company's officers and directors have entered into a letter agreement with the Company, pursuant to which they have agreed to waive their rights to liquidating distributions from the Trust Account with respect to any Founder Shares (as defined in Note 4) held by them if the Company fails to complete the initial Business Combination within 24 months of the closing of the Public Offering. However, if the Sponsor or any of the Company's directors, officers or affiliates acquires Public Shares, they will be entitled to liquidating distributions from the Trust Account with respect to such shares if the Company fails to complete the initial Business Combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after an initial Business Combination, the Company's stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. The Company's stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that the Company will provide its public stockholders with the opportunity to redeem their Public Shares for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account, upon the completion of the initial Business Combination and the other circumstances described above, subject to the limitations described herein.

## 2.    Summary of Significant Accounting Policies

### *Basis of Presentation*

The Company's unaudited condensed interim financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("**U.S. GAAP**") and the rules and regulations of the SEC for interim financial information and the instructions to Form 10-Q. Accordingly, the financial statements do not include all of the information and footnotes required by U.S. GAAP. In the opinion of management, all adjustments (consisting of normal accruals) considered for a fair presentation have been included. The Company has evaluated subsequent events after September 30, 2017. Operating results for the three and nine months ended September 30, 2017 are not necessarily indicative of the results that may be expected for the year ending December 31, 2017 or any other period. The accompanying unaudited condensed interim financial statements should be read in conjunction with the Company's audited financial statements and notes thereto included in the Company's prospectus filed with the SEC on March 22, 2017, as well as the Company's Form 8-K filed with the SEC on April 4, 2017. Management has determined that the Company has access to funds from the Sponsor entity that are sufficient to fund the working capital needs of the Company until the earlier of the consummation of the Business Combination or a minimum one year from the date of issuance of these financial statements.

### *Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to

Fin-7

Table of Contents

opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

### Net Income Per Common Share

Net income per common share is computed by dividing net income applicable to common stockholders by the weighted average number of common shares outstanding during the period. An aggregate of 99,545,041 shares of Class A common stock subject to possible redemption at September 30, 2017 have been excluded from the calculation of basic income per common share since such shares, if redeemed, only participate in their pro rata share of the trust earnings. The Company has not considered the effect of the warrants sold in the Initial Public Offering (including the consummation of the over-allotment) and Private Placement Warrants to purchase 49,633,333 shares of the Company's Class A common stock in the calculation of diluted income per share, since their inclusion would be anti-dilutive.

### Cash and Cash Equivalents

The Company considers all short-term investments with an original maturity of three months or less when purchased to be cash equivalents.

### Marketable Securities held in Trust Account

The amounts held in the Trust Account represent proceeds from the Public Offering and the IPO Private Placement of $1,035,000,000 which were invested in a money market instrument that invests in United States Treasury Securities with original maturities of six months or less and are classified as restricted assets because such amounts can only be used by the Company in connection with the consummation of an initial Business Combination.

As of September 30, 2017, marketable securities held in the Trust Account had a fair value of $1,038,946,417. At September 30, 2017, there was $3,946,417 of interest income held in the Trust Account available to be released to the Company to pay accrued tax expenses.

### Redeemable Common Stock

As discussed in Note 1, all of the 103,500,000 Public Shares contain a redemption feature which allows for the redemption of Class A Common Stock under the Company's liquidation or tender offer/stockholder approval provisions. In accordance with FASB ASC 480, redemption provisions not solely within the control of the Company require the security to be classified outside of permanent equity. Ordinary liquidation events, which involve the redemption and liquidation of all of the entity's equity instruments, are excluded from the provisions of FASB ASC 480. Although the Company has not specified a maximum redemption threshold, its amended and restated certificate of incorporation provides that in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001.

The Company recognizes changes in redemption value immediately as they occur and will adjust the carrying value of the security to equal the redemption value at the end of each reporting period. Increases or decreases in the carrying amount of redeemable shares of Class A Common Stock shall be affected by charges against additional paid in capital.

Accordingly, at September 30, 2017, 99,545,041 of the 103,500,000 shares of Class A Common Stock included in the Units were classified outside of permanent equity at their redemption value.

Fin-8

Table of Contents

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentration of credit risk consist of cash accounts in a financial institution which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

### Financial Instruments

The fair value of the Company's assets and liabilities, which qualify as financial instruments under FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet.

### Use of Estimates

The preparation of the financial statements in conformity with U.S. GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Offering Costs

The Company complies with the requirements of FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A – "Expenses of Offering." Offering costs of $58,232,323, consisting primarily of underwriting discounts of $56,925,000 (including $36,225,000 of which is deferred), and $1,307,323 of professional, filing, regulatory and other costs, were charged to additional paid-in capital.

### Income Taxes

The Company follows the asset and liability method of accounting for income taxes under FASB ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of September 30, 2017. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties at September 30, 2017. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

During the three and nine months ended September 30, 2017, the Company recorded federal income tax expense of $773,998 and $1,349,746, respectively, primarily related to interest income earned on the Trust Account. The Company's effective tax rate for the three and nine months ended September 30, 2017, was 35% and 35%, respectively, which does not differ significantly from the U.S. federal statutory income tax rate of 35 percent.

Fin-9

Table of Contents

### *Related Parties*

The Company follows subtopic ASC 850-10 for the identification of related parties and disclosure of related party transactions.

Pursuant to Section 850-10-20, the related parties include: (a) affiliates of the Company ("Affiliate" means, with respect to any specified person, any other person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such person, as such terms are used in and construed under Rule 405 under the Securities Act); (b) entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity; (c) trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; (d) principal owners of the Company; (e) management of the Company; (f) other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and (g) other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

### *Subsequent Events*

The Company evaluates subsequent events and transactions that occur after the balance sheet date for potential recognition or disclosure. Any material events that occur between the balance sheet date and the date that the financial statements were issued are disclosed as subsequent events, while the financial statements are adjusted to reflect any conditions that existed at the balance sheet date.

### *Recent Accounting Pronouncements*

The Company's management does not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have an effect on the Company's financial statements.

### 3. Public Offering

On the IPO Closing Date, the Company sold 103,500,000 units (the "**Units**") at a price of $10.00 per Unit, generating gross proceeds to the Company of $1,035,000,000. Each Unit consists of one share of Class A Common Stock and one-third of one warrant (each whole warrant, a "**Warrant**" and, collectively, the "**Warrants**"). Each whole Warrant entitles the holder thereof to purchase one whole share of Class A Common Stock at a price of $11.50 per share. No fractional shares will be issued upon separation of the Units and only whole Warrants will trade. Each Warrant will become exercisable on the later of 30 days after the completion of the initial Business Combination or 12 months from the closing of the Public Offering and will expire five years after the completion of the initial Business Combination or earlier upon redemption or liquidation. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of the Class A Common Stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sent the notice of redemption to the Warrant holders.

The Company paid an upfront underwriting discount of 2.0% ($20,700,000) of the per Unit offering price to the underwriters at the closing of the Public Offering, with an additional fee (**"Deferred Discount"**) of 3.5% ($36,225,000) of the gross offering proceeds payable upon the Company's completion of an initial Business Combination. The Deferred Discount will become payable to the underwriters from the amounts held in the Trust Account solely in the event the Company completes an initial Business Combination.

Fin-10

Table of Contents

**4.     Related Party Transactions**

*Founder Shares*

On November 21, 2016, the Sponsor purchased 11,500,000 shares (the "**Founder Shares**") of Class B common stock, par value $0.0001 per share (the "**Class B Common Stock**"), for an aggregate purchase price of $25,000, or approximately $0.002 per share. In March 2017, the Sponsor transferred 33,000 Founder Shares to each of the Company's independent directors (together with the Sponsor, the "**Initial Stockholders**") at their original purchase price. In March 2017, the Company effected stock dividends of approximately 1.25 shares for each outstanding share of Class B Common Stock, resulting in the Initial Stockholders holding an aggregate of 25,875,000 Founder Shares. As used herein, unless the context otherwise requires, "Founder Shares" shall be deemed to include the shares of Class A Common Stock issuable upon conversion thereof. The Founder Shares are identical to the Class A Common Stock included in the Units sold in the Public Offering except that the Founder Shares automatically convert into shares of Class A Common Stock at the time of the initial Business Combination and are subject to certain transfer restrictions, as described in more detail below. Holders of Founder Shares may also elect to convert their shares of Class B Common Stock into an equal number of shares of Class A Common Stock, subject to adjustment, at any time.

The Company's Initial Stockholders have agreed, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier to occur of: (A) one year after the completion of the initial Business Combination or (B) subsequent to the initial Business Combination, (x) if the last sale price of the Class A Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 trading day period commencing at least 150 days after the initial Business Combination, or (y) the date on which the Company completes a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

*Private Placement Warrants*

The Sponsor purchased an aggregate of 15,133,333 Private Placement Warrants at a price of $1.50 per whole warrant ($22,700,000 in the aggregate) in a private placement that occurred simultaneously with the closing of the Public Offering. Each whole Private Placement Warrant is exercisable for one whole share of Class A Common Stock at a price of $11.50 per share. A portion of the purchase price of the Private Placement Warrants was added to the proceeds from the Public Offering held in the Trust Account such that at the closing of the Public Offering $1,035,000,000 was placed in the Trust Account. If the initial Business Combination is not completed within 24 months from the closing of the Public Offering, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Placement Warrants will expire worthless. The Private Placement Warrants are non-redeemable and exercisable on a cashless basis so long as they are held by the Sponsor or its permitted transferees.

The Sponsor and the Company's officers and directors have agreed, subject to limited exceptions, not to transfer, assign or sell any of their Private Placement Warrants until 30 days after the completion of the initial Business Combination.

In March 2017, the Sponsor transferred 33,000 Founder Shares to each of our independent director nominees at their original purchase price.

*Registration Rights*

The holders of Founder Shares, Private Placement Warrants and warrants that may be issued upon conversion of working capital loans, if any, are entitled to registration rights (in the case of the Founder Shares, only after conversion of such shares to shares of Class A Common Stock) as stated in the registration rights

Fin-11

Table of Contents

agreement signed on the date of the prospectus for the Public Offering. These holders are entitled to certain demand and "piggyback" registration rights.

However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period for the securities to be registered. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

### *Related Party Loans*

On November 22, 2016, the Sponsor agreed to loan the Company an aggregate of up to $300,000 to cover expenses related to the Public Offering pursuant to a promissory note (the "**2016 Note**"). This loan is non-interest bearing and payable on the earlier of March 31, 2017 or the completion of the Public Offering. On November 22, 2016, the Company borrowed $300,000 under the 2016 Note. On March 29, 2017, the full $300,000 balance of the 2016 Note was repaid to the Sponsor.

On September 27, 2017, the Sponsor agreed to loan the Company an aggregate of up to $2,000,000 to cover expenses related to the business combination pursuant to a promissory note (the "**2017 Note**"). This loan is non-interest bearing and payable on the earlier of March 29, 2019 or the date on which the Company consummates a business combination. On September 27, 2017, the Company borrowed $1,500,000 under the 2017 Note. At the time of this filing, $1,500,000 remains outstanding on the 2017 Note.

### *Administrative Support Agreement*

The Company has agreed to pay an affiliate of the Sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of the initial Business Combination or the Company's liquidation, the Company will cease paying these monthly fees.

### *Forward Purchase Agreement*

In March 2017, the Company entered into a forward purchase agreement (**"Forward Purchase Agreement"**) pursuant to which Riverstone VI SRII Holdings, L.P. ("**Fund VI Holdings**") agreed to purchase an aggregate of up to 40,000,000 shares of the Company's Class A common stock, plus an aggregate of up to 13,333,333 warrants ("**Forward Purchase Warrant**"), for an aggregate purchase price of up to $400,000,000 or $10.00 per unit (collectively, "**Forward Purchase Units**"). Each Forward Purchase Warrant has the same terms as each of the Private Placement Warrants.

The obligations under the Forward Purchase Agreement do not depend on whether any public stockholders elect to redeem their shares in connection with the initial Business Combination and provide the Company with a minimum funding level for the initial Business Combination. Additionally, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to termination prior to the closing of the sale of such units by mutual written consent of the Company and such party, or automatically: (i) if the proposed offering is not consummated on or prior to June 30, 2017; (ii) if the initial Business Combination is not consummated within 24 months from the closing of the proposed offering, unless extended up to a maximum of sixty (60) days in accordance with the amended and restated certificate of incorporation; or (iii) if the Sponsor or the Company become subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of the Sponsor or the Company in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to fulfillment of customary closing conditions, including that the initial Business Combination must be consummated substantially concurrently with the purchase of the Forward Purchase Units.

Fin-12

Table of Contents

*Riverstone Contribution Agreement and Business Combination Forward Purchase Agreement*

See Note 8 for a description of the contribution agreement entered into between the Company and Riverstone VI Alta Mesa Holdings, L.P. on August 16, 2017 and the related forward purchase agreement entered into between the Company and Fund VI Holdings

**5.    Deferred Underwriting Discounts**

The Company is committed to pay the Deferred Discount of 3.5% of the gross proceeds of the Public Offering, or $36,225,000, to the underwriters upon the Company's completion of an initial Business Combination (as discussed in Note 3). The underwriters are not entitled to receive any of the interest earned on Trust Account funds that would be used to pay the Deferred Discount, and no Deferred Discount is payable to the underwriters if an initial Business Combination is not completed within 24 months after the Public Offering.

**6.    Stockholders' Equity**

*Common Stock*

The authorized common stock of the Company includes up to 400,000,000 shares of Class A Common Stock and 50,000,000 shares of Class B Common Stock. If the Company enters into an initial Business Combination, it may (depending on the terms of such an initial Business Combination) be required to increase the number of shares of Class A Common Stock which the Company is authorized to issue at the same time as the Company's stockholders vote on the initial Business Combination to the extent the Company seeks stockholder approval in connection with the initial Business Combination. Holders of the Company's common stock are entitled to one vote for each share of common stock. At September 30, 2017, there were 103,500,000 shares of Class A Common Stock, of which 99,545,041 were classified outside of permanent equity, and 25,875,000 shares of Class B Common Stock issued and outstanding.

*Preferred Stock*

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors. At September 30, 2017 there were no shares of preferred stock issued or outstanding.

*Warrants*

Public warrants may only be exercised for a whole number of shares. No fractional shares will be issued upon exercise of the public warrants. The public warrants will become exercisable on the later of (a) 30 days after the completion of a Business Combination or (b) 12 months from the closing of the Initial Public Offering; provided in each case that the Company has an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement). We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file and have an effective registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed; provided, that if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the

Fin-13

Table of Contents

extent an exemption is not available. The Public Warrants will expire five years after the completion of a Business Combination or earlier upon redemption or liquidation.

The Private Placement Warrants are identical to the public warrants underlying the Units sold in the Initial Public Offering, except that the Private Placement Warrants and the common stock issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or salable until 30 days after the completion of a Business Combination, subject to certain limited exceptions.

### 7.   Trust Account and Fair Value Measurements

On the IPO Closing Date, gross proceeds of $1,035,000,000 and $22,700,000 from the Public Offering and the IPO Private Placement, respectively, less underwriting discounts of $20,700,000 and $2,000,000 designated to fund the Company's accrued formation and offering costs (including the note payable to the Sponsor), business, legal and accounting due diligence expenses on prospective acquisitions, and continuing general and administrative expenses, were placed in the Trust Account.

As of September 30, 2017, marketable securities held in the Trust Account had a fair value of $1,038,946,417 which was invested in a money market instrument that invests in United States Treasury Securities with original maturities of six months or less.

The following table presents information about the Company's assets that are measured on a recurring basis as of September 30, 2017 and indicates the fair value hierarchy of the valuation techniques that the Company utilized to determine such fair value. In general, fair values determined by Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities. Fair values determined by Level 2 inputs utilize data points that are observable, such as quoted prices, interest rates and yield curves. Fair values determined by Level 3 inputs are unobservable data points for the asset or liability, and includes situations where there is little, if any, market activity for the asset or liability.

| Description | September 30, 2017 | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Other Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Investments held in Trust Account | $1,038,946,417 | $1,038,946,417 | $   — | $   — |

### 8.   Contribution and Forward Purchase Agreements

_Contribution Agreements_

On August 16, 2017, the Company entered into:

- the Contribution Agreement dated as of August 16, 2017 (as the same may be amended from time to time, the "Alta Mesa Contribution Agreement"), among High Mesa Holdings, LP, a Delaware limited partnership (the "Alta Mesa Contributor"), High Mesa Holdings GP, LLC, a Texas limited liability company and the sole general partner of the Alta Mesa Contributor, Alta Mesa Holdings, LP, a Texas limited partnership ("Alta Mesa"), Alta Mesa Holdings GP, LLC, a Texas limited liability company and sole general partner of Alta Mesa ("Alta Mesa GP"), and, solely for certain provisions therein, the equity owners of the Alta Mesa Contributor, pursuant to which the Company will acquire from the Alta Mesa Contributor (a) all of the limited partner interests in Alta Mesa held by the Alta Mesa Contributor and (b) 100% of the economic interests and 90% of the voting interests in Alta Mesa GP;

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Kingfisher Contribution Agreement"), among KFM Holdco, LLC, a Delaware limited liability company (the "Kingfisher Contributor"), Kingfisher Midstream, LLC, a Delaware limited liability company ("Kingfisher"), and, solely for certain provisions therein, the equity owners of the Kingfisher Contributor, pursuant to which the Company will acquire 100% of the outstanding membership interests in Kingfisher; and

Fin-14

Table of Contents

- the Contribution Agreement, dated as of August 16, 2017 (as the same may be amended from time to time, the "Riverstone Contribution Agreement" and, together with the Alta Mesa Contribution Agreement and the Kingfisher Contribution Agreement, the "Contribution Agreements"), between Riverstone VI Alta Mesa Holdings, L.P., a Delaware limited partnership (the "Riverstone Contributor"), pursuant to which the Company will acquire from the Riverstone Contributor all of the limited partner interests in Alta Mesa held by the Riverstone Contributor.

Pursuant to the Contribution Agreements, the Company will contribute cash to SRII Opco, LP, a Delaware limited partnership and wholly owned subsidiary of the Company ("SRII Opco"), in exchange for (a) a number of common units representing limited partner interests in SRII Opco (the "SRII Opco Common Units") equal to the number of shares of the Company's Class A common stock, outstanding as of the closing (the "Closing") of the transactions contemplated by the Contribution Agreements (the "Transactions"), and (b) a number of SRII Opco warrants exercisable for SRII Opco Common Units equal to the number of the Company's warrants outstanding as of the Closing. Following the Closing, the Company will control SRII Opco through its ownership of SRII Opco GP, LLC, the sole general partner of SRII Opco.

Pursuant to the terms of the Alta Mesa Contribution Agreement, at the Closing, the Alta Mesa Contributor will receive consideration consisting of 220,000,000 SRII Opco Common Units, as adjusted (i) upward for any inorganic acquisition capital expenditures invested by Alta Mesa during the interim period (based on a value of $10.00 per SRII Opco Common Unit), (ii) downward for the Riverstone Contributor's $200 million contribution to Alta Mesa, which was made in connection with the parties entering into the Contribution Agreements (based on a value of $10.00 per SRII Opco Common Unit), and (iii) downward for debt and transaction expenses (based on a value of $10.00 per SRII Opco Common Unit). The Alta Mesa Contributor will also purchase from the Company a number of shares of a new class of common stock designated as the Class C common stock equal to the number of SRII Opco Common Units received by the Alta Mesa Contributor at the Closing.

In addition to the above, for a period of seven years following the Closing, the Alta Mesa Contributor will be entitled to receive an aggregate of up to $800 million in earn-out consideration if the 20-day volume-weighted average price ("20-Day VWAP") of the Class A common stock equals or exceeds certain prices (each such payment, an "Earn-Out Payment"). The earn-out consideration will be paid in the form of SRII Opco Common Units (and the Alta Mesa Contributor will acquire a corresponding number of shares of Class C common stock) as follows based on the specified 20-Day VWAP hurdle: $14.00 – 10,714,285 SRII Opco Common Units; $16.00 – 9,375,000 SRII Opco Common Units; $18.00 – 13,888,889 SRII Opco Common Units and $20.00 – 12,500,000 SRII Opco Common Units.

The Alta Mesa Contributor will not be entitled to receive a particular Earn-Out Payment on more than one occasion and, if, on a particular date, the 20-Day VWAP entitles the Alta Mesa Contributor to more than one Earn-Out Payment (each of which has not been previously paid), the Alta Mesa Contributor will be entitled to receive each such Earn-Out Payment. The Alta Mesa Contributor will be entitled to the earn-out consideration in connection with certain liquidity events of the Company, including a merger or sale of all or substantially all of its assets, if the consideration paid to holders of Class A common stock in connection with such liquidity event is greater than any of the above-specified 20-Day VWAP hurdles.

The Company will also contribute $400 million in cash to Alta Mesa at the Closing.

Pursuant to the Kingfisher Contribution Agreement, at the Closing, the Kingfisher Contributor will receive consideration consisting of:

- 55,000,000 SRII Opco Common Units; and

- subject to the Kingfisher Contributor's election to receive additional SRII Opco Common Units as described below, $800 million in cash, as adjusted for net working capital, debt, transaction expenses, capital expenditures and banking fees.

Fin-15

Table of Contents

The Kingfisher Contributor will also purchase from the Company a number of shares of Class C common stock equal to the number of SRII Opco Common Units received by the Kingfisher Contributor at the Closing.

If the Company does not have cash on hand at the Closing necessary to pay the cash consideration to the Kingfisher Contributor, the Kingfisher Contributor has the option to receive any deficit in the form of SRII Opco Common Units (and acquire a corresponding number of shares of Class C common stock) valued at $10.00 per SRII Opco Common Unit. At the Closing, $5 million of the cash consideration to be received by the Kingfisher Contributor will be funded into escrow to satisfy any post-Closing purchase price adjustments. If such escrowed amount is insufficient to satisfy any post-Closing adjustment, then the Kingfisher Contributor will transfer to the Company a number of SRII Opco Common Units (not to exceed 16,000,000 SRII Opco Common Units), and a corresponding number of shares of Class C common stock, with a value equal to the deficiency.

In addition to the above, for a period of seven years following the Closing, the Kingfisher Contributor will be entitled to receive an aggregate of up to $200 million in earn-out consideration if the 20-Day VWAP of the Class A Common Stock equals or exceeds certain prices. The earn-out consideration will be paid in the form of SRII Opco Common Units (and the Kingfisher Contributor will acquire a corresponding number of shares of Class C common stock) as follows based on the specified 20-Day VWAP hurdle: $14.00 – 7,142,857 SRII Opco Common Units and $16.00 – 6,250,000 SRII Opco Common Units.

The terms of the payment of the earn-out consideration, including in connection with a liquidity event of the Company, are substantially similar to the terms of the payment of the earn-out consideration to the Alta Mesa Contributor described above.

Pursuant to the Riverstone Contribution Agreement, the Riverstone Contributor will receive 20,000,000 SRII Opco Common Units in exchange for the Riverstone Contributor's limited partner interests in Alta Mesa and will acquire an equal number of shares of Class C common stock from the Company.

The Contribution Agreements contain customary representations, warranties and covenants and may be terminated by the parties thereto as set forth therein, including if the Transactions are not consummated by February 28, 2018. The Transactions will constitute a "Business Combination" under the Company's amended and restated certificate of incorporation.

### *Business Combination Forward Purchase Agreement*

In connection with the execution of the Contribution Agreements, on August 16, 2017, the Company entered into a forward purchase agreement (the "Business Combination Forward Purchase Agreement") with Fund VI Holdings, pursuant to which the Company has agreed to sell at the Closing, and Fund VI Holdings has agreed to purchase, up to $200 million of shares of Class A common stock at a purchase price of $10.00 per share. The number of shares of Class A common stock to be sold by the Company, and purchased by Fund VI Holdings, will equal that number which, after payment of the aggregate purchase price paid by Fund VI Holdings under the Business Combination Forward Purchase Agreement, will result in gross proceeds to the Company in an aggregate amount necessary to satisfy any exercise of rights of the public stockholders in connection with the Transactions or determined by the Company and Fund VI Holdings to be necessary for general corporate purposes in connection with or following consummation of the Transactions, but in no event will the number of shares of Class A common stock purchased exceed 20,000,000 shares.

Fin-16

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholder of
Silver Run Acquisition Corporation II

We have audited the accompanying balance sheet of Silver Run Acquisition Corporation II (the "Company"), as of December 31, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Silver Run Acquisition Corporation II as of December 31, 2016, and the results of its operations and its cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016, in accordance with accounting principles generally accepted in the United States of America.

/s/ WithumSmith+Brown, PC

New York, New York
March 22, 2017

Fin-17

Table of Contents

**Silver Run Acquisition Corporation II**
**BALANCE SHEET**
**December 31, 2016**

**ASSETS:**

| | |
|---|---:|
| Current assets – cash | $225,500 |
| Deferred offering costs | 169,552 |
| Total assets | $395,052 |

**LIABILITIES AND STOCKHOLDER'S EQUITY**

Current Liabilities:

| | |
|---|---:|
| Accrued formation and offering costs | $ 72,052 |
| Sponsor note | 300,000 |
| Total current liabilities | 372,052 |
| Commitments and contingencies | |
| Stockholder's equity: | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | — |
| Class A common stock, $0.0001 par value; 400,000,000 shares authorized; none issued and outstanding | — |
| Class B common stock, $0.0001 par value; 50,000,000 shares authorized; 25,875,000 shares issued and outstanding [1] | 2,588 |
| Additional paid-in capital | 22,412 |
| Accumulated deficit | (2,000) |
| Total stockholder's equity | 23,000 |
| Total liabilities and stockholder's equity | $395,052 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

Fin-18

**Table of Contents**

**Silver Run Acquisition Corporation II**
**STATEMENT OF OPERATIONS**
**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | | |
|---|---|---:|
| Revenue | $ | — |
| General and administrative expenses | | 2,000 |
| Net loss attributable to common stock | $ | (2,000) |
| Weighted average number of shares outstanding: | | |
| Basic and diluted [1] | | 25,875,000 |
| Net loss per common share: | | |
| Basic and diluted | $ | (0.00) |

---

(1)  Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

Fin-19

Table of Contents

**Silver Run Acquisition Corporation II**
**STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Stockholder's Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Sale of common stock to Sponsor at approx. $0.001 per share [1] | 25,875,000 | $2,588 | $ 22,412 | $ — | $ 25,000 |
| Net loss | — | — | — | (2,000) | (2,000) |
| Balances, December 31, 2016 | 25,875,000 | $2,588 | $ 22,412 | $ (2,000) | $ 23,000 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

Fin-20

**Table of Contents**

**Silver Run Acquisition Corporation II**
**STATEMENT OF CASH FLOWS**
**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | |
|---|---:|
| Net loss | $ (2,000) |
| Adjustments to reconcile net loss to net cash used in operations: | |
| Increase in accounts payable and accrued liabilities | 2,000 |
| Net cash used in operating activities | — |
| Cash flows from financing activities: | |
| Proceeds from Sponsor note | 300,000 |
| Payment of offering costs | (74,500) |
| Net cash provided by financing activities | 225,500 |
| Increase in cash | 225,500 |
| Cash at beginning of period | — |
| Cash at end of period | $225,500 |
| Supplemental disclosure of non-cash financing activities | |
| Deferred offering costs included in accrued formation and offering costs | $ 70,052 |
| Offering costs paid by Sponsor in exchange for Founder Shares | $ 25,000 |

See accompanying notes to financial statements

Fin-21

**Table of Contents**

## NOTES TO FINANCIAL STATEMENTS

### Note 1 – Description of Organization and Business Operations

*Organization and General*

Silver Run Acquisition Corporation II (the "**Company**") was incorporated in Delaware on November 16, 2016. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "**Initial Business Combination**"). The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the "**Securities Act**," as modified by the Jumpstart Our Business Startups Act of 2012 (the "**JOBS Act**").

At December 31, 2016, the Company had not commenced any operations. All activity for the period from November 16, 2016 (inception) through December 31, 2016 relates to the Company's formation and the proposed initial public offering ("**Proposed Offering**") described below. The Company will not generate any operating revenues until after completion of its Initial Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31st as its fiscal year end.

*Sponsor and Proposed Financing*

The Company's sponsor is Silver Run Sponsor II, LLC, a Delaware limited liability company (the "**Sponsor**"). The Company intends to finance its Initial Business Combination with proceeds from the proposed $900,000,000 initial public offering of Units (as defined below) (Note 3) and a $20,000,000 private placement (Note 4). Upon the closing of the Proposed Offering and the private placement, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full – Note 3) will be held in a trust account (the "**Trust Account**") (discussed below).

*The Trust Account*

The proceeds held in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred eighty (180) days or less or in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act of 1940 and that invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Initial Business Combination or (ii) the distribution of the Trust Account proceeds as described below. The remaining proceeds outside the Trust Account may be used to pay for business, legal and accounting due diligence on prospective acquisitions and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes, if any, none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Initial Business Combination; (ii) the redemption of any shares of Class A common stock included in the Units (the "**Public Shares**") being sold in the Proposed Offering that have been properly tendered in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of its obligation to redeem 100% of such shares of Class A common stock if it does not complete the Initial Business Combination within 24 months from the closing of the Proposed Offering; and (iii) the redemption of 100% of the shares of Class A common stock included in the Units being sold in the Proposed Offering if the Company is unable to complete an Initial Business Combination within 24 months from the closing of the Proposed Offering (subject to the requirements of law). The proceeds deposited in the Trust Account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

Fin-22

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 1 – Description of Organization and Business Operations (Continued)**

*Initial Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be generally applied toward consummating an Initial Business Combination. The Initial Business Combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on income earned on the Trust Account) at the time of the agreement to enter into the Initial Business Combination. Furthermore, there is no assurance that the Company will be able to successfully effect an Initial Business Combination.

The Company, after signing a definitive agreement for an Initial Business Combination, will either (i) seek stockholder approval of the Initial Business Combination at a meeting called for such purpose in connection with which stockholders may seek to redeem their shares, regardless of whether they vote for or against the Initial Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to sell their Public Shares to the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the Initial Business Combination or will allow stockholders to sell their Public Shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval, unless a vote is required by law or under NASDAQ rules. If the Company seeks stockholder approval, it will complete its Initial Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the Initial Business Combination. However, in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. In such case, the Company would not proceed with the redemption of its Public Shares and the related Initial Business Combination, and instead may search for an alternate Initial Business Combination.

If the Company holds a stockholder vote or there is a tender offer for shares in connection with an Initial Business Combination, a public stockholder will have the right to redeem its shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. As a result, such shares of Class A common stock will be recorded at redemption amount and classified as temporary equity upon the completion of the Proposed Offering, in accordance with the Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") 480, "Distinguishing Liabilities from Equity."

Pursuant to the Company's amended and restated certificate of incorporation, if the Company is unable to complete the Initial Business Combination within 24 months from the closing of the Proposed Offering, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay the Company's franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholder's rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the

Fin-23

Table of Contents

NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 1 – Description of Organization and Business Operations (Continued)**

approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. The Sponsor and the Company's officers and directors will enter into a letter agreement with the Company, pursuant to which they will agree to waive their rights to liquidating distributions from the Trust Account with respect to any Founder Shares (as defined below) held by them if the Company fails to complete the Initial Business Combination within 24 months of the closing of the Proposed Offering. However, if the Sponsor or any of the Company's directors, officers or affiliates acquires shares of Class A common stock in or after the Proposed Offering, they will be entitled to liquidating distributions from the Trust Account with respect to such shares if the Company fails to complete the Initial Business Combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after an Initial Business Combination, the Company's stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. The Company's stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that the Company will provide its stockholders with the opportunity to redeem their Public Shares for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account, upon the completion of the Initial Business Combination, subject to the limitations described herein.

**Note 2 – Summary of Significant Accounting Policies**

*Basis of Presentation*

The financial statements of the Company are presented in U.S. dollars in conformity with accounting principles generally accepted in the United States of America ("**GAAP**"). In connection with the Company's assessment of going concern considerations in accordance with ASU 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern", as of December 31, 2016, the Company does not have sufficient liquidity to meet its current obligations. However, management has determined that the Company has access to funds from the Sponsor entity that are sufficient to fund the working capital needs of the Company until the earlier of the consummation of the Proposed Offering or a minimum one year from the date of issuance of these financial statements.

*Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statement with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

Fin-24

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 2 – Summary of Significant Accounting Policies (Continued)**

*Net Loss Per Common Share*

Net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the period, plus, to the extent dilutive, the incremental number of shares of common stock to settle warrants, as calculated using the treasury stock method. At December 31, 2016, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company under the treasury stock method. As a result, diluted loss per common share is the same as basic loss per common share for the period.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash accounts in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

*Financial Instruments*

The fair value of the Company's assets and liabilities, which qualify as financial instruments under the FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Deferred Offering Costs*

The Company complies with the requirements of the FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A – "Expenses of Offering." Deferred offering costs of approximately $170,000 consist of costs incurred in connection with formation and preparation for the Proposed Offering. These costs, together with the underwriter discount, will be charged to additional paid-in capital upon completion of the Proposed Offering or charged to operations if the Proposed Offering is not completed.

*Income Taxes*

The Company follows the asset and liability method of accounting for income taxes under FASB ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

Fin-25

**Table of Contents**

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 2 – Summary of Significant Accounting Policies (Continued)**

FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of December 31, 2016. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties at December 31, 2016. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

*Recent Accounting Pronouncements*

In August 2014, FASB issued ASU 2014-15, "Presentation of Financial Statements – Going Concern" (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern. ASU 2014-15 provides guidance on management's responsibility to evaluate whether there is a substantial doubt about an organization's ability to continue as a going concern and to provide related footnote disclosures. For each reporting period, management will be required to evaluate whether there are conditions or events that raise substantial doubt about a company's ability to continue as a going concern within one year from the date the financial statements are issued. The amendments in ASU 2014-15 are effective for annual reporting periods ending after December 15, 2016 and for annual and interim periods thereafter. Early adoption is permitted. The Company has adopted the methodologies prescribed by ASU 2014-15 and it did not have a material effect on its financial position or results of operations. See *Basis of Presentation* for additional considerations.

Management does not believe that any other recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have an effect on the Company's financial statements.

**Note 3 – Public Offering**

Pursuant to the Proposed Offering, the Company intends to offer for sale up to 90,000,000 units at a price of $10.00 per unit (the "**Units**"). The Sponsor has committed to purchase an aggregate of 13,333,333 warrants at a price of $1.50 per warrant in a private placement that will close simultaneously with the Proposed Offering.

Each Unit consists of one share of the Company's Class A common stock, $0.0001 par value, and one-third of one warrant (each, a "**Warrant**" and, collectively, the "**Warrants**"). Each whole Warrant entitles the holder to purchase one share of Class A common stock at a price of $11.50 per share. No fractional shares will be issued upon separation of the Units and only whole Warrants will trade. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's Initial Business Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's Initial Business Combination or earlier upon redemption or liquidation. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of the Company's Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sent the notice of redemption to the Warrant holders.

The Company expects to grant the underwriters a 45-day option to purchase up to 13,500,000 additional Units to cover any over-allotments at the initial public offering price less the underwriting discounts and commissions. The Units that would be issued in connection with the over-allotment option would be identical to the Units issued in the Proposed Offering.

Fin-26

**Table of Contents**

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 3 – Public Offering (Continued)**

The Company expects to pay an underwriting discount of 2.0% of the per Unit offering price to the underwriters at the closing of the Proposed Offering, with an additional fee (the "**Deferred Discount**") of 3.5% of the gross offering proceeds payable upon the Company's completion of an Initial Business Combination. The Deferred Discount will become payable to the underwriters from the amounts held in the Trust Account solely in the event the Company completes its Initial Business Combination.

**Note 4 – Related Party Transactions**

*Founder Shares*

On November 21, 2016, the Sponsor purchased 11,500,000 shares of Class B common stock (the "**Founder Shares**") for an aggregate price of $25,000, or approximately $0.002 per share. As used herein, unless the context otherwise requires, "Founder Shares" shall be deemed to include the shares of Class A common stock issuable upon conversion thereof. The Founder Shares are identical to the Class A common stock included in the Units being sold in the Proposed Offering except that the Founder Shares automatically convert into shares of Class A common stock at the time of the Company's Initial Business Combination and are subject to certain transfer restrictions, as described in more detail below. Holders of Founder Shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. The Sponsor has agreed to forfeit up to 1,500,000 Founder Shares to the extent that the over-allotment option is not exercised in full by the underwriters (see Note 6). The forfeiture will be adjusted to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering. If the Company increases or decreases the size of the offering, the Company will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the Proposed Offering in such amount as to maintain the Founder Share ownership of the Company's stockholders prior to the Proposed Offering at 20.0% of the Company's issued and outstanding common stock upon the consummation of the Proposed Offering.

The Company's initial stockholders will agree, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier to occur of: (A) one year after the completion of the Initial Business Combination or (B) subsequent to the Initial Business Combination, (x) if the last sale price of the Company's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Initial Business Combination, or (y) the date on which we complete a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

The Sponsor will agree to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or $22,700,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of the Proposed Offering (the "**Private Placement Warrants**"). Each whole Private Placement Warrant is exercisable for one whole share of the Company's Class A common stock at a price of $11.50 per share. A portion of the purchase price of the Private Placement Warrants will be added to the proceeds from the Proposed Offering to be held in the Trust Account such that at the closing of the Proposed Offering $900.0 million (or $1,035.0 million if the underwriters exercise their over-allotment option in full) will be held in the Trust Account. If the Initial Business Combination is not completed within 24 months from the closing of the Proposed Offering, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Placement Warrants will expire worthless. The Private Placement

Fin-27

**Table of Contents**

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 4 – Related Party Transactions (Continued)**

Warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the Sponsor or its permitted transferees.

The Sponsor and the Company's officers and directors will agree, subject to limited exceptions, not to transfer, assign or sell any of their Private Placement Warrants until 30 days after the completion of the Initial Business Combination.

*Registration Rights*

The holders of Founder Shares, Private Placement Warrants and Warrants that may be issued upon conversion of working capital loans, if any, will be entitled to registration rights (in the case of the Founder Shares, only after conversion of such shares to shares of Class A common stock) pursuant to a registration rights agreement to be signed on or before the date of the prospectus for the Proposed Offering. These holders will be entitled to certain demand and "piggyback" registration rights. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period for the securities to be registered. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Related Party Loans*

On November 22, 2016, the Sponsor loaned the Company an aggregate of $300,000 to cover expenses related to the Proposed Offering pursuant to a promissory note (the "**Note**"). This loan is non-interest bearing and payable on the earlier of March 31, 2017 or the completion of the Proposed Offering. As of March 20, 2017, $300,000 is still outstanding under the Note.

*Administrative Support Agreement*

Commencing on the date the Units are first listed on the NASDAQ, the Company has agreed to pay the Sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of the Initial Business Combination or the Company's liquidation, the Company will cease paying these monthly fees.

**Note 5 – Stockholder's Equity**

*Common Stock*

The authorized common stock of the Company includes up to 400,000,000 shares of Class A common stock and 50,000,000 shares of Class B common stock (see Note 6). If the Company enters into an Initial Business Combination, it may (depending on the terms of such an Initial Business Combination) be required to increase the number of shares of Class A common stock which the Company is authorized to issue at the same time as the Company's stockholders vote on the Initial Business Combination to the extent the Company seeks stockholder approval in connection with the Initial Business Combination. Holders of the Company's common stock are entitled to one vote for each share of common stock. At December 31, 2016, there were 25,875,000 shares of Class B common stock issued and outstanding (see Note 6).

*Preferred Stock*

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors (see Note 6). At December 31, 2016, there were no shares of preferred stock issued or outstanding.

Fin-28

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 6 – Subsequent Events**

In March 2017, the Company effected stock dividends in the aggregate of approximately 1.25 shares for each outstanding share of Class B common stock, resulting in the initial stockholders holding an aggregate of 25,875,000 Founder Shares. The stock dividends also adjusted the shares subject to forfeiture from 1,500,000 to 3,375,000, to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering.

In March 2017, the Company entered into a forward purchase agreement ("**Forward Purchase Agreement**") pursuant to which Riverstone VI SRII Holdings, L.P. ("**Fund VI Holdings**") agreed to purchase an aggregate of up to 40,000,000 shares of the Company's Class A common stock, plus an aggregate of up to 13,333,333 warrants ("**Forward Purchase Warrant**"), for an aggregate purchase price of up to $400,000,000 or $10.00 per unit (collectively, "**Forward Purchase Units**"). Each Forward Purchase Warrant has the same terms as each of the Private Placement Warrants.

The obligations under the Forward Purchase Agreement do not depend on whether any public stockholders elect to redeem their shares in connection with the Initial Business Combination and provide the Company with a minimum funding level for the Initial Business Combination. Additionally, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to termination prior to the closing of the sale of such units by mutual written consent of the Company and such party, or automatically: (i) if the Proposed Offering is not consummated on or prior to June 30, 2017; (ii) if the Initial Business Combination is not consummated within 24 months from the closing of the Proposed Offering, unless extended up to a maximum of sixty (60) days in accordance with the amended and restated certificate of incorporation; or (iii) if the Sponsor or the Company become subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of the Sponsor or the Company in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to fulfillment of customary closing conditions, including that the Initial Business Combination must be consummated substantially concurrently with the purchase of the Forward Purchase Units.

In March 2017, the Company updated the articles of incorporation to increase the authorized capital stock. The total number of all shares of all classes of capital stock is 451,000,000, consisting of (a) 450,000,000 shares of common stock including (i) 400,000,000 shares of Class A common stock and (ii) 50,000,000 shares of Class B common stock, and (b) 1,000,000 shares of preferred stock.

Fin-29

**Table of Contents**

**ALTA MESA HOLDINGS, LP AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (in thousands) | |
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 3,740 | $ 7,185 |
| Short-term restricted cash | 1,173 | 433 |
| Accounts receivable, net of allowance of $802 and $889, respectively | 71,260 | 37,611 |
| Other receivables | 679 | 8,061 |
| Receivables due from affiliate | 839 | 8,883 |
| Prepaid expenses and other current assets | 2,215 | 3,986 |
| Derivative financial instruments | 6,952 | 83 |
| Total current assets | 86,858 | 66,242 |
| PROPERTY AND EQUIPMENT | | |
| Oil and natural gas properties, successful efforts method, net | 944,867 | 712,162 |
| Other property and equipment, net | 9,139 | 9,731 |
| Total property and equipment, net | 954,006 | 721,893 |
| OTHER ASSETS | | |
| Investment in LLC – cost | 9,000 | 9,000 |
| Deferred financing costs, net | 1,943 | 3,029 |
| Notes receivable due from affiliate | 12,121 | 9,987 |
| Deposits and other long-term assets | 14,686 | 2,977 |
| Derivative financial instruments | 5,282 | 723 |
| Total other assets | 43,032 | 25,716 |
| TOTAL ASSETS | $ 1,083,896 | $ 813,851 |
| **LIABILITIES AND PARTNERS' CAPITAL** | | |
| CURRENT LIABILITIES | | |
| Accounts payable and accrued liabilities | $ 144,546 | $ 84,234 |
| Advances from non-operators | 3,872 | 4,058 |
| Advances from related party | 47,794 | 42,528 |
| Asset retirement obligations | 3,960 | 376 |
| Derivative financial instruments | 348 | 21,207 |
| Total current liabilities | 200,520 | 152,403 |
| LONG-TERM LIABILITIES | | |
| Asset retirement obligations, net of current portion | 65,152 | 61,128 |
| Long-term debt, net | 565,247 | 529,905 |
| Notes payable to founder | 27,861 | 26,957 |
| Derivative financial instruments | — | 4,482 |
| Other long-term liabilities | 7,613 | 6,870 |
| Total long-term liabilities | 665,873 | 629,342 |
| TOTAL LIABILITIES | 866,393 | 781,745 |
| Commitments and Contingencies (Note 11) | | |
| PARTNERS' CAPITAL | 217,503 | 32,106 |
| TOTAL LIABILITIES AND PARTNERS' CAPITAL | $ 1,083,896 | $ 813,851 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Fin-30

**Table of Contents**

**ALTA MESA HOLDINGS, LP AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2017 | 2016 |
| | (in thousands) | |
| OPERATING REVENUES AND OTHER | | |
| Oil | $169,611 | $ 115,778 |
| Natural gas | 37,780 | 20,277 |
| Natural gas liquids | 22,814 | 10,109 |
| Other revenues | 274 | 358 |
| Total operating revenues | 230,479 | 146,522 |
| Gain on sale of assets | — | 3,723 |
| Gain on acquisition of oil and natural gas properties | 6,893 | — |
| Gain (loss) on derivative contracts | 38,024 | (23,970) |
| Total operating revenues and other | 275,396 | 126,275 |
| OPERATING EXPENSES | | |
| Lease and plant operating expense | 49,836 | 45,222 |
| Marketing and transportation expense | 21,566 | 8,140 |
| Production and ad valorem taxes | 8,812 | 8,021 |
| Workover expense | 5,112 | 3,242 |
| Exploration expense | 19,930 | 15,304 |
| Depreciation, depletion, and amortization expense | 80,082 | 66,857 |
| Impairment expense | 29,206 | 14,238 |
| Accretion expense | 1,447 | 1,615 |
| General and administrative expense | 35,534 | 32,909 |
| Total operating expenses | 251,525 | 195,548 |
| INCOME (LOSS) FROM OPERATIONS | 23,871 | (69,273) |
| OTHER INCOME (EXPENSE) | | |
| Interest expense | (39,069) | (52,253) |
| Interest income | 880 | 672 |
| Total other income (expense) | (38,189) | (51,581) |
| LOSS BEFORE STATE INCOME TAXES | (14,318) | (120,854) |
| Provision for state income taxes | 285 | 107 |
| NET LOSS | $ (14,603) | $(120,961) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Fin-31

Table of Contents

**ALTA MESA HOLDINGS, LP AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2017 | 2016 |
|  | (in thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (14,603) | $(120,961) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, and amortization expense | 80,082 | 66,857 |
| Impairment expense | 29,206 | 14,238 |
| Accretion expense | 1,447 | 1,615 |
| Amortization of deferred financing costs | 2,205 | 3,004 |
| Amortization of debt discount | — | 382 |
| Dry hole expense | 2,447 | 423 |
| Expired leases | 8,394 | 6,689 |
| (Gain) loss on derivative contracts | (38,024) | 23,970 |
| Settlements of derivative contracts | 1,775 | 83,839 |
| Premium paid on derivative contracts | (520) | — |
| Interest converted into debt | 904 | 904 |
| Interest on notes receivable due from affiliates | (619) | (574) |
| Gain on sale of assets | — | (3,723) |
| Gain on acquisition of oil and natural gas properties | (6,893) | — |
| Changes in assets and liabilities: | | |
| Restricted cash | (740) | (92,046) |
| Accounts receivable | (33,649) | (4,774) |
| Other receivables | 7,382 | 14,436 |
| Receivables due from affiliate | 169 | 214 |
| Prepaid expenses and other non-current assets | (9,938) | (1,898) |
| Advances from related party | 5,266 | 13,425 |
| Settlement of asset retirement obligation | (6,083) | (1,465) |
| Accounts payable, accrued liabilities, and other liabilities | 27,308 | 2,918 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 55,516 | 7,473 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for property and equipment | (244,308) | (149,179) |
| Acquisitions | (55,236) | — |
| Proceeds from sale of property | — | 1,405 |
| Notes receivable due from affiliate | (1,515) | — |
| NET CASH USED IN INVESTING ACTIVITIES | (301,059) | (147,774) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from long-term debt | 286,065 | 141,935 |
| Repayments of long-term debt | (251,622) | (1,500) |
| Additions to deferred financing costs | (220) | (799) |
| Capital contributions | 207,875 | — |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 242,098 | 139,636 |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (3,445) | (665) |
| CASH AND CASH EQUIVALENTS, beginning of period | 7,185 | 8,869 |
| CASH AND CASH EQUIVALENTS, end of period | $ 3,740 | $ 8,204 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Fin-32

Table of Contents

**ALTA MESA HOLDINGS, LP AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. DESCRIPTION OF BUSINESS

Alta Mesa Holdings, LP and its subsidiaries ("we," "us," "our," the "Company," and "Alta Mesa") is an independent exploration and production company engaged primarily in the acquisition, exploration, development, and production of oil and natural gas properties. Our principal area of operation is in the eastern portion of the Anadarko Basin commonly referred to as the STACK. The STACK is an acronym describing both its location – Sooner Trend Anadarko Basin Canadian and Kingfisher County – and the multiple, stacked productive formations present in the area. Our operations also include other non-STACK oil and natural gas interests within the continental United States.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

We have provided a discussion of significant accounting policies in Note 2 in our Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Annual Report"). As of September 30, 2017, our significant accounting policies are consistent with those discussed in Note 2 in the 2016 Annual Report.

### *Principles of Consolidation and Reporting*

The condensed consolidated financial statements reflect our accounts after elimination of all significant intercompany transactions and balances. The condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in our annual consolidated financial statements for the year ended December 31, 2016, which were filed with the Securities and Exchange Commission (the "SEC") in our 2016 Annual Report.

The condensed consolidated financial statements included herein as of September 30, 2017, and for the nine months ended September 30, 2017 and 2016, are unaudited, and in the opinion of management, the information furnished reflects all material adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of consolidated financial position and of the results of operations for the interim periods presented. The condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, the condensed consolidated financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. Certain reclassifications of prior period condensed consolidated financial statements have been made to conform to current reporting practices. The consolidated results of operations for interim periods are not necessarily indicative of results to be expected for a full year.

### *Use of Estimates*

The preparation of condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period.

Reserve estimates significantly impact depreciation, depletion, and amortization expense and potential impairments of oil and natural gas properties and are subject to change based on changes in oil and natural gas prices and trends and changes in estimated reserve quantities. We analyze estimates, including those related to oil and natural gas reserves, oil and natural gas revenues, the value of oil and natural gas properties, bad debts, asset retirement obligations, derivative contracts, state taxes, and contingencies and litigation. We base our estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances. Actual results may differ from these estimates.

Fin-33

Table of Contents

### *Accounts Receivable*

Accounts receivable consists of the following:

| | September 30, 2017 | | December 31, 2016 |
|---|---|---|---|
| | (in thousands) | | |
| Oil, natural gas and natural gas liquids sales | $ 27,670 | $ | 25,156 |
| Joint interest billings | 16,792 | | 10,427 |
| Pooling interest [1] | 27,600 | | 2,917 |
| Allowance for doubtful accounts | (802) | | (889) |
| Total accounts receivable, net | $ 71,260 | $ | 37,611 |

---

(1)    Pooling interest relates to Oklahoma's forced pooling process to ensure all working interest owners participate in drilling and spacing units for wells we propose to drill as operator on our STACK acreage. We expect full realization from our pooling efforts associated with the drilling activities in Oklahoma totaling approximately $27.6 million over the next 12 months.

### *Recent Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, Revenue from Contracts with Customers (Topic 606) ("ASU 2014-09"), which seeks to provide a single, comprehensive revenue recognition model for all contracts with customers concerning the recognition, measurement and disclosure of revenue from those contracts. The revenue standard contains principles that an entity will apply to determine the measurement of revenue and timing of when it is recognized. Subsequent to the issuance of ASU 2014-09, the FASB issued various clarifications and interpretive guidance to assist entities with implementation efforts, including guidance pertaining to the presentation of revenues on a gross basis (revenues presented separately from associated expenses) versus a net basis. ASU 2014-09 and related interpretive guidance will be effective for interim and annual periods beginning after December 15, 2017 and allows for either full retrospective adoption, meaning the standard is applied to all periods presented in the financial statements, or modified retrospective adoption, meaning the standard is applied only to the most current period presented. We plan to adopt the standard on January 1, 2018 using the modified retrospective method with a cumulative adjustment to retained earnings as necessary.

We are in the process of assessing our contracts and evaluating the impact on the condensed consolidated financial statements. We are continuing to evaluate the provisions of ASU 2014-09 as it relates to certain sales contracts, and in particular, as it relates to disclosure requirements. In addition, we are evaluating the impact, if any, on the presentation of our future revenues and expenses under the new gross-versus-net presentation guidance. We continue to evaluate the impact of these and other provisions of ASU 2014-09 on our accounting policies, changes to relevant business practices, internal controls, and consolidated financial statements. We will complete our evaluation during the fourth quarter of 2017.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842)("ASU 2016-02"), which supersedes ASC 840 "Leases" and creates a new topic, ASC 842 "Leases." The amendments in this update require, among other things, that lessees recognize the following for all leases (with the exception of short-term leases) at the commencement date: (i) a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and (ii) a right-of-use asset, which is an asset that represents a lessee's right to use, or control the use of, a specified asset for the lease term. Lessees and lessors must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements. ASU 2016-02 also requires disclosures designed to provide information on the amount, timing, and uncertainty of cash flows arising from leases. The standard will be effective for interim and annual periods beginning after December 15, 2018, with earlier adoption permitted. In the normal course of business, we enter into operating lease agreements to support our exploration and

Fin-34

Table of Contents

development operations and lease assets such as drilling rigs, well equipment, compressors, office space and other assets.

At this time, we cannot reasonably estimate the financial impact ASU 2016-02 will have on our financial statements; however, the adoption and impletion of ASU 2016-02 is expected to have a material impact on our condensed consolidated balance sheets resulting in an increase in both the assets and liabilities relating to our operating lease activities greater than twelve months As part of our assessment to date, we have formed an implementation work team and will complete our evaluation in 2018. As we continue to evaluate and implement the standard, we will provide additional information about the expected financial impact at a future date. We plan to adopt ASU 2016-02 on January 1, 2019.

In August 2016, the FASB issued ASU No. 2016-15, Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments ("ASU 2016-15"), which is intended to reduce diversity in practice in how certain transactions are classified in the statements of cash flows. ASU 2016-15 is effective for fiscal years beginning after December 15, 2017, including interim periods within those years. The adoption of this guidance will not impact our financial position or results of operations but could result in presentation changes on our condensed consolidated statements of cash flows.

In November 2016, the FASB issued ASU 2016-18, Statement of Cash Flows: Restricted Cash ("ASU 2016-18"), which requires an entity to explain the changes in the total of cash, cash equivalents, restricted cash, and restricted cash equivalents on the statements of cash flows and to provide a reconciliation of the totals in that statement to the related captions in the balance sheet when the cash, cash equivalents, restricted cash, and restricted cash equivalents are presented in more than one line item on the balance sheet. ASU 2016-18 is effective for annual and interim periods beginning after December 15, 2017, and is required to be adopted using a retrospective approach, with early adoption permitted. The adoption of this guidance will not impact our financial position or results of operations but could result in presentation changes on our consolidated statements of cash flows.

In January 2017, the FASB issued ASU No. 2017-01, Clarifying the Definition of a Business ("ASU 2017-01"), which provides guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. ASU 2017-01 requires entities to use a screen test to determine when an integrated set of assets and activities is not a business or if the integrated set of assets and activities needs to be further evaluated against the framework. ASU 2017-01 is effective for interim and annual periods after December 15, 2017, and should be applied prospectively. We are currently evaluating the effect that adopting this guidance will have on our financial position, cash flows and results of operations.

## 3. SUPPLEMENTAL CASH FLOW INFORMATION

Supplemental cash flow disclosures and non-cash investing and financing activities are presented below:

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2017 | 2016 |
|  | (in thousands) | |
| Supplemental cash flow information: |  |  |
| Cash paid for interest | $ 25,675 | $ 37,006 |
| Cash paid for state income taxes | — | 422 |
| Non-cash investing and financing activities: |  |  |
| Change in asset retirement obligations | 3,778 | 1,032 |
| Asset retirement obligations assumed, purchased properties | 705 | — |
| Change in accruals or liabilities for capital expenditures | 41,322 | 11,524 |

Fin-35

Table of Contents

### 4. ACQUISITIONS

*2017 Acquisitions*

In July 2017, we closed on our acquisition to acquire certain oil and natural gas properties in Oklahoma with an unaffiliated third party for a purchase price of approximately $45.4 million, net of customary post-closing purchase price adjustments. The acquired oil and natural gas properties were primarily unproved leasehold. We accounted for this transaction as an asset acquisition with substantially all of the purchase price allocated to unproved property within oil and natural gas properties, successful efforts method, net. We funded the acquisition with borrowings under our senior secured revolving credit facility.

In September 2017, we acquired approximately $4.6 million of unproved leasehold in Oklahoma. We funded the transaction with cash on hand and accounted for this transaction as an asset acquisition.

In September 2017, we completed a transaction to acquire certain proved oil and natural gas properties from Brown & Borelli, et al (the "B&B Acquisition") for a purchase price of approximately $3.5 million, net of customary post-closing purchase price adjustments. We funded the acquisition with cash on hand. The acquisition was accounted for using the acquisition method under ASC 805, "Business Combinations," which requires acquired assets and liabilities to be recorded at fair value as of the acquisition date. The difference between the historical results of operations and the unaudited pro forma results of operations for the three and nine months ended September 30, 2017 and 2016 was determined to be de minimus and therefore pro forma information has not been provided.

A summary of the consideration paid and the allocation of the total purchase price to the assets acquired and the liabilities assumed in the B&B Acquisition based on the preliminary fair value at the acquisition date is as follows:

|  | (in thousands) |
|---|---:|
| *Summary of Consideration* |  |
| Cash | $ 3,469 |
| Total consideration paid | 3,469 |
| *Summary of Purchase Price Allocation* |  |
| Plus: fair value of liabilities assumed |  |
| Asset retirement obligations assumed | 370 |
| Total fair value liabilities assumed | 370 |
| Less: fair value of assets acquired |  |
| Proved oil and natural gas properties | 9,106 |
| Total fair value assets acquired | 9,106 |
| Bargain purchase gain | $ (5,267) |

The fair value of the net assets acquired was approximately $9.1 million. As the fair value of the net assets acquired exceeded the total consideration paid, we recorded a bargain purchase gain of approximately $5.3 million. The acquisition resulted in a bargain purchase gain primarily as a result of timing from the execution of the purchase and sale agreement to the closing date of the acquisition at which time the value of the underlying properties increased substantially due to increased proved reserves. The bargain purchase gain is reflected in gain on acquisition of oil and natural gas properties on our condensed consolidated statements of operations.

In April 2017, we completed an acquisition of certain non-STACK proved oil and natural gas properties from Setanta Energy, LLC (the "Setanta" Acquisition) for a purchase price of approximately $0.9 million, net of customary post-closing purchase price adjustments. We funded the acquisition with borrowings under our senior secured revolving credit facility. This purchase increases our working interest in various wells in which we already hold an interest. The acquisition was accounted for using the acquisition method under ASC 805.

Fin-36

Table of Contents

A summary of the consideration paid and the allocation of the total purchase price to the assets acquired and the liabilities assumed in the Setanta Acquisition based on the preliminary fair value at the acquisition date is as follows:

|  | (in thousands) |
|---|---:|
| *Summary of Consideration* | |
| Cash | $    890 |
| Total consideration paid | 890 |
| *Summary of Purchase Price Allocation* | |
| Plus: fair value of liabilities assumed | |
| Asset retirement obligations assumed | 89 |
| Total fair value liabilities assumed | 89 |
| Less: fair value of assets acquired | |
| Proved oil and natural gas properties | 2,605 |
| Unproved oil and natural gas properties | — |
| Total fair value assets acquired | 2,605 |
| Bargain Purchase Gain | $   (1,626) |

The fair value of the net assets acquired was approximately $2.6 million. As the fair value of the net assets acquired exceeded the total consideration paid, we recorded a bargain purchase gain of approximately $1.6 million. The bargain purchase gain is reflected in gain on acquisition of oil and natural gas properties on our condensed consolidated statement of operations.

In accordance with ASC 805, the following unaudited pro forma results of operations for the nine months ended September 30, 2017 and 2016 have been prepared to give effect to the Setanta acquisition on our condensed consolidated results of operations as if it had occurred on January 1, 2016. Therefore, the bargain purchase gain on acquisition of $1.6 million has been included in pro forma income (loss) for the nine months ended September 30, 2016. The difference between the historical results of operations and the unaudited pro forma results of operations for the three months ended September 30, 2017 and 2016 was determined to be de minimus and therefore not provided.

|  | Total Operating Revenues | Income (Loss) |
|---|---:|---:|
|  | (in thousands) | |
| Pro forma results of operations for the nine months ended September 30, 2017 | $    230,819 | $   (16,188) |
| Pro forma results of operations for the nine months ended September 30, 2016 | $    146,664 | $(119,455) |

### 2016 Acquisition

On December 31, 2016, High Mesa, Inc. ("High Mesa") purchased from BCE-STACK Development LLC ("BCE") and contributed interests in 24 producing wells (the "Contributed Wells") drilled under the joint development agreement to us. We accounted for the Contributed Wells as a business combination in the prior year and the results of operations from the acquisition is reflected in the consolidated statement of operations for the three and nine months ended September 30, 2016 as presented below as if it had occurred on January 1, 2016.

|  | Total Operating Revenues | Income (Loss) |
|---|---:|---:|
|  | (in thousands) | |
| Pro forma results of operations for the three months ended September 30, 2016 | $    64,370 | $   (19,143) |
| Pro forma results of operations for the nine months ended September 30, 2016 | $    157,898 | $(112,822) |

Fin-37

Table of Contents

The unaudited pro forma information has been derived from historical information and are for illustrative purposes only. The unaudited pro forma financial information does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had the companies been combined during this period.

The fair value of the oil and natural gas properties are based on inputs that are not observable in the market and therefore represent Level 3 inputs. The fair values of oil and natural gas properties were measured using valuation techniques that convert future cash flows into a single discounted amount. Significant inputs to the valuation of oil and natural gas properties include, but are not limited to recoverable reserves, production rates, future operating and development costs, future commodity price and estimates by management at the time of the valuation are the most sensitive and may be subject to change.

## 5. PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (in thousands) | |
| OIL AND NATURAL GAS PROPERTIES | | |
| Unproved properties | $ 136,410 | $ 116,311 |
| Accumulated impairment of unproved properties | (18,974) | (65) |
| Unproved properties, net | 117,436 | 116,246 |
| Proved oil and natural gas properties | 1,931,207 | 1,611,249 |
| Accumulated depreciation, depletion, amortization and impairment | (1,103,776) | (1,015,333) |
| Proved oil and natural gas properties, net | 827,431 | 595,916 |
| TOTAL OIL AND NATURAL GAS PROPERTIES, net | 944,867 | 712,162 |
| OTHER PROPERTY AND EQUIPMENT | | |
| Land | 5,339 | 4,730 |
| Office furniture and equipment, vehicles | 20,170 | 19,446 |
| Accumulated depreciation | (16,370) | (14,445) |
| OTHER PROPERTY AND EQUIPMENT, net | 9,139 | 9,731 |
| TOTAL PROPERTY AND EQUIPMENT, net | $ 954,006 | $ 721,893 |

## 6. FAIR VALUE DISCLOSURES

The Company follows ASC 820, "Fair Value Measurements and Disclosures." ASC 820 provides a hierarchy of fair value measurements, based on the inputs to the fair value estimation process. It requires disclosure of fair values classified according to defined "levels," which are based on the reliability of the evidence used to determine fair value, with Level 1 being the most reliable and Level 3 the least reliable. Level 1 evidence consists of observable inputs, such as quoted prices in an active market. Level 2 inputs typically correlate the fair value of the asset or liability to a similar, but not identical item which is actively traded. Level 3 inputs include at least some unobservable inputs, such as valuation models developed using the best information available in the circumstances.

The fair value of cash, accounts receivable, other current assets, and current liabilities approximate book value due to their short-term nature. The estimate of fair value of long-term debt under our senior secured revolving credit facility is not considered to be materially different from carrying value due to market rates of interest. The fair value of the notes payable to our founder is not practicable to determine because the transactions cannot be assumed to have been consummated at arm's length, the terms are not deemed to be market terms, there are no

Fin-38

Table of Contents

quoted values available for this instrument, and an independent valuation would not be practicable due to the lack of data regarding similar instruments, if any, and the associated potential costs.

Our senior notes are carried at historical cost, and we estimate the fair value of the senior notes for disclosure purposes. We have estimated the fair value of our $500 million senior notes payable to be $545.0 million at September 30, 2017. This estimation is based on the most recent trading values of the senior notes at or near the reporting dates, which is a Level 1 determination. See Note 9 for information on long-term debt.

We utilize the modified Black-Scholes and the Turnbull Wakeman option pricing models to estimate the fair values of oil, natural gas and natural gas liquids derivative contracts. Inputs to these models include observable inputs from the New York Mercantile Exchange ("NYMEX") for futures contracts, and inputs derived from NYMEX observable inputs, such as implied volatility of oil, natural gas and natural gas liquids prices. We have classified the fair values of all our oil, natural gas and natural gas liquids derivative contracts as Level 2.

Oil and natural gas properties are subject to impairment testing and potential impairment write down. Oil and natural gas properties with a carrying amount of $36.2 million were written down to their fair value of $7.0 million, resulting in an impairment charge of $29.2 million for the nine months ended September 30, 2017. For the nine months ended September 30, 2016, oil and natural gas properties with a carrying amount of $28.7 million were written down to their fair value of $14.5 million, resulting in an impairment charge of $14.2 million. Oil and natural gas properties with a carrying amount of $0.1 million were written down to their fair value of zero, resulting in an impairment charge of $0.1 million for the three months ended September 30, 2017. For the three months ended September 30, 2016, oil and natural gas properties with a carrying amount of $1.2 million were written down to their fair value of $0.3 million, resulting in an impairment charge of $0.9 million. Significant Level 3 assumptions used in the calculation of estimated discounted cash flows in the impairment analysis included our estimate of future oil and natural gas prices, production costs, development expenditures, estimated timing of production of proved reserves, appropriate risk-adjusted discount rates, and other relevant data.

New additions to asset retirement obligations result from estimations for new properties, and fair values for them are categorized as Level 3. Such estimations are based on present value techniques that utilize company-specific information for such inputs as cost and timing of plugging and abandonment of wells and facilities. We recorded $1.2 million and $1.0 million in additions to asset retirement obligations measured at fair value during the nine months ended September 30, 2017 and 2016, respectively.

The following table presents information about our financial assets and liabilities measured at fair value on a recurring basis as of September 30, 2017 and December 31, 2016, and indicates the fair value hierarchy of the valuation techniques we utilized to determine such fair value:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (in thousands) | | |
| **At September 30, 2017:** | | | | |
| Financial Assets: | | | | |
|     Commodity derivative contracts | — | $24,558 | — | $24,558 |
| Financial Liabilities: | | | | |
|     Commodity derivative contracts | — | $12,672 | — | $12,672 |
| **At December 31, 2016:** | | | | |
| Financial Assets: | | | | |
|     Commodity derivative contracts | — | $15,773 | — | $15,773 |
| Financial Liabilities: | | | | |
|     Commodity derivative contracts | — | $40,656 | — | $40,656 |

The amounts above are presented on a gross basis. Presentation on our consolidated balance sheets utilizes netting of assets and liabilities with the same counterparty where master netting agreements are in place. For additional information on derivative contracts, see Note 7.

Fin-39

Table of Contents

### 7. DERIVATIVE FINANCIAL INSTRUMENTS

We account for our derivative contracts under the provisions of ASC 815, "Derivatives and Hedging." We have entered into forward-swap contracts and collar contracts to reduce our exposure to price risk in the spot market for oil, natural gas and natural gas liquids. From time to time, we also utilize financial basis swap contracts, which address the price differential between market-wide benchmark prices and other benchmark pricing referenced in certain of our oil, natural gas and natural gas liquids sales contracts. Substantially all of our hedging agreements are executed by affiliates of our lenders under the senior secured revolving credit facility described in Note 9, and are collateralized by the security interests of the respective affiliated lenders in certain of our assets under the senior secured revolving credit facility. The contracts settle monthly and are scheduled to coincide with oil production equivalent to barrels (Bbl) per month, natural gas production equivalent to volumes in millions of British thermal units (MMBtu) per month, and natural gas liquids production to volumes in gallons (Gal) per month. The contracts represent agreements between us and the counterparties to exchange cash based on a designated price, or in the case of financial basis hedging contracts, based on a designated price differential between various benchmark prices. Cash settlement occurs monthly. No derivative contracts have been entered into for trading or speculative purposes.

From time to time, we enter into interest rate swap agreements with financial institutions to mitigate the risk of loss due to changes in interest rates.

We have not designated any of our derivative contracts as fair value or cash flow hedges. Accordingly, we use mark-to-market accounting, recognizing changes in the fair value of derivative contracts in the condensed consolidated statements of operations at each reporting date.

Derivative contracts are subject to master netting arrangements and are presented on a net basis in the condensed consolidated balance sheets. This netting can cause derivative assets to be ultimately presented in a liability account on the condensed consolidated balance sheets. Likewise, derivative liabilities could be presented in a derivative asset account.

The following table summarizes the fair value and classification of our derivative instruments, none of which have been designated as hedging instruments under ASC 815:

#### Fair Values of Derivative Contracts:

|  | September 30, 2017 | | |
|---|---|---|---|
| Balance sheet location | Gross Fair Value of Assets | Gross amounts offset against assets in the Balance Sheet | Net Fair Value of Assets presented in the Balance Sheet |
|  | | (in thousands) | |
| Derivative financial instruments, current assets | $ 13,904 | $ (6,952) | $ 6,952 |
| Derivative financial instruments, long-term assets | 10,654 | (5,372) | 5,282 |
| Total | $ 24,558 | $ (12,324) | $ 12,234 |

|  | Gross Fair Value of Liabilities | Gross amounts offset against liabilities in the Balance Sheet | Net Fair Value of Liabilities presented in the Balance Sheet |
|---|---|---|---|
|  | | (in thousands) | |
| Derivative financial instruments, current liabilities | $ 7,300 | $ (6,952) | $ 348 |
| Derivative financial instruments, long-term liabilities | 5,372 | (5,372) | — |
| Total | $ 12,672 | $ (12,324) | $ 348 |

Fin-40

**Table of Contents**

| | December 31, 2016 | | |
| Balance sheet location | Gross Fair Value of Assets | Gross amounts offset against assets in the Balance Sheet | Net Fair Value of Assets presented in the Balance Sheet |
|---|---|---|---|
| | | (in thousands) | |
| Derivative financial instruments, current assets | $ 3,296 | $ (3,213) | $ 83 |
| Derivative financial instruments, long-term assets | 12,477 | (11,754) | 723 |
| Total | $ 15,773 | $ (14,967) | $ 806 |

| | | | |
| Balance sheet location | Gross Fair Value of Liabilities | Gross amounts offset against liabilities in the Balance Sheet | Net Fair Value of Liabilities presented in the Balance Sheet |
|---|---|---|---|
| | | (in thousands) | |
| Derivative financial instruments, current liabilities | $ 24,420 | $ (3,213) | $ 21,207 |
| Derivative financial instruments, long-term liabilities | 16,236 | (11,754) | 4,482 |
| Total | $ 40,656 | $ (14,967) | $ 25,689 |

The following table summarizes the effect of our derivative instruments in the condensed consolidated statements of operations:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| Derivatives not designated as hedging instruments under ASC 815 | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| | (in thousands) | | | |
| *Gain (loss) on derivative contracts* | | | | |
| Oil commodity contracts | $(10,873) | $ 577 | $31,665 | $(22,794) |
| Natural gas commodity contracts | 1,035 | 3,265 | 6,763 | (506) |
| Natural gas liquids commodity contracts | (630) | (334) | (404) | (670) |
| Total gain (loss) on derivative contracts | $(10,468) | $3,508 | $38,024 | $(23,970) |

Although our counterparties provide no collateral, the master derivative agreements with each counterparty effectively allow us, so long as we are not a defaulting party, after a default or the occurrence of a termination event, to set-off an unpaid hedging agreement receivable against the interest of the counterparty in any outstanding balance under the senior secured revolving credit facility.

If a counterparty were to default in payment of an obligation under the master derivative agreements, we could be exposed to commodity price fluctuations, and the protection intended by the hedge could be lost. The value of our derivative financial instruments would be impacted.

Fin-41

Table of Contents

We had the following open derivative contracts for crude oil at September 30, 2017:

**OIL DERIVATIVE CONTRACTS**

| Period and Type of Contract | Volume in Bbls | Weighted Average | Range High | Range Low |
|---|---|---|---|---|
| **2017** | | | | |
| **Price Swap Contracts** | 643,500 | $ 51.16 | $57.25 | $46.00 |
| **Collar Contracts** | | | | |
| Long Call Options | 46,000 | 85.00 | 85.00 | 85.00 |
| Short Call Options | 437,000 | 60.51 | 85.00 | 54.40 |
| Long Put Options | 391,000 | 48.24 | 50.00 | 47.00 |
| Short Put Options | 299,000 | 36.38 | 37.00 | 35.00 |
| **2018** | | | | |
| **Price Swap Contracts** | 1,825,000 | 52.74 | 57.25 | 50.27 |
| **Collar Contracts** | | | | |
| Long Call Options | 365,000 | 54.00 | 54.00 | 54.00 |
| Short Call Options | 2,190,000 | 60.87 | 62.00 | 60.50 |
| Long Put Options | 1,825,000 | 50.00 | 50.00 | 50.00 |
| Short Put Options | 2,190,000 | 40.26 | 42.00 | 40.00 |
| **2019** | | | | |
| **Collar Contracts** | | | | |
| Short Call Options | 1,606,000 | 61.44 | 63.00 | 56.50 |
| Long Put Options | 1,606,000 | 50.00 | 50.00 | 50.00 |
| Short Put Options | 1,606,000 | 38.07 | 40.00 | 37.50 |

We had the following open derivative contracts for natural gas at September 30, 2017:

**NATURAL GAS DERIVATIVE CONTRACTS**

| Period and Type of Contract | Volume in MMBtu | Weighted Average | Range High | Range Low |
|---|---|---|---|---|
| **2017** | | | | |
| **Price Swap Contracts** | 232,500 | $ 3.40 | $3.40 | $3.39 |
| **Collar Contracts** | | | | |
| Short Call Options | 3,036,000 | 3.69 | 4.11 | 3.25 |
| Long Put Options | 2,728,500 | 3.17 | 3.60 | 3.00 |
| Long Call Options | 155,000 | 2.95 | 2.95 | 2.95 |
| Short Put Options | 2,883,500 | 2.60 | 3.00 | 2.50 |
| **2018** | | | | |
| **Collar Contracts** | | | | |
| Short Call Options | 6,582,000 | 5.26 | 5.53 | 4.00 |
| Long Put Options | 5,925,000 | 4.43 | 4.50 | 3.60 |
| Short Put Options | 5,925,000 | 3.92 | 4.00 | 3.00 |

In those instances where contracts are identical as to time period, volume and strike price, and counterparty, but opposite as to direction (long and short), the volumes and average prices have been netted in the two tables above. Prices stated in the table above for oil may settle against either the NYMEX or Brent ICE indices or may reflect a mix of positions settling on various of these benchmarks.

Fin-42

Table of Contents

We had the following open derivative contracts for natural gas liquids at September 30, 2017:

**NATURAL GAS LIQUIDS DERIVATIVE CONTRACTS**

| Period and Type of Contract | Volume in Gal | Weighted Average | Range High | Low |
|---|---|---|---|---|
| **2017** | | | | |
| **Price Swap Contracts** | | | | |
| Short Price Swaps | 1,545,600 | $   0.47 | $0.47 | $0.47 |

We had the following open financial basis swaps at September 30, 2017:

**BASIS SWAP DERIVATIVE CONTRACTS**

| Volume in MMBtu (1) | Reference Price 1 | Reference Price 2 | Period | Weighted Average Spread ($ per MMBtu) |
|---|---|---|---|---|
| 2,915,000 | TEX/OKL Mainline (PEPL) | NYMEX Henry Hub | Oct'17 – Dec' 17 | $        (0.21) |
| 6,980,000 | TEX/OKL Mainline (PEPL) | NYMEX Henry Hub | Jan'18 – Dec' 18 | (0.30) |
| 152,500 | WAHA | NYMEX Henry Hub | Nov'18 – Dec' 18 | (0.46) |
| 225,000 | WAHA | NYMEX Henry Hub | Jan'19 – Mar' 19 | (0.46) |

(1)   Represents short swaps that fix the basis differentials (i) between Tex/OKL Panhandle Eastern Pipeline ("PEPL") Inside FERC ("IFERC") and NYMEX Henry Hub and (ii) between WAHA and NYMEX Henry Hub.

## 8. ASSET RETIREMENT OBLIGATIONS

A summary of the changes in asset retirement obligations is included in the table below:

| | Nine Months Ended September 30, 2017 (in thousands) |
|---|---|
| Balance, beginning of year | $        66,028 |
| Liabilities incurred | 1,202 |
| Liabilities assumed with acquired producing properties | 705 |
| Liabilities settled | (6,083) |
| Liabilities transferred in disposition of properties | (47) |
| Revisions to estimates | 5,860 |
| Accretion expense | 1,447 |
| Balance, September 30, 2017 | 69,112 |
| Less: Current portion | 3,960 |
| Long-term portion | $        65,152 |

The total revisions to estimates include approximately $2.6 million related to additions to oil and natural gas properties with the remaining revisions related to the difference between our beginning asset retirement obligation and the actual settlement amounts for the nine months ended September 30, 2017.

Fin-43

Table of Contents

**9. LONG-TERM DEBT, NET AND NOTES PAYABLE TO FOUNDER**

Long-term debt, net and notes payable to founder consists of the following:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (in thousands) | |
| Senior secured revolving credit facility | $ 75,065 | $ 40,622 |
| 7.875% senior unsecured notes due 2024 | 500,000 | 500,000 |
| Unamortized deferred financing costs | (9,818) | (10,717) |
| Total long-term debt, net | $ 565,247 | $ 529,905 |
| Notes payable to founder | $ 27,861 | $ 26,957 |

*Senior Secured Revolving Credit Facility.* In November 2016, we entered into the Seventh Amended and Restated Credit Agreement (as amended, the "credit facility") with Wells Fargo Bank, National Association, as administrative agent, and a syndicate of banks. On June 13, 2017, we entered into an Agreement and Amendment No. 2 (the "Second Amendment") to the credit facility which, among other things: (a) increased our borrowing base from $287.5 million to $315.0 million until the next scheduled redetermination and (b) permits us to make a one-time cash distribution of no more than $1.0 million to a limited partner. As of September 30, 2017, we had $75.1 million outstanding with $234.6 million of available borrowing capacity under the credit facility. The letters of credit outstanding as of September 30, 2017 and December 31, 2016 were approximately $5.3 million and $7.6 million, respectively. The borrowing base is currently $315.0 million and is redetermined semi-annually in May and November of each year. The principal amount is payable on the maturity date of November 10, 2020.

The credit facility is secured by substantially all of our oil and natural gas properties and is based on our proved reserves and the value attributed to those reserves. We have a choice of borrowing in Eurodollars or at the "Reference Rate," which is based on the prime rate of Wells Fargo Bank, National Association. The credit facility bears interest at the London Interbank Offered Rate ("LIBOR") plus applicable margins ranging from 2.75% and 3.75% if our leverage ratio does not exceed 3.25 to 1.00, depending on the percentage of our borrowing based utilized, and ranging from 3.00% to 4.00% if our leverage ratio exceeds 3.25 to 1.00. The Reference Rate loans bear interest at a rate per annum equal to the greatest of (i) the agent bank's Reference Rate, (ii) the federal funds effective rate plus 50 basis points and (iii) the rate for one month Eurodollar loans plus 1%, plus a margin ranging from 1.75% to 2.75% if our leverage ratio does not exceed 3.25 to 1.00, depending on the percentage of our borrowing base utilized, and ranging from 2.00% to 3.00% if our leverage ratio exceeds 3.25 to 1.00. The weighted average and effective interest rate on outstanding borrowings was 4.75% as of September 30, 2017 and 4.00% as of December 31, 2016.

The credit facility contains restrictive covenants that may limit our ability to, among other things, incur additional indebtedness, sell assets, guaranty or make loans to others, make investments, enter into mergers, make certain payments and distributions, enter into or be party to hedge agreements, amend our organizational documents, incur liens and engage in certain other transactions without the prior consent of the lenders. The credit facility permits us to make distributions in any fiscal quarter so long as (i) the amount of distributions made in such fiscal quarter does not exceed our excess cash flow from the immediately preceding fiscal quarter, (ii) no event of default exists, before and after giving effect to such distribution, (iii) our pro forma leverage ratio is less than 3.00 to 1.00 and (iv) before and after giving effect to such distribution the unused commitment amounts available under the credit facility are at least 20% of the commitments in effect.

The credit facility also requires us to maintain a current ratio (as defined in the credit facility), of consolidated current assets (including unused borrowing base committed capacity and with exclusions as described in the credit facility) to consolidated current liabilities of no less than 1.0 to 1.0 as of the last day of any fiscal quarter and leverage ratio of our consolidated debt (other than obligations under hedge agreements and founder notes) as of the end of such fiscal quarter to our consolidated earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses ("EBITDAX") over the four quarter period then ended of not greater than 4.0 to 1.0.

Fin-44

Table of Contents

As of September 30, 2017, we were in compliance with all financial covenants of the credit facility.

*Senior Unsecured Notes.* We have $500 million in aggregate principal amount of 7.875% senior unsecured notes (the "senior notes") due December 15, 2024 which were issued at par by the Company and our wholly owned subsidiary Alta Mesa Finance Services Corp. (collectively, the "Issuers") during the fourth quarter of 2016. Interest is payable semi-annually on June 15 and December 15 of each year, beginning June 15, 2017. At any time prior to December 15, 2019, we may, from time to time, redeem up to 35% of the aggregate principal amount of the senior notes in an amount of cash not greater than the net cash proceeds from certain equity offerings at the redemption price of 107.875% of the principal amount, plus accrued and unpaid interest, if any, to the date of redemption, if at least 65% of the aggregate principal amount of the senior notes remains outstanding after such redemption and the redemption occurs within 120 days of the closing date of such equity offering. At any time prior to December 15, 2019, we may, on any one or more occasions, redeem all or part of the senior notes for cash at a redemption price equal to 100% of their principal amount of the senior notes redeemed plus an applicable make-whole premium and accrued and unpaid interest, if any, to the date of redemption. Upon the occurrence of certain kinds of change of control, each holder of the senior notes may require us to repurchase all or a portion of the senior notes for cash at a price equal to 101% of the aggregate principal amount of the senior notes, plus accrued and unpaid interest, if any, to the date of repurchase. On and after December 15, 2019, we may redeem the senior notes, in whole or in part, at redemption prices (expressed as percentages of principal amount) equal to 105.906% for the twelve-month period beginning on December 15, 2019, 103.938% for the twelve-month period beginning on December 15, 2020, 101.969% for the twelve-month period beginning on December 15, 2021 and 100.000% beginning on December 15, 2022, plus accrued and unpaid interest, if any, to the date of redemption.

The senior notes are fully and unconditionally guaranteed on a senior unsecured basis by each of our material subsidiaries, subject to certain customary release provisions. Accordingly, they will rank equal in right of payment to all of our existing and future senior indebtedness; senior in right of payment to all of our existing and future indebtedness that is expressly subordinated to the senior notes or the respective guarantees; effectively subordinated to all of our existing and future secured indebtedness to the extent of the value of the collateral securing such indebtedness, including amounts outstanding under our credit facility; and structurally subordinated to all existing and future indebtedness and obligations of any of our subsidiaries that do not guarantee the senior notes.

The senior notes contain certain covenants limiting the Issuers' ability and the ability of the Restricted Subsidiaries (as defined in the indenture governing the senior notes (the "indenture")) to, under certain circumstances, prepay subordinated indebtedness, pay distributions, redeem stock or make certain restricted investments; incur indebtedness; create liens on the Issuers' assets to secure debt; restrict dividends, distributions or other payments; enter into transactions with affiliates; designate subsidiaries as unrestricted subsidiaries; sell or otherwise transfer or dispose of assets, including equity interests of restricted subsidiaries; effect a consolidation or merger; and change our line of business.

Under the terms of the indenture for the senior notes, if we experience certain specific change of control events, unless the Issuers have previously or concurrently exercised their right to redeem all of the senior notes under the optional redemption provision, such holder has the right to require us to purchase such holder's senior notes at 101% of the principal amount plus accrued and unpaid interest to the date of purchase.

As of September 30, 2017, we were in compliance with the indentures governing the senior notes.

*Notes Payable to Founder.* We have notes payable to our founder ("Founder Notes") that bear simple interest at 10% with a balance of $27.9 million and $27.0 million at September 30, 2017 and December 31, 2016, respectively. The maturity date was extended on March 25, 2014 from December 31, 2018 to December 31, 2021. Interest and principal are payable at maturity.

Fin-45

Table of Contents

These Founder Notes are subordinate to the paid-in-kind notes of High Mesa. The Founder Notes are also subordinated to the rights of High Mesa Holdings, LP ("HMH") and Riverstone VI Alta Mesa Holdings, L.P. ("Riverstone") to receive distributions under our Amended Partnership Agreement and subordinated to the rights of the holders of Series B preferred stock of High Mesa to receive payments. Our founder shall convert the Founder Notes into equity interests in HMH immediately prior to the closing of the business combination with Silver Run Acquisition Corporation II. See Note 13 for further details.

Interest on the Founder Notes amounted to $0.9 million for each of the nine months ended September 30, 2017 and 2016 and $0.3 million for each of the three months ended September 30, 2017 and 2016. Such amounts have been added to the balance of the Founder Notes.

*Deferred financing costs.* As of September 30, 2017, we had $11.8 million of deferred financing costs related to the credit facility and senior notes, which are being amortized over the respective terms of the related debt instrument. Deferred financing costs of $9.8 million related to the senior notes are netted with long-term debt on the condensed consolidated balance sheet as of September 30, 2017. Deferred financing costs of $1.9 million related to the credit facility are included in deferred financing costs, net on the condensed consolidated balance sheets at September 30, 2017. Amortization of deferred financing costs recorded for the nine months ended September 30, 2017 and 2016 was $2.2 million and $3.0 million, respectively. The amortization of these costs are included in interest expense on the condensed consolidated statements of operations.

The credit facility and the senior notes contain customary events of default. If an event of default occurs and is continuing, the holders of such indebtedness may elect to declare all the funds borrowed to be immediately due and payable with accrued and unpaid interest. Borrowings under other debt instruments that contain cross-acceleration or cross-default provisions may also be accelerated and become due and payable.

## 10. ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

The following provides the details of accounts payable and accrued liabilities:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (in thousands) | |
| Capital expenditures | $ 42,621 | $ 15,155 |
| Revenues and royalties payable | 23,010 | 12,187 |
| Operating expenses/taxes | 18,485 | 17,499 |
| Interest | 12,903 | 2,627 |
| Compensation | 3,296 | 5,302 |
| Derivative settlement payable | 665 | 1,126 |
| Other | 721 | 1,164 |
| Total accrued liabilities | 101,701 | 55,060 |
| Accounts payable | 42,845 | 29,174 |
| Accounts payable and accrued liabilities | $ 144,546 | $ 84,234 |

## 11. COMMITMENTS AND CONTINGENCIES

### *Contingencies*

*Environmental claims*: Various landowners have sued us in lawsuits concerning several fields in which we have or historically had operations. The lawsuits seek injunctive relief and other relief, including unspecified amounts in both actual and punitive damages for alleged breaches of mineral leases and alleged failure to restore the plaintiffs' lands from alleged contamination and otherwise from our oil and natural gas operations. We are unable to express an opinion with respect to the likelihood of an unfavorable outcome of the various

Fin-46

Table of Contents

environmental claims or to estimate the amount or range of potential loss should the outcome be unfavorable. Therefore, we have not provided any material amounts for these claims in our condensed consolidated financial statements at September 30, 2017.

*Title/lease disputes:* Title and lease disputes may arise in the normal course of our operations. These disputes are usually small but could result in an increase or decrease in reserves and/or other forms of settlement, such as cash, once a final resolution to the title dispute is made.

*Litigation:* On April 13, 2005, Henry Sarpy and several other plaintiffs (collectively, "Plaintiffs") filed a petition against Exxon, Extex, The Meridian Resource Corporation ("TMRC," our wholly-owned subsidiary), and the State of Louisiana for contamination of their land in the New Sarpy and/or Good Hope Field in St. Charles Parish. Plaintiffs claimed they are owners of land upon which oil field waste pits containing dangerous and contaminating substances are located. Plaintiffs alleged that they discovered in May 2004 that their property is contaminated with oil field wastes greater than represented by Exxon. The property was originally owned by Exxon and was sold to TMRC. TMRC subsequently sold the property to Extex. On April 14, 2015, TMRC entered into a Memorandum of Understanding with Exxon to settle the claims in this ongoing matter. On July 10, 2015, the settlement and comprised agreements were finalized and signed by the Plaintiffs and Exxon. On July 28, 2015, the State of Louisiana issued a letter of no objection to the settlement. As of September 30, 2017, we have accrued approximately $3.2 million ($0.8 million in current liabilities and $2.4 million in other long-term liabilities) as the outcome of the litigation was deemed probable and estimable. The settlement requires payment over the term of six years.

On January 25, 2017, Bollenbach Enterprises Limited Partnership filed a class action petition in Kingfisher County, Oklahoma against Oklahoma Energy Acquisitions, LP, our wholly-owned subsidiary ("OEA"), Alta Mesa Services, LP, our wholly-owned subsidiary ("AMS"), and the Company (collectively, the "AMH Parties") claiming royalty underpayment or non-payment of royalty. The suit against the AMH Parties alleges that the AMH Parties made improper deductions that resulted in underpayment of royalties on natural gas and/or constituents of the gas stream produced from wells. The case was moved to federal court and stayed by the court pending the parties' efforts to settle the case. In June 2017, the court administratively closed the case following mediation. Class settlement requires approval of the court after certain lengthy notice periods. As of September 30, 2017, we believe losses are probable and estimable in connection with this litigation and have accrued approximately $4.5 million in accounts payable and accrued liabilities in our condensed consolidated balance sheets.

*Other contingencies:* We are subject to legal proceedings, claims and liabilities arising in the ordinary course of business for which the outcome cannot be reasonably estimated; however, in the opinion of management, such litigation and claims will be resolved without material adverse effect on our financial position, results of operations or cash flows. Accruals for losses associated with litigation are made when losses are deemed probable and can be reasonably estimated.

*Performance appreciation rights:* In the third quarter of 2014, we adopted the Alta Mesa Holdings, LP Amended and Restated Performance Appreciation Rights Plan (the "Plan"), effective September 24, 2014. The Plan is intended to provide incentive compensation to key employees and consultants who make significant contributions to the Company. Under the Plan, participants are granted performance appreciation rights ("PARs") with a stipulated initial designated value ("SIDV"). The PARs vest over time (as specified in each grant, typically five years) and entitle the owner to receive a cash amount equal to the increase, if any, between the SIDV and the designated value of the PAR on the payment valuation date. The payment valuation date is the earlier of a liquidity event (as defined in the Plan, but generally can be construed in accordance with the meaning of the term "change in control event") or as selected by the participant, but no earlier than five years from the end of the year of the grant. Both the initial designated value and the designated payment value of the PAR are determined by the Plan's administrative committee, composed of members of our board of directors. In the case of a liquidity event, the designated value of all PARs is to be based on the net sale proceeds (as defined in the

Fin-47

**Table of Contents**

Plan) from the liquidity event. After any payment valuation date, regardless of payment or none, vested PARs expire. During the first nine months of 2017, we granted 308,800 new PARs with a SIDV of $40 and terminated 1,400 PARs with a SIDV of $40, resulting in 883,300 PARs issued at a weighted average of $37.91 as of September 30, 2017. We are unable to express an opinion with respect to the likelihood of a qualifying liquidity event which would result in any payment under the Plan or to estimate any amount which may become payable under the Plan. We consider the possibility of payment at a fixed determination date absent a positive liquidity event to be remote. Therefore, we have not provided any amount for this contingent liability in our condensed consolidated financial statements at September 30, 2017 or December 31, 2016.

## 12. SIGNIFICANT RISKS AND UNCERTAINTIES

Our business makes us vulnerable to changes in wellhead prices of crude oil and natural gas. Historically, world-wide oil and natural gas prices and markets have been volatile, and may continue to be volatile in the future. In particular, the prices of oil and natural gas have been highly volatile and declined dramatically since the second half of 2014. Although oil and natural gas prices have recently begun to recover from lows experienced since such decline, forecasted prices for both oil and natural gas continue to remain depressed. The duration and magnitude of changes in oil and natural gas prices cannot be predicted. Continued depressed oil and natural gas prices, further price declines or any other unfavorable market conditions could have a material adverse effect on our financial condition and on the carrying value of our proved oil and natural gas reserves. Sustained low oil or natural gas prices may require us to write down the value of our oil and natural gas properties and/or revise our development plans, which may cause certain of our undeveloped well locations to no longer be deemed proved. This could cause a reduction in the borrowing base under our credit facility to the extent that we are not able to replace the reserves that we produce. Low prices may also reduce our cash available for distribution, acquisitions and for servicing our indebtedness. We mitigate some of this vulnerability by entering into oil, natural gas and natural gas liquids price derivative contracts. See Note 7.

## 13. PARTNERS' CAPITAL

***Management and Control***: Our business and affairs are managed by Alta Mesa Holdings GP, LLC, our general partner ("General Partner"). With certain exceptions, the General Partner may not be removed except for the reasons of "cause," which are defined in the Sixth Amended and Restated Agreement of Limited Partnership (the "Amended Partnership Agreement"). Our Amended Partnership Agreement currently provides for two classes of limited partners, Class A and Class B. Our limited partners include our General Partner, HMH and Riverstone.

On August 16, 2017, we entered into a Contribution Agreement (the "Contribution Agreement") with Silver Run Acquisition Corporation II, a Delaware corporation ("SRII"), HMH, High Mesa Holdings GP, LLC, a Texas limited liability company, our General Partner and solely for certain provisions therein, the equity owners of HMH. Pursuant to the Contribution Agreement, SRII will acquire from HMH (i) all of its limited partner interest in us and (ii) 100% of the economic interests and 90% of the voting interests in our General Partner. In return, the HMH will receive: (i) 220,000,000 common units as adjusted of SRII Opco, LP, a Delaware limited partnership and wholly owned subsidiary of SRII; (ii) $400 million in cash, which shall be contributed to us; and (iii) up to $800 million in earn-out consideration in the form of common units of SRII Opco, LP (the "Earn-out Consideration"). The Earn-out Consideration will be paid as set forth below if the 20-day volume-weighted average price ("VWAP") of the Class A Common Stock of SRII (the "Class A Common Stock") equals or exceeds the following prices:

| 20-Day VWAP | Earn-Out Consideration |
|---|---|
| $14.00 | 10,714,285 Common Units |
| $16.00 | 9,375,000 Common Units |
| $18.00 | 13,888,889 Common Units |
| $20.00 | 12,500,000 Common Units |

Fin-48

Table of Contents

Additionally, HMH will purchase non-economic capital stock of SRII, dedicated as Class C Common Stock ("Class C Common Stock"). The common units of SRII Opco, LP and corresponding Class C Common Stock are redeemable for Class A Common Stock beginning 180 days after the closing.

The Contribution Agreement contains customary representations and warranties and pre-closing covenants, with the representations and warranties not surviving the closing. Additionally, prior to closing, we have agreed to transfer to HMH all assets and liabilities related to the non-STACK assets. The closing of the Contribution Agreement is subject to (i) the approval of the SRII stockholders, (ii) the simultaneous closing of the contribution agreement by and among SRII, KFM Holdco, LLC, a Delaware limited liability company, Kingfisher Midstream, LLC, a Delaware limited liability company ("Kingfisher") and the equity owners party thereto pursuant to which SRII will acquire 100% of the outstanding membership interests in Kingfisher, (iii) a SRII Opco, LP leverage ratio of less than 1.5x, (iv) certain regulatory approvals and (v) the satisfaction or waiver of other customary closing conditions. The Contribution Agreement also contains certain customary termination rights, including if the transaction is not consummated by February 28, 2018.

On August 16, 2017, our General Partner, HMH and Riverstone entered into the Amended Partnership Agreement. The Amended Partnership Agreement reflects, among other things, certain changes in our ownership, and provides for certain preemptive rights, tag-along rights, and drag-along rights for the limited partners. In connection with the Amended Partnership Agreement, our limited partners at the time transferred their interests in us to HMH. The Amended Partnership Agreement also reflects the admission of Riverstone and HMH to the Company as limited partners, and provides for certain distribution rights for the Class A and Class B Limited Partners (as defined therein) with respect to the STACK and non-STACK assets.

Riverstone was admitted as a limited partner in connection with its $200 million capital contribution to us on August 17, 2017, in exchange for limited partner interests in us with respect to the economic rights to the STACK assets. We used all of the capital contribution to pay down our credit facility.

On August 16, 2017, the owners of our General Partner entered into a Fifth Amended and Restated Limited Liability Company Agreement, which was amended to, among other things, show certain changes in the ownership of our General Partner and reflect that the holders of Class A Units (as defined therein) are entitled to 100% of the economic rights with respect to our General Partner and the holders of Class B Units (as defined therein) are entitled to 100% of the voting rights with respect to our General Partner.

***Contribution, Distribution and Income Allocation***: The Amended Partnership Agreement specifies the manner in which we will make cash distributions to our partners.

*Distributions from Operations.* Current distributions of Net Cash Flow and distributions upon the liquidation, sale, merger, consolidation, dissolution or winding up of the Company shall be made by the General Partner as described below. The General Partner shall have sole discretion to determine the timing of any distribution and the aggregate amounts available for such distribution and such distributions will be made:

- With respect to distributions of Net Cash Flow attributable to the STACK Assets, one hundred percent (100%) to the Class A Partners Pro Rata. Notwithstanding the foregoing, to the extent the Company makes a payment under the Founder Notes, such payment shall be treated as an advance against and, thus, shall reduce the amount otherwise distributable to HMH or its permitted transferees under the Partnership Agreement.

- With respect to distributions of Net Cash Flow attributable to the Non-STACK Assets, one hundred percent (100%) to the Class B Partners Pro Rata.

Net cash flow means all cash flow, receipts and revenues generated by the Company minus amounts necessary for (i) operating expenses (as defined in the Amended Partnership Agreement), (ii) a reserve fund for future operating expenses, (iii) debt service of the Company, or (iv) any other expenses of the Company. STACK assets

Fin-49

**Table of Contents**

means (a) interests in each of Alta Mesa Finance Services Corp., a Delaware corporation, Oklahoma Energy Acquisitions, LP, a Texas limited partnership, and Alta Mesa Services, LP, a Texas limited partnership, (b) all assets held by each of the foregoing as of the date hereof and (c) all oil and gas properties acquired by the Company or any of its subsidiaries after the date hereof in any of Kingfisher, Garfield, Major, Blaine, Logan

# PX 105

REDACTED IN ITS ENTIRETY

# PX 106

REDACTED IN ITS ENTIRETY

# PX 107

REDACTED IN ITS ENTIRETY

# PX 108

## REDACTED IN ITS ENTIRETY

# PX 109

REDACTED IN ITS ENTIRETY

# PX 110

REDACTED IN ITS ENTIRETY

# PX 111

REDACTED IN ITS ENTIRETY

# PX 112

## REDACTED IN ITS ENTIRETY

# PX 113

REDACTED IN ITS ENTIRETY

# PX 114

REDACTED IN ITS ENTIRETY

# PX 115

REDACTED IN ITS ENTIRETY

# PX 116

REDACTED IN ITS ENTIRETY

# PX 117

# Alta Mesa Resources, Inc.

## Enercom Dallas 2018
**February 2018**



**Exhibit
CP- 0284**
4/3/2023
Ellis



# Disclaimer

**FORWARD-LOOKING STATEMENTS**

The information in this presentation and the oral statements made in connection therewith include "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this presentation, regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this presentation, including any oral statements made in connection therewith, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations and assumptions about future events and are based on currently available information as to the outcome and timing of future events. We caution you that these forward-looking statements are subject to all of the risks and uncertainties, most of which are difficult to predict and many of which are beyond our control, incident to the development, production, gathering and sale of oil, natural gas and natural gas liquids. These risks include, but are not limited to, commodity price volatility, low prices for oil and/or natural gas, global economic conditions, inflation, increased operating costs, lack of availability of drilling and production equipment, supplies, services and qualified personnel, processing volumes and pipeline throughput, uncertainties related to new technologies, geographical concentration of operations of our subsidiaries Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream, LLC ("KFM"), environmental risks, weather risks, security risks, drilling and other operating risks, regulatory changes, the uncertainty inherent in estimating oil and natural gas reserves and in projecting future rates of production, reductions in cash flow, lack of access to capital, Alta Mesa's and KFM's ability to satisfy future cash obligations, restrictions in existing or future debt agreements of Alta Mesa or KFM, the timing of development expenditures, managing Alta Mesa's and KFM's growth and integration of acquisitions, failure to realize expected value creation from property acquisitions, title defects and limited control over non-operated properties, our ability to complete an initial public offering of the KFM midstream business and the other risks described in our filings with the Securities and Exchange Commission (the "SEC"). Should one or more of the risks or uncertainties described in this presentation and the oral statements made in connection therewith occur, or should underlying assumptions prove incorrect, our actual results and plans could differ materially from those expressed in any forward-looking statements. Except as otherwise required by applicable law, we disclaim any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this presentation.

**RESERVE INFORMATION**

Reserve engineering is a process of estimating underground accumulations of hydrocarbons that cannot be measured in an exact way. The accuracy of any reserve estimate depends on the quality of available data, the interpretation of such data and price and cost assumptions made by reserve engineers. In addition, the results of drilling, testing and production activities may justify revisions of estimates that were made previously. If significant, such revisions could impact our strategy and change the schedule of any further production and development drilling. Accordingly, reserve estimates may differ significantly from the quantities of oil and natural gas that are ultimately recovered. Estimated Ultimate Recoveries, or "EURs," refers to estimates of the sum of total gross remaining proved reserves per well as of a given date and cumulative production prior to such given date for developed wells. These quantities do not necessarily constitute or represent reserves as defined by the SEC and are not intended to be representative of anticipated future well results of all wells drilled on our STACK acreage.

**INDUSTRY AND MARKET DATA**

This presentation has been prepared by us and includes market data and other statistical information from sources we believe to be reliable, including independent industry publications, government publications or other published independent sources. Some data is also based on our good faith estimates, which are derived from our review of internal sources as well as the independent sources described above. Although we believe these sources are reliable, we have not independently verified the information and cannot guarantee its accuracy and completeness.

**TRADEMARKS AND TRADE NAMES**

We own or have rights to various trademarks, service marks and trade names we use in connection with the operation of our business. This presentation also contains trademarks, service marks and trade names of third parties, which are the property of their respective owners. The use or display of third parties' trademarks, service marks, trade names or products in this presentation is not intended to, and does not imply, a relationship with us, or an endorsement or sponsorship by or of us. Solely for convenience, the trademarks, service marks and trade names referred to in this presentation may appear without the ®, TM or SM symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the right of the applicable licensor to these trademarks, service marks and trade names.



# Alta Mesa: Sustainable STACK Development
## *Integrated upstream & midstream with fully funded growth and low leverage*

- **Disciplined Operations with 10+ year Horizon in STACK Oil Window, growing to 10-12 rig cadence**
  - Highly contiguous ~130,000 net acres; infrastructure a key competitive advantage
  - Low cost operator, resilient well economics in low commodity price environment, low leverage development plan
  - Kingfisher Midstream (KFM) purpose built and highly synergistic; flow assurance de-risks production growth
  - KFM initial 60 MMCFD plant full, additional volumes bridged via offtake agreements
  - KFM 200 MMCFD expansion in startup; 350 MMCFD total system capacity at completion

- **2012-2017 Execution and Results De-Risk Investment**
  - 250+ horizontal STACK wells drilled by Alta Mesa across entirety of Kingfisher acreage
  - Multi-well development projects initiated in 2017; previous pattern tests validate approach
  - Consistency and geographic breadth of well results underscores repeatable development

- **Experienced Management Team Aligned with Shareholders**
  - Alta Mesa Resources, Inc. (AMR) management team remain large shareholders
  - Demonstrated discipline to sustain and grow the enterprise through cyclical downturns

- **Comprehensive Application of Best Practices and Technology**
  - Efficient, scalable drilling team currently managing 6 rig program delivering > 2 wells per month per rig
  - Geoscience team applying full suite of tools including 3-D seismic and geosteering to optimize development
  - Completions team providing top-tier design and execution of hydraulic fracture stimulations
  - Production team enhances individual well performance by daily managing compression and artificial lift

3



# Alta Mesa Resources
## *Focused on development and consolidation in the STACK*

### Upstream Metrics

| | |
|---|---|
| Net STACK Surface Acres | ~130,000 |
| Current Net Production (BOE/D) | ~24,000 |
| % Liquids | 69% |
| Resource Potential (MMBOE)[1] | >1,000 |
| Breakeven Oil Price, $/BBL WTI | < $30 |
| Single-well IRR | >80% |
| Gross Identified Base Case Locations[2] | 4,196 |
| Operated STACK Hz. Wells Producing / Operated STACK Hz. Wells Drilled[3] | 221/ 247 |
| Early 2018 rig count | 6 |

### Midstream Metrics

| | |
|---|---|
| Natural Gas Processing Feb 18 | 350[4] MMCF/D |
| Pipelines | 400+ miles |
| Dedicated Acreage | ~300,000 gross acres |
| Oil Storage Capacity | 50 MBBL with 6 loading LACTs[5] |



Source: Public Filings, Investor Relations
Note: Acreage as of 11/9/2017
[1] Does not include additional resource potential or undeveloped locations on ~20,000 net acres acquired mid-2017 in the Major County Acquisition
[2] Does not Include additional locations from downspacing in the Oswego, Meramec, Lower and Upper Osage formations or additional locations in the Big Lime, Cherokee, Manning, Chester, Woodford and Hunton formations
[3] Horizontal wells drilled as of 1/6/2018, 214 Meramec/Osage, 6 Oswego, 1 Manning on production
[4] Includes existing 90 MMCF/D offtake processing plus expected completion of 200 MMCFD expansion
[5] Lease Automatic Custody Transfer units

4



# Progressive Execution through Cycles
## *Track record of growth in production, reserves, leasehold*

**Net STACK Acreage**



- YE13: 40,587
- YE14: 44,506
- YE15: 73,512
- YE16: 102,466
- Current: ~ 130,000

**Total Net Production (MBOE/D)[1]**

CAGR = 90%

- 2012: 1.0
- 2013: 1.7
- 2014: 4.8
- 2015: 8.8
- 2016: 13.1
- Nov '17: 23.5

**SEC Proved Reserves (MMBOE)[2]**

CAGR = 102%

- YE12: 8.7
- YE13: 17.3
- YE14: 28.2
- YE15: 67.0
- YE16: 129.6

**Alta Mesa Footprint**



- Disciplined acreage aggregation focused primarily on "bolt-on" acquisitions to increase contiguous position as STACK play has emerged

- Production has responded to systematic de-risking, delineation, and now development of acreage

- Proved reserves growth reflects significant continuity of producing acreage in Osage, Meramec, and Oswego

Source: Company data, Public Filings, IHS Herolds, RigData.
[1] Inclusive of Net Production from Bayou City JV. 2012 and 2013 data reflects occurrence date and not accounting date LOS, due to the reasoning that occurrence date method incorporated a change in NGL accounting; whereas accounting date LOS does not.
[2] Proved reserves based on SEC pricing.

5



# Meramec/Osage Natural Fracture Fairways

- **Quartz-rich Meramec and Osage zones are intensely fractured near the Nemaha Fault zone**
- **Fracture fairways create migration pathways through the matrix**
- **Oil and gas is stored in both the matrix and fracture porosity (dual system)**
- **Effects of natural fractures on fluid flow seen in vertical well (black spots) performance, which is often related to the proximity to fractures**
- **Fracturing / fracture fairways identified from multiple sources including Formation Micro-Imaging (FMI) logs, lost returns in drilling, low ISIP's on frac stages, cores and 3D seismic**
- **Alta Mesa typically targets the Meramec and Osage benches with interbedded chert and silty carbonates with the strongest oil cuts**



6



# Meramec/Osage Key Targeted Interval

*Siliceous siltstone/carbonate section between Chester and Woodford Shales*



Flattened on Woodford Shale



- **Gamma Ray measurement, used as a lithology "quick-look" in carbonates/silts, is limited for adequate characterization of STACK siliceous limestone/siltstone**

- **High tier computed log lithology describes the laminated siliceous limestone/dolomite character of Meramec and Osage as seen in cores**

- **Nemaha uplift and related faulting created highly fractured, dual porosity system in quartz-rich siltstone/carbonate system of eastern Kingfisher County**

**Computed Log Lithology**

 Dolomite

 Limestone

 Quartz – Chert/Siltstone

 Clay

7

# Meramec/Osage Key Targeted Interval
*Shelf and natural fractures result from significant uplift of Cambrian/Pre-Cambrian*





**Nemaha Ridge (Uplift) is nearly 500 miles long**



**Shelf created by basement upthrust resulting in highly fractured carbonates**



**Woodford below; Kinderhook (lower Osage) above (highly fractured)**

8



# Production Growth in De-Risked Acreage
## *Consistent growth in STACK oil window*

**Gross Operated Horizontal Production, BOE/Day**



**Wells in STACK Oil Window**



9



# Recent North Area Meramec/Osage Operated Wells
## *Production data*



4,714 ft average lateral

| | Well Name | Landing | Days from 1st oil to Peak | Peak Day Rate BOD | Peak 30 Day Avg. BOD |
|---|---|---|---|---|---|
| 1 | Maly 30-M4H | Osage | 103 | 531 | 272 |
| 2 | Bugabago 2006 1-31MH | Osage | 163 | 804 | 479 |
| 3 | Maly 32-M1-H | Osage | 46 | 633 | 470 |
| 4 | EHU 236H | Osage | 107 | 621 | 436 |
| 5 | Scout 1906 1-34MH | Osage | 48 | 525 | 363 |
| 6 | Cobra 1806 1-8Mh (<30 Days) | Osage | 27 | 559 | 268 |
| 7 | Macallan 1806 4-17MH | Osage | 36 | 523 | 423 |
| 8 | Towne 1806 1-31MH | Osage | 24 | 1096 | 763 |
| 9 | Farrar 1806 1-32MH | Osage | 48 | 768 | 497 |
| 10 | McNulty 1806 1-33MH | Osage | 81 | 847 | 619 |
| 11 | Slughworth 1906 1-1MH | Osage | 108 | 731 | 375 |
| 12 | Buttercup 1905 1-5MH | Osage | 90 | 203 | 119 |
| 13 | Stags Leap 1905 1-7MH | Osage | 64 | 460 | 287 |
| 14 | Raisin Cane 1905 1-8MH | Osage | 87 | 527 | 271 |
| 15 | Fowler 1906 1-12MH | Osage | 33 | 450 | 308 |
| 16 | Pollard 1805 3-2MH | Osage | 125 | 378 | 312 |
| 17 | Vadder 1805 2-12MH | Osage | 40 | 495 | 388 |
| 18 | Oltmanns 1805 6-14MH | Osage | 39 | 836 | 605 |
| 19 | Edwin 1805 4-22MH | Osage | 70 | 680 | 425 |
| 20 | Cleveland 1805 2-26MH | Osage | 47 | 602 | 420 |
| 21 | Wendt 1806 1-26MH | Osage | 101 | 508 | 433 |
| 22 | Mitchell 1806 1-26MH | Osage | 81 | 543 | 394 |
| 23 | Steele 1806 1-34RMH | Osage | 182 | 485 | 376 |
| 24 | EHU 239H | Osage | 74 | 808 | 387 |



# Recent South Area Meramec/Osage Operated Wells
## *Production data*



4,714 ft average lateral

| | Well Name | Landing | Days from 1st oil to Peak | Peak Day Rate BOD | Best 30 Day Avg. BOD |
|---|---|---|---|---|---|
| 1 | McLovin 1605 1-6MH | Osage | 13 | 578 | 449 |
| 2 | Aces High 1606 4-11MH | Osage | 10 | 647 | 501 |
| 3 | Odie 1606 1-12MH | Osage | 27 | 446 | 270 |
| 4 | Jacob 1605 1-8MH | Osage | 16 | 594 | 479 |
| 5 | Aberfeldy 1605 4-16MH | Osage | 5 | 728 | 606 |
| 6 | Speyside 1606 1-27MH | Osage | 34 | 862 | 690 |
| 7 | Peat 1606 1-26MH | Osage | 49 | 573 | 405 |
| 8 | Oak Tree 1605 2-30MH | Meramec | 33 | 916 | 688 |
| 9 | Hasley 1605 1-28MH | Osage | 41 | 951 | 416 |
| 10 | Ray 1605 3-27MH | Meramec | 14 | 539 | 210 |
| 11 | Sadiebug 1606 1-35MH | Osage | 21 | 907 | 736 |
| 12 | Dalwhinnie 1605 1-31MH | Meramec | 19 | 875 | 490 |
| 13 | Helen 1605 5-33MH | Meramec | 104 | 587 | 337 |
| 14 | PlumpJack 1605 1-34MH | Osage | 18 | 1131 | 466 |
| 15 | Opus One 1605 1-35MH | Osage | 11 | 375 | 328 |
| 16 | Red Queen 1506 1-1MH | Meramec | 28 | 469 | 347 |
| 17 | Best Thirty 1505 1-5MH | Osage | 43 | 264 | 231 |
| 18 | Shiner 1505 1-3MH | Osage | 0 | 740 | 404 |
| 19 | White King 1506 1-12MH | Osage | 29 | 430 | 335 |
| 20 | Redbreast 1505 4-7MH | Osage | 91 | 438 | 371 |
| 21 | Yellowstone 1505 4-8MH | Meramec | 42 | 480 | 444 |
| 22 | Martin 1505 4-9MH | Meramec | 66 | 385 | 250 |
| 23 | Cheshire Cat 1506 1-13MH | Meramec | 42 | 368 | 328 |
| 24 | Aberlour 1505 1-18MH | Osage | 20 | 521 | 383 |
| 25 | Three Wood 1505 4-17MH | Meramec | 50 | 430 | 369 |
| 26 | Dixon 1505 3-16MH | Meramec | 34 | 570 | 391 |
| 27 | Huntsman 1506 2-23MH | Meramec | 35 | 670 | 458 |
| 28 | Huntsman 1506 4-23MH | Meramec | 154 | 620 | 298 |
| 29 | Old Crab 1506 1-24MH | Osage | 48 | 837 | 678 |
| 30 | White Rabbit 1506 2-27MH | Osage | 108 | 726 | 444 |
| 31 | Samuel 1505 1-29MH | Meramec | 14 | 492 | 403 |
| 32 | Mad Hatter 1506 2-34MH | Osage | 156 | 491 | 323 |

# Top-Tier Results in STACK Oil Window
## *Horizontal Meramec/Osage wells, Kingfisher County*

**Public data illustrate Alta Mesa has significant portion of top quartile producers**



*Alta Mesa has 27% of top-quartile wells*

*Alta Mesa has 32% of top-quartile wells*

*Alta Mesa has 44% of top-quartile wells*

Cumulative BO @ 6 Months

Cumulative BO @ 12 Months

Cumulative BO @ 24 Months

Source: Drilling Info public production data, all horizontal wells in Kingfisher Co., all Operators, all vintages, Mississippian only.

12

# Development Process Underway
*Spacing test pilots establish basis for development approach*





### Ash-Foster Flowback ~100 days
*2 parent, 8 infill wells*



### Themer Flowback ~75 days
*1 parent, 7 infill wells*



### Hoskins Flowback ~60 days
*1 parent, 7 infill wells*



### Paris Flowback ~40 days
*1 parent, 5 infill wells*



13



# Drilling Highlights
*Building on over 250 STACK Horizontal wells in 5 years of development*





### Current Rig Fleet
- Omaha – Latshaw Rig 39
  - Well Count: 61
  - Footage: 726,269ft
- Utah – Latshaw Rig 12
  - Well Count: 50
  - Footage: 609,808ft
- Juno – Latshaw Rig 29
  - Well Count: 42
  - Footage: 505,713ft
- Gold – Latshaw Rig 13
  - Well Count: 30
  - Footage: 3588,761ft
- Neptune – Latshaw 14
  - Well Count: 10
  - Footage: 108,209ft
- H&P 250
  - Well Count: 5
  - Footage: 50,209ft

14



# Completions – Key to Value Realization
*Progressive, Continuous Optimization*

- **Completions**
  - 2013 – Q1 2014 – Sliding Sleeves / Mechanical Packers
  - Q2 2014 – Current – Plug and Perf / Swellable Packers
  - Improved frac coverage of lateral
- **Frac Stage Length**
  - 2013 – Q1 2014 – 300 ft spacing
  - Q2 2014 – Q4-2015 – 200 ft spacing
  - 2016 – 2017 - 140 ft spacing
- **Fracture Volumes**
  - Proppant
    - 2013 – 310 lbs/ft of lateral
    - 2014 – 540 lbs/ft of lateral
    - 2015 – 680 lbs/ft of lateral
    - 2016 – 1,097 lbs/ft of lateral
    - 2017 - 1,311 lbs/ft of lateral
  - Fluid
    - 2013 – 1,120 gal/ft of lateral
    - 2014 – 1,930 gal/ft of lateral
    - 2015 – 2,350 gal/ft of lateral
    - 2016 – 2,600 gal/ft of lateral
    - 2017 – 2,734 gal/ft of lateral

**Proppant, lb/lateral ft**



**Fluid, gal/lateral ft**



15

# Artificial Lift Optimization
*Key driver to maximize ROI, EBITDA and optimize reserves*

## Well Productivity Focus: Key to Long-Term Value

### Gas Lift for Initial Well Design
- Flowback constrained to 100 Bbl total fluid per hr
- Up to 50% oil EUR recovered via gas lift
- Lower CAPEX / OPEX than ESP

### Gas Lift Shift to Plunger Lift
- Up to 80% of EUR recovered in Gas Lift / Plunger Lift
- Lower OPEX, extends economic limit, increases NPV over time by downsizing/eliminating compressor
- Tolerant and robust (sand, deviation high GLR >5,000)

### Further Drawdown Strategies
- Several technologies in field trials to maintain production rates in later life wells
- Small jet pumps (1-1/4"), hydraulic piston pumps, modified rod pumps (improved gas & deviation handling)

### Key Factors
- Fit-for-purpose / well-specific solutions
- Accelerated production / maximize NPV
- CAPEX and LOE per BOE for production gains

**Daily Lift Optimization Report Excerpt**



**Artificial Lift Lifecycle**

16



# Infrastructure
## *LOE reduction, capital cost control, and revenue generation*

### Saltwater Disposal System

- **100% AMR-owned system; assurance of disposal**
  - 170+ miles SWD pipelines
  - 11 active SWD wells throughout field area
  - SWD additions integrated into field development plan
- **Continual improvement of system**
  - Loop lines if capacity becomes constrained
  - Upgrade power supply for future development
  - Leverage data infrastructure for monitoring and optimization
- **Cost efficient and accretive to bottom line**
  - $1,00/BW charge vs $2.00 - $3.00/BW to haul offsite
  - Beneficial to 3rd-party working interest owners

### Expanded Operations Supply Water Network

- **Water supply system for cost control, reliability**
  - Water for drilling & completion ranges $40M - $400M, most variable cost in drilling & completion AFE
  - Supply cost driven by distance from source
- **Supply water network expansion underway**
  - "Fire hydrant" network of pipe, storage, and pumps
  - Ensure low cost supply of water for all operations
  - Phase I to supply water to highest cost area of field



# Kingfisher Midstream System
## *Robust, expandable gathering and processing*



**Natural Gas Processing**
- Current processing capacity of 150 Mmcf/d, inclusive of offtake agreements
- Incremental 200 Mmcf/d Cryo plant in startup
- 1,200 Bbl/d condensate stabilizer

**Low Pressure Pipeline**
- ~309 miles of low-pressure crude and gas gathering lines[1]
  - Natural gas gathering: 4"-16" pipeline
  - Crude gathering: 6"-12" pipeline

**High Pressure Pipeline**
- ~104 miles of 4"-16" rich gas transportation pipeline[2]
  - Average operating pressure of 1,100 psig and piggable
- 4 miles of 12" residue gas pipeline to PEPL
- 9 miles of 16" residue gas pipeline to OGT
- 4 miles of 6" NGL Y-grade pipeline, with 13,000 Bbl/d capacity to Chisolm Pipeline

**Compression Facilities**
- Field Compression:
  - 17 CAT 3516s (23,460 total HP)[3]
  - 3 CAT 3508s (2,070 total HP)
  - 1 CAT 3306 (203 HP)
- Inlet Compression:
  - 6 CAT 3606s (10,650 total HP)
- Residue Compression:
  - 3 CAT 3516s (4,140 total HP)
  - 5 CAT 3608s (12,500 total HP)[4]

**Other Infrastructure**
- 50,000 Bbl crude storage with 6 truck loading LACTS
- 3 NGL bullet tanks: 90,000 gallon capacity

**Producer Connections**
- 145 meters settled through November 2017

[1]7 miles under construction. [2]1 mile under construction. [3]6 under construction. [4]All under construction

18



# Summary
*Continued execution facilitates disciplined growth*

- **Team**
  - 25+ years in Sooner Trend, 5+ years horizontal development
  - Multi-discipline continuous improvement + continual learning

- **Assets**
  - Highly contiguous acreage in black oil window
  - Multi-well patterns focus of 2018 development plans
  - Integrated purpose-built midstream system provides efficiency, flow assurance, and serves growing third-party needs in STACK

- **Processes**
  - Operating team has scaled up effectively
  - Established disciplines, controls, and systems

- **Balance Sheet**
  - Fully funded growth with low-leverage
  - Focus on capital efficiency

# PX 118

## REDACTED IN ITS ENTIRETY

# PX 119

REDACTED IN ITS ENTIRETY

# PX 120

REDACTED IN ITS ENTIRETY