**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | CASE NO. 4:19-CV-00957 (CONSOLIDATED) <br><br> JUDGE GEORGE C. HANKS, JR. <br><br> THIS DOCUMENT RELATES TO: <br><br> CASE NO. 4:22-CV-01189 <br> CASE NO. 4:22-CV-02590 |

**THE DIRECT ACTION PLAINTIFFS'**
**OPPOSITION TO MOTION OF DONALD DIMITRIEVICH**
**AND WILLIAM MCMULLEN**
**FOR SUMMARY JUDGMENT AS TO**
**SECTION 18 AND STATE LAW FRAUD CLAIMS**

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING ................................................ 1

SUMMARY OF THE ARGUMENT ...................................................................... 1

COUNTERSTATEMENT OF ISSUES TO BE RULED UPON ....................... 3

COUNTERSTATEMENT OF MATERIAL DISPUTED FACTS  AND
PROCEDURAL HISTORY ................................................................................... 3

        A.    Alta Mesa's Fraud .......................................................... 3

        B.    The Direct Action Plaintiffs' Investment Processes .......................... 5

        C.    The Direct Action Plaintiffs Evaluate and Analyze Alta Mesa
Securities Before Investing ................................................... 7

        D.    Direct Action Plaintiffs Buy (or Hold) Alta Mesa Common Stock
in Reliance on the Disclosures in the 2017 10-K .............................. 8

LEGAL STANDARD ............................................................................................ 10

ARGUMENT .......................................................................................................... 10

    I.    THE JURY SHOULD RESOLVE PLAINTIFFS' SECTION 18 CLAIMS .. 10

        A.    Genuine Issues of Material Fact Preclude Summary Judgment on
the Direct Action Plaintiffs' Reliance ............................... 11

        B.    Plaintiffs' Section 18 Claims Are Timely ........................................ 15

        C.    Defendants Have Not Established the "Good Faith Defense" ......... 18

    II.    THE JURY SHOULD RESOLVE THE TEXAS LAW FRAUD CLAIMS .. 19

        A.    There is a Factual Dispute About Whether Defendants' Intended to
Induce Reliance ............................................................... 19

        B.    Fact Issues Preclude Summary Judgment on Justifiable Reliance .. 21

        C.    Plaintiffs' Texas Law "Holder" Claims are Viable ......................... 21

        D.    SLUSA Does Not Bar Plaintiffs' Texas Law Fraud Claims ............ 23

i

CONCLUSION ............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
483 U.S. 143 (1987) ........................................................................................... 17

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ........................................................................................... 11

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) ........................................................................................... 22

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................................... 10

*Cuellar v. GEO Group, Inc.,*
2023 WL 4535079 (5th Cir. Jul. 13, 2023) ........................................................ 10

*Cullen v. Margiotta,*
811 F.2d 698 (2d Cir. 1987) .......................................................................... 17, 18

*Dekalb Cty. Pension Fund v. Transocean Ltd.,*
817 F.3d 393 (2d Cir. 2016) .......................................................................... 16, 18

*DirecTech Del., Inc., v. Allstar Satellite, Inc.,*
2010 WL 1838573 (D.N.J. May 6, 2010) ........................................................... 12

*Discovery Glob. Citizens Master Fund, Ltd. v. Valeant Pharm. Int'l, Inc.,*
2018 WL 406046 (D.N.J. Jan 12, 2018) ............................................................. 15

*Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,*
51 S.W.3d 573 (Tex. 2001) ................................................................................ 20

*Exxon Corp. v. Emerald Oil & Gas Co., L.C.,*
348 S.W.3d 194 (Tex. 2011) ...................................................................... 2, 20, 21

*Felix v. Mary Kay, Inc.,*
2022 WL 4360554 (N.D. Tex. Sept. 19, 2022) ................................................... 19

*Gould v. Winstar Commc'ns, Inc.,*
692 F.3d 148 (2d Cir. 2012) .......................................................................... 13, 14

*Grant Thornton LLP v. Prospect High Income Fund,*
314 S.W.3d 913 (Tex. 2010) .............................................................................. 22

iii

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ................................................. 18

*In re Enron Corp. Sec., Deriv., and "ERISA" Litig.*,
  540 F. Supp. 2d 800 (S.D. Tex. 2010) ............................................. 2, 11, 12

*In re Enron Corp. Secs.*,
  535 F.3d 325 (5th Cir. 2008) ....................................................... 24, 25

*In re Enron Corp. Secs., Deriv. & ERISA Litig.*,
  2002 WL 32107216 (S.D. Tex. Aug. 12, 2002) ("*Enron I*") ........................ 24

*In re Parkcentral Glob. Litig.*,
  2010 WL 3119403 (N.D. Tex. Aug 5, 2010) ........................................ 22

*In re Petrobras Sec. Litig.*,
  152 F. Supp. 3d 186 (S.D.N.Y. 2016) ............................................. 15

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ..................................................... 12

*In re WorldCom, Inc. Secs. Litig.*,
  308 F. Supp. 2d 236 (S.D.N.Y. 2004) ............................................ 24

*Ion v. Chevron USA, Inc.*
  731 F.3d 379 (5th Cir. 2013) .................................................... 11

*J.P. Morgan Chase Bank, N.A. v. Orca Assets G.P., LLC*,
  546 S.W.3d 648 (Tex. 2018) ..................................................... 21

*Jackson v. Hollowell*,
  685 F.2d 961 (5th Cir. 1982) .................................................... 19

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ............................................................. 25

*MYL Litig. Recovery I LLC v. Mylan N.V.*,
  2020 WL 1503673 (S.D.N.Y. Mar 30, 2020) ....................................... 16

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
  898 F.3d 461 (5th Cir. 2018) .................................................... 12

*Newby v. Enron Corp.*,
  338 F.3d 467 (5th Cir. 2003) .................................................... 25

iv

*Ross v. A.H. Robins Co., Inc.*,
   607 F.2d 545 (2d Cir. 1979) ........................................................................ 17

*Zaragoza v. Union Pac. R.R. Co.*,
   606 F. Supp. 3d 427 (W.D. Tex. 2022) .......................................................... 16

**Statutes**

15 U.S.C. § 78bb(f)(1)(A) ................................................................................... 23

**Other Authorities**

Edward T. McDermott, *Holder Claims-Potential Causes of Action in Delaware and*
   *Beyond?*, 41 DEL. J. CORP. L. 933, 935 n.11 (2017) ...................................... 23

S. REP. NO. 105-182 (1998) ................................................................................ 25

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................... 10

## NATURE AND STAGE OF THE PROCEEDING

These cases arise from the collapse of Alta Mesa,[1] a multibillion dollar E&P venture that shockingly fell apart almost as soon as it went public.  The Alyeska Plaintiffs and the Orbis Plaintiffs were two of the largest investors in the SPAC that became Alta Mesa.  They suffered tremendous economic harm as a result of Defendants' misrepresentations and omissions.  The Direct Action Plaintiffs elected to file their own securities fraud actions against Defendants.  In addition to claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act, which are also being pressed in the class action, the Direct Action Plaintiffs have asserted claims under Section 18 of the Exchange Act and Texas statutory and common law.  Defendants Donald Dimitrievich and William McMullen now move for summary judgment against the Direct Action Plaintiffs' Section 18 and state law claims.[2]

## SUMMARY OF THE ARGUMENT

In arguing that Plaintiffs' Section 18 and state law fraud claims cannot reach a jury, Moving Defendants misstate the law, mischaracterize the record, and re-hash the very arguments that this Court has already rejected on their motions to dismiss.  Their Motion should be denied for the following reasons:

*First*, without contesting that their statements were false or misleading, Moving Defendants argue that no genuine dispute exists that the Direct Action Plaintiffs did not

---

[1] Party names and other relevant terms are defined in Appendix A, submitted herewith.  Citations to "Ex." are to the exhibits to the Declaration of Lawrence M. Rolnick in Opposition to Motion of Donald Dimitrievich and William McMullen for Summary Judgment as to Section 18 and State Law Fraud Claims, submitted herewith.

[2] Even if the Motion is granted (it should not be), Direct Action Plaintiffs would still have claims against Moving Defendants under Sections 10(b) and 20(a) of the Exchange Act.

rely on Moving Defendants' misstatements in the 2017 10-K.  They are wrong.  The Direct Action Plaintiffs testified ████████████████████████████████████ ████████████████████ and have adduced a voluminous documentary record to support that they so relied.  In doing so, Plaintiffs have established the "causal nexus" required to prove reliance under Section 18.  *See In re Enron Corp. Sec., Deriv., and "ERISA" Litig.*, 540 F. Supp. 2d 800, 830 (S.D. Tex. 2010).

**Second**, Moving Defendants argue once again that Plaintiffs' Section 18 claims are not timely, but this Court has already soundly rejected this exact argument.  Moving Defendants provide no basis for the Court to revisit the issue.

**Third**, Moving Defendants claim that they have established the good faith defense such that there are no triable issues.  But that fact-sensitive affirmative defense is not suitable for resolution at this stage, and there is substantial evidence demonstrating that Moving Defendants acted with *scienter*, rebutting their supposed good faith.

**Fourth**, Moving Defendants argue that the state law claims cannot reach the jury because they (1) purportedly did not intend to induce Plaintiffs' reliance on the 2017 10-K and (2) Plaintiffs did not justifiably rely on the 2017 10-K.  In making this argument movants **misstate the holding of their principal case**, which did not "affirm[] a directed defense verdict on the fraud claim" (Defs.' Br. at 21), but rather held "that the trial court **erred** in granting a directed verdict on [the] fraud claim." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 221 (Tex. 2011).  *Exxon* supports Plaintiffs' position.

**Finally**, Moving Defendants recycle their arguments regarding the viability of Plaintiffs' "holder" claims under Texas law and the applicability of SLUSA to bar the state

law claims.  As with the timeliness of Plaintiffs' Section 18 claims, the Court has already roundly rejected these arguments, and Moving Defendants have raised no basis for the Court to revisit them.

## COUNTERSTATEMENT OF ISSUES TO BE RULED UPON

The issues to be ruled upon are:  (1)  whether Moving Defendants have established that there is no genuine issue of Plaintiffs' reliance on the 2017 10-K sufficient to prevent their Section 18 claims and that portion of their state law claims from proceeding to trial; (2) whether the Section 18 claims are time-barred; (3) whether the Section 18 claims cannot reach the jury because Moving Defendants have established their good faith as a matter of law; (4) whether there is a triable issue of fact regarding the intent-to-induce-reliance element of the state law fraud claims as to the Moving Defendants; and (5) whether SLUSA bars the state law claims.

## COUNTERSTATEMENT OF MATERIAL DISPUTED FACTS AND PROCEDURAL HISTORY

### A.    Alta Mesa's Fraud[3]

Alta Mesa's rise and fall occurred staggeringly quickly.  The company began as a SPAC, Silver Run II, that was formed by the private equity firm Riverstone in March 2017. On February 6, 2018, following a lengthy investor roadshow, Silver Run II  merged with AMH, an upstream oil and gas production company, and KFM, a midstream gathering and processing company, to form AMR.[4]  Thirteen months after the Merger, on February 25,

---

[3] Because Moving Defendants have not challenged falsity, this section is abbreviated to include only the necessary context applicable to this Motion.
[4] *See generally* Ex. 7 at 160-69.

2019, Alta Mesa wrote down the value of its business by **$3.1 billion** – representing over 80% of the value ascribed to it in the Merger – and admitted to ineffective internal controls over financial reporting.[5]   On September 11, 2019, the company filed for bankruptcy.

Alta Mesa's core promise to investors was to embark on a drilling program that would yield at least 4,196 wells across its STACK acreage (plus upside to reach as many as 12,133 wells), with those wells averaging Alta Mesa's "type curve" EUR of 250 MBO. Alta Mesa's core promise was based on 12 wells per section and sometimes more.   Such a program would, in turn, feed – together with a purportedly robust third-party business – AMR's midstream segment, which might then spin off at an attractive multiple.[6]

Unbeknownst to investors, Defendants possessed data showing the exact opposite of their representations.   Alta Mesa's acreage could not support its aggressive drilling plan.



Another problem was KFM's third-party business.   Rather than the robust system of third-party contractual relationships that Alta Mesa had represented to investors, KFM's

---

[5] Its auditors later confirmed that AMR had various material weaknesses in its internal controls over financial reporting as of December 31, 2018.   *See* Alta Mesa's Annual Report on Form 10-K for the Year Ended December 31, 2018, dated May 17, 2019, at pp. 25, 103-05, *available at* https://www.sec.gov/Archives/edgar/data/1518403/000151840319000021/altms_20181231x10k.htm.
[6] *See generally* Ex. 1; *see id.* at pp. 14, 25, 54; Ex. 2 (stating, in footnotes to NAV shown on p. 14 of Ex. 1, that the NAV "[r]eflects Generation 2.0 Type Curve."); Ex. 1 at p. 30.
[7] *See* Ex. 4 at AMR_SDTX01825621; *see also* Ex. 5 ¶¶ 55-58 (████████████████████████████ ████████████████████████████).
[8] *See* Ex. 6.

█████████████████████████████████████████████████████████

████ As AMR's upstream segment failed to produce the volumes it promised based on its own over-aggressive assumptions, KFM – lacking any other source of hydrocarbon volumes except those they fictitiously modeled – also saw its value quickly evaporate.

## B. The Direct Action Plaintiffs' Investment Processes

The Alyeska and Orbis Plaintiffs are funds advised by professional investment firms that invest in public equities ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

The team responsible for overseeing Orbis' investment in Alta Mesa consisted of Adam Karr, Alec Cutler, and Brad Murray.[11] Karr and Cutler were Portfolio Managers for their respective funds, and Murray was the common investment analyst assigned to cover Alta Mesa.[12] As the analyst on the deal, Murray ████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████

---

[9] *See* Ex. 8 at AMR_SDTX00686799.
[10] *See, e.g.*, Ex. 9 at ALYESKA_AM00003513; Ex. 10 ("Mitchell Dep. Tr.") at 67:22-69:5; *id.* at 68:7-69:1 (███████████████████████████); Ex. 11 at ORBIS_AM00027248; Ex. 11 at ORBIS_AM00027248 ("Orbis devotes a significant proportion of its business efforts to detailed 'bottom up' investment research conducted with a long-term perspective.").
[11] Ex. 12 ("Karr Dep. Tr.") at 56:5.
[12] Karr Dep. Tr. 29:12-23; *see* Ex. 13 ("Cutler Dep. Tr.") at 45:2-6; *id.* at 35:8-11.
[13] *See* Cutler Dep. Tr. at 35:21-36:8.
[14] *Id.* at 35:4-11; Karr Dep. Tr. at 57:1-8.



For Alyeska, Randy Mitchell and Jonathan Berger handled the investment in Alta Mesa; Mitchell was the Portfolio Manager and senior member of the team; Berger was the lead analyst and reported to Mitchell.[20]   Like Orbis, Alyeska ███████████████

---

[15] Karr Dep. Tr. at 41:20-25 – 42:1
████████████████████████████████████████████████████ .
[16] *See id.* at 38:20-40:7; *id.* at 40:4-7
███████████████████); *see also id*. at 42:5-8.
[17] *Id.* at 116:2-17.
[18] *Id.* at 43:5-11.
[19] *Id.* at 42:13-15; *id.* at 41:20-25 – 42:1; *id.* at 116:2-17.
[20] Mitchell Dep. Tr. at 46:13-16; Berger Dep. Tr. at 16:6-17:10.



## C. The Direct Action Plaintiffs Evaluate and Analyze Alta Mesa Securities Before Investing

Orbis and Alyeska purchased two of the largest allocations in the Silver Run II IPO and had direct interactions with several Defendants in conducting their fundamental research. Prior to Silver Run II's IPO, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

Silver Run II's combination with AMH and KFM was announced in an August 16, 2017 8-K. █████████████████████████████████

---

21 Ex. 9 at ALYESKA_AM00003513.
22 Mitchell Dep. Tr. at 31:11-24.
23 Berger Dep. Tr. at 171:19-20 (████████); *id.* at 189:20-24 (████████).
24 *See generally* Ex. 15.
25 *See* Ex. 15 at ORBIS_AM00000165.
26 Ex. 16.



Following an investor roadshow in the fall of 2017,[28] on February 6, 2018, Alyeska and Orbis both elected to retain their shares – rather than exercise their right to redeem them for $10 per share – in the now-combined entity, AMR.

### D.    Direct Action Plaintiffs Buy (or Hold) Alta Mesa Common Stock in Reliance on the Disclosures in the 2017 10-K

Once Defendants convinced the Direct Action Plaintiffs and others to vote in favor of the Merger and not redeem, investors looked to AMR's first release of results to confirm the attractiveness of the investment.  On March 29, 2018, AMR did so, announcing its financial results for the fourth quarter of 2017 and the full-year 2017 on a Form 10-K filed with the SEC.[29] ████████████████████████████

████████████████████████████████████████

███████   ██████████████████████████████

---

[27] Murray Dep. Tr. at 110:4-9; Ex. 17; Ex. 18.

[28] Alta Mesa's strategy on the roadshow was, in part, to ████████████████   *See* Ex. 19.

[29] *See* Ex. 20 ("2017 10-K") at 53, F-1 – F-6.  Alta Mesa also released a Form 8-K, press release, slide presentation, and held an earning's call.

[30] *See* Mitchell Dep. Tr. at 31:11-20 ████████████████████████████
████████); *id.* at 156:2-7 ████████████████████████████
████████████████████   ; *id.* at 157:2-6
████████████████████████████████████); Berger Dep.
Tr. at 189:23-24 ████████████████████████████████████);
*id.* at 266:25 – 267:1 (████████████████████); Karr Dep. Tr. at 116:2-17; Murray Dep. Tr. 67:7-68:2; Cutler Dep. Tr. 105:22 – 106:7.

[31] Berger Dep. Tr. at 197:4-5; Murray Dep. Tr. at 224:13-24.

Indeed, both Alyeska and Orbis were highly focused on the information released in the 2017 10-K. ███████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ ████████

████████████████████████████████████████████████

███████████████████████████████████

The disclosures in the 2017 10-K were materially false or misleading.  In addition to disclosing Alta Mesa's financial results for the fourth quarter and full year 2017, the 2017 10-K contained "risk factors" applicable to Alta Mesa's business.  This included risk factors specific to Alta Mesa's upstream business ("Upstream Risk Factors") and risks specific to its midstream business ("Midstream Risk Factors").[34]  The Upstream Risk Factors were materially false or misleading because they failed to disclose that Alta Mesa possessed internal data contradicting the feasibility of its drilling program, including data related to well spacing and parent-child well interference.  The Midstream Risk Factors were materially false or misleading because they failed to disclose that Alta Mesa was projecting third-party business that it not only did not have under contract, but also had no reasonable basis to assume would come under contract in the future.  The 2017 10-K was further misleading in that it contained a certification that AMR's CEO and CFO concluded that AMR's "disclosure controls and procedures . . . were effective," when they were not.

---

[32] Ex. 21 at ORBIS_AM00001046.
[33] *See* Ex. 22; Ex. 16.
[34] 2017 10-K at 6-43 (All Risk Factors); *id.* at 13-36 ("Risks Related to Our E&P Business"); *id.* at 37-43 ("Risks Related to Our Midstream Business").

Following Alta Mesa's publication of the 2017 10-K, Alyeska and Orbis purchased AMR common stock in reliance on the 10-K misstatements, and also held AMR common stock when they could have sold.[35]

## LEGAL STANDARD

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury . . . to resolve the parties' differing versions of that truth at trial." *Cuellar v. GEO Group, Inc.*, 2023 WL 4535079, at *1 (5th Cir. Jul. 13, 2023).  In deciding the Motion, all evidence must be viewed in the light most favorable to Plaintiffs, and the Court must draw all reasonable inferences in Plaintiffs' favor. *Id.* at 255. The Court may not weigh conflicting evidence or make credibility determinations.  *See, e.g.*, *Ion v. Chevron USA, Inc.* 731 F.3d 379, 389 (5th Cir. 2013).  Rather, the relevant inquiry is only "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).

## ARGUMENT

**I.   THE JURY SHOULD RESOLVE PLAINTIFFS' SECTION 18 CLAIMS**

---

[35] *See* Ex. 23 (████████████████) (████████████████████████); Ex. 24 (████████████████) (████████████████).

Section 18 requires evidence that (1) "a document filed pursuant to the Exchange Act, or any rule or regulation promulgated under it, contained a false or misleading statement"; (2) "the defendant made or caused to be made" the false or misleading statement; (3) "the plaintiff actually relied" on the false or misleading statement; and (4) plaintiffs' reliance on the false or misleading statement caused their loss. *In re Enron Corp. Sec., Deriv., & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813 (S.D. Tex. 2010).  Section 18 liability attaches to all those "who sign the filed documents." *Id.*  Moving Defendants concede that they signed the 2017 10-K, and they do not contest on this Motion that the 2017 10-K contained materially false or misleading statements.  Instead, they erroneously argue that the Section 18 claims fail based on reliance, timeliness, and good faith.

### A. Genuine Issues of Material Fact Preclude Summary Judgment on the Direct Action Plaintiffs' Reliance

Moving Defendants challenge whether Plaintiffs actually relied on Moving Defendants' misleading statements in the 2017 10-K (but do not challenge whether that reliance was justifiable).  To prove reliance under Section 18, a plaintiff must demonstrate "a causal nexus between their purchase of securities and specific statements contained in the SEC filings." *Enron*, 540 F. Supp. at 831 (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006)).  Deciding whether a plaintiff relied on a misrepresentation is not well-suited for disposition by the Court as a matter of law.  "[T]he question of whether a plaintiff relied on a misrepresentation . . . is a question of fact best reserved for the jury." *DirecTech Del., Inc., v. Allstar Satellite, Inc.*, 2010 WL 1838573, at *6 (D.N.J. May 6, 2010); *see also N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna*

11

*Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018) (holding that "reliance usually presents a question of fact" but recognizing that whether that reliance *was justified* – which is not something the Moving Defendants challenge here – can be determined as a matter of law).

　　Defendants' argument that Plaintiffs did not rely on the misrepresentations in the 2017 10-K is contradicted by the evidence.  As shown above, both the Orbis Plaintiffs and the Alyeska Plaintiffs ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ ██████████████████████████

██████████████████████████ ████████████████████████

█████████████████████████████████████████ ████████

███████████████████████████████████████████████

████████████████████████████████████

---

[36] Karr Dep. Tr. at 121:13-15 (██████████████████████████████████████████████████
████████████████████████); *id.* at 129:15-22 ████████████████
█████████████████████████████████████████████████████████); *id.* at 131:15-23; *id.*
at 139:10-19; *id.* at 143:19-24; *see* Berger Dep. Tr. 189:20-24.
[37] Murray Dep. Tr. at 224:13-24 ██████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████; Berger
Dep. Tr. at 194:11-12 (███████████████████████████████████████████).
[38] Karr Dep. Tr. at 131:15-23 (Misstatement No. 1) (██████████████████████████████
██████████████████████████████████████████; *id.* at 139:10-19 (Misstatement No.
4) (█████████████████████████████████████████████████████████████████████████████
████████████████████████); *id.* at 143:19-24 (Misstatement No. 5)█████████████████
███████████████████████████████████████████████████ (emphases added)).

12

Even if Plaintiffs had not █████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████   *See* Fed. R. Evid. 406 ("Evidence of a person's habit or an

organization's routine practice may be admitted to prove that on a particular occasion the

person or organization acted in accordance with the habit or routine practice.  The court

may admit this evidence regardless of whether it is corroborated or whether there was an

eyewitness."); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012).  In

*Gould*, the plaintiffs brought Section 18 claims alleging misstatements in the Form 10-K.

692 F.3d at 155-56.  While "uncertain of the date of, or reason for, her recommendation"

that the plaintiffs purchase the company's stock, the plaintiffs' analyst testified that it was

her practice to review company filings.  *Id.* at 156.  The Second Circuit rejected the *very*

*argument* Moving Defendants now make – namely, that a failure of recall conclusively

bars a Section 18 claim – and held that the plaintiffs' general practice evidence was enough

for a jury to "infer that [plaintiff] actually reviewed and relied on the relevant statements

in the documents." *Id.* at 161. ██████████████████████████

███████████████████████████████████████████████████████████

████   This evidence creates a triable issue of fact about whether the Direct Action

Plaintiffs relied on the misrepresentations in the 2017 10-K.  *See Gould*, 692 F.3d at 161.

---

[39] Mitchell Dep. Tr. at 31:11-24 (████████████████████████████████████████
███████████████████████ ; Berger Dep. Tr. at 189:20-24
(██████████████████████████████████████████████████████);
*id.* at 194:11-12 (█████████████████████████████████████████████████████████
████████████████████████); Karr Dep. Tr. at 116:2-17 (████████████████████████
█████████████████████████████████████████████

Defendants' motion rests on a thin reed. They argue that when they pointed witnesses to a *specific sentence* in the over 100-page 2017 10-K, the witnesses could not always recall that sentence and whether that sentence was the basis for a specific investment decision. (*See generally* Defs. Br. at 9-14). These "gotcha" memory-test questions are a red herring and do not establish a lack of reliance as a matter of law. *First*, the attempt to pluck single sentences as independent reasons for investment decisions fundamentally misunderstands the investment process. An investor may – and, in Plaintiffs' case, did – rely on multiple pieces of information. The *misleading* information was part of the mosaic of information Plaintiffs relied on in making investment decisions – even if it was not the *only* information on which they relied. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Second*, it was not what the statements in question said, but rather what they omitted that was critical. Here, the statements failed to disclose that what Defendants were representing about the upstream business, the midstream business, and Alta Mesa's internal controls was false. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

<hr>

████████████████████████████████████████████████████

); Murray Dep. Tr. 67:7-68:2; *id.* at 224:13-24.
[40] Mitchell Dep. Tr. at 157:2-6; *see also* Karr Dep. Tr. at 148:2-4 (███████████████

████████████████████████████████████████████████).



**B.      Plaintiffs' Section 18 Claims Are Timely**

This Court has already concluded that Plaintiffs' Section 18 claims were timely under the Supreme Court's *American Pipe* class-action tolling doctrine.  (Dkt. 343 at 12-14).  This Court surveyed applicable case law, recognized that there is a split in authority as to the scope of claims to which class action tolling applies, and chose to "recognize class action tolling" because the Class Action Section 10(b) claims and Direct Action Plaintiffs'

---

[41] *See* Ex. 18 (⬛⬛⬛⬛); Ex. 17 (⬛⬛⬛⬛⬛⬛⬛⬛); Ex. 21 at ORBIS_AM00001046 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Karr Dep. Tr. at 43:5-11; Mitchell Dep. Tr. at 98:11-19, 99:1-100:5 (⬛⬛⬛⬛⬛⬛); Ex. 16 ⬛⬛⬛⬛⬛⬛⬛⬛⬛); Mitchell Dep. Tr. at 316:17-317:5 (⬛⬛⬛⬛⬛⬛).
[42] Mitchell Dep. Tr. at 270:9-270:16; *id.* at 316:17-318:9.
[43] Defendants also argue that Direct Action Plaintiffs do not ***plead*** reliance.  (*See* Defs.' Br. at 10). Defendants are wrong.  The Direct Action Plaintiffs' Complaints specifically allege that analysts at Orbis and Alyeska – Plaintiffs' investment advisors – "actually read, reviewed" and "had direct eyeball reliance on," among other things, the false and misleading statements in the 2017 10-K.  (Orbis Compl. ¶¶ 410-17; Alyeska Compl. ¶¶ 335-42).  These particularized allegations are more than enough to state a claim, as courts nationwide have concluded.  *See, e.g.*, *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 195-96 (S.D.N.Y. 2016) (finding Section 18 claim sufficiently pled even where the complaint "d[id] not tie specific misstatements to specific transactions" because "such specificity is not necessary for a [Section] 18 claim to survive a motion to dismiss"); *Discovery Glob. Citizens Master Fund, Ltd. v. Valeant Pharm. Int'l, Inc.*, 2018 WL 406046, at *4 (D.N.J. Jan 12, 2018).  In any event, there is no basis to dismiss the Section 18 claims on the pleadings when Direct Action Plaintiffs have submitted sufficient proof to place the issue of their reliance before a jury.

Section 18 claims "share a common factual basis and legal nexus." (*Id.* at 13 (quoting *Zaragoza v. Union Pac. R.R. Co.*, 606 F. Supp. 3d 427, 434-35 (W.D. Tex. 2022)).[44] The Court's ruling is in line with numerous courts that permit *American Pipe* tolling where the claims in the class action and those in a later-filed individual action are not based on the identical legal theory, including those specifically in the Section 18 context. *See, e.g.*, *MYL Litig. Recovery I LLC v. Mylan N.V.*, 2020 WL 1503673, at *8 (S.D.N.Y. Mar 30, 2020). The Court should not reverse itself at summary judgment, as Defendants urge.

No one disputes that tolling extends to individual claims that involve "the same evidence, memories, and witnesses" as were involved in the initial putative class action. (Defs.' Br. at 15). Thus, Defendants are forced to argue that the Section 18 claims are "distinct" and "do not rely on 'the same evidence, memories, and witnesses'" as the Class Action Section 10(b) claims. (Defs.' Br. at 16 (quotation omitted)). Defendants are wrong.

Plaintiffs' Section 18 claims share a common factual basis with the Section 10(b) claims. "By its terms, [Section] 10(b) prohibits a broader range of conduct than does [Section 18]" but, in certain circumstances, Section 18 "may . . . provide another remedy for the same conduct." *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 552-53 (2d Cir. 1979). These are such circumstances. There is no dispute that Plaintiffs' Section 18 claims arise from the ***same*** public filing, Alta Mesa's 2017 10-K, and the ***same*** misrepresentations in

___
[44] Moving Defendants' attempt to distinguish *Zaragoza* fails. That case, as here, involved two factually similar but legally distinct claims – discrimination based on disparate treatment and disparate impact – with similar, but not identical, elements. *See* 606 F. Supp. 3d at 435. Yet Judge Cardone still applied *American Pipe* tolling, because "evidence of disparate impact can be relevant to a finding of disparate treatment.". *Id.* at 435-36. The same is true for Section 10(b) and Section 18 claims – evidence of one is "relevant to a finding" of the other, and the proofs largely overlap. *Dekalb Cty.*, 817 F.3d at 401-02.

that filing as alleged by the Class.  Because the alleged wrongful acts are the same, "the relevant evidence, memories, and witnesses with regard to these facts are the same for both actions."  *Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs.*, *Inc.*, 483 U.S. 143 (1987). Moving Defendants tacitly admit this, stating that the "primary" difference between the Class and Direct Actions is that the latter have "tacked on" Section 18 and state law claims to the same underlying conduct.  (Defs.' Br. at 4).

Defendants focus on the "legal standards governing the two claims," (Defs.' Br. at 16), but that argument is misplaced.  In *Cullen*, "[n]otwithstanding the differences between the legal theories," the court concluded that a state court class action asserting state law claims tolled the limitations period on the plaintiffs' federal RICO and discrimination claims.  811 F.2d at 720.  The court explained that the "differences between the state-law causes of action that were asserted in the putative state class action and the federal causes of action asserted [in the present action]" were "entirely peripheral" and "not the sorts of elements that suggest that *American Pipe* tolling would be inconsistent with the functional goal of statutes of limitations" – "to prevent 'stale' lawsuits, *i.e.*, suits after 'evidence has been lost, memories have faded, and witnesses have disappeared.'" *Id.* at 720-21 (quoting *Am. Pipe*, 414 U.S. at 554). The court then squarely held that "[t]he ***challenged conduct*** is what is common to both the RICO and the state-law claims, and that is what the defendant must be alerted to in order to preserve its evidence, record its recollections, and keep track of its witnesses." *Id.* at 721 (emphasis added).  Here, the challenged conduct is the same in

17

this case and the Class case: recklessly signing an SEC filing containing numerous material misstatements.

Nevertheless, the differences between the legal standards for a Section 18 and Section 10(b) claim are not, as Defendants argue, "substantive." In fact, courts consistently hold otherwise, explaining that (for instance) "[a] plaintiff asserting a Section 18(a) claim is, in essence, asserting a fraud claim – a fraud claim with respect to which the defendant, and not the plaintiff, uncharacteristically bears the burden of proof regarding the defendant's state of mind, but a fraud claim no less." *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 407 (2d Cir. 2016).

The alleged differences on which Defendants must hang their hat, then, are in fact insignificant: both claims require proof of reliance, and both claims require proof of culpable intent. *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *24 (D.N.J. Mar. 24, 2008). That these elements *may* be proved in different ways is a modest difference at best and does not negate the fact that the claims require "the same evidence, memories, and witnesses."[45] Plaintiffs' Section 18 claims factually overlap and share a legal nexus with Class Plaintiffs' Section 10(b) claims. Therefore, tolling applies and the Section 18 claims are timely.

### C. Defendants Have Not Established the "Good Faith Defense"

---

[45] Defendants' attempt to draw a core distinction between the reliance element of each claim fails. (*See* Defs.' Br. 16). There is no debating that reliance is an element of both Section 10(b) and Section 18 claims (even if the element is proven differently in each). Reliance is proven or disproven based on evidence from the plaintiffs' files, not the defendants', or market evidence and witnesses (like expert economists) that are not at risk of becoming stale or not being preserved. Such evidence does not implicate the reasons to toll (or not). This Motion proves the point – Defendants are trying (and failing) to disprove Direct Action Plaintiffs' reliance by pointing to Direct Action Plaintiffs' testimony and records. (Defs.' Br. at 9-14).

Moving Defendants argue that they have established their affirmative good faith defense as a matter of law, but that defense is a "quintessential jury question." *See Felix v. Mary Kay, Inc.*, 2022 WL 4360554, at *3 (N.D. Tex. Sept. 19, 2022); *Jackson v. Hollowell*, 685 F.2d 961, 967 (5th Cir. 1982). Moreover, substantial evidence in the record demonstrates that Moving Defendants acted with *scienter*, which rebuts their good faith.[46] Thus, the Moving Defendants cannot establish their good faith as a matter of law.

## II. THE JURY SHOULD RESOLVE THE TEXAS LAW FRAUD CLAIMS

### A. There is a Factual Dispute About Whether Defendants' Intended to Induce Reliance

In Texas, fraud requires evidence of five elements: (1) a material misrepresentation; (2) knowledge or recklessness as to the falsity of the misrepresentation; (3) intent to induce reliance on the statement; (4) justifiable reliance; and (5) injury. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). For the third element, "intent to induce reliance," Texas does not require "a direct relationship between an alleged fraudfeasor and a specific known person." *Id.* Rather, the relevant inquiry is whether the defendant possesses "information that would lead a reasonable man to conclude that there is an *especial likelihood* that it will reach" the plaintiff and cause them to incur a loss "in the type of transaction in which [the maker of the representation] intends or has reason to expect [his or her] conduct to be influenced." *Id.* at 580.

---

[46] The evidence is described in detail in Class Plaintiffs' Opposition to Motion of HPS, BCE, and ARM for Summary Judgment as to 20(a) Claims (Dkt. 445), Opposition to Motion of Donald Dimitrievich for Summary Judgment and Incorporated Memorandum of Law (Dkt. 446), and Opposition to William McMullen's Motion for Summary Judgment (Dkt. 449), which the Direct Action Plaintiffs joined in full (*see* Dkt. 447, 448, and 450) and incorporate by reference herein.

Moving Defendants possessed information indicating an "especial likelihood" that the Direct Action Plaintiffs would review the 2017 10-K and purchase or hold AMR stock as a result.  When the 2017 10-K was issued, they were directors of AMR, and the Direct Action Plaintiffs were two of its largest shareholders.  It requires improperly drawing inferences in favor of Moving Defendants to conclude as a matter of law that a reasonable person in their position would conclude that major company investors would not rely on statements in the 2017 10-K, the first major SEC filing of AMR.  Further, there is specific record evidence showing that Moving Defendants in fact knew the Direct Action Plaintiffs were large shareholders.[47]  Under *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 220-21 (Tex. 2011), this evidence creates a genuine issue of fact whether Moving Defendants intended to induce the Direct Action Plaintiffs' reliance.  In arguing otherwise, Moving Defendants ***misstate the holding of Exxon***, which did not "affirm[] a directed defense verdict on the fraud claim" (Defs.' Br. at 21), but rather held "that the trial court ***erred*** in granting a directed verdict on [the] fraud claim," reasoning that there was "legally

---

[47] As part of the Silver Run II roadshow, Moving Defendants received updates concerning communications with investors, including the Direct Action Plaintiffs.  *See, e.g.*, Ex. 33 at BCEM_0107223 and -25 (███████████████████████████████████████
███); Ex. 34  at ARMEnergy_00052337 and -39 (███████████████████████████████
█████████████████████████); Ex. 19 at ARMEnergy_00038014 (████████████
██████████████████████████████████); Ex. 35 ("M. Christopher Dep. Tr.") at 247:13-248:1 (noting that he typically kept Dimitrievich informed of what was occurring on the roadshow); Ex. 3 (██████████████████████████████████████).

sufficient evidence in the record" that the plaintiff had been identified to the defendant in a letter prior to the filing of the public report at issue there.  348 S.W.3d at 220-21.[48]

### B.    Fact Issues Preclude Summary Judgment on Justifiable Reliance

As discussed above, Plaintiffs have adduced substantial evidence of their "justifiable reliance" on the 2017 10-K sufficient to put this fact-sensitive issue before the jury.  *See, e.g.*, *J.P. Morgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 654 (Tex. 2018) ("Justifiable reliance usually presents a question of fact.").  And the question of whether, for Texas state law fraud purposes Plaintiffs justifiably relied on statements outside of the 2017 10-K, such as the proxy misstatements or direct misstatements, is not before the Court on this motion and should be resolved on the merits at the trial of this matter, against all relevant Defendants.

### C.    Plaintiffs' Texas Law "Holder" Claims are Viable

This Court has already applied binding Texas Supreme Court law in sustaining Plaintiffs' state law holder fraud claims.  (Dkt. 343 1 at 9).  Demanding the Court reverse itself, Defendants urge that the MTD Order permitted the Direct Action Plaintiffs' "holder claims to proceed [at the motion to dismiss stage] because Texas might eventually recognize them." (Defs.' Br. at 23).  But that is demonstrably false.  The Court instead sustained Direct Action Plaintiffs' claims because it found (correctly) under *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010), that holder

---

[48] The *Exxon* language Moving Defendants seize on – that public filings do not "alone satisfy the intent-to-induce reliance element," 348 S.W.3d at 217 – is inapposite because it was responding to the proposition that "unidentified, subsequent" purchasers might bring fraud claims. *Id.* at 218.  Here, the Direct Action Plaintiffs were neither unidentified nor subsequent – they were current shareholders that were specifically identified to Moving Defendants.

21

claims are viable in Texas.  (Dkt. 343 at 9 (citing *In re Parkcentral Glob. Litig.*, 2010 WL 3119403, at \*8 (N.D. Tex. Aug 5, 2010)).

Moving Defendants again unsuccessfully attempt to tap dance around *Grant Thornton*.  Citing non-binding federal district court cases and referencing cases "outside of Texas," Defendants argue that Texas common and statutory law do not recognize "holder" claims.  (Defs.' Br. at 22).  These cases are, in a word, immaterial, because this Court's task is to determine how the Texas Supreme Court would evaluate a holder claim, and it has already done so:  such claims are viable in circumstances like those present here. Moving Defendants also protest that *Grant Thornton* "casts significant doubt" on whether holder claims "will ever be cognizable in Texas."  (Defs.' Br. at 22).  But that flawed reading does violence to the *Grant Thornton* opinion, which explained that holder claims based on direct communication are more akin to run-of-the-mill Texas deceit cases, *see* 314 S.W.3d at 930, while referencing the numerous other states in which "holder" claims are viable.  *Id.* at 928.  *Grant Thornton* emphasized that one of the considerations underlying the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) – which found that holder claims were not permissible under Section 10(b) – was that "remedies are available to nonpurchasers and nonsellers ***under state law*.*"  *Grant Thornton*, 314 S.W.3d at 927 (quoting *Blue Chip Stamps*, 421 U.S. at 739 n.9).  Given this language, only a jaundiced eye would read *Grant Thornton* and conclude that Texas will, one day, reject any and all holder claims. *See* Edward T. McDermott, <u>*Holder Claims-Potential Causes of Action in Delaware and Beyond?*</u>, 41 DEL. J. CORP. L. 933, 935 n.11

(2017) (observing that Texas is one of eight states that has "expressly ruled" that "holder claims based on either fraudulent or negligent misrepresentations are legally cognizable.").

### D.   SLUSA Does Not Bar Plaintiffs' Texas Law Fraud Claims

Warming over yet another argument this Court has already rejected (*see* Dkt. 343 at 6-8), Moving Defendants erroneously contend that the Direct Action Plaintiffs' Texas state law claims are barred by SLUSA and should be dismissed.  (Defs.' Br. at 23).  Moving Defendants are wrong.  This Court has already correctly and faithfully applied SLUSA's text[49] to conclude that "only 13 plaintiffs in the consolidated action have pled claims under Texas state law," so SLUSA's "preclusion provisions [are] inapplicable."  (Dkt. 343 at 8). Defendants present no cogent reason to revisit or reconsider that ruling.

*First*, the operative facts have not changed.  It is still the case that fewer than fifty plaintiffs have brought claims "based upon [state] law."  15 U.S.C. § 78bb(f)(1)(A).

*Second*, it is still the case that the "available caselaw regarding SLUSA preclusion does not conclusively forestall" Direct Action Plaintiffs' state law claims.  (Dkt. 343 at 8). Try as they might, Moving Defendants cannot evade Judge Harmon's ruling in *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2002 WL 32107216 (S.D. Tex. Aug. 12, 2002) ("*Enron I*"), which refused to apply SLUSA because the plaintiffs there were "composed of only eight entities that do not seek damages on behalf of others similarly

---

[49] SLUSA states that "[n]o covered class action ***based upon [state] law*** . . . may be maintained . . . alleging [a securities claim] in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).  Plaintiffs refer the Court to their Brief in Opposition to the MTD for a full recitation of SLUSA's statutory history and purpose, which confirms that Congress did not pass SLUSA to preclude plaintiffs in individual actions – like Direct Action Plaintiffs here – from vindicating both federal and state rights in federal court.  (*See* Dkt. 284 at 14-18).

situated." *Id.* at *5.  Defendants misapprehend *Enron I* by characterizing it as only having dealt with removal.  (*See* Defs.' Br. at 24).  But *Enron I* expressly denied the motion to dismiss on SLUSA grounds as well.  *See* 2002 WL 32107216, at *10 (concluding that the plaintiffs' state law claims "remain viable because they are not preempted by SLUSA").

Nor does it help Defendants to point out that the courts in *In re WorldCom, Inc. Securities Litigation*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004), and *In re Enron Corp. Securities*, 535 F.3d 325 (5th Cir. 2008) ("*Enron II*"), distinguished Judge Harmon's *Enron I* decision.  (*See* Defs.' Br. at 24-25).  This only underscores the Court's conclusion that "the total number of plaintiffs bringing state-law claims . . . matters" for SLUSA preclusion.  (Dkt. 343 at 8).  The decision in *WorldCom* rested on the fact that ten identical individual actions on behalf of a total of 293 plaintiffs had been filed by the same attorneys in state court and then removed to federal court and consolidated.  *See* 308 F. Supp. 2d at 240-41, 247.  This made it materially different from *Enron I*, in which there was only one action on behalf of eight plaintiffs.  Further, it was clear that the plaintiffs' counsel had been trying to evade SLUSA by filing multiple identical actions with fewer than fifty plaintiffs each.  *See id.* at 240-41.  The facts of *Enron II* were nearly identical to *WorldCom* – there, a single firm (Fleming) filed ten separate Enron-related lawsuits for a total of 172 plaintiffs.  *See* 535 F.3d at 333, 342.  The Fifth Circuit found that SLUSA preclusion applied because "the Fleming plaintiffs" created the foundation for it by, among other things, filing nearly identical complaints, having joint motions and joint discovery, on behalf of "well over 50 plaintiffs."  *See id.* at 342.  Thus, as in *WorldCom*, the motive underlying the suits was to avoid SLUSA's bar on more than fifty plaintiffs bringing claims

24

based on state law.  *See* S. REP. NO. 105-182, at 7 (1998) (legislative history discussing intent to preclude "mass actions" that "function very much like traditional class actions").

Defendants' final argument wrongly asserts that the Direct Action Plaintiffs "can no more pursue state law claims than can class members."  (Defs.' Br. at 25).  This does violence to SLUSA's purpose, which was to curtail attempts by *class action* lawsuits to avoid the strictures of the PSLRA, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006); *Newby v. Enron Corp.*, 338 F.3d 467, 472 (5th Cir. 2003), not preclude legitimate state law claims by individual litigants.  Nor did the Direct Action Plaintiffs' "actions trigger[ SLUSA's] application."  (Defs.' Br. at 25).  Direct Action Plaintiffs did not try to evade the PSLRA, *Newby*, 338 F.3d at 472, and they did not bring state law claims for more than fifty plaintiffs.  Instead, they brought "bona fide individual actions" to vindicate legitimate federal and state statutory and common law rights.  *See* S. REP. NO. 105-182, at 7 (1998).  The Court correctly allowed Direct Action Plaintiffs to pursue those rights here.  It should not reverse course now.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion for Summary Judgment.

Dated:  September 28, 2023

Respectfully submitted,

By: */s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Michael J. Hampson
Matthew A. Peller
Joseph R. Sparacio

25

**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
mpeller@rksllp.com
jsparacio@rksllp.com

*Attorneys for the Alyeska and Orbis
Plaintiffs*

Jules P. Slim
TX Bar No. 00793026
Attorney and Counselor
PO Box 140307
Irving, TX 75014-0307
Tel.: (214) 350-5183
Fax: (214) 350-5184
jslim@slimlawfirm.com

*Counsel for the Alyeska and Orbis
Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 28, 2023, a true and correct copy of the foregoing

document was filed with the Clerk of Court using the CM/ECF system, which will send

electronic notification of such filing to all counsel of record.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

# APPENDIX A

**GLOSSARY OF KEY TERMS, ENTITIES, AND PERSONS**

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|---|---|
| 2017 10-K | Alta Mesa's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2017, filed with the SEC on March 29, 2018. |
| Action | Case No. 4:19-cv-00957. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-de-SPAC company. |
| AMH | Alta Mesa Holdings, LP, the private pre-de-SPAC company. |
| Alta Mesa | Refers to AMR, including its subsidiaries, AMH and KFM, for the period after the Merger, and to AMH and/or Silver Run II for the period before the Merger. |
| Alyeska Compl. | Complaint of the Alyeska Plaintiffs (Dkt. 1 in 4:22-cv-01189). |
| Alyeska Plaintiffs | Alyeska Master Fund, L.P., Alyeska Master Fund 2, L.P., and Alyeska Master Fund 3, L.P. |
| ARM Energy | Defendant ARM Energy Holdings LLC. |
| Bayou City | Defendant Bayou City Energy Management, LLC. |
| Chappelle | Defendant Harlan Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Christopher | Defendant Michael Christopher, CFO at Defendant ARM Energy during the relevant period. |
| Defendants | All defendants in this Action: AMR, ARM Energy, Bayou City, Chappelle, Coats, Dimitrievich, Ellis, Gutermuth, Hackett, HPS, Lapeyre, Leuschen, McMullen, Riverstone, Sinclair, Smith, Tepper, Walker, Walters. |
| Defs. Br. | Moving Defendants' Brief in Support of the Motion. |
| Dimitrievich | Moving Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| Direct Action Plaintiffs or Plaintiffs | The Alyeska Plaintiffs and the Orbis Plaintiffs. |
| E&P | Acronym for the exploration and production industry |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the anticipated total quantity of oil or gas that is potentially recoverable or has already been recovered from a reserve or well. |
| Exchange Act | The Securities and Exchange Act of 1934. |

| | |
|---|---|
| Hackett | Defendant James T. Hackett, a Riverstone Partner, CEO of Silver Run II prior to the de-SPAC and Executive Chairman of the Board of Directors of AMR. |
| HPS | Defendant HPS Investment Partners, LLC. |
| IPO | Initial public offering. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with Silver Run II in the de-SPAC. |
| Lapeyre | Defendant Pierre F. Lapeyre, Jr. |
| Leuschen | Defendant David M. Leuschen. |
| MBO | Industry term for one-thousand barrels of oil. |
| McMullen | Moving Defendant William McMullen. |
| Merger | The merger of Silver Run II with KFM and AMH on February 9, 2018. |
| Misstatement No. | Refers to Moving Defendants' misstatements in the 2017 10-K and adopts the same numbering as the Motion (*see* Defs.' Br. at 9-14. |
| Motion | Moving Defendants' Motion for Summary Judgment as to Direct Action Plaintiffs' Section 18 and State Law Claims. |
| Moving Defendants | Defendant Donald Dimitrievich and Defendant William McMullen. |
| MTD Order | This Court's Memorandum and Opinion Order denying the Defendants' Motions to Dismiss, dated June 7, 2023 (Dkt. 343). |
| NAV | Net asset value. |
| Orbis Compl. | Complaint of the Orbis Plaintiffs (Dkt. 1 in 4:22-cv-02590). |
| Orbis Plaintiffs | Plaintiffs Orbis Global Equity LE Fund (Australia Registered), Orbis Global Equity Fund (Australia Registered), Orbis Global Balanced Fund (Australia Registered), Orbis SICAV, Orbis Institutional Global Equity L.P., Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray Australia Balanced Fund, Orbis OEIC, and Orbis Institutional U.S. Equity L.P. |
| Riverstone | Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP, a Defendant that was the sponsor of Silver Run II. |
| SEC | U.S. Securities and Exchange Commission. |
| Silver Run II | The SPAC entity created by Riverstone that merged with |

| | |
|---|---|
| | KFM and AMH. |
| Schlumberger | Petrochemical engineering company that advised Alta Mesa. |
| SLUSA | Securities Litigation Uniform Standards Act of 1998. |
| SPAC | Acronym for "special purpose acquisition company." |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Stoner | Mark Stoner, Partner at Defendant BCE. |
| Type Curve | A projection of the expected EUR of a well based on a statistical average of similar wells within the same reservoir. |
| WPS | Wells per section. |