# EXHIBIT 9

# PART 2A OF FORM ADV:  FIRM BROCHURE



## Alyeska Investment Group, L.P.

### 77 West Wacker Drive

### Chicago, IL  60601

### Tel:  312-899-7900; Fax:  312-899-7952

## WWW.ALYESKAGROUP.COM

### 11/7/2017

This brochure provides information about the qualifications and business practices of Alyeska Investment Group, L.P. ("Alyeska").  If you have any questions about the contents of this brochure, please contact us at 312-899-7900 and/or compliance@alyeskagroup.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.

Additional information about Alyeska also is available on the SEC's website at www.adviserinfo.sec.gov.

Alyeska is registered as an investment adviser with the SEC under the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act").  SEC registration does not imply a certain level of skill or training.

ALYESKA_AM00003500

## ITEM 2 – MATERIAL CHANGES

If you are amending your *brochure* for your annual update and it contains material changes from your last annual update, identify and discuss those changes on the cover page of the *brochure* or on the page immediately following the cover page, or as a separate document accompanying the *brochure*. You must state clearly that you are discussing only material changes since the last annual update of your *brochure*, and you must provide the date of the last annual update of your *brochure*.

Other than the addition of Credit Suisse Securities (USA) LLC as a prime broker and custodian under Item 15, this update to Alyeska's Brochure does not contain any material changes. Alyeska updated its Brochure on June 30, 2017, disclosing at that time a material change since the last annual update to this Brochure on March 15, 2017. That change described revisions to the Funds' management fee schedule, specifically as it pertains to the Reduction for Multi-Year Past Investment, as that term is defined in Item 5.A., below.

CONFIDENTIAL

ALYESKA_AM00003501

# ITEM 3 - TABLE OF CONTENTS

**Page**

ITEM 2 – MATERIAL CHANGES ................................................................ II
ITEM 3 - TABLE OF CONTENTS ............................................................. III
ITEM 4 – ADVISORY BUSINESS .............................................................. 1
ITEM 5 – FEES AND COMPENSATION ..................................................... 3
ITEM 6 - PERFORMANCE-BASED FEES AND  SIDE-BY-SIDE MANAGEMENT .. 9
ITEM 7 – TYPES OF CLIENTS ................................................................ 10
ITEM 8 – METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF
LOSS ................................................................................................. 11
ITEM 9 – DISCIPLINARY INFORMATION .............................................. 20
ITEM 10 – OTHER FINANCIAL INDUSTRY  ACTIVITIES AND AFFILIATIONS . 21
ITEM 11 – CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT
TRANSACTIONS AND PERSONAL TRADING........................................... 23
ITEM 12 – BROKERAGE PRACTICES..................................................... 26
ITEM 13 – REVIEW OF ACCOUNTS........................................................ 31
ITEM 14 – CLIENT REFERRALS AND OTHER COMPENSATION.................. 32
ITEM 15 – CUSTODY ........................................................................... 33
ITEM 16 – INVESTMENT DISCRETION .................................................. 34
ITEM 17 – VOTING CLIENT SECURITIES................................................ 35
ITEM 18 – FINANCIAL INFORMATION .................................................. 36

iii

ALYESKA_AM00003502

# ITEM 4 – ADVISORY BUSINESS

| | |
|---|---|
| **Item 4.A** | Describe your advisory firm, including how long you have been in business. Identify your principal owner(s).<br><br>Alyeska Investment Group, L.P. ("Alyeska") was founded in February 2008 and became a SEC registered investment adviser effective November 17, 2010. Alyeska provides discretionary investment advisory services to private investment funds (the "Funds" or the "Advisory Clients").<br><br>The Funds pursue their investment strategy through two separate master-feeder fund structures.  Each master-feeder structure consists of the following:<br><br>Fund One:<br>      A Delaware limited partnership (the "Domestic Feeder One")<br>      A Cayman Islands exempted company (the "Offshore Feeder One")<br>      A Cayman Islands exempted limited partnership (the "Master Fund One")<br><br>Fund Two:<br>      A Delaware limited partnership (the "Domestic Feeder Two")<br>      A Cayman Islands exempted company (the "Offshore Feeder Two")<br>      A Cayman Islands exempted limited partnership (the "Master Fund Two", together with Master Fund One, the "Master Funds")<br><br>Each of the Domestic Feeders, the Offshore Feeders and the Master Funds may be referred to individually in this Brochure as a "Fund" and together as the "Funds."<br><br>Affiliates of Alyeska, Alyeska Fund GP, LLC (the "General Partner One") and Alyeska Fund 2 GP, LLC (the "General Partner Two", together with the General Partner One, the "General Partners"), serve as the general partners of the Domestic Feeder One, Master Fund One, and Domestic Feeder Two and Master Fund Two, respectively.   Each General Partner is governed by a Board of Managers (the "Board of Managers"). Principals of Alyeska serve as members of the Board of Managers.<br><br>Anand Parekh is the principal owner of Alyeska.  Alyeska Investment Group, LLC is the sole owner of the General Partner One and the General Partner Two. Anand Parekh is the managing member of Alyeska Investment Group, LLC. |
| **Item 4.B** | Describe the types of advisory services you offer. If you hold yourself out as specializing in a particular type of advisory service, such as financial planning, quantitative analysis, or market timing, explain the nature of that service in greater detail. If you provide investment advice only with respect to limited types of investments, explain the type of investment advice you offer, and disclose that your advice is limited to those types of investments.<br><br>Alyeska has broad and flexible investment authority.  Alyeska offers advice on both long and short positions in a wide range of investment products, including equity, equity-linked, credit and credit-linked instruments.  The actual instruments traded generally include stocks, corporate bonds, convertible bonds, options, futures, credit and equity derivates, and other credit-based instruments.  Such instruments are traded on public exchanges or in private over-the-counter ("OTC") transactions. |

1

ALYESKA_AM00003503

|  | Alyeska seeks to mitigate systematic risk embedded in equity securities through the deliberate construction of non-systematic portfolios.  Advisory Clients enter into various contracts or positions to further mitigate unwanted exposures.  To reduce interest rate and/or currency risk, and subject to certain regulatory thresholds applicable to pools relying on Commodity Futures Trading Commission ("CFTC") Regulation 4.13(a)(3), Advisory Clients enter into long or short positions in interest rate derivatives government securities (and derivatives thereon) and/or foreign currency spot and forward contracts.  In connection with certain transactions involving convertible bonds and capital structure arbitrage, the Advisory Clients at times enter into credit default swap contracts.  Advisory Clients buy or sell equity index contracts as specific or portfolio hedges.  Derivatives contracts may be exchange-traded or OTC.  Advisory Clients also retain amounts in cash or cash equivalents, pending reinvestment.<br><br>While the above describes the main financial instruments on which Alyeska offers advice, it is not meant to preclude Alyeska from using other financial instruments not described above.<br><br>Advisory Clients, to the extent permitted by the rules of the Financial Industry Regulatory Authority ("FINRA Rules"), purchase equity securities that are part of an initial public offering (sometimes referred to as "IPOs" or "New Issues") when such opportunity is deemed appropriate for the Advisory Clients.  Any investments in New Issues are equitably allocated amongst investors based on their restricted/unrestricted status consistent with the mandates of the FINRA Rules.<br><br>Fund One is managed largely in parallel with Fund Two, except that Fund Two generally targets a leverage ratio that is approximately 1.5 times greater than Fund One, and a corresponding risk that is approximately 1.5 times greater than Fund One. |
|---|---|
| **Item 4.C** | Explain whether (and, if so, how) you tailor your advisory services to the individual needs of *clients*. Explain whether *clients* may impose restrictions on investing in certain securities or types of securities.<br><br>Alyeska does not tailor its advisory services to the individual needs of investors in the Funds ("Investors"), nor may Investors impose restrictions on investing in certain securities or types of securities. |
| **Item 4.D** | If you participate in *wrap fee programs* by providing portfolio management services, (1) describe the differences, if any, between how you manage wrap fee accounts and how you manage other accounts, and (2) explain that you receive a portion of the wrap fee for your services.<br><br>Alyeska does not participate in wrap fee programs. |
| **Item 4.E** | If you manage *client* assets, disclose the amount of *client* assets you manage on a *discretionary basis* and the amount of *client* assets you manage on a *non-discretionary basis*. Disclose the date "as of" which you calculated the amounts.<br><br>As of December 31, 2016, Alyeska manages approximately $16,532,203,000 of Advisory Client regulatory assets under management on a discretionary basis. Alyeska does not currently manage any Advisory Client assets on a non-discretionary basis. |

2

ALYESKA_AM00003504

# ITEM 5 – FEES AND COMPENSATION

| Item 5.A | Describe how you are compensated for your advisory services.  Provide your fee schedule. Disclose whether the fees are negotiable. |
|---|---|

**Funds:**

Alyeska receives compensation based on assets under management and performance.  Detailed disclosure about the fees and other expenses applicable to an investment in the Funds is provided in the operative documents for the applicable Fund.

## Management Fees

**Offshore Feeder One**

The Master Fund One pays Alyeska a management fee (the "Offshore Feeder One Management Fee") quarterly in advance equal to 0.50% (2.0% annually) of the Master Fund One's net asset value pertaining to Shares of the Offshore Feeder One as of the first day of each calendar quarter. Alyeska has, and may in the future, also reduce the Offshore Feeder One Management Fee incrementally by between one-eighth and one-half beginning with assets that have been invested in the Offshore Feeder One for more than two years (the "Reduction for Multi-Year Past Investment").

In the event shares in the Offshore Feeder One are purchased on a day other than the first business day of the quarter, the Offshore Feeder One Management Fee payable by the Master Fund One for the quarter in which such sale of shares occurs shall be prorated to reflect only that portion of such quarter during which the shares were outstanding. To the extent a shareholder redeems other than as of the last day of the calendar quarter, such shareholder will be refunded a pro rata portion of the Offshore Feeder One Management Fee.

Alyeska, in its sole discretion, may elect (and has elected) to reduce or waive the Offshore Feeder One Management Fee with respect to principals and employees of Alyeska and its affiliates and their respective family members.

**Domestic Feeder One**

The Master Fund One pays Alyeska a management fee (the "Domestic Feeder One Management Fee") quarterly in advance equal to 0.50% (2.0% annually) of the Master Fund One's net asset value pertaining to each Domestic Feeder One limited partner's capital account balance as of the beginning of such calendar quarter, calculated after accrual of the Incentive Allocation (as defined below). Alyeska has, and may in the future, also incrementally reduce the Domestic Feeder One Management Fee by between one-eighth and one-half beginning with assets that have been invested in the Domestic Feeder One for more than two years (the "Reduction for Multi-Year Past Investment").

The Master Fund One also pays to Alyeska on behalf of the Domestic Feeder One a pro rata portion of the Domestic Feeder One Management Fee with respect to the Master Fund One's net asset value attributable to capital contributions to the

3

ALYESKA_AM00003505

Domestic Feeder One made other than as of the first day of a calendar quarter, based on the actual number of days remaining in such partial quarter. To the extent a Domestic Feeder One limited partner makes a withdrawal other than as of the last day of the calendar quarter, such limited partner will be refunded a pro rata portion of the Domestic Feeder One Management Fee.

Alyeska, in its sole discretion, may elect (and has elected) to reduce or waive the Domestic Feeder One Management Fee with respect to principals and employees of the General Partners, Alyeska and their affiliates and their respective family members.

**Offshore Feeder Two**

The Master Fund Two pays Alyeska a management fee (the "Offshore Feeder Two Management Fee") quarterly in advance equal to 0.75% (3.0% annually) of the Master Fund Two's net asset value pertaining to the Offshore Feeder Two as of the first day of each calendar quarter. Similar to Offshore Feeder One, Alyeska may also incrementally reduce the Offshore Feeder Two Management Fee by between one-eighth and one-half beginning with assets that have been invested in the Offshore Feeder Two for more than two years (the "Reduction for Multi-Year Past Investment"); provided that the NAV of the Class F Shares are deemed to qualify for the "Eight Year NAV," as defined in the Offshore Feeder Two offering memorandum, for purposes of calculating the Reduction for Multi-Year Past Investment regardless of the length of investment.

In the event shares in the Offshore Feeder Two are purchased on a day other than the first business day of the quarter, the Offshore Feeder Two Management Fee payable by the Master Fund Two for the quarter in which such sale of shares occurs shall be prorated to reflect only that portion of such quarter during which the shares were outstanding. To the extent a shareholder redeems other than as of the last day of the calendar quarter, such shareholder will be refunded a pro rata portion of the Offshore Feeder Two Management Fee.

Alyeska, in its sole discretion, may elect (and has elected) to reduce or waive the Offshore Feeder Two Management Fee with respect to principals and employees of Alyeska and its affiliates and their respective family members.

As of the date of this Brochure, Class F Shares are not open for investment.

**Domestic Feeder Two**

The Master Fund Two pays Alyeska a management fee (the "Domestic Feeder Two Management Fee") quarterly in advance equal to 0.75% (3.0% annually) of the Master Fund Two's net asset value pertaining to each Domestic Feeder Two limited partner's capital account balance as of the beginning of such calendar quarter, calculated after accrual of the Incentive Allocation (as defined below). Alyeska may also incrementally reduce the Domestic Feeder Two Management Fee by between one-eighth and one-half beginning with assets that have been invested in the Domestic Feeder Two for more than two years, (the "Reduction for Multi-Year Past Investment").

Similar to the Offshore Feeder Two, the NAV of the Class F Interests are deemed to qualify for the "Eight Year NAV," as defined in the Domestic Feeder Two's

4

ALYESKA_AM00003506

offering memorandum, for purposes of calculating the Reduction for Multi-Year Past Investment regardless of the length of investment.

The Master Fund Two also pays to Alyeska a pro rata portion of the Domestic Feeder Two Management Fee with respect to the Master Fund Two's net asset value attributable to capital contributions to the Domestic Feeder Two made other than as of the first day of a calendar quarter, based on the actual number of days remaining in such partial quarter. To the extent a Domestic Feeder Two limited partner makes a withdrawal other than as of the last day of the calendar quarter, such limited partner will be refunded a pro rata portion of the Domestic Feeder Two Management Fee.

Alyeska, in its sole discretion, may elect (and has elected) to reduce or waive the Domestic Feeder Two Management Fee with respect to principals and employees of the General Partners, Alyeska and their affiliates and their respective family members.

As noted above, Class F Interests are no longer being offered.

**Performance-Based Compensation**

**Offshore Feeder One**

Each holder of a Share in the Offshore Feeder One is subject to an incentive fee (the "Incentive Fee"), calculated monthly and paid annually as of the last day of each year (or as of the date of redemption of such share, if other than at year end), equal to 20% of the net realized and unrealized appreciation in the net asset value of such holder's Shares for such year (excluding any accrued but unpaid Incentive Fee), on a high water mark basis.

Alyeska may (and has waived) waive some or all of the Incentive Fee with respect to Offshore Feeder One shares held by principals and employees of Alyeska and its affiliates and their respective family members.

**Domestic Feeder One**

As of the end of each fiscal year (or as of the date of withdrawal with respect to the withdrawn portion of a Domestic Feeder One limited partner's capital account), subject to a high water mark, the General Partner One is reallocated by the Master Fund One, an amount equal to 20% of the net profits (the "Incentive Allocation") allocated to each Domestic Feeder One limited partner's capital account.

The General Partner One, in its sole discretion, may elect (and has elected) to reduce or waive the Incentive Allocation with respect to principals and employees of the General Partner One, Alyeska and their affiliates and their respective family members.

**Offshore Feeder Two**

Each Investor in the Offshore Feeder Two is subject to an Incentive Fee, calculated monthly and paid annually as of the last day of each year (or as of the date of redemption of such share, if other than at year end), equal to 20% of the

5

|  | net realized and unrealized appreciation in the net asset value of such Investor's shares for such year (excluding any accrued but unpaid Incentive Fee), on a high water mark basis. |
|--|--|
|  | Alyeska may waive (and has waived) some or all of the Incentive Fee with respect to Offshore Feeder Two shares held by principals and employees of Alyeska and its affiliates and their respective family members. |
|  | **Domestic Feeder Two** |
|  | As of the end of each fiscal year (or as of the date of withdrawal with respect to the withdrawn portion of a Domestic Feeder Two limited partner's capital account), subject to a high water mark, the General Partner Two is reallocated by the Master Fund Two, an amount equal to 20% of the net profits (the "Incentive Allocation") allocated to each Domestic Feeder Two limited partner's capital account. |
|  | The General Partner Two, in its sole discretion, may elect (and has elected) to reduce or waive the Incentive Allocation with respect to principals and employees of the General Partner Two, Alyeska and their affiliates and their respective family members. |
|  | **Investors should refer to each Fund's respective offering memoranda for more detailed information regarding how Alyeska is compensated for its advisory services. The information contained herein is a summary only and is qualified in its entirety by such documents.** |
| **Item 5.B** | Describe whether you deduct fees from *clients*' assets or bill *clients* for fees incurred. If *clients* may select either method, disclose this fact. Explain how often you bill *clients* or deduct your fees. |
|  | Alyeska deducts fees from Investor assets in the Funds. Investors do not have the ability to choose to be billed directly for fees.  Management Fees are deducted quarterly in advance or at the time of investment if the investment is made intra-quarter and performance-based compensation (if applicable) is deducted annually or at the time of redemption or withdrawal. |
| **Item 5.C** | Describe any other types of fees or expenses *clients* may pay in connection with your advisory services, such as custodian fees or mutual fund expenses. Disclose that *clients* will incur brokerage and other transaction costs, and direct *clients* to the section(s) of your *brochure* that discuss brokerage. |
|  | The Master Funds bear all of the operating expenses of the Master Funds and of their respective Offshore Feeders or Domestic Feeders, whether incurred by such entity or by the General Partners or Alyeska (or an affiliate thereof) on such entity's behalf.  Such expenses include, but are not limited to the Management Fees; Organizational Costs, as defined below; indemnification expenses; commissions; clearing fees; fees, interest and other costs on margin accounts or other financings or re-financings; accounting and legal fees and disbursements (including legal fees related to the protection of the Master Funds' investments); accounting, audit and tax preparation expenses; third-party administrator fees; borrowing charges on securities sold short; custodial fees; bank service fees; expenses incurred in connection with the purchase of shares by new or existing |

6

ALYESKA_AM00003508

shareholders; investment and trading consultant expenses; research fees; expenses in connection with proposed transactions (including transactions that fail to close); expenses related to the registered offices of the Funds, and the General Partners and any other reasonable expenses (as determined by the General Partners or Directors, as the case may be, in their sole discretion) related to the purchase, sale, holding or transmittal of the Master Funds' assets or liabilities.

Expenses paid on behalf of the Master Funds, by the General Partners or Alyeska, are reimbursed by the Master Funds.  All of the foregoing expenses are treated as expense items of the Master Funds and accordingly are shared by their respective Offshore Feeders or Domestic Feeders *pro rata* based on the balance in their respective invested capital as of the first day of each calendar month; provided that any such expenses specific to the Offshore Feeders, the Domestic Feeders or a Master Fund are specially allocated to the respective Fund, as the case may be. For purposes of this calculation, invested capital is approximately equal to the gross market value of the securities held and sold short by the Funds.

The Master Funds bear all costs and expenses incurred in connection with the formation and organization (such costs and expenses, the "Organizational Costs") of their respective feeder Funds. Such Organizational Costs are being or have already been amortized over the first 60 months of the Master Funds' operations.

Alyeska seeks to allocate expenses among the Funds and Alyeska in a manner it believes is fair and reasonable. Alyeska determines the allocation of expenses in accordance with the methodology described above and the Funds' governing documents, as amended from time to time. The intent of any such expense allocation procedures is generally to establish a reasonable (and administratively practical) approach to allocating shared expenses among the Funds and Alyeska. While it is generally not possible to precisely determine the portion of a shared resource that was actually utilized for the benefit of a particular Fund, the methodologies utilized pursuant to any expense allocation policies are intended to establish a reasonable basis for approximating such utilization. Alyeska believes that its expense allocation methodologies are fair and reasonable under the circumstances; however, allocation of expenses between the Funds and between Alyeska and the Funds has inherent conflicts of interest and any methodologies used to determine an allocation will often need to involve estimates (including, for example, when determining the allocation of a particular resource across different Funds or over extended periods of time) and subjective judgments about the most appropriate methodology to use to allocate a particular expense. It is also possible that there may be other reasonable (and potentially more precise) methods for allocating any particular items of expense, including methods that could have resulted in less (or more) expense being borne by the Funds, a particular Fund, or by Alyeska than those which have been selected. Moreover, while the allocation of expenses among the Funds is designed generally to reflect each Fund's use of a shared resource, certain expenses may be specifically allocated to only a certain Fund or Funds, and some expenses will be allocated *pro rata* among all the Funds based on the balance in their respective invested capital as of the first day of each calendar month. Should Alyeska advise additional funds or advisory clients in the future, these conflicts will be present and may be exacerbated.

The Funds may be deemed to be paying for research and other services with bundled commission arrangements. Refer to Item 12 – Brokerage Practices for further information.

7

ALYESKA_AM00003509

|  | Investors should refer to each Fund's respective offering memoranda for more detailed information regarding fees and expenses. The information contained herein is a summary only and is qualified in its entirety by such documents. |
|---|---|
| Item 5.D | If your *clients* either may or must pay your fees in advance, disclose this fact. Explain how a *client* may obtain a refund of a pre-paid fee if the advisory contract is terminated before the end of the billing period. Explain how you will determine the amount of the refund.<br><br>As noted in Item 5.A, above, asset-based fees are generally charged quarterly in advance, as of the first day of each calendar quarter. To the extent an Investor makes a withdrawal/redemption other than as of the last day of the calendar quarter, such Investor will be refunded a *pro rata* portion of the Management Fee.<br><br>**Investors should refer to each Fund's respective offering memoranda for more detailed information regarding the treatment of fees in the event of a withdrawal, redemption or termination. The information contained herein is a summary only and is qualified in its entirety by such documents.** |
| Item 5.E | If you or any of your *supervised persons* accepts compensation for the sale of securities or other investment products, including asset-based sales charges or service fees from the sale of mutual funds, disclose this fact and respond to Items 5.E.1, 5.E.2, 5.E.3 and 5.E.4.<br><br>Not applicable. |
| Item 5.E.1 | Explain that this practice presents a conflict of interest and gives you or your *supervised persons* an incentive to recommend investment products based on the compensation received, rather than on a *client*'s needs. Describe generally how you address conflicts that arise, including your procedures for disclosing the conflicts to *clients*. If you primarily recommend mutual funds, disclose whether you will recommend "no-load" funds.<br><br>Not applicable. |
| Item 5.E.2 | Explain that *clients* have the option to purchase investment products that you recommend through other brokers or agents that are not affiliated with you.<br><br>Not applicable. |
| Item 5.E.3 | If more than 50% of your revenue from advisory *clients* results from commissions and other compensation for the sale of investment products you recommend to your *clients*, including asset-based distribution fees from the sale of mutual funds, disclose that commissions provide your primary or, if applicable, your exclusive compensation.<br><br>Not applicable. |
| Item 5.E.4 | If you charge advisory fees in addition to commissions or markups, disclose whether you reduce your advisory fees to offset the commissions or markups.<br><br>Not applicable. |

8

ALYESKA_AM00003510

# ITEM 6 - PERFORMANCE-BASED FEES AND
# SIDE-BY-SIDE MANAGEMENT

If you or any of your *supervised persons* accepts *performance-based fees* – that is, fees based on a share of capital gains on or capital appreciation of the assets of a *client* (such as a *client* that is a hedge fund or other pooled investment vehicle) – disclose this fact. If you or any of your *supervised persons* manage both accounts that are charged a *performance-based fee* and accounts that are charged another type of fee, such as an hourly or flat fee or an asset-based fee, disclose this fact. Explain the conflicts of interest that you or your *supervised persons* face by managing these accounts at the same time, including that you or your *supervised persons* have an incentive to favor accounts for which you or your *supervised persons* receive a *performance-based fee*, and describe generally how you address these conflicts.

As described in Item 5.A above, Alyeska (or an affiliate of Alyeska) has received performance-based compensation from the Funds.   All Advisory Clients are subject to performance-based compensation.

Alyeska recognizes that it is a fiduciary and as such must act in the best interests of the Advisory Clients and Investors.   Further, Alyeska recognizes that it must treat all clients fairly and must refrain from favoring one Advisory Client's interests over another's.

Alyeska may waive (and has waived) some or all of the Incentive Fee with respect to investments held by principals and employees of Alyeska and its affiliates and their respective family members.

CONFIDENTIAL

ALYESKA_AM00003511

# ITEM 7 – TYPES OF CLIENTS

Describe the types of *clients* to whom you generally provide investment advice, such as individuals, trusts, investment companies, or pension plans. If you have any requirements for opening or maintaining an account, such as a minimum account size, disclose the requirements.

Alyeska provides investment advisory services to private investment funds.

Each Investor in the Funds must meet certain eligibility provisions: Interests/Shares in the Funds are generally offered to (A) U.S. Investors who are (i) accredited investors within the meaning of Regulation D of the Securities Act of 1933, as amended and (ii) qualified purchasers within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended, and (B) non-U.S. Investors.  Investments in Fund One are subject to a minimum investment of $15,000,000 per Investor, subject to waiver at the discretion of the General Partner One or the board of directors of the Offshore Feeder One. Investments in Fund Two are subject to a minimum investment of $10,000,000 per Investor, subject to waiver at the discretion of the General Partner Two or the board of directors of the Offshore Feeder Two.

CONFIDENTIAL

ALYESKA_AM00003512

# ITEM 8 – METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

| Item 8.A | Describe the methods of analysis and investment strategies you use in formulating investment advice or managing assets. Explain that investing in securities involves risk of loss that *clients* should be prepared to bear. |
| --- | --- |
| | **METHODS OF ANALYSIS** |
| | Alyeska employs both fundamental and quantitative analysis of publicly traded companies and their respective securities. |
| | **INVESTMENT STRATEGIES** |
| | Alyeska's objective in providing advisory services to the Advisory Clients is to generate a consistent, long term appreciation of assets through the active management of an equity-focused portfolio which includes sector specific, market-neutral sub-portfolios together with various complementary equity-focused investment strategies. |
| | Alyeska has flexibility to invest in a wide range of listed and OTC equity, equity-linked and credit instruments as well as other asset classes in connection with the fundamental and quantitative strategies that it employs. Alyeska's approach is equity-focused and it takes both long and short positions in equities and equity derivatives. In addition, Alyeska generally invest in convertible bonds as well as credit derivatives, corporate bonds, securitizations, synthetic securitizations, and other credit-based instruments. |
| | Market Neutral Sector Portfolios: Alyeska invests in strategies that utilize fundamental, company-specific research. Research and investment views are then expressed primarily in market-neutral sector-specific portfolios. Investment views on both future earnings of companies as well as forecast market valuations of earnings generally have a time horizon between 3 months and 18 months. The portfolio construction objective is to mitigate systematic risks in the sector portfolios and to ensure that the predominant risk from the sector portfolios is stock specific or idiosyncratic in nature. |
| | Non-Sector Focused Strategies: In addition to the sector-specific, market-neutral portfolios, Alyeska invests in a number of other equity-focused strategies that are designed to contribute to and benefit from the sector research and investment process. This may include but will not be limited to Risk Arbitrage (predominantly announced transactions), Primary Strategies (opportunistic multi-sector event portfolio), Equity Volatility Arbitrage (listed and OTC), Convertible Bond Arbitrage and Statistical Arbitrage (systematic construction of long short equity portfolios). |
| | Hedge Instruments: Alyeska seeks to mitigate systematic risk embedded in equity securities through the deliberate construction of non-systematic portfolios. However, Alyeska may enter into various contracts or positions to further mitigate unwanted exposures. To reduce interest rate and/or currency risk, and subject to certain regulatory thresholds applicable to pools relying on CFTC Regulation 4.13(a)(3), Alyeska may enter into long or short positions in interest rate derivatives (including swaps and swaptions), government securities (and derivatives thereon) and foreign currency spot, forward and option contracts. In |

11

ALYESKA_AM00003513

connection with certain transactions involving convertible bonds and capital structure arbitrage, Alyeska may enter into credit default swap contracts. Alyeska may buy or sell equity index contracts as specific or portfolio hedges. Derivatives contracts may be exchange- traded or   OTC.   Alyeska may also retain amounts in cash or cash equivalents, pending reinvestment.

Accurate identification and management of risk is central to the investment process. Alyeska employs both externally vended and proprietary risk management models to decompose the risk exposures and attribute the P/L of each of the investment portfolios. In addition, Alyeska controls aggregate portfolio risk thorough single position limits (liquidity and volatility based), idiosyncratic risk balance between longs and shorts, industry exposure limits, portfolio capital allocation rules and stress test. **There can be no assurance that the Advisory Clients' investment objectives will be achieved or that Alyeska's risk management techniques will protect against loss.**

An investment in the Funds may be deemed speculative and is not intended as a complete investment program.   Investments are designed only for certain experienced and sophisticated persons who are able to bear the risk of substantial impairment or total loss of their investment in the Funds.

**Investors should refer to each Fund's respective offering memoranda for more detailed information regarding Alyeska's investment strategy and methods of analysis.  The information contained herein is a summary only and is qualified in its entirety by such documents.**

| | |
|---|---|
| **Item 8.B** | For each significant investment strategy or method of analysis you use, explain the material risks involved. If the method of analysis or strategy involves significant or unusual risks, discuss these risks in detail. If your primary strategy involves frequent trading of securities, explain how frequent trading can affect investment performance, particularly through increased brokerage and other transaction costs and taxes.<br><br>Alyeska has broad discretion in making investments for the Advisory Clients and utilizes highly speculative investment techniques.  There can be no assurance that Alyeska will correctly evaluate the nature or magnitude of the various factors that could affect the value of and return on investments.  Prices of investments may be volatile.   A variety of factors that are inherently difficult to predict, such as domestic or international economic and political developments, may detrimentally impact businesses in which Alyeska invests, affecting their access to capital and public market valuations.   These factors and others may significantly affect the results of the Advisory Clients' activities and the value of their investments.   In addition, the value of the Advisory Clients' portfolio may fluctuate in response to fluctuations in the general level of interest rates.<br><br>Available Information: Alyeska selects investments for the Advisory Clients in part on the basis of information and data filed by the issuers of securities with various government regulators or made directly available to Alyeska by such issuers, or through sources other than the issuers. Although Alyeska evaluates all such information and data and seeks independent corroboration when Alyeska considers it appropriate and when it is reasonably available, Alyeska is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases complete and accurate information is not |

12

readily available.

Economic Conditions: Changes in economic conditions, including changes in interest rates, inflation rates, industry conditions, government regulation, competition, technological developments, political events and trends, tax laws and many other factors can affect substantially and adversely the business and prospects of the Advisory Clients and of the businesses that they invest in. None of these conditions are within the control of Alyeska.

Market Disruptions: The Advisory Clients may incur substantial losses in the event of disrupted markets or other extraordinary events in which historical pricing relationships (on which Alyeska bases a number of its trading positions) become materially distorted. The risk of loss from pricing distortions is compounded by the fact that in disrupted markets many positions become illiquid, making it difficult or impossible to close out positions against which the markets are moving. Further, the financing available to the Advisory Clients from their banks, dealers and other counterparties is typically reduced in disrupted markets. Such a reduction could require the Advisory Clients to sell off into a declining market, which would result in substantial losses. Market disruptions may from time to time cause dramatic losses for the Advisory Clients, and such events can result in otherwise historically low-risk strategies performing with unprecedented volatility and risk.

Competition: The securities industry generally, and the varied strategies and techniques to be engaged in by Alyeska in particular, are extremely competitive. The Advisory Clients compete for investment opportunities against various other investors, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs, as well as other hedge funds, which may also have greater resources and access to information, different investment strategies or compensation structures. Competitive investment activity by other firms may reduce the Advisory Clients' opportunity for profit by reducing or amplifying the magnitude as well as the duration of the market inefficiencies which it seeks to exploit.

Leverage: Alyeska employs leverage for the purpose of making investments and to hedge exposure to market and credit risk. The use of leverage creates special risks and may significantly increase investment risk. Leverage creates an opportunity for greater yield and total return but, at the same time, increases exposure to capital risk and interest costs. Any investment income and gains earned on investments made through the use of leverage that are in excess of the interest costs associated therewith may cause the value of an investment to increase more rapidly than would otherwise be the case. Conversely, where the associated interest costs are greater than such income and gains, the value of the investment may decrease more rapidly than would otherwise be the case.

As disclosed above, Fund One is managed largely in parallel with Fund Two, except that Fund Two generally targets a leverage ratio that is approximately 1.5 times greater than Fund One, and a corresponding risk that is approximately 1.5 times greater than Fund One.

Short Selling: Alyeska engages in short selling for the Advisory Clients. Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the

13

ALYESKA_AM00003515

borrowed securities at a later date.  Short selling allows the Advisory Clients to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities.  However, since the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss.  Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.

There can be no assurance that securities necessary to cover a short position will be available for purchase or that securities will be available to be borrowed by the Advisory Client at reasonable costs.  If a request for return of borrowed securities occurs at a time when other short sellers of the security are receiving similar requests, a short squeeze can occur, and the Advisory Client may be compelled to replace borrowed securities previously sold short with purchases on the open market at the most disadvantageous time, possibly at prices significantly in excess of the proceeds received in originally selling the securities short.

Short selling activities with respect to U.S. securities are subject to other restrictions imposed by U.S. securities laws and the regulations of various U.S. securities exchanges that may affect investment activities of the Advisory Clients. If short sales are effected on an exchange or OTC market outside the United States, such transactions will be subject to the applicable local law, which may be more or less restrictive than U.S. law.  Moreover, such laws and regulations are subject to change without notice.  Any of these factors could make the Advisory Clients unable to execute their investment strategy.

Volatility: The market value of certain of the Advisory Clients' investments may be volatile, and will generally fluctuate due to a variety of factors that are inherently difficult to predict, including, among other things, the macro business and economic environment, specific developments or trends within a company or in any particular industry, the market's overall perception of risk, general economic conditions, the condition of certain financial markets, domestic and international economic or political events, prevailing credit spreads, changes in prevailing interest rates and the financial condition of counterparties.

Frequent Trading/Transaction Costs: The Advisory Clients' investment approach may involve a high level of trading and turnover of their investments, which may generate substantial transaction/brokerage costs, a pro-rata portion of which is borne by the applicable Advisory Client.  Frequent trading can reduce overall investment performance, particularly through increased brokerage and other transaction costs and taxes.

Financial Model Risk: Most, if not all, of the Advisory Clients' investments and investment strategies require the use of quantitative and qualitative valuation models developed by Alyeska and third parties.  As market dynamics (for example, due to changed market conditions and participants) shift over time, a previously highly successful model often becomes outdated or inaccurate, perhaps without Alyeska recognizing the change before significant losses are incurred.

Liquidity of Investments: The Advisory Clients may acquire illiquid investments which are difficult to dispose of quickly. In addition, investments that were once liquid may become illiquid, making it difficult to acquire or dispose of them at the

14

ALYESKA_AM00003516

prices quoted on the various exchanges. In that event, Alyeska's ability to respond to market movements may be impaired and the Advisory Clients may experience adverse price movements.

Concentration of Investments: Alyeska generally seeks to maintain a diversified portfolio of investments. However, the Advisory Clients may at certain times hold relatively few investments, which could subject the Advisory Clients to significant losses if they hold a large position in a particular investment that declines in value or is otherwise adversely affected. In addition, the Advisory Clients' portfolios could be negatively impacted if investments experience a greater than anticipated correlation. In that circumstance, Advisory Client positions that may have been considered diversified could be subject to significant losses due to related events or changes in investment correlation more generally.

New Issue Trading: One of Alyeska's investment strategies involves New Issues trading for the Advisory Clients. Investing in New Issues poses unique risks arising out of their transient illiquidity, lack of trading history and concentration of ownership. In the event that Alyeska elects to trade New Issues on behalf of Alyeska's Advisory Clients, then investors that are restricted persons under applicable FINRA rules may not be permitted to participate or participate fully in the returns generated by those trades.

Spread Trading Risks: Alyeska also utilizes a trading strategy that emphasizes the price spread between two or more positions. To the extent the price relationships between such positions remain constant, no gain or loss on the positions will occur. In addition, such positions entail substantial risk that the price differential could change unfavorably, causing a loss to the spread position.

Arbitrage Transaction Risks: Alyeska utilizes arbitrage strategies in connection with its management of the Advisory Clients' portfolios. Arbitrage strategies attempt to take advantage of perceived price discrepancies of identical or similar financial instruments, on different markets or in different forms. Alyeska employs these various arbitrage strategies. If the requisite elements of an arbitrage strategy are not properly analyzed, or unexpected events or price movements intervene, losses can occur which can be magnified to the extent the Advisory Clients have employed leverage. Moreover, arbitrage strategies often depend upon identifying favorable spreads, which can also be identified, reduced or eliminated by other market participants.

Hedging: The success of Alyeska's hedging strategy is subject to Alyeska's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged. Since the characteristics of many securities change as markets change or time passes, the success of Alyeska's hedging strategy is subject to Alyeska's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner.

While Alyeska enters into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for Advisory Clients than if it had not engaged in any such hedging transactions. For a variety of reasons, Alyeska may not seek to establish a perfect correlation between such hedging instruments and the risks being hedged. Such imperfect correlation may prevent Alyeska from achieving the intended hedge or expose the Advisory Clients to risk

15

ALYESKA_AM00003517

of loss.  In addition, Alyeska may not hedge a risk inherent in an Advisory Client's portfolio because a hedge may not be available or would be too costly in light of the likelihood of the possible risk actually occurring or because the risk simply could not be reasonably anticipated.

Currency Exposure: An Advisory Client's portfolio, from time to time, has positions which are denominated in currencies other than U.S. Dollars. Accordingly, the value of such assets may be affected favorably or unfavorably by fluctuations in currency rates.  Alyeska may not necessarily seek to hedge the foreign currency exposure of the Advisory Clients, and as such, the Advisory Clients would be subject to varying degrees of foreign exchange risks.

Possible Positive Correlation: One of the goals in incorporating non-traditional investment strategies such as those utilized by the Advisory Clients into a portfolio or series of portfolios is to provide a potentially valuable element of diversification. However, there can be no assurance, particularly during periods of market disruption and stress, when the risk control benefits of diversification may be most important, that the Advisory Clients will, in fact, be negatively- or non-correlated with a traditional portfolio of stocks or bonds.

Incentive Allocation: The Funds' Incentive Allocation creates an incentive for Alyeska to effect transactions in securities that are riskier or more speculative than would be the case in the absence of such an allocation. Since the Incentive Allocation is calculated on a basis which includes unrealized appreciation of the applicable Fund's assets, such allocation may differ from an amount based solely on realized gains.

Effect of Substantial Withdrawals: Substantial withdrawals by investors within a short period of time could require the Funds to liquidate securities positions more rapidly than would otherwise be desirable, possibly reducing the value of the Funds' assets and/or disrupting Alyeska's investment strategy. Reduction in the size of the Funds could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Funds' ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses. Substantial withdrawals from other investment vehicles advised by Alyeska could also detrimentally affect the Funds by increasing the Funds' allocation of shared expenses. In addition, an overall reduction in the Alyeska's assets under management, whether through the Funds or otherwise, could limit Alyeska's ability to make particular investments.

Indemnification:  The Funds' governing documents and investment management agreements contain indemnification provisions that limit the General Partners' and Alyeska's liability for certain damages, disbursements, suits, claims, liabilities, obligations, judgments, fines, penalties, charges. Therefore, an investor may have a more limited right of action against the General Partners or Alyeska than an investor would have had absent these provisions in the Funds' governing documents or the investment management agreements.

Reliance on Mr. Parekh and the Sub-Portfolio Managers:  As noted above, Alyeska's investment strategy is an equity-focused portfolio which includes sector specific, market-neutral sub-portfolios.  Mr. Parekh is assisted by the portfolio managers of the Funds' sub-portfolios who help to determine whether security positions should be maintained or modified in view of market conditions.

16

ALYESKA_AM00003518

Accordingly, the Investors and the Advisory Clients rely on Mr. Parekh and the sub-portfolio managers to identify, manage and implement investment strategies consistent with each Fund's investment objectives and to conduct the business of such Fund as contemplated by the Funds' offering documents. The loss of Mr. Parekh or one or more sub-portfolio managers could have a significant adverse impact on the business of Alyeska, the Funds and their financial performance. No assurances can be given that each of the sub-portfolio managers will continue to be affiliated with Alyeska or the Funds.

Cybersecurity: The computer systems, networks and devices used by Alyeska and its service providers to carry out routine business operations employ a variety of protections designed to prevent damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches. Despite the various protections utilized, systems, networks, or devices potentially can be breached. As a result, the Funds and investors could be negatively impacted as a result of a cybersecurity breach. Cybersecurity breaches can include unauthorized access to systems, networks, or devices; infection from computer viruses or other malicious software code; and attacks that shut down, disable, slow, or otherwise disrupt operations, business processes, or website access or functionality. Cybersecurity breaches may cause disruptions and impact business operations, potentially resulting in financial losses to the Funds; impediments to trading; the inability of Alyeska and other service providers to transact business; violations of applicable privacy and other laws; regulatory fines, penalties, reputational damage, reimbursement or other compensation costs, or additional compliance costs; as well as the inadvertent release of confidential information.

**It is critical that Investors refer to the relevant confidential private offering memorandum, advisory agreement, and other governing documents for a complete understanding of the material risks involved in relation to Alyeska's investment strategies and methods of analysis. The information contained herein is a summary only and is qualified in its entirety by such documents.**

| | |
|---|---|
| **Item 8.C** | If you recommend primarily a particular type of security, explain the material risks involved.  If the type of security involves significant or unusual risks, discuss these risks in detail.

Equity Securities: Alyeska invests Advisory Client assets in equity securities, and expects to hold both long and short positions in such securities.  Such investments will be subordinate to the claims of an issuer's creditors and, to the extent such securities are common securities, preferred stockholders.  Dividends customarily paid to equity holders can be suspended or cancelled at any time.  For the foregoing reasons, investments in equity securities can be highly speculative and carry a substantial risk of loss of principal.

Debt Securities:  Alyeska invests Advisory Client assets in unrated or low grade debt securities which are subject to greater risk of loss of principal and interest than higher-rated debt securities. Alyeska may invest in debt securities which rank junior to other outstanding securities and obligations of the issuer, all or a significant portion of which may be secured on substantially all of that issuer's assets. Alyeska may invest in debt securities which are not protected by financial covenants or limitations on additional indebtedness. Lower or unrated securities |

CONFIDENTIAL

ALYESKA_AM00003519

are more likely to react to developments affecting market and credit risk than are more highly rated securities, which primarily react to movements in the general level of interest rates. Investors should be aware that ratings are relative and subjective and are not absolute standards of quality. Subsequent to its purchase by an Advisory Client, an issue of securities may cease to be rated or its rating may be reduced. Neither event will require sale of such securities by the Advisory Client, although Alyeska will consider such event in its determination of whether the Advisory Client should continue to hold the securities.

The market value of securities in lower-rated categories is more volatile than that of higher quality securities. In addition, the Advisory Clients may have difficulty disposing of certain of these securities because there may be a thin trading market. The lack of a liquid secondary market for certain securities may have an adverse impact on the Advisory Client's ability to dispose of such securities and may make it more difficult for the Advisory Client to obtain accurate market quotations for purposes of valuing the Advisory Client and calculating the value of its net assets.

Convertible Securities:  Alyeska invests Advisory Client assets in convertible securities.  Convertible securities provide higher yields than the underlying equity securities, but generally offer lower yields than non-convertible securities of similar quality. The value of convertible securities fluctuates in relation to changes in interest rates like bonds and, in addition, fluctuates in relation to the underlying common stock. In addition, convertible securities are often held in large concentrations by levered investors and hence may be materially devalued when those investors are selling, irrespective of the underlying issuer's financial health.

Options: Alyeska engages in the trading of options for the Advisory Clients. Such trading involves risks substantially similar to those involved in trading margined securities in that options are speculative and highly leveraged. Specific market movements of the securities underlying an option cannot accurately be predicted. The purchaser of an option is subject to the risk of losing the entire purchase price of the option. The writer of an option is subject to the risk of loss resulting from the difference between the premium received for the option and the price of the security underlying the option which the writer must purchase or deliver upon exercise of the option.

Derivatives:  Alyeska invests Advisory Client assets in derivative financial instruments.  In addition, Alyeska from time to time utilizes both exchange-traded and OTC futures, options and contracts for differences, for hedging purposes, as well as other derivatives.  Regulatory restraints may restrict the instruments that Alyeska may trade for the Advisory Clients.  Such derivative instruments are highly volatile, involve certain special risks and expose investors to a high risk of loss.  The low initial margin deposits normally required to establish a position in such instruments permit a high degree of leverage.  As a result, a relatively small movement in the price of a contract may result in a profit or a loss which is high in proportion to the amount of funds actually placed as initial margin and may result in unquantifiable further losses exceeding any margin deposited.  Further, when used for hedging purposes there may be an imperfect correlation between these instruments and the investments or market sectors being hedged.

18

The trading of OTC derivatives subjects the Advisory Clients to a variety of risks including: (i) counterparty risk, (ii) basis risk, (iii) interest rate risk, (iv) settlement risk, (v) legal risk, and (vi) operational risk. Counterparty risk is the risk that one of the Advisory Client's counterparties might default on its obligation to pay or perform generally on its obligations. Basis risk is the risk that the normal relationship between two prices might move in opposite directions. Interest rate risk is the general risk associated with movements in interest rates. Settlement risk is the risk that a settlement in a transfer system does not take place as expected. Legal risk is the risk that a transaction proves unenforceable in law or because it has been inadequately documented. Operational risk is the risk of unexpected losses arising from deficiencies in a firm's management information, support and control systems and procedures. Transactions in OTC derivatives may involve other risks as well, as there is no exchange market on which to close out an open position. It may be impossible to liquidate an existing position, to assess the value of a position or to assess the exposure to risk.

Foreign Securities: Alyeska invests Advisory Client assets in securities and other instruments of foreign corporations and foreign countries. Investing in such securities involves certain considerations not usually associated with investing in securities of U.S. companies or the U.S. government, including, among other things, political and economic considerations, such as greater risks of expropriation, nationalization and general social, political and economic instability; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion, imposition of withholdings and other taxes and certain government policies that may restrict the Advisory Clients' investment opportunities. In addition, accounting and financial reporting standards that prevail in many foreign countries are not equivalent to U.S. standards and, consequently, less information may be available to investors in companies located in foreign countries than is available to investors in companies located in the U.S. There is also less regulation, generally, of the securities markets in many foreign countries than there is in the U.S.

**It is critical that Investors in the Funds refer to the relevant confidential private offering memorandum and other governing documents for a complete understanding of the material risks involved in relation to the types of securities that Alyeska invests in on behalf of its Advisory Clients. The information contained herein is a summary only and is qualified in its entirety by such documents.**

19

ALYESKA_AM00003521

## ITEM 9 – DISCIPLINARY INFORMATION

Alyeska is required to disclose all material facts regarding any legal or disciplinary events that would be material to an investor's evaluation of Alyeska or the integrity of Alyeska's management.  Alyeska has no legal or disciplinary information to disclose at this time.

CONFIDENTIAL

ALYESKA_AM00003522

# ITEM 10 – OTHER FINANCIAL INDUSTRY
## ACTIVITIES AND AFFILIATIONS

| Item 10.A | If you or any of your *management persons* are registered, or have an application pending to register, as a broker-dealer or a registered representative of a broker-dealer, disclose this fact.<br><br>Not applicable. |
| --- | --- |
| Item 10.B | If you or any of your *management persons* are registered, or have an application pending to register, as a futures commission merchant, commodity pool operator, a commodity trading advisor, or an associated person of the foregoing entities, disclose this fact.<br><br>Not applicable. |
| Item 10.C | Describe any relationship or arrangement that is material to your advisory business or to your *clients* that you or any of your *management persons* have with any *related person* listed below. Identify the *related person* and if the relationship or arrangement creates a material conflict of interest with *clients*, describe the nature of the conflict and how you address it.<br><br>1.  broker-dealer, municipal securities dealer, or government securities dealer or broker<br>2.  investment company or other pooled investment vehicle (including a mutual fund, closed-end investment company, unit investment trust, private investment company or "hedge fund," and offshore fund)<br>3.  other investment adviser or financial planner<br>4.  futures commission merchant, commodity pool operator, or commodity trading advisor<br>5.  banking or thrift institution<br>6.  accountant or accounting firm<br>7.  lawyer or law firm<br>8.  insurance company or agency<br>9.  pension consultant<br>10.  real estate broker or dealer<br>11.  sponsor or syndicator of limited partnerships<br><br>Alyeska serves as the investment manager to the Funds. Alyeska, its principals and employees also invest directly in the Funds. Investments in the Funds made by such parties, generally, are not subject to the management fees or performance-based compensation described in Item 5 above.<br><br>As previously noted in Item 4.A above, the General Partners are the general partner of the Domestic Feeders and Master Funds. Alyeska's principals, Anand Parekh and Jason Bragg, serve as directors of the Offshore Feeders and on the General Partners' Boards of Managers.<br><br>The General Partners, Alyeska and their affiliates may have conflicts of interest in allocating their time, services and functions among the Advisory Clients and other business ventures. In an effort to minimize potential conflicts of interest, Alyeska has adopted a Code of Ethics that requires Alyeska's Access Persons to act in the |

CONFIDENTIAL

ALYESKA_AM00003523

|  | best interests of the Advisory Clients and to place the interests of the Advisory Clients above their personal interests and those of Alyeska.<br><br>It should be noted that certain employees of Alyeska have personal private investments in the management entities and/or pooled investment vehicles of unaffiliated registered investment advisers. Alyeska has reviewed all such investments to ensure those investments are passive in nature and Alyeska's employees do not devote any time to the management or oversight of such unaffiliated investment advisers. As such, Alyeska believes that these investments do not present a material conflict of interest for the Funds or investors. |
|---|---|
| **Item 10.D** | If you recommend or select other investment advisers for your *clients* and you receive compensation directly or indirectly from those advisers that creates a material conflict of interest, or if you have other business relationships with those advisers that create a material conflict of interest, describe these practices and discuss the material conflicts of interest these practices create and how you address them.<br><br>Not applicable. |

22

ALYESKA_AM00003524

# ITEM 11 – CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

| Item 11.A | If you are an SEC-registered adviser, briefly describe your code of ethics adopted pursuant to SEC rule 204A-1 or similar state rules. Explain that you will provide a copy of your code of ethics to any *client* or prospective *client* upon request.

Alyeska has adopted a Code of Ethics (the "Code") which is designed to meet the requirements of Rule 204A-1 of the Advisers Act. The Code applies to Alyeska's Access Persons and sets forth a standard of business conduct that takes into account Alyeska's status as a fiduciary and requires Access Persons to place the interests of the Advisory Clients above their own interests and those of Alyeska. The Code requires Access Persons to comply with applicable federal securities laws. Further, Access Persons are required to promptly bring violations of the Code to the attention of Alyeska's Chief Compliance Officer. All Access Persons are provided with a copy of the Code and are required to acknowledge receipt and understanding of the Code on at least an annual basis.

As required by Rule 204A-1 of the Advisers Act, Alyeska's Access Persons must provide Alyeska's Chief Compliance Officer with a list of their personal accounts and an initial holdings report within 10 days of becoming an Access Person. Alyeska also requires its Access Persons to report their securities transactions on a quarterly basis thereafter and disclose their securities holdings on an annual basis. Alyeska restricts the personal trading of its Access Persons. Alyeska maintains a Restricted List, hereinafter defined, of issuers of the securities of which Access Persons are generally prohibited from trading (the "Restricted List"). The Restricted List includes the names of any issuers for which Alyeska has come into contact with material non-public information. Alyeska also requires Access Persons to adhere to a 30-day holding period for the purchase of securities in their personal accounts, subject to waiver by the Chief Compliance Officer in his sole discretion.

The Code also includes insider trading policies and procedures that are designed to prevent the improper use of material, non-public information. Such insider trading policies and procedures prohibit Alyeska and its personnel from trading for Advisory Clients or themselves, or recommend trading, in securities of a company while in possession of material, non-public information about the company, and from disclosing such information to any person not entitled to receive it.

In addition, the Code seeks to ensure the protection of nonpublic information about the activities of the Advisory Clients. Investors or prospective Investors may obtain a copy of Alyeska's Code by contacting the Chief Compliance Officer at (312) 899-7902. |
|---|---|
| Item 11.B | If you or a *related person* recommends to *clients*, or buys or sells for *client* accounts, securities in which you or a *related person* has a material financial interest, describe your practice and discuss the conflicts of interest it presents. Describe generally how you address conflicts that arise.

Examples: (1) You or a *related person*, as principal, buys securities from (or sells |

23

ALYESKA_AM00003525

|  | securities to) your *clients*; (2) you or a *related person* acts as general partner in a partnership in which you solicit *client* investments; or (3) you or a *related person* acts as an investment adviser to an investment company that you recommend to *clients*.<br><br>As of the date of this brochure, Alyeska does not engage in principal transactions.<br><br>As explained in Item 10.C above, Alyeska serves as the investment manager to the Funds. Alyeska (in the case of the Offshore Feeders and Domestic Feeders) and the General Partners (in the case of the Domestic Feeders) have financial ownership interests in the Funds and receive a Management Fee and, in some cases, performance-based compensation for their services. Alyeska and its principals, employees, and affiliates, and their respective family members, invest directly in the Funds, which investments generally are not subject to Management Fees or performance-based compensation. Investments by such persons are subject to the same liquidity terms as all other Investors. Alyeska recognizes the potential conflicts of interest that arise when its related persons invest in the Funds. Alyeska addresses such potential conflicts through its Aggregation and Allocation policies which can be found in Alyeska's compliance manual. Further, the Code sets forth a fiduciary standard that requires Access Persons to act in the best interests of the Advisory Clients and place the interests of Advisory Clients ahead of their own and those of Alyeska. Access Persons are required to acknowledge receipt of the Code and agree to abide by its terns.<br><br>The fact that Alyeska, its employees, the General Partners, or their respective affiliates have a financial ownership interest in the Funds creates a potential conflict in that it could cause Alyeska to make different investment decisions than if such parties did not have a financial ownership interest. Performance-based compensation may create an incentive for Alyeska to make investment decisions that may differ from decisions that may be made in the absence of such performance-based compensation, including decisions that are riskier or less risky than would be made in the absence of such performance-based compensation. Alyeska manages this potential conflict through regular monitoring of the Advisory Client portfolios to help ensure consistency with Advisory Client objectives and disclosures, as more fully set forth in Item 13.A, below.<br><br>Alyeska addresses these potential conflicts through regular monitoring of the Advisory Client portfolios for consistency with Advisory Client objectives, strategies, and target capacity. Alyeska also subjects its principals and employees who invest in the Funds to the same liquidity as other Investors. Further, Alyeska carefully considers the risks involved in any investments and Alyeska provides extensive disclosure to clients regarding the potential risks that come with an investment with Alyeska. |
|---|---|
| **Item 11.C** | If you or a *related person* invests in the same securities (or related securities, *e.g.*, warrants, options or futures) that you or a *related person* recommends to *clients*, describe your practice and discuss the conflicts of interest this presents and generally how you address the conflicts that arise in connection with personal trading.<br><br>Access Persons of Alyeska buy, sell or otherwise invest in securities that Alyeska also recommends to Advisory Clients. Alyeska seeks to monitor the potential conflicts of interests within the firm as it relates to Access Person personal trading |

CONFIDENTIAL

ALYESKA_AM00003526

|  | (including investments in the Funds). Alyeska requires each of its Access Persons to pre-clear transactions in reportable securities, subject to waiver by the Chief Compliance Officer in his sole discretion. In reviewing pre-clearance requests, the Chief Compliance Officer, or his designee, considers all the facts and circumstances related to the contemplated trade including when the security was last traded by the Advisory Clients. Such pre-clearance requests are approved by the Chief Compliance Officer, or his designee, only after careful consideration of any conflicts of interests and only if made in a manner consistent with the pre-clearance guidelines set forth in the Code.

A potential conflict exists in that employees could use information obtained through their work at Alyeska or could take for themselves an opportunity available to the Advisory Clients. Alyeska addresses this conflict through pre-clearance requirements, review of Access Person holdings reports, use of a Restricted List, and a 30-day holding period for Access Person personal trading.

As previously noted in Item 11.B, Alyeska and its principals, employees, and affiliates, and their respective family members, invest directly in the Funds, which investments may not be subject to the management fees or performance-based compensation described herein.

Alyeska's Code also contains policies and procedures to prevent insider trading that are designed to prevent the misuse of material, non-public information. Alyeska's personnel are required to certify their compliance with the Code. |
|---|---|
| **Item 11.D** | If you or a *related person* recommends securities to *clients*, or buys or sells securities for *client* accounts, at or about the same time that you or a *related person* buys or sells the same securities for your own (or the *related person's* own) account, describe your practice and discuss the conflicts of interest it presents. Describe generally how you address conflicts that arise.

Please refer to Items 11.A, 11.B, and 11.C above |

CONFIDENTIAL                                                                                 ALYESKA_AM00003527

## ITEM 12 – BROKERAGE PRACTICES

| Item 12.A.1 | Describe the factors that you consider in selecting or recommending broker-dealers for *client* transactions and determining the reasonableness of their compensation (*e.g.*, commissions). |
|---|---|
| | 1.     Research and Other Soft Dollar Benefits. If you receive research or other products or services other than execution from a broker-dealer or a third party in connection with client securities transactions ("soft dollar benefits"), disclose your practices and discuss the conflicts of interest they create. |
| |     a.     Explain that when you use *client* brokerage commissions (or markups or markdowns) to obtain research or other products or services, you receive a benefit because you do not have to produce or pay for the research, products or services. |
| |     b.     Disclose that you may have an incentive to select or recommend a broker-dealer based on your interest in receiving the research or other products or services, rather than on your *clients*' interest in receiving most favorable execution. |
| |     c.     If you may cause *clients* to pay commissions (or markups or markdowns) higher than those charged by other broker-dealers in return for soft dollar benefits (known as paying-up), disclose this fact. |
| |     d.     Disclose whether you use soft dollar benefits to service all of your *clients*' accounts or only those that paid for the benefits. Disclose whether you seek to allocate soft dollar benefits to *client* accounts proportionately to the soft dollar credits the accounts generate. |
| |     e.     Describe the types of products and services you or any of your *related persons* acquired with *client* brokerage commissions (or markups or markdowns) within your last fiscal year. |
| |     f.     Explain the procedures you used during your last fiscal year to direct *client* transactions to a particular broker-dealer in return for soft dollar benefits you received. |
| | Alyeska recognizes its duty to obtain best execution in effecting transactions on behalf of the Advisory Clients. In selecting brokers or dealers to effect transactions, Alyeska seeks to obtain the best combination of pricing, expertise and ability to perform execution services, ability to execute transactions in liquid and illiquid markets at competitive prices without disrupting the market for a particular security, range of services provided and products offered (including research and brokerage services), quality and timeliness of market information provided, ability to maintain confidentiality, creditworthiness and financial responsibility. Alyeska need not solicit competitive bids for execution services and does not have an obligation to seek the lowest available commission cost. |

CONFIDENTIAL

ALYESKA_AM00003528

Alyeska will make a good faith determination that the amount of commissions paid is reasonable in light of the products or services provided by a broker. Commission rates are generally negotiable and thus, selecting brokers on the basis of considerations that are not limited to the applicable commission rates may result in higher transaction costs than would otherwise be obtainable. The receipt of such products or services creates a potential conflict of interest between Alyeska and the Advisory Clients.

Alyeska enters into bundled commission arrangements pursuant to which Advisory Clients pay commissions to brokers or dealers who provide research and other services in amounts that may be greater than would be paid for execution-only services. The amount by which the bundled commission rate exceeds a broker's execution-only rate is considered soft dollars. Notwithstanding that the Advisory Clients may pay bundled commission rates, Alyeska will not (i) engage any brokers or dealers in any third-party soft dollar arrangements or (ii) enter into any third party commission sharing arrangements by which a broker would pay third party service providers on behalf of Alyeska.

Alyeska will only subject the Advisory Clients to such higher commission rates from a particular broker if it determines in good faith that the amount of the charged commissions is reasonable in relation to the value of the brokerage and research services provided by such broker. In any event, such brokerage and research services furnished by brokers through which the Advisory Clients effect securities transactions will be limited to services that fall within the safe harbor contained in Section 28(e) of the Securities Exchange Act of 1934.

Alyeska also has the authority to cause the Advisory Clients to pay brokers and other research providers directly for research. When Alyeska pays bundled commissions, or makes direct payments that are charged to Advisory Clients, and receives research or other products or services from brokers or other research providers, it receives a benefit because it does not have to produce or pay for the research, products or services.

Further, with respect to bundled commissions, Alyeska has an incentive to select or recommend a broker-dealer based on its interest in receiving the research or other products or services, rather than on Advisory Clients' interest in receiving most favorable execution. Such soft dollar benefits may be used to service all Advisory Client accounts and not just those that paid for the benefits. It is anticipated that any soft dollar benefits received by Alyeska will be applicable to all Advisory Clients, since the Advisory Clients generally utilize very similar strategies.

In the past year, research and related services obtained through soft dollars or direct payments included, among other things, written information, models and analyses concerning specific securities, companies or sectors; market, financial and economic studies, data and forecasts; and discussions with research personnel and industry experts.

Other types of research and related services obtained through soft dollars or direct payments included, among other things, meetings with corporate executives to obtain oral reports on company performance; seminars or conferences specifically geared towards "research"; advice on order execution; market color and advice on the availability of buyers and sellers; software that provides analysis of securities

27

ALYESKA_AM00003529

|  | portfolios as well as other products and services that provide assistance to us in the performance of our investment and trading decision-making responsibilities.<br><br>As part of its responsibility to obtain best execution, Alyeska periodically and systematically evaluates the performance of broker-dealers. Such reviews include a thorough analysis of the services provided by each broker-dealer. |
|---|---|
| **Item 12.A.2** | Brokerage for *Client* Referrals. If you consider, in selecting or recommending broker-dealers, whether you or a *related person* receives *client* referrals from a broker-dealer or third party, disclose this practice and discuss the conflicts of interest it creates.<br><br>    a.    Disclose that you may have an incentive to select or recommend a broker-dealer based on your interest in receiving *client* referrals, rather than on your *clients*' interest in receiving most favorable execution.<br><br>    b.    Explain the procedures you used during your last fiscal year to direct *client* transactions to a particular broker-dealer in return for *client* referrals.<br><br>Alyeska does not utilize any broker-dealers or third parties to solicit client referrals. Alyeska may, however, consider a broker-dealer's ability to provide Alyeska with the opportunity to participate in capital introduction events sponsored by the broker-dealer and to refer Investors to the Funds. It should be emphasized that Alyeska does not select broker-dealers solely in return for referrals. Alyeska recognizes that it may have an incentive to favor broker-dealers that provide capital introduction services to Alyeska or refer Investors. Alyeska receives asset-based fees and accordingly would receive a financial benefit from the increase in assets under management that result from capital introduction services and Investor referrals. Similarly, Alyeska's affiliates receive performance-based allocations and Alyeska receives performance based fees and accordingly could receive larger performance-based allocations and fees in any given profit period as a result of an increase in assets under management that results from capital introduction services and Investor referrals. The potential for higher fees presents a potential conflict in that Alyeska may have an incentive to favor broker-dealers that provide services that have a direct impact on fees even if those broker-dealers rate unfavorably in other categories. |
| **Item 12.A.3** | Directed Brokerage.<br><br>    a.    If you routinely recommend, request or require that a *client* direct you to execute transactions through a specified broker-dealer, describe your practice or policy. Explain that not all advisers require their *clients* to direct brokerage. If you and the broker-dealer are affiliates or have another economic relationship that creates a material conflict of interest, describe the relationship and discuss the conflicts of interest it presents. Explain that by directing brokerage you may be unable to achieve most favorable execution of *client* transactions, and that this practice may cost *clients* more money.<br><br>    b.    If you permit a *client* to direct brokerage, describe your practice. If applicable, explain that you may be unable to achieve most favorable |

28

ALYESKA_AM00003530

|  |  |
|---|---|
|  | execution of *client* transactions. Explain that directing brokerage may cost *clients* more money. For example, in a directed brokerage account, the *client* may pay higher brokerage commissions because you may not be able to aggregate orders to reduce transaction costs, or the *client* may receive less favorable prices.<br><br>Not applicable. Alyeska does not have directed brokerage arrangements. |
| **Item 12.B** | Discuss whether and under what conditions you aggregate the purchase or sale of securities for various *client* accounts. If you do not aggregate orders when you have the opportunity to do so, explain your practice and describe the costs to *clients* of not aggregating.<br><br>Upon determination to buy or sell the same security on behalf of more than one Advisory Client (based upon the investment mandates of such Advisory Clients), Alyeska will generally aggregate trades, subject to best execution. Alyeska believes that aggregating orders generally leads to a more favorable price for Advisory Clients. Notwithstanding the foregoing, there may be limited circumstances in which Alyeska determines that it would be more operationally efficient to fill trades on an Advisory Client-by-Advisory Client basis. In some circumstances, it may be appropriate for Alyeska to buy or sell a security on behalf of more than one Advisory Client over a period of time. Trading is reviewed periodically to the extent deemed necessary by the Chief Compliance Officer to ensure that Advisory Clients are not systematically disadvantaged by this policy.<br><br>Alyeska acts in a fair and reasonable manner in allocating investment and trading opportunities among the Advisory Clients. In furtherance of the foregoing, Alyeska considers participation in all appropriate opportunities within the purpose and scope of each Advisory Client's objectives and evaluates such factors as it considers relevant in determining whether a particular situation or strategy is suitable and feasible for each Advisory Client. Alyeska generally allocates investment opportunities pro rata based upon invested capital across all Advisory Clients. For purposes of this calculation, invested capital is approximately equal to the gross market value of the securities held and sold short by the Advisory Clients.<br><br>Alyeska is not obligated to purchase or sell for each Advisory Client every security which it may purchase or sell for other Advisory Clients, as some transactions or investments may appear unsuitable, impractical or undesirable for an Advisory Client. Accordingly, there are situations where investment opportunities are allocated on a basis other than pro rata among all Advisory Clients based upon assets under management. Allocations may be made on a basis other than pro rata based upon invested capital for a variety of reasons. For purposes of this calculation, invested capital is approximately equal to the gross market value of the securities held and sold short by the Advisory Clients.<br><br>Alyeska periodically reviews and revises (as appropriate) the criteria it considers when allocating investment opportunities among Advisory Clients in order to ensure investment opportunities are allocated in a fair and reasonable manner and that Alyeska's practices are in conformity with applicable laws and regulations. |

CONFIDENTIAL

ALYESKA_AM00003531

|  | Notwithstanding any of the foregoing, Alyeska, to the extent within its control, will not favor itself in any way to an Advisory Client's detriment and will act in a manner that it believes over the long term is fair and equitable to all of its Advisory Clients. |
|---|---|

CONFIDENTIAL

ALYESKA_AM00003532

# ITEM 13 – REVIEW OF ACCOUNTS

| | |
|---|---|
| **Item 13.A** | Indicate whether you periodically review *client* accounts or financial plans. If you do, describe the frequency and nature of the review, and the titles of the *supervised persons* who conduct the review.<br><br>The Advisory Client portfolios are under continuous review by Mr. Parekh, who, as Chief Executive Officer, has overall responsibility for selecting investments for the Advisory Clients. Mr. Parekh is assisted by the portfolio managers of the firm who help to determine whether security positions should be maintained or modified in view of market conditions. The portfolios are under continuous review by these individuals with regard to investment policy, the suitability of the investments used to meet policy objectives, and the investment objectives of the Advisory Clients. The portfolios are reviewed frequently to evaluate and assess, among other things, investment performance, sensitivity to market changes, and whether Advisory Clients continue to meet certain established investment criteria.<br><br>While there are no set factors that trigger review of portfolios and no procedure that determines the sequence in which portfolios will be reviewed, the noted individuals generally review the portfolios in the event of the realization of certain events that drive a contemplated or actual trade or the occurrence of certain other market movements which materially impact the underlying investments of the portfolios.<br><br>In addition, Alyeska's Chief Compliance Officer periodically reviews trade policies and procedures to ensure they represent Alyeska's current practices and are in conformity with applicable law and regulations. |
| **Item 13.B** | If you review *client* accounts on other than a periodic basis, describe the factors that trigger a review<br><br>Please see Item 13.A above. The Advisory Clients' accounts are under continuous review. |
| **Item 13.C** | Describe the content and indicate the frequency of regular reports you provide to *clients* regarding their accounts. State whether these reports are written.<br><br>Investors generally receive unaudited performance reports monthly and audited financial statements within 120 days of the end of the fiscal year. In addition, Investors generally receive quarterly newsletters.<br><br>Upon request, Alyeska has provided Investors with ad hoc reports regarding performance, risk, attribution, exposure and other metrics related to one or more of the Advisory Clients. |

CONFIDENTIAL

ALYESKA_AM00003533

## ITEM 14 – CLIENT REFERRALS AND OTHER COMPENSATION

| Item 14.A | If someone who is not a *client* provides an economic benefit to you for providing investment advice or other advisory services to your *clients*, generally describe the arrangement, explain the conflicts of interest, and describe how you address the conflicts of interest. For purposes of this Item, economic benefits include any sales awards or other prizes.<br><br>Not applicable. |
|---|---|
| Item 14.B | If you or a *related person* directly or indirectly compensates any *person* who is not your *supervised person* for *client* referrals, describe the arrangement and the compensation.<br><br><u>Note</u>: If you compensate any person for client referrals, you should consider whether SEC rule 206(4)-3 or similar state rules regarding solicitation arrangements and/or state rules requiring registration of investment adviser representatives apply.<br><br>Alyeska does not utilize any broker-dealers and/or third parties to solicit client referrals.  Please refer to Item 12.A.2. for a discussion of potential conflicts of interest related to a broker-dealer's ability to provide Alyeska with the opportunity to participate in capital introduction events sponsored by the broker-dealer and to refer Investors to the Funds. |

CONFIDENTIAL

ALYESKA_AM00003534

# ITEM 15 – CUSTODY

If you have *custody* of *client* funds or securities and a qualified custodian sends quarterly, or more frequent, account statements directly to your *clients*, explain that *clients* will receive account statements from the broker-dealer, bank or other qualified custodian and that *clients* should carefully review those statements. If your *clients* also receive account statements from you, your explanation must include a statement urging *clients* to compare the account statements they receive from the qualified custodian with those they receive from you.

Alyeska (with respect to the Funds) and the General Partners (with respect to the respective Domestic Feeders and Master Funds) are deemed to have custody by virtue of their status as investment manager or general partner, respectively.  Alyeska maintains the assets of the Funds in accounts with a qualified custodian pursuant to Rule 206(4)-2 under the Advisers Act.  Alyeska has established prime brokerage and custodial arrangements for the Funds with Deutsche Bank Securities Inc., a U.S. registered broker-dealer, 60 Wall Street, New York, New York10005, Goldman, Sachs & Co., a U.S. registered broker-dealer, 200 West Street, New York, New York 10282, Morgan Stanley & Co. LLC, a U.S. registered broker-dealer, 1585 Broadway, New York, New York 10036, Barclays Capital Inc., a U.S. registered broker-dealer, 745 Seventh Avenue, New York, New York 10019,Merrill Lynch Professional Clearing Corp., a U.S. registered broker-dealer, One Bryant Park, 6th Floor, New York, NY 10036, Credit Suisse Securities (USA) LLC, a U.S. registered broker-dealer, 11 Madison Avenue, New York, NY 10010, and J.P. Morgan Clearing Corp., a U.S. registered broker-dealer, 383 Madison Avenue, New York, New York 10179.  Alyeska has established additional custodial arrangements for the Funds with The Bank of New York Mellon, 1 Wall Street, New York, New York 10286 and with CITCO Bank (Canada), 2 Bloor Street East, Unit 2700, Toronto, ON M4W 1A8.

To ensure compliance with Rule 206(4)-2 under the Advisers Act, Alyeska has arranged for the Funds to be audited in accordance with Generally Accepted Accounting Principles by an independent public accountant registered with, and subject to inspection by, the Public Company Accounting Oversight Board, on an annual basis and ensures that all Investors in the Funds are provided with copies of such audited financial statements within 120 days of the end of the Funds' respective fiscal years (i.e., generally by April 30).  Investors should carefully review the Funds' audited financial statements.

CONFIDENTIAL

ALYESKA_AM00003535

# ITEM 16 – INVESTMENT DISCRETION

If you accept discretionary authority to manage securities accounts on behalf of clients, disclose this fact and describe any limitations clients may (or customarily do) place on this authority. Describe the procedures you follow before you assume this authority (e.g., execution of a power of attorney).

Alyeska has discretionary authority to manage the Advisory Clients. Alyeska is authorized to make purchase and sale decisions for the Advisory Clients.

As explained in Item 8 above, each Fund's investment strategy is set forth in detail in such Fund's offering memorandum. Investors do not have the ability to impose limitations on Alyeska's discretionary authority. Prospective Investors are provided with an offering memorandum prior to their investment and are encouraged to carefully review the offering memorandum, along with all other relevant offering materials, and to be sure that the proposed investment is consistent with their investment goals and tolerance for risk. Prospective Investors should also consult with their legal, tax, or other advisors prior to making any investment. Prospective Investors must also execute a subscription agreement, in which they make various representations, including representations regarding their suitability to invest in a high-risk investment pool. Further, prospective Investors in the Domestic Feeders must execute limited partnership agreements. Investors grant Alyeska discretionary authority through the execution of the applicable Fund's subscription agreement.

34

ALYESKA_AM00003536

# ITEM 17 – VOTING CLIENT SECURITIES

| Item 17.A | If you have, or will accept, authority to vote *client* securities, briefly describe your voting policies and procedures, including those adopted pursuant to SEC rule 206(4)-6. Describe whether (and, if so, how) your *clients* can direct your vote in a particular solicitation. Describe how you address conflicts of interest between you and your *clients* with respect to voting their securities. Describe how *clients* may obtain information from you about how you voted their securities. Explain to *clients* that they may obtain a copy of your proxy voting policies and procedures upon request. |
|---|---|
| | Alyeska's advisory agreements generally give Alyeska authority to vote proxies received by Advisory Clients.  Investors do not have the ability to direct a particular solicitation. |
| | Alyeska understands and appreciates the importance of proxy voting.  Alyeska votes proxies in the best interests of Advisory Clients (as applicable) and in accordance with its policies and procedures for voting proxies.  Alyeska has appointed Institutional Shareholder Services ("ISS") to, among other things, place votes based on specified policies and guidelines established by Alyeska.  In the event that Alyeska decides to directly exercise discretion to vote a proxy (in the event such authority is not delegated to ISS, or such authority is revoked from ISS with respect to any specific proxy), Alyeska will strive to vote any such proxies in the best interests of Advisory Clients (as applicable) and in accordance with its policies and procedures for voting proxies.  In situations in which Alyeska decides to directly exercise discretion to vote a proxy, it will consider whether there are any conflicts between Alyeska and the Advisory Clients.  A proxy voting committee will consider any conflicts and document the resolution.  It should be noted that these procedures will be applied solely when Alyeska is requested to exercise its voting authority with respect to Advisory Client securities.  There are situations in which Alyeska may be requested to provide consent with respect to a particular security where Alyeska may not apply the technical requirements of the procedures because Alyeska is not being asked to exercise voting authority with respect to Advisory Client securities (although Alyeska will act in the best interests of the Advisory Clients and Investors, as applicable, in responding to any such request). |
| | Investors may contact Alyeska's Chief Compliance Officer at (312) 899-7900 with questions about or to request Alyeska's proxy voting procedures or for information about how proxies were actually voted. |
| Item 17.B | If you do not have authority to vote *client* securities, disclose this fact. Explain whether *clients* will receive their proxies or other solicitations directly from their custodian or a transfer agent or from you, and discuss whether (and, if so, how) *clients* can contact you with questions about a particular solicitation. |
| | Not applicable. |

35

ALYESKA_AM00003537

## ITEM 18 – FINANCIAL INFORMATION

| | |
|---|---|
| **Item 18.A** | If you require or solicit prepayment of more than $1,200 in fees per *client*, six months or more in advance, include a balance sheet for your most recent fiscal year. |
| | 1.   The balance sheet must be prepared in accordance with generally accepted accounting principles, audited by an independent public accountant, and accompanied by a note stating the principles used to prepare it, the basis of securities included, and any other explanations required for clarity. |
| | 2.   Show parenthetically the market or fair value of securities included at cost. |
| | 3.   Qualifications of the independent public accountant and any accompanying independent public accountant's report must conform to Article 2 of SEC Regulation S-X. |
| | Not applicable. |
| **Item 18.B** | If you have *discretionary authority* or *custody* of *client* funds or securities, or you require or solicit prepayment of more than $1,200 in fees per *client*, six months or more in advance, disclose any financial condition that is reasonably likely to impair your ability to meet contractual commitments to *clients*. |
| | Alyeska is not currently aware of any financial condition that is reasonably likely to impair its ability to meet contractual commitments to its Advisory Clients. |
| **Item 18.C** | If you have been the subject of a bankruptcy petition at any time during the past ten years, disclose this fact, the date the petition was first brought, and the current status. |
| | Not applicable. |

36

CONFIDENTIAL

ALYESKA_AM00003538