# Exhibit 1

# Exhibit A

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF TEXAS

2                    HOUSTON DIVISION

3

IN RE ALTA MESA          §   CASE NO. 4:19-CV-00957

4    RESOURCES, INC.          §

SECURITIES LITIGATION    §

5

6

7                   ***CONFIDENTIAL***

8

                REMOTE AND VIDEOTAPED DEPOSITION OF

9                WILLIAM WALLACE MCMULLEN

                      JUNE 6, 2023

10

11

12

13      REMOTE AND VIDEOTAPED DEPOSITION OF WILLIAM

14   WALLACE MCMULLEN, produced as a witness at the

15   instance of the Plaintiff and duly sworn, was taken

16   in the above styled and numbered cause on Tuesday,

17   June 6, 2023, from 8:37 a.m. to 10:37 p.m., before

18   TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of

19   Texas, reported remotely by computerized stenotype

20   machine in Austin, Texas, pursuant to the Federal

21   Rules of Civil Procedure and any provisions stated

22   on the record herein.

23

24

25

CONFIDENTIAL

Page 110

20      Q.    When the -- the business combination

21  closed in February of 2018, what -- what

22  consideration did Bayou City receive as a result of

23  its investments in -- in High Mesa?

24      A.    We received stock in AMR.

25      Q.    How much stock did it receive?

Page 111

1        A.    We received 100 percent stock

2   consideration.  So it must have been approximately

3   that $701 million worth of AMR stock.

4        Q.    At -- was that at the -- the $10 per

5   share price?

6        A.    I believe so, yes.

7        Q.    So it was probably 70.1 million shares of

8   Alta Mesa Resources' stock?

9        A.    That -- that would be my best guess, yes.

10       Q.    Did Alta Mesa receive -- or excuse me --

11   not Alta Mesa.  Did Bayou City Energy receive any

12   cash consideration as a result of the business

13   combination?

14       A.    We did not.

15       Q.    There -- there was some cash that flowed

16   to Kingfisher Midstream as a result of the business

17   combination.  Correct?

18       A.    That's correct.

19       Q.    And -- and did some of that cash flow to

20   High Mesa as a partial owner of Kingfisher

21   Midstream?

22       A.    Yes, it did.

23       Q.    Do you recall how much cash flowed to

24   High Mesa -- High Mesa, Inc. as a result of the

25   business combination?

1    A.    I don't recall.  It was material.
2    Hundreds of millions.
3    Q.    Was -- was any of that cash distributed
4    to BCE as a -- as an owner of Kingfisher midstream
5    through its High Mesa, Inc. investments?
6    A.    Zero.
7    Q.    Do you recall who it was distributed to?
8    A.    Yes.  High -- Highbridge, HPS, and ARM.
9    Q.    Do you recall the dollar value of the
10   cash that flowed through to Highbridge slash HPS?
11   A.    I -- I -- I don't know exactly.  It was
12   hundreds of millions.
13   Q.    What about for -- for ARM Energy?  Any
14   recollection of the cash consideration that flowed
15   through to ARM Energy?
16   A.    No, but it -- no, but it was hundreds of
17   millions.
18   Q.    Anyone else other than -- that Highbridge
19   slash HPS or ARM Energy that -- that took out cash
20   from the -- the Kingfisher midstream side of the
21   equation to the best of your recollection?
22        MR. YOUNG:  Objection, form of the
23   question.
24   A.    Not to my knowledge.
25   Q.    Do you recall that there was cash --

1    excuse me -- cash consideration to Alta Mesa

2    Holdings as a result of the business combination?

3        A.    I don't believe so, but I can't -- I

4    can't recall.

5        Q.    Suffice to say if there was any cash --

6    cash consideration of Alta Mesa Holdings, none of it

7    flowed through to BCE?

8        A.    That's correct.

9        Q.    The -- excuse me.  The business

10   combination was announced in August of 2017.  Right?

11       A.    I believe that's right, yes.

12       Q.    And it ultimately closed in February

13   of 2018.  Correct?

14       A.    Yes.

15       Q.    Over the course of those few months from

16   August of '17 to February of 2018, was Bayou City

17   expecting to receive cash from the business

18   combination?

19       A.    No.  From the outset of our negotiations

20   with Silver Run, Bayou City intended to roll

21   100 percent of its equity into the public company

22   fully aligning ourselves with the public

23   shareholders.

24       Q.    Did -- did Bayou City have -- have plans

25   to liquidate its shares in Alta Mesa Resources after

CONFIDENTIAL

Page 114

1   the business combination?

2       A.    Not at all.  And, in fact, we ended up

3   buying more shares on the open market at some point

4   before the company went bankrupt.

CONFIDENTIAL

**Page 116**



CONFIDENTIAL

**Page 143**



CONFIDENTIAL

**Page 246**

```
 6    and projections and be able to assess that.  We were

 7    a shareholder, along with public shareholders, and

 8    we were all investing together in the public

 9    enterprise.  And this really was my early days of

10
```

CONFIDENTIAL

Page 315

1             (Exhibit 565 was marked.)

2        A.    I'm sorry, Mr. Browne, which exhibit do

3   you want me on?

4        Q.    It should be numbered 565?

5        A.    I've got that.

6        Q.    Take a look at that then.  And while you

7   do that, for the record, Exhibit 565 is a two-page

8   email chain.  The first page in the exhibit is

9   Bates-stamped BCEM_0126564.  The -- the last part of

10  that chain or the most-recent-in-time part of the

11  chain is from Mark Stoner to you, Mr. McMullen, it's

12  dated March 26th of 2018.

13       A.    Yep.  I've -- I've looked at this.

14       Q.    Is Exhibit 565 familiar to you?

15       A.    It is.

16       Q.    What is Exhibit 565?

CONFIDENTIAL

**Page 316**



CONFIDENTIAL

Page 317

1          THE DEFENDANTS:  Object to form.

2          Objection to form.



21     Q.    Do you have an understanding of who was

22 responsible for providing KFM connections that were

23 used in the -- the proxy that was filed in January

24 of 2018?

25          THE DEFENDANTS:  Object to form.

CONFIDENTIAL

Page 318

```
 1              Objection to form.
 2      A.     Now, you said KFM connections?  Did you
 3  mean something else?
 4      Q.     If I said connections, I meant
 5  projections.
 6      A.     Okay.
 7      Q.     Who was responsible for providing KFM
 8  EBITDA projections that were presented in the proxy
 9  that was filed in January of 2018?
10              THE DEFENDANTS:  Objection; form.
11              Object to form.
12      A.     No.
13      Q.     Okay.  It wasn't -- it wasn't ARM Energy?
14              THE DEFENDANTS:  Objection; form.
15              Object to form.
16      A.     I'm sure they had a say in it given that
17  they were the management team of Kingfisher
18  Midstream.
19      Q.     Do you think HPS had a say in it?
20              THE DEFENDANTS:  Objection; form.
21              Object to form.
22      A.     I'm not sure.
23      Q.     And ultimately you -- you said the -- I
24  think you testified to the -- the effect that the
25  proxy was kind of shepherded by Alta Mesa
```

CONFIDENTIAL

Page 319

1    management.  Correct?

2                   THE DEFENDANTS:  Objection; form.

3                   Object to form.

4                   Object to form.

5        A.    I'm not sure I said the proxy.  The

6    negotiation were certainly shepherded by Alta Mesa

7    and KFM management.

8        Q.    The proxy was ultimately filed by Silver

9    Run II.  Right?

10       A.    That's --

11                  THE DEFENDANTS:  Object to form.

12       A.    That's correct.  They were at the proxy.

CONFIDENTIAL

Page 320



CONFIDENTIAL

**Page 321**



CONFIDENTIAL

**Page 322**



17      Q.      Do you think it was Bayou City's

18  responsibility to adjudicate the KFM projections?

19                  THE DEFENDANTS:  Objection to form.

20  Object to form.

21      A.      No, as I said before, Bayou City didn't

22  have a role with KFM.  We weren't investors in KFM.

23  We didn't sit on the board of KFM.  We didn't have

24  any governance of KFM, either before the de-SPAC or

25  after the de-SPAC.

CONFIDENTIAL

Page 323



CONFIDENTIAL

**Page 324**



CONFIDENTIAL

**Page 326**

5      Q.    And is it fair to say you, I guess,

6    communicate much the same message to Mr. Hackett

7    about being frustrated about how things were turning

8    out for KFM?

9              THE DEFENDANTS:  Objection; form.

10    Objection to form.

11      A.    Yes.  I -- I stated that the

12    reforecasting of KFM's projections was news to me.

13      Q.    You called it disheartening.  Right?

14      A.    I did.

CONFIDENTIAL

**Page 349**



CONFIDENTIAL

Page 350



# Exhibit D

Message

| | |
|---|---|
| **From:** | Cyndhia Lasso [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECB55CD8F3914813856A7D6F2CB1D5D6-CYNDHIA] |
| on behalf of | William McMullen [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=92634123CC14477589C0D24273D22C8A-WILL] |
| **Sent:** | 8/22/2018 5:52:07 PM |
| **To:** | Cyndhia Lasso [cyndhia@bayoucityenergy.com]; William McMullen [will@bayoucityenergy.com] |
| **Subject:** | AMR Second Quarter Review |
| **Attachments:** | AMR 2Q18 Update.pdf |

Dear BCE Limited Partner,



Warm regards,
The BCE Team

**William W. McMullen** | Managing Partner
**Bayou City Energy** | www.bayoucityenergy.com
1201 Louisiana Street, Suite 3308 | Houston | TX | 77002
O: 713.400.8210 | C: 832.385.0859 | E: will@bayoucityenergy.com

Confidential