# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE: ALTA MESA )
RESOURCES, INC., ) CASE NO. 4:19-cv-00957
SECURITIES LITIGATION )

**************************************************

VIDEOTAPED ORAL DEPOSITION OF

JOHN P. FIEBIG

NOVEMBER 16, 2023

**************************************************

On the 16th day of November, 2023, at 8:59 a.m., the videotaped oral deposition of the above-named witness was taken at the instance of the Class Plaintiffs, before Michelle L. Munroe, Certified Shorthand Reporter in and for the State of Texas, at Kirkland & Ellis LLP, 4550 Travis Street, Suite 1200, Dallas, Texas, pursuant to Notice and the agreement hereinafter set forth.

[PAGES OMITTED]

Andersen.

So am I correct in reading this that your first job out of Oklahoma State University was at Arthur Andersen?

A. That's correct.

Q. Okay. And thereafter you were employed by Ernst & Young; is that correct?

A. Yes, as a partner.

Q. Okay. And you provide some bullet points as to the work you did in both firms as an audit partner and a senior audit manager; is that correct?

A. That's correct.

Q. Would you agree with me that none of the bullet points involved forensic accounting work?

A. That's correct.

Q. And tell me, what is your understanding as to the difference between auditing and forensic accounting?

A. I think it's generally the -- the purpose of the -- of the procedures you're performing, the purpose of the engagement in terms of, while it includes a lot of the same type of principles, auditing has its own standards, forensics has its, but they're all kind of in the same area of expertise, I think, as it relates to identifying,

evaluating evidence and information.

Q. Did you do any forensic accounting work at Arthur Andersen?

A. I don't believe so.

Q. How about at Ernst & Young?

A. No.

Q. In your time at Arthur Andersen and Ernst & Young, for the audits that you conducted for various public and private companies, wasn't it true that, in general, you relied upon the public or private company that you audited to provide you with all the information, materials in which you based your audit on?

A. I think in general that's correct, that we would have our list of items that we requested from them, and then we would expect them to provide the information that we had requested.

Q. You didn't have subpoena power with respect to any of your audit clients, right?

A. No.

Q. Okay. And you didn't have access during any of the audits you participated in to nonpublic documents produced or in litigation involving the audit client, did you?

A. I'm sorry, I didn't hear the first part of

[PAGES OMITTED]

documents. But the analysis and opinions within the report are mine.

Q. And who actually wrote the report?

A. It was a combination of me and some of the staff from Cornerstone that worked together on it.

Q. And who at Cornerstone participated in drafting the report?

A. I would say primarily JP Poissant, Steve McBride, and then Kelly -- they're on the list of names. I don't always remember their last name.

Q. Let's turn to paragraph 1 of your report. And this indicates what your scope of engagement was as an expert, correct?

A. Yes.

Q. And it says here that, I have been retained as an independent expert to evaluate and respond to financial accounting and reporting opinions expressed by Mr. D Paul Regan, CPA/CFF, in his expert report dated August 31, 2003. Specifically I have been asked to evaluate Mr. Regan's following opinions. And then it lists out Mr. Regan's opinions.

Is it correct that you never conducted your own independent analysis as to the accounting matters at issue in this litigation?

[PAGES OMITTED]

disclosures after the close of business combination were, in fact, materially misleading to investors; is that correct?

A. That's correct.

MR. NASKO: Object to form.

Q. And you have provided no opinion as to whether the statements made by defendants violated the federal securities laws; is that correct?

MR. NASKO: Object to form.

A. No.

Q. In paragraph 32 of your report, you state that Mr. Regan acknowledges that his work in this matter is governed by the American Institute of Certified Public (sic) Statement for Forensic Services of the AICPA forensic standards.

To be clear, do you also acknowledge that the AICPA forensic standards are the operative accounting principles and standards with respect to both Mr. Regan's report and yours?

A. Yes.

MR. NASKO: Object to form.

Q. How are the AICPA forensic standards different than the accounting -- than the auditing standards?

A. The forensic standards are fairly broad

[PAGES OMITTED]

A. I believe that's correct.

Q. Are you a member of the AICPA's Forensic and Valuation Services section?

A. I am not.

Q. Are you a CFF?

A. No.

Q. And why not?

A. I haven't gone through the certification process.

Q. What experience do you have applying SSFS?

A. Generally within my expert engagements that I have performed while with ADIGEO.

Q. In your role at the PCOB, did you ever analyze whether an accountant had appropriately applied SSFS?

MR. NASKO: Object to form.

A. I don't believe so, no.

Q. In your role at Arthur Andersen, did you ever perform an engagement pursuant to SSFS?

A. Not that I can recall.

Q. At Ernst & Young?

A. No.

Q. Are you familiar with the AICPA's Forensic and Valuation Services, which I'll abbreviate as FVS, practice aids?

A. I don't know that I have seen them recently, no.

Q. Can you name any FVS practice aids?

A. Not off the top of my head.

MR. NASKO: Object to form.

Q. Have you ever attended the AICPA's Forensic and Valuation Services national conference?

A. No. I attend the annual AICPA and SEC update and the audit ENGAGE conference, which is a large breadth of experience for everybody within the AICPA. They may -- I don't know but what they may offer those types of courses in that because it's -- every practice that the -- basically the AICPA members are in. So I don't know if I have ever attended one of their sessions or not if they're part of that, so...

Q. You don't recall one way or the other ever having attended a session of the Forensic and Valuation Services national conference?

A. No.

Q. Okay. Have you ever attended any state-based forensic accounting conferences?

A. No.

Q. Have you ever spoken at a forensic accounting conference?

A. No.
Q. Given that we all agree that the SSFS are the appropriate standards to apply with regard to Mr. Regan's report, can you tell me what the SSFS standards for the CPA regarding the quantum and quality of data that the CPA should obtain in coming to any conclusion?
MR. NASKO: Object to form.
A. The quantum and quality?
Q. Of the data that the CPA should obtain in coming to any conclusion.
What is the standard with respect --
A. I think it's within the sufficient relevant data, paragraph 6 of the standard, would -- generally that would be the principle you would apply.
Q. You're talking about the fourth bullet point on that page?
A. That's correct.
Q. And that's under subsection Standards for Forensic Services, correct?
A. That's correct.
Q. Which contains four bullet pointed standards, correct?
A. Correct.

[PAGES OMITTED]

answered.

A. In this case, I would say yes, it is.

Q. And what's the basis for that opinion?

A. In terms of determining -- in order to have a basis for the opinion, there is a level of diligence and understanding that you have to have of the underlying aspect.

As I list in my report, you know, in terms of being able to understand, it can't just be a, you know, retrospective look back and say, okay, well, they didn't get there, and here is an email that said this, that, or the other.

Without providing the context, if you will, of what those mean within the determination and development of the projections themselves and, you know, without that understanding, it calls into question really the relevance of what some of these other emails and items that he pointed to were from his -- from the perspective of his evaluation.

Q. Just to be clear, then, are you saying that the standards require -- when the standards refer to sufficient relevant data, that they mean a comprehensive -- a comprehensive analysis of the data?

MR. NASKO: Object to form.

A. Again, in this situation, I believe so.

Q. Not just -- I'm talking generally, not just this situation.

A. It's a principles-based standard, and I think that you apply that principle and -- within the situation. You know, having been at the PCOB for so many years and the auditing standards were principle based, not prescriptive as the accounting standards sometimes are, you have to have experience with saying, okay -- or maybe even a comfort level with what a principle-based standard is to say, yes, that broad -- that broad principle or that very clearly stated principle, you know, is something that within those two sentences is not meant to be limiting as to -- as to what a CPA would need to do in order to apply it.

Q. Do you derive any support for the view that a sufficient relevant data equals a comprehensive analysis of the data from any FVS forensic accounting practice aids?

MR. NASKO: Object to form.

A. I have not.

Q. From any treaties adopted by forensic accountants?

MR. NASKO: Object to form.

A. Not that I'm aware of, no.

Q. I note, sir, that Mr. Regan in Appendix B of his report lists over six pages with three to four columns in each page all of the documents produced in this case he considered. And this is by contrast with your over five pages with only one column of documents on each page.

So is it fair to say you did not review all the documents that Mr. Regan listed that he considered?

MR. NASKO: Objection; form.

A. I have reviewed all of the documents that he cited to that I have cited to. Cornerstone has reviewed all of the documents within his appendix that I haven't, and I have reviewed some of those, but they have reviewed those under my direction and have provided me any relevant information or observations from their review of that.

Q. So you're relying upon Mr. -- I'm sorry, you're relying upon Cornerstone to provide you with relevant documents that Mr. Regan had considered but you did not?

MR. NASKO: Object to form.

Q. Is that correct?

A. That they have reviewed -- I'm relying on

their significant experience in this field and experience reviewing documents in support in terms of being able to provide me with any views that would be relevant to my opinion.

Q. And you determined that that was the proper procedure, that you didn't need to look at every single document that Mr. Regan looked at?

MR. NASKO: Object to form.

A. That's correct.

Q. Okay. Would you consider that to be a comprehensive analysis of the data?

MR. NASKO: Object to form.

A. Yes, within -- within the confines of my team that was under my direction, yes.

Q. And in paragraph 65(e) of your report, you state that, Mr. Regan has not identified evidence that causes me to believe that KPMG did not conduct their audits and review in compliance with relevant PCAOB auditing standards.

Sir, did you understand that Mr. Regan attempted to assess the quality of KPMG's audit?

MR. NASKO: Object to form.

A. I did not understand that from his report, no.

Q. And, therefore, why are you asserting this

[PAGES OMITTED]

I'll have marked as Exhibit 815.

MR. SCHOCHET: Which is tab 5, Umair.

MR. HUSSAIN: The exhibit has been introduced.

Q. In the first instance, let me ask you if you have seen this document before, Mr. Fiebig.

(Exhibit 815 marked.)

A. (Reviewed document.) Not that I recall.

Q. And this is an April 2017 Riverstone email containing an engineering report from what appears to be an outside consultant, Chris Widell, correct?

MR. NASKO: Object to form.

A. I'm sorry, I would have to --

Q. Sure. Take a look. Take your time.

A. (Reviewed document.) I'm sorry, so I haven't finished reading the full part of it, but what was your question?

Q. My question is: This seems to be a -- well, it is an April 2017 Riverstone email, correct? I'm sorry, 2017 email; is that correct?

A. That's correct.

Q. Okay. And it contains an engineering report from what appears to be an outside consultant, Chris Widell; is that correct?

MR. NASKO: Object to form.

[PAGES OMITTED]

AMR's wells, correct?

MR. NASKO: Object to form.

A. You know, again, he's applying those to determine his view of the AMR doesn't -- that doesn't necessarily, for me, tie it back to that he's looking at an AMH testing. You know, he may have other industry or other information that he's aware of that's indicating that there's difficulty with it.

Q. So you say you haven't seen this document before, correct?

A. That's correct.

Q. So you don't know one way or the other as to whether or not he was referring to a spacing test at that time?

A. I don't.

Q. And do you know whether there was spacing tests at that time?

MR. NASKO: Object to form.

A. As of April?

Q. Uh-huh.

A. I -- I would have to look back. I don't know as of that date.

MR. SCHOCHET: Let's look at another document, please, which we'll mark as Exhibit 816.

It's tab 6, Umair.

MR. HUSSAIN: The exhibit has been introduced.

Q. Sir, your appendix in the back of your report doesn't indicate that you considered this document.

Have you seen it before?

(Exhibit 816 marked.)

A. I don't believe that I have.

Q. And this is a June 2017 AMH email among a number of people including Hal Chappelle, Gene Cole, Tim Turner, Mike Ellis, Michael McCabe, and attaches an email from Fred Mueller.

In his next-to-last paragraph, sir, you'll see that he states that in his opinion, quote, The down-spaced well patterns influence the data, as it appears that on average, there is some well interference thus less production on a per-well basis. There may also be a negative effect on frac interference on producing wells, as an increased number of wells are drilled resulting in completions that are closer to producing wells.

Do you have any reason, sir, to believe that KPMG saw this document?

MR. NASKO: Object to form.

[PAGES OMITTED]

would be no, I don't understand that to be the case.

Q. Did you know that there was a deposition of a 30(b)(6) witness for Ryder Scott, Miles Palke?

A. I am aware of that.

Q. I notice in your Appendix A that you don't show his deposition.

Did you review it?

A. I did not personally review it, but it was reviewed by Cornerstone -- Cornerstone.

Q. To the extent that you're relying upon Ryder Scott in your assessment of Mr. Regan's report, why did you not personally read Mr. Palke's deposition?

MR. NASKO: Object to form.

A. Just made a judgment on -- based on the information that I had seen in reading their report and, you know, reliance on the experience and knowledge of the Cornerstone staff who did review it.

MR. SCHOCHET: Let's introduce as Exhibit 819 Mr. Palke's deposition transcript. Tab 13.

MR. SALDAMANDO: Umair, this is tab 13.

Q. I take it you have not seen this document

[PAGES OMITTED]

number 4 used. I'm not sure I see -- perhaps they started with it but they also asked the question of is it 6 or 8 or 12.

Q. Let me just ask bottom line question: You don't have any understanding that Ryder Scott only looked at four -- four wells per section?

MR. NASKO: Object to form.

A. No, I don't know that that's my understanding based on the work that they performed.

Q. Okay. Let's go to page 49, please. Tell me when you're there.

A. Yes.

Q. Line 4, it says, question: The first file in your Marked Exhibits folder should now be filed Exhibit 3. And the rest of it says -- he answers: I see that.

If you could open that up.

I have it open.

Did you review this email chain or any part of this email chain when you were preparing for your deposition today?

And he said: Yes, I have seen this chain.

Did you end up speaking with Mr. Zajac around this time?

Answer: I believe we had a

[PAGES OMITTED]

rocks and the different zones and what have you, you know, how they would have or where they would have considered that.

Q. Do you know whether or not there was any evidence in the record on the issue of whether or not Ryder Scott tested the reasonableness of the three -- three benches?

MR. NASKO: Object to form.

A. Again, not having a full understanding of all the test work that they did to come to their conclusion. Again, I do think that they -- start again.

I'm not aware of all the inputs and all the evaluations that went into their determination of their audit opinion.

Q. So you're not aware of whether or not there's any evidence on that issue as to whether or not Ryder Scott looked at the reasonableness of the three bench -- three bench assumption?

A. Any evidence within --

MR. NASKO: Object to form; asked and answered.

A. -- within the record?

Q. Uh-huh.

A. Not that I can recall at this point.

[PAGES OMITTED]

A. In general terms, yes.

Q. Let me show you another document that Mr. Regan considered and that is not listed in your documents reviewed. It is -- I'll mark it as Exhibit 821.

MR. SCHOCHET: And it's tab 10, Umair.

MS. WALLER: Take a quick break?

MR. SCHOCHET: After this document, yes.

MS. WALLER: Are you okay?

THE WITNESS: Yes.

(Exhibit 821 marked.)

Q. Sir, let me first ask you: Did you see this document before?

MR. HUSSAIN: The exhibit has been introduced.

A. Not that I recall.

Q. And it's dated April 16, 2018, almost a month before that representation by Mr. Chappelle of at least 8 percent recovery rate that he said was the basis of many of their assumptions. And these are emails among Tim Turner, Mike Ellis, Gene Cole, and Kevin Bourque, and the subject matter of the emails is Pattern Analysis.

Do you see that?

[PAGES OMITTED]

Q. Yes.

Recall, again, it includes a table showing the results of five pattern tests with all but the two having only three wells per space having EURs only a fraction of the type curve; is that correct?

MR. NASKO: Object to form.

A. I see the amounts that are listed in the EUR/type column.

Q. And references the spacing being too tight, correct?

MR. NASKO: Objection; form.

A. This is in regards to EHU and Bullis Coleman?

Q. Yes -- well, it's a reference to the overall assessment by Mr. Turner.

MR. NASKO: Objection; form, mischaracterizes the document.

Q. Well -- and he does refer to EHU and Bullis Coleman, yes.

MR. NASKO: Objection; form.

A. Okay.

Q. Now, you reviewed the transcript of Mr. Knupp, correct?

A. Yes.

Q. And you're opining that the TPH

presentation was contrary evidence specifically to Exhibit 818; is that correct?

A. Again, I don't think that's what I say in my opinion. I indicate that he cites that communication but fails to address the TPH presentation that included the assumptions from that exceeded those attributed to Alta Mesa. I think he was using this to say that the -- that he hasn't reconciled his conclusions to the TPH report.

Q. But you knew, Mr. Fiebig, that TPH expressly denied ever having access not only to this document, 818, but the information contained in it, right?

MR. NASKO: Objection; form.

A. That they have expressly denied that, is that within...

Q. I'm just -- having reviewed the transcript, you knew that TPH expressly denied ever having access to what's Exhibit 818 and the information that's contained in it, right?

MR. NASKO: Objection; form, --

A. I don't --

MR. NASKO: -- mischaracterizes the document.

A. Again, I don't specifically recall that

representation in it.

Q. Let's go to page 166.

A. Okay.

MR. NASKO: Feel free to take as much time as you need --

THE WITNESS: Okay.

MR. NASKO: -- to get the context of the document and the context of these questions that we're jumping around to.

THE WITNESS: Yeah.

Q. And tell me when you're there.

A. Okay.

Q. Are you there?

A. Yes.

Q. Okay. Look at, please, lines 2 to 15.

And Mr. Knupp says: I see the exhibit.

And then the question is: I would ask you if you recognize it but you're not on it. I will briefly describe it for the record. It's an email between Mr. Bourque, and Mr. Turner, Mr. Chappelle, Ellis and Cole at Alta Mesa. Subject line is re: Food for Thought. And it describes the performance of some wells.

First, I should point out that it's dated June 6, 2017. And it describes the performance of

some wells, along with their spacing and how they're matching up against a type curve.

Do you see that data?

Would you agree that the questioner at Mr. Knupp's deposition was referring to Exhibit 818?

A. I believe it is.

Q. Now let's look at page 167 -- from the point at which we left off until -- until the point which I'm going to direct you to on page 167, there's a lot of colloquy about what's in the document.

So I'm asking you, though, on page 167, lines 22 to 25, has a question: Did TPH have access to this data -- to the data, sir?

And Mr. Knupp says: I don't recall seeing this.

Do you see that, sir?

A. I do.

Q. So I asked you when critiquing Mr. Regan whether Mr. Regan should have considered the TPH presentation specifically when determining whether Exhibit 818 is undermined by it.

Why did you not mention that TPH was never provided with the data in that document?

MR. NASKO: Objection; form.

A. I mean, he's basically saying I don't recall, but I don't think that it says he was specifically denied access to that.

Q. If you look at page 168. And Mr. Knupp says: This appears to be a very specific analysis. So we would request types of analysis. This is a very specific and bespoke piece of evidence. So I would not say that this is -- there is no way that this would be typical of something we request because this is very specific and unique.

Question: If you received the information -- let's stop there.

Do you believe, based upon this testimony, that Mr. Knupp did not see this document?

MR. NASKO: Objection; form.

A. Again, the document or relevant data that was used to prepare the document, I can't tell based on his, you know, view that they have what the request was but that they had submitted a request. So I don't know that I have an answer to that.

Q. Well, Mr. Knupp is saying that he doesn't recall seeing the data. That was -- the question was asked: And do you have access to the data?

He said: I don't recall receiving -- seeing this.

So my question is to --

MR. NASKO: Objection.

Q. -- why did you not mention Mr. Knupp's testimony in your comparison of Mr. Regan's use of Exhibit 818 with the TPH presentation?

MR. NASKO: Objection; mischaracterizes testimony.

A. So I think my criticism is that, you know, he didn't reconcile or didn't evaluate the presentation. This might have been one aspect of it, but it doesn't mean that that presentation itself was improper, inappropriate, unsupported but that it was contradictory evidence that existed that I don't see him performing any analysis of.

Q. Was it objective not to have mentioned this fact that -- when critiquing Mr. Regan's use of Exhibit 818 with the TPH presentation, you didn't mention that, though, TPH did not have access to the data within Exhibit 818?

MR. NASKO: Objection; form.

MS. WALLER: Mischaracterizes the documents and the testimony.

A. You said was it an objective? Can you ask the question again?

Q. Was it objective on your part to not

[PAGES OMITTED]

A. I don't see his review of that. I don't see his evaluation of the process to determine what the projections are, the model or whatever that is used. And while he points to, you know, emails and other information about what are purported to be inputs or parts of the projections, I don't see how he's evaluated the relevance or how those affect the projections and how a change in whatever those may be would result in a -- what change or what effect those would have to the projections.

Q. Is there a specific document you reviewed that would be -- that would lend you to believe that -- this contrary evidence to Mr. Regan's analysis and conclusions?

MR. NASKO: Objection; asked and answered.

A. I think my -- I'm sorry, can you ask that question again.

Q. Yeah. Is there a single piece of evidence that you're aware of that would reflect evidence that's contrary to Mr. Regan's analysis and conclusions?

MR. NASKO: Objection; asked and answered.

A. I would have to go back and look at some

of his report to understand some of the conclusions that he has made. But I do think that he tends to take the emails and other information that he uses out of context or without providing context, excuse me, in terms of -- you know, that that means that the projections were misstated that there was some back-and-forth email, if you will, between the people involved in determining or preparing the projections and that that somehow resulted in them being incorrect or what have you.

What I don't see and I think what I address in my opinion is that there's not a context provided into, you know, what those changes are that are being made, how they affect the projections, and how they are -- how they reflect what management's plans are relative to the operation of the business.

Q. Did you review that context -- that information and find anything that would be -- that would reflect anything that's contrary to the assertions made by Mr. Regan in his report with respect to the projections?

MR. NASKO: Object to form.

A. I think my opinion is based on the fact that he comes to conclusions based on these emails or portions of emails that are back and forth

between the people that are preparing the projections and takes that to conclude that the projections therefore aren't fairly stated or based on the best currently available information.

Q. And my question to you is have you seen any evidence to show that Mr. Regan is taking those emails out of context?

MR. NASKO: Objection to form.

A. I don't see any evidence to see the context with which he's considered those other than that the emails themselves he's looking at without really understanding. And I think at the core of what I think I have tried to say is that he's taking that and not further evaluating the context or the impact of these changes and discussions that are being had. And so I don't see him evaluating that context for me to have identified any information that would be contrary to a context that he may be using.

Q. And, again, I'm asking you if you've reviewed that context and found that there was something that he missed, that Mr. Regan missed that would show that his consideration of those emails and the information in those emails was inappropriate --

MR. NASKO: Objection; asked and --

Q. -- and did not support his conclusions?

MR. NASKO: Objection; asked and answered.

A. I would have to go back and look at some of the emails that he refers to. And, you know, let me just see if I can identify where --

Q. Yeah. And my next question is going to refer to -- them to you, so why don't we do that if you don't mind.

A. Uh-huh.

Q. So in paragraphs 62 to 73, he presents a number of documents all dated before the business combination. And in support of his conclusion in paragraph 73 that the AMH 2018 EBITDA projections appear to have been prepared in a results-driven manner and it was viewed internally as aggressive and likely unachievable. As such, they were not prepared using management's best current estimates.

And as to this data cited in those paragraphs, you don't address any of it in any specific way, do you?

MR. NASKO: Objection; mischaracterizes the underlying document.

A. If you'll allow me to read 62 through 73.

[PAGES OMITTED]

come to this conclusion that it's aggressive and likely unachievable, it doesn't evaluate the underlying assumptions that are used to get to this and how those reflect what is being planned by management.

You know, the -- the back-and-forth with management and with the person preparing, you know, discusses changes to the projections that are made as a result of their expectation, and what I don't see in his analysis that he has brought those discussions back to and therefore this was the change that was made in the projection and this is the assumption that management -- that was unachievable or management was unable to -- did not have it within their plan or didn't, you know, have within their plan to carry out those plans that would have resulted in the projected EBITDAX.

Q. And, sir, what information did you review and analyze that you claim Mr. Regan failed to analyze that would have put these emails into better context?

MR. NASKO: Objection; asked and answered.

A. You know, I was aware that there -- within some of the record there were -- there were details

[PAGES OMITTED]

have evidence of them.

Q. Well, do you have any other examples?

MR. NASKO: Objection; form.

A. I guess examples in what regard? I'm sorry. I'm really having trouble following the --

Q. You accuse Mr. Regan of hindsight bias and you gave as an example in those over 20 paragraphs one email that was dated after the issuance of the January proxy. I'm asking if you have any other examples with regard to the KFM projections.

MR. NASKO: Objection; form.

A. Again, I would have to -- I would have to consider it. Off the top of my head, I'm not -- I'm not coming up with one.

Q. So tell me, with respect to the KFM projections -- and you had referred to a broader context -- can you tell me any specific relevant facts that is contrary to Mr. Regan's conclusions with regard to the KFM projections?

MR. NASKO: Objection; form.

A. You know, I think my opinions speak to his analysis and that he has not analyzed sufficient relevant data in coming to his conclusions. And, you know, I think -- I think when you look at my paragraph 52, I think his representation as to

[PAGES OMITTED]