# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:  ALTA MESA             §
RESOURCES, INC.               §   CASE NO. 4:19-cv-00957
SECURITIES LITIGATION         §

ORAL AND VIDEOTAPED DEPOSITION OF MILES PALKE 30(b)(6)
JUNE 13, 2023

ORAL AND VIDEOTAPED DEPOSITION OF MILES PALKE 30(B)(6), produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Tuesday, June 13, 2023, from 9:39 a.m. to 4:06 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, viz Zoom, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Exhibit
CP 819
Fiebig

[PAGES OMITTED]

Page 30

1  A. So at the time -- okay. So I'm trying to think
2 of how to describe this. So one -- the stack was
3 considered to be an unconventional reservoir. And in
4 unconventional reservoirs, one of the early questions
5 you always end up asking is, how many wells can we place
6 in a section before we start diminishing the results per
7 well?
8      And the number that Alta Mesa was proposing
9 to us for a proved well spacing would be four wells per
10 section. And we were in agreement that that was a
11 reasonable number to start with, which would mean four
12 horizontal wells laid out kind of evenly spaced across
13 one section of land, each well being horizontal and
14 being approximately a mile long, so spanning the
15 section.
16      But every unconventional reservoir has gone
17 through processes where operators tried to figure out is
18 it -- is it four wells per section or is it six or is it
19 eight or is it 12? And the reservoir engineering, the
20 basic physics, indicates there's going to be a point
21 where you start reaching a diminishing return and
22 additional wells are not really providing the same
23 benefit that the prior wells did.
24      And so at this time for proved reserves,
25 both parties were aligned in terms of using four wells

Page 31

1 per section for proved reserves.
2  Q. Thank you. Could you use this same methodology
3 to assume that if Alta Mesa were to drill eight wells
4 per section, it could expect to recover about half of
5 that 243 or 121.5 thousand barrels of oil per well?
6      MR. FOERSTER: Objection, form.
7      Sorry, Mr. Palke.
8      THE WITNESS: No, that's fine.
9      You'd need more technical analysis that we
10 weren't really asked to do because the other thing that
11 should happen with additional wells is your recovery
12 factor should actually increase as you drill additional
13 wells. So the 975,000 would also be expected to climb.
14      The other thing is that there's probably a
15 reasonable amount of uncertainty in the 13 million
16 barrels per section. So it's kind of hard to say with
17 further analysis if what you're saying would hold up or
18 it would simply become, you're going to get a million no
19 matter how many you drill or you're going to get it
20 with -- or as you drill eight, you're now going to get
21 twice as much. But those aren't analyses we performed
22 for Alta Mesa.
23  Q. (BY MR. BRODEUR) If Alta Mesa had asked Ryder
24 Scott to perform such analyses in terms of more wells
25 per section, eight is just a number I picked, but if

Page 32

1 they asked for eight wells per section, 12 wells per
2 section, is that the sort of analysis that Ryder Scott
3 would be able to provide to Alta Mesa?
4      MR. FOERSTER: Objection, form.
5      THE WITNESS: We could have done further
6 technical work to estimate recovery at higher -- at
7 higher well counts.
8  Q. (BY MR. BRODEUR) Okay. Alta Mesa simply did
9 not ask Ryder Scott to do that analysis?
10  A. No, we weren't -- we weren't requested to do
11 that.
12  Q. Okay. So going into the third quarter of 2016,
13 did Ryder Scott's analysis suggest that Alta Mesa should
14 expect to recover about 250,000 barrels of oil per well
15 if it were to drill more than four wells per section?
16      MR. ELKIN: Objection, form.
17      THE WITNESS: I would like you to repeat
18 that, actually.
19  Q. (BY MR. BRODEUR) Sure. So going into the
20 third quarter of 2016, did any of Ryder Scott's analyses
21 suggest that Alta Mesa should expect to recover about
22 250,000 barrels of oil per well if it were to drill more
23 than four wells per section?
24      MR. FOERSTER: Objection, form.
25      THE WITNESS: I don't think we did any work

Page 33

1 along -- along those lines.
2  Q. (BY MR. BRODEUR) Going into the third quarter
3 of 2016, had Ryder Scott told anyone at Alta Mesa that
4 Alta Mesa should expect about 250,000 barrels of oil per
5 well if Alta Mesa drilled more than four wells per
6 section?
7      MR. FOERSTER: Objection, form.
8      THE WITNESS: I don't think so because the
9 only analysis we did was for four wells per section on
10 proved acreage.
11  Q. (BY MR. BRODEUR) Was it Ryder Scott's practice
12 to -- strike that.
13      Do you see the bold heading about halfway
14 down the page that reads, "2016 YE"?
15  A. Yes, sir.
16  Q. And YE is year end?
17  A. Yes, sir.
18  Q. Okay. Did Ryder Scott conduct an audit for
19 Alta Mesa relating to its proved reserves as of the end
20 of 2016?
21  A. Give me a second to look at what follows.
22  Q. Okay. Yeah, please read the paragraph to
23 yourself and let me know when you're done.
24  A. I'm done.
25  Q. Do you see that the first sentence reads,

9 (Pages 30 - 33)

[PAGES OMITTED]

Page 50

1 long.
2    Q.  Did you speak with Mr. Turner on the phone
3 between the time he sent this email that is at the top
4 of Exhibit 632?
5    A.  It's not impossible, but I don't recollect
6 speaking to Mr. Turner on the phone that day until maybe
7 later that day to discuss the 10-K that we were kicking
8 around at the time.
9    Q.  Okay.  What did you discuss with Mr. Zajac?
10   A.  So what I recollect discussing with Mr. Zajac
11 was him asking us questions about how -- you know, about
12 probable well counts and numbers of wells and, you know,
13 these were things that we had not done any prior work on
14 for probable wells or possible wells.  And that's -- I
15 think the basis of the conversation was we said, well,
16 we don't know what you're going to get with 12 wells per
17 section because -- or eight wells per section -- and
18 those numbers are off the hip.  I don't remember the
19 specifics.  But we hadn't done any technical work on it,
20 so we didn't have much to say.
21   Q.  Did you discuss the reasonableness of the -- of
22 the assumption of four wells per section and the earlier
23 estimate of 250,000 barrels of oil per well?
24   A.  We -- we -- I -- we may have discussed that.  I
25 don't recollect it clearly.

Page 51

1    Q.  Okay.  Do you see where Mr. Turner refers to
2 the reasonableness of three benches in the lower email?
3    A.  Let me read that, please.
4    Q.  I'm referring to the email at the bottom of the
5 page.
6    A.  Yeah, I've read that.
7    Q.  Do you understand what Mr. Turner meant by,
8 quote, reasonableness of three benches?
9        MS. PRESTON:  Objection, form.
10       THE WITNESS:  The reasonableness --
11       THE REPORTER:  Who was that that objected?
12       MS. PRESTON:  Katy Preston.
13       THE WITNESS:  I don't know if there was
14 necessarily clear understanding of reasonableness.  And,
15 I mean, that's not a particularly specific word.
16 Benches is a common language for unconventional
17 reservoirs where you can de-separate what is, otherwise,
18 a big thick formation into smaller -- we'll call them
19 zones for this conversation that have differing
20 properties and may be -- may or may not be in
21 communication with one another.
22       So I understood the conversation about
23 benches, but we had not really done any of our work
24 based on the assumption that the Mississippian
25 formation, which was the target of these horizontal

Page 52

1 wells, was really -- had specific benches within it that
2 we were targeting.
3    Q.  (BY MR. BRODEUR) Okay.  Would the number of
4 benches impact Ryder Scott's evaluation of Alta Mesa
5 estimated proved reserves?
6        MR. FOERSTER:  Objection, form, calls for
7 speculation.
8        THE WITNESS:  I think -- I think that
9 objection was pretty much right.  We didn't work on it.
10 We weren't asked to work it that way.  So without having
11 worked it that way, it's impossible to say what our
12 results would have been had we worked it that way.
13   Q.  (BY MR. BRODEUR) Okay.  In your personal
14 experience in your work for other clients, do you
15 sometimes consider the number of benches within a
16 formation in evaluating estimates of proved reserves?
17   A.  For other formations I've worked on, yes, it
18 matters.
19   Q.  And why would it matter?
20   A.  So certain -- certain basins, the intervals can
21 be very, very thick and, therefore, for instance, if you
22 add up all the oil and all the different benches, it's a
23 very sizeable number, and it may require more wells to
24 efficiently exploit it.
25   Q.  And would the number of benches affect the

Page 53

1 volumetric estimate of original oil in place, in
2 general?
3        MR. FOERSTER:  Objection, form.
4        THE WITNESS:  There's not a good answer to
5 that because it depends on who -- what matters -- you
6 know, what would matter is a combination of the overall
7 thickness with the -- what are called petrophysical
8 properties as well as how they vary with the depth or
9 over the thickness and how you -- how many -- how many
10 layers you slice an overall cake into doesn't change how
11 thick the cake is, in your analogy is stack them.
12   Q.  (BY MR. BRODEUR)  In your analogy the layers of
13 the cake are the benches?
14   A.  Could be, yes.
15   Q.  Okay.  Did Ryder Scott ever discuss with Alta
16 Mesa prior to this email whether there were three
17 benches in Alta Mesa's Oklahoma acreage?
18   A.  I don't -- I don't know the answer to that.  I
19 suspect not.
20   Q.  Okay.  In preparing for -- back in 2019 in
21 preparing for your conversation with Mr. Zajac, did you
22 discuss with any current or former Ryder Scott personnel
23 whether they ever thought there were three benches in
24 Alta Mesa's Oklahoma acreage?
25   A.  I'm sure we did not because, you know, we --

14 (Pages 50 - 53)