# EXHIBIT 17

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE SOUTHERN DISTRICT OF TEXAS

2                   HOUSTON DIVISION

3

4   IN RE: ALTA MESA              §

5   RESOURCES, INC.              § CASE NO. 4:19-cv-00957

6   SECURITIES LITIGATION        §

7   ----------------------------------------------------------

8          ORAL AND VIDEOTAPED DEPOSITION OF

9                   HARLAN CHAPPELLE

10                   JULY 28, 2023

11  ----------------------------------------------------------

12

13          ORAL AND VIDEOTAPED DEPOSITION OF

14  HARLAN CHAPPELLE, produced as a witness at the instance

15  of the Plaintiffs and duly sworn, was taken in the above

16  styled and numbered cause on Friday, July 28, 2023, from

17  9:40 a.m. to 2:43 p.m., before Kari Behan, CSR, in and

18  for the State of Texas, reported by computerized

19  stenotype machine, viz Zoom, pursuant to the Federal

20  Rules of Civil Procedure and any provisions stated on

21  the record herein.

22

23

24

25

[PAGES OMITTED]

1           Do you see where you wrote:  Mike thinks

2    our patterns will average 150 MBO and seven wells?

3         A.  I see that.

4         Q.  Okay.  And Mike here refers to Michael Ellis?

5         A.  It probably does.  That would be most logical.

6         Q.  Okay.  Did -- how did Mike Ellis inform you of

7    his thinking in that record?

8               MR. BERGER:  Objection, form.

9               THE WITNESS:  I don't know.  I mean, this

10   is the first time I've seen this, and don't recall this

11   conversation, again, over five years ago.

12   BY MR. BRODEUR:

13        Q.  Do you recall around Memorial Day, 2018,

14   learning that Mr. Ellis had a view that pattern --

15   pattern wells would average about 150,000 barrels of oil

16   of ultimate recovery?

17              MR. BERGER:  Objection, form.

18              THE WITNESS:  I -- I don't recall.

19   BY MR. BRODEUR:

20        Q.  It's fair to say, though, that that would be --

21   have a fairly significant impact on Alta Mesa's

22   prospects, right?

23              MR. BERGER:  Objection, form.

24              THE WITNESS:  I -- I don't think so.  I --

25   I think what we show -- what -- in fact, this text chain

Page 64

```
 1    addressed the key thing here, is that we didn't have --
 2    we -- we were early; we didn't have sufficient data
 3    to -- to make those kind of conclusions.  We're
 4    certainly a very open -- we had a very open dialogue
 5    about how wells were performing, and -- and so
 6    there's -- there was a lot to learn.
 7                 And I don't know the -- the rest of the
 8    context behind why I'm saying Mike thinks that, if it's
 9    a -- it's a conclusion, analysis, or a stated -- some
10    sort of statement to you that had a different context.
11    BY MR. BRODEUR:
12        Q.  Is it true that -- that, prior to this
13    conversation, you had been generally thinking that
14    pattern wells might yield around 250,000 barrels of oil?
15                 MR. BERGER:  Objection, form.
16                 THE WITNESS:  Well, I didn't know what they
17    would yield; I knew that we had a strong basis for
18    average wells in the -- in the play up to that point
19    being at 250,000 barrels, and it was our reference.  It
20    had a -- a very sound -- or, I would say, a logical
21    construct for the -- for the amount of oil in place, our
22    recovery, which I felt was conservative -- we -- and
23    a -- a logical scenario for a certain number of wells
24    per bench, per drilling unit, recovering on the order of
25    3 million barrels from the -- if you will, the average
```

[PAGES OMITTED]

1    an individual well basis, and then you have to then say

2    how many data -- how much data is in the data set that

3    I'm evaluating.

4    BY MR. BRODEUR:

5        Q.   And then is it also true that the ultimate

6    recovery from the well is derived over potentially a

7    span of decades?

8        A.   That's correct.

9        Q.   Okay.  So if -- if it were correct as of

10   July 4, 2018, that Alta Mesa's child wells, on average,

11   would yield about 150,000 barrels of oil, so less -- you

12   know, 100 barrels of oil -- sorry, 100,000 barrels of

13   oil less than the previous forecast, if that were

14   true -- do you understand the premise of the question?

15       A.   I understand what you've said so far.

16       Q.   Okay.

17            If that were true, would that be sort of

18   a -- a change in the, sort of, prospectivity of the

19   resource underlying the acreage?

20            MR. BERGER:  Objection, form.

21            THE WITNESS:  So if all the wells performed

22   going forward in that manner, that would be a change in

23   prospectivity.  Just as if it were 300,000 barrels, it

24   would be a change in prospectivity.

25            We had -- remember, we're easily over a

Page 97

1   decade into understanding the value of this asset and

2   five years into a horizontal drilling, multi-stage

3   completion program over a very large footprint, and for

4   us to reach certain conclusions, we needed sufficient

5   number of -- amount of data in a relevant data set.

6           And -- and so what -- so to make a -- a

7   future forecast of that would -- would require us to

8   have, ideally, lots more data, but certainly we're at --

9   at a point in the year where we're starting to put

10  together a picture and understand:  What is it that the

11  wells are telling us, and how do we -- what are the

12  things we need to learn, and how do we maximize the

13  value of this asset?

14  BY MR. BRODEUR:

15      Q.  Ultimately, with the benefit of hindsight, was

16  it true that Alta Mesa's child wells in the STACK

17  yielded significantly less than 250,000 barrels of oil,

18  on average?

19           MR. BERGER:  Objection, form.

20           THE WITNESS:  You know, I left there five

21  years ago.  I don't know what they -- what they yield.

22  I don't know what the reserves are today.  I know that

23  what this e-mail says refers to a small data set within

24  a very, very large area.

25  BY MR. BRODEUR:

[PAGES OMITTED]

1      Q.   Okay.   In that interim period, was Alta Mesa

2   still involved in any activities, let's say, doing, you

3   know, further pattern tests?

4              MR. BERGER:   Objection, form.

5              THE WITNESS:   We were executing our

6   business plan.   I don't recall what the rig count was.

7   I know we were doing -- I don't recall which pattern

8   tests at what time, but that would not be inconsistent

9   with what our -- our purpose was during that period.

10  BY MR. CATALINA:

11     Q.   Yeah.   And I don't -- I don't mean to ask if

12  you recall a specific pattern tests on a specific, you

13  know, day or week or something like that.

14              But, you know, generally, during that

15  period, was Alta Mesa continuing to -- to drill and gain

16  information from the new wells that it was drilling?

17              MR. BERGER:   Objection, form.

18              THE WITNESS:   It was doing that, and we

19  had -- we had certain competitive activity during that

20  time, so we would -- it wasn't just patterns or pattern

21  tests; it could have been well -- drilling wells to hold

22  acreage, such as in Major County, capture acreage in

23  Kingfisher and -- or perform on a farm-in agreement in

24  Garfield County.

25              And, again, those are examples of what

```
                                                     Page 113
 1    would be driving our drilling and that were roughly

 2    contemporaneous with this -- this activity.

 3    BY MR. CATALINA:

 4         Q.  Okay.  So during that time period, if you were

 5    learn- -- if you were obtaining new information --

 6         A.  Yes, sir.

 7         Q.  -- about new wells you were drilling and

 8    Riverstone wanted you to share that information, would

 9    you have shared that information?

10         A.  Yes.

11         Q.  And do you believe you did?

12         A.  I -- I don't have any reason to believe we

13    didn't.  I just don't recall what the specific dialogue

14    was with Riverstone and -- and the other parties in this

15    agreement -- in this activity, like Citigroup and -- and

16    others.

17         Q.  And you never provided Riverstone with

18    inaccurate information; is that fair?

19         A.  Well, I'm not aware of sharing inaccurate

20    information at all.

21         Q.  All right.  I'm going to bring up another

22    exhibit.

23              MR. CATALINA:  I'll ask my -- my colleague,

24    Joe Sparacio is attending.  I'll ask if he can please

25    put Tab 1 into "Exhibit Share."
```

[PAGES OMITTED]