EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re ALTA MESA RESOURCES, INC.<br>SECURITIES LITIGATION | §<br>§<br>§<br>§<br>§ | Civil Action No. 4:19-cv-00957<br><br>CLASS ACTION<br><br>Judge George C. Hanks, Jr. |

**ADAM BADAWI'S SUPPLEMENTAL REBUTTAL TO THE OPINIONS OFFERED BY CHARLES WHITEHEAD AND STEVEN J. PULLY**

**TABLE OF CONTENTS**

Page

I.      SCOPE OF PROJECT AND REPORT ...............................................................1

II.     CREDENTIALS ................................................................................................1

III.    SUMMARY OF REBUTTAL OPINIONS TO WHITEHEAD .........................3

IV.     REBUTTAL OF PROF. WHITEHEADS' OPINIONS ......................................7

        A.      The Conflict-Laden Nature of SPACS and Their Frequent Association
                with Financial Fraud are Leading Reasons Why SPACs are Essentially
                Dead .......................................................................................................7

        B.      Whitehead's Flawed Methodology to Determine the Preparation of
                Financial Projections in de-SPAC Transactions ...................................13

        C.      The Evidence in this Case Shows that the Behavior of the Defendants Was
                Not Consistent with Whitehead's "Custom and Practice" .....................20

                1.      Opinion 1 Ignores that Defendant Hackett was Directly Involved in
                        the Due Diligence Related to the Business Combination .........................21

                2.      The Evidence is Not Consistent with the Assertion in Opinion 2
                        That It is "Custom and Practice" for Directors to "Independently
                        Evaluat[e] Assumptions and Information Presented" ...............................22

                3.      Whitehead's Opinion 3 is Rebutted by the Evidence that Hackett –
                        an SR-II Director, and Acting Chairman of the Board – Played an
                        Active Role in Editing and Drafting the Definitive Proxy
                        Statement ...................................................................................................24

                4.      The Evidence of the Extensive Role that Hackett, the Acting
                        Chairman of the SR-II Board, Played in the Due Diligence of
                        AMR and KFM Rebuts Opinion 4 ............................................................27

                5.      The Glaring Operational Red Flags in Existence prior to March 29,
                        2018 Rebuts Opinion 5 ..............................................................................28

                6.      Acting Chair Hackett's Work in Drafting, Verifying and Revising
                        the Definitive Proxy Statement and Reliance by the Remaining
                        SR-II Directors on That Work Was Not Consistent with
                        Whitehead's Asserted "Custom and Practice" ..........................................33

                7.      SR-II's Purported Due Diligence Did Not Comport with Custom
                        and Practice ................................................................................................34

**Page**

8.      The AMR Board's Reliance on the Process Managed by AMR's Chairman (Hackett) and Several AMR Executives in Drafting, Verifying and Revising AMR's 2017 Form 10-K and each 2018 Form 10-Q Was Inconsistent with Whitehead's Asserted "Custom and Practice Because There Were Glaring Red Flags ..............................35

9.      The AMR Board's Reliance on the Process Managed by AMR's Chairman (Hackett) and Several AMR Executives in Drafting, Verifying and Revising AMR's Earnings Statements, Earnings Call Scripts and Slides Was Inconsistent with Whitehead's Asserted "Custom and Practice"................................................................37

V.      REBUTTAL OF PULLY'S OPINIONS .........................................................38

A.      Dimitrievich and McMullen Failed in Their Duties to Alta Mesa Shareholders in their Review and Signing of the 2017 Form 10-K......................38

B.      The Subject Director Defendants and the Minority Shareholder Defendants' Conduct Did Not Comply With Pully's Purported Industry Custom and Practice .................................................................................40

C.      ARM, Bayou City, and HPS Deviated from Pully's Purported Custom and Practice in Connection with Their Involvement in the Definitive Proxy .............41

## I.      SCOPE OF PROJECT AND REPORT

Co-lead counsel for the Class, Robbins Geller Rudman & Dowd LLP and Entwistle & Cappucci LLP, have retained me as an expert in this case, and I am being compensated $1,000 per hour. My compensation is neither contingent on the form or content of my opinions, nor the outcome of this action. A listing of the materials I have considered in rendering my opinions is attached as Appendix-1.

My assignment was to review the expert reports of Charles K. Whitehead and Steven J. Pully, both dated August 31, 2023, and the opinions offered in their reports. As indicated in Sections III.-V., *infra*, I believe that Messrs. Whitehead and Pully's opinions are methodologically flawed, incorrect, and otherwise disconnected from the facts in this case.

My work as a rebuttal expert for the Class is ongoing. I reserve the right to amend, modify, refine or supplement my analysis and opinions in the event I become aware of additional relevant information, evidence, arguments or analyses that may become available during the remainder of this case.

## II.     CREDENTIALS

I am Professor of Law at the University of California, Berkeley Law School (Berkeley). I joined the Berkeley faculty in 2017 after seven years on the faculty at Washington University in St. Louis, School of Law. At Berkeley, I teach Business Associations, Mergers & Acquisitions, Contracts, and seminars related to these subjects. I have published widely on corporate governance and securities law topics. My articles on these subjects have appeared in law reviews, including Michigan Law Review, California Law Review, Washington University Law Review, The Yale Journal on Regulation, the Harvard Business Law Review, the Journal of Corporation Law among others. My work has also appeared in peer-reviewed journals including the Journal of Law and Economics, the Journal of Law, Economics & Organization, the American Law and Economics

Review, and the Journal of Empirical Legal Studies. A current copy of my curriculum vitae, which includes my publications and prior testimony, is attached as Appendix-2.

I have published two books on corporate law. The first, an edited volume, is the book on Corporate Law and Economics that appears in Edward Elgar Publishing's Encyclopedia of Law and Economics (2023). The second is a casebook, Business Associations: Cases and Materials (2nd ed. 2023) (co-authored with Anthony J. Casey).

I often present my work at the invitation of other law schools and at competitive submission conferences. In recent years I have presented at the University of Chicago Law School, Columbia University Law School, Northwestern Law School, University of Southern California, Gould School of Law, the University of Amsterdam, and ETH Zurich among others. I have had multiple papers accepted for presentation at the two of the most competitive conferences for corporate law: the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies.

I have engaged in extensive service to the profession. I am a past Co-President of the Society of Empirical Legal Studies, I was on the editorial board for the International Review of Law and Economics. I have served on the paper selection committees for both the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies. I also frequently referee papers for the top peer-reviewed journals in law and economics including the Journal of Law and Economics, the Journal of Law, Economics & Organizations, the Journal of Legal Studies, and the American Law and Economics Review.

Prior to entering the legal academy, I was a litigation associate in the San Francisco office of Munger, Tolles & Olson LLP. I worked on corporate fiduciary litigation, complex commercial litigation, and served as counsel to multiple special committees of the boards of publicly listed companies. When working for special committees, I helped to draft the final reports those

committees prepared and engaged in discussions about how to disclose the results of the committees' work in the companies' public disclosures.

I have written expert reports and had my testimony taken in depositions and in arbitration hearings as an expert. A list of my expert engagements in the past four years appears in Appendix-2.

## III.    SUMMARY OF REBUTTAL OPINIONS TO WHITEHEAD

Professor Whitehead's over-view of SPACs and de-SPACs makes no mention of the academic research and commentary on the conflict-laden incentive structure for participants in SPAC's, as well as the history of "blank-check-companies" and the increased level of fraud associated with such transactions in the last six years. They have resulted in multiple SEC investigations, securities class actions, and Delaware fiduciary suits that have been successful. These risks have contributed to the near-complete disappearance of SPACS.

Opinion I is flawed because it uses an improper methodology. Whitehead has not established (and could not establish) whether any persons other than the "target" were involved in the development of "de-SPAC financial projections" with respect to the 98 companies he selected as the basis of his "empirical" study.[1] Whitehead claims no personal knowledge or inside information of how those projections were prepared and the public disclosures he relies present incomplete, and sometimes misleading, accounts of how projections get generated. This very case shows why this methodology is flawed. There is ample evidence that Silver Run II ("SR-II") took an active role in the preparation of the projections for Alta Mesa Holdings, LP ("AMH") and

---

[1]    As discussed below, Whitehead's analysis of target-prepared projections is limited to the de-SPACs that included projections. That limits the sample to 81 transactions. *See* Whitehead Report, Appendix C ("2023.08.31 Empirical Results for Sample de-SPACs.xlsx").

Kingfisher Midstream, LLC ("KFM"). Yet the Definitive Proxy Statement sent to shareholders omitted these facts and claimed that the projections were prepared by the target.

In addition, the Report's empirical analysis, which Whitehead relies on, in part, for Opinion I uses a flawed methodology. These flaws lead to an inaccurate and misleading picture of the supposed "custom and practice" in other de-SPAC transactions. Of the 68 de-SPAC transactions where the report claims the projections were "solely" prepared by the target, at least 8 of these are plainly incorrect. A more complete review of the relevant disclosures shows that the sponsors of these de-SPACs played an active role in the preparation of these transactions. These mistakes reveal that the methodology and the application of that methodology lead to an inaccurate and incomplete picture of the preparation of projections in de-SPAC transactions.

Whitehead claims that it is the "custom and practice" of public company directors to delegate diligence, the preparation of public disclosures, and related matters to officers and financial advisors in the absence of red flags. Even if these are the "custom and practice" in these areas, it is irrelevant in this case. There is ample evidence that the directors in this case deviated from the "custom and practice" that Whitehead asserts. And, as one would expect when a public company slashes projections in its *very first public earnings announcement*, there were bright red flags about the difference from what the public disclosures stated and the reality on the ground.

As I discuss in more detail below, there is significant evidence that each of Whitehead's opinions is flawed because it is inconsistent with the "custom and practice" Whitehead asserts.

Opinion 1:  SR-II's Chairman of the Board, James Hackett, was directly involved in the due diligence for the business combination and could not have reasonably relied upon on information, reporting or control systems managed by or under the direction of the officers of AMH or KFM. Further, the other members of SR-II's board of directors failed to "independently evaluate" the assumptions and information presented by the officers of AMH and KFM in

connection with the business combination.[2] These facts are inconsistent with Whitehead's "custom and practice" opinions.

Opinion 2: Whitehead's opinion about the general practice of corporate directors states that directors should only "rely upon the advice of management and the company's officers and advisors," if they "independently evaluate assumptions and information presented."[3] That opinion is irrelevant here because there is evidence that some of the directors of SR-II, including defendants Gutermuth, Tepper, and Walters, failed to independently evaluate the assumptions and information presented about the proposed business combination.

Opinion 3: Defendant Hackett, SR-II's Acting Chairman of the Board, directly participated in due diligence of both AMH and KFM. Accordingly, Hackett's conduct was outside of Whitehead's definition of "custom and practice" regarding the roles of directors in drafting of de-SPAC proxy statements.

Opinion 4:  Defendant Hackett, the Acting Chairman of the Board of SR-II, was directly involved in the analysis and assessment of AMH and KFM. Accordingly, Hackett's conduct was outside of Whitehead's definition of "custom and practice" regarding the roles of directors, and "other representatives."

Opinion 5: Defendants Hackett, Leuschen, Lapeyre, Walters, Sinclair, Chappelle, Tepper, Ellis, Smith, Coats and Walker, and Gutermuth had direct knowledge of "red flags" with respect to AMR's operations prior to March 29, 2018. Accordingly, it was inappropriate for each of them

---

[2]   *See* Expert Report of Professor Charles Whitehead ("Whitehead Report"), ¶58.

[3]   Whitehead Report, ¶58 (citing Cunningham, Lawrence A., et al., "Governance and Disclosure Reminders for Public Companies," Harvard Law School Forum on Corporate Governance, April 18, 2023, available at https://corpgov.law.harvard.edu/2023/04/18/governance-and-disclosure-reminders-for-public-companies).

to rely on any process managed by AMR's senior management with regard to the drafting, verifying and revising of information contained in the Company's public disclosures.

Opinion 6. SR-II's Board relied on Hackett's (SR-II's Chairman of the Board) processes for the drafting, verification and revision of the Definitive Proxy Statement. Mr. Hackett was personally aware of numerous "red flags" associated with various assertions contained in the Definitive Proxy Statement. With regard to Whitehead's reference to a process that included Meridian, Rock Oil and Ernst & Young LLP ("E&Y"), only Meridian was listed in the defendants' Rule 26(a)(1) disclosures as persons with information relevant to the Defendants' "good faith" defense.[4] Meridian testified that it "did nothing," were not asked to render an opinion, and did not provide one. Neither Rock Oil nor E&Y were deposed in this case – presumably because Defendants have not identified them as persons with relevant knowledge as to their "good faith" defenses – and thus I have no way of testing Whitehead's assertions relating to those entities.

Opinion 7. A cursory review of the evidence in this action reveals that SR-II's due diligence of AMH and Kingfisher was well outside Whitehead's definition of "custom and practice."

Opinions 8 & 9:  As Whitehead concedes, it is "custom and practice" for directors to rely on a process managed by a company's officers for the preparation and dissemination of quarterly and annual results only in the absence of red flags. Hackett, Chappelle, Ellis, Cole, Smith, Leuschen, Lapeyre, McMullen, Dimitrievich, Tepper, Walters and Sinclair were directly aware of so many "red flags" that it would have been inappropriate for anybody to rely on what Chappelle, Ellis, Cole and Smith had to say about any Class Period disclosures after February 8, 2018.

---

[4]  *See* Defendants' Supplemental Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) (May 24, 2023).

## IV.    REBUTTAL OF PROF. WHITEHEADS' OPINIONS

### A.    The Conflict-Laden Nature of SPACS and Their Frequent Association with Financial Fraud are Leading Reasons Why SPACs are Essentially Dead

Professor Whitehead's report ignores the conflict-laden nature of the SPAC structure. These conflicts have been the basis for SEC investigations, securities class actions, and Delaware fiduciary lawsuits that have produced substantial settlements. The SEC's concerns about the rules that govern SPACs has led to proposed regulations that would harmonize SPAC rules with the laws governing the transaction that the de-SPAC seeks to mimic, an initial public offering.[5] The alleged fraud that SPACs invite, the calls and proposals for stricter regulation of SPACs, and the abysmal financial performance of SPACs have led to the near-disappearance of SPACs from the financial marketplace.[6] This Section begins with a brief overview of the structure of SPACs and then details how the inherent conflicts in SPACs can engender fraudulent behavior.

A SPAC is a "blank-check" company that raises funds from an IPO.[7] A SPAC typically has a "sponsor," which can be a private equity fund, a hedge fund, executives, or, as became common during the SPAC boom, a well-known athlete or celebrity.[8]  After the IPO, the SPAC

---

[5]    *See* SEC, "Special Purpose Acquisition Companies, Shell Companies, and Projections," Proposed Rule, Securities Act Release No. 33-11048, March 30, 2022 (explaining that it was motivated by, among issues, "concerns about potential conflicts of interest between sponsors and retail investors, and the effectiveness of the disclosures provided in these transactions.") at p. 16.

[6]    *See* Baily Lipschultz, "Zero SPAC Offerings Since August with Market Gone Cold," Bloomberg, October 3, 2023 (detailing a "a roughly 95% drop from this point last year"). Baily Lipschultz and Jeremy Hill, "The SPAC Fad is Ending in a Pile of Bankruptcies and Fire Sales," Bloomberg Businessweek, February 28, 2023 ("a growing number of ventures that went public [through SPACs] have gone bankrupt, highlighting how speculative the SPAC game could be.").

[7]    *See* SEC, "Special Purpose Acquisition Companies, Shell Companies, and Projections," Proposed Rule, Securities Act Release No. 33-11048, March 30, 2022, p. 9.

[8]    *Id.* at 181 (detailing institutional involvement in SPAC sponsorship). Matthew Goldstein and Lauren Hirsh, "Athletes Pitch Wall Street's Hot New Toy, but Not Just to Their Fans," The New York Times, March 26, 2021. Celebrity involvement in SPACs led the SEC to issue an investor alert that warned "sponsors may have conflicts of interest so their economic interests in the SPAC

will typically have 18 to 24 months to find a potential operating company that it can acquire.[9] If it

finds an appropriate target, it will attempt to acquire it in a "de-SPAC" transaction.[10] The SPAC

will use the funds it raised in the IPO, and potentially funds from other sources, to consummate

the de-SPAC transaction.[11]

The root of the conflicts in SPACs is the significant mismatch in the compensation for

SPAC sponsors and the returns for ordinary SPAC investors.[12] Ordinary investors in the SPAC

typically receive "units" that consist of one SPAC Class A common stock share and a fractional

share of a warrant.[13] A whole warrant entitles the holder to acquire one share of Class A common

stock of the entity that results from the de-SPAC transaction at an exercise price (often $11.50)

that is above the IPO price (usually $10).[14] If a de-SPAC transaction occurs, SPAC unit investors

have the choice of receiving a single class A in the combined entity or redeeming that share for a

---

may differ from shareholders." SEC, Investor Alert-Celebrity Involvement in SPACs, March 10, 2021. *See also* BCEM_0119789 (Chappelle noting the "potential positives of the SPAC," including "[n]ame recognition and implied valuation of our assets/team/story ('Hackett halo')"; BCEM_0132796 (BCE partner noting "[r]egardless of whether the traditional IPO or SPAC route is chosen …. it may make sense to float this by Hackett since he is likely focused on Day 1 scale and is able to fully exploit the 'Hackett halo' with respect to expanded multiples.").

[9]   *See* Michael Klausner, Michael Ohlrogge, and Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. on Reg. 228 (2022) at p. 237.

[10]   *Id.* at p. 238 n. 20.

[11]   *Id.* at p. 238-39.

[12]   *Id.* at p. 234.

[13]   *See* Vinson & Elkins LLP, "Special Purpose Acquisition Companies: An Introduction," Harvard Law School Forum on Corporate Governance, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/ (accessed on October 17, 2023).

[14]   *Id.*

pro-rata portion of the proceeds in the SPAC's trust account.[15] That will typically be for an amount that equals the IPO price plus interest.[16] The returns for ordinary investors who choose to keep shares in the combined entity depends on stock price performance of the combined entity.

The bulk of compensation for SPAC sponsors will typically be from its "founder shares" (often referred to as the "promote"). The sponsor purchases these Class B shares for a nominal amount.[17] If a de-SPAC transaction occurs, the Class B shares convert into Class A shares and usually represent 20% of the outstanding Class A shares at the time of the IPO.[18] The sponsor thus receives a giant windfall if it consummates a de-SPAC transaction.[19] While the value of those shares may decrease if the firm performs poorly, the sponsor still gains much more than it would if the SPAC fails to find a merger target within allotted time period.[20] If the time to find a merger target expires, the sponsor will lose much of its initial investment in the SPAC. The founder shares,

---

[15]  *Id.*

[16]  *Id.*

[17]  *See* Michael Klausner, Michael Ohlrogge, and Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. on Reg. 228 (2022) at p. 232.

[18]  *See* Vinson & Elkins LLP, "Special Purpose Acquisition Companies: An Introduction," Harvard Law School Forum on Corporate Governance, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/ (accessed on October 17, 2023).

[19]  *See* Feng et al., *The Incentives of SPAC Sponsors*, working paper at 2, 2023, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4069007.

[20]  *Id.* ("for deals that perform poorly after the de-SPAC, the sponsors may still receive a windfall in the form of their promote shares while the SPAC shareholders suffer substantial losses."). *See also* Blankespoor, Elizabeth, et al., "A Hard Look at SPAC Projections," Management Science, Vol. 68, No. 6, June 2022, pp. 4742–4753, 4742 ("the sponsor receives deeply discounted ownership shares when it completes a merger and stands to earn substantial profits even if the company's shares lose value after the merger"); Amanda M. Rose, *SPAC Mergers, IPOs, and PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage*, 64 William & Mary L. Rev. 1757, 1775 (2023) ("SPAC sponsors' promote and their warrants will be rendered worthless if the SPAC liquidates, so they have an incentive to recommend de-SPAC transactions even if they are value destroying for SPAC investors.").

and any other investment the sponsor has in the SPAC, expire as worthless.[21] The stakes are thus high for the sponsor. If it successfully finds and consummates a de-SPAC transaction with a target, it will own upwards of 20% of a public company. If it fails, its entire investment will essentially be lost.

The consummation of most de-SPAC transactions requires a successful vote of the SPAC shareholders.[22] Those votes will typically require issuing a proxy, which is a process governed by federal securities laws and regulations. That process involves a filing of the proxy with the SEC, review and comment by the SEC, followed by distribution of the proxy to shareholders.[23]

The proxy will usually include information about the merger target's business and financial performance.[24] As many commentators have noted, one of the allures of the SPAC form is a perception that it permits more latitude to include financial projections in disclosures.[25] And that

---

[21] *Id.* ("if the SPAC fails to complete a deal within the allotted time (usually two years after its IPO), the SPAC is liquidated, outside investors are made whole, and SPAC sponsors get essentially nothing.").

[22] *See* Vinson & Elkins LLP, "Special Purpose Acquisition Companies: An Introduction," Harvard Law School Forum on Corporate Governance, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/ (accessed on October 17, 2023) (noting that stock exchange rules require a shareholder vote "if more than 20% of the voting stock of the SPAC is being issued in the [d]e-SPAC transaction.").

[23] *Id.*

[24] *Id.*

[25] *See, e.g,* Michael Klausner, Michael Ohlrogge, and Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. on Reg. 228, 234 (2022); Blankespoor, Elizabeth, et al., "A Hard Look at SPAC Projections," Management Science, Vol. 68, No. 6, June 2022, pp. 4742–4753, 4742 ("Practitioners suggest a possible reason for this increased interest is that SPACs enable firms going public to focus more on forward-looking information") (citing Ryan, B. SPACs – They're back. CFO. Available at: https://www.cfo.com/capital-markets/2020/12/special-report-spacs-theyre-back); Michael Dambra, Omri Even-Tov, Kimberlyn Munevar, Are SPAC Revenue Forecasts Informative? 98 *The Accounting Review* 1, 3 (2023) ("SPACs exploit a loophole by offering private companies a way to go public and provide [forward looking statements].").

perception is borne out in the data. De-SPAC disclosures frequently share projections with investors.[26]

There is evidence that the need to minimize redemptions and the requirement of a successful shareholder vote can lead to inflated projections of the target's future financial performance. Studies that compare de-SPAC projections to actual post-merger performance routinely show that these projections are too optimistic. One study shows that 65% of de-SPACs underperform the projections they released to shareholders in advance of the shareholder vote.[27] These studies also show that retail shareholders are particularly susceptible to optimistic projections.[28]

The incentive to inflate the projected performance of the post-merger entity has led to multiple allegations of fraud and other illegal behavior. The SEC has charged multiple SPACs with deceiving shareholders in proxy statements.[29] De-SPACs have also been a magnet for securities class action litigation. One study reports that about 17% of completed de-SPAC

---

[26]   *See* Michael Dambra, Omri Even-Tov, Kimberlyn Munevar, Are SPAC Revenue Forecasts Informative? 98 *The Accounting Review* 1, 2 (2023) ("Approximately 81 percent of our sample includes revenue forecasts in their investor presentations.").

[27]   *See* Blankespoor, Elizabeth, et al., "A Hard Look at SPAC Projections," Management Science, Vol. 68, No. 6, June 2022, pp. 4742–4753, 4743 ("we find that firms meet only 35% of the forecasts").

[28]   *See* Michael Dambra, Omri Even-Tov, Kimberlyn Munevar, Are SPAC Revenue Forecasts Informative? 98 *The Accounting Review* 1, 3 (2023) ("[W]e find that retail investors engage in larger net buying as a function of the [the optimism of projections] surrounding the merger announcement.").

[29]   *See* Brenneman et al. "SEC Brings SPAC Enforcement Action and Signals More to Come," Cleary Gottlieb, July 16, 2021, available at https://www.clearyenforcementwatch.com/2021/07/sec-brings-spac-enforcement-action-and-signals-more-to-come/ (detailing settled charges against a SPAC for failing to disclose material information). SEC Press Release, "Post-SPAC Music Streaming Company Reaches $38.8 Million Settlement in Ongoing Fraud Action," available at: https://www.sec.gov/news/press-release/2021-216.

transactions are the subject of a securities class action and about 75% of those cases involve allegations of false statements about future projections.[30] There have also been challenges to de-SPAC transactions that assert claims under Delaware fiduciary principles. In the *Multiplan* case, Vice Chancellor Will determined that the inherent conflicts of interest between SPAC sponsors and SPAC shareholders warranted the application of the "entire fairness" standard of review, which is the strictest level of scrutiny applied under Delaware corporate principles.[31] That case settled for $33.75 million.[32] Several other SPAC cases have been filed in Delaware and litigation remains pending.[33]

In addition to enforcement actions, the concerns about inflated, and potentially fraudulent, SPAC projections have caught the attention of SEC regulators. After releasing guidance on SPACs five times after December 2020, the SEC sought to eliminate the differences between traditional IPOs and de-SPAC transactions.[34] In an effort to "regulate SPACs more intensely" the SEC has proposed a rule that would, among other regulations, harmonize de-SPAC rules on projections

---

[30]   *See* Michael Dambra, Omri Even-Tov, Kimberly Munevar, Are SPAC Revenue Forecasts Informative? 98 *The Accounting Review* 1, 12 (2023).

[31]   *In Re MultiPlan Corp. Stockholders Litigation*, C.A. No. 2021-0300-LWW (Del. Ch.) at 3. ("The entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction.")

[32]   Multiplan Press Release, "Multiplan Corporation Announces Settlement of Delaware Litigation," November 17, 2022, available at https://investors.multiplan.us/latest-news/news-details/2022/MultiPlan-Corporation-Announces-Settlement-of-Delaware-Litigation/default.aspx.

[33]   *See* American Bar Association, Business Law Section, "SPAC Litigation Mid-Year Update: Delaware Opens the Gates," June 23, 2023 available at https://businesslawtoday.org/2023/06/spac-litigation-mid-year-update-delaware-opens-gates/#:~:text=SPAC%20Litigation%20by%20the%20Numbers,in%20the%20previous%20two%20years.

[34]   *See* SEC, "Special Purpose Acquisition Companies, Shell Companies, and Projections," Proposed Rule, Securities Act Release No. 33-11048, March 30, 2022, p. 15.

with the rules that govern IPOs and would obligate additional disclosure of additional information about any projections released in de-SPAC disclosures.[35]

The combination of allegations of fraud, abysmal financial performance, and the prospect of increased regulation has turned SPACs into an endangered species.[36] Some commentators have suggested that SPACs pose such a danger that the SEC's proposed rule would not go far enough to eliminate the trap that they pose.[37]

### B.   Whitehead's Flawed Methodology to Determine the Preparation of Financial Projections in de-SPAC Transactions

Whitehead uses a review of the disclosures in 98 de-SPAC transactions to form his opinion of "custom and practice" of how the projections that appear in those disclosures are prepared.[38] There are at least three reasons why this method does not produce reliable evidence of custom and practice in de-SPAC transactions. First, and most importantly, the information that SPACs choose to release in a proxy or Form S-4 does not always present a complete picture of how they prepared financial projections. The best evidence of that is *this very case*. The SR-II Definitive Proxy Statement asserts that only the targets, AMH and KFM, were involved in the preparation of the

---

[35]  *Id.* at p. 16.

[36]  *See* Baily Lipschultz, "Zero SPAC Offerings Since August with Market Gone Cold," Bloomberg, October 3, 2023 (detailing a "a roughly 95% drop from this point last year"). Baily Lipschultz and Jeremy Hill, "The SPAC Fad is Ending in a Pile of Bankruptcies and Fire Sales," Bloomberg Businessweek, February 28, 2023 ("a growing number of ventures that went public [through SPACs] have gone bankrupt, highlighting how speculative the SPAC game could be.").

[37]  *See* Holger Spamann & Hao Guo, *The SPAC Trap: How SPACs Disable Indirect Investor Protection*, 40 Yale J. on Reg. 75, 85-86 ("SPACs may not have been designed to trap unsophisticated investors while enriching sophisticated sponsors and investors. But such a trap has regrettably become a feature of modern SPACs. The SEC's recent proposal on SPACs does not directly address this nefarious dynamic, and the SEC may lack statutory authority to do so.")

[38]  Whitehead Report at pp. 15-25.

financial projections for the combined entity.[39] Had Whitehead's research team coded the SR-II transaction based on the Definitive Proxy Statement, they likely would have put it into the group of de-SPAC transactions where the target prepared the financials. But there is extensive evidence that persons other than the target influenced and otherwise affected the financial projections in this de-SPAC transaction.

That evidence shows that SR-II took an involved role in the de-SPAC projections. In August, 2017 AMH began to rework its projections because it discovered that its existing projections would run afoul of covenants imposed by its lenders.[40] The resulting model produced by AMR's Senior Financial Analyst showed a $300 million 2018 EBITDA projection for AMH.[41] Learning this, defendant Chappelle writes that "$300 million is too low for the valuation we have."[42] Tamara Alsarraf (Sheils), AMH's Senior Financial Analyst, expresses a willingness to work on the 2018 projection, but Chappelle says that he will "be talking this over tomorrow morning with Jim so you may want to wait until I get some feedback from that."[43] During her deposition, Alsarraf stated that she understood "Jim" to refer to Hackett at Riverstone (the SR-II sponsor).[44] After that meeting, Chappelle writes to Alsarraf: "OK superwoman, it looks like we need a $350 million scenario. Give us some strawman…"[45] The next day, presumably after trying to make this model work, Alsaraff laments "[Hal Chappelle] may be mad at me. [Because]

---

[39]   *See* CP-0053 at p. 172.

[40]   *See* CP-0190 at AMR_SDTX01144948.

[41]   *Id.* at AMR_SDTX01144949.

[42]   *Id.*

[43]   *Id.*

[44]   Sheils Trans. at 170:12-171:2.

[45]   *See* CP-0190 at AMR_SDTX01144949.

yesterday he was trying to get me to do a model that shows $350MM EBITDAX, but I have all these other constraints, so I was like AAAAAAH IT CANT BE DONE."[46]  Several days later, Citigroup reaches out to Alsarraf and asks "What other levers do we have to goose the 18 forecast besides rig count?"[47]

There is also evidence that the KFM projections were subject to outside influence. Communications suggest that KFM relied upon AMH production volumes to model KFM's projections, and that JP Morgan had a substantial role in their development as well.[48]  Upon learning the extent of the input that JP Morgan had over the projections, Defendants McMullen, the founder and managing partner of Defendant Bayou City (part of the selling group) states: "Completely unacceptable."[49]

Moreover, defendant Hackett has admitted: "We used [Citigroup's] mid midstream numbers throughout the various roadshows and no one at Citi or KFM bothered to say 'wait', the number for '18 will be much lower than we originally projected back in May and then again in August of ['17]. I am very disappointed."[50] He continues: "Fortunately, we had internal models that were less aggressive than Citi's numbers in calculation for returns for [Riverstone], but that doesn't help the public shareholders who bought in after some or our original SPAC buyers rotated out. The shareholder base will likely react very negatively to the drop in midstream EBITDA guidance for '18."[51] Hackett's reference to the roadshow 2018 KFM projections made in the

---

[46]  *See* CP-0480.

[47]  *See* CP-0191 at AMR_SDTX00048280.

[48]  *See* CP-0551 at BCEM_0062840-41. *See also* Sheils Trans. at 92:18-93:7.

[49]  *Id.* at BCEM_0062840.

[50]  *See* RIVERSTONE_SDTX00320552-55, at 53

[51]  *Id.*

Definitive Proxy Statement shows that those projections were based on Citigroup's work, not the target, KFM.[52]   It also reflects Hackett's acquiescence to inclusion of projections that he knew were overstated.[53]

This evidence shows that the projections in this case were not prepared "solely" by the targets. This mismatch between the information in the Definitive Proxy Statement and the actual evidence of the preparation of AMR and KFM's unaudited financial projections also demonstrates the flaws with Whitehead's methodology. Without personal knowledge of each of the 98 transactions that are the subject of his analysis or without access to inside information about those transaction, it is impossible to conclude one way or another that persons other than the target were involved in the preparation of the financial projections in the de-SPAC transaction. Whitehead does not claim to have personal knowledge of any of these transactions nor does he claim to have that inside information. Instead, the analysis relies only on a review of publicly available SPAC's disclosures, which this case demonstrates are not reliable. Without the sort of detailed information that is available in this case, it is impossible to use public filings as a definitive statement about the degree of sponsor involvement in the preparation of projections in a de-SPAC transaction.

The methodology is deficient for a second reason. Whitehead directed his team to review only a small portion of the relevant disclosures to determine whether the target was "solely" responsible for the preparation of projections. As the report explains, Whitehead "had the Team review the introductory information provided about the financial projections to identify who

---

[52]   *Id.*

[53]   As later detailed herein, Hackett collaborated with Citigroup with respect to its work during the roadshows that formed the basis for the projections included in the Definitive Proxy Statement. *See, e.g.,* RIVERSTONE_SDTX00026387 (Citigroup "should only work thru me [Hackett] on changes to content.").

prepared the projections."[54] There are two primary problems with this approach.[55] The first is obvious. Without reviewing the entirety of the disclosures, it is not possible to conclude what the disclosures say about the preparation of the projections without examining the entirety of those disclosures. As discussed below, de-SPAC disclosures can and do discuss the preparation of projections in sections other than "the introductory information provided about the financial projections." The second reason is the potential misreading of the text of the relevant section. Whitehead does not supply the guidance that he provided to his team to categorize his text. But that guidance was deficient because it produced incorrect results. There are multiple instances where the Report classifies projections as solely prepared by the target when a review of "the introductory information provided about the financial projections" shows exactly the opposite. As a result of these deficiencies, I identify at least eight instances where the Report includes incorrect and misleading information. These errors demonstrate that the methodology used to identify the custom and practice of the preparation of financial projections by the target in de-SPAC transactions is not reliable and, thus, Whitehead's opinions based on his flawed methodology should be disregarded.

I identify four instances where Whitehead classifies the SPAC projections as solely prepared by the target, yet the de-SPAC disclosure discusses the sponsor's involvement in the preparation of transactions in a section other than the "the introductory information provided about the financial projections." Those cases are:

---

[54]   Whitehead Report, ¶47.

[55]   To develop the evidence in this section, I directed a research assistant to review the relevant disclosures for the 68 de-SPAC where the Whitehead team classified the projections as prepared "solely" by the target. Given the length of these disclosures and time constraints, this review cannot claim to be exhaustive. Rather, the misclassified cases we identify should be regarded as a lower bound on the number of misclassifications.

☐ FGL/CF Corp. In the section "Additional CF Corp Prepared Forecasts," the document explains "In addition to the forecasts for FGL set forth and discussed above under '— Certain FGL Forecasts,' ***CF Corp. management prepared the Adjusted FGL Forecasts***."[56]

☐ Gores I/Hostess Brands. The section "Additional Company-Prepared Projected Financial Information" states "***The projections were prepared by, and are the responsibility of, the Company***." The beginning of the proxy explains that "the company" is Gores ("Gores Holdings, Inc., a Delaware corporation ('*we*,' '*us*,' '*our*' or the '*Company*'")).[57]

☐ M III Acq/ IEA. The "Additional Projected Financial Data" section discusses SPAC-prepared projections.[58]

☐ Monocle Acq/AerSale. The section "The Monocle Board's Reasons for the Approval of the Business Combination" explains that "Monocle's Board also ***considered certain historical and projected financial information prepared by management, in collaboration with AerSale Management and representatives***."[59]

These four examples are the minimum number of errors produced by Whitehead's flawed methodology because time constraints did not allow a complete review of the entirety of the disclosures. It is possible that there were additional instances of collaboration in projections that this review did not identify.

I identify four other cases where the "the introductory information provided about the financial projections" explains that the sponsor was involved in the preparation of the projections even though the Report mistakenly classifies them as prepared "solely" by the target. Whitehead

---

[56]  https://www.sec.gov/Archives/edgar/data/1668428/000157104917006940/t1702051-defm14a.htm

[57]
    https://www.sec.gov/Archives/edgar/data/1644406/000119312516743593/d230057ddefm14a.htm

[58]
    https://www.sec.gov/Archives/edgar/data/1652362/000104746918000682/a2234428zdefm14a.htm

[59]  https://www.sec.gov/Archives/edgar/data/1754170/000110465920115661/tm2025456-9_def14a.htm

does not discuss the details of how he instructed his team to review this section beyond the quote given above. Whitehead's guidance to his team failed in the following cases:

☐ Gores III/ PAE. In the section "Certain Company Projected Financial Information," the Definitive Proxy states, "The projections were requested by, and disclosed to, the Company for use as a component in its overall evaluation of Shay. Following their disclosure, *the Company and Shay, along with their respective advisors, updated the projections that were disclosed to the Company to reflect revised views on near-term performance*, Shay's pipeline, and long-term industry growth rates for each segment based on diligence."[60]

☐ Pensare Acq/Stratos Management Systems. In the section, "Certain Computex Projected Financial Information" the Definitive Proxy summarizes a set of "Telco Projections *prepared by Pensare management*."[61]

☐ Hennessy II/Daseke. In the section "Certain Company Projected Financial Information," the Definitive Proxy explains that one set of projections consisted of: "five-year financial forecast information regarding Daseke's anticipated future operations for the years ending December 31, 2016 through December 31, 2020, which was based on *Hennessy Capital's due diligence of Daseke and extrapolations from Daseke's financial forecasts* for the years ending December 31, 2016 and 2017 and assumed Daseke's Adjusted EBITDA thresholds were met to achieve the earn-out for the years ending December 31, 2017, 2018 and 2019."[62]

☐ Industrea Acq/CPH. In the section "Certain CPH Historical and Projected Financial Information," the proxy explains that "[f]ollowing the provision of [target-prepared projections], *Industrea's management team collaborated with CPH management to create certain pro forma historical and projected information set forth in the table below.*"[63]

---

[60]
https://www.sec.gov/Archives/edgar/data/1720821/000119312520014348/d834494ddefm14a.htm

[61]
https://www.sec.gov/Archives/edgar/data/1704760/000104746920000860/a2240743zdef14a.htm

[62]
https://www.sec.gov/Archives/edgar/data/1642453/000121390017000988/defm14a_hennessy.htm

[63]   https://www.sec.gov/Archives/edgar/data/1703956/000114420418060929/tv507660-defm14a.htm

These examples of misclassifications show that the methodology used by Whitehead is deficient because it did not produce accurate results. And these are the cases where there is no question about the misclassifications. Our review produced additional cases where the language was ambiguous and a determination could not be made one way or another.

Finally, the academic sources that the Whitehead Report cites do not establish the custom and practice that Whitehead claims. The Whitehead Report relies on an academic article on the failure of the average de-SPAC transaction to meet its financial projections.[64] The Whitehead Report quotes the following from a footnote in the article: "Per conversations with multiple practitioners, the target firm's management, not the sponsor, originates the projections."[65] This information says nothing about whether the target was the sole source of information of the projections.[66] That the target originated the projection poses no obstacle to the sponsors influencing or adjusting those projections. As the evidence above shows, sponsors frequently intervene with projections that purportedly originated with the target.

### C.  The Evidence in this Case Shows that the Behavior of the Defendants Was Not Consistent with Whitehead's "Custom and Practice"

Whitehead claims that it is "custom and practice" for public company directors to delegate information production to others unless there are red flags in some instances.[67] He claims that the

---

[64]  *See* Whitehead Report at pp. 22 n.75 (citing Blankespoor, Elizabeth, et al., "A Hard Look at SPAC Projections," Management Science, Vol. 68, No. 6, June 2022, pp. 4742–4753 (finding that only 35% of SPAC mergers meet projections)).

[65]  *Id.* at p. 23 n.77.

[66]  The authors of the article also report that "we find that the projection wording in a randomly selected 10% of our sample indicates that the target firm management provided the projections to the sponsor in connection with its consideration of the potential business combination." This statement, which does not provide a framework for categorization or a description of how much of the proxy was searched, does not establish that the projections were solely prepared by the target.

[67]  Whitehead Report, ¶¶87-89. Whitehead defines red flags as a significant, undisclosed matter. Id. at 27 (citing American Bar Association Committee on Corporate Laws, "Corporate Director's

directors of a SPAC in a de-SPAC transaction rely on target management for projections[68] [Opinion 1] and he asserts that public company directors rely on the company's management for information production and related public company reporting functions in the absence of red flags [Opinions 2-5].[69] He then opines that SR-II acted in a manner consistent with this "custom and practice" prior to the de-SPAC transaction and that the Alta Mesa Resources, Inc. ("AMR") board also acted in a manner consistent with this "custom and practice" after the consummation of the transaction (Opinions 6-9).[70] These opinions are all irrelevant. The evidence in this case shows that SR-II's Acting Chairman, Hackett, was actively involved in the preparation of projections, the due diligence process, and the preparation of the Definitive Proxy Statement associated with the de-SPAC transaction. The evidence also shows that there were bright red flags about the difference between the optimistic information released to investors and the reality of AMH's woeful performance once it went public.

> 1.    **Opinion 1 Ignores that Defendant Hackett was Directly Involved in the Due Diligence Related to the Business Combination**

Defendant Hackett served as a Board Member of SR-II and was the Acting Chairman.[71] As explained here and below in Sections IV.C.2.-4., there is evidence that Hackett influenced the

---

Guidebook: Sixth Edition," The Business Lawyer, Vol. 66, No. 4, August 2011, pp. 975–1065 at 991–992, 1022–1023.

[68]   *Id.*, ¶¶86-87.

[69]   *Id.*, ¶¶87-89.

[70]   *Id.*, ¶¶89-96. *See also* Section IV.C.3., *infra.*

[71]   *See* RIVERSTONE_SDTX00144100-02 (email and draft SR-II Board Minutes); RIVERSTONE_SDTX00207002 (signature pages for unanimous written consent of SR-II board. Hackett signs as SR-II board member); RIVERSTONE_SDTX00207497 (Hackett listed as SR-II board member and identified as acting as the Chairman); RIVERSTONE_SDTX00207502 (same).

projections that were used in the Definitive Proxy Statement and the roadshow. The documentary evidence shows that Hackett directly influenced AMR's 2018 EBITDA projection. After a conversation between defendant Chappelle and Hackett, for example, Chappelle instructed his Senior Financial Analyst as follows: "OK superwoman, it looks like we need a $350 million scenario. Give us some strawman…"[72] This evidence is sufficient to show that the projections in this case were not prepared solely by the targets. Accordingly, Whitehead's opinion that it is "custom and practice" to rely completely on the target for this work is incorrect and has no connection to the facts of this case.

## 2.   The Evidence is Not Consistent with the Assertion in Opinion 2 That It is "Custom and Practice" for Directors to "Independently Evaluat[e] Assumptions and Information Presented"

Whitehead asserts that it is "custom and practice" for directors to "rely upon the advice of management and the company's officers and advisors," as long as they "independently evaluate assumptions and information presented."[73] There is evidence that the other directors of SR-II, defendants Gutermuth, Tepper, and Walters, failed to independently evaluate the assumptions and information presented about the proposed business combination.

The inaction of the other defendants was inconsistent with the purported "custom and practice" of "independently evaluat[ing] assumptions and information presented."[74] For instance, Gutermuth stated he had no role in due diligence – it was conducted by "Olivia and her team

---

[72]   *See* CP-0190 at AMR_SDTX01144949.

[73]   Whitehead Report, ¶58 (citing Cunningham, Lawrence A., et al., "Governance and Disclosure Reminders for Public Companies," Harvard Law School Forum on Corporate Governance, April 18, 2023, available at https://corpgov.law.harvard.edu/2023/04/18/governance-and-disclosure-reminders-for-public-companies).

[74]   *Id.*

[reference to Riverstone Holdings deal team] and TPH …"[75] Gutermuth could not recall whether he asked any questions of Hackett regarding the proposed transaction and had no specific recollection of Tudor Pickering's ("TPH") presentation during a July 21, 2017 SR-II board meeting.[76] In addition, he testified that he had no idea what the term "oil in place" meant.[77]

Director/Defendant Tepper could not specifically recall what he did in due diligence.[78] Tepper had no knowledge who was responsible for conducting due diligence.[79] Tepper had no specific recollection regarding the due diligence process, including that regarding the unaudited financial projections.[80] Tepper had no specific recollection of questioning anybody regarding the 250 EUR assumption, and had no knowledge what an EUR even meant.[81] Regarding the 12-WPS (or "downspacing") assumption, Tepper had no knowledge how AMH estimated the projected 4000+ primary drilling locations.[82] Tepper was unable to testify to any conversations he had with SR-II's acting Chairman, Hackett, or any other member of the SR-II's board about the downspacing assumption built into AMH's 2018 EBITDA projection.[83]

---

[75]   Gutermuth Trans. at 83:8-23.

[76]   *Id.* at 61:18-66:19.

[77]   *Id.* at 106:15-110:13.

[78]   Tepper Trans. 59:25-60:18. *See also id.* at 68:13-69:10 (no recollection of questioning anything relating to the August 17, 2017 press release (starts the Class Period).

[79]   *Id.* at 73:21-75:5.

[80]   *Id.* at 120:12-21.

[81]   *Id.* at 134:4-11.

[82]   *Id.* at 129:4-25.

[83]   *Id.* at 138:13-20.

Walters testified she relied on the Riverstone's "deal team" and other "experts" for due diligence purposes.[84] Walters added that TPH did not do "due diligence" but performed "valuation" of AMH and KFM.[85] Walters was unable to testify whether TPH was involved in due diligence regarding AMR's 12-WPS well spacing assumption.[86] Walters had no idea whether SR-II, or Riverstone, relied on any experts other than TPH for purposes of keeping the SR-II board advised of due diligence findings.[87]

This evidence shows that the behavior of these directors was inconsistent with Whitehead's asserted "custom and practice." These directors did not independently evaluate the assumptions information presented by the officers of AMH and KFM related to the proposed business combination. Whitehead's opinion on this point should thus be disregarded.

> **3.     Whitehead's Opinion 3 is Rebutted by the Evidence that Hackett – an SR-II Director, and Acting Chairman of the Board – Played an Active Role in Editing and Drafting the Definitive Proxy Statement**

Whitehead opines that it is "custom and practice for the board of a public company not to draft the company's proxy statement."[88] However, Hackett, an SR-II director and acting Chairman of the Board, took an active role in drafting and editing of the contents of the Definitive Proxy Statement up to its filing on January 19, 2018. Hackett's conduct is inconsistent with Whitehead's claim of custom and practice. Accordingly, this opinion is not relevant to this matter.

---

[84]   Walters Trans. at 53:7-18.

[85]   *Id.* at 54:6-10.

[86]   *Id.* at 56:20-57:18

[87]   *Id.* at 62:10-17.

[88]   Whitehead Report, ¶59.

For instance, Hackett directly influenced AMH's 2018 EBITDA projection of $358 million, which was presented as a key basis underlying the $3.86 billion estimated market value of the merged entities in August 2017, and was included as an "unaudited financial projection" in the January 19, 2018 Definitive Proxy Statement. As noted, *supra,* AMH's Senior Financial Analyst stated it was her understanding that Chappelle visited Hackett in the morning of August 13, 2017 to determine whether projecting 2018 EBITDA of $300 million for AMH EBITDA would be sufficient to support the fair market "valuation" desired for purposes of the merger.[89] After Chappelle met with Hackett on the morning of August 13, 2017, Chappelle told his Senior Financial Analyst, "Ok superwoman, looks like we do need a $350 million 2018 scenario. Give us some straw man…"[90] This development is particularly troublesome given that the seller (Chappelle) and the buyer (Hackett) appear to have colluded in artificially boosting AMR's most recent 2018 EBITDA projection of $300 million, to above $350 million.[91]

On August 14, 2017, Hackett was directly involved in 2018 EBITDA projections for both AMR and KFM and noted to AMR banking representative, "[Chappelle] and I spoke with Steve Trauber about using more conservative '18 grown numbers for AM and KFM and using KFM EBITDA percentages from AM and third parties, instead of volumes."[92] This fact is troubling because it suggests that Hackett misrepresented the outcome of his meeting with Chappelle on the day earlier.

On November 13, 2017, Hackett sent an email to Chappelle that encapsulates Hackett's, and, therefore, Riverstone and SR-II's influence on AMR's reporting of EBITDA projections to

---

[89]   CP-0190 at AMR_SDTX01144949.

[90]   *Id.*

[91]   *See* CP-0053 at p. 173.

[92]   *See* RIVERSTONE_SDTX00187245.

investors: "[You and I] have sold investors a model of fast growing EBITDA, not acreage footprint growth. Investors won' be persuaded by anything but EBITDA growth for the next 18 [months]. Investors may not see as 'smart' a failure to deliver on our projections."[93]  The same day, Chappelle responded to Hackett, stating, "Absolutely…. As you've emphasized during our investor meetings, the type of step that made sense to build and de-risk the asset when we didn't have the balance sheet, setting us up for the growth we will achieve."[94] On November 21, 2017, Hackett stated that page 260 of the current draft of the Definitive Proxy Statement needed to include "explanatory text" on why AMR had shown flat oil production quarter after quarter, and suggested it was necessary to "reclassify[]" ad valorem taxes captured as general and administrative costs with regard to KFM.[95]

On November 22, 2017, Hackett sent an e-mail demonstrating the detailed knowledge he had of the contents of the Definitive Proxy Statement. He writes: "Why on page 258 of the attached proxy is total liquids prod estimated 50.3% of total STACK production when we claim that EURs are over 65% liquids?"[96] He continues "Why on page 260 do we not have Q3 marked on the graph for net daily production?"[97] He also wonders why "[o]n p. 266 [does] the horizontal well count seem[] different (lower) than the numbers we used in the October update."[98] Subsequent

---

[93]  *See* RIVERSTONE_SDTX00233730.

[94]  *See* RIVERSTONE_SDTX00233732.

[95]  *See* RIVERSTONE_SDTX00111589-93, at 90.

[96]  *See* RIVERSTONE_SDTX00234896.

[97]  *Id.*

[98]  *Id.*

correspondence shows that these comments were sent to Latham & Watkins for incorporation into the proxy.[99]

    **4.**    **The Evidence of the Extensive Role that Hackett, the Acting Chairman of the SR-II Board, Played in the Due Diligence of AMR and KFM Rebuts Opinion 4**

Whitehead opines that "it is custom and practice for the due diligence of the target company to be comprised of reviews and analyses by the acquirer's officers, other representatives, and expert advisors to assess the integrity of, and verify, the information provided by or on behalf of the target company."[100] This opinion is rendered moot by the evidence that defendant Hackett, the Chairman of the Board of SR-II, took an active and extensive role in the due diligence of AMH and KFM.

That involvement began at least by July 2017. In email correspondence, Hackett takes an active role in the preparation of the KFM projections by forwarding questions and ensuring what the process would be for producing those projections.[101] On August 13, 2017, Hackett writes, "I want to reserve the right to use difference portrayal of third phase volumes as being more contingent. Let me control presentation with [Chappelle]. Then Hackett states that Citigroup "should only work thru me on changes to content."[102] This shows that Hackett was working directly with the target's investment bank (Citigroup).[103] This is reinforced that day when Riverstone tells Citigroup that they should only work through Hackett regarding changes to KFM

---

[99]  *See* RIVERSTONE_SDTX00236440.

[100]  Whitehead Report, ¶194.

[101]  *See* RIVERSTONE_SDTX00223722.

[102]  *See* RIVERSTONE_SDTX00026387.

[103]  *See* CP-0053 at p.162.

projections, according to Hackett's instructions.[104] Citigroup then asks Hackett whether Riverstone wants to remove the Phase III Volume projections. He responds, "Let's let Hal [Chapelle] and I handle that, please."[105] He makes clear that changes they make will require sign off from the deal team. Hackett then directs Citigroup to drop the Phase III and states that he *has been working with the seller* about the assumptions in the projections.[106]

This evidence, along with other evidence cited *supra*, shows that Hackett, the Acting Chairman of the Board of SR-II, was deeply involved in the due diligence associated with the business combination transaction. Accordingly, Whitehead's opinion that directors rely on officers for this type of due diligence information is irrelevant to this matter.

### 5. The Glaring Operational Red Flags in Existence prior to March 29, 2018 Rebuts Opinion 5

Whitehead states that "absent red flags," it would have been "custom and practice" for AMR's  Board of Directors to rely on a process managed by or under the direction of AMR's officers for the drafting, verification and revision of public disclosures.[107] This opinion is not relevant because it is readily apparent that bright red flags were waving at the AMR Board as of February 12, 2018. On February 12, 2018, the members of AMR's Board of Directors included the following defendants: Hackett, Chappelle, Coats, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Sinclair, Tepper, and Walters.

On April 11, 2017, Hackett was first informed by an oil and gas engineer he retained for purposes of Riverstone's due diligence that AMR's leasehold in the STACK suffered well bore

---

[104] *See* RIVERSTONE_SDTX00036075.

[105] *See* RIVERSTONE_SDTX00026399.

[106] *See* RIVERSTONE_SDTX00187245.

[107] Whitehead Report, ¶195.

interference, which was evident from the engineer's half-day assessment of the Company's well spacing test results to date.[108] That engineer specifically informed Hackett that the well bore interference in the Osage and well spacing test results at 4 WPS and above "limit[ed] AMR's 'STACK upside' story."[109]

On June 6, 2017, Chappelle and Ellis participated in an email communication showing that each time AMR tested at 4 WPS or higher, each well on average performed between 33% and 54% below the 250 MBO per well assumption (including for the 10-WPS spacing test referred to as the "Bullis-Coleman").[110] As Ellis testified, once AMR senior management saw the poor performance of the Bullis-Coleman spacing test, AMR's senior management believed that the child wells would not perform as they had presumed (*i.e.,* each on average would produce 250 MBO over the lifetime of each well).[111] On June 7 and 8, 2017, Hackett participated in a two-day due diligence session of AMR operational capabilities in Houston, TX.[112] The next day, Hackett lamented, "the public shareholder can receive comfort on the deal value … if we can project a future tally of 4200 wells at a reasonable EUR number."[113] On June 12, 2017, a member of the Riverstone deal team sent a memorialization of the due diligence session to Hackett and others, which essentially repeated what Hackett had been told on April 11, 2017: "Potential downsides include: …. Lack of predictability (as the Osage is a carbonate not a ubiquitous shale) and implications for being able

---

[108]  *See* CP-0077.

[109]  *Id.*

[110]  *See* CP-0186.

[111]  *See* Ellis Trans. at 227:16-228:6, 240:15-241.

[112]  *See* CP-0084.

[113]  *See* CP-0083.

to deliver all modeled locations (4,200) at the type curve."[114] The fact that Hackett was aware, no later than June 2017, of the risks to the 12-WPS and 250 MBO assumptions provided initial signs that he would ultimately head a board at AMR that did not know how to grapple with red flags. Don Dimitrievich, the HPS representative on the AMR Board likely had direct knowledge of the baselessness of the 12-WPS and 250 MBO assumptions as well, given his lengthy history of access to and analysis of the finest details of AMR's daily production results (and because he had reviewed AMH's well spacing tests during the 2017 due diligence period).[115]

Less than a week after SR-II shareholders approved the AMR/KFM merger, AMR's new Board of Directors met for the first time on February 12, 2018. On that day, Hackett, Chappelle, Coats, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Sinclair, Tepper, and Walters, each received board packets that indicated that 2018 EBITDA projections for AMR and KFM would have to be substantially reduced.[116] The materials communicated to all board members that significant shortfalls in product volumes expected from AMR, and other "third-party" producers in the STACK, to be delivered to KFM.[117] This is rather remarkable given that SR-II shareholders were asked to vote based on the prior 2018 EBITDA projections six days earlier.

---

[114] *See* CP-0084.

[115] *See, e.g.,* HPS_00000022-88, at 26 (Dimitrievich boasting to the HPS investment committee in August 2015 that he had "access to and review[ed] daily production data from each of Alta Mesa's horizontal wells."); CP-0002 at HPS_00001112 (Dimitrievich boasting to potential investors in January 2016 that he had "significant visibility into Alta Mesa's projected STACK [production] volumes."); Dimitrievich Trans. at 152:10 (admitting to reviewing well spacing tests during 2017 due diligence).

[116] *Compare, e.g.,* CP-0053 at p. 173 (Definitive Proxy Statement providing $185 million in projected 2018 EBITDA for KFM), with CP-0310, at AMRAP-1687729 (providing $100 million in projected 2018 EBITDA for KFM).

[117] *See* CP-0310 at AMRAP_1687722.

On March 28, 2018, AMR's Board of Directors met to discuss the upcoming filing of the Company's 2017 Form 10-K (filed with the SEC on March 29, 2018).[118] Hackett, Chappelle, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Tepper, and Walters, each signed that 2017 Form 10-K.[119] What transpired in the days leading to that March 28, 2018 Board of Directors meeting paints AMR's Board as dysfunctional.

On March 26, 2018, for example, Hackett informed his fellow Riverstone partners and AMR board members (Leuschen and Lapeyre) that KFM projections "will be much lower than we originally projected in May [2017] and then again in August [2017]" and that "we used Citi's midstream numbers throughout the various roadshows."[120] On March 26, 2018, AMR Board Member McMullen admitted that "KFM was a bit of a pig in a poke."[121]

On March 27, 2018, AMR Board Member McMullen complained that AMR Board Member Dimitrievich and others were "bad people" and agreed with a colleague who noted that Dimitrievich had "lied to our faces" regarding KFM's 2018 EBITDA projections during the 2017 due diligence period.[122] McMullen added his belief that AMR's STACK acreage was "condemned."[123] Also on March 27, 2018, Chappelle sent an email to Hackett and others with a script about how AMR intended to explain to investors the sudden 50% cut in 2018 KFM projections (in which Chappelle said nothing about AMR's challenges in hitting its oil production

---

[118]  *See* AMR_SDTX00000781-817.

[119]  *See* CP-0158 at pp. 81-82.

[120]  *See* RIVERSTONE_SDTX00320552-55, at 53

[121]  *See* CP-0565 at BCEM)0126564.

[122]  *See generally* CP-0566.

[123]  *Id.* at BCEM_0086030-31.

targets).[124] Also on March 27, 2018, after seeing that Chappelle intended to blame the KFM shortfall on "third-party" producers, the CFO of the company that actually operated KFM remarked, "[s]onofabitch, it's fucking Alta Mesa volumes dickhead."[125]

I note that Whitehead's report is silent regarding this evidence of known "red flags" at the AMR Board level. Accordingly, Whitehead's report is silent regarding whether those problems and complaints about fraudulent conduct during the 2017 due diligence period were reasonably discussed and addressed during the March 28, 2018, Board of Directors meeting. Whitehead also fails to address what, if anything, the Board of Directors did to either follow-up or investigate the underlying causes of Hackett relying on an investment banker's numbers for KFM's 2018 EBITDA projections, let alone why the 50% cut in guidance was necessary. Whitehead's report is also silent regarding subsequent Board of Directors meetings, the minutes of which should have reflected a functional board's investigation and follow up on these issues. Whitehead's report is further silent regarding Chappelle and Ellis's duty to be transparent and inform other board members that the Company's 12-WPS and 250 MBO assumptions were not substantiated with AMR's contemporaneous field data, which contradicted those assumptions.

The AMR Board did not act on these red flags in the window from February 12, 2018, through the end of the Class Period. In light of the empty 12-WPS and 250 MBO assumptions, and the significant impact they had on the March 29, 2018 50% cut in KFM 2018 EBITDA guidance, McMullen's comment that the STACK acreage was "condemned" appears to have been prescient. The fact that the AMR Board of Directors did not insist on reporting a material weakness (for the inability to develop reasonable forecasts) and report an impairment of the purported $3.86 billion

---

[124]  *See generally* CP-0433.

[125]  *Id.* at ARMEnergy_00053810.

fair market value of the merged assets in AMR's 2017 Form 10-K, suggests direct knowledge of red flags. The Board did not intervene or report this information. This indifference to these concerns shows the Board did not act in act in a manner consistent with Whitehead's asserted "custom and practice."

> **6.      Acting Chair Hackett's Work in Drafting, Verifying and Revising the Definitive Proxy Statement and Reliance by the Remaining SR-II Directors on That Work Was Not Consistent with Whitehead's Asserted "Custom and Practice"**

Whitehead Opinion 6 conveniently omits that Hackett was a *Director and Acting Chair of the SR-II Board.* That he was acting in that role is apparent from what SR-II told its investors:  SR-II had no full-time employees and warned investors that its "officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between operations and our search for a business combination and their other businesses."[126] Whitehead's attempt to characterize Hackett as the CEO of SR-II and then assert it is "custom and practice" for "executives," not board members, to do that work is, thus, inconsistent with the record.

Whitehead further claims that reliance of SR-II directors on the work of Hackett and others is consistent with "custom and practice." Given the dysfunction on that board, it is not clear that they did anything with regard to the Definitive Proxy Statement that would demonstrate that purported reliance. There were, at a minimum, beholden to Riverstone, given that Hackett, Walker and Coats' simultaneous service as partners to that firm.[127] Moreover, SR-II board members

---

[126]  *See* March 23, 2017 Silver Run II prospectus, at p. 52.

[127]  *See id.*, at p. 109.

Gutermuth, Tepper and Walters had served on the Silver Run I Board, another SPAC deal that Riverstone had set up a few years earlier.[128]

In short, all other SR-II board members have not demonstrated engagement in the proxy process that would be necessary to comply with the asserted "custom and practice." Had they done so, they may have uncovered that Meridian really did not do supportive due diligence on behalf of the SR-II Board.[129] Furthermore, it is questionable as to why Whitehead even refers to E&Y and Rock Oil as doing due diligence on behalf of the SR-II Board given that no testimony was obtained from those entities about what they, in fact, did. Lastly, had the SR-II Board members been more involved in the process, they may have discovered that Tudor Pickering & Holt, Co. ("TPH") did not provide them with an opinion on the reasonableness of a 12-WPS spacing scheme.[130] Had the SR-II Board not delegated all drafting and revision work on the proxy to Hackett, each one of them might have been in a position to question the 12-WPS and 250 MBO assumptions (upon which AMH and KFM's 2018 EBITDA projections were fundamentally based).

**7.     SR-II's Purported Due Diligence Did Not Comport with Custom and Practice**

First, and as described in detail above, SR-II's due diligence was not driven by SR-II's executive suite, but rather by Hackett, SR-II's Acting Chairman of the Board.[131]

Second, and as described above, Whitehead has seen no evidence, or has ignored it, regarding what Riverstone's representatives, including E&Y, Rock Oil, Meridian did or did not do

---

[128]   *Id.* at pp. 110-11.

[129]   *See* Campbell Trans. at 25:20-29:14; Castiglione Trans. at 23:8-28:8.

[130]   *See* Knupp Trans. at 173:4-175:13, 166:4-169:17.

[131]   *See supra*, Sections IV.B. and IV.C.6.

during due diligence. Whitehead also fails to address any limitations placed on TPH, by Hackett, regarding the due diligence it did (*e.g.,* they did not opine on the 12-WPS spacing assumption).[132]

Third, Whitehead correctly observes in general that during due diligence, opposing viewpoints often come up regarding risks and operational issues, and should be considered. However, Whitehead ignores that within days of the February 6, 2018 shareholder approval of the merger, the AMR Board of Directors was informed that the Company would cut KFM 2018 EBITDA guidance by 50%. Further, there is little doubt that Hackett was fully aware in 2017 that there was no reasonable basis to project performance based on the 12-WPS and 250 MBO assumptions. He was informed of that fact on April 11, 2017, and again on June 7-8, 2017. The failure to digest and disseminate that information to other members of the SR-II Board is a hallmark of due diligence failure, and, likely, deliberate misconduct on the part of SR-II's Chairman.

> **8.    The AMR Board's Reliance on the Process Managed by AMR's Chairman (Hackett) and Several AMR Executives in Drafting, Verifying and Revising AMR's 2017 Form 10-K and each 2018 Form 10-Q Was Inconsistent with Whitehead's Asserted "Custom and Practice Because There Were Glaring Red Flags**

Whitehead opines that it is only reasonable to rely on a process managed by executives for public reporting if there are no red flags.[133] His opinion about the AMR's board reliance on a process managed by Chairman Hackett and several AMR executives for public reporting is thus irrelevant because there were red flags present.

As noted above, on February 12, 2018, all AMR Board Members were apprised that just six days after shareholders voted on the merger, KFM's 2018 EBITDA guidance would need to

---

[132]  *See supra,* Section IV.C.6.

[133]  Whitehead Report, ¶195.

cut by 50%. Further, leading up to the March 28, 2018 Board of Directors meeting, some of the AMR Board Members were hurling accusations about lying regarding KFM's 2018 EBITDA projection, and, that one board member in particular (Dimitrievich) was a "bad person" because he had purportedly lied to other AMR board members about that projection during the 2017 due diligence. The fact that there is no evidence in the record, moreover, that AMR's Board members attempted to investigate the causes of deep 2018 EBITDA projection with the operator of KFM – ARM Energy (who claimed the shortfall was due to AMH's poor production in the STACK) – is not an indicator that the AMR Board could recognize and respond to red flags.

The fact that there is no evidence of further investigation by the AMR Board of Directors into the reasons why KFM would miss so significantly in 2018 is strong evidence that AMR's board was too dysfunctional to investigate this obvious red flag. Had AMR Board members done a reasonable investigation, perhaps they would have also discovered the miss was largely due to unsubstantiated 12-WPS and 250 EUR assumptions, both of which primarily drove the 2018 EBITDA projections for both AMH and KFM. Lastly, the fact that it took less than 10 months of operation in 2018 before AMR took a $3.2 billion impairment charge against the assets of Alta Mesa and Kingfisher certainly does not militate in favor of finding that Hackett, Chappelle, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Tepper, and Walters acted reasonably, let alone in the interests of AMR and its shareholders.

**9.    The AMR Board's Reliance on the Process Managed by AMR's Chairman (Hackett) and Several AMR Executives in Drafting, Verifying and Revising AMR's Earnings Statements, Earnings Call Scripts and Slides Was Inconsistent with Whitehead's Asserted "Custom and Practice"**

Whitehead opines that it is only reasonable to rely on a process managed by executives for earnings statements and earnings call scripts and slides if there are no red flags.[134] His opinion about the AMR's board reliance on a process managed by Chairman Hackett and several AMR executives for the preparation of these materials is thus irrelevant because there were red flags present.

For the same reasons stated in Section III.C.8, the AMR Board's reliance on the process managed by AMR's Chairman (Hackett) and several AMR Executives in drafting, verifying and revising AMR's earnings statements, earnings call scripts and slides was not appropriate due to the presence of red flags. A simple example should suffice. On March 29, 2018, AMR issued a press release blaming the KFM 2018 EBITDA guidance cut on "delays in volumes due to changes in third party drilling and completion schedules…."[135] As noted, that excuse was concocted by Chappelle, who also served on the Board of Directors. Hackett, as Chief Operating Officer of KFM (and AMR's Chairman) also knew that AMR's oil production guidance was suffering significantly due to the Company's failure to meet the unsubstantiated 12-WPS and 250 MBO assumptions. In fact, Hackett later admitted that the $3.2 billion impairment charge was necessary because as of February 2018: (a) AMR's wells in the STACK had long been experiencing well bore interference; (b) the 250 MBO assumption was incorrect and was downwardly adjusted to 175 MBO; (c) the

---

[134]  Whitehead Report, ¶195.

[135]  https://www.sec.gov/Archives/edgar/data/1690769/000117184318002356/exh_991.htm

new 175 MBO assumption was based on a 4- to 5-WPS assumption; and (d) the 12-WPS assumption was erroneous.[136]

At bottom, Hackett, Chappelle and Ellis were aware in 2017 that the 12-WPS and 250 MBO assumptions were not adequately substantiated. Either they shared that information with the other AMR Board Members during its first meeting on February 12, 2018, or they did not. But that is largely irrelevant because there is no evidence in the record that any other AMR Board member complied with his or her duties to question those assumptions, let alone initiate an investigation to get to the bottom of why a 50% cut in KFM 2018 EBITDA guidance was necessary.

## V.   REBUTTAL OF PULLY'S OPINIONS

Due to the overlap between the opinions expressed in Steven J. Pully's expert report ("Pully Report") and the Whitehead Report, I am able to briefly offer the following rebuttals to the opinions expressed in the Pully Report.

### A.   Dimitrievich and McMullen Failed in Their Duties to AMR Shareholders in their Review and Signing of the 2017 Form 10-K

The Pully Report's first opinion is that AMR Board members, Dimitrievich and McMullen, "acted reasonably and appropriately, consistent with … custom and practice…in discharging their obligation to review the 2017 Form 10-K prior to signing it and prior to it being filed with the SEC."[137] Notably, with regard to the Pully Report's reference to a purported "custom and practice," he correctly notes that Dimitrievich and McMullen were required, "[i]n practice [to] discharg[e] their duties [to AMR's shareholders] [by] approaching the board role with integrity,

---

[136] *See* Alta Mesa's 2018 Form 10-K (filed on August 27, 2019), at https://www.sec.gov/Archives/edgar/data/1690769/000169076919000059/amr-2018x10xk.htm, pp. 58, 200.

[137] Pully Report, ¶83.

transparency, exercising reasonable care in all decision making, and applying oneself in a diligent manner to understand and resolve the company's issues."[138]

The record indicates that Dimitrievich and McMullen violated the duties Pully imparted on them as members of AMR's Board of Directors. As noted in Section IV.C.5., *supra*, on March 27, 2018 (two days before approving and signing the 2017 Form 10-K), it was McMullen who acknowledged that Dimitrievich and HPS had "lied to our faces" during the 2017 due diligence regarding KFM's 2018 EBITDA projections. On March 26, 2018, it was McMullen who admitted that the STACK acreage was likely "condemned" due to the near 50% cut to KFM 2018 EBITDA projections (even though SR-II shareholders relied upon the artificially inflated KFM 2018 EBITDA projections in February 2018). On February 9, 2018, it was McMullen who accused Dimitrievich and HPS of being "bad people" because, among other things, HPS had "background entities" attempting to sell stock in February 2018.[139]

Furthermore, as noted in Section IV.C.5., *supra*, the evidence indicates that Dimitrievich knew that the 12-WPS and 250 MBO per well average production assumptions (which drove the merged entities' estimated $3.86 billion fair market value) were unsubstantiated prior to the Definitive Proxy Statement being filed on January 19, 2018.

That evidence indicates that AMR was incapable of generating reliable forecasts leading up to the February 2018 Definitive Proxy Statement vote, and that the book value of AMR's assets was significantly overstated as of March 29, 2018.[140]   And yet, there is nothing in the record

---

[138] *Id.*, ¶61.

[139] *See* CP-0562.

[140] *See* FN132, *supra*. Dimitrievich and McMullen also signed the 2018 Form 10-K in August 2019, in which they both admitted that the 12-WPS and 250 MBO assumptions were incorrect as of the February 2018 business combination.

indicating that Dimitrievich and McMullen were "transparent" with other Board members about these problems.[141] But, there is nothing in the record indicating that the AMR Board attempted to investigate, let alone resolve these issues. As such, Pully's first opinion should be disregarded as unreliable.

> **B.     The Subject Director Defendants and the Minority Shareholder Defendants' Conduct Did Not Comply With Pully's Purported Industry Custom and Practice**

As noted in Section V.A., *supra*, Dimitrievich and McMullen's conduct as members of AMR's Board failed to comply with the duties imposed on them by Pully. In addition, it was not until August 2019 that Dimitrievich and McMullen admitted that the 12-WPS and 250 EUR assumptions were erroneous as of the February 2018 merger of AMR and KFM. That is not an indicator of a functional board of directors. Rather, it indicates that Dimitrievich and McMullen's conduct was likely unlawful and, at minimum, created a dysfunctional environment for effective board leadership. Pully claims that ARM, Bayou City, and HPS acted in conformity with some undefined "custom and practice" governing the conduct of minority shareholders. Further, there is no evidence in the record to substantiate Whitehead's claim, Bayou City acted through its agent, McMullen, and HPS acted through its agent, Dimitrievich.

With regard to ARM, which actually operated KFM prior to and during the Class Period, it too did not conform with Pully's purported custom and practice. On March 27, 2018, after seeing that Chappelle intended to blame the KFM 50% cut in 2018 EBITDA guidance on "third-party" producers, the CFO of ARM remarked, "[s]onofabitch, it's fucking Alta Mesa volumes

---

[141] Given that Hackett, Chappelle and Ellis were aware those assumptions were unsubstantiated during the 2017 due diligence period, perhaps Dimitrievich and McMullen concluded it was not necessary to share their concerns with them (*i.e.,* their fellow AMR Board members and co-defendants).

dickhead."[142] Yet, ARM said nothing to the AMR Board. As such, Pully's second opinion should be disregarded as unreliable.

### C.    ARM, Bayou City, and HPS Deviated from Pully's Purported Custom and Practice in Connection with Their Involvement in the Definitive Proxy

As noted, Pully fails to define what the purported "custom and practice" is with regard to how minority shareholders should conduct themselves in the context of a SPAC transaction. But that is inconsequential in light of their conduct in connection with the January 2018 Definitive Proxy. Notably, Pully does not dispute that ARM, Bayou City and HPS were afforded the opportunity to both comment upon and edit the various drafts of the Definitive Proxy, including in its final as filed form.

With regard to HPS, Pully says nothing about the evidence indicating that HPS (via its agent, Dimitrievich) had knowledge that AMH and KFM's 2018 EBITDA projections (as well as other statements contained in the Definitive Proxy) were misleading due to the unsubstantiated 12-WPS and 250 MBO assumptions. Pully says nothing about the fact that HPS received $700 million in proceeds immediately upon shareholder approval of the AMR/KFM merger.[143]  As such, Pully's opinion is unreliable given the evidence that HPS (via its agent Dimitrievich) also "lied" to interested parties concerning KFM's 2018 EBITDA projections during the 2017 due diligence.

Bayou City's position is similar. That Defendant (through its agent McMullen) acknowledged in August 2017 (five months before the Proxy was filed) that it was "[c]ompletely unacceptable" that AMR and JP Morgan were responsible for KFM's wildly optimistic 2018

---

[142]  *See* Section IV.C.5, *supra.*

[143]  *See* HPS Investment Partners, LLC's Responses to Plaintiffs' First Set of Requests for Admission (Response No. 10).

EBITDA projections. And yet, Bayou City communicated nothing to the other interested parties regarding this issue prior to the Definitive Proxy Statement being filed in January 2018.

Finally, ARM was directly involved in the unlawful conduct that contributed to materially overstated 2018 KFM EBITDA projections. For example, HPS and ARM worked together to create a non-standard policy of including non-contracted potential customers in KFM's revenue projections.[144] ARM and HPS also had free reign over KFM's accounting and used that control to cause KFM to borrow off-balance sheet to make its financial condition appear stronger.[145] Accordingly, Pully's third opinion is unreliable and should be disregarded.

---

[144] *See* Collins Trans. at 27:9-28:16; Christopher Trans. at 25:3-25:11, 29:7-30:5.

[145] *See generally* CP-0373.

DATED:     November 10, 2023

_____

**ADAM BADAWI**