**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | CASE NO. 4:19-CV-00957 (CONSOLIDATED)<br><br>JUDGE GEORGE C. HANKS, JR.<br><br>THIS DOCUMENT RELATES TO:<br><br>CASE NO. 4:22-CV-01189<br>CASE NO. 4:22-CV-02590 |

**THE DIRECT ACTION PLAINTIFFS' MOTION TO EXCLUDE**
**THE TESTIMONY OF STEVEN J. PULLY AND**
**TO PARTIALLY EXCLUDE THE TESTIMONY OF CHARLES WHITEHEAD**

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE AND STAGE OF THE PROCEEDING ............................................................... 1

STATEMENT OF ISSUES TO BE RULED UPON .......................................................... 2

SUMMARY OF THE ARGUMENT ................................................................................. 2

      A.    Pully's Opinions ..................................................................................... 3

      B.    Whitehead's Opinions ............................................................................ 4

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT .................................................................................................................... 8

  I.    The Court Should Exclude Pully's Opinions ................................................. 8

      A.    Pully Does Not Employ a Reliable Methodology .............................. 8

      B.    Pully's Opinions Seek to Back-Door Legal Opinions and Invade the Province of this Court and the Jury ............................................. 17

  II.    The Court Should Exclude Whitehead's "Empirical" Analysis and His Opinions 1 and 6 through 9 ............................................................................ 19

      A.    Whitehead's Sample de-SPAC Analysis is Irrelevant .................... 19

      B.    Whitehead's Sample de-SPAC Analysis is Further Irrelevant and Flawed Insofar As It Fails to Control for Conformity with the Securities Laws ................................................................................. 23

      C.    Whitehead's Opinions 6-9 Seek to Backdoor Legal Opinions and Invade the Province of this Court and the Jury ............................... 25

CONCLUSION ............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Askanase v. Fatjo*,
    130 F.3d 657 (5th Cir. 1997) ........................................................................ 17

*Brown v. Miska*,
    1995 WL 723156 (S.D. Tex. July 19, 1995)
    *aff'd*, 96 F.3d 1445 (5th Cir. 1996) ............................................................... 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................ 7, 16

*Estate of Sowell v. United States*,
    198 F.3d 169 (1999) ..................................................................... 17, 18, 19, 23

*Falcon v. State Farm Lloyds*,
    2014 WL 2711849 (W.D. Tex. June 16, 2014) .............................................. 25

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ............................................. 18, 19, 23

*Fucich Contracting, Inc. v. Shread-Kuyrkendall & Assocs., Inc.*,
    2021 WL 11669758 (E.D. La. July 28, 2021) ................................................ 9

*Glover v. Ford Motor Co.*,
    1997 WL 106110 (W.D. Tex. Jan. 27, 1997) .................................................. 9

*Knight v. Kirby Inland Marine, Inc.*,
    482 F.3d 347 (5th Cir. 2007) .......................................................................... 7

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137, (1999) ............................................................................ 8, 9, 16

*Layssard v. United States*,
    2007 WL 4144936 (W.D. La. Nov. 20, 2007) ............................................... 8

*Lifemark Hosps., Inc. v. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P.*,
    1999 WL 33579253 (E.D. La. Sept. 21, 1999) ............................................. 9

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ....................................................................... 23

*McManaway v. KBR, Inc.*,
  852 F.3d 444 (5th Cir. 2017) ....................................................................... 8

*Minton v. Intercontinental Terminals Co., LLC*,
  2023 WL 6394385 (S.D. Tex. Oct. 2, 2023) ............................................... 21

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ................................................................... 7, 9

*Nucor Corp. v. Requenez*,
  578 F. Supp. 3d 873 (S.D. Tex. 2022) ........................................................ 21

*Peters v. Five Star Marine Serv.*,
  898 F.2d 448 (5th Cir. 1990) ...................................................................... 22

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987) ...................................................................... 16

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) ........................................................................ 9

*Whitney Nat'l Bank v. Air Ambulance ex rel. B & C Flight Mgmt., Inc.*,
  516 F. Supp. 2d 802 (S.D. Tex. 2007) ........................................................ 11

**Rules**

Fed. R. Evid. 702 .................................................................................... 7, 9

## NATURE AND STAGE OF THE PROCEEDING

These cases arise from the collapse of Alta Mesa,[1] a multibillion dollar energy E&P venture that shockingly fell apart almost as soon as it went public.  The Alyeska Plaintiffs and the Orbis Plaintiffs (together, the "Direct Action Plaintiffs") were two of the largest investors in Alta Mesa and suffered tremendous economic harm as a result of Defendants' misrepresentations and omissions in the Proxy Statement and elsewhere.  In a transparent attempt to whitewash their wrongful acts, Defendants have engaged Steven J. Pully, CPA, CFA, Esq. ("Pully") and Professor Charles Whitehead ("Whitehead"), two purported experts in corporate governance, to opine that Defendants' conduct complied with supposed industry custom and practice.  The Direct Action Plaintiffs now move to exclude Pully's testimony and to partially exclude Whitehead's testimony because:  (1) Pully does not employ any methodology in concluding that certain Defendants' conduct complied with custom and practice; (2) Whitehead's empirical analysis is flawed, irrelevant to the issues in the case, and will not assist the jury; and (3) Pully's opinions and certain of Whitehead's opinions invade the province of the Court and the jury.

---

[1] Party names and other relevant terms are defined in Appendix A, submitted herewith.  Citations to "Ex." are to the exhibits to the Declaration of Lawrence M. Rolnick in Support of the Direct Action Plaintiffs' Motion to Exclude the Testimony of Steven J. Pully and to Partially Exclude the Testimony of Charles Whitehead, submitted herewith.  Citations to the "Pully Rpt." are to the Expert Report of Steven J. Pully, CPA, CFA, Esq., dated August 31, 2023, and attached as Ex. 1 to the Rolnick Declaration.  Citations to the "Pully Dep." are to the transcript of the deposition of Steven J. Pully, CPA, CFA, Esq., taken on November 9, 2023, and attached as Ex. 2 to the Rolnick Declaration.  Citations to the "Whitehead Rpt." are to the Expert Report of Professor Charles Whitehead, dated August 31, 2023, and attached as Ex. 3 to the Rolnick Declaration.  Citations to "Whitehead Dep." are to the transcript of the deposition of Charles Whitehead, taken on November 17, 2023, and attached as Ex. 4 to the Rolnick Declaration.

## STATEMENT OF ISSUES TO BE RULED UPON

The issues to be ruled upon are:  (1) whether Pully should be excluded from testifying because he does not apply a reliable methodology in rendering his opinions and because his opinions attempt to usurp the roles of the Court and the jury; (2) whether Whitehead's empirical analysis and Opinion 1 (as defined below) should be excluded because they are flawed, irrelevant, and will not assist the jury; and (3) whether Whitehead's Opinions 6-9 (as defined below) should be excluded because they, like Pully's opinions, impermissibly invade the province of the Court and the jury.

## SUMMARY OF THE ARGUMENT

In an effort to evade responsibility for their perpetration of and involvement in Alta Mesa's serious securities fraud, Defendants have retained two "corporate governance" experts to opine that Defendants did not run afoul of supposed industry custom and practice.  The testimony of Pully and Whitehead should be excluded and partially excluded, respectively, for the following reasons:

***First***, in reaching his conclusions, Pully fails to apply a reliable methodology or one that is remotely testable by anyone besides Pully.  Instead, Pully employs an *ad hoc*, ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[2]  But Pully does not provide any reliable analysis undergirding his idiosyncratic conclusions, as his testimony makes clear.  Pully's *ipse dixit* should be rejected, and his opinions excluded.

---

[2] Pully Dep. at 39:11, 40:5-25.

***Second***, in asserting that certain Defendants complied with the standard of conduct defined by his subjective view of "custom and practice"—which is no different than what Pully views as legally allowed—Pully attempts to usurp the role of the Court and the jury. This Court will instruct the jury on the applicable law and the jury will apply that law to the facts of this case.  Pully's opinions should be excluded for this additional reason.

***Third***, Whitehead's empirical analysis is fatally flawed, irrelevant, and will not assist the jury.  To determine the "custom and practice" applicable to proxy statements issued in connection with de-SPAC mergers, Whitehead merely observes that most of those proxy statements include financial projections, boilerplate cautionary language, and cursorily represent that the target company prepared those projections.  Those observations are unmoored from any of the issues the jury will decide here, and they are undermined by the fact—consciously ignored by Whitehead—that nearly a quarter of his dataset consists of SPACs accused of wrongdoing under the federal securities laws.

***Finally***, like Pully's opinion, certain of Whitehead's opinions invade the province of the Court and the jury and should be excluded on that basis.

## RELEVANT BACKGROUND[3]

### A.     Pully's Opinions

Defendants Donald Dimitrievich, William McMullen, ARM, BCE, and HPS have retained Pully to offer opinions related to the custom and practice of directors and minority

---

[3] A summary of Defendants' securities fraud is set forth in pages 3 through 13 of the Direct Action Plaintiffs' Motion to Exclude the Expert Testimony of Professor Audra L. Boone, Ph.D., filed herewith.

shareholders.  Pully purports to offer three opinions, none of which apply a reliable methodology:



(i) ████████████████████████████████████████

████████████████████████████████ ("Pully's Opinion 1");

(ii) ████████████████████████████████████████

████████████████████████████████████████████

████████████████ ("Pully's Opinion 2");

(iii) ████████████████████████████████████████

████████████████████████████████████████████

████████ ("Pully's Opinion 3").[4]

### B.    Whitehead's Opinions

Defendants David Leuschen, Diana J. Walters, Donald Sinclair, Harlan H. Chappelle, James T. Hackett, Jeffrey H. Tepper, Michael E. Ellis, Pierre F. Lapeyre, Ronald Smith, Stephen Coats, Thomas J. Walker, William D. Gutermuth, AMR, and Riverstone have retained Whitehead to offer opinions relating to the supposed custom and practice governing SPAC proxy statements, SPAC due diligence, and the duties of public company directors.

### i.    Whitehead's Sample de-SPAC Analysis (Opinion 1)

Whitehead's  team ████████████████████████████████████

████████████████████████████████████████████████████

---

[4] Pully Rpt. ¶¶ 21-23.

██████████████████████████████████████████████████████

███████████████████ (the "Sample de-SPAC Analysis").[5]   Whitehead reviewed the

Sample de-SPACs for three criteria:  (1) ███████████████████████████████

████████████; (2) ██████████████████████████████████████████████

███████████████████████████████████████████████████; and (3)

██████████████████████████████████████████████████████

██████████████████████████████████████[6]   From  this  analysis,

Whitehead  asserts  that  ████████████████████████████████████████

██████████████████████████████████ in the SPAC industry ("Whitehead

Opinion 1").[7]

       Whitehead  █████████████████████████████████████████████

██████████████████████████████████████████████████.[8]  For

example,  in  determining  the  number  of  Sample  de-SPACs  that  used  "target-prepared"

financial  projections  in  their  proxy  statement,  Whitehead  never  asked  whether  those

financial projections were actually prepared by the target company.  Rather, ██████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████.[9]

---

[5] Whitehead Rpt. ¶ 43-45.
[6] *Id.* ¶ 47.
[7] *Id.* ¶ 186.
[8] Whitehead Dep. at 273:19-25.
[9] *Id.* at 71:11-20.

Whitehead also testified that it ██████████████ whether any of the Sample de-SPACs violated disclosure laws.[10]  For that reason, Whitehead ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████[11]  As it turns out, ***nearly a quarter*** of the Sample de-SPACs have.[12]

ii.     **Whitehead's Opinions that Defendants Complied with the Applicable Standard of Conduct Based on Custom and Practice (Opinions 6-9)**

Whitehead further purports to define the standard of conduct applicable to directors based on custom and practice and claims that Defendants comported with that standard of conduct.[13]  Whitehead asserts that ████████████████████████████████████ ████████████████████████████████ ("Whitehead Opinion 6")[14]; that ████████████████████████████████████████████████████████████████ ██████ ("Whitehead Opinion 7")[15]; that ██████████████████████████ ████████████████████████████ ("Whitehead Opinion 8")[16]; and that ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ ("Whitehead Opinion 9").[17]

---

[10] Whitehead Dep. at 273:11-18.
[11] *Id.* at 50:8-18, 270:16 – 271:3.
[12] *See* n.46 *infra* and accompanying text.
[13] Whitehead Rpt. ¶¶ 196-220.
[14] *Id.* at ¶ 196.
[15] *Id.* at ¶ 203.
[16] *Id.* at ¶ 209.
[17] *Id.* at ¶ 215.

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides that:

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if:
>
> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

As the Supreme Court made clear in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Rule 702 charges courts with the responsibility of acting as "gatekeepers" to exclude irrelevant or unreliable expert testimony.

The proponent of an expert bears the burden of demonstrating that the expert is qualified, that her methodology is reliable, and that her testimony will assist the trier of fact in understanding the evidence or to determining a fact in issue.  *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc); *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).  To be admissible, "the expert's testimony must be reliable at each and every step."  *Id.* at 355.

# **ARGUMENT**

## I.    **The Court Should Exclude Pully's Opinions**

### A.  **Pully Does Not Employ a Reliable Methodology**

Pully purports to opine that Defendants Dimitrievich, McMullen, ARM, BCE, and HPS acted in accordance with industry custom and practice in connection with SEC disclosures challenged by the Alyeska and Orbis Plaintiffs as materially false and misleading.  Pully puts himself forward as an expert on industry custom and practice governing directors and minority shareholders based on his experience serving on corporate boards and working as an investment banker and in-house counsel for a hedge fund.  However, "it is not his CV that is at issue" on this motion, "but his report.  An expert is not a shaman, and his word must be supported."  *Layssard v. United States*, 2007 WL 4144936, at *5 (W.D. La. Nov. 20, 2007).

"[I]n reviewing expert opinion evidence, [courts] look to the basis of the expert's opinion, and not the bare opinion alone."  *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017) (internal quotation marks omitted).  Pully's report lacks any methodology— let alone a reliable one—guiding how he applied his subjective view of industry custom and practice of corporate directors or minority shareholders to the facts in this case.  Without any methodology, Pully's opinions rest on nothing more than his own say-so.  But it is well settled that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999).

An expert must identify the methodology that he utilized and demonstrate that it is "reliable" and was "reliably applied." Fed. R. Evid. 702(c), (d). This standard demands more than a mantra that an opinion is based on the expert's experience, but rather "requires some objective, independent validation of the expert's methodology." *Moore*, 151 F.3d at 276. Even if testifying based on "personal experience," an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.[18] As the Advisory Committee Notes to the 2000 amendments to Federal Rule of Evidence 702 explain, "[i]f the witness is relying solely or primarily on experience, then the witness must explain . . . how that experience is reliably applied to the facts." *See Lifemark Hosps., Inc. v. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P.*, 1999 WL 33579253, at *3 (E.D. La. Sept. 21, 1999) ("Under *Daubert* and its progeny, . . . testimony drawn from this experience-based knowledge must still be . . . reliable.").

Pully's report does not provide any overarching methodology for how he set out to apply his subjective view of reasonable custom and practice to the evidence in this case. Rather, Pully concedes that he prepared his analysis in an entirely *ad hoc* manner, testifying that he ████████████████████████████████████████████████████████████

---

[18] *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380-81 (5th Cir. 2010) (finding testimony based on "anecdotal evidence" did not meet threshold for admission under Daubert); *Fucich Contracting, Inc. v. Shread-Kuyrkendall & Assocs., Inc.*, 2021 WL 11669758, at *4 (E.D. La. July 28, 2021) (excluding expert who did not provide "any methodology" or "how he arrive[d] at [his] conclusion" "[b]esides providing two anecdotal examples"); *Glover v. Ford Motor Co.*, 1997 WL 106110, at *4 (W.D. Tex. Jan. 27, 1997) (excluding expert that did not identify "what process was used to formulate the opinion given or the application of particular methodology in reaching that opinion" because "[d]espite . . . listing of 'evidence,' the Court [wa]s still left with no more than the expert's subjective belief").

██████████████████████████████████████████[19]  Pully himself

characterizes this approach as █████████████[20]  The set of initial documents with

which Pully began his analysis ███████████████████████████████

███████████████████████[21]  Pully's evaluation of the evidence he did review

was entirely subjective.  As he explained it, he weighed the evidence by ████████████

████████████████████████████████████████████████

███[22]  But Pully's report does not provide his reasoning or any analysis of the ████████

█████████  on which he based his inherently subjective reasonableness determinations.

Nor does Pully support his views by citing any objective evidence, such as actual academic

or industry studies or other commentary.  Indeed, despite claiming to base his views of

industry custom and practice on ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[23]

Yet these sources do not support the sweeping conclusions Pully ascribes to them.

Pully's "I know it when I see it" approach cannot be replicated or objectively

validated by another expert, nor has it been subject to any testing, peer review, or

publication.  *See Brown v. Miska*, 1995 WL 723156, at *4 (S.D. Tex. July 19, 1995) ("If a

methodology cannot be falsified, refuted, or tested by any objective means, then it is

---

[19] Pully Dep. at 38:20-23.
[20] *Id.* at 39:11.
[21] *Id.* at 40:5-25.
[22] *Id.* at 160:15-22.
[23] Pully Rpt. ¶¶ 54 n.62, 73 n.63; Pully Dep. at 53:18-21.

incapable of meeting the 'validity' criterion of *Daubert* . . . ."), *aff'd*, 96 F.3d 1445 (5th

Cir. 1996).   And there is no evidence that it is anything other than manufactured for

litigation use.  *See Whitney Nat'l Bank v. Air Ambulance ex rel. B & C Flight Mgmt., Inc.*,

516 F. Supp. 2d 802, 815 (S.D. Tex. 2007).

  ***Pully   Opinion   1***.   Pully's  Opinion  1  purports  to [24]   Pully  observes  that  Dimitrievich,

according to his deposition testimony,

[25]

  Pully next observes that two board meetings occurred between the Alta Mesa de-

SPAC and the filing of the 2017 10-K, and that

was presented at those meetings.[26]  Yet Pully does

not discuss—let alone analyze—the actual information presented at those meetings.   In

particular, at the February 12, 2018 meeting,

---

[24] Pully Rpt. ¶¶ 82-94.
[25] *Id.* ¶ 84.
[26] *Id.* ¶ 85.



█████████████████████████████████████████████████████████████████

██████████████████████████████████[27]

Pully then opines that directors are required to review ████████████████

████████████████████████ and that they ████████████████████████████████

████████████████████████████[28] Yet Pully stops there.

Pully does not provide any objective standards for what he considers ████████

████████████████████████████████ He gives no examples

from his service on numerous boards as to how he (or other directors with whom he has

served) have actually discharged this duty, and cites no objective evidence.  When asked

what a director should do if presented with information that contradicts what the director

had been told by management, Pully testified that ████████████████████ and that

████████████████████████████████████[29]  As to

whether a director should share the results of any investigation of contradictory information

with the board, Pully testified that it ████████████████████████████████

████████████████████████████████████████████

████[30]  But ██████████ is not a reliable methodology.

When asked whether downward revisions to Alta Mesa's midstream business

projections immediately prior to approval of Alta Mesa's 2017 10-K should have

evidenced to Dimitrievich and McMullen the inability of Alta Mesa to accurately forecast

---

[27] Ex. 5 at -777.
[28] Pully Rpt. ¶ 88.
[29] Pully Dep. at 137:19-21.
[30] *Id.* at 138:10-19.

those financials, Pully testified that ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████ [31] But Pully is not an oil-and-gas expert,

and he does not identify the specific experience that he drew upon in analyzing ████

███████████████████████████████████████████████████

█████████████████████ Nor does Pully explain how he determined ████████████████

███████████ All that connects the evidence to Pully's conclusion is his bare assertion about

how he hypothetically might have acted.

McMullen signed the 2017 10-K on March 29, 2018.  Pully was confronted at his

deposition with a March 27, 2018 email chain ███████████████████████████████

███████████████████████████████████████████████████████████████████████ [32]

Pully did not recall whether ██████████████████████████████████████ [33]  Pully testified

that ██████████████████████████████████████████████████████████████

█████████████████████████████████ [34]  Yet at one of the companies for which he

was a director, Pully ████████████████████████████████████████████████████

Pully asserted that his own experience and the McMullen email were ████████████████

████████████████████████████████████ [35]  But Pully did not explain why, or support his

---

[31] Pully Dep. 168:23-25 – 169:1-7.
[32] *Id.* at 174:7-9; Ex. 12.
[33] *Id.* at 175:4-8.
[34] *Id.* at 179:2-25 – 180:2-10.
[35] *Id.* at 187:10-12; *see also id.* at 183-84, 186:3:21.

bare-bones assertion.  Pully's opinion thus does not employ "the same level of intellectual rigor" as—and indeed conflicts with—his experience as a director.

 ***Pully Opinion 2.***  In Pully's Opinion 2, Pully opines that ███████████████

███████████████████████████████████████████████████████

██████████████████[36]  Pully states that ███████████████████████████

██████████████████████████████████████[37]  Yet when asked if it was custom and practice for a director to communicate daily with management, Pully testified that it ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████[38]  Again, none of this nuance appears in Pully's report.  He does not provide any criteria for evaluating the appropriate level of communication between a director and management—such as examples of when custom and practice would dictate more frequent communication.  Nor does Pully provide any relevant examples from his service on numerous corporate boards.  All we are left with is Pully's say-so.

 Pully concludes that Dimitrievich and McMullen ███████████████████████

███████████████████████████████████████████████████[39]  Pully does not provide any analysis supporting this assertion.  He does not cite a single piece of record evidence, such as minutes of board meetings attended by Dimitrievich or McMullen

---

[36] Pully Rpt. ¶¶ 95-102.
[37] *Id.* ¶ 97.
[38] Pully Dep. at 215:8-18, 217:16-22.
[39] Pully Rpt. ¶ 102.

or their email communications with management.  At his deposition, Pully was shown an email—on which he did not rely in his report—from Defendant Jim Hackett, Alta Mesa's Chairman, stating: ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████[40]  When asked to reconcile that email with ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████[41]  To say this "answer" has no content is to overstate its responsiveness.  Pully testified that where this has occurred in his experience, ████████████████████████████

████████████████████████[42]  But again, none of this appears in Pully's Report, which simply provides a conclusory statement that ████████████████████████████

███████████████  and does not give any standards for evaluating whether a director is discharging that duty, whether a deviation is warranted, or even any examples from Pully's experience—on which his expertise is based—about these "temporary deviations."

 ***Pully Opinion 3***.  Pully's Opinion 3 is that ██████████████████████████████

█████████████████████████████████████████████[43]  But Pully's Report does not provide the basis for his opinion concerning industry custom and practice

---

[40] Ex. 6.
[41] Pully Dep. at 219:20-23.
[42] *Id.* at 220:8-10.
[43] Pully Rpt. ¶¶ 103-10.

with respect to a proxy statement in connection with a de-SPAC merger.  Pully testified

that ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ [44]  Incredibly, despite the plethora of commentary surrounding SPACs, Pully ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [45]

Accordingly, Pully has no basis, whether based on his experience or any objective sources,

for any of his conclusions in Opinion 3, including that ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [46]  Those conclusions are

nothing more than Pully's naked *ipse dixit*.

Without a valid methodology, Pully's say-so is all that is left to establish a fit

between his opinions and the limited record evidence on which those opinions are based.

But that does not satisfy *Daubert* or the Federal Rules of Evidence.  *See Kumho Tire*, 526

U.S. at 157.  "[A]n expert's testimony that 'it is so' is not admissible."  *Viterbo v. Dow

Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

---

[44] Pully Dep. at 59:16-18, 83:25 – 84:14, 227:3-5.
[45] *Id.* at 228:23-25 – 229:1-6.
[46] Pully Rpt. ¶¶ 107-09.

### B.     Pully's Opinions Seek to Back-Door Legal Opinions and Invade the Province of this Court and the Jury

The Court should exclude Pully because his opinions impermissibly suggest a legal conclusion and would confuse the jury, invade the Court's province of determining the applicable law, and invade the jury's province of applying the law to the facts.   It is axiomatic that an expert witness cannot offer a legal opinion.  *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.").  This prohibition extends to experts who disclaim that they are rendering a legal opinion, but nevertheless still attempt to define the law or suggest to the jury what to do under the law. *Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (1999).

Pully's opinions that certain Defendants complied with the applicable custom and practice (as Pully sees it) amount to the impermissible rendering of legal opinions.  First, under *Sowell*, an expert cannot circumvent the bar on rendering a legal opinion by speaking in terms that are different than, but ultimately amount to, a legal opinion.  *Id.*  There, a decedent's estate sought appeal of a jury verdict that the estate did not have "reasonable cause" to delay payment of its estate taxes.  *Id.* at 171.  The estate had introduced an expert to opine on "questions concerning what a reasonable fiduciary would do" in a situation similar to the one faced by the estate.  *Id.*  The district court permitted the estate's expert "to testify as to the definition and general standards of conduct of a fiduciary, but forb[ade] [him] from testifying as to whether the fiduciaries in this case acted reasonably."  *Id.*  The Fifth Circuit affirmed, holding that "[t]he principles espoused in *Askanase* are equally

applicable here" because "[w]hether the Estate was 'acting reasonably' was, for all practical purposes, the only issue for the jury in this case to decide." *Id.* at 171-72.

Second, experts speaking to the custom and practice of directors cannot opine on whether the directors complied with that custom and practice. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 640-41 (S.D. Tex. 2008). In that case, the plaintiffs engaged "a lawyer with over twenty years of experience in corporate and securities matters" to opine on the care exercised by the directors in authorizing a transaction. *Id.* at 640. The court held first that the expert could:

> testify as to the standards of conduct applicable to directors in general, ***but he [could not] testify as to whether the Defendants' conduct comported with*** the actions of reasonably prudent individuals in the same or similar circumstances. ***The latter is a conclusion that must be determined by the trier of fact.***

*Id.* (emphasis added). The court also held that although the expert could "opine[] that it is prudent practice within the industry to appoint an independent special committee when interested Directors are involved in a transaction," the expert *could not* "testify as to his conclusion that the Directors failed to conform to the applicable standard of care by failing to appoint an independent committee." *Id.* at 641.

Just the same here. Pully's opinions are impermissible because they will interfere with the jury's role in applying the law to the facts. Pully opines, for example, that Dimitrievich and McMullen 

[47] Pully comes to this opinion by purporting to identify the

---

[47] Pully Rpt. ¶ 21.

custom and practice of directors and then applying that custom and practice to (his version of) the facts of the case.  This approach is impermissible under *Sowell* and *Floyd*.  Pully's opinions should be excluded.

## II.   The Court Should Exclude Whitehead's "Empirical" Analysis and His Opinions 1 and 6 through 9

The Court should exclude Whitehead's Sample de-SPAC Analysis, Whitehead Opinion 1, and Whitehead Opinions 6-9.  Whitehead's Sample de-SPAC Analysis and Whitehead Opinion 1 should be excluded because both are unmoored from any of the factual issues the jury here will be asked to decide.  *First*, the Sample de-SPAC Analysis purports to identify industry custom and practice with respect to subjects that are irrelevant to this case.  *Second*, Whitehead ██████████████████████████████████████████ ████████████████████████████████████  Yet numerous companies included in Whitehead's sample have, in fact, been accused of securities law violations.  Thus, his conclusion of the custom and practice in de-SPAC transactions is flawed and unreliable.

### A.   Whitehead's Sample de-SPAC Analysis is Irrelevant

Whitehead's Sample de-SPAC Analysis purports to opine on industry custom and practice as to three subjects: ████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████[48]  But Plaintiffs' claims do not turn on whether the Silver Run II Proxy Statement should have included financial projections said to be prepared by AMH or Kingfisher, or language purporting to invoke

---

[48] Whitehead Rpt. ¶ 47.

the PSLRA's safe harbor.  Rather, Plaintiffs allege that *having chosen to include those disclosures in the Proxy Statement*, Defendants are liable because those disclosures were materially false and misleading.  None of the three subjects on which Whitehead purports to identify industry custom and practice have any relevance to determining whether the challenged disclosures are false or misleading, or to any other factual issue that the jury will be asked to decide at trial in this action.  Accordingly, Whitehead's opinions as to any industry custom or practice on these three subjects are inadmissible.

### i.     It is Irrelevant Whether There is a Custom and Practice of Merely Including Financial Projections in a Proxy Statement

Whitehead opines that ████████████████████████████████████████ ███████████ in their proxy statements.[49]  But Plaintiffs' claims do not allege misconduct based on the mere fact that the Proxy Statement included financial projections.  Rather, Plaintiffs allege that Defendants included financial projections that were materially false and misleading given the information that Defendants knew at the time.  What is at issue is the accuracy of the financial projections that Defendants chose to make—not whether it was proper for Defendants to include those projections in the Proxy Statement in the first place.  And as Whitehead concedes, his analysis looked only at ████████████ ████████████████████████████████████████████████████████ ████████████████████[50]  Accordingly, any custom or practice of de-SPAC proxy statements including financial projections is irrelevant to any of the issues the jury will be

---

[49] Whitehead Rpt. ¶ 187 (emphasis and internal citation omitted).
[50] Whitehead Dep. at 271:16-19.

asked to decide at trial in this action.  As such, Whitehead's opinion on this subject is inadmissible.  *See, e.g.*, *Minton v. Intercontinental Terminals Co., LLC*, 2023 WL 6394385, at *4 (S.D. Tex. Oct. 2, 2023) ("The Court will not allow an expert to give an opinion on an irrelevant standard of care."); *Nucor Corp. v. Requenez*, 578 F. Supp. 3d 873, 895-96 (S.D. Tex. 2022) (excluding expert testimony about industry standard as "irrelevant," where contract specified another standard of care).

### ii. It is Irrelevant Whether There Is a Custom and Practice of Disclosing that Financial Projections were Prepared by the Target

Whitehead's Sample de-SPAC Analysis also purports to opine on whether there is a custom and practice of de-SPAC proxy statements using "target-prepared" financial projections.  But this is inaccurate.  Whitehead's analysis examines only whether ███████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████[51]  Indeed, Whitehead intends to tell the jury in this case that the financial projections contained in the Proxy Statement were ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████[52] Whether there is a custom and practice of de-SPAC proxy statements *saying* that financial

---

[51] Whitehead Dep. at 71:11-20 ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████) (emphasis added).
[52] Ex. 7; *see, e.g.*, Ex. 8; Ex. 9; Ex. 10; Ex. 11.

projections are target-prepared is not relevant to any issue here.  And to the extent that Whitehead simply wants to tell the jury that the Proxy Statement contained certain language, that is not proper expert testimony.  *See, e.g.*, *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (excluding expert testimony on matters that jurors could assess "using only their common experience and knowledge").

Whitehead's opinion should also be excluded because his definition of whether financial projections were "solely" target-prepared is misleading and will confuse the jury. Whitehead conceded that ███████████████████████████████████████████ ████████████████████████████████████████████████[53]  Rather, Whitehead ██████████████████████████████████████████████████ █████████████████████████████████  This contorts the plain meaning of the word "solely" and will confuse the jury.  Accordingly, exclusion is proper.

### iii.    It Is Irrelevant Whether There is a Custom and Practice of Merely Including in a Proxy Statement Boilerplate Language Invoking the PSLRA Safe Harbor

Whitehead purports to opine that there is a custom and practice of de-SPAC proxy statements including language meant to invoke the PSLRA's safe-harbor provisions.  But it is irrelevant whether there is a custom or practice of de-SPAC proxy statements including such language.  Such a custom and practice has no relevance to whether the safe harbor

---

[53] Whitehead Dep. at 85:3-5.

actually applies to the Proxy Statement that the jury will evaluate in this case.[54]  And to the extent that Whitehead opines that Defendants complied with custom and practice by including language intended to receive safe harbor protection, he plainly invades the roles of the judge and the jury.  *See, e.g.*, *Sowell*, 198 F.3d at 171-72; *Floyd*, 556 F. Supp. 2d at 640-41.

### B.    Whitehead's Sample de-SPAC Analysis is Further Irrelevant and Flawed Insofar As It Fails to Control for Conformity with the Securities Laws

Whitehead's Sample de-SPAC Analysis should also be excluded because he did not determine whether any of the companies in his sample might have violated the federal securities laws.  Without removing any such companies, his sample is worthless, as the custom and practice of companies that do not follow the securities laws will not assist the jury in determining whether Defendants here violated those laws.

Whitehead admitted ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████[55]  As shown in the following exchange with counsel, Whitehead made absolutely clear this was not germane to his analysis:



---

[54] "Under the PSLRA safe harbor," "a forward-looking statement is not actionable if:  (1) the statement is identified as . . . forward looking . . . and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially . . .; (2) it is immaterial; or (3) the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 243 (5th Cir. 2009).
[55] Whitehead Dep. at 50:8-18, 270:16 – 271:3.



In other words, Whitehead's Sample de-SPAC Analysis is ████████████ ████████████████████████████ The custom and practice that the Sample de-SPAC Analysis establishes is therefore irrelevant to the issues in this case.

Furthermore, Whitehead's failure to control for the Sample de-SPACs' conformity with the securities laws renders that analysis unreliable.  This is no speculative concern. At least 23 of the Sample de-SPACs—nearly a quarter of them—have been sued for fraud.[58]  This includes Nikola Corporation, which settled fraud charges with the SEC for $125 million and whose founder was convicted of criminal securities fraud and sentenced to years in prison.[59]  It also includes XL Fleet, an electric vehicle company that settled a shareholder suit and now faces charges from the SEC for "misleading investors about revenue projections" in connection with its de-SPAC, including by basing the de-SPAC

---

[56] Whitehead Dep. at 272:2-18.

[57] *Id.* at 273:11-18 (emphasis added).

[58] Those 23 de-SPAC companies are shown in Appendix B, submitted herewith.

[59] SEC Press Release, "Nikola Corporation to Pay $125 Million to Resolve Fraud Charges," *available at* https://www.sec.gov/news/press-release/2021-267; Reuters, "U.S. Jury Convicts Nikola Founder of Fraud," *available at* https://www.reuters.com/legal/us-jury-deliberating-nikola-founders-fraud-trial-2022-10-14/.

projections "almost entirely [on] speculative opportunities, including sales to potential customers with whom XL Fleet had little or no contact."[60]  Any analysis that treats Nikola and XL Fleet as exemplars of the "industry standard" is thus fatally compromised.  *See, e.g.*, *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at \*14 (W.D. Tex. June 16, 2014) (excluding expert opinion based on "skewed data set").

### C.     Whitehead's Opinions 6-9 Seek to Backdoor Legal Opinions and Invade the Province of this Court and the Jury

Like Pully's Opinions, Whitehead's Opinions 6-9 encroach on the court's role in defining the applicable law and the jury's role in applying the law to the facts.  The Court should exclude Whitehead's Opinions 6-9 for the same reasons set forth in Section I.B, *supra*.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court should (i) exclude the testimony of Steven J. Pully; and (ii) partially exclude the testimony of Charles Whitehead.

Dated:  December 22, 2023

Respectfully submitted,

By: *<u>/s/ Lawrence M. Rolnick</u>*
Lawrence M. Rolnick
Michael J. Hampson
Matthew A. Peller
Joseph R. Sparacio
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com

---

[60] SEC Press Release, "SEC Charges Electric Vehicle Co. for Misleading Revenue Projections Ahead of SPAC Merger," *available at* https://www.sec.gov/news/press-release/2023-208.

mhampson@rksllp.com
mpeller@rksllp.com
jsparacio@rksllp.com

*Attorneys for the Alyeska and Orbis
Plaintiffs*

Jules P. Slim
TX Bar No. 00793026
Attorney and Counselor
PO Box 140307
Irving, TX 75014-0307
Tel.: (214) 350-5183
Fax: (214) 350-5184
jslim@slimlawfirm.com

*Counsel for the Alyeska and Orbis
Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on December 22, 2023, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

## **CERTIFICATE OF CONFERENCE**

I certify that on December 21, 2023, counsel for the Direct Action Plaintiffs conferred with counsel for the parties that have retained Steven J. Pully and Charles Whitehead in this matter regarding the substance of the relief requested herein.  The relief requested herein is opposed.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

## GLOSSARY OF KEY TERMS, ENTITIES, AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|------|-------------|
| 2017 10-K | Alta Mesa's Annual Report on Form 10-K for the Year Ended December 31, 2017, filed with the SEC on March 29, 2018. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-de-SPAC company. |
| AMH | Alta Mesa Holdings, LP, the private pre-de-SPAC company. |
| Alta Mesa | Refers to AMR, including its subsidiaries, AMH and KFM, for the period after the Merger, and to AMH and/or Silver Run II for the period before the Merger. |
| Alyeska or Alyeska Plaintiffs | Alyeska Master Fund, L.P., Alyeska Master Fund 2, L.P., and Alyeska Master Fund 3, L.P., which are investment funds managed by Alyeska Investment Group, L.P. |
| ARM Energy or ARM | Defendant ARM Energy Holdings LLC. |
| Bayou City or BCE | Bayou City Energy Management, LLC. |
| Defendants | All Defendants in the Direct Actions. |
| Direct Actions | The civil actions pending before this Court filed by the Alyeska Plaintiffs and the Orbis Plaintiffs. |
| Dimitrievich | Donald Dimitrievich. |
| Direct Action Plaintiffs or Plaintiffs | The Alyeska Plaintiffs and the Orbis Plaintiffs. |
| DOJ | United States Department of Justice. |
| E&P | Acronym for the oil and natural gas exploration and production industry. |
| Hackett | James T. Hackett. |
| HPS | HPS Investment Partners, LLC. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing, and marketing of hydrocarbons from oil and gas producers that combined with Silver Run II in the de-SPAC. |
| McMullen | William McMullen. |
| Orbis Plaintiffs | Orbis Global Equity LE Fund (Australia Registered), Orbis Global Equity Fund (Australia Registered), Orbis Global Balanced Fund (Australia Registered), Orbis SICAV, Orbis Institutional Global Equity L.P., Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray |

| | |
|---|---|
| | Australia Balanced Fund, Orbis OEIC, and Orbis Institutional U.S. Equity L.P., which are investment funds managed by Orbis Investment Management (U.S.), L.P. or Orbis Investment Management Limited. |
| Proxy Statement | The proxy statement issued by Silver Run II in connection with the Alta Mesa de-SPAC, dated January 19, 2018. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4. |
| Riverstone | Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP, the sponsor of Silver Run II. |
| SEC | United States Securities and Exchange Commission. |
| Securities Act | The Securities Act of 1933, 15 U.S.C. § 77a *et seq*. |
| Silver Run II or "SRII" | Silver Run Acquisition Corporation II, the SPAC entity created by Riverstone that merged with KFM and AMH. |
| SPAC | Acronym for "special purpose acquisition company." |

## APPENDIX B

**Securities Fraud Lawsuits Against Companies**
**Included in Prof. Whitehead's Sample SPACs**

*In re Alta Mesa Resources, Inc. Securities Litigation*

| *Entity* | *Case or Proceeding* |
| --- | --- |
| **Canoo Inc.** | *In re Canoo Inc.*, Securities Act Release No. 11217, Exchange Act Release No. 98052, SEC File No. 3-21544 ($1.5 million settlement of SEC claims of violations of Section 17(a) of the Securities Act and Sections 13(a) and 14(a) of the Exchange Act); *Blake v. Canoo Inc.*, No. 2:21-cv-02873, ECF No. 125 (C.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Clarivate Plc** | *Parot v. Clarivate Plc*, No. 1:22-cv-00394, ECF No. 97 (E.D.N.Y.) (claims under Sections 11 and 15 of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act). |
| **Danimer Scientific, Inc.** | *In re Danimer Scientific, Inc. Securities Litigation*, No. 1:21-cv-02708, ECF No. 44 (E.D.N.Y.) (claims under Sections 11, 12, and 15 of the Securities Act and Sections 10(b), 14(a), and 20(a) of the Exchange Act). |
| **DermTech, Inc.** | *Bagheri v. Dermtech, Inc.*, No. 3:23-cv-01885, ECF No. 1 (S.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Desktop Metal, Inc.** | *Luongo v. Desktop Metal, Inc.*, No. 1:21-cv-12099, ECF No. 107 (D. Mass) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **DraftKings Inc.** | *In re Draftkings Securities Litigation*, No. 1:21-cv-05739, ECF No. 62 (S.D.N.Y.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Eos Energy Storage LLC** | *Houck v. Eos Energy Enterprises, Inc.*, No. 2:23-cv-04113, ECF No. 1 (D.N.J.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Fisker Inc.** | *Zahabi v. Fisker Inc.*, No. 2:23-cv-09976, ECF No. 1 (C.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **HF Foods Group Inc.** | *Mendoza v. HF Foods Group Inc.*, No. 2:20-cv-02929, ECF No. 51 (C.D. Cal.) (claims under Sections 10(b), 14(a), and 20(a) of the Exchange Act). |
| **Immunovant, Inc.** | *Pitman v. Immunovant, Inc.*, No. 1:21-cv-00918, ECF No. 82 (E.D.N.Y.) (claims under Sections 11, 12, and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act). |

| *Entity* | *Case or Proceeding* |
|---|---|
| **Lordstown Motors Corp.** | *In re Lordstown Motors Securities Litigation*, No. 4:21-cv-00616, ECF No. 61 (N.D. Ohio) (claims under Sections 10(b), 14(a), 20A, 20(a) of the Exchange Act). |
| **Luminar Technologies Inc.** | *Johnson v. Luminar Technologies, Inc.*, No. 6:2023-cv-00982, ECF No. 37 (M.D. Fla.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **MultiPlan Corp.** | *Kong v. Multiplan Corp. (f/k/a Churchill Capital Corp. III)*, No. 2:21-cv-3186, ECF No. 1 (E.D.N.Y.) (claims under Sections 10(b), 14, and 20(a) of the Exchange Act); *see also In re MultiPlan Corp. Stockholders Litigation*, 268 A.3d 784 (Del. Ch. 2022) (denying motion to dismiss claims that directors breached their fiduciary duty of loyalty in connection with de-SPAC merger). |
| **Nikola Corp.** | *In re Nikola Corp.*, Securities Act Release No. 11018, Exchange Act Release No. 93838, SEC File No. 3-20687 (Dec. 21, 2021) ($125 million settlement of SEC claims of violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 13a-15(a) of the Exchange Act); *United States v. Milton*, No. 21 Cr. 478 (E.D.N.Y.) (CEO convicted of criminal securities fraud and sentenced to four years in prison); *Borteanu v. Nikola Corp.*, No. 2:20-cv-01797, ECF No. 129 (D. Ariz.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Opendoor Technologies Inc.** | *In re Opendoor Technologies Inc. Securities Litigation*, No. 2:22-cv-01717, ECF No. 39 (D.Ariz.) (claims under Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act). |
| **Organogenesis Holdings Inc.** | *Meyer v. Organogenesis Holdings, Inc.*, No. 1:21-cv-06845, ECF No. 34 (E.D.N.Y.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **QuantumScape Corp.** | *In re Quantumscape Securities Class Action Litigation*, No. 3:21-cv-00058, ECF No. 164 (N.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Romeo Power Inc.** | *In re Romeo Power Inc. Securities Litigation*, No. 1:21-cv-03362, ECF No. 135 (S.D.N.Y.) (claims under Sections 10(b), 14(a), and 20(a) of the Exchange Act). |
| **Skillz Inc.** | *Jedrzejczyk v. Skillz Inc.*, No. 3:21-cv-03450 (N.D. Cal.), ECF No. 136 (claims under Sections 10(b) and 20(a) claims of the Exchange Act). |
| **Tattooed Chef, Inc.** | *Mihaylov v. Tattooed Chef, Inc.*, No. 2:22-cv-09311, ECF No. 64 (C.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |

| Entity | Case or Proceeding |
|---|---|
| **Velodyne Lidar, Inc.** | *Moradpour v. Velodyne Lidar, Inc.*, No. 3:21-cv-01486, ECF No. 99 (N.D. Cal.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |
| **Waitr Holdings Inc.** | *Welch v. Meaux*, No. 2:19-cv-01260, ECF No. 37 (W.D. La.) (claims under Sections 10(b), 14(a), and 20(a) of the Exchange Act). |
| **XL Fleet Corp.** | *In re Spruce Power Holding Corp.*, Securities Act Release No. 11247, Exchange Act Release No. 98612, SEC File No. 3-21748 ($11 million settlement of SEC claims of violations of Sections 13(a) and 14(a) of the Exchange Act and Section 17(a) of the Securities Act); *In re XL Fleet Corp. Securities Litigation*, No. 1:21-cv-02002, ECF No. 72 (S.D.N.Y.) (claims under Sections 10(b) and 20(a) of the Exchange Act). |