# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | CASE NO. 4:19-CV-00957 (CONSOLIDATED) <br><br> JUDGE GEORGE C. HANKS, JR. <br><br> THIS DOCUMENT RELATES TO: <br><br> CASE NO. 4:22-CV-01189 <br> CASE NO. 4:22-CV-02590 |

## THE DIRECT ACTION PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR AUDRA L. BOONE, PH.D.

<u>**TABLE OF CONTENTS**</u>

**Page**

NATURE AND STAGE OF THE PROCEEDING ............................................................ 1

STATEMENT OF ISSUES TO BE RULED UPON ........................................................ 1

SUMMARY OF THE ARGUMENT ................................................................................ 2

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................................ 3

        A.    Overview of Defendants' Securities Fraud ........................................ 3

        B.    Defendants Make Materially False and Misleading Statements in the 2017 10-K ................................................................................. 5

        C.    Nye's Expert Opinions ...................................................................... 7

        D.    Boone's Deficient Rebuttal ............................................................. 11

LEGAL STANDARD ..................................................................................................... 13

ARGUMENT ................................................................................................................... 14

    I.     BOONE IS NOT QUALIFIED ......................................................... 14

    II.    BOONE'S OPINIONS ARE IRRELEVANT .................................... 17

    III.   BOONE'S OPINIONS ARE UNRELIABLE ................................... 20

CONCLUSION ............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................... 14, 17

*Diaz v. Con-Way Truckload, Inc.*,
  279 F.R.D. 412 (S.D. Tex. 2012) .................................................. 19

*Guile v. United Sta*tes,
  422 F.3d 221 (5th Cir. 2005) ........................................................ 21

*In re Allstate Corp. Sec. Litig.*,
  2022 WL 842737 (N.D. Ill. Jan. 10, 2022) ................................... 16

*In re BP p.l.c. Sec. Litig.*,
  2014 WL 2112823 (S.D. Tex. May 20, 2014) ........................... 16, 22

*In re Novatel Wireless Sec. Litig.*,
  2013 WL 12247558 (S.D. Cal. Nov. 19, 2013) ............................. 16

*In re Novatel Wireless Sec. Litig.*,
  846 F. Supp. 2d 1104 (S.D. Cal. 2012) ......................................... 24

*In re Ocwen Fin. Corp. Sec. Litig.*,
  2017 WL 11680400 (S.D. Fla. June 21, 2017) ............................... 7

*In re St. Jude Med. Inc. Sec. Litig.*,
  2014 WL 6908434 (D. Minn. Dec. 8, 2014) ................................. 16

*Knight v. Kirby Inland Marine, Inc.*,
  482 F.3d 347 (5th Cir. 2007) ........................................................ 14

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ...................................................................... 14

*Ludlow v. BP, p.l.c.*,
  800 F.3d 674 (5th Cir. 2015) .................................................... 16, 23

*Mauss v. NuVasive, Inc.*,
  2018 WL 656036 (S.D. Cal. Feb. 1, 2018) ..................................... 7

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir. 1998) ........................................................ 14

*Smilovits v. First Solar, Inc.*,
   2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ................................................................ 16

*Smith v. Goodyear Tire & Rubber Co.*,
   495 F.3d 224 (5th Cir. 2007) ........................................................................................ 15

*Tanner v. Westbrook*,
   174 F.3d 542 (5th Cir. 1999) ........................................................................................ 15

*United States v. Cooks*,
   589 F.3d 173 (5th Cir. 2009) .......................................................................... 14, 15, 16

*United States v. Hodge*,
   933 F.3d 468 (5th Cir. 2019) ........................................................................................ 21

*Viterbo v. Dow Chem. Co.*,
   826 F.2d 420 (5th Cir. 1987) .................................................................................. 21, 24

*Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*,
   801 F.3d 512 (5th Cir. 2015) .................................................................................. 15, 16

*Wells v. Smithkline Beecham Corp.*,
   601 F.3d 375 (5th Cir. 2010) .................................................................................. 20, 21

*Wilson v. Woods*,
   163 F.3d 935 (5th Cir. 1999) ........................................................................................ 14

**Rules**

Fed. R. Civ. P. 26(a)(2) ...................................................................................................... 18

Fed. R. Evid. 702 ................................................................................................ 13, 14, 17

**Regulations**

Section 10(b) of the Exchange Act ................................................................ 7, 10, 12, 20

Section 14(a) of the Exchange Act ...................................................................................... 7

Section 18 of the Exchange Act ................................................................................ passim

Section 20(a) of the Exchange Act ...................................................................................... 7

## NATURE AND STAGE OF THE PROCEEDING

These cases arise from the collapse of Alta Mesa,[1] a multibillion dollar E&P venture that shockingly fell apart almost as soon as it went public.  The Alyeska Plaintiffs and the Orbis Plaintiffs were two of the largest investors in Alta Mesa and suffered tremendous economic harm as a result of Defendants' fraud.  In support of their securities fraud claims against Defendants, the Direct Action Plaintiffs have proffered the expert testimony of Dr. Zachary Nye, Ph.D. ("Nye"), who offers opinions on the issues of market efficiency, economic materiality, proximate cause, loss causation, and damages. In rebuttal, Defendants Donald Dimitrievich, William McMullen, HPS, and Bayou City have proffered the testimony of Professor Audra L. Boone, Ph.D. ("Boone"), who purports to opine on the issues of loss causation and damages.  The Direct Action Plaintiffs now move to exclude the testimony of Boone because:  (1) she is unqualified to testify about the specific subject matter on which she is offering an opinion; (2) her opinions would not be helpful to the jury; and (3) her opinions do not apply *any* methodology, let alone a *reliable* one.

## STATEMENT OF ISSUES TO BE RULED UPON

The issues to be ruled upon are:  (1)  whether Boone's testimony should be excluded because she is unqualified to testify about the specific subject matters on which she is

---

[1] Party names and other relevant terms are defined in Appendix A, submitted herewith.  Citations to "Ex." are to the exhibits to the Declaration of Lawrence M. Rolnick in Support of the Direct Action Plaintiffs' Motion to Exclude the Testimony of Professor Audra L. Boone, Ph.D. ("Rolnick Declaration"), submitted herewith.  Citations to the "Nye Rpt." are to the Expert Report of Zachary Nye, Ph.D., dated August 31, 2023, and attached as Ex. 3 to the Rolnick Declaration.  Citations to the "Boone Rpt." are to the Expert Report of Professor Audra L. Boone, Ph.D., dated October 19, 2023, and attached as Ex. 4 to the Rolnick Declaration.  Citations to "Boone Dep." are to the transcript of the deposition of Audra L. Boone, Ph.D., taken on November 16, 2023, and attached as Ex. 5 to the Rolnick Declaration.

offering an opinion; (2) whether Boone's testimony should be excluded because her opinions would not be helpful to the jury; and (3) whether Boone's testimony should be excluded because her opinions are not reliable.

## <u>SUMMARY OF THE ARGUMENT</u>

Boone's testimony should be excluded because she is not a qualified loss causation or damages expert.  Although Boone is a professor of finance, ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Indeed, her lack of qualifications in these areas were highlighted in deposition, when Boone testified ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ Boone is not qualified to render the opinions she is offering.

Even if Boone were a qualified loss causation and damages expert – and she is not – her testimony should be excluded because it would not help the jury understand the evidence or determine a fact in issue.  Boone's opinions address ████████████████ ████████████████████████████████████████████; they do not address ████████████████████████████████████████████; and they apply to only ██████████████████████████████████████████.  Thus,

2

even if the jurors were to accept Boone's opinions, Nye's analysis is uncontested with

respect to the 

Boone's opinions are more likely to confuse the jurors than

assist them, and therefore they are irrelevant and inadmissible.

Finally, Boone's opinions should be excluded because she did not conduct any

scientific analysis and offers only unsupported conclusions.  Boone did not 

The three opinions that Boone provides with

respect to Nye are unsupported by any testable or replicable scientific basis.  If Boone's

testimony is admitted, the jury will not be left with two competing explanations to weigh,

but instead will have to compare Nye's reasoned analysis against Boone's *ipse dixit*.

Boone's subjective testimony should be excluded as unreliable.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Overview of Defendants' Securities Fraud

Alta Mesa's staggeringly quick collapse was the result of Defendants' securities

fraud.  The company began as a SPAC, Silver Run II, that was formed by a private equity

firm, Riverstone, in March 2017.  On February 9, 2018, following a lengthy investor

roadshow, Silver Run II merged with AMH, an upstream oil and gas production company,

and Kingfisher, a midstream gathering and processing company, to form AMR.  To solicit

approval of that transaction, Silver Run II issued a proxy statement on January 19, 2018,

which included financial projections for AMH and Kingfisher.[2]  Following issuance of the Proxy Statement, on February 6, 2018, Silver Run II shareholders voted to approve the transaction, which closed on February 9, 2018.

Alta Mesa's core promise to investors was to embark on a drilling program that would yield at least 4,196 wells across its STACK acreage (plus upside to reach as many as 12,133 wells), with those wells averaging Alta Mesa's "type curve" EUR of 250 MBO. This projection was based on twelve wells per section and sometimes more.  Such a program would, in turn, feed – together with a purportedly robust third-party business – AMR's midstream segment, which might then spin off at an attractive multiple.[3]

Unbeknownst to investors, ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████[4] ██████████████████████████████████████
██████████████████████████████[5]

Another problem was KFM's third-party business.  Rather than the robust system of third-party contractual relationships that Alta Mesa had represented to investors, KFM's prospects ████████████████████████████████████████████████████████

---

[2] *See generally* Ex. 6.
[3] *See generally* Ex. 7; *see id.* at pp. 14, 25, 30, 54; Ex. 8 (stating, in footnotes to NAV shown on slide 14 of Ex. 7, that the NAV "[r]eflects Generation 2.0 Type Curve.").
[4] *See* Ex. 9 at AMR_SDTX01825621.
[5] *See* Ex. 10.

███████[6]  As AMR's upstream segment failed to produce the volumes it promised based on its own overly-aggressive assumptions, KFM – lacking any other source of hydrocarbon volumes except those they fictitiously modeled – also saw its value quickly evaporate.

Alta Mesa also did not have the robust system of internal controls to prevent fraud that Defendants certified it had.  Despite telling investors that they had established effective internal controls over financial reporting and vigorous disclosure controls and procedures, Defendants were able to blatantly lie to the market completely unchecked.

Thirteen months after the Merger, on February 25, 2019, Alta Mesa wrote down the value of its business by *$3.1 billion* – representing over 80% of the value ascribed to it in the Merger – and admitted to ineffective internal controls over financial reporting.[7]  On September 11, 2019, the company filed for bankruptcy.

### B.   Defendants Make Materially False and Misleading Statements in the 2017 10-K

Once Defendants convinced the Direct Action Plaintiffs and others to vote in favor of the Merger and not redeem, investors looked to AMR's first release of results to confirm the attractiveness of the investment.  On March 29, 2018, AMR did so, announcing its financial results for the fourth quarter of 2017 and the full-year 2017 on a Form 10-K filed with the SEC.[8]

---

[6] *See* Ex. 11 at AMR_SDTX00686799.
[7] Its auditors later confirmed that AMR had various material weaknesses in its internal controls over financial reporting as of December 31, 2018.  *See* Alta Mesa's Annual Report on Form 10-K for the Year Ended December 31, 2018, dated May 17, 2019, at pp. 25, 103-05, *available at* https://www.sec.gov/Archives/edgar/data/1518403/000151840319000021/altms_20181231x10k.htm.
[8] *See* Ex. 12 ("2017 10-K") at 53, F-1 – F-6.

The disclosures in the 2017 10-K were materially false or misleading.  In addition to disclosing Alta Mesa's financial results for the fourth quarter and full year 2017, the 2017 10-K contained "risk factors" applicable to Alta Mesa's business.  This included risk factors specific to Alta Mesa's upstream business ("Upstream Risk Disclosures") and risks specific to its midstream business ("Midstream Risk Disclosures").[9]  The Upstream Risk Disclosures were materially false and misleading because they failed to disclose that Alta Mesa possessed internal data contradicting the feasibility of its drilling program, including data related to well spacing and parent-child well interference.  The Midstream Risk Disclosures were materially false and misleading because they failed to disclose that Alta Mesa was projecting third-party business that it not only did not have under contract, but also had no reasonable basis to assume would come under contract in the future.  The 2017 10-K was further misleading in that it contained a statement that AMR's CEO and CFO concluded that AMR's "disclosure controls and procedures . . . were effective" ("Internal Control Disclosures"), when they were not.[10]

Following Alta Mesa's publication of the 2017 10-K, Alyeska and Orbis purchased AMR common stock in reliance on the 10-K misstatements, and also held AMR common stock when they could have sold.  As the truth about Defendants' fraud slowly and partially was disclosed to the market, Alta Mesa's stock price cratered, and Alyeska and Orbis suffered significant damages.

---

[9] 2017 10-K at 6-43 (All Risk Factors); *id.* at 13-36 ("Risks Related to Our E&P Business"); *id.* at 37-43 ("Risks Related to Our Midstream Business").
[10] 2017 10-K at 66.

Alyeska and Orbis filed actions against Defendants asserting claims under Sections 10(b), 14(a), 18, and 20(a) of the Exchange Act, as well as under Texas statutory and common law.[11]   With respect to Defendants Dimitrievich and McMullen specifically, Alyseska and Orbis allege that by signing the 2017 10-K, Dimitrievich and McMullen made the false and misleading Upstream Risk Disclosures, Midstream Risk Disclosures, and Internal Control Disclosures in the 10-K.[12]

## C.    Nye's Expert Opinions

The Direct Action Plaintiffs' market efficiency, economic materiality, proximate cause, loss causation, and damages expert is Dr. Zachary Nye, who is Vice President of the highly esteemed Stanford Consulting Group.   Nye holds a bachelor's degree in economics from Princeton University, a master's degree in finance from the London Business School, and a Ph.D. in finance from the University of California, Irvine.   Nye has provided expert testimony in over forty cases involving securities fraud or valuation.[13]   Nye has been accepted by courts across the country as an expert on the issues of loss causation and damages.  *See, e.g.*, *Mauss v. NuVasive, Inc.*, 2018 WL 656036, at *6 (S.D. Cal. Feb. 1, 2018) (permitting Nye to testify as to loss causation and damages); *In re Ocwen Fin. Corp. Sec. Litig.*, 2017 WL 11680400, at *1 (S.D. Fla. June 21, 2017) (same).

Nye applied the preeminent methodology relied upon by courts to determine whether the Direct Action Plaintiffs can establish loss causation – an "event study" using

---

[11] Ex. 1 ¶¶ 398-465; Ex. 2 ¶¶ 323-77.
[12] Ex. 1 ¶¶ 43-44, 184-87, 222-27, 239-40; Ex. 2 ¶¶ 34-35, 175-78, 206-11, 223-24.  The Direct Action Plaintiffs do not assert claims under Section 14(a) against Defendants Dimitrievich and McMullen because they did not sign the Proxy.
[13] Nye Rpt. at Ex. 1.

a statistical "regression analysis" to determine whether Defendants' misrepresentations, as alleged in the Complaints, caused losses suffered by Plaintiffs.  Nye carefully examined each Plaintiff's Complaint to determine the scope of the alleged fraud.[14] ████

██████████████████████████████████████████████████████████

████████████████████████████████.[15]

████ Nye ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████[16] ████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████[17]

████ Nye ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████[18]  An event study is a well-accepted scientific, statistical methodology for measuring the impact of information on market prices.[19] ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████[20] ████████████████████

---

[14] Nye Rpt. ¶¶ 61-70.
[15] *Id.* ¶¶ 71-80.
[16] *Id.* at ¶¶ 84-87.
[17] *See id.* ¶¶ 88-153.
[18] *Id.* ¶ 196.
[19] *Id.* ¶ 84.
[20] *See, e.g., id.* ¶ 111 & Ex. 11A.

[REDACTED] [21] Nye then [REDACTED]

[REDACTED] [22]

For each day on which Nye [REDACTED] Nye [REDACTED] [23] Having performed this analysis for each corrective event, Nye was able to opine, with a reasonable degree of economic certainty, the amount of loss caused by Defendants' fraud on a particular day.   Applying this methodology, Nye [REDACTED] [24]

Nye's loss causation analysis [REDACTED] [25]

---

[21] Nye Rpt. ¶ 85.
[22] *See id.* ¶ 54.
[23] *Id.* ¶ 86.
[24] *Id.* ¶ 88.
[25] *Id.* ¶ 166.

Nye ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ [26] ████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ [27] Pulling artificial inflation back to the start of the relevant period at a

constant amount to calculate damages – ████████████ – is commonly referred to as the

"constant dollar" approach.

To calculate each Plaintiff's damages under Section 10(b) and Section 18, Nye

████████████████████████████████ [28] ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ [29] For Plaintiffs' state law

claims, Nye ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ [30] For the holder claims under state

common law, Nye applied one of three different methodologies.[31] A summary of the Direct

---

[26] Nye Rpt. ¶ 166.
[27] *Id.* ¶ 168.
[28] *Id.* ¶¶ 7, 172.
[29] *Id.* ¶ 172.
[30] *Id.* ¶¶ 184, 188.
[31] *Id.* ¶¶ 185-87.

Action Plaintiffs' damages, as calculated by Nye and applying the different methodologies, is set forth in paragraphs 192 and 193 of Nye's report.

### D.    Boone's Deficient Rebuttal

Defendants Dimitrievich, McMullen, HPS, and Bayou City retained Professor Audra Boone to offer rebuttal opinions to Nye's expert testimony on loss causation and damages for some of the misstatements made by Dimitrievich and McMullen.  Although Boone has a Ph.D. in finance and teaches classes in that field at Texas Christian University,[32] ██████████████████████████████████████████████

████████████████████████████████[33]   When asked to state her expertise, Boone testified ███████████████████████████████████████████

████████████████████████████████████████████████████[34]

In response to questions about the damages methodology Nye applies, Boone testified that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████[35]

Boone does not challenge Nye's opinions with respect to ███████████████

████████████████████████████████████    Nye's opinions about damages cover three sets of misrepresentations made by Dimitrievich and McMullen in the 2017 10-K: ████████████████████████████████████

---

[32] Boone Rpt. App'x A.
[33] Boone Dep. at 263:15-264:3.
[34] *Id.* at 234:18-235:10.
[35] *Id.* at 264:16-266:11.

███████████████████████████████ [36] In her report, however, Boone ██████████████████████████

████████████████████████ [37]   Thus, ████████████████████████████████████

█████████████████████████████████████████████████████

    Boone also ████████████████████████████████████████████████

████████████████████████████████   Instead, she █████████████████████████████

███████████████████████████████████ [38]   Nye's analysis of █████████████

██████████████████████████████████████████████████████████████████

███████

    Boone further limits her opinion to the Direct Action Plaintiffs' claims ████████████

██████████████████████████████ [39]   Her report ████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████   Thus, although Nye issues damages opinions under Section 18

and under Texas common and statutory law with respect to Defendants Dimitrievich and

McMullen's misstatements in the 2017 10-K, ████████████████████████████████████

█████████

    Nye's opinions are based on a widely accepted methodology routinely accepted by

courts in securities fraud cases. ████████████████████████████████████████

████████████   █████████████████████████████████████████████████

█████████████████████████████████ [40] ███████████████████████████████

---

[36] *See* Nye Rpt. ¶ 64 at pp. 38-39, ¶ 65 at p. 42, ¶ 68.
[37] Boone Rpt. ¶¶ 23, 32.
[38] Boone Dep. at 298:25-301:19.
[39] Boone Rpt. ¶ 32.
[40] Boone Dep. at 271:22-273:11.



Although refusing to engage in any scientific analysis, Boone baldly criticizes Nye

for:  (1) ████████████████████████████████████████████████████████

████████[43];  (2) ████████████████████████████████████████████████

████████████████████████[44];  and (3) ████████████████████████████

████████████████████████████████████████████████████████  (*id.* ¶

43).[45]  As explained below, these opinions should be excluded for a number of reasons.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules

of Evidence.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[41] Boone Dep. at 273:12-25.
[42] *Id.* at 281:20-285:13.
[43] Boone Rpt. ¶¶ 34-38.
[44] *Id.* ¶¶ 41-42.
[45] *Id.* ¶ 43.

Rule 702 and the Supreme Court's jurisprudence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), charge courts with the responsibility of acting as "gatekeepers" to exclude unqualified, irrelevant, or unreliable expert testimony.

The proponent of an expert bears the burden of demonstrating that the expert is qualified, that her methodology is reliable, and that her testimony will assist the trier of fact. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). To allow a witness to testify as an expert, the Court "must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training or education." *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009). For the expert's testimony to be relevant, it must assist the trier of fact to understand the evidence or to determine a fact in issue. *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). Furthermore, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id.* at 355.

## ARGUMENT

### I.  BOONE IS NOT QUALIFIED

Boone is not a loss causation or damages expert. Although Boone is a professor of finance, that does not qualify her to testify on the specific subject matters of loss causation and damages in a securities fraud case, ████████████████████████ "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a ***particular*** field or on a ***given*** subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (emphasis added); *see, e.g.*, *id.* at 938 (holding that general

scientific background of mechanical engineer did not qualify him to testify in the specific area of automobile accident reconstruction); *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529-30 (5th Cir. 2015) (holding that in-house risk manager for insured companies lacked experience and knowledge to testify about whether insurance adjuster acted in bad faith); *Cooks*, 589 F.3d at 180 (holding that certified fraud examiner was not qualified to testify as an expert in mortgage fraud because he had never been qualified as a mortgage fraud expert and was "seemingly unaware of basic statutes and literature" governing mortgage fraud); *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (holding that polymer scientist was not qualified to testify about cause of tire failure because he did not have specific expertise with tire treads); *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (holding that doctor who was qualified to testify about standard of care did not have specialized expertise necessary to testify about causes of condition).



████████████████████████████████████████████████

████████████████████████[46]████████████████████████████

████████████████████████████████████████████████

██████[47]  Indeed, Boone ████████████████████████████

████████████████████████████████████[48]  Thus, while qualified to testify about

---

[46] Boone Dep. at 263:15-264:3.
[47] *See* Boone Rpt. App'x A.
[48] Boone Dep. at 234:18-235:10 (██████████████████████████████████.

15

corporate finance and economics generally, Boone lacks the training and experience necessary to qualify her as an expert in the specific areas of loss causation and damages.

During her deposition, Boone ████████████████████████████████████ ████████████████████████████████████████████ For example, Boone testified ██████████████████████████████████████ ████████████████████████[49] The constant dollar measure is a widely accepted damages methodology in this Circuit and others. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12-13 (S.D. Tex. May 20, 2014) (accepting expert's use of constant dollar approach for measuring class-wide damages), *aff'd sub nom. Ludlow v. BP, p.l.c.*, 800 F.3d 674 (5th Cir. 2015); *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *17-18 (N.D. Ill. Jan. 10, 2022); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *8 (D. Ariz. Dec. 27, 2019); *In re St. Jude Med. Inc. Sec. Litig.*, 2014 WL 6908434, at *7-8 (D. Minn. Dec. 8, 2014); *In re Novatel Wireless Sec. Litig.*, 2013 WL 12247558, at *3 & n.3 (S.D. Cal. Nov. 19, 2013). Importantly, it is also the approach that Nye applied here to calculate Plaintiffs' damages. As explained in more detail in Section III below, Nye's use of the constant dollar methodology fatally undermines Boone's criticism ███████████ ████████████████████████████████████████████ ████ ███████████████████████████████████████ ████ underscores her lack of qualifications to testify as an expert on these specific issues. *See Weiser-Brown.*, 801 F.3d at 529-30; *Cooks*, 589 F.3d at 180.



---

[49] Boone Dep. at 264:16-266:11.

## II.    BOONE'S OPINIONS ARE IRRELEVANT

Boone's testimony should be excluded not only because she is unqualified, but also because it would not be helpful to the jury.  To be admissible, expert testimony must "help the trier of fact to understand evidence or to determine a fact in issue."  Fed. R. Evid. 702. Boone's opinions address only a ████████████████████████████████████ ████████████████████████; they  do  not  address  ████████████████████ ████████████████████████████; and they apply to only ███████████████ ███████████████████████████████████ Thus, even if the jurors were to accept Boone's  opinions,  Nye's  analysis  is  uncontested  with  respect ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ Boone's testimony thus fails the relevancy prong of Rule 702 and *Daubert*.

Boone  appears  to  fundamentally  misunderstand  the  scope  of  the  claims  that  the Direct Action Plaintiffs assert against Dimitrievich and McMullen.  Nye's opinions about damages  cover  three  sets  of  misstatements  made  by  Dimitrievich  and  McMullen  in  the 2017 10-K:  (1) ████████████████████; (2) ████████████████████; and (3) ██████████████████████[50]  In her report, however, Boone ████████████████ ████████████████[51] ████████████████████████████████████████████ ████████████████████████  which  the  Direct  Action  Plaintiffs  allege  were materially  false  and  misleading  statements  made  by  Defendants  Dimitrievich  and

---

[50] Nye Rpt. ¶ 64 at pp. 38-39, ¶ 65 at p. 42, ¶ 68.
[51] Boone Rpt. ¶¶ 23, 32.

17

McMullen.[52]  Because Boone's opinion addresses only ███████████████████

they are unhelpful.  Even if the jury credited everything Boone says ██████████

████████████████ that would not provide a basis to discredit Nye's damages opinions

because Boone does not address █████████████████████████████████████████

████████████

Boone's attempt to change her written opinions mid-deposition should be rejected.

A testifying expert is required to provide "*__a complete statement of all opinions__* the witness

will express and the basis and reasons for them" in a written report.  Fed. R. Civ. P. 26(a)(2)

(emphasis added).  Boone testified ████████████████████████████████████

███████████████████████████████████████████████████[53]███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████[54]  However, later in her

deposition, ████████████████████████████████████████████████████

████████████████[55]

Such supplementation is prohibited.  A failure to set forth all opinions in a written

report can be excused only under "limited circumstances."  *Diaz v. Con-Way Truckload,*



---

[52] Boone Dep. at 244:36-246:10, 247:12-249:9.
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████ (Boon Rpt. ¶¶ 14, 24),
█████████████ (Boone Dep. at 244:36-249:9).
  Boone Dep. at 29:13-16.
[54] *Id.* at 29:16-30:12.
[55] *Id.* at 129:8-25.

*Inc.*, 279 F.R.D. 412, 421 (S.D. Tex. 2012).  Supplementation is allowed only "when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect." *Id.*  This means "correcting inaccuracies, or filling the interstices of an incomplete report based on information ***that was not available at the time of the initial disclosure***." *Id.* (emphasis in original).  Boone's ████████ was not based on new information that was not available at the time of her report.  ████████████████

████████████████████████████████████████████████████████

██████████████████ [56] Both of these pleadings are clear that the Upstream Risk Disclosures and the Midstream Risk Disclosures are alleged misrepresentations in the 2017 Form 10-K.[57]  Thus, Boone's ████████ was an attempt to correct a disqualifying flaw in her written report without any new evidence or changed circumstances.  That is not permitted.

Even if one accepted Boone's improper supplementation, her opinions are still unhelpful to the jury because she does not opine ██████████████████████ ████████████████████████████████ Boone's opinions cover ██████████████████████████████ Specifically, ████████████████████████ ██████████████████ [58] Nye's analysis ████████████████ ██████████████████████ is uncontested by Boone.  Thus, even if Boone's opinions did apply to ████████████████████████

---

[56] Boone Rpt. App'x B.
[57] Ex. 1 ¶¶ 43-44, 184-87, 222-27, 239-40; Ex. 2 ¶¶ 34-35, 175-78, 206-11, 223-24.
[58] Boone Dep. at 298:25-301:19.

██████████████████████████████████████████████

██████████████████████████████████████████████

Her opinion would therefore not provide a basis for the jury to reject Nye's damages opinion.

Boone's opinions also are limited to the Direct Action Plaintiffs' claims under Section 10(b), which further renders her testimony irrelevant. The Direct Action Plaintiffs have asserted claims against Dimitrievich and McMullen under more than just Section 10(b) of the Exchange Act. They also bring claims against Dimitrievich and McMullen for their misstatements in the 2017 10-K under Section 18 of the Exchange Act, Texas statutory law, and Texas common law.[59] █████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████[60] Thus, again, even if the jury credits Boone's opinions, they will not assist the jury in determining whether to award Plaintiffs damages. Boone's testimony therefore should be excluded as irrelevant.

## III.  BOONE'S OPINIONS ARE UNRELIABLE

Another basis to exclude Boone's testimony is because she applies no reliable methodology, but rather simply offers unsupported conclusions. To be reliable, an opinion must be "scientifically valid." *Wells v. Smithkline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "Factors that might inform whether testimony is reliable 'include whether the

---

[59] Ex. 1 ¶¶ 410-17, 447-65; Ex. 2 ¶¶ 335-42, 361-77.
[60] Boone Rpt. ¶ 32 & n.50.

expert's theory or technique:  (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.'" *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019).  An opinion based on the mere *ipse dixit* of an expert is inadmissible.  *Guile v. United Sta*tes, 422 F.3d 221, 227 (5th Cir. 2005).  "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Boone did not conduct any of the scientific analysis that a loss causation and damages expert typically performs.   ████████████████████████ ████████████████████████████████████[61] ████ ████████████████████████████████████████ ████████████████████████████████[62]  This is particularly notable given that this Circuit places great weight on statistical significance in determining causation.  *See Wells*, 601 F.3d at 380.  Further, ████████████ ████████████████████████████████████████ ████████[63]  Finally, Boone did not attempt to calculate ██████████ ████████████████  Thus, not only did Boone fail to apply a ***reliable*** methodology, she did not apply ***any*** methodology.  That renders her opinions unreliable.

---

[61] Boone Dep. at 271:22-273:11.
[62] *Id.* at 273:12-25.
[63] *Id.* at 281:20-285:13.

The three opinions that Boone offers with respect to Nye are all conclusory assertions unsupported by any testable or replicable scientific basis.  *First*, ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[64]  Boone does not cite any support for imposing such a requirement on Nye.  And for good reason.  Nye is applying the constant dollar methodology to calculate damages, which does not involve ████ ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████[65]

The constant dollar approach is based on a "price maintenance" theory that Defendants' misstatements maintained artificial inflation in the stock price because they did not disclose the truth.  All that is required under the constant dollar approach is to measure the inflation that left the stock price as the truth was disclosed, which is then pulled back to each misstatement.  *See BP*, 2014 WL 2112823, at *9 ("[C]ase law reflects a long-standing and widespread practice of measuring the stock price impact of a given misstatement *by implication* from the stock price decline caused by the misstatement's disclosure." (emphasis in original).)  As explained by the Court of Appeals:

> To visualize this approach, imagine a graph, with the x-axis measuring the date (starting when the misstatements were made and ending when after the last corrective event occurred) and the y-axis representing the scale of the price inflation. The inflation starts with some positive number and then – proceeding in a step-function – declines by a certain dollar amount after each corrective event is disclosed, eventually ending with zero.  To calculate damages, plaintiffs need only to know the date they bought the shares

---

[64] Boone Rpt. ¶ 34-38.
[65] Boone Dep. at 264:16-266:11.

(measured on the x-axis), and then multiply the price inflation on that date by the total number of shares.

*Ludlow*, 800 F.3d at 684.  This approach does not require calculating the particular amount of inflation "caused" by each misstatement – which would ignore the price maintenance theory that Nye used here.  However, Boone forms a contrary opinion based purely on her own *ipse dixit*, unsupported by any authority from actual loss causation and damages experts.  Her naked opinion is fundamentally unreliable.

*Second*, ███████████████████████████████████████████████

████████████████████████████████████████████████[66]  But in doing so Boone simply ignores the scientific analysis that Nye performed.  Nye's event study statistically eliminated as the cause of the stock price drops any information unrelated to Alta Mesa, such as broader market or industry factors.[67]  Having determined that the statistically significant price drops in Alta Mesa stock on February 25 and May 19 were related to company-specific news, Nye then carefully examined the news and disclosed information to determine whether any of the decline could be reasonably attributed, in his expert opinion, to anything that was not new, fraud-related information.  And in his view, having carefully reviewed the news, Nye found that for both February 25 and May 19, the news partially revealed Defendants' fraud and that revelation was the cause of the stock price decline.[68] ███████████████████████████████████████

█████[69]   Boone's bald opinion that █████████████████████████████████

---

[66] Boone Rpt. ¶¶ 41-42.
[67] Nye Rpt. ¶ 85.
[68] *Id.* ¶¶ 139-43, 154-58.
[69] *Compare* Boone Rpt. ¶ 41, *with* Nye Rpt. ¶ 135 n.275.

███████████████████████████████████████████ is based solely on Boone's *ipse dixit*.

Boone failed ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ The fact that Alta Mesa stock plummeted on the challenged corrective event dates is not something Boone disputes. Boone had ample opportunity to explain why, specifically, the stock price declined. She had ample opportunity to explain why, specifically, the stock price declined for non-fraud-related reasons. ██████████████ A "methodology" that consists of saying the other expert is "just wrong'" is not a methodology at all. Thus, in any "battle of the experts," the jury will not be left with two competing explanations to weigh, but instead will have to compare Nye's reasoned analysis for why the stock price declined against Boone's *ipse dixit*. Applying a standard that has no basis other than the expert's say-so is a basis for exclusion. *See Viterbo*, 826 F.2d at 424 ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."); *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1107–08 (S.D. Cal. 2012) (excluding testimony of defendant's expert who applied wrong standard for loss causation).

*Finally*, █████████████████████████████████████

█████████████████████████████████████[70]  Here, too, Boone's conclusion lacks any analysis. Nye's event study, which includes his quantitative

---

[70] Boone Rpt. ¶ 43.

regression analysis, scientifically demonstrates that the drop in the price of Alta Mesa stock on May 19 was caused by new, fraud-related, company-specific information.[71]  Boone did not ███████████████████████████████████████████████████████████ ███████████████████ And she did not ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ Stripped of any scientific methodology, Boone's bald opinions are unreliable and should be excluded.

## **CONCLUSION**

For the reasons set forth above, the Court should grant the Direct Action Plaintiffs' motion to exclude Boone's testimony.

Dated:  December 22, 2023

Respectfully submitted,

By: */s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Michael J. Hampson
Matthew A. Peller
Joseph R. Sparacio
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
mpeller@rksllp.com
jsparacio@rksllp.com

*Attorneys for the Alyeska and Orbis Plaintiffs*

---

[71] Nye Rpt. ¶¶ 154-58.

Jules P. Slim
TX Bar No. 00793026
Attorney and Counselor
PO Box 140307
Irving, TX 75014-0307
Tel.: (214) 350-5183
Fax: (214) 350-5184
jslim@slimlawfirm.com

*Counsel for the Alyeska and Orbis
Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on December 22, 2023, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

## CERTIFICATE OF CONFERENCE

I certify that on December 21, 2023, counsel for the Direct Action Plaintiffs conferred with counsel for the parties that have retained Audra L. Boone, Ph.D. in this matter regarding the substance of the relief requested herein.  The relief requested herein is opposed.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

## APPENDIX A: GLOSSARY OF KEY TERMS, ENTITIES, AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
| --- | --- |
| 2017 10-K | Alta Mesa's Annual Report on Form 10-K for the Year Ended December 31, 2017, filed with the SEC on March 29, 2018. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-de-SPAC company. |
| AMH | Alta Mesa Holdings, LP, the private pre-de-SPAC company. |
| Alta Mesa | Refers to AMR, including its subsidiaries, AMH and KFM, for the period after the Merger, and to AMH and/or Silver Run II for the period before the Merger. |
| Alyeska Complaint | Complaint of the Alyeska Plaintiffs (Dkt. 1 in 4:22-cv-01189). |
| Alyeska or Alyeska Plaintiffs | Alyeska Master Fund, L.P., Alyeska Master Fund 2, L.P., and Alyeska Master Fund 3, L.P., which are investment funds managed by Alyeska Investment Group, L.P. |
| Bayou City | Bayou City Energy Management, LLC. |
| Company | Refers to Alta Mesa. |
| Complaints | The Alyeska Complaint and the Orbis Complaint, collectively. |
| Defendants | All Defendants in the Direct Actions. |
| Dimitrievich | Donald Dimitrievich. |
| Direct Actions | The civil actions pending before this Court filed by the Alyeska Plaintiffs and the Orbis Plaintiffs. |
| Direct Action Plaintiffs or Plaintiffs | The Alyeska Plaintiffs and the Orbis Plaintiffs. |
| E&P | Acronym for the oil and natural gas exploration and production industry. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the anticipated total quantity of oil or gas that is potentially recoverable or has already been recovered from a reserve or well. |
| Exchange Act | The Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. |
| HPS | HPS Investment Partners, LLC. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing, and marketing of |

| | |
|---|---|
| | hydrocarbons from oil and gas producers that combined with Silver Run II in the de-SPAC. |
| MBO | Industry term for one-thousand barrels of oil. |
| McMullen | William McMullen. |
| Merger | The merger of Silver Run II with KFM and AMH on February 9, 2018. |
| NAV | Net asset value. |
| Orbis Complaint | Complaint of the Orbis Plaintiffs (Dkt. 1 in 4:22-cv-02590). |
| Orbis or Orbis Plaintiffs | Orbis Global Equity LE Fund (Australia Registered), Orbis Global Equity Fund (Australia Registered), Orbis Global Balanced Fund (Australia Registered), Orbis SICAV, Orbis Institutional Global Equity L.P., Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray Australia Balanced Fund, Orbis OEIC, and Orbis Institutional U.S. Equity L.P., which are investment funds managed by Orbis Investment Management (U.S.), L.P. or Orbis Investment Management Limited. |
| Proxy Statement | The proxy statement issued by Silver Run II in connection with the Alta Mesa de-SPAC, dated January 19, 2018. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4. |
| Riverstone | Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP, the sponsor of Silver Run II. |
| SEC | United States Securities and Exchange Commission. |
| Silver Run II | Silver Run Acquisition Corporation II, the SPAC entity created by Riverstone that merged with KFM and AMH. |
| Schlumberger | Schlumberger Limited, the petrochemical engineering company that advised Alta Mesa. |
| SPAC | Acronym for "special purpose acquisition company." |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |