# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>Judge George C. Hanks, Jr. |

## APPENDIX TO DEFENDANTS' OPPOSITION TO CLASS PLAINTIFFS' CORRECTED MOTION TO EXCLUDE THE TESTIMONY OF JOHN FIEBIG

In accordance with Court Procedure 7(B)(3), Moving Defendants submit this Appendix in support of their Opposition to Class Plaintiffs' Corrected Motion to Exclude the Testimony of John Fiebig, which is filed concurrently herewith.  Moving Defendants rely on the following evidence to support their motion:

| Ex. | Description |
|---|---|
| 1. | Excerpts of the Deposition of John Fiebig taken on November 16, 2023 |
| 2. | AICPA Code of Professional Conduct 1.300.001 (Effective December 15, 2014) |
| 3. | Excerpts of the Deposition of Jeffrey Knupp (TPH 30(b)(6)) taken on June 14, 2023 |
| 4. | Project Amberjack Technical Review Presentation dated June 2, 2017 (DEF-36) |
| 5. | Excerpts of the Deposition of D. Paul Regan taken on November 2, 2023 |

Dated: January 19, 2024                 Respectfully submitted,

By  /s/ *J. Christian Word*

> J. Christian Word
> Attorney-in-Charge for Defendants
> D.C. Bar No. 461346
> S.D. Tex. Bar No. 3398485
> **LATHAM & WATKINS LLP**
> 555 Eleventh Street, NW
> Suite 1000
> Washington DC 20004
> Tel: (202) 637-2200
> Fax: (202) 637-2201
> Christian.Word@lw.com
>
> Of Counsel:
> Heather A. Waller (with permission of
> Attorney-in-Charge)
> IL Bar No. 6302537
> S.D. Tex. Bar No. 2886108
> **LATHAM & WATKINS LLP**
> 330 North Wabash Avenue, Suite 2800
> Chicago, IL 60611
> Tel: (312) 876-7700
> Fax: (312) 993-9767
> Heather.Waller@lw.com
>
> Stephen T. Nasko (*pro hac vice*)
> D.C. Bar No. 1779366
> **LATHAM & WATKINS LLP**
> 555 Eleventh Street, NW
> Suite 1000
> Washington DC 20004
> Tel: (202) 637-2200
> Fax: (202) 637-2201
> Stephen.Nasko@lw.com
>
> *Counsel for Defendants Alta Mesa
> Resources, Inc., f/k/a Silver Run
> Acquisition Corporation II; Riverstone
> Holdings LLC; Harlan H. Chappelle;*

2

*Stephen S. Coats; Michael E. Ellis; William D. Gutermuth; James T. Hackett; Pierre F. Lapeyre, Jr.; David M. Leuschen; Donald R. Sinclair; Ronald J. Smith; Jeffrey H. Tepper; Thomas J. Walker; and Diana J. Walters*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com

Of Counsel:
Katherine A. Preston
TX Bar No. 24088255
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
CA Bar No. 261558
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
jschreiber@winston.com

*Co-Counsel for Defendants Harlan H. Chappelle and Michael E. Ellis*

3

## **CERTIFICATE OF SERVICE**

I certify that on January 19, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ J. Christian Word*
J. Christian Word

# EXHIBIT 1

Page 1

1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4   IN RE:  ALTA MESA              )

5   RESOURCES, INC.,              ) CASE NO. 4:19-cv-00957

6   SECURITIES LITIGATION         )

7

8

9

10   ***********************************************

11           VIDEOTAPED ORAL DEPOSITION OF

12               JOHN P. FIEBIG

13              NOVEMBER 16, 2023

14   ***********************************************

15

16

17       On the 16th day of November, 2023, at 8:59 a.m.,

18   the videotaped oral deposition of the above-named

19   witness was taken at the instance of the Class

20   Plaintiffs, before Michelle L. Munroe, Certified

21   Shorthand Reporter in and for the State of Texas, at

22   Kirkland & Ellis LLP, 4550 Travis Street, Suite 1200,

23   Dallas, Texas, pursuant to Notice and the agreement

24   hereinafter set forth.

25

Page 2

1                    A P P E A R A N C E S

2

     FOR THE PLAINTIFF CAMELOT EVENT DRIVEN FUND:
3          Ira Schochet
           LABATON SUCHAROW LLP
4          300 Delaware Avenue, Suite 1340
           Wilmington, Delaware  19801
5          ischochet@labaton.com

6
           David Saldamando
7          LABATON SUCHAROW LLP
           140 Broadway
8          New York, New York  10005
           dsaldamando@labaton.com

9

10    FOR THE DEFENDANTS HPS INVESTMENT PARTNERS, LLC AND
     DON DIMITRIEVICH:
11         Emily Couture  (via Zoom)
           QUINN EMANUEL URQUHART & SULLIVAN, LLP
12         300 W. 6th Street, Suite 2010
           Austin, Texas  78701
13         emilycouture@quinnemanuel.com

14

15    FOR THE DEFENDANTS ARM ENERGY HOLDINGS LLC:
           Andrea L. Gordon  (via Zoom)
16         EVERSHEDS SUTHERLAND
           700 6th Street NW, Suite 700
17         Washington, DC  20001
           andreagordon@eversheds-sutherland.com

18

19
     FOR THE DEFENDANTS BAYOU CITY ENERGY AND WILLIAM
20    MCMULLEN:
           Shainee S. Shah  (via Zoom)
21         Sarah Kaplan  (via Zoom)
           KIRKLAND & ELLIS LLP
22         609 Main Street
           Suite 4700
23         Houston, Texas  77002
           shainee.shah@kirkland.com
24         sarah.kaplan@kirkland.com

25

```
 1            A P P E A R A N C E S (continued)
 2   FOR THE DEFENDANTS ALTA MESA RESOURCES, INC., HARLAN
     H. CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER,
 3   WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J.
     WALTERS, RIVERSTONE INVESTMENT GROUP LLC, STEPHEN
 4   COATS, MICHAEL E. ELLIS, PIERRE F. LAPEYRE, DAVID M.
     LEUSCHEN, DONALD SINCLAIR, RONALD SMITH AND THE
 5   WITNESS:
         Heather Waller
 6       Natalie Salazar  (via Zoom)
         LATHAM & WATKINS LLP
 7       300 N. Wabash Avenue
         Suite 2800
 8       Chicago, Illinois  60611
         heather.waller@lw.com
 9
         Stephen Nasko
10       LATHAM & WATKINS LLP
         555 Eleventh Street NW
11       Suite 1000
         Washington, DC  20004
12       stephen.nasko@lw.com
13
14   FOR THE DEFENDANTS CHAPPELLE AND ELLIS:
         Walter Moreau Berger  (via Zoom)
15       WINSTON & STRAWN, LLP
         800 Capitol Street
16       Suite 2400
         Houston, Texas  77002
17       cberger@winston.com
18
19   ALSO PRESENT:
         Umair Hussain  (via Zoom)
20       Steven McBride  (via Zoom)
         Jean Philippe Poissant
21       Miranda Glover, Video Technician
22
23
24
25
```

Page 9

1      A.   I do not.

2      Q.   And are there any continuing education or

3  certifications you are required to obtain to stay up

4  to date as an accounting professional?

5      A.   Yes.  I take regular CPE.  I have for, you

6  know, all of my career since the beginning in all

7  various types of topics; auditing, accounting,

8  internal controls, oil and gas accounting,

9  throughout.  I generally receive, you know, minimum

10  of 40 hours a year.

11      Q.   Okay.  Your CV makes no reference to any

12  publications.

13           Have you ever been published before?

14      A.   I think we provided you with a -- some

15  recent documents from a company called GAAP Dynamics

16  where I contributed to their eBook, if you will.

17  That's really the extent of it.

18      Q.   Have you ever been published in any

19  journals under a peer-review process?

20      A.   No.

21      Q.   Let's work through -- walk through your

22  work experience now.

23      A.   Okay.

24      Q.   Your CV lists during the years 1987 to

25  2002 and then 2002 to 2004, Ernst & Young and Arthur

Page 10

1    Andersen.

2            So am I correct in reading this that your

3    first job out of Oklahoma State University was at

4    Arthur Andersen?

5        A.    That's correct.

6        Q.    Okay.  And thereafter you were employed by

7    Ernst & Young; is that correct?

8        A.    Yes, as a partner.

9        Q.    Okay.  And you provide some bullet points

10   as to the work you did in both firms as an audit

11   partner and a senior audit manager; is that correct?

12       A.    That's correct.

13       Q.    Would you agree with me that none of the

14   bullet points involved forensic accounting work?

15       A.    That's correct.

16       Q.    And tell me, what is your understanding as

17   to the difference between auditing and forensic

18   accounting?

19       A.    I think it's generally the -- the purpose

20   of the -- of the procedures you're performing, the

21   purpose of the engagement in terms of, while it

22   includes a lot of the same type of principles,

23   auditing has its own standards, forensics has its,

24   but they're all kind of in the same area of

25   expertise, I think, as it relates to identifying,

```
                                              Page 11
```

1   evaluating evidence and information.

2        Q.    Did you do any forensic accounting work at

3   Arthur Andersen?

4        A.    I don't believe so.

5        Q.    How about at Ernst & Young?

6        A.    No.

7        Q.    In your time at Arthur Andersen and Ernst

8   & Young, for the audits that you conducted for

9   various public and private companies, wasn't it true

10  that, in general, you relied upon the public or

11  private company that you audited to provide you with

12  all the information, materials in which you based

13  your audit on?

14       A.    I think in general that's correct, that we

15  would have our list of items that we requested from

16  them, and then we would expect them to provide the

17  information that we had requested.

18       Q.    You didn't have subpoena power with

19  respect to any of your audit clients, right?

20       A.    No.

21       Q.    Okay.  And you didn't have access during

22  any of the audits you participated in to nonpublic

23  documents produced or in litigation involving the

24  audit client, did you?

25       A.    I'm sorry, I didn't hear the first part of

1    that.  Can you ask it again?

2        Q.    Sure.  You didn't have access during the

3    audits that you participated in to nonpublic

4    documents produced during litigation involving the

5    audit client?

6        A.    I don't recall.  I don't recall that I

7    have or -- probably didn't make that distinction at

8    the time or was aware of it perhaps.

9        Q.    And why did you leave Arthur Andersen to

10   go to Ernst & Young?

11       A.    Arthur Andersen collapsed.  So the

12   Oklahoma City practice was acquired by Ernst &

13   Young, at which time I went over as a direct-admit

14   partner and almost immediately was transferred to

15   the Fort Worth office of Ernst & Young to move down

16   here as part of the firm.

17       Q.    While at Arthur Andersen, did you have any

18   role in the Enron audit which I think we can agree

19   had something to do with the collapse of Arthur

20   Andersen?

21                MR. NASKO:  Objection.

22       A.    I did not.

23       Q.    Did you have any role in the preparation

24   of any Arthur Andersen audit work conclusion or

25   finding that any judicial body criticized?

```
                                                    Page 21
 1        Q.    How many hours of work have you expended
 2   in this case thus far?
 3        A.    I haven't really added up what I have done
 4   this month, but it was -- I would say I'm in the
 5   area of 160 to 170 hours.
 6        Q.    And when were you hired by Latham?
 7        A.    Late September.
 8        Q.    You don't provide the compensation rate of
 9   those who are assisting you as well as the number of
10   hours they have expanded on this case.
11              Is there a reason why you didn't provide
12   that information?
13                    MR. NASKO:  Objection.
14        A.    I believe we produced that separately, but
15   no.
16                    MR. SCHOCHET:  Heather, if it has been
17   produced, I believe we haven't been able to locate
18   it.  Can you provide us with that information?
19                    First instance, have you provided it
20   to us because we haven't seen it.
21                    MR. NASKO:  You mean, the people that
22   supported him from Cornerstone.
23                    MR. SCHOCHET:  People who supported
24   him and their rates and the hours expended.
25                    MR. NASKO:  Because there was two
```

Page 22

```
1    separate fee summaries.  There was one from ADIGEO
2    and then one from Cornerstone, both of them related
3    to the report.  We can get you both of those.
4                    MR. SCHOCHET:  That would be great.
5    Thank you so much.
6         Q.   Are there any invoices that you have
7    issued to Latham that remain unpaid?
8         A.   I haven't checked recently.  I know we
9    were contacted this week asking about payment terms.
10   So I don't know if we received or not any.  I am the
11   accounting department, so it takes for me to go look
12   at the bank account.
13        Q.   Have you ever conducted an audit or
14   involved in any team that conducted an audit for any
15   of the defendants in this action?
16        A.   No.
17        Q.   Okay.  And it says that you were assisted
18   in this matter by staff of ADIGEO Consulting, LLC,
19   and Cornerstone Research.
20             What does it mean that you were assisted
21   in the matter with -- by these entities?
22        A.   They helped me in terms of drafting the
23   report.  I was identifying and determining what the
24   opinions were and which were the relevant documents
25   that I wanted to consider and bring in.  They helped
```

Page 23

1   me to organize the documents.  And, you know,
2   basically I'm using their -- Cornerstone's portal to
3   access the documents that we're using.
4           And in terms of drafting, as we bring
5   those in and as I develop the opinions and the
6   views, they help to both bring in the support into
7   the report as well as helping to draft and edit.
8       Q.   When you say bring in the support to
9   draft, what does that mean?
10      A.   Well, if I reference an exhibit, I may
11  have said, hey, can you -- can you quote this
12  section in here and provide the footnote reference,
13  and, you know -- there's a lot to do to do that I
14  find out.
15      Q.   Did they select the documents that you
16  reviewed?
17      A.   No.  They helped me in selecting them, but
18  I drove the selection process and worked with them
19  on an iterative basis as we were working through the
20  documents.
21      Q.   And did they provide any of the analysis
22  that's contained in the report?
23      A.   No.  Ultimately, I mean, they -- they
24  contributed to it.  They did review some documents
25  and provide me with views relative to those

Page 24

1   documents.  But the analysis and opinions within the

2   report are mine.

3        Q.   And who actually wrote the report?

4        A.   It was a combination of me and some of the

5   staff from Cornerstone that worked together on it.

6        Q.   And who at Cornerstone participated in

7   drafting the report?

8        A.   I would say primarily JP Poissant, Steve

9   McBride, and then Kelly -- they're on the list of

10  names.  I don't always remember their last name.

11       Q.   Let's turn to paragraph 1 of your report.

12  And this indicates what your scope of engagement was

13  as an expert, correct?

14       A.   Yes.

15       Q.   And it says here that, I have been

16  retained as an independent expert to evaluate and

17  respond to financial accounting and reporting

18  opinions expressed by Mr. D Paul Regan, CPA/CFF, in

19  his expert report dated August 31, 2003.

20  Specifically I have been asked to evaluate

21  Mr. Regan's following opinions.  And then it lists

22  out Mr. Regan's opinions.

23            Is it correct that you never conducted

24  your own independent analysis as to the accounting

25  matters at issue in this litigation?

1           MR. NASKO:  Objection.

2      A.   When you say "independent analysis,"

3   certainly relative to some of the documentation I

4   obtained and some of what Mr. Regan had referenced

5   in his report and some of the opinions and findings

6   that he offered in his report, I obtained, you know,

7   support for it, understood it.

8           I think to say no independent analysis, I

9   think you have to be more specific as to which area

10  where I thought about it.

11     Q.   Did you ever perform any auditing tests?

12     A.   Auditing tests?  I think that's a very

13  broad term because when you think about auditing,

14  auditing includes review as a procedure.  Certainly

15  I reviewed the documents that I reference to,

16  including many of the work papers at KPMG to review

17  and understand.  So I think that's probably one of

18  the tests that I would have performed.

19     Q.   Did you rerun any financial models used to

20  prepare projections?

21     A.   No, I certainly -- I obtained and reviewed

22  and understood what were in those models.  But given

23  the fact that Mr. Regan hadn't really provided any

24  analysis of the underlying information within them,

25  I did not.

                                                    Page 26

1        Q.    Did you rerun any accounting calculations

2   to determine either impairment or for any other

3   purpose?

4        A.    I reviewed many of the calculations that

5   were provided within the support, did not retest the

6   clerical accuracy.

7        Q.    And you never performed an audit of Alta

8   Mesa as of the time the business combination or any

9   other time thereafter; is that correct?

10       A.    That's correct.

11       Q.    The scope of your work, sir, was solely

12  limited to reviewing and providing analysis as to

13  Paul Regan's opinions; is that correct?

14                 MR. NASKO:   Object to form.

15       A.    Solely limited to reviewing -- obtaining

16  the information in support of my opinion, looking at

17  the information that he had cited, some of the other

18  information that existed, and evaluating his

19  opinions, that just sounded very limiting, so I

20  don't know that I --

21       Q.    Well --

22       A.    -- definitely agree with --

23       Q.    I'm sorry.

24       A.    Go ahead.

25       Q.    You're not offering any opinions separate

1   and apart from your conclusions as to what you

2   termed in paragraph 1 of your report, the financial

3   accounting and reporting opinions of Mr. Regan; is

4   that correct?

5        A.   I think -- yeah, to be clear, all the

6   opinions that I'm offering are included within this

7   document.

8        Q.   It says that -- it says in paragraph 1,

9   you were asked by counsel to specifically evaluate

10  those of Mr. Regan's opinions that you then list

11  with bullet points.

12            Does your report contain any opinions

13  other than your -- other than your --

14                 MS. WALLER:  Casey, I think you're off

15  mute.

16       Q.   It says in paragraph 1 that you were asked

17  by counsel to specifically evaluate those of

18  Mr. Regan's opinions that you then list with bullet

19  points.

20            Does your report contain any opinions

21  other than your evaluation of Mr. Regan's opinions

22  that are bullet pointed in paragraph 1?

23                 MR. NASKO:  Object to form.

24       A.   I think all of my opinions relate to these

25  bullet points and my -- my view of them.

```
                                              Page 32
 1                MR. SCHOCHET:  Tab 3, Umair.
 2                (Exhibit 813 marked.)
 3                MS. WALLER:  Are you just marking the
 4     copies or just marking --
 5                MR. SALDAMANDO:  We put it in Exhibit
 6     Share.  These are just courtesy copies.
 7                MR. HUSSAIN:  The exhibit has been
 8     introduced.
 9        Q.   You'll note, sir, first in the box below
10     the title that the SSFS are issued by the Forensic
11     and Valuation Services Executive Committee; is that
12     correct?
13        A.   That's correct.
14        Q.   And are you aware that this committee is
15     the AICPA standards setting body for CPAs performing
16     forensic and valuation services?
17                MR. NASKO:  Object to form.
18        A.   I believe so.
19        Q.   Would you agree, sir, that a person who
20     served on the Forensic and Valuation Services
21     Executive Committee would have a better and deeper
22     understanding of the SSFS than would you?
23                MR. NASKO:  Object to form.
24        A.   Not necessarily.  I recognize that service
25     on that but the experience and application or
```

```
                                            Page 33
 1    understanding, I just wouldn't know exactly to the
 2    extent that they would have -- what experience they
 3    may have, so I can't really speak to what their
 4    experience might be.
 5         Q.   Okay.  You testified, though, that you
 6    have never conducted a forensic audit -- accounting
 7    audit; is that correct?
 8              MR. NASKO:  Object to form.
 9         A.   I believe the question was while I was at
10    Arthur Andersen.  I mean, when you say forensic
11    audit, forensic procedures, I believe that within
12    some of my expert engagements, that I would have
13    utilized the forensic standards.
14         Q.   In which instances?
15         A.   In the ones where I have issued a report.
16         Q.   And you did so pursuant to SSFS?
17         A.   Yes.
18         Q.   Would you agree that a person who -- let
19    me strike that.
20              What is the credential that the AICPA
21    issues for forensic accountants?
22         A.   Off the top of my head, I can't think of
23    what the designation is.
24         Q.   Would you agree it's the certified in
25    financial forensics, CFF?
```

```
                                           Page 34
 1        A.    I believe that's correct.
 2        Q.    Are you a member of the AICPA's Forensic
 3    and Valuation Services section?
 4        A.    I am not.
 5        Q.    Are you a CFF?
 6        A.    No.
 7        Q.    And why not?
 8        A.    I haven't gone through the certification
 9    process.
10        Q.    What experience do you have applying SSFS?
11        A.    Generally within my expert engagements
12    that I have performed while with ADIGEO.
13        Q.    In your role at the PCOB, did you ever
14    analyze whether an accountant had appropriately
15    applied SSFS?
16              MR. NASKO:  Object to form.
17        A.    I don't believe so, no.
18        Q.    In your role at Arthur Andersen, did you
19    ever perform an engagement pursuant to SSFS?
20        A.    Not that I can recall.
21        Q.    At Ernst & Young?
22        A.    No.
23        Q.    Are you familiar with the AICPA's Forensic
24    and Valuation Services, which I'll abbreviate as
25    FVS, practice aids?
```

```
                                              Page 35
```

1         A.   I don't know that I have seen them

2    recently, no.

3         Q.   Can you name any FVS practice aids?

4         A.   Not off the top of my head.

5                   MR. NASKO:   Object to form.

6         Q.   Have you ever attended the AICPA's

7    Forensic and Valuation Services national conference?

8         A.   No.  I attend the annual AICPA and SEC

9    update and the audit ENGAGE conference, which is a

10   large breadth of experience for everybody within the

11   AICPA.  They may -- I don't know but what they may

12   offer those types of courses in that because it's --

13   every practice that the -- basically the AICPA

14   members are in.  So I don't know if I have ever

15   attended one of their sessions or not if they're

16   part of that, so...

17        Q.   You don't recall one way or the other ever

18   having attended a session of the Forensic and

19   Valuation Services national conference?

20        A.   No.

21        Q.   Okay.  Have you ever attended any

22   state-based forensic accounting conferences?

23        A.   No.

24        Q.   Have you ever spoken at a forensic

25   accounting conference?

```
                                            Page 39
 1   that critical evaluation of it.
 2       Q.   All that goes, though, into determining as
 3   to whether or not, would you agree, that -- as to
 4   whether or not he looked at sufficient relevant
 5   data; is that correct?
 6              MR. NASKO:  Object to form.
 7       A.   No, I think it's beyond that as well.  I
 8   think it's the due professional care and critically
 9   evaluating that, and in terms of evaluating it,
10   reconciling those contradictory views to his opinion
11   to the extent that they are relevant, yes.
12       Q.   Beyond the extent to which how he
13   evaluates data, what he's -- what he's required to
14   look at, though, is sufficient relevant data; is
15   that correct?
16              MR. NASKO:  Object to form.
17       A.   That's one component of it -- of the
18   requirements.
19       Q.   Do the SSFS define specific type of data
20   that a CPA should obtain to support the reasonable
21   basis for conclusions?
22              MR. NASKO:  Object to form.
23       A.   I don't believe that it goes that far.
24       Q.   Does it say that email should not be used
25   to support an opinion?
```

```
                                              Page 40
 1                MR. NASKO:  Object to form.
 2        A.    No, I don't believe so.
 3        Q.    If you look at paragraph 33(a)(2) of your
 4    opinion -- and this is something that you repeat
 5    elsewhere including in 36(b).
 6              You fault Mr. Regan for not -- quote, not
 7    providing a comprehensive analysis of the data.
 8              Do you see that, sir?
 9        A.    Is that in (a)(1)?
10        Q.    (a)(2).
11        A.    I'm sorry.
12        Q.    In the first sentence.
13        A.    Yes.
14        Q.    Can you show me where in the SSFS that
15    that is the appropriate standard?
16                MR. NASKO:  Object to form.
17        A.    I think it goes back to both the
18    determination or the sufficient relevant data and
19    due professional care.
20        Q.    Is it your opinion, sir, that a
21    requirement that CPA review, quote, sufficient
22    relevant data to afford a reasonable basis for
23    conclusions is the same as requiring the CPA to
24    provide a comprehensive analysis of the data?
25                MR. NASKO:  Object to form.
```

Page 41

1      A.   I think this is very much a

2  principles-based standard, and it's how a CPA would

3  apply it.  And I think, given my -- and my opinion

4  is fairly clear that I believe that he needed to

5  provide a more comprehensive analysis of the

6  underlying data.

7      Q.   Is it your opinion those are the same

8  standards?  Let me state what they are:  Sufficient

9  relevant data to afford a reasonable basis for

10  conclusions.

11           Is it your opinion that that's the same

12  standard as providing a comprehensive analysis of

13  the data?

14               MR. NASKO:  Object to form.

15      A.   I would also say that it applies due

16  professional care.

17      Q.   My question is:  Are those the same

18  standards?

19      A.   Those two standards?

20      Q.   Uh-huh.

21               MR. NASKO:  Object to form.

22      A.   I think these are very much

23  principles-based standards and that the application

24  in this situation would have required a more

25  comprehensive analysis of the underlying assumptions

Page 42

1    process.

2        Q.   You don't say more comprehensive; you say

3    a comprehensive analysis --

4                 (Simultaneous speaking.)

5                 MS. WALLER:  Can you let him answer

6    the question and finish it, and then you can ask him.

7    Slow down a little bit.  You're talking over each

8    other.

9                 MR. SCHOCHET:  I agree.

10       Q.   I'm sorry, go ahead, finish your answer.

11       A.   Yeah, I don't -- I don't believe -- well,

12   to be clear, for a lot of these I'm not sure I have

13   seen where he has understood the underlying or even

14   evaluated the underlying assumptions or processes to

15   create the projections.

16       Q.   Again, the question, though, is whether or

17   not -- putting aside your -- your analysis of

18   Mr. Regan's opinion, which we'll get to, I'm talking

19   now about the standards themselves.

20           And the question is whether or not a

21   sufficient relevant -- a standard requiring a

22   sufficient relevant data to afford a reasonable

23   basis for the conclusions is the same as requiring a

24   CPA to provide a comprehensive analysis of the data?

25                 MR. NASKO:  Objection; asked and

Page 43

1    answered.

2          A.    In this case, I would say yes, it is.

3          Q.    And what's the basis for that opinion?

4          A.    In terms of determining -- in order to

5    have a basis for the opinion, there is a level of

6    diligence and understanding that you have to have of

7    the underlying aspect.

8                As I list in my report, you know, in terms

9    of being able to understand, it can't just be a, you

10   know, retrospective look back and say, okay, well,

11   they didn't get there, and here is an email that

12   said this, that, or the other.

13               Without providing the context, if you

14   will, of what those mean within the determination

15   and development of the projections themselves and,

16   you know, without that understanding, it calls into

17   question really the relevance of what some of these

18   other emails and items that he pointed to were from

19   his -- from the perspective of his evaluation.

20         Q.    Just to be clear, then, are you saying

21   that the standards require -- when the standards

22   refer to sufficient relevant data, that they mean a

23   comprehensive -- a comprehensive analysis of the

24   data?

25                    MR. NASKO:  Object to form.

Page 44

1        A.    Again, in this situation, I believe so.

2        Q.    Not just -- I'm talking generally, not

3    just this situation.

4        A.    It's a principles-based standard, and I

5    think that you apply that principle and -- within

6    the situation.  You know, having been at the PCOB

7    for so many years and the auditing standards were

8    principle based, not prescriptive as the accounting

9    standards sometimes are, you have to have experience

10   with saying, okay -- or maybe even a comfort level

11   with what a principle-based standard is to say, yes,

12   that broad -- that broad principle or that very

13   clearly stated principle, you know, is something

14   that within those two sentences is not meant to be

15   limiting as to -- as to what a CPA would need to do

16   in order to apply it.

17       Q.    Do you derive any support for the view

18   that a sufficient relevant data equals a

19   comprehensive analysis of the data from any FVS

20   forensic accounting practice aids?

21                MR. NASKO:  Object to form.

22       A.    I have not.

23       Q.    From any treaties adopted by forensic

24   accountants?

25                MR. NASKO:  Object to form.

Page 45

```
 1        A.    Not that I'm aware of, no.
 2        Q.    I note, sir, that Mr. Regan in Appendix B
 3   of his report lists over six pages with three to
 4   four columns in each page all of the documents
 5   produced in this case he considered.  And this is by
 6   contrast with your over five pages with only one
 7   column of documents on each page.
 8              So is it fair to say you did not review
 9   all the documents that Mr. Regan listed that he
10   considered?
11                   MR. NASKO:  Objection; form.
12        A.    I have reviewed all of the documents that
13   he cited to that I have cited to.  Cornerstone has
14   reviewed all of the documents within his appendix
15   that I haven't, and I have reviewed some of those,
16   but they have reviewed those under my direction and
17   have provided me any relevant information or
18   observations from their review of that.
19        Q.    So you're relying upon Mr. -- I'm sorry,
20   you're relying upon Cornerstone to provide you with
21   relevant documents that Mr. Regan had considered but
22   you did not?
23                   MR. NASKO:  Object to form.
24        Q.    Is that correct?
25        A.    That they have reviewed -- I'm relying on
```

Page 46

1    their significant experience in this field and

2    experience reviewing documents in support in terms

3    of being able to provide me with any views that

4    would be relevant to my opinion.

5         Q.   And you determined that that was the

6    proper procedure, that you didn't need to look at

7    every single document that Mr. Regan looked at?

8                   MR. NASKO:   Object to form.

9         A.   That's correct.

10        Q.   Okay.  Would you consider that to be a

11   comprehensive analysis of the data?

12                  MR. NASKO:   Object to form.

13        A.   Yes, within -- within the confines of my

14   team that was under my direction, yes.

15        Q.   And in paragraph 65(e) of your report, you

16   state that, Mr. Regan has not identified evidence

17   that causes me to believe that KPMG did not conduct

18   their audits and review in compliance with relevant

19   PCAOB auditing standards.

20             Sir, did you understand that Mr. Regan

21   attempted to assess the quality of KPMG's audit?

22                  MR. NASKO:   Object to form.

23        A.   I did not understand that from his report,

24   no.

25        Q.   And, therefore, why are you asserting this

```
                                                    Page 60
 1   Thank you.
 2                    THE VIDEOGRAPHER:  We're off the
 3   record at 10:07.
 4                    (Recess 10:07 a.m. to 10:22 a.m.)
 5                    THE VIDEOGRAPHER:  We're back on the
 6   record at 10:22.
 7        Q.   Sir, if you look at the Regan report and
 8   if you look at paragraph 57 of the report.
 9        A.   Okay.
10        Q.   You see Mr. Regan states that, As of
11   August 17, 2017, however, when AMH first published
12   the 2018 EBITDAX -- that's E-B-I-T-D-A-X --
13   projection of $258 (sic) million, AMH had
14   contemporaneous STACK field production data that
15   appears to have contradicted the WPS in EUR
16   assumptions.
17             And, sir, in support of that assertion,
18   besides a chart contained in the report which we'll
19   discuss later, he gives expressly as one example a
20   specific email with certain well spacing
21   information.  And we'll get to that later as well,
22   sir.
23             But, first, let me bring a couple more
24   documents to your attention, one of which you appear
25   not to have considered.  Let me show you first what
```

                                              Page 61

1    I'll have marked as Exhibit 815.

2                    MR. SCHOCHET:  Which is tab 5, Umair.

3                    MR. HUSSAIN:  The exhibit has been

4    introduced.

5         Q.   In the first instance, let me ask you if

6    you have seen this document before, Mr. Fiebig.

7                    (Exhibit 815 marked.)

8         A.   (Reviewed document.)  Not that I recall.

9         Q.   And this is an April 2017 Riverstone email

10   containing an engineering report from what appears

11   to be an outside consultant, Chris Widell, correct?

12                    MR. NASKO:  Object to form.

13        A.   I'm sorry, I would have to --

14        Q.   Sure.  Take a look.  Take your time.

15        A.   (Reviewed document.)  I'm sorry, so I

16   haven't finished reading the full part of it, but

17   what was your question?

18        Q.   My question is:  This seems to be a --

19   well, it is an April 2017 Riverstone email, correct?

20   I'm sorry, 2017 email; is that correct?

21        A.   That's correct.

22        Q.   Okay.  And it contains an engineering

23   report from what appears to be an outside

24   consultant, Chris Widell; is that correct?

25                    MR. NASKO:  Object to form.

Page 62

1      A.   You say an engineering report.  I guess I
2  would have to -- I'm not sure I characterize it --
3  again, I haven't read the full body.
4      Q.   Of course.
5      A.   If you would like me to, I would.
6      Q.   Sure.
7      A.   But from an engineering report, I'm not
8  sure if that's what this represents or if it's some
9  thoughts on it.
10      Q.   It appears to be a set of conclusions by
11  an outside consultant, Chris Widell; is that
12  correct?
13                MR. NASKO:  Object to form.
14      A.   If you'll allow me, then I'll read these
15  three paragraphs and then I'll respond.  (Reviewed
16  document.)  Okay.
17      Q.   So my question again is:  Am I correct in
18  characterizing this email, at least the front -- the
19  top page of the email as a report of what appears --
20  from what appears to be an outside consultant, Chris
21  Widell; is that correct?
22                MR. NASKO:  Objection; form.
23      A.   It's an email expressing some of his
24  views.  I'm not sure I would call it a report but
25  more of a three-paragraph email sharing some of his

```
                                              Page 63
 1   views.
 2        Q.   From an outside consultant; is that
 3   correct?
 4        A.   Yeah, I believe --
 5             MR. NASKO:   Object to form.
 6        A.   -- from the context of this, that he is
 7   that.
 8        Q.   You will note that among other things, he
 9   concludes by saying that he wasn't surprised to see
10   their lackluster down-spacing results.  And then --
11   and referring to Alta Mesa spacing tests on part of
12   its acreage position, he refers to, quote, a high
13   degree of wellbore interference with even the four
14   wells per unit having a hard time hitting the type
15   curve.
16             Sir, do you have any reason to believe
17   that KPMG saw this document?
18        A.   I'm sorry, I was just trying to catch --
19             MR. NASKO:   Objection; form.
20        A.   -- where you had read that from.  Sorry, I
21   was reading.
22        Q.   Oh, sure.  Of course.
23        A.   I don't know if they have or not.
24        Q.   You have no reason to believe they saw it,
25   though, right?
```

Page 64

1            MR. NASKO:  Objection; asked and

2     answered.

3        A.    I have no idea.

4        Q.    At the least, would you agree this

5     document is not consistent with management's

6     representation to KPMG that the company had minimal

7     to no child wells completed as of February 9, 2018,

8     by which it could have tested its reservoir

9     engineering assumptions?

10            MR. NASKO:  Object to form.

11       A.    You know, this is a fairly technical memo,

12    and I'm not sure that it -- that I can glean from

13    that that that's what it -- that it's contradictory.

14       Q.    Beyond the conclusions that he comes to,

15    he is assessing testing -- pattern testing before

16    February 19, 2018, the results of that testing; is

17    that correct?

18            MR. NASKO:  Object to form.

19       A.    I don't -- you say he's assessing pattern

20    results.  I'm not sure what his basis is for this

21    and what he's assessed or who he has discussed it

22    with because I'm a little confused as to what

23    that --

24       Q.    Would you agree -- I'm sorry.

25            MR. NASKO:  Just let him fully finish.

Page 65

1    Q.   Are you finished?

2    A.   Yes, sir.

3    Q.   Would you agree that -- that it is an

4    examination of Alta Mesa Holdings' wells?

5              MR. NASKO:  Object to form.

6    A.   Again, an examination to me seems to mean

7    something more than, you know, having flown out to

8    discuss with the people what they were doing.  So

9    I -- he's providing some observations based on his

10   interaction with the company.

11   Q.   There's a reference to spacing test, even

12   the 1,320-foot tests (4 wells per unit).

13             This appears to be a pattern test, doesn't

14   it?

15             MR. NASKO:  Object to form.

16   A.   Can you point me to where that is?

17   Q.   Sure.  The next-to-the-last paragraph,

18   last sentence:  In that vein, I wasn't surprised to

19   see their lackluster down-spacing results.  The

20   Osage, due to its fractured nature here, has a high

21   degree of wellbore interference, and they're seeing

22   that the spacing tests, even the 1,320-foot tests (4

23   wells per unit), have a hard time hitting the type

24   curve.

25             And then it says, To me, these results --

Page 66

```
 1   these results limit AMR's STACK upside story.
 2              Would you agree that this is -- this is
 3   examination, to look at, whatever you -- whatever
 4   you want to refer to it as, whatever degree of depth
 5   you want to give to it, but, nonetheless, a review
 6   of spacing tests, pattern tests, of AMH wells before
 7   February 9, 2018?
 8              MR. NASKO:  Object to form.
 9        A.   Well, I mean, in part, he's talking about
10   the Osage, and I don't know if that's based on his
11   experience or otherwise in terms of what that is,
12   and, you know, when he says they're seeing.  I don't
13   know what that's based on.
14        Q.   Again, I'm not asking you to assess --
15              MS. WALLER:  Ira, let him finish his
16   answer.  Let him finish.
17        Q.   I thought you had finished.
18              MS. WALLER:  Give him, like .1 second
19   after he finishes to make sure he finished.  You're
20   giving him no time.
21        A.   I think I finish quickly once you start
22   talking, so I've lost what else I had meant to say.
23        Q.   No, I apologize.  I'm just asking what you
24   wish to say.
25        A.   No.
```

```
                                              Page 67

 1        Q.    Okay.  So I'm not asking you to look to
 2   evaluate his conclusions.  I'm simply asking you on
 3   what the basis upon which he made his conclusions,
 4   was he looking at spacing tests of AMH -- of AMH
 5   wells?
 6                 MR. NASKO:  Objection; asked and
 7   answered.
 8        A.    I don't know from reading this, to be
 9   honest with you.  I mean, I don't know --
10                 MS. WALLER:  Ira, give him a second.
11   Let him finish.
12        A.    I don't know what he looked at or what --
13   you know, he's saying this, but it's not a report or
14   what have you where he's providing the basis for the
15   observations that he's making.
16        Q.    He refers to spacing test; is that
17   correct?
18        A.    That they're seeing spacing tests even
19   1,320, that they're seeing.  Yeah, I don't know that
20   that means that he's looked at it or he has a basis
21   other than discussions with them.
22        Q.    And refers to results with respect to
23   AMR's STACK upside story; is that correct?
24        A.    That's his observation.
25        Q.    So the spacing tests obviously refer to
```

Page 68

1    AMR's wells, correct?

2                    MR. NASKO:  Object to form.

3        A.    You know, again, he's applying those to

4    determine his view of the AMR doesn't -- that

5    doesn't necessarily, for me, tie it back to that

6    he's looking at an AMH testing.  You know, he may

7    have other industry or other information that he's

8    aware of that's indicating that there's difficulty

9    with it.

10       Q.    So you say you haven't seen this document

11   before, correct?

12       A.    That's correct.

13       Q.    So you don't know one way or the other as

14   to whether or not he was referring to a spacing test

15   at that time?

16       A.    I don't.

17       Q.    And do you know whether there was spacing

18   tests at that time?

19                   MR. NASKO:  Object to form.

20       A.    As of April?

21       Q.    Uh-huh.

22       A.    I -- I would have to look back.  I don't

23   know as of that date.

24                   MR. SCHOCHET:  Let's look at another

25   document, please, which we'll mark as Exhibit 816.

                                                    Page 69

1    It's tab 6, Umair.

2                    MR. HUSSAIN:  The exhibit has been

3    introduced.

4        Q.   Sir, your appendix in the back of your

5    report doesn't indicate that you considered this

6    document.

7                Have you seen it before?

8                    (Exhibit 816 marked.)

9        A.   I don't believe that I have.

10       Q.   And this is a June 2017 AMH email among a

11   number of people including Hal Chappelle, Gene Cole,

12   Tim Turner, Mike Ellis, Michael McCabe, and attaches

13   an email from Fred Mueller.

14               In his next-to-last paragraph, sir, you'll

15   see that he states that in his opinion, quote, The

16   down-spaced well patterns influence the data, as it

17   appears that on average, there is some well

18   interference thus less production on a per-well

19   basis.  There may also be a negative effect on frac

20   interference on producing wells, as an increased

21   number of wells are drilled resulting in completions

22   that are closer to producing wells.

23               Do you have any reason, sir, to believe

24   that KPMG saw this document?

25                    MR. NASKO:  Object to form.

Page 152

1      A.    I'm sorry, I didn't -- which one is that?

2                 MR. NASKO:   It sort of looks like

3      this.

4                 THE WITNESS:   Oh, that email.

5                 God, if my desk at home looked like

6      this, I'd be in trouble.

7      A.    Okay.

8      Q.    Mr. Fiebig, in paragraphs 55 to 57 of your

9      report, you challenge Mr. Regan's opinions generally

10     and specifically as to this document, the June 6,

11     2017, communication as to pattern test results as of

12     then.

13                If you recall, Mr. Fiebig, in your report,

14     you assert, am I correct, that Mr. Regan should have

15     reconciled his conclusions with what you call the

16     contemporaneous work by Tudor Pickering, otherwise

17     known as TPH, specifically as to its estimate of oil

18     production by AMR in a July 19, 2017, presentation;

19     is that correct?

20                I'm referring to paragraphs 55 to 57 of

21     your report.

22     A.    Okay.   I apologize.   I was getting

23     oriented.   Can you ask me that question again.

24     Q.    Sure.   Your opinion as to -- with respect

25     to -- with respect to the June 6, 2017, document,

1    you -- your opinion is that Mr. Regan should have

2    reconciled his conclusions with respect to that

3    document with what you call contemporaneous work by

4    TPH, specifically as to its estimate of oil

5    production by AMR, and the July 19, 2017,

6    presentation; is that correct?

7         A.   Yes.  He cites to this in his report, and

8    I refer that he fails to address TPH's presentation,

9    which is dated after this communication.

10        Q.   Now is it your opinion a forensic

11   accountant who relies for his opinions on actual

12   contemporaneous, nonpublic information directly from

13   management obtained in a litigation must also

14   consider the analyses of a third-party financial

15   advisor as to whom there is no evidence that was

16   privy to the same information?

17             MR. NASKO:  Object to form.

18        A.   My view is that TPH -- and this was

19   available to Mr. Regan -- did perform an analysis at

20   the direction of management and had conclusions that

21   contradicted his and that he should have evaluated

22   those contradictions and reconciled them to his

23   conclusion.

24        Q.   Even where there's no evidence that it was

25   privy to the same information that Mr. Regan has by

Page 154

1    reason of this litigation?

2                    MR. NASKO:   Object to form.

3        A.    Clearly they didn't have the same

4    information that he has, but they had

5    contemporaneous information that they used to

6    evaluate the projections that they made and made a

7    reasonable or professional conclusion on their

8    behalf based on what management had hired them to

9    do.

10       Q.    Well, let's look at the deposition

11   transcript of the TPH representative, Mr. Knupp,

12   which we'll have marked as Exhibit 823.

13                   MR. SCHOCHET:   And, Umair, that's

14   tab 12.

15                   (Exhibit 823 marked.)

16       Q.    And I take it you have seen this document

17   before.   I'll wait for Umair to say that it has been

18   loaded.

19                   MR. HUSSAIN:   It has been introduced.

20   The exhibit has been introduced.

21       Q.    I take it, sir, that you have reviewed

22   this document, this deposition transcript?

23       A.    That's correct.

24       Q.    Okay.   So you are aware, are you not, that

25   whatever oil and gas technical proficiency that TPH

1   representation.

2       Q.   Again, you refer to the process, but it

3   says that the process is to determine the best

4   reasonable available relevant data to develop --

5   with respect to the assumptions.

6           And isn't that essentially the

7   representation that was made, that the projections

8   are based upon the best currently available

9   estimates?

10          MR. NASKO:   Objection; form.

11      A.   Let me see if I can kind of describe that

12  further.  There's some similarities between this

13  language.  But when saying that management's

14  representations are consistent with the standards

15  set forth in the AICPA audit guide, there's a

16  significant amount of more guidance included within

17  that audit guide that is in addition to what

18  management has said.

19          So to make that statement that they were

20  prepared in conformity with the AICPA audit guide

21  and that these are representations that would cause

22  me to believe that they were, I think there's more

23  to it.

24      Q.   Putting aside what else is in the

25  guidelines with respect to those representations

                                              Page 178

1    that are reflected in the guidelines, would you

2    agree that they essentially mirror each other?

3                   MR. NASKO:  Objection; form.

4        A.   I wouldn't say mirror.  And I think I said

5    that earlier, that I don't think that they

6    completely mirror each other.

7        Q.   Are they consistent?

8                   MR. NASKO:  Objection; form.

9        A.   You know, the assumption says the

10   assumption should be reasonably and suitably

11   supported.  Here they say the projections were

12   prepared on a reasonable basis.  It doesn't speak to

13   the language --

14       Q.   Do you find that different?

15                  MR. NASKO:  Were you finished with

16   your answer?

17       A.   I don't know.  I kind of lost my train of

18   thought after that.

19                  MR. NASKO:  Just give him a second.

20       A.   But I think you asked another question.  I

21   don't know -- can't remember what else I was going

22   to say.

23       Q.   Do you think they're different?  Do you

24   think those representations are different --

25       A.   I think within --

Page 179

1      Q.    -- materially different?

2      A.    -- within the standard that clearly

3   whenever the AICPA or any other standard setting

4   body says reasonable and suitably, those are two

5   different words that have two different meanings.

6   So whenever I see that, I consider it from the

7   perspective of, you know, those aren't mirrored,

8   those aren't exactly the same because the guide

9   itself has a specific meaning.

10     Q.    You believe they're materially consistent,

11  though?

12             MR. NASKO:  Objection; form, asked and

13  answered.

14     A.    I would -- I would say that, you know --

15  let me look at this last one again.  I think they're

16  similar.  Again, these are -- these are snippets or

17  outtakes from the guidance, which, you know, doesn't

18  indicate that -- that within that guidance that all

19  of the criteria set forth by the AICPA have been

20  met, which, again, management represents that it did

21  not prepare it in accordance with AICPA guidance.

22     Q.    Are you offering an opinion that when a

23  company simply states in a public filing that it is

24  not intending to follow the AICPA guidelines, then

25  that means the AICPA guidelines just don't apply?

Page 182

1    opinion on that issue?

2         A.    As to the SEC's acceptance or...

3         Q.    As to whether or not an issuer can simply

4    say AICPA guidelines don't apply and therefore they

5    wouldn't apply?

6         A.    I have not formed an opinion as it relates

7    to the requirements of the disclosure of the

8    projections within the proxy.

9         Q.    In paragraph 44 of your opinion, you

10   generally state that Mr. Regan's opinion that the

11   projections did not reflect management's best

12   estimates as was indicated in the proxy was not

13   based on sufficient relevant data to afford a

14   reasonable basis for that opinion.

15              And you make reference to a purported

16   failure to provide a comprehensive analysis of the

17   data underlying the assumptions of the process used

18   to create the projections.

19              So let's put aside now -- because we have

20   gone through this already -- whether or not that's

21   the proper standard for a forensic accountant.

22              I note that you didn't sign a specific --

23   a single piece of data to support this claim that is

24   specific evidence in support of the reasonableness

25   of the projections that was not considered --

1                    MR. NASKO:  Objection.

2        Q.    -- by Mr. Regan --

3                    MR. NASKO:  Objection; form.

4        Q.    -- is that correct?

5        A.    Let me read through the paragraph again

6    just to make sure I understand your question.

7        Q.    Sure.  Paragraph 44.

8        A.    (Reviewed document.)  Okay.  Can you ask

9    me the question again.

10       Q.    The question -- the question is:  Am I

11   correct that you didn't cite a single piece of data

12   to support your claim --

13                   MR. NASKO:  Object --

14       Q.    -- that Mr. Regan did not review all

15   relevant information or engage in a comprehensive

16   review of relevant information --

17                   MR. NASKO:  Objection; form.

18       Q.    -- with respect to the projections?

19       A.    Well, I think it --

20                   MR. NASKO:  Objection; form.

21       A.    -- it relates to his lack of analysis of

22   the data underlying the assumptions of the process

23   to create the projections.

24       Q.    And what -- what document are you relying

25   upon for that suggestion?

1    A.    I don't see his review of that.  I don't

2  see his evaluation of the process to determine what

3  the projections are, the model or whatever that is

4  used.  And while he points to, you know, emails and

5  other information about what are purported to be

6  inputs or parts of the projections, I don't see how

7  he's evaluated the relevance or how those affect the

8  projections and how a change in whatever those may

9  be would result in a -- what change or what effect

10  those would have to the projections.

11    Q.    Is there a specific document you reviewed

12  that would be -- that would lend you to believe

13  that -- this contrary evidence to Mr. Regan's

14  analysis and conclusions?

15              MR. NASKO:  Objection; asked and

16  answered.

17    A.    I think my -- I'm sorry, can you ask that

18  question again.

19    Q.    Yeah.  Is there a single piece of evidence

20  that you're aware of that would reflect evidence

21  that's contrary to Mr. Regan's analysis and

22  conclusions?

23              MR. NASKO:  Objection; asked and

24  answered.

25    A.    I would have to go back and look at some

Page 185

```
 1    of his report to understand some of the conclusions
 2    that he has made.  But I do think that he tends to
 3    take the emails and other information that he uses
 4    out of context or without providing context, excuse
 5    me, in terms of -- you know, that that means that
 6    the projections were misstated that there was some
 7    back-and-forth email, if you will, between the
 8    people involved in determining or preparing the
 9    projections and that that somehow resulted in them
10    being incorrect or what have you.
11              What I don't see and I think what I
12    address in my opinion is that there's not a context
13    provided into, you know, what those changes are that
14    are being made, how they affect the projections, and
15    how they are -- how they reflect what management's
16    plans are relative to the operation of the business.
17        Q.   Did you review that context -- that
18    information and find anything that would be -- that
19    would reflect anything that's contrary to the
20    assertions made by Mr. Regan in his report with
21    respect to the projections?
22              MR. NASKO:  Object to form.
23        A.   I think my opinion is based on the fact
24    that he comes to conclusions based on these emails
25    or portions of emails that are back and forth
```

1   between the people that are preparing the

2   projections and takes that to conclude that the

3   projections therefore aren't fairly stated or based

4   on the best currently available information.

5        Q.   And my question to you is have you seen

6   any evidence to show that Mr. Regan is taking those

7   emails out of context?

8                MR. NASKO:  Objection to form.

9        A.   I don't see any evidence to see the

10  context with which he's considered those other than

11  that the emails themselves he's looking at without

12  really understanding.  And I think at the core of

13  what I think I have tried to say is that he's taking

14  that and not further evaluating the context or the

15  impact of these changes and discussions that are

16  being had.  And so I don't see him evaluating that

17  context for me to have identified any information

18  that would be contrary to a context that he may be

19  using.

20       Q.   And, again, I'm asking you if you've

21  reviewed that context and found that there was

22  something that he missed, that Mr. Regan missed that

23  would show that his consideration of those emails

24  and the information in those emails was

25  inappropriate --

Page 187

1            MR. NASKO:  Objection; asked and --

2      Q.   -- and did not support his conclusions?

3            MR. NASKO:  Objection; asked and

4  answered.

5      A.   I would have to go back and look at some

6  of the emails that he refers to.  And, you know, let

7  me just see if I can identify where --

8      Q.   Yeah.  And my next question is going to

9  refer to -- them to you, so why don't we do that if

10  you don't mind.

11      A.   Uh-huh.

12      Q.   So in paragraphs 62 to 73, he presents a

13  number of documents all dated before the business

14  combination.  And in support of his conclusion in

15  paragraph 73 that the AMH 2018 EBITDA projections

16  appear to have been prepared in a results-driven

17  manner and it was viewed internally as aggressive

18  and likely unachievable.  As such, they were not

19  prepared using management's best current estimates.

20            And as to this data cited in those

21  paragraphs, you don't address any of it in any

22  specific way, do you?

23            MR. NASKO:  Objection;

24  mischaracterizes the underlying document.

25      A.   If you'll allow me to read 62 through 73.

Page 188

1      Q.   Sure.  Sure.

2      A.   (Reviewed document.)

3      Q.   Let me just note for the record that

4  certainly it's appropriate for you to acquaint

5  yourself with material that I show you, but to the

6  extent that I've shown you material, for instance,

7  Mr. Regan's report, which you have already read, I'm

8  not sure it's necessary for you to review them from

9  beginning to end.  But --

10     A.   Well, it's a total of 12 paragraphs or 13

11 paragraphs and --

12     Q.   Uh-huh.  Yeah.

13     A.   -- when I reviewed this and the number of

14 times that I reviewed it, to be clear, it wasn't

15 necessarily in the context of the question that you

16 have asked me.  So in order to properly and, you

17 know, try to fully respond to your question, I do

18 want to make sure that I'm thinking about the

19 context of your question as I look at this again.

20          So I apologize that I'm reading it over

21 again as a source of the question, but I'll try

22 and -- I'll try and be quicker.

23               MR. NASKO:  You don't need to rush.

24 Take the time that you need.

25     A.   (Reviewed document.)  Okay.  Now, if you

1      A.   I see the paragraph 113 and paragraph 45.

2      Q.   Right.  Okay.  And that's an example that

3  relates to data that was available on the day of the

4  business combination, correct?

5      A.   The Dunne email?

6      Q.   Yes.

7      A.   Yes.

8      Q.   Do you have any other examples of evidence

9  prior to the proxy being issued that Mr. Regan cites

10  in those emails from paragraphs 90 through 113

11  although this one goes to 115 as well?

12           MR. NASKO:  Objection; form.

13      A.   Can you ask me the first part of that

14  question again?

15      Q.   Sure.  Do you have any other examples of

16  documents that Mr. Regan cites that were dated

17  before the January proxy was issued in those -- in

18  those over 20 paragraphs?

19           MR. NASKO:  Objection; form.

20      A.   Do I have any other evidence of emails

21  that Mr. Regan cites?

22      Q.   Right.

23      A.   I'm not sure I understand by "evidence."

24      Q.   That were dated before the January -- I'm

25  sorry, the January proxy -- when the January proxy

Page 206

1    was issued.  Any other examples --

2         A.   I'm sorry.

3         Q.   -- of emails that he cites within the 20

4    paragraphs beginning in paragraph 20 -- paragraph 90

5    that are dated before the issuance of the January

6    proxy.

7         A.   Do I have any examples of emails that were

8    issued -- I mean --

9         Q.   That were -- that were dated before the

10   January 20 proxy was issued.

11        A.   That are included in his report --

12        Q.   That's right.

13        A.   -- including --

14        Q.   In those over 20 paragraphs.

15        A.   On paragraph 99, this email was dated

16   before the proxy if I understand your question of

17   emails --

18        Q.   Uh-huh.

19        A.   -- that were dated before the proxy --

20        Q.   Yes.

21        A.   -- which he has included in his report.

22        Q.   In those paragraphs, yes.

23        A.   Do I have evidence of them?

24        Q.   Uh-huh.

25        A.   I not sure I understand what you mean by I

Page 207

1    have evidence of them.

2         Q.   Well, do you have any other examples?

3              MR. NASKO:  Objection; form.

4         A.   I guess examples in what regard?  I'm

5    sorry.  I'm really having trouble following the --

6         Q.   You accuse Mr. Regan of hindsight bias and

7    you gave as an example in those over 20 paragraphs

8    one email that was dated after the issuance of the

9    January proxy.  I'm asking if you have any other

10   examples with regard to the KFM projections.

11             MR. NASKO:  Objection; form.

12        A.   Again, I would have to -- I would have to

13   consider it.  Off the top of my head, I'm not -- I'm

14   not coming up with one.

15        Q.   So tell me, with respect to the KFM

16   projections -- and you had referred to a broader

17   context -- can you tell me any specific relevant

18   facts that is contrary to Mr. Regan's conclusions

19   with regard to the KFM projections?

20             MR. NASKO:  Objection; form.

21        A.   You know, I think my opinions speak to his

22   analysis and that he has not analyzed sufficient

23   relevant data in coming to his conclusions.  And,

24   you know, I think -- I think when you look at my

25   paragraph 52, I think his representation as to

```
 1   Mr. Hackett's view, you know, omitted the fact that
 2   Mr. Hackett believed that the Kingfisher performance
 3   was reversible with time and that the upstream rock
 4   is still good, just delays.  And, again, just kind
 5   of reading through here, I think that's one example
 6   I can point to at this point.
 7                    MR. SCHOCHET:  Let's go -- let's look
 8   at that document.  We'll mark that as Exhibit 826.
 9                    Umair, it's tab 14.
10                    MR. NASKO:  We've been going for an
11   hour.  Do you need a break?
12                    THE WITNESS:  Yeah, when we get a
13   good -- next stopping point.
14                    MR. NASKO:  Maybe after this document,
15   it will be all right to take a break?
16                    MR. SCHOCHET:  Sure.
17                    MR. NASKO:  Thanks.
18                    MS. WALLER:  Ira, you didn't ask
19   anything about 825 or did I miss something?
20                    MR. SCHOCHET:  No.
21                    MS. WALLER:  Okay.
22                    MR. SCHOCHET:  I think that was marked
23   as a separate document.
24                    MR. HUSSAIN:  The exhibit has been
25   uploaded.
```

Page 209

1                    (Exhibit 826 marked.)

2          Q.    Okay.   This is the document you were

3     referring to, correct, that you said Mr. Regan did

4     not appropriately characterize?

5          A.    Yes, I believe so.   I would have to go

6     back to that, but I think that's correct.

7          Q.    And you claim that because Mr. Regan did

8     not refer to certain statements in his emails, his

9     opinion that the KFM projections included in the

10    business combination did not reflect the best

11    currently available estimates was flawed; is that

12    correct?

13         A.    Yes.   Once again, can you point me to the

14    paragraph just so I can make sure that that's

15    exactly how I said it?

16         Q.    I think you had referred to it yourself.

17         A.    Yeah.

18         Q.    Paragraph 52.

19         A.    Okay.   Thank you.

20         Q.    So let's look at the document, shall we.

21    Sir, it starts with a communication from Mr. Hackett

22    to River -- of Riverstone to two other Riverstone

23    board members explaining the drop in guidance for

24    2018 KFM EBITDA from $185 million in the proxy to a

25    range of around 95- to $100 million, which is a 40

Page 260

1    output of what they have done.

2        Q.   Based upon what's in the document, though,

3    it's simply know that the type curve was consistent

4    with its understanding; is that correct?

5        A.   They certainly come to that conclusion

6    within this.  And, again, this appears to be a

7    summary memo to document their test work, which

8    includes reference to other work papers that --

9    within this section and procedures that they

10   performed in support of --

11       Q.   You didn't reference those additional

12   procedures, is that correct, in your report?

13       A.   I don't believe I did because they're

14   referenced in this memo.

15       Q.   So my question to the extent it was simply

16   noting that the type curve was consistent with its

17   understanding, how does Mr. Fiebig -- how does this

18   support that KPMG concluded the reserve volume

19   assumptions were reasonable as of February 9, 2018?

20       A.   I think it's the combination of that

21   conclusion that they have made there as well as

22   their overall conclusion that the assumptions

23   utilized by AM -- utilized in the AMH acquisition

24   value are reasonable as of 2/9/2018 and for the year

25   ended 12/31/18.

1      Q.  Well, that's a conclusion, but based upon

2  what testing?  The only testing I see is what's on

3  941, correct?

4      A.  Well --

5          MR. NASKO:  Objection; form.

6      A.  -- again, they refer to other work papers

7  where they've performed testing in this area.

8      Q.  But the results of that testing is not

9  referenced in 941; is that correct?

10         MR. NASKO:  Objection to form.

11     A.  I don't know exactly if those results are

12  or if those results are what this was based on.

13     Q.  Uh-huh.

14     A.  So --

15     Q.  When you say this is -- I'm sorry, are you

16  finished?

17     A.  I might have said something else but I

18  don't know.

19     Q.  Yeah.  Yeah.

20         But, again, the only thing that's on 941

21  is a graphing of volumes by reserve category.  And

22  it may refer to other documents, other work papers,

23  but that's all that's shown on 941; is that correct?

24         MR. NASKO:  Objection; asked and

25  answered.

1      A.   I think -- I think stepping back and just

2   looking at what's documented in this section under

3   production, to see that the graph is the only thing

4   documented, the engagement team agreed the reserve

5   volumes in the fair value to reserve reports.  The

6   proved reserve report was prepared by Alta Mesa and

7   audited by Ryder Scott --

8      Q.   Uh-huh.

9      A.   -- and was updated by the reserve

10  engineers through 2/9.  It goes on to kind of

11  describe their understanding of it.

12           But to say -- go back to that, I guess the

13  point when I was -- you know, when I first asked if

14  this was just handed to them, you know, it does

15  indicate that the reserves that they have were from

16  the reserves that were audited by Ryder Scott.

17     Q.   Uh-huh.  Anything else?

18     A.   And, again, the reference to the

19  additional testing that they performed.

20     Q.   Additional testing generally you're

21  saying?

22     A.   Well, the specific work paper references

23  which -- you know, consistent with my experience as

24  an auditor and --

25     Q.   Uh-huh.

Page 322

1    STATE OF TEXAS    )

2    COUNTY OF DALLAS )

3         I, Michelle L. Munroe, Certified Shorthand

4    Reporter in and for the State of Texas, certify that

5    the foregoing deposition of JOHN FIEBIG was reported

6    stenographically by me at the time and place

7    indicated, said witness having been placed under oath

8    by me, and that the deposition is a true record of

9    the testimony given by the witness;

10        That the amount of time used by each party at

11   the deposition is as follows:

          Mr. Schochet -    7 hours, 9 minutes

12

13        I further certify that I am neither counsel for

14   nor related to any party in this cause and am not

15   financially interested in its outcome.

16        Given under my hand on this the 21st day

17   of November, 2023.

18

19

20

21                      Michelle L. Munroe, CSR No. 6011

22                      Commission expires 1-31-24

                        Firm Registration #571

23                      VERITEXT LEGAL SOLUTIONS

                        300 Throckmorton Street, Suite 1600

24                      Fort Worth, Texas  76102

                        817.336.3042  telephone

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 Judge George C. Hanks, Jr. |

**Notice of Errata – Deposition of John Fiebig**
**(November 16, 2023)**

     I, the undersigned, do hereby declare that I have read the deposition transcript of John Fiebig dated November 16, 2023 and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | **From** | **To** | |
| 14 | 1 | by the PCOB or SEC | by the PCAOB or SEC | Transcription error |
| 15 | 11 | that would fall into that. | that would not fall into that. | Clarification |
| 15 | 15 | whether that's PCOB | whether that's PCAOB | Transcription error |
| 17 | 24–25 | description of what I do. | description of what I do with ADIGEO. | Clarification |
| 21 | 14–15 | produced that separately, but no. | produced that separately. | Clarification |
| 30 | 10 | No. | No, I have not. | Clarification |
| 44 | 6 | at the PCOB | at the PCAOB | Transcription error |
| 47 | 8 | within PCOB | within PCAOB | Transcription error |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|-----|--------|
| | | **From** | **To** | |
| 51 | 13 | HBS? | HPS? | Transcription error |
| 52 | 11 | EMP | E&P | Transcription error |
| 52–53 | 25–1 | and I really don't have a memory, | and I really don't have a specific memory, | Clarification |
| 53 | 19–20 | I've already lost the question again | I'm already lost in the question again | Transcription error |
| 75 | 24 | consistent | inconsistent | Transcription error |
| 77 | 17–19 | it appears that on average there's some interference.  There may also be negative effects. | [Reading from Exhibit CP-816] it appears that on average there's some interference.  There may also be negative effects. | Clarification |
| 81 | 5 | and it's their documentations | and that's their documentation | Transcription error |
| 90 | 9 | reviewed by Cornerstone—Cornerstone. | reviewed by Cornerstone—Cornerstone staff. | Transcription error |
| 97 | 17 | the -- the unconventional reservoirs, which is | the -- in the unconventional reservoirs, which is | Transcription error |
| 101 | 6 | recognize | recognizing | Transcription error |
| 103 | 11–12 | start again | let me start again | Clarification |
| 104 | 19–20 | says were most of the wells | says [reading from Exhibit CP-820] were most of the wells | Clarification |
| 104 | 23 | he says, yes, at that point | he says, yes, [reading from Exhibit CP-820] at that point | Clarification |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|---|--------|
| | | From | To | |
| 106 | 1–2 | It's kind of blank to me | It's coming blank to me | Transcription error |
| 108 | 12 | may or may -- you | may or may not -- you | Transcription error |
| 116 | 7 | They had reviewed the quarters | KPMG and BDO had reviewed the quarters | Clarification |
| 116 | 14 | as part of his audit | as part of KPMG's audit | Clarification |
| 142 – 143 | 25–2 | would indicate, you know, again that many of the wells produce as expected for 60 days but fell below type after 90 and 120 | would indicate, you know, again [Reading from Exhibit CP-822] that many of the wells produce as expected for 60 days but fell below type after 90 and 120 | Clarification |
| 167 | 3–4 | I think it's the September proxy | I think it's the October proxy | Correction |
| 170 | 9 | I have not been updated | the prospective financial statements have not been updated | Clarification |
| 193 | 24–25 | it doesn't provide a reasonable basis to continue that it would assert | it doesn't provide a reasonable basis to assume that it would continue | Clarification |
| 195 | 9–10 | attempting to apply those backwards to -- | attempting to apply those backwards to the time of the Business Combination | Clarification |
| 227 | 1–4 | But it is the - Q.  I understand.  A.  -- plus the historical cost | But it is the that Q.  I understand.  A.  -- plus the historical cost | Transcription Error |
| 258 | 25 | yes, that's what where that | yes, that's where that | Transcription error |
| 262 | 5 | in the fair value to reserve reports | in the fair value to the reserve reports | Transcription error |

3

| Page | Line(s) | Change | | Reason |
|------|---------|--------|--|--------|
| | | **From** | **To** | |
| 299 | 19 | should have been existed or reported | should have existed or been reported | Clarification |
| 318 | 4–5 | the time fair value | the fair value | Transcription error |
| 124 | 16 | be clear | to be clear | Clarification |
| 146 | 16 | that were determined as of September 30, 2019 | that were determined as of September 30, 2018 | Correction |
| 146 | 21-22 | And if you're out here at September 13 and you see something different | And if you're out here at September 30 and you see something different | Correction |
| 159 | 6-7 | presentation that included the assumptions from that exceeded those attributed to Alta Mesa. | presentation that included the assumptions that exceeded those attributed to Alta Mesa. | Clarification |
| 168 | 10 | the appropriateness of the projections or for the | the appropriateness of the projections for the | Clarification |
| 170 | 9 | the -- that the -- I have not been updated since the | the -- that they have not been updated since the | Clarification |
| 199 | 7-8 | You know, again, I haven't reviewed it in detail. | You know, again, I haven't reviewed it today in detail. | Clarification |
| 262 | 3-4 | to see that the graph is the only thing documented | to say that the graph is the only thing documented | Clarification |
| 304 | 13 | Yes | Yes [Acknowledging the contents of Paragraph 214 of Mr. Regan's report] | Clarification |
| 312 | 9-10 | you're saying the simple math of 100.2 times -- what was the multiple? | you're saying the simple math of 10.2 times -- what was the multiple? | Correction |

I declare under penalty of perjury that the foregoing is true and correct.

Date: December 20, 2023   Signed: _____

# EXHIBIT 2

# AICPA Code of Professional Conduct



**Effective December 15, 2014.**

Updated for all official releases through June 2020.

Copyright © 2020, American Institute of Certified Public Accountants, Inc. All Rights Reserved.

# Table of Contents

Preface: Applicable to All Members ........................................................................................ 1
   0.100 Overview of the Code of Professional Conduct ...................................................... 1
      .01 ................................................................................................................... 1
      .02 ................................................................................................................... 1
      .03 ................................................................................................................... 1
      0.100.010 Principles and Rules of Conduct ...................................................... 1
      0.100.020 Interpretations and Other Guidance ........................................................ 1
   0.200 Structure and Application of the AICPA Code ........................................................ 2
      0.200.010 Structure of the AICPA Code ............................................................ 2
      0.200.020 Application of the AICPA Code ......................................................... 2
      0.200.030 Citations ......................................................................................... 3
      0.200.040 Transition Provisions ...................................................................... 4
      0.200.050 Drafting Conventions ...................................................................... 4
   0.300 Principles of Professional Conduct ........................................................................ 5
      0.300.010 Preamble ........................................................................................ 5
      0.300.020 Responsibilities .............................................................................. 5
      0.300.030 The Public Interest ......................................................................... 5
      0.300.040 Integrity ......................................................................................... 6
      0.300.050 Objectivity and Independence ......................................................... 6
      0.300.060 Due Care ........................................................................................ 7
      0.300.070 Scope and Nature of Services .......................................................... 7
   0.400 Definitions ........................................................................................................... 8
      .01 ................................................................................................................... 8
      .02 ................................................................................................................... 8
      .03 ................................................................................................................... 9
      .04 ................................................................................................................... 9
      .05 ................................................................................................................... 9
      .06 ................................................................................................................... 9
      .07 ................................................................................................................... 10
      .08 ................................................................................................................... 10
      .09 ................................................................................................................... 10
      .10 ................................................................................................................... 10
      .11 ................................................................................................................... 10
      .12 ................................................................................................................... 10
      .13 ................................................................................................................... 11
      .14 ................................................................................................................... 11
      .15 ................................................................................................................... 11
      .16 ................................................................................................................... 11
      .17 ................................................................................................................... 12
      .18 ................................................................................................................... 12
      .19 ................................................................................................................... 12
      .20 ................................................................................................................... 12
      .21 ................................................................................................................... 12
      .22 ................................................................................................................... 12
      .23 ................................................................................................................... 12
      .24 ................................................................................................................... 13
      .25 ................................................................................................................... 13
      .26 ................................................................................................................... 13
      .27 ................................................................................................................... 13
      .28 ................................................................................................................... 13
      .29 ................................................................................................................... 13

FIEBIG_SDTX01233

.30 ..................................................................................................... 14
.31 ..................................................................................................... 14
.32 ..................................................................................................... 14
.33 ..................................................................................................... 14
.34 ..................................................................................................... 14
.35 ..................................................................................................... 14
.36 ..................................................................................................... 15
.37 ..................................................................................................... 15
.38 ..................................................................................................... 15
.39 ..................................................................................................... 15
.40 ..................................................................................................... 15
.41 ..................................................................................................... 16
.42 ..................................................................................................... 16
.43 ..................................................................................................... 16
.44 ..................................................................................................... 16
.45 ..................................................................................................... 16
.46 ..................................................................................................... 16
.47 ..................................................................................................... 16
.48 ..................................................................................................... 17
.49 ..................................................................................................... 17
0.500 Nonauthoritative Guidance ............................................................... 17
.01 ..................................................................................................... 17
.02 ..................................................................................................... 17
.03 ..................................................................................................... 17
0.600 New, Revised, and Pending Interpretations and Other Guidance .............................. 17
0.600.010 New and Revised Interpretations and Other Guidance ............................... 17
0.600.020 Pending Interpretations and Other Guidance ......................................... 18
0.700 Deleted Interpretations and Other Guidance ........................................... 18
.01 ..................................................................................................... 18
Part 1 ..................................................................................................... 22
1.000 Introduction ..................................................................................... 22
.01 ..................................................................................................... 22
.02 ..................................................................................................... 22
.03 ..................................................................................................... 22
1.000.010 Conceptual Framework for Members in Public Practice ............................... 22
1.000.020 Ethical Conflicts ............................................................................. 28
1.100 Integrity and Objectivity ..................................................................... 29
1.100.001 Integrity and Objectivity Rule ........................................................... 29
Interpretations Under the Integrity and Objectivity Rule ......................................... 29
1.200 Independence ..................................................................................... 37
1.200.001 Independence Rule ........................................................................... 37
Interpretations Under the Independence Rule ....................................................... 37
1.300 General Standards ............................................................................... 117
1.300.001 General Standards Rule .................................................................... 117
Interpretations Under the General Standards Rule ................................................. 117
1.310 Compliance With Standards ..................................................................... 119
1.310.001 Compliance With Standards Rule ......................................................... 119
Interpretations Under the Compliance with Standards Rule ....................................... 119
1.320 Accounting Principles ........................................................................... 120
1.320.001 Accounting Principles Rule ................................................................ 120
Interpretations Under the Accounting Standards Rule ............................................. 120
1.400 Acts Discreditable ............................................................................... 122
1.400.001 Acts Discreditable Rule ................................................................... 122
Interpretations Under the Acts Discreditable Rule ................................................ 122

FIEBIG_SDTX01234

## 0.300.060 Due Care

.01 *Due care principle.* A *member* should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the *member's* ability.

.02 The quest for excellence is the essence of due care. Due care requires a *member* to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform *professional services* to the best of a *member's* ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public.

.03 Competence is derived from a synthesis of education and experience. It begins with a mastery of the common body of knowledge required for designation as a certified public accountant. The maintenance of competence requires a commitment to learning and professional improvement that must continue throughout a *member's* professional life. It is a *member's* individual responsibility. In all engagements and in all responsibilities, each *member* should undertake to achieve a level of competence that will assure that the quality of the *member's* services meets the high level of professionalism required by these Principles.

.04 Competence represents the attainment and maintenance of a level of understanding and knowledge that enables a *member* to render services with facility and acumen. It also establishes the limitations of a *member's* capabilities by dictating that consultation or referral may be required when a professional engagement exceeds the personal competence of a *member* or a *member's firm.* Each *member* is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed.

.05 *Members* should be diligent in discharging responsibilities to *clients,* employers, and the public. Diligence imposes the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards.

.06 Due care requires a *member* to plan and supervise adequately any professional activity for which he or she is responsible. [Prior reference: ET section 56]

## 0.300.070 Scope and Nature of Services

.01 *Scope and nature of services principle.* A *member* in public practice should observe the Principles of the Code of Professional Conduct in determining the scope and nature of services to be provided.

.02 The public interest aspect of *members'* services requires that such services be consistent with acceptable professional behavior for *members.* Integrity requires that service and the public trust not be subordinated to personal gain and advantage. Objectivity and *independence* require that *members* be free from conflicts of interest in discharging professional responsibilities. Due care requires that services be provided with competence and diligence.

.03 Each of these Principles should be considered by *members* in determining whether or not to provide specific services in individual circumstances. In some instances, they may represent an overall constraint on the nonaudit services that might be offered to a specific *client.* No hard-and-fast rules can be developed to help *members* reach these judgments, but they must be satisfied that they are meeting the spirit of the Principles in this regard.

.04 In order to accomplish this, *members* should

  a. Practice in *firms* that have in place internal quality control procedures to ensure that services are competently delivered and adequately supervised.

  b. Determine, in their individual judgments, whether the scope and nature of other services provided to an audit *client* would create a conflict of interest in the performance of the audit function for that *client.*

FIEBIG_SDTX01242

of the breach such that the *firm* could issue an attest report. Failure to prepare the required documentation does not *impair independence* provided the *member* can demonstrate the *member* satisfactorily addressed the consequences of the breach and discussed the breach, the action taken, and key decisions made with *those charged with governance*, and as applicable, a professional body, relevant regulator, or oversight authority. However, failure to prepare the required documentation would be considered a violation of the "Compliance With Standards Rule" [1.310.001].

**.15**     Refer to the "Unsolicited Financial Interests" interpretation [1.240.020] of the "Independence Rule" [1.200.001] for guidance on unsolicited financial interests.

***Effective Date***

**.16**     This interpretation is effective March 31, 2016. Early implementation is allowed.

## 1.300 General Standards

## 1.300.001 General Standards Rule

**.01**     A *member* shall comply with the following standards and with any *interpretations* thereof by bodies designated by *Council*:

> *a.* Professional Competence. Undertake only those *professional services* that the *member* or the *member's firm* can reasonably expect to be completed with professional competence.

> *b.* Due Professional Care. Exercise due professional care in the performance of *professional services*.

> *c.* Planning and Supervision. Adequately plan and supervise the performance of *professional services*.

> *d.* Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any *professional services* performed.

(See appendix A, "*Council* Resolution Designating Bodies to Promulgate Technical Standards.") [Prior reference: paragraph .01 of ET section 201]

## Interpretations Under the General Standards Rule

## 1.300.005 Application of the Conceptual Framework for Members in Public Practice and Ethical Conflicts

**.01**     In the absence of an *interpretation* of the "General Standards Rule" [1.300.001] that addresses a particular relationship or circumstance, a *member* should apply the "Conceptual Framework for Members in Public Practice" [1.000.010].

**.02**     A *member* would be considered in violation of the "General Standards Rule" [1.300.001] if the *member* cannot demonstrate that *safeguards* were applied that eliminated or reduced significant *threats* to an *acceptable level*.

**.03**     A *member* should consider the guidance in "Ethical Conflicts" [1.000.020] when addressing ethical conflicts that may arise when the *member* encounters obstacles to following an appropriate course of action. Such obstacles may be due to internal or external pressures or to conflicts in applying relevant professional or legal standards, or both. [No prior reference: new content]

***Effective Date***

**.04**     Paragraphs .01 and .02 are effective December 15, 2015, and early implementation is allowed provided the member has implemented the revised code. Paragraph .03 is effective December 15, 2014.

FIEBIG_SDTX01352

# EXHIBIT 3

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

                  FOR THE SOUTHERN DISTRICT OF TEXAS

2                            HOUSTON DIVISION

3    IN RE: ALTA MESA                §

4    RESOURCES, INC.                 §   CASE NO. 4:19-cv-00957

5    SECURITIES LITIGATION           §

6

7

8

9

10   **************************************************

11          VIDEOTAPED / REALTIMED DEPOSITION OF

12                    JEFFREY P. KNUPP

13                     JUNE 14, 2023

14     (PRESENTED AS 30(B)(6) CORPORATE REPRESENTATIVE

15           OF TUDOR PICKERING, HOLT & CO.)

16   **************************************************

17

18

19

20

21

22

23

24

25

Page 2

1          VIDEOTAPED / REALTIMED DEPOSITION OF JEFFREY P.

2     KNUPP, produced as a witness at the instance of the

3     Defendants Alta Mesa Resources, and duly sworn, was

4     taken in the above styled and numbered cause on

5     Wednesday, the 14th day of June, 2023, from 9:37 a.m. to

6     5:03 p.m., before Pat English-Arredondo, CSR, RMR, CRR,

7     CLR, in and for the State of Texas, reported by

8     computerized stenotype machine in Remote Counsel

9     realtime, via Zoom, pursuant to the Federal Rules of

10    Civil Procedure and any provisions stated on the record

11    herein.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3
 1                A P P E A R A N C E S
 2    COUNSEL FOR TUDOR PICKERING, HOLT & CO. and JEFF KNUPP:
 3         Mr. Christopher D. Belelieu
           GIBSON DUNN & CRUTCHER, LLP
 4         200 Park Avenue
           New York, New York 10166
 5         Phone:  212.351.4000
           cbelelieu@gibsondunn.com
 6
      COUNSEL FOR CLASS PLAINTIFFS:
 7
           Mr. John M. "Jack" Kelley (via Zoom / Realtime)
 8         ROBBINS GELLER RUDMAN & DOWD LLP
           655 West Broadway
 9         San Diego, California 92101
           Phone:  619.231.1058
10         Jkelley@rgrdlaw.com
11    COUNSEL FOR PLAINTIFFS, ALYESKA AND ORBIS:
12         Mr. Joseph Sparacio  (via Zoom / Realtime)
           ROLNICK KRAMER SADIGHI LLP
13         1251 Avenue of the Americas, 41st Floor
           New York, New York 10020
14         Phone:  212.597.2800
           Jsparacio@rksllp.com
15
      COUNSEL FOR DEFENDANTS BAYOU CITY ENERGY AND
16    WILLIAM MCMULLEN:
17         Mr. Kenneth Young (Via Zoom / as noted)
           Ms. Sydney Corry  (Via Zoom / Realtime)
18         KIRKLAND & ELLIS LLP
           609 Main Street
19         Houston, Texas 77002
           Phone:  713.836.3761
20         Sydney.corry@kirkland.com
           Kenneth.young@kirkland.com
21
      COUNSEL FOR DEFENDANTS, HAL CHAPPELLE AND MICHAEL ELLIS:
22
           Ms. Katy Preston (via Zoom / Realtime)
23         WINSTON & STRAWN LLP
           333 S. Grand Avenue
24         Los Angeles, California 90071
           Phone:  213.615.1778
25         Kpreston@winston.com
```

```
                                                    Page 4
 1                 A P P E A R A N C E S
 2                     (Continued)
 3   COUNSEL FOR DEFENDANTS, ARM ENERGY HOLDINGS LLC:
 4        Mr. Dane Sowers (via Zoom / Realtime)
          EVERSHEDS SUTHERLAND (US) LLP
 5        One American Center
          600 Congress Avenue, Suite 2000
 6        Austin, Texas 78701
          Phone:  512.721.2664
 7        DaneSowers@eversheds-sutherland.com
 8        - and -
 9        Ms. Tanvi Shah (via Zoom / as noted)
          EVERSHEDS SUTHERLAND (US) LLP
10        700 Sixth Street, NW, Suite 700
          Washington, DC 20001
11        Phone:  202.383.0100
          tanvishah@eversheds-sutherland.com
12
     COUNSEL FOR DEFENDANTS ALTA MESA RESOURCES, INC., HARLAN
13   H. CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER,
     WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J.
14   WALTERS, RIVERSTONE INVESTMENT GROUP LLC, STEPHEN COATS,
     MICHAEL E. ELLIS, PIERRE F. LAPEYRE, DAVID M. LEUSCHEN,
15   DONALD SINCLAIR, RONALD SMITH:
16        Mr. Matthew Peters (via Realtime)
          Mr. Jansen Mackenzie Vandermeulen
17        LATHAM & WATKINS LLP
          555 Eleventh Street, NW, Suite 1000
18        Washington, DC 20004
          Phone:  202.637.2200
19        Matthew.peters@lw.com
          Jansen.vandermeulen@lw.com
20
          - and -
21
          Mr. Arthur F. Foerster (Via Remote)
22        LATHAM & WATKINS LLP
          330 North Wabash Avenue, Suite 2800
23        Chicago, Illinois 60611
          Phone:  312.876.7700
24        Arthur.foerster@lw.com
25
```

```
                                              Page 5
 1                  A P P E A R A N C E S
                        (Continued)
 2

    COUNSEL FOR DEFENDANTS HPS INVESTMENT PARTNERS LLC and
 3  DON DIMITRIEVICH:
 4       Ms. Emily Couture (via Zoom / Realtime)
         QUINN EMANUEL URQUHART & SULLIVAN LLP
 5       51 Madison Avenue, 22nd Floor
         New York, New York 10010
 6       Phone: 212.849.7000
         Emilycouture@quinnemanuel.com
 7

    THE VIDEOGRAPHER:
 8

         Mr. Christopher Dolan,
 9       Veritext Legal Solutions
10  VERITEXT CONCIERGE:
11       Ms. Alexa Pastor (Remote)
         Veritext Legal Solutions
12

    CERTIFIED REALTIME / STENOGRAPHIC COURT REPORTER:
13

         Ms. Pat English-Arredondo, CSR, RMR, CRR, CLR
14       Veritex Legal Solutions
15
16
17
18
19
20
21
22
23
24
25
```

Page 166

1              MR. KELLEY:  Okay.  Thanks.

2       A.   (Reviewing.)  I see the exhibit.

3              (Previously marked was Exhibit No. 95.)

4       Q.   (By Mr. Kelley)  I would ask you if you

5  recognize it, but you're not on it.  I will briefly

6  describe it for the record.

7              It's an email between Mr. Bourque and

8  Mr. Turner, Chappelle, Ellis and Cole at Alta Mesa.

9              Subject line is, "RE:  Food for Thought."

10  And it describes the performance of some wells.  First,

11  I should point out that it's dated June 6, 2017.

12              And it describes the performance of some

13  wells, along with their spacing and how they are

14  matching up against a type curve.

15              Do you see that data?

16       A.   It's hard for me to read what the title of the

17  Y axis is.  Could you read that for me on the exhibit?

18       Q.   I'm looking at (as read):  "Actual Order EUR

19  versus Type Oil EUR."

20       A.   Okay.

21       Q.   Does that make sense?

22       A.   I think so.

23       Q.   So my second column is Average Spacing.  Third

24  column is Wells.  And then there is a ratio going on

25  between spacing; there is 750.  And then MBO shows how

1    much oil compared to what type they would spec out of

2    those wells.

3                    Do you see that there?

4        A.    I see those columns.

5        Q.    Let's just focus on this column and row.  Do

6    you see that?

7        A.    I see that row.

8        Q.    The average spacing there is 444 feet, and

9    they have got ten wells there.

10                   Am I reading that correctly?

11                   MR. PETERS:  Objection, form.

12       A.    That looks accurate.

13       Q.    (By Mr. Kelley)  So on the far right column,

14   EUR Per Type Curve, they have got .65 implying that

15   Bullis-Coleman, the well that is Bullis-Coleman, is

16   operating .65 -- excuse me, 65 percent of the type

17   curve.

18                   Is that accurate?

19                   MR. PETERS:  Objection, form.

20       A.    That appears to be my -- my interpretation of

21   this table.

22       Q.    (By Mr. Kelley)  Did TPH have access to this

23   data?

24                   MR. PETERS:  Objection, form.

25       A.    I don't recall seeing this.

Page 168

1      Q.   (By Mr. Kelley)  Did TPH request data like

2    this?

3                   MR. BELELIEU:  Object to the form.

4      A.   I don't recall the data we requested.  I

5    believe our data request list was submitted.

6      Q.   (By Mr. Kelley)  Is this the type of data that

7    would -- that TPH would request in order to assess

8    the -- in order to perform -- excuse me -- in order to

9    generate a valuation?

10                  MR. PETERS:  Objection to form.

11                  MR. BELELIEU:  Join.

12     A.   So this appears to be a very specific

13   analysis.  So we would request types of analysis.  This

14   is a very specific and bespoke piece of work.

15                  So I would not say that this is

16   a -- there is no way that this would be typical of

17   something that we request, because this is very specific

18   and unique.

19     Q.   (By Mr. Kelley)  If you received information

20   -- strike that.

21                  If you received information that wells

22   that you received data to and generated type curves on

23   prior were operating well below their expected type

24   curves, would that prompt you to update those type

25   curves?

Page 201

1    before the completion of the deposition.

2        I further certify that I am neither counsel for,

3    related to, nor employed by any of the parties or

4    attorneys in the action in which this proceeding was

5    taken, and further that I am not financially or

6    otherwise interested in the outcome of the action.

7        Certified to by me this 19th day of June, 2023.

8

9

10

11                   *Pat English-Arredondo*

                     Pat English-Arredondo,

12                   CSR (TX), RMR, CRR, CLR

                     Texas CSR 3828

13                   Expiration Date:  4/30/2024

14   Independent Contract Reporter for:

     Veritext Legal Solutions

15   Certificate No.:  571

     300 Throckmorton, Suite 1600

16   Fort Worth, Texas 76102

     817.336.3042

17

18

19

20

21

22

23

24

25   Job No. 5943865

Deposition Errata Sheet
Jeffrey Knupp
*In re Alta Mesa Resources, Inc. Securities Litigation*
Case No. 4:19-cv-00957 (S.D. Tex.)

I, JEFFREY KNUPP, do hereby declare that I have read the transcript of my testimony taken under oath on June 14, 2023 and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
|------|---------|--------|------|--------|
| | | **From** | **To** | |
| 18 | 3 | I had an MBA from University of Texas | I have an MBA from University of Texas | Clarity |
| 18 | 15 | And when did you start Exxon? | And when did you start at Exxon? | Transcription error |
| 19 | 16 | determining how many wells to drill with | determining how many wells to drill | Clarity |
| 24 | 4 | which is really not technical work | which is arguably not technical work | Transcription error |
| 30 | 11 | So petrophysics analysis | So the petrophysics analysis | Transcription error |
| 34 | 14 | managing director at this time | managing director quite at this time | Transcription error |
| 37 | 21 | of the business combination. | Of the business combination? | Typographical error |
| 38 | 15-16 | information should probably be the VDRs | information that you recall would be in the VDRs | Transcription error |
| 38 | 16 | AFM | KFM | Transcription error |
| 48 | 19 | also | analysis | Transcription error |
| 51 | 10 | would you say, the space | we'll just say, the space | Transcription error |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|------|--------|
| | | **From** | **To** | |
| 51 | 16 | SW | S sub W | Transcription error |
| 51 | 18 | SW | S sub W | Transcription error |
| 58 | 23 | the saying | saying the | Transcription error |
| 59 | 1 | properties | porosities | Transcription error |
| 63 | 6 | it's gross thickness for the Osage | is gross thickness for the Osage | Typographical error |
| 65 | 1 | oil and gas production of oil | oil and gas production of a well | Transcription error |
| 67 | 15 | column over, Amberjack 2.0 | column over, labeled Amberjack 2.0, | Transcription error |
| 80 | 17 | 0IP | OIP | Typographical error |
| 91 | 21 | meaning | mean | Transcription error |
| 95 | 20 | well | as well | Transcription error |
| 98 | 13 | Oswego | Oswego OP | Transcription error |
| 100 | 6 | upside case were likely to occur | upside case were to occur | Clarity |
| 102 | 12 | were – was relevant to the work | were relevant to the work | Clarity |
| 108 | 3 | And what's the name of "completion techniques" in this context? | And what's the meaning of "completion techniques" in this context? | Transcription error |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|--------|--------|
| | | **From** | **To** | |
| 117 | 13 | April 25, 2007 (sic/2017) | April 25, 2017 | Clarity |
| 134 | 9 | And is it in same | And is it the same | Transcription error |
| 135 | 15 | in connection with this combination | in connection with the business combination | Transcription error |
| 148 | 25 | Knapp | Knupp | Transcription error |
| 149 | 1 | Jeff | Jack | Transcription error |
| 149 | 14 | Gibson & Dunn | Gibson Dunn | Clarity |
| 162 | 20 | ACH | Osage | Transcription error |
| 167 | 1 | they would spec | curve they would expect | Transcription error |
| 167 | 5 | this column and row | Bullis-Coleman row | Transcription error |
| 185 | 4 | portions | position | Transcription error |
| 186 | 9 | multiple-well VDR assessment | multiple-well EUR assessment | Transcription error |

I declare under penalty of perjury that the foregoing is true and correct.

Date: _7-24-23_          Signed: _____

3

# EXHIBIT 4

# Project Amberjack
# Technical Review

June 2, 2017

**Exhibit**
Def. Ex. 36



PRELIMINARY & CONFIDENTIAL DRAFT

# Reviewing Well Performance
## Type Curve Development – Osage Gen 2

### Gen 2 Type Curve Well List

| | Well Name | Operator | Completion Date | Peak 30 contrib. Oil/mo | Prop-pant Gas/mo | Water/mo |
|---|---|---|---|---|---|---|
| 1 | Wakeman 1706 - 6-25Mh | Alta Mesa | 5/15/2016 | 663 | 797 | 708 |
| 2 | Vieth 1605 - 2-26Mh | Alta Mesa | 6/16/2016 | 187 | 282 | 686 |
| 3 | Todd 1706 - 6-4Mh | Alta Mesa | 6/21/2016 | 722 | 1,209 | 686 |
| 4 | Themer 1706 - 6-6Mh | Alta Mesa | 5/21/2016 | 462 | 574 | 706 |
| 5 | Shackelford 1705 - 5-31Mh | Alta Mesa | 11/20/2015 | 359 | 673 | 707 |
| 6 | Schilde 1706 - 3-15Mh | Alta Mesa | 10/26/2015 | 668 | 674 | 699 |
| 7 | Power 1705 - 2-16Mh | Alta Mesa | 10/12/2015 | 212 | 424 | 679 |
| 8 | Pool - 2-17H | Alta Mesa | 7/31/2014 | 340 | 515 | 661 |
| 9 | Paris 1706 - 5-28Mh | Alta Mesa | 2/11/2016 | 326 | 441 | 686 |
| 10 | Oswald 1705 - 5-28Mh | Alta Mesa | 8/24/2015 | 458 | 481 | 711 |
| 11 | Oswald 1705 - 4-28Mh | Alta Mesa | 8/24/2015 | 388 | 906 | 695 |
| 12 | Oswald 1705 - 6-28Mh | Alta Mesa | 8/24/2015 | 485 | 601 | 674 |
| 13 | Nelson 1805 - 4-18Mh | Alta Mesa | 5/10/2016 | 227 | 284 | 643 |
| 14 | Musick - 4-11H | Alta Mesa | 10/23/2014 | 288 | 527 | 678 |
| 15 | Mayes 1706 - 7B-16Mh | Alta Mesa | 5/26/2016 | 359 | 482 | 706 |
| 16 | Mayes 1706 - 3-16Mh | Alta Mesa | 11/2/2015 | 527 | 732 | 625 |
| 17 | Lincoln North Unit - 15-5H | Alta Mesa | 1/7/2015 | 234 | 366 | 704 |
| 18 | Lincoln North Unit - 13-3H | Alta Mesa | 4/21/2014 | 444 | 629 | 588 |
| 19 | Lincoln North Unit - 16-4H | Alta Mesa | 1/7/2015 | 377 | 527 | 718 |
| 20 | Lincoln North Unit - 15-4H | Alta Mesa | 5/11/2014 | 273 | 374 | 411 |
| 21 | Lincoln North Unit - 16-2H | Alta Mesa | 7/13/2014 | 399 | 479 | 614 |
| 22 | Lincoln North Unit - 16-3H | Alta Mesa | 1/7/2015 | 312 | 430 | 697 |
| 23 | Kilgore - 2-4H | Alta Mesa | 8/18/2014 | 489 | 742 | 655 |
| 24 | James 1706 - 5-26Mh | Alta Mesa | 12/10/2015 | 559 | 535 | 705 |
| 25 | Humphrey - 2-5H | Alta Mesa | 10/16/2014 | 644 | 906 | 659 |
| 26 | House - 4-13H | Alta Mesa | 7/8/2014 | 175 | 252 | 709 |
| 27 | Hoskins 1705 - 2-9Mh | Alta Mesa | 10/17/2015 | 704 | 836 | 755 |
| 28 | Hennessey East Unit - 233H | Alta Mesa | 3/1/2016 | 389 | 589 | 703 |
| 29 | Hennessey East Unit - 231H | Alta Mesa | 3/1/2016 | 634 | 962 | 718 |
| 30 | Hennessey East Unit - 221H | Alta Mesa | 10/7/2014 | 371 | 521 | 691 |
| 31 | Hennessey East Unit - 219H | Alta Mesa | 3/19/2014 | 224 | 287 | 617 |
| 32 | Hennessey East Unit - 217H | Alta Mesa | 7/19/2014 | 268 | 337 | 675 |
| 33 | Hennessey East Unit - 227H | Alta Mesa | 3/26/2014 | 341 | 496 | 719 |
| 34 | Hennessey East Unit - 232H | Alta Mesa | 3/1/2016 | 210 | 253 | 711 |
| 35 | Hennessey East Unit - 218H | Alta Mesa | 7/24/2014 | 165 | 226 | 491 |
| 36 | Hennessey East Unit - 220H | Alta Mesa | 10/10/2014 | 344 | 440 | 603 |

### Type Curve Well Map



**Type Well Criteria**
- AM Gen 2 & 2.5 Osage wells
- Kingfisher & southern Garfield County

**Legend**
- Gen 2 TC Well
- Gen 2.5 TC Well

TUDOR PICKERING HOLT & CO

21

RIVERSTONE_SDTX00044165

PRELIMINARY & CONFIDENTIAL DRAFT

# Reviewing Well Performance
## Type Curve Development – Osage Gen 2 (cont'd)

### Gen 2 Type Curve Well List

| | Well Name | Operator | Completion Date | Peak 30 Day Rate | EUR (MBoe) | Lateral Length |
|---|---|---|---|---|---|---|
| 37 | Hennessey East Unit - 223H | Alta Mesa | 11/4/2014 | 60 | 91 | 620 |
| 38 | Hennessey East Unit - 222H | Alta Mesa | 11/7/2014 | 266 | 334 | 759 |
| 39 | Hennessey East Unit - 226H | Alta Mesa | 3/24/2015 | 266 | 366 | 690 |
| 40 | Hennessey East Unit - 230H | Alta Mesa | 3/1/2016 | 209 | 292 | 708 |
| 41 | Heller - 5-33H | Alta Mesa | 3/15/2014 | 253 | 333 | 367 |
| 42 | Helen 1605 - 5-33Mh | Alta Mesa | 2/1/2016 | 337 | 438 | 732 |
| 43 | Freeman 1706 - 3-14Mh | Alta Mesa | 9/19/2015 | 354 | 776 | 711 |
| 44 | Foster 1706 - 5-24Mh | Alta Mesa | 4/21/2016 | 494 | 522 | 751 |
| 45 | Dodd 1705 - 3-8Mh | Alta Mesa | 5/18/2015 | 451 | 514 | 690 |
| 46 | Cronkite 1505 - 4-14Mh | Alta Mesa | 4/16/2016 | 235 | 377 | 736 |
| 47 | Copeland - 4-20H | Alta Mesa | 6/18/2014 | 605 | 834 | 669 |
| 48 | Coleman 1706 - 4-9Mh | Alta Mesa | 11/6/2015 | 631 | 787 | 723 |
| 49 | Burpo 1705 - 2-7Mh | Alta Mesa | 1/23/2015 | 641 | 901 | 609 |
| 50 | Borelli 1705 - 5-8Mh | Alta Mesa | 5/18/2015 | 652 | 823 | 664 |
| 51 | Borelli 1705 - 4-8Mh | Alta Mesa | 5/18/2015 | 921 | 1,165 | 692 |
| 52 | Bollenbach 1705 - 2-27 Mh | Alta Mesa | 9/12/2015 | 379 | 518 | 1,030 |
| 53 | Bollenbach 1705 - 6-30Mh | Alta Mesa | 11/17/2015 | 727 | 1,053 | 708 |
| 54 | Bollenbach 1705 - 4-21Mh | Alta Mesa | 9/6/2015 | 340 | 534 | 690 |
| 55 | Bollenbach - 2-29H | Alta Mesa | 5/27/2014 | 554 | 738 | 714 |
| 56 | Beyer - 4-6H | Alta Mesa | 9/25/2014 | 736 | 838 | 496 |
| 57 | Bates 1706 - 3-12Mh | Alta Mesa | 9/25/2015 | 403 | 572 | 709 |
| 58 | Ash 1705 - 3-19Mh | Alta Mesa | 3/5/2015 | 549 | 878 | 660 |
| 59 | Airheart 1505 - 5-4Mh | Alta Mesa | 6/10/2016 | 147 | 243 | 715 |

### Type Curve Well Map



**Type Well Criteria**
- AM Gen 2 & 2.5 Osage wells
- Kingfisher & southern Garfield County

Legend
- ● Gen 2 TC Well
- ○ Gen 2.5 TC Well

Alta Mesa Acreage

TUDOR PICKERING HOLT & CO

22

RIVERSTONE_SDTX00044166

# Reviewing Well Performance
## Type Curve Development – Osage Gen 2.5

### Gen 2.5 Type Curve Well List

| | Well Name | Operator | Completion Date | Peak Rate | Prospect | |
|---|---|---|---|---|---|---|
| | | | | | Prod | EUR |
| 1 | Yellowstone 1505 - 4-8Mh | AltaMesa | 1/11/2017 | 430 | 583 | 1,263 |
| 2 | Wishbone 1805 - 5-4Mh | AltaMesa | 11/22/2016 | 51 | 65 | 1,406 |
| 3 | White Rabbit 1506 - 2-27Mh | AltaMesa | 11/7/2016 | 441 | 539 | 1,225 |
| 4 | White King 1506 - 1-12Mh | AltaMesa | 2/16/2017 | NA | NA | 1,278 |
| 5 | Weber 1806 - 3-22Mh | AltaMesa | 10/21/2016 | 102 | 154 | 1,230 |
| 6 | Vadder 1805 - 2-12Rmh | AltaMesa | 10/18/2016 | 388 | 592 | 1,298 |
| 7 | Tullamore 1706 - 4-7Mh | AltaMesa | 7/25/2016 | 465 | 600 | 725 |
| 8 | Trimble 1706 - 2B-31Mh | AltaMesa | 7/8/2016 | 170 | 330 | 716 |
| 9 | Three Wood 1505 - 4-17Mh | AltaMesa | 8/31/2016 | 369 | 544 | 1,467 |
| 10 | Steele 1806 - 1-34Rmh | AltaMesa | 4/14/2017 | NA | NA | NA |
| 11 | Speyside 1606 - 1-27Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 12 | Shiner 1505 - 1-3Mh | AltaMesa | 3/31/2017 | NA | NA | 1,242 |
| 13 | Shimmek 1906 - 2-6Mh | AltaMesa | 8/25/2016 | 231 | 250 | 1,257 |
| 14 | Scout 1906 - 1-34Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 15 | Sawgrass 1705 - 1-32Mh | AltaMesa | 2/16/2017 | NA | NA | 1,513 |
| 16 | Sudiebug 1606 - 1-35Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 17 | Rudd 1605 - 2A-5Mh | AltaMesa | 7/3/2016 | 396 | 571 | 672 |
| 18 | Rigdon 1705 - 6-11Mh | AltaMesa | 9/29/2016 | 653 | 742 | 1,451 |
| 19 | Redbreast 1505 - 4-7Mh | AltaMesa | 11/16/2016 | 342 | 549 | 1,270 |
| 20 | Red Queen 1506 - 1-1Mh | AltaMesa | 2/9/2017 | NA | NA | 1,265 |
| 21 | Ray 1605 - 3-27Mh | AltaMesa | 4/7/2016 | 210 | 579 | 694 |
| 22 | Pollard 1805 - 3-2Mh | AltaMesa | 10/3/2016 | 93 | 141 | 1,461 |
| 23 | Pinehurst 1706 - 5-5Mh | AltaMesa | 9/8/2016 | 543 | 689 | 1,309 |
| 24 | Pest 1606 - 1-26Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 25 | Opus One 1605 - 1-35Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 26 | Oltmanns 1805 - 6-14Mh | AltaMesa | 10/11/2016 | 561 | 772 | 1,374 |
| 27 | Odie 1606 - 1-12Mh | AltaMesa | 4/9/2017 | NA | NA | 1,244 |
| 28 | Oak Tree 1605 - 2-30Mh | AltaMesa | 8/11/2016 | 688 | 887 | 999 |
| 29 | Nicklaus 1706 - 1-29Mh | AltaMesa | 1/15/2017 | 97 | 110 | 1,296 |
| 30 | Motorhead 1706 - 4-20Mh | AltaMesa | 4/4/2017 | NA | NA | 1,295 |
| 31 | Mitchell 1806 - 2B-27Mh | AltaMesa | 10/14/2016 | 393 | 495 | 1,309 |
| 32 | Mcnulty 1806 - 1-33Mh | AltaMesa | 1/0/1900 | NA | NA | NA |
| 33 | Matheson 1705 - 5-10Mh | AltaMesa | 7/16/2016 | 527 | 675 | 699 |
| 34 | Martin 1505 - 4-9Mh | AltaMesa | 8/9/2016 | 250 | 438 | 993 |
| 35 | Maly - 30-M4H | AltaMesa | 3/7/2017 | NA | NA | 1,125 |
| 36 | Mad Hatter 1706 - 2-34Mh | AltaMesa | 10/28/2016 | 316 | 343 | 1,258 |
| 37 | Macallan 1806 - 4-17Mh | AltaMesa | 3/24/2017 | NA | NA | 1,228 |
| 38 | Lankord 1706 - 6-34Mh | AltaMesa | 8/17/2016 | 1,109 | 1,808 | 1,048 |
| 39 | Huntsman 1506 - 4-23Mh | AltaMesa | 2/27/2017 | NA | NA | 1,306 |
| 40 | Huntsman 1506 - 3-23Mh | AltaMesa | 2/27/2017 | NA | NA | 1,310 |
| 41 | Huntsman 1506 - 2-23Mh | AltaMesa | 2/27/2017 | NA | NA | 1,372 |
| 42 | Huntsman 1506 - 4-23Mh | AltaMesa | 2/27/2017 | NA | NA | 1,299 |
| 43 | Hennessey East Unit - 237H | AltaMesa | 1/0/1900 | NA | NA | NA |
| 44 | Hennessey East Unit - 240H | AltaMesa | 1/0/1900 | NA | NA | NA |

### Type Curve Well Map



**Type Well Criteria**
- AM Gen 2 & 2.5 Osage wells
- Kingfisher & southern Garfield County

**Legend**
- ◉ Gen 2 TC Well
- ○ Gen 2.5 TC Well

TUDOR PICKERING HOLT & CO.

23

RIVERSTONE_SDTX00044167

# Reviewing Well Performance
## Type Curve Development – Osage Gen 2.5 (cont'd)

PRELIMINARY & CONFIDENTIAL DRAFT

### Gen 2.5 Type Curve Well List

| | Well Name | Operator | Online Date | Peak Month Rate Oil | Peak Month Rate Gas | Proppant (lbs/ft) |
|---|---|---|---|---|---|---|
| 45 | Hennessey East Unit - 234H | Alta Mesa | 3/27/2016 | 241 | 256 | 749 |
| 46 | Hennessey East Unit - 235H | Alta Mesa | 4/1/2016 | 461 | 548 | 712 |
| 47 | Hennessey East Unit - 239H | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 48 | Hennessey East Unit - 241H | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 49 | Hennessey East Unit - 228H | Alta Mesa | 2/2/2017 | NA | NA | 1,828 |
| 50 | Hennessey East Unit - 216H | Alta Mesa | 3/15/2017 | NA | NA | 1,235 |
| 51 | Hawk 1906 - 7-13Mh | Alta Mesa | 7/22/2016 | 226 | 1,092 | 987 |
| 52 | Hailey 1605 - 1-28Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 53 | Gregory 1705 - 6-1Mh | Alta Mesa | 9/12/2016 | 204 | 381 | 1,398 |
| 54 | Gilbert 1706 - 6-21Mh | Alta Mesa | 5/30/2016 | 381 | 697 | 748 |
| 55 | Garrett 1605 - 6A-36Mh | Alta Mesa | 6/26/2016 | 183 | 271 | 656 |
| 56 | Freeman 1706 - 3-14Rush | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 57 | Francis 1706 - 5-8Mh | Alta Mesa | 2/25/2016 | 502 | 763 | 704 |
| 58 | Fowler 1906 - 1-12Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 59 | Fazio 1705 - 1-13Mh | Alta Mesa | 2/27/2017 | NA | NA | 1,283 |
| 60 | Farrar 1806 - 1-32Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 61 | Exaggerator 1805 - 1-10Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 62 | Evelyn 1706 - 5-18Mh | Alta Mesa | 7/18/2016 | 752 | 964 | 687 |
| 63 | Elling 1505 - 2-15Mh | Alta Mesa | 3/17/2016 | 129 | 205 | 665 |
| 64 | Edwin 1805 - 4-22Mh | Alta Mesa | 11/1/2016 | 425 | 619 | 1,238 |
| 65 | Dixon 1505 - 3-16Mh | Alta Mesa | 8/15/2016 | 390 | 559 | 1,017 |
| 66 | Dalwhinnie 1605 - 1-31Mh | Alta Mesa | 4/17/2017 | NA | NA | NA |
| 67 | Dalmore 1706 - 4-17Mh | Alta Mesa | 9/16/2016 | 289 | 362 | 1,435 |
| 68 | Crosswhite 1805 - 3-20Mh | Alta Mesa | 3/19/2016 | 290 | 349 | 693 |
| 69 | Colemm 1706 - 5A-9Mh | Alta Mesa | 12/2/2016 | 262 | 336 | 1,314 |
| 70 | Coleman 1706 - 6B-9Mh | Alta Mesa | 12/2/2016 | 222 | 321 | 1,243 |
| 71 | Coleman 1706 - 5B-9Mh | Alta Mesa | 12/2/2016 | 173 | 251 | 1,271 |
| 72 | Coleman 1706 - 7A-9Mh | Alta Mesa | 12/2/2016 | 270 | 502 | 1,253 |
| 73 | Coleman 1706 - 6A-9Mh | Alta Mesa | 12/2/2016 | 276 | 478 | 1,265 |
| 74 | Cleveland 1805 - 2-26Mh | Alta Mesa | 4/14/2016 | 420 | 533 | 763 |
| 75 | Clark 1705 - 5-12Mh | Alta Mesa | 9/18/2016 | 893 | 1,178 | 1,504 |
| 76 | Cheshire Cat 1506 - 1-13Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 77 | Bullis 1706 - 2A-10Mh | Alta Mesa | 12/2/2016 | 250 | 429 | 1,276 |
| 78 | Bullis 1706 - 1A-10Mh | Alta Mesa | 12/2/2016 | 77 | 151 | 1,246 |
| 79 | Bullis 1706 - 1B-10Mh | Alta Mesa | 12/2/2016 | 171 | 263 | 1,261 |
| 80 | Bugabugs 2006 - 1-31Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 81 | Brown 1706 - 6-27Mh | Alta Mesa | 2/17/2016 | 727 | 1,083 | 726 |
| 82 | Boecher 1706 - 4-19Mh | Alta Mesa | 8/2/2016 | 521 | 795 | 1,003 |
| 83 | Best Thirty 1605 - 1-36Mh | Alta Mesa | 1/26/2017 | NA | NA | 1,528 |
| 84 | Barbora 1706 - 3-22Mh | Alta Mesa | 9/25/2016 | 388 | 478 | 1,452 |
| 85 | Augusta 1905 - 1-6Mh | Alta Mesa | 1/4/2017 | 227 | 297 | 1,253 |
| 86 | Alicat 1705 - 1-2Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 87 | Aces High 1606 - 4-11Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |
| 88 | Aberfeldy 1605 - 4-16Mh | Alta Mesa | 1/0/1900 | NA | NA | NA |

### Type Curve Well Map



**Type Well Criteria**
- AM Gen 2 & 2.5 Osage wells
- Kingfisher & southern Garfield County

**Legend**
- ◉ Gen 2 TC Well
- ○ Gen 2.5 TC Well
- ▢ Alta Mesa Acreage

TUDOR PICKERING HOLT & CO.

24

RIVERSTONE_SDTX00044168

# Reviewing Well Performance
## Type Curve Development - Meramec

## Type Curve Well List

| | Well Name | Operator | Completion Date | Peak Month Rate | | Proppant |
|---|---|---|---|---|---|---|
| | | | | BBl/d | BOE/d | Lbs/ft |
| 1 | Bighorn 18-09-33 - 1H | Staghorn | 9/15/2016 | 734 | 976 | 2,800 |
| 2 | Geis - 31-1H | Gastar | 12/15/2016 | 270 | 284 | 2,312 |
| 3 | The Dude 1707 - 1Umh-12 | Chaparral | 5/13/2016 | 370 | 486 | NA |
| 4 | Deep River - 30-1Mh | Gastar | 11/28/2015 | 386 | 653 | 2,423 |
| 5 | Ingle - 29-1H | Gastar | 12/14/2016 | 195 | 252 | 3,118 |
| 6 | Holiday Road - 2-1H | Gastar | 5/16/2016 | 214 | 255 | 2,495 |
| 7 | Chital 18-05-15 - 1H | Staghorn | 12/24/2016 | 96 | 116 | 2,430 |
| 8 | Huntsman 1506 - 2-23Mh | Alta Mesa | 2/27/2017 | NA | NA | 1,372 |
| 9 | Huntsman 1506 - 4-23Mh | Alta Mesa | 2/27/2017 | NA | NA | 1,299 |
| 10 | Moffat 1406 - 1-2Mh | Payrock | 6/14/2015 | 365 | 404 | 1,607 |
| 11 | Yost 1607 - 1-8Mh | Marathon | 11/18/2015 | 1,575 | 1,964 | 2,525 |
| 12 | Ruzek - 1H-3X | Newfield | 8/17/2016 | 614 | 838 | 2,500 |
| 13 | Beecher 1607 - 1-11Mh | Payrock | 10/25/2015 | 468 | 1,210 | 2,498 |
| 14 | Wile E Coyote - 1-2Mh | Marathon | 4/10/2016 | 436 | 679 | 2,610 |
| 15 | Hansens 1607 - 1-12Mh | Payrock | 7/20/2015 | 667 | 1,124 | 1,726 |
| 16 | Williams 1607 - 1-24Mh | Marathon | 1/11/2016 | 372 | 474 | 2,415 |
| 17 | Eve 1506 - 1-17Mh | Marathon | 1/16/2015 | 748 | 864 | 1,688 |
| 18 | Bullis 1706 - 2A-10Mh | Alta Mesa | 12/2/2016 | 250 | 429 | 1,276 |
| 19 | Rincon - 14-3H | Devon | 6/4/2015 | 693 | 760 | 652 |

### Type Well Criteria
- Meramec Wells 2013+ drilled in <300' thickness
- <0.5 psig pressure gradient
- Black oil window (5,000 GOR)
- Alta Mesa Gen 2 & 2.5

## Type Curve Well Map



**Legend**
- ○ <300' TC Well
- ◉ <350' TC Well

RIVERSTONE_SDTX00044169

PRELIMINARY & CONFIDENTIAL DRAFT

# Reviewing Well Performance
## Type Curve Development - Oswego

### Type Curve Well List

| # | Well Name | Operator | Original First Prod | Peak Month Rate | | Baseline |
|---|-----------|----------|---------------------|-----------------|---|----------|
| 1 | Tomahawk - 7-1H | Gastar | 10/15/2016 | 271 | 271 | NA |
| 2 | Hennessey Unit - 2-9H Os | Blake | 3/6/2015 | 104 | 116 | 117 |
| 3 | Hennessey Unit - 2-11H Os | Blake | 2/11/2014 | 227 | 227 | NA |
| 4 | Hennessey Unit - 3-4H Os | Blake | 11/30/2013 | 75 | 75 | NA |
| 5 | Hennessey Unit - 1-9H Os | Blake | 1/5/2015 | 95 | 95 | 130 |
| 6 | Hennessey Unit - 1-11H Os | Blake | 12/29/2013 | 341 | 341 | NA |
| 7 | Hennessey Unit - 1-3H Os | Blake | 2/5/2015 | 120 | 125 | 45 |
| 8 | Hennessey Unit - 3-11H Os | Blake | 4/4/2014 | 103 | 103 | NA |
| 9 | Hennessey Unit - 1-2H Os | Blake | 9/3/2014 | 257 | 257 | 283 |
| 10 | Hennessey Unit - 2-3H Os | Blake | 9/3/2014 | 215 | 215 | 117 |
| 11 | Dover Unit 1807 - 1Oh-11 | Chaparral | 10/19/2014 | 161 | 161 | 120 |
| 12 | Dover Unit (Trifecta) 1807 - 2Oh-14-11 | Chaparral | 1/1/2015 | 776 | 776 | 154 |
| 13 | Dover Unit (Triad) - 1Oh-12 | Chaparral | 6/11/2014 | 275 | 275 | 277 |
| 14 | Dover Unit (Trifecta) - 1Oh-14 | Chaparral | 4/30/2014 | 673 | 673 | NA |
| 15 | Dover Unit (Triad) 1807 - 2Oh-12-1 | Chaparral | 8/27/2015 | 428 | 489 | 81 |
| 16 | Dover Unit (Triton) 1807 - 1Oh-15 | Chaparral | 11/16/2015 | 249 | 304 | 87 |
| 17 | Hennessey Unit - 1-10H Os | Blake | 5/5/2014 | 114 | 114 | 122 |
| 18 | Dover Unit (Lithium) - 1Oh-28 | Chaparral | 5/20/2014 | 248 | 268 | 93 |
| 19 | Dover Unit (Tripoli) 1807 - 2Oh-22 | Chaparral | 11/5/2015 | 230 | 277 | 97 |
| 20 | Dover Unit (Callisto) 1807 - 1Oh-23 | Chaparral | 12/30/2014 | 281 | 281 | 121 |
| 21 | Dover Unit - 1Oh-24 | Chaparral | 8/27/2013 | 696 | 765 | 119 |
| 22 | Dover Unit (Titania) 1807 - 1Oh-13 | Chaparral | 9/4/2015 | 349 | 358 | 95 |
| 23 | Emmerich 30-18-6 - 1H | Chesapeake | 3/4/2014 | 100 | 139 | 117 |
| 24 | Sydena 1807 - 1Oh-29 | Chaparral | 2/28/2016 | 226 | 226 | 116 |
| 25 | Hughes Trust 33-18-7 - 1H | Chesapeake | 4/30/2015 | 1,064 | 1,172 | NA |
| 26 | Hennessey East Unit - 224H-O | Alta Mesa | 9/10/2014 | 37 | 25 | 309 |
| 27 | Hasty 3-18-6 - 1H | Chesapeake | 8/1/2016 | 878 | 1,013 | NA |
| 28 | Farrar 11-18-6 - 1H | Chesapeake | 9/5/2016 | 722 | 806 | NA |
| 29 | Anderson 21-18-6 - 3H | Chesapeake | 2/3/2015 | 92 | 115 | 134 |
| 30 | Mueggenborg 7-17-6 - 1H | Chesapeake | 6/30/2016 | 614 | 689 | NA |
| 31 | Lincoln North Unit - 60-3Ho | Alta Mesa | 10/10/2016 | NA | NA | 391 |
| 32 | Lincoln Southeast Oswego Unit - 89-2H | Alta Mesa | 5/31/2014 | 216 | 271 | 321 |

### Type Curve Well Map



**Type Well Criteria**
- All Oswego Wells
- Kingfisher County

Garfield

Kingfisher

Alta Mesa Acreage

TUDOR PICKERING HOLT & CO

26

# EXHIBIT 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4

5   IN RE:  ALTA MESA

6   RESOURCES, INC.,          Case No.:  4:19-cv-00957

7   SECURITIES LITIGATION

8   ------------------------/

9

10

11

12        Video-recorded deposition of D. PAUL REGAN, at

13        Latham & Watkins, LLP, 505 Montgomery Street,

14        Suite 2000, San Francisco, California,

15        commencing at 9:29 a.m. PDT, Thursday, November

16        2, 2023, before Lorrie L. Marchant, California

17        CSR No. 10523.

18

19

20

21   Stenographically reported by:

     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC

22   California CSR No. 10523

     Washington CSR No. 3318

23   Oregon CSR No. 19-0458

     Texas CSR No. 11318

24

     Job No. MW 6290725

25   California Firm Registration No.:  48

```
                                              Page 2

 1                A P P E A R A N C E S
 2
    ON BEHALF OF CLASS PLAINTIFFS AND THE WITNESS:
 3
             LABATON SUCHAROW, LLP
 4           BY:  IRA A. SCHOCHET, ESQ.
                  DAVID SALDAMANDO, ESQ.
 5           140 Broadway
             New York, NY 1005
 6           (212) 907-0700
             ischochet@labaton.com
 7           dsaldamando@labaton.com
 8  ON BEHALF OF CLASS PLAINTIFFS:
 9           ROBBINS GELLER RUDMAN & DOWD, LLP
             BY:  LONNIE A. BROWNE, ESQ. (via Zoom)
10                TRIG R. SMITH, ESQ. (via Zoom)
                  JACK KELLEY, ESQ. (via Zoom)
11           655 West Broadway, Suite 1900
             San Diego, CA 92101
12           (619) 231-1058
             lbrowne@rgrdlaw.com
13           tsmith@rgrdlaw.com
             jkelley@rgrdlaw.com
14
    ON BEHALF OF PLAINTIFFS, ALYESKA AND ORBIS:
15
             ROLNICK KRAMER SADIGHI, LLP
16           BY:  JOSEPH SPARACIO, ESQ. (via Zoom)
             1251 Avenue of the Americas, 41st Floor
17           New York, NY 10020
             (212) 597-2800
18           jsparacio@rksllp.com
19  ON BEHALF OF DEFENDANTS, BAYOU CITY ENERGY
    MANAGEMENT AND WILLIAM McMULLEN:
20
             KIRKLAND & ELLIS, LLP
21           BY:  NICK BROWN, ESQ. (via Zoom)
                  BELLE A.E. HARRIS, ESQ., (via Zoom)
22           609 Main Street
             Houston, TX 77002
23           (713) 836-3507
             nick.brown@kirkland.com
24           belle.harris@kirkland.com
25  (Continued)
```

Page 3

1               A P P E A R A N C E S
2
   ON BEHALF OF ALTA MESA RESOURCES, INC., HARLAN H.
3  CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER,
   WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANNA J.
4  WALTERS, RIVERSTONE INVESTMENT GROUP LLC, STEPHEN
   COATS, MICHAEL E. ELLIS, PIERRE F. LAPEYRE, DAVID M.
5  LEUSCHEN, DONALD SINCLAIR, RONALD SMITH:
6               LATHAM & WATKINS, LLP
                BY:  HEATHER WALLER, ESQ.
7               330 North Wabash Avenue, Suite 2800
                Chicago, IL 60611
8               (312) 876-6554
                heather.waller@lw.com
9               BY:  HENRY ZAYTOUN, ESQ. (via Zoom)
                     STEPHEN NASKO, ESQ. (via Zoom)
10              555 11th St NW
                Washington, DC 20004
11              (202) 637-2200
                henry.zaytoun@lw.com
12              stephen.nasko@lw.com
13
   ON BEHALF OF DEFENDANT, ARM ENERGY HOLDINGS, LLC:
14
                EVERSHEDS SUTHERLAND (US) LLP
15              BY:  ADAM POLLET, ESQ. (via Zoom)
                700 Sixth Street, NW, Suite 700
16              Washington, DC 20001
                (202) 383-0812
17              adampollet@eversheds-sutherland.com
18
   ON BEHALF OF DEFENDANTS, HPS INVESTMENT PARTNERS,
19 LLC AND DON DIMITRIEVICH:
20              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                BY:  JACOB WALDMAN, ESQ. (via Zoom)
21              51 Madison Avenue, 22nd Floor
                New York, NY 10010
22              (212) 849-7000
                jacobwaldman@quinnemanuel.com
23
24 (Continued)
25

Page 4

1                    A P P E A R A N C E S

2

   Also present:

3

             Keigo Painter, Videographer
4            Dan Acosta, Veritext Concierge (via Zoom)
             Steve McBride, Cornerstone Research
5                              (via Zoom)
             Jean-Philippe Poissant, Cornerstone
6                    Research (via Zoom)
7                    ---oOo---
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1    100 percent my being hired by the big six or big

2    four, but I didn't testify for them after that.

3            I have testified for regional and smaller

4    national firms since then.  But a lot of my work has

5    been on the plaintiffs' side when it involves

6    accounting firms since the MiniScribe trial.

7            But I continue to do where I -- I think

8    it's about 40 percent for defendants and 60 percent

9    for plaintiff.

10           BY MS. WALLER:

11      Q.   Who retained you in this matter?

12      A.   The plaintiffs' counsel.

13      Q.   When were you first retained?

14      A.   We were retained in the spring of 2021.

15      Q.   Which firm reached out to you first?

16      A.   My understanding is that the Labaton firm

17   reached out to us first.

18      Q.   Have you worked with the Labaton firm

19   before?

20      A.   Me personally, I worked with the Labaton

21   firm in the countrywide litigation.

22           I don't have a recollection of working with

23   the Labaton firm other than in this case or in the

24   countrywide litigation.

25      Q.   How about Robbins Geller Hopkins [sic]?

Page 43

1  Have you testified for Robbins Geller -- been

2  retained as an expert by Robbins Geller?

3       A.   I've probably testified for Robbins Geller

4  in -- something in the neighborhood of ten times.

5       Q.   Have you been retained as an expert by

6  Robbins Geller more than ten times?

7       A.   I don't know that it's more than ten times

8  that I've been retained as an expert by

9  Robbins Geller.  That's different -- typically I'm

10  retained by Robbins as a consultant.  And at some

11  point during my work on a case, I may be designated

12  as an expert.  And that designation and service as

13  an expert I don't think is more than ten times.

14       Q.   When did you start drafting the report

15  that's Defendants' Exhibit 47?

16       A.   Approximately April of 2023.

17       Q.   And did you personally draft the report?

18       A.   I worked on drafting the report with others

19  in -- actually with Greg Regan.  Greg Regan and I

20  drafted the report.

21       Q.   Any relation?

22       A.   He's my son.

23            MS. WALLER:  I'm going to mark, Henry,

24  Tab 71.  I think it's Defendants' Exhibit 51.

25  ///

Page 44

1           (Marked for identification purposes,

2            Exhibit 51.)

3           BY MS. WALLER:

4      Q.   Do you recognize Defendants' Exhibit 51,

5  Mr. Regan?

6      A.   No, I don't.  I --

7      Q.   You've never seen this before?

8      A.   I know that the numbers -- this represents

9  something during our work on this report.  It's not

10  the numbers which -- which I was provided subsequent

11  to the production of this document.

12      Q.   So just to be clear, you don't think this

13  accurately represents the hours spent on the report

14  that has been produced in this case?

15      A.   Well, I know that my hours are

16  approximately 180.

17           Greg's hours are -- Greg Regan's hours are

18  slightly in excess of 450.

19           (Simultaneous speakers - unclear.)

20           BY MS. WALLER:

21      Q.   Sorry.

22      A.   Travis's hours, I think, have remained

23  about what's seen on this document.

24      Q.   Let me try and clarify because it might be

25  a time-period question.

Page 45

1          So are -- this document was produced to us

2     shortly after your report was produced in August.

3     Are you referencing, when you were just saying your

4     hours are 180, time on your report and anything

5     after your report was served in August?

6        A.    I'm referencing a document that I received

7     last week, because I wanted to know the hours that

8     I've spent on this matter, the hours that others

9     have spent on this matter as -- from start to

10    finish.

11          I hadn't seen this document before.  I

12    don't know when it was prepared or who prepared it.

13          MS. WALLER:  We can talk about it

14    afterwards.  Just checking to see if this is an

15    accurate --

16          MR. SCHOCHET:  Sure, m-hm.

17          MS. WALLER:  -- reflection of the

18    information that was supposed to be provided.

19          BY MS. WALLER:

20       Q.    So you think that you've spent a total of

21    180 hours on this matter?

22       A.    Approximately, yes.

23       Q.    And you said Greg, your son, was at -- in

24    excess of 450?

25       A.    Approximately 450, yes.

Page 46

1      Q.    Who are the other individuals,

2   Travis Armstrong and Perry Carter?

3      A.    Travis is another one of my partners.

4            Perry Carter is an associate.

5            And there's an intern that did some work on

6   this matter.

7      Q.    What was the responsibility of your son for

8   purposes of his work on this matter?

9      A.    My recollection is that Greg had the

10  original contact in connection with this matter,

11  spent time on this case, gathering documents,

12  assisting with some depositions that were taken.

13     Q.    What do you mean by assisting with

14  depositions taken?

15     A.    Assisting counsel and identifying documents

16  and areas in which witnesses would be asked

17  questions about such documents, discussing with

18  counsel the areas of importance to ask those

19  witnesses.

20           And then Greg and I met, and we began to

21  outline the issues in the case and to structure an

22  outline of what our report should discuss.  We went

23  over key documents.

24           After we decided the structure of the

25  report, he would prepare portions.

Page 47

1          I would meet with him.  I would look at the

2    documents, edit the reports, suggest changes.

3          Greg would consider those comments.

4          And the report eventually was fleshed out

5    and finalized.  And I think it's in August 2023.

6          Q.   Is Greg a CPA?

7          A.   Yes.  He's been a CPA for -- I haven't

8    looked at his CV lately, but it's probably 20 years.

9          He's also a CFF.  He's partner in charge of

10   our litigation practice and has testified many times

11   around the country.

12         Q.   Take a look at the Appendix B-1 in your

13   report, the Documents Considered.

14         Does Appendix B-1 contain all of the

15   materials that you considered in forming your

16   opinions?

17         A.   Yes.

18         Q.   Are there any documents that were produced

19   in this litigation that you reviewed that you did

20   not include on your Documents Considered list?

21         A.   I don't -- I'm not aware of any such

22   documents.

23         Q.   The first case filing is "Alta Mesa Request

24   For Admission."

25         Do you -- do you know, is that responses to

Page 48

1   requests for admission or just the requests

2   themselves?

3       A.    I think that's likely to be both.

4       Q.    Did you personally review the plaintiffs'

5   responses to the defendants' requests for admission?

6       A.    In my discussions with Greg, I have a

7   recollection of discussing requests for admissions

8   and responses.

9           So I have a recollection that I became

10  aware of responses to certain of the requests.

11      Q.    Did any of -- did you take into account any

12  of the responses where plaintiffs admitted facts in

13  response to those requests for admission -- did you

14  take those into account in your opinions?

15      A.    Where plaintiffs responses?

16      Q.    Where plaintiffs admitted facts in their

17  responses to the requests for admission, did you

18  take those admissions into account in your opinions

19  in this case?

20      A.    As I sit here today, I don't have a

21  recollection of that.  I don't have a recollection

22  that any of -- that any were relevant to my

23  opinions.

24      Q.    Were any of them contrary to the opinions

25  that you offered in this case?

Page 49

1    A.   I don't have a present recollection of

2  that.

3    Q.   Did you review any of the filings from

4  Alta Mesa's bankruptcy?

5    A.   I don't recall that.

6    Q.   Are you aware of the findings that were

7  made by Judge Isgur in the bankruptcy matter for

8  Alta Mesa?

9    A.   I don't have a -- I don't have a personal

10  recollection of that.

11    Q.   Do you have any understanding whether any

12  of his findings are contrary to your opinions in

13  this case?

14    A.   I'm not aware that they are.

15    Q.   You didn't take his findings into

16  consideration in your opinion?

17    A.   I don't have a recollection of doing that.

18    Q.   How did you determine which depositions to

19  review?

20    A.   Based on -- the depositions that I reviewed

21  are listed on the first page of Appendix B-1.  And

22  based on -- or my recollection is based upon the

23  original depositions.

24       Documents were introduced.  People were

25  identified as relating to facts and circumstances

Page 259

1                 STENOGRAPHER'S CERTIFICATE
2
3          I, LORRIE L. MARCHANT, a Certified
     Shorthand Reporter, holding a valid and current
     license issued by the State of California, CSR No.
4    10523, duly authorized to administer oaths, do
     hereby certify:
5          That the witness in the foregoing
     deposition was administered an oath to testify to
6    the whole truth in the within-entitled cause.
           That said deposition was taken down by me
7    in shorthand at the time and place therein stated
     and thereafter transcribed into typewriting, by
8    computer, under my direction and supervision to the
     best of my ability.
9          Should the signature of the witness not be
     affixed to the deposition, the witness shall not
10   have availed himself/herself of the opportunity to
     sign or the signature has been waived.
11         I further certify that I am neither
     counsel for nor related to any party in the
12   foregoing deposition and caption named nor in any
     way interested in the outcome thereof.
13
           THE DISMANTLING, UNSEALING, OR UNBINDING
14   OF THE ORIGINAL TRANSCRIPT WILL RENDER THE
     REPORTER'S CERTIFICATE NULL AND VOID.
15
           In WITNESS WHEREOF, I have hereunto set my
16   hand this November 6, 2023.
17
18
19
20
21         _____
           LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22         California CSR No. 10523
           Washington CSR No. 3318
23         Oregon CSR No. 19-0458
           Texas CSR No. 11318
24
25