**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957

Judge George C. Hanks, Jr. |

**APPENDIX TO DEFENDANTS' OPPOSITION TO CLASS PLAINTIFFS'
MOTION TO EXCLUDE CHARLES WHITEHEAD'S OPINION NO. 1**

In accordance with Court Procedure 7(B)(3), Moving Defendants submit this Appendix in support of their Opposition to Class Plaintiffs' Motion to Exclude Charles Whitehead's Opinion No. 1, which is filed concurrently herewith. Moving Defendants rely on the following evidence to support their motion:

| Ex. | Description |
|---|---|
| 1. | Excerpts of the Deposition Transcript of Charles Whitehead dated November 17, 2023 |
| 2. | Excerpts of the Deposition Transcript of Adam Badawi dated November 16, 2023 |
| 3. | Excerpts of CF Corporation's Form Schedule 14A dated July 26, 2017 |
| 4. | Excerpts of Gores Holdings, Inc.'s Form Schedule 14A dated October 21, 2016 |
| 5. | Excerpts of M III Acquisition Corp.'s Form Schedule 14A dated February 8, 2018 |
| 6. | Excerpts of Gores Holdings, III Inc.'s Form Schedule 14A dated January 24, 2020 |

| 7. | Excerpts of Industrea Acquisition Corp.'s Form Schedule 14A dated November 20, 2018 |
| 8. | Excerpts of Monocle Acquisition Corp.'s Form Schedule 14A dated October 16, 2020 |
| 9. | Excerpts of Black Ridge Acquisition Corp.'s Form Schedule 14A dated June 12, 2019 |
| 10. | Excerpts of ChaSerg Technology Acquisition Corp.'s Form Schedule 14A dated February 10, 2020 |
| 11. | Excerpts of Insurance Acquisition Corp.'s Amendment No. 5 to Form S-4 Registration Statement dated September 23, 2020 |
| 12. | Excerpts of Clarivate Analytics Plc's Amendment No. 4 to Form F-4 dated April 25, 2019 |
| 13. | Excerpts of The Simply Good Foods Company's Amendment No. 3 to Form S-4 dated June 12, 2017 |

Dated: January 19, 2024

Respectfully submitted,

By  /s/  *J. Christian Word*

J. Christian Word
Attorney-in-Charge for Defendants
D.C. Bar No. 461346
S.D. Tex.  Bar No. 3398485
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
(202) 637-2200
Christian.Word@lw.com

Of Counsel:
Heather A. Waller (with permission of
Attorney-in-Charge)
IL Bar No. 6302537
S.D. Tex. Bar No. 2886108
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700

Fax: (312) 993-9767
Heather.Waller@lw.com

Laura E. Bladow (*pro hac vice*)
D.C. Bar No. 1740343
Eunice M. Kabuga (*pro hac vice*)
D.C. Bar No. 90006573
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
(202) 637-2200
Laura.Bladow@lw.com
Eunice.Kabuga@lw.com

*Counsel for Defendants Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II; Riverstone Holdings LLC; Harlan H. Chappelle; Stephen S. Coats; Michael E. Ellis; William D. Gutermuth; James T. Hackett; Pierre F. Lapeyre, Jr.; David M. Leuschen; Donald R. Sinclair; Ronald J. Smith; Jeffrey H. Tepper; Thomas J. Walker; and Diana J. Walters*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com

Of Counsel:
Katherine A. Preston
TX Bar No. 24088255
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699

3

Fax: (713) 651-2700
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
CA Bar No. 261558
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
jschreiber@winston.com

*Co-Counsel for Defendants Harlan H.
Chappelle and Michael E. Ellis*

## **CERTIFICATE OF SERVICE**

I certify that on January 19, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ J. Christian Word*
J. Christian Word

# EXHIBIT 1

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF TEXAS

3                HOUSTON DIVISION

4    _____
                               )
5    IN RE ALTA MESA RESOURCES,  )
                               )    Case No.
6    INC. SECURITIES LITIGATION  )
     _____)    4:19-cv-00957

7

8                * * * * * * * * * * * * * *

                    CONFIDENTIAL

9                * * * * * * * * * * * * * *

10              VIDEOTAPED DEPOSITION OF

11                CHARLES WHITEHEAD

12               November 17, 2023

13                   9:12 a.m.

14

15          Via Zoom Remote Conferencing

16

17

18       Reported by:  Marsi Koehl, CCR-B-2424

19

20

21

22

23

24

25

CONFIDENTIAL

Page 2

1                    C O N T E N T S

2                  E X A M I N A T I O N

3                                              Page

4   Examination by Mr. Smith...........................6

5   Examination by Mr. Peller.......................265

6

7                      E X H I B I T S

8   Exhibit No.        Description              Page

9

    Exhibit 0832       Expert Report of          20

10                     Professor Charles Whitehead

11  Exhibit 0833       15 U.S.C.A. Section 78t   129

12  Exhibit 0834       G.A. Thompson & Co. v.    138

                       Partridge

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

1    APPEARANCES OF COUNSEL (REMOTELY)

2

     On behalf of Plaintiff and class:
3        TRIG SMITH
         JACK KELLEY
4        Attorneys at Law
         ROBBINS GELLER RUDMAN & DOWD, LLP
5        655 West Broadway
         Suite 1900
6        San Diego, California  92101
         (619) 231-1058
7        trigs@rgrdlaw.com

8

     On behalf of Alyeska and Orbis Plaintiffs:
9        MATTHEW PELLER
         Attorney at Law
10       ROLNIK KRAMER SADIGHI, LLP
         1251 Avenue of the Americas
11       New York, New York  10020
         (212) 597-2800
12       mpeller@rksllp.com

13

     On behalf of Alta Mesa Resources, Incorporated,
14   Riverstone Holdings, LLC, and certain of the
     individual defendants:
15       LAURA E. BLADOW
         CHRISTINA WORD
16       Attorneys at Law
         LATHAM & WATKINS, LLP
17       555 Eleventh Street, NW
         Suite 1000
18       Washington, D.C.  20004
         (202) 637-2200
19       laura.bladow@lw.com

20

     Also present remotely:
21       Gordon Thomas, Videographer
         Jacob Waldman, Esq.
22       Grant Jones, Esq.
         Eunice Kabuga, Esq.
23       Andrew Entwistle, Esq.
         Adam Pollet, Esq.

24

25

1          you're saying.

2      BY MR. SMITH:

3          Q.  Well, the way you're framing your

4      conclusion -- and we don't need to go to the bases.

5      I understand what the bases of your opinions are.

6      I'm just trying to figure out what you intend to

7      testify to.

8              Is it the question here whether Alta Mesa --

9      or, excuse me, the Alta Mesa proxy statement utilized

10     solely targeted prepared financial projections?

11             MS. BLADOW:  Objection.

12     BY MR. SMITH:

13         Q.  And you can answer the question.

14         A.  So I'm -- again, I'm not sure I understand

15     the basis for the question.  Right?  So -- so here

16     we're talking about --

17         Q.  Let me rephrase it.

18             Isn't the factual issue that you're dealing

19     with here is whether or not, in fact, the financial

20     projections in the Alta Mesa proxy were prepared

21     solely by the target?

22             MS. BLADOW:  Objection.

23             THE WITNESS:  So I would say three

24         things in response.  Again, first remember

25         solely -- when we talk about "solely," it's

CONFIDENTIAL

Page 83

```
 1        solely by the target as opposed to the SPAC

 2        or the sponsor or some combination of the

 3        above.  Right?  So just to make it clear,

 4        that's what we mean by "solely."

 5             Secondly, our focus is on the use of the

 6        target prepared financial projections in the

 7        proxy.  So we say it quite clearly here in

 8        the opinion.  Right?  It's the use of these

 9        financial projections in the proxy and

10        that's the focus of the opinion.

11             The third is we're focused on the way in

12        which they are presented.  So we talk about,

13        for example, the Safe Harbor disclosures as

14        well.

15             So that's the scope of what the opinion

16        is covering.

17   BY MR. SMITH:

18        Q.  I understand that question, but -- at the

19   simplest level of -- regarding the issue -- the

20   factual issue of whether the financial projections

21   contained in the Alta Mesa Resources proxy statement

22   were solely prepared by Alta Mesa and KFM?

23             MS. BLADOW:  Is there a question there?

24   BY MR. SMITH:

25        Q.  Yes.  I said, isn't that the factual
```

CONFIDENTIAL

Page 84

1    question that you're dealing with is whether or not

2    the financial projections contained in the proxy in

3    this case were prepared solely by the targets?

4        A.   So, again, I think the opinion on this

5    speaks for itself.  It's pretty clear.  Right?  The

6    factual question is whether or not the use of the

7    target prepared financial projections in the proxy

8    was consistent with custom and practice, again, as

9    evidenced by the empirical analysis.

10             So that is what the opinion speaks to and

11   that's what I'm opining on.

12       Q.   And I understand that.  But maybe I can

13   state it a little bit differently.

14             If -- this is hypothetical.  Again, there's

15   going to be a factual dispute on this.  That's

16   obvious.

17             Let's assume for sake of argument that the

18   financial projections in the proxy for this case were

19   not prepared solely by the targets.  What does this

20   empirical study have to do with that question?

21       A.   So, again, the first question is:  What do

22   you mean by "solely"?

23             You referenced Professor Badawi's report.

24   I'll just mention as an aside he defines it as

25   whether the target was the sole source of

1    information.  I think that's how he defines "solely."

2    It's not -- as I made clear, I hope, how we have

3    defined it.  That's certainly not the input of the

4    opinion.  It's not that the target was the sole

5    source of information.  In fact, that's not the way I

6    would even understand my report to speak, how it's

7    written.

8            But, again, the report speaks for itself.

9    Right?  What I'm focused on here is whether the use

10   of target prepared financials are -- that SRII has

11   done in its proxy statement is consistent with the

12   custom and practice as evidenced by the empirical

13   results.

14       Q.  My question is:  Assuming that that's not

15   the case in this case, what does your empirical study

16   have to do with that question?

17       A.  Assuming what's not the case?  That's the

18   part I'm having a hard time with.

19       Q.  I'm sorry if I wasn't clear.

20           The fact I want you to assume for purposes

21   of the question -- I'm not asking you to agree that

22   it's true.  I just want you to assume this, that the

23   financial projections in this case were not, in fact,

24   prepared solely by the targets -- and I understand

25   how you're qualifying "solely."  I understand that.

CONFIDENTIAL

Page 282

1                        CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6            I hereby certify that the foregoing

7    transcript was taken down, as stated in the caption,

8    and the colloquies, questions, and answers were

9    reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12           I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15           This the 22nd day of November, 2023.

16

17

18                    *Marsi Koehl*

19   _____

20               Marsi Koehl, CCR-B-2424

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>Judge George C. Hanks, Jr. |
| --- | --- |

<u>Notice of Errata – Deposition of Charles Whitehead<br>(November 17, 2023)</u>

I, the undersigned, do hereby declare that I have read the deposition transcript of Charles Whitehead dated November 17, 2023, and that, to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
| --- | --- | --- | --- | --- |
| | | From | To | |
| Global | | S4 | S-4 | Transcription Error |
| Global | | F4 | F-4 | Transcription Error |
| 11 | 12 | I don't know how that were produced. | I don't know how they were produced. | Transcription Error |
| 18 | 13 | The principle condition | The principal condition | Transcription Error |
| 29 | 11 | industry, which tie into | industry, which ties into | Transcription Error |
| 33 | 11 | also observe. | also observe? | Transcription Error |
| 48 | 11 | in the variation figures. | in the various figures. | Transcription Error |
| 62 | 19-20 | whatever we're not coming across it | whatever reason we're not coming across it | Transcription Error |
| 73 | 23-24 | There were that many. | There were not that many. | Transcription Error |

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | **From** | **To** | |
| 78 | 24-25 | methodology – at least five. | methodology, perhaps it should have said at least five. | Transcription Error |
| 90 | 10-11 | but I don't that to be | but I don't understand that to be | Transcription Error |
| 100 | 19 | prepared financial projections used by SRI. | prepared financial projections used by SRII. | Transcription Error |
| 109 | 5 | do this as someone whose done his own | say this as someone who's done his own | Transcription Error |
| 169 | 25 | financial statements. | financial projections. | Transcription Error |
| 196 | 5 | reasonable rely upon advise | reasonably rely on advice | Transcription Error |
| 203 | 7 | I'd will reluctant | I'd be reluctant | Transcription Error |
| 206 | 12 | know that what's what was meant by opine | know that that's what was meant by opine | Transcription Error |
| 208 | 22 | they provide | they provided | Transcription Error |
| 210 | 10 | what the SRI folks | what the SRII folks | Transcription Error |
| 215 | 3 | don't recall the specific | don't recall the specifics | Transcription Error |
| 226 | 24 | inexperience | inexperienced | Transcription Error |
| 228 | 5 | a fuel review | a full review | Transcription Error |
| 229 | 19 | Mr. Waddell | Mr. Widell | Transcription Error |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|--------|--------|
| | | **From** | **To** | |
| 232 | 25 | Mr. Waddell | Mr. Widell | Transcription Error |
| 241 | 6 | Mr. Waddell | Mr. Widell | Transcription Error |
| 248 | 22 | for prefaces of the CapEx | for purposes of the CapEx | Transcription Error |
| 255 | 2 | or he doing it | or he is doing it | Transcription Error |
| 266 | 24-25 | The Professor Badawi | Professor Badawi | Transcription Error |
| 270 | 7 | as a single SPAC. | as a single SPAC industry. | Transcription Error |
| 277 | 19 | all things I've done with trying | all things that I've done in connection with trying | Transcription Error |
| 277 | 21 | in the Europe | in Europe | Transcription Error |

I declare under penalty of perjury that the foregoing is true and correct.

Date: 12/21/2023     Signed: _____

# EXHIBIT 2

Page 1

1                 UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4

5    IN RE:                        )

6    ALTA MESA RESOURCES, INC.     ) Civil Action No.

7    SECURITIES LITIGATION         ) 4:19-cv-00957

8                                  )

9                                  )

10           The videotaped videoconference deposition

11    of ADAM BADAWI, called for examination pursuant to

12    the Rules of Civil Procedure for the United States

13    District Courts pertaining to the taking of

14    depositions, taken at on the 16th day of

15    November, 2023, at the hour of 11:02 a.m.

16

17

18

19

20

21

22

23

24    Reported by:  Gina M. Luordo, CSR, RPR, CRR

25    License No.:  084-004143

```
                                        Page 2
 1    REMOTE APPEARANCES:
 2    ON BEHALF OF CLASS PLAINTIFFS:
          ROBBINS GELLER RUDMAN & DOWD
 3        BY:  MR. JOHN KELLEY
          655 West Broadway
 4        San Diego, California  92101
          (619) 231-1058
 5        jkelley@rdrglaw.com
 6            - and -
 7        ENTWISTLE & CAPPUCCI LLP
          BY:  MR. ANDREW J. ENTWISTLE
 8        230 Park Avenue, 3rd Floor
          New York, New York  10169
 9        (212) 894-7200
          aentwistle@entwistle-law.com
10
11    ON BEHALF OF PLAINTIFFS ORBIS INVESTMENTS and
      ALYESKA INVESTMENT GROUP
12        ROLNICK KRAMER SADIGHI LLP
          1251 Avenue of the Americas
13        New York, New York  10020
          (212) 597-2825
14        jsparacio@rksllp.com
15
      ON BEHALF OF ALTA MESA RESOURCES, INC., HARLAN
16    CHAPPELLE, JAMES HACKETT, THOMAS WALKER, WILLIAM
      GUTERMUTH, JEFFREY TEPPER, DIANA WALTERS,
17    RIVERSTONE INVESTMENT GROUP, LLC, STEPHEN COATS,
      MICHAEL ELLIS, PIERRE LAPEYRE, DAVID LEUSCHEN,
18    DONALD SINCLAIR AND RONALD SMITH:
19        LATHAM & WATKINS
          BY:  MR. L. CHRISTIAN WORD
20             MS. LAURA BLADOW
               MS. EUNICE MUTHONI KABUGA
21        555 Eleventh Street, NW
          Washington, DC  20004
22        christian.word@lw.com
          laura.bladow@lw.com
23        eunice.kabuga@lw.com
24             - and -
25
```

```
                                                     Page 3
 1     REMOTE APPEARANCES (continued):
 2         WINSTON & STRAWN
           BY:  MS. KATHERINE PRESTON
 3         800 Capitol Street, Suite 2400
           Houston, Texas  77002
 4         (713) 651-2699
           kpreston@winston.com
 5
 6     ON BEHALF OF DON DOMITRIEVICH AND HPS INVESTMENT
       PARTNERS:
 7
           QUINN EMANUEL URQUHART & SULLIVAN, LLP
 8         BY:  MS. COURTNEY WHANG
           51 Madison Avenue, 22nd Floor
 9         New York, New York  10010
           (212) 849-7375
10         courtneywhang@quinnemanuel.com
11
       ON BEHALF OF WILLIAM McMULLEN AND BAYOU CITY ENERGY
12     MAGNAGEMENT, LLC:
           KIRKLAND & ELLIS LLP
13         BY:  MR. NICK BROWN
                MR. GRANT JONES
14         609 Main Street
           Houston, Texas  77002
15         (713) 836-3507
           nick.brown@kirkland.com
16         grant.jones@kirkland.com
17
       ON BEHALF OF ARM ENERGY HOLDINGS, LLC:
18         EVERSHEDS SUTHERLAND,
           BY:  MS. TANVI SHAH
19         12255 El Camino Real
           San Diego, California 92130
20         (858) 252-4983
           tanvishah@eversheds-sutherland.com
21
22
23
24
       Also Present:  Mr. Michael Prager - Videographer
25                     Ms. Jessica Reid - Concierge
```

Page 50

1      A.   As well as the Delaware fiduciary

2  litigation, which some of that is still ongoing,

3  but --

4      Q.   But the Delaware fiduciary duty litigation

5  has nothing to do with fraud, right?  That's

6  conflict of interest or disclosure issues, right?

7      A.   It's still ongoing, so it's unclear what

8  those are ultimately going to uncover.

9      Q.   So all you really have or that exists with

10 respect to your conclusion is accusations of fraud.

11 There have been no findings of fraud, right?

12     MR. KELLEY:  Objection to form.

13     THE WITNESS:  I don't specifically recall.  I

14 can't say that one way or another, but I would say

15 there's an incentive to inflate and to engage in

16 fraud.  The numbers are consistent with that, and

17 settlements -- sizable settlements suggest that

18 those allegations have some merit.

19 BY MR. WORD:

20     Q.   So a settlement suggests that allegations

21 have merit.  That's your conclusion, right?

22     A.   It would be consistent with it, yes.

23     Q.   Is there an incentive to commit fraud in

24 the IPOs?

25     A.   I would say that that is -- the regulation

Page 51

1    of IPOs is structured in a way that I think does a

2    much better job of minimizing the potential for

3    fraud.

4        Q.    That's not what I asked, though.  I said

5    incentives, right?

6            Your theory is that sponsors of SPACs are

7    incentivized to inflate projections so they can get

8    this windfall, right?  That's your theory, right?

9        A.    Correct.

10       Q.    And so is there a similar financial

11   incentive to inflate the value of a company stock

12   in the IPO price?

13       A.    No.

14       Q.    There's not an incentive?

15       A.    Well, you're subject to Section 11

16   liability, which, as I'm sure you're aware, is a

17   strict liability standard, which means that the

18   chances of that getting -- that has a couple

19   consequences, right?  That means people don't do

20   things like include projections in IPOs.  Why?

21   Because there's a much greater danger that if those

22   turn out to be wrong, you're going to be subject to

23   potential liability.  So it has an ex-ante effect

24   of minimizing the incentive to actually do that.

25            And then the ex-post potential being

Page 52

1    subject to the Section 11 standard, I think, also

2    minimizes, right?  This is the entire problem with

3    SPACs is that they're subject to a 10(b) standard

4    rather than a Section 11 standard, which makes it

5    easier to engage in some of these problematic

6    activities.

7         Q.    SPACs are also subject to 14(a) liability,

8    right?

9         A.    Typically, yes.

10        Q.    That's not a 10(b) fraud standard, is it?

11        A.    It's -- it's not the same as 10(b).

12        Q.    It's simple negligence, right?

13        A.    For?

14        Q.    For 14(a), right?

15        A.    It's not strict liability.

16        Q.    And who faces strict liability in a

17   Section 11 case?

18        A.    It would depend on the circumstances of

19   the cases, but typically the officers and directors

20   who have engaged in the potentially problematic

21   behavior.

22        Q.    They also have a due diligence defense,

23   right?

24        A.    Typically.

25        Q.    So your theory is there's no financial

Page 53

1    incentive to inflate the value of an IPO price?

2        MR. KELLEY:  Objection to form.  Misstates

3    testimony.

4        THE WITNESS:  I wouldn't say that there's no

5    incentive.  I would say relative to the SPACs, they

6    are much more diminished.

7    BY MR. WORD:

8        Q.   Solely because of the difference between

9    Section 11 standard of liability and the 10(b)

10   standard of liability, right?

11       MR. KELLEY:  Objection to form.  Misstates

12   testimony.

13       THE WITNESS:  I wouldn't say solely.

14   BY MR. WORD:

15       Q.   What else besides that?

16       A.   A number of things happen as a consequence

17   of that, right?  So the use of projections I

18   wouldn't say is -- I think it's a product of the

19   ability to -- of being subject to 10(b), but I

20   wouldn't say -- I wouldn't just tie it only to

21   those things, right?  The inflated projections are

22   a consequence not only of the legal standard of

23   liability, but of the incentive structure provided

24   by the SPAC.

25       MR. KELLEY:  Excuse me, Christian.  We're just

Page 54

1    continuing this line of questioning.  I understand

2    we're right at about an hour now if you guys are

3    ready for a break sometime coming up.

4        MR. WORD:  Okay.  We can take one now.  That's

5    fine.

6        THE VIDEOGRAPHER:  This is the end of media 1.

7    We are going off the record.  The time is

8    12:09 p.m.

9                        (Whereupon, a short break was

10                       taken.)

11       THE VIDEOGRAPHER:  We are back on the record.

12   This is the beginning of media 2.  The time is

13   12:22 p.m.  Please proceed.

14   BY MR. WORD:

15       Q.   Welcome back, Professor.  Before we broke,

16   we were talking about SPACs and your opinions about

17   their structure.  I wonder in formulating that

18   opinion, have you spoken with any sponsors of

19   SPACs?

20       A.   I don't believe so.

21       Q.   So your conclusion that sponsors of SPACs

22   are incentivized to commit fraud is just based upon

23   empirical data and accusations of fraud; is that

24   right?

25       A.   It's based on the sources I've cited in my

Page 94

1     A.   I don't know for sure what the ultimate
2  financial payoff or loss was for Riverstone.
3     Q.   We're going to mark as the next exhibit
4  Professor Whitehead's report.  It's lengthy, too,
5  so it might take a little bit to load.
6     A.   I have a paper copy of it.
7     Q.   Perfect.  We'll mark it as an exhibit for
8  everyone else, but you can use your paper copy.
9  That's fine.
10                    (Whereupon, Deposition Exhibit
11                     No. 119 was marked for
12                     identification.)
13  BY MR. WORD:
14     Q.   I'm going to start on -- the document you
15  have in front of you, that's Professor Whitehead's
16  report as of August or dated August 31, 2023,
17  right?
18     A.   Correct.
19     Q.   And your report is -- for that document --
20  making sure it's the same one.  I've got that
21  report being 98 pages before you get to Appendix A.
22     A.   I have the signature page on Page 98.
23     Q.   I'm going to turn to Page 86.
24     A.   I'm there.
25     Q.   You see on that page Dr. Whitehead's first

Page 95

1    opinion, correct?

2        A.   Yes.

3        Q.   And do you agree or disagree with that

4    opinion?

5        A.   I don't agree with it.

6        Q.   And why do you not agree with it?

7        A.   I don't agree that Silver Run II used

8    target-prepared financials, and I don't agree that

9    it's -- that the empirical results that

10   Dr. Whitehead produced are evidence that -- use a

11   methodology that is sufficient to produce evidence

12   of the custom and practice.

13       Q.   How many -- let's go through that in

14   parts.

15            With respect to the custom and practice,

16   have you reviewed all the SPAC proxy statements

17   referred to in Professor Whitehead's report?

18       A.   I have not.

19       Q.   Do you know in how many of those -- well,

20   strike that.

21            So do you disagree that it's custom and

22   practice for SPACs to disclose target-prepared

23   proxy -- excuse me, projections?

24       A.   I don't have a specific opinion on what

25   the custom and practice is.  My opinion is that the

Page 96

1    methodology that Professor Whitehead used to

2    establish custom and practice is deficient and is

3    not, in fact, evidence of that custom and practice.

4        Q.   And why is that?

5        A.   There are three reasons.  So one is

6    that's -- this case shows why the proxy statements

7    are not reliable evidence of the custom and

8    practice.  If -- as I understand Professor

9    Whitehead's methodology, had he reviewed the Silver

10   Run II proxy statement, he -- or not he.  His team

11   likely would have coded it as target-prepared

12   financial projections, which is not consistent with

13   the record in this case or at least my

14   understanding of the record.

15        The second reason is that I hired my

16   research assistant to review the work that

17   Professor Whitehead had done.  In his instructions,

18   he told his team to only review one small portion

19   of the proxy statement to determine whether or not

20   targets were -- whether or not the projections were

21   solely prepared by the targets.  In my view, that

22   is a deficient methodology because you're not

23   reading the entire proxy statement.

24        When I had an RA review other portions of

25   the proxy statement, he found at least four

Page 192

1   which it was produced, it certainly helps to have a

2   deposition, right, to be able to provide a complete

3   picture.  It may not be for every sentence that's

4   written in a document, but at least for

5   understanding the context under which it was

6   produced.  That's what I didn't have to -- that's

7   what I didn't have here.

8       Q.   So I'm hearing you say for the documents

9   in your report, it didn't matter whether someone

10  testified to them or not, but the ones you didn't

11  consider, you could only consider those if someone

12  testified to them; is that right?

13      A.   No.

14      Q.   Then tell me what you're distinguishing

15  between documents that are incomplete without

16  testimony and documents that are complete without

17  testimony.

18      A.   For most of the documents that I cite, and

19  I don't think for all, but for most of the

20  documents that I cite, like it's Hackett wrote this

21  in an e-mail or Alsarraf wrote this in an e-mail, I

22  could put that in the context of deposition

23  testimony as we've done earlier today, but that's

24  not something that's possible here.

25      Q.   So how do you decide I'm not going to look

Page 193

1    at the E&Y documents, no one talked about them?

2        A.    The -- again, I can't give them complete

3    context, and so that would be my answer.

4        Q.    You talked about the academic articles you

5    write and studying SEC filings and things like

6    that.  Are you able to write those articles and

7    assess those documents without talking to the

8    authors?

9        A.    In some cases.

10       Q.    So which of your articles have you written

11   where you've able to speak to the authors of the

12   SEC filings or they were deposed so you were able

13   to get a complete picture of what the S-1 or the

14   proxy statement actually means?

15       A.    Well, as I said earlier, because I don't

16   have those conversations, you don't know -- like

17   there's a potential disconnect between what -- the

18   actual facts and what is released in a proxy

19   statement.  This case certainly shows that.  And

20   so -- but I'm not writing about what actually

21   happened.  I'm writing about the -- when I write

22   articles, I'm writing about the content of proxy

23   statements.  So I don't view those two as

24   necessarily related.

25       Q.    Would you similarly agree there's a

Page 194

1    difference between the actual facts and what's
2    stated in your report?
3        A.    No, because here there's been discovery.
4    We have a lot of materials, including deposition
5    testimony, and so that presents a much more
6    complete picture than you can get from just looking
7    at, say, a proxy statement or a 10-Q.
8        Q.    But we've established you didn't see all
9    the discovery, and you didn't read all the
10   deposition transcripts, right?
11       A.    I have not read every word of every
12   document in this case.
13       Q.    Nor have you read every word of a
14   deposition that you include in your report?
15       A.    I did not read every word of every
16   deposition.
17       Q.    This Opinion 6 refers to the good-faith
18   defense.  What do you mean good-faith defense?
19       A.    In securities law, there's a good-faith
20   defense for like relying in good faith can -- as a
21   defense under some elements of securities law.
22       Q.    And which particular claim are you talking
23   about with respect to the good-faith defense?
24       A.    So some of the -- I would have to go back
25   to the -- I recall seeing some summary judgment

Page 268

1          I further certify that the taking of this
2     deposition was pursuant to notice and that there
3     were present at the deposition the attorneys
4     hereinbefore mentioned.
5          I further certify that I am not counsel
6     for nor in any way related to the parties to this
7     suit, nor am I in any way interested in the outcome
8     thereof.
9          IN TESTIMONY WHEREOF:  I have hereunto set
10    my hand and affixed my notarial seal this 21st day
11    of November, 2023.

12

13

14

15

16    _____
17    NOTARY PUBLIC, COOK COUNTY, ILLINOIS
18    LIC. NO. 084-004143
19

20

21

22

23

24

25

# EXHIBIT 3

TABLE OF CONTENTS

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
- ☐ Preliminary Proxy Statement
- ☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
- ☒ Definitive Proxy Statement
- ☐ Definitive Additional Materials
- ☐ Soliciting Material under §240.14a-12

# CF Corporation

**(Name of Registrant as Specified In Its Charter)**

## N/A

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

- ☐ No fee required.
- ☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

- ☒ Fee paid previously with preliminary materials.
- ☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)   Amount Previously Paid:

    (2)   Form, Schedule or Registration Statement No.:

    (3)   Filing Party:

    (4)   Date Filed:

certain mergers and acquisitions, (ii) having acted or acting as administrative agent, collateral agent, arranger and/or bookrunner for, and/or lender under, certain term loans, letters of credit, leasing, revolving and other credit facilities of Blackstone and/or certain of its affiliates and portfolio companies (including acquisition financing), (iii) having acted or acting as underwriter, initial purchaser and/or placement agent for various equity and debt offerings undertaken by Blackstone and/or certain of its affiliates and portfolio companies, including having acted as joint bookrunner and underwriter for CF Corp.'s initial public offering and placement agent for a related CF Corp. private placement of warrant securities, (iv) having provided or providing certain treasury management services and products for Blackstone and/or certain of its affiliates and portfolio companies and (v) having provided or providing certain commodity, derivatives and foreign exchange trading services for Blackstone and/or certain of its affiliates and portfolio companies. As CF Corp.'s board of directors was aware, BofA Merrill Lynch deferred the principal portion of its underwriting fees and all of its private placement fees payable in respect of its services to CF Corp. referred to in clause (iii) above until an initial business combination by CF Corp. was consummated and that, upon consummation of the business combination, BofA Merrill Lynch will be entitled to payment of an aggregate of approximately $20 million for such services. From May 1, 2015 through April 30, 2017, BofA Merrill Lynch and its affiliates derived aggregate revenues from Blackstone and certain of its affiliates and/or portfolio companies (including CF Corp.) of approximately $500 million for corporate and investment banking services.

In addition, BofA Merrill Lynch and its affiliates in the past have provided, currently are providing, and in the future may provide, investment banking, commercial banking and other financial services to HRG and/or certain of its affiliates, including FGL, and have received or in the future may receive compensation for the rendering of these services, including (i) having acted or acting as lender under certain term loans, letters of credit and other credit facilities of HRG and/or certain of its affiliates, (ii) having acted as a joint bookrunner for a debt offering undertaken by an affiliate of HRG, (iii) having provided or providing certain treasury management services and products for HRG and/or certain of its affiliates and (iv) having provided or providing certain commodity, derivatives and foreign exchange trading services for HRG and/or certain of its affiliates, including certain derivatives trading services for FGL. From May 1, 2015 through April 30, 2017, BofA Merrill Lynch and its affiliates derived aggregate revenues from HRG and/or certain of its affiliates (including FGL) of approximately $9 million for corporate and investment banking services.

## Certain Projected Financial Information

### Certain FGL Forecasts

FGL does not, as a matter of general practice, develop or publicly disclose long-term forecasts or internal projections of its future performance, revenues, earnings, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, certain financial forecasts were prepared by FGL's management and made available to its board of directors and financial advisors and to CF Corp. and its financial advisor.

The financial projections reflect numerous estimates and assumptions with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to FGL's business, all of which are difficult to predict and many of which are beyond FGL's control. As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the projections cover multiple years, such information by its nature becomes less predictive with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. As such, these financial projections constitute forward-looking information and are subject to risks and uncertainties, including the various risks set forth in FGL's Form 10-K for the year ended September 30, 2016.

The financial projections were prepared solely for internal use and not with a view toward public disclosure or toward complying with GAAP, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The financial projections included below were prepared

147

TABLE OF CONTENTS

by FGL's management. Neither FGL's independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections included below, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. Nonetheless, a summary of the projections is provided in this information statement only because the projections were made available to CF Corp. and its financial advisor. The inclusion of financial projections in this proxy statement should not be regarded as an indication that CF Corp., CF Corp.'s board of directors, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. No person has made or makes any representation or warranty to any CF Corp. shareholder regarding the information included in these financial projections. The financial forecasts are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this information statement are cautioned not to place undue reliance on this information.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, CF CORP. UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

| Year | 2017 | 2018 | 2019 |
|---|---|---|---|
| Adjusted Operating EPS[1] | $ 2.59 | $ 2.90 | $ 3.24 |
| Adjusted Operating ROE, excluding AOCI[2] | 9.8% | 10.1% | 10.4% |
| Book Value/Share, excluding AOCI[3] | $27.46 | $29.82 | $32.51 |

(1)  Adjusted Operating EPS is calculated as adjusted operating income ("AOI") divided by weighted average diluted shares. AOI is a non-GAAP economic measure FGL uses to evaluate financial performance each period. AOI is calculated by adjusting net income to eliminate (i) the impact of net investment gains including OTTI losses recognized in operations, the realized gains and losses on derivatives hedging our indexed annuity policies, (ii) the effect of changes in the interest rates used to discount the FIA embedded derivative liability, (iii) the effect of changes in fair value of reinsurance related embedded derivatives and (iv) the effect of class action litigation reserves. All adjustments to AOI are net of the corresponding VOBA, DAC and income tax impact (using an effective tax rate of 35%) related to these adjustments as appropriate. While these adjustments are an integral part of the overall performance of FGL, market conditions impacting these items can overshadow the underlying performance of the business. Accordingly, FGL believes using a measure which excludes their impact is effective in analyzing the trends of its operations. FGL's non-GAAP measures may not be comparable to similarly titled measures of other organizations because other organizations may not calculate such non-GAAP measures in the same manner as FGL does.

(2)  Adjusted Operating Return on Equity ("ROE"), excluding Accumulated Other Comprehensive Income ("AOCI") is a non-GAAP measure. It is calculated by dividing AOI by total average equity excluding AOCI. Average equity excluding AOCI for the twelve months rolling, is the average of 5 points throughout the period.

(3)  Book value per share excluding AOCI is calculated as total stockholders' equity excluding AOCI divided by the total number of shares of common stock outstanding.

148

# EXHIBIT 4

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A

**Information Required in Proxy Statement**
**Schedule 14A Information**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant ☒     Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to §240.14a-12

# GORES HOLDINGS, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)   Amount Previously Paid:

    (2)   Form, Schedule or Registration Statement No.:

    (3)   Filing Party:

    (4)   Date Filed:

Table of Contents

In addition to considering the factors described above, the Board also considered that:

- *Interests of Certain Persons.* Some officers and directors of the Company may have interests in the Business Combination as individuals that are in addition to, and that may be different from, the interests of the Company's stockholders (see "*Proposal No. 1 — Approval of the Business Combination — Interests of Certain Persons in the Business Combination*" beginning on page 178 of this document). Our independent directors reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and unanimously approving, as members of the Board, the Master Transaction Agreement and the transactions contemplated therein, including the Business Combination.

The Board concluded that the potential benefits that it expected the Company and its stockholders to achieve as a result of the Business Combination outweighed the potentially negative factors associated with the Business Combination. Accordingly, the Board unanimously determined that the Master Transaction Agreement and the transactions contemplated thereby, including the Business Combination, were advisable, fair to, and in the best interests of, the Company and its stockholders.

## Satisfaction of 80% Test

It is a requirement under our current certificate of incorporation and NASDAQ listing requirements that the business or assets acquired in our initial business combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for our initial business combination. As of July 5, 2016, the date of the execution of the Master Transaction Agreement, the fair value of marketable securities held in the Trust Account was approximately $362,160,509.98 (excluding $13,125,000 of deferred underwriting commissions and taxes payable on the income earned on the Trust Account) and 80% thereof represents approximately $289,728,407.98. In reaching its conclusion that the Business Combination meets the 80% asset test, our Board reviewed the enterprise value of Hostess of approximately $2.3 billion implied by adding: (i) approximately $532,000,000 of equity consideration in the post-combination company to be issued to the Selling Equityholders, including the CDM Rollover Amount; (ii) approximately $472,000,000 (excluding transaction costs incurred by Hostess) of cash consideration payable to the Selling Equityholders at the closing of the Business Combination; (iii) the assumption of approximately $991,800,000 of Hostess' existing net indebtedness; (iv) the repayment of approximately $173,000,000 of Hostess' existing indebtedness; (v) the payment of approximately $30,000,000 of certain transaction costs; and (vi) approximately $93,750,000 of Founder Shares retained by our Initial Stockholders. In determining whether the enterprise value described above represents the fair market value of Hostess, our Board considered all of the factors described above in this section and the fact that the purchase price for Hostess was the result of an arm's length negotiation. As a result, our Board concluded that the fair market value of the business acquired was significantly in excess of 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account).

## Certain Company Projected Financial Information

In May 2016 (as updated in June 2016), Hostess provided the Company with its internally prepared projections for the fiscal years ending December 31, 2016 and December 31, 2017 and certain additional projected information for the fiscal years ending December 31, 2018 through December 31, 2020, including Hostess' five-year capital expenditure plan on May 6, 2016. The prospective financial information was not prepared with a view towards compliance with the published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. These projections were prepared solely for internal use, and capital budgeting and other management purposes, and are subjective in many respects and therefore susceptible to varying interpretations and the need for periodic revision based on actual experience and business developments, and were not intended

174

Table of Contents

for third-party use, including by investors or holders. You are cautioned not to rely on the projections in making a decision regarding the transaction, as the projections may be materially different than actual results.

The projections reflect numerous assumptions including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors, all of which are difficult to predict and many of which are beyond Hostess' control, such as the risks and uncertainties contained in the section entitled "*Risk Factors.*" The projections reflect the consistent application of the accounting policies of Hostess and should be read in conjunction with the accounting policies included in Note 1 to the accompanying the historical audited consolidated financial statement of Hostess Holdings included in this proxy statement.

The financial projections for revenue and costs are forward-looking statements that are based on growth assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond Hostess' control. While all projections are necessarily speculative, Hostess believes that the prospective financial information covering periods beyond 12 months from its date of preparation carries increasingly higher levels of uncertainty and should be read in that context. There will be differences between actual and projected results, and actual results may be materially greater or materially less than those contained in the projections. The inclusion of the projections in this proxy statement should not be regarded as an indication that Hostess or its representatives considered or currently consider the projections to be a reliable prediction of future events, and reliance should not be placed on the projections.

The projections were requested by, and disclosed to, the Company for use as a component in its overall evaluation of Hostess, and are included in this proxy statement because they were provided to the Board for its evaluation of the Business Combination and were provided to Moelis for its use in connection with its financial analyses and opinion to the Board, as described in the section entitled "*Opinion of the Company's Financial Advisor*" above and as set forth as Annex D to this proxy statement. Hostess has not warranted the accuracy, reliability, appropriateness or completeness of the projections to anyone, including to the Company. Neither Hostess' management nor any of its representatives has made or makes any representation to any person regarding the ultimate performance of Hostess compared to the information contained in the projections, and none of them intends to or undertakes any obligation to update or otherwise revise the projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events in the event that any or all of the assumptions underlying the projections are shown to be in error. Accordingly, they should not be looked upon as "guidance" of any sort. Hostess will not refer back to these forecasts in its future periodic reports filed under the Exchange Act.

The projections were prepared by, and are the responsibility of, Hostess' management. KPMG, Hostess' independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it. The KPMG report included in this proxy statement relates to historical financial information of Hostess Holdings. They do not extend to the projections and should not be read as if they do.

175

**Table of Contents**

The key elements of the projections provided to the Company are summarized below (in millions of dollars):[1][2][3]

| ($ in millions) | Fiscal Year Ending December 31, | | | |
|---|---|---|---|---|
| | **2016E** | | **2017E** | |
| Net Revenue | | | | |
| Hostess | $ | 684 | $ | 738 |
| Superior | $ | 39 | $ | 42 |
| Combined Total | $ | 722 | $ | 781 |
| *% Growth* | | *11%* | | *8%* |
| Gross Profit | | | | |
| Hostess | $ | 306 | $ | 326 |
| Superior | $ | 11 | $ | 13 |
| Combined Total | $ | 317 | $ | 339 |
| *% Margin* | | *44%* | | *43%* |
| Adjusted EBITDA[4] | | | | |
| Hostess | $ | 214 | $ | 227 |
| Superior | $ | 7 | $ | 8 |
| Combined Total | $ | 220 | $ | 235 |
| *% Margin* | | *30%* | | *30%* |

(1) Each of Hostess' and Superior Cake Products, Inc.'s ("*Superior*") projections are unaudited, based upon estimated results and represent their respective standalone business and do not include the impact of purchase accounting or other impacts from the consummation of the Business Combination. Some figures may not add up exactly due to rounding.

(2) After providing the Company with its projected financial information for the fiscal years ending December 31, 2016 through December 31, 2017, Hostess provided an updated reforecast of its 2016E projections, which reflected an adjustment to projected net revenues and adjusted EBITDA. The Company and Hostess determined that the adjustment that resulted from this 2016E adjustment would also be applied to the projections provided by Hostess for 2017E, and the Company applied such assumptions to such projections.

(3) Some figures may not add up exactly due to rounding.

(4) Adjusted EBITDA is a non-GAAP measure. Please see below for a reconciliation of net income to adjusted EBITDA for Hostess.

The reconciliation of net income to adjusted EBITDA for Hostess is summarized below (in millions of dollars):[1]

| ($ in millions) | Fiscal Year Ending December 31, | |
|---|---|---|
| | **2016E** | **2017E** |
| Net Income (loss) | $  74.9 | $101.8 |
| *Plus non-GAAP adjustments:* | | |
| Interest expense, net | 59.6 | 50.1 |
| Depreciation and amortization | 11.5 | 15.3 |
| Related party expenses | 2.5 | — |
| Unit-based compensation | 0.3 | 0.2 |
| Bakery shutdown expenses | 0.2 | — |
| Other (income) expense[2] | 9.9 | — |
| Impairment of property and equipment | 7.3 | — |
| Distributions for cash taxes and tax sharing | 47.4 | 60.1 |
| Adjusted EBITDA | $ 213.8 | $227.5 |

(1) Hostess projections represent the stand alone business and do not include the impact of purchase accounting or other impacts from the consummation of the Business Combination. The reconciliation of net income to adjusted EBITDA for Hostess does not include the reconciliation of net income to adjusted EBITDA for Superior. The acquisition of Superior was not material to Hostess for purposes of Item 3-05 of Regulation S-X and, accordingly, financial statements of Superior have not been presented.

(2) 2016 estimate includes $7.7 million of exceptional one-time items, $2.1 million of fees for professional services and $0.1 million of other expenses.

**Table of Contents**

In addition, Hostess provided the Company with its internally prepared projections of (i) its adjusted EBITDA for the fiscal year ending December 31, 2018, and (ii) its anticipated capital expenditures for the fiscal years ending December 31, 2016 through December 31, 2020 (and for the six months ending December 31, 2016). The key elements of these projections provided to the Company are summarized below (in millions of dollars): [1]

| ($ in millions) | Fiscal Year Ending December 31, | | | | | |
| | 2016E | 2016H2 | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|
| Adjusted EBITDA[2] | $ | | | 253 | | |
| Capital Expenditures[3] | $  46 | 31 | 31 | 26 | 32 | 26 |

[1]   These projections represent the combined total of Hostess' and Superior's business. Each of Hostess' and Superior's projections are unaudited, based upon estimated results and represent their respective standalone business and do not include the impact of purchase accounting or other impacts from the consummation of the Business Combination.

[2]   After providing the Company with its projected financial information for the fiscal years ending December 31, 2016 through December 31, 2017 discussed above, Hostess provided an updated reforecast of its 2016E projections, which reflected an adjustment to projected net revenues and adjusted EBITDA. The Company and Hostess determined that the adjustment that resulted from this 2016E adjustment would also be applied to the projection of Adjusted EBITDA for 2018 provided by Hostess, and the Company applied such assumptions to such projections.

[3]   Excludes capital expenditures for the acquisition of Superior, but includes ongoing Superior capital expenditures as well as capitalized software development costs.

*Note on Hostess Presentation of Adjusted EBITDA*

With respect to the projections provided by Hostess to the Company, Adjusted EBITDA was calculated in a manner consistent with the provisions of the Master Transaction Agreement. Following the execution of the Master Transaction Agreement, Hostess revised the method in which it presents Adjusted EBITDA to no longer add back to the calculation of Adjusted EBITDA related party expenses, which consist of expenses associated with Hostess' employment agreement with Mr. Metropoulos. This only impacts the projections for 2016E, for which the estimated add back was $2.5 million. Therefore, projected 2016E Adjusted EBITDA included in the tables above and below in the section entitled *"Additional Company-Prepared Projected Financial Information"* now differs from the manner in which historical Adjusted EBITDA is presented under the section entitled *"Information About Hostess— Selected Consolidated Historical Financial and Other Data of Hostess Holdings"* and elsewhere in this proxy statement. If the projected 2016E Adjusted EBITDA had been calculated in the same manner as Adjusted EBITDA is now presented by Hostess, projected Adjusted EBITDA of Hostess for 2016E would have been $211 million rather than $214 million (or $218 million rather than $220 million on a combined basis with Superior).

**Additional Company-Prepared Projected Financial Information**

In addition to the projections for Hostess set forth and discussed above under *"—Certain Company Projected Financial Information,"* projections of (i) net revenue and gross profit for Hostess for the fiscal years ending December 31, 2018 through December 31, 2020 and the terminal value, and (ii) free cash flow for Hostess for the fiscal years ending December 31, 2016 through December 31, 2020 and the terminal value, were prepared by the Company and provided to Moelis to assist them in the preparation of their fairness opinion. The key elements of such projections are summarized in the table below. In preparing this information, the Company utilized the projections provided by Hostess to the Company, as set forth and discussed above under *"—Certain Company Projected Financial Information."* All information set forth below relating to the (i) projected net revenue and gross profit for the fiscal years ending December 31, 2018 through December 31, 2020, and (ii) projected free cash flows for the fiscal years ending December 31, 2016 through December 31, 2020 has been prepared by the Company (and not by Hostess Holdings) based upon certain of the projections provided to the Company by Hostess, as set forth and summarized above.

The projections were prepared by, and are the responsibility of, the Company. KPMG, the Company's independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, expresses no opinion or any

177

# EXHIBIT 5

DEFM14A 1 a2234428zdefm14a.htm DEFM14A

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO CONSOLIDATED FINANCIAL INFORMATION
TABLE OF CONTENTS
EXHIBITS
TABLE OF CONTENTS

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

---

**M III ACQUISITION CORP.**

---

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☒    Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount Previously Paid:
_____

(2)   Form, Schedule or Registration Statement No.:
_____

(3)   Filing Party:
_____

(4)   Date Filed:
_____

Table of Contents

*Changing Federal policies.*    Over the past year, Federal government policies have deemphasized renewable energy, while seeking to create incentives for the continued operation of fossil fuel and nuclear generating capacity. Our board of directors considered the risk that such policies could have an adverse impact upon IEA, but believes that the potential impact of state renewables mandates, corporate renewables targets, improved efficiency and cost-effectiveness of renewables generation is likely to have a greater positive impact upon IEA.

**Satisfaction of 80% Test**

It is a requirement under NASDAQ listing requirements that the business or assets acquired in our initial business combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for our initial business combination. As of November 3, 2017, the date of the execution of the Merger Agreement, the fair value of marketable securities held in the Trust Account was approximately $150,945,248 (excluding $6,000,000 of deferred underwriting commissions and financial advisory fees) and 80% thereof represents approximately $120,756,198. In reaching its conclusion that the Business Combination meets the 80% asset test, our Board reviewed the enterprise value of IEA of approximately $293,400,000 implied by adding $273,350,000 of common equity value (at $10.00 per share and excluding Unvested Founder Shares), $20,000,000 of capital leases and $35,000,000 of Series A Preferred Stock less approximately $35,000,000 of cash. In determining whether the enterprise value described above represents the fair market value of IEA, our Board considered all of the factors described above in this section and the fact that the purchase price for IEA was the result of an arm's length negotiation. As a result, our Board concluded that the fair market value of the business acquired was significantly in excess of 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on the income earned on the Trust Account).

**Certain IEA Projected Financial Information**

IEA provided the Company with its internally prepared projections for the fiscal years ending December 31, 2017 through December 31, 2022. The Company's management and the Board considered the most recent three years of those projections (set forth below) as material to their consideration of the Business Combination. The prospective financial information was not prepared with a view towards compliance with the published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. These projections were prepared solely for internal use, and capital budgeting and other management purposes, and are subjective in many respects and therefore susceptible to varying interpretations and the need for periodic revision based on actual experience and business developments, and were not intended for third-party use, including by investors or holders. You are cautioned not to rely on the projections in making a decision regarding the transaction, as the projections may be materially different than actual results.

The projections reflect numerous assumptions including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors, all of which are difficult to predict and many of which are beyond IEA's control, such as the risks and uncertainties contained in the section entitled "*Risk Factors.*" The projections reflect the consistent application of the accounting policies of IEA and should be read in conjunction with the accounting policies included in Note 2 to the accompanying historical audited consolidated financial statements of IEA included elsewhere in this proxy statement.

The projected financial data is forward-looking and based on growth assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond IEA's control. While all projections are necessarily speculative, IEA believes that the prospective financial

151

Table of Contents

information covering periods beyond 12 months from its date of preparation carries increasingly higher levels of uncertainty and should be read in that context. There will be differences between actual and projected results, and actual results may be materially greater or materially less than those contained in the projections.

The projections were requested by, and disclosed to, the Company for use as a component in its overall evaluation of IEA. As discussed below, these projections were utilized by the Company in creating an additional set of projections based upon assumptions the Company believes are more reflective of IEA's business plan following the Business Combination. The projections below prepared by IEA's management reflect two alternative sets of assumptions. The projected data labeled "Base Case" assume an increase in IEA's solar construction business, as well as additional selling, general and administrative expenses ("SG&A") associated with that expansion. The projected data labeled "HV & MV Scenario" assume additional growth through the expansion of its high voltage and medium voltage electrical team, including additional gross margin from self-performing certain electrical work that IEA currently subcontracts and additional revenue from performing such services for other EPC firms, as well as incremental costs that will be incurred as a public company.

IEA has not made any representations or warranties with respect to the accuracy, reliability, appropriateness or completeness of the projections to anyone, including to the Company. Neither IEA's management nor any of its representatives has made or makes any representation or warranty to any person regarding the ultimate performance of IEA compared to the information contained in the projections, and none of them intends to or undertakes any obligation to update or otherwise revise the projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events in the event that any or all of the assumptions underlying the projections are shown to be in error. Accordingly, they should not be looked upon as "guidance" of any sort. IEA will not refer back to these forecasts in its future periodic reports filed under the Exchange Act.

The projections were prepared by, and are the responsibility of, IEA's management. Crowe Horwath, LLP, IEA's independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it.

The key elements of the projections provided to the Company in connection with the evaluation of the Business Combination by the Company's board of directors are summarized below:

| Base Case ($ in millions) | 2018E | 2019E |
|---|---|---|
| Revenue | $ 865 | $ 1,140 |
| Gross Profit | $ 109 | $ 139 |
| SG&A | $ 33 | $ 34 |
| Depreciation | $ 6 | $ 6 |
| EBITDA | $ 82 | $ 111 |

| HV & MV Case ($ in millions) | 2018E | 2019E |
|---|---|---|
| Revenue | $ 880 | $ 1,205 |
| Gross Profit | $ 119 | $ 167 |
| SG&A | $ 38 | $ 41 |
| Depreciation | $ 6 | $ 6 |
| EBITDA(1) | $ 87 | $ 132 |

(1)     IEA calculated EBITDA as gross profit less SG&A plus depreciation.

152

Table of Contents

In addition, in October 2017, IEA provided the Company with estimated fiscal 2017 financial statements, which included actual results through September 2017 and projected results for the remainder of 2017.

|  | 2017E |
|---|---|
| Total Revenue | $ 480,000 |
| Cost of Revenue | 412,638 |
| Gross Profit | 67,362 |
| SG&A | 28,778 |
| Operating Income | 38,584 |
| Interest Expense, net | (1,709) |
| Credit Support Fees(1) | (1,537) |
| Other Expense (includes Prof. Services) | (599) |
| Income before Provisions for Tax | 34,739 |
| Provisions for Income Taxes | (3,561) |
| Net Income | $ 31,178 |

The following is a reconciliation of estimated net income from continuing operations to estimated EBITDA.

|  | 2017E |
|---|---|
| Net Income | $ 31,178 |
| Interest Expense (net) | 1,709 |
| Depreciation & Amortization | 5,568 |
| Taxes | 3,561 |
| EBITDA | $ 42,016 |
| Diversification SG&A(1) | 4,447 |
| Credit Support Fees(2) | 1,537 |
| Full year impact of capital lease program(3) | 4,700 |
| Adjusted EBITDA | $ 52,700 |

(1)     In fiscal 2017, IEA began expanding its capability to self-perform certain electrical transmission work and related services. Such services were historically contracted to third parties. Revenue related to these services is not anticipated until fiscal 2018.

(2)     Represents fees paid to Oaktree for guarantees provided on IEA's existing credit facility.

(3)     Reflects the annualization of the impact on EBIT and EBITDA of the capital leasing program for cranes and yellow iron, which was implemented in 2017, consisting of a (i) $1.7 million positive adjustment due to the elimination of cost of goods sold attributable to operating lease payments, (ii) $1.6 million in reduction in cost of goods due to estimated and operational efficiencies resulting from the program, and (iii) $1.4 million, representing a pro rata portion of the estimated gain due to estimated future residual value exceeding depreciated carrying value on the sale of the leased assets following the 48 month term of the lease.

As discussed under "*IEA's Management's Discussion and Analysis of Financial Condition and Results of Operations—Outlook—Impact of 2017 Tax Act on 2017 Estimated Results*," during the fourth quarter of 2017, the U.S. Senate and U.S. House of Representatives undertook the process of enacting significant changes to the United States Tax Code, which culminated in the signing of the 2017 Tax Act

153

Table of Contents

by President Trump on December 22, 2017. During the legislative process for enacting the 2017 Tax Act, various changes to the existing tax incentive programs for renewable energy production (the "*Incentive Programs*") were proposed that, if enacted into law, could have significantly changed the Incentive Programs. In response to the uncertainty caused by the legislative process, many participants in the renewable energy industry delayed their new development projects until the ultimate terms of the 2017 Tax Act could be evaluated. As a result of the uncertainty and delay of new development projects in the fourth quarter of 2017, IEA currently anticipates that approximately $28.0 million of revenue and $2.2 million of Adjusted EBITDA that would have been received during the fourth quarter of 2017 will, instead, be realized in 2018. See "*Risk Factors—Risks Related to IEA—Tax reform legislation recently enacted by the U.S. Congress may reduce materially the value of production tax credits and investment tax credits under certain circumstances*" and "*Outlook; 2018 Growth Opportunities: Impact of 2017 Tax Act on 2017 Estimated Results*."

**Additional Projected Financial Data**

In addition to the projections for IEA set forth and discussed above under "*—Certain Projected Financial Information*," projections of EBITDA and Adjusted EBITDA for IEA for the fiscal years ending December 31, 2017, 2018 and 2019 were prepared by the Company in August, 2017. In preparing this information, the Company relied upon the projections provided by IEA to the Company, as set forth and discussed above under "*—Certain Projected Financial Information*." All information set forth below was jointly prepared by the Company and IEA management based upon the HV & MV Scenario projections provided to the Company by IEA, as set forth and summarized above. The additional projections below assume a more conservative estimate of growth in IEA's solar construction business and removes the additional revenue from performing certain electrical services for other EPC firms. The projections assume debt levels consistent with IEA historical borrowings and do not give effect to any additional indebtedness that may be incurred under the replacement credit facility to be entered into in connection with the Closing.

The projections were prepared by, and are the responsibility of, the Company. Crowe Horwath LLP ("*Crowe*"), the Company's independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it.

|  | 2018E | 2019E |
|---|---|---|
| Total Revenue | $ 804,357 | $ 937,250 |
| Cost of Revenue | 695,410 | 807,988 |
| Gross Profit | $ 108,947 | $ 129,262 |
| SG&A | 38,000 | 40,940 |
| Operating Income | $ 70,947 | $ 88,322 |
| Interest Expense, net | (1,443) | (1,722) |
| Credit Support Fees | (449) | (449) |
| Other Expense (includes Prof. Services) | — | — |
| Income before Provisions for Tax | $ 69,055 | $ 86,151 |
| Provisions for Income Taxes | (24,860) | (31,015) |
| Net Income | $ 44,195 | $ 55,136 |

# EXHIBIT 6

DEFM14A 1 d834494ddefm14a.htm DEFM14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

---

Filed by the Registrant  ☒        Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

# GORES HOLDINGS III, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)   Amount Previously Paid:

    (2)   Form, Schedule or Registration Statement No.:

    (3)   Filing Party:

(4)    Date Filed:

**Table of Contents**

In addition, Shay prepared projections of revenue, pro forma adjusted EBITDA, unadjusted EBIT, tax effected EBIT and unlevered free cash flow for Shay for the fiscal years ending December 31, 2020 through December 31, 2024 and the terminal year. The Company reviewed the projections and provided the projections to the Board and to Moelis to be utilized and relied on by Moelis in the preparation of its fairness opinion. Such projections are summarized in the table below.

| ($ in millions)[1][2] | | Fiscal Year Ending December 31, | | | | | Terminal Year |
|---|---|---|---|---|---|---|---|
| | | 2020P | 2021P | 2022P | 2023P | 2024P | |
| **Revenue** | | $2,838.7 | $2,930.7 | $3,061.2 | $3,198.2 | $3,342.1 | $3,342.1 |
| *% Growth* | | *4.2%* | *3.2%* | *4.5%* | *4.5%* | *4.5%* | *—* |
| **Pro Forma Adjusted EBITDA** | | $ 174.0 | $ 187.5 | $ 197.4 | $ 207.9 | $ 219.0 | $ 219.0 |
| *% Margin* | | *6.1%* | *6.4%* | *6.4%* | *6.5%* | *6.6%* | *6.6%* |
| Less: Depreciation and Amortization | | (8.2) | (9.3) | (10.8) | (12.0) | (13.2) | (6.1)[5] |
| Less: One-Time Costs[3] | | (1.5) | — | — | — | — | — |
| **Unadjusted EBIT** | | $ 164.3 | $ 178.2 | $ 186.6 | $ 195.9 | $ 205.8 | $ 212.9 |
| Less: Taxes @ 23.1%[4] | | (38.0) | (41.2) | (43.1) | (45.3) | (47.6) | (49.2) |
| **Tax Effected EBIT** | | $ 126.3 | $ 137.0 | $ 143.5 | $ 150.6 | $ 158.2 | $ 163.7 |
| Plus: Depreciation & Amortization | | 8.2 | 9.3 | 10.8 | 12.0 | 13.2 | 6.1 |
| Less: Change in Net Working Capital | | (5.7) | 0.8 | (8.8) | (9.2) | (9.6) | (9.6)[6] |
| Less: Capital Expenditures | | (5.2) | (5.4) | (5.6) | (5.9) | (6.1) | (6.1)[7] |
| **Unlevered Free Cash Flow** | | $ 123.6 | $ 141.7 | $ 139.9 | $ 147.5 | $ 155.7 | $ 154.1 |

| | |
|---|---|
| (1) | Some figures may not add up due to rounding. |
| (2) | Unlevered after-tax free cash flows and terminal value are discounted to December 31, 2019. |
| (3) | One-time costs in 2020P reflect SOX preparation costs of $1.5 million that are additive and not included in the Pro Forma Adjustments public company costs reflected in the Pro Forma Adjusted EBITDA. |
| (4) | Cash tax rate of 23.1% during projection period. |
| (5) | Depreciation and Amortization assumed to equal Capital Expenditures in terminal year. |
| (6) | Terminal year Change in Net Working Capital as percentage of revenue assumed to equal Change in Net Working Capital as percentage of revenue in 2024P. |
| (7) | Terminal year Capital Expenditures as percentage of revenue assumed to equal Capital Expenditures as percentage of revenue in 2024P. |

## Interests of Certain Persons in the Business Combination

In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination.

These interests include, among other things:

- the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that our Initial Stockholders have agreed to waive their rights to conversion price adjustments with respect to any shares of our Common Stock they may hold in connection with the consummation of the Business Combination;

- the fact that our Sponsor paid an aggregate of $25,000 for 10,781,250 Founder Shares and (after giving effect to the cancellation of (i) 781,250 Founder Shares on October 22, 2018 and (ii) approximately 3,000,000 Founder Shares at the time of the Business Combination) the remaining 7,000,000 Founder

171

# EXHIBIT 7

DEFM14A 1 tv507660-defm14a.htm DEFINITIVE PROXY STATEMENT

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**
**(Amendment No.    )**

---

Filed by the Registrant                                    ☒

Filed by a Party other than the Registrant        ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to Rule 14a-12

# Industrea Acquisition Corp.

(Name of Registrant as Specified in Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)    Title of each class of securities to which transaction applies:

_____

(2)    Aggregate number of securities to which transaction applies:

_____

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

_____

(4)    Proposed maximum aggregate value of transaction:

_____

(5)    Total fee paid:

_____

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

_____

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

During the afternoon of September 7, 2018, Messrs. Osman, Morgan, Young and Humphries held a joint Industrea/CPH investor call to discuss the Business Combination and CPH's business.

On September 10, 2018, the preliminary proxy statement/prospectus for the transaction was filed with the SEC.

On September 12, 2018, Messrs. Osman, Morgan, Young and Humphries presented information about the transaction to the BRFBR salesforce.

On September 13, 2018, Messrs. Osman, Morgan, Young and Humphries presented information about the transaction to the Stifel salesforce.

From September 20, 2018 through October 4, 2018, Messrs. Osman, Morgan, Young and Humphries and representatives from BRFBR met with both existing Industrea and potential new investors in order to present information about the transaction and CPH and gauge potential investor interest in the transaction.

On September 26, 2018, the Term Commitment Letter was executed.

On October 5, 2018, representatives of Industrea including Mr. Morgan, Ms. Schnoedl, Mr. Burns and Mr. Beres, representatives of Peninsula including Mr. Stevens and Mr. Homme, and representatives of BRFBR held a telephonic call to discuss the investor feedback from the September 20 through October 4, 2018 investor meetings.

On October 10, 2018, Mr. Young, Mr. Humphries, Mr. Osman, Ms. Schnoedl, Mr. Beres and representatives from CS met with ratings agencies S&P and Moody's in order to update them about the transaction.

On October 11, 2018, Mr. Young, Mr. Humphries, Mr. Osman, Ms. Schnoedl, Mr. Beres, and representatives from CS met with certain potential lender participants for the anticipated term loan to fund the transaction.

On October 22, 2018, Messrs. Young, Humphries, and Osman and representatives from CS met with a number of potential lenders regarding the syndication of the term loan.

From October 22 through early November 2018, representatives of Industrea and CS continued discussions with potential lenders regarding the syndication of the term loan.

On or about November 7, 2018, in connection with the preparation for marketing efforts in connection with the Business Combination, CPH management provided to Industrea certain revised projected financial information for the fiscal years 2018 and 2019 (the "Updated CPH Projections") for inclusion in the materials to be used in meetings with and presentations to current and potential investors. The Industrea Board reviewed the Updated CPH Projections and concluded that the adjustments were not material and did not affect its prior unanimous decision to approve the Business Combination and its recommendation that stockholders vote in favor of the Business Combination and the other proposals presented at the special meeting. See "— Certain CPH Historical and Projected Financial Information" for further information.

The parties have continued and expect to continue regular discussions regarding the execution and timing of the Business Combination.

**Independent Director Oversight**

The Industrea Board is comprised of a majority of independent directors who are not affiliated with our Sponsor and its affiliates. In connection with the business combination, our independent directors, David A.B. Brown, Thomas K. Armstrong, Jr., David G. Hall, Brian Hodges and Gerard F. Rooney, took an active role in evaluating the proposed terms of the Business Combination. As part of their evaluation of the Business Combination, our independent directors were aware of the potential conflicts of interest with our Sponsor and their affiliates that could arise with regard to the proposed terms of the Merger Agreement. Our independent directors reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and unanimously approving, as members of Industrea Board, the Merger Agreement and the Business Combination.

141

TABLE OF CONTENTS

### Updated CPH Projections

As noted above, in November 2018, CPH management provided the Updated CPH Projections to Industrea. The Updated CPH Projections adjusted the prior projections to take into account weather-related and pricing factors which impacted the prior projections by approximately 2% for revenue and 3% for Adjusted EBITDA. The Industrea Board reviewed the Updated CPH Projections and concluded that the adjustments were not material and did not affect its prior unanimous decision to approve the Business Combination and its recommendation that stockholders vote in favor of the Business Combination and the other proposals presented at the special meeting. The key elements of the Updated CPH Projections are provided below:

| ($ in millions) | 2018E | 2019E |
|---|---|---|
| Revenue | $251 | $273 |
| Adjusted EBITDA | $ 85 | $ 95 |
| *Margin* | *34%* | *35%* |
| Maintenance Capex | ($19) | ($18) |
| Growth Capex | ($6) | ($13) |
| Total Capex | ($25) | ($31) |
| Adjusted Free Cash Flow | $60 | $64 |
| *Adjusted Cash Flow Conversion* | *71%* | *68%* |

The Updated CPH Projections were not prepared with a view towards complying with the guidelines established by the SEC with respect to prospective financial information, but, in the view of Industrea and CPH, were prepared on a reasonable basis, based on the best available estimates and judgments, and presents, to the best of Industrea's and CPH's management knowledge and belief at the time such information was prepared, the expected future financial performance of CPH. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on the Updated CPH Projections. Neither CPH's independent registered public accounting firm, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the Updated CPH Projections, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the Updated CPH Projections.

Neither Industrea nor CPH has warranted the accuracy, reliability, appropriateness or completeness of the Updated CPH Projections to anyone. Neither Industrea nor CPH nor any of their representatives has made or makes any representation to any person regarding the ultimate performance of CPH compared to the information contained in the pro forma historical and projected information, and none of them intends to or undertakes any obligation to update or otherwise revise such information to reflect circumstances existing after November 7, 2018, the date when such Updated CPH Projections were provided to Industrea, or to reflect the occurrence of future events in the event that any or all of the assumptions underlying the Updated CPH Projections are shown to be in error. Accordingly, they should not be looked upon as "guidance" of any sort. CPH will not refer back to these forecasts in its future periodic reports filed under the Exchange Act.

### Reconciliation of Non-GAAP Measures

Pro Forma Adjusted Revenue, Pro Forma Adjusted EBITDA, Adjusted EBITDA, Pro Forma Adjusted EBITDA Margin, Adjusted EBITDA Margin and Adjusted Free Cash Flow are non-GAAP financial measures. Pro Forma Adjusted Revenue is defined as GAAP revenue after giving pro forma effect to (i) the Camfaud Acquisition on November 17, 2016, as further adjusted to reflect a constant a currency exchange rate, and (ii) the O'Brien Acquisition on April 20, 2018. Pre-acquisition financial results of Camfaud and O'Brien are labeled "pre-acquisition," in the table below. Post-acquisition financial results of Camfaud and O'Brien are consolidated within CPH's financial statements for periods following the date of acquisition. Pro Forma Adjusted EBITDA is defined as Adjusted EBITDA (as defined below), as further adjusted to give pro forma effect to the acquisitions of Camfaud and O'Brien as discussed above, to reflect a constant currency exchange rate and to reflect the impact of non-recuring, non-operational and other normalizing expense adjustments. Pro Forma Adjusted EBITDA Margin is Pro Forma Adjusted EBITDA

152

# EXHIBIT 8

DEF 14A 1 tm2025456-9_def14a.htm DEF 14A

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

---

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

    ☐  Preliminary Proxy Statement

    ☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

    ☒  Definitive Proxy Statement

    ☐  Definitive Additional Materials

    ☐  Soliciting Material Pursuant to Rule 14a-12

# Monocle Acquisition Corporation

(Name of Registrant as Specified in Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

---

Payment of Filing Fee (Check the appropriate box):

    ☒  No fee required.

    ☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

        (1)  Title of each class of securities to which transaction applies:

        (2)  Aggregate number of securities to which transaction applies:

        (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

        (4)  Proposed maximum aggregate value of transaction:

        (5)  Total fee paid:

    ☐  Fee paid previously with preliminary materials.

    ☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

        (1)  Amount Previously Paid:

        (2)  Form, Schedule or Registration Statement No.:

        (3)  Filing Party:

        (4)  Date Filed:

Neither NewCo, Monocle nor AerSale is warranting nor has warranted the accuracy, reliability, appropriateness or completeness of the projections to anyone. Neither NewCo, Monocle nor AerSale nor any of their representatives has made or makes any representation to any person regarding the ultimate performance of AerSale compared to the information contained in the projections, and none of them intends to or undertakes any obligation to update or otherwise revise such information to reflect circumstances existing after the date when such projections were provided to the Monocle Board in connection with its vote to approve the Business Combination, or to reflect the occurrence of future events in the event that any or all of the assumptions underlying the projections are shown to be in error, notwithstanding the update to the projections reflected in Note 2 to the table below. Accordingly, they should not be looked upon as "guidance" of any sort. NewCo will not refer back to these forecasts in its future periodic reports filed under the Exchange Act.

The following projected financial information was prepared by AerSale. Certain public company cost assumptions reflected in the projections were provided by Monocle. AerSale's independent registered public accounting firm (Grant Thornton LLP), has not examined, compiled or otherwise applied procedures with respect to the accompanying financial information presented below and, accordingly, expresses no opinion or any other form of assurance on it. The Grant Thornton LLP audit report included in this proxy statement/prospectus relates to historical financial information of AerSale as of December 31, 2018 and 2019 and for each of the two years in the period ended December 31, 2019. It does not extend to the following projected financial information and should not be read as if it does.

The key elements of the historical and projected financial information as of August 31, 2020, the date on which the Monocle Board approved the Business Combination, is summarized below:

| | Historical | Projected | Forecasted | | | | 19A-24-F | 20F-24F |
|---|---|---|---|---|---|---|---|---|
| | 2019A | 2020F[(2)] | 2021F | 2022F | 2023F | 2024F | CAGR | CAGR |
| **Total Revenue** | $ 304 | $ 197 | $ 307 | $ 432 | $ 513 | $ 562 | 13.1% | 30.0% |
| % Growth | 28.5% | (35.4)% | 56.2% | 40.8% | 18.6% | 9.6% | | |
| **Gross Profit** | $ 85 | $ 65 | $ 98 | $ 152 | $ 176 | $ 191 | 17.5% | 30.7% |
| % Gross Margin | 28.0% | 33.2% | 32.0% | 35.1% | 34.3% | 33.9% | | |
| Operating Expenses & SG&A | $ (56) | $ (49)[(3)] | $ (65) | $ (80) | $ (85) | $ (88) | 9.3% | 15.6% |
| **PF Adj. EBIT** | $ 29 | $ 16 | $ 33 | $ 72 | $ 91 | $ 103 | 29.2% | 58.8% |
| % Margin | 8.8%[(4)] | 8.2% | 10.9% | 16.6% | 17.7% | 18.3% | | |
| **PF Adj. EBITDA** | $ 59 | $ 42 | $ 54 | $ 101 | $ 122 | $ 135 | 17.7% | 33.9% |
| % Margin | 18.3%[(3)] | 21.3% | 17.6% | 23.3% | 23.8% | 23.9% | | |
| Public Company Costs | $ 3 | $ 3 | $ 3 | $ 3 | $ 3 | $ 3 | | |
| EBITDA Adjustments | $ (7) | — | — | — | — | — | | |
| **Adj. EBITDA** | $ 56[(5)] | $ 45 | $ 57 | $ 103 | $ 125 | $ 137 | 19.8% | 32.4% |
| % Margin | 18.3% | 22.8% | 18.5% | 23.9% | 24.4% | 24.4% | | |

---

(1) 2019A revenue and gross profit are presented as reported and not pro forma for acquisitions. PF Adj. EBITDA includes $2.9 million in cash public company costs, impact of the ACT and Qwest acquisitions, and a non-recurring adjustments of $7.0 million.

(2) Excludes impairment costs of $20.0 million and includes $2.9 million in public company costs and $12.7 million of CARES Act Payroll Support Program proceeds.

(3) Operating Expenses for 2020 include benefit of $12.7 million in CARES Act Payroll Support Program proceeds.

(4) Percent margin calculated using 2019A PF Adj. Revenue.

(5) Excludes pro forma impact of the ACT and Qwest acquisitions for 2019.

The projected financial information set forth in the tables above was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the SEC with

140

# EXHIBIT 9

DEFM14A 1 brac_defm14a.htm DEFINITIVE PROXY

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**
**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934**

Filed by the Registrant ☒
Filed by a Party other than the Registrant ☐
Check the appropriate box:

☐  Preliminary Proxy Statement
☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material under § 240.14a-12

**BLACK RIDGE ACQUISITION CORP.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box)
☐  No fee required.
☒  Fee computed on table below per Exchange Act Rules 14a-6(i) (1) and 0-11.

   (1)  Title of each class of securities to which transaction applies:

Common stock, par value $0.0001 per share, and warrants to purchase common stock

   (2)  Aggregate number of securities to which transaction applies:

15,448,907 shares of common stock and 3,800,003 warrants

   (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

$10.1175 per share and $0.29 per warrant

   (4)  Proposed maximum aggregate value of transaction:

$156,828,795.38

   (5)  Total fee paid:

$ 19,007.65

☒ Fee paid previously with preliminary materials.
☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)        Amount Previously Paid:

(2)        Form, Schedule or Registration Statement No.

(3)      Filing Party:

_____

(4)      Date Filed:

_____

**Unaudited Financial Projections of AEM**

Management of AEM prepared prospective financial projections and provided it to Craig-Hallum to assist it in arriving at the opinion discussed above. After Craig-Hallum provided its opinion to BRAC and the parties executed the merger agreement, management of AEM updated those financial projections to account for a later transaction closing date than originally anticipated as well as to update certain information relating to AEM's business operations and initiatives. Craig-Hallum did not utilize these updated projections in any way in arriving at the opinion set forth above. BRAC is providing holders with both sets of financial projections in order to assist them in their analysis of the proposed transaction.

The following summary unaudited financial projections of AEM were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the SEC or the American Institute of Certified Public Accountants with respect to prospective financial information. In the view of AEM's management, the financial projections were prepared on a reasonable basis, reflected the best currently available estimates and judgments of AEM and presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of AEM. However, the financial projections are not fact.

None of BRAC's or AEM's independent auditors, nor any other independent auditors, have compiled, examined or performed any procedures with respect to the unaudited financial projections contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for the financial projections. The reports of the independent registered public accounting firms included in this proxy statement relate to the historical financial information of BRAC and AEM, respectively. Such reports do not extend to the unaudited financial projections and should not be read to do so.

AEM has not warranted the accuracy, reliability, appropriateness or completeness of the projections to anyone, including BRAC. Neither AEM's management nor its representatives has made or makes any representations to any person regarding the ultimate performance of AEM relative to the financial projections contained herein, and none of them intends to or undertakes any obligation to update or otherwise revise the projections going forward. As such, these projections should not be looked upon as "guidance" of any sort. BRAC will not refer back to these forecasts in its future periodic reports filed under the Exchange Act. Such projections are inherently subjective in nature, though considered reasonable by the management of AEM, as of the date such projections were prepared, and are susceptible to interpretation and, accordingly, contemplated results may not be achieved.

Both sets of financial projections set forth below assume that no holder of BRAC public shares seek conversion of their shares into cash in connection with the proposed transaction. To the extent that holders of BRAC public shares seek conversion of their shares into cash, BRAC may need to raise additional capital or alter its current operations to account for the reduction in capital becoming available to BRAC. Additionally, while otherwise presented with numerical specificity, the unaudited financial projections reflect numerous estimates and assumptions with respect to future industry performance under various industry scenarios as well as assumptions for competition, general business, economic, market and financial conditions and matters specific to the businesses of BRAC and AEM, all of which are difficult to predict and many of which are beyond the preparing parties' control including, among other things, the matters described in the sections entitled "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors." Accordingly, there can be no assurance that the assumptions made in preparing any particular projection will prove accurate. There will be differences between actual and forecasted results, and the differences may be material. The risk that these uncertainties and contingencies could cause the assumptions to fail to be reflective of actual results is further increased due to the length of time over which these assumptions apply. As a result, any further delay in consummating the proposed transaction could further impact the combined company's results of operations, and in turn, the financial projections presented herein. In light of the foregoing factors and the uncertainties inherent in the unaudited financial projections, the BRAC stockholders are cautioned not to place undue reliance on the unaudited financial projections and the inclusion of the unaudited financial projections in this proxy statement should not be regarded as a representation by any person that the results contained therein will be achieved.

71

# EXHIBIT 10

6/15/23, 3:29 PM Case 4:19-cv-00957 Document 567-1 sec.gov/Archives/edgar/data/1743725/000121390020002993/defm14a020420_chaserg.htm Filed on 12/04/23 in TXSD Page 67 of 80

DEFM14A 1 defm14a020420_chaserg.htm

<hr style="border-top: 3px double;" />

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————————————

### SCHEDULE 14A

### SCHEDULE 14A INFORMATION
Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

———————————————

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

# ChaSerg Technology Acquisition Corp.
### (Name of Registrant as Specified in its Charter)
### N/A
### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  Title of each class of securities to which transaction applies:

  Aggregate number of securities to which transaction applies:

  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  Proposed maximum aggregate value of transaction:

  Total fee paid:

☒ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

  (1) Amount Previously Paid:

———————————————

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

The projections reflect numerous assumptions, including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors, all of which are difficult to predict and many of which are beyond Grid Dynamics' control, such as the risks and uncertainties contained in the section entitled "Risk Factors." The projections reflect the consistent application of the accounting policies of Grid Dynamics and should be read in conjunction with the accounting policies included in the accompanying consolidated financial statements of Grid Dynamics included elsewhere in this proxy statement.

The most significant assumptions made by Grid Dynamics' management in preparing its projections included: (i) a detailed forecast on a project-by-project basis for customers already engaged for fiscal years 2019 and 2020; (ii) an estimate for revenue from new clients forecasted to be brought on in fiscal years 2019 and 2020; (iii) forecasted sales and marketing spend to drive new clients and marketing programs in fiscal years 2019 and 2020; (iv) with respect to costs of goods sold, the required headcount and operating expenses to support those engaged projects in fiscal years 2019 and 2020 referenced in clause (i) above, including utilized and unutilized headcount; (v) general and administrative expense required to support the business, including visa sponsorships, rent, and finance, accounting and legal overhead costs; and (vi) sales and marketing expense that is driven by sales representative headcount increases and marketing programs that have been allocated for fiscal year 2020. With respect to the financial projections, ChaSerg's board of directors also considered, among other things, the discussions ChaSerg's management team had with many of Grid Dynamics' existing customers and the site visits ChaSerg's management team made to Grid Dynamics' U.S. headquarters and Ukraine, Poland and Russia offices to understand the team and cost structures and ability of each office to scale.

The projected financial information is forward-looking and based on growth assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond Grid Dynamics' control. While all projections are necessarily speculative, Grid Dynamics believes that the prospective financial information covering periods beyond 12 months from its date of preparation carries increasingly higher levels of uncertainty and should be read in that context. There will be differences between actual and projected results, and actual results may be materially greater or materially less than those contained in the projections.

Grid Dynamics has not made any representations or warranties with respect to the accuracy, reliability, appropriateness or completeness of the projections to anyone, including to ChaSerg. Neither Grid Dynamics' management nor any of its representatives has made or makes any representation or warranty to any person regarding the ultimate performance of Grid Dynamics compared to the information contained in the projections, and none of them intends to or undertakes any obligation to update or otherwise revise the projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events in the event that any or all of the assumptions underlying the projections are shown to be in error. Accordingly, they should not be looked upon as "guidance" of any sort.

The projections were prepared by, and are the responsibility of, Grid Dynamics' management. Grant Thornton LLP, Grid Dynamics' independent registered public accountant, has not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it.

### Interests of Certain Persons in the Business Combination

*In considering the recommendation of ChaSerg's board of directors to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, the Sponsor and certain members of ChaSerg's board of directors and executive officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. ChaSerg's board of directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination. These interests include, among other things:*

- Unless ChaSerg amends its Certificate of Incorporation to extend its life and certain other agreements it has entered into, if the Business Combination or another business combination is not consummated by April 10, 2020, ChaSerg will cease all operations except for the purpose of winding up, redeeming 100%

99

# EXHIBIT 11

S-4/A 1 fs42020a5_insuranceacqcorp.htm AMENDMENT NO. 5 TO FORM S-1

As filed with the Securities and Exchange Commission on September 23, 2020

Registration No. 333-239896

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

AMENDMENT NO. 5
TO
FORM S-4
REGISTRATION STATEMENT
UNDER THE SECURITIES ACT OF 1933

# INSURANCE ACQUISITION CORP.

**(Exact name of registrant as specified in its charter)**

| Delaware | 6770 | 82-5325852 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

2929 Arch Street, Suite 1703
Philadelphia, PA 19104-2870
(215) 701-9555
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

2929 Arch Street, Suite 1703
Philadelphia, PA 19104-2870
Attn: John M. Butler
President and Chief Executive Officer
(215) 701-9555
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*
Sean M. Donahue
Jeffrey A. Letalien
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
(202) 538-3557

Martin C. Glass
Jeffrey R. Shuman
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
(212) 891-1672

Approximate date of commencement of proposed sale to the public: As soon as practicable after this Registration Statement becomes effective and after all conditions under the Merger Agreement to consummate the proposed merger are satisfied or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer,"

"smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

|                         |   |                             |   |
|-------------------------|---|-----------------------------|---|
| Large accelerated filer: | ☐ | Accelerated filer:          | ☐ |
| Non-accelerated filer:   | ☒ | Smaller reporting company:  | ☒ |
|                         |   | Emerging growth company     | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

financial advisor to any party to the Merger other than as stated in the previous sentence. In the ordinary course of its business, Northland and its affiliates may actively trade securities of the Company for its own account or the account of its customers and, accordingly, may at any time hold a long or short position in such securities. Northland has not received fees or other compensation from the Company or Shift in the past two years prior to the issuance of its opinion. Northland and its affiliates may from time to time perform various investment banking and financial advisory services for the Company and for other clients and customers that may have conflicting interests with the Company, for which Northland would expect to receive compensation.

Consistent with applicable legal and regulatory requirements, Northland has adopted policies and procedures to establish and maintain the independence of Northland's research department and personnel. As a result, Northland's research analysts may hold opinions, make statements or investment recommendations and/or publish research reports with respect to the Merger and other participants in the Merger that differ from the opinions of Northland's investment banking personnel.

## Certain Projected Financial Information

We and Shift do not as a practice make public projections as to future revenues, earnings or other results. However, in connection with our board of directors' evaluation of the Merger and Northland's financial analysis of Shift described in the subsection entitled *"— Description of Fairness Opinion of Northland"* above, Shift management provided to us and Northland Shift's non-public, three-year internal financial forecasts regarding Shift's anticipated future operations for fiscal 2020 through fiscal 2022 which incorporated the financial forecasts prepared by Shift management without any adjustment by our management. We have included summary information from such financial forecasts in the tables below to give our stockholders access to certain previously non-public information because such information was considered by our board of directors for purposes of evaluating the Merger and by Northland for purposes of rendering its fairness opinion. Inclusion of summary information regarding the financial forecasts in this proxy statement/prospectus is not intended to influence your decision whether to vote for the Merger.

The unaudited prospective financial information was not prepared with a view toward public disclosure, nor was it prepared with a view toward complying with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for the preparation and presentation of prospective financial information, or GAAP, but, in the view of Shift 's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of Shift management's knowledge and belief, the expected course of action and the expected future financial performance of the Company. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this document are cautioned not to place undue reliance on the prospective financial information.

Neither our independent registered public accounting firm nor the independent registered public accounting firm of Shift has audited, reviewed, compiled, or performed any procedures with respect to the accompanying unaudited prospective financial information for the purpose of its inclusion herein, and accordingly, neither of them expresses an opinion or provides any other form of assurance with respect thereto for the purpose of this proxy statement/prospectus. The report of the independent registered public accounting firm of Shift included elsewhere in this proxy statement/prospectus relates to the historical financial information of Shift. It does not extend to the unaudited prospective financial information and should not be read to do so.

Furthermore, the unaudited prospective financial information does not take into account any circumstances or events occurring after the date it was prepared and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on the prospective financial information.

The accompanying prospective financial information includes financial measures that were not calculated in accordance with GAAP, namely Shift Take, Adjusted Gross Profit, EBITDA and EBITDA Margin. Non-GAAP measures are not necessarily calculated the same way by different companies and should not be considered a substitute for or superior to GAAP results.

# EXHIBIT 12

F-4/A 1 tv519564_f4a.htm AMENDMENT NO. 4 TO FORM F-4

TABLE OF CONTENTS

**As filed with the Securities and Exchange Commission on April 25, 2019**

Registration No. 333-229899

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# AMENDMENT NO. 4
# TO
# FORM F-4
## REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

---

# CLARIVATE ANALYTICS PLC
*(Exact Name of Each Registrant as Specified in its Charter)*

---

| Jersey, Channel Islands | 7374 | Not Applicable |
|---|---|---|
| *(State or other jurisdiction of Incorporation or organization)* | *(Primary standard industrial classification code number)* | *(I.R.S. Employer Identification Number)* |

**4th Floor, St. Paul's Gate, 22-24 New Street**
**St. Helier, Jersey JE1 4TR**
**Telephone: +44 153 450 4700 (ext. 4531)**

*(Address, including zip code, and telephone number, including area code, of each registrant's principal executive offices)*

**Vistra USA (IES), LLC**
**888 Seventh Avenue, 5th Floor**
**New York, NY 10106**
**Telephone: (212) 500-6259**

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

---

*With copies to:*

| Rachel W. Sheridan, Esq. | Raphael M. Russo, Esq. | Robert J. Mittman, Esq. |
|---|---|---|
| Shagufa R. Hossain, Esq. | Paul, Weiss, Rifkind, Wharton & | Brad L. Shiffman, Esq. |
| Latham & Watkins LLP | Garrison LLP | Kathleen A. Cunningham, Esq. |
| 555 Eleventh Street, NW | 1285 Avenue of the Americas | Blank Rome LLP |
| Washington, D.C. 20004 | New York, NY 10019 | 405 Lexington Avenue |
| Telephone: (202) 637-2200 | Telephone: (212) 373-3000 | New York, NY 10174 |
| Fax: (202) 637-2201 | Fax: (212) 757-3990 | Telephone: (212) 885-5000 |
| | | Fax: (212) 885-5001 |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this Registration Statement becomes effective and all other conditions to the transactions contemplated by the Agreement and Plan of Merger described in the included proxy statement/prospectus have been satisfied or waived.

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933. Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☒

---

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

TABLE OF CONTENTS

- ***Tax Receivable Agreement.***   The risk that payments related to a tax receivable agreement may limit the availability of capital to support the Company's growth initiatives, including M&A activities;

- ***No Third-Party Valuation.***   The risk that Churchill did not obtain a third-party valuation or fairness opinion in connection with the Transactions;

- ***The Rights of Onex and Baring Pursuant to the Amended and Restated Stockholder Agreement.***   The risks relating to the rights granted to Onex and Baring pursuant to the Amended and Restated Stockholder Agreement, including such holders' right to designate up to nine out of 14 directors of Clarivate;

- ***Churchill Stockholders Receiving a Minority Position in Clarivate.***   The risk that Churchill stockholders will hold a minority share position in Clarivate, or approximately 26% of the outstanding capital stock of Clarivate (assuming no holder of public shares exercises redemption rights and excluding the 10.6 million ordinary shares of Clarivate which will be subject to vesting restrictions); and

- ***Other Risks.***   Various other risks associated with the business of the Company, as described in the section entitled "*Risk Factors*" appearing elsewhere in this proxy statement/prospectus.

The Churchill board concluded that the potential benefits that it expected Churchill and its shareholders to achieve as a result of the Transactions outweighed the potentially negative factors associated with the Transactions. The board also noted that the Churchill stockholders would have a substantial economic interest in the combined company (depending on the level of Churchill stockholders that sought redemption of their public shares into cash). Accordingly, the board unanimously determined that the Merger Agreement and the Transactions contemplated therein, were advisable, fair to, and in the best interests of the Churchill and its stockholders.

### Certain Forecasted Financial Information for the Company

The Company provided Churchill with its internally prepared forecasts for period ending December 31, 2018 and preliminary budget for 2019. This prospective financial information was not prepared with a view toward compliance with published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The forecasts were prepared solely for internal use, capital budgeting, covenant compliance planning and other management purposes. As such, they include certain pro forma adjustments that are permissible under the covenants in the Company's Credit Agreement. The forecasts are subjective in many respects and therefore susceptible to varying interpretations and the need for periodic revision based on actual experience and business developments, and were not intended for third-party use, including by investors or holders. You are cautioned not to rely on the forecasts in making a decision regarding the transaction, as the forecasts may be materially different than actual results.

The forecasts are based on information as of the date of this proxy statement/prospectus and reflect numerous assumptions including assumptions with respect to general business, economic, market, regulatory and financial conditions and various other factors, all of which are difficult to predict and many of which are beyond the Company's control, such as the risks and uncertainties contained in the section entitled "*Risk Factors*." The most significant assumptions upon which the Company's management based its forecasts and the reasonable and supportable basis for those assumptions are, among other things, subscription revenue growth being driven by the higher ACV entry rate in 2019 as well as the benefit of new sales and an improvement in renewal rates. Transactional revenues are assumed to show some modest year to year growth with professional services revenue assumed to be flat year to year. Expense growth is assumed to be in line with inflation as increases in personnel related costs from higher headcount and merit compensation are offset by higher capitalization of internal and external staff. Capital expenditure assumptions reflect a return to historical spending levels seen in 2015 and 2016.

The Company believes that the assumptions used to derive its forecasts are both reasonable and supportable. The Company's management derived its forecasts based on modeling revenues growth assumptions and estimates of controllable expenditures. In preparing the models, the Company's

87

# EXHIBIT 13

S-4/A 1 fs42017a3_simplygood.htm AMENDMENT NO. 3 TO FORM S-4

**As filed with the Securities and Exchange Commission on June 12, 2017**

**Registration No. 333-217244**

---

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

**Amendment No. 3 to**

**FORM S-4**
**REGISTRATION STATEMENT**
*UNDER THE SECURITIES ACT OF 1933*

---

# The Simply Good Foods Company
**(Exact name of registrant as specified in its charter)**

---

| Delaware | 2000 | 82-1038121 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**1 Greenwich Office Park, 2nd Floor**
**Greenwich, CT 06831**
**(212) 429-2211**

---

**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

---

**Brian K. Ratzan**
**Vice President**
**1 Greenwich Office Park, 2nd Floor**
**Greenwich, CT 06831**
**(212) 429-2211**

---

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | |
|---|---|
| Michael Movsovich | Raymond E. Baltz, Jr. |
| Christian O. Nagler | Carrie A. Ratliff |
| Kirkland & Ellis LLP | King & Spalding LLP |
| 601 Lexington Avenue | 1180 Peachtree Street |
| New York, New York 10022 | Atlanta, Georgia 30309 |
| (212) 446-4800 – Phone | (404) 572-4600 – Phone |
| (212) 446-4900 – Facsimile | (404) 572-5100 – Facsimile |

Approximate date of commencement of proposed sale to the public: As soon as practicable after this Registration Statement becomes effective and after all conditions under the Merger Agreement to consummate the proposed merger are satisfied or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☒

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer: | ☐ | Accelerated filer: | ☐ |
| | ☒ (Do not check if a smaller reporting | | |
| Non-accelerated filer: | company) | Smaller reporting company: | ☐ |

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

the consummation of the transactions contemplated thereby including the Common Stock Private Placement and the the Debt Financing, (ii) recommending that the Merger Agreement be submitted to Conyers Park's stockholders for approval, and (iii) delegating the decision on the record date, date and time for such meeting to a committee of the board which was established for such purpose whose members are David J. West and Brian K. Ratzan. The board, with Messrs. Kilts, Ratzan, and West recusing themselves due to their ownership interests in Sponsor, also approved the entry by Simply Good Foods into an investor rights agreement, substantially in the form attached hereto as Annex D with Sponsor.

**The Company's Board of Directors' Reasons for the Approval of the Business Combination**

On April 3, 2017, Conyers Park's board of directors met and unanimously (i) approved the Purchase Agreement and the transaction contemplated thereby, (ii) determined that the Business Combination is in the best interest of Conyers Park and its stockholders, (iii) directed the Purchase Agreement be submitted to its stockholders for approval and adoption, and (iv) recommended that our stockholders approve and adopt the Purchase Agreement.

Before reaching its decision, Conyers Park's board of directors reviewed the results of its management's due diligence, which included:

- research on comparable companies including Amplify Snack Brands, Inc., B&G Foods, Inc., Flowers Foods, Inc., Hostess Brands, Inc., J&J Snack Foods Corp., Lancaster Colony Corporation, McCormick & Company, Inc., Pinnacle Foods Inc., Post Holdings, Inc., Snyder's-Lance, Inc., and The J. M. Smucker Company, and over 30 precedent transactions involving branded food acquisitions from the past 10 years, ranging in transaction size from approximately $90 million to $7 billion in enterprise value. Conyers Park's board of directors compared the EBITDA multiple derived from the purchase price for Atkins (including the dilution resulting from the conversion of the Founder shares) to the average EBITDA multiple of the aforementioned publicly traded comparable companies, as well as to the average EBITDA multiple of the aforementioned precedent transactions, and found that Atkins' transaction multiple was in-line with both;

- extensive meetings and calls with Atkins' management team regarding operations and projections;

- research on the nutritional snacking industry, including historical growth trends, market share information and market size projections;

- review of Atkins' material contracts, environmental matters, intellectual property matters, labor matters, and financial, tax, legal, environmental and accounting diligence;

- financial and valuation analysis including financial projections provided by Atkins, which indicated Net Sales of $402 million and $428 million, Gross Profit of $188 million and $201 million and Adjusted EBITDA of $72 million and $78 million, for the fiscal years ending August 31, 2017 and 2018, respectively, an implied trading multiple (after accounting for the dilution from the Founder Shares and fees and expenses related to the transaction resulting in an enterprise value of $856 million at the original issue price of $10.00 per share) of 11.6x estimated EBITDA for the 12-months ended December 31, 2017 of $74 million, compared to a peer set median trading multiple of 13.7x 2017 estimated EBITDA, and an implied trading multiple (after accounting for the dilution from the Founder Shares and fees and expenses related to the transaction resulting in an enterprise value of $856 million at the original issue price of $10.00 per share) of 11.8x estimated EBITDA less capital expenditure for the 12-months ended December 31, 2017 of $73 million, compared to a peer set median trading multiple of 16.4x 2017 estimated EBITDA less capital expenditure; and

- reports relating to Quality of Earnings, tax, legal and cost diligence prepared by external advisors of KPMG LLP, Kirkland & Ellis LLP, Mercer Inc., and Marsh USA Inc.

The Company's board of directors considered a wide variety of factors in connection with its evaluation of the Business Combination. In light of the complexity of those factors, the Company's board of directors, as a whole, did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision.

90