UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 <br><br> Judge George C. Hanks, Jr. <br><br> THIS DOCUMENT RELATES TO: <br><br> CASE NO. 4:22-CV-01189 <br> CASE NO. 4:22-CV-02590 |

**APPENDIX TO DEFENDANTS' OPPOSITION TO
DIRECT ACTION PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE
THE TESTIMONY OF CHARLES WHITEHEAD**

In accordance with Court Procedure 7(B)(3), Moving Defendants submit this Appendix in support of their Opposition to Direct Action Plaintiffs' Motion to Partially Exclude the Testimony of Charles Whitehead, which is filed concurrently herewith. Moving Defendants rely on the following evidence to support their motion:

| Ex. | Description |
|---|---|
| 1. | Excerpts of the Deposition of Charles Whitehead taken on November 17, 2023 |

Dated: January 19, 2024

Respectfully submitted,

By  /s/ *J. Christian Word*
    J. Christian Word
    Attorney-in-Charge for Defendants

D.C. Bar No. 461346
S.D. Tex. Bar No. 3398485
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Christian.Word@lw.com

Of Counsel:
Heather A. Waller (with permission of Attorney-in-Charge)
IL Bar No. 6302537
S.D. Tex. Bar No. 2886108
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
Heather.Waller@lw.com

Laura E. Bladow (*pro hac vice*)
D.C. Bar No. 1740343
Eunice M. Kabuga (*pro hac vice*)
D.C. Bar No. 90006573
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Laura.Bladow@lw.com
Eunice.Kabuga@lw.com

*Counsel for Defendants Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II; Riverstone Holdings LLC; Harlan H. Chappelle; Stephen S. Coats; Michael E. Ellis; William D. Gutermuth; James T. Hackett; Pierre F. Lapeyre, Jr.; David M. Leuschen; Donald R. Sinclair; Ronald J.*

*Smith; Jeffrey H. Tepper; Thomas J. Walker; and Diana J. Walters*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com

Of Counsel:
Katherine A. Preston
TX Bar No. 24088255
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
CA Bar No. 261558
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
jschreiber@winston.com

*Co-Counsel for Defendants Harlan H. Chappelle and Michael E. Ellis*

## **CERTIFICATE OF SERVICE**

I certify that on January 19, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ J. Christian Word*
J. Christian Word

# EXHIBIT 1

CONFIDENTIAL

Page 1

1        UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF TEXAS
3              HOUSTON DIVISION
4   _____
                                   )
5   IN RE ALTA MESA RESOURCES,     )
                                   )    Case No.
6   INC. SECURITIES LITIGATION     )
    _____ )    4:19-cv-00957
7
8              **************
                 CONFIDENTIAL
9              **************
10          VIDEOTAPED DEPOSITION OF
11              CHARLES WHITEHEAD
12              November 17, 2023
13                  9:12 a.m.
14
15        Via Zoom Remote Conferencing
16
17
18       Reported by:  Marsi Koehl, CCR-B-2424
19
20
21
22
23
24
25

```
 1                    C O N T E N T S
 2                  E X A M I N A T I O N
 3                                                   Page
 4   Examination by Mr. Smith..........................6
 5   Examination by Mr. Peller.......................265
 6
 7                      E X H I B I T S
 8   Exhibit No.        Description                   Page
 9
     Exhibit 0832       Expert Report of               20
10                      Professor Charles Whitehead
11   Exhibit 0833       15 U.S.C.A. Section 78t       129
12   Exhibit 0834       G.A. Thompson & Co. v.        138
                        Partridge
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL (REMOTELY)
 2
     On behalf of Plaintiff and class:
 3       TRIG SMITH
         JACK KELLEY
 4       Attorneys at Law
         ROBBINS GELLER RUDMAN & DOWD, LLP
 5       655 West Broadway
         Suite 1900
 6       San Diego, California  92101
         (619) 231-1058
 7       trigs@rgrdlaw.com
 8
     On behalf of Alyeska and Orbis Plaintiffs:
 9       MATTHEW PELLER
         Attorney at Law
10       ROLNIK KRAMER SADIGHI, LLP
         1251 Avenue of the Americas
11       New York, New York  10020
         (212) 597-2800
12       mpeller@rksllp.com
13
     On behalf of Alta Mesa Resources, Incorporated,
14   Riverstone Holdings, LLC, and certain of the
     individual defendants:
15       LAURA E. BLADOW
         CHRISTINA WORD
16       Attorneys at Law
         LATHAM & WATKINS, LLP
17       555 Eleventh Street, NW
         Suite 1000
18       Washington, D.C.  20004
         (202) 637-2200
19       laura.bladow@lw.com
20
     Also present remotely:
21       Gordon Thomas, Videographer
         Jacob Waldman, Esq.
22       Grant Jones, Esq.
         Eunice Kabuga, Esq.
23       Andrew Entwistle, Esq.
         Adam Pollet, Esq.
24
25
```

Page 270

1    industry but like any industry you're going
2    to have some that perform and some that
3    don't perform as well.  So I don't view this
4    as an industry, actually, neither does
5    Mr. Klausner.  He -- his data breaks it out
6    this way, but he doesn't present it this
7    way.  He's presenting it as a single SPAC.
8    In fact, I believe he ends up using
9    averages.
10        But You have to dig into it to realize
11   that, in fact, his averages are reflecting
12   different types of sponsors.  So, no, I
13   don't understand this to be anything other
14   than a single SPAC industry.
15  BY MR. PELLER:
16       Q.  And then I think Trig may have gone into
17  this with you a little before, but you didn't look
18  into whether any of the SPACs listed in appendix D
19  have been, for example, investigated by the
20  Securities Exchange Commission, correct?
21           MS. BLADOW:  Objection.
22           THE WITNESS:  That's correct.
23  BY MR. PELLER:
24       Q.  And you haven't looked into whether any of
25  the SPACs listed in appendix D have faced criminal

Page 271

1    inquiries from the Department of Justice, correct?
2             MS. BLADOW:  Objection.
3             THE WITNESS:  That's correct.
4    BY MR. PELLER:
5        Q.   Okay.  So, for example, you include Nikola,
6    right, in appendix D?  It's number 59.
7        A.   Yes.
8        Q.   And was the CEO of Nikola convicted of
9    criminal securities fraud?
10       A.   I don't know.
11       Q.   How can you include a population to derive
12   industry custom and practice for disclosures, which
13   is what I believe you're trying to do here, without
14   determining whether certain members of that
15   population actually violated disclosure laws?
16       A.   So, again, we're providing custom and
17   practice as to the disclosures that were actually
18   made and the way in which they were presented.  We're
19   not speaking to any sort of inside information or
20   outside the scope of the disclosure.
21            Whether or not the particular disclosures
22   were, you know, in terms of inside information -- I
23   think this is something we talked earlier about to
24   Trig.  Whether or not the inside disclosures were --
25   whether there's inside information that speaks to the

Page 272

1  way in which the disclosures were prepared.
2       Q.  I guess I just don't understand the point or
3  the usefulness of a survey of disclosure practices
4  that doesn't take into account that some of the
5  members of the population may have been violating
6  disclosure laws.  It's hard for me to square.  It
7  would be sort of like take ago survey of the speed at
8  which people driving on a highway without excluding
9  the people who are breaking the speed limit.  I mean,
10 I don't get it.  Can you explain it?
11      A.  Well, let's use your analogy.  If I want to
12 understand the speed at which people are driving on
13 the highway, I want to understand the speed at which
14 all the people are driving on the highway.
15          And so on that basis, I would assess without
16 regard to speed limits, right, what the different --
17 what the different speeds are in order to determine
18 overall what we understand the speeds to be.  In
19 fact, I'm sure you know, there are studies that
20 actually do this.  And they find that average speeds
21 are, in fact, above the speed limit.
22          I want to take a step back, though, to your
23 other point though about disclosure issues.  You
24 know, you mentioned Nikola.
25          Are you representing that they -- the CEO

1  was found to have violated disclosures as it related
2  to target projections?  I'm not aware of anybody in
3  this group has that type of problem.  And so to that
4  extent I don't know that any of the information in
5  here is addressed by the different things you're
6  describing, the criminal or the other proceedings.
7      Q.  So it sounds like you did look into it?
8      A.  No.  I'm saying I'm not aware of.
9      Q.  You're not aware of --
10     A.  That's right.
11     Q.  So if you were to become aware that there
12 were companies in the sample that had violated laws
13 with respect to financial projections, would that be
14 relevant?
15     A.  I'd want to understand again the context.
16 Right?  So if what you're telling me is -- first of
17 all, it wouldn't be relevant to what we were doing in
18 terms of this analysis.  Right?
19         Again, in terms of this analysis we were
20 looking at the actual disclosures made and the ways
21 in which they were presented without regard to the
22 underlying -- sort of the inside information we were
23 describing this morning, whether or not in fact
24 there's other information to suggest something
25 different from what was presented in the proxy.

1    What you're suggesting to me is there might
2    be publicly available inside information. Again,
3    we're not -- I'm not aware of this. And as I
4    mentioned this morning, I've not -- I've not seen
5    anything that suggests one way or the other as to
6    how this -- how the -- whether or not the disclosures
7    are consistent in which the projections were
8    presented.
9         But irrespective of what might be available,
10   our -- our focus here were the disclosures themselves
11   not the underlying process by which the disclosures
12   may have been made.
13        Q.  Okay.  You know, obviously, there's been a
14   lot of questions about this, so I don't want to beat
15   a dead horse.
16        But what value is it to the factual issues
17   and legal issues in this case as to what people do
18   about disclosures if that's completely unmoored from
19   whether that complied with the securities laws?
20        MS. BLADOW:  Objection.
21   BY MR. PELLER:
22        Q.  So a different way of saying it is, what
23   relevance does it have if 82.7 percent of de-SPAC
24   disclosures included financial projections if it's
25   possible that those 82.7 percent violated the

Page 275

1  securities laws?
2       A.  So unless you're representing to me that
3  82.7 percent violated the securities law, the point I
4  made this morning was that one of the reasons we use
5  a very large N, a large number of samples, is to --
6  is to address the possibility of aberrations in a
7  smaller group of samples.
8           And so we have 98 in this case.  And within
9  that 98, we have a significant number -- 84 percent
10 of those who provide projections include target
11 prepared projections as stated in the proxy
12 statement.
13          Let's take your example.  Let's assume that
14 Nikola turned out not to be accurate.  Well, that's
15 not going to change my data very much.  So the idea
16 behind -- the idea behind using a large N, a large
17 dataset, was to address the general custom and
18 practice and not have it impacted by, in this case, a
19 single aberration.
20          And so unless you're saying there's an
21 industry-wide attempt, that still doesn't really go
22 to -- attempt to mislead the public, that still
23 doesn't go to, again, what it is we're doing in this
24 particular empirical analysis.  What we're doing here
25 is looking at what's been provided and asking whether

1  or not what the company did is consistent with what's
2  out there in the general public.
3          And that's all we're doing.  Right?  Again,
4  we're not going to that additional step I said this
5  morning to look at inside information to find out,
6  you know, the nuance of what was behind the
7  particular disclosures and the proxy.  But we are
8  trying to address that type of concern by having a
9  large data set against which we're measuring custom
10 and practice.
11      Q.   You testified earlier that you worked in the
12 SPAC industry?
13      A.   I've been involved with SPACs.  Yes.
14      Q.   Involved in what manner?
15      A.   So, for example, I'm currently de-SPACing.
16 I'm working with a SPAC group to de-SPAC into,
17 potentially, an agro-business.
18      Q.   Okay.  And are those positions listed on the
19 CV that's attached to your expert report?
20      A.   No.  Because, again, we're in the process of
21 doing this.  I reference it in my -- in my discussion
22 up front that I'm working on SPACs.  But I'm doing it
23 as me.  It's not -- it's not -- I'm not employed by
24 somebody.  I'm doing it as -- as me, actually.  I'm
25 not working for an investment bank or a law firm.

CONFIDENTIAL

Page 282

1  CERTIFICATE

2

3  STATE OF GEORGIA:

4  COUNTY OF FULTON:

5

6  I hereby certify that the foregoing
7  transcript was taken down, as stated in the caption,
8  and the colloquies, questions, and answers were
9  reduced to typewriting under my direction; that the
10 transcript is a true and correct record of the
11 evidence given upon said proceeding.
12          I further certify that I am not a relative
13 or employee or attorney of any party, nor am I
14 financially interested in the outcome of this action.
15          This the 22nd day of November, 2023.

*[signature: Marsi Koehl]*

_____

Marsi Koehl, CCR-B-2424

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>Judge George C. Hanks, Jr. |

### Notice of Errata – Deposition of Charles Whitehead (November 17, 2023)

I, the undersigned, do hereby declare that I have read the deposition transcript of Charles Whitehead dated November 17, 2023, and that, to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | From | To | |
| Global | | S4 | S-4 | Transcription Error |
| Global | | F4 | F-4 | Transcription Error |
| 11 | 12 | I don't know how that were produced. | I don't know how they were produced. | Transcription Error |
| 18 | 13 | The principle condition | The principal condition | Transcription Error |
| 29 | 11 | industry, which tie into | industry, which ties into | Transcription Error |
| 33 | 11 | also observe. | also observe? | Transcription Error |
| 48 | 11 | in the variation figures. | in the various figures. | Transcription Error |
| 62 | 19-20 | whatever we're not coming across it | whatever reason we're not coming across it | Transcription Error |
| 73 | 23-24 | There were that many. | There were not that many. | Transcription Error |

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | From | To | |
| 78 | 24-25 | methodology – at least five. | methodology, perhaps it should have said at least five. | Transcription Error |
| 90 | 10-11 | but I don't that to be | but I don't understand that to be | Transcription Error |
| 100 | 19 | prepared financial projections used by SRI. | prepared financial projections used by SRII. | Transcription Error |
| 109 | 5 | do this as someone whose done his own | say this as someone who's done his own | Transcription Error |
| 169 | 25 | financial statements. | financial projections. | Transcription Error |
| 196 | 5 | reasonable rely upon advise | reasonably rely on advice | Transcription Error |
| 203 | 7 | I'd will reluctant | I'd be reluctant | Transcription Error |
| 206 | 12 | know that what's what was meant by opine | know that that's what was meant by opine | Transcription Error |
| 208 | 22 | they provide | they provided | Transcription Error |
| 210 | 10 | what the SRI folks | what the SRII folks | Transcription Error |
| 215 | 3 | don't recall the specific | don't recall the specifics | Transcription Error |
| 226 | 24 | inexperience | inexperienced | Transcription Error |
| 228 | 5 | a fuel review | a full review | Transcription Error |
| 229 | 19 | Mr. Waddell | Mr. Widell | Transcription Error |

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | From | To | |
| 232 | 25 | Mr. Waddell | Mr. Widell | Transcription Error |
| 241 | 6 | Mr. Waddell | Mr. Widell | Transcription Error |
| 248 | 22 | for prefaces of the CapEx | for purposes of the CapEx | Transcription Error |
| 255 | 2 | or he doing it | or he is doing it | Transcription Error |
| 266 | 24-25 | The Professor Badawi | Professor Badawi | Transcription Error |
| 270 | 7 | as a single SPAC. | as a single SPAC industry. | Transcription Error |
| 277 | 19 | all things I've done with trying | all things that I've done in connection with trying | Transcription Error |
| 277 | 21 | in the Europe | in Europe | Transcription Error |

I declare under penalty of perjury that the foregoing is true and correct.

Date: 12/21/2023        Signed: _/s/_