# **Exhibit E**

# LITIGATION SERVICES HANDBOOK

## The Role of the Financial Expert

Third Edition

**Edited by**

**ROMAN L. WEIL**

**MICHAEL J. WAGNER**

**PETER B. FRANK**



**JOHN WILEY & SONS, INC.**

**New York   •   Chichester   •   Weinheim   •   Brisbane   •   Singapore   •   Toronto**

This book is printed on acid-free paper. ♾

Copyright © 2001 by John Wiley & Sons, Inc. All rights reserved.

Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4744. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008, E-Mail: PERMREQ@WILEY.COM.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

*Library of Congress Cataloging-in-Publication Data:*
Litigation services handbook : the role of the financial expert / [edited by] Roman L. Weil, Michael J. Wagner, Peter B. Frank.—3rd ed.
    p. cm.
   Includes index.
   ISBN 0-471-40309-1 (cloth : alk. paper)
    1. Forensic accounting—United States. 2. Evidence, Expert—United States. I. Weil, Roman L. II. Wagner, Michael J., 1948- III. Frank, Peter B.
   KF8968.15 .L57 2001
347.73'67—dc21                                                                00-054555

Printed in the United States of America.

10 9 8 7 6 5 4 3 2 1

CHAPTER **19**

# MATERIALITY AND MAGNITUDE: EVENT STUDIES IN THE COURTROOM

## David I. Tabak, PhD
## Frederick C. Dunbar, PhD

### CONTENTS

19.1 Introduction and Background 19.1
   (a) Overview of the Event Study Technique 19.2
   (b) Materiality 19.3
   (c) Magnitude 19.3
19.2 Performing the Basic Event Study 19.4
   (a) Identifying the Event 19.4
   (b) The Event Window 19.4
   (c) Controlling for Market and Industry Effects 19.5
   (d) Estimating the Effects of the Event 19.6
19.3 Are Event Studies Really Science under *Daubert*? 19.6
   (a) The *Daubert* Decision 19.6
   (b) Are Event Studies Objective? 19.7
   (c) Applying the *Daubert* Factors 19.8
19.4 Deciding on Materiality 19.9
   (a) Standard for Materiality 19.9
   (b) Other Price Reaction Methodologies 19.9
   (c) Changing Levels of Materiality 19.10

19.5 Measuring Lost Profits 19.11
   (a) Lost Profits Calculations Based on Projections 19.11
   (b) Lost Profits Calculations Based on Future Events 19.12
19.6 Recent Literature and Case Law 19.12
19.7 Do Event Studies Accurately Measure Loss to the Corporation? 19.13
   (a) Stock Market Anomalies 19.13
   (b) Bias from Litigation Expectations 19.14
   (c) Whose Loss Does an Event Study Measure? 19.15
   (d) Do Event Studies Capture All Components of a Loss? 19.15
   (e) Tax Effects 19.16
19.8 Conclusion 19.16

NOTES 19.17

LIST OF CASES 19.22

**19.1 INTRODUCTION AND BACKGROUND.** The Supreme Court's *Daubert* ruling[1] has led to increased scrutiny of expert testimony in the courtroom. This scrutiny has generated a need for analyses that, to the extent possible, are testable, supported by published literature, have a "known or potential rate of error," and

   The authors would like to thank Denise Martin for research on the *Daubert* decision, Lucy Allen for research on the use of event studies in damages studies; and Louis Guth and Christoph Muelbert for many helpful comments on earlier drafts of this chapter.

follow procedures derived from objective standards, rather than from an expert's own potentially subjective opinions or beliefs.

Courts can screen an event study of a security's price, typically the measurement of a stock price's movement in response to a specific event or announcement, for admissibility with straightforward application of the *Daubert* factors. Courts have admitted testimony based on correctly done event studies but excluded testimony based on an infirm event study.[2] Although commonly used in securities litigation, their use in other commercial litigation is less common, but increasing.[3]

Here, we argue that a properly conducted event study can help in litigation outside the field of securities law, and that event studies are often applied in a crude or unscientific manner within securities litigation.[4] This chapter discusses how experts can use event studies to measure the impact of two different types of events. First, we look at revelations of securities fraud, where event studies are already common, though often nonrigorous. Second, we examine the measurement of the effect of offending actions on a plaintiff's future profits, an area in which the use of event studies is less common.

We also compare the event study to other methodologies for measuring the importance and size of an outside event on a company, and examine the conditions under which properly conducted event studies provide more objective and accurate measurements of the effects of these events on the company. We describe the event study technique and the two items that stock price changes let us measure, materiality and magnitude, as well as their relevance to the determinations of liability and damages in a litigation context.

**(a) Overview of the Event Study Technique.**   Event studies of the type used in litigation rely on two well-accepted principles: first, the semi-strong version of the Efficient Market Hypothesis, which states that stock prices in an actively traded security reflect all publicly available information and respond quickly to new information;[5] second, the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow.[6] Consequently, the stock price impacts of an event can reveal the effects of the event on future cash flows if the following four conditions are present:

1. The event is a well-defined news item or series of items.
2. The times that the news reaches the market are known.
3. There is no reason to believe that the market anticipated the news.
4. It is possible to isolate the effect of the news from market, industry, and other firm-specific factors simultaneously affecting the firm's stock price.

The procedure for performing an event study has several well-defined steps.

First, one estimates a predicted stock price return, or percentage change, from the day before the news reaches the market to the day the stock price assimilates the news. In doing this estimation, one uses a model that takes into account market and industry effects on stock price returns. One can do this for several dates, not necessarily consecutive.

Next, the analyst subtracts the predicted return from the actual return to compute the so-called *abnormal return.* If the abnormal return is calculated as the sum of individual abnormal returns over a number of periods (usually individual trad-

ing days), the difference between the actual and predicted returns summed over all these periods is called the *cumulative abnormal return* (or *CAR*).

Typically, the predicted return does not exactly equal the actual return even when no event has occurred. To decide whether the difference between the actual and the predicted return (the CAR) results merely from chance, one tests the CAR for statistical significance, as described in section 19.4 (a).

The final step, if necessary, involves computing the relevant magnitude of the event. To do this, one calculates the change in stock price or capitalized value of the firm implied by the estimated CAR and thus attributable to the event in question.

Because of its wide acceptance, the existence of standards governing its operation, the known rate of error and the ability to test hypotheses, the event study technique provides a good example of scientific evidence. Furthermore, these same factors mean that a court can screen any particular event study under the *Daubert* guidelines to determine its admissibility as the basis for expert testimony.

**(b) Materiality.** An event study can help measure the materiality of the event under consideration. While all can agree that an event is material if it is important, this begs the question of how to measure importance. We can consider several measures suggested by Mitchell and Netter in their examination of the role of financial economics in litigation. They note three such measures: reasonable investor, probability/magnitude, and market impact.[7] Unfortunately, these imprecise standards require subjective determinations that vary from case to case. For example, how should a trier of fact determine what a reasonable investor would consider material? One could ask a long-time investor to serve as an expert on materiality, and while this does provide useful insight, the results are necessarily subjective and could vary from case to case.[8] Standardization over different cases could come only from a careful reading of the case law and would be followed by disputes about the similarity or difference between the case at bar and cited precedents. Instead, using the tools of financial economics, one can measure materiality as the probability that a stock price movement resulted from chance and not from the news about a particular event.[9] One can quantify materiality with an event study in a manner comparable across cases and events.

**(c) Magnitude.** Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences.[10] This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed. As a result, an event study is a common method that serves as the basis for quantifying damages in securities fraud cases.[11]

Consider a different litigation setting where the plaintiff is a firm suing for lost profits due the company.[12] According to economic theory, there are circumstances in which damages can be measured by the change in the stock price caused by the defendant's conduct multiplied by the number of shares outstanding.[13] This is true

because stock prices are the market's estimate of the present value of future cash flows.[14] Equivalently, stock prices are the market's estimate of a company's net liquid assets plus the present value of future profits from the operating assets.[15] Consequently, when there is an unexpected change in assets, liabilities, or expected future profits, this will show up as a change in the stock price. To the extent that the defendant's actions giving rise to liability negatively impact the company's financial well-being, the stock price will decline by the market's estimation of the present value of the harm that the company has suffered.

Though not common in litigation, case law supports this proposition. For example, consider a situation where a business files a suit claiming that another party's illegal actions have damaged it and reduced the company's value or worth. Courts have supported the use of market value to determine the value of a company.[16] Thus, it naturally follows that the portion of the change in the enterprise's market value that can be attributed to the defendant, as measured by a careful event study, is a proper measure of the change in corporate value, that is, damages, in this case.

## 19.2   PERFORMING THE BASIC EVENT STUDY

**(a) Identifying the Event.**   Many texts discuss how to perform an event study.[17] While there are some differences in exposition, authors agree on the necessary steps and general procedures. First, one must identify the event or events to be studied. In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud, the dates of the fraudulent statements, or both. When one is measuring lost profits, the relevant dates would be those dates on which the public received information about the alleged wrongful act.

**(b) The Event Window.**   Next, we establish the event windows. *Event windows* are the periods over which stock price movements are calculated. Generally, these windows begin immediately before an announcement and conclude shortly thereafter. When it is unlikely that the news of an announcement was leaked beforehand, one typically would start the event window at the end of the trading day before the announcement was made. When there is a reasonable possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage.[18] The end of the event window is somewhat more arbitrary. In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement. The most recent academic pronouncement expresses support for the shorter one-day or two-day window, though it recognizes that in practice, analysts often use longer windows.[19] Occasionally, there is another news announcement, or confounding event, within the event window. When this occurs, the event window is often cut short so that it does not include the effects of the confounding event.

The longer the event window, the more likely it incorporates all of the prior leakage and the market's ongoing adjustment to the news, but also the more likely it picks up other effects unrelated to the event under consideration. Deciding on the length of the event window is thus one of the most important considerations in performing an event study.[20]

**(c) Controlling for Market and Industry Effects.**   Once the event windows have been established, the analyst next calculates the relations between the company's stock and an index or indices that proxy for outside forces such as market and industry effects. These relations will later be used to remove those market and industry effects from the price movement observed in the event window.[21] One finds these relations by running a regression of the company's stock price on a market or industry index, or both, over a period of time labeled an estimation window.[22] Here, the analyst must make two additional decisions. First, over what period should the regression be run? This period is called the *estimation window.* And, second, which market or industry indices should be used to control for outside influences on the company's stock price?

In regard to the first question, one would typically like to use an estimation window close to the event because the relation between the company's stock and an index changes over time. Therefore, the closer the estimation window is to the event, the more relevant the estimated relation will be. Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window. The most common choice places the estimation window before the event.[23] Analysts sometimes place the estimation window after the event window or split the estimation window to cover periods before and after the event window. When the analysis studies multiple events, the estimation window may cover the periods around the event windows, including the period(s) between event windows. The estimation window is often placed at one of these locations rather than before the event window because of a lack of relevant prior trading history (for example, because the event window comes shortly after an IPO or change in regulatory environment).[24]

In addition to determining the placement of the estimation window, the analyst must also determine the length of that window. Again a tradeoff applies: the longer the estimation window is, the more data there will be, implying a more accurate regression. On the other hand, the farther the estimation window stretches from the event window, the less the estimated relation between the stock price and the market index is likely to represent the underlying relation during the event window.

A second decision the analyst must make is which market and/or industry indices to use to control for outside influences on the company's stock price. When deciding which indices to use, the analyst should consider both the source of the index and the relation between movements of the company's stock price and the index during the estimation window.

A good index can be

- a standard index (say one developed by Standard & Poor's), or
- one that was constructed based on comparable companies listed in analyst reports or public filings, or
- one based on selecting all companies that meet certain objective criteria (e.g., market capitalization within 10 percent of the pre-event market capitalization of the company being studied).

On the other hand, an index is suspect when the expert chooses the companies in the index without objective criteria.

The second consideration in selecting an index relates to how the company's stock price movements relate to those of the index during the estimation window.

When the estimation regression is run, one of the statistics generated is the adjusted $R$-squared.[25] This statistic measures the strength of the fraction of the variability of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining. The higher this statistic, the larger the portion of the variability explained. Another relevant statistic is the $t$-statistic associated with each independent variable; this statistic measures the strength of the individual independent variable's correlation with the company's stock price. The farther the $t$-statistic is from zero, the stronger the relation. While one should not use either the adjusted $R$-squared or $t$-statistics as a blind measure for the comparison of the explanatory power of different indices, an expert should be prepared to provide these statistics.[26] Moreover, if the expert chooses one index with less statistical explanatory power than a second index, he or she should be prepared to defend this choice.[27]

**(d) Estimating the Effects of the Event.**   The choice of the event window and indices used to predict the stock price over the estimation window provide the basic ingredients for the analytical steps of the event study. The estimated relations from the regression during the estimation window are applied to control for market and industry movements in the event window. The predicted return is then compared to the actual return in the event window, with the difference representing the abnormal or excess return. This return, multiplied by the company stock price, provides an estimate of the per-share dollar effect of the event being studied.[28]

Finally, note that the abnormal return would include the effects of the event being studied as well as any other company-specific news or events (if any) that occur in the event window. Whenever possible, the analysis should disentangle the effects of these events. The procedure for doing so depends on the available data and the nature of the other event(s) in the window. For example, if the event coincided with an earnings announcement, the effects of the latter could be removed by estimating the stock price's response to earnings surprises and applying the measured relation to the announcement within the event window. Though this would not perfectly remove the effects of the earnings announcement, the remaining abnormal return would be a much better estimate of the effect of the event for which the window was constructed. After removing the effects of these other events, materiality tests have to be adjusted to account for both the magnitudes of these events and the uncertainty surrounding the estimates of those magnitudes.[29]

## 19.3   ARE EVENT STUDIES REALLY SCIENCE UNDER *DAUBERT*?

**(a) The *Daubert* Decision.**   In 1993, the Supreme Court reviewed a standard on the admissibility of expert testimony stated in *Frye v. United States* (1923). *Frye* set a standard that an expert's methodology must be "generally accepted" in the scientific community to be admissible. In its 1993 ruling in *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court expanded the admissibility standard set forth in *Frye* to allow potentially new though reliable techniques that had not yet achieved peer review. In its 1999 ruling in *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that the *Daubert* criteria apply to "all expert testimony."

The plaintiffs in the *Daubert* case, a products-liability action, sought to establish a causal link between the ingestion of a prescription drug during pregnancy and

the subsequent delivery of children with birth defects. Consequently, the Court's decision focused on scientific rather than economic testimony.

The Court found that the basic rule is that "all relevant evidence is admissible."[30] According to the Court, relevant evidence must "assist the trier of fact to understand the evidence or determine a fact in issue."[31]

The Supreme Court also limited the *Daubert* analysis to "scientific" knowledge, which it defined as based on the scientific method. The evidence must meet the same standards of all evidence by being "not only relevant, but reliable." In the scientific context, reliable evidence is "based upon scientific validity."[32] A federal district court in the Sixth Circuit has expanded the *Daubert* framework beyond scientific testimony, to include technical and other specialized knowledge.[33]

The *Daubert* Court admonished against proffering testimony that was based on "unsupported assertion" or "subjective belief" and provided guidance by noting four factors that should be considered to assist in this inquiry:

1. whether the theory or technique can be (and has been) tested;
2. whether the technique or theory has been subjected to peer review and publication;
3. the known or potential rate of error and standards controlling the technique's operations; and
4. whether the theory or technique has been generally accepted by the scientific community.[34]

After the Supreme Court sent the case back to the Court of Appeals for the Ninth Circuit, that court suggested a fifth factor: whether the methodology was created solely for purposes of litigation.[35] The Sixth Circuit apparently also considers this factor important.[36]

**(b) Are Event Studies Objective?**   We now take a moment to consider the effects of the choices discussed in the previous section to see if they would withstand being called "subjective belief" or "unsupported assertion" under *Daubert*. If the calculation is to take into consideration the specifics of a particular case, some common sense must be added to the science because several considerations determine the proper methodology for running an event study.[37]

The foregoing does not imply that one cannot use a standard procedure. In fact, it is often useful to do so when one is running a number of event studies for different firms (for example, if one wanted to look at how the average firm responded to a certain type of announcement). In that situation, it is common to establish a standard price reaction methodology both for ease of analysis and to prevent the possibility that choosing different methodologies for different events biased, or even determined, the overall result. When combining multiple event studies to determine how stock prices respond to events, it is not necessary to find a procedure that provides the best estimate for each firm or event individually; instead, with a large number of events being combined, errors in one event will, at least to some degree, cancel those in another.

When looking at the particular firm and events at issue in a lawsuit, however, it may be preferable to tailor the event study to the special circumstances at hand. As discussed above, in performing an event study there are at least three choices that

feature prominently in the analyst's mind: (1) the time frame for the measurement of the price reaction; (2) the time frame for estimating the relation between the stock and the market, both in terms of length of period and when the period should be relative to the event under consideration; and (3) which index or indices should be used to control for market and/or industry effects.

The effects of the different choices will naturally vary from case to case. Generally, though, the choice of index and estimation window will likely have a relatively minor impact.[38] On the other hand, the choice of the time frame for measuring the price reaction (the event window) would be expected to lead to greater variability.

Even so, once the analyst makes these choices, the analysis is completely objective, in that another expert would be able to replicate it. That is, if one specified an index, an estimation window, and an event window, any two experts would come up with the same measurement for the price reaction.[39] This means that if one expert presents a result based on an event study, an opposing expert can check for errors in the underlying calculations. The opposing expert can also test what would happen if the first expert changed any of the assumptions. This allows the opposing expert to discover which assumptions, if any, are innocuous because changing them has no significant effect on the results. (For example, adjusting for market movements with the S&P 500 and with the Nasdaq Composite Index is likely to produce similar results if the indices moved similarly in the event window.) Conversely, the opposing expert can identify which assumptions, if any, drive the first expert's result and focus the debate on those points. (For example, if the price reaction is large after two days but the price returns to its original level after five days, the debate can focus on how long it took for the market to absorb all of the effects of the relevant event.)

In most cases, objective measures can aid in evaluating the choices. For example, as discussed above, comparing the adjusted $R$-squared from one estimating regression to the next provides information that can help in deciding which better explains the stock price's movements.[40] In deciding the proper price reaction period, one could go with accepted standards in the literature or in litigation. Alternatively, one could use a proxy for materiality, such as trading volume or number of news stories relating to the event, in deciding over what period of time the stock was still responding to an event.

**(c) Applying the *Daubert* Factors.**   The event study technique satisfies the four factors to be used in determining the admissibility of expert testimony as described by the Court.

1. Can the theory or technique be tested? The choices available to the analyst involving the index and estimation window are testable using statistics that are computed when the analyst performs a regression analysis of the firm's stock price return on the return of an index. The choice of event window may be tested using approaches mentioned above, although it may instead be based on convention (that is, the analyst can use a one- or two-day window supported by the literature rather than doing a separate analysis for each event study to determine *de novo* the length of the window most appropriate for the individual event under consideration).

2. Has the technique or theory been subjected to peer review and publication? By now, hundreds of peer-reviewed articles have applied the event study methodology, including many that focus specifically on methodological considerations.

3. Does the technique have a known or potential rate of error and standards for controlling its operations? The error associated with either a test of materiality or the measurement of the size of the event is a statistic that can be estimated with each application; moreover, the academic literature provides guidance on proper application of the technique.

4. Has the scientific community generally accepted the theory or technique? The scale of publications alone shows that the technique has gained general acceptance.

## 19.4   DECIDING ON MATERIALITY

**(a) Standard for Materiality.**   In determining materiality, statistical analysis can provide information on the likelihood that the price movement was due solely to chance. Formally, a materiality test provides a statistical answer to the question: How likely is it that the observed stock price movement in the event window could have occurred if there were no event influencing stock prices in that window? For example, if an event is material at the 5 percent level, this means that there is only a 5 percent likelihood that the abnormal return (or the stock price movement once one controls for market, industry, and other effects) could have been caused by the stock's normal random price fluctuations. Alternatively, we can say that we are 95 percent confident that the abnormal return is greater than what would be expected based on the stock's normal random price fluctuations.

It is not clear what level of statistical significance corresponds to a legal definition of materiality. As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options. There is no definitive case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation. With an event study, however, courts can quantify the level of materiality, compare it across cases, and assess it using professional standards from the economics literature.

**(b) Other Price Reaction Methodologies**

*(i) Simple Price Reaction.*   Occasionally, expert reports will contain a conclusion on materiality based on the observation that the stock price reacted to an event and, relying solely on the expert's background and judgment, this price reaction was material. Absent more, such an opinion would fail the Court's admonishment to avoid "unsupported assertion" and "subjective belief." Besides obviously not satisfying the factors laid down for scientific evidence (including testability, known rate of error, standards for operation of the technique, and general acceptability), the approach fails to consider the other potential influences on the stock price over the time period the price was observed to be falling. This alone would make the proffered opinion run afoul of *Executive Telecard.*

*(ii) Net-of-Market Price Reaction.*   A somewhat more sophisticated, and common, methodology designed to take account of other influences on price reactions is to simply measure so-called net-of-market movements. This is done, for example, by first computing the average price of a security over the five days before an event and the average price over the five days after the event. The percentage change in these two averages is then compared to the percentage change of a market or industry index over the same period of time.

This methodology has at least two flaws. First, this form of price reaction implicitly assumes that the stock moves one-for-one with the market or the chosen industry index. One can, and should, test this assumption with, say, a regression analysis to measure the relation between the security and the index. The regression would supply a beta or a coefficient showing how much the stock moved with the index, and a *t*-statistic on that coefficient, showing the statistical significance of that relation. If the beta is statistically different from one, it would be difficult to see why one would throw out the empirical results in favor of the generic alternative.[41] A second problem with the net-of-market methodology is that it does not allow for the most accurate determination of materiality. Because the assumed one-for-one relation between the stock and the market or industry index is generally not statistically the best estimate, the estimated abnormal returns with this approach may also not be a best estimate statistically, and a materiality test is not as powerful as it otherwise could be.[42]

When used by itself, the net-of-market adjustment would appear to fail some of the *Daubert* criteria. First, a simple net-of-market calculation has no known rate of error (in part because the analyst never computes the standard deviation of the average five-day return). Second, its support in the academic literature is generally limited to studies that focus on many firms, where running multiple market model regressions may be cumbersome. Finally, because a net-of-market model provides no test for the goodness-of-fit of the market or industry index (i.e., an adjusted *R*-squared or any other residual analysis is never computed), the choice of index is more subjective than when such a statistic is used to evaluate the appropriateness of different indices. None of the above is meant to say that net-of-market models are useless or necessarily wrong; rather, they are dominated by regression analysis and should not be used unless other choices add error or are infeasible. For example, if a company goes public and then stops trading all within an extremely short time frame, the lack of trading data may make the regression results unreliable.

**(c) Changing Levels of Materiality.**   A final issue pertaining to materiality arises when the cumulative price reaction moves in and out of materiality as time passes. For example, if a stock drops by a large amount on the day of an announcement, the one-day reaction may be significant. However, a rebound on the next day may cause the two-day price reaction to be not material, while another drop on the third day may cause the three-day price reaction to regain its status as a material event. In general, one needs to look at why the level of materiality changes over the price reaction window. If new information comes into the market that is not relevant to the instant case, then the analysis should remove the effects of this new information in considering the materiality of the event under examination. In addition, one would want to see whether the changes in materiality result from the market's reevaluating the importance of the initial event or information, something that one can often deduce from contemporaneous news stories or analyst reports.

As a general matter, the potential for stock market overreaction is now generally accepted as a factor in stock market behavior.[43] Though there remains some dispute over long-term overreaction, short-term price reversal after unconditional price declines has been detected in large samples of stock prices. This means that if the price initially declines after an event and if, say on the second day, the price returns to a level that makes the event not material with no intervening news event, then there is justification for assuming short-term overreaction. The analyst would be hard pressed to make a finding that the event was material under this fact pattern.

**19.5   MEASURING LOST PROFITS.**   This section examines how an event study compares to other methodologies for measuring lost profits.[44]

**(a) Lost Profits Calculations Based on Projections.**   Experts often calculate lost profits by measuring changes in future profit estimates using data from before and after some specific action by the defendant that harmed the plaintiff. For example, suppose that before an allegedly tortious event occurred, analysts projected that Prospects, Ltd. would have profits of $5 million in each of the next five years. Further suppose that following the event, analysts projected that Prospects' profits would be $1 million for the next three years and $2 million for the following two years. Prospects has therefore been harmed, in the analysts' view, by the present value of $4 million for each of the next three years plus $3 million for each of the two years after that. Prospects' harm would also include effects that would be measured by the changes in projections that could have been made for periods more than five years in the future.

Note that this form of measurement does not depend on the actual realization of profits. Instead, it concerns changes in the expectation of future profits at the time of an event. In that sense, it is quite similar to an event study, in which stock prices before and after the event are the market's projections of future profits or cash flows.

Thus, the principal question that arises here is which set of projections to use, those assumed by the market in setting stock prices, or some other set of projections from a different source. In deciding this issue, one criterion is the degree of objectivity in the two measures. The event study is based primarily on market conditions, or on values set by investors only concerned with obtaining the proper value for their purchases and sales, and not by parties interested in the outcome of the litigation. Investors have incentives to set the price correctly because they invest their own money. If the market believes that a stock is underpriced relative to the company's value, investors will place orders to buy the stock, driving its price up; similarly, if the market consensus is that a company's stock is overpriced, sell orders will drive the stock price down.

In an examination of expected lost profits based on the change in analyst or expert projections surrounding the allegedly tortious act, the results will naturally depend on the projections used. Often, there is a large range of projections for profits from the company and analysts for the short term. If one goes out more than a few years, there are often no projections or only internal company projections. And at some point, there are generally not even company projections. Thus, for events likely to have a long-term impact on profits, the expert must create projections in the litigation. Even if the expert attempts to be completely objective,

this often involves a large degree of subjectivity.[45] Moreover, even when projections are available, the expert must decide which one or ones to use.

If done carefully, the use of analyst projections to calculate lost profits is likely to satisfy the *Daubert* criteria, though perhaps not as well as an event study would. In an event study, one uses stock prices, figures that are accepted by all to be what they represent: the market's current valuation of a company's equity. In looking at projections, the question arises as to which set of projections to use. If one uses projections from the same disinterested analysts both before and after the tortious event, there is likely to be little objection about subjectivity (provided, of course, that one does not select only those analysts who viewed the event as especially large or small). If the expert uses projections from one of the interested parties, such as the plaintiff company, or makes his or her own estimates of what projections should have been before and after the tortious event, then subjectivity becomes a serious concern.

**(b) Lost Profits Calculations Based on Future Events.**    Lost profits are also often calculated by comparing actual results to projections made at or immediately before the alleged business interference. This section compares the calculation of lost profits using this methodology to the calculation of lost profits through the use of an event study.

Let us return to the example of Prospects, Ltd., which was expected to have $5 million in profits in each of the five years immediately following the tortious event. Suppose that its actual profits were $1 million in the first year and $3 million in each of the next four years. Prospects' damages claim would then include $4 million in lost profits from the first year and $2 million in lost profits from each of the subsequent years. These values would then be expressed in present value terms, or adjusted for prejudgment interest. In addition, the company would still have a claim for any lost profits occurring more than five years from the time of the wrong.

The most important difference between the methodologies is that an event study (or a comparison of changes in projections as discussed in the previous section) is an ex ante analysis, while an examination of actual results is an ex post analysis.

**19.6  RECENT LITERATURE AND CASE LAW.**    The question of whether experts can use the stock (and debt) market value of a firm to value the underlying asset has been answered affirmatively by both appraisers and the courts. In the legal context, the so-called stock and debt approach to valuation has been advocated primarily for railroad and utility properties, but applies to firms in other industries.[46] Indeed, a textbook on corporate valuation devotes an entire chapter to the approach without limitation to type of firm or industry.[47]

Adherents to the approach make the claim that "[w]here data to make possible a stock and debt valuation are available, it is best to go no further."[48] With regard to the objectivity of the approach, "[t]he stock and debt method avoids overreliance on the judgment or expectations of a single individual (the appraiser) about the future prospects of the firm, substituting instead the consensus view of many market participants—all of whom, as we have said, have a strong interest in making accurate forecasts."[49]

The stock and debt approach to appraisal has been accepted by both regulatory bodies and courts.[50] A circuit court decision, *Mills v. Electric Auto-Lite Co.*, used language that virtually mirrored the professional literature.[51] The court held that to determine the worth of a company "when market value is available and reliable, other factors should not be utilized. . . . Although criteria such as earnings and book value are an indication of actual worth, they are only secondary indicia. In a market economy, market value will always be the primary gauge of an enterprise's worth."

Furthermore, another court recognized the distinction between the projections made by analysts and those implicitly made by the market: "self-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges."[52]

It follows from these citations that the change in capitalization of the company accurately measures a change in the worth of a company. Such change in worth, of course, can come from the present discounted value of the future stream of cash flows lost by the actions of a defendant. As such, the appraisal and valuation methods that support determining the value of a company by using the market value of stock and debt would also support determining the value of a company before and after the wrongful act of a defendant. The event study method measures this change in valuation.

## 19.7   DO EVENT STUDIES ACCURATELY MEASURE LOSS TO THE CORPORATION?   We next ask whether the event study is a reliable measure of damages. This includes a discussion of the issue of whether the technique really measures the loss to the corporation instead of, for example, the loss to shareholders.

**(a) Stock Market Anomalies.**   A violation of the efficient market hypothesis means that stock prices may not reflect fundamental values at every moment, which, in turn, means that the prices do not always equate to the present discounted value of future dividends. Over the years following the stock market crash of 1987, there developed an academic literature that found a variety of anomalies in stock price behavior and that, when taken as a whole, has probably led economists to have less faith in the efficient market hypothesis than they had in the 1970s.[53]

We do not wish to overturn the presumption accorded the efficient market hypothesis in *Basic v. Levinson*.[54] Rather, we should view the efficient market hypothesis as a presumption that can be disproved for a particular security in a particular time frame. The same literature that has focused on stock market anomalies has also provided analysts with the tools to diagnose the patterns of a stock price to determine whether its behavior is anomalous.

Although it is not the purpose of this chapter to review either the stock market efficiency literature or the adjustments to the event study technique that might be called for if an anomaly exists, we mention a few issues that might arise that could affect the event analysis.[55]

*(i) Volatility.*   Financial economists studied stock market volatility well before the late 1990s.[56] Their principal finding was that the volatility of stock prices likely exceeds

that justified by the variance of dividends. This means that there is no guarantee that stock prices will reflect fundamental value. This being said, these findings by themselves did not lead to professional rejection of the efficient market hypothesis—it was still treated as a presumption for any individual stock or stock market index.

By itself, volatility does not mean that the event study technique is worse than other methods of valuation. The reason for this is that it can be shown that virtually any asset returning a cash flow is likely to be volatile. For example, Paul Samuelson has shown that stock prices following what appears to be a random walk could be based on fundamental values and, in a later article, that the price of land could be a stochastic process much as stock prices appear to be.[57] In both cases, the source of the variation in prices is similar: for stock prices, dividends are a stochastic process because earnings themselves contain a stochastic component; for land prices, rents may also contain a stochastic component. This means, of course, that lost profits (damages) to the underlying asset will themselves be volatile. We should not be surprised, then, that event studies (measuring, as they do, the present discounted value of the lost profits) have some statistical error associated with them though they are generally unbiased. The test statistics typically computed when performing an event study help in assessing the dimensions of this error.

*(ii) Speculative Bubbles.*  In light of the behavior of both the market and individual stocks since 1987, there has grown theoretical literature to show how speculative bubbles can form.[58] These theories show that in speculative markets where there are both informed and uninformed traders, it may be rational for the informed traders to follow the uninformed in a price trend away from fundamental value. If the theory is true, there is no mechanism that, in the short term, causes stock prices to equal the value of their underlying assets. Such an overpriced stock has the unfortunate tendency to crash when the bubble bursts. The bursting of the bubble can occur at the same time as, indeed be precipitated by, the event being analyzed to compute damages. Consequently, the price drop unadjusted for the speculative bubble likely mismeasures damages. The effect of this condition has been noted in the legal literature with reference to shareholder class actions.[59] Fortunately, there are diagnostics that can be used to ascertain whether there appears to be a speculative bubble and, if so, whether other techniques are available to measure the lost profits.[60]

**(b) Bias from Litigation Expectations.**  Event studies are biased toward finding a price drop that is too small because of the market's expectation of a possible recovery through the legal system. To see this, suppose a company lost $1 million in future profits and was expected to sue and recover the million dollars and appropriate interest, but at the expense of $300,000 of legal fees. Then the price reaction observed in the market would reflect only the $300,000 net loss. If this were successfully used as the basis for a damages calculation at trial, the company would receive only the $300,000 of legal fees but not compensation for its actual loss of $1 million in future profits. At the extreme, if the market expected the company to recover lost profits plus punitive damages, or treble damages, its stock price could go up as a result of the malfeasance. Consequently, interpreting the event study re-

sults requires care. Still, because this bias serves to make price reactions show a smaller drop than that due to the defendant's act alone, an event study can still serve to show the minimum damages caused by that act.

**(c) Whose Loss Does an Event Study Measure?**   One of the potential objections one may make to an event study is that it is measuring the wrong damages. Because an event study looks at the value of a corporation's shares, some may argue that one is measuring the loss suffered by shareholders and not by the corporation itself. This leads to the question of whether the event study is measuring the proper damages for use in corporate litigation.

The first answer is that this is a fair criticism of any measure of damages to a corporation. Suppose that Prospects' factory burns down in an apparently accidental fire on February 1, and that Prospects has no insurance to cover the loss. Further suppose that on March 1 it is suddenly revealed that the fire was not an accident but instead was set by agents of a competitor, Ruthless Corp. Last, suppose that on March 1, Prospects sues Ruthless and that everyone believes that Prospects will recover the cost of rebuilding the factory plus any lost profits, however measured, as a result of the arson. We now ask: Who wins and who loses?

In theory, if the damages payment is truly comprehensive, covering all manner of costs and legal fees, loss of competitive position, and so forth, and assuming no punitive damages are awarded, Prospects will be left exactly as well off as if there had been no fire. On March 1, its stock price would therefore recover to where it was on February 1, once one adjusts for market and other forces in the interim. Shareholders on February 1 who held through March 1 have seen a temporary drop in the value of their holdings but are unaffected at the end of the day. February 1 shareholders who sold before March 1 are worse off, because they sold their shares at a time when the price was unduly low. Conversely, investors who purchased between February 1 and March 1 benefit when their shares of Prospects appreciate in value on March 1. But note that this is true no matter how the damages to Prospects are measured, whether it is by the change in its share price or a discounted cash flow model of lost profits. Simply put, under the current legal system, investors who hold shares at the time of a bad act are damaged, while those who hold at the time of an unexpected recovery are benefited.[61] As such, because the change in stock price is simply a *measure* of the damages to Prospects, in the same way that a discounted valuation of lost profits is such a measure, concerns about winners and losers are not specific to the event study methodology.

**(d) Do Event Studies Capture All Components of a Loss?**   Another argument against event studies is that by focusing on a small period of time, an event study does not provide a complete characterization of the effects of a wrongful act. To answer this, let's create an example where the case at bar involves some defamatory statements made by Ruthless against Prospects. Also, suppose that Prospects' stock price falls at the time that the statements are made. One could then ask whether changes in the public's views of the credibility of those statements shouldn't change the damages estimate from the libel. This possibility can be addressed in an event study by looking for changes in the perception of the libelous statements and measuring the effects that those changes in perceptions had on the stock price. For example, if there were a public retraction by Ruthless, one would want to offset the drop in

Prospects' stock price in the event window corresponding to the original libel by the rebound, if any, in an event window corresponding to the retraction.

Again, however, this criticism does not apply solely to event studies. Suppose that an expert was measuring damages by looking at the decline in expected future income. Suppose further that the original libel caused a permanent 30 percent drop in Prospects' sales, perhaps because consumers were misled into believing that Prospects was marketing an unsafe product. If the retraction caused sales to rebound to within 10 percent of their previous level, this information would also have to be incorporated into measures of discounted lost cash flows.[62] Therefore, to the extent that new information affects continuing results, *any* measure of lost profits that does not purport to measure expected lost profits solely at the time of the original bad act must take this new information into account.

**(e) Tax Effects.**   The discounted cash flows measured by stock prices reflect free cash flow available to stockholders that, of course, are after tax. This creates the need for an adjustment to the event study measure of damages. Because damages awards are usually taxable, the convention has arisen that lost profit damages are awarded on a pretax basis. Fortunately, the adjustment to the event study magnitude to remove tax effects is rather simple; in most instances, it can be accomplished by dividing the event study result by one minus the marginal income tax rate of the corporation.

**19.8   CONCLUSION.**   We have seen that event studies can be useful in quantifying damages in cases ranging from securities fraud to other commercial litigation requiring the calculation of lost profits. In some areas, such as securities fraud, stock price reactions are already a standard method for quantifying damages. In such cases, the overarching question is how to perform the most accurate price reaction. This entails developing a model that accounts for market and industry effects. It also entails explicitly testing for the materiality of stock price movements. When this is done, we have a damages calculation that is based on economic literature and that, given the results of the materiality test, has a known rate of error. In this manner, one can perform a damages calculation that meets the *Daubert* criteria for admission as expert testimony. A failure to perform these analyses when possible would mean that the analysis is not in accordance with the literature and has an unknown rate of error.[63]

In comparison to many other methods of calculating lost profits, the measurement of stock price reactions has the benefit of being based on numbers that, being determined by the collective decisions of all investors in the market, are both objective and present a consensus, rather than an idiosyncratic, viewpoint. While the measurement of stock price reactions will inevitably incorporate some degree of choice on the part of the analyst, the degree of subjectivity in these choices is usually low.[64] This contrasts with the situation where an analyst has to choose some set of projections and then decide how to discount those projections back in time, to say nothing of the subjectivity involved in making new projections for the purposes of litigation.

When using stock price movements to measure lost profits, one employs a methodology that is supported by the academic literature, is completely replicable, has a measurable rate of error, and uses a minimal number of variables. By con-

trast, an analyst creating projections of future profits is engaging in a process that may not be replicable by others; while other experts can create their own projections, there is often no reason to believe that they would match those of the original analyst. When several independent sources of profits are available, a study of lost profits using projections requires deciding which projection(s) to use and how to discount the cash flows envisioned in those projections.

None of the foregoing discussion is meant to say that other analyses are not useful, or even necessary at times. When a company is not publicly traded, there would be no stock price data that one can use for an event study, and other methodologies often have to be employed.[65] In addition, other assumptions underlying the appropriateness of the technique, such as the efficient market hypothesis, may not be valid in any individual application requiring either adjustments to the results or abandonment of the method altogether.

Moreover, an event study and another methodology such as a discounted cash flow analysis can be used in conjunction as a test of the robustness of the damages calculation. If the two yield similar results, one can feel more confident in the final figure. If the results differ materially, then the expert should look for errors in both studies by considering the reliability of the data underlying each, the uncertainty surrounding any assumptions made in each analysis, and sources of error such as those discussed in this chapter. If both methodologies still seem reasonable, the expert can use the two results to establish a likely range for alleged damages.

An event study provides an objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused damages. In general, other methodologies for calculating damages do not provide a measure of materiality, other than the simple observation that calculated damages are large, small, or zero. By using the statistical tools that are the basis for event studies, an expert can provide not only a measure of damages based on objective data and calculations but also a statistically accepted means of testing the materiality of this measurement.

## NOTES

1. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

2. *In re Executive Telecard, Ltd. Securities Litigation*, 94 Civ. 7846 (CLB) (S.D.N.Y. 1997). See also *In re Seagate Technology II Securities Litigation*, C-89-2498(A)-VRW (N.D. Cal.), in which the court accepted some of the defendants' event studies and dismissed certain claims on that basis, but ruled that the defendants' other event studies were inadequate and denied their request for summary judgment with regard to those issues. The court also found the plaintiffs' event studies lacking and therefore denied a cross-motion for summary judgment. Also, see *Goldkrantz v. Griffin*, QBS: 02760800 (S.D.N.Y. 1999), in which the court granted summary judgment based on the plaintiffs' failure to contest the defendants' event study analysis.

3. With regard to securities litigation, see, for example, Janet C. Alexander, "The Value of Bad News," *UCLA Law Review*, Vol. 41, No. 6, 1994, pp. 1421–69; Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, Vol. 38, November 1982, pp. 1–20; Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of *Basic v. Levinson*," 77 *Virginia Law Review Association* 1017 (1991), pp. 1021–28; A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997, pp. 13–39; and Mark L. Mitchell and Jeffry

M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer,* Vol. 49, February 1994, pp. 545–90.

4. The use of an event study to measure the magnitude of an event is certainly not new. See, for example, Mark P. Kritzman, "What Practitioners Need to Know About Event Studies," *Financial Analysts Journal,* November–December 1994. ("Aside from tests of market efficiency, event studies are valuable in gauging the magnitude of an event's impact.") For a recent application, see Jay Dial and Kevin J. Murphy, "Incentives, Downsizing, and Value Creation at General Dynamics," *Journal of Financial Economics,* March 1995.

5. Richard A. Brealey and Stewart C. Myers, *Fundamentals of Corporate Finance,* New York: McGraw-Hill, 1995, p. 306.

6. Brealey and Myers, 1995, Chapter 4.

7. Arnold S. Jacobs, "Litigation and Practice Under Rule 10b-5," cited in Mark L. Mitchell and Jeffry M. Netter, *op. cit.*

8. Recognizing this problem, the court in *Feit v. Leasco Data Processing Equipment Corp.,* 332 F. Supp. 544, 586 (E.D.N.Y. 1971), confronted with determining the materiality of an omission from a proxy statement, suggested drawing a scientific sample of investors to determine how they might have voted if the truth had been known. To our knowledge, this approach to materiality has never been attempted.

9. Intuitively, if an event is material to investors, it should move stock prices, and if it is not material, it should not affect stock prices. By examining whether the stock price change is different from random movements that occur on days when there is no news, we can determine whether investors felt that the event under consideration was material. As an example, Mitchell and Netter state that "[t]he SEC recently began to use stock price evidence to show materiality in securities fraud cases, especially insider trading cases." Also, from the same paper, "Statistical tests of significance are useful both in establishing materiality and in calculating disgorgement. A finding that a stock return associated with the release of information is large enough that it is unlikely that the return occurred by chance is strong evidence that the information was important." Of course, this is relevant only for potentially large events. An announcement that someone had stolen a $20 bill from a Sears cash register would likely not have any material effect on Sears' stock price.

10. See, for examples, the Alexander and MacKinlay articles cited in note 3 above. Note that in the vocabulary of securities litigation, the inflation in a stock price is the difference between the market price of the stock and the price it would have traded at had there been no misrepresentation or omission of public information. This use of inflation is not to be confused with its traditional economics usage referring to overall price level rate of change.

11. It is, however, not the only way to compute damages. Sometimes a fundamental analysis is appropriate. Also, the expected change in the stock price based on a sample of stock price changes in response to similar events may be used. Which approach is best will depend on circumstances relating to the allegations in the complaint and the reliability of the various types of estimates given the available data.

12. The distinction between a firm and its shareholders is a legal artifact and ignores certain economic ambiguities. For example, in economics it is theoretically possible for the current shareholders to be the firm, whereas under the law the firm is a distinct person. Presumably, this legal distinction is necessary to allow the firm to have access to the courts on behalf of the shareholders, thereby reducing the inefficiencies that would occur if the shareholders themselves had to perform the legal duties of the firm.

13. This is strictly true only if common equity is the sole source of financing. When the company has also issued debt and/or other forms of equity, lost profits would be measured by summing the changes in the market value of all of the outstanding financing sources (e.g., number of shares times the share price movement plus the number of bonds times the bond price movement). When the company does not face any serious threat of default on its senior obligations, the change in the market value of its common stock should serve as a good proxy for the change in the total capitalized value of the firm.

14. But note an exception due to the bias from the recovery from future litigation discussed in section 19.7(b).

15. The stock market's assessment would be on an after-tax basis taking account of litigation expenses and contingent claims. The effects of these issues on damages assessment using stock prices are discussed in more detail in section 19.7.

16. See section 19.6.

17. See, for example, MacKinley, *op. cit.* for a description.

18. It is also possible to look at intraday trading to get a tighter event window. This is especially useful if before the news announcement there was a large change in the stock price that one believes was caused by other events. Use of intraday prices, however, entails several difficulties. Among these are calculating movements of the market or industry index over the same time period and adjusting materiality tests to account for the nonstandard event window. A suggested approach for determining the length of an intraday event window is in S. C. Hilmer and P. L. Yu, "The Market Speed of Adjustment to New Information," *Journal of Financial Economics*, Dec. 1979. See also S. J. Chang and Son Nan Chen, "Stock Price Adjustment to Earnings and Dividend Surprises," *Quarterly Review of Economics and Business*, Spring 1989.

19. See MacKinlay, note 3.

20. As with other expert decisions, it is helpful to have some rationale for the length of the event window chosen. For example, one can employ a standard period over different cases, cutting short the window when new information reaches the public. Alternatively, one can look at some other indicator of materiality, such as trading volume or the quantity of news coverage, to decide the period in which the market was reacting to the new information.

21. While some analysts perform crude event studies without adjusting for market effects, the literature nearly uniformly argues that a market adjustment is desirable. Moreover, relevant case law, such as *In re Executive Telecard Ltd. Securities Litigation*, states that in measuring stock price declines, one must eliminate "that portion of the price decline that is the result of forces unrelated to the wrong."

22. A regression is a statistical tool used to estimate the relation between one or more variables (here, the market and/or industry index) and another variable (the stock price of a particular company). An early, but still useful, discussion is provided in Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, May 1980.

23. In securities fraud cases, estimation windows are often placed before the beginning of the alleged class period, even if the only event measured is at the end of the period. This is likely done so that the estimation window would cover a "clean" period that could not have been tainted by any alleged stock price inflation. There is often no theoretical basis for doing so, because the concern about a "clean" period actually relates to the possibility that the estimation of the relation between the stock and the index is contaminated by the effects of the event being studied. That is, one does not want any overlap between the estimation window and the event window. Depending on the nature of the alleged stock price manipulation, there may be no statistical basis for excluding prices during the period of alleged manipulation from the estimation window.

24. Michael Salinger ("Value Event Studies," *Boston University School of Management Working Paper*, 1991) provides a theoretical discussion on whether to place the estimation window before or after the event window. However, see note 38 on his conclusion that such methodological choices are generally irrelevant for short event windows.

25. The adjusted R-squared should not be confused with the [unadjusted] R-squared. The R-squared is a simple measurement of the explanatory power of the independent variables. The adjusted R-squared penalizes the use of additional independent variables to account for the possibility that any additional explanatory power that these variables bring to the overall regression is due solely to chance.

26. Sometimes, the expert will use a multifactor model to predict the stock price. This is a model that has more than one index in it, such as the S&P 500 and an industry index; see MacKinlay, *op. cit.* If the analyst tries a number of multifactor models and ultimately chooses

a model with only one index, then the expert may have to support this decision with the relevant statistical test.

27. There are various reasons for not simply choosing the index with the strongest statistical properties. One would be if it were known that there was a change in the operating characteristics or competitive environment facing members of one index between the estimation and event windows. Also, there are other considerations involved in comparing statistics from different estimation windows, most notably that a good index from an estimation period near the event window may be preferable to an index with more explanatory power in an estimation period further from the event window.

28. There is a question about whether to apply the abnormal return to the stock price at the beginning or end of the event window. This question essentially turns on whether the event occurs first, followed by market effects, or whether market effects come first, followed by the event. As an example, suppose that a stock price drops from $20 to $9 during an event window in which the predicted return was −10%. If we apply the predicted return first, the stock would have been expected to drop to $18, and then it fell by an additional $9 as a result of the event. Alternatively, one could say that the stock fell by $10 as a result of the event, reaching a level of $10, and then fell an additional 10% due to market forces, to reach its final level of $9. The difference is generally not important when market movements are small. In general, one would want to consider when in the event window the effects of the event were more likely to have been felt.

29. See, for example, Katherine Schipper, Rex Thompson, and Roman L. Weil, "Disentangling Interrelated Effects of Regulatory Changes on Shareholder Wealth: The Case of Motor Carrier Deregulation," *Journal of Law and Economics*, Vol. 30, April 1987, pp. 67–100.

30. Fed. R. Evid. 402, as cited in *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1251 (S.D. Ohio 1996).

31. Fed. R. Evid. 702, as cited in *Ohio ex rel. Montgomery*, 925 F. Supp. at 1251.

32. *Daubert*, 113 S. Ct. at 2795.

33. *Ohio ex rel. Montgomery*, 925 F. Supp. at 1251.

34. *Daubert*, 113 S. Ct. at 2795.

35. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

36. *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir. 1997).

37. Still, at least one court has ruled that in examining how events affected stock prices, "available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the opportunity for such manipulation of data." *In re LTV Securities Litigation* (88 F.R.D. 134). Such a statement certainly could not be made about analyses where the analyst has the freedom to essentially make up one or more inputs to the calculation based on nothing more than a claim that those inputs are reasonable.

38. In a seminal article ("Measuring Security Price Performance," *Journal of Financial Economics*, 1980), Stephen J. Brown and Jerold B. Warner state that "a simple methodology based on the market model performs well under a wide variety of conditions." In discussing this and a later paper by the same authors, Michael Salinger, *op. cit.*, states that the previous authors' "results tended to be robust to the methodological alternatives." Salinger further states, "There is a schizophrenia in the event study literature between a very close attention to methodology and the view that for events of any importance, methodology is unlikely to matter a great deal. The latter view is probably quite appropriate when news is revealed over a brief, identifiable interval." "Measuring Security Price Performance," *Journal of Financial Economics* 8 (1980), pp. 205–58.

39. To be entirely correct, one would also have to specify several other minor choices, such as whether to use logarithmic or percentage returns and whether returns are measured daily or over some other period of time.

40. Of course, one must still use common sense in interpreting these results. For instance, if a company moves from an environment characterized by a high degree of government regulation to one of low regulation, there would be reasons to potentially challenge the use of a regression from one period to account for market movements in the other.

41.  The net-of-market methodology also assumes that the constant term from the regression, or alpha, equals zero. References to an assumed beta of one should be considered to include this second assumption as well. We do not independently criticize the assumption that alpha is set equal to zero over the event window. Given an accurate estimate of beta, it is possible for reasonable analysts to perform the analysis with different estimates of alpha than what would be produced from a market model regression. One assumption, for example, is to compute an estimate based on the formula given by the Capital Asset Pricing Model; this formula would produce a value of alpha equal to zero whenever beta equals one. In practice, different reasonable estimates of the value of alpha generally do not make a noticeable difference in the expert's findings.

42.  If betas are symmetrically distributed around one, the materiality test would be unbiased but not efficient. This means (1) that excessively positive and excessively negative returns would roughly balance over numerous observations but (2) that other tests were more likely to give the correct answer on any one individual case.

43.  See Werner F. M. DeBondt, "Stock Price Reversals and Overreaction to New Events: A Survey of Theory and Evidence," 1989; Rui M. C. Guimaraes, Brian G. Kingsman and Stephen J. Taylor, eds., *A Reappraisal of the Efficiency of Financial Markets*, Berlin: Springer-Verlag. Much of the evidence is from the research of Paul Zarowin, including his 1989 article "Short-Run Market Overreaction: Size and Seasonality Effects," *The Journal of Portfolio Management*, Spring, pp. 26–29. See also M. Bremer and Richard Sweeney, "The Information Content of Extreme Daily Rates of Return," *Claremont McKenna College Working Paper*, 1987, later published in the *Journal of Finance*.

44.  For more detail on some of the alternative methods, see, for example, Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan, "Losses in Commercial Litigation," *Journal of Forensic Economics* Vol. 6, No. 3, 1993, pp. 179–96. This paper discusses some of the means of measuring lost profits based on projections and accounting statements. Interestingly, while the authors say that the methodology they describe "is conceptually similar to the situation where a plaintiff suffered a loss of a passive investment, such as a securities fraud case," they do not appear to consider whether the event study methodologies of securities fraud cases could be applied to measuring lost profits in a commercial setting.

45.  For a series of simple examples on how the same data can lead to extreme variations in lost profits, see Robert L. Dunn, *Recovery of Damages for Lost Profits*, 1992, pp. 459–70. ("The point made is that, depending on the approach taken, great variations in projections will result.")

46.  See, for example, Richard R. Simonds, "Public Utility Valuation Methods: Theoretically Equivalent But Not Redundant," *Property Tax Journal*, September 1992, pp. 289–300.

47.  Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, Irwin Prof. Publishing, 1993.

48.  Steven H. Hanke and Stephen J. K. Walters, "Recent Controversies in the Valuation of Utility Properties," *Public Utilities Fortnightly*, July 21, 1988, p. 24.

49.  *Id.* at 23.

50.  "Court Declines Review in Five Cases, Including Three Involving Rail Property," *BNA Washington Insider*, June 6, 1995.

51.  *Elmer E. Mills and Louis Susman v. The Electric Auto-Lite Co. et al.*, 552 F.2d 1239, 1247 (1997).

52.  *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987).

53.  Recent financial press commentaries on the volatility, previously high values, and rapid collapse of many Internet stocks represent another event that should lead to investigation of stock market anomalies.

54.  *Basic v. Levinson*, 485 U.S. 224, 247 (1988).

55.  We omit here mention of stock price overreaction, which was discussed in section 19.4.

56.  For a review, see Stephen F. LeRoy, "Efficient Capital Markets and Martingales," *Journal of Economic Literature*, Vol. XXVII, 1989, pp. 1583–621.

57. Paul A. Samuelson, "Proof That Properly Discounted Present Values of Assets Vibrate Randomly," *The Bell Journal of Economics and Management Science,* Vol. 4, No. 2, 1973, pp. 369–74; and "Stochastic Land Valuation: Total Return as Martingale Implying Price Changes a Negatively Correlated Walk," *Paul A. Samuelson's Collected Scientific Papers,* Vol. 5, Cambridge: MIT Press, 1986.

58. See, for example, J. Bradford DeLong, Andrei Shleifer, Lawrence H. Summers, and Robert J. Waldmann, "Positive Feedback Investment Strategies and Destabilizing Rational Speculation," *Journal of Finance,* Vol. 45, No. 2, 1990, pp. 379–95.

59. Baruch Lev and Meiring Devilliers, "Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis," *Stanford Law Review,* November 1994.

60. *Ibid* at p. 35.

61. In some ways this is clearly unfair, as there has been a transfer of wealth from one set of shareholders to another as a result of an illegal act in which neither group knowingly participated. An alternative view is that when investors buy and sell shares, they are trading in the company's fortunes, including unexpected gains and losses from legal actions and certain illegal acts affecting the company's value.

62. One advantage of event studies here is that if the changes in the perception of the libel occur at discrete times, these effects can be captured by using readily available stock market data. Directly measuring the changes in expected income at various points in time would require a large set of contemporaneous projections.

63. While the actual rate of error is not known without the materiality test, if the stock is simply assumed by the expert to move one-for-one with the market, we can be sure that the rate of error is higher than if the relation between market and stock movements used in the damages calculation is based on statistical analysis.

64. The general attitude toward event studies may be best summed up by Glenn V. Henderson, Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance* 57(2), June 1990: "The event study is a classic design. Classic designs are simple and elegant, and above all else, functional. The event study has become a classic because it works. It can be used under less than perfect conditions and still produce reliable results."

65. In a case where a private company went through with an initial public offering after suffering some harm, data on the actual offering price can be compared to a previously expected offering price to perform a basic event study. Appropriate market and industry adjustments to the expected offering price can be made based upon the stock's post-offering behavior.

## LIST OF CASES

*Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988)

*In re Central Ice Cream Co.,* 836 F. 2d 1068 (7th Cir. 1987)

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786 (1993)

*In re Executive Telecard, Ltd. Securities Litigation,* 94 Cir. 7846 (CLB) (S.D.N.Y. 1997)

*Feit v. Leasco Data Processing Equipment Corp.,* 332 F. Supp. 544, 586 (E.D.N.Y. 1971)

*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923)

*Goldkrantz v. Griffin* (S.D.N.Y. 1999)

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167 (1999)

*In re LTV Securities Litigation,* 88 F.R.D. 134, 149 (1980)

*Mills v. Electric Auto-Lite Co.,* 552 F. 2d 1239, 1247 (1977)

*Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,* 925 F. Supp. 1247, 1251 (S.D. Ohio 1996)

*In re Seagate Technology II Securities Litigation,* C-89-2498(A)-VRW (N.D. Cal.)

*Smelser v. Norfolk Southern Railway Co.,* 105 F. 3d 299, 303 (6th Cir. 1997)