# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | CASE NO. 4:19-CV-00957 (CONSOLIDATED)<br><br>JUDGE GEORGE C. HANKS, JR.<br><br>THIS DOCUMENT RELATES TO:<br><br>CASE NO. 4:22-CV-01189<br>CASE NO. 4:22-CV-02590 |

---

## THE DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF DR. ZACHARY NYE, PH.D.

---

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE AND STAGE OF THE PROCEEDING ............................................................ 1

COUNTER-STATEMENT OF ISSUES TO BE RULED UPON ...................................... 1

SUMMARY OF THE ARGUMENT ................................................................................ 2

STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................................... 5

    A.    Overview of Defendants' Securities Fraud ....................................... 5

    B.    Dr. Nye's Expert Opinions............................................................... 7

    C.    Defendants' Rebuttal Expert .......................................................... 11

LEGAL STANDARD ...................................................................................................... 12

ARGUMENT ................................................................................................................... 13

    I.    Dr. Nye's Loss Causation and Damages Opinions Are Reliable and Relevant ............................................................................... 13

    II.    Defendants' Attacks on Dr. Nye's Section 10(b) Damages Opinion Lack Merit and Do Not Form a Basis for Exclusion ............................................... 17

    III.    Defendants' Challenge to Dr. Nye's Section 14(a) Damages Similarly Are Unfounded and Do Not Prevent Dr. Nye from Testifying About Them at Trial ............................................................................ 23

CONCLUSION ................................................................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) .................................................................. 17, 20

*Branch v. CEMEX, Inc.*,
    2012 WL 2357280 (S.D. Tex. June 20, 2012) ............................................. 16

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) ...................................................................... 16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ........................................................................ 12, 13, 17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................. passim

*Fener v. Operating Eng'rs Constr. Indus. & Miscellaneous Pension Fund*,
    579 F.3d 401 (5th Cir. 2009) ...................................................................... 21

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ...................................................... 14, 21, 23

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021) ............................................................................... 21

*Greenberg v. Crossroads System, Inc.*,
    364 F.3d 657 (5th Cir. 2004) ...................................................................... 21

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) .................................................. 7

*Hohenstein v. Behringer Harvard REIT I, Inc.*,
    2014 WL 1265949 (N.D. Tex. Mar. 27, 2014) ............................................ 24

*In re BP p.l.c. Sec. Litig.*,
    2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................. 15

*In re DaimlerChrysler AG Sec. Litig.*,
    294 F. Supp. 2d 616 (D. Del. 2003) ........................................................... 15

*In re Heckmann Corp. Sec. Litig.*,
    2013 WL 2456104 (D. Del. June 6, 2013) .................................................... 7

*In re Ocwen Fin. Corp. Sec. Litig.*,
   2017 WL 11680400 (S.D. Fla. June 21, 2017) ............................................................7

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ..................................................................21, 23

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007) ..............................................24

*Karinski v. Stamps.com, Inc.*,
   2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) .............................................................7

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..................................................................19, 20

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ..................................................13, 15, 21, 22

*Magruder v. Halliburton Co.*,
   2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ............................................20

*Mauss v. NuVasive, Inc.*,
   2018 WL 656036 (S.D. Cal. Feb. 1, 2018) ..............................................................7

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ..................................................................12, 17

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ..................................................14, 18, 20, 23

*Puga v. RCX Sols., Inc.*,
   922 F.3d 285 (5th Cir. 2019) ..................................................................13

*Ramirez v. Exxon Mobil Corp.*,
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) ............................................21

*Robles v. Eminent Med. Ctr. LLC*,
   619 F. Supp. 3d 609 (N.D. Tex. 2022) ..............................................17

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ..................................................................14, 20

*Superior Offshore Int'l, Inc. v. Shaefer*,
   2012 WL 6160873 (S.D. Tex. Dec. 11, 2012) ............................................22

*United States v. Aegis Therapies, Inc.*,
2015 WL 1541491 (S.D. Ga. Mar. 31, 2015) ................................................................ 17

**Statutes**

15 U.S.C. § 78u-4(b)(4) ................................................................................................ 18

**Rules**

Fed. R. Evid. 702(a)-(d) ................................................................................................ 12

## NATURE AND STAGE OF THE PROCEEDING

These cases arise from the collapse of Alta Mesa.[1]  Alyeska and Orbis were two of the largest investors in Alta Mesa.  They have asserted claims against Defendants under Sections 10(b), 14(a), 18, and 20(a) of the Exchange Act, as well as under Texas statutory and common law.  In support of their securities fraud claims against Defendants, they have proffered the expert testimony of Dr. Zachary Nye, Ph.D., who offers opinions on the issues of market efficiency, economic materiality, proximate cause, loss causation, and damages. Defendants have moved to exclude Dr. Nye's opinions about the amount of per-share damages that Alyeska and Orbis suffered in connection with their claims under Sections 10(b) and 14(a) of the Exchange Act.[2]  Defendants' arguments lack merit, and their motion should be denied.

## COUNTER-STATEMENT OF ISSUES TO BE RULED UPON

The issue to be ruled upon is whether the jury should be prohibited from hearing Dr. Nye's opinions about the amount of per-share damages that Alyeska and Orbis suffered in

---

[1] Party names and other relevant terms are defined in Appendix A, submitted herewith. Citations to "Defs. Br." are to Defendants' Motion to Exclude Opinions of Expert Witnesses Steven P. Feinstein and Zachary Nye Under Rule 702, dated December 22, 2023 (ECF No. 511). Citations to "Ex." are to the exhibits to the Declaration of Lawrence M. Rolnick in Opposition to Defendants' Motion to Exclude Opinions of Dr. Zachary Nye, Ph.D. ("Rolnick Declaration"), submitted herewith. Citations to the "Nye Rpt." are to the Expert Report of Zachary Nye, Ph.D., dated August 31, 2023, and attached as Ex. 1 to the Rolnick Declaration. Citations to the "Stulz Rpt." are to the Expert Report of René Stulz, Ph.D., dated October 19, 2023, and attached as Ex. 2 to the Rolnick Declaration. Citations to "Nye Dep." are to the transcript of the deposition of Zachary Nye, Ph.D., taken on November 14, 2023, and attached as Ex. 3 to the Rolnick Declaration. Citations to "Stulz Dep." are to the transcript of the deposition of René Stulz, Ph.D., taken on November 17, 2023, and attached as Ex. 4 to the Rolnick Declaration.

[2] Defendants' Motion seeks to exclude the opinions on these issues of both Dr. Nye and the loss causation and damages expert proffered by the Class Plaintiffs, Dr. Steven P. Feinstein, Ph.D.  This opposition addresses the arguments as they relate only to Dr. Nye.  However, it is telling that Defendants' level the same blunderbuss criticisms at both Dr. Nye and Dr. Feinstein when both separately reached essentially the same conclusions concerning loss causation and damages by applying independent scientific event studies.

connection with their claims under Sections 10(b) and 14(a) of the Exchange Act (but not his other opinions), where Dr. Nye applied the widely accepted, preeminent methodologies for calculating such damages, and where excluding Dr. Nye's opinions would leave the jury with no expert testimony to assist them with the complex task of calculating damages under Section 10(b) and Section 14(a) of the Exchange Act.

## SUMMARY OF THE ARGUMENT

Alyeska and Orbis purchased shares in Silver Run II, a SPAC. When Silver Run II announced that it was planning to acquire AMH and Kingfisher to form Alta Mesa, Alyeska and Orbis had the absolute right to redeem their Silver Run II shares at $10 per share. These two large shareholders were induced, by Defendants' misrepresentations, to forgo redemption and instead accept stock in the new enterprise: Alta Mesa. As Defendants continued to make misleading statements, Alyeska and Orbis purchased more Alta Mesa stock, not knowing that they were being lied to. Beginning on March 29, 2018, a series of partial corrective disclosures slowly revealed that Defendants had committed fraud. The price of Alta Mesa stock tumbled from $10 to just $0.13 per share by May 17, 2019 – a collapse of 99% in less than two years.

The Direct Action Plaintiffs (Alyeska and Orbis) offer the expert testimony of Dr. Nye to prove that they suffered damages as a result of Defendants' fraud. Dr. Nye is eminently qualified in the areas in which he offers opinions and has been accepted as an expert in those areas by dozens of other courts. To analyze loss causation and damages, Dr. Nye conducted an event study, which is the most commonly accepted methodology used in federal securities fraud cases. As part of his event study, Dr. Nye first ruled out all

other causal factors using a statistical regression analysis.  He then carefully examined the information released on each particular disclosure date and scrupulously determined whether or not it was corrective of the precise misstatements and omissions alleged by the Direct Action Plaintiffs.  Dr. Nye next reviewed whether potentially confounding information existed, and if so, its impact on his opinions.  Having conducted his analysis, Dr. Nye was thus able to opine that Defendants' material misstatements and omissions caused specific, quantifiable, and economically reasonable amounts of the Direct Action Plaintiffs' losses.

Defendants' challenge to Dr. Nye's Section 10(b) per-share damages opinion lacks merit.  Defendants criticize Dr. Nye for not linking each specific disclosure to a specific misrepresentation.   But Defendants' proposed one-to-one, mirror-image matching requirement does not exist under the PSLRA or binding case law.  In fact, it is contrary to established Fifth Circuit precedent.  Dr. Nye performed the core task he was required to: determining whether the information concealed by Defendants' fraud, when revealed, caused Plaintiffs' loss.  Similarly, Defendants' assertion that Dr. Nye was required to calculate the amount of price inflation caused by each specific representation is fatally flawed.  Defendants' argument ignores the widely accepted "price maintenance" theory, which recognizes that a misrepresentation can cause the stock price to remain inflated by failing to reveal the truth and preventing preexisting inflation from dissipating from the stock price.  Defendants ignore the core premise of Dr. Nye's event study:  on each misstatement date, Defendants had a choice – to disclose the full truth or to continue the

3

lie.  They chose to continue the lie.  Dr. Nye's analysis assists the jury in understanding what those lies cost the Direct Action Plaintiffs.

Defendants' arguments concerning Dr. Nye's Section 14(a) per-share damages opinion also are baseless.  Dr. Nye's analysis is premised on Defendants' statements in the Proxy inducing the Direct Action Plaintiffs to not exercise their absolute redemption right for their Silver Run II shares.  The option to redeem for $10 per share was a concrete right of Silver Run II shareholders that was set forth in the Proxy.  The Direct Action Plaintiffs will testify that they would have redeemed their shares if they had known the truth, which was concealed from them by Defendants in the Proxy.  Dr. Nye provides the jury helpful analysis to determine the loss the Direct Action Plaintiffs suffered by not exercising their redemption right.   His methodology is based on Defendants' statements being the proximate cause of the Direct Action Plaintiffs' damages.  And there is nothing speculative about Dr. Nye's damages theory – it is based on the structure of the Alta Mesa SPAC and the reality of the business combination.

Defendants do not challenge Dr. Nye's qualifications.  They move to exclude only a portion of his damages opinions on limited grounds, and do not seek exclusion of his opinions on market efficiency and economic materiality.  Thus, even if the Court were to grant Defendants' motion, Dr. Nye would still be an expert witness at trial.  Granting Defendants' motion, therefore, would simply deprive the jurors of expert testimony to assist them in determining the Direct Action Plaintiffs' damages, which is a subject matter that courts uniformly conclude is the province of an expert economist like Dr. Nye.

Even if Defendants' attacks on Dr. Nye' Section 10(b) and Section 14(a) per-share damages opinions did not lack merit, their arguments go to Dr. Nye's conclusions rather than his methodologies, which means they go to weight, not admissibility.  Defendants can use cross-examination or the testimony of their own expert at trial to attempt to rebut Dr. Nye's conclusions.  But the Court should not exclude Dr. Nye from presenting his relevant and reliable opinions to the jury.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Overview of Defendants' Securities Fraud

For a more fulsome recitation of the underlying facts giving rise to the Direct Action Plaintiffs' claims for securities fraud, the Direct Action Plaintiffs respectfully refer the Court to paragraphs 61 through 70, and 88 through 158 of Dr. Nye's report, as well as to pages 4 through 13 of their Opposition to Defendants' Motion for Summary Judgment, filed herewith.

Defendants' fraudulent misrepresentations included statements about AMH's oil reserves, projected 2018 and 2019 earnings for AMH and Kingfisher, Alta Mesa's ability to sustain growth, Alta Mesa's undisclosed strategic decisions to prioritize temporary oil production gains at the expense of long-term production viability, and Alta Mesa's internal controls.  (Nye Rpt. ¶ 63.)  These representations were inextricably intertwined.  (Nye Dep. at 51:12-15.)  Defendants made these misrepresentations in various forms, including press releases, investor presentations, SEC filings, and in face-to-face meetings with the Direct Action Plaintiffs.   The Complaints group these misstatements into three conceptual

categories:  (i) "AMH/Alta Mesa Oil Production and Drilling Methods;" (ii) "Kingfisher's Prospects and Expected Revenue;" and (iii) "Alta Mesa's Internal Controls."  (*Id.* ¶ 64.)

The first category of misstatements was false and misleading because, among other things, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ (*Id.*

¶ 65.)  The second category of misstatements were false and misleading because, among other things, ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ (*Id.* ¶ 67.)  The third category of misstatements were false and misleading because Alta Mesa did not have effective internal controls and disclosure procedures.  (*Id.* ¶ 68.)

The price of Alta Mesa stock was artificially inflated by Defendants' false and misleading statements.  (*Id.* ¶ 70.)  The artificial inflation caused by Defendants' fraud was gradually removed from the stock as the truth about AMH/Alta Mesa oil production and drilling methods, Kingfisher's prospects and expected revenue, and Alta Mesa's ineffective internal controls gradually and slowly leaked into the market on five occasions when new fraud-related information was disclosed to the market.  (*Id.*)

6

### B.      Dr. Nye's Expert Opinions

The Direct Action Plaintiffs have retained Dr. Nye as their market efficiency, economic materiality, proximate cause, loss causation, and damages expert.  Dr. Nye is Vice President of the highly esteemed Stanford Consulting Group.  (Nye Rpt. Ex. 1.)  He holds a bachelor's degree in economics from Princeton University, a master's degree in finance from the London Business School, and a Ph.D. in finance from the University of California, Irvine.  (*Id.*)  Dr. Nye has provided expert testimony in dozens of cases involving securities fraud.  (*Id.*)  He has been accepted by courts across the country as an expert on the issues of loss causation and damages.  *See, e.g.*, *Mauss v. NuVasive, Inc.*, 2018 WL 656036, at *6 (S.D. Cal. Feb. 1, 2018) (permitting Dr. Nye to testify as to loss causation and damages); *In re Ocwen Fin. Corp. Sec. Litig.*, 2017 WL 11680400, at *1 (S.D. Fla. June 21, 2017) (same).  Courts have credited or relied on Dr. Nye's expert economic testimony in the securities fraud context on more than twenty occasions.  *See, e.g.*, *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2023 WL 7285167, at *24-25 (E.D. Pa. Nov. 3, 2023) (most recent case accepting Dr. Nye's analysis);  *Karinski v. Stamps.com, Inc.*, 2020 WL 6572660, at *8 (C.D. Cal. Nov. 9, 2020) ("Dr. Nye's damages methodology has been routinely accepted by courts . . . ."); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *8 (D. Del. June 6, 2013) (denying *Daubert* motion and observing that "Defendants may challenge Dr. Nye's conclusions in the appropriate forum, that is, at trial").

Dr. Nye applied the preeminent methodology relied upon by courts to determine whether the Direct Action Plaintiffs can establish loss causation.  He conducted an "event

study" using a statistical "regression analysis" to determine whether Defendants' misrepresentations, as alleged in the Complaints, caused losses suffered by Plaintiffs. An event study is a well-accepted scientific, statistical methodology for measuring the impact of information on market prices. (Nye Rpt. ¶ 84.)

Dr. Nye carefully examined each Plaintiff's Complaint to determine the scope of the alleged fraud, including the allegedly concealed information. (*Id.* ¶¶ 61-70.) Dr. Nye reviewed each of the events that Plaintiffs allege in their Complaints revealed information corrective of the material misrepresentations and omissions made by Defendants. (*Id.* ¶¶ 84-87.) Dr. Nye specifically analyzed whether the information revealed on those dates related to the alleged misstatements. (*Id.* ¶¶ 88-153; *see also* Nye Dep. at 26:23-29:11.)

Dr. Nye empirically analyzed whether the entry of corrective information into the market caused a statistically significant, negative, abnormal return in Alta Mesa's stock price. (Nye Rpt. ¶ 196.) Having established that the market for Alta Mesa stock was efficient, Dr. Nye examined the price movement of Alta Mesa stock on days when fraud-related information entered the market and tested whether the deviation from expected price movements was sufficiently large that simple random movement could be rejected as the cause. (*See, e.g.*, *id.* ¶ 111 & Ex. 11A.) Using a regression model, Dr. Nye controlled for market and industry factors to isolate any unexplained price movement, or an "abnormal return," on the trading days being examined. (*Id.* ¶ 85.) If the statistical analysis resulted in a 95% confidence level that the abnormal return was not caused by random movement, Dr. Nye concluded that the stock price movement was caused, at least in part, by the entry of the new, fraud-related information into the market. (*See id.* ¶ 54.)

8

For each day on which Dr. Nye found a statistically significant, abnormal, negative return in Alta Mesa's stock following the release of corrective information, Dr. Nye considered and analyzed the degree to which confounding information (i.e., information *unrelated* to the fraud-correcting information), if any, impacted the stock price.  (*Id.* ¶ 86.) Dr. Nye did not identify any confounding information on the corrective event days.

Having performed this analysis for each corrective event, Dr. Nye was able to opine, with a reasonable degree of economic certainty, the amount of loss caused by Defendants' fraud on a particular day.   Applying this methodology, Dr. Nye found statistically significant, negative, abnormal returns occurred in Alta Mesa stock and were caused by the revelation of Defendants' fraud during the following five event windows:  March 29–April 2, 2018; August 14–15, 2018; November 14–15, 2018; February 26–27, 2019; and May 20, 2019.  (*Id.* ¶ 88.)

To calculate each Plaintiff's damages under Section 10(b) and Section 18, Dr. Nye applied the "out-of-pocket" methodology.   (*Id.* ¶¶ 7, 165-72.)   The out-of-pocket methodology measures damages as the artificial inflation per share at the time of purchase minus the artificial inflation at the time of sale (or the artificial inflation at the time of purchase if the share was not ultimately sold before the dissipation of all relevant inflation), but caps damages by applying the PSLRA's "90-day lookback" on the sales price.  (*Id.* ¶ 172.)  Dr. Nye's loss causation analysis quantified the amount of artificial inflation that dissipated from the price of Alta Mesa as Defendants' fraud was revealed to the market. (*Id.* ¶ 166.)  Dr. Nye measured the amount of inflation removed from the price of the common stock during each of the corrective events to determine how much Alta Mesa's

9

stock price was inflated by Defendants' fraud.  (*Id.*)  To then determine how much Alta Mesa stock was inflated by the fraud on any particular day, which is part of calculating damages, Dr. Nye constructed an "inflation ribbon."  (*Id.* ¶ 168.)  Pulling artificial inflation back to the first misstatement concealing applicable information at a constant amount to calculate damages – as Dr. Nye did here – is commonly referred to as the "constant dollar" approach.  The constant dollar approach is based on a "price maintenance" theory that Defendants' misstatements maintained artificial inflation in the stock price because they did not disclose the truth.  (*See id.* ¶ 165.)  Dr. Nye specifically applied the limiting principles articulated by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), when calculating the Direct Action Plaintiffs' damages.  (Nye Rpt. ¶ 169 & n.338.)

To calculate the Direct Action Plaintiffs damages under Section 14(a), Dr. Nye used two different methodologies:  a "lost opportunity" theory and an out-of-pocket theory.  (*Id.* ¶ 175.)  Under the lost opportunity theory, Dr. Nye assumed that if Defendants had not lied to the Direct Action Plaintiffs, they would have exercised their right to redeem their Silver Run II shares and received approximately $10 in cash.  (*Id.* ¶¶ 176-80.)  Because Defendants' misstatements proximately caused the Direct Action Plaintiffs not to redeem their Silver Run II shares, the damages they suffered under the lost opportunity methodology were $10 per share less any proceeds they ultimately received from the corresponding Alta Mesa share that they actually received.  (*Id.* ¶ 180.)  Under the out-of-pocket theory, Dr. Nye applied the same methodology as for Section 10(b) damages, but

limited damages to shares held by Plaintiffs as of the record date set forth in the Proxy. (*Id.* ¶ 181.)

For Plaintiffs' state law claims, Dr. Nye applied the out-of-pocket methodology for acquisition claims under the common law and under Texas statutory law, but did not apply the PSLRA's 90-day lookback (which is inapplicable to state law claims). (*Id.* ¶¶ 184, 188.) For the holder claims under state common law, Nye applied one of three different methodologies: a "redemption forfeiture" theory, a "direct loss from holding" theory, and a "pre-vs-post redemption" theory. (*Id.* ¶¶ 185-87.)

## C. Defendants' Rebuttal Expert

Defendants retained Professor René Stulz to offer rebuttal opinions to Dr. Nye's expert testimony on loss causation and damages.[3] Unlike Dr. Nye – whose opinions are based on a widely accepted methodology routinely accepted by courts in securities fraud cases – Professor Stulz declined to conduct his own scientific analysis. He did not conduct a market efficiency analysis and does not opine that Alta Mesa stock traded in an inefficient market. (Stulz Dep. at 365:8-368:8.) He did not conduct an event study to try and demonstrate that factors other than Defendants' fraud caused Plaintiffs' investment losses. (*Id.* at 356:6-12.) He did not challenge any of the inputs that Dr. Nye selected in

---

[3] A subset of Defendants also retained another purported rebuttal expert, Professor Audra Boone, who offered opinions on damages that covered some of the same areas as Professor Stulz. However, unlike Professor Stulz, Professor Boone is not a qualified securities fraud loss causation and damages expert. Moreover, Professor Boone fundamentally misunderstood the Direct Action Plaintiffs' allegations and Dr. Nye's opinions, making her testimony more likely to confuse jurors than help them. Consequently, the Direct Action Plaintiffs have moved to exclude Professor Boone from testifying at trial. (ECF No. 514.) If that motion is granted, Defendants can still proffer Professor Stulz as a rebuttal witness to Dr. Nye.

constructing his event study.  (*Id.* at 358:24-360:21, 365:3-6.)  And he did not attempt to calculate alternative damages figures, leaving the jury with only Dr. Nye's calculations.

The arguments that Defendants make in support of their motion to exclude Dr. Nye's opinions about the amount of per-share damages that the Direct Action Plaintiffs suffered in connection with their claims under Sections 10(b) and 14(a) are some of the same points that Professor Stulz makes in his rebuttal report.  (*Compare* Defs. Br. at 7-16, *with* Stulz Rpt. ¶¶ 338-45, 356-61.)  At trial, the jury will be presented with a classic "battle of the experts" to decide whether to accept Dr. Nye's damages calculations under Sections 10(b) and 14(a) of the Exchange Act or instead modify or reject those damages calculations based on Professor Stulz's criticisms.  If Defendants' motion is granted, however, the jury will be deprived of that opportunity, and will have no expert testimony to assist them in calculating the Direct Action Plaintiffs' damages under Section 10(b) and Section 14(a).

## LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, an expert may offer "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  Although the Court acts as a gatekeeper to prevent the admission of "junk science," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993), the Court's role as gatekeeper "is not intended to serve as a replacement for the adversary system," *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note).  The Court should

focus on the methodology the expert employs, not on her conclusions. *Daubert*, 509 U.S. at 595. Indeed, the Court must be mindful that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the preferred tools for ensuring the validity of expert testimony, not the exclusion of the expert witness's testimony. *Id.* at 596. "[T]he rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory committee's notes).

## **ARGUMENT**

### I.  **Dr. Nye's Loss Causation and Damages Opinions Are Reliable and Relevant**

Dr. Nye is a highly qualified securities fraud loss causation and damages expert. Defendants do not dispute that – nor could they, given Dr. Nye's education, experience, and other courts' frequent acceptance of his expert opinions in the areas of loss causation and damages. Instead, Defendants argue that some of Dr. Nye's damages calculations should be excluded and, in doing so, contend that he did not follow governing legal principles in determining loss causation. Defendants are wrong on all counts.

Loss causation is "a causal connection between the material misrepresentation [or omission] and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). It is "[a]kin to a concept of proximate cause in tort law." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 682 (5th Cir. 2015). In cases involving efficient markets, such as here, loss causation can be proven by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud);

13

(2) showing that the stock price dropped soon after the corrective disclosure; and

(3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a "substantial" amount of price drop.

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311-12 (11th Cir. 2011)).  "A corrective disclosure can come from any source, and can take any form from which the market can absorb the information and react . . . so long as it reveals to the market the falsity of the prior misstatements."  *Id.* at 322 (internal quotation marks, citations, and alterations omitted).  In order to be considered corrective, a disclosure need not "squarely and directly contradict the earlier misrepresentations."  *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014).  Rather, it need only contain the "'relevant truth' with a logical link to the ultimate drop in stock price."  *Id.* (quoting *Dura*, 544 U.S. at 342-43).  When confronted with a series of partial disclosures, the Court should "consider them collectively in determining whether a corrective disclosure has occurred."  *Amedisys*, 769 F.3d at 322.

Dr. Nye applied a reliable and widely accepted methodology – an event study – to determine loss causation in this case.  "[E]vent studies are a common method of establishing loss causation, used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price."  *FindWhat*, 658 F.3d at 1313 (quotation marks omitted).  Through his event study, Dr. Nye carefully examined the information released on each particular disclosure date and

14

scrupulously determined whether or not it was corrective of the precise misstatements and omissions alleged by Plaintiffs.  (Nye Rpt. ¶¶ 61-68, 84-158; Nye Dep. at 26:23-29:11.) Through his regression analysis and review for confounding information, Dr. Nye ruled out all other factors – including, specifically, random movements, industry-wide price movements, market-wide price movements, and non-fraud related negative information. (Nye Rpt. ¶¶ 84-158.)  He was thus able to conclude that the economic evidence demonstrated that Defendants' material misstatements and omissions caused the Direct Action Plaintiffs' losses.

Dr. Nye applied reliable and established methodologies to calculate the damages suffered by the Direct Action Plaintiffs.  To calculate Plaintiffs' damages under Section 10(b), Dr. Nye used the out-of-pocket methodology applying constant dollar back-casting. (*Id.* ¶¶ 165-72.)  That methodology has been accepted by the Court of Appeals.  *Ludlow*, 800 F.3d at 684; *see also In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12-13 (S.D. Tex. May 20, 2014) (accepting expert's use of constant dollar approach).  For Section 14(a), in addition to using an out-of-pocket methodology (Nye Rpt. ¶ 181), Dr. Nye applied a lost opportunity methodology (*id.* ¶¶ 176-80).  That methodology also has been accepted by courts in measuring damages for such claims.  *See, e.g.*, *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 627, 631-32 (D. Del. 2003).  Defendants' rebuttal expert, Professor Stulz, did not opine that the out-of-pocket or lost opportunity methods are unreliable methodologies for calculating damages, nor did he perform an analysis using an alternative methodology.

15

Defendants limit their challenge to Dr. Nye to his calculation of per-share damages under Sections 10(b) and 14(a) of the Exchange Act.  (Defs. Br. at 7-16.)  They do not challenge Dr. Nye's opinion that the market for Alta Mesa common stock was efficient. (*See* Nye Rpt. ¶¶ 16-60.)   Nor do Defendants contest Dr. Nye's findings that their misstatements were economically material.  (*See id.*  ¶¶ 71-80.)  They completely ignore Dr. Nye's damages calculations under Section 18 of the Exchange Act.  (*See id.* ¶¶ 7, 165-72, 192-93.)  And while they summarily assert in two footnotes that their attacks of Dr. Nye's Section 10(b) and 14(a) damages calculations apply equally to his Texas statutory and common law damages calculations (Defs. Br. at 5 n.2, 14 n.11), that simply is not true. The damages figures that Dr. Nye calculated under the state law causes of action are clearly different from those that he calculated under Sections 10(b) and 14(a).  (Nye Rpt. ¶¶ 192-93.)  Moreover, the law that is purportedly the basis for Defendants' motion – the PSLRA, a federal statute, and *Dura*, a Supreme Court case interpreting that statute – does not apply to the state law claims.  In any event, Defendants' attempt to raise this point in a footnote constitutes a waiver of the argument.  *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) ("Arguments that are insufficiently addressed in the body of the brief . . . are waived."); *Branch v. CEMEX, Inc.*, 2012 WL 2357280, at *12 n.8 (S.D. Tex. June 20, 2012) (holding that a "one-sentence footnote briefly mentioning the issue" in a summary judgment motion is insufficient to raise the issue).

Thus, even if Defendants' motion were granted – and it should not be – Dr. Nye still would testify at trial on numerous other issues.  Meanwhile, the jury would be left with no expert testimony to assist them in calculating damages for the Direct Action Plaintiffs'

claims under Section 10(b) and 14(a).  Given that Dr. Nye applies a reliable and trusted methodology for determining loss causation and calculating damages – which can be tested before a jury through cross-examination and the presentation of Defendants' rebuttal expert's opinions – none of Dr. Nye's testimony should be excluded.  *See Daubert*, 509 U.S. at 595-96; *Pipitone*, 288 F.3d at 250.[4]

## II. Defendants' Attacks on Dr. Nye's Section 10(b) Damages Opinion Lack Merit and Do Not Form a Basis for Exclusion

Defendants attempt to fashion an impossible standard for loss causation that is not only unsupported by the law they cite, but also is contrary to established Fifth Circuit precedent.  Specifically, Defendants incorrectly argue that Plaintiffs are required to "prove which alleged misstatements were corrected by which corrective disclosure."  (Defs. Br. at 8.)  That is pure sophistry.  None of the authorities Defendants cite imposes such an unworkable one-to-one matching standard on defrauded investors.  Indeed, the Fifth Circuit has cautioned against adopting a "fact-for-fact" disclosure standard because "a defendant could defeat liability by refusing to admit the falsity of its prior misstatements."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (per curiam).  Rather than impose a one-to-one matching requirement, the Court of Appeals has stated

---

[4] Defendants cite two cases supposedly as support for the proposition that "[c]ourts exclude expert damages analyses as irrelevant and unhelpful to the jury when those analyses calculate damages for a theory of recovery that is inapplicable to the plaintiff's claim."  (Defs. Br. 7.)  Even putting aside that Dr. Nye does not calculate damages for a theory of recovery that is inapplicable to the Direct Action Plaintiffs' claims, neither of Defendants' cases involved the exclusion of a securities fraud loss causation and damages expert.  The only in-Circuit case cited by Defendants, *Robles v. Eminent Med. Ctr. LLC*, 619 F. Supp. 3d 609 (N.D. Tex. 2022), involved an expert's calculation of damages in connection with a claim for wrongful termination under the FMLA and ADA.  The other case cited by Defendants, *United States v. Aegis Therapies, Inc.*, 2015 WL 1541491 (S.D. Ga. Mar. 31, 2015), did not even involve a damages expert, but rather two medical experts who opined about whether the treatments for which the defendant billed Medicare was medically necessary.  Defendants' cases are thus inapposite.

that multiple disclosures can be considered collectively to determine whether they reveal the relevant truth. *Amedisys*, 769 F.3d at 324-25.

Defendants erroneously contend that one-to-one matching of corrective disclosures to misrepresentations is required by federal statute, the PSLRA. But the PSLRA says no such thing. It provides in pertinent part: "[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The Court of Appeals has interpreted this provision merely to require the plaintiff to prove that the defendants' misrepresentations or omissions proximately caused the plaintiff's loss. *Amedisys*, 769 F.3d at 320. "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Id*. That is precisely what Dr. Nye did here.[5]

Contrary to Defendants' bald assertion, the Supreme Court's decision in *Dura* does not require one-to-one matching either. The issue in *Dura* was whether a plaintiff could plead loss causation merely by alleging that it purchased stock at a price inflated by fraud. 544 U.S. at 342. The Supreme Court held that it could not. That is because the plaintiff might sell the security prior to any drop in stock price, thus suffering no loss. *Id*. Or the plaintiff might sell the stock after a price drop unrelated to the fraud, in which case the loss

---

[5] Defendants misguidedly accuse Dr. Nye of categorizing the misstatements but not opining which misstatements fall within each category. (Defs. Br. at 9 n.6). That is demonstrably false. Dr. Nye fastidiously lists each statement in each category in several tables in the body of his report, which Defendants seemingly ignore. (Nye Rpt. ¶¶ 64-69.)

suffered cannot said to have been caused by the defendants' fraud.  *Id.* at 343.  Thus, the Supreme Court held that alleging a fraudulently inflated purchase is not in-and-of-itself sufficient to plead loss causation – a plaintiff must also plead that the fraud proximately caused the plaintiff's economic loss.  *Id.* at 343-46.  Dr. Nye meticulously followed that standard here in calculating damages.  (Nye Rpt. ¶¶ 81, 169.)  At no point did the Court in *Dura* impose the one-to-one matching requirement that Defendants conjure up.

The only other authority that Defendants cite as purported support for their manufactured one-to-one matching requirement is the Court of Appeals' decision in *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)*.*  (Defs. Br. at 8.)  However, not only does *Lormand* not contain such a requirement, the Court in that case *reversed* the district court's dismissal for imposing too stringent a standard for proximate causation. 565 F.3d at 262-65.  Indeed, the Court in *Lormand* determined that the district court should have applied a more holistic analysis in examining the revelation of the fraud alleged by the plaintiffs.  *Id.* at 262 (finding that first three disclosures "as a whole" revealed "the leaking out of the truth" of several alleged misstatements, and then the final two disclosures "completed the revelation of the truth" with respect to numerous misstatements).  Thus, *Lormand* undermines, not buttresses, Defendants' tenuous argument.

Defendants disingenuously contend that they are "unaware" of any decision where a court assumed that every corrective disclosure corrected every misstatement.  (Defs. Br. at 11.)  But one of the Court of Appeals cases that Defendants themselves cite in their supposedly supporting string cite did precisely that.  In *Spitzberg* – a case with similar facts to the one at bar – the plaintiff investors alleged that the defendant energy company and its

executives lied to them about an oil-and-gas concession in Colombia.  758 F.3d at 680. The plaintiffs alleged that the defendants made various misstatements over a three-year period, first about the amount of reserves and then about the results from the test well.  *Id.* at 680-81.  The stock price of the energy company tumbled upon a single disclosure announcing that the company had abandoned the test well after an unsuccessful second test.  *Id.* at 682.  The district court dismissed the case for inadequately pleading loss causation because the test well could have been abandoned for reasons unrelated to the defendants' misrepresentations.  *Id.* at 686-87.  The Court of Appeals reversed, *id.* at 687-89, finding that "[t]he fact that the well site was not commercially viable certainly makes it more probable that [the defendants'] representations in November 2009 and later in 2011 and 2012 were false statements," *id.* at 689.  Thus, the Court held that a single disclosure could be corrective of multiple, different misstatements.

In addition to *Spitzberg*, other cases from the Court of Appeals undermine Defendants' position that one corrective disclosure cannot correct multiple misstatements, or vice versa.  *See, e.g.*, *Amedisys*, 769 F.3d at 324-25 (finding that five partial corrective disclosures collectively revealed the relevant truth concealed by a series of misrepresentations); *Lormand*, 565 F.3d at 259-62 (determining that a series of partial disclosures corrected multiple misrepresentations by gradually leaking the truth).[6]

---

[6] The other cases cited by Defendants do not help them.  (*See* Defs. Br. at 11-12.)  In *Magruder v. Halliburton Co.*, 2009 WL 854656, at *15 (N.D. Tex. Mar. 31, 2009), the court took issue with the plaintiffs' failure to disaggregate other confounding information on the date of the disclosure, which is something Dr. Nye expressly controlled for through his event study.  The part of *Alaska Electrical Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009), that Defendants cite stands for the

Defendants' argument that Dr. Nye has not demonstrated the amount of price inflation attributable to each misstatement completely misses the mark because it ignores that Dr. Nye is applying the "price maintenance" theory.  (*See* Defs. Br. 12-13.)  The price maintenance theory "is widely accepted by the federal judiciary," *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *13 (N.D. Tex. Aug. 21, 2023), including the Fifth Circuit Court of Appeals, *Ludlow*, 800 F.3d at 674.  "Under this theory, a misrepresentation causes a stock price 'to remain inflated by preventing preexisting inflation from dissipating from the stock price.'"  *Goldman Sachs*, 141 S. Ct. at 1959 (quoting *FindWhat*, 658 F.3d at 1315).  "Fraudulent statements that *prevent* a stock price from falling can cause harm by prolonging the period during which the stock is traded at inflated prices."  *FindWhat*, 658 F.3d at 1314-15; *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) (rejecting contention that "an alleged misstatement must be associated with an increase in inflation to have any effect on a company's stock price" and finding that damages expert "did not have to show such an association for each alleged misstatement").  And that is precisely what Dr. Nye found here.  It was Defendants' concealment of the truth while making materially misleading statements that caused Alta Mesa's stock price to remain

_____

unremarkable proposition that "undisclosed information cannot drive down the market price of a stock." Dr. Nye's event study was limited to examining new, publicly disclosed information.  Both the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021), and the Fifth Circuit's decision in *Greenberg v. Crossroads System, Inc.*, 364 F.3d 657 (5th Cir. 2004), involved issues around the presumption of reliance under the fraud on the market theory, and did not address the standards for proving loss causation.  Finally, the Court of Appeals' concern in *Fener v. Operating Engineers Construction Industry & Miscellaneous Pension Fund*, 579 F.3d 401, 409 (5th Cir. 2009), was with the plaintiffs' treatment of both fraud-related and non-fraud-related information in a press release as corrective of the fraud.  Dr. Nye does no such thing here – he considered only fraud-related information as corrective in his event study.

inflated.  (*See, e.g.*, Nye Dep. at 230:15-233:11.)  The price maintenance theory fatally undermines Defendants' attacks on Dr. Nye's methodology.[7]

Finally, Defendants erroneously argue that Dr. Nye's opinions will not be helpful to a jury if it determines that one or more of the misstatements are not actionable.  (Defs. Br. at 13.)  Not so.  Under the constant dollar methodology, it is the corrective disclosures that determine the amount of damages, not the misstatements.  As the Court of Appeals explained:

> [I]magine a graph, with the x-axis measuring the date (starting when the misstatements were made and ending when after the last corrective event occurred) and the y-axis representing the scale of the price inflation. The inflation starts with some positive number and then – proceeding in a step-function – declines by a certain dollar amount after each corrective event is disclosed, eventually ending with zero.  To calculate damages, plaintiffs need only to know the date they bought the shares (measured on the x-axis), and then multiply the price inflation on that date by the total number of shares.

*Ludlow*, 800 F.3d at 684.  This approach does not require calculating the particular amount of inflation caused by each misstatement, and therefore is not rendered unhelpful to the jury by the exclusion of a single misstatement.  Moreover, Dr. Nye's models can be recalibrated, if necessary, to conform to the jury's findings.  (*See* Nye Dep. at 153:24-155:3.)

Ultimately, Defendants are free to make these arguments to the jury, through cross-examination of Dr. Nye, Professor Stulz's testimony, or other permissible means.

---

[7] Defendants' citation to *Superior Offshore International, Inc. v. Shaefer*, 2012 WL 6160873 (S.D. Tex. Dec. 11, 2012) is perplexing.  (Defs. Br. at 13.)  There, the court permitted a valuation expert to testify about an opposing expert's appraisal of a boat – even though the valuation expert did not have marine experience – because it was a bench trial with no risk of juror confusion.  *Shaefer* has no applicability to the case at bar.

However, their arguments go to weight, not to admissibility.  *See Vivendi*, 838 F.3d at 259-60.  Thus, Defendants' request to exclude of Dr. Nye's opinions of per-share damages under Section 10(b) lack merit.

### III.   Defendants' Challenge to Dr. Nye's Section 14(a) Damages Similarly Are Unfounded and Do Not Prevent Dr. Nye from Testifying About Them at Trial

Defendants' arguments concerning Dr. Nye's per-share damages calculations under Section 14(a) are similarly unavailing.  (*See* Defs. Br. 14-15.)  Defendants first raise the same argument about tying price inflation to specific misstatements that they make with respect to Section 10(b).  (*Id.* at 14.)  Their argument fails for the same reason stated above. The misstatements in the Proxy maintained the artificial inflation in Alta Mesa's stock price because they did not disclose the relevant truth that was subsequently disclosed on the corrective event dates.  *See FindWhat*, 658 F.3d at 1314-15.  Defendants purported "illustration" (relegated to a footnote) is a red herring.  (*See* Defs. Br. at 15 n.12.)  Even accepting Defendants' contention that the disclosures on March 29, 2018, announced the actual results for AMH and KFM, the full truth was not completely revealed on that date. (Nye Rpt. ¶ 99; *see also* Nye Dep. at 190:21-191:14.)  Defendants' "illustration" is counter-factual because it assumes that the truth was fully revealed on that date, which it was not. *See Amedisys*, 769 F.3d at 324-25 ("After each negative partial disclosure, Defendants

attempted to mitigate the impact of those disclosures by making contemporaneous misstatements to the market and prevented the full truth from being revealed at once.").[8]

Defendants' second argument fares no better. They erroneously assert that Dr. Nye's lost opportunity damages methodology under Section 14(a) does not demonstrate that Defendants' misrepresentations in the Proxy proximately caused Plaintiffs' loss. (Defs. Br. at 16.) That is demonstrably false. Dr. Nye's lost opportunity methodology is expressly premised on the notion that Defendants' misrepresentations in the Proxy caused the Direct Action Plaintiffs not to redeem their shares of Silver Run II for $10 and instead accept equity in the new Alta Mesa business enterprise. (Nye Rpt. ¶ 180.) That is sufficient to establish proximate causation for purposes of a Section 14(a) claim under the PSLRA. *Cf. Hohenstein v. Behringer Harvard REIT I, Inc.*, 2014 WL 1265949, at *8 (N.D. Tex. Mar. 27, 2014) ("Plaintiffs who sue under [Section 14(a) of] the Exchange Act because of a missed tender opportunity must show that they suffered an economic loss by retaining the stock instead of selling it at the premium offered by the tender offeror."). Nor are Dr. Nye's lost opportunity damages "unreasonably speculative." (Defs. Br. at 16 n.13.) The option to redeem their shares for $10 per share, on a date certain, via a specific mechanism, was a concrete and absolute right available to Silver Run II shareholders that was set forth in the Proxy. (Nye Rpt. ¶¶ 176-79.)

---

[8] Defendants' reliance on *In re Williams Securities Litigation*, 496 F. Supp. 2d 1195, 1275 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009), is misplaced. (*See* Defs. Br. at 15.) The court excluded the expert testimony in *Williams* because the expert did not distinguish between losses attributable to fraud and losses attributable to broader industry factors. Defendants cannot (and do not) say the same thing about Dr. Nye, who through his event study expressly ruled out industry-wide price movements, market-wide price movements, and information unrelated to the fraud.

As with their Section 10(b) arguments, Defendants' arguments about Section 14(a) at best go to weight, not admissibility.  The jury can decide whether they believe the Direct Action Plaintiffs' testimony that they would have exercised their redemption option if Defendants had not misled them in the Proxy.  There is no basis to exclude Dr. Nye's reliable and relevant damages opinions.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Defendants' motion to exclude Dr. Nye's opinions about the amount of per-share damages that the Direct Action Plaintiffs suffered in connection with their claims under Sections 10(b) and 14(a) of the Exchange Act.

Dated:  January 19, 2024

Respectfully submitted,

By: */s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Michael J. Hampson
Matthew A. Peller
Joseph R. Sparacio
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
mpeller@rksllp.com
jsparacio@rksllp.com

*Attorneys for the Alyeska and Orbis Plaintiffs*

Jules P. Slim
TX Bar No. 00793026

25

Attorney and Counselor
PO Box 140307
Irving, TX 75014-0307
Tel.: (214) 350-5183
Fax: (214) 350-5184
jslim@slimlawfirm.com

*Counsel for the Alyeska and Orbis*
*Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 19, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick

## APPENDIX A:  GLOSSARY OF KEY TERMS, ENTITIES, AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|---|---|
| AMH | Alta Mesa Holdings, LP, the private, pre-de-SPAC company. |
| AMR | Alta Mesa Resources, Inc., the publicly traded, post-de-SPAC company. |
| Alta Mesa | Refers to AMR, including its subsidiaries, AMH and KFM, for the period after the Merger, and to AMH and/or Silver Run II for the period before the Merger. |
| Alyeska or Alyeska Plaintiffs | Alyeska Master Fund, L.P., Alyeska Master Fund 2, L.P., and Alyeska Master Fund 3, L.P., which are investment funds managed by Alyeska Investment Group, L.P. |
| Alyeska Complaint | Complaint of the Alyeska Plaintiffs (ECF No. 1 in 4:22-cv-01189). |
| Company | Refers to Alta Mesa. |
| Complaints | The Alyeska Complaint and the Orbis Complaint, collectively. |
| Defendants | All Defendants in the Direct Actions. |
| Direct Actions | The civil actions pending before this Court filed by the Alyeska Plaintiffs and the Orbis Plaintiffs. |
| Direct Action Plaintiffs or Plaintiffs | The Alyeska Plaintiffs and the Orbis Plaintiffs. |
| Exchange Act | The Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing, and marketing of hydrocarbons from oil and gas producers that combined with Silver Run II in the de-SPAC. |
| Merger | The merger of Silver Run II with KFM and AMH on February 9, 2018. |
| Motion | Defendants' Motion to Exclude the Opinions of Expert Witnesses Steven P. Feinstein and Zachary Nye Under Rule 702 (ECF No. 511 in 4:19-cv-00957). |
| Orbis or Orbis Plaintiffs | Orbis Global Equity LE Fund (Australia Registered), Orbis Global Equity Fund (Australia Registered), Orbis Global Balanced Fund (Australia Registered), Orbis SICAV, Orbis Institutional Global Equity L.P., Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray Australia Balanced Fund, Orbis OEIC, and Orbis |

| | Institutional U.S. Equity L.P., which are investment funds managed by Orbis Investment Management (U.S.), L.P. or Orbis Investment Management Limited. |
|---|---|
| Orbis Complaint | Complaint of the Orbis Plaintiffs (ECF No. 1 in 4:22-cv-02590). |
| Proxy | The proxy statement issued by Silver Run II in connection with the Alta Mesa de-SPAC, dated January 19, 2018. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4. |
| Riverstone | Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP, the sponsor of Silver Run II. |
| SEC | United States Securities and Exchange Commission. |
| Silver Run II | Silver Run Acquisition Corporation II, the SPAC entity created by Riverstone that merged with KFM and AMH. |
| SPAC | Acronym for "special purpose acquisition company." |