**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 |
| | Judge George C. Hanks, Jr. |

**APPENDIX TO DEFENDANTS' REPLY IN SUPPORT OF MOTION**
**TO EXCLUDE CERTAIN OPINIONS OF CLASS PLAINTIFFS' EXPERT**
**HAROLD MCGOWEN III UNDER RULE 702**

In accordance with Court Procedure 7(B)(3), Moving Defendants submit this Appendix in support of their Reply in Support of Motion to Exclude Certain Opinions of Class Plaintiffs' Expert Harold McGowen III Under Rule 702, which is filed concurrently herewith.  Moving Defendants rely on the following evidence to support their motion:

| Ex. No. | Description |
|:---:|---|
| 3 | Excerpts of the Deposition of Harold E. McGowen III taken on November 13, 2023 |
| 4 | Excerpts of the Expert Report On: Alta Mesa Resources' Development of its Stack Acreage by Edward James Fetkovich dated August 31, 2023 |

Dated: February 2, 2024

Respectfully submitted,

By */s/ J. Christian Word*
J. Christian Word
Attorney-in-Charge for Defendants
D.C. Bar No. 461346
S.D. Tex. Bar No. 3398485
**LATHAM & WATKINS LLP**

555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Christian.Word@lw.com

Of Counsel:
Heather A. Waller
IL Bar No. 6302537
S.D. Tex. Bar No. 2886108
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
Heather.Waller@lw.com

Sarah M. Gragert (*pro hac vice*)
D.C. Bar No. 977097
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Sarah.Gragert@lw.com

Ashley Gebicke (*pro hac vice*)
CA Bar No. 330300
**LATHAM & WATKINS LLP**
12670 High Bluff Drive
San Diego, CA 92130
Tel: (858) 523-5400
Fax: (858) 523-5450
Ashley.Gebicke@lw.com

*Counsel for Defendants Alta Mesa
Resources, Inc., f/k/a Silver Run
Acquisition Corporation II; Riverstone
Holdings LLC; Harlan H. Chappelle;
Stephen S. Coats; Michael E. Ellis;
William D. Gutermuth; James T. Hackett;*

2

*Pierre F. Lapeyre, Jr.; David M. Leuschen; Donald R. Sinclair; Ronald J. Smith; Jeffrey H. Tepper; Thomas J. Walker; and Diana J. Walters*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com

Of Counsel:
Katherine A. Preston
TX Bar No. 24088255
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
CA Bar No. 261558
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
jschreiber@winston.com

*Co-Counsel for Defendants Harlan H. Chappelle and Michael E. Ellis*

3

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 2, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.


*/s/ J. Christian Word*
J. Christian Word

# EXHIBIT 3

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION
3      IN RE:
4      ALTA MESA RESOURCES,        Civil Action No.
       INC. SECURITIES             4:19-cv-00957
5      LITIGATION
       _____
6      ALYESKA MASTER FUND,
       L.P., ALYESKA MASTER
7      FUND 2, L.P., AND
       ALYESKA MASTER FUND 3,
8      L.P.,
                      Plaintiffs,
9        v.                        Case No.
       ALTA MESA RESOURCES,        4:22-cv-01189
10     INC., f/k/a SILVER RUN
       ACQUISITION CORPORATION
11     II; RIVERSTONE HOLDINGS,
       LLC; ARM ENERGY
12     HOLDINGS, LLC; BAYOU
       CITY ENERGY MANAGEMENT,
13     LLC; HPS INVESTMENT
       PARTNERS, LLC; JAMES T.
14     HACKETT; HARLAN H.
       CHAPPELLE; WILLIAM
15     GUTERMUTH; JEFFREY H.
       TEPPER; DIANA J.
16     WALTERS; MICHAEL E.
       ELLIS; RONALD SMITH; DON
17     DIMITRIEVICH; PIERRE F.
       LAPEYRE, JR.; DAVID M.
18     LEUSCHEN; WILLIAM W.
       McMULLEN; DONALD
19     SINCLAIR; STEPHEN COATS;
       and THOMAS J. WALKER,
20                   Defendants.
21              REMOTE VIDEOTAPED DEPOSITION OF
22                  HAROLD E. McGOWEN III
23                   November 13, 2023
24                    8:35 a.m. Central
25        Deanna Amore - CRR, RPR, CSR - 084-003999

Page 2

1        APPEARANCES OF COUNSEL
         (All counsel appeared remotely.)
2
   On Behalf of the Class Plaintiffs:
3
      ENTWISTLE & CAPPUCCI
4     BRENDAN J. BRODEUR
      SAL H. LEE
5     CALLIE CRISPIN
      ANDREW M. SHER
6     ANDREW ENTWISTLE
      299 Park Avenue
7     20th Floor
      New York, New York 10171
8     ccrispin@entwistle-law.com
      bbrodeur@entwistle-law.com
9     slee@entwistle-law.com
      asher@entwistle-law.com
10    aentwistle@entwistle-law.com
         - and -
11    ROBBINS GELLER RUDMAN & DOWD
      JACK KELLEY
12    655 West Broadway, Suite 1900
      San Diego, California 92101
13    jkelley@rdrglaw.com
14 On Behalf of Plaintiffs Orbis Investments and
      Alyeska Investment Group:
15
      ROLNICK KRAMER SADIGHI LLP
16    FRANK CATALINA
      1251 6th Avenue
17    New York, New York 10020
      fcatalina@rkslp.com
18
19
20
21
22
23
24
25

Page 3

1        APPEARANCES OF COUNSEL
         (All counsel appeared remotely.)
2
   On Behalf of Defendants William McMullen and Bayou
3 City Energy Management LLC:
4     KIRKLAND & ELLIS
      GRANT JONES
5     609 Main Street, Suite 4700
      Houston, Texas 77002
6     grant.jones@kirkland.com
7
   On Behalf of Defendants Alta Mesa Resources, Inc.,
8 Harlan Chapelle, James Hackett, Thomas Walker,
   Riverstone Investment Group, LLC, Stephen Coats,
9 Michael Ellis, Pierre Lapeyre, David Leuschen,
   Donald Sinclair, and Ronald Smith:
10
      LATHAM & WATKINS
11    SARAH M. GRAGERT
      JANSEN VANDERMEULEN
12    555 Eleventh Street, NW
      Washington, DC 20004
13    sarah.gragert@lw.com
      jansen.vanmeulen@lw.com
14       - and -
      WINSTON & STRAWN
15    KATY PRESTON
      800 Capitol Street, Suite 2400
16    Houston, Texas 77002
      kpreston@winston.com
17
   On Behalf of Defendant ARM Energy Holdings, Inc.:
18
      EVERSHEDS SUTHERLAND
19    DANE N. SOWERS
      600 Congress Avenue
20    One American Center
      Suite 2000
21    Austin, Texas 78701
      danesowers@eversheds-sutherland.com
22 ALSO PRESENT:
      Tim Tupiak, Legal Video Specialist
23    Chelsea Gilchrist, Veritext Legal Solutions,
      Concierge-Technician
24    Mariana Rojas, Entwistle, Paralegal
      Belle Harris, Kirkland & Ellis,
25    Litigation Associate

Page 4

1              I N D E X
2 WITNESS                    EXAMINATION
3 HAROLD McGOWEN
4    EXAMINATION BY MS. GRAGERT         8
5    EXAMINATION BY MR. BRODEUR        271
6    FURTHER EXAMINATION BY MS. GRAGERT   301
7          EXHIBITS
8 Exhibit 84    8.31.2023 Expert Report   10
9          of Harold E. McGowen III
10 Exhibit 85    Condensed CV of        11
11         Harold E. McGowen III
12 Exhibit 86    McGowen Income Statement   11
13 Exhibit 87    Defendants' Notice of     12
14         Deposition of
15         Harold E. McGowen III
16 Exhibit 88    Understanding Well     95
17         Interference and
18         Parent-Child Well
19         Relationships - Sudiptya
20         Banerjee, Tracerco
21 Exhibit 89    3.22.2018 RS Energy Group   98
22         Analysis:
23         RASOR-SDTX00913-924
24
25

Page 5

1          EXHIBITS
2 NUMBER       DESCRIPTION       PAGE
3 Exhibit 90   1.12-19.2013 Longfellow   124
4         Energy PSET FracStar
5         Passive Seismic Monitoring;
6         ELLIS_SDTX0001864
7 Exhibit 91   August 2017 Alta Mesa    190
8         Resources Pure-Play STACK
9         Enterprises Excerpt
10 Exhibit 92   Society of Petroleum    265
11         Engineers Article
12 Exhibit CP-0774 Tab 20 Slide Excerpt of  282
13         CP-0407 and CP-0409
14 Exhibit CP-0775 3.23.2018 Email Re:   299
15         STACK_Spacing_Report_
16         20180322.pdf;
17         AMR_SDTX00903271-283
18 EXHIBITS PREVIOUSLY MARKED PAGE FIRST REFERRED TO
19 CP-0186         300
20 CP-356          225
21 CP-743          36
22 Exhibit 6        182
23 Exhibit 64       166
24 Exhibit 66       103
25

2 (Pages 2 - 5)

Page 70

1    Q.  But you're not an expert in what Alta Mesa
2  actually considered or their decision-making
3  process?
4      MR. BRODEUR:  Objection.
5      THE WITNESS:  Other than the emails I reviewed
6  and comparing that to my 40 years of experience.
7  BY MS. GRAGERT:
8    Q.  In paragraph 8 you say, "Alta Mesa drilled
9  too many wells too close together in the hope that
10  more wells would correspond to commensurately
11  greater production."
12      Is it generally true that an operator
13  drills more wells to increase production?
14      MR. BRODEUR:  Objection.
15      THE WITNESS:  That is one of the goals, yeah,
16  and the other would be to maximize return on
17  investment while you're trying to do that.
18  BY MS. GRAGERT:
19    Q.  Do you intend to offer an opinion on what
20  Alta Mesa hoped?
21    A.  I'm not offering opinions on their mental
22  state necessarily.  I'm just trying to understand
23  -- in my own mind, I'm trying to explain how this
24  could have occurred especially with this really
25  experienced team.  How did this experienced team

Page 71

1  end up in this situation?  So I'm using my
2  experience, having been in the business for
3  40 years and been part of this process for
4  40 years, to try to understand why or how this
5  could have happened.
6    Q.  Do you intend to offer an opinion on why
7  it happened as opposed to simply that it happened?
8    A.  Well, I did offer an opinion on why it
9  happened.  I think they spent all their money too
10  rapidly before they had enough information, and as
11  a result, they overdrilled and destroyed value.
12    Q.  Similarly, on the same line, at
13  paragraph 28 on page 10, you state that "They
14  proceeded with the aggressive drilling plan" --
15  "that to proceed with the aggressive drilling plan
16  in the face of this evidence was reckless."
17      Again, just do you intend to provide
18  testimony to the jury on their mental state with
19  respect to whether or not they were reckless?
20      MR. BRODEUR:  Objection.
21      THE WITNESS:  I'm just comparing what they did
22  to what I think a reasonable operator should
23  have done given the fact set at the time.
24  BY MS. GRAGERT:
25    Q.  Did you talk with any employees or board

Page 72

1  members of Alta Mesa before reaching this opinion?
2    A.  No.
3    Q.  Did you review any of their deposition
4  transcripts --
5    A.  Yes.
6    Q.  -- before reaching this opinion?
7    A.  Yes.
8    Q.  Do you recall whose?
9    A.  I think they're listed in the appendix of
10  which of those I got to look at.
11    Q.  Are you aware that every officer and board
12  member was deposed in this case?
13      MR. BRODEUR:  Objection.
14      THE WITNESS:  I assume that they were.
15  BY MS. GRAGERT:
16    Q.  Do you recall if you read all of their
17  depositions?
18    A.  No, I didn't read all of them.
19    Q.  Did you review their interrogatory
20  responses?
21    A.  Again, if it's not in the list of
22  documents, then I probably didn't look at that.
23    Q.  If we look to Opinion 1A with respect to
24  interference, it's your opinion that there is a
25  risk of interference among infill wells; is that

Page 73

1  right?
2      MR. BRODEUR:  Objection.
3      THE WITNESS:  This is -- where are we referring
4  to?
5  BY MS. GRAGERT:
6    Q.  Well, I'm just asking you generally, with
7  respect to 1A, which starts on page 5, is it your
8  opinion that there is a risk of interference among
9  infill wells in a play like the STACK?
10    A.  Yes.
11    Q.  And some interference is to be expected in
12  developing a play, an unconventional play?
13      MR. BRODEUR:  Objection.
14      THE WITNESS:  Depending on the spacing, yes.
15  BY MS. GRAGERT:
16    Q.  The issue, though, is figuring out the
17  best well spacing and well numbers to minimize the
18  interference and maximize output?
19      MR. BRODEUR:  Objection.
20      THE WITNESS:  Yes.  I think the objective,
21  again, is to maximize return on investment.
22  BY MS. GRAGERT:
23    Q.  But the goal is not to eliminate all
24  interference?
25    A.  I would agree with that.

19 (Pages 70 - 73)

Page 74

1    Q.  If avoiding -- otherwise, an operator
2    might just put one well in every other section to
3    avoid any interference if that was the goal; right?
4    A.  Correct.
5    Q.  Now, you aren't offering an opinion that
6    based on the information available by mid 2017,
7    what the severity of interference was in
8    Alta Mesa's acreage?
9         Let me strike -- rephrase that.
10        You aren't offering an opinion that based
11   on the information available by mid 2017 --
12   actually, the original question, I'm going to stick
13   with that.
14        Do you have an opinion on -- based on the
15   information available in 2017, what that
16   information showed the severity of the interference
17   was in Alta Mesa's acreage?
18   MR. BRODEUR:  Objection.
19   THE WITNESS:  Well, since they hadn't drilled
20   the acreage yet, what you would have to work with
21   would be the potential for interference at that
22   point as a risk factor.
23   BY MS. GRAGERT:
24   Q.  Did you conduct any analysis of what the
25   extent of that potential risk was as of mid 2017?

Page 75

1    A.  Well, what I saw was a number of red flags
2    that were trying to telegraph that it was going to
3    be -- it was going to be fairly extensive, and --
4         (Simultaneous speaking.)
5    THE WITNESS:  -- could have taken that into
6    account.
7    BY MS. GRAGERT:
8    Q.  Are all of those red flags identified in
9    your report?
10   A.  I'm not sure all of them are, but they're
11   in the materials I reviewed, but I tried to point
12   out some of them.
13   Q.  Are there other red flags that you did not
14   mention that are in your report that you saw?
15   A.  Well, generally, I saw a number of emails
16   where they were internally concerned about these
17   things and they made comments that they seemed to
18   understand that they were potential problems.
19        Then there was some hard data such as the
20   microseismic that should have been a red flag, and
21   then there is some tracer data that should have
22   been a red flag.
23        So I think it's a combination of those
24   things that led me to that opinion.
25   Q.  In your report you identify the historical

Page 76

1    industry knowledge of the risk as one red flag; is
2    that right?
3    A.  Yes.
4    Q.  The microseismic tests?
5    A.  Yes.
6    Q.  The tracer study?
7    A.  Yes.
8    Q.  And the -- and there's three emails that
9    you cite talking about some interference.  That's
10   also -- you considered a red flag?
11   A.  Yes.
12   Q.  Anything I'm missing?
13   A.  There was an analysis by Chris Widell with
14   Sponte Resources that was -- turned out to be spot
15   on.
16   Q.  Do you know who Mr. Widell is?
17   A.  Yes.
18   Q.  Who is he?
19   A.  He's a young engineer that I know
20   personally.
21   Q.  Did you read Mr. Hackett's deposition?
22   A.  I recall reviewing it, but I don't
23   remember many details about his deposition.
24   Q.  Do you recall that Mr. Widell was simply a
25   business school classmate of Mr. Hackett's son?

Page 77

1    A.  I'm not sure why that matters, but maybe
2    he was.  I thought he was his son-in-law, but maybe
3    I heard wrong.
4    Q.  Is there any information that Mr. Widell
5    provided that -- to -- well, first of all,
6    Mr. Widell provided that information to Riverstone;
7    is that right?
8    MR. BRODEUR:  Objection.
9    THE WITNESS:  I don't recall precisely, but
10   I think that was the email that I saw was related
11   to comments by Riverstone.
12   BY MS. GRAGERT:
13   Q.  Is that information that you believe
14   Alta Mesa had access to pre-business combination?
15   A.  Well --
16   MR. BRODEUR:  Objection.
17   THE WITNESS:  -- I'm assuming Mr. Hackett had
18   access to it.
19   BY MS. GRAGERT:
20   Q.  Did anyone else at Alta Mesa, to your
21   knowledge, have information -- have access to that
22   information?
23   A.  I don't know if anyone else did.
24   Q.  Are you aware of any information that
25   Mr. Widell looked at that was not public

Page 266

1    Q.   Okay.  If you take a look at the bottom of
2  page 16 -- page 17 of the PDF, page 16 of the
3  report -- no, that's not true.  It is page 16 of
4  the PDF.
5    A.   Yes.
6    Q.   Do you see at the bottom where it says
7  "It is important to note that ESP OPEX is now
8  comparable to other forms of lift system in the
9  basin based on the new artificial lift strategy and
10  vendor's support on new contract"?
11    A.   Yes.
12        Now which basin are they referring to
13  here?
14    Q.   The Permian Basin.
15    A.   Yeah.
16    Q.   So based on this study, which is using the
17  Permian Basin, the Society of Petroleum Engineers
18  concludes that the ESP OPEX is comparable to other
19  forms of lift systems?
20    A.   Well, just one caveat, the Society of
21  Petroleum Engineers didn't write the report.
22  There's an author to this report, and that's that
23  author's opinion.  Just a clarification.  So --
24    Q.   Okay.
25    A.   -- they usually put a disclaimer here at

Page 267

1  the beginning, "The material does not necessarily
2  reflect any position of the Society of Petroleum
3  Engineers."  It's at the very top there.  But --
4    Q.   This is an article you cited in your
5  report?
6    A.   Yes.  Yeah, I agree with that.  I'm just
7  clarifying.
8        And the Permian Basin is unique in that
9  the density of wells is higher than pretty much
10  anywhere else in the country.  So their
11  infrastructure is very robust and that probably
12  gives them some advantages in terms of
13  electrification, rural electrification, with
14  three-phase current which is required.
15    Q.   Do you believe that you can't draw
16  conclusions of the Permian Basin artificial lifts
17  to what was used in the STACK?
18    MR. BRODEUR:  Objection to form.
19    THE WITNESS:  I don't think so.  I think that
20  would be a broad jump.  In my experience, the
21  electrical cost in getting electricity to your well
22  could be expensive if you're not in an area that
23  has that infrastructure because, typically, it's
24  three-phase power, the power of these big pumps,
25  and that's not available everywhere.  But the

Page 268

1  Permian is developing on a cube structure, and they
2  really have many, many STACK piezos and lots of
3  wells per pad.  So they have some advantages over
4  other parts of the country.
5  BY MS. GRAGERT:
6    Q.   Have you done any analysis with how the
7  Permian Basin infrastructure compares with the
8  infrastructure around Alta Mesa's acreage?
9    A.   No, it's just based on what I know about
10  the Permian, and it's my opinion.
11    Q.   Let's take a look at the table on the next
12  page, page 17.  There's -- the first group of costs
13  here, as I understand, are the OPEX costs -- I'm
14  sorry -- the CAPEX costs, and the bottom set of
15  costs are the monthly OPEX costs comparing various
16  artificial lifts.
17        Does that seem a fair assessment of this
18  table?
19    A.   Let's see if I understand.  Make sure I'm
20  reading this correctly.
21        So, apparently, they're running a gas lift
22  on electricity in this example, which is unusual.
23  You normally run that on natural gas from your
24  well.  I've got --
25        I had a chance to look at it.  So please

Page 269

1  ask your question.
2    Q.   This study concludes that for capital
3  expenditures, the gas lift, in total, costs
4  $202,872 more than an ESP.  Do you see that
5  conclusion?
6    A.   I did.
7    Q.   And, in fact, the gas lift is -- that was
8  about three times more expensive to assemble?
9    A.   Well, I'm surprised at that because that
10  hasn't been my experience, but that does seem what
11  they are showing here for the Permian.
12    Q.   If we take a look at the bottom set of
13  numbers with the monthly CAPEX, it shows that the
14  gas lift is about $20,000 per month cheaper than an
15  ESP.  Do you see that conclusion?
16    A.   Yes.
17    Q.   Okay.  So an operator could run an ESP for
18  about ten months and break even under these
19  numbers?
20    A.   Yeah, if you were in the Permian and under
21  these conditions.
22    Q.   Do you have any basis to identify how the
23  Permian Basin differed from Alta Mesa's acreage in
24  the STACK?
25    A.   Well, again, I base my opinion on the

68 (Pages 266 - 269)

Page 270

1 conclusions that were drawn at the time from the
2 staff at Alta Mesa. So I wasn't doing a full cycle
3 economic analysis to determine if their decision
4 was right or not in hindsight.
5    Q. Do you -- under paragraph 70 of your
6 report, you state that "Based on my review, it does
7 not appear that Alta Mesa completed an appropriate
8 level of evaluation before making a large-scale
9 switch to ESPs."
10   A. I didn't see evidence of that.
11   Q. The next sentence says "Rather, it appears
12 that Alta Mesa intentionally prioritized near-term
13 production increases without regard to the
14 long-term economics of their wells."
15      Other than the email chain that you gave
16 us the Bates number for, what basis did you use to
17 determine that Alta Mesa intentionally prioritized
18 near-term production over long-term economics?
19   A. Just the email where they said they were
20 chasing production.
21   Q. That was what one person had said in that
22 email chain?
23   A. Yes.
24   MS. GRAGERT: Let's go off the record for a
25 minute.

Page 271

1    THE VIDEOGRAPHER: Going off the record. The
2 time is 5:12 p.m.
3      (A short break was taken.)
4    THE VIDEOGRAPHER: We are going back on the
5 video record. The time is 5:21 p.m.
6    MS. GRAGERT: Mr. McGowen, thank you for your
7 time. I have no further questions today. I don't
8 know if any other parties might have some questions
9 for you.
10   MR. BRODEUR: Any other defendant have
11 questions?
12      Hearing none, do opt-out plaintiffs have
13 any questions before I ask mine?
14   MR. CATALINA: No, we don't.
15      EXAMINATION
16 BY MR. BRODEUR:
17   Q. Once again, Brendan Brodeur, for the class
18 plaintiffs.
19      Mr. McGowen, do you still have Exhibit 92
20 in front of you?
21   A. I can open it.
22   Q. Please do.
23   A. I have it open.
24   Q. Okay. If you could go back to page 17 of
25 the article, please. Just let me know when you're

Page 272

1 there.
2    A. I'm there.
3    Q. Okay. Does this table consider or compare
4 situations where gas lift is installed initially
5 against situations where ESP is installed
6 initially?
7    A. I believe that's what it's showing. It's
8 assuming you're doing it from day one.
9    Q. Does this table appear to account at all
10 for a situation where a gas lift is initially
11 installed, then replaced by an ESP, and then
12 replaced by a gas lift all in the same well?
13   A. I don't believe so. I think that's --
14 I think they are intentionally just trying to show
15 you from day one.
16   Q. If you were to use -- try to use this
17 table to understand the cost of installing a gas
18 lift and then an ESP and then a gas lift again in
19 the same well, how would you use this table with
20 respect to the Permian?
21   A. Assuming that we're still, you know, happy
22 with these assumptions for the Permian, it looks
23 like you'd need to spend additional capital to
24 remove the gas lift. So you would have a work-over
25 cost.

Page 273

1      You'd need to remove some equipment at the
2 surface. You'd need to change some electrical,
3 probably, and then you'd need to -- then you'd need
4 to install your ESP, and then probably come back --
5 if you're going to put a gas lift on it later, you
6 would need to have that -- the gas lift expense
7 again.
8    Q. And are you aware of situations where
9 Alta Mesa installed gas lift initially in a well,
10 then replaced that with ESP in the same well, and
11 then later installed gas lift in that same well
12 again?
13   A. I'm not aware of that scenario occurring.
14   Q. Are you aware of situations where
15 Alta Mesa installed gas lift initially and then
16 replaced it with ESP in the same well?
17   A. That was my understanding is that they
18 were removing the gas lift and putting some ESPs
19 on.
20   Q. So if you were to use this table to
21 evaluate a similar situation in the Permian where a
22 gas lift was initially installed and then the gas
23 lift was removed and ESP installed in the same
24 well, how would you use this table to understand
25 the cost of that endeavor?

69 (Pages 270 - 273)

Page 302

1  BY MS. GRAGERT:
2     Q.   Mr. McGowen, do you intend to offer any
3  opinions about logarithmic versus linear plots at
4  trial?
5     A.   Well, I think that's covered in the other
6  report and in the report by the other expert.
7     Q.   So is the answer no?
8     A.   That wasn't really part of my scope.
9     Q.   Did you do any analysis of Mr. Kirkland's
10 work to verify his conclusions?
11    A.   I didn't do independent analysis.
12 I reviewed it and decided whether I agreed with him
13 or not.
14    MS. GRAGERT:  I think that's all the questions
15 I have.  Thank you very much, Mr. McGowen.
16    THE WITNESS:  Thank you.
17    THE VIDEOGRAPHER:  Are we ready to go off the
18 record?
19    MR. BRODEUR:  I just want to give the class
20 plaintiffs and the other defendants a chance, or
21 I will conclude the deposition if they don't have
22 questions.
23    UNIDENTIFIED SPEAKER:  We don't have anything.
24    THE WITNESS:  One question:  Can I get all of
25 these exhibits, you know --

Page 303

1     MR. BRODEUR:  You'll have all the exhibits.
2       Okay.  Yeah, I have no further questions
3  for the witness.  I consider the deposition
4  concluded.
5     THE VIDEOGRAPHER:  One moment, please.
6       We are going off the record.  The time is
7  6:11 p.m.  This conclude today's testimony given by
8  Harold McGowen.  The total number of media unit
9  used was seven, and they will be retained by
10 Veritext Legal Solutions.  Thank you.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 304

1           C E R T I F I C A T E
2
3       I, DEANNA AMORE, a Shorthand Reporter and
4  notary public, within and for the State of
5  Illinois, County of DuPage, do hereby certify:
6       That HAROLD MCGOWEN, the witness whose
7  examination is hereinbefore set forth, was first
8  duly sworn by me and that this transcript of said
9  testimony is a true record of the testimony given
10 by said witness.
11      I further certify that I am not related to
12 any of the parties to this action by blood or
13 marriage, and that I am in no way interested in the
14 outcome of this matter.
15
16      IN WITNESS WHEREOF, I have hereunto set my
17 hand this 15th day of November 2023.
18
19
20      _Deanna Amore_
21      Deanna M. Amore, CRR, RPR, CSR
22
23
24
25

Page 305

1       Veritext Legal Solutions
         1100 Superior Ave
2             Suite 1820
         Cleveland, Ohio 44114
3       Phone: 216-523-1313
4
5
   To: Brendan J. Brodeur
6
   Case Name: Alta Mesa Resources, Inc. Securities Litigation v.
7
   Veritext Reference Number: 6294445
8
   Witness: Harold McGowen      Deposition Date: 11/13/2023
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

77 (Pages 302 - 305)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

Judge George C. Hanks, Jr.

**<u>Errata To November 13, 2023 Deposition of Harold E. McGowen III, PE</u>**

| Page / Line | Transcript Reads | Transcript Should Read | Reason For Change |
|---|---|---|---|
| 7/16 | Harold McGowen III | Harold Edward McGowen III | Correction/Clarification |
| 19/11 | rehab | have | correction |
| 24/3 | it | unconventional pay | Clarification |
| 43/7 | said | sell | Correction |
| 52/25 | That's the optimal | The optimal | Grammar |
| 55/8 | change **and** the rate of change | change **in** the rate of change | Correction |
| 55/9 | , the velocity of a fluid particle or molecules is negligible | , **and** the velocity of a fluid particle or molecules, is negligible | Correction/Clarification |

| Page / Line | Transcript Reads | Transcript Should Read | Reason For Change |
|---|---|---|---|
| Page 56/13 | and but | and | Correction/Clarification |
| Page 64/17 | old | whole | Correction |
| Page 85/19 | level | well | Correction |
| Page 86/3 | doesn't | does | Correction |
| Page 114/16 | approved | proved | Correction |
| Page 117 | drawing | drainage | Correction |
| Page 121/11 | fracturing | fractured | Correction |
| Page 122/25 | to | in | Correction |
| Page 130/18 | fraction | fracture | Correction |
| Page 133/6 | tracing | tracer | Correction |
| Page 133/13 | that form the wellbore | that extend from the wellbore | Correction/Clarification |
| Page 141/9 | release | re-lease (as in lease again) | Correction |
| Page 141/18 | build back | dial back | Correction/Clarification |
| Page 175/9 | at | up | Correction/Clarification |
| Page 223/6 | and new | and not new | Correction |

| Page / Line | Transcript Reads | Transcript Should Read | Reason For Change |
|---|---|---|---|
| Page 231/7 | how I approach | how I would approach | Correction/Clarification |
| Page 232/19 | the responsible well | the response of the well | Correction/Clarification |
| Page 238/24 | long | far | Correction/grammar |
| Page 240/21 | Share | Shale | Correction |
| Page 263/16 | gas lifts | gas lift | Correction |
| Page 263/17 | unusable | usable [life span] | Correction/Clarification |
| Page 265/10 | you would run gas lift valves in the well of an ESP | you would not run gas lift valves in the well with an ESP | Correction/Clarification |
| Page 267/24 | the power of | [that is required] to power | Correction/Grammar |
| Page 268/2 | STACK piezos | stacked pays | Correction |
|  |  |  |  |

Signature of Witness:

__11/13/23__

(Date Signed)                                   Harold E. McGowen III (Signature)

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DIVISION OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | |
| ALYESKA MASTER FUND, L.P., et al.<br>Plaintiffs,<br><br>v.<br><br>ALTA MESA RESOURCES, INC., et al.,<br>Defendants. | No. 4:22-cv-1189<br><br>Judge George C. Hanks, Jr. |
| ORBIS GLOBAL EQUITY LE FUND (AUSTRALIA REGISTERED), et al.,<br>Plaintiffs,<br><br>v.<br><br>ALTA MESA RESOURCES, INC., et al.,<br>Defendants. | . |

**EXPERT REPORT ON:**
**ALTA MESA RESOURCES' DEVELOPMENT OF ITS STACK ACREAGE**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Prepared by: Edward James Fetkovich

*Eddie Fetkovich*
Prepared for Latham and Watkins, LLP
August 31, 2023

**Table 5 – Key Dates and Well Types for Alta Mesa's Multi-Well Development Patterns[48]**

| PATTERN | FIRST SPUD DATE | FIRST PRODUCTION DATE | DELTA | FIRST ASSESSMENT DATE | PARENT COUNT | SIBLING COUNT | INFILL PARENT COUNT | CHILD COUNT | TOTAL WELL COUNT |
|---|---|---|---|---|---|---|---|---|---|
| Ash-Foster | 5/14/2017 | 11/4/2017 | 174 | 3/4/2018 | 2 | | 1 | 7 | 10 |
| Hoskins | 6/9/2017 | 12/17/2017 | 191 | 4/16/2018 | 1 | | 2 | 5 | 8 |
| Themer | 6/22/2017 | 11/28/2017 | 159 | 3/28/2018 | 1 | | 3 | 4 | 8 |
| Paris | 8/9/2017 | 1/4/2018 | 148 | 5/4/2018 | 1 | | 1 | 4 | 6 |
| Todd | 8/18/2017 | 1/22/2018 | 157 | 5/22/2018 | 1 | | | 3 | 4 |
| Lankard | 9/12/2017 | 1/18/2018 | 128 | 5/18/2018 | 1 | | | 5 | 6 |
| James | 10/13/2017 | 4/22/2018 | 191 | 8/20/2018 | 1 | | | 3 | 4 |
| Zeppelin | 11/3/2017 | 4/5/2018 | 153 | 8/3/2018 | 0 | | 1 | 3 | 4 |
| The Trick | 11/16/2017 | 3/22/2018 | 126 | 7/20/2018 | 1 | | 2 | 4 | 7 |
| Niko | 11/29/2017 | 4/16/2018 | 138 | 8/14/2018 | | 4 | | | 4 |
| Odie | 1/1/2018 | 5/18/2018 | 137 | 9/15/2018 | 1 | | 1 | 5 | 7 |
| Red Queen | 1/13/2018 | 5/25/2018 | 132 | 9/22/2018 | 1 | | | 3 | 4 |
| Huntsman Old Crab | 1/19/2018 | 5/31/2018 | 132 | 9/28/2018 | 1 | | 4 | 5 | 10 |
| Oak Tree | 1/28/2018 | 5/4/2018 | 96 | 9/1/2018 | 1 | | | 3 | 4 |
| SE-Slaughter House | 2/18/2018 | 8/14/2018 | 177 | 12/12/2018 | | | 12 | 2 | 14 |
| Speyside | 2/26/2018 | 5/16/2018 | 79 | 9/13/2018 | 1 | | | 3 | 4 |
| Peat | 3/5/2018 | 6/17/2018 | 104 | 10/15/2018 | 1 | | | 3 | 4 |
| Greene-Mackey | 3/13/2018 | 7/2/2018 | 111 | 10/30/2018 | 1 | | | 5 | 6 |
| Sawgrass | 3/15/2018 | 6/25/2018 | 102 | 10/23/2018 | 1 | | | 3 | 4 |
| Slugworth | 4/20/2018 | 7/30/2018 | 101 | 11/27/2018 | 1 | | | 4 | 5 |
| Whiskeyfeet | 5/4/2018 | 8/28/2018 | 116 | 12/26/2018 | | 4 | | | 4 |
| Redbreast | 5/12/2018 | 9/23/2018 | 134 | 1/21/2019 | 1 | | | 6 | 7 |
| Daydrinker | 6/5/2018 | 9/1/2018 | 88 | 12/30/2018 | 1 | | | 3 | 4 |
| Walrus | 6/11/2018 | 9/30/2018 | 111 | 1/28/2019 | 1 | | | 6 | 7 |
| White King | 6/14/2018 | 9/28/2018 | 106 | 1/26/2019 | 1 | | | 3 | 4 |
| Dalwhinnie | 7/4/2018 | 10/22/2018 | 110 | 2/19/2019 | 1 | | 2 | 1 | 4 |
| Mad Hatter | 7/4/2018 | 10/27/2018 | 115 | 2/24/2019 | 1 | | | 6 | 7 |
| White Rabbit | 7/17/2018 | 11/2/2018 | 108 | 3/2/2019 | 1 | | 2 | 4 | 7 |
| Bollenbach - sec 21 | 8/3/2018 | 11/19/2018 | 108 | 3/19/2019 | | | 3 | 4 | 7 |
| Boecher | 8/29/2018 | 11/17/2018 | 80 | 3/17/2019 | 1 | | | 3 | 4 |
| Cheshire Cat | 8/31/2018 | 11/24/2018 | 85 | 3/24/2019 | 1 | | 1 | 4 | 6 |
| Fazio | 9/3/2018 | 12/15/2018 | 103 | 4/14/2019 | 1 | | 1 | 5 | 7 |
| Bollenbach - sec 27 | 10/8/2018 | 12/8/2018 | 61 | 4/7/2019 | 1 | | | 2 | 3 |
| Tullamore | 10/10/2018 | 12/24/2018 | 75 | 4/23/2019 | 1 | | | 6 | 7 |
| Lil Sebastian | 10/14/2018 | 1/18/2019 | 96 | 5/18/2019 | 1 | | | 4 | 5 |
| Sadiebug | 10/31/2018 | 2/20/2019 | 112 | 6/20/2019 | 1 | | | 3 | 4 |
| Evelyn | 11/1/2018 | 4/4/2019 | 154 | 8/2/2019 | 1 | | | 3 | 4 |
| Cleveland | 11/10/2018 | 2/26/2019 | 108 | 6/26/2019 | 1 | | 1 | 4 | 6 |
| Towne | 11/17/2018 | 3/29/2019 | 132 | 7/27/2019 | 1 | | | 3 | 4 |
| EHU 255/257/259 | 11/17/2018 | 4/23/2019 | 157 | 8/21/2019 | | 3 | | | 3 |
| EHU 252/254/256/258 | 12/3/2018 | 4/13/2019 | 131 | 8/11/2019 | | 4 | | | 4 |
| Kilgore | 12/19/2018 | 4/12/2019 | 114 | 8/10/2019 | 2 | | | 2 | 4 |
| Helen | 12/19/2018 | 4/12/2019 | 114 | 8/10/2019 | 1 | | 1 | 1 | 3 |
| Edwin | 3/1/2019 | 5/11/2019 | 71 | 9/8/2019 | 1 | | | 3 | 4 |
| Aberfeldy | 3/2/2019 | 5/10/2019 | 69 | 9/7/2019 | 1 | | | 3 | 4 |
| Mouse Rat | 4/9/2019 | 7/3/2019 | 85 | 10/31/2019 | 1 | | | 3 | 4 |
| Bunker Buster | 4/11/2019 | 7/11/2019 | 91 | 11/8/2019 | 1 | | | 3 | 4 |
| Aces High | 5/16/2019 | 7/25/2019 | 70 | 11/22/2019 | 1 | | | 2 | 3 |
| Mayes-Schilde | 5/21/2019 | 7/26/2019 | 66 | 11/23/2019 | 2 | | | 3 | 5 |
| Wakeman | 6/13/2019 | 8/30/2019 | 78 | 12/28/2019 | 1 | | | 3 | 4 |
| Brown | 6/20/2019 | 8/22/2019 | 63 | 12/20/2019 | 1 | | | 3 | 4 |
| Hasley | 7/24/2019 | 10/25/2019 | 93 | 2/22/2020 | 1 | | | 2 | 3 |

[48] For purposes of this report, a "parent well" is defined as a well drilled with no previous horizontal Mississippian production within a drainage area of 2,640 feet (2 well-per-section ("WPS") spacing) in both the east and west perpendicular direction from the wellbore. Using the same drainage area assumption, a "child well" is defined as a new well that has had previous horizontal Mississippian production more than 90 days before the production of the new well within the assumed drainage area. An "infill parent well" is defined as a new well that is part of a multi-well development pattern that contains children wells, but it is not a child well since it is not

44

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER