UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 Judge George C. Hanks, Jr. |

## APPENDIX TO DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE CLASS PLAINTIFFS' EXPERT WITNESS PROFESSOR ADAM BADAWI

In accordance with Court Procedure 7(B)(3), Moving Defendants submit this Appendix in support of their Reply in Support of Motion to Exclude Class Plaintiffs' Expert Witness Professor Adam Badawi, which is filed concurrently herewith. Moving Defendants rely on the following evidence to support their motion:

| Ex. No. | Description |
|---|---|
| 14 | Excerpts of the Deposition of Jeffrey Knupp dated June 14, 2023 |

Dated: February 2, 2024             Respectfully submitted,

By /s/ *J. Christian Word*

J. Christian Word
Attorney-in-Charge for Defendants
D.C. Bar No. 461346
S.D. Tex. Bar No. 3398485
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201

Of counsel:
Heather A. Waller
IL Bar No. 6302537
S.D. Tex. Bar No. 2886108
**LATHAM & WATKINS LLP**
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
Heather.Waller@lw.com

Laura E. Bladow (*pro hac vice*)
D.C. Bar No. 1740343
Eunice M. Kabuga (*pro hac vice*)
D.C. Bar No. 90006573
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Tel.: (202) 637-2200
Fax: (202) 637-2201
Laura.Bladow@lw.com
Eunice.Kabuga@lw.com

*Counsel for Defendants Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II; Riverstone Holdings LLC; Harlan H. Chappelle; Stephen S. Coats; Michael E. Ellis; William D. Gutermuth; James T. Hackett; Pierre F. Lapeyre, Jr.; David M. Leuschen; Donald R. Sinclair; Ronald J. Smith; Jeffrey H. Tepper; Thomas J. Walker; and Diana J. Walters*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com

Of Counsel:
Katherine A. Preston
TX Bar No. 24088255
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel: (713) 615-2699
Fax: (713) 651-2700
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
CA Bar No. 261558
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1700
Fax: (213) 615-1750
jschreiber@winston.com

*Co-Counsel for Defendants Harlan H. Chappelle and Michael E. Ellis*

3

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ J. Christian Word*
J. Christian Word

# EXHIBIT 14

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION
3   IN RE: ALTA MESA              §
4   RESOURCES, INC.               §   CASE NO. 4:19-cv-00957
5   SECURITIES LITIGATION         §
6
7
8
9
10  **************************************************
11         VIDEOTAPED / REALTIMED DEPOSITION OF
12                   JEFFREY P. KNUPP
13                   JUNE 14, 2023
14   (PRESENTED AS 30(B)(6) CORPORATE REPRESENTATIVE
15          OF TUDOR PICKERING, HOLT & CO.)
16  **************************************************
17
18
19
20
21
22
23
24
25

Page 2

1  VIDEOTAPED / REALTIMED DEPOSITION OF JEFFREY P.
2  KNUPP, produced as a witness at the instance of the
3  Defendants Alta Mesa Resources, and duly sworn, was
4  taken in the above styled and numbered cause on
5  Wednesday, the 14th day of June, 2023, from 9:37 a.m. to
6  5:03 p.m., before Pat English-Arredondo, CSR, RMR, CRR,
7  CLR, in and for the State of Texas, reported by
8  computerized stenotype machine in Remote Counsel
9  realtime, via Zoom, pursuant to the Federal Rules of
10 Civil Procedure and any provisions stated on the record
11 herein.

Page 3

1           A P P E A R A N C E S
2  COUNSEL FOR TUDOR PICKERING, HOLT & CO. and JEFF KNUPP:
3     Mr. Christopher D. Belelieu
       GIBSON DUNN & CRUTCHER, LLP
4      200 Park Avenue
       New York, New York 10166
5      Phone: 212.351.4000
       cbelelieu@gibsondunn.com
6
   COUNSEL FOR CLASS PLAINTIFFS:
7
       Mr. John M. "Jack" Kelley (via Zoom / Realtime)
8      ROBBINS GELLER RUDMAN & DOWD LLP
       655 West Broadway
9      San Diego, California 92101
       Phone: 619.231.1058
10     Jkelley@rgrdlaw.com
11 COUNSEL FOR PLAINTIFFS, ALYESKA AND ORBIS:
12     Mr. Joseph Sparacio (via Zoom / Realtime)
       ROLNICK KRAMER SADIGHI LLP
13     1251 Avenue of the Americas, 41st Floor
       New York, New York 10020
14     Phone: 212.597.2800
       Jsparacio@rksllp.com
15
   COUNSEL FOR DEFENDANTS BAYOU CITY ENERGY AND
16 WILLIAM MCMULLEN:
17     Mr. Kenneth Young (Via Zoom / as noted)
       Ms. Sydney Corry (Via Zoom / Realtime)
18     KIRKLAND & ELLIS LLP
       609 Main Street
19     Houston, Texas 77002
       Phone: 713.836.3761
20     Sydney.corry@kirkland.com
       Kenneth.young@kirkland.com
21
   COUNSEL FOR DEFENDANTS, HAL CHAPPELLE AND MICHAEL ELLIS:
22
       Ms. Katy Preston (via Zoom / Realtime)
23     WINSTON & STRAWN LLP
       333 S. Grand Avenue
24     Los Angeles, California 90071
       Phone: 213.615.1778
25     Kpreston@winston.com

Page 4

1           A P P E A R A N C E S
2              (Continued)
3  COUNSEL FOR DEFENDANTS, ARM ENERGY HOLDINGS LLC:
4      Mr. Dane Sowers (via Zoom / Realtime)
       EVERSHEDS SUTHERLAND (US) LLP
5      One American Center
       600 Congress Avenue, Suite 2000
6      Austin, Texas 78701
       Phone: 512.721.2664
7      DaneSowers@eversheds-sutherland.com
8      - and -
9      Ms. Tanvi Shah (via Zoom / as noted)
       EVERSHEDS SUTHERLAND (US) LLP
10     700 Sixth Street, NW, Suite 700
       Washington, DC 20001
11     Phone: 202.383.0100
       tanvishah@eversheds-sutherland.com
12
   COUNSEL FOR DEFENDANTS ALTA MESA RESOURCES, INC., HARLAN
13 H. CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER,
   WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J.
14 WALTERS, RIVERSTONE INVESTMENT GROUP LLC, STEPHEN COATS,
   MICHAEL E. ELLIS, PIERRE F. LAPEYRE, DAVID M. LEUSCHEN,
15 DONALD SINCLAIR, RONALD SMITH:
16     Mr. Matthew Peters (via Realtime)
       Mr. Jansen Mackenzie Vandermeulen
17     LATHAM & WATKINS LLP
       555 Eleventh Street, NW, Suite 1000
18     Washington, DC 20004
       Phone: 202.637.2200
19     Matthew.peters@lw.com
       Jansen.vandermeulen@lw.com
20
       - and -
21
       Mr. Arthur F. Foerster (Via Remote)
22     LATHAM & WATKINS LLP
       330 North Wabash Avenue, Suite 2800
23     Chicago, Illinois 60611
       Phone: 312.876.7700
24     Arthur.foerster@lw.com
25

Page 5

1           A P P E A R A N C E S
               (Continued)
2
   COUNSEL FOR DEFENDANTS HPS INVESTMENT PARTNERS LLC and
3  DON DIMITRIEVICH:
4      Ms. Emily Couture (via Zoom / Realtime)
       QUINN EMANUEL URQUHART & SULLIVAN LLP
5      51 Madison Avenue, 22nd Floor
       New York, New York 10010
6      Phone: 212.849.7000
       Emilycouture@quinnemanuel.com
7
   THE VIDEOGRAPHER:
8
       Mr. Christopher Dolan,
9      Veritext Legal Solutions
10 VERITEXT CONCIERGE:
11     Ms. Alexa Pastor (Remote)
       Veritext Legal Solutions
12
   CERTIFIED REALTIME / STENOGRAPHIC COURT REPORTER:
13
       Ms. Pat English-Arredondo, CSR, RMR, CRR, CLR
14     Veritex Legal Solutions
15
16
17
18
19
20
21
22
23
24
25

Page 70

1  A.  When looking at oil, at only oil produced, the
2 Amberjack 2.0 has the lowest oil value.
3  Q.  And looking at the row again, the highest type
4 curve when you look at oil is the Amberjack 2.5.  Is
5 that correct?
6  A.  That's correct.
7  Q.  So the TPH type curve came in higher than the
8 Amberjack 2.0 type curve.  Is that fair?
9  A.  Sorry.  Say that again.
10  Q.  The TPH type curve, when you look at oil, came
11 in higher than the Amberjack 2.0 type curve?
12  A.  That's correct.
13  Q.  And if you look at the chart labeled
14 "Generation 2.5 Type Well Fit" -- do you see that?
15  A.  Yes.
16  Q.  Looking at from zero to six months, it looks
17 like there's only a yellow line.  Is that correct?
18  A.  No, that's not correct.  The yellow
19 line -- there is a yellow and a black line for that time
20 period.  The yellow line is on top of the black line, so
21 it was hard to see the black line.
22  Q.  So the type curve for the AM2.5 -- I guess
23 that would be the Amberjack 2.5 type curve and the TPH
24 2.5 type curve overlap up into roughly six months?
25  A.  They are very close to overlapping, yes.

Page 71

1  Q.  And the type curves we've been discussing on
2 this slide, they are specific to the Osage zone.  Is
3 that correct?
4  A.  That's correct.
5  Q.  If you could turn the slide, please.
6  A.  (Complying.)
7  Q.  Does this Slide 12 reflect that TPH created
8 type curves specific to the Meramec zone in connection
9 with the business combination?
10  A.  Yes.
11  Q.  And if you could explain for me here, what is
12 the meaning of TPH with less than 300?
13  A.  Yeah.  So we created two separate type curves
14 for the Meramec to reflect predicted performance based
15 on reservoir thickness.  So the less than 300 feet is in
16 reference to the thickness of the Meramec zone in a
17 specific area.
18      So the TPH less than 300 feet would be
19 our representation or our prediction of how a well would
20 perform that was in the thinner part of the reservoir.
21      And then the other one, TPH less than 350
22 feet, is our representation of how a Meramec well would
23 perform in the thicker part of the reservoir.
24  Q.  And we previously, on Slide 9, looked at a map
25 of AMH's acreage that had the Osage, Meramec, Oswego,

Page 72

1 and Osage Thin.  Do you recall that?
2  A.  Yes, I do.
3  Q.  So does this Slide 12 that we're discussing
4 mean that in actuality there's this -- TPH created even
5 more type curves than what's possibly reflected on here?
6 They created an Oswego Thin, for lack of a better word?
7      MR. SPARACIO:  Object to form.
8  A.  And --
9      (Simultaneous speaking.)
10  Q.  (By Mr. Peters)  Osage Thin, sorry --
11  A.  Thank you.
12  Q.  -- for lack of a better word?
13  A.  I believe that is correct.
14  Q.  Okay.  And turning to Slide 12, the -- we
15 previously discussed that the total EUR MBOE reflects
16 the oil type curve for the -- for wells.  Is that
17 correct here as well?
18  A.  That is correct.
19  Q.  And so TPH's type curve for the Meramec zone
20 was 641 MBOE?
21  A.  No.  641 is Amberjack's type curve for the
22 Meramec zone.
23  Q.  Oh, sorry.  Okay.  Oh, I think that's actually
24 total --
25  A.  Yeah.

Page 73

1  Q.  -- so apologies.
2      So the -- was Amberjack type curve for
3 the Meramec 290 EUR MBO?
4  A.  Yes, that's correct.
5  Q.  And TPH's -- the type curves that TPH
6 developed for the Meramec came in both higher and lower
7 than that Amberjack type curve for the Meramec.  Is that
8 correct?
9  A.  One of the curves is lower.  One of the curves
10 is higher.
11      MR. PETERS:  Why don't we take a short
12 break and go off the record.
13      THE VIDEOGRAPHER:  All parties in
14 agreement with going off the record?
15      We are going off the record at 11:09 a.m.
16      (Recess taken at 11:09 a.m., resuming at
17      11:28 a.m.)
18      THE VIDEOGRAPHER:  We are going back on
19 the record at 10:28 a.m. [sic].
20      THE REPORTER:  11:28.
21      THE VIDEOGRAPHER:  11:28.  Sorry.
22  Q.  (By Mr. Peters)  Mr. Knupp, welcome back.
23  A.  Thank you.
24  Q.  I believe we were reviewing the April 25th TPH
25 presentation.  If you could turn to Slide 13, please.

19 (Pages 70 - 73)

Page 74

1  A. Okay.
2  Q. Does this slide reflect that TPH developed a
3 type curve for the Oswego zone in connection with the
4 due diligence for the business combination?
5  A. Yes.
6  Q. And is that type curve, the data for that type
7 curve, reflected under the column TPH on this slide?
8  A. Yes, it is.
9  Q. And in this instance was TPH projecting more
10 oil could be recovered from the Oswego zone than the
11 sellers were projecting?
12  A. That appears to be correct.
13  Q. Could you turn to Slide 14, please?
14  A. (Reviewing.)
15  Q. Does this slide reflect the type curves that
16 TPH created for AMH wells for each of the geological
17 zones in the AMH STACK acreage?
18  A. Yes. This page looks at the input assumptions
19 for the type curves that TPH created as well as listing
20 the comparable input assumptions that the seller had
21 used.
22  Q. And the assumptions that TPH used were not
23 always identical to the assumptions that the seller
24 used. Correct?
25  A. That's correct.

Page 75

1  Q. So TPH created its type curves in connection
2 with the business combination independent of what the
3 seller's assumptions were?
4  A. That's correct.
5  Q. So does this reflect that TPH developed six
6 distinct type curves in connection with its due
7 diligence for the business combination?
8  A. This reflects that we used six distinct type
9 curves in our economic model. It's possible that we
10 developed more and didn't use the others.
11  Q. And these type curves that TPH developed
12 informed the valuation that TPH prepared in connection
13 with the due diligence for the business combination?
14  A. That's correct.
15  Q. And if you look under (as read) "Well Type
16 Assumptions," the column on the left, does the
17 categories listed under -- sorry, "Type Well
18 Assumptions," if you look at the categories listed under
19 that all the way to stopping at Type Curve, do those
20 reflect the considerations that TPH gave thought to in
21 preparing a type well in connection with the business
22 combination?
23  A. I think the subtitle, Type Well Assumptions,
24 is maybe not the best choice of words. As I look at
25 this, some of these are actually outputs of the type

Page 76

1 curve, not inputs to the type curve. It's a mix.
2  Q. And which ones are outputs for the type curve?
3  A. Just going in order (as read): "EUR, Gross
4 Wellhead" is an output. "Oil EUR" is an output.
5 "Wellhead Gas EUR" is an output. "% Oil" is an output.
6 "EUR, Gross Sales" is an output.
7      "GOR, Initial" is an input. "GOR, To
8 Life," is an input, and "NGL Yield" is an input.
9  Q. So the outputs that you just read for each of
10 these TPH type curves shown on this, these values
11 reflect the output of TPH's calculations for that type
12 curve?
13  A. Yes, that's correct.
14  Q. And I won't hazard a guess for this one.
15 Looking under Type Curve, the next header in that
16 column, but stopping before you get to Economics, what
17 are those values showing?
18  A. These are all input variables to the type
19 curve equation.
20  Q. And how -- let's -- how did TPH come to decide
21 which inputs to use for its type curve analysis?
22  A. They are the result of engineering analysis.
23  Q. And would that engineering analysis have been
24 done specifically in connection for the business
25 combination?

Page 77

1  A. Yes.
2  Q. And would TPH's conclusions about which inputs
3 for the type curve to use also have been informed by its
4 other experience working for operators in the STACK?
5  A. Yes.
6  Q. If we could look at Slide 15. It's titled (as
7 read): "Comparing Assumptions, Petrophysical Approach
8 to Locations Per Section Development."
9  A. (Reviewing.)
10  Q. And in this context "Locations" mean number of
11 drilling locations?
12  A. Generally speaking -- not exactly. I believe
13 "Locations" is the total number of locations, which
14 would be the sum of wells already drilled plus future
15 locations to be drilled.
16  Q. If you could look under the column labeled
17 Methodology, it says (as read): "Locations calculated
18 on a section-by-section basis based on OIP and recovery
19 factor assumptions."
20      Do you see that?
21  A. Yes, I do.
22  Q. Is that OIP assumptions the calculation that
23 we were discussing earlier?
24  A. Yes, it is. It's oil in place.
25  Q. So the oil in place assumptions here would

20 (Pages 74 - 77)

Page 78

1 have been something that TPH created specifically in
2 connection with the due diligence for the business
3 combination?
4    A.  TPH created the oil in place assumptions.
5    Q.  And what is a recovery factor?
6    A.  It's the percent of oil in place that is
7 expected to be produced.  So the, you know, definition
8 would be produced oil divided by oil in place.
9    Q.  And did TPH utilize more than one recovery
10 factor in connection with its analysis of TPH's acreage
11 in the STACK?
12    A.  We looked at a range of reasonable recovery
13 factors.  This page reflects a range.  Ultimately for
14 our base case we used one -- the same recovery factor
15 for each of the three zones.
16    Q.  And is the range of reasonable recovery
17 factors that you referenced the 10 percent to
18 25 percent?
19    A.  Yes, that's correct.
20    Q.  And how did TPH decide in this instance what
21 would be a reasonable recovery factor to use?
22    A.  Yes, that's the result of our geologic and
23 reservoir engineering analysis, both of this specific
24 area and of these specific reservoirs, in addition to
25 all of the experience that TPH has evaluating analogous

Page 79

1 reservoirs.
2    Q.  Based on your experience, do you have a sense
3 of what's a typical recovery factor for operators in the
4 STACK?
5    A.  Our experience -- in our experience typical
6 recovery factors would have ranged from approximately
7 10 percent up to potentially as high as 30 percent.
8    Q.  And under Methodology it says that (as read):
9 "Locations calculated on a section-by-section basis."
10        So does that reflect that the drilling
11 locations were calculated by TPH for each section within
12 AMH's acreage?
13    A.  Yes, that's correct.
14    Q.  And before we proceed, this does -- we've been
15 referencing or discussing the content under Methodology.
16        What does this describe as far as
17 methodology?  What's the final product of this
18 methodology that's being described here?
19    A.  The -- one of the final -- the main product of
20 the methodology described on this page would be the
21 number of locations to be drilled.
22    Q.  And this is to be the potential number of
23 locations to be drilled in Alta Mesa Holdings's acreage?
24    A.  Yes, that's correct.
25    Q.  And had TPH done this type of analysis before

Page 80

1 for other operators in the STACK?
2    A.  Yes.
3    Q.  But TPH tailored this analysis as needed to
4 fit the particular circumstances of the business
5 combination.  Is that right?
6    A.  Yes, that's correct.
7    Q.  Continuing down the methodology it says (as
8 read):  "No locations modeled for sections without:
9 Enough OIP for 2 wells per section at assumed recovery
10 factors."
11        What does that mean?
12    A.  If the oil in place was too low for -- so the
13 recovery, if you -- if the oil in place was too low to
14 justify or, based on our calculation, to support two
15 wells, we just assumed it was zero wells to be drilled
16 in that section.
17    Q.  And again, the 0IP reference here is TPH's
18 analysis of OIP that was created for the business
19 combination?
20    A.  Yes, that's correct.
21    Q.  And the Other Criteria, it says (as read):
22 "No locations modeled for section without:  Depth rights
23 for that respective zone."
24        What is that referring to?
25    A.  That refers to we didn't model locations in

Page 81

1 areas where AMH did not own the rights to that zone.
2    Q.  So this analysis for the number of -- the
3 potential number of drilling locations within AMH's
4 acreage also considered legal constraints on that
5 drilling as far as ownership rights of the right to
6 drill in that depth?
7    A.  Yes, that's correct.
8    Q.  And under the next bullet under Methodology,
9 it says (as read):  "If enough OIP for greater than
10 16 wells per zone per section, wells capped at 16 in
11 that zone in that section."
12        Did I read that correctly?
13    A.  Yes.
14    Q.  Does this reflect that TPH is considering
15 whether each zone might support over -- strike that.
16        Does this reflect that TPH is considering
17 whether the oil in place in each zone might support
18 greater than 16 wells in that zone?
19        MR. SPARACIO:  Object to form.
20    A.  This reflects that our geologic analysis
21 suggested there were areas that might support greater
22 than 16 wells per section.
23        However, our engineering analysis -- in
24 doing our engineering analysis, we determined that we
25 would not model anything more than 16 wells per section.

Page 82

1  Q. (By Mr. Peters) And is that 16 wells -- just
2  to make sure I understand, is that 16 up to, but no
3  greater than 16 wells per zone per section?
4  A. Yes, that's correct.
5  Q. And the zones were Osage, Meramec and Oswego?
6  A. Yes, that's correct.
7  Q. Next criteria is (as read): "No Meramec
8  locations modeled at less than 200 feet zone thickness."
9      Did I read that correctly?
10  A. Yes, that's correct.
11  Q. And what is this indicating?
12  A. This is in reference to where the geology,
13  where the Meramec zone in our analysis -- in our
14  determination, the zone was too thin to have locations
15  specifically targeting the Meramec.
16  Q. So this is another instance where TPH's
17  analysis considered the underlying geological thickness
18  of the zone?
19  A. That's correct. This is an example of how we
20  considered the variability or the variation of the
21  geology across the Alta Mesa or the AMH position.
22  Q. And it also says that "In sections with less
23  than 200 feet Meramec thickness, Meramec OIP contributed
24  to Osage."
25      So is this reflecting that in its

Page 83

1  analysis for the potential number of locations within
2  AMH's STACK acreage for areas, sections where the
3  Meramec was less than 200 feet thick, the oil in place
4  within that section was contributed to the Osage zone?
5  A. That's correct.
6  Q. And in the -- in the STACK, is the Osage
7  generally located directly below the Meramec section or
8  zone?
9  A. I believe that's correct.
10  Q. So in this instance where the Meramec zone was
11  less than 200 feet thick in a particular section, TPH
12  did not treat those zones as distinct. Is that correct?
13  A. That is correct.
14  Q. And in sections within AMH's acreage where the
15  Meramec was greater than 200 feet in thickness, TPH's
16  analysis for potential locations treated the Meramec and
17  Osage as distinct?
18  A. That's correct.
19  Q. And the last bullet says: Location -- under
20  Methodology, it says (as read): "Location counts shown
21  at right include PDP horizontal wells; those locations
22  are excluded from modeled undeveloped locations."
23      What is that saying?
24  A. So PDP stand for proved developed producing.
25  That's the producing wells. So my comment earlier about

Page 84

1  locations was the sum of wells that had already been
2  drilled plus the number of wells to be drilled. This
3  bullet explains that.
4  Q. So looking at the Osage column within the
5  Slide 15, is this -- does this reflect that the TPH
6  predicted that the average number of wells per section
7  for a TPH 2.0 type curve well within the Osage and the
8  recovery factor of 15 was 7.4?
9  A. Yes, that's correct.
10  Q. And an average number of wells means some
11  sections that have this characteristic would have more
12  wells and some would have less. Is that fair?
13  A. That's fair.
14  Q. And what is the -- could you explain, what
15  does the 2,405 total locations under Osage signify?
16  A. I believe that is the aggregate total number
17  of locations that our model predicted for the Osage. So
18  that would be inclusive of wells already drilled, plus
19  wells to be drilled.
20  Q. And the number of predicted drilling locations
21  increased if the recovery factor was higher than 15
22  percent. Is that correct?
23  A. That is correct.
24  Q. And looking under Meramec zone, so sticking
25  with the 15 percent as the recovery factor, does this

Page 85

1  chart reflect that TPH predicted that the Meramec
2  section at a 15 percent recovery factor could support,
3  on average, 6.4 wells?
4  A. I believe that is correct. This is an
5  unfortunate situation where converting from a PowerPoint
6  file to a PDF file has distorted the data, but I believe
7  what you said is correct.
8  Q. If you -- I agree with you. And I think if
9  you go to the -- for reasons that are unknown to me, if
10  you go to the black-and-white version, the Bates-stamped
11  version of this presentation of Exhibit 29 -- let's see
12  if this gives us some clarity here.
13  A. It does.
14  Q. Give me clarity.
15      So I will reask the question.
16      So does this -- under the Meramec, so
17  still on Slide 15 of this exhibit, does this reflect
18  that for the Meramec and a recovery factor of 15
19  percent, TPH predicted that the average number of wells
20  per section in that zone would be 6.4?
21  A. Yes, that's correct.
22  Q. And looking at Oswego at a recovery factor of
23  15 percent, does this reflect that TPH predicted that
24  the average number of wells per section for that zone
25  would be .2?

22 (Pages 82 - 85)

Page 198

1 questions for you.  We reserve our rights, though.
2 Thanks.
3             THE WITNESS:  Thank you.
4                FURTHER EXAMINATION
5 BY MR. PETERS:
6     Q.  This is Matt Peters with defendants.  I just
7 have a few quick questions for you, Mr. Knupp.
8           Did any potential indemnification
9 agreement with TPH and as Silver Run II affect in any
10 way the analysis that TPH performed in connection with
11 the business combination?
12     A.  No.
13     Q.  And at the time of TPH's due diligence for the
14 business combination in July 2017, do you know whether
15 there was consensus among operators in the STACK as to
16 how parent-child wells would interact?
17     A.  My recollection was at that time it was way
18 too early and there was not enough data to form a
19 consensus as to how parent and child wells would
20 interact.
21     Q.  Thank you.
22           MR. PETERS:  No more questions from me.
23           (Following commenced at 5:03 p.m.)
24           THE VIDEOGRAPHER:  All parties in
25 agreement with going off the record?

Page 199

1           MR. PETERS:  Yes.
2           THE VIDEOGRAPHER:  This concludes the
3 deposition of Jeffrey Knupp on Wednesday, June 14, 2023.
4 We are going off the record at 5:03 p.m.
5           (Proceedings concluded at 5:03 p.m.)
6                   * * *

Page 200

1       IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3 IN RE: ALTA MESA          §
4 RESOURCES, INC.           §  CASE NO. 4:19-cv-00957
5 SECURITIES LITIGATION     §
6
7     REPORTER'S CERTIFICATION TO THE
     VIDEOTAPED / REALTIMED DEPOSITION OF
8             JEFFREY P. KNUPP
                 JUNE 14, 2023
9    (PRESENTED AS 30(B)(6) CORPORATE REPRESENTATIVE
           OF TUDOR PICKERING, HOLT & CO.)l
10
11     I, Pat English-Arredondo, CSR, RMR, CRR, CLR,
12 Certified Shorthand Reporter in and for the State of
13 Texas, hereby certify to the following:
14     That the witness, JEFFREY P. KNUPP, was duly sworn
15 by the officer and that the transcript of the oral
16 deposition is a true record of the testimony given by
17 the witness;
18     I further certify that pursuant to FRCP Rule
19 30(f)(1) that the signature of the deponent:
20     __X___ was requested by the deponent or a party
21 before the completion of the deposition and returned
22 within 30 days from date of receipt of the transcript.
23 If returned, the attached Changes and Signature Page
24 contains any changes and the reasons therefor;
25     _____ was not requested by the deponent or a party

Page 201

1 before the completion of the deposition.
2     I further certify that I am neither counsel for,
3 related to, nor employed by any of the parties or
4 attorneys in the action in which this proceeding was
5 taken, and further that I am not financially or
6 otherwise interested in the outcome of the action.
7     Certified to by me this 19th day of June, 2023.

11           *Pat English-Arredondo*
             Pat English-Arredondo,
12           CSR (TX), RMR, CRR, CLR
             Texas CSR 3828
13           Expiration Date:  4/30/2024
14 Independent Contract Reporter for:
   Veritext Legal Solutions
15 Certificate No.:  571
   300 Throckmorton, Suite 1600
16 Fort Worth, Texas 76102
   817.336.3042

25 Job No. 5943865

51 (Pages 198 - 201)

<u>Deposition Errata Sheet</u>
<u>Jeffrey Knupp</u>
*In re Alta Mesa Resources, Inc. Securities Litigation*
<u>Case No. 4:19-cv-00957 (S.D. Tex.)</u>

I, JEFFREY KNUPP, do hereby declare that I have read the transcript of my testimony taken under oath on June 14, 2023 and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | **From** | **To** | |
| 18 | 3 | I had an MBA from University of Texas | I have an MBA from University of Texas | Clarity |
| 18 | 15 | And when did you start Exxon? | And when did you start at Exxon? | Transcription error |
| 19 | 16 | determining how many wells to drill with | determining how many wells to drill | Clarity |
| 24 | 4 | which is really not technical work | which is arguably not technical work | Transcription error |
| 30 | 11 | So petrophysics analysis | So the petrophysics analysis | Transcription error |
| 34 | 14 | managing director at this time | managing director quite at this time | Transcription error |
| 37 | 21 | of the business combination. | Of the business combination? | Typographical error |
| 38 | 15-16 | information should probably be the VDRs | information that you recall would be in the VDRs | Transcription error |
| 38 | 16 | AFM | KFM | Transcription error |
| 48 | 19 | also | analysis | Transcription error |
| 51 | 10 | would you say, the space | we'll just say, the space | Transcription error |

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | From | To | |
| 51 | 16 | SW | S sub W | Transcription error |
| 51 | 18 | SW | S sub W | Transcription error |
| 58 | 23 | the saying | saying the | Transcription error |
| 59 | 1 | properties | porosities | Transcription error |
| 63 | 6 | it's gross thickness for the Osage | is gross thickness for the Osage | Typographical error |
| 65 | 1 | oil and gas production of oil | oil and gas production of a well | Transcription error |
| 67 | 15 | column over, Amberjack 2.0 | column over, labeled Amberjack 2.0, | Transcription error |
| 80 | 17 | 0IP | OIP | Typographical error |
| 91 | 21 | meaning | mean | Transcription error |
| 95 | 20 | well | as well | Transcription error |
| 98 | 13 | Oswego | Oswego OP | Transcription error |
| 100 | 6 | upside case were likely to occur | upside case were to occur | Clarity |
| 102 | 12 | were – was relevant to the work | were relevant to the work | Clarity |
| 108 | 3 | And what's the name of "completion techniques" in this context? | And what's the meaning of "completion techniques" in this context? | Transcription error |

2

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | From | To | |
| 117 | 13 | April 25, 2007 (sic/2017) | April 25, 2017 | Clarity |
| 134 | 9 | And is it in same | And is it the same | Transcription error |
| 135 | 15 | in connection with this combination | in connection with the business combination | Transcription error |
| 148 | 25 | Knapp | Knupp | Transcription error |
| 149 | 1 | Jeff | Jack | Transcription error |
| 149 | 14 | Gibson & Dunn | Gibson Dunn | Clarity |
| 162 | 20 | ACH | Osage | Transcription error |
| 167 | 1 | they would spec | curve they would expect | Transcription error |
| 167 | 5 | this column and row | Bullis-Coleman row | Transcription error |
| 185 | 4 | portions | position | Transcription error |
| 186 | 9 | multiple-well VDR assessment | multiple-well EUR assessment | Transcription error |

I declare under penalty of perjury that the foregoing is true and correct.

Date: 7-24-23         Signed: [signature]

3