UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>**PUBLIC VERSION OF DKT. 609** |

**REPLY IN SUPPORT OF CLASS PLAINTIFFS' MOTION TO EXCLUDE
<u>CHARLES WHITEHEAD'S OPINION NO. 1</u>**

## TABLE OF CONTENTS

                                                                                                                          **Page**

I. STATEMENT OF THE ISSUE TO BE RULED UPON ........................................ 1

II. SUMMARY OF THE ARGUMENT ...................................................................... 1

III. LEGAL STANDARD ............................................................................................ 2

IV. DEFENDANTS ATTEMPT TO SALVAGE OPINION NO. 1 BY ASSERTING IT IS BASED ON "PERSONAL EXPERIENCE" ........................... 4

V. DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT OPINION NO. 1 IS RELIABLE ............................................................................................ 5

    A. Defendants Have Failed to Carry Their Burden to Establish that Whitehead's Hypothesis Can Be or Has Been Tested ................................. 5

    B. It's Too Late Now to Identify Other Peer-Reviewed Academic Studies to Satisfy *Daubert's* Peer Review and Publication Factor ............... 7

    C. Defendants Concede Whitehead Does Not Satisfy *Daubert's* Potential or Known Rate of Error Factor ......................................................... 9

    D. Defendants Fail to Demonstrate that the Methodology of Divining a Corporate "Custom and Practice" by Relying on SEC Disclosures Is Widely Accepted by Whitehead's Academic Peers ................................... 11

VI. CONCLUSION ..................................................................................................... 11

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Black v. Food Lion, Inc.*,
 171 F.3d 308 (5th Cir. 1999) ............................................................................. 6, 7, 10, 11

*Brumley v. Pfizer, Inc.*,
 200 F.R.D. 596 (S.D. Tex. 2001) ................................................................................... 3

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) ............................................................................................... passim

*Frye v. United States*,
 293 F. 1013 (D.C. 1923),
 *superseded by rule*, Fed. R. Evid. 702 ........................................................................... 3

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) ....................................................................................................... 3

*Johnson v. Arkema, Inc.*,
 685 F.3d 452 (5th Cir. 2012) ......................................................................................... 4

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) .................................................................................................. 2, 3

*Moore v. Ashland Chem. Inc.*,
 151 F.3d 269 (5th Cir. 1998) ......................................................................................... 2

*Tanner v. Westbrook*,
 174 F.3d 542 (5th Cir. 1999),
 *superseded in part by rule on other grounds*, Fed. R. Evid. 103(a) ............................... 2

*Varner v. Dometic Corp.*,
 No. 16-22482-CIV-SCOLA/OTAZO-REYES, 2022 WL 2307002 (S.D. Fla. Mar. 25, 2022) ................................................................................................. 6, 8

**OTHER AUTHORITIES**

Mark Chang,
 *Principles of Scientific Methods* viii (2014) ................................................................ 2

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) ..................................................................................... 7, 8

|  | **Page** |
|---|---|
| Fed. R. Evid. 702 | 1, 2 |

Lead Plaintiffs FNY Partners Fund LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund, and plaintiff Camelot Event Driven Fund (collectively, "Class Plaintiffs"), respectfully submit this reply in support of Class Plaintiffs' Motion to Exclude Charles Whitehead's Opinion No. 1. ECF 519 ("Motion").

## I.  STATEMENT OF THE ISSUE TO BE RULED UPON

Is Charles Whitehead's ("Whitehead") proffered testimony regarding his Opinion No. 1, which is irrelevant and based on a novel and untested methodology with serious analytical flaws, inadmissible pursuant to Federal Rules of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and related decisional authority?

## II.  SUMMARY OF THE ARGUMENT

The following factual assertion is pivotal to Defendants' opposition:  Whitehead applied the "'soft sciences'" of his "personal experience" to reach Opinion No. 1. *See* Defendants' Opposition to Motion to Exclude Charles Whitehead's Opinion No. 1 ("Oppo.") (ECF 567) at 2, 8-10, 14.[1]  But the record contradicts that assertion.  Whitehead's Report states **28 times** that the methodology underlying Opinion No. 1 is the scientific method of "empirical analysis."  *See* Motion, Ex. A (ECF 519-2) (the "Whitehead Report" or "Report").  During deposition, Whitehead admitted that Opinion No. 1 was ***only*** based on empirical analysis.

This Court will consider a specific line of authority (*i.e.*, *Daubert*, 509 U.S. 579 (reliability of opinions based on a scientific method), or *Kumho Tire Co. v. Carmichael*, 526

---

[1] Class Plaintiffs decline to respond to the legal authority cited in Defendants' Oppo. as each case addresses the reliability of opinions based solely on personal experience (as opposed to empirical analysis).

U.S. 137 (1999) (reliability of opinions based on skill or experience)), depending on the appropriate characterization of Whitehead's methodology.[2]  A basic definition of the scientific method and its reliance on empirical analysis is, thus, warranted:

> ***To be termed scientific***, a method of inquiry must be based on gathering observable, ***empirical***, and measurable evidence subject to specific principles of reasoning.  Scientific method is a set of procedures consisting of systematic experiment, observation, measurement, and the formulation, testing, and modification of hypothesis.

Mark Chang, *Principles of Scientific Methods* viii (2014).  *See also Daubert*, 509 US at 579-80 (the adjective "scientific" in Federal Rule of Evidence 702 "implies a grounding in science's methods and procedures"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274-75 (5th Cir. 1998) (where an opinion is grounded in scientific method, the *Daubert* factors are relevant).

Lastly, because Defendants have failed to show that Whitehead's methodology satisfies the *Daubert* factors, the Court must preclude Opinion No. 1.

## III. LEGAL STANDARD

Rule 702 governs the admissibility of proffered expert testimony.  *See Daubert*, 509 U.S. at 589-90.  If an opinion's admissibility is challenged, the trial judge is required to "perform a screening function" to ensure that the offered opinion is both "reliable and relevant" to the facts in the particular action.  *See Tanner v. Westbrook*, 174 F.3d 542, 545 n.1 (5th Cir. 1999), *superseded in part by rule on other grounds*, Fed. R. Evid. 103(a).  *See*

---

[2] Citations are omitted and emphasis is added unless otherwise noted.  All "Ex. __" references are to the Declaration of Trig R. Smith in Support of Class Plaintiffs' Reply in Support of Class Plaintiffs' Motion to Exclude Charles Whitehead's Opinion No. 1., filed concurrently herewith.  To avoid confusion with the exhibits submitted with the Motion (which are Exhibits A-O at Dkt. 519-1), the exhibits to the Reply Declaration begin at Ex. P.

*also Kumho*, 526 U.S. at 149 (noting that should an expert's "testimony's factual basis, data, principles, methods or their application [be] called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline'"). The burden is on the party proffering the expert opinion to establish admissibility by a preponderance of the evidence. *Daubert,* 509 U.S. at 592 n.10.

In *Daubert*, the Supreme Court provided a non-exhaustive list of four factors that this Court should consider when determining if expert testimony is purportedly based on reliable scientific knowledge. Those factors are: (1) the expert's hypothesis can be and has been tested; (2) the methodology has been subject to peer review and publication; (3) the methodology is associated with a "known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation"; and (4) the degree of acceptance the methodology has within the relevant scientific community. *See Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001) (citing *Daubert*, 509 U.S. at 591-95 and *Frye v. United States*, 293 F. 1013, 1014 (D.C. 1923), *superseded by rule*, Fed. R. Evid. 702).

Further, "nothing in either *Daubert* or the Federal Rules of Evidence require[] a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Should a court make that determination, it may exclude an opinion

as unreliable, even if it otherwise satisfies the *Daubert* factors. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012).

## IV. DEFENDANTS ATTEMPT TO SALVAGE OPINION NO. 1 BY ASSERTING IT IS BASED ON "PERSONAL EXPERIENCE"

Because Class Plaintiffs' Motion exposed Opinion No. 1 to be what it is – junk science – Defendants are forced to re-invent the methodology underlying it. Now, Defendants' lawyers, rather than Whitehead, testify that Opinion No. 1 is based on the "'soft sciences'" of "personal experience." *See* Oppo. at 2, 8-10, 14. But Defendants fail to identify any evidence supporting that factual assertion.[3]

Here are the facts. Whitehead's Report characterizes the methodology underlying Opinion No. 1 as scientifically-based ***28 times*** (using the phrase "empirical" or "empirical analysis"). *See* Motion, Ex. A (ECF 519-2); *id.*, ¶¶37-53 (methods for Opinion No. 1); *id.*, ¶¶186-190 (Opinion No. 1); *id.*, ¶221(i) (Opinion No. 1 conclusion). Whitehead reinforced that the "empirical analysis" underlies Opinion No. 1:

> Below, I summarize the data and methodology used to perform this report's ***empirical analysis*** of the Sample de-SPACs. ***That empirical analysis*** was conducted by a team at Cornerstone Research, under my supervision ("Team").

*Id.*, ¶42.

Whitehead adds that Opinion No. 1 was "evidenced" by that empirical analysis:

---

[3] Defendants' denial that Opinion No. 1 is based on a scientific method permeates their opposition and, thus, reinforces why this Court should preclude it. *See, e.g.*, Oppo. at 11 (contending that "[s]ince Whitehead is not employing a 'scientific technique,'" *Daubert*'s "'known or potential rate of error' factor" is irrelevant).

- 4 -

> It is my opinion that SRII's use of target-prepared financial projections in the SRII Proxy was consistent with the custom and practice *evidenced* by the Sample de-SPACs and **Empirical Results** as set forth in Section V.C. above.

*Id.*, ¶186. *See also* Ex. P at 47:23-48:3 (the empirical study only supports Opinion No. 1); *id.* at 169:7-170:2 (the "empirical analysis" was the basis for establishing the "custom and practice"). Whitehead admitted that personal experience did not underlie Opinion No. 1. *Id.* at 37:13-15 ("And so, rather than providing my sense of these things, we decided it made sense to provide an empirical analysis. . . .").

On the other hand, with regard to Opinion Nos. 2-8, Whitehead differentiated them as being based on personal "experience." Motion, Ex. A (ECF 519-2), ¶191 (Opinion No. 2), ¶192 (Opinion No. 3, same), ¶194 (Opinion No. 4, same), ¶195 (Opinion No. 5, same), ¶197 (Opinion No. 6, same), ¶204 (Opinion No. 7, same), ¶210 (Opinion No. 8, same), ¶216 (Opinion No. 9, same). The *Daubert* factors, therefore, apply to Opinion No. 1.

## V.   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT OPINION NO. 1 IS RELIABLE

### A.   Defendants Have Failed to Carry Their Burden to Establish that Whitehead's Hypothesis Can Be or Has Been Tested

Defendants admit that Whitehead utilized data in his empirical model without regard to its accuracy. *See* Oppo. at 10 ("Whitehead made a perfectly reasonable assumption" that his SPAC data was "truthful"). With regard to "testability," the Supreme Court noted "'[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" *Daubert*, 509 U.S. at 593.

Defendants' opposition does not point to any evidence that Whitehead tested his novel hypothesis. How could he have? He conceded he did nothing to assess the accuracy of his data, which fed his scientific model. *See* Ex. P at 40:4-41:9, 174:6-14. It is not Class Plaintiffs' burden to test it. It is Defendants' burden to show that the theory has been tested. They failed. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (finding error at trial and noting the expert's hypothesis should not have been admitted because it was not "verified by testing and, thus, **has not been peer-reviewed**."). And, Defendants have identified no other tested academic work postulating a corporate "custom and practice" based on snippets of SEC filings either.[4]

A peer review panel would be aghast with an admission that Whitehead's brand new theory was premised on data only presumed to be accurate. It's no secret that bad data makes for bad science. For example:

> [I]n May 2020, the British journal *The Lancet* published an article associating the use of chloroquine and hydroxychloroquine with increased deaths in patients diagnosed with Covid-19, which resulted in the interruption of testing of the drug globally. ***A few days later, the journal published a retraction stating that it could not guarantee the accuracy of primary data sources and opted to withdraw the article, which caused repercussions worldwide*** (Boseley & Davey, 2020).

*See* Ex. Q at 6872. *See also Varner v. Dometic Corp.*, 2022 WL 2307002, *4 (S.D. Fla. Mar. 25, 2022) (admission that experiment is novel with no known ***rate of error*** "support[s] the finding that [the hypothesis] fails to meet the reliability standards of *Daubert*").

---

[4] The "testability" factor is related to the "peer review and publication" factor. *See, e.g.*, *Daubert*, 509 U.S. at 593 (noting "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected").

### B. It's Too Late Now to Identify Other Peer-Reviewed Academic Studies to Satisfy *Daubert's* Peer Review and Publication Factor

Defendants concede that Whitehead's brand new theory has not been peer reviewed or published. That alone is sufficient to preclude it. *Black*, 171 F.3d at 313. But Defendants' counsel belatedly claims it is "wildly incorrect" "that Whitehead's methodology (using personal experience in analyzing SEC filings to evaluate disclosures) has not been 'published in any academic article[s] (or otherwise).'" Oppo. at 10-11. That argument should be rejected because it is untimely and misleading.

Defendants' counsel now identifies several academic articles in which empirically based studies utilized data from SEC filings. *Id.* at 11 nn.12-14. But not one of those articles was identified in the Whitehead Report. That is a critical error. Whitehead was required to make that showing in his Report (not Defendants' counsel in an opposition brief). *See* Fed. R. Civ. P. 26(a)(2)(B) ("[t]he report **must contain** . . . a complete statement of . . . the basis and reasons for [all opinions]").[5]

The Court should also reject Defendants' argument because it is misleading. First, Opinion No. 1 is not based on Whitehead's personal experience. *See supra* at 4-5. Second, Class Plaintiffs do not contend **all** empirically based hypotheses are unreliable merely because their source data was derived from SEC filings. Rather, Class Plaintiffs criticize Opinion No. 1 for relying on "untrustworthy"[6] snippets of SEC filing disclosures for the purposes of asserting Whitehead's **admittedly novel, untested, unpublished, non-peer-**

---

[5] Defendants have not appropriately moved for relief to supplement the Whitehead Report given that expert discovery closed over two months ago, on November 16, 2023. *See* Oppo. at 3.

[6] *See supra* at 10-11 (methods for ensuring "trustworthiness" of empirical data).

***reviewed hypothesis***: It is "custom and practice" for a SPAC issuers to include target-prepared financial projections in its de-SPAC disclosures. *See* Motion, Ex. A (ECF 519-2) at 15. *See also Varner*, 2022 WL 2307002, at *4 (first time experiments, without peer-review, are generally unreliable).

Defendants' counsel, for the first time, points to recent work by Matteo Tonello as a basis for Whitehead's method. *See* Oppo. at 11 n.12. A review of that Internet post, however, reveals that Mr. Tonello's hypothesis was presented at a "forum" (Defendants do not demonstrate it to be published or peer-reviewed), and that Mr. Tonello relied upon the "CEO Succession Practices in the Russell 3000 and S&P 500: Live Dashboard" database for his empirical research.[7] And, Whitehead's corporate "custom and practice" hypothesis bears no relation to Mr. Tonello's hypothesis: The CEO succession rate did not slow after the peak of Covid-19 in 2021.[8] *See supra* n.7. Further, the Whitehead Report does not identify Mr. Tonello's work.

Next, Defendants' counsel points to academic work conducted by Class Plaintiffs' rebuttal expert, Adam Badawi, and argue "see, he looked at SEC filings too." Oppo. at 7 n.7, 11 & n.13, 12. The Whitehead Report does not identify Mr. Badawi's work either. *See* Fed. R. Civ. P. 26(a)(2)(B). Even if it had, Mr. Badawi's empirically-based published work has no relation to establishing SPAC issuer "pattern and practice" based on snippets of

---

[7] https://corpgov.law.harvard.edu/2023/09/19/ceo-succession-practices-in-the-russell-3000-and-sp-500-2/. Further, the source material there is not available unless the reader holds a subscription to "The Conference Board." None of it is listed in the Whitehead Report.

[8] Various different data sources would have been available to "triangulate" the SEC filings' contents in that study, including press releases, CEO surveys, magazine articles, etc. *See infra* at 10-11.

unverified data.[9]  Defendants' counsel next points to a non-published, non-peer reviewed paper referenced in Mr. Badawi's rebuttal report (discussing SPAC incentive structures) to bolster the claim that Whitehead's Opinion No. 1 was reached using the same method.[10]  *See* Oppo. at 11 n.14.  The Whitehead Report makes no mention of that study.  That study's hypothesis – whether investors face increased agency costs in SPAC deals – also bears no relation to Whitehead's novel theory.  *See* Ex. T.  And, unlike Whitehead's empirical analysis, the authors of the paper characterized their dataset as being "rich information," which drew from many different sources other than mere SEC filings such as the CRISP and Gritstone scientific databases.  *Id.* at 1, 23-25.  *See also infra* at 10-11 ("trustworthiness" of empirical data).  Further, the hypothesis presented in that paper "contribute[d]" to ***a wealth of prior peer-reviewed and published academic articles dating back to 2009, which presented similar hypotheses***.  Ex. T at 6-7.  Here, Whitehead's brand new hypothesis finds no such prior scientific exploration.  Thus, his Report does not identify any.

    **C.**    **Defendants Concede Whitehead Does Not Satisfy *Daubert's* Potential or Known Rate of Error Factor**

Defendants' attempt to excuse Whitehead's failure to provide a potential or known rate of error by echoing their false factual assertion:  It's irrelevant because Opinion No. 1 is based on nothing but personal experience.  Oppo. at 2, 10.

---

[9] One of Mr. Badawi's null hypotheses was whether mandating disclosure of fairness opinion details in tender offer deals had no effect on deal repricing.  *See* Ex. R at 541 In a different published work, the null hypothesis was whether the party that first receives the draft merger agreement does not receive better terms on the deal.  *See* Ex. S.  ***Whitehead's Report fails to identify these empirically-based published studies to bolster the reliability of his hypothesis***.  Nor could it:  Mr. Badawi's hypotheses have nothing to do with Whitehead's.

[10] Unlike Whitehead, Mr. Badawi did not base his rebuttal opinions on empirical analysis.

Defendants' counsel then attempts to shift the burden of demonstrating this factor on Class Plaintiffs by pointing to what Mr. Badawi identified as potential data analysis errors by Cornerstone Research. Oppo. at 12-14. But it's not Class Plaintiffs' burden to do that *after* Whitehead issued his opinion. Rather, it is Whitehead's job to first determine, and then disclose in his Report, the known or potential rate of error. He did not. *See Black,* 171 F.3d at 313 (reversing trial court's admission of opinion because it "**has no known potential rate of error**").

Next, Defendants expound on the disputes regarding the interpretation of SEC disclosures that Cornerstone Research read, categorized, and fed into the empirical model. *See* Oppo. at 12-14. But that argument proves too much. Indeed, where empirical research is based on "qualitative data" (words, as opposed to numbers), that dataset's "trustworthiness" is generally measured by four criterion: "Credibility," "Transferability," "Dependability," and "Confirmability." *See* Ex. U at 150-58. Here, Whitehead's Report should have disclosed the methodology utilized to address competing views on the meaning of SEC disclosures while he was developing Opinion No. 1. But, it does not.

Academics agree on numerous methods that provide "trustworthiness" to empirical studies drawing upon qualitative data, including:

- Triangulation of data sources (cross checking data analysis utilizing multiple data sources)
- Asking those who provided the data to evaluate conclusions
- Saturation, or continuous data collection
- Peer review, or consultation with other experts

*See* Ex. V at 362-64. Yet, the Whitehead Report says nothing in this regard.

Whitehead testified he did not lift a finger to check his data or conclusions with any of the companies that source the empirical data. Ex. P at 39:5-41:9, 49:3-25. ***Whitehead further admitted he did nothing to cross-check the accuracy of the "prepared by the targets" disclosure in the Proxy at issue in this action***. *Id.* at 170:7, 172:1-14. In order to reach his conclusion that the disclosure language in this case belonged to the "financial projections prepared by targets" group, he relied on an assumed fact that could have been readily checked. Whitehead could have asked Defendants' Counsel to provide evidence produced in discovery concerning who was involved in preparing the financial projections in this case. He did not.

### D. Defendants Fail to Demonstrate that the Methodology of Divining a Corporate "Custom and Practice" by Relying on SEC Disclosures Is Widely Accepted by Whitehead's Academic Peers

Lastly, the Whitehead Report and Defendants' Oppo. fails to identify a single, previously published, scientific study divining a corporate "custom and practice" based **solely** on snippets of vague data gleaned from SEC filings. That demands exclusion. *See Black*, 171 F.3d at 313. If that peer-reviewed experiment existed, Whitehead should have listed it in his Report. Alas, he did not because none exist.

## VI. CONCLUSION

For the reasons stated in the Motion and this reply, Whitehead should be precluded from offering Opinion No. 1 in support of summary judgment and trial.

Dated: February 2, 2024

Respectfully submitted,

/s/ *Andrew J. Entwistle*
Andrew J. Entwistle (attorney-in-charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*

/s/ *Trig R. Smith*
Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

- 13 -

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on February 2, 2024.

                                     */s/ Andrew J. Entwistle*
                                     Andrew J. Entwistle