# EXHIBIT P

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3             HOUSTON DIVISION

4    _____

                                )

5    IN RE ALTA MESA RESOURCES,  )

                                )    Case No.

6    INC. SECURITIES LITIGATION  )

     _____)    4:19-cv-00957

7

8              * * * * * * * * * * * * * *

               CONFIDENTIAL

9              * * * * * * * * * * * * * *

10          VIDEOTAPED DEPOSITION OF

11            CHARLES WHITEHEAD

12            November 17, 2023

13               9:12 a.m.

14

15       Via Zoom Remote Conferencing

16

17

18       Reported by:  Marsi Koehl, CCR-B-2424

19

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

1      A.   Really, I think it's in encapsulated in

2   paragraph 42, which says that:  Below I summarize the

3   data and methodology used to perform this report's

4   empirical analysis of the sample de-SPACs.

5           And that's what -- that's what we're doing

6   here.  So we're summarizing the data that we looked

7   at and the methodology by which we then assess the

8   data.

9      Q.   And why did you perform an empirical study?

10      A.   I'm not sure I follow the question.  I'm

11   sorry.

12      Q.   My question is this:  Why did you do an

13   empirical study?

14      A.   As -- as opposed to?

15      Q.   Oh, well, why don't we compare it to what

16   you offered in Twitter.  You basically gave similar

17   opinions in the Twitter matter; right?

18      A.   No.  It was a -- it was a different focus.

19   Right?  Twitter was a different type of analysis, I

20   think, than what's covered here.  This is going

21   specifically to disclosure in either an S4 or a proxy

22   statement.

23           And keep in mind, too, in Twitter, I was

24   constrained on what I could do given what the judge's

25   order were.  And so it's little bit of a different

```
 1   set of circumstances.
 2        Q.   Okay.  So my question is just -- it's just a
 3   general question.  Why did you believe an empirical
 4   study was necessary for offering your opinions?
 5        A.   So in this particular area, the -- we're
 6   going to the question of the way in which target
 7   prepared financials are presented.  And the
 8   presentation itself in terms of, you know, what
 9   health warnings accompany the target prepared
10   financials, the number of times, how common is it for
11   there to be target prepared financials.
12             Well, these are things that you can readily
13   assess.  And so rather than providing my sense of
14   these things, we decided it made sense to provide an
15   empirical analysis, which, I suppose, not
16   surprisingly was consistent with my sense of these
17   things.  But it was done to really check the market
18   to see whether or not what we thought was the case
19   was, in fact, the case.
20        Q.   Okay.  And you used the phrase this is
21   something that can be -- that somebody can readily
22   assess.
23             When you use the phrase "readily assess,"
24   what do you mean by that?
25        A.   I mean the methodology that appears, again,
```

1    beginning on page 18.  So these are things that we

2    can take this methodology and we can apply it to the

3    disclosures to reach an empirical result.

4         Q.  And you just referred to the disclosures.

5    And when you use that phrase "the disclosures," would

6    it be fair to say that when you use that phrase,

7    you're referring to disclosures that were reviewed

8    and were assessable to the public?

9         A.  So we're talking about target prepared

10   projections.  That was our focus, target prepared

11   projections.  And as I mentioned in the methodology,

12   that appeared in either the S4 or the proxy

13   statement.

14        Q.  So I'll ask the question a little bit

15   differently.

16             So is my understanding correct that when

17   you're referring to the disclosures in this concept

18   of readily assessing, you're referring to the fact

19   that you go to the SEC website and pull information

20   off the website that is publicly available?

21        A.  Well, the documents are publicly available.

22   Yes.

23        Q.  Right.  Right.  And so when you say "readily

24   assess," is that in reference to the fact that you

25   can go to the SEC's website and pull a series of

1    documents off the website?

2        A.  Well, you can pull a series of documents off

3    the website and then review those documents.  Right?

4    That's the -- that's the assessable part.

5        Q.  Understood.  Now, what I want to ask you is:

6    As part of gathering that material, were there any

7    assumptions that you relied upon in gathering that

8    material?

9        A.  So, again, our -- our empirical analysis

10   here was to look at target prepared financials, how

11   they were prepared in terms of the presentation, the

12   disclosure.  I mentioned the health warnings a few

13   moments ago.

14        And so we did not have any particular

15   assumptions walking in the door.  The methodology

16   lays out what we looked at and how we looked at it.

17   I don't think that reflects assumptions as much as

18   the basis upon which we're presenting the results.

19        Q.  Understood.  Well, would it not be true that

20   you and your team assumed that the information in the

21   SEC filings was accurate?

22        A.  Well, again, we're -- we're focused on what

23   was in the disclosure.  Right?  And unless you're

24   suggesting to me that people are substituting

25   registration statements or people are substituting

1    proxy statements, I am assuming yes.  To that extent,

2    I'm assuming that the SEC documents are, in fact,

3    what was filed with the SEC.

4         Q.  Let me ask the question a little bit

5    differently.  You looked at disclosures and various

6    SEC filings for purposes of the empirical study,

7    correct?

8         A.  That's correct.

9         Q.  And those disclosures that you or your team

10   reviewed, is it not true that you presumed that that

11   information was accurate?

12        A.  So you're asking did we assume -- if I

13   understand the question correctly, you're asking did

14   we assume that the people responsible for disclosure

15   didn't lie?

16        Q.  No.  I'm not saying didn't lie.  I'm saying:

17   Did you presume it was accurate?

18        A.  I understand that.  But I'm saying the only

19   way it wouldn't be accurate is if somebody had not

20   put in an accurate statement, in other words, that

21   they had put in a misstatement.

22             So you're asking did I presume that the

23   people who prepared the documents were not misstating

24   what was in the disclosure.  I used the word "lie"

25   for shorthand.  We can say misstating what was in the

1   disclosure.

2       Q.   Mm-hmm, understood.  But --

3       A.   Is that what you're asking?

4       Q.   Yeah, that's precisely what I'm asking.  You

5   assumed that the disclosures were not misleading.

6            Is that not right?

7       A.   So we do assume that the disclosures were an

8   accurate reflection of whatever the parties chose to

9   put into the document.

10      Q.   Okay.  I'm just going to do a couple more

11  questions.  We can take a break.

12           And I understand for purposes of your --

13  your empirical study that you did not include Alta

14  Mesa in the population; correct?

15      A.   That's correct.

16      Q.   Okay.  Can you explain to me why you didn't

17  include Alta Mesa in the population?

18      A.   Because this case involves Alta Mesa, so we

19  just thought it made sense to exclude it.

20      Q.   Okay.  All right.  And would you -- well,

21  let me ask it this way.  Again, I want to get back to

22  this assumption that the -- that you and your team

23  had, that the disclosures that you assessed were not

24  misleading.

25           Would you not agree with respect to all the

CONFIDENTIAL

Page 42

1    companies in your population, there was no way to

2    really check or control for the fact that one or two,

3    three or four -- it doesn't matter the number -- of

4    those disclosures were not accurate?

5         A.  So if I understand correctly, you're asking

6    whether or not the dozens, you know, the large number

7    of -- the large number of deals that we looked at --

8    you're asking did we assume that they were all not

9    misstating what actually occurred.

10        Q.  We've already -- we've already crossed that

11   bridge.  I think we established that you did assume

12   that the disclosures were not misleading or am I

13   misstating your testimony?

14        A.  Well, again, the reason I'm balking with the

15   word "assume" is because we're talking about

16   disclosures that actually appeared in the document.

17            So, again, if what you're asking is did we

18   assume that these were not misstated, then, yes, we

19   are assuming they are not misstating that actually

20   occurred, if that's -- if that's what you're asking.

21            But, clearly, these were disclosures in the

22   document, right, where we checked those.  That's not

23   part of the assumption.

24        Q.  Well, as part of your empirical analysis,

25   did you do anything to control for the potentiality

```
 1    that any one or more of those disclosures may be

 2    misleading?

 3        A.  This is why we looked at such a broad sample

 4    set.  Right?  We looked at almost a hundred, if not

 5    over a hundred.  I'm trying to remember the number.

 6            I think -- I think the concern, perhaps --

 7    you know, to the extent there might even be a

 8    concern.  I'm not sure I follow the question.  But to

 9    the extent there might be a concern, you know, maybe

10    if you were to look at one or two companies, you

11    might be somewhat concerned about just the fact that

12    your -- your group is small, not because I think

13    they're misleading, just because it may not be

14    representative of the market.

15            In our case, we looked at, you know, dozens,

16    over a hundred different SPACs.  I would think that

17    would give you a pretty good sense of the market.

18    Unless, using your words, we were to assume that the

19    entire market has decided to misstate disclosures,

20    which I think is one hell of an assumption to make.

21        Q.  That's not what I'm -- that's not what I'm

22    asking.  I'm just asking you if you did anything to

23    control for the potential that any one of them could

24    have been misleading.

25        A.  But that's what I mean by control.  What I'm
```

[PAGES INTENTIONALLY OMITTED]

1    not -- not specifics.

2        Q.  Just to make the record clear and then we'll

3    take a break.  As part of your work, did you consider

4    the recent trends in SPAC litigation for purposes of

5    your empirical study?

6        A.  I did not.

7            MR. SMITH:  All right.  Sir, we're going

8        to go ahead and take a break.

9            Let's go off the record.

10           THE VIDEOGRAPHER:  The time is

11   10:09 a.m.  We're going off the record.

12           (Recess from 10:09 a.m. to 10:29 a.m.)

13           THE VIDEOGRAPHER:  The time is

14   10:29 a.m.  We're going back on the record.

15           Please proceed, Counsel.

16   BY MR. SMITH:

17       Q.  Welcome back, Professor.  I just want to ask

18   you a general question regarding the empirical study

19   that you performed.

20           Can you please tell me which opinions rely

21   on that empirical study?

22       A.  Well, we have the section Roman numeral V

23   beginning on page 15 describes the -- describes the

24   analysis itself.  And if you go to page 86, that's

25   where we include opinion number 1 that refers back to

CONFIDENTIAL

Page 47

1    section V.  And that's where the opinion itself is.

2             So that's -- that's the focus of the

3    empirical analysis.

4        Q.  So it would be opinion number 1 that's

5    identified in the table of contents, small one,

6    numeral number three in your report, beginning on

7    page 86; correct?

8        A.  You know my report better than I do.  Hold

9    on.

10            You said Roman numeral III?  I'm sorry.

11       Q.  I apologize.  So if you go to small Roman

12   numeral III, which is in your report, which is a

13   portion of your opinions -- or describes your

14   opinions, at the top of that page, there's a Roman

15   numeral number IX, opinion 1, that begins at 86,

16   right?

17       A.  Okay.  So I have -- I have Roman numeral IX

18   on page 86.  That's the opinion.

19       Q.  Correct.

20       A.  And you're refer- -- I'm sorry.  You were

21   referring to something else earlier in the report.

22   That's the part I'm missing.

23       Q.  I'm just trying to confirm that your

24   empirical study supports opinion number 1.

25       A.  That's correct.

1        Q.   And it does not support any of the other

2   opinions; is that right?

3        A.   That's -- that's correct.

4        Q.   I just want to go back -- well, let me ask

5   you to state it.

6             So what was the finding of your empirical

7   study regarding target prepared projections?

8        A.   So the results begin on page 22 of the

9   report and we find a few things.  They're actually

10  summarized on page 25 of the report.  And they're

11  also illustrated in the variation figures.  This is

12  paragraph 53 where we ultimately summarize what's

13  picked up earlier in -- in that section.

14            So as Figure 1 shows, a significant number

15  of these facts, over 80 percent, included financial

16  projections.  As Figure 2 shows, within that universe

17  of these fact disclosures that includes financial

18  projections, 84 percent included target prepared

19  financial projections.

20            To be clear, that's not to say other things

21  may not be in there, but 84 percent included target

22  prepared financial projections.  And as Figure 3

23  shows, within the prepared sample subset, meaning

24  those target prepared financial projections, nearly

25  all of them included cautionary statements.

CONFIDENTIAL

Page 49

1       Q.  All right.  So I'll go on and use the

2   language of your -- of your opinion.  You used the

3   phrase "prepared solely by the target company,"

4   correct?

5       A.  Can you point --

6       Q.  Yeah.

7       A.  -- where you're --

8       Q.  Paragraph 51.

9       A.  Solely by the target company, that's the

10  language.

11          I -- I would say that within the context,

12  we're talking about solely by the target as opposed

13  to by the sponsor or the SPAC.

14      Q.  Understood.  Okay.  Okay, thank you.

15          So -- so one of the findings as reflected in

16  your report at page 23 is that of the group of SPAC

17  deals in which financial projections were included,

18  you found that 84 percent of that group those

19  financial projections were prepared solely by the

20  target company, correct?

21      A.  Well, we're saying in 84 percent there were

22  target prepared financials.  So we're not saying that

23  there weren't, perhaps, other things in there as

24  well, but there were in 84 percent target prepared

25  financials -- projections.

CONFIDENTIAL

Page 50

1        Q.  Understood.  Okay.  All right.  So I want to

2    go back to this -- this issue that we were speaking

3    about before the break.

4             Did you or any member of your team speak

5    with any employees or executives of any of the

6    companies that you've listed in the population?

7        A.  No.

8        Q.  Okay.  Did you or any member of your team

9    check to see whether any of the companies in your

10   population were involved in litigation?

11       A.  No --

12       Q.  I'm sorry?

13       A.  Involved in litigation?  No.

14       Q.  Yes, okay.  All right.  Did you or any

15   member of your team check any of the listed companies

16   in your population to see if they eventually went

17   bankrupt?

18       A.  No.

19       Q.  I want to ask you some general questions.

20   Please don't take offense at this -- at the line of

21   questioning.

22             But is this the first empirical study that

23   you've done as an expert?

24       A.  No.

25       Q.  How many empirical studies as an expert have

[PAGES INTENTIONALLY OMITTED]

1        Q.   Welcome back, Professor.

2             I'd like to go to the section of your report

3    where you kind of expound on opinion 1and -- so if

4    you can direct your attention to page 86.

5        A.   Okay.

6        Q.   And it appears that your explication of the

7    opinion stretches through paragraph 190 on page 87;

8    is that correct?

9        A.   As far as what's here, but -- yes.  But I'm

10   also referring back to section 5C as well.  But, yes.

11       Q.   Right.  Okay.  So can you identify where in

12   this section you point to any of the evidence

13   produced in discovery to support this opinion?

14       A.   Whether it was produced -- I assume it was

15   in discovery.  Of course, there is it is 14A proxy

16   statement itself, which was the target prepared

17   financial projections in the SRII proxy that this

18   opinion is covering.  So that certainly would be -- I

19   assume it was produced.  It's a public document that

20   was the basis for part of this opinion.

21       Q.   Okay.  So other than the proxy itself, can

22   you identify any other evidence that was produced

23   over the course of discovery that you cite to in

24   support of the opinion?

25       A.   I'm just going back to review to make sure

CONFIDENTIAL

Page 169

1   I'm not missing anything.

2          No.  I think that was the sum of what we

3   looked at in terms of discovery materials for

4   purposes of opinion -- opinion 1.

5      Q.  So I just want to walk this through with

6   you.

7          So your empirical study that you conducted

8   set the definition of what you believe to be the

9   custom and practice with regard to target -- target

10  prepared financial projections; is that right?

11     A.  It's the evidence of what we understand

12  custom and practice to be.  I'm not sure we were

13  setting a definition.  But, yeah, it's the empirical

14  results that we looked at and used that as the

15  benchmark, maybe is a better way to think about it,

16  for custom and practice.

17     Q.  In other words, the empirical study is the

18  evidentiary base -- or is the base of information

19  that evidences the custom and practice that you so

20  found?

21     A.  Yeah.  It's -- the empirical analysis is the

22  basis for our determination as set out here on

23  page 86, 87 as to what it is that companies do in

24  de-SPAC transactions with respect to target prepared

25  financial statements.  And then we look at that

Page 170

1   relative to what was in the SRII proxy and the result
2   is what's here in opinion 1.
3       Q.  Another way of saying that is because the
4   words -- or the -- strike that.
5           Because the SRII proxy in this case included
6   language that said that the financial projections
7   were prepared -- prepared by the targets, that is the
8   piece of evidence upon which you say -- that is the
9   only piece of evidence that you base your conclusion
10  that it is consistent with the custom and practice as
11  evidenced by your empirical study?
12      A.  No.  That's certainly a part of it.  But
13  remember the empirical analysis also speaks to the --
14  I think they call them health warnings, the -- the
15  disclosure that relates to meaningful cautionary
16  statements, which is also included, right, in the --
17  the SRII proxy statement as well as what we looked at
18  in the other de-SPAC transactions.  So it's not
19  simply those words.  It's also the meaningful
20  cautionary language, as well.
21      Q.  Let me ask the question a little bit
22  differently.
23          So the only document you've identified that
24  was produced in discovery, the actual proxy itself,
25  that is the single piece of evidence upon which

Page 171

1    you're relying to reach the conclusion that SRI's use

2    of target prepared financial projections was

3    consistent with custom and practice as evidenced by

4    the sample de-SPACs and empirical results?

5              MS. BLADOW:  Objection.  Asked and

6         answered.

7              THE WITNESS:  So -- right.  We're not --

8         we're looking at the -- the materials in the

9         proxy itself, right, the disclosure in the

10        proxy itself and comparing that to

11        disclosures in other S4s, F4s, 14A proxy

12        statements to reach the conclusion here in

13        opinion 1.

14   BY MR. SMITH:

15        Q.  If you can go to your -- excuse me.  Go back

16   to appendix C in your report, the list of documents

17   relied upon, please.

18              I want to focus your attention -- focus your

19   attention on the documents you list here that were

20   produced in discovery.

21              The first one is Bates stamped documents.

22   Do you see that?

23        A.  Sorry.  Is that a heading?

24        Q.  It's page 17 of appendix...

25        A.  Here it is.  Yes.

Page 172

1       Q.  Can you count the number of pages of Bates
2   stamped documents you listed in this appendix C?
3       A.  It's from page 17 to 24.
4       Q.  We'll say it's about six to seven pages,
5   correct?
6       A.  Six and-a-half; something like that.  Yeah,
7   six and a third.
8       Q.  None of the materials that you cite, the
9   Bates stamped documents that you cite in appendix C
10  or none of the -- strike that.
11          Isn't it true that you didn't cite to any of
12  these Bates stamped documents in support of opinion
13  1?
14          MS. BLADOW:  Objection.  Asked and
15          answered.
16          THE WITNESS:  I have to go back and
17          check.  I just don't remember all the
18          footnotes, but I don't -- off the top of my
19          head, it's not something that I can recall
20          doing, but I'd have had to go back and look
21          at the footnotes.
22  BY MR. SMITH:
23      Q.  If you go to page 2, appendix C, there's a
24  listing of depositions here.
25      A.  I'm on page 2.

CONFIDENTIAL

Page 173

1      Q.  Did you review the entirety of the

2   depositions and the attached exhibits to these

3   depositions?

4      A.  I did.  Although, some of the review was

5   some months ago, but I did go through these things,

6   yes.

7      Q.  And isn't it true that you do not cite to

8   any of these depositions or deposition exhibits in

9   support of opinion number 1?

10      A.  Again, I don't recall doing it, but I'd have

11   to go back and check to confirm.  I just don't

12   remember what's in the footnotes.

13      Q.  But I think you previously answered, as your

14   counsel objected that it was asked and answered, that

15   you could not identify anything other than the proxy

16   itself in terms of documents produced in discovery

17   that you cited in support of opinion 1?

18          MS. BLADOW:  Objection.

19          THE WITNESS:  And I -- and I certainly

20          said that.  I'm saying if you're asking me

21          does this appear anywhere in terms of

22          citations, I would have to go back and check

23          again.  I'm not aware of it, but I would

24          want to go back and check.  If you'd like, I

25          can check now.

CONFIDENTIAL

Page 174

1    BY MR. SMITH:
2         Q.   Yeah, we probably should.
3              Again, the question is with regard to your
4    explication of opinion 1 -- (audio distortion) --
5    page 86.
6              Can you identify anything other than the
7    Silver Run II proxy that you cite to and produce in
8    discovery?
9         A.   Let me check.
10             (Witness reviews document.)
11             THE WITNESS:  Yeah.  I've looked at the
12        footnotes and I've not seen anything from
13        either the deposition list of documents or
14        the Bates stamped list of documents.
15   BY MR. SMITH:
16        Q.   Let's shift tact here a little bit.
17             Is there a reason why your report does not
18   acknowledge that Mr. Hackett was a board member of
19   Silver Run II?
20             MS. BLADOW:  Objection.
21             THE WITNESS:  I do acknowledge that he
22        was a board member.
23   BY MR. SMITH:
24        Q.   Is there a reason why your report doesn't
25   mention the fact that he was the acting chairman of

1    the board?

2         MS. BLADOW:  Objection.

3         THE WITNESS:  So I know that Professor

4         Badawi references this.  I would ask

5         counsel, because I have a basic disagreement

6         with that characterization, that you direct

7         me to what would support the idea that

8         Mr. Hackett was acting chairman of the board

9         as opposed to acting as a chairman of a

10        meeting.

11   BY MR. SMITH:

12        Q.  Sure.  I understand what you're saying.

13             So, evidently, you're referring to a piece

14   of evidence that Mr. Badawi relied on where it said

15   he was acting as the chairman of the meeting?

16        A.  I'm simply responding to -- I'm responding

17   to your question, Mr. Smith.

18        Q.  I'm asking you is there a reason why you

19   neglected to mention that they was acting chairman of

20   the board?

21        A.  Because --

22        MS. BLADOW:  Objection.

23        THE WITNESS:  So I noticed that in

24         Professor Badawi's documents.  I see nothing

25         that indicates that he was acting chairman

[PAGES INTENTIONALLY OMITTED]