# EXHIBIT S

# Is There a First-Drafter Advantage in M&A?

Adam B. Badawi[*] & Elisabeth de Fontenay[**]

*Does the party that provides the first draft of a merger agreement get better terms as a result? There is considerable lore among transactional lawyers on this question, yet it has never been examined empirically. In this Article, we develop a novel dataset of drafting practices in large M&A transactions involving US public-company targets. First, we find that acquirers and sellers prepare the first draft of the merger agreement with roughly equal frequency, contrary to the conventional wisdom that acquirers virtually always draft first. Second, we find that providing the first draft offers little or no advantage with regard to the most monetizable merger agreement terms, such as merger breakup fees. Third, and notwithstanding, we do find an association between drafting first and attaining a more favorable outcome for terms that are harder to monetize, that are more complex, and that tend to be negotiated exclusively by counsel, such as the material adverse change (MAC) clause. These findings are consistent with the view that the negotiation process generates frictions and agency costs, which can affect the final deal terms and result in a limited first-drafter advantage.*

Introduction ........................................................................................ 1120
I. Review of the Literature .................................................................. 1126
    A.  Efficient Bargaining in M&A Transactions ...................... 1126

DOI: https://doi.org/10.15779/Z38SF2MC3N
Copyright © 2019 California Law Review, Inc. California Law Review, Inc. (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.
    *.    Professor of Law, UC Berkeley School of Law (abadawi@berkeley.edu).
    **.    Associate Professor of Law, Duke University School of Law (defontenay@law.duke.edu).
    We thank audiences at the 2018 American Law and Economics Association annual meeting, the 2018 BYU Winter Deals Conference, Columbia Law School, Duke University School of Law, Fordham University School of Law, Northwestern Pritzker School of Law, UC Berkeley School of Law, and the University of Chicago Law School for helpful comments and suggestions. Rob Anderson is owed special thanks for early discussions. Joseph Hahn, Josh Klaber, and Ashley Waid provided outstanding research assistance. All errors remain ours.

*CALIFORNIA LAW REVIEW*                    [Vol. 107:1119

    B.    Departures from Efficient Bargaining ................................ 1128
II. Background ................................................................................ 1131
    A.    Merger Transactions and the Role of Lawyers ................. 1131
    B.    Prominent Terms in M&A Agreements............................. 1134
          1.    Termination Fee. ..................................................... 1134
          2.    Reverse Termination Fee. ......................................... 1135
          3.    Go-Shop Period. ...................................................... 1137
          4.    The MAC Clause. ..................................................... 1137
III. Description of the Dataset.......................................................... 1139
    A.    Merger Information.......................................................... 1139
          1.    Sample of Merger Transactions. ................................ 1139
          2.    First Drafter and Auction. ........................................ 1139
          3.    SDC Platinum. ......................................................... 1140
    B.    Sample Statistics ............................................................. 1141
    C.    Who Drafts First? ............................................................ 1143
    D.    Law Firm Involvement in M&A Transactions ................. 1145
IV. Data Analysis and Results .......................................................... 1146
    A.    Matched Sample Analysis of Non-Auctions..................... 1147
    B.    Matched Sample Analysis of Auctions............................. 1151
    C.    Interpretation of Results.................................................. 1154
V. Potential Objections ................................................................... 1157
    A.    Choice of Non-Price Terms ............................................. 1157
    B.    Importance of MAC Drafting .......................................... 1160
          1.    The Paradoxical MAC Clause. .................................. 1161
          2.    Uses and Interpretation. ........................................... 1164
Conclusion ...................................................................................... 1166
Appendix A - Construction of MAC Measures ..................................... 1167
Appendix B - Law Firm Involvement in M&A Transactions (cont.) ... 1170

"Always grab the pen."

　　　　　　　　　　　–M&A partner at top-5 US law firm (Nov. 3, 2017).

## INTRODUCTION

　　Major corporate transactions, such as mergers and acquisitions (M&As) and large debt or equity financings, involve big teams of lawyers commanding premium billing rates.[1] The functions these lawyers serve are many and varied.[2] Among these, lawyers view preparing the first draft of the transaction agreement as a critical component of the value they provide, devoting considerable time and effort to it. In the drafting process, lawyers select the best precedent agreement

---

　　1.　*See* Larry E. Ribstein, *The Death of Big Law*, 2010 WIS. L. REV. 749, 763 (2010).
　　2.　For a review of the literature on the role of transactional lawyers, see Elisabeth de Fontenay, *Law Firm Selection and the Value of Transactional Lawyering*, 41 J. CORP. L. 393, 398–404 (2015).

form to start from and strategize how strongly to tilt the draft terms in their client's favor. Indeed, it is an article of faith among lawyers that the first draft of the agreement can influence the final deal reached: an advantage in the first stage leads to an advantage for one's client in the end.[3]

This belief in the importance of providing the first draft extends to the most elite law firms and their most sophisticated clients. For debt financing transactions, for example, it has long been the unquestioned practice for lender's counsel to draft all major financing documents. This is because the banks involved are repeat players in these transactions and find it efficient to develop their own forms.[4] Yet sophisticated borrowers are now challenging this long-established practice. The largest private equity firms currently represent a large share of debt financing transactions on the borrower side. They are using their bargaining power to wrest first-drafter rights from bank counsel.[5] The result is that banks such as JP Morgan and Citibank may be required to work from an unfamiliar draft credit agreement provided by borrower's counsel, even when underwriting and syndicating multibillion-dollar financing transactions. Why do private equity firms find drafting rights so important that they are willing to expend some of their capital vis-à-vis the banks to obtain them?

Relatedly, transactional lawyers also maintain that parties with superior bargaining power tend to obtain better outcomes across the whole range of transaction terms in an agreement.[6] In other words, "leverage" over one's counterparty in a transaction leads not only to more favorable deal pricing, but also to many other more favorable terms.

Are these deeply held beliefs about a "first draft effect" or "bargaining power effect" on deal terms correct? Many contract theorists would find them implausible. For several decades now, a dominant view in the field of law and

---

3.   *See* Robert Anderson & Jeffrey Manns, *The Inefficient Evolution of Merger Agreements*, 85 GEO. WASH. L. REV. 57, 66 (2017) ("Generally, lawyers believe that the ability to create the first draft offers an advantage by giving lawyers the chance to choose the precedent and shape it to meet the needs of the new deal."); *see also* ROBERT A. FELDMAN & RAYMOND T. NIMMER, DRAFTING EFFECTIVE CONTRACTS: A PRACTITIONER'S GUIDE (2d ed. 2005) 1–20 (cited in Anderson & Manns); JAMES C. FREUND, ANATOMY OF A MERGER: STRATEGIES AND TECHNIQUES FOR NEGOTIATING CORPORATE ACQUISITIONS 26–27 (1975) ("[T]he axiom is: if you have the opportunity to draft the documents, do so.") (cited in Anderson & Manns).

4.   *See* PRACTICAL LAW FINANCE, SPONSOR/LENDER NEGOTIATING ISSUES IN ACQUISITION FINANCE at 11 (2015), West Practical Law, Article 7-381-0292.

5.   *See id.* (noting that this development defies the "customary procedure" of having lender's counsel draft); Client Memorandum, Davis Polk & Wardwell LLP, What a Difference a Year Makes: A Review of Acquisition Financing in 2010, at 1 (2011), https://www.davispolk.com/files/files/Publication/79ac6695-c491-423e-b82e-02e788176f51/Preview/PublicationAttachment/f15a07d3-9664-44f1-b845-0493e0b07591/012511_acq_financing.pdf [https://perma.cc/8EU7-7CDT] (finding that "major [private equity] sponsors are asking their counsel to produce the first draft of mandate papers").

6.   *See, e.g.*, Omri Ben-Shahar & James J. White, *Boilerplate and Economic Power in Auto Manufacturing Contracts*, 104 MICH. L. REV. 953, 964 (2006) ("The lawyers and purchasing officials who write and negotiate the supply contracts invest much effort in tightening up the legal terms and in leveraging the OEMs' bargaining power in securing adherence to these terms.").

economics has been that parties to any voluntary arrangement choose final terms—other than the "price" term—that maximize their *collective* interests.[7] Further, the parties will arrive at these "efficient" terms regardless of their relative bargaining power or the specifics of the negotiation process. One implication is that who provides the first draft, and even what that first draft contains, should be entirely irrelevant to the final contractual outcome. In this view, the first draft of a transaction agreement is simply a default starting point for negotiations: if the terms included in the first draft happen to be the efficient ones, they will be retained; otherwise, they will be modified because both parties have an interest in arriving at the efficient terms.[8] For any given deal, if we observe that most of the terms in the first draft have been retained in the final agreement, that would simply indicate that the precedent form correctly anticipated most of the efficient terms—as one might expect from a well-selected precedent.

The prediction that the first drafter of a merger agreement will be irrelevant to the terms of the final merger agreement therefore fits within the broader literature on whether default terms matter in contractual relationships and other voluntary arrangements.[9] Here, "default terms" are those that will apply to the parties' relationship or transaction unless they are modified by mutual agreement. There are other well-known contexts in which default terms may or may not affect final outcomes, and the terms agreed to may or may not be efficient. These include business organizational law, in which state statutes provide certain default terms for each type of business entity, which the parties are permitted to modify;[10] commercial contracts governed by the Uniform Commercial Code, which supplies default terms for such arrangements;[11] and charter and by-law provisions at a corporation's initial public offering, which are drafted unilaterally by the issuer's counsel, but may subsequently be modified if the shareholders and board of directors so approve.[12] In each case, scholars are

---

7. *See* Albert Choi & George Triantis, *The Effect of Bargaining Power on Contract Design*, 98 VA. L. REV. 1665, 1667 (2012); *see also infra* note 29 and accompanying text.

8. For a comprehensive discussion of default rules in contract, see Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 YALE L.J. 87 (1989).

9. *See* Frank H. Easterbrook & Daniel R. Fischel, *The Corporate Contract*, 89 CHI. L. REV. 1416, 1444–45 (1989) (discussing the role of corporate law as a set of "off-the-rack" default rules that minimize the transaction costs of negotiations); Yair Listokin, *What Do Corporate Default Rules and Menus Do? An Empirical Examination*, 6 J. EMPIRICAL LEGAL STUD. 279, 280–81 (2009) (surveying the theoretical literature on the use of default rules in voluntary arrangements).

10. *See* Bernard S. Black, *Is Corporate Law Trivial? A Political and Economic Analysis*, 84 NW. U.L. REV. 542, 592–93 (1990) (arguing that the default rules in corporate statutes do not influence the ultimate bargain between shareholders and management). *But see* Listokin, *supra* note 9 at 306–08 (providing empirical evidence that default rules do affect such bargains).

11. *See* Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 VA. L. REV. 821, 825 (1992) (noting that "many of the provisions of Article 2 of the Uniform Commercial Code (U.C.C.) are default rules, because they apply 'unless otherwise agreed'").

12. *See, e.g.,* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. FIN. ECON. 305, 306 (1976) (arguing that

divided as to whether the default terms actually influence the final terms, *i.e.*, whether the parties retain them even when they are not efficient.[13]

If one believes that default terms in voluntary arrangements are largely irrelevant, this should especially be the case for large mergers and acquisitions. In these transactions, the parties are sophisticated, informed, and wealthy. The negotiations are typically bilateral, and the transaction costs of negotiating, while high in absolute terms, are low relative to the value of the deal. This is the setting in which we explore the first-drafter advantage.[14] Although claims about a first-drafter advantage on corporate transaction terms are ubiquitous among practitioners, these claims have not been explored empirically. In fact, although M&A transactions figure prominently in both the finance and the corporate law literature, to our knowledge, the literature includes no data on who first drafts the merger agreements, and under what circumstances.

The conventional wisdom is that drafting responsibility is overwhelmingly awarded to the acquirer.[15] Using a sample of 867 merger agreements involving US public company targets signed between 2007 and 2016, we show that this view is simply incorrect. For each deal, we examine the proxy statement to determine which party provided the first draft of the agreement and how competitive the sale process was. Contrary to the conventional wisdom, we find that initial drafting responsibility for our sample was split almost perfectly evenly between acquirer's counsel and seller's counsel.[16] Further, we find that the strongest predictor of which party drafts first is whether the target company is sold in an auction process. If it is, the seller is overwhelmingly likely to draft; if it is not, then drafting responsibility tends to rest with the acquirer.

We then turn to the task of identifying whether drafting first is associated with more favorable deal terms for that party. We find that this is indeed the case for some terms in the merger agreement, but not for the most monetizable

---

founders are incentivized to choose efficient corporate governance arrangements at the initial public offering (IPO) stage. *But see* Lucian A. Bebchuk, *Why Firms Adopt Antitakeover Arrangements*, 152 U. PA. L. REV. 713, 753 (2003) (challenging the claim that corporate governance terms at the IPO stage are efficient); Robert Daines & Michael Klausner, *Do IPO Charters Maximize Firm Value? Antitakeover Protection in IPOs*, 17 J. L. ECON. & ORG. 83, 110–13 (2001) (finding that IPO investors price economic terms, but not necessarily governance terms).

13.   *See, e.g.*, *supra* notes 10, 12.

14.   This Article focuses on contractual arrangements between sophisticated parties. We note, however, that the question of whether default terms matter has been extensively treated in the context of consumer transactions or employee arrangements, such as end user license agreements (EULAs) or retirement-plan choices. *See, e.g.*, John Beshears et al., *The Importance of Default Options for Retirement Saving Outcomes: Evidence from the United States*, in LESSONS FROM PENSION REFORM IN THE AMERICAS, 59 (Stephen J. Kay & Tapen Sinha eds., 2008); Florencia Marotta-Wurgler, *Are "Pay Now, Terms Later" Contracts Worse for Buyers? Evidence from Software License Agreements*, 38 J. LEGAL STUD. 309 (2009).

15.   *See, e.g.*, Anderson & Manns, *supra* note 3, at 64 (stating that "lawyers representing an acquirer in an M&A transaction typically choose the precedent used in the deal which sets the defaults and baselines for negotiations among the lawyers (and their clients)").

16.   *See infra* Part III.C.

terms.[17] Specifically, we examine the association between the merger agreement's first drafter and four material provisions in public-company deals: the termination fee, the reverse termination fee, the "go-shop" period, and the "material adverse change" (or "MAC") clause. We do so separately for auction deals and non-auction deals. In each case, we construct a matched sample of buyer- and seller-drafted merger transactions based on propensity scores—that is, we restrict our sample to deals that are highly similar according to various observable characteristics, such as size, type of consideration, and so forth. Propensity-score matching provides some assurance that the results we observe are not driven by differences between buyer-drafted and seller-drafted deals or statistical outliers. We then analyze the association between the four selected non-price deal provisions and various deal characteristics, including which party provided the first draft. We find, on average, that the go-shop and the MAC clause in the final (executed) merger agreement are relatively more favorable to acquirers when the acquirer provides the first draft, and relatively more favorable to sellers when the seller provides the first draft. We find little or no evidence of such an association for the termination fee or reverse termination fee.

To what should we attribute this limited first-drafter advantage in public company M&A? We identify four possible drivers. One possibility is that it reflects pure bargaining power. This assumes drafting responsibility tends to be allocated to the party with superior bargaining power. Second, a first-drafter advantage may result from transaction costs: negotiating the terms of a very lengthy document takes time, such that a party preferring to sign the deal rapidly may concede on certain terms in the initial draft even if it finds them suboptimal.[18] A third possibility is that the terms first proposed by the drafting party have an "anchoring" or "framing" effect on the counterparty—a form of cognitive bias.[19] The final hypothesis concerns the role of lawyers in these transactions. If drafting responsibilities are typically assigned to the more experienced counsel, then that law firm may obtain more advantageous terms for its client through better negotiating skills or better market information, for instance. Alternatively, agency costs in the lawyer-client relationship could lead the drafting law firm to waste time negotiating terms with immaterial payoffs, or, conversely, lead the non-drafting law firm to negotiate only those terms that are most salient to its client.

While we cannot provide a definitive theoretical answer, we find evidence that supports some of these theories over others. Notably, we show that transaction costs associated with the M&A negotiation process, and lawyer agency costs, may play an important role in fixing deal terms. By design, we

---

17.   *See infra* Part IV.
18.   In effect, this may be viewed as a particular form of bargaining power. If the drafting party is less affected by the passage of time (that is, less "impatient" in the language of bargaining theory) than its counterparty, then the drafting party thus acquires bargaining power.
19.   *See* sources cited *infra* note 43.

examine very different types of M&A deal terms.[20] The termination fee and reverse termination fee are highly salient, are specified numerically, and are easily translated into (expected) dollar amounts. Therefore these terms are obvious points of negotiation for the parties themselves. By contrast, the MAC clause is a complex, non-numerical term that tends to be negotiated exclusively by counsel. The go-shop period term lies somewhere in between: although it is specified numerically (in terms of days), it is not readily converted into dollars and cents by the parties, and is far less salient to the parties than the termination fee or reverse termination fee. Thus, the fact that we find evidence of a first-drafter advantage for the go-shop fee and the MAC clause, but not for the termination fee and reverse termination fee, is consistent with the negotiation process itself affecting final terms. A party's impatience to get the deal done may cause it to concede to the drafting party on terms that require time and expertise to negotiate and that are difficult to value, but not on the most fundamental economic terms. These findings are not consistent with behavioral anchoring explanations, however: providing the initial draft does not lead to a meaningful advantage for the termination or reverse termination fee provisions, which are the most salient of the four provisions that we examine.

Whatever the explanation, our results cast doubt on both the classical prediction that parties will always agree to efficient terms and the view that drafting first provides a clear advantage. The answer lies somewhere in between. We provide evidence that there is a first-mover advantage even in major transactions among highly sophisticated, informed parties, but that this advantage dissipates for terms that are easy to monetize.

The Article proceeds as follows. Part I briefly reviews the theoretical and empirical literatures on the determinants of M&A contract terms. Part II provides background on the negotiation of merger agreements and presents competing hypotheses that we wish to test, as to how non-price terms are determined in merger agreements. Part III describes the construction of our dataset. Part IV provides the results of our data analyses, suggesting that there is indeed a limited first-drafter advantage in M&A. Part V addresses potential objections, including the contention that MAC clause drafting is immaterial. Appendix A describes our methodology for creating various measures of the MAC clause's value to the seller versus its value to the acquirer, while Appendix B provides detail on which law firms tend to draft first and under what circumstances.

---

20. *See infra* Part II.B.

I.

REVIEW OF THE LITERATURE

### A. *Efficient Bargaining in M&A Transactions*

While contract theory has long been a topic of research, considerable work remains to be done in understanding precisely what determines the final terms agreed to by the parties. Contract theorists often divide agreement terms into "price terms" and "non-price terms."[21] Non-price terms are components of the bargain intended to create value for one or both parties, while price terms indicate how that value is split between them.[22] When purchasing a new car, for example, the seller warranty would be a non-price term, while the total amount payable to the dealership would be the price term.

Over the years, scholars have considered whether bargaining power imbalances among the parties affect non-price terms.[23] Scholars have also focused on the role played by the parties' agents in negotiating and even designing non-price terms.[24] For large transactions such as M&A deals, lawyers tend to be primarily responsible for negotiating the non-price terms of the key contracts.[25] Do lawyers themselves affect the final terms agreed to by the parties, and if so, by what means?

For decades, a widespread position in the field of law and economics has been that factors such as bargaining power and the negotiation process have no effect on the final non-price terms to which the parties agree.[26] Instead, the parties are always incentivized to agree to the non-price terms that maximize their *joint* surplus from the transaction (the "efficient" terms), after which they will split this surplus through the price term, according to their relative bargaining power.[27] Any term for which the benefit to one party outweighs the

---

21.   *See, e.g.*, Choi & Triantis, *supra* note 7 at 1667.

22.   *But see id.* at 1667 n.2 (noting the difficulty of distinguishing between price terms and non-price terms).

23.   *See, e.g.*, Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 COLUM. L. REV. 629, 632 (1943) (arguing that the imbalance in bargaining power between the parties to a contract of adhesion can result in contract terms that are not socially optimal).

24.   *See infra* notes 39–44.

25.   *See* John C. Coates IV, *Explaining Variation in Takeover Defenses: Blame the Lawyers*, 89 CALIF. L. REV. 1301, 1301 (2001) [hereinafter Coates, *Explaining Variation*] ("Together, these findings provide strong evidence that lawyers determine key terms in the 'corporate contract,' due to agency costs between owner-managers and their lawyers.").

26.   *See, e.g.*, Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 STAN. L. REV. 548 (1969); George L. Priest, *A Theory of the Consumer Product Warranty*, 90 YALE L.J. 1297 (1981); Alan Schwartz, *A Reexamination of Nonsubstantive Unconscionability*, 63 VA. L. REV. 1053 (1977).

27.   In the case of an M&A transaction, the parties' joint surplus would be the sum of (1) the difference between the acquirer's willingness to pay and the acquirer's aggregate payoff from the agreed-upon terms and (2) the difference between the seller's aggregate payoff and the seller's reservation price. Note, therefore, that the "efficient" terms are not those that split surplus evenly between the parties. In fact, the efficient terms may be very one-sided in favor of a particular party, if the payoff they produce for that party is so large that it outweighs the harm to the other party.

cost to the other is an "efficient" term. In choosing which terms to agree to, the hypothesis goes, a party takes into account the costs and benefits (the "payoff") not only to itself, but also to its counterparty. As long as the joint net payoff for any term is positive, the parties should both be willing to agree to it.[28] Intuitively, the idea is that the parties will both do better if they make the pie as large as possible before bargaining over how to split it.

If this hypothesis is correct, it implies that bargaining power should affect only the price term(s) of voluntary bargains, and not the non-price terms.[29] In this view, if the non-price terms in a contract between sophisticated parties appear to be unfavorable to one side, this is not because that party lacks bargaining power, but rather because the terms are "efficient": the collective benefit to the parties from each of these terms outweighs their costs, so both parties have an incentive to agree to them. The parties can then divide the collective surplus from these terms through the price term, and it is there—and only there—that bargaining power comes into play. A corollary of the prediction that parties to a voluntary agreement will inevitably agree to efficient non-price terms is thus that other factors, such as bargaining power, the negotiation process, and negotiating skill, have no effect on the final non-price terms. This "irrelevance proposition," as Albert Choi and George Triantis call it, has been a defining feature of much of the study of contracts in law and economics.[30]

As an illustration, imagine two parties, A and B, negotiating a simple transaction. During the course of negotiations, they consider four potential non-price terms to include in their agreement. If included, each such term would be expected to generate a particular payoff (positive or negative) for A and for B. These expected payoffs are reported in **Table 1** below. We assume for simplicity's sake that both parties are aware of each other's expected payoff from any given term.

**Table 1.** Expected Payoffs from Non-Price Terms: Example.

| Expected Payoffs | Term 1 | Term 2 | Term 3 | Term 4 |
|---|---|---|---|---|
| Party A | +$5 | +$10 | -$7 | -$4 |
| Party B | +$3 | -$6 | -$8 | +$3 |

Which terms, if any, should the parties include in their bargain? If Term 1 were included in the agreement, it would be expected to increase Party *A*'s payoff by $5 and Party *B*'s payoff by $3. Both parties therefore benefit from this term and would readily agree to include it in their agreement. Term 2, on the other hand, should increase Party *A*'s payoff (by $10), but decrease Party *B*'s payoff

---

28.   *See* Avinash Dixit & Susan Skeath, GAMES OF STRATEGY 571–72 (2d ed. 2004) (illustrating the Nash model of cooperative bargaining).

29.   *But see generally* Choi & Triantis, *supra* note 7 (explaining—and critiquing—the theory that bargaining power does not affect non-price terms).

30.   *See id.* at 1675–77 (describing several circumstances in which the irrelevance proposition may be violated).

*CALIFORNIA LAW REVIEW*

(by \$6). Should Party *B* therefore refuse the term? The answer is no, because the benefit to Party *A* from Term 2 is larger than the cost the term imposes on Party *B*. Party *A* should be willing to pay Party *B*—through adjustment of the price term of this agreement—at least enough to make Party *B* whole, in exchange for Party *B*'s agreement to include the term.

Thus, although Term 2 imposes a cost on Party *B*, Party *B* will agree to it, because the parties' joint payoff from the term—\$10 minus \$6—is positive. Term 3 imposes a cost on both parties and will therefore not be included. Term 4 also will not be included, because although it provides an expected benefit of \$3 to Party B, the loss of \$4 to A results in a negative joint payoff to the parties of -\$1.

Thus, the parties will only agree to Term 1 and Term 2 in their transaction. This is the set of non-price terms that maximizes their joint payoff, rather than their individual payoffs. Indeed, this bargain results in significantly different total payoffs for each party. Party *A*'s expected payoff from a deal that includes both Term 1 and Term 2 is positive: \$5 + \$10 = \$15. Party B, by contrast, obtains a negative expected payoff: \$3 - \$6 = -\$3. Therefore, in order to arrive at the efficient bargain with Term 1 and Term 2, A will have to pay B a price that is somewhere between \$3 and \$15—\$3 being the minimum amount B would accept, and \$15 being the maximum amount A would pay for such terms.[31] This simple example illustrates the logic behind the standard law and economics prediction that rational parties to a voluntary bargain will agree to the efficient set of non-price terms—that is, to the non-price terms that maximize their joint payoff.

## B. *Departures from Efficient Bargaining*

Recently, however, strict adherence to the theory of efficient bargaining and to the irrelevance principle have been challenged on both theoretical and empirical grounds. Choi and Triantis argue that in certain negotiations, bargaining power can both (1) alter the set of terms that would be efficient for the parties and (2) lead parties to agree to inefficient terms.[32] They provide a detailed taxonomy of the various sources of bargaining power and model certain cases in which bargaining power can affect non-price terms. These cases include (1) transactions, including mergers and acquisitions, in which the price term is negotiated and effectively fixed before the non-price terms are, and (2) transactions involving asymmetric information.[33]

---

31. How the parties will ultimately end up splitting the price term depends on factors such as their outside options (also known as their reservation values) and their relative bargaining power. Different bargaining models predict different splits of the \$12 surplus from the transaction.

32. Choi & Triantis, *supra* note 29, at 1678.

33. *See also* Albert Choi & George Triantis, *Strategic Vagueness in Contract Design: The Case of Corporate Acquisitions*, 119 YALE L.J. 848, 873 (2013).

Another approach to challenging the efficiency of M&A terms examines the specific process by which they are negotiated, and by whom. For example, certain merger agreement terms may be partially determined by considerations extending beyond the payoffs to the individual parties. Marcel Kahan and Michael Klausner have argued that "boilerplate" terms in merger agreements reflect learning and network externalities.[34] This means that, while considered in a vacuum, boilerplate terms may not be efficient for the negotiating parties, the parties are incentivized to adopt them simply because a large number of third parties has adopted them. The benefits of having shared understandings of and experiences with boilerplate terms within the larger market may be sufficiently large that the parties will choose not to deviate from such terms, even if they would have selected different terms in the absence of such externalities.

Relatedly, Robert Anderson and Jeffrey Manns advocate for greater standardization in M&A practice.[35] They find that M&A agreements derive from a vast set of different precedent forms, on a seemingly *ad hoc* basis, and argue that this lack of standardization is inefficient.[36] They claim that, on average, M&A clients would obtain better outcomes at lower cost if law firms were willing to coordinate to develop a standard set of forms and commit to spending less time modifying them.[37]

As the primary agents responsible for negotiating merger agreements, lawyers may shape the non-price terms of M&A deals in ways that depart from the efficient bargain. Through several empirical studies, John Coates shows that law firm experience has a significant effect on the final terms of M&A contracts.[38] As Coates recognizes, however, it is not necessarily clear that more experienced counsel leads to more efficient terms. Coates marshals many examples in which experienced counsel proves instrumental in developing new, value-increasing terms; however, he also provides some evidence that, by siding with management for agency-cost reasons, these lawyers introduce terms in corporate transactions that may be value-decreasing for investors.[39] C. N. V.

---

34.   *See* Marcel Kahan & Michael Klausner, *Standardization and Innovation in Corporate Contracting*, 83 VA. L. REV. 713, 766 (1997).

35.   Anderson & Manns, *supra* note 3, at 61–62.

36.   *See id.*

37.   Other scholars have highlighted the extent to which merger agreement provisions are path-dependent. *E.g.,* Matthew Jennejohn, *The Architecture of Contract Innovation*, 59 B.C. L. REV. 71 (2018).

38.   *See* Coates IV, *Explaining Variation, supra* note 25, at 1385–86 (2001) (focusing on takeover defenses); John C. Coates IV, *Managing Disputes through Contract: Evidence from M&A*, 2 HARV. BUS. L. REV. 295, 336–37 (2012) (focusing on dispute management provisions); John C. Coates, IV, Allocating Risk Through Contract: Evidence from M&A and Policy Implications 43 (Aug. 22, 2012) (unpublished manuscript), *available at* https://ssrn.com/abstract=2133343 [https://perma.cc/S975-99US] (examining all risk-shifting provisions in M&A contracts).

39.   *See* Coates IV, *Explaining Variation, supra* note 25, at 1311–12. Because managers, rather than investors, select a firm's counsel, there is the potential for an agency problem whereby experienced counsel may write in terms that provide greater private benefits for management (such as higher

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

Krishnan and Ronald Masulis find that law firms with the greatest share of the M&A advisory market are associated with key positive outcomes for their clients (such as higher deal completion rates and higher takeover premia, on the acquirer's side), suggesting a value-increasing contribution from experienced firms.[40] Using a sample of private merger agreements from a single Dutch law firm, Christel Karsten, Ulrike Malmendier and Zacharias Sautner find that individual lawyer expertise is also associated with better client outcomes in M&A negotiations.[41] By contrast, a study by Anderson and Manns suggests that shareholders do not price merger agreement provisions, thereby calling into question the value of lawyers' time and effort in negotiating these terms.[42]

With these competing positions on the efficiency of M&A terms in mind, we consider a context in which the irrelevance principle would seem most likely to hold: bilateral negotiations between highly sophisticated parties with ample resources, in which transaction costs are small relative to the size of the deal. Specifically, we look at whether the final terms agreed to by parties to a merger agreement differ according to which party provided the first draft. As noted earlier, the irrelevance principle predicts that there would be no association between first-drafter status and the final value of the merger agreement terms.

In contrast to the irrelevance proposition, various other theories could support the association between first-drafter status and relatively more favorable M&A deal terms. First, in a process referred to in the behavioral economics and negotiations literature as "framing" or "anchoring," the initial set of terms proposed in a negotiation may influence what the other party views as reasonable, or what it believes the drafting party's reservation price to be.[43]

---

compensation, lower risk of personal liability, more protection against being replaced by new managers, etc.) than investors would prefer. This deviates from the efficient terms.

40. *See* C.N.V. Krishnan & Ronald W. Masulis, *Law Firm Expertise and Merger and Acquisition Outcomes*, 56 J.L. & ECON. 189, 220 (2013).

41. *See* Christel Karsten, Ulrike Malmendier & Zacharias Sautner, Lawyer Expertise and Contract Design – Evidence from M&A Negotiations 22 (Jan. 28, 2019) (working paper), *available at* https://ssrn.com/abstract=2576866 [https://perma.cc/6MHQ-JX6K].

42. Jeffrey Manns & Robert Anderson, *The Merger Agreement Myth*, 98 CORNELL L. REV. 1143, 1154, 1186 (2013) (using an event-study design to show that the market does not react to the disclosure of acquisition agreements in the one to four days following the merger announcement). *But see* John C. Coates, Darius Palia & Ge Wu, *Are M&A Contract Clauses Value Relevant to Bidder and Target Shareholders?* 3 (June 22, 2018) (working paper), *available at* https://ssrn.com/abstract=3201235 [https://perma.cc/JLV9-UQ43] (finding evidence that specific M&A contract clauses do affect stock returns for the bidder and target upon announcement, suggesting that deal lawyer expertise aids with efficient contracting).

43. *See* Adam D. Galinsky & Thomas Mussweiler, *First Offers as Anchors: The Role of Perspective-Taking and Negotiator Focus*, 81 J. PERSONALITY & SOC. PSYCHOL. 657, 667 (2001); Amos Tversky & Daniel Kahneman, *Judgment under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1131 (1974). In contract, the "status quo bias" describes a similar phenomenon for default rules. *See* Russell Korobkin, *The Status Quo Bias and Contract Default Rules*, 83 CORNELL L. REV. 608, 675–76 (1998). *But see* Alan Schwartz & Robert Scott, *Contract Law and the Limits of Contract*, 113 YALE L.J. 541, 551–52 n.18 (2003) (suggesting that the status quo bias is less likely to apply where the parties are sophisticated repeat players).

Indeed, there is empirical evidence in the M&A context of such anchoring effects on the price term itself. Malcolm Baker, Xin Pan and Jeffrey Wurgler find that the target company's most recent peak in stock price biases both the amount of the acquirers' offers and the likelihood that the target will accept an offer.[44]

Second, if first drafters tend to end up with more favorable terms than their counterparties, all else equal, this might simply be a reflection of the drafting party's superior bargaining power. Indeed, the first drafter not necessarily randomly assigned: in many cases, one could imagine, the party with superior bargaining power is given the opportunity to provide the first draft for precisely that reason. If Choi and Triantis are correct that bargaining power can affect non-price terms, then this would lead us to observe an association between first-drafter status and more favorable non-price terms.

Third, various transaction costs, agency costs, and other frictions involved in the negotiation process (such as lawyer time and effort) could provide the first-drafting party with an advantage in negotiating non-price terms. Because of these costs, parties may be less likely to depart entirely from a one-sided first draft to reach the efficient draft.[45]

Fourth, if the more experienced law firm between acquirer's counsel and seller's counsel tends to be assigned the task of providing the first draft, then, as discussed above, such experience could lead to more favorable outcomes for that client. We revisit each of these hypotheses in discussing the empirical results reported in Part V.

## II.
### BACKGROUND

#### A. *Merger Transactions and the Role of Lawyers*

The most common means of acquiring a public company is through a merger.[46] A merger has the same effect as purchasing 100 percent of the outstanding shares of the target, giving the acquirer complete control of the target business. At the same time, a merger only requires approval of a majority of the target shareholders under state law.[47] If the acquirer is an existing operating company (a "strategic" buyer), the acquirer's goal may be to derive synergies from combining the acquirer and target businesses or to gain market power by

---

44.   *See* Malcolm Baker, Xin Pan & Jeffrey Wurgler, *The Effect of Reference Point Prices on Mergers and Acquisitions*, 106 J. FIN. ECON. 49, 70 (2012).

45.   *See Ben-Shahar & White, supra* note 6, at 981–82 (finding that being differentially affected by negotiating and drafting transactions costs may illustrate yet another form of bargaining power imbalance).

46.   *See* PRACTICAL LAW CORPORATE & SECURITIES, BUYOUTS: OVERVIEW (maintained), West Practical Law, Practice Note 4-381-1368.

47.   *See* ROBERT B. THOMPSON, MERGERS AND ACQUISITIONS: LAW AND FINANCE 26 (2d ed. 2014).

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

absorbing a competitor.[48] If the acquirer is an investment fund, such as a private equity fund (a "financial" buyer), the target company is likely to be held on a standalone basis as a portfolio investment and then resold after a few years.[49]

Public company merger transactions involve multiple stages, which may be divided into (1) negotiation, (2) signing, (3) pre-closing, (4) closing, and (5) post-closing. Our focus here is on the first three stages. Negotiations begin either when an interested party approaches the target (or vice versa), or when the target explicitly solicits indications of interest from a wide field of potential candidates—a process that we will refer to as an "auction." Depending on the particular path chosen, therefore, the preliminary negotiations may be bilateral (between a single potential acquirer and the target) or multilateral (between several interested bidders and the target, in the auction format). Given the capital at stake and the potential for litigation, the parties will typically be advised by counsel from the very earliest discussions. On the target company side, in addition to counsel for the target itself, independent board members may engage their own counsel, if they are concerned about conflicts of interest involving insider board members.[50]

The parties may exchange various informal or formal indications of interest, often culminating in a signed letter of intent and term sheet, though these are typically not intended to be legally binding. Once the parties have reached broad agreement on major deal points, counsel for one side will begin drafting the merger agreement. After negotiating and revising the merger agreement extensively, the acquirer and target may eventually execute it (an event referred to as "signing"). The merger agreement is a lengthy, complex contract[51] governing the parties' rights and obligations between (1) the signing date and (2) the date on which the merger is actually consummated and the consideration is paid to the target shareholders (the "closing date"). With public company mergers (that is, mergers in which the target is a public company), the period between signing and closing may last from several months to more than one year.[52] This gap allows time for the parties to obtain all necessary regulatory

---

48. *See id.* at 11–12.

49. *See* Steven N. Kaplan & Per Strömberg, *Leveraged Buyouts and Private Equity*, 23 J. ECON. PERSP. 121, 125 (2009). In either case, the target company is typically merged with a newly formed shell entity created by the acquirer but may instead be merged with an entity that already conducts business.

50. *See* Thompson, *supra* note 47, at 130.

51. *See* John C. Coates IV, Why Have M&A Contracts Grown? Evidence from Twenty Years of Deals 3 (2016) (European Corporate Governance Institute (ECGI) - Law Working Paper No. 333), *available at* http://ssrn.com/abstract_id=2862019 [https://perma.cc/J4P9-BFTK] [hereinafter Coates IV, Why Have M&A Contracts Grown?] (finding that merger agreements have become vastly longer and more complex over a twenty-year period).

52. For example, AT&T's acquisition of Time Warner closed in June 2018—almost two years after the parties signed the merger agreement. *See* Cecilia Kang & Edmund Lee, *AT&T-Time Warner Deal Approval Gets Justice Department Challenge*, N.Y. TIMES, (July 12, 2018), https://www.nytimes.com/2018/07/12/business/justice-department-plans-appeal-of-att-time-warner-merger-approval.html [https://perma.cc/XH9F-UA62].

approvals (such as approval from antitrust authorities), for the acquirer to finalize financing for the transaction, for the target to hold the shareholders' meeting at which they must vote to approve the merger, and even to allow for other potential acquirers to make superior bids for the firm.[53]

Merger agreements are not drafted from scratch: the law firm or, rarely, in-house counsel, assigned the task of drafting the agreement, always begins from a precedent form.[54] The particular precedent form selected for a transaction might be, among others: (a) the law firm's standard form merger agreement, if any; (b) the most recent merger agreement prepared by the firm for the same client; (c) the most recent merger agreement for the same client prepared by another firm; (d) the most comparable recent deal done by the firm for another client; (e) a form recommended by the client's financial advisor; or (f) a precedent form mutually agreed to by the parties in preliminary discussions.

In any event, the drafting law firm typically modifies the precedent form considerably before circulating it to the other side,[55] whether one believes these edits to be primarily substantive[56] or mere "churning."[57] These modifications have several different plausible goals, such as tailoring the terms to the needs of the parties or their particular business arrangement, signaling information, upgrading to the most recent "market" terms, addressing regulatory developments, or even providing tangible evidence to the client of lawyer effort (even with no measurable impact on substance). Most relevant for our purposes, the drafting lawyers will also modify the precedent form to produce a first draft that includes terms more favorable to the drafters than those they expect to retain in the final agreement. Thus, the expectation across deals is that acquirer's counsel will prepare a buyer-friendly first draft, while seller's counsel will prepare a seller-friendly one. (In fact, many firms that develop a standard precedent form explicitly create alternate seller-favorable or buyer-favorable versions of particular terms or of the entire agreement for just this purpose.) Counsel's implicit hope, of course, is to retain as many of these favorable terms in the final agreement as possible, without affecting the parties' agreement on the price term(s).

As discussed, however, many of these goals conflict with the traditional law and economics proposition that bargaining power and default terms do not affect the parties' ultimate bargain with respect to non-price terms. We continue this section with a discussion of the four key non-price terms in merger agreements on which we base the empirical tests described in Part IV.

---

53.   *See* Coates IV, Why Have M&A Contracts Grown?, *supra* note 51, at 8.

54.   *See* Anderson & Manns, *supra* note 3, at 61.

55.   *See id.* at 75–77.

56.   *See* Coates IV, Why Have M&A Contracts Grown?, *supra* note 51, at 2.

57.   *See* Anderson & Manns, *supra* note 3, at 68, 76, 88 (noting that transactional attorneys have perverse incentives to go through inefficient processes or spend time on immaterial negotiations to generate billable hours).

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

### B.   Prominent Terms in M&A Agreements

Merger agreements commonly leave the door open for one or the other party to terminate the merger agreement prior to consummation of the merger. The reasons for these escape hatches are many, but we focus primarily on three. First, directors' fiduciary duties under state corporate law may prohibit the target from signing a merger agreement that leaves the board no room to consider subsequent better offers.[58] In order to preserve the board's flexibility in the merger agreement, the target may negotiate for the right to affirmatively seek superior bids for a period of time after signing (the "go-shop" period)[59] or simply to accept superior unsolicited bids. Should the target choose to accept such a bid and terminate the original merger agreement, it must pay a "termination fee" (often 2 to 4 percent of deal value) to the acquirer.[60]

Second, due to events occurring between signing and closing, an acquirer may no longer have the practical ability to follow through with the merger, such as when it fails to secure financing. Anticipating this possibility, the parties may provide that if the acquirer terminates the merger agreement for this reason, it must pay a fee (the "reverse termination fee") to the target.[61]

Third, merger agreements virtually always provide that if the target is deemed to have experienced a material adverse change between signing and closing, the acquirer may terminate the merger agreement without paying anything whatsoever to the target (the "MAC" clause).[62] This Sub-Part B describes the four provisions introduced above, all of which deal with the possibility of terminating the merger agreement prior to closing.

#### 1.   Termination Fee.

The termination fee (or "break-up" fee) is the amount payable by the target to the acquirer if the target elects to terminate the merger agreement; this may happen if the target fails to obtain the requisite shareholder approval for the merger, or if the board of directors decides to pursue an alternative transaction with a party offering a higher price for the target.[63] The purpose of including a termination fee provision in the merger agreement is to compensate the acquirer for expenses and opportunity costs in the event that the merger agreement is so terminated by the seller, and to provide the acquirer with some certainty that the merger will be consummated as planned.

A large termination fee can operate as a deal protection device, however—that is, it can materially reduce the target's incentives to back out of the executed

58.   *See* Omnicare v. NCS Healthcare, Inc., 818 A.2d 914, 935–36 (Del. 2003).
59.   *See infra* Part II.B.3.
60.   *See infra* Part II.B.1.
61.   *See infra* Part II.B.2.
62.   *See infra* Part II.B.4.
63.   *See* Brian J.M. Quinn, *Optionality in Merger Agreements*, 35 DEL. J. CORP. L. 789, 799–801 (2010).

merger agreement. Courts are generally wary of deal protection devices in merger agreements, because these render the target less receptive to other potential transactions, even those priced significantly higher.[64] When the target board chooses to put the company in play, Delaware law may require the board to seek a transaction that maximizes the return to shareholders.[65] This may require the board to remain open to bids for the target on better terms, even after the target has signed an acquisition agreement with a bidder. If the agreement signed includes excessive deal protection, the target may have no meaningful alternative to proceeding with the original transaction, regardless of whether superior bids arise. As a result, target directors may be deemed to have breached their fiduciary duties to the stockholders by agreeing to excessive deal protection.[66]

Courts have therefore held in the case of termination fees that the amount payable by the target must be reasonable and appropriate, rather than punitive. Specifically, courts will consider whether a termination fee is so large that it either coerces stockholders into voting in favor of the original transaction[67] (in order to avoid causing the target to pay out the fee) or has a chilling effect on other potential bidders for the target.[68] In practice, the Delaware Court of Chancery has held that there is no bright-line rule for the maximum permissible value of termination fees,[69] having blessed fees as high as 5.3 percent of the transaction value.[70] Termination fees in the range of 2 to 4 percent of the transaction value are routinely agreed to in public company mergers.

### 2. *Reverse Termination Fee.*

A reverse termination fee (or "reverse break-up" fee), is an amount the acquirer pays to the seller if the acquirer breaches the merger agreement; this may happen, for example, when it is unable to close because it has failed to obtain the necessary financing to pay the merger consideration.[71] The reverse

---

64.   *See* Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 FORDHAM L. REV. 1899, 1903–04 (2002) (describing Delaware case law criticizing or invalidating deal protection).

65.   Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986).

66.   *See* Omnicare v. NCS Healthcare, Inc., 818 A.2d 914, 936, 939 (Del. 2003).

67.   *See In re* Netsmart Tech., Inc. S'holder Litig., 924 A.2d 171, 197 (Del. Ch. 2007).

68.   *See* McMillan v. Intercargo Corp., 768 A.2d 492, 505–06 (Del. Ch. 2000) (determining that while a 3.5 percent termination fee may "rebuff a bidder who wished to top [the] bid by a relatively insignificant amount," it was not a material obstacle); *see also In re* Toys "R" Us, Inc. S'holder Litig., 877 A.2d 975, 1017–19 (Del. Ch. 2005) (permitting a 3.75 percent termination fee).

69.   *See In re* Cogent, Inc. S'holder Litig., 7 A.3d 487, 503 (Del. Ch. 2010); La. Mun. Police Employees' Ret. Sys. v. Crawford, 918 A.2d 1172, 1181 n. 10 (Del. Ch. 2007); *In re* Netsmart Tech., Inc. S'holders Litig., 924 A.2d at 197.

70.   *See In re* BioClinica, Inc. S'holder Litig., No. 8272–VCG, 2013 WL 5631233, at *2–3 (Del. Ch. Oct. 16, 2013) (allowing a termination fee of $6.5 million in a deal valued at $123 million).

71.   There is a robust, but conflicting, literature on whether termination fees and reverse termination fees are efficient or reflect agency costs or other inefficiencies. *See, e.g.*, Paul André, Samer Khalil & Michel Magnan, *Termination Fees in Mergers and Acquisitions: Protecting Investors or Managers?*, 34 J. BUS. FIN. & ACCT. 541 (2007) (suggesting termination fees are usually efficient);

*CALIFORNIA LAW REVIEW*         [Vol. 107:1119

termination fee gained popularity with the increase in acquisitions by private equity funds, which, unlike most strategic buyers, depend on debt financing from third parties in order to pay the merger price.[72] Nonetheless, reverse termination fees appear in deals involving both financial and strategic buyers.

Reverse termination fees may be likened to liquidated damages provisions.[73] Initially, market practice tended towards setting reverse termination fees equal to or approximately equal to the termination fee in the same merger agreement, suggesting that the parties viewed them as symmetrical obligations of the buyer and seller.[74] The symmetry is illusory, however. Directors owe heightened fiduciary duties to shareholders only when they are selling control of their companies; these duties are not in effect when they are purchasers. Thus, the fiduciary duty considerations that limit the amount of termination fees do not apply to reverse termination fees. This explains why recently buyers have agreed to reverse termination fees that are significantly larger than the seller's termination fee, averaging 6.76 percent of the transaction value in leveraged public company mergers in 2017.[75]

In Part IV, we look for evidence of a first-drafter advantage on both of these fees, using our sample of merger agreements. For each agreement in the sample,

---

Thomas W. Bates & Michael L. Lemmon, *Breaking Up Is Hard to Do? An Analysis of Termination Fee Provisions and Merger Outcomes*, 69 J. FIN. ECON. 469 (2003) (concluding that termination fees are efficient and provide value); Audra L. Boone & J. Harold Mulherin, *How Are Firms Sold?*, 62 J. Fin. 847 (2007); John C. Coates IV, Darius Palia & Ge Wu, *Reverse Termination Fees in M&A* (forthcoming 2018), *available at* https://ssrn.com/abstract=3016785 [https://perma.cc/S6JU-DVM7] (suggesting some negative and inefficient impacts of certain reverse terminations fees); Jin Q. Jeon & James A. Ligon, *How Much Is Reasonable? The Size of Termination Fees in Mergers and Acquisitions*, 17 J. CORP. FIN. 959 (2011) (concluding that small to moderate termination fees are efficient while larger fees suggest agency conflicts); Micah S. Officer, *Termination Fees in Mergers and Acquisitions*, 69 J. FIN. ECON. 431 (2003) (finding that termination fees tend to be beneficial); Brian J.M. Quinn, *supra* note 63 (concluding that reverse termination fees may be insufficient); Fernán Restrepo & Guhan Subramanian, *The Effect of Prohibiting Deal Protection in M&A*, 60 J.L. & ECON. 75 (2017) (finding that eliminating deal protection measures did not improve shareholder value); Fernán Restrepo & Guhan Subramanian, *The New Look of Deal Protection*, 69 STAN. L. REV. 1013 (2017).

72.    Afra Afsharipour, *Transforming the Allocation of Deal Risk Through Reverse Termination Fees*, 63 VAND. L. REV. 1163, 1170 (2010).

73.    Prior to our sample period, reverse termination fee provisions in merger agreements often amounted to a simple option for the acquirer to abandon the transaction upon payment of a large fee. Following the failed leveraged buyouts of the 2008 financial crisis, however, this model was abandoned in favor of a more restrictive one where, in most circumstances, an acquirer's damages extend beyond mere payment of the reverse termination fee. *See* PRACTICAL LAW, REVERSE BREAK-UP FEES AND SPECIFIC PERFORMANCE: A SURVEY OF REMEDIES IN LEVERAGED PUBLIC DEALS 2018 EDITION, 2, 4–5 (2018), West Practical Law, Article W-014-1867 [hereinafter PRACTICAL LAW, 2018 SURVEY OF REMEDIES].

74.    *See* PRACTICAL LAW CORPORATE & SECURITIES, PRACTICE NOTE: REVERSE BREAK-UP FEES AND SPECIFIC PERFORMANCE (maintained), West Practical Law, Practice Note 6-386-5096.

75.    *See* PRACTICAL LAW, 2018 SURVEY OF REMEDIES, *supra* note 73, at 11. For example, the reverse termination fee in Pfizer's 2009 merger agreement with Wyeth was 6.62 percent. Agreement and Plan of Merger among Pfizer Inc., Wagner Acquisition Corp. and Wyeth § 8.2(e), Jan. 25, 2009, https://www.sec.gov/Archives/edgar/data/5187/000119312509014288/dex21.htm [https://perma.cc/AWP7-UKDS].

we code the value of both the reverse termination fee and the termination fee as a percentage of the total transaction value. We note, however, that many deals do not include a reverse termination fee, such as when the acquirer does not intend to rely on third-party financing to pay the merger consideration. Moreover, the conditions under which the reverse termination fee are payable and the accompanying remedies (such as specific performance) for the acquirer's breach of the merger agreement, are not uniform across deals.[76]

### 3. Go-Shop Period.

The "go-shop period" is a provision that explicitly permits the target to solicit and negotiate higher offers from other parties for a period of time after signing.[77] We code the length of the go-shop period, which typically ranges from twenty-five to fifty days from the date on which the merger agreement was executed. Most merger agreements in our sample do not contain a go-shop provision, however, which is consistent with reports that the provision is relatively rare[78] and largely confined to deals involving private equity buyers.[79] While negotiating for a go-shop provision seems to suggest that the target board wishes to foster a competitive sale process, the cynical view is that "go-shops" are used as substitutes for proper auctions and induce less competition. Target management may prefer the insulation that a go-shop provides, because a favored private equity buyer may be willing to provide management with more private benefits than other bidders, for example.[80]

### 4. The MAC Clause.

The "material adverse change" ("MAC") clause is one of the most heavily negotiated provisions in a merger agreement, and has given rise to a considerable amount of litigation and commentary.[81] The MAC clause plays several key roles

---

76. *See* Coates, Palia & Wu, *supra* note 71 (documenting variation in the features of reverse termination fee provisions, beyond the amount of the fee itself; *see generally* PRACTICAL LAW, 2018 SURVEY OF REMEDIES, *supra* note 73.

77. Guhan Subramanian, *Go-Shops vs. No-Shops in Private Equity Deals: Evidence and Implications*, 69 Bus. Law. 729, 730 (2008).

78. For a discussion of the evolution of go-shop provisions, see Christina Sautter, *Shopping During Extended Store Hours: From No-Shops to Go-Shops*, 73 BROOK. L. REV. 525 (2008).

79. *See* PRACTICAL LAW CORPORATE & SECURITIES, NO-SHOPS AND THEIR EXCEPTIONS, 8,9 (maintained), West Practical Law, Practice Note 8-386-1078 [hereinafter PRACTICAL LAW, NO-SHOPS AND THEIR EXCEPTIONS].

80. J. Russel Denton, *Stacked Deck: Go-Shops and Auction Theory*, 60 STAN. L. REV. 1529, 1542–43 (2008). *But see* Zhe Wang, Structuring M&A Offers: Auctions, Negotiations and Go-Shop Provisions 5 (2016) (working paper, Stanford University), *available at* https://ssrn.com/abstract=2925018 [https://perma.cc/Q6SK-RJ3K] (suggesting that go-shop provisions are common in private equity deals where other financial bidders are likely to have similar valuations of the target).

81. *See infra* notes 139-168 and accompanying text. Today, this clause is more commonly referred to as the "material adverse event" or "material adverse effect" (MAE) clause.

in merger agreements.[82] Most importantly, it grants the acquirer a right to walk away from the transaction (technically, a right to terminate the merger agreement) without paying the seller any compensation or damages if the target company experiences a major impairment to its business between signing and closing. The provision is thus designed to allocate the risk of such an event to the seller, which continues to own and control the target company during this interim period. Because the remedy is so drastic, however, sellers negotiate fiercely to narrow the scope of the clause and to introduce broad exceptions to its application.[83]

MAC clauses may enhance the value of a merger transaction in one of many ways. A well-negotiated MAC clause may allow the target to signal private information to the buyer, place incentives on the target to maintain firm value between signing and closing, and minimize overall transaction costs.[84]

Unlike the termination fee, reverse termination fee, or go-shop period, the MAC clause is not specified numerically: it is a complex, lengthy definition, involving numerous exceptions and provisos. In our sample of public company merger agreements, typical MAC definitions range anywhere from three hundred to eight hundred words. For purposes of the empirical tests described in Part IV, we coded the MAC definition from each merger agreement in our dataset and developed an index (referred to hereinafter as the "MAC index") measuring how

---

82.   The MAC clause frequently sets the threshold for when individual representations and warranties in the merger agreement are deemed to have been breached. For example, the seller might represent that the target company has not experienced any losses relating to litigation that "would reasonably be expected" to have a Material Adverse Effect on the target. For private company targets, breach of a representation or warranty by the target frequently gives the acquirer the right to indemnification from the target post-closing. For public company mergers, however, the merger agreement typically does not include any such indemnification right, due to the difficulty of collecting funds post-closing from dispersed former shareholders. We therefore do not discuss this function of the MAC clause hereafter.

83.   Although one can easily describe the merger agreement provisions that make use of the MAC definition, there remains considerable disagreement over the fundamental purposes of the provision. *See* Choi & Triantis, *Strategic Vagueness in Contract Design, supra* note 33, at 883-96 (reviewing several possible explanations for MAC clauses); Ronald Gilson & Alan Schwartz, *Understanding MACs: Moral Hazard in Acquisitions*, 21 J.L. ECON. & ORG. 30 (2005) (concluding that MAC clauses protect buyers in the event that the combination is ultimately of low value); Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change Clauses in Business Combination Agreements*, 31 CARDOZO L. REV. 99 (2009) (viewing MAC clauses as efficiency devices for appropriating risks to the party best placed to address them); Andrew A. Schwartz, *A "Standard Clause Analysis" of the Frustration Doctrine and the Material Adverse Change Clause*, 57 UCLA L. REV. 789 (2010); Eric L. Talley, *On Uncertainty, Ambiguity, and Contractual Conditions*, 34 DEL. J. CORP. L. 755 (2009) (concluding that MAC clauses are a form of ambiguity aversion rather than risk aversion). There is also disagreement over how significant the provision actually is, given that courts virtually never find MAC provisions to have been triggered. *But see* David J. Denis & Antonio J. Macias, *Material Adverse Change Clauses and Acquisitions Dynamics*, 48 J. FIN. & QUANTITATIVE ANALYSIS 819 (2013) (providing evidence that MAC provisions do have a material impact on M&A terms and outcomes); Antonio J. Macias & Thomas Moeller, *Target Signaling with Material Adverse Change Clauses in Merger Agreements*, 39 J. EMPIRICAL FIN. 69 (2016) (same).

84.   Choi & Triantis, *Strategic Vagueness in Contract Design, supra* note 33, at 851.

favorable the MAC definition is to the seller relative to the acquirer. Part V.B addresses the question of whether different formulations of the MAC clause should be expected to result in different payoffs to the parties. Appendix A describes in detail our methodology for deriving the MAC index.

## III.
## DESCRIPTION OF THE DATASET

### A.  Merger Information

#### 1.  Sample of Merger Transactions.

We begin with the complete sample of public company M&A transactions summarized in Thomson Reuter's Practical Law database. This database is limited to mergers in which the target was a US reporting company[85] when the merger agreement was signed. The database consists of (1) a selection of eleven mergers signed in 2007, (2) all mergers signed in 2008 with a signing value of at least $250 million, and (3) all mergers signed on or after January 1, 2009, with a signing value of at least $100 million.[86] As of July 19, 2017, this represented a total of 1,438 mergers. For each transaction, the Practical Law database reports or summarizes various information regarding the economic and contractual terms of the deal and provides the names of the parties' legal and financial advisors. Because the targets are US public companies, the proxy statements and merger agreements are publicly available in the Securities and Exchange Commission's (SEC's) EDGAR database, and we extracted each one accordingly.

#### 2.  First Drafter and Auction.

We relied on the merger proxy statement prepared by the target company to determine which side's law firm circulated the first draft of the merger agreement, and coded this information by hand.[87] State corporate law requires

---

85.    "Reporting companies" are companies that are subject to substantial disclosure and other obligations under Sections 13 or 15(d) of the Securities Exchange Act of 1934. A firm becomes subject to the Exchange Act as a reporting company if (1) it offers to sell its securities to the general public; (2) it exceeds a certain size (measured by its assets and the number of its record shareholders); or (3) its securities are traded on a national securities exchange. *See* 15 U.S.C. § 77e(c) (2012) (prohibiting the sale of any security unless a registration statement is effective); *id.* § 77e(1)(A) (declaring that the prohibition does not apply to "transactions by an issuer not involving any public offering"); *id.* § 78l(g)(1)(A) (2012) (requiring a company to register its securities under the Exchange Act if it has $10 million or more in total assets and a class of equity securities "held of record" by two thousand or more persons); *id.* § 78l(d) (explaining when securities may be withdrawn from a national exchange). The Practical Law sample focuses on mergers involving actual operating companies, and therefore excludes real estate investment trusts (REITs) and debt-only issuers.

86.    Practical Law began collecting and summarizing merger agreements in 2007; coverage expanded significantly thereafter.

87.    Credit and thanks are due to Robert Anderson for suggesting this approach.

that shareholders approve mergers, typically by majority vote, with limited exceptions.[88] In most cases, where the target is a public company (as is the case for all mergers in our sample), the company produces a lengthy disclosure statement—referred to as the proxy statement—that it must both send to shareholders and file publicly, in connection with the vote.[89] We were able to locate the proxy statement for just over 60 percent of the merger transactions in our dataset.[90] The section of the proxy statement entitled "Background of the Merger" contains a detailed timeline of the events leading up to the signing of the merger agreement, including a description of communications between the target and all interested parties, including the eventual acquirer. In most cases, this section states explicitly which party's counsel provided the first draft of the merger agreement.

We also used this section of the proxy statement to code by hand whether the target was sold in a competitive process initiated by the target (which we refer to as an "auction") or in a purely bilateral negotiation with the eventual acquirer (a "non-auction"). In practice, it can be difficult to gauge the degree to which target boards succeeded in fostering true competition in the sale process.[91] In true auctions, the target engages a financial advisor at the outset to run a sale process in which (1) the target is explicitly offered for sale to a large number of potential bidders, and (2) the interested parties are treated on roughly equivalent terms, such as by being required to submit formal bids on the same dates and conduct due diligence during the same periods. In our coding, we use the term "auction" more broadly to refer to sales processes in which the target put itself up for sale in a competitive process. Specifically, we code as "auctions" both true auctions and cases in which the target was in negotiations with multiple parties simultaneously.

### 3. *SDC Platinum.*

We supplemented the information from the merger agreements, the proxy statements, and the Practical Law database with Thomson Reuter's SDC

---

88. *See, e.g.*, DEL. CODE ANN. tit. 8, § 251(c) (2017).

89. *See* Thompson, *supra* note 47, at 52 (describing the proxy solicitation process for public company acquisitions).

90. The vast majority of the remaining deals involved tender offers, for which no proxy statement is required.

91. To minimize the risk of shareholder litigation, corporate boards should rationally seek to demonstrate in the proxy statement that they conducted a fair process, designed to maximize the merger consideration payable to shareholders in the end. *See* Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV. 557, 563–65 (2015) (describing directors' fiduciary duties—including a duty to provide adequate disclosure—in the context of mergers). In particular, a board should wish to signal that it remained open to offers from multiple parties and, ideally, actively sought competing offers by canvassing the market. Thus, in our large sample of proxy statements, it was rare for companies to engage solely in bilateral negotiations with the eventual acquirer, without at least discussing the possibility of a transaction with other parties.

Platinum database of US mergers and acquisitions.[92] Among much other merger-related information, SDC Platinum reports the premium over the target's publicly traded stock at various intervals from before the announcement of the merger agreement signing. This premium equals the difference between the per-share consideration payable to shareholders upon consummation of the merger and the target company's stock price during the relevant period prior to the announcement. This difference is typically expressed as a percentage of the pre-announcement price.

In our analysis, we use the premium that SDC Platinum calculates; its basis is the target's stock price from four weeks prior to announcement of the deal.[93] We use this premium as our primary measure of the parties' relative bargaining power: the higher the merger premium percentage, the greater the imputed bargaining power of the seller relative to the acquirer. However, we note that merger premium is an imperfect measure of relative bargaining power.[94]

## B. Sample Statistics

Beginning with our dataset of 1,438 public company merger transactions, we removed the following deals from our sample:

- all mergers preceded by tender offers;[95]
- all mergers that we were able to identify as affiliated transactions, such as freeze-outs or parent-subsidiary mergers;[96]
- all "mergers-of-equals" and other mergers for which we could not reasonably describe one party as the "acquirer" and the

---

92.   A study comparing SDC Platinum data to hand-coded data has identified inaccuracies in the former, but finds that accuracy improves for deals—such as those in our sample—that are relatively large and that occurred relatively recently. *See* Beau Grant Barnes, Nancy L. Harp & Derek Oler, *Evaluating the SDC Mergers and Acquisitions Database*, 49 FIN. REV. 793, 815–19 (2014).

93.   Note that we are only able to match 779 deals to the SDC Platinum data set and that thus the sample is limited to that number when we include the premium in our analyses.

94.   The merger premium only reveals the amount of the transaction surplus that the parties chose to allocate to the seller in cash or stock (or perhaps both). In order to adequately measure the parties' relative bargaining power, however, we would also need to know the overall amount of the surplus generated by the transaction and how this surplus was split between the parties through the non-price terms. Thus, in using the merger premium as our measure of relative bargaining power, we are implicitly assuming either (1) that surplus is generated and split through non-price terms in the same proportions across all deals or (2) that the amount of surplus is randomly distributed across deals, neither of which may be valid in practice.

95.   The terms of such "two-step" tender offers differ in various ways from typical merger transactions. *See* Audra L. Boone, Brian J. Broughman & Antonio J. Macias, Shareholder Decision Rights in Acquisitions: Evidence from Tender Offers 4, 7–8 (working paper, Indiana Legal Studies Research Paper No. 331, 2017), *available at* https://ssrn.com/abstract=2629424 [https://perma.cc/4X8J-2DPN].

96.   A freeze-out merger is a transaction in which the existing controlling shareholder uses a merger transaction to cash out minority stockholders. Fernán Restrepo & Guhan Subramanian, *The Effect of Delaware Doctrine on Freezeout Structure & Outcomes: Evidence on the Unified Approach*, 5 HARV. BUS. L. REV. 205, 208 (2015).

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

other as the "target";

- all mergers for which no proxy statement was available or for which the proxy statement did not clearly specify which party provided the first draft.

We were left with a final sample of 842 mergers and merger agreements, signed from 2007 through 2016. They involve public company targets in twenty-three different industries. The average deal size is nearly $5 billion. Descriptive statistics for this sample are provided in **Table 2** below, which reports the overall means and standard deviations of selected variables, separately for non-auctions and auctions. In this sample, all-stock consideration is relatively rare (17 percent of deals), financial buyers are in the minority (23 percent of deals), Delaware law is the overwhelming choice of governing law (81 percent of deals), and the average premium is close to 37 percent. With respect to the major non-price terms, we observe a mean termination fee of approximately 2.6 percent of the deal value, a mean reverse termination fee of 2.2 percent of deal value, a mean go-shop period of 4.5 days, and a mean MAC index of 11.4.[97] (The higher the MAC index, the more seller-favorable it is.)

**Table 2.** Final Sample of Merger Transactions: Descriptive Statistics.

| | Non Auctions | | Auctions | | Total | |
|---|---|---|---|---|---|---|
| | Mean | St. Dev. | Mean | St. Dev. | Mean | St. Dev. |
| All Stock Consideration | 0.24 | 0.42 | 0.09 | 0.28 | 0.17 | 0.38 |
| Delaware Governing Law | 0.80 | 0.40 | 0.83 | 0.38 | 0.81 | 0.39 |
| Financial Buyer | 0.14 | 0.35 | 0.35 | 0.48 | 0.23 | 0.42 |
| Deal Value (in $ billions) | 6.44 | 32.81 | 2.81 | 6.70 | 4.91 | 25.40 |
| Premium (n=755, No Auction=436, Auction=319) | 36.36 | 38.65 | 38.04 | 28.73 | 37.07 | 34.79 |
| Termination fee (as % of deal value) | 2.53 | 1.14 | 2.79 | 1.02 | 2.64 | 1.10 |
| Rev. Termination Fee (as % of deal value) | 1.90 | 2.56 | 2.64 | 3.14 | 2.21 | 2.84 |
| Go-Shop Period (in days) | 4.98 | 13.64 | 3.71 | 11.47 | 4.45 | 12.78 |

---

97. Recall that many merger agreements in our sample do not contain a reverse termination fee, and most do not contain a go-shop provision. Although the mean go-shop period for all deals in our sample is approximately 4.5 days, the mean go-shop period among deals that include a go-shop provision is approximately thirty-seven days.

| | | | | | | |
|---|---|---|---|---|---|---|
| Go-Shop Period (in days for deals with a go-shop>0, n=100, No Auction=65, Auction=35)) | 37.4 | 13.60 | 37.6 | 7.53 | 37.46 | 11.76 |
| MAC Index | 11.00 | 2.50 | 12.03 | 2.26 | 11.44 | 2.45 |
| No. of observations | 488 | | 354 | | 842 | |

### C.   Who Drafts First?

The primary novelty in our dataset is the addition of information about the sales process (auction versus non-auction) and about which party provides the first draft of the agreement. The existing literature includes surprisingly little discussion of which party or law firm is chosen to select the merger agreement precedent and prepare the initial draft. Where addressed, it is commonly noted that acquirers almost always provide the first draft.[98] On this point, however, the conventional wisdom is simply incorrect. In our final sample of public company merger agreements, the allocation of drafting responsibility between acquirers and sellers across all deals is split almost perfectly evenly. As reported in **Table 3** below, seller's counsel provides the first draft of the merger agreement approximately 49.9 percent of the time, versus 50.1 percent for acquirer's counsel.

**Table 3.** Responsibility for First Draft of M&A Agreement.

| Drafting Party | Acquirer | Seller | Total |
|---|---|---|---|
| Non-Auction | 387 (79.3%) | 101 (20.7%) | 488 (58.0%) |
| Auction | 35 (9.9%) | 319 (90.1%) | 354 (42.0%) |
| Total | 422 (50.1%) | 420 (49.9%) | 842 (100%) |

**Table 3** suggests that the primary factor associated with drafting responsibility is whether the target is sold in an auction process. In the absence of an auction, the acquirer drafts nearly 80 percent of the time. By contrast, where the target is sold in an auction, the roles are flipped: the seller provides the first draft in over 90 percent of deals.

The practice of having the seller draft in auction settings is best explained by transaction costs. When a target is offered for sale in an auction, many potential acquirers are invited to make a bid for the company at the same time.

---

98.   *See* Anderson & Manns, *supra* note 3, at 64 (stating that "lawyers representing an acquirer in an M&A transaction typically choose the precedent used in the deal which sets the defaults and baselines for negotiations among the lawyers (and their clients)").

*CALIFORNIA LAW REVIEW* [Vol. 107:1119]

Thus, rather than negotiate entirely different merger agreements with several parties at once, the target company can save considerable time and effort by preparing and circulating to all bidders involved in the auction a single merger agreement.[99] Bidders are then invited to comment on the seller's draft merger agreement when they submit their bids.[100] Later, when auction participants submit their bids to the target, the "bid package" consists primarily of their mark-up of the seller's draft merger agreement, making the participants' bids relatively easy to compare.[101]

The small set of thirty-five auction deals in which the acquirer drafted first poses something of a puzzle. Our review of the "Background of the Merger" section in the proxy statements for these transactions suggests that in many or most cases, the acquirer sought to preempt the auction process by putting in an early bid and also sought to signal its strong commitment to the deal by drafting a complete merger agreement that it was prepared to execute.

**Table 4** provides cross-tabulations of the party that drafted the agreement with other major variables. With respect to deal size, there is a fairly even split between buyer drafting and seller drafting across all categories.[102] When it comes to acquirer type, the differences are more pronounced. Strategic buyers draft the agreement just over half of the time, but financial buyers only draft approximately a quarter of the time. We may observe this pattern because financial buyers are more likely to acquire companies in auctions, where seller drafting prevails. As for deal consideration, all-cash deals are drafted by the seller approximately 61 percent of the time, while deals that include at least some stock compensation are drafted by the buyer about two-thirds of the time.

**Table 4.** Cross-Tabulations of Agreement Drafter and Other Variables.

|  | **Buyer-Drafted** | **Seller-Drafted** | **Total** |
|---|---|---|---|
| Deal Size | | | |
| Less than $250M | 75 (56.4%) | 58 (43.6%) | 133 (15.8%) |
| $250M to $1B | 126 (46.8%) | 143 (53.2%) | 269 (31.9%) |

---

99.  See PRACTICAL LAW CORPORATE & SECURITIES, AUCTIONS: FROM THE SELLER'S PERSPECTIVE (maintained) West Practical Law, Practice Note 6-383-1087.

100.  *See id.*

101.  *See id.*

102.  We also conduct some regression analysis to assess the factors associated with sellers drafting merger agreements. Using non-auction deals, we run a logistic regression where the dependent variable is a dummy for whether the seller drafted the agreement or not. We find that the only statistically significant associations with seller drafting are the log deal size and the presence of a financial buyer. Both of these associations are positive, which suggests that larger targets and private equity buyers are more likely to have sellers draft the agreement. These results are consistent with smaller targets and financial buyers exhibiting some sensitivity to legal costs. But it is difficult for us to say more about these associations because we cannot distinguish between a number of plausible accounts. For auctions, we do not find a statistically significant association between deal size and seller drafting, but we do find a significant association between financial buyers and seller drafting.

| | | | |
|---|---|---|---|
| $1B to $5B | 134 (47.3%) | 149 (52.7%) | 283 (33.6%) |
| More than $5B | 87 (55.4%) | 70 (44.6%) | 157 (18.6%) |
| **Acquirer Type** | | | |
| Strategic | 368 (56.7%) | 281 (43.3%) | 649 (77.1%) |
| Financial | 54 (28.0%) | 139 (72.0%) | 193 (22.9%) |
| **Consideration Type** | | | |
| All Cash | 194 (38.5%) | 310 (61.5%) | 504 (59.9%) |
| All Stock | 100 (69.4%) | 44 (30.6%) | 144 (17.1%) |
| Mixed | 128 (66.0%) | 66 (34.0%) | 194 (23.0%) |

### D.   Law Firm Involvement in M&A Transactions

The Practical Law database includes the names of the law firms that represented the buyer and the target or seller in each M&A transaction. In this subsection we summarize some of that information with an emphasis on whether specific law firms tend to draft more often than others. **Table 5** shows the top twenty law firms by total appearances in our final sample (i.e., the law firms that represented either the buyer or the seller in these transactions). It comes as no surprise that Skadden, Arps, Slate, Meagher & Flom and Wachtell, Lipton, Rosen & Katz are the top two firms by appearances. Both of these firms are known as powerhouses in the public M&A market.[103] The table also shows that the law firm market is quite top-heavy, with a small number of firms doing the lion's share of M&A advisory work.[104] The firm that is ranked tenth advised on fewer than half the number of transactions as did each of the top two firms, and the firm that is ranked twentieth on the list advised on fewer than one seventh of the transactions as the top firm did.

However, the table does not suggest any immediate association between a law firm's M&A experience and the likelihood that it will provide the first draft. Skadden and Wachtell supply first draft in just over half the deals in which they are counsel. Three of the next four firms on the list provide the initial draft in less than half of their deals. No firm on the list provides the initial draft in an overwhelming majority of its deals.

---

103.   *See* Skadden, Arps, Slate, Meagher & Flom LLP, *Mergers and Acquisitions*, https://www.skadden.com/capabilities/practices/mergers-and-acquisitions/cc/mergers-and-acquisitions [https://perma.cc/88FU-4DXC]; Wachtell, Lipton, Rosen & Katz, Corporate: A Preeminent Corporate Practice, http://www.wlrk.com/Corporate [https://perma.cc/R37Y-ZZUY].

104.   Prior research examines the high degree of concentration in the market for M&A legal advisory work. *See, e.g.*, Krishnan & Masulis, *supra* note 40, at 190 (finding that the top ten law firms handled nearly half of the advisory work during their sample period).

**Table 5.** Number of Deals and First Drafts for Top M&A Law Firms.

| Rank | Law Firm | Appearances | Supplied First Draft | Pct. |
|------|----------|-------------|----------------------|------|
| 1 | Skadden, Arps, Slate, Meagher, & Flom | 122 | 68 | 55.7% |
| 2 | Wachtell, Lipton, Rosen & Katz | 107 | 55 | 51.4% |
| 3 | Kirkland & Ellis | 80 | 31 | 38.8% |
| 4 | Sullivan & Cromwell | 75 | 43 | 57.3% |
| 5 | Latham & Watkins | 73 | 31 | 42.5% |
| 6 | Simpson Thacher & Bartlett | 73 | 22 | 30.1% |
| 7 | Wilson Sonsini Goodrich & Rosati | 51 | 26 | 51.0% |
| 8 | Weil, Gotshal & Manges | 50 | 25 | 50.0% |
| 9 | Cravath, Swain & Moore | 49 | 30 | 61.2% |
| 10 | Jones Day | 49 | 26 | 53.1% |
| 11 | Davis Polk & Wardwell | 47 | 26 | 55.3% |
| 12 | Gibson, Dunn & Crutcher | 44 | 21 | 47.7% |
| 13 | Vinson & Elkins | 34 | 23 | 67.6% |
| 14 | Sidley Austin | 33 | 15 | 45.5% |
| 15 | Shearman & Sterling | 32 | 16 | 50.0% |
| 16 | Cleary Gottlieb Steen & Hamilton | 28 | 7 | 25.0% |
| 17 | Ropes & Gray | 22 | 7 | 31.8% |
| 18 | Debevoise & Plimpton | 20 | 7 | 35.0% |
| 19 | Willkie Farr & Gallagher | 18 | 9 | 50.0% |
| 20 | Goodwin Procter | 16 | 9 | 56.2% |

Appendix B provides additional descriptive tables that suggest conditions under which law firms tend to provide the first draft. Overall, we do not observe, all else equal, that more experienced law firms are more likely to provide the first draft of the merger agreement.

IV.

DATA ANALYSIS AND RESULTS

In Part IV, we conduct a more complex analysis of the associations between the agreement drafter and deal terms. We begin this analysis in Subpart A by focusing on non-auction deals. We do so because we have a sufficiently large sample with sufficient variation in drafter type to create a balanced, matched sample. We then use this sample to perform regressions on specific deal terms. In Subpart B, we conduct a similar analysis of auction deals, although we exclude financial buyers from this analysis because there is virtually no variation with respect to the drafting party for such deals.

### A. Matched Sample Analysis of Non-Auctions.

For non-auctions, there is relatively substantial variation in the party that drafts the agreement. As **Table 3** shows, the seller supplies the first draft about 21 percent of the time. This variation allows us to limit the sample of non-auction deals to (1) all the seller-drafted agreements and (2) a subset of *buyer*-drafted agreements similar to the seller-drafted agreements with respect to important observable deal characteristics (such as deal size, buyer type, target industry, etc.).[105] Limiting the sample in this way helps to reduce statistical biases that could otherwise occur due to imbalance among such characteristics.[106]

To create the matched sample, we use nearest neighbor propensity score matching.[107] This is a two-stage process. In the first stage, we calculate a propensity score based on the variables that we use to match observations. The propensity score is a value that reflects the probability that a particular merger agreement will be drafted by the seller, based on observable characteristics of the deal. In the second stage, each seller-drafted deal is matched to the buyer-drafted deals with the most similar propensity scores. In choosing how many buyer-drafted deals to include, there is a tradeoff between increasing sample size and ensuring that the matched sample is balanced (i.e., is similar along observable dimensions). Our matching algorithm attempts to find two buyer-drafted agreements for every seller-drafted agreement because we are able to maintain balance in the sample using this two-to-one ratio, but not when using a three-to-one ratio.[108]

We match using six variables that are likely to influence the choice of the four deal terms that we consider. These variables represent (1) log deal value,[109]

---

105.  We cannot, of course, be sure that the matched subsample is similar along *unobservable* dimensions—that is, deal characteristics that may affect the non-price terms of the deal but for which we do not have data. Examples of such unobservable characteristics could include the parties' private information about the deal (such as the target knowing that the company is worth less than the buyer believes) or the parties' idiosyncratic incentives or constraints with respect to the deal (such as one party's desire to close the deal before a certain date).

106.  We also perform regressions on the full, unmatched auction and non-auction samples and find results that are highly similar to the matched auction and non-auction samples.

107.  The technique was originally proposed and described in Paul R. Rosenbaum & Donald B. Rubin, *The Central Role of the Propensity Score in Observational Studies for Causal Effects*, 70 BIOMETRIKA 41, 48–51 (1983).

108.  To help ensure covariate balance, we use a caliper of .5 standard deviations to select the control units. The propensity score process calculates a distance score for each of the treated (seller-drafted) and control (buyer-drafted) agreements. A caliper of .5 means that the distance score for each selected control agreement must be within .5 standard deviations of the distance score for each treated agreement. The algorithm randomly selects control agreements from those that are within the .5 caliper. We choose a caliper of .5 because it ensures that we get two control agreements for every treated agreement while still maintaining covariate balance. Because the largest covariate imbalance is for strategic versus financial buyers, we use that variable to perform Mahalanobis-metric matching within each caliper.

109.  *See, e.g.*, Macias & Moeller, *supra* note 83, at 76 (finding that deal size influences MAC clauses in M&A agreements); Eric Rauch & Brian Burke, *The Impact of Transaction Size on Highly*

(2) whether the consideration is 100 percent stock,[110] (3) whether the acquirer is a financial buyer,[111] (4) whether Delaware law governs the agreement, (5) deal premium,[112] and (6) the single-digit SIC industry code of the target firm.[113] **Table 6** reflects the balance of the matched sample for all of these variables. The means of each of these variables for the eighty-six seller-drafted agreements are very close to the means of the variables for the 172 matched buyer-drafted agreements.[114] The third column presents the p-value for a two-tailed t-test of the difference between the means of each group. In all cases, the difference in the means is not statistically significant, which provides some confidence that our sample is balanced along these observable variables and therefore appropriate to use in statistical analysis.

**Table 6.** Matched Sample Balance for Non-Auctions.

**Matched Sample Balance**

|                   | Buyer Drafted | Seller Drafted | P-Value |
| ----------------- | ------------- | -------------- | ------- |
| All Stock         | 0.182         | 0.159          | 0.642   |
| Financial         | 0.21          | 0.239          | 0.607   |
| Delaware          | 0.881         | 0.83           | 0.280   |
| ln(Value)         | 21.479        | 21.542         | 0.727   |
| Premium           | 31.367        | 34.397         | 0.431   |
| Single-Digit SIC  | 4.489         | 4.568          | 0.765   |

*Negotiated M&A Deal Points*, 71 BUS. LAW. 835 (2016) (arguing that deal size significantly influences the final terms in M&A transactions).

110.    *See* Hubert de La Bruslerie, *Crossing Takeover Premiums and Mix of Payment: Empirical Test of Contractual Setting in M&A Transactions*, 37 J. BANKING & FIN. 2106 (2013) (providing evidence that the type of merger compensation affects deal terms).

111.    *See* Robert P. Bartlett III, *Taking Finance Seriously: How Debt Financing Distorts Bidding Outcomes in Corporate Takeovers*, 76 FORDHAM L. REV. 1975 (2008) (describing how strategic and financial buyers value targets differently); Alexander S. Gorbenko & Andrey Malenko, *Strategic and Financial Bidders in Takeover Auctions*, 69 J. AMER. FIN. ASS'N 2513 (2014) (finding that strategic and financial buyers tend to pursue different types of targets, resulting in different valuations); Jana P. Fidrmuc et al., *One Size Does Not Fit All: Selling Firms to Private Equity Versus Strategic Acquirers*, 18 J. CORP. FIN. 828 (2012) (same).

112.    *See, e.g.*, Kenneth R. Ahren, *Bargaining Power and Industry Dependence in Mergers*, 103 J. FIN. ECON. 530 (2012) (finding that the target's scarcity—measured by the target's relative profitability and industry concentration—influences deal terms). As explained in Part III.A, we use the deal premium as a proxy for bargaining power imbalances between the acquirer and seller.

113.    *See, e.g.*, Macias & Moeller, *supra* note 83, at 73–74 (finding that MAC clauses in M&A agreements differ according to the target's industry).

114.    The reason there are only eighty-eight seller-drafted agreements in this sample—as opposed to the 101 in Table 3—is that the use of the deal premium requires that we match each deal to the SDC Platinum database. We are only able to do so for eighty-six of the observations.

This table reports the means for the matched sample of non-auction mergers. The matched sample includes 176 agreements drafted by the buyer and 88 agreements drafted by the seller for a total of 264 observations. The p-value column reports the p-value from a two-sample t-test of the seller-drafted and buyer-drafted agreements for the relevant variable.

We next conduct regressions using this matched sample. In these regressions, the dependent variables are the four non-price deal terms for which we have data: the termination fee, reverse termination fee, go-shop period, and MAC index.[115] (The termination and reverse termination fees are expressed as a percentage of deal value, and the go-shop period is expressed in days.) The independent variables are (1) indicator variables representing seller drafting, all-stock consideration, Delaware governing law, and whether the acquirer is a financial buyer and (2) continuous variables representing log deal value and deal premium. We also include fixed effects for the year in which the merger agreement was signed and for the single digit SIC code of the target's industry.[116] The regressions report robust standard errors.

The primary variable of interest is the indicator variable for whether the agreement was drafted by the seller. All else equal, the seller in an M&A transaction would prefer the following: (1) a smaller termination fee (given that this fee is paid by the seller to the acquirer), (2) a larger reverse termination fee (given that this fee is paid by the acquirer to the seller), (3) a longer go-shop period, and (4) a more seller-favorable MAC clause—that is, a higher score on the MAC index. This leads to the following predictions for our regressions. If providing the first draft of the merger agreement is indeed associated with more favorable terms for the drafting party, then we would expect the regression coefficient on our indicator variable for seller-drafted agreements to be (1) negative when the dependent variable is the termination fee, and (2) positive when the dependent variable is the reverse termination fee, the go-shop period, or the MAC Index.

**Table 7** reports the results of these regressions both with and without fixed effects for the year and the SIC code. For the termination fee and the reverse termination fee, the coefficient signs for the seller-drafted indicator variable are consistent with a first-drafter advantage—i.e., they are negative for the termination fee and positive for the reverse termination fee. However, only the coefficient for the reverse termination fee is statistically significant at the 5

115.   We selected these terms, described in Part II.B, because they are viewed as important M&A provisions; because they can be coded uniformly (with more or less difficulty) to allow for comparison across deals; and because they vary widely as to how complex they are and by whom they are negotiated, which allows us to test different hypotheses that would explain the first-drafter advantage, if any.

116.   Stated differently, we control for the year and the target company's industry in the regressions by including separate dummy variables for each year (2007–2016) covered in our sample and for each of the nine industries of the target companies in our matched sample.

*CALIFORNIA LAW REVIEW*                    [Vol. 107:1119

percent level, and that effect is no longer statistically significant when we include controls. By contrast, we observe statistically significant coefficients on the seller-drafted indicator variable for the go-shop period and the MAC index, both with and without year and industry fixed effects. Moreover, these coefficients are in the seller-favorable direction that we would expect: both are positive. In other words, when sellers provide the initial draft, those agreements tend to have longer periods for sellers to shop the bid, and the MAC index is higher (i.e., more seller friendly).

Although it is not the focus of our analysis, we also note that the coefficients for the "financial buyer" indicator variable are consistent with expectations. It is common knowledge among deal lawyers that sellers insist on higher reverse termination fees for financial buyers, because these buyers may fail to obtain the third-party financing necessary to consummate the merger,[117] and well-known also that go-shop provisions are much more common for private equity deals.[118] The large and statistically significant positive coefficients on the financial buyer indicator variable for both the reverse termination fee and go-shop period regressions confirm this conventional wisdom.

**Table 7.** Matched Sample Regressions for Non-Auctions.

|  | Term. Fee | Rev. Term. Fee | Go-Shop | MAC Index | Term. Fee | Rev. Term. Fee | Go-Shop | MAC Index |
|---|---|---|---|---|---|---|---|---|
| Seller Drafted | -0.134 | 0.618* | 3.346* | 0.610* | -0.165 | 0.617 | 3.623* | 0.660* |
|  | (0.131) | (0.305) | (1.589) | (0.303) | (0.133) | (0.319) | (1.527) | (0.312) |
| All Stock | -0.25 | 0.680* | -1.089 | 0.107 | -0.155 | 0.978* | -1.507 | 0.328 |
|  | (0.219) | (0.337) | (1.238) | (0.417) | (0.220) | (0.395) | (1.609) | (0.470) |
| Delaware | -0.027 | 0.752* | 1.582 | 0.266 | 0.084 | 0.724 | 2.261 | 0.315 |
|  | (0.183) | (0.327) | (2.225) | (0.376) | (0.182) | (0.382) | (2.425) | (0.384) |
| ln(Deal Value) | -0.149** | 0.156 | -0.88 | 0.541*** | -0.122* | 0.171 | -0.978 | 0.396** |
|  | (0.048) | (0.129) | (0.556) | (0.106) | (0.055) | (0.155) | (0.668) | (0.125) |

117. *See* Steven M. Davidoff, *The Failure of Private Equity*, 82 S. CAL. L. REV. 481, 515–22 (2009).
118. PRACTICAL LAW, NO-SHOPS AND THEIR EXCEPTIONS, *supra* note 79 ("Go-shops are primarily found in private equity transactions because private equity buyers tend to prefer avoiding a full-blown auction.").

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Financial Buyer | -0.943*** | 1.893*** | 19.538*** | 0.506 | -0.772*** | 1.885*** | 19.660*** | 0.59 |
| | (0.155) | (0.381) | (2.939) | (0.373) | (0.161) | (0.423) | (2.883) | (0.381) |
| Deal Premium | 0.003 | 0.004 | -0.019 | 0.009* | 0.004 | 0.006 | -0.02 | 0.009 |
| | (0.003) | (0.006) | (0.030) | (0.004) | (0.003) | (0.007) | (0.027) | (0.005) |
| Year and Industry FEs | No | No | No | No | Yes | Yes | Yes | Yes |
| Observations | 264 | 264 | 264 | 264 | 264 | 264 | 264 | 264 |
| Adjusted $R^2$ | 0.116 | 0.095 | 0.346 | 0.104 | 0.168 | 0.07 | 0.395 | 0.125 |

*Notes:*    This table reports the coefficients for OLS regressions with each of the dependent variables listed in the columns. The table reports robust standard errors. Standard errors are reported in parentheses. ***p<0.001,**p<0.01,*p<0.05.

Interestingly, we find only a muted association between deal premium and the four deal terms. As discussed above, the deal premium is our primary (albeit imperfect) measure of the target's bargaining power. Thus, our results do not provide clear evidence of an association between bargaining power and the non-price terms of a merger agreement.

To summarize, we find substantial evidence that is consistent with a first-drafter advantage for the go-shop period and MAC clause, but little or no evidence of an association between the termination fees and the identity of the first drafter. These results are interpreted in Part IV.C.

## B.   *Matched Sample Analysis of Auctions.*

In this subsection, we conduct a similar matched sample analysis of the more overtly competitive deals. Insofar as a first-drafter advantage exists, we expect that increased competition should reduce, if not eliminate, any benefit in deal terms that it produces. We thus expect to see less, or no, association between the initial drafter and the non-price terms. We expect this to be particularly true for the most easily monetizable non-price terms such as termination fees and reverse termination fees.

Analyzing competitive deals requires us to highlight some important distinctions in the data we used on auctions. As **Table 3** suggests, it is far more common for the seller to supply the initial agreement in a competitive setting. This is particularly the case for the 115 auctions won by financial buyers. The buyer produced the first draft of the agreement in only five of these deals. This lack of variation makes it difficult to achieve a sufficiently large sample with

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

balance and, for this reason, we omit financial deals from the analysis in this subsection. There is also very little variation in the go-shop provisions in competitive deals. As one would expect, virtually no auction deals provide for a go-shop period, because the deal has already been subject to competitive pressure.[119] As a consequence, we also omit the go-shop variable from our regressions.

As in the previous subsection, we use propensity score matching to create a balanced sample. We use the same variables to match observations as we did for the non-auctions (with the exception of the financial buyer variable): (1) log deal value, (2) whether the consideration is 100 percent stock, (3) whether Delaware is the governing law, (4) deal premium, and (5) the single-digit SIC industry code of the target firm. We are able to maintain a balanced sample using a ratio of approximately six seller-drafted agreements to every one buyer-drafted agreement. **Table 8** compares the means for these variables for the twenty-five buyer-drafted agreements with those for the 154 seller-drafted agreements in the matched auction sample.[120]

**Table 8.** Matched Sample Balance for Auctions.

| | Buyer Drafted | Seller Drafted | P-Value |
|---|---|---|---|
| All Stock | 0.120 | 0.114 | 0.930 |
| Delaware | 0.720 | 0.808 | 0.368 |
| ln(Value) | 21.036 | 20.858 | 0.622 |
| Premium | 32.095 | 37.977 | 0.401 |
| Single-Digit SIC | 4.600 | 4.575 | 0.959 |

This table reports the means for the matched sample of auction mergers. The matched sample includes 25 agreements drafted by the buyer and 154 agreements drafted by the seller for a total of 179 observations. The p-value column reports the p-value from a two-sample t-test of the seller-drafted and buyer-drafted agreements for the relevant variable.

---

119. Of the 204 competitive deals won by strategic bidders, only six of them provide for a go-shop period. *See also* Matthew Gentry & Caleb Stroup, *Entry and Competition in Takeover Auctions*, 132 J. FIN. ECON. 298 (2019) (assessing the degree of competition in auctions versus bilateral negotiations for M&A transactions and the associated effects on deal outcomes).

120. As mentioned before, we use a caliper of .5 standard deviations to select the matches. We specify that the matching algorithm attempts to match eight seller-drafted deals for every buyer-drafted deal. There are not enough observations within the caliper to get eight control observations for every treated observation, which explains why our final ratio is closer to six.

As we observe in the non-auction setting, all of the matching variables have average differences that are not statistically significant in two-tailed t-tests.[121] As before, we perform separate ordinary least-squares (OLS) regressions using the relevant non-price terms--the termination fee, reverse termination fee, and MAC clause index—as the dependent variable. **Table 9** reports the results of these regressions.

As **Table 9** shows, there is a mild association between a seller supplying the first draft of a merger agreement and a seller-favorable MAC clause, just as we found in the non-auction context. In the MAC Index regression, the coefficient for the seller-drafted variable is positive and statistically significant at the 5 percent level without the controls, but is not statistically significant with controls included. We find no statistically significant relationship between seller-drafted agreements and either termination fees or reverse termination fees. The termination fee and reverse termination fee results are consistent with our expectation that an overtly competitive bidding environment is likely to eliminate any rents that the initial drafter might try to extract through easily monetizable terms. The MAC clause, however, provides mildly suggestive evidence that initial drafts supplied by sellers contain MAC clauses that are more favorable to seller interests. Though competitive, the auction process may not eliminate all of the advantage that drafting first conveys.

**Table 9.** Matched Sample Regressions for Auctions.

| | Termination Fee | Rev. Term. Fee | MAC Index | Termination Fee | Rev. Term. Fee | MAC Index |
|---|---|---|---|---|---|---|
| Seller Drafted | -0.045 | 0.428 | 0.862* | -0.027 | 0.202 | 0.770 |
| | (0.212) | (0.531) | (0.427) | (0.194) | (0.529) | (0.451) |
| All Stock | 0.41 | -0.904* | -1.218** | 0.306 | -0.323 | -0.904 |
| | (0.307) | (0.367) | (0.402) | (0.302) | (0.405) | (0.483) |
| Delaware | -0.214 | 0.241 | 0.085 | -0.186 | 0.27 | 0.324 |
| | (0.169) | (0.453) | (0.372) | (0.169) | (0.449) | (0.354) |
| ln(Deal Value) | -0.190*** | 0.077 | 0.347** | -0.183** | 0.09 | 0.250* |
| | (0.052) | (0.117) | (0.106) | (0.058) | (0.141) | (0.107) |

---

121.   When we limit the match ratio to seven seller-drafted deals for every one buyer-drafted deal, we obtain highly similar results in the regressions. Naturally, we obtain a tighter match on the five relevant covariates when we implement this restriction.

| Deal Premium | -0.006 | -0.011 | -0.004 | -0.006 | -0.01 | -0.003 |
|---|---|---|---|---|---|---|
| | (0.005) | (0.006) | (0.005) | (0.005) | (0.006) | (0.005) |
| Year and Industry FEs | No | No | No | Yes | Yes | Yes |
| Observations | 192 | 192 | 192 | 192 | 192 | 192 |
| Adjusted $R^2$ | 0.109 | 0.011 | 0.091 | 0.152 | 0.026 | 0.191 |

*Notes:* This table reports the coefficients for OLS regressions with each of the dependent variables listed in the columns. The table reports robust standard errors. Standard errors are reported in parentheses. ***p<0.001,**p<0.001,*p<0.05.

### C.  Interpretation of Results

**Table 7** (matched sample regressions for non-auctions) provides evidence that is consistent with a first-drafter advantage for MAC clauses and go-shop periods, but not for termination fees and reverse termination fees. Table 9 (matched sample regressions for competitive auctions) confirms these results for termination fees and reverse termination fees, but does not clearly resolve whether the first-drafter advantage for the MAC clause persists in a highly competitive sale process.

What might explain the difference in results among the four terms? By design, we selected these terms in order to test both "business" and "legal" deal terms for a first-drafter advantage. Practitioners and clients tend to refer to terms with clear, easily quantifiable economic payoffs as "business" (or "economic") terms; these are terms that tend to be negotiated by the parties themselves, rather than their lawyers.[122] "Legal" terms, by contrast, are those that are primarily negotiated by counsel, generally because they are complex or require specialized expertise to interpret and are difficult to translate into an economic payoff.[123] The two termination fees qualify as "business" terms: they are easily and immediately monetizable. As such, they are highly salient to the parties themselves and are likely to serve as a focal point in negotiations.[124] By contrast, the go-shop and MAC clause are better described as "legal" terms, because they are more complex and harder to monetize, and because they tend to be negotiated primarily or exclusively by counsel. Our results might therefore suggest that the first-drafter advantage is tied to the difficulty of monetizing terms: the less

---

122. Darren Dahl, *How to Redline a Contract*, INC. (Sept. 15, 2010), https://www.inc.com/guides/2010/09/how-to-red-line-a-contract.html [https://perma.cc/2DRA-4HF5].

123. *Id.*

124. *See* Pedro Bordalo, Nicola Gennaioli & Andrei Shleifer, *Salience Theory of Choice Under Risk*, 127 Q.J. ECON. 1243 (2012) (explaining that individuals overweigh the salience, or distinct relative amount, of lottery payoffs in making choices under risk).

monetizable the term, the more likely it is that drafting first leads to a favorable outcome for the drafter.[125]

This relationship in turn allows us to draw tentative inferences about the various theories that could potentially explain a first-drafter advantage. As discussed earlier these theories included: (1) bargaining power; (2) transaction costs and other frictions generated by the negotiation process; (3) anchoring and framing; (4) lawyer experience; and (5) lawyer agency costs.

Our results serve most clearly to rule out the anchoring (or framing) hypothesis. If a party's first draft of the merger agreement had an anchoring effect on its counterparty, we would expect it to impact numerical non-price terms (such as the termination fees) at least as much as it would the non-numerical ones (such as the MAC clause). Instead, our results indicate there was no statistically significant association between the first drafter and the termination or reverse termination fees.

The regression results also do not clearly support bargaining power as an explanation for the first-drafter advantage. We find only a limited association between bargaining power—as proxied by the deal premium—and more favorable deal terms. It could still be the case that bargaining power leads to better terms, however, if bargaining power drives the selection of the first drafter. In other words, if the party that drafts first is determined primarily by bargaining power, then the first-drafter advantage might simply be a reflection of superior bargaining power. Yet in that case, we would expect to observe a first-drafter advantage with respect to all four of the merger agreement terms that we consider, rather than just the go-shop period and the MAC clause.[126]

Nor does it appear that superior law firm experience explains the first-drafter advantage. In Part III.D and Appendix B, we examine whether the most experienced law firms for M&A transactions are more likely to provide the first draft in a merger transaction, and do not find this to be the case. Further, in unreported tests, we developed various measures of law firm experience with M&A deals, divided into sell-side and buy-side advisory work. We did not find any association between these measures and more favorable deal terms.

This leaves the negotiation-cost and lawyer agency-cost hypotheses as the most plausible explanations. Merger agreement negotiations can be lengthy and costly, given their complexity, yet the parties have strong incentives to conclude

---

125.   An alternative explanation for why the termination fee and reverse termination fee do not appear to vary depending on the first drafter would be that the parties generally negotiate and agree to such terms in a term sheet before the first draft of the merger agreement is produced. If that were the case, then our results potentially understate the size and scope of the first-drafter effect by including transactions where these terms are pre-determined. This alternative explanation is discussed in Part V.A.

126.   In unreported regressions, we include the interaction between the deal premium and the seller-drafted indicator as an additional independent variable. The coefficients on this variable are not statistically significant, which again fails to support the bargaining power hypothesis.

them rapidly.[127] If the costs of negotiating each and every term in the merger agreement are too high in terms of delay, then the first draft is akin to a take-it-or-leave-it offer to the other party, at least with respect to whatever subset of terms the parties choose not to negotiate efficiently. Under the circumstances, the non-drafting party might choose to negotiate hard only on terms that are easily monetized, and to defer at least to some extent to the initial draft on most other terms. This would lead precisely to the pattern that we observe in the regressions: a first-drafter advantage for non-monetizable terms, like the go-shop and MAC clause, but not for easily monetized terms, like the termination and reverse termination fees.

A non-drafting party's decision to focus on easily monetizable terms arguably serves two purposes. First, it may in fact maximize that party's tradeoff between obtaining the most favorable terms and concluding the transaction as quickly as possible. Second, it can serve as a mechanism for reducing lawyer agency costs. By focusing only on "business" terms, the principal may be trying to limit the amount of time the lawyers spend negotiating the "legal" terms. On the other hand, because the principal lacks expertise with respect to such terms, it cannot know whether prioritizing the "business" terms is, in fact, the rational choice. Our results do not resolve whether or not principals behave rationally by focusing on easily monetizable terms.

The stronger results that we find in non-auction deals may be a product of this less competitive setting. In non-auctions, the buyer and seller are stuck with one another, at least to some degree. This bilateral monopoly may make it easier for initial drafters to extract some advantage because they know that other buyers (or sellers) are not waiting in the wings.[128] The standard non-auction M&A drafting environment, where the principals agree on monetizable terms and delegate drafting to the lawyers on a tight timetable, may make it especially easy for initial drafters to take some advantage through non-monetizable terms.

Gaining an edge in agreement terms may be more difficult in the auction environment, where sellers will typically provide a deal package that includes a draft agreement. If the seller uses an efficient MAC clause in the deal package, a potential buyer who includes a more buyer-friendly MAC clause in a buyer-drafted agreement is unlikely to compare favorably to other bidders. And, if

---

127. From the acquirer's perspective, protracted negotiations increase the risk that another bidder will materialize and offer a higher price for the target. From the seller's perspective, lengthy negotiations result in leaks to the public and impose real costs on the target's business by tying up management's time and attention. For both parties, the longer negotiations last, the more likely the deal will fall through for any reason, in which case each party will have to incur, once again, the substantial costs of reaching a deal with another party.

128. Legal scholars and economists have long emphasized that transaction costs can make bargaining difficult when parties are in a bilateral monopoly and do not have access to the same information. *See* RICHARD POSNER, ECONOMIC ANALYSIS OF LAW 251 (6th. ed. 2003); Oliver E. Williamson, *Transaction-Cost Economics: The Governance of Contractual Relations*, 22 J.L. & ECON. 233, 241–42 (1979).

sellers include an overly seller-friendly MAC clause in a deal package, a bidder could supply a draft agreement with a more efficient term along with a higher overall price. While we cannot confirm these dynamics, they would be consistent with our finding of a more pronounced first-drafter advantage in non-auctions.

These findings partially support and partially undermine the conventional law and economics wisdom positing that parties will reach agreement on the most efficient terms and exercise bargaining power only through price. Evidence of even a limited first-drafter advantage calls into question the prediction that voluntary agreements result in efficient terms. This is particularly notable in our chosen setting, public company M&A, where the parties are highly sophisticated and well informed. On the other hand, we find only very mild evidence that drafting first provides an advantage for the terms that are most economically significant, at least in the parties' estimation. Therefore, the precise value of this first-drafter advantage remains an open question.

## V.
### POTENTIAL OBJECTIONS

This Part addresses various potential concerns with the results presented in Part IV and their interpretation.

### A.  *Choice of Non-Price Terms*

First, we identify possible critiques of our approach to studying the non-price terms of M&A agreements. We will briefly discuss the difficulty of identifying the determinants of non-price terms, the ways in which we sought to minimize statistical errors, and challenges and responses to our method. As discussed in Part I, standard law and economics theory states that the parties should agree to the set of non-price terms that maximize their joint surplus.[129] Directly testing whether parties bargain efficiently in practice is infeasible, however. For any given merger transaction, one would need to know: (1) the full set of non-price terms to which the parties agreed; (2) the expected payoffs to both parties from each such term; (3) the expected payoffs to both parties from all other terms that they could have included in their bargain, but chose not to; and (4) the expected payoffs associated with all other potential transactions that each party could have entered into with all other potential counterparties. Aside from the first item, each of these elements poses insurmountable difficulties. By definition, non-price terms are not immediately translatable into an expected payoff that is uncontestable and readily observable by all. Much of the challenge associated with empirical testing of contract theory owes precisely to the difficulty of observing or estimating payoffs from non-price terms.[130]

---

129.  *See supra* note 27 and accompanying text.
130.  *See, e.g.,* Coates IV, *Explaining Variation, supra* note 25, at 1312 (describing legal advice as a "credence good" for which the value cannot be directly observed and measured).

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

Instead, we take an indirect approach to this question, which avoids the necessity of estimating expected payoffs from contract terms. We simply consider whether one difference identified across merger deals—the particular party chosen to provide the first draft—results in different non-price terms in the final merger agreement. We do this by selecting specific non-price terms that figure prominently in public company merger agreements, and by testing whether the value of each such term tends to differ depending on whether the acquirer or the seller was the first drafter.

Of course, we would expect that all four of the non-price terms that we select here—the termination fee, reverse termination fee, go-shop period, and MAC clause—would be affected by several other party, deal, and market characteristics. In other words, we do not predict that there is a single set of non-price terms that is efficient for all public company mergers at all times. Thus, to account for additional factors affecting the value of these non-price terms, we employ the technique of ordinary least-squares regression, using the non-price term as the dependent variable, and the first drafter and other deal features as independent variables. Examining the regression coefficient for the first-drafter indicator variable and its standard error tells us whether there is a statistically significant association between the first drafter and the final agreed-upon value of the non-price term in question.

This approach gives rise to several potential critiques with respect to our choice of non-price terms, however. We address each of these below. The first critique is that, rather than considering the full set of non-price terms in the merger agreement, we focus exclusively on four: the termination fee, the reverse termination fee, the go-shop period, and the MAC clause. As a result, we do not have a complete picture of the parties' bargain. It is well known that parties may trade off one non-price term against another during negotiations.[131] The buyer in a particular merger transaction might agree to a higher reverse termination fee, for example, in exchange for stricter representations and warranties by the target. The higher-than-average termination fee in that transaction can thus be explained by a factor that we do not capture in our model. We have no reason to believe that this buyer's tradeoff is inefficient under the circumstances. Our failure to take into account *all* non-price terms could thus pose a problem for our empirical analysis if the particular tradeoffs that parties make were related to non-price terms that we do not include or control for in systematic ways. We cannot know for certain whether these unobservable variables have these relationships with the observable ones, and for that reason we are cautious in drawing inferences from the relationships that we observe.

Second, one might object that all four of the terms that we consider are related to one another, in that they all deal with unilateral termination of the

---

131. *See* Choi & Triantis, *The Effect of Bargaining Power on Contract Design*, supra note 7, at 1690–96 (describing the process of "logrolling" terms in corporate transactions).

merger agreement by one of the parties. It is possible that parties trade these terms against each other and, to the extent we cannot account or control for these effects, this would be another reason to interpret the results with caution. That said, the negotiations of these four terms may be less closely linked than their subject matter would suggest. If, as we suspect, the principals take the lead in negotiating some of the more monetizable terms, before they delegate to their lawyers the task of negotiating the non-monetizable terms, then the two types of negotiation may take place relatively independently of one another.

Third, our choice of non-price terms may lead us to understate the size and scope of any first-drafter effect. All four of the terms studied here are widely known and considered material to a merger transaction. Some of these terms may therefore be negotiated and agreed to by the parties in advance of the first draft of the merger agreement. In many non-auction deals, for example, the termination fee and reverse termination fee may already have been agreed to in a letter of intent or a term sheet before either party began drafting the merger agreement. If so, we would not expect to see, for these fees, a difference dependent on which party provided the first draft—and this is entirely consistent with our findings. Thus, the fact that the relevant regression coefficients for the termination fee and reverse termination fee in **Table 7** are not statistically significant could reflect either (1) that there is no first-drafter advantage for such terms or (2) that we cannot test for such an advantage because these terms were agreed to before the merger agreement was drafted.

However, our methodology alleviates the concern regarding pre-agreed terms, because we perform the same regressions on our sample of auction deals as on our sample of non-auction deals.[132] In auction deals, the terms are negotiated solely through the merger agreement, rather than through term sheets. As discussed in Part IV, our results for auction deals and non-auctions deals are consistent with respect to these two fees. Thus, we can conclude with more confidence that there is no first-drafter advantage for termination fees and reverse termination fees in merger agreements.

Finally, one might question whether the termination fee and the reverse termination fee are truly non-price terms, as we posit. Facially, they appear to be mere price terms, because they are generally expressed in dollars in the merger agreement. The claim would be that these two fees simply reveal how the parties choose to *split* the surplus from the deal (as a price term would), rather than actually *creating* surplus for one or both parties (as a non-price term would). This view is mistaken, however, because these fees do not represent a simple payment from one party to the other as compensation for the transaction.[133] Rather, these fees play one or more roles in the transaction that can generate value for the parties.

---

132.   *See supra* Part IV.B.

133.   For the principal sources in the literature on the value potentially created by termination and reverse termination fees, *see supra* note 71.

Take the reverse termination fee, for example. By agreeing to pay a reverse break-up fee in the event that it fails to consummate the merger, the acquirer signals to the target both that it is committed to the transaction and that it is confident that it will have the funds necessary to complete the acquisition on the closing date.[134] This is valuable information to the target. In addition, the reverse termination fee shifts those specific risks of non-consummation to the buyer, which is likely the efficient outcome.[135] Thus, the reverse termination fee can enhance the value of the transaction and make it more likely that the parties will agree to transact in the first place. The same is true of the termination fee; it serves both signaling and risk-allocation functions that can increase the parties' surplus from the deal.[136] The two types of termination fees are therefore best characterized as non-price terms.

## B.   Importance of MAC Drafting

As discussed in Part IV, we consistently find that the party that prepares the first draft of the merger agreement tends to obtain a more favorable MAC clause in the final agreement, as measured by our MAC index. MAC clauses tend to be divided into two parts: (1) a brief statement of what qualifies as a "material adverse change" or "material adverse event," which would trigger the buyer's termination right under the merger agreement, and (2) a long series of exclusions (or "carve-outs") from this definition. Because unique language in MAC clauses is exceedingly rare, MAC definitions may be broken up into their component sub-clauses and compared against one another. As described in Appendix A, our principal measure of how favorable a given MAC clause is to a party is based on which, and how many, MAC sub-clauses the parties have chosen to include in their MAC definition.

This raises an important question with regard to the MAC results: does it actually matter to the parties how the MAC clause is drafted, so long as they have a MAC clause in the agreement? More precisely, are different formulations of the MAC clause actually associated with different expected payoffs? One can argue plausibly that different MAC formulations should materially change the parties' expected payoffs, or instead that they should matter little, if at all. On balance, we believe that how the MAC clause is drafted *does* affect the parties' economics (for the reasons discussed below), though we do not purport to resolve the debate definitively.

The answer to this question does affect how one assesses the lawyers' role in creating the drafting differences that we identify, however. If MAC drafting does indeed matter to the parties' bottom line, then our result that the drafting party obtains a more favorable MAC clause might suggest that (1) the drafting

---

134.   *See* Afsharipour, *supra* note 72, at 1207.
135.   *See id.* at 1200.
136.   *See* Bates & Lemmon, *supra* note 71, at 471–72 (2003) (finding evidence that target shareholder value is increased in deals where the target agrees to pay a termination fee).

counsel is behaving as a faithful agent to their client in seeking a favorable MAC clause, but also that (2) the non-drafting counsel engenders agency costs in not bargaining sufficiently hard over the MAC clause, perhaps because clients themselves do not pay sufficient heed to the term. If instead different MAC clauses do *not* materially change the economics of the deal, the agency cost story is reversed.[137] The drafting law firm may be devoting too much time to drafting provisions with no measurable payoff out of excessive risk aversion or a desire to maximize billable hours. By contrast, the non-drafting law firm correctly chooses not to push back on the MAC formulation included in the first draft, recognizing that there is no material benefit to doing so. The subsections below summarize the arguments for the competing views on the importance of MAC drafting.

### 1. The Paradoxical MAC Clause.

Virtually every public company merger agreement includes a MAC clause.[138] In our starting dataset of 1,438 merger agreements from the Practical Law database, only three did not include a MAC. Because the occurrence of a MAC allows the acquirer to abandon the deal between signing and closing without paying any compensation to the seller, the clause can be enormously significant to the economics of the deal. It has been referred to as "the most important contract term of our time,"[139] having been invoked repeatedly in systemically important mergers during the 2008-2009 financial crisis.[140] And yet, the instances in which a court finds that a MAC[141] has occurred are vanishingly rare. In the Delaware Court of Chancery, which handles much of the highest-profile litigation involving public company mergers, no merger-agreement case had ever resulted in a finding of a MAC until 2018.[142]

---

137. *See* Coates IV, *Explaining Variation, supra* note 25, at 1309–11 (describing the agency costs that arise in the relationship between clients and their law firms).

138. David A. Katz & Theodore N. Mirvis, *Takeover Law and Practice*, TUL. UNIV. L. SCH. 29TH ANN. CORP. L. INSTIT. 110 (Mar. 30–31, 2017), http://www.law.tulane.edu/tlsLifeAfterLS/files/40/I.%20%206G.%20%20Takeover%20Law%20%20Practice%202017.pdf [https://perma.cc/H9CT-UFCT].

139. *See* Andrew A. Schwartz, *A "Standard Clause Analysis" of the Frustration Doctrine and the Material Adverse Change Clause*, 57 UCLA L. REV. 789, 789 (2010).

140. *See id.* at 835–38.

141. To note, we use the acronym "MAC" in two senses. Throughout the article, MAC largely refers to the clause in the merger agreement itself. However, we also use it (as here) to indicate whether a court found that a MAC clause was triggered (i.e., found that both a "material adverse change occurred" and that none of the MAC clauses' many exceptions applied).

142. Hexion Specialty Chems., Inc. v. Huntsman Corp., 965 A.2d 715, 738 (Del. Ch. 2008). The first and only Delaware case to have resulted in a MAC finding, Akorn, Inc., v. Fresenius Kabi AG, et al., C.A. No. 2018-0300JTL (Del. Ch. Oct. 1, 2018), is discussed *infra* notes 165–168 and accompanying text.

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

Despite the courts' reluctance to enforce MACs, the clause has prompted copious litigation, given the high stakes involved.[143] Further, disputes over MACs have occasionally resulted in major repricings of public company deals in favor of the acquirer.[144] Thus, even though courts routinely side with sellers in MAC disputes, this has not prevented the pursuit of settlements in such disputes, including in some of the very largest mergers.[145] Recent empirical research concludes that the MAC clause remains highly significant to deal outcomes.[146]

What explains this seeming paradox? Notwithstanding the difficulty buyers face in proving the occurrence of a MAC, sellers have little incentive to pursue litigation. First, time may well be of the essence for the target, if it did indeed experience a serious adverse event or unexpected poor performance. If so, agreeing to a lower deal price to avoid litigation may be the target's only alternative to bankruptcy. In addition, litigation over a potential MAC tends to bring unwelcome publicity to the target's poor performance.[147] Finally, if the seller hopes to force the acquirer to proceed with the merger without any alteration of the merger agreement terms, it faces the hurdle of Delaware's high standard for injunctive relief.[148]

To be sure, acquirers themselves often have little incentive to litigate. Arguing that a MAC has occurred places the buyer in an uncomfortable position if it is compelled to consummate the transaction in the end. For one, customers, suppliers, and financing sources will be wary of contracting with the target, and further, the buyer's relationship with target management and employees may be strained. Also, certain buyers, particularly private equity firms, may want to minimize any potential reputational harm from backing out of a transaction.[149] Additionally, given the difficulty of proving the occurrence of a MAC, buyers may not want to risk the costs of losing. In *Hexion Specialty Chemicals v. Huntsman Corp.*,[150] a private-equity-sponsored acquirer sought to abandon its $10.6 billion merger with Huntsman Corporation, claiming that the latter had experienced a MAC. After the Delaware Court of Chancery found that no such

---

143.    Steven D. Solomon, *The MAC Is Back but Does It Kill a Deal?*, N.Y. TIMES: DEALBOOK (Aug. 23, 2011), https://dealbook.nytimes.com/2011/08/23/the-big-mac-is-back-but-does-it-kill-a-deal/?_r=0 [https://perma.cc/PY9W-UABD].

144.    *See infra* notes 152–154 and accompanying text.

145.    *See infra* notes 150–151 and accompanying text.

146.    *See* Denis & Macias, *supra* note 83; Macias & Moeller, *supra* note 83 (providing evidence that MAC provisions do have a material impact on M&A terms and outcomes).

147.    *See* Solomon, *supra* note 143.

148.    Under Delaware law, specific performance can be obtained only upon a showing of clear and convincing evidence. *See* Katz & Mirvis, *supra* note 138, at 111. While the Delaware Court of Chancery in IBP ordered specific performance, it was applying New York law, which requires only that the party seeking specific performance establish its entitlement by a preponderance of the evidence.

149.    Arnold & Porter Kaye Scholer, *Making Adverse Effects Material Again* (Dec. 7, 2016), https://www.arnoldporter.com/en/perspectives/publications/2016/12/making-adverse-effects-material-again [https://perma.cc/F26F-9AUA].

150.    965 A.2d 715 (Del. Ch. 2008).

change had occurred, the acquirer settled the litigation by paying not only the $325 million reverse break-up fee, but also an additional $425 million.[151]

Given these disincentives to litigation, events adversely impacting the target company may affect the deal even if the matter is not litigated.[152] First, the possibility of a MAC may lead the parties to renegotiate the deal price. After Yahoo suffered "the largest known security breach of one company's computer network" in 2016, Yahoo and Verizon amended their merger agreement.[153] By agreeing to exempt the 2016 breaches from the MAC definition, Verizon obtained a $350 million discount from the purchase price (roughly 8 percent of the $4.48 billion total deal value).[154] Other prominent examples of MAC-driven repricings include Bank of America's use of the MAC clause in its $50 billion acquisition of Merrill Lynch to receive more bailout funds during the financial crisis, and J.C. Flowers & Co.'s use of the clause to persuade Sallie Mae to drop its claim for a termination fee in exchange for a refinancing of its debt.[155]

Second, a potential MAC may simply cause a deal to collapse. These terminated deals occasionally lead to entirely new arrangements. When a MAC clause disrupted KKR's $8 billion acquisition of Harman International Industries in 2007, for example, the parties renegotiated a new deal under which KKR would invest $400 million in convertible notes.[156] Some deals are simply abandoned after price renegotiation efforts fail. A $4.9 billion merger between MGIC Investment Corp. and Radian Group Inc. was abandoned by mutual agreement following claims that Radian had experienced a MAC.[157]

We can therefore conclude that the presence of a MAC clause in a merger agreement is economically significant for the parties. Yet this alone does not tell

---

151.  Lisa R. Stark, *Revisiting MAE/MAC Clauses in M&A after Cooper Tire, Huntsman, and Osram*, BUS. L. TODAY (Feb. 2014), https://www.americanbar.org/publications/blt/2014/02/delaware_insider.html [https://perma.cc/V8CM-BG6E].

152.  *See, e.g.*, Natalie M. Jersak, *Can You Buy Me Now?: The Erratic Closing of the Verizon-Yahoo Merger*, 36 REV. BANKING & FIN. L. 544, 546–50 (discussing the adverse impact of Yahoo's cyber data breaches on the Verizon merger) (2017).

153.  Vindu Goel & Nicole Perlroth, *Yahoo Says 1 Billion User Accounts Were Hacked*, N.Y. TIMES (Dec. 14, 2016), https://www.nytimes.com/2016/12/14/technology/yahoo-hack.html [https://perma.cc/6BCA-F2R4].

154.  Scott Moritz, *Verizon Reaches Deal for Lowered Yahoo Price After Hacks*, BLOOMBERG (Feb. 21, 2017), https://www.bloomberg.com/news/articles/2017-02-21/verizon-said-to-reach-deal-for-lowered-yahoo-price-after-hacks [https://perma.cc/UZ4R-SNNX].

155.  Ashton et al., Debevoise & Plimpton LLP, *MAC Clauses in the U.K. and U.S.: Much Ado About Nothing?*, 13:4 PRIVATE EQUITY REPORT (Fall 2013), https://privateequityreport.debevoise.com/the-private-equity-report-winter-2014-vol-14-number-1/the-private-equity-report-fall-2013-vol-13-number-4 [https://perma.cc/LX8L-VDGF].

156.  Peter Lattman, *When Harman Met Kravis*, N.Y. TIMES: DEALBOOK (Apr. 13, 2011), https://dealbook.nytimes.com/2011/04/13/when-harman-met-kravis/ [https://perma.cc/LNK8-GL4B].

157.  Lingling Wei, *MGIC, Radian Untie the Merger Knot*, WALL ST. J. (Sept. 6, 2007), https://www.wsj.com/articles/SB118899136624017977 [https://perma.cc/5AMB-STRB] (citing losses from investing in subprime mortgages as the material adverse change).

us whether different formulations of the MAC clause are associated with different expected payoffs for the parties, a topic addressed in the next section.

### 2. *Uses and Interpretation.*

The MAC clause is perplexing in that, despite its long history in corporate transactions, there remains considerable disagreement as to how it should be interpreted.[158] The fundamental term in the MAC definition—"material adverse change" (or "material adverse effect")—is itself virtually never defined. In deciding *In re IBP, Inc. Shareholders Litigation*,[159] the Delaware Court of Chancery stated that MACs are "unknown events that substantially threaten the overall earnings potential of the target in a durationally-significant manner."[160] Similarly, in *Hexion*, the court clarified that the adverse event must be "consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months."[161] In neither case did the court point to any specific contract language to that effect.

Recently, in *The Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, the Delaware Court of Chancery went even further in abstracting from the language of the merger agreement itself. The court ruled that the MAC elements of "knowledge, magnitude, and duration" identified in *IBP* would be implied in any broadly written MAC clause that did not explicitly include these requirements.[162] If the courts tend to interpret all MAC clauses similarly and pay little heed to the precise language used, this might suggest that specific formulations of the MAC clause matter relatively little.[163]

Yet there is also substantial evidence to the contrary—that is, that (1) party behavior suggests economic importance in different formulations of the MAC clause, and that (2) courts do respond to variations in the particular language of the agreement. First, the manner in which MAC clauses are drafted has changed significantly over time, which would be puzzling if the precise wording were economically irrelevant. Indeed, since *IBP* and *Hexion*, the set of seller-friendly carve-outs to the MAC definition has expanded significantly, reflecting a perceived expansion of sellers' bargaining power over acquirers in public

---

158.   *See* Andrew A. Schwartz, *A "Standard Clause Analysis" of the Frustration Doctrine and the Material Adverse Change Clause*, 57 UCLA L. REV. 789, 789 (2010) (stating with regards to the MAC clause that "no one knows what it means").

159.   789 A.2d 14, 68 (Del. Ch. 2001).

160.   *Id.*

161.   Hexion Specialty Chems., Inc. v. Huntsman Corp., 965 A.2d 715, 738 (Del. Ch. 2008).

162.   Mrs. Fields Brand, Inc. v. Interbake Foods LLC, No. 12201-CB, at *22 (Del. Ch. June 26, 2017).

163.   For example, even if the parties use forward-looking language in their MAC definition, a MAC may not be found if it is considered a low-probability event. *See* Frontier Oil Corp. v. Holly Corp., No. 20502, 2005 WL 1039027, 92 (Del. Ch. Apr. 29, 2005).

company M&A, which suggests that sellers do indeed value these MAC exclusions.[164]

Second, courts have, on occasion, decided MAC cases on the basis of a specific carve-out. This reinforces the view that the carve-outs and the drafting process of MAC provisions are important. The first and only case in which the Delaware Court of Chancery found the target to have suffered a MAC was *Akorn, Inc., v. Fresenius Kabi AG*[165]—a 2018 case involving a $4.75 billion transaction. The court walked painstakingly through various exceptions in the MAC definition and explained why each did not apply.[166] Further, in finding that the target had experienced a MAC, the court suggested that the outcome might have been different had the parties included in the MAC clause an exception for events arising from facts already disclosed to the buyer or in public filings—a specific carve-out already known to the market and used in a number of comparable transactions.[167] Finally, the court expressly rejected the notion that *IBP* imposed a uniform interpretation of all MAC clauses "regardless of what the parties specifically bargained for in the contract."[168]

To conclude, while its impact on deal outcomes suggests that the MAC clause itself is economically significant, it is less certain whether different MAC formulations result in different expected payoffs for the parties. We tentatively conclude that they do, based on recent Delaware precedent. Thus, our results are consistent with the view that taking the lead in drafting may improve a firm's expected payoff from an M&A transaction to some degree, by providing an advantage with respect to terms that are relatively difficult to monetize, such as the MAC clause and the go-shop provision.

---

164.   Arnold & Porter Kaye Scholer, *supra* note 149. More generally, MAC clauses have become longer and more detailed over the years. Ironically, theory suggests that there may be efficiencies generated by vague MAC provisions; for example, such provisions can conceal potential obstacles to the deal, saving transaction costs on the front end and providing incentives for bargaining. *See* Choi & Triantis, *The Effect of Bargaining Power on Contract Design, supra* note 7.

165.   No. 2018-0300JTL, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018). Akorn, the target company in the disputed merger transaction, was a generic pharmaceuticals company. *Id.* at 11. After the merger agreement was signed, the acquirer, Fresenius, received an anonymous letter from a whistleblower regarding Akorn's activities. *Id.* at 3. After conducting an investigation, Fresenius uncovered "serious and pervasive" regulatory violations and compliance failures at Akorn and eventually brought litigation seeking to terminate the merger agreement on the grounds that Akorn had experienced a MAC. *Id.* Siding with Fresenius on this issue, the court found, among other things, that Akorn's EBITDA (earnings before interest, taxes, depreciation, and amortization) had declined 86 percent since the merger agreement was signed, and that Akorn had materially breached its regulatory representations. *Id.* at 5, 135. The Delaware Supreme Court affirmed the *Akorn* opinion in a three-page order. *Akorn v. Fresenius Kabi AG*, 198 A.3d 724, 2018 WL 6427137 (Del. Dec. 7, 2018).

166.   *See Akorn*, No. 2018-0300-JTL, 2018 at 142–49.

167.   *See id.* at 61.

168.   *See id.* In another case, *Genesco Inc. v. The Finish Line, Inc.*, No. 07-2137-II(III), 2007 WL 4698244, *33 (Tenn. Ch. Dec. 27. 2007), the court likewise weighed the specific drafting of the MAC carve-outs. The court found that the target had indeed experienced a "material adverse effect," but that the MAC clause was not triggered due to the inclusion of a carve-out for adverse effects that do not have a disproportionate effect on the target within its industry. *Id.*

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

CONCLUSION

Deal lawyers have longstanding beliefs about who supplies the initial draft agreement and whether supplying that draft conveys an advantage. In this Article, we develop novel datasets on the sales process for public company M&A (auction or non-auction), and on which side provided the first draft of the merger agreement (buyer or seller). We show that the conventional wisdom that buyers generally provide the initial draft is incorrect: drafting responsibility is divided equally among buyers and sellers. The division of labor is primarily determined by the target's sale process. Sellers almost always draft when the target is sold in an auction, whereas buyers tend to draft in bilateral negotiations.

As for the possibility of a drafting advantage, we find that, to the extent such an advantage exists, it appears to be a subtle one. Terms that are easy to monetize, such as termination fees and reverse termination fees, show little or no evidence of a favorable association with the initial drafter. However, terms that are harder to boil down to a dollar figure, such as MAC clauses and go-shop periods, tilt somewhat in favor of drafters.

To explain this limited first-drafter advantage, we hypothesize that the negotiation process itself alters the incentives of the parties and their lawyers. As a result, terms that are hard to monetize are negotiated less efficiently. Because lengthy negotiations are costly (primarily in terms of delay), the non-drafting party must choose which terms to focus on in negotiations. Our results are consistent with principals having strong beliefs about monetizable terms, but less concern for "legal" terms that are more difficult to value. If the target's lawyers agree to a high termination fee, for example, they may get immediate negative feedback from their client. But if those lawyers concede to a MAC clause that favors the buyer, there may be little or no feedback. This dynamic is consistent with lawyers using their limited negotiating capital to push back on draft terms that are most salient to their clients.

What are the implications for M&A deals going forward? While we are reluctant to make predictions or prescriptions based on these results, two conclusions follow for researchers and practitioners.

First, there is considerably more work to be done in estimating the payoffs from transaction terms. In particular, our results suggest that terms that are harder to monetize are associated with greater contracting frictions. More broadly, there remains a disconnect between lawyers and their clients as to the value of certain terms, which future empirical studies could conceivably narrow or even resolve. In the meantime, the current theoretical and empirical work in law and economics should be more attuned to qualitative differences between transaction terms that can in turn lead to differences in how they are negotiated and whether they are set efficiently.

Second, there is some support for lawyers' belief in the importance of drafting first in M&A. While practitioner lore on this point is likely exaggerated, it is not entirely unfounded. Should every party therefore push to draft first? We

would not go so far. It is conceivable that parties must give something up in exchange for the right to draft first, though we do not observe this quid pro quo in our empirical study. Notwithstanding the law and economics doctrine, lawyers may have good reason to "grab the pen" in corporate transactions.

## APPENDIX A - CONSTRUCTION OF MAC MEASURES

Unlike the termination fee, reverse termination fee, and length of the go-shop period, the definition of a "material adverse change" or "material adverse effect" in a merger agreement is not specified numerically. Moreover, MAC definitions are complex provisions with numerous and lengthy sub-clauses, the precise wording of which varies from deal to deal. The goal is thus to derive one or more measures of how favorable a given MAC clause is to the seller relative to the acquirer, by analyzing its component parts. This Appendix describes the methodology for our creation of three such alternative measures.

The first step is to break down each MAC clause in our sample into distinct sub-clauses. MAC clauses consist of two parts. The "affirmative" MAC includes the basic definition of what constitutes a "material adverse change" or "material adverse effect" and would therefore trigger the acquirer's right to terminate the merger agreement without penalty in the absence of an exception.[169] The following example is typical:

> "Material Adverse Effect" means with respect to any Person, any change, effect, circumstance, development or event that has had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the financial condition, business, assets, or results of operations of such Person and its Subsidiaries, taken as a whole.

The second part of the MAC clause consists of the "exceptions" to the MAC. This includes any carve-outs or qualifiers to the basic MAC definition. These often include events thought to be beyond the seller's control (such as changes in the overall economy or the capital markets, changes in law, and acts of war or terrorism) or events for which the seller should not reasonably be penalized (such as changes due to the announcement of the merger or due to actions taken by the target as required by the merger agreement).[170]

Following Talley and O'Kane, we begin by identifying for each merger agreement in our sample which of the separate sub-clauses of the MAC are present in the agreement's MAC definition.[171] Also following Talley and

---

169.   Eric Talley & Drew O'Kane, *The Measure of a MAC: A Machine-Learning Protocol for Analyzing Force Majeure Clauses in M&A Agreements*, 168 J. INSTITUTIONAL & THEORETICAL ECON. 181, 185 (2012).

170.   *See* PRACTICAL LAW, MATERIAL ADVERSE CHANGE PROVISIONS: MERGERS AND ACQUISITIONS (2019), West Practical Law, 9-386-4019 (describing the broad categories of carve-outs in MAC definitions).

171.   *See* Talley & O'Kane, *supra* note 169 at 183.

O'Kane, we rely primarily (with modifications) on the separate MAC sub-clauses identified and described in the most recent annual study of MAC clauses in M&A agreements prepared by Nixon Peabody LLP.[172]

Table A1 lists each of the sub-clauses that we sought to identify in MAC clauses in our merger agreement sample.[173]

**Table A1.** MAC Sub-Clauses.

| MAC Sub-Clause | % Deals Including Sub-Clause | Assigned Score in MAC Index |
|---|---|---|
| Affirmative MAC on target's ability to close the deal | 62.6% | -1 |
| Affirmative MAC for losses over a specified threshold | 0.6% | -1 |
| Affirmative MAC on target's prospects | 0.6% | -1 |
| Affirmative MAC if event would "reasonably be expected" to have material adverse effect | 57.2% | -1 |
| Materiality tied to "disproportionate effects" on target | 96.3% | 1 |
| Exception for change in economy or business in general | 97.5% | 1 |
| Exception for change in general conditions of target's industry | 87.9% | 1 |
| Exception for change in securities markets | 77.0% | 1 |
| Exception for change in trading price or volume of target's stock | 74.8% | 1 |
| Exception for change in interest or exchange rates | 41.1% | 1 |
| Exception for acts of war, major hostilities, or terrorism | 94.4% | 1 |
| Exception for acts of God | 64.1% | 1 |
| Exception for change in political conditions | 75.6% | 1 |
| Exception for changes in laws or regulations | 94.7% | 1 |
| Exception for changes in applicable taxes/tax law | 4.0% | 1 |
| Exception for changes in target's relationship with any labor organization/unions | 2.8% | 1 |
| Exception for seasonal reduction in revenues | 1.7% | 1 |
| Exception for delay or cancellation of orders for services or products | 0.6% | 1 |
| Exception for facts that were expressly disclosed to the bidder/public | 14.0% | 1 |
| Exception for effects of the announcement of the transaction | 94.6% | 1 |
| Exception for expenses incurred in connection with transaction | 4.8% | 1 |
| Exception for actions required or permitted by the merger agreement | 82.2% | 1 |
| Exception for changes in GAAP | 91.7% | 1 |

---

172.   RICHARD F. LANGAN, JR. ET AL., 16TH ANNUAL MAC SURVEY, NIXON PEABODY (Dec. 18, 2017), https://www.nixonpeabody.com/-/media/Files/PDF-Others/mac-survey-2017-nixon-peabody.ashx [https://perma.cc/7C5D-MBRR]. The precise MAC sub-clauses that we coded differ slightly from those listed in the Nixon Peabody and Talley & O'Kane studies, however, for two reasons. First, we chose not to code a small number of clauses that are both extremely rare and prone to non-negligible error rates in our automated searches (described below). Second, we combined certain sub-clauses that are virtually always included together and appear redundant.

173.   In our MAC analysis, we excluded the three merger agreements that did not grant the seller a right to terminate the merger agreement following the occurrence of a material adverse event.

| MAC Sub-Clause | % Deals Including Sub-Clause | Assigned Score in MAC Index |
|---|---|---|
| Exception for failure by the target to meet revenue or earnings projections | 90.1% | 1 |
| Exception for actions required to be taken by law or by target's existing contracts | 4.2% | 1 |
| Exception for litigation related to the transaction | 50.1% | 1 |

For each merger agreement in our sample, we coded the presence or absence of each MAC sub-clause, using word searches (created using regular expressions) to identify them.[174]

We then constructed three separate measures of how favorable a MAC clause is to the seller relative to the acquirer. These included: (1) an index based on the presence or absence of the sub-clauses identified in **Table A1** above; (2) a count of the total number of sub-clauses found among the exceptions to the MAC clause (regardless of whether the sub-clause appears in the Nixon Peabody survey); and (3) a count of the total number of words in the exceptions to the MAC clause. The index was constructed as follows. First, we divided all MAC sub-clauses listed in **Table A1** into two groups according to whether they are favorable to the seller or to the acquirer. We then assigned seller-favorable clauses a value of +1 if included in the merger agreement and 0 otherwise. Similarly, we assigned buyer-favorable clauses a value of -1 if included in the agreement and 0 otherwise. We then summed all of these scores for each MAC definition in our sample.[175]

The index is an imperfect measure in several ways, however. First, though the legal or practical significance of the various MAC sub-clauses may differ widely, we assign them equal weight. For example, the exception for changes in the economy or business in general (included to account for the possibility of a recession, for example) is likely to be far more valuable to the seller than the exception for changes in GAAP. Second, the index does not give credit for MAC sub-clauses that are unique to a particular transaction and therefore not catalogued in the Nixon Peabody annual survey. For this reason, we also use the total number of sub-clauses and total number of words in the exceptions to the MAC clause as two alternative measures of how seller-favorable the MAC is.[176] (All else being equal, the more exceptions to the MAC clause, the more seller-favorable the provision should be.)

174.   Talley and O'Kane also employed machine learning to automatically code MAC sub-clauses, as an alternative to the regular expressions approach, in their study of MAC clauses. Talley & O'Kane, *supra* note 169, at 183.

175.   The approach is similar to that of Marotta-Wurgler, who creates an index for how consumer-friendly EULA contracts are. Florencia Marotta-Wurgler, *supra* note 14, at 327.

176.   Denis and Macias use a similar technique of counting the number of exclusions to the MAC definition. Denis & Macias, *supra* note 83, at 827–29.

**Table A2.** Measures of seller-favorable MACs.

| MAC Measures | Sample Avg. | Std. Dev. |
|---|---|---|
| 1. Index of seller-favorable MAC (based on the presence or absence of well-known MAC sub-clauses) | 11.44 | 2.46 |
| 2. Total number of sub-clauses in exceptions to MAC | 9.01 | ± 2.50 |
| 3. Total number of words in exceptions to MAC | 123.77 | ± 53.17 |

Notwithstanding their differences, we find that our three measures of how favorable the MAC clause is to the seller relative to the acquirer are highly correlated. The results reported in Part IV rely solely on the first measure (the MAC index).

APPENDIX B - LAW FIRM INVOLVEMENT IN M&A TRANSACTIONS (CONT.)

This Appendix provides additional detail on law firm involvement in the M&A deals in our sample, focusing in particular on whether more experienced law firms are more likely to provide first drafts of merger agreements.

**Tables B1a** and **B1b** list the number of times, in our sample of non-auction deals, each law firm appears representing the buyer or the seller, respectively. These tables suggest that experienced firms may be slightly more likely to draft first, but this evidence is far from overwhelming. In non-auctions, the buyer drafts in about 79 percent of the deals. For the top three firms that represent buyers in non-auctions—Skadden, Wachtell, and Sullivan & Cromwell—that measure is over 80 percent for all three. That is true for all of the top ten firms on this list other than Simpson Thacher and Latham & Watkins. There is a somewhat similar trend for law firms representing targets in non-auctions. The overall average for target law firms providing the initial draft is about 21 percent. The top four firms on the list all provide the initial draft at a rate higher than the average. Three of the top-ten firms provide the initial draft at a rate lower than 21 percent, however, and two of those firms draft at a percentage rate in the single-digits.

**Table B1a.** Law Firms Representing Acquirers in Non-Auctions.

| Rank | Law Firm | Appearances | Supplied First Draft | Percentage |
|---|---|---|---|---|
| 1 | Skadden, Arps, Slate, Meagher & Flom | 37 | 30 | 81.1% |
| 2 | Wachtell, Lipton, Rosen & Katz | 30 | 26 | 86.7% |
| 3 | Sullivan & Cromwell | 27 | 23 | 85.2% |
| 4 | Simpson Thacher & Bartlett | 22 | 11 | 50.0% |
| 5 | Davis Polk & Wardwell | 21 | 17 | 81.0% |
| 6 | Jones Day | 20 | 16 | 80.0% |

| 7 | Weil, Gotshal & Manges | 19 | 18 | 94.7% |
| 8 | Latham & Watkins | 16 | 9 | 56.2% |
| 9 | Cravath, Swain & Moore | 15 | 13 | 86.7% |
| 10 | Kirkland & Ellis | 15 | 13 | 86.7% |

**Table B1b.** Law Firms Representing Targets in Non-Auctions.

| Rank | Law Firm | Appearances | Supplied First Draft | Percentage |
|------|----------|-------------|----------------------|------------|
| 1 | Wachtell, Lipton, Rosen & Katz | 36 | 9 | 25.0% |
| 2 | Skadden, Arps, Slate, Meagher & Flom | 33 | 10 | 30.3% |
| 3 | Latham & Watkins | 23 | 6 | 26.1% |
| 4 | Sullivan & Cromwell | 23 | 6 | 26.1% |
| 5 | Wilson Sonsini Goodrich & Rosati | 20 | 1 | 5.0% |
| 6 | Cravath, Swain & Moore | 19 | 7 | 36.8% |
| 7 | Kirkland & Ellis | 16 | 7 | 43.8% |
| 8 | Simpson Thacher & Bartlett | 14 | 2 | 14.3% |
| 9 | Weil, Gotshal & Manges | 14 | 1 | 7.1% |
| 10 | Jones Day | 12 | 3 | 25.0% |

For firms representing targets in auctions, the trends are more consistent with the overall averages. Across the entire sample of auctions, the seller provides the first draft about 90 percent of the time and the buyer 10 percent of the time. As **Tables B2a** and **B2b** show, some of the top firms representing buyers in auctions—such as Kirkland & Ellis and Simpson Thacher—provide the first draft at a rate lower than this, while others exceed this rate. For firms representing targets in auctions, once again some of the most experienced firms draft at a rate above the overall average while others draft at a rate below that mark.

**Table B2a.** Law Firms Representing Acquirers in Auctions.

| Rank | Law Firm | Appearances | Supplied First Draft | Percentage |
|------|----------|-------------|----------------------|------------|
| 1 | Kirkland & Ellis | 40 | 2 | 5.0% |
| 2 | Simpson Thacher & Bartlett | 29 | 1 | 3.5% |
| 3 | Skadden, Arps, Slate, Meagher & Flom | 25 | 3 | 12.0% |

*CALIFORNIA LAW REVIEW* [Vol. 107:1119

| 4 | Latham & Watkins | 20 | 2 | 10.0% |
| 5 | Wachtell, Lipton, Rosen & Katz | 17 | 2 | 11.8% |
| 6 | Gibson, Dunn & Crutcher | 12 | 2 | 16.7% |
| 7 | Sullivan & Cromwell | 12 | 2 | 16.7% |
| 8 | Cleary Gottlieb Steen & Hamilton | 11 | 0 | 0.0% |
| 9 | Weil, Gotshal & Manges | 11 | 0 | 0.0% |
| 10 | Ropes & Gray | 9 | 0 | 0.0% |

**Table B2b.** Law Firms Representing Targets in Auctions.

| Rank | Law Firm | Appearances | Supplied First Draft | Percentage |
|---|---|---|---|---|
| 1 | Skadden, Arps, Slate, Meagher & Flom | 27 | 25 | 92.6% |
| 2 | Wachtell, Lipton, Rosen & Katz | 24 | 18 | 75.0% |
| 3 | Wilson Sonsini Goodrich & Rosati | 19 | 16 | 84.2% |
| 4 | Gibson, Dunn & Crutcher | 14 | 14 | 100.0% |
| 5 | Latham & Watkins | 14 | 14 | 100.0% |
| 6 | Sullivan & Cromwell | 13 | 12 | 92.3% |
| 7 | Cravath, Swain & Moore | 12 | 10 | 83.3% |
| 8 | Jones Day | 10 | 6 | 60.0% |
| 9 | Kirkland & Ellis | 9 | 9 | 100.0% |
| 10 | Davis Polk & Wardwell | 8 | 7 | 87.5% |