# EXHIBIT 16

Page 1

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF TEXAS
3  HOUSTON DIVISION
4  IN RE:  ALTA MESA           )
5  RESOURCES, INC.,            ) CASE NO. 4:19-cv-00957
6  SECURITIES LITIGATION       )
7
8
9
10 ************************************************
11 VIDEOTAPED ORAL DEPOSITION OF
12 JOHN P. FIEBIG
13 NOVEMBER 16, 2023
14 ************************************************
15
16
17   On the 16th day of November, 2023, at 8:59 a.m.,
18 the videotaped oral deposition of the above-named
19 witness was taken at the instance of the Class
20 Plaintiffs, before Michelle L. Munroe, Certified
21 Shorthand Reporter in and for the State of Texas, at
22 Kirkland & Ellis LLP, 4550 Travis Street, Suite 1200,
23 Dallas, Texas, pursuant to Notice and the agreement
24 hereinafter set forth.
25

[PAGES INTENTIONALLY OMITTED]

Page 10

1 Andersen.
2      So am I correct in reading this that your
3 first job out of Oklahoma State University was at
4 Arthur Andersen?
5   A.  That's correct.
6   Q.  Okay.  And thereafter you were employed by
7 Ernst & Young; is that correct?
8   A.  Yes, as a partner.
9   Q.  Okay.  And you provide some bullet points
10 as to the work you did in both firms as an audit
11 partner and a senior audit manager; is that correct?
12   A.  That's correct.
13   Q.  Would you agree with me that none of the
14 bullet points involved forensic accounting work?
15   A.  That's correct.
16   Q.  And tell me, what is your understanding as
17 to the difference between auditing and forensic
18 accounting?
19   A.  I think it's generally the -- the purpose
20 of the -- of the procedures you're performing, the
21 purpose of the engagement in terms of, while it
22 includes a lot of the same type of principles,
23 auditing has its own standards, forensics has its,
24 but they're all kind of in the same area of
25 expertise, I think, as it relates to identifying,

Page 11

1 evaluating evidence and information.
2   Q.  Did you do any forensic accounting work at
3 Arthur Andersen?
4   A.  I don't believe so.
5   Q.  How about at Ernst & Young?
6   A.  No.
7   Q.  In your time at Arthur Andersen and Ernst
8 & Young, for the audits that you conducted for
9 various public and private companies, wasn't it true
10 that, in general, you relied upon the public or
11 private company that you audited to provide you with
12 all the information, materials in which you based
13 your audit on?
14   A.  I think in general that's correct, that we
15 would have our list of items that we requested from
16 them, and then we would expect them to provide the
17 information that we had requested.
18   Q.  You didn't have subpoena power with
19 respect to any of your audit clients, right?
20   A.  No.
21   Q.  Okay.  And you didn't have access during
22 any of the audits you participated in to nonpublic
23 documents produced or in litigation involving the
24 audit client, did you?
25   A.  I'm sorry, I didn't hear the first part of

Page 12

1 that.  Can you ask it again?
2   Q.  Sure.  You didn't have access during the
3 audits that you participated in to nonpublic
4 documents produced during litigation involving the
5 audit client?
6   A.  I don't recall.  I don't recall that I
7 have or -- probably didn't make that distinction at
8 the time or was aware of it perhaps.
9   Q.  And why did you leave Arthur Andersen to
10 go to Ernst & Young?
11   A.  Arthur Andersen collapsed.  So the
12 Oklahoma City practice was acquired by Ernst &
13 Young, at which time I went over as a direct-admit
14 partner and almost immediately was transferred to
15 the Fort Worth office of Ernst & Young to move down
16 here as part of the firm.
17   Q.  While at Arthur Andersen, did you have any
18 role in the Enron audit which I think we can agree
19 had something to do with the collapse of Arthur
20 Andersen?
21      MR. NASKO:  Objection.
22   A.  I did not.
23   Q.  Did you have any role in the preparation
24 of any Arthur Andersen audit work conclusion or
25 finding that any judicial body criticized?

Page 13

1   A.  No.
2   Q.  Did you have any role in the participation
3 of any Arthur Andersen audit work that any
4 professional auditing organization had criticized?
5   A.  No.
6   Q.  You list certain experience with the PCAOB
7 from 2004 to 2018.  We'll return to that when we get
8 to certain parts of your report, Mr. Fiebig.
9      Let me go to your experience with --
10 correct me if I'm mispronouncing this -- ADIGEO
11 Consulting, LLC?
12   A.  ADIGEO, correct.
13   Q.  Okay.  I was wondering if it was a hard G
14 or a soft G.  It is ADIGEO?
15   A.  That's right.
16   Q.  Okay.  And here -- here among your --
17 your -- among other services that you provide with
18 ADIGEO, you describe and list your professional
19 expert experience.
20      Is it fair to say that the bullet points
21 on pages 1 and 2 of your CV list all of your
22 professional expert experience?
23   A.  I would also -- I tend to put the
24 independent consultant in that same bucket as an
25 expert because we were retained -- we were approved

4 (Pages 10 - 13)

[PAGES INTENTIONALLY OMITTED]

Page 42

1 process.
2  Q.  You don't say more comprehensive; you say
3 a comprehensive analysis --
4       (Simultaneous speaking.)
5       MS. WALLER:  Can you let him answer
6 the question and finish it, and then you can ask him.
7 Slow down a little bit.  You're talking over each
8 other.
9       MR. SCHOCHET:  I agree.
10  Q.  I'm sorry, go ahead, finish your answer.
11  A.  Yeah, I don't -- I don't believe -- well,
12 to be clear, for a lot of these I'm not sure I have
13 seen where he has understood the underlying or even
14 evaluated the underlying assumptions or processes to
15 create the projections.
16  Q.  Again, the question, though, is whether or
17 not -- putting aside your -- your analysis of
18 Mr. Regan's opinion, which we'll get to, I'm talking
19 now about the standards themselves.
20       And the question is whether or not a
21 sufficient relevant -- a standard requiring a
22 sufficient relevant data to afford a reasonable
23 basis for the conclusions is the same as requiring a
24 CPA to provide a comprehensive analysis of the data?
25       MR. NASKO:  Objection; asked and

Page 43

1 answered.
2  A.  In this case, I would say yes, it is.
3  Q.  And what's the basis for that opinion?
4  A.  In terms of determining -- in order to
5 have a basis for the opinion, there is a level of
6 diligence and understanding that you have to have of
7 the underlying aspect.
8       As I list in my report, you know, in terms
9 of being able to understand, it can't just be a, you
10 know, retrospective look back and say, okay, well,
11 they didn't get there, and here is an email that
12 said this, that, or the other.
13       Without providing the context, if you
14 will, of what those mean within the determination
15 and development of the projections themselves and,
16 you know, without that understanding, it calls into
17 question really the relevance of what some of these
18 other emails and items that he pointed to were from
19 his -- from the perspective of his evaluation.
20  Q.  Just to be clear, then, are you saying
21 that the standards require -- when the standards
22 refer to sufficient relevant data, that they mean a
23 comprehensive -- a comprehensive analysis of the
24 data?
25       MR. NASKO:  Object to form.

Page 44

1  A.  Again, in this situation, I believe so.
2  Q.  Not just -- I'm talking generally, not
3 just this situation.
4  A.  It's a principles-based standard, and I
5 think that you apply that principle and -- within
6 the situation.  You know, having been at the PCOB
7 for so many years and the auditing standards were
8 principle based, not prescriptive as the accounting
9 standards sometimes are, you have to have experience
10 with saying, okay -- or maybe even a comfort level
11 with what a principle-based standard is to say, yes,
12 that broad -- that broad principle or that very
13 clearly stated principle, you know, is something
14 that within those two sentences is not meant to be
15 limiting as to -- as to what a CPA would need to do
16 in order to apply it.
17  Q.  Do you derive any support for the view
18 that a sufficient relevant data equals a
19 comprehensive analysis of the data from any FVS
20 forensic accounting practice aids?
21       MR. NASKO:  Object to form.
22  A.  I have not.
23  Q.  From any treaties adopted by forensic
24 accountants?
25       MR. NASKO:  Object to form.

Page 45

1  A.  Not that I'm aware of, no.
2  Q.  I note, sir, that Mr. Regan in Appendix B
3 of his report lists over six pages with three to
4 four columns in each page all of the documents
5 produced in this case he considered.  And this is by
6 contrast with your over five pages with only one
7 column of documents on each page.
8       So is it fair to say you did not review
9 all the documents that Mr. Regan listed that he
10 considered?
11       MR. NASKO:  Objection; form.
12  A.  I have reviewed all of the documents that
13 he cited to that I have cited to.  Cornerstone has
14 reviewed all of the documents within his appendix
15 that I haven't, and I have reviewed some of those,
16 but they have reviewed those under my direction and
17 have provided me any relevant information or
18 observations from their review of that.
19  Q.  So you're relying upon Mr. -- I'm sorry,
20 you're relying upon Cornerstone to provide you with
21 relevant documents that Mr. Regan had considered but
22 you did not?
23       MR. NASKO:  Object to form.
24  Q.  Is that correct?
25  A.  That they have reviewed -- I'm relying on

[PAGES INTENTIONALLY OMITTED]

Page 90

1 would be no, I don't understand that to be the case.
2   Q.  Did you know that there was a deposition
3 of a 30(b)(6) witness for Ryder Scott, Miles Palke?
4   A.  I am aware of that.
5   Q.  I notice in your Appendix A that you don't
6 show his deposition.
7       Did you review it?
8   A.  I did not personally review it, but it was
9 reviewed by Cornerstone -- Cornerstone.
10   Q.  To the extent that you're relying upon
11 Ryder Scott in your assessment of Mr. Regan's
12 report, why did you not personally read Mr. Palke's
13 deposition?
14       MR. NASKO:  Object to form.
15   A.  Just made a judgment on -- based on the
16 information that I had seen in reading their report
17 and, you know, reliance on the experience and
18 knowledge of the Cornerstone staff who did review
19 it.
20       MR. SCHOCHET:  Let's introduce as
21 Exhibit 819 Mr. Palke's deposition transcript.
22 Tab 13.
23       MR. SALDAMANDO:  Umair, this is tab
24 13.
25   Q.  I take it you have not seen this document

Page 91

1 before; is that correct?
2       (Exhibit 819 marked.)
3       MR. HUSSAIN:  The exhibit has been
4 introduced.
5   A.  That's correct.
6   Q.  All right.  Let's go to first page 15.  Do
7 you see where it says -- there's a question:  Did
8 Alta Mesa ever ask Ryder Scott to provide estimates
9 of -- to provide -- of unproved reserves?
10       And the answer is:  To the best of my
11 knowledge, no.
12       Were you aware of that fact?
13   A.  Yes.
14   Q.  And do you know of any reason why Ryder
15 Scott would not be able to provide that service to
16 Alta Mesa if Alta Mesa had requested and paid for
17 it?
18       And the answer is:  No.
19       And he says:  In estimating Alta Mesa's
20 proved reserves, did Ryder Scott rely on data that
21 was provided to Ryder Scott by Alta Mesa?
22       And the answer is:  Yes.
23       So are you aware that Ryder Scott only had
24 access to documents provided by Alta Mesa; is that
25 correct?

Page 92

1       MR. NASKO:  Object to form.
2   A.  No, I don't take that to be what that --
3 what that question and answer means nor do I believe
4 that Ryder Scott would have based it just on the
5 data that was provided directly by the company.
6       Given their knowledge and experience as
7 reserve engineers and the operating characteristics
8 and other -- you know, I think Ryder Scott is a, you
9 know, well-known, very experienced reserve engineer.
10 And in my experience that when you hire someone like
11 that, they're just not -- not just taking the
12 company's data and saying, okay, I'm just going to
13 use that information regardless of anything else I
14 may know about the characteristics of the field, the
15 geology, whatever else that that engineer has
16 information on.
17       That's kind of the benefit of having a
18 Ryder Scott is that they bring to the table not just
19 this, I'm going to plug it into my calculation and
20 take it for what it is, but they would have come to
21 that with knowledge well in excess of what the
22 company provided, including, you know, related to
23 other properties surrounding the company.
24       It's my experience that that's very common
25 when you have a third-party reserve engineer, that

Page 93

1 they're bringing to the table a much more extensive
2 knowledge of, you know, oil and gas engineering, the
3 properties and production and results from
4 throughout.
5   Q.  Let's continue:  Okay.  And did Ryder
6 Scott independently verify that the data Alta Mesa
7 provided to Ryder Scott was correct?
8       Answer:  No.
9       Did Ryder Scott rely on data or
10 information other than what was provided to Alta
11 Mesa in auditing Alta Mesa's estimated of proved
12 reserves?
13       Answer:  I don't think we did, no.  We
14 would have been dependent on Alta Mesa's data.
15       Do you want to in any way change your last
16 answer?
17       MR. NASKO:  Object to form.
18   A.  I think based on the way that's answered
19 in his response, I don't think it necessarily
20 changes my understanding from, you know, my years of
21 oil and gas auditing and interacting with reserve
22 engineers, third-party reserve engineers that they
23 also bring to the table a strong understanding of
24 the environment where they're -- where they're
25 performing the reserve engineering.

[PAGES INTENTIONALLY OMITTED]