**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>**PUBLIC VERSION OF DKT. 549** |

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE CLASS PLAINTIFFS' EXPERT WITNESS
PROFESSOR ADAM BADAWI**

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

STATEMENT OF THE ISSUE ........................................................................................ 1

SUMMARY OF THE ARGUMENT ................................................................................ 2

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT .................................................................................................................... 6

    A.     Professor Badawi's Selection of Documents and Evidence Was in Keeping with Appropriate Standards, and Commensurate with a Rebuttal Expert Opinion ................................................................................ 6

    B.     Plaintiffs Are Not Introducing Professor Badawi to Provide a Negligence Opinion ................................................................................... 12

CONCLUSION ............................................................................................................... 14

4866-6239-8365.v1

## TABLE OF AUTHORITIES

Page

**CASES**

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ................................................................................. 7

*Butler v. Home Depot, Inc.*,
984 F. Supp. 1257 (N.D. Cal. 1997) ........................................................................... 7

*Daubert v. Merrel Dow Pharms., Inc.*,
509 U.S. 579 (1993)............................................................................................*passim*

*Kim v. Am. Honda Motor Co., Inc.*,
86 F.4th 150 (5th Cir. 2023) ................................................................................ 5, 11

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999); ................................................................................................. 5

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002),
*rehearing and rehearing en banc denied*,
48 F. App'x 919 (5th Cir. 2002) ................................................................................ 5

*Meeker v. Meeker*,
2004 WL 2457793 (N.D. Cal. July 6, 2004),
*reconsideration denied*, 2004 WL 2513041
(N.D. Cal. Nov. 8, 2004)............................................................................................ 6

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ..................................................................................... 5

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
382 F.3d 546 (5th Cir. 2004) ........................................................................... 5, 6, 11

*Puga v. RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) ..................................................................................... 5

*Recif Res., LLC v. Juniper Cap. Advisors, L.P.*,
2020 WL 11025602 (S.D. Tex. Oct. 1, 2020)............................................................ 7

*Viterbo v. Dow Chem. Co.*,
826 F.2d 420 (5th Cir. 1987) ................................................................................. 5, 6

4866-6239-8365.v1

## NATURE AND STAGE OF THE PROCEEDINGS

This is a certified class action pursuant to §§10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934. Dkt. 241. The action concerns the rapid collapse of Alta Mesa Resources, Inc. ("AMR") f/k/a Silver Run II following a de-SPAC transaction wherein two privately held companies – Alta Mesa Holdings ("AMH") and Kingfisher Midstream ("KFM") went public by merging into a Riverstone-sponsored SPAC. On February 12, 2018, Defendants began discussing whether and how to disclose a 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it. Less than a year after asking for shareholder approval, AMR was forced to write off more than 80% of its $3.86 billion market value for the same reason. AMR filed for bankruptcy protection just seven months after that.

Defendants AMR, Riverstone Holdings LLC ("Riverstone"), Harlan Chappelle, Stephen Coats, Michael Ellis, William Gutermuth, James T. Hackett ("Hackett"), Pierre Lapeyre, David Leuschsen, Donald Sinclair, Ronald Smith, Jeffrey Tepper, Thomas Walker, and Diana Walters (collectively, the "Moving Defendants") move to preclude the expert testimony of Class Plaintiffs' expert rebuttal witness to the opinions of Moving Defendants' expert Professor Charles Whitehead ("Whitehead") concerning Defendants' good faith defense.

## STATEMENT OF THE ISSUE

Whether Class Plaintiffs' expert rebuttal witness's (Professor Adam Badawi ("Badawi")) opinions are admissible during summary judgment and trial.

## SUMMARY OF THE ARGUMENT

Professor Badawi's report cuts directly to the many failings of Professor Whitehead's report, and by extension, Defendants' proposed expert testimony. First, Professor Badawi lays bare the flawed methodologies underlying Whitehead's Opinion No. 1 and his improper characterization of the AMH and KFM Proxy projections as being strictly "target-prepared."[1] Contrary to Whitehead's characterization, as Professor Badawi points out, Hackett and Riverstone were intimately involved in the process of developing the false and misleading AMH and KFM Proxy projections. *See* Adam Badawi's Supplemental Rebuttal to the Opinions Offered by Charles Whitehead and Steven J. Pully (Dkt 510-1, Ex. 1) (the "Badawi Supp. Rebuttal Rpt.") at 21-22.[2]

As for Whitehead's Opinions 2-9, Badawi highlights a sampling of the damning evidence documenting the Moving Defendants' failures throughout the Class Period, and Whitehead's complete failure to grapple with that evidence in reaching his opinions. *See id.* at 22-38.

---

[1] Whitehead offers nine opinions: Opinion No. 1 concerns the general use of "target-prepared financial projections" in SPAC transactions and SRII's use of AMH and KFM financial projections in the Proxy here (BX A at 7); Opinion Nos. 2-9 concern whether the actions of the SRII and AMR Board before, during, and after the Business Combination were in compliance with the "custom and practice" of the industry (*id.* at 7-8). All "BX __" references are to the Declaration of Trig Smith in Support of Class Plaintiffs' Opposition thereto, filed concurrently herewith.

[2] Of course, as detailed in Plaintiffs' *Daubert* motion to exclude Whitehead's Opinion No. 1 (Dkt. 519), Whitehead makes drastic, sweeping assumptions about what constitutes the actual practice of preparing financial projections, after limiting his (and Cornerstone's) research to the brief viewing of several dozen other SPAC proxy statements.

As only one example of Whitehead's failures, throughout his report Whitehead utilizes the phrase "absent red flags" to attempt to minimize the Defendants' deliberate misconduct. *See, e.g.*, BX A at i-iii. In response, Badawi cites to several of the worst instances of what were obvious red flags, ignored by the parties to the de-SPAC transaction, in order to close the deal they were all incentivized to close. *See* Badawi Supp. Rebuttal Rpt. at 28-32, 35-36. One such red flag was the need for a 46% cut to the Proxy's 2018 KFM EBITDA projections less than a week after SRII's shareholders had approved the Business Combination. *Id.* at 31-32. Badawi further details evidence of a highly dysfunctional board as it was preparing to issue AMR's 2017 10-K in March 2018, with defendants Hackett and Will McMullen of BCE accusing fellow defendant and board member Donald Dimitrievich of HPS (and the other owners and operators of KFM prior to the de-SPAC) of lying about KFM in connection with the Business Combination. *Id.* at 32. Thus, Badawi's rebuttal goes directly to the (little) credibility that the Court and the jury should afford Whitehead's report and his assumed trial testimony. *See, e.g.*, BX B at 201:19-202:21.

Moving Defendants, many of whom have extensive board experience, are just as capable as Professor Whitehead of speaking to the general customs and practices of board members and their good faith, here, in serving as SRII and AMR board members. BX C at 31:11-17 ("Q. Is there any reason that you can think of as to why the defendants themselves can't testify about what they observed regarding the custom and practice of board members? . . . [A.] That's somewhat speculative since I've not met them."). But having failed to elicit any evidence in support of their good faith during fact discovery, Moving Defendants were forced to fill this glaring hole through expert testimony. And now confronted by the clearly

- 3 -

qualified Professor Badawi's relevant rebuttal opinions, Moving Defendants attempt to exclude the entirety of Professor Badawi's report. Defendants should not be allowed to bolster the record on their good faith defense in this way, and each of their arguments to exclude Professor Badawi's opinions fails.

Badawi's report and potential testimony need not opine on every piece of evidence in the record; instead, it is perfectly sufficient for Professor Badawi to have reviewed available evidence, and having identified the red flags seemingly missed (or ignored) by Whitehead, point to those documents, as well as Defendants' repeated non-denials, as symptoms of an obviously fatally flawed expert opinion.

Further, Plaintiffs are of course not required to submit an expert opinion on what constitutes negligence; the Court is perfectly capable of instructing the jury on the type of (mis)behavior that constitutes negligence, which Plaintiffs expect to occur when this case goes to trial.[3] Indeed, at trial, Plaintiffs may avoid the negligence issue altogether by showing the Defendants' repeated, documented, glaringly ***deliberate*** misconduct. Thus, Plaintiffs were under no obligation to identify Badawi as an expert initially or provide an initial report.

## LEGAL STANDARD

"While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the

---

[3] As Class Counsel informed defense counsel during a pre-motion meet and confer, they do not intend to ask Badawi at trial to opine on the standard for negligence.

rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).[4] The trial court must "ensur[e] that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Id*. Where, as here, an expert's opinion is based on experience and specialized knowledge, the factors in *Daubert* may or may not be relevant to assessing reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (noting "it is appropriate for [a] court to consider factors other than those listed in *Daubert* to evaluate reliability" where the opinion is premised on "personal observations, professional experience, education and training").

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "The courts must focus 'on [the expert's] principles and methodology, not on the conclusions that they generate.'" *Kim v. Am. Honda Motor Co., Inc.*, 86 F.4th 150, 160 (5th Cir. 2023) (alteration in original). And a movant's challenge to how an expert applies the generally acceptable methodology does not go to admissibility, but rather is properly brought up during cross-examination at trial. *See, e.g.*, *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004) (holding that challenges to the bases and sources of an expert's opinion go to weight rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence").

---

[4] Unless otherwise noted, citations and footnotes are omitted and emphasis is added throughout.

In other words, exclusion is available but disfavored in this Circuit. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of attacking otherwise admissible evidence. *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). "The *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002), *rehearing and rehearing en banc denied*, 48 F. App'x 919 (5th Cir. 2002).

## ARGUMENT

### A. Professor Badawi's Selection of Documents and Evidence Was in Keeping with Appropriate Standards, and Commensurate with a Rebuttal Expert Opinion

Moving Defendants assert Badawi did not review "sufficient information" to arrive at his rebuttal opinions because he ignored relevant evidence and cherry-picked facts to arrive at his desired outcome. Defendants' Motion to Exclude Class Plaintiffs' Expert Witness Professor Adam Badawi (Dkt. 510) ("MTE") at 3. Nothing could be further from the truth.

First, a basic read of Professor Badawi's heavily footnoted report and the materials cited or relied upon therein makes clear that Professor Badawi's opinions are based on more than sufficient information. *See Viterbo*, 826 F.2d at 422.

Second, it is simply not the law that just because contradictory evidence or alternative reasonable interpretations of evidence considered and relied upon in an expert report exist, that the report should be excluded under *Daubert*. To the contrary, arguments about the "scope" of evidence considered or that an expert "failed[] to thoroughly analyze the data gathered . . . go to the weight of the . . . evidence and not its admissibility." *Meeker v. Meeker*, 2004 WL 2457793, at *11 (N.D. Cal. July 6, 2004), *reconsideration denied*, 2004

WL 2513041 (N.D. Cal. Nov. 8, 2004); *see also Primrose*, 382 F.3d at 562-63 (holding that challenges to the bases and sources of an expert's opinion go to weight rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence"). Defendants' objections, here, should be aired through "vigorous cross-examination, presentation of contrary evidence, and requests for limiting instructions" – not by excluding the expert's testimony. *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1265 (N.D. Cal. 1997).[5]

Third, much of the contradictory evidence that Defendants reference is simply not contradictory and, thus, cannot provide a basis for excluding Professor Badawi's opinions.

Despite ample opportunity to identify supposedly contradictory information ignored by Badawi, Moving Defendants only offer vague denials from Board and AMR management depositions, and third-party consultants who were not engaged to perform the work on which Defendants now claim to rely. MTE at 4-5.

Moving Defendants waste a great deal of ink attempting to explain away the evidence of glaring red flags ignored by Defendants throughout the Class Period, arguing that

---

[5] Defendants' "cherry picking" cases are readily distinguishable, for the simple fact that they involve experts "'reject[ing] some . . . data that contradicted [their] opinion[s].'" *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). As just one example, the excluded expert in *Recif Resources* had an opinion discarded for "without explanation fail[ing] to consider substantial and especially significant information that was inconsistent with his [o]pinion." *Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, 2020 WL 11025602, at *9 (S.D. Tex. Oct. 1, 2020). As explained more fully below, Defendants try and fail to identify any information inconsistent with Badawi's rebuttal opinions. Instead, the "cherry picking" accusations are more appropriately leveled at Whitehead, who repeatedly testified that he did not consider certain evidence contradictory to his own opinions (*see* BX C at 213:12-217:5), and if he did consider it, remarkably insists that it did not amount to a "red flag" for the Moving Defendants, including, somehow, the need to cut KFM projections by approximately $80 million just six days after the Proxy vote. *Id.* at 242:16-246:19.

Professor Badawi simply did not read the Defendants' deposition transcripts close enough. *Id.* However, reading those transcripts closely in their full context makes one thing perfectly clear: given the opportunity, each deponent failed to provide specific evidence of their own good faith, and instead, only offered non-specific denials or vaguely alluded to what their conduct "would have been." *See, e.g.*, BX D at 80:12-15 ("You've asked me a couple of times, did I recall asking any questions. My questions are not reflected in the minutes, but *I regularly ask questions* at every board meeting and every conference call."); BX E at 60:7-18 ("Q. What due diligence did you do? A. *I can't specifically recall what I did, but my normal course*, having worked in the industry for – worked in investment banking for 30 plus years, worked with companies and boards, invested in many companies, provided fairness opinions for companies, my normal process is to review all the information thoroughly, confer with experts if they are brought into a situation and then make my own independent investment decision."); *id.* at 75:21-76:4 ("Q. In connection with your own due diligence, what information or types of information were you relying upon? A. *Again, I can't be specific, but in general my practice would be* to review all materials I felt relevant in a continual evaluation of the subject matter."); BX F at 53:12-15 ("Q. Were you involved in secondary due diligence of those entities? A. *I would have an oversight role* as a board member, but not the due diligence itself.").

Moving Defendants also refer to the work performed by Tudor Pickering Holt & Co. ("TPH") and argue that Professor Badawi failed to consider the scope and import of that work. MTE at 5. But Moving Defendants obfuscate record testimony from TPH and Professor Badawi on the true basis and purpose of TPH's work. *See* BX B at 180:12-181:8

- 8 -

("Q. So do you consider this to be TPH's opinion on the reasonableness of a 12-well-per-section model? . . . [A.] I don't have enough information to make that conclusion. . . . Q. But you have enough information to conclude that TPH did not provide an opinion about the wells per section that Alta Mesa had rejected? A. I don't see anything purporting to claim that this is an opinion about the reasonableness of the assumptions. Q. Just a comparison of what TPH's base case is versus AMH's case, right? . . . [A.] It is a comparison, but there's no discussion of reasonableness in that. So I did not see an opinion on the reasonableness of the 12-WPS spacing. ***I don't recall seeing something that purports to be an opinion on the reasonableness, and this doesn't change my opinion***.").

Notably, in attempting to undermine Badawi's opinions and his determination that Whitehead failed to address limitations on the scope of the work TPH conducted, *see* Badawi Supp. Rebuttal Rpt. at 35, Moving Defendants fail to point to any record testimony from TPH on the subject of the work performed in support of the Business Combination. *See* MTE at 5. But Professor Badawi did and this testimony confirms just what Badawi says: TPH was never engaged to analyze the reasonableness of a 12 wells per section assumption, and thus, TPH's work cannot form the basis for a good faith defense on behalf of the SRII or AMR Board. *See* Badawi Supp. Rebuttal Rpt. at 35 (citing BX G at 174:13-175:13 ("Q. . . . Were you hired by Riverstone or Silver Run, interchangeably, to determine the appropriate number of wells per section? . . . A. I think we were engaged by Silver Run II. So could – stating that, could you repeat the question? Q. . . . Sure. Did Silver Run II . . . hire TPH to generate the appropriate number of wells per section in Alta Mesa's play? . . . A. Sorry. I believe the – part of the scope of our engagement was to perform an evaluation of the

- 9 -

properties being sold by AMH.  Q. . . . Understood.  And in evaluating that property, the property being sold by AMH, ***did Silver Run II hire you to generate the appropriate number of wells per section*** for that property? . . . A.  ***That was not a specific request that was ever communicated to us***.")).

Further demonstrating the ridiculousness of relying on TPH for due diligence on the transaction is TPH's testimony on their compensation: $6 million, paid only if the Business Combination closed.  BX G at 142:3-8.  Given the testimony by the Defendants' own third-party advisor, it's no wonder that Badawi gives little credence to Defendants' self-serving, vague assertions about what due diligence they "would have" performed.  Badawi Supp. Rebuttal Rpt. at 27-37.

In a similar fashion, Moving Defendants then move on to Badawi's assessment of communications between Messrs. Hackett, Chappelle, and Ms. Tamara Alsarraf in the days leading up to the announcement of the Business Combination.  MTE at 5; Badawi Supp. Rebuttal Rpt. at 21-22, 25.  Moving Defendants baselessly assert that Badawi ignored evidence that contradicts his assessment, but fail to acknowledge, cite to, or in any way point the Court to Badawi's actual record testimony on the issue.  Yet again obfuscating both Badawi's and Chappelle's testimonies, Defendants argue that Chappelle gave a different version of events; he did nothing of the sort.  BX B at 105:23-106:13 (Q.  And fair to say Mr. Chapelle (sic) disagrees, right, that Mr. Hackett directed him to use the $350 million projection for EBITDAX?  A.  I don't see it being definitive one way or another.  It says I don't recall the substance of the conversation, and I don't see a specific denial.  Q.  You don't see him say that it would not be consistent for Jim [Hackett] to somehow, as you seem

to be suggesting, tell me what the number should be? You don't see those words? A. I see that it says that it would not be consistent for Jim to somehow tell me what the numbers should be. ***I don't see a specific denial Jim didn't tell me, did or did not, a definitive statement one way or another***."). Yet again, Moving Defendants rely on a tortured reading of their own deposition testimony in order to futilely argue that Badawi "failed to consider" the evidence in the record. Put differently, given the opportunity to testify that he did not have that conversation with Hackett, Chappelle specifically elected not to, perhaps perceiving that a specific denial would expose him to perjury charges if Hackett told the whole truth (whereas no one can prove Mr. Chappelle's testimony to the effect that he now does not recall the conversation to be false unless Chappelle admits to it).

At bottom, Defendants have put forth no evidence that contradicts Badawi's interpretations, opinions, or conclusions – they simply do not like his interpretation of the evidence or the conclusions he reaches from that evidence. But as Moving Defendants well know, this is not a basis for exclusion under *Daubert*, and these challenges are better left for cross examination at trial. *See Primrose*, 382 F.3d at 562-63 (holding that challenges to the bases and sources of an expert's opinion go to weight rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence"); *Kim*, 86 F.4th at 160 ("The courts must focus 'on [the expert's] principles and methodology, not on the conclusions that they generate.") (alteration in original); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### B. Plaintiffs Are Not Introducing Professor Badawi to Provide a Negligence Opinion

Moving Defendants also try to exclude certain of Professor Badawi's rebuttal opinions by attempting to re-characterize them as affirmative opinions. MTE at 7-11. Moving Defendants spend the entire second half of their motion asserting that Class Plaintiffs owe the Court an expert opinion on the negligence standard and intend to use Professor Badawi to testify as to that standard, and thus Defendants are unjustifiably prejudiced by Class Plaintiffs utilizing Badawi as a rebuttal expert. *Id.* In fact, between Whitehead and Badawi, the only expert referring to a legal standard of care is Whitehead, although he lacks the conviction to stand behind it. BX C at 126:12-22 ("Q. Okay. So why did you cite to the case law regarding the standard of a good faith defense? A. Again, as I said before, ***counsel advised me what these standards were. I accepted the advice without necessarily opining on it one way or the other***. I'm aware of the position counsel has on this. And, you know, in connection with my opinions, I assumed the advice to be true. But whether or not counsel strategically is offering me as a witness for this or that, you'll have to talk with counsel about that.").[6]

---

[6] Defendants' misplaced complaints about "cherry picked" evidence (MTE at 3-7) read even more hollow in light of this portion of Whitehead's testimony, in which he received a legal standard from counsel and includes it in his opinion without verification of the correct standard, and without even reviewing the entire opinion which he quotes in his report. BX C at 138:10-22 ("Q. Can you tell me about approximately how much time you spent reading this opinion after it was brought to your attention by defendants – defense counsel? A. ***Less than a minute***. Q. Okay. That's how long it took you to confirm that the statements were accurate? A. Again, what I was doing was ***accepting the statements as an accurate reflection of the law*** not passing upon the analysis itself and ***did not bother to read the entirety of the opinion*** to decide what the standard might or might not be. That's beyond the scope of what my opinion is covering.").

- 12 -

Class Plaintiffs do not dispute that they bear the burden of proving that Defendants acted "at least negligently" in connection with their §14(a)(9) claims. Dkt. 160. However, that burden is irrelevant to Professor Badawi's rebuttal for two reasons: (1) this Court is more than capable of instructing the jury on the negligence standard applicable in the Fifth Circuit; and (2) Class Plaintiffs will exceed that standard at trial with reams of evidence of Defendants' deliberate misconduct.

Moving Defendants invent a classification for Badawi's opinions (the "Negligence Opinions"), despite the clear focus and import of those opinions being the rebuttal of Whitehead's opinions, and then demand those opinions be excluded for being untimely. MTE at 2-3. Moving Defendants' sole explanation – limited to less than one sentence in an 11-page brief – for the classification is their claim that Badawi opines "the Proxy Defendants' conduct did not comport with custom and practice." *Id.* at 2. A quick review of Badawi's actual opinions, however, demonstrates the falsity of Defendants' claim. Simply put, throughout his report and the challenged rebuttal Opinions 1-4 and 6-7, Badawi points out the ways in which Whitehead's report ignores relevant evidence to come to the baffling conclusion that there were no red flags that management or the Board could have seen, despite the near-immediate implosion of AMR after the Business Combination. *See* Badawi Supp. Rebuttal Rpt. at 21-38.[7]

Put another way, Class Plaintiffs were under no obligation to provide an affirmative expert to explain to the Court a "negligence" standard of care in support of their §14(a)(9)

---

[7] Notably, if Professor Badawi was indeed attempting to provide the Court with an expert opinion on negligence, he did a lackluster job; the words "negligence" and "negligent" appear a grand total of zero times in his 46-page supplemental report.

claim, and did not intend to do so.  Despite Moving Defendants' lengthy citations to out-of-circuit and inapposite cases, Professor Badawi's report merely rebuts, in sequence and in depth, Whitehead's gross misreading or ignorance of the evidence as it actually exists, documenting the repeated red flags alternatively ignored or hidden by Defendants in the lead up to and following the Business Combination.

## CONCLUSION

Clearly, Professor Badawi's rebuttal opinions are proper.  Throughout his report, he utilizes record evidence to demonstrate the inaccuracy of Whitehead's opinions, as well as Whitehead's eliding of Defendants' testimony and documentary evidence to somehow find no "red flags."  Badawi Supp. Rebuttal Rpt. at 21-38.  Further, Class Plaintiffs were not obliged to, and do not seek to, introduce Professor Badawi as an affirmative expert on the negligence standard of care.  Defendants' motion to exclude Professor Badawi should therefore be denied.

Dated:  January 18, 2024

Respectfully submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle (attorney-in-charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)

*/s/ Trig R. Smith*
Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

- 15 -

Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*