BX B

Page 1

1              UNITED STATES DISTRICT COURT
2           FOR THE SOUTHERN DISTRICT OF TEXAS
3                     HOUSTON DIVISION
4
5   IN RE:                          )
6   ALTA MESA RESOURCES, INC.       ) Civil Action No.
7   SECURITIES LITIGATION           ) 4:19-cv-00957
8                                   )
9                                   )
10          The videotaped videoconference deposition
11  of ADAM BADAWI, called for examination pursuant to
12  the Rules of Civil Procedure for the United States
13  District Courts pertaining to the taking of
14  depositions, taken at on the 16th day of
15  November, 2023, at the hour of 11:02 a.m.
16
17
18
19
20
21
22
23
24  Reported by:  Gina M. Luordo, CSR, RPR, CRR
25  License No.:  084-004143

[PAGES INTENTIONALLY OMITTED]

Page 105

1        (Whereupon, Deposition Exhibit
2        No. 120 was marked for
3        identification.)
4        THE WITNESS:  It looks like the Chapelle
5    transcript is there.
6    BY MR. WORD:
7        Q.   It's there?  Okay.  Great.
8        A.   It being there and me pulling it up are
9    two separate things.
10       Q.   Right.  Fair point.  Let me know when you
11   have it.
12       A.   It says generating preview.  The proxy
13   number came up.  I think it was too large.  I think
14   I have it.
15       Q.   Can you look at Page 51, please?
16       A.   I have 51.
17       Q.   Read the section beginning with Line 4
18   through Line 22.  This passage is discussing the
19   same document you rely upon for your conclusion
20   that Mr. Hackett had strong views about the
21   projection being 350.
22       A.   I've read that section.
23       Q.   And fair to say Mr. Chapelle disagrees,
24   right, that Mr. Hackett directed him to use the
25   $350 million projection for EBITDAX?

Page 106

1    A.   I don't see it being definitive one way or
2    another.  It says I don't recall the substance of
3    the conversation, and I don't see a specific
4    denial.
5    Q.   You don't see him say that it would not be
6    consistent for Jim to somehow, as you seem to be
7    suggesting, tell me what the number should be?  You
8    don't see those words?
9    A.   I see that it says that it would not be
10   consistent for Jim to somehow tell me what the
11   numbers should be.  I don't see a specific denial
12   Jim didn't tell me, did or did not, a definitive
13   statement one way or another.
14   Q.   But you're definitive, though, right?
15   You've decided, even though you weren't a
16   participant to the conversation, that Mr. Chapelle
17   is not definitive that Mr. Hackett must have told
18   him it was $350 million?
19   A.   I think it's consistent with the evidence
20   that I've cited.
21   Q.   But not consistent with the testimony
22   here, right?
23       MR. KELLEY:  Objection to form.
24       THE WITNESS:  My job is to be an expert witness
25   to testify on the things that I know about.  The

[PAGES INTENTIONALLY OMITTED]

Page 180

1    A.   I believe so.
2    Q.   13.8 wells per section in the TPH base
3    case, right?
4    A.   Yes.
5    Q.   And then below, you see where it says AM
6    modeled?
7    A.   Yes.
8    Q.   You add up those same numbers in the same
9    columns 7.9 and 3.9, that's about 12, right, rounds
10   up to 12?
11   A.   Roughly, yeah.
12   Q.   So do you consider this to be TPH's
13   opinion on the reasonableness of a
14   12-well-per-section model?
15   MR. KELLEY:  Objection to form.
16   THE WITNESS:  I don't have enough information
17   to make that conclusion.
18   BY MR. WORD:
19   Q.   But you have enough information to
20   conclude that TPH did not provide an opinion about
21   the wells per section that Alta Mesa had rejected?
22   A.   I don't see anything purporting to claim
23   that this is an opinion about the reasonableness of
24   the assumptions.
25   Q.   Just a comparison of what TPH's base case

Page 181

1    is versus AMH's case, right?
2        MR. KELLEY:  Objection.  Form.
3        THE WITNESS:  It is a comparison, but there's
4    no discussion of reasonableness in that.  So I did
5    not see an opinion on the reasonableness of the
6    12-WPS spacing.  I don't recall seeing something
7    that purports to be an opinion on the
8    reasonableness, and this doesn't change my opinion.
9    BY MR. WORD:
10       Q.   And that's not what you say in your
11   report, though, right?  You don't say I've not seen
12   this.  You say it doesn't exist.
13       A.   So I haven't -- I have not seen something,
14   and so given that I didn't see something that said
15   that, I assumed that it didn't exist.
16       Q.   Have you been to Antarctica?
17       A.   I have not.
18       Q.   So you've not seen Antarctica in person,
19   so does it exist or not?
20       A.   I have evidence to believe that it exists.
21       Q.   Can you look at Page 91 of Professor
22   Whitehead's report.  You'll see opinion No. 7.
23       A.   I do see opinion No. 7.
24       Q.   And do you disagree with that opinion?
25       A.   I don't agree with that opinion.

[PAGES INTENTIONALLY OMITTED]

Page 201

1      Q.   Which managers?

2      A.   The AMR managers.

3      Q.   The people that weren't involved in
4   preparing those projections?

5      MR. KELLEY:  Objection to form.

6      THE WITNESS:  They're managers in the combined
7   entity.  That red flag is -- once that red flag
8   goes up, they shouldn't -- in my view -- so first
9   of all, my view is this is a red flag.  Once we
10  have a red flag, Professor Whitehead's opinion with
11  respect to custom and practice goes out the window
12  because he said absent red flags.  So I believe
13  there was a red flag.

14          I don't know what he thinks should have
15  happened, but once I believe that there's a red
16  flag, I don't think this -- that's why I disagree
17  with this opinion.  That is sufficient enough.
18  BY MR. WORD:

19     Q.   Right, but it's -- it might be sufficient
20  for you to reach that opinion, but it's also
21  incomplete, right?  When a red flag emerges, you
22  have to respond to that red flag, right?

23     A.   Professor Whitehead did not tell us what
24  he thinks should be done when a red flag arises.

25     Q.   I'm talking about your opinion.

Page 202

1  A. I was asked to opine with respect to
2  Professor Whitehead's opinions. You asked me if I
3  agree with Opinion 8. I disagree with Opinion 8
4  because I believe a red flag was present, which
5  obviates this opinion.
6  Q. That's the sole basis of your opinion. So
7  if that red flag is either not a red flag or was
8  thoroughly investigated so that the board of
9  directors got comfortable that they could rely upon
10 management, then your opinion or you would agree
11 with Dr. Whitehead then, right, or Professor
12 Whitehead?
13 A. He couched his opinion by saying in the
14 absence of red flags. So I am -- I don't know --
15 the second part of your question which discusses
16 what -- how you could get rid of a red flag,
17 Professor Whitehead hasn't provided any sort of
18 opinion about the custom and practice related to
19 kind of red flags that turn out -- that are
20 adequately investigated, so I have no opinion on
21 that.
22      I do believe there was a red flag here,
23 and if -- if there was -- there is no red flag,
24 then -- sorry. I'm getting a little bit lost. So
25 I believe there was a red flag. If there was no

[PAGES INTENTIONALLY OMITTED]