BX C

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3               HOUSTON DIVISION

4    _____

                                   )

5    IN RE ALTA MESA RESOURCES,     )

                                   )    Case No.

6    INC. SECURITIES LITIGATION     )

     _____)    4:19-cv-00957

7

8               * * * * * * * * * * * * * *

               CONFIDENTIAL

9               * * * * * * * * * * * * * *

10          VIDEOTAPED DEPOSITION OF

11            CHARLES WHITEHEAD

12           November 17, 2023

13               9:12 a.m.

14

15       Via Zoom Remote Conferencing

16

17

18    Reported by:  Marsi Koehl, CCR-B-2424

19

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 31

1   know, in the sense of understanding, for example,

2   their activities on other boards and how that might

3   relate to this, this particular board of -- or these

4   boards of directors, that wasn't a factor.

5        Q.  Okay.  Understood.  Did you -- did you meet

6   with any of the individual defendants in this case

7   that were either -- that were former board members of

8   any of the entities that we're discussing in this

9   case?

10       A.  Not that I'm aware of.

11       Q.  Is there any reason that you can think of as

12  to why the defendants themselves can't testify about

13  what they observed regarding the custom and practice

14  of board members?

15            MS. BLADOW:  Objection.

16            THE WITNESS:  That's somewhat

17       speculative since I've not met them.

18  BY MR. SMITH:

19       Q.  Right.  Well, that's what I'm asking you.

20            Do you have any reason to believe that they

21  couldn't testify to what the custom and practice is

22  based on their own experience?

23       A.  Well, again, as I mentioned a few moments

24  ago, it's not that I spent a lot of time looking at

25  their experience.  So your -- it's premised on

[PAGES INTENTIONALLY OMITTED]

```
 1    I'm aware of that position that counsel has taken,
 2    you know, in the context of the opinions that I'm
 3    providing.
 4           But, again, to be clear, my opinions don't
 5    speak to the legal analysis; they speak simply to
 6    custom and practice.
 7       Q.   And I understand that.
 8           Is it your understanding that defense
 9    counsel intends to you use as an expert for purposes
10    of their 20(a) good faith -- good faith defense?
11       A.   I don't know counsel's strategy on this.
12       Q.   Okay.  So why did you cite to the case law
13    regarding the standard of a good faith defense?
14       A.   Again, as I said before, counsel advised me
15    what these standards were.  I accepted the advice
16    without necessarily opining on it one way or the
17    other.  I'm aware of the position counsel has on
18    this.  And, you know, in connection with my opinions,
19    I assumed the advice to be true.  But whether or not
20    counsel strategically is offering me as a witness for
21    this or that, you'll have to talk with counsel about
22    that.
23       Q.   I understand.  Okay.  So let's start at the
24    top of the paragraph.  You say, I've been advised by
25    counsel that defendants have a legal defense to
```

[PAGES INTENTIONALLY OMITTED]

```
 1            (Plaintiff's Exhibit 0834 was marked for
 2         identification.)
 3    BY MR. SMITH:
 4         Q.   Professor Whitehead, can you please take a
 5    look at Exhibit 834?
 6         A.   Rats, hold on.  What did I do?
 7              (Discussion ensued off the record.)
 8              THE WITNESS:  I have 834.
 9    BY MR. SMITH:
10         Q.   Can you tell me about approximately how much
11    time you spent reading this opinion after it was
12    brought to your attention by defendants -- defense
13    counsel?
14         A.   Less than a minute.
15         Q.   Okay.  That's how long it took you to
16    confirm that the statements were accurate?
17         A.   Again, what I was doing was accepting the
18    statements as an accurate reflection of the law not
19    passing upon the analysis itself and did not bother
20    to read the entirety of the opinion to decide what
21    the standard might or might not be.  That's beyond
22    the scope of what my opinion is covering.
23         Q.   I understand.  It kind of begs the question,
24    why include that if you didn't care whether it was
25    accurate or not?
```

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 213

1    BY MR. SMITH:

2         Q.   Paragraph 108.

3         A.   Paragraph 108.  Yeah, got it.

4         Q.   And you mention Meridian.

5         A.   Got it.

6         Q.   TPH, SRII and Riverstone Investment Group

7    invited Meridian to -- quote, to take a look at the

8    engineering and production of the oil and gas wells

9    at AMH and Kingfisher.  Do you see that?

10        A.   I do.

11        Q.   Do you recall reading -- strike that.

12             Who are the two representatives or the three

13   representatives that accompanied Mr. Hackett to that

14   June 7th, June 8th, 2017 due diligence meeting in

15   Houston, Texas?

16             MS. BLADOW:  Objection.

17             THE WITNESS:  I can't recall the names.

18             You're talking about that initial

19        meeting?

20   BY MR. SMITH:

21        Q.   Yeah.

22        A.   Yeah, I can't -- I can't recall the names.

23   But, you know, there were a couple of folks in that

24   meeting as I recall.

25        Q.   I agree.  I think there were three.  The

1    third, there's some question about what role that

2    person played because Mr. Hackett wanted to keep him

3    away from Mr. Chappelle.

4            So are you fam- -- did you read the

5    deposition transcript of Mr. Castiglioni?

6        A.  I guess so.  Yes.  He's one of the ones I

7    looked at, yes.

8        Q.  And did you read the deposition transcript

9    of Mr. Campbell?

10       A.  If it's in the list, then yes.

11           UNIDENTIFIED COUNSEL:  Sorry.  Ms. Who?

12           MR. SMITH:  Mr. Campbell.

13           UNIDENTIFIED COUNSEL:  Oh, I thought you

14       said Ms. Campbell.  I'm sorry.

15           MR. SMITH:  It's John.  John Campbell.

16           THE WITNESS:  Mr. Campbell is not in my

17       list.

18   BY MR. SMITH:

19       Q.  You understand that Mr. Campbell was one of

20   the representatives from Meridian that accompanied

21   Mr. Hackett; is that right?

22       A.  I don't recall the names.

23       Q.  Let's talk about Mr. Castiglioni.

24           Did he testify that he had provided

25   Mr. Hackett any opinions regarding the capabilities

1   of the SPAC leasehold during that due diligence

2   session?

3        A.   I don't recall the specific -- I'd have to

4   go back and check.  I know there was -- I know there

5   was testimony to this.  I just don't remember the

6   specifics.

7        Q.   Isn't it true that the essence of

8   Mr. Castiglioni's and Mr. Campbell's testimony was

9   that they basically sat in the room for a couple of

10  hours, watched a presentation, but they were not

11  asked for any opinions and they didn't provide any

12  opinions regarding anything during that due diligence

13  session or in connection with it?

14          MS. BLADOW:  Object to the form.

15          THE WITNESS:  I'm sorry.  Could you ask

16      the question again?

17  BY MR. SMITH:

18       Q.   Isn't it true that the gist of those

19  witnesses' testimony is they -- they said they

20  basically sat in a room for a couple of hours and

21  watched a presentation but provided -- well, but were

22  asked -- strike that.

23          Is it the gist of their testimony that they

24  sat in the room for a couple of hours and they

25  weren't asked to provide Mr. Hackett any opinions and

1    they didn't deliver Mr. Hackett any opinions

2    regarding the operational capabilities of the STACK

3    leasehold?

4             MS. BLADOW:  Object to the form.

5             THE WITNESS:  So I don't recall the

6         specifics of the testimony.  I believe that

7         this particular meeting was, in fact, a

8         presentation by the targets.

9             The nature of what happened during the

10         presentation, I don't recall that being

11         discussed in detail in the deposition

12         testimony, but I can't recall the specifics

13         off the top of my head.

14    BY MR. SMITH:

15         Q.  Well, do you have an understanding that

16    Mr. Hackett asked any of the Meridian folks for any

17    type of opinion regarding the STACK in connection

18    with that meeting?

19             MS. BLADOW:  Object to the form.  We're

20         over an hour, Trig.  I think it would be

21         good to get a break.

22             MR. SMITH:  Yeah.  Let me just -- I just

23         need to finish up the questioning on

24         Meridian, please.  Thank you.

25             THE WITNESS:  So, again, I can't recall

1      one way or the other simply because I just

2      don't remember the specifics of the

3      deposition testimony off the top of my head,

4      but -- I just don't recall one way or

5      another.

6    BY MR. SMITH:

7      Q.  I'm just trying to figure out why you

8    elected to list those entities.

9          Did you feel it was important to list those

10   entities in your report?

11     A.  Well, sure.  You know, I think you're

12   focusing very much on the delivery of an opinion.

13   That's not the way due diligence operates, Mr. Smith.

14   Right?  You typically have, you know, groups of folks

15   in a room.  They have different views.  They ask

16   different questions.  They have different

17   perspectives.

18          Whether or not they ultimately deliver an

19   opinion is in some respects neither here nor there.

20   So the value of having experts in the room is that

21   they provide different insight and perspectives that

22   are valuable as part of the due diligence process

23   even if no formal opinion is delivered.

24     Q.  Is it your understanding based on the

25   reading of those gentlemen's depositions that that's,

[PAGES INTENTIONALLY OMITTED]

1       withdraw it.

2    BY MR. SMITH:

3       Q.   Okay.   We'll just push on because I'm

4    confident that you're not going to acknowledge that

5    anything that happened here is a red flag, but let me

6    just ask you one last question.

7            When were shareholders asked about on this

8    deal?

9       A.   February of 2018 as I understand it.

10      Q.   February 6th -- February --

11           (Overlapping speakers.)

12           THE WITNESS:   Was it six or eight?

13           (Overlapping speakers.)

14           THE WITNESS:   I think it was 8.

15   BY MR. SMITH:

16      Q.   Okay.   Perfect.   February 8th.

17           So when the board is informed four days

18   later that they are going to have to cut the KFM

19   projections by almost half, you don't see that as a

20   red flag?

21           MS. BLADOW:   Objection to form.

22           THE WITNESS:   So it's not entirely clear

23        to me what the board was informed of on

24        February 12th.

25   BY MR. SMITH:

CONFIDENTIAL

Page 243

1      Q.   Why is that?

2      A.   Well, the minutes -- the materials that I've

3   looked at suggest that there was a discussion about

4   CapEx budget but not necessarily about the extent to

5   which there might be a shortfall in EBITDA.

6           However, to the extent that there was a

7   shortfall in EBITDA, there were also a lot of reasons

8   why that shortfall might have taken place, for

9   example, the transition of the management team, the

10   fact that you have a new management team coming into

11   Kingfisher.  As I understand it, there were CapEx

12   constraints at AMH that may have slowed their ability

13   to build out as quickly as they otherwise wanted.

14           There was also a concern that there might

15   have been a CapEx slowdown in the STACK generally.

16   And as I understand it, also during this period there

17   were changes in commodity pricing.

18           So in aggregate, I would not have viewed a

19   change in projections -- because projections by their

20   nature are forward looking and based upon lots of

21   variables, that there would be based on this a red

22   flag.

23      Q.   Where were oil prices going in February of

24   2018?  Are you suggesting they were going down?

25      A.   No.  I'm saying there was volatility.  I

CONFIDENTIAL

Page 244

1   don't know what the impact was/ my point is there are

2   lots of things that feed into the way in which you

3   look at the projections, lots of different factors.

4   I don't -- I don't know where oil prices were, up or

5   down.

6       Q.  Do you know what the assumption was for the

7   oil price in 2018 and the model the company used to

8   come up with the valuation for the business

9   combination?

10          MS. BLADOW:  Objection.

11          THE WITNESS:  Yeah.  I don't recall.

12  BY MR. SMITH:

13      Q.  Above it or below it?

14      A.  I don't recall.

15      Q.  Okay.  So your explanation for volatile oil

16  prices -- how does that -- how does that dovetail to

17  this?

18      A.  Because you had asked -- you had asked

19  whether or not a change in EBITDA projections is a

20  red flag.  My point to you is within this there's

21  buried lots of different information.  There is

22  commodity prices, up or down.  There is, as I

23  mentioned, this delay in CapEx as I understand.  I

24  think Mr. Hackett spoke of this.

25          There's the question about transition in

CONFIDENTIAL

Page 245

1    management teams, whether or not ARM Energy had been

2    able to basically meet what they thought as a

3    build-up -- as a sales plan to bring in

4    third-party -- third-party companies, the extent to

5    which there might have been a slowdown in CapEx

6    expenditures generally in the STACK.

7         These are all factors.  So I think you,

8    perhaps, understood this to mean all negative

9    factors.  I'm just saying these are all factors that

10   speak to the projection.

11        And because of these different factors, it

12   wouldn't -- you can point to any number of

13   combination of these factors to understand why

14   there's been a shift in the projections, keeping in

15   mind these are projections.

16   Q.  No, I understand.  I totally understand.

17        What other than a slowdown in third-party

18   activity did the company give for the reason to cut

19   KFM's projections from 185 million to a range of 95

20   to 110?

21        MS. BLADOW:  Objection.

22   BY MR. SMITH:

23   Q.  Did they give an excuse that there were

24   problems with oil prices?

25        MS. BLADOW:  Objection.

CONFIDENTIAL

Page 246

1            THE WITNESS:  Oh, I don't recall there

2       being specifically -- you're talking about,

3       I think, in the guidance that was provided.

4       I don't recall there being something

5       specific on oil prices.

6            Again, my point is projections by their

7       nature have lots of factors in them.  And so

8       some of them will be up.  Some of them will

9       be down.  But the point is you can have as a

10      result significant fluctuations in

11      projections and not -- and have them not be

12      a red flag.

13           In fact, I would suggest to you if you

14      had a significant increase in projections

15      that's also something that could happen

16      given the nature of the projections because

17      there are so many factors that feed into it.

18      In this case it just happened to be a

19      downturn.

20  BY MR. SMITH:

21      Q.  Did the company ever increase the

22  projections in 2018?

23           MS. BLADOW:  Objection.

24           THE WITNESS:  I think they stuck -- I

25      don't believe they increased them.  I don't

[PAGES INTENTIONALLY OMITTED]