# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE ALTA MESA RESOURCES, INC. | ) | Civil Action No. 4:19-cv-00957 |
| SECURITIES LITIGATION | ) | |
| | ) | Judge George C. Hanks, Jr. |
| | ) | |
| | ) | **PUBLIC VERSION OF DKT. 551** |
| | ) | |
| _____ | ) | |

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE CLASS PLAINTIFFS' ACCOUNTING EXPERT D. PAUL REGAN
UNDER RULE 702**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      STATEMENT OF ISSUES TO BE DECIDED ...................................................... 1

II.     SUMMARY OF ARGUMENT ............................................................................... 1

III.    LEGAL STANDARD ............................................................................................. 3

IV.     ARGUMENT .......................................................................................................... 4

        A.      Mr. Regan Is Qualified to Provide the Opinions Offered ............................ 4

        B.      Mr. Regan's Opinions Are Admissible ......................................................... 5

                1.      The Projections Opinions ................................................................... 5

                        a.      Mr. Regan's Opinions Need Not, But Nevertheless Do,
                                Involve Numerical Analysis ..................................................... 9

                        b.      Defendants Mischaracterize the Record ................................. 9

                        c.      No Legal Conclusions Were Rendered .................................. 11

                        d.      Mr. Regan Offered no Opinion as to Defendants' State
                                of Mind ................................................................................... 12

                2.      The Material Weakness Opinions ..................................................... 14

                        a.      Defendants Again Misconstrue the Record ........................... 16

                        b.      Defendants' Remaining Criticism of the Evidence Mr.
                                Regan Relied Upon Does Not Constitute Grounds for
                                Exclusion ................................................................................ 17

                3.      The Complaint Alleges that AMR's Reserves And KFM's
                        Goodwill And Intangible Assets Were Overstated .......................... 21

V.      CONCLUSION ..................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Allen v. Wyeth*,
   2012 WL 13026947 (N.D. Tex. Jan. 12, 2012) ........................................................ 21

*Avomeen Holdings, LLC v. Thanedar*,
   2019 WL 3491620 (E.D. Mich. Aug. 1, 2019) ...................................................... 7, 9

*City of Tuscaloosa v. Harcros Chems.*,
   158 F.3d 548 (11th Cir. 1998) ........................................................................... 4

*Collmer v. U.S. Liquids, Inc.*,
   268 F. Supp. 2d 718 (S.D. Tex. 2001) ............................................................ 21

*E.E.O.C. v. Boh Bros. Const. Co.*,
   731 F.3d 444 (5th Cir. 2013) ............................................................................ 4

*Goodman v. Harris Cnty.*,
   571 F.3d 388 (5th Cir. 2009) .......................................................................... 10

*Goodwin v. Am. Marine Express, Inc.*,
   2021 WL 848948 (N.D. Ohio Mar. 5, 2021) .................................................. 6, 21

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
   2015 WL 364796 (N.D. Cal. Jan. 27, 2015) .................................................... 5, 7

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ....................................................................................... 3, 4

*Mod. Remodeling, Inc. v. Tripod Holdings, LLC*,
   2021 WL 5234698 (D. Md. Nov. 9, 2021) ..................................................... 14

*In re Novatel Wireless Sec. Litig.*,
   2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) ............................................ 7, 16, 21

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd sub nom. In re
   Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ................................ 22

*Peters v. Five Star Marine Serv.*,
   898 F.2d 448 (5th Cir. 1990) ...................................................................... 4, 21

**Page**

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ........................................................................ 4

*Puga v. RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) .................................................................... 4, 6

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................................... 5, 16

*Rozinsky v. Assurance Co. of Am.*,
2017 WL 3116682 (D. Md. July 21, 2017) ................................................ 3, 4

*SEC v. Bankatlantic Bancorp*,
2013 WL 12009694 (S.D. Fla. Nov. 14, 2013) .............................................. 6

*SEC v. Guenthner*,
395 F. Supp. 2d 835 (D. Neb. 2005) ........................................................... 21

*SEC v. KPMG LLP*,
412 F. Supp. 2d 349 (S.D.N.Y. 2006) ......................................................... 14

*SEC v. Lucent Techs., Inc.*,
610 F. Supp. 2d 342 (D.N.J. 2009) ............................................................... 6

*Smilovits v. First Solar, Inc.*,
2019 WL 6875492 (D. Ariz. Dec. 17, 2019) ............................... 6, 7, 12, 20

*State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*,
2019 WL 1436659 (N.D. Tex. Mar. 31, 2019) ......................................... 8, 10

*In re Titanium Dioxide Antitrust Litig.*,
2013 WL 1855980 (D. Md. May 1, 2013) .................................................... 11

*U.S. v. Hankey*,
203 F.3d 1160 (9th Cir. 2000) ...................................................................... 4

*U.S. v. Javidan*,
2013 WL 1563212 (E.D. Mich. Apr. 15, 2013) ........................................ 6, 15

*U.S. v. Smith*,
919 F.3d 825 (4th Cir. 2019) ..................................................................... 6, 7

**Page**

*Vasquez v. Hall*,
   2020 WL 9597732 (W.D. Tex. Oct. 13, 2020) ........................................................... 10

*Viterbo v. Dow Chem. Co.*,
   826 F.2d 420 (5th Cir. 1987) ...................................................................................... 4

**Other Authorities**

Fed. R. Evid. 702 ............................................................................................................ 1, 4

Lead Plaintiffs FNY Partners Fund LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (f/k/a Plumbers and Pipefitters National Pension Fund), along with Plaintiff Camelot Event Driven Fund (collectively, "Class Plaintiffs"), respectfully file this opposition to Defendants Motion to Exclude Class Plaintiffs' Accounting Expert D. Paul Regan Under Rule 702 (Dkt. 512, "Motion" or "Mot.").[1]

## I.    STATEMENT OF ISSUES TO BE DECIDED

Are Mr. Regan's opinions sufficiently reliable and relevant such that they are appropriate for the jury's consideration?

## II.    SUMMARY OF ARGUMENT

The opinions of Plaintiffs' accounting expert, D. Paul Regan are admissible under the liberal standard of Rule 702 of the Federal Rules of Evidence ("Rule 702"). Mr. Regan's testimony and opinions will assist the jury tasked with navigating the accounting issues underlying Defendants' misrepresentations to investors. Specifically, Mr. Regan will be able to help the jury understand how and why (1) the projections used in the Business Combination Proxies were not supported by the best currently available

---

[1] Capitalized terms herein have the meaning ascribed in the Expert Report of D. Paul Regan, CPA/CFF (the "Regan Report" or "RRpt.") and the Complaint. Citations to "¶" or "¶¶" refer to Paragraphs in the Complaint (Dkt. No. 218). Citations to "RX__" refer to exhibits attached the Entwistle Declaration filed in support of this opposition. Unless otherwise noted, emphasis has been added and all internal quotation marks have been omitted throughout.

information (the "Projections Opinions"); (2) the reported value of AMH's oil and gas reserves were overstated and KFM's intangible assets were overstated and reported in violation of GAAP accounting (the "Overstated Assets Opinions"); and (3) AMH and AMR failed to disclose material weaknesses within DC&P and ICFR during the Class Period (the "Material Weakness Opinions"). A lay person should not be expected to make accounting determinations that require specialized knowledge of accounting standards, including GAAP, SEC Rules and Releases, and the COSO Framework on their own without guidance from an expert such as Mr. Regan—a CPA with decades of forensic accounting experience.

Mr. Regan's testimony and opinions are not just clearly relevant, they are also reliable for the reasons explained herein. Nevertheless, without challenging Mr. Regan's qualifications, Defendants have sought to exclude Mr. Regan by all other means. Having failed to discredit Mr. Regan during his deposition, Defendants now advance arguments that rely near-exclusively on wildly mischaracterized testimony and incorrect conclusions of law.

For example, Defendants argue that Mr. Regan admitted that his Projections Opinions entail witness credibility determinations, including the credibility of Mr. Palke. *See* Mot. at 6. This clearly mischaracterizes his testimony. As explained below, Mr. Regan explicitly stated that he did not analyze the credibility of witnesses. Rather, Mr. Regan's opinions and testimony simply demonstrate his analysis of evidence.

Similarly, as to Mr. Regan's Material Weakness Opinions, Defendants uncannily argue that AMR's material weaknesses in internal controls could not have been present as of the Business Combination because AMR's auditors, including KPMG, did not identify a material weakness prior to Q4 2018. Mot. at 10-11. In doing so, Defendants completely ignore the fact that (1) KPMG was not retained as AMR's independent auditor until well after the Business Combination; and (2) KPMG's assessment was limited to the information provided by AMR's management—including false statements as to whether child wells were drilled prior to 2018.

Finally, Defendants seek to escape liability for their failure to recognize asset impairments (until they were forced to), of almost the entire market capitalization of the company, by both pretending Plaintiffs have made no such allegations and by lodging readily discredited hindsight accusations against Mr. Regan.

Defendants' Motion contains additional arguments that also amount to mischaracterized testimony or opinions, misconstrued evidence, and the blatant disregard of ample caselaw rejecting similar attempts to exclude experts with accounting expertise.

Accordingly, Defendants' Motion should be denied in full.

## III.   LEGAL STANDARD

When considering the admissibility of experts, courts assess whether the testimony is both reliable and relevant. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Courts do "not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Rozinsky v. Assurance Co. of Am.*, 2017 WL 3116682, at *2-3

(D. Md. July 21, 2017). Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "[T]he rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).

Where, as here, an expert's opinion is based on experience and specialized knowledge, the factors in *Daubert* may or may not be relevant to assessing reliability. *Kumho*, 526 U.S. at 147; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) ("it is appropriate for [a] court to consider factors other than those listed in *Daubert* to evaluate reliability" where opinion is premised on "personal observations, professional experience, education and training"). "[T]he court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Peters v. Five Star Marine Serv*., 898 F.2d 448, 449 (5th Cir. 1990). The "helpfulness threshold is low: it is principally ... a matter of relevance." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013).

"[A]ccounting expertise is among the sorts of technical and specialized expertise the use of which is governed by Rule 702 and *Daubert*." *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 564 n.17 (11th Cir. 1998) (collecting cases). When considering the admissibility of testimony based on such "specialized knowledge, … Rule 702 generally is construed liberally." *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

## IV.   ARGUMENT

### A.   Mr. Regan Is Qualified to Provide the Opinions Offered

Defendants do not dispute that Mr. Regan is a well-qualified accounting expert.  Nor could they. His academic and professional credentials render him eminently qualified to

offer the reports, opinions, and testimony he provides in this case. *See* RX 1 (RRpt.) at ¶¶13-22 & App'x A. It is no surprise, therefore, that the expert opinions of Mr. Regan have been found admissible in numerous securities fraud actions under the Exchange Act. *See, e.g.*, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1220 (S.D. Cal. 2010) (denying motion to exclude Mr. Regan's goodwill impairment analysis in securities fraud action); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, 2015 WL 364796, at *4 (N.D. Cal. Jan. 27, 2015) (rejecting motion to exclude and finding Mr. Regan was "qualified to undertake the economic calculations described in his report").

### B.    Mr. Regan's Opinions Are Admissible

Defendants attempt to exclude three topics on which Mr. Regan has opined, including his Projections Opinions, Material Weakness Opinions, and Overstated Assets Opinions. All of Defendants' arguments fail for the reasons explained below.

#### 1.    The Projections Opinions

Defendants argue that Mr. Regan's Projections Opinions are inadmissible because they: (1) are based on an unreliable method that improperly usurps the role of the finder of fact; (2) proffer an inappropriate "legal interpretation"; and (3) render impermissible conclusions as to management's state of mind. Yet Mr. Regan's proposed testimony neither goes to any ultimate issue nor usurps the jury's role. Moreover, these arguments are meritless because they misconstrue case law and distort the evidence at hand.

Defendants assert that Mr. Regan's opinions are premised "only on his review of certain documents and testimony in the record that require no specialized CPA knowledge to understand." Mot. at 3. This is simply not the case. Mr. Regan applied his forensic

accounting expertise to internal Alta Mesa and other documents in rendering his opinions. *See, e.g.*, RX 1 (RRpt.) at ¶¶23-24, 51-54, 93, 125-131, 146, 153-159, 171-178, 203-212, 224, 230 (listing various accounting rules, regulations, or guidelines used in rendering opinions); *see also Goodwin v. Am. Marine Express, Inc.,* 2021 WL 848948, at *14 (N.D. Ohio Mar. 5, 2021) (rejecting argument "that [accounting expert's] testimony should be excluded because her analysis involved nothing more than simple math for which expert testimony is inappropriate"); *U.S. v. Javidan*, 2013 WL 1563212, at *2 (E.D. Mich. Apr. 15, 2013) (denying motion to exclude expert opinion purportedly "based on simple financial documents"); *SEC v. Bankatlantic Bancorp*, 2013 WL 12009694, at *7 (S.D. Fla. Nov. 14, 2013) ("[B]ecause she applied her professional experience to formulate her opinion, [the accounting expert] did not just weigh the facts as a lay jury would.").

The fact that Mr. Regan's opinions are informed by discovery materials provided by Defendants does not impinge on their admissibility. *See Smilovits v. First Solar, Inc.*, 2019 WL 6875492, at *8 (D. Ariz. Dec. 17, 2019). Rather, the weight afforded to Mr. Regan's analysis of facts is a question for the jury. *Puga*, 922 F.3d at 294 (questions regarding bases and sources of opinion affect weight, not admissibility of expert opinion); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350-52 (D.N.J. 2009) (rejecting motion to exclude because expert "extensively examined the voluminous record" and "applied sound accounting principles to reach her opinion").

Consistent with the foregoing, courts have found that Mr. Regan's inclusion of similar "factual context reduced the risk of jury confusion by providing a more coherent

narrative," and served as "a proper framework for [his] expert opinions." *See, e.g.*, *U.S. v. Smith*, 919 F.3d 825, 838 (4th Cir. 2019); *GSI Tech.*, 2015 WL 364796, at *4 (denying motion to exclude Mr. Regan).[2]

The Regan Report cites to documents and evidence demonstrating that AMH's projection was biased to achieve a desired result. RX 1 (RRpt.) at ¶¶62-73. As for the KFM Projections, the Regan Report cites to documents and evidence showing: ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████[3]

---

[2] Defendants' case law is inapposite. Mot. at 1. The court in *Smilovits* noted it would accept Mr. Regan's testimony regarding, *e.g.*, certain internal conclusions, "if those internal conclusions are clear from documents or testimony." *Smilovits*, 2019 WL 6875492, at *11. Unlike *Novatel*, here Mr. Regan's analysis is guided by, *inter alia*, specific GAAP and SEC rules and the COSO Framework. *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *5 (S.D. Cal. Nov. 17, 2011).

[3] Defendants even allege Mr. Regan opined that ARM Energy "were manipulative liars." Mot. at 7. ████████████████████████████████████████

██████████████████████ *See Avomeen Holdings, LLC v. Thanedar*, 2019 WL 3491620, at *4 (E.D. Mich. Aug. 1, 2019) ("[A]ny potential danger of prejudice can be curtailed through cross-examination.").

As to the 2018 KFM projections, Mr. Regan bases his conclusions on: 

Many of the documents informing these opinions are long, dense, and/or technical. *See, e.g.*, ████████████████████████████ (cited in Schedule 2.1 of RRpt.); *see also* RX 3 (ARMEnergy_00088051) (cited in Schedule 2.2 of RRpt.). The jury should not be expected to wade through them without the assistance of an accounting expert.

Mr. Regan also analyzed evidence sufficient to cast significant doubt on the estimated ultimate recovery ("EUR") assumptions related directly to the AMH projections (RX 1 (RRpt.) at ¶¶55-73) and indirectly to the KFM projections because AMH constituted 60% of KFM's customer contracts (*id.* at ¶¶ 88-89). While Defendants contend that Mr. Regan is unqualified to analyze this information because he is not a petroleum engineer, this argument fails because he relies on Class Plaintiffs' oil and gas experts (*id.* at ¶¶58, 140-143) when rendering his opinions relating to forensic accounting and auditing issues. *See State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, 2019 WL 1436659, at *10 (N.D. Tex. Mar. 31, 2019) (expert may rely on another expert's data and opinions). Moreover, Mr. Regan followed standards applicable to CPAs in performing his analysis and relying on the work of Class Plaintiffs' experts. *See* RX 4 (AICPA & CIMA Forensic & Valuation

Services Practice Aid) at 47 (CPA may require the services of a specialist. In this instance, the CPA is required to consider the training and experience of the specialist.).

### a. Mr. Regan's Opinions Need Not, But Nevertheless Do, Involve Numerical Analysis

Despite Defendants' arguments to the contrary (Mot. at 3), there was no requirement that Mr. Regan provide an alternative set of assumptions or projections in support of his opinions. *See Avomeen*, 2019 WL 3491620, at *4 (rejecting motion to exclude for failure to perform certain valuation procedures due to lack of legal authority requiring such analysis). Notwithstanding, Mr. Regan **does** incorporate calculations in support of his conclusion that EBITDA and MBOE projections were overstated. RX 1 (RRpt.) at ¶¶94-96, 100-102, 146-152; RX 5 (Regan Tr.) at 70:13-71:17. Further, Mr. Regan engages in numerical analysis and performs calculations to reach his opinion that AMR failed to record the necessary impairment of KFM's Intangible Assets, which resulted in substantial part from the overstated Projections Opinions. *See* RX 1 (RRpt.) at ¶¶191-195.

### b. Defendants Mischaracterize the Record

Defendants incorrectly argue that Mr. Regan "fundamentally mischaracterizes the record" to claim that the data in ¶60 of the Regan Report was available pre-Business Combination. Mot. at 4-5. Specifically, they construe as damning that the chart in ¶60 of the Regan Report "is labeled as reflecting data available as of 9/30/18." *Id.* Defendants' logic is flawed. The fact that the chart reflects data available in September 2018 does not mean that all of the information in the chart was unavailable pre-Business Combination. Further, Defendants purposely ignore related findings in ¶¶57 and 60 of the Regan Report,

which show that information contradicting AMR's assumptions was available prior to the Business Combination. RX 1 (RRpt.) at ¶57 (By August 17, 2017, AMH had contemporaneous STACK field production data that appears to have contradicted the WPS and EUR assumptions), ¶60 (production data available "by middle of 2017" showed 15 out of 17 AMH child wells were underperforming).

Defendants also incorrectly argue that Mr. Regan analyzed the credibility of John Campbell's testimony regarding ¶60 of the Regan Report and whether 2018 drilling results were needed to conclude that Defendants' reservoir assumptions were unreasonable. Mot. at 4-6. This argument relies on the cherry-picked and out of context phrase "not credible," spoken by Mr. Regan when weighing contradictory evidence. *See id.*; RX 5 (Regan Tr.) at 95:20-98:8. Mr. Regan simply explained that Mr. Campbell's contradictory conclusion had not altered his opinion, which was based on the application of relevant auditing standards to information available pre-Business Combination.[4] *See Goodman v. Harris Cnty.*, 571 F.3d 388, 400 (5th Cir. 2009) (expert may point to inconsistent evidence without opining on a witness's credibility). Defendants' similar arguments with respect to Mr. Palke and Ms. Shiels also fail.[5] Comically, Defendants also argue their Motion should be granted

---

[4] Defendants' authority for the position that an expert cannot weigh evidence is distinguishable because Mr. Regan does not weigh the credibility of witnesses. *Vasquez v. Hall*, 2020 WL 9597732, at *3 (W.D. Tex. Oct. 13, 2020) (excluding expert testimony as to witness's truthfulness); *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, 2019 WL 1436659 (N.D. Tex. Mar. 31, 2019) (expert cannot opine that a breach of implied contract had occurred due to a biased investigation).

[5] Mr. Regan's opinions and testimony demonstrate the analysis of evidence. *See, e.g.*, RX 5 (Regan Tr.) at 55:12-16 ("I don't question his credibility...."), 151-153 (testifying that he

because Mr. Regan **did not** analyze the credibility of the Meridian witness. *See In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *9 (D. Md. May 1, 2013) ("[E]xperts cannot be expected to review all of the materials.").

A full and proper reading of Mr. Regan's testimony reflects his conclusion that there was well data available prior to the Business Combination demonstrating that virtually all child wells failed to meet projections by a significant degree. RX 5 (Regan Tr.) at 96:11-24; *see also* RX 1 (RRpt.) at ¶60 n.89 (citing Turner's testimony that a forecast could be made with reasonable certainty about 4-6 months after the well was drilled); RX 6 (AMR's 2018 Form 10-K) at 58 ("wells … began to fall below type curve *after 90 to 120 days*").[6]

### c.   No Legal Conclusions Were Rendered

Defendants improperly misconstrue Mr. Regan's Projections Opinions as an impermissible "legal interpretation" of the Contribution Agreements. Mot. at 8. As explained, Mr. Regan analyzed the Contribution Agreements, which were appended to the Business Combination Proxies, in the context of its representations to investors regarding the "reliability of the financial reporting." RX 1 (RRpt.) at ¶¶50-61.

---

weighed the statement made in light of conflicting evidence, not the credibility of the witness), 156:10-21 ("I don't think it outweighs the contemporaneous e-mails…."). Further, Defendants' quotation of Mr. Regan that "I don't have a recollection of what I would characterize as a 'credibility determinations'" (*id.* at 157:1-8), is a rejection of the premise of the question posed to him as to "other credibility determinations[.]" *Id.*

[6] Despite Defendants' attempt to misconstrue Mr. Castiglione's testimony (Mot. at 5), it fully supports Mr. Regan's analysis. RX 7 (Castiglione Tr.) at 62:12-23 (admitting there was enough data for wells that "came on-line shortly after the beginning of 2017").

According to Mr. Regan, these documents contained SOX-related representations that "provided reasonable assurance of the reliability of the financial reporting contained in the Business Combination Proxy, including the projections for AMH and KFM." RX 1 (RRpt.) at ¶51. As such, they were "consistent with the standards set forth in the AICPA's Audit and Accounting Guide, *Prospective Financial Information*." *Id.* at ¶52. Applying these accounting standards, Mr. Regan determined, in his capacity as an accounting expert, that the Projections Opinions were not based on the best currently available data and were thus overstated. *Id.* at ¶¶55-61. In a blatant obfuscation of the obvious, Defendants argue that Mr. Regan has proffered a "legal interpretation" of the Contribution Agreements. Mot. at 8-9. Yet Defendants fail to cite any specific example where Mr. Regan has opined on any legal obligations arising from these agreements. *Id.*[7] Without explanation, Defendants leave Plaintiffs and the Court guessing as to how exactly Mr. Regan's opinion constitutes a legal interpretation. Accordingly, the Court need not acknowledge this argument.

### d.   Mr. Regan Offered no Opinion as to Defendants' State of Mind

Defendants contend that Mr. Regan has improperly opined on Defendants' "state of mind[.]" *Id.* at 1, 9-10. This is simply not true. Mr. Regan has merely offered his opinion, based on his understanding of the facts and circumstances cited in ¶¶62-72 of the Regan Report, that the Projections Opinions "were not prepared using management's best current

---

[7] Defendants' caselaw is inapposite. *Smilovits*, 2019 WL 6875492, at *10 (excluding conclusion that there had been no "breach [of] the express warranty created implied warranty obligations[,]" but otherwise denying request to exclude Mr. Regan's accounting related opinions about the document).

estimates….” *Id.* at ¶73. These opinions do not touch upon Defendants' state of mind because they do not need to. The evidence speaks for itself.

For example, the Regan Report cites evidence relating to AMH's projection in which Mr. Chappelle informed Ms. Alsarraf that a production assumption of ~$330MM of EBITDAX in 2018 was not enough and that "[w]e need a scenario that gives us $350 in 2018." *Id.* at ¶67 (quoting RX 8 (AMR_SDTX01144946) at 948). Likewise, the Regan Report cites evidence demonstrating that AMR Energy manipulated KFM's reported earnings, including an email discussing how KFM failed to meet its first half 2017 EBITDA projections, where Mr. Christopher states, "Going to use May EBITDA (*which we 'fluffed' by having ARM bear a bunch of expenses (for eventual repayment[)]* instead of June."). *Id.* at ¶91.

Mr. Regan does not opine on Defendants' state of mind to analyze facts in rendering his Projections Opinions. Instead, he identifies indications that AMR failed to use the best available data as it represented in the Proxy—an approach that is consistent with standards applicable to forensic accountants. *See* RX 4 (AICPA & CIMA, Forensic & Valuation Services Practice Aid) at 68 ("Accounting standards require use of fair value in a number of situations. A number of fair value calculations require the use of subjective data…. A financial reporting fraud scheme would unfold if management manipulates these estimates or decisions in order to achieve a certain outcome."). In other words, accountants regularly apply their expertise in accounting standards, both within the litigation context and

otherwise, to evaluate the process by which estimates are prepared, without inquiring into the subjective beliefs of those who prepared them.

To the extent Mr. Regan's conclusion invokes any "purpose" underlying the Projections Opinions, courts have frequently found such testimony admissible. *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 355 (S.D.N.Y. 2006) (admitting Mr. Regan's testimony that "accounting treatments violated GAAP" and "the purpose and effect of the[] treatments was artificially to inflate … quarterly earnings to meet[] earnings targets").[8]

## 2.   The Material Weakness Opinions

Mr. Regan's Material Weakness Opinions are relevant and reliable. Defendants fail to acknowledge that KPMG: (1) found "pervasive" material weaknesses at AMR, affecting "every one of AMR's significant financial statement accounts" (RX 1 (RRpt.) at ¶213); and (2) was not tasked with and provided no analysis as to whether any of these material weaknesses were present prior to December 31, 2018 (*id.* at ¶225).[9] *See also* RX 9 (Smith Tr.) at 51:8-14.

Mr. Regan applied his expertise to financial documents, emails, the findings of KPMG, deposition testimony, in accordance with applicable accounting standards and SEC guidance. RX 1 (RRpt.) at ¶¶214-224. From this extensive analysis, Mr. Regan concluded

---

[8]   Defendants' authority misses the mark. *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, 2021 WL 5234698, at *6 (D. Md. Nov. 9, 2021) (expert sought to opine directly on *mens rea*, *i.e.*, individuals "acted without malice when they wiped their MRI laptops.").

[9] BDO was not tasked with and provided no analysis as to whether any material weaknesses were present prior to December 31, 2018. RX 10 (Fiebig Report) at ¶15 (BDO was only tasked with auditing AMH's financial statements).

that numerous of AMR's internal controls 1) were deficient, and 2) those deficiencies arose at the time of the Business Combination. *Id.* at ¶¶214.

Mr. Regan's analysis involved the application of accounting concepts outside a layperson's knowledge, including the COSO Framework and related findings of KMPG regarding material weaknesses. *See Javidan*, 2013 WL 1563212, at *2. These determinations also support Mr. Regan's opinion that AMR failed to disclose these material weaknesses, and its CEO and CFO therefore violated their SOX 302 requirements, as of March 31, 2018, June 30, 2018, and September 30, 2018.[10] A lay jury should not be expected to understand all of this evidence and relevant accounting and disclosure rules without Mr. Regan's assistance. *See id.*, *see also Johnson*, 525 F. Supp. 2d at 78; RX 1 (RRpt.) at ¶¶204-231 (applying COSO framework and seven separate SEC Releases).

Defendants wrongly contend that Mr. Regan only "points to a handful of anecdotal emails referring to resource shortages" to support his findings. Mot. at 11. Not so. While Mr. Regan considered emails that confirmed his findings,[11] the evidence that he relied upon consists of technical documents such as KPMG's testing of internal controls (RX 1 (RRpt.)

---

[10] In addition, the fact that Defendants were able to manipulate EBITDA projections for AMH and KFM further establishes that material weaknesses in the Company's ICFR and DC&P existed at the time of the Business Combination. *See* PCAOB Standard AS 2401 at ¶¶8-9 ("Fraudulent financial reporting often involves management override of controls that otherwise may appear to be operating effectively….").

[11] *See e.g.*, RX 11 (AMR_SDTX00708225-34) (email attaching AMR memo); RX 12 (RIVERSTONE_SDTX00026860) ("we don't have high confidence in AM/KFM's reporting fidelity or frequency"), RX 13 (RIVERSTONE_SDTX00039133) ("the management team of Alta Mesa was unqualified"), RX 14 (RIVERSTONE_ SDTX00121026) ("the Alta Mesa team is clueless").

at ¶213), relevant testimony (*id.* at ¶214), AMR's matrices of internal controls and identified deficiencies (*id.* at ¶212), and AMR's SEC filings and disclosures (*id.*). Even if Defendants had undertaken examination of such evidence, their conclusion that it is unreliable is of no probative value.[12] Such arguments should be rejected.[13]

### a.   Defendants Again Misconstrue the Record

Defendants improperly misconstrue the facts and evidence to call into question the Material Weakness Opinions. For example, Defendants argue that Mr. Regan relies upon a misinterpretation of the testimony by Ron Smith. Mot. at 11 ("Smith simply testified that the material weaknesses … resulted from the purchase price accounting work that needed to be done because of the combination …"). However, Defendants cherry pick and distort the evidence by ignoring Smith's own admissions that the material internal control issues were "pervasive" and tied to the time of the Business Combination. RX 9 (Smith Tr.) at 40:3-18. Indeed, Smith's views were consistent with the other evidence demonstrating that AMR management failed to assign proper personnel with sufficient knowledge to design a functional internal control system. *Id.* at 41:11-42:19.

The only piece of evidence mentioned by Defendants, without any discussion of its substance, is a December 2018 email. But it is one intimately tied to what was clear at the

---

[12] *See REMEC*, 702 F. Supp. 2d at 1217 (denying defendants' argument that Regan "simply substituted his own subjective judgment" because the argument "bear[s] on the weight of the evidence.").

[13] Defendants cannot rely on *Novatel* because Mr. Regan's opinions implicate GAAP requirements (*see, e.g.*, RX 1 (RRpt.) at ¶¶35, 46, 125-132, 146, 153-165, 172-176, 206-207) and the COSO framework (*id.* at ¶¶204, 212-213). Whereas in *Novatel*, "Mr. Regan cite[d] no professional standards or principles." 2011 WL 5827198, at *5.

very beginning—a failure of adequate internal control personnel, resulting in pervasive material weaknesses that significantly impacted AMR after the Business Combination. This email shows that Mr. Smith was asked by KPMG to provide the basis for the CITI KFM projections model, which Grant Thornton used in its valuation model in February 2018. RX 15 (AMR_SDTX00725145). But despite the advice he received and the methods he employed, Smith testified that he could not confirm the model inputs, and is unaware if AMR was ever able to do so. RX 9 (Smith Tr.) at 162:21-165:12.[14]

> **b.** **Defendants' Remaining Criticism of the Evidence Mr. Regan Relied Upon Does Not Constitute Grounds for Exclusion**

In addition to misconstruing the record, Defendants raise several arguments that amount to nothing more than criticism of the evidence that Mr. Regan relied upon. For example, Defendants contend that Mr. Regan's conclusions are somehow outweighed by the Weaver reports, which purportedly did not conclude that AMR had material weaknesses until Q4 2018. Mot. at 12. However, Defendants glaringly omit the Weaver reports' findings of high-risk deficiencies in virtually every important part of AMR's business that were presented to the Board of Directors before the Company issued its quarterly Form 10-Q reports, which contained signed SOX 302 certifications as to the

---

[14] Defendants further misconstrue Mr. Regan's testimony, contending he "admitted that the material weaknesses did not cause the impairment that was later taken in 2019." Mot. at 12. He did not. *See* RX 5 (Regan Tr.) at 116:14-117:7 ("I don't express it that way. I express it in the way which the SEC guides, statements about this, and that is that material weaknesses open the reasonable possibility that there will be material misstatements in the resulting financial statements or financial documents.").

reliability of Alta Mesa's financial statements and no changes as to its internal controls. *See* RX 16 (Nov. 13, 2018 Weaver Report) at 5 (listing high risk deficiencies); *see also* RX 17 (Aug. 13, 2018 Weaver Report) at 3 (listing similar high risks). While the words "material weakness" do not appear in the reports, Defendants ignore the fact that the accumulation of material deficiencies in significant areas constitutes a material weakness. RX 1 (RRpt.) at ¶207 n.387 ("SEC Release No. 33-8810 § II.A, p.9 (citing 17 C.F.R. § 240.12b-2; 17 C.F.R. § 210.1-02), indicating a material weakness is a 'deficiency, or a combination of deficiencies….'").

Defendants also contend that Ron Smith's testimony only establishes that he did not recall the scope of Ryder Scott's audit during his deposition. Mot. at 12. Even so, this was a significant failure of recollection given that he was CAO of AMH since 2016 (RX 9 (Smith Tr.) at 14:11-17) and Ryder Scott was performing audits for AMH proved reserves for years (*see id.* at 60:22-61:2). But this misses the point: Smith testified that notwithstanding he was the CAO, he had no responsibility for auditing reserves. *Id.* at 54:18-55:9. His understanding was that this was the responsibility of only a third party (*i.e.*, Ryder Scott). *Id.* Given that Ryder Scott also had no responsibility to audit reliance on unproved reserves (*id.* at 60:11-17), Smith's testimony is remarkable given that AMR's unproven reserves were deemed to be a significant risk of fraud. *See* RX 1 (RRpt.) at ¶221 n.428 (quoting ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████[15]

As explained in the Regan Report, probable and possible reserves are two critical classifications constituting unproved oil and gas reserves. *Id.* at ¶¶134-136.

Defendants seek to discredit Mr. Regan's reference to incoming CFO Randy Limbacher's stark assessment of the state of AMR's internal controls when he stated that "the accounting issues, lack of processes and systems, and cultural issues will prove to be more of a challenge than I first thought…." RX 1 (RRpt.) at ¶223. But, again, this is a plain distortion. Defendants cite only Mr. Limbacher's deposition testimony about a lack of processes and systems and management reports, and claim he said they "were ***not*** about AMR's accounting or internal controls." Mot. at 12-13 (emphasis in original). First, they ignore the fact that Mr. Limbacher's answer referred to a lack of "management reporting systems to track day-to day business" (RX 20 (Limbacher Tr.) at 77:23-78:1), which he later agreed would make "it more difficult to see if a company's drilling program was adhering to the budget for expenditures and achieving production targets" (*id.* at 79:18-20)—clearly an internal control problem. More importantly, Defendants' truncated reading

---

[15] Defendants seek to distinguish between internal controls over financial reporting and internal controls over reserves. Mot. at 12. This ignores that the lack of sufficient controls over the assumptions that were employed was the most significant reason for the impairment that led to the collapse of AMR. While Defendants rely on an auditing assessment of the latter by KPMG, they fail to consider that KPMG relied on the clearly false statements from AMR's internal reserve engineers that ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *see also* RX 1 (RRpt.) at ¶145 n.254.

of the transcript leaves out the following, relating to the views he came to based on his own independent assessment upon taking his position: "Q. What were you referring to in that sentence on accounting issues? A. As we found out as we went through the process, there were some material weaknesses in accounting that kept us from filing financial statements for a period of time." RX 20 (Limbacher Tr.) at 77:17-22. And while Limbacher's assessment was made in Q4 2018, that was the precise time when he assumed corporate management responsibility. There is no evidence, including from Limbacher, that the accounting and internal control problems he observed developed over time as opposed to what he considered to be a pre-existing "cultural issue" of a lack of "systems in place[.]" *Id.* at 78:4-20.[16]

Defendants again fail to consider that the significant amount of evidence that Regan analyzed was in the context of his role as a forensic accountant, charged with "obtain[ing] sufficient relevant data to afford a reasonable basis for conclusions[,]"[17] relating to the sufficiency of ICFR as of the Business Combination. In doing so, he identifies a consistent pattern of a lack of sufficient systems and experienced personnel. The inclusion or integration of the internal views of an incoming CEO with those pieces of evidence does not render his methodology improper. *See Smilovits*, 2019 WL 6875492 at *11 (accounting

---

[16] Notably, the deposition transcript of Mr. Limbacher that Defendants misread is from AMR's bankruptcy adversary proceeding, not one from this action.

[17] RX 21 (Forensic and Valuation Services Executive Committee, SSFS No. 1) at ¶6.

expert may opine based in part on defendants' "own internal conclusions" of GAAP implications).

Despite Defendants' repeated attempts to argue that Mr. Regan's expert opinions should be excluded because a "jury may review the same evidence [] and reach its own conclusions" (Mot. at 12), Mr. Regan's reliable opinions and testimony will assist jurors with complex accounting concepts and the analysis necessary to evaluate AMR's DC&P and ICFR issues. *See, e.g.*, *Goodwin*, 2021 WL 848948, at *14.[18]

### 3. The Complaint Alleges that AMR's Reserves And KFM's Goodwill And Intangible Assets Were Overstated

Defendants argue that Mr. Regan should be prohibited from testifying that AMR's reserves and KFM's goodwill and intangible assets were overstated in AMR's financial statements because "Plaintiffs do not allege that any of those recorded balances were false or misleading." Mot. at 13-15.[19] This argument is nothing more than smoke and mirrors

---

[18] Defendants' caselaw is inapposite (Mot. at 10-13) because Mr. Regan's opinion as to when material weaknesses in financial reporting existed is a technical accounting determination that requires the application of relevant accounting standards and SEC guidance. *See Allen v. Wyeth*, 2012 WL 13026947, at *2 (N.D. Tex. Jan. 12, 2012) (excluding part of expert's opinion that defendant drug manufacturer failed to sufficiently test drug despite the lack of any specific statute, regulation, custom, or practice requiring such testing); *see also Peters*, 898 F.2d at 450 (excluding expert's opinion because jury could assess whether it was reasonable to instruct employee to manually move equipment on boat deck during heavy seas); *Novatel*, 2011 WL 5827198 at *4-5 (excluding portion of Mr. Regan's opinion because it "contains no professional standards or principles").

[19] Notably, Defendants do not (and cannot) argue that it would be improper for an accounting expert to opine on the issue as to whether AMR's reserves, and KFM's goodwill and intangible assets, were overstated in financial statements in violation of GAAP. *See, e.g.*, *SEC v. Guenthner*, 395 F. Supp. 2d 835, 846 (D. Neb. 2005) ("Establishing that an accounting practice or method is inconsistent with GAAP requires expert testimony.") (collecting cases); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 741 n.15 (S.D. Tex.

intended to distract from the other wanting arguments set forth in Defendants' Motion. Further, such an argument rests on the non-existent rule of law that allegations at the pleading stage need be a perfect facsimile of those post-discovery. *See In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at \*18 (N.D. Cal. June 19, 2009), *aff'd sub nom. In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) (finding lack of specificity in complaint was "not dispositive … as it can be expected that some details of an accounting fraud will materialize during discovery").

Defendants' contention that the Complaint lacks allegations as to the overstatement of recorded asset values is at odds with this Court's analysis of the case. *See* Dkt. No. 160 at 26 ("Plaintiffs base their Section 10(b) claims in this case in part on Alta Mesa's first 10-K and the subsequent write-down.… Alta Mesa disclosed a $3.1 billion dollar write-down, equivalent to more than 80% of the company's value."). This write-down was directly attributable to the overstated value of AMR's reserves, goodwill, and intangible assets. RX 1 (RRpt.) at ¶¶45-46. And Plaintiffs allege that the SOX certifications, signed by Defendant Chappelle and the CFO on behalf of AMR, were misleading because they state that AMR's financial filing "fairly present[ed], in all material respects the financial condition, results of operations and cash flow of [Alta Mesa Resources, Inc.]…." ¶220. Thus, evidence of gross misreporting of assets is evidence of the falsity of the SOX

---

2001) (finding that whether defendant's accounting practices were consistent with GAAP is a factual question that requires expert testimony).

certifications, regardless of whether the particular line items were specifically alleged to be false.

Further, the Complaint itself contains myriad allegations directly related to reserves, goodwill, and intangible assets. As alleged, the "primary drivers" of AMR's impairment charges were attributable to, *inter alia*, intangible assets and goodwill. *See, e.g.*, ¶166. Plaintiffs allege Defendants' SOX certifications attesting to the accuracy of AMR's financial reporting, which obviously includes reserves, goodwill, and intangible assets, were materially false and misleading. *See, e.g.*, ¶¶235-36, 329-30. Plaintiffs allege the same as to AMR's statements regarding the sufficiency of its internal controls over financial reporting. *See, e.g.*, ¶¶257-58, 329-30. Plaintiffs allege that certain risk factors in AMR's SEC filings regarding drilling, completion, and production technology were false and misleading insofar as they failed to disclose such methods would undermine the long-term viability of AMR's oil and gas assets, which includes reserves. *See, e.g.*, ¶¶229-230. Plaintiffs allege it was clear AMR would not be able to reach forecasted production levels, which implicates reserves. *See, e.g.*, ¶¶254-55, 265-82. Defendants touted to the market that "[m]ulti-well development pattern results continue to be favorable," and would ultimately provide "compelling long-term returns to [AFM] shareholders," which Plaintiffs alleged to be false and misleading given the ultimate impairment and related contrary data known to Defendants at the time. *See* ¶¶237, 241-42. Further, in accordance with Plaintiffs' allegations, these statements implied that Defendant Chappelle reaffirmed 2018 guidance, and in so doing assured investors that no impairment charge loomed on the horizon. *See,*

*e.g.*, ¶227. In total, the Complaint clearly alleges that Defendants actively overstated AMR's oil and gas reserves and that, as a result of this fraud, AMR was forced to record billions of dollars in impairment charges. *See, e.g.*, ¶256.

Defendants also argue that Regan's opinion was based on hindsight rather than information known to AMR in February 2018. Mot. at 15. Not so. Defendants focus on, and grossly mischaracterize, just three paragraphs of the Regan Report. *Id.* at 13-14 (citing RRpt. at ¶¶150-152). In doing so, they ignore other sections of the Regan Report and Mr. Regan's testimony establishing the availability of data to AMR by February 2018 showing that oil and gas reserves assumptions were overstated. *See, e.g.*, RX 1 (RRpt.) at ¶¶57-61, 139-152; RX 5 (Regan Tr.) at 196:10-22. Mr. Regan explained that AMR's misstatement of the three assumptions underlying the reported volume of oil and gas reserves culminated in overstatement of oil and gas reserves in its financial statements throughout 2018. RX 1 (RRpt.) at ¶¶44, 139-145. Specifically, Mr. Regan demonstrated that Defendants had information available by February 2018 contradicting AMR's public disclosures: (1) there were not 3 benches in the STACK—there was one bench; (2) the public estimates of 250 MBOE reasonably could not be produced by drilling 12 wells per section, as opposed to the 4 to 5 wells per section assumption provided to Ryder Scott; and (3) child wells did not perform the same as parent wells. *Id.*

Seeking investor support for the Business Combination, AMR reported $2.3 billion of oil and gas reserves in February 2018 based on incorrect and material assumptions. *Id.* at ¶151. Mr. Regan calculated that the actual value of AMR's oil and gas reserves was

approximately $1.1 billion. *Id.* at ¶152. As a result, Mr. Regan opined that AMR had overstated oil and gas reserves by $1.2 billion (*i.e.*, $2.3 billion minus $1.1 billion). Mr. Regan's estimate of AMR's overstatement of the value of oil and gas reserves in February 2018 is conservative as it falls far short of the actual $2.0 billion impairment charge to those oil and gas reserves taken by AMR in December 2018. His estimate is also consistent with both AMR's and KPMG's calculations—finding that oil and gas reserves were reduced by approximately 50% after removing the impact of AMR's false assumptions. *Id.* at ¶¶149-150.

Mr. Regan's elimination of the overstatement of AMR's oil and gas reserves to correct for these false assumptions as of February 2018 is not hindsight—it is a reflection of the actual conditions that existed at that time concerning the extent of available oil and gas reserves. Put differently, the actual volume of AMR's oil and gas reserves in February 2018 never changed. What changed was that AMR's illusion of vastly greater reserves became exposed. Instead, Mr. Regan properly eliminated the impact of events subsequent to February 2018, including (1) the decline in commodity prices between the date of the Business Combination and those prices on December 31, 2018, and (2) the reserves AMR actually extracted after the Business Combination through December 2018. *Id.* at ¶¶150-152; RX 5 (Regan Tr.) at 189:11-23.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

25

Dated:  January 18, 2024

/s/ Andrew J. Entwistle
Andrew J. Entwistle (attorney-in-charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*

Respectfully submitted,

/s/ Trig Smith
Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*