RX 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4

5    IN RE:  ALTA MESA

6    RESOURCES, INC.,          Case No.:  4:19-cv-00957

7    SECURITIES LITIGATION

8    ------------------------/

9

10

11

12        Video-recorded deposition of D. PAUL REGAN, at

13        Latham & Watkins, LLP, 505 Montgomery Street,

14        Suite 2000, San Francisco, California,

15        commencing at 9:29 a.m. PDT, Thursday, November

16        2, 2023, before Lorrie L. Marchant, California

17        CSR No. 10523.

18

19

20

21   Stenographically reported by:

     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC

22   California CSR No. 10523

     Washington CSR No. 3318

23   Oregon CSR No. 19-0458

     Texas CSR No. 11318

24

     Job No. MW 6290725

25   California Firm Registration No.:  48

[PAGES INTENTIONALLY OMITTED]

Page 55

1    think given the facts and circumstances that are in

2    place here, that kind of off-the-cuff comment that

3    was made by Mr. Palke was not -- it did not have

4    sufficient weight to offset the opinions that are

5    presented in my report.

6         Q.   So your opinions are using your example

7    based on your assessment of Mr. Palke's credibility

8    with respect to his statements on parent-child

9    wells?

10             MR. SCHOCHET:   Objection.   Misstates the

11   witness's testimony.

12             THE WITNESS:   I don't question his

13   credibility.   But I question when you put into

14   context his statement, that it's not relevant to the

15   circumstances that -- that I'm reporting on in my

16   Exhibit 47.

17             It goes to the weight of Mr. Palke's

18   statement in his deposition and the context of that

19   weight versus the weight of other evidence that is

20   cited in my report.

21             BY MS. WALLER:

22        Q.   How did you -- using this specific example,

23   how did you -- what weight did you put on his

24   statement regarding child-parent wells?

25        A.   Well, my recollection in his deposition, he

[PAGES INTENTIONALLY OMITTED]

Page 70

1    I've used their data.
2         Q.   You've never worked at a private equity
3    firm?
4         A.   No.
5         Q.   And when we were talking earlier about your
6    experience, I think you said in some of your prior
7    experience, you took the calculations of projections
8    that were prepared and, in -- I think in your words,
9    corrected them; is that right?
10        A.   Yes.
11        Q.   You didn't do that in this case, did you?
12        A.   No.  I wasn't asked to do that.
13        Q.   You didn't do your own calculation of what
14   appropriate assumptions would be and what
15   appropriate projections would be?
16             MR. SCHOCHET:  Objection.  Compound.
17             THE WITNESS:  No.  I haven't -- I don't
18   have a recollection of amending, for example, the
19   EBITDA.
20             I do say in -- in my report that if
21   EBITDA -- when valuing an entity, if the slope of
22   the growth line of EBITDA declines, it has a
23   significant downward pressure on the EBITDA
24   multiple.  And that's based on my experience in
25   valuing companies generally and seeing how oil and

Page 71

1   gas companies are valued, in particular.

2          So if I were to make a revision, you know,

3   what I would do is I'd attempt to identify the --

4   the best information available for -- and to produce

5   the most reasonable result.  And if I were to turn

6   that into an evaluation using EBITDA, I would then

7   adjust the EBITDA multiple appropriately.

8          BY MS. WALLER:

9      Q.   You didn't do that, though, here?

10     A.   No.  I commented that it would be lower

11  than the EBITDA that has been used in some of the

12  documents in this case.

13         And I certainly say that, you know, the

14  expected MBOE was overstated and it did not

15  represent the best information available and the

16  most reasonable information available at the time

17  that the projections were made.

18     Q.   You never operated an oil and gas

19  exploration company; right?

20     A.   No, I didn't consider myself an operator.

21     Q.   You've never actually tried to operate a

22  well and work on how to maximize production out of

23  an individual well?

24     A.   No, I would not do that.

25     Q.   You've never worked at an oil and gas

[PAGES INTENTIONALLY OMITTED]

Page 95

1  portion of Mr. Campbell's testimony over the lunch

2  period?

3      A.  I did.

4      Q.  And you didn't review this when forming

5  your opinion; is that right?

6      A.  Correct.

7      Q.  And in reviewing Mr. Campbell's testimony,

8  Mr. Smith, plaintiffs' attorney, was asking him

9  about this chart that's on page 17 of your report

10  and asking him about what it -- what it shows.

11         And if you see -- I'm going to point you

12  specifically to -- on page 67, line 10.  He says

13  (as read):

14              "I mean, I think maybe you had some

15          outliers that showed you that there, you

16          know.  But I would say you really didn't

17          see enough data until late in 2018 to

18          draw any conclusions, and that data was

19          still pretty fresh."

20         Did you -- does Mr. Campbell's testimony

21  with respect to his interpretation of the document

22  that you're relying on, does that change your

23  opinion?

24      A.  No.

25      Q.  Why not?

Page 96

1        A.    A couple of things.  He comments that "you

2   had some outliers that showed you that there."

3              When I look at -- at the chart that he was

4   looking at, which is on page 50 -- or paragraph 59,

5   that represents all of the wells as of September 30,

6   2018 which had been in operation and for which there

7   was a UR -- EUR.  This is all wells.

8              And the only outliers I see are those where

9   child wells are over -- are shown to be over 250

10  MBOE.

11             That's a lot of wells.  It's all of the

12  wells.  And it's basically saying that at the time

13  the projections were prepared, the comments that I

14  see in my report, in the documents that I cite in my

15  report that basically say 250 MBOE is too much and

16  that the child wells are not going to perform as

17  well as the parent wells, which is, I think, pretty

18  obvious based on my review of the chart in 59.

19             And particularly when I -- when I focused

20  on the child wells, and they're all of the child

21  wells that were drilled and measured, you only

22  see -- before the middle of 2017 when the

23  projections were prepared, you only see two that are

24  over 250.

25             And if you move to all of the wells on this

Page 97

1    chart that were child wells, there's only 4.  And I

2    haven't counted all of the wells that are here, but

3    there's -- there may be 100.  I don't -- I would

4    consider the -- those that were over 250 to be

5    outliers, not all of the other child wells that

6    showed underperformance.

7            It also is in contradiction to the expert

8    reports that were -- were prepared by plaintiffs'

9    experts.  And probably more importantly from my

10   perspective and my report is it contradicts other

11   contemporaneous conclusions that had been made by

12   the person cited in my report.

13           This testimony looks not credible.

14       Q.   So you're -- are you giving Mr. Campbell's

15   testimony any weight in coming to that conclusion?

16       A.   I am not giving it any weight for the

17   reasons that I describe.

18       Q.   What are the accounting standards that

19   govern how to weigh credibility of conflicting

20   evidence in reviewing e-mails and deposition

21   testimony?

22       A.   Well, in the -- the accounting standards

23   don't talk about that.  But auditing standards talk

24   about the -- assessing the credibility of evidence.

25           There's a -- there's a PCAOB standard on

Page 98

1   evidence and the accountants weigh an assessment of

2   that evidence.

3          For forensic purpose, it's the need to look

4   at sufficient evidence to support a reasonable --

5   have a reasonable bases for the opinions.

6          And certainly I've looked at sufficient

7   evidence to support -- have a reasonable basis of

8   support for my opinions.

9      Q.   You mentioned the other plaintiffs'

10  experts.  Is your opinion that you have sufficient

11  evidence -- does that rely on the other expert

12  reports that the plaintiffs have submitted in this

13  case?

14         MR. SCHOCHET:  Objection.  Asked and

15  answered and misstates the testimony.

16         THE WITNESS:  Well, I describe that in

17  paragraph 140 of Exhibit 47.

18         And then I say that (as read):

19             "As described in paragraph 58, the

20             plaintiffs have retained additional

21             experts to perform analyses that are

22             relevant to my consideration of AR --

23             AMR's accounting and oil and gas

24             reserves.  I have identified these

25             experts.  I understand that there are

[PAGES INTENTIONALLY OMITTED]

Page 116

1    have a material weakness, it exposes the financial

2    statements to the possibility of -- reasonable

3    possibility of material misstatement.

4          Now, when I look to the facts and

5    circumstances which led to the recorded reserves at

6    the time of the business combination and -- you

7    know, it certainly appears as if it was reasonable

8    to conclude that oil and gas reserves were

9    materially misstated on the business combination,

10   the financial statements that were created as a

11   result of the business combination, and the

12   projected EBITDA in the -- then incorporated in the

13   business combination documents.

14        Q.   But you're not opining -- I just want to be

15   clear, you're not opining in this case that the --

16   what you believe is a financial mis- -- a financial

17   statement misstatement as of February 2018 was

18   caused by any of the material weaknesses?

19        A.   I don't express it that way.  I express it

20   in the way which the SEC guides, statements about

21   this, and that is that material weaknesses open the

22   reasonable possibility that there will be material

23   misstatements in the resulting financial statements

24   or financial documents.

25          I don't -- I don't say with definity that

Page 117

1    that's what happened, but it's certainly -- to the

2    extent you've got people that are not capable,

3    don't -- and don't have the skill set to properly

4    interpret, process, and record complex information,

5    you are opening the door to the possibility of

6    material misstatements.  And it may be one of the

7    reasons why there were material misstatements.

8        Q.   With respect to each of the material

9    misstatements -- and, I'm sorry, material

10   weaknesses -- if we could just maybe stick with that

11   part of your opinion -- did you do any independent

12   analysis of Alta Mesa's controls, any controls

13   testing of your own as part of your opinion?

14            MR. SCHOCHET:  Objection to form.

15            THE WITNESS:  No.  I started working on

16   this case in 2021, and I don't think it's practical

17   to -- to do an evaluation of -- in 2021 of controls

18   that were in place in 2017 and 2018.

19            So, no, I've -- I've not done that.  I'm

20   relying on the work that was done by others in this

21   time frame.

22            BY MS. WALLER:

23       Q.   Whose work?

24       A.   KPMG.  And certainly the comments that are

25   cited, for example, beginning on page 214 and in

[PAGES INTENTIONALLY OMITTED]

Page 151

1     A.    Yes.

2     Q.    You reviewed all of it?

3     A.    I did, I read all of it.  I thought it was

4  important testimony.  I should look -- take a look

5  at what she had to say.

6     Q.    You didn't find her credible?

7     A.    It depends on what topic she was asked

8  about.

9     Q.    But particularly with respect to her

10 testimony regarding the e-mail that's in

11 paragraph 69 shown on page 21 of your report, you

12 didn't find her testimony about that document to be

13 credible?

14    A.    That was my recollection, particularly when

15 you consider all of the e-mails that she sent with

16 respect to the issue of projected 2018 EBITDA.

17    Q.    All right.  And if you turn to page 190 of

18 her deposition, you'll see at the top of page 190,

19 this exhibit is -- she's asked about this exhibit at

20 her testimony.

21          Do you see that reference to Exhibit 480?

22    A.    Yeah, this is a discussion about

23 Hal Chappelle might be mad because she expressed the

24 view that such a result could not be achieved.

25          Okay.

Page 152

1     Q.   And this is the testimony you didn't think
2  she was very credible in explaining her perspective
3  on this e-mail?
4     A.   Well, her testimony was not such that I --
5  I determined that I shouldn't use this e-mail.
6  Because I think the part of this where she says it
7  can't be done is an important indicator of the
8  concern with respect to the 350 million EBITDA.
9     Q.   How did you weigh in your opinion her
10  testimony where she's asked specifically about
11  whether -- about that statement, and in her
12  testimony she says later on (as read):
13            "I said that I found a model that
14            works which would indicate that it could
15            be done"?
16     A.   Can you point me to a page or ...
17     Q.   Page 194.
18     A.   194.
19            MR. SCHOCHET:  I'm going to object.
20  Objection to the extent that it excludes other
21  portions of her testimony which follows this.
22            THE WITNESS:  Well, if you look at the
23  bottom of page 95 -- well, actually, all of 95,
24  she's --
25  ///

Page 153

1          BY MS. WALLER:
2     Q.    195?
3          MR. SCHOCHET:   195?
4          THE WITNESS:   195.  She says (as read):
5              "This is confusing."
6          Then it says (as read):
7              "That's confusing to me.  I'm
8          wondering if there's a -- the time stamp
9          on the e-mail doesn't reflect the time
10         stamp from the Skype message."
11         Line 10, Mr. Smith --
12         (Stenographer interrupted for clarification
13          of the record.)
14         THE WITNESS:   Line 10, question Mr. -- by
15    Mr. Smith (as read):
16             "Whether this document is accurate,
17         you know they did produce it?"
18         Line 12 (as read):
19             "Answer:  No, I'm not saying it's not
20         accurate.  I just can't tell the time
21         stamp on the Skype.  Because I agree, it
22         would be confusing for me to say maybe
23         couldn't be done, if later it was done."
24         Line 17 (as read):
25             "Well, wouldn't it make sense if you

[PAGES INTENTIONALLY OMITTED]

Page 156

1      Q.   On page 310, she was asked (as read):

2           "Sitting here today, do you remember

3      ever believing those projections were

4      unreasonable when they were released?

5           "No.

6           "Sitting here today, do you remember

7      ever believing that those projections

8      were unrealistic when they were released?

9           "No."

10          How did you take that testimony into

11     account in your opinion?

12     A.   I -- I noted that it was at 6:13 at night.

13     It was a further examination.  These are very broad

14     questions that are not specific as to all of the

15     various e-mails that she sent that were done

16     contemporaneously.

17          And this is a very broad, vague question

18     asked in May 2023, five years later.  Interesting

19     perspective, but I don't think it outweighs the

20     contemporaneous e-mails that she sent five years

21     earlier.

22     Q.   And that's based on your assessment from

23     reading her e-mails and reading her transcript; is

24     that right?

25     A.   Correct.

Page 157

1      Q.   What other credibility determinations did

2   you make with respect to the testimony that you

3   reviewed that is relevant for purposes of the

4   opinions that you're offering in this case?

5           MR. SCHOCHET:   Objection to form.

6           THE WITNESS:   Well, I don't have a

7   recollection of what I would characterize as

8   "credibility determinations."

9           I -- I think I do that with respect to most

10  documents that I refer to in support of my

11  determinations.   I look at -- at the date of the

12  document.   I look at who prepared the document, who

13  it was sent to, what -- what is said within the

14  document, who prepared the document, whether the

15  content of the document appears to be credible.

16          I think I do that with respect to virtually

17  all of the documents that I rely on to support my

18  opinions.

19          BY MS. WALLER:

20     Q.   Let's take a look at a specific example.

21          So turn to paragraph 102.

22          In paragraph 102, you -- you rely on an

23  e-mail written by Bo Dunne as well as an e-mail

24  written by Mr. Michael Christopher.

25          Do you see that?

[PAGES INTENTIONALLY OMITTED]

Page 189

1   January 9, 2018 and 12/31/2018, which was a

2   20 percent decline.

3          So we want to eliminate that 20 percent

4   decline.  And it results in an indication that the

5   February 9, 2018, using the calculation at

6   12/31 where we restored the -- the depletion -- the

7   depletion and we eliminate the adverse affect of

8   declining commodity prices and calculate a value of

9   a billion 72 million.

10         BY MS. WALLER:

11     Q.   And what does the billion 72 million

12  represent?

13     A.   It's a -- represents approximately the

14  value of the oil and gas reserves, the volumes,

15  priced using the commodity prices at February 9 as

16  calculated without the -- without the improper

17  assumptions that contaminated the calculation at

18  February 9 for the benches, the parent-child well,

19  and the issues with respect to spacing.

20         When you correct those three, which is what

21  happened at 12/31/18, and you bring that correction

22  back to February 9, 2018, you get an approximate

23  value of a billion 72 million.

24     Q.   Does the billion 72 million, the

25  calculation of that at all rely on the 50 percent in

[PAGES INTENTIONALLY OMITTED]

Page 196

1    February 9th, 2018?

2         A.    It's an effort to estimate the balance in

3    oil and gas reserves in dollars, eliminating

4    depletion, eliminating the adverse impact of

5    commodity price reduction, and eliminating the --

6    the reduction that occurred because of the

7    impairment arising as a result of capital

8    restraints.

9              So we tried to exclude all of those things.

10        Q.    Did you do an independent assessment of

11   what the reserves should have been based on the well

12   results that AMR had at the time in February of

13   2018?

14        A.    No, I -- I did not.

15             The statements that I've made in the report

16   is that those estimates were materially overstated

17   because of the assumptions of -- that I discuss in

18   paragraph 139.

19             And the -- the expectation based upon the

20   documents that I cite is that these incorrect

21   assumptions had materially overstated the oil and

22   gas reserves at February 9, 2018.

23        Q.    Is the proved oil and gas balance at

24   December 31st, 2018, is that based on the same

25   Ryder Scott report that you previously referenced

[PAGES INTENTIONALLY OMITTED]