# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 553**

## CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF CLASS PLAINTIFFS' EXPERT JAMES JOHNSON

## <u>TABLE OF CONTENTS</u>

NATURE AND STAGE OF PROCEEDINGS....................................................................1

STATEMENT OF ISSUES TO BE RULED UPON ..........................................................2

LEGAL STANDARD ........................................................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT....................................................4

STATEMENT OF FACTS................................................................................................10

    A.    Mr. Johnson's Opinions Relate to Allegations Regarding Kingfisher that are Directly Supported by the Summary Judgment Evidence .............10

    B.    Mr. Johnson's Investigation and Conclusions.............................................11

ARGUMENTS & AUTHORITIES...................................................................................13

    I.    DEFENDANTS' CHALLENGE TO OPINION "C" ON RELEVANCE GROUNDS IS DEMONSTRABLY SPECIOUS .............13

    II.    JOHNSON OPINION "D" IS WELL FOUNDED ....................................14

    III.    MR. JOHNSON'S OPINION CONCERNING THE "RISK FACTOR" IS BASED ON DEMONSTRABLE FACTS ..........................16

CONCLUSION ................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Trustmark Nat'l Bank*,
No. 4:22-CV-00800, 2022 WL 14813716 (S.D. Tex. Oct. 3, 2022) ..................... 14

*Anders v. Hercules Offshore Servs., LLC*,
311 F.R.D. 161 (E.D. La. 2015) ........................................................................... 10

*Browning v. Sw. Research Inst.*,
No. SA–05–CA–0245–FB, 2006 WL 6549921 (W.D. Tex. Aug. 17, 2006) ......... 17

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
No. 4:19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ........................ 14

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) .................................................................. 16

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................................... 4

*De Luna v. Hidalgo Cnty., Tex.*,
853 F. Supp. 2d 623 (S.D. Tex. 2012) ................................................................ 8, 9

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................................... 4

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002) ................................................................................. 4

*McManaway v. KBR, Inc.*,
No. H-10-1044, 2012 WL 13059744 (S.D. Tex. Aug. 22, 2012) ........................ 14

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ................................................................................. 4

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
382 F.3d 546 (5th Cir. 2004) ................................................................................. 4

*Puga v. RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) ........................................................................... 3, 15

*Viterbo v. Dow Chem. Co.*,
826 F.2d 420 (5th Cir. 1987) ................................................................................. 3

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*,
     No. SA–16–CA–00485–FB–ESC,
     2017 WL 1133506 (W.D. Tex. Mar. 24, 2017)......................................................17

## NATURE AND STAGE OF PROCEEDINGS

This is a certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Exchange Act. (Dkt. 241). This dispute arose in the wake of the catastrophic collapse of Alta Mesa Resources, Inc. ("Alta Mesa") following a De-SPAC transaction in which two affiliated private companies Alta Mesa Holdings L.P. ("AMH") and Kingfisher Midstream LLC ("Kingfisher") combined and went public via a blank check company, Silver Run II.

Immediately following the De-SPAC, Defendants were forced to cut Kingfisher's 2018 EBITDA projections by nearly 50% and partially restate Alta Mesa's production and reserve projections to acknowledge what Alta Mesa had known since before August 2017—that it simply could not get sufficient oil and gas out of the ground to meet the production and reserve projections that Defendants grossly misrepresented and overstated in the Proxy Statement for the De-SPAC (the "Proxy"). Not only were Kingfisher's EBITDA projections exaggerated by the fact that 80% of its volume came from Alta Mesa's own grossly overstated production projections, Kingfisher's original projections were also manipulated by including hypothetical projected revenue from non-customers, manipulating expenses and vendor payments, and wholly disregarding known Kingfisher infrastructure and quality-control problems that were so bad that even Alta Mesa was sending some of its production to other midstream companies.[1] Less than a year after asking for shareholder approval, Alta Mesa acknowledged its assets were overvalued,

---

[1] "Defendants" are listed in the *Third Consolidated Amended Complaint for Violations of the Federal Securities Laws* (Dkt. 218, the "Complaint") at ¶¶ 43-59.

writing off more than 80% of the $3.8 billion valuation it touted to investors at the time of the De-SPAC.  Alta Mesa filed for bankruptcy protection just seven months later.

On August 31, 2023, Class Plaintiffs' expert on the midstream aspect of oil-and-gas industry, James C. Johnson, issued an expert report based on more than 1,000 produced documents relevant to Kingfisher's operations.[2]   Mr. Johnson proffers seven opinions/conclusions, including opinions on: Kingfisher's inclusion of non-customers in its revenue projections (Opinion "b.3"); purported synergies between Kingfisher and AMH as a reason for the De-SPAC (Opinion "c"); infrastructure design and construction problems (Opinion "d"); and quality-control issues in its system (Opinion "e").

On December 22, 2023, Moving Defendants moved to exclude portions of opinions "c," "d," and "e" under Federal Rule of Evidence 702.[3]  Class Plaintiffs hereby oppose the exclusion of any portion of Mr. Johnson's opinions for the reasons set forth herein.

## STATEMENT OF ISSUES TO BE RULED UPON

I.      Will the portion of Mr. Johnson's Opinion "c" that "defendants' statements characterizing Kingfisher as a purpose-built and integrated midstream

---

[2] *See Expert Report of James C. Johnson*, dated August 31, 2023 (the "Report" or "Rpt."), at Appendix B, attached as Exhibit JX 1 to the *Declaration of Andrew J. Entwistle in Opposition to Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Expert James Johnson Under Rule 702* (the "Entwistle/Johnson Declaration"). For convenience Exhibits to the Entwistle/Johnson Declaration will be referenced simply as "JX#".

[3] *See Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Expert James C. Johnson Under Rule 702* (Dkt. 507, the "Motion" or "Mot."). Moving Defendants are Alta Mesa; Control Entity Defendant Riverstone Holdings, LLC; Management Defendants Harlan H. Chappelle, Michael E. Ellis, and Ronald J. Smith; Proxy Defendants James T. Hackett Stephen S. Coats, William D. Gutermuth, Jeffrey H. Tepper, Thomas J. Walker, and Diana J. Walters; and Director Defendants Pierre F. Lapeyre, Jr., David M. Leuschen, and Donald R. Sinclair.

system for Alta Mesa Holdings were inaccurate" assist the jury to understand the evidence or to determine a fact in issue, and is therefore relevant?

II.   Will the portion of Mr. Johnson's Opinion "d" that "Kingfisher's poor design and operations may have also undermined its efforts to obtain business from third-party producers" relevant and reliable and therefore helpful to the jury?

III.   Is the portion of Mr. Johnson's Opinion "e" that "Kingfisher's warning to investors in March 2018 that it may in the future have profit and cash flow problems 'if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect' reflected conditions that already existed rather than reflecting a potential outcome" reliable and therefore helpful to the jury?

## LEGAL STANDARD

"While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (internal citation omitted). The trial court must "ensur[e] that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Id.* at 294.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see also, Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th

Cir. 2004) (holding that challenges to the bases and sources of an expert's opinion go to weight rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence").

Where, as here, an expert's opinion is based on experience and specialized knowledge, the factors in *Daubert* may or may not be relevant to assessing reliability.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (noting "it is appropriate for [a] court to consider factors other than those listed in *Daubert* to evaluate reliability" where the opinion is premised on "personal observations, professional experience, education and training").

Exclusion is available but disfavored in this Circuit.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  "The *Daubert* analysis should not supplant trial on the merits."  *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants told investors voting to approve Silver Run II's De-SPAC transaction purchasing and combining upstream AMH and midstream Kingfisher that there were synergies between the companies and that would allow Kingfisher both to economically serve AMH's volumes while at the same time grow its third-party business in the STACK. This narrative was among the core reasons for the De-SPAC and $3.8 billion valuation of the combined Company.  *See*, *e.g.*, JX 9 at internal p. 111 ("The factors that make up the goodwill reflected in the preliminary purchase price allocation include expected synergies,

including future cost efficiencies with continual flow of activity of Alta Mesa production into the Kingfisher processing facility"); *id*., at internal p. 170 ("The factors considered by the board of directors include . . . [the] *Highly Strategic and Synergistic Midstream Platform*"). But discovery has revealed that the Management and Board Defendants knew that the synergies were overstated (along with Alta Mesa's drilling plan and production projections) and that Kingfisher had significant, undisclosed infrastructure and quality-control problems that would affect Alta Mesa's business and Kingfisher's business development. To make matters worse, Kingfisher overstated its projected revenue by including *potential* revenue from *potential* third-party customers, a practice that is atypical in the midstream industry. The overstated projections for AMH and Kingfisher caused Defendants to reduce Kingfisher's public revenue projections less than *two months* after the De-SPAC by 46% versus the Proxy and ultimately contributed to Alta Mesa's $3.2 billion impairment *less than twelve months* after the De-SPAC that Defendants valued at $3.8 billion—ultimately costing Silver Run II's public investors their entire $10 per share investment (approximately $1 billion).

Mr. Johnson speaks directly to these core issues in his Report. Having reviewed volumes of the evidence and testimony developed during discovery, Mr. Johnson concludes that Kingfisher's projections were overstated because they included potential—not actual—customers, that the synergies between AMH and Kingfisher were overstated, and that Kingfisher's infrastructure and quality-control issues impacted its services to Alta Mesa and made it unreasonable to think that Kingfisher would significantly grow its third-party business.

Moving Defendants do not challenge Mr. Johnson's qualifications as an expert in the midstream sector of the oil-and-gas industry.  And, of course, they cannot because Mr. Johnson has 40 years of experience in the oil-and-gas industry, including responsibility for developing a standalone midstream affiliate to gather and process natural gas production from an affiliated producer and third-party operators—exactly what Kingfisher tried and failed to do.

Mr. Johnson's extensive review of the discovery materials in this case and relevant Alta Mesa presentations and public filings caused him to independently offer five highly relevant opinions, summarized in paragraph 8 of his Report.  Mr. Johnson's summarized opinions follow, with the challenged portions underlined:

b.2.   Kingfisher's projections reflected unrealistic assumptions about volumes from both existing and potential third-party customers. Kingfisher's projections for 2018 and beyond failed to account for undisclosed slowed drilling and production by actual and potential third-party customers, which defendants have admitted began in 2017;

b.3.   Kingfisher's decision to include in its projections potential revenue from third parties with whom it did not have contracts was contrary to industry custom and, consequently, inherently unreasonable. Moreover, Kingfisher continued to include potential revenue from non-contracted customers even though its business development efforts continually failed to generate *any* new customers;

c.   Kingfisher and Alta Mesa Holdings had an unbalanced financial relationship that was unusual in the industry insofar as Kingfisher charged Alta Mesa Holdings materially higher rates for midstream services than it charged third-party upstream customers. The structure of the relationship (including the fees) appears to have been designed to prop up Kingfisher's revenue and thus apparent value (including in a potential IPO) irrespective of its negative impact on Alta Mesa Holdings. Accordingly, defendants' statements characterizing Kingfisher as a purpose-built and integrated midstream system for Alta Mesa Holdings were inaccurate;

6

d.      Kingfisher's poor design and construction of infrastructure, along
        with attendant operational issues, caused delays and other obstacles
        for Alta Mesa Holdings to operate and grow its business. This
        likewise undermined the statements that Kingfisher was a purpose-
        built and integrated midstream system for Alta Mesa Holdings.
        <u>Kingfisher's poor design and operations may have also undermined
        its efforts to obtain business from third-party producers</u>; and

e.      No later than March 2018, Kingfisher was experiencing problems
        meeting the quality requirements for volumes to the downstream
        pipelines and facilities, including issues with the quality of the NGLs
        and volumes Kingfisher attempted to export to downstream
        customers. <u>Accordingly, Kingfisher's warning to investors in March
        2018 that it may in the future have profit and cash flow problems "if
        the volumes we gather, process, store or transport do not meet the
        quality requirements of the pipelines or facilities to which we
        connect" reflected conditions that already existed rather than
        reflecting a potential outcome.</u>

(Report at ¶ 8.b.2 to 8.e).

Moving Defendants do not challenge Opinions "b.2," "b.3," or the bulk of Opinions
"c," "d," or "e," and thus concede that Mr. Johnson can present testimony to the jury on
the topics of Kingfisher's unrealistic projections, improper inclusion of projected revenue
from non-customers, unbalanced financial relationship with AMH that was unusual in the
industry, poor design and construction of infrastructure, and problems meeting quality
requirements.

Moving Defendants only challenge the underlined portions of Opinions "c," "d,"
and "e." (Mot. at 4-7).  But in doing so, they do not articulate a legitimate challenge to the
relevance nor bases or methodology for Mr. Johnson's opinions.  Moving Defendants'
dislike of the opinions is properly left for cross examination at trial for the jury to determine
their weight, not for a *Daubert* motion.  *See, e.g., De Luna v. Hidalgo Cnty., Tex.*, 853 F.

Supp. 2d 623, 652 (S.D. Tex. 2012)  ("The Court cannot take on the role of fact-finder in fulfilling its role under *Daubert,* and must allow the jury to determine [plaintiff's] credibility and the weight to be given to [the expert's] report. In this regard, Defendants' use of the adversary process can adequately address their concerns.").

Moving Defendants argue relevance in connection with Mr. Johnson's Opinion "c," but that opinion directly speaks to alleged misstatements in the Proxy that Kingfisher had a "purpose-built system" to allow AMH to "handle larger volumes in an efficient processing system."  The Complaint points to the "purpose-built" statement as one of the synergies misstated in the Proxy to justify both the De-SPAC and, expressly, the valuation of the combined Alta Mesa.  It is difficult to conceive of how an opinion analyzing the underlying technical issues and explaining that both the "purpose-built" statement promoting synergies and the valuation justification were overstated and misleading would not assist the jury understand the core issues in the case (*see* Part I, *infra*).

Moving Defendants' argument that Mr. Johnson "does not have any evidence that Kingfisher in fact lost third-party business due to 'poor design' or 'operations'" in connection with Opinion "d" is equally inapt.  First, the Report points to evidence both that Alta Mesa itself was sending production volumes elsewhere because of infrastructure issues at Kingfisher and notes the developed evidence that Kingfisher was unable to develop new third-party customers.  (*See, e.g.*, Report ¶¶ 117, 121 (citing JX 4; JX 7; JX 11)).

Second, Moving Defendants do not question the methodology or analysis underlying that portion of Opinion "d" but instead simply argue that the relative loss of

business is irrelevant.  This is wrong given the representations about Kingfisher's potential growth as a reason for the De-SPAC, but in any case the challenged portion of Opinion "d" says nothing about the loss of business—simply that the Kingfisher infrastructure issues may undermine efforts to seek new business—an issue that, if relevant, can be raised on cross examination should Defendants choose to do so, but it is not a basis for a *Daubert* challenge (*see* Part II, *infra*).  *See De Luna*, 853 F. Supp. 2d, at 652.

Moving Defendants' challenge to Opinion "e" is similarly infirm.  In arguing that Mr. Johnson "did no independent economic analysis" to quantify whether Kingfisher's quality-control problems caused it to have existing profit and cash flow problems, Moving Defendants ignore the fact that the challenged portion of Opinion "e" focuses on the manifestation of quality-control and infrastructure problems, not their economic impact. In support of his opinion that the warned-of quality-control and infrastructure risks had manifested, Mr. Johnson points to the fact that, in February 2018, quality-control problems caused a purchaser to reject natural gas liquids ("NGLs") transported in Kingfisher's system and the fact that, shortly after the De-SPAC, Kingfisher's new COO recognized $25 million in necessary infrastructure and quality-control improvements during a year in which Kingfisher only generated $30.8 million in post-De-SPAC EBITDA.  It is the established fact that these issues had manifested prior to the Proxy that is at the heart of this Opinion—which makes no attempt to quantify the amount of the impact (thereby making an economic analysis of that impact irrelevant)—but regardless, it is an issue that is up to the jury to weigh (*see* Part III, *infra*).

Moving Defendants may dislike or disagree with the challenged opinions, but they

have not provided any legitimate basis to exclude them.  *See*, *e.g.*, *Anders v. Hercules Offshore Servs., LLC*, 311 F.R.D. 161, 165 (E.D. La. 2015) ("The fact that [defendant] disagrees with this [expert opinion] is not enough to exclude it as unreliable at this stage of the proceedings").

## STATEMENT OF FACTS

### A.    Mr. Johnson's Opinions Relate to Allegations Regarding Kingfisher that are Directly Supported by the Summary Judgment Evidence

The summary judgment evidence directly supports the allegations in the Complaint that the Kingfisher EBITDA projections in the Proxy were massively inflated and unrealistic (Complaint at ¶ 110), and related misstatements and omissions about Kingfisher's: (i) purported synergies with AMH—*i.e.*, that Kingfisher's system was "purpose-built" for Alta Mesa—which were the justification for the Business Combination (*id.* at ¶ 105); (ii) Kingfisher's expected robust growth from non-existent third-party customers (*id.* at ¶¶ 105, 106, 109); and (iii) that the "risk factor" concerning potential future issues with Kingfisher's volumes and quality-control reflected conditions that *already* existed (*id.* at ¶ 217).

For example: (1) ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████; (2) Kingfisher's historical EBITDA was deliberately inflated through off-book loans and other accounting shenanigans, including overcharging ARM compared to third-party customers

for the same products and services (Report at ¶¶ 105-108, JX 6; JX 5); (3) internal documents demonstrate that management knew Kingfisher's financials were inaccurate from at least August 2017 but were not corrected prior to the Proxy being filed (JX 10); (4) the synergies between Alta Mesa and Kingfisher were overstated and Kingfisher's system was not "purpose built" for Alta Mesa, as evidenced by the fact that design and construction deficiencies in Kingfisher's system caused delays and other obstacles in AHM's business (Report at ¶¶ 109-118), and that by 2018, Alta Mesa ceased connecting wells to Kingfishers' crude oil gathering system because part of the system was constructed with noncompliant materials, and the system suffered from continual pressure spikes and other operational problems on the system (*id.*); and (5) ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

### B.     Mr. Johnson's Investigation and Conclusions

Mr. Johnson's 43-page Report is the result of a comprehensive review of the discovery materials in this case, including review and consideration of more than 1,100 documents produced in this matter and more than 50 deposition transcripts, public filings, or investment presentations.  (*See* Report at Appendix B).

Mr. Johnson's Report explains the financial and operational relationship between Kingfisher Midstream and Alta Mesa Holdings.  Specifically, "Kingfisher's revenue, like most midstream companies, was directly tied to the volume of oil and gas flowing through its system from upstream producers, including, in large part, its affiliate Alta Mesa

Holdings." Report ¶ 8.a. Kingfisher's financials were particularly intertwined with AMH because AMH was Kingfisher's "anchor," or primary, customer. "Alta Mesa Holdings' production from operations represented ~80-90% of the volume on Kingfisher's system and, as a result, Alta Mesa Holdings' volumes heavily impacted Kingfisher's revenue." (*Id*. at ¶¶ 8.b.1, 31). Thus, to the extent that AMH's projections were overstated due to faulty assumptions, Kingfisher's projected revenue was similarly flawed. (*Id*. at ¶ 8.b.1).

To explain this impact, Mr. Johnson's Report analyzes relevant internal AMH and Kingfisher documents that ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

Mr. Johnson's review of technical and financial materials and related evidence led him to conclude that the financial relationship between Kingfisher and AMH was a "material deviation from industry norm" that "overly benefited Kingfisher at the expense of AMH" because, among other things, AMH paid Kingfisher "abnormally high rates for the midstream services that KFM provided (in comparison to the fees it charged third-party customers)." (*Id*. at ¶ 88). Mr. Johnson's Report also details operational issues that occurred within Kingfisher Midstream, and he concludes that "Kingfisher's infrastructure,

including its pipeline system, was poorly constructed with timing delays and operating inefficiencies on both KFM's pipeline system and processing plants, creating additional costs to be borne by Alta Mesa." (*Id.* at ¶ 110).  In support, Mr. Johnson explains that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

With regards to Kingfisher's operational issues, Mr. Johnson also explains that, "[d]espite the Company's assurances that '[a]lignment with KFM ensures no curtailments of drilling activities and production due to midstream activities,' there were situations in which Kingfisher's operations caused production delays and curtailment" and, as an example, points to a ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

## ARGUMENTS & AUTHORITIES

### I.   DEFENDANTS' CHALLENGE TO OPINION "C" ON RELEVANCE GROUNDS IS DEMONSTRABLY SPECIOUS

As discussed above, not only does the Complaint contain a series of allegations based upon misstatements and omissions related to Kingfisher, the summary judgment evidence wholly supports those allegations. *See* Statement of Facts Section A *Supra*.  Quite clearly then, Moving Defendants' challenge to Mr. Johnson's Opinion "c" as "irrelevant and unhelpful to the jury" (*e.g.*, Mot. at 2) is flatly incorrect if not wholly specious.  *See*

*McManaway v. KBR, Inc.*, No. H-10-1044, 2012 WL 13059744, at *3 (S.D. Tex. Aug. 22, 2012) ("The relevance standard is a liberal one").  The documents and materials forming the basis for Mr. Johnson's Opinion "c" are largely technical in nature, and his explanation of those materials and his related analysis and conclusions will manifestly assist the jury in evaluating a core part of this case, whether Defendants misled investors.  *See*, *e.g.*, *Abbott v. Trustmark Nat'l Bank*, No. 4:22-CV-00800, 2022 WL 14813716, at *2 (S.D. Tex. Oct. 3, 2022).  Here, the Complaint identifies the "purpose-built" language and other Kingfisher-related misstatements and omissions in the Proxy as designed to mislead Class members from casting an accurate vote on the De-SPAC, and it is difficult to conceive of how an expert's analysis of *why* the statement concerning the synergies was inaccurate will not help the jury determine whether Class Plaintiffs have proven essential elements of their Section 14(a) claim—namely, that Defendants misrepresented or omitted a material fact in the Proxy, which was an essential link in closing the Business Combination.  *See*, *e.g.*, *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No, 4:19-CV-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021).

## II.   JOHNSON OPINION "D" IS WELL FOUNDED

Moving Defendants' challenge that Mr. Johnson's Opinion "d" lacks adequate basis because Mr. Johnson "does not have any evidence that Kingfisher in fact lost third-party business due to 'poor design' or 'operations'" (Mot. at 5) is a red herring that strips the challenged portion of the opinion from its context and mischaracterizes the challenged portion of the Opinion, which states that the infrastructure issues "may have also undermined its efforts to obtain business from third-party producers." (*Id.*).  Mr. Johnson's

Opinion "d" does not attempt to quantify the amount of lost business; rather, it simply concludes that these known problems may have undermined efforts to obtain business from third-party producers, which Defendants undisputedly did not do post De-SPAC.  Mr. Johnson's analysis of the known infrastructure and design problems and the consequent capital expenditure costs will clearly assist the jury in evaluating whether Alta Mesa's representations in the Proxy touting Kingfisher's growth potential with third-party customers were unreasonable and misleading and is also directly relevant to the jury's consideration of whether it was reasonable to include revenue from non-customer third parties in the Proxy projections as Defendants contend.  It will also assist the jury in evaluating other statements alleged to be false and misleading in the Complaint, including that "Chapelle further stated that despite the 'setbacks,' Kingfisher's 'vision for growth remain[s] strong.'"  (*E.g.*, Complaint at ¶ 142).  And, of course, Mr. Johnson's Opinion "d" is supported directly by his analysis of evidence that Kingfisher's infrastructure and operational problems caused Kingfisher to delay well connections and also required Alta Mesa to use Kingfisher's competitors.  (Report at ¶ 121; JX 4.).

In this regard, *Puga v. RCX Solutions, Inc.*, relied on by Moving Defendants, actually supports the admissibility of Mr. Johnson's opinion.  *See Puga*, 922 F.3d 285, at 293 (holding that "[t]he district court did not abuse its discretion in allowing [witness] to offer an expert opinion on the cause of the accident" where he "considered an appropriate amount of physical evidence at the scene of the crime to offer his opinion, and [defendant] had ample opportunity to show the jury any flaws in his opinion.").

### III.   MR. JOHNSON'S OPINION CONCERNING THE "RISK FACTOR" IS BASED ON DEMONSTRABLE FACTS

Moving Defendants challenge Mr. Johnson's Opinion "e" asserting that Mr. Johnson "did no independent economic analysis to quantify whether" an incident where a customer rejected NGLs due to excess methanol "had a material impact on Kingfisher's financial performance." (Mot. at 6). Moving Defendants miss the point. Mr. Johnson's Opinion "e" concludes that the putative risks warned of in Alta Mesa's "Risk Factor" in the March 29, 2018 Form 10-K concerning purported future potential impacts on Kingfisher's volumes were already occurring:

> Kingfisher's warning to investors in March 2018 that it may in the future have profit and cash flow problems "if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect" reflected conditions that already existed rather than reflecting a potential outcome.

(Report at ¶ 8.e). Of course, as alleged in the Complaint, this "Risk Factor" violated the long-settled principle that "[a]n issuer cannot list its lines of business, say we could have problems in any of these, and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 492 (S.D. Tex. 2016).

And Mr. Johnson refers to the loss of business due to Kingfisher's customer Chisolm for precisely that reason, as an example that the warned of quality-control and infrastructure risks had already manifested before Defendants' eyes. The same is true of Mr. Johnson's reference to ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

Moving Defendants are, of course, entitled to ask Mr. Johnson during cross examination about the economic impact of non-conforming volumes on Kingfisher's system as of March 2018, but the *fact* that Kingfisher had non-conforming volumes in its system before March 2018 is uncontroverted and admissible to assist the jury in evaluating whether the putative risks warned of in the "Risk Factor" already existed and were known at the time the warning was made. *See*, *e.g.*, *Browning v. Sw. Research Ins.*, No. SA–05–CA–0245–FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006) ("[The expert] provides evidentiary support and reasoning for his assumptions. While [defendant] disagrees with [the expert's] assumptions, these challenges are best left to proper cross examination."); *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA–16–CA–00485–FB–ESC, 2017 WL 1133506, at *5 (W.D. Tex. Mar. 24, 2017) ("While [movant] may disagree with the facts upon which [the expert] bases his analysis, the proper vehicle for [movant] to challenge [the expert's] opinion is cross-examination.").

## CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully request that the Court deny Moving Defendants' limited challenges to Mr. Johnson's expert opinion in its entirety.

17

Dated: January 18, 2024                                      Respectfully submitted,

/s/ Andrew J. Entwistle                                     /s/ Trig Smith
Andrew J. Entwistle (attorney-in-charge)                    Trig Smith (*pro hac vice*)
State Bar No. 24038131                                      Lonnie Browne (*pro hac vice*)
Callie Crispin                                              John Kelley (*pro hac vice*)
State Bar No. 24104231
Sal H. Lee                                                  **ROBBINS GELLER RUDMAN &**
State Bar No. 24127308                                      **DOWD LLP**
                                                            655 West Broadway, Suite 1900
**ENTWISTLE & CAPPUCCI LLP**                                San Diego, CA 92101
500 West 2nd Street, Suite 1900                             Telephone: (619) 231-1058
Austin, TX 78701                                            Facsimile: (619) 231-7423
Telephone: (512) 710-5960
Facsimile: (212) 894-7278                                   *Court-Appointed Co-Lead Counsel*

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*


Carol Villegas (*pro hac vice* forthcoming)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW
LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven
Fund, A Series of Frank Funds Trust*