**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957<br><br>**PUBLIC VERSION OF DKT. 555** |

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO**
**EXCLUDE CERTAIN OPINIONS OF EXPERT TAYLOR KIRKLAND**

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

STATEMENT OF ISSUES TO BE RULED UPON ........................................... 2

LEGAL STANDARD ......................................................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 3

STATEMENT OF FACTS ................................................................................... 8

      A.    Defendants Knowingly Overestimated Reserves and Used
            Aggressive Assumptions without a Reasonable Basis ................................. 8

      B.    Alta Mesa Used ESPs to Inflate Short-Term Production Results ................. 9

      C.    Alta Mesa Management Lied to KMPG's Investigator After the
            Scheme Collapsed ...................................................................................... 10

      D.    Mr. Kirkland's Reports ............................................................................... 11

      E.    Mr. Kirkland's Challenged Opinion Concerning Misuse of ESPs ............... 12

      F.    Mr. Kirkland's Unchallenged Opinions Concerning Alta Mesa's
            Drilling Practices ....................................................................................... 14

ARGUMENTS & AUTHORITIES ..................................................................... 15

I.     MR. KIRKLAND'S WELL-SUPPORTED OPINION REGARDING ALTA
      MESA'S COSTLY AND UNECONOMICAL USE OF ESPS IS RELIABLE ..... 15

II.    MR. KIRKLAND'S OPINION REGARDING THE OSAGE BEHAVING AS
      ONE UNIT IS AN INTERPRETATION OF TECHNICALLY COMPLEX
      STATEMENTS AND DATA, NOT AN IMPERMISSIBLE STATE-OF-MIND
      OPINION ....................................................................................................... 18

III.   MOVING DEFENDANTS' ISSUES ARE PROPERLY ADRESSED TO THE
      JURY THROUGH CROSS-EXAMINATION ...................................................... 21

CONCLUSION ................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Browning v. Sw. Research Institute*,
    No. SA–05–CA–0245–FB, 2006 WL 6549921 (W.D. Tex. Aug. 17, 2006) ......... 22

*Daubert v. Merrel Dow Pharms., Inc.*,
    509 U.S. 579 (1993). ................................................................................................... 3

*De Luna v. Hidalgo County, Tex.*,
    853 F. Supp. 2d 623 (S.D. Tex. 2012) ....................................................................... 6

*Mathis v. Exxon Corp.*,
    302 F.3d 448 (5th Cir. 2002). ................................................................................... 3

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
    382 F.3d 546 (5th Cir. 2004) ................................................................................... 3

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019) ................................................................................... 2

*Silverman v. Watson Pharms., Inc.*,
    No. H–10–1952, 2013 WL 1413782 (S.D. Tex. Apr. 8, 2013) .............................. 22

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ................................................................................... 2

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*,
    No. SA–16–CA–00485–FB–ESC,
    2017 WL 1133506 (W.D. Tex. Mar. 24, 2017) ....................................................... 22

## NATURE AND STAGE OF PROCEEDINGS

This is a certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Exchange Act. (Dkt. 241). The dispute arose in the wake of the catastrophic collapse of Alta Mesa within a year after it was taken public on February 9, 2018 at a valuation of $3.8 billion by way of a SPAC named Silver Run II.  On February 12, 2018, Defendants began discussing whether and how to disclose a nearly 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it.  Within two months of the De-SPAC, Defendants announced the cut to Kingfisher's 2018 EBITDA projections and partially restated Alta Mesa's production and reserve projections to acknowledge what Alta Mesa had known since before August 2017—that it simply could not get sufficient oil and gas out of the ground to meet the production and reserve projections that Defendants grossly misrepresented and overstated in the Proxy Statement for the De-SPAC.  Less than a year after asking for shareholder approval, Alta Mesa admitted its assets were overstated at the time of the Proxy, writing off approximately $3.2 billion of the $3.8 billion valuation it touted to investors at the time of the De-SPAC.  Alta Mesa filed for bankruptcy protection just seven months later.

On August 31, 2023, Class Plaintiffs' expert in reservoir engineering in the oil-and-gas exploration and production ("E&P") industry, Taylor Kirkland, issued his expert Report that considered issues directly related to the core assumptions forming the basis for the so-called "base case" for the overstated reserve and production projections contained in the Proxy, including well-interference, "parent" and "child" wells, pattern testing, and use of ESPs, and on October 19, 2023, Mr. Kirkland issued his Rebuttal Report regarding

spacing test data, when Alta Mesa could make certain determinations based on the production results available to them, and Alta Mesa's usage of ESPs, in response to various opinions submitted by certain Defendants' experts Edward James Fetkovich and Robert Rasor.

On December 22, 2023, Moving Defendants filed their Motion to exclude certain opinions of Mr. Kirkland.  Class Plaintiffs hereby oppose the exclusion of any portion of Mr. Kirkland's opinions for the reasons set forth herein.

### STATEMENT OF ISSUES TO BE RULED UPON

1.      Is Mr. Kirkland's opinion that Alta Mesa's use of ESPs resulted in exorbitant and unnecessary costs sufficiently reliable so that it is appropriate for the jury's consideration?

2.      Whether the discrete portions of Mr. Kirkland's Report interpreting Alta Mesa's presentation on the benches in the Osage reservoir should be excluded at trial?

### LEGAL STANDARD

"While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (citation omitted).  The trial court must "ensur[e] that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Id.* at 294.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987);

*see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004) (holding that challenges to the bases and sources of an expert's opinion go to weight rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence").

Where, as here, an expert's opinion is based on experience and specialized knowledge, the factors in *Daubert* may or may not be relevant to assessing reliability. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (noting "it is appropriate for [a] court to consider factors other than those listed in *Daubert* to evaluate reliability" where the opinion is premised on "personal observations, professional experience, education and training").

Exclusion is available but disfavored in this Circuit. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). "The *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants told investors voting to approve Silver Run II's purchase and combination of upstream Alta Mesa Holdings L.P. ("AMH") and midstream Kingfisher Midstream L.P. that the "base case" for oil and gas production on AMH's acreage—and thus the core assumptions for reserve and production projections to justify the De-SPAC and $3.8 billion valuation of the combined company—was 12 wells per square-mile "Section" and 250,000 barrels of oil (250 "MBO") per well, for an estimated recovery of

3 million barrels (3 "MMBO") per Section.  But discovery has revealed that the Proxy, Management, and Board Defendants all knew that test results and actual production results on drilled wells showed that the 250 MBO type curve could not be achieved anytime more than 4 wells per Section were drilled.[1]  AMH's own consultants calculated that the recovery per Section would be substantially lower.

Their gross manipulation and overstatement of AMH's internal data and actual production enabled Defendants to get Silver Run's shareholders to vote for the transaction (creating Alta Mesa Resources, Inc. ("Alta Mesa" or the "Company")), but ultimately forced Alta Mesa to take a $3.2 billion impairment *less than twelve months* after the De-SPAC Defendants valued at $3.8 billion—ultimately costing Silver Run II's public investors their entire $10 per share investment (approximately $1 billion).

 Mr. Kirkland speaks directly to these core issues in this case.[2]  Moving Defendants do not challenge Mr. Kirkland's qualifications as an expert in the E&P industry, how could they?  Mr. Kirkland has been a reservoir engineer for 14 years and has specialized in designing completions and artificial lift programs and evaluating well results and economics. Rather, they challenge an exceedingly narrow portion of his opinions, on

---

[1] The Proxy, Management, Board, and Control Entity Defendants (with Defendant Alta Mesa, the "Defendants") are listed in the *Third Consolidated Amended Complaint for Violations of the Federal Securities Laws* (the "Complaint") at ¶¶ 43-59.

[2] *See Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Expert Taylor Kirkland Under Rule 702* (Dkt. 508, the "Motion" or "Mot.").  Moving Defendants are Alta Mesa; Control Entity Defendant Riverstone Holdings, LLC; Management Defendants Harlan H. Chappelle, Michael E. Ellis, and Ronald J. Smith; Proxy Defendants James T. Hackett Stephen S. Coats, William D. Gutermuth, Jeffrey H. Tepper, Thomas J. Walker, and Diana J. Walters; and Director Defendants Pierre F. Lapeyre, Jr., David M. Leuschen, and Donald R. Sinclair.

largely semantic grounds.

Mr. Kirkland concludes in his expert report[3] that the assumptions underlying Alta Mesa's projections were unfounded and contrary to the evidence available at the time and that Alta Mesa's ESP program resulted in a short-term increase in oil production without increasing the overall oil recovery. Moving Defendants challenge none of this.

Specifically, Mr. Kirkland's extensive review of the discovery materials in this case and relevant Alta Mesa presentations and public filings caused him to independently offer four highly relevant opinions through his Report:

(a) As of August 16, 2017, Alta Mesa did not have a reasonable basis to conclude that its STACK acreage could support 12 wells per section at the represented 250 MBO/650 MBOE type curve or to conclude that wells drilled at a density of more than 4 wells per section would yield production results generally in line with results obtained from single wells.

(b) At all times after the end of 2017, the production data available to Alta Mesa strongly indicated that wells drilled in patterns of more than 4 per section would yield significantly less oil and gas than single wells. By the end of 2017, Alta Mesa did not "de-risk" its acreage with regard to more than 4 well per section spacing.

(c) Alta Mesa's 250 MBO/650 MBOE type curve as of August 2017 was not a reliable predictor of future well performance because the data set used to derive this type curve included more than 80% parent wells while the vast majority (90%+) of future development would be child or sibling wells. In March 2018, Alta Mesa combined Gen 2.0 and 2.5 wells to maintain the 250 MBO type curve. At this time, data was available on 46 child wells to help build a more representative type curve, but 72% of them were excluded. The net result was a type curve

---

[3] *See* August 31, 2023 Expert Report of Taylor Kirkland (the "Report" or "Rpt.") at ¶ 2(d), attached as KX 1 to the *Declaration of Andrew J. Entwistle in Opposition to Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Expert Taylor Kirkland Under Rule 702* (the "Entwistle/Kirkland Declaration").

that was now 90% parent wells and even less representative of go-forward development.

(d)    Alta Mesa used ESPs widely, including on numerous wells that were not proper candidates, the effect being a short-term production boost at an exorbitant cost without increasing the overall recovery expected from the acreage.

Moving Defendants do not challenge opinions (a), (b), and (c) and thus concede that Mr. Kirkland can present testimony to the jury on Alta Mesa's testing, purported "de-risking," and type curves.

Moving Defendants only challenge opinion (d) and do so only to the extent that it characterizes the cost of ESPs as exorbitant and uneconomical.  (Mot. pp. 2-4).  But in doing so, they do not challenge either the science or the methodology.  Fully distilled, Moving Defendants simply do not like the opinion, which is properly left for cross examination at trial for the jury to determine the weight it should be given, not a *Daubert* motion.  *See*, *e.g.*, *De Luna v. Hidalgo County, Tex.*, 853 F. Supp. 2d 623, 652 (S.D. Tex. 2012) ("The Court cannot take on the role of fact-finder in fulfilling its role under *Daubert,* and must allow the jury to determine [plaintiff's] credibility and the weight to be given to [the expert's] report. In this regard, Defendants' use of the adversary process can adequately address their concerns.").

Moving Defendants' challenge to Mr. Kirkland's comments about Alta Mesa's ESP program and its (lack of) overall economic justification is similarly misplaced.  *First*, as Mr. Kirkland explained in his deposition, Alta Mesa never provided the accounting data needed to conduct a full economic analysis.  *Second*, such an analysis is not needed for Mr. Kirkland to assist the jury to understand proper and improper uses of ESPs.  Mr. Kirkland's

opinion is based on his extensive experience, which more than adequately reflects his specialized knowledge and familiarity with evaluating the installation of different forms of artificial lift in oil and gas wells (including specifically ESPs) and determining how to achieve results most effectively based on available well characteristics and data.  Regarding the cost, it is plainly appropriate for an expert to explain to the lay jury that ESPs are the most expensive artificial lift option and to describe the cost in qualitative terms based on his experience.  The lack of "financial data" confirming the content of Alta Mesa's internal emails concerning its ESP usage just goes to the weight of the evidence, not its admissibility.  Moving Defendants may not like that Mr. Kirkland used the terms "exorbitant" and "massive" to describe the costs associated with ESPs, but that is not a reason to exclude his testimony (*see* Part I, *infra*).

Moving Defendants also challenge what they mischaracterize as a purported "state of mind" opinion of Defendants' belief as to whether one or two "benches" were present in the Osage reservoir.  (Mot. pp. 5-6).  "Bench" is a colloquial term for horizontal layers in geological formation from which hydrocarbons can be recovered.  Relevant here is whether Alta Mesa's STACK acreage had two distinct, non-communicating benches in the Osage rock as opposed to one comingled bench where one well can drain hydrocarbons from the entire layer.  Mr. Kirkland does not offer an opinion on anyone's state of mind regarding benches in the Osage reservoir.  Rather, in a paragraph outside of his core opinions (but well within his expertise), Mr. Kirkland explains the implications of a highly technical aspect of a presentation prepared and published by Alta Mesa (*i.e.*, what the presentation means to a person experienced in oil and gas production).  Moving Defendants

may not like the fact that the evidence makes clear their putative assumption regarding multiple benches was baseless and contradicted by their own observations (KX 11), but that does not change the fact that the observation in the Kirkland Report is apt, well founded, and will assist the jury in understanding the technical issues here (*see* Part II, *infra*).

## STATEMENT OF FACTS

### A. Defendants Knowingly Overestimated Reserves and Used Aggressive Assumptions without a Reasonable Basis

Leading up to and following Alta Mesa's transformation into a $3.8 billion publicly held company, various Defendants made a series of public misstatements regarding, among other things, the Company's oil reserves and drilling locations and its confidence in its plan to develop its acreage, while omitting the Company's undisclosed strategic decisions to temporarily inflate oil production rates at the expense of the long-term viability of its operations. In order to entice approval of the De-SPAC and enlarge their share of the new public company, Defendants presented, as "de-risked," a "base case scenario" in which Alta Mesa would recover an average of 3 million barrels of oil per drilling Section by drilling 12 horizontal oil wells in each Section with a type curve of 250 MBO per well. To sell investors on this plan, Alta Mesa presented stale and manipulated production data, and concealed or obfuscated "negative data point[s]" (KX 1).

In reality, Alta Mesa's internal production and testing data did not reasonably support Alta Mesa's "base-case" when it was presented in August 2017 (when the De-SPAC was announced). And by the time Defendants issued their January 19, 2018

definitive proxy statement (the "Proxy") urging public shareholders to vote for the De-SPAC, Alta Mesa's undisclosed data showed that the "base case" was not achievable.

### B.   Alta Mesa Used ESPs to Inflate Short-Term Production Results

In 2018, after the De-SPAC closed, to "make a dent in the production shortfall," Alta Mesa—at the direction of CEO and COO Defendants Chappelle and Ellis—implemented an "aggressive artificial lift program" that focused on installing ESPs, which produce fluids from a well faster but are very costly and typically do not materially increase the estimated ultimate oil recovery ("EUR") from a well over time. (KX 13).

Alta Mesa's widespread and indiscriminate deployment of ESPs in 2018 was an artifice to boost short-term production and thereby conceal the fact that the acreage was not as productive as the public had been told.  Alta Mesa's artificial lift team, whose mission was ostensibly to determine and deploy the most effective form of lift for each well, insisted to management that there were very few wells at Alta Mesa that were proper candidates for ESPs.  (KX 5 at 105:7-106:4).  Alta Mesa's internal economic analyses at the time showed that the ESPs did not make economic sense for most of the wells in which they were installed, and Alta Mesa's Vice President of Finance acknowledged internally that Alta Mesa was using them to "chas[e] production." (KX 17; *see also* KX 16; KX 5). When Alta Mesa's artificial lift expert told Mr. Chappelle that the ESP program did not make economic sense, Mr. Chappelle pretended not to hear him and walked away. (KX 5 at 153:1-19).  Despite installing over 90 ESPs in 2018—many in wells that Alta Mesa's own artificial lift team advised were not proper candidates—Alta Mesa and Mr. Chappelle

promoted the success of Alta Mesa's artificial lift program, untruthfully claiming they were "disciplined" with ESPs being used selectively.  (*See*, *e.g.*, KX 15 at slide 9).

### C.    Alta Mesa Management Lied to KMPG's Investigator After the Scheme Collapsed

In February 2019, Alta Mesa announced that it had ineffective internal controls and needed to write down approximately $3.2 billion of goodwill due to an impairment it admitted had existed since at least the De-SPAC transaction.  The impairment was, of course, driven by the fact that Alta Mesa did not have, and never had, recoverable oil reserves in quantities anywhere near those presented in the "base case."  Management told Alta Mesa's financial auditor, KPMG, that ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████  Although no witness has been willing to repeat that excuse under oath, KPMG accepted it uncritically at the time and, based on that excuse (and outright lies about prior drilling practices), closed its cursory investigation.  Among the numerous documents showing that management knew there were not three distinct benches is a highly technical public presentation that was released on March 29, 2018, which presents well-spacing information in a way that only makes sense if the author assumed that there was only one bench in the Osage layer. (KX 12; *see also* Report at ¶¶ 53, 59.)

### D.      Mr. Kirkland's Reports

Based on Mr. Kirkland's knowledge and first-hand experience studying other operators' early spacing tests in the STACK and directly overseeing the installation of various forms of artificial lift, including ESPs, and a thorough review of the record—including deposition testimony and extensive, internal-technical Alta Mesa documents surrounding Alta Mesa's projections and results, well spacing and spacing tests, type curves, drilling locations, and use of ESPs—Mr. Kirkland opined that "Alta Mesa's projections were overstated because they relied on unfounded assumptions contrary to the evidence available at the time" and that "Alta Mesa used uneconomical practices to artificially increase production for the short term." (*See* Report at ¶ 2).

Mr. Kirkland also submitted a rebuttal report on October 19, 2023 (the "Rebuttal Report"), responding to various opinions submitted by Defendants' experts Edward James Fetkovich and Robert Rasor, regarding spacing test data, when Alta Mesa could make certain determinations based on the production results available to them, and Alta Mesa's usage of ESPs.

Both of Mr. Kirkland's reports examine in detail Alta Mesa's production data at various points in time and compare that data to what was publicly presented, illustrating in detail why the data presented to the public did not accurately convey the actual results.  Mr. Kirkland's reports also explain the technical meaning of words and phrases in Alta Mesa's internal discussions to help the tribunal and jury understand this technical evidence.

### E.     Mr. Kirkland's Challenged Opinion Concerning Misuse of ESPs

Defendants challenge only a single phrase in Mr. Kirkland's opinion (d) related to

Defendants misuse of ESPs:

> Alta Mesa used ESPs widely, including on numerous wells that were
> not proper candidates, the effect being a short-term production boost
> <u>at an exorbitant cost</u> without increasing the overall recovery expected
> from the acreage. (Report at ¶ 2(d) (underline added)).

But Mr. Kirkland's Report explains in great detail and plain English what artificial

lifts are and the circumstances in which it is appropriate to use an ESP.  For example, Mr.

Kirkland explains that "[t]ypically, ESPs are used in high fluid volume wells where other

forms of artificial lift are insufficient to move the fluid required to reduce the flowing

bottom hole pressure ('FBHP')" (Report at ¶ 92).  He further explains the select

circumstances for proper use of ESPs and that otherwise ESPs have no appreciable effect:

> Reduction of FBHP is critical to drawing hydrocarbons to the
> wellbore and is why ESPs are necessary in order to produce
> meaningful oil on very select wells that have high water
> production. In most cases, any properly designed artificial lift
> method can ultimately draw the FBHP to the same point, which
> would tie to ultimate recovery of hydrocarbons. That is to say,
> in a well without an abnormal rate of water production, the
> artificial lift method has minimal to no effect on ultimate
> recovery. What it can affect, though, is how quickly the
> reserves are produced" (¶ 92).

As to Alta Mesa specifically, Mr. Kirkland's ESP opinion analyzes when Alta Mesa

began utilizing ESPs with frequency (April 2018) (Report at ¶ 94) and his analysis of the

wells on which Alta Mesa implemented ESPs, including his opinion that, of the first 49

ESPs that Alta Mesa installed, only 25% were properly used on high-water wells, and thus,

were likely economical, while the remaining 75% were "a coinflip at best" (*Id*. at ¶ 96).

Mr. Kirkland's ESP opinion also summarizes his analysis of production trends of individual wells following the installation of ESPs in comparison to the wells' prior, pre-ESP trends, which is the result that must be weighed against the cost of the ESP installation in the economic analysis. (*Id*. at ¶ 97).

Mr. Kirkland also explains with specificity several reasons why an ESP is a more expensive form of artificial lift compared to other options. For example, Mr. Kirkland explains:

> Even more meaningful to the economics is the failure rate of ESPs. ESPs often have the highest failure rate of any lift method, especially compared to gas lift, and the cost to repair ESPs is much higher than other lift methods. That is, ESPs fail more often, and when ESP failures occur, the remedial work is more expensive. To repair a gas lift installation, it might cost $25k, while an ESP workover is at least $100k because it typically requires a new pump and cable. In my experience, an ESP failure is at least an annual event for a given ESP" (Report at ¶ 100).

And in his Rebuttal Report, which he submitted in response to the reports of Defendants' experts Messrs. Fetkovich and Rasor, Mr. Kirkland explains how installation of an ESP on one well can effectively steal production from a nearby well: "While ESPs may result in an increase in production on the installation well, installing an ESP often decreases production of the offsetting well by a comparable amount" (KX 2 at ¶ 42). Mr. Kirkland details that this, in fact, did occur in two of Alta Mesa's early spacing tests, and "[i]n both cases, the net production gain is less than the production of the ESP well, meaning that some of the oil production gained through the ESP well is at the expense of production in the offsetting wells." (*Id*.).

13

**F.     Mr. Kirkland's Unchallenged Opinions Concerning Alta Mesa's Drilling Practices**

While not challenged on this motion, Mr. Kirkland's opinions (a), (b), and (c) provide important context for this Motion.  In this regard, Mr. Kirkland explains with specificity how the assumptions underlying Alta Mesa's drilling program were unreasonable and contradictory to known evidence.  For example, after analyzing all of Alta Mesa's spacing tests prior to year-end 2017, Mr. Kirkland explains that Alta Mesa's most relevant tests to evaluate its stated base-case assumption for recoverable oil in place was the spacing tests that had the tightest spacing and most-developed sections because "[r]ecoverable oil in place is largely not dependent on optimal spacing, and, consequently, an over-developed section can be a useful predictor of recoverable oil" (Report at ¶ 69). The most relevant tests were the two spacing tests with 10 wells per section each, the Bullis-Coleman and Ash-Foster units.  However, Mr. Kirkland found that the results of these units was far from optimal and explained:

> The fact that both units that fully developed the Osage had total recoverable reserves of less than half the assumption by YE17 in the Bullis-Coleman and by early 2018 in the Ash-Foster should have caused Alta Mesa to rewrite their assumptions. However, it took Alta Mesa until 2019 to make any such change to their public assumptions about recoverable OOIP. I have not seen any reasonable explanation why it took Alta Mesa so long to make this revision.  (*Id*. at ¶ 72).

Mr. Kirkland also explains that "Alta Mesa rationalized their 12 wells per section assumption by using partial unit development that they claimed 'implied' spacing of a much higher well count" (Report at ¶ 34).  In other words, "Alta Mesa drilled as few as 3 wells in certain of its spacing tests and claimed that those spacing tests represented ultimate

14

spacing of 12 or more wells per section," but doing so "was not a reasonable approach given the available data."  (*Id*.).

## ARGUMENTS & AUTHORITIES

Moving Defendants do not challenge the relevance, reliability, or admissibility of Mr. Kirkland's opinions (a) - (c) regarding the (lack of) basis for Alta Mesa's touted 12 wells per Section drilling plans or for its accompanying reserve and type-curve assumptions, which were categorically unreasonable given the information Alta Mesa had available at the time.  Nor do they challenge Mr. Kirkland's qualifications as a reservoir engineering expert—which includes prior industry experience analyzing artificial lift methods to optimize production in oil and gas wells and evaluating the economics associated with well results.  (*See* Report at Exhibit B).  Accordingly, Moving Defendants concede that Mr. Kirkland can present testimony to the jury on the opinions that are central to Class Plaintiffs' claims.

Moving Defendants challenge only two narrow aspects of Mr. Kirkland's expert opinions, both of which fail in law and fact.

## I. MR. KIRKLAND'S WELL-SUPPORTED OPINION REGARDING ALTA MESA'S COSTLY AND UNECONOMICAL USE OF ESPS IS RELIABLE

Moving Defendants claim that Mr. Kirkland could not have concluded Alta Mesa's use of ESPs was "uneconomical" without reviewing all of Alta Mesa's financial data or conducting "any economic analysis of profitability." (Mot. at 3).  That argument is wholly disingenuous because ESP-related economic documents were not produced in this litigation, by Defendants or otherwise.  Moving Defendants also flagrantly ignore that

Defendants' own expert, Mr. Fetkovich, had to use cost "guesses" for his analysis for this very reason. Moving Defendants may not, on one hand, fail to produce the documents necessary to perform a more thorough and specific ESP economic analysis while, on the other hand, argue that Mr. Kirkland's ESP opinion is unreliable because he failed to analyze the same non-produced ESP-related economic documents. Moreover, Moving Defendants mischaracterize the opinion: Mr. Kirkland did not conclude that the ESP program was ultimately uneconomical, but rather explains why certain technical data available in 2018 indicated that such a program would be uneconomical.

Moving Defendants quote Mr. Kirkland's deposition testimony in which he acknowledges that he did not review such documents, but Moving Defendants conveniently leave out Mr. Kirkland's deposition testimony explaining that, to his knowledge, no ESP-economic documents were in the document productions:

> Q. Why didn't you review the financial data at -- from AMH/AMR about the installation and operation of ESPs?
>
> A. I tried to. I asked for it. ***But the data that was required for that, I don't believe we could get it from the production, from -- from the document production***.
>
> Q. What did you do to understand that the financial data, necessary to analyze whether -- whether or not ESPs were economic at Alta Mesa, was not obtainable through the productions that you had access to?
>
> A. ***I did a significant amount of searching in the data production***, as well requested from Entwistle & Cappucci help on -- on locating that, and we were unable to do so.

(KX 3 at 41:2-8, 16-24).

It is ironic that Moving Defendants criticize Mr. Kirkland's (non)opinion in this regard. Defendants' expert also did not review the actual costs of the ESP program because

Alta Mesa did not bother to find and produce the required documents.  Rather, Defendants'

expert guessed at the costs and then plugged his guesses into a formula, ultimately

presenting his guesswork calculation as quantitative and precise, which **is** a basis for

exclusion of **their** expert (*see* Dkt. 516).

In any case, an economic analysis of the ESP program is unnecessary.  Mr. Kirkland

reviewed Alta Mesa's production data from wells with ESPs and concluded that the ESPs

did indeed boost short-term production in certain wells but did not increase the overall

production from the area.  (*See* Report at ¶ 2(d)).  Mr. Kirkland also reviewed the data

available to Alta Mesa pre-installation and concluded that, while some wells were proper

candidates for ESPs, based on their characteristics, numerous were not.  (*Id.*).  These

opinions support the inference that Class Plaintiffs will urge at trial, that the Alta Mesa's

top management deliberately used ESPs to inflate short term production because they knew

that they otherwise could not meet their projections and needed to maintain a high stock

price long enough for their stock restrictions to expire and their earn-outs to trigger.

Moving Defendants also incorrectly assert that Mr. Kirkland's ESP opinion is

"based on reading a few internal emails and documents and surmising their meaning

without any independent economic analysis" and argue that "the jury can read the same

documents and reach their own conclusion about what those documents mean."  (Mot. at

3).  They are wrong for two reasons.  *First*, Mr. Kirkland's opinions regarding ESPs go

well beyond the narrow scope that Moving Defendants describe and include the fact that

ESPs did not increase overall ultimate production in the acreage (Report at ¶ 2(d)), and it

is uncontroverted that Defendants themselves did not subject their ESP program to the sort

of pre-implementation analysis that is standard in the industry. (*Id*. ¶ 101).

*Second*, because Alta Mesa did not produce its accounting data regarding the costs of the ESP program, Mr. Kirkland used other contemporaneous internal documents (which were produced) to discern those costs. (*Id*. at ¶ 98). However, the emails were contradictory. Nevertheless, Mr. Kirkland can "bring to the jury more than the lawyers can offer in argument," because he can explain the technical aspects and terms of those documents. (*See*, *e.g.*, KX 14; KX 17; KX 18) (technically complex internal Alta Mesa documents Mr. Kirkland used to shed light on ESP costs, even though estimates are not exact). Accordingly, Mr. Kirkland's opinion on this issue will assist the jury and should not be excluded.

## II. MR. KIRKLAND'S OPINION REGARDING THE OSAGE BEHAVING AS ONE UNIT IS AN INTERPRETATION OF TECHNICALLY COMPLEX STATEMENTS AND DATA, NOT AN IMPERMISSIBLE STATE-OF-MIND OPINION

As the Moving Defendants acknowledge, Mr. Kirkland confirmed during his deposition that he was not opining as to Alta Mesa's subjective beliefs. Yet Defendants still appear to misunderstand Mr. Kirkland's opinion in paragraph 53 of his Report. To be clear: Mr. Kirkland analyzed a highly technical presentation that Alta Mesa published on March 29, 2018. (KX 12). Mr. Kirkland is prepared to explain to the jury why this presentation of data acknowledges implicitly that the Osage layer was behaving as a single unit. (*Id.*). This is an opinion about what Alta Mesa ***said it believed***, which is derived from Mr. Kirkland's long experience in analyzing the exact type of technical data presented in KX 12. Specifically, the language from Mr. Kirkland's Report that Moving Defendants

quote "believed" (Mot. at 5) was based on record evidence showing that Alta Mesa itself "started to describe the spacing between wells within the Osage as one unit, rather than the distance between wells within the upper or lower Osage benches."  Mr. Kirkland observed this was an unexplained change when comparing the technical data in Alta Mesa's public presentations and internal documents.

Ultimately, it will be up to the jury to determine whether any person at Alta Mesa actually believed at that time that the Osage layer was behaving as a single unit or any of the other baseless assumptions in the "base case" overstated in the Proxy, and there is ample evidence outside of that referenced in Mr. Kirkland's reports that there were "red flags" regarding those assumptions. By way of example only, in a single email chain (*see* KX 11) with the subject "*Lets stay away from the two eastern sections in 16-5.  BUT lets not give up on 15-5*" among Alta Mesa's chief reserves engineer Tim Turner, Defendant Ellis, and others at Alta Mesa from December 2017 (pre De-SPAC) we see: (1) Ellis state that "I raised red flags here once before" about low producing wells (140 MBO as compared to the 250 MBO type curve), causing him to conclude "So we are zero for three in these 12 sections so far."; (2) Ellis then observes another well in the "Prue Unit" with 85 MBO production was "a negative"; (3) Turner then observes that two producing wells, Old Crab and Sadibug, that were drilled laterally into the lower Osage are "likely draining from upper layers [of the Meramec and Osage] which may be connected naturally or induced"— making clear that Alta Mesa knew that the layers had substantial interference and were naturally connected, thereby contradicting various statements and assumptions that the layers were separate benches; (4) to which Ellis responds, "Eagleford is where the industry

19

realized how important rock typing is. Some rocks maybe 1% recover. Some maybe 15%. I am not saying that you are wrong. We just need to understand what we don't know." To which Turner responds, "Agree. There's a lot we don't know!"—acknowledging the lack of any reasonable basis for their assumptions and that they did not do the rock typing that would have been necessary to draw comparisons to the geologically dissimilar and distant Eagleford play, which subsequent management falsely told investigators was a basis for their assumptions about the number of distinct "benches" in the Osage; and (5) the chain concludes with Turner conceding that even his assumption that the "layers are consistent" is "probably wrong."  (*Id.*).

This one email chain alone, with some explanation of the technical terminology and its import on recovery estimates, would be more than sufficient basis for the jury to adopt Mr. Kirkland's opinions and to reject Defendants' contentions regarding the putative good-faith basis for their base case assumptions underlying the manipulated projections and valuations in the Proxy, but the evidence developed through discovery offers a myriad of other examples proving the issue.  For example, by the end of 2017, Alta Mesa's production data showed that Alta Mesa could not achieve its "base-case" of 12 wells per section at or above a 250 MBO type curve.  By that time, Alta Mesa had production data for 8 multi-well development units containing 43 Osage and Meramec wells.  (Report at ¶¶ 73-74). The average EUR in these units was only 154 MBO, with just 9 of the 43 wells at or above the 250 MBO type curve.  (*Id.*).  In units with 4 or more wells drilled per section, the average EUR ranged from 88 MBO to 188 MBO.  (*Id.*).  Similarly, in early 2017, Alta Mesa's largest spacing test to date, the Bullis-Coleman, which tested 10 wells, produced

results significantly below type curve.  (KX 8; Report at ¶¶ 54-59).  The one spacing test that was most similar to Alta Mesa's "base case," the Ash-Foster, was only 61% of type curve production by March 2018.  (*See* Report at ¶¶ 64-68, 78).

Alta Mesa and the Management and Director Defendants knew that the 12 wells per section "base case" was not achievable.  Although the vast majority of Alta Mesa's planned wells going forward were to be "child" wells (new wells drilled around an already producing "parent" well), Mr. Ellis has testified that the early 2017 "Bullis-Coleman pattern was the first pattern where we -- where it was really obvious that we weren't going to get recoveries out of the children wells that we expected."  (KX 6 at 105:10-17).  With similar sentiment, on May 27, 2017, Senior Engineer Eric Ecklund said to VP of Operations Kevin Bourque: "Like you said, the pattern drills aren't giving us the bang that we hoped." (KX 7).

In short, Mr. Kirkland is able to interpret for the jury technical terms in internal documents that reveal information possessed that was contrary to Defendants statements to investors.

### III.    MOVING DEFENDANTS' ISSUES ARE PROPERLY ADRESSED TO THE JURY THROUGH CROSS-EXAMINATION

Moving Defendants' challenges to Mr. Kirkland's opinions are nothing more than a disagreement with his conclusions and the materials upon which he relied regarding the costs (but not other aspects) of ESPs and a misreading of paragraph 53 of his Report.  These may be proper subjects for cross examination at trial, but they are not a basis to exclude his opinions or testimony.  *See*, *e.g.*, *Silverman v. Watson Pharms., Inc.*, No. H–10–1952, 2013

WL 1413782, at *2 (S.D. Tex. Apr. 8, 2013) ("[Defendant's] criticisms of her opinion go the weight of her testimony, not the admissibility, and are proper subjects for vigorous cross-examination."); *Browning v. Sw. Research Institute*, No. SA–05–CA–0245–FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006) ("[The expert] provides evidentiary support and reasoning for his assumptions. While [defendant] disagrees with [the expert's] assumptions, these challenges are best left to proper cross examination."); *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA–16–CA–00485–FB–ESC, 2017 WL 1133506, at *5 (W.D. Tex. Mar. 24, 2017) ("While [movant] may disagree with the facts upon which [the expert] bases his analysis, the proper vehicle for [movant] to challenge [the expert's] opinion is cross-examination.").

## CONCLUSION

For the foregoing reasons, Moving Defendants' motion to exclude portions of Mr. Kirkland's expert opinion under Rule 702 should be denied.

Dated:  January 18, 2024                              Respectfully submitted,

/s/ Andrew J. Entwistle                              /s/ Trig Smith
Andrew J. Entwistle (attorney-in-charge)             Trig Smith (*pro hac vice*)
State Bar No. 24038131                               Lonnie Browne (*pro hac vice*)
Callie Crispin                                       John Kelley (*pro hac vice*)
State Bar No. 24104231                               **ROBBINS GELLER RUDMAN &**
Sal H. Lee                                           **DOWD LLP**
State Bar No. 24127308                               655 West Broadway, Suite 1900
**ENTWISTLE & CAPPUCCI LLP**                         San Diego, CA 92101
500 West 2nd Street, Suite 1900                      Telephone: (619) 231-1058
Austin, TX 78701                                     Facsimile: (619) 231-7423
Telephone: (512) 710-5960
Facsimile: (212) 894-7278                            *Court-Appointed Co-Lead Counsel*

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*


Carol Villegas (*pro hac vice* forthcoming)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW
LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven
Fund, A Series of Frank Funds Trust*