# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 557**

# CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
# EXCLUDE CERTAIN OPINIONS OF EXPERT HAROLD McGOWEN III

## **TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS .................................................................... 1

STATEMENT OF ISSUE TO BE RULED UPON ........................................................... 2

LEGAL STANDARD ...................................................................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 3

STATEMENT OF FACTS ............................................................................................... 7

      A.    Defendants Knowingly Overestimated Reserves Through
            Unreasonable and Aggressive Assumptions ................................................ 7

      B.    Discovery Reveals that Management "Chased" Production, Using
            ESPs to Artificially Boost Production............................................................ 9

      C.    Mr. McGowen's Conclusions Concerning Alta Mesa's Drilling............... 10

      D.    Mr. McGowen's Conclusions Concerning Alta Mesa's Use of ESPs ........ 14

ARGUMENTS & AUTHORITIES.................................................................................. 15

I.      MR. MCGOWEN'S OPINION THAT ALTA MESA OVERDRILLED IS
        WELL SUPPORTED AND RELIABLE ................................................................. 15

II.     MR. MCGOWEN'S OPINION THAT ALTA MESA MISUSED ESP
        TECHNOLOGY IS RELEVANT AND RELIABLE ........................................... 17

III.    MOVING DEFENDANTS' ISSUES ARE PROPERLY ADDRESSED TO
        THE JURY THROUGH CROSS-EXAMINATION ............................................. 19

CONCLUSION .............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Browning v. Sw. Research Inst.*,
  No. SA–05–CA–0245–FB, 2006 WL 6549921 (W.D. Tex. Aug. 17, 2006) ......... 19

*Burleson v. Tex. Dep't. of Crim. Just.*,
  393 F.3d 577 (5th Cir. 2004) ................................................................................. 17

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................ 3

*De Luna v. Hidalgo Cnty., Tex.*,
  853 F. Supp. 2d 623 (S.D. Tex. 2012) ................................................................. 6, 7

*Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*,
  No. 7:12-cv-00133-O, 2014 WL 3744976 (N.D. Tex. July 30, 2014) ................... 17

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................... 3, 17

*Mathis v. Exxon Corp.*,
  302 F.3d 448 (5th Cir. 2002) ................................................................................... 3

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) ................................................................................... 3

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
  382 F.3d 546 (5th Cir. 2004) ........................................................................ 3, 17, 19

*Puga v. RCX Sols., Inc.*,
  922 F.3d 285 (5th Cir. 2019) ............................................................................... 2, 3

*Silverman v. Watson Pharms., Inc.*,
  No. H–10–1952, 2013 WL 1413782 (S.D. Tex. Apr. 8, 2013) ............................. 19

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*,
  No. SA–16–CA–00485–FB–ESC,
  2017 WL 1133506 (W.D. Tex. Mar. 24, 2017) .................................................... 19

## NATURE AND STAGE OF PROCEEDINGS

This is a certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Exchange Act. (Dkt. 241). This dispute arose in the wake of the catastrophic collapse of Alta Mesa Resources ("Alta Mesa" or the "Company") following a De-SPAC transaction in which two related private companies Alta Mesa Holdings L.P. ("AMH") and Kingfisher Midstream LLC ("Kingfisher") went public via a blank check company, Silver Run II.  On February 12, 2018, Defendants began discussing whether and how to disclose a nearly 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it.  Within two months of the De-SPAC, Defendants cut the Kingfisher 2018 projections in the Proxy by 46% because Alta Mesa could not get sufficient oil and gas out of the ground to meet the production and reserve projections that Defendants grossly misrepresented and overstated in the Proxy.[1]  Then, less than a year after asking for shareholder approval, Alta Mesa wrote off $3.2 billion of its $3.8 billion market value for the same reason—admitting that Alta Mesa's assets were overstated in the Proxy by that amount.  Alta Mesa filed for bankruptcy protection just seven months later.

On August 31, 2023, Class Plaintiffs' expert in the "upstream" aspect of the oil-and-gas exploration and production ("E&P") industry, Harold McGowen III, issued an expert report regarding well-interference, "parent" and "child" wells, pattern testing, and use of ESPs in connection with Defendants' manipulation and misrepresentation of production

---

[1] "Defendants" are listed in the *Third Consolidated Amended Complaint for Violations of the Federal Securities Laws* (the "Complaint") at ¶¶ 43-59.

and reserve projections.[2]   Mr. McGowen proffered four opinions/conclusions, outlined in paragraph 13 of his Report, concerning Alta Mesa's over drilling and use of ESPs.   On December 22, 2023, Moving Defendants moved to exclude opinions (a) and (d) in paragraph 13 under Federal Rule of Evidence 702.   Class Plaintiffs hereby oppose the exclusion of any portion of Mr. McGowen's opinions for the reasons set forth herein.

**STATEMENT OF ISSUE TO BE RULED UPON**

I.      Is Mr. McGowen's opinion (a) that Alta Mesa "over drilled its acreage by placing too many wells in a section" sufficiently reliable and relevant to the disputed issues underlying Class Plaintiffs' claims so that it is appropriate for the jury's consideration?

II.     Is Mr. McGowen's opinion (d) that Alta Mesa's use of electrical submersible pumps (ESPs) in 2018 "was an attempt to inflate production that it knew or should have known would be uneconomic" sufficiently reliable and relevant to the disputed issues underlying Class Plaintiffs' claims so that it is appropriate for the jury's consideration?

**LEGAL STANDARD**

"While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (citation omitted). The trial court must "ensur[e] that the evidence in dispute is at least sufficiently reliable

---

[2] *See Expert Report of Harold E. McGowen III PE*, dated August 31, 2023 (the "Report" or "Rpt."), attached as Exhibit MX 1 to the *Declaration of Andrew J. Entwistle in Opposition to Defendants' Motion to Exclude Experts Under Rule 702* (the "Entwistle/McGowen Decl.").

and relevant to the issue so that it is appropriate for the jury's consideration." *Id.* at 294; *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004) (holding that challenges to the bases and sources of an expert's opinion go to weight rather than admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence").

Where, as here, an expert's opinion is based on experience and specialized knowledge, the factors in *Daubert* may or may not be relevant to assessing reliability. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (noting "it is appropriate for [a] court to consider factors other than those listed in *Daubert* to evaluate reliability" where the opinion is premised on "personal observations, professional experience, education and training").

Exclusion is available but disfavored in this Circuit. "Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). "The *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants told investors voting to approve Silver Run II's purchase and combination of upstream AMH and midstream Kingfisher (the "De-SPAC") that the "base case" for oil-and-gas production on AMH's acreage—and thus the core assumptions for reserve and production projections to justify the De-SPAC and $3.86 billion valuation of the combined company—was 12 wells per square-mile "Section" and 250,000 barrels of

oil ("250 <u>MBO</u>") per well, for an estimated recovery of 3 million barrels ("<u>MMBO</u>") per Section.  But discovery has revealed that the Management and Board Defendants knew that test results and actual production results on drilled wells showed that the 250 MBO type curve could not be achieved anytime more than 4 wells per Section were drilled.  AMH's own consultants calculated that the recovery per Section would be substantially lower.

Their gross manipulation and overstatement of AMH's internal data and actual production enabled Defendants to get Silver Run's shareholders to vote for the transaction (creating Alta Mesa) but ultimately forced Alta Mesa to take a $3.1 billion impairment *less than twelve months* after the De-SPAC Defendants valued at $3.8 billion—ultimately costing Silver Run II's public investors their entire $10 per share investment (approximately $1 billion).

Mr. McGowen speaks directly to the core issues in this case in his Report.  He concludes that Alta Mesa engaged in over drilling and other attempts to artificially boost short-term production to chase the manipulated and unrealistic projections contained in the Proxy so that the Proxy, Management, and Board Defendants could cash out before the truth was revealed.

Moving Defendants do not challenge Mr. McGowen's qualifications as an expert in the E&P industry, how could they?[3]   Mr. McGowen has been building and operating

---

[3] *See Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Expert Harold McGowen III Under Rule 702* (the "<u>Motion</u>" or "<u>Mot.</u>").  Moving Defendants are Alta Mesa; Control Entity Defendant Riverstone Holdings, LLC; Management Defendants Harlan H. Chappelle, Michael E. Ellis, and Ronald J. Smith; Proxy Defendants James T. Hackett Stephen S. Coats, William D. Gutermuth, Jeffrey H. Tepper, Thomas J. Walker, and Diana J. Walters; and Director Defendants Pierre F. Lapeyre, Jr., David M. Leuschen, and Donald R. Sinclair.

upstream oil-and-gas companies for 40 years and has repeatedly served as an expert in the E&P industry on behalf of plaintiffs and defendants.  (*See* Report at ¶ 4).

Mr. McGowen's extensive review of the discovery materials in this case and relevant industry articles caused him to independently offer four highly relevant opinions, which are outlined in paragraph 13 of his Report as follows:

(a)   Alta Mesa over drilled its acreage by placing too many wells in a section, which led to uneconomic drilling costs and much lower than advertised oil recovery per well;

(b)   As of August 2017, Alta Mesa did not possess sufficient empirical data to reasonably validate the various hypotheses that formed the basis for their aggressive development plan.  In particular, Alta Mesa did not complete enough pattern testing, failed to prove its underlying technical assumptions regarding interference, relied on Original Oil in Place (OOIP) and Recovery Factor estimates without any validation, used improper analogs, and applied assumptions from its core area to less proven areas.[4]  In other words, Alta Mesa failed to use Standard Practices when establishing its development plan and its production projections lacked any reasonable bases;

(c)   By August 2017, and continuing through the remainder of 2017 and early 2018, Alta Mesa all but ignored industry information and its own test results that indicated its assumptions were unreasonable, including additional evidence of well interference and further poor pattern data that undermined its OOIP and volumetric assumptions; and

(d)   Alta Mesa's use of electrical submersible pumps (ESPs) in 2018 was an attempt to inflate production that it knew or should have known would be uneconomic because of the enormous costs and little benefit to EURs.

(*See* Report at ¶ 13(a)-(d)).

Moving Defendants do not challenge opinions (b) and (c), and thus concede that

---

[4] OOIP is a term used in reservoir engineering to denote the total volume of oil that is initially present in a reservoir before any oil extraction has taken place.

Mr. McGowen can present testimony to the jury that Alta Mesa all but ignored industry information and its own test results that indicated the assumptions used in its production and reserve projections were unreasonable.

Moving Defendants only challenge opinions (a) and (d). (Mot. at 2-3, 4-5). But in doing so, they do not challenge either the science or the methodology underlying these opinions. Fully distilled, Moving Defendants simply do not like the opinions, but their challenges are properly left for cross examination at trial for the jury to determine their weight, not a *Daubert* motion. *See*, *e.g.*, *De Luna v. Hidalgo Cnty., Tex.*, 853 F. Supp. 2d 623, 652 (S.D. Tex. 2012) ("The Court cannot take on the role of fact-finder in fulfilling its role under *Daubert,* and must allow the jury to determine [plaintiff's] credibility and the weight to be given to [the expert's] report. In this regard, Defendants' use of the adversary process can adequately address their concerns.").

Moving Defendants challenge Mr. McGowen's opinion (a) on grounds that he purportedly "did no analysis to conclude that [Alta Mesa] did in fact over drill." (Mot. at 1). This is demonstrably contrary to the record. Mr. McGowen's conclusion Alta Mesa engaged in over drilling that caused massive capital depletion is the result of a comprehensive review of the facts adduced in discovery, including thousands of pages of internal Alta Mesa documents that reveal the Company's data did not support the drilling. This review, coupled with Mr. McGowen's extensive experience, will assist the jury in understanding Alta Mesa's over drilling without needing to establish by *how many* wells Alta Mesa over drilled (*see* Part I, *infra*). Mr. McGowen's testimony will further assist the jury to understand ***why*** over-drilling is uneconomic, both generally and in the case of Alta

Mesa.  (*See*, *e.g.*, Report at ¶¶ 9-12).

Moving Defendants challenge Mr. McGowen's opinion (d) because he purportedly "did not actually study or analyze Alta Mesa's use of ESPs in reaching this opinion."  Mot. at 4.  But that assertion is likewise demonstrably contrary to the record, which shows that Alta Mesa's reason for employing expensive ESPs was to artificially inflate initial production despite the detriment to the wells' long-term viability.  Mr. McGowen has more than adequate familiarity with the standard practices for the use of artificial lifts in the E&P industry to determine that Alta Mesa misused the technology.  Mr. McGowen does not need to conduct an "economic analysis" (Mot. at 1) of whether there was a small, temporary boost in production (which was management's intent) to be able to reliably assist the jury to understand that Alta Mesa's misuse of ESPs violated industry standards, misled investors, and was implemented to help hide Defendants' manipulation and overstatement of reserve and production projections in the Proxy and thereafter (*see* Part II, *infra*).

At bottom, Moving Defendants' challenges to opinions (a) and (d) are just complaints about Mr. McGowen's conclusions and the damaging materials he reviewed.  If Moving Defendants believe that Mr. McGowen is wrong or inadequately evaluated certain facts, their remedy is to cross-examine Mr. McGowen before the jury (*see* Part III, *infra*).  *See De Luna*, 853 F. Supp. 2d at 652.

## STATEMENT OF FACTS

### A.    Defendants Knowingly Overestimated Reserves Through Unreasonable and Aggressive Assumptions

Class Plaintiffs allege that Alta Mesa and its management and directors intentionally

overstated its reserves to inflate the Company's valuation both prior to and following the De-SPAC.  The evidence developed in discovery makes clear that, by the end of 2017, Alta Mesa's production data showed Alta Mesa could not achieve its "base-case" of 12 wells per section at or above a 250 MBO type curve.  By that time, Alta Mesa had production data for 8 multi-well development units containing 43 Osage and Meramec wells.  (MX 3 at ¶¶ 73-74).  The average EUR in these units was only 154 MBO, with just 9 of the 43 wells at or above the 250 MBO type curve.  (*Id.*).  In units with 4 or more wells drilled per section, the average EUR ranged from 88 MBO to 188 MBO.  (*Id.*).

In early 2017, Alta Mesa's largest spacing test to date, the Bullis-Coleman, which tested 10 wells, produced results significantly below type curve.  (MX 10).  The one spacing test that most closely mirrored Alta Mesa's "base case," the Ash-Foster (also 10 wells), was only 61% of type curve production by March 2018.  In fact, discovery has shown that Alta Mesa based its 250 MBO type curve assumption on two spacing tests that contained *only three wells per section*—not the 12 wells per section used in the "base-case" in the Proxy. (MX 8).

Alta Mesa and the Management and Director Defendants knew that the 12 wells per section "base case" was not achievable.  Although the vast majority of Alta Mesa's planned wells going forward were to be "child" wells (new wells drilled in the same section as an already producing "parent" well), Mr. Ellis has testified that the "Bullis-Coleman pattern was the first pattern where we -- where it was really obvious that we weren't going to get recoveries out of the children wells that we expected."  (MX 5 at 105:10-17).  With similar sentiment, on May 27, 2017, Senior Engineer Eric Ecklund said to VP of Operations Kevin

Bourque: "Like you said, the pattern drills aren't giving us the bang that we hoped."  (MX 9).

**B.      Discovery Reveals that Management "Chased" Production, Using ESPs to Artificially Boost Production**

Defendants (by their own private admissions) "chased" the unrealistic production forecasts and engaged in uneconomical practices in an attempt to keep production numbers (and, therefore, share prices) high long enough for them to cash out.  Among other things, "chasing production" included over-drilling and using expensive ESPs.  Specifically, to "make a dent in the production shortfall," Alta Mesa—at the direction of CEO Chappelle and founder and COO Ellis—implemented an "aggressive artificial lift program" that focused on installing ESPs, which produce fluids from a well faster but are very costly and do not materially increase the estimated ultimate oil recovery from a well over time.  (*See* MX 11; MX 14 ("ESPs only affect rate, not EUR"); MX 13 (ESPs "only recover the reserves faster").  While there are occasionally appropriate and economical use cases for ESPs, they are often problematic because of their high cost and, in plays such as the one at issue here where nearby ("offset") wells are in "communication," they can lead to negative effects at the offset wells.  (*See* McGowen Report at ¶¶ 67-69).

Alta Mesa's widespread and indiscriminate deployment of ESPs in 2018 was an artifice to boost short-term production and thereby conceal the fact that the acreage was not as productive as the public was being told.  Alta Mesa's artificial lift team, whose mission was ostensibly to determine and deploy the most effective form of lift for each well, insisted to management that there were very few wells at Alta Mesa that were proper

candidates for ESPs.  (*See* MX 4 at 105:7-106:4).  Alta Mesa's internal economic analyses at the time showed that the ESPs did not make economic sense for most of the wells in which they were installed, and Alta Mesa's Vice President of Finance acknowledged internally that Alta Mesa was using them to "chas[e] production." (MX 16; *see also* MX 15; MX 4).  When Alta Mesa's artificial lift expert told Mr. Chappelle that the ESP program did not make economic sense, Mr. Chappelle pretended not to hear him and walked away. (MX 4 at 153:1-19).  Despite installing over 90 ESPs in 2018—many in wells that Alta Mesa's own artificial lift team advised were not proper candidates—Alta Mesa and Mr. Chappelle promoted the success of Alta Mesa's artificial lift program, untruthfully calling it "disciplined" with ESPs being used "selectively."  (*See, e.g.*, MX 12 at slide 9).

### C.    Mr. McGowen's Conclusions Concerning Alta Mesa's Drilling

Mr. McGowen's twenty-five-page Report is based on significant analysis and substantial supporting documentary evidence.  Mr. McGowen reviewed thousands of pages of documents produced in this matter and conducted analyses based on his consideration of approximately 400 documents, six deposition transcripts, 18 industry articles concerning type curves and well-interference among parent and child wells, and the Robbins Russell report in the bankruptcy proceedings concerning Alta Mesa's drilling plan.  (*See* McGowen Report at Exhibit D).  This included reviewing materials and deposition transcripts from Ryder Scott and Tudor Pickering Holt—the outside consultants Moving Defendants misleadingly claim in their motions for summary judgement "conducted audits" of Alta Mesa's 12-well-per-section-projections.  (*See* McGowen Report at 23 n. 42 (Ryder Scott concluded that up to four wells per section would yield 250 MBO per well, and its "audit

does not say anything about the expected per well results with 5-12 wells drilled per section")).[5]

Mr. McGowen's Report will help the jury understand the specialized evidence that is central to this case. For example, for those unfamiliar with the oil-and-gas industry, Mr. McGowen offers a "milkshake" analogy to explain the concept of over drilling:

> …imagine a very large, thick milkshake with four straws for four people to share. This milkshake represents a "section" (640-acres) of an oil reservoir, the straws represent the wells, and each person's share of the milk shake represents an oil well's estimate of ultimate recovery (EUR), or the amount of ultimate recoverable reserves for a given well… If four people drink from the milkshake all at the same rate, it follows logically that each person gets a significant share of the milkshake (*i.e.*, the reservoir).

(McGowen Report at ¶ 9).

Mr. McGowen continues the analogy by explaining the effect of additional straws (representative of Alta Mesa adding additional wells) and explains, simply, "[n]aturally, the milkshake (*i.e.*, oil reservoir) will be depleted more quickly."   (*Id*. at ¶ 10).   He elaborates on the importance of this:

> Significantly, the new straws (*i.e.*, wells) aren't just reducing what the new people who have arrived late to the party with their straws can consume in the future, they're also "stealing" what the original straws had already assumed was their share (*i.e.*, the EUR/well estimates for the original wells). The milkshake that the original straws had counted on consuming

---

[5] Compare, *e.g.*, Ryder Scott Tr. (MX 6 at 50:15 to 50:20) ("we said, well, we don't know what you're going to get with 12 wells per section because – or eight wells per section – and those numbers are off the hip. I don't remember the specifics. But we hadn't done any technical work on it, so we didn't have much to say"); with *Proxy Defendants' Motion for Summary Judgment* (Dkt. 520) p. 23 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮) and AMR and Management Defendants' Motion for Summary Judgment (Dkt. 523) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

is now being consumed by the new straws. **In the same way that adding more straws to a milkshake can leave everyone with less than what they had anticipated, adding too many wells to a block of reservoir rock reduces the performance of the new wells relative to the old wells and makes the early reserves estimates for the older wells invalid, because the new wells "drank their milkshake."**

(*Id.* ¶ 12).

Mr. McGowen brings the analogy full circle by explaining, "Having too many straws in the milkshake is precisely what happened with Alta Mesa."  Mr. McGowen's expert opinion on how it came to be "that Alta Mesa over drilled its acreage to the point of financial ruin" is the consequence of Alta Mesa having "developed a business plan and made related public statements and projections that were driven by a desire to excite investors but were, in reality, based on a variety of very aggressive and unrealistic assumptions." (*Id.*).  Based on a review of the record, Mr. McGowen's opinion is that "in forming these aggressive assumptions, Alta Mesa not only lacked reasonable bases in support of these assumptions, but Alta Mesa also ignored or improperly discounted negative indicators present in their own data and in industry-wide findings." (*Id.*).

To help explain to the jury the meaning and importance of the well-interference data that Alta Mesa had but apparently ignored, Mr. McGowen explains in lay terms some important pieces of evidence, including: an internal email in which Alta Mesa's management and directors discuss well "bashing" (*i.e.*, interference) and state "[b]etween me and you, this is a negative data point for infill drilling a lot of wells" (*id.* at ¶ 24); and Alta Mesa acknowledging a third-party analyst's conclusion that "closely drilled wells in

down-spaced well patterns were causing interference in STACK wells, resulting in lower

production per well" (*id*. at ¶ 25).

In light of such data, Mr. McGowen's opinion is:

> …it was highly unreasonable for Alta Mesa to advertise and pursue a drilling plan that assumed little to no interference when there was an abundance of information indicating interference was likely, and the company had little, if any, evidence otherwise. Alta Mesa management ignored or discounted negative indicators present in their own data and in industry-wide findings regarding infill well interference. It is my firm belief that management's stated assumptions were not reasonable by industry Standard Practices, particularly considering Alta Mesa's decision to ignore contradicting data.

(*Id*. at ¶ 29).

Mr. McGowen also discusses the results of Alta Mesa's pattern tests, explaining that

three of the five pattern tests—all of which tested more than three wells per section—were

"failures, producing just 45% to 67% of the expected 250 MBO/well type curve." (*Id*. at ¶

33).   These "failures" were a "bright warning sign," yet Alta Mesa did not change its

drilling based on pattern results that undermined Alta Mesa's OOIP and recovery factor

assumptions.  (*Id*. at ¶ 47).

Mr. McGowen further explains that, to the extent that Alta Mesa took the results

from the remaining two tests, both of which had only three wells per section, and

extrapolated those results to support a 12-well pattern, "Alta Mesa was reckless" (*id*. at ¶

34) because "both these tests were only 3-well tests, meaning they had very limited if any

ability to test interference and could not have given Alta Mesa confidence a 12-well pattern

would be successful, particularly when the larger tests were all failures." (*Id*. at ¶ 48).

Mr. McGowen's analysis of pertinent documents and the preparation of his expert Report involved over 395 hours of expert work.  (MX 7).  When he was challenged during his deposition, Mr. McGowen was repeatedly able to point to specific facts and materials that he reviewed to support his conclusions.

### D.    Mr. McGowen's Conclusions Concerning Alta Mesa's Use of ESPs

Mr. McGowen's Report examines Alta Mesa's use of ESPs and concludes that Alta Mesa misused this technology to boost short-term production.   Specifically, Mr. McGowen's review of the evidence showed that Alta Mesa's "early projections assumed the use of gas lifts as the artificial lift system to be employed on a typical well.  However, Alta Mesa, having repeatedly failed to meet its projections, ditched its initial, gas-lift assumption, and instead began rapidly installing [ESPs] on its wells to more rapidly increase production in an attempt to meet its forecasts."  (*Id*. at ¶ 67).  Mr. McGowen explains that a "problem with Alta Mesa's approach is that ESPs are typically one of the most expensive artificial lift methods available, and ESPs are only proper when a well meets certain criteria," so it is "crucial to balance the well's natural energy with the need for artificial lift to ensure its appropriate use."  (*Id*. at ¶ 68).

After a thorough review of the record, Mr. McGowen concluded as follows:

> Based on my review, it does not appear that Alta Mesa completed an appropriate level of evaluation before making a large-scale switch to ESPs. Rather, it appears that Alta Mesa intentionally prioritized near-term production increases without regard to the long-term economics of their wells. Ultimately, Alta Mesa made a large capital investment to install ESPs, which resulted in a temporary, small incremental gain in production relative to gas lift and an increase in OPEX relative to gas lift, which, on average, resulted in little or no

14

> increase in estimated ultimate recovery (EUR) and very little
> or no (or negative) incremental economic value over the long
> term.

(*Id.* at ¶ 70).

## ARGUMENTS & AUTHORITIES

Moving Defendants' challenges to Mr. McGowen's two of the four opinions concerning Alta Mesa's over drilling and misuse of ESPs to inflate short-term results are contrary to the facts adduced during discovery and do not support precluding the jury from hearing Mr. McGowen's cogent and helpful explanations and conclusions.

## I. MR. MCGOWEN'S OPINION THAT ALTA MESA OVERDRILLED IS WELL SUPPORTED AND RELIABLE

After extensive review of thousands of pages of internal documents from Defendants, numerous industry articles, and relevant deposition transcripts—including the deposition and audit of Ryder Scott that reveals, contrary to Defendants' assertion, Ryder Scott never audited the aggressive 12-well per section plan—Mr. McGowen concluded that Alta Mesa's "problem was the result of over drilling in an attempt to meet its projection targets that lacked any reasonable basis" and was "attributable to overly aggressive assumptions regarding well spacing (both vertically and horizontally) and the amount of oil in place." (*Id.* at ¶ 14). He also concluded that "[i]n implementing these highly unreasonable assumptions, Alta Mesa apparently elected to disregard pertinent data that was available at the time." (*Id.*).

When challenged at his deposition, Mr. McGowen was able to support his conclusions with voluminous documents, facts, and data to support his conclusions, including but not limited to:

- "they deployed an enormous amount of capital very quickly and that the ultimate recovery per well on child wells was dropping rapidly" (MX 2 at 57:11 to 57:13);

- "[t]oo many [wells] is when you begin to destroy capital and you're destroying value by drilling too many wells" (MX 2 at. 57:22 to 57:24);

- "there's a number of plots in the data that show the decrease in net present value is they reached a certain point" (MX 2 at. 58:8 to 58:11);

- "on average, they began to see a degradation in EUR as they increased the number of wells per section on average, and there is data in the record that shows that. There's documentation to that effect" (MX 2 at 60:14 to 60:18); and

- "[m]y opinion is that [the microseismic tests were] a red flag that should have informed the process, caused them to do more testing, and slow down the pace of the capital deployment." (MX 2 at 119:15 to 119:18).

Moving Defendants' argument that Mr. McGowen "did no analysis at all and simply took it as a given that Alta Mesa drilled too many wells, without *any* explanation for that conclusion" (Mot. at 2) is simply contrary to the record. Mr. McGowen's conclusions are demonstrably supported by comprehensive analysis.

At bottom, Moving Defendants' core argument that Mr. McGowen "could not say how many extra wells Alta Mesa drilled," "did not do analysis necessary to form an opinion on how many wells Alta Mesa should have drilled," and "failed to determine what the optimal well count was in any part of Alta Mesa's acreage" (Mot. at 3) is a hypothetical exercise with no bearing on the two challenged opinions. Mr. McGowen's opinion that Alta Mesa over drilled is reasonably based on established petroleum engineering standards, industry publications and practices, his over 40 years of experience in the industry, and the

operating and testing records produced in discovery.  The fact that Mr. McGowen did not undertake the analysis hypothesized by Moving Defendants to determine how many wells Alta Mesa should have drilled—an issue not raised by Class Plaintiffs here—does not render his challenged opinions any less relevant and reliable to a jury.  *See*, *e.g.*, *Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*, No. 7:12-cv-00133-O, 2014 WL 3744976, at *6 (N.D. Tex. July 30, 2014) (finding expert opinions reliable and relevant where "reasonably based on established petroleum engineering standards, industry publication and practices, applicable regulations, his over thirty years of experience in the industry, and the operating records at the Well").[6]  To the contrary, if relevant at all, Moving Defendants' hypotheticals are the subject of cross examination, not a *Daubert* challenge. *See*, *e.g.*, *Primrose Operating*, 382 F.3d at 562-63 (holding that challenges to the bases and sources of an expert's opinion go to weight rather than admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence").

## II.   MR. MCGOWEN'S OPINION THAT ALTA MESA MISUSED ESP TECHNOLOGY IS RELEVANT AND RELIABLE

Mr. McGowen's review of internal Company documents cited in his Report led him to conclude that "Alta Mesa, having repeatedly failed to meet its projections, ditched its

---

[6] Moving Defendants' cases do not support their standard—created from whole cloth—they claim requires Mr. McGowen to analyze every section, acre, and well, but rather involve fundamental deficiencies in the science and methodologies at issue not present here.  *See*, *e.g.*, *Kumho Tire*, 526 U.S. at 152 (excluding testimony where there was no evidence of articles or other experts supporting methodology for testing tire treads); *Burleson v. Tex. Dep't. of Crim. Just.*, 393 F.3d 577, 587 (5th Cir. 2004) ("magistrate judge based his conclusion on the fact that [expert] failed to conduct a dose assessment, there was no scientific evidence linking thoriated welding electrodes to lung or throat cancer, and the studies [expert] did rely on concerned Thorotrast" and "the articles [expert] relied on contain statements which either directly contradict his conclusion or don't concern thoriated tungsten").

initial, gas-lift assumption and instead began rapidly installing electric submersible pumps (ESP)—a form of artificial lift that uses an electric motor to lift resources from a well—on its wells to more rapidly increase production in an attempt to meet its forecasts." (Report at ¶ 13(b); 13(c)). Mr. McGowen is demonstrably qualified to offer this opinion given his 40 years of E&P experience and his current position as a CEO that evaluates the economic viability of, among other things, "artificial lift projects to ensure the accurate preparation and publication of SEC-compliant reserves reports." (*Id.* at ¶ 7).

In addition to his industry experience involving ESPs and the extensive discussion and support in his Report for his opinion that Alta Mesa misused the technology (*id.* at ¶¶ 67-73), during his deposition, Mr. McGowen pointed directly to internal Alta Mesa documents and data that he reviewed and relied upon to draw his conclusion, including:

- "part of it is some of the email traffic internally where folks talked about they didn't really think [installing ESPs] made sense" (MX 2 at 250:1 to 250:4);

- "[t]here's a PowerPoint I looked at that has a plot that showed some ESP performance data" (MX 2 at 255:8 to 255:10);

- "I just thought it was unusual that this was a top-down requirement to install ESPs when normally that's an artificial lift recommendation that normally comes from the bottom up from production engineers that are most familiar with the wells" (MX 2 at 256:2 to 256:9);

- "[t]here's an email where they talk about chasing -- chasing production, which I assume means that they're trying to hit their production targets. So that sounds like that was the genesis of the decision to try to boost production to meet their production target" (MX 2 at 257:13 to 257:17); and

- "I see an email from Scott Grant to Hal Chappelle, and he talks about the ESPs and some skepticism about whether he thought

that was going to work or not" (MX 2 at 258:11 to 258:14).

Moving Defendants' core challenge to Mr. McGowen's opinion regarding Alta Mesa's misuse of ESPs that he purportedly "did not actually study or analyze Alta Mesa's use of ESPs in reaching this opinion" (Mot. at 4) is plainly incorrect.  Nor are Moving Defendants correct that Mr. McGowen was required to do a full economic analysis of every ESP installed on Alta Mesa's wells to offer his opinion and explain to the jury why Alta Mesa's use of ESPs was contrary to standard E&P industry practice.  Once again, Moving Defendants attempt to create a requirement that is not the standard.

## III.   MOVING DEFENDANTS' ISSUES ARE PROPERLY ADDRESSED TO THE JURY THROUGH CROSS-EXAMINATION

Moving Defendants' challenges to Mr. McGowen's two well-supported opinions are little more than a disagreement with his conclusions and the materials upon which he relied.  But these are the proper subjects for cross-examination, not a basis to exclude his opinions or testimony.  *See, e.g., Primrose Operating Co.*, 382 F.3d at 562-63; *Silverman v. Watson Pharms., Inc.*, No. H–10–1952, 2013 WL 1413782, at *2 (S.D. Tex. Apr. 8, 2013) ("[Defendant's] criticisms of her opinion go the weight of her testimony, not the admissibility, and are proper subjects for vigorous cross-examination."); *Browning v. Sw. Research Inst.*, No. SA–05–CA–0245–FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006) ("[The expert] provides evidentiary support and reasoning for his assumptions. While [defendant] disagrees with [the expert's] assumptions, these challenges are best left to proper cross examination."); *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA–16–CA–00485–FB–ESC, 2017 WL 1133506, at *5 (W.D. Tex. Mar. 24, 2017)

("While [movant] may disagree with the facts upon which [the expert] bases his analysis, the proper vehicle for [movant] to challenge [the expert's] opinion is cross-examination.").

## **CONCLUSION**

For the foregoing reasons, Class Plaintiffs respectfully request that the Court deny Moving Defendants' challenge to Mr. McGowen's expert opinion.

Dated: January 18, 2024

Respectfully submitted,

/s/ Andrew J. Entwistle

Andrew J. Entwistle (attorney-in-charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308

**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

/s/ Trig Smith

Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)

**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

Carol Villegas (*pro hac vice* forthcoming)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW
LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven
Fund, A Series of Frank Funds Trust*