# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 559**

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEVEN P. FEINSTEIN**

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

STATEMENT OF THE ISSUE ..................................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................ 2

LEGAL STANDARD ................................................................................................... 6

ARGUMENT................................................................................................................ 6

    A.    Feinstein's §10(b) Loss Causation Opinion Is Reliable and
           Admissible Pursuant to Rule 702 ................................................................. 8

    B.    Feinstein's §14(a)(9) Loss Causation Opinion Is Reliable and
           Admissible Pursuant to Rule 702 ............................................................... 18

    C.    Feinstein's Damages Opinions Regarding the §§10(b) and 14(a)
           Claims Are Reliable and Admissible .......................................................... 20

          1.    Feinstein's Estimate of "Out-of-Pocket" Damages Is Reliable
               and Admissible ................................................................................ 20

          2.    Feinstein's "Benefit-of-the-Bargain" Damages Estimate Is
               Reliable and Admissible.................................................................. 24

CONCLUSION ........................................................................................................... 25

4859-3528-0029.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ala. Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) .......................................................................... 4, 9, 18

*Archdiocese of Milwaukee Supp. Fund, Inc. v. Halliburton Co.*,
  597 F.3d 330 (5th Cir. 2010) ................................................................................. 4, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................................. 3

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................................................................... *passim*

*Edwards v. McDermott Int'l, Inc.*,
  2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) ....................................................... 4, 19

*Erickson v. Jernigan Cap., Inc.*,
  __ F. Supp. 3d __, 2023 WL 5966785,
  (S.D.N.Y. Sept. 14, 2023) ....................................................................................... 25

*Fener v. Operating Eng. Constr. Indus.*,
  579 F.3d 401 (5th Cir. 2009) .................................................................................... 18

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (5th Cir. 2011) .................................................................................... 2

*Goldman Sachs Grp., Inc. v. Ark. Tcher. Ret. Sys.*,
  594 U.S. ___, 141 S. Ct. 1951 (2021) ....................................................................... 18

*Greenberg v. Crossroads Sys. Inc.*,
  364 F.3d 657 (5th Cir. 2004) .................................................................................... 18

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 712 (S.D. Tex. 2012) ....................................................................... 9, 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ............................................................................... 8

*In re Groupon, Inc. Sec. Litig.*,
  2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ................................................................ 2

- ii -

**Page**

*In re Vivendi Universal, S.A. Sec. Litig.*,
  2009 WL 10695884 (S.D.N.Y. Apr. 6, 2009) ............................................. 7, 20, 21, 22

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 ........................................................................................ 18

*Kim v. Am. Honda Motor Co., Inc.*,
  86 F.4th 150 (5th Cir. 2023) ............................................................................... 6

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2nd Cir. 2005) ............................................................................ 22

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................... 8

*Magruder v. Halliburton Co.*,
  2009 WL 854656 (N.D. Tex. Mar. 31 2009) ..................................................... 18

*Mauss v. NuVasive, Inc.*,
  2018 WL 656036 (S.D. Cal. Feb. 1, 2018) .......................................................... 7

*Miller v. Asensio & Co., Inc.*,
  364 F.3d 223 (2d Cir. 2004) .............................................................................. 22

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
  382 F.3d 546 (5th Cir. 2004) ................................................................ 3, 6, 19, 24

*Puga v. RCX Sols., Inc.*,
  922 F.3d 285 (5th Cir. 2019) ............................................................................... 6

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) .......................................................................................... 22

*Spitzberg v. Hous. Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ............................................................................. 18

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987) ............................................................................... 6

*Wilson v. Great Am. Indus., Inc.*,
  855 F.2d 987 (2d Cir. 1988) .............................................................................. 25

- iii -

## NATURE AND STAGE OF THE PROCEEDINGS

This is a certified class action pursuant to §§10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934.  Dkt. 241.  The action concerns the rapid collapse of Alta Mesa Resources, Inc. ("AMR" or the "Company") f/k/a Silver Run II following a de-SPAC transaction wherein two privately held companies – Alta Mesa Holdings ("AMH") and Kingfisher Midstream ("KFM") went public by merging into a Riverstone-sponsored SPAC. On February 12, 2018, Defendants began discussing whether and how to disclose a 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it.  Less than a year after asking for shareholder approval, AMR was forced to write off more than 80% of its $3.86 billion market value for the same reason. AMR filed for bankruptcy protection just seven that.

Defendants AMR, Rivestone Holdings LLC, Harlan Chappelle, Stephen Coats, Michael Ellis, William Gutermuth, James T. Hackett, Pierre Lapeyre, David Leuschsen, Donald Sinclair, Ronald Smith, Jeffrey Tepper, Thomas Walker, and Diana Walters (collectively, the "Moving Defendants") move to preclude the expert testimony of Class Plaintiffs' expert witness, Dr. Steven P. Feinstein, Ph.D., CFA ("Feinstein") regarding loss causation and damages.

## STATEMENT OF THE ISSUE

Whether Feinstein's loss causation and damages opinions are admissible during summary judgment and trial.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Moving Defendants contend that Feinstein's opinions regarding loss causation and damages are unreliable, and, therefore they are inadmissible pursuant to Federal Rule of Evidence 702 ("Rule 702").  *See generally* Defendants' Motion to Exclude Opinions of Expert Witnesses Steven P. Feinstein and Zachary Nye Under Rule 702 (ECF 511) ("Motion" or "MTN").  Feinstein has offered expert testimony on the issues of loss causation and the damages caused by securities fraud in more than 75 cases, and that testimony has never been excluded.

Feinstein's loss causation opinions here are based on the same widely-accepted event study methodology he has deployed before, which is "'used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price.'"  *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (5th Cir. 2011).  *See also In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015) ("The Court found [Feinstein] to be reliable and clearly an expert in conducting event studies.").[1]  Furthermore, Feinstein relied on the widely-accepted event study and linear regression models to eliminate non-fraud related factors and estimate out-of-pocket damages.  Lastly, Feinstein's methodology in estimating §14(a) "benefit-of-the-bargain" damages is not speculative.

By applying the event study methodology, Feinstein identifies company-specific statistically significant declines in AMR's stock price that were caused by fraud-related disclosures in March, August, and November 2018, as wells as February and May 2019.

---

[1]      Citations are omitted and emphasis is added unless otherwise noted.

- 2 -

These disclosures revealed the true state of the Moving Defendants' misleading statements concerning AMH's and KFM's ability to generate and transport oil, gas, and importantly, EBITDA, thereby dissipating the artificial inflation in the Company stock price due to their fraudulent conduct. For each disclosure day, Feinstein analyzed relevant public disclosures and accounted for possible non-fraud reasons for AMR's company-specific stock price declines. His testimony is relevant, reliable, and admissible under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The Moving Defendants do not dispute that Feinstein is qualified to issue his opinions. Tellingly, the Moving Defendants do not even suggest that the event study, linear regression, or the methodology by which Feinstein estimated §14(a) benefit-of-the bargain damages are unreliable. Nor could they. As such, they merely complain about his conclusions, which were based on his application of indisputably, widely-accepted, and reliable methods. The Motion is nothing more than a critique of his conclusions. Thus, this Court should deny it. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004).

The Moving Defendants first contend that Feinstein's loss causation opinions with respect to Class Plaintiffs' §§10(b) and 14(a) claims are in contravention of *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See* MTN at 10-13, 14-16.[2] To the contrary, not only

---

[2] The Moving Defendants do not argue that Feinstein has failed to opine on the "but for" causation element (or the "causation in fact") of Class Plaintiffs' claims. Rather, their arguments are focused exclusively on the "proximate causation" element of those claims. *See generally id.*

has Feinstein utilized reliable methods to reach his loss causation opinions on the §§10(b) and 14(a) claims, but those opinions dovetail with the Fifth Circuit's standards.  With regard to §10(b), a plaintiff merely needs to demonstrate that the purported disclosures had a negative and corrective effect on the alleged misstatements.  *Archdiocese of Milwaukee Supp. Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 338 (5th Cir. 2010).  The opinion should demonstrate that a corrective disclosure "reflect[s] *part* of the 'relevant truth' – the truth obscured by the [defendants']" misleading statements.  *See Ala. Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (also rejecting the frequently argued "fact-for-fact" disclosure requirement).  By employing widely-accepted methods, Feinstein did just that.

With regard to the §14(a) claim, Feinstein's loss causation opinion reliably demonstrates that the Moving Defendants' misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction.  *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at *6 (S.D. Tex. Apr. 13, 2021).  Under this broader loss causation standard, every corrective disclosure revealed new material information concerning the full extent of the Moving Defendants' deliberately false and misleading conduct to induce approval of the merger at $3.86 billion.  And, while the loss causation standards for §§10(b) and 14(a) are somewhat different, Feinstein's utilization of the event study and linear regression methodologies to reach his opinions regarding loss causation is reliable.

In an effort to salvage their Motion, the Moving Defendants have improperly intermingled damages arguments into their loss causation arguments (and *vice versa*).  *See*

MTN at 10-13, 14-16.  Yet, the Moving Defendants have come forward with no authority supporting the argument that a damages expert, as a matter of law, is required to apportion the specific amount of damages associated with every single alleged misstatement.  Nor have the Moving Defendants provided any legal authority supporting their argument that a damages expert, as a matter of law, is required to place an exact measure of damages on each ***fraud-related*** factor.  The law requires Feinstein to control for ***non-fraud related factors***. He did.  The empaneled jury will be capable of making damage allocation decisions based on the evidence presented at trial.

The Moving Defendants also complain that Class Plaintiffs' "benefit-of-the-bargain" damages theory is "inapplicable" under §14(a) pursuant to *Dura* and the PSLRA.  In making that argument, they contend benefit-of-the-bargain damages are not appropriate because "Feinstein . . . ma[kes] no attempt to show proximate cause." *Id.* at 16.  But as demonstrated below, his report contradicts the argument.  Then, the Moving Defendants complain that Feinstein's benefit-of-the-bargain damages are "higher than" his of "out-of-pocket" damages, but do not argue he used an unreliable method. *Id.* at 12, 15.

Lastly, and in further proof of the reliability of Feinstein's opinions, the Moving Defendants simultaneously attack the individual action Class Plaintiffs' expert, Dr. Zachary Nye ("Nye"). *See generally id.*  No court has found Nye to be unreliable as a loss causation or damages expert, or his methods to be unsound.  And, Nye relied upon the identical widely-accepted methodologies that Feinstein did in reaching his opinions.  And, in application of those methodologies, Nye arrived at a slightly different out-of-pocket damages estimate.  The Moving Defendants have come forward with no evidence that Feinstein and

- 5 -

Nye coordinated their work, let alone even spoke to each other about it.  How could two experts, whose prior loss causation and damages opinions have never been precluded by a court, have made the identical purported methodological errors?  Answer:  They did not because both of their opinions are a product of deploying the same widely-accepted methodologies.

## LEGAL STANDARD

"While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'"  *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).  The trial court must "ensur[e] that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration."  *Id.*

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).  "The courts must focus 'on [the expert's] principles and methodology, not on the conclusions that they generate.'"  *Kim v. Am. Honda Motor Co., Inc.*, 86 F.4th 150, 160 (5th Cir. 2023) (alteration in original).  A challenge to how an expert ***applies*** the generally acceptable methodology does not go to admissibility, but rather is properly brought up during cross-examination at trial.  *See, e.g.*, *Primrose*, 382 F.3d at 562-63.

## ARGUMENT

The Moving Defendants do not argue Feinstein is unqualified to issue his opinions.  Nor could they.  *See* Report on Loss Causation and Damages Professor Steven P. Feinstein,

Ph.D., CFA (Dkt. 511-1, Ex. 1) ("FRpt."), ¶¶10-20, Exhibit 3.  The Moving Defendants do not dispute that Feinstein's opinions were reached by applying widely-accepted reliable methodologies.  Nor could they.  *Id.*, ¶¶26, 171-175, 193-218, 228-271; *see also Mauss v. NuVasive, Inc.*, 2018 WL 656036, at * 5 (S.D. Cal. Feb. 1, 2018) (noting "[t]he use of an event study is often necessary to provide an evidentiary basis for a reasonable jury to determine the existence of loss causation and damages").  As such, they do not.

As demonstrated in detail below, Feinstein's event study identifies: (i) AMR-specific, allegation-related information that caused stock price drops; (ii) statistically significant movements in AMR's stock price; (iii) quantifies the amount of the daily stock price movement in AMR's stock price that was caused by the Company-specific news by controlling for general market and industry factors; and (iv) analyzes the news that caused the stock price movements to determine whether, and if so, how it related to the alleged fraudulent misstatements and omissions.  *See* Argument, A., *infra*.

The event study methodology typically entails a review of "'day-to-day information releases from sources including . . . press releases, conference calls, news reports, securities analysts' reports, and SEC filings,'" which Feinstein did here.  *See* FRpt., ¶¶64-167; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 10695884, at *4 (S.D.N.Y. Apr. 6, 2009).  Based on this analysis, an economist can opine on what company-specific information caused the identified residual return.  This portion of the event study analysis "require[s] some subjectivity, *i.e.*, identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or

negative influence on price." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009). That's precisely what Feinstein did. *See* FRpt., ¶¶168-218.

Defendants also do not challenge Feinstein's econometric regression analysis, which, along with his event study, is the underlying basis for his opinions regarding loss causation and damages. *Id.*, ¶¶196-197, 229-271.

Rather, the Moving Defendants complain about things Feinstein purportedly did not do, which they claim render his loss causation and damages opinions unreliable. The Moving Defendants deliberately ignore the widely-accepted methodologies Feinstein applied in reaching his opinions, and concoct arguments untethered from legal authority about what he purportedly was required to do. Not one of their arguments is persuasive.

### A.   Feinstein's §10(b) Loss Causation Opinion Is Reliable and Admissible Pursuant to Rule 702

With regard to loss causation, Class Plaintiffs must demonstrate "that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause[d] the plaintiff's economic loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255 (5th Cir. 2009); MTN at 7-8. Here, Feinstein came forward with evidence demonstrating that the purported disclosures had a negative and corrective effect on the alleged misrepresentations or omissions. *Halliburton Co.*, 597 F.3d at 338. And, he did so again, by applying reliable methods.

Feinstein considered Class Plaintiffs' case and the alleged misleading statements. FRpt., ¶¶5, 22, 39-46, 63-163. For each alleged corrective disclosure, Feinstein utilized the widely-accepted "event study" methodology to identify the contents of the disclosure for

- 8 -

non-fraud related factors, and identified the excess, statistically significant abnormal negative return (*i.e.*, drop in stock price) associated with the corrective disclosure. *Id.*, ¶¶199-218, 282-305. With regard to Feinstein's loss causation opinion on the §10(b) claim, nothing more is required. Class Plaintiffs need only come forward with evidence demonstrating that a subsequent disclosure "reflect[s] *part* of the 'relevant truth' – the truth obscured by the [defendants']" misleading statements. *Flowserve Corp.*, 572 F.3d at 230. Feinstein's report shows that is what he has done.[3]

**Statement No. 1**: Feinstein identifies the alleged misleading financial projections first published on August 16, 2017, and then *repeated* in the January 19, 2018 Proxy. FRpt., ¶¶72, 74. *See also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 712, 759 (S.D. Tex. 2012) (noting repeated statements are actionable where they give an impression of a state of affairs that conflicts with the undisclosed truth). On March 29, 2018, the Company disclosed revised 2018 estimates for AMH's average daily production, and the near 50% cut in KFM's 2018 EBITDA projection. FRpt., ¶199. Feinstein identifies the excess negative return for AMR's stock following the disclosure. *Id.*, ¶¶282-284.[4] Feinstein further noted: "The new guidance

---

[3]     The Moving Defendants' complaint (Motion at 6, 10) that Feinstein "holistically" reviewed the misrepresentations and alleged corrective disclosures is of no moment. Not only did Feinstein conduct that holistic review, but he did so through the lens of an *exhaustive assessment* of the events of the Class Period. *See* FRpt., ¶63 (which provided him "context" for understanding Class Plaintiffs' allegations and the Company's experience during the Class Period); *id.*, ¶¶64-167 (analysis of events). It is odd that the Moving Defendants now complain about analyses that Feinstein deliberately undertook to further ensure his opinions remain objective. Further, they point to not a single case holding that this holistic review is even marginally unreliable.

[4]     Class Plaintiffs contend that the Moving Defendants "walked" AMR's stock price down through a series of corrective disclosures on March 29, 2018 (50% cut to KFM projections); on August 14, 2018 (further reduction in KFM 2018 EBITDA guidance); and

- 9 -

for Kingfisher was far below what had been project[ing] in the Proxy, while AMH's new guidance was modestly lower." *Id.*, ¶199. Feinstein identifies the series of corrective disclosures in which the Moving Defendants repeatedly and downwardly revised the Proxy projections (and fully disclosed the extent of their fraudulent conduct) on March 29, August 14, November 13, 2018, and February 25, 2019, as well as the statistically significant stock drops that followed each. *Id.*, ¶¶88, 109-110, 142, 144, 199-215.

*Statement No. 2*: Feinstein identifies the August 16, 2017 misleading statement that KFM was uniquely "'positioned to capitalize on the increasing development activity in the STACK.'" *Id.*, ¶67. Feinstein notes the March 29, 2018 disclosure of the 50% cut in KFM's 2018 EBITDA projection. *Id.*, ¶199. Feinstein also analyzed the March 29, 2018 corrective disclosure wherein AMR explained that the 50% cut was necessary because "'"large third-party producers have delayed drilling on dedicated acreage."'" *Id.*, ¶¶86-88. The 50% cut in KFM's 2018 EBITDA guidance and Chappelle's statement that KFM would not be ready for growth for months, demonstrates that KFM was not "'rapidly growing'" or well "'positioned to capture volume growth'" from third-party customers, or AMR. *Id.*, ¶¶70, 72.

*Statement No. 3*: Feinstein identifies the August 16, 2017 misleading statement regarding the merged entities being "low cost" or "low-breakeven" in the STACK. *Id.*, ¶¶65-66. Feinstein identifies the February 25, 2019 disclosure in which Hackett admitted

---

on November 13, 2018 (further reduction in KFM 2018 EBITDA guidance). But during the Class Period, the Moving Defendants stayed put on the AMH 2018 EBITDA estimate of $358 million. Accordingly, the baselessness of the AMH/KFM projections was not fully disclosed until the Company admitted in February 2019 that a $3.0+ billion write-off may be necessary due to incorrect 12-WPS and 250 MBO assumptions underlying the financial projections.

4859-3528-0029.v1

that AMR had been right-sizing its cost structure for the current business outlook. *Id.*, ¶141. AMR then admitted that it had halted all drilling activity in the STACK, at the same time it stated it was forced to "right-size" its bloated cost structure. *Id.* Feinstein identifies a 119.63% negative AMR-specific return after that disclosure. *Id.*, ¶296.

**Statement No. 4**: Feinstein identifies the August 17, 2017 misleading statement regarding AMH identifying 4200 gross well locations and the expectation of "[EURs] at year end to exceed 650 thousand BOE per well." *Id.*, ¶67. Feinstein identifies the Moving Defendants' February 2019 disclosure admitting that assumptions underlying oil in place at the time of the business combination needed to be revisited (which explained why a $3.0+ billion write-off was necessary). *Id.*, ¶214.[5] Feinstein identifies a 119.63% negative AMR-specific return after that disclosure. FRpt., ¶299.

**Statement No. 5**: Feinstein identifies the August 17, 2017 misleading statement about the STACK being a "'[h]igh margin core basin with low field break-evens [with] deep inventory.'" *Id.*, ¶70. Feinstein identifies the February 25, 2019 corrective disclosure (*id.*, ¶141 ("'right-siz[ing] the [AMR's] cost structure for the current . . . business outlook'" and change of assumptions)), and the 97.62% negative abnormal return following that disclosure. *Id.*, ¶260.

---

[5]    Defendants arrived at the 4000+ well locations by multiplying the 12 WPS by the number of sections in AMH's STACK leasehold. *See also* FX A at 58 (Company admitting it was the 12 WPS and 250 MBO assumptions that were corrected in connection with business combination). References to Exs. A-C are to the Exhibits attached to the Declaration of Trig R. Smith Class Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Testimony of Steven P. Feinstein, filed concurrently herewith.

**Statement No. 6**:  Feinstein identifies the August 17, 2017 misleading statement that AMH had sufficient production history to give it confidence that by end of 2017, "'our year-end reserves will reflect better than 650,000 Boe (sic).'"  *Id.*, ¶71.  Feinstein identifies the February 25, 2019 corrective disclosure in which the Moving Defendants admitted that assumptions underlying reserve calculations needed to be revisited (*id.*, ¶141), and the 119.63% negative AMR-specific return following that disclosure (*id.*, ¶260).

**Statement Nos. 7 and 8**:  On August 17, 2017, the Moving Defendants stated that KFM was "'positioned to capture volume growth'" to take advantage of "'[e]xpansion opportunities'" and KFM's EBITDA projections.  *Id.*, ¶¶70, 72.  These are substantively identical statements as those addressed in Statement No. 2, *supra*, Feinstein associated those statements with a corrective disclosure and statistically significant stock price drop.  And, as with regard to Statement No. 1, *supra*, he did same with the repeated KFM projection.  *See In re BP*, 843 F. Supp. at 759.

**Statement No. 9**:  On January 19, 2018, the Moving Defendants reiterated the "'sufficient production history'" provided "confidence" in an EUR greater than 650 MBOE by year-end statement.  FRpt., ¶75.  As noted above with respect to Statement No. 6, *supra*, Feinstein appropriately assessed that statement for loss causation purposes.

**Statement No. 10**:  Feinstein identifies the January 19, 2018 statement that AMH expected to produce 38.5 MBO per day in 2018, and the corrective disclosures associated with that projection.  FRpt., ¶¶93, 114.  Feinstein also identifies the March and August 2018 statistically significant stock price drops associated with each of these disclosures.  *Id.*, ¶¶282-284, 288-289.

- 12 -

***Statement No. 11***:  On January 29, 2018, the Moving Defendants reiterated KFM was capable of "'rapidly expanding'" and well "'positioned to capture volume growth,'" as well as the KFM 2018 projections published after market-close on August 16, 2017.  *Id.*, ¶72.[6] As discussed with respect to Statement Nos. 7 and 8, *supra*, Feinstein's analysis is sufficient.

***Statements 12 and 13***:  On January 19, 2018, the Moving Defendants **repeated** the misleading AMH and KFM projections.  As noted above with respect to Statement No. 1, Feinstein reliably assessed loss causation.

***Statement No. 14***:  Feinstein identified the January 19, 2018 statement that the AMH/KFM financial projections "'were prepared on a reasonable basis'" and reflected (to the best of their knowledge) "'the expected future financial performance of [AMH] and [KFM], respectively.'"  FRpt., ¶77 (alteration in original).  These statements are not functionally different than the AMH/KFM EBITDA projections themselves.  Class Plaintiffs allege that the projections were materially misleading because the assumptions underlying the projections were baseless.  Feinstein's analysis is sufficient.  *See* Statement No. 1, *supra*.

***Statement Nos. 15-18***:  On February 21, 2018, the Moving Defendants made four qualitative statements that are, again, inseparable from the AMH/KFM projections.  The statements focus on AMH's STACK development execution, and the purported "de-risked" STACK acreage based on AMH's prevailing, historic field data associated with prior multi-well pattern tests, "'repeatable [STACK] development,'" and that AMH's multi-well pattern

---

[6]     To the extent the Moving Defendants have counted as a unique alleged misleading statement, they are mistaken.  That statement is functionally equivalent to saying that KFM was well "'positioned to capture volume growth [attributable to third parties and AMH] from the STACK.'"  *Id.*, ¶72.

tests (then running from 3-WPS to 10-WPS) ""established the basis for the development approach."" FRpt., ¶¶82, 119.  In fact, the Moving Defendants assured investors that their prior well spacing tests "'validat[ed]'" the approach.  Feinstein identifies the misleading statements.  *Id.*, ¶82.  Feinstein identifies the corrective disclosures and statistically significant stock price drops that followed each identified corrective disclosure.  *Id.*, ¶¶109-110, 142, 144, 199-203, 213-215.  *See also* Statement No. 1, *supra*.

**Statement No. 19**:  On March 29, 2018, the Moving Defendants **re-iterated** the assertion that their past and current field production data "de-risked" the 12-WPS assumption (*i.e.*, the purported "de-risking" allowed the Company to "begin" the systematic development of the STACK (at 12-WPS)).  This statement served to comfort investors that the AMH and KFM EBITDA projections were based on reasonable assumptions.  Because Statement No. 19 is not functionally different than Statement Nos. 15-18, Feinstein has reached a reliable opinion that these statements caused Class Plaintiffs' losses.  *See* FRpt., ¶¶94, 109-110, 142, 144, 199-203, 213-215.

**Statement No. 20**:  On March 29, 2018, the Moving Defendants **repeated** their estimated reserve statement of 650 MBOE, first made on the first day of the Class Period. *See* Statement Nos. 4, 6, 9, *supra*.

**Statement No. 21**:  On March 29, 2018, the Moving Defendants claimed that 8- to 10 WPS was "optimal" for the STACK, but did not downwardly revise the AMH 2018 EBITDA projection (or further revise the KFM 2018 EBITDA projection) based on this material change to the 12-WPS assumption.  Feinstein identifies the misleading statement. FRpt., ¶95.  Feinstein also identifies the corrective disclosure and the statistically significant

stock price drop that followed it.  *Id.*, ¶142 (admitting reduction in proved reserves driven by revisions to the assumptions for recovery); *see also id.*, ¶¶296-299.

**Statement No. 22**:  On March 29, 2018, the Moving Defendants stated that there had been "'no change in [ARM's] internal control over financial reporting.'"  Feinstein identified that category of statements, the February 25, and May 19, 2019 corrective disclosures, and the statistically significant stock price drops that followed.  *Id.*, ¶¶22, 39-44, 96 n.10, 158, 214, 296-299, 303-305.[7]

**Statement No. 23**:  Feinstein identified the August 14, 2018 statement that "'[m]ulti-well development pattern results continue to be favorable.'"  FRpt., ¶116.  This statement is mere reiteration of the Moving Defendants' false statement that the Company's multi-well activities "establish[ed]" and "'validate[d] [the STACK development] approach.'"  *Id.*, ¶82.  *See also* Statement Nos. 15-18, *supra.*  Feinstein identified the February 2019 corrective disclosure, as well as the statistically significant stock price drop that followed that disclosure.  *See* Statement Nos. 15-18, *infra.*

**Statement No. 24**:  Feinstein identified the August 14, 2018 misleading statements regarding ESPs.  FRpt., ¶¶39(iv), 40 (iii).  On that date, the Moving Defendants presented a slide suggesting that the utilization of ESPs in the STACK continued to make economic sense.  *See* Dkt. 218, ¶237.  Feinstein indicated he understood that the Moving Defendants,

---

[7]      That misleading internal control statement was ***repeated*** in AMR's May 21, August 14, and November 14, 2018 Forms 10-Q filed with the SEC.  Furthermore, the Moving Defendants oddly suggest Feinstein's opinions are flawed because he did not determine whether AMR's stock price increased after making that statement.  *See* Motion at 12-13.  The only thing that statement conveyed is that nothing has changed.  Of course, AMR's stock price would not react until the Moving Defendants disclosed in February 2019 that AMR, in fact, suffered from a material weakness.

unknown to investors, utilized "'costly electronic pumps [ESPs] [to artificially] inflate[]'" production results.  FRpt., ¶40.  Feinstein identified the February 25, 2019 corrective disclosure in which the Moving Defendants admitted to "'taking the initial steps to right-size'" AMR's cost structure given the Company's business outlook.  *Id.*, ¶141.  Feinstein identifies the statistically significant stock price drop following the cost containment disclosure.  *Id.*, ¶¶297-299.  Notably, the Moving Defendants later admitted that the Company's operating costs ballooned from $4 million in 2017, to $60.5 million, "primarily due to cost associated with increased use of submersible pumps for artificial lift."  FX A at 63.

**Statement No. 25**:  Feinstein read and understood the Complaint, which included the August 15, 2018 risk disclosure that AMR business "depend[s] on [the] successful exploration, exploitation, development and acquisition to maintain reserves and revenue" (*see* Dkt. 218, ¶239).[8]  FRpt., ¶5.  Class Plaintiffs allege the statement was misleading, in part, because the Company's use of costly ESPs was intended to chase production – at the expense of future viability of those wells – since AMR was incapable of producing the volume of oil that it previously projected.  Feinstein acknowledges Class Plaintiffs' theory of falsity.  FRpt., ¶¶39-40, 177.  Feinstein identifies the February 25, 2019 corrective disclosure of "right-siz[ing]" costs, and the statistically significant stock price drop that followed the corrective disclosure.  *See* Statement No. 24, *supra.*

**Statement No. 26**:  Feinstein read and understood the Complaint.  FRpt., ¶5.  With regard to the Moving Defendants' August 14, 2018 statement that AMR purportedly still

---

[8]    The Moving Defendants **repeated** this risk disclosure on November 14, 2018.

"""offer[ed] compelling long-term [investor] returns to [its] shareholders,"""" his Report and deposition testimony made clear that "over the course of the Class Period, . . . Defendants made materially false and misleading statement and omissions concerning *the condition, capability, and value of AMH and [KFM]*." FRpt., ¶¶39, 116. *See also* FX B at 166:10-18, 177:21-178:7. The August 14, 2018 statement related directly to the capability and value of AMR. Feinstein identified the corrective disclosures that righted that statement (February 25, 2019 announcement of a potential $3.1 billion asset write-off, and the statistically significant stock price drop that followed). FRpt., ¶¶140, 297-299.

**Statement No. 27**: Feinstein identifies the September 6, 2018 statement concerning the basis for AMR's development drilling and the confidence that multi-well testing and development gave the Moving Defendants when they made their projections (*i.e.*, """[s]o that gave us the confidence to move forward with this base case of 1,500-foot spacing""" (in other words, 12-WPS)). *Id.*, ¶119. This is a reiteration of the same misleading statements made on August 17, 2017, and January 19, 2018. *See* Statement Nos. 6 and 9, *supra*. As such, Feinstein's methodology in arriving at his loss causation opinion concerning Statement No. 27 is reliable for the same reasons.

**Statement No. 28**: On September 6, 2018, the Moving Defendants showed the same slide presented to investors on August 14, 2018 (suggesting ESP utilization continue to make economic sense). *See* Statement No. 27, *supra*. Feinstein identified the statement, the associated corrective disclosure and the statistically significant stock price drop that followed. *Id.*

- 17 -

Feinstein's opinions need only demonstrate that a "**part** of the 'relevant truth' – the truth obscured by the [defendants']" misleading statements, and that a meaningful stock price drop followed that disclosure. *Flowserve Corp.*, 572 F.3d at 230.  Feinstein has reliably, and painstakingly, done so.[9]

### B.   Feinstein's §14(a)(9) Loss Causation Opinion Is Reliable and Admissible Pursuant to Rule 702

Defendants make the strawman argument that Feinstein "ma[d]e no attempt to show proximate caus[ation]" for Class Plaintiffs' §14(a)(9) claims.  *See* MTN at 16.  The Moving

---

[9]      The cases the Moving Defendants rely upon to bolster their mistaken argument that Feinstein "merely assumed" each misstatement was corrected are not persuasive. *See* MTN at 11-12. *Magruder v. Halliburton Co.*, 2009 WL 854656 (N.D. Tex. Mar. 31 2009), deals with the sufficiency of loss causation allegations at motion to dismiss, not the admissibility of expert testimony after closure of discovery. *See also Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 682-82 (5th Cir. 2014) (addressing irrelevant statute of limitations arguments), 688-89 (loss causation pleading standard). The Fifth Circuit in *Flowserve Corp.* stands for the well-known proposition that "it [is] enough that the market learned that the . . . guidance was wrong and other negative information **unrelated** to the reduced [and corrective] guidance did not cause the decline in . . . share price." *Id.*, 572 F.3d at 231. Feinstein has satisfied both requirements, and the Moving Defendants do not contend (let alone identify) any "non-fraud" related factors Feinstein failed to address. *Goldman Sachs Grp., Inc. v. Ark. Tcher. Ret. Sys.*, 594 U.S. ___, 141 S. Ct. 1951, 1960-61 (2021), is irrelevant to the Rule 702 inquiry because that case dealt with the assessment of alleged "generic" misrepresentations at class certification, and which party bears the burden on demonstrating the lack of price impact (which is on defendants). The Moving Defendants do not contend that the corrective disclosures identified by Feinstein bear no relation to the alleged misleading statements. As such, *Greenberg v. Crossroads Systems Inc.*, 364 F.3d 657, 666-69 (5th Cir. 2004), is of no help. *Fener v. Operating Eng. Construction Industry*, 579 F.3d 401, 411 (5th Cir. 2009), deals with an expert's control for market variations in isolating the "firm-specific" information that is attributed to stock price drops. Notably, the Moving Defendants do not dispute that Feinstein's event study did so control (and, they do not attack Feinstein's methodology at all). *See also* FRpt., ¶¶228-244. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1275, is irrelevant because, as the Tenth Circuit (and plaintiffs) acknowledged, the expert did not "'perform a separate, independent regression analysis for'" the debt securities. Here, the Moving Defendants do not contend Feinstein failed to perform a regression analysis for the securities in this case. Nor could they. *See* FRpt., ¶¶229, 231, 235, 237-243.

- 18 -

Defendants factual premise is plainly false.  Feinstein exhaustively assessed the alleged misleading statements in the Proxy, including the bogus financial projections, identified the corrective disclosures, and the statistically significant stock price drops following those corrective disclosures.  *See* Argument, A., *supra*.  And, the Moving Defendants do not dispute that Feinstein utilized the widely-accepted "event study" methodology to reach his loss causation opinion.  Rather, they vehemently disagree with his conclusions.  But that does not warrant exclusion.  *See Primrose*, 382 F.3d at 562-63.

The Moving Defendants conveniently avoid expressing the loss causation standard that this Court eloquently enunciated recently: A "'plaintiff satisfies [Section] 14(a)'s loss causation requirement by demonstrating that [the] defendant's misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction.'"  *McDermott Int'l*, 2021 WL 1421603, at *6.

And, because Feinstein's §10(b) loss causation methodology satisfies *Dura,* it must also satisfy the more liberal §14(a) standard.  Why wouldn't it?[10]  As noted above, Feinstein testified that he interpreted the misleading statements in this case to have falsely conveyed to voters that the merged AMH/KFM assets were worth $3.86 billion as of the time of the business combination.  Every single corrective disclosure Feinstein identified suggested or revealed that ARM's valuation was worth much less than $3.86 billion.  *See* Argument, A., *supra*.

---

[10]     Ironically, it is the Moving Defendants who suggest that the loss causation approach/methodology is no different between §§10(b) and 14(a) claims.

It was the Moving Defendants who issued a cascade of corrective disclosures that slowly revealed the depth of falsity of the AMH and KFM financial projections.  It was the Moving Defendants who disclosed a material weakness in financial reporting, disclosed that assumptions used at the time of the business combination required revision (and, as a results, a \$3.0+ billion write-off).  It was the Moving Defendants who materially revised the value of AMRs' reserves because the 12-WPS and 250 MBO assumptions were incorrect as of August 17, 2017, and as of the January 19, 2018 filing of the Proxy.  It was the Moving Defendants who, when ultimately recognizing a \$3.2 billion write-off, admitted the \$3.2 billion write-off was necessary because the 12-WPS and 250 MBO used at the time of the business combination were not correct.

### C. Feinstein's Damages Opinions Regarding the §§10(b) and 14(a) Claims Are Reliable and Admissible

#### 1. Feinstein's Estimate of "Out-of-Pocket" Damages Is Reliable and Admissible

The Moving Defendants' brief has improperly conflated proof of loss causation with damages.  *See Vivendi*, 634 F. Supp. at 364 (warning that "it is important not to confuse causation with damages").  Judge Holwell explained that with regard to loss causation, a plaintiff must generally demonstrate that the "fraud related event" (a defendant's misleading statement) was a "substantial" factor in causing economic loss.  *Id.* at 364-365.  Then as part of the damages assessment, a plaintiff is required to "ascribe some ***rough proportion*** of the whole loss" to defendants' fraud by "disaggregat[ing] the [stock price drops] or some rough percentage of the [stock price drops] resulting from other, ***non-fraud related*** events."  *Id.* at 365.

- 20 -

As an initial matter, the Moving Defendants do not challenge Feinstein's use of event study and regressions models to reach his damage opinions.  Nor have the Moving Defendants argued or identified ***any*** non-fraud related factors that Feinstein failed to disaggregate in estimating damages.  *See generally* MTN.  *See also Vivendi*, 634 F. Supp. 2d at 370 (noting "defendants must at least adduce competing causal events that plaintiffs have failed to disaggregate").  And, Feinstein diligently searched for non-fraud related factors (referred to by Feinstein as "confounding" information), but was unable to identify any (save one with regard to the February 26-28, 2019 stock price drop).  *See* FRpt., ¶¶286, 291, 295, 301, 305.[11]

So, the Moving Defendants raise a strawman argument untethered from the law.  They contend:  "The upshot of this approach [to loss causation] is that neither expert calculates the damages caused by any given misrepresentation, independent of other misrepresentations, as required by the PSLRA and *Dura*."  MTN at 10-11.  No language in the PSLRA or in *Dura* requires this type of damages "allocation" exercise where there are no "non-fraud" related factors present.[12]  And, the Motion does not refer to a single legal authority supporting the

---

[11]     Feinstein explained how he controlled for the February 27 "market overshoot" in estimating damages.  *See id.*, ¶301.  The Moving Defendants also do not dispute that Feinstein's event-study reliably eliminated all non-fraud related factors on AMR's stock price on disclosure days.  *Id.* ¶¶174, 196, 228-231, 233, 251, 255, 259, 267, 270, 278, 280, 285-286, 290-291, 294-295, 300-301, 304-305 (referred to as "confounding information").

[12]     Defendants cite the PSLRA's standard on loss causation, not damages.  *See id.* at 7.  Defendants attempt to find legal authority with their citation to *Dura*.  *Id.* at 9.  While *Dura* stands for the proposition that a plaintiff must eliminate non-fraud related factors from their damage estimates, nowhere in the case does it say plaintiffs must provide the jury with a precise allocation of damages for separate statements that were corrected on the same day (particularly in the absence of non-fraud (or confounding) factors).

argument.  Further, the Moving Defendants' expert who criticized Feinstein did not dispute that a jury would be fully capable of making the damage "allocation" findings based on all the evidence introduced at trial.  *See* FX C at 164:3-22.[13]

   As noted in *Vivendi*, a plaintiff need only "'ascribe some **rough** proportion'" of the fraud-related damages attributable to a defendant's conduct.  634 F. Supp. 2d at 365.  *See also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 475-76 (1977) (holding that "§10(b) must be read flexibly, not technically and restrictively and that the statute provides a cause of action for any plaintiffs who suffer(s) an injury as a result of deceptive practices touching its sale (or purchase) of securities").  *See also Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 231 (2d Cir. 2004) (noting "[m]ost often, if a plaintiff can demonstrate that the defendant's acts caused him economic loss . . . the plaintiffs will also be able to establish 'facts and circumstances that show the probable amount of . . . damages'" sufficiently to allow the jury to form a reasonable and likely estimate of recoverable damages); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2nd Cir. 2005) (it is not necessary for a plaintiff to prove precise damages).  Feinstein reliably apportioned a "rough amount" of damages for the actionable statements in the case.  *See* FRpt., ¶¶306-310.  Nothing else is required.

---

[13]   For example, the jury will be presented with evidence regarding which misstatements were relatively more material (*e.g.*, bogus financial projections underlying the purported $3.86 billion market value of the merged assets), and which misstatements were relatively less material (*e.g.*, the disclosure of a material weakness in financial reporting at the same time the Company announced it will likely take a $3.0+ billion write-off because they had to revisit the assumptions underlying the financial projections at the time of the business combination).  The jury may also consider the degree of the Moving Defendants' deliberate conduct in making their apportioning decisions on a statement-by-statement basis.

- 22 -

The Moving Defendants have not disputed that Feinstein has utilized the widely-accepted methodologies to estimate the "out-of-pocket" damages associated with the corrective disclosures on March 29, 2018 ($1.29 per share), August 14, 2018 ($1.58 per share), November 13, 2018 ($0.54 per share), February 25, 2019 ($0.64 per share), and May 17, 2019 ($0.04 per share). They merely complain about those conclusions.

Further, the Moving Defendants '"allocation" of damages argument should be rejected because it is speculative. Hypothetically, a jury could find liability for all alleged misleading statements in the case. Under those circumstances, it would be reasonable for a jury to award Class Plaintiffs the entirety of their "out-of-pocket" damages, or $4.09 per share. But the Moving Defendants must assume, *arguendo*, that the jury will not find all statements misleading. But lest they forget: There has been no trial, yet.

Defendants also contend that Feinstein's opinions must be unreliable because the artificial inflation was "never higher than it was on August 17, 2017, the start of the Class Period" and that means the misstatements made after that date "inflated AMR's stock price before the statements were made." MTN at 12. Hogwash. It was the Moving Defendants who told investors on August 17, 2017 that the merged assets had an estimated market value of $3.86 billion (or $10.00 per share). The Moving Defendants' subsequent Class Period misleading statements were made to support or rationalize the assumptions underlying the projections utilized to estimate the $3.86 billion value, or basically repeated what Defendants said at the outset of the Class Period.

For example, the fact that the Moving Defendants failed to disclose that they planned and began utilizing large numbers of expensive ESPs in the March to May 2018 time period

- 23 -

is of no moment.  The market had no way of placing an "up-front" value on the **undisclosed scheme** to chase production because AMR couldn't get the amount of oil out of the ground as they told investors between August 2017 and January 2018.  Further, that conduct cannot be separated from the bogus projections in the first instance.  The Moving Defendants were forced to deploy the ESPs in 2018 because the leasehold would not produce the oil and gas volumes previously espoused (let alone the EBITDA) at the 12-WPS and 250 MBO assumptions, and KFM's commodity volumes – 80% to 90% of which were assumed to be delivered by AMH – were derivatively baseless too.

### 2.     Feinstein's "Benefit-of-the-Bargain" Damages Estimate Is Reliable and Admissible

Defendants next contend that Feinstein's $8.23 per share in "benefit-of-the-bargain" damages estimate is "incompatible" with *Dura* and the PSLRA for three reasons.  MTN at 14-16.  The Moving Defendants are incorrect.

First, the Moving Defendants suggest that because the out-of-pocket damages for the §§10(b) and 14(a) are the same, his §14(a) out-of-pocket must be unreliable.  *Id.* at 14.  However, an expert's **application** of widely-accepted and reliable methods goes to the weight of the opinion, not its admissibility.  Just because Feinstein concluded they are equal does not call for preclusion.  *See Primrose*, 382 F.3d at 562-63.

Second, the Moving Defendants reargue that Feinstein "ma[d]e no attempt to show proximate caus[ation]" with respect to the §14(a) claim.  MTN at 16.  As demonstrated in Argument, A. and B., *supra*, that argument is meritless.

The Moving Defendants do not dispute, let alone criticize, Feinstein's methodology in estimating "benefit-of-the-bargain" damages.  Importantly, they say nothing of whether the

methodology Feinstein applied to estimate these damages is speculative.[14]   Rather, the Moving Defendants suggest only Feinstein's damage estimate is unreliable because it is "greater" (*i.e.*, it's too high) when compared to his out-of-pocket estimate.  *Id.* at 15.  That is not a basis for exclusion.  Nor do the Moving Defendants cite a single legal authority saying otherwise.  Federal courts have recognized that class plaintiffs may be entitled to "windfall" benefit-of-the-bargain damages where the defendant's conduct strays from mere negligence into fraud.  *See, e.g.*, *Erickson v. Jernigan Cap., Inc.*, __ F. Supp. 3d __, 2023 WL 5966785, at *5 (S.D.N.Y. Sept. 14, 2023) (recognizing benefit-of-the-bargain damages appropriate where a defendant's "conduct extended beyond negligence to fraud"); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 996 (2d Cir. 1988) (same).  Plaintiffs have ample evidence of the Moving Defendants' deceitful conduct.  Accordingly, Feinstein's "benefit-of-the-bargain" damages opinion is reliable and may be presented to a jury.

## CONCLUSION

For the reasons stated herein, Feinstein's loss causation and damage opinions are reliable and admissible.  The Court should deny the Moving Defendants' Motion in its entirety.

Dated:  January 18, 2024                                Respectfully submitted,

/s/ Andrew J. Entwistle                                  /s/ Trig R. Smith
Andrew J. Entwistle (attorney-in-charge)       Trig Smith (*pro hac vice*)
State Bar No. 24038131                               Lonnie Browne (*pro hac vice*)
Callie Crispin                                              John Kelley (*pro hac vice*)
State Bar No. 24104231                               **ROBBINS GELLER RUDMAN &**
Sal H. Lee                                                   **DOWD LLP**

---

[14]     The Court should disregard the Moving Defendants footnote 12.  Defendants do not identify any evidence supporting any contention contained in it.  *See id.* at 15.

4859-3528-0029.v1

State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice*
*forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven*
*Fund, A Series of Frank Funds Trust*

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

- 26 -