# PX 203

REDACTED IN ITS ENTIRETY

# PX 204

REDACTED IN ITS ENTIRETY

# PX 205

REDACTED IN ITS ENTIRETY

# PX 206

REDACTED IN ITS ENTIRETY

# PX 207

REDACTED IN ITS ENTIRETY

# PX 208

REDACTED IN ITS ENTIRETY

# PX 209

REDACTED IN ITS ENTIRETY

# PX 210

## REDACTED IN ITS ENTIRETY

# PX 211

REDACTED IN ITS ENTIRETY

# PX 212

Page 1

1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3

    IN RE                    |
4                            |
    ALTA MESA                |   Civil Action No. 4:19-cv-00957
5   RESOURCES, INC.          |
    SECURITIES               |
6   LITIGATION               |

7

    ********************************************************
8              ORAL AND VIDEOTAPED DEPOSITION OF
9                       JOHN BALDAUFF
10                      APRIL 17, 2023
11  ********************************************************

12

          ORAL AND VIDEOTAPED DEPOSITION of JOHN BALDAUFF,
13  produced as a witness at the instance of the
    Defendants, and duly sworn, was taken in the
14  above-styled and numbered cause on April 17, 2023,
    from 9:42 a.m. to 4:03 p.m., before Mendy A.
15  Schneider, CSR, RPR, in and for the State of Texas,
    recorded by machine shorthand, at the offices of
16  Latham & Walker, 811 Main Street, Suite 3700, Houston,
    Texas, pursuant to the Texas Rules of Civil Procedure
17  and the provisions stated on the record or attached
    hereto; that the deposition shall be read and signed.

18

19

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

Page 26

1      Q.   Did you start at AMH as an operations --
2  senior operations engineer?
3      A.   Yes, ma'am.
4      Q.   And now you're aware that in February 9,
5  2018, there was a merger involving AMH.  True?
6      A.   I -- I believe that -- if you say so, the
7  date, but, yeah, early '19.  Yes, ma'am.
8      Q.   And as part of that merger, it became a part
9  of Alta Mesa Resources.  Yes?
10     A.   I believe so.
11     Q.   And you understand that this transaction was
12  known as the business combination.  True?
13     A.   Yes, ma'am.
14     Q.   And if I say "AMR," you understand that I'm
15  referring to Alta Mesa Resources and not Alta Mesa
16  Holdings, right?
17     A.   Yes, ma'am.
18     Q.   So after the business combination in 2018,
19  you weren't just a senior operations engineer, were
20  you?
21          MR. SHER:  Objection.
22     A.   I believe I was a senior -- still a senior
23  operations engineer.  I'm not -- I mean, I -- I --
24  titles weren't a very big thing at Alta Mesa.  I --
25  I -- I really don't understand the question.

Page 27

1      Q.   (BY MS. GUZMAN)  Well, I guess after the
2   business combination in 2018, by that time your --
3   your title was ESP and hydraulic pump expert.  True?
4      A.   No.
5      Q.   No, you were not the ESP hydraulic --
6      A.   I --
7      Q.   Sir, you were not an ESP and hydraulic pump
8   expert in 2018 --
9      A.   I was --
10     Q.   -- as your title?
11     A.   That was not my title, but I was an expert.
12     Q.   Okay.  Tab 10.  I'm going to show you what's
13   been marked as Baldauff Exhibit 1.
14              (Marked Baldauff Exhibit 1.)
15     A.   Yes, ma'am.
16     Q.   (BY MS. GUZMAN)  Okay.  And for the record,
17   this is the document beginning with Bates
18   No. AMR_SDTX01096261.
19              Do you see that number at the bottom of
20   the page?
21     A.   Yes, ma'am.
22     Q.   This is known as a Bates number.  So when I
23   say "Bates number," it's the -- the number at the
24   bottom.
25     A.   Okay.

[PAGES INTENTIONALLY OMITTED]

Page 64

1  Paragraph 256 at the top of my Page 84.  Oh, I was
2  looking at --
3      Q.   I apologize.  For the record, there are two
4  different numbers.
5           The Page 84 number at the bottom.
6      A.   Thank you.
7      Q.   Thank you.
8           Starting at the second sentence, it
9  says:  "The allegations contained at Paragraph 266 --
10  266 are based on information from CW2."
11           Do you see that?
12      A.   It says CW -- are you talking about 264?
13      Q.   Yes, the second sentence.
14      A.   Oh, the second sentence.  Yes.
15      Q.   And you're CW2, right?
16      A.   Yes.
17      Q.   If you'll turn to the next page, Page 85.
18  Starting at the second sentence of Paragraph 266, it
19  says:  "A senior reservoir engineer at Alta Mesa
20  initially provided management with internal EUR
21  estimates, the estimated recoverable reserves of an
22  average Company oil well over its lifetime.  But,
23  unhappy with these numbers, Alta Mesa management
24  pressured the reservoir engineer to provide higher EUR
25  estimates.  After the engineer refused to do so,

Page 65

1    management removed them from the task of generating

2    EUR estimates and reduce their job responsibilities."

3                    Did I read that correctly?

4        A.   You read that correctly.

5        Q.   Did you provide this information to

6    plaintiffs' counsel?

7        A.   I don't recall, but that basically is

8    incorrect.

9        Q.   Which parts are incorrect?

10       A.   Okay.  So if I may elaborate just a little

11   bit, I do not know if the gentleman was a senior

12   reservoir engineer.  He was a -- he was a reservoir

13   engineer.  I don't know what his title was.

14                   And I do not know if Alta Mesa

15   management pressured the reservoir engineer to provide

16   higher EUR estimates, but I knew, though, they were

17   unhappy with his estimates and they ended up using

18   somebody else's estimates.

19                   So that last paragraph -- the last

20   statement -- or I'm sorry -- the last sentence in that

21   paragraph, "after the engineer refused to do so," I

22   don't say he -- they just started using somebody

23   else's estimates.

24       Q.   So let's break this down a little bit.

25                   Who is the reservoir engineer that

Page 66

1   you're referring to?

2       A.    Abbas Belyadi.

3       Q.    Abbas Belyadi?

4       A.    Yes, ma'am.

5       Q.    Can you spell either of those?

6       A.    A-B-B-A-S, Belyadi, B-Y-L-A-I-D-I [verbatim].

7   I don't know.  He's -- he's Persian.  He's Iranian, so

8   I don't...

9       Q.    And you told plaintiffs' counsel that

10  Mr. Belyadi provided management with internal EUR

11  estimates and they were unhappy with those numbers.

12  True?

13      A.    Mr. Belyadi and I were friends.  He told me

14  that a huge part of his job was to provide those

15  numbers.  And the company started getting them from

16  somebody else that provided larger numbers.

17      Q.    Okay.  And you told this to plaintiffs'

18  counsel?

19      A.    I don't recall, but it's in there.  I

20  remember having this conversation with Mr. Belyadi.

21      Q.    Uh-huh.

22      A.    I do not remember having this conversation

23  with plaintiffs' counsel.  I'll be honest with you, I

24  don't.

25      Q.    The complaint here says that you provided

Page 67

1    them with this information, correct?

2                    MR. MAURIELLO:  Objection.

3        A.   Then -- then I possibly did.  I just don't

4    recall, to be honest.

5        Q.   (BY MS. GUZMAN)  So Mr. --

6                    (Speaking simultaneously.)

7        Q.   (BY MS. GUZMAN)  Sorry.

8        A.   But they didn't get it all correct, because I

9    didn't say everything in that paragraph.  Okay.

10       Q.   Do you recall when you and Mr. Belyadi had

11   this conversation?

12       A.   No.  It was before Mr. Belyadi lost his job

13   and was laid off.

14       Q.   Do you know when that was?

15       A.   No.

16       Q.   After the business combination?

17       A.   Yes -- I -- I -- I don't recall.  I have

18   to -- I don't recall.

19       Q.   And I think you -- you said this earlier, but

20   just to be clear, Mr. Belyadi wasn't part of the

21   production operations group, right?

22       A.   No.

23       Q.   What -- what group was he a part of?  Do you

24   know?

25       A.   He reported -- he reported to Kevin Bourque.

Page 68

1      Q.   Is that upstream?

2      A.   Yes.

3      Q.   And who was Mr. Bourque?

4      A.   He was vice president of -- I don't -- I

5   don't remember his exact title.  He was the vice

6   president and he worked in the Oklahoma team.  His

7   office was right next to Mr. Belyadi's.

8      Q.   And you didn't tell plaintiffs that

9   Mr. Belyadi told you that he was pressured to provide

10  higher EUR estimates.  True?

11              MR. SHER:  Objection.

12     A.   I don't remember my conversation with them.

13  I -- I -- I remember my conversation with Mr. Belyadi.

14  I don't remember Mr. Belyadi -- I do not believe

15  Mr. Belyadi was pressured.  He did not give me that.

16  He just said that they were unhappy with his lower

17  projections.

18     Q.   (BY MS. GUZMAN)  Did you tell plaintiffs'

19  counsel that he was pressured?

20              MR. SHER:  Objection.

21     A.   I don't recall.

22     Q.   (BY MS. GUZMAN)  And --

23     A.   I -- I -- I think it's a poor choice of

24  words.  I don't -- I don't believe so.

25     Q.   Did you tell plaintiffs' counsel that he

Page 69

1   refused to provide higher EUR numbers?

2        A.   I don't recall.

3        Q.   Did you tell plaintiffs' counsel that

4   management removed -- management removed them from the

5   task of generating EUR estimates and reduced their job

6   responsibilities?

7        A.   I possibly could have said that.

8        Q.   Possibly could have told them this, but

9   you're not sure?

10       A.   I don't recall.

11       Q.   How many conversations did you have with

12  Mr. Belyadi about those EUR estimates?

13       A.   About that particular issue, just once.

14       Q.   And you don't have any notes from that

15  conversation, right?

16       A.   No, ma'am.

17       Q.   And you don't have any documents that show

18  that he told you this?

19       A.   No.

20       Q.   You didn't think it was important to put in

21  writing?

22                MR. MAURIELLO:  Objection.

23       A.   No.  I -- I don't -- I wasn't in a position

24  to take it in writing and I -- there was no reason for

25  me to do that.

Page 70

1      Q.   (BY MS. GUZMAN)  So, no, you didn't think it
2   was important to put it in writing?
3      A.   No.
4             MR. MAURIELLO:  Objection.
5      A.   I -- at the time, no.
6      Q.   (BY MS. GUZMAN)  But you did think it was
7   important enough to tell plaintiffs' counsel even
8   though you didn't experience this firsthand?
9             MR. MAURIELLO:  Objection.
10            MR. SHER:  Objection.
11     A.   I did not say I didn't experience it
12  firsthand.  I don't -- I don't understand the
13  question.  Could you repeat that, please?
14     Q.   (BY MS. GUZMAN)  You didn't think this was
15  important enough to put in writing, but you did think
16  it was important to tell plaintiffs' counsel?
17            MR. MAURIELLO:  Objection.
18            MR. SHER:  Objection.
19     A.   Yes.
20     Q.   (BY MS. GUZMAN)  And it wasn't important
21  enough to write it down at any point prior to this
22  litigation?
23            MR. MAURIELLO:  Objection.
24            MR. SHER:  Objection.
25     A.   I had no dog in the fight.  I wasn't -- no.

Page 71

1   I was called by plaintiffs' attorneys, and they asked

2   me and so then I told them.

3        Q.   (BY MS. GUZMAN)  Did they ask you about

4   Mr. Belyadi specifically?

5                  MR. SHER:  Objection.

6        A.   I don't recall.

7        Q.   (BY MS. GUZMAN)  Were they already aware about

8   a reservoir engineer who provided EUR estimates that

9   management was unhappy with?

10                  MR. MAURIELLO:  Objection.

11                  MR. SHER:  Objection.

12       A.   I have no idea.

13       Q.   (BY MS. GUZMAN)  And do you recall which of

14  the conversations with plaintiffs you told them about

15  Mr. Belyadi?

16       A.   No, I don't.

17       Q.   Did you tell plaintiffs' counsel that

18  Mr. Belyadi was the reservoir engineer that you were

19  referring to?

20       A.   I don't recall.

21       Q.   Do you know whether plaintiffs' counsel ever

22  contacted Mr. Belyadi to confirm his story?

23       A.   I have no idea.

24                  MR. SHER:  Objection.

25       Q.   (BY MS. GUZMAN)  Do you know whether they ever

Page 72

1    asked him to be a witness in this case?

2                    MR. SHER:   Objection.

3        A.   I don't know.

4        Q.   (BY MS. GUZMAN)  And you don't know when he

5    provided the EUR estimates to management, correct?

6                    MR. MAURIELLO:   Objection.

7        A.   Could you repeat that again, please?

8        Q.   (BY MS. GUZMAN)  Do you know when he provided

9    the EUR estimates to management that they were unhappy

10   with?

11                   MR. MAURIELLO:   Objection.

12       A.   He provided them on a regular basis.  That

13   was his main job, if I can remember correctly, and he

14   was very good at that.  That was his specialty.  And

15   he performed them, and how often he reported -- you

16   know, I -- I have no idea how often he reported to

17   management.

18       Q.   (BY MS. GUZMAN)  Do you know what his

19   estimates were that management was unhappy with?

20                   MR. MAURIELLO:   Objection.

21       A.   No.  Mr. Belyadi just told me someone else

22   could do -- was doing it and they were higher, and so

23   they were using that other person's numbers.

24       Q.   (BY MS. GUZMAN)  And when we say "management,"

25   are you -- which individuals are you referring to?

Page 73

1      A.   I don't know.  He just said -- used the words

2   "they" in re -- if I can remember correctly, he did

3   not name any names of management.

4      Q.   To your knowledge, is any of the information

5   in Paragraph 266 in writing somewhere?

6      A.   No.  I -- let me -- no.

7      Q.   And you weren't personally there when they

8   told him they were unhappy with his EUR estimates,

9   right?

10      A.   No, I was not.

11      Q.   So the truth is you have no idea what they

12   told him, right?

13                 MR. MAURIELLO:   Objection.

14                 MR. SHER:   Objection.

15      A.   Mr. Belyadi told me what I just told you

16   earlier, that he -- that was his main job and somebody

17   else was -- that was his main job, and he was worried

18   about keeping his job because somebody else was now

19   doing it.  He was still doing it, but they weren't

20   using his numbers.

21      Q.   (BY MS. GUZMAN) Do you know who the -- the

22   other person was?

23      A.   I truly don't.  I don't know.

24      Q.   But in short, all of the information in

25   Paragraph 266 is secondhand information that you got

Page 74

1   from Mr. Belyadi.   True?

2              MR. SHER:   Objection.

3              MR. MAURIELLO:   Objection.

4      A.   I received it from Mr. Belyadi who told me

5   that happened.

6      Q.   (BY MS. GUZMAN)   And you haven't seen any

7   documents to back up the story, right?

8      A.   No, I had no reason to.

9      Q.   Just to make sure the record is clear, you

10  have not seen any documents that prove Mr. Belyadi's

11  story is true, correct?

12             MR. SHER:   Objection.

13     A.   I talked to Mr. Belyadi myself about the

14  issue and I believe he was telling me the truth, but I

15  have not seen any documents.

16     Q.   (BY MS. GUZMAN)   Okay.   And you cannot point

17  to any single document that proves this ever happened.

18  True?

19             MR. SHER:   Objection.

20     A.   I never saw any document.

21     Q.   (BY MS. GUZMAN)   And the first record from you

22  that shows this ever happened is the complaint that

23  was filed in this litigation.   True?

24             MR. SHER:   Objection.

25             MR. MAURIELLO:   Objection.

Page 75

1      A.   It jogged my memory.  I did not remember

2  telling them that I did -- it jogged my memory about

3  the conversation that I had with Mr. Belyadi.

4      Q.   (BY MS. GUZMAN)  But prior to looking at this

5  complaint this morning, you've never made a record

6  that Mr. Belyadi told you this story.  True?

7                MR. SHER:  Objection.

8                MR. MAURIELLO:  Objection.

9      A.   There was no reason for me to.

10     Q.   (BY MS. GUZMAN)  You never made a record that

11 Mr. Belyadi told you this story.  True?

12                MR. MAURIELLO:  Objection.

13     A.   No.  There was no reason for me to.

14     Q.   (BY MS. GUZMAN)  Is that a no?

15     A.   That -- that's an, I did not -- I did not

16 make any record, no.

17     Q.   Thank you.

18          Going back to the complaint, can you

19 please turn to Page 37?  At the bottom, No. 37.

20     A.   Sure.

21     Q.   Okay.  And I am looking at Paragraph 120.

22 I'm going to start at the second -- second sentence

23 beginning with "for example."

24          Do you see that?

25     A.   Yes, ma'am.

[PAGES INTENTIONALLY OMITTED]

Page 102

1    Q.   (BY MS. GUZMAN)  But you never wrote down what
2  your stance was?
3                 MR. SHER:  Objection.
4    A.   I may have.  I just -- I just -- I may have.
5    Q.   (BY MS. GUZMAN)  Okay.
6    A.   But I just don't know.  I know that was --
7  there were economical analysis done that -- that may
8  have stated that, spreadsheets.
9            I don't own -- I don't have anything.
10  That's why I didn't declare anything.  I have no
11  e-mails.  I have no files.  Of course, you know, I
12  stated that almost on a daily basis, and till -- till
13  they were tired of hearing it, and that was that.  It
14  was just my job to keep them running.
15    Q.   But you're saying that it's possible that you
16  did put in writing that you thought ESPs were not
17  effective or economical for AMH's wells?
18    A.   I -- I've explained to them many times, I
19  believe in writing.  I -- I'm sure there -- it was in
20  writing somewhere.  I -- I don't have a copy of any of
21  those.  That was years ago, okay.
22            I made that abundantly clear many times
23  in meetings straight to their faces, that this was not
24  fit for purpose for these wells.
25    Q.   Uh-huh.

Page 103

1          And we reviewed all of your documents

2   from your time at Alta Mesa.  We didn't see anything

3   that said that.

4          So is it still your -- is it still your

5   testimony today under oath that there is a document

6   out there that says that you -- let me finish -- that

7   you thought ESPs were not effective or economical?

8          MR. MAURIELLO:  Objection.

9          MR. SHER:  Objection.

10   A.   I don't know.  I know there were spreadsheets

11   that were -- I don't know what you -- what you with

12   recovered, ma'am, or what you discovered.  I truly

13   don't.

14          There were -- there were -- there were a

15   lot of discussions.  There were spreadsheets that we

16   ran that were -- and that was just the economics of

17   the -- of the -- of the pumps.  Everybody there knew

18   that I was against that policy.  Everybody.

19   Q.   (BY MS. GUZMAN)  Did -- sorry.

20          But is there a document that says --

21   A.   I don't --

22   Q.   -- John Baldauff is against this policy?

23          MR. SHER:  Objection.

24          MR. MAURIELLO:  Objection.

25   A.   I don't know where it would be.

1      Q.   (BY MS. GUZMAN)  And you said you --

2                MS. GUZMAN:  Well, first, I -- to the

3      extent such documents exist, I just want to reserve

4      the right to ask those -- that they be produced

5      because they're covered by the document subpoena in

6      this case.

7                MR. MAURIELLO:  Mr. Baldauff has

8      indicated that he's made a diligent good faith search

9      for all responsive documents to the subpoena and

10     produced through documents which were the only

11     responsive documents he had.

12               MS. GUZMAN:  Understood.  He's just

13     indicating there are documents out there that we

14     haven't seen, so I just wanted to put it on the

15     record.

16               MR. SHER:  And plaintiffs' lawyer --

17     you -- you said you reviewed all his e-mails.  We

18     request you produce everything that you reviewed that

19     we might not have.

20               MS. GUZMAN:  Everything I reviewed was

21     produced.

22               MR. SHER:  By defendants?

23               MS. GUZMAN:  Everything I reviewed was

24     produced.

25               MR. SHER:  Okay.  Thank you.

Page 105

1      Q.   (BY MS. GUZMAN)   Okay.  So you -- you said you
2   told -- you told people orally how you felt about ESPs
3   at Alta Mesa.
4             Who did you tell?
5      A.   Everybody on the -- on the engineering team
6   Jeff Janik, Mike Ellis, Hal Chappelle.
7      Q.   What did you tell them exactly?
8      A.   I told them what I told you.  Because of
9   those reasons, they were not -- they wanted a list of
10  25 wells, asked me how many wells that I had
11  recommended.  And I said one and I -- I don't remember
12  the name of the well.
13            It was a well near a saltwater disposal
14  well far up north.  It was a different type of well.
15  It had issues and problems that produced extra water
16  that -- that an ESP would be good in unloading and --
17  and helping that well.
18     Q.   Uh-huh.
19     A.   But the other wells were -- were -- was --
20  they were not fit for purpose and not -- not good
21  candidates for ESPs.  I stand by that now.
22     Q.   Uh-huh.
23     A.   I've been in -- I've worked ESPs, my first
24  well in 2000 -- I'm sorry, 1977 was my first ESP that
25  I ran, and I've been running them ever since.

Page 106

1          Q.    Uh-huh.

2          A.    I told them from the very beginning -- they

3      asked me how many wells were on a list, I said one.

4      And they said we want 25 by Monday.

5                    MS. GUZMAN:   Tab 17.

6          Q.    (BY MS. GUZMAN)   Okay.   Mr. Baldauff, I'm

7      going to show you what has been marked as Baldauff

8      Exhibit 4.

9                    (Marked Baldauff Exhibit 4.)

10                   (Discussion off the record.)

11         Q.    (BY MS. GUZMAN)   And do you recognize this

12     document?

13         A.    Uh-huh.   Yes, I do.

14         Q.    This is your -- from your LinkedIn page,

15     correct?

16         A.    Yes, it is.   Uh-huh.

17         Q.    At the bottom of the page you see Alta Mesa

18     Resources Inc.   True?

19         A.    Uh-huh.

20         Q.    And you see "Artificial Lift, Production

21     Optimization SME," right?

22         A.    Yes.

23         Q.    Does SME stand for subject --

24         A.    Subject matter expert, yes, ma'am.   I'm

25     sorry.

[PAGES INTENTIONALLY OMITTED]

Page 153

1    Q.   (BY MS. GUZMAN)   Just so I understand, there
2    were other wells that you thought not effective or
3    noneconomical or was it just that one?
4              MR. SHER:   Objection.
5              MR. MAURIELLO:   Objection.
6    A.   Quite a few wells that were uneconomical.
7    Q.   (BY MS. GUZMAN)   Okay.   And there are --
8    sitting here today, you cannot identify a specific
9    document where you told Mr. Chappelle that either
10   EHU36 or any other well was not effective or
11   noneconomical?
12   A.   I spoke to him -- he came by the -- no, I
13   didn't have anything in writing, but I spoke to him.
14   He didn't answer back, he turned his back and walked
15   away.   But he heard me because we were the only ones
16   in the room and I was two feet away from him.   And I
17   spoke that and he didn't turn around -- or he
18   didn't -- he pretended I -- he didn't hear, but he
19   heard.
20   Q.   Okay.
21   A.   And at that point -- and at that point, he
22   did that because he knew this day was going to come.
23   And here I am.
24   Q.   And at that point, you -- you didn't follow
25   up in writing about your position on ESPs at Alta

Page 154

1   Mesa -- well, on Alta Mesa's wells?

2            MR. SHER:  Objection.

3       A.   I valued my paycheck.  I didn't want to

4   push the -- that was it.  If he didn't want to listen

5   to me, why would he read something in writing.

6       Q.   (BY MS. GUZMAN)  So there was a monetary

7   incentive then to not -- to not speak out about the --

8   your concern about the ESPs?

9       A.   These -- these wells were going to be run

10  with ESPs whether I helped or not.  If I helped, it

11  could mitigate the losses that we were going to incur,

12  and I'd keep my job and my paycheck.  And I was over

13  60, okay.

14           And so I was doing the best I could to

15  help the shareholders out for Alta Mesa by -- by using

16  my expertise to try to mitigate the -- mitigate the

17  damages.

18      Q.   And you weren't concerned about the fact that

19  you were doing something that you wholeheartedly

20  believed was ineffective or economical, as you sit

21  here today?

22           MR. SHER:  Objection.

23      A.   I wasn't -- I wasn't doing anything illegal.

24  I was doing something in my mind to help -- I truly

25  believed I was helping the company by staying in the

Page 155

1   game and trying to mitigate the problems that we --
2   that we were having.
3              As soon as -- as soon as there was a
4   change in management and Mr. Ellis and Mr. Chappelle
5   left and there were new people there, we spent our --
6   our efforts in dismantling the ESPs and pulling them
7   out when we could -- and put them back on gas lift.
8   And that, by the way, is noted in one of my -- my
9   LinkedIn things, okay.
10             By lower -- go ahead, I'm sorry.
11  Q.   (BY MS. GUZMAN)  Did you have any
12  communications with Ronald Smith about any of the
13  allegations in the complaint from you -- attributed to
14  you?
15  A.   None at all.
16             MR. SHER:  Objection.
17  Q.   (BY MS. GUZMAN)  Did you have any
18  conversations with Mr. Hackett about any of the
19  allegations in the complaint that are attributed to
20  you?
21  A.   No.  Mr. Hackett came to our Monday meetings,
22  and he didn't ask any questions.
23  Q.   So you never specifically told Mr. Hackett
24  that you thought ESPs were not effective and not
25  economical?

[PAGES INTENTIONALLY OMITTED]

Page 169

1                    E X A M I N A T I O N
2    BY MR. SHER:
3        Q.   Hey, good afternoon, Mr. Baldauff.  My name
4    is Andrew Sher.  I represent the plaintiffs in this
5    class action.  I just have a few questions for you
6    this afternoon.
7                 Do you recall testifying a few minutes
8    ago about being forced to identify wells to install
9    ESPs in?
10                MS. GUZMAN:  Objection to form to the
11   extent it misstates prior testimony.
12       Q.   (BY MR. SHER)  Earlier today do you recall
13   testifying generally about ESPs?
14       A.   Yes, I do.
15       Q.   And do you recall testimony about being asked
16   or ordered to identify wells that were candidates for
17   ESPs shortly after the business combination closed?
18                MS. GUZMAN:  Same objection.
19       A.   Yes.  About a month probably past that date,
20   yes.  Uh-huh.  It was on a Friday afternoon.
21       Q.   (BY MR. SHER)  And who told you that the
22   company was looking for additional wells that were
23   candidates for ESPs to be installed in?
24                MS. GUZMAN:  Objection.  Same objection.
25       A.   Jerry Swearingen.

Page 170

1      Q.    (BY MR. SHER)  Do you know whose idea it was
2   to have additional ESPs installed at that time?
3      A.    I was told that Hal Chappelle had -- had --
4   was giving some advice that we get the maximum
5   production possible and that felt that that was the
6   best route to do it and we needed to run them.
7      Q.    I'm going to -- I -- I believe -- did you
8   testify -- sorry, strike that.
9               And you testified also before our last
10  break that you voiced concerns to Mr. Hal Chappelle
11  regarding the installation of ESPs, that it was not
12  optimal?
13              MS. GUZMAN:  Objection to the extent it
14  misstates the witness's prior testimony.
15     Q.    (BY MR. SHER)  Sorry.
16              Do you recall testifying earlier that
17  you raised concerns to Mr. Hal Chappelle on regarding
18  whether -- or that it was not optimal to install
19  additional ESPs?
20              MS. GUZMAN:  Same objection, and also
21  vague.
22     A.    I -- I stated that a specific well, EHU,
23  which he liked to talk about and say, hey, it did well
24  there, hopefully we can get some more like that.  And
25  my point to him was, Hal, that was the exception and