# PX 213

Page 1

1                UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF TEXAS

2                     HOUSTON DIVISION

3

4    IN RE ALTA MESA RESOURCES,  )

                                 ) Case No. 4:19-cv-00957

5    INC. SECURITIES LITIGATION  )

     _____)

6

7

8

9            REMOTE VIDEOTAPED DEPOSITION OF

10                  KEVIN BOURQUE

11                 MARCH 3, 2023

12                 9:05 a.m. CST

13

14

15              Witness Appearing From:

16        Law Offices of Winston & Strawn LLP

                 800 Capitol Street

17                 Suite 2400

                Houston, Texas 77002

18

19

20

21

22

23

24      Conducted Remotely Via Videoconference

25

[PAGES INTENTIONALLY OMITTED]

1  system, that would be -- again, we all worked in the

2  same group.  Alex was on the team with us.  This

3  would have been something that I would have -- I

4  would have counseled my employees not to do is

5  don't -- don't bypass your teammates.

6            I don't know that Mike or Gene was trying

7  to do that.  Again, this is Alex's assumption here.

8      Q.   Your team disagreed with Mike and Gene's

9  logic for spacing?

10           MS. PRESTON:  Objection, form.

11     A.   We had several opinions and differences.

12 I mean, again, it was an open debate that was

13 regularly encouraged.  I mean, we were able to have

14 communications.

15           Again, part of the reason for reminding

16 Cathy to not enable anybody is we want to keep that

17 fostered environment where people are able to be

18 heard.  Just because we have an opinion doesn't mean

19 we're right or it doesn't mean we're the only one.

20     Q.   Who made the ultimate decisions on well

21 spacing?  Was it Mike and Gene?

22           MS. PRESTON:  Objection, form.

23     A.   I would have taken my direction from Mike

24 Ellis.  He was my boss.

25     Q.   Do you think Gene Cole also had input?

[PAGES INTENTIONALLY OMITTED]

Page 243

```
 1   provide a high -- I'll call it a high rate of lift
 2   to be able to draw down the pressure in the
 3   wellbore.
 4       Q.   So an ESP alone cannot increase the
 5   recoverable reserves?
 6            MS. PRESTON:  Objection, form.
 7       A.   Correct.
 8       Q.   Do you know someone by the name of Lance
 9   Weaver?
10       A.   I do.
11       Q.   What was his role at Alta Mesa?
12       A.   I believe his title was investor
13   relations.
14       Q.   Was Mr. Chappelle involved in the
15   decisions regarding whether or not to use ESPs?
16            MS. PRESTON:  Objection, form.
17       A.   Not that I recall.  Would not have been --
18   would not have normally been that he would come
19   around and tell us what type of lift mechanism to
20   use.
21       Q.   Do you recall whether investors were
22   interested -- strike that.
23            Did you ever meet with investors regarding
24   ESPs?
25       A.   Not that I specifically recall.
```

# PX 214

Page 1

1          IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF TEXAS

2                    HOUSTON DIVISION

3                           )

    IN RE:  ALTA MESA        )

4   RESOURCES, INC.          )

    SECURITIES LITIGATION    )

5                           )

                            ) CIVIL ACTION

6                           )

                            ) NO.: 4:19-cv-00957

7                           )

8

9   ----------------------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF

11                 JOHN Q. CAMPBELL, JR.

12                    JUNE 23, 2023

13                  (Reported Remotely)

14  ----------------------------------------------

15

16

17       ORAL AND VIDEOTAPED DEPOSITION OF JOHN Q. CAMPBELL,

18  JR., produced as a witness at the instance of the

19  Plaintiff, and duly sworn, was taken in the above-styled

20  and numbered cause on the JUNE 23, 2023, from 2:16 p.m.

21  to 4:38 p.m. before Kelly Bryant, CSR in and for the

22  State of Texas, reported by machine shorthand, pursuant

23  to the Federal Rules of Civil Procedure and the

24  provisions stated on the record or attached hereto.

25

[PAGES INTENTIONALLY OMITTED]

1        Q.    (BY MR. SMITH)  Are -- are you familiar with

2    the -- the phrase "wells per section"?

3        A.    Yes.

4        Q.    Okay.  And I'll -- I may refer to that as just

5    WPS, the acronym WPS, just to let you know that I'm

6    referring to wells per section.

7                  Did --  do you recall whether anybody on

8    the Riverstone technical team reviewed any of the well

9    spacing tests that the company had conducted up to June

10   2017?

11                  MR. PETERS:  Objection, form.

12       A.    I don't recall that we reviewed any spacing in

13   that -- in that time period.

14       Q.    (BY MR. SMITH)  Did you ever have any

15   understanding that the Riverstone technical team was

16   brought on to provide an opinion to Riverstone as to

17   whether any WPS assumption that Alta Mesa management had

18   come up with was reasonable?

19                  MR. PETERS:  Objection to form.

20       A.    We weren't asked to -- to approve the wells

21   per section that you're talking about.  That -- that

22   wasn't our focus.

23       Q.    (BY MR. SMITH)  Okay.  Was your -- was any

24   part of your focus providing any opinion to Riverstone

25   regarding the reasonableness of the EUR assumptions that

                                                    Page 27

1    Alta Mesa had arrived at?

2                    MR. PETERS:  Objection to form.

3        A.    I mean we've looked at the stuff that was

4    presented, that they presented at the time, and, you

5    know, were asked to opine on if that was reasonable or

6    not.

7        Q.    (BY MR. SMITH)  Okay.  So just to make the

8    record clear, you -- you were asked to provide an

9    opinion.  And when I say "you," I'm referring to the

10   Riverstone technical team was asked to provide an

11   opinion to Riverstone regarding the reasonableness of

12   Alta Mesa's type curve assumptions?

13                   MR. PETERS:  Objection, form.

14       A.    We didn't specifically review detailed type

15   curves.  We -- we were asked to go and look and see if

16   everything, you know -- we were -- did it make sense to

17   us and, you know, was it reasonable, so...

18       Q.    Okay.

19       A.    As far as digging into type curves and doing

20   all that technical work, we had very little involvement

21   in the -- in the early stages of this.

22       Q.    Okay.  And when you -- when you say the early

23   stages, can you be a little bit more specific what

24   you're referring to?

25       A.    Prior to the fourth quarter of 2018.

[PAGES INTENTIONALLY OMITTED]

```
 1    or as a result of the Riverstone technical team's work,
 2    do you recall whether there were any specific opinions
 3    that were given to Riverstone regarding that work?
 4         A.   No.
 5              MR. PETERS:  Objection to form.
 6         Q.   (BY MR. SMITH)  Okay.  Do you recall whether
 7    the opinions were delivered in writing?
 8              MR. PETERS:  Objection to form.
 9         A.   I -- I don't recall.
10         Q.   (BY MR. SMITH)  Do you recall whether they
11    were communicated orally?
12         A.   I'm sure that, you know, they asked us, you
13    know, if we saw anything concerning or what we thought,
14    so, yeah.
15         Q.   All right.  Thank you.  We'll come back to
16    that document.  I'll -- I'll let you know when we're
17    ready to open that back up again.
18              Sir, again, I just want to make the record
19    clear.  So with regard to the Riverstone technical
20    team's involvement in the SPAC deal, can you tell me
21    precisely when you first learned that your services
22    would be needed?
23              MR. PETERS:  Objection, form.
24         A.   I don't know the date when -- when we sent,
25    but we were asked to go meet with the management team
```

# PX 215

Page 1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE SOUTHERN DISTRICT OF TEXAS

2                        HOUSTON DIVISION

3    IN RE:  ALTA MESA          )

     RESOURCES, INC.            ) CASE NO. 4:19-cv-00957

4    SECURITIES LITIGATION      )

5

6                ORAL VIDEOTAPED DEPOSITION

7                    MARK CASTIGLIONE

8                     July 7, 2023

9

10        ORAL VIDEOTAPED DEPOSITION OF MARK CASTIGLIONE,

11   produced as a witness at the instance of the

12   Plaintiff and duly sworn, was taken remotely by Zoom

13   in the above-styled and numbered cause on the 7th day

14   of July, 2023, from 12:14 p.m. Central to 3:18 p.m.

15   Central, before Shauna Foreman, Certified Shorthand

16   Reporter in and for the State of Texas, reported by

17   computerized stenotype machine, pursuant to the

18   Federal Rules of Civil Procedure and the provisions

19   stated on the record or attached hereto.

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

Page 23

1    that meeting.

2        Q.    (BY MR. SMITH)  Understood.

3              And do you recall that first day's

4    meeting on the 7th, that it was TPH that made a

5    presentation?

6              MR. PETERS:  Objection to form.

7        A.    Actually, I don't remember that.

8        Q.    (BY MR. SMITH)  All right.  So at any time

9    during 2017, did Riverstone ask you to independently

10   assess any of the work that TPH had done for

11   Riverstone in connection with the potential merger of

12   Alta Mesa and KFM?

13             MR. PETERS:  Objection to form.

14       A.    I don't recall that request.

15       Q.    (BY MR. SMITH)  All right.  Prior to

16   June 7th or June 8th, do you recall Riverstone asking

17   you to provide it with any opinion regarding Alta

18   Mesa operational data?

19             MR. PETERS:  Objection to form.

20       A.    No, I don't recall that.

21       Q.    (BY MR. SMITH)  Okay.  Do you recall

22   submitting any written opinion to Riverstone

23   regarding your attendance at those two days' meetings

24   at Alta Mesa's headquarters?

25             MR. PETERS:  Objection.  Form.

1      A.    I could not recall submitting a written

2   review.

3      Q.    (BY MR. SMITH)  All right.  Did you provide

4   anybody at Riverstone an oral opinion about what you

5   saw on June 7th and June 8th, 2017?

6                MR. PETERS:  Objection to form.

7      A.    I don't really remember.

8      Q.    (BY MR. SMITH)  Now, I think you suggested

9   that there were some subsequent meetings that you

10  were involved in; is that right?

11     A.    Yes.

12     Q.    Do you recall approximately how many?

13     A.    It was maybe two others that I recall.  I

14  know we had -- I believe we had a meeting with TPH.

15  I believe we also had a meeting with JPMorgan.  And

16  those two, I remember.  There may have been others,

17  but those -- those two, I remember.

18     Q.    Okay.  I want to kind of go through those

19  two meetings.

20                Do you recall approximately when the

21  meeting with TPH occurred?

22     A.    No, I don't.  I don't remember -- I don't

23  remember.

24     Q.    Was it -- was it after the

25  June 7th/June 8th meeting in Houston?

[PAGES INTENTIONALLY OMITTED]

1      Q.   (BY MR. SMITH)  Okay.  Do you have -- do

2  you have a general recollection of what TPH

3  presented?

4      A.   The only thing -- the thing I remember was

5  really a review of the geology and reserves

6  associated with the opportunity.  I'm sure there was

7  more to it, but that's all I recall.

8      Q.   Thank you.  And so, I'll just ask some

9  similar questions, but I'll be a little bit more

10  specific.

11          Did you or any member of your team

12  provide Riverstone any type of opinion regarding the

13  STACK geology after that meeting?

14          MR. PETERS:  Objection.  Form.

15      A.   I don't recall providing that.

16      Q.   (BY MR. SMITH)  Okay.  Did Riverstone ask

17  you to provide any type of opinion, the team, any

18  opinion to it regarding Alta Mesa reserves in the

19  STACK?

20          MR. PETERS:  Objection to form.

21      A.   I don't recall that specifically.

22      Q.   (BY MR. SMITH)  Maybe I can ask you just a

23  general question.

24          Between June 2017 and January 30th --

25  January 31st, 2018, did Riverstone ask you to provide

1    it any type of opinion regarding any type of

2    assumption that was being built into a valuation

3    model of the joint assets?

4                    MR. PETERS:  Objection to form.

5         A.   I do not recall being asked to provide an

6    opinion.

7         Q.   (BY MR. SMITH)  You know what the acronym

8    EUR means?

9         A.   Yes.

10        Q.   Did you or any member of your team provide

11   Riverstone any type of opinion regarding the

12   reasonableness of the EUR assumption that Alta Mesa

13   was using for purposes of the potential deal?

14                   MR. PETERS:  Objection.  Form.

15        A.   I do not recall providing that.

16        Q.   (BY MR. SMITH)  You're familiar with the

17   acronym wells per section or well spacing?

18        A.   Yes, sir.  Yes, sir.

19        Q.   Same question.  Do you recall any opinion

20   that was provided by the Meridian team regarding any

21   well spacing assumptions that Alta Mesa had been

22   utilizing for purposes of its valuation model?

23                   MR. PETERS:  Objection to form.

24        A.   No.  I don't recall.

25        Q.   (BY MR. SMITH)  At any time between

Page 28

1    June 2017 and the end of January 2018 did Riverstone
2    ask you to provide it any opinion regarding the
3    fairness of the estimated enterprise value of the
4    merged assets?  And the merged assets being Alta Mesa
5    Holdings less operations outside of the STACK plus
6    KFM.
7                    MR. PETERS:  Objection.  Form.
8         A.    I do not recall being asked to do that.
9                    MR. SMITH:  Okay.  Why don't you bring
10   up Exhibit 95, please?
11        Q.    (BY MR. SMITH)  And, Mr. Castiglione, we're
12   going to bring up what has been previously marked as
13   Exhibit 95.  And I'll represent to you that you're
14   not on this -- you're not a recipient, a sender, or a
15   cc on this e-mail.  Just take a look at it -- it's a
16   single e-mail -- and I just have a basic question for
17   you.
18        A.    Okay.
19        Q.    Okay.  I want to direct your attention to
20   the data that's in the center of this exhibit.  And
21   my question is specifically directed towards the
22   table above that has the Average Spacing, Well
23   Spacing per -- divided by 750, MBO, 250 Type,
24   EUR/Type -- do you see those columns in that table?
25        A.    Yes.

[PAGES INTENTIONALLY OMITTED]

```
                                            Page 33
 1        Q.   (BY MR. SMITH)  Okay.  And then -- so
 2   Mr. Karian forwarded you the IC memo on the 9th,
 3   right?
 4                 MR. PETERS:  Objection.  Form.
 5        A.   I believe he -- he forwarded me -- as I
 6   review this e-mail, what he forwarded to me was
 7   Chelsea's e-mail and the slides attached to that
 8   e-mail.
 9        Q.   (BY MR. SMITH)  Right.  So that's fair.  So
10   on the 9th, he forwards you the deck, correct?
11        A.   I'm sorry.  He forwarded me the what?
12        Q.   Well, there's -- there's a PowerPoint
13   presentation or a deck attached to the e-mail, right?
14        A.   Oh, yes.  Yes.
15                 (Simultaneous cross-talk.)
16        Q.   (BY MR. SMITH)  -- he forwarded you that
17   deck on the 9th, right?
18                 MR. PETERS:  Objection.  Form.
19        A.   That's what it appears to be from the
20   e-mail.
21        Q.   (BY MR. SMITH)  Okay.  And he says, "More
22   looks that at it" -- strike that.
23                 He said, "More looks that at it that
24   make me uncomfortable."
25                 Do you see that?
```

```
                                            Page 34
 1        A.    I do see that.

 2        Q.    Do you recall responding to that?

 3        A.    I may have responded to that.  I don't

 4   recall specifically.

 5        Q.    Do you recall what your response was?

 6        A.    I'm not sure.

 7        Q.    We'll get to the exhibit here, but I'll

 8   just represent for the record that you had a one-word

 9   response to it the same day.  You said, "Agreed."

10        A.    Okay.

11        Q.    At the time that you said you agreed with

12   Mr. Karian's statement here, did you understand what

13   you were agreeing with?

14              MR. PETERS:  Objection.  Form.

15        A.    No, I do not.

16        Q.    (BY MR. SMITH)  Do you presume that you

17   didn't understand what you were agreeing with when

18   you sent your e-mail?

19              MR. PETERS:  Objection.  Form.

20        A.    This was six years ago, so I'm not really

21   sure.

22        Q.    (BY MR. SMITH)  No, and I understand.  Just

23   to the best of your recollection.  I'm just trying to

24   figure out what you were agreeing with that made

25   Mr. Karian uncomfortable about the whatever.
```

1           MR. PETERS:  Objection to form.

2      A.    I do not recall.

3      Q.    (BY MR. SMITH)  Do you think it would be a

4  fair interpretation of this document that Mr. Karian

5  was saying the more times he looks at the potential

6  deal, the more uncomfortable he was becoming with it?

7           MR. PETERS:  Objection to form.

8      A.    I can't really say what Mr. Karian meant in

9  his e-mail.

10           MR. SMITH:  Let's bring up the next

11  document.

12           (Exhibit 720 marked)

13      Q.    (BY MR. SMITH)  We're going to bring up

14  your e-mail where you responded to it, and then we'll

15  take a break.  It will just take me a couple minutes

16  here.  And this will be marked as Plaintiffs'

17  Exhibit 720.

18           Mr. Karian -- I apologize.

19  Mr. Castiglione, this is just a single page e-mail.

20  It's just a continuation of the prior exhibit.  And I

21  just want to ask you simple questions regarding your

22  response.

23      A.    Sure.

24      Q.    Okay.  Does this document refresh your

25  recollection about what you were agreeing to?

# PX 216

Page 1

```
1            IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE SOUTHERN DISTRICT OF TEXAS
3                    HOUSTON DIVISION
4
      In re:              : CHAPTER 11
5    ALTA MESA RESOURCES,  :
      INC., et al., Debtors. :
6                          : Case No. 19-351333
      ALTA MESA HOLDINGS, LP : (MI)
7    and OKLAHOMA ENERGY   :
      ACQUISITIONS, LP,    :
8        Plaintiffs,       : (Joint Administration
                           : Requested)
9    vs.                   :
                           :
10   KINGFISHER MIDSTREAM, : ADVERSARY PROCEEDING
      LLC, et al.,         : 19-3609
11        Defendants.      :
12
13
14        VIDEOTAPED ORAL DEPOSITION OF
15            HARLAN H. CHAPPELLE
16                 CONFIDENTIAL
17
18        Called as a witness by Counsel for the
19   Kingfisher Parties, taken before Peggy Ann Antone, a
20   Certified Shorthand Reporter in and for the State of
21   Texas, on October 25, 2019, beginning at 9:01 a.m., at
22   the offices of Winston & Strawn, 1111 Louisiana Street,
23   25th Floor, Houston, Texas, pursuant to the Federal
24   Rules of Civil Procedure and the following stipulation
25   and agreement of counsel:
```

Page 2

```
1          A P P E A R A N C E S
2    COUNSEL FOR ALTA MESA HOLDINGS, LP and OKLAHOMA ENERGY
3    ACQUISITIONS, LP, Plaintiffs:
4        Robbins, Russell, Englert, Orseck, Untereiner &
5    Sauber LLP
6            LAWRENCE S. ROBBINS
7            RALPH C. MAYRELL
8            2000 K Street, NW, 4th Floor
9            Washington, DC  20006
10           Phone:  (202) 775-4501
11           Fax:  (202) 775-4510
12           Lrobbins@robbinsrussell.com
13           Rmayrell@robbinsrussell.com
14               AND
15       Foley & Lardner LLP
16           MICHAEL RIORDAN
17           1000 Louisiana Street, Suite 2000
18           Houston, Texas  77002-2099
19           Phone:  713.276.5500
20           Fax:  713.276.5555
21           Mriordan@foley.com
22
23
24
25
```

Page 3

```
1    COUNSEL FOR KINGFISHER MIDSTREAM, LLC, et al.,
2    Defendants:
3        Quinn Emanuel Urquhart & Sullivan, LLP
4            CHRISTOPHER PORTER
5            DEVIN VAN DER HAHN
6            Pennzoil Plaza, 711 Louisiana, Suite 500
7            Houston, Texas  77002
8            Phone:  713.221.7007
9            Fax:  713.221.7400
10           Chrisporter@quinnemanuel.com
11           Devinvanderhahn@quinnemanuel.com
12
13   COUNSEL FOR THE WITNESS:
14       Winston & Strawn LLP
15           ROLF S. WOOLNER
16           333 South Grand Avenue, 38th Floor
17           Los Angeles, California  90071-1543
18           Phone:  213.615.1831
19           Fax:  213.615.1750
20           Rwoolner@winston.com
21
22
23
24
25
```

Page 4

```
1          A P P E A R A N C E S (Continued)
2
3    COUNSEL FOR THE WITNESS (Continued):
4               And
5        Winston & Strawn LLP
6            KATHERINE A. PRESTON
7            1111 Louisiana Street, 25th Floor
8            Houston, TX  77002-5242
9            Phone:  713.651.2699
10           Fax:  713.651.2700
11           Kpreston@winston.com
12
13   COUNSEL FOR SPONSORS:
14       Vinson & Elkins LLP
15           MANUEL G. BERRELEZ
16           Trammell Crow Center
17           2001 Ross Avenue, Suite 3900
18           Dallas, Texas  75201-2975
19           Phone:  214.220.7709
20           Fax:  214.999.7709
21           Mberrelez@velaw.com
22
23
24
25
```

[PAGES INTENTIONALLY OMITTED]

Page 57

1        THE VIDEOGRAPHER:  Disc 2.  We're on back
2 on the record.  Disc 2.
3    Q.  (BY MR. PORTER)  Mr. Chappelle, we're back from
4 a break and before we broke, we were going through the
5 complaint.
6        Do you recall that?
7    A.  I do.
8    Q.  And talking about different topics that you
9 discussed with the plaintiffs' lawyer?
10    A.  Correct.
11    Q.  Okay.  And we're going to come back to that in
12 a little bit, but before we do, you're obviously
13 familiar with the gathering agreements that are at issue
14 in this dispute; correct?
15    A.  Yes.
16    Q.  Okay.  We have, again, the 2015 crude and
17 oil -- and gas agreement; right?
18    A.  Uh-huh.
19    Q.  And the 2016 --
20    A.  Right.
21    Q.  -- amended?  Okay.
22        Now -- and I'm sorry, sir, just so the
23 court reporter can get everything down, if you can wait
24 for me to finish my question before you give me an
25 answer, and then I will wait for you to answer before I

Page 58

1 jump in with another question.
2    A.  Okay.
3    Q.  Sometimes you'll --
4    A.  I just did it again.
5    Q.  Yeah.  You'll know where I'm going and
6 sometimes we have a tendency to jump in.  But just --
7 you know, we'll -- we just want to make sure that we
8 have a clean record for the court reporter.  Is that
9 okay?
10    A.  Yes.
11    Q.  Okay.  Now, do you recall the ownership
12 structure of AMH at the time that it executed the 2015
13 gathering agreements?
14    A.  Yes.
15    Q.  Okay.  Can you explain that to me, please.
16    A.  The -- the equity owners of AMH were -- were
17 housed in High Mesa, and -- and I can't recount for you
18 the exact corporate structure of that in terms of LLCs,
19 GPs and -- and C Corps, but -- but, in effect, High Mesa
20 owned Alta Mesa Holdings and High Mesa shareholders were
21 Michael Ellis, Hal Chappelle, de minimis interests in --
22 in Dale Hayes, and -- and then Highbridge.  And I don't
23 know if they were known as Highbridge Principal
24 Strategies at the time, but Highbridge.
25        The -- the split, if you will, of that

Page 59

1 ownership was subject to a -- what we would refer to as
2 a waterfall calculation at a liquidity event.  In other
3 words, at the time in the future where we would sell the
4 company, somehow dispose of the assets to provide
5 Highbridge its exit from this investment, and -- and
6 possibly management, for that matter.  An IPO would be
7 an example of a liquidity event that would be -- that
8 would be contemplated in that agreement.
9        And when we say waterfall, the waterfall
10 essentially was where management, Ellis and Chappelle,
11 primarily, would expose themselves to owning zero if
12 Highbridge didn't achieve its financial goals and give
13 it -- give itself the opportunity to have a substantial
14 equity stake, on a percentage basis, if we were very,
15 very successful.
16        And -- and so that was -- and it's not an
17 uncommon, in my experience, form of -- of a private
18 equity investment.
19    Q.  And do you recall the ownership structure of
20 Kingfisher at the time that the 2015 gathering
21 agreements were executed?
22    A.  Yes.  It was -- it was Highbridge owning
23 about -- owning 40 percent, to my recollection, 30
24 percent for ARM, or ARM Energy Management.  I'm not sure
25 which ARM entity.  And then 30 percent for Alta Mesa or

Page 60

1 High Mesa.
2        High Mesa or Alta Mesa, again, I'm not sure
3 where the ownership resided, also owned a 10 percent
4 stake in a part of ARM; therefore, that meant that we
5 effectively had a 33 percent ownership in KFM and ARM a
6 27 percent ownership.
7    Q.  Okay.  Now, do you know if the equity structure
8 of AMH changed significantly between the time that the
9 parties initiated the 2015 agreements until the time
10 that they executed the amended and restated agreements
11 of 2016?
12    A.  I believe that Bayou City Energy Management
13 made an equity investment in Alta Mesa, or High Mesa, in
14 late 2016, and so that changed the equity ownership of
15 AMH.
16    Q.  But AMH and -- and Kingfisher were not under
17 common control at the time they executed the 2015 and
18 2016 agreements; correct?
19    A.  Correct.
20    Q.  Now, I think you may have talked about this
21 early on, but what does AMH do as its primary business?
22    A.  Exploration and production of oil and gas.
23    Q.  And it does that in the Anadarko basin;
24 correct?
25    A.  Today, it's -- that's the only place where it

LEXITAS

[PAGES INTENTIONALLY OMITTED]

Page 137

1 achieve financially.

2     Q.  And then below that, it says, "Joint venture

3 achieves superior economics based on the following."

4         Do you see that?

5     A.  I do.

6     Q.  And what joint venture is referred to here,

7 sir?

8     A.  This joint venture, this is -- Paul Williams

9 put this together, really sharp guy at ARM, and what he

10 was essentially saying is we together, because we didn't

11 know if Highbridge would be part of this or not, have

12 the opportunity to build out this -- this purpose-built

13 midstream operation in Kingfisher County.

14     Q.  And the fourth of the bullet points that this

15 presentation lists is called -- is -- says "Equity

16 Participation and Upside".

17         Do you see that?

18     A.  I do.

19     Q.  What do you understand that to refer to,

20 please?

21     A.  That part of the consideration for this could

22 be that -- that Alta Mesa as the producer, ARM as the

23 supplier, a potential developer of this, would both have

24 an equity stake.

25     Q.  In what?

Page 138

1     A.  In the entity that ultimately gets built.

2     Q.  Which was KFM; correct?

3     A.  Which ended up being KFM; correct.

4     Q.  All right.

5     A.  Yeah, I don't know if we even called it

6 Kingfisher Midstream at this time, but, yeah.

7     Q.  141, please.  We'll mark the next exhibit.  You

8 can set that aside, please.

9         (Discussion off the stenographic record.)

10     A.  I'm fine with going to -- through this one

11 exhibit and then let's just have lunch.

12     Q.  (BY MR. ROBBINS)  That's fine.

13     A.  Does that work for you?

14     Q.  Of course.

15     A.  Okay.

16         (Exhibit 4 was marked.)

17     Q.  (BY MR. ROBBINS)  All right, sir.  I have

18 marked this as Chappelle 4, e-mail chain, AMRAP-1399634

19 to 35, headed at the top by an e-mail from Zach Lee, but

20 the next to the -- the next to the top e-mail, it's from

21 you; correct?

22     A.  Correct.

23     Q.  You recognize this e-mail chain?

24     A.  I do.  You showed this to me yesterday.

25     Q.  All right.  So, sir, let me ask you:  The

Page 139

1 bottom e-mail is from a fellow named Mike Ellis?

2     A.  Yes.

3     Q.  Can you tell me who was -- who he is?

4     A.  Mike Ellis was the chairman of Alta Mesa and

5 the principal shareholder outside of -- of Highbridge.

6     Q.  And he --

7     A.  He's the chief operating officer as well.

8     Q.  He is the fellow who brought you into the

9 business; correct?

10     A.  He is.  And in our relationship he reported to

11 me on a day-to-day basis and because he was the chairman

12 of the board, I guess I reported to him as the

13 president.

14     Q.  And did you understand, sir, that he had some

15 concerns about the proposed fees that KFM was going to

16 be charging under the gathering agreements?

17     A.  I did.

18     Q.  He communicated those to you?

19     A.  In this e-mail.

20     Q.  In your e-mail second from the top you say,

21 "Mike is not letting go and now is pointing to Mustang's

22 most recent proposal."

23         Do you see that, sir?

24     A.  I see that, yeah, that he's -- yes.  Yeah.

25     Q.  And the Mike is Mike Ellis?

Page 140

1     A.  I believe it is Mike Ellis.  There's three

2 Mikes in this e-mail, so it might be that I'm incorrect,

3 but I -- but I interpret it as Mike Ellis.

4     Q.  All right.

5     A.  Because Mike and I had and continue to have a

6 very, very aggressive relationship on getting the

7 right -- to the right answer.  And so --

8     Q.  And he's been in this line of business -- as of

9 2015, how long has he been in that business?

10     A.  Mike and I are about two weeks apart in our

11 birth date within the industry long -- as the same

12 amount of time, virtually.

13     Q.  All right.  So --

14     A.  He founded Alta Mesa in 1987.

15     Q.  You said you wanted to do one more exhibit

16 before lunch and we've just finished that exhibit.  How

17 long would you like for lunch?

18         MR. WOOLNER:  Let's go off the record.

19         MR. ROBBINS:  All right.

20         THE VIDEOGRAPHER:  12:24.  Off the record.

21         (Recess taken from 12:24 p.m. to

22          12:59 p.m.)

23         THE VIDEOGRAPHER:  12:59.  Back on record.

24 Disc 4.

25         (Exhibit 5 was marked.)



# PX 217

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION
3
4    IN RE ALTA MESA RESOURCES,  )
                                 ) Case No. 4:19-cv-00957
5    INC. SECURITIES LITIGATION  )
     _____)
6
7
8
9
10        REMOTE VIDEOTAPED DEPOSITION OF
11               DONALD SINCLAIR
12                 MAY 2, 2023
13                9:18 a.m. CDT
14
15             **CONFIDENTIAL**
16
17           Witness Appearing From:
18        Law Offices of Latham & Watkins LLP
19                Houston, Texas
20
21
22
23
24        Conducted Remotely Via Videoconference
25

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 28

```
1    Alta Mesa Resources was being formed by the
2    combination of two companies, one of which was a
3    midstream company?
4         A.   He told me that there was a midstream
5    component to Alta Mesa.
6         Q.   And you had substantial experience in the
7    midstream business, correct?
8         A.   Yes, ma'am.
9         Q.   Did you also have experience in the
10   upstream side of the oil and gas business?
11        A.   Not directly.
12        Q.   Would you say you had more experience in
13   midstream as opposed to upstream?
14        A.   Professionally, correct.
15                  (Reporter Clarification)
16        A.   I said, professionally, that is correct.
17        Q.   And could you put a number on the number
18   of years you were involved professionally in the
19   midstream business?
20        A.   21.
21        Q.   21 years?
22        A.   Yes, ma'am.
23        Q.   You testified earlier that Mr. -- that you
24   asked Mr. Hackett who else was going to be on the
25   board of Alta Mesa Resources.  When he told you
```

# PX 218

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF TEXAS

2                    HOUSTON DIVISION

3

  IN RE:  ALTA MESA          §

4  RESOURCES, INC.           §  CASE NO. 4:19-cv-00957

  SECURITIES LITIGATION      §

5

6    ORAL AND VIDEOTAPED DEPOSITION OF HARLAN H. CHAPPELLE

                    APRIL 19, 2023

7

8       ORAL AND VIDEOTAPED DEPOSITION OF HARLAN H.

9  CHAPPELLE, produced as a witness at the instance of the

10  Plaintiffs and duly sworn, was taken in the above styled

11  and numbered cause on Wednesday, April 19, 2023, from

12  9:11 a.m. to 6:08 p.m., before Janalyn Elkins, CSR, in

13  and for the State of Texas, reported by computerized

14  stenotype machine, viz Zoom, pursuant to the Federal

15  Rules of Civil Procedure and any provisions stated on

16  the record herein.

17

18

19

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

                                                      Page 30

1    and we had the Hunton.  But in the Mississippian portion

2    of those sections, we proceeded on a plan to develop

3    multi-well patterns.

4         Q.  (BY MR. BRODEUR)  Did Alta Mesa ever drill 12

5    horizontal -- strike that.

6                   During the time that you were at Alta Mesa,

7    did Alta Mesa ever drill 12 or more horizontal wells in

8    a section?

9                   MR. BERGER:  Objection, form.

10                  THE WITNESS:  I don't recall that we ever

11   got to that point during the period that I was there.

12        Q.  (BY MR. BRODEUR)  You see one of the tests

13   listed in the left column is LNU?  Do you see that?

14        A.  I do.

15        Q.  The LNU was a five-well pattern?

16        A.  That's what it says there, yes.

17        Q.  Or a five-well test?

18        A.  Yeah, it's five wells.

19        Q.  Would you describe the performance of the wells

20   in the LNU as strong?

21                  MR. BERGER:  Objection, form.

22                  THE WITNESS:  There's a lot to -- that goes

23   into whether something is strong or not.  And if we take

24   one particular pattern or section, we have to take into

25   account historic production from vertical wells in that

[PAGES INTENTIONALLY OMITTED]

Page 104

1    projections shown here under Alta Mesa projections on

2    page 173 of the proxy, did anyone at Riverstone or

3    Silver Run ask you whether they were reasonable in your

4    judgment?

5         A.  I don't recall a specific conversation of that.

6    But the entirety of the process going back to the very

7    first conversation with Jim and then the ongoing

8    iterative deliberations on this would necessarily give

9    everybody insight into the context, the veracity, the --

10   you know, just the entire -- the entirety of those

11   projections.

12              So I think the process itself is one that

13   created confidence.  But if you ask me if there was a

14   specific conversation where that table was asked, I -- I

15   don't recall that.

16        Q.  You would agree with me that the EBITDAX

17   numbers for 2018 and 2019 would be something that would

18   be very important to Silver Run investors in their

19   consideration of the business combination, correct?

20              MR. BERGER:  Objection, form.

21              THE WITNESS:  I agree the EBITDAX is one of

22   many things that would be important to investors,

23   EBITDAX outlooks.

24        Q.  (BY MR. BRODEUR)  Do you know when these

25   projections -- you know, between the Alta Mesa

[PAGES INTENTIONALLY OMITTED]

```
                                              Page 125
1    package for your services as a CEO, correct?
2         A.  To my greatest recollection, that's correct.
3         Q.  So you -- is it your testimony that you
4    owned -- sort of indirectly had an ownership interest in
5    Alta Mesa Resources through your ownership interest in
6    High Mesa?
7                   MR. BERGER:  Objection, form.
8                   THE WITNESS:  Could you repeat the
9    question?
10        Q.  (BY MR. BRODEUR)  Did you own an indirect
11   interest in Alta Mesa Resources through your ownership
12   of High Mesa?
13                  MR. BERGER:  Objection, form.
14                  THE WITNESS:  Yeah, I considered it a
15   beneficial ownership.
16        Q.  (BY MR. BRODEUR)  So did High Mesa have an
17   earnout provision as part of the business combination?
18                  MR. BERGER:  Objection, form.
19                  THE WITNESS:  I know there was an earnout.
20   I don't recall how it was structured and I'm not sure
21   that High Mesa was relevant to that.
22        Q.  (BY MR. BRODEUR)  Were you the beneficiary, you
23   personally the beneficiary of any earnout in the
24   business pursuant to the business combination?
25                  MR. BERGER:  Objection to form.
```

[PAGES INTENTIONALLY OMITTED]

1    the focus of our near-term development plan was this

2    area that is described in terms of 4,200 identified

3    gross drilling locations.

4         Q.   (BY MR. BRODEUR)   What does "near term" mean in

5    this context?

6         A.   It's been almost six years since we -- since I

7    last looked at this.   So when I think of near-term

8    development plan, it was what we would be doing in the

9    initial stages, be it months or years, of our

10   stewardship of this acreage and our focus would be the

11   area that is represented by -- and we have maps, too,

12   that we show, represented by these, if you will,

13   floating bars, the value of those.

14        Q.   Does the number 4,196 come from simply taking a

15   number of sections in Alta Mesa's stack acreage and

16   multiplying it by 14?

17        A.   It was derived mathematically.   I don't know

18   the -- I don't recall the specific math, but it's fairly

19   straightforward based on the acreage position we

20   controlled and the number of benches that we saw in the

21   Osage and Meramac and a fairly nominal amount of

22   activity in the Oswego.

23        Q.   Okay.   So each blue bar inside the dashed red

24   box, each of those represents a dollar value assigned to

25   a group of existing or contemplated wells; is that true?

1      A.  Let me look at the footnotes because that would
2   give insight.
3      Q.  We actually have marked the footnotes as a
4   separate exhibit for ease of viewing, Exhibit CP-0409.
5   It would be much easier for you to read.
6               (Exhibit No. CP-0408 and 0409 were marked.)
7               THE WITNESS:  I hate to do that because I'm
8   going to lose my place here.  But I think the key to
9   this is that this is a discounted cash flow value in
10  each of these floating bars.  And the -- and so as I
11  said earlier, the PDP portion of this is one that has --
12  you know, per SEC reserves engineering approach and
13  protocol, has the highest confidence level.
14              And then the next three bars being just --
15  you know, being in -- representing three different
16  horizons, the Osage, you know, being most of our
17  Mississippian was Osage, and then we had Meramac and
18  then Oswego.  There would be a variation, a gradation
19  across this in terms of certainty.
20              But when you bucket it all together for the
21  Osage, it's that two-and-a-half billion dollars, in the
22  Meramac 1.3, you know, 200,000 in the Oswego, which,
23  yeah, it's a whole lot more than that but -- I mean,
24  today, it's 16,000 barrels a day.
25              So the -- yeah, I mean, it's -- and this is

                                              Page 194

1    based on price techs and operating cost assumptions and

2    GNA costs and things that are relevant to a NAV

3    depiction.

4          Q.   (BY MR. BRODEUR)  Is one of the

5    assumptions underlying -- so on the top of those bars,

6    you see a dollar value assigned to each bar written in

7    numerical format.  Do you see that?

8          A.   I do.

9          Q.   Okay.  Are the dollar values here, is one of

10   the assumptions underlying those numbers the assumption

11   that there would -- Alta Mesa would drill 12 wells per

12   section in the Meramac and Osage?

13                  MR. BERGER:  Objection, form.

14         Q.   (BY MR. BRODEUR)  Okay.  So let's do it one at

15   a time.

16                  So you talked about PDPs.  The next bar

17   over is the Osage, correct?

18         A.   It is.

19         Q.   Okay.  And these are -- these are wells that

20   had not yet -- were not yet producing in the Osage,

21   correct?

22         A.   That's correct.  These are wells yet to be

23   drilled or at least yet to be completed.  You know, the

24   PDP is everything that -- it's on production.

25         Q.   So 2,000,000,566, that is the value assigned to

[PAGES INTENTIONALLY OMITTED]

Page 216

1    Q.  Having reviewed this document, does this -- did

2  this document refresh your recollection in any respect?

3    A.  Not really.  It does tell -- it does say that

4  Tim spoke to me and I see that we used Inner Site, which

5  is a scenario generating model that tries to take into

6  account all of the shut-ins, the offset fracs, drilling

7  activity.  It's sort of like a -- what a programming

8  model would be in a manufacturing operation and...yeah,

9  that's...

10    Q.  Do you read this document to suggest that

11  Mr. Turner spoke to you around 2:00 in the afternoon on

12  February 28, 2018 about potentially adjusting Alta

13  Mesa's type curve?

14             MR. BERGER:  Objection, form.

15             THE WITNESS:  I think the context here is

16  the basis of the forecast and it suggests that he -- I

17  mean, the two of us had a discussion.  And whether or

18  not it was related to type curve, I don't get that out

19  of this.

20    Q.  (BY MR. BRODEUR)  Mr. Turner writes in the top

21  email, (Reading:)  I'm going to re-forecast PDP to take

22  into account better operations.

23             Do you see that?

24    A.  I do.

25    Q.  Do you remember having any conversation with

```
                                              Page 217
```

 1   Tim Turner in February of 2018 about re-forecasting

 2   proven developed producing?

 3                  THE REPORTER:  Can you say that again?

 4                  THE WITNESS:  I don't --

 5                  MR. BRODEUR:  Proven developed producing.

 6                  THE WITNESS:  Yeah.  And I don't -- is it

 7   okay to proceed?

 8                  THE REPORTER:  Yes.

 9                  THE WITNESS:  I'm asking the reporter.

10                  Okay.  I don't really recall this.

11   Generally, I recall these kinds of conversations, and I

12   don't know enough about Inner Site to even understand to

13   be able to speak authoritatively on what PDP means in

14   this context, because it's certainly not a forecast of

15   proven reserves.

16                  To me, it's -- well, Inner Site takes

17   existing wells and makes a forecast.  I don't know the

18   better operations that he's referring to.  But, yeah, I

19   just don't have enough context for this -- this email

20   chain.

21       Q.  (BY MR. BRODEUR)  All right.  If you scroll

22   down to the email that -- from Kaitlyn Matthews that

23   carries over on to the second page, do you see that

24   email?

25       A.  I do.

[PAGES INTENTIONALLY OMITTED]

1    Q.  Okay.  And then there was another -- other

2  option was exponentially increasing by two well hookups

3  per month, correct?

4    A.  That's correct.

5    Q.  And that gets you to $101.1 million EBITDA?

6    A.  That's correct.

7    Q.  Okay.  What basis did you have to believe that

8  Alta Mesa's midstream business would add even one

9  additional well hookup per month for 2018?

10              MR. BERGER:  Objection, form.

11              THE WITNESS:  Well, that's not what I'm

12  saying here.  Nobody is saying that I believe this.

13    Q.  (BY MR. BRODEUR)  Okay.  Did you believe that

14  Alta Mesa's midstream business would add one additional

15  well hookup per month through the end of 2018?

16    A.  I -- I don't recall and this doesn't inform me.

17    Q.  Okay.  Did you ask Ms. Alsarraf whether the

18  assumptions in her -- these two cases here -- strike

19  that.

20              Did you ask Ms. Alsarraf whether the cases

21  that she's referring here in the top email were

22  realistic in her judgment?

23    A.  I don't recall having a specific conversation

24  with Tamara about this.  But it's the sort of thing that

25  informs the group that is looking at planning, and I

[PAGES INTENTIONALLY OMITTED]

Page 235

1              THE WITNESS:  I wouldn't.  I can't

2     imagine -- well, I can't imagine John speaking loudly,

3     first.  He's not a loud person.  And I can't imagine not

4     paying attention.

5          Q.  (BY MR. BRODEUR)  Why can't you imagine not

6     paying attention?

7          A.  I try to respect people.

8          Q.  And the -- Alta Mesa's use of ESPs was

9     something you were paying a lot of attention to in 2018,

10    correct?

11             MR. BERGER:  Objection, form.

12             THE WITNESS:  From time to time.  It was

13    certainly an important part of what we were trying to

14    learn and we -- we message that all the way back into

15    2017 as we're using -- we're trying to figure out the

16    best application of artificial lift throughout the life

17    cycle of a well.  We -- or Mike -- actually, Mike and

18    Gene established a -- a team that looked at lift, and I

19    have seen that weekly from what I recall.  Probably sat

20    in on ten minutes of one of those meetings.  But he had

21    all -- Gene had all his -- the people on his team

22    participate in those meetings.

23         Q.  (BY MR. BRODEUR)  And was Mr. Balbauff at that

24    meeting?

25         A.  Now, I couldn't tell you if John was at a given

[PAGES INTENTIONALLY OMITTED]

```
                                              Page 238
1     that ultimately get developed in the area that we were

2     taking the steps to understand the right amount of lift,

3     critical part of the life cycle of the well.

4          Q.  (BY MR. BRODEUR)  Is it true that you

5     instructed Jerry Swearingen in mid to late March of 2018

6     to identify about 20 wells that were good candidates for

7     ESPs?

8                    MR. BERGER:  Objection, form.

9                    THE WITNESS:  Jerry didn't report to me.  I

10    didn't give instruction to Jerry.

11         Q.  (BY MR. BRODEUR)  Did you give that instruction

12    to anyone in March of 2018?

13         A.  You know, the number sounds familiar, and Mike

14    Ellis and I discussed the application and we had general

15    confidence that there -- this was, you know, a good

16    application and appropriate.

17                   VIDEOGRAPHER:  Excuse me.  We're at the

18    seven hours.  Excuse me.  Just saying.  Sorry.

19                   MR. BERGER:  I don't think there's a

20    question pending.

21                   MR. BRODEUR:  Are you done with your

22    answer, sir?

23                   THE WITNESS:  Yeah.

24                   MR. BRODEUR:  Okay.  Are you suspending the

25    deposition, Casey?
```

[PAGES INTENTIONALLY OMITTED]

# PX 219

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF TEXAS

4    HOUSTON DIVISION

5    Case No. 4:19-CV-00957

6    ----------------------------------x

7    In re ALTA MESA RESOURCES, INC.

8    SECURITIES LITIGATION

9    ----------------------------------x

10                July 13, 2023

11                1:01 p.m.

12

13           CONFIDENTIAL TRANSCRIPT

14

15           Remote video-teleconference

16    deposition via Zoom of STEPHEN COATS,

17    pursuant to notice, before Jineen Pavesi,

18    a Registered Professional Reporter,

19    Registered Merit Reporter, Certified

20    Realtime Reporter and Notary Public of the

21    State of New York.

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

```
                                        Page 20
 1            COATS - CONFIDENTIAL
 2   either.
 3       Q.      Was the first of those SPACs
 4   chronologically Silver Run I?
 5       A.      Yes.
 6       Q.      Do you remember what your role
 7   was with respect to Silver Run I?
 8       A.      I think I was just secretary.
 9       Q.      What are the duties of being
10   the secretary of a SPAC?
11       A.      Very few; given that a SPAC
12   doesn't have any assets, it only has --
13   sorry, when they're formed they don't have
14   any assets, they only have cash at the
15   time of the IPO, so the secretary's job
16   would have been to forward --  my job
17   would have been to forward certain
18   documents to the board of directors, to
19   make sure they got signed, to help make
20   sure those meetings happened; I don't
21   think there are really any other roles.
22            Obviously a secretary in a
23   public company that's a right-way public
24   company with a pool of assets is a little
25   different, probably a lot more board
```

```
                                            Page 21
 1              COATS - CONFIDENTIAL
 2   meetings and more roles for the secretary.
 3                 In a SPAC, very, very limited.
 4      Q.      Do you still talk to any of
 5   your colleagues when you were at
 6   Riverstone Holdings?
 7      A.      I do, yes.
 8      Q.      Who are you still in touch
 9   with?
10      A.      I am in touch with I think
11   probably everybody at the firm at one time
12   or another over the last year.
13                 Our office is currently in the
14   same building that Riverstone's office is
15   in, so I see them all the time.
16                 As I said, they're clients, so
17   I see the founders regularly, I see a lot
18   of other people regularly and I still, you
19   know, being in the same building, I see
20   them a lot.
21      Q.      Have you discussed with any of
22   the employees this litigation?
23      A.      Well, have I ever discussed
24   this litigation, yes, when I was still at
25   Riverstone as general counsel.
```

[PAGES INTENTIONALLY OMITTED]

```
                                    Page 25
 1          COATS - CONFIDENTIAL
 2      Q.       Did you have a Silver Run II
 3  e-mail address?
 4      A.       No.
 5      Q.       Did you have a Silver Run II
 6  office?
 7      A.       No.
 8      Q.       Did you have a Silver Run II
 9  business card?
10      A.       No.
11      Q.       Were you involved in any way in
12  Silver Run II's SEC filings during the
13  period of March 2017 to August of 2017?
14      A.       Only in that I probably saw
15  e-mails when they were sent to the board,
16  but, no, I wasn't involved in the
17  preparation or review of them.
18      Q.       Did you do anything personally
19  to ensure the documents filed with the SEC
20  during that time period were accurate?
21      A.       I just wasn't involved in
22  preparing them, so I didn't --  I wouldn't
23  say I made sure they were accurate, I
24  don't know that I would even have fully
25  read them.
```

Page 26

```
 1          COATS - CONFIDENTIAL
 2              My job was to forward them on
 3   to the board to approve.
 4       Q.      Are you aware that Silver Run
 5   II, once the business combination closed,
 6   was renamed Alta Mesa Resources?
 7       A.      Yes.
 8       Q.      Were you ever an employee of
 9   Alta Mesa Resources?
10       A.      No.
11       Q.      Who was the sponsor for Silver
12   Run II?
13       A.      Riverstone.
14       Q.      Do you recall any differences
15   in the structures between Silver Run I and
16   Silver Run II regarding who was the
17   sponsor?
18       A.      Yes, because Silver Run I was
19   the sponsor --  when I say Riverstone, I'm
20   using that sort of generally -- Riverstone
21   was the sponsor of Silver Run I, meaning a
22   vehicle owned by the partners of
23   Riverstone, and so employees of Riverstone
24   were the owners of the --  the sponsor
25   shares, not all the sponsor warrants, I
```

[PAGES INTENTIONALLY OMITTED]

Page 32

1          COATS - CONFIDENTIAL

2       A.       I think it would have been

3    probably David Leuschen, his job to select

4    the initial board members.

5       Q.       After the Silver Run II IPO,

6    were you involved at all in the process to

7    search for an acquisition or merger

8    target?

9       A.       No.

10      Q.       Who was responsible for Silver

11   Run II finding and negotiating with a

12   merger or acquisition target?

13      A.       It would have been the deal

14   team at Riverstone, so anyone who works,

15   again, splitting the equity side of the

16   house and credit side of the house, so

17   anybody from a partner down to a junior

18   person on the equity side.

19              There was no formal group that

20   was responsible for selecting an

21   acquisition, but there were acquisitions

22   that were always being reviewed at the

23   firm because Fund VI is always looking for

24   opportunities and so that would have been

25   I assume one of the opportunities that

```
                                            Page 33
 1            COATS - CONFIDENTIAL
 2    came up to the deal team and they thought
 3    it was right for the SPAC.
 4        Q.      Do you recall learning at some
 5    point that Silver Run II was considering a
 6    transaction with Alta Mesa Holdings and
 7    Kingfisher Midstream?
 8        A.      Yes.
 9        Q.      Do you know approximately when
10    that was?
11        A.      No.
12        Q.      Had you ever heard of those
13    companies?
14        A.      No, not before that.
15        Q.      Were you involved in Silver Run
16    II's negotiations with Alta Mesa Holdings
17    and Kingfisher Midstream?
18        A.      I was not.
19        Q.      Were you involved in Silver Run
20    II's due diligence of Alta Mesa Holdings
21    in Kingfisher Midstream?
22        A.      No.
23        Q.      Who at Silver Run II was
24    responsible for due diligence of Alta Mesa
25    Holdings and Kingfisher Midstream?
```

1              COATS - CONFIDENTIAL

2      A.         It wouldn't have been at Silver

3   Run II, it would have been at Riverstone,

4   and it would have been the deal team, same

5   group I was talking about that selects a

6   transaction, it would have been some

7   subset of that group, probably partner

8   level down to associate level, there would

9   have been a group of people who both did

10  the diligence --  if you're talking about

11  internal people versus hiring external

12  parties, there were lots of external

13  parties involved.

14             But it would have been a deal

15  team at Riverstone, I couldn't tell you

16  exactly who that is, but it would have

17  involved Jim Hackett, Olivia Wassner,

18  others, Kevin Wang, there are probably

19  five or six other people that worked on

20  it.

21      Q.      Are you still in touch today

22  with Mr. Hackett?

23      A.      No, I haven't spoken with Jim

24  in several years.

25      Q.      Do you know how Mr. Hackett was

```
                                           Page 35
 1              COATS - CONFIDENTIAL
 2    selected as the head of Silver Run II?
 3        A.      No.
 4        Q.      After the IPO and before the
 5    merger was announced, proposed merger was
 6    announced in 2017, did you attend any
 7    meetings with the management of Alta Mesa
 8    or Kingfisher?
 9        A.      Not that I recall, I never met
10    the management in person of those
11    companies.
12              I can't tell you, I may have
13    been on a board call where they were on
14    the same call, but I certainly have never
15    met them.
16        Q.      Have you ever been to Alta
17    Mesa's offices?
18        A.      No.
19        Q.      Have you ever been to any of
20    Alta Mesa's well sites?
21        A.      No.
22        Q.      Have you ever been to
23    Kingfisher's offices?
24        A.      No.
25        Q.      Have you ever been to
```

Page 36

1              COATS - CONFIDENTIAL
2     Kingfisher's facilities?
3          A.      No.
4          Q.      Did you do any analysis of Alta
5     Mesa's drilling results in 2017?
6          A.      No, I'm not  -- that wasn't my
7     role.
8          Q.      Did you do any analysis of Alta
9     Mesa's accounting practices during 2017?
10         A.      No.
11         Q.      Are you aware that Silver Run
12    II pursued a pipe offering in connection
13    with its merger with Alta Mesa and
14    Kingfisher?
15         A.      Yes.
16         Q.      Did you have any role with
17    respect to the pipe offering?
18         A.      Not that I recall, no.
19         Q.      When the proposed transaction
20    was announced in August of 2017, there was
21    a press release and Form 8-K and investor
22    presentation released on August 16th and
23    August 17th of 2017.
24                 Did you have any role in
25    preparing any of those documents?

Page 37

```
 1            COATS - CONFIDENTIAL
 2      A.      No, not that I recall, no.
 3      Q.      Do you recall if you reviewed
 4  those documents before they were filed
 5  with the SEC?
 6      A.      No, I don't recall reviewing
 7  those.
 8      Q.      Did you do anything to verify
 9  the statements in those filings were
10  accurate?
11      A.      Again, I don't recall reviewing
12  them, so, no.
13      Q.      Are you aware that after the
14  proposed transaction was announced but
15  before it closed, Silver Run II issued a
16  proxy statement to investors?
17      A.      Yes.
18      Q.      Did you have any role with
19  respect to the proxy statement?
20      A.      No.
21      Q.      Who was responsible for
22  preparing the proxy statement?
23      A.      Proxy statement would have been
24  prepared by outside counsel and approved
25  by the board.
```

```
 1              COATS - CONFIDENTIAL
 2      Q.        When you say outside counsel in
 3   this context, who are you referring to?
 4      A.        I think in that case, at that
 5   time, given that it was deal-related, I
 6   think it would have been someone at Latham
 7   & Watkins, but I can't be sure.
 8      Q.        It is your testimony that
 9   Latham & Watkins was responsible for
10   drafting the proxy statement?
11      A.        Well, as I said, Weil was
12   involved earlier on, Latham was involved
13   later, so I couldn't tell you exactly who
14   prepared that proxy statement, but it
15   would have been one of those two counsel.
16              I should say prepared that
17   along with I assume the management team as
18   Latham doesn't have underlying details, so
19   they're just preparing based on
20   information provided to them.
21      Q.        When you say management team,
22   management team of what company?
23      A.        I guess --  I am not sure who
24   prepared that, to be honest.
25      Q.        Do you recall reviewing the
```

```
 1              COATS - CONFIDENTIAL
 2   proxy before it was filed?
 3        A.       I don't.
 4        Q.       Did you personally do anything
 5   to verify the accuracy of the statements
 6   in the proxy statement?
 7        A.       No, I don't recall reviewing
 8   it; I might have read it, but I don't
 9   recall that.
10              That wasn't really my role, to
11   review those documents.
12        Q.       Was there someone at Riverstone
13   responsible for reviewing those documents
14   before they were filed?
15        A.       It would have been people who
16   worked on the deal team probably would
17   have reviewed that proxy, I assume they
18   did, and there may have been a lawyer on
19   it who reviewed it on the Riverstone side,
20   but that wasn't me.
21        Q.       Are you familiar with the term
22   co-investment?
23        A.       Yes.
24        Q.       What is a co-investment in a
25   private equity context?
```

# PX 220

REDACTED IN ITS ENTIRETY

# PX 221

REDACTED IN ITS ENTIRETY

# PX 222

Page 1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE SOUTHERN DISTRICT OF TEXAS

2                      HOUSTON DIVISION

3

     IN RE ALTA MESA            ) Case No.:

4    RESOURCES, INC.            ) 4:19-cv-00957

     SECURITIES LITIGATION      )

5

6

7

8    **********************************************************

9              ORAL AND VIDEOTAPED DEPOSITION OF

10                  CHARLES "BO" DUNNE

11                     June 8, 2023

12   **********************************************************

13

14

15            ORAL AND VIDEOTAPED DEPOSITION OF CHARLES "BO"

16   DUNNE, produced as a witness at the instance of the

17   Plaintiffs, and duly sworn, was taken in the

18   above-styled and numbered cause on the 8th day of June,

19   2023, from 9:11 a.m. to 5:23 p.m., via videoconference,

20   before Abigail Guerra, CSR, in and for the State of

21   Texas, reported by machine shorthand, where all

22   attendees appeared via Zoom in their respective

23   locations, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.

[PAGES INTENTIONALLY OMITTED]

```
                                                     Page 32

 1    closed in February of 2018?

 2         A.   No.

 3                   We formed a new entity, KFM Holdco, at one

 4    point.  I think it was prior to -- well, it was prior to

 5    the combination, and I can't -- I think it was to make,

 6    you know, the transaction a little bit more seamless

 7    from a consideration perspective.

 8                   There are also might have been some tax

 9    implications.  I don't entirely recall.  But the

10    ownership remained the same and the structure, the

11    underlying structure.

12         Q.   In the period from the start of 2017 through, I

13    want to say, March 30, 2017, did Kingfisher Midstream

14    hold any board of directors meetings?

15         A.   From January to March?

16         Q.   Sorry.  Let's make it simpler.

17                   Prior -- prior to March of 2017, did

18    Kingfisher hold board of directors meetings?

19         A.   Yes.

20         Q.   Approximately how often were they held?

21         A.   I think they were more ad hoc, but I would say

22    we probably had one at least every six months.

23         Q.   And prior to March of 2017, do you know who

24    composed or who -- yeah.

25                   Who -- who was on the Kingfisher Midstream
```

```
                                              Page 33
 1   board of directors?
 2        A.  Yes.
 3              So it was representatives from HPS.  I
 4   believe Don was the manager or designee.  And then from
 5   Alta Mesa, it would have been Hal Chappelle and
 6   Michael Ellis.  And then at ARM, it was Zach Lee and Gil
 7   Burciaga.
 8        Q.  Was ARM Energy responsible for preparing
 9   updates and other materials for the Kingfisher board of
10   directors?
11        A.  Yes.
12        Q.  Is that true all the way up through the closing
13   of the business combination?
14        A.  Yes.
15        Q.  Prior to the business combination in February
16   of 2018, who was responsible for managing Kingfisher
17   Midstream's bank accounts?
18              MR. POLLET:  Object to form.
19        A.  ARM was responsible for the day to day.
20        Q.  (BY MR. SHER)  You said "day to day."
21              Is there -- there any other type of
22   oversight or management of Kingfisher Midstream's bank
23   accounts prior to February 2018?
24              MR. POLLET:  Object to form.
25        A.  Yes.
```