# PX 223





Transcript of **Michael E. Ellis**

Wednesday, December 4, 2019

*In re Alta Mesa Resources, Inc. and Alta Mesa Holdings, LP*

Alderson Court Reporting
1-800-FOR-DEPO (367-3376)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 89949

[PAGES INTENTIONALLY OMITTED]

1    A.    I don't remember that occurring.

2    Q.    (BY MR. GOERLICH)  Do you recall any change in

3    the valuation of AMH in the course of the negotiations

4    over the business combination?

5    A.    Yes.

6    Q.    And what was that change?

7    A.    I believe that we were valued maybe at $1.7

8    billion initially, and Hal made a recommendation that

9    with the oil pricing coming down, that we should agree

10   or volunteer to reduce our valuation of 1.4 to help to

11   make sure that this transaction would actually close.

12   Q.    And did you agree with Mr. Chappelle's

13   recommendation?

14   A.    I did.

15   Q.    Do you remember anyone disagreeing with it?

16   A.    No.

17   Q.    In discussing the joint development agreement

18   with Bayou City, you mentioned some concerns about

19   child -- with regard to Bayou City and not recouping

20   its investment, you mentioned some issues with child

21   well production decreasing, as well as falling oil

22   prices.

23         When did those issues occur?

24   A.    The realization of the decrease in recoveries

25   from the children wells occurred after we started

1    drilling children wells, and I started -- started

2    seeing enough performance in enough wells to realize

3    that this is a regional issue, and now we know -- the

4    whole industry now knows it's a total nonconventional

5    issue, as far as I can think of.  Every -- every basin

6    is discovering that on their own.

7         Q.   And so you said after you began drilling the

8    child wells.

9              When was that precisely?

10        A.   We had a few children wells drilled prior to

11   the February date and in producing, but those

12   actually -- they were spaced far enough apart that

13   they pretty much fit into range.  So it was the -- the

14   first one was the Bullis-Coleman pattern was the first

15   pattern where we -- where it was really obvious that

16   we weren't going to get recoveries out of the children

17   wells that we expected.

18        Q.   And when was that?

19        A.   Well, I know that -- I know when it was

20   obvious of the conclusion for the whole idea.  That

21   would have probably been third quarter of 2018.

22        Q.   But for the initial Bullis-Coleman wells, you

23   don't remember a specific date?

24        A.   No.

25        Q.   And then you also mentioned falling oil

# PX 224

Page 1

1            UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF TEXAS

2                  HOUSTON DIVISION

3

4    IN RE ALTA MESA RESOURCES,   )

                                  ) Case No. 4:19-cv-00957

5    INC. SECURITIES LITIGATION   )

     _____)

6

7

8

9         REMOTE VIDEOTAPED DEPOSITION OF

10                MICHAEL E. ELLIS

11                APRIL 3, 2023

12                9:09 a.m. CDT

13

14

15            Witness Appearing From:

16       Law Offices of Winston & Strawn LLP

                800 Capitol Street

17                 Suite 2400

              Houston, Texas 77002

18

19

20

21

22

23

24      Conducted Remotely Via Videoconference

25

[PAGES INTENTIONALLY OMITTED]

Page 12

1   Friday that impacted your ability to give accurate

2   testimony?

3        A.   No.

4        Q.   And we're talking about last Friday, would

5   have been March 31st, correct?

6        A.   Yes.

7        Q.   Did you prepare for your deposition today?

8        A.   I met with the attorneys on Thursday.

9        Q.   Okay.  Other than meeting with your

10  attorneys last Thursday, did you do anything else to

11  prepare for your deposition?

12       A.   No.

13       Q.   For about how long did you meet with your

14  attorneys last Thursday to prepare for your

15  deposition?

16       A.   Probably 10:00 to 3:00, so five hours with

17  obvious breaks in there, yeah.

18       Q.   Is it true that you founded Alta Mesa in

19  or about 1987?

20       A.   That's correct.

21       Q.   Is it true that Hal Chappelle joined

22  Alta Mesa in or about 2004?

23       A.   That's correct.

24       Q.   Did you make the decision to hire

25  Mr. Chappelle?

Page 13

1      A.    Yes.

2      Q.    For how long had you known Mr. Chappelle

3  when you decided to hire him?

4      A.    Probably somewhere around three years.

5      Q.    And how did you know Mr. Chappelle?

6      A.    He was the engineer for LL&E that was in

7  charge of the Jay Plant, and we operated a smaller,

8  I'll call it, satellite plant called Blackjack Creek

9  in Florida.

10     Q.    Did you have a personal relationship with

11 Mr. Chappelle at the time that you hired him?

12          MS. PRESTON:  Objection, form.

13     Q.    I'll ask it a little bit -- a little bit

14 of a different way.

15          If you were to characterize your

16 relationship with Mr. Chappelle at the time you

17 hired him as either a personal relationship or a

18 professional relationship primarily, how would you

19 characterize it?

20     A.    Professional for sure.

21     Q.    What was Mr. Chappelle's role at Alta Mesa

22 immediately after you hired him in 2004?

23     A.    Well, it's simpler to say what my role

24 was.  I wasn't the type of person that liked dealing

25 with banks or financial matters, and I love

Page 14

1    engineering, so I was going to be responsible for

2    the engineering and he was going to be responsible

3    for everything else.

4        Q.   Okay.  Did he have a title upon joining

5    Alta Mesa?

6        A.   Yeah, I believe he -- it was either

7    president or chief executive officer, one of the

8    two.

9        Q.   And did he become your business partner at

10   that time?

11            MS. PRESTON:  Objection, form.

12       A.   Yeah, well, he had -- he had a -- he was a

13   business partner in that he had a -- we had a

14   earn-in agreement.

15       Q.   And what was the earn-in agreement?

16       A.   It's been a long time.  After -- after we

17   reached certain goals, he would get a percentage of

18   the company.

19       Q.   And did he in fact come to own a part of

20   the company?

21       A.   He did.

22       Q.   If we fast-forward to the time when we're

23   going in the beginning of 2017, about how much of

24   the company did Mr. Chappelle own?

25       A.   A number close to 25 percent.

[PAGES INTENTIONALLY OMITTED]

```
                                        Page 19
 1   in the first equity partner?
 2            MS. PRESTON:  Objection, form.
 3       A.   I don't know.
 4       Q.   Did you have the ability to remove
 5   Mr. McCabe at that time, after you brought in the
 6   first equity partner?
 7            MS. PRESTON:  Objection, form.
 8       A.   I don't know that either.
 9       Q.   Do you know whether you retained a
10   majority ownership interest in the company after you
11   brought in the first equity partner in 2007?
12       A.   I had a majority of a certain class of
13   stock, but the equity partner had the other stock,
14   and so I wouldn't have wanted to say that I had
15   majority then.
16       Q.   Who designed that capital structure that
17   you're describing?
18       A.   I would say it was probably Mike McCabe
19   and Hal and the equity partner.
20       Q.   After you brought in the first equity
21   partner in 2007 or thereabouts, did you maintain a
22   majority of the voting power with respect to the
23   Alta Mesa company?
24            MS. PRESTON:  Objection, form.
25       A.   I don't know the answer to that.
```

[PAGES INTENTIONALLY OMITTED]

                                                      Page 22

1    with anyone who to appoint to Alta Mesa's board?

2         A.    Well, I don't remember, but Hal and I

3    would have definitely had those discussions.

4         Q.    And in those discussions between you and

5    Mr. Chappelle, when you were having those

6    discussions, did you understand that you, Michael

7    Ellis, had the ultimate authority to decide who

8    would be appointed to certain seats on Alta Mesa's

9    board?

10             MS. PRESTON:   Objection, form.

11        A.    I never took on that attitude.  I trusted

12   Hal to be responsible to that.  And he always kept

13   me informed of his thinking.

14        Q.    Did you -- do you recall ever disagreeing

15   with Mr. Chappelle -- strike that.

16             Did Mr. Chappelle ever want to appoint

17   someone to Alta Mesa's board who you did not want

18   appointed to Alta Mesa's board?

19        A.    Not to my memory.

20        Q.    Did you ever want to appoint someone to

21   Alta Mesa's board that Mr. Chappelle did not want

22   appointed to Alta Mesa's board?

23        A.    Not to my memory.

24        Q.    Who is Mickey Ellis?

25        A.    That's my wife.

Page 23

1        Q.    Was your wife a member of Alta Mesa's

2   board at the beginning of 2017?

3        A.    Probably so.  She was a member at one

4   time.

5        Q.    How did -- how did Mickey Ellis become a

6   member of Alta Mesa's board?

7        A.    Hal suggested that we invite her as a

8   board member, and I agreed to that.

9              MR. BRODEUR:  Faith, could you mark or

10   introduce or mark Tab 25, please.

11        Q.    Are you familiar with a company called --

12   sorry.  Are you looking for the exhibit?

13        A.    Yeah.  Is it here yet?

14        Q.    Oh, I don't know.  I sometimes ask for

15   them a little bit before to give our team time to

16   load them.

17        A.    Okay.

18        Q.    So my question is, without looking at the

19   exhibit, are you familiar with a company called

20   Kingfisher Midstream?

21        A.    Yeah, I believe that's who built the gas

22   plant in Kingfisher.

23        Q.    If I refer to "KFM," will you understand

24   that I mean Kingfisher Midstream?

25        A.    Yes.

[PAGES INTENTIONALLY OMITTED]

Page 29

```
1    answer to that would be yes.
2         Q.   Were you involved in negotiating that
3    joint venture?
4         A.   Not that I remember.
5         Q.   Do you remember when that joint venture
6    came to be?
7         A.   No.  It was in place in 2018, but I don't
8    remember when it started.
9         Q.   What was the purpose of the joint venture?
10             MS. PRESTON:  Objection, form.
11        A.   Bayou City was providing funds and they
12   were looking to make revenue, make profit off of it,
13   and it allowed us to accelerate our drilling.
14        Q.   Was there a reason that you didn't -- you
15   did not accomplish that simply by having Bayou City
16   buy additional equity in Alta Mesa?
17             MS. PRESTON:  Objection, form.
18        A.   I don't know the answer to that.
19        Q.   Did Alta Mesa consider going public by way
20   of an initial public offering or IPO?
21        A.   Yes.
22        Q.   When was that?
23        A.   Well, we had to file some sort of a -- of
24   a -- something with the SEC.  And then I think from
25   that date we had like a year to go public, and so
```

```
                                          Page 30
```

1   that was prob- -- I'm guessing that was filed in

2   2016, but I could be wrong on that.

3       Q.   Whose idea was it to explore the

4   possibility of an IPO for Alta Mesa?

5       A.   That would have came from Hal and Mike

6   McCabe, as far as I know.

7       Q.   Why -- strike that.

8            Did you discuss the possibility of an IPO

9   with Mr. Chappelle?

10      A.   Yes.

11      Q.   Did you discuss the idea of an IPO with

12  Mr. McCabe?

13      A.   Probably.

14      Q.   Why was Alta Mesa's management considering

15  an IPO for Alta Mesa?

16      A.   We felt that we had a couple thousand

17  wells to drill up there in Kingfisher County, and

18  that was a way of getting the funding for them.

19      Q.   Are you referring to horizontal wells,

20  vertical wells, or a combination of horizontal and

21  vertical wells in that number?

22      A.   Well, in that particular number, time

23  frames gets -- get -- makes things get fuzzy, but in

24  that particular number 2,000 is the number I'm

25  remembering as the number of laterals that we were

```
                                        Page 31
 1   hoping to have.
 2        Q.   And that time frame is, you think,
 3   sometime in 2016?
 4        A.   It would have been -- I don't know if we'd
 5   have had that number in our heads when we started
 6   the process.  By the time we ended the process, we
 7   had that number in our heads.  So by some date in
 8   2017, we -- that was our -- that was our plan.
 9        Q.   Under Alta Mesa's current -- strike that.
10             Under Alta Mesa's capital structure as of
11   the beginning of 2017, is it true that Alta Mesa
12   simply did not have the capital to drill on the
13   order of 2,000 laterals?
14             MS. PRESTON:  Objection, form.
15        A.   It would -- it would have taken longer
16   than my lifetime under that capital structure.
17        Q.   Why is that?
18        A.   Because we would have had to go real slow,
19   relying on borrowing base increases to -- for the
20   capital, and that would have been a slow process to
21   drill that many wells.
22        Q.   So the concept of the IPO was to raise
23   capital for a drilling program that could drill
24   somewhere on the order of 2,000 wells?
25             MS. PRESTON:  Objection, form.
```

Page 32

1      A.   That would have been the goal, yes, to

2    ultimately drill that many wells, yes.

3      Q.   Did you support that idea?  Strike that.

4    That was unclear.

5           Did you support the idea of doing an IPO

6    in the late 2016, early 2017 time period?

7      A.   I was -- I was excited about our

8    opportunities there as an engineer, and that was one

9    way of going, and I -- I was -- you know, I kind of

10   trusted Hal and Mike McCabe to lead us down that

11   financial path, and that was certainly one of the

12   options.

13     Q.   At the time that you were considering an

14   IPO and before the negotiations with the SPAC

15   started, where did this number of about 2,000

16   laterals come from?

17          MS. PRESTON:  Objection, form.

18     A.   Well, we did our best from a engineering,

19   geology standpoint of estimating oil in place up

20   there over our footprint, and we put in a what we

21   thought was a reasonable number of sticks and felt

22   that -- felt that there was somewhere, you know, in

23   the 2,000 range that could be drilled, and it could

24   be as high as 3,000 is my memory.  So --

25     Q.   What did you do to estimate oil in place

1    in your STACK footprint?

2         A.   Initial -- initially, back in that time

3    frame, we hadn't done any reservoir modeling yet.

4    Later on, Schlumberger did that for us.  And we did

5    internally also though.  And that's what, you know,

6    that's what I believe in as an engineer is reservoir

7    modeling.

8              And -- but we didn't have that in place

9    then.  So it was basically doing it by hand.  That's

10   probably a little bit of an exaggeration, but it's

11   not much different from that.  You just look at your

12   data and do some -- do your calculations in each

13   section and then -- and then draw your maps and put

14   together the big picture as best you can.

15        Q.   So going into 2017 -- strike that.

16             When you started considering an IPO in

17   2016, what was the basis for your -- strike that.

18             I'm just trying to break down your last

19   answer a little bit, make sure we understand.

20             When you started considering an IPO, you

21   had in mind a number of about 2,000 lateral wells to

22   drill, correct?

23             MS. PRESTON:  Objection, form.

24        A.   Yes, somewhere in that range.

25        Q.   And was that number informed by work that

Page 34

1    Schlumberger had already done for Alta Mesa?

2           MS. PRESTON:  Objection, form.

3        A.   They might have started that work, but

4    they were certainly not completed by then.  Ryder

5    Scott had done some work for us, and that was

6    helpful obviously.

7        Q.   Had anyone outside of Alta Mesa told you

8    that 2,000 lateral wells was a reasonable

9    approximate number to plan to drill?

10          MS. PRESTON:  Objection, form.

11       A.   Well, the only other technical person

12   outside of Ryder Scott then, the only other

13   technical person that looked at this was another

14   consulting firm, Bill Von Gonten, and they were very

15   optimistic about the opportunities there also.  They

16   might have represented one of the equity partners.

17   I'm not -- I don't -- I'm not sure about that.

18          But I think everybody we talked to thought

19   that that was a reasonable expectation, that we were

20   going to be able to develop this big -- this big

21   footprint that we had with the 500-foot-thick

22   limestone and that was a reasonable expectation of

23   the number of wells it would take to most

24   efficiently develop it.

25       Q.   Do you know how to spell Mr. Von Gonten's

```
                                             Page 35
 1   last name?
 2        A.   It's probably -- it's probably V-O-N
 3   capital G-O-T-E-N, probably.
 4        Q.   Thank you.  Did Ryder Scott -- at the time
 5   you started considering an IPO for Alta Mesa, had
 6   Ryder Scott advised you that 2,000 laterals was a
 7   reasonable approximate number to expect to drill in
 8   Alta Mesa's STACK footprint?
 9             MS. PRESTON:  Objection, form.
10        A.   Well, there was no expectation that they
11   were going to say there was 2,000 proved,
12   undeveloped locations.  They would have been
13   different categories, probables or possibles, and we
14   had not asked them to document that as far as I
15   know.
16             So -- but they knew what our plans were.
17   And in the meetings I had, which were pretty limited
18   because Tim did the heavy lifting there, but the
19   meetings I had with them, they were -- they were
20   supportive of our idea.  They thought it was
21   reasonable.
22        Q.   "Tim" in your last answer is Tim Turner?
23        A.   That's correct.
24        Q.   How many meetings did you have with Ryder
25   Scott prior to your consideration of taking
```

[PAGES INTENTIONALLY OMITTED]

```
                                              Page 44
 1        Q.   Did you personally receive stock in the
 2   new public company in connection with the business
 3   combination?
 4        A.   Yes.
 5        Q.   How much?
 6        A.   I don't remember.
 7        Q.   Approximately how much stock in the new
 8   public company do you think you received in
 9   connection with the business combination?
10             MS. PRESTON:  Objection, form.
11        A.   Yeah, I could be way off on this, but I'm
12   remembering a number of like $200 million.
13        Q.   And did you ever sell -- strike that.
14             After the business combination, did you
15   ever purchase shares in the new public company?
16        A.   No, not that I --
17        Q.   Prior to the business combination, did you
18   purchase shares in the SPAC?
19        A.   No.
20        Q.   Did you receive stock in the new company
21   as compensation for your employment with the new
22   company after the SPAC?
23             MS. PRESTON:  Objection, form.
24        A.   You know, I don't know how to answer that.
25   I mean, at closing, you know, I had these shares of
```

[PAGES INTENTIONALLY OMITTED]

```
                                            Page 56
 1        A.    Yeah, it's my understanding.
 2        Q.    Do you remember what the thresholds -- the
 3   threshold was or the thresholds were related to your
 4   earn-out?
 5        A.    I think there was more than one, and I
 6   think the upper limit was $20 a share.
 7        Q.    Was there a threshold at $12 per share?
 8        A.    Could have been.
 9        Q.    If everything -- well, strike that.
10              How much equity would you potentially
11   receive if the Alta Mesa Resources, Inc., stock
12   price went up and stayed up at sufficient levels?
13              MS. PRESTON:  Objection, form.
14        A.    Well, I was optimistic enough to think
15   that we were going to $20 a share, so I'd actually
16   scribbled down some of those numbers back in the day
17   and it was -- I was going to be worth a whole bunch
18   of money.  But I don't remember the number.
19        Q.    More than a hundred million dollars?
20        A.    Yes.
21        Q.    More than a billion?
22        A.    Probably not.
23        Q.    Do you remember calculating what you
24   might -- what you might receive if the stock went up
25   above 12 and stayed above $12 per share?
```

[PAGES INTENTIONALLY OMITTED]

```
                                              Page 68
 1            MS. PRESTON:  Objection, form.
 2       A.   Yeah, to the best of my knowledge, they --
 3   yeah, I didn't have any reason to think that they
 4   didn't understand.  John and Mr. Hackett are both
 5   very smart.
 6       Q.   When you were -- did you prepare for the
 7   meeting with the Silver Run team?
 8       A.   I didn't prepare with Silver Run team.  I
 9   prepared for the Silver Run team.
10       Q.   Thank you.  Did you discuss your
11   preparation with Mr. Chappelle?
12       A.   Probably so.  I would think I did, yes.
13       Q.   Did Mr. Chappelle suggest that you give
14   your presentation in any particular way?
15            MS. PRESTON:  Objection, form.
16       Q.   Strike that.
17            Did Mr. Chappelle advise you how he
18   thought you should give your presentation?
19            MS. PRESTON:  Objection, form.
20       A.   Not to my memory.
21       Q.   Is there -- did Mr. Chappelle -- strike
22   that.
23            Is there any information that
24   Mr. Chappelle asked you not to share with the
25   Silver Run team?
```

Page 69

1      A.    No.

2      Q.    Is there any particular information that

3  Mr. Chappelle suggested that you share with the

4  Silver Run team?

5      A.    Well, Hal knew -- Hal knew all the work I

6  was doing.  And I suspect I told Hal what I was

7  going to show him, which would have been, you know,

8  our results to date, our oil in place map, our plans

9  for developing.  I don't remember -- I don't

10  remember him suggesting that I do something

11  different than what I had planned.

12      Q.    You mentioned there was some discussion

13  about the number of wells you planned to drill at

14  this meeting with Silver Run.  Do you remember

15  mentioning that a few minutes ago?

16          MS. PRESTON:  Objection, form.

17      A.    Yeah, there's -- there's always number of

18  wells.  And in our -- when we were talking earlier

19  before, I was using that number of 2- -- something

20  in the range of 2,000 laterals, I think.  And then

21  there was -- but that might have been a different

22  time period.  I mean, it might have been a little

23  bit higher by this time period.  We might have added

24  on some acreage.  So -- but it would have been a

25  really big number that we'd have been talking about

[PAGES INTENTIONALLY OMITTED]

1    hydraulic pumps.  So those are your -- those are

2    your big picture options, I think.

3         Q.   Is it true that in a lot of wells,

4    installing an ESP increases production in the short

5    term but has minimal effect on the EUR?

6              MS. PRESTON:  Objection, form.

7         A.   Yeah, I would disagree with that

8    conclusion for sure.  The reason I -- the reason

9    that I became such an advocate for ESPs was because

10   of my belief the faster you got that frac water off

11   of that rock, the less damage you're allowing that

12   frac water to do to the rock.  And that seemed

13   particularly important at East Hennessy.

14             And the more damage you do to the rock,

15   the less your ultimate recovery will be.  So I was

16   trying to increase ultimate recovery by running

17   these ESPs.  And it is true that you do increase

18   production.  What realistically happens more

19   precisely is that you increase your water production

20   because you're getting your frac water back faster.

21   And with that, getting that frac water back faster,

22   that means you're starting to cut oil faster.  So

23   therefore, your early time rates on oil go up too.

24        Q.   So you would agree that using ESP on --

25   strike that.

[PAGES INTENTIONALLY OMITTED]

Page 126

1       A.    Well, yeah.  Tim and I talked every week,
2    so my input was important with what Tim developed.
3       Q.    What did you and Mr. Turner discuss in
4    that regard?
5       A.    Would have been what kind of EURs of oil
6    and natural gas, so therefore equivalents, we should
7    be expecting from each of our geographic areas.
8       Q.    What is the relationship between the EUR
9    and the expected production for 2017?
10      A.    Generally speaking, the higher the EUR,
11   the higher the initial production would be, early
12   time production in this case.  It's not always that
13   way, but that's a general statement.
14      Q.    Did you assist in developing Alta Mesa's
15   type curve in 2017?
16      A.    No.
17      Q.    Did you review any forecasts regarding the
18   barrels of oil equivalent that Alta Mesa's STACK
19   acreage was expected to yield in 2017?
20      A.    I would have -- I would have reviewed the
21   barrel of oil part of that.  The equivalent part of
22   it, that was something that didn't -- that I didn't
23   concentrate on, the associated gas.
24      Q.    Did you concentrate on expectations for
25   gas separately?

1          MS. PRESTON:  Objection, form.

2      A.   I would have concentrated on expectations

3   for gas as a secondary objective of what I was

4   doing.  I was concentrating on the oil reserves.

5      Q.   Is that because the oil reserves are

6   better economically?

7      A.   Yes.

8      Q.   Did anyone ever ask you if a forecast

9   regarding the barrels of oil equivalent that

10  Alta Mesa's STACK acreage would yield in 2017 was

11  reasonable in your judgment?

12          MS. PRESTON:  Objection, form.

13      A.   I don't remember.

14      Q.   What about barrels of oil?  Did anyone

15  ever say to you in 2017, you know, "We think we can

16  get this many barrels of oil for the year of 2017.

17  What do you think"?

18          MS. PRESTON:  Objection, form.

19      A.   We had weekly meetings, and I'm sure that

20  was discussed.  I don't specifically remember it,

21  but I'm sure that was discussed, and everything that

22  Tim was forecasting I didn't have a problem with.

23      Q.   Do you know if -- strike that.

24          At any time prior to the closing of the

25  business combination in February of 2018, did you

[PAGES INTENTIONALLY OMITTED]

Page 130

1    with based on the information available?

2              MS. PRESTON:  Objection, form.

3         A.   Well, I don't know if I -- if I looked at

4    that forecast with the focus on 2018 production, but

5    what I'm stating is that if I would have been asked

6    to develop it, since Tim and I had the same opinion

7    about that, we would have came up with the same

8    answer.

9         Q.   Prior to the close of the business

10   combination, did you do anything to ensure that any

11   forecasts being provided by Alta Mesa to the

12   investing public were reasonable in your judgment?

13             MS. PRESTON:  Objection, form.

14        A.   Yeah, the answer would be very similar.

15   It would be, I'd be most concentrating on the oil,

16   the EUR side of the oil.

17        Q.   And did you do anything to ensure that the

18   projections for oil recovery that were being

19   provided by Alta Mesa to the public were reasonable

20   in your judgment?

21             MS. PRESTON:  Objection, form.

22        A.   Well, only that I think the whole

23   leadership team believed that our type curve is

24   250,000 barrels or so and that we all believed that

25   at the time.

[PAGES INTENTIONALLY OMITTED]

1      Q.   Did you prepare any part of this press

2   release?

3           MS. PRESTON:   Take a second to look at it,

4   Mr. Ellis.

5      A.   Yeah.   (Witness reviews document)

6           No, I wouldn't have prepared this.

7      Q.   Did you review any drafts before it was

8   published?

9      A.   Usually I did.   I mean, probably.

10      Q.   Do you see under "Highlights" there's a

11   series of sort of arrow-shaped bullets?   The fourth

12   one, you see the fourth one where it reads, "Alta

13   Mesa is providing 2018 exit production guidance of

14   38,000 to 40,000 BOE per day"?

15      A.   Yes.

16      Q.   And it goes on to say "and updated annual

17   production guidance of 29,000 to 31,000 BOE per day

18   for full year 2018"?   Do you see that?

19      A.   Yes, yes.

20      Q.   Who made the decision to give an updated

21   annual production guidance of 29,000 to 31,000 BOE

22   per day?

23           MS. PRESTON:   Objection, form.

24      A.   Well, that would -- I mean, Hal and Mike

25   McCabe would have been instrumental in those numbers

Page 200

1    and using Tim Turner's work.

2         Q.   Did anyone discuss -- did anyone discuss

3    that with you?

4         A.   Well, we -- again, leadership team met at

5    least twice a month, and we -- and we all were aware

6    of what everybody in leadership team was doing.  So

7    I don't specifically remember those -- those

8    numbers, but I would have been in agreement with

9    them at the time.

10        Q.   Why was Alta Mesa's production forecast

11   for 2018 as of August 14, 2018, lower than what had

12   been forecast in March of 2018?

13             MS. PRESTON:  Objection, form.

14        A.   I don't remember.  I mean, one of the big

15   items we talked about before was the shut-ins

16   period, and that was -- that was -- that was a very

17   difficult issue, and I'm not sure even now the

18   industry's come up with a good solution to that.  I

19   think the whole industry was recognizing this being

20   an issue at the same time as we were.

21        Q.   Is it true that in addition to the shut-in

22   issue, the wells that Alta Mesa had drilled simply

23   had a lower EUR on average than what had been

24   predicted before they were drilled and producing?

25             MS. PRESTON:  Objection, form.

[PAGES INTENTIONALLY OMITTED]

1            And, you know, we -- I relied a lot on the

2    Schlumberger reservoir modeling which suggested, as

3    I've testified before, eight wells in the lower

4    bench.  But they also said there's risk to that in

5    that there's reasons to perhaps drill four wells in

6    the lower bench and four wells in the middle, middle

7    bench.

8        Q.    Did you resign your position at Alta Mesa?

9        A.    I was asked to resign.

10        Q.    What was said to you when you were asked

11    to resign?

12        A.    That the board had voted to relieve me of

13    my duties.

14        Q.    Were you told why?

15        A.    Nothing more than that, that the board

16    had -- board had voted to remove Hal, me, and Gene.

17        Q.    With no explanation?

18            MS. PRESTON:  Objection, form.

19        A.    Jim came into my office and gave me that

20    news probably an hour after I left the meeting, and

21    that's all that I remember him saying.

22        Q.    Did you have any conversations with anyone

23    after you were asked to resign about why the board

24    asked you to resign?

25        A.    No, I don't think I questioned that.

[PAGES INTENTIONALLY OMITTED]

# PX 225

**In the Matter Of:**

*DUNN vs*

*CHAPPELLE*

---

*MICHAEL ELLIS*

*March 31, 2023*

---



[PAGES INTENTIONALLY OMITTED]

DUNN vs.
CHAPPELLE

4:19-cv-00957   Document 672-3   Filed on 02/16/24 in TXSD   Page 48 of 125

Confidential

Michael Ellis
March 31, 2023

Page 9

1 might just ask that my final question be answered.
2 Okay?
3   A.   Yes.
4   Q.   Is there anything that would prevent you from
5 providing truthful testimony today, Mr. Ellis?
6   A.   No.
7   Q.   So I understand that you founded Alta Mesa in
8 around 1987.  Is that accurate?
9   A.   That is correct.
10   Q.   Not meaning this to be a memory test.
11       At its founding, could you just generally
12 describe what the business of Alta Mesa was.
13   A.   Yes.  I started up Alta Mesa out of my house.
14 That's why the name is Alta Mesa because it was on Alta
15 Mesa Street at the time.  A lot of my experience was
16 Gulf Coast, Texas; and so we started off trying to do
17 acquisitions in Gulf Coast, Texas.
18   Q.   Acquisitions of what?
19   A.   Oil and gas wells.
20   Q.   Did you have any other partners at the time
21 that you started the company?
22   A.   No.
23   Q.   And this will be -- I'm going to tell you right
24 now it will be a broad question.  But can you kind of
25 give me a timeline from, you know, roughly the start of

Page 10

1 the company through -- let's start with like 2000, so
2 those first 13 years.
3   A.   Yeah.  Starting in '87, then I was the only
4 engineer.  So I did all the workovers.  It was a lot of
5 hours away from the house.  That was stressful.
6       But then in '89 I developed enough wells
7 that I could hire somebody to help me out.  We moved
8 into an office in '89.
9       Then during the '90s I was involved with
10 some of the initial 3D seismic along the Gulf Coast
11 onshore that independents were doing.  And that's what I
12 concentrated on generally through the '90s.  And, of
13 course, it was during the mid '90s I started acquiring
14 acreage in Oklahoma.
15   Q.   And was that in the STACK region of Oklahoma?
16   A.   It was.
17   Q.   Any other regions that you were acquiring
18 acreage?
19   A.   Not in Oklahoma.
20   Q.   In roughly like the 2000 time frame how many
21 employees or people were working with you, if you
22 recall?
23   A.   We just had two.  I had an engineer and a
24 secretary.
25   Q.   Can you then bring me through, you know, 2000

Page 11

1 to roughly 2010, the next kind of ten years of the
2 business.
3   A.   Yeah.  We grew mainly through the drilling in
4 South Texas of the 3D seismic that we were shooting.  We
5 grew the company.  By the year 2000, I had somewhere
6 around 14 employees.  I had one geologist and about four
7 engineers and staff to make it all work.
8   Q.   And throughout that ten-year time frame from
9 2000 to 2010, did the company continue to acquire
10 acreage in Oklahoma?
11   A.   Yes, definitely.  Most of it was done in the
12 mid '90s, yes.
13   Q.   And you mentioned there was some other places
14 outside of Texas and Oklahoma.  Where else was the
15 company owning -- where else did the company own acreage
16 in this time frame?
17   A.   Panhandle Florida, a field called Blackjack
18 Creek.  I'm not sure if we were in Louisiana in the '90s
19 or not.  We were there shortly after the year 2000.
20   Q.   What about Idaho, was that sometime after 2000
21 as well?
22   A.   That was, yeah.
23   Q.   And I guess, you know, more importantly, let's
24 talk kind of 2010 through 2017.  I know it's a large
25 time frame.  But can you give me your description of the

Page 12

1 kind of history and evolution of the business during
2 those seven years?
3       MS. PRESTON:  Objection, form.
4   A.   Well, in 2004 I had the attitude that I was
5 just going to stay a small independent but I had built
6 this relationship with Hal Chappelle and he had become
7 available.  So we talked for many months, maybe six
8 months.  And ultimately I decided to let him come
9 on-board and run the company as the CEO because I didn't
10 like dealing with banks.  And then I would just take
11 care of the engineering.
12       So under Hal's stewardship then we got
13 more aggressive with operations everywhere.  We chased a
14 lot of acreage plays, most of which didn't work.  Idaho
15 did work, and we're proud of that.  And we were able
16 to -- with all the knowledge we had in the STACK we were
17 able to start expanding our footprint in the STACK also.
18 BY MR. BRUCKERHOFF:
19   Q.   You mentioned Mr. Chappelle.  When did he
20 approximately join at the company?
21   A.   Around 2004.
22   Q.   And during the time frame 2016/2017, what then
23 were your job responsibilities at Alta Mesa?
24   A.   Overseeing the engineering, all aspects of the
25 engineering.

# PX 226

Page 1

1                          VOLUME:    I
                           PAGES:    1-301
2                          EXHIBITS:  D-79-D-83
             UNITED STATES DISTRICT COURT
3          FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION
4          CIVIL ACTION NO. 4:19-cv-00957
   IN RE:
5  ALTA MESA RESOURCES, INC.
   SECURITIES LITIGATION
6  _____
7  ALYESKA MASTER FUND, L.P., ALYESKA MASTER
8  FUND 2, L.P., AND ALYESKA MASTER FUND 3, L.P.,
9                    Plaintiffs,
10                 vs.
11  ALTA MESA RESOURCES, INC., f/k/a SILVER RUN
12  ACQUISITION CORPORATION II; RIVERSTONE HOLDINGS,
13  LLC; ARM ENERGY HOLDINGS, LLC; BAYOU CITY ENERGY
14  MANAGEMENT, LLC; HPS INVESTMENT PARTNERS, LLC;
15  JAMES T. HACKETT; HARLAN H. CHAPPELLE; WILLIAM
16  GUTERMUTH; JEFFREY H. TEPPER; DIANA J. WALTERS;
17  MICHAEL E. ELLIS; RONALD SMITH; DON
18  DIMITRIEVICH; PIERRE F. LAPEYRE, JR.; DAVID M.
19  LEUSCHEN; WILLIAM W. McMULLEN; DONALD SINCLAIR;
20  STEPHEN COATS; and THOMAS J. WALKER,
21                    Defendants.
22  _____
23  VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, PhD
24          FRIDAY, NOVEMBER 10, 2023
25                 8:56 AM (EST)

[PAGES INTENTIONALLY OMITTED]

Page 113

1      Q.   And Silver Run did not yet own Kingfisher
2    as of December 31st, 2017; correct?
3      A.   Right.  So there's -- the ownership isn't
4    there, but there is an economic linkage 'cause the
5    company is marketing its securities by explaining
6    that these two operating entities will be owned by
7    Silver Run.
8           So -- but they -- but they weren't yet
9    owned at that point, but there -- but there is a
10   linkage between the -- you know, the business
11   combination hadn't -- hadn't happened yet and
12   hadn't been voted on yet, but Silver Run existed at
13   this point for the purpose of buying either AMH and
14   Kingfisher or assets similar to it.
15     Q.   Okay.  But you'd agree that this statement
16   does not concern the internal controls of AMH?
17          MR. SMITH:  Objection to form.
18     A.   I'm not -- I'm not an accountant or a
19   lawyer.  So there -- there it gets a little tricky.
20   It might.  Like, I -- I mean, where my expertise is
21   is, you know, how do equity analysts and investors
22   interpret this information?
23          Internal controls are about the flow of
24   information, and if this is -- I think it's
25   reasonable -- I think a reasonable economic -- or

1   stock investor or equity analyst would consider

2   this statement to be a reflection on the flow of

3   information involved in the due diligence that was

4   purportedly taking place at that point in time.

5       Q.   Okay.

6       A.   Which would include the targets, not just

7   the acquirer.

8       Q.   Had there been a change in Silver Run's

9   internal controls as of December 31st, 2017?

10          MR. SMITH:  Objection to form.

11      A.   Again, I -- I -- I don't know.  I mean,

12  I -- it's -- it's altogether possible that the

13  answer is no because they were deficient before and

14  after.  I think -- in fact, I think that's what the

15  allegation is, is that they were deficient before

16  and after.

17          But what's -- what's more -- what I

18  analyzed is what was the economic impact of the

19  market not knowing that there were deficiencies in

20  internal controls since the start of the class

21  period and then learning that there were

22  deficiencies in internal controls near the end of

23  the class period.  That's what I studied.

24          THE WITNESS:  Can we take a break?  It's

25  been another -- it's 11:30.  Actually, beyond

# PX 227

Page 1

1        UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4

5

6   IN RE ALTA MESA RESOURCES,  ) CASE NO.

7   INC. SECURITIES LITIGATION  ) 4:19-cv-00957

8

9

10

11        REMOTE VIDEOTAPED DEPOSITION OF

12              EDWARD FETKOVICH

13              NOVEMBER 1, 2023

14               9:03 a.m. ET

15

16

17          Witness Appearing From:

18     Law Offices of Latham & Watkins LLP

              555 Eleventh Street, NW

19            Washington, D.C. 20004

20

21

22     Conducted Remotely Via Videoconference

23

24

25

[PAGES INTENTIONALLY OMITTED]

Page 182

1    there's -- you know, there's the continuation of

2    that that's a much smaller payment annually.

3    But yeah.

4         Q.   And then the other bullets listed here,

5    these are all different ways that the operator can

6    save costs by drilling an S-shaped well, correct?

7         A.   Correct.

8         Q.   Okay.

9         A.   Well, let me -- let me -- let me restate

10   that.

11             By drilling a deviated well or by -- or by

12   minimizing the number of surface locations required

13   to develop the acreage, that's -- that's the name of

14   the game.

15        Q.   And all of these costs, are they all

16   substantially all -- are all of the cost savings

17   noted in these bullets substantially realized up

18   front?

19        A.   Yes.

20        Q.   Okay.  So is it -- is it fair to say that

21   the cost savings realized from drilling S-shaped

22   wellbores are mostly realized up front?

23        A.   The cost of drilling deviated wellbores

24   are realized up front.

25        Q.   I'm -- the answer is different for

# PX 228

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION
 3      IN RE:
 4      ALTA MESA RESOURCES,          Civil Action No.
        INC. SECURITIES               4:19-cv-00957
 5      LITIGATION
        _____
 6      ALYESKA MASTER FUND,
        L.P., ALYESKA MASTER
 7      FUND 2, L.P., AND
        ALYESKA MASTER FUND 3,
 8      L.P.,
                    Plaintiffs,
 9        v.                          Case No.
        ALTA MESA RESOURCES,          4:22-cv-01189
10      INC., f/k/a SILVER RUN
        ACQUISITION CORPORATION
11      II; RIVERSTONE HOLDINGS,
        LLC; ARM ENERGY
12      HOLDINGS, LLC; BAYOU
        CITY ENERGY MANAGEMENT,
13      LLC; HPS INVESTMENT
        PARTNERS, LLC; JAMES T.
14      HACKETT; HARLAN H.
        CHAPPELLE; WILLIAM
15      GUTERMUTH; JEFFREY H.
        TEPPER; DIANA J.
16      WALTERS; MICHAEL E.
        ELLIS; RONALD SMITH; DON
17      DIMITRIEVICH; PIERRE F.
        LAPEYRE, JR.; DAVID M.
18      LEUSCHEN; WILLIAM W.
        McMULLEN; DONALD
19      SINCLAIR; STEPHEN COATS;
        and THOMAS J. WALKER,
20                  Defendants.
21              REMOTE VIDEOTAPED DEPOSITION OF
22                    FRANK GAGLIARDI
23                  November 3, 2023
24                  9:41 a.m. Central
25       Deanna Amore - CRR, RPR, CSR - 084-003999
```

[PAGES INTENTIONALLY OMITTED]

Page 152

1      A.   It was never proven to be successful.

2      Q.   Was it an unreasonable initial base case

3  assumption?

4      MR. SPARACIO:  Objection.  Form.

5      THE STENOGRAPHER:  Who was that?

6      MR. SPARACIO:  Mr. Sparacio for the Alyeska and

7  Orbis plaintiffs.  Sorry.

8          Objection.  Form.

9  BY MS. GRAGERT:

10     Q.   What's your answer, sir?

11     A.   Can you repeat the question?

12     Q.   Sure.

13          Was 12 wells per section an unreasonable

14  initial base case assumption?

15     MR. SPARACIO:  Same objection.

16     THE WITNESS:  Yes, it seemed unreasonable.

17  BY MS. GRAGERT:

18     Q.   Why?

19     A.   They were relying on three benches that

20  were never proven to be independent.

21     Q.   Based on what they knew, let's say early

22  2017, was it unreasonable at that time?

23     MS. CRISPIN:  Objection.  Form.

24     THE WITNESS:  Yes, it was.

25

Page 153

1    BY MS. GRAGERT:

2        Q.   Did they -- is it your position that an

3    operator has to have a proven -- has to know for

4    certainty the number of benches available and their

5    acreage before they could create an initial base

6    case assumption?

7        A.   There is testing that you can do prior to

8    making those assumptions to see if your theory is

9    valid.

10       Q.   Do you need to have certainty about those

11   benches before you can have a base case assumption?

12       A.   You would want to know the range of

13   certainty.

14       Q.   Is it your opinion that Alta Mesa as of

15   mid 2017 had no evidence to support multiple

16   benches?

17       MS. CRISPIN:   Objection.   Form.

18       THE WITNESS:   They had three benches, but they

19   were not independent of each other.   They could

20   have had 12 benches, 24 benches, as many benches as

21   they wanted, but there weren't two benches that

22   were not connected.

23   BY MS. GRAGERT:

24       Q.   Is it your opinion that an operator should

25   not assume that it can land wells in multiple

Page 154

1    benches if there's any level of communication

2    between those benches?

3         MS. CRISPIN:  Objection.  Form.

4         THE WITNESS:  There's a degree of interference,

5    obviously, to where it's not a problem, and there's

6    a degree where it's massively a problem.

7    BY MS. GRAGERT:

8         Q.   As of mid 2017, what is your understanding

9    of Alta Mesa's understanding of the degree of --

10   what's the word you used? -- interference?

11        MS. CRISPIN:  Objection.  Form.

12        THE WITNESS:  There, again, I don't know --

13   I don't know what Alta Mesa was thinking.

14   BY MS. GRAGERT:

15        Q.   You believed it was unreasonable for them

16   to conclude, based on the evidence they had, that

17   they would not be able to -- that there was -- let

18   me -- let me rephrase that.

19             Do you believe, as of mid 2017, Alta Mesa

20   knew that there was too much interference between

21   the three -- between multiple benches for them to

22   operate under an assumption they would be able to

23   land wells in multiple benches?

24        MS. CRISPIN:  Objection.  Form.

25        THE WITNESS:  I don't know what Alta Mesa was

Page 155

1    thinking.

2    BY MS. GRAGERT:

3        Q.   You looked at the evidence available to

4    them as of mid 2017; right?

5        A.   Yes, I did look at that evidence.

6        Q.   And based upon all of the evidence that

7    you looked at, you concluded -- did you conclude --

8    well, let me rephrase that.

9            Based on all of the evidence available to

10   Alta Mesa in mid 2017 that you reviewed, did you

11   reach a conclusion about the severity of

12   interference amongst the benches?

13       A.   So did I understand the severity of the

14   interference?  Is that the question?

15       Q.   Yes.

16       A.   For me, reviewing the data, I could see

17   the severity of the interference between benches.

18       Q.   Did you conduct any analysis of the amount

19   of interference between the benches based on the

20   data available as of mid 2017?

21       A.   Yeah, I think if you look at my report,

22   there's evidence on the Bullis-Coleman pad to where

23   parent wells that had been drilled the prior year,

24   year and a half before, drained multiple benches.

25   So you have direct evidence of depletion in the

Page 156

1    vertical that suggested -- and then there was

2    tracer tests and trading of fluids, and so there

3    was no evidence there that suggested benches were

4    separate.

5        Q.   I recognize -- I understand you believe

6    there was connection between those benches.  I'm

7    trying to understand, did you conduct any of your

8    own analysis to understand how severe that

9    interconnectedness might be?

10       A.   Only from the data of looking at

11   production, raw production data, and some pressure

12   data from the Ash Foster test that was a little bit

13   later.  Actually, the Ash Foster was mid summer

14   2017.  You had pressure and tracer data, but it

15   didn't come online until later in the fall.  But

16   you had early indications in the Ash Foster that

17   multiple benches, a three-bench test, where you had

18   interference and production savings from zones.

19       Q.   Ash Foster was spud in May of 2017;

20   correct?

21       A.   Correct.

22       Q.   First production wasn't until the end of

23   2017.  Would you agree with me?

24       A.   Correct.

25       Q.   Is it your opinion that by mid 2017

Page 157

1    Ash Foster provided evidence of connectivity
2    amongst the benches?
3        A.   Yeah, there was tracer information and
4    pressure data and information that was run when the
5    wells were fracked in August.
6        Q.   What was that data?  What did it show?
7        A.   It showed interference.  It's in my
8    report.
9        Q.   How much?
10       A.   It's ultimately borne out in the
11   production numbers that came later, but there was
12   interference between them.  So you knew there was
13   interference.
14       Q.   How much interference did the Ash Foster
15   pattern test demonstrate to Alta Mesa was occurring
16   before first production?
17       A.   Would you like to go to my report?
18       Q.   Sure.  Let's look at your report and tell
19   me where it shows that.
20       A.   I didn't say it showed that.
21       Q.   Okay.  I didn't mean to misunderstand.
22   Where in your reporting supports this argument
23   you're making now?
24       A.   On page 18.  Paragraph 54, 17 and 18.
25       Q.   What does this tell you about the degree

Page 158

1    of connectivity of the benches?

2        A.   To answer your question on degree, it's a

3    relative -- there's not -- it's not quantitative

4    until you don't see any production, and then you

5    don't have any production.  So there are some wells

6    that when they are interfered with, they have zero

7    production.  So that's zero dollars, zero revenue.

8    So that's severe.  That's your one end of

9    interference.

10           The other end of interference would be,

11   you know, wells are just taken offline for a couple

12   of months, and maybe they come back.  Some wells

13   never come back.

14           So there's a range of interference.

15   There's not a degree such as like 10 percent or

16   15 percent.  There's no answer in that regard.

17       Q.   So is it fair that there's some degree of

18   interference that can occur in which it still makes

19   sense to treat the area as multiple benches?

20       MS. CRISPIN:  Objection to form.

21       THE WITNESS:  If the spacing permits -- sorry.

22           If the spacing permits, yes.

23   BY MS. GRAGERT:

24       Q.   It's -- it's your opinion that Alta Mesa

25   was the only operator drilling in the Osage?

Page 159

1     A.    No.

2     Q.    How many others were drilling in the Osage

3 in the STACK?

4     A.    On the shelf in the STACK, there were a

5 handful of operators that were drilling Osage.

6     Q.    Were they acting unreasonably in doing so?

7     MS. CRISPIN:  Objection.  Form.

8     THE WITNESS:  I did not study those companies

9 as far as their procedures and methods.  I know of

10 them.

11 BY MS. GRAGERT:

12    Q.    Based on public information, is there any

13 reason to believe that what they -- was there any

14 reason at the time to believe what they were doing

15 was unreasonable?

16    MS. CRISPIN:  Objection.  Form.

17    THE WITNESS:  Are you referring to their peers

18 on their shelf?

19 BY MS. GRAGERT:

20    Q.    Yes.

21    A.    There, again, I wasn't -- I didn't study

22 those companies.

23    Q.    Alta Mesa could have seen that their peers

24 were doing this as well to provide them comfort in

25 their own plans.

Page 160

1      MS. CRISPIN:  Objection to form.

2      THE WITNESS:  I'm sure Alta Mesa -- sorry,

3  Callie.

4          I'm sure Alta Mesa looked at what their

5  peers were doing.

6  BY MS. GRAGERT:

7      Q.    And if it demonstrated they were

8  drilling -- they assumed multiple benches as well,

9  that's at least some evidence for Alta Mesa to

10  consider to support their belief in multiple

11  benches?

12      A.    If the geology was similar and the

13  treatments were similar.  So you have to have --

14  you just can't say -- they may be tighter space,

15  but they don't treat them as heavily.  So just

16  looking at what another operator does -- you have

17  to look at your geology.  Then you have to look at

18  their treatment structure.  It may not be the

19  blueprint.

20      Q.    You should have Exhibit 66 in your exhibit

21  folder now, sir.

22                      (Whereupon, Exhibit 66 was

23                      marked for identification.)

24      THE WITNESS:  Yes.

25

# PX 229

CONFIDENTIAL

Page 1

1         IN THE UNITED STATES DISTRICT COURT

          FOR THE SOUTHERN DISTRICT OF TEXAS

2              HOUSTON DIVISION

3

IN RE:  ALTA MESA      §

4  RESOURCES, INC.      §   CASE NO. 4:19-cv-00957

SECURITIES LITIGATION   §

5

6    ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM GUTERMUTH

7               MAY 9, 2023

8

9            ** CONFIDENTIAL **

10

11     ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM

12  GUTERMUTH, produced as a witness at the instance of the

13  Plaintiffs and duly sworn, was taken in the above styled

14  and numbered cause on Tuesday, May 9, 2023, from

15  10:07 a.m. to 6:31 p.m., before Janalyn Elkins, CSR, in

16  and for the State of Texas, reported by computerized

17  stenotype machine, viz Zoom, pursuant to the Federal

18  Rules of Civil Procedure and any provisions stated on

19  the record herein.

20

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 24

1        A.   No, or otherwise.

2        Q.   How long did your tenure as a board member of

3    Silver Run II last?

4        A.   From the time -- in other words, I went on the

5    board in the spring of 2017 until the annual meeting of

6    2018, after the Alta Mesa and Kingfisher acquisitions,

7    which was in June the following year, June 18th -- June

8    of 2018.

9        Q.   And did you seek reelection at the end of the

10   annual meeting in order to continue serving on the board

11   of Alta Mesa Resources?

12       A.   I did not.

13       Q.   And why was that?

14       A.   Jim Hackett contacted me in the spring of 2018

15   and said he was dealing with a situation with Ellis &

16   Chappelle, that they felt they did not have much of a

17   say in who was on the board.  And Jim said, "Well,

18   that's fine, but if you have -- if you have some

19   candidates you think would be good for the board, I'd be

20   happy to look at them."  And I understand he submitted a

21   couple that were not acceptable.  And he subsequently

22   submitted Sylvia Kerrigan, who is highly credentialed,

23   very competent.  And her credentials, she was a lawyer

24   and I would think probably more highly credentialed than

25   I was.

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 26

1    repeat the question?  I think I maybe wandered off

2    there.

3        Q.  The question was if you had served on the audit

4    committee of the board throughout your tenure, so from

5    March of 2017 to June of 2018, when you did not seek

6    reelection.

7        A.  Yes is the answer.

8        Q.  Okay.  And it sounds like at least until the

9    business combination closed, you were on other

10   committees also?

11       A.  Yes.  Well, again, sorry, not to split hairs

12   here, but we served as committees of the whole.  There

13   were no -- we didn't really act formally as committees.

14   As I said, there really wasn't much for us to do.

15       Q.  I'm not familiar with the term "committees of

16   the whole."  What is -- when you say that, what do you

17   mean?

18       A.  I mean that all three of the directors,

19   independent directors served as the committee members of

20   all the committees.  So there was very little difference

21   between the board and the committees.

22       Q.  And did you hold board meetings prior to the

23   business combination?

24       A.  We did.  Yes is the answer to the question.  We

25   certainly did, yes.

CONFIDENTIAL

Page 27

1      Q.  And what business was there to conduct prior to

2  the announcement of the proposed business combination?

3      A.  Well, there were the routine corporate matters

4  associated with the directors of a public company.  We

5  still had to file Qs and Ks and approve those things.

6  But in I'd say July of 2017 when the proposal -- when

7  the management brought to the board a proposal regarding

8  Alta Mesa and Kingfisher, then there was a lot of work

9  to do in terms of working through what that looked like,

10  what it was going to cost, how it was going to be

11  structured, all the things that go into board-level

12  activity for a major acquisition, in this case, II.

13      Q.  When you joined the board of Silver Run II, did

14  you disclose a potential conflict that you had?

15      A.  Yes.

16      Q.  And what was the nature of that potential

17  conflict?

18      A.  Let me be clear.  I didn't think it was a

19  conflict.  But I wanted to -- I wanted the board to be

20  aware of it in case someone was concerned about it.

21          I had, prior to the time I joined the

22  board, invested approximately $400,000 in Bayou City

23  Energy fund 1 which had two investments in Alta Mesa.

24  They were drilling partnerships.  And the -- I made an

25  estimate of what Bayou City's estimate of the value was.

[PAGES INTENTIONALLY OMITTED]

```
 1   to the board about issues with the auditor or otherwise.
 2        Q.  And I think you said you reviewed financial
 3   statements of Alta Mesa Resources.  Did you review the
 4   draft 10-K for Alta Mesa Resources for 2017?
 5        A.  When it was filed in March of 2018, is that the
 6   one you're referring to?
 7        Q.  Yes.
 8        A.  Yes, I did.  I did, yes.
 9        Q.  Were you given the opportunity to provide
10   comments on that draft 10-K?
11        A.  Yes, I was.
12        Q.  And do you recall if you had any edits or
13   comments to that document?
14        A.  I do not recall.
15        Q.  Do you recall if you were given the opportunity
16   to review any draft press releases between the time the
17   business combination closed and the time you left the
18   board?
19        A.  Press releases regarding financial statements
20   or press releases generally?
21        Q.  I meant press releases generally.
22        A.  I reviewed the ones having to do with the
23   quarterly and annual financial statements.  I don't
24   recall reviewing ones that -- other ones that were
25   issued for whatever reason.
```

[PAGES INTENTIONALLY OMITTED]

1      A.   It was BDO.

2      Q.   And were you -- were you part of the process of

3   selecting BDO as auditor for AMR?

4      A.   No.

5      Q.   Were they a legacy auditor of one of the

6   entities involved in the business combination?

7      A.   Yes.

8      Q.   And which entity was that?

9      A.   AMR.

10     Q.   Were you part of the process of selecting a

11  replacement auditor for BDO Seidman?

12     A.   I was.

13     Q.   And did you help interview and select KPMG?

14     A.   I did.

15     Q.   And who did you work on in -- with that -- in

16  that process?

17     A.   All the independent directors were on the audit

18  committee and we all -- certainly all had the

19  opportunity to participate in those interviews.  I know

20  Dianna was there.  I can't remember off the top of my

21  head if Jeff and Don were there or not.  But everybody

22  had the opportunity to and may, in fact, have done it.

23  Dianna was there in person as was I.  I don't recall if

24  anybody else was or was on the phone.

25     Q.   And do you recall what was the reason there was

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 61

1  of the board of directors.  Do you have any recollection

2  of why three separate meetings were called over a

3  four-day time frame?

4       A.  The dates are 18th, 19th and 21st; those are

5  the ones you're referring to?

6       Q.  Yes.  My question was whether you had an

7  independent recollection election of why the company

8  scheduled three special meetings within a four-day time

9  frame.

10      A.  The reason that there were three meetings in

11  such close proximity is that the first one was when the

12  notion of the Alta Mesa-Kingfisher acquisition was

13  introduced by TPH.  The others were follow-ups to that

14  meeting that were requested board members or other

15  parties to follow up or get additional information or

16  ask questions.  So they were all related to the

17  potential acquisition.

18      Q.  And if I could direct your attention again to

19  the July 18, 2017 minutes.  The bottom of the first page

20  reads, (Reading:)  Ms. Wassenaar presented a detailed

21  description of the assets of Alta Mesa and Kingfisher

22  Midstream.  The due diligence results to date in a

23  potential valuation of $4.1 billion with a 700 million

24  earnout.  The independent members of the board requested

25  a meeting with Tudor Pickering Holt & Co. to verify

CONFIDENTIAL

Page 62

1    independently the valuations presented by Ms. Wassenaar.

2                    Do you see that?

3         A.  I do.

4         Q.  Do you recall what were the due diligence

5    results to date that Ms. Wassenaar was presenting?

6         A.  Not with any specificity other than she had

7    done a lot of due diligence and she was presenting her

8    findings and those of her team.

9         Q.  And was she presenting on any other potential

10   acquisitions at that meeting?

11        A.  No.  No.

12        Q.  And was she recommending the company -- strike

13   that.

14                    Was she recommending the board consider

15   that acquisition?

16                    MS. WALLER:  Objection, form.

17                    THE WITNESS:  I don't know that she was in

18   a position to make a recommendation of that type.  The

19   reason that she was making the presentation is so the

20   board could evaluate a possible acquisition.  But I

21   don't recall that she made a recommendation one way or

22   other.

23        Q.  (BY MS. FOX)  And did she explain how she had

24   obtained the valuation of $4 billion -- $4.1 billion?

25   Sorry.

CONFIDENTIAL

Page 63

1        A.  I'm sure she did.  Although I don't recall what

2   the components of that recommendation were or the basis

3   of the recommendation.  Sorry, not a recommendation, the

4   valuation.

5        Q.  If you could go to page 6 of 6.  It is the

6   minutes from the July 19, 2017, special committee and it

7   looks like you participated in the meeting

8   telephonically, correct?

9        A.  I did.

10       Q.  And the board had previously requested that

11   representatives from TPH be convened to verify the

12   valuations presented by Ms. Wassenaar.  Is that what was

13   done at the July 19, 2017, meeting?

14       A.  I'm sorry.  Could you ask the question again?

15       Q.  Sure.  When we looked at the July 18, 2018,

16   minutes, they reflected that the board of SRun II --

17   strike that.  Let's start again.

18            When we looked at the July 18, 2017,

19   minutes, they reflected that the independent members of

20   the SRun II board had requested a meeting with TPH to

21   verify independently the valuations presented by

22   Ms. Wassenaar.

23            The question is:  The meeting that was held

24   the very next day on July 19, 2017, appears to have

25   representatives of TPH at the meeting.  Do you recall

CONFIDENTIAL

Page 64

1   the representatives from TPH presenting any valuation of

2   the proposed business combination?

3       A.  Well, I see the minutes say that they did.  I

4   don't have a specific recollection of what they said.

5       Q.  Do you recall what was the numerical valuation

6   they assigned to the proposed business combination?

7       A.  I do not.

8       Q.  And do you recall if they explained to the

9   board at the July 19, 2017, meeting what they had done

10  to assess the valuation of the proposed business

11  combination?

12      A.  Do I recall that?

13      Q.  Yes.

14      A.  I do not have a specific recollection of that.

15      Q.  Do you recall if at the July 19, 2017, meeting

16  TPH presented a slide deck of any sort?

17      A.  I don't recall what the presentation looked

18  like.

19      Q.  Do you recall if you received a report of any

20  sort from TPH in advance of the July 19, 2017, meeting?

21      A.  I recall that there was a report which I

22  believe came from TPH.  I don't know if it was in

23  advance of this meeting in connection with this meeting

24  or what the chronology was.  But we did have a report

25  from TPH.

CONFIDENTIAL

Page 65

1        Q.   And do you recall what that report said?

2        A.   It said a lot of things.  It was real long.

3        Q.   Do you recall what the valuation was that TPH

4   assigned to the proposed business combination?

5        A.   I do not.

6        Q.   Do you recall if you kept a copy of the TPH

7   report that you just mentioned?

8        A.   I believe I did.

9        Q.   If I could direct your attention now to the

10   very first page of Exhibit 450, it is the minutes from

11   the July 21, 2017, special meeting of the board of

12   directors.

13            Do you see that you attended that

14   teleconference meeting?

15        A.   I do.

16        Q.   And under feedback from TPH meeting it reads,

17   (Reading:)  The board discussed the information

18   presented by Tudor Pickering Holt & Co. at the previous

19   board meeting.  The board was satisfied with the

20   valuation proposed by the company for the Alta Mesa and

21   Kingfisher assets.

22            Do you see that?

23        A.   I do.

24        Q.   And by the valuation proposed by the company,

25   do you recall if that was the $4.1 billion valuation

CONFIDENTIAL

Page 66

```
1    proposed by Ms. Wassenaar?

2         A.  I do not recall.

3         Q.  Then under status of negotiations, it says

4    that, (Reading:)  Mr. Hackett -- and that's in

5    brackets -- then discussed key features of a proposed

6    purchase agreement of Alta Mesa and Kingfisher and

7    further due diligence updates.  Mr. Hackett and other

8    representatives of Riverstone Holdings, LLC, answered

9    questions from the board about the proposed transaction.

10                   Do you see that?

11        A.  I do.

12        Q.  Do you recall any of the further due diligence

13   updates that Mr. Hackett made at the July 21, 2017,

14   meeting?

15        A.  No, I don't.  Not with any specificity.

16        Q.  Do you recall if you were one of the -- one of

17   the board members who asked any questions about the

18   proposed transaction?

19        A.  I don't recall.

20        Q.  If you turn to the next page, there's a

21   description of a proposed $500 million PIPE.

22                   Do you see that?

23        A.  I do.

24        Q.  Do you have any understanding of why

25   Mr. Hackett was proposing a -- the launch of a
```

[PAGES INTENTIONALLY OMITTED]

1    have admired and respected and enjoyed knowing.

2         Q.  And in connection with what I've marked as

3    Exhibit 455, you write to Jim Hackett, (Reading:)  Many

4    thanks to you and the entire Riverstone team.  This is a

5    tough deal and getting it signed up is a real tribute to

6    everyone involved.  I fully expect this to be a home run

7    for Riverstone.  Best, WDG.

8              What did you mean by the fact that you

9    expected it to be a home run for Riverstone?

10        A.  I meant that I believed in the assets that were

11   being acquired.  I believed in their potential to be

12   extremely profitable and that the company, in

13   combination with KFI, could be have a very successful

14   acquisition for SR2.

15        Q.  Now, you mentioned that you believed the assets

16   that were being acquired were -- had the potential to be

17   extremely profitable.  Did you do any personal due

18   diligence in connection with assessing the potential

19   profitability of the assets being acquired?

20        A.  No.  My impression was based on the due

21   diligence that had been done and presented to us by

22   Olivia and her team and TPH and whoever else was

23   providing diligence information.

24        Q.  In addition -- in addition to the presentations

25   made by Ms. Wassenaar and TPH, do you recall any

[PAGES INTENTIONALLY OMITTED]

```
                                                  Page 92
 1    board read in full and asked questions about.  I can't

 2    tell you to this day what the questions were, but I know

 3    there were a lot of questions asked and those were

 4    extended meetings.

 5         Q.  Do you recall any of the questions -- strike

 6    that.

 7              Did you ask any questions about the draft

 8    proxy statements?

 9         A.  I did.

10         Q.  And do you recall the nature of those

11    questions?

12         A.  I think they were probably the only things I

13    just mentioned.

14         Q.  Do you recall specifically any of the questions

15    that you asked?

16         A.  I don't.

17         Q.  Do you recall if you consented to your

18    signature being used in connection with the proxy

19    statement?

20         A.  I did.

21         Q.  Do you know that at the time the Silver Run II

22    board recommended that Silver Run stockholders vote for

23    each of the proposals set forth in the January 2018

24    proxy?

25              MS. WALLER:  Objection to form.
```

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 100

1           Do you see that?

2      A.  I do.

3      Q.  The proxy for the proposed business combination

4  was not filed until January of 2018.  When you say you

5  have nothing further on the proxy, was that on a much

6  earlier draft of the proxy?

7      A.  It would have had to have been.

8      Q.  Do you recall receiving -- strike that.

9           Do you recall reviewing multiple versions

10 of the proxy before it was filed in January of 2018?

11     A.  Every time they sent a round of proxy for

12 review, I reviewed it.  The answer is undoubtedly yes.

13          MS. FOX:  I'm about to start another series

14 of documents so this might be a descent time to break.

15 Let's go off the record.

16          MS. WALLER:  Okay.

17          VIDEOGRAPHER:  We are going off the record

18 at 1:04 p.m.

19          (Lunch recess.)

20          VIDEOGRAPHER:  We are back on the record at

21 1:46 p.m.

22     Q.  (BY MS. FOX)  Mr. Gutermuth, you recognize that

23 you're still under oath, correct?

24     A.  Yes, ma'am.

25     Q.  This morning we spoke --

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 106

1    are probably not the notes you took during this

2    presentation, correct?

3        A.  Let me take a quick look at those.  Well, the

4    questions that are identified in the margin and those

5    were -- as I mentioned earlier, I had barely time to

6    look at these documents because I had set them aside

7    pending confirmation that it would be okay.  It's

8    possible that this -- these notes are misdated.  It

9    should have been the 17th and not the 18th.

10              But in any event, those are the kinds of

11   questions that I would have asked, and my guess is, they

12   had other ones elsewhere.  Matter of fact, I had some on

13   the document itself which is one of the reasons I think

14   I had it in paper form.  But in any event.

15       Q.  And we have not received a copy of this

16   presentation as part of your production materials.  So

17   if you believe that you still have it somewhere, will

18   you provide it to your counsel to produce to us,

19   especially if it has handwritten notes?

20       A.  Yes, I will.

21       Q.  So did you -- apologies for this toggling back

22   and forth, but if I could direct your attention back to

23   Exhibit 459.  Do you recall receiving information about

24   the well performance in the different zones, I guess, is

25   what they're called, including Osage, Meramac, and

1    Oswego?

2         A.   Specific well performance you're referring to?

3         Q.   Did you receive this -- do you recall this

4    portion of the presentation where TPH was going through

5    well performance of the different areas, Osage, Meramac,

6    and Oswego?

7         A.   Yes.   There's an area titled "Reviewing Well

8    Performance."

9         Q.   One of my questions is -- let's go to page 15

10   of 41.   This is reviewing well performance-type curve

11   development Osage, and on the left top corner, is

12   something called fit parameters.

13                  Do you see that?

14        A.   I do.

15        Q.   And there is -- there are four columns -- TPH,

16   TPH 2.0, Amberjack 2, and Amberjack 2.5.   Can you

17   explain for me what those four headings represent?

18        A.   I don't recall.

19        Q.   Was the presentation made on July 19th of 2017,

20   a revision of an earlier presentation made to the SRun

21   II board of directors?

22        A.   No.   This is the first thing we had seen, as I

23   recall.

24        Q.   And do you recall any discussion of what the

25   2.5 meant for TPH?

1      A.  I do not.  If it was not explained by the TPH,

2  I'm sure somebody asked about it, though, by TPH.

3      Q.  And I have the same question with respect to

4  Amberjack.  There's an Amberjack 2.0, and an

5  Amberjack 2.5.  Do you remember during any course of the

6  meeting, what the difference between Amberjack 2 and

7  Amberjack 2.5 was?

8      A.  I do not.

9      Q.  And still in that same block, in that same fit

10  parameter section there is an estimated ultimate

11  recovery and that's represented as total -- total

12  estimated ultimate recovery and in parenthesis,

13  thousands of barrels of oil equivalent per day.

14          Do you see that?

15      A.  On 15 of 41?

16      Q.  On 15 of 41, the first row, total estimated

17  ultimate recovery MBOE?

18      A.  Mine says -- oh, total UR MBOE, I do see that.

19      Q.  Yeah.  And was there any discussion during the

20  presentation by TPH of the differences in the total

21  estimated ultimate recovery for the different, I'm going

22  to call them, scenarios for lack of a better term?

23      A.  I don't recall any.  But if TPH did not

24  adequately explain it to the satisfaction of everybody,

25  there would have been questions about it.

1        Q.  And if you could scroll down one more page to

2    the Meramac well performance.  I think that may be 17 of

3    41.

4        A.  I see it.

5        Q.  Again, there are columns, this time it's TPH

6    less than 300 and TPH less than 350.  Do you know what

7    those column headings represent?

8        A.  I do not.

9        Q.  And if I could direct your attention to page 19

10   of 41.  It's entitled "Comparing Assumptions."

11       A.  Okay.

12       Q.  Do you know -- when it says comparing

13   assumptions, do you know what was -- strike that.

14               Was it discussed at the board meeting on

15   July 19th of 2017 who prepared the assumptions that TPH

16   was comparing in this slide?

17       A.  I don't recall.

18       Q.  And do you recall what OIP stands for?

19       A.  Where do you see that?

20       Q.  In the methodology, first column.

21       A.  Sorry, which page are we on now?

22       Q.  I'm on the comparing assumptions page, which I

23   believe is 19 of 41.

24       A.  I'm sorry.  What was the question again?

25       Q.  What OIP stands for?  It's used in that first

CONFIDENTIAL

```
                                        Page 110
 1   column, methodology.
 2              MS. WALLER:  Do you see it?
 3              THE WITNESS:  No.  It's page 19, right?
 4              MS. WALLER:  18.  You're on page 18,
 5   Christine?
 6              MS. FOX:  Okay.  If I scroll too far down,
 7   even though I'm still on the same page.  It changes page
 8   numbers.  But that's --
 9              THE WITNESS:  Osage, OIP.
10       Q.  (BY MS. FOX)  Is it oil in production or does
11   its stand for something else?
12       A.  I don't know what it stands for, but it
13   obviously has something to do with barrels.
14       Q.  Also in that same column, further down, there's
15   a reference to PDP horizontal wells.  Do you know what
16   that means?
17       A.  Location counts shown at right include PDP
18   horizontal wells.  Is that what you're referring to?
19       Q.  Yes.  Do you have an understanding of what PDP?
20       A.  It means proved development producing.
21       Q.  And there's commentary, those locations are
22   excluded for models as undeveloped locations.
23              Do you see that?
24       A.  I do.
25       Q.  Is the acronym PDU, proved undeveloped wells,
```

[PAGES INTENTIONALLY OMITTED]

CONFIDENTIAL

Page 129

1         A.   Okay.

2         Q.   Let me know when you get there.

3         A.   I happen to be there.

4         Q.   In the middle of the page, it says, (Reading:)

5    Reasons For Approval of the Business Combination.

6              Do you see that?

7         A.   I do.

8         Q.   It reads, (Reading:)  After careful

9    consideration the Silver Run board of directors

10   recommends that Silver Run shareholders vote for each

11   proposal being submitted to a vote of the Silver Run

12   stockholders at the Silver Run special meeting.

13             Did you understand that when you decided

14   to -- strike that.

15             Did you understand that shareholders would

16   be relying on the board's recommendation of the proposed

17   business combination when you signed the proxy

18   statement?

19        A.   I suppose I realized they would be considering

20   it.  Most shareholders would make their own decision.

21             MS. WALLER:  Objection to form.

22        Q.   (BY MS. FOX)  But clearly, the Silver Run board

23   wanted the Silver Run shareholders to vote in favor of

24   the transaction, right?

25        A.   That was our recommendation.

[PAGES INTENTIONALLY OMITTED]

```
 1    put in contextually not a big deal and not anything

 2    anybody was concerned about on the BDO side.  And I

 3    think we were -- I don't recall exactly what Weaver

 4    said.  But I don't know that they came up with any

 5    deficiencies that were --

 6                    THE REPORTER:  Can you speak up, please?

 7                    THE WITNESS:  Sorry.

 8         Q.   (BY MS. FOX)  These minutes you were reviewing,

 9    you were talking about the 10-K for 2017.  Did you

10    personally review drafts of the report on 10-K before it

11    was filed with the SEC?

12         A.   I did.

13         Q.   And do you recall if you had any changes to any

14    of the draft 10-Ks that you reviewed?

15         A.   I don't know that I had changes.  I undoubtedly

16    had some questions, maybe a comment or two, possibly a

17    change.  But it was -- as I said, I read these things

18    and I tend to have questions or comments about them and

19    raise them with the appropriate person regularly.

20         Q.   I would like to show you what's previously been

21    marked as Exhibit 327.  It is an email and attachments

22    from Jim Hackett to the AMR board, and it is -- the

23    attachments are budget discussion March 2018 board, and

24    it appears to be the same presentation in two formats,

25    PDF and PowerPoint.  It bears the Bates stamp
```

# PX 230

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION
3

IN RE:  ALTA MESA           §
4    RESOURCES, INC.            §   CASE NO. 4:19-cv-00957
     SECURITIES LITIGATION      §
5
6       ORAL AND VIDEOTAPED DEPOSITION OF JIM HACKETT
                    APRIL 27, 2023
7
8        ORAL AND VIDEOTAPED DEPOSITION OF JIM HACKETT,
9    produced as a witness at the instance of the Plaintiffs
10   and duly sworn, was taken in the above styled and
11   numbered cause on Thursday, April 27, 2023, from 9:29
12   a.m. to 8:07 p.m., before Janalyn Elkins, CSR, in and
13   for the State of Texas, reported by computerized
14   stenotype machine, Latham & Watkins, 301 Colorado,
15   Austin, Texas, pursuant to the Federal Rules of Civil
16   Procedure and any provisions stated on the record
17   herein.
18
19
20
21
22
23
24
25

[PAGES INTENTIONALLY OMITTED]

Page 30

1   identifying targets, right.  So there was -- as I

2   mentioned earlier, when we -- when we were out marketing

3   SR2, we made it clear to investors that the likelihood

4   of having to take a management team on board was very

5   high because you have to buy a company that is close to

6   going public, that has to roll almost all of their

7   interest into the new entity to make it work, especially

8   where we were with the fund at Riverstone being depleted

9   a bit from its initial start.

10          So we had done this earlier SPAC with Mark

11  Papa but where we were able to finance it all with cash.

12  And so these issues only became relevant when we weren't

13  going to fund the whole transaction with cash from the

14  fund.  In the case that we found, you have to buy

15  something twice as big as you to make the discount for

16  the promote to work properly.  And the likelihood of

17  being able to do that is almost zilch if you can't pay

18  cash for that additional two-thirds.

19          And that means that by definition or at

20  least by regular reasoning is that the people who are

21  selling the company to you have to take a bunch of

22  equity and unless they want to just quit working, they

23  get to run the company.  That didn't bother me.  It was

24  actually consistent with my plan not to be the CEO.

25          So I had a team in place to take that role

Page 31

1    on at Riverstone, which is the Meridian team, or I was

2    going to take another team assuming that when we made

3    the analysis and the estimates of what we could do with

4    that asset that I was comfortable, at least as going in

5    proposition that they would be competent in running that

6    company all to be proved, right, because until you

7    actually work with someone for an extended period of

8    time, you can't be sure how good they are, particularly

9    as they transition from private to public.

10              So there was always the assumption, hey,

11   this is a testing period for new management team.  We

12   have a backup if we need them and that backup would not

13   typically include me in the thinking.

14              So when you talk about when did the

15   opportunity become available, we knew that the

16   opportunity to be chairman was both there at SR2 and

17   they're a new entity if we merged.  But it was all

18   dependent on finding an asset that we liked and we found

19   attractive.  As you can imagine, at this point in my

20   career I didn't need to go buy another company to prove

21   that I was special or that we're something special.  We

22   were going to do what was right for the investors, both

23   public and Riverstone LP's.  And if we didn't find

24   something we liked, we just wouldn't do it.

25              So the chairman role was no one going in,

[PAGES INTENTIONALLY OMITTED]

Page 91

1    looked at all the well results and find out -- you would

2    be trying to figure out what did it tell us in the past

3    about the performance of the reservoir.

4         Q.  And he adds, you know, he says, (Reading:)  The

5    Osage due to its fractured nature here has a high degree

6    of well-born interference and they're seeing that the

7    spacing test even at 1,320 feet for wells per unit have

8    a hard time hitting the type curve.

9              Setting aside the statement that he made to

10   you on April 10th, of course, you would want to look at

11   that as well as you were conducting due diligence in

12   2017; isn't that right?

13        A.  Yes.  Yes, sir.

14        Q.  Right.  And then he says, (Reading:)  To me,

15   these results limit AMR's, quote, STACK up story.

16             Did that give you any plausible concern?

17        A.  No.  And -- well, let me just say, did it

18   register, yes.  Was it to be proven that if he was right

19   or wrong, that that still had not been proven by other

20   teams that were much more experienced.

21        Q.  Well, it's interesting that you raise that.  I

22   mean, it sounds like he was pretty close to being right

23   when you look back at it, right?  I mean, in

24   December 2018 you were part of a project to reduce the

25   down spacing assumption from 12 to five; is that right?

Page 92

```
 1                  MR. WORD:  Objection to form.
 2                  THE WITNESS:  I'm not sure that this
 3      statement was -- that his conclusion was a result of his
 4      instincts on all of this or if there were a number of
 5      other contributing factors.
 6          Q.  (BY MR. SMITH)  Sure.
 7          A.  I'm just -- there isn't a good way to answer
 8      that.
 9          Q.  But in hindsight would you agree that that's
10      kind of an impression statement?
11          A.  We had reservoir performance issues for sure at
12      the end of the day.
13                  MR. SMITH:  Sean, can you bring up tab 3,
14      please?
15                  (Exhibit No. 239 was previously marked.)
16                  MR. SMITH:  Do one more document and take a
17      break?
18                  THE WITNESS:  Whatever you want.  I can
19      keep going.
20                  MR. WORD:  Yeah, lunch is set up.
21                  THE WITNESS:  Okay.  Whatever you-all
22      decide, that's great.
23                  MR. SMITH:  We'll just plow through this
24      document and take a break.
25                  THE WITNESS:  Whatever.  That's great.
```

[PAGES INTENTIONALLY OMITTED]

1    someone that had some urgency behind it as well and that

2    was what was driving my interest in getting together

3    with them.

4         Q.  Understood.  Were all members of the new board

5    there at that meeting?

6         A.  I don't recall when we brought in Sylvia

7    Kerrigan and Don Sinclair, so I don't know what the

8    board you saw or depending when you saw the board, it

9    might have been different by one or two members.  But

10   the majority of the members were in that board meeting.

11        Q.  Before we push on, how many of the board

12   members were Silver Run II moved over to the board

13   members of Alta Mesa?

14        A.  Diana Walters did, who became our audit chair.

15   Jeff Tepper did.  Somebody will have to remind me if

16   Bill Gutermuth left right away or if he was replaced

17   later.  I don't -- I don't recall.

18        Q.  And who is Don Sinclair?

19        A.  Don Sinclair is a person I've worked with

20   before.  He's run -- he ran a major midstream business

21   and we were very interested in getting him on the board

22   because of his midstream knowledge.  And he was -- I

23   don't think he was on the board yet, but he was kind

24   enough to offer himself up to go and review the AMR

25   activities to be a more informed board member as well as

Page 275

1    to be an advisor of me of what to do with the -- as that

2    business transitioned over to my team.

3         Q.  And you state in the email, (Reading:)  This is

4    very urgent since we will need to give revised guidance

5    to the investment community in March.

6              Right?

7         A.  Yeah.  And I don't know what generated that

8    comment.  That might have been the reason why the

9    urgency was there and that would have been shared by

10   Zach because he's an investor in the combined entity.

11   So I may have been using that -- the issue of guidance

12   in March to make sure that he hurried up to meet with us

13   on the other issues.  I don't know what "revised"

14   referred to.

15        Q.  And do you understand why Mr. Sinclair wanted

16   to see the latest -- or you know, what you had been

17   presenting regarding KFM during the road show?

18        A.  Only because he wasn't part of SR2 so he didn't

19   see any of that until he was being considered for the

20   AMR board.

21        Q.  And the guidance that you're referring to, is

22   that in reference to the guidance that was included in

23   the road show presentations in the proxy?

24        A.  No.  This would have been the guidance we would

25   give after the first quarter -- excuse me, year-end

# PX 231

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF TEXAS

4    HOUSTON  DIVISION

5    ---------------------------------------------x

6    IN RE ALTA MESA RESOURCES, INC. SECURITIES

7    LITIGATION          Case No:  4:19-cv-00957

8    ---------------------------------------------x

9            ** ATTORNEY'S EYES ONLY **

10

                          April 18, 2023

11                        8:13 a.m.

12

13

14

15        DEPOSITION of JEFFREY HOSTETTLER, taken

16    pursuant to Notice, held at the office of Quinn

17    Emanuel Urquhart & Sullivan, LLP, 51 Madison

18    Avenue, 22nd Floor, New York, New York, before

19    Fran Insley, a Notary Public of the States of

20    New York and New Jersey.

21

22

23

24

25

[PAGES INTENTIONALLY OMITTED]

Page 256

HOSTETTLER - ATTYS' EYES ONLY

1

2          Q.     Mr. Christopher responds and offers
3     "One side note/suggestion." Do you see where
4     I'm reading?
5          A.     Yes.
6          Q.     And he says "But an important one:
7     We need to achieve EBITDA
8     guidance/projections... full stop."  Did I read
9     that right?
10         A.     Yes.
11         Q.     Do you agree that it was important
12    to achieve EBITDA guidance/projections?
13                MR. WALDMAN:  Objection to form.
14         A.     In general, yes.
15         Q.     Was it important for KFM as well?
16                MR. WALDMAN:  Objection to form.
17         A.     Yes.
18         Q.     And it was important to Alta Mesa
19    Holding, right?
20                MR. WALDMAN:  Same objection.
21         A.     Sure.
22         Q.     If you could, I would like to take a
23    look at some of the draft slides.  So looking
24    at the page that ends in Bates number 742,
25    Riverstone_SDTX223742, the internal pagination

# PX 232

1               UNITED STATES DISTRICT COURT

               SOUTHERN DISTRICT OF TEXAS

2                  HOUSTON DIVISION

3

   In re ALTA MESA RESOURCES, INC. *  Civil Action No.

4                     * 4:19-cv-00957

   SECURITIES LITIGATION        *

5

6       **********************************************

7          ORAL AND VIDEOTAPED DEPOSITION OF

8              PIERRE F. LAPEYRE, JR.

9          INDIVIDUALLY AND ON BEHALF OF

10           RIVERSTONE HOLDINGS LLC

11              JUNE 13, 2023

12            (Reported Remotely)

13      **********************************************

14          ORAL AND VIDEOTAPED DEPOSITION OF PIERRE

15   F. LAPEYRE, JR., INDIVIDUALLY AND ON BEHALF OF

16   RIVERSTONE HOLDINGS LLC, produced as a witness at the

17   instance of the Plaintiffs and duly sworn, was taken

18   via videoconference in the above-styled and numbered

19   cause on the 13th day of June, 2023, from 9:06 a.m. to

20   5:21 p.m. CDT, before Marsha Yarberry, Certified

21   Shorthand Reporter in and for the State of Texas,

22   reported by machine shorthand, at the law offices of

23   Latham & Watkins LLP, 1271 Avenue of the Americas, New

24   York, New York, pursuant to the Federal Rules of Civil

25   Procedure and the provisions stated on the record.

[PAGES INTENTIONALLY OMITTED]

Page 21

1    originally three founders, and then a year into it one
2    person retired, and myself and David, the other
3    cofounder, have been the two lead, you know, people
4    within the firm since its founding in May of 2000.
5         Q.   Do you -- and by "David," you're referring
6    there to Mr. Leuschen, correct?
7         A.   Yes.  Sorry.  David Leuschen.
8         Q.   That's okay.  And do you and Mr. Leuschen have
9    any particular manner in which you divide
10   responsibilities between you, or do both of you do very
11   similar things?
12        A.   I would say the latter.  There is no formal
13   delineation of one does certain functions and one does
14   another.  It's a true partnership and we do
15   everything -- in effect all decisions are done
16   together.
17        Q.   And has that been true since the time of the
18   founding?  Your day-to-day role hasn't really changed
19   since you founded the company?
20        A.   Yeah.  I think that's -- that's accurate to
21   say.  There's no -- the way in which we operate the
22   firm is the same way -- we operate the same way today
23   as we did when we started.  At any given moment in time
24   one of us may focus on certain things while the other
25   is focusing on something else, but there isn't a -- I

Page 22

1    will call it a bright line or a division that, you

2    know, one deals with X and one deals with Y.

3                 That's -- I don't know how else to really

4    describe it.

5        Q.    Okay.  And does -- strike that.  Riverstone is

6    an investment firm, correct?

7        A.    Yes.

8        Q.    And how does the investment firm work

9    day-to-day?

10                MS. WALLER:  Objection to form.

11                THE WITNESS:  Well, I think we work like

12   I would consider a typical private equity firm to work,

13   which is that, you know, my day on any given day can --

14   and David's as well for the reasons I just mentioned,

15   can vary from managing existing portfolio company

16   relationships, sourcing new investments, fundraising,

17   you know, executing on certain, you know, transactions,

18   whether that's the acquisition of an investment or the

19   exit of an investment.  We both cochair our investment

20   committee within the firm that makes decisions

21   ultimately on new investments, as well as when to exit,

22   and then obviously managing and dealing with whatever

23   individual or employee-related, hiring, retirement, et

24   cetera, issues that we may have, promotions, et cetera.

25   So I would say all things you would expect two owners

[PAGES INTENTIONALLY OMITTED]

Page 26

1   partner to join in?  Is there a certain capital

2   contribution requirement or any other requirements?

3        A.    No.

4        Q.    Okay.

5        A.    There's no minimum financial requirement if

6   that's what you're asking when you say "capital

7   contribution."

8        Q.    Okay.  And what are the roles of the partners

9   in the day-to-day operation of the firm as distinct

10  from the roles of you and Mr. Leuschen?  Are they

11  reporting to you in terms of, "Hey, there's this

12  investment opportunity I want to discuss," or how does

13  that relationship work?

14       A.    Well, yes.  I mean, David and I are the two --

15  I guess for lack of a better word as founders the two

16  senior partners of the firm, so technically everyone

17  that is working for the firm ultimately works, you

18  know, in the direction that we point the firm and point

19  those people, but they are doing very similar things I

20  think as all partners, which is they are managing all

21  the things that I mentioned before for their -- you

22  know, everything from looking for new investments,

23  managing and monitoring the existing investments that

24  they are the lead individuals on, for lack of a better

25  term.  They are also responsible for monitoring those,