# PX 247

# Unconventional Resources





## Alta Mesa
## East Hennessey Unit (EHU) Evaluation Project

September 19, 2016

**Exhibit
CP- 0765**
Rasor



ALTA MESA
HOLDINGS, LP

# Schlumberger

CONFIDENTIAL

AMR_SDTX01827132

## Workflow for Modeling Well Interference





Parent Well      Child Well

SCHLUMBERGER PRIVATE



**Schlumberger**

CONFIDENTIAL

AMR_SDTX01827143

## Parent Well Drainage Impact on Offset Infill/Child Wells

| Hydraulic Frac Network and Drainage Area | Drainage Area and Stress Field Change | Hydraulic Fracture Geometry of Infill Well |
|---|---|---|

  

*SPE-174902

❑ Depletion changes the stress field and minimizes infill well(s) stimulated reservoir volume (SRV)

SCHLUMBERGER PRIVATE



**Schlumberger**

CONFIDENTIAL

AMR_SDTX01827144

# PX 248

# Memorandum



**To:**      Investment Committee

**From:**   Robert Tichio, Olivia Wassenaar, Chelsea Williamson and Austin Winger

**Date:**   September 19, 2016

**Re:**      Bayou City Energy / High Mesa Heads-Up Memo

---

**Deal Summary**

Bayou City Energy ("BCE"), a Houston, Texas based energy private equity fund focused on making growth capital investments between $5 million and $50 million, has agreed to invest up to $500 million in Series D Convertible Preferred Equity in High Mesa, Inc. ("High Mesa").  High Mesa is a privately-held exploration and production company based in Houston, Texas.  High Mesa is the 100% owner of Alta Mesa Holdings, LP and a 33.3% owner of Kingfisher Midstream.  Alta Mesa holds 100,000 net acres in the updip oil window of the STACK in Kingfisher County, Oklahoma and conventional assets in East Texas and Louisiana.  2016 net production is estimated at 20,902 boe/d (~17,000 boe/d from the STACK), producing an estimated $172 million in EBITDA. 3Q 2016 reserves are estimated at 103 / 168 Mmboe (1P / 2P).  Kingfisher Midstream consists of a $187 million gathering system and 60 Mmcf/d cryogenic processing plant in Kingfisher County commissioned in May 2016.

BCE has committed $100 million to the investment and is seeking co-investment partners for the other $400 million.  BCE has received co-investment commitments of ~$200 - $250 million to-date, inclusive of a $50 million commitment from Intervale, and has offered Riverstone the opportunity to invest $100 - $200 million in the transaction (8.4% to 16.8% implied ownership net to Riverstone on an as-converted basis).  BCE plus Co-investors will own approximately ~42% of High Mesa on an as-converted basis and control two of eight board seats; Riverstone would be offered an observer seat as part of the transaction.  The entry price values High Mesa at $1.7 billion, which equates to $80,876 boe/d, $16.47 1P, $10.03 2P, $11,679/net acre and 9.8x 2016 EBITDA.

Based on our initial review, we are inclined to pass on the investment due to the high entry valuation, levered pro forma capital structure, uncertainty around the drilling inventory and the pro forma governance structure.

**High Mesa Capital Structure Overview**

<u>Equity</u>
High Mesa's equity capitalization consists of Series A Common Stock, Series B Convertible Preferred Stock, Series C Convertible Preferred Stock and Series D Convertible Preferred Stock.  Series A Common Stock is held by management and legacy owners of Alta Mesa.  Series B Convertible Preferred Stock was issued in March of 2014 in conjunction with the recapitalization of High Mesa by Highbridge Principal Strategies ("Highbridge"). Highbridge invested $350mm into High Mesa through $150 million of Series B Convertible Preferred Stock and $242 million in a hybrid mezzanine security.  Proceeds of the recapitalization were used to purchase Denham Capital's stake in High Mesa (estimated 3.0x and 25%

1

IRR to Denham).  $31 million of Series C Convertible Preferred Stock was issued in July of 2015 to Highbridge to fund the acquisition of 19,000 net acres in Kingfisher County, Oklahoma. Both the Series B and Series C Convertible Preferred Stock were issued with a 12% - 14% PIK annual dividend and have rights to appoint one director.  $500 million of Series D Convertible Preferred Stock will be issued to BCE and other Co-investors (including Riverstone).  Series D Convertible Preferred Stock does not have a PIK annual dividend.  The Series B & C PIK annual dividends will cease with the Series D investment by BCE & Co-investors.  The distribution waterfall associated with all classes of Equity in both an Asset Sale and IPO Scenario are presented in the Exit Analysis section.



| High Mesa Convertible Preferred Equity | Original Liquidation Preference | PIK Preferred Dividend Rate (%) | Accrued PIK Preferred Dividends | Current Liquidation Preference |
|---|---|---|---|---|
| 2014 Series B Preferred - Highbridge | $150.0 | 12% - 14% | $46.0 | $196.0 |
| 2015 Series C Preferred - Highbridge | 31.0 | 12% - 14% | $3.7 | 34.7 |
| 2016 Series D Preferred - BCE & Coinvest | 500.0 | 0% | $0.0 | 500.0 |
| **Total Convertible Preferred** | **$681.0** | | **$49.7** | **$730.7** |

2

RIVERSTONE_SDTX00012247

Debt

As of 6/30/16, High Mesa had a total of $1,213 million of debt outstanding ($1,082 million of net debt). The debt structure of High Mesa is summarized in the table below.  The RBL, Second Lien Term Loan and Unsecured Senior Notes sit at Alta Mesa Holdings, LP while the Kingfisher Midstream HoldCo Note and the Highbridge Hybrid Mezz Facility sit at High Mesa, Inc.  High Mesa expects the RBL borrowing  base to be reaffirmed at $300 million during the fall redetermination in October.  Should the Second Lien Term Loan be repaid with the Series D Equity proceeds and 3rd quarter reserve additions come in on-target, they expect a small increase to the $300 million current borrowing base ($30-$50 million).

| High Mesa Debt Summary - 06/30/16 | Amount Outstanding | Interest Rate (%) | Maturity Date |
|---|---|---|---|
| RBL ($300mm Borrowing Base)[1, 2, 3] | $300.0 | 3.25% | October 13, 2017 |
| Second Lien Term Loan[4] | 125.0 | LIBOR + 8% | April 15, 2018 |
| Unsecured Senior Notes (Publicly Traded) | 450.0 | 9.63% | October 15, 2018 |
| Kindfisher Midstream HoldCo Note[5] | 87.0 | 5% | N/A |
| Highbridge Hybrid Mezz Facility[6] | 251.0 | 12.5% - 14.5% | 5 Years from Series D |
| **Total High Mesa Debt** | **$1,213.0** | | |
| Cash (6/30/16) | 131.0 | | |
| **Total High Mesa Net Debt** | **$1,082.0** | | |

1: High Mesa drew $142 million, maxing out the revolver, on March 16, 2016; Wells Fargo is the lead bank
2: $122 million held in a WF controlled account and is excluded from debt for the purposes of leverage covenants
3: RBL reaffirmed at $300mm in May of 2016; including a 25% grinder for the Second Lien Term Loan
4: Issued June 2, 2015 by Morgan Stanley Energy Capital
5: Note funded by Highbridge for capital to build the Kingfisher Midstream Plant
6: Cash interest of 12.5% subject to 2% increase if an event of default occurs; option to pay 4.5% in PIK Notes; if liquidity test is not made, PIK at 14.5%

BCE Drilling Joint Venture

On January 13, 2016, High Mesa formed a Drilling Joint Venture with BCE on their STACK acreage.  The drilling program initially included the development of 40 well locations across High Mesa's STACK acreage.  BCE agreed to fund 100% of the DCE&T costs up to $3.2 million per well in two tranches of twenty wells each for total capital program of $128 million.  BCE will receive an 80% working interest in each tranche of wells that will then revert to a 20% working interest upon BCE achieving a 15% IRR, flipping to a 7.5% working interest upon BCE achieving a 25% IRR.  The original 40-well program was expanded an additional 20 wells for a total of 60 wells on March 8, 2016.  A fourth tranche of twenty wells, bringing the total program wells to 80, is currently being negotiated.  As of July 18, 2016, BCE has funded 18 wells, deploying a total of ~$50 million.  20 BCE wells have been spudded to-date and 3 are in the drilling queue.

3

RIVERSTONE_SDTX00012248

**Entry Analysis**

In negotiating the Series D Convertible Preferred investment, BCE and High Mesa Management arrived at a Pre-money Enterprise Valuation of $1,6950.5 million ($1,000.0 million of Net Debt + $690.5 million Equity Valuation).  Implied entry multiples of EBITDA, Production, 1P Reserves and Adj. Net Acres are shown in the table below. Management's latest 3Q 2016 estimated STACK reserves are also shown below at both a strip and management price deck.

| High Mesa Pre-money Enterprise Valuation | ($MM) |
|---|---|
| Equity Value | $690.5 |
| Net Debt | 1,000.0 |
| **Pre-money Enterprise Value** | **$1,690.5** |

| Enterprise Value / | Metric | Multiple |
|---|---|---|
| 2016E EBITDA[1] | $172.1 | 9.8x |
| 2017E EBITDA[1] | 268.4 | 6.3x |
| 2016E Daily Production | 20,902.3 | $80,876.3 |
| 2017E Daily Production | 29,424.5 | $57,452.0 |
| 1P Reserves (Mboe)[2] | 102.6 | $16.47 |
| Adj. Net Acres[3] | 100,000.0 | $11,679.4 |

1: Based on NYMEX pricing included in the Reserves Summary
2: Based on Management's estimated reserves for 3Q 2016
3: Adjusted for 2016E Production Valued at $25,000/bbl

**High Mesa STACK 3Q16 Reserves Summary**

| Reserve Category | Oil (Mbbl) | Gas (Mmcf) | NGL (Mbbl) | TOTAL (Mboe) | $MM - PV 10% NYMEX[1] | Management[2] |
|---|---|---|---|---|---|---|
| PDP | 11,917 | 59,270 | 7,508 | 29,303 | $351 | $450 |
| PDNP | 29 | 17 | 0 | 32 | 0 | 0 |
| PUD | 30,426 | 139,075 | 19,682 | 73,287 | 569 | 840 |
| **1P** | **42,372** | **198,362** | **27,190** | **102,622** | **$920** | **$1,290** |
| Probable | 32,319 | 115,501 | 14,236 | 65,805 | 235 | 392 |
| **2P** | **74,691** | **313,863** | **41,426** | **168,428** | **$1,155** | **$1,682** |
| Possible | 119,378 | 525,997 | 73,771 | 280,815 | 1,460 | 2,168 |
| **3P** | **194,069** | **839,860** | **115,197** | **449,243** | **$2,615** | **$3,850** |

1: NYMEX 2016 - 2020: $49.79 / $50.40 / $54.69 / $55.11; $2.87 / $3.18 / $3.02 / $2.99 / $3.00
2: Management Pricing: 2016 - 2019+: $55.00 / $60.00 / $65.00 / $70.00; gas @ NYMEX case

4

RIVERSTONE_SDTX00012249

Benchmarking the Pre-money valuation of High Mesa against recent transactions in the STACK is shown below.  The negotiated Pre-money Enterprise Valuation that BCE and Co-investors (including Riverstone) will be investing at is slightly higher than the multiple Marathon paid for PayRock (06/20/16) but significantly under what Devon paid for Felix (12/07/15).  Most analysts currently categorize High Mesa's STACK acreage as "fringe", while the PayRock (normally pressured oil) and Felix acreage (overpressured volitile oil) is valued at a premium, with the Felix acreage being categorized as the "core of the core".

| STACK Benchmarking | High Mesa | MRO/PayRock | DVN/Felix |
|---|---|---|---|
| Net Acreage | 100,000.0 | 61,000.0 | 80,000.0 |
| 2016E Daily Production[1] | 20,902.3 | 8,600.0 | 9,000.0 |
| Pre-Money EV / Purchase Price | $1,690.5 | $888.0 | $1,900.0 |
| Production Value @ $25k/boe/d | $522.6 | $215.0 | $225.0 |
| **Adj. $ / Net Acre** | **$11,679.4** | **$11,032.8** | **$20,937.5** |

1: High Mesa Daily Production inlcudes 4,000 boe/d from oustide the STACK

Sources & Uses for the Series D Convertible Preferred and a High Mesa Pro Forma Debt Summary are shown below.

| Sources | ($MM) |
|---|---|
| BCE Equity | $100.0 |
| Co-Investors | 400.0 |
| **Total Sources** | **$500.0** |

| Uses | ($MM) |
|---|---|
| Retire 2LTL and Paydown RBL | $305.0 |
| KFM 200 Mmcf/d Plant Expansion | 70.0 |
| E&P Growth Capital, Gen. Corporate | 125.0 |
| **Total Uses** | **$500.0** |

| High Mesa Debt Summary - Pro Forma | Amount Outstanding | Interest Rate (%) | Maturity Date |
|---|---|---|---|
| RBL ($300mm Borrowing Base) | $0.0 | 3.25% | October 13, 2017 |
| Second Lien Term Loan | 0.0 | N/A | N/A |
| Unsecured Senior Notes (Publicly Traded) | 450.0 | 9.63% | October 15, 2018 |
| Kindfisher Midstream HoldCo Note[1] | 87.0 | 5% | N/A |
| Highbridge Hybrid Mezz Facility[2] | 251.0 | 12.5% - 14.5% | 5 Years from Series D |
| **Total High Mesa Debt** | **$788.0** | | |
| Cash (Pro Forma for Series D)[3] | 136.0 | | |
| **Total High Mesa Net Debt** | **$652.0** | | |

1: Note funded by Highbridge for capital to build the Kingfisher Midstream Plant
2: Cash interest of 12.5% subject to 2% increase if an event of default occurs; option to pay 4.5% in PIK Notes; if liquidity test is not made, PIK at 14.5%
4: $131mm BB + $500mm Series D Proceeds - $70mm KFM Expansion - $300mm RBL Paydown - $125mm 2LTL

5

RIVERSTONE_SDTX00012250

**Exit Analysis**

Exit Waterfall

Exit proceeds will be distributed according to the following two waterfall schedules depending on whether the exit is through an IPO or Asset Sale.  In each scenario, the proceeds after debt repayment will flow first to the Series B & C Convertible Preferred holders totaling $230.7 million (including the accumulated preferred PIK dividends to-date).   Following the Series B & C return of capital, BCE, Riverstone and other Co-investors will receive 100% of the distributions until the original investment of $500 million is returned.  Following the Series D return of capital, there is a short catch up period for the holders of the Series B, C & Common Shares. Following the catch up, Series D and other holders (Series B, C & Common) will share proceeds according to an MOIC schedule based on the Series D returns.

**Waterfall Schedule - IPO Exit on 12/31/2020**

| Waterfall Level | Description | Series D Sharing % | Series B, C & Common Sharing % | Series D MOIC | Equity Value (marginal) | Equity Value (cumulative) |
|---|---|---|---|---|---|---|
| 1 | Series B & C - Return of Capital | - | 100.000% | N/A | $230.7 | $230.7 |
| 2 | Series D - Return of Capital | 100.000% | - | N/A | 500.0 | 730.7 |
| 3 | Catch Up | 10.000% | 90.000% | N/A | 603.4 | 1,334.1 |
| 4 | Ordinary Sharing I | 42.000% | 58.000% | Until 2.50x | 1,642.0 | 2,976.1 |
| 5 | Ordinary Sharing II | 30.000% | 70.000% | Until 3.25x | 1,250.0 | 4,226.1 |
| 6 | Ordinary Sharing III | 20.000% | 80.000% | Until 4.25x | 1,875.0 | 6,101.1 |
| 7 | Ordinary Sharing IV | 15.000% | 85.000% | Thereafter | | |

**Waterall Schedule - Asset Sale Exit on 12/31/2020**

| Waterfall Level | Description | Series D Sharing % | Series B, C & Common Sharing % | Series D MOIC | Equity Value (marginal) | Equity Value (cumulative) |
|---|---|---|---|---|---|---|
| 1 | Series B & C - Return of Capital | - | 100.000% | N/A | $230.7 | $230.7 |
| 2 | Series D - Return of Capital | 100.000% | - | N/A | 500.0 | 730.7 |
| 3(a) | Catch Up (I) | 10.000% | 90.000% | N/A | 344.6 | 1,075.3 |
| 3(b) | Catch Up (II) | 12.903% | 87.097% | N/A | 258.8 | 1,334.1 |
| 4 | Ordinary Sharing I | 54.194% | 45.806% | Until 2.50x | 1,642.0 | 2,976.1 |
| 5 | Ordinary Sharing II | 38.710% | 61.290% | Until 3.25x | 1,250.0 | 4,226.1 |
| 6 | Ordinary Sharing III | 25.806% | 74.194% | Until 4.25x | 1,875.0 | 6,101.1 |
| 7 | Ordinary Sharing IV | 19.355% | 80.645% | Thereafter | | |

6

RIVERSTONE_SDTX00012251

**Summary Takeaways**

The following is a summary of our key takeaways based on our review of the diligence materials provided by BCE and High Mesa and the High Mesa management presentation in Houston on 9/16/16.

*STACK Assets:* High Mesa's STACK assets sit in the updip oil window of the STACK. This area has historically been overlooked by the market relative to the overpressured volitile oil window (NFX, CLR & DVN/Felix) and normally pressured oil window (MRO/PayRock).  Public data in Oklahoma is notoriously bad and High Mesa has made a deliberate effort to not publicly discuss individual well results or type curves in order to minimize leasing competition in their area.  Both IPs and EURs are lower in the updip oil window (IP30: 300 bop/d; EUR: 228 Mbo & 600 Mboe) but $3.0 million per well DCE&T costs help drive economic returns that appear on-par with core STACK operators (see Appendix).  High Mesa has drilled approximately 109 horizontal wells in the Osage zone across their acreage.  Based on the undeveloped pre-money enterprise value of $1,168 million and a $5.4 million Type Curve PV-10 it implies entry value given to ~216 net undeveloped locations (undiscounted) or ~322 net locations assuming even drilling over a 5-year timeframe.  Applying Ryder Scott's current 4 wells per section estimate across the 250 gross sections High Mesa holds in the Osage/Meremac implies a gross 1,000 well inventory, providing adequate development running room for equity value creation. What remains to be seen, is if all 250 gross section are fully prospective for the Osage/Meremac and if other zones that High Mesa believes are prospective will also work.  Further diligence is required for us to fully vet both the current single well type curve and gross inventory estimates.

*High Mesa Capital Structure:* At over $1.0 billion of net debt, the current capital structure of High Mesa is not sustainable.  With the proceeds of the Series D offering, the $125 million Second Lien Term Loan will be repaid and the RBL will be paid down leaving $300 million of available borrowings under the RBL and ~$136 million of cash on hand (after spending $70 million on the KFM expansion). Pro forma net debt will be $652 million, inclusive of the Highbridge Hybrid Mezz Facility (3.8x 2016E NYMEX Case EBITDA of $172 million).  In all projections, High Mesa assumes that it will be able to refinance the $450 million of Senior Notes Due 2018 by the end of Q4 2016 at the current 9.625% coupon.

*Entry Valuation:* At $11,679 / adjusted net acre, the entry valuation for this investment is high when compared to the Marathon acquisition of PayRock at $11,032 / adjusted net acre especially given that the Payrock acreage is in the heart of the normally pressured oil window. The High Mesa position has historically been considered more "fringe". Further diligence is required to properly vet the benchmarking High Mesa has provided showing their well results and returns on-par or superior to PayRock, which could justify the entry acreage multiple.

*Governance Considerations:* While not yet finalized, Riverstone may only have Board Observer status at High Mesa.  Per the current terms of the investment, BCE would receive two board seats at High Mesa (out of eight total).  Holding only Board Observer status, Riverstone would be unable to exercise any direct control at High Mesa.  This is a key consideration, especially given the existing relationship the BCE has with High Mesa in their drilling joint venture.  Furthermore, decisions around corporate acquisitions, divestitures and a total company sale / IPO offering would be out of Riverstone's direct control, though we would negotiate standard minority rights

*Structure Considerations:* Co-investors (including Intervale and Riverstone), are being asked to invest in a BCE entity via subscription agreement and will not hold direct ownership in High Mesa.  Intervale has negotiated certain governance rights with BCE via a side letter.  A redacted copy has been provided to

7

RIVERSTONE_SDTX00012252

Riverstone.  BCE has indicated that they would be open to Riverstone also negotiating a side letter to help us gain comfort with the investment and governance structure, though the preference would be to invest directly in High Mesa to enable us to control our equity position.

8

**APPENDIX**
**High Mesa Asset Summary**



Source: Data per High Mesa management as of April 2016.

**High Mesa STACK Acreage Position**



9

RIVERSTONE_SDTX00012254

## Type Curve Summary



## Well Inventory and Drilling Forecast

| Reservoir Target | Sections | Wells per Section Most Likely | Upside | HZ Wells Drilled | Gross Well Inventory Most Likely | Upside |
|---|---|---|---|---|---|---|
| Meramec / Osage[1] | 250 | 11 | 23 | 81 | 2,750 | 5,750 |
| Oswego | 200 | 4 | 8 | 28 | 800 | 1,600 |
| Woodford | 100 | 4 | 8 | 0 | 400 | 800 |
| Big Lime | 70 | 2 | 4 | 0 | 140 | 280 |
| Manning | 60 | 2 | 4 | 0 | 120 | 240 |
| Cherokee Sands / Shale | 250 | 2 | 4 | 0 | 500 | 1,000 |
| Chester Shale | 100 | 2 | 4 | 0 | 200 | 400 |
| | | | | 109 | 4,910 | 10,070 |

1: Ryder Scott is currently assigning only 4 wells per section (implying ~1,000 total gross total locations)

| STACK Drilling | 2H 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|
| NYMEX Case | 45 | 113 | 194 | 361 | 377 | 1,090 |
| Management Case | 39 | 174 | 374 | 377 | 37 | 1,001 |

10

RIVERSTONE_SDTX00012255

## Type Curve Benchmarking



High Mesa a Leading Operator — Type Curves Comparison [(2)]

30-Day Rate per 1,000 Ft (Boepd) | EUR per 1,000 Ft (MBoe) | D&C Cost per 1,000 Ft ($K)

(1) Selected based on comparable asset size and proximity to High Mesa acreage in Kingfisher County, OK. See Appendix for additional detail on comparable transactions.
(2) High Mesa includes 43 wells. NFX includes 54 wells. GST has 1 producing STACK well, completed in late 2015. These well samples represent random completion design wells with sufficient production histories to establish the 30-day rates and EUR.

### High Mesa's Results to Date are Leading Operator Performance in this Play

| Operator | # Wells | Avg. Lateral Length | D&C Cost ($MM) | EUR (MBOE) | Avg. Gross 30-Day (Boepd) | Avg. Gross 30-Day % Oil | Avg. Gross 60-Day (Boepd) | Avg. Gross 60-Day % Oil |
|---|---|---|---|---|---|---|---|---|
| High Mesa | 43 | 4,517 | $3.2 | 620 | 614 | 74% | 514 | 71% |
| High Mesa (Norm.) [(1)] | 43 | 10,000 | $7.1 | 1,373 | 1,359 | 74% | 1,138 | 71% |
| Newfield [(2)] | 54 | 9,944 | $7.4 | 950 | 1,122 | 68% | 1,039 | 64% |
| Devon | 15 | 10,000 | $8.0 | 1,000 | 1,100 | 45% | - | - |

| Operator | EUR MBOE / 1,000 Ft | D&C Cost / 1,000 Ft | 30-Day IP Boe/d / 1000 Ft |
|---|---|---|---|
| High Mesa | 137 | $708 | 136 |
| Newfield | 96 | $744 | 113 |
| Devon | 100 | $800 | 110 |
| Chaparral | 70 | $600 | 92 |
| Gastar [7] | 142 | $900 | 87 |

(1) High Mesa includes 29 wells for 60-day rates. (Norm. = Normalized to 10,000 ft lateral)
(2) NFX includes 46 wells for 60-day rates.
(3) GST has 1 producing STACK well, completed in late 2015.
Note: Samples for comparison exclude wells outside of Kingfisher County and those with fewer than 18 fracture stimulation stages.

11

RIVERSTONE_SDTX00012256

**BCE Unrisked Exit Forecast**

BCE has worked with High Mesa management to develop an operating case which has been sensitized across three price cases, $45 WTI Flat, 6/30/16 NYMEX Strip and Management's forecast and three exit multiples 6.0x, 8.0x & 10.0x on 2020E EBITDA. Illustrative returns to the Co-Investors (including Riverstone) are shown in the table below and reflect Riverstone's negotiated 3% upfront structuring fee paid to BCE and no additional carry paid to BCE.  Other Co-investors may not have equivalent investment terms as Riverstone with BCE.  The original Co-investor investment proposal was a 2% upfront structuring fee and 25% carry paid to BCE after a 15% IRR.  Please see footnote 3 for a list of operating assumptions imbedded in the forecast.

**Unrisked Returns to $500 million Series D Convertible Preferred Investment (Assumes 2020 Exit; $MM)[3]**

| Pricing Scenario | Pricing Scenario 2020 EBITDA | EXIT EBITDA Multiple | Exit EV | Equity Investment | Equity Proceeds after High Mesa Waterfall[4] | Investors Gross Profits | Gross MOIC | Gross IRR[5] | New Investors Equity Invested | Co-Investors Net Proceeds[6] | Co-Investors Net Profits | Co-Investors Net MOIC | Co-Investors Net IRR[6] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $45 Flat | $1,078 | 6.0x | $6,468 | ($500) | $1,991 | $1,491 | 4.0x | 41.2% | ($400) | $1,581 | $1,181 | 4.0x | 41.0% |
| NYMEX[1] | $1,344 | 6.0x | $8,064 | ($500) | $2,342 | $1,842 | 4.7x | 47.1% | ($400) | $1,861 | $1,461 | 4.7x | 46.8% |
| Management[2] | $2,348 | 6.0x | $14,088 | ($500) | $3,528 | $3,028 | 7.1x | 62.9% | ($400) | $2,811 | $2,411 | 7.0x | 62.8% |
| $45 Flat | $1,078 | 8.0x | $8,624 | ($500) | $2,332 | $1,832 | 4.7x | 46.9% | ($400) | $1,853 | $1,453 | 4.6x | 46.7% |
| NYMEX[1] | $1,344 | 8.0x | $10,752 | ($500) | $2,745 | $2,245 | 5.5x | 53.0% | ($400) | $2,184 | $1,784 | 5.5x | 52.8% |
| Management[2] | $2,348 | 8.0x | $18,784 | ($500) | $4,233 | $3,733 | 8.5x | 70.5% | ($400) | $3,374 | $2,974 | 8.4x | 70.4% |
| $45 Flat | $1,078 | 10.0x | $10,780 | ($500) | $2,655 | $2,155 | 5.3x | 51.8% | ($400) | $2,112 | $1,712 | 5.3x | 51.5% |
| NYMEX[1] | $1,344 | 10.0x | $13,440 | ($500) | $3,148 | $2,648 | 6.3x | 58.4% | ($400) | $2,506 | $2,106 | 6.3x | 58.2% |
| Management[2] | $2,348 | 10.0x | $23,480 | ($500) | $4,937 | $4,437 | 9.9x | 77.2% | ($400) | $3,938 | $3,538 | 9.8x | 77.1% |

1: NYMEX 2016 - 2020: $49.79 / $50.40 / $54.69 / $55.11; $2.87 / $3.18 / $3.02 / $2.99 / $3.00

2: Management Case 2016 - 2020: $47.77 / $60.00 / $65.00 / $70.00; gas @ NYMEX case

3: Investment Assumptions: $500mm investment in High Mesa; $80mm organic acquisitions in 2H 2016, $50mm in 2017 & $20mm in 2018; $50mm committed to KFM expansion in 2016; STACK rig count builds from 4 rigs on 7/1/16 to 10-16 in 2019 - 2020 (1 rig added per quarter); Type curve performance at $3.0mm DCE&T; 2LTL repurchased ($125mm), RBL paid down ($180mm), bonds refinanced; assumes $125mm of cash on hand to pursue strategic M&A

4: Inclusive of additional equity proceeds net to High Mesa from KFM at exit ($583mm in $45 Flat Case; $734mm in NYMEX case; $1,330 in Management Case)

5: Assumes August 2016 entry and August 2020 exit

6: Net returns reflect a 3% upfront structuring fee paid to BCE and no carry paid by Co-investors

12

RIVERSTONE_SDTX00012257

## Management Operating Projections – NYMEX Pricing Case

| Summary Financial Projections | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| *NYMEX as of 6/30/2016* | | $49.79/bbl | $52.4/bbl | $53.81/bbl | $54.69/bbl | $55.11/bbl |
| *Actuals through 4/30/2016* | | $2.87/mmbtu | $3.18/mmbtu | $3.02/mmbtu | $3/mmbtu | $3.06/mmbtu |

| Net Production Summary | | | | | | |
|---|---|---|---|---|---|---|
| **Net Production** | | | | | | |
| Oil BBL | 4,202,683 | 4,243,000 | 6,452,515 | 10,522,176 | 16,620,331 | 24,962,795 |
| Gas MMCF | 11,899 | 14,044 | 16,582 | 26,796 | 38,605 | 57,488 |
| NGL BBl | 678,417 | 1,045,663 | 1,523,763 | 2,627,473 | 4,339,659 | 6,925,837 |
| **Total MBoe** | 6,864 | 7,629 | 10,740 | 17,616 | 27,394 | 41,470 |
| MBOEPD | 18.8 | 20.9 | 29.4 | 48.3 | 75.1 | 113.6 |
| % Oil (6:1) | 61.2% | 55.6% | 60.1% | 59.7% | 60.7% | 60.2% |

| Net Realized Pricing | | | | | | |
|---|---|---|---|---|---|---|
| Gas - $/Mcf (including Hedges) | $4.43 | $2.36 | $2.93 | $2.63 | $2.57 | $2.83 |
| Oil - $/BBL (including Hedges) | $67.73 | $48.82 | $51.89 | $54.14 | $54.36 | $55.58 |

| Annual Financial Review ($000s) | | | | | | |
|---|---|---|---|---|---|---|
| **Total Net Revenue** | **$349,637** | **$295,586** | **$409,980** | **$686,946** | **$1,081,896** | **$1,678,217** |
| Oil Revenue | $199,799 | $182,650 | $333,312 | $556,940 | $897,611 | $1,387,321 |
| Gas Revenue | $30,621 | $32,340 | $48,938 | $67,868 | $99,267 | $162,731 |
| NGL Revenue | $10,864 | $16,080 | $26,582 | $46,640 | $79,176 | $128,165 |
| Other Revenue | $1,405 | $516 | $0 | $0 | $0 | $0 |
| Hedge Revenue | $106,949 | $64,001 | $1,148 | $15,499 | $5,842 | $0 |
| Operating Expenses | $71,736 | $65,401 | $66,810 | $88,342 | $132,491 | $196,885 |
| Workover Expenses | $6,511 | $5,280 | $7,500 | $9,375 | $11,719 | $14,648 |
| Depletion, Depreciation & Amortization | $143,969 | $132,808 | $218,478 | $358,347 | $557,267 | $843,605 |
| Production & Ad Val Taxes | $15,131 | $11,639 | $22,253 | $28,338 | $41,372 | $62,341 |
| G&A | $44,454 | $41,205 | $45,000 | $45,000 | $55,000 | $60,000 |
| **Income (Loss) From Operations** | **$74,347** | **$39,253** | **$57,439** | **$166,918** | **$295,767** | **$515,386** |
| **EBITDAX** | **$211,805** | **$172,061** | **$268,417** | **$515,891** | **$841,315** | **$1,344,343** |
| **Total Capex** | **$223,604** | **$111,557** | **$263,188** | **$461,389** | **$694,170** | **$986,018** |
| Drill & Complete | $223,604 | $111,557 | $263,188 | $461,389 | $694,170 | $986,018 |
| Exploration Expense (excl Seismic) | $27,999 | $2,214 | $1 | $0 | $0 | $0 |
| G&G Seismic | $10,451 | $0 | $2,113 | $6,040 | $4,290 | $1,708 |
| Acquisitions | $46,000 | $114,811 | $50,000 | $20,000 | $0 | $0 |
| Divestitures | $122,000 | $1,000 | $0 | $0 | $0 | $0 |
| Interest Expense | $59,291 | $59,355 | $49,667 | $53,952 | $52,897 | $48,514 |
| **Operating Cash Flow** | **($33,540)** | **($114,875)** | **($96,552)** | **($25,490)** | **$89,957** | **$308,102** |
| Dividend & Financing Cash Inflow | $20,000 | $136,702 | $0 | $0 | $0 | $0 |
| **Change in Cash** | **($13,540)** | **$21,827** | **($96,552)** | **($25,490)** | **$89,957** | **$308,102** |
| Net Debt to EBITDAX | 3.41 | 2.36 | 1.87 | 1.03 | 0.53 | 0.09 |

| Liquidity during the Year | good | good | good | good | good | good |
|---|---|---|---|---|---|---|
| Debt Covenant Ratio | good | good | good | good | good | good |
| Net Debt:EBITDAX | 3.41 | 2.36 | 1.87 | 1.03 | 0.53 | 0.09 |
| Maximum Debt:EBITDAX | 3.74 | 4.44 | 2.56 | 1.77 | 0.98 | 0.48 |
| | | | | | | |
| Asset Coverage Ratio Test | good | good | good | good | good | good |
| Asset Coverage Ratio at YE | 2.48 | 4.10 | 3.22 | 2.89 | 3.91 | 7.69 |
| Minimum Current Ratio | - | 2.34 | 3.18 | 2.58 | 2.77 | 4.11 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash | | $116,676 | $116,676 | $116,676 | $116,676 | $334,177 |
| Aggregate Debt | | $522,174 | $618,725 | $646,715 | $558,425 | $450,000 |
| Net Debt | | 405,498 | 502,049 | 530,039 | 441,749 | 115,823 |
| | | | | | | |
| Revolver Balance | | 72,174 | 168,725 | 196,715 | 108,425 | - |
| Second Lien | | - | - | - | - | - |
| HY Debt | | 450,000 | 450,000 | 450,000 | 450,000 | 450,000 |

13

# PX 249

**MEETING OF THE**
**BOARD OF MANAGERS**
**OF**
**KINGFISHER MIDSTREAM, LLC**
a Delaware limited liability company

A duly noticed meeting of the board of managers (the "Board") of Kingfisher Midstream, LLC, a Delaware limited liability company (the "Company" or "KFM"), was held beginning at 3:00 p.m. on October 19, 2016, at the Company's main offices located at 20329 State Highway 249, Houston, TX 77070.  The following Managers were present in person: Gilbert Burciaga, Zachary D. Lee, Harlan H. Chappelle, Michael McCabe and Don Dimitrievich of HPS Investment Partners, LLC ("HPS").  Also present were David McClure of Alta Mesa Services, L.P.; ("Alta Mesa"); Taylor Tipton, Michael Christopher, Paul Williams and Cody Deru of Asset Risk Management, LLC ("ARM" or "Operator"); and Jeff Hostettler and Catherine Cusimano of HPS. Mr. Christopher acted as secretary of the meeting to record the minutes thereof.  The Board agreed quorum was reached prior to the meeting.

Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Amended and Restated Limited Liability Company Agreement of Kingfisher Midstream, LLC, dated August 31, 2015 (the "LLC Agreement").

**Opening Remarks**

Mr. Tipton, on behalf of the Operator (as defined in the C&O Agreement), opened the meeting with a description of the agenda and an introduction of JP Morgan's Technical Transaction Team, represented by Jonathan Sloan and Kirk Chatawanich.

**Resource Review—Major County**

Mr. Sloan presented to the Board a general resource review of Major County, Oklahoma. Following his presentation, and related Q&A associated with his presentation, Mr. Sloan and Mr. Chatawanich were dismissed from the meeting.

**Executive Summary**

Mr. Tipton on behalf of the Operator, presented to the Board an executive synopsis of the Company's development trends within the Kingfisher County / STACK Play area.  Mr. Tipton also asked that the board approve the minutes of all prior board meetings, as those minutes were distributed subsequent to each meeting. The parties agreed to approve the board minutes by email by Friday, October 21, 2016.

**Approval of Previous Minutes of the Board**

Whereas each member of the Board received copies of the minutes of the meetings of the Board held on: (i) February 10, 2016; (ii) April 27, 2016; and (iii) July 26, 2016 (collectively, the "Prior Board Minutes") for review.

ARMEnergy_00040928

The Board discussed the Prior Board Minutes and agreed to review and approve the Prior Board Minutes by written consent in accordance with Section 5.3(g) of the LLC Agreement, such consent to occur no later than October 28, 2016.

**Lincoln System Update**

Mr. Tipton on behalf of the Operator, presented to the Board a year-to-date volume and rig update comprising of a forecast of additional rigs to be operated and connected wells by Alta Mesa and various third party gas gathering agreements both executed and imminent.

**Existing and Proposed AFEs**

Mr. Tipton, on behalf of the Operator, presented to the Board an update on construction spending, including project updates, and budgetary forecasts of various expansion projects previously approved by the Board, such expenditures including (i) the purchase of materials necessary for the new 200/day Cryo Plant; (ii) East Hennessey and Way South compression systems, and (iii) the Way South HP gathering system.

During this update, the board discussed various differences in plan vs. actual in revenues, and the reasons for any deficiencies.  The board also discussed the construction of the crude pipeline to Cashion by Alta Mesa (the "Cashion Pipeline"), rather than KFM. The Board agreed that (i) Alta Mesa was to provide a status report of completed and expected activities related to the Cashion Pipeline and (ii) subject to the Board's review of the foregoing, the Board may permit Alta Mesa to build the Cashion Pipeline by waiving the Company's "Corporate Opportunity" restrictions set forth in Section 5.6(e) of the LLC Agreement.

1. **KFM Sales Process**

In furtherance of the Board's discussion of a prospective limited-scope, sell-side process of the Company (the "Sale"), Mr. Christopher, on behalf of the Operator, presented to the Board an overview of current MLP market and valuations of comparable sell-side and capital markets processes in contemplation with such Sale.   The board discussed various timing issues related with the Sale, including improvement of the creditworthiness of Alta Mesa in the near-term.

Mr. Christopher, on behalf of the Operator, requested for the Board to agree to commence various procedural efforts in connection with the Sale.

Upon motion duly made by Mr. Lee and seconded by Mr. Dimitrievich, the following resolutions were unanimously adopted:

**NOW THEREFORE, BE IT RESOLVED**, that the Board hereby approves the Operator's actions to commence procedural efforts related to the Sale, subject to Alta Mesa's launch of its bond transaction ~~and successful refinancing of its bonds~~ in mid-November and board approval of engagement letters with advisors and marketing materials related to the Sale;

CONFIDENTIAL

2. <u>**Additional Field Compression**</u>

Mr. Tipton and Mr. Williams, on behalf of the Operator, presented to the Board for its consideration the authorization to capitalize the purchase of additional incremental field compression for an aggregate amount of $2,600,000.00 (the "Field Compression Project"). Mr. Tipton, on behalf of the Operator, articulated to the Board that the Field Compression Project would facilitate the transport of volumes in conjunction with arrangements involving third party producers. The Board discussed the Field Compression Project in further detail and upon motion duly made by Mr. Burciaga and seconded by Mr. McCabe, the following resolutions were unanimously adopted:

> **NOW THEREFORE, BE IT RESOLVED**, that the Field Compression Project, as presented to the Board, is hereby approved.

> **RESOLVED FURTHER**, that the Operator is hereby authorized, directed and empowered to operate the Company and to utilize a portion of the <u>funds allocated for the Company's expansion efforts</u>~~Company's AFE~~ for the purposes of funding the Field Compression Project.

> **RESOLVED FURTHER**, that all actions of the Operator and the officers and Managers of the Company taken by them prior hereto in respect to the Field Compression Project or within the terms of any of the foregoing resolutions are hereby ratified, approved and confirmed, and declared to be the valid and binding acts and deeds of the Company.

3. <u>**Gastar 18-6 Gathering**</u>

Mr. Tipton, on behalf of the Operator, presented to the Board an expansion to the gas gathering agreement between the Company and Gastar Exploration Inc. ("Gastar") by which the Company is (a) receiving, gathering, and processing dedicated gas for Gastar at the KFM gas processing plant and (b) purchasing residue gas (or delivering in-kind at Gastar's direction) and plant products from Gastar (the "Gastar Agreement"). The term of the Gastar Agreement is 10 years and Gastar is dedicating all of its current and future acreage that is not subject to existing dedications in Township 18N, Range 6W in Kingfisher County. In connection with the Gastar Agreement, the Company will require an additional $4,300,000.00 in order to construct a low pressure buildout ("Buildout AFE").

The Board discussed the Firm Agreement in detail, and upon motion duly made by Mr. Lee and seconded by Mr. Dimitrievich, the following resolutions were unanimously adopted:

> **NOW THEREFORE, BE IT RESOLVED**, that the Board hereby approves the Gastar Agreement, with such changes necessary for the execution of the Gastar Agreement, in their discretion, deem advisable.

> **RESOLVED FURTHER,** that the Operator is hereby authorized, directed and empowered to operate the Company and utilize <u>a portion of the funds allocated for the</u>

**Commented [HJ1]:** I think this should fall under "Expansion" related items?

ARMEnergy_00040930

Company's expansion efforts in order to fund the~~the~~ Buildout AFE for the furtherance of the transactions contemplated in the Gastar Agreement.

**RESOLVED FURTHER**, that the officers of the Company be, and each hereby is, authorized and directed on behalf of the Company to execute and deliver the Gastar Agreement on substantially the same terms approved by the Board with such changes as the Operator and such officer deem necessary or appropriate (as evidenced by such officer's execution thereof).

**RESOLVED FURTHER**, that the officers of the Company be, and each hereby is, authorized and directed to execute and deliver on behalf of the Company any and all other documents as such officer deems necessary, advisable, or appropriate in connection with the Gastar Agreement.

**RESOLVED FURTHER**, that the Operator is hereby authorized and directed, on behalf of the Company, to take such action as the Operator deems necessary, advisable, or appropriate in connection with the Gastar Agreement.

**RESOLVED FURTHER**, that all actions of the Operator and the officers and Managers of the Company taken by them prior hereto in respect to the Gastar Agreement or within the terms of any of the foregoing resolutions are hereby ratified, approved and confirmed, and declared to be the valid and binding acts and deeds of the Company.

4. **Tier 1 High Pressure Expansion**

Mr. Tipton and Mr. Deru, on behalf of the Operator, presented to the Board for its consideration the authorization to capitalize the construction of approximately 21 miles of 16" of high pressure pipeline in order to connect Staghorn Maral and Thamin Wells for an aggregate amount of $17,900,000.00 (the "HP Expansions"). Mr. Tipton, on behalf of the Operator, articulated to the Board that the HP Expansions would provide additional opportunity in additional townships, de-risks the Company's 200/day Cryo expansion, block expansion efforts of competitors and facilitate opportunities of third party producers. The Board discussed the HP Expansion in further detail, including the various risks and mitigating factors, strategic importance and third party well results in the area.

The Board discussed the HP Expansions in further detail and proposed to reconvene discussions related thereto on Friday, October 21, 2016.

**Adjournment**

The Board of Managers unanimously agreed to adjourn the meeting at 6:00 p.m. CT and to resume discussion Friday, October 21, 2016 at 12:00 p.m. CT.

**Fri, Oct 21:**

The Board reconvened via teleconference on Friday, October 21, 2016 at 12:00 p.m. CT in order to discuss the outstanding agenda items from the Board meeting held on Wednesday, October 19, 2016. The following Managers were present via teleconference: Gilbert Burciaga, Zachary D. Lee,

ARMEnergy_00040931

Harlan H. Chappelle, Michael McCabe and Don Dimitrievich of HPS Investment Partners, LLC. Also present were Taylor Tipton, Michael Christopher and Paul Williams of ARM; David McClure of Alta Mesa; and Jeff Hostettler of HPS.

Mr. Lee, on behalf of the Operator (as defined in the C&O Agreement), opened the meeting with a description of the remaining agenda.

5.   **Tier 1 High Pressure Expansion**

Discussion from prior board meeting regarding the HP Expansions resumed. After discussion by the Board and upon motion duly made by Mr. Lee and seconded by Mr. Dimitrievich, the following resolutions were unanimously adopted:

**NOW THEREFORE, BE IT RESOLVED**, that the HP Expansions, as presented to the Board, is hereby approved.

**RESOLVED FURTHER**, that the Operator is hereby authorized, directed and empowered to operate the Company and to utilize a portion of the funds allocated for the Company's expansion efforts Company's AFE for the purposes of funding the HP Expansions.

**RESOLVED FURTHER**, that all actions of the Operator and the officers and Managers of the Company taken by them prior hereto in respect to the HP Expansions or within the terms of any of the foregoing resolutions are hereby ratified, approved and confirmed, and declared to be the valid and binding acts and deeds of the Company

6.   **OGT Firm Transportation**

Mr. Williams, on behalf of Operator, presented to the Board for its consideration a proposed arrangement with OGT (the "OGT Agreement") for an additional Firm 100,000 Dth/day residue takeaway to support increased plant volumes. The projected in-service date of the OGT Agreement would be June 1, 2018 (provided that the obligation may start as early as March 1, 2018) with a term of 10 years. Mr. Williams explained that following the execution of the definitive OGT agreement, OGT would hold an open season for 30 days during which other shippers would be allowed to bid on the capacity. The volumetric commitment of the OGT Agreement would be 100,000 dth/day, with an annual firm obligation of approximately $5,700,000 (the "OGT Financial Commitment"). In addition, KFM would be required to spend $5,700,000 on HP piping to connect the existing KFM plant to the OGT residue line. The Board also recognized that OGT may request additional credit support, which may be critical to the Board's decision to consummate the deal. The board also recognized that KFM has the ability to terminate the transaction December 1st 2016 for an amount payable to OGT for up to $500,000 to cover OGT cost incurred.

The Board discussed entering into the OGT Agreement in further detail. Upon motion duly made by Mr. Chappelle and seconded by Mr. Lee, the following resolutions were unanimously adopted:

**NOW THEREFORE, BE IT RESOLVED**, that the Board hereby approves the Operator's actions to negotiate the OGT Agreement and to finalize the OGT Agreement,

ARMEnergy_00040932

on behalf of the Company, subject to: (i) prior approval of the terms of the OGT Agreement and (ii) prior approval of the terms of the credit support required by OGT in contemplation of the OGT Agreement by the Board.

**RESOLVED FURTHER**, notwithstanding the fact that the financing terms of the OGT Financial Commitment are still subject to discussion by the Board, the Operator is hereby authorized, directed and empowered to enter into the OGT Agreement, subject to prior approval of the OGT Agreement (including the terms of any required credit support) by the Board.

**RESOLVED FURTHER**, that the HMS Member and officers of the Company be, and each hereby is, authorized and directed on behalf of the Company to execute and deliver the OGT Agreement, subject to prior approval of the finalized OGT Agreement (including the terms of any required credit support) by the Board.

**RESOLVED FURTHER**, that, subject to the prior approval of the finalized OGT Agreement by the Board, the Operator is hereby authorized and directed, on behalf of the Company, to take such action as the Operator deems necessary, advisable, or appropriate in furtherance of the OGT Agreement.

**Adjournment**

There being no further business, on motion, duly made and seconded, the Board of Managers unanimously agreed to adjourn the meeting at 1:00 p.m. CT.

_____
Michael Christopher
Secretary of the Meeting

ARMEnergy_00040933

# PX 250

DRS 1 filename1.htm

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

**This is a confidential draft submission to the U.S. Securities and Exchange Commission on November 23, 2016
and is not being filed under the Securities Act of 1933, as amended.**

Registration No. 333-

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM S-1
**REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933**

---

# Silver Run Acquisition Corporation II
(Exact name of registrant as specified in its charter)

---

| Delaware | 6770 | 81-4433840 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1000 Louisiana Street, Suite 1450
Houston, TX 77002
(713) 357-1400**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

---

**Stephen S. Coats
Secretary
Silver Run Acquisition Corporation II
1000 Louisiana Street, Suite 1450
Houston, TX 77002
(713) 357-1400**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

---

Copy to:

**Jennifer A. Bensch, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007**

---

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after the effective date of this registration statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☒          Smaller reporting company ☐
                                                                (Do not check if a
                                                                smaller reporting
                                                                company)

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security(1) | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $.0001 par value, and one-third of one warrant(2) | 46,000,000 Units | $10.00 | $460,000,000 | $53,314 |
| Shares of Class A common stock included as part of the units(3) | 46,000,000 Shares | — | — | —(4) |
| Warrants included as part of the units(3) | 15,333,333 Warrants | — | — | —(4) |
| Total | | | $460,000,000 | $53,314 |

(1) Estimated solely for the purpose of calculating the registration fee.

(2) Includes 6,000,000 units, consisting of 6,000,000 shares of Class A common stock and 2,000,000 warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3) Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4) No fee pursuant to Rule 457(g).

The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.

Table of Contents

**The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

<p align="center">SUBJECT TO COMPLETION, DATED NOVEMBER 23, 2016</p>

PRELIMINARY PROSPECTUS

<p align="center">$400,000,000</p>

# Silver Run Acquisition Corporation II

<p align="center">40,000,000 Units</p>

---

Silver Run Acquisition Corporation II is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. We intend to focus our search for a target business in the energy industry.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. The warrants will become exercisable on the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering, and will expire five years after the completion of our initial business combination or earlier upon redemption or liquidation, as described in this prospectus. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. We have also granted the underwriters a 45-day option to purchase up to an additional 6,000,000 units to cover over-allotments, if any.

We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding shares of Class A common stock that were sold as part of the units in this offering, which we refer to collectively as our public shares throughout this prospectus, subject to the limitations described herein. If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, subject to applicable law and as further described herein.

Our sponsor, Silver Run Sponsor II, LLC (which we refer to as our sponsor throughout this prospectus), has committed to purchase an aggregate of 6,666,666 warrants (or 7,466,666 warrants if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $10,000,000 in the aggregate, or $11,200,000 if the over-allotment option is exercised in full) in a private placement that will close simultaneously with the closing of this offering. We refer to these warrants as the private placement warrants throughout this prospectus. Each whole private placement warrant is exercisable to purchase one whole share of our Class A common stock at $11.50 per share.

Prior to this offering, our sponsor purchased 11,500,000 shares of our Class B common stock (up to 1,500,000 shares of which are subject to forfeiture depending on the extent to which the underwriter's over-allotment option is exercised). We refer to these shares of Class B common stock as the founder shares throughout this prospectus. The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination, or earlier at the option of the holder, on a one-for-one basis, subject to adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of the Class B common stock and holders of the Class A common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law.

Currently, there is no public market for our units, Class A common stock or warrants. We will apply to list our units on the NASDAQ Capital Market, or NASDAQ, under the symbol "          U" on or promptly after the date of this prospectus. We cannot guarantee that our securities will be approved for listing on NASDAQ. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless          informs us of its decision to allow earlier separate trading, subject to our filing a Current Report on Form 8-K with the Securities and Exchange Commission, or the SEC, containing an audited balance sheet reflecting our receipt of the gross proceeds of this offering and issuing a press release announcing when such separate trading will begin. Once the securities comprising the units begin separate trading, we expect that the Class A common stock and warrants will be listed on NASDAQ under the symbols "          " and "          W," respectively.

---

**We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See the section of this prospectus entitled "Risk Factors" beginning on page 30 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.**

Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

|  | Per Unit | Total |
|---|---|---|
| Public offering price | $10.00 | $400,000,000 |
| Underwriting discounts and commissions(1) | $0.55 | $22,000,000 |
| Proceeds, before expenses, to Silver Run Acquisition Corporation II | $9.45 | $378,000,000 |

(1) Includes $0.35 per unit, or $14,000,000 (or up to $16,100,000 if the underwriters' over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, as described in this prospectus. See the section of this prospectus entitled "Underwriting" beginning on page 140.

Of the proceeds we receive from this offering and the sale of the private placement warrants described in this prospectus, $400.0 million or $460.0 million if the underwriters' over-allotment option is exercised in full ($10.00 per unit) will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and $2.0 million will be available to pay fees and expenses in connection with the closing of this offering and for working capital following the closing of this offering. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of (a) the completion of our initial business combination, (b) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about                              , 2017.

, 2017

Table of Contents

## TABLE OF CONTENTS

**We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

| | |
|---|---|
| Summary | 1 |
| Risk Factors | 30 |
| Cautionary Note Regarding Forward-Looking Statements | 61 |
| Use of Proceeds | 62 |
| Dividend Policy | 67 |
| Dilution | 68 |
| Capitalization | 70 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 71 |
| Proposed Business | 77 |
| Management | 104 |
| Principal Stockholders | 112 |
| Certain Relationships and Related Party Transactions | 114 |
| Description of Securities | 117 |
| United States Federal Income Tax Considerations | 131 |
| Underwriting | 139 |
| Legal Matters | 145 |
| Experts | 145 |
| Where You Can Find Additional Information | 145 |
| Index to Financial Statements | F-1 |

i

Table of Contents

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. As this is a summary, it does not contain all of the information that you should consider in making an investment decision. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, references to:*

- *"we," "us," "company" or "our company" are to Silver Run Acquisition Corporation II;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"management" or our "management team" are to our officers and directors;*

- *"sponsor" are to Silver Run Sponsor II, LLC, a Delaware limited liability company and an affiliate of Riverstone;*

- *"initial stockholders" are to holders of our founder shares prior to this offering;*

- *"Riverstone" are to Riverstone Investment Group LLC, a Delaware limited liability company and its affiliates;*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issued upon the conversion thereof as provided herein;*

- *"private placement warrants" are to the warrants issued to our sponsor in a private placement simultaneously with the closing of this offering; and*

- *"specified future issuance" are to an issuance of a class of equity or equity-linked securities to specified purchasers, which may include affiliates of Riverstone, that we may determine to make in connection with financing our initial business combination.*

*Each unit consists of one share of Class A common stock and one-third of one warrant for each unit purchased. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.*

*Registered trademarks referred to in this prospectus are the property of their respective owners. Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

1

Table of Contents

### Our Company

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, or one that does not fit with Riverstone's mandate, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

Our sponsor is an affiliate of Riverstone, which has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

2

Table of Contents

## Business Strategy

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

## Acquisition Criteria

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential as a result of the current commodity price dislocation;

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our shareholders. We will seek to acquire the target on terms and in a manner that leverage our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the

3

Table of Contents

event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

### Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of the Financial Industry Regulatory Authority, or FINRA, or an independent accounting firm with respect to the satisfaction of such criteria.

We may, at our option, pursue an acquisition opportunity jointly with one or more entities affiliated with Riverstone and/or one or more investors in funds managed by Riverstone, which we refer to as an "Affiliated Joint Acquisition." Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by issuing to such parties a class of equity or equity-linked securities. We refer to this potential future issuance, or a similar issuance to other specified purchasers, as a "specified future issuance" throughout this prospectus. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes of our common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition as described above. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended, or the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company,

4

Table of Contents

depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

### Our Acquisition Process

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity. Accordingly, if any of our

5

Table of Contents

officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

### Corporate Information

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

6

Table of Contents

### The Offering

*In making your decision on whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

| | |
|---|---|
| Securities offered | 40,000,000 units, at $10.00 per unit, each unit consisting of: |
| | • one share of Class A common stock; and |
| | • one-third of one warrant. |
| NASDAQ symbols | Units: "          U" |
| | Class A Common Stock: "          " |
| | Warrants: "          W" |
| Trading commencement and separation of Class A common stock and warrants | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus          unless          informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. |
| Separate trading of the Class A common stock and warrants is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock and warrants be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

7

Table of Contents

Units:

| | |
|---|---|
| Number outstanding before this offering | 0 |
| Number outstanding after this offering | 40,000,000(1) |

Common stock:

| | |
|---|---|
| Number outstanding before this offering | 11,500,000 shares of Class B common stock(2)(3) |
| Number outstanding after this offering | 50,000,000 shares of Class A common stock and Class B common stock(1)(3) |

Warrants:

| | |
|---|---|
| Number of private placement warrants to be sold in a private placement simultaneously with this offering | 6,666,666(1) |
| Number of warrants to be outstanding after this offering and the private placement | 19,999,999(1) |

(1)    Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 1,500,000 founder shares.

(2)    Includes up to 1,500,000 shares that are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)    The shares of common stock included in the units are Class A common stock. Founder shares are classified as shares of Class B common stock, which shares are convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution."

| | |
|---|---|
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock and only whole warrants are exercisable. |
| Exercise price | $11.50 per share, subject to adjustment as described herein. |
| Exercise period | The warrants will become exercisable on the later of: |

- 30 days after the completion of our initial business combination, or

- 12 months from the closing of this offering;

8

Table of Contents

provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file and have an effective registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed; provided, that if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement.

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation. On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants                  Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the private placement warrants):

• in whole and not in part;

• at a price of $0.01 per warrant;

• upon a minimum of 30 days' prior written notice of redemption, which we refer to as the 30-day redemption period; or

• if, and only if, the last sale price of our Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which we send the notice of redemption to the warrant holders.

9

Table of Contents

We will not redeem the warrants unless a registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants is effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. Please see the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants" for additional information.

None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

10

Table of Contents

Founder shares

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering. As such, our initial stockholders will collectively own 20% of our issued and outstanding shares after this offering (assuming they do not purchase any units in this offering). In          , our sponsor transferred          founder shares to each of our independent director nominees at their original purchase price. If we increase or decrease the size of the offering, we will effect a stock dividend or share contribution back to capital, as applicable, with respect to our Class B common stock immediately prior to the consummation of this offering in such amount as to maintain the ownership of our initial stockholders prior to this offering at 20% of the issued and outstanding shares of our common stock upon the consummation of this offering. Up to 1,500,000 founder shares will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering.

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

11

Table of Contents

• our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (i) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within the prescribed time frame. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial business combination. Our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 15,000,001, or 37.5%, of the 40,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised); and

• the founder shares are subject to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders— Restrictions on Transfers of Founder Shares and Private Placement Warrants"). We refer to such transfer restrictions throughout this prospectus as the lock-up. |

Table of Contents

| | |
|---|---|
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. |
| Voting | Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Each share of common stock will have one vote on all such matters. |
| Private placement warrants | Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 6,666,666 private placement warrants (or 7,466,666 if the over-allotment option is exercised in full), each exercisable to purchase one share of our Class A common stock at $11.50 per share, at a price of $1.50 per whole warrant (approximately $10,000,000 in the aggregate or $11,200,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. |

13

Table of Contents

|  | A portion of the purchase price of the private placement warrants will be added to the proceeds from this offering to be held in the trust account such that at the time of closing $400.0 million (or $460.0 million if the underwriters exercise their over-allotment option in full) will be held in the trust account. If we do not complete our initial business combination within 24 months from the closing of this offering, the proceeds from the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares (subject to the requirements of applicable law) and the private placement warrants will expire worthless. |
|  | The private placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering. |
| Transfer restrictions on private placement warrants | The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). |

14

Table of Contents

| | |
|---|---|
| Cashless exercise of private placement warrants | If holders of private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| Proceeds to be held in trust account | The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $400,000,000, or $10.00 per unit ($460,000,000, or $10.00 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. These proceeds include $14,000,000 (or $16,100,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions. |

15

Table of Contents

|  | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest of (a) the completion of our initial business combination, (b) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. Based upon current interest rates, we expect the trust account to generate approximately $80,000 of interest annually. Unless and until we complete our initial business combination, we may pay our expenses only from: |

- the net proceeds of this offering and the sale of the private placement warrants not held in the trust account, which will be approximately $1,100,000 in working capital after the payment of approximately $900,000 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of a business combination.

|  |  |
|---|---|
| Conditions to completing our initial business combination | There is no limitation on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial business combination. Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. |

16

Table of Contents

If our board is not able to independently determine the fair market value of the target business or businesses or we are considering an initial business combination with an affiliated entity, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm. We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test, provided that in the event that the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

17

Table of Contents

| | |
|---|---|
| Permitted purchases of public shares by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our initial stockholders, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Securities Exchange Act of 1934, as amended, or the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. |
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our business combination or otherwise. |

18

| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under the law or stock exchange listing requirements. Asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. |
|---|---|

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act.

19

Table of Contents

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

20

Table of Contents

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial stockholders will count towards this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 15,000,001, or 37.5%, of the 40,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. We believe that this will allow our transfer agent to efficiently process any redemptions without the need for further communication or action from the redeeming public stockholders, which could delay redemptions and result in additional administrative cost. If the proposed business combination is not approved and we continue to search for a target company, we will promptly return any certificates delivered, or shares tendered electronically, by public stockholders who elected to redeem their shares.

21

Table of Contents

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

22

Table of Contents

| | |
|---|---|
| Limitation on redemption rights of stockholders holding 20% or more of the shares sold in this offering if we hold stockholder vote | Notwithstanding the foregoing redemption rights, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares sold in this offering. We believe the restriction described above will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to redeem their shares as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights against a business combination if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem to no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including all shares held by those stockholders that hold more than 20% of the shares sold in this offering) for or against our business combination. |

23

Table of Contents

| | |
|---|---|
| Redemption rights in connection with proposed amendments to our certificate of incorporation | Some other blank check companies have a provision in their charter which prohibits the amendment of certain charter provisions. Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the Delaware General Corporation Law, or DGCL, or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. Our sponsor, executive officers, and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable) divided by the number of then outstanding public shares. Our initial stockholders have entered into a letter agreement with us pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and public shares held by them in connection with the completion of our initial business combination. |

24

Table of Contents

| | |
|---|---|
| Release of funds in trust account on closing of our initial business combination | On the completion of our initial business combination, all amounts held in the trust account will be released to us. We will use these funds to pay amounts due to any public stockholders who exercise their redemption rights as described above under "Redemption rights for public stockholders upon completion of our initial business combination," to pay the underwriters their deferred underwriting commissions, to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of post-transaction businesses, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. |
| Redemption of public shares and distribution and liquidation if no initial business combination | Our sponsor, officers and directors have agreed that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period. |

25

Table of Contents

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

The underwriters have agreed to waive their rights to their deferred underwriting commission held in the trust account in the event we do not complete our initial business combination and subsequently liquidate and, in such event, such amounts will be included with the funds held in the trust account that will be available to fund the redemption of our public shares.

**Limited payments to insiders**

There will be no finder's fees, reimbursements or cash payments made to our sponsor, officers or directors, or our or their affiliates, for services rendered to us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment of an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

26

Table of Contents

| | |
|---|---|
| Audit Committee | We will establish and maintain an audit committee, which will be composed entirely of independent directors to, among other things, monitor compliance with the terms described above and the other terms relating to this offering. If any noncompliance is identified, then the audit committee will be charged with the responsibility to immediately take all action necessary to rectify such noncompliance or otherwise to cause compliance with the terms of this offering. For more information, see the section of this prospectus entitled "Management—Committees of the Board of Directors—Audit Committee." |
| Conflicts of Interest | Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware, unless presented to such member solely in his or her capacity as an officer of the company. Riverstone and/or our management, in their capacities as employees of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us. |
| | Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle. |

27

Table of Contents

| | |
|---|---|
| Indemnity | Our sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or by a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses. |

### Risks

We are a newly formed company that has conducted no operations and has generated no revenues. Until we complete our initial business combination, we will have no operations and will generate no operating revenues. In making your decision whether to invest in our securities, you should take into account not only the background of our management team, but also the special risks we face as a blank check company. This offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. Accordingly, you will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. For additional information concerning how Rule 419 blank check offerings differ from this offering, please see the section of this prospectus entitled "Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419." You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."

Table of Contents

## Summary Financial Data

The following table summarizes the relevant financial data for our business and should be read with our financial statements, which are included in this prospectus. We have not had any significant operations to date, so only balance sheet data is presented.

| | November 21, 2016 | |
| | Actual | As Adjusted |
|---|---|---|
| **Balance Sheet Data:** | | |
| Working capital (deficiency) | $ (23,000) | $ 387,123,000(1) |
| Total assets | $ 46,000 | $ 401,123,000(2) |
| Total liabilities | $ 23,000(6) | $ 14,000,000(3) |
| Value of Class A common stock that may be redeemed in connection with our initial business combination ($10.00 per share) | $ — | $ 382,122,990(4) |
| Stockholders' equity | $ 23,000 | $ 5,000,010(5) |

(1)    The "as adjusted" calculation includes $400,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,100,000 in cash held outside the trust account, plus $23,000 of actual stockholder's equity as of November 21, 2016, less $14,000,000 of deferred underwriting commissions.

(2)    The "as adjusted" calculation equals $400,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,100,000 in cash held outside the trust account plus $23,000 of actual stockholder's equity as of November 21, 2016.

(3)    The "as adjusted" calculation includes $14,000,000 of deferred underwriting commissions.

(4)    The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the "as adjusted" stockholders' equity, which is set to approximate the minimum net tangible assets threshold of at least $5,000,001.

(5)    Excludes 23,212,299 shares of Class A common stock purchased in the public market which are subject to redemption in connection with our initial business combination. The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the value of Class A common stock that may be redeemed in connection with our initial business combination (approximately $10.00 per share).

(6)    Subsequent to November 21, 2016, our sponsor loaned us $300,000 to be used for a portion of the expenses of this offering. This amount will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

If no business combination is completed within 24 months from the closing of this offering, the proceeds then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), will be used to fund the redemption of our public shares. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within such 24 month time period.

Table of Contents

## RISK FACTORS

*An investment in our securities involves a high degree of risk. You should consider carefully all of the risks described below, together with the other information contained in this prospectus, before making a decision to invest in our units. If any of the following events occur, our business, financial condition and operating results may be materially adversely affected. In that event, the trading price of our securities could decline, and you could lose all or part of your investment.*

### We are a newly formed company with no operating history and no revenues, and you have no basis on which to evaluate our ability to achieve our business objective.

We are a newly formed company with no operating results, and we will not commence operations until obtaining funding through this offering. Because we lack an operating history, you have no basis upon which to evaluate our ability to achieve our business objective of completing our initial business combination with one or more target businesses. We have no plans, arrangements or understandings with any prospective target business concerning a business combination and may be unable to complete our business combination. If we fail to complete our business combination, we will never generate any operating revenues.

### Our public stockholders may not be afforded an opportunity to vote on our proposed business combination, which means we may complete our initial business combination even though a majority of our public stockholders do not support such a combination.

We may not hold a stockholder vote to approve our initial business combination unless the business combination would require stockholder approval under applicable law or stock exchange listing requirements or if we decide to hold a stockholder vote for business or other legal reasons. Except as required by law, the decision as to whether we will seek stockholder approval of a proposed business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors, such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Accordingly, we may complete our initial business combination even if holders of a majority of our public shares do not approve of the business combination we complete. Please see the section of this prospectus entitled "Proposed Business —Stockholders May Not Have the Ability to Approve Our Initial Business Combination" for additional information.

### If we seek stockholder approval of our initial business combination, our initial stockholders have agreed to vote in favor of such initial business combination, regardless of how our public stockholders vote.

Unlike many other blank check companies in which the initial stockholders agree to vote their founder shares in accordance with the majority of the votes cast by the public stockholders in connection with an initial business combination, our initial stockholders have agreed to vote their founder shares, as well as any public shares purchased during or after this offering, in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 15,000,001, or 37.5%, of the 40,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Our initial stockholders will own shares representing 20% of our outstanding shares of common stock immediately following the completion of this offering. Accordingly, if we seek stockholder approval of our initial business combination, it is more likely that the necessary stockholder approval will be received than would be the case if our initial stockholders agreed to vote their founder shares in accordance with the majority of the votes cast by our public stockholders.

30

Table of Contents

***Your only opportunity to affect the investment decision regarding a potential business combination will be limited to the exercise of your right to redeem your shares from us for cash, unless we seek stockholder approval of the business combination.***

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses. Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote. Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

***The ability of our public stockholders to redeem their shares for cash may make our financial condition unattractive to potential business combination targets, which may make it difficult for us to enter into a business combination with a target.***

We may seek to enter into a business combination transaction agreement with a prospective target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights, we would not be able to meet such closing condition and, as a result, would not be able to proceed with the business combination. Furthermore, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. Consequently, if accepting all properly submitted redemption requests would cause our net tangible assets to be less than $5,000,001 or such greater amount necessary to satisfy a closing condition as described above, we would not proceed with such redemption and the related business combination and may instead search for an alternate business combination. Prospective targets will be aware of these risks and, thus, may be reluctant to enter into a business combination transaction with us.

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares may not allow us to complete the most desirable business combination or optimize our capital structure.***

At the time we enter into an agreement for our initial business combination, we will not know how many stockholders may exercise their redemption rights, and therefore will need to structure the transaction based on our expectations as to the number of shares that will be submitted for redemption. If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, we will need to reserve a portion of the cash in the trust account to meet such requirements, or arrange for third party financing. In addition, if a larger number of shares are submitted for redemption than we initially expected, we may need to restructure the transaction to reserve a greater portion of the cash in the trust account or arrange for third party financing. Raising additional third party financing may involve dilutive equity issuances or the incurrence of indebtedness at higher than desirable levels. The above considerations may limit our ability to complete the most desirable business combination available to us or optimize our capital structure. The amount of the deferred underwriting commissions payable to the underwriters will not be adjusted for any shares that are redeemed in connection with a business combination. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the deferred underwriting commission and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the deferred underwriting commissions.

31

Table of Contents

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares could increase the probability that our initial business combination would be unsuccessful and that you would have to wait for liquidation in order to redeem your stock.***

If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, the probability that our initial business combination would be unsuccessful is increased. If our initial business combination is unsuccessful, you would not receive your pro rata portion of the trust account until we liquidate the trust account. If you are in need of immediate liquidity, you could attempt to sell your stock in the open market; however, at such time our stock may trade at a discount to the pro rata amount per share in the trust account. In either situation, you may suffer a material loss on your investment or lose the benefit of funds expected in connection with our redemption until we liquidate or you are able to sell your stock in the open market.

***The requirement that we complete our initial business combination within the prescribed time frame may give potential target businesses leverage over us in negotiating a business combination and may decrease our ability to conduct due diligence on potential business combination targets as we approach our dissolution deadline, which could undermine our ability to complete our business combination on terms that would produce value for our stockholders.***

Any potential target business with which we enter into negotiations concerning a business combination will be aware that we must complete our initial business combination within 24 months from the closing of this offering. Consequently, such target business may obtain leverage over us in negotiating a business combination, knowing that if we do not complete our initial business combination with that particular target business, we may be unable to complete our initial business combination with any target business. This risk will increase as we get closer to the timeframe described above. In addition, we may have limited time to conduct due diligence and may enter into our initial business combination on terms that we would have rejected upon a more comprehensive investigation.

***We may not be able to complete our initial business combination within the prescribed time frame, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.***

Our sponsor, officers and directors have agreed that we must complete our initial business combination within 24 months from the closing of this offering. We may not be able to find a suitable target business and complete our initial business combination within such time period. If we have not completed our initial business combination within such time period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, our public stockholders may only receive $10.00 per share, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the

32

Table of Contents

proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors and their affiliates may elect to purchase shares from public stockholders, which may influence a vote on a proposed business combination and reduce the public "float" of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination, although they are under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business combination, or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our Class A common stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on a national securities exchange.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our business combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

We will comply with the tender offer rules or proxy rules, as applicable, when conducting redemptions in connection with our business combination. Despite our compliance with these rules, if a stockholder fails to receive our tender offer or proxy materials, as applicable, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the tender offer documents or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will describe the various procedures that must be complied with in order to validly tender or redeem public shares. For example, we may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. In the event that a stockholder fails to comply with these or any other procedures, its shares may not be redeemed. See the section of this prospectus entitled "Proposed Business—Business Strategy—Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights."

33

Table of Contents

***You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares or warrants, potentially at a loss.***

Our public stockholders will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete an initial business combination within 24 months from the closing of this offering, subject to applicable law and as further described herein. In addition, if we are unable to complete an initial business combination within 24 months from the closing of this offering for any reason, compliance with Delaware law may require that we submit a plan of dissolution to our then-existing stockholders for approval prior to the distribution of the proceeds held in our trust account. In that case, public stockholders may be forced to wait beyond 24 months from the closing of this offering before they receive funds from our trust account. In no other circumstances will a public stockholder have any right or interest of any kind in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.

***NASDAQ may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

We will apply to have our units listed on NASDAQ on or promptly after the date of this prospectus and our Class A common stock and warrants listed on or promptly after their date of separation. Although after giving effect to this offering we expect to meet, on a pro forma basis, the minimum initial listing standards set forth in the NASDAQ listing standards, we cannot assure you that our securities will be, or will continue to be, listed on NASDAQ in the future or prior to our initial business combination. In order to continue listing our securities on NASDAQ prior to our initial business combination, we must maintain certain financial, distribution and stock price levels. Generally, we must maintain a minimum amount in stockholders' equity (generally $2,500,000) and a minimum number of holders of our securities (generally 300 round-lot holders). Additionally, in connection with our initial business combination, we will be required to demonstrate compliance with NASDAQ's initial listing requirements, which are more rigorous than NASDAQ's continued listing requirements, in order to continue to maintain the listing of our securities on NASDAQ. For instance, our stock price would generally be required to be at least $4.00 per share and our stockholders' equity would generally be required to be at least $5.0 million. We cannot assure you that we will be able to meet those initial listing requirements at that time.

If NASDAQ delists our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect our securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Class A common stock is a "penny stock" which will require brokers trading in our Class A common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

34

Table of Contents

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because we expect that our units and eventually our Class A common stock and warrants will be listed on NASDAQ, our units, Class A common stock and warrants will be covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the State of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on NASDAQ, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities.

***You will not be entitled to protections normally afforded to investors of many other blank check companies.***

Since the net proceeds of this offering and the sale of the private placement warrants are intended to be used to complete an initial business combination with a target business that has not been identified, we may be deemed to be a "blank check" company under the United States securities laws. However, because we will have net tangible assets in excess of $5,000,000 upon the successful completion of this offering and the sale of the private placement warrants and will file a Current Report on Form 8-K, including an audited balance sheet demonstrating this fact, we are exempt from rules promulgated by the SEC to protect investors in blank check companies, such as Rule 419. Accordingly, investors will not be afforded the benefits or protections of those rules. Among other things, this means our units will be immediately tradable and we will have a longer period of time to complete our business combination than do companies subject to Rule 419. Moreover, if this offering were subject to Rule 419, that rule would prohibit the release of any interest earned on funds held in the trust account to us unless and until the funds in the trust account were released to us in connection with our completion of an initial business combination. For a more detailed comparison of our offering to offerings that comply with Rule 419, please see the section of this prospectus entitled "Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419."

***If we seek stockholder approval of our initial business combination and we do not conduct redemptions pursuant to the tender offer rules, and if you or a "group" of stockholders are deemed to hold in excess of 20% of our Class A common stock, you will lose the ability to redeem all such shares in excess of 20% of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Your inability to redeem the Excess Shares will reduce your influence over our ability to complete our business combination and you could suffer a material loss on your investment in us if you sell Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Excess Shares if we complete our business combination. And as a result, you will continue to hold that number of shares exceeding 20% and, in order to dispose of such shares, would be required to sell your stock in open market transactions, potentially at a loss.

35

Table of Contents

*Because of our limited resources and the significant competition for business combination opportunities, it may be more difficult for us to complete our initial business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on our redemption of our public shares, or less than such amount in certain circumstances, and our warrants will expire worthless.*

We expect to encounter intense competition from other entities having a business objective similar to ours, including private investors (which may be individuals or investment partnerships), other blank check companies and other entities, domestic and international, competing for the types of businesses we intend to acquire. Many of these individuals and entities are well-established and have extensive experience in identifying and effecting, directly or indirectly, acquisitions of companies operating in or providing services to various industries. Many of these competitors possess greater technical, human and other resources or more local industry knowledge than we do and our financial resources will be relatively limited when contrasted with those of many of these competitors. While we believe there are numerous target businesses we could potentially acquire with the net proceeds of this offering and the sale of the private placement warrants, our ability to compete with respect to the acquisition of certain target businesses that are sizable will be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses. Furthermore, because we are obligated to pay cash for the shares of Class A common stock which our public stockholders redeem in connection with our initial business combination, target companies will be aware that this may reduce the resources available to us for our initial business combination. This may place us at a competitive disadvantage in successfully negotiating a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

*If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient to allow us to operate for at least the next 24 months, we may be unable to complete our initial business combination, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.*

The funds available to us outside of the trust account may not be sufficient to allow us to operate for at least the next 24 months, assuming that our initial business combination is not completed during that time. We believe that, upon the closing of this offering, the funds available to us outside of the trust account will be sufficient to allow us to operate for at least the next 24 months; however, we cannot assure you that our estimate is accurate. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into a letter of intent where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the

36

Table of Contents

trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient, it could limit the amount available to fund our search for a target business or businesses and complete our initial business combination and we will depend on loans from our sponsor or management team to fund our search for a business combination, to pay our franchise and income taxes and to complete our initial business combination. If we are unable to obtain these loans, we may be unable to complete our initial business combination.***

Of the net proceeds of this offering and the sale of the private placement warrants, only approximately $1,100,000 will be available to us initially outside the trust account to fund our working capital requirements. In the event that our offering expenses exceed our estimate of $900,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $900,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount. If we are required to seek additional capital, we would need to borrow funds from our sponsor, management team or other third parties to operate or may be forced to liquidate. None of our sponsor, members of our management team nor any of their affiliates is under any obligation to advance funds to us in such circumstances. Any such advances would be repaid only from funds held outside the trust account or from funds released to us upon completion of our initial business combination. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account. If we are unable to obtain these loans, we may be unable to complete our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. Consequently, our public stockholders may only receive approximately $10.00 per share on our redemption of our public shares, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***Subsequent to the completion of our initial business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Even if we conduct extensive due diligence on a target business with which we combine, we cannot assure you that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject as a result of assuming pre-existing debt held by a target business or by virtue of our obtaining post-combination debt financing. Accordingly, any stockholders who choose to remain

37

Table of Contents

stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Our placing of funds in the trust account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of our public shares, if we are unable to complete our business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the trust account, due to claims of such creditors. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

38

Table of Contents

***Our directors may decide not to enforce the indemnification obligations of our sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public stockholders.***

In the event that the proceeds in the trust account are reduced below the lesser of (i) $10.00 per public share or (ii) such lesser amount per share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations.

While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***If we are deemed to be an investment company under the Investment Company Act, we may be required to institute burdensome compliance requirements and our activities may be restricted, which may make it difficult for us to complete our business combination.***

If we are deemed to be an investment company under the Investment Company Act, our activities may be restricted, including:

- restrictions on the nature of our investments; and

- restrictions on the issuance of securities, each of which may make it difficult for us to complete our business combination.

39

Table of Contents

In addition, we may have imposed upon us burdensome requirements, including:

- registration as an investment company;

- adoption of a specific form of corporate structure; and

- reporting, record keeping, voting, proxy and disclosure requirements and other rules and regulations.

In order not to be regulated as an investment company under the Investment Company Act, unless we can qualify for an exclusion, we must ensure that we are engaged primarily in a business other than investing, reinvesting or trading in securities and that our activities do not include investing, reinvesting, owning, holding or trading "investment securities" constituting more than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. Our business will be to identify and complete a business combination and thereafter to operate the post-transaction business or assets for the long term. We do not plan to buy businesses or assets with a view to resale or profit from their resale. We do not plan to buy unrelated businesses or assets or to be a passive investor.

We do not believe that our anticipated principal activities will subject us to the Investment Company Act. To this end, the proceeds held in the trust account may only be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. Pursuant to the trust agreement, the trustee is not permitted to invest in other securities or assets. By restricting the investment of the proceeds to these instruments, and by having a business plan targeted at acquiring and growing businesses for the long term (rather than on buying and selling businesses in the manner of a merchant bank or private equity fund), we intend to avoid being deemed an "investment company" within the meaning of the Investment Company Act. This offering is not intended for persons who are seeking a return on investments in government securities or investment securities. The trust account is intended as a holding place for funds pending the earliest to occur of: (i) the completion of our primary business objective, which is a business combination; (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering; or (iii) absent a business combination, our return of the funds held in the trust account to our public stockholders as part of our redemption of the public shares. If we do not invest the proceeds as discussed above, we may be deemed to be subject to the Investment Company Act. If we were deemed to be subject to the Investment Company Act, compliance with these additional regulatory burdens would require additional expenses for which we have not allotted funds and may hinder our ability to complete a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

***Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations.***

We are subject to laws and regulations enacted by national, regional and local governments. In particular, we will be required to comply with certain SEC and other legal requirements. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming and costly. Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of

40

Table of Contents

operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business and results of operations.

***Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.***

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is our intention to redeem our public shares as soon as reasonably possible following the 24th month from the closing of this offering in the event we do not complete our business combination and, therefore, we do not intend to comply with the foregoing procedures.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the 10 years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***We may not hold an annual meeting of stockholders until after the consummation of our initial business combination, which could delay the opportunity for our stockholders to elect directors.***

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in

41

Table of Contents

compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

***We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis and potentially causing such warrants to expire worthless.***

We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed to use our best efforts to file a registration statement under the Securities Act covering such shares and maintain a current prospectus relating to the Class A common stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption from registration is available. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that we are unable to register or qualify the shares underlying the warrants under applicable state securities laws and there is no exemption available. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Class A common stock included in the units. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying shares of Class A common stock for sale under all applicable state securities laws.

***The grant of registration rights to our initial stockholders may make it more difficult to complete our initial business combination, and the future exercise of such rights may adversely affect the market price of our Class A common stock.***

Pursuant to an agreement to be entered into concurrently with the issuance and sale of the securities in this offering, our initial stockholders and their permitted transferees can demand that we register the private placement warrants and the shares of Class A common stock issuable upon exercise of the founder shares and the private placement warrants held by them and holders of warrants that may be issued upon conversion of working capital loans may demand that we register such warrants or the Class A common stock issuable upon exercise of such warrants. We will bear the cost of registering

42

Table of Contents

these securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of our Class A common stock. In addition, the existence of the registration rights may make our initial business combination more costly or difficult to conclude. This is because the stockholders of the target business may increase the equity stake they seek in the combined entity or ask for more cash consideration to offset the negative impact on the market price of our Class A common stock that is expected when the securities owned by our initial stockholders or holders of working capital loans or their respective permitted transferees are registered.

***Because we are not limited to a particular industry, sector or any specific target businesses with which to pursue our initial business combination, you will be unable to ascertain the merits or risks of any particular target business' operations.***

Although we expect to focus our search for a target business in the energy industry, we may seek to complete a business combination with an operating company in any industry or sector. However, we will not, under our amended and restated certificate of incorporation, be permitted to effectuate our business combination with another blank check company or similar company with nominal operations. Because we have not yet identified or approached any specific target business with respect to a business combination, there is no basis to evaluate the possible merits or risks of any particular target business's operations, results of operations, cash flows, liquidity, financial condition or prospects. To the extent we complete our business combination, we may be affected by numerous risks inherent in the business operations with which we combine. For example, if we combine with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all of the significant risk factors or that we will have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business. We also cannot assure you that an investment in our units will ultimately prove to be more favorable to investors than a direct investment, if such opportunity were available, in a business combination target. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Because we intend to seek a business combination with a target business in the energy industry, we expect our future operations to be subject to risks associated with this industry.***

We intend to focus our search for a target business in the energy industry. Riverstone has historically focused on four sectors in this industry, including exploration and production, midstream, energy services, and power and coal. Accordingly, we may pursue a target business in these sectors or any other sector within the energy industry. Because we have not yet identified or approached any specific target business or sector, we cannot provide specific risks of any business combination. However, risks inherent in investments in the energy industry include, but are not limited to, the following:

- Volatility of oil and natural gas prices;

- Price and availability of alternative fuels, such as solar, coal, nuclear and wind energy;

- Competitive pressures in the utility industry, primarily in wholesale markets, as a result of consumer demand, technological advances, greater availability of natural gas and other factors;

- Significant federal, state and local regulation, taxation and regulatory approval processes as well as changes in applicable laws and regulations;

43

Table of Contents

- The speculative nature of and high degree of risk involved in investments in the exploration and development sector, including relying on estimates of oil and gas reserves and the impacts of regulatory and tax changes;

- Drilling, exploration and development risks, including encountering unexpected formations or pressures, premature declines of reservoirs, blow-outs, equipment failures and other accidents, cratering, sour gas releases, uncontrollable flows of oil, natural gas or well fluids, adverse weather conditions, pollution, fires, spills and other environmental risks, any of which could lead to environmental damage, injury and loss of life or the destruction of property;

- Proximity and capacity of oil, natural gas and other transportation and support infrastructure to production facilities;

- Availability of key inputs, such as strategic consumables, raw materials and drilling and processing equipment;

- Changes in global supply and demand and prices for commodities;

- Impact of energy conservation efforts;

- Technological advances affecting energy production and consumption;

- Overall domestic and global economic conditions;

- Availability of, and potential disputes with, independent contractors;

- Natural disasters, terrorist acts and similar dislocations; and

- Value of U.S. dollar relative to the currencies of other countries.

***Past performance by Riverstone, including our management team, may not be indicative of future performance of an investment in the Company.***

Information regarding performance by, or businesses associated with, Riverstone and its affiliates is presented for informational purposes only. Past performance by Riverstone, including our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to locate a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management team's performance as indicative of our future performance of an investment in the company or the returns the company will, or is likely to, generate going forward.

***We may seek acquisition opportunities in industries or sectors which may or may not be outside of our management's area of expertise.***

We will consider a business combination outside of our management's area of expertise if a business combination candidate is presented to us and we determine that such candidate offers an attractive acquisition opportunity for our company. Although our management will endeavor to evaluate the risks inherent in any particular business combination candidate, we cannot assure you that we will adequately ascertain or assess all of the significant risk factors. We also cannot assure you that an investment in our units will not ultimately prove to be less favorable to investors in this offering than a direct investment, if an opportunity were available, in a business combination candidate. In the event we elect to pursue an acquisition outside of the areas of our management's expertise, our management's expertise may not be directly applicable to its evaluation or operation, and the information contained in this prospectus regarding the areas of our management's expertise would not be relevant to an understanding of the business that we elect to acquire. As a result, our management may not be able to adequately ascertain or assess all of the significant risk factors. Accordingly, any stockholders who choose to remain stockholders following our business combination could suffer a

44

Table of Contents

reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Although we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses, we may enter into our initial business combination with a target that does not meet such criteria and guidelines, and as a result, the target business with which we enter into our initial business combination may not have attributes entirely consistent with our general criteria and guidelines.***

Although we have identified general criteria and guidelines for evaluating prospective target businesses, it is possible that a target business with which we enter into our initial business combination will not have all of these positive attributes. If we complete our initial business combination with a target that does not meet some or all of these guidelines, such combination may not be as successful as a combination with a business that does meet all of our general criteria and guidelines. In addition, if we announce a prospective business combination with a target that does not meet our general criteria and guidelines, a greater number of stockholders may exercise their redemption rights, which may make it difficult for us to meet any closing condition with a target business that requires us to have a minimum net worth or a certain amount of cash. In addition, if stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, it may be more difficult for us to attain stockholder approval of our initial business combination if the target business does not meet our general criteria and guidelines. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

***We may seek acquisition opportunities with a financially unstable business or an entity lacking an established record of revenue or earnings, which could subject us to volatile revenues or earnings or difficulty in retaining key personnel.***

To the extent we complete our initial business combination with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by numerous risks inherent in the operations of the business with which we combine. These risks include volatile revenues or earnings and difficulties in obtaining and retaining key personnel. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not be able to properly ascertain or assess all of the significant risk factors and we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business.

***We are not required to obtain an opinion from an independent investment banking firm or from an independent accounting firm, and consequently, you may have no assurance from an independent source that the price we are paying for the business is fair to our company from a financial point of view.***

Unless we complete our business combination with an affiliated entity or our board cannot independently determine the fair market value of the target business or businesses, we are not required to obtain an opinion from an independent investment banking firm that is a member of FINRA or from an independent accounting firm that the price we are paying is fair to our company from a financial point of view. If no opinion is obtained, our stockholders will be relying on the judgment of our board of directors, who will determine fair market value based on standards generally accepted by the financial community. Such standards used will be disclosed in our tender offer documents or proxy solicitation materials, as applicable, related to our initial business combination.

45

Table of Contents

***We may issue additional common stock or preferred stock to complete our initial business combination or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon the conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. Any such issuances would dilute the interest of our stockholders and likely present other risks.***

Our amended and restated certificate of incorporation will authorize the issuance of up to 200,000,000 shares of Class A common stock, par value $0.0001 per share, 20,000,000 shares of Class B common stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. Immediately after this offering, there will be 140,000,000 and 10,000,000 (assuming, in each case, that the underwriters have not exercised their over-allotment option) authorized but unissued shares of Class A common stock and Class B common stock, respectively, available for issuance, which amount takes into account the shares of Class A common stock reserved for issuance upon exercise of outstanding warrants but not the shares of Class A common stock issuable upon conversion of Class B common stock, which amount is not currently determinable. Immediately after the consummation of this offering, there will be no shares of preferred stock issued and outstanding. Shares of Class B common stock are convertible into shares of our Class A common stock initially at a one-for-one ratio but subject to adjustment as set forth herein, including in certain circumstances in which we issue Class A common stock or equity-linked securities related to our initial business combination. Shares of Class B common stock are also convertible at the option of the holder at any time.

We may issue a substantial number of additional shares of common or preferred stock to complete our initial business combination (including pursuant to a specified future issuance) or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. However, our amended and restated certificate of incorporation will provide, among other things, that prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination. The issuance of additional shares of common or preferred stock:

- may significantly dilute the equity interest of investors in this offering;

- may subordinate the rights of holders of common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change of control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and

- may adversely affect prevailing market prices for our units, Class A common stock and/or warrants.

***Resources could be wasted in researching acquisitions that are not completed, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share, or less than such amount in certain circumstances, on the liquidation of our trust account and our warrants will expire worthless.***

We anticipate that the investigation of each specific target business and the negotiation, drafting and execution of relevant agreements, disclosure documents and other instruments will require

46

Table of Contents

substantial management time and attention and substantial costs for accountants, attorneys and others. If we decide not to complete a specific initial business combination, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to complete our initial business combination for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

*Our ability to successfully effect our initial business combination and to be successful thereafter will be totally dependent upon the efforts of our key personnel, some of whom may join us following our initial business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.*

Our ability to successfully effect our business combination is dependent upon the efforts of our key personnel. The role of our key personnel in the target business, however, cannot presently be ascertained. Although some of our key personnel may remain with the target business in senior management or advisory positions following our business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we engage after our initial business combination, we cannot assure you that our assessment of these individuals will prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

In addition, the officers and directors of an acquisition candidate may resign upon completion of our initial business combination. The departure of a business combination target's key personnel could negatively impact the operations and profitability of our post-combination business. The role of an acquisition candidate's key personnel upon the completion of our initial business combination cannot be ascertained at this time. Although we contemplate that certain members of an acquisition candidate's management team will remain associated with the acquisition candidate following our initial business combination, it is possible that members of the management of an acquisition candidate will not wish to remain in place. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.

*Our key personnel may negotiate employment or consulting agreements with a target business in connection with a particular business combination. These agreements may provide for them to receive compensation following our business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.*

Our key personnel may be able to remain with the company after the completion of our business combination only if they are able to negotiate employment or consulting agreements in connection with the business combination. Such negotiations would take place simultaneously with the negotiation of the business combination and could provide for such individuals to receive compensation in the form of cash payments and/or our securities for services they would render to us after the completion of the business combination. The personal and financial interests of such individuals may influence their motivation in identifying and selecting a target business. However, we believe the ability of such individuals to remain with us after the completion of our business combination will not be the determining factor in our decision as to whether or not we will proceed with any potential business combination. There is no certainty, however, that any of our key personnel will remain with us after the completion of our business combination. We cannot assure you that any of our key personnel will remain in senior management or advisory positions with us. The determination as to whether any of our key personnel will remain with us will be made at the time of our initial business combination.

47

Table of Contents

***We may have a limited ability to assess the management of a prospective target business and, as a result, may effect our initial business combination with a target business whose management may not have the skills, qualifications or abilities to manage a public company, which could, in turn, negatively impact the value of our stockholders' investment in us.***

When evaluating the desirability of effecting our initial business combination with a prospective target business, our ability to assess the target business's management may be limited due to a lack of time, resources or information. Our assessment of the capabilities of the target's management, therefore, may prove to be incorrect and such management may lack the skills, qualifications or abilities we suspected. Should the target's management not possess the skills, qualifications or abilities necessary to manage a public company, the operations and profitability of the post-combination business may be negatively impacted. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Our officers and directors will allocate their time to other businesses thereby causing conflicts of interest in their determination as to how much time to devote to our affairs. This conflict of interest could have a negative impact on our ability to complete our initial business combination.***

Our officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between our operations and our search for a business combination and their other businesses. We do not intend to have any full-time employees prior to the completion of our initial business combination. Each of our officers is engaged in several other business endeavors for which he may be entitled to substantial compensation and our officers are not obligated to contribute any specific number of hours per week to our affairs. In particular, certain of our officers and directors are employed by Riverstone, which is an investment manager to various private investment funds, which make investments in securities or other interests of or relating to companies in industries we may target for our initial business combination. Our independent directors also serve as officers or board members for other entities. If our officers' and directors' other business affairs require them to devote substantial amounts of time to such affairs in excess of their current commitment levels, it could limit their ability to devote time to our affairs which may have a negative impact on our ability to complete our initial business combination. For a complete discussion of our officers' and directors' other business affairs, please see the section of this prospectus entitled "Management—Directors and Officers."

***Certain of our officers and directors are now, and all of them may in the future become, affiliated with entities engaged in business activities similar to those intended to be conducted by us and, accordingly, may have conflicts of interest in allocating their time and determining to which entity a particular business opportunity should be presented.***

Following the completion of this offering and until we consummate our initial business combination, we intend to engage in the business of identifying and combining with one or more businesses. Our sponsor and officers and directors are, and may in the future become, affiliated with entities that are engaged in a similar business.

Our officers and directors also may become aware of business opportunities which may be appropriate for presentation to us and the other entities to which they owe certain fiduciary or contractual duties.

Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented. These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate

48

Table of Contents

opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

For a complete discussion of our officers' and directors' business affiliations and the potential conflicts of interest that you should be aware of, please see the sections of this prospectus entitled "Management—Directors and Officers," "Management—Conflicts of Interest" and "Certain Relationships and Related Party Transactions."

**_Our officers, directors, security holders and their respective affiliates may have competitive pecuniary interests that conflict with our interests._**

We have not adopted a policy that expressly prohibits our directors, officers, security holders or affiliates from having a direct or indirect pecuniary or financial interest in any investment to be acquired or disposed of by us or in any transaction to which we are a party or have an interest. In fact, we may enter into a business combination with a target business that is affiliated with our sponsor, our directors or officers, although we do not intend to do so, or we may acquire a target business through an Affiliated Joint Acquisition with one or more affiliates of Riverstone and/or one or more investors in funds managed by Riverstone. We do not have a policy that expressly prohibits any such persons from engaging for their own account in business activities of the types conducted by us. Accordingly, such persons or entities may have a conflict between their interests and ours.

In particular, Riverstone and its affiliates also are focused on investments in the energy industry. As a result, there may be substantial overlap between companies that would be a suitable business combination for us and companies that would make an attractive target for such other affiliates.

**_We may engage in a business combination with one or more target businesses that have relationships with entities that may be affiliated with our sponsor, officers, directors or existing holders which may raise potential conflicts of interest._**

In light of the involvement of our sponsor, officers and directors with other entities, we may decide to acquire one or more businesses affiliated with our sponsor, officers or directors. Our directors also serve as officers and board members for other entities, including, without limitation, those described under the section of this prospectus entitled "Management—Conflicts of Interest." Such entities may compete with us for business combination opportunities. Our sponsor, officers and directors are not currently aware of any specific opportunities for us to complete our business combination with any entities with which they are affiliated, and there have been no preliminary discussions concerning a business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for a business combination as set forth in the section of this prospectus entitled "Proposed Business—Selection of a Target Business and Structuring of our Initial Business Combination" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, regarding the fairness to our company from a financial point of view of a business combination with one or more domestic or international businesses affiliated with our officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest.

Moreover, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or

49

---

Table of Contents

we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties.

***Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination.***

On November 21, 2016, our sponsor acquired an aggregate of 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares after this offering. In          , our sponsor transferred          founder shares to each of our independent director nominees at their original purchase price. The founder shares will be worthless if we do not complete an initial business combination. In addition, our sponsor has committed to purchase an aggregate of 6,666,666 (or 7,466,666 if the underwriters' over-allotment option is exercised in full) private placement warrants, each exercisable for one share of our Class A common stock at $11.50 per share, for a purchase price of approximately $10,000,000 (or $11,200,000 if the underwriters' over-allotment option is exercised in full), or $1.50 per whole warrant, that will also be worthless if we do not complete a business combination. Holders of founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any founder shares in connection with a stockholder vote to approve a proposed initial business combination. In addition, we may obtain loans from our sponsor, affiliates of our sponsor or an officer or director. The personal and financial interests of our officers and directors may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

***We may issue notes or other debt securities, or otherwise incur substantial debt, to complete a business combination, which may adversely affect our leverage and financial condition and thus negatively impact the value of our stockholders' investment in us.***

Although we have no commitments as of the date of this prospectus to issue any notes or other debt securities, or to otherwise incur outstanding debt following this offering, we may choose to incur substantial debt to complete our business combination. We have agreed that we will not incur any indebtedness unless we have obtained from the lender a waiver of any right, title, interest or claim of any kind in or to the monies held in the trust account. As such, no issuance of debt will affect the per-share amount available for redemption from the trust account. Nevertheless, the incurrence of debt could have a variety of negative effects, including:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay

50

Table of Contents

expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other disadvantages compared to our competitors who have less debt.

***We may only be able to complete one business combination with the proceeds of this offering and the sale of the private placement warrants, which will cause us to be solely dependent on a single business which may have a limited number of products or services. This lack of diversification may negatively impact our operations and profitability.***

Of the net proceeds from this offering and the sale of the private placement warrants, $400,000,000 (or $460,000,000 if the underwriters' over-allotment option is exercised in full) will be available to complete our business combination and pay related fees and expenses (which includes up to approximately $14,000,000, or up to approximately $16,100,000 if the over-allotment option is exercised in full, for the payment of deferred underwriting commissions).

We may effectuate our business combination with a single target business or multiple target businesses simultaneously or within a short period of time. However, we may not be able to effectuate our business combination with more than one target business because of various factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By completing our initial business combination with only a single entity, our lack of diversification may subject us to numerous economic, competitive and regulatory developments. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities which may have the resources to complete several business combinations in different industries or different areas of a single industry. In addition, we intend to focus our search for an initial business combination in a single industry. Accordingly, the prospects for our success may be:

- solely dependent upon the performance of a single business, property or asset, or

- dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our business combination.

***We may attempt to simultaneously complete business combinations with multiple prospective targets, which may hinder our ability to complete our business combination and give rise to increased costs and risks that could negatively impact our operations and profitability.***

If we determine to simultaneously acquire several businesses that are owned by different sellers, we will need for each of such sellers to agree that our purchase of its business is contingent on the simultaneous closings of the other business combinations, which may make it more difficult for us, and delay our ability, to complete our initial business combination. With multiple business combinations, we could also face additional risks, including additional burdens and costs with respect to possible multiple

51

Table of Contents

negotiations and due diligence investigations (if there are multiple sellers) and the additional risks associated with the subsequent assimilation of the operations and services or products of the acquired companies in a single operating business. If we are unable to adequately address these risks, it could negatively impact our profitability and results of operations.

***We may attempt to complete our initial business combination with a private company about which little information is available, which may result in a business combination with a company that is not as profitable as we suspected, if at all.***

In pursuing our acquisition strategy, we may seek to effectuate our initial business combination with a privately held company. Very little public information generally exists about private companies, and we could be required to make our decision on whether to pursue a potential initial business combination on the basis of limited information, which may result in a business combination with a company that is not as profitable as we suspected, if at all.

***Our management may not be able to maintain control of a target business after our initial business combination.***

We may structure a business combination so that the post-transaction company in which our public stockholders own shares will own less than 100% of the equity interests or assets of a target business, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for us not to be required to register as an investment company under the Investment Company Act. We will not consider any transaction that does not meet such criteria. Even if the post-transaction company owns 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares of Class A common stock in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% interest in the target. However, as a result of the issuance of a substantial number of new shares of common stock, our stockholders immediately prior to such transaction could own less than a majority of our outstanding shares of common stock subsequent to such transaction. In addition, other minority stockholders may subsequently combine their holdings resulting in a single person or group obtaining a larger share of the company's stock than we initially acquired. Accordingly, this may make it more likely that our management will not be able to maintain our control of the target business. We cannot provide assurance that, upon loss of control of a target business, new management will possess the skills, qualifications or abilities necessary to profitably operate such business.

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a business combination with which a substantial majority of our stockholders do not agree.***

Our amended and restated certificate of incorporation will not provide a specified maximum redemption threshold, except that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (such that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. As a result, we may be able to complete our business combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or, if we seek stockholder approval of our initial business combination and do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, have entered into privately negotiated agreements to

52

Table of Contents

sell their shares to our sponsor, officers, directors, advisors or their affiliates. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, all shares of Class A common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***The exercise price for the public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the warrants are more likely to expire worthless.***

The exercise price of the public warrants is higher than is typical in many similar blank check companies in the past. Historically, the exercise price of a warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share. As a result, the warrants are less likely to ever be in the money and more likely to expire worthless.

***In order to effectuate our initial business combination, we may seek to amend our amended and restated certificate of incorporation or governing instruments in a manner that will make it easier for us to complete our initial business combination but that our stockholders may not support.***

In order to effectuate a business combination, blank check companies have, in the recent past, amended various provisions of their charters and modified governing instruments. For example, blank check companies have amended the definition of business combination, increased redemption thresholds and changed industry focus. We cannot assure you that we will not seek to amend our charter or governing instruments or change our industry focus in order to effectuate our initial business combination.

***The provisions of our amended and restated certificate of incorporation that relate to our pre-business combination activity (and corresponding provisions of the agreement governing the release of funds from our trust account) may be amended with the approval of holders of 65% of our common stock, which is a lower amendment threshold than that of some other blank check companies. It may be easier for us, therefore, to amend our amended and restated certificate of incorporation and the trust agreement to facilitate the completion of an initial business combination that some of our stockholders may not support.***

Some other blank check companies have a provision in their charter which prohibits the amendment of certain of its provisions, including those which relate to a company's pre-business combination activity, without approval by a certain percentage of the company's stockholders. In those companies, amendment of these provisions requires approval by between 90% and 100% of the company's public stockholders. Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the DGCL or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own up to 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will

53

Table of Contents

have the discretion to vote in any manner they choose. As a result, we may be able to amend the provisions of our amended and restated certificate of incorporation which govern our pre-business combination behavior more easily than some other blank check companies, and this may increase our ability to complete a business combination with which you do not agree. Our stockholders may pursue remedies against us for any breach of our amended and restated certificate of incorporation.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, divided by the number of then outstanding public shares. These agreements are contained in a letter agreement that we have entered into with our sponsor, officers and directors. Our stockholders are not parties to, or third-party beneficiaries of, these agreements and, as a result, will not have the ability to pursue remedies against our sponsor, officers or directors for any breach of these agreements. As a result, in the event of a breach, our stockholders would need to pursue a stockholder derivative action, subject to applicable law.

***We may be unable to obtain additional financing to complete our initial business combination or to fund the operations and growth of a target business, which could compel us to restructure or abandon a particular business combination.***

Although we believe that the net proceeds of this offering and the sale of the private placement warrants will be sufficient to allow us to complete our initial business combination, because we have not yet identified any prospective target business we cannot ascertain the capital requirements for any particular transaction. If the net proceeds of this offering and the sale of the private placement warrants prove to be insufficient, either because of the size of our initial business combination, the depletion of the available net proceeds in search of a target business, the obligation to repurchase for cash a significant number of shares from stockholders who elect redemption in connection with our initial business combination or the terms of negotiated transactions to purchase shares in connection with our initial business combination, we may be required to seek additional financing or to abandon the proposed business combination. We cannot assure you that such financing will be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to complete our initial business combination, we would be compelled to either restructure the transaction or abandon that particular business combination and seek an alternative target business candidate. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share plus any pro rata interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes on the liquidation of our trust account and our warrants will expire worthless. In addition, even if we do not need additional financing to complete our business combination, we may require such financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the target business. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after our initial business combination. If we are unable to complete our initial business combination, our public stockholders may only receive approximately $10.00 per share on the liquidation of our trust account, and our warrants will expire worthless.

54

Table of Contents

*Our initial stockholders may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.*

Upon the closing of this offering, our initial stockholders will own shares representing 20% of our issued and outstanding shares of common stock (assuming they do not purchase any units in this offering). Accordingly, they may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support, including amendments to our amended and restated certificate of incorporation and approval of major corporate transactions. If our initial stockholders purchase any units in this offering or if our initial stockholders purchase any additional shares of common stock in the aftermarket or in privately negotiated transactions, this would increase their control. Factors that would be considered in making such additional purchases would include consideration of the current trading price of our Class A common stock. In addition, our board of directors, whose members were elected by our initial stockholders, is and will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. We may not hold an annual meeting of stockholders to elect new directors prior to the completion of our business combination, in which case all of the current directors will continue in office until at least the completion of the business combination. If there is an annual meeting, as a consequence of our "staggered" board of directors, only a minority of the board of directors will be considered for election and our initial stockholders, because of their ownership position, will have considerable influence regarding the outcome. Accordingly, our initial stockholders will continue to exert control at least until the completion of our business combination.

*Our sponsor contributed an aggregate of $25,000, or approximately $0.002 per founder share, and, accordingly, you will experience immediate and substantial dilution from the purchase of our Class B common stock.*

The difference between the public offering price per share (allocating all of the unit purchase price to the Class A common stock and none to the warrant included in the unit) and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to you and the other investors in this offering. Our sponsor acquired the founder shares at a nominal price, significantly contributing to this dilution. Upon the closing of this offering, and assuming no value is ascribed to the warrants included in the units, you and the other public stockholders will incur an immediate and substantial dilution of approximately 95.8% (or $9.58 per share, assuming no exercise of the underwriters' over-allotment option), the difference between the pro forma net tangible book value per share of $0.42 and the initial offering price of $10.00 per unit. In addition, because of the anti-dilution rights of the founder shares, any equity or equity-linked securities issued in connection with our initial business combination would be disproportionately dilutive to our Class A common stock.

*We may amend the terms of the warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of shares of our Class A common stock purchasable upon exercise of a warrant could be decreased, all without your approval.*

Our warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the

55

Table of Contents

then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of shares of our Class A common stock purchasable upon exercise of a warrant.

***We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of such redemption and provided certain other conditions are met. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you (i) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

***Our warrants and founder shares may have an adverse effect on the market price of our Class A common stock and make it more difficult to effectuate our business combination.***

We will be issuing warrants to purchase 13,333,333 shares of our Class A common stock (or up to 15,333,333 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) as part of the units offered by this prospectus and, simultaneously with the closing of this offering, we will be issuing in a private placement warrants to purchase an aggregate of 6,666,666 (or up to 7,466,666 if the underwriters' over-allotment option is exercised in full) shares of Class A common stock at $11.50 per share. Prior to this offering, our sponsor purchased an aggregate of 11,500,000 founder shares in a private placement. The founder shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment as set forth herein. In addition, if our sponsor makes any working capital loans, up to $1,500,000 of such loans may be converted into warrants, at the price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

To the extent we issue shares of Class A common stock to effectuate a business combination, the potential for the issuance of a substantial number of additional shares of Class A common stock upon exercise of these warrants and conversion rights could make us a less attractive acquisition vehicle to a target business. Any such issuance will increase the number of issued and outstanding shares of our Class A common stock and reduce the value of the shares of Class A common stock issued to complete the business combination. Therefore, our warrants and founder shares may make it more difficult to effectuate a business combination or increase the cost of acquiring the target business.

The private placement warrants are identical to the warrants sold as part of the units in this offering except that, so long as they are held by our sponsor or its permitted transferees, (i) they will not be redeemable by us, (ii) they (including the Class A common stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by our sponsor until 30 days after the completion of our initial business combination and (iii) they may be exercised by the holders on a cashless basis.

56

Table of Contents

***Because each unit contains one-third of one warrant and only a whole warrant may be exercised, the units may be worth less than units of other blank check companies.***

Each unit contains one-third of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. This is different from other offerings similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of a business combination since the warrants will be exercisable in the aggregate for one third of the number of shares compared to units that each contain a warrant to purchase one whole share, thus making us, we believe, a more attractive merger partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

***The determination of the offering price of our units and the size of this offering is more arbitrary than the pricing of securities and size of an offering of an operating company in a particular industry. You may have less assurance, therefore, that the offering price of our units properly reflects the value of such units than you would have in a typical offering of an operating company.***

Prior to this offering there has been no public market for any of our securities. The public offering price of the units and the terms of the warrants were negotiated between us and the underwriters. In determining the size of this offering, management held customary organizational meetings with representatives of the underwriters, both prior to our inception and thereafter, with respect to the state of capital markets, generally, and the amount the underwriters believed they reasonably could raise on our behalf. Factors considered in determining the size of this offering, prices and terms of the units, including the Class A common stock and warrants underlying the units, include:

- the history and prospects of companies whose principal business is the acquisition of other companies;

- prior offerings of those companies;

- our prospects for acquiring an operating business;

- a review of debt to equity ratios in leveraged transactions;

- our capital structure;

- an assessment of our management and their experience in identifying operating companies;

- general conditions of the securities markets at the time of this offering; and

- other factors as were deemed relevant.

Although these factors were considered, the determination of our offering price is more arbitrary than the pricing of securities of an operating company in a particular industry since we have no historical operations or financial results.

***There is currently no market for our securities and a market for our securities may not develop, which would adversely affect the liquidity and price of our securities.***

There is currently no market for our securities. Stockholders therefore have no access to information about prior market history on which to base their investment decision. Following this offering, the price of our securities may vary significantly due to one or more potential business combinations and general market or economic conditions. Furthermore, an active trading market for our securities may never develop or, if developed, it may not be sustained. You may be unable to sell your securities unless a market can be established and sustained.

57

Table of Contents

***Because we must furnish our stockholders with target business financial statements, we may lose the ability to complete an otherwise advantageous initial business combination with some prospective target businesses.***

The federal proxy rules require that a proxy statement with respect to a vote on a business combination meeting certain financial significance tests include target historical and/or pro forma financial statement disclosure in periodic reports. We will include the same financial statement disclosure in connection with our tender offer documents, whether or not they are required under the tender offer rules. These financial statements may be required to be prepared in accordance with, or be reconciled to, accounting principles generally accepted in the United States of America, or GAAP, or international financing reporting standards, or IFRS, depending on the circumstances and the historical financial statements may be required to be audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), or PCAOB. These financial statement requirements may limit the pool of potential target businesses we may acquire because some targets may be unable to provide such financial statements in time for us to disclose such financial statements in accordance with federal proxy rules and complete our initial business combination within the prescribed time frame.

***We are an emerging growth company within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if the market value of our Class A common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended

58

Table of Contents

transition period difficult or impossible because of the potential differences in accountant standards used.

***Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate our initial business combination, require substantial financial and management resources, and increase the time and costs of completing an acquisition.***

Section 404 of the Sarbanes-Oxley Act requires that we evaluate and report on our system of internal controls beginning with our Annual Report on Form 10-K for the year ending December 31, 2018. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. Further, for as long as we remain an emerging growth company, we will not be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because a target company with which we seek to complete our business combination may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of its internal controls. The development of the internal control of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

***Provisions in our amended and restated certificate of incorporation and Delaware law may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our Class A common stock and could entrench management.***

Our amended and restated certificate of incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. These provisions include a staggered board of directors and the ability of the board of directors to designate the terms of and issue new series of preferred shares, which may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

***If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to a variety of additional risks that may negatively impact our operations.***

If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to any special considerations or risks associated with companies operating in an international setting, including any of the following:

- higher costs and difficulties inherent in managing cross-border business operations and complying with different commercial and legal requirements of overseas markets;

- rules and regulations regarding currency redemption;

- complex corporate withholding taxes on individuals;

- laws governing the manner in which future business combinations may be effected;

- tariffs and trade barriers;

- regulations related to customs and import/export matters;

59

Table of Contents

- longer payment cycles and challenges in collecting accounts receivable;

- tax issues, such as tax law changes and variations in tax laws as compared to the United States;

- currency fluctuations and exchange controls;

- rates of inflation;

- cultural and language differences;

- employment regulations;

- crime, strikes, riots, civil disturbances, terrorist attacks, natural disasters and wars;

- deterioration of political relations with the United States; and

- government appropriations of assets.

We may not be able to adequately address these additional risks. If we were unable to do so, our operations might suffer, which may adversely impact our results of operations and financial condition.

60

---

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this prospectus may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to select an appropriate target business or businesses;

- our ability to complete our initial business combination;

- our expectations around the performance of the prospective target business or businesses;

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;

- our officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;

- our potential ability to obtain additional financing to complete our initial business combination;

- our pool of prospective target businesses;

- the ability of our officers and directors to generate a number of potential acquisition opportunities;

- our public securities' potential liquidity and trading;

- the lack of a market for our securities;

- the use of proceeds not held in the trust account or available to us from interest income on the trust account balance; or

- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section of this prospectus entitled "Risk Factors." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

61

Table of Contents

## USE OF PROCEEDS

We are offering 40,000,000 units at an offering price of $10.00 per unit. We estimate that the net proceeds of this offering together with the funds we will receive from the sale of the private placement warrants will be used as set forth in the following table.

| | Without Over-Allotment Option | | Over-Allotment Option Fully Exercised | |
|---|---|---|---|---|
| ***Gross proceeds*** | | | | |
| Gross proceeds from units offered to public(1) | $ | 400,000,000 | $ | 460,000,000 |
| Gross proceeds from private placement warrants offered in the private placement | | 10,000,000 | | 11,200,000 |
| Total gross proceeds | $ | 410,000,000 | $ | 471,200,000 |
| ***Offering expenses(2)*** | | | | |
| Underwriting commissions (2% of gross proceeds from units offered to public, excluding deferred portion)(3) | $ | 8,000,000 | $ | 9,200,000 |
| Legal fees and expenses | | 350,000 | | 350,000 |
| Accounting fees and expenses | | 47,500 | | 47,500 |
| SEC/FINRA Expenses | | 122,814 | | 122,814 |
| Travel and road show | | 20,000 | | 20,000 |
| NASDAQ listing and filing fees | | 75,000 | | 75,000 |
| Director and Officer liability insurance premiums | | 175,000 | | 175,000 |
| Printing and engraving expenses | | 75,000 | | 75,000 |
| Miscellaneous | | 34,686 | | 34,686 |
| Total offering expenses (excluding underwriting commissions) | $ | 900,000 | $ | 900,000 |
| Proceeds after offering expenses | $ | 401,100,000 | $ | 461,100,000 |
| Held in trust account(3) | $ | 400,000,000 | $ | 460,000,000 |
| % of public offering size | | 100% | | 100% |
| Not held in trust account | $ | 1,100,000 | $ | 1,100,000 |

62

Table of Contents

The following table shows the use of the approximately $1,100,000 of net proceeds not held in the trust account.(4)

| | Amount | | % of Total |
|---|---|---|---|
| Legal, accounting, due diligence, travel, and other expenses in connection with any business combination(5) | $ | 350,000 $ | 31.8% |
| Legal and accounting fees related to regulatory reporting obligations | | 150,000 | 13.6% |
| Payment for office space, utilities and secretarial and administrative support ($10,000 per month for up to 24 months) | | 240,000 | 21.8% |
| Consulting, travel and miscellaneous expenses incurred during search for initial business combination target | | 150,000 | 13.6% |
| Reserve for liquidation | | 100,000 | 9.1% |
| Working capital to cover miscellaneous expenses (including franchise taxes net of anticipated interest income) | | 110,000 | 10.0% |
| Total | $ | 1,100,000 | 100.0% |

(1)    Includes amounts payable to public stockholders who properly redeem their shares in connection with our successful completion of our initial business combination.

(2)    A portion of the offering expenses will be paid from the proceeds of a loan from our sponsor of $300,000 as described in this prospectus. This amount will be repaid upon completion of this offering out of the $2,000,000 of offering proceeds that has been allocated for the payment of offering expenses (other than underwriting commissions) and amounts not to be held in the trust account. In the event that offering expenses are less than set forth in this table, any such amounts will be used for post-closing working capital expenses. In the event that the offering expenses are more than as set forth in this table, we may fund such excess with funds not held in the trust account.

(3)    The underwriters have agreed to defer underwriting commissions equal to 3.5% of the gross proceeds of this offering. Upon completion of our initial business combination, $14,000,000, which constitutes the underwriters' deferred commissions (or $16,100,000 if the underwriters' over-allotment option is exercised in full) will be paid to the underwriters from the funds held in the trust account, and the remaining funds will be released to us and can be used to pay all or a portion of the purchase price of the business or businesses with which our initial business combination occurs or for general corporate purposes, including payment of principal or interest on indebtedness incurred in connection with our initial business combination, to fund the purchases of other companies or for working capital. The underwriters will not be entitled to any interest accrued on the deferred underwriting discounts and commissions.

(4)    These expenses are estimates only. Our actual expenditures for some or all of these items may differ from the estimates set forth herein. For example, we may incur greater legal and accounting expenses than our current estimates in connection with negotiating and structuring our business combination based upon the level of complexity of such business combination. In the event we identify a business combination target in a specific industry subject to specific regulations, we may incur additional expenses associated with legal due diligence and the engagement of special legal counsel. In addition, our staffing needs may vary and as a result, we may engage a number of consultants to assist with legal and financial due diligence. We do not anticipate any change in our intended use of proceeds,

63

Table of Contents

other than fluctuations among the current categories of allocated expenses, which fluctuations, to the extent they exceed current estimates for any specific category of expenses, would not be available for our expenses.

(5)    Includes estimated amounts that may also be used in connection with our business combination to fund a "no shop" provision and commitment fees for financing.

The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $400,000,000 (or $460,000,000 if the underwriters' over-allotment option is exercised in full), including $14,000,000 (or $16,100,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions, will be placed in a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We estimate that the interest earned on the trust account will be approximately $80,000 per year, assuming an interest rate of 0.02% per year. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. Based on current interest rates, we do not expect that the interest earned on the trust account, net of income taxes, will be sufficient to pay Delaware franchise taxes.

The net proceeds held in the trust account may be used as consideration to pay the sellers of a target business with which we ultimately complete our business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination, we may apply the balance of the cash released from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We believe that amounts not held in trust will be sufficient to pay the costs and expenses to which such proceeds are allocated. This belief is based on the fact that while we may begin preliminary due diligence of a target business in connection with an indication of interest, we intend to undertake in-depth due diligence, depending on the circumstances of the relevant prospective acquisition, only after we have negotiated and signed a letter of intent or other preliminary agreement that addresses the terms of a business combination. However, if our estimate of the costs of undertaking in-depth due diligence and negotiating a business combination is less than the actual amount necessary to do so, we may be required to raise additional capital, the amount, availability and cost of which is currently unascertainable. If we are required to seek additional capital, we could seek such additional capital through loans or additional investments from our sponsor, members of our management team or their affiliates, but such persons are not under any obligation to advance funds to, or invest in, us.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon

64

Table of Contents

completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts out of the proceeds of the trust account released to us. Otherwise, such loans would be repaid only out of funds held outside the trust account. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used to repay such loaned amounts. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

We may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) and the agreement for our business combination may require as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares or the business combination, and instead may search for an alternate business combination.

A public stockholder will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete our business combination within 24 months following the closing of this offering, subject to applicable law and as further described herein and any limitations (including but not limited to cash requirements) created by

65

Table of Contents

the terms of the proposed business combination. In no other circumstances will a public stockholder have any right or interest of any kind to or in the trust account.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. In addition, our initial stockholders have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within the prescribed time frame. However, if our sponsor or any of our officers, directors or affiliates acquires public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the prescribed time frame.

66

Table of Contents

## DIVIDEND POLICY

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of our initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our initial business combination. The payment of any cash dividends subsequent to our initial business combination will be within the discretion of our board of directors at such time. In addition, our board of directors is not currently contemplating and does not anticipate declaring any stock dividends in the foreseeable future. However, if we increase the size of the offering, we will effect a stock dividend with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of the issued and outstanding shares of our common stock upon the consummation of this offering. Further, if we incur any indebtedness in connection with our business combination, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

67

Table of Contents

# DILUTION

The difference between the public offering price per share of Class A common stock, assuming no value is attributed to the warrants included in the units we are offering pursuant to this prospectus or the private placement warrants, and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to investors in this offering. Such calculation does not reflect any dilution associated with the sale and exercise of warrants, including the private placement warrants, which would cause the actual dilution to the public stockholders to be higher, particularly where a cashless exercise is utilized. Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities (including the value of Class A common stock which may be redeemed for cash), by the number of outstanding shares of our Class A common stock.

At November 21, 2016, our net tangible book value was $(23,000), or approximately $(0.00) per share of common stock. After giving effect to the sale of 40,000,000 shares of Class A common stock included in the units we are offering by this prospectus, the sale of the private placement warrants and the deduction of underwriting commissions and estimated expenses of this offering, our pro forma net tangible book value at November 21, 2016 would have been $5,000,010, or approximately $0.42 per share, representing an immediate increase in net tangible book value (as decreased by the value of the approximately 38,212,299 shares of Class A common stock that may be redeemed for cash and assuming no exercise of the underwriters' over-allotment option) of $9.58 per share to our initial stockholders as of the date of this prospectus and an immediate dilution of $10.00 per share or 100% to our public stockholders not exercising their redemption rights. Total dilution to public stockholders from this offering will be $9.58 per share. The dilution to new investors if the underwriters exercise the over-allotment option in full would be an immediate dilution of $9.63 per share or 96.3%.

The following table illustrates the dilution to the public stockholders on a per-share basis, assuming no value is attributed to the warrants included in the units or the private placement warrants:

| | | | | |
|---|---|---|---|---|
| Public offering price | | | $ | 10.00 |
| Net tangible book value before this offering | $ | (0.00) | | |
| Increase attributable to public stockholders | | 9.58 | | |
| Decrease attributable to public shares subject to redemption | | (10.00) | | |
| Pro forma net tangible book value after this offering and the sale of the private placement warrants | | | $ | 0.42 |
| Dilution to public stockholders | | | $ | 9.58 |

For purposes of presentation, we have reduced our pro forma net tangible book value after this offering (assuming no exercise of the underwriters' over-allotment option) by $382,122,990 because holders of up to approximately 95.5% of our public shares may redeem their shares for a pro rata share of the aggregate amount then on deposit in the trust account at a per share redemption price equal to the amount in the trust account as set forth in our tender offer or proxy materials (initially anticipated to be the aggregate amount held in trust two days prior to the commencement of our tender offer or stockholders meeting, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes), divided by the number of shares of Class A common stock sold in this offering.

68

Table of Contents

The following table sets forth information with respect to our initial stockholders and the public stockholders:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percentage | Amount | Percentage | |
| Initial Stockholders(1) | 10,000,000 | 20.0% | $ 25,000 | 0.006% | $ 0.002 |
| Public Stockholders | 40,000,000 | 80.0% | 400,000,000 | 99.9% | $ 10.00 |
| | 50,000,000 | 100.0% | $ 400,025,000 | 100.0% | |

(1)     Assumes no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 1,500,000 shares of Class B common stock held by our sponsor.

The pro forma net tangible book value per share after the offering is calculated as follows:

| | | |
|---|---|---|
| Numerator: | | |
| Net tangible book value before this offering | $ | (23,000) |
| Proceeds from this offering and the sale of the private placement warrants, net of expenses | | 401,100,000 |
| Offering costs excluded from net tangible book value before this offering | | 46,000 |
| Less: deferred underwriters' commissions payable | | (14,000,000) |
| Less: amount of Class A common stock subject to redemption to maintain net tangible assets of $5,000,001 | | 382,122,990 |
| | $ | 5,000,010 |
| | | |
| Denominator: | | |
| Shares of Class B common stock outstanding prior to this offering | $ | 11,500,000 |
| Shares of Class B common stock forfeited if over-allotment is not exercised | | (1,500,000) |
| Shares of Class A common stock included in the units offered | | 40,000,000 |
| Less: shares of Class A common stock subject to redemption | | (38,212,299) |
| | $ | 11,787,701 |

69

Table of Contents

# CAPITALIZATION

The following table sets forth our capitalization at November 21, 2016, and as adjusted to give effect to the sale of our units and the private placement warrants and the application of the estimated net proceeds derived from the sale of such securities:

| | November 21, 2016 | |
| | Actual | As Adjusted(1) |
|---|---|---|
| Deferred underwriting commissions | $ — | $ 14,000,000 |
| Class A common stock, subject to redemption(2) | — | 382,122,990 |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.0001 par value, 1,000,000 shares authorized (actual and as adjusted); none issued or outstanding (actual and as adjusted) | — | — |
| Common stock | | |
| Class A common stock, $0.0001 par value, 200,000,000 shares authorized (actual and as adjusted); no shares issued and outstanding (actual); 1,787,701 shares issued and outstanding (excluding 38,212,299 shares subject to redemption) (as adjusted) | — | 179 |
| Class B common stock, $0.0001 par value, 20,000,000 shares authorized (actual and as adjusted); 11,500,000 shares issued and outstanding (actual); 10,000,000 shares issued and outstanding (as adjusted)(3) | 1,150 | 1,000 |
| Additional paid-in capital | 23,850 | 5,000,831 |
| Accumulated deficit | (2,000) | (2,000) |
| Total stockholders' equity | 23,000 | 5,000,010 |
| Total capitalization(4) | 23,000 | 401,123,000 |

(1) Assumes the over-allotment option has not been exercised and the resulting forfeiture of 1,500,000 founder shares held by our sponsor has occurred.

(2) Upon the completion of our initial business combination, we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, subject to the limitations described herein whereby our net tangible assets will be maintained at a minimum of $5,000,010 and any limitations (including, but not limited to, cash requirements) created by the terms of the proposed business combination.

(3) Actual share amount is prior to any forfeiture of founder shares by our sponsor and as adjusted amount assumes no exercise of the underwriters' over-allotment option.

(4) Subsequent to November 21, 2016, our sponsor loaned us $300,000 to be used for a portion of the expenses of this offering. This amount will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

70

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Overview**

We are a blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions directly or indirectly, with respect to identifying any business combination target. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placement of the private placement warrants, our capital stock, debt or a combination of cash, stock and debt.

The issuance of additional shares of our stock in a business combination:

- may significantly dilute the equity interest of investors in this offering, which dilution would increase if the anti-dilution provisions in the Class B common stock resulted in the issuance of Class A shares on a greater than one-to-one basis upon conversion of the Class B common stock;

- may subordinate the rights of holders of our common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change in control if a substantial number of shares of our common stock is issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;

- may have the effect of delaying or preventing a change of control of us by diluting the stock ownership or voting rights of a person seeking to obtain control of us; and

- may adversely affect prevailing market prices for our Class A common stock and/or warrants.

Similarly, if we issue debt securities, it could result in:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

71

Table of Contents

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other purposes and other disadvantages compared to our competitors who have less debt.

As indicated in the accompanying financial statements, at November 21, 2016, we had deferred offering costs of $46,000. Further, we expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to raise capital or to complete our initial business combination will be successful.

**Results of Operations and Known Trends or Future Events**

We have neither engaged in any operations nor generated any revenues to date. Our only activities since inception have been organizational activities and those necessary to prepare for this offering. Following this offering, we will not generate any operating revenues until after completion of our initial business combination. We will generate non-operating income in the form of interest income on cash and cash equivalents after this offering. There has been no significant change in our financial or trading position and no material adverse change has occurred since the date of our audited financial statements. After this offering, we expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses. We expect our expenses to increase substantially after the closing of this offering.

**Liquidity and Capital Resources**

Our liquidity needs have been satisfied prior to the completion of this offering through a capital contribution of our sponsor of $25,000 for the founder shares and a loan to us of $300,000 by our sponsor under an unsecured promissory note. We estimate that the net proceeds from (i) the sale of the units in this offering, after deducting offering expenses of approximately $900,000, underwriting commissions of $8,000,000 ($9,200,000 if the underwriters' over-allotment option is exercised in full) (excluding deferred underwriting commissions of $14,000,000 (or $16,100,000 if the underwriters' over-allotment option is exercised in full)), and (ii) the sale of the private placement warrants for a purchase price of $10,000,000 (or $11,200,000 if the over-allotment option is exercised in full), will be $401,100,000 (or $461,100,000 if the underwriters' over-allotment option is exercised in full). Of this amount, $400,000,000 (or $460,000,000 if the underwriters' over-allotment option is exercised in full) will be held in the trust account, which includes $14,000,000 (or $16,100,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions. The remaining approximately $1,100,000 will not be held in the trust account. In the event that our offering expenses exceed our estimate of $900,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $900,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less deferred underwriting commissions) to complete our initial business combination. We may withdraw interest to pay franchise and income taxes. We estimate our annual franchise tax obligations, based on the number of shares of our common stock authorized and outstanding after the completion of this offering, to be $180,000, which is the maximum amount of annual franchise taxes payable by us as a Delaware corporation per annum. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the trust account. Based on current interest rates, we do not expect that the interest earned on

72

Table of Contents

the trust account, net of income taxes, will be sufficient to pay Delaware franchise taxes. To the extent that our capital stock or debt is used, in whole or in part, as consideration to complete our initial business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the target business or businesses, make other acquisitions and pursue our growth strategies.

Prior to the completion of our initial business combination, we will have available to us the approximately $1,100,000 of proceeds held outside the trust account. We will use these funds to identify and evaluate target businesses, perform business due diligence on prospective target businesses, travel to and from the offices, plants or similar locations of prospective target businesses or their representatives or owners, review corporate documents and material agreements of prospective target businesses, and structure, negotiate and complete a business combination.

In order to fund working capital deficiencies or finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We expect our primary liquidity requirements during that period to include approximately $350,000 for legal, accounting, due diligence, travel and other expenses associated with structuring, negotiating and documenting successful business combinations; $150,000 for legal and accounting fees related to regulatory reporting requirements; $240,000 for office space, utilities and secretarial and administrative support; $150,000 for consulting, travel and miscellaneous expenses incurred during the search for a business combination target; $100,000 reserved for liquidation; and approximately $110,000 for working capital that will be used for miscellaneous expenses and reserves (including franchise taxes net of anticipated interest income).

These amounts are estimates and may differ materially from our actual expenses. In addition, we could use a portion of the funds not being placed in trust to pay commitment fees for financing, fees to consultants to assist us with our search for a target business or as a down payment or to fund a "no-shop" provision (a provision designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into an agreement where we paid for the right to receive exclusivity from a target business, the amount that would be used as a down payment or to fund a "no-shop" provision would be determined based on the terms of the specific business combination and the amount of our available funds at the time. Our forfeiture of such funds (whether as a result of our breach or otherwise) could result in our not having sufficient funds to continue searching for, or conducting due diligence with respect to, prospective target businesses.

73

Table of Contents

We do not believe we will need to raise additional funds following this offering in order to meet the expenditures required for operating our business. However, if our estimates of the costs of identifying a target business, undertaking in-depth due diligence and negotiating an initial business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our business combination. Moreover, we may need to obtain additional financing either to complete our business combination or because we become obligated to redeem a significant number of our public shares upon completion of our business combination, in which case we may issue additional securities or incur debt in connection with such business combination, which may include a specified future issuance. Subject to compliance with applicable securities laws, we would only complete such financing simultaneously with the completion of our business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. In addition, following our initial business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

**Controls and Procedures**

We are not currently required to maintain an effective system of internal controls as defined by Section 404 of the Sarbanes-Oxley Act. We will be required to comply with the internal control requirements of the Sarbanes-Oxley Act for the fiscal year ending December 31, 2018. Only in the event that we are deemed to be a large accelerated filer or an accelerated filer would we be required to comply with the independent registered public accounting firm attestation requirement. Further, for as long as we remain an emerging growth company as defined in the JOBS Act, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirement.

Prior to the closing of this offering, we have not completed an assessment, nor have our auditors tested our systems, of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;

- reconciliation of accounts;

- proper recording of expenses and liabilities in the period to which they relate;

- evidence of internal review and approval of accounting transactions;

- documentation of processes, assumptions and conclusions underlying significant estimates; and

- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively may also take longer than we expect, thus increasing our exposure to financial fraud or erroneous financing reporting.

74

Table of Contents

Once our management's report on internal controls is complete, we will retain our independent auditors to audit and render an opinion on such report when required by Section 404 of the Sarbanes-Oxley Act. The independent auditors may identify additional issues concerning a target business's internal controls while performing their audit of internal control over financial reporting.

**Quantitative and Qualitative Disclosures about Market Risk**

The net proceeds of this offering and the sale of the private placement warrants held in the trust account will be invested in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

**Related Party Transactions**

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. In            , our sponsor transferred            founder shares to each of our independent director nominees at their original purchase price. If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise

75

Table of Contents

price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

Our sponsor has committed to purchase an aggregate of 6,666,666 private placement warrants (or 7,466,666 if the underwriters' over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $10,000,000 in the aggregate or $11,200,000 if the underwriters' over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. Our sponsor will be permitted to transfer the private placement warrants held by it to certain permitted transferees, including our officers and directors and other persons or entities affiliated with or related to it, but the transferees receiving such securities will be subject to the same agreements with respect to such securities as the sponsor. Otherwise, these warrants will not, subject to certain limited exceptions, be transferable or salable until 30 days after the completion of our business combination. The private placement warrants will be non-redeemable so long as they are held by our sponsor or its permitted transferees. The private placement warrants may also be exercised by the sponsor and its permitted transferees for cash or on a cashless basis. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period.

Pursuant to a registration rights agreement we will enter into with our initial stockholders on or prior to the closing of this offering, we may be required to register certain securities for sale under the Securities Act. These holders, and holders of warrants issued upon conversion of working capital loans, if any, are entitled under the registration rights agreement to make up to three demands that we register certain of our securities held by them for sale under the Securities Act and to have the securities covered thereby registered for resale pursuant to Rule 415 under the Securities Act. In addition, these holders have the right to include their securities in other registration statements filed by us. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until the securities covered thereby are released from their lock-up restrictions, as described herein. We will bear the costs and expenses of filing any such registration statements. See the section of this prospectus entitled "Certain Relationships and Related Party Transactions."

**Off-Balance Sheet Arrangements; Commitments and Contractual Obligations; Quarterly Results**

As of November 21, 2016, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K and did not have any commitments or contractual obligations. No unaudited quarterly operating data is included in this prospectus, as we have conducted no operations to date.

**JOBS Act**

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We will qualify as an "emerging growth company" and under the JOBS Act will be allowed to comply with new or revised accounting pronouncements based on the effective date for private (not publicly traded) companies. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial

76

Table of Contents

statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Additionally, we are in the process of evaluating the benefits of relying on the other reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an "emerging growth company", we choose to rely on such exemptions we may not be required to, among other things, (i) provide an auditor's attestation report on our system of internal controls over financial reporting pursuant to Section 404, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act, (iii) comply with any requirement that may be adopted by the PCAOB regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (auditor discussion and analysis), and (iv) disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation. These exemptions will apply for a period of five years following the completion of this offering or until we are no longer an "emerging growth company," whichever is earlier.

## PROPOSED BUSINESS

### Overview

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, or one that does not fit with Riverstone's mandate, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside

Table of Contents

protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

Our sponsor is an affiliate of Riverstone, which has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

**Business Strategy**

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

**Acquisition Criteria**

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business

78

Table of Contents

combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential as a result of the current commodity price dislocation;

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our shareholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

**Initial Business Combination**

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm with respect to the satisfaction of such criteria.

We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the

79

Table of Contents

conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes of our common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended, or the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

**Our Acquisition Process**

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

80

Table of Contents

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

**Our Management Team**

Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any member of our management team will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

We believe our management team's operating and transaction experience and relationships with companies will provide us with a substantial number of potential business combination targets. Over the course of their careers, the members of our management team have developed a broad network of contacts and corporate relationships around the world. This network has grown through the activities of our management team sourcing, acquiring and financing businesses, our management team's relationships with sellers, financing sources and target management teams and the experience of our management team in executing transactions under varying economic and financial market conditions.

81

Table of Contents

See the section of this prospectus entitled "Management" for a more complete description of our management team's experience

**Status as a Public Company**

We believe our structure will make us an attractive business combination partner to target businesses. As an existing public company, we offer a target business an alternative to the traditional initial public offering through a merger or other business combination. In this situation, the owners of the target business would exchange their shares of stock in the target business for shares of our stock or for a combination of shares of our stock and cash, allowing us to tailor the consideration to the specific needs of the sellers. Although there are various costs and obligations associated with being a public company, we believe target businesses will find this method a more certain and cost effective method to becoming a public company than the typical initial public offering. In a typical initial public offering, there are additional expenses incurred in marketing, road show and public reporting efforts that may not be present to the same extent in connection with a business combination with us.

Furthermore, once a proposed business combination is completed, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could delay or prevent the offering from occurring or could have negative valuation consequences. Once public, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

**Financial Position**

With funds available for a business combination initially in the amount of $384,000,000, after payment of $14,000,000 of deferred underwriting fees (or $443,900,000 after payment of up to

82

Table of Contents

$16,100,000 of deferred underwriting fees if the underwriters' over-allotment option is exercised in full), in each case before fees and expenses associated with our initial business combination, we offer a target business a variety of options such as creating a liquidity event for its owners, providing capital for the potential growth and expansion of its operations or strengthening its balance sheet by reducing its debt or leverage ratio. Because we are able to complete our business combination using our cash, debt or equity securities, or a combination of the foregoing, we have the flexibility to use the most efficient combination that will allow us to tailor the consideration to be paid to the target business to fit its needs and desires. However, we have not taken any steps to secure third party financing and there can be no assurance it will be available to us.

**Effecting our Initial Business Combination**

We are not presently engaged in, and we will not engage in, any operations for an indefinite period of time following this offering. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placement of the private placement warrants, our capital stock, debt or a combination of these as the consideration to be paid in our initial business combination. We may seek to complete our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, which would subject us to the numerous risks inherent in such companies and businesses.

If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination or used for redemptions or purchases of our Class A common stock, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

We may seek to raise additional funds through a private offering of debt or equity securities in connection with the completion of our initial business combination (which may include a specified future issuance), and we may effectuate our initial business combination using the proceeds of such offering rather than using the amounts held in the trust account. Subject to compliance with applicable securities laws, we would expect to complete such financing only simultaneously with the completion of our business combination. In the case of an initial business combination funded with assets other than the trust account assets, our tender offer documents or proxy materials disclosing the business combination would disclose the terms of the financing and, only if required by law, we would seek stockholder approval of such financing. There are no prohibitions on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial

83

Table of Contents

business combination. At this time, we are not a party to any arrangement or understanding with any third party with respect to raising any additional funds through the sale of securities or otherwise.

**Sources of Target Businesses**

We anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Target businesses may be brought to our attention by such unaffiliated sources as a result of being solicited by us through calls or mailings. These sources may also introduce us to target businesses in which they think we may be interested on an unsolicited basis, since many of these sources will have read this prospectus and know what types of businesses we are targeting. Our officers and directors, as well as their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. In addition, we expect to receive a number of proprietary deal flow opportunities that would not otherwise necessarily be available to us as a result of the business relationships of our officers and directors. While we do not presently anticipate engaging the services of professional firms or other individuals that specialize in business acquisitions on any formal basis, we may engage these firms or other individuals in the future, in which event we may pay a finder's fee, consulting fee or other compensation to be determined in an arm's length negotiation based on the terms of the transaction. We will engage a finder only to the extent our management determines that the use of a finder may bring opportunities to us that may not otherwise be available to us or if finders approach us on an unsolicited basis with a potential transaction that our management determines is in our best interest to pursue. Payment of finder's fees is customarily tied to completion of a transaction, in which case any such fee will be paid out of the funds held in the trust account. In no event, however, will our sponsor or any of our existing officers or directors, or any entity with which they are affiliated, be paid any finder's fee, consulting fee or other compensation prior to, or for any services they render in order to effectuate, the completion of our initial business combination (regardless of the type of transaction that it is). We have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support and to reimburse our sponsor for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination. Some of our officers and directors may enter into employment or consulting agreements with the post-transaction company following our initial business combination. The presence or absence of any such fees or arrangements will not be used as a criterion in our selection process of an acquisition candidate.

We are not prohibited from pursuing an initial business combination with a business combination target that is affiliated with our sponsor, officers or directors or making the acquisition through a joint venture or other form of shared ownership with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a business combination target that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that such an initial business combination is fair to our company from a financial point of view. We are not required to obtain such an opinion in any other context.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has pre-existing fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity prior to presenting such business combination opportunity to us. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which

84

Table of Contents

an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

## Selection of a Target Business and Structuring of our Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. The fair market value of the target or targets will be determined by our board of directors based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation or value of comparable businesses. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, with respect to the satisfaction of such criteria. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. Subject to this requirement, our management will have virtually unrestricted flexibility in identifying and selecting one or more prospective target businesses, although we will not be permitted to effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In any case, we will only complete an initial business combination in which we own or acquire 50% or more of the outstanding voting securities of the target or otherwise acquire a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. If we own or acquire less than 100% of the equity interests or assets of a target business or businesses, the portion of such business or businesses that are owned or acquired by the post-transaction company is what will be valued for purposes of the 80% of net assets test. There is no basis for investors in this offering to evaluate the possible merits or risks of any target business with which we may ultimately complete our business combination.

To the extent we effect our business combination with a company or business that may be financially unstable or in its early stages of development or growth we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review, which will encompass, among other things, meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial and other information that will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

## Lack of Business Diversification

For an indefinite period of time after the completion of our initial business combination, the prospects for our success may depend entirely on the future performance of a single business. Unlike other entities that have the resources to complete business combinations with multiple entities in one or several industries, it is probable that we will not have the resources to diversify our operations and mitigate the risks of being in a single line of business. In addition, we intend to focus our search for an

85

Table of Contents

initial business combination in a single industry. By completing our business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and

- cause us to depend on the marketing and sale of a single product or limited number of products or services.

**Limited Ability to Evaluate the Target's Management Team**

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our business combination with that business, our assessment of the target business' management may not prove to be correct. In addition, the future management may not have the necessary skills, qualifications or abilities to manage a public company. Furthermore, the future role of members of our management team, if any, in the target business cannot presently be stated with any certainty. While it is possible that one or more of our directors will remain associated in some capacity with us following our business combination, it is unlikely that any of them will devote their full efforts to our affairs subsequent to our business combination. Moreover, we cannot assure you that members of our management team will have significant experience or knowledge relating to the operations of the particular target business.

We cannot assure you that any of our key personnel will remain in senior management or advisory positions with the combined company. The determination as to whether any of our key personnel will remain with the combined company will be made at the time of our initial business combination.

Following a business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. We cannot assure you that we will have the ability to recruit additional managers, or that additional managers will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

**Stockholders May Not Have the Ability to Approve our Initial Business Combination**

We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC. However, we will seek stockholder approval if it is required by law or applicable stock exchange rule, or we may decide to seek stockholder approval for business or other legal reasons. Presented in the table below is a graphic explanation of the types of initial business combinations we may consider and whether stockholder approval is currently required under Delaware law for each such transaction.

| Type of Transaction | Whether Stockholder Approval is Required |
|---|---|
| Purchase of assets | No |
| Purchase of stock of target not involving a merger with the company | No |
| Merger of target into a subsidiary of the company | No |
| Merger of the company with a target | Yes |

Under NASDAQ's listing rules, stockholder approval would be required for our initial business combination if, for example:

- we issue shares of Class A common stock that will be equal to or in excess of 20% of the number of shares of our Class A common stock then outstanding;

86

Table of Contents

- any of our directors, officers or substantial stockholders (as defined by NASDAQ rules) has a 5% or greater interest (or such persons collectively have a 10% or greater interest), directly or indirectly, in the target business or assets to be acquired or otherwise and the present or potential issuance of common stock could result in an increase in outstanding common shares or voting power of 5% or more; or

- the issuance or potential issuance of common stock will result in our undergoing a change of control.

**Permitted Purchases of our Securities**

In the event we seek stockholder approval of our business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares in such transactions. They will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

The purpose of such purchases would be to (i) vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business combination or (ii) to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our common stock may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our sponsor, officers, directors and/or their affiliates anticipate that they may identify the stockholders with whom our sponsor, officers, directors or their affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders following our mailing of proxy materials in connection with our initial business combination. To the extent that our sponsor, officers, directors, advisors or their affiliates enter into a private purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the trust account or vote against the business combination. Our sponsor, officers, directors, advisors or their affiliates will only purchase shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

87

Table of Contents

Any purchases by our sponsor, officers, directors and/or their affiliates who are affiliated purchasers under Rule 10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) and Rule 10b-5 of the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our sponsor, officers, directors and/or their affiliates will not make purchases of common stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act.

**Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination**

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination.

*Manner of Conducting Redemptions*

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under the law or stock exchange listing requirement. Asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. If we structure a business combination transaction with a target company in a manner that requires stockholder approval, we will not have discretion as to whether to seek a stockholder vote to approve the proposed business combination. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

88

Table of Contents

Upon the public announcement of our business combination, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market if we elect to redeem our public shares through a tender offer, to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares which are not purchased by our sponsor, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirement, or we decide to obtain stockholder approval for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

In the event that we seek stockholder approval of our initial business combination, we will distribute proxy materials and, in connection therewith, provide our public stockholders with the redemption rights described above upon completion of the initial business combination.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial stockholders will count toward this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 15,000,001, or 37.5%, of the 40,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For

89

Table of Contents

example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

### Limitation on Redemption upon Completion of our Initial Business Combination if we Seek Stockholder Approval

Notwithstanding the foregoing, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." We believe this restriction will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to exercise their redemption rights against a proposed business combination as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination.

### Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically using Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option. The tender offer or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. Accordingly, a public stockholder would have from the time we send out our tender offer materials until the close of the tender offer period, or up to two days prior to the vote on the business combination if we distribute proxy materials, as applicable, to tender its shares if it wishes to seek to exercise its redemption rights. Given the relatively short exercise period, it is advisable for stockholders to use electronic delivery of their public shares.

90

Table of Contents

There is a nominal cost associated with the above-referenced tendering process and the act of certificating the shares or delivering them through the DWAC System. The transfer agent will typically charge the tendering broker $80.00 and it would be up to the broker whether or not to pass this cost on to the redeeming holder. However, this fee would be incurred regardless of whether or not we require holders seeking to exercise redemption rights to tender their shares. The need to deliver shares is a requirement of exercising redemption rights regardless of the timing of when such delivery must be effectuated.

The foregoing is different from the procedures used by many blank check companies. In order to perfect redemption rights in connection with their business combinations, many blank check companies would distribute proxy materials for the stockholders' vote on an initial business combination, and a holder could simply vote against a proposed business combination and check a box on the proxy card indicating such holder was seeking to exercise his or her redemption rights. After the business combination was approved, the company would contact such stockholder to arrange for him or her to deliver his or her certificate to verify ownership. As a result, the stockholder then had an "option window" after the completion of the business combination during which he or she could monitor the price of the company's stock in the market. If the price rose above the redemption price, he or she could sell his or her shares in the open market before actually delivering his or her shares to the company for cancellation. As a result, the redemption rights, to which stockholders were aware they needed to commit before the stockholder meeting, would become "option" rights surviving past the completion of the business combination until the redeeming holder delivered its certificate. The requirement for physical or electronic delivery prior to the meeting ensures that a redeeming holder's election to redeem is irrevocable once the business combination is approved.

Any request to redeem such shares, once made, may be withdrawn at any time up to the date set forth in the tender offer materials or the date of the stockholder meeting set forth in our proxy materials, as applicable. Furthermore, if a holder of a public share delivered its certificate in connection with an election of redemption rights and subsequently decides prior to the applicable date not to elect to exercise such rights, such holder may simply request that the transfer agent return the certificate (physically or electronically). It is anticipated that the funds to be distributed to holders of our public shares electing to redeem their shares will be distributed promptly after the completion of our business combination.

If our initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights would not be entitled to redeem their shares for the applicable pro rata share of the trust account. In such case, we will promptly return any certificates delivered by public holders who elected to redeem their shares.

If our initial proposed business combination is not completed, we may continue to try to complete a business combination with a different target until 24 months from the closing of this offering.

### Redemption of Public Shares and Liquidation if no Initial Business Combination

Our sponsor, officers and directors have agreed that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible

91

Table of Contents

following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes divided by the number of then outstanding public shares. However, we may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules).

We expect that all costs and expenses associated with implementing our plan of dissolution, as well as payments to any creditors, will be funded from amounts remaining out of the approximately $1,100,000 of proceeds held outside the trust account, although we cannot assure you that there will be sufficient funds for such purpose. However, if those funds are not sufficient to cover the costs and expenses associated with implementing our plan of dissolution, to the extent that there is any interest accrued in the trust account not required to pay franchise and income taxes on interest income earned on the trust account balance, we may request the trustee to release to us an additional amount of up to $100,000 of such accrued interest to pay those costs and expenses.

If we were to expend all of the net proceeds of this offering and the sale of the private placement warrants, other than the proceeds deposited in the trust account, and without taking into account interest, if any, earned on the trust account, the per-share redemption amount received by stockholders upon our dissolution would be approximately $10.00. The proceeds deposited in the trust account could, however, become subject to the claims of our creditors which would have higher priority than the claims of our public stockholders. We cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.00. Under Section 281(b) of the DGCL, our plan of dissolution must provide for all claims against us to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before we make any distribution of our remaining assets to our stockholders. While we intend to pay such amounts, if any, we cannot assure you that we will have funds sufficient to pay or provide for all creditors' claims.

Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the

92

Table of Contents

trust account including but not limited to fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative. Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver.

In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

In the event that the proceeds in the trust account are reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. We have not asked our sponsor to reserve for such indemnification obligations and we cannot assure you that our sponsor would be able to satisfy those obligations. Accordingly, we cannot assure you that due to claims of creditors the actual value of the per-share redemption price will not be less than $10.00 per public share.

93

Table of Contents

We will seek to reduce the possibility that our sponsor will have to indemnify the trust account due to claims of creditors by endeavoring to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to monies held in the trust account. Our sponsor will also not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. We will have access to up to approximately $1,100,000 from the proceeds of this offering with which to pay any such potential claims (including costs and expenses incurred in connection with our liquidation, currently estimated to be no more than approximately $100,000). In the event that we liquidate and it is subsequently determined that the reserve for claims and liabilities is insufficient, stockholders who received funds from our trust account could be liable for claims made by creditors. In the event that our offering expenses exceed our estimate of $900,000, we may fund such excess with funds from the funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $900,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering, is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution. If we are unable to complete our business combination within 24 months from the closing of this offering, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible following our 24th month and, therefore, we do not intend to comply with those procedures. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

94

Table of Contents

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent 10 years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. As described above, pursuant to the obligation contained in our underwriting agreement, we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account. As a result of this obligation, the claims that could be made against us are significantly limited and the likelihood that any claim that would result in any liability extending to the trust account is remote. Further, our sponsor may be liable only to the extent necessary to ensure that the amounts in the trust account are not reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest withdrawn to pay taxes and will not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, our sponsor will not be responsible to the extent of any liability for such third-party claims.

If we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, we cannot assure you we will be able to return $10.00 per share to our public stockholders. Additionally, if we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. Furthermore, our board may be viewed as having breached its fiduciary duty to our creditors and/or may have acted in bad faith, and thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

Our public stockholders will be entitled to receive funds from the trust account only in the event of the redemption of our public shares if we do not complete our business combination within 24 months from the closing of this offering or if they redeem their respective shares for cash upon the completion of the initial business combination. In no other circumstances will a stockholder have any right or interest of any kind to or in the trust account. In the event we seek stockholder approval in connection with our initial business combination, a stockholder's voting in connection with the business combination alone will not result in a stockholder's redeeming its shares to us for an applicable pro rata share of the trust account. Such stockholder must have also exercised its redemption rights described above.

Table of Contents

***Comparison of Redemption or Purchase Prices in Connection with our Initial Business Combination and if We Fail to Complete our Business Combination***

The following table compares the redemptions and other permitted purchases of public shares that may take place in connection with the completion of our initial business combination and if we are unable to complete our business combination within 24 months from the closing of this offering.

| | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Calculation of redemption price** | Redemptions at the time of our initial business combination may be made pursuant to a tender offer or in connection with a stockholder vote. The redemption price will be the same whether we conduct redemptions pursuant to a tender offer or in connection with a stockholder vote. In either case, our public stockholders may redeem their public shares for cash equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination (which is initially anticipated to be $10.00 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitation that no redemptions will take place, if all of the redemptions would cause our net tangible assets to be less than $5,000,001 and any limitations (including but not limited to cash requirements) agreed to in connection with the negotiation of terms of a proposed business combination. | If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market prior to or following completion of our initial business combination. There is no limit to the prices that our sponsor, directors, officers, advisors or their affiliates may pay in these transactions. | If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem all public shares at a per-share price, payable in cash, equal to the aggregate amount, then on deposit in the trust account (which is initially anticipated to be $10.00 per public share including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares. |

96

Table of Contents

|  | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Impact to remaining stockholders** | The redemptions in connection with our initial business combination will reduce the book value per share for our remaining stockholders, who will bear the burden of the deferred underwriting commissions and franchise and income taxes payable. | If the permitted purchases described above are made there would be no impact to our remaining stockholders because the purchase price would not be paid by us. | The redemption of our public shares if we fail to complete our business combination will reduce the book value per share for the shares held by our initial stockholders, who will be our only remaining stockholders after such redemptions. |

## Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419

The following table compares the terms of this offering to the terms of an offering by a blank check company subject to the provisions of Rule 419. This comparison assumes that the gross proceeds, underwriting commissions and underwriting expenses of our offering would be identical to those of an offering undertaken by a company subject to Rule 419, and that the underwriters will not exercise their over-allotment option. None of the provisions of Rule 419 apply to our offering.

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Escrow of offering proceeds** | $400,000,000 of the net proceeds of this offering and the sale of the private placement warrants will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. | Approximately $340,200,000 of the offering proceeds would be deposited into either an escrow account with an insured depositary institution or in a separate bank account established by a broker-dealer in which the broker-dealer acts as trustee for persons having the beneficial interests in the account. |
| **Investment of net proceeds** | $400,000,000 of the net offering proceeds and the sale of the private placement warrants held in trust will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. | Proceeds could be invested only in specified securities such as a money market fund meeting conditions of the Investment Company Act or in securities that are direct obligations of, or obligations guaranteed as to principal or interest by, the United States. |

97

Table of Contents

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
| --- | --- | --- |
| **Receipt of interest on escrowed funds** | Interest on proceeds from the trust account to be paid to stockholders is reduced by (i) any income or franchise taxes paid or payable, and (ii) in the event of our liquidation for failure to complete our initial business combination within the allotted time, up to $100,000 of net interest that may be released to us should we have no or insufficient working capital to fund the costs and expenses of our dissolution and liquidation. | Interest on funds in escrow account would be held for the sole benefit of investors, unless and only after the funds held in escrow were released to us in connection with our completion of a business combination. |
| **Limitation on fair value or net assets of target business** | Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. | The fair value or net assets of a target business must represent at least 80% of the maximum offering proceeds. |

98

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Trading of securities issued** | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless _____ informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, an additional Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the over-allotment option. | No trading of the units or the underlying Class A common stock and warrants would be permitted until the completion of a business combination. During this period, the securities would be held in the escrow or trust account. |
| **Exercise of the warrants** | The warrants cannot be exercised until the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering. | The warrants could be exercised prior to the completion of a business combination, but securities received and cash paid in connection with the exercise would be deposited in the escrow or trust account. |

99

Table of Contents

| Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|
| **Election to remain an investor** | We will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, upon the completion of our initial business combination, subject to the limitations described herein. We may not be required by law to hold a stockholder vote. If we are not required by law and do not otherwise decide to hold a stockholder vote, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC and file tender offer documents with the SEC which will contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, we hold a stockholder vote, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. Additionally, each public stockholder may elect to redeem their public shares irrespective of whether they vote for or against the proposed transaction. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. | A prospectus containing information pertaining to the business combination required by the SEC would be sent to each investor. Each investor would be given the opportunity to notify the company in writing, within a period of no less than 20 business days and no more than 45 business days from the effective date of a post-effective amendment to the company's registration statement, to decide if it elects to remain a stockholder of the company or require the return of its investment. If the company has not received the notification by the end of the 45th business day, funds and interest or dividends, if any, held in the trust or escrow account are automatically returned to the stockholder. Unless a sufficient number of investors elect to remain investors, all funds on deposit in the escrow account must be returned to all of the investors and none of the securities are issued. |

100

Table of Contents

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Business combination deadline** | If we are unable to complete an initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. | If an acquisition has not been completed within 18 months after the effective date of the company's registration statement, funds held in the trust or escrow account are returned to investors. |

101

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| Release of funds | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering held in the trust account will not be released from the trust account until the earliest to occur of: (i) the completion of our initial business combination, (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of 100% of our public shares if we are unable to complete a business combination within the required time frame (subject to the requirements of applicable law). | The proceeds held in the escrow account are not released until the earlier of the completion of a business combination or the failure to effect a business combination within the allotted time. |

**Competition**

In identifying, evaluating and selecting a target business for our business combination, we may encounter intense competition from other entities having a business objective similar to ours, including other blank check companies, private equity groups and leveraged buyout funds, and operating businesses seeking strategic acquisitions. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Moreover, many of these competitors possess greater financial, technical, human and other resources than we do. Our ability to acquire larger target businesses will be limited by our available financial resources. This inherent limitation gives others an advantage in pursuing the acquisition of a target business. Furthermore, our obligation to pay cash in connection with our public stockholders who exercise their redemption rights may reduce the resources available to us for our initial business combination and our outstanding warrants, and the future dilution they potentially represent, may not be viewed favorably by certain target businesses. Either of these factors may place us at a competitive disadvantage in successfully negotiating an initial business combination.

**Facilities**

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400. Our executive offices are provided to us by an affiliate of our sponsor. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. We consider our current office space adequate for our current operations.

102

Table of Contents

## Employees

We currently have three officers. Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any such person will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

## Periodic Reporting and Financial Information

We will register our units, Class A common stock and warrants under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual reports will contain financial statements audited and reported on by our independent registered public accountants.

We will provide stockholders with audited financial statements of the prospective target business as part of the tender offer materials or proxy solicitation materials sent to stockholders to assist them in assessing the target business. In all likelihood, these financial statements will need to be prepared in accordance with GAAP. We cannot assure you that any particular target business identified by us as a potential acquisition candidate will have financial statements prepared in accordance with GAAP or that the potential target business will be able to prepare its financial statements in accordance with GAAP. To the extent that this requirement cannot be met, we may not be able to acquire the proposed target business. While this may limit the pool of potential acquisition candidates, we do not believe that this limitation will be material.

We will be required to evaluate our internal control procedures for the fiscal year ending December 31, 2018 as required by the Sarbanes-Oxley Act. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to have our internal control procedures audited. A target company may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of their internal controls. The development of the internal controls of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

## Legal Proceedings

There is no material litigation, arbitration or governmental proceeding currently pending against us or any members of our management team in their capacity as such, and we and the members of our management team have not been subject to any such proceeding in the 12 months preceding the date of this prospectus.

103

Table of Contents

## MANAGEMENT

**Officers, Directors and Director Nominees**

Our officers, directors and director nominees are as follows:

| Name | Age | Position |
|---|---|---|
| Ken Ryan | 44 | Chief Executive Officer |
| Thomas J. Walker | 46 | Chief Financial Officer and Director |
| Stephen S. Coats | 46 | Secretary |

**Ken Ryan** has been our Chief Executive Officer since November 2016. Mr. Ryan is a Partner of Riverstone. He is based in New York. Mr. Ryan joined Riverstone in 2011 and is responsible for corporate development. In addition, Mr. Ryan has primary responsibility for Riverstone Energy Limited, an affiliated publicly traded energy investment company that is listed on the London Stock Exchange. Prior to joining Riverstone, Mr. Ryan worked for Gleacher & Company/Gleacher Partners in both London and New York, most recently as Managing Director and co-head of Investment Banking. Prior to Gleacher, Mr. Ryan worked in the investment banking division of Goldman Sachs in London and New York. Mr. Ryan currently serves on the Board of Directors of TrailStone and Riverstone Energy Limited. Mr. Ryan received his degree in law from the University of Dublin, Trinity College.

**Thomas J. Walker** has been our Chief Financial Officer and a Director since November 2016. Mr. Walker is a New York-based Partner at Riverstone. Mr. Walker joined Riverstone in January 2007 as the Chief Financial Officer, a position that he still holds currently. Prior to joining Riverstone, Mr. Walker was a Principal at The Carlyle Group from June 2005, serving as the Chief Financial Officer of the jointly sponsored Carlyle/Riverstone Funds. Prior to Carlyle, Mr. Walker held similar positions at Hampshire Equity Partners, a middle market buyout fund, from February 2001 to June 2005, and Ripplewood Holdings, a private equity firm managing capital commitments in the United States and Japan, from November 1999 to February 2001. Prior to joining Ripplewood, Mr. Walker was the Director of Financial Reporting and Planning at Asbury Automotive Group (NYSE: ABG), a Ripplewood portfolio company, from August 1998 to November 1999. Mr. Walker started his career in the Metro New York office of Arthur Andersen, an international accounting firm. Mr. Walker received a B.S. in Accounting from Binghamton University in 1994.

**Stephen S. Coats** has been our Secretary since November 2016. Mr. Coats is a New York-based Partner at Riverstone. Mr. Coats joined Riverstone in April 2008 and currently serves as the General Counsel. Prior to joining Riverstone, Mr. Coats was a partner at Vinson & Elkins LLP, a law firm specializing in the energy industry. While at Vinson & Elkins, Mr. Coats focused on domestic and crossborder M&A work within the energy industry and was outside counsel to Riverstone on many of Riverstone's early transactions. He received his B.A. in government from the University of Texas at Austin and his J.D. from the University of Texas School of Law. Mr. Coats is licensed to practice law in the State of New York and the State of Texas.

**Number and Terms of Office of Officers and Directors**

We intend to have            directors upon completion of this offering. Our board of directors will be divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The term of office of the first class of directors, consisting of            , will expire at our first annual meeting of stockholders. The term of office of the second class of directors, consisting of            and            , will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of            , will expire at the third annual meeting of stockholders. We may not hold an annual meeting of stockholders until after we consummate our initial business combination.

104

Table of Contents

Our officers are appointed by the board of directors and serve at the discretion of the board of directors, rather than for specific terms of office. Our board of directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our officers may consist of a Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Vice Presidents, Secretary, Treasurer and such other offices as may be determined by the board of directors.

**Director Independence**

NASDAQ listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director. Our board of directors has determined that            ,            and            are "independent directors" as defined in the NASDAQ listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

**Officer and Director Compensation**

None of our officers or directors has received any cash compensation for services rendered to us. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees. No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of our initial business combination. However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

After the completion of our initial business combination, directors or members of our management team who remain with us may be paid consulting or management fees from the combined company. All of these fees will be fully disclosed to stockholders, to the extent then known, in the tender offer materials or proxy solicitation materials furnished to our stockholders in connection with a proposed business combination. We have not established any limit on the amount of such fees that may be paid by the combined company to our directors or members of management. It is unlikely the amount of such compensation will be known at the time of the proposed business combination, because the directors of the post-combination business will be responsible for determining officer and director compensation. Any compensation to be paid to our officers will be determined, or recommended to the board of directors for determination, either by a compensation committee constituted solely by independent directors or by a majority of the independent directors on our board of directors.

We do not intend to take any action to ensure that members of our management team maintain their positions with us after the consummation of our initial business combination, although it is possible that some or all of our officers and directors may negotiate employment or consulting arrangements to remain with us after our initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with us may influence our management's motivation in identifying or selecting a target business but we do not believe that the ability of our management to remain with us after the consummation of our initial business combination will be a determining factor in our decision to proceed with any potential business

105

Table of Contents

combination. We are not party to any agreements with our officers and directors that provide for benefits upon termination of employment.

## Committees of the Board of Directors

Our board of directors will have two standing committees: an audit committee and a compensation committee. Subject to phase-in rules and a limited exception, the rules of NASDAQ and Rule 10A-3 of the Exchange Act require that the audit committee of a listed company be comprised solely of independent directors, and the rules of NASDAQ require that the compensation committee of a listed company be comprised solely of independent directors.

### *Audit Committee*

Prior to the consummation of this offering, we will establish an audit committee of the board of directors.              ,           and           will serve as members of our audit committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least three members of the audit committee, all of whom must be independent.

Each member of the audit committee is financially literate and our board of directors has determined that           qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

We will adopt an audit committee charter, which will detail the principal functions of the audit committee, including:

- the appointment, compensation, retention, replacement, and oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us;

- pre-approving all audit and permitted non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;

- reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence;

- setting clear hiring policies for employees or former employees of the independent auditors;

- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;

- obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues;

- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and

- reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in

106

Table of Contents

accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

### Compensation Committee

Prior to the consummation of this offering, we will establish a compensation committee of the board of directors.                    ,          and          will serve as members of our compensation committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least two members of the compensation committee, all of whom must be independent.                    ,          and          are independent.

We will adopt a compensation committee charter, which will detail the principal functions of the compensation committee, including:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, evaluating our Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer based on such evaluation;

- reviewing and approving on an annual basis the compensation of all of our other officers;

- reviewing on an annual basis our executive compensation policies and plans;

- implementing and administering our incentive compensation equity-based remuneration plans;

- assisting management in complying with our proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our officers and employees;

- if required, producing a report on executive compensation to be included in our annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

Notwithstanding the foregoing, as indicated above, other than the $10,000 per month administrative fee payable to an affiliate of our sponsor and reimbursement of expenses, no compensation of any kind, including finders, consulting or other similar fees, will be paid to any of our existing stockholders, officers, directors or any of their respective affiliates, prior to, or for any services they render in order to effectuate the consummation of a business combination. Accordingly, it is likely that prior to the consummation of an initial business combination, the compensation committee will only be responsible for the review and recommendation of any compensation arrangements to be entered into in connection with such initial business combination.

The charter will also provide that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by NASDAQ and the SEC.

### Director Nominations

We do not have a standing nominating committee. In accordance with Rule 5605(e)(2) of the NASDAQ Rules, a majority of the independent directors may recommend a director nominee for

107

Table of Contents

selection by the board of directors. The board of directors believes that the independent directors can satisfactorily carry out the responsibility of properly selecting or approving director nominees without the formation of a standing nominating committee. As there is no standing nominating committee, we do not have a nominating committee charter in place.

The board of directors will also consider director candidates recommended for nomination by our stockholders during such times as they are seeking proposed nominees to stand for election at the next annual meeting of stockholders (or, if applicable, a special meeting of stockholders). Our stockholders that wish to nominate a director for election to the Board should follow the procedures set forth in our bylaws.

We have not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, the board of directors considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our stockholders.

### Compensation Committee Interlocks and Insider Participation

None of our officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more officers serving on our board of directors.

### Code of Ethics

Prior to the consummation of this offering, we will have adopted a Code of Ethics applicable to our directors, officers and employees. We will file a copy of our Code of Ethics and our audit committee charter as exhibits to the registration statement of which this prospectus is a part. You will be able to review these documents by accessing our public filings at the SEC's web site at www.sec.gov. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See the section of this prospectus entitled "Where You Can Find Additional Information."

### Conflicts of Interest

Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware. Riverstone and/or our management, in their capacities as officers or managing directors of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us.

Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle.

108

Table of Contents

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present business combination opportunities to such entity. Accordingly, in the future, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We do not believe, however, that any fiduciary duties or contractual obligations of our officers arising in the future would materially undermine our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors may become involved with subsequent blank check companies similar to our company, although they have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within 24 months after the closing of this offering. Potential investors should also be aware of the following other potential conflicts of interest:

- None of our officers or directors is required to commit his or her full time to our affairs and, accordingly, may have conflicts of interest in allocating his or her time among various business activities.

- In the course of their other business activities, our officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to us as well as the other entities with which they are affiliated. Our management may have conflicts of interest in determining to which entity a particular business opportunity should be presented.

- Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the consummation of our initial business combination. Additionally, our initial stockholders have agreed to waive their redemption rights with respect to any founder shares held by them if we fail to consummate our initial business combination within 24 months after the closing of this offering. If we do not complete our initial business combination within such applicable time period, the proceeds of the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares, and the private placement warrants will expire worthless. With certain limited exceptions, the founder shares will not be transferable, assignable by our sponsor until the earlier of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. With certain limited exceptions, the private placement warrants and the Class A common stock underlying such warrants, will not be transferable, assignable or salable by our sponsor or its permitted transferees until 30 days after the completion of our initial business combination. Since our sponsor and officers and directors may directly or indirectly own common stock and warrants following this offering, our officers

109

Table of Contents

and directors may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination.

- Our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

- Our sponsor, officers or directors may have a conflict of interest with respect to evaluating a business combination and financing arrangements as we may obtain loans from our sponsor or an affiliate of our sponsor or any of our officers or directors to finance transaction costs in connection with an intended initial business combination. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

The conflicts described above may not be resolved in our favor.

In general, officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;

- the opportunity is within the corporation's line of business; and

- it would not be fair to our company and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. Furthermore, our amended and restated certificate of incorporation will provide that the doctrine of corporate opportunity will not apply with respect to any of our officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with such a company, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA, or from an independent accounting firm, that such an initial business combination is fair to our company from a financial point of view.

In the event that we submit our initial business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after the offering in favor of our initial business combination and our officers and directors have also agreed to vote any public shares purchased during or after the offering in favor of our initial business combination.

**Limitation on Liability and Indemnification of Officers and Directors**

Our amended and restated certificate of incorporation will provide that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our amended and restated certificate of incorporation will provide that our directors will not be personally liable for monetary damages to us or our stockholders for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful

110

Table of Contents

payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

We will enter into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our amended and restated certificate of incorporation. Our bylaws also will permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We will purchase a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify our officers and directors.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against officers and directors pursuant to these indemnification provisions.

We believe that these provisions, the directors' and officers' liability insurance and the indemnity agreements are necessary to attract and retain talented and experienced officers and directors.

111

Table of Contents

# PRINCIPAL STOCKHOLDERS

The following table sets forth information regarding the beneficial ownership of our common stock as of the date of this prospectus, and as adjusted to reflect the sale of our common stock included in the units offered by this prospectus, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of our outstanding shares of common stock;

- each of our executive officers, directors and director nominees that beneficially owns shares of our common stock; and

- all our executive officers, directors and director nominees as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of common stock beneficially owned by them. The following table does not reflect record or beneficial ownership of the private placement warrants as these warrants are not exercisable within 60 days of the date of this prospectus.

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In      , our sponsor transferred           founder shares to each of our independent director nominees at their original purchase price. The following table presents the number of shares and percentage of our common stock owned by our initial stockholders before and after this offering. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our sponsor forfeits 1,500,000 founder shares, and that there are 50,000,000 shares of our common stock issued and outstanding after this offering.

| | Before Offering | | After Offering | |
|---|---|---|---|---|
| Name and Address of Beneficial Owner(1) | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock |
| Silver Run Sponsor II, LLC(3) | 10,000,000 | 100.0% | 10,000,000 | 20.0% |
| Ken Ryan | — | * | — | * |
| Thomas J. Walker | — | * | — | * |
| Stephen S. Coats | — | * | — | * |
| All executive officers, directors and director nominees as a group (three individuals) | — | * | — | * |

———————

\* Less than one percent.

(1) Unless otherwise noted, the business address of each of the following entities or individuals is c/o Silver Run Acquisition Corporation II, 1000 Louisiana Street, Suite 1450, Houston, TX 77002.

(2) Interests shown consist solely of founder shares, classified as shares of Class B common stock. Such shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment, as described in the section of this prospectus entitled "Description of Securities."

(3) Silver Run Sponsor II, LLC is the record holder of the shares reported herein. Riverstone Holdings LLC is the managing member of Silver Run Sponsor II, LLC. David Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC and have or share voting and investment discretion with respect to the common stock held of record by Silver Run Sponsor II, LLC. As such, each of Riverstone Holdings LLC, Mr. Leuschen and Mr. Lapeyre may be deemed to have or share beneficial ownership of the common stock held directly by Silver Run Sponsor II, LLC. Each such entity or person disclaims any such beneficial ownership of such

112

Table of Contents

securities. The business address of each of these entities and individuals is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

Immediately after this offering, our initial stockholders will beneficially own 20% of the then-issued and outstanding shares of our common stock (assuming they do not purchase any units in this offering). If we increase or decrease the size of the offering, we will effect a stock dividend or a share contribution back to capital, or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of our issued and outstanding shares of common stock upon the consummation of this offering. Because of this ownership block, our initial stockholders may be able to effectively influence the outcome of all matters requiring approval by our stockholders, including the election of directors, amendments to our amended and restated certificate of incorporation and approval of significant corporate transactions, including approval of our initial business combination.

The holders of the founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any shares in connection with a stockholder vote to approve a proposed initial business combination.

Our sponsor and our executive officers and directors are deemed to be our "promoters" as such term is defined under the federal securities laws.

**Restrictions on Transfers of Founder Shares and Private Placement Warrants**

The founder shares and private placement warrants and any shares of Class A common stock issued upon conversion or exercise thereof are subject to transfer restrictions pursuant to lock-up provisions in a letter agreement with us to be entered into by our sponsor, officers and directors. Those lock-up provisions provide that such securities are not transferable or salable (i) in the case of the founder shares, until the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property, and (ii) in the case of the private placement warrants and the Class A common stock underlying such warrants, until 30 days after the completion of our initial business combination, except in each case (a) to our officers or directors, any affiliates or family members of any of our officers or directors, any members of our sponsor, or any affiliates of our sponsor, (b) in the case of an individual, by gift to a member of one of the members of the individual's immediate family or to a trust, the beneficiary of which is a member of one of the individual's immediate family, an affiliate of such person or to a charitable organization; (c) in the case of an individual, by virtue of laws of descent and distribution upon death of the individual; (d) in the case of an individual, pursuant to a qualified domestic relations order; (e) by private sales or transfers made in connection with the consummation of a business combination at prices no greater than the price at which the shares were originally purchased; (f) in the event of our liquidation prior to the completion of our initial business combination; (g) by virtue of the laws of Delaware or our sponsor's limited liability company agreement upon dissolution of our sponsor; or (h) in the event of our liquidation, merger, capital stock exchange, reorganization or other similar transaction which results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property subsequent to the completion of our initial business combination; provided, however, that in the case of clauses (a) through (e) these permitted transferees must enter into a written agreement agreeing to be bound by these transfer restrictions.

113

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On November 21, 2016, we issued an aggregate of 11,500,000 founder shares to our sponsor in exchange for a capital contribution of $25,000, or approximately $0.002 per share. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. If we increase or decrease the size of the offering, we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering. In      , our sponsor transferred        founder shares to each of our independent director nominees at their original purchase price. Up to 1,500,000 founder shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised. The founder shares (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 6,666,666 (or 7,466,666 if the over-allotment option is exercised in full) private placement warrants for a purchase price of $1.50 per whole warrant in a private placement that will occur simultaneously with the closing of this offering. As such, our sponsor's interest in this transaction is valued at between $10,000,000 and $11,200,000, depending on the number of private placement warrants purchased. Each private placement warrant entitles the holder to purchase one share of our Class A common stock at $11.50 per share. The private placement warrants (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of an initial business combination. However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of

114

Table of Contents

this offering. The loan will be repaid upon the closing of this offering out of the estimated $2,000,000 of offering proceeds not held in the trust account. The value of our sponsor's interest in this transaction corresponds to the principal amount outstanding under any such loan.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete an initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

After our initial business combination, members of our management team who remain with us may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to our stockholders, to the extent then known, in the tender offer or proxy solicitation materials, as applicable, furnished to our stockholders. It is unlikely the amount of such compensation will be known at the time of distribution of such tender offer materials or at the time of a stockholder meeting held to consider our initial business combination, as applicable, as it will be up to the directors of the post-combination business to determine executive and director compensation.

We will enter into a registration rights agreement with respect to the private placement warrants, the warrants issuable upon conversion of working capital loans (if any) and the shares of Class A common stock issuable upon exercise of the foregoing and upon conversion of the founder shares, which is described under the section of this prospectus entitled "Description of Securities—Registration Rights."

**Related Party Policy**

We have not yet adopted a formal policy for the review, approval or ratification of related party transactions. Accordingly, the transactions discussed above were not reviewed, approved or ratified in accordance with any such policy.

Prior to the consummation of this offering, we will adopt a code of ethics requiring us to avoid, wherever possible, all conflicts of interests, except under guidelines or resolutions approved by our board of directors (or the appropriate committee of our board) or as disclosed in our public filings with the SEC. Under our code of ethics, conflict of interest situations will include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) involving the company. A form of the code of ethics that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part.

In addition, our audit committee, pursuant to a written charter that we will adopt prior to the consummation of this offering, will be responsible for reviewing and approving related party transactions to the extent that we enter into such transactions. An affirmative vote of a majority of the members of the audit committee present at a meeting at which a quorum is present will be required in order to approve a related party transaction. A majority of the members of the entire audit committee will constitute a quorum. Without a meeting, the unanimous written consent of all of the members of the audit committee will be required to approve a related party transaction. A form of the audit committee charter that we plan to adopt prior to the consummation of this offering is filed as an

115

Table of Contents

exhibit to the registration statement of which this prospectus is a part. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

To further minimize conflicts of interest, we have agreed not to consummate an initial business combination with an entity that is affiliated with any of our sponsor, officers or directors unless we, or a committee of independent directors, have obtained an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view. Furthermore, no finder's fees, reimbursements or cash payments will be made to our sponsor, officers or directors, or our or their affiliates, for services rendered to us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment to an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

116

Table of Contents

## DESCRIPTION OF SECURITIES

Pursuant to our amended and restated certificate of incorporation, our authorized capital stock consists of 200,000,000 shares of Class A common stock, $0.0001 par value, 20,000,000 shares of Class B common stock, $0.0001 par value, and 1,000,000 shares of undesignated preferred stock, $0.0001 par value. The following description summarizes the material terms of our capital stock. Because it is only a summary, it may not contain all the information that is important to you.

### Units

Each unit has an offering price of $10.00 and consists of one whole share of Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.

The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the closing of this offering unless           informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants.

In no event will the Class A common stock and warrants be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file a Current Report on Form 8-K which includes this audited balance sheet upon the completion of this offering, which is anticipated to take place three business days after the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option.

### Common Stock

Upon the closing of this offering, 50,000,000 shares of our common stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of 1,500,000 founder shares by our sponsor), consisting of:

- 40,000,000 shares of our Class A common stock underlying the units being offered in this offering; and

- 10,000,000 shares of Class B common stock held by our initial stockholders.

If we increase or decrease the size of the offering, we will effect a stock dividend or share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of founder shares by our initial stockholders prior to this offering at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering.

117

Table of Contents

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Unless specified in our amended and restated certificate of incorporation or bylaws, or as required by applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of common stock that are voted is required to approve any such matter voted on by our stockholders. Our board of directors will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares voted for the election of directors can elect all of the directors. Our stockholders are entitled to receive ratable dividends when, as and if declared by the board of directors out of funds legally available therefor.

Because our amended and restated certificate of incorporation authorizes the issuance of up to 200,000,000 shares of Class A common stock, if we were to enter into a business combination, we may (depending on the terms of such a business combination) be required to increase the number of shares of Class A common stock which we are authorized to issue at the same time as our stockholders vote on the business combination to the extent we seek stockholder approval in connection with our business combination.

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws, unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

We will provide our stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination. Unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by law, if a stockholder vote is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC, and file tender offer documents with the SEC prior to completing our initial business combination. Our amended and restated certificate of incorporation will require these tender offer documents to contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If,

118

Table of Contents

however, a stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. However, the participation of our sponsor, officers, directors, advisors or their affiliates in privately-negotiated transactions (as described in this prospectus), if any, could result in the approval of our business combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our business combination once a quorum is obtained. We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares of common stock sold in this offering, which we refer to as the Excess Shares. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Our stockholders' inability to redeem the Excess Shares will reduce their influence over our ability to complete our business combination, and such stockholders could suffer a material loss in their investment if they sell such Excess Shares on the open market. Additionally, such stockholders will not receive redemption distributions with respect to the Excess Shares if we complete the business combination. And, as a result, such stockholders will continue to hold that number of shares exceeding 20% and, in order to dispose such shares would be required to sell their stock in open market transactions, potentially at a loss.

If we seek stockholder approval in connection with our business combination, our initial stockholders have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 15,000,001, or 37.5%, of the 40,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Additionally, each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction (subject to the limitation described in the preceding paragraph).

Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses),

119

Table of Contents

divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our business combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the company after a business combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, upon the completion of our initial business combination, subject to the limitations described herein.

**Founder Shares**

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, and holders of founder shares have the same stockholder rights as public stockholders, except that (i) the founder shares are subject to certain transfer restrictions, as described in more detail below, (ii) our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (A) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination and (B) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within such time period, (iii) the founder shares are shares of our Class B common stock that will automatically convert into shares of our Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein and (iv) are subject to registration rights. If we submit our business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination.

The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination on a one-for-one basis (subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like), and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the business combination, including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all

120

Table of Contents

shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time.

With certain limited exceptions, the founder shares are not transferable, assignable or salable (except to our officers and directors and other persons or entities affiliated with our sponsor, each of whom will be subject to the same transfer restrictions) until the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property.

## Preferred Stock

Our amended and restated certificate of incorporation will provide that shares of preferred stock may be issued from time to time in one or more series. Our board of directors will be authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. Our board of directors will be able to, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the common stock and could have anti-takeover effects. The ability of our board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of us or the removal of existing management. We have no preferred stock outstanding at the date hereof. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future. No shares of preferred stock are being issued or registered in this offering.

## Warrants

### Public Stockholders' Warrants

Each whole warrant entitles the registered holder to purchase one whole share of our Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of this offering or 30 days after the completion of our initial business combination. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. The warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations

121

Table of Contents

described below with respect to registration. No warrant will be exercisable and we will not be obligated to issue shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a warrant, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In the event that a registration statement is not effective for the exercised warrants, the purchaser of a unit containing such warrant will have paid the full purchase price for the unit solely for the share of Class A common stock underlying such unit.

We have agreed that as soon as practicable, but in no event later than 15 business days, after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the shares of Class A common stock issuable upon exercise of the warrants. We will use our best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

Once the warrants become exercisable, we may call the warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption (the "30-day redemption period") to each warrant holder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending three business days before we send the notice of redemption to the warrant holders.

If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the warrants, each warrant holder will be entitled to exercise its warrant prior to the scheduled redemption date. However, the price of the Class A common stock may fall below the $18.00 redemption trigger price as well as the $11.50 (for whole shares) warrant exercise price after the redemption notice is issued.

If we call the warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. If our management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of

122

Table of Contents

shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of Class A common stock to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. We believe this feature is an attractive option to us if we do not need the cash from the exercise of the warrants after our initial business combination. If we call our warrants for redemption and our management does not take advantage of this option, our sponsor and its permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrant holders would have been required to use had all warrant holders been required to exercise their warrants on a cashless basis, as described in more detail below.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Class A common stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of Class A common stock is increased by a stock dividend payable in shares of Class A common stock, or by a split-up of shares of Class A common stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of Class A common stock. A rights offering to holders of Class A common stock entitling holders to purchase shares of Class A common stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Class A common stock equal to the product of (i) the number of shares of Class A common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Class A common stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Class A common stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Class A common stock, in determining the price payable for Class A common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of Class A common stock as reported during the ten (10) trading day period ending on the trading day prior to the first date on which the shares of Class A common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of Class A common stock on account of such shares of Class A common stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of Class A common stock in connection with a proposed initial business combination, (d) to satisfy the redemption rights of the holders of Class A common stock in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our Class A common stock if we do not complete our initial business combination within 24 months from the closing of this offering, or (e) in connection with the redemption of our public shares upon our failure

123

Table of Contents

to complete our initial business combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of Class A common stock in respect of such event.

If the number of outstanding shares of our Class A common stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Class A common stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Class A common stock.

Whenever the number of shares of Class A common stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of Class A common stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Class A common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Class A common stock (other than those described above or that solely affects the par value of such shares of Class A common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of Class A common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of our Class A common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. If less than 70% of the consideration receivable by the holders of Class A common stock in such a transaction is payable in the form of Class A common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within thirty days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the Black-Scholes value (as defined in the warrant agreement) of the warrant.

The warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which will be filed as an exhibit to the registration statement of which this prospectus is a part, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of warrants being exercised. The warrant holders do not have the rights or privileges of holders

124

Table of Contents

of Class A common stock and any voting rights until they exercise their warrants and receive shares of Class A common stock. After the issuance of shares of Class A common stock upon exercise of the warrants, each holder will be entitled to one (1) vote for each share held of record on all matters to be voted on by stockholders.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of Class A common stock to be issued to the warrant holder.

### Private Placement Warrants

The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants," to our officers and directors and other persons or entities affiliated with our sponsor) and they will not be redeemable by us so long as they are held by our sponsor or its permitted transferees. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering.

If holders of the private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate.

In order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our sponsor has agreed not to transfer, assign or sell any of the private placement warrants (including the Class A common stock issuable upon exercise of any of these warrants) until the date that is 30 days after the date we complete our initial business combination, except that, among other

125

Table of Contents

limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants" made to our officers and directors and other persons or entities affiliated with our sponsor.

**Dividends**

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial conditions subsequent to completion of a business combination. The payment of any cash dividends subsequent to a business combination will be within the discretion of our board of directors at such time. Our board of directors is not currently contemplating and does not anticipate declaring any stock dividends in the foreseeable future, except if we increase the size of the offering, in which case we will effect a stock dividend immediately prior to the consummation of the offering in such amount as to maintain the ownership of founder shares by our initial stockholders prior to this offering at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering. Further, if we incur any indebtedness, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

**Our Transfer Agent and Warrant Agent**

The transfer agent for our common stock and warrant agent for our warrants is Continental Stock Transfer & Trust Company. We have agreed to indemnify Continental Stock Transfer & Trust Company in its roles as transfer agent and warrant agent, its agents and each of its stockholders, directors, officers and employees against all claims and losses that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

**Our Amended and Restated Certificate of Incorporation**

Our amended and restated certificate of incorporation will contain certain requirements and restrictions relating to this offering that will apply to us until the completion of our initial business combination. These provisions cannot be amended without the approval of the holders of 65% of our common stock. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose. Specifically, our amended and restated certificate of incorporation provides, among other things, that:

- If we are unable to complete our initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter subject to lawfully available funds therefor, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law;

126

Table of Contents

- Prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination;

- Although we do not intend to enter into a business combination with a target business that is affiliated with our sponsor, our directors or our officers, we are not prohibited from doing so. In the event we enter into such a transaction, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm that such a business combination is fair to our company from a financial point of view;

- If a stockholder vote on our initial business combination is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will offer to redeem our public shares pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, and will file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about our initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act;

- Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination;

- If our stockholders approve an amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our business combination within 24 months from the closing of this offering, we will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon such approval at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares; and

- We will not effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In addition, our amended and restated certificate of incorporation will provide that under no circumstances will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001.

**Certain Anti-Takeover Provisions of Delaware Law and our Amended and Restated Certificate of Incorporation and Bylaws**

We will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers upon completion of this offering. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

127

Table of Contents

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by our board of directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Our amended and restated certificate of incorporation will provide that our board of directors will be classified into three classes of directors. As a result, in most circumstances, a person can gain control of our board only by successfully engaging in a proxy contest at two or more annual meetings.

Our authorized but unissued common stock and preferred stock are available for future issuances without stockholder approval (including a specified future issuance) and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

### Special meeting of stockholders

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of our board of directors, by our Chief Executive Officer or by our Chairman.

### Advance notice requirements for stockholder proposals and director nominations

Our bylaws provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our bylaws also specify for certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

## Securities Eligible for Future Sale

Immediately after the consummation of this offering (assuming no exercise of the underwriters' over-allotment option) we will have 50,000,000 (or 57,500,000 if the underwriters' over-allotment option is exercised in full) shares of common stock outstanding. Of these shares, the 40,000,000 shares (or 46,000,000 if the underwriters' over-allotment option is exercised in full) sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. All of the remaining 10,000,000 (or 11,500,000 if the underwriters' over-allotment option is exercised in full) shares and all 6,666,666 (or 7,466,666 if the underwriters' over-allotment option is exercised in full)

128

Table of Contents

private placement warrants are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering, and the shares of Class B common stock and private placement warrants are subject to transfer restrictions as set forth elsewhere in this prospectus. These restricted securities will be subject to registration rights as more fully described below under "— Registration Rights."

## Rule 144

Pursuant to Rule 144, a person who has beneficially owned restricted shares of our common stock or warrants for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as we were required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of our common stock or warrants for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of common stock then outstanding, which will equal 400,000 shares immediately after this offering (or 460,000 if the underwriters exercise their over-allotment option in full); or

- the average weekly reported trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

## Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and materials required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our initial stockholders will be able to sell their founder shares and private placement warrants, as applicable, pursuant to Rule 144 without registration one year after we have completed our initial business combination.

129

Table of Contents

**Registration Rights**

    The holders of the founder shares, private placement warrants and warrants that may be issued upon conversion of working capital loans (and any shares of Class A common stock issuable upon the exercise of the private placement warrants and warrants that may be issued upon conversion of working capital loans and upon conversion of the founder shares) will be entitled to registration rights pursuant to a registration rights agreement to be signed prior to or on the effective date of this offering, requiring us to register such securities for resale (in the case of the founder shares, only after conversion to our Class A common stock). The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of our initial business combination and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period, which occurs (i) in the case of the founder shares, on the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property and (ii) in the case of the private placement warrants and the respective Class A common stock underlying such warrants, 30 days after the completion of our initial business combination. We will bear the expenses incurred in connection with the filing of any such registration statements.

**Listing of Securities**

    We will apply to list our units, Class A common stock and warrants on NASDAQ under the symbols "    U," "    " and "    W," respectively. We expect that our units will be listed on NASDAQ on or promptly after the effective date of the registration statement. Following the date the shares of our Class A common stock and warrants are eligible to trade separately, we anticipate that the shares of our Class A common stock and warrants will be listed separately and as a unit on NASDAQ. We cannot guarantee that our securities will be approved for listing on NASDAQ.

<div align="center">130</div>

Table of Contents

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a discussion of the material U.S. federal income tax consequences of the acquisition, ownership and disposition of our units, shares of Class A common stock and warrants, which we refer to collectively as our securities. Because the components of a unit are separable at the option of the holder, the holder of a unit generally should be treated, for U.S. federal income tax purposes, as the owner of the underlying Class A common stock and one-third of one warrant components of the unit, as the case may be. As a result, the discussion below with respect to actual holders of Class A common stock and warrants should also apply to holders of units (as the deemed owners of the underlying Class A common stock and warrants that comprise the units). This discussion applies only to securities that are held as a capital asset for U.S. federal income tax purposes and is applicable only to holders who purchased units in this offering.

This discussion does not describe all of the tax consequences that may be relevant to you in light of your particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income and the different consequences that may apply if you are subject to special rules that apply to certain types of investors, such as:

- financial institutions;

- insurance companies;

- dealers or traders subject to a mark-to-market method of accounting with respect to the securities;

- persons holding the securities as part of a "straddle," hedge, integrated transaction or similar transaction;

- U.S. holders (as defined below) whose functional currency is not the U.S. dollar;

- partnerships or other pass-through entities for U.S. federal income tax purposes; and

- tax-exempt entities.

If you are a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of your partners will generally depend on the status of the partners and your activities.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), and administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, changes to any of which subsequent to the date of this prospectus may affect the tax consequences described herein. This discussion does not address any aspect of state, local or non-U.S. taxation, or any U.S. federal taxes other than income taxes (such as gift and estate taxes).

You are urged to consult your tax advisor with respect to the application of U.S. federal tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdiction.

**Personal Holding Company Status**

We could be subject to a second level of U.S. federal income tax on a portion of our income if we are determined to be a personal holding company, or PHC, for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations, pension funds and charitable trusts) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the

131

Table of Contents

corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, certain royalties, annuities and, under certain circumstances, rents).

Depending on the date and size of our initial business combination, at least 60% of our adjusted ordinary gross income may consist of PHC income as discussed above. In addition, depending on the concentration of our stock in the hands of individuals, including the members of our sponsor and certain tax-exempt organizations, pension funds and charitable trusts, more than 50% of our stock may be owned or deemed owned (pursuant to the constructive ownership rules) by such persons during the last half of a taxable year. Thus, no assurance can be given that we will not be a PHC following this offering or in the future. If we are or were to become a PHC in a given taxable year, we would be subject to an additional PHC tax, currently 20%, on our undistributed PHC income, which generally includes our taxable income, subject to certain adjustments.

**Allocation of Purchase Price and Characterization of a Unit**

No statutory, administrative or judicial authority directly addresses the treatment of a unit or instruments similar to a unit for U.S. federal income tax purposes and, therefore, that treatment is not entirely clear. The acquisition of a unit should be treated for U.S. federal income tax purposes as the acquisition of one share of our Class A common stock and one-third of one warrant to acquire one share of our Class A common stock. We intend to treat the acquisition of a unit in this manner and, by purchasing a unit, you will agree to adopt such treatment for tax purposes. For U.S. federal income tax purposes, each holder of a unit must allocate the purchase price paid by such holder for such unit between the one share of Class A common stock and the one-third of one warrant based on the relative fair market value of each at the time of issuance. The price allocated to each share of Class A common stock and the one-third of one warrant should be the shareholder's tax basis in such share or one-third of one warrant, as the case may be. Any disposition of a unit should be treated for U.S. federal income tax purposes as a disposition of the share of Class A common stock and one-third of one warrant comprising the unit, and the amount realized on the disposition should be allocated between the Class A common stock and the one-third of one warrant based on their respective relative fair market values at the time of disposition. The separation of shares of Class A common stock and warrants comprising units should not be a taxable event for U.S. federal income tax purposes.

The foregoing treatment of the shares of Class A common stock and warrants and a holder's purchase price allocation are not binding on the Internal Revenue Service ("IRS") or the courts. Because there are no authorities that directly address instruments that are similar to the units, no assurance can be given that the IRS or the courts will agree with the characterization described above or the discussion below. Accordingly, each prospective investor is urged to consult its own tax advisors regarding the tax consequences of an investment in a unit (including alternative characterizations of a unit). The balance of this discussion assumes that the characterization of the units described above is respected for U.S. federal income tax purposes.

**U.S. Holders**

This section applies to you if you are a "U.S. holder." A U.S. holder is a beneficial owner of our units, shares of Class A common stock or warrants who or that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia; or

132

Table of Contents

- an estate or trust the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

*Taxation of Distributions.*    If we pay cash distributions to U.S. holders of shares of our Class A common stock, such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Class A common stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Class A common stock and will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock" below.

Dividends we pay to a U.S. holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Class A common stock described in this prospectus may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.*    Upon a sale or other taxable disposition of our Class A common stock or warrants which, in general, would include a redemption of Class A common stock or warrants as described below, and including as a result of a dissolution and liquidation in the event we do not consummate an initial business combination within the required time period, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. holder's adjusted tax basis in the Class A common stock or warrants. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for the Class A common stock or warrants so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Class A common stock described in this prospectus may suspend the running of the applicable holding period for this purpose. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

Generally, the amount of gain or loss recognized by a U.S. holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition (or, if the Class A common stock or warrants are held as part of units at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the Class A common stock or the warrants based upon the then fair market values of the Class A common stock and the warrants included in the units) and (ii) the U.S. holder's adjusted tax basis in its Class A common stock or warrants so disposed of. A U.S. holder's adjusted tax basis in its Class A common stock or warrants generally will equal the U.S. holder's acquisition cost (that is, as discussed above, the portion of the purchase price of a unit allocated to a share of Class A common stock or one-third of one warrant or, as discussed below, the U.S. holder's initial basis for Class A common stock received upon exercise of warrants) less, in the case of a share of Class A common stock, any prior distributions treated as a return of capital.

*Redemption of Class A Common Stock.*    In the event that a U.S. holder's Class A common stock is redeemed pursuant to the redemption provisions described in this prospectus under the section of this prospectus entitled "Description of Securities—Common Stock" or if we purchase a U.S. holder's

133

Table of Contents

Class A common stock in an open market transaction, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale of the Class A common stock under Section 302 of the Code. If the redemption qualifies as a sale of common stock, the U.S. holder will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" above. If the redemption does not qualify as a sale of common stock, the U.S. holder will be treated as receiving a corporate distribution with the tax consequences described above under "U.S. Holders—Taxation of Distributions". Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. holder (including any stock constructively owned by the U.S. holder as a result of owning warrants) relative to all of our shares outstanding both before and after the redemption. The redemption of Class A common stock generally will be treated as a sale of the Class A common stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. holder, (ii) results in a "complete termination" of the U.S. holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder takes into account not only stock actually owned by the U.S. holder, but also shares of our stock that are constructively owned by it. A U.S. holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. holder has an interest or that have an interest in such U.S. holder, as well as any stock the U.S. holder has a right to acquire by exercise of an option, which would generally include Class A common stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately following the redemption of Class A common stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately before the redemption. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of our stock actually and constructively owned by the U.S. holder are redeemed or (ii) all of the shares of our stock actually owned by the U.S. holder are redeemed and the U.S. holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. holder does not constructively own any other stock. The redemption of the Class A common stock will not be essentially equivalent to a dividend if a U.S. holder's conversion results in a "meaningful reduction" of the U.S. holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests is satisfied, then the redemption will be treated as a corporate distribution and the tax effects will be as described under "U.S. Holders—Taxation of Distributions," above. After the application of those rules, any remaining tax basis of the U.S. holder in the redeemed Class A common stock will be added to the U.S. holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Exercise or Lapse of a Warrant.*    Except as discussed below with respect to the cashless exercise of a warrant, a U.S. holder generally will not recognize taxable gain or loss the acquisition of common stock upon exercise of a warrant for cash. The U.S. holder's tax basis in the share of our Class A common stock received upon exercise of the warrant generally will be an amount equal to the sum of the U.S. holder's initial investment in the warrant (i.e., the portion of the U.S. holder's purchase price

134

Table of Contents

for units that is allocated to the warrant, as described above under "—General Treatment of Units") and the exercise price. The U.S. holder's holding period for the Class A common stock received upon exercise of the warrants will begin on the date following the date of exercise (or possibly the date of exercise) of the warrants and will not include the period during which the U.S. holder held the warrants. If a warrant is allowed to lapse unexercised, a U.S. holder generally will recognize a capital loss equal to such holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current tax law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. holder's basis in the Class A common stock received would equal the holder's basis in the warrant. If the cashless exercise were treated as not being a gain realization event, a U.S. holder's holding period in the Class A common stock would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the Class A common stock would include the holding period of the warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. holder would recognize gain or loss with respect to the portion of the exercised warrants treated as surrendered to pay the exercise price of the warrants (the "surrendered warrants"). The U.S. holder would recognize capital gain or loss with respect to the surrendered warrants in an amount generally equal to the difference between (i) the fair market value of the Class A common stock that would have been received with respect to the surrendered warrants in a regular exercise of warrants and (ii) the sum of the U.S. holder's tax basis in the surrendered warrants and the aggregate cash exercise price of such warrants (if they had been exercised in a regular exercise). In this case, a U.S. holder's tax basis in the Class A common stock received would equal the U.S. holder's tax basis in the warrants exercised plus (or minus) the gain (or loss) recognized with respect to the surrendered warrants. A U.S. holder's holding period for the Class A common stock would commence on the date following the date of exercise (or possibly the date of exercise) of the warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

*Possible Constructive Distributions.*    The terms of each warrant provide for an adjustment to the number of shares of common stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants." An adjustment which has the effect of preventing dilution generally is not taxable. The U.S. holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrant holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of common stock that would be obtained upon exercise) as a result of a distribution of cash to the holders of shares of our common stock which is taxable to the U.S. holders of such shares as described under "U.S. Holders—Taxation of Distributions" above. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest. For certain information reporting purposes, we are required to determine the date and amount of any such constructive distributions. Recently proposed Treasury regulations, which we may rely on prior to the issuance of final regulations, specify how the date and amount of constructive distributions are determined.

135

Table of Contents

*Information Reporting and Backup Withholding.*   In general, information reporting requirements may apply to dividends paid to a U.S. holder and to the proceeds of the sale or other disposition of our units, shares of Class A common stock and warrants, unless the U.S. holder is an exempt recipient. Backup withholding may apply to such payments if the U.S. holder fails to provide a taxpayer identification number, a certification of exempt status or has been notified by the IRS that it is subject to backup withholding (and such notification has not been withdrawn).

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

## Non-U.S. Holders

This section applies to you if you are a "Non-U.S. holder." A Non-U.S. holder is a beneficial owner of our units, shares of Class A common stock and warrants who or that is, for U.S. federal income tax purposes:

- a non-resident alien individual, other than certain former citizens and residents of the United States subject to U.S. tax as expatriates;

- a foreign corporation; or

- a foreign estate or trust;

but does not include an individual who is present in the United States for 183 days or more in the taxable year of disposition. If you are such an individual, you should consult your tax advisor regarding the U.S. federal income tax consequences of the sale or other disposition of our units.

*Taxation of Distributions.*   In general, any distributions (including constructive distributions) we make to a Non-U.S. holder of shares of our Class A common stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). In the case of any constructive dividend, it is possible that this tax would be withheld from any amount owed to a Non-U.S. holder by the applicable withholding agent, including cash distributions on other property or sale proceeds from warrants or other property subsequently paid or credited to such holder. Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. holder's adjusted tax basis in its shares of our Class A common stock and, to the extent such distribution exceeds the Non-U.S. holder's adjusted tax basis, as gain realized from the sale or other disposition of the Class A common stock, which will be treated as described under "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below. In addition, if we determine that we are likely to be classified as a "U.S. real property holding corporation" (see "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below), we will withhold 15% of any distribution that exceeds our current and accumulated earnings and profits.

The withholding tax does not apply to dividends paid to a Non-U.S. holder who provides a Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. corporation receiving effectively

136

Table of Contents

connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate).

*Exercise of a Warrant.*   The U.S. federal income tax treatment of a Non-U.S. holder's exercise of a warrant, or the lapse of a warrant held by a Non-U.S. holder, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of a warrant by a U.S. holder, as described under "U.S. holders—Exercise or Lapse of a Warrant" above, although to the extent a cashless exercise results in a taxable exchange, the consequences would be similar to those described below in "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants."

*Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.*   A Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized on a sale, taxable exchange or other taxable disposition of our Class A common stock, which would include a dissolution and liquidation in the event we do not complete an initial business combination within 24 months from the closing of this offering, or warrants (including an expiration or redemption of our warrants), in each case without regard to whether those securities were held as part of a unit, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. holder); or

- we are or have been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. holder held our Class A common stock, and, in the case where shares of our Class A common stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or constructively, more than 5% of our Class A common stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. holder's holding period for the shares of our Class A common stock. There can be no assurance that our Class A common stock will be treated as regularly traded on an established securities market for this purpose.

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. holder were a U.S. resident. Any gains described in the first bullet point above of a Non-U.S. holder that is a foreign corporation may also be subject to an additional "branch profits tax" at a 30% rate (or lower treaty rate).

If the second bullet point above applies to a Non-U.S. holder, gain recognized by such holder on the sale, exchange or other disposition of our Class A common stock or warrants will be subject to tax at generally applicable U.S. federal income tax rates. In addition, a buyer of our Class A common stock or warrants from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We cannot determine whether we will be a U.S. real property holding corporation in the future until we complete an initial business combination. We will be classified as a U.S. real property holding corporation if the fair market value of our "U.S. real property interests" equals or exceeds 50 percent of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

*Redemption of Class A Common Stock.*   The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. holder's Class A common stock pursuant to the redemption provisions described in the section of this prospectus entitled "Description of Securities—Common Stock" generally will correspond to the U.S. federal income tax characterization of such a redemption of a

137

Table of Contents

U.S. holder's Class A common stock, as described under "U.S. Holders—Redemption of Class A Common Stock" above, and the consequences of the redemption to the Non-U.S. holder will be as described above under "Non-U.S. holders—Taxation of Distributions" and "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants," as applicable. It is possible that because the applicable withholding agent may not be able to determine the proper characterization of a redemption of a Non-U.S. holder's Class A common stock, the withholding agent might treat the redemption as a distribution subject to withholding tax.

*Information Reporting and Backup Withholding.*   Information returns will be filed with the IRS in connection with payments of dividends and the proceeds from a sale or other disposition of our units, shares of Class A common stock and warrants. A Non-U.S. holder may have to comply with certification procedures to establish that it is not a United States person in order to avoid information reporting and backup withholding requirements. The certification procedures required to claim a reduced rate of withholding under a treaty will satisfy the certification requirements necessary to avoid the backup withholding as well. The amount of any backup withholding from a payment to a Non-U.S. holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

*FATCA Withholding Taxes.*   Provisions commonly referred to as "FATCA" impose withholding of 30% on payments of dividends (including constructive dividends) on our Class A common stock or warrants, and, beginning in 2019, sales or other disposition proceeds from our units, shares of Class A common stock and warrants to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other Non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies (typically certified as to by the delivery of a properly completed IRS Form W-8BEN-E). If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Prospective investors should consult their tax advisers regarding the effects of FATCA on their investment in our securities.

138

Table of Contents

## UNDERWRITING

      is acting as representative of the underwriters named below. Subject to the terms and conditions of the underwriting agreement dated the date of this prospectus, each underwriter named below has severally agreed to purchase, and we have agreed to sell to that underwriter, the number of units set forth opposite the underwriter's name.

| Underwriter | Number of Units |
|---|---|
| Total | 40,000,000 |

      The underwriting agreement provides that the obligations of the underwriters to purchase the units included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all of the units (other than those covered by the over-allotment option described below) if they purchase any of the units.

      Units sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any units sold by the underwriters to securities dealers may be sold at a discount from the initial public offering price not to exceed $     per unit. If all of the units are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The representative has advised us that the underwriters do not intend to make sales to discretionary accounts.

      If the underwriters sell more units than the total number set forth in the table above, we have granted to the underwriters an option, exercisable for 45 days from the date of this prospectus, to purchase up to 6,000,000 additional units at the public offering price less the underwriting discount. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, in connection with this offering. To the extent the option is exercised, each underwriter must purchase a number of additional units approximately proportionate to that underwriter's initial purchase commitment. Any units issued or sold under the option will be issued and sold on the same terms and conditions as the other units that are the subject of this offering.

      We, our sponsor and our officers and directors have agreed that, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of the representatives, offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any units, warrants, shares of common stock or any other securities convertible into, or exercisable, or exchangeable for, shares of common stock, subject to certain exceptions. The representative in its sole discretion may release any of the securities subject to these lock-up agreements at any time without notice, other than in the case of the officers and directors, which shall be with notice. Our sponsor, officers and directors are also subject to separate transfer restrictions on their founder shares and private placement warrants pursuant to the insider letters as described herein.

      Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or

139

Table of Contents

other property (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants").

Prior to this offering, there has been no public market for our securities. Consequently, the initial public offering price for the units was determined by negotiations between us and the representatives. Among the factors considered in determining initial public offering price were the history and prospects of companies whose principal business is the acquisition of other companies, prior offerings of those companies, our management, our capital structure, and currently prevailing general conditions in equity securities markets, including current market valuations of publicly traded companies considered comparable to our company. We cannot assure you, however, that the price at which the units, Class A common stock or warrants will sell in the public market after this offering will not be lower than the initial public offering price or that an active trading market in our units, Class A common stock or warrants will develop and continue after this offering.

We will apply to list our units on NASDAQ under the symbol "          U." We expect that our Class A common stock and warrants will be listed under the symbols "          " and "          W," respectively, once the Class A common stock and warrants begin separate trading.

The following table shows the underwriting discounts and commissions that we are to pay to the underwriters in connection with this offering. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

|  | Payable by Silver Run Acquisition Corporation II | |
| --- | --- | --- |
|  | No Exercise | Full Exercise |
| Per Unit(1) | $          0.55 | $          0.55 |
| Total(1) | $   22,000,000 | $   25,300,000 |

(1)    Includes $0.35 per unit, or $14,000,000 (or $16,100,000 if the over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, in an amount equal to $0.35 multiplied by the number of shares of Class A common stock sold as part of the units in this offering, as described in this prospectus.

If we do not complete our initial business combination and subsequently liquidate, the trustee and the underwriters have agreed that (i) they will forfeit any rights or claims to their deferred underwriting discounts and commissions, including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the deferred underwriters' discounts and commissions will be distributed on a pro rata basis, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes to the public stockholders.

In connection with the offering, the underwriters may purchase and sell units in the open market. Purchases and sales in the open market may include short sales, purchases to cover short positions, which may include purchases pursuant to the over-allotment option and stabilizing purchases, in accordance with Regulation M under the Exchange Act.

140

Table of Contents

- Short sales involve secondary market sales by the underwriters of a greater number of units than they are required to purchase in the offering.

- "Covered" short sales are sales of units in an amount up to the number of units represented by the underwriters' over-allotment option.

- "Naked" short sales are sales of units in an amount in excess of the number of units represented by the underwriters' over-allotment option.

- Covering transactions involve purchases of units either pursuant to the over-allotment option or in the open market after the distribution has been completed in order to cover short positions.

- To close a naked short position, the underwriters must purchase units in the open market after the distribution has been completed. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the units in the open market after pricing that could adversely affect investors who purchase in the offering.

- To close a covered short position, the underwriters must purchase units in the open market after the distribution has been completed or must exercise the over-allotment option. In determining the source of units to close the covered short position, the underwriters will consider, among other things, the price of units available for purchase in the open market as compared to the price at which they may purchase units through the over-allotment option.

- Stabilizing transactions involve bids to purchase units so long as the stabilizing bids do not exceed a specified maximum.

Purchases to cover short positions and stabilizing purchases, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the units. They may also cause the price of the units to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions in the over-the-counter market or otherwise. If the underwriters commence any of these transactions, they may discontinue them at any time.

We estimate that our portion of the total expenses of this offering payable by us will be $900,000 (which includes $47,500 of accounting fees and expenses), excluding underwriting discounts and commissions. We have agreed to reimburse the underwriters for all expenses and fees related to the review by FINRA, which will not exceed $15,000.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make because of any of those liabilities.

We are not under any contractual obligation to engage any of the underwriters to provide any services for us after this offering, and have no present intent to do so. However, any of the underwriters may introduce us to potential target businesses or assist us in raising additional capital in the future. If any of the underwriters provide services to us after this offering, we may pay such underwriter fair and reasonable fees that would be determined at that time in an arm's length negotiation; provided that no agreement will be entered into with any of the underwriters and no fees for such services will be paid to any of the underwriters prior to the date that is 90 days from the date of this prospectus, unless FINRA determines that such payment would not be deemed underwriters' compensation in connection with this offering and we may pay the underwriters of this offering or any entity with which they are affiliated a finder's fee or other compensation for services rendered to us in connection with the completion of a business combination.

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our

141

Table of Contents

affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Notice to Prospective Investors in the European Economic Area**

In relation to each member state of the European Economic Area that has implemented the Prospectus Directive (each, a "relevant member state"), with effect from and including the date on which the Prospectus Directive is implemented in that relevant member state (the "relevant implementation date"), an offer of units described in this prospectus may not be made to the public in that relevant member state prior to the publication of a prospectus in relation to the units that has been approved by the competent authority in that relevant member state or, where appropriate, approved in another relevant member state and notified to the competent authority in that relevant member state, all in accordance with the Prospectus Directive, except that, with effect from and including the relevant implementation date, an offer of our units may be made to the public in that relevant member state at any time:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100, or, if the relevant member state has implemented the relevant provisions of the 2010 PD Amending Directive, 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the issuer for any such offer; or natural or legal persons (other than qualified investors as defined below) subject to obtaining the prior consent of the underwriter for any such offer; or

- in any other circumstances that do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

provided that no such offer of units referred to in the bullet points above shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each purchaser of units described in this prospectus located within a relevant member state will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purpose of this provision, the expression an "offer of units to the public" in any relevant member state means the communication in any form and by any means of sufficient information on the terms of the offer and the units to be offered so as to enable an investor to decide to purchase or subscribe for the units, as the expression may be varied in that member state by any measure implementing the Prospectus Directive in that member state, and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive to the extent implemented by the relevant member state) and includes any relevant implementing measure in each relevant member state. The expression 2010 PD Amending Directive means Directive 2010/73/EU.

142

Table of Contents

We have not authorized and do not authorize the making of any offer of units through any financial intermediary on their behalf, other than offers made by the underwriters with a view to the final placement of the units as contemplated in this prospectus. Accordingly, no purchaser of the units, other than the underwriters, is authorized to make any further offer of the units on behalf of us or the underwriters.

**Notice to Prospective Investors in the United Kingdom**

This prospectus is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (each such person being referred to as a "relevant person"). The units are only available to, and any invitation, offer or agreement to purchase or otherwise acquire such units will be engaged in only with, relevant persons. This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents.

**Notice to Prospective Investors in France**

Neither this prospectus nor any other offering material relating to the units described in this prospectus has been submitted to the clearance procedures of the Autorité des Marchés Financiers or by the competent authority of another member state of the European Economic Area and notified to the Autorité des Marchés Financiers. The units have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the units has been or will be:

-   released, issued, distributed or caused to be released, issued or distributed to the public in France; or

-   used in connection with any offer for subscription or sale of the units to the public in France.

Such offers, sales and distributions will be made in France only:

-   to qualified investors (investisseurs qualifiés) and/or to a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French Code monétaire et financier;

-   to investment services providers authorized to engage in portfolio management on behalf of third parties; or

-   in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French Code monétaire et financier and article 211-2 of the General Regulations (Règlement Général) of the Autorité des Marchés Financiers, does not constitute a public offer (appel public à l'épargne).

The units may be resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code monétaire et financier.

**Notice to Prospective Investors in Hong Kong**

The units may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the

143

Table of Contents

Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the units may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the units may not be circulated or distributed, nor may the units be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the units are subscribed or purchased under Section 275 of the SFA by a relevant person which is

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

- to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than $200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

- where no consideration is or will be given for the transfer; or

- where the transfer is by operation of law.

**Notice to Prospective Investors in Canada**

The units may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions*

144

Table of Contents

or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the units must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York, has passed upon the validity of the securities offered hereby on behalf of us. Certain legal matters will be passed upon on behalf of the underwriter by         .

## EXPERTS

The balance sheet of Silver Run Acquisition Corporation II as of November 21, 2016, and the related statements of operations, stockholders' equity and cash flow for the period November 16, 2016 (inception) through November 21, 2016, have been audited by WithumSmith+Brown, PC, independent registered public accounting firm, as stated in their report which is incorporated herein. Such financial statements have been incorporated herein in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the securities we are offering by this prospectus. This prospectus does not contain all of the information included in the registration statement. For further information about us and our securities, you should refer to the registration statement and the exhibits and schedules filed with the registration statement. Whenever we make reference in this prospectus to any of our contracts, agreements or other documents, the references are materially complete but may not include a description of all aspects of such contracts, agreements or other documents, and you should refer to the exhibits attached to the registration statement for copies of the actual contract, agreement or other document.

Upon completion of this offering, we will be subject to the information requirements of the Exchange Act and will file annual, quarterly and current event reports, proxy statements and other information with the SEC. You can read our SEC filings, including the registration statement, over the Internet at the SEC's website at www.sec.gov. You may also read and copy any document we file with the SEC at its public reference facility at 100 F Street, N.E., Washington, D.C. 20549.

You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference facilities.

145

Table of Contents

## INDEX TO FINANCIAL STATEMENTS

|  | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Stockholder's Equity | F-5 |
| Statement of Cash Flows | F-6 |
| Notes to Financial Statements | F-7 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholder of
Silver Run Acquisition Corporation II

We have audited the accompanying balance sheet of Silver Run Acquisition Corporation II (the "Company"), as of November 21, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period from November 16, 2016 (date of inception) to November 21, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Silver Run Acquisition Corporation II as of November 21, 2016, and the results of its operations and its cash flows for the period from November 16, 2016 (date of inception) to November 21, 2016, in accordance with accounting principles generally accepted in the United States of America.

/s/ WithumSmith+Brown, PC

New York, New York
November 23, 2016

F-2

Table of Contents

**Silver Run Acquisition Corporation II**

**BALANCE SHEET**

**November 21, 2016**

| | | |
|---|---|---:|
| **ASSETS** | | |
| Deferred offering costs | $ | 46,000 |
| **Total assets** | $ | **46,000** |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Liabilities | | |
| Current liabilities—Accrued formation and offering costs | $ | 23,000 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | — |
| Class A ordinary shares, $0.0001 par value; 200,000,000 shares authorized; none issued and outstanding | | — |
| Class B ordinary shares, $0.0001 par value; 20,000,000 shares authorized; 11,500,000 shares issued and outstanding(1) | | 1,150 |
| Additional paid-in capital | | 23,850 |
| Accumulated deficit | | (2,000) |
| Total stockholder's equity | | 23,000 |
| **Total liabilities and stockholder's equity** | $ | **46,000** |

(1)   This number includes an aggregate of up to 1,500,000 shares of common stock subject to forfeiture if the over-allotment option is not exercised by the underwriters.

See accompanying notes to financial statements

F-3

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF OPERATIONS**

**For the period from November 16, 2016 (date of inception) to November 21, 2016**

| | | |
|---|---|---:|
| Revenues | $ | — |
| General and administrative expenses | | 2,000 |
| Net loss attributable to common shares | $ | (2,000) |
| Weighted average number of shares outstanding: | | |
| Basic and diluted(1) | | 11,500,000 |
| Net loss per common share: | | |
| Basic and diluted | $ | (0.00) |

(1)   This number includes an aggregate of up to 1,500,000 shares of common stock subject to forfeiture if the over-allotment option is not exercised by the underwriters.

See accompanying notes to financial statements

F-4

Table of Contents

## Silver Run Acquisition Corporation II

## STATEMENT OF STOCKHOLDER'S EQUITY

### For the period from November 16, 2016 (date of inception) to November 21, 2016

| | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Stockholder's Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance November 16, 2016 | — | $ — | $ — | $ — | $ — |
| Sale of common stock to Sponsor at approx. $0.002 per share(1) | 11,500,000 | 1,150 | 23,850 | — | 25,000 |
| Net loss | — | — | — | (2,000) | (2,000) |
| Balances, November 21, 2016 | 11,500,000 | $ 1,150 | $ 23,850 | $ (2,000) | $ 23,000 |

(1)    This number includes an aggregate of up to 1,500,000 shares of common stock subject to forfeiture if the over-allotment option is not exercised by the underwriters.

See accompanying notes to financial statements

F-5

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF CASH FLOWS**

**For the period from November 16, 2016 (date of inception) to November 21, 2016**

| | | |
|---|---:|---:|
| **Net loss** | $ | (2,000) |
| Adjustments to reconcile net loss to net cash used in operations: | | |
|    Increase in accounts payable and accrued liabilities | | 2,000 |
|      Net cash used in operating activities | | — |
| Net change in cash | | — |
| | | |
| Cash at beginning of period | | — |
| Cash at end of period | | — |
| Supplemental disclosure of non-cash financing activities | | |
|    Deferred offering costs included in accrued formation and offering costs | $ | 21,000 |
|    Offering costs paid by Sponsor in exchange for Founder Shares | $ | 25,000 |

See accompanying notes to financial statements

F-6

Table of Contents

## NOTES TO FINANCIAL STATEMENTS

### Note 1—Description of Organization and Business Operations

*Organization and General*

Silver Run Acquisition Corporation II (the "**Company**") was incorporated in Delaware on November 16, 2016. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "**Initial Business Combination**"). The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the "**Securities Act**," as modified by the Jumpstart Our Business Startups Act of 2012 (the "**JOBS Act**").

At November 21, 2016, the Company had not commenced any operations. All activity for the period from November 16, 2016 (inception) through November 21, 2016 relates to the Company's formation and the proposed initial public offering ("**Proposed Offering**") described below. The Company will not generate any operating revenues until after completion of its Initial Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31st as its fiscal year end.

*Sponsor and Proposed Financing*

The Company's sponsor is Silver Run Sponsor II, LLC, a Delaware limited liability company (the "**Sponsor**"). The Company intends to finance its Initial Business Combination with proceeds from the proposed $400,000,000 initial public offering of Units (as defined below) (Note 3) and a $10,000,000 private placement (Note 4). Upon the closing of the Proposed Offering and the private placement, $400,000,000 (or $460,000,000 if the underwriters' over-allotment option is exercised in full—Note 3) will be held in a trust account (the "**Trust Account**") (discussed below).

*The Trust Account*

The proceeds held in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred eighty (180) days or less or in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act of 1940 and that invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Initial Business Combination or (ii) the distribution of the Trust Account proceeds as described below. The remaining proceeds outside the Trust Account may be used to pay for business, legal and accounting due diligence on prospective acquisitions and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes, if any, none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Initial Business Combination; (ii) the redemption of any shares of Class A common stock included in the Units (the "**Public Shares**") being sold in the Proposed Offering that have been properly tendered in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of its obligation to redeem 100% of such shares of Class A common stock if it does not complete the Initial Business Combination within 24 months from the closing of the Proposed Offering; and (iii) the redemption of 100% of the shares of Class A common stock included in the Units being sold in the Proposed Offering if the Company is unable to complete an Initial Business Combination within 24 months from the closing of the Proposed Offering (subject to the requirements of law). The proceeds deposited in the Trust Account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

F-7

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 1—Description of Organization and Business Operations (Continued)**

*Initial Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be generally applied toward consummating an Initial Business Combination. The Initial Business Combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on income earned on the Trust Account) at the time of the agreement to enter into the Initial Business Combination. Furthermore, there is no assurance that the Company will be able to successfully effect an Initial Business Combination.

The Company, after signing a definitive agreement for an Initial Business Combination, will either (i) seek stockholder approval of the Initial Business Combination at a meeting called for such purpose in connection with which stockholders may seek to redeem their shares, regardless of whether they vote for or against the Initial Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to sell their Public Shares to the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the Initial Business Combination or will allow stockholders to sell their Public Shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval, unless a vote is required by law or under NASDAQ rules. If the Company seeks stockholder approval, it will complete its Initial Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the Initial Business Combination. However, in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. In such case, the Company would not proceed with the redemption of its Public Shares and the related Initial Business Combination, and instead may search for an alternate Initial Business Combination.

If the Company holds a stockholder vote or there is a tender offer for shares in connection with an Initial Business Combination, a public stockholder will have the right to redeem its shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. As a result, such shares of Class A common stock will be recorded at redemption amount and classified as temporary equity upon the completion of the Proposed Offering, in accordance with the Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") 480, "Distinguishing Liabilities from Equity."

Pursuant to the Company's amended and restated certificate of incorporation, if the Company is unable to complete the Initial Business Combination within 24 months from the closing of the Proposed Offering, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay the Company's franchise and income taxes

F-8

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 1—Description of Organization and Business Operations (Continued)

(less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. The Sponsor and the Company's officers and directors will enter into a letter agreement with the Company, pursuant to which they will agree to waive their rights to liquidating distributions from the Trust Account with respect to any Founder Shares (as defined below) held by them if the Company fails to complete the Initial Business Combination within 24 months of the closing of the Proposed Offering. However, if the Sponsor or any of the Company's directors, officers or affiliates acquires shares of Class A common stock in or after the Proposed Offering, they will be entitled to liquidating distributions from the Trust Account with respect to such shares if the Company fails to complete the Initial Business Combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after an Initial Business Combination, the Company's stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. The Company's stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that the Company will provide its stockholders with the opportunity to redeem their Public Shares for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account, upon the completion of the Initial Business Combination, subject to the limitations described herein.

### Note 2—Summary of Significant Accounting Policies

#### Basis of Presentation

The financial statements of the Company are presented in U.S. dollars in conformity with accounting principles generally accepted in the United States of America ("**GAAP**").

#### Emerging Growth Company

We are an "emerging growth company" as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act, and are subject to reduced public company reporting requirements. This prospectus complies with the requirements that apply to an issuer that is an emerging growth company. Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statement with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using

F-9

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 2—Summary of Significant Accounting Policies (Continued)

the extended transition period difficult or impossible because of the potential differences in accounting standards used.

*Net Loss Per Common Share*

Net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the period, plus, to the extent dilutive, the incremental number of shares of common stock to settle warrants, as calculated using the treasury stock method. At November 21, 2016, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company under the treasury stock method. As a result, diluted loss per common share is the same as basic loss per common share for the period.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash accounts in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

*Financial Instruments*

The fair value of the Company's assets and liabilities, which qualify as financial instruments under the FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Deferred Offering Costs*

The Company complies with the requirements of the FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A —"Expenses of Offering." Deferred offering costs of approximately $46,000 consist of costs incurred in connection with formation and preparation for the Proposed Offering. These costs, together with the underwriter discount, will be charged to capital upon completion of the Proposed Offering or charged to operations if the Proposed Offering is not completed.

*Income Taxes*

The Company follows the asset and liability method of accounting for income taxes under FASB ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a

F-10

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 2—Summary of Significant Accounting Policies (Continued)**

change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of November 21, 2016. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties at November 21, 2016. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

*Recent Accounting Pronouncements*

Management does not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have a material effect on the Company's financial statements.

**Note 3—Public Offering**

Pursuant to the Proposed Offering, the Company intends to offer for sale up to 40,000,000 units at a price of $10.00 per unit (the "**Units**"). The Sponsor has committed to purchase an aggregate of 6,666,666 warrants at a price of $1.50 per warrant in a private placement that will close simultaneously with the Proposed Offering.

Each Unit consists of one share of the Company's Class A common stock, $0.0001 par value, and one-third of one warrant (each, a "**Warrant**" and, collectively, the "**Warrants**"). Each whole Warrant entitles the holder to purchase one share of Class A common stock at a price of $11.50 per share. No fractional shares will be issued upon separation of the Units and only whole Warrants will trade. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's Initial Business Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's Initial Business Combination or earlier upon redemption or liquidation. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of the Company's Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sent the notice of redemption to the Warrant holders.

The Company expects to grant the underwriters a 45-day option to purchase up to 6,000,000 additional Units to cover any over-allotments at the initial public offering price less the underwriting discounts and commissions. The Units that would be issued in connection with the over-allotment option would be identical to the Units issued in the Proposed Offering.

The Company expects to pay an underwriting discount of 2.0% of the per Unit offering price to the underwriters at the closing of the Proposed Offering, with an additional fee (the "**Deferred Discount**") of 3.5% of the gross offering proceeds payable upon the Company's completion of an Initial Business Combination. The Deferred Discount will become payable to the underwriters from the

F-11

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 3—Public Offering (Continued)**

amounts held in the Trust Account solely in the event the Company completes its Initial Business Combination.

**Note 4—Related Party Transactions**

*Founder Shares*

On November 21, 2016, the Sponsor acquired 11,500,000 shares of Class B common stock (the "**Founder Shares**") in exchange for a capital contribution of $25,000, or approximately $0.002 per share. As used herein, unless the context otherwise requires, "Founder Shares" shall be deemed to include the shares of Class A common stock issuable upon conversion thereof. The Founder Shares are identical to the Class A common stock included in the Units being sold in the Proposed Offering except that the Founder Shares automatically convert into shares of Class A common stock at the time of the Company's Initial Business Combination and are subject to certain transfer restrictions, as described in more detail below. Holders of Founder Shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. The Sponsor has agreed to forfeit up to 1,500,000 Founder Shares to the extent that the over-allotment option is not exercised in full by the underwriters. The forfeiture will be adjusted to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering. If the Company increases or decreases the size of the offering, the Company will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the Proposed Offering in such amount as to maintain the Founder Share ownership of the Company's stockholders prior to the Proposed Offering at 20.0% of the Company's issued and outstanding common stock upon the consummation of the Proposed Offering.

The Company's initial stockholders will agree, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier to occur of: (A) one year after the completion of the Initial Business Combination or (B) subsequent to the Initial Business Combination, (x) if the last sale price of the Company's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Initial Business Combination, or (y) the date on which we complete a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

The Sponsor will agree to purchase an aggregate of 6,666,666 private placement warrants (or 7,466,666 if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $10,000,000 in the aggregate or $11,200,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of the Proposed Offering (the "**Private Placement Warrants**"). Each whole Private Placement Warrant is exercisable for one whole share of the Company's Class A common stock at a price of $11.50 per share. A portion of the purchase price of the Private Placement Warrants will be added to the proceeds from the Proposed Offering to be held in the Trust Account such that at the closing of the Proposed Offering $400.0 million (or $460.0 million if the underwriters exercise their over-allotment option in full) will be held in the Trust Account. If the Initial Business Combination is not completed within 24 months from the closing of the Proposed Offering, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Placement Warrants will expire

F-12

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 4—Related Party Transactions (Continued)**

worthless. The Private Placement Warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the Sponsor or its permitted transferees.

The Sponsor and the Company's officers and directors will agree, subject to limited exceptions, not to transfer, assign or sell any of their Private Placement Warrants until 30 days after the completion of the Initial Business Combination.

*Registration Rights*

The holders of Founder Shares, Private Placement Warrants and Warrants that may be issued upon conversion of working capital loans, if any, will be entitled to registration rights (in the case of the Founder Shares, only after conversion of such shares to shares of Class A common stock) pursuant to a registration rights agreement to be signed on or before the date of the prospectus for the Proposed Offering. These holders will be entitled to certain demand and "piggyback" registration rights. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period for the securities to be registered. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Administrative Support Agreement*

The Company will agree to pay an affiliate of the Sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of the Initial Business Combination or the Company's liquidation, the Company will cease paying these monthly fees.

**Note 5—Stockholder's Equity**

*Common Stock*

The authorized common stock of the Company includes up to 200,000,000 shares of Class A common stock and 20,000,000 shares of Class B common stock. If the Company enters into an Initial Business Combination, it may (depending on the terms of such an Initial Business Combination) be required to increase the number of shares of Class A common stock which the Company is authorized to issue at the same time as the Company's stockholders vote on the Initial Business Combination to the extent the Company seeks stockholder approval in connection with the Initial Business Combination. Holders of the Company's common stock are entitled to one vote for each share of common stock. At November 21, 2016, there were 11,500,000 shares of Class B common stock issued and outstanding.

*Preferred Stock*

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors. At November 21, 2016, there were no shares of preferred stock issued or outstanding.

**Note 6—Subsequent Events**

*Related Party Loans*

On November 22, 2016, the Sponsor loaned the Company an aggregate of $300,000 to cover expenses related to the Proposed Offering pursuant to a promissory note (the "**Note**"). This loan is non-interest bearing and payable on the earlier of March 31, 2017 or the completion of the Proposed Offering. As of November 23, 2016, $300,000 is still outstanding under the Note.

F-13

Table of Contents

**40,000,000 Units**

# Silver Run Acquisition Corporation II

---

**PRELIMINARY PROSPECTUS**

**, 2017**

---

Until              , 2017 (25 days after the date of this prospectus), all dealers that buy, sell or trade shares of our Class A common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

Table of Contents

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13.** *Other Expenses of Issuance and Distribution.*

The estimated expenses payable by us in connection with the offering described in this registration statement (other than the underwriting discount and commissions) will be as follows:

| | |
|---|---:|
| Legal fees and expenses | $   350,000 |
| Accounting fees and expenses | 47,500 |
| SEC expenses | 53,314 |
| FINRA expenses | 69,500 |
| Travel and road show | 20,000 |
| NASDAQ listing and filing fees | 75,000 |
| Directors and officers insurance(1) | 175,000 |
| Printing and engraving expenses | 75,000 |
| Miscellaneous expenses | 34,686 |
| Total offering expenses | $   900,000 |

(1)   This amount represents the approximate amount of annual director and officer liability insurance premiums the registrant anticipates paying following the completion of its initial public offering and until it completes a business combination.

**Item 14.** *Indemnification of Directors and Officers.*

Our amended and restated certificate of incorporation will provide that all of our directors, officers, employees and agents shall be entitled to be indemnified by us to the fullest extent permitted by Section 145 of the Delaware General Corporation Law ("DGCL").

Section 145 of the DGCL concerning indemnification of officers, directors, employees and agents is set forth below.

Section 145. Indemnification of officers, directors, employees and agents; insurance.

(a)   A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b)   A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is

II-1

Table of Contents

or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)   To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)   Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e)   Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former officers and directors or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f)   The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to such provision after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

(g)   A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving

<div align="center">II-2</div>

---

Table of Contents

at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h)   For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i)   For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

(j)   The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k)   The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees).

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers, and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment of expenses incurred or paid by a director, officer or controlling person in a successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to the court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

In accordance with Section 102(b)(7) of the DGCL, our amended and restated certificate of incorporation, will provide that no director shall be personally liable to us or any of our stockholders for monetary damages resulting from breaches of their fiduciary duty as directors, except to the extent such limitation on or exemption from liability is not permitted under the DGCL unless they violated their duty of loyalty to the Company or its stockholders, acted in bad faith, knowingly or intentionally

II-3

Table of Contents

violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors. The effect of this provision of our amended and restated certificate of incorporation is to eliminate our rights and those of our stockholders (through stockholders' derivative suits on our behalf) to recover monetary damages against a director for breach of the fiduciary duty of care as a director, including breaches resulting from negligent or grossly negligent behavior, except, as restricted by Section 102(b)(7) of the DGCL. However, this provision does not limit or eliminate our rights or the rights of any stockholder to seek non-monetary relief, such as an injunction or rescission, in the event of a breach of a director's duty of care.

If the DGCL is amended to authorize corporate action further eliminating or limiting the liability of directors, then, in accordance with our amended and restated certificate of incorporation, the liability of our directors to us or our stockholders will be eliminated or limited to the fullest extent authorized by the DGCL, as so amended. Any repeal or amendment of provisions of our amended and restated certificate of incorporation limiting or eliminating the liability of directors, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to further limit or eliminate the liability of directors on a retroactive basis.

Our amended and restated certificate of incorporation will also provide that we will, to the fullest extent authorized or permitted by applicable law, indemnify our current and former officers and directors, as well as those persons who, while directors or officers of our corporation, are or were serving as directors, officers, employees or agents of another entity, trust or other enterprise, including service with respect to an employee benefit plan, in connection with any threatened, pending or completed proceeding, whether civil, criminal, administrative or investigative, against all expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by any such person in connection with any such proceeding. Notwithstanding the foregoing, a person eligible for indemnification pursuant to our amended and restated certificate of incorporation will be indemnified by us in connection with a proceeding initiated by such person only if such proceeding was authorized by our board of directors, except for proceedings to enforce rights to indemnification.

The right to indemnification conferred by our amended and restated certificate of incorporation is a contract right that includes the right to be paid by us the expenses incurred in defending or otherwise participating in any proceeding referenced above in advance of its final disposition, provided, however, that if the DGCL requires, an advancement of expenses incurred by our officer or director (solely in the capacity as an officer or director of our corporation) will be made only upon delivery to us of an undertaking, by or on behalf of such officer or director, to repay all amounts so advanced if it is ultimately determined that such person is not entitled to be indemnified for such expenses under our amended and restated certificate of incorporation or otherwise.

The rights to indemnification and advancement of expenses will not be deemed exclusive of any other rights which any person covered by our amended and restated certificate of incorporation may have or hereafter acquire under law, our amended and restated certificate of incorporation, our bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

Any repeal or amendment of provisions of our amended and restated certificate of incorporation affecting indemnification rights, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to any act or omission occurring prior to such repeal or amendment or adoption of such

II-4

Table of Contents

inconsistent provision. Our amended and restated certificate of incorporation will also permit us, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other that those specifically covered by our amended and restated certificate of incorporation.

Our bylaws include the provisions relating to advancement of expenses and indemnification rights consistent with those set forth in our amended and restated certificate of incorporation. In addition, our bylaws provide for a right of indemnity to bring a suit in the event a claim for indemnification or advancement of expenses is not paid in full by us within a specified period of time. Our bylaws also permit us to purchase and maintain insurance, at our expense, to protect us and/or any director, officer, employee or agent of our corporation or another entity, trust or other enterprise against any expense, liability or loss, whether or not we would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Any repeal or amendment of provisions of our bylaws affecting indemnification rights, whether by our board of directors, stockholders or by changes in applicable law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection existing thereunder with respect to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

We will enter into indemnity agreements with each of our officers and directors, a form of which is to be filed as an exhibit to this Registration Statement. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Pursuant to the Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement, we have agreed to indemnify the underwriters and the underwriters have agreed to indemnify us against certain civil liabilities that may be incurred in connection with this offering, including certain liabilities under the Securities Act.

## Item 15.   *Recent Sales of Unregistered Securities.*

On November 21, 2016, Silver Run Sponsor II, LLC, our sponsor, acquired an aggregate of 11,500,000 shares of our Class B common stock, in exchange for a capital contribution of $25,000, or approximately $0.002 per share. Such securities were issued in connection with our organization pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act.

Our sponsor is an accredited investor for purposes of Rule 501 of Regulation D under the Securities Act.

In addition, our sponsor has committed, pursuant to a written agreement, to purchase from us an aggregate of 6,666,666 (or 7,466,666 if the underwriters' over-allotment option is exercised in full) private placement warrants at $1.50 per warrant (for an aggregate purchase price of approximately $10,000,000 (or $11,200,000 if the underwriters' over-allotment option is exercised in full)). These purchases will take place on a private placement basis simultaneously with the completion of this offering. These issuances will be made pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act.

No underwriting discounts or commissions were paid with respect to such sales.

## Item 16.   Exhibits and Financial Statement Schedules.

(a)  Exhibits. The list of exhibits following the signature page of this registration statement is incorporated herein by reference.

II-5

Table of Contents

(b)  Financial Statements. See page F-1 for an index to the financial statements and schedules included in the registration statement.

**Item 17.**  *Undertakings.*

(a)  The undersigned registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreements, certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

(b)  Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(c)  The undersigned registrant hereby undertakes that:

(1)  For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)  For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

<div align="center">II-6</div>

Table of Contents

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this amendment to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on the            day of            , 201 .

### SILVER RUN ACQUISITION CORPORATION II

By:  _____

Ken Ryan
*Chief Executive Officer*

# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Thomas J. Walker and Stephen S. Coats, each acting alone, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-1 (including all pre-effective and post-effective amendments and registration statements filed pursuant to Rule 462 under the Securities Act of 1933), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| **Name** | **Position** | **Date** |
|---|---|---|
| _____<br>Ken Ryan | Chief Executive Officer<br>(Principal Executive Officer) | |
| _____<br>Thomas J. Walker | Chief Financial Officer and Director<br>(Principal Financial and Accounting Officer) | |

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 1.1 | Form of Underwriting Agreement.* |
| 3.1 | Certificate of Incorporation.* |
| 3.2 | Form of Amended and Restated Certificate of Incorporation.* |
| 3.3 | Bylaws.* |
| 4.1 | Specimen Unit Certificate.* |
| 4.2 | Specimen Class A Common Stock Certificate.* |
| 4.3 | Specimen Warrant Certificate.* |
| 4.4 | Form of Warrant Agreement between Continental Stock Transfer & Trust Company and the Registrant.* |
| 5.1 | Form of Opinion of Weil, Gotshal & Manges LLP.* |
| 10.1 | Promissory Note, dated November 22, 2016, issued to Silver Run Sponsor II, LLC.* |
| 10.2 | Form of Letter Agreement among the Registrant and its officers and directors and Silver Run Sponsor II, LLC.* |
| 10.3 | Form of Investment Management Trust Agreement between Continental Stock Transfer & Trust Company and the Registrant.* |
| 10.4 | Form of Registration Rights Agreement among the Registrant and certain security holders.* |
| 10.5 | Securities Subscription Agreement, dated November 21, 2016, between the Registrant and Silver Run Sponsor II, LLC.* |
| 10.6 | Form of Sponsor Warrants Purchase Agreement between the Registrant and Silver Run Sponsor II, LLC.* |
| 10.7 | Form of Indemnity Agreement.* |
| 10.8 | Form of Administrative Support Agreement.* |
| 14.1 | Form of Code of Ethics.* |
| 23.1 | Consent of WithumSmith+Brown, PC.* |
| 23.2 | Consent of Weil, Gotshal & Manges LLP (to be included in Exhibit 5.1).* |
| 24.1 | Power of Attorney (included on signature page of this Registration Statement).* |
| 99.1 | Form of Audit Committee Charter.* |

99.2   Form of Compensation Committee Charter.*

---

\*        To be filed by amendment.

---

# PX 251

S-1/A 1 a2231490zs-1a.htm S-1/A

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

As filed with the U.S. Securities and Exchange Commission on
March 22, 2017.

Registration No. 333-216409

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

Amendment No. 3
to

# FORM S-1
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# Silver Run Acquisition Corporation II
(Exact name of registrant as specified in its charter)

| **Delaware** | **6770** | **81-4433840** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1000 Louisiana Street, Suite 1450**
**Houston, TX 77002**
**(713) 357-1400**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Stephen S. Coats**
**Secretary**
**Silver Run Acquisition Corporation II**
**1000 Louisiana Street, Suite 1450**
**Houston, TX 77002**
**(713) 357-1400**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

Copies to:

| | |
|---|---|
| **Jennifer A. Bensch, Esq.** | **Douglas E. McWilliams, Esq.** |
| **Weil, Gotshal & Manges LLP** | **E. Ramey Layne, Esq.** |
| **767 Fifth Avenue** | **Vinson & Elkins L.L.P.** |
| **New York, NY 10153** | **1001 Fannin Street, Suite 2500** |
| **Tel: (212) 310-8000** | **Houston, TX 77002** |
| **Fax: (212) 310-8007** | **Tel: (713) 758-2222** |
| | **Fax: (713) 758-2346** |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after the effective date of this registration statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security(1) | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(2) |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value, and one-third of one warrant(3) | 103,500,000 Units | $10.00 | $1,035,000,000 | $119,957 |
| Shares of Class A common stock included as part of the units(4) | 103,500,000 Shares | — | — | —(5) |
| Warrants included as part of the units(4) | 34,500,000 Warrants | — | — | —(5) |
| Total | | | $1,035,000,000 | $119,957 |

(1)   Estimated solely for the purpose of calculating the registration fee.

(2)   Of this amount, $73,307 has previously been paid.

(3)   Includes 13,500,000 units, consisting of 13,500,000 shares of Class A common stock and 4,500,000 warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(4)   Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(5)   No fee pursuant to Rule 457(g).

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED MARCH 22, 2017**

**PRELIMINARY PROSPECTUS**

<div align="center">

**$900,000,000**

# Silver Run Acquisition Corporation II

## 90,000,000 Units

———————————

</div>

Silver Run Acquisition Corporation II is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. We intend to focus our search for a target business in the energy industry.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. The warrants will become exercisable on the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering, and will expire five years after the completion of our initial business combination or earlier upon redemption or liquidation, as described in this prospectus. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. We have also granted the underwriters a 45-day option to purchase up to an additional 13,500,000 units to cover over-allotments, if any.

We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding shares of Class A common stock that were sold as part of the units in this offering, which we refer to collectively as our public shares throughout this prospectus, subject to the limitations described herein. If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, subject to applicable law and as further described herein.

Our sponsor, Silver Run Sponsor II, LLC (which we refer to as our sponsor throughout this prospectus), has committed to purchase an aggregate of 13,333,333 warrants (or 15,133,333 warrants if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate, or $22,700,000 if the over-allotment option is exercised in full) in a private placement that will close simultaneously with the closing of this offering. We refer to these warrants as the private placement warrants throughout this prospectus. Each whole private placement warrant is exercisable to purchase one whole share of our Class A common stock at $11.50 per share.

Our initial stockholders own 25,875,000 shares of our Class B common stock (up to 3,375,000 shares of which are subject to forfeiture depending on the extent to which the underwriter's over-allotment option is exercised). We refer to these shares of Class B common stock as the founder shares throughout this prospectus. The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination, or earlier at the option of the holder, on a one-for-one basis, subject to adjustment as provided herein.

Riverstone VI SR II Holdings, L.P., the sole member of our sponsor (we refer to Riverstone VI SR II Holdings, L.P. throughout this prospectus as "Fund VI Holdings" or as a "Fund VI" vehicle), has entered into a forward purchase agreement with us that provides for the purchase by Fund VI Holdings of an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein.

Currently, there is no public market for our units, Class A common stock or warrants. We have applied to list our units on the NASDAQ Capital Market, or NASDAQ, under the symbol "SRUNU" on or promptly after the date of this prospectus. We cannot guarantee that our securities will be approved for listing on NASDAQ. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. inform us of their decision to allow earlier separate trading, subject to our filing a Current Report on Form 8-K with the Securities and Exchange Commission, or the SEC, containing an audited balance sheet reflecting our receipt of the gross proceeds of this offering and issuing a press release announcing when such separate trading will begin. Once the securities comprising the units begin separate trading, we expect that the Class A common stock and warrants will be listed on NASDAQ under the symbols "SRUN" and "SRUNW," respectively.

———————————

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See the section of this prospectus entitled "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| | Per Unit | Total |
|---|---|---|
| Public offering price | $10.00 | $900,000,000 |
| Underwriting discounts and commissions(1) | $0.55 | $49,500,000 |
| Proceeds, before expenses, to Silver Run Acquisition Corporation II | $9.45 | $850,500,000 |

(1)    Includes $0.35 per unit, or $31,500,000 (or up to $36,225,000 if the underwriters' over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, as described in this prospectus. See the section of this prospectus entitled "Underwriting" beginning on page 144 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the private placement warrants described in this prospectus, $900.0 million or $1,035.0 million if the underwriters' over-allotment option is exercised in full ($10.00 per unit) will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and $2.0 million will be available to pay fees and expenses in connection with the closing of this offering and for working capital following the closing of this offering. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about           , 2017.

**Citigroup**

**Credit Suisse**

**Deutsche Bank Securities**

**Goldman, Sachs & Co.**

, 2017

Table of Contents

**TABLE OF CONTENTS**

     **We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

| | |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 65 |
| Use of Proceeds | 66 |
| Dividend Policy | 71 |
| Dilution | 72 |
| Capitalization | 74 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 75 |
| Proposed Business | 82 |
| Management | 109 |
| Principal Stockholders | 118 |
| Certain Relationships and Related Party Transactions | 120 |
| Description of Securities | 124 |
| United States Federal Income Tax Considerations | 138 |
| Underwriting | 146 |
| Legal Matters | 152 |
| Experts | 152 |
| Where You Can Find Additional Information | 152 |
| Index to Financial Statements | F-1 |

i

Table of Contents

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. As this is a summary, it does not contain all of the information that you should consider in making an investment decision. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"we," "us," "company" or "our company" are to Silver Run Acquisition Corporation II;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"management" or our "management team" are to our officers and directors;*

- *"sponsor" are to Silver Run Sponsor II, LLC, a Delaware limited liability company and a wholly owned subsidiary of Fund VI Holdings;*

- *"Fund VI" are to Riverstone Global Energy and Power Fund VI, L.P., an investment vehicle for which Riverstone Investment Group LLC serves as investment manager, together with its parallel funds and any of its co-investment vehicles and other intermediate investment vehicles holding an interest, directly or indirectly, in us, including Fund VI Holdings; or any of the foregoing Fund VI vehicles individually;*

- *"Fund VI Holdings" are to Riverstone VI SR II Holdings, L.P., an investment vehicle controlled by Riverstone in which Riverstone Global Energy and Power Fund VI, L.P., its parallel funds and one or more co-investment vehicles participate, directly or indirectly through intermediate investment vehicles. Fund VI Holdings is the Fund VI vehicle with which we have entered into the forward purchase agreement;*

- *"initial stockholders" are to holders of our founder shares prior to this offering;*

- *"Riverstone" are to Riverstone Investment Group LLC, a Delaware limited liability company and its affiliates. Riverstone manages funds in the energy and power industry, including Fund VI;*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issued upon the conversion thereof as provided herein;*

- *"private placement warrants" are to the warrants issued to our sponsor in a private placement simultaneously with the closing of this offering;*

- *"equity-linked securities" are to any securities of our company which are convertible into or exchangeable or exercisable for, common stock of our company;*

-

*"forward purchase agreement" are to an agreement providing for the sale of our Class A common stock and warrants to Fund VI Holdings and its permitted transferees in a private placement that will close simultaneously with the closing of our initial business combination;*

1

Table of Contents

- *"forward purchase shares"* are to the shares of our Class A common stock to be issued pursuant to the forward purchase agreement;

- *"forward purchase warrants"* are to warrants to purchase shares of our Class A common stock to be issued pursuant to the forward purchase agreement;

- *"forward purchase securities"* are to the forward purchase shares and the forward purchase warrants;

- *"forward purchase unit"* are to one forward purchase share and one-third of one forward purchase warrant;

- *"Forward Transferee"* are to any entity to which Fund VI Holdings transfers any portion of its obligation to purchase the forward purchase securities under the forward purchase agreement; and

- *"specified future issuance"* are to an issuance of a class of equity or equity-linked securities (other than the forward purchase securities) to specified purchasers, which may include affiliates of Riverstone, that we may determine to make in connection with financing our initial business combination.

*Each unit consists of one share of Class A common stock and one-third of one warrant for each unit purchased. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.*

*Registered trademarks referred to in this prospectus are the property of their respective owners. Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

### Our Company

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We are an acquisition vehicle of Fund VI, an energy-focused private investment fund managed by Riverstone. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

Table of Contents

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

In November 2015, Riverstone formed Silver Run Acquisition Corporation ("Silver Run I"), a blank check company formed for substantially the same purposes as our company. Silver Run I aimed to capitalize on the 45 years of experience in the oil and gas industry of its Chief Executive Officer, Mark Papa. Prior to Silver Run I and his time with Riverstone, Mr. Papa was Chairman and Chief Executive Officer of EOG Resources, an exploration and production company. Through its initial public offering in February 2016, Silver Run I raised $500 million from the sale of 50 million units to public investors, with each unit consisting of one share of Class A common stock and one-third of one warrant. On July 6, 2016, an affiliate of Riverstone entered into a definitive agreement to purchase an approximate 89% interest in Centennial Resource Production, LLC ("Centennial"), an independent oil and natural gas company with assets located in the core of the Southern Delaware Basin, from funds controlled by, and affiliates of, NGP Energy Capital Management, L.L.C. In accordance with the definitive agreement, the Riverstone affiliate agreed to assign, and Silver Run I agreed to assume, its right to purchase the interest in Centennial. On October 11, 2016, Silver Run I consummated the acquisition of approximately 89% of the outstanding membership interests in Centennial. In connection with the acquisition, Silver Run I raised an additional approximately $1.0 billion through a private placement of shares of its Class A Common Stock at $10.00 per share. Upon the closing of the transaction, Silver Run I was renamed Centennial Resource Development, Inc., and its common stock and warrants began trading on NASDAQ under the symbols "CDEV" and "CDEVW", respectively.

Our sponsor is an investment vehicle of Fund VI, which is managed by Riverstone. Riverstone has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

In addition, we believe our ability to complete an initial business combination will be enhanced by our having entered into the forward purchase agreement pursuant to which Fund VI Holdings has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an

Table of Contents

aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

## Business Strategy

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

## Acquisition Criteria

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies or assets that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential;

4

Table of Contents

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

### Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of the Financial Industry Regulatory Authority, or FINRA, or an independent accounting firm with respect to the satisfaction of such criteria. Our stockholders may not be provided with a copy of such opinion, nor will they be able to rely on such opinion.

We may, at our option, pursue an acquisition opportunity jointly with one or more entities affiliated with Riverstone and/or one or more investors in funds managed by Riverstone, which we refer to as an "Affiliated Joint Acquisition." Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by issuing to such parties a class of equity or equity-linked securities. We refer to this potential future issuance, or a similar issuance to other specified purchasers, as a "specified future issuance" throughout this prospectus. Any such Affiliated Joint Acquisition or specified future issuance would be in addition to, and would not include, the forward purchase securities issued pursuant to the forward purchase agreement. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes

5

Table of Contents

of our common stock. The issuance of the forward purchase securities will not result in such an adjustment to the conversion ratio of our Class B common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition as described above. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target or assets sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act of 1940, as amended, or the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

## Our Acquisition Process

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Fund VI, members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any

Table of Contents

discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity, including Fund VI. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

## Corporate Information

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors

Table of Contents

find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

8

Table of Contents

### The Offering

*In making your decision on whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

| | |
|---|---|
| Securities offered | 90,000,000 units, at $10.00 per unit, each unit consisting of: |
| | • one share of Class A common stock; and |
| | • one-third of one warrant. |
| NASDAQ symbols | Units: "SRUNU" |
| | Class A Common Stock: "SRUN" |
| | Warrants: "SRUNW" |
| Trading commencement and separation of Class A common stock and warrants | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. as representatives of the several underwriters (the "Representatives") inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. |

9

Table of Contents

| | |
|---|---|
| Separate trading of the Class A common stock and warrants is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock and warrants be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

Units:

| | |
|---|---|
| Number outstanding before this offering | 0 |
| Number outstanding after this offering | 90,000,000(1) |

Common stock:

| | |
|---|---|
| Number outstanding before this offering | 25,875,000 shares of Class B common stock(2)(3) |
| Number outstanding after this offering | 112,500,000 shares of Class A common stock and Class B common stock(1)(3) |

Warrants:

| | |
|---|---|
| Number of private placement warrants to be sold in a private placement simultaneously with this offering | 13,333,333(1) |
| Number of warrants to be outstanding after this offering and the private placement | 43,333,333(1) |

(1)   Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 3,375,000 founder shares.

(2)   Includes up to 3,375,000 shares that are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)   The shares of common stock included in the units are Class A common stock. Founder shares are classified as shares of Class B common stock, which shares are convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution."

Table of Contents

| | |
|---|---|
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock and only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. |
| Exercise price | $11.50 per share, subject to adjustment as described herein. |
| Exercise period | The warrants will become exercisable on the later of: |

- 30 days after the completion of our initial business combination, or

- 12 months from the closing of this offering;

provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file and have an effective registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed; provided, that if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation. On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

| | |
|---|---|
| Redemption of warrants | Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the private placement warrants): |

- in whole and not in part;

- at a price of $0.01 per warrant;

11

Table of Contents

- upon a minimum of 30 days' prior written notice of redemption, which we refer to as the 30-day redemption period; and

- if, and only if, the last sale price of our Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which we send the notice of redemption to the warrantholders.

We will not redeem the warrants unless a registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants is effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. Please see the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants" for additional information.

None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

12

Table of Contents

| Forward Purchase Agreement | We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI. |
| --- | --- |
| | The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering. |
| | Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties (which we refer to throughout this prospectus as the "Forward Transferees"), and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full. |
| | The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants. |

Table of Contents

The proceeds from the sale of the forward purchase securities may be used as part of the consideration to the sellers in the initial business combination, expenses in connection with our initial business combination or for working capital in the post-transaction company. These purchases will be required to be made regardless of whether any shares of Class A common stock are redeemed by our public shareholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

| | |
|---|---|
| Founder shares | On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering. As such, our initial stockholders will collectively own 20% of our issued and outstanding shares after this offering (assuming they do not purchase any units in this offering). In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. If we increase or decrease the size of the offering, we will effect a stock dividend or share contribution back to capital, as applicable, with respect to our Class B common stock immediately prior to the consummation of this offering in such amount as to maintain the ownership of our initial stockholders prior to this offering at 20% of the issued and outstanding shares of our common stock upon the consummation of this offering. Up to 3,375,000 founder shares will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering. |

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

14

Table of Contents

|  | • our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (i) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within the prescribed time frame. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial business combination. Our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised); and<br><br>• the founder shares are subject to registration rights. |
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). We refer to such transfer restrictions throughout this prospectus as the lock-up. |

Table of Contents

| | |
|---|---|
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination (other than the forward purchase securities), including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding the forward purchase securities and any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. |
| Voting | Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Each share of common stock will have one vote on all such matters. |
| Private placement warrants | Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the over-allotment option is exercised in full), each exercisable to purchase one share of our Class A common stock at $11.50 per share, at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or approximately $22,700,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. |

16

Table of Contents

|  | A portion of the purchase price of the private placement warrants will be added to the proceeds from this offering to be held in the trust account such that at the time of closing $900.0 million (or $1,035.0 million if the underwriters exercise their over-allotment option in full) will be held in the trust account. If we do not complete our initial business combination within 24 months from the closing of this offering, the proceeds from the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares (subject to the requirements of applicable law) and the private placement warrants will expire worthless. |
|---|---|
|  | The private placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering. |
| Transfer restrictions on private placement warrants | The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). |

Table of Contents

| | |
|---|---|
| Cashless exercise of private placement warrants | If holders of private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| Proceeds to be held in trust account | The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $900,000,000, or $10.00 per unit ($1,035,000,000, or $10.00 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. These proceeds include $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions. |

18

Table of Contents

|  | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest of (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $180,000 of interest annually. Unless and until we complete our initial business combination, we may pay our expenses only from: |

- the net proceeds of this offering and the sale of the private placement warrants not held in the trust account, which will be approximately $1,000,000 in working capital after the payment of approximately $1,000,000 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of our initial business combination.

Table of Contents

| | |
|---|---|
| Conditions to completing our initial business combination | There is no limitation on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial business combination. Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination.<br><br>If our board is not able to independently determine the fair market value of the target business or businesses or we are considering an initial business combination with an affiliated entity, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm. We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test, provided that in the event that the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |

20

Table of Contents

| | |
|---|---|
| Permitted purchases of public shares by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our initial stockholders, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Securities Exchange Act of 1934, as amended, or the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. |
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our business combination or otherwise. |

Table of Contents

| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Asset acquisitions and stock purchases would not typically require stockholder approval, while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

• conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

• file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 under the Exchange Act to purchase shares of our Class A common stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act. |
| --- | --- |

Table of Contents

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

23

Table of Contents

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial stockholders will count towards this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. We believe that this will allow our transfer agent to efficiently process any redemptions without the need for further communication or action from the redeeming public stockholders, which could delay redemptions and result in additional administrative cost. If the proposed business combination is not approved and we continue to search for a target company, we will promptly return any certificates delivered, or shares tendered electronically, by public stockholders who elected to redeem their shares.

24

Table of Contents

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

Table of Contents

| | |
|---|---|
| Limitation on redemption rights of stockholders holding 20% or more of the shares sold in this offering if we hold stockholder vote | Notwithstanding the foregoing redemption rights, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares sold in this offering. We believe the restriction described above will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to redeem their shares as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights against a business combination if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem to no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including all shares held by those stockholders that hold more than 20% of the shares sold in this offering) for or against our business combination. |

Table of Contents

| | |
|---|---|
| Redemption rights in connection with proposed amendments to our certificate of incorporation | Some other blank check companies have a provision in their charter which prohibits the amendment of certain charter provisions. Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the Delaware General Corporation Law, or DGCL, or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. Our sponsor, executive officers, and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable) divided by the number of then outstanding public shares. Our sponsor, officers and directors have entered into a letter agreement with us pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. |

Table of Contents

| | |
|---|---|
| Release of funds in trust account on closing of our initial business combination | On the completion of our initial business combination, all amounts held in the trust account will be released to us. We will use these funds to pay amounts due to any public stockholders who exercise their redemption rights as described above under "Redemption rights for public stockholders upon completion of our initial business combination," to pay the underwriters their deferred underwriting commissions, to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of post-transaction businesses, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. |
| Redemption of public shares and distribution and liquidation if no initial business combination | Our amended and restated certificate of incorporation provides that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period. |

28

Table of Contents

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

The underwriters have agreed to waive their rights to their deferred underwriting commission held in the trust account in the event we do not complete our initial business combination and subsequently liquidate and, in such event, such amounts will be included with the funds held in the trust account that will be available to fund the redemption of our public shares.

Limited payments to insiders | There will be no finder's fees, reimbursements or cash payments made to our sponsor, officers or directors, or our or their affiliates, for services rendered to us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment of an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

Table of Contents

| | |
|---|---|
| Audit Committee | We will establish and maintain an audit committee, which will be composed entirely of independent directors to, among other things, monitor compliance with the terms described above and the other terms relating to this offering. If any noncompliance is identified, then the audit committee will be charged with the responsibility to immediately take all action necessary to rectify such noncompliance or otherwise to cause compliance with the terms of this offering. For more information, see the section of this prospectus entitled "Management—Committees of the Board of Directors—Audit Committee." |
| Conflicts of Interest | Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates, including Fund VI, may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware, unless presented to such member specifically in his or her capacity as an officer of the company. Riverstone and/or our management, in their capacities as employees of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. |
| | Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle. |

Table of Contents

| Indemnity | Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or by a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses. |
|---|---|

### Risks

We are a newly formed company that has conducted no operations and has generated no revenues. Until we complete our initial business combination, we will have no operations and will generate no operating revenues. In making your decision whether to invest in our securities, you should take into account not only the background of our management team, but also the special risks we face as a blank check company. This offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. Accordingly, you will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. For additional information concerning how Rule 419 blank check offerings differ from this offering, please see the section of this prospectus entitled "Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419." You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."

Table of Contents

**Summary Financial Data**

The following table summarizes the relevant financial data for our business and should be read with our financial statements, which are included in this prospectus. We have not had any significant operations to date, so only balance sheet data is presented.

| | December 31, 2016 | |
|---|---|---|
| | Actual | As Adjusted(1) |
| **Balance Sheet Data:** | | |
| Working capital (deficiency) | $ (146,552) | $ 869,523,000(2) |
| Total assets | $ 395,052 | $ 901,023,000(3) |
| Total liabilities | $ 372,052(7) | $ 31,500,000(4) |
| Value of Class A common stock that may be redeemed in connection with our initial business combination ($10.00 per share) | $ — | $ 864,522,990(5) |
| Stockholders' equity | $ 23,000 | $ 5,000,010(6) |

(1)     Excludes gross proceeds of $400,000,000 from the sale of the forward purchase securities that is expected to close simultaneously with the closing of our initial business combination.

(2)     The "as adjusted" calculation includes $900,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,000,000 in cash held outside the trust account, plus $23,000 of actual stockholder's equity as of December 31, 2016, less $31,500,000 of deferred underwriting commissions.

(3)     The "as adjusted" calculation equals $900,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,000,000 in cash held outside the trust account plus $23,000 of actual stockholder's equity as of December 31, 2016.

(4)     The "as adjusted" calculation includes $31,500,000 of deferred underwriting commissions.

(5)     The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the "as adjusted" stockholders' equity, which is set to approximate the minimum net tangible assets threshold of at least $5,000,001.

(6)     Excludes 86,452,299 shares of Class A common stock purchased in the public market which are subject to redemption in connection with our initial business combination. The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the value of Class A common stock that may be redeemed in connection with our initial business combination (approximately $10.00 per share).

(7)     During the period ended December 31, 2016, our sponsor loaned us $300,000 to be used for a portion of the expenses of this offering. This amount will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

If no business combination is completed within 24 months from the closing of this offering, the proceeds then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), will be used to fund the redemption of our public shares. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within such 24 month time period.

Table of Contents

# RISK FACTORS

*An investment in our securities involves a high degree of risk. You should consider carefully all of the risks described below, together with the other information contained in this prospectus, before making a decision to invest in our units. If any of the following events occur, our business, financial condition and operating results may be materially adversely affected. In that event, the trading price of our securities could decline, and you could lose all or part of your investment.*

**We are a newly formed company with no operating history and no revenues, and you have no basis on which to evaluate our ability to achieve our business objective.**

We are a newly formed company with no operating results, and we will not commence operations until obtaining funding through this offering. Because we lack an operating history, you have no basis upon which to evaluate our ability to achieve our business objective of completing our initial business combination with one or more target businesses. We have no plans, arrangements or understandings with any prospective target business concerning a business combination and may be unable to complete our business combination. If we fail to complete our business combination, we will never generate any operating revenues.

**Our public stockholders may not be afforded an opportunity to vote on our proposed business combination, which means we may complete our initial business combination even though a majority of our public stockholders do not support such a combination.**

We may not hold a stockholder vote to approve our initial business combination unless the business combination would require stockholder approval under applicable law or stock exchange listing requirements or if we decide to hold a stockholder vote for business or other legal reasons. Except as required by law, the decision as to whether we will seek stockholder approval of a proposed business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors, such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Accordingly, we may complete our initial business combination even if holders of a majority of our public shares do not approve of the business combination we complete. Please see the section of this prospectus entitled "Proposed Business— Stockholders May Not Have the Ability to Approve our Initial Business Combination" for additional information.

**If we seek stockholder approval of our initial business combination, our initial stockholders have agreed to vote in favor of such initial business combination, regardless of how our public stockholders vote.**

Unlike many other blank check companies in which the initial stockholders agree to vote their founder shares in accordance with the majority of the votes cast by the public stockholders in connection with an initial business combination, our initial stockholders have agreed to vote their founder shares, as well as any public shares purchased during or after this offering, in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Our initial stockholders will own shares representing 20% of our outstanding shares of common stock immediately following the completion of this offering. Accordingly, if we seek stockholder approval of our initial business combination, it is more likely that the necessary stockholder approval will be received than would be the case if our initial stockholders agreed to vote their founder shares in accordance with the majority of the votes cast by our public stockholders.

33

Table of Contents

***In evaluating a prospective target business for our initial business combination, our management will rely on the availability of all of the funds from the sale of the forward purchase securities to be used as part of the consideration to the sellers in the initial business combination. If the sale of some or all of the forward purchase securities fails to close, we may lack sufficient funds to consummate our initial business combination.***

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination.

The funds from the sale of the forward purchase securities are expected to be used as part of the consideration to the sellers in our initial business combination, and to pay expenses in connection with our initial business combination and may be used, with the agreement of Fund VI Holdings, for working capital in the post-transaction company. If Fund VI Holdings does not agree to fund more than the amount necessary to complete the initial business combination, the post-transaction company may not have enough cash available for working capital. The obligations under the forward purchase agreements do not depend on whether any public stockholders elect to redeem their shares in connection with our initial business combination and provide us with a minimum funding level for the initial business combination. However, if the sale of the forward purchase securities does not close by reason of the failure of Fund VI Holdings or any Forward Transferee to fund the purchase price for their forward purchase securities, for example, we may lack sufficient funds to consummate our initial business combination. In addition, Fund VI Holding's obligation to purchase forward purchase securities is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI. Accordingly, if we pursue an acquisition target that is outside of Fund VI's investment objectives, Fund VI Holdings would not be obligated to purchase any forward purchase securities, and we may need to seek alternative financing. Additionally, Fund VI Holdings's and any Forward Transferee's obligations to purchase the forward purchase securities are subject to termination prior to the closing of the sale of such securities by mutual written consent of the Company and such party, or automatically: (i) if this offering is not consummated on or prior to June 30, 2017; (ii) if our initial business combination is not consummated within 24 months from the closing of this offering, unless extended up to a maximum of sixty (60) days in accordance with our amended and restated certificate of incorporation; or (iii) if our sponsor or we become subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of our sponsor or us, in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, Fund VI Holdings's obligations to purchase the forward purchase securities are subject to fulfillment of customary closing conditions, including that our initial business combination must be consummated substantially concurrently with the purchase of the forward purchase securities. In the event of any such failure to fund by Fund VI Holdings or any Forward Transferee, any obligation is so terminated or any such condition is not satisfied and not waived by such party, we may not be able to obtain additional funds to account for such shortfall on terms favorable to us or at all. Any such shortfall would also reduce the amount of funds that we have available for working capital of the post-business combination company.

***Your only opportunity to affect the investment decision regarding a potential business combination will be limited to the exercise of your right to redeem your shares from us for cash, unless we seek stockholder approval of the business combination.***

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses. Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote. Accordingly,

34

Table of Contents

if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

***The ability of our public stockholders to redeem their shares for cash may make our financial condition unattractive to potential business combination targets, which may make it difficult for us to enter into a business combination with a target.***

We may seek to enter into a business combination transaction agreement with a prospective target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights, we would not be able to meet such closing condition and, as a result, would not be able to proceed with the business combination. Furthermore, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. Consequently, if accepting all properly submitted redemption requests would cause our net tangible assets to be less than $5,000,001 or such greater amount necessary to satisfy a closing condition as described above, we would not proceed with such redemption and the related business combination and may instead search for an alternate business combination. Prospective targets will be aware of these risks and, thus, may be reluctant to enter into a business combination transaction with us.

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares may not allow us to complete the most desirable business combination or optimize our capital structure.***

At the time we enter into an agreement for our initial business combination, we will not know how many stockholders may exercise their redemption rights, and therefore will need to structure the transaction based on our expectations as to the number of shares that will be submitted for redemption. If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, we will need to reserve a portion of the cash in the trust account to meet such requirements, or arrange for third party financing. In addition, if a larger number of shares are submitted for redemption than we initially expected, we may need to restructure the transaction to reserve a greater portion of the cash in the trust account or arrange for third party financing. Raising additional third party financing may involve dilutive equity issuances or the incurrence of indebtedness at higher than desirable levels. The above considerations may limit our ability to complete the most desirable business combination available to us or optimize our capital structure. The amount of the deferred underwriting commissions payable to the underwriters will not be adjusted for any shares that are redeemed in connection with a business combination. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the deferred underwriting commission and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the deferred underwriting commissions.

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares could increase the probability that our initial business combination would be unsuccessful and that you would have to wait for liquidation in order to redeem your stock.***

If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, the probability that our initial business combination would be unsuccessful is increased. If our initial business combination is unsuccessful, you would not receive your pro rata portion of the trust account until we liquidate the trust account. If you are in need of immediate liquidity, you could attempt to sell your

35

Table of Contents

stock in the open market; however, at such time our stock may trade at a discount to the pro rata amount per share in the trust account. In either situation, you may suffer a material loss on your investment or lose the benefit of funds expected in connection with our redemption until we liquidate or you are able to sell your stock in the open market.

***The requirement that we complete our initial business combination within the prescribed time frame may give potential target businesses leverage over us in negotiating a business combination and may decrease our ability to conduct due diligence on potential business combination targets as we approach our dissolution deadline, which could undermine our ability to complete our business combination on terms that would produce value for our stockholders.***

Any potential target business with which we enter into negotiations concerning a business combination will be aware that we must complete our initial business combination within 24 months from the closing of this offering. Consequently, such target business may obtain leverage over us in negotiating a business combination, knowing that if we do not complete our initial business combination with that particular target business, we may be unable to complete our initial business combination with any target business. This risk will increase as we get closer to the timeframe described above. In addition, we may have limited time to conduct due diligence and may enter into our initial business combination on terms that we would have rejected upon a more comprehensive investigation.

***We may not be able to complete our initial business combination within the prescribed time frame, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.***

Our amended and restated certificate of incorporation provides that we must complete our initial business combination within 24 months from the closing of this offering. We may not be able to find a suitable target business and complete our initial business combination within such time period. If we have not completed our initial business combination within such time period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, our public stockholders may only receive $10.00 per share, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors and their affiliates may elect to purchase shares from public stockholders, which may influence a vote on a proposed business combination and reduce the public "float" of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business

36

Table of Contents

combination, although they are under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business combination, or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our Class A common stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on a national securities exchange.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our business combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

We will comply with the tender offer rules or proxy rules, as applicable, when conducting redemptions in connection with our business combination. Despite our compliance with these rules, if a stockholder fails to receive our tender offer or proxy materials, as applicable, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the tender offer documents or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will describe the various procedures that must be complied with in order to validly tender or redeem public shares. For example, we may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. In the event that a stockholder fails to comply with these or any other procedures, its shares may not be redeemed. See the section of this prospectus entitled "Proposed Business— Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination—Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights."

***You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares or warrants, potentially at a loss.***

Our public stockholders will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete an initial business combination within 24 months from the closing of this offering, subject to applicable law and as further described herein. In addition, if we are unable to complete an initial business combination within 24 months from the closing of this offering for any reason, compliance with Delaware law may require that we submit a plan of dissolution to our then-existing stockholders for approval prior to the distribution of the proceeds held in our trust account. In that case, public stockholders may be forced to wait beyond 24 months from the closing of this offering before they

37

Table of Contents

receive funds from our trust account. In no other circumstances will a public stockholder have any right or interest of any kind in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.

***NASDAQ may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

We have applied to have our units listed on NASDAQ on or promptly after the date of this prospectus and our Class A common stock and warrants listed on or promptly after their date of separation. Although after giving effect to this offering we expect to meet, on a pro forma basis, the minimum initial listing standards set forth in the NASDAQ listing standards, we cannot assure you that our securities will be, or will continue to be, listed on NASDAQ in the future or prior to our initial business combination. In order to continue listing our securities on NASDAQ prior to our initial business combination, we must maintain certain financial, distribution and stock price levels. Generally, we must maintain a minimum amount in stockholders' equity (generally $2,500,000) and a minimum number of holders of our securities (generally 300 public holders). Additionally, in connection with our initial business combination, we will be required to demonstrate compliance with NASDAQ's initial listing requirements, which are more rigorous than NASDAQ's continued listing requirements, in order to continue to maintain the listing of our securities on NASDAQ. For instance, our stock price would generally be required to be at least $4.00 per share and our stockholders' equity would generally be required to be at least $5.0 million. We cannot assure you that we will be able to meet those initial listing requirements at that time.

If NASDAQ delists our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect our securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Class A common stock is a "penny stock" which will require brokers trading in our Class A common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because we expect that our units and eventually our Class A common stock and warrants will be listed on NASDAQ, our units, Class A common stock and warrants will be covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the State of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on NASDAQ, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities.

***You will not be entitled to protections normally afforded to investors of many other blank check companies.***

Since the net proceeds of this offering and the sale of the private placement warrants are intended to be used to complete an initial business combination with a target business that has not been

Table of Contents

identified, we may be deemed to be a "blank check" company under the United States securities laws. However, because we will have net tangible assets in excess of $5,000,000 upon the successful completion of this offering and the sale of the private placement warrants and will file a Current Report on Form 8-K, including an audited balance sheet demonstrating this fact, we are exempt from rules promulgated by the SEC to protect investors in blank check companies, such as Rule 419. Accordingly, investors will not be afforded the benefits or protections of those rules. Among other things, this means our units will be immediately tradable and we will have a longer period of time to complete our business combination than do companies subject to Rule 419. Moreover, if this offering were subject to Rule 419, that rule would prohibit the release of any interest earned on funds held in the trust account to us unless and until the funds in the trust account were released to us in connection with our completion of an initial business combination. For a more detailed comparison of our offering to offerings that comply with Rule 419, please see the section of this prospectus entitled "Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419."

***If we seek stockholder approval of our initial business combination and we do not conduct redemptions pursuant to the tender offer rules, and if you or a "group" of stockholders are deemed to hold in excess of 20% of our Class A common stock, you will lose the ability to redeem all such shares in excess of 20% of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." However, our amended and restated certificate of incorporation does not restrict our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Your inability to redeem the Excess Shares will reduce your influence over our ability to complete our business combination and you could suffer a material loss on your investment in us if you sell Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Excess Shares if we complete our business combination. And as a result, you will continue to hold that number of shares exceeding 20% and, in order to dispose of such shares, would be required to sell your stock in open market transactions, potentially at a loss.

***Because of our limited resources and the significant competition for business combination opportunities, it may be more difficult for us to complete our initial business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on our redemption of our public shares, or less than such amount in certain circumstances, and our warrants will expire worthless.***

We expect to encounter intense competition from other entities having a business objective similar to ours, including private investors (which may be individuals or investment partnerships), other blank check companies and other entities, domestic and international, competing for the types of businesses we intend to acquire. Many of these individuals and entities are well-established and have extensive experience in identifying and effecting, directly or indirectly, acquisitions of companies operating in or providing services to various industries. Many of these competitors possess greater technical, human and other resources or more local industry knowledge than we do and our financial resources will be relatively limited when contrasted with those of many of these competitors. While we believe there are numerous target businesses we could potentially acquire with the net proceeds of this offering and the sale of the private placement warrants, our ability to compete with respect to the acquisition of certain target businesses that are sizable will be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses.

39

Table of Contents

Furthermore, because we are obligated to pay cash for the shares of Class A common stock which our public stockholders redeem in connection with our initial business combination, target companies will be aware that this may reduce the resources available to us for our initial business combination. This may place us at a competitive disadvantage in successfully negotiating a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient to allow us to operate for at least the next 24 months, we may be unable to complete our initial business combination, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.***

The funds available to us outside of the trust account may not be sufficient to allow us to operate for at least the next 24 months, assuming that our initial business combination is not completed during that time. We believe that, upon the closing of this offering, the funds available to us outside of the trust account will be sufficient to allow us to operate for at least the next 24 months; however, we cannot assure you that our estimate is accurate. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent or merger agreements designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into a letter of intent or merger agreement where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient, it could limit the amount available to fund our search for a target business or businesses and complete our initial business combination and we will depend on loans from our sponsor or management team to fund our search for a business combination, to pay our franchise and income taxes and to complete our initial business combination. If we are unable to obtain these loans, we may be unable to complete our initial business combination.***

Of the net proceeds of this offering and the sale of the private placement warrants, only approximately $1,000,000 will be available to us initially outside the trust account to fund our working capital requirements. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount. If we are required to seek additional capital, we would need to borrow funds from our sponsor, management team or other third parties to operate or may be forced to liquidate. None of our sponsor, members of

40

Table of Contents

our management team nor any of their affiliates is under any obligation to advance funds to us in such circumstances. Any such advances would be repaid only from funds held outside the trust account or from funds released to us upon completion of our initial business combination. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account. If we are unable to obtain these loans, we may be unable to complete our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. Consequently, our public stockholders may only receive approximately $10.00 per share on our redemption of our public shares, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***Subsequent to the completion of our initial business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Even if we conduct extensive due diligence on a target business with which we combine, we cannot assure you that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject as a result of assuming pre-existing debt held by a target business or by virtue of our obtaining post-combination debt financing. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Our placing of funds in the trust account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

41

Table of Contents

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of our public shares, if we are unable to complete our business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the trust account, due to claims of such creditors. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Our directors may decide not to enforce the indemnification obligations of our sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public stockholders.***

In the event that the proceeds in the trust account are reduced below the lesser of (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations.

While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to our public stockholders may be reduced below $10.00 per share.

Table of Contents

***If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***If we are deemed to be an investment company under the Investment Company Act, we may be required to institute burdensome compliance requirements and our activities may be restricted, which may make it difficult for us to complete our business combination.***

If we are deemed to be an investment company under the Investment Company Act, our activities may be restricted, including:

- restrictions on the nature of our investments; and

- restrictions on the issuance of securities, each of which may make it difficult for us to complete our business combination.

In addition, we may have imposed upon us burdensome requirements, including:

- registration as an investment company;

- adoption of a specific form of corporate structure; and

- reporting, record keeping, voting, proxy and disclosure requirements and other rules and regulations.

In order not to be regulated as an investment company under the Investment Company Act, unless we can qualify for an exclusion, we must ensure that we are engaged primarily in a business other than investing, reinvesting or trading of securities and that our activities do not include investing, reinvesting, owning, holding or trading "investment securities" constituting more than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. Our business will be to identify and complete a business combination and thereafter to operate the post-transaction business or assets for the long term. We do not plan to buy businesses or assets with a view to resale or profit from their resale. We do not plan to buy unrelated businesses or assets or to be a passive investor.

43

Table of Contents

We do not believe that our anticipated principal activities will subject us to the Investment Company Act. To this end, the proceeds held in the trust account may only be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. Pursuant to the trust agreement, the trustee is not permitted to invest in other securities or assets. By restricting the investment of the proceeds to these instruments, and by having a business plan targeted at acquiring and growing businesses for the long term (rather than on buying and selling businesses in the manner of a merchant bank or private equity fund), we intend to avoid being deemed an "investment company" within the meaning of the Investment Company Act. This offering is not intended for persons who are seeking a return on investments in government securities or investment securities. The trust account is intended as a holding place for funds pending the earliest to occur of: (i) the completion of our primary business objective, which is a business combination; (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering; or (iii) absent a business combination, our return of the funds held in the trust account to our public stockholders as part of our redemption of the public shares. If we do not invest the proceeds as discussed above, we may be deemed to be subject to the Investment Company Act. If we were deemed to be subject to the Investment Company Act, compliance with these additional regulatory burdens would require additional expenses for which we have not allotted funds and may hinder our ability to complete a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

### *Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations.*

We are subject to laws and regulations enacted by national, regional and local governments. In particular, we will be required to comply with certain SEC and other legal requirements. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming and costly. Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business and results of operations.

### *Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.*

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Table of Contents

However, it is our intention to redeem our public shares as soon as reasonably possible following the 24th month from the closing of this offering in the event we do not complete our business combination and, therefore, we do not intend to comply with the foregoing procedures.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the 10 years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***We may not hold an annual meeting of stockholders until after the consummation of our initial business combination, which could delay the opportunity for our stockholders to elect directors.***

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

***We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis and potentially causing such warrants to expire worthless.***

We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed to use our best efforts to file a registration statement under the Securities Act covering such shares and maintain a current prospectus relating to the Class A common stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by

45

Table of Contents

reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption from registration is available. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Class A common stock included in the units. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying shares of Class A common stock for sale under all applicable state securities laws.

***The grant of registration rights to our initial stockholders and holders of our forward purchase securities may make it more difficult to complete our initial business combination, and the future exercise of such rights may adversely affect the market price of our Class A common stock.***

Pursuant to an agreement to be entered into concurrently with the issuance and sale of the securities in this offering, our initial stockholders and their permitted transferees can demand that we register the shares of Class A common stock into which founder shares are convertible, holders of our private placement warrants and their permitted transferees can demand that we register the private placement warrants and the shares of Class A common stock issuable upon exercise of the private placement warrants and holders of warrants that may be issued upon conversion of working capital loans may demand that we register such warrants or the Class A common stock issuable upon exercise of such warrants. Pursuant to the forward purchase agreement, we have agreed that we will use our commercially reasonable efforts to file within 30 days after the closing of the initial business combination a registration statement with the SEC for a secondary offering of the forward purchase shares and the forward purchase warrants (and the underlying Class A common stock) and to cause such registration statement to be declared effective as soon as practicable after it is filed. Assuming the founder shares convert on a one-for-one basis and no warrants are issued upon conversion of working capital loans, an aggregate of up to 89,166,666 shares of Class A common stock and up to 26,666,666 warrants (or up to 94,341,666 shares of Class A common stock and up to 28,466,666 warrants if the over-allotment option is exercised in full) are subject to registration under these agreements. We will bear the cost of registering these securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of our Class A common stock. In addition, the existence of the registration rights may make our initial business combination more costly or difficult to conclude. This is because the stockholders of the target business may increase the equity stake they seek in the combined entity or ask for more cash consideration to offset the negative impact on the market price of our Class A common stock that is expected when the securities owned by our initial stockholders, holders of our forward purchase securities or holders of working capital loans or their respective permitted transferees are registered.

46

Table of Contents

***Because we are not limited to a particular industry, sector or any specific target businesses with which to pursue our initial business combination, you will be unable to ascertain the merits or risks of any particular target business' operations.***

Although we expect to focus our search for a target business in the energy industry, we may seek to complete a business combination with an operating company in any industry or sector. However, we will not, under our amended and restated certificate of incorporation, be permitted to effectuate our business combination with another blank check company or similar company with nominal operations. Because we have not yet identified or approached any specific target business with respect to a business combination, there is no basis to evaluate the possible merits or risks of any particular target business's operations, results of operations, cash flows, liquidity, financial condition or prospects. To the extent we complete our business combination, we may be affected by numerous risks inherent in the business operations with which we combine. For example, if we combine with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all of the significant risk factors or that we will have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business. We also cannot assure you that an investment in our units will ultimately prove to be more favorable to investors than a direct investment, if such opportunity were available, in a business combination target. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Because we intend to seek a business combination with a target business in the energy industry, we expect our future operations to be subject to risks associated with this industry.***

We intend to focus our search for a target business in the energy industry. Riverstone has historically focused on four sectors in this industry, including exploration and production, midstream, energy services, and power and coal. Accordingly, we may pursue a target business in these sectors or any other sector within the energy industry. In addition, Fund VI Holding's obligation to purchase forward purchase securities is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI. This condition may make it more likely that we will pursue a target in the energy industry and be subject to the risks associated with this industry. Because we have not yet identified or approached any specific target business or sector, we cannot provide specific risks of any business combination. However, risks inherent in investments in the energy industry include, but are not limited to, the following:

- Volatility of oil and natural gas prices;

- Price and availability of alternative fuels, such as solar, coal, nuclear and wind energy;

- Competitive pressures in the utility industry, primarily in wholesale markets, as a result of consumer demand, technological advances, greater availability of natural gas and other factors;

- Significant federal, state and local regulation, taxation and regulatory approval processes as well as changes in applicable laws and regulations;

- The speculative nature of and high degree of risk involved in investments in the exploration and development sector, including relying on estimates of oil and gas reserves and the impacts of regulatory and tax changes;

47

Table of Contents

- Drilling, exploration and development risks, including encountering unexpected formations or pressures, premature declines of reservoirs, blow-outs, equipment failures and other accidents, cratering, sour gas releases, uncontrollable flows of oil, natural gas or well fluids, adverse weather conditions, pollution, fires, spills and other environmental risks, any of which could lead to environmental damage, injury and loss of life or the destruction of property;

- Proximity and capacity of oil, natural gas and other transportation and support infrastructure to production facilities;

- Availability of key inputs, such as strategic consumables, raw materials and drilling and processing equipment;

- Changes in global supply and demand and prices for commodities;

- Impact of energy conservation efforts;

- Technological advances affecting energy production and consumption;

- Overall domestic and global economic conditions;

- Availability of, and potential disputes with, independent contractors;

- Natural disasters, terrorist acts and similar dislocations; and

- Value of U.S. dollar relative to the currencies of other countries.

***Past performance by Riverstone, including our management team, may not be indicative of future performance of an investment in the Company.***

Information regarding performance by, or businesses associated with, Riverstone and its affiliates is presented for informational purposes only. Past performance by Riverstone, including our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to locate a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management team's performance as indicative of our future performance of an investment in the company or the returns the company will, or is likely to, generate going forward.

***We may seek acquisition opportunities in industries or sectors which may or may not be outside of our management's area of expertise.***

We will consider a business combination outside of our management's area of expertise if a business combination candidate is presented to us and we determine that such candidate offers an attractive acquisition opportunity for our company. Although our management will endeavor to evaluate the risks inherent in any particular business combination candidate, we cannot assure you that we will adequately ascertain or assess all of the significant risk factors. We also cannot assure you that an investment in our units will not ultimately prove to be less favorable to investors in this offering than a direct investment, if an opportunity were available, in a business combination candidate. In the event we elect to pursue an acquisition outside of the areas of our management's expertise, our management's expertise may not be directly applicable to its evaluation or operation, and the information contained in this prospectus regarding the areas of our management's expertise would not be relevant to an understanding of the business that we elect to acquire. As a result, our management may not be able to adequately ascertain or assess all of the significant risk factors. Accordingly, any stockholders who choose to remain stockholders following our business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

48

Table of Contents

*Although we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses, we may enter into our initial business combination with a target that does not meet such criteria and guidelines, and as a result, the target business with which we enter into our initial business combination may not have attributes entirely consistent with our general criteria and guidelines.*

Although we have identified general criteria and guidelines for evaluating prospective target businesses, it is possible that a target business with which we enter into our initial business combination will not have all of these positive attributes. If we complete our initial business combination with a target that does not meet some or all of these guidelines, such combination may not be as successful as a combination with a business that does meet all of our general criteria and guidelines. In addition, if we announce a prospective business combination with a target that does not meet our general criteria and guidelines, a greater number of stockholders may exercise their redemption rights, which may make it difficult for us to meet any closing condition with a target business that requires us to have a minimum net worth or a certain amount of cash. In addition, if stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, it may be more difficult for us to attain stockholder approval of our initial business combination if the target business does not meet our general criteria and guidelines. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

*We may seek acquisition opportunities with a financially unstable business or an entity lacking an established record of revenue or earnings, which could subject us to volatile revenues or earnings or difficulty in retaining key personnel.*

To the extent we complete our initial business combination with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by numerous risks inherent in the operations of the business with which we combine. These risks include volatile revenues or earnings and difficulties in obtaining and retaining key personnel. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not be able to properly ascertain or assess all of the significant risk factors and we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business.

*We are not required to obtain an opinion from an independent investment banking firm or from an independent accounting firm, and consequently, you may have no assurance from an independent source that the price we are paying for the business is fair to our company from a financial point of view.*

Unless we complete our business combination with an affiliated entity or our board cannot independently determine the fair market value of the target business or businesses, we are not required to obtain an opinion from an independent investment banking firm that is a member of FINRA or from an independent accounting firm that the price we are paying is fair to our company from a financial point of view. If no opinion is obtained, our stockholders will be relying on the judgment of our board of directors, who will determine fair market value based on standards generally accepted by the financial community. Such standards used will be disclosed in our proxy solicitation or tender offer materials, as applicable, related to our initial business combination.

Table of Contents

***We may issue additional common stock or preferred stock to complete our initial business combination or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon the conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. Any such issuances would dilute the interest of our stockholders and likely present other risks.***

Our amended and restated certificate of incorporation will authorize the issuance of up to 400,000,000 shares of Class A common stock, par value $0.0001 per share, 50,000,000 shares of Class B common stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. Immediately after this offering, there will be 310,000,000 and 27,500,000 (assuming, in each case, that the underwriters have not exercised their over-allotment option) authorized but unissued shares of Class A common stock and Class B common stock, respectively, available for issuance, which amount does not take into account the shares of Class A common stock reserved for issuance upon exercise of any outstanding warrants, the forward purchase shares or the shares of Class A common stock issuable upon conversion of Class B common stock. Immediately after the consummation of this offering, there will be no shares of preferred stock issued and outstanding. Shares of Class B common stock are convertible into shares of our Class A common stock initially at a one-for-one ratio but subject to adjustment as set forth herein, including in certain circumstances in which we issue Class A common stock or equity-linked securities related to our initial business combination. Shares of Class B common stock are also convertible at the option of the holder at any time.

We may issue a substantial number of additional shares of common or preferred stock to complete our initial business combination (including pursuant to a specified future issuance) or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. However, our amended and restated certificate of incorporation will provide, among other things, that prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination. The issuance of additional shares of common or preferred stock:

- may significantly dilute the equity interest of investors in this offering;

- may subordinate the rights of holders of common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change of control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and

- may adversely affect prevailing market prices for our units, Class A common stock and/or warrants.

***Resources could be wasted in researching acquisitions that are not completed, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share, or less than such amount in certain circumstances, on the liquidation of our trust account and our warrants will expire worthless.***

We anticipate that the investigation of each specific target business and the negotiation, drafting and execution of relevant agreements, disclosure documents and other instruments will require

50

Table of Contents

substantial management time and attention and substantial costs for accountants, attorneys and others. If we decide not to complete a specific initial business combination, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to complete our initial business combination for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

***Our ability to successfully effect our initial business combination and to be successful thereafter will be totally dependent upon the efforts of our key personnel, some of whom may join us following our initial business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.***

Our ability to successfully effect our business combination is dependent upon the efforts of our key personnel. The role of our key personnel in the target business, however, cannot presently be ascertained. Although some of our key personnel may remain with the target business in senior management or advisory positions following our business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we engage after our initial business combination, we cannot assure you that our assessment of these individuals will prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

In addition, the officers and directors of an acquisition candidate may resign upon completion of our initial business combination. The departure of a business combination target's key personnel could negatively impact the operations and profitability of our post-combination business. The role of an acquisition candidate's key personnel upon the completion of our initial business combination cannot be ascertained at this time. Although we contemplate that certain members of an acquisition candidate's management team will remain associated with the acquisition candidate following our initial business combination, it is possible that members of the management of an acquisition candidate will not wish to remain in place. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.

***Our key personnel may negotiate employment or consulting agreements with a target business in connection with a particular business combination. These agreements may provide for them to receive compensation following our business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.***

Our key personnel may be able to remain with the company after the completion of our business combination only if they are able to negotiate employment or consulting agreements in connection with the business combination. Such negotiations would take place simultaneously with the negotiation of the business combination and could provide for such individuals to receive compensation in the form of cash payments and/or our securities for services they would render to us after the completion of the business combination. The personal and financial interests of such individuals may influence their motivation in identifying and selecting a target business. However, we believe the ability of such individuals to remain with us after the completion of our business combination will not be the determining factor in our decision as to whether or not we will proceed with any potential business combination. There is no certainty, however, that any of our key personnel will remain with us after the completion of our business combination. We cannot assure you that any of our key personnel will

51

Table of Contents

remain in senior management or advisory positions with us. The determination as to whether any of our key personnel will remain with us will be made at the time of our initial business combination.

***We may have a limited ability to assess the management of a prospective target business and, as a result, may effect our initial business combination with a target business whose management may not have the skills, qualifications or abilities to manage a public company, which could, in turn, negatively impact the value of our stockholders' investment in us.***

When evaluating the desirability of effecting our initial business combination with a prospective target business, our ability to assess the target business's management may be limited due to a lack of time, resources or information. Our assessment of the capabilities of the target's management, therefore, may prove to be incorrect and such management may lack the skills, qualifications or abilities we suspected. Should the target's management not possess the skills, qualifications or abilities necessary to manage a public company, the operations and profitability of the post-combination business may be negatively impacted. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Our officers and directors will allocate their time to other businesses thereby causing conflicts of interest in their determination as to how much time to devote to our affairs. This conflict of interest could have a negative impact on our ability to complete our initial business combination.***

Our officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between our operations and our search for a business combination and their other businesses. We do not intend to have any full-time employees prior to the completion of our initial business combination. Each of our officers is engaged in several other business endeavors for which he may be entitled to substantial compensation and our officers are not obligated to contribute any specific number of hours per week to our affairs. In particular, certain of our officers and directors are employed by Riverstone, which is an investment manager to various private investment funds, including Fund VI, which make investments in securities or other interests of or relating to companies in industries we may target for our initial business combination. Our independent directors also serve as officers or board members for other entities. If our officers' and directors' other business affairs require them to devote substantial amounts of time to such affairs in excess of their current commitment levels, it could limit their ability to devote time to our affairs which may have a negative impact on our ability to complete our initial business combination. For a complete discussion of our officers' and directors' other business affairs, please see the section of this prospectus entitled "Management—Officers and Directors."

***Certain of our officers and directors are now, and all of them may in the future become, affiliated with entities engaged in business activities similar to those intended to be conducted by us and, accordingly, may have conflicts of interest in allocating their time and determining to which entity a particular business opportunity should be presented.***

Following the completion of this offering and until we consummate our initial business combination, we intend to engage in the business of identifying and combining with one or more businesses. Our sponsor and officers and directors are, and may in the future become, affiliated with entities that are engaged in a similar business.

Our officers and directors also may become aware of business opportunities which may be appropriate for presentation to us and the other entities to which they owe certain fiduciary or contractual duties. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us.

52

Table of Contents

Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented. These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

For a complete discussion of our officers' and directors' business affiliations and the potential conflicts of interest that you should be aware of, please see the sections of this prospectus entitled "Management—Officers and Directors," "Management—Conflicts of Interest" and "Certain Relationships and Related Party Transactions."

***Our officers, directors, security holders and their respective affiliates may have competitive pecuniary interests that conflict with our interests.***

We have not adopted a policy that expressly prohibits our directors, officers, security holders or affiliates from having a direct or indirect pecuniary or financial interest in any investment to be acquired or disposed of by us or in any transaction to which we are a party or have an interest. In fact, we may enter into a business combination with a target business that is affiliated with our sponsor, our directors or officers, although we do not intend to do so, or we may acquire a target business through an Affiliated Joint Acquisition with one or more affiliates of Riverstone and/or one or more investors in funds managed by Riverstone. We do not have a policy that expressly prohibits any such persons from engaging for their own account in business activities of the types conducted by us. Accordingly, such persons or entities may have a conflict between their interests and ours.

In particular, Riverstone and its affiliates also are focused on investments in the energy industry. As a result, there may be substantial overlap between companies that would be a suitable business combination for us and companies that would make an attractive target for such other affiliates.

***We may engage in a business combination with one or more target businesses that have relationships with entities that may be affiliated with our sponsor, officers, directors or existing holders which may raise potential conflicts of interest.***

In light of the involvement of our sponsor, officers and directors with other entities, we may decide to acquire one or more businesses affiliated with our sponsor, officers or directors. Our directors also serve as officers and board members for other entities, including, without limitation, those described under the section of this prospectus entitled "Management—Conflicts of Interest." Such entities may compete with us for business combination opportunities. Our sponsor, officers and directors are not currently aware of any specific opportunities for us to complete our business combination with any entities with which they are affiliated, and there have been no preliminary discussions concerning a business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for a business combination as set forth in the section of this prospectus entitled "Proposed Business—Selection of a Target Business and Structuring of our Initial Business Combination" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, regarding the fairness to our company from a financial point of view of a business combination with one or more domestic or international businesses affiliated with our officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest.

Table of Contents

Moreover, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties.

***Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination.***

On November 21, 2016, our sponsor acquired an aggregate of 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,815,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares after this offering. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. The founder shares will be worthless if we do not complete an initial business combination. In addition, our sponsor has committed to purchase an aggregate of 13,333,333 (or 15,133,333 if the underwriters' over-allotment option is exercised in full) private placement warrants, each exercisable for one share of our Class A common stock at $11.50 per share, for a purchase price of approximately $20,000,000 (or approximately $22,700,000 if the underwriters' over-allotment option is exercised in full), or $1.50 per whole warrant, that will also be worthless if we do not complete a business combination. Holders of founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any founder shares in connection with a stockholder vote to approve a proposed initial business combination. In addition, we may obtain loans from our sponsor, affiliates of our sponsor or an officer or director. The personal and financial interests of our officers and directors may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

***We may issue notes or other debt securities, or otherwise incur substantial debt, to complete a business combination, which may adversely affect our leverage and financial condition and thus negatively impact the value of our stockholders' investment in us.***

Although we have no commitments as of the date of this prospectus to issue any notes or other debt securities, or to otherwise incur outstanding debt following this offering, we may choose to incur substantial debt to complete our business combination. We have agreed that we will not incur any indebtedness unless we have obtained from the lender a waiver of any right, title, interest or claim of any kind in or to the monies held in the trust account. As such, no issuance of debt will affect the per-share amount available for redemption from the trust account. Nevertheless, the incurrence of debt could have a variety of negative effects, including:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

54

Table of Contents

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other disadvantages compared to our competitors who have less debt.

***We may only be able to complete one business combination with the proceeds of this offering and the sale of the private placement warrants and the forward purchase securities, which will cause us to be solely dependent on a single business which may have a limited number of products or services. This lack of diversification may negatively impact our operations and profitability.***

Of the net proceeds from this offering and the sale of the private placement warrants and the forward purchase securities, up to $1,300,000,000 (or $1,435,000,000 if the underwriters' over-allotment option is exercised in full) will be available to complete our business combination and pay related fees and expenses (which includes up to approximately $31,500,000, or up to approximately $36,225,000 if the over-allotment option is exercised in full, for the payment of deferred underwriting commissions).

We may effectuate our business combination with a single target business or multiple target businesses simultaneously or within a short period of time. However, we may not be able to effectuate our business combination with more than one target business because of various factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By completing our initial business combination with only a single entity, our lack of diversification may subject us to numerous economic, competitive and regulatory developments. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities which may have the resources to complete several business combinations in different industries or different areas of a single industry. In addition, we intend to focus our search for an initial business combination in a single industry. Accordingly, the prospects for our success may be:

- solely dependent upon the performance of a single business, property or asset, or

- dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our business combination.

55

Table of Contents

***We may attempt to simultaneously complete business combinations with multiple prospective targets, which may hinder our ability to complete our business combination and give rise to increased costs and risks that could negatively impact our operations and profitability.***

If we determine to simultaneously acquire several businesses that are owned by different sellers, we will need for each of such sellers to agree that our purchase of its business is contingent on the simultaneous closings of the other business combinations, which may make it more difficult for us, and delay our ability, to complete our initial business combination. With multiple business combinations, we could also face additional risks, including additional burdens and costs with respect to possible multiple negotiations and due diligence investigations (if there are multiple sellers) and the additional risks associated with the subsequent assimilation of the operations and services or products of the acquired companies in a single operating business. If we are unable to adequately address these risks, it could negatively impact our profitability and results of operations.

***We may attempt to complete our initial business combination with a private company about which little information is available, which may result in a business combination with a company that is not as profitable as we suspected, if at all.***

In pursuing our acquisition strategy, we may seek to effectuate our initial business combination with a privately held company. Very little public information generally exists about private companies, and we could be required to make our decision on whether to pursue a potential initial business combination on the basis of limited information, which may result in a business combination with a company that is not as profitable as we suspected, if at all.

***Our management may not be able to maintain control of a target business after our initial business combination.***

We may structure a business combination so that the post-transaction company in which our public stockholders own shares will own less than 100% of the equity interests or assets of a target business, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. We will not consider any transaction that does not meet such criteria. Even if the post-transaction company owns 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares of Class A common stock in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% interest in the target. However, as a result of the issuance of a substantial number of new shares of common stock, our stockholders immediately prior to such transaction could own less than a majority of our outstanding shares of common stock subsequent to such transaction. In addition, other minority stockholders may subsequently combine their holdings resulting in a single person or group obtaining a larger share of the company's stock than we initially acquired. Accordingly, this may make it more likely that our management will not be able to maintain our control of the target business. We cannot provide assurance that, upon loss of control of a target business, new management will possess the skills, qualifications or abilities necessary to profitably operate such business.

56

Table of Contents

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a business combination with which a substantial majority of our stockholders do not agree.***

Our amended and restated certificate of incorporation will not provide a specified maximum redemption threshold, except that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (such that we are not subject to the SEC's "penny stock" rules). As a result, we may be able to complete our business combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or, if we seek stockholder approval of our initial business combination and do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, have entered into privately negotiated agreements to sell their shares to our sponsor, officers, directors, advisors or their affiliates. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, all shares of Class A common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***The exercise price for the public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the warrants are more likely to expire worthless.***

The exercise price of the public warrants is higher than is typical in many similar blank check companies in the past. Historically, the exercise price of a warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share. As a result, the warrants are less likely to ever be in the money and more likely to expire worthless.

***In order to effectuate our initial business combination, we may seek to amend our amended and restated certificate of incorporation or other governing instruments, including our warrant agreement, in a manner that will make it easier for us to complete our initial business combination but that our stockholders or warrantholders may not support.***

In order to effectuate a business combination, blank check companies have, in the recent past, amended various provisions of their charters and governing instruments, including their warrant agreement. For example, blank check companies have amended the definition of business combination, increased redemption thresholds, changed industry focus and, with respect to their warrants, amended their warrant agreements to require the warrants to be exchanged for cash and/or other securities. We cannot assure you that we will not seek to amend our charter or other governing instruments or change our industry focus in order to effectuate our initial business combination.

***The provisions of our amended and restated certificate of incorporation that relate to our pre-business combination activity (and corresponding provisions of the agreement governing the release of funds from our trust account) may be amended with the approval of holders of 65% of our common stock, which is a lower amendment threshold than that of some other blank check companies. It may be easier for us, therefore, to amend our amended and restated certificate of incorporation and the trust agreement to facilitate the completion of an initial business combination that some of our stockholders may not support.***

Some other blank check companies have a provision in their charter which prohibits the amendment of certain of its provisions, including those which relate to a company's pre-business combination activity, without approval by a certain percentage of the company's stockholders. In those companies, amendment of these provisions requires approval by between 90% and 100% of the company's public stockholders. Our amended and restated certificate of incorporation will provide that

57

Table of Contents

any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the DGCL or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own up to 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. As a result, we may be able to amend the provisions of our amended and restated certificate of incorporation which govern our pre-business combination behavior more easily than some other blank check companies, and this may increase our ability to complete a business combination with which you do not agree. Our stockholders may pursue remedies against us for any breach of our amended and restated certificate of incorporation.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, divided by the number of then outstanding public shares. These agreements are contained in a letter agreement that we have entered into with our sponsor, officers and directors. Our stockholders are not parties to, or third-party beneficiaries of, these agreements and, as a result, will not have the ability to pursue remedies against our sponsor, officers or directors for any breach of these agreements. As a result, in the event of a breach, our stockholders would need to pursue a stockholder derivative action, subject to applicable law.

***We may be unable to obtain additional financing to complete our initial business combination or to fund the operations and growth of a target business, which could compel us to restructure or abandon a particular business combination.***

Although we believe that the net proceeds of this offering and the sale of the private placement warrants and the forward purchase securities will be sufficient to allow us to complete our initial business combination, because we have not yet identified any prospective target business we cannot ascertain the capital requirements for any particular transaction. If the net proceeds of this offering and the sale of the private placement warrants and the forward purchase securities prove to be insufficient, either because of the size of our initial business combination, the depletion of the available net proceeds in search of a target business, the obligation to repurchase for cash a significant number of shares from stockholders who elect redemption in connection with our initial business combination or the terms of negotiated transactions to purchase shares in connection with our initial business combination, we may be required to seek additional financing or to abandon the proposed business combination. We cannot assure you that such financing will be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to complete our initial business combination, we would be compelled to either restructure the transaction or abandon that particular business combination and seek an alternative target business candidate. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share plus any pro rata interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes on the liquidation of our trust account

Table of Contents

and our warrants will expire worthless. In addition, even if we do not need additional financing to complete our business combination, we may require such financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the target business. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after our initial business combination. If we are unable to complete our initial business combination, our public stockholders may only receive approximately $10.00 per share on the liquidation of our trust account, and our warrants will expire worthless.

***Our initial stockholders may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.***

Upon the closing of this offering, our initial stockholders will own shares representing 20% of our issued and outstanding shares of common stock (assuming they do not purchase any units in this offering). Accordingly, they may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support, including amendments to our amended and restated certificate of incorporation and approval of major corporate transactions. If our initial stockholders purchase any units in this offering or if our initial stockholders purchase any additional shares of common stock in the aftermarket or in privately negotiated transactions, this would increase their control. Factors that would be considered in making such additional purchases would include consideration of the current trading price of our Class A common stock. In addition, our board of directors, whose members were elected by our initial stockholders, is and will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. We may not hold an annual meeting of stockholders to elect new directors prior to the completion of our business combination, in which case all of the current directors will continue in office until at least the completion of the business combination. If there is an annual meeting, as a consequence of our "staggered" board of directors, only a minority of the board of directors will be considered for election and our initial stockholders, because of their ownership position, will have considerable influence regarding the outcome. Accordingly, our initial stockholders will continue to exert control at least until the completion of our business combination. The forward purchase shares will not be issued until completion of our initial business combination and, accordingly, will not be included in any stockholder vote until such time.

***Our sponsor contributed an aggregate of $25,000, or approximately $0.002 per founder share, and, accordingly, you will experience immediate and substantial dilution from the purchase of our Class A common stock.***

The difference between the public offering price per share (allocating all of the unit purchase price to the Class A common stock and none to the warrant included in the unit) and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to you and the other investors in this offering. Our sponsor acquired the founder shares at a nominal price, significantly contributing to this dilution. Upon the closing of this offering, and assuming no value is ascribed to the warrants included in the units, you and the other public stockholders will incur an immediate and substantial dilution of approximately 98.1% (or $9.81 per share, assuming no exercise of the underwriters' over-allotment option), the difference between the pro forma net tangible book value per share of $0.19 and the initial offering price of $10.00 per unit. In addition, because of the anti-dilution rights of the founder shares, any equity or equity-linked securities issued in connection with our initial business combination would be disproportionately dilutive to our Class A common stock.

Table of Contents

***We may amend the terms of the warrants in a manner that may be adverse to holders of public warrants with the approval by the holders of at least 50% of the then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of shares of our Class A common stock purchasable upon exercise of a warrant could be decreased, all without your approval.***

Our warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, convert the warrants into cash, shorten the exercise period or decrease the number of shares of our Class A common stock purchasable upon exercise of a warrant.

***We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of such redemption and provided certain other conditions are met. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you (i) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

***Our warrants and founder shares may have an adverse effect on the market price of our Class A common stock and make it more difficult to effectuate our business combination.***

We will be issuing warrants to purchase 30,000,000 shares of our Class A common stock (or up to 34,500,000 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) as part of the units offered by this prospectus and, simultaneously with the closing of this offering, we will be issuing in a private placement warrants to purchase an aggregate of 13,333,333 (or up to 15,133,333 if the underwriters' over-allotment option is exercised in full) shares of Class A common stock at $11.50 per share. In addition, we may also issue warrants to purchase up to 13,333,333 shares of Class A common stock at the closing of our initial business combination pursuant to the forward purchase agreement. Our initial stockholders currently own 25,875,000 founder shares. The founder shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment as set forth herein. In addition, if our sponsor makes any working capital loans, up to $1,500,000 of such loans may be converted into warrants, at the price of $1.50 per warrant at the

60

Table of Contents

option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

To the extent we issue shares of Class A common stock to effectuate a business combination, the potential for the issuance of a substantial number of additional shares of Class A common stock upon exercise of these warrants and conversion rights could make us a less attractive acquisition vehicle to a target business. Any such issuance will increase the number of issued and outstanding shares of our Class A common stock and reduce the value of the shares of Class A common stock issued to complete the business combination. Therefore, our warrants and founder shares may make it more difficult to effectuate a business combination or increase the cost of acquiring the target business.

The private placement warrants are identical to the warrants sold as part of the units in this offering except that, so long as they are held by our sponsor or its permitted transferees, (i) they will not be redeemable by us, (ii) they (including the Class A common stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by our sponsor until 30 days after the completion of our initial business combination and (iii) they may be exercised by the holders on a cashless basis.

***Because each unit contains one-third of one warrant and only a whole warrant may be exercised, the units may be worth less than units of other blank check companies.***

Each unit contains one-third of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. This is different from other offerings similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of a business combination since the warrants will be exercisable in the aggregate for one third of the number of shares compared to units that each contain a warrant to purchase one whole share, thus making us, we believe, a more attractive merger partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

***The determination of the offering price of our units and the size of this offering is more arbitrary than the pricing of securities and size of an offering of an operating company in a particular industry. You may have less assurance, therefore, that the offering price of our units properly reflects the value of such units than you would have in a typical offering of an operating company.***

Prior to this offering there has been no public market for any of our securities. The public offering price of the units and the terms of the warrants were negotiated between us and the underwriters. In determining the size of this offering, management held customary organizational meetings with the underwriters with respect to the state of capital markets, generally, and the amount the underwriters believed they reasonably could raise on our behalf. Factors considered in determining the size of this offering, prices and terms of the units, including the Class A common stock and warrants underlying the units, include:

- the history and prospects of companies whose principal business is the acquisition of other companies;

- prior offerings of those companies;

- our prospects for acquiring an operating business;

- a review of debt to equity ratios in leveraged transactions;

- our capital structure;

Table of Contents

- an assessment of our management and their experience in identifying operating companies;

- general conditions of the securities markets at the time of this offering; and

- other factors as were deemed relevant.

Although these factors were considered, the determination of our offering price is more arbitrary than the pricing of securities of an operating company in a particular industry since we have no historical operations or financial results.

***There is currently no market for our securities and a market for our securities may not develop, which would adversely affect the liquidity and price of our securities.***

There is currently no market for our securities. Stockholders therefore have no access to information about prior market history on which to base their investment decision. Following this offering, the price of our securities may vary significantly due to one or more potential business combinations and general market or economic conditions. Furthermore, an active trading market for our securities may never develop or, if developed, it may not be sustained. You may be unable to sell your securities unless a market can be established and sustained.

***Because we must furnish our stockholders with target business financial statements, we may lose the ability to complete an otherwise advantageous initial business combination with some prospective target businesses.***

The federal proxy rules require that a proxy statement with respect to a vote on a business combination meeting certain financial significance tests include target historical and/or pro forma financial statement disclosure. We will include the same financial statement disclosure in connection with our tender offer documents, whether or not they are required under the tender offer rules. These financial statements may be required to be prepared in accordance with, or be reconciled to, accounting principles generally accepted in the United States of America, or GAAP, or international financial reporting standards as issued by the International Accounting Standards Board, or IFRS, depending on the circumstances and the historical financial statements may be required to be audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), or PCAOB. These financial statement requirements may limit the pool of potential target businesses we may acquire because some targets may be unable to provide such financial statements in time for us to disclose such financial statements in accordance with federal proxy rules and complete our initial business combination within the prescribed time frame.

***We are an emerging growth company within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if the market value of our Class A common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot

Table of Contents

predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

***Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate our initial business combination, require substantial financial and management resources, and increase the time and costs of completing an acquisition.***

Section 404 of the Sarbanes-Oxley Act requires that we evaluate and report on our system of internal controls beginning with our Annual Report on Form 10-K for the year ending December 31, 2018. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. Further, for as long as we remain an emerging growth company, we will not be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because a target company with which we seek to complete our business combination may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of its internal controls. The development of the internal control of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

***Provisions in our amended and restated certificate of incorporation and Delaware law may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our Class A common stock and could entrench management.***

Our amended and restated certificate of incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. These provisions include a staggered board of directors and the ability of the board of directors to designate the terms of and issue new series of preferred shares, which may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make the removal of management more difficult

Table of Contents

and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

***If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to a variety of additional risks that may negatively impact our operations.***

If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to any special considerations or risks associated with companies operating in an international setting, including any of the following:

- higher costs and difficulties inherent in managing cross-border business operations and complying with different commercial and legal requirements of overseas markets;

- rules and regulations regarding currency redemption;

- complex corporate withholding taxes on individuals;

- laws governing the manner in which future business combinations may be effected;

- tariffs and trade barriers;

- regulations related to customs and import/export matters;

- longer payment cycles and challenges in collecting accounts receivable;

- tax issues, such as tax law changes and variations in tax laws as compared to the United States;

- currency fluctuations and exchange controls;

- rates of inflation;

- cultural and language differences;

- employment regulations;

- crime, strikes, riots, civil disturbances, terrorist attacks, natural disasters and wars;

- deterioration of political relations with the United States; and

- government appropriations of assets.

We may not be able to adequately address these additional risks. If we were unable to do so, our operations might suffer, which may adversely impact our results of operations and financial condition.

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this prospectus may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to select an appropriate target business or businesses;

- our ability to complete our initial business combination;

- our expectations around the performance of the prospective target business or businesses;

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;

- our officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;

- our potential ability to obtain additional financing to complete our initial business combination;

- our pool of prospective target businesses;

- the ability of our officers and directors to generate a number of potential acquisition opportunities;

- our public securities' potential liquidity and trading;

- the lack of a market for our securities;

- the use of proceeds not held in the trust account or available to us from interest income on the trust account balance;

- the trust account not being subject to claims of third parties; or

- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described in the section of this prospectus entitled "Risk Factors." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

Table of Contents

**USE OF PROCEEDS**

We are offering 90,000,000 units at an offering price of $10.00 per unit. We estimate that the net proceeds of this offering together with the funds we will receive from the sale of the private placement warrants will be used as set forth in the following table.

| | Without Over-Allotment Option | Over-Allotment Option Fully Exercised |
|---|---|---|
| ***Gross proceeds*** | | |
| Gross proceeds from units offered to public(1) | $ 900,000,000 | $ 1,035,000,000 |
| Gross proceeds from private placement warrants offered in the private placement | 20,000,000 | 22,700,000 |
| Total gross proceeds | $ 920,000,000 | $ 1,057,700,000 |
| ***Offering expenses(2)*** | | |
| Underwriting commissions (2% of gross proceeds from units offered to public, excluding deferred portion)(3) | $ 18,000,000 | $ 20,700,000 |
| Legal fees and expenses | 350,000 | 350,000 |
| Accounting fees and expenses | 47,500 | 47,500 |
| SEC/FINRA Expenses | 275,707 | 275,707 |
| Travel and road show | 20,000 | 20,000 |
| NASDAQ listing and filing fees | 75,000 | 75,000 |
| Director and Officer liability insurance premiums | 140,000 | 140,000 |
| Printing and engraving expenses | 75,000 | 75,000 |
| Miscellaneous | 16,793 | 16,793 |
| Total offering expenses (excluding underwriting commissions) | $ 1,000,000 | $ 1,000,000 |
| Proceeds after offering expenses | $ 901,000,000 | $ 1,036,000,000 |
| Held in trust account(3) | $ 900,000,000 | $ 1,035,000,000 |
| % of public offering size | 100% | 100% |
| Not held in trust account | $ 1,000,000 | $ 1,000,000 |

66

Table of Contents

The following table shows the use of the approximately $1,000,000 of net proceeds not held in the trust account.(4)

| | Amount | | % of Total |
|---|---|---|---|
| Legal, accounting, due diligence, travel, and other expenses in connection with any business combination(5) | $ | 150,000 | $ 15.0% |
| Legal and accounting fees related to regulatory reporting obligations | | 75,000 | 7.5% |
| Payment for office space, utilities and secretarial and administrative support ($10,000 per month for up to 24 months) | | 240,000 | 24.0% |
| Consulting, travel and miscellaneous expenses incurred during search for initial business combination target | | 75,000 | 7.5% |
| Reserve for liquidation | | 100,000 | 10.0% |
| Working capital to cover miscellaneous expenses (including franchise taxes) | | 360,000 | 36.0% |
| Total | $ | 1,000,000 | 100.0% |

(1)    Includes amounts payable to public stockholders who properly redeem their shares in connection with our successful completion of our initial business combination.

(2)    A portion of the offering expenses will be paid from the proceeds of a loan from our sponsor of $300,000 as described in this prospectus. This amount will be repaid upon completion of this offering out of the $2,000,000 of offering proceeds that has been allocated for the payment of offering expenses (other than underwriting commissions) and amounts not to be held in the trust account. In the event that offering expenses are less than set forth in this table, any such amounts will be used for post-closing working capital expenses. In the event that the offering expenses are more than as set forth in this table, we may fund such excess with funds not held in the trust account.

(3)    The underwriters have agreed to defer underwriting commissions equal to 3.5% of the gross proceeds of this offering. Upon completion of our initial business combination, $31,500,000, which constitutes the underwriters' deferred commissions (or $36,225,000 if the underwriters' over-allotment option is exercised in full) will be paid to the underwriters from the funds held in the trust account, and the remaining funds, less amounts released to the trustee to pay redeeming stockholders, will be released to us and can be used to pay all or a portion of the purchase price of the business or businesses with which our initial business combination occurs or for general corporate purposes, including payment of principal or interest on indebtedness incurred in connection with our initial business combination, to fund the purchases of other companies or for working capital. The underwriters will not be entitled to any interest accrued on the deferred underwriting discounts and commissions.

(4)    These expenses are estimates only. Our actual expenditures for some or all of these items may differ from the estimates set forth herein. For example, we may incur greater legal and accounting expenses than our current estimates in connection with negotiating and structuring our business combination based upon the level of complexity of such business combination. In the event we identify a business combination target in a specific industry subject to specific regulations, we may incur additional expenses associated with legal due diligence and the engagement of special legal counsel. In addition, our staffing needs may vary and as a result, we may engage a number of consultants to assist with legal and

Table of Contents

financial due diligence. We do not anticipate any change in our intended use of proceeds, other than fluctuations among the current categories of allocated expenses, which fluctuations, to the extent they exceed current estimates for any specific category of expenses, would not be available for our expenses.

(5)    Includes estimated amounts that may also be used in connection with our business combination to fund a "no shop" provision and commitment fees for financing.

The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full), including $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions, will be placed in a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We estimate that the interest earned on the trust account will be approximately $180,000 per year, assuming an interest rate of 0.02% per year; however, we can provide no assurance regarding this amount. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. Based on current interest rates, we do not expect that the interest earned on the trust account, net of income taxes, will be sufficient to pay Delaware franchise taxes.

The net proceeds held in the trust account may be used as consideration to pay the sellers of a target business with which we ultimately complete our business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination, we may apply the balance of the cash released from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We believe that amounts not held in trust will be sufficient to pay the costs and expenses to which such proceeds are allocated. This belief is based on the fact that while we may begin preliminary due diligence of a target business in connection with an indication of interest, we intend to undertake in-depth due diligence, depending on the circumstances of the relevant prospective acquisition, only after we have negotiated and signed a letter of intent or other preliminary agreement that addresses the terms of a business combination. However, if our estimate of the costs of undertaking in-depth due diligence and negotiating a business combination is less than the actual amount necessary to do so, we may be required to raise additional capital, the amount, availability and cost of which is currently unascertainable. If we are required to seek additional capital, we could seek such additional capital through loans or additional investments from our sponsor, members of our management team or their affiliates, but such persons are not under any obligation to advance funds to, or invest in, us.

68

Table of Contents

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts out of the proceeds of the trust account released to us. Otherwise, such loans would be repaid only out of funds held outside the trust account. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used to repay such loaned amounts. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. Prior to the completion of our initial business combination, we do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be required to be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-

69

Table of Contents

private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

We may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) and the agreement for our business combination may require as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares or the business combination, and instead may search for an alternate business combination.

A public stockholder will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete our business combination within 24 months following the closing of this offering, subject to applicable law and as further described herein and any limitations (including but not limited to cash requirements) created by the terms of the proposed business combination. In no other circumstances will a public stockholder have any right or interest of any kind to or in the trust account.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. In addition, our initial stockholders have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within the prescribed time frame. However, if our sponsor or any of our officers, directors or affiliates acquires public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the prescribed time frame.

70

Table of Contents

## DIVIDEND POLICY

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of our initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our initial business combination. The payment of any cash dividends subsequent to our initial business combination will be within the discretion of our board of directors at such time. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. If we increase the size of the offering, we will effect a stock dividend with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of the issued and outstanding shares of our common stock upon the consummation of this offering. Further, if we incur any indebtedness in connection with our business combination, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

71

Table of Contents

## DILUTION

The difference between the public offering price per share of Class A common stock, assuming no value is attributed to the warrants included in the units we are offering pursuant to this prospectus or the private placement warrants, and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to investors in this offering. Such calculation does not reflect any dilution associated with the sale and exercise of warrants, including the private placement warrants, which would cause the actual dilution to the public stockholders to be higher, particularly where a cashless exercise is utilized. Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities (including the value of Class A common stock which may be redeemed for cash), by the number of outstanding shares of our Class A common stock.

At December 31, 2016, our net tangible book value was $(146,552), or approximately $(0.01) per share of common stock. After giving effect to the sale of 90,000,000 shares of Class A common stock included in the units we are offering by this prospectus, the sale of the private placement warrants and the deduction of underwriting commissions and estimated expenses of this offering, our pro forma net tangible book value at December 31, 2016 would have been $5,000,010, or approximately $0.19 per share, representing an immediate increase in net tangible book value (as decreased by the value of the approximately 86,452,299 shares of Class A common stock that may be redeemed for cash and assuming no exercise of the underwriters' over-allotment option) of $9.82 per share to our initial stockholders as of the date of this prospectus and an immediate dilution of $10.00 per share or 100% to our public stockholders not exercising their redemption rights. Total dilution to public stockholders from this offering will be $9.81 per share. The dilution to new investors if the underwriters exercise the over-allotment option in full would be an immediate dilution of $9.83 per share or 98.3%.

The following table illustrates the dilution to the public stockholders on a per-share basis, assuming no value is attributed to the warrants included in the units or the private placement warrants:

| | | |
|---|---|---|
| Public offering price | | $ 10.00 |
| Net tangible book value before this offering | $ (0.01) | |
| Increase attributable to public stockholders | 9.82 | |
| Decrease attributable to public shares subject to redemption | (10.00) | |
| Pro forma net tangible book value after this offering and the sale of the private placement warrants | | $ 0.19 |
| Dilution to public stockholders | | $ 9.81 |

For purposes of presentation, we have reduced our pro forma net tangible book value after this offering (assuming no exercise of the underwriters' over-allotment option) by $864,522,990 because holders of up to approximately 96.1% of our public shares may redeem their shares for a pro rata share of the aggregate amount then on deposit in the trust account at a per share redemption price equal to the amount in the trust account as set forth in our tender offer or proxy materials (initially anticipated to be the aggregate amount held in trust two days prior to the commencement of our tender offer or stockholders meeting, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes), divided by the number of shares of Class A common stock sold in this offering.

Table of Contents

The following table sets forth information with respect to our initial stockholders and the public stockholders:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
| | Number | Percentage | Amount | Percentage | |
|---|---|---|---|---|---|
| Initial Stockholders(1) | 22,500,000 | 20.0% | $    25,000 | 0.01% | $  0.001 |
| Public Stockholders | 90,000,000 | 80.0% | 900,000,000 | 99.9% | $  10.00 |
| | 112,500,000 | 100.0% | $ 900,025,000 | 100.0% | |

(1)     Assumes no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 3,375,000 shares of Class B common stock held by our sponsor.

The pro forma net tangible book value per share after the offering is calculated as follows:

| | |
|---|---|
| Numerator: | |
| Net tangible book value (deficit) before this offering | $      (146,552) |
| Proceeds from this offering and the sale of the private placement warrants, net of expenses | 901,000,000 |
| Offering costs excluded from net tangible book value before this offering | 169,552 |
| Less: deferred underwriters' commissions payable | (31,500,000) |
| Less: amount of Class A common stock subject to redemption to maintain net tangible assets of $5,000,001 | (864,522,990) |
| | $      5,000,010 |
| | |
| Denominator: | |
| Shares of Class B common stock outstanding prior to this offering | 25,875,000 |
| Shares of Class B common stock forfeited if over-allotment is not exercised | (3,375,000) |
| Shares of Class A common stock included in the units offered | 90,000,000 |
| Less: shares of Class A common stock subject to redemption | (86,452,299) |
| | 26,047,701 |

73

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization at December 31, 2016, and as adjusted to give effect to the sale of our units and the private placement warrants and the application of the estimated net proceeds derived from the sale of such securities:

| | December 31, 2016 | |
| | Actual | As Adjusted[1] |
|---|---|---|
| Deferred underwriting commissions | $        — | $    31,500,000 |
| Promissory note to affiliate[2] | 300,000 | — |
| Class A common stock, subject to redemption[3] | — | 864,522,990 |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.0001 par value, 1,000,000 shares authorized (actual and as adjusted); none issued or outstanding (actual and as adjusted) | — | — |
| Common stock | | |
| Class A common stock, $0.0001 par value, 400,000,000 shares authorized (actual and as adjusted); no shares issued and outstanding (actual); 3,547,701 shares issued and outstanding (excluding 86,452,299 shares subject to redemption) (as adjusted) | — | 355 |
| Class B common stock, $0.0001 par value, 50,000,000 shares authorized (actual and as adjusted); 25,875,000 shares issued and outstanding (actual); 22,500,000 shares issued and outstanding (as adjusted)[4] | 2,588 | 2,250 |
| Additional paid-in capital | 22,412 | 4,999,405 |
| Accumulated deficit | (2,000) | (2,000) |
| Total stockholders' equity | 23,000 | 5,000,010 |
| Total capitalization | 323,000 | 901,023,000 |

(1)     Assumes the over-allotment option has not been exercised and the resulting forfeiture of 3,375,000 founder shares held by our sponsor has occurred. Excludes gross proceeds of $400,000,000 from the sale of the forward purchase securities that may close simultaneously with the closing of our initial business combination.

(2)     Our sponsor has agreed to loan as up to $300,000 to be used for a portion of the expenses of this offering. As of December 31, 2016, we had borrowed $300,000 under the promissory note with our sponsor.

(3)     Upon the completion of our initial business combination, we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, subject to the limitations described herein whereby our net tangible assets will be maintained at a minimum of $5,000,001 and any limitations (including, but not limited to, cash requirements) created by the terms of the proposed business combination.

(4)     Actual share amount is prior to any forfeiture of founder shares by our sponsor and as adjusted amount assumes no exercise of the underwriters' over-allotment option.

74

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

We are a blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions directly or indirectly, with respect to identifying any business combination target. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placements of the private placement warrants and forward purchase securities, our capital stock, debt or a combination of cash, stock and debt.

The issuance of additional shares of our stock in a business combination, including the forward purchase shares:

- may significantly dilute the equity interest of investors in this offering, which dilution would increase if the anti-dilution provisions in the Class B common stock resulted in the issuance of Class A shares on a greater than one-to-one basis upon conversion of the Class B common stock;

- may subordinate the rights of holders of our common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change in control if a substantial number of shares of our common stock is issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;

- may have the effect of delaying or preventing a change of control of us by diluting the stock ownership or voting rights of a person seeking to obtain control of us; and

- may adversely affect prevailing market prices for our Class A common stock and/or warrants.

Similarly, if we issue debt securities or otherwise incur significant debt to bank or other lenders or owners of a target, it could result in:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

Table of Contents

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other purposes and other disadvantages compared to our competitors who have less debt.

As indicated in the accompanying financial statements, at December 31, 2016, we had deferred offering costs of $169,552. Further, we expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to raise capital or to complete our initial business combination will be successful.

**Results of Operations and Known Trends or Future Events**

We have neither engaged in any operations nor generated any revenues to date. Our only activities since inception have been organizational activities and those necessary to prepare for this offering. Following this offering, we will not generate any operating revenues until after completion of our initial business combination. We will generate non-operating income in the form of interest income on cash and cash equivalents after this offering. There has been no significant change in our financial or trading position and no material adverse change has occurred since the date of our audited financial statements. After this offering, we expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses. We expect our expenses to increase substantially after the closing of this offering.

**Liquidity and Capital Resources**

Our liquidity needs have been satisfied prior to the completion of this offering through a capital contribution of our sponsor of $25,000 for the founder shares and a loan to us of $300,000 by our sponsor under an unsecured promissory note. We estimate that the net proceeds from (i) the sale of the units in this offering, after deducting offering expenses of approximately $1,000,000, underwriting commissions of $18,000,000 ($20,700,000 if the underwriters' over-allotment option is exercised in full) (excluding deferred underwriting commissions of $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full)), and (ii) the sale of the private placement warrants for a purchase price of $20,000,000 (or $22,700,000 if the over-allotment option is exercised in full), will be $901,000,000 (or $1,036,000,000 if the underwriters' over-allotment option is exercised in full). Of this amount, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full) will be held in the trust account, which includes $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions. The remaining approximately $1,000,000 will not be held in the trust account. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less taxes payable and deferred underwriting commissions), and the proceeds from the sale of the forward purchase securities to complete our initial business combination. We may withdraw interest to pay franchise and income taxes. We estimate our annual franchise tax obligations, based on the number of shares of our common stock authorized and outstanding after the completion of this offering, to be $180,000, which is the maximum amount of annual franchise taxes payable by us as a Delaware corporation per annum. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the trust account. Based on current interest rates, we do not expect that the interest earned on the trust

76

Table of Contents

account, net of income taxes, will be sufficient to pay Delaware franchise taxes. To the extent that our capital stock or debt is used, in whole or in part, as consideration to complete our initial business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the target business or businesses, make other acquisitions and pursue our growth strategies.

Prior to the completion of our initial business combination, we will have available to us the approximately $1,000,000 of proceeds held outside the trust account. We will use these funds primarily to identify and evaluate target businesses, perform business due diligence on prospective target businesses, travel to and from the offices, plants or similar locations of prospective target businesses or their representatives or owners, review corporate documents and material agreements of prospective target businesses, and structure, negotiate and complete a business combination.

In order to fund working capital deficiencies or finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We expect our primary liquidity requirements during that period to include approximately $150,000 for legal, accounting, due diligence, travel and other expenses associated with structuring, negotiating and documenting successful business combinations; $75,000 for legal and accounting fees related to regulatory reporting requirements; $240,000 for office space, utilities and secretarial and administrative support; $75,000 for consulting, travel and miscellaneous expenses incurred during the search for a business combination target; $100,000 reserved for liquidation; and approximately $360,000 for working capital that will be used for miscellaneous expenses and reserves (including franchise taxes).

These amounts are estimates and may differ materially from our actual expenses. In addition, we could use a portion of the funds not being placed in trust to pay commitment fees for financing, fees to consultants to assist us with our search for a target business or as a down payment or to fund a "no-shop" provision (a provision designed to keep target businesses from "shopping" around for transactions with other companies or investors on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into an agreement where we paid for the right to receive exclusivity from a target business, the amount that would be used as a down payment or to fund a "no-shop" provision would be determined based on the terms of the specific business combination and the amount of our available funds at the time. Our forfeiture of such funds (whether as a result of our breach or otherwise) could result in our not having sufficient funds to continue searching for, or conducting due diligence with respect to, prospective target businesses.

We do not believe we will need to raise additional funds following this offering in order to meet the expenditures required for operating our business. However, if our estimates of the costs of identifying a target business, undertaking in-depth due diligence and negotiating an initial business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our business combination. Moreover, we may need to obtain additional financing either to complete our business combination or because we become obligated to

77

Table of Contents

redeem a significant number of our public shares upon completion of our business combination, in which case we may issue additional securities or incur debt in connection with such business combination, which may include a specified future issuance. Subject to compliance with applicable securities laws, we would only complete such financing simultaneously with the completion of our business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. In addition, following our initial business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

## Controls and Procedures

We are not currently required to maintain an effective system of internal controls as defined by Section 404 of the Sarbanes-Oxley Act. We will be required to comply with the internal control requirements of the Sarbanes-Oxley Act for the fiscal year ending December 31, 2018. Only in the event that we are deemed to be a large accelerated filer or an accelerated filer would we be required to comply with the independent registered public accounting firm attestation requirement. Further, for as long as we remain an emerging growth company as defined in the JOBS Act, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirement.

Prior to the closing of this offering, we have not completed an assessment, nor have our auditors tested our systems, of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;

- reconciliation of accounts;

- proper recording of expenses and liabilities in the period to which they relate;

- evidence of internal review and approval of accounting transactions;

- documentation of processes, assumptions and conclusions underlying significant estimates; and

- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively may also take longer than we expect, thus increasing our exposure to financial fraud or erroneous financial reporting.

Once our management's report on internal controls is complete, we will retain our independent auditors to audit and render an opinion on such report when required by Section 404 of the Sarbanes-Oxley Act. The independent auditors may identify additional issues concerning a target business's internal controls while performing their audit of internal control over financial reporting.

Table of Contents

**Quantitative and Qualitative Disclosures about Market Risk**

The net proceeds of this offering and the sale of the private placement warrants held in the trust account will be invested in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

**Related Party Transactions**

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not

79

Table of Contents

believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

Our sponsor has committed to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the underwriters' over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or $22,700,000 if the underwriters' over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. Our sponsor will be permitted to transfer the private placement warrants held by it to certain permitted transferees, including our officers and directors and other persons or entities affiliated with or related to it, but the transferees receiving such securities will be subject to the same agreements with respect to such securities as the sponsor. Otherwise, these warrants will not, subject to certain limited exceptions, be transferable or salable until 30 days after the completion of our business combination. The private placement warrants will be non-redeemable so long as they are held by our sponsor or its permitted transferees. The private placement warrants may also be exercised by the sponsor and its permitted transferees for cash or on a cashless basis. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI.

The investment objective of Fund VI is to generate long-term capital appreciation through investments in Energy Companies (which includes entities predominantly engaged in (a) the production, exploration, development, extraction, processing, transportation, refining, storage, distribution, marketing and/or trading of oil, gas, coal or other natural resources used to produce energy, or ethanol; (b) the generation, transmission, distribution, marketing and/or trading of all forms of electrical power; (c) the manufacturing, marketing and/or trading of equipment or other supplies predominantly used by entities engaged in businesses described in clause (a) or (b) above or the following clause (d); and (d) the provision of services to entities engaged in businesses described in clause (a), (b) or (c) above; as well as other businesses or assets determined by the General Partner of Fund VI to be related or complementary to any of the foregoing, including without limitation in respect of feedstocks, supplies or other materials usable by any of the foregoing.

The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

80

Table of Contents

Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties, and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full.

The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants.

Pursuant to a registration rights agreement we will enter into with our initial stockholders on or prior to the closing of this offering, we may be required to register certain securities for sale under the Securities Act. These holders, and holders of warrants issued upon conversion of working capital loans, if any, are entitled under the registration rights agreement to make up to three demands that we register certain of our securities held by them for sale under the Securities Act and to have the securities covered thereby registered for resale pursuant to Rule 415 under the Securities Act. In addition, these holders have the right to include their securities in other registration statements filed by us. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until the securities covered thereby are released from their lock-up restrictions, as described herein. We will bear the costs and expenses of filing any such registration statements. See the section of this prospectus entitled "Certain Relationships and Related Party Transactions."

**Off-Balance Sheet Arrangements; Commitments and Contractual Obligations; Quarterly Results**

As of December 31, 2016, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K and did not have any commitments or contractual obligations. No unaudited quarterly operating data is included in this prospectus, as we have conducted no operations to date.

**JOBS Act**

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We will qualify as an "emerging growth company" and under the JOBS Act will be allowed to comply with new or revised accounting pronouncements based on the effective date for private (not publicly traded) companies. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Additionally, we are in the process of evaluating the benefits of relying on the other reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an "emerging growth company", we choose to rely on such exemptions we may not be required to, among other things, (i) provide an auditor's attestation report on our system of internal controls over financial reporting pursuant to Section 404, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act, (iii) comply with any requirement that may be adopted by the PCAOB regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (auditor discussion and analysis), and (iv) disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation. These exemptions will apply for a period of five years following the completion of this offering or until we are no longer an "emerging growth company," whichever is earlier.

Table of Contents

## PROPOSED BUSINESS

### Overview

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We are an acquisition vehicle of Fund VI, an energy-focused private investment fund managed by Riverstone. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

In November 2015, Riverstone formed Silver Run I, a blank check company formed for substantially the same purposes as our company. Silver Run I aimed to capitalize on the 45 years of experience in the oil and gas industry of its Chief Executive Officer, Mark Papa. Prior to Silver Run I and his time with Riverstone, Mr. Papa was Chairman and Chief Executive Officer of EOG Resources, an exploration and production company. Through its initial public offering in February 2016, Silver Run I raised $500 million from the sale of 50 million units to public investors, with each unit consisting of one share of Class A common stock and one-third of one warrant. On July 6, 2016, an affiliate of Riverstone entered into a definitive agreement to purchase an approximate 89% interest in Centennial, an independent oil and natural gas company with assets located in the core of the Southern Delaware Basin, from funds controlled by, and affiliates of, NGP Energy Capital Management, L.L.C. In

82

Table of Contents

accordance with the definitive agreement, the Riverstone affiliate agreed to assign, and Silver Run I agreed to assume, its right to purchase the interest in Centennial. On October 11, 2016, Silver Run I consummated the acquisition of approximately 89% of the outstanding membership interests in Centennial. In connection with the acquisition, Silver Run I raised an additional approximately $1.0 billion through a private placement of shares of its Class A Common Stock at $10.00 per share. Upon the closing of the transaction, Silver Run I was renamed Centennial Resource Development, Inc., and its common stock and warrants began trading on NASDAQ under the symbols "CDEV" and "CDEVW", respectively.

Our sponsor is an acquisition vehicle of Fund VI, which is managed by Riverstone. Riverstone has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

In addition, we believe our ability to complete an initial business combination will be enhanced by our having entered into the forward purchase agreement pursuant to which Fund VI Holdings has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

**Business Strategy**

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both

Table of Contents

investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

## Acquisition Criteria

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies or assets that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential;

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

## Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm with respect to the satisfaction of such criteria.

84

Table of Contents

We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties. Any such Affiliated Joint Acquisition or specified future issuance would be in addition to, and would not include, the forward purchase securities issued pursuant to the forward purchase agreement. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes of our common stock. The issuance of the forward purchase securities will not result in such an adjustment to the conversion ratio of our Class B common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

85

Table of Contents

**Our Acquisition Process**

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Fund VI, members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business combination for our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity, including Fund VI. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company

86

Table of Contents

and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

**Our Management Team**

Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any member of our management team will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

We believe our management team's operating and transaction experience and relationships with companies will provide us with a substantial number of potential business combination targets. Over the course of their careers, the members of our management team have developed a broad network of contacts and corporate relationships around the world. This network has grown through the activities of our management team sourcing, acquiring and financing businesses, our management team's relationships with sellers, financing sources and target management teams and the experience of our management team in executing transactions under varying economic and financial market conditions. See the section of this prospectus entitled "Management" for a more complete description of our management team's experience.

**Status as a Public Company**

We believe our structure will make us an attractive business combination partner to target businesses. As an existing public company, we offer a target business an alternative to the traditional initial public offering through a merger or other business combination. In this situation, the owners of the target business would exchange their shares of stock in the target business for shares of our stock or for a combination of shares of our stock and cash, allowing us to tailor the consideration to the specific needs of the sellers. Although there are various costs and obligations associated with being a public company, we believe target businesses will find this method a more certain and cost effective method to becoming a public company than the typical initial public offering. In a typical initial public offering, there are additional expenses incurred in marketing, road show and public reporting efforts that may not be present to the same extent in connection with a business combination with us.

Furthermore, once a proposed business combination is completed, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could delay or prevent the offering from occurring or could have negative valuation consequences. Once public, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from

87

Table of Contents

the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

## Financial Position

With funds available for a business combination initially in the amount of $1,268,500,000, after payment of $31,500,000 of deferred underwriting fees (or $1,398,775,000 after payment of up to $36,225,500 of deferred underwriting fees if the underwriters' over-allotment option is exercised in full), in each case before fees and expenses associated with our initial business combination, we offer a target business a variety of options such as creating a liquidity event for its owners, providing capital for the potential growth and expansion of its operations or strengthening its balance sheet by reducing its debt or leverage ratio. Because we are able to complete our business combination using our cash, debt or equity securities, or a combination of the foregoing, we have the flexibility to use the most efficient combination that will allow us to tailor the consideration to be paid to the target business to fit its needs and desires. However, we have not taken any steps to secure third party financing and there can be no assurance it will be available to us.

## Effecting our Initial Business Combination

We are not presently engaged in, and we will not engage in, any operations for an indefinite period of time following this offering. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placement of the private placement warrants and the forward purchase securities, our capital stock, debt or a combination of these as the consideration to be paid in our initial business combination. We may seek to complete our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, which would subject us to the numerous risks inherent in such companies and businesses.

If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination or used for redemptions of our Class A common stock, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other

Table of Contents

advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

In addition to the forward purchase securities, we may seek to raise additional funds through a private offering of debt or equity securities in connection with the completion of our initial business combination (which may include a specified future issuance), and we may effectuate our initial business combination using the proceeds of such offering rather than using the amounts held in the trust account. Subject to compliance with applicable securities laws, we would expect to complete such financing only simultaneously with the completion of our business combination. In the case of an initial business combination funded with assets other than the trust account assets, our tender offer documents or proxy materials disclosing the business combination would disclose the terms of the financing and, only if required by law, we would seek stockholder approval of such financing. There are no prohibitions on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial business combination. At this time, other than the forward purchase agreement, we are not a party to any arrangement or understanding with any third party with respect to raising any additional funds through the sale of securities or otherwise.

**Sources of Target Businesses**

We anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Target businesses may be brought to our attention by such unaffiliated sources as a result of being solicited by us through calls or mailings. These sources may also introduce us to target businesses in which they think we may be interested on an unsolicited basis, since many of these sources will have read this prospectus and know what types of businesses we are targeting. Our officers and directors, as well as their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. In addition, we expect to receive a number of proprietary deal flow opportunities that would not otherwise necessarily be available to us as a result of the business relationships of our officers and directors. While we do not presently anticipate engaging the services of professional firms or other individuals that specialize in business acquisitions on any formal basis, we may engage these firms or other individuals in the future, in which event we may pay a finder's fee, consulting fee or other compensation to be determined in an arm's length negotiation based on the terms of the transaction. We will engage a finder only to the extent our management determines that the use of a finder may bring opportunities to us that may not otherwise be available to us or if finders approach us on an unsolicited basis with a potential transaction that our management determines is in our best interest to pursue. Payment of finder's fees is customarily tied to completion of a transaction, in which case any such fee will be paid out of the funds held in the trust account. In no event, however, will our sponsor or any of our existing officers or directors, or any entity with which they are affiliated, be paid any finder's fee, consulting fee or other compensation prior to, or for any services they render in order to effectuate, the completion of our initial business combination (regardless of the type of transaction that it is). We have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office

89

Table of Contents

space, utilities and secretarial and administrative support and to reimburse our sponsor for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination. Some of our officers and directors may enter into employment or consulting agreements with the post-transaction company following our initial business combination. The presence or absence of any such fees or arrangements will not be used as a criterion in our selection process of an acquisition candidate.

We are not prohibited from pursuing an initial business combination with a business combination target that is affiliated with our sponsor, officers or directors or making the acquisition through a joint venture or other form of shared ownership with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a business combination target that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that such an initial business combination is fair to our company from a financial point of view. We are not required to obtain such an opinion in any other context.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has pre-existing fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity, including Fund VI, prior to presenting such business combination opportunity to us. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

### Selection of a Target Business and Structuring of our Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. The fair market value of the target or targets will be determined by our board of directors based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation or value of comparable businesses. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, with respect to the satisfaction of such criteria. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. Subject to this requirement, our management will have virtually unrestricted flexibility in identifying and selecting one or more prospective target businesses, although we will not be permitted to effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In any case, we will only complete an initial business combination in which we own or acquire 50% or more of the outstanding voting securities of the target or otherwise acquire an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. If we own or acquire less than 100% of the equity interests or assets of a target business or businesses, the portion of such business or businesses that are owned or acquired by the post-transaction company is what will be valued for purposes of the 80% of net assets test. There is no basis for investors in this offering to evaluate the possible merits or risks of any target business with which we may ultimately complete our business combination.

Table of Contents

To the extent we effect our business combination with a company or business that may be financially unstable or in its early stages of development or growth we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review, which will encompass, among other things, meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial and other information that will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Lack of Business Diversification**

For an indefinite period of time after the completion of our initial business combination, the prospects for our success may depend entirely on the future performance of a single business. Unlike other entities that have the resources to complete business combinations with multiple entities in one or several industries, it is probable that we will not have the resources to diversify our operations and mitigate the risks of being in a single line of business. In addition, we intend to focus our search for an initial business combination in a single industry. By completing our business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and

- cause us to depend on the marketing and sale of a single product or limited number of products or services.

**Limited Ability to Evaluate the Target's Management Team**

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our business combination with that business, our assessment of the target business' management may not prove to be correct. In addition, the future management may not have the necessary skills, qualifications or abilities to manage a public company. Furthermore, the future role of members of our management team, if any, in the target business cannot presently be stated with any certainty. While it is possible that one or more of our directors will remain associated in some capacity with us following our business combination, it is unlikely that any of them will devote their full efforts to our affairs subsequent to our business combination. Moreover, we cannot assure you that members of our management team will have significant experience or knowledge relating to the operations of the particular target business.

We cannot assure you that any of our key personnel will remain in senior management or advisory positions with the combined company. The determination as to whether any of our key personnel will remain with the combined company will be made at the time of our initial business combination.

Following a business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. We cannot assure you that we will have the ability to recruit additional managers, or that additional managers will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

Table of Contents

**Stockholders May Not Have the Ability to Approve our Initial Business Combination**

We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC. However, we will seek stockholder approval if it is required by law or applicable stock exchange rule, or we may decide to seek stockholder approval for business or other legal reasons. Presented in the table below is a graphic explanation of the types of initial business combinations we may consider and whether stockholder approval is currently required under Delaware law for each such transaction.

| Type of Transaction | Whether Stockholder Approval is Required |
|---|:---:|
| Purchase of assets | No |
| Purchase of stock of target not involving a merger with the company | No |
| Merger of target into a subsidiary of the company | No |
| Merger of the company with a target | Yes |

Under NASDAQ's listing rules, stockholder approval would be required for our initial business combination if, for example:

- we issue shares of Class A common stock that will be equal to or in excess of 20% of the number of shares of our Class A common stock then outstanding;

- any of our directors, officers or substantial stockholders (as defined by NASDAQ rules) has a 5% or greater interest (or such persons collectively have a 10% or greater interest), directly or indirectly, in the target business or assets to be acquired or otherwise and the present or potential issuance of common stock could result in an increase in outstanding common shares or voting power of 5% or more; or

- the issuance or potential issuance of common stock will result in our undergoing a change of control.

**Permitted Purchases of our Securities**

In the event we seek stockholder approval of our business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares in such transactions. They will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

The purpose of such purchases would be to (i) vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business

92

Table of Contents

combination or (ii) to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our common stock may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our sponsor, officers, directors and/or their affiliates anticipate that they may identify the stockholders with whom our sponsor, officers, directors or their affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders following our mailing of proxy materials in connection with our initial business combination. To the extent that our sponsor, officers, directors, advisors or their affiliates enter into a private purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the trust account or vote against the business combination. Our sponsor, officers, directors, advisors or their affiliates will only purchase shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

Any purchases by our sponsor, officers, directors and/or their affiliates who are affiliated purchasers under Rule 10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) and Rule 10b-5 of the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our sponsor, officers, directors and/or their affiliates will not make purchases of common stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act.

### Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination.

#### Manner of Conducting Redemptions

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under the law or stock exchange listing requirement. Asset acquisitions and stock purchases would not typically require stockholder approval while direct

93

Table of Contents

mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. If we structure a business combination transaction with a target company in a manner that requires stockholder approval, we will not have discretion as to whether to seek a stockholder vote to approve the proposed business combination. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our business combination, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market if we elect to redeem our public shares through a tender offer, to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares which are not purchased by our sponsor, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirement, or we decide to obtain stockholder approval for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

In the event that we seek stockholder approval of our initial business combination, we will distribute proxy materials and, in connection therewith, provide our public stockholders with the redemption rights described above upon completion of the initial business combination.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial

94

Table of Contents

stockholders will count toward this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

### *Limitation on Redemption upon Completion of our Initial Business Combination if we Seek Stockholder Approval*

Notwithstanding the foregoing, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." We believe this restriction will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to exercise their redemption rights against a proposed business combination as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, our amended and restated certificate of incorporation does not restrict our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination.

95

Table of Contents

*Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights*

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically using the Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option. The tender offer or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. Accordingly, a public stockholder would have from the time we send out our tender offer materials until the close of the tender offer period, or up to two days prior to the vote on the business combination if we distribute proxy materials, as applicable, to tender its shares if it wishes to seek to exercise its redemption rights. Given the relatively short exercise period, it is advisable for stockholders to use electronic delivery of their public shares.

There is a nominal cost associated with the above-referenced tendering process and the act of certificating the shares or delivering them through the DWAC System. The transfer agent will typically charge the tendering broker $80.00 and it would be up to the broker whether or not to pass this cost on to the redeeming holder. However, this fee would be incurred regardless of whether or not we require holders seeking to exercise redemption rights to tender their shares. The need to deliver shares is a requirement of exercising redemption rights regardless of the timing of when such delivery must be effectuated.

The foregoing is different from the procedures used by many blank check companies. In order to perfect redemption rights in connection with their business combinations, many blank check companies would distribute proxy materials for the stockholders' vote on an initial business combination, and a holder could simply vote against a proposed business combination and check a box on the proxy card indicating such holder was seeking to exercise his or her redemption rights. After the business combination was approved, the company would contact such stockholder to arrange for him or her to deliver his or her certificate to verify ownership. As a result, the stockholder then had an "option window" after the completion of the business combination during which he or she could monitor the price of the company's stock in the market. If the price rose above the redemption price, he or she could sell his or her shares in the open market before actually delivering his or her shares to the company for cancellation. As a result, the redemption rights, to which stockholders were aware they needed to commit before the stockholder meeting, would become "option" rights surviving past the completion of the business combination until the redeeming holder delivered its certificate. The requirement for physical or electronic delivery prior to the meeting ensures that a redeeming holder's election to redeem is irrevocable once the business combination is approved.

Any request to redeem such shares, once made, may be withdrawn at any time up to the date set forth in the tender offer materials or the date of the stockholder meeting set forth in our proxy materials, as applicable. Furthermore, if a holder of a public share delivered its certificate in connection with an election of redemption rights and subsequently decides prior to the applicable date not to elect to exercise such rights, such holder may simply request that the transfer agent return the certificate (physically or electronically). It is anticipated that the funds to be distributed to holders of our public shares electing to redeem their shares will be distributed promptly after the completion of our business combination.

If our initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights would not be entitled to redeem their

96

Table of Contents

shares for the applicable pro rata share of the trust account. In such case, we will promptly return any certificates delivered by public holders who elected to redeem their shares.

If our initial proposed business combination is not completed, we may continue to try to complete a business combination with a different target until 24 months from the closing of this offering.

### *Redemption of Public Shares and Liquidation if no Initial Business Combination*

Our amended and restated certificate of incorporation provides that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our sponsor, officers or directors acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes divided by the number of then outstanding public shares. However, we may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules).

We expect that all costs and expenses associated with implementing our plan of dissolution, as well as payments to any creditors, will be funded from amounts remaining out of the approximately $1,000,000 of proceeds held outside the trust account, although we cannot assure you that there will be sufficient funds for such purpose. However, if those funds are not sufficient to cover the costs and expenses associated with implementing our plan of dissolution, to the extent that there is any interest accrued in the trust account not required to pay franchise and income taxes on interest income earned on the trust account balance, we may request the trustee to release to us an additional amount of up to $100,000 of such accrued interest to pay those costs and expenses.

97

Table of Contents

If we were to expend all of the net proceeds of this offering and the sale of the private placement warrants, other than the proceeds deposited in the trust account, and without taking into account interest, if any, earned on the trust account, the per-share redemption amount received by stockholders upon our dissolution would be approximately $10.00. The proceeds deposited in the trust account could, however, become subject to the claims of our creditors which would have higher priority than the claims of our public stockholders. We cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.00. Under Section 281(b) of the DGCL, our plan of dissolution must provide for all claims against us to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before we make any distribution of our remaining assets to our stockholders. While we intend to pay such amounts, if any, we cannot assure you that we will have funds sufficient to pay or provide for all creditors' claims.

Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest and claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the trust account including but not limited to fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative. Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver.

In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party (other than our independent auditors) for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor will be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

98

Table of Contents

In the event that the proceeds in the trust account are reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. We have not asked our sponsor to reserve for such indemnification obligations and we cannot assure you that our sponsor would be able to satisfy those obligations. Accordingly, we cannot assure you that due to claims of creditors the actual value of the per-share redemption price will not be less than $10.00 per public share.

We will seek to reduce the possibility that our sponsor will have to indemnify the trust account due to claims of creditors by endeavoring to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to monies held in the trust account. Our sponsor will also not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. We will have access to up to approximately $1,000,000 from the proceeds of this offering with which to pay any such potential claims (including costs and expenses incurred in connection with our liquidation, currently estimated to be no more than approximately $100,000). In the event that we liquidate and it is subsequently determined that the reserve for claims and liabilities is insufficient, stockholders who received funds from our trust account could be liable for claims made by creditors. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds from the funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering, is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution. If

99

Table of Contents

we are unable to complete our business combination within 24 months from the closing of this offering, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible following our 24th month and, therefore, we do not intend to comply with those procedures. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent 10 years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. As described above, pursuant to the obligation contained in our underwriting agreement, we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account. As a result of this obligation, the claims that could be made against us are significantly limited and the likelihood that any claim that would result in any liability extending to the trust account is remote. Further, our sponsor may be liable only to the extent necessary to ensure that the amounts in the trust account are not reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest withdrawn to pay taxes and will not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, our sponsor will not be responsible to the extent of any liability for such third-party claims.

If we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, we cannot assure you we will be able to return $10.00 per share to our public stockholders. Additionally, if we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by our stockholders. Furthermore, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or may have acted in bad faith, thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

Table of Contents

Our public stockholders will be entitled to receive funds from the trust account only (i) in the event of the redemption of our public shares if we do not complete our business combination within 24 months from the closing of this offering, subject to applicable law, (ii) in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we have not consummated an initial business combination within 24 months from the closing of this offering or (iii) if they redeem their respective shares for cash upon the completion of the initial business combination. In no other circumstances will a stockholder have any right or interest of any kind to or in the trust account. In the event we seek stockholder approval in connection with our initial business combination, a stockholder's voting in connection with the business combination alone will not result in a stockholder's redeeming its shares to us for an applicable pro rata share of the trust account. Such stockholder must have also exercised its redemption rights as described above.

### Comparison of Redemption or Purchase Prices in Connection with our Initial Business Combination and if We Fail to Complete our Business Combination

The following table compares the redemptions and other permitted purchases of public shares that may take place in connection with the completion of our initial business combination and if we are unable to complete our business combination within 24 months from the closing of this offering.

| | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Calculation of redemption price** | Redemptions at the time of our initial business combination may be made pursuant to a tender offer or in connection with a stockholder vote. The redemption price will be the same whether we conduct redemptions pursuant to a tender offer or in connection with a stockholder vote. In either case, our public stockholders may redeem their public shares for cash equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination (which is initially anticipated to be $10.00 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitation that no redemptions will take place, if all of the redemptions would cause our net tangible assets to be less than $5,000,001 and any limitations (including but not limited to cash requirements) agreed to in connection with the negotiation of terms of a proposed business combination. | If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market prior to or following completion of our initial business combination. There is no limit to the prices that our sponsor, directors, officers, advisors or their affiliates may pay in these transactions. | If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem all public shares at a per-share price, payable in cash, equal to the aggregate amount, then on deposit in the trust account (which is initially anticipated to be $10.00 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares. |

Table of Contents

| | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Impact to remaining stockholders** | The redemptions in connection with our initial business combination will reduce the book value per share for our remaining stockholders, who will bear the burden of the deferred underwriting commissions and franchise and income taxes payable. | If the permitted purchases described above are made there would be no impact to our remaining stockholders because the purchase price would not be paid by us. | The redemption of our public shares if we fail to complete our business combination will reduce the book value per share for the shares held by our initial stockholders, who will be our only remaining stockholders after such redemptions. |

**Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419**

The following table compares the terms of this offering to the terms of an offering by a blank check company subject to the provisions of Rule 419. This comparison assumes that the gross proceeds, underwriting commissions and underwriting expenses of our offering would be identical to those of an offering undertaken by a company subject to Rule 419, and that the underwriters will not exercise their over-allotment option. None of the provisions of Rule 419 apply to our offering.

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Escrow of offering proceeds** | $900,000,000 of the net proceeds of this offering and the sale of the private placement warrants will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. | Approximately $765,450,000 of the offering proceeds would be deposited into either an escrow account with an insured depositary institution or in a separate bank account established by a broker-dealer in which the broker-dealer acts as trustee for persons having the beneficial interests in the account. |
| **Investment of net proceeds** | $900,000,000 of the net offering proceeds and the sale of the private placement warrants held in trust will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. | Proceeds could be invested only in specified securities such as a money market fund meeting conditions of the Investment Company Act or in securities that are direct obligations of, or obligations guaranteed as to principal or interest by, the United States. |

102

Table of Contents

|  | **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|---|
| **Receipt of interest on escrowed funds** | Interest on proceeds from the trust account to be paid to stockholders is reduced by (i) any income or franchise taxes paid or payable, and (ii) in the event of our liquidation for failure to complete our initial business combination within the allotted time, up to $100,000 of net interest that may be released to us should we have no or insufficient working capital to fund the costs and expenses of our dissolution and liquidation. | Interest on funds in escrow account would be held for the sole benefit of investors, unless and only after the funds held in escrow were released to us in connection with our completion of a business combination. |
| **Limitation on fair value or net assets of target business** | Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. | The fair value or net assets of a target business must represent at least 80% of the maximum offering proceeds. |

103

Table of Contents

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Trading of securities issued** | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless the Representatives inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, an additional Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the over-allotment option. | No trading of the units or the underlying Class A common stock and warrants would be permitted until the completion of a business combination. During this period, the securities would be held in the escrow or trust account. |
| **Exercise of the warrants** | The warrants cannot be exercised until the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering. | The warrants could be exercised prior to the completion of a business combination, but securities received and cash paid in connection with the exercise would be deposited in the escrow or trust account. |

Table of Contents

| | **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|---|
| **Election to remain an investor** | We will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, upon the completion of our initial business combination, subject to the limitations described herein. We may not be required by law to hold a stockholder vote. If we are not required by law and do not otherwise decide to hold a stockholder vote, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC and file tender offer documents with the SEC which will contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, we hold a stockholder vote, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. Additionally, each public stockholder may elect to redeem their public shares irrespective of whether they vote for or against the proposed transaction. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. | A prospectus containing information pertaining to the business combination required by the SEC would be sent to each investor. Each investor would be given the opportunity to notify the company in writing, within a period of no less than 20 business days and no more than 45 business days from the effective date of a post-effective amendment to the company's registration statement, to decide if it elects to remain a stockholder of the company or require the return of its investment. If the company has not received the notification by the end of the 45th business day, funds and interest or dividends, if any, held in the trust or escrow account are automatically returned to the stockholder. Unless a sufficient number of investors elect to remain investors, all funds on deposit in the escrow account must be returned to all of the investors and none of the securities are issued. |

105

Table of Contents

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Business combination deadline** | If we are unable to complete an initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. | If an acquisition has not been completed within 18 months after the effective date of the company's registration statement, funds held in the trust or escrow account are returned to investors. |

106

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Release of funds** | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants held in the trust account will not be released from the trust account until the earliest to occur of: (i) the completion of our initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of 100% of our public shares if we are unable to complete a business combination within the required time frame (subject to the requirements of applicable law). | The proceeds held in the escrow account are not released until the earlier of the completion of a business combination or the failure to effect a business combination within the allotted time. |

## Competition

In identifying, evaluating and selecting a target business for our business combination, we may encounter intense competition from other entities having a business objective similar to ours, including other blank check companies, private equity groups and leveraged buyout funds, and operating businesses seeking strategic acquisitions. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Moreover, many of these competitors possess greater financial, technical, human and other resources than we do. Our ability to acquire larger target businesses will be limited by our available financial resources. This inherent limitation gives others an advantage in pursuing the acquisition of a target business. Furthermore, our obligation to pay cash in connection with our public stockholders who exercise their redemption rights may reduce the resources available to us for our initial business combination and our outstanding warrants, and the future dilution they potentially represent, may not be viewed favorably by certain target businesses. Either of these factors may place us at a competitive disadvantage in successfully negotiating an initial business combination.

## Facilities

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400. Our executive offices are provided to us by an affiliate of our sponsor. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. We consider our current office space adequate for our current operations.

Table of Contents

**Employees**

We currently have three officers. Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any such person will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

**Periodic Reporting and Financial Information**

We will register our units, Class A common stock and warrants under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual reports will contain financial statements audited and reported on by our independent registered public accountants.

We will provide stockholders with audited financial statements of the prospective target business as part of the tender offer materials or proxy solicitation materials sent to stockholders to assist them in assessing the target business. In all likelihood, these financial statements will need to be prepared in accordance with GAAP. We cannot assure you that any particular target business identified by us as a potential acquisition candidate will have financial statements prepared in accordance with GAAP or that the potential target business will be able to prepare its financial statements in accordance with GAAP. To the extent that this requirement cannot be met, we may not be able to acquire the proposed target business. While this may limit the pool of potential acquisition candidates, we do not believe that this limitation will be material.

We will be required to evaluate our internal control procedures for the fiscal year ending December 31, 2018 as required by the Sarbanes-Oxley Act. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to have our internal control procedures audited. A target company may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of their internal controls. The development of the internal controls of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

**Legal Proceedings**

There is no material litigation, arbitration or governmental proceeding currently pending against us or any members of our management team in their capacity as such, and we and the members of our management team have not been subject to any such proceeding in the 12 months preceding the date of this prospectus.

108

Table of Contents

# MANAGEMENT

**Officers and Directors**

Upon completion of this offering, our officers and directors will be as follows:

| Name | Age | Position |
| --- | --- | --- |
| James T. Hackett | 63 | Chief Executive Officer and Director |
| Thomas J. Walker | 46 | Chief Financial Officer |
| Stephen S. Coats | 46 | Secretary |
| William D. Gutermuth | 65 | Director |
| Jeffrey H. Tepper | 51 | Director |
| Diana J. Walters | 54 | Director |

*James T. Hackett* will serve as our Chief Executive Officer and a director upon completion of this offering. Mr. Hackett is a Partner at Riverstone. Prior to joining Riverstone in 2013, Mr. Hackett served as the Chairman of the Board from 2006 to 2013 and the Chief Executive Officer from 2003 to 2012 of Anadarko Petroleum Corporation. Before joining Anadarko, Mr. Hackett served as President and Chief Operating Officer of Devon Energy Corporation, following its merger with Ocean Energy, where he had served as Chairman, President, and Chief Executive Officer. Mr. Hackett has held senior positions at Seagull, Duke Energy, and Pan Energy. He also held positions in engineering, finance and marketing in the midstream, oil field services, and power sectors of the energy industry. Mr. Hackett serves on the Board of Directors of Enterprise Products Holdings, LLC, Fluor Corporation (NYSE: FLR), National Oilwell Varco, Inc. (NYSE: NOV), Sierra Oil and Gas and Talen Energy Corporation. Mr. Hackett is a former Chairman of the Board of the Federal Reserve Bank of Dallas. Mr. Hackett received a Bachelor of Science degree from the University of Illinois in 1975 and an MBA from Harvard Business School in 1979. Mr. Hackett was selected to serve on the board of directors due to his significant leadership experience and his extensive experience in the energy industry.

*Thomas J. Walker* has been our Chief Financial Officer and a director since November 2016. Mr. Walker is a New York-based Partner at Riverstone. Mr. Walker joined Riverstone in January 2007 as the Chief Financial Officer, a position that he still holds currently. Mr. Walker also served as the Chief Financial Officer of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Prior to joining Riverstone, Mr. Walker was a Principal at The Carlyle Group from June 2005, serving as the Chief Financial Officer of the jointly sponsored Carlyle/Riverstone Funds. Prior to Carlyle, Mr. Walker held similar positions at Hampshire Equity Partners, a middle market buyout fund, from February 2001 to June 2005, and Ripplewood Holdings, a private equity firm managing capital commitments in the United States and Japan, from November 1999 to February 2001. Prior to joining Ripplewood, Mr. Walker was the Director of Financial Reporting and Planning at Asbury Automotive Group (NYSE: ABG), a Ripplewood portfolio company, from August 1998 to November 1999. Mr. Walker started his career in the Metro New York office of Arthur Andersen, an international accounting firm. Mr. Walker received a B.S. in Accounting from Binghamton University in 1994. We expect that Mr. Walker will resign from our board of directors upon the appointment of Mr. Hackett to our board of directors in connection with this offering.

*Stephen S. Coats* has been our Secretary since November 2016. Mr. Coats is a New York-based Partner at Riverstone. Mr. Coats joined Riverstone in April 2008 and currently serves as the General Counsel. Mr. Coats also served as the Secretary of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Prior to joining Riverstone, Mr. Coats was a partner at Vinson & Elkins LLP, a law firm specializing in the energy industry. While at Vinson & Elkins, Mr. Coats focused on domestic and crossborder M&A work within the energy industry and was outside counsel to Riverstone on many of Riverstone's early transactions.

Table of Contents

He received his B.A. in government from the University of Texas at Austin and his J.D. from the University of Texas School of Law. Mr. Coats is licensed to practice law in the State of New York and the State of Texas.

*William D. Gutermuth* will serve as a director following completion of this offering. Mr. Gutermuth is the Founder and Chairman of Bluegrass Capital LLC, a privately owned investment and consulting firm. Since January 1, 2015, he has devoted substantially all of his professional time and energies to Bluegrass Capital. Prior to that, Mr. Gutermuth was an equity partner at Bracewell & Giuliani LLP and its predecessor firm, Bracewell & Patterson, LLP, where he practiced corporate and transactional law for almost 35 years. Mr. Gutermuth's legal career focused principally on mergers and acquisitions, particularly in the energy industry, as well as most aspects of corporate finance and corporate governance. Mr. Gutermuth chaired Bracewell & Giuliani's worldwide Corporate and Securities Practice from 1999 to 2005 and served as a member of the Business Group Executive Committee from 2005 to 2007, as well as serving in other leadership positions within the law firm throughout his career. Mr. Gutermuth served as a director of Main Street Capital Corporation (NYSE: MAIN), a publicly traded business development company, from 2007 to 2012 and on the Compensation and Nominating and Governance Committees during his tenure as a director. Mr. Gutermuth also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Mr. Gutermuth holds a B.S. in Political Science from Vanderbilt University and a J.D. from Vanderbilt University School of Law. Mr. Gutermuth was selected to serve on the board of directors due to his significant leadership experience and his extensive merger and acquisition experience.

*Jeffrey H. Tepper* will serve as a director following completion of this offering. Mr. Tepper is a Founder of JHT Advisors LLC, a mergers and acquisitions advisory and investment firm. From 1990 to 2013, Mr. Tepper served in a variety of senior management and operating roles at the investment bank Gleacher & Company, Inc. and its predecessors and affiliates ("Gleacher"). Mr. Tepper is experienced in mergers and acquisitions, corporate finance, leveraged finance and asset management. Mr. Tepper was Head of Investment Banking and a member of the Management Committee while at Gleacher. Mr. Tepper led numerous investment banking transactions on behalf of clients in a variety of industries but with a specialty in financial services and asset management. Mr. Tepper also served as Gleacher's Chief Operating Officer, overseeing operations, compliance, technology and financial reporting. In 2001, Mr. Tepper co-founded Gleacher's asset management activities and served as President. Mr. Tepper served on the Investment Committees of Gleacher Mezzanine and Gleacher Fund Advisors. Between 1997 and 1999, Mr. Tepper served as Managing Director of and Chief Operating Officer of Gleacher NatWest Inc. (a predecessor to Gleacher Partners). Mr. Tepper was part of the senior management team of Gleacher NatWest with oversight responsibility for middle-market senior and subordinated debt, high-yield and equity principal activities. Between 1987 and 1990, Mr. Tepper was employed by Morgan Stanley & Co. as a financial analyst in the mergers and acquisitions and merchant banking departments. Mr. Tepper also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016 and has served as a director of Centennial (NASDAQ: CDEV) since October 2016. Mr. Tepper received an MBA from Columbia Business School and a B.S. in Economics from The Wharton School of the University of Pennsylvania with concentrations in finance and accounting. Mr. Tepper was selected to serve on the board of directors due to his significant investment and financial experience.

*Diana J. Walters* will serve as a director following completion of this offering. Ms. Walters has 30 years of experience in the Natural Resources sector, as an investment manager and equity investor, as an investment banker and in operating roles. Ms. Walters has been the owner and sole manager of 575 Grant, LLC, a company that provides advisory services in the field of natural resources, since 2014. She served as the President and Chief Executive Officer of Liberty Metals & Mining Holdings, LLC and a member of senior management of Liberty Mutual Asset Management from January 2010 to

110

Table of Contents

September 2014. She was a Managing Partner of Eland Capital, LLC, a natural resources advisory firm founded by her, from 2007 to 2010. Ms. Walters has extensive investment experience with both debt and equity through various previous leadership roles at Credit Suisse, HSBC and other firms. She also served previously as Chief Financial Officer of Tatham Offshore Inc., an independent oil and gas company with assets in the Gulf of Mexico. Ms. Walters also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Ms. Walters currently serves on the board of directors of Platinum Group Metals (NYSE: PLG) and Electrum Special Acquisition Corporation (NASDAQ: ELECU). Ms. Walters graduated with Honors from the University of Texas at Austin with a B.A. in Plan II Liberal Arts and an M.A. in Energy and Mineral Resources. Ms. Walters was selected to serve on the board of directors due to her significant investment and operating experience in the energy industry.

**Number and Terms of Office of Officers and Directors**

We intend to have four directors upon completion of this offering. Our board of directors will be divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The term of office of the first class of directors, consisting of William D. Gutermuth, will expire at our first annual meeting of stockholders. The term of office of the second class of directors, consisting of Jeffrey H. Tepper and Diana J. Walters, will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of James T. Hackett, will expire at the third annual meeting of stockholders. We may not hold an annual meeting of stockholders until after we consummate our initial business combination.

Our officers are appointed by the board of directors and serve at the discretion of the board of directors, rather than for specific terms of office. Our board of directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our officers may consist of a Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Vice Presidents, Secretary, Treasurer and such other offices as may be determined by the board of directors. We expect that our current Chief Executive Officer, Ken Ryan, will resign from his position upon the appointment of Mr. Hackett as our Chief Executive Officer in connection with this offering.

**Director Independence**

NASDAQ listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director. Our board of directors has determined that William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters are "independent directors" as defined in the NASDAQ listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

**Officer and Director Compensation**

None of our officers or directors has received any cash compensation for services rendered to us. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees. No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of our initial business combination. However, these individuals will be

111

Table of Contents

reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

After the completion of our initial business combination, directors or members of our management team who remain with us may be paid consulting or management fees from the combined company. All of these fees will be fully disclosed to stockholders, to the extent then known, in the tender offer materials or proxy solicitation materials furnished to our stockholders in connection with a proposed business combination. We have not established any limit on the amount of such fees that may be paid by the combined company to our directors or members of management. It is unlikely the amount of such compensation will be known at the time of the proposed business combination, because the directors of the post-combination business will be responsible for determining officer and director compensation. Any compensation to be paid to our officers will be determined, or recommended to the board of directors for determination, either by a compensation committee constituted solely by independent directors or by a majority of the independent directors on our board of directors.

We do not intend to take any action to ensure that members of our management team maintain their positions with us after the consummation of our initial business combination, although it is possible that some or all of our officers and directors may negotiate employment or consulting arrangements to remain with us after our initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with us may influence our management's motivation in identifying or selecting a target business but we do not believe that the ability of our management to remain with us after the consummation of our initial business combination will be a determining factor in our decision to proceed with any potential business combination. We are not party to any agreements with our officers and directors that provide for benefits upon termination of employment.

**Committees of the Board of Directors**

Our board of directors will have two standing committees: an audit committee and a compensation committee. Subject to phase-in rules and a limited exception, the rules of NASDAQ and Rule 10A-3 of the Exchange Act require that the audit committee of a listed company be comprised solely of independent directors, and the rules of NASDAQ require that the compensation committee of a listed company be comprised solely of independent directors.

*Audit Committee*

Prior to the consummation of this offering, we will establish an audit committee of the board of directors. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters will serve as members of our audit committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least three members of the audit committee, all of whom must be independent.

Each member of the audit committee is financially literate and our board of directors has determined that Diana J. Walters qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

We will adopt an audit committee charter, which will detail the principal functions of the audit committee, including:

- the appointment, compensation, retention, replacement, and oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us;

112

Table of Contents

- pre-approving all audit and permitted non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;

- reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence;

- setting clear hiring policies for employees or former employees of the independent auditors;

- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;

- obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues;

- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and

- reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

### Compensation Committee

Prior to the consummation of this offering, we will establish a compensation committee of the board of directors. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters will serve as members of our compensation committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least two members of the compensation committee, all of whom must be independent. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters are independent.

We will adopt a compensation committee charter, which will detail the principal functions of the compensation committee, including:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, evaluating our Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer based on such evaluation;

- reviewing and approving on an annual basis the compensation of all of our other officers;

- reviewing on an annual basis our executive compensation policies and plans;

- implementing and administering our incentive compensation equity-based remuneration plans;

- assisting management in complying with our proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our officers and employees;

Table of Contents

- if required, producing a report on executive compensation to be included in our annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

Notwithstanding the foregoing, as indicated above, other than the $10,000 per month administrative fee payable to an affiliate of our sponsor and reimbursement of expenses, no compensation of any kind, including finders, consulting or other similar fees, will be paid to any of our existing stockholders, officers, directors or any of their respective affiliates, prior to, or for any services they render in order to effectuate the consummation of a business combination. Accordingly, it is likely that prior to the consummation of an initial business combination, the compensation committee will only be responsible for the review and recommendation of any compensation arrangements to be entered into in connection with such initial business combination.

The charter will also provide that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by NASDAQ and the SEC.

**Director Nominations**

We do not have a standing nominating committee. In accordance with Rule 5605(e)(2) of the NASDAQ Rules, a majority of the independent directors may recommend a director nominee for selection by the board of directors. The board of directors believes that the independent directors can satisfactorily carry out the responsibility of properly selecting or approving director nominees without the formation of a standing nominating committee. As there is no standing nominating committee, we do not have a nominating committee charter in place.

The board of directors will also consider director candidates recommended for nomination by our stockholders during such times as they are seeking proposed nominees to stand for election at the next annual meeting of stockholders (or, if applicable, a special meeting of stockholders). Our stockholders that wish to nominate a director for election to our board of directors should follow the procedures set forth in our bylaws.

We have not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, our board of directors considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our stockholders.

**Compensation Committee Interlocks and Insider Participation**

None of our officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more officers serving on our board of directors.

**Code of Ethics**

Prior to the consummation of this offering, we will have adopted a Code of Ethics applicable to our directors, officers and employees. We will file a copy of our Code of Ethics and our audit and compensation committee charters as exhibits to the registration statement of which this prospectus is a part. You will be able to review these documents by accessing our public filings at the SEC's web site

114

Table of Contents

at www.sec.gov. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See the section of this prospectus entitled "Where You Can Find Additional Information."

## Conflicts of Interest

Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates, including Fund VI, may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware. Riverstone and/or our management, in their capacities as officers or managing directors of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us.

Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present business combination opportunities to such entity. Accordingly, in the future, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We do not believe, however, that any fiduciary duties or contractual obligations of our officers arising in the future would materially undermine our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors may become involved with subsequent blank check companies similar to our company, although they have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within 24 months after the closing of this offering. Potential investors should also be aware of the following other potential conflicts of interest:

- None of our officers or directors is required to commit his or her full time to our affairs and, accordingly, may have conflicts of interest in allocating his or her time among various business activities.

- In the course of their other business activities, our officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to us as well

115

Table of Contents

as the other entities with which they are affiliated. Our management may have conflicts of interest in determining to which entity a particular business opportunity should be presented.

- Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the consummation of our initial business combination. Additionally, our initial stockholders have agreed to waive their redemption rights with respect to any founder shares held by them if we fail to consummate our initial business combination within 24 months after the closing of this offering. If we do not complete our initial business combination within such applicable time period, the proceeds of the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares, and the private placement warrants will expire worthless. With certain limited exceptions, the founder shares will not be transferable, assignable by our sponsor until the earlier of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. With certain limited exceptions, the private placement warrants and the Class A common stock underlying such warrants, will not be transferable, assignable or salable by our sponsor or its permitted transferees until 30 days after the completion of our initial business combination. Since our sponsor and officers and directors may directly or indirectly own common stock and warrants following this offering, our officers and directors may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination.

- Our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

- Our sponsor, officers or directors may have a conflict of interest with respect to evaluating a business combination and financing arrangements as we may obtain loans from our sponsor or an affiliate of our sponsor or any of our officers or directors to finance transaction costs in connection with an intended initial business combination. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

The conflicts described above may not be resolved in our favor.

In general, officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;

- the opportunity is within the corporation's line of business; and

- it would not be fair to our company and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. Furthermore, our amended and restated certificate of incorporation will provide that

116

Table of Contents

the doctrine of corporate opportunity will not apply with respect to any of our officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with such a company, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA, or from an independent accounting firm, that such an initial business combination is fair to our company from a financial point of view.

In the event that we submit our initial business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after the offering in favor of our initial business combination and our officers and directors have also agreed to vote any public shares purchased during or after the offering in favor of our initial business combination.

**Limitation on Liability and Indemnification of Officers and Directors**

Our amended and restated certificate of incorporation will provide that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our amended and restated certificate of incorporation will provide that our directors will not be personally liable for monetary damages to us or our stockholders for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

We will enter into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our amended and restated certificate of incorporation. Our bylaws also will permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We will purchase a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify our officers and directors.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against officers and directors pursuant to these indemnification provisions.

We believe that these provisions, the directors' and officers' liability insurance and the indemnity agreements are necessary to attract and retain talented and experienced officers and directors.

117

Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth information regarding the beneficial ownership of our common stock as of the date of this prospectus, and as adjusted to reflect the sale of our common stock included in the units offered by this prospectus, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of our outstanding shares of common stock;

- each of our executive officers and directors upon completion of this offering that beneficially owns shares of our common stock; and

- all our executive officers and directors upon completion of this offering as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of common stock beneficially owned by them. The following table does not reflect record or beneficial ownership of the private placement warrants as these warrants are not exercisable within 60 days of the date of this prospectus.

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,500 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. The following table presents the number of shares and percentage of our common stock owned by our initial stockholders before and after this offering. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our sponsor forfeits 3,375,000 founder shares, and that there are 112,500,000 shares of our common stock issued and outstanding after this offering.

| | Before Offering | | After Offering | |
|---|---|---|---|---|
| Name and Address of Beneficial Owner(1) | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock |
| Silver Run Sponsor II, LLC(3) | 25,776,000 | 99.6% | 22,401,000 | 19.9% |
| James T. Hackett | — | * | — | * |
| Thomas J. Walker | — | * | | * |
| Stephen S. Coats | — | * | — | * |
| William D. Gutermuth | 33,000 | * | 33,000 | * |
| Jeffrey H. Tepper | 33,000 | * | 33,000 | * |
| Diana J. Walters | 33,000 | * | 33,000 | * |
| All executive officers and directors as a group (six individuals) | 99,000 | * | 99,000 | * |

\* Less than one percent.

(1) Unless otherwise noted, the business address of each of the following entities or individuals is c/o Silver Run Acquisition Corporation II, 1000 Louisiana Street, Suite 1450, Houston, TX 77002.

(2) Interests shown consist solely of founder shares, classified as shares of Class B common stock. Such shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment, as described in the section of this prospectus entitled "Description of Securities." Excludes forward purchase shares that will only be issued, if at all, at the time of our initial business combination.

(3) Silver Run Sponsor II, LLC is the record holder of the shares reported herein. David M. Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC, which is the sole shareholder of Riverstone Energy GP VI Corp, which is the sole and managing member of Riverstone Energy GP VI, LLC ("Riverstone Energy GP"), which is the general partner of Riverstone Energy Partners VI, L.P., which is the managing member of Riverstone Energy VI Holdings GP, LLC, which is the general partner of Riverstone VI SR II Holdings, L.P., which is

Table of Contents

the sole and managing member of Silver Run Sponsor II, LLC. Riverstone Energy GP is managed by a managing committee consisting of Pierre F. Lapeyre, Jr., David M. Leuschen, James T. Hackett, Michael B. Hoffman, N. John Lancaster, Mark G. Papa and, on a rotating basis, one of E. Bartow Jones, Baran Tekkora and Robert M. Tichio. As such, each of the persons and the entities named in this footnote may be deemed to have or share beneficial ownership of the Class A Common Stock held directly by Silver Run Sponsor II, LLC. Each such entity or person disclaims any such beneficial ownership. The business address of each of these entities and individuals is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

Immediately after this offering, our initial stockholders will beneficially own 20% of the then-issued and outstanding shares of our common stock (assuming they do not purchase any units in this offering). If we increase or decrease the size of the offering, we will effect a stock dividend or a share contribution back to capital, or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of our issued and outstanding shares of common stock upon the consummation of this offering. Because of this ownership block, our initial stockholders may be able to effectively influence the outcome of all matters requiring approval by our stockholders, including the election of directors, amendments to our amended and restated certificate of incorporation and approval of significant corporate transactions, including approval of our initial business combination.

The holders of the founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any shares in connection with a stockholder vote to approve a proposed initial business combination.

Our sponsor, Fund VI and our executive officers and directors are deemed to be our "promoters" as such term is defined under the federal securities laws.

**Restrictions on Transfers of Founder Shares and Private Placement Warrants**

The founder shares and private placement warrants and any shares of Class A common stock issued upon conversion or exercise thereof are subject to transfer restrictions pursuant to lock-up provisions in a letter agreement with us to be entered into by our sponsor, officers and directors. Those lock-up provisions provide that such securities are not transferable or salable (i) in the case of the founder shares, until the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property, and (ii) in the case of the private placement warrants and the Class A common stock underlying such warrants, until 30 days after the completion of our initial business combination, except in each case (a) to our officers or directors, any affiliates or family members of any of our officers or directors, any members of our sponsor, or any affiliates of our sponsor, (b) in the case of an individual, by gift to a member of the individual's immediate family, to a trust, the beneficiary of which is a member of the individual's immediate family or an affiliate of such person, or to a charitable organization; (c) in the case of an individual, by virtue of laws of descent and distribution upon death of the individual; (d) in the case of an individual, pursuant to a qualified domestic relations order; (e) by private sales or transfers made in connection with the consummation of a business combination at prices no greater than the price at which the securities were originally purchased; (f) in the event of our liquidation prior to the completion of our initial business combination; (g) by virtue of the laws of Delaware or our sponsor's limited liability company agreement upon dissolution of our sponsor; (h) any Forward Transferee or (i) in the event of our liquidation, merger, capital stock exchange, reorganization or other similar transaction which results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property subsequent to the completion of our initial business combination; provided, however, that in the case of clauses (a) through (e) and (h) these permitted transferees must enter into a written agreement agreeing to be bound by these transfer restrictions.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On November 21, 2016, we issued an aggregate of 11,500,000 founder shares to our sponsor in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,500 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. If we increase or decrease the size of the offering, we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. Up to 3,375,000 founder shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised. The founder shares (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 13,333,333 (or 15,133,333 if the over-allotment option is exercised in full) private placement warrants for a purchase price of $1.50 per whole warrant in a private placement that will occur simultaneously with the closing of this offering. As such, our sponsor's interest in this transaction is valued at between $20,000,000 and $22,700,000, depending on the number of private placement warrants purchased. Each private placement warrant entitles the holder to purchase one share of our Class A common stock at $11.50 per share. The private placement warrants (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI.

The investment objective of Fund VI is to generate long-term capital appreciation through investments in Energy Companies (which includes entities predominantly engaged in (a) the production, exploration, development, extraction, processing, transportation, refining, storage, distribution, marketing and/or trading of oil, gas, coal or other natural resources used to produce energy, or ethanol; (b) the generation, transmission, distribution, marketing and/or trading of all forms of electrical power; (c) the manufacturing, marketing and/or trading of equipment or other supplies predominantly used by entities engaged in businesses described in clause (a) or (b) above or the following clause (d); and (d) the provision of services to entities engaged in businesses described in clause (a), (b) or (c) above); as well as other businesses or assets determined by the General Partner of

120

Table of Contents

Fund VI to be related or complementary to any of the foregoing, including without limitation in respect of feedstocks, supplies or other materials usable by any of the foregoing.

The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties, and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full.

The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has then-current fiduciary or contractual obligations, including Fund VI, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of an initial business combination. However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the estimated $2,000,000 of offering proceeds not held in the trust account. The value of our sponsor's interest in this transaction corresponds to the principal amount outstanding under any such loan.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but

121

Table of Contents

are not obligated to, loan us funds as may be required. If we complete an initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

After our initial business combination, members of our management team who remain with us may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to our stockholders, to the extent then known, in the tender offer or proxy solicitation materials, as applicable, furnished to our stockholders. It is unlikely the amount of such compensation will be known at the time of distribution of such tender offer materials or at the time of a stockholder meeting held to consider our initial business combination, as applicable, as it will be up to the directors of the post-combination business to determine executive and director compensation.

We will enter into a registration rights agreement with respect to the private placement warrants, the warrants issuable upon conversion of working capital loans (if any) and the shares of Class A common stock issuable upon exercise of the foregoing and upon conversion of the founder shares, which is described under the section of this prospectus entitled "Description of Securities—Registration Rights."

**Related Party Policy**

We have not yet adopted a formal policy for the review, approval or ratification of related party transactions. Accordingly, the transactions discussed above were not reviewed, approved or ratified in accordance with any such policy.

Prior to the consummation of this offering, we will adopt a code of ethics requiring us to avoid, wherever possible, all conflicts of interests, except under guidelines or resolutions approved by our board of directors (or the appropriate committee of our board) or as disclosed in our public filings with the SEC. Under our code of ethics, conflict of interest situations will include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) involving the company. A form of the code of ethics that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part.

In addition, our audit committee, pursuant to a written charter that we will adopt prior to the consummation of this offering, will be responsible for reviewing and approving related party transactions to the extent that we enter into such transactions. An affirmative vote of a majority of the members of the audit committee present at a meeting at which a quorum is present will be required in order to approve a related party transaction. A majority of the members of the entire audit committee will constitute a quorum. Without a meeting, the unanimous written consent of all of the members of the audit committee will be required to approve a related party transaction. A form of the audit committee charter that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

122

Table of Contents

To further minimize conflicts of interest, we have agreed not to consummate an initial business combination with an entity that is affiliated with any of our sponsor, officers or directors unless we, or a committee of independent directors, have obtained an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view. Furthermore, no finder's fees, reimbursements or cash payments will be made to our sponsor, officers or directors, or our or their affiliates, for services rendered us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment to an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

123

Table of Contents

## DESCRIPTION OF SECURITIES

Pursuant to our amended and restated certificate of incorporation, our authorized capital stock consists of 400,000,000 shares of Class A common stock, $0.0001 par value, 50,000,000 shares of Class B common stock, $0.0001 par value, and 1,000,000 shares of undesignated preferred stock, $0.0001 par value. The following description summarizes the material terms of our capital stock. Because it is only a summary, it may not contain all the information that is important to you.

### Units

Each unit has an offering price of $10.00 and consists of one whole share of Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.

The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the closing of this offering unless the Representatives inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants.

In no event will the Class A common stock and warrants be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file a Current Report on Form 8-K which includes this audited balance sheet upon the completion of this offering, which is anticipated to take place three business days after the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option.

### Common Stock

Upon the closing of this offering, 112,500,000 shares of our common stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of 3,375,500 founder shares by our sponsor), consisting of:

- 90,000,000 shares of our Class A common stock underlying the units being offered in this offering; and

- 22,500,000 shares of Class B common stock held by our initial stockholders.

If we increase or decrease the size of the offering, we will effect a stock dividend or share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of founder shares by our initial stockholders prior to this offering at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering.

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except

Table of Contents

as required by law. Unless specified in our amended and restated certificate of incorporation or bylaws, or as required by applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of common stock that are voted is required to approve any such matter voted on by our stockholders. Our board of directors will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares voted for the election of directors can elect all of the directors. Our stockholders are entitled to receive ratable dividends when, as and if declared by the board of directors out of funds legally available therefor.

Because our amended and restated certificate of incorporation authorizes the issuance of up to 400,000,000 shares of Class A common stock, if we were to enter into a business combination, we may (depending on the terms of such a business combination) be required to increase the number of shares of Class A common stock which we are authorized to issue at the same time as our stockholders vote on the business combination to the extent we seek stockholder approval in connection with our business combination.

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws, unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

We will provide our stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination. Unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by law, if a stockholder vote is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC, and file tender offer documents with the SEC prior to completing our initial business combination. Our amended and restated certificate of incorporation will require these tender offer documents to contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination

125

Table of Contents

only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. However, the participation of our sponsor, officers, directors, advisors or their affiliates in privately-negotiated transactions (as described in this prospectus), if any, could result in the approval of our business combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our business combination once a quorum is obtained. We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares of common stock sold in this offering, which we refer to as the Excess Shares. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Our stockholders' inability to redeem the Excess Shares will reduce their influence over our ability to complete our business combination, and such stockholders could suffer a material loss in their investment if they sell such Excess Shares on the open market. Additionally, such stockholders will not receive redemption distributions with respect to the Excess Shares if we complete the business combination. And, as a result, such stockholders will continue to hold that number of shares exceeding 20% and, in order to dispose such shares would be required to sell their stock in open market transactions, potentially at a loss.

If we seek stockholder approval in connection with our business combination, our initial stockholders have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Additionally, each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction (subject to the limitation described in the preceding paragraph).

Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims

126

Table of Contents

of creditors and the requirements of other applicable law. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our business combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the company after a business combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, upon the completion of our initial business combination, subject to the limitations described herein.

## Founder Shares

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, and holders of founder shares have the same stockholder rights as public stockholders, except that (i) the founder shares are subject to certain transfer restrictions, as described in more detail below, (ii) our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (A) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination and (B) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within such time period, (iii) the founder shares are shares of our Class B common stock that will automatically convert into shares of our Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein and (iv) are subject to registration rights. If we submit our business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination.

The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination on a one-for-one basis (subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like), and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the business combination (other than the forward purchase securities), including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the business combination (excluding the forward purchase securities and any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of

127

Table of Contents

Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time.

With certain limited exceptions, the founder shares are not transferable, assignable or salable (except to our officers and directors and other persons or entities affiliated with our sponsor, each of whom will be subject to the same transfer restrictions) until the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property.

**Preferred Stock**

Our amended and restated certificate of incorporation will provide that shares of preferred stock may be issued from time to time in one or more series. Our board of directors will be authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. Our board of directors will be able to, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the common stock and could have anti-takeover effects. The ability of our board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of us or the removal of existing management. We have no preferred stock outstanding at the date hereof. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future. No shares of preferred stock are being issued or registered in this offering.

**Warrants**

*Public Stockholders' Warrants*

Each whole warrant entitles the registered holder to purchase one whole share of our Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of this offering or 30 days after the completion of our initial business combination. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. The warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration. No warrant will be exercisable and we will not be obligated to issue shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a warrant, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In no event will we be required to net cash settle any warrant. In the event

128

Table of Contents

that a registration statement is not effective for the exercised warrants, the purchaser of a unit containing such warrant will have paid the full purchase price for the unit solely for the share of Class A common stock underlying such unit.

We have agreed that as soon as practicable, but in no event later than 15 business days, after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the shares of Class A common stock issuable upon exercise of the warrants. We will use our best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

Once the warrants become exercisable, we may call the warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption (the "30-day redemption period") to each warrantholder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending three business days before we send the notice of redemption to the warrantholders.

If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the warrants, each warrantholder will be entitled to exercise its warrant prior to the scheduled redemption date. However, the price of the Class A common stock may fall below the $18.00 redemption trigger price (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) as well as the $11.50 (for whole shares) warrant exercise price after the redemption notice is issued.

If we call the warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. If our management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If our management takes advantage of this option, the

129

Table of Contents

notice of redemption will contain the information necessary to calculate the number of shares of Class A common stock to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. We believe this feature is an attractive option to us if we do not need the cash from the exercise of the warrants after our initial business combination. If we call our warrants for redemption and our management does not take advantage of this option, our sponsor and its permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrantholders would have been required to use had all warrantholders been required to exercise their warrants on a cashless basis, as described in more detail below.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Class A common stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of Class A common stock is increased by a stock dividend payable in shares of Class A common stock, or by a split-up of shares of Class A common stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of Class A common stock. A rights offering to holders of Class A common stock entitling holders to purchase shares of Class A common stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Class A common stock equal to the product of (i) the number of shares of Class A common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Class A common stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Class A common stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Class A common stock, in determining the price payable for Class A common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of Class A common stock as reported during the ten (10) trading day period ending on the trading day prior to the first date on which the shares of Class A common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of Class A common stock on account of such shares of Class A common stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of Class A common stock in connection with a proposed initial business combination, (d) to satisfy the redemption rights of the holders of Class A common stock in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our Class A common stock if we do not complete our initial business combination within 24 months from the closing of this offering, or (e) in connection with the redemption of our public shares upon our failure to complete our initial business combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of Class A common stock in respect of such event.

If the number of outstanding shares of our Class A common stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Class A common stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification

130

Table of Contents

or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Class A common stock.

Whenever the number of shares of Class A common stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of Class A common stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Class A common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Class A common stock (other than those described above or that solely affects the par value of such shares of Class A common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of Class A common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of our Class A common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. If less than 70% of the consideration receivable by the holders of Class A common stock in such a transaction is payable in the form of common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within thirty days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the Black-Scholes value (as defined in the warrant agreement) of the warrant.

The warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which will be filed as an exhibit to the registration statement of which this prospectus is a part, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of warrants being exercised. The warrantholders do not have the rights or privileges of holders of Class A common stock or any voting rights until they exercise their warrants and receive shares of Class A common stock. After the issuance of shares of Class A common stock upon exercise of the warrants, each holder will be entitled to one (1) vote for each share held of record on all matters to be voted on by stockholders.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round

131

Table of Contents

down to the nearest whole number of shares of Class A common stock to be issued to the warrantholder.

### Private Placement Warrants

The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants," to our officers and directors and other persons or entities affiliated with our sponsor) and they will not be redeemable by us so long as they are held by our sponsor or its permitted transferees. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering.

If holders of the private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate.

In order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our sponsor has agreed not to transfer, assign or sell any of the private placement warrants (including the Class A common stock issuable upon exercise of any of these warrants) until the date that is 30 days after the date we complete our initial business combination, except that, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants" made to our officers and directors and other persons or entities affiliated with our sponsor.

## Forward Purchase Securities

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate up to of 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a

132

Table of Contents

private placement that will close simultaneously with the closing of our initial business combination. The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

### Dividends

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial conditions subsequent to completion of a business combination. The payment of any cash dividends subsequent to a business combination will be within the discretion of our board of directors at such time. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. If we increase the size of the offering, in which case we will effect a stock dividend immediately prior to the consummation of the offering in such amount as to maintain the ownership of founder shares by our initial stockholders prior to this offering at 20.0% of the issued and outstanding shares of our common stock upon the consummation of this offering. Further, if we incur any indebtedness, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

### Our Transfer Agent and Warrant Agent

The transfer agent for our common stock and warrant agent for our warrants is Continental Stock Transfer & Trust Company. We have agreed to indemnify Continental Stock Transfer & Trust Company in its roles as transfer agent and warrant agent, its agents and each of its stockholders, directors, officers and employees against all claims and losses that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

### Our Amended and Restated Certificate of Incorporation

Our amended and restated certificate of incorporation will contain certain requirements and restrictions relating to this offering that will apply to us until the completion of our initial business combination. These provisions cannot be amended without the approval of the holders of 65% of our common stock. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose. Specifically, our amended and restated certificate of incorporation provides, among other things, that:

- If we are unable to complete our initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter subject to lawfully available funds therefor, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating

133

Table of Contents

distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law;

- Prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination;

- Although we do not intend to enter into a business combination with a target business that is affiliated with our sponsor, our directors or our officers, we are not prohibited from doing so. In the event we enter into such a transaction, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm that such a business combination is fair to our company from a financial point of view;

- If a stockholder vote on our initial business combination is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will offer to redeem our public shares pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, and will file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about our initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act;

- Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination;

- If our stockholders approve an amendment to our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our business combination within 24 months from the closing of this offering, we will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon such approval at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares; and

- We will not effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In addition, our amended and restated certificate of incorporation will provide that under no circumstances will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001.

**Certain Anti-Takeover Provisions of Delaware Law and our Amended and Restated Certificate of Incorporation and Bylaws**

We will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers upon completion of this offering. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

134

Table of Contents

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by our board of directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Our amended and restated certificate of incorporation will provide that our board of directors will be classified into three classes of directors. As a result, in most circumstances, a person can gain control of our board only by successfully engaging in a proxy contest at two or more annual meetings.

Our authorized but unissued common stock and preferred stock are available for future issuances without stockholder approval (including a specified future issuance) and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

### Special meeting of stockholders

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of our board of directors, by our Chief Executive Officer or by our Chairman.

### Advance notice requirements for stockholder proposals and director nominations

Our bylaws provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

## Securities Eligible for Future Sale

Immediately after the consummation of this offering (assuming no exercise of the underwriters' over-allotment option) we will have 112,500,000 (or 129,375,000 if the underwriters' over-allotment option is exercised in full) shares of common stock outstanding. Of these shares, the 90,000,000 shares (or 103,500,000 if the underwriters' over-allotment option is exercised in full) sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. All of the remaining 22,500,000 (or 25,875,000 if the underwriters' over-allotment option is exercised in

135

Table of Contents

full) shares and all 13,333,333 (or 15,133,333 if the underwriters' over-allotment option is exercised in full) private placement warrants are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering, and the shares of Class B common stock and private placement warrants are subject to transfer restrictions as set forth elsewhere in this prospectus. These restricted securities will be subject to registration rights as more fully described below under "—Registration Rights."

Upon the closing of the sale of the forward purchase securities, all of the up to 40,000,000 forward purchase shares, up to 13,333,333 forward purchase warrants and shares of Class A common stock underlying the forward purchase warrants will be restricted securities under Rule 144.

## Rule 144

Pursuant to Rule 144, a person who has beneficially owned restricted shares of our common stock or warrants for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as we were required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of our common stock or warrants for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of Class A common stock then outstanding, which will equal 900,000 shares immediately after this offering (or 1,035,000 if the underwriters exercise their over-allotment option in full); or

- the average weekly reported trading volume of the Class A common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

## Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and materials required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our initial stockholders will be able to sell their founder shares and private placement warrants, as applicable, pursuant to Rule 144 without registration one year after we have completed our initial business combination.

Table of Contents

**Registration Rights**

The holders of the founder shares, private placement warrants and warrants that may be issued upon conversion of working capital loans (and any shares of Class A common stock issuable upon the exercise of the private placement warrants and warrants that may be issued upon conversion of working capital loans and upon conversion of the founder shares) will be entitled to registration rights pursuant to a registration rights agreement to be signed prior to or on the effective date of this offering, requiring us to register such securities for resale (in the case of the founder shares, only after conversion to our Class A common stock). The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of our initial business combination and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period, which occurs (i) in the case of the founder shares, on the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property and (ii) in the case of the private placement warrants and the respective Class A common stock underlying such warrants, 30 days after the completion of our initial business combination. We will bear the expenses incurred in connection with the filing of any such registration statements.

Pursuant to the forward purchase agreement, we have agreed that we will use our commercially reasonable efforts to file within 30 days after the closing of the initial business combination a registration statement with the SEC for a secondary offering of the forward purchase shares and the forward purchase warrants (and the underlying Class A common stock) and to cause such registration statement to be declared effective as soon as practicable after it is filed.

**Listing of Securities**

We have applied to list our units, Class A common stock and warrants on NASDAQ under the symbols "SRUNU," "SRUN" and "SRUNW," respectively. We expect that our units will be listed on NASDAQ on or promptly after the effective date of the registration statement. Following the date the shares of our Class A common stock and warrants are eligible to trade separately, we anticipate that the shares of our Class A common stock and warrants will be listed separately and as a unit on NASDAQ. We cannot guarantee that our securities will be approved for listing on NASDAQ.

137

Table of Contents

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a discussion of the material U.S. federal income tax consequences of the acquisition, ownership and disposition of our units, shares of Class A common stock and warrants, which we refer to collectively as our securities. Because the components of a unit are separable at the option of the holder, the holder of a unit generally should be treated, for U.S. federal income tax purposes, as the owner of the underlying Class A common stock and one-third of one warrant components of the unit, as the case may be. As a result, the discussion below with respect to actual holders of Class A common stock and warrants should also apply to holders of units (as the deemed owners of the underlying Class A common stock and warrants that comprise the units). This discussion applies only to securities that are held as a capital asset for U.S. federal income tax purposes and is applicable only to holders who purchased units in this offering.

This discussion does not describe all of the tax consequences that may be relevant to you in light of your particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income and the different consequences that may apply if you are subject to special rules that apply to certain types of investors, such as:

- financial institutions;

- insurance companies;

- dealers or traders subject to a mark-to-market method of accounting with respect to the securities;

- persons holding the securities as part of a "straddle," hedge, integrated transaction or similar transaction;

- U.S. holders (as defined below) whose functional currency is not the U.S. dollar;

- partnerships or other pass-through entities for U.S. federal income tax purposes; and

- tax-exempt entities.

If you are a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of your partners will generally depend on the status of the partners and your activities.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), and administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, changes to any of which subsequent to the date of this prospectus may affect the tax consequences described herein. This discussion does not address any aspect of state, local or non-U.S. taxation, or any U.S. federal taxes other than income taxes (such as gift and estate taxes).

You are urged to consult your tax advisor with respect to the application of U.S. federal tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdiction.

**Personal Holding Company Status**

We could be subject to a second level of U.S. federal income tax on a portion of our income if we are determined to be a personal holding company, or PHC, for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations, pension funds and charitable trusts) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the

138

Table of Contents

corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, certain royalties, annuities and, under certain circumstances, rents).

Depending on the date and size of our initial business combination, at least 60% of our adjusted ordinary gross income may consist of PHC income as discussed above. In addition, depending on the concentration of our stock in the hands of individuals, including the members of our sponsor and certain tax-exempt organizations, pension funds and charitable trusts, more than 50% of our stock may be owned or deemed owned (pursuant to the constructive ownership rules) by such persons during the last half of a taxable year. Thus, no assurance can be given that we will not be a PHC following this offering or in the future. If we are or were to become a PHC in a given taxable year, we would be subject to an additional PHC tax, currently 20%, on our undistributed PHC income, which generally includes our taxable income, subject to certain adjustments.

**Allocation of Purchase Price and Characterization of a Unit**

No statutory, administrative or judicial authority directly addresses the treatment of a unit or instruments similar to a unit for U.S. federal income tax purposes and, therefore, that treatment is not entirely clear. The acquisition of a unit should be treated for U.S. federal income tax purposes as the acquisition of one share of our Class A common stock and one-third of one warrant to acquire one share of our Class A common stock. We intend to treat the acquisition of a unit in this manner and, by purchasing a unit, you will agree to adopt such treatment for tax purposes. For U.S. federal income tax purposes, each holder of a unit must allocate the purchase price paid by such holder for such unit between the one share of Class A common stock and the one-third of one warrant based on the relative fair market value of each at the time of issuance. The price allocated to each share of Class A common stock and the one-third of one warrant should be the shareholder's tax basis in such share or one-third of one warrant, as the case may be. Any disposition of a unit should be treated for U.S. federal income tax purposes as a disposition of the share of Class A common stock and one-third of one warrant comprising the unit, and the amount realized on the disposition should be allocated between the Class A common stock and the one-third of one warrant based on their respective relative fair market values at the time of disposition. The separation of shares of Class A common stock and warrants comprising units should not be a taxable event for U.S. federal income tax purposes.

The foregoing treatment of the shares of Class A common stock and warrants and a holder's purchase price allocation are not binding on the Internal Revenue Service ("IRS") or the courts. Because there are no authorities that directly address instruments that are similar to the units, no assurance can be given that the IRS or the courts will agree with the characterization described above or the discussion below. Accordingly, each prospective investor is urged to consult its own tax advisors regarding the tax consequences of an investment in a unit (including alternative characterizations of a unit). The balance of this discussion assumes that the characterization of the units described above is respected for U.S. federal income tax purposes.

**U.S. Holders**

This section applies to you if you are a "U.S. holder." A U.S. holder is a beneficial owner of our units, shares of Class A common stock or warrants who or that is, for U.S. federal income tax purposes:

•   an individual who is a citizen or resident of the United States;

•   a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia; or

139

Table of Contents

- an estate or trust the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

*Taxation of Distributions.*   If we pay cash distributions to U.S. holders of shares of our Class A common stock, such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Class A common stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Class A common stock and will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock" below.

Dividends we pay to a U.S. holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Class A common stock described in this prospectus may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.*   Upon a sale or other taxable disposition of our Class A common stock or warrants which, in general, would include a redemption of Class A common stock or warrants as described below, and including as a result of a dissolution and liquidation in the event we do not consummate an initial business combination within the required time period, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. holder's adjusted tax basis in the Class A common stock or warrants. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for the Class A common stock or warrants so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Class A common stock described in this prospectus may suspend the running of the applicable holding period for this purpose. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

Generally, the amount of gain or loss recognized by a U.S. holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition (or, if the Class A common stock or warrants are held as part of units at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the Class A common stock or the warrants based upon the then fair market values of the Class A common stock and the warrants included in the units) and (ii) the U.S. holder's adjusted tax basis in its Class A common stock or warrants so disposed of. A U.S. holder's adjusted tax basis in its Class A common stock or warrants generally will equal the U.S. holder's acquisition cost (that is, as discussed above, the portion of the purchase price of a unit allocated to a share of Class A common stock or one-third of one warrant or, as discussed below, the U.S. holder's initial basis for Class A common stock received upon exercise of warrants) less, in the case of a share of Class A common stock, any prior distributions treated as a return of capital.

*Redemption of Class A Common Stock.*   In the event that a U.S. holder's Class A common stock is redeemed pursuant to the redemption provisions described in this prospectus under the section of this prospectus entitled "Description of Securities—Common Stock" or if we purchase a U.S. holder's

140

Table of Contents

Class A common stock in an open market transaction, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale of the Class A common stock under Section 302 of the Code. If the redemption qualifies as a sale of common stock, the U.S. holder will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" above. If the redemption does not qualify as a sale of common stock, the U.S. holder will be treated as receiving a corporate distribution with the tax consequences described above under "U.S. Holders—Taxation of Distributions". Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. holder (including any stock constructively owned by the U.S. holder as a result of owning warrants) relative to all of our shares outstanding both before and after the redemption. The redemption of Class A common stock generally will be treated as a sale of the Class A common stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. holder, (ii) results in a "complete termination" of the U.S. holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder takes into account not only stock actually owned by the U.S. holder, but also shares of our stock that are constructively owned by it. A U.S. holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. holder has an interest or that have an interest in such U.S. holder, as well as any stock the U.S. holder has a right to acquire by exercise of an option, which would generally include Class A common stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately following the redemption of Class A common stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately before the redemption. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of our stock actually and constructively owned by the U.S. holder are redeemed or (ii) all of the shares of our stock actually owned by the U.S. holder are redeemed and the U.S. holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. holder does not constructively own any other stock. The redemption of the Class A common stock will not be essentially equivalent to a dividend if a U.S. holder's conversion results in a "meaningful reduction" of the U.S. holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests is satisfied, then the redemption will be treated as a corporate distribution and the tax effects will be as described under "U.S. Holders—Taxation of Distributions," above. After the application of those rules, any remaining tax basis of the U.S. holder in the redeemed Class A common stock will be added to the U.S. holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Exercise or Lapse of a Warrant.*   Except as discussed below with respect to the cashless exercise of a warrant, a U.S. holder generally will not recognize taxable gain or loss the acquisition of common stock upon exercise of a warrant for cash. The U.S. holder's tax basis in the share of our Class A common stock received upon exercise of the warrant generally will be an amount equal to the sum of the U.S. holder's initial investment in the warrant (i.e., the portion of the U.S. holder's purchase price

141

Table of Contents

for units that is allocated to the warrant, as described above under "—General Treatment of Units") and the exercise price. The U.S. holder's holding period for the Class A common stock received upon exercise of the warrants will begin on the date following the date of exercise (or possibly the date of exercise) of the warrants and will not include the period during which the U.S. holder held the warrants. If a warrant is allowed to lapse unexercised, a U.S. holder generally will recognize a capital loss equal to such holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current tax law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. holder's basis in the Class A common stock received would equal the holder's basis in the warrant. If the cashless exercise were treated as not being a gain realization event, a U.S. holder's holding period in the Class A common stock would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the Class A common stock would include the holding period of the warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. holder would recognize gain or loss with respect to the portion of the exercised warrants treated as surrendered to pay the exercise price of the warrants (the "surrendered warrants"). The U.S. holder would recognize capital gain or loss with respect to the surrendered warrants in an amount generally equal to the difference between (i) the fair market value of the Class A common stock that would have been received with respect to the surrendered warrants in a regular exercise of warrants and (ii) the sum of the U.S. holder's tax basis in the surrendered warrants and the aggregate cash exercise price of such warrants (if they had been exercised in a regular exercise). In this case, a U.S. holder's tax basis in the Class A common stock received would equal the U.S. holder's tax basis in the warrants exercised plus (or minus) the gain (or loss) recognized with respect to the surrendered warrants. A U.S. holder's holding period for the Class A common stock would commence on the date following the date of exercise (or possibly the date of exercise) of the warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

*Possible Constructive Distributions.*   The terms of each warrant provide for an adjustment to the number of shares of Class A common stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants." An adjustment which has the effect of preventing dilution generally is not taxable. The U.S. holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrantholders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of Class A common stock that would be obtained upon exercise) as a result of a distribution of cash to the holders of shares of our Class A common stock which is taxable to the U.S. holders of such shares as described under "U.S. Holders—Taxation of Distributions" above. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest. For certain information reporting purposes, we are required to determine the date and amount of any such constructive distributions. Recently proposed Treasury regulations, which we may rely on prior to the issuance of final regulations, specify how the date and amount of constructive distributions are determined.

142

Table of Contents

*Information Reporting and Backup Withholding.*   In general, information reporting requirements may apply to dividends paid to a U.S. holder and to the proceeds of the sale or other disposition of our units, shares of Class A common stock and warrants, unless the U.S. holder is an exempt recipient. Backup withholding may apply to such payments if the U.S. holder fails to provide a taxpayer identification number, a certification of exempt status or has been notified by the IRS that it is subject to backup withholding (and such notification has not been withdrawn).

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

**Non-U.S. Holders**

This section applies to you if you are a "Non-U.S. holder." A Non-U.S. holder is a beneficial owner of our units, shares of Class A common stock and warrants who or that is, for U.S. federal income tax purposes:

- a non-resident alien individual, other than certain former citizens and residents of the United States subject to U.S. tax as expatriates;

- a foreign corporation; or

- a foreign estate or trust;

but does not include an individual who is present in the United States for 183 days or more in the taxable year of disposition. If you are such an individual, you should consult your tax advisor regarding the U.S. federal income tax consequences of the sale or other disposition of our units.

*Taxation of Distributions.*   In general, any distributions (including constructive distributions) we make to a Non-U.S. holder of shares of our Class A common stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). In the case of any constructive dividend, it is possible that this tax would be withheld from any amount owed to a Non-U.S. holder by the applicable withholding agent, including cash distributions on other property or sale proceeds from warrants or other property subsequently paid or credited to such holder. Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. holder's adjusted tax basis in its shares of our Class A common stock and, to the extent such distribution exceeds the Non-U.S. holder's adjusted tax basis, as gain realized from the sale or other disposition of the Class A common stock, which will be treated as described under "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below. In addition, if we determine that we are likely to be classified as a "U.S. real property holding corporation" (see "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below), we will withhold 15% of any distribution that exceeds our current and accumulated earnings and profits.

The withholding tax does not apply to dividends paid to a Non-U.S. holder who provides a Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. corporation receiving effectively

143

Table of Contents

connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate).

*Exercise of a Warrant.*   The U.S. federal income tax treatment of a Non-U.S. holder's exercise of a warrant, or the lapse of a warrant held by a Non-U.S. holder, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of a warrant by a U.S. holder, as described under "U.S. holders—Exercise or Lapse of a Warrant" above, although to the extent a cashless exercise results in a taxable exchange, the consequences would be similar to those described below in "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants."

*Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.*   A Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized on a sale, taxable exchange or other taxable disposition of our Class A common stock, which would include a dissolution and liquidation in the event we do not complete an initial business combination within 24 months from the closing of this offering, or warrants (including an expiration or redemption of our warrants), in each case without regard to whether those securities were held as part of a unit, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. holder); or

- we are or have been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. holder held our Class A common stock and, in the case where shares of our Class A common stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or constructively, more than 5% of our Class A common stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. holder's holding period for the shares of our Class A common stock. There can be no assurance that our Class A common stock will be treated as regularly traded on an established securities market for this purpose.

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. holder were a U.S. resident. Any gains described in the first bullet point above of a Non-U.S. holder that is a foreign corporation may also be subject to an additional "branch profits tax" at a 30% rate (or lower treaty rate).

If the second bullet point above applies to a Non-U.S. holder, gain recognized by such holder on the sale, exchange or other disposition of our Class A common stock or warrants will be subject to tax at generally applicable U.S. federal income tax rates. In addition, a buyer of our Class A common stock or warrants from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We cannot determine whether we will be a U.S. real property holding corporation in the future until we complete an initial business combination. We will be classified as a U.S. real property holding corporation if the fair market value of our "U.S. real property interests" equals or exceeds 50 percent of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

*Redemption of Class A Common Stock.*   The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. holder's Class A common stock pursuant to the redemption provisions described in the section of this prospectus entitled "Description of Securities—Common Stock" generally will correspond to the U.S. federal income tax characterization of such a redemption of a

144

Table of Contents

U.S. holder's Class A common stock, as described under "U.S. Holders—Redemption of Class A Common Stock" above, and the consequences of the redemption to the Non-U.S. holder will be as described above under "Non-U.S. holders—Taxation of Distributions" and "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants," as applicable. It is possible that because the applicable withholding agent may not be able to determine the proper characterization of a redemption of a Non-U.S. holder's Class A common stock, the withholding agent might treat the redemption as a distribution subject to withholding tax.

*Information Reporting and Backup Withholding.*   Information returns will be filed with the IRS in connection with payments of dividends and the proceeds from a sale or other disposition of our units, shares of Class A common stock and warrants. A Non-U.S. holder may have to comply with certification procedures to establish that it is not a United States person in order to avoid information reporting and backup withholding requirements. The certification procedures required to claim a reduced rate of withholding under a treaty will satisfy the certification requirements necessary to avoid the backup withholding as well. The amount of any backup withholding from a payment to a Non-U.S. holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

*FATCA Withholding Taxes.*   Provisions commonly referred to as "FATCA" impose withholding of 30% on payments of dividends (including constructive dividends) on our Class A common stock or warrants, and, beginning in 2019, sales or other disposition proceeds from our units, shares of Class A common stock and warrants to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other Non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies (typically certified as to by the delivery of a properly completed IRS Form W-8BEN-E). If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Prospective investors should consult their tax advisers regarding the effects of FATCA on their investment in our securities.

Table of Contents

## UNDERWRITING

Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. are acting as representatives of the underwriters named below. Subject to the terms and conditions of the underwriting agreement dated the date of this prospectus, each underwriter named below has severally agreed to purchase, and we have agreed to sell to that underwriter, the number of units set forth opposite the underwriter's name.

| Underwriter | Number of Units |
| --- | --- |
| Citigroup Global Markets Inc. | |
| Credit Suisse Securities (USA) LLC | |
| Deutsche Bank Securities Inc. | |
| Goldman, Sachs & Co. | |
| Total | 90,000,000 |

The underwriting agreement provides that the obligations of the underwriters to purchase the units included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all of the units (other than those covered by the over-allotment option described below) if they purchase any of the units.

Units sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any units sold by the underwriters to securities dealers may be sold at a discount from the initial public offering price not to exceed $          per unit. If all of the units are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The Representatives have advised us that the underwriters do not intend to make sales to discretionary accounts.

If the underwriters sell more units than the total number set forth in the table above, we have granted to the underwriters an option, exercisable for 45 days from the date of this prospectus, to purchase up to 13,500,000 additional units at the public offering price less the underwriting discount. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, in connection with this offering. To the extent the option is exercised, each underwriter must purchase a number of additional units approximately proportionate to that underwriter's initial purchase commitment. Any units issued or sold under the option will be issued and sold on the same terms and conditions as the other units that are the subject of this offering.

We, our sponsor and our officers and directors have agreed that, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of the Representatives, offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any units, warrants, shares of common stock or any other securities convertible into, or exercisable, or exchangeable for, shares of common stock, subject to certain exceptions. The Representatives in their sole discretion may release any of the securities subject to these lock-up agreements at any time without notice, other than in the case of the officers and directors, which shall be with notice. Our sponsor, officers and directors are also subject to separate transfer restrictions on their founder shares and private placement warrants pursuant to the letter agreement described herein.

Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a

146

Table of Contents

liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except with respect to permitted transferees as in the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants").

Prior to this offering, there has been no public market for our securities. Consequently, the initial public offering price for the units was determined by negotiations between us and the representatives. Among the factors considered in determining initial public offering price were the history and prospects of companies whose principal business is the acquisition of other companies, prior offerings of those companies, our management, our capital structure, and currently prevailing general conditions in equity securities markets, including current market valuations of publicly traded companies considered comparable to our company. We cannot assure you, however, that the price at which the units, Class A common stock or warrants will sell in the public market after this offering will not be lower than the initial public offering price or that an active trading market in our units, Class A common stock or warrants will develop and continue after this offering.

We will apply to list our units on NASDAQ under the symbol "SRUNU." We expect that our Class A common stock and warrants will be listed under the symbols "SRUN" and "SRUNW," respectively, once the Class A common stock and warrants begin separate trading.

The following table shows the underwriting discounts and commissions that we are to pay to the underwriters in connection with this offering. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

|  | Payable by Silver Run Acquisition Corporation II | |
|  | No Exercise | Full Exercise |
| --- | --- | --- |
| Per Unit(1) | $ 0.55 | $ 0.55 |
| Total(1) | $ 49,500,000 | $ 56,925,500 |

(1)   Includes $0.35 per unit, or $31,500,000 (or $36,225,000 if the over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, in an amount equal to $0.35 multiplied by the number of shares of Class A common stock sold as part of the units in this offering, as described in this prospectus.

If we do not complete our initial business combination and subsequently liquidate, the trustee and the underwriters have agreed that (i) they will forfeit any rights or claims to their deferred underwriting discounts and commissions, including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the deferred underwriting discounts and commissions will be distributed on a pro rata basis, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes to the public stockholders.

In connection with the offering, the underwriters may purchase and sell units in the open market. Purchases and sales in the open market may include short sales, purchases to cover short positions, which may include purchases pursuant to the over-allotment option and stabilizing purchases, in accordance with Regulation M under the Exchange Act.

147

Table of Contents

- Short sales involve secondary market sales by the underwriters of a greater number of units than they are required to purchase in the offering.

- "Covered" short sales are sales of units in an amount up to the number of units represented by the underwriters' over-allotment option.

- "Naked" short sales are sales of units in an amount in excess of the number of units represented by the underwriters' over-allotment option.

- Covering transactions involve purchases of units either pursuant to the over-allotment option or in the open market after the distribution has been completed in order to cover short positions.

- To close a naked short position, the underwriters must purchase units in the open market after the distribution has been completed. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the units in the open market after pricing that could adversely affect investors who purchase in the offering.

- To close a covered short position, the underwriters must purchase units in the open market after the distribution has been completed or must exercise the over-allotment option. In determining the source of units to close the covered short position, the underwriters will consider, among other things, the price of units available for purchase in the open market as compared to the price at which they may purchase units through the over-allotment option.

- Stabilizing transactions involve bids to purchase units so long as the stabilizing bids do not exceed a specified maximum.

Purchases to cover short positions and stabilizing purchases, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the units. They may also cause the price of the units to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions in the over-the-counter market or otherwise. If the underwriters commence any of these transactions, they may discontinue them at any time.

We estimate that our portion of the total expenses of this offering payable by us will be $1,000,000 (which includes $47,500 of accounting fees and expenses), excluding underwriting discounts and commissions. We have agreed to reimburse the underwriters for all expenses and fees related to the review by FINRA, which will not exceed $15,000.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make because of any of those liabilities.

We are not under any contractual obligation to engage any of the underwriters to provide any services for us after this offering, and have no present intent to do so. However, any of the underwriters may introduce us to potential target businesses or assist us in raising additional capital in the future. If any of the underwriters provide services to us after this offering, we may pay such underwriter fair and reasonable fees that would be determined at that time in an arm's length negotiation; provided that no agreement will be entered into with any of the underwriters and no fees for such services will be paid to any of the underwriters prior to the date that is 90 days from the date of this prospectus, unless FINRA determines that such payment would not be deemed underwriters' compensation in connection with this offering and we may pay the underwriters of this offering or any entity with which they are affiliated a finder's fee or other compensation for services rendered to us in connection with the completion of a business combination.

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our

148

Table of Contents

affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Notice to Prospective Investors in the European Economic Area**

In relation to each member state of the European Economic Area that has implemented the Prospectus Directive (each, a "relevant member state"), with effect from and including the date on which the Prospectus Directive is implemented in that relevant member state (the "relevant implementation date"), an offer of units described in this prospectus may not be made to the public in that relevant member state prior to the publication of a prospectus in relation to the units that has been approved by the competent authority in that relevant member state or, where appropriate, approved in another relevant member state and notified to the competent authority in that relevant member state, all in accordance with the Prospectus Directive, except that, with effect from and including the relevant implementation date, an offer of our units may be made to the public in that relevant member state at any time:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100, or, if the relevant member state has implemented the relevant provisions of the 2010 PD Amending Directive, 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the issuer for any such offer; or natural or legal persons (other than qualified investors as defined below) subject to obtaining the prior consent of the underwriter for any such offer; or

- in any other circumstances that do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

provided that no such offer of units referred to in the bullet points above shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each purchaser of units described in this prospectus located within a relevant member state will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purpose of this provision, the expression an "offer of units to the public" in any relevant member state means the communication in any form and by any means of sufficient information on the terms of the offer and the units to be offered so as to enable an investor to decide to purchase or subscribe for the units, as the expression may be varied in that member state by any measure implementing the Prospectus Directive in that member state, and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive to the extent implemented by the relevant member state) and includes any relevant implementing measure in each relevant member state. The expression 2010 PD Amending Directive means Directive 2010/73/EU.

Table of Contents

We have not authorized and do not authorize the making of any offer of units through any financial intermediary on their behalf, other than offers made by the underwriters with a view to the final placement of the units as contemplated in this prospectus. Accordingly, no purchaser of the units, other than the underwriters, is authorized to make any further offer of the units on behalf of us or the underwriters.

**Notice to Prospective Investors in the United Kingdom**

This prospectus is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (each such person being referred to as a "relevant person"). The units are only available to, and any invitation, offer or agreement to purchase or otherwise acquire such units will be engaged in only with, relevant persons. This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents.

**Notice to Prospective Investors in France**

Neither this prospectus nor any other offering material relating to the units described in this prospectus has been submitted to the clearance procedures of the Autorité des Marchés Financiers or by the competent authority of another member state of the European Economic Area and notified to the Autorité des Marchés Financiers. The units have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the units has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or

- used in connection with any offer for subscription or sale of the units to the public in France.

Such offers, sales and distributions will be made in France only:

- to qualified investors (investisseurs qualifiés) and/or to a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French Code monétaire et financier;

- to investment services providers authorized to engage in portfolio management on behalf of third parties; or

- in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French Code monétaire et financier and article 211-2 of the General Regulations (Règlement Général) of the Autorité des Marchés Financiers, does not constitute a public offer (appel public à l'épargne).

The units may be resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code monétaire et financier.

**Notice to Prospective Investors in Hong Kong**

The units may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the

150

Table of Contents

Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the units may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the units may not be circulated or distributed, nor may the units be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the units are subscribed or purchased under Section 275 of the SFA by a relevant person which is

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

- to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than $200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

- where no consideration is or will be given for the transfer; or

- where the transfer is by operation of law.

**Notice to Prospective Investors in Canada**

The units may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions*

151

Table of Contents

or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the units must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York, has passed upon the validity of the securities offered hereby on behalf of us. Certain legal matters will be passed upon on behalf of the underwriters by Vinson & Elkins L.L.P., Houston, Texas.

## EXPERTS

The balance sheet of Silver Run Acquisition Corporation II as of December 31, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period November 16, 2016 (inception) through December 31, 2016, have been audited by WithumSmith+Brown, PC, independent registered public accounting firm, as stated in their report which is incorporated herein. Such financial statements have been incorporated herein in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the securities we are offering by this prospectus. This prospectus does not contain all of the information included in the registration statement. For further information about us and our securities, you should refer to the registration statement and the exhibits and schedules filed with the registration statement. Whenever we make reference in this prospectus to any of our contracts, agreements or other documents, the references are materially complete but may not include a description of all aspects of such contracts, agreements or other documents, and you should refer to the exhibits attached to the registration statement for copies of the actual contract, agreement or other document.

Upon completion of this offering, we will be subject to the information requirements of the Exchange Act and will file annual, quarterly and current event reports, proxy statements and other information with the SEC. You can read our SEC filings, including the registration statement, over the Internet at the SEC's website at www.sec.gov. You may also read and copy any document we file with the SEC at its public reference facility at 100 F Street, N.E., Washington, D.C. 20549.

You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference facilities.

Table of Contents

## INDEX TO FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Changes in Stockholder's Equity | F-5 |
| Statement of Cash Flows | F-6 |
| Notes to Financial Statements | F-7 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholder of
Silver Run Acquisition Corporation II

We have audited the accompanying balance sheet of Silver Run Acquisition Corporation II (the "Company"), as of December 31, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Silver Run Acquisition Corporation II as of December 31, 2016, and the results of its operations and its cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016, in accordance with accounting principles generally accepted in the United States of America.

/s/ WithumSmith+Brown, PC

New York, New York
March 22, 2017

F-2

Table of Contents

**Silver Run Acquisition Corporation II**

**BALANCE SHEET**

**December 31, 2016**

| | | |
|---|---|---:|
| **ASSETS:** | | |
| Current assets—cash | $ | 225,500 |
| Deferred offering costs | | 169,552 |
| Total assets | $ | 395,052 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current Liabilities: | | |
| Accrued formation and offering costs | $ | 72,052 |
| Sponsor note | | 300,000 |
| Total current liabilities | | 372,052 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | — |
| Class A common stock, $0.0001 par value; 400,000,000 shares authorized; none issued and outstanding | | — |
| Class B common stock, $0.0001 par value; 50,000,000 shares authorized; 25,875,000 shares issued and outstanding(1) | | 2,588 |
| Additional paid-in capital | | 22,412 |
| Accumulated deficit | | (2,000) |
| Total stockholder's equity | | 23,000 |
| Total liabilities and stockholder's equity | $ | 395,052 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-3

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF OPERATIONS**

**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | | |
|---|---|---:|
| Revenue | $ | — |
| General and administrative expenses | | 2,000 |
| Net loss attributable to common stock | $ | (2,000) |
| Weighted average number of shares outstanding: | | |
|    Basic and diluted(1) | | 25,875,000 |
| Net loss per common share: | | |
|    Basic and diluted | $ | (0.00) |

(1)     Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-4

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**

**For the period from November 16, 2016 (date of inception) to December 31, 2016**

|  | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Stockholder's Equity |
|  | Shares | Amount |  |  |  |
|---|---|---|---|---|---|
| Sale of common stock to Sponsor at approx. $0.001 per share(1) | 25,875,000 | $ 2,588 | $ 22,412 | $ — | $ 25,000 |
| Net loss | — | — | — | (2,000) | (2,000) |
| Balances, December 31, 2016 | 25,875,000 | $ 2,588 | $ 22,412 | $ (2,000) | $ 23,000 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-5

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF CASH FLOWS**

**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | | |
|---|---:|---:|
| Net loss | $ | (2,000) |
| Adjustments to reconcile net loss to net cash used in operations: | | |
| Increase in accounts payable and accrued liabilities | | 2,000 |
| Net cash used in operating activities | | — |
| Cash flows from financing activities: | | |
| Proceeds from Sponsor note | | 300,000 |
| Payment of offering costs | | (74,500) |
| Net cash provided by financing activities | | 225,500 |
| Increase in cash | | 225,500 |
| Cash at beginning of period | | — |
| Cash at end of period | $ | 225,500 |
| Supplemental disclosure of non-cash financing activities | | |
| Deferred offering costs included in accrued formation and offering costs | $ | 70,052 |
| Offering costs paid by Sponsor in exchange for Founder Shares | $ | 25,000 |

See accompanying notes to financial statements

F-6

Table of Contents

## NOTES TO FINANCIAL STATEMENTS

**Note 1—Description of Organization and Business Operations**

*Organization and General*

Silver Run Acquisition Corporation II (the "**Company**") was incorporated in Delaware on November 16, 2016. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "**Initial Business Combination**"). The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the "**Securities Act**," as modified by the Jumpstart Our Business Startups Act of 2012 (the "**JOBS Act**").

At December 31, 2016, the Company had not commenced any operations. All activity for the period from November 16, 2016 (inception) through December 31, 2016 relates to the Company's formation and the proposed initial public offering ("**Proposed Offering**") described below. The Company will not generate any operating revenues until after completion of its Initial Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31st as its fiscal year end.

*Sponsor and Proposed Financing*

The Company's sponsor is Silver Run Sponsor II, LLC, a Delaware limited liability company (the "**Sponsor**"). The Company intends to finance its Initial Business Combination with proceeds from the proposed $900,000,000 initial public offering of Units (as defined below) (Note 3) and a $20,000,000 private placement (Note 4). Upon the closing of the Proposed Offering and the private placement, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full—Note 3) will be held in a trust account (the "**Trust Account**") (discussed below).

*The Trust Account*

The proceeds held in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred eighty (180) days or less or in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act of 1940 and that invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Initial Business Combination or (ii) the distribution of the Trust Account proceeds as described below. The remaining proceeds outside the Trust Account may be used to pay for business, legal and accounting due diligence on prospective acquisitions and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes, if any, none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Initial Business Combination; (ii) the redemption of any shares of Class A common stock included in the Units (the "**Public Shares**") being sold in the Proposed Offering that have been properly tendered in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of its obligation to redeem 100% of such shares of Class A common stock if it does not complete the Initial Business Combination within 24 months from the closing of the Proposed Offering; and (iii) the redemption of 100% of the shares of Class A common stock included in the Units being sold in the Proposed Offering if the Company is unable to complete an Initial Business Combination within 24 months from the closing of the Proposed Offering (subject to the requirements of law). The

F-7

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 1—Description of Organization and Business Operations (Continued)**

proceeds deposited in the Trust Account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

*Initial Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be generally applied toward consummating an Initial Business Combination. The Initial Business Combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on income earned on the Trust Account) at the time of the agreement to enter into the Initial Business Combination. Furthermore, there is no assurance that the Company will be able to successfully effect an Initial Business Combination.

The Company, after signing a definitive agreement for an Initial Business Combination, will either (i) seek stockholder approval of the Initial Business Combination at a meeting called for such purpose in connection with which stockholders may seek to redeem their shares, regardless of whether they vote for or against the Initial Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to sell their Public Shares to the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the Initial Business Combination or will allow stockholders to sell their Public Shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval, unless a vote is required by law or under NASDAQ rules. If the Company seeks stockholder approval, it will complete its Initial Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the Initial Business Combination. However, in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. In such case, the Company would not proceed with the redemption of its Public Shares and the related Initial Business Combination, and instead may search for an alternate Initial Business Combination.

If the Company holds a stockholder vote or there is a tender offer for shares in connection with an Initial Business Combination, a public stockholder will have the right to redeem its shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. As a result, such shares of Class A common stock will be recorded at redemption amount and classified as temporary equity upon the completion of the Proposed Offering, in accordance with the Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") 480, "Distinguishing Liabilities from Equity."

Pursuant to the Company's amended and restated certificate of incorporation, if the Company is unable to complete the Initial Business Combination within 24 months from the closing of the Proposed Offering, the Company will (i) cease all operations except for the purpose of winding up,

F-8

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 1—Description of Organization and Business Operations (Continued)**

(ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay the Company's franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholder's rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. The Sponsor and the Company's officers and directors will enter into a letter agreement with the Company, pursuant to which they will agree to waive their rights to liquidating distributions from the Trust Account with respect to any Founder Shares (as defined below) held by them if the Company fails to complete the Initial Business Combination within 24 months of the closing of the Proposed Offering. However, if the Sponsor or any of the Company's directors, officers or affiliates acquires shares of Class A common stock in or after the Proposed Offering, they will be entitled to liquidating distributions from the Trust Account with respect to such shares if the Company fails to complete the Initial Business Combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after an Initial Business Combination, the Company's stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. The Company's stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that the Company will provide its stockholders with the opportunity to redeem their Public Shares for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account, upon the completion of the Initial Business Combination, subject to the limitations described herein.

**Note 2—Summary of Significant Accounting Policies**

*Basis of Presentation*

The financial statements of the Company are presented in U.S. dollars in conformity with accounting principles generally accepted in the United States of America ("**GAAP**"). In connection with the Company's assessment of going concern considerations in accordance with ASU 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern", as of December 31, 2016, the Company does not have sufficient liquidity to meet its current obligations. However, management has determined that the Company has access to funds from the Sponsor entity that are sufficient to fund the working capital needs of the Company until the earlier of the consummation of the Proposed Offering or a minimum one year from the date of issuance of these financial statements.

*Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of

F-9

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 2—Summary of Significant Accounting Policies (Continued)**

securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statement with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

*Net Loss Per Common Share*

Net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the period, plus, to the extent dilutive, the incremental number of shares of common stock to settle warrants, as calculated using the treasury stock method. At December 31, 2016, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company under the treasury stock method. As a result, diluted loss per common share is the same as basic loss per common share for the period.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash accounts in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

*Financial Instruments*

The fair value of the Company's assets and liabilities, which qualify as financial instruments under the FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Deferred Offering Costs*

The Company complies with the requirements of the FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A —"Expenses of Offering." Deferred offering costs of approximately $170,000 consist of costs incurred in connection with formation and preparation for the Proposed Offering. These costs, together with the underwriter discount, will be charged to additional paid-in

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 2—Summary of Significant Accounting Policies (Continued)**

capital upon completion of the Proposed Offering or charged to operations if the Proposed Offering is not completed.

*Income Taxes*

The Company follows the asset and liability method of accounting for income taxes under FASB ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of December 31, 2016. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties at December 31, 2016. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

*Recent Accounting Pronouncements*

In August 2014, FASB issued ASU 2014-15, "Presentation of Financial Statements—Going Concern" (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern. ASU 2014-15 provides guidance on management's responsibility to evaluate whether there is a substantial doubt about an organization's ability to continue as a going concern and to provide related footnote disclosures. For each reporting period, management will be required to evaluate whether there are conditions or events that raise substantial doubt about a company's ability to continue as a going concern within one year from the date the financial statements are issued. The amendments in ASU 2014-15 are effective for annual reporting periods ending after December 15, 2016 and for annual and interim periods thereafter. Early adoption is permitted. The Company has adopted the methodologies prescribed by ASU 2014-15 and it did not have a material effect on its financial position or results of operations. See *Basis of Presentation* for additional considerations.

Management does not believe that any other recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have an effect on the Company's financial statements.

**Note 3—Public Offering**

Pursuant to the Proposed Offering, the Company intends to offer for sale up to 90,000,000 units at a price of $10.00 per unit (the "**Units**"). The Sponsor has committed to purchase an aggregate of 13,333,333 warrants at a price of $1.50 per warrant in a private placement that will close simultaneously with the Proposed Offering.

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 3—Public Offering (Continued)

Each Unit consists of one share of the Company's Class A common stock, $0.0001 par value, and one-third of one warrant (each, a "**Warrant**" and, collectively, the "**Warrants**"). Each whole Warrant entitles the holder to purchase one share of Class A common stock at a price of $11.50 per share. No fractional shares will be issued upon separation of the Units and only whole Warrants will trade. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's Initial Business Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's Initial Business Combination or earlier upon redemption or liquidation. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of the Company's Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sent the notice of redemption to the Warrant holders.

The Company expects to grant the underwriters a 45-day option to purchase up to 13,500,000 additional Units to cover any over-allotments at the initial public offering price less the underwriting discounts and commissions. The Units that would be issued in connection with the over-allotment option would be identical to the Units issued in the Proposed Offering.

The Company expects to pay an underwriting discount of 2.0% of the per Unit offering price to the underwriters at the closing of the Proposed Offering, with an additional fee (the "**Deferred Discount**") of 3.5% of the gross offering proceeds payable upon the Company's completion of an Initial Business Combination. The Deferred Discount will become payable to the underwriters from the amounts held in the Trust Account solely in the event the Company completes its Initial Business Combination.

### Note 4—Related Party Transactions

*Founder Shares*

On November 21, 2016, the Sponsor purchased 11,500,000 shares of Class B common stock (the "**Founder Shares**") for an aggregate price of $25,000, or approximately $0.002 per share. As used herein, unless the context otherwise requires, "Founder Shares" shall be deemed to include the shares of Class A common stock issuable upon conversion thereof. The Founder Shares are identical to the Class A common stock included in the Units being sold in the Proposed Offering except that the Founder Shares automatically convert into shares of Class A common stock at the time of the Company's Initial Business Combination and are subject to certain transfer restrictions, as described in more detail below. Holders of Founder Shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. The Sponsor has agreed to forfeit up to 1,500,000 Founder Shares to the extent that the over-allotment option is not exercised in full by the underwriters (see Note 6). The forfeiture will be adjusted to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering. If the Company increases or decreases the size of the offering, the Company will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the Proposed Offering in such amount as to maintain the Founder Share ownership of the Company's stockholders prior to the Proposed Offering at 20.0% of the Company's issued and outstanding common stock upon the consummation of the Proposed Offering.

F-12

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 4—Related Party Transactions (Continued)**

The Company's initial stockholders will agree, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier to occur of: (A) one year after the completion of the Initial Business Combination or (B) subsequent to the Initial Business Combination, (x) if the last sale price of the Company's Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Initial Business Combination, or (y) the date on which we complete a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

The Sponsor will agree to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or $22,700,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of the Proposed Offering (the "**Private Placement Warrants**"). Each whole Private Placement Warrant is exercisable for one whole share of the Company's Class A common stock at a price of $11.50 per share. A portion of the purchase price of the Private Placement Warrants will be added to the proceeds from the Proposed Offering to be held in the Trust Account such that at the closing of the Proposed Offering $900.0 million (or $1,035.0 million if the underwriters exercise their over-allotment option in full) will be held in the Trust Account. If the Initial Business Combination is not completed within 24 months from the closing of the Proposed Offering, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Placement Warrants will expire worthless. The Private Placement Warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the Sponsor or its permitted transferees.

The Sponsor and the Company's officers and directors will agree, subject to limited exceptions, not to transfer, assign or sell any of their Private Placement Warrants until 30 days after the completion of the Initial Business Combination.

*Registration Rights*

The holders of Founder Shares, Private Placement Warrants and Warrants that may be issued upon conversion of working capital loans, if any, will be entitled to registration rights (in the case of the Founder Shares, only after conversion of such shares to shares of Class A common stock) pursuant to a registration rights agreement to be signed on or before the date of the prospectus for the Proposed Offering. These holders will be entitled to certain demand and "piggyback" registration rights. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period for the securities to be registered. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Related Party Loans*

On November 22, 2016, the Sponsor loaned the Company an aggregate of $300,000 to cover expenses related to the Proposed Offering pursuant to a promissory note (the "**Note**"). This loan is non-interest bearing and payable on the earlier of March 31, 2017 or the completion of the Proposed Offering. As of March 20, 2017, $300,000 is still outstanding under the Note.

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 4—Related Party Transactions (Continued)**

*Administrative Support Agreement*

Commencing on the date the Units are first listed on the NASDAQ, the Company has agreed to pay the Sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of the Initial Business Combination or the Company's liquidation, the Company will cease paying these monthly fees.

**Note 5—Stockholder's Equity**

*Common Stock*

The authorized common stock of the Company includes up to 400,000,000 shares of Class A common stock and 50,000,000 shares of Class B common stock (see Note 6). If the Company enters into an Initial Business Combination, it may (depending on the terms of such an Initial Business Combination) be required to increase the number of shares of Class A common stock which the Company is authorized to issue at the same time as the Company's stockholders vote on the Initial Business Combination to the extent the Company seeks stockholder approval in connection with the Initial Business Combination. Holders of the Company's common stock are entitled to one vote for each share of common stock. At December 31, 2016, there were 25,875,000 shares of Class B common stock issued and outstanding (see Note 6).

*Preferred Stock*

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors (see Note 6). At December 31, 2016, there were no shares of preferred stock issued or outstanding.

**Note 6—Subsequent Events**

In March 2017, the Company effected stock dividends in the aggregate of approximately 1.25 shares for each outstanding share of Class B common stock, resulting in the initial stockholders holding an aggregate of 25,875,000 Founder Shares. The stock dividends also adjusted the shares subject to forfeiture from 1,500,000 to 3,375,000, to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering.

In March 2017, the Company entered into a forward purchase agreement (**"Forward Purchase Agreement"**) pursuant to which Riverstone VI SRII Holdings, L.P. (**"Fund VI Holdings"**) agreed to purchase an aggregate of up to 40,000,000 shares of the Company's Class A common stock, plus an aggregate of up to 13,333,333 warrants ("**Forward Purchase Warrant**"), for an aggregate purchase price of up to $400,000,000 or $10.00 per unit (collectively, "**Forward Purchase Units**"). Each Forward Purchase Warrant has the same terms as each of the Private Placement Warrants.

The obligations under the Forward Purchase Agreement do not depend on whether any public stockholders elect to redeem their shares in connection with the Initial Business Combination and provide the Company with a minimum funding level for the Initial Business Combination. Additionally, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to termination prior to the closing of the sale of such units by mutual written consent of the Company and such party, or automatically: (i) if the Proposed Offering is not consummated on or prior to June 30, 2017; (ii) if

F-14

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 6—Subsequent Events (Continued)**

the Initial Business Combination is not consummated within 24 months from the closing of the Proposed Offering, unless extended up to a maximum of sixty (60) days in accordance with the amended and restated certificate of incorporation; or (iii) if the Sponsor or the Company become subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of the Sponsor or the Company in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to fulfillment of customary closing conditions, including that the Initial Business Combination must be consummated substantially concurrently with the purchase of the Forward Purchase Units.

In March 2017, the Company updated the articles of incorporation to increase the authorized capital stock. The total number of all shares of all classes of capital stock is 451,000,000, consisting of (a) 450,000,000 shares of common stock including (i) 400,000,000 shares of Class A common stock and (ii) 50,000,000 shares of Class B common stock, and (b) 1,000,000 shares of preferred stock.

F-15

Table of Contents

**90,000,000 Units**

# Silver Run Acquisition Corporation II

————————————

**PRELIMINARY PROSPECTUS**

**, 2017**

————————————

# Citigroup

# Credit Suisse

# Deutsche Bank Securities

# Goldman, Sachs & Co.

Until             , 2017 (25 days after the date of this prospectus), all dealers that buy, sell or trade shares of our Class A common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

Table of Contents

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13.   *Other Expenses of Issuance and Distribution.***

The estimated expenses payable by us in connection with the offering described in this registration statement (other than the underwriting discounts and commissions) will be as follows:

| | |
|---|---:|
| Legal fees and expenses | $ 350,000 |
| Accounting fees and expenses | 47,500 |
| SEC expenses | 119,957 |
| FINRA expenses | 155,750 |
| Travel and road show | 20,000 |
| NASDAQ listing and filing fees | 75,000 |
| Directors and officers insurance(1) | 140,000 |
| Printing and engraving expenses | 75,000 |
| Miscellaneous expenses | 16,793 |
| Total offering expenses | $ 1,000,000 |

(1)   This amount represents the approximate amount of annual director and officer liability insurance premiums the registrant anticipates paying following the completion of its initial public offering and until it completes a business combination.

**Item 14.   *Indemnification of Directors and Officers.***

Our amended and restated certificate of incorporation will provide that all of our directors, officers, employees and agents shall be entitled to be indemnified by us to the fullest extent permitted by Section 145 of the Delaware General Corporation Law ("DGCL").

Section 145 of the DGCL concerning indemnification of officers, directors, employees and agents is set forth below.

Section 145. Indemnification of officers, directors, employees and agents; insurance.

(a)   A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b)   A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is

II-1

Table of Contents

or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)   To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)   Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer of the corporation at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e)   Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former officers and directors or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f)   The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to the certificate of incorporation or the bylaws after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

II-2

Table of Contents

(g)   A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h)   For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i)   For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

(j)   The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k)   The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees).

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers, and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment of expenses incurred or paid by a director, officer or controlling person in a successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to the court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

In accordance with Section 102(b)(7) of the DGCL, our amended and restated certificate of incorporation, will provide that no director shall be personally liable to us or any of our stockholders for monetary damages resulting from breaches of their fiduciary duty as directors, except to the extent

II-3

Table of Contents

such limitation on or exemption from liability is not permitted under the DGCL unless they violated their duty of loyalty to the Company or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors. The effect of this provision of our amended and restated certificate of incorporation is to eliminate our rights and those of our stockholders (through stockholders' derivative suits on our behalf) to recover monetary damages against a director for breach of the fiduciary duty of care as a director, including breaches resulting from negligent or grossly negligent behavior, except, as restricted by Section 102(b)(7) of the DGCL. However, this provision does not limit or eliminate our rights or the rights of any stockholder to seek non-monetary relief, such as an injunction or rescission, in the event of a breach of a director's duty of care.

If the DGCL is amended to authorize corporate action further eliminating or limiting the liability of directors, then, in accordance with our amended and restated certificate of incorporation, the liability of our directors to us or our stockholders will be eliminated or limited to the fullest extent authorized by the DGCL, as so amended. Any repeal or amendment of provisions of our amended and restated certificate of incorporation limiting or eliminating the liability of directors, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to further limit or eliminate the liability of directors on a retroactive basis.

Our amended and restated certificate of incorporation will also provide that we will, to the fullest extent authorized or permitted by applicable law, indemnify our current and former officers and directors, as well as those persons who, while directors or officers of our corporation, are or were serving as directors, officers, employees or agents of another entity, trust or other enterprise, including service with respect to an employee benefit plan, in connection with any threatened, pending or completed proceeding, whether civil, criminal, administrative or investigative, against all expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by any such person in connection with any such proceeding. Notwithstanding the foregoing, a person eligible for indemnification pursuant to our amended and restated certificate of incorporation will be indemnified by us in connection with a proceeding initiated by such person only if such proceeding was authorized by our board of directors, except for proceedings to enforce rights to indemnification.

The right to indemnification conferred by our amended and restated certificate of incorporation is a contract right that includes the right to be paid by us the expenses incurred in defending or otherwise participating in any proceeding referenced above in advance of its final disposition, provided, however, that if the DGCL requires, an advancement of expenses incurred by our officer or director (solely in the capacity as an officer or director of our corporation) will be made only upon delivery to us of an undertaking, by or on behalf of such officer or director, to repay all amounts so advanced if it is ultimately determined that such person is not entitled to be indemnified for such expenses under our amended and restated certificate of incorporation or otherwise.

The rights to indemnification and advancement of expenses will not be deemed exclusive of any other rights which any person covered by our amended and restated certificate of incorporation may have or hereafter acquire under law, our amended and restated certificate of incorporation, our bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

Any repeal or amendment of provisions of our amended and restated certificate of incorporation affecting indemnification rights, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection

II-4

Table of Contents

existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision. Our amended and restated certificate of incorporation will also permit us, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than those specifically covered by our amended and restated certificate of incorporation.

Our bylaws include the provisions relating to advancement of expenses and indemnification rights consistent with those set forth in our amended and restated certificate of incorporation. In addition, our bylaws provide for a right of indemnity to bring a suit in the event a claim for indemnification or advancement of expenses is not paid in full by us within a specified period of time. Our bylaws also permit us to purchase and maintain insurance, at our expense, to protect us and/or any director, officer, employee or agent of our corporation or another entity, trust or other enterprise against any expense, liability or loss, whether or not we would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Any repeal or amendment of provisions of our bylaws affecting indemnification rights, whether by our board of directors, stockholders or by changes in applicable law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection existing thereunder with respect to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

We will enter into indemnity agreements with each of our officers and directors, a form of which is to be filed as an exhibit to this Registration Statement. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Pursuant to the Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement, we have agreed to indemnify the underwriters and the underwriters have agreed to indemnify us against certain civil liabilities that may be incurred in connection with this offering, including certain liabilities under the Securities Act.

**Item 15.** *Recent Sales of Unregistered Securities.*

On November 21, 2016, Silver Run Sponsor II, LLC, our sponsor, acquired an aggregate of 11,500,000 shares of our Class B common stock, in exchange for a capital contribution of $25,000, or approximately $0.002 per share. Such securities were issued in connection with our organization pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act. Our sponsor is an accredited investor for purposes of Rule 501 of Regulation D under the Securities Act.

In addition, our sponsor has committed, pursuant to a written agreement, to purchase from us an aggregate of 13,333,333 (or 15,133,333 if the underwriters' over-allotment option is exercised in full) private placement warrants at $1.50 per warrant (for an aggregate purchase price of approximately $20,000,000 (or $22,700,000 if the underwriters' over-allotment option is exercised in full)). These purchases will take place on a private placement basis simultaneously with the completion of this offering. These issuances will be made pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act. Our sponsor is an accredited investor for purposes of Rule 501 of Regulation D under the Securities Act.

In March 2017, we entered into a forward purchase agreement pursuant to which Fund VI Holdings agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000. These issuances will take place on a private placement basis that is expected to close simultaneously

II-5

Table of Contents

with the closing of our initial business combination. These issuances have been and will be made pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act. Fund VI Holdings is an accredited investor for purposes of Rule 501 of Regulation D under the Securities Act.

No underwriting discounts or commissions were paid with respect to such sales.

**Item 16.   Exhibits and Financial Statement Schedules.**

(a)   Exhibits. The list of exhibits following the signature page of this registration statement is incorporated herein by reference.

(b)   Financial Statements. See page F-1 for an index to the financial statements and schedules included in the registration statement.

**Item 17.   *Undertakings.***

(a)   The undersigned registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreements, certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

(b)   Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(c)   The undersigned registrant hereby undertakes that:

(1)   For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)   For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused Amendment No. 3 to the Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on the 22nd day of March, 2017.

**SILVER RUN ACQUISITION CORPORATION II**

By:     /s/ THOMAS J. WALKER

Thomas J. Walker
*Chief Financial Officer*

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| Name | Position | Date |
|------|----------|------|
| * <br> Ken Ryan | Chief Executive Officer (Principal Executive Officer) | March 22, 2017 |
| /s/ THOMAS J. WALKER <br> Thomas J. Walker | Chief Financial Officer and Director (Principal Financial and Accounting Officer) | March 22, 2017 |

*By:     /s/ THOMAS J. WALKER

Thomas J. Walker
*Attorney-in-fact*

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 1.1 | Form of Underwriting Agreement.* |
| 3.1 | Certificate of Incorporation.* |
| 3.2 | Amended and Restated Certificate of Incorporation. |
| 3.3 | Bylaws.* |
| 3.4 | Certificate of Amendment of Amended and Restated Certificate of Incorporation. |
| 4.1 | Specimen Unit Certificate.* |
| 4.2 | Specimen Class A Common Stock Certificate.* |
| 4.3 | Specimen Warrant Certificate.* |
| 4.4 | Form of Warrant Agreement between Continental Stock Transfer & Trust Company and the Registrant.* |
| 5.1 | Opinion of Weil, Gotshal & Manges LLP. |
| 10.1 | Promissory Note, dated November 22, 2016, issued to Silver Run Sponsor II, LLC.* |
| 10.2 | Form of Letter Agreement among the Registrant and its officers and directors and Silver Run Sponsor II, LLC.* |
| 10.3 | Form of Investment Management Trust Agreement between Continental Stock Transfer & Trust Company and the Registrant.* |
| 10.4 | Form of Registration Rights Agreement among the Registrant and certain security holders.* |
| 10.5 | Securities Subscription Agreement, dated November 21, 2016, between the Registrant and Silver Run Sponsor II, LLC.* |
| 10.6 | Form of Private Placement Warrants Purchase Agreement between the Registrant and Silver Run Sponsor II, LLC.* |
| 10.7 | Form of Indemnity Agreement.* |
| 10.8 | Form of Administrative Support Agreement.* |
| 10.9 | Forward Purchase Agreement.* |
| 14.1 | Form of Code of Ethics.* |
| 23.1 | Consent of WithumSmith+Brown, PC. |
| 23.2 | Consent of Weil, Gotshal & Manges LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney.* |

99.1    Form of Audit Committee Charter.*

99.2    Form of Compensation Committee Charter.*

99.3    Consent of William D. Gutermuth.*

99.4    Consent of Jeffrey H. Tepper.*

99.5    Consent of Diana J. Walters.*

99.6    Consent of James T. Hackett.*

_____

*       Previously filed.

# PX 252

424B4 1 a2231531z424b4.htm 424B4

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-216409**

**PROSPECTUS**

## $900,000,000

# Silver Run Acquisition Corporation II

## 90,000,000 Units

_____

Silver Run Acquisition Corporation II is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. We intend to focus our search for a target business in the energy industry.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. The warrants will become exercisable on the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering, and will expire five years after the completion of our initial business combination or earlier upon redemption or liquidation, as described in this prospectus. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. We have also granted the underwriters a 45-day option to purchase up to an additional 13,500,000 units to cover over-allotments, if any.

We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding shares of Class A common stock that were sold as part of the units in this offering, which we refer to collectively as our public shares throughout this prospectus, subject to the limitations described herein. If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, subject to applicable law and as further described herein.

Our sponsor, Silver Run Sponsor II, LLC (which we refer to as our sponsor throughout this prospectus), has committed to purchase an aggregate of 13,333,333 warrants (or 15,133,333 warrants if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate, or $22,700,000 if the over-allotment option is exercised in full) in a private placement that will close simultaneously with the closing of this offering. We refer to these warrants as the private placement warrants throughout this prospectus. Each whole private placement warrant is exercisable to purchase one whole share of our Class A common stock at $11.50 per share.

Our initial stockholders own 25,875,000 shares of our Class B common stock (up to 3,375,000 shares of which are subject to forfeiture depending on the extent to which the underwriter's over-allotment option is exercised). We refer to these shares of Class B common stock as the founder shares throughout this prospectus. The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination, or earlier at the option of the holder, on a one-for-one basis, subject to adjustment as provided herein.

Riverstone VI SR II Holdings, L.P., the sole member of our sponsor (we refer to Riverstone VI SR II Holdings, L.P. throughout this prospectus as "Fund VI Holdings" or as a "Fund VI" vehicle), has entered into a forward purchase agreement with us that provides for the purchase by Fund VI Holdings of an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein.

Currently, there is no public market for our units, Class A common stock or warrants. We have been approved to have our units listed on the NASDAQ Capital Market, or NASDAQ, under the symbol "SRUNU" promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. inform us of their decision to allow earlier separate trading, subject to our filing a Current Report on Form 8-K with the Securities and Exchange Commission, or the SEC, containing an audited balance sheet reflecting our receipt of the gross proceeds of this offering and issuing a press release announcing when such separate trading will begin. Once the securities comprising the units begin separate trading, we expect that the Class A common stock and warrants will be listed on NASDAQ under the symbols "SRUN" and "SRUNW," respectively.

_____

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See the section of this prospectus entitled "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

|  | Per Unit | Total |
|---|---|---|
| Public offering price | $10.00 | $900,000,000 |
| Underwriting discounts and commissions(1) | $0.55 | $49,500,000 |
| Proceeds, before expenses, to Silver Run Acquisition Corporation II | $9.45 | $850,500,000 |

(1)     Includes $0.35 per unit, or $31,500,000 (or up to $36,225,000 if the underwriters' over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, as described in this prospectus. See the section of this prospectus entitled "Underwriting" beginning on page 144 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the private placement warrants described in this prospectus, $900.0 million or $1,035.0 million if the underwriters' over-allotment option is exercised in full ($10.00 per unit) will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and $2.0 million will be available to pay fees and expenses in connection with the closing of this offering and for working capital following the closing of this offering. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about March 29, 2017.

**Citigroup**

    **Credit Suisse**

        **Deutsche Bank Securities**

            **Goldman, Sachs & Co.**

March 23, 2017

Table of Contents

## TABLE OF CONTENTS

**We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

| | |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 65 |
| Use of Proceeds | 66 |
| Dividend Policy | 71 |
| Dilution | 72 |
| Capitalization | 74 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 75 |
| Proposed Business | 82 |
| Management | 109 |
| Principal Stockholders | 118 |
| Certain Relationships and Related Party Transactions | 120 |
| Description of Securities | 124 |
| United States Federal Income Tax Considerations | 138 |
| Underwriting | 146 |
| Legal Matters | 152 |
| Experts | 152 |
| Where You Can Find Additional Information | 152 |
| Index to Financial Statements | F-1 |

i

Table of Contents

# SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. As this is a summary, it does not contain all of the information that you should consider in making an investment decision. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"we," "us," "company" or "our company" are to Silver Run Acquisition Corporation II;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"management" or our "management team" are to our officers and directors;*

- *"sponsor" are to Silver Run Sponsor II, LLC, a Delaware limited liability company and a wholly owned subsidiary of Fund VI Holdings;*

- *"Fund VI" are to Riverstone Global Energy and Power Fund VI, L.P., an investment vehicle for which Riverstone Investment Group LLC serves as investment manager, together with its parallel funds and any of its co-investment vehicles and other intermediate investment vehicles holding an interest, directly or indirectly, in us, including Fund VI Holdings; or any of the foregoing Fund VI vehicles individually;*

- *"Fund VI Holdings" are to Riverstone VI SR II Holdings, L.P., an investment vehicle controlled by Riverstone in which Riverstone Global Energy and Power Fund VI, L.P., its parallel funds and one or more co-investment vehicles participate, directly or indirectly through intermediate investment vehicles. Fund VI Holdings is the Fund VI vehicle with which we have entered into the forward purchase agreement;*

- *"initial stockholders" are to holders of our founder shares prior to this offering;*

- *"Riverstone" are to Riverstone Investment Group LLC, a Delaware limited liability company and its affiliates. Riverstone manages funds in the energy and power industry, including Fund VI;*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issued upon the conversion thereof as provided herein;*

- *"private placement warrants" are to the warrants issued to our sponsor in a private placement simultaneously with the closing of this offering;*

- *"equity-linked securities" are to any securities of our company which are convertible into or exchangeable or exercisable for, common stock of our company;*

-

*"forward purchase agreement"* are to an agreement providing for the sale of our Class A common stock and warrants to Fund VI Holdings and its permitted transferees in a private placement that will close simultaneously with the closing of our initial business combination;

1

Case 4:19-cv-00957 Document 672-5 Filed on 02/16/24 in TXSD Page 396 of 845

Table of Contents

- *"forward purchase shares"* are to the shares of our Class A common stock to be issued pursuant to the forward purchase agreement;

- *"forward purchase warrants"* are to warrants to purchase shares of our Class A common stock to be issued pursuant to the forward purchase agreement;

- *"forward purchase securities"* are to the forward purchase shares and the forward purchase warrants;

- *"forward purchase unit"* are to one forward purchase share and one-third of one forward purchase warrant;

- *"Forward Transferee"* are to any entity to which Fund VI Holdings transfers any portion of its obligation to purchase the forward purchase securities under the forward purchase agreement; and

- *"specified future issuance"* are to an issuance of a class of equity or equity-linked securities (other than the forward purchase securities) to specified purchasers, which may include affiliates of Riverstone, that we may determine to make in connection with financing our initial business combination.

*Each unit consists of one share of Class A common stock and one-third of one warrant for each unit purchased. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus, and only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.*

*Registered trademarks referred to in this prospectus are the property of their respective owners. Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

### Our Company

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We are an acquisition vehicle of Fund VI, an energy-focused private investment fund managed by Riverstone. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

2

Table of Contents

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

In November 2015, Riverstone formed Silver Run Acquisition Corporation ("Silver Run I"), a blank check company formed for substantially the same purposes as our company. Silver Run I aimed to capitalize on the 45 years of experience in the oil and gas industry of its Chief Executive Officer, Mark Papa. Prior to Silver Run I and his time with Riverstone, Mr. Papa was Chairman and Chief Executive Officer of EOG Resources, an exploration and production company. Through its initial public offering in February 2016, Silver Run I raised $500 million from the sale of 50 million units to public investors, with each unit consisting of one share of Class A common stock and one-third of one warrant. On July 6, 2016, an affiliate of Riverstone entered into a definitive agreement to purchase an approximate 89% interest in Centennial Resource Production, LLC ("Centennial"), an independent oil and natural gas company with assets located in the core of the Southern Delaware Basin, from funds controlled by, and affiliates of, NGP Energy Capital Management, L.L.C. In accordance with the definitive agreement, the Riverstone affiliate agreed to assign, and Silver Run I agreed to assume, its right to purchase the interest in Centennial. On October 11, 2016, Silver Run I consummated the acquisition of approximately 89% of the outstanding membership interests in Centennial. In connection with the acquisition, Silver Run I raised an additional approximately $1.0 billion through a private placement of shares of its Class A Common Stock at $10.00 per share. Upon the closing of the transaction, Silver Run I was renamed Centennial Resource Development, Inc., and its common stock and warrants began trading on NASDAQ under the symbols "CDEV" and "CDEVW", respectively.

Our sponsor is an investment vehicle of Fund VI, which is managed by Riverstone. Riverstone has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

In addition, we believe our ability to complete an initial business combination will be enhanced by our having entered into the forward purchase agreement pursuant to which Fund VI Holdings has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an

3

aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

## Business Strategy

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

## Acquisition Criteria

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies or assets that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential;

4

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

### Initial Business Combination

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of the Financial Industry Regulatory Authority, or FINRA, or an independent accounting firm with respect to the satisfaction of such criteria. Our stockholders may not be provided with a copy of such opinion, nor will they be able to rely on such opinion.

We may, at our option, pursue an acquisition opportunity jointly with one or more entities affiliated with Riverstone and/or one or more investors in funds managed by Riverstone, which we refer to as an "Affiliated Joint Acquisition." Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by issuing to such parties a class of equity or equity-linked securities. We refer to this potential future issuance, or a similar issuance to other specified purchasers, as a "specified future issuance" throughout this prospectus. Any such Affiliated Joint Acquisition or specified future issuance would be in addition to, and would not include, the forward purchase securities issued pursuant to the forward purchase agreement. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes

5

Table of Contents

of our common stock. The issuance of the forward purchase securities will not result in such an adjustment to the conversion ratio of our Class B common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition as described above. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target or assets sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act of 1940, as amended, or the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

<div align="center">

**Our Acquisition Process**

</div>

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Fund VI, members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any

<div align="center">6</div>

discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity, including Fund VI. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

### Corporate Information

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors

7

find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

8

Table of Contents

### The Offering

*In making your decision on whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

| | |
|---|---|
| Securities offered | 90,000,000 units, at $10.00 per unit, each unit consisting of: |
| | • one share of Class A common stock; and |
| | • one-third of one warrant. |
| NASDAQ symbols | Units: "SRUNU" |
| | Class A Common Stock: "SRUN" |
| | Warrants: "SRUNW" |
| Trading commencement and separation of Class A common stock and warrants | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. as representatives of the several underwriters (the "Representatives") inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. |

9

Table of Contents

| | |
|---|---|
| Separate trading of the Class A common stock and warrants is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock and warrants be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

**Units:**

| | |
|---|---|
| Number outstanding before this offering | 0 |
| Number outstanding after this offering | 90,000,000(1) |

**Common stock:**

| | |
|---|---|
| Number outstanding before this offering | 25,875,000 shares of Class B common stock(2)(3) |
| Number outstanding after this offering | 112,500,000 shares of Class A common stock and Class B common stock(1)(3) |

**Warrants:**

| | |
|---|---|
| Number of private placement warrants to be sold in a private placement simultaneously with this offering | 13,333,333(1) |
| Number of warrants to be outstanding after this offering and the private placement | 43,333,333(1) |

(1)  Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 3,375,000 founder shares.

(2)  Includes up to 3,375,000 shares that are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)  The shares of common stock included in the units are Class A common stock. Founder shares are classified as shares of Class B common stock, which shares are convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution."

10

Table of Contents

| | |
|---|---|
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock and only whole warrants are exercisable. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. |
| Exercise price | $11.50 per share, subject to adjustment as described herein. |
| Exercise period | The warrants will become exercisable on the later of: |
| | • 30 days after the completion of our initial business combination, or |
| | • 12 months from the closing of this offering; |
| | provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement). |
| | We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file and have an effective registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed; provided, that if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. |
| | The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation. On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account. |
| Redemption of warrants | Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the private placement warrants): |
| | • in whole and not in part; |
| | • at a price of $0.01 per warrant; |

11

Table of Contents

- upon a minimum of 30 days' prior written notice of redemption, which we refer to as the 30-day redemption period; and

- if, and only if, the last sale price of our Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which we send the notice of redemption to the warrantholders.

We will not redeem the warrants unless a registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants is effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. Please see the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants" for additional information.

None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

12

Table of Contents

| | |
|---|---|
| Forward Purchase Agreement | We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI.

The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties (which we refer to throughout this prospectus as the "Forward Transferees"), and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full.

The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants. |

13

1/8/24, 2:00 PM

Table of Contents

|  |  |
|---|---|
|  | The proceeds from the sale of the forward purchase securities may be used as part of the consideration to the sellers in the initial business combination, expenses in connection with our initial business combination or for working capital in the post-transaction company. These purchases will be required to be made regardless of whether any shares of Class A common stock are redeemed by our public shareholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination. |
| Founder shares | On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering. As such, our initial stockholders will collectively own 20% of our issued and outstanding shares after this offering (assuming they do not purchase any units in this offering). In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. Up to 3,375,000 founder shares will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering.

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below; |

14

https://www.sec.gov/Archives/edgar/data/1690769/000104746917001986/a2231531z424b4.htm

Table of Contents

|  | |
|---|---|
|  | • our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (i) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within the prescribed time frame. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial business combination. Our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised); and |
|  | • the founder shares are subject to registration rights. |
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). We refer to such transfer restrictions throughout this prospectus as the lock-up. |

15

Table of Contents

| | |
|---|---|
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination (other than the forward purchase securities), including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding the forward purchase securities and any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. |
| Voting | Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Each share of common stock will have one vote on all such matters. |
| Private placement warrants | Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the over-allotment option is exercised in full), each exercisable to purchase one share of our Class A common stock at $11.50 per share, at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or approximately $22,700,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. |

16

Table of Contents

|  |  |
| --- | --- |
|  | A portion of the purchase price of the private placement warrants will be added to the proceeds from this offering to be held in the trust account such that at the time of closing $900.0 million (or $1,035.0 million if the underwriters exercise their over-allotment option in full) will be held in the trust account. If we do not complete our initial business combination within 24 months from the closing of this offering, the proceeds from the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares (subject to the requirements of applicable law) and the private placement warrants will expire worthless. |
|  | The private placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering. |
| Transfer restrictions on private placement warrants | The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). |

<div align="center">17</div>

Table of Contents

| | |
|---|---|
| Cashless exercise of private placement warrants | If holders of private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| Proceeds to be held in trust account | The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $900,000,000, or $10.00 per unit ($1,035,000,000, or $10.00 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. These proceeds include $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions. |

18

Table of Contents

|  | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest of (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $180,000 of interest annually. Unless and until we complete our initial business combination, we may pay our expenses only from:<br><br>• the net proceeds of this offering and the sale of the private placement warrants not held in the trust account, which will be approximately $1,000,000 in working capital after the payment of approximately $1,000,000 in expenses relating to this offering; and<br><br>• any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of our initial business combination. |

19

Table of Contents

| | |
|---|---|
| Conditions to completing our initial business combination | There is no limitation on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial business combination. Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. |
| | If our board is not able to independently determine the fair market value of the target business or businesses or we are considering an initial business combination with an affiliated entity, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm. We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test, provided that in the event that the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |

20

Table of Contents

| | |
|---|---|
| Permitted purchases of public shares by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our initial stockholders, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Securities Exchange Act of 1934, as amended, or the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. |
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our business combination or otherwise. |

21

Table of Contents

| | |
|---|---|
| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Asset acquisitions and stock purchases would not typically require stockholder approval, while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. |

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 under the Exchange Act to purchase shares of our Class A common stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act.

22

Table of Contents

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

23

Table of Contents

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial stockholders will count towards this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. We believe that this will allow our transfer agent to efficiently process any redemptions without the need for further communication or action from the redeeming public stockholders, which could delay redemptions and result in additional administrative cost. If the proposed business combination is not approved and we continue to search for a target company, we will promptly return any certificates delivered, or shares tendered electronically, by public stockholders who elected to redeem their shares.

24

Table of Contents

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

25

Table of Contents

| | |
|---|---|
| Limitation on redemption rights of stockholders holding 20% or more of the shares sold in this offering if we hold stockholder vote | Notwithstanding the foregoing redemption rights, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares sold in this offering. We believe the restriction described above will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to redeem their shares as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights against a business combination if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem to no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including all shares held by those stockholders that hold more than 20% of the shares sold in this offering) for or against our business combination. |

26

Table of Contents

| | |
|---|---|
| Redemption rights in connection with proposed amendments to our certificate of incorporation | Some other blank check companies have a provision in their charter which prohibits the amendment of certain charter provisions. Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the Delaware General Corporation Law, or DGCL, or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. Our sponsor, executive officers, and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable) divided by the number of then outstanding public shares. This redemption right shall apply in the event of the approval of any such amendment, whether proposed by our sponsor, any executive officer, director or director nominee, or any other person. Our sponsor, officers and directors have entered into a letter agreement with us pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. |

27

Table of Contents

| | |
|---|---|
| Release of funds in trust account on closing of our initial business combination | On the completion of our initial business combination, all amounts held in the trust account will be released to us. We will use these funds to pay amounts due to any public stockholders who exercise their redemption rights as described above under "Redemption rights for public stockholders upon completion of our initial business combination," to pay the underwriters their deferred underwriting commissions, to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of post-transaction businesses, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. |
| Redemption of public shares and distribution and liquidation if no initial business combination | Our amended and restated certificate of incorporation provides that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period. |

28

Table of Contents

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

The underwriters have agreed to waive their rights to their deferred underwriting commission held in the trust account in the event we do not complete our initial business combination and subsequently liquidate and, in such event, such amounts will be included with the funds held in the trust account that will be available to fund the redemption of our public shares.

Limited payments to insiders

There will be no finder's fees, reimbursements or cash payments made to our sponsor, officers or directors, or our or their affiliates, for services rendered to us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment of an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

29

Table of Contents

| | |
|---|---|
| Audit Committee | We will establish and maintain an audit committee, which will be composed entirely of independent directors to, among other things, monitor compliance with the terms described above and the other terms relating to this offering. If any noncompliance is identified, then the audit committee will be charged with the responsibility to immediately take all action necessary to rectify such noncompliance or otherwise to cause compliance with the terms of this offering. For more information, see the section of this prospectus entitled "Management— Committees of the Board of Directors—Audit Committee." |
| Conflicts of Interest | Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates, including Fund VI, may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware, unless presented to such member specifically in his or her capacity as an officer of the company. Riverstone and/or our management, in their capacities as employees of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. |
| | Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle. |

30

Table of Contents

| | |
|---|---|
| Indemnity | Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or by a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses. |

### Risks

We are a newly formed company that has conducted no operations and has generated no revenues. Until we complete our initial business combination, we will have no operations and will generate no operating revenues. In making your decision whether to invest in our securities, you should take into account not only the background of our management team, but also the special risks we face as a blank check company. This offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. Accordingly, you will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. For additional information concerning how Rule 419 blank check offerings differ from this offering, please see the section of this prospectus entitled "Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419." You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."

31

Table of Contents

**Summary Financial Data**

The following table summarizes the relevant financial data for our business and should be read with our financial statements, which are included in this prospectus. We have not had any significant operations to date, so only balance sheet data is presented.

| | December 31, 2016 | |
| | Actual | As Adjusted(1) |
|---|---|---|
| **Balance Sheet Data:** | | |
| Working capital (deficiency) | $ (146,552) | $ 869,523,000(2) |
| Total assets | $ 395,052 | $ 901,023,000(3) |
| Total liabilities | $ 372,052(7) $ | 31,500,000(4) |
| Value of Class A common stock that may be redeemed in connection with our initial business combination ($10.00 per share) | $ — | $ 864,522,990(5) |
| Stockholders' equity | $ 23,000 | $ 5,000,010(6) |

(1)  Excludes gross proceeds of $400,000,000 from the sale of the forward purchase securities that is expected to close simultaneously with the closing of our initial business combination.

(2)  The "as adjusted" calculation includes $900,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,000,000 in cash held outside the trust account, plus $23,000 of actual stockholder's equity as of December 31, 2016, less $31,500,000 of deferred underwriting commissions.

(3)  The "as adjusted" calculation equals $900,000,000 cash held in trust from the proceeds of this offering and the sale of the private placement warrants, plus $1,000,000 in cash held outside the trust account plus $23,000 of actual stockholder's equity as of December 31, 2016.

(4)  The "as adjusted" calculation includes $31,500,000 of deferred underwriting commissions.

(5)  The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the "as adjusted" stockholders' equity, which is set to approximate the minimum net tangible assets threshold of at least $5,000,001.

(6)  Excludes 86,452,299 shares of Class A common stock purchased in the public market which are subject to redemption in connection with our initial business combination. The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the value of Class A common stock that may be redeemed in connection with our initial business combination (approximately $10.00 per share).

(7)  During the period ended December 31, 2016, our sponsor loaned us $300,000 to be used for a portion of the expenses of this offering. This amount will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

If no business combination is completed within 24 months from the closing of this offering, the proceeds then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), will be used to fund the redemption of our public shares. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have

agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within such 24 month time period.

32

Table of Contents

## RISK FACTORS

*An investment in our securities involves a high degree of risk. You should consider carefully all of the risks described below, together with the other information contained in this prospectus, before making a decision to invest in our units. If any of the following events occur, our business, financial condition and operating results may be materially adversely affected. In that event, the trading price of our securities could decline, and you could lose all or part of your investment.*

**We are a newly formed company with no operating history and no revenues, and you have no basis on which to evaluate our ability to achieve our business objective.**

We are a newly formed company with no operating results, and we will not commence operations until obtaining funding through this offering. Because we lack an operating history, you have no basis upon which to evaluate our ability to achieve our business objective of completing our initial business combination with one or more target businesses. We have no plans, arrangements or understandings with any prospective target business concerning a business combination and may be unable to complete our business combination. If we fail to complete our business combination, we will never generate any operating revenues.

**Our public stockholders may not be afforded an opportunity to vote on our proposed business combination, which means we may complete our initial business combination even though a majority of our public stockholders do not support such a combination.**

We may not hold a stockholder vote to approve our initial business combination unless the business combination would require stockholder approval under applicable law or stock exchange listing requirements or if we decide to hold a stockholder vote for business or other legal reasons. Except as required by law, the decision as to whether we will seek stockholder approval of a proposed business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors, such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Accordingly, we may complete our initial business combination even if holders of a majority of our public shares do not approve of the business combination we complete. Please see the section of this prospectus entitled "Proposed Business —Stockholders May Not Have the Ability to Approve our Initial Business Combination" for additional information.

**If we seek stockholder approval of our initial business combination, our initial stockholders have agreed to vote in favor of such initial business combination, regardless of how our public stockholders vote.**

Unlike many other blank check companies in which the initial stockholders agree to vote their founder shares in accordance with the majority of the votes cast by the public stockholders in connection with an initial business combination, our initial stockholders have agreed to vote their founder shares, as well as any public shares purchased during or after this offering, in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Our initial stockholders will own shares representing 20% of our outstanding shares of common stock immediately following the completion of this offering. Accordingly, if we seek stockholder approval of our initial business combination, it is more likely that the necessary stockholder approval will be received than would be the case if our initial stockholders agreed to vote their founder shares in accordance with the majority of the votes cast by our public stockholders.

33

Table of Contents

*In evaluating a prospective target business for our initial business combination, our management will rely on the availability of all of the funds from the sale of the forward purchase securities to be used as part of the consideration to the sellers in the initial business combination. If the sale of some or all of the forward purchase securities fails to close, we may lack sufficient funds to consummate our initial business combination.*

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination.

The funds from the sale of the forward purchase securities are expected to be used as part of the consideration to the sellers in our initial business combination, and to pay expenses in connection with our initial business combination and may be used, with the agreement of Fund VI Holdings, for working capital in the post-transaction company. If Fund VI Holdings does not agree to fund more than the amount necessary to complete the initial business combination, the post-transaction company may not have enough cash available for working capital. The obligations under the forward purchase agreements do not depend on whether any public stockholders elect to redeem their shares in connection with our initial business combination and provide us with a minimum funding level for the initial business combination. However, if the sale of the forward purchase securities does not close by reason of the failure of Fund VI Holdings or any Forward Transferee to fund the purchase price for their forward purchase securities, for example, we may lack sufficient funds to consummate our initial business combination. In addition, Fund VI Holding's obligation to purchase forward purchase securities is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI. Accordingly, if we pursue an acquisition target that is outside of Fund VI's investment objectives, Fund VI Holdings would not be obligated to purchase any forward purchase securities, and we may need to seek alternative financing. Additionally, Fund VI Holdings's and any Forward Transferee's obligations to purchase the forward purchase securities are subject to termination prior to the closing of the sale of such securities by mutual written consent of the Company and such party, or automatically: (i) if this offering is not consummated on or prior to June 30, 2017; (ii) if our initial business combination is not consummated within 24 months from the closing of this offering, unless extended up to a maximum of sixty (60) days in accordance with our amended and restated certificate of incorporation; or (iii) if our sponsor or we become subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of our sponsor or us, in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, Fund VI Holdings's obligations to purchase the forward purchase securities are subject to fulfillment of customary closing conditions, including that our initial business combination must be consummated substantially concurrently with the purchase of the forward purchase securities. In the event of any such failure to fund by Fund VI Holdings or any Forward Transferee, any obligation is so terminated or any such condition is not satisfied and not waived by such party, we may not be able to obtain additional funds to account for such shortfall on terms favorable to us or at all. Any such shortfall would also reduce the amount of funds that we have available for working capital of the post-business combination company.

*Your only opportunity to affect the investment decision regarding a potential business combination will be limited to the exercise of your right to redeem your shares from us for cash, unless we seek stockholder approval of the business combination.*

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses. Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote. Accordingly,

34

Table of Contents

if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

***The ability of our public stockholders to redeem their shares for cash may make our financial condition unattractive to potential business combination targets, which may make it difficult for us to enter into a business combination with a target.***

We may seek to enter into a business combination transaction agreement with a prospective target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights, we would not be able to meet such closing condition and, as a result, would not be able to proceed with the business combination. Furthermore, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. Consequently, if accepting all properly submitted redemption requests would cause our net tangible assets to be less than $5,000,001 or such greater amount necessary to satisfy a closing condition as described above, we would not proceed with such redemption and the related business combination and may instead search for an alternate business combination. Prospective targets will be aware of these risks and, thus, may be reluctant to enter into a business combination transaction with us.

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares may not allow us to complete the most desirable business combination or optimize our capital structure.***

At the time we enter into an agreement for our initial business combination, we will not know how many stockholders may exercise their redemption rights, and therefore will need to structure the transaction based on our expectations as to the number of shares that will be submitted for redemption. If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, we will need to reserve a portion of the cash in the trust account to meet such requirements, or arrange for third party financing. In addition, if a larger number of shares are submitted for redemption than we initially expected, we may need to restructure the transaction to reserve a greater portion of the cash in the trust account or arrange for third party financing. Raising additional third party financing may involve dilutive equity issuances or the incurrence of indebtedness at higher than desirable levels. The above considerations may limit our ability to complete the most desirable business combination available to us or optimize our capital structure. The amount of the deferred underwriting commissions payable to the underwriters will not be adjusted for any shares that are redeemed in connection with a business combination. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the deferred underwriting commission and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the deferred underwriting commissions.

***The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares could increase the probability that our initial business combination would be unsuccessful and that you would have to wait for liquidation in order to redeem your stock.***

If our business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, the probability that our initial business combination would be unsuccessful is increased. If our initial business combination is unsuccessful, you would not receive your pro rata portion of the trust account until we liquidate the trust account. If you are in need of immediate liquidity, you could attempt to sell your

Table of Contents

stock in the open market; however, at such time our stock may trade at a discount to the pro rata amount per share in the trust account. In either situation, you may suffer a material loss on your investment or lose the benefit of funds expected in connection with our redemption until we liquidate or you are able to sell your stock in the open market.

***The requirement that we complete our initial business combination within the prescribed time frame may give potential target businesses leverage over us in negotiating a business combination and may decrease our ability to conduct due diligence on potential business combination targets as we approach our dissolution deadline, which could undermine our ability to complete our business combination on terms that would produce value for our stockholders.***

Any potential target business with which we enter into negotiations concerning a business combination will be aware that we must complete our initial business combination within 24 months from the closing of this offering. Consequently, such target business may obtain leverage over us in negotiating a business combination, knowing that if we do not complete our initial business combination with that particular target business, we may be unable to complete our initial business combination with any target business. This risk will increase as we get closer to the timeframe described above. In addition, we may have limited time to conduct due diligence and may enter into our initial business combination on terms that we would have rejected upon a more comprehensive investigation.

***We may not be able to complete our initial business combination within the prescribed time frame, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.***

Our amended and restated certificate of incorporation provides that we must complete our initial business combination within 24 months from the closing of this offering. We may not be able to find a suitable target business and complete our initial business combination within such time period. If we have not completed our initial business combination within such time period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, our public stockholders may only receive $10.00 per share, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors and their affiliates may elect to purchase shares from public stockholders, which may influence a vote on a proposed business combination and reduce the public "float" of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business

36

Table of Contents

combination, although they are under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business combination, or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our Class A common stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on a national securities exchange.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our business combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

We will comply with the tender offer rules or proxy rules, as applicable, when conducting redemptions in connection with our business combination. Despite our compliance with these rules, if a stockholder fails to receive our tender offer or proxy materials, as applicable, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the tender offer documents or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will describe the various procedures that must be complied with in order to validly tender or redeem public shares. For example, we may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. In the event that a stockholder fails to comply with these or any other procedures, its shares may not be redeemed. See the section of this prospectus entitled "Proposed Business—Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination—Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights."

***You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares or warrants, potentially at a loss.***

Our public stockholders will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete an initial business combination within 24 months from the closing of this offering, subject to applicable law and as further described herein. In addition, if we are unable to complete an initial business combination within 24 months from the closing of this offering for any reason, compliance with Delaware law may require that we submit a plan of dissolution to our then-existing stockholders for approval prior to the distribution of the proceeds held in our trust account. In that case, public stockholders may be forced to wait beyond 24 months from the closing of this offering before they

37

Table of Contents

receive funds from our trust account. In no other circumstances will a public stockholder have any right or interest of any kind in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your public shares or warrants, potentially at a loss.

***NASDAQ may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

We have been approved to have our units listed on NASDAQ on or promptly after the date of this prospectus and our Class A common stock and warrants listed on or promptly after their date of separation. Although after giving effect to this offering we expect to meet, on a pro forma basis, the minimum initial listing standards set forth in the NASDAQ listing standards, we cannot assure you that our securities will be, or will continue to be, listed on NASDAQ in the future or prior to our initial business combination. In order to continue listing our securities on NASDAQ prior to our initial business combination, we must maintain certain financial, distribution and stock price levels. Generally, we must maintain a minimum amount in stockholders' equity (generally $2,500,000) and a minimum number of holders of our securities (generally 300 public holders). Additionally, in connection with our initial business combination, we will be required to demonstrate compliance with NASDAQ's initial listing requirements, which are more rigorous than NASDAQ's continued listing requirements, in order to continue to maintain the listing of our securities on NASDAQ. For instance, our stock price would generally be required to be at least $4.00 per share and our stockholders' equity would generally be required to be at least $5.0 million. We cannot assure you that we will be able to meet those initial listing requirements at that time.

If NASDAQ delists our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect our securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Class A common stock is a "penny stock" which will require brokers trading in our Class A common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because we expect that our units and eventually our Class A common stock and warrants will be listed on NASDAQ, our units, Class A common stock and warrants will be covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the State of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on NASDAQ, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities.

***You will not be entitled to protections normally afforded to investors of many other blank check companies.***

Since the net proceeds of this offering and the sale of the private placement warrants are intended to be used to complete an initial business combination with a target business that has not been

38

Table of Contents

identified, we may be deemed to be a "blank check" company under the United States securities laws. However, because we will have net tangible assets in excess of $5,000,000 upon the successful completion of this offering and the sale of the private placement warrants and will file a Current Report on Form 8-K, including an audited balance sheet demonstrating this fact, we are exempt from rules promulgated by the SEC to protect investors in blank check companies, such as Rule 419. Accordingly, investors will not be afforded the benefits or protections of those rules. Among other things, this means our units will be immediately tradable and we will have a longer period of time to complete our business combination than do companies subject to Rule 419. Moreover, if this offering were subject to Rule 419, that rule would prohibit the release of any interest earned on funds held in the trust account to us unless and until the funds in the trust account were released to us in connection with our completion of an initial business combination. For a more detailed comparison of our offering to offerings that comply with Rule 419, please see the section of this prospectus entitled "Proposed Business —Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419."

***If we seek stockholder approval of our initial business combination and we do not conduct redemptions pursuant to the tender offer rules, and if you or a "group" of stockholders are deemed to hold in excess of 20% of our Class A common stock, you will lose the ability to redeem all such shares in excess of 20% of our Class A common stock.***

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." However, our amended and restated certificate of incorporation does not restrict our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Your inability to redeem the Excess Shares will reduce your influence over our ability to complete our business combination and you could suffer a material loss on your investment in us if you sell Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Excess Shares if we complete our business combination. And as a result, you will continue to hold that number of shares exceeding 20% and, in order to dispose of such shares, would be required to sell your stock in open market transactions, potentially at a loss.

***Because of our limited resources and the significant competition for business combination opportunities, it may be more difficult for us to complete our initial business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on our redemption of our public shares, or less than such amount in certain circumstances, and our warrants will expire worthless.***

We expect to encounter intense competition from other entities having a business objective similar to ours, including private investors (which may be individuals or investment partnerships), other blank check companies and other entities, domestic and international, competing for the types of businesses we intend to acquire. Many of these individuals and entities are well-established and have extensive experience in identifying and effecting, directly or indirectly, acquisitions of companies operating in or providing services to various industries. Many of these competitors possess greater technical, human and other resources or more local industry knowledge than we do and our financial resources will be relatively limited when contrasted with those of many of these competitors. While we believe there are numerous target businesses we could potentially acquire with the net proceeds of this offering and the sale of the private placement warrants, our ability to compete with respect to the acquisition of certain target businesses that are sizable will be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses.

39

1/8/24, 2:00 PM
Case 4:19-cv-00957    Document 672-5    Filed on 02/16/24 in TXSD    Page 435 of 845
Document672-5.edgar/data/1690769/000104746917001986/a2231531z424b4.htm

Table of Contents

Furthermore, because we are obligated to pay cash for the shares of Class A common stock which our public stockholders redeem in connection with our initial business combination, target companies will be aware that this may reduce the resources available to us for our initial business combination. This may place us at a competitive disadvantage in successfully negotiating a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient to allow us to operate for at least the next 24 months, we may be unable to complete our initial business combination, in which case our public stockholders may only receive $10.00 per share, or less than such amount in certain circumstances, and our warrants will expire worthless.***

The funds available to us outside of the trust account may not be sufficient to allow us to operate for at least the next 24 months, assuming that our initial business combination is not completed during that time. We believe that, upon the closing of this offering, the funds available to us outside of the trust account will be sufficient to allow us to operate for at least the next 24 months; however, we cannot assure you that our estimate is accurate. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent or merger agreements designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into a letter of intent or merger agreement where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share upon our liquidation. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***If the net proceeds of this offering and the sale of the private placement warrants not being held in the trust account are insufficient, it could limit the amount available to fund our search for a target business or businesses and complete our initial business combination and we will depend on loans from our sponsor or management team to fund our search for a business combination, to pay our franchise and income taxes and to complete our initial business combination. If we are unable to obtain these loans, we may be unable to complete our initial business combination.***

Of the net proceeds of this offering and the sale of the private placement warrants, only approximately $1,000,000 will be available to us initially outside the trust account to fund our working capital requirements. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount. If we are required to seek additional capital, we would need to borrow funds from our sponsor, management team or other third parties to operate or may be forced to liquidate. None of our sponsor, members of

40

Table of Contents

our management team nor any of their affiliates is under any obligation to advance funds to us in such circumstances. Any such advances would be repaid only from funds held outside the trust account or from funds released to us upon completion of our initial business combination. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account. If we are unable to obtain these loans, we may be unable to complete our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. Consequently, our public stockholders may only receive approximately $10.00 per share on our redemption of our public shares, and our warrants will expire worthless. In certain circumstances, our public stockholders may receive less than $10.00 per share on the redemption of their shares. See "—If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share" and other risk factors below.

***Subsequent to the completion of our initial business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Even if we conduct extensive due diligence on a target business with which we combine, we cannot assure you that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject as a result of assuming pre-existing debt held by a target business or by virtue of our obtaining post-combination debt financing. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Our placing of funds in the trust account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

41

Table of Contents

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of our public shares, if we are unable to complete our business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the trust account, due to claims of such creditors. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes. This liability will not apply with respect to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Our directors may decide not to enforce the indemnification obligations of our sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public stockholders.***

In the event that the proceeds in the trust account are reduced below the lesser of (i) $10.00 per public share or (ii) such lesser amount per share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations.

While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to our public stockholders may be reduced below $10.00 per share.

42

Table of Contents

***If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***If we are deemed to be an investment company under the Investment Company Act, we may be required to institute burdensome compliance requirements and our activities may be restricted, which may make it difficult for us to complete our business combination.***

If we are deemed to be an investment company under the Investment Company Act, our activities may be restricted, including:

- restrictions on the nature of our investments; and

- restrictions on the issuance of securities, each of which may make it difficult for us to complete our business combination.

In addition, we may have imposed upon us burdensome requirements, including:

- registration as an investment company;

- adoption of a specific form of corporate structure; and

- reporting, record keeping, voting, proxy and disclosure requirements and other rules and regulations.

In order not to be regulated as an investment company under the Investment Company Act, unless we can qualify for an exclusion, we must ensure that we are engaged primarily in a business other than investing, reinvesting or trading of securities and that our activities do not include investing, reinvesting, owning, holding or trading "investment securities" constituting more than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. Our business will be to identify and complete a business combination and thereafter to operate the post-transaction business or assets for the long term. We do not plan to buy businesses or assets with a view to resale or profit from their resale. We do not plan to buy unrelated businesses or assets or to be a passive investor.

43

Table of Contents

We do not believe that our anticipated principal activities will subject us to the Investment Company Act. To this end, the proceeds held in the trust account may only be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. Pursuant to the trust agreement, the trustee is not permitted to invest in other securities or assets. By restricting the investment of the proceeds to these instruments, and by having a business plan targeted at acquiring and growing businesses for the long term (rather than on buying and selling businesses in the manner of a merchant bank or private equity fund), we intend to avoid being deemed an "investment company" within the meaning of the Investment Company Act. This offering is not intended for persons who are seeking a return on investments in government securities or investment securities. The trust account is intended as a holding place for funds pending the earliest to occur of: (i) the completion of our primary business objective, which is a business combination; (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering; or (iii) absent a business combination, our return of the funds held in the trust account to our public stockholders as part of our redemption of the public shares. If we do not invest the proceeds as discussed above, we may be deemed to be subject to the Investment Company Act. If we were deemed to be subject to the Investment Company Act, compliance with these additional regulatory burdens would require additional expenses for which we have not allotted funds and may hinder our ability to complete a business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

### Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations.

We are subject to laws and regulations enacted by national, regional and local governments. In particular, we will be required to comply with certain SEC and other legal requirements. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming and costly. Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business and results of operations.

### Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

44

Table of Contents

However, it is our intention to redeem our public shares as soon as reasonably possible following the 24th month from the closing of this offering in the event we do not complete our business combination and, therefore, we do not intend to comply with the foregoing procedures.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the 10 years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 24 months from the closing of this offering is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***We may not hold an annual meeting of stockholders until after the consummation of our initial business combination, which could delay the opportunity for our stockholders to elect directors.***

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

***We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis and potentially causing such warrants to expire worthless.***

We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed to use our best efforts to file a registration statement under the Securities Act covering such shares and maintain a current prospectus relating to the Class A common stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by

45

Table of Contents

reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption from registration is available. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Class A common stock included in the units. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying shares of Class A common stock for sale under all applicable state securities laws.

***The grant of registration rights to our initial stockholders and holders of our forward purchase securities may make it more difficult to complete our initial business combination, and the future exercise of such rights may adversely affect the market price of our Class A common stock.***

Pursuant to an agreement to be entered into concurrently with the issuance and sale of the securities in this offering, our initial stockholders and their permitted transferees can demand that we register the shares of Class A common stock into which founder shares are convertible, holders of our private placement warrants and their permitted transferees can demand that we register the private placement warrants and the shares of Class A common stock issuable upon exercise of the private placement warrants and holders of warrants that may be issued upon conversion of working capital loans may demand that we register such warrants or the Class A common stock issuable upon exercise of such warrants. Pursuant to the forward purchase agreement, we have agreed that we will use our commercially reasonable efforts to file within 30 days after the closing of the initial business combination a registration statement with the SEC for a secondary offering of the forward purchase shares and the forward purchase warrants (and the underlying Class A common stock) and to cause such registration statement to be declared effective as soon as practicable after it is filed. Assuming the founder shares convert on a one-for-one basis and no warrants are issued upon conversion of working capital loans, an aggregate of up to 89,166,666 shares of Class A common stock and up to 26,666,666 warrants (or up to 94,341,666 shares of Class A common stock and up to 28,466,666 warrants if the over-allotment option is exercised in full) are subject to registration under these agreements. We will bear the cost of registering these securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of our Class A common stock. In addition, the existence of the registration rights may make our initial business combination more costly or difficult to conclude. This is because the stockholders of the target business may increase the equity stake they seek in the combined entity or ask for more cash consideration to offset the negative impact on the market price of our Class A common stock that is expected when the securities owned by our initial stockholders, holders of our forward purchase securities or holders of working capital loans or their respective permitted transferees are registered.

46

Table of Contents

***Because we are not limited to a particular industry, sector or any specific target businesses with which to pursue our initial business combination, you will be unable to ascertain the merits or risks of any particular target business' operations.***

Although we expect to focus our search for a target business in the energy industry, we may seek to complete a business combination with an operating company in any industry or sector. However, we will not, under our amended and restated certificate of incorporation, be permitted to effectuate our business combination with another blank check company or similar company with nominal operations. Because we have not yet identified or approached any specific target business with respect to a business combination, there is no basis to evaluate the possible merits or risks of any particular target business's operations, results of operations, cash flows, liquidity, financial condition or prospects. To the extent we complete our business combination, we may be affected by numerous risks inherent in the business operations with which we combine. For example, if we combine with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all of the significant risk factors or that we will have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business. We also cannot assure you that an investment in our units will ultimately prove to be more favorable to investors than a direct investment, if such opportunity were available, in a business combination target. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Because we intend to seek a business combination with a target business in the energy industry, we expect our future operations to be subject to risks associated with this industry.***

We intend to focus our search for a target business in the energy industry. Riverstone has historically focused on four sectors in this industry, including exploration and production, midstream, energy services, and power and coal. Accordingly, we may pursue a target business in these sectors or any other sector within the energy industry. In addition, Fund VI Holding's obligation to purchase forward purchase securities is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI. This condition may make it more likely that we will pursue a target in the energy industry and be subject to the risks associated with this industry. Because we have not yet identified or approached any specific target business or sector, we cannot provide specific risks of any business combination. However, risks inherent in investments in the energy industry include, but are not limited to, the following:

- Volatility of oil and natural gas prices;

- Price and availability of alternative fuels, such as solar, coal, nuclear and wind energy;

- Competitive pressures in the utility industry, primarily in wholesale markets, as a result of consumer demand, technological advances, greater availability of natural gas and other factors;

- Significant federal, state and local regulation, taxation and regulatory approval processes as well as changes in applicable laws and regulations;

- The speculative nature of and high degree of risk involved in investments in the exploration and development sector, including relying on estimates of oil and gas reserves and the impacts of regulatory and tax changes;

47

Table of Contents

- Drilling, exploration and development risks, including encountering unexpected formations or pressures, premature declines of reservoirs, blow-outs, equipment failures and other accidents, cratering, sour gas releases, uncontrollable flows of oil, natural gas or well fluids, adverse weather conditions, pollution, fires, spills and other environmental risks, any of which could lead to environmental damage, injury and loss of life or the destruction of property;

- Proximity and capacity of oil, natural gas and other transportation and support infrastructure to production facilities;

- Availability of key inputs, such as strategic consumables, raw materials and drilling and processing equipment;

- Changes in global supply and demand and prices for commodities;

- Impact of energy conservation efforts;

- Technological advances affecting energy production and consumption;

- Overall domestic and global economic conditions;

- Availability of, and potential disputes with, independent contractors;

- Natural disasters, terrorist acts and similar dislocations; and

- Value of U.S. dollar relative to the currencies of other countries.

***Past performance by Riverstone, including our management team, may not be indicative of future performance of an investment in the Company.***

Information regarding performance by, or businesses associated with, Riverstone and its affiliates is presented for informational purposes only. Past performance by Riverstone, including our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to locate a suitable business combination candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management team's performance as indicative of our future performance of an investment in the company or the returns the company will, or is likely to, generate going forward.

***We may seek acquisition opportunities in industries or sectors which may or may not be outside of our management's area of expertise.***

We will consider a business combination outside of our management's area of expertise if a business combination candidate is presented to us and we determine that such candidate offers an attractive acquisition opportunity for our company. Although our management will endeavor to evaluate the risks inherent in any particular business combination candidate, we cannot assure you that we will adequately ascertain or assess all of the significant risk factors. We also cannot assure you that an investment in our units will not ultimately prove to be less favorable to investors in this offering than a direct investment, if an opportunity were available, in a business combination candidate. In the event we elect to pursue an acquisition outside of the areas of our management's expertise, our management's expertise may not be directly applicable to its evaluation or operation, and the information contained in this prospectus regarding the areas of our management's expertise would not be relevant to an understanding of the business that we elect to acquire. As a result, our management may not be able to adequately ascertain or assess all of the significant risk factors. Accordingly, any stockholders who choose to remain stockholders following our business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

48

Table of Contents

***Although we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses, we may enter into our initial business combination with a target that does not meet such criteria and guidelines, and as a result, the target business with which we enter into our initial business combination may not have attributes entirely consistent with our general criteria and guidelines.***

Although we have identified general criteria and guidelines for evaluating prospective target businesses, it is possible that a target business with which we enter into our initial business combination will not have all of these positive attributes. If we complete our initial business combination with a target that does not meet some or all of these guidelines, such combination may not be as successful as a combination with a business that does meet all of our general criteria and guidelines. In addition, if we announce a prospective business combination with a target that does not meet our general criteria and guidelines, a greater number of stockholders may exercise their redemption rights, which may make it difficult for us to meet any closing condition with a target business that requires us to have a minimum net worth or a certain amount of cash. In addition, if stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, it may be more difficult for us to attain stockholder approval of our initial business combination if the target business does not meet our general criteria and guidelines. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

***We may seek acquisition opportunities with a financially unstable business or an entity lacking an established record of revenue or earnings, which could subject us to volatile revenues or earnings or difficulty in retaining key personnel.***

To the extent we complete our initial business combination with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by numerous risks inherent in the operations of the business with which we combine. These risks include volatile revenues or earnings and difficulties in obtaining and retaining key personnel. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not be able to properly ascertain or assess all of the significant risk factors and we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business.

***We are not required to obtain an opinion from an independent investment banking firm or from an independent accounting firm, and consequently, you may have no assurance from an independent source that the price we are paying for the business is fair to our company from a financial point of view.***

Unless we complete our business combination with an affiliated entity or our board cannot independently determine the fair market value of the target business or businesses, we are not required to obtain an opinion from an independent investment banking firm that is a member of FINRA or from an independent accounting firm that the price we are paying is fair to our company from a financial point of view. If no opinion is obtained, our stockholders will be relying on the judgment of our board of directors, who will determine fair market value based on standards generally accepted by the financial community. Such standards used will be disclosed in our proxy solicitation or tender offer materials, as applicable, related to our initial business combination.

49

Table of Contents

*We may issue additional common stock or preferred stock to complete our initial business combination or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon the conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. Any such issuances would dilute the interest of our stockholders and likely present other risks.*

Our amended and restated certificate of incorporation will authorize the issuance of up to 400,000,000 shares of Class A common stock, par value $0.0001 per share, 50,000,000 shares of Class B common stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. Immediately after this offering, there will be 310,000,000 and 27,500,000 (assuming, in each case, that the underwriters have not exercised their over-allotment option) authorized but unissued shares of Class A common stock and Class B common stock, respectively, available for issuance, which amount does not take into account the shares of Class A common stock reserved for issuance upon exercise of any outstanding warrants, the forward purchase shares or the shares of Class A common stock issuable upon conversion of Class B common stock. Immediately after the consummation of this offering, there will be no shares of preferred stock issued and outstanding. Shares of Class B common stock are convertible into shares of our Class A common stock initially at a one-for-one ratio but subject to adjustment as set forth herein, including in certain circumstances in which we issue Class A common stock or equity-linked securities related to our initial business combination. Shares of Class B common stock are also convertible at the option of the holder at any time.

We may issue a substantial number of additional shares of common or preferred stock to complete our initial business combination (including pursuant to a specified future issuance) or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon conversion of the Class B common stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. However, our amended and restated certificate of incorporation will provide, among other things, that prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination. The issuance of additional shares of common or preferred stock:

- may significantly dilute the equity interest of investors in this offering;

- may subordinate the rights of holders of common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change of control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and

- may adversely affect prevailing market prices for our units, Class A common stock and/or warrants.

*Resources could be wasted in researching acquisitions that are not completed, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share, or less than such amount in certain circumstances, on the liquidation of our trust account and our warrants will expire worthless.*

We anticipate that the investigation of each specific target business and the negotiation, drafting and execution of relevant agreements, disclosure documents and other instruments will require

50

Table of Contents

substantial management time and attention and substantial costs for accountants, attorneys and others. If we decide not to complete a specific initial business combination, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to complete our initial business combination for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of our trust account and our warrants will expire worthless.

***Our ability to successfully effect our initial business combination and to be successful thereafter will be totally dependent upon the efforts of our key personnel, some of whom may join us following our initial business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.***

Our ability to successfully effect our business combination is dependent upon the efforts of our key personnel. The role of our key personnel in the target business, however, cannot presently be ascertained. Although some of our key personnel may remain with the target business in senior management or advisory positions following our business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we engage after our initial business combination, we cannot assure you that our assessment of these individuals will prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

In addition, the officers and directors of an acquisition candidate may resign upon completion of our initial business combination. The departure of a business combination target's key personnel could negatively impact the operations and profitability of our post-combination business. The role of an acquisition candidate's key personnel upon the completion of our initial business combination cannot be ascertained at this time. Although we contemplate that certain members of an acquisition candidate's management team will remain associated with the acquisition candidate following our initial business combination, it is possible that members of the management of an acquisition candidate will not wish to remain in place. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.

***Our key personnel may negotiate employment or consulting agreements with a target business in connection with a particular business combination. These agreements may provide for them to receive compensation following our business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.***

Our key personnel may be able to remain with the company after the completion of our business combination only if they are able to negotiate employment or consulting agreements in connection with the business combination. Such negotiations would take place simultaneously with the negotiation of the business combination and could provide for such individuals to receive compensation in the form of cash payments and/or our securities for services they would render to us after the completion of the business combination. The personal and financial interests of such individuals may influence their motivation in identifying and selecting a target business. However, we believe the ability of such individuals to remain with us after the completion of our business combination will not be the determining factor in our decision as to whether or not we will proceed with any potential business combination. There is no certainty, however, that any of our key personnel will remain with us after the completion of our business combination. We cannot assure you that any of our key personnel will

51

Table of Contents

remain in senior management or advisory positions with us. The determination as to whether any of our key personnel will remain with us will be made at the time of our initial business combination.

*We may have a limited ability to assess the management of a prospective target business and, as a result, may effect our initial business combination with a target business whose management may not have the skills, qualifications or abilities to manage a public company, which could, in turn, negatively impact the value of our stockholders' investment in us.*

When evaluating the desirability of effecting our initial business combination with a prospective target business, our ability to assess the target business's management may be limited due to a lack of time, resources or information. Our assessment of the capabilities of the target's management, therefore, may prove to be incorrect and such management may lack the skills, qualifications or abilities we suspected. Should the target's management not possess the skills, qualifications or abilities necessary to manage a public company, the operations and profitability of the post-combination business may be negatively impacted. Accordingly, any stockholders who choose to remain stockholders following the business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

*Our officers and directors will allocate their time to other businesses thereby causing conflicts of interest in their determination as to how much time to devote to our affairs. This conflict of interest could have a negative impact on our ability to complete our initial business combination.*

Our officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between our operations and our search for a business combination and their other businesses. We do not intend to have any full-time employees prior to the completion of our initial business combination. Each of our officers is engaged in several other business endeavors for which he may be entitled to substantial compensation and our officers are not obligated to contribute any specific number of hours per week to our affairs. In particular, certain of our officers and directors are employed by Riverstone, which is an investment manager to various private investment funds, including Fund VI, which make investments in securities or other interests of or relating to companies in industries we may target for our initial business combination. Our independent directors also serve as officers or board members for other entities. If our officers' and directors' other business affairs require them to devote substantial amounts of time to such affairs in excess of their current commitment levels, it could limit their ability to devote time to our affairs which may have a negative impact on our ability to complete our initial business combination. For a complete discussion of our officers' and directors' other business affairs, please see the section of this prospectus entitled "Management—Officers and Directors."

*Certain of our officers and directors are now, and all of them may in the future become, affiliated with entities engaged in business activities similar to those intended to be conducted by us and, accordingly, may have conflicts of interest in allocating their time and determining to which entity a particular business opportunity should be presented.*

Following the completion of this offering and until we consummate our initial business combination, we intend to engage in the business of identifying and combining with one or more businesses. Our sponsor and officers and directors are, and may in the future become, affiliated with entities that are engaged in a similar business.

Our officers and directors also may become aware of business opportunities which may be appropriate for presentation to us and the other entities to which they owe certain fiduciary or contractual duties. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us.

52

Table of Contents

Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented. These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

For a complete discussion of our officers' and directors' business affiliations and the potential conflicts of interest that you should be aware of, please see the sections of this prospectus entitled "Management—Officers and Directors," "Management—Conflicts of Interest" and "Certain Relationships and Related Party Transactions."

*Our officers, directors, security holders and their respective affiliates may have competitive pecuniary interests that conflict with our interests.*

We have not adopted a policy that expressly prohibits our directors, officers, security holders or affiliates from having a direct or indirect pecuniary or financial interest in any investment to be acquired or disposed of by us or in any transaction to which we are a party or have an interest. In fact, we may enter into a business combination with a target business that is affiliated with our sponsor, our directors or officers, although we do not intend to do so, or we may acquire a target business through an Affiliated Joint Acquisition with one or more affiliates of Riverstone and/or one or more investors in funds managed by Riverstone. We do not have a policy that expressly prohibits any such persons from engaging for their own account in business activities of the types conducted by us. Accordingly, such persons or entities may have a conflict between their interests and ours.

In particular, Riverstone and its affiliates also are focused on investments in the energy industry. As a result, there may be substantial overlap between companies that would be a suitable business combination for us and companies that would make an attractive target for such other affiliates.

*We may engage in a business combination with one or more target businesses that have relationships with entities that may be affiliated with our sponsor, officers, directors or existing holders which may raise potential conflicts of interest.*

In light of the involvement of our sponsor, officers and directors with other entities, we may decide to acquire one or more businesses affiliated with our sponsor, officers or directors. Our directors also serve as officers and board members for other entities, including, without limitation, those described under the section of this prospectus entitled "Management—Conflicts of Interest." Such entities may compete with us for business combination opportunities. Our sponsor, officers and directors are not currently aware of any specific opportunities for us to complete our business combination with any entities with which they are affiliated, and there have been no preliminary discussions concerning a business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for a business combination as set forth in the section of this prospectus entitled "Proposed Business—Selection of a Target Business and Structuring of our Initial Business Combination" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, regarding the fairness to our company from a financial point of view of a business combination with one or more domestic or international businesses affiliated with our officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest.

53

Table of Contents

Moreover, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties.

***Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination.***

On November 21, 2016, our sponsor acquired an aggregate of 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares after this offering. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. The founder shares will be worthless if we do not complete an initial business combination. In addition, our sponsor has committed to purchase an aggregate of 13,333,333 (or 15,133,333 if the underwriters' over-allotment option is exercised in full) private placement warrants, each exercisable for one share of our Class A common stock at $11.50 per share, for a purchase price of approximately $20,000,000 (or approximately $22,700,000 if the underwriters' over-allotment option is exercised in full), or $1.50 per whole warrant, that will also be worthless if we do not complete a business combination. Holders of founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any founder shares in connection with a stockholder vote to approve a proposed initial business combination. In addition, we may obtain loans from our sponsor, affiliates of our sponsor or an officer or director. The personal and financial interests of our officers and directors may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

***We may issue notes or other debt securities, or otherwise incur substantial debt, to complete a business combination, which may adversely affect our leverage and financial condition and thus negatively impact the value of our stockholders' investment in us.***

Although we have no commitments as of the date of this prospectus to issue any notes or other debt securities, or to otherwise incur outstanding debt following this offering, we may choose to incur substantial debt to complete our business combination. We have agreed that we will not incur any indebtedness unless we have obtained from the lender a waiver of any right, title, interest or claim of any kind in or to the monies held in the trust account. As such, no issuance of debt will affect the per-share amount available for redemption from the trust account. Nevertheless, the incurrence of debt could have a variety of negative effects, including:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

54

Table of Contents

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other disadvantages compared to our competitors who have less debt.

***We may only be able to complete one business combination with the proceeds of this offering and the sale of the private placement warrants and the forward purchase securities, which will cause us to be solely dependent on a single business which may have a limited number of products or services. This lack of diversification may negatively impact our operations and profitability.***

Of the net proceeds from this offering and the sale of the private placement warrants and the forward purchase securities, up to $1,300,000,000 (or $1,435,000,000 if the underwriters' over-allotment option is exercised in full) will be available to complete our business combination and pay related fees and expenses (which includes up to approximately $31,500,000, or up to approximately $36,225,000 if the over-allotment option is exercised in full, for the payment of deferred underwriting commissions).

We may effectuate our business combination with a single target business or multiple target businesses simultaneously or within a short period of time. However, we may not be able to effectuate our business combination with more than one target business because of various factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By completing our initial business combination with only a single entity, our lack of diversification may subject us to numerous economic, competitive and regulatory developments. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities which may have the resources to complete several business combinations in different industries or different areas of a single industry. In addition, we intend to focus our search for an initial business combination in a single industry. Accordingly, the prospects for our success may be:

- solely dependent upon the performance of a single business, property or asset, or

- dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our business combination.

55

Table of Contents

***We may attempt to simultaneously complete business combinations with multiple prospective targets, which may hinder our ability to complete our business combination and give rise to increased costs and risks that could negatively impact our operations and profitability.***

If we determine to simultaneously acquire several businesses that are owned by different sellers, we will need for each of such sellers to agree that our purchase of its business is contingent on the simultaneous closings of the other business combinations, which may make it more difficult for us, and delay our ability, to complete our initial business combination. With multiple business combinations, we could also face additional risks, including additional burdens and costs with respect to possible multiple negotiations and due diligence investigations (if there are multiple sellers) and the additional risks associated with the subsequent assimilation of the operations and services or products of the acquired companies in a single operating business. If we are unable to adequately address these risks, it could negatively impact our profitability and results of operations.

***We may attempt to complete our initial business combination with a private company about which little information is available, which may result in a business combination with a company that is not as profitable as we suspected, if at all.***

In pursuing our acquisition strategy, we may seek to effectuate our initial business combination with a privately held company. Very little public information generally exists about private companies, and we could be required to make our decision on whether to pursue a potential initial business combination on the basis of limited information, which may result in a business combination with a company that is not as profitable as we suspected, if at all.

***Our management may not be able to maintain control of a target business after our initial business combination.***

We may structure a business combination so that the post-transaction company in which our public stockholders own shares will own less than 100% of the equity interests or assets of a target business, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. We will not consider any transaction that does not meet such criteria. Even if the post-transaction company owns 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares of Class A common stock in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% interest in the target. However, as a result of the issuance of a substantial number of new shares of common stock, our stockholders immediately prior to such transaction could own less than a majority of our outstanding shares of common stock subsequent to such transaction. In addition, other minority stockholders may subsequently combine their holdings resulting in a single person or group obtaining a larger share of the company's stock than we initially acquired. Accordingly, this may make it more likely that our management will not be able to maintain our control of the target business. We cannot provide assurance that, upon loss of control of a target business, new management will possess the skills, qualifications or abilities necessary to profitably operate such business.

56

Table of Contents

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a business combination with which a substantial majority of our stockholders do not agree.***

Our amended and restated certificate of incorporation will not provide a specified maximum redemption threshold, except that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (such that we are not subject to the SEC's "penny stock" rules). As a result, we may be able to complete our business combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or, if we seek stockholder approval of our initial business combination and do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, have entered into privately negotiated agreements to sell their shares to our sponsor, officers, directors, advisors or their affiliates. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, all shares of Class A common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***The exercise price for the public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the warrants are more likely to expire worthless.***

The exercise price of the public warrants is higher than is typical in many similar blank check companies in the past. Historically, the exercise price of a warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share. As a result, the warrants are less likely to ever be in the money and more likely to expire worthless.

***In order to effectuate our initial business combination, we may seek to amend our amended and restated certificate of incorporation or other governing instruments, including our warrant agreement, in a manner that will make it easier for us to complete our initial business combination but that our stockholders or warrantholders may not support.***

In order to effectuate a business combination, blank check companies have, in the recent past, amended various provisions of their charters and governing instruments, including their warrant agreement. For example, blank check companies have amended the definition of business combination, increased redemption thresholds, changed industry focus and, with respect to their warrants, amended their warrant agreements to require the warrants to be exchanged for cash and/or other securities. We cannot assure you that we will not seek to amend our charter or other governing instruments or change our industry focus in order to effectuate our initial business combination.

***The provisions of our amended and restated certificate of incorporation that relate to our pre-business combination activity (and corresponding provisions of the agreement governing the release of funds from our trust account) may be amended with the approval of holders of 65% of our common stock, which is a lower amendment threshold than that of some other blank check companies. It may be easier for us, therefore, to amend our amended and restated certificate of incorporation and the trust agreement to facilitate the completion of an initial business combination that some of our stockholders may not support.***

Some other blank check companies have a provision in their charter which prohibits the amendment of certain of its provisions, including those which relate to a company's pre-business combination activity, without approval by a certain percentage of the company's stockholders. In those companies, amendment of these provisions requires approval by between 90% and 100% of the company's public stockholders. Our amended and restated certificate of incorporation will provide that

57

Table of Contents

any of its provisions related to pre-business combination activity (including the requirement to deposit proceeds of this offering and the private placement of warrants into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the DGCL or applicable stock exchange rules. Our initial stockholders, who will collectively beneficially own up to 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. As a result, we may be able to amend the provisions of our amended and restated certificate of incorporation which govern our pre-business combination behavior more easily than some other blank check companies, and this may increase our ability to complete a business combination with which you do not agree. Our stockholders may pursue remedies against us for any breach of our amended and restated certificate of incorporation.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, divided by the number of then outstanding public shares. These agreements are contained in a letter agreement that we have entered into with our sponsor, officers and directors. Our stockholders are not parties to, or third-party beneficiaries of, these agreements and, as a result, will not have the ability to pursue remedies against our sponsor, officers or directors for any breach of these agreements. As a result, in the event of a breach, our stockholders would need to pursue a stockholder derivative action, subject to applicable law.

***We may be unable to obtain additional financing to complete our initial business combination or to fund the operations and growth of a target business, which could compel us to restructure or abandon a particular business combination.***

Although we believe that the net proceeds of this offering and the sale of the private placement warrants and the forward purchase securities will be sufficient to allow us to complete our initial business combination, because we have not yet identified any prospective target business we cannot ascertain the capital requirements for any particular transaction. If the net proceeds of this offering and the sale of the private placement warrants and the forward purchase securities prove to be insufficient, either because of the size of our initial business combination, the depletion of the available net proceeds in search of a target business, the obligation to repurchase for cash a significant number of shares from stockholders who elect redemption in connection with our initial business combination or the terms of negotiated transactions to purchase shares in connection with our initial business combination, we may be required to seek additional financing or to abandon the proposed business combination. We cannot assure you that such financing will be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to complete our initial business combination, we would be compelled to either restructure the transaction or abandon that particular business combination and seek an alternative target business candidate. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.00 per share plus any pro rata interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes on the liquidation of our trust account

58

Table of Contents

and our warrants will expire worthless. In addition, even if we do not need additional financing to complete our business combination, we may require such financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the target business. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after our initial business combination. If we are unable to complete our initial business combination, our public stockholders may only receive approximately $10.00 per share on the liquidation of our trust account, and our warrants will expire worthless.

***Our initial stockholders may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.***

Upon the closing of this offering, our initial stockholders will own shares representing 20% of our issued and outstanding shares of common stock (assuming they do not purchase any units in this offering). Accordingly, they may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support, including amendments to our amended and restated certificate of incorporation and approval of major corporate transactions. If our initial stockholders purchase any units in this offering or if our initial stockholders purchase any additional shares of common stock in the aftermarket or in privately negotiated transactions, this would increase their control. Factors that would be considered in making such additional purchases would include consideration of the current trading price of our Class A common stock. In addition, our board of directors, whose members were elected by our initial stockholders, is and will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. We may not hold an annual meeting of stockholders to elect new directors prior to the completion of our business combination, in which case all of the current directors will continue in office until at least the completion of the business combination. If there is an annual meeting, as a consequence of our "staggered" board of directors, only a minority of the board of directors will be considered for election and our initial stockholders, because of their ownership position, will have considerable influence regarding the outcome. Accordingly, our initial stockholders will continue to exert control at least until the completion of our business combination. The forward purchase shares will not be issued until completion of our initial business combination and, accordingly, will not be included in any stockholder vote until such time.

***Our sponsor contributed an aggregate of $25,000, or approximately $0.002 per founder share, and, accordingly, you will experience immediate and substantial dilution from the purchase of our Class A common stock.***

The difference between the public offering price per share (allocating all of the unit purchase price to the Class A common stock and none to the warrant included in the unit) and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to you and the other investors in this offering. Our sponsor acquired the founder shares at a nominal price, significantly contributing to this dilution. Upon the closing of this offering, and assuming no value is ascribed to the warrants included in the units, you and the other public stockholders will incur an immediate and substantial dilution of approximately 98.1% (or $9.81 per share, assuming no exercise of the underwriters' over-allotment option), the difference between the pro forma net tangible book value per share of $0.19 and the initial offering price of $10.00 per unit. In addition, because of the anti-dilution rights of the founder shares, any equity or equity-linked securities issued in connection with our initial business combination would be disproportionately dilutive to our Class A common stock.

59

Table of Contents

*We may amend the terms of the warrants in a manner that may be adverse to holders of public warrants with the approval by the holders of at least 50% of the then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of shares of our Class A common stock purchasable upon exercise of a warrant could be decreased, all without your approval.*

Our warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, convert the warrants into cash, shorten the exercise period or decrease the number of shares of our Class A common stock purchasable upon exercise of a warrant.

*We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.*

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of such redemption and provided certain other conditions are met. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you (i) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

*Our warrants and founder shares may have an adverse effect on the market price of our Class A common stock and make it more difficult to effectuate our business combination.*

We will be issuing warrants to purchase 30,000,000 shares of our Class A common stock (or up to 34,500,000 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) as part of the units offered by this prospectus and, simultaneously with the closing of this offering, we will be issuing in a private placement warrants to purchase an aggregate of 13,333,333 (or up to 15,133,333 if the underwriters' over-allotment option is exercised in full) shares of Class A common stock at $11.50 per share. In addition, we may also issue warrants to purchase up to 13,333,333 shares of Class A common stock at the closing of our initial business combination pursuant to the forward purchase agreement. Our initial stockholders currently own 25,875,000 founder shares. The founder shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment as set forth herein. In addition, if our sponsor makes any working capital loans, up to $1,500,000 of such loans may be converted into warrants, at the price of $1.50 per warrant at the

60

Table of Contents

option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

To the extent we issue shares of Class A common stock to effectuate a business combination, the potential for the issuance of a substantial number of additional shares of Class A common stock upon exercise of these warrants and conversion rights could make us a less attractive acquisition vehicle to a target business. Any such issuance will increase the number of issued and outstanding shares of our Class A common stock and reduce the value of the shares of Class A common stock issued to complete the business combination. Therefore, our warrants and founder shares may make it more difficult to effectuate a business combination or increase the cost of acquiring the target business.

The private placement warrants are identical to the warrants sold as part of the units in this offering except that, so long as they are held by our sponsor or its permitted transferees, (i) they will not be redeemable by us, (ii) they (including the Class A common stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by our sponsor until 30 days after the completion of our initial business combination and (iii) they may be exercised by the holders on a cashless basis.

**_Because each unit contains one-third of one warrant and only a whole warrant may be exercised, the units may be worth less than units of other blank check companies._**

Each unit contains one-third of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. This is different from other offerings similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of a business combination since the warrants will be exercisable in the aggregate for one third of the number of shares compared to units that each contain a warrant to purchase one whole share, thus making us, we believe, a more attractive merger partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

**_The determination of the offering price of our units and the size of this offering is more arbitrary than the pricing of securities and size of an offering of an operating company in a particular industry. You may have less assurance, therefore, that the offering price of our units properly reflects the value of such units than you would have in a typical offering of an operating company._**

Prior to this offering there has been no public market for any of our securities. The public offering price of the units and the terms of the warrants were negotiated between us and the underwriters. In determining the size of this offering, management held customary organizational meetings with the underwriters with respect to the state of capital markets, generally, and the amount the underwriters believed they reasonably could raise on our behalf. Factors considered in determining the size of this offering, prices and terms of the units, including the Class A common stock and warrants underlying the units, include:

- the history and prospects of companies whose principal business is the acquisition of other companies;

- prior offerings of those companies;

- our prospects for acquiring an operating business;

- a review of debt to equity ratios in leveraged transactions;

- our capital structure;

61

Table of Contents

- an assessment of our management and their experience in identifying operating companies;

- general conditions of the securities markets at the time of this offering; and

- other factors as were deemed relevant.

Although these factors were considered, the determination of our offering price is more arbitrary than the pricing of securities of an operating company in a particular industry since we have no historical operations or financial results.

***There is currently no market for our securities and a market for our securities may not develop, which would adversely affect the liquidity and price of our securities.***

There is currently no market for our securities. Stockholders therefore have no access to information about prior market history on which to base their investment decision. Following this offering, the price of our securities may vary significantly due to one or more potential business combinations and general market or economic conditions. Furthermore, an active trading market for our securities may never develop or, if developed, it may not be sustained. You may be unable to sell your securities unless a market can be established and sustained.

***Because we must furnish our stockholders with target business financial statements, we may lose the ability to complete an otherwise advantageous initial business combination with some prospective target businesses.***

The federal proxy rules require that a proxy statement with respect to a vote on a business combination meeting certain financial significance tests include target historical and/or pro forma financial statement disclosure. We will include the same financial statement disclosure in connection with our tender offer documents, whether or not they are required under the tender offer rules. These financial statements may be required to be prepared in accordance with, or be reconciled to, accounting principles generally accepted in the United States of America, or GAAP, or international financial reporting standards as issued by the International Accounting Standards Board, or IFRS, depending on the circumstances and the historical financial statements may be required to be audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), or PCAOB. These financial statement requirements may limit the pool of potential target businesses we may acquire because some targets may be unable to provide such financial statements in time for us to disclose such financial statements in accordance with federal proxy rules and complete our initial business combination within the prescribed time frame.

***We are an emerging growth company within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if the market value of our Class A common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot

62

Table of Contents

predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

***Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate our initial business combination, require substantial financial and management resources, and increase the time and costs of completing an acquisition.***

Section 404 of the Sarbanes-Oxley Act requires that we evaluate and report on our system of internal controls beginning with our Annual Report on Form 10-K for the year ending December 31, 2018. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. Further, for as long as we remain an emerging growth company, we will not be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because a target company with which we seek to complete our business combination may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of its internal controls. The development of the internal control of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

***Provisions in our amended and restated certificate of incorporation and Delaware law may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our Class A common stock and could entrench management.***

Our amended and restated certificate of incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. These provisions include a staggered board of directors and the ability of the board of directors to designate the terms of and issue new series of preferred shares, which may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make the removal of management more difficult

63

Table of Contents

and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

***If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to a variety of additional risks that may negatively impact our operations.***

If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to any special considerations or risks associated with companies operating in an international setting, including any of the following:

- higher costs and difficulties inherent in managing cross-border business operations and complying with different commercial and legal requirements of overseas markets;

- rules and regulations regarding currency redemption;

- complex corporate withholding taxes on individuals;

- laws governing the manner in which future business combinations may be effected;

- tariffs and trade barriers;

- regulations related to customs and import/export matters;

- longer payment cycles and challenges in collecting accounts receivable;

- tax issues, such as tax law changes and variations in tax laws as compared to the United States;

- currency fluctuations and exchange controls;

- rates of inflation;

- cultural and language differences;

- employment regulations;

- crime, strikes, riots, civil disturbances, terrorist attacks, natural disasters and wars;

- deterioration of political relations with the United States; and

- government appropriations of assets.

We may not be able to adequately address these additional risks. If we were unable to do so, our operations might suffer, which may adversely impact our results of operations and financial condition.

64

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this prospectus may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to select an appropriate target business or businesses;

- our ability to complete our initial business combination;

- our expectations around the performance of the prospective target business or businesses;

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;

- our officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;

- our potential ability to obtain additional financing to complete our initial business combination;

- our pool of prospective target businesses;

- the ability of our officers and directors to generate a number of potential acquisition opportunities;

- our public securities' potential liquidity and trading;

- the lack of a market for our securities;

- the use of proceeds not held in the trust account or available to us from interest income on the trust account balance;

- the trust account not being subject to claims of third parties; or

- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described in the section of this prospectus entitled "Risk Factors." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

65

1/8/24, 2:00 PM

Table of Contents

## USE OF PROCEEDS

We are offering 90,000,000 units at an offering price of $10.00 per unit. We estimate that the net proceeds of this offering together with the funds we will receive from the sale of the private placement warrants will be used as set forth in the following table.

| | Without Over-Allotment Option | Over-Allotment Option Fully Exercised |
|---|---|---|
| ***Gross proceeds*** | | |
| Gross proceeds from units offered to public(1) | $ 900,000,000 | $ 1,035,000,000 |
| Gross proceeds from private placement warrants offered in the private placement | 20,000,000 | 22,700,000 |
| Total gross proceeds | $ 920,000,000 | $ 1,057,700,000 |
| ***Offering expenses(2)*** | | |
| Underwriting commissions (2% of gross proceeds from units offered to public, excluding deferred portion)(3) | $ 18,000,000 | $ 20,700,000 |
| Legal fees and expenses | 350,000 | 350,000 |
| Accounting fees and expenses | 47,500 | 47,500 |
| SEC/FINRA Expenses | 275,707 | 275,707 |
| Travel and road show | 20,000 | 20,000 |
| NASDAQ listing and filing fees | 75,000 | 75,000 |
| Director and Officer liability insurance premiums | 140,000 | 140,000 |
| Printing and engraving expenses | 75,000 | 75,000 |
| Miscellaneous | 16,793 | 16,793 |
| Total offering expenses (excluding underwriting commissions) | $ 1,000,000 | $ 1,000,000 |
| Proceeds after offering expenses | $ 901,000,000 | $ 1,036,000,000 |
| Held in trust account(3) | $ 900,000,000 | $ 1,035,000,000 |
| % of public offering size | 100% | 100% |
| Not held in trust account | $ 1,000,000 | $ 1,000,000 |

66

Table of Contents

The following table shows the use of the approximately $1,000,000 of net proceeds not held in the trust account.(4)

| | Amount | | % of Total |
|---|---|---|---|
| Legal, accounting, due diligence, travel, and other expenses in connection with any business combination(5) | $ | 150,000 | $ | 15.0% |
| Legal and accounting fees related to regulatory reporting obligations | | 75,000 | 7.5% |
| Payment for office space, utilities and secretarial and administrative support ($10,000 per month for up to 24 months) | | 240,000 | 24.0% |
| Consulting, travel and miscellaneous expenses incurred during search for initial business combination target | | 75,000 | 7.5% |
| Reserve for liquidation | | 100,000 | 10.0% |
| Working capital to cover miscellaneous expenses (including franchise taxes) | | 360,000 | 36.0% |
| Total | $ | 1,000,000 | 100.0% |

(1)    Includes amounts payable to public stockholders who properly redeem their shares in connection with our successful completion of our initial business combination.

(2)    A portion of the offering expenses will be paid from the proceeds of a loan from our sponsor of $300,000 as described in this prospectus. This amount will be repaid upon completion of this offering out of the $2,000,000 of offering proceeds that has been allocated for the payment of offering expenses (other than underwriting commissions) and amounts not to be held in the trust account. In the event that offering expenses are less than set forth in this table, any such amounts will be used for post-closing working capital expenses. In the event that the offering expenses are more than as set forth in this table, we may fund such excess with funds not held in the trust account.

(3)    The underwriters have agreed to defer underwriting commissions equal to 3.5% of the gross proceeds of this offering. Upon completion of our initial business combination, $31,500,000, which constitutes the underwriters' deferred commissions (or $36,225,000 if the underwriters' over-allotment option is exercised in full) will be paid to the underwriters from the funds held in the trust account, and the remaining funds, less amounts released to the trustee to pay redeeming stockholders, will be released to us and can be used to pay all or a portion of the purchase price of the business or businesses with which our initial business combination occurs or for general corporate purposes, including payment of principal or interest on indebtedness incurred in connection with our initial business combination, to fund the purchases of other companies or for working capital. The underwriters will not be entitled to any interest accrued on the deferred underwriting discounts and commissions.

(4)    These expenses are estimates only. Our actual expenditures for some or all of these items may differ from the estimates set forth herein. For example, we may incur greater legal and accounting expenses than our current estimates in connection with negotiating and structuring our business combination based upon the level of complexity of such business combination. In the event we identify a business combination target in a specific industry subject to specific regulations, we may incur additional expenses associated with legal due diligence and the engagement of special legal counsel. In addition, our staffing needs may vary and as a result, we may engage a number of consultants to assist with legal and

67

Table of Contents

financial due diligence. We do not anticipate any change in our intended use of proceeds, other than fluctuations among the current categories of allocated expenses, which fluctuations, to the extent they exceed current estimates for any specific category of expenses, would not be available for our expenses.

(5)     Includes estimated amounts that may also be used in connection with our business combination to fund a "no shop" provision and commitment fees for financing.

The rules of NASDAQ provide that at least 90% of the gross proceeds from this offering and the sale of the private placement warrants be deposited in a trust account. Of the net proceeds of this offering and the sale of the private placement warrants, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full), including $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions, will be placed in a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee, and will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We estimate that the interest earned on the trust account will be approximately $180,000 per year, assuming an interest rate of 0.02% per year; however, we can provide no assurance regarding this amount. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (c) the redemption of our public shares if we are unable to complete our business combination within 24 months from the closing of this offering, subject to applicable law. Based on current interest rates, we do not expect that the interest earned on the trust account, net of income taxes, will be sufficient to pay Delaware franchise taxes.

The net proceeds held in the trust account may be used as consideration to pay the sellers of a target business with which we ultimately complete our business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination, we may apply the balance of the cash released from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We believe that amounts not held in trust will be sufficient to pay the costs and expenses to which such proceeds are allocated. This belief is based on the fact that while we may begin preliminary due diligence of a target business in connection with an indication of interest, we intend to undertake in-depth due diligence, depending on the circumstances of the relevant prospective acquisition, only after we have negotiated and signed a letter of intent or other preliminary agreement that addresses the terms of a business combination. However, if our estimate of the costs of undertaking in-depth due diligence and negotiating a business combination is less than the actual amount necessary to do so, we may be required to raise additional capital, the amount, availability and cost of which is currently unascertainable. If we are required to seek additional capital, we could seek such additional capital through loans or additional investments from our sponsor, members of our management team or their affiliates, but such persons are not under any obligation to advance funds to, or invest in, us.

68

Table of Contents

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts out of the proceeds of the trust account released to us. Otherwise, such loans would be repaid only out of funds held outside the trust account. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used to repay such loaned amounts. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. Prior to the completion of our initial business combination, we do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be required to be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-

69

Table of Contents

private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

We may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) and the agreement for our business combination may require as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares or the business combination, and instead may search for an alternate business combination.

A public stockholder will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of our public shares if we are unable to complete our business combination within 24 months following the closing of this offering, subject to applicable law and as further described herein and any limitations (including but not limited to cash requirements) created by the terms of the proposed business combination. In no other circumstances will a public stockholder have any right or interest of any kind to or in the trust account.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. In addition, our initial stockholders have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within the prescribed time frame. However, if our sponsor or any of our officers, directors or affiliates acquires public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the prescribed time frame.

70

Table of Contents

## DIVIDEND POLICY

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of our initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our initial business combination. The payment of any cash dividends subsequent to our initial business combination will be within the discretion of our board of directors at such time. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. Further, if we incur any indebtedness in connection with our business combination, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

71

Table of Contents

## DILUTION

The difference between the public offering price per share of Class A common stock, assuming no value is attributed to the warrants included in the units we are offering pursuant to this prospectus or the private placement warrants, and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to investors in this offering. Such calculation does not reflect any dilution associated with the sale and exercise of warrants, including the private placement warrants, which would cause the actual dilution to the public stockholders to be higher, particularly where a cashless exercise is utilized. Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities (including the value of Class A common stock which may be redeemed for cash), by the number of outstanding shares of our Class A common stock.

At December 31, 2016, our net tangible book value was $(146,552), or approximately $(0.01) per share of common stock. After giving effect to the sale of 90,000,000 shares of Class A common stock included in the units we are offering by this prospectus, the sale of the private placement warrants and the deduction of underwriting commissions and estimated expenses of this offering, our pro forma net tangible book value at December 31, 2016 would have been $5,000,010, or approximately $0.19 per share, representing an immediate increase in net tangible book value (as decreased by the value of the approximately 86,452,299 shares of Class A common stock that may be redeemed for cash and assuming no exercise of the underwriters' over-allotment option) of $9.82 per share to our initial stockholders as of the date of this prospectus and an immediate dilution of $10.00 per share or 100% to our public stockholders not exercising their redemption rights. Total dilution to public stockholders from this offering will be $9.81 per share. The dilution to new investors if the underwriters exercise the over-allotment option in full would be an immediate dilution of $9.83 per share or 98.3%.

The following table illustrates the dilution to the public stockholders on a per-share basis, assuming no value is attributed to the warrants included in the units or the private placement warrants:

| | | | | |
|---|---|---|---|---|
| Public offering price | | | $ | 10.00 |
| Net tangible book value before this offering | $ | (0.01) | | |
| Increase attributable to public stockholders | | 9.82 | | |
| Decrease attributable to public shares subject to redemption | | (10.00) | | |
| Pro forma net tangible book value after this offering and the sale of the private placement warrants | | | $ | 0.19 |
| Dilution to public stockholders | | | $ | 9.81 |

For purposes of presentation, we have reduced our pro forma net tangible book value after this offering (assuming no exercise of the underwriters' over-allotment option) by $864,522,990 because holders of up to approximately 96.1% of our public shares may redeem their shares for a pro rata share of the aggregate amount then on deposit in the trust account at a per share redemption price equal to the amount in the trust account as set forth in our tender offer or proxy materials (initially anticipated to be the aggregate amount held in trust two days prior to the commencement of our tender offer or stockholders meeting, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes), divided by the number of shares of Class A common stock sold in this offering.

72

Table of Contents

The following table sets forth information with respect to our initial stockholders and the public stockholders:

|  | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
|  | Number | Percentage | Amount | Percentage |  |
| Initial Stockholders(1) | 22,500,000 | 20.0% | $ 25,000 | 0.01% | $ 0.001 |
| Public Stockholders | 90,000,000 | 80.0% | 900,000,000 | 99.9% | 10.00 |
|  | 112,500,000 | 100.0% | $ 900,025,000 | 100.0% |  |

(1)   Assumes no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 3,375,000 shares of Class B common stock held by our sponsor.

The pro forma net tangible book value per share after the offering is calculated as follows:

| | |
|---|---|
| Numerator: | |
| Net tangible book value (deficit) before this offering | $ (146,552) |
| Proceeds from this offering and the sale of the private placement warrants, net of expenses | 901,000,000 |
| Offering costs excluded from net tangible book value before this offering | 169,552 |
| Less: deferred underwriters' commissions payable | (31,500,000) |
| Less: amount of Class A common stock subject to redemption to maintain net tangible assets of $5,000,001 | (864,522,990) |
| | $ 5,000,010 |
| Denominator: | |
| Shares of Class B common stock outstanding prior to this offering | 25,875,000 |
| Shares of Class B common stock forfeited if over-allotment is not exercised | (3,375,000) |
| Shares of Class A common stock included in the units offered | 90,000,000 |
| Less: shares of Class A common stock subject to redemption | (86,452,299) |
| | 26,047,701 |

73

Table of Contents

# CAPITALIZATION

The following table sets forth our capitalization at December 31, 2016, and as adjusted to give effect to the sale of our units and the private placement warrants and the application of the estimated net proceeds derived from the sale of such securities:

| | December 31, 2016 | |
| --- | --- | --- |
| | Actual | As Adjusted[(1)] |
| Deferred underwriting commissions | $ — | $ 31,500,000 |
| Promissory note to affiliate[(2)] | 300,000 | — |
| Class A common stock, subject to redemption[(3)] | — | 864,522,990 |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.0001 par value, 1,000,000 shares authorized (actual and as adjusted); none issued or outstanding (actual and as adjusted) | — | — |
| Common stock | | |
| Class A common stock, $0.0001 par value, 400,000,000 shares authorized (actual and as adjusted); no shares issued and outstanding (actual); 3,547,701 shares issued and outstanding (excluding 86,452,299 shares subject to redemption) (as adjusted) | — | 355 |
| Class B common stock, $0.0001 par value, 50,000,000 shares authorized (actual and as adjusted); 25,875,000 shares issued and outstanding (actual); 22,500,000 shares issued and outstanding (as adjusted)[(4)] | 2,588 | 2,250 |
| Additional paid-in capital | 22,412 | 4,999,405 |
| Accumulated deficit | (2,000) | (2,000) |
| Total stockholders' equity | 23,000 | 5,000,010 |
| Total capitalization | 323,000 | 901,023,000 |

(1)    Assumes the over-allotment option has not been exercised and the resulting forfeiture of 3,375,000 founder shares held by our sponsor has occurred. Excludes gross proceeds of $400,000,000 from the sale of the forward purchase securities that may close simultaneously with the closing of our initial business combination.

(2)    Our sponsor has agreed to loan us up to $300,000 to be used for a portion of the expenses of this offering. As of December 31, 2016, we had borrowed $300,000 under the promissory note with our sponsor.

(3)    Upon the completion of our initial business combination, we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, subject to the limitations described herein whereby our net tangible assets will be maintained at a minimum of $5,000,001 and any limitations (including, but not limited to, cash requirements) created by the terms of the proposed business combination.

(4)    Actual share amount is prior to any forfeiture of founder shares by our sponsor and as adjusted amount assumes no exercise of the underwriters' over-allotment option.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Overview**

We are a blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. We have not identified any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions directly or indirectly, with respect to identifying any business combination target. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placements of the private placement warrants and forward purchase securities, our capital stock, debt or a combination of cash, stock and debt.

The issuance of additional shares of our stock in a business combination, including the forward purchase shares:

- may significantly dilute the equity interest of investors in this offering, which dilution would increase if the anti-dilution provisions in the Class B common stock resulted in the issuance of Class A shares on a greater than one-to-one basis upon conversion of the Class B common stock;

- may subordinate the rights of holders of our common stock if preferred stock is issued with rights senior to those afforded our common stock;

- could cause a change in control if a substantial number of shares of our common stock is issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;

- may have the effect of delaying or preventing a change of control of us by diluting the stock ownership or voting rights of a person seeking to obtain control of us; and

- may adversely affect prevailing market prices for our Class A common stock and/or warrants.

Similarly, if we issue debt securities or otherwise incur significant debt to bank or other lenders or owners of a target, it could result in:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;

- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

75

Table of Contents

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and

- other purposes and other disadvantages compared to our competitors who have less debt.

As indicated in the accompanying financial statements, at December 31, 2016, we had deferred offering costs of $169,552. Further, we expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to raise capital or to complete our initial business combination will be successful.

**Results of Operations and Known Trends or Future Events**

We have neither engaged in any operations nor generated any revenues to date. Our only activities since inception have been organizational activities and those necessary to prepare for this offering. Following this offering, we will not generate any operating revenues until after completion of our initial business combination. We will generate non-operating income in the form of interest income on cash and cash equivalents after this offering. There has been no significant change in our financial or trading position and no material adverse change has occurred since the date of our audited financial statements. After this offering, we expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses. We expect our expenses to increase substantially after the closing of this offering.

**Liquidity and Capital Resources**

Our liquidity needs have been satisfied prior to the completion of this offering through a capital contribution of our sponsor of $25,000 for the founder shares and a loan to us of $300,000 by our sponsor under an unsecured promissory note. We estimate that the net proceeds from (i) the sale of the units in this offering, after deducting offering expenses of approximately $1,000,000, underwriting commissions of $18,000,000 ($20,700,000 if the underwriters' over-allotment option is exercised in full) (excluding deferred underwriting commissions of $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full)), and (ii) the sale of the private placement warrants for a purchase price of $20,000,000 (or $22,700,000 if the over-allotment option is exercised in full), will be $901,000,000 (or $1,036,000,000 if the underwriters' over-allotment option is exercised in full). Of this amount, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full) will be held in the trust account, which includes $31,500,000 (or $36,225,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions. The remaining approximately $1,000,000 will not be held in the trust account. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less taxes payable and deferred underwriting commissions), and the proceeds from the sale of the forward purchase securities to complete our initial business combination. We may withdraw interest to pay franchise and income taxes. We estimate our annual franchise tax obligations, based on the number of shares of our common stock authorized and outstanding after the completion of this offering, to be $180,000, which is the maximum amount of annual franchise taxes payable by us as a Delaware corporation per annum. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the trust account. Based on current interest rates, we do not expect that the interest earned on the trust

76

Table of Contents

account, net of income taxes, will be sufficient to pay Delaware franchise taxes. To the extent that our capital stock or debt is used, in whole or in part, as consideration to complete our initial business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the target business or businesses, make other acquisitions and pursue our growth strategies.

Prior to the completion of our initial business combination, we will have available to us the approximately $1,000,000 of proceeds held outside the trust account. We will use these funds primarily to identify and evaluate target businesses, perform business due diligence on prospective target businesses, travel to and from the offices, plants or similar locations of prospective target businesses or their representatives or owners, review corporate documents and material agreements of prospective target businesses, and structure, negotiate and complete a business combination.

In order to fund working capital deficiencies or finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We expect our primary liquidity requirements during that period to include approximately $150,000 for legal, accounting, due diligence, travel and other expenses associated with structuring, negotiating and documenting successful business combinations; $75,000 for legal and accounting fees related to regulatory reporting requirements; $240,000 for office space, utilities and secretarial and administrative support; $75,000 for consulting, travel and miscellaneous expenses incurred during the search for a business combination target; $100,000 reserved for liquidation; and approximately $360,000 for working capital that will be used for miscellaneous expenses and reserves (including franchise taxes).

These amounts are estimates and may differ materially from our actual expenses. In addition, we could use a portion of the funds not being placed in trust to pay commitment fees for financing, fees to consultants to assist us with our search for a target business or as a down payment or to fund a "no-shop" provision (a provision designed to keep target businesses from "shopping" around for transactions with other companies or investors on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into an agreement where we paid for the right to receive exclusivity from a target business, the amount that would be used as a down payment or to fund a "no-shop" provision would be determined based on the terms of the specific business combination and the amount of our available funds at the time. Our forfeiture of such funds (whether as a result of our breach or otherwise) could result in our not having sufficient funds to continue searching for, or conducting due diligence with respect to, prospective target businesses.

We do not believe we will need to raise additional funds following this offering in order to meet the expenditures required for operating our business. However, if our estimates of the costs of identifying a target business, undertaking in-depth due diligence and negotiating an initial business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our business combination. Moreover, we may need to obtain additional financing either to complete our business combination or because we become obligated to

77

redeem a significant number of our public shares upon completion of our business combination, in which case we may issue additional securities or incur debt in connection with such business combination, which may include a specified future issuance. Subject to compliance with applicable securities laws, we would only complete such financing simultaneously with the completion of our business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. In addition, following our initial business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

## Controls and Procedures

We are not currently required to maintain an effective system of internal controls as defined by Section 404 of the Sarbanes-Oxley Act. We will be required to comply with the internal control requirements of the Sarbanes-Oxley Act for the fiscal year ending December 31, 2018. Only in the event that we are deemed to be a large accelerated filer or an accelerated filer would we be required to comply with the independent registered public accounting firm attestation requirement. Further, for as long as we remain an emerging growth company as defined in the JOBS Act, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirement.

Prior to the closing of this offering, we have not completed an assessment, nor have our auditors tested our systems, of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;

- reconciliation of accounts;

- proper recording of expenses and liabilities in the period to which they relate;

- evidence of internal review and approval of accounting transactions;

- documentation of processes, assumptions and conclusions underlying significant estimates; and

- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively may also take longer than we expect, thus increasing our exposure to financial fraud or erroneous financing reporting.

Once our management's report on internal controls is complete, we will retain our independent auditors to audit and render an opinion on such report when required by Section 404 of the Sarbanes-Oxley Act. The independent auditors may identify additional issues concerning a target business's internal controls while performing their audit of internal control over financial reporting.

78

Table of Contents

**Quantitative and Qualitative Disclosures about Market Risk**

The net proceeds of this offering and the sale of the private placement warrants held in the trust account will be invested in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

**Related Party Transactions**

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $2,000,000 of offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

Our sponsor has committed to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the underwriters' over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or $22,700,000 if the underwriters' over-allotment

79

Table of Contents

option is exercised in full) in a private placement that will occur simultaneously with the closing of this offering. Each whole private placement warrant is exercisable for one whole share of our Class A common stock at $11.50 per share. Our sponsor will be permitted to transfer the private placement warrants held by it to certain permitted transferees, including our officers and directors and other persons or entities affiliated with or related to it, but the transferees receiving such securities will be subject to the same agreements with respect to such securities as the sponsor. Otherwise, these warrants will not, subject to certain limited exceptions, be transferable or salable until 30 days after the completion of our business combination. The private placement warrants will be non-redeemable so long as they are held by our sponsor or its permitted transferees. The private placement warrants may also be exercised by the sponsor and its permitted transferees for cash or on a cashless basis. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI.

The investment objective of Fund VI is to generate long-term capital appreciation through investments in Energy Companies (which includes entities predominantly engaged in (a) the production, exploration, development, extraction, processing, transportation, refining, storage, distribution, marketing and/or trading of oil, gas, coal or other natural resources used to produce energy, or ethanol; (b) the generation, transmission, distribution, marketing and/or trading of all forms of electrical power; (c) the manufacturing, marketing and/or trading of equipment or other supplies predominantly used by entities engaged in businesses described in clause (a) or (b) above or the following clause (d); and (d) the provision of services to entities engaged in businesses described in clause (a), (b) or (c) above; as well as other businesses or assets determined by the General Partner of Fund VI to be related or complementary to any of the foregoing, including without limitation in respect of feedstocks, supplies or other materials usable by any of the foregoing.

The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties, and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward

80

Table of Contents

Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full.

The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants.

Pursuant to a registration rights agreement we will enter into with our initial stockholders on or prior to the closing of this offering, we may be required to register certain securities for sale under the Securities Act. These holders, and holders of warrants issued upon conversion of working capital loans, if any, are entitled under the registration rights agreement to make up to three demands that we register certain of our securities held by them for sale under the Securities Act and to have the securities covered thereby registered for resale pursuant to Rule 415 under the Securities Act. In addition, these holders have the right to include their securities in other registration statements filed by us. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until the securities covered thereby are released from their lock-up restrictions, as described herein. We will bear the costs and expenses of filing any such registration statements. See the section of this prospectus entitled "Certain Relationships and Related Party Transactions."

**Off-Balance Sheet Arrangements; Commitments and Contractual Obligations; Quarterly Results**

As of December 31, 2016, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K and did not have any commitments or contractual obligations. No unaudited quarterly operating data is included in this prospectus, as we have conducted no operations to date.

**JOBS Act**

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We will qualify as an "emerging growth company" and under the JOBS Act will be allowed to comply with new or revised accounting pronouncements based on the effective date for private (not publicly traded) companies. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Additionally, we are in the process of evaluating the benefits of relying on the other reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an "emerging growth company", we choose to rely on such exemptions we may not be required to, among other things, (i) provide an auditor's attestation report on our system of internal controls over financial reporting pursuant to Section 404, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act, (iii) comply with any requirement that may be adopted by the PCAOB regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (auditor discussion and analysis), and (iv) disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation. These exemptions will apply for a period of five years following the completion of this offering or until we are no longer an "emerging growth company," whichever is earlier.

81

Table of Contents

# PROPOSED BUSINESS

## Overview

We are a newly organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We are an acquisition vehicle of Fund VI, an energy-focused private investment fund managed by Riverstone. We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential business combination target. Although we may pursue an acquisition opportunity in any business or industry, we intend to capitalize on the ability of our management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns.

We intend to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience in the energy sector and that presents potential for an attractive risk-adjusted return profile under our stewardship. Even fundamentally sound companies can often under-perform their potential due to a temporary period of dislocation in the markets in which they operate, inefficient capital allocation, over-levered capital structures, excessive cost structures, incomplete management teams and/or inappropriate business strategies. Our management team has extensive experience in identifying and executing such full-potential acquisitions across the upstream, midstream, refining, power, services and renewable energy sectors. In addition, our team has significant hands-on experience working with private companies in preparing for and executing an initial public offering and serving as active owners and directors by working closely with these companies to continue their transformations and help create value in the public markets.

We believe that our management team is well positioned to identify attractive risk-adjusted returns in the marketplace and that their contacts and transaction sources, ranging from industry executives, private owners, private equity funds, and investment bankers, in addition to the extensive global industry and geographical reach of the Riverstone platform, will enable us to pursue a broad range of opportunities. Our management believes that its ability to identify and implement value creation initiatives will remain central to its differentiated acquisition strategy.

Our management team's objective is to generate attractive returns and create value for our shareholders by applying a disciplined strategy of underwriting intrinsic worth and affecting changes after making an acquisition to unlock value. We favor opportunities with certain elements of downside protection, for example, opportunities where we can hedge proven reserves to reduce commodity risk, while improving the risk-reward return by driving change and often accelerating the target's growth initiatives. Our management team has successfully applied this approach at Riverstone in both North America and Europe and has deployed capital successfully in all market cycles. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination.

In November 2015, Riverstone formed Silver Run I, a blank check company formed for substantially the same purposes as our company. Silver Run I aimed to capitalize on the 45 years of experience in the oil and gas industry of its Chief Executive Officer, Mark Papa. Prior to Silver Run I and his time with Riverstone, Mr. Papa was Chairman and Chief Executive Officer of EOG Resources, an exploration and production company. Through its initial public offering in February 2016, Silver Run I raised $500 million from the sale of 50 million units to public investors, with each unit consisting of one share of Class A common stock and one-third of one warrant. On July 6, 2016, an affiliate of Riverstone entered into a definitive agreement to purchase an approximate 89% interest in Centennial, an independent oil and natural gas company with assets located in the core of the Southern Delaware Basin, from funds controlled by, and affiliates of, NGP Energy Capital Management, L.L.C. In

82

Table of Contents

accordance with the definitive agreement, the Riverstone affiliate agreed to assign, and Silver Run I agreed to assume, its right to purchase the interest in Centennial. On October 11, 2016, Silver Run I consummated the acquisition of approximately 89% of the outstanding membership interests in Centennial. In connection with the acquisition, Silver Run I raised an additional approximately $1.0 billion through a private placement of shares of its Class A Common Stock at $10.00 per share. Upon the closing of the transaction, Silver Run I was renamed Centennial Resource Development, Inc., and its common stock and warrants began trading on NASDAQ under the symbols "CDEV" and "CDEVW", respectively.

Our sponsor is an acquisition vehicle of Fund VI, which is managed by Riverstone. Riverstone has considerable experience investing in the energy industry. Since the firm's founding in 2000 by David Leuschen and Pierre Lapeyre, Riverstone has committed over $30 billion to more than 120 transactions, and has raised approximately $33 billion since its inception across nine private funds and two listed vehicles. Riverstone has experience investing across a variety of commodity price cycles and a track record of identifying high-quality assets, businesses and management teams with significant resources, capital and optimization potential.

With respect to the foregoing examples, past performance of Riverstone, including by our management team, is not a guarantee either (i) of success with respect to any business combination we may consummate or (ii) that we will be able to identify a suitable candidate for our initial business combination. You should not rely on the historical record of Riverstone's or our management's performance as indicative of our future performance.

In addition, we believe our ability to complete an initial business combination will be enhanced by our having entered into the forward purchase agreement pursuant to which Fund VI Holdings has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. These purchases will be made regardless of whether any shares of Class A common stock are redeemed by our public stockholders in connection with our initial business combination and are intended to provide us with a minimum funding level for our initial business combination.

## Business Strategy

Our acquisition and value creation strategy will be to identify, acquire and, after our initial business combination, build a company in the energy industry that complements the experience of our management team and can benefit from their operational expertise. Our acquisition strategy will leverage our team's network of potential proprietary and public transaction sources where we believe a combination of our relationships, knowledge and experience in the energy industry could effect a positive transformation or augmentation of existing businesses or properties to improve their overall value proposition.

We plan to utilize the network and industry experience of our management team in seeking an initial business combination and employing our acquisition strategy. Over the course of their careers, the members of our management team and their affiliates have developed a broad network of contacts and corporate relationships that we believe will serve as a useful source of acquisition opportunities. This network has been developed through our management team's extensive experience in both

83

investing in and operating in the energy industry. We will additionally leverage Riverstone's considerable experience investing in the energy industry; since 2000, Riverstone has committed over $30 billion to more than 120 transactions. We expect these networks will provide our management team with a robust flow of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, which may include investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Upon completion of this offering, members of our management team will communicate with their networks of relationships to articulate the parameters for our search for a target company and a potential business combination and begin the process of pursuing and reviewing potentially interesting leads.

**Acquisition Criteria**

Consistent with this strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines. We intend to acquire companies or assets that we believe:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound companies that are underperforming their potential;

- exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management may deem relevant. In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, as discussed in this prospectus, would be in the form of tender offer documents or proxy solicitation materials that we would file with the SEC.

**Initial Business Combination**

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm with respect to the satisfaction of such criteria.

84

Table of Contents

We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity affiliated with Riverstone and/or one or more investors in funds managed by Riverstone. Any such parties may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such parties. Any such Affiliated Joint Acquisition or specified future issuance would be in addition to, and would not include, the forward purchase securities issued pursuant to the forward purchase agreement. The amount and other terms and conditions of any such specified future issuance would be determined at the time thereof. We are not obligated to make any specified future issuance and may determine not to do so. This is not an offer for any specified future issuance. Pursuant to the anti-dilution provisions of our Class B common stock, any such specified future issuance would result in an adjustment to the conversion ratio such that our initial stockholders and their permitted transferees, if any, would retain their aggregate percentage ownership at 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares issued in the specified future issuance, unless the holders of a majority of the then-outstanding shares of Class B common stock agreed to waive such adjustment with respect to the specified future issuance at the time thereof. We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any such specified future issuance would agree to waive such adjustment to the conversion ratio. If such adjustment is not waived, the specified future issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the specified future issuance would reduce the percentage ownership of holders of both classes of our common stock. The issuance of the forward purchase securities will not result in such an adjustment to the conversion ratio of our Class B common stock.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, including an Affiliated Joint Acquisition. However, we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test. If the business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

85

Table of Contents

**Our Acquisition Process**

In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a company that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business combination is fair to our company from a financial point of view.

Fund VI, members of our management team and our independent directors will directly or indirectly own founder shares and/or private placement warrants following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity, including Fund VI. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company

86

Table of Contents

and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within the required timeframe.

## Our Management Team

Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any member of our management team will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

We believe our management team's operating and transaction experience and relationships with companies will provide us with a substantial number of potential business combination targets. Over the course of their careers, the members of our management team have developed a broad network of contacts and corporate relationships around the world. This network has grown through the activities of our management team sourcing, acquiring and financing businesses, our management team's relationships with sellers, financing sources and target management teams and the experience of our management team in executing transactions under varying economic and financial market conditions. See the section of this prospectus entitled "Management" for a more complete description of our management team's experience.

## Status as a Public Company

We believe our structure will make us an attractive business combination partner to target businesses. As an existing public company, we offer a target business an alternative to the traditional initial public offering through a merger or other business combination. In this situation, the owners of the target business would exchange their shares of stock in the target business for shares of our stock or for a combination of shares of our stock and cash, allowing us to tailor the consideration to the specific needs of the sellers. Although there are various costs and obligations associated with being a public company, we believe target businesses will find this method a more certain and cost effective method to becoming a public company than the typical initial public offering. In a typical initial public offering, there are additional expenses incurred in marketing, road show and public reporting efforts that may not be present to the same extent in connection with a business combination with us.

Furthermore, once a proposed business combination is completed, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could delay or prevent the offering from occurring or could have negative valuation consequences. Once public, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from

87

Table of Contents

the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

**Financial Position**

With funds available for a business combination initially in the amount of $1,268,500,000, after payment of $31,500,000 of deferred underwriting fees (or $1,398,775,000 after payment of up to $36,225,500 of deferred underwriting fees if the underwriters' over-allotment option is exercised in full), in each case before fees and expenses associated with our initial business combination, we offer a target business a variety of options such as creating a liquidity event for its owners, providing capital for the potential growth and expansion of its operations or strengthening its balance sheet by reducing its debt or leverage ratio. Because we are able to complete our business combination using our cash, debt or equity securities, or a combination of the foregoing, we have the flexibility to use the most efficient combination that will allow us to tailor the consideration to be paid to the target business to fit its needs and desires. However, we have not taken any steps to secure third party financing and there can be no assurance it will be available to us.

**Effecting our Initial Business Combination**

We are not presently engaged in, and we will not engage in, any operations for an indefinite period of time following this offering. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placement of the private placement warrants and the forward purchase securities, our capital stock, debt or a combination of these as the consideration to be paid in our initial business combination. We may seek to complete our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, which would subject us to the numerous risks inherent in such companies and businesses.

If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our business combination or used for redemptions of our Class A common stock, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We currently do not have any specific business combination under consideration. Our officers and directors have neither individually identified or considered a target business nor have they had any discussions regarding possible target businesses among themselves or with our underwriters or other

88

Table of Contents

advisors. All of the members of our management team are employed by Riverstone. Riverstone is continuously made aware of potential business opportunities, one or more of which we may desire to pursue for a business combination, but we have not (nor has anyone on our behalf) contacted any prospective target business or had any discussions, formal or otherwise, with respect to a business combination transaction. We have not (nor have any of our agents or affiliates) been approached by any candidates (or representative of any candidates) with respect to a possible acquisition transaction with us and we will not consider a business combination with any company that has already been identified to Riverstone as a suitable acquisition candidate for it. Additionally, we have not, nor has anyone on our behalf, taken any measure, directly or indirectly, to identify or locate any suitable acquisition candidate for us, nor have we engaged or retained any agent or other representative to identify or locate any such acquisition candidate.

In addition to the forward purchase securities, we may seek to raise additional funds through a private offering of debt or equity securities in connection with the completion of our initial business combination (which may include a specified future issuance), and we may effectuate our initial business combination using the proceeds of such offering rather than using the amounts held in the trust account. Subject to compliance with applicable securities laws, we would expect to complete such financing only simultaneously with the completion of our business combination. In the case of an initial business combination funded with assets other than the trust account assets, our tender offer documents or proxy materials disclosing the business combination would disclose the terms of the financing and, only if required by law, we would seek stockholder approval of such financing. There are no prohibitions on our ability to raise funds privately, including pursuant to any specified future issuance, or through loans in connection with our initial business combination. At this time, other than the forward purchase agreement, we are not a party to any arrangement or understanding with any third party with respect to raising any additional funds through the sale of securities or otherwise.

**Sources of Target Businesses**

We anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banking firms, consultants, accounting firms and large business enterprises. Target businesses may be brought to our attention by such unaffiliated sources as a result of being solicited by us through calls or mailings. These sources may also introduce us to target businesses in which they think we may be interested on an unsolicited basis, since many of these sources will have read this prospectus and know what types of businesses we are targeting. Our officers and directors, as well as their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. In addition, we expect to receive a number of proprietary deal flow opportunities that would not otherwise necessarily be available to us as a result of the business relationships of our officers and directors. While we do not presently anticipate engaging the services of professional firms or other individuals that specialize in business acquisitions on any formal basis, we may engage these firms or other individuals in the future, in which event we may pay a finder's fee, consulting fee or other compensation to be determined in an arm's length negotiation based on the terms of the transaction. We will engage a finder only to the extent our management determines that the use of a finder may bring opportunities to us that may not otherwise be available to us or if finders approach us on an unsolicited basis with a potential transaction that our management determines is in our best interest to pursue. Payment of finder's fees is customarily tied to completion of a transaction, in which case any such fee will be paid out of the funds held in the trust account. In no event, however, will our sponsor or any of our existing officers or directors, or any entity with which they are affiliated, be paid any finder's fee, consulting fee or other compensation prior to, or for any services they render in order to effectuate, the completion of our initial business combination (regardless of the type of transaction that it is). We have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office

89

Table of Contents

space, utilities and secretarial and administrative support and to reimburse our sponsor for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination. Some of our officers and directors may enter into employment or consulting agreements with the post-transaction company following our initial business combination. The presence or absence of any such fees or arrangements will not be used as a criterion in our selection process of an acquisition candidate.

We are not prohibited from pursuing an initial business combination with a business combination target that is affiliated with our sponsor, officers or directors or making the acquisition through a joint venture or other form of shared ownership with our sponsor, officers or directors. In the event we seek to complete our initial business combination with a business combination target that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that such an initial business combination is fair to our company from a financial point of view. We are not required to obtain such an opinion in any other context.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has pre-existing fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity, including Fund VI, prior to presenting such business combination opportunity to us. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

**Selection of a Target Business and Structuring of our Initial Business Combination**

Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. The fair market value of the target or targets will be determined by our board of directors based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation or value of comparable businesses. If our board is not able to independently determine the fair market value of the target business or businesses, we will obtain an opinion from an independent investment banking firm that is a member of FINRA, or from an independent accounting firm, with respect to the satisfaction of such criteria. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. Subject to this requirement, our management will have virtually unrestricted flexibility in identifying and selecting one or more prospective target businesses, although we will not be permitted to effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In any case, we will only complete an initial business combination in which we own or acquire 50% or more of the outstanding voting securities of the target or otherwise acquire an interest in the target sufficient for the post-transaction company not to be required to register as an investment company under the Investment Company Act. If we own or acquire less than 100% of the equity interests or assets of a target business or businesses, the portion of such business or businesses that are owned or acquired by the post-transaction company is what will be valued for purposes of the 80% of net assets test. There is no basis for investors in this offering to evaluate the possible merits or risks of any target business with which we may ultimately complete our business combination.

90

Table of Contents

To the extent we effect our business combination with a company or business that may be financially unstable or in its early stages of development or growth we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review, which will encompass, among other things, meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial and other information that will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Lack of Business Diversification**

For an indefinite period of time after the completion of our initial business combination, the prospects for our success may depend entirely on the future performance of a single business. Unlike other entities that have the resources to complete business combinations with multiple entities in one or several industries, it is probable that we will not have the resources to diversify our operations and mitigate the risks of being in a single line of business. In addition, we intend to focus our search for an initial business combination in a single industry. By completing our business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and

- cause us to depend on the marketing and sale of a single product or limited number of products or services.

**Limited Ability to Evaluate the Target's Management Team**

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our business combination with that business, our assessment of the target business' management may not prove to be correct. In addition, the future management may not have the necessary skills, qualifications or abilities to manage a public company. Furthermore, the future role of members of our management team, if any, in the target business cannot presently be stated with any certainty. While it is possible that one or more of our directors will remain associated in some capacity with us following our business combination, it is unlikely that any of them will devote their full efforts to our affairs subsequent to our business combination. Moreover, we cannot assure you that members of our management team will have significant experience or knowledge relating to the operations of the particular target business.

We cannot assure you that any of our key personnel will remain in senior management or advisory positions with the combined company. The determination as to whether any of our key personnel will remain with the combined company will be made at the time of our initial business combination.

Following a business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. We cannot assure you that we will have the ability to recruit additional managers, or that additional managers will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

91

Table of Contents

**Stockholders May Not Have the Ability to Approve our Initial Business Combination**

We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC. However, we will seek stockholder approval if it is required by law or applicable stock exchange rule, or we may decide to seek stockholder approval for business or other legal reasons. Presented in the table below is a graphic explanation of the types of initial business combinations we may consider and whether stockholder approval is currently required under Delaware law for each such transaction.

| Type of Transaction | Whether Stockholder Approval is Required |
|---|---|
| Purchase of assets | No |
| Purchase of stock of target not involving a merger with the company | No |
| Merger of target into a subsidiary of the company | No |
| Merger of the company with a target | Yes |

Under NASDAQ's listing rules, stockholder approval would be required for our initial business combination if, for example:

- we issue shares of Class A common stock that will be equal to or in excess of 20% of the number of shares of our Class A common stock then outstanding;

- any of our directors, officers or substantial stockholders (as defined by NASDAQ rules) has a 5% or greater interest (or such persons collectively have a 10% or greater interest), directly or indirectly, in the target business or assets to be acquired or otherwise and the present or potential issuance of common stock could result in an increase in outstanding common shares or voting power of 5% or more; or

- the issuance or potential issuance of common stock will result in our undergoing a change of control.

**Permitted Purchases of our Securities**

In the event we seek stockholder approval of our business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares in such transactions. They will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules.

The purpose of such purchases would be to (i) vote such shares in favor of the business combination and thereby increase the likelihood of obtaining stockholder approval of the business

92

Table of Contents

combination or (ii) to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our business combination, where it appears that such requirement would otherwise not be met. This may result in the completion of our business combination that may not otherwise have been possible.

In addition, if such purchases are made, the public "float" of our common stock may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our sponsor, officers, directors and/or their affiliates anticipate that they may identify the stockholders with whom our sponsor, officers, directors or their affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders following our mailing of proxy materials in connection with our initial business combination. To the extent that our sponsor, officers, directors, advisors or their affiliates enter into a private purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the trust account or vote against the business combination. Our sponsor, officers, directors, advisors or their affiliates will only purchase shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

Any purchases by our sponsor, officers, directors and/or their affiliates who are affiliated purchasers under Rule 10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) and Rule 10b-5 of the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our sponsor, officers, directors and/or their affiliates will not make purchases of common stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act.

## Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination.

### Manner of Conducting Redemptions

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under the law or stock exchange listing requirement. Asset acquisitions and stock purchases would not typically require stockholder approval while direct

93

mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. If we structure a business combination transaction with a target company in a manner that requires stockholder approval, we will not have discretion as to whether to seek a stockholder vote to approve the proposed business combination. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our business combination, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market if we elect to redeem our public shares through a tender offer, to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares which are not purchased by our sponsor, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

If, however, stockholder approval of the transaction is required by law or stock exchange listing requirement, or we decide to obtain stockholder approval for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

In the event that we seek stockholder approval of our initial business combination, we will distribute proxy materials and, in connection therewith, provide our public stockholders with the redemption rights described above upon completion of the initial business combination.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. Our initial

94

Table of Contents

stockholders will count toward this quorum and have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we will not complete the business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

### Limitation on Redemption upon Completion of our Initial Business Combination if we Seek Stockholder Approval

Notwithstanding the foregoing, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 20% of the shares sold in this offering, which we refer to as the "Excess Shares." We believe this restriction will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to exercise their redemption rights against a proposed business combination as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder holding more than an aggregate of 20% of the shares sold in this offering could threaten to exercise its redemption rights if such holder's shares are not purchased by us or our management at a premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem no more than 20% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our business combination, particularly in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, our amended and restated certificate of incorporation does not restrict our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination.

95

Table of Contents

### *Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights*

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve the business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically using the Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option. The tender offer or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. Accordingly, a public stockholder would have from the time we send out our tender offer materials until the close of the tender offer period, or up to two days prior to the vote on the business combination if we distribute proxy materials, as applicable, to tender its shares if it wishes to seek to exercise its redemption rights. Given the relatively short exercise period, it is advisable for stockholders to use electronic delivery of their public shares.

There is a nominal cost associated with the above-referenced tendering process and the act of certificating the shares or delivering them through the DWAC System. The transfer agent will typically charge the tendering broker $80.00 and it would be up to the broker whether or not to pass this cost on to the redeeming holder. However, this fee would be incurred regardless of whether or not we require holders seeking to exercise redemption rights to tender their shares. The need to deliver shares is a requirement of exercising redemption rights regardless of the timing of when such delivery must be effectuated.

The foregoing is different from the procedures used by many blank check companies. In order to perfect redemption rights in connection with their business combinations, many blank check companies would distribute proxy materials for the stockholders' vote on an initial business combination, and a holder could simply vote against a proposed business combination and check a box on the proxy card indicating such holder was seeking to exercise his or her redemption rights. After the business combination was approved, the company would contact such stockholder to arrange for him or her to deliver his or her certificate to verify ownership. As a result, the stockholder then had an "option window" after the completion of the business combination during which he or she could monitor the price of the company's stock in the market. If the price rose above the redemption price, he or she could sell his or her shares in the open market before actually delivering his or her shares to the company for cancellation. As a result, the redemption rights, to which stockholders were aware they needed to commit before the stockholder meeting, would become "option" rights surviving past the completion of the business combination until the redeeming holder delivered its certificate. The requirement for physical or electronic delivery prior to the meeting ensures that a redeeming holder's election to redeem is irrevocable once the business combination is approved.

Any request to redeem such shares, once made, may be withdrawn at any time up to the date set forth in the tender offer materials or the date of the stockholder meeting set forth in our proxy materials, as applicable. Furthermore, if a holder of a public share delivered its certificate in connection with an election of redemption rights and subsequently decides prior to the applicable date not to elect to exercise such rights, such holder may simply request that the transfer agent return the certificate (physically or electronically). It is anticipated that the funds to be distributed to holders of our public shares electing to redeem their shares will be distributed promptly after the completion of our business combination.

If our initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights would not be entitled to redeem their

96

Table of Contents

shares for the applicable pro rata share of the trust account. In such case, we will promptly return any certificates delivered by public holders who elected to redeem their shares.

If our initial proposed business combination is not completed, we may continue to try to complete a business combination with a different target until 24 months from the closing of this offering.

### Redemption of Public Shares and Liquidation if no Initial Business Combination

Our amended and restated certificate of incorporation provides that we will have only 24 months from the closing of this offering to complete our initial business combination. If we are unable to complete our business combination within such 24-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our business combination within the 24-month time period.

Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 24 months from the closing of this offering. However, if our sponsor, officers or directors acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the allotted 24-month time period.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes divided by the number of then outstanding public shares. However, we may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we are not subject to the SEC's "penny stock" rules).

We expect that all costs and expenses associated with implementing our plan of dissolution, as well as payments to any creditors, will be funded from amounts remaining out of the approximately $1,000,000 of proceeds held outside the trust account, although we cannot assure you that there will be sufficient funds for such purpose. However, if those funds are not sufficient to cover the costs and expenses associated with implementing our plan of dissolution, to the extent that there is any interest accrued in the trust account not required to pay franchise and income taxes on interest income earned on the trust account balance, we may request the trustee to release to us an additional amount of up to $100,000 of such accrued interest to pay those costs and expenses.

97

Table of Contents

If we were to expend all of the net proceeds of this offering and the sale of the private placement warrants, other than the proceeds deposited in the trust account, and without taking into account interest, if any, earned on the trust account, the per-share redemption amount received by stockholders upon our dissolution would be approximately $10.00. The proceeds deposited in the trust account could, however, become subject to the claims of our creditors which would have higher priority than the claims of our public stockholders. We cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.00. Under Section 281(b) of the DGCL, our plan of dissolution must provide for all claims against us to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before we make any distribution of our remaining assets to our stockholders. While we intend to pay such amounts, if any, we cannot assure you that we will have funds sufficient to pay or provide for all creditors' claims.

Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest and claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the trust account including but not limited to fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative. Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver.

In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party (other than our independent auditors) for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, then our sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. We have not asked our sponsor to reserve for such indemnification obligations. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our initial business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our initial business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

98

Table of Contents

In the event that the proceeds in the trust account are reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. We have not asked our sponsor to reserve for such indemnification obligations and we cannot assure you that our sponsor would be able to satisfy those obligations. Accordingly, we cannot assure you that due to claims of creditors the actual value of the per-share redemption price will not be less than $10.00 per public share.

We will seek to reduce the possibility that our sponsor will have to indemnify the trust account due to claims of creditors by endeavoring to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to monies held in the trust account. Our sponsor will also not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. We will have access to up to approximately $1,000,000 from the proceeds of this offering with which to pay any such potential claims (including costs and expenses incurred in connection with our liquidation, currently estimated to be no more than approximately $100,000). In the event that we liquidate and it is subsequently determined that the reserve for claims and liabilities is insufficient, stockholders who received funds from our trust account could be liable for claims made by creditors. In the event that our offering expenses exceed our estimate of $1,000,000, we may fund such excess with funds from the funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $1,000,000, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our business combination within 24 months from the closing of this offering, is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution. If

99

Table of Contents

we are unable to complete our business combination within 24 months from the closing of this offering, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible following our 24th month and, therefore, we do not intend to comply with those procedures. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent 10 years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. As described above, pursuant to the obligation contained in our underwriting agreement, we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account. As a result of this obligation, the claims that could be made against us are significantly limited and the likelihood that any claim that would result in any liability extending to the trust account is remote. Further, our sponsor may be liable only to the extent necessary to ensure that the amounts in the trust account are not reduced below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest withdrawn to pay taxes and will not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, our sponsor will not be responsible to the extent of any liability for such third-party claims.

If we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, we cannot assure you we will be able to return $10.00 per share to our public stockholders. Additionally, if we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by our stockholders. Furthermore, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or may have acted in bad faith, thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

100

Table of Contents

Our public stockholders will be entitled to receive funds from the trust account only (i) in the event of the redemption of our public shares if we do not complete our business combination within 24 months from the closing of this offering, subject to applicable law, (ii) in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we have not consummated an initial business combination within 24 months from the closing of this offering or (iii) if they redeem their respective shares for cash upon the completion of the initial business combination. In no other circumstances will a stockholder have any right or interest of any kind to or in the trust account. In the event we seek stockholder approval in connection with our initial business combination, a stockholder's voting in connection with the business combination alone will not result in a stockholder's redeeming its shares to us for an applicable pro rata share of the trust account. Such stockholder must have also exercised its redemption rights as described above.

### *Comparison of Redemption or Purchase Prices in Connection with our Initial Business Combination and if We Fail to Complete our Business Combination*

The following table compares the redemptions and other permitted purchases of public shares that may take place in connection with the completion of our initial business combination and if we are unable to complete our business combination within 24 months from the closing of this offering.

| | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Calculation of redemption price** | Redemptions at the time of our initial business combination may be made pursuant to a tender offer or in connection with a stockholder vote. The redemption price will be the same whether we conduct redemptions pursuant to a tender offer or in connection with a stockholder vote. In either case, our public stockholders may redeem their public shares for cash equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination (which is initially anticipated to be $10.00 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitation that no redemptions will take place, if all of the redemptions would cause our net tangible assets to be less than $5,000,001 and any limitations (including but not limited to cash requirements) agreed to in connection with the negotiation of terms of a proposed business combination. | If we seek stockholder approval of our initial business combination, our sponsor, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions or in the open market prior to or following completion of our initial business combination. There is no limit to the prices that our sponsor, directors, officers, advisors or their affiliates may pay in these transactions. | If we are unable to complete our business combination within 24 months from the closing of this offering, we will redeem all public shares at a per-share price, payable in cash, equal to the aggregate amount, then on deposit in the trust account (which is initially anticipated to be $10.00 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares. |

101

Table of Contents

|  | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Impact to remaining stockholders** | The redemptions in connection with our initial business combination will reduce the book value per share for our remaining stockholders, who will bear the burden of the deferred underwriting commissions and franchise and income taxes payable. | If the permitted purchases described above are made there would be no impact to our remaining stockholders because the purchase price would not be paid by us. | The redemption of our public shares if we fail to complete our business combination will reduce the book value per share for the shares held by our initial stockholders, who will be our only remaining stockholders after such redemptions. |

## Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419

The following table compares the terms of this offering to the terms of an offering by a blank check company subject to the provisions of Rule 419. This comparison assumes that the gross proceeds, underwriting commissions and underwriting expenses of our offering would be identical to those of an offering undertaken by a company subject to Rule 419, and that the underwriters will not exercise their over-allotment option. None of the provisions of Rule 419 apply to our offering.

|  | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Escrow of offering proceeds** | $900,000,000 of the net proceeds of this offering and the sale of the private placement warrants will be deposited into a U.S.-based trust account at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company acting as trustee. | Approximately $765,450,000 of the offering proceeds would be deposited into either an escrow account with an insured depositary institution or in a separate bank account established by a broker-dealer in which the broker-dealer acts as trustee for persons having the beneficial interests in the account. |
| **Investment of net proceeds** | $900,000,000 of the net offering proceeds and the sale of the private placement warrants held in trust will be invested only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. | Proceeds could be invested only in specified securities such as a money market fund meeting conditions of the Investment Company Act or in securities that are direct obligations of, or obligations guaranteed as to principal or interest by, the United States. |

102

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Receipt of interest on escrowed funds** | Interest on proceeds from the trust account to be paid to stockholders is reduced by (i) any income or franchise taxes paid or payable, and (ii) in the event of our liquidation for failure to complete our initial business combination within the allotted time, up to $100,000 of net interest that may be released to us should we have no or insufficient working capital to fund the costs and expenses of our dissolution and liquidation. | Interest on funds in escrow account would be held for the sole benefit of investors, unless and only after the funds held in escrow were released to us in connection with our completion of a business combination. |
| **Limitation on fair value or net assets of target business** | Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. | The fair value or net assets of a target business must represent at least 80% of the maximum offering proceeds. |

103

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Trading of securities issued** | The units will begin trading on or promptly after the date of this prospectus. The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the date of this prospectus unless the Representatives inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, an additional Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the over-allotment option. | No trading of the units or the underlying Class A common stock and warrants would be permitted until the completion of a business combination. During this period, the securities would be held in the escrow or trust account. |
| **Exercise of the warrants** | The warrants cannot be exercised until the later of 30 days after the completion of our initial business combination or 12 months from the closing of this offering. | The warrants could be exercised prior to the completion of a business combination, but securities received and cash paid in connection with the exercise would be deposited in the escrow or trust account. |

104

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Election to remain an investor** | We will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, upon the completion of our initial business combination, subject to the limitations described herein. We may not be required by law to hold a stockholder vote. If we are not required by law and do not otherwise decide to hold a stockholder vote, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC and file tender offer documents with the SEC which will contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, we hold a stockholder vote, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. Additionally, each public stockholder may elect to redeem their public shares irrespective of whether they vote for or against the proposed transaction. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. | A prospectus containing information pertaining to the business combination required by the SEC would be sent to each investor. Each investor would be given the opportunity to notify the company in writing, within a period of no less than 20 business days and no more than 45 business days from the effective date of a post-effective amendment to the company's registration statement, to decide if it elects to remain a stockholder of the company or require the return of its investment. If the company has not received the notification by the end of the 45th business day, funds and interest or dividends, if any, held in the trust or escrow account are automatically returned to the stockholder. Unless a sufficient number of investors elect to remain investors, all funds on deposit in the escrow account must be returned to all of the investors and none of the securities are issued. |

105

Table of Contents

|  | **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|---|
| **Business combination deadline** | If we are unable to complete an initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. | If an acquisition has not been completed within 18 months after the effective date of the company's registration statement, funds held in the trust or escrow account are returned to investors. |

106

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Release of funds** | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our franchise and income tax obligations, the proceeds from this offering and the sale of the private placement warrants held in the trust account will not be released from the trust account until the earliest to occur of: (i) the completion of our initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering and (iii) the redemption of 100% of our public shares if we are unable to complete a business combination within the required time frame (subject to the requirements of applicable law). | The proceeds held in the escrow account are not released until the earlier of the completion of a business combination or the failure to effect a business combination within the allotted time. |

**Competition**

In identifying, evaluating and selecting a target business for our business combination, we may encounter intense competition from other entities having a business objective similar to ours, including other blank check companies, private equity groups and leveraged buyout funds, and operating businesses seeking strategic acquisitions. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Moreover, many of these competitors possess greater financial, technical, human and other resources than we do. Our ability to acquire larger target businesses will be limited by our available financial resources. This inherent limitation gives others an advantage in pursuing the acquisition of a target business. Furthermore, our obligation to pay cash in connection with our public stockholders who exercise their redemption rights may reduce the resources available to us for our initial business combination and our outstanding warrants, and the future dilution they potentially represent, may not be viewed favorably by certain target businesses. Either of these factors may place us at a competitive disadvantage in successfully negotiating an initial business combination.

**Facilities**

Our executive offices are located at 1000 Louisiana Street, Suite 1450, Houston, TX 77002, and our telephone number is (713) 357-1400. Our executive offices are provided to us by an affiliate of our sponsor. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. We consider our current office space adequate for our current operations.

107

Table of Contents

**Employees**

We currently have three officers. Members of our management team are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary to our affairs until we have completed our initial business combination. The amount of time that any such person will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the current stage of the business combination process.

**Periodic Reporting and Financial Information**

We will register our units, Class A common stock and warrants under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual reports will contain financial statements audited and reported on by our independent registered public accountants.

We will provide stockholders with audited financial statements of the prospective target business as part of the tender offer materials or proxy solicitation materials sent to stockholders to assist them in assessing the target business. In all likelihood, these financial statements will need to be prepared in accordance with GAAP. We cannot assure you that any particular target business identified by us as a potential acquisition candidate will have financial statements prepared in accordance with GAAP or that the potential target business will be able to prepare its financial statements in accordance with GAAP. To the extent that this requirement cannot be met, we may not be able to acquire the proposed target business. While this may limit the pool of potential acquisition candidates, we do not believe that this limitation will be material.

We will be required to evaluate our internal control procedures for the fiscal year ending December 31, 2018 as required by the Sarbanes-Oxley Act. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to have our internal control procedures audited. A target company may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of their internal controls. The development of the internal controls of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

**Legal Proceedings**

There is no material litigation, arbitration or governmental proceeding currently pending against us or any members of our management team in their capacity as such, and we and the members of our management team have not been subject to any such proceeding in the 12 months preceding the date of this prospectus.

108

Table of Contents

## MANAGEMENT

### Officers and Directors

Upon completion of this offering, our officers and directors will be as follows:

| Name | Age | Position |
| --- | --- | --- |
| James T. Hackett | 63 | Chief Executive Officer and Director |
| Thomas J. Walker | 46 | Chief Financial Officer |
| Stephen S. Coats | 46 | Secretary |
| William D. Gutermuth | 65 | Director |
| Jeffrey H. Tepper | 51 | Director |
| Diana J. Walters | 54 | Director |

*James T. Hackett* will serve as our Chief Executive Officer and a director upon completion of this offering. Mr. Hackett is a Partner at Riverstone. Prior to joining Riverstone in 2013, Mr. Hackett served as the Chairman of the Board from 2006 to 2013 and the Chief Executive Officer from 2003 to 2012 of Anadarko Petroleum Corporation. Before joining Anadarko, Mr. Hackett served as President and Chief Operating Officer of Devon Energy Corporation, following its merger with Ocean Energy, where he had served as Chairman, President, and Chief Executive Officer. Mr. Hackett has held senior positions at Seagull, Duke Energy, and Pan Energy. He also held positions in engineering, finance and marketing in the midstream, oil field services, and power sectors of the energy industry. Mr. Hackett serves on the Board of Directors of Enterprise Products Holdings, LLC, Fluor Corporation (NYSE: FLR), National Oilwell Varco, Inc. (NYSE: NOV), Sierra Oil and Gas and Talen Energy Corporation. Mr. Hackett is a former Chairman of the Board of the Federal Reserve Bank of Dallas. Mr. Hackett received a Bachelor of Science degree from the University of Illinois in 1975 and an MBA from Harvard Business School in 1979. Mr. Hackett was selected to serve on the board of directors due to his significant leadership experience and his extensive experience in the energy industry.

*Thomas J. Walker* has been our Chief Financial Officer and a director since November 2016. Mr. Walker is a New York-based Partner at Riverstone. Mr. Walker joined Riverstone in January 2007 as the Chief Financial Officer, a position that he still holds currently. Mr. Walker also served as the Chief Financial Officer of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Prior to joining Riverstone, Mr. Walker was a Principal at The Carlyle Group from June 2005, serving as the Chief Financial Officer of the jointly sponsored Carlyle/Riverstone Funds. Prior to Carlyle, Mr. Walker held similar positions at Hampshire Equity Partners, a middle market buyout fund, from February 2001 to June 2005, and Ripplewood Holdings, a private equity firm managing capital commitments in the United States and Japan, from November 1999 to February 2001. Prior to joining Ripplewood, Mr. Walker was the Director of Financial Reporting and Planning at Asbury Automotive Group (NYSE: ABG), a Ripplewood portfolio company, from August 1998 to November 1999. Mr. Walker started his career in the Metro New York office of Arthur Andersen, an international accounting firm. Mr. Walker received a B.S. in Accounting from Binghamton University in 1994. We expect that Mr. Walker will resign from our board of directors upon the appointment of Mr. Hackett to our board of directors in connection with this offering.

*Stephen S. Coats* has been our Secretary since November 2016. Mr. Coats is a New York-based Partner at Riverstone. Mr. Coats joined Riverstone in April 2008 and currently serves as the General Counsel. Mr. Coats also served as the Secretary of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Prior to joining Riverstone, Mr. Coats was a partner at Vinson & Elkins LLP, a law firm specializing in the energy industry. While at Vinson & Elkins, Mr. Coats focused on domestic and crossborder M&A work within the energy industry and was outside counsel to Riverstone on many of Riverstone's early transactions.

109

Table of Contents

He received his B.A. in government from the University of Texas at Austin and his J.D. from the University of Texas School of Law. Mr. Coats is licensed to practice law in the State of New York and the State of Texas.

**William D. Gutermuth** will serve as a director following completion of this offering. Mr. Gutermuth is the Founder and Chairman of Bluegrass Capital LLC, a privately owned investment and consulting firm. Since January 1, 2015, he has devoted substantially all of his professional time and energies to Bluegrass Capital. Prior to that, Mr. Gutermuth was an equity partner at Bracewell & Giuliani LLP and its predecessor firm, Bracewell & Patterson, LLP, where he practiced corporate and transactional law for almost 35 years. Mr. Gutermuth's legal career focused principally on mergers and acquisitions, particularly in the energy industry, as well as most aspects of corporate finance and corporate governance. Mr. Gutermuth chaired Bracewell & Giuliani's worldwide Corporate and Securities Practice from 1999 to 2005 and served as a member of the Business Group Executive Committee from 2005 to 2007, as well as serving in other leadership positions within the law firm throughout his career. Mr. Gutermuth served as a director of Main Street Capital Corporation (NYSE: MAIN), a publicly traded business development company, from 2007 to 2012 and on the Compensation and Nominating and Governance Committees during his tenure as a director. Mr. Gutermuth also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Mr. Gutermuth holds a B.S. in Political Science from Vanderbilt University and a J.D. from Vanderbilt University School of Law. Mr. Gutermuth was selected to serve on the board of directors due to his significant leadership experience and his extensive merger and acquisition experience.

**Jeffrey H. Tepper** will serve as a director following completion of this offering. Mr. Tepper is a Founder of JHT Advisors LLC, a mergers and acquisitions advisory and investment firm. From 1990 to 2013, Mr. Tepper served in a variety of senior management and operating roles at the investment bank Gleacher & Company, Inc. and its predecessors and affiliates ("Gleacher"). Mr. Tepper is experienced in mergers and acquisitions, corporate finance, leveraged finance and asset management. Mr. Tepper was Head of Investment Banking and a member of the Management Committee while at Gleacher. Mr. Tepper led numerous investment banking transactions on behalf of clients in a variety of industries but with a specialty in financial services and asset management. Mr. Tepper also served as Gleacher's Chief Operating Officer, overseeing operations, compliance, technology and financial reporting. In 2001, Mr. Tepper co-founded Gleacher's asset management activities and served as President. Mr. Tepper served on the Investment Committees of Gleacher Mezzanine and Gleacher Fund Advisors. Between 1997 and 1999, Mr. Tepper served as Managing Director of and Chief Operating Officer of Gleacher NatWest Inc. (a predecessor to Gleacher Partners). Mr. Tepper was part of the senior management team of Gleacher NatWest with oversight responsibility for middle-market senior and subordinated debt, high-yield and equity principal activities. Between 1987 and 1990, Mr. Tepper was employed by Morgan Stanley & Co. as a financial analyst in the mergers and acquisitions and merchant banking departments. Mr. Tepper also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016 and has served as a director of Centennial (NASDAQ: CDEV) since October 2016. Mr. Tepper received an MBA from Columbia Business School and a B.S. in Economics from The Wharton School of the University of Pennsylvania with concentrations in finance and accounting. Mr. Tepper was selected to serve on the board of directors due to his significant investment and financial experience.

**Diana J. Walters** will serve as a director following completion of this offering. Ms. Walters has 30 years of experience in the Natural Resources sector, as an investment manager and equity investor, as an investment banker and in operating roles. Ms. Walters has been the owner and sole manager of 575 Grant, LLC, a company that provides advisory services in the field of natural resources, since 2014. She served as the President and Chief Executive Officer of Liberty Metals & Mining Holdings, LLC and a member of senior management of Liberty Mutual Asset Management from January 2010 to

110

1/8/24, 2:00 PM                    Document 672-5 - Filed on 02/16/24 in TXSD - Page 506 of 845

Table of Contents

September 2014. She was a Managing Partner of Eland Capital, LLC, a natural resources advisory firm founded by her, from 2007 to 2010. Ms. Walters has extensive investment experience with both debt and equity through various previous leadership roles at Credit Suisse, HSBC and other firms. She also served previously as Chief Financial Officer of Tatham Offshore Inc., an independent oil and gas company with assets in the Gulf of Mexico. Ms. Walters also served as a director of Silver Run I (NASDAQ: SRAQ) from its inception in November 2015 until the completion of the Centennial acquisition in October 2016. Ms. Walters currently serves on the board of directors of Platinum Group Metals (NYSE: PLG) and Electrum Special Acquisition Corporation (NASDAQ: ELECU). Ms. Walters graduated with Honors from the University of Texas at Austin with a B.A. in Plan II Liberal Arts and an M.A. in Energy and Mineral Resources. Ms. Walters was selected to serve on the board of directors due to her significant investment and operating experience in the energy industry.

### Number and Terms of Office of Officers and Directors

We intend to have four directors upon completion of this offering. Our board of directors will be divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The term of office of the first class of directors, consisting of William D. Gutermuth, will expire at our first annual meeting of stockholders. The term of office of the second class of directors, consisting of Jeffrey H. Tepper and Diana J. Walters, will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of James T. Hackett, will expire at the third annual meeting of stockholders. We may not hold an annual meeting of stockholders until after we consummate our initial business combination.

Our officers are appointed by the board of directors and serve at the discretion of the board of directors, rather than for specific terms of office. Our board of directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our officers may consist of a Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Vice Presidents, Secretary, Treasurer and such other offices as may be determined by the board of directors. We expect that our current Chief Executive Officer, Ken Ryan, will resign from his position upon the appointment of Mr. Hackett as our Chief Executive Officer in connection with this offering.

### Director Independence

NASDAQ listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director. Our board of directors has determined that William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters are "independent directors" as defined in the NASDAQ listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

### Officer and Director Compensation

None of our officers or directors has received any cash compensation for services rendered to us. Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees. No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of our initial business combination. However, these individuals will be

111

Table of Contents

reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

After the completion of our initial business combination, directors or members of our management team who remain with us may be paid consulting or management fees from the combined company. All of these fees will be fully disclosed to stockholders, to the extent then known, in the tender offer materials or proxy solicitation materials furnished to our stockholders in connection with a proposed business combination. We have not established any limit on the amount of such fees that may be paid by the combined company to our directors or members of management. It is unlikely the amount of such compensation will be known at the time of the proposed business combination, because the directors of the post-combination business will be responsible for determining officer and director compensation. Any compensation to be paid to our officers will be determined, or recommended to the board of directors for determination, either by a compensation committee constituted solely by independent directors or by a majority of the independent directors on our board of directors.

We do not intend to take any action to ensure that members of our management team maintain their positions with us after the consummation of our initial business combination, although it is possible that some or all of our officers and directors may negotiate employment or consulting arrangements to remain with us after our initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with us may influence our management's motivation in identifying or selecting a target business but we do not believe that the ability of our management to remain with us after the consummation of our initial business combination will be a determining factor in our decision to proceed with any potential business combination. We are not party to any agreements with our officers and directors that provide for benefits upon termination of employment.

**Committees of the Board of Directors**

Our board of directors will have two standing committees: an audit committee and a compensation committee. Subject to phase-in rules and a limited exception, the rules of NASDAQ and Rule 10A-3 of the Exchange Act require that the audit committee of a listed company be comprised solely of independent directors, and the rules of NASDAQ require that the compensation committee of a listed company be comprised solely of independent directors.

*Audit Committee*

Prior to the consummation of this offering, we will establish an audit committee of the board of directors. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters will serve as members of our audit committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least three members of the audit committee, all of whom must be independent.

Each member of the audit committee is financially literate and our board of directors has determined that Diana J. Walters qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

We will adopt an audit committee charter, which will detail the principal functions of the audit committee, including:

- the appointment, compensation, retention, replacement, and oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us;

112

Table of Contents

- pre-approving all audit and permitted non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;

- reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence;

- setting clear hiring policies for employees or former employees of the independent auditors;

- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;

- obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues;

- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and

- reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

### Compensation Committee

Prior to the consummation of this offering, we will establish a compensation committee of the board of directors. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters will serve as members of our compensation committee. Under the NASDAQ listing standards and applicable SEC rules, we are required to have at least two members of the compensation committee, all of whom must be independent. William D. Gutermuth, Jeffrey H. Tepper and Diana J. Walters are independent.

We will adopt a compensation committee charter, which will detail the principal functions of the compensation committee, including:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, evaluating our Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer based on such evaluation;

- reviewing and approving on an annual basis the compensation of all of our other officers;

- reviewing on an annual basis our executive compensation policies and plans;

- implementing and administering our incentive compensation equity-based remuneration plans;

- assisting management in complying with our proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our officers and employees;

113

Table of Contents

- if required, producing a report on executive compensation to be included in our annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

Notwithstanding the foregoing, as indicated above, other than the $10,000 per month administrative fee payable to an affiliate of our sponsor and reimbursement of expenses, no compensation of any kind, including finders, consulting or other similar fees, will be paid to any of our existing stockholders, officers, directors or any of their respective affiliates, prior to, or for any services they render in order to effectuate the consummation of a business combination. Accordingly, it is likely that prior to the consummation of an initial business combination, the compensation committee will only be responsible for the review and recommendation of any compensation arrangements to be entered into in connection with such initial business combination.

The charter will also provide that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by NASDAQ and the SEC.

**Director Nominations**

We do not have a standing nominating committee. In accordance with Rule 5605(e)(2) of the NASDAQ Rules, a majority of the independent directors may recommend a director nominee for selection by the board of directors. The board of directors believes that the independent directors can satisfactorily carry out the responsibility of properly selecting or approving director nominees without the formation of a standing nominating committee. As there is no standing nominating committee, we do not have a nominating committee charter in place.

The board of directors will also consider director candidates recommended for nomination by our stockholders during such times as they are seeking proposed nominees to stand for election at the next annual meeting of stockholders (or, if applicable, a special meeting of stockholders). Our stockholders that wish to nominate a director for election to our board of directors should follow the procedures set forth in our bylaws.

We have not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, our board of directors considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our stockholders.

**Compensation Committee Interlocks and Insider Participation**

None of our officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more officers serving on our board of directors.

**Code of Ethics**

Prior to the consummation of this offering, we will have adopted a Code of Ethics applicable to our directors, officers and employees. We will file a copy of our Code of Ethics and our audit and compensation committee charters as exhibits to the registration statement of which this prospectus is a part. You will be able to review these documents by accessing our public filings at the SEC's web site

114

Table of Contents

at www.sec.gov. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See the section of this prospectus entitled "Where You Can Find Additional Information."

## Conflicts of Interest

Riverstone manages several investment vehicles. Funds managed by Riverstone or its affiliates, including Fund VI, may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware. Riverstone and/or our management, in their capacities as officers or managing directors of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities described above, current or future Riverstone investment vehicles, or third parties, before they present such opportunities to us. Any presentation of such opportunities to Fund VI may present additional conflicts, given Fund VI's significant investment in us.

Notwithstanding the foregoing, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with any such fund or other investment vehicle. Such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle.

Each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present business combination opportunities to such entity. Accordingly, in the future, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We do not believe, however, that any fiduciary duties or contractual obligations of our officers arising in the future would materially undermine our ability to complete our business combination. In addition, we may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

Our sponsor, officers and directors may become involved with subsequent blank check companies similar to our company, although they have agreed not to participate in the formation of, or become an officer or director of, any other blank check company (other than any such positions held on the date of this prospectus) until we have entered into a definitive agreement regarding our initial business combination or we have failed to complete our initial business combination within 24 months after the closing of this offering. Potential investors should also be aware of the following other potential conflicts of interest:

- None of our officers or directors is required to commit his or her full time to our affairs and, accordingly, may have conflicts of interest in allocating his or her time among various business activities.

- In the course of their other business activities, our officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to us as well

115

Table of Contents

as the other entities with which they are affiliated. Our management may have conflicts of interest in determining to which entity a particular business opportunity should be presented.

• Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the consummation of our initial business combination. Additionally, our initial stockholders have agreed to waive their redemption rights with respect to any founder shares held by them if we fail to consummate our initial business combination within 24 months after the closing of this offering. If we do not complete our initial business combination within such applicable time period, the proceeds of the sale of the private placement warrants held in the trust account will be used to fund the redemption of our public shares, and the private placement warrants will expire worthless. With certain limited exceptions, the founder shares will not be transferable, assignable by our sponsor until the earlier of: (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. With certain limited exceptions, the private placement warrants and the Class A common stock underlying such warrants, will not be transferable, assignable or salable by our sponsor or its permitted transferees until 30 days after the completion of our initial business combination. Since our sponsor and officers and directors may directly or indirectly own common stock and warrants following this offering, our officers and directors may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination.

• Our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

• Our sponsor, officers or directors may have a conflict of interest with respect to evaluating a business combination and financing arrangements as we may obtain loans from our sponsor or an affiliate of our sponsor or any of our officers or directors to finance transaction costs in connection with an intended initial business combination. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

The conflicts described above may not be resolved in our favor.

In general, officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

• the corporation could financially undertake the opportunity;

• the opportunity is within the corporation's line of business; and

• it would not be fair to our company and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. Furthermore, our amended and restated certificate of incorporation will provide that

116

Table of Contents

the doctrine of corporate opportunity will not apply with respect to any of our officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with such a company, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA, or from an independent accounting firm, that such an initial business combination is fair to our company from a financial point of view.

In the event that we submit our initial business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after the offering in favor of our initial business combination and our officers and directors have also agreed to vote any public shares purchased during or after the offering in favor of our initial business combination.

## Limitation on Liability and Indemnification of Officers and Directors

Our amended and restated certificate of incorporation will provide that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our amended and restated certificate of incorporation will provide that our directors will not be personally liable for monetary damages to us or our stockholders for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

We will enter into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our amended and restated certificate of incorporation. Our bylaws also will permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We will purchase a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify our officers and directors.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against officers and directors pursuant to these indemnification provisions.

We believe that these provisions, the directors' and officers' liability insurance and the indemnity agreements are necessary to attract and retain talented and experienced officers and directors.

117

Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth information regarding the beneficial ownership of our common stock as of the date of this prospectus, and as adjusted to reflect the sale of our common stock included in the units offered by this prospectus, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of our outstanding shares of common stock;

- each of our executive officers and directors upon completion of this offering that beneficially owns shares of our common stock; and

- all our executive officers and directors upon completion of this offering as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of common stock beneficially owned by them. The following table does not reflect record or beneficial ownership of the private placement warrants as these warrants are not exercisable within 60 days of the date of this prospectus.

On November 21, 2016, our sponsor acquired 11,500,000 founder shares in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. The following table presents the number of shares and percentage of our common stock owned by our initial stockholders before and after this offering. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our sponsor forfeits 3,375,000 founder shares, and that there are 112,500,000 shares of our common stock issued and outstanding after this offering.

| | Before Offering | | After Offering | |
| --- | --- | --- | --- | --- |
| Name and Address of Beneficial Owner(1) | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock | Number of Shares Beneficially Owned(2) | Approximate Percentage of Outstanding Common Stock |
| Silver Run Sponsor II, LLC(3) | 25,776,000 | 99.6% | 22,401,000 | 19.9% |
| James T. Hackett | — | * | — | * |
| Thomas J. Walker | — | * | — | * |
| Stephen S. Coats | — | * | — | * |
| William D. Gutermuth | 33,000 | * | 33,000 | * |
| Jeffrey H. Tepper | 33,000 | * | 33,000 | * |
| Diana J. Walters | 33,000 | * | 33,000 | * |
| All executive officers and directors as a group (six individuals) | 99,000 | * | 99,000 | * |

\* Less than one percent.

(1) Unless otherwise noted, the business address of each of the following entities or individuals is c/o Silver Run Acquisition Corporation II, 1000 Louisiana Street, Suite 1450, Houston, TX 77002.

(2) Interests shown consist solely of founder shares, classified as shares of Class B common stock. Such shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment, as described in the section of this prospectus entitled "Description of Securities." Excludes forward purchase shares that will only be issued, if at all, at the time of our initial business combination.

(3) Silver Run Sponsor II, LLC is the record holder of the shares reported herein. David M. Leuschen and Pierre F. Lapeyre, Jr. are the managing directors of Riverstone Holdings LLC, which is the sole shareholder of Riverstone Energy GP VI Corp, which is the sole and managing member of Riverstone Energy GP VI, LLC ("Riverstone Energy GP"), which is the general partner of Riverstone Energy Partners VI, L.P., which is the managing member of Riverstone Energy VI Holdings GP, LLC, which is the general partner of Riverstone VI SR II Holdings, L.P., which is

the sole and managing member of Silver Run Sponsor II, LLC. Riverstone Energy GP is managed by a managing committee consisting of Pierre F. Lapeyre, Jr., David M. Leuschen, James T. Hackett, Michael B. Hoffman, N. John Lancaster, Mark G. Papa and, on a rotating basis, one of E. Bartow Jones, Baran Tekkora and Robert M. Tichio. As such, each of the persons and the entities named in this footnote may be deemed to have or share beneficial ownership of the Class A Common Stock held directly by Silver Run Sponsor II, LLC. Each such entity or person disclaims any such beneficial ownership. The business address of each of these entities and individuals is c/o Riverstone Holdings LLC, 712 Fifth Avenue, 36th Floor, New York, NY 10019.

Immediately after this offering, our initial stockholders will beneficially own 20% of the then-issued and outstanding shares of our common stock (assuming they do not purchase any units in this offering). Because of this ownership block, our initial stockholders may be able to effectively influence the outcome of all matters requiring approval by our stockholders, including the election of directors, amendments to our amended and restated certificate of incorporation and approval of significant corporate transactions, including approval of our initial business combination.

The holders of the founder shares have agreed (A) to vote any shares owned by them in favor of any proposed business combination and (B) not to redeem any shares in connection with a stockholder vote to approve a proposed initial business combination.

Our sponsor, Fund VI and our executive officers and directors are deemed to be our "promoters" as such term is defined under the federal securities laws.

**Restrictions on Transfers of Founder Shares and Private Placement Warrants**

The founder shares and private placement warrants and any shares of Class A common stock issued upon conversion or exercise thereof are subject to transfer restrictions pursuant to lock-up provisions in a letter agreement with us to be entered into by our sponsor, officers and directors. Those lock-up provisions provide that such securities are not transferable or salable (i) in the case of the founder shares, until the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property, and (ii) in the case of the private placement warrants and the Class A common stock underlying such warrants, until 30 days after the completion of our initial business combination, except in each case (a) to our officers or directors, any affiliates or family members of any of our officers or directors, any members of our sponsor, or any affiliates of our sponsor, (b) in the case of an individual, by gift to a member of the individual's immediate family, to a trust, the beneficiary of which is a member of the individual's immediate family or an affiliate of such person, or to a charitable organization; (c) in the case of an individual, by virtue of laws of descent and distribution upon death of the individual; (d) in the case of an individual, pursuant to a qualified domestic relations order; (e) by private sales or transfers made in connection with the consummation of a business combination at prices no greater than the price at which the securities were originally purchased; (f) in the event of our liquidation prior to the completion of our initial business combination; (g) by virtue of the laws of Delaware or our sponsor's limited liability company agreement upon dissolution of our sponsor; (h) any Forward Transferee or (i) in the event of our liquidation, merger, capital stock exchange, reorganization or other similar transaction which results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property subsequent to the completion of our initial business combination; provided, however, that in the case of clauses (a) through (e) and (h) these permitted transferees must enter into a written agreement agreeing to be bound by these transfer restrictions.

119

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On November 21, 2016, we issued an aggregate of 11,500,000 founder shares to our sponsor in exchange for a capital contribution of $25,000, or approximately $0.002 per share. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering. In March 2017, our sponsor transferred 33,000 founder shares to each of our independent director nominees at their original purchase price. Up to 3,375,000 founder shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised. The founder shares (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

Our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 13,333,333 (or 15,133,333 if the over-allotment option is exercised in full) private placement warrants for a purchase price of $1.50 per whole warrant in a private placement that will occur simultaneously with the closing of this offering. As such, our sponsor's interest in this transaction is valued at between $20,000,000 and $22,700,000, depending on the number of private placement warrants purchased. Each private placement warrant entitles the holder to purchase one share of our Class A common stock at $11.50 per share. The private placement warrants (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate of up to 13,333,333 warrants, for a purchase price of $10.00 per forward purchase unit, or an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. Fund VI Holdings will purchase a number of forward purchase units that will result in gross proceeds to us necessary to enable us to consummate our initial business combination and pay related fees and expenses, after first applying amounts available to us from the trust account (after paying the deferred underwriting discount and giving effect to any redemptions of public shares) and any other financing source obtained by us for such purpose at or prior to the consummation of our initial business combination, plus any additional amounts mutually agreed by us and Fund VI Holdings to be retained by the post-business combination company for working capital or other purposes. Fund VI Holding's obligation to purchase forward purchase units is conditioned on, among other things, our completing an initial business combination with a company engaged in a business that is within the investment objectives of Fund VI.

The investment objective of Fund VI is to generate long-term capital appreciation through investments in Energy Companies (which includes entities predominantly engaged in (a) the production, exploration, development, extraction, processing, transportation, refining, storage, distribution, marketing and/or trading of oil, gas, coal or other natural resources used to produce energy, or ethanol; (b) the generation, transmission, distribution, marketing and/or trading of all forms of electrical power; (c) the manufacturing, marketing and/or trading of equipment or other supplies predominantly used by entities engaged in businesses described in clause (a) or (b) above or the following clause (d); and (d) the provision of services to entities engaged in businesses described in clause (a), (b) or (c) above); as well as other businesses or assets determined by the General Partner of Fund VI to be related or complementary to any of the foregoing, including without limitation in respect of feedstocks, supplies or other materials usable by any of the foregoing.

The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except

120

Table of Contents

that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

Fund VI Holdings has the right to transfer a portion of its obligation to purchase the forward purchase securities to third parties, and to correspondingly transfer, directly or indirectly, a proportionate number of the founder shares and private placement warrants held by our sponsor to any such Forward Transferee, subject to compliance with applicable securities laws. Any Forward Transferees will also forfeit a pro rata portion of any founder shares held by them in the event the over-allotment option is not exercised in full.

The forward purchase agreement also provides that Fund VI Holdings and any Forward Transferee are entitled to certain registration rights with respect to their forward purchase securities, including the Class A common stock underlying their forward purchase warrants.

As more fully discussed in the section of this prospectus entitled "Management—Conflicts of Interest," if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has then-current fiduciary or contractual obligations, including Fund VI, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us. We may, at our option, pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our initial business combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such entity.

Commencing on the date of this prospectus, we have agreed to pay an affiliate of our sponsor a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

No compensation of any kind, including finder's and consulting fees, will be paid to our sponsor, officers and directors, or any of their respective affiliates, for services rendered prior to or in connection with the completion of an initial business combination. However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Our sponsor has loaned us $300,000 to be used for a portion of the expenses of this offering. This loan is non-interest bearing, unsecured and is due at the earlier of March 31, 2017 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the estimated $2,000,000 of offering proceeds not held in the trust account. The value of our sponsor's interest in this transaction corresponds to the principal amount outstanding under any such loan.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete an initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the

121

Table of Contents

lender. The warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

After our initial business combination, members of our management team who remain with us may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to our stockholders, to the extent then known, in the tender offer or proxy solicitation materials, as applicable, furnished to our stockholders. It is unlikely the amount of such compensation will be known at the time of distribution of such tender offer materials or at the time of a stockholder meeting held to consider our initial business combination, as applicable, as it will be up to the directors of the post-combination business to determine executive and director compensation.

We will enter into a registration rights agreement with respect to the private placement warrants, the warrants issuable upon conversion of working capital loans (if any) and the shares of Class A common stock issuable upon exercise of the foregoing and upon conversion of the founder shares, which is described under the section of this prospectus entitled "Description of Securities— Registration Rights."

**Related Party Policy**

We have not yet adopted a formal policy for the review, approval or ratification of related party transactions. Accordingly, the transactions discussed above were not reviewed, approved or ratified in accordance with any such policy.

Prior to the consummation of this offering, we will adopt a code of ethics requiring us to avoid, wherever possible, all conflicts of interests, except under guidelines or resolutions approved by our board of directors (or the appropriate committee of our board) or as disclosed in our public filings with the SEC. Under our code of ethics, conflict of interest situations will include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) involving the company. A form of the code of ethics that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part.

In addition, our audit committee, pursuant to a written charter that we will adopt prior to the consummation of this offering, will be responsible for reviewing and approving related party transactions to the extent that we enter into such transactions. An affirmative vote of a majority of the members of the audit committee present at a meeting at which a quorum is present will be required in order to approve a related party transaction. A majority of the members of the entire audit committee will constitute a quorum. Without a meeting, the unanimous written consent of all of the members of the audit committee will be required to approve a related party transaction. A form of the audit committee charter that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

To further minimize conflicts of interest, we have agreed not to consummate an initial business combination with an entity that is affiliated with any of our sponsor, officers or directors unless we, or a committee of independent directors, have obtained an opinion from an independent investment banking firm which is a member of FINRA or an independent accounting firm that our initial business

122

Table of Contents

combination is fair to our company from a financial point of view. Furthermore, no finder's fees, reimbursements or cash payments will be made to our sponsor, officers or directors, or our or their affiliates, for services rendered to us prior to or in connection with the completion of our initial business combination. However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment to an aggregate of $300,000 in loans made to us by our sponsor;

- Payment to an affiliate of our sponsor of $10,000 per month, for up to 24 months, for office space, utilities and secretarial and administrative support;

- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and

- Repayment of loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into warrants, at a price of $1.50 per warrant at the option of the lender.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors, or our or their affiliates.

123

Table of Contents

## DESCRIPTION OF SECURITIES

Pursuant to our amended and restated certificate of incorporation, our authorized capital stock consists of 400,000,000 shares of Class A common stock, $0.0001 par value, 50,000,000 shares of Class B common stock, $0.0001 par value, and 1,000,000 shares of undesignated preferred stock, $0.0001 par value. The following description summarizes the material terms of our capital stock. Because it is only a summary, it may not contain all the information that is important to you.

### Units

Each unit has an offering price of $10.00 and consists of one whole share of Class A common stock and one-third of one warrant. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described in this prospectus. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant.

The Class A common stock and warrants comprising the units will begin separate trading on the 52nd day following the closing of this offering unless the Representatives inform us of their decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants.

In no event will the Class A common stock and warrants be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file a Current Report on Form 8-K which includes this audited balance sheet upon the completion of this offering, which is anticipated to take place three business days after the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option.

### Common Stock

Upon the closing of this offering, 112,500,000 shares of our common stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of 3,375,500 founder shares by our sponsor), consisting of:

- 90,000,000 shares of our Class A common stock underlying the units being offered in this offering; and

- 22,500,000 shares of Class B common stock held by our initial stockholders.

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Unless specified in our amended and restated certificate of incorporation or bylaws, or as required by applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of common stock that are voted is required to approve any such matter voted on by our stockholders. Our board of directors will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders

124

Table of Contents

of more than 50% of the shares voted for the election of directors can elect all of the directors. Our stockholders are entitled to receive ratable dividends when, as and if declared by the board of directors out of funds legally available therefor.

Because our amended and restated certificate of incorporation authorizes the issuance of up to 400,000,000 shares of Class A common stock, if we were to enter into a business combination, we may (depending on the terms of such a business combination) be required to increase the number of shares of Class A common stock which we are authorized to issue at the same time as our stockholders vote on the business combination to the extent we seek stockholder approval in connection with our business combination.

In accordance with NASDAQ corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on NASDAQ. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws, unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

We will provide our stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.00 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination. Unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by law, if a stockholder vote is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC, and file tender offer documents with the SEC prior to completing our initial business combination. Our amended and restated certificate of incorporation will require these tender offer documents to contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. However, the participation of our sponsor, officers, directors, advisors or their affiliates in privately-negotiated transactions (as described in this prospectus), if any, could result in the approval of our business

125

Table of Contents

combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our business combination once a quorum is obtained. We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 20% of the shares of common stock sold in this offering, which we refer to as the Excess Shares. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our business combination. Our stockholders' inability to redeem the Excess Shares will reduce their influence over our ability to complete our business combination, and such stockholders could suffer a material loss in their investment if they sell such Excess Shares on the open market. Additionally, such stockholders will not receive redemption distributions with respect to the Excess Shares if we complete the business combination. And, as a result, such stockholders will continue to hold that number of shares exceeding 20% and, in order to dispose such shares would be required to sell their stock in open market transactions, potentially at a loss.

If we seek stockholder approval in connection with our business combination, our initial stockholders have agreed to vote their founder shares and any public shares purchased during or after this offering in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, we would need 33,750,001, or 37.5%, of the 90,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all outstanding shares are voted) in order to have our initial business combination approved (assuming the over-allotment option is not exercised). Additionally, each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction (subject to the limitation described in the preceding paragraph).

Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to

126

Table of Contents

liquidating distributions from the trust account with respect to such public shares if we fail to complete our business combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the company after a business combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, upon the completion of our initial business combination, subject to the limitations described herein.

**Founder Shares**

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, and holders of founder shares have the same stockholder rights as public stockholders, except that (i) the founder shares are subject to certain transfer restrictions, as described in more detail below, (ii) our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed (A) to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our business combination and (B) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our business combination within 24 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our business combination within such time period, (iii) the founder shares are shares of our Class B common stock that will automatically convert into shares of Class A common stock at the time of our initial business combination, or at any time prior thereto at the option of the holder, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein and (iv) are subject to registration rights. If we submit our business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any founder shares held by them and any public shares purchased during or after this offering in favor of our initial business combination.

The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of our initial business combination on a one-for-one basis (subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like), and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the business combination (other than the forward purchase securities), including pursuant to a specified future issuance, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance, including a specified future issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the business combination (excluding the forward purchase securities and any shares or equity-linked securities issued, or to be issued, to any seller in the business combination). Holders of founder shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time.

With certain limited exceptions, the founder shares are not transferable, assignable or salable (except to our officers and directors and other persons or entities affiliated with our sponsor, each of whom will be subject to the same transfer restrictions) until the earlier of (A) one year after the

127

Table of Contents

completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property.

## Preferred Stock

Our amended and restated certificate of incorporation will provide that shares of preferred stock may be issued from time to time in one or more series. Our board of directors will be authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. Our board of directors will be able to, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the common stock and could have anti-takeover effects. The ability of our board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of us or the removal of existing management. We have no preferred stock outstanding at the date hereof. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future. No shares of preferred stock are being issued or registered in this offering.

## Warrants

### Public Stockholders' Warrants

Each whole warrant entitles the registered holder to purchase one whole share of our Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of this offering or 30 days after the completion of our initial business combination. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrantholder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least three units, you will not be able to receive or trade a whole warrant. The warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration. No warrant will be exercisable and we will not be obligated to issue shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a warrant, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In no event will we be required to net cash settle any warrant. In the event that a registration statement is not effective for the exercised warrants, the purchaser of a unit containing such warrant will have paid the full purchase price for the unit solely for the share of Class A common stock underlying such unit.

We have agreed that as soon as practicable, but in no event later than 15 business days, after the closing of our initial business combination, we will use our best efforts to file with the SEC a

128

Table of Contents

registration statement for the registration, under the Securities Act, of the shares of Class A common stock issuable upon exercise of the warrants. We will use our best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. Notwithstanding the above, if our Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will be required to use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

Once the warrants become exercisable, we may call the warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption (the "30-day redemption period") to each warrantholder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending three business days before we send the notice of redemption to the warrantholders.

If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the warrants, each warrantholder will be entitled to exercise its warrant prior to the scheduled redemption date. However, the price of the Class A common stock may fall below the $18.00 redemption trigger price (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) as well as the $11.50 (for whole shares) warrant exercise price after the redemption notice is issued.

If we call the warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. If our management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of Class A common stock to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. We believe this feature is an attractive option to us if we do not need the cash from the exercise of the warrants after our initial business

129

Table of Contents

combination. If we call our warrants for redemption and our management does not take advantage of this option, our sponsor and its permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrantholders would have been required to use had all warrantholders been required to exercise their warrants on a cashless basis, as described in more detail below.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Class A common stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of Class A common stock is increased by a stock dividend payable in shares of Class A common stock, or by a split-up of shares of Class A common stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of Class A common stock. A rights offering to holders of Class A common stock entitling holders to purchase shares of Class A common stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Class A common stock equal to the product of (i) the number of shares of Class A common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Class A common stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Class A common stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Class A common stock, in determining the price payable for Class A common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of Class A common stock as reported during the ten (10) trading day period ending on the trading day prior to the first date on which the shares of Class A common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of Class A common stock on account of such shares of Class A common stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of Class A common stock in connection with a proposed initial business combination, (d) to satisfy the redemption rights of the holders of Class A common stock in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our Class A common stock if we do not complete our initial business combination within 24 months from the closing of this offering, or (e) in connection with the redemption of our public shares upon our failure to complete our initial business combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of Class A common stock in respect of such event.

If the number of outstanding shares of our Class A common stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Class A common stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Class A common stock.

Whenever the number of shares of Class A common stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which

130

Table of Contents

will be the number of shares of Class A common stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Class A common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Class A common stock (other than those described above or that solely affects the par value of such shares of Class A common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of Class A common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of our Class A common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. If less than 70% of the consideration receivable by the holders of Class A common stock in such a transaction is payable in the form of common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within thirty days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the Black-Scholes value (as defined in the warrant agreement) of the warrant.

The warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which will be filed as an exhibit to the registration statement of which this prospectus is a part, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of warrants being exercised. The warrantholders do not have the rights or privileges of holders of Class A common stock or any voting rights until they exercise their warrants and receive shares of Class A common stock. After the issuance of shares of Class A common stock upon exercise of the warrants, each holder will be entitled to one (1) vote for each share held of record on all matters to be voted on by stockholders.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of Class A common stock to be issued to the warrantholder.

*Private Placement Warrants*

The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the

131

completion of our initial business combination (except, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants," to our officers and directors and other persons or entities affiliated with our sponsor) and they will not be redeemable by us so long as they are held by our sponsor or its permitted transferees. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period. If the private placement warrants are held by holders other than the sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering.

If holders of the private placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the excess of the "fair market value" (defined below) over the exercise price of the warrants by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following a business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate.

In order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. Up to $1,500,000 of such loans may be convertible into warrants at a price of $1.50 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

Our sponsor has agreed not to transfer, assign or sell any of the private placement warrants (including the Class A common stock issuable upon exercise of any of these warrants) until the date that is 30 days after the date we complete our initial business combination, except that, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants" made to our officers and directors and other persons or entities affiliated with our sponsor.

**Forward Purchase Securities**

We have entered into a forward purchase agreement with Fund VI Holdings pursuant to which it has agreed to purchase an aggregate of up to 40,000,000 shares of our Class A common stock, plus an aggregate up to of 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of our initial business combination. The forward purchase warrants will have the same terms as the private placement warrants so long as they are held by Fund VI Holdings or its permitted transferees, and the forward purchase shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that the forward purchase shares are subject to transfer restrictions and certain registration rights, as described herein. Any forward purchase warrant held by a holder other than Fund VI Holdings or its

132

Table of Contents

permitted transferees will have the same terms as the warrants included in the units being sold in this offering.

**Dividends**

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial conditions subsequent to completion of a business combination. The payment of any cash dividends subsequent to a business combination will be within the discretion of our board of directors at such time. In March 2017, we effected stock dividends with respect to our Class B common stock of 14,375,000 shares thereof, resulting in our initial stockholders holding an aggregate of 25,875,000 founder shares. Further, if we incur any indebtedness, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

**Our Transfer Agent and Warrant Agent**

The transfer agent for our common stock and warrant agent for our warrants is Continental Stock Transfer & Trust Company. We have agreed to indemnify Continental Stock Transfer & Trust Company in its roles as transfer agent and warrant agent, its agents and each of its stockholders, directors, officers and employees against all claims and losses that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

**Our Amended and Restated Certificate of Incorporation**

Our amended and restated certificate of incorporation will contain certain requirements and restrictions relating to this offering that will apply to us until the completion of our initial business combination. These provisions cannot be amended without the approval of the holders of 65% of our common stock. Our initial stockholders, who will collectively beneficially own 20% of our common stock upon the closing of this offering (assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose. Specifically, our amended and restated certificate of incorporation provides, among other things, that:

- If we are unable to complete our initial business combination within 24 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter subject to lawfully available funds therefor, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law;

- Prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination;

- Although we do not intend to enter into a business combination with a target business that is affiliated with our sponsor, our directors or our officers, we are not prohibited from doing so. In

133

the event we enter into such a transaction, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm that is a member of FINRA or an independent accounting firm that such a business combination is fair to our company from a financial point of view;

- If a stockholder vote on our initial business combination is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will offer to redeem our public shares pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, and will file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about our initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act;

- Our initial business combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of our assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination;

- If our stockholders approve an amendment to our amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our business combination within 24 months from the closing of this offering, we will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon such approval at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes, divided by the number of then outstanding public shares; and

- We will not effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In addition, our amended and restated certificate of incorporation will provide that under no circumstances will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001.

## Certain Anti-Takeover Provisions of Delaware Law and our Amended and Restated Certificate of Incorporation and Bylaws

We will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers upon completion of this offering. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

134

Table of Contents

-    on or subsequent to the date of the transaction, the business combination is approved by our board of directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Our amended and restated certificate of incorporation will provide that our board of directors will be classified into three classes of directors. As a result, in most circumstances, a person can gain control of our board only by successfully engaging in a proxy contest at two or more annual meetings.

Our authorized but unissued common stock and preferred stock are available for future issuances without stockholder approval (including a specified future issuance) and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

### Special meeting of stockholders

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of our board of directors, by our Chief Executive Officer or by our Chairman.

### Advance notice requirements for stockholder proposals and director nominations

Our bylaws provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

## Securities Eligible for Future Sale

Immediately after the consummation of this offering (assuming no exercise of the underwriters' over-allotment option) we will have 112,500,000 (or 129,375,000 if the underwriters' over-allotment option is exercised in full) shares of common stock outstanding. Of these shares, the 90,000,000 shares (or 103,500,000 if the underwriters' over-allotment option is exercised in full) sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. All of the remaining 22,500,000 (or 25,875,000 if the underwriters' over-allotment option is exercised in full) shares and all 13,333,333 (or 15,133,333 if the underwriters' over-allotment option is exercised in full) private placement warrants are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering, and the shares of Class B common stock and private placement warrants are subject to transfer restrictions as set forth elsewhere in this prospectus. These restricted securities will be subject to registration rights as more fully described below under "— Registration Rights."

Upon the closing of the sale of the forward purchase securities, all of the up to 40,000,000 forward purchase shares, up to 13,333,333 forward purchase warrants and shares of Class A common stock underlying the forward purchase warrants will be restricted securities under Rule 144.

135

Table of Contents

## Rule 144

Pursuant to Rule 144, a person who has beneficially owned restricted shares of our common stock or warrants for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as we were required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of our common stock or warrants for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of Class A common stock then outstanding, which will equal 900,000 shares immediately after this offering (or 1,035,000 if the underwriters exercise their over-allotment option in full); or

- the average weekly reported trading volume of the Class A common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

## Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and materials required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our initial stockholders will be able to sell their founder shares and private placement warrants, as applicable, pursuant to Rule 144 without registration one year after we have completed our initial business combination.

## Registration Rights

The holders of the founder shares, private placement warrants and warrants that may be issued upon conversion of working capital loans (and any shares of Class A common stock issuable upon the exercise of the private placement warrants and warrants that may be issued upon conversion of working capital loans and upon conversion of the founder shares) will be entitled to registration rights pursuant to a registration rights agreement to be signed prior to or on the effective date of this offering, requiring us to register such securities for resale (in the case of the founder shares, only after conversion to our Class A common stock). The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration

136

Table of Contents

statements filed subsequent to the completion of our initial business combination and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period, which occurs (i) in the case of the founder shares, on the earlier of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property and (ii) in the case of the private placement warrants and the respective Class A common stock underlying such warrants, 30 days after the completion of our initial business combination. We will bear the expenses incurred in connection with the filing of any such registration statements.

Pursuant to the forward purchase agreement, we have agreed that we will use our commercially reasonable efforts to file within 30 days after the closing of the initial business combination a registration statement with the SEC for a secondary offering of the forward purchase shares and the forward purchase warrants (and the underlying Class A common stock) and to cause such registration statement to be declared effective as soon as practicable after it is filed.

**Listing of Securities**

We have been approved to list our units, Class A common stock and warrants on NASDAQ under the symbols "SRUNU," "SRUN" and "SRUNW," respectively. We expect that our units will be listed on NASDAQ promptly after the effective date of the registration statement. Following the date the shares of our Class A common stock and warrants are eligible to trade separately, we anticipate that the shares of our Class A common stock and warrants will be listed separately and as a unit on NASDAQ.

137

Table of Contents

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a discussion of the material U.S. federal income tax consequences of the acquisition, ownership and disposition of our units, shares of Class A common stock and warrants, which we refer to collectively as our securities. Because the components of a unit are separable at the option of the holder, the holder of a unit generally should be treated, for U.S. federal income tax purposes, as the owner of the underlying Class A common stock and one-third of one warrant components of the unit, as the case may be. As a result, the discussion below with respect to actual holders of Class A common stock and warrants should also apply to holders of units (as the deemed owners of the underlying Class A common stock and warrants that comprise the units). This discussion applies only to securities that are held as a capital asset for U.S. federal income tax purposes and is applicable only to holders who purchased units in this offering.

This discussion does not describe all of the tax consequences that may be relevant to you in light of your particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income and the different consequences that may apply if you are subject to special rules that apply to certain types of investors, such as:

- financial institutions;

- insurance companies;

- dealers or traders subject to a mark-to-market method of accounting with respect to the securities;

- persons holding the securities as part of a "straddle," hedge, integrated transaction or similar transaction;

- U.S. holders (as defined below) whose functional currency is not the U.S. dollar;

- partnerships or other pass-through entities for U.S. federal income tax purposes; and

- tax-exempt entities.

If you are a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of your partners will generally depend on the status of the partners and your activities.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), and administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, changes to any of which subsequent to the date of this prospectus may affect the tax consequences described herein. This discussion does not address any aspect of state, local or non-U.S. taxation, or any U.S. federal taxes other than income taxes (such as gift and estate taxes).

You are urged to consult your tax advisor with respect to the application of U.S. federal tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdiction.

**Personal Holding Company Status**

We could be subject to a second level of U.S. federal income tax on a portion of our income if we are determined to be a personal holding company, or PHC, for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations, pension funds and charitable trusts) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the

138

Table of Contents

corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, certain royalties, annuities and, under certain circumstances, rents).

Depending on the date and size of our initial business combination, at least 60% of our adjusted ordinary gross income may consist of PHC income as discussed above. In addition, depending on the concentration of our stock in the hands of individuals, including the members of our sponsor and certain tax-exempt organizations, pension funds and charitable trusts, more than 50% of our stock may be owned or deemed owned (pursuant to the constructive ownership rules) by such persons during the last half of a taxable year. Thus, no assurance can be given that we will not be a PHC following this offering or in the future. If we are or were to become a PHC in a given taxable year, we would be subject to an additional PHC tax, currently 20%, on our undistributed PHC income, which generally includes our taxable income, subject to certain adjustments.

**Allocation of Purchase Price and Characterization of a Unit**

No statutory, administrative or judicial authority directly addresses the treatment of a unit or instruments similar to a unit for U.S. federal income tax purposes and, therefore, that treatment is not entirely clear. The acquisition of a unit should be treated for U.S. federal income tax purposes as the acquisition of one share of our Class A common stock and one-third of one warrant to acquire one share of our Class A common stock. We intend to treat the acquisition of a unit in this manner and, by purchasing a unit, you will agree to adopt such treatment for tax purposes. For U.S. federal income tax purposes, each holder of a unit must allocate the purchase price paid by such holder for such unit between the one share of Class A common stock and the one-third of one warrant based on the relative fair market value of each at the time of issuance. The price allocated to each share of Class A common stock and the one-third of one warrant should be the shareholder's tax basis in such share or one-third of one warrant, as the case may be. Any disposition of a unit should be treated for U.S. federal income tax purposes as a disposition of the share of Class A common stock and one-third of one warrant comprising the unit, and the amount realized on the disposition should be allocated between the Class A common stock and the one-third of one warrant based on their respective relative fair market values at the time of disposition. The separation of shares of Class A common stock and warrants comprising units should not be a taxable event for U.S. federal income tax purposes.

The foregoing treatment of the shares of Class A common stock and warrants and a holder's purchase price allocation are not binding on the Internal Revenue Service ("IRS") or the courts. Because there are no authorities that directly address instruments that are similar to the units, no assurance can be given that the IRS or the courts will agree with the characterization described above or the discussion below. Accordingly, each prospective investor is urged to consult its own tax advisors regarding the tax consequences of an investment in a unit (including alternative characterizations of a unit). The balance of this discussion assumes that the characterization of the units described above is respected for U.S. federal income tax purposes.

**U.S. Holders**

This section applies to you if you are a "U.S. holder." A U.S. holder is a beneficial owner of our units, shares of Class A common stock or warrants who or that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia; or

139

Table of Contents

- an estate or trust the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

*Taxation of Distributions.* If we pay cash distributions to U.S. holders of shares of our Class A common stock, such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Class A common stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Class A common stock and will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock" below.

Dividends we pay to a U.S. holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Class A common stock described in this prospectus may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.* Upon a sale or other taxable disposition of our Class A common stock or warrants which, in general, would include a redemption of Class A common stock or warrants as described below, and including as a result of a dissolution and liquidation in the event we do not consummate an initial business combination within the required time period, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. holder's adjusted tax basis in the Class A common stock or warrants. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for the Class A common stock or warrants so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Class A common stock described in this prospectus may suspend the running of the applicable holding period for this purpose. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

Generally, the amount of gain or loss recognized by a U.S. holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition (or, if the Class A common stock or warrants are held as part of units at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the Class A common stock or the warrants based upon the then fair market values of the Class A common stock and the warrants included in the units) and (ii) the U.S. holder's adjusted tax basis in its Class A common stock or warrants so disposed of. A U.S. holder's adjusted tax basis in its Class A common stock or warrants generally will equal the U.S. holder's acquisition cost (that is, as discussed above, the portion of the purchase price of a unit allocated to a share of Class A common stock or one-third of one warrant or, as discussed below, the U.S. holder's initial basis for Class A common stock received upon exercise of warrants) less, in the case of a share of Class A common stock, any prior distributions treated as a return of capital.

*Redemption of Class A Common Stock.* In the event that a U.S. holder's Class A common stock is redeemed pursuant to the redemption provisions described in this prospectus under the section of this prospectus entitled "Description of Securities—Common Stock" or if we purchase a U.S. holder's

140

Table of Contents

Class A common stock in an open market transaction, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale of the Class A common stock under Section 302 of the Code. If the redemption qualifies as a sale of common stock, the U.S. holder will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" above. If the redemption does not qualify as a sale of common stock, the U.S. holder will be treated as receiving a corporate distribution with the tax consequences described above under "U.S. Holders—Taxation of Distributions". Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. holder (including any stock constructively owned by the U.S. holder as a result of owning warrants) relative to all of our shares outstanding both before and after the redemption. The redemption of Class A common stock generally will be treated as a sale of the Class A common stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. holder, (ii) results in a "complete termination" of the U.S. holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder takes into account not only stock actually owned by the U.S. holder, but also shares of our stock that are constructively owned by it. A U.S. holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. holder has an interest or that have an interest in such U.S. holder, as well as any stock the U.S. holder has a right to acquire by exercise of an option, which would generally include Class A common stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately following the redemption of Class A common stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately before the redemption. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of our stock actually and constructively owned by the U.S. holder are redeemed or (ii) all of the shares of our stock actually owned by the U.S. holder are redeemed and the U.S. holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. holder does not constructively own any other stock. The redemption of the Class A common stock will not be essentially equivalent to a dividend if a U.S. holder's conversion results in a "meaningful reduction" of the U.S. holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests is satisfied, then the redemption will be treated as a corporate distribution and the tax effects will be as described under "U.S. Holders—Taxation of Distributions," above. After the application of those rules, any remaining tax basis of the U.S. holder in the redeemed Class A common stock will be added to the U.S. holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Exercise or Lapse of a Warrant.* Except as discussed below with respect to the cashless exercise of a warrant, a U.S. holder generally will not recognize taxable gain or loss the acquisition of common stock upon exercise of a warrant for cash. The U.S. holder's tax basis in the share of our Class A common stock received upon exercise of the warrant generally will be an amount equal to the sum of the U.S. holder's initial investment in the warrant (i.e., the portion of the U.S. holder's purchase price

141

Table of Contents

for units that is allocated to the warrant, as described above under "—General Treatment of Units") and the exercise price. The U.S. holder's holding period for the Class A common stock received upon exercise of the warrants will begin on the date following the date of exercise (or possibly the date of exercise) of the warrants and will not include the period during which the U.S. holder held the warrants. If a warrant is allowed to lapse unexercised, a U.S. holder generally will recognize a capital loss equal to such holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current tax law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. holder's basis in the Class A common stock received would equal the holder's basis in the warrant. If the cashless exercise were treated as not being a gain realization event, a U.S. holder's holding period in the Class A common stock would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the Class A common stock would include the holding period of the warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. holder would recognize gain or loss with respect to the portion of the exercised warrants treated as surrendered to pay the exercise price of the warrants (the "surrendered warrants"). The U.S. holder would recognize capital gain or loss with respect to the surrendered warrants in an amount generally equal to the difference between (i) the fair market value of the Class A common stock that would have been received with respect to the surrendered warrants in a regular exercise of warrants and (ii) the sum of the U.S. holder's tax basis in the surrendered warrants and the aggregate cash exercise price of such warrants (if they had been exercised in a regular exercise). In this case, a U.S. holder's tax basis in the Class A common stock received would equal the U.S. holder's tax basis in the warrants exercised plus (or minus) the gain (or loss) recognized with respect to the surrendered warrants. A U.S. holder's holding period for the Class A common stock would commence on the date following the date of exercise (or possibly the date of exercise) of the warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

*Possible Constructive Distributions.*    The terms of each warrant provide for an adjustment to the number of shares of Class A common stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus entitled "Description of Securities—Warrants—Public Stockholders' Warrants." An adjustment which has the effect of preventing dilution generally is not taxable. The U.S. holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrantholders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of Class A common stock that would be obtained upon exercise) as a result of a distribution of cash to the holders of shares of our Class A common stock which is taxable to the U.S. holders of such shares as described under "U.S. Holders—Taxation of Distributions" above. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest. For certain information reporting purposes, we are required to determine the date and amount of any such constructive distributions. Recently proposed Treasury regulations, which we may rely on prior to the issuance of final regulations, specify how the date and amount of constructive distributions are determined.

142

Table of Contents

*Information Reporting and Backup Withholding.*   In general, information reporting requirements may apply to dividends paid to a U.S. holder and to the proceeds of the sale or other disposition of our units, shares of Class A common stock and warrants, unless the U.S. holder is an exempt recipient. Backup withholding may apply to such payments if the U.S. holder fails to provide a taxpayer identification number, a certification of exempt status or has been notified by the IRS that it is subject to backup withholding (and such notification has not been withdrawn).

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

**Non-U.S. Holders**

This section applies to you if you are a "Non-U.S. holder." A Non-U.S. holder is a beneficial owner of our units, shares of Class A common stock and warrants who or that is, for U.S. federal income tax purposes:

- a non-resident alien individual, other than certain former citizens and residents of the United States subject to U.S. tax as expatriates;

- a foreign corporation; or

- a foreign estate or trust;

but does not include an individual who is present in the United States for 183 days or more in the taxable year of disposition. If you are such an individual, you should consult your tax advisor regarding the U.S. federal income tax consequences of the sale or other disposition of our units.

*Taxation of Distributions.*   In general, any distributions (including constructive distributions) we make to a Non-U.S. holder of shares of our Class A common stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). In the case of any constructive dividend, it is possible that this tax would be withheld from any amount owed to a Non-U.S. holder by the applicable withholding agent, including cash distributions on other property or sale proceeds from warrants or other property subsequently paid or credited to such holder. Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. holder's adjusted tax basis in its shares of our Class A common stock and, to the extent such distribution exceeds the Non-U.S. holder's adjusted tax basis, as gain realized from the sale or other disposition of the Class A common stock, which will be treated as described under "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below. In addition, if we determine that we are likely to be classified as a "U.S. real property holding corporation" (see "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants" below), we will withhold 15% of any distribution that exceeds our current and accumulated earnings and profits.

The withholding tax does not apply to dividends paid to a Non-U.S. holder who provides a Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. corporation receiving effectively

143

1/8/24, 2:00 PM
Document672-5 Filed on 02/16/24 in TXSD Page 540 of 845
https://www.sec.gov/Archives/edgar/data/1690769/000104746917001986/a2231531z424b4.htm

Table of Contents

connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate).

*Exercise of a Warrant.*   The U.S. federal income tax treatment of a Non-U.S. holder's exercise of a warrant, or the lapse of a warrant held by a Non-U.S. holder, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of a warrant by a U.S. holder, as described under "U.S. holders—Exercise or Lapse of a Warrant" above, although to the extent a cashless exercise results in a taxable exchange, the consequences would be similar to those described below in "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants."

*Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants.*   A Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized on a sale, taxable exchange or other taxable disposition of our Class A common stock, which would include a dissolution and liquidation in the event we do not complete an initial business combination within 24 months from the closing of this offering, or warrants (including an expiration or redemption of our warrants), in each case without regard to whether those securities were held as part of a unit, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. holder); or

- we are or have been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. holder held our Class A common stock, and, in the case where shares of our Class A common stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or constructively, more than 5% of our Class A common stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. holder's holding period for the shares of our Class A common stock. There can be no assurance that our Class A common stock will be treated as regularly traded on an established securities market for this purpose.

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. holder were a U.S. resident. Any gains described in the first bullet point above of a Non-U.S. holder that is a foreign corporation may also be subject to an additional "branch profits tax" at a 30% rate (or lower treaty rate).

If the second bullet point above applies to a Non-U.S. holder, gain recognized by such holder on the sale, exchange or other disposition of our Class A common stock or warrants will be subject to tax at generally applicable U.S. federal income tax rates. In addition, a buyer of our Class A common stock or warrants from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We cannot determine whether we will be a U.S. real property holding corporation in the future until we complete an initial business combination. We will be classified as a U.S. real property holding corporation if the fair market value of our "U.S. real property interests" equals or exceeds 50 percent of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

*Redemption of Class A Common Stock.*   The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. holder's Class A common stock pursuant to the redemption provisions described in the section of this prospectus entitled "Description of Securities—Common Stock" generally will correspond to the U.S. federal income tax characterization of such a redemption of a

144

Table of Contents

U.S. holder's Class A common stock, as described under "U.S. Holders—Redemption of Class A Common Stock" above, and the consequences of the redemption to the Non-U.S. holder will be as described above under "Non-U.S. holders—Taxation of Distributions" and "Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Class A Common Stock and Warrants," as applicable. It is possible that because the applicable withholding agent may not be able to determine the proper characterization of a redemption of a Non-U.S. holder's Class A common stock, the withholding agent might treat the redemption as a distribution subject to withholding tax.

*Information Reporting and Backup Withholding.*   Information returns will be filed with the IRS in connection with payments of dividends and the proceeds from a sale or other disposition of our units, shares of Class A common stock and warrants. A Non-U.S. holder may have to comply with certification procedures to establish that it is not a United States person in order to avoid information reporting and backup withholding requirements. The certification procedures required to claim a reduced rate of withholding under a treaty will satisfy the certification requirements necessary to avoid the backup withholding as well. The amount of any backup withholding from a payment to a Non-U.S. holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

*FATCA Withholding Taxes.*   Provisions commonly referred to as "FATCA" impose withholding of 30% on payments of dividends (including constructive dividends) on our Class A common stock or warrants, and, beginning in 2019, sales or other disposition proceeds from our units, shares of Class A common stock and warrants to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other Non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies (typically certified as to by the delivery of a properly completed IRS Form W-8BEN-E). If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Prospective investors should consult their tax advisers regarding the effects of FATCA on their investment in our securities.

<div align="center">145</div>

Table of Contents

# UNDERWRITING

Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc. and Goldman, Sachs & Co. are acting as representatives of the underwriters named below. Subject to the terms and conditions of the underwriting agreement dated the date of this prospectus, each underwriter named below has severally agreed to purchase, and we have agreed to sell to that underwriter, the number of units set forth opposite the underwriter's name.

| Underwriter | Number of Units |
|---|---|
| Citigroup Global Markets Inc. | 33,750,000 |
| Credit Suisse Securities (USA) LLC | 27,000,000 |
| Deutsche Bank Securities Inc. | 20,250,000 |
| Goldman, Sachs & Co. | 9,000,000 |
| Total | 90,000,000 |

The underwriting agreement provides that the obligations of the underwriters to purchase the units included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all of the units (other than those covered by the over-allotment option described below) if they purchase any of the units.

Units sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any units sold by the underwriters to securities dealers may be sold at a discount from the initial public offering price not to exceed $0.12 per unit. If all of the units are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The Representatives have advised us that the underwriters do not intend to make sales to discretionary accounts.

If the underwriters sell more units than the total number set forth in the table above, we have granted to the underwriters an option, exercisable for 45 days from the date of this prospectus, to purchase up to 13,500,000 additional units at the public offering price less the underwriting discount. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, in connection with this offering. To the extent the option is exercised, each underwriter must purchase a number of additional units approximately proportionate to that underwriter's initial purchase commitment. Any units issued or sold under the option will be issued and sold on the same terms and conditions as the other units that are the subject of this offering.

We, our sponsor and our officers and directors have agreed that, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of the Representatives, offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any units, warrants, shares of common stock or any other securities convertible into, or exercisable, or exchangeable for, shares of common stock, subject to certain exceptions. The Representatives in their sole discretion may release any of the securities subject to these lock-up agreements at any time without notice, other than in the case of the officers and directors, which shall be with notice. Our sponsor, officers and directors are also subject to separate transfer restrictions on their founder shares and private placement warrants pursuant to the letter agreement described herein.

Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares until the earlier to occur of (A) one year after the completion of our initial business combination or (B) subsequent to our initial business combination, (x) if the last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a

146

Table of Contents

liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except with respect to permitted transferees as in the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants"). The private placement warrants (including the Class A common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders—Restrictions on Transfers of Founder Shares and Private Placement Warrants").

Prior to this offering, there has been no public market for our securities. Consequently, the initial public offering price for the units was determined by negotiations between us and the representatives. Among the factors considered in determining initial public offering price were the history and prospects of companies whose principal business is the acquisition of other companies, prior offerings of those companies, our management, our capital structure, and currently prevailing general conditions in equity securities markets, including current market valuations of publicly traded companies considered comparable to our company. We cannot assure you, however, that the price at which the units, Class A common stock or warrants will sell in the public market after this offering will not be lower than the initial public offering price or that an active trading market in our units, Class A common stock or warrants will develop and continue after this offering.

We have been approved to have our units listed on NASDAQ under the symbol "SRUNU." We expect that our Class A common stock and warrants will be listed under the symbols "SRUN" and "SRUNW," respectively, once the Class A common stock and warrants begin separate trading.

The following table shows the underwriting discounts and commissions that we are to pay to the underwriters in connection with this offering. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

| | Payable by Silver Run Acquisition Corporation II | |
| | No Exercise | Full Exercise |
| --- | --- | --- |
| Per Unit(1) | $ 0.55 | $ 0.55 |
| Total(1) | $ 49,500,000 | $ 56,925,000 |

(1)     Includes $0.35 per unit, or $31,500,000 (or $36,225,000 if the over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the underwriters only on completion of an initial business combination, in an amount equal to $0.35 multiplied by the number of shares of Class A common stock sold as part of the units in this offering, as described in this prospectus.

If we do not complete our initial business combination and subsequently liquidate, the trustee and the underwriters have agreed that (i) they will forfeit any rights or claims to their deferred underwriting discounts and commissions, including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the deferred underwriting discounts and commissions will be distributed on a pro rata basis, including interest earned on the funds held in the trust account and not previously released to us to pay our franchise and income taxes to the public stockholders.

In connection with the offering, the underwriters may purchase and sell units in the open market. Purchases and sales in the open market may include short sales, purchases to cover short positions, which may include purchases pursuant to the over-allotment option and stabilizing purchases, in accordance with Regulation M under the Exchange Act.

147

Table of Contents

- Short sales involve secondary market sales by the underwriters of a greater number of units than they are required to purchase in the offering.

- "Covered" short sales are sales of units in an amount up to the number of units represented by the underwriters' over-allotment option.

- "Naked" short sales are sales of units in an amount in excess of the number of units represented by the underwriters' over-allotment option.

- Covering transactions involve purchases of units either pursuant to the over-allotment option or in the open market after the distribution has been completed in order to cover short positions.

- To close a naked short position, the underwriters must purchase units in the open market after the distribution has been completed. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the units in the open market after pricing that could adversely affect investors who purchase in the offering.

- To close a covered short position, the underwriters must purchase units in the open market after the distribution has been completed or must exercise the over-allotment option. In determining the source of units to close the covered short position, the underwriters will consider, among other things, the price of units available for purchase in the open market as compared to the price at which they may purchase units through the over-allotment option.

- Stabilizing transactions involve bids to purchase units so long as the stabilizing bids do not exceed a specified maximum.

Purchases to cover short positions and stabilizing purchases, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the units. They may also cause the price of the units to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions in the over-the-counter market or otherwise. If the underwriters commence any of these transactions, they may discontinue them at any time.

We estimate that our portion of the total expenses of this offering payable by us will be $1,000,000 (which includes $47,500 of accounting fees and expenses), excluding underwriting discounts and commissions. We have agreed to reimburse the underwriters for all expenses and fees related to the review by FINRA, which will not exceed $15,000.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make because of any of those liabilities.

We are not under any contractual obligation to engage any of the underwriters to provide any services for us after this offering, and have no present intent to do so. However, any of the underwriters may introduce us to potential target businesses or assist us in raising additional capital in the future. If any of the underwriters provide services to us after this offering, we may pay such underwriter fair and reasonable fees that would be determined at that time in an arm's length negotiation; provided that no agreement will be entered into with any of the underwriters and no fees for such services will be paid to any of the underwriters prior to the date that is 90 days from the date of this prospectus, unless FINRA determines that such payment would not be deemed underwriters' compensation in connection with this offering and we may pay the underwriters of this offering or any entity with which they are affiliated a finder's fee or other compensation for services rendered to us in connection with the completion of a business combination.

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our

148

Table of Contents

affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Notice to Prospective Investors in the European Economic Area**

In relation to each member state of the European Economic Area that has implemented the Prospectus Directive (each, a "relevant member state"), with effect from and including the date on which the Prospectus Directive is implemented in that relevant member state (the "relevant implementation date"), an offer of units described in this prospectus may not be made to the public in that relevant member state prior to the publication of a prospectus in relation to the units that has been approved by the competent authority in that relevant member state or, where appropriate, approved in another relevant member state and notified to the competent authority in that relevant member state, all in accordance with the Prospectus Directive, except that, with effect from and including the relevant implementation date, an offer of our units may be made to the public in that relevant member state at any time:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100, or, if the relevant member state has implemented the relevant provisions of the 2010 PD Amending Directive, 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the issuer for any such offer; or natural or legal persons (other than qualified investors as defined below) subject to obtaining the prior consent of the underwriter for any such offer; or

- in any other circumstances that do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

provided that no such offer of units referred to in the bullet points above shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each purchaser of units described in this prospectus located within a relevant member state will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purpose of this provision, the expression an "offer of units to the public" in any relevant member state means the communication in any form and by any means of sufficient information on the terms of the offer and the units to be offered so as to enable an investor to decide to purchase or subscribe for the units, as the expression may be varied in that member state by any measure implementing the Prospectus Directive in that member state, and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive to the extent implemented by the relevant member state) and includes any relevant implementing measure in each relevant member state. The expression 2010 PD Amending Directive means Directive 2010/73/EU.

149

Table of Contents

We have not authorized and do not authorize the making of any offer of units through any financial intermediary on their behalf, other than offers made by the underwriters with a view to the final placement of the units as contemplated in this prospectus. Accordingly, no purchaser of the units, other than the underwriters, is authorized to make any further offer of the units on behalf of us or the underwriters.

**Notice to Prospective Investors in the United Kingdom**

This prospectus is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (each such person being referred to as a "relevant person"). The units are only available to, and any invitation, offer or agreement to purchase or otherwise acquire such units will be engaged in only with, relevant persons. This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents.

**Notice to Prospective Investors in France**

Neither this prospectus nor any other offering material relating to the units described in this prospectus has been submitted to the clearance procedures of the Autorité des Marchés Financiers or by the competent authority of another member state of the European Economic Area and notified to the Autorité des Marchés Financiers. The units have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the units has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or

- used in connection with any offer for subscription or sale of the units to the public in France.

Such offers, sales and distributions will be made in France only:

- to qualified investors (investisseurs qualifiés) and/or to a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French Code monétaire et financier;

- to investment services providers authorized to engage in portfolio management on behalf of third parties; or

- in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French Code monétaire et financier and article 211-2 of the General Regulations (Règlement Général) of the Autorité des Marchés Financiers, does not constitute a public offer (appel public à l'épargne).

The units may be resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code monétaire et financier.

**Notice to Prospective Investors in Hong Kong**

The units may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the

150

Table of Contents

Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the units may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the units may not be circulated or distributed, nor may the units be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the units are subscribed or purchased under Section 275 of the SFA by a relevant person which is

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

- to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than $200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

- where no consideration is or will be given for the transfer; or

- where the transfer is by operation of law.

**Notice to Prospective Investors in Canada**

The units may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions*

151

Table of Contents

or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the units must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York, has passed upon the validity of the securities offered hereby on behalf of us. Certain legal matters will be passed upon on behalf of the underwriters by Vinson & Elkins L.L.P., Houston, Texas.

## EXPERTS

The balance sheet of Silver Run Acquisition Corporation II as of December 31, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period November 16, 2016 (inception) through December 31, 2016, have been audited by WithumSmith+Brown, PC, independent registered public accounting firm, as stated in their report which is incorporated herein. Such financial statements have been incorporated herein in reliance on the report of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the securities we are offering by this prospectus. This prospectus does not contain all of the information included in the registration statement. For further information about us and our securities, you should refer to the registration statement and the exhibits and schedules filed with the registration statement. Whenever we make reference in this prospectus to any of our contracts, agreements or other documents, the references are materially complete but may not include a description of all aspects of such contracts, agreements or other documents, and you should refer to the exhibits attached to the registration statement for copies of the actual contract, agreement or other document.

Upon completion of this offering, we will be subject to the information requirements of the Exchange Act and will file annual, quarterly and current event reports, proxy statements and other information with the SEC. You can read our SEC filings, including the registration statement, over the Internet at the SEC's website at www.sec.gov. You may also read and copy any document we file with the SEC at its public reference facility at 100 F Street, N.E., Washington, D.C. 20549.

You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference facilities.

152

1/8/24, 2:00 PM
sec.gov/Archives/edgar/data/1690769/000104746917001986/a2231531z424b4.htm
Case 4:19-cv-00957 Document 672-5 Filed on 02/16/24 in TXSD Page 549 of 845

Table of Contents

## INDEX TO FINANCIAL STATEMENTS

|                                                                | Page |
| -------------------------------------------------------------- | ---- |
| Report of Independent Registered Public Accounting Firm        | F-2  |
| Balance Sheet                                                  | F-3  |
| Statement of Operations                                        | F-4  |
| Statement of Changes in Stockholder's Equity                   | F-5  |
| Statement of Cash Flows                                        | F-6  |
| Notes to Financial Statements                                  | F-7  |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholder of
Silver Run Acquisition Corporation II

We have audited the accompanying balance sheet of Silver Run Acquisition Corporation II (the "Company"), as of December 31, 2016, and the related statements of operations, changes in stockholder's equity and cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Silver Run Acquisition Corporation II as of December 31, 2016, and the results of its operations and its cash flows for the period from November 16, 2016 (date of inception) to December 31, 2016, in accordance with accounting principles generally accepted in the United States of America.

/s/ WithumSmith+Brown, PC

New York, New York
March 22, 2017

F-2

Table of Contents

**Silver Run Acquisition Corporation II**

**BALANCE SHEET**

**December 31, 2016**

| | | |
|---|---|---:|
| **ASSETS:** | | |
| Current assets—cash | $ | 225,500 |
| Deferred offering costs | | 169,552 |
| Total assets | $ | 395,052 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current Liabilities: | | |
| Accrued formation and offering costs | $ | 72,052 |
| Sponsor note | | 300,000 |
| Total current liabilities | | 372,052 |
| Commitments and contingencies | | |
| Stockholder's equity: | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | — |
| Class A common stock, $0.0001 par value; 400,000,000 shares authorized; none issued and outstanding | | — |
| Class B common stock, $0.0001 par value; 50,000,000 shares authorized; 25,875,000 shares issued and outstanding(1) | | 2,588 |
| Additional paid-in capital | | 22,412 |
| Accumulated deficit | | (2,000) |
| Total stockholder's equity | | 23,000 |
| Total liabilities and stockholder's equity | $ | 395,052 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-3

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF OPERATIONS**

**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | | |
|---|---|---:|
| Revenue | $ | — |
| General and administrative expenses | | 2,000 |
| Net loss attributable to common stock | $ | (2,000) |
| Weighted average number of shares outstanding: | | |
| Basic and diluted(1) | | 25,875,000 |
| Net loss per common share: | | |
| Basic and diluted | $ | (0.00) |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-4

Table of Contents

## Silver Run Acquisition Corporation II

## STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

### For the period from November 16, 2016 (date of inception) to December 31, 2016

| | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Stockholder's Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Sale of common stock to Sponsor at approx. $0.001 per share(1) | 25,875,000 | $ 2,588 | $ 22,412 | $ — | $ 25,000 |
| Net loss | — | — | — | (2,000) | (2,000) |
| Balances, December 31, 2016 | 25,875,000 | $ 2,588 | $ 22,412 | $ (2,000) | $ 23,000 |

(1)    Share amounts have been retroactively restated to reflect the stock dividends of 14,375,000 shares in March 2017 (see Note 6).

See accompanying notes to financial statements

F-5

Table of Contents

**Silver Run Acquisition Corporation II**

**STATEMENT OF CASH FLOWS**

**For the period from November 16, 2016 (date of inception) to December 31, 2016**

| | | |
|---|---:|---:|
| Net loss | $ | (2,000) |
| Adjustments to reconcile net loss to net cash used in operations: | | |
|    Increase in accounts payable and accrued liabilities | | 2,000 |
|      Net cash used in operating activities | | — |
| Cash flows from financing activities: | | |
|    Proceeds from Sponsor note | | 300,000 |
|    Payment of offering costs | | (74,500) |
|      Net cash provided by financing activities | | 225,500 |
| Increase in cash | | 225,500 |
| Cash at beginning of period | | — |
| Cash at end of period | $ | 225,500 |
| Supplemental disclosure of non-cash financing activities | | |
|    Deferred offering costs included in accrued formation and offering costs | $ | 70,052 |
|    Offering costs paid by Sponsor in exchange for Founder Shares | $ | 25,000 |

See accompanying notes to financial statements

F-6

Table of Contents

## NOTES TO FINANCIAL STATEMENTS

**Note 1—Description of Organization and Business Operations**

*Organization and General*

Silver Run Acquisition Corporation II (the "**Company**") was incorporated in Delaware on November 16, 2016. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "**Initial Business Combination**"). The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the "**Securities Act**," as modified by the Jumpstart Our Business Startups Act of 2012 (the "**JOBS Act**").

At December 31, 2016, the Company had not commenced any operations. All activity for the period from November 16, 2016 (inception) through December 31, 2016 relates to the Company's formation and the proposed initial public offering ("**Proposed Offering**") described below. The Company will not generate any operating revenues until after completion of its Initial Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31st as its fiscal year end.

*Sponsor and Proposed Financing*

The Company's sponsor is Silver Run Sponsor II, LLC, a Delaware limited liability company (the "**Sponsor**"). The Company intends to finance its Initial Business Combination with proceeds from the proposed $900,000,000 initial public offering of Units (as defined below) (Note 3) and a $20,000,000 private placement (Note 4). Upon the closing of the Proposed Offering and the private placement, $900,000,000 (or $1,035,000,000 if the underwriters' over-allotment option is exercised in full—Note 3) will be held in a trust account (the "**Trust Account**") (discussed below).

*The Trust Account*

The proceeds held in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred eighty (180) days or less or in money market funds that meet certain conditions under Rule 2a-7 under the Investment Company Act of 1940 and that invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Initial Business Combination or (ii) the distribution of the Trust Account proceeds as described below. The remaining proceeds outside the Trust Account may be used to pay for business, legal and accounting due diligence on prospective acquisitions and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes, if any, none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Initial Business Combination; (ii) the redemption of any shares of Class A common stock included in the Units (the "**Public Shares**") being sold in the Proposed Offering that have been properly tendered in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of its obligation to redeem 100% of such shares of Class A common stock if it does not complete the Initial Business Combination within 24 months from the closing of the Proposed Offering; and (iii) the redemption of 100% of the shares of Class A common stock included in the Units being sold in the Proposed Offering if the Company is unable to complete an Initial Business Combination within 24 months from the closing of the Proposed Offering (subject to the requirements of law). The

F-7

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 1—Description of Organization and Business Operations (Continued)**

proceeds deposited in the Trust Account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

*Initial Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be generally applied toward consummating an Initial Business Combination. The Initial Business Combination must occur with one or more target businesses that together have an aggregate fair market value of at least 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on income earned on the Trust Account) at the time of the agreement to enter into the Initial Business Combination. Furthermore, there is no assurance that the Company will be able to successfully effect an Initial Business Combination.

The Company, after signing a definitive agreement for an Initial Business Combination, will either (i) seek stockholder approval of the Initial Business Combination at a meeting called for such purpose in connection with which stockholders may seek to redeem their shares, regardless of whether they vote for or against the Initial Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to sell their Public Shares to the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the Initial Business Combination or will allow stockholders to sell their Public Shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval, unless a vote is required by law or under NASDAQ rules. If the Company seeks stockholder approval, it will complete its Initial Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the Initial Business Combination. However, in no event will the Company redeem its Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. In such case, the Company would not proceed with the redemption of its Public Shares and the related Initial Business Combination, and instead may search for an alternate Initial Business Combination.

If the Company holds a stockholder vote or there is a tender offer for shares in connection with an Initial Business Combination, a public stockholder will have the right to redeem its shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the Initial Business Combination, including interest but less taxes payable. As a result, such shares of Class A common stock will be recorded at redemption amount and classified as temporary equity upon the completion of the Proposed Offering, in accordance with the Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") 480, "Distinguishing Liabilities from Equity."

Pursuant to the Company's amended and restated certificate of incorporation, if the Company is unable to complete the Initial Business Combination within 24 months from the closing of the Proposed Offering, the Company will (i) cease all operations except for the purpose of winding up,

F-8

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 1—Description of Organization and Business Operations (Continued)**

(ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay the Company's franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public stockholder's rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and the Company's board of directors, dissolve and liquidate, subject in each case to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. The Sponsor and the Company's officers and directors will enter into a letter agreement with the Company, pursuant to which they will agree to waive their rights to liquidating distributions from the Trust Account with respect to any Founder Shares (as defined below) held by them if the Company fails to complete the Initial Business Combination within 24 months of the closing of the Proposed Offering. However, if the Sponsor or any of the Company's directors, officers or affiliates acquires shares of Class A common stock in or after the Proposed Offering, they will be entitled to liquidating distributions from the Trust Account with respect to such shares if the Company fails to complete the Initial Business Combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after an Initial Business Combination, the Company's stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. The Company's stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that the Company will provide its stockholders with the opportunity to redeem their Public Shares for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account, upon the completion of the Initial Business Combination, subject to the limitations described herein.

**Note 2—Summary of Significant Accounting Policies**

*Basis of Presentation*

The financial statements of the Company are presented in U.S. dollars in conformity with accounting principles generally accepted in the United States of America (**"GAAP"**). In connection with the Company's assessment of going concern considerations in accordance with ASU 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern", as of December 31, 2016, the Company does not have sufficient liquidity to meet its current obligations. However, management has determined that the Company has access to funds from the Sponsor entity that are sufficient to fund the working capital needs of the Company until the earlier of the consummation of the Proposed Offering or a minimum one year from the date of issuance of these financial statements.

*Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of

F-9

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 2—Summary of Significant Accounting Policies (Continued)

securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such an election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statement with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

#### Net Loss Per Common Share

Net loss per common share is computed by dividing net loss applicable to common stockholders by the weighted average number of common shares outstanding during the period, plus, to the extent dilutive, the incremental number of shares of common stock to settle warrants, as calculated using the treasury stock method. At December 31, 2016, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company under the treasury stock method. As a result, diluted loss per common share is the same as basic loss per common share for the period.

#### Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash accounts in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

#### Financial Instruments

The fair value of the Company's assets and liabilities, which qualify as financial instruments under the FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet.

#### Use of Estimates

The preparation of financial statements in conformity with GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

#### Deferred Offering Costs

The Company complies with the requirements of the FASB ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A —"Expenses of Offering." Deferred offering costs of approximately $170,000 consist of costs incurred in connection with formation and preparation for the Proposed Offering. These costs, together with the underwriter discount, will be charged to additional paid-in

F-10

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 2—Summary of Significant Accounting Policies (Continued)**

capital upon completion of the Proposed Offering or charged to operations if the Proposed Offering is not completed.

    *Income Taxes*

    The Company follows the asset and liability method of accounting for income taxes under FASB ASC 740, "Income Taxes." Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statements carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

    FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of December 31, 2016. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties at December 31, 2016. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

    *Recent Accounting Pronouncements*

    In August 2014, FASB issued ASU 2014-15, "Presentation of Financial Statements—Going Concern" (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern. ASU 2014-15 provides guidance on management's responsibility to evaluate whether there is a substantial doubt about an organization's ability to continue as a going concern and to provide related footnote disclosures. For each reporting period, management will be required to evaluate whether there are conditions or events that raise substantial doubt about a company's ability to continue as a going concern within one year from the date the financial statements are issued. The amendments in ASU 2014-15 are effective for annual reporting periods ending after December 15, 2016 and for annual and interim periods thereafter. Early adoption is permitted. The Company has adopted the methodologies prescribed by ASU 2014-15 and it did not have a material effect on its financial position or results of operations. See *Basis of Presentation* for additional considerations.

    Management does not believe that any other recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have an effect on the Company's financial statements.

**Note 3—Public Offering**

    Pursuant to the Proposed Offering, the Company intends to offer for sale up to 90,000,000 units at a price of $10.00 per unit (the "**Units**"). The Sponsor has committed to purchase an aggregate of 13,333,333 warrants at a price of $1.50 per warrant in a private placement that will close simultaneously with the Proposed Offering.

F-11

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 3—Public Offering (Continued)

Each Unit consists of one share of the Company's Class A common stock, $0.0001 par value, and one-third of one warrant (each, a "**Warrant**" and, collectively, the "**Warrants**"). Each whole Warrant entitles the holder to purchase one share of Class A common stock at a price of $11.50 per share. No fractional shares will be issued upon separation of the Units and only whole Warrants will trade. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's Initial Business Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's Initial Business Combination or earlier upon redemption or liquidation. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of the Company's Class A common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sent the notice of redemption to the Warrant holders.

The Company expects to grant the underwriters a 45-day option to purchase up to 13,500,000 additional Units to cover any over-allotments at the initial public offering price less the underwriting discounts and commissions. The Units that would be issued in connection with the over-allotment option would be identical to the Units issued in the Proposed Offering.

The Company expects to pay an underwriting discount of 2.0% of the per Unit offering price to the underwriters at the closing of the Proposed Offering, with an additional fee (the "**Deferred Discount**") of 3.5% of the gross offering proceeds payable upon the Company's completion of an Initial Business Combination. The Deferred Discount will become payable to the underwriters from the amounts held in the Trust Account solely in the event the Company completes its Initial Business Combination.

### Note 4—Related Party Transactions

#### Founder Shares

On November 21, 2016, the Sponsor purchased 11,500,000 shares of Class B common stock (the "**Founder Shares**") for an aggregate price of $25,000, or approximately $0.002 per share. As used herein, unless the context otherwise requires, "Founder Shares" shall be deemed to include the shares of Class A common stock issuable upon conversion thereof. The Founder Shares are identical to the Class A common stock included in the Units being sold in the Proposed Offering except that the Founder Shares automatically convert into shares of Class A common stock at the time of the Company's Initial Business Combination and are subject to certain transfer restrictions, as described in more detail below. Holders of Founder Shares may also elect to convert their shares of Class B common stock into an equal number of shares of Class A common stock, subject to adjustment as provided above, at any time. The Sponsor has agreed to forfeit up to 1,500,000 Founder Shares to the extent that the over-allotment option is not exercised in full by the underwriters (see Note 6). The forfeiture will be adjusted to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering.

The Company's initial stockholders will agree, subject to limited exceptions, not to transfer, assign or sell any of their Founder Shares until the earlier to occur of: (A) one year after the completion of the Initial Business Combination or (B) subsequent to the Initial Business Combination, (x) if the last sale price of the Company's Class A common stock equals or exceeds $12.00 per share (as adjusted for

F-12

Case 4:19-cv-00957 Document 672-5 Filed 02/16/24 in TXSD Page 561 of 845

Table of Contents

**NOTES TO FINANCIAL STATEMENTS (Continued)**

**Note 4—Related Party Transactions (Continued)**

stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Initial Business Combination, or (y) the date on which we complete a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

The Sponsor will agree to purchase an aggregate of 13,333,333 private placement warrants (or 15,133,333 if the over-allotment option is exercised in full) at a price of $1.50 per whole warrant (approximately $20,000,000 in the aggregate or $22,700,000 in the aggregate if the over-allotment option is exercised in full) in a private placement that will occur simultaneously with the closing of the Proposed Offering (the "**Private Placement Warrants**"). Each whole Private Placement Warrant is exercisable for one whole share of the Company's Class A common stock at a price of $11.50 per share. A portion of the purchase price of the Private Placement Warrants will be added to the proceeds from the Proposed Offering to be held in the Trust Account such that at the closing of the Proposed Offering $900.0 million (or $1,035.0 million if the underwriters exercise their over-allotment option in full) will be held in the Trust Account. If the Initial Business Combination is not completed within 24 months from the closing of the Proposed Offering, the proceeds from the sale of the Private Placement Warrants held in the Trust Account will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Placement Warrants will expire worthless. The Private Placement Warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by the Sponsor or its permitted transferees.

The Sponsor and the Company's officers and directors will agree, subject to limited exceptions, not to transfer, assign or sell any of their Private Placement Warrants until 30 days after the completion of the Initial Business Combination.

*Registration Rights*

The holders of Founder Shares, Private Placement Warrants and Warrants that may be issued upon conversion of working capital loans, if any, will be entitled to registration rights (in the case of the Founder Shares, only after conversion of such shares to shares of Class A common stock) pursuant to a registration rights agreement to be signed on or before the date of the prospectus for the Proposed Offering. These holders will be entitled to certain demand and "piggyback" registration rights. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period for the securities to be registered. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

*Related Party Loans*

On November 22, 2016, the Sponsor loaned the Company an aggregate of $300,000 to cover expenses related to the Proposed Offering pursuant to a promissory note (the "**Note**"). This loan is non-interest bearing and payable on the earlier of March 31, 2017 or the completion of the Proposed Offering. As of March 20, 2017, $300,000 is still outstanding under the Note.

*Administrative Support Agreement*

Commencing on the date the Units are first listed on the NASDAQ, the Company has agreed to pay the Sponsor a total of $10,000 per month for office space, utilities and secretarial and

F-13

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

### Note 4—Related Party Transactions (Continued)

administrative support. Upon completion of the Initial Business Combination or the Company's liquidation, the Company will cease paying these monthly fees.

### Note 5—Stockholder's Equity

#### Common Stock

The authorized common stock of the Company includes up to 400,000,000 shares of Class A common stock and 50,000,000 shares of Class B common stock (see Note 6). If the Company enters into an Initial Business Combination, it may (depending on the terms of such an Initial Business Combination) be required to increase the number of shares of Class A common stock which the Company is authorized to issue at the same time as the Company's stockholders vote on the Initial Business Combination to the extent the Company seeks stockholder approval in connection with the Initial Business Combination. Holders of the Company's common stock are entitled to one vote for each share of common stock. At December 31, 2016, there were 25,875,000 shares of Class B common stock issued and outstanding (see Note 6).

#### Preferred Stock

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors (see Note 6). At December 31, 2016, there were no shares of preferred stock issued or outstanding.

### Note 6—Subsequent Events

In March 2017, the Company effected stock dividends in the aggregate of approximately 1.25 shares for each outstanding share of Class B common stock, resulting in the initial stockholders holding an aggregate of 25,875,000 Founder Shares. The stock dividends also adjusted the shares subject to forfeiture from 1,500,000 to 3,375,000, to the extent that the over-allotment option is not exercised in full by the underwriters so that the Founder Shares will represent 20.0% of the Company's issued and outstanding shares after the Proposed Offering.

In March 2017, the Company entered into a forward purchase agreement (**"Forward Purchase Agreement"**) pursuant to which Riverstone VI SRII Holdings, L.P. (**"Fund VI Holdings"**) agreed to purchase an aggregate of up to 40,000,000 shares of the Company's Class A common stock, plus an aggregate of up to 13,333,333 warrants (**"Forward Purchase Warrant"**), for an aggregate purchase price of up to $400,000,000 or $10.00 per unit (collectively, **"Forward Purchase Units"**). Each Forward Purchase Warrant has the same terms as each of the Private Placement Warrants.

The obligations under the Forward Purchase Agreement do not depend on whether any public stockholders elect to redeem their shares in connection with the Initial Business Combination and provide the Company with a minimum funding level for the Initial Business Combination. Additionally, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to termination prior to the closing of the sale of such units by mutual written consent of the Company and such party, or automatically: (i) if the Proposed Offering is not consummated on or prior to June 30, 2017; (ii) if the Initial Business Combination is not consummated within 24 months from the closing of the Proposed Offering, unless extended up to a maximum of sixty (60) days in accordance with the amended and restated certificate of incorporation; or (iii) if the Sponsor or the Company become

F-14

Table of Contents

## NOTES TO FINANCIAL STATEMENTS (Continued)

**Note 6—Subsequent Events (Continued)**

subject to any voluntary or involuntary petition under the United States federal bankruptcy laws or any state insolvency law, in each case which is not withdrawn within sixty (60) days after being filed, or a receiver, fiscal agent or similar officer is appointed by a court for business or property of the Sponsor or the Company in each case which is not removed, withdrawn or terminated within sixty (60) days after such appointment. In addition, the obligations of Fund VI Holdings to purchase the Forward Purchase Units are subject to fulfillment of customary closing conditions, including that the Initial Business Combination must be consummated substantially concurrently with the purchase of the Forward Purchase Units.

In March 2017, the Company updated the articles of incorporation to increase the authorized capital stock. The total number of all shares of all classes of capital stock is 451,000,000, consisting of (a) 450,000,000 shares of common stock including (i) 400,000,000 shares of Class A common stock and (ii) 50,000,000 shares of Class B common stock, and (b) 1,000,000 shares of preferred stock.

F-15

Table of Contents

**90,000,000 Units**

# Silver Run Acquisition Corporation II

**PROSPECTUS**

**March 23, 2017**

# Citigroup

# Credit Suisse

# Deutsche Bank Securities

# Goldman, Sachs & Co.

Until April 17, 2017 (25 days after the date of this prospectus), all dealers that buy, sell or trade shares of our Class A common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# PX 253

| From: | "Papa, Mark" <mark@riverstonellc.com> |
|---|---|
| Sent: | Mon, 27 Mar 2017 16:47:21 +0000 (UTC) |
| To: | Jim Hackett <jimt@jimthackett.com> |
| Cc: | "Leuschen, David" <david@riverstonellc.com>; "Lapeyre, Pierre F."<pierre@riverstonellc.com>; "Tichio, Robert" <rtichio@riverstonellc.com> |
| Subject: | RE: Riverstone Update - Pricing of Silver Run Acquisition Corporation II |

Last Thursday I reviewed the Eagle Claw assumptions with John S. and gave him my directional suggestions. I think this could be a decent SR II candidate.

**From:** Jim Hackett [mailto:jimt@jimthackett.com]
**Sent:** Monday, March 27, 2017 10:36 AM
**To:** Papa, Mark <mark@riverstonellc.com>
**Subject:** Re: Riverstone Update - Pricing of Silver Run Acquisition Corporation II

No sir. Your success and Riverstone's reputation made this happen.
I am counting on your help, my friend. Thanks for getting me ready for the roadshow.

**From:** Mark Papa <mark@riverstonellc.com>
**Date:** Monday, March 27, 2017 at 10:14 AM
**To:** Jim Hackett <jimt@jimthackett.com>
**Subject:** FW: Riverstone Update - Pricing of Silver Run Acquisition Corporation II

Jim, that's quite a job you accomplished – makes SR I look like child's play...

**From:** Riverstone Limited Partner Relations
**Sent:** Friday, March 24, 2017 4:31 PM
**To:** Riverstone Limited Partner Relations <LPrelations@riverstonellc.com>
**Subject:** Riverstone Update - Pricing of Silver Run Acquisition Corporation II

Dear Limited Partners of Riverstone Global Energy and Power Fund VI, L.P. ("Fund VI" or the "Fund"),

We are excited to share the attached press release providing you with an update on Silver Run Acquisition Corporation II ("SR-II", or the "Company"). Yesterday SR-II announced the pricing of its initial public offering (its "IPO") of 90 million units at a price of $10 per unit for $900 million of total gross proceeds. As is standard, the underwriters have a 45-day option to purchase up to an additional 13,500,000 units (15% of the base offering) to cover over-allotments, if any. Today, after the close of the first day of trading the over-allotment option was successfully exercised in full and the total amount of the offering was $1.035 billion. The units will be listed on the NASDAQ under the ticker symbol "SRUNU". The units began trading today, March 24, and closed at $10.36/unit. Each unit consists of one share of the Company's Class A common stock and one-third of a warrant, each whole warrant enabling the holder thereof to purchase one whole share of Class A common stock at a price of $11.50 per share. Once the securities comprising the units begin trading separately which occurs 52 days after the IPO, the Class A common stock and warrants are expected to be listed on the NASDAQ Stock Market under the symbols "SRUN" and "SRUNW," respectively. SR-II will be led by Jim Hackett, Riverstone Partner and former CEO & Chairman of Anadarko, whose extensive energy industry experience uniquely positions him to identify an acquisition target that has strong operational performance and growth potential. Jim remains a partner of the firm but will lead the Riverstone team responsible for sourcing the investment for the de-SPACing of SR-II which we refer to as the "Business Combination".

In the email below sent on March 3, we wrote to you announcing the initial filing of SR-II as a $400 million IPO. Once on the road, it became clear to us that public market investors had conviction in the strength of the Riverstone team

**Exhibit 0688**
6/13/2023
Lapeyre 30(b)(6)

CONFIDENTIAL

and shared our view that there are a growing number of opportunities in the energy industry for a vehicle like this alongside private capital. Since Fund VI and its related entities act as the sponsor of SR-II, the increased size of the offering also results in significant additional potential value to Riverstone's Fund VI and related entities through the greater number of founder shares and warrants which go along with the ~160% upsizing of the IPO.

Riverstone pursued this opportunity through Fund VI following the recent success of our investment in Silver Run I, a $500 million SPAC sponsored by Riverstone in February 2016. As you recall, Riverstone raised Silver Run I as an acquisition tool for Fund VI, giving it both a balance sheet partner and a publicly-traded acquisition currency which is a unique competitive edge for Fund VI. Silver Run I acquired Centennial Resource Development, Inc. ("Centennial"), a pure-play Southern Delaware Basin E&P company, in July 2016 for approximately $1.6 billion and subsequently in December completed an additional acquisition of Silverback, an $855 million acquisition of additional pure-play Southern Delaware Basin properties. Silver Run I has been an extremely successful investment for Fund VI (Centennial is marked at approximately 1.8x total invested capital as of December 31, 2016).

As mentioned in our original email, Fund VI and its related entities entered into a forward purchase agreement with SR-II to purchase up to 40,000,000 shares of SR-II Class A common stock, plus up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 in a private placement that will close simultaneously with the closing of the initial Business Combination. Given the current commitments in Fund VI, our existing investment pipeline and our desire to manage concentration risk, we did not increase the amount of Fund VI's forward purchase agreement in conjunction with the upsizing of the offering. Riverstone will continue to evaluate what portion of the commitment to SR-II will be offered for co-investment as well as the amount of co-investment that is likely to be needed to complete the Business Combination. As the General Partner of the Fund, we offer co-investment for a number of reasons, from capital constraints to diversification and risk management. The ultimate value of the Fund VI's founder shares and warrants will continue to depend on the size and attractiveness of, as well as the ability of, SR-II to execute a Business Combination in the allotted time period to do so. Given the likely size of a SR-II's Business Combination, the current commitment level of Fund VI and the current pipeline of opportunities we have for Fund VI, it is likely that we will offer co-investment for some portion of the Fund's commitment as well as raise additional co-investment to make sure that we have sufficient capital to close a Business Combination. We intend to offer any co-investment in SR-II on a fee-free and carry-free basis to our Limited Partners. If we do offer co-investment to our Limited Partners or to third parties, we would expect to offer those co-investors a pro rata percentage of the founder shares and warrants since they are part of the transaction and will expect them to reimburse their proportionate share of the start-up costs of the SPAC.

Riverstone was able to replicate the innovative nature of Silver Run I amid favorable market conditions, by launching a second Riverstone-sponsored SPAC. The strong demand for SR-II builds upon the success of Silver Run I, the best-in-class management teams we have been able to attract to Riverstone, and the market perception that the recent pull back in energy prices may provide a unique investment window as it did for Silver Run I. Riverstone believes that the energy sector, in particular, is underserved by SPAC-style capital relative to other industrial sectors and we believe there will continue to be significant public market institutional interest in vehicles like this as we continue to think about ways in which to make it more applicable to energy and a more flexible and efficient funding tool. We believe the unique benefits of the SPAC, including access to a strong base of institutional public market investors and a publicly-traded acquisition currency, will allow us to pursue unique and potentially larger transactions on behalf of both our private funds and dedicated long-only public institutional energy investors. The SPAC targets an acquisition market that may otherwise be difficult for Fund VI to compete against strategic buyers with only private equity capital. In light of these factors, we believe SR-II will provide Fund VI with the opportunity to take advantage of current energy industry dynamics that can generate attractive returns for our investors, as we have done with Silver Run I.

This is a great outcome for SR-II and for Fund VI and its related entities as the sponsor, but the offering is merely the first step. The ultimate success of SR-II depends on our ability to execute a transaction that makes sense for our investors. We will continue to keep you updated on that process and look forward to speaking with each of you to answer any addition questions that you may have.

If you have any questions please do not hesitate to contact us at Riverstone Limited Partner Relations (lprelations@riverstonellc.com).

Best regards,
Riverstone Limited Partner Relations

**From:** Riverstone Limited Partner Relations
**Sent:** Friday, March 03, 2017 11:03 AM
**To:** Riverstone Limited Partner Relations
**Subject:** Riverstone Update - New Commitment in Riverstone Global Energy and Power Fund VI

Dear Limited Partners of Riverstone Global Energy and Power Fund VI, L.P. ("Fund VI"),

We are excited to share with you that on March 2, 2017, Riverstone, through Fund VI, publicly filed a registration statement for an initial public offering of Silver Run Acquisition Corporation II ("SRUN"), a newly formed special purpose acquisition company.  The public offering consists of 40 million units, each comprised of one share of Class A common stock and one-third of one warrant, each whole warrant exercisable to purchase one share of Class A common stock, at an offering price of $10 per unit or $400 million in total gross proceeds before the exercise of the underwriter's over-allotment option (the "greenshoe"). SRUN was formed for the sole purpose of effecting a merger or other business combination with a target company.  The proceeds of the public offering will be used to fund such business combination.

Fund VI and its related entities are the sole owner of the sponsor of SRUN.  In addition, Fund VI and its related entities have entered into an agreement to purchase $400 million of units in SRUN ($460 million if the greenshoe is exercised in full) to be funded at the closing of a successful initial business combination, under the same terms investors will receive at the initial public offering.  As a reminder, Riverstone's first SPAC, Silver Run I, acquired Centennial Resource Development, Inc. ("Centennial"), a pure-play Delaware Basin E&P company, in July 2016.

SRUN plans to list its units on the NASDAQ Stock Market under the symbol "SRUNU."  Once the securities comprising the units begin separate trading, we expect that the common stock and warrants will be listed on the NASDAQ Stock Market under the symbols "SRUN" and "SRUNW," respectively.  This letter does not constitute an offer to sell or a solicitation of an offer to buy any units or any other securities of Silver Run Acquisition Corporation II, nor will there be any sale of the units or any other securities of SRUN in any state or jurisdiction in which such an offer, solicitation or sale is not permitted.  A registration statement relating to SRUN's securities has been filed with the Securities and Exchange Commission but has not yet become effective.  These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective.  The offering will be made only by means of a prospectus.  When available, copies of the prospectus may be obtained from Citigroup, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717 (Tel: 800-831-9146), and Credit Suisse, Prospectus Department, One Madison Avenue, New York, NY 10010; Telephone: (800) 221-1037; email: newyork.prospectus@credit-suisse.com.

Should you have any questions please do not hesitate to contact us at Riverstone Limited Partner Relations (lprelations@riverstonellc.com).

Best regards,
Riverstone Limited Partner Relations

CONFIDENTIALITY NOTICE:

**The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it**

RIVERSTONE_SDTX00272272

be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

**The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.**

CONFIDENTIAL

RIVERSTONE_SDTX00272273

# PX 254

| From: | "Karian, Drew" <dkarian@riverstonellc.com> |
|---|---|
| Sent: | Wed, 12 Apr 2017 19:34:01 +0000 (UTC) |
| To: | "Babaria, Neil" <NBabaria@riverstonellc.com>; "Wassenaar, Olivia"<owassenaar@riverstonellc.com> |
| Cc: | "Dodds Williamson, Chelsea" <cwilliamson@riverstonellc.com> |
| Subject: | RE: Alta Mesa Overview |

Well done.  Thanks.  Defer to OW/the group but a few comments/thoughts below.  No need to incorporate every one.

- Page 4
    - Proved reserve multiple is off
    - Footnote EBITDA as open or hedged
    - No debt on midstream business?
    - May show a total
    - May show $ in mm, unless…
    - Defer to RT/OW on range in table
- Page 17
    - Footnote if EBITDA is consensus or open so we know if we can comp to AVP page
- Page 18
    - Should we add Apollo deal based on our guesstimate?
    - May separate (2 tables) or delineate/label SCOOP vs STACK since SCOOP is more gas weighted, or separate between gas and oil weighted, defer to you guys on best way to show
    - May scrub out deals with no comp information
- May include a slide (or bullet or pic) somewhere to talk about spacing, AM's assertion of one type curve and 12 well unit across the entire leasehold is aggressive in my opinion and we may want to make that point

**From:** Babaria, Neil
**Sent:** Wednesday, April 12, 2017 1:28 PM
**To:** Wassenaar, Olivia
**Cc:** Karian, Drew; Dodds Williamson, Chelsea
**Subject:** Alta Mesa Overview

Olivia,

Hope you're well. Please find attached slides we pulled together as an "introduction" to Alta Mesa for the SRII SWOT team call. The deck includes overview slides from the Alta Mesa presentation as well as an AVP analysis and comps as we discussed yesterday. Please let us know if you have any questions or comments. We are happy to discuss.

Thanks,
Neil

_____

Neil Babaria
Riverstone Holdings LLC
712 Fifth Avenue, 36th Floor
New York, NY 10019
Office: (212) 271-6306
████████████████
nbabaria@riverstonellc.com

**Exhibit
CP- 0078**
2/24/2023
Wassenaar

# PX 255

| From: | Jim Hackett <jimt@jimthackett.com> |
|---|---|
| Sent: | Wed, 12 Apr 2017 02:13:47 +0000 (UTC) |
| To: | Chris Widell <Chris@sponteresources.com> |
| Cc: | "Wassenaar, Olivia" <owassenaar@riverstonellc.com>; "Tichio, Robert"<rtichio@riverstonellc.com>; "Karian, Drew" <dkarian@riverstonellc.com> |
| Subject: | Re: Alta Mesa - Engineering perspective |

Chris,
Thank you. This seems to imply technical and operational upsides, if innovation can be promoted in the technical ranks.
Jim

On Apr 11, 2017, at 9:55 PM, Chris Widell <Chris@sponteresources.com> wrote:

Olivia and Robert,
It was a pleasure joining your team at AMR's offices in Houston. Monstrously technical but time well-spent, I think.

Wanted to share my thoughts.

They've got an extremely unique and valuable contiguous 100,000+ac up-dip, normal-pressure STACK leasehold position with low royalties which boost their economics- that point cannot be overstated. They are certainly executing along the trajectory towards full manufacturing mode and no doubt drill the cheapest wells in the STACK. They are an Osage-heavy Stack company. (As they noted, some might say that makes them not "STACK" at all).

One interesting bit of information I noticed right away is that it looks like they've spent 80-90% of their drilling dollars on about 25% of their acreage position. This is important because they are using one oil type curve with an EUR of 350MBO and one PUD down-spacing scheme (8x Osage, 4x Meramec) and then spreading it across the entire less-proven acreage position to back into an NAV. The evaluations engineer side of me has a problem with this not only because of SEC PUD standards but more so because where you spend your budget tells me a lot about how much confidence you truly have in your acreage.

Further, the Osage is not a completions-technology, big hydrocarbon volumes play- it's a low-cost play. As you probably saw, they don't see well performance improvement above 1,500#/ft of sand (best rock in industry responds positively all the way up to 3,000#/ft, as of right now) and they don't really care what kind of sand they use (best rock in industry is focusing more on smaller proppant for diversion purposes- going towards a mining inspired extraction process). This is significant in my opinion because as our industry has shown- as technology improves, we will be able to produce and down-space more and more out of the porous, tight, non-fractured rock (like the Meramec in STACK and Delaware basin Wolfcamp) with these techniques. In that vein, I wasn't surprised to see their lackluster down-spacing results. The Osage- due to its fractured nature here, has a high degree of wellbore interference and they're seeing that the spacing tests- even the 1320' tests (4-wells per unit) have a hard time hitting the type curve. To me these results limit AMR's "STACK upside" story.

Again- was a pleasure. Hope this was helpful. Please let me know if you need anything additional.

-Chris

Chris Widell
Sponte Resources, LLC

**Exhibit**
**CP- 0077**
2/24/2023
Wassenaar

RIVERSTONE_SDTX00255190

Chris@sponteresources.com

On Apr 9, 2017, at 9:59 PM, Chris Widell <Chris@sponteresources.com> wrote:

      See you there.

-Chris

Chris Widell
Sponte Resources, LLC

Chris@sponteresources.com

      On Apr 9, 2017, at 9:27 PM, Wassenaar, Olivia
      <owassenaar@riverstonellc.com> wrote:

      Chris,

      We will meet you in the lobby of Alta Mesa's offices (15021 Katy
      Freeway) tomorrow at 1pm.

      All best,

      Olivia

      -----Original Message-----

      From: Chris Widell [mailto:Chris@sponteresources.com]

      Sent: Sunday, April 09, 2017 2:06 PM

      To: Jim Hackett

      Cc: Wassenaar, Olivia; Karian, Drew

      Subject: Re: Thank You

      No problem, Jim.

      Olivia,

RIVERSTONE_SDTX00255191

Just let me know when and where I need to be. I'm aiming for 1pm in Houston as of now.

-Chris

Chris Widell

Sponte Resources, LLC

███████

Chris@sponteresources.com

> On Apr 8, 2017, at 6:01 PM, Jim Hackett <jimt@jimthackett.com> wrote:
>
> Wonderful. You will need to sign a side letter with us that simply includes you under the NDA we have with the company you will visit. I am putting you in touch with Olivia Wassenaar, who will communicate the plan of action. She is a key member of the De-SPAC team and is leading the due diligence on Monday.
>
> Thank you so much.
>
> Jim
>
>> On Apr 8, 2017, at 1:50 PM, Chris Widell <Chris@sponteresources.com> wrote:
>>
>> Sure, Jim. I think standard evaluations engineering fees are $150-$175/hr for a guy like me. If that works I can catch a flight down and make 1pm on Monday, no problem.
>>
>> -Chris
>>
>> Chris Widell
>>
>> Sponte Resources, LLC
>>
>> ███████
>>
>> Chris@sponteresources.com

RIVERSTONE_SDTX00255192

Chris Widell

Sponte Resources, LLC

████████

Chris@sponteresources.com

> On Apr 8, 2017, at 11:30 AM, Jim
> Hackett <jimt@jimthackett.com>
> wrote:


> Chris,

> Might you be able to be in
> Houston on Monday by 1PM to
> help us review a SPAC
> opportunity? If so, let's discuss a
> consulting charge.

> Jim


CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the
person or entity to which it is addressed and may contain confidential,
trade secret and/or privileged material. If you are not the intended
recipient of this information, do not review, retransmit, disclose,
disseminate, use, or take any action in reliance upon, this information. If
you received this transmission in error, please contact the sender and
destroy all printed copies and delete the material from all computers.
The information included in this email does not constitute and will not
give rise to any legally binding obligation nor may it be relied upon as
the basis for a contract by estoppel or otherwise.

RIVERSTONE_SDTX00255193

# PX 256

| From: | "Tichio, Robert" <rtichio@riverstonellc.com> |
|---|---|
| Sent: | Wed, 12 Apr 2017 14:30:24 +0000 (UTC) |
| To: | "Wassenaar, Olivia" <owassenaar@riverstonellc.com> |
| Subject: | RE: Alta Mesa - Engineering perspective |

Is this his value add??? I came to the same conclusion, which means either you and I have officially been doing this too long . . . or he is not good

Robert M. Tichio
Riverstone Holdings LLC
712 Fifth Avenue, 36th Floor, New York, New York 10019
▮▮▮▮▮▮▮▮▮ robert@riverstonellc.com

**From:** Wassenaar, Olivia
**Sent:** Wednesday, April 12, 2017 5:58 AM
**To:** Tichio, Robert
**Subject:** Fwd: Alta Mesa - Engineering perspective

Hummmm

Begin forwarded message:

**From:** Chris Widell <Chris@sponteresources.com>
**Date:** April 11, 2017 at 9:55:39 PM EDT
**To:** "Wassenaar, Olivia" <owassenaar@riverstonellc.com>, "Tichio, Robert"
<rtichio@riverstonellc.com>
**Cc:** Jim Hackett <jimt@jimthackett.com>, "Karian, Drew" <dkarian@riverstonellc.com>
**Subject: Alta Mesa - Engineering perspective**

Olivia and Robert,
It was a pleasure joining your team at AMR's offices in Houston. Monstrously technical but time
well-spent, I think.

Wanted to share my thoughts.

They've got an extremely unique and valuable contiguous 100,000+ac up-dip, normal-pressure
STACK leasehold position with low royalties which boost their economics- that point cannot be
overstated. They are certainly executing along the trajectory towards full manufacturing mode
and no doubt drill the cheapest wells in the STACK. They are an Osage-heavy Stack company.
(As they noted, some might say that makes them not "STACK" at all).
One interesting bit of information I noticed right away is that it looks like they've spent 80-90%
of their drilling dollars on about 25% of their acreage position. This is important because they
are using one oil type curve with an EUR of 350MBO and one PUD down-spacing scheme (8x
Osage, 4x Meramec) and then spreading it across the entire less-proven acreage position to back
into an NAV. The evaluations engineer side of me has a problem with this not only because of
SEC PUD standards but more so because where you spend your budget tells me a lot about how
much confidence you truly have in your acreage.
Further, the Osage is not a completions-technology, big hydrocarbon volumes play- it's a low-cost play.
As you probably saw, they don't see well performance improvement above 1,500#/ft of sand
(best rock in industry responds positively all the way up to 3,000#/ft, as of right now) and they
don't really care what kind of sand they use (best rock in industry is focusing more on smaller
proppant for diversion purposes- going towards a mining inspired extraction process). This is

RIVERSTONE_SDTX00286077

significant in my opinion because as our industry has shown- as technology improves, we will be able to produce and down-space more and more out of the porous, tight, non-fractured rock (like the Meramec in STACK and Delaware basin Wolfcamp) with these techniques. In that vein, I wasn't surprised to see their lackluster down-spacing results. The Osage- due to its fractured nature here, has a high degree of wellbore interference and they're seeing that the spacing tests- even the 1320' tests (4-wells per unit) have a hard time hitting the type curve. To me these results limit AMR's "STACK upside" story.

Again- was a pleasure. Hope this was helpful. Please let me know if you need anything additional.


-Chris

Chris Widell
Sponte Resources, LLC
███████
Chris@sponteresources.com
On Apr 9, 2017, at 9:59 PM, Chris Widell <Chris@sponteresources.com> wrote:

See you there.

-Chris


Chris Widell
Sponte Resources, LLC
████████
Chris@sponteresources.com

On Apr 9, 2017, at 9:27 PM, Wassenaar, Olivia <owassenaar@riverstonellc.com> wrote:

Chris,

We will meet you in the lobby of Alta Mesa's offices (15021 Katy Freeway) tomorrow at 1pm.

All best,

Olivia


-----Original Message-----
From: Chris Widell [mailto:Chris@sponteresources.com]
Sent: Sunday, April 09, 2017 2:06 PM
To: Jim Hackett
Cc: Wassenaar, Olivia; Karian, Drew
Subject: Re: Thank You

RIVERSTONE_SDTX00286078

No problem, Jim.

Olivia,
Just let me know when and where I need to be. I'm aiming for 1pm in Houston as of now.

-Chris


Chris Widell
Sponte Resources, LLC
▇▇▇▇▇▇
Chris@sponteresources.com

> On Apr 8, 2017, at 6:01 PM, Jim Hackett <jimt@jimthackett.com> wrote:
>
> Wonderful. You will need to sign a side letter with us that simply  includes you under the NDA we have with the company you will visit. I am putting you in touch with Olivia Wassenaar, who will communicate the plan of action. She is a key member of the De-SPAC team and is leading the due diligence on Monday.
> Thank you so much.
> Jim

>> On Apr 8, 2017, at 1:50 PM, Chris Widell <Chris@sponteresources.com> wrote:
>>
>> Sure, Jim. I think standard evaluations engineering fees are $150-$175/hr for a guy like me. If that works I can catch a flight down and make 1pm on Monday, no problem.
>>
>> -Chris
>>
>> Chris Widell
>> Sponte Resources, LLC
>> ▇▇▇▇▇▇
>> Chris@sponteresources.com

>> Chris Widell
>> Sponte Resources, LLC
>> ▇▇▇▇▇▇
>> Chris@sponteresources.com
>>> On Apr 8, 2017, at 11:30 AM, Jim Hackett <jimt@jimthackett.com> wrote:

RIVERSTONE_SDTX00286079

Chris,
Might you be able to be in
Houston on Monday by 1PM to
help us review a SPAC
opportunity? If so, let's discuss a
consulting charge.
Jim

CONFIDENTIALITY NOTICE:
The information contained in this transmission is intended only for the
person or entity to which it is addressed and may contain confidential,
trade secret and/or privileged material. If you are not the intended
recipient of this information, do not review, retransmit, disclose,
disseminate, use, or take any action in reliance upon, this information. If
you received this transmission in error, please contact the sender and
destroy all printed copies and delete the material from all computers.
The information included in this email does not constitute and will not
give rise to any legally binding obligation nor may it be relied upon as
the basis for a contract by estoppel or otherwise.

# PX 257

**From**: Hal H. Chappelle [hchappelle@AltaMesa.net]
**on behalf of** Hal H. Chappelle <hchappelle@AltaMesa.net> [hchappelle@AltaMesa.net]
**Sent**: 4/14/2017 6:21:41 PM
**To**: Tim Turner [tturner@AltaMesa.net]
**CC**: Kevin J. Bourque [kbourque@AltaMesa.net]
**Subject**: Re: AMR - Latest Analyst Presentation

Should I ask Derek and team to try it?

Sent from my iPhone

On Apr 14, 2017, at 5:37 PM, Hal H. Chappelle <hchappelle@AltaMesa.net> wrote:

Suggest we add Clark, Pinehurst, Francis, Boecher, Rudd, EHU 235

**From:** Tim Turner <tturner@altamesa.net>
**Date:** Friday, April 14, 2017 at 4:50 PM
**To:** Hal Chappelle <hchappelle@altamesa.net>
**Cc:** "Kevin J. Bourque" <kbourque@AltaMesa.net>
**Subject:** RE: AMR - Latest Analyst Presentation

Pick what looks good to you. The file was sent in my last email and the wells in green are the ones on the map except for the non-op wells.

<image001.png>

-----Original Message-----
From: Hal H. Chappelle
Sent: Friday, April 14, 2017 4:35 PM
To: Tim Turner <tturner@AltaMesa.net>
Cc: Kevin J. Bourque <kbourque@AltaMesa.net>
Subject: Re: AMR - Latest Analyst Presentation

I guess I would add Rudd and pinehurst. Any other EHU WELLS?

I am suggesting a tweak to your logic ... putting a few more dots to get both sides of the township

Sent from my iPhone

> On Apr 14, 2017, at 4:25 PM, Tim Turner <tturner@AltaMesa.net> wrote:
>
> List below is MBOE/Township. Most wells in 1706. To me, it screams sweet spot if we bunch up in 1705/1706. Could add Rudd in 1605, but it's under 600 MBOE. All of our wells on the map are over 600 MBOE (i.e. near or above type curve). Well list from last night is attached.
>
> From: Hal H. Chappelle
> Sent: Friday, April 14, 2017 4:04 PM
> To: Tim Turner <tturner@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
> Subject: Re: AMR - Latest Analyst Presentation
>
> Looking at Slide 23. I like it, but thinking on how to illustrate a little more continuity ... do any of the following have good EURs such that we might want to add them on the map?
>

AMR_003655
AMR_SDTX00003655

> * Augusta – 255 - 1905
> * Evelyn – 575 - 1706
> * Themer – 510 - 1706
> * Pinehurst – 672 - 1706
> * Tullamore – 428 - 1706
> * Boecher – 574 - 1706
> * Aces High – not producing - 1606
> * Rudd – 520 - 1605
> * Ray – 373 - 1605
> * Shimanek 213 - 1906
>
>
>
> From: Tim Turner <tturner@altamesa.net<mailto:tturner@altamesa.net>>
> Date: Friday, April 14, 2017 at 1:47 PM
> To: "Paull, Mark" <Mark.Paull@gs.com<mailto:Mark.Paull@gs.com>>
> Cc: "Hankey, Scott" <Scott.Hankey@gs.com<mailto:Scott.Hankey@gs.com>>,
"derek.deas@citi.com<mailto:derek.deas@citi.com>" <derek.deas@citi.com<mailto:derek.deas@citi.com>>, Hal
Chappelle <hchappelle@altamesa.net<mailto:hchappelle@altamesa.net>>, "Michael A. McCabe"
<mmccabe@AltaMesa.net<mailto:mmccabe@AltaMesa.net>>, "Kevin J. Bourque"
<kbourque@AltaMesa.net<mailto:kbourque@AltaMesa.net>>,
"james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>"
<james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>>, "jacob.call@citi.com<mailto:jacob.call@citi.com>"
<jacob.call@citi.com<mailto:jacob.call@citi.com>>, "chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>"
<chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>>, "Siddiqui, Nameer"
<Nameer.Siddiqui@gs.com<mailto:Nameer.Siddiqui@gs.com>>, "Lambert, Bill"
<Bill.Lambert@gs.com<mailto:Bill.Lambert@gs.com>>, "Mills, Ryan" <Ryan.Mills@gs.com<mailto:Ryan.Mills@gs.com>>,
"Goldenberg, Naum" <Naum.Goldenberg@gs.com<mailto:Naum.Goldenberg@gs.com>>
> Subject: Re: AMR - Latest Analyst Presentation
>
> Happy to discuss the process. Oil is reported by the purchaser in OK, do not much we can do other than encourage
them. It worked to our advantage for a long time.
>
> Tim
>
> On Apr 14, 2017, at 1:25 PM, Paull, Mark <Mark.Paull@gs.com<mailto:Mark.Paull@gs.com>> wrote:
> Tim
> My only concern is that the data shows an apparent under reporting of oil. Which is not correct. It is most likely an
allocation issue. Maybe oil is being allocated to vertical unit wells. We are only showing horizontals on the page. Having
the page in the appendix gives you the option to discuss if it comes up.
> Mark
>
> From: Tim Turner [mailto:tturner@AltaMesa.net]
> Sent: Friday, April 14, 2017 12:24 PM
> To: Hankey, Scott [IBD]
> Cc: Deas, Derek <derek.deas@citi.com<mailto:derek.deas@citi.com>>; Paull, Mark [IBD]; Hal H. Chappelle
<hchappelle@AltaMesa.net<mailto:hchappelle@AltaMesa.net>>; Michael A. McCabe
<mmccabe@AltaMesa.net<mailto:mmccabe@AltaMesa.net>>; Kevin J. Bourque
<kbourque@AltaMesa.net<mailto:kbourque@AltaMesa.net>>; Jackson, James R
<james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>>; Call, Jacob
<jacob.call@citi.com<mailto:jacob.call@citi.com>>; O'suji, Chinna
<chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>>; Siddiqui, Nameer [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD];
Goldenberg, Naum [IBD]

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

> Subject: Re: AMR - Latest Analyst Presentation
>
> Very helpful. Explains a lot of things. Agree with Mark we should put in the appendix. It doesn't really fit into the flow, but may be very important if questions come up. Thanks for preparing.
>
> Tim
>
> On Apr 14, 2017, at 12:13 PM, Hankey, Scott <Scott.Hankey@gs.com<mailto:Scott.Hankey@gs.com>> wrote:
> For context I think what we'll do ultimately is boil it down to one slide that includes some bullets describing why the results are different
>
> From: Deas, Derek [mailto:derek.deas@citi.com]
> Sent: Friday, April 14, 2017 12:12 PM
> To: Paull, Mark [IBD]; Hankey, Scott [IBD]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'
> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD]; Goldenberg, Naum [IBD]
> Subject: RE: AMR - Latest Analyst Presentation
>
> Impressive, very helpful slides.  I'm in favor of adding.  Hal / AMR team, what are your thoughts?  Happy to handle as you see fit.  If you'd like to add, please ballpark roughly what location in the deck you'd like these placed in (once in AMR format).
>
> From: Paull, Mark [mailto:Mark.Paull@gs.com]
> Sent: Friday, April 14, 2017 12:00 PM
> To: Hankey, Scott; Deas, Derek [ICG-CIB]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'
> Cc: Jackson, James R [ICG-CIB]; Call, Jacob [ICG-CIB]; O'suji, Chinna [ICG-CIB]; Siddiqui, Nameer; Lambert, Bill; Mills, Ryan; Goldenberg, Naum
> Subject: RE: AMR - Latest Analyst Presentation
>
> We have attached 2 comparisons of AMR data to IHS.  The first on a boe basis and the second is oil only.  Both show a material difference.  I think both plots can go in the appendix.
>
> Both plots represent a selection of recent horizontal wells that we could cross reference Aries to IHS using API numbers.  The data set includes 102 wells (plot).  The table shows the impact on total reported production for the first 24 months.
>
> Mark
>
> From: Hankey, Scott [IBD]
> Sent: Thursday, April 13, 2017 7:01 PM
> To: 'Deas, Derek '; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'
> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Paull, Mark [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD]
> Subject: RE: AMR - Latest Analyst Presentation
>
> Yes we can absolutely put the slide together.
>
> From: Deas, Derek [mailto:derek.deas@citi.com]
> Sent: Thursday, April 13, 2017 5:58 PM
> To: Hankey, Scott [IBD]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'
> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Paull, Mark [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD]
> Subject: RE: AMR - Latest Analyst Presentation

>

> Thank you Scott.  Appreciate the feedback.  I'll defer to Alta Mesa on how they'd like to handle slide 23.

>

> On slide 23, Alta Mesa has specifically selected these wells to show consistent results across the entire acreage position – we've iterated on it about a dozen times to get to a listing with which AMR is comfortable.  I take your point (and made a similar one) about the EUR range on the wells and it is a very good one.  I seem to recall that we agreed in the drafting session that Hal / team would voice over that the wells listed were not the best wells (i.e. not cherry picked), but rather a geographically diverse (across the acreage position) set of wells to confirm the validity of full type curve credit across the 100k AMR net acres.

>

> Hal and Alta Mesa team, please let us know if you'd like us to alter the wells listed on slide 23.  Alternatively, should we go back to how we showed it before and kill the EUR and EUR / Lt. Foot columns?  We'll stand by for AMR's feedback as needed on this slide.

>

> On your second bullet point, that's very valid.  Would the Goldman team be able to work something up on this?  I believe Goldman has the Alta Mesa private data but let us know if not and Citi needs to send that data your way.

>

> Regards,

>

> -Derek

>

> From: Hankey, Scott [mailto:Scott.Hankey@gs.com]

> Sent: Thursday, April 13, 2017 5:43 PM

> To: Deas, Derek [ICG-CIB]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'

> Cc: Jackson, James R [ICG-CIB]; Call, Jacob [ICG-CIB]; O'suji, Chinna [ICG-CIB]; Siddiqui, Nameer; Paull, Mark; Lambert, Bill; Mills, Ryan

> Subject: RE: AMR - Latest Analyst Presentation

>

> Citi Team (+AMR Team) –

>

> A couple of comments / thoughts, but otherwise signed off.  This has come together very nicely.

>

> And apologies for the late notes.

>

>

> ·     23 – we wonder if some of the data on the right is distracting and could be interpreted the wrong way. What would this look like if we did top 20 - 25 by EUR? Analysts will focus heavily on this page.

>

> ·     Given divergence between public and private data, would it be helpful to show a slide that provides an illustrative comparison between the data and an explanation as to why they differ? We figure that this would help make the case vs. any inaccurate pre-conceived notions, including those of RSEG

>

> Happy to discuss further if helpful

>

> Scott

>

> From: Deas, Derek [mailto:derek.deas@citi.com]

> Sent: Wednesday, April 12, 2017 9:55 PM

> To: Deas, Derek

> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna

> Subject: AMR - Latest Analyst Presentation

>

> Team (included in bcc line),

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

AMR_003658
AMR_SDTX00003658

>

> Attached please find the latest AMR Analyst Presentation having turned comments received today. Citi, Goldman and Morgan teams, please provide any final comments by midday tomorrow.

>

> Please note that Citi and AMR are still working on tweaking the forecast / model, which will be finalized by tomorrow.

>

> Regards,

>

> Derek Deas

> Citi | Investment Banking

> Global Energy Group

> 811 Main Street, Suite 3900

> Houston, TX 77002

>

> Tel: +1 713 821 4719

> Fax: +1.281.973.4948

> derek.deas@citi.com<mailto:derek.deas@citi.com>

>

>

>

> _____

>

> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.

> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.

> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the

http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.

>

> _____

>

> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.

> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.

> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the

http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.

>

> _____

>

> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.

> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.

> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.

>

> _____

>

> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.

> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.

> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.

> <Consistent Results Throughout Acreage Position.xlsx>

<image001.png>

# PX 258

| From: | Tim Turner [tturner@AltaMesa.net] |
|---|---|
| on behalf of | Tim Turner <tturner@AltaMesa.net> [tturner@AltaMesa.net] |
| Sent: | 4/14/2017 6:34:31 PM |
| To: | Derek Deas [derek.deas@citi.com]; Jacob Call [jacob.call@citi.com]; Brian Periman [brian.periman@citi.com]; chinna.osuji@citi.com; Joan Lindsey [joan.lindsey@citi.com] |
| CC: | Hal H. Chappelle [hchappelle@AltaMesa.net]; Kevin J. Bourque [kbourque@AltaMesa.net] |
| Subject: | Re: AMR - Latest Analyst Presentation |

Derek,

Please add the wells suggested by Hal. This should help round out the acreage. Thanks.


Tim

On Apr 14, 2017, at 5:37 PM, Hal H. Chappelle <hchappelle@AltaMesa.net> wrote:

Suggest we add Clark, Pinehurst, Francis, Boecher, Rudd, EHU 235

**From:** Tim Turner <tturner@altamesa.net>
**Date:** Friday, April 14, 2017 at 4:50 PM
**To:** Hal Chappelle <hchappelle@altamesa.net>
**Cc:** "Kevin J. Bourque" <kbourque@AltaMesa.net>
**Subject:** RE: AMR - Latest Analyst Presentation

Pick what looks good to you.  The file was sent in my last email and the wells in green are the ones on the map except for the non-op wells.

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

AMR_021654
AMR_SDTX00021654

| WellName | Townst | 30d BOEPD_IP_% | 30d BO/PD/1000' Lateral | 30d Mbbl | 30d BO/1000' Lat |
|---|---|---|---|---|---|
| EHU 213H | 1906 | 523 | 25 | 790 | 160 |
| EHU 220H | 1906 | 216 | 39 | 978 | 189 |
| EHU 235H | 1906 | 357 | 67 | 559 | 106 |
| Hawk 1906 7-15MH | 1906 | 216 | 45 | 549 | 111 |
| EHU 233H | 1906 | 201 | 137 | 499 | 97 |
| EHU 222H | 1906 | 363 | 99 | 440 | 120 |
| EHU 218H | 1906 | 40 | 25 | 371 | 101 |
| EHU 227H | 1906 | 413 | 112 | 369 | 98 |
| EHU 233H | 1906 | 454 | 89 | 339 | 66 |
| EHU 217H | 1906 | 233 | 93 | 308 | 83 |
| EHU 225H | 1906 | 266 | 74 | 294 | 79 |
| Shireman 1906 2-06H | 1906 | 204 | 48 | 219 | 45 |
| EHU 222H | 1906 | 265 | 73 | 184 | 51 |
| EHU 213H | 1906 | 10 | 2 | 133 | 28 |
| EHU 284H | 1906 | 208 | 82 | 133 | 25 |
| EHU 230H | 1906 | 216 | 42 | 183 | 25 |
| EHU 218H | 1906 | 106 | 53 | 113 | 31 |
| EHU 232H | 1906 | 166 | 37 | 103 | 19 |
| EHU 228H | 1906 | 12 | 3 | 89 | 24 |
| EHU 214H | 1906 | 1 | 0 | 39 | 7 |
| EX3D 11M 2H | 1807 | 583 | 99 | 1459 | 232 |
| Roberts 1802 20H-14-11 | 1807 | 555 | 138 | 662 | 152 |
| Shelley 1806 3-22MH | 1806 | 552 | 29 | 646 | 135 |
| Mitchell 1806 2B-21MH | 1806 | 911 | 68 | 644 | 140 |
| LNU 28-2H | 1805 | 282 | 59 | 673 | 182 |
| Crosstown 1805 6-14MH | 1805 | 831 | 128 | 821 | 167 |
| LNU 49-4H | 1805 | 618 | 115 | 786 | 167 |
| Cleveland 1806 2-26MH | 1806 | 461 | 97 | 586 | 148 |
| Svoboe 1806 2-12BMH | 1805 | 642 | 120 | 689 | 148 |
| LNU 13-3H | 1805 | 442 | 97 | 578 | 114 |
| LNU 27-3H | 1805 | 295 | 65 | 514 | 113 |
| Edwin 1806 4-32SH | 1806 | 486 | 114 | 363 | 109 |
| Heller 5-33H | 1805 | 72 | 16 | 395 | 86 |
| LNU 15-4H | 1805 | 121 | 26 | 383 | 81 |
| Crosswhite 1805 3-20MH | 1805 | 170 | 38 | 372 | 79 |
| Nelson 1805 5-18MH | 1806 | 224 | 46 | 345 | 71 |
| LNU 19-3H | 1805 | 288 | 65 | 218 | 49 |
| LNU 14-4H | 1805 | 208 | 83 | 188 | 29 |
| LNU 15-5H | 1805 | 265 | 55 | 173 | 36 |
| Rudd 1706 6-4MH | 1706 | 590 | 119 | 996 | 189 |
| Shakeman 1706 9-25MH | 1706 | 162 | 925 | 191 |  |
| Sanford 1706 6-28MH | 1706 | 1,291 | 206 | 847 | 174 |
| Brown 1706 6-27MH | 1706 | 316 | 65 | 839 | 173 |
| Barron 1706 5-26MH | 1706 | 352 | 74 | 738 | 155 |
| Pinehurst 1706 5-8MH | 1706 | 572 | 113 | 672 | 133 |
| Francis 1706 6-8MH | 1706 | 345 | 72 | 564 | 157 |
| Coleman 1706 6-9N/H | 1706 | 728 | 152 | 602 | 124 |
| Schilke 1706 2-15MH | 1706 | 845 | 133 | 583 | 119 |
| Barbara 1706 3-22MH | 1706 | 346 | 72 | 579 | 120 |
| Mackey 3-1H | 1706 | 711 | 182 | 576 | 111 |
| Evelyn 1706 5-18MH | 1706 | 621 | 128 | 575 | 118 |
| Boecher 1706 4-19MH | 1706 | 566 | 116 | 574 | 119 |
| Moyes 1706 3-16MH | 1706 | 565 | 118 | 570 | 119 |
| Moyes 1706 2B-16MH | 1706 | 383 | 79 | 557 | 115 |
| Thomes 1706 6-8MH | 1706 | 464 | 92 | 510 | 101 |
| Bates 1706 3-12MH | 1706 | 212 | 44 | 508 | 105 |
| Delmarre 1706 4-17MH | 1706 | 278 | 58 | 503 | 106 |
| Paris 1706 5-28MH | 1706 | 148 | 31 | 441 | 91 |
| Tuberose 1706 4-7MH | 1706 | 488 | 105 | 428 | 89 |
| Fosuer 1706 5-24MH | 1706 | 473 | 98 | 429 | 89 |
| Musick 4-13H | 1706 | 424 | 95 | 373 | 84 |
| House 4-18H | 1706 | 264 | 62 | 289 | 97 |
| Frinzle 1706 2b-33MH | 1706 | 357 | 75 | 233 | 53 |
| Simos 4-19H | 1706 | 290 | 59 | 289 | 55 |
| Freeman 1706 3-14MH | 1706 | 394 | 43 | 124 | 26 |
| Buffa 2-10H | 1706 | 331 | 81 | 117 | 24 |
| Borlenbach 1705 6-10MH | 1705 | 456 | 93 | 1198 | 259 |
| Oswald 1705 4-7EMH | 1705 | 278 | 58 | 1144 | 238 |
| Borlenbach 1705 4-21MH | 1707 | 180 | 38 | 994 | 206 |
| Hoskins 1705 7-9MH | 1705 | 507 | 108 | 931 | 199 |
| Beyer 4-6H | 1705 | 520 | 113 | 903 | 194 |
| Clark 1705 3-12MH | 1705 | 815 | 132 | 877 | 178 |
| Kilgore 2-4H | 1705 | 759 | 35 | 812 | 174 |
| Bovelli 1705 4-8MH | 1705 | 689 | 205 | 789 | 162 |
| Humphrey 2-9H | 1705 | 705 | 150 | 784 | 165 |
| Burso 1705 2-7MH | 1705 | 287 | 61 | 783 | 161 |
| Rollenbach 1705 2-77MH | 1705 | 355 | 75 | 741 | 155 |
| Mathiason 1705 3-10MH | 1705 | 448 | 94 | 729 | 153 |
| Ash 1705 8-19MH | 1705 | 708 | 153 | 728 | 156 |
| Rigdon 1705 6-11MH | 1705 | 697 | 144 | 725 | 139 |
| Copeland 6-20H | 1705 | 254 | 152 | 718 | 151 |
| Oswald 1705 4-28MH | 1705 | 251 | 32 | 711 | 148 |
| Dodd 1706 3-8MH | 1705 | 405 | 63 | 686 | 145 |
| Borlenbach 2-29H | 1705 | 654 | 158 | 608 | 139 |
| Oswald 1705 5-28MH | 1705 | 248 | 53 | 659 | 137 |
| Horn 3-9H | 1705 | 850 | 377 | 586 | 130 |
| Gilbert 1706 6-21MH | 1705 | 929 | 88 | 560 | 125 |
| Shackelford 1705 5-31MH | 1705 | 188 | 39 | 555 | 116 |
| Pewter 1705 2-16MH | 1705 | 161 | 34 | 509 | 108 |
| Gregory 1705 6-14MH | 1705 | 262 | 50 | 466 | 97 |
| Ford 2-17H | 1705 | 290 | 66 | 401 | 101 |
| Bovelli 1705 6-8MH | 1705 | 674 | 140 | 315 | 65 |
| LPM 7-3H | 1705 | 320 | 30 | 305 | 69 |
| Jech 1-20H | 1705 | 345 | 81 | 301 | 71 |
| Barker 4-17H | 1705 | 330 | 43 | 92 | 22 |
| Michul 4-18H | 1705 | 203 | 44 | 82 | 18 |
| Oak Tree 1606 2-30MH | 1605 | 634 | 136 | 813 | 171 |
| Breon 1605 5-31MH | 1605 | 931 | 72 | 552 | 141 |
| Redo 1606 2A-54H | 1605 | 489 | 122 | 520 | 130 |
| Fay 1605 2-27MH | 1605 | 249 | 95 | 370 | 77 |
| Vieth 1605 2-20MH | 1605 | 293 | 60 | 219 | 61 |
| Garrett 1605 6A-26MH | 1605 | 231 | 49 | 242 | 51 |
| White Rabbit 1506 2-27MH | 1506 | 628 | 89 | 643 | 132 |
| Mud Horse 1506 2-36MH | 1506 | 294 | 63 | 532 | 135 |
| Bixon 1505 3-10MH | 1505 | 325 | 67 | 607 | 135 |
| Stedlowen 1506 9-7MH | 1505 | 251 | 33 | 563 | 135 |
| Bronc Wood 1505 3-12MH | 1505 | 321 | 69 | 529 | 136 |
| Martin 1505 4-4MH | 1505 | 278 | 58 | 573 | 129 |
| Crunkin 1505 4-14MH | 1505 | 282 | 59 | 395 | 82 |
| Airheart 1505 5-4MH | 1505 | 95 | 11 | 225 | 46 |

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

-----Original Message-----
From: Hal H. Chappelle
Sent: Friday, April 14, 2017 4:35 PM
To: Tim Turner <tturner@AltaMesa.net>
Cc: Kevin J. Bourque <kbourque@AltaMesa.net>
Subject: Re: AMR - Latest Analyst Presentation

I guess I would add Rudd and pinehurst.  Any other EHU WELLS?

I am suggesting a tweak to your logic ... putting a few more dots to get both sides of the township

Sent from my iPhone

> On Apr 14, 2017, at 4:25 PM, Tim Turner <tturner@AltaMesa.net> wrote:
>
> List below is MBOE/Township.  Most wells in 1706.  To me, it screams sweet spot if we bunch up in 1705/1706.  Could add Rudd in 1605, but it's under 600 MBOE.  All of our wells on the map are over 600 MBOE (i.e. near or above type curve).  Well list from last night is attached.
>
> From: Hal H. Chappelle
> Sent: Friday, April 14, 2017 4:04 PM
> To: Tim Turner <tturner@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
> Subject: Re: AMR - Latest Analyst Presentation
>
> Looking at Slide 23. I like it, but thinking on how to illustrate a little more continuity ... do any of the following have good EURs such that we might want to add them on the map?
>
> *  Augusta – 255 - 1905
> *  Evelyn – 575 - 1706
> *  Themer – 510 - 1706
> *  Pinehurst – 672 - 1706
> *  Tullamore – 428 - 1706
> *  Boecher – 574 - 1706
> *  Aces High – not producing - 1606
> *  Rudd – 520 - 1605
> *  Ray – 373 - 1605
> *  Shimanek 213 - 1906
>
>
>
> From: Tim Turner <tturner@altamesa.net<mailto:tturner@altamesa.net>>
> Date: Friday, April 14, 2017 at 1:47 PM
> To: "Paull, Mark" <Mark.Paull@gs.com<mailto:Mark.Paull@gs.com>>
> Cc: "Hankey, Scott" <Scott.Hankey@gs.com<mailto:Scott.Hankey@gs.com>>,
"derek.deas@citi.com<mailto:derek.deas@citi.com>" <derek.deas@citi.com<mailto:derek.deas@citi.com>>, Hal Chappelle <hchappelle@altamesa.net<mailto:hchappelle@altamesa.net>>, "Michael A. McCabe" <mmccabe@AltaMesa.net<mailto:mmccabe@AltaMesa.net>>, "Kevin J. Bourque" <kbourque@AltaMesa.net<mailto:kbourque@AltaMesa.net>>,
"james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>" <james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>>, "jacob.call@citi.com<mailto:jacob.call@citi.com>" <jacob.call@citi.com<mailto:jacob.call@citi.com>>, "chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>" <chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>>, "Siddiqui, Nameer"

<Nameer.Siddiqui@gs.com<mailto:Nameer.Siddiqui@gs.com>>, "Lambert, Bill"
<Bill.Lambert@gs.com<mailto:Bill.Lambert@gs.com>>, "Mills, Ryan" <Ryan.Mills@gs.com<mailto:Ryan.Mills@gs.com>>,
"Goldenberg, Naum" <Naum.Goldenberg@gs.com<mailto:Naum.Goldenberg@gs.com>>
> Subject: Re: AMR - Latest Analyst Presentation
>
> Happy to discuss the process. Oil is reported by the purchaser in OK, do not much we can do other than encourage
them. It worked to our advantage for a long time.
>
> Tim
>
> On Apr 14, 2017, at 1:25 PM, Paull, Mark <Mark.Paull@gs.com<mailto:Mark.Paull@gs.com>> wrote:
> Tim
> My only concern is that the data shows an apparent under reporting of oil. Which is not correct. It is most likely an
allocation issue. Maybe oil is being allocated to vertical unit wells. We are only showing horizontals on the page. Having
the page in the appendix gives you the option to discuss if it comes up.
> Mark
>
> From: Tim Turner [mailto:tturner@AltaMesa.net]
> Sent: Friday, April 14, 2017 12:24 PM
> To: Hankey, Scott [IBD]
> Cc: Deas, Derek <derek.deas@citi.com<mailto:derek.deas@citi.com>>; Paull, Mark [IBD]; Hal H. Chappelle
<hchappelle@AltaMesa.net<mailto:hchappelle@AltaMesa.net>>; Michael A. McCabe
<mmccabe@AltaMesa.net<mailto:mmccabe@AltaMesa.net>>; Kevin J. Bourque
<kbourque@AltaMesa.net<mailto:kbourque@AltaMesa.net>>; Jackson, James R
<james.r.jackson@citi.com<mailto:james.r.jackson@citi.com>>; Call, Jacob
<jacob.call@citi.com<mailto:jacob.call@citi.com>>; O'suji, Chinna
<chinna.osuji@citi.com<mailto:chinna.osuji@citi.com>>; Siddiqui, Nameer [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD];
Goldenberg, Naum [IBD]
> Subject: Re: AMR - Latest Analyst Presentation
>
> Very helpful. Explains a lot of things. Agree with Mark we should put in the appendix. It doesn't really fit into the flow,
but may be very important if questions come up. Thanks for preparing.
>
> Tim
>
> On Apr 14, 2017, at 12:13 PM, Hankey, Scott <Scott.Hankey@gs.com<mailto:Scott.Hankey@gs.com>> wrote:
> For context I think what we'll do ultimately is boil it down to one slide that includes some bullets describing why the
results are different
>
> From: Deas, Derek [mailto:derek.deas@citi.com]
> Sent: Friday, April 14, 2017 12:12 PM
> To: Paull, Mark [IBD]; Hankey, Scott [IBD]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'
> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD];
Goldenberg, Naum [IBD]
> Subject: RE: AMR - Latest Analyst Presentation
>
> Impressive, very helpful slides.  I'm in favor of adding.  Hal / AMR team, what are your thoughts?  Happy to handle as
you see fit.  If you'd like to add, please ballpark roughly what location in the deck you'd like these placed in (once in AMR
format).
>
> From: Paull, Mark [mailto:Mark.Paull@gs.com]
> Sent: Friday, April 14, 2017 12:00 PM
> To: Hankey, Scott; Deas, Derek [ICG-CIB]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'

> Cc: Jackson, James R [ICG-CIB]; Call, Jacob [ICG-CIB]; O'suji, Chinna [ICG-CIB]; Siddiqui, Nameer; Lambert, Bill; Mills, Ryan; Goldenberg, Naum

> Subject: RE: AMR - Latest Analyst Presentation

>

> We have attached 2 comparisons of AMR data to IHS.  The first on a boe basis and the second is oil only.  Both show a material difference.  I think both plots can go in the appendix.

>

> Both plots represent a selection of recent horizontal wells that we could cross reference Aries to IHS using API numbers.  The data set includes 102 wells (plot).  The table shows the impact on total reported production for the first 24 months.

>

> Mark

>

> From: Hankey, Scott [IBD]

> Sent: Thursday, April 13, 2017 7:01 PM

> To: 'Deas, Derek '; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'

> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Paull, Mark [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD]

> Subject: RE: AMR - Latest Analyst Presentation

>

> Yes we can absolutely put the slide together.

>

> From: Deas, Derek [mailto:derek.deas@citi.com]

> Sent: Thursday, April 13, 2017 5:58 PM

> To: Hankey, Scott [IBD]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'

> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna ; Siddiqui, Nameer [IBD]; Paull, Mark [IBD]; Lambert, Bill [IBD]; Mills, Ryan [IBD]

> Subject: RE: AMR - Latest Analyst Presentation

>

> Thank you Scott.  Appreciate the feedback.  I'll defer to Alta Mesa on how they'd like to handle slide 23.

>

> On slide 23, Alta Mesa has specifically selected these wells to show consistent results across the entire acreage position – we've iterated on it about a dozen times to get to a listing with which AMR is comfortable.  I take your point (and made a similar one) about the EUR range on the wells and it is a very good one.  I seem to recall that we agreed in the drafting session that Hal / team would voice over that the wells listed were not the best wells (i.e. not cherry picked), but rather a geographically diverse (across the acreage position) set of wells to confirm the validity of full type curve credit across the 100k AMR net acres.

>

> Hal and Alta Mesa team, please let us know if you'd like us to alter the wells listed on slide 23.  Alternatively, should we go back to how we showed it before and kill the EUR and EUR / Lt. Foot columns?  We'll stand by for AMR's feedback as needed on this slide.

>

> On your second bullet point, that's very valid.  Would the Goldman team be able to work something up on this?  I believe Goldman has the Alta Mesa private data but let us know if not and Citi needs to send that data your way.

>

> Regards,

>

> -Derek

>

> From: Hankey, Scott [mailto:Scott.Hankey@gs.com]

> Sent: Thursday, April 13, 2017 5:43 PM

> To: Deas, Derek [ICG-CIB]; Hal Chappelle ; Michael McCabe; Tim Turner; 'Kevin J. Bourque'

AMR_021658
AMR_SDTX00021658

> Cc: Jackson, James R [ICG-CIB]; Call, Jacob [ICG-CIB]; O'suji, Chinna [ICG-CIB]; Siddiqui, Nameer; Paull, Mark; Lambert, Bill; Mills, Ryan

> Subject: RE: AMR - Latest Analyst Presentation

>

> Citi Team (+AMR Team) –

>

> A couple of comments / thoughts, but otherwise signed off. This has come together very nicely.

>

> And apologies for the late notes.

>

>

> ·    23 – we wonder if some of the data on the right is distracting and could be interpreted the wrong way. What would this look like if we did top 20 - 25 by EUR? Analysts will focus heavily on this page.

>

> ·    Given divergence between public and private data, would it be helpful to show a slide that provides an illustrative comparison between the data and an explanation as to why they differ? We figure that this would help make the case vs. any inaccurate pre-conceived notions, including those of RSEG

>

> Happy to discuss further if helpful

>

> Scott

>

> From: Deas, Derek [mailto:derek.deas@citi.com]

> Sent: Wednesday, April 12, 2017 9:55 PM

> To: Deas, Derek

> Cc: Jackson, James R ; Call, Jacob ; O'suji, Chinna

> Subject: AMR - Latest Analyst Presentation

>

> Team (included in bcc line),

>

> Attached please find the latest AMR Analyst Presentation having turned comments received today. Citi, Goldman and Morgan teams, please provide any final comments by midday tomorrow.

>

> Please note that Citi and AMR are still working on tweaking the forecast / model, which will be finalized by tomorrow.

>

> Regards,

>

> Derek Deas

> Citi | Investment Banking

> Global Energy Group

> 811 Main Street, Suite 3900

> Houston, TX 77002

>

> Tel:   +1.713.821.4719

>

> Fax: +1.281.973.4948

> derek.deas@citi.com<mailto:derek.deas@citi.com>

>

>

>

> _____

>

> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.
>
> _____
>
> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.
>
> _____
>
> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.
> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.
>
> _____
>
> This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unintended recipients are prohibited from taking action on the basis of information in this e-mail.
> E-mail messages may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Goldman Sachs.

> Goldman Sachs reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept e-mail messages to and from its systems. See the
http://www.gs.com/disclaimer/afg/<https://protect-us.mimecast.com/s/7GwmB1ieO29fM?domain=gs.com> for important information regarding this message and your reliance on information contained in it.
> <Consistent Results Throughout Acreage Position.xlsx>

<image001.png>

AMR_021661
AMR_SDTX00021661

# PX 259

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 600 of 845   Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

CONCLUSION

## CONCLUSION OF VALUES & ALLOCATION
### RIVERSTONE HOLDINGS LLC
AS OF DECEMBER 31, 2016

($ Millions)

| | Value of Management Fee Streams | Value of Carried Interest Streams | | |
|---|---|---|---|---|
| **Existing Funds** | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | $0.000 | $0.000 | | |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | $14.201 | $0.000 | | |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | $39.370 | $0.000 | | |
| Riverstone Global Energy & Power Fund V, L.P. | $110.264 | $0.000 | | |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | $29.925 | $0.000 | | |
| Riverstone Capital Partners - Credit LP | $10.925 | $16.694 | | |
| Riverstone Energy Partners VI, L.P. | $218.959 | $286.115 | | |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | $11.642 | $15.512 | | |
| REL IP General Partner Limited | $265.791 | $226.411 | | |
| Riverstone Capital Partners CKD, LP | $36.982 | $49.495 | | |
| **Totals** | $738.060 | $594.227 | | |
| **Total Existing Funds Value** | | | $1,332.286 | A |
| | | | | |
| **Future Funds** | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | $235.260 | $86.762 | | |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | $49.662 | $22.139 | | |
| Riverstone Credit Partners II, L.P. | $42.639 | $15.249 | | |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | $28.275 | $15.501 | | |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | $31.271 | $12.102 | | |
| Riverstone Energy Infrastructure Fund, L.P. | $72.905 | $32.522 | | |
| **Totals** | $460.012 | $184.275 | | |
| **Total Future Funds Value** | | | $644.287 | B |
| | | | | |
| **Total Value of Existing & Future Funds** | | | $1,976.574 | C = (A + B) |
| | | | | |
| **Implied Aggregate Transaction Value** [1] | | | $2,916.667 | D |
| **Unallocated "Goodwill" in Excess of Existing/Future Funds** | | | $940.093 | E = (D - C) |

| Allocation Conclusion of Identified Future and Unidentified Future Income | | | % of Transaction Value | |
|---|---|---|---|---|
| Total Future Funds Value | $644.287 | B | 22% | |
| Unallocated "Goodwill" in Excess of Existing/Future Funds | $940.093 | E | 32% | |
| **Total Allocation of Identified & Unidentified Future Income** | $1,584.380 | (B +E) | 54% | |

(1) Management expects transaction will result in approximately $350MM purchase for a 12% royalty on Management Fees and Carried Interest allocations.
(2) Purchase includes additional contingent & earn out payments, for a total consideration of up to $497MM.

**Exhibit
0681**

6/13/2023
Lapeyre 30(b)(6)

Highly Confidential

RSH126390

Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT A

**PRESENT VALUES OF CARRIED INTEREST & MANAGEMENT FEES**
**RIVERSTONE MASTER**
**AS OF DECEMBER 31, 2016**

| Year Ending December 31, | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Terminal | Totals | % of Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | | |
| ($ Millions) | | | | | | | | | | | | | | |
| **Existing Funds - Carried Interest** | | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 | 0.00% |
| Carlyle/Riverstone Energy Partners III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 | 0.00% |
| Riverstone/Carlyle Energy Partners IV, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 | 0.00% |
| Riverstone Energy Partners V, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 | 0.00% |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 | 0.00% |
| Riverstone Capital Partners - Credit LP | 0.00 | 0.00 | 0.00 | 16.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 16.68 | 0.84% |
| Riverstone Energy Partners VI, L.P. | 0.00 | 0.00 | 0.00 | 113.82 | 87.52 | 84.78 | 0.00 | 0.00 | 0.00 | 0.00 | | | 286.12 | 14.40% |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | 0.00 | 0.00 | 0.00 | 6.16 | 4.74 | 4.61 | 0.00 | 0.00 | 0.00 | 0.00 | | | 15.51 | 0.78% |
| REL IP General Partner Limited | 32.62 | 26.57 | 23.17 | 19.71 | 79.56 | 11.25 | 15.61 | 9.16 | 7.50 | 0.00 | 4.44 | | 225.41 | 11.45% |
| Riverstone Capital Partners GKD, L.P. | 0.00 | 0.00 | 0.00 | 19.96 | 12.76 | 8.82 | 7.50 | 0.00 | 0.00 | 0.00 | | | 49.48 | 2.50% |
| **Existing Funds - Carried Interest Total** | 32.62 | 26.57 | 23.17 | 175.74 | 183.58 | 118.45 | 15.36 | 9.16 | 7.50 | 0.00 | 4.44 | | 594.23 | 30.00% |
| | | | | | | | | | | | | | | |
| **Existing Funds - Management Fees** | | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | | 0.00 | 0.00% |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | 2.98 | 2.96 | 3.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 14.20 | 0.72% |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | 19.55 | 13.82 | 5.24 | 0.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 38.37 | 1.89% |
| Riverstone Global Energy & Power Fund V, L.P. | 51.41 | 35.25 | 17.60 | 4.65 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 195.16 | 9.59% |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | 13.11 | 9.93 | 5.27 | 1.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 29.82 | 1.51% |
| Riverstone Credit Management LLC | 3.50 | 2.61 | 3.09 | 1.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 10.97 | 0.55% |
| Riverstone Global Energy & Power Fund VI, L.P. | 56.70 | 53.37 | 46.38 | 44.76 | 11.33 | 4.42 | 0.00 | 0.00 | 0.00 | 0.00 | | | 218.86 | 11.08% |
| Riverstone Non-ECI Partners, L.P. | 3.19 | 2.69 | 2.52 | 2.23 | 0.55 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | | | 11.64 | 0.59% |
| Riverstone Energy Limited | 20.51 | 20.63 | 19.63 | 19.59 | 19.33 | 17.00 | 19.61 | 19.36 | 15.35 | 13.28 | 14.15 | 70.73 | 255.79 | 13.48% |
| Riverstone GKD Management Company, S.De R.L., De C.V. | 9.77 | 8.86 | 7.72 | 6.89 | 2.19 | 1.18 | 5.35 | 0.00 | 0.00 | 0.00 | | | 55.48 | 1.87% |
| **Existing Funds - Management Fees Total** | 165.71 | 152.49 | 110.70 | 83.63 | 32.45 | 22.84 | 17.16 | 19.36 | 15.35 | 13.28 | 14.15 | 70.73 | 738.06 | 37.34% |
| | | | | | | | | | | | | | | |
| **New Funds - Carried Interest** | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.20 | 24.58 | 18.20 | 10.78 | 0.00 | | 86.76 | 4.39% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.47 | 6.27 | 4.65 | 2.75 | 0.00 | 0.00 | | 22.14 | 1.12% |
| Riverstone Credit Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.25 | 0.00 | 0.00 | 0.00 | 0.00 | | 13.25 | 0.67% |
| Riverstone GKD Renewable & Alternative Energy, S.De R.L., De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.88 | 4.35 | 3.52 | 1.95 | 0.00 | 0.00 | 0.00 | | 15.50 | 0.78% |
| Riverstone GKD Management Company II, S.De R.L., De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.86 | 3.60 | 2.65 | 0.89 | 0.00 | | 12.10 | 0.61% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.05 | 9.67 | 7.16 | 2.65 | 0.00 | 0.00 | | 33.52 | 1.69% |
| **New Funds - Carried Interest Total** | 0.00 | 0.00 | 0.00 | 0.00 | 0.88 | 25.76 | 71.76 | 41.64 | 26.26 | 11.77 | 0.00 | | 184.28 | 8.32% |
| | | | | | | | | | | | | | | |
| **New Funds - Management Fees** | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 56.93 | 49.96 | 42.29 | 36.48 | 31.43 | 12.94 | 4.87 | 1.29 | 0.00 | | 235.26 | 11.80% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 12.01 | 10.35 | 8.92 | 7.69 | 8.63 | 2.74 | 1.05 | 0.28 | 0.00 | 0.00 | | 49.66 | 2.51% |
| Riverstone Credit Partners II, L.P. | 0.00 | 4.94 | 6.97 | 16.34 | 6.16 | 3.65 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | | 42.54 | 2.16% |
| Riverstone GKD Renewable & Alternative Energy, S.De R.L., De C.V. | 0.86 | 6.00 | 5.46 | 4.46 | 3.84 | 1.11 | 0.56 | 0.16 | 0.00 | 0.00 | 0.00 | | 26.27 | 1.43% |
| Riverstone GKD Management Company II, S.De R.L., De C.V. | 0.00 | 0.00 | 7.75 | 6.69 | 5.77 | 4.97 | 4.29 | 1.15 | 0.53 | 0.12 | 0.00 | | 31.27 | 1.58% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 16.01 | 15.53 | 13.36 | 11.53 | 8.94 | 2.86 | 1.29 | 0.28 | 0.00 | 0.00 | | 72.80 | 3.69% |
| **New Funds - Management Fees Total** | 0.86 | 46.96 | 104.71 | 98.86 | 79.90 | 63.75 | 42.53 | 16.58 | 5.95 | 1.41 | 0.00 | | 490.01 | 23.27% |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | Aggregate Total | 1,976.57 | 100.00% |

| | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | | | |
| | Midpoint of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | | | |
| | | | | | | | | | | | | | | | |
| Carried Interest PV Factors | Discount Rate | | | | | | | | | | | | | | |
| Existing Funds - Near Term | 20% | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | | | |
| Existing Funds | 30% | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 | | | |
| New Funds | 35% | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 | | | |
| | | | | | | | | | | | | | | | |
| Management Fees PV Factors | Discount Rate | | | | | | | | | | | | | | |
| Existing Funds - Near Term | 10% | 0.95 | 0.87 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | | | |
| Existing Funds | 12% | N/A | N/A | 0.75 | 0.67 | 0.60 | 0.54 | 0.48 | 0.43 | 0.38 | 0.34 | 0.30 | | | |
| New Funds | 16% | 0.93 | 0.80 | 0.69 | 0.59 | 0.51 | 0.44 | 0.38 | 0.33 | 0.28 | 0.24 | 0.21 | | | |

*(1) Values shown on this Exhibit are the Present Values of the expected cash flows from Exhibits B and C.*

RSH126391

RIVERSTONE_SDTX00156526

Confidential  
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

EXHIBIT B

## DISCOUNTED CASH FLOW ANALYSIS - CARRIED INTEREST CASH FLOWS (From Supporting Exhibits)
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | |
| ***Existing Funds*** | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Carlyle/Riverstone Energy Partners III, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Riverstone/Carlyle Energy Partners IV, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Riverstone Energy Partners V, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Riverstone Capital Partners - Credit LP | | 0.00 | 0.00 | 0.00 | 41.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41.83 |
| Riverstone Energy Partners VI, L.P. | | 0.00 | 0.00 | 0.00 | 285.21 | 285.21 | 358.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 928.58 |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | | 0.00 | 0.00 | 0.00 | 15.44 | 15.44 | 19.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.42 |
| REL IP General Partner Limited | | 36.47 | 40.35 | 44.64 | 49.38 | 256.00 | 47.85 | 58.55 | 65.78 | 72.67 | 0.00 | 69.90 | 742.39 |
| Riverstone Capital Partners CKD, LP | | 0.00 | 0.00 | 0.00 | 48.52 | 41.59 | 41.59 | 41.59 | 0.00 | 0.00 | 0.00 | 0.00 | 173.29 |
| **Existing Funds Total** | (A) | 36.47 | 40.35 | 44.64 | 440.39 | 598.24 | 467.93 | 101.14 | 65.78 | 72.67 | 0.00 | 69.90 | 1,937.52 |
| ***New Funds*** | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 233.88 | 233.88 | 233.88 | 186.94 | 0.00 | 887.96 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 44.16 | 44.16 | 44.16 | 35.33 | 0.00 | 0.00 | 167.81 |
| Riverstone Credit Partners II, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 107.34 | 0.00 | 0.00 | 0.00 | 0.00 | 107.34 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 0.00 | 0.00 | 0.00 | 0.00 | 26.56 | 22.14 | 17.71 | 17.71 | 0.00 | 0.00 | 0.00 | 84.12 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 34.19 | 34.19 | 34.19 | 17.09 | 0.00 | 119.86 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 68.04 | 68.04 | 68.04 | 34.02 | 0.00 | 0.00 | 238.14 |
| **New Funds Total** | (B) | 0.00 | 0.00 | 0.00 | 0.00 | 26.56 | 134.34 | 505.12 | 397.78 | 337.22 | 204.04 | 0.00 | 1,605.06 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | |
| | Mid-point of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | |
| | Discount Rate | | | | | | | | | | | | |
| Existing Funds - Near Term | 25% (C) | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Existing Funds | 30% (C) | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 | |
| | (A x C) | 32.62 | 28.87 | 23.17 | 175.74 | 183.58 | 110.45 | 18.35 | 9.18 | 7.80 | 0.00 | 4.44 | |
| New Funds | 35% (C) | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 | |
| | (B x C) | 0.00 | 0.00 | 0.00 | 0.00 | 6.88 | 25.76 | 71.76 | 41.84 | 26.26 | 11.77 | 0.00 | |

| | | |
|---|---|---|
| Value of Existing Funds Carried Interest | 594.23 | |
| Value of New Funds Carried Interest | 184.28 | |
| **Aggregate Value of Carried Interest** | **778.50** | |

(1) 90% of Fees flow to Riverstone, 10% to Carlyle.

(2) Approx 80% of fees flow to Riverstone, 20% to Cornerstone investors.

Highly Confidential

RSH126392

EXHIBIT C

## DISCOUNTED CASH FLOW ANALYSIS - MANAGEMENT FEE CASH FLOWS (From Supporting Exhibits)
## RIVERSTONE MASTER
## AS OF DECEMBER 31, 2016

| Year Ending December 31, | | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Terminal | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | |
| **Management Fees ($ Millions)** | | | | | | | | | | | | | | |
| *Existing Funds* | | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | N/A |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | | 8.24 | 4.60 | 3.92 | 1.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 18.71 |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | | 20.51 | 15.94 | 6.95 | 1.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 44.53 |
| Riverstone Global Energy & Power Fund V, L.P. | | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 129.53 |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | | 13.75 | 11.37 | 7.00 | 2.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 34.63 |
| Riverstone Credit Management LLC | | 3.68 | 3.24 | 4.11 | 2.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 13.28 |
| Riverstone Global Energy & Power Fund VI, L.P. | | 61.57 | 61.57 | 61.57 | 65.57 | 18.87 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 278.39 |
| Riverstone Non-ECI Partners, L.P. | | 3.34 | 3.34 | 3.34 | 3.34 | 0.91 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 14.74 |
| Riverstone Energy Limited | | 21.51 | 23.80 | 26.33 | 29.13 | 30.54 | 31.71 | 35.13 | 38.80 | 42.87 | 44.88 | 46.53 | 232.63 [4] | 589.85 |
| Riverstone CKD Management Company, S.De R.L. De C.V. | | 10.25 | 10.25 | 10.25 | 10.25 | 3.85 | 2.21 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | | 47.57 |
| **Existing Funds Total** | (A) | 194.78 | 175.92 | 146.96 | 124.36 | 54.05 | 42.80 | 35.86 | 38.80 | 42.87 | 44.88 | 46.53 | 232.63 | 1,178.24 |
| **New Funds** | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 82.50 | 82.50 | 82.50 | 82.50 | 82.50 | 39.41 | 17.21 | 5.29 | 0.00 | | 474.41 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 7.21 | 3.19 | 0.98 | 0.00 | 0.00 | | 85.37 |
| Riverstone Credit Partners II, L.P. | | N/A | 8.19 | 13.00 | 27.48 | 15.95 | 8.26 | 1.47 | 0.00 | 0.00 | 0.00 | 0.00 | | 72.33 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 2.51 | 1.47 | 0.49 | 0.00 | 0.00 | 0.00 | | 41.97 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 11.25 | 11.25 | 11.25 | 11.25 | 11.25 | 3.50 | 1.86 | 0.49 | 0.00 | | 62.10 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 22.50 | 22.50 | 22.50 | 22.50 | 22.50 | 7.74 | 3.92 | 0.98 | 0.00 | 0.00 | | 125.14 |
| **New Funds Total** | (B) | 7.50 | 51.19 | 151.75 | 166.23 | 154.70 | 142.02 | 111.84 | 50.51 | 21.03 | 5.78 | 0.00 | | 862.33 |
| | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | | |
| | Mid-point of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | | |
| | Discount Rate | | | | | | | | | | | | | |
| **Existing Funds - Near Term** | 10% (C) | 0.95 | 0.87 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | |
| **Existing Funds** | 12% (C) | N/A | N/A | 0.75 | 0.67 | 0.60 | 0.54 | 0.48 | 0.43 | 0.38 | 0.34 | 0.30 | | |
| | (A x C) | 185.71 | 152.49 | 110.70 | 83.63 | 32.45 | 22.84 | 17.16 | 16.58 | 16.35 | 15.28 | 14.15 | 70.73 | |
| **New Funds** | 16% (C) | 0.93 | 0.80 | 0.69 | 0.59 | 0.51 | 0.44 | 0.38 | 0.33 | 0.28 | 0.24 | 0.21 | | |
| | (B x C) | 6.96 | 40.96 | 104.71 | 98.86 | 79.30 | 62.75 | 42.53 | 16.58 | 5.95 | 1.41 | 0.00 | | |
| Value of Existing Funds Management Fees | 738.06 | | | | | | | | | | | | | |
| Value of New Funds Management Fees | 460.01 | | | | | | | | | | | | | |
| **Aggregate Value of Management Fees** | **1,198.07** | | | | | | | | | | | | | |

(1) In 2015, Management elected to forgo future management fees.

(2) 90% of Fees flow to Riverstone, 10% to Carlyle.

(3) Approx 80% of fees flow to Riverstone, 20% to Cornerstone investors.

(4) Gordon Growth Model: Vo = [Cf × (1 + g)] ÷ (r - g).

(5) Growth Rate of 0%, Probability Factor of 60% based on 4-5% annual risk of closure.

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 604 of 845 Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT D-1**

| DISCOUNT RATE SUMMARY CONCLUSION |
| :--- |
| **RIVERSTONE HOLDINGS LLC** |
| AS OF DECEMBER 31, 2016 |

The Discount Rate was estimated using the methods described in the following pages.

**Equity Rate**

| Method | Equity Rate |
| :--- | :---: |
| Build-Up Approach (see Exhibit D-2) | 16.4% |
| Capital Asset Pricing Model (see Exhibits D-3 and D-4) | 16.4% |
| | |
| **Selected Base Equity Rate** | **16.0%** |

| **Company Cash Flow Source Specific Risk Adjustments** | **Risk Adj.** | **Concluded Discount Rate** |
| :--- | :---: | :---: |
| *Management Fees* | | |
| Private Equity Funds (Existing) Management Fees – High Probability | -6.0% | 10.0% |
| Private Equity Funds (Existing) Management Fees | -4.0% | 12.0% |
| Private Equity Funds (New) Management Fees | 0.0% | 16.0% |
| | | |
| *Carried Interest* | | |
| Private Equity Funds (Existing) Carried Interest - High Probability | 9.0% | 25.0% |
| Private Equity Funds (Existing) Carried Interest | 14.0% | 30.0% |
| Private Equity Funds (New) Carried Interest | 19.0% | 35.0% |

CONFIDENTIAL                                                    RIVERSTONE_SDTX00156529

Confidential
Empire Valuation Consultants

Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT D-2**

## BUILD-UP APPROACH EQUITY RATE
## RIVERSTONE HOLDINGS LLC
### AS OF DECEMBER 31, 2016

| | |
|---|---:|
| Risk-free Rate (20 years) | 2.79% |
| Equity Risk Premium | 6.00% |
| Size Premium (Beta Adjusted) | 5.60% |
| Industry Premium | 2.00% |
| **Build-up Equity Rate of Return** | **16.39%** |

Highly Confidential

RSH126395

CONFIDENTIAL

RIVERSTONE_SDTX00156530

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 606 of 845   Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-3

## BETA CALCULATION
## RIVERSTONE HOLDINGS LLC
### AS OF DECEMBER 31, 2016

**Peer Group Data as of**      12/31/2016

| Company Name | Symbol | Beta* | $R^2$ | Share Price | Shares Outstanding (MM) | MV of Equity ($MM) | | | |
|---|---|---|---|---|---|---|---|---|---|
| Blackrock, Inc. | BLK | 1.30 | 0.66 | $380.54 | 163.858 | $62,354.5 | **Average** | = | 1.33 |
| Eaton Vance Corp. | EV | 1.35 | 0.51 | $41.88 | 113.550 | $4,755.5 | **Median** | = | 1.35 |
| Franklin Resources, Inc. | BEN | 1.41 | 0.65 | $39.58 | 568.806 | $22,513.3 | | | |
| T. Rowe Price Group, Inc. | TROW | 1.19 | 0.65 | $75.26 | 243.430 | $18,320.5 | | | |
| Legg Mason Inc. | LM | 1.41 | 0.49 | $29.91 | 101.010 | $3,021.2 | | | |
| Och-Ziff Capital Management | OZM | 1.20 | 0.17 | $3.31 | 479.023 | $1,585.6 | **Average** | = | 1.31 |
| Blackstone | BX | 1.43 | 0.40 | $27.03 | 1,181.828 | $31,944.8 | **Median** | = | 1.30 |
| Man Group Plc | LSE:EMG | 1.32 | 0.22 | $1.46 | 1,688.488 | $2,465.2 | | | |
| Fortress Investment Group LLC | FIG | 1.43 | 0.33 | $4.86 | 386.047 | $1,876.2 | | | |
| Kohlberg Kravis Roberts & Co. | KKR | 1.28 | 0.34 | $15.39 | 806.218 | $12,407.7 | **Overall Average** | = | 1.32 |
| Apollo Global Management | APO | 1.18 | 0.25 | $19.36 | 408.216 | $7,903.1 | **Overall Median** | = | 1.32 |
| | | | Computed Beta, see Exhibit E-3 | | | | | | |
| **Average** | | **1.32** | **0.42** | | | **$15,377.1** | | | |
| **Median** | | **1.32** | **0.37** | | | **$7,903.1** | **Selected** | = | **1.30** |

CONFIDENTIAL

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 607 of 845   Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT D-4**

## CAPM SUMMARY
## RIVERSTONE HOLDINGS LLC
### AS OF DECEMBER 31, 2016

The cost of equity capital using the Capital Asset Pricing Model (CAPM) is as follows:

| Re = Rf + (ß x ( Rm - Rf )) + Rsm |
|---|

| Where: | Rf | = | Return on a risk-free asset |
|---|---|---|---|
| | ß | = | Beta - a measure of the systematic risk of the firm compared to the risk of an investment in a fully diversified stock market portfolio |
| | Rm - Rf | = | The market risk premium defined as the expected return required for investing in a fully diversified portfolio (Rm) less the risk-free rate (Rf) |
| | Rsm | = | Small stock premium |

We then calculated the Re as follows:

| Variable | Value | Source |
|---|---|---|
| Rf = | 2.79% | 20-yr treasury bond rate |
| Rm - Rf = | 6.00% | Equity Risk Premium |
| ß = | 1.30 | Computed Beta, see Exhibit D-3 |
| Rsm | 5.78% | Duff&Phelps 2016 Cost of Capital Book Exhibit 7.3 - (10th decile) |

$$Re = Rf + (ß \times ( Rm - Rf )) + Rsm$$

$$= 2.79\% + [ 1.30 * 6.00\% ] + 5.78\%$$

| Re = | 16.37% |
|---|---|

Highly Confidential

RSH126397

RIVERSTONE_SDTX00156532

Confidential
Empire Valuation Consultants

Compiled 04/24/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-5

## PRIVATE EQUITY / VC RATES OF RETURN
## RIVERSTONE HOLDINGS LLC
## AS OF DECEMBER 31, 2016

| | Source | |
|---|---|---|
| | QED Report – 288 VC Firms | Ruhnka & Young – 72 VC Firms |
| Stage | Range of Required Returns (Medians) | Median Compound Annual Rate of Return Demanded |
| Seed | 50%–70% | 73% |
| First Stage | 40%–60% | 55% |
| Second Stage | 35%–50% | 42% |
| Third Stage | 30%–50% | 35% |
| Fourth Stage | 30%–40% | 35% |
| Bridge/Mezzanine | 25%–35 | N/A |

| | Source | | | | | |
|---|---|---|---|---|---|---|
| Stage | Plummer(1) | Scherlis and Sahlman(2) | Sahlman, Stevenson and Bhide(3) | Pepperdine(4) | Razgaitis(5) | Parr(6) |
| Start-Up | 50%–70% | 50%–70% | 50%–100% | 23%–38% | 50%–70% | 50% |
| Early Development | 40%–60% | 40%–60% | 40%–60% | 23%–38% | 40%–50% | 40% |
| First Stage | N/A | N/A | N/A | 23%–38% | 30%–40% | 30%–40% |
| Expansion | 35%–50% | 30%–50% | 30%–40% | 19%–33% | 25%–35% | 30% |
| Mezzanine/ IPO | 25%–35% | 20%–35% | 20%–30% | 18%–33% | 10%–20% | 25% |

### Standard Definitions of Venture Capital Investment Stages:

"Seed" In this earliest stage, it was noted that the venture was conceptual. The primary benchmark for this stage was to verify the feasibility of the business, either from a technological or market standpoint. From an operational standpoint, there was generally no team in place beyond the founder/inventor and a few technicians. Risks of investment at this stage were recognized as being primarily internal.

"First Stage" In this stage, the feasibility analysis of the business concept has generally progressed to the development of a formal business plan, including some initial market analysis for the proposed product or service. Major benchmarks at this stage generally include the completion of beta testing and preparing the product for market, completing some initial sales to verify that real demand exists, and establishing manufacturing feasibility. Major risks at this stage remained internally driven.

"Second Stage" In this stage, initial market acceptance of the product or service has usually been established, and the company begins to focus on increasing manufacturing capacity and expanding its marketing efforts. The focus at this stage is generally on expansion, and driving the venture toward cash flow break-even, although most companies in the second stage have not reached this benchmark. Risks at this stage were shifting to a balance between external (market) risks and internal risks, where earlier stages were characterized primarily by internal risk.

"Third Stage" A continuation of the prior stage, companies at this stage generally have significant sales and orders, remain focused on broadening their markets, and are profitable or nearly so. However, companies at this stage were still generally dependent on external capital for growth. Goals at this stage became increasingly focused, with emphasis on the following: (1) achieving sales growth and market share targets; and (2) focusing an achieving an exit vehicle by demonstrating cash flow break-even or profitability targets. An increasing percentage of risks at this stage were considered to be market-determined.

"Fourth Stage" This stage is characterized by an explicit focus on identifying an exit vehicle for investors. Businesses have expanded since the prior stage, with maturity generally being identified both in management and in internal controls. Businesses at this stage would be profitable and growing rapidly. Risks at this stage were identified as being generally external, although remaining internal concerns involved inadequate management and financial controls.

"IPO/ Bridge/Mezzanine" companies are similar to the fourth stage but may be seeking financing for growth or an injection of liquidity prior to a public offering of a full change of control.

### Sources:
(1)Plummer, James L., QED Report on Venture Capital Financial Analysis, Palo Alto: QED Research, Inc. 1987.
(2)Scherlis, Daniel R. and Sahlman, William A., A Method for Valuing High Risk, Long-Term Investments: The Venture Capital Method, Harvard Business School, 1989.
(3)Sahlman, William A., Stevenson, Howard H, and Bhide, Amar V., Financing Entrepreneurial Ventures, Business Fundamental Series, Harvard Business School, 1998.
(4)Pepperdine University Graziadio School of Business and Management: Private Capital Markets Project, 2015.
(5)Razgaitis, Richard, Pricing the Intellectual Property of Early-Stage Technologies: A Primer of Basic Valuation Tools and Considerations, 2007.
(6)Parr, Russell L., "Patent Valuation and Royalty Rates," 71-73, 2004

**Privileged Document Withheld**

CONFIDENTIAL

Confidential
Empire Valuation Consultants
PDF Compiled 05.22.2017
DRAFT COPY - For Discussion Purposes Only



# Riverstone Holdings LLC

Report 3 of 3: Valuation of Goodwill (as defined herein)

As of December 31, 2016

empireval.com

PDF copied 01/22/2015
DRAFT COPY - For Discussion Purposes Only

# Table of Contents

**Report 3 Executive Summary**.................................................................................. 2

**Valuation Standards**............................................................................................... 2

**Sources of Information**.......................................................................................... 3

**Background**............................................................................................................. 4

**Riverstone Holdings, LLC** ................................................................................... 4

**The Funds**................................................................................................................ 4

    A.   Overview ....................................................................................................... 4

    B.   Value of the Riverstone's Fee Income Streams ......................................... 4

**The Transaction** ..................................................................................................... 5

    A.   Terms of the Purchase Agreement ............................................................. 5

    B.   Conclusion of Transaction Value ............................................................... 7

**Allocation of Identified & Unidentified Future Income** ................................... 7

**Valuation Summary** .............................................................................................. 8

**Valuation Addenda**
    Addendum 1         Statement of Limiting Conditions
    Addendum 2         Certification of Appraisers
    Addendum 3         Company & Appraiser Profiles

**Valuation Exhibits**

RIVERSTONE_SDTX00156536

Confidential                                                              PDF copied 05/22/17
Empire Valuation Consultants                        DRAFT COPY - For Discussion Purposes Only



350 Fifth Ave. Suite 6P5                    T 212.714.0122
New York, New York 10118                   empireval.com

**PRIVATE & CONFIDENTIAL**

May 4, 2017

Mr. Thomas J. Walker
Chief Financial Officer
Riverstone Holdings LLC
712 5th Avenue, 51st Floor
New York, NY 10019

Dear Mr. Walker:

You, on behalf of Riverstone Holdings LLC ("Riverstone" or the "Company"),  have
engaged Empire Valuation Consultants, LLC ("Empire") ") to estimate, as of December 31,
2016 (the "Valuation Date"), the fair market value of: 1) certain income streams (i.e.,
carried interest and management fees) from existing Riverstone funds as well as six future
funds expected to be raised (the "Interests"); and 2) the Goodwill[1] related to a purchase of
the Interests to be booked at the Riverstone and affiliates level.

It is our understanding that the valuations will be used for corporate planning purposes,
specifically in assisting management in its allocation of a predetermined sale value of the
Interests to partners owning the Interests, and for booking goodwill related to such a sale of
the Interests.

Empire's analysis is presented in three reports, as described below:

- **Report 1,**  which determines the fair market value of the income streams (i.e.,
  largely management fees and carried interest) related to 10 existing and six
  prospective Riverstone funds (including parallel vehicles);

- **Report 2,** which determines the fair market value of the income streams (i.e.,
  management fees and incentive allocations) related to Riverstone's interest in
  Riverstone Energy Limited, a perpetual entity; and

---

[1] Goodwill, in this analysis, is defined as the value allocated to prospective funds as well as the spread between
identifiable assets and the purchase price.

New York            Rochester            West Hartford            Boston            San Francisco
212.714.0122       585.475.9260        860.233.6552            617.535.7785        415.659.1860

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 613 of 845
Confidential                                                     PDF copied on 08/02/2017
Empire Valuation Consultants                    DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 4, 2017
Page 2

- **Report 3 (this report),** a summary report which aggregates the values derived in
  Reports 1 and 2, and derives the Goodwill (as defined above) from the anticipated
  purchase price.

For purposes of this report, fair market value is defined in accordance with Treasury
Regulations established for income, estate and gift taxes as the price at which ownership
interests would change hands between a willing buyer and a willing seller, neither being
under any compulsion to buy or sell and both having reasonable knowledge of relevant
facts.

## Report 3 Executive Summary

Based upon the following review and analysis, and subject to the attached Statement of
Limiting Conditions, we have determined that the value of the future funds' income streams
is $628.8 million, Goodwill related to the Riverstone Interests is $943.8 million, and
combined, the total value of identified and unidentified future funds' income is equal to
$1.573 billion, or approximately 54% of the transaction's estimated value, as of the
Valuation Date.

## Valuation Standards

This report is an Appraisal Report as defined in Standards Rule 10 of The Appraisal
Foundation's Uniform Standards of Professional Appraisal Practice ("USPAP"), which
specifically applies to the preparation of valuation reports of business interests.

The Interests have been valued on a going concern basis. Since the Interests are closely-
held, with no public market for its ownership interests, this appraisal was conducted
according to guidelines established by the Internal Revenue Service ("IRS"), and in
conformity with the American Society of Appraisers' Principles of Appraisal Practice and
Code of Ethics. This report has also been prepared in accordance with the American
Institute of Certified Public Accountants Statement on Standards for Valuation Services 1:
Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset,
together with other standards that were deemed relevant to this engagement.

This appraisal considered all pertinent factors outlined in USPAP Standards Rule 9 and IRS
Revenue Ruling 59-60, including, but not limited to, the following:

- the nature and history of Riverstone;

- the financial and economic conditions affecting the general economy, Riverstone,
  and its industry;

- the past results, current operations, and future prospects of Riverstone;



                                    RIVERSTONE_SDTX00156538

Confidential

Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 4, 2017
Page 3

- the earning capacity and dividend-paying capacity of Riverstone;

- the economic benefit to Riverstone of both its tangible and intangible assets;

- the market price of actively traded interests in public entities engaged in the same or similar lines of business as Riverstone, as well as sales of ownership interests in entities similar to Riverstone;

- the prices, terms, and conditions of past sales of ownership interests in Riverstone; and

- the impact on the value of ownership interests in Riverstone resulting from the existence of buy-sell and option agreements, investment letter stock restrictions, restrictive shareholders agreements, or other such agreements.

## Sources of Information

Information used in determining the fair market value of the Interests was provided by the documents and sources listed below:

- An executed copy of the Equity Subscription and Investment Agreement (the "Purchase Agreement") among Riverstone, Riverstone Management Group, L.L.C., Riverstone Gower Carry Partners, L.L.C., Riverstone/Gower Mgmt Co Holdings, L.L.C., Riverstone Holdings II (Cayman) Ltd., Riverstone/Carlyle Energy Partners IV Corp, Riverstone Carlyle Energy GP IV Ltd., Riverstone Energy GP V Corp., Riverstone GP V Cayman LLC, Riverstone Energy GP VI Corp., Riverstone GP VI Cayman LLC,, Riverstone Non-ECI GP Cayman LLC, and certain related persons (collectively, the "Riverstone Issuers");

- Access to the public portions of Riverstone's website, http://www.riverstonellc.com/;

- Conversation's and correspondence with Riverstone representatives including you, Mr. Thomas Walker, Chief Financial Officer, Mr. Pierre Lapeyre, Founder, Mr. Paul Cabral, Principal, and  Mr. Sergio Maruschak, Vice President (collectively, "Management"); and

- Other reviews, analyses, and research as were deemed necessary.

Empire assumes that all information provided to us by the Company or its representatives in the context of an analysis is true, complete and correct in all material respects.  Changes to any of this information could have a material impact on our valuation conclusion.



Mr. Thomas J. Walker
May 4, 2017
Page 4

## Background

At the Valuation Date, Riverstone was in the process of selling a 12% royalty in the Company's fee income streams which includes management fees, carried interest, and other portfolio fees (which are generally applied as offsets to the management fees). The royalty is applicable to nearly all of Riverstone's current and future funds.

## Riverstone Holdings, LLC

Riverstone is an experienced private equity firm focused on the energy and power industry. Riverstone was co-founded by Mr. Pierre F. Lapeyre, Jr. and Mr. David M. Leuschen (together the "Founders") in May 2000. Riverstone has raised approximately $36 billion of capital across numerous private equity funds and their co-investment vehicles, including a publicly-listed vehicle.

Riverstone makes buyout and growth capital investments in the exploration & production, midstream, oilfield services, power, and renewable sectors of the energy industry. With offices in New York, London, Houston, and Mexico City, the Company has committed over $35 billion to more than 130 investments in North America, South America, Europe, Africa, Asia, and Australia.

## The Funds

### A. Overview

Generally, the Funds' investment objectives are to provide investors with long-term capital appreciation through privately negotiated investments in companies in the energy and power industries. Investment activity for the Funds are primarily targeted within five major industry sectors: (1) exploration and production; (2) midstream; (3) energy services; (4) power and coal; and (6) renewable energy.

### B. Value of the Riverstone's Fee Income Streams

The aggregate value of the fee income streams (largely comprised of management fees and carried interest/incentive allocations) in the selected Riverstone funds (collectively, the "Funds") as of the Valuation Date was $1.973 billion.[2] This includes the interests in the Funds listed in the following table.

---

[2] See Reports 1 and 2 for the derivation of the Funds' values.



Mr. Thomas J. Walker
May 4, 2017
Page 5

## Value of the Funds' Fee Income Streams

| Fund Name | Value of Management Fees ($ Millions) | Value of Carried Interest ($ Millions) |
|---|---|---|
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. ("Fund II") | $0.000 | $0.000 |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. ("Fund III") | $13.91 | $0.00 |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. ("Fund IV") | $39.89 | $0.00 |
| Riverstone Global Energy & Power Fund V, L.P. ("Fund V") | $108.48 | $0.00 |
| Riverstone Energy Partners VI, L.P. ("Fund VI") | $241.79 | $286.12 |
| Riverstone Non-ECI Partners GP (Cayman), L.P. ("Non-ECI") | $13.00 | $15.51 |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. ("Renew II") | $29.40 | $0.00 |
| Riverstone Capital Partners - Credit LP ("Credit I") | $15.34 | $16.69 |
| Riverstone Capital Partners CKD, LP ("CKD I") | $35.75 | $49.49 |
| Riverstone Global Energy & Power Fund VII, L.P. ("Fund VII") | $226.36 | $86.76 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. ("Renew III") | $48.19 | $22.14 |
| Riverstone Credit Partners II, L.P. ("Credit II") | $41.39 | $15.25 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. ("CKD Renew") | $27.69 | $15.50 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. ("CKD II") | $30.11 | $12.10 |
| Riverstone Energy Infrastructure Fund, L.P. ("Infrastructure") | $70.79 | $32.52 |
| Riverstone Energy Limited ("REL") | $266.5 | $212.2 |
| **Totals** | **$1,208.6** | **$764.3** |

## The Transaction

According to the Purchase Agreement, Goldman Sachs's newly formed affiliates were purchasing a 12% royalty on the Funds' fee income streams (i.e., largely comprised of the management fee and carried interest cash flows). This royalty would be applicable to any and all future "funds" Riverstone and its affiliates launch.

### A. Terms of the Purchase Agreement

The following terms of the Purchase Agreement were considered most relevant to an analysis of its economic interests as they pertain to estimating the Riverstone Goodwill allocation.

- **Subscribers:** Rawhide US IM Holdings (PH) Ltd, Rawhide Offshore IM Holdings (PH) Corp, Rawhide US IM Holdings (PH PE) Ltd, Rawhide Offshore IM Holdings (PH PE) Corp, Rawhide US IM Holdings (VNT) LLC, Rawhide V-IM Holdings (VNT) Corp, QPB PH LP, Rawhide US GP Holdings (PH) Ltd, Rawhide Offshore Holdings (PH) LP, Rawhide Offshore Holdings (PH) LLC, Rawhide US



Empire Valuation Consultants

Mr. Thomas J. Walker
May 4, 2017
Page 6

GP Holdings (PH PE) LP, Rawhide Offshore Holdings (PH PE) LP, Rawhide Offshore Holdings (PH PE) LCC, Rawhide US GP Holdings (VNT) LLC, and Rawhide V-GP Holdings (VNT) LLC (collectively, the "Subscribers").

- **Closing Purchase Payment:** At Closing, the Riverstone Issuers will receive $235.0 million from the Subscribers.

- **Contingent Payments:** The Riverstone Issuers may also receive an additional $12.0 million (the "RAE II Contingent Payment") and $250.0 million (the "Earn-out Consideration" and, together with the RAE II Contingent Payment, the "Contingent Consideration") provided certain conditions are met.

- **Total Purchase Price:** The Riverstone Issuers could potentially receive $497.0 million if, along with the Closing Purchase Payment, the Contingent Consideration is fully realized.

- **Revenue Sharing (i.e. the Royalty):** In exchange for the purchase payments, the Subscribers will receive a revenue sharing percentage of 12% on all fees, including management fees, carried interest, and incentive fees received by the Riverstone Issuers.

- **Voting Rights of the Subscribers:** The Subscribers holding any class or series of shares corresponding to the Subscribers' economic interest in any of the Riverstone Funds shall be limited to 4.99% of any vote of any class of members.

- **RAE II Contingent Payment:** The RAE III Contingent Payment will only be realized if the prospective fund Renew III has its initial closing by December 31, 2017.  Further, the payment will be based on the lesser of $12.0 million or 53.33% of the expected Renew III management fees to be earned in the first twelve month period beginning on the Renew III initial closing date.

- **Earn-out Consideration:** The Earn-out Consideration payment (comprised of an initial $150.0 million and additional $100.0 million earn-outs) is based on new management fees (i.e., from prospective funds, excluding Renew III) beginning on the Closing Date and ending on the seventh anniversary of the Closing Date. Further, the initial Earn-out Consideration is paid only when the new management fees exceed the annual minimum earn-out threshold (which increases each year). The additional Earn-out Consideration is paid only when new management fees exceed the annual management budget threshold (which increases in the fifth of the seven years).  See Exhibit C for an illustrative graphic of the earn-out.



RIVERSTONE_SDTX00156542

Mr. Thomas J. Walker
May 4, 2017
Page 7

### B.   Conclusion of Transaction Value

Based on the terms of the Purchase Agreement and the expectations for the prospective Funds (i.e., capital commitments and thereby management fees), Management expects the transaction will result in approximately $350 million in aggregate payments by the Subscribers to the Riverstone Issuers, or approximately $115.0 million in Contingent Considerations.  This was considered reasonable as the forecasts indicated Riverstone would meet some but not the maximum of the Contingent Considerations.  For example, Renew III was expected to generate $15.0 million in annual management fees, meaning Riverstone could expect the RAE III Contingent Payment would be $8.0 million, or approximately $2/3^{\text{rds}}$ of the potential $12.0 million contingent payment.

A $350 million price for the 12% royalty on the fee income stream results in an implied aggregate value of $2.916 billion for a 100% interest in the Riverstone's fee income.  See Exhibit D.

## Allocation of Identified & Unidentified Future Income

The unallocated (i.e., goodwill) value of the implied transaction value is $943.8 million.  See Exhibit D.  The value of the six prospective funds was estimated at $628.8 million.  See Exhibits A and D.  The prospective funds and the unallocated implied transaction value results in a combined $1.573 billion value of the identified and unidentified future Riverstone funds income streams, as of the Valuation Date.  Again, see Exhibit D.

{This Space Intentionally Left Blank}



Mr. Thomas J. Walker
May 4, 2017
Page 8

## Valuation Summary

Given the foregoing review and analysis, and subject to the attached Statement of Limiting Conditions, it is our estimate that the value of the identified and unidentified future funds' fee income, as related to Riverstone Holdings LLC, is reasonably stated as $1.573 billion as of December 31, 2016.   It is our understanding that this valuation will be used, in conjunction with additional reports, for corporate planning purposes, specifically in assisting management in its allocation for booking goodwill related to such a sale of the Interests.

This appraisal is not intended for any other purpose nor for any other users and the sharing of the contents herein is not permitted without the express written consent of Empire Valuation Consultants, LLC.   Empire has no obligation to update this appraisal for information that comes to our attention after the date of this report.

Respectfully submitted,

**Empire Valuation Consultants, LLC**

_____

Nathan P. Schroeder
Engagement Leader

_____

Scott A. Nammacher, CFA, ASA
Managing Director



Confidential
Empire Valuation Consultants
PDF compiled on 02/02/2017
DRAFT COPY - For Discussion Purposes Only

**Addendum 1-1**

# STATEMENT OF LIMITING CONDITIONS

1. Financial statements and other related information provided by or on behalf of the client entity or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Empire Valuation Consultants, LLC has not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

2. Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information. Information used was limited to that available on or before the Valuation Date, or which could be reasonably ascertained as of that date. We reserve the right to make such adjustments to the valuation herein reported as may be required by consideration of additional or more reliable data that may become available subsequent to the issuance of this report.

3. We do not provide assurance on the achievability of the results forecasted by the client entity because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

4. The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

5. This report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore the report and conclusion of value are not intended by Empire Valuation Consultants, LLC and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the considered opinion of Empire Valuation Consultants, LLC, based on information furnished to them by the client entity and other sources.

6. Neither all nor any part of the contents of this report (especially the conclusion of value, the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent and approval of Empire Valuation Consultants, LLC.

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 621 of 845
Confidential                                                          PDF compiled on 05/22/2017
Empire Valuation Consultants                                   DRAFT COPY - For Discussion Purposes Only
                                                                                    Addendum 1-2

7. Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Empire Valuation Consultants, LLC unless previous arrangements have been made in writing.

8. Empire Valuation Consultants, LLC is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. Empire Valuation Consultants, LLC does not conduct or provide environmental assessments and has not performed one for the subject property.

9. Empire Valuation Consultants, LLC has not determined independently whether the client entity is subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. Empire Valuation Consultants, LLC's valuation takes no such liabilities into account, except as they have been reported to Empire Valuation Consultants, LLC by the client entity or by an environmental consultant working for the client entity, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, Empire Valuation Consultants, LLC has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

10. Empire Valuation Consultants, LLC has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the Americans with Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

11. No change of any item in this appraisal report shall be made by anyone other than Empire Valuation Consultants, LLC, and we shall have no responsibility for any such unauthorized change.

12. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

13. If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

14. We have conducted interviews with the current management of the client entity concerning the past, present, and prospective operating results of the company, as applicable for this analysis.

15. Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the client entity has good title to all assets.

16. The fee established for the formulation and reporting of these conclusions is not contingent upon the value or other opinions presented.

17. Neither the appraiser nor any officer or employee of Empire Valuation Consultants, LLC has any interest in the property appraised.

18. We assume that there are no hidden or unexpected conditions of the assets valued that would adversely affect value.

19. No opinion is intended for matters which require legal or specialized expertise, investigation or knowledge, beyond that customarily employed by appraisers.

**Addendum 2**

# CERTIFICATION OF APPRAISERS

We the appraisers certify that, to the best of our knowledge and belief:

1.  Our analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

2.  All statements of fact contained in this report are true and correct.

3.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

4.  Neither Empire nor any of its employees has, to the best of our knowledge, either a present or intended financial interest in the entity that is the subject of this report, in any affiliates that may exist, or with respect to the parties involved.

5.  Empire has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

6.  We have no bias with respect to the entity that is the subject of this report or to the parties involved with this assignment.

7.  Empire's engagement in this assignment was not contingent upon developing or reporting predetermined results.

8.  The professional fee paid to Empire for the preparation of this report is not contingent upon its conclusion, including: developing or reporting a predetermined value or direction of value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

9.  No one provided significant business appraisal assistance to the persons signing this certification, unless specifically stated herein.

The American Society of Appraisers has a mandatory recertification program for all of its Accredited Senior Appraisers. The senior members signing below, designated by the "ASA," are in compliance with that program.


_____
Nathan P. Schroeder
Engagement Leader


_____
Scott A. Nammacher, CFA, ASA
Managing Director



May 22, 2017

Empire Valuation Consultants

**Addendum 3-1**

# EMPIRE VALUATION CONSULTANTS, LLC
www.empireval.com

| | | |
|---|---|---|
| 777 Canal View Blvd. | 350 Fifth Avenue | One International Place |
| Suite 200 | Suite 6115 | Suite 1400 |
| Rochester, NY 14623 | New York, NY 10118 | Boston, MA 02110 |
| Tel: (585) 475-9260 | Tel: (212) 714-0122 | Tel: (617) 535-7785 |

| | |
|---|---|
| 61 South Main Street | 555 California Street |
| Suite 201 | Suite 4925 |
| West Hartford, CT 06107 | San Francisco, CA 94104 |
| Tel: (860) 233-6552 | Tel: (415) 659-1860 |

## Valuation Services

**Empire Valuation Consultants, LLC** provides valuations to private equity and hedge funds, business owners, attorneys, accountants, commercial bankers, investment bankers, trust departments, insurance agents, and financial planners, among others. **Empire's** consultants have prepared or managed the preparation of over 25,000 appraisals for the following reasons:

- Private Equity & Hedge Fund Marking
- Transfer Pricing
- Solvency Opinions
- Buy/Sell Agreements
- Gifting Programs
- Estate Taxes
- Mergers & Acquisitions
- Blocks of Publicly Traded Securities
- Employee Stock Ownership Plans (ESOPs)

- Financial and SEC Reporting
- Fairness Opinions
- Litigation Support
- Redemptions
- Recapitalizations
- Going Private Transactions
- Stock Option Plans
- Dissenting Shareholder Suits
- Impairment Testing
- Intellectual Property
- Purchase Price Allocations

## Other Financial Services

### Litigation Support & Expert Testimony

**Empire** can assist you with research and litigation support and its professionals are available to provide expert testimony in matters involving questions of valuation.

### ESOP Feasibility Studies & Preliminary Valuations

**Empire** is available to work with our client's team of financial advisors or participate in independent feasibility studies and preliminary valuation reviews in connection with ESOP formation planning.

Confidential
Empire Valuation Consultants                                          DRAFT COPY - For Discussion Purposes Only

# NATHAN P. SCHROEDER

## Academic Degrees

M.S.F.          Boston College, Carroll School of Management, Finance, 2007

B.S.            State University of New York at Albany, Economics, 2003

## Employment

**Empire Valuation Consultants, Rochester, New York**
Engagement Leader, 2016-Present
Senior Valuation Consultant, 2012-2016
Valuation Consultant, 2008-2012

**Investors Bank & Trust, Boston, Massachusetts**
Senior Financial Analyst, 2006-2007
Trust Administrator, 2005-2006
Fund Accountant, 2004-2005

## Experience

While employed with Empire, Mr. Schroeder has performed valuations of derivative instruments, intangible assets, and equity and debt interests for diverse purposes, including those of tax planning and reporting, lending purposes, financial and Securities and Exchange (SEC) reporting (including ASC 350-20, formerly SFAS 142- impairment testing and ASC 820, formerly SFAS 157- fair value measurements), ESOP purposes, and other corporate planning and reporting purposes.

Mr. Schroeder's professional experience, prior to joining Empire, includes fund accounting for certain mutual and hedge funds as well as managing high profile client relationships within a wealth and trust management division. As an analyst in the corporate financial planning and analysis (FP&A) group at Investors Bank & Trust, he generated a rolling 3-year-period corporate forecast, resulting in EPS guidance for the CFO, the Board of Directors, and Wall Street. Mr. Schroeder was primarily, and exclusively, responsible for forecasting the company's revenue. This involved analyzing and forecasting: new business, interest income, business turn, treasury and ALCO expectations, as well as other information related to the company's revenue. In addition to generating the forecast, Mr. Schroeder performed regular variance analysis and coordinated the annual corporate budget with the company's cost center directors and managers.

CONFIDENTIAL                                                          RIVERSTONE_SDTX00156550

<div align="right">Addendum 3-3</div>

# SCOTT A. NAMMACHER, ASA, CFA

## Academic Degrees

M.B.A.   New York University Graduate School of Business, Finance, 1985

B.S.   University of Minnesota, Business, 1977

## Employment

Principal and Managing Director, Empire Valuation Consultants, LLC, New York, New York, 1992-Present

Manager, Financial Valuations, Arthur Andersen & Co., New York, 1990-1991

V.P., Marigold Capital Development, Investment Banking Div. of Marigold Enterprises, Greenwich, Connecticut, 1989-1990

Manager - Domestic Finance, PepsiCo, Inc. Purchase, New York,  1985-1989

## Experience

Mr. Nammacher is an Accredited Senior Appraiser (ASA) of the American Society of Appraisers and is a Chartered Financial Analyst (CFA). He has over 30 years of experience in financial consulting, business and financial asset valuations.  He has valued the equity, debt, carried interests, etc. of publicly and privately held businesses for acquisitions, divestitures, stock repurchases, estate and gift tax reporting, buy/sell agreements, and general corporate planning purposes.  He has also valued entertainment and royalty stream related assets.  Mr. Nammacher developed business plans and financing packages, and has been involved in completed transactions totaling over $2.0 billion.  In addition, he played key roles in the successful launch of a new business publication.

Mr. Nammacher has testified as an expert witness in U.S. Tax Court, U.S. Bankruptcy Court, Delaware Chancery Court and other courts and arbitration settings around the country, and published a book and several articles on "junk bonds."  He also received the prestigious "Graham & Dodd Scroll Award" from the *Financial Analysts Journal* for outstanding financial writing relating to a cover story he co-authored.

He served two terms as an elected member of the American Society of Appraisers' Business Valuation Committee, and one term as a Governor (board member) for the ASA's parent organization.  He has spoken on valuation issues around the country and chaired an annual valuation conference in New York City for over 20 years. He also co-chaired the first joint AICPA/ASA valuation conference ever presented.

RIVERSTONE_SDTX00156551

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT A

## PRESENT VALUES OF CARRIED INTEREST & MANAGEMENT FEES
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Terminal | Totals | % of Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | | |
| *($ Millions)* | | | | | | | | | | | | | | |
| **Existing Funds - Carried Interest** | | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00% |
| Carlyle/Riverstone Energy Partners III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00% |
| Riverstone/Carlyle Energy Partners IV, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00% |
| Riverstone Energy Partners V, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00% |
| Riverstone Energy Partners VI, L.P. | 0.00 | 0.00 | 113.82 | 87.52 | 84.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 286.12 | 14.50% |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | 0.00 | 0.00 | 6.16 | 4.74 | 4.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 15.51 | 0.79% |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00% |
| Riverstone Capital Partners - Credit LP | 0.00 | 0.00 | 16.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 16.69 | 0.85% |
| Riverstone Capital Partners CKD, LP | 0.00 | 0.00 | 19.36 | 12.76 | 9.82 | 7.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 49.49 | 2.51% |
| REL IP General Partner Limited | 35.04 | 31.19 | 25.17 | 21.53 | 18.42 | 15.77 | 13.50 | 11.55 | 8.88 | 8.46 | 7.24 | 14.47 | 212.22 | 10.76% |
| **Existing Funds - Carried Interest Total** | 35.04 | 31.19 | 25.17 | 177.57 | 123.45 | 114.98 | 21.05 | 11.55 | 8.88 | 8.46 | 7.24 | 14.47 | 580.04 | 29.40% |
| | | | | | | | | | | | | | | |
| **Existing Funds - Management Fees** | | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | 0.00 | 0.00% |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | 5.92 | 3.83 | 2.82 | 1.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 13.81 | 0.71% |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | 20.53 | 13.63 | 5.01 | 0.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 39.89 | 2.02% |
| Riverstone Global Energy & Power Fund V, L.P. | 51.19 | 35.76 | 16.83 | 4.56 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 108.46 | 5.50% |
| Riverstone Global Energy & Power Fund VI, L.P. | 67.93 | 61.20 | 51.58 | 45.23 | 11.95 | 4.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 241.79 | 12.26% |
| Riverstone Non-ECI Partners, L.P. | 3.65 | 3.29 | 2.77 | 2.43 | 0.64 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 13.00 | 0.66% |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | 13.05 | 9.72 | 5.05 | 1.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 29.40 | 1.49% |
| Riverstone Credit Management LLC | 5.39 | 4.48 | 4.04 | 1.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 15.34 | 0.78% |
| Riverstone CKD Management Company, S De R.L. De C.V. | 9.72 | 9.76 | 7.36 | 6.48 | 2.02 | 1.07 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | | 35.75 | 1.81% |
| Riverstone Limited | 20.49 | 20.54 | 19.26 | 18.80 | 18.34 | 17.90 | 17.47 | 17.05 | 16.64 | 16.24 | 15.85 | 67.92 | 266.49 | 13.51% |
| **Existing Funds - Management Fees Total** | 197.88 | 161.31 | 114.84 | 92.46 | 32.90 | 23.20 | 17.78 | 17.05 | 16.64 | 16.24 | 15.95 | 67.92 | 764.06 | 38.73% |
| | | | | | | | | | | | | | | |
| **New Funds - Carried Interest** | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.20 | 24.58 | 18.20 | 10.79 | 0.00 | | 86.76 | 4.40% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.47 | 6.27 | 4.65 | 2.75 | 0.00 | 0.00 | | 22.14 | 1.12% |
| Riverstone Credit Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 15.25 | 0.00 | 0.00 | 0.00 | 0.00 | | 15.30 | 0.77% |
| Riverstone CKD Renewables & Alternative Energy, S De R.L. De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.69 | 4.25 | 2.52 | 0.08 | 0.00 | 0.00 | | 15.50 | 0.79% |
| Riverstone CKD Management Company II, S De R.L. De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.86 | 3.60 | 2.66 | 0.98 | 0.00 | | 12.10 | 0.61% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.05 | 9.87 | 7.16 | 2.65 | 0.00 | 0.00 | | 32.52 | 1.65% |
| **New Funds - Carried Interest Total** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.78 | 71.76 | 41.84 | 26.26 | 11.77 | 0.00 | | 184.28 | 9.34% |
| | | | | | | | | | | | | | | |
| **New Funds - Management Fees** | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 55.72 | 47.61 | 40.68 | 34.77 | 29.72 | 12.13 | 4.53 | 1.19 | 0.00 | | 226.36 | 11.47% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 11.85 | 10.13 | 8.66 | 7.40 | 6.32 | 2.60 | 0.98 | 0.26 | 0.00 | 0.00 | | 48.19 | 2.44% |
| Riverstone Credit Partners II, L.P. | 0.00 | 4.88 | 9.78 | 15.86 | 7.87 | 3.48 | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | | 41.39 | 2.10% |
| Riverstone CKD Renewables & Alternative Energy, S De R.L. De C.V. | 8.93 | 5.93 | 5.07 | 4.33 | 3.70 | 1.06 | 0.53 | 0.15 | 0.00 | 0.00 | 0.00 | | 27.69 | 1.40% |
| Riverstone CKD Management Company II, S De R.L. De C.V. | 0.00 | 0.00 | 7.60 | 8.49 | 5.55 | 4.74 | 4.05 | 1.08 | 0.49 | 0.11 | 0.00 | | 30.11 | 1.53% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 17.78 | 15.20 | 12.98 | 11.10 | 9.48 | 2.79 | 1.21 | 0.26 | 0.00 | 0.00 | | 70.79 | 3.59% |
| **New Funds - Management Fees Total** | 8.93 | 40.44 | 102.48 | 95.93 | 76.28 | 59.86 | 40.22 | 15.55 | 5.53 | 1.30 | 0.00 | | 444.53 | 22.53% |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | **Aggregate Total** | 1,972.91 | 100.00% |

| | | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Mid-point of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 |

| **Carried Interest PV Factors** | Discount Rate | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing Funds - Near Term | 25% | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Existing Funds | 30% | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 |
| New Funds | 35% | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 |

| **Management Fees PV Factors** | Discount Rate | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing Funds - Near Term | 11% | 0.95 | 0.86 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Existing Funds | 14% | N/A | N/A | 0.72 | 0.63 | 0.55 | 0.49 | 0.43 | 0.37 | 0.33 | 0.29 | 0.25 |
| New Funds | 17% | 0.92 | 0.79 | 0.68 | 0.58 | 0.49 | 0.42 | 0.36 | 0.31 | 0.26 | 0.22 | 0.19 |

*(1) Values shown on this Exhibit are the Present Values of the expected cash flows from Exhibits B and C.*

**EXHIBIT B-1**

## DISCOUNTED CASH FLOW ANALYSIS - CARRIED INTEREST CASH FLOWS (From Supporting Exhibits)
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | | Year 1<br>2017 | Year 2<br>2018 | Year 3<br>2019 | Year 4<br>2020 | Year 5<br>2021 | Year 6<br>2022 | Year 7<br>2023 | Year 8<br>2024 | Year 9<br>2025 | Year 10<br>2026 | Year 11<br>2027 | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| *Existing Funds* | | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 [1] |
| Carlyle/Riverstone Energy Partners III, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 [1] |
| Riverstone/Carlyle Energy Partners IV, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 [1] |
| Riverstone Energy Partners V, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| Riverstone Energy Partners VI, L.P. | | 0.00 | 0.00 | 0.00 | 285.21 | 285.21 | 359.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 929.58 |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | | 0.00 | 0.00 | 0.00 | 15.44 | 15.44 | 19.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 50.42 |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 [1] |
| Riverstone Capital Partners - Credit LP | | 0.00 | 0.00 | 41.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 41.83 |
| Riverstone Capital Partners CKD, LP | | 0.00 | 0.00 | 0.00 | 48.52 | 41.59 | 41.59 | 41.59 | 0.00 | 0.00 | 0.00 | 0.00 | | 173.29 |
| REL IP General Partner Limited | | 39.18 | 43.59 | 48.50 | 53.96 | 60.04 | 66.81 | 74.33 | 82.70 | 92.02 | 102.39 | 113.92 | 227.84 [3],[4] | 1,005.28 [2] |
| **Existing Funds Total** | (A) | 39.18 | 43.59 | 48.50 | 444.97 | 402.28 | 487.09 | 115.92 | 82.70 | 92.02 | 102.39 | 113.92 | 227.84 | 2,200.40 |
| *New Funds* | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 233.68 | 233.68 | 233.68 | 186.94 | 0.00 | | 887.98 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 44.16 | 44.16 | 44.16 | 35.33 | 0.00 | 0.00 | | 167.81 |
| Riverstone Credit Partners II, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 107.34 | 0.00 | 0.00 | 0.00 | 0.00 | | 107.34 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 0.00 | 0.00 | 0.00 | 26.56 | 22.14 | 17.71 | 17.71 | 0.00 | 0.00 | 0.00 | 0.00 | | 84.12 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 34.19 | 34.19 | 34.19 | 17.09 | 0.00 | | 119.66 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 68.04 | 68.04 | 68.04 | 34.02 | 0.00 | 0.00 | | 238.14 |
| **New Funds Total** | (B) | 0.00 | 0.00 | 0.00 | 0.00 | 26.56 | 134.34 | 505.12 | 397.78 | 337.22 | 204.04 | 0.00 | | 1,605.06 |
| Days | | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | | |
| Mid-point of Period | | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | | |

| | Discount Rate | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing Funds - Near Term | 25% | (C) | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Existing Funds | 30% | (C) | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 |
| | | (A x C) | 35.04 | 31.19 | 25.17 | 177.57 | 123.45 | 114.98 | 21.05 | 11.55 | 9.88 | 8.46 | 7.24 |
| New Funds | 35% | (C) | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 |
| | | (B x C) | 0.00 | 0.00 | 0.00 | 0.00 | 6.88 | 25.76 | 71.76 | 41.84 | 26.26 | 11.77 | 0.00 |

| | |
|---|---|
| Value of Existing Funds Carried Interest | 565.56 |
| Value of New Funds Carried Interest | 184.28 |
| **Aggregate Value of Carried Interest** | **749.84** |

*(1) 90% of Fees flow to Riverstone, 10% to Carlyle.*     *(3) Gordon Growth Model: Vo = [Cf × (1 + g)] ÷ (r - g).*

*(2) Approx 80% of fees flow to Riverstone, 20% to Cornerstone investors.*     *(4) Growth Rate of 0%, Probability Factor of 0% based on 4-5% annual risk of closure.*

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT B-2

## DISCOUNTED CASH FLOW ANALYSIS - MANAGEMENT FEE CASH FLOWS (From Supporting Exhibits)
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Terminal | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | |
| **Management Fees ($ Millions)** | | | | | | | | | | | | | | |
| *Existing Funds* | | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | N/A [1] |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | | 6.24 | 4.60 | 3.92 | 1.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 16.71 [2] |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | | 21.63 | 15.94 | 6.95 | 1.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 45.66 [2] |
| Riverstone Global Energy & Power Fund V, L. P. | | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 126.53 |
| Riverstone Global Energy & Power Fund VI, L. P. | | 71.57 | 71.57 | 71.57 | 71.57 | 21.37 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 315.89 |
| Riverstone Non-ECI Partners, L.P. | | 3.84 | 3.84 | 3.84 | 3.84 | 1.16 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 16.99 |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | | 13.75 | 11.37 | 7.00 | 2.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 34.63 [2] |
| Riverstone Credit Management LLC | | 5.68 | 5.24 | 5.61 | 2.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 18.78 |
| Riverstone CKD Management Company, S.De R.L. De C.V. | | 10.25 | 10.25 | 10.25 | 10.25 | 3.65 | 2.21 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | | 47.57 |
| Riverstone Energy Limited | | 21.59 | 24.02 | 26.73 | 29.74 | 33.09 | 36.81 | 40.96 | 45.57 | 50.71 | 56.42 | 62.78 | 269.04 [4],[5] | 697.45 [3] |
| **Existing Funds Total** | (A) | 208.48 | 188.64 | 159.35 | 130.47 | 59.35 | 47.71 | 41.70 | 45.57 | 50.71 | 56.42 | 62.78 | 269.04 | 1,320.21 |
| *New Funds* | | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 82.50 | 82.50 | 82.50 | 82.50 | 82.50 | 39.41 | 17.21 | 5.29 | 0.00 | | 474.41 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 7.21 | 3.19 | 0.98 | 0.00 | 0.00 | | 86.37 |
| Riverstone Credit Partners II, L.P. | | N/A | 6.18 | 13.00 | 27.48 | 15.95 | 8.26 | 1.47 | 0.00 | 0.00 | 0.00 | 0.00 | | 72.33 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 2.51 | 1.47 | 0.49 | 0.00 | 0.00 | 0.00 | | 41.97 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 11.25 | 11.25 | 11.25 | 11.25 | 11.25 | 3.50 | 1.86 | 0.49 | 0.00 | | 62.10 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 22.50 | 22.50 | 22.50 | 22.50 | 22.50 | 7.74 | 3.92 | 0.98 | 0.00 | 0.00 | | 125.14 |
| **New Funds Total** | (B) | 7.50 | 51.18 | 151.75 | 166.23 | 154.70 | 142.02 | 111.64 | 50.51 | 21.03 | 5.78 | 0.00 | | 882.33 |
| | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | | |
| | Mid-point of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | | |
| | **Discount Rate** | | | | | | | | | | | | | |
| **Existing Funds - Near Term** | 11% (C) | 0.95 | 0.86 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| **Existing Funds** | 14% (C) | N/A | N/A | 0.72 | 0.63 | 0.55 | 0.49 | 0.43 | 0.37 | 0.33 | 0.29 | 0.25 | 0.25 | |
| | (A x C) | 197.88 | 161.31 | 114.84 | 82.46 | 32.90 | 23.20 | 17.78 | 17.05 | 16.64 | 16.24 | 15.85 | 67.92 | |
| **New Funds** | 17% (C) | 0.92 | 0.79 | 0.68 | 0.58 | 0.49 | 0.42 | 0.36 | 0.31 | 0.26 | 0.22 | 0.19 | | |
| | (B x C) | 6.93 | 40.44 | 102.48 | 95.93 | 76.29 | 59.86 | 40.22 | 15.55 | 5.53 | 1.30 | 0.00 | | |
| Value of Existing Funds Management Fees | 764.06 | | | | | | | | | | | | | |
| Value of New Funds Management Fees | 444.53 | | | | | | | | | | | | | |
| **Aggregate Value of Management Fees** | **1,208.60** | | | | | | | | | | | | | |

(1) In 2015, Management elected to forgo future management fees.

(2) 90% of Fees flow to Riverstone, 10% to Carlyle.

(3) Approx 80% of fees flow to Riverstone, 20% to Cornerstone investors.

(4) Gordon Growth Model: Vo = [Cf × (1 + g)] ÷ (r - g).

(5) Growth Rate of 0%, Probability Factor of 60% based on 4-5% annual risk of closure.

RIVERSTONE_SDTX00156554

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT C**



## EARNOUT CONSIDERATION
### RIVERSTONE HOLDINGS LLC
#### AS OF DECEMBER 31, 2016

STRICTLY CONFIDENTIAL

# Project Rawhide
*Illustrative earnout*

| Year | Annual NNM Thresholds | | | Rawhide NNM | Earn-in thresholds | | Earnout Payments ($m) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Earnout threshold | Management Budget threshold | Maximum Earnout threshold | Achieved (illustrative) | % achieved of Initial Earnout threshold | % achieved of additional Earnout threshold | Aggr. total payment (capped at $150m) | Aggr. total payment (capped at $100m) | Total Earnout payment |
| Year 1 (2017) | 23.3 | 128.0 | 200.0 | 10.0 | - | - | -- | -- | -- |
| Year 2 | 46.5 | 128.0 | 200.0 | 50.0 | 4.2% | - | 6.4 | -- | 6.4 |
| Year 3 | 69.8 | 128.0 | 200.0 | 100.0 | 47.6% | - | 71.5 | -- | 71.5 |
| Year 4 | 93.1 | 128.0 | 200.0 | 170.0 | 48.1% | 58.3% | 72.2 | 58.3 | 130.5 |
| Year 5 | 116.4 | 173.0 | 266.7 | 180.0 | - | - | -- | -- | -- |
| Year 6 | 139.6 | 218.0 | 333.3 | 190.0 | - | - | -- | -- | -- |
| Year 7 | 162.9 | 263.0 | 400.0 | 200.0 | - | - | -- | -- | -- |
| **Total earnout** | | | | | **100.0%** | **58.3%** | **150.0** | **58.3** | **208.3** |
| **Total (including $235.0m upfront)** | | | | | | | **385.0** | **443.3** | **443.3** |

Graphic from Exhibit A of the Purchase Agreement.

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT D**

## CONCLUSION OF VALUES & ALLOCATION
**RIVERSTONE HOLDINGS LLC**
AS OF DECEMBER 31, 2016

($ Millions)

| | Value of Management Fee Streams | Value of Carried Interest Streams | | |
|---|---|---|---|---|
| **Existing Funds** | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | $0.000 | $0.000 | | |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | $13.914 | $0.000 | | |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | $39.891 | $0.000 | | |
| Riverstone Global Energy & Power Fund V, L.P. | $108.483 | $0.000 | | |
| Riverstone Energy Partners VI, L.P. | $241.794 | $286.115 | | |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | $12.997 | $15.512 | | |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | $29.403 | $0.000 | | |
| Riverstone Capital Partners - Credit LP | $15.336 | $16.694 | | |
| Riverstone Capital Partners CKD, LP | $35.754 | $49.495 | | |
| REL IP General Partner Limited | $266.491 | $212.221 | | |
| **Totals** | $764.063 | $580.037 | | |
| **Total Existing Funds Value** | | | $1,344.100 | A |
| | | | | |
| **Future Funds** | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | $226.356 | $86.762 | | |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | $48.194 | $22.139 | | |
| Riverstone Credit Partners II, L.P. | $41.393 | $15.249 | | |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | $27.689 | $15.501 | | |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | $30.110 | $12.102 | | |
| Riverstone Energy Infrastructure Fund, L.P. | $70.793 | $32.522 | | |
| **Totals** | $444.534 | $184.275 | | |
| **Total Future Funds Value** | | | $628.809 | B |
| | | | | |
| **Total Value of Existing & Future Funds** | | | $1,972.909 | C = (A + B) |
| | | | | |
| Implied Aggregate Transaction Value [1] | | | $2,916.667 | D |
| Unallocated "Goodwill" in Excess of Existing/Future Funds | | | $943.758 | E = (D - C) |

| Allocation Conclusion of Identified Future and Unidentified Future Income | | | % of Transaction Value | |
|---|---|---|---|---|
| Total Future Funds Value | $628.809 | B | 22% | |
| Unallocated "Goodwill" in Excess of Existing/Future Funds | $943.758 | E | 32% | |
| **Total Allocation of Identified & Unidentified Future Income** | $1,572.567 | (B +E) | 54% | |

(1) Management expects transaction will result in approximately $350MM purchase for a 12% royalty on Management Fees and Carried Interest allocations.

(2) Purchase includes additional contingent & earn out payments, for a total consideration of up to $497MM.

# Privileged Document Withheld

CONFIDENTIAL



# Riverstone Holdings LLC

---

Report 1 of 3: Valuation of the Carried Interest and Management Fee Streams

---

As of December 31, 2016

---

empireval.com

RIVERSTONE_SDTX00156558

# Table of Contents

**Report 1 Executive Summary**........................................................................................ 2

**Valuation Standards**..................................................................................................... 2

**Sources of Information**................................................................................................ 3

**Background**................................................................................................................. 5

**Riverstone Holdings, LLC**........................................................................................... 5

**The Funds**................................................................................................................... 6

    A.   Overview ................................................................................................ 6

    B.   Investment Strategy .............................................................................. 7

    C.   General Fund Structure ........................................................................ 8

    D.   Historical Performance of the Funds ..................................................... 9

    E.   Employees ............................................................................................ 9

    F.   Characteristics of the Existing Funds ................................................... 10

        1.   Fund II ..................................................................................... 10

        2.   Fund III .................................................................................... 10

        3.   Fund IV .................................................................................... 11

        4.   Fund V ..................................................................................... 11

        5.   Fund VI .................................................................................... 11

        6.   Non-ECI ................................................................................... 11

        7.   Renew II ................................................................................... 12

        8.   Credit I .................................................................................... 12

        9.   CKD I ...................................................................................... 12

    G.   Characteristics of the Prospective Funds .............................................. 13

    H.   General Agreement Terms of the Funds ................................................ 13

**Economic & Industry Outlook** ................................................................................... 15

    A.   General Economic Outlook .................................................................... 15

    B.   Capital Markets Overview ...................................................................... 17

    C.   Private Equity Industry Outlook ............................................................. 23

        1.   Industry Overview .................................................................... 23

        2.   Performance ............................................................................. 23

        3.   Asset Flow ................................................................................ 26

        4.   Secondary Market Activity ........................................................ 27

    D.   Energy Industry Outlook ....................................................................... 29

                                   RIVERSTONE_SDTX00156559

**Valuation Overview** ............................................................................................ **32**

   A.   General Valuation Methods .................................................................... 32

   B.   Outline of Valuation Process .................................................................. 33

**Valuation of the Funds' Carried Interest and Management Fee Streams** ..................... **33**

   A.   Derivation of Cash Flow Base ................................................................ 33

       1.   Fund II ................................................................................... 35

       2.   Fund III .................................................................................. 35

       3.   Fund IV .................................................................................. 35

       4.   Fund V ................................................................................... 36

       5.   Fund VI .................................................................................. 36

       6.   Non-ECI ................................................................................. 36

       7.   Renew II ................................................................................. 36

       8.   Credit I ................................................................................... 36

       9.   CKD I .................................................................................... 37

       10.   Prospective Funds .................................................................. 37

       11.   Additional Cash Flow Inputs ................................................... 37

   B.   Derivation of Required Rate of Return .................................................. 39

   C.   Conclusion of Fully Marketable Value .................................................. 42

**Valuation Summary** ............................................................................................ **44**

**Valuation Addenda**
      Addendum 1        Statement of Limiting Conditions
      Addendum 2        Certification of Appraisers
      Addendum 3        Company & Appraiser Profiles

**Valuation Exhibits**

PDF compiled 06/02/2017
DRAFT COPY - For Discussion Purposes Only



350 Fifth Ave. Suite 606        T 212.714.0122
New York, New York 10118        empireval.com

## PRIVATE & CONFIDENTIAL

May 22, 2017

Mr. Thomas J. Walker
Chief Financial Officer
Riverstone Holdings LLC
712 5th Avenue, 51st Floor
New York, NY 10019

Dear Mr. Walker:

You, on behalf of Riverstone Holdings LLC ("Riverstone" or the "Company"), have engaged Empire Valuation Consultants, LLC ("Empire") ") to estimate, as of December 31, 2016 (the "Valuation Date"), the fair market value of: 1) certain income streams (i.e., carried interest and management fees) from existing Riverstone funds, as well as six future funds expected to be raised (collectively, the "Interests"); and 2) the Goodwill[1] related to a purchase of the Interests to be booked at the Riverstone and affiliates level.

It is our understanding that the valuations will be used for corporate planning purposes, specifically in assisting management in its allocation of a predetermined sale value of the Interests to partners owning the Interests, and for booking goodwill related to such a sale of the Interests.

Empire's analysis is presented in three reports, as described below:

- **Report 1 (this report)**, which determines the fair market value of the income streams (i.e., largely management fees and carried interest) related to 10 existing and six prospective Riverstone funds (including parallel vehicles);

- **Report 2**, which determines the fair market value of the management fee and incentive allocations related to Riverstone Energy Limited (a perpetual entity); and

- **Report 3**, a summary report which aggregates the values derived in Reports 1 and 2, and derives the Goodwill (as defined above) from the anticipated purchase price.

---

[1] Goodwill, in this analysis, is defined as the value allocated to prospective funds as well as the spread between identifiable assets and the purchase price.

New York        Rochester        West Hartford        Boston        San Francisco
212.714.0122        585.475.9260        860.233.6552        617.535.7785        415.659.1860

Mr. Thomas J. Walker
May 22, 2017
Page 2

For purposes of this report, fair market value is defined in accordance with Treasury Regulations established for income, estate and gift taxes as the price at which ownership interests would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

# Report 1 Executive Summary

Based upon the following review and analysis, and subject to the attached Statement of Limiting Conditions, we have determined that the aggregate value of the management fees and carried interest allocations in the selected Riverstone funds (collectively, the "Funds") was $1.494 billion, as of the Valuation Date.  This includes the interests in the Funds listed in the following table.

**Value of the Funds' Management Fees and Carried Interest**

| Fund Name | Value of Management Fees ($ Millions) | Value of Carried Interest ($ Millions) |
|---|---|---|
| Carlyle/Riverstone Global Energy & Power Fund II, L.P.  ("Fund II") | $0.00 | $0.00 |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. ("Fund III") | $13.91 | $0.00 |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. ("Fund IV") | $39.89 | $0.00 |
| Riverstone Global Energy & Power Fund V, L.P. ("Fund V") | $108.48 | $0.00 |
| Riverstone Energy Partners VI, L.P. ("Fund VI") | $241.79 | $286.12 |
| Riverstone Non-ECI Partners GP (Cayman), L.P. ("Non-ECI") | $13.00 | $15.51 |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. ("Renew II") | $29.40 | $0.00 |
| Riverstone Capital Partners - Credit LP ("Credit I") | $15.34 | $16.69 |
| Riverstone Capital Partners CKD, LP ("CKD I") | $35.75 | $49.49 |
| Riverstone Global Energy & Power Fund VII, L.P. ("Fund VII") | $226.36 | $86.76 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. ("Renew III") | $48.19 | $22.14 |
| Riverstone Credit Partners II, L.P. ("Credit II") | $41.39 | $15.25 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. ("CKD Renew") | $27.69 | $15.50 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. ("CKD II") | $30.11 | $12.10 |
| Riverstone Energy Infrastructure Fund, L.P. ("Infrastructure") | $70.79 | $32.52 |
| **Totals** | **$942.11** | **$552.09** |

## Valuation Standards

This report is an Appraisal Report as defined in Standards Rule 10 of The Appraisal Foundation's Uniform Standards of Professional Appraisal Practice ("USPAP"), which specifically applies to the preparation of valuation reports of business interests.



Empire Valuation Consultants                          DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 3

The Interests have been valued on a going concern basis. Since the Interests are closely-held, with no public market for its ownership interests, this appraisal was conducted according to guidelines established by the Internal Revenue Service ("IRS"), and in conformity with the American Society of Appraisers' Principles of Appraisal Practice and Code of Ethics. This report has also been prepared in accordance with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services 1: Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, together with other standards that were deemed relevant to this engagement.

This appraisal considered all pertinent factors outlined in USPAP Standards Rule 9 and IRS Revenue Ruling 59-60, including, but not limited to, the following:

- the nature and history of Riverstone and the Funds;

- the financial and economic conditions affecting the general economy, the Funds, the Company, and its industry;

- the past results, current operations, and future prospects of Riverstone and the Funds;

- the earning capacity and dividend-paying capacity of the Company and the Funds;

- the economic benefit to the Company and the Funds of both their tangible and intangible assets;

- the market price of actively traded interests in public entities engaged in the same or similar lines of business as Riverstone and the Funds, as well as sales of ownership interests in entities similar to the Company and the Funds;

- the prices, terms, and conditions of past sales of ownership interests in Riverstone and the Funds; and

- the impact on the value of ownership interests in Riverstone and the Funds resulting from the existence of buy-sell and option agreements, investment letter stock restrictions, restrictive shareholders agreements, or other such agreements.

## Sources of Information

Information used in determining the fair market value of the Interests was provided by the documents and sources listed below:



Mr. Thomas J. Walker
May 22, 2017
Page 4

- **Fund II:** (1) Copies of the fund's audited financial statements for the years ended December 31, 2014 through December 31, 2016; (2) A copy of Fund II's Amended and Restated Limited Partnership Agreement, dated as of July 12, 2002; and (3) A copy of Fund II's Confidential Private Placement Memorandum ("PPM"), dated September 2001;

- **Fund III:** (1) Copies of the fund's audited financial statements for the years ended December 31, 2014 through December 31, 2016; (2) A copy of Fund III's Amended and Restated Limited Partnership Agreement, dated as of October 28, 2005; and (3) A copy of Fund III's PPM, dated September 2005;

- **Fund IV:** (1) Copies of the fund's audited financial statements for the years ended December 31, 2014 through December 31, 2016; (2) A copy of Fund IV's Eighth Amended and Restated Limited Partnership Agreement, dated as of February 13, 2009; and (3) A copy of Fund IV's PPM, dated November 2007;

- **Fund V:** (1) Copies of the fund's audited financial statements for the years ended December 31, 2014 through December 31, 2016; (2) A copy of Fund V's Sixth Amended and Restated Limited Partnership Agreement, dated as of June 17, 2013; and (3) A copy of Fund V's PPM, dated September 2011;

- **Fund VI:** (1) A copy of the fund's audited financial statements for the years ended December 31, 2015 and December 31, 2016; (2) A draft copy of the fund's PPM, undated; and (3) copy of the Fund VI's amended and restated limited partnership agreement, dated 2014;

- **Non-ECI:** (1) A copy of the fund's audited financial statements for the year ended December 31, 2016; and (2) A copy of Non-ECI's Third Amended and Restated Exempted Limited Partnership Agreement, dated as of September 30, 2016.

- **Renew II:** (1) Copies of the fund's audited financial statements for the years ended December 31, 2014 through December 31, 2016; (2) A copy of Renew II's Fourth Amended and Restated Limited Partnership Agreement, dated as of September 30, 2009; and (3) A copy of Renew II's PPM, dated November 2007;

- **Credit I:** (1) A copy of the fund's audited financial statements (inclusive of RCP Fund I Feeder, L.P. and Riverstone Credit Partners Co-Investment, L.P.) for the years ended December 31, 2015 and December 31, 2016;

- **CKD I:** (1) A copy of the fund's financial statements for the year ended December 31, 2016; and (2) A copy of CKD I's Definitive Prospectus, dated December 15, 2015;



Confidential                                                                              DRAFT COPY - For Discussion Purposes Only
Empire Valuation Consultants

Mr. Thomas J. Walker
May 22, 2017
Page 5

- **Riverstone Equity Partners LP ("REP"):**[2]   A copy of the fund's audited financial statements for the year ended December 31, 2016;

- An executed copy of the Equity Subscription and Investment Agreement among Riverstone, Riverstone Management Group, L.L.C., Riverstone Gower Carry Partners, L.L.C., Riverstone/Gower Mgmt Co Holdings, L.L.C., Riverstone Holdings II (Cayman) Ltd., Riverstone/Carlyle Energy Partners IV Corp, Riverstone Carlyle Energy GP IV Ltd., Riverstone Energy GP V Corp., Riverstone GP V Cayman LLC, Riverstone Energy GP VI Corp., Riverstone GP VI Cayman LLC,, Riverstone Non-ECI GP Cayman LLC, and certain related persons (the "Purchase Agreement");

- Copies of the Funds' financial/investment forecasts, as provided by Management;

- Access to the public portions of the Riverstone website, http://www.riverstonellc.com/;

- Conversation's and correspondence with Riverstone representatives including you, Mr. Thomas Walker, Chief Financial Officer, Mr. Pierre Lapeyre, Founder, Mr. Paul Cabral, Principal, and  Mr. Sergio Maruschak, Vice President (collectively, "Management"); and

- Other reviews, analyses, and research as were deemed necessary.

Empire assumes that all information provided to us by the Company or its representatives in the context of an analysis is true, complete and correct in all material respects.  Changes to any of this information could have a material impact on our valuation conclusion.

## Background

At the Valuation Date, Riverstone was in the process of selling a 12% royalty in the Company's fee income streams which includes management fees, carried interest, and other portfolio fees (which are generally applied as offsets to the management fees).  The royalty is applicable to nearly all of Riverstone's current and future funds.

## Riverstone Holdings, LLC

Riverstone is an experienced private equity firm focused on the energy and power industry. Riverstone was co-founded by Mr. Pierre F. Lapeyre, Jr. and Mr. David M. Leuschen (together the "Founders") in May 2000.  Riverstone has raised approximately $36 billion of

---

[2] REP acts as the investment advisor to Fund II, Fund III, Fund IV, Fund V, Fund VI, Non-ECI, Renew II, Credit I, and CKD I.



Confidential
Empire Valuation Consultants                                    DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 6

capital across numerous private equity funds and their co-investment vehicles, including a
publicly-listed vehicle, Riverstone Energy Limited.

Riverstone makes buyout and growth capital investments in the exploration & production,
midstream, oilfield services, power, and renewable sectors of the energy industry.  With
offices in New York, London, Houston, and Mexico City, the Company has committed over
$35 billion to more than 130 investments in North America, South America, Europe, Africa,
Asia, and Australia.

## The Funds

### A.  Overview

Generally, the Funds' investment objectives are to provide investors with long-term capital
appreciation through privately negotiated investments in companies in the energy and power
industries.  Investment activity for the Funds is primarily targeted within five major industry
sectors: (1) exploration and production; (2) midstream; (3) energy services; (4) power and
coal; and (6) renewable energy.

**Exploration and production:** Almost all of Riverstone's conventional upstream portfolio,
consisting of 40 companies with $9.5 billion of equity committed, is focused on finding and
developing oil and natural gas resources around the world.  The returns the Company has
produced for its investors in this sector have come almost entirely from developing new
reserves and increased production, often through aggressively employing new recovery
methods and technologies as well as lowering operating costs.

**Midstream:** Riverstone has committed roughly $6 billion to the midstream sector.  Over the
past 14 years the Company has partnered with companies that service the majority of the
conventional and unconventional oil and gas producing basins with key infrastructure,
including pipelines, vessels, trucks, railcars, and blending and storage terminals or facilities
for crude oil, natural gas and refined products (including gasoline, diesel fuel, jet fuel and
heating oil).  From oil batteries in Northern Alberta to key pipeline infrastructure in the Gulf
of Mexico, Riverstone has invested in a range of midstream companies that span North
America, with recent extension of this strategy into Europe.

As North America has undergone a dramatic shift in its oil and gas landscape in the last
decade with the advent and proliferation of shale gas and tight oil, the energy centers have
been redefined, presenting new and compelling opportunities for midstream investments in
the decade to come.  Riverstone's track record of backing both build-up and buyout
strategies in midstream, coupled with its deep basin-level knowledge of upstream producer
activity due to the breadth of its portfolio in explorations and production, position it to take
advantage of these industry trends.



Mr. Thomas J. Walker
May 22, 2017
Page 7

**Energy services:** The ongoing shift to oil and gas extraction from unconventional on-shore and off-shore reservoirs will continue to require increasingly specialized technology, equipment, and services.  Riverstone has committed a total of $3 billion to partner with companies that provide services or manufacture equipment designed to exploit the opportunities created by these trends, including valves and flow control equipment, storage tanks, downhole tools, hydraulic fracturing services, and deep water drilling rigs, among many others.

**Power and coal:** Riverstone has committed a total of $2 billion to power generation and coal production, building some of the most industrially innovative businesses in those sectors through strategic acquisitions, organic growth, and strong industry partnerships.

Supported by the deep expertise of its management teams, Riverstone's opportunistic approach to these inherently cyclical sectors is focused on managing the risks and opportunities associated with large-scale coal mines, power stations and associated infrastructure.  The Company believes there will be ample opportunity to achieve attractive risk-adjusted returns by continuing to build high-quality businesses with best-in-class, strategically-situated assets.

**Renewable energy:** Riverstone manages the largest private equity fund dedicated exclusively to private renewable energy investment in the world.  The Company has committed $4.1 billion of equity capital to 18 companies, and Riverstone's renewable energy management teams, many of which involve new start-up companies, all have a common theme: to develop incremental production of renewable energy resources on a global scale.

## B.   Investment Strategy

Riverstone generally seeks to play an active and opportunistic role in the ongoing refocusing of the energy and power industry.  Riverstone believes that its ability to invest in the key sectors across the entire energy value chain on a global basis allows the dynamic allocation of capital to a range of attractive opportunities at any given time.  This enables Riverstone to develop a diversified portfolio for its Funds while adapting the portfolio to the specific market conditions during any given fund's investment period.

Riverstone expects the Funds to invest in companies with a broad range of enterprise values, and which generally require between $100 million and $750 million of equity.  Certain high-growth-oriented investments may initially involve smaller amounts of equity with additional development capital invested over time.  The Funds are expected to make both controlling and strategic minority investments; its focus, however, is on control investments where Riverstone can drive change.  In its minority investments, the Funds seek to negotiate varying degrees of control over certain key areas of corporate governance, including capital spending, external financing and major corporate transactions, as well as controls over exit.



DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 8

## C. General Fund Structure

The following diagram depicts the general relationship of the Funds, the Funds' general partners (the "Fund GPs"), Coinvestors (if applicable), and Riverstone.

### Organization Chart



Riverstone's investment professionals and affiliates invest in the Funds through coinvest vehicles (the "Coinvestors"). Each Fund pays carried interest to a Fund GP, as well as a return of the *de minimis* direct capital investment and its return on investment ("ROI"). Riverstone, through wholly owned entities, is the managing member or ultimate general partner of the Fund GP. Management fees paid by the Fund's limited partners are paid to an affiliated investment manager (the "Investment Manager"), which is ultimately controlled by Riverstone. The Coinvestors, generally, do not pay management fees.



Confidential                                                                                    PDF compiled 4/6/2021 2:45
Empire Valuation Consultants                                                    DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 9

Again, the Fund GPs' economic participation in the Funds' structure includes: (1) receipt of carried interest from the Funds' fee-paying limited partners; and (2) a *de minimis* capital investment and related ROI.

Multiple entities may be created to facilitate both domestic and foreign investors' ability to invest in the Fund. Also, entities may be created in order to allow the Fund to make its investments in portfolio companies in various tax and legal regimes.

### D. Historical Performance of the Funds

A performance summary for the Funds is shown below. Note the first four global energy and power funds (i.e., through Fund IV) and Renew II were raised and run with the Carlyle Group, Inc. ("Carlyle"), a prominent global private equity firm with over $100 billion in AUM. Carlyle is not affiliated with any Funds formed after Fund IV.

#### Summary of Investment Performance[3] ($ millions)

|          | Vintage Year | Committed Capital | Net Contributed | Partners Capital[4] | Net Clawback | Net IRR |
|----------|--------------|-------------------|-----------------|---------------------|--------------|---------|
| Fund II  | 2004 | $1,000 | 122.7% | $15 | $50.2 | 54.3% |
| Fund III | 2006 | $3,700 | 103.7% | $296 | $307.3 | 6.3% |
| Fund IV  | 2008 | $5,800 | 109.9% | $2,853 | $248.6 | 4.9% |
| Fund V   | 2012 | $7,700 | 96.7% | $5,433 | $64.4 | 2.7% |
| Fund VI  | 2015 | $4,800 | 13.3% | $1,498 | N/A | 1242.3% |
| Renew II | 2008 | $3,300 | 93.1% | $1,962 | $16.1 | 5.8% |
| Credit I | 2015 | $470 | 48.4% | $226 | N/A | 19.4% |

### E. Employees

Riverstone believes its single-industry focus facilitates decision making resulting in high returns. Riverstone also believes that its investment professionals offer a distinctive combination of financial expertise, operating capabilities and deep industry knowledge. For example, the Founders, Partners and Managing Directors who focus on investment activities have an average experience of 20 years in the energy and power industry. The following table outlines the number of Riverstone professionals associated with the Funds.

---

[3] Provided by the Funds' 2016 financial statements. Non-ECI and CKD I were newly formed and therefore lacked information pertinent to this table.

[4] Book value, with certain portfolio investments adjusted to fair value.



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 10

## Riverstone Professionals[5]

| Affiliation | Total |
|-------------|-------|
| Founders | 2 |
| Partners | 12 |
| Managing Directors | 13 |
| Principals | 10 |
| Vice Presidents | 10 |
| Associates | 19 |
| Other Employees | 26 |
| **Total** | **92** |

**F.   Characteristics of the Existing Funds**

Specific characteristics of the Riverstone Funds are described below.

1.   Fund II

Fund II commenced operations on June 10, 2002, and was formed in conjunction with Carlyle.  The fund's original termination date was July 12, 2012.  However, the GP and the investment advisory committee extended the term for two additional one-year periods. After the second extension, the GP did not extend the term further.  As of the Valuation Date, Fund II was in a wind-up phase and held two portfolio investments with an aggregate fair value of $15.5 million (one of the two remaining investments was being written off).  In July 2015, the GP waived all future management fees.  As of the Valuation Date, the GP's net clawback was approximately $50.2 million.

From discussions with Management, as well as a review of Fund II's financial condition and expectations for the fund's future cash flows, Fund II was not explicitly modeled in this valuation analysis.  This was considered prudent as Fund II was not generating any management fee revenue, and the probability of any carried interest allocations was very low given the clawback was over 3 times the remaining portfolio investment value.

2.   Fund III

Fund III commenced operations on October 28, 2005 and was formed in conjunction with Carlyle.  Because of Fund III's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%.  The fund's original termination date

---

[5]   As per Riverstone's website.  The order of presentation represents the hierarchical relationship of the affiliations.  The Founders and Partners are also Managing Directors.  The Managing Director total excludes Founders and Partners.



Confidential
Empire Valuation Consultants DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 11

was October 28, 2015.  However, the GP and the investment advisory committee extended the term for one additional one-year period.  As of the Valuation Date, Fund III had begun the orderly disposition of the remaining assets and held six portfolio investments with an aggregate fair value of $291.4 million (with a cost of $1.15 billion, including one asset being written off).  As of the Valuation Date, the GP's net clawback was approximately $307.3 million.

3.   Fund IV

Fund IV commenced operations on December 21, 2007 and was formed in conjunction with Carlyle.  Because of Fund IV's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%.  The fund's original termination date is December 21, 2017.  However, the GP and the investment advisory committee may extend the term for two additional one-year periods.  As of the Valuation Date, Fund IV held thirteen portfolio investments with an aggregate fair value of $2.9 billion (at a cost of $3.4 billion).  As of the Valuation Date, the GP's net clawback was approximately $248.6 million.

4.   Fund V

Fund V commenced operations on February 17, 2012.  The fund's agreement provides for a termination date of February 17, 2022.  The fund's GP and the investment advisory committee may extend the term for two additional one-year periods.  As of the Valuation Date, Fund V held thirty portfolio investments with an aggregate fair value of $5.3 billion (at a cost of $5.9 billion).  As of the Valuation Date, the GP's net clawback was approximately $64.4 million.

5.   Fund VI

Fund VI commenced operations on February 23, 2015.  The fund's agreement provides for a termination date of February 23, 2025.  The fund's GP and the investment advisory committee may extend the term for two additional one-year periods.  As of the Valuation Date, Fund VI held eleven portfolio investments with an aggregate fair value of $2.7 billion (at a cost of $1.7 billion).  As of the Valuation Date, the GP had accrued $167 million in carried interest.  The fund had called only 13.3% of its committed capital, while it had outstanding investment commitments of $1.2 billion as of the Valuation Date.

6.   Non-ECI

Non-ECI commenced operations on June 24, 2015.  The fund's agreement provides for a termination date of June 24, 2025.  The fund's GP and the investment advisory committee may extend the term for two additional one-year periods.  As of the Valuation Date, Non-ECI held six portfolio investments with an aggregate fair value of $152 million (at a cost of $99 million).  As of the Valuation Date, the GP had accrued $8.8 million in carried interest.



Mr. Thomas J. Walker
May 22, 2017
Page 12

The fund had called 46.7% of its committed capital, while it had outstanding investment commitments of $73 million as of the Valuation Date.

7.   Renew II

Renew II commenced operations on March 7, 2008 and was formed in conjunction with Carlyle.  Because of Renew II's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%.  The fund's agreement provides for a termination date of March 7, 2018.  The fund's GP and the investment advisory committee may extend the term for two additional one-year periods.  As of the Valuation Date, Renew II held seven portfolio investments with an aggregate fair value of $1.96 billion (at a cost of $1.53 billion).  As of the Valuation Date, the GP's net clawback was approximately $16.1 million.

8.   Credit I

Credit I's terms are generally different than those of the Funds.  Credit I commenced operations on April 13, 2015.  The fund's commitment period ends on April 13, 2017, however it may be extended by the GP for one additional one-year period.  The fund's agreement provides for a termination date four years from the end of the commitment period.  From discussions with Management, it was reasonable to assume the fund would extend the commitment period through April 2018.  The fund's distribution waterfall was also unique when compared to Riverstone's other funds.  The LP's preferred return was 6% and the carried interest allocation to the fund's GP was 15%.

As of the Valuation Date, Credit I held fourteen portfolio investments with an aggregate fair value of $266 million (at a cost of $260 million).  As of the Valuation Date, the GP had accrued $6.4 million in carried interest.  As of the Valuation Date, Credit I had $69.9 million outstanding on a $175 million line of credit from Goldman Sachs.

9.   CKD I

CKD I is a fund that is based in Mexico.  CKD I issued capital development certificates through the Mexican Stock Exchange on December 14, 2015, with a ten year maturity or December 14, 2025.  The fund's GP and its investment committee may extend the term for two additional one-year periods.  The proceeds of the issued certificates are being held in deposit at Banamex Mexico, S.A.  As portfolio investments are identified, the fund will draw down the deposits during the first five years following the certificate issuance.  As of the Valuation Date, CKD I held two portfolio investments with an aggregate fair value of $7.5 million (at cost, converted from Mexican Pesos).  The fund had drawn 6% of its available capital as of the Valuation Date.



Mr. Thomas J. Walker
May 22, 2017
Page 13

### G.  Characteristics of the Prospective Funds

As of the Valuation Date, Management stated that Riverstone anticipated that it would launch several new funds through 2019.  These prospective funds are largely replicas of existing funds.  For example, the Fund VII is expected to mirror the attributes of Fund VI, and Credit II will mirror the characteristics of Credit I, etc.   The Company's expectations for the prospective funds are shown in the following table.

**Riverstone's Prospective Funds**

| Name | Vintage | Size ($ Millions) |
|------|---------|-------------------|
| Fund VII | 2019 | $5,500 |
| Renew III | 2018 | $1,000 |
| Credit II | 2018 | $1,000 |
| CKD Renew | 2017 | $500 |
| CKD II | 2019 | $750 |
| Infrastructure I | 2018 | $1,500 |

### H.  General Agreement Terms of the Funds

The following provisions are generally representative of the Funds' various agreements.  Differences between the agreements of the Funds are largely found in the commitment and investment periods, and the life of the funds.

- **Management:** Management of the Funds are through the individual Fund GPs.  Generally, Riverstone ultimately controls the Funds through its Managing Member/Ultimate GP position of each Fund GP.  The economic benefit derived from the Funds' carried interest and the general partner's direct interest reverts to the Fund GPs.

- **Management Fees:** The Funds' third party limited partners pay a management fee quarterly.  During the Funds' commitment period, the annual fee is 1.5% of the third party limited partner's committed capital.  After the commitment period, the management fee is reduced to an annual fee of 1.0% of the third party limited partner's unrealized cost basis related to the Funds' portfolio companies.  Management fees are paid quarterly in advance.  Management fees can be offset by other fees earned by Riverstone as a result of managing the Fund, i.e. monitoring fees, transaction fees and broken deal fees.

- **Commitment Period:** The Commitment Period/Investment Period is generally the period from the (initial) Closing Date through the earlier of (i) the fifth anniversary of the Final Closing Date; (ii) the sixth anniversary of the (initial) Closing Date; or

CONFIDENTIAL

Confidential

Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 14

(iii) the date on which the Commitment Period is terminated pursuant to the agreement.

- **Distributions:** Upon the divestiture of a portfolio investment held by the Funds, proceeds would first be allocated pro rata between the fund's GP, Coinvestor and third party limited partners. Next, the proceeds initially allocated to third party limited partners would be subjected to the following distribution waterfall.

    - **Distribution Tier 1a:** To all limited partners pro rata until the cost basis of the investment is returned.

    - **Distribution Tier 1b:** To all limited partners pro rata until all cost contributions are returned.

    - **Distribution Tier 1c:** To all limited partners pro rata until an 8% compounded preferred return is realized regarding the realized investment.[6]

    - **Distribution Tier 2:** 80% to the Fund's GP and 20% to the third party limited partners until the Fund's GP has received an amount equal to 20% of the net profits earned by the realized investment.[7]

    - **Distribution Tier 3:** 20% to the Fund GP's and 80% to the third party limited partners pro rata according to their capital commitments. Carried interest is subject to a clawback provision at the end of the Fund GP's term. The clawback provision ensures: (1) the third party limited partners earn an 8% annualized return in aggregate over the Funds' term; and (2) the Fund's GP does not receive carried interest in excess of 20%.[8]

- **Transfer and Withdrawal:** Transfers and withdrawals are generally not allowed without the consent of the fund's general partner.

- **Books, Records and Information:** The Funds will provide their partners with audited annual and unaudited quarterly financial statements.

- **Term, Key Dates:** The Funds generally have ten-year terms which begin on the date of the (initial) Closing Date. The general partner may extend the term of the partnership for two successive one-year periods with the consent of the LPAC.[9]

---

[6] The preferred return for both Credit I and prospective Credit II is 6%.
[7] The carried interest for both Credit I and prospective Credit II is 15%.
[8] *Ibid.*
[9] Limited Partner Advisory Committee.

EMPIRE
VALUATION CONSULTANTS

RIVERSTONE_SDTX00156574

Mr. Thomas J. Walker
May 22, 2017
Page 15

## Economic & Industry Outlook

In the appraisal of any company, the general economic factors prevailing at the Valuation Date, as well as those foreseen then, must be considered. Assimilation of these facts and forecasts provides insight into the economic climate in which investors are dealing. Although individual factors may or may not have a direct impact upon a particular industry, the overall economy and its outlook have a strong influence on how investors perceive investment opportunities.

### A.   General Economic Outlook

For this analysis, the general economic climate and outlook for the domestic economy that prevailed through the Valuation Date were considered. This section of the report contains an overview of selected economic factors, such as gross domestic product ("GDP"), inflation, U.S. monetary and fiscal policy, corporate earnings, and unemployment.

**GDP:** According to Value Line,[10] GDP growth was 0.8% in 2016's first quarter, marking the fourth consecutive year in which first quarter growth was less than 1%. Value Line attributed this trend to the changing of seasons and severe winter weather. Nevertheless, in each of the past three years, the economy rebounded in the second quarter. 2016 shaped up to be slightly different, as GDP growth only marginally improved in the second quarter to 1.4%. The anticipated turnaround, however, did take place in the third quarter. While growth was suppressed by a decrease in business fixed investment and inventory drawdowns during the first half of 2016, a recovery in these metrics took place during the third quarter of 2016. Third quarter 2016 growth was also supported by improvements in industrial production, factory use, and federal government spending. As a result, GDP growth was 3.5%, the largest quarterly increase in two years. Value Line expected healthy growth of 2.4% in the fourth quarter of 2016, backed by rising retail spending, a strengthening housing market, and continued wage and income gains. Altogether, 1.5% GDP growth was expected in 2016. If this is the case, it would mark the first year of growth below 1.6% since the onset of the recovery, which began in 2010. This was an unusual up cycle, in that there had been few growth spurts of note, and certainly none that were sustained for any length of time.

**Inflation:** Long-term pricing trends were stable during the first three quarters of 2016, and inflation remained below the Federal Reserve's (the "Fed") 2% target. During October 2016, the Producer Price Index rose by a modest 0.3% and the Consumer Price Index increased by only 0.4%. Value Line's inflation forecast for 2016 and 2017 showed little change of note. That said, the return on the 10-year Treasury note surged in October and November, climbing from 1.5% to 2.3%. This jump was primarily attributed to the election of Donald Trump as the 45th President of the U.S., and the major infrastructure programs he

---

[10] *Quarterly Economic Review*, Value Line Publishing LLC ("Value Line"), December 2, 2016.



Mr. Thomas J. Walker
May 22, 2017
Page 16

is expected to adopt.   As a result, Value Line suggested that there was potential inflation risk in 2017 and beyond.

**Interest Rates:**  Despite continued economic growth and payroll expansion, the Fed again voted to leave rates unchanged in its November 2016 meeting.   Value Line cited low inflation as the primary obstacle preventing the Fed from raising rates.   Going forward, however, based on the newly anticipated rise in infrastructure spending, the Fed was expected to increase short-term interest rates at their December 2016 meeting and then again on several occasions in 2017.

**Corporate Profits:**  In 2016's third quarter, the majority of companies in the *Standard and Poor's 500 Index* posted earnings above their mean estimate, and the strong stock market was reflective of solid profit performance.   Value Line expected earnings growth to end 2016 on a strong note and carry that momentum into 2017, as the price of oil and other commodities improve.

**Other Economic Indicators:** For the years 2016 through 2018, Value Line forecasted the economic environment as shown in the following table.

### National Economic Indicator Annual Projections

| Annual Statistics | 2016 | 2017 | 2018 |
|---|---|---|---|
| GDP Growth (%) | 1.5% | 2.4% | 2.5% |
| Unemployment Rate (%) | 4.9% | 4.7% | 4.6% |
| Housing Starts (millions of units) | 1.18 | 1.23 | 1.32 |
| Oil Prices[11] | $41.35 | $50.00 | $54.00 |
| Long-Term Treasury Bond Rate (%) | 2.6% | 2.8% | 3.2% |
| Prime Rate (%) | 3.6% | 4.2% | 4.7% |
| AAA Corporate Bond Rates (%) | 3.6% | 4.0% | 4.2% |
| Personal Savings Rate (%) | 5.8% | 5.7% | 6.0% |

**Summary:** Looking forward to 2017, Value Line's optimism rested on several recent foundations, including an anticipated rise in business fixed investment as well as gains in jobs, income and household net worth.  The election of Donald Trump was also expected to bring tax cuts, a toughened posture on trade, and a significant increase in infrastructure spending, the latter of which could spur additional GDP growth.   In all, Value Line projected growth to remain in the 2% to 3% range during 2017, though likely struggling to reach the higher end of that range.  This solid growth was expected to continue until the end of the decade, making this upturn more like the long-lived cycles of the 1960s, 1980s, and 1990s, and less like the unstable 1970s and early 2000s, when high inflation held court.

---

[11] Represents a dollar volume weighted average of oil prices (U.S. Refiners' Cost) throughout the year, rather than an   explicit projection of spot prices.



Mr. Thomas J. Walker
May 22, 2017
Page 17

## B.   Capital Markets Overview

**Public Markets Performance:[12]**

- On November 7th, 2016, Donald Trump was elected President of the U.S.   The surprise election result resulted in higher equity prices, increased long-term interest rates, and a stronger U.S. dollar over the remainder of the fourth quarter.

- The Federal Open Market Committee ("FOMC") increased the target range for the fed funds rate to 0.50% to 0.75% during their December meeting.   The December 2016 increase was the second rate hike in a year.   The benchmark rate was previously maintained between 0.00% and 0.25% for roughly seven years (from December 2008 to December 2015).

- The U.S. GDP expanded at annualized rate of 3.5% during the third quarter of 2016, further accelerating from the pace of 1.4% set during the second quarter and 0.8% recorded during the first quarter of the year.   The third quarter GDP reading was the strongest quarterly figure in more than two years.

- The U.S. dollar appreciated by approximately 7% relative to a basket of foreign currencies from major developed markets during the fourth quarter of 2016, including an appreciation of roughly 15% relative to the Japanese Yen.

- The combination of rising interest rates and an increase in the federal funds rate target range caused U.S. government and corporate bond prices to decline during the final quarter of 2016.   The 10-year U.S. treasury yield increased 53.1% or 85 basis points to a yield of 2.45% at the conclusion of 2016.

---

[12] Sources Include: (1) AMG Funds, *Financial Markets Review and Outlook Fourth Quarter 2016*; and (2) U.S. Department of Commerce Bureau of Economic Analysis' ("BEA") *National Income and Product Accounts – Third Quarter 2016 (Third Estimate)*, December 22, 2016;



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 18

## Index Performance – Period Ended December 31, 2016[13]

| Index | Q4 2016 | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|
| *S&P 500* | 3.8% | 12.0% | 8.9% | 14.7% |
| *Russell 2000* | 8.8% | 21.3% | 6.7% | 14.5% |
| *MSCI EAFE* | -0.7% | 1.0% | -1.6% | 6.5% |
| *MSCI World* | 1.9% | 7.5% | 3.8% | 10.4% |
| *Barclays Capital Aggregate* | -3.0% | 2.7% | 3.0% | 2.2% |
| *Barclays Capital Credit* | -3.0% | 5.6% | 4.1% | 3.8% |

- Domestic equity markets, as measured by the *S&P 500 Index,* gained 3.8% in the fourth quarter of 2016, which followed a 3.9% return in the third quarter of 2016. The *S&P 500 Index* had a total return of 12.0% during 2016. Small-cap equities, as measured by the *Russell 2000 Index,* advanced 8.8% in the fourth quarter after returning 9.1% in the third quarter of 2016. The full-year total return for the *Russell 2000 Index* was 21.3% in 2016.

- Developed foreign markets, as measured by the *MSCI EAFE Index,* lost 0.7% during the final quarter of 2016 following a gain of 6.4% during the prior quarter. The index advanced 1.0% for the year.

- Global equity markets, as measured by the *MSCI World Index,* gained 1.9% in the fourth quarter of 2016. The *MSCI World Index*'s full-year return in 2016 was 7.5%.

- Fixed income sector returns, measured by the 10-Year U.S. Treasury Bond, lost 0.4% in December 2016, which caused full-year 2016 returns to fall into negative territory with a loss of 0.2% during the year.

- Overall U.S. investment grade bond returns, as measured by the broad *Barclays Capital Aggregate Bond Index* declined 3.0% in the fourth quarter, which followed a 0.5% return in the third quarter of 2016. Corporate bonds advanced 2.7% during 2016.

- The U.S. investment grade corporate bond index, as measured by the *Barclays Capital Credit Bond Index*, contracted by 3.0% during the final quarter, which followed a gain of 1.2% in third quarter of 2016. During 2016, U.S. investment grade corporate bonds returned 5.6%.

---

[13] The Concord Advisory Group Ltd., *December 2016 Market Highlights: "Does the Election Matter to Markets"*, January 3, 2017



RIVERSTONE_SDTX00156578

Mr. Thomas J. Walker
May 22, 2017
Page 19

**Volatility:** Volatility, as measured by the *Chicago Board Options Exchange Volatility Index* ("VIX"),[14] indicated that investors remained relatively confident that the equity market would remain stable.

- During the fourth quarter of 2016, the VIX ranged from 11.3% to 22.5%. The VIX closed at 14.0% on the final trading day of 2016. The average closing price for the VIX during the fourth quarter was 14.1%, which was up slightly from the average of 13.2% recorded during the third quarter.

- For comparative purposes, the VIX rose above 80 during the depths of the financial crisis in November 2008, but resettled below 25 for most of the periods since then. The gauge has risen above 45 only three times since late 2008: in May 2010 (amidst the flash crash), and twice in the second half of 2011 (August and October).

**Hedge Fund Performance:**[15] As measured by the *Credit Suisse/Standard & Poor's Capital IQ ("S&P") Dow Jones Hedge Fund Index* (the "DJCS Index"), eight of the ten sub-strategies of the index recorded positive returns throughout December 2016. Listed below is a table outlining returns for each sub-strategy.

### HF Index Performance Statistics by Sector

| Strategy | December 2016 | YTD | Avg. Annualized Performance | Annualized Volatility |
|---|---|---|---|---|
| Convertible Arbitrage | 0.4% | 6.6% | 6.7% | 6.4% |
| Dedicated Short Bias | 0.4% | -16.9% | -5.7% | 16.3% |
| Emerging Markets | -0.2% | 4.5% | 6.8% | 13.5% |
| Equity Market Neutral | -0.5% | -4.6% | 4.2% | 9.4% |
| Event Driven | 1.2% | 2.7% | 8.2% | 6.1% |
| Fixed Income Arbitrage | 0.9% | 4.3% | 5.1% | 5.2% |
| Global Macro | 1.1% | 3.6% | 10.1% | 8.9% |
| Long/Short Equity | 0.9% | -3.4% | 8.5% | 9.2% |
| Managed Futures | 0.2% | -6.8% | 4.8% | 11.5% |
| Multi Strategy | 1.6% | 4.4% | 7.7% | 4.9% |
| **DJCS Index** | **1.0%** | **1.2%** | **7.8%** | **6.9%** |

**Middle Market Merger & Acquisition ("M&A") Activity:**[16] Middle market (companies with an enterprise value between $10 million to $250 million, inclusive) M&A transaction

---

[14] The VIX is an index of the implied volatility of 30-day options on the S&P 500 calculated from a wide range of calls and puts. Investors believe that a high VIX reading (above 30) translates into a greater degree of market uncertainty, while a low reading (below 20) is consistent with greater stability.

[15] *S&P Dow Jones Credit Suisse Hedge Fund Index (the "DJCS Index")*, December 2016.

[16] Quarton Partners ("Quarton"), *Middle Market Transaction Update*, Fourth Quarter 2016.



Mr. Thomas J. Walker
May 22, 2017
Page 20

volume declined year-over-year for the third consecutive quarter. There were 148 middle market companies acquired in private equity transactions during the first nine months of 2016, a decline of 11.4% relative to the 167 deals completed through the first three quarters of 2015.[17] Quarton reported that the average acquisition multiple for middle market transactions completed in the third quarter was 8.0x enterprise value divided by EBITDA ("EV/EBITDA")[18], an increase of 0.4x turns from the 7.6x EV/EBITDA multiple recorded in the previous quarter. The average transaction multiple was just 0.2x turns below the peak post-recession transaction multiple of 8.2x set during 2015.[19]

Quarton observed that acquisitions were transacted by both strategic buyers and private equity firms, with the primary purpose of supplementing existing low-growth businesses through add-on companies. Through the first nine months of 2016, private equity-backed deals with an enterprise value of less than $25 million accounted for more than 46% of all private equity transactions completed during the period.

The total debt/EBITDA multiple for transactions completed during the third quarter was 4.0x, an increase of 0.2x and 0.1x turns from the prior quarter and the previous year, respectively. Further, 55.3% of the average transaction value was financed with debt for deals completed in the third quarter of 2016, an increase of 170 basis points from the average of 53.6% of the deal price in the second quarter of 2016. Senior debt comprised 87.5% of the debt used to finance middle market transactions in the third quarter of 2016, the highest proportion since at least 2008. For middle market transactions completed between 2008 and the first nine months of 2016, an average of 52.7% of the enterprise value was financed with debt, which was approximately 2.6% or 260 basis points below the proportion realized in the third quarter of 2016.

Quarton believed that middle market transaction volume would accelerate from current levels during 2017 due to the pent-up demand for middle market M&A and subsiding uncertainty due to the realization of the U.S. presidential election results. Favorable lending conditions had been a leading catalyst for increased valuation multiples through 2015. However, on December 14, 2016, the FOMC raised the federal funds target rate by 25 basis points to a range of 0.50% to 0.75%, their second rate hike in a year. In spite of the increase in the benchmark rate, Quarton noted that credit conditions remained favorable to acquirers and sellers, which was expected to further support increase M&A activity for middle market companies.

---

[17] Includes middle market, private equity transactions completed at a valuation multiple between 3.0x EV/EBITDA and 15.0x EV/EBITDA (see footnote 9).
[18] Enterprise Value ("EV") divided by Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA")
[19] Middle market transaction multiples include all M&A deals between $10 million and $250 million with EV/EBITDA multiples < 15.0x, excluding deals for technology, media, and telecom companies.



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 21

### Summary M&A Statistics

| Year/ Quarter | Purchase Multiple[20] | Debt Multiple | Equity Contribution |
|---|---|---|---|
| 2012 | 7.2x | 3.5x | 46.6% |
| 2013 | 7.6x | 3.4x | 49.7% |
| 2014 | 7.8x | 3.7x | 46.7% |
| 2015 | 8.2x | 3.9x | 43.5% |
| 1Q 2016 | 7.5x | 4.0x | 41.2% |
| 2Q 2016 | 7.6x | 3.8x | 46.4% |
| 3Q 2016 | 8.0x | 4.0x | 44.7% |

**Flow of Capital:** An analysis of fund flows information indicated that hybrid and bond funds reported net outflows of $24 billion and $1 billion in the fourth quarter of 2016, respectively. U.S. equity funds had new inflows of $25 billion during the same period. For the year of 2016, equity and hybrid funds had investment outflows of $67 billion and $44 billion, respectively, the second consecutive year of net outflows for each of the investment categories. Bond funds had a net investment inflow of $193 billion over the twelve months ended in December 2016, which was $219 billion more than the $26 billion net outflow during 2016.

The following table is a summary of mutual fund capital flows for recent measurement periods.

{This Space Intentionally Left Blank}

---

[20] Middle market transaction multiples include all M&A deals between $10 million and $250 million with EV/EBITDA multiples < 15.0x, excluding deals for technology, media, and telecom companies.



Confidential
Empire Valuation Consultants

PDF Page 657 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 22

### Flow of Capital ($ billions)[21]

| Year/Quarter | Mutual Funds | | |
|---|---|---|---|
| | Equity | Hybrid | Bond |
| 2012 | ($153) | $45 | $306 |
| 2013 | $160 | $71 | ($71) |
| 2014 | $25 | $27 | $44 |
| 2015 | ($77) | ($21) | ($26) |
| 2016 | ($67) | ($44) | $193 |
| 1Q 2016 | ($13) | ($9) | $49 |
| 2Q 2016 | ($52) | ($5) | $56 |
| 3Q 2016 | ($27) | ($6) | $89 |
| 4Q 2016 | $25 | ($24) | ($1) |

**Initial Public Offerings ("IPOs"):**[22] Renaissance noted that investors remained cautious due to the slowdown in the Chinese economy and the unexpected Brexit vote and U.S. presidential election results. In spite of the uncertainty, global IPO activity experienced a resurgence of activity during the final quarter of 2016 with $41.5 billion in proceeds raised from 90 initial equity issuances. The number of IPOs completed and the total proceeds raised from the deals increased by 47.5% and 41.6%, respectively, compared to the prior quarter. The average total returns of the recently IPO'd securities was 49% during 2016, primarily due to Chinese A-share IPOs. Global returns excluding Chinese A-share listings were 12% during the year, up from the average return of 7% for IPOs completed during 2015.

IPOs in the Asia Pacific region raised approximately $57.6 billion in proceeds during 2016, accounting for roughly 56% of global IPO issuance. Postal Savings Bank of China raised $7.4 billion during their IPO, the largest initial offering in the region throughout 2016. Financial IPOs had the most initial investment capital of any sector during 2016, with proceeds of $39.1 billion of 38% of global proceeds raised. Technology IPOs experienced the most significant decline in IPO proceeds, with a decline of 54% in capital raised during 2016 compared to the previous year. In total, aggregate global IPO proceeds raised contracted by more than 34% from the $156.4 billion raised during 2015.

---

[21] http://www.ici.org/research/stats/flows/
[22] Renaissance Capital, LLC's ("Renaissance") *Global IPO Market Preliminary 2016 Annual Review*, December 14, 2016



RIVERSTONE_SDTX00156582

Confidential
Empire Valuation Consultants

PDF copy 658 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 23

### Summary of Global IPO Data[23]

| Metric | 4Q 2015 | 1Q 2016 | 2Q 2016 | 3Q 2016 | 4Q 2016 | FY 2016 |
|---|---|---|---|---|---|---|
| Number of Deals | 72 | 29 | 68 | 61 | 90 | 248 |
| Total Proceeds (B)[24] | $55.5 | $9.6 | $22.5 | $29.3 | $41.5 | $102.9 |
| Median Size (MM)[25] | $344 | $178 | $182 | $199 | $194.5 | $194.5 |

### C. Private Equity Industry Outlook

This private equity ("PE") industry outlook for the fourth quarter of 2016 contains an analysis of the following: (1) an overview of the industry; (2) recent performance trends; (3) asset flows; and (4) secondary market activity. Each topic is discussed below.

1. Industry Overview

PE involves investments in privately held companies. For most investors, PE investing is accomplished through illiquid, long-term partnerships, i.e., funds, which are formed by PE firms. Funds are generally closed-end with finite lives, usually ten to fifteen years. Investors typically participate in the asset class through one of three ways: (1) direct investment in private companies; (2) investment in private equity funds, which pool capital and invest in private companies; or (3) investment in a fund of funds ("FOFs"), which pools capital and invest in funds. Direct funds and FOFs are typically structured as closed-end limited partnerships, and encompass three phases: (1) fundraising; (2) investment; and (3) realization. Funds are generally structured with an annual management fee ranging from 1.5% to 3.0%. In addition to management fees, PE fund managers are usually entitled to participate in the limited partners' profits from the investments. The profit participation, or carried interest, on most direct funds is 20%, although in certain instances, it can be higher or lower.

2. Performance

According to *Cambridge Associates, LLC* ("Cambridge"), U.S. private equity capital funds maintained positive returns through the third quarter of 2016. Cambridge's *Private Equity Index* (the "PE Index"), which is presented in the following table, provides market returns as

---

[23] Global statistics include IPOs with a deal size of at least $100 million and exclude closed-end funds and special purpose acquisition companies ("SPAC").

[24] In billions of U.S. dollars ("B").

[25] In millions of U.S. dollars ("MM").



Confidential
Empire Valuation Consultants

PDF Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 24

of September 30, 2016 (latest available as of the Valuation Date),[26] together with comparisons of select indices.[27]

## Market Returns as of September 30, 2016

| Index | Q3 2016 | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| *U.S. Private Equity Index* | 3.8% | 8.0% | 8.5% | 11.2% | 13.8% |
| *Bloomberg Barclays Gov't/Credit Bond Index* | 0.4% | 6.7% | 5.9% | 4.2% | 3.2% |
| *Dow Jones Industrial Average* | 2.8% | 7.2% | 15.5% | 9.2% | 13.8% |
| *Dow Jones U.S. Small Cap Index* | 5.7% | 10.7% | 12.4% | 6.9% | 15.6% |
| *Dow Jones U.S. TopCap Index* | 4.0% | 7.8% | 15.1% | 10.9% | 16.3% |
| *Nasdaq Composite* | 9.7% | 6.1% | 15.0% | 12.1% | 17.1% |
| *Russell 1000* | 4.0% | 7.9% | 14.9% | 10.8% | 16.4% |
| *Russell 2000* | 9.1% | 11.5% | 15.5% | 6.7% | 15.8% |
| *S&P 500* | 3.9% | 7.8% | 15.4% | 11.2% | 16.4% |
| *Wilshire 5000* | 4.3% | 8.4% | 15.4% | 10.7% | 16.3% |

The PE Index returned 3.8% in the third quarter, up from the gain of 4.0% in the second quarter and 0.2% returned during the first quarter of 2016. The quarterly PE Index underperformed the *S&P 500 Index* by just 0.1% in the third quarter of 2016. The 1-year return for the PE Index underperformed the *S&P 500* by 6.9%, returning 8.5% compared to the *S&P 500 Index's* return of 15.4%.

The following table presents annualized internal rate of return ("IRR") data, since inception, for funds with vintage years 2004 through 2014.

{This Space Intentionally Left Blank}

---

[26] Private equity performance is net to limited partners, i.e., after management fee and carry. General partners typically have up to 120 days to provide LPs with financial data. As a result, there is generally a "lag" in performance reporting.

[27] Cambridge Associates, LLC *U.S. Private Equity Index and Selected Benchmark Statistics: September 30, 2016*, published January 30, 2017.



PDF compiled 05/22/17
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 25

### Private Equity Returns 2004 to 2014[28]

| Vintage Year | Mean Net to LPs | Median Net to LPs | Number of Funds |
|---|---|---|---|
| 2004 | 11.1% | 10.5% | 67 |
| 2005 | 8.3% | 7.9% | 95 |
| 2006 | 10.7% | 10.9% | 81 |
| 2007 | 11.9% | 11.1% | 98 |
| 2008 | 16.2% | 12.4% | 81 |
| 2009 | 17.8% | 14.8% | 35 |
| 2010 | 18.8% | 15.6% | 33 |
| 2011 | 12.9% | 11.1% | 70 |
| 2012 | 11.4% | 11.9% | 59 |
| 2013 | 6.7% | 7.6% | 67 |
| 2014 | 5.7% | 3.9% | 64 |

As shown in the following table, PE performance has been positive for each of the periods studied. Returns include all vintage years reporting data for the applicable measurement period.

### Private Equity Multi-Year Returns[29]

| Duration (years) | Returns |
|---|---|
| 1 | 8.5% |
| 3 | 11.2% |
| 5 | 13.8% |
| 10 | 10.7% |
| 15 | 12.2% |
| 20 | 12.5% |
| 25 | 13.3% |

A Pepperdine University ("Pepperdine") survey[30] analyzed, among other items: (1) minimum return thresholds required to qualify for capital in various market segments; (2) accessibility of capital; and (3) required rates of return by market segments, which are presented in the table below. It was noted that, as the size of the loan or investment increases, the cost of borrowing or financing from any of the following sources tends to decline.

---

[28] Returns are net of fees, expenses, and carried interests as of September 30, 2016.
[29] Pooled end-to-end returns, net of fees, expenses, and carried interest based on 1,334 funds formed between 1986 and 2016.
[30] Everett, Dr. Craig R. *Private Capital Markets Project 2016 Capital Markets Report,* March 15, 2016



RIVERSTONE_SDTX00156585

Mr. Thomas J. Walker
May 22, 2017
Page 26

### Pepperdine Required Rates of Return

| Market Segment | Median Required Rate of Returns |
|---|---|
| Banks, $1M CF Loan | 6.0% |
| Banks, $50M CF Loan | 3.0% |
| Asset-Backed Lenders, $1M Loan | 11.0% |
| Asset-Backed Lenders, $50M Loan | 3.0% |
| Mezzanine Funds, $1M Loan | 22.0% |
| Mezzanine Funds, $25M Loan | 16.0% |
| Private Equity Groups, EBITDA of $25M | 24.0% |
| Private Equity Groups, EBITDA of $50M | 22.0% |
| Venture Capital Firms, Startup | 33.0% |
| Venture Capital Firms, Expansion | 28.0% |
| Venture Capital Firms, Later Stage | 23.0% |

3.  Asset Flow[31]

According to *PitchBook Data, Inc.* ("PitchBook"), there was $649 billion of merger and acquisition ("M&A") transaction volume completed over 3,538 deals in 2016. However, the number of deals completed in 2016 was 14% below the 4,131 transaction finalized in 2015. M&A dollar volume in 2016 was 12% below the $737 billion transacted during 2015. PitchBook reported the median EV/EBITDA[32] was 10.9x for M&A transactions completed in 2016, an increase of 0.9x turns from the median EV/EBITDA of 10.0x recorded for transactions completed in 2015. During the financial crisis, EV/EBITDA multiples for M&A transactions reached a trough of 7.9x in 2010. The increase in M&A valuation multiples was likely driven by the increase in the price-to-earnings multiple of the *S&P 500 Index*, which expanded from a post-great-recession low of roughly 13.5x to nearly 26x at the end of 2016. As a result of the multiple expansion experienced across U.S. equity markets, the median percentage of M&A transaction values funded with debt has declined to 50.5% during 2016, a decline of 630 basis points or 6.3% from the median debt percentage of 56.8% realized during 2015.

PitchBook noted that PE firms were struggling to complete acquisitions in 2016 due to increased competition from strategic acquirers and elevated valuation multiples of middle market companies. Collectively, PE firms had $852 billion in capital available globally to acquire middle market companies, while the number of attractive acquisitions has contracted. As a consequence, add-on transactions, as percentage of total middle market buyouts, have steadily increased to 64% in 2016 from 54% of middle market M&A deals completed in 2010. The proportion of add-on buyouts as a percentage of total middle market buyouts was the highest ever recorded by PitchBook.

---

[31] PitchBook Data, Inc., *2016 Annual U.S. Private Equity Breakdown Report,* January 19, 2017
[32] Enterprise Value ("EV") divided by Earnings Before Interest, Depreciation, and Amortization



Mr. Thomas J. Walker
May 22, 2017
Page 27

The technology sector experienced the highest level of middle market M&A activity during 2016 than any other year since at least 2001 with 567 deals valued at an aggregate $159.8 billion during the year.  Middle market tech deals represented 16.0% of total transaction volume and 24.6% of M&A dollar volume during 2016.  Though, tech M&A dollar volume in 2016 was substantially influenced by the $60 billion Dell and EMC combination. However, if you exclude the Dell/EMC deal then tech M&A dollar volume still grew approximately 11% during 2016 compared to the prior year.

4.    Secondary Market Activity

NYPPEX projected that the supply of secondary private equity funds would continue to grow through the completion of 2016, primarily due to a relatively high degree of geopolitical uncertainty that was anticipated to lead investors to reduce their allocation to risk assets.  In the second quarter of 2016, NYPPEX reported that secondary interest transaction volume increased substantially as compared to the prior quarter.  However, transaction volume declined 45% year-over-year during the first quarter.  Despite the significant quarter-over-quarter growth during the most recent trimester, secondary L.P. interest transaction volume declined 22.5% to $15.7 billion through the first six months of 2016 compared to the $20.3 billion of volume during the same period in 2015.  Although the pace of secondary transaction volume increased in the second quarter versus the first quarter, secondary bid price spreads widened between private equity funds invested in the U.S. versus more uncertain regions such as Europe.  For the second-half of 2016, NYPPEX projected that secondary bid prices would decline by 3% to 5% and that cash distributions from private equity funds would continue to be 20% to 75% below 2015 levels.

Cogent noted that macroeconomic volatility was a primary driver behind the drop in deal volume.  During the first half of 2016, deal volume totaled $12 billion, a 20% decline from the first half of 2015 and the lowest aggregate first half volume since 2013.  As a result, Cogent revised their full year volume estimate to $30 billion to $35 billion from $35 billion to $45 billion previously projected.  Further supporting the reduced guidance was the dearth of deals of more than $1 billion or more.  Cogent reported that there were just two such deals during the first half of 2016.  Buyers' sought high quality funds and post-2009 vintages.  Due to the shift in demand, Cogent stated that there was a substantial supply of pre-2009 funds available.

The following table showcases the historical secondary market discount bids, by sector, as reported by NYPPEX.



RIVERSTONE_SDTX00156587

Mr. Thomas J. Walker
May 22, 2017
Page 28

### Historical NYPPEX Median Secondary Bids by Sector[33]

| Sector | 12/31/2013 (% of NAV) | 12/31/2014 (% of NAV) | 12/31/2015 (% of NAV) | 3/31/2016 (% of NAV) | 06/30/2016 (% of NAV) |
|---|---|---|---|---|---|
| Buyout | 90.8% | 93.0% | 75.3% | 76.2% | 76.0% |
| Venture | 72.6% | 83.8% | 63.8% | 61.5% | 61.8% |
| Fund of Funds | 72.2% | 79.9% | 65.8% | 66.3% | 67.0% |
| Real Estate | 72.5% | 88.1% | 73.6% | 74.7% | 74.9% |
| Distressed Debt | 81.4% | 78.6% | 75.4% | 75.6% | 76.6% |
| Natural Resources | 86.5% | 74.3% | 72.2% | 72.0% | 74.1% |
| Hedge Funds | 83.2% | 89.4% | 89.0% | 88.7% | 88.8% |
| **All Fund Sectors** | **76.3%** | **83.9%** | **73.6%** | **73.6%** | **74.2%** |

The following table compares the discount bids reported by NYPPEX and Cogent, by sector.

### NYPPEX and Cogent Median SM Bids by Sector[34]

| Sector | NYPPEX 12/31/2015 (% of NAV) | NYPPEX 6/30/2016 (% of NAV) | Cogent 12/31/2015 (% of NAV) | Cogent 6/30/2016 (% of NAV) | 2015-2016 Change NYPPEX/ Cogent/ Mean |
|---|---|---|---|---|---|
| NR PE | 72.2% | 74.1% | N/A | N/A | 1.9% / N/A / N/A |
| GB PE | 75.3% | 76.0% | 94.0% | 94.0% | 0.7% / 0.0% / 0.4% |
| RE PE | 73.6% | 74.9% | 90.0% | 88.0% | 1.3% / (2.0%) / (0.4%) |
| VC PE | 63.8% | 61.8% | 75.0% | 73.0% | (2.0%) / (2.0%) / (2.0%) |
| AS PE | 73.6% | 74.2% | 90.0% | 87.0% | 0.6% / (3.0%) / (1.2%) |

In response to the 2008 financial crisis, new regulations were introduced to establish higher standards for risk and operations management, capital adequacy, and asset valuation in 2013. These regulations included Basel III, Solvency II, the Volcker Rule, the U.K. Alternative Investment Fund Managers Directive ("AIFMD"), and were expected to have a significant impact on investors, alternative investment fund managers, and their respective auditors and legal advisors. NYPPEX anticipated that banks in Europe, North America and Asia would be forced to reduce their holdings in private equity assets in order to increase Tier I Capital ratios and to increase capital solvency ratios. In addition, the Volcker Rule was also expected to force banks to sell or spinoff private equity funds and hedge funds in an effort to emphasize traditional banking services. Finally, NYPPEX believed that AIFMD

---

[33] NYPPEX Holdings, LLC's ("NYPPEX") *2016 Mid-Year Secondary Private Equity Market Trends and Outlook Worldwide,* August 2016.
[34] Sectors include: Natural Resources ("NR"); General Buyouts ("GB"); Real Estate ("RE"); Venture Capital ("VC"); and All Sectors ("AS").



PDF Page 664 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 29

would significantly increase operating expenses for general partners, which in turn, was projected to cause divestitures of tail end funds and fund restructuring.

### D.   Energy Industry Outlook[35][36]

According to BP's 2016 *Statistical Review of Energy*, global primary energy (i.e., coal and gas) consumption increased by just 1.0% in 2015, similar to the below-average growth recorded in 2014 (+1.1%) and well below its 10-year average of 1.9%.  Consumption growth was below the 10-year average for all regions except Europe & Eurasia; emerging economies accounted for 97% of the increase in global consumption.  Renewables in power generation continued to grow robustly, to nearly 3% of global primary energy consumption, while coal consumption recorded the largest percentage decline on record.  Prices for all fossil fuels fell in 2015 for all regions.  Crude oil prices recorded the largest decline on record in dollar terms, and the largest percentage decline since 1986.

The most recent report from the U.S. EIA estimated that world energy use would climb 48% between 2012 and 2040, rising from 549 quadrillion British thermal units ("Btu") in 2012 to 629 quadrillion Btu in 2020 and to 815 quadrillion Btu in 2040.

**Liquid Fuels:** EIA estimated that global consumption of petroleum and other liquid fuels grew by 1.4 million barrels per day ("b/d") in 2015, averaging 93.8 million b/d.  EIA expected global consumption of petroleum and other liquid fuels to continue to grow by 1.2 million b/d in 2016 and by 1.5 million b/d in 2017.

North Sea Brent ("Brent") crude oil spot prices averaged $31 per barrel ("b") in January of 2016, a $7/b decrease from December and the lowest monthly average price since December 2003.  Brent crude oil prices averaged $52/b in 2015, down $47/b from the average in 2014.  Growth in global liquids inventories, which averaged 1.8 million b/d in 2015, continued to put downward pressure on Brent prices.  Brent crude oil prices were forecast to average $38/b in 2016 and $50/b in 2017.  Forecast West Texas Intermediate ("WTI") crude oil prices were expected to average the same as Brent in both years.  However, the current values of futures and options contracts continued to suggest high uncertainty in the price outlook.

The EIA estimated that the Organization of the Petroleum Exporting Countries' ("OPEC") crude oil production averaged 31.6 million b/d in 2015, an increase of 0.8 million b/d from 2014, led by rising production in Iraq and Saudi Arabia.  Forecast OPEC crude oil

---

[35] Sources for this outlook include: (1) U.S. Energy Information Administration's ("EIA") *Short-Term Energy Outlook ("STEO")*, published February 2016; (2) International Energy Agency's ("IEA") *Key Natural Gas Trends 2016*, published 2016; (3) IEA's *Coal Medium-Term Market Report 2016*, published December 2016; (4) IEA's *Electricity Information 2016 Edition*, published 2016; (5) U.S. EIA *International Energy Outlook 2014*, published May 2016; (6) British Petroleum's ("BP") *Statistical Review of World Energy*, published June 2016.

[36] Pricing throughout this section is expressed in terms of U.S. dollars.



RIVERSTONE_SDTX00156589

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 30

production increased by 0.7 million b/d in 2016 and by 0.6 million b/d in 2017, with Iran accounting for most of the increase.

**West Texas Intermediate (WTI) Crude Oil Futures Prices (USD/bbl)**

|  | 1 Month | 3 Month | 6 Month | 1 Year | 2 Year | 5 Year |
|---|---|---|---|---|---|---|
| 12/30/2016[37] | 53.72 | 55.43 | 56.76 | 56.99 | 56.37 | 56.20 |
| 2/18/2015 | 52.14 | 53.97 | 57.46 | 60.80 | 64.11 | 68.97 |
| 1/16/2015 | 48.69 | 49.84 | 52.09 | 55.56 | 60.69 | 66.87 |
| 11/18/2014 | 74.61 | 74.73 | 75.12 | 75.43 | 76.86 | 80.30 |
| 8/18/2014 | 96.41 | 93.12 | 92.43 | 91.16 | 89.27 | 88.00 |

Non-OPEC oil supply was expected to grow by around 400,000 barrels a day in 2017 to average 57.7m b/d.

**Natural Gas:** Natural gas was expected to grow faster than oil or coal, helped by the rapid growth of liquefied natural gas increasing the accessibility of gas across the globe. According to the IEA, global demand for natural gas showed a small increase year-over-year in 2015 (1.4%), to a level very close to 3,600 billion cubic meters ("Bcm") and recovering from the small decrease observed in 2014 (-0.1%). In 2015, the Organization for Economic Cooperation and Development's ("OECD") natural gas demand increased by 1.0% from 2014, mainly due to the exceptionally mild winter in Europe. Non-OECD natural gas demand increased by 1.6%, surpassing OECD demand by more than 260 billion cubic meters ("Bcm"), almost equivalent to the combined demand of France, Germany, Italy and the United Kingdom.

The implications of the drop in oil prices went far beyond the oil market itself and included the natural gas market through its direct and indirect linkages to oil. Within the OECD, prices reacted in different ways according to geographical region. In 2015, natural gas import prices by pipeline fell by an average of 27.2% for European Union members, while they rose by 45.6% in the U.S. temporarily as a result of extremely cold winter conditions. LNG import prices in Europe in 2015 were lower than in the American market for the first time since 2008.

In 2015, global production of natural gas hit a record high of 3,590 Bcm, but was only 1.6% higher than the figure registered in 2014. In the OECD, 2015 production rose by 2.7% year-over-year. This growth was mostly driven by the U.S. (+5.5%), which offset a substantial decrease in Europe (-2.5%). The natural gas production of the other key player organization, the Gas Exporting Countries Forum ("GECF"), decreased in production by 1.6% year-over-year. In the rest of the world, the production of natural gas increased 1.6%, exceeding for the first time the threshold of 960 Bcm.

---

[37] Market was closed on 12/31/2016.



RIVERSTONE_SDTX00156590

Mr. Thomas J. Walker
May 22, 2017
Page 31

**Coal:** After a sustained decline over more than four years, coal prices saw a strong rebound in 2016. Supply discipline, high cost mine closures and capital expenditures reduction have retired some output from the market. However, rather than a big change in the international supply/demand balance, the main driver of the rise has been the policy changes in China to cut coal output, which have pushed domestic prices up resulting in higher prices elsewhere. Coal prices increased significantly, from around $45/tonne (t) in January 2016 up to over $90/t in November 2016 (thermal coal imports to Europe). Likewise, with regard to coking coal, the increase was even higher, quadrupling from $77/t in January 2016 up to over $300/t in November 2016 (coking coal exports from Australia). IEA forecasted that coal demand in China would decrease through 2018 with a slight recovery afterwards, but coal demand in 2021 was expected to be lower than 2013 levels. The increase post 2018 was expected to be driven by coal demand for power, while hydro growth was expected to decline. Declines in steel and cement production also negative impact the demand for coal. Despite this projected decline, China would still account for almost 50% of global coal demand, over 45% of coal production, and more than 10% of coal seaborne trade.

According to EIA, the average annual coal price fell from a record high $2.39/MMBtu in 2011 to an estimated $2.35/MMBtu in 2014. EIA expected the delivered coal price averaged $2.23/MMBtu in 2015. Forecast prices were $2.18/MMBtu in 2016 and $2.20/MMBtu in 2017.

**Electricity:** In 2014, calculated electricity consumption in OECD countries was 9,320 terawatt hours ("TWh"), 0.6% higher than in 2013. Based on provisional data, 2015 apparent consumption of electricity in OECD countries was 9,300 TWh. In non-OECD countries, 2014 calculated final electricity consumption was 10,520 TWh. This represented a 3.9% increase over the calculated final consumption in 2013.

Average real electricity prices in the OECD decreased by 0.3% in 2015 from 2014 levels. Real prices for the industry decreased by 0.6% and while prices for households declined by 0.1%. Electricity prices for consumers varied widely among OECD countries. Based on available 2015 data, electricity prices for industry were the lowest in the Norway ($35.34 per MWh), while they were the highest in Italy ($263.33 per MWh). Electricity prices for households varied from $75.33 per MWh in Mexico to $337.38 per MWh in Denmark.

In 2015, gross electricity production in OECD countries fell by 0.2% to 10,822 TWh. This was mainly the result of a decrease in electricity production from fossil fuels. Between 2014 and 2015, there was a decrease in electricity production from fossil fuels notably coal (-7.6%), and oil (-10.6%). Nuclear energy slightly decreased (-0.4%). Meanwhile, electricity from natural gas (+7.2%), and renewable sources such as wind (+16.0%), solar (+17.8%) and biofuels (+2.5%) have increased. Hydroelectricity also slightly decreased (-1.9%). In 2015, nuclear plants accounted for 18.3% of total OECD gross electricity production, hydroelectric plants 12.8%, total combustible fuel plants 61.3% (made up of 58.2% from fossil-fuel-fired plants and 3.1% from biofuels and waste plants) and



Mr. Thomas J. Walker
May 22, 2017
Page 32

geothermal, solar, wind and other plants 7.5%. Gross electricity production in 2014 in non-OECD countries was 13,056 TWh, an increase of 4.2% from the 2013 level. In 2014, 73.0% of non-OECD electricity production was generated from fossil fuels, 19.1% was provided by hydroelectric plants, 4.3% by nuclear plants and 2.3% by biofuels and waste and geothermal/solar/wind capacity.

## Valuation Overview

The purpose of the valuation section is to incorporate the information considered and/or presented previously into a quantitative representation. The valuation methodology reflects the analyst's expectation of how free and open capital markets would assign value to the economic activities of the business asset under analysis.

### A.   General Valuation Methods

Generally, there are three commonly used approaches to determine the value of a company. These three approaches are the Income, Market and Asset (or Cost) Approaches. The nature of the business, industry, and economic circumstances of the particular company/asset being valued at the specific valuation date, as well as the availability of data will dictate which approach(es) will ultimately be used in determining the company's/asset's value.

The **Income Approach** uses valuation techniques to estimate value based on an expected stream of benefits, such as earnings or cash flow. Two common methods under this approach are the capitalization of benefits method, which is based on adjusted historical results, and the discounted future benefits method. In the capitalization of benefits method, a representative benefit level is divided by an appropriate capitalization factor to convert the benefit to a value. In the discounted future benefits method, benefits are estimated for each of several future periods. These benefits are converted to value by applying an appropriate discount rate and using present value calculations.

The **Market Approach** uses prices and other relevant information generated by market transactions. Two common methods under this approach are the guideline company method and the guideline transaction method. A guideline company analysis considers transactions that generally involve minority positions in publicly-traded companies. A guideline transaction analysis considers third-party and arms-length transactions in the subject company as well as transactions in similar entities. These valuation techniques often use market multiples from the identified transactions to provide valuation guidance for the subject entity. The selection of the appropriate multiple requires judgment and should consider factors (both qualitative and quantitative) specific to the circumstances.

The **Asset (or Cost) Approach** determines the value of a business based on the value of its assets net of liabilities. Typically, the asset-based approach should be considered: (1) in valuations conducted at the enterprise level: (2) when valuing an investment or real estate



Mr. Thomas J. Walker
May 22, 2017
Page 33

holding company; or (3) when the market value of an entity's net assets materially exceeds the value derived under the income or market approaches.

**B.   Outline of Valuation Process**

In order to arrive at a value for the Interests, it is necessary to first determine the Funds' cash flows, including: the size of Funds' capital commitments, the size and timing of the Funds' portfolio investments, the returns on such investments, and the Fund's expenses. From these cash flows, each Funds' management fees and carried interest realizations (if applicable) could be modeled.   In order to do so, the DCF method was applied.   After identifying the cash flows attributable to the Interests, appropriate discount rates were selected and applied which resulted in the present value of future cash flows for the Interests.

## Valuation of the Funds' Carried Interest and Management Fee Streams

The valuation of the Interests includes two primary components: (1) the valuation of the Funds' management fee revenue; and (2) the valuation of Funds' projected carried interest. The valuation of both components began with the derivation of projected cash flows. Key exhibits are identified in the following table.

### Riverstone Valuation Exhibits

| Description | Exhibit |
|---|---|
| Valuation Inputs | Exhibit A |
| Funds' Valuation Exhibits (incl. distribution waterfalls) | Exhibits B to O |
| Development of Discount Rates | Exhibits P-1 to P-5 |
| Aggregation of Funds' Management Fee Revenue | Exhibit Q-1 |
| Aggregation of Funds' Carried Interest | Exhibit Q-2 |
| Present Value of Cash Flows | Exhibit R |

Again, each Fund was modeled given its individual characteristics. The overall structures were largely the same, but the timing and size of the expected management fees and carried interest allocations varied.   Generally, the structure of the Funds' exhibits are the same as Fund III's model, with the exception of Credit I and Credit II.   Again, Credit I and Credit II are highly leveraged private equity funds with shorter terms.

**A.   Derivation of Cash Flow Base**

Modern financial theory holds the value of any asset to be a function of several interrelated factors:

- The stream of benefits the owner of the asset expects to receive;

EMPIRE
VALUATION CONSULTANTS

Mr. Thomas J. Walker
May 22, 2017
Page 34

- The timing of the receipt of these benefits; and

- The risk borne by the owner.

Thus, appraisal methodologies rely on the premise that the value of a business enterprise is equal to the present value of the income that it can expect to generate going forward. From an investor's standpoint, these future income streams represent the dividend-paying (i.e., distribution-paying) capacity of the company or, in the case of a leveraged company, monies available for all invested capital (i.e., interest-bearing debt plus owners' capital).

In order to complete a DCF analysis, it is necessary to develop an explicit forecast for the Funds' cash flows, together with a required rate of return by which those cash flows can be discounted back to their present value. General assumptions for the Funds are described below, followed by specific Fund attributes.

- **Management Fees:** Management fees were articulated in the Funds' operating agreements. Universally, the management fee paid during the investment period was 1.5% of the fee paying partners' committed capital. After the investment period, a management fee of 1.0% is charged on the pro rata share of the fee-paying partners' cost basis of remaining investments. Management fee offsets can, and do, reduce the management fee paid by the fee-paying partners. The Fund GPs and Coinvestors are not subject to capital calls for management fees.

- **Preferred Returns:** Fee-paying LPs earn a preferred return at an annual rate of 8%.[38] This preferred return is based on adjusted invested capital, which is the sum of contributed capital plus any preferred return earned to date, less distributions received by a partner to return contributed capital and pay preferred returns accrued. The calculation and payment of preferred return is based on provisions in the Funds' operating agreements.

- **Carried Interest:** After the return of capital and accrued preferred returns, a catch-up distribution is paid 80% to the Fund GPs (and 20% to the LPs) until the Fund GPs receive a distribution equal to 20% of all LP profit distributions made prior to the full carried interest.[39] All remaining available funds for distribution after the catch-up are allocated 80% to the LPs and 20% to the Funds' GPs. This division is per the provisions of the Funds' operating agreements.

- **Clawback:** Carried interest is subject to a clawback provision at the end of the Funds' terms. The clawback provision ensures: (1) the third party limited partners earn an 8% annualized return (i.e., the Preferred Return) in aggregate over the

---

[38] Except for interests in Credit I and Credit II, whose preferred return is 6%.
[39] Except Credit I and Credit II, with carried interest of 15% and catchup of 85% to the Fund GP and 15% to the LPs



Mr. Thomas J. Walker
May 22, 2017
Page 35

Funds' terms; and (2) the Funds' GPs do not receive carried interest in excess of 20%.

- **Fund Expenses:**  Based on input from Management and as well the Funds' historical trends, annual fund expenses and one time organizational expenses were modeled for each of the Funds.  All partners pay their pro-rata share of fund expenses.

- **Term of the Funds:**  Generally, each Fund was expected to have a ten year term, with the option of extending the term.  Credit I and Credit II each have a shorter term of six years, prior to the option of extending the term.

Specific Fund assumptions and characteristics are described below.

1.   Fund II

From discussions with Management, as well as a review of Fund II's financial condition and expectations for the fund's future cash flows, Fund II was not explicitly modeled.  This was considered prudent as Fund II was not generating any management fee revenue, and the probability of any carried interest allocations was very low given the size of the clawback relative to the fair value of its remaining portfolio investments.

2.   Fund III

Based on information provided by the Company, the exit timing and sales proceeds of the fund's portfolio investments were modeled.  The remaining investments were expected to be harvested between 2017 and 2020, with an implied average exit multiple of 0.30 times.  Fund III would continue to generate management fee revenue through 2020.  Because of Fund III's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%.  Given the size of the fund's clawback and the expected portfolio exit proceeds, Fund III was not expected to generate any carried interest.  See Exhibits B-1 through B-7.

3.   Fund IV

Based on information provided by the Company, the exit timing and sales proceeds of the fund's portfolio investments were modeled.  The remaining investments were expected to be harvested between 2017 and 2020, with an implied average exit multiple of 0.85 times.  Fund IV would continue to generate management fee revenue through 2020.  Because of Fund IV's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%.  Given the size of the fund's clawback and the expected portfolio exit proceeds, Fund IV was not expected to generate any carried interest.  See Exhibits C-1 through C-7.



Mr. Thomas J. Walker
May 22, 2017
Page 36

4.  Fund V

Based on information provided by the Company, the exit timing and sales proceeds of the fund's portfolio investments were modeled. The remaining investments were expected to be harvested between 2017 and 2021, with an implied average exit multiple of 1.22 times. Fund V would continue to generate management fee revenue through 2021. Given the size of the fund's clawback and the expected portfolio exit proceeds, Fund V was not expected to generate any carried interest. See Exhibits D-1 through D-7.

5.  Fund VI

Based on discussions with Management and information provided by the Company, the investment timing, exit timing, and sale proceeds of the fund's portfolio investments were modeled. Additional portfolio and follow-on investments would be made through 2021. Fund VI's portfolio investments were expected to be harvested between 2020 and 2022, with an implied average exit multiple of 2.20 times. Fund VI would continue to generate management fee revenue through 2022 and carried interest was expected to be realized in 2020 through 2022. See Exhibits E-1 through E-7.

6.  Non-ECI

Based on discussions with Management and information provided by the Company, the investment timing, exit timing, and sale proceeds of the fund's portfolio investments were modeled to largely follow Fund VI. The additional portfolio and follow-on investments would be made through 2021. Non-ECI's portfolio investments were expected to be harvested between 2020 and 2022, with an implied average exit multiple of 2.20 times. Non-ECI would continue to generate management fee revenue through 2022 and carried interest was expected to be realized in 2020 through 2022. See Exhibits F-1 through F-7.

7.  Renew II

Based on information provided by the Company, the exit timing and sales proceeds of the fund's portfolio investments were modeled. The remaining investments were expected to be harvested between 2018 and 2020, with an implied average exit multiple of 1.28 times. Renew II would continue to generate management fee revenue through 2020. Because of Renew II's relationship with Carlyle, Riverstone receives 90% of the management fee revenue while Carlyle receives 10%. Given the size of the fund's clawback and the expected portfolio exit proceeds, Renew II was not expected to generate any carried interest. See Exhibits G-1 through G-7.

8.  Credit I

Again, Credit I's terms are generally different than the other Funds, as its preferred return was 6% and the carried interest allocation to the fund's GP was 15%.



Mr. Thomas J. Walker
May 22, 2017
Page 37

From discussions with Management, we modeled the fund's expected cash flows, including dividend payments, recycling, leverage, exit timing, and harvest proceeds. Assumptions regarding dividends and leverage cost were provided in the fund's PPM and were considered reasonable as of the Valuation Date. The fund was expected to recycle its available cash through the commitment period. Thereafter, harvest proceeds would be distributed to Credit I's partners. Distributions were expected to be realized in 2019 and 2020, with an implied average exit multiple of 1.74 times. Credit I would continue to generate management fee revenue through 2020 and carried interest was expected to be realized in 2020. See Exhibits H-1 through H-7.

9. CKD I

Based on discussions with Management and information provided by the Company, the investment timing, exit timing, and sales proceeds of the fund's portfolio investments were modeled. The portfolio investments would be made through 2019. CKD I's portfolio investments were expected to be harvested between 2020 and 2023, with an implied average exit multiple of 2.50 times. CKD I would continue to generate management fee revenue through 2023 and carried interest was expected to be realized in 2020 through 2023. See Exhibits I-1 through I-7.

10. Prospective Funds

Using the forecast information Management provided to the purchaser, the prospective funds were modeled using the same templates, and general terms (though not all), as used for each fund's predecessor fund: (1) Fund VI's model was used for Fund VII and the Infrastructure fund; (2) Credit I's model was used for Credit II; (3) CKD I's model was used for CKD II and CDK Renew; and (4) Renew II's model was used for Renew III, although the management fee and carried interest allocations of 10% to Carlyle was not applicable for Renew III.

11. Additional Cash Flow Inputs

For each of the Funds, the following table shows the selected average holding period (in years), expected average exit multiple of invested capital (on investments only), and the resulting IRR. The IRRs for Funds III through Fund V and Renew II are indicative of the remaining investment basis and exclude the realizations of investments prior to the Valuation Date.



Confidential
Empire Valuation Consultants

PDF compiled on 06/22/2017
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 38

### Holding Period, Exit Multiples, and Fund IRRs

| Name | Holding Period[40] | Exit Multiple[41] | Fund IRRs |
|---|---|---|---|
| Fund II[42] | N/A | N/A | N/A |
| Fund III | Investment Specific | Investment Specific | -13.4% |
| Fund IV | Investment Specific | Investment Specific | -3.7% |
| Fund V | Investment Specific | Investment Specific | 2.4% |
| Fund VI | 4 | 2.25x | 21.5% |
| Non-ECI | 4 | 2.25x | 21.4% |
| Renew II | Investment Specific | Investment Specific | 0.4% |
| Credit I | 2 | 1.20x | 19.7% |
| CKD I | 4 | 2.50x | 23.5% |
| Fund VII | 4 | 2.00x | 17.0% |
| Renew III | 4 | 2.00x | 17.7% |
| Credit II | 3 | 1.50x | 16.2% |
| CKD Renew | 4 | 2.00x | 17.5% |
| CKD II | 4 | 2.00x | 18.5% |
| Infrastructure I | 4 | 2.00x | 17.7% |

The older funds (i.e., Fund III through Fund IV and Renew II) were beyond their respective investment period, and largely had remaining portfolio investments that were expected, on average, to produce minimal gains. The exit timing and valuations of the portfolio investments in the older funds were provided by Management. The more recent vintage funds (i.e., Fund VI, Credit I, and CKD I) were still in their investment period and were believed to be in a favorable asset acquisition environment, given the fall in oil prices since 2015. Management was extremely bullish on the portfolio investments acquired in the more recent years. Generally, we relied on Management's input for the recent vintage funds' expected holding periods. However, we generally adjusted the exit multiples upward given the current market conditions, and cyclical nature, of the energy sector. Our outlook for the prospective funds was tempered from the current funds as the industry was historically volatile and the favorable buying environment may not hold when the prospective funds launch.

---

[40] Most of the Funds with available capital calls were modeled with follow-on portfolio investment opportunities. The follow-on investments were either 2 or 3 years following the initial investment, and averaged between 10% and 20% of the capital deployed into portfolio investments.

[41] These exit multiples are on the initial investments, the exit multiples for follow-on investments are generally lower (notwithstanding CKD I).

[42] Again, Fund II's cash flows were not explicitly modeled given the lack of any future management fees and the likelihood of realizing any future carried interest was considered very unlikely.



RIVERSTONE_SDTX00156598

Confidential    PDF Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

Empire Valuation Consultants

Mr. Thomas J. Walker
May 22, 2017
Page 39

Again, key assumptions are presented in Exhibit A. The individual fund models are provided in Exhibits B through O. Using Fund III as an example, highlights are presented below.

- Fund-specific assumptions, driven by the inputs on Exhibit A, are presented in **Exhibit B-1**.

- Investment capital and the implied exit multiple are highlighted in **Exhibit B-2**.

- Fund-level cash flows related to Fund III are presented in **Exhibit B-3**. This includes capital calls for investments, management fees and fund expenses.

- The allocation of cash flows between the fund's GP and the fund LPs are presented in **Exhibit B-4**. The top portion of this exhibit presents the summary of LP capital calls and the calculation of the preferred return. The bottom portion of the exhibit displays the distribution waterfall which allocates cash flows between the fund GP and the LPs.

- Implied IRRs associated with the fund are presented in **Exhibit B-5**. This exhibit shows the implied IRRs to the LPs, GP (excluding and including carry) and the fund.

- The carried interest cash flows are segregated from the implied IRRs exhibit and are presented in **Exhibit B-6**.

The Funds' resulting management fees and carried interest cash flows are aggregated in Exhibits Q-1 and Q-2, respectively.

**B.   Derivation of Required Rate of Return**

**Discount Rate:** The discount rates selected represent the required rates of return that an investor would demand at a point in time in order to invest in the Funds' management fees and carried interest.   The selected rates would need to account for the inherent risks associated with the Funds and their associated revenue streams.   Since the Funds have no debt in their capital structure, the discount rates selected below for the Funds' cash flows, and developed separately for each of the fund categories, is equivalent to the cost of equity.

A number of benchmarks were considered in developing an estimated discount rate to be applied to the Interests' expected cash flows, including: (1) the PE Index, maintained by Cambridge; and (2) the Pepperdine survey. Each is discussed below.

<u>PE Index:</u> As discussed in the Private Equity Industry Outlook, the PE Index measures returns to LPs net of fees, expenses, and carried interest.   As shown in the following table, Cambridge reported that returns to LPs were materially higher for shorter historical periods, highlighting the relatively strong environment present in recent years.



RIVERSTONE_SDTX00156599

Mr. Thomas J. Walker
May 22, 2017
Page 40

### Private Equity Multi-Year Returns[43]

| Duration (years) | Returns |
|---|---|
| 1 | 8.5% |
| 3 | 11.2% |
| 5 | 13.8% |
| 10 | 10.7% |
| 15 | 12.2% |
| 20 | 12.5% |
| 25 | 13.3% |

It is clear that these benchmarks are specific to limited partnership interests, and it is recognized that no data was found to be available that is specific to required returns for management fee or carried interest cash flows. However, it is also clear that the required return associated with the projected cash flow stream associated with a carried interest allocation must be materially higher than that associated with a limited partnership interest, particularly at a point in time that is at (or near) a fund's inception. Additionally, the required return associated with the projected cash flow stream associated with management fees must be on par or lower than that associated with a limited partnership interest.

Pepperdine Survey: A research survey conducted by the Graziadio School of Business and Management, Pepperdine University. This university produced a report, *Private Capital Markets Project*, 2016, reviewing the returns of private equity and venture capital portfolios. This survey reported median required rate of returns of 22% and 24% for the private equity groups incorporated in their study, which was presented earlier in the Private Equity Industry Outlook.

Cash Flow-Specific Risk Adjustments: Taking these and other factors into consideration, a discount rate of 13% was assumed for the cash flows attributable to a limited partner's interest. Given the subjects of this analysis (i.e., the carried interest allocations and management fees), further adjustments were made to reflect the specific characteristics of each income stream. These adjustments consider a number of factors, including, but not limited to:

- **Management Fees:** Management fees are a relatively stable source of cash flows based on aggregate fund commitments and invested capital. Further, value of the management fee streams in this analysis are based on top-line allocations and are not subject to a fund's management related expenses and operating profitability.

---

[43] Pooled end-to-end returns, net of fees, expenses, and carried interest based on 1,334 funds formed between 1986 and 2016.



Mr. Thomas J. Walker
May 22, 2017
Page 41

- **Carried Interest:** Carried interest allocations are relatively riskier source of cash flow based on significant risk in satisfying LP preferred returns, especially for long exit horizons. These fees are largely dependent upon minimizing portfolio defaults and maximizing exit valuations in an efficient timeframe. There is significant risk associated with realizing the projected cash flows given historical IRR results and future exit multiples.

- **Near Term Cash Flows:** The cash flows expected in the near term (i.e., two years in this analysis) were considered to be less risky than the longer term expected cash flows. This is largely because the confidence is higher for both forecasted management fees and carried interest (i.e., the timing and exit valuations) in the near term.

- **Prospective Funds:** Prospective funds (not yet launched or formed as of the Valuation Date) are riskier than existing funds. The risk is elevated for prospective funds given significant capital raising requirements and investment risk, and it is unknown if the Funds will be able to find suitable investments over the longer horizon that meet its expectations of risk and reward. Further, the projected cash flows assume historical cash flow realizations and returns will not be replicated in the future, which is highly uncertain given a competitive environment and economic conditions.

- **Company/Industry Risks:** The Funds are focused on a single industry, global energy and power. The cash flows for commodity businesses can be highly volatile and the kinds of swings in recent history (e.g. oil prices) have been larger than historic levels.

The following table summarizes the selected risk adjustment and resulting discount rate applied to each cash flow stream considered in the DCF analyses. See Exhibit P-1.

{This Space Intentionally Left Blank}



PDF compiled 05/22/17
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 42

### Summary of Selected Discount Rates

| Cash Flow and Fund Category | Cash Flow Specific Risk Adjustment | Concluded Discount Rate | Key Risks |
|---|---|---|---|
| *Management Fees* | | | |
| Near Term/2 Years (Existing) | -2.0% | 11.0% | AUM committed, exit values and timing. |
| Longer Term (Existing) | 1.0% | 14.0% | Fundraising, timing, and ability to find suitable portfolio investments. |
| Prospective Funds | 4.0% | 17.0% | Fundraising, timing, and ability to find suitable portfolio investments, expected to launch between 1 and 3 years post VD. |
| *Carried Interest* | | | |
| Near Term, High Probability (Existing) | 12.0% | 25.0% | Profit realization/IRR risks in excess of preferred return.  Increased certainty in near term exits. |
| Longer Term (Existing) | 17.0% | 30.0% | Profit realization/IRR risks in excess of preferred return. |
| Prospective Funds | 22.0% | 35.0% | Fundraising, investment selection, and profit realization/IRR in excess of preferred return. |

## C.  Conclusion of Fully Marketable Value

The Interests' projected cash flows were discounted using discount rates ranging from 11% to 35% based on the timing (i.e., first two years following the Valuation Date), type of cash flow (i.e., management fees or carried interest), and whether the modeled fund was existing or prospective.  The present values of the Funds' management fees and carried interest cash flows are shown in the following table and on Exhibit R.

{This Space Intentionally Left Blank}



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 43

### Present Value of the Funds' Management Fees and Carried Interest

| Name | Management Fee Value ($ in Millions) | Carried Interest Value ($ in Millions) |
|---|---|---|
| Fund II | $0.00 | $0.00 |
| Fund III | $13.91 | $0.00 |
| Fund IV | $39.89 | $0.00 |
| Fund V | $108.48 | $0.00 |
| Fund VI | $241.79 | $286.12 |
| Non-ECI | $13.00 | $15.51 |
| Renew II | $29.40 | $0.00 |
| Credit I | $15.34 | $16.69 |
| CKD I | $35.75 | $49.49 |
| Fund VII | $226.36 | $86.76 |
| Renew III | $48.19 | $22.14 |
| Credit II | $41.39 | $15.25 |
| CKD Renew | $27.69 | $15.50 |
| CKD II | $30.11 | $12.10 |
| Infrastructure I | $70.79 | $32.52 |
| **Totals** | **$942.11** | **$552.09** |

{This Space Intentionally Left Blank}



Mr. Thomas J. Walker
May 22, 2017
Page 44

## Valuation Summary

Given the foregoing review and analysis, and subject to the attached Statement of Limiting Conditions, it is our estimate that the value of the carried interest and management fee streams from nine existing funds as well as six prospective funds, all related to Riverstone Holdings LLC is reasonably stated as $1.494 billion as of December 31, 2016. It is our understanding that this valuation will be used, in conjunction with additional reports, for corporate planning purposes, specifically in assisting management in its allocation for booking goodwill related to such a sale of the Interests.

This appraisal is not intended for any other purpose nor for any other users and the sharing of the contents herein is not permitted without the express written consent of Empire Valuation Consultants, LLC. Empire has no obligation to update this appraisal for information that comes to our attention after the date of this report.

Respectfully submitted,

**Empire Valuation Consultants, LLC**

_____

Nathan P. Schroeder
Engagement Leader

_____

Scott A. Nammacher, CFA, ASA
Managing Director



# STATEMENT OF LIMITING CONDITIONS

1. Financial statements and other related information provided by or on behalf of the client entity or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Empire Valuation Consultants, LLC has not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

2. Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information. Information used was limited to that available on or before the Valuation Date, or which could be reasonably ascertained as of that date. We reserve the right to make such adjustments to the valuation herein reported as may be required by consideration of additional or more reliable data that may become available subsequent to the issuance of this report.

3. We do not provide assurance on the achievability of the results forecasted by the client entity because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

4. The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

5. This report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore the report and conclusion of value are not intended by Empire Valuation Consultants, LLC and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the considered opinion of Empire Valuation Consultants, LLC, based on information furnished to them by the client entity and other sources.

6. Neither all nor any part of the contents of this report (especially the conclusion of value, the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent and approval of Empire Valuation Consultants, LLC.

7. Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Empire Valuation Consultants, LLC unless previous arrangements have been made in writing.

8. Empire Valuation Consultants, LLC is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. Empire Valuation Consultants, LLC does not conduct or provide environmental assessments and has not performed one for the subject property.

9. Empire Valuation Consultants, LLC has not determined independently whether the client entity is subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. Empire Valuation Consultants, LLC's valuation takes no such liabilities into account, except as they have been reported to Empire Valuation Consultants, LLC by the client entity or by an environmental consultant working for the client entity, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, Empire Valuation Consultants, LLC has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

10. Empire Valuation Consultants, LLC has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the Americans with Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

11. No change of any item in this appraisal report shall be made by anyone other than Empire Valuation Consultants, LLC, and we shall have no responsibility for any such unauthorized change.

12. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

13. If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

14. We have conducted interviews with the current management of the client entity concerning the past, present, and prospective operating results of the company, as applicable for this analysis.

Confidential
Empire Valuation Consultants

15. Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the client entity has good title to all assets.

16. The fee established for the formulation and reporting of these conclusions is not contingent upon the value or other opinions presented.

17. Neither the appraiser nor any officer or employee of Empire Valuation Consultants, LLC has any interest in the property appraised.

18. We assume that there are no hidden or unexpected conditions of the assets valued that would adversely affect value.

19. No opinion is intended for matters which require legal or specialized expertise, investigation or knowledge, beyond that customarily employed by appraisers.

CONFIDENTIAL

Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Addendum 2

# CERTIFICATION OF APPRAISERS

We the appraisers certify that, to the best of our knowledge and belief:

1. Our analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

2. All statements of fact contained in this report are true and correct.

3. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

4. Neither Empire nor any of its employees has, to the best of our knowledge, either a present or intended financial interest in the entity that is the subject of this report, in any affiliates that may exist, or with respect to the parties involved.

5. Empire has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

6. We have no bias with respect to the entity that is the subject of this report or to the parties involved with this assignment.

7. Empire's engagement in this assignment was not contingent upon developing or reporting predetermined results.

8. The professional fee paid to Empire for the preparation of this report is not contingent upon its conclusion, including: developing or reporting a predetermined value or direction of value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

9. No one provided significant business appraisal assistance to the persons signing this certification, unless specifically stated herein.

The American Society of Appraisers has a mandatory recertification program for all of its Accredited Senior Appraisers. The senior members signing below, designated by the "ASA," are in compliance with that program.


_____
Nathan P. Schroeder
Engagement Leader


_____
Scott A. Nammacher, CFA, ASA
Managing Director


May 22, 2017

# EMPIRE VALUATION CONSULTANTS, LLC

www.empireval.com

| | | |
|---|---|---|
| 777 Canal View Blvd. | 350 Fifth Avenue | One International Place |
| Suite 200 | Suite 6115 | Suite 1400 |
| Rochester, NY 14623 | New York, NY 10118 | Boston, MA 02110 |
| Tel: (585) 475-9260 | Tel: (212) 714-0122 | Tel: (617) 535-7785 |

| | |
|---|---|
| 61 South Main Street | 555 California Street |
| Suite 201 | Suite 4925 |
| West Hartford, CT 06107 | San Francisco, CA 94104 |
| Tel: (860) 233-6552 | Tel: (415) 659-1860 |

## Valuation Services

**Empire Valuation Consultants, LLC** provides valuations to private equity and hedge funds, business owners, attorneys, accountants, commercial bankers, investment bankers, trust departments, insurance agents, and financial planners, among others. **Empire's** consultants have prepared or managed the preparation of over 25,000 appraisals for the following reasons:

- Private Equity & Hedge Fund Marking
- Transfer Pricing
- Solvency Opinions
- Buy/Sell Agreements
- Gifting Programs
- Estate Taxes
- Mergers & Acquisitions
- Blocks of Publicly Traded Securities
- Employee Stock Ownership Plans (ESOPs)

- Financial and SEC Reporting
- Fairness Opinions
- Litigation Support
- Redemptions
- Recapitalizations
- Going Private Transactions
- Stock Option Plans
- Dissenting Shareholder Suits
- Impairment Testing
- Intellectual Property
- Purchase Price Allocations

## Other Financial Services

### Litigation Support & Expert Testimony

**Empire** can assist you with research and litigation support and its professionals are available to provide expert testimony in matters involving questions of valuation.

### ESOP Feasibility Studies & Preliminary Valuations

**Empire** is available to work with our client's team of financial advisors or participate in independent feasibility studies and preliminary valuation reviews in connection with ESOP formation planning.

Confidential
Empire Valuation Consultants

PDF compiled 08/22/17
DRAFT COPY - For Discussion Purposes Only

Addendum 3-2

# NATHAN P. SCHROEDER

## Academic Degrees

M.S.F.        Boston College, Carroll School of Management, Finance, 2007

B.S.        State University of New York at Albany, Economics, 2003

## Employment

**Empire Valuation Consultants, Rochester, New York**
   Engagement Leader, 2016-Present
   Senior Valuation Consultant, 2012-2016
   Valuation Consultant, 2008-2012

**Investors Bank & Trust, Boston, Massachusetts**
   Senior Financial Analyst, 2006-2007
   Trust Administrator, 2005-2006
   Fund Accountant, 2004-2005

## Experience

While employed with Empire, Mr. Schroeder has performed valuations of derivative instruments, intangible assets, and equity and debt interests for diverse purposes, including those of tax planning and reporting, lending purposes, financial and Securities and Exchange (SEC) reporting (including ASC 350-20, formerly SFAS 142- impairment testing and ASC 820, formerly SFAS 157- fair value measurements), ESOP purposes, and other corporate planning and reporting purposes.

Mr. Schroeder's professional experience, prior to joining Empire, includes fund accounting for certain mutual and hedge funds as well as managing high profile client relationships within a wealth and trust management division. As an analyst in the corporate financial planning and analysis (FP&A) group at Investors Bank & Trust, he generated a rolling 3-year-period corporate forecast, resulting in EPS guidance for the CFO, the Board of Directors, and Wall Street. Mr. Schroeder was primarily, and exclusively, responsible for forecasting the company's revenue. This involved analyzing and forecasting: new business, interest income, business turn, treasury and ALCO expectations, as well as other information related to the company's revenue. In addition to generating the forecast, Mr. Schroeder performed regular variance analysis and coordinated the annual corporate budget with the company's cost center directors and managers.

CONFIDENTIAL

RIVERSTONE_SDTX00156610

Addendum 3-3

# SCOTT A. NAMMACHER, ASA, CFA

## Academic Degrees

M.B.A.        New York University Graduate School of Business, Finance, 1985

B.S.        University of Minnesota, Business, 1977

## Employment

Principal and Managing Director, Empire Valuation Consultants, LLC, New York, New York, 1992-Present

Manager, Financial Valuations, Arthur Andersen & Co., New York, 1990-1991

V.P., Marigold Capital Development, Investment Banking Div. of Marigold Enterprises, Greenwich, Connecticut, 1989-1990

Manager - Domestic Finance, PepsiCo, Inc. Purchase, New York, 1985-1989

## Experience

Mr. Nammacher is an Accredited Senior Appraiser (ASA) of the American Society of Appraisers and is a Chartered Financial Analyst (CFA). He has over 30 years of experience in financial consulting, business and financial asset valuations. He has valued the equity, debt, carried interests, etc. of publicly and privately held businesses for acquisitions, divestitures, stock repurchases, estate and gift tax reporting, buy/sell agreements, and general corporate planning purposes. He has also valued entertainment and royalty stream related assets. Mr. Nammacher developed business plans and financing packages, and has been involved in completed transactions totaling over $2.0 billion. In addition, he played key roles in the successful launch of a new business publication.

Mr. Nammacher has testified as an expert witness in U.S. Tax Court, U.S. Bankruptcy Court, Delaware Chancery Court and other courts and arbitration settings around the country, and published a book and several articles on "junk bonds." He also received the prestigious "Graham & Dodd Scroll Award" from the *Financial Analysts Journal* for outstanding financial writing relating to a cover story he co-authored.

He served two terms as an elected member of the American Society of Appraisers' Business Valuation Committee, and one term as a Governor (board member) for the ASA's parent organization. He has spoken on valuation issues around the country and chaired an annual valuation conference in New York City for over 20 years. He also co-chaired the first joint AICPA/ASA valuation conference ever presented.

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 687 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT A

**VALUATION DASHBOARD**
**RIVERSTONE HOLDINGS LLC**
AS OF DECEMBER 31, 2016

| Fund Name | General Partner Name | Exhibit | Vintage | Holding Period (in Years) | Follow-On Investment Lag | MOIC [1] | Follow-On MOIC | Fund IRR (net of Mgmt Fees) [2] |
|---|---|---|---|---|---|---|---|---|
| *Existing Funds* | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | Carlyle/Riverstone Energy Partners II, L.P. | N/A | 2004 | N/A | N/A | N/A | N/A | N/A |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | Carlyle/Riverstone Energy Partners III, L.P. | B | 2006 | Asset Specific | N/A | Asset Specific | N/A | -13.4% |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | Riverstone/Carlyle Energy Partners IV, L.P. | C | 2008 | Asset Specific | N/A | Asset Specific | N/A | -3.7% |
| Riverstone Global Energy & Power Fund V, L.P. | Riverstone Energy Partners V, L.P. | D | 2012 | Asset Specific | N/A | Asset Specific | N/A | 2.4% |
| Riverstone Global Energy & Power Fund VI, L.P. | Riverstone Energy Partners VI, L.P. | E | 2015 | 4 | 3 | 2.25 | 2.00 | 21.5% |
| Riverstone Non-ECI Partners, L.P. | Riverstone Non-ECI Partners GP (Cayman), L.P. | F | 2016 | 4 | 3 | 2.25 | 2.00 | 21.4% |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | Riverstone/Carlyle Renewable Energy Partners II, L.P. | G | 2008 | Asset Specific | N/A | Asset Specific | N/A | 0.4% |
| Riverstone Credit Management LLC | Riverstone Capital Partners - Credit LP | H | 2015 | 2 | N/A | 1.20 | N/A | 19.7% |
| Riverstone CKD Management Company, S.De R.L. De C.V. | Riverstone Capital Partners CKD, LP | I | 2016 | 4 | 3 | 2.50 | 2.50 | 23.5% |
| *Prospective Funds* | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | N/A | J | 2019 | 4 | 2 | 2.00 | 1.75 | 17.0% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | N/A | K | 2018 | 4 | 2 | 2.00 | 1.50 | 17.7% |
| Riverstone Credit Partners II, L.P. | N/A | L | 2018 | 3 | N/A | 1.25 | N/A | 16.2% |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | N/A | M | 2017 | 4 | 2 | 2.00 | 1.75 | 17.5% |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | N/A | N | 2019 | 4 | 3 | 2.00 | 1.75 | 18.5% |
| Riverstone Energy Infrastructure Fund, L.P. | N/A | O | 2018 | 4 | 2 | 2.00 | 1.75 | 17.7% |

(1) Multiple of Invested Capital ("MOIC")
(2) Differences in the prospective IRRs can be attributed to variances in the MOIC, follow-on MOIC, follow-on investment lag, and portfolio income and offsets.

RIVERSTONE_SDTX00156612

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 688 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT B-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
## CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.
## AS OF DECEMBER 31, 2016

|   | Key Information | | |
|---|---|---|---|
| 1 | Fund Name | | CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P. |
| 2 | Fund Short Name | | RIVERSTONE III |
| 3 | GP Entity Name | | CARLYLE/RIVERSTONE ENGERY PARTNERS III, L.P. |
| 4 | GP Entity Short Name | | RIVERSTONE III GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

|   | Committed Capital by Class of Partner | | |
|---|---|---|---|
| 6 | FUND LPs | 99.4% | 3,677.90 |
| 7 | RIVERSTONE GP (de minimus) | 0.1% | 3.70 |
| 8 | COINVESTMENT | 0.5% | 18.40 |
| 9 | **Total Capital Commitments ($ in millions)** | | **3,700.00** |

|    | Key Fund Dates | | |
|----|---|---|---|
| 10 | Initial Close | | 10/28/2005 |
| 11 | Final Close | | 10/28/2006 |
| 12 | Investment Period End Date | 5 | 10/28/2010 |
| 13 | Fund Term End Date | 10 | 10/28/2015 |
| 14 | Fund Term with Extensions | 2 | 10/28/2017 |
| 15 | Valuation Date | | 12/31/2016 |

|    | Gross Exit Multiples | |
|----|---|---|
| 16 | Fund IRR (net of Mgt. Fees, calculated) | -13.4% |
| 17 | LP IRR (net of Fees and Expenses, calculated) | -13.4% |

|    | Management Fees | |
|----|---|---|
| 18 | Investment Period | 1.50% |
| 19 | Post-Investment Period | 1.00% |
| 20 | Capital exempt from Management Fees | 0.6% |
| 21 | Capital exempt from Management Fees in $ | 22.100 |

|    | Preferred Rate of Return | |
|----|---|---|
| 22 | LP Preferred Return | 8% |
| 23 | GP Preferred Return | N/A |
| 24 | GP Preferred Return Catch Up (as % of LP Preferred Return) | 33.33% |

|    | Carried Interest | |
|----|---|---|
| 25 | General Partners (w/ LPs) | 20% |
| 26 | Limited Partners | 80% |

RIVERSTONE_SDTX00156613

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT B-2**

## SUMMARY OF INVESTMENTS AND EXITS
**CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.**
AS OF DECEMBER 31, 2016

*(Year End 10/28)*

| Company | Initial Cost Basis | Year of Acquisition | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|
| **Cobalt International Energy & Targe Energy** | $152,070,000 | 2007 | $40,779,000 | 2018 |
| **Moreno Energy** | $215,007,000 | 2006 | $43,001,000 | 2017 |
| **Talen Energy & Rice Energy** | $437,838,000 | 2008 | $156,789,000 | 2020 |
| Total | $804,915,000 | | $240,569,000 | |
| FUND LPs | $800,107,264 | | | |
| RIVERSTONE GP (de minimus) | $804,915 | | | |
| COINVESTMENT | $4,002,821 | | $240,569,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $804,915,000 | | $804,915,000 | Aggregate Investment Outlays |
| | | | 0.30 | Implied Average Exit Multiple |

| | Capital Commitment | | | |
|---|---|---|---|---|
| FUND LPs | $3,677,900,000 | 99.4% | | |
| RIVERSTONE GP (de minimus) | $3,700,000 | 0.1% | | |
| COINVESTMENT | $18,400,000 | 0.5% | | |
| | $3,700,000,000 | 100% | | |

RIVERSTONE_SDTX00156614

EXHIBIT B-3

## SUMMARY OF FUND CASH FLOWS ($ millions)
**CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.**
**AS OF DECEMBER 31, 2016**

| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ending October 28, | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | | | | | | |
| 1 Investments made in 2006 + follow-on | 215.01 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 215.01 |
| 2 Investments made in 2007 + follow-on | - | 152.07 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 152.07 |
| 3 Investments made in 2008 + follow-on | - | - | 437.84 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 437.84 |
| 4 Investments made in 2009 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 5 Investments made in 2010 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 Investments made in 2011 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 Investments made in 2012 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 Sum of Investments | 215.01 | 152.07 | 437.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 804.92 |
| 9 Aggregate Sum of Investments | 215.01 | 367.08 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | | | | | | |
| 10 Investment Distributions from 2006 Investments | - | - | - | - | - | - | - | - | - | - | - | 43.00 | - | - | - | - | - | 43.00 |
| 11 Investment Distributions from 2007 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 40.78 | - | - | - | - | 40.78 |
| 12 Investment Distributions from 2008 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 156.79 | - | - | 156.79 |
| 13 Investment Distributions from 2009 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 14 Investment Distributions from 2010 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 Investment Distributions from 2011 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 Investment Distributions from 2012 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43.00 | 40.78 | 0.00 | 156.79 | 0.00 | 0.00 | 240.57 |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | | | | | | |
| 18 Cumulative Capital Contributions - Beginning | 0.00 | 215.01 | 367.08 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 589.91 | 437.84 | 437.84 | 0.00 | 0.00 | |
| 19 Plus: New Investments | 215.01 | 152.07 | 437.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (215.01) | (152.07) | 0.00 | (437.84) | 0.00 | 0.00 | (804.92) |
| 21 Net Contributions that Remain Invested - End | 215.01 | 367.08 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 804.92 | 589.91 | 437.84 | 437.84 | 0.00 | 0.00 | | |
| 22 Pro Rata Portion Excluded from Mgmt. Fee Calculation | (22.10) | (22.10) | (22.10) | (22.10) | (22.10) | (4.81) | (4.81) | (4.81) | (4.81) | (4.81) | (4.81) | (3.52) | (2.62) | (2.62) | 0.00 | 0.00 | | |
| 23 Net Capital/Contributions for Mgmt. Fee Calculation | 3,677.90 | 3,677.90 | 3,677.90 | 3,677.90 | 3,677.90 | 800.11 | 800.11 | 800.11 | 800.11 | 800.11 | 800.11 | 586.38 | 435.22 | 435.22 | 0.00 | 0.00 | | |
| **Management Fees** | | | | | | | | | | | | | | | | | | |
| 24 Management Fees Due to Investment Manager | 55.17 | 55.17 | 55.17 | 55.17 | 55.17 | 22.39 | 8.03 | 8.00 | 8.00 | 8.00 | 8.00 | 6.93 | 5.11 | 4.35 | 2.18 | 0.00 | 0.00 | 356.83 |
| 25 Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (78.75) |
| 26 Net Management Fees to be Called | 45.17 | 45.17 | 45.17 | 45.17 | 45.17 | 12.39 | 0.00 | 3.00 | 5.50 | 6.75 | 8.00 | 6.93 | 5.11 | 4.35 | 2.18 | 0.00 | 0.00 | 280.06 |
| **Capital Calls** | | | | | | | | | | | | | | | | | | |
| 27 Investment Needs | 215.01 | 152.07 | 437.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 804.92 |
| 28 Management Fees | 45.17 | 45.17 | 45.17 | 45.17 | 45.17 | 12.39 | 0.00 | 3.00 | 5.50 | 6.75 | 8.00 | 6.93 | 5.11 | 4.35 | 2.18 | 0.00 | 0.00 | 280.06 |
| 29 Fund Expenses (2) | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.06 |
| 30 Sum of Capital Calls | 272.68 | 204.74 | 490.51 | 52.67 | 52.67 | 19.89 | 7.50 | 6.75 | 7.38 | 7.69 | 8.00 | 6.93 | 5.11 | 4.35 | 2.18 | 0.00 | 0.00 | 1,149.03 |
| 31 Aggregate of Capital Called | 272.68 | 477.41 | 967.92 | 1,020.59 | 1,073.26 | 1,093.15 | 1,100.65 | 1,107.40 | 1,114.77 | 1,122.46 | 1,130.46 | 1,137.40 | 1,142.50 | 1,146.86 | 1,149.03 | 1,149.03 | 1,149.03 | |

Percentage of Committed Capital Called    31%
Net Exit Multiple    0.21

(1) Management fee offset data provided by Management. See Exhibit B-4 for details.
(2) Fund Expense data provided by Management. See Exhibit B-4 for details.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT B-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.
AS OF DECEMBER 31, 2016

*($ millions)*
*(based on data provided by Management)*

| | % offset | Year 1 2006 | Year 2 2007 | Year 3 2008 | Year 4 2009 | Year 5 2010 | Year 6 2011 | Year 7 2012 | Year 8 2013 | Year 9 2014 | Year 10 2015 | Year 11 2016 | Year 12 2017 | Year 13 2018 | Year 14 2019 | Year 15 2020 | Year 16 2021 | Year 16 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3   Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (78.75) |
| 4 Net Management Fee Offsets (Line 3) | | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (78.75) |

| **Estimated Portfolio Expenses** | Year 1 2006 | Year 2 2007 | Year 3 2008 | Year 4 2009 | Year 5 2010 | Year 6 2011 | Year 7 2012 | Year 8 2013 | Year 9 2014 | Year 10 2015 | Year 11 2016 | Year 12 2017 | Year 13 2018 | Year 14 2019 | Year 15 2020 | Year 16 2021 | Year 16 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6 Annual Fund Operating Expenses | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59.06 |
| 7 Capital Calls for Expenses | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.06 |

* Per Management.

**EXHIBIT B-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.
AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | Harvest Period | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | |
| Year Ending October 28, | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | | | | | | |
| **LP Invested Capital Subject to Preferred Return** | | | | | | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 293.02 | 536.55 | 1106.35 | 1251.69 | 1408.66 | 1542.79 | 1674.26 | 1815.47 | 1968.66 | 2134.45 | 2313.85 | 2460.28 | 2618.84 | 2833.05 | 2893.72 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 271.32 | 203.79 | 487.85 | 52.62 | 52.62 | 19.85 | 7.46 | 6.73 | 7.36 | 7.68 | 8.00 | 6.93 | 5.11 | 4.35 | 2.18 | 0.00 | 1,143.84 |
| 2a | *Investment Needs* | *213.72* | *151.16* | *435.22* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *800.11* |
| 2b | *Management Fees* | *45.17* | *45.17* | *45.17* | *45.17* | *45.17* | *12.39* | *0.00* | *3.00* | *5.50* | *6.75* | *8.00* | *6.93* | *5.11* | *4.35* | *2.18* | *0.00* | *280.06* |
| 2c | *Fund Expenses* | *12.43* | *7.46* | *7.46* | *7.46* | *7.46* | *7.46* | *7.46* | *3.73* | *1.86* | *0.93* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *63.68* |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (42.74) | (40.54) | 0.00 | (185.86) | 0.00 | (239.13) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 271.32 | 496.81 | 1024.40 | 1158.97 | 1304.32 | 1428.51 | 1550.24 | 1680.99 | 1822.83 | 1976.34 | 2142.45 | 2278.04 | 2424.85 | 2623.19 | 2679.37 | 2893.72 | |
| 5 | Plus: Current Period Preferred Return | 21.71 | 39.74 | 81.95 | 92.72 | 104.35 | 114.28 | 124.02 | 134.48 | 145.83 | 158.11 | 171.40 | 182.24 | 193.99 | 209.86 | 214.35 | 231.50 | |
| 6 | End of Period Net LP Contributed Capital | 293.02 | 536.55 | 1106.35 | 1251.69 | 1408.66 | 1542.79 | 1674.26 | 1815.47 | 1968.66 | 2134.45 | 2313.85 | 2460.28 | 2618.84 | 2833.05 | 2893.72 | 3125.22 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (3125.22) | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3125.22 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 293.02 | 536.55 | 1106.35 | 1251.69 | 1408.66 | 1542.79 | 1674.26 | 1815.47 | 1968.66 | 2134.45 | 2313.85 | 2460.28 | 2618.84 | 2833.05 | 2893.72 | 3125.22 | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43.00 | 40.78 | 0.00 | 156.79 | 0.00 | 240.57 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.16 | 0.00 | 0.24 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.20 | 0.00 | 0.78 | 0.00 | 1.20 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.74 | 40.54 | 0.00 | 155.85 | 0.00 | 239.13 |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | | | | | Total |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 271.32 | 496.81 | 1024.40 | 1158.97 | 1304.32 | 1428.51 | 1550.24 | 1680.99 | 1822.83 | 1976.34 | 2142.45 | 2320.78 | 2465.39 | 2623.19 | 2835.22 | 2893.72 | |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.74 | 40.54 | 0.00 | 155.85 | 0.00 | 239.13 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 7.24 | 20.48 | 47.80 | 78.71 | 113.49 | 151.58 | 192.92 | 237.75 | 286.36 | 339.06 | 397.19 | 459.94 | 527.60 | 601.55 | 678.00 | 4470.66 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total LP Capital Through Carry Waterfall    239.13

EXHIBIT B-6

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.
### AS OF DECEMBER 31, 2016

| | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | 14.00 | 15.00 | 16.00 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ending October 28, | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Totals |
| | **Aggregate LP IRR** | | | | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.74 | 40.54 | 0.00 | 155.86 | 0.00 | 239.13 |
| 2 | Projected Pro Rata Share of Residual | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3 | Capital to be Funded | (271.32) | (203.79) | (487.85) | (52.62) | (52.62) | (19.85) | (7.46) | (6.73) | (7.36) | (7.68) | (8.00) | (6.93) | (5.11) | (4.35) | (2.18) | 0.00 | (1,143.84) |
| 4 | Net Capital Flows | (271.32) | (203.79) | (487.85) | (52.62) | (52.62) | (19.85) | (7.46) | (6.73) | (7.36) | (7.68) | (8.00) | 35.81 | 35.43 | (4.35) | 153.68 | 0.00 | (904.71) |
| 5 | Implied IRR, rounded | -13.4% | | | | | | | | | | | | | | | | |
| | | | 1.07 | 1.24 | 1.43 | 1.65 | 1.91 | 2.20 | 2.54 | 2.94 | 3.39 | 3.92 | 4.52 | 5.22 | 6.02 | 6.96 | 8.03 | 9.27 |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (291.52) | (252.79) | (698.67) | (87.01) | (100.45) | (43.74) | (18.97) | (19.77) | (24.96) | (30.08) | (36.17) | 186.89 | 213.44 | (30.27) | 1,234.09 | 0.00 |
| | | | | | | | | | | | | | | | | | | |
| | **FUND GP AFFILIATES IRR** | | | | | | | | | | | | | | | | | |
| 7 | Projected Return of Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.20 | 0.00 | 0.78 | 0.00 | 1.20 |
| 8 | Capital to be Funded | (1.13) | (0.79) | (2.21) | (0.04) | (0.04) | (0.04) | (0.04) | (0.02) | (0.01) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (4.32) |
| 9 | Net Capital Flows | (1.13) | (0.79) | (2.21) | (0.04) | (0.04) | (0.04) | (0.04) | (0.02) | (0.01) | (0.00) | (0.00) | 0.21 | 0.20 | 0.00 | 0.78 | 0.00 | (3.13) |
| 10 | Implied IRR, rounded | -10.4% | | | | | | | | | | | | | | | | |
| | | | 1.06 | 1.18 | 1.32 | 1.47 | 1.64 | 1.83 | 2.04 | 2.28 | 2.54 | 2.84 | 3.17 | 3.53 | 3.94 | 4.40 | 4.91 | 5.48 |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (1.20) | (0.94) | (2.91) | (0.05) | (0.06) | (0.07) | (0.08) | (0.04) | (0.02) | (0.01) | 0.00 | 0.76 | 0.80 | 0.00 | 3.83 | 0.00 |
| | | | | | | | | | | | | | | | | | | |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.16 | 0.00 | 0.24 |
| 13 | Capital to be Funded | (0.23) | (0.16) | (0.45) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | (0.00) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (0.87) |
| 14 | Net Capital Flows | (0.23) | (0.16) | (0.45) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | (0.00) | (0.00) | (0.00) | 0.04 | 0.04 | 0.00 | 0.16 | 0.00 | (0.63) |
| 15 | Implied IRR, rounded | -10.4% | | | | | | | | | | | | | | | | |
| | | | 1.06 | 1.18 | 1.32 | 1.47 | 1.64 | 1.83 | 2.04 | 2.28 | 2.54 | 2.84 | 3.17 | 3.53 | 3.94 | 4.40 | 4.91 | 5.48 |
| 16 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.24) | (0.19) | (0.59) | (0.01) | (0.01) | (0.01) | (0.02) | (0.01) | (0.00) | (0.00) | 0.00 | 0.15 | 0.16 | 0.00 | 0.77 | 0.00 |
| | | | | | | | | | | | | | | | | | | |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | | | | |
| 17 | Projected Return of GP Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.16 | 0.00 | 0.24 |
| 18 | Capital to be Funded | (0.23) | (0.16) | (0.45) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | (0.00) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (0.87) |
| 19 | Projected Catch Up on Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 20 | Carry | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 21 | Net Capital Flows | (0.23) | (0.16) | (0.45) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | (0.00) | (0.00) | (0.00) | 0.04 | 0.04 | 0.00 | 0.16 | 0.00 | (0.63) |
| 22 | Implied IRR, rounded | -10.4% | | | | | | | | | | | | | | | | |
| | | | 1.06 | 1.18 | 1.32 | 1.47 | 1.64 | 1.83 | 2.04 | 2.28 | 2.54 | 2.84 | 3.17 | 3.53 | 3.94 | 4.40 | 4.91 | 5.48 |
| 23 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.24) | (0.19) | (0.59) | (0.01) | (0.01) | (0.01) | (0.02) | (0.01) | (0.00) | (0.00) | 0.00 | 0.15 | 0.16 | 0.00 | 0.77 | 0.00 |
| | | | | | | | | | | | | | | | | | | |
| | **CARLYLE/RIVERSTONE GLOBAL ENERGY AND POWER FUND III, L.P.-FUND IRR** | | | | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | (215.01) | (152.07) | (437.84) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (804.92) |
| 25 | Projected Return on Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43.00 | 40.78 | 0.00 | 156.79 | 0.00 | 240.57 |
| 26 | Management Fees (to Mgt. Co) | (45.17) | (45.17) | (45.17) | (45.17) | (45.17) | (12.39) | 0.00 | (3.00) | (5.50) | (6.75) | (8.00) | (6.93) | (5.11) | (4.35) | (2.18) | 0.00 | (280.06) |
| 27 | Fund Expenses | (12.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (3.75) | (1.88) | (0.94) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (64.06) |
| 28 | Net Capital Flows | (272.68) | (204.74) | (490.51) | (52.67) | (52.67) | (19.89) | (7.50) | (6.75) | (7.38) | (7.69) | (8.00) | 36.07 | 35.67 | (4.35) | 154.61 | 0.00 | (908.46) |
| 29 | Implied IRR, rounded | -13.4% | | | | | | | | | | | | | | | | |
| | | | 1.07 | 1.24 | 1.43 | 1.65 | 1.91 | 2.20 | 2.54 | 2.93 | 3.39 | 3.91 | 4.51 | 5.21 | 6.01 | 6.94 | 8.01 | 9.24 |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (292.96) | (253.90) | (702.15) | (87.03) | (100.45) | (43.79) | (19.06) | (19.80) | (24.97) | (30.05) | (36.09) | 187.82 | 214.41 | (30.20) | 1,238.23 | 0.00 |

EXHIBIT B-7

## DISCOUNTED CASH FLOW ANALYSIS
### CARLYLE/RIVERSTONE ENGERY PARTNERS III, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending October 28, | | Year 1 2006 | Year 2 2007 | Year 3 2008 | Year 4 2009 | Year 5 2010 | Year 6 2011 | Year 7 2012 | Year 8 2013 | Year 9 2014 | Year 10 2015 | Year 11 2016 | Year 12 2017 | Year 13 2018 | Year 14 2019 | Year 15 2020 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | (10.18) | (9.18) | (8.18) | (7.18) | (6.18) | (5.18) | (4.18) | (3.18) | (2.18) | (1.18) | (0.18) | 0.82 | 1.82 | 2.82 | 3.82 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Carlyle/Riverstone Energy Partners III, L.P.)** | Reference | | | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT B-6, Row 19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Full Carry | EXHIBIT B-6, Row 20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 695 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT C-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.
### AS OF DECEMBER 31, 2016

**Key Information**

|  |  |  |  |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P. |
| 2 | Fund Short Name | | RIVERSTONE IV |
| 3 | GP Entity Name | | RIVERSTONE/CARLYLE ENGERY PARTNERS IV, L.P. |
| 4 | GP Entity Short Name | | RIVERSTONE IV GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

|  |  |  |  |
|---|---|---|---|
| 6 | FUND LPs | 99.7% | 5,784.60 |
| 7 | RIVERSTONE IV GP | 0.3% | 15.40 |
| 8 | COINVESTMENT | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **5,800.00** |

**Key Fund Dates**

|  |  |  |  |
|---|---|---|---|
| 10 | Initial Close | | 12/21/2007 |
| 11 | Final Close | | 12/21/2008 |
| 12 | Investment Period End Date | 5 | 12/21/2012 |
| 13 | Fund Term End Date | 10 | 12/21/2017 |
| 14 | Fund Term with Extensions | 2 | 12/21/2019 |
| 15 | Valuation Date | | 12/31/2016 |

**Gross Exit Multiples**

|  |  |  |  |
|---|---|---|---|
| 16 | Fund IRR (net of Mgt. Fees, calculated) | | -3.7% |
| 17 | LP IRR (net of Fees and Expenses, calculated) | | -3.7% |

**Management Fees**

|  |  |  |  |
|---|---|---|---|
| 18 | Investment Period | | 1.43% |
| 19 | Post-Investment Period | | 0.75% |
| 20 | Capital exempt from Management Fees | | 0.3% |
| 21 | Capital exempt from Management Fees in $ | | 15.400 |

**Preferred Rate of Return**

|  |  |  |  |
|---|---|---|---|
| 22 | LP Preferred Return | | 8% |
| 23 | GP Preferred Return | | N/A |
| 24 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

|  |  |  |  |
|---|---|---|---|
| 25 | General Partners (w/ LPs) | | 20% |
| 26 | Limited Partners | | 80% |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT C-2

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.
### AS OF DECEMBER 31, 2016

| Company *(Year End 12/21)* | Initial Cost Basis | Year of Acquisition | *(Fair Value per F/S)* Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|
| Hudson Products | $415,972,000 | 2008 | $167,746,000 | 2017 |
| Trinity River | $395,112,000 | 2009 | $25,686,000 | 2018 |
| Cuadrilla | $105,104,000 | 2010 | $191,277,000 | 2019 |
| Enduro | $453,663,000 | 2009 | $195,636,000 | 2018 |
| Northern Blizzard | $289,382,000 | 2009 | $100,437,000 | 2018 |
| Ridgewood/ILX | $232,803,000 | 2010 | $474,908,000 | 2019 |
| Liberty Oilfield | $137,325,000 | 2009 | $693,250,000 | 2018 |
| HES International | $385,259,000 | 2010 | $331,355,000 | 2019 |
| USA Compression | $432,993,000 | 2010 | $441,611,000 | 2019 |
| Quintana | $238,100,000 | 2010 | $71,430,000 | 2019 |
| Barra Energia | $335,851,000 | 2011 | $201,511,000 | 2020 |
| Total | $3,421,564,000 | | $2,894,847,000 | |
| FUND LPs | $3,412,479,158 | | | |
| RIVERSTONE IV GP | $9,084,842 | | | |
| COINVESTMENT | $0 | | $2,894,847,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $3,421,564,000 | | $3,421,564,000 | Aggregate Investment Outlays |
| | | | 0.85 | Implied Average Exit Multiple |

| | Capital Commitment | | | |
|---|---|---|---|---|
| FUND LPs | $5,784,600,000 | 99.7% | | |
| RIVERSTONE IV GP | $15,400,000 | 0.3% | | |
| COINVESTMENT | $0 | 0.0% | | |
| | $5,800,000,000 | 100% | 685 | |

CONFIDENTIAL

RIVERSTONE_SDTX00156621

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT C-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.
#### AS OF DECEMBER 31, 2016

| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ending December 21, | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Totals |
| | **Summary of Fund Cash Outflows** | | | | | | | | | | | | | | | |
| 1 | Investments made in 2008 + follow-on | 415.97 | - | - | - | - | - | - | - | - | - | - | - | - | - | 415.97 |
| 2 | Investments made in 2009 + follow-on | - | 848.78 | - | - | - | - | - | - | - | - | - | - | - | - | 848.78 |
| 3 | Investments made in 2010 + follow-on | - | - | 1,202.90 | - | - | - | - | - | - | - | - | - | - | - | 1,202.90 |
| 4 | Investments made in 2011 + follow-on | - | - | - | 953.91 | - | - | - | - | - | - | - | - | - | - | 953.91 |
| 5 | Investments made in 2012 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 | Investments made in 2013 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 | Investments made in 2014 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 | Sum of Investments | 415.97 | 848.78 | 1,202.90 | 953.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,421.56 |
| 9 | Aggregate Sum of Investments | 415.97 | 1,264.75 | 2,467.65 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | |
| | **Summary of Fund Cash Inflows** | | | | | | | | | | | | | | | |
| 10 | Investment Distributions from 2008 Investments | - | - | - | - | - | - | - | - | - | 167.75 | - | - | - | - | 167.75 |
| 11 | Investment Distributions from 2009 Investments | - | - | - | - | - | - | - | - | - | - | 221.32 | - | - | - | 221.32 |
| 12 | Investment Distributions from 2010 Investments | - | - | - | - | - | - | - | - | - | - | 793.69 | 704.32 | - | - | 1,498.01 |
| 13 | Investment Distributions from 2011 Investments | - | - | - | - | - | - | - | - | - | - | - | 806.26 | 201.51 | - | 1,007.77 |
| 14 | Investment Distributions from 2012 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 | Investment Distributions from 2013 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 | Investment Distributions from 2014 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.75 | 1,015.01 | 1,510.58 | 201.51 | 0.00 | 2,894.85 |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | | | |
| 18 | Cumulative Capital Contributions - Beginning | 0.00 | 415.97 | 1,264.75 | 2,467.65 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,005.59 | 1,730.11 | 335.85 | 0.00 | |
| 19 | Plus: New Investments | 415.97 | 848.78 | 1,202.90 | 953.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (415.97) | (1,275.48) | (1,394.26) | (335.85) | 0.00 | (3,421.56) |
| 21 | Net Contributions that Remain Invested - End | 415.97 | 1,264.75 | 2,467.65 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,421.56 | 3,005.59 | 1,730.11 | 335.85 | 0.00 | 0.00 | |
| 22 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (15.40) | (15.40) | (15.40) | (15.40) | (15.40) | (9.08) | (9.08) | (9.08) | (9.08) | (7.98) | (4.59) | (0.89) | 0.00 | 0.00 | |
| 23 | Net Capital/Contributions for Mgmt. Fee Calculation | 5,784.60 | 5,784.60 | 5,784.60 | 5,784.60 | 5,784.60 | 3,412.48 | 3,412.48 | 3,412.48 | 3,412.48 | 2,997.61 | 1,725.52 | 334.96 | 0.00 | 0.00 | |
| | **Management Fees** | | | | | | | | | | | | | | | |
| 24 | Management Fees Due to Investment Manager | 82.78 | 82.78 | 82.78 | 82.78 | 82.78 | 34.49 | 25.63 | 25.59 | 25.59 | 24.04 | 17.71 | 7.73 | 1.26 | 0.00 | 575.93 |
| 25 | Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | (78.75) |
| 26 | Net Management Fees to be Called | 72.78 | 72.78 | 72.78 | 72.78 | 72.78 | 24.49 | 15.63 | 20.59 | 23.09 | 22.79 | 17.71 | 7.73 | 1.26 | 0.00 | 497.18 |
| | **Capital Calls** | | | | | | | | | | | | | | | |
| 27 | Investment Needs | 415.97 | 848.78 | 1,202.90 | 953.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,421.56 |
| 28 | Management Fees | 72.78 | 72.78 | 72.78 | 72.78 | 72.78 | 24.49 | 15.63 | 20.59 | 23.09 | 22.79 | 17.71 | 7.73 | 1.26 | 0.00 | 497.18 |
| 29 | Fund Expenses (2) | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 64.06 |
| 30 | Sum of Capital Calls | 501.25 | 929.05 | 1,283.18 | 1,034.19 | 80.28 | 31.99 | 23.13 | 24.34 | 24.97 | 23.73 | 17.71 | 7.73 | 1.26 | 0.00 | 3,982.81 |
| 31 | Aggregate of Capital Called | 501.25 | 1,430.31 | 2,713.49 | 3,747.68 | 3,827.96 | 3,859.95 | 3,883.08 | 3,907.42 | 3,932.39 | 3,956.12 | 3,973.83 | 3,981.55 | 3,982.81 | 3,982.81 | |

69%
0.73

(1) Management fee offset data provided by Management.  See Exhibit C-4 for details.
(2) Fund Expense data provided by Management.  See Exhibit C-4 for details.

RIVERSTONE_SDTX00156622

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT C-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
**RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.**
**AS OF DECEMBER 31, 2016**

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2008 | Year 2 2009 | Year 3 2010 | Year 4 2011 | Year 5 2012 | Year 6 2013 | Year 7 2014 | Year 8 2015 | Year 9 2016 | Year 10 2017 | Year 11 2018 | Year 12 2019 | Year 13 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | |
| 2  Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | |
| 3     Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | (78.75) |
| **4  Net Management Fee Offsets (Line 6 + Line 3)** | | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(5.00)** | **(2.50)** | **(1.25)** | **0.00** | **0.00** | **0.00** | **(78.75)** |

| **Estimated Portfolio Expenses** | Year 1 2008 | Year 2 2009 | Year 3 2010 | Year 4 2011 | Year 5 2012 | Year 6 2013 | Year 7 2014 | Year 8 2015 | Year 9 2016 | Year 10 2017 | Year 11 2018 | Year 12 2019 | Year 13 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5  Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6  Annual Fund Operating Expenses | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 59.06 |
| **7  Capital Calls for Expenses** | **12.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **3.75** | **1.88** | **0.94** | **0.00** | **0.00** | **0.00** | **64.06** |

* Per Management.

RIVERSTONE_SDTX00156623

**EXHIBIT C-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
## RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.
## AS OF DECEMBER 31, 2016

| Fund Year | | Investment Period | | | | | Harvest Period | | | | | | | |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Year Ending December 21, | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | | |
| LP Invested Capital Subject to Preferred Return | 0.00 | 540.12 | 1584.26 | 3093.36 | 4455.00 | 4898.09 | 5324.46 | 5775.37 | 6263.68 | 6791.74 | 7180.01 | 6680.24 | 5595.91 | |
| 1  Beginning Balance | 0.00 | 540.12 | 1584.26 | 3093.36 | 4455.00 | 4898.09 | 5324.46 | 5775.37 | 6263.68 | 6791.74 | 7180.01 | 6680.24 | 5595.91 | |
| 2  Plus:  Contributed Capital in Current Period from LP's | 500.11 | 926.78 | 1279.97 | 1031.64 | 80.26 | 31.97 | 23.11 | 24.33 | 24.96 | 23.72 | 17.71 | 7.73 | 1.26 | 3,973.56 |
| 2a  *Investment Needs* | 414.87 | 846.52 | 1199.71 | 951.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,412.48 |
| 2b  *Management Fees* | 72.78 | 72.78 | 72.78 | 72.78 | 72.78 | 24.49 | 15.63 | 20.59 | 23.09 | 22.79 | 17.71 | 7.73 | 1.26 | 497.18 |
| 2c  *Fund Expenses* | 12.47 | 7.48 | 7.48 | 7.48 | 7.48 | 7.48 | 7.48 | 3.74 | 1.87 | 0.94 | 0.00 | 0.00 | 0.00 | 63.89 |
| 3  Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (167.30) | (1012.31) | (1506.57) | (200.98) | (2,887.16) |
| 4  Equals: End of Period Contributed Capital, prior to preferred return accrual | 500.11 | 1466.90 | 2864.23 | 4125.00 | 4535.26 | 4930.05 | 5347.57 | 5799.71 | 6288.65 | 6648.16 | 6185.41 | 5181.40 | 5396.19 | |
| 5  Plus:  Current Period Preferred Return | 40.01 | 117.35 | 229.14 | 330.00 | 362.82 | 394.40 | 427.81 | 463.98 | 503.09 | 531.85 | 494.83 | 414.51 | 431.70 | |
| 6  End of Period Net LP Contributed Capital | 540.12 | 1584.26 | 3093.36 | 4455.00 | 4898.09 | 5324.46 | 5775.37 | 6263.68 | 6791.74 | 7180.01 | 6680.24 | 5595.91 | 5827.89 | |
| 7  Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8  Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9  End of Period Net LP Contributed Capital including previous deficient returns | 540.12 | 1584.26 | 3093.36 | 4455.00 | 4898.09 | 5324.46 | 5775.37 | 6263.68 | 6791.74 | 7180.01 | 6680.24 | 5595.91 | 5827.89 | |
| | | | | | | | | | | | | | | |
| 10  **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.75 | 1015.01 | 1510.58 | 201.51 | 2,894.85 |
| 11  Less:  GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 2.70 | 4.01 | 0.54 | 7.69 |
| 12  Less:  Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13  **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.30 | 1012.31 | 1506.57 | 200.98 | 2,887.16 |
| | | | | | | | | | | | | | | |
| **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | | |
| 14  Aggregate Contributed Capital and Preferred Return Due | 500.11 | 1466.90 | 2864.23 | 4125.00 | 4535.26 | 4930.05 | 5347.57 | 5799.71 | 6288.65 | 6815.46 | 7197.72 | 6687.97 | 5597.17 | Total |
| 15  Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.30 | 1012.31 | 1506.57 | 200.98 | 2,887.16 |
| 16  Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | | |
| 17  GP Catch-up Distribution Payable | 13.34 | 52.45 | 128.83 | 238.83 | 359.77 | 491.24 | 633.84 | 788.50 | 956.20 | 1133.48 | 1298.43 | 1436.60 | 1580.50 | |
| 18  GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19  Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | |
| 20  Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | | |
| 21  20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 22  80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total LP Capital Through Carry Waterfall   2,887.16

**EXHIBIT C-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.
### AS OF DECEMBER 31, 2016

| | Year Ending December 21, | | 1.00 2008 | 2.00 2009 | 3.00 2010 | 4.00 2011 | 5.00 2012 | 6.00 2013 | 7.00 2014 | 8.00 2015 | 9.00 2016 | 10.00 2017 | 11.00 2018 | 12.00 2019 | 13.00 2020 | 14.00 2021 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR** | | | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.30 | 1,012.31 | 1,506.57 | 200.98 | 0.00 | 2,887.16 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3 | Capital to be Funded | | (500.11) | (926.78) | (1,279.97) | (1,031.64) | (80.26) | (31.97) | (23.11) | (24.33) | (24.96) | (23.72) | (17.71) | (7.73) | (1.26) | 0.00 | (3,973.56) |
| 4 | Net Capital Flows | | (500.11) | (926.78) | (1,279.97) | (1,031.64) | (80.26) | (31.97) | (23.11) | (24.33) | (24.96) | 143.58 | 994.60 | 1,498.84 | 199.72 | 0.00 | (1,086.40) |
| 5 | Implied IRR, rounded | -3.7% | | | | | | | | | | | | | | | |
| | | | 1.02 | 1.06 | 1.10 | 1.14 | 1.18 | 1.23 | 1.28 | 1.32 | 1.37 | 1.43 | 1.48 | 1.54 | 1.60 | 1.66 | |
| 6 | Check Sum: Present Value of Net Capital Flows | (0.00) | (509.56) | (980.28) | (1,405.47) | (1,175.97) | (94.98) | (39.27) | (29.47) | (32.22) | (34.31) | 204.85 | 1,473.18 | 2,304.68 | 318.80 | 0.00 | (0.00) |
| | | | | | | | | | | | | | | | | | |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 2.70 | 4.01 | 0.54 | 0.00 | 7.69 |
| 8 | Capital to be Funded | | (1.14) | (2.27) | (3.21) | (2.55) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | (9.25) |
| 9 | Net Capital Flows | | (1.14) | (2.27) | (3.21) | (2.55) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | 0.44 | 2.70 | 4.01 | 0.54 | 0.00 | (1.57) |
| 10 | Implied IRR, rounded | -2.1% | | | | | | | | | | | | | | | |
| | | | 1.01 | 1.03 | 1.05 | 1.08 | 1.10 | 1.12 | 1.15 | 1.17 | 1.20 | 1.22 | 1.25 | 1.28 | 1.30 | 1.33 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (1.15) | (2.35) | (3.39) | (2.75) | (0.02) | (0.02) | (0.02) | (0.01) | (0.01) | 0.54 | 3.37 | 5.12 | 0.70 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | | | |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 2.70 | 4.01 | 0.54 | 0.00 | 7.69 |
| 13 | Capital to be Funded | | (1.14) | (2.27) | (3.21) | (2.55) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | (9.25) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 16 | Net Capital Flows | | (1.14) | (2.27) | (3.21) | (2.55) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | 0.44 | 2.70 | 4.01 | 0.54 | 0.00 | (1.57) |
| 17 | Implied IRR, rounded | -2.1% | | | | | | | | | | | | | | | |
| | | | 1.01 | 1.03 | 1.05 | 1.08 | 1.10 | 1.12 | 1.15 | 1.17 | 1.20 | 1.22 | 1.25 | 1.28 | 1.30 | 1.33 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (1.15) | (2.35) | (3.39) | (2.75) | (0.02) | (0.02) | (0.02) | (0.01) | (0.01) | 0.54 | 3.37 | 5.12 | 0.70 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | | | |
| | **RIVERSTONE/CARLYLE GLOBAL ENERGY AND POWER FUND IV, L.P.- FUND IRR** | | | | | | | | | | | | | | | | |
| 19 | Projected Investments to be made | | (415.97) | (848.78) | (1,202.90) | (953.91) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (3,421.56) |
| 20 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167.75 | 1,015.01 | 1,510.58 | 201.51 | 0.00 | 2,894.85 |
| 21 | Management Fees (to Mgt. Co) | | (72.78) | (72.78) | (72.78) | (72.78) | (72.78) | (24.49) | (15.63) | (20.59) | (23.09) | (22.79) | (17.71) | (7.73) | (1.26) | 0.00 | (497.18) |
| 22 | Fund Expenses | | (12.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (3.75) | (1.88) | (0.94) | 0.00 | 0.00 | 0.00 | 0.00 | (64.06) |
| 23 | Net Capital Flows | | (501.25) | (929.05) | (1,283.18) | (1,034.19) | (80.28) | (31.99) | (23.13) | (24.34) | (24.97) | 144.02 | 997.30 | 1,502.85 | 200.25 | 0.00 | (1,087.96) |
| 24 | Implied IRR, rounded | -3.7% | | | | | | | | | | | | | | | |
| | | | 1.02 | 1.06 | 1.10 | 1.14 | 1.18 | 1.23 | 1.27 | 1.32 | 1.37 | 1.43 | 1.48 | 1.54 | 1.60 | 1.66 | |
| 25 | Check Sum: Present Value of Net Capital Flows | 0.00 | (510.71) | (982.62) | (1,408.85) | (1,178.71) | (94.98) | (39.29) | (29.49) | (32.22) | (34.30) | 205.41 | 1,476.53 | 2,309.74 | 319.49 | 0.00 | 0.00 |

Confidential
Empire Valuation Consultants

EXHIBIT C-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE/CARLYLE ENGERY PARTNERS IV, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending December 21, | Reference | Year 1 2008 | Year 2 2009 | Year 3 2010 | Year 4 2011 | Year 5 2012 | Year 6 2013 | Year 7 2014 | Year 8 2015 | Year 9 2016 | Year 10 2017 | Year 11 2018 | Year 12 2019 | Year 13 2020 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | (8.03) | (7.03) | (6.03) | (5.03) | (4.03) | (3.03) | (2.03) | (1.03) | (0.03) | 0.97 | 1.97 | 2.97 | 3.97 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone/Carlyle Energy Partners IV, L.P.)** | | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT C-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Full Carry | EXHIBIT C-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

RIVERSTONE_SDTX00156626

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

| # | Key Information | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P. |
| 2 | Fund Short Name | | RIVERSTONE V |
| 3 | GP Entity Name | | RIVERSTONE ENGERY PARTNERS V, L.P. |
| 4 | GP Entity Short Name | | RIVERSTONE V GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |
| | **Committed Capital by Class of Partner** | | |
| 6 | FUND LPs | 97.2% | 7,486.40 |
| 7 | RIVERSTONE V GP | 0.0% | 2.40 |
| 8 | COINVESTMENT | 2.7% | 211.20 |
| 9 | **Total Capital Commitments ($ in millions)** | | **7,700.00** |
| | **Key Fund Dates** | | |
| 10 | Initial Close | | 2/17/2012 |
| 11 | Final Close | | 2/17/2013 |
| 12 | Investment Period End Date | 3 | 2/17/2015 |
| 13 | Fund Term End Date | 10 | 2/17/2022 |
| 14 | Fund Term with Extensions | 2 | 2/17/2024 |
| 15 | Valuation Date | | 12/31/2016 |
| | **Gross Exit Multiples** | | |
| 16 | Fund IRR (net of Mgt. Fees, calculated) | | 2.4% |
| 17 | LP IRR (net of Fees and Expenses, calculated) | | 2.4% |
| | **Management Fees** | | |
| 18 | Investment Period | | 1.34% |
| 19 | Post-Investment Period | | 1.00% |
| 20 | Capital exempt from Management Fees | | 2.8% |
| 21 | Capital exempt from Management Fees in $ | | 213.600 |
| | **Preferred Rate of Return** | | |
| 22 | LP Preferred Return | | 8% |
| 23 | GP Preferred Return | | N/A |
| 24 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |
| | **Carried Interest** | | |
| 25 | General Partners (w/ LPs) | | 20% |
| 26 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156627

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-2

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

| Company | Initial Cost Basis | Year of Acquisition | (Fair Value per F/S) Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|
| *(Year End 2/17)* | | | | |
| Abaco | $185,679,000 | 2015 | $129,975,000 | 2019 |
| CanEra Resources III | $1,389,000 | 2013 | $1,389,000 | 2017 |
| Carrier Energy Partners | $153,388,000 | 2014 | $506,776,000 | 2018 |
| Castex Energy 2005 | $95,936,000 | 2013 | $23,964,000 | 2017 |
| Castex Energy 2014 | $72,365,000 | 2014 | $144,730,000 | 2020 |
| CIOC | $327,523,000 | 2014 | $1,510,090,000 | 2020 |
| CNOR LP | $160,705,000 | 2014 | $281,255,750 | 2018 |
| Eagle Energy II | $111,713,000 | 2013 | $167,989,900 | 2017 |
| EP Energy | $448,740,000 | 2014 | $204,863,000 | 2018 |
| Fieldwood Energy LLC | $656,465,000 | 2015 | $820,591,250 | 2019 |
| Kerogen Exploration | $272,300,000 | 2013 | $54,460,000 | 2017 |
| Liberty Resources | $240,797,000 | 2014 | $421,394,750 | 2018 |
| Meritage Midstream Services | $384,324,000 | 2014 | $768,648,000 | 2020 |
| Origio Exploration | $16,508,000 | 2014 | $20,635,000 | 2021 |
| Proserv | $516,793,000 | 2015 | $84,532,000 | 2019 |
| Rice Energy (RJS) | $143,219,000 | 2014 | $119,911,000 | 2020 |
| Ridgebury Tankers Holdings | $226,182,000 | 2014 | $311,248,000 | 2018 |
| Ridgewood Energy II | $537,499,000 | 2015 | $644,999,000 | 2019 |
| Riverstone Credit Opps | $34,154,000 | 2013 | $83,457,000 | 2017 |
| Rock Oil | $0 | 2012 | $47,531,000 | 2016 |
| Sierra Oil & Gas | $2,702,000 | 2015 | $5,404,000 | 2019 |
| Talen Energy EP | $105,000,000 | 2014 | $299,225,000 | 2018 |
| Trailstone | $322,858,000 | 2014 | $242,143,000 | 2020 |
| Trailstone (Cayman) | $199,701,000 | 2014 | $149,776,000 | 2020 |
| UTEX Industries | $194,870,000 | 2014 | $41,586,000 | 2018 |
| Venado | $104,015,000 | 2013 | $52,007,000 | 2017 |
| Talos Energy | $250,038,000 | 2014 | $338,935,000 | 2018 |
| Trail Ridge | $92,045,000 | 2014 | $92,045,000 | 2018 |
| Total | $5,856,908,000 | | $7,169,130,250 | |

| | | |
|---|---|---|
| FUND LPs | $5,694,435,851 | |
| RIVERSTONE V GP | $1,825,530 | |
| COINVESTMENT | $160,646,619 | |
| Total Investment Cost Basis | $5,856,908,000 | |

| | | |
|---|---|---|
| $7,169,130,250 | Aggregate Investment Proceeds |
| $5,856,908,000 | Aggregate Investment Outlays |
| 1.22 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $7,486,400,000 | 97.2% |
| RIVERSTONE V GP | $2,400,000 | 0.0% |
| COINVESTMENT | $211,200,000 | 2.7% |
| | $7,700,000,000 | 100% |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 704 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-3

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| | Year Ending February 17, | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Summary of Fund Cash Outflows** | | | | | | | | | | | |
| 1 | Investments made in 2013 + follow-on | 619.51 | - | - | - | - | - | - | - | - | - | 619.51 |
| 2 | Investments made in 2014 + follow-on | - | 3,338.26 | - | - | - | - | - | - | - | - | 3,338.26 |
| 3 | Investments made in 2015 + follow-on | - | - | 1,899.14 | - | - | - | - | - | - | - | 1,899.14 |
| 4 | Investments made in 2016 + follow-on | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 5 | Investments made in 2017 + follow-on | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 | Investments made in 2018 + follow-on | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 | Investments made in 2019 + follow-on | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 | Sum of Investments | 619.51 | 3,338.26 | 1,899.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,856.91 |
| 9 | Aggregate Sum of Investments | 619.51 | 3,957.77 | 5,856.91 | 5,856.91 | 5,856.91 | 5,856.91 | 5,856.91 | 5,856.91 | 5,856.91 | 5,856.91 | |
| | | | | | | | | | | | | |
| | **Summary of Fund Cash Inflows** | | | | | | | | | | | |
| 10 | Investment Distributions from 2013 Investments | - | - | - | - | 382.87 | - | - | - | - | - | 382.87 |
| 11 | Investment Distributions from 2014 Investments | - | - | - | - | - | 2,297.31 | - | 2,735.30 | 20.64 | - | 5,053.24 |
| 12 | Investment Distributions from 2015 Investments | - | - | - | - | - | - | 1,685.49 | - | - | - | 1,685.49 |
| 13 | Investment Distributions from 2016 Investments | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 14 | Investment Distributions from 2017 Investments | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 | Investment Distributions from 2018 Investments | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 | Investment Distributions from 2019 Investments | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 382.87 | 2,297.31 | 1,685.49 | 2,735.30 | 20.64 | 0.00 | 7,121.60 |
| | | | | | | | | | | | | |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | | | | |
| 18 | Cumulative Capital Contributions - Beginning | 0.00 | 619.51 | 3,957.77 | 5,856.91 | 5,856.91 | 5,237.40 | 3,365.64 | 1,466.50 | 16.51 | 0.00 | |
| 19 | Plus: New Investments | 619.51 | 3,338.26 | 1,899.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (619.51) | (1,871.77) | (1,899.14) | (1,449.99) | (16.51) | 0.00 | (5,856.91) |
| 21 | Net Contributions that Remain Invested - End | 619.51 | 3,957.77 | 5,856.91 | 5,856.91 | 5,237.40 | 3,365.64 | 1,466.50 | 16.51 | 0.00 | 0.00 | |
| 22 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (213.60) | (213.60) | (213.60) | (162.47) | (145.29) | (93.36) | (40.68) | (0.46) | 0.00 | 0.00 | |
| 23 | Net Capital/Contributions for Mgmt. Fee Calculation | 7,486.40 | 7,486.40 | 7,486.40 | 5,694.44 | 5,092.11 | 3,272.27 | 1,425.82 | 16.05 | 0.00 | 0.00 | |
| | | | | | | | | | | | | |
| | **Management Fees** | | | | | | | | | | | |
| 24 | Management Fees Due to Investment Manager | 100.00 | 100.00 | 100.00 | 57.76 | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 484.29 |
| 25 | Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (40.00) |
| 26 | Net Management Fees to be Called | 90.00 | 90.00 | 90.00 | 47.76 | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 444.29 |
| | | | | | | | | | | | | |
| | **Capital Calls** | | | | | | | | | | | |
| 27 | Investment Needs | 619.51 | 3,338.26 | 1,899.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,856.91 |
| 28 | Management Fees | 90.00 | 90.00 | 90.00 | 47.76 | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 444.29 |
| 29 | Fund Expenses (2) | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 64.06 |
| 30 | Sum of Capital Calls | 722.01 | 3,435.76 | 1,996.64 | 55.26 | 61.43 | 49.32 | 30.99 | 10.96 | 1.96 | 0.94 | 6,365.26 |
| 31 | Aggregate of Capital Called | 722.01 | 4,157.77 | 6,154.41 | 6,209.66 | 6,271.10 | 6,320.42 | 6,351.41 | 6,362.37 | 6,364.32 | 6,365.26 | |

Percentage of Committed Capital Called   83%
Net Exit Multiple   1.12

(1) Management fee offset data provided by Management. See Exhibit D-4 for details.
(2) Fund Expense data provided by Management. See Exhibit D-4 for details.

EXHIBIT D-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2013 | Year 2 2014 | Year 3 2015 | Year 4 2016 | Year 5 2017 | Year 6 2018 | Year 7 2019 | Year 8 2020 | Year 9 2021 | Year 10 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (40.00) |
| **4 Net Management Fee Offsets (Line 6 + Line 3)** | | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | (40.00) |

| Estimated Portfolio Expenses | Year 1 2013 | Year 2 2014 | Year 3 2015 | Year 4 2016 | Year 5 2017 | Year 6 2018 | Year 7 2019 | Year 8 2020 | Year 9 2021 | Year 10 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6 Annual Fund Operating Expenses | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 59.06 |
| **7 Capital Calls for Expenses** | **12.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **3.75** | **1.88** | **0.94** | 64.06 |

* Per Management.

EXHIBIT D-5

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
## RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

| | | Investment Period | | | Harvest Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| Year Ending February 17, | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
| | **Accrual of Contributed Capital** | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 760.83 | 4432.09 | 6885.90 | 7496.22 | 7760.02 | 6021.60 | 4766.74 | 2287.63 | 2451.02 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 704.47 | 3342.95 | 1943.75 | 55.05 | 61.22 | 49.11 | 30.78 | 10.86 | 1.90 | 0.91 | 6,201.01 |
| 2a | *Investment Needs* | *602.32* | *3245.66* | *1846.46* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *5,694.44* |
| 2b | *Management Fees* | *90.00* | *90.00* | *90.00* | *47.76* | *53.93* | *41.82* | *23.49* | *7.21* | *0.08* | *0.00* | *444.29* |
| 2c | *Fund Expenses* | *12.15* | *7.29* | *7.29* | *7.29* | *7.29* | *7.29* | *7.29* | *3.65* | *1.82* | *0.91* | *62.29* |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (372.25) | (2233.58) | (1638.74) | (2659.42) | (20.06) | 0.00 | (6,924.04) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 704.47 | 4103.78 | 6375.83 | 6940.95 | 7185.20 | 5575.56 | 4413.65 | 2118.17 | 2269.47 | 2451.94 | |
| 5 | Plus: Current Period Preferred Return | 56.36 | 328.30 | 510.07 | 555.28 | 574.82 | 446.04 | 353.09 | 169.45 | 181.56 | 196.15 | |
| 6 | End of Period Net LP Contributed Capital | 760.83 | 4432.09 | 6885.90 | 7496.22 | 7760.02 | 6021.60 | 4766.74 | 2287.63 | 2451.02 | 2648.09 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 760.83 | 4432.09 | 6885.90 | 7496.22 | 7760.02 | 6021.60 | 4766.74 | 2287.63 | 2451.02 | 2648.09 | |
| | | | | | | | | | | | | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 382.87 | 2297.31 | 1685.49 | 2735.30 | 20.64 | 0.00 | 7,121.60 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.72 | 0.53 | 0.85 | 0.01 | 0.00 | 2.22 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 63.01 | 46.23 | 75.03 | 0.57 | 0.00 | 195.34 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 372.25 | 2233.58 | 1638.74 | 2659.42 | 20.06 | 0.00 | 6,924.04 |
| | | | | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 704.47 | 4103.78 | 6375.83 | 6940.95 | 7557.45 | 7809.13 | 6052.38 | 4777.59 | 2289.53 | 2451.94 | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 372.25 | 2233.58 | 1638.74 | 2659.42 | 20.06 | 0.00 | 6,924.04 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 18.79 | 128.22 | 298.24 | 483.33 | 674.94 | 823.62 | 941.32 | 997.80 | 1058.32 | 1123.71 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total LP Capital Through Carry Waterfall    6,924.04

EXHIBIT D-6

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.
### AS OF DECEMBER 31, 2016

| | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ending February 17, | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Totals |
| | **Aggregate LP IRR** | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 372.25 | 2,233.58 | 1,638.74 | 2,659.42 | 20.06 | 0.00 | 0.00 | 6,924.04 |
| 2 | Projected Pro Rata Share of Residual | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3 | Capital to be Funded | (704.47) | (3,342.95) | (1,943.75) | (55.05) | (61.22) | (49.11) | (30.78) | (10.86) | (1.90) | (0.91) | 0.00 | (6,201.01) |
| 4 | Net Capital Flows | (704.47) | (3,342.95) | (1,943.75) | (55.05) | 311.02 | 2,184.46 | 1,607.95 | 2,648.57 | 18.16 | (0.91) | 0.00 | 723.03 |
| 5 | Implied IRR, rounded | 2.4% | | | | | | | | | | | |
| | | 0.99 | 0.96 | 0.94 | 0.92 | 0.90 | 0.88 | 0.86 | 0.84 | 0.82 | 0.80 | 0.78 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (696.15) | (3,225.87) | (1,831.62) | (50.65) | 279.47 | 1,916.79 | 1,377.78 | 2,216.14 | 14.84 | (0.73) | 0.00 | 0.00 |
| | **FUND GP AFFILIATES IRR** | | | | | | | | | | | | |
| 7 | Projected Return of Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 63.01 | 46.23 | 75.03 | 0.57 | 0.00 | 0.00 | 195.34 |
| 8 | Capital to be Funded | (17.34) | (91.77) | (52.30) | (0.21) | (0.21) | (0.21) | (0.21) | (0.10) | (0.05) | (0.03) | 0.00 | (162.40) |
| 9 | Net Capital Flows | (17.34) | (91.77) | (52.30) | (0.21) | 10.30 | 62.81 | 46.02 | 74.92 | 0.51 | (0.03) | 0.00 | 32.93 |
| 10 | Implied IRR, rounded | 4.0% | | | | | | | | | | | |
| | | 0.98 | 0.94 | 0.91 | 0.87 | 0.84 | 0.81 | 0.78 | 0.75 | 0.72 | 0.69 | 0.66 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (17.00) | (86.53) | (47.42) | (0.18) | 8.63 | 50.63 | 35.67 | 55.84 | 0.37 | (0.02) | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.72 | 0.53 | 0.85 | 0.01 | 0.00 | 0.00 | 2.22 |
| 13 | Capital to be Funded | (0.20) | (1.04) | (0.59) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | 0.00 | (1.85) |
| 14 | Net Capital Flows | (0.20) | (1.04) | (0.59) | (0.00) | 0.12 | 0.71 | 0.52 | 0.85 | 0.01 | (0.00) | 0.00 | 0.37 |
| 15 | Implied IRR, rounded | 4.0% | | | | | | | | | | | |
| | | 0.98 | 0.94 | 0.91 | 0.87 | 0.84 | 0.81 | 0.78 | 0.75 | 0.72 | 0.69 | 0.66 | |
| 16 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.19) | (0.98) | (0.54) | (0.00) | 0.10 | 0.58 | 0.41 | 0.63 | 0.00 | (0.00) | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | |
| 17 | Projected Return of GP Capital & ROI | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.72 | 0.53 | 0.85 | 0.01 | 0.00 | 0.00 | 2.22 |
| 18 | Capital to be Funded | (0.20) | (1.04) | (0.59) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) | 0.00 | (1.85) |
| 19 | Projected Catch Up on Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 20 | Carry | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 21 | Net Capital Flows | (0.20) | (1.04) | (0.59) | (0.00) | 0.12 | 0.71 | 0.52 | 0.85 | 0.01 | (0.00) | 0.00 | 0.37 |
| 22 | Implied IRR, rounded | 4.0% | | | | | | | | | | | |
| | | 0.98 | 0.94 | 0.91 | 0.87 | 0.84 | 0.81 | 0.78 | 0.75 | 0.72 | 0.69 | 0.66 | |
| 23 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.19) | (0.98) | (0.54) | (0.00) | 0.10 | 0.58 | 0.41 | 0.63 | 0.00 | (0.00) | 0.00 |
| | **RIVERSTONE GLOBAL ENERGY AND POWER FUND V, L.P.-FUND IRR** | | | | | | | | | | | | |
| 24 | Projected Investments to be made | (619.51) | (3,338.26) | (1,899.14) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | (5,856.91) |
| 25 | Projected Return on Investments | 0.00 | 0.00 | 0.00 | 0.00 | 382.87 | 2,297.31 | 1,685.49 | 2,735.30 | 20.64 | 0.00 | 0.00 | 7,121.60 |
| 26 | Management Fees (to Mgt. Co) | (90.00) | (90.00) | (90.00) | (47.76) | (53.93) | (41.82) | (23.49) | (7.21) | (0.08) | 0.00 | 0.00 | (444.29) |
| 27 | Fund Expenses | (12.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (3.75) | (1.88) | (0.94) | 0.00 | (64.06) |
| 28 | Net Capital Flows | (722.01) | (3,435.76) | (1,996.64) | (55.26) | 321.43 | 2,247.98 | 1,654.50 | 2,724.34 | 18.68 | (0.94) | 0.00 | 756.34 |
| 29 | Implied IRR, rounded | 2.4% | | | | | | | | | | | |
| | | 0.99 | 0.96 | 0.94 | 0.92 | 0.90 | 0.88 | 0.85 | 0.83 | 0.81 | 0.79 | 0.78 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (713.33) | (3,313.35) | (1,879.49) | (50.77) | 288.29 | 1,967.99 | 1,413.81 | 2,272.39 | 15.21 | (0.75) | 0.00 | 0.00 |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE ENGERY PARTNERS V, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending February 17, | Reference | Year 1 2013 | Year 2 2014 | Year 3 2015 | Year 4 2016 | Year 5 2017 | Year 6 2018 | Year 7 2019 | Year 8 2020 | Year 9 2021 | Year 10 2022 | Year 11 2023 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | (3.87) | (2.87) | (1.87) | (0.87) | 0.13 | 1.13 | 2.13 | 3.13 | 4.13 | 5.13 | 6.13 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Energy Partners V, L.P.)** | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT D-6, Row 19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Full Carry | EXHIBIT D-6, Row 20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

RIVERSTONE_SDTX00156633

**EXHIBIT E-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
### AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P. |
| 2 | Fund Short Name | | RIVERSTONE VI |
| 3 | GP Entity Name | | RIVERSTONE ENGERY PARTNERS VI, L.P. |
| 4 | GP Entity Short Name | | RIVERSTONE GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs (Including Non-ECI) | 96.9% | 4,771.20 |
| 7 | RIVERSTONE GP (de minimus) | 0.0% | 2.40 |
| 8 | RIVERSTONE ENERGY COINVESTMENT VI, LP | 3.0% | 148.40 |
| 9 | **Total Capital Commitments ($ in millions)** | | **4,922.00** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 2/23/2015 |
| 11 | Final Close | | 2/23/2016 |
| 12 | Investment Period End Date | 6 | 2/23/2021 |
| 13 | Fund Term End Date | 10 | 2/23/2025 |
| 14 | Fund Term with Extensions | 2 | 2/23/2027 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **4,872.522** |
| 17 | LP Capital Called | | 4,735.540 |
| 18 | GP Capital Called (cash only) | | 2.180 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 134.802 |
| 20 | Percentage of Capital Called | | 99% |

**Investment Time Frame**

| | | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 3 |
| 22 | Investment to Harvest Time in years | | 4 |

**Gross Exit Multiples**

| | | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.25 |
| 22 | For Follow-on Investments | | 2.00 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 21.5% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 18.0% |

**Management Fees**

| | | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 3.1% |
| 28 | Capital exempt from Management Fees in $ | | 150.800 |

**Preferred Rate of Return**

| | | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

| | | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156634

EXHIBIT E-2

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
## AS OF DECEMBER 31, 2016

*(Year End 2/23)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| **TBD - Unidentified Investment(s) in fiscal 2015** | $0 | 2015 | $0 | 2018 | $0 | 2019 |
| **TBD - Unidentified Investment(s) in fiscal 2016** | $1,080,000,000 | 2016 | $270,000,000 | 2019 | $2,970,000,000 | 2020 |
| **TBD - Unidentified Investment(s) in fiscal 2017** | $1,080,000,000 | 2017 | $270,000,000 | 2020 | $2,970,000,000 | 2021 |
| **TBD - Unidentified Investment(s) in fiscal 2018** | $720,000,000 | 2018 | $180,000,000 | 2021 | $1,980,000,000 | 2022 |
| **TBD - Unidentified Investment(s) in fiscal 2018** | $640,000,000 | 2018 | $160,000,000 | 2021 | $1,760,000,000 | 2022 |
| Total | $3,520,000,000 | | $880,000,000 | | $9,680,000,000 | |
| FUND LPs (Including Non-ECI) | $3,412,154,409 | | $853,038,602 | | | |
| RIVERSTONE GP (de minimus) | $1,716,375 | | $429,094 | | | |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $106,129,216 | | $26,532,304 | | $9,680,000,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $4,400,000,000 | | | | $4,400,000,000 | Aggregate Investment Outlays |
| | | | | | 2.20 | Implied Average Exit Multiple |
| | Capital Commitment | | | | | |
| FUND LPs (Including Non-ECI) | $4,771,200,000 | 96.9% | | | | |
| RIVERSTONE GP (de minimus) | $2,400,000 | 0.0% | | | | |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $148,400,000 | 3.0% | | | | |
| | $4,922,000,000 | 100% | | | | |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT E-1**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
### AS OF DECEMBER 31, 2016

| | | | | Investment Period | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending February 23 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Totals |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1 Investments made in 2015 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 2 Investments made in 2016 + follow-on | - | 1,080.00 | - | - | 270.00 | - | - | - | - | - | - | - | 1,350.00 |
| 3 Investments made in 2017 + follow-on | - | - | 1,080.00 | - | - | 270.00 | - | - | - | - | - | - | 1,350.00 |
| 4 Investments made in 2018 + follow-on | - | - | - | 1,360.00 | - | - | 340.00 | - | - | - | - | - | 1,700.00 |
| 5 Investments made in 2019 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 Investments made in 2020 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 Investments made in 2021 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 Sum of Investments | 0.00 | 1,080.00 | 1,080.00 | 1,360.00 | 270.00 | 270.00 | 340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,400.00 |
| 9 Aggregate Sum of Investments | 0.00 | 1,080.00 | 2,160.00 | 3,520.00 | 3,790.00 | 4,060.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10 Investment Distributions from 2015 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 11 Investment Distributions from 2016 Investments | - | - | - | - | - | 2,970.00 | - | - | - | - | - | - | 2,970.00 |
| 12 Investment Distributions from 2017 Investments | - | - | - | - | - | - | 2,970.00 | - | - | - | - | - | 2,970.00 |
| 13 Investment Distributions from 2018 Investments | - | - | - | - | - | - | - | 3,740.00 | - | - | - | - | 3,740.00 |
| 14 Investment Distributions from 2019 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 Investment Distributions from 2020 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,970.00 | 2,970.00 | 3,740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,680.00 |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18 Cumulative Capital Contributions - Beginning | 0.00 | 0.00 | 1,080.00 | 2,160.00 | 3,520.00 | 3,790.00 | 2,710.00 | 1,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19 Plus: New Investments | 0.00 | 1,080.00 | 1,080.00 | 1,360.00 | 270.00 | 270.00 | 340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,350.00) | (1,350.00) | (1,700.00) | 0.00 | 0.00 | 0.00 | 0.00 | (4,400.00) |
| 21 Net Contributions that Remain Invested - End | 0.00 | 1,080.00 | 2,160.00 | 3,520.00 | 3,790.00 | 2,710.00 | 1,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22 Pro Rata Portion Excluded from Mgmt. Fee Calculation | (150.80) | (150.80) | (150.80) | (150.80) | (150.80) | (150.80) | (52.08) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 Net Capital/Contributions for Mgmt. Fee Calculation | 4,771.20 | 4,771.20 | 4,771.20 | 4,771.20 | 4,771.20 | 4,771.20 | 1,647.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **Management Fees** | | | | | | | | | | | | | |
| 24 Management Fees Due to Investment Manager | 71.57 | 71.57 | 71.57 | 71.57 | 71.57 | 71.57 | 21.37 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 459.02 |
| 25 Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (57.50) |
| 26 Net Management Fees to be Called | 61.57 | 61.57 | 61.57 | 61.57 | 61.57 | 66.57 | 18.87 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 401.52 |
| **Capital Calls** | | | | | | | | | | | | | |
| 27 Investment Needs | 0.00 | 1,080.00 | 1,080.00 | 1,360.00 | 270.00 | 270.00 | 340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,400.00 |
| 28 Management Fees | 61.57 | 61.57 | 61.57 | 61.57 | 61.57 | 66.57 | 18.87 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 401.52 |
| 29 Fund Expenses (2) | 6.00 | 17.50 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 71.00 |
| 30 Sum of Capital Calls | 67.57 | 1,159.07 | 1,151.57 | 1,431.57 | 341.57 | 346.57 | 363.87 | 10.74 | 0.00 | 0.00 | 0.00 | 0.00 | 4,872.52 |
| 31 Aggregate of Capital Called | 67.57 | 1,226.64 | 2,378.20 | 3,809.77 | 4,151.34 | 4,497.91 | 4,861.78 | 4,872.52 | 4,872.52 | 4,872.52 | 4,872.52 | 4,872.52 | |

Percentage of Committed Capital Called   **99%**
Net Exit Multiple   **1.99**

(1)  Management fee offset data provided by Management.  See Exhibit E-4 for details.
(2)  Fund Expense data provided by Management.  See Exhibit E-4 for details.

RIVERSTONE_SDTX00156636

Confidential
Empire Valuation Consultants

845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT E-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
## RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
## AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Investment period | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (57.50) |
| 4 **Net Management Fee Offsets (Line 6 + Line 3)** | | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(5.00)** | **(2.50)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **(57.50)** |

| Estimated Portfolio Expenses | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Investment period | | | | | | | | |
| 5 Organizational Expenses | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.00 |
| 6 Annual Fund Operating Expenses | 2.00 | 17.50 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 67.00 |
| 7 **Capital Calls for Expenses** | **6.00** | **17.50** | **10.00** | **10.00** | **10.00** | **10.00** | **5.00** | **2.50** | **0.00** | **0.00** | **0.00** | **0.00** | **71.00** |

* Per Management.

RIVERSTONE_SDTX00156637

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT E-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
**AS OF DECEMBER 31, 2016**

| | Fund Year | Investment Period 1 | 2 | 3 | 4 | 5 | 6 | Harvest Period 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ending February 23 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Total |
| | **Accrual of Contributed Capital** | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 72.77 | 1294.08 | 2605.23 | 4314.41 | 5019.19 | 3722.26 | 2353.64 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 67.38 | 1125.44 | 1118.17 | 1389.59 | 332.99 | 337.99 | 353.30 | 10.66 | 0.00 | 0.00 | 0.00 | 0.00 | 4,735.54 |
| 2a | *Investment Needs* | *0.00* | *1046.91* | *1046.91* | *1318.33* | *261.73* | *261.73* | *329.58* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *4,265.19* |
| 2b | *Management Fees* | *61.57* | *61.57* | *61.57* | *61.57* | *61.57* | *66.57* | *18.87* | *8.24* | *0.00* | *0.00* | *0.00* | *0.00* | *401.52* |
| 2c | *Fund Expenses* | *5.82* | *16.96* | *9.69* | *9.69* | *9.69* | *9.69* | *4.85* | *2.42* | *0.00* | *0.00* | *0.00* | *0.00* | *68.82* |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1910.64) | (1896.27) | (2364.30) | 0.00 | 0.00 | 0.00 | 0.00 | (6,171.21) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 67.38 | 1198.22 | 2412.25 | 3994.82 | 4647.40 | 3446.54 | 2179.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus: Current Period Preferred Return | 5.39 | 95.86 | 192.98 | 319.59 | 371.79 | 275.72 | 174.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 72.77 | 1294.08 | 2605.23 | 4314.41 | 5019.19 | 3722.26 | 2353.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 72.77 | 1294.08 | 2605.23 | 4314.41 | 5019.19 | 3722.26 | 2353.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2970.00 | 2970.00 | 3740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,680.00 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.45 | 1.45 | 1.82 | 0.00 | 0.00 | 0.00 | 0.00 | 4.72 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 89.55 | 89.55 | 112.76 | 0.00 | 0.00 | 0.00 | 0.00 | 291.86 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2879.01 | 2879.01 | 3625.41 | 0.00 | 0.00 | 0.00 | 0.00 | 9,383.42 |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 67.38 | 1198.22 | 2412.25 | 3994.82 | 4647.40 | 5357.18 | 4075.57 | 2364.30 | 0.00 | 0.00 | 0.00 | 0.00 | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1910.64 | 1896.27 | 2364.30 | 0.00 | 0.00 | 0.00 | 0.00 | 6,171.21 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 968.37 | 982.73 | 1261.12 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 1.80 | 33.75 | 98.08 | 204.60 | 328.54 | 420.44 | 325.99 | 178.22 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 122.05 | 118.22 | 142.58 | 0.00 | 0.00 | 0.00 | 0.00 | 382.85 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.51 | 29.55 | 35.64 | 0.00 | 0.00 | 0.00 | 0.00 | 95.71 |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 815.80 | 834.96 | 1082.90 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 163.16 | 166.99 | 216.58 | 0.00 | 0.00 | 0.00 | 0.00 | 546.73 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 652.64 | 667.96 | 866.32 | 0.00 | 0.00 | 0.00 | 0.00 | 2,186.92 |

Total LP Capital Through Carry Waterfall   9,383.42

**EXHIBIT E-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.
### AS OF DECEMBER 31, 2016

| | Year Ending February 23 | | 1.00 2015 | 2.00 2016 | 3.00 2017 | 4.00 2018 | 5.00 2019 | 6.00 2020 | 7.00 2021 | 8.00 2022 | 9.00 2023 | 10.00 2024 | 11.00 2025 | 12.00 2026 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,910.64 | 1,896.27 | 2,364.30 | 0.00 | 0.00 | 0.00 | 0.00 | 6,171.2118 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 683.16 | 697.52 | 901.96 | 0.00 | 0.00 | 0.00 | 0.00 | 2,282.6358 |
| 3 | Capital to be Funded | | (67.38) | (1,125.44) | (1,118.17) | (1,389.59) | (332.99) | (337.99) | (353.30) | (10.66) | 0.00 | 0.00 | 0.00 | 0.00 | (4,735.5397) |
| 4 | Net Capital Flows | | (67.38) | (1,125.44) | (1,118.17) | (1,389.59) | (332.99) | 2,255.80 | 2,240.49 | 3,255.60 | 0.00 | 0.00 | 0.00 | 0.00 | 3,718.3079 |
| 5 | Implied IRR, rounded | 18.0% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.66 | 0.56 | 0.48 | 0.40 | 0.34 | 0.29 | 0.25 | 0.21 | 0.18 | 0.15 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (62.04) | (878.44) | (739.88) | (779.47) | (158.34) | 909.36 | 765.66 | 943.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **FUND GP AFFILIATES IRR** | | | | | | | | | | | | | | |
| 7 | Projected Return of Capital & ROI | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 89.55 | 89.55 | 112.76 | 0.00 | 0.00 | 0.00 | 0.00 | 291.86 |
| 8 | Capital to be Funded | | (0.18) | (33.09) | (32.86) | (41.31) | (8.44) | (8.44) | (10.40) | (0.08) | 0.00 | 0.00 | 0.00 | 0.00 | (134.80) |
| 9 | Net Capital Flows | | (0.18) | (33.09) | (32.86) | (41.31) | (8.44) | 81.10 | 79.14 | 112.69 | 0.00 | 0.00 | 0.00 | 0.00 | 157.05 |
| 10 | Implied IRR, rounded | 24.4% | | | | | | | | | | | | | |
| | | | 0.90 | 0.72 | 0.58 | 0.47 | 0.37 | 0.30 | 0.24 | 0.19 | 0.16 | 0.13 | 0.10 | 0.08 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.16) | (23.85) | (19.04) | (19.23) | (3.16) | 24.40 | 19.14 | 21.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.45 | 1.45 | 1.82 | 0.00 | 0.00 | 0.00 | 0.00 | 4.72 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (0.00) | (0.54) | (0.53) | (0.67) | (0.14) | (0.14) | (0.17) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (2.18) |
| 14 | Net Capital Flows | | (0.00) | (0.54) | (0.53) | (0.67) | (0.14) | 1.31 | 1.28 | 1.82 | 0.00 | 0.00 | 0.00 | 0.00 | 2.54 |
| 15 | Implied IRR, rounded | 24.4% | | | | | | | | | | | | | |
| | | | 0.90 | 0.72 | 0.58 | 0.47 | 0.37 | 0.30 | 0.24 | 0.19 | 0.16 | 0.13 | 0.10 | 0.08 | |
| 16 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.00) | (0.39) | (0.31) | (0.31) | (0.05) | 0.39 | 0.31 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 17 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.45 | 1.45 | 1.82 | 0.00 | 0.00 | 0.00 | 0.00 | 4.72 |
| 18 | Capital to be Funded (Cash, net of fee waiver) | | (0.00) | (0.54) | (0.53) | (0.67) | (0.14) | (0.14) | (0.17) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (2.18) |
| 19 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 122.05 | 118.22 | 142.58 | 0.00 | 0.00 | 0.00 | 0.00 | 382.85 |
| 21 | Net Capital Flows | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 163.16 | 168.99 | 216.58 | 0.00 | 0.00 | 0.00 | 0.00 | 546.73 |
| 22 | Implied IRR, rounded | 378.5% | | (0.00) | (0.54) | (0.53) | (0.67) | (0.14) | 286.52 | 286.49 | 360.98 | 0.00 | 0.00 | 0.00 | 0.00 | 932.12 |
| | | | 0.46 | 0.10 | 0.02 | 0.00 | (0.00) | 0.05 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.00) | (0.05) | (0.01) | (0.00) | (0.00) | 0.05 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **RIVERSTONE GLOBAL ENERGY AND POWER FUND VI, L.P.--FUND IRR** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | 0.00 | (1,080.00) | (1,080.00) | (1,360.00) | (270.00) | (270.00) | (340.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (4,400.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,970.00 | 2,970.00 | 3,740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,680.00 |
| 26 | Management Fees (to Mgt. Co) | | (61.57) | (61.57) | (61.57) | (61.57) | (61.57) | (66.57) | (18.87) | (8.24) | 0.00 | 0.00 | 0.00 | 0.00 | (401.52) |
| 27 | Fund Expenses | | (6.00) | (17.50) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | 0.00 | 0.00 | 0.00 | 0.00 | (71.00) |
| 28 | Net Capital Flows | | (67.57) | (1,159.07) | (1,151.57) | (1,431.57) | (341.57) | 2,623.43 | 2,606.13 | 3,729.26 | 0.00 | 0.00 | 0.00 | 0.00 | 4,807.48 |
| 29 | Implied IRR, rounded | 21.5% | | | | | | | | | | | | | |
| | | | 0.91 | 0.75 | 0.61 | 0.51 | 0.42 | 0.34 | 0.28 | 0.23 | 0.19 | 0.16 | 0.13 | 0.11 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (61.30) | (865.63) | (707.94) | (724.44) | (142.28) | 899.55 | 735.59 | 866.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

EXHIBIT E-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE ENGERY PARTNERS VI, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending February 23 | Reference | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | | (1.85) | (0.85) | 0.15 | 1.15 | 2.15 | 3.15 | 4.15 | 5.15 | 6.15 | 7.15 | 8.15 | 9.15 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Capital Partners VI, LLC)** | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT E-6, Row 19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $122.05 | $118.22 | $142.58 | $0.00 | $0.00 | $0.00 | $0.00 | $382.85 |
| Full Carry | EXHIBIT E-6, Row 20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $163.16 | $166.99 | $216.58 | $0.00 | $0.00 | $0.00 | $0.00 | $546.73 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $285.21 | $285.21 | $359.15 | $0.00 | $0.00 | $0.00 | $0.00 | $929.58 |

**EXHIBIT F-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
## RIVERSTONE NON-ECI PARTNERS, L.P.
## AS OF DECEMBER 31, 2016

**Key Information**

| # | | |
|---|---|---|
| 1 | Fund Name | RIVERSTONE NON-ECI PARTNERS, L.P. |
| 2 | Fund Short Name | RIVERSTONE NON-ECI |
| 3 | GP Entity Name | RIVERSTONE NON-ECI PARTNERS GP (CAYMAN), L.P. |
| 4 | GP Entity Short Name | RIVERSTONE GP |
| 5 | Valuation Date | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| # | | | |
|---|---|---|---|
| 6 | FUND LPs | 99.9% | 256.30 |
| 7 | RIVERSTONE GP (de minimus) | 0.1% | 0.20 |
| 8 | COINVESTMENT | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **256.50** |

**Key Fund Dates**

| # | | | |
|---|---|---|---|
| 10 | Initial Close | | 6/24/2015 |
| 11 | Final Close | | 6/24/2016 |
| 12 | Investment Period End Date | 6 | 6/24/2022 |
| 13 | Fund Term End Date | 10 | 6/24/2025 |
| 14 | Fund Term with Extensions | 2 | 6/24/2027 |
| 15 | Valuation Date | | 12/31/2016 |

| # | | |
|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | **256.324** |
| 17 | LP Capital Called | 256.141 |
| 18 | GP Capital Called (cash only) | 0.183 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | 0.000 |
| 20 | Percentage of Capital Called | 100% |

**Investment Time Frame**

| # | | |
|---|---|---|
| 21 | Follow-on Investment Lag in years | 3 |
| 22 | Investment to Harvest Time in years | 4 |

**Gross Exit Multiples**

| # | | |
|---|---|---|
| 23 | For Initial Investments | 2.25 |
| 22 | For Follow-on Investments | 2.00 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | 21.4% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | 18.0% |

**Management Fees**

| # | | |
|---|---|---|
| 25 | Investment Period | 1.50% |
| 26 | Post-Investment Period | 1.00% |
| 27 | Capital exempt from Management Fees | 0.1% |
| 28 | Capital exempt from Management Fees in $ | 0.200 |

**Preferred Rate of Return**

| # | | |
|---|---|---|
| 29 | LP Preferred Return | 8% |
| 30 | GP Preferred Return | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | 33.33% |

**Carried Interest**

| # | | |
|---|---|---|
| 32 | General Partners (w/ LPs) | 20% |
| 33 | Limited Partners | 80% |

RIVERSTONE_SDTX00156641

Empire Valuation Consultants
Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT F-2**

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE NON-ECI PARTNERS, L.P.
### AS OF DECEMBER 31, 2016

*(Year End 6/24)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| TBD - Unidentified Investment(s) in fiscal 2015 | $0 | 2015 | $0 | 2018 | $0 | 2019 |
| TBD - Unidentified Investment(s) in fiscal 2016 | $56,640,000 | 2016 | $14,160,000 | 2019 | $155,760,000 | 2020 |
| TBD - Unidentified Investment(s) in fiscal 2017 | $56,640,000 | 2017 | $14,160,000 | 2020 | $155,760,000 | 2021 |
| TBD - Unidentified Investment(s) in fiscal 2018 | $37,760,000 | 2018 | $9,440,000 | 2021 | $103,840,000 | 2022 |
| TBD - Unidentified Investment(s) in fiscal 2018 | $33,920,000 | 2018 | $8,480,000 | 2021 | $93,280,000 | 2022 |
| Total | $184,960,000 | | $46,240,000 | | $508,640,000 | |
| FUND LPs | $184,815,782 | | $46,203,945 | | | |
| RIVERSTONE GP (de minimus) | $144,218 | | $36,055 | | | |
| COINVESTMENT | $0 | | $0 | | $508,640,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $231,200,000 | | | | $231,200,000 | Aggregate Investment Outlays |
| | | | | | 2.20 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $256,300,000 | 99.9% |
| RIVERSTONE GP (de minimus) | $200,000 | 0.1% |
| COINVESTMENT | $0 | 0.0% |
| | $256,500,000 | 100% |

RIVERSTONE_SDTX00156642

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT F-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
**RIVERSTONE NON-ECI PARTNERS, L.P.**
AS OF DECEMBER 31, 2016

| | | | | Investment Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| | Year Ending June 24 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Totals |
| | **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1 | Investments made in 2015 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 2 | Investments made in 2016 + follow-on | - | 56.64 | - | - | 14.16 | - | - | - | - | - | - | - | 70.80 |
| 3 | Investments made in 2017 + follow-on | - | - | 56.64 | - | - | 14.16 | - | - | - | - | - | - | 70.80 |
| 4 | Investments made in 2018 + follow-on | - | - | - | 71.68 | - | - | 17.92 | - | - | - | - | - | 89.60 |
| 5 | Investments made in 2019 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 | Investments made in 2020 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 | Investments made in 2021 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 | Sum of Investments | 0.00 | 56.64 | 56.64 | 71.68 | 14.16 | 14.16 | 17.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 231.20 |
| 9 | Aggregate Sum of Investments | 0.00 | 56.64 | 113.28 | 184.96 | 199.12 | 213.28 | 231.20 | 231.20 | 231.20 | 231.20 | 231.20 | 231.20 | |
| | | | | | | | | | | | | | | |
| | **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10 | Investment Distributions from 2015 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 11 | Investment Distributions from 2016 Investments | - | - | - | - | - | 155.76 | - | - | - | - | - | - | 155.76 |
| 12 | Investment Distributions from 2017 Investments | - | - | - | - | - | - | 155.76 | - | - | - | - | - | 155.76 |
| 13 | Investment Distributions from 2018 Investments | - | - | - | - | - | - | - | 197.12 | - | - | - | - | 197.12 |
| 14 | Investment Distributions from 2019 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 | Investment Distributions from 2020 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 | Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 155.76 | 155.76 | 197.12 | 0.00 | 0.00 | 0.00 | 0.00 | 508.64 |
| | | | | | | | | | | | | | | |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18 | Cumulative Capital Contributions - Beginning | 0.00 | 0.00 | 56.64 | 113.28 | 184.96 | 199.12 | 142.48 | 89.60 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19 | Plus: New Investments | 0.00 | 56.64 | 56.64 | 71.68 | 14.16 | 14.16 | 17.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (70.80) | (70.80) | (89.60) | 0.00 | 0.00 | 0.00 | 0.00 | (231.20) |
| 21 | Net Contributions that Remain Invested - End | 0.00 | 56.64 | 113.28 | 184.96 | 199.12 | 142.48 | 89.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (0.20) | (0.20) | (0.20) | (0.20) | (0.20) | (0.20) | (0.07) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 | Net Capital/Contributions for Mgmt. Fee Calculation | 256.30 | 256.30 | 256.30 | 256.30 | 256.30 | 256.30 | 89.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Management Fees** | | | | | | | | | | | | | |
| 24 | Management Fees Due to Investment Manager | 3.84 | 3.84 | 3.84 | 3.84 | 3.84 | 3.84 | 1.16 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 24.67 |
| 25 | Less: Estimated Net Management Fees Offset (1) | (0.50) | (0.50) | (0.50) | (0.50) | (0.50) | (0.50) | (0.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (3.25) |
| 26 | Net Management Fees to be Called | 3.34 | 3.34 | 3.34 | 3.34 | 3.34 | 3.34 | 0.91 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 21.42 |
| | | | | | | | | | | | | | | |
| | **Capital Calls** | | | | | | | | | | | | | |
| 27 | Investment Needs | 0.00 | 56.64 | 56.64 | 71.68 | 14.16 | 14.16 | 17.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 231.20 |
| 28 | Management Fees | 3.34 | 3.34 | 3.34 | 3.34 | 3.34 | 3.34 | 0.91 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 21.42 |
| 29 | Fund Expenses (2) | 1.10 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 3.70 |
| 30 | Sum of Capital Calls | 4.44 | 60.38 | 60.38 | 75.42 | 17.90 | 17.90 | 19.23 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 256.32 |
| 31 | Aggregate of Capital Called | 4.44 | 64.83 | 125.21 | 200.64 | 218.54 | 236.45 | 255.68 | 256.32 | 256.32 | 256.32 | 256.32 | 256.32 | |

| | |
|---|---|
| Percentage of Committed Capital Called | 100% |
| Net Exit Multiple | 1.98 |

(1) Management fee offset data provided by Management. See Exhibit F-4 for details.
(2) Fund Expense data provided by Management. See Exhibit F-4 for details.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT F-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE NON-ECI PARTNERS, L.P.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Investment period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | |
| 1 Total Fees Available for Fee Offset | | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (0.50) | (0.50) | (0.50) | (0.50) | (0.50) | (0.50) | (0.25) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (3.25) |
| 4 **Net Management Fee Offsets (Line 6 + Line 3)** | | **(0.50)** | **(0.50)** | **(0.50)** | **(0.50)** | **(0.50)** | **(0.50)** | **(0.25)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **(3.25)** |

| Estimated Portfolio Expenses | Investment period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | |
| 5 Organizational Expenses | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| 6 Annual Fund Operating Expenses | 0.10 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 2.70 |
| 7 **Capital Calls for Expenses** | **1.10** | **0.40** | **0.40** | **0.40** | **0.40** | **0.40** | **0.40** | **0.20** | **0.00** | **0.00** | **0.00** | **0.00** | **3.70** |

* Per Management.

RIVERSTONE_SDTX00156644

**EXHIBIT F-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)

### RIVERSTONE NON-ECI PARTNERS, L.P.
### AS OF DECEMBER 31, 2016

| | Fund Year | Investment Period | | | | | | Harvest Period | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| | Year Ending June 24 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Total |
| | **Accrual of Contributed Capital** | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 4.80 | 70.35 | 141.15 | 233.84 | 271.87 | 201.45 | 127.68 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 4.44 | 60.34 | 60.34 | 75.37 | 17.89 | 17.89 | 19.22 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 256.14 |
| 2a | *Investment Needs* | *0.00* | *56.60* | *56.60* | *71.62* | *14.15* | *14.15* | *17.91* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *231.02* |
| 2b | *Management Fees* | *3.34* | *3.34* | *3.34* | *3.34* | *3.34* | *3.34* | *0.91* | *0.45* | *0.00* | *0.00* | *0.00* | *0.00* | *21.42* |
| 2c | *Fund Expenses* | *1.10* | *0.40* | *0.40* | *0.40* | *0.40* | *0.40* | *0.40* | *0.20* | *0.00* | *0.00* | *0.00* | *0.00* | *3.70* |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (103.23) | (102.45) | (128.32) | 0.00 | 0.00 | 0.00 | 0.00 | (334.00) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 4.44 | 65.14 | 130.69 | 216.51 | 251.73 | 186.53 | 118.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus: Current Period Preferred Return | 0.36 | 5.21 | 10.46 | 17.32 | 20.14 | 14.92 | 9.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 4.80 | 70.35 | 141.15 | 233.84 | 271.87 | 201.45 | 127.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 4.80 | 70.35 | 141.15 | 233.84 | 271.87 | 201.45 | 127.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| 10 | Money available for Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 155.76 | 155.76 | 197.12 | 0.00 | 0.00 | 0.00 | 0.00 | 508.64 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.12 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | Net Distributions Available for LP Distribution Provisions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 155.64 | 155.64 | 196.97 | 0.00 | 0.00 | 0.00 | 0.00 | 508.24 |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 4.44 | 65.14 | 130.69 | 216.51 | 251.73 | 289.76 | 220.67 | 128.32 | 0.00 | 0.00 | 0.00 | 0.00 | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 103.23 | 102.45 | 128.32 | 0.00 | 0.00 | 0.00 | 0.00 | 334.00 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52.41 | 53.19 | 68.64 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 0.12 | 1.86 | 5.34 | 11.11 | 17.83 | 22.80 | 17.69 | 9.69 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.61 | 6.40 | 7.75 | 0.00 | 0.00 | 0.00 | 0.00 | 20.76 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.65 | 1.60 | 1.94 | 0.00 | 0.00 | 0.00 | 0.00 | 5.19 |
| | | | | | | | | | | | | | | |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 44.15 | 45.18 | 58.96 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.83 | 9.04 | 11.79 | 0.00 | 0.00 | 0.00 | 0.00 | 29.66 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35.32 | 36.15 | 47.17 | 0.00 | 0.00 | 0.00 | 0.00 | 118.63 |

Total LP Capital Through Carry Waterfall   508.24

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 721 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT F-6

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
## RIVERSTONE NON-ECI PARTNERS, L.P.
## AS OF DECEMBER 31, 2016

| | Year Ending June 24 | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | |
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 103.23 | 102.45 | 128.32 | 0.00 | 0.00 | 0.00 | 0.00 | 334.0022 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 36.97 | 37.75 | 49.10 | 0.00 | 0.00 | 0.00 | 0.00 | 123.8207 |
| 3 | Capital to be Funded | | (4.44) | (60.34) | (60.34) | (75.37) | (17.89) | (17.89) | (19.22) | (0.65) | 0.00 | 0.00 | 0.00 | 0.00 | (256.1410) |
| 4 | Net Capital Flows | | (4.44) | (60.34) | (60.34) | (75.37) | (17.89) | 122.31 | 120.98 | 176.78 | 0.00 | 0.00 | 0.00 | 0.00 | 201.6819 |
| 5 | Implied IRR, rounded | 18.0% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.66 | 0.56 | 0.48 | 0.40 | 0.34 | 0.29 | 0.25 | 0.21 | 0.18 | 0.15 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (4.09) | (47.10) | (39.93) | (42.29) | (8.51) | 49.32 | 41.36 | 51.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.12 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (0.00) | (0.04) | (0.04) | (0.06) | (0.01) | (0.01) | (0.01) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (0.18) |
| 9 | Net Capital Flows | | (0.00) | (0.04) | (0.04) | (0.06) | (0.01) | 0.11 | 0.11 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 |
| 10 | Implied IRR, rounded | 24.4% | | | | | | | | | | | | | |
| | | | 0.90 | 0.72 | 0.58 | 0.47 | 0.37 | 0.30 | 0.24 | 0.19 | 0.16 | 0.13 | 0.10 | 0.08 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.00) | (0.03) | (0.03) | (0.03) | (0.00) | 0.03 | 0.03 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.12 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (0.00) | (0.04) | (0.04) | (0.06) | (0.01) | (0.01) | (0.01) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (0.18) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.61 | 6.64 | 7.75 | 0.00 | 0.00 | 0.00 | 0.00 | 20.76 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.83 | 9.04 | 11.79 | 0.00 | 0.00 | 0.00 | 0.00 | 29.66 |
| 16 | Net Capital Flows | | (0.00) | (0.04) | (0.04) | (0.06) | (0.01) | 15.55 | 15.55 | 19.69 | 0.00 | 0.00 | 0.00 | 0.00 | 50.63 |
| 17 | Implied IRR, rounded | 325.6% | | | | | | | | | | | | | |
| | | | 0.48 | 0.11 | 0.03 | 0.01 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.00) | (0.01) | (0.00) | (0.00) | (0.00) | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **RIVERSTONE NON-ECI PARTNERS, L.P.--FUND IRR** | | | | | | | | | | | | | | |
| 19 | Projected Investments to be made | | 0.00 | (56.64) | (56.64) | (71.68) | (14.16) | (14.16) | (17.92) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (231.20) |
| 20 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 155.76 | 155.76 | 197.12 | 0.00 | 0.00 | 0.00 | 0.00 | 508.64 |
| 21 | Management Fees (to Mgt. Co) | | (3.34) | (3.34) | (3.34) | (3.34) | (3.34) | (3.34) | (0.91) | (0.45) | 0.00 | 0.00 | 0.00 | 0.00 | (21.42) |
| 22 | Fund Expenses | | (1.10) | (0.40) | (0.40) | (0.40) | (0.40) | (0.40) | (0.20) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (3.70) |
| 23 | Net Capital Flows | | (4.44) | (60.38) | (60.38) | (75.42) | (17.90) | 137.86 | 136.53 | 196.47 | 0.00 | 0.00 | 0.00 | 0.00 | 252.32 |
| 24 | Implied IRR, rounded | 21.4% | | | | | | | | | | | | | |
| | | | 0.91 | 0.75 | 0.62 | 0.51 | 0.42 | 0.34 | 0.28 | 0.23 | 0.19 | 0.16 | 0.13 | 0.11 | |
| 25 | Check Sum: Present Value of Net Capital Flows | 0.00 | (4.03) | (45.15) | (37.20) | (38.28) | (7.49) | 47.48 | 38.74 | 45.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Confidential

Empire Valuation Consultants

Compiled 05/22/2017

DRAFT COPY - For Discussion Purposes Only

EXHIBIT F-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE NON-ECI PARTNERS GP (CAYMAN), L.P.
### AS OF DECEMBER 31, 2016

| Year Ending June 24 | Year 1 2015 | Year 2 2016 | Year 3 2017 | Year 4 2018 | Year 5 2019 | Year 6 2020 | Year 7 2021 | Year 8 2022 | Year 9 2023 | Year 10 2024 | Year 11 2025 | Year 12 2026 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | (1.52) | (0.52) | 0.48 | 1.48 | 2.48 | 3.48 | 4.48 | 5.48 | 6.48 | 7.48 | 8.48 | 9.48 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Non-ECI Partners GP (Cayman), L.P.)** | Reference | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT F-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $6.61 | $6.40 | $7.75 | $0.00 | $0.00 | $0.00 | $0.00 | $20.76 |
| Full Carry | EXHIBIT F-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8.83 | $9.04 | $11.79 | $0.00 | $0.00 | $0.00 | $0.00 | $29.66 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $15.44 | $15.44 | $19.54 | $0.00 | $0.00 | $0.00 | $0.00 | $50.42 |

RIVERSTONE_SDTX00156647

EXHIBIT G-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
**RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.**
AS OF DECEMBER 31, 2016

|  | **Key Information** | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P. |
| 2 | Fund Short Name | | RENEWABLE II |
| 3 | GP Entity Name | | RIVERSTONE/CARLYLE RENEWABLE ENGERY PARTNERS II, L.P. |
| 4 | GP Entity Short Name | | RENEWABLE II GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |
|  | **Committed Capital by Class of Partner** | | |
| 6 | FUND LPs | 99.8% | 3,300.00 |
| 7 | RENEWABLE II GP | 0.2% | 7.00 |
| 8 | COINVESTOR | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **3,307.00** |
|  | **Key Fund Dates** | | |
| 10 | Initial Close | | 3/7/2008 |
| 11 | Final Close | | 3/7/2009 |
| 12 | Investment Period End Date | 5 | 3/7/2013 |
| 13 | Fund Term End Date | 10 | 3/7/2018 |
| 14 | Fund Term with Extensions | 2 | 3/7/2020 |
| 15 | Valuation Date | | 12/31/2016 |
|  | **Gross Exit Multiples** | | |
| 16 | Fund IRR (net of Mgt. Fees, calculated) | | 0.4% |
| 17 | LP IRR (net of Fees and Expenses, calculated) | | 0.4% |
|  | **Management Fees** | | |
| 18 | Investment Period | | 1.50% |
| 19 | Post-Investment Period | | 1.00% |
| 20 | Capital exempt from Management Fees | | 0.2% |
| 21 | Capital exempt from Management Fees in $ | | 7.000 |
|  | **Preferred Rate of Return** | | |
| 22 | LP Preferred Return | | 8% |
| 23 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |
|  | **Carried Interest** | | |
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 724 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT G-2

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.
## AS OF DECEMBER 31, 2016

| Company | Initial Cost Basis | Year of Acquisition | (Fair Value per F/S) Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|
| *(Year End 3/7)* | | | | |
| Silver Ridge Power | $333,610,000 | 2009 | $243,518,000 | 2018 |
| Patagonia Bioenergia Holdings | $63,236,000 | 2009 | $2,344,000 | 2018 |
| ReEnergy Holdings LLC | $232,125,000 | 2011 | $113,825,000 | 2020 |
| Enviva, LP | $327,235,000 | 2010 | $870,819,000 | 2020 |
| Pattern Energy Group Holdings, LP | $440,508,000 | 2010 | $568,834,000 | 2019 |
| Velocita Enegry Developments | $88,747,000 | 2009 | $113,222,000 | 2016 |
| Talen Energy Corporation | $45,603,000 | 2010 | $42,773,000 | 2018 |
| Total | $1,531,064,000 | | $1,955,335,000 | |
| FUND LPs | $1,527,823,163 | | | |
| RENEWABLE II GP | $3,240,837 | | | |
| COINVESTOR | $0 | | $1,955,335,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $1,531,064,000 | | $1,531,064,000 | Aggregate Investment Outlays |
| | | | 1.28 | Implied Average Exit Multiple |
| | Capital Commitment | | | |
| FUND LPs | $3,300,000,000 | 99.8% | | |
| RENEWABLE II GP | $7,000,000 | 0.2% | | |
| COINVESTOR | $0 | 0.0% | | |
| | $3,307,000,000 | 100% | | |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT G-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.
AS OF DECEMBER 31, 2016

| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| | Year Ending March 7, | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Totals |
| | **Summary of Fund Cash Outflows** | | | | | | | | | | | | | | |
| 1 | Investments made in 2009 + follow-on | 485.59 | - | - | - | - | - | - | - | - | - | - | - | - | 485.59 |
| 2 | Investments made in 2010 + follow-on | - | 813.35 | - | - | - | - | - | - | - | - | - | - | - | 813.35 |
| 3 | Investments made in 2011 + follow-on | - | - | 232.13 | - | - | - | - | - | - | - | - | - | - | 232.13 |
| 4 | Investments made in 2012 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 5 | Investments made in 2013 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 | Investments made in 2014 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 | Investments made in 2015 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 | Sum of Investments | 485.59 | 813.35 | 232.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,531.06 |
| 9 | Aggregate Sum of Investments | 485.59 | 1,298.94 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | |
| | | | | | | | | | | | | | | | |
| | **Summary of Fund Cash Inflows** | | | | | | | | | | | | | | |
| 10 | Investment Distributions from 2009 Investments | - | - | - | - | - | - | - | - | - | 359.08 | - | - | - | 359.08 |
| 11 | Investment Distributions from 2010 Investments | - | - | - | - | - | - | - | - | - | 42.77 | 568.83 | 870.82 | - | 1,482.43 |
| 12 | Investment Distributions from 2011 Investments | - | - | - | - | - | - | - | - | - | - | - | 113.83 | - | 113.83 |
| 13 | Investment Distributions from 2012 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 14 | Investment Distributions from 2013 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 | Investment Distributions from 2014 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 | Investment Distributions from 2015 Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.86 | 568.83 | 984.64 | 0.00 | 1,955.34 |
| | | | | | | | | | | | | | | | |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | | |
| 18 | Cumulative Capital Contributions - Beginning | 0.00 | 485.59 | 1,298.94 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 999.87 | 559.36 | 0.00 | |
| 19 | Plus: New Investments | 485.59 | 813.35 | 232.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (531.20) | (440.51) | (559.36) | 0.00 | (1,531.06) |
| 21 | Net Contributions that Remain Invested - End | 485.59 | 1,298.94 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 1,531.06 | 999.87 | 559.36 | 0.00 | | |
| 22 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (7.00) | (7.00) | (7.00) | (7.00) | (7.00) | (3.24) | (3.24) | (3.24) | (3.24) | (2.12) | (1.18) | 0.00 | 0.00 | |
| 23 | Net Capital/Contributions for Mgmt. Fee Calculation | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 | 3,300.00 | 1,527.82 | 1,527.82 | 1,527.82 | 1,527.82 | 997.75 | 558.18 | 0.00 | | |
| | | | | | | | | | | | | | | | |
| | **Management Fees** | | | | | | | | | | | | | | |
| 24 | Management Fees Due to Investment Manager | 49.50 | 49.50 | 49.50 | 49.50 | 49.50 | 15.29 | 15.28 | 15.28 | 15.28 | 12.63 | 7.78 | 2.79 | 0.00 | 331.83 |
| 25 | Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | - | - | - | - | - | - | - | (47.50) |
| 26 | Net Management Fees to be Called | 39.50 | 39.50 | 39.50 | 39.50 | 44.50 | 12.79 | 15.28 | 15.28 | 15.28 | 12.63 | 7.78 | 2.79 | 0.00 | 284.33 |
| | | | | | | | | | | | | | | | |
| | **Capital Calls** | | | | | | | | | | | | | | |
| 27 | Investment Needs | 485.59 | 813.35 | 232.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,531.06 |
| 28 | Management Fees | 39.50 | 39.50 | 39.50 | 39.50 | 44.50 | 12.79 | 15.28 | 15.28 | 15.28 | 12.63 | 7.78 | 2.79 | 0.00 | 284.33 |
| 29 | Fund Expenses (2) | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 64.06 |
| 30 | Sum of Capital Calls | 537.59 | 860.35 | 279.13 | 47.00 | 52.00 | 20.29 | 22.78 | 19.03 | 17.15 | 13.57 | 7.78 | 2.79 | 0.00 | 1,879.45 |
| 31 | Aggregate of Capital Called | 537.59 | 1,397.94 | 1,677.06 | 1,724.06 | 1,776.06 | 1,796.36 | 1,819.14 | 1,838.16 | 1,855.32 | 1,868.88 | 1,876.66 | 1,879.45 | 1,879.45 | |

Percentage of Committed Capital Called: **57%**
Net Exit Multiple: **1.04**

(1) Management fee offset data provided by Management. See Exhibit G-4 for details.
(2) Fund Expense data provided by Management. See Exhibit G-4 for details.

RIVERSTONE_SDTX00156650

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 726 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT G-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2009 | Year 2 2010 | Year 3 2011 | Year 4 2012 | Year 5 2013 | Year 6 2014 | Year 7 2015 | Year 8 2016 | Year 9 2017 | Year 10 2018 | Year 11 2019 | Year 12 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2  Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3      Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (47.50) |
| **4  Net Management Fee Offsets (Line 6 + Line 3)** | | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(5.00)** | **(2.50)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | (47.50) |

| **Estimated Portfolio Expenses** | | Year 1 2009 | Year 2 2010 | Year 3 2011 | Year 4 2012 | Year 5 2013 | Year 6 2014 | Year 7 2015 | Year 8 2016 | Year 9 2017 | Year 10 2018 | Year 11 2019 | Year 12 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5  Organizational Expenses | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6  Annual Fund Operating Expenses | | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 59.06 |
| **7  Capital Calls for Expenses** | | **12.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **7.50** | **3.75** | **1.88** | **0.94** | **0.00** | **0.00** | 64.06 |

* Per Management.

RIVERSTONE_SDTX00156651

Confidential
Empire Valuation Consultants

845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT G-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

| | Fund Year | Investment Period | | | | | Harvest Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| | Year Ending March 7, | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| | **Accrual of Contributed Capital** | | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 579.46 | 1553.12 | 1978.27 | 2187.28 | 2418.40 | 2633.77 | 2869.06 | 3119.13 | 3387.18 | 3239.71 | 2894.25 | 2067.64 | |
| 2 | Plus:  Contributed Capital in Current Period from LP's | 536.54 | 858.61 | 278.62 | 46.98 | 51.98 | 20.28 | 22.76 | 19.02 | 17.15 | 13.56 | 7.78 | 2.79 | 0.00 | 1,876.08 |
| 2a | *Investment Needs* | *484.57* | *811.62* | *231.63* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *1,527.82* |
| 2b | *Management Fees* | *39.50* | *39.50* | *39.50* | *39.50* | *44.50* | *12.79* | *15.28* | *15.28* | *15.28* | *12.63* | *7.78* | *2.79* | *0.00* | *284.33* |
| 2c | *Fund Expenses* | *12.47* | *7.48* | *7.48* | *7.48* | *7.48* | *7.48* | *7.48* | *3.74* | *1.87* | *0.94* | *0.00* | *0.00* | *0.00* | *63.93* |
| 3 | Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (401.01) | (567.63) | (982.56) | 0.00 | (1,951.20) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 536.54 | 1438.07 | 1831.73 | 2025.26 | 2239.26 | 2438.68 | 2656.54 | 2888.08 | 3136.28 | 2999.74 | 2679.86 | 1914.48 | 2067.64 | |
| 5 | Plus:  Current Period Preferred Return | 42.92 | 115.05 | 146.54 | 162.02 | 179.14 | 195.09 | 212.52 | 231.05 | 250.90 | 239.98 | 214.39 | 153.16 | 165.41 | |
| 6 | End of Period Net LP Contributed Capital | 579.46 | 1553.12 | 1978.27 | 2187.28 | 2418.40 | 2633.77 | 2869.06 | 3119.13 | 3387.18 | 3239.71 | 2894.25 | 2067.64 | 2233.05 | |
| 7 | Less:  Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus:  Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 579.46 | 1553.12 | 1978.27 | 2187.28 | 2418.40 | 2633.77 | 2869.06 | 3119.13 | 3387.18 | 3239.71 | 2894.25 | 2067.64 | 2233.05 | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.86 | 568.83 | 984.64 | 0.00 | 1,955.34 |
| 11 | Less:  GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.85 | 1.20 | 2.08 | 0.00 | 4.14 |
| 12 | Less:  Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.01 | 567.63 | 982.56 | 0.00 | 1,951.20 |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 536.54 | 1438.07 | 1831.73 | 2025.26 | 2239.26 | 2438.68 | 2656.54 | 2888.08 | 3136.28 | 3400.74 | 3247.49 | 2897.04 | 2067.64 | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.01 | 567.63 | 982.56 | 0.00 | 1,951.20 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 14.31 | 52.66 | 101.50 | 155.51 | 215.22 | 280.25 | 351.10 | 428.11 | 511.74 | 591.74 | 663.20 | 714.25 | 769.39 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Total LP Capital Through Carry Waterfall     1,951.20

RIVERSTONE_SDTX00156652

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT G-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
### RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending March 7, | | 1.00 2009 | 2.00 2010 | 3.00 2011 | 4.00 2012 | 5.00 2013 | 6.00 2014 | 7.00 2015 | 8.00 2016 | 9.00 2017 | 10.00 2018 | 11.00 2019 | 12.00 2020 | 13.00 2021 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Aggregate LP IRR** | | | | | | | | | | | | | | | |
| 1 Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.01 | 567.63 | 982.56 | 0.00 | 1,951.1961 |
| 2 Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |
| 3 Capital to be Funded | | (536.54) | (858.61) | (278.62) | (46.98) | (51.98) | (20.28) | (22.76) | (19.02) | (17.15) | (13.56) | (7.78) | (2.79) | 0.00 | (1,876.0776) |
| 4 Net Capital Flows | | (536.54) | (858.61) | (278.62) | (46.98) | (51.98) | (20.28) | (22.76) | (19.02) | (17.15) | 387.44 | 559.85 | 979.77 | 0.00 | 75.1185 |
| 5 Implied IRR, rounded | 0.4% | | | | | | | | | | | | | | |
| | | 1.00 | 0.99 | 0.99 | 0.98 | 0.98 | 0.98 | 0.97 | 0.97 | 0.96 | 0.96 | 0.96 | 0.95 | 0.95 | |
| 6 Check Sum: Present Value of Net Capital Flows | 0.00 | (535.37) | (852.99) | (275.59) | (46.27) | (50.97) | (19.80) | (22.12) | (18.41) | (16.52) | 371.66 | 534.70 | 931.67 | 0.00 | 0.00 |
| **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | | |
| 7 Projected Return of GP Capital & ROI | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.85 | 1.20 | 2.08 | 0.00 | 4.14 |
| 8 Capital to be Funded | | (1.05) | (1.74) | (0.51) | (0.02) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | (3.38) |
| 9 Net Capital Flows | | (1.05) | (1.74) | (0.51) | (0.02) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | 0.85 | 1.20 | 2.08 | 0.00 | 0.76 |
| 10 Implied IRR, rounded | 2.2% | | | | | | | | | | | | | | |
| | | 0.99 | 0.97 | 0.95 | 0.93 | 0.91 | 0.89 | 0.87 | 0.85 | 0.83 | 0.81 | 0.80 | 0.78 | 0.76 | |
| 11 Check Sum: Present Value of Net Capital Flows | 0.00 | (1.04) | (1.68) | (0.48) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | 0.69 | 0.96 | 1.62 | 0.00 | 0.00 |
| **GP IRR - WITH CARRY** | | | | | | | | | | | | | | | |
| 12 Projected Return of GP Capital & ROI | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.85 | 1.20 | 2.08 | 0.00 | 4.14 |
| 13 Capital to be Funded | | (1.05) | (1.74) | (0.51) | (0.02) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | (3.38) |
| 14 Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 15 Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 16 Net Capital Flows | | (1.05) | (1.74) | (0.51) | (0.02) | (0.02) | (0.02) | (0.02) | (0.01) | (0.00) | 0.85 | 1.20 | 2.08 | 0.00 | 0.76 |
| 17 Implied IRR, rounded | 2.2% | | | | | | | | | | | | | | |
| | | 0.99 | 0.97 | 0.95 | 0.93 | 0.91 | 0.89 | 0.87 | 0.85 | 0.83 | 0.81 | 0.80 | 0.78 | 0.76 | |
| 18 Check Sum: Present Value of Net Capital Flows | 0.00 | (1.04) | (1.68) | (0.48) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.00) | 0.69 | 0.96 | 1.62 | 0.00 | 0.00 |
| **RIVERSTONE/CARLYLE RENEWABLE AND ALTERNATIVE ENERGY FUND II, L.P.-FUND IRR** | | | | | | | | | | | | | | | |
| 19 Projected Investments to be made | | (485.59) | (813.35) | (232.13) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,531.06) |
| 20 Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 401.86 | 568.83 | 984.64 | 0.00 | 1,955.34 |
| 21 Management Fees (to Mgt. Co) | | (39.50) | (39.50) | (39.50) | (39.50) | (44.50) | (12.79) | (15.28) | (15.28) | (15.28) | (12.63) | (7.78) | (2.79) | 0.00 | (284.33) |
| 22 Fund Expenses | | (12.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (7.50) | (3.75) | (1.88) | (0.94) | 0.00 | 0.00 | 0.00 | (64.06) |
| 23 Net Capital Flows | | (537.59) | (860.35) | (279.13) | (47.00) | (52.00) | (20.29) | (22.78) | (19.03) | (17.15) | 388.29 | 561.05 | 981.85 | 0.00 | 75.88 |
| 24 Implied IRR, rounded | 0.4% | | | | | | | | | | | | | | |
| | | 1.00 | 0.99 | 0.99 | 0.98 | 0.98 | 0.98 | 0.97 | 0.97 | 0.96 | 0.96 | 0.95 | 0.95 | 0.95 | |
| 25 Check Sum: Present Value of Net Capital Flows | (0.00) | (536.41) | (854.67) | (276.06) | (46.28) | (50.98) | (19.81) | (22.13) | (18.41) | (16.52) | 372.35 | 535.65 | 933.27 | 0.00 | (0.00) |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT G-7

## DISCOUNTED CASH FLOW ANALYSIS
**RIVERSTONE/CARLYLE RENEWABLE ENGERY PARTNERS II, L.P.**
**AS OF DECEMBER 31, 2016**

| Year Ending March 7, | Reference | Year 1 2009 | Year 2 2010 | Year 3 2011 | Year 4 2012 | Year 5 2013 | Year 6 2014 | Year 7 2015 | Year 8 2016 | Year 9 2017 | Year 10 2018 | Year 11 2019 | Year 12 2020 | Year 13 2021 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | (7.82) | (6.82) | (5.82) | (4.82) | (3.82) | (2.82) | (1.82) | (0.82) | 0.18 | 1.18 | 2.18 | 3.18 | 4.18 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone/Carlyle Renewable Energy Partners II, L.P.)** | | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT G-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Full Carry | EXHIBIT G-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

RIVERSTONE_SDTX00156654

**EXHIBIT H-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE CREDIT PARTNERS, L.P.
### AS OF DECEMBER 31, 2016

**Key Information**

|   | | |
|---|---|---|
| 1 | Fund Name | RIVERSTONE CREDIT PARTNERS, L.P. |
| 2 | Fund Short Name | RIVERSTONE CREDIT |
| 3 | GP Entity Name | RCP F1 GP, L.P. |
| 4 | GP Entity Short Name | RIVERSTONE GP |
| 5 | Valuation Date | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

|   | | | |
|---|---|---|---|
| 6 | FUND LPs | 94.5% | 444.00 |
| 7 | RIVERSTONE GP (de minimus) | 0.4% | 2.00 |
| 8 | RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, LP | 5.1% | 24.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **470.00** |

**Key Fund Dates**

|   | | | |
|---|---|---|---|
| 10 | Initial Close | | 4/13/2015 |
| 11 | Final Close | | 4/13/2016 |
| 12 | Investment Period End Date | 2 | 4/13/2018 |
| 13 | Fund Term End Date | 4 | 4/13/2022 |
| 14 | Fund Term with Extensions | 1 | 4/13/2023 |
| 15 | Valuation Date | | 12/31/2016 |

|   | | |
|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | **468.261** |
| 17 | LP Capital Called | 421.535 |
| 18 | GP Capital Called (cash only) | 1.932 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | 23.183 |
| 20 | Percentage of Capital Called | 100% |

**Investment Time Frame**

|   | | |
|---|---|---|
| 21 | Follow-on Investment Lag in years | 0 |
| 22 | Investment to Harvest Time in years | 2 |

**Gross Exit Multiples**

|   | | |
|---|---|---|
| 23 | For Initial Investments | 1.20 |
| 22 | For Follow-on Investments | 0.00 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | 19.7% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | 18.6% |

**Management Fees**

|   | | |
|---|---|---|
| 25 | Investment Period | 1.50% |
| 26 | Post-Investment Period | 1.00% |
| 27 | Capital exempt from Management Fees | 5.5% |
| 28 | Capital exempt from Management Fees in $ | 26.000 |

**Preferred Rate of Return**

|   | | |
|---|---|---|
| 29 | LP Preferred Return | 6% |
| 30 | GP Preferred Return | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | 17.65% |

**Carried Interest**

|   | | |
|---|---|---|
| 32 | General Partners (w/ LPs) | 15% |
| 33 | Limited Partners | 85% |

RIVERSTONE_SDTX00156655

**EXHIBIT H-2**

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE CREDIT PARTNERS, L.P.
## AS OF DECEMBER 31, 2016

*(Year End 4/6)*

| Company | Initial Cost Basis | Year of Acquisition | Dividend Payments | Year of Dividend | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| **Investment in fiscal 2016** | $125,000,000 | 2016 | Recycled | 2017 | Recycled | 2018 |
| *Non-Capital Calls for Investment* | | | Recycled | 2018 | | |
|   Leverage Basis | $50,000,000 | | | | | |
| **TBD - Unidentified Investment(s) in fiscal 2017** | $150,000,000 | 2017 | Recycled | 2018 | $209,728,000 | 2019 |
| *Non-Capital Calls for Investment* | | | $18,154,580 | 2019 | | |
|   Recycled Funds (2016 Investment, Dividend 2017) | $13,850,000 | | | | | |
|   Leverage Basis | $65,540,000 | | | | | |
| **TBD - Unidentified Investment(s) in fiscal 2018** | $150,000,000 | 2018 | $37,894,107 | 2019 | $437,765,862 | 2020 |
| *Non-Capital Calls for Investment* | | | $37,894,107 | 2020 | | |
|   Recycled Funds (2016 Investment, Dividend 2018) | $13,850,000 | | | | | |
|   Recycled Funds (2017 Investment, Dividend 2018) | $18,154,580 | | | | | |
|   Recycled Funds (2016 Investment, Proceeds 2018) | $160,000,000 | | | | | |
|   Leverage Basis | $136,801,832 | | | | | |
| Total | $883,196,412 | | $93,942,795 | | $647,493,862 | |
|   FUND LPs | $401,489,362 | | | | | |
|   RIVERSTONE GP (de minimus) | $1,808,511 | | | | | |
|   RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, | $21,702,128 | | | | | |
|   RECYCLED | $205,854,580 | | | | | |
|   LEVERAGE | $252,341,832 | | | | $741,436,657 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $883,196,412 | | | | $425,000,000 | Aggregate Investment Outlays |
| | | | | | 1.74 | Implied Average Exit Multiple |
| | Capital Commitment | | | | | |
|   FUND LPs | $444,000,000 | 94.5% | | | | |
|   RIVERSTONE GP (de minimus) | $2,000,000 | 0.4% | | | | |
|   RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, | $24,000,000 | 5.1% | | | | |
| | $470,000,000 | 100% | | | | |

(1) Dividends are 9.2% of Cost Basis less 4.5% of Leverage Basis.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT H-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
## RIVERSTONE CREDIT PARTNERS, L.P.
## AS OF DECEMBER 31, 2016

| | Fund Year | Investment Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ending April 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Totals |
| | **Summary of Fund Cash Outflows** | | | | | | | | |
| 1 | Investments made in 2016 + follow-on | 125.00 | - | - | - | - | - | - | 125.00 |
| 2 | Leverage & Recycled Investments in 2016 | 50.00 | | | | | | | 50.00 |
| 3 | Investments made in 2017 + follow-on | - | 150.00 | - | - | - | - | - | 150.00 |
| 4 | Leverage & Recycled Investments in 2017 | | 79.39 | | | | | | 79.39 |
| 5 | Investments made in 2018 + follow-on | - | - | 150.00 | - | - | - | - | 150.00 |
| 6 | Leverage & Recycled Investments in 2018 | | | 328.81 | | | | | 328.81 |
| 7 | Sum of Investments | 175.00 | 229.39 | 478.81 | 0.00 | 0.00 | 0.00 | 0.00 | 883.20 |
| 8 | Aggregate Sum of Investments | 175.00 | 404.39 | 883.20 | 883.20 | 883.20 | 883.20 | 883.20 | |
| | | | | | | | | | |
| | **Summary of Fund Cash Inflows (excluding Leverage)** | | | | | | | | |
| 9 | Investment Distributions from 2016 Investments | - | - | - | - | - | - | - | 0.00 |
| 10 | Investment Distributions from 2017 Investments | - | - | - | 227.88 | - | - | - | 227.88 |
| 11 | Investment Distributions from 2018 Investments | - | - | - | 37.89 | 475.66 | - | - | 513.55 |
| 12 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 265.78 | 475.66 | 0.00 | 0.00 | 741.44 |
| | | | | | | | | | |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | |
| 13 | Cumulative Capital Contributions - Beginning | 0.00 | 175.00 | 404.39 | 708.20 | 478.81 | 0.00 | 0.00 | |
| 14 | Plus: New Investments | 175.00 | 229.39 | 478.81 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 15 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | (125.00) | (150.00) | (150.00) | 0.00 | 0.00 | (425.00) |
| 16 | Less: Leverage & Recycled Associated with Harvested Investments | 0.00 | 0.00 | (50.00) | (79.39) | (328.81) | 0.00 | 0.00 | (458.20) |
| 17 | Net Contributions that Remain Invested - End | 175.00 | 404.39 | 708.20 | 478.81 | 0.00 | 0.00 | 0.00 | |
| 18 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (9.68) | (26.00) | (39.18) | (26.49) | 0.00 | 0.00 | 0.00 | |
| 19 | Net Capital/Contributions for Mgmt. Fee Calculation | 165.32 | 378.39 | 669.02 | 452.32 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | |
| | **Management Fees** | | | | | | | | |
| 20 | Management Fees Due to Investment Manager | 2.48 | 5.68 | 5.24 | 5.61 | 2.26 | 0.00 | 0.00 | 21.26 |
| 21 | Less: Estimated Net Management Fees Offset (1) | (1.50) | (2.00) | (2.00) | (1.50) | 0.00 | 0.00 | 0.00 | (7.00) |
| 22 | Net Management Fees to be Called | 0.98 | 3.68 | 3.24 | 4.11 | 2.26 | 0.00 | 0.00 | 14.26 |
| | | | | | | | | | |
| | **Capital Calls** | | | | | | | | |
| 23 | Investment Needs | 125.00 | 150.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 425.00 |
| 24 | Management Fees | 0.98 | 3.68 | 3.24 | 4.11 | 2.26 | 0.00 | 0.00 | 14.26 |
| 25 | Fund Expenses (2) | 8.00 | 6.00 | 6.00 | 5.00 | 4.00 | 0.00 | 0.00 | 29.00 |
| 26 | Sum of Capital Calls | 133.98 | 159.68 | 159.24 | 9.11 | 6.26 | 0.00 | 0.00 | 468.26 |
| 27 | Aggregate of Capital Called | 133.98 | 293.66 | 452.89 | 462.00 | 468.26 | 468.26 | 468.26 | |

Percentage of Committed Capital Called   100%
Net Exit Multiple   1.58

(1)  *Management fee offset data provided by Management.  See Exhibit H-4 for details.*
(2)  *Fund Expense data provided by Management.  See Exhibit H-4 for details.*

RIVERSTONE_SDTX00156657

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT H-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES

### RIVERSTONE CREDIT PARTNERS, L.P.

### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

|  |  | % offset | Year 1 2016 | Year 2 2017 | Year 3 2018 | Year 4 2019 | Year 5 2020 | Year 6 2021 | Year 7 2022 |  |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | **Investment period** | | | | | | | |
| 1 | Total Fees Available for Fee Offset |  | 1.50 | 2.00 | 2.00 | 1.50 | 0.00 | 0.00 | 0.00 | |
| 2 | Current Period Management Fee Offset | 100% | 1.50 | 2.00 | 2.00 | 1.50 | 0.00 | 0.00 | 0.00 | |
| 3 | Less: Available Portfolio Income Offset Applied |  | (1.50) | (2.00) | (2.00) | (1.50) | 0.00 | 0.00 | 0.00 | (7.00) |
| **4** | **Net Management Fee Offsets (Line 6 + Line 3)** |  | **(1.50)** | **(2.00)** | **(2.00)** | **(1.50)** | **0.00** | **0.00** | **0.00** | **(7.00)** |

| | | | Year 1 2016 | Year 2 2017 | Year 3 2018 | Year 4 2019 | Year 5 2020 | Year 6 2021 | Year 7 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Estimated Portfolio Expenses** | | **Investment period** | | | | | | | |
| 5 | Organizational Expenses | | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 |
| 6 | Annual Fund Operating Expenses | | 6.00 | 6.00 | 6.00 | 5.00 | 4.00 | 0.00 | 0.00 | 27.00 |
| **7** | **Capital Calls for Expenses** | | **8.00** | **6.00** | **6.00** | **5.00** | **4.00** | **0.00** | **0.00** | **29.00** |

\* Per Management.

RIVERSTONE_SDTX00156658

Confidential
Empire Valuation Consultants

8:45 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT H-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE CREDIT PARTNERS, L.P.
#### AS OF DECEMBER 31, 2016

| | | Investment Period | | | Harvest Period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| | Year Ending April 6 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | |
| | **Accrual of Contributed Capital** | | | | | | | | **Total** |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 134.22 | 302.34 | 473.02 | 235.26 | 0.00 | 0.00 | |
| 2 | Plus:  Contributed Capital in Current Period from LP's | 126.62 | 151.00 | 143.91 | 0.00 | 0.00 | 0.00 | 0.00 | 421.53 |
| 2a | *Investment Needs* | *118.09* | *141.70* | *141.70* | *0.00* | *0.00* | *0.00* | *0.00* | *401.49* |
| 2b | *Management Fees* | *0.98* | *3.68* | *2.21* | *0.00* | *0.00* | *0.00* | *0.00* | *6.86* |
| 2c | *Fund Expenses* | *7.56* | *5.63* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *13.18* |
| 3 | Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | (251.07) | (235.26) | 0.00 | 0.00 | (486.34) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 126.62 | 285.22 | 446.25 | 221.95 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus:  Current Period Preferred Return | 7.60 | 17.11 | 26.77 | 13.32 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 134.22 | 302.34 | 473.02 | 235.26 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | (147.59) | (105.71) | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 147.59 | 105.71 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 134.22 | 302.34 | 473.02 | 235.26 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 265.78 | 475.66 | 0.00 | 0.00 | 741.44 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 1.13 | 2.02 | 0.00 | 0.00 | 3.16 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 13.57 | 24.29 | 0.00 | 0.00 | 37.86 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 251.07 | 449.35 | 0.00 | 0.00 | 700.42 |
| | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 126.62 | 285.22 | 446.25 | 473.02 | 235.26 | 0.00 | 0.00 | **Total** |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 251.07 | 235.26 | 0.00 | 0.00 | 486.34 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 214.08 | 0.00 | 0.00 | |
| | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 1.34 | 4.36 | 13.25 | 19.95 | 11.44 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 11.44 | 0.00 | 0.00 | 11.44 |
| | | | | | | | | | |
| 19 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 202.65 | 0.00 | 0.00 | |
| | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | |
| 20 | 15% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 30.40 | 0.00 | 0.00 | 30.40 |
| 21 | 85% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 172.25 | 0.00 | 0.00 | 172.25 |

Total LP Capital Through Carry Waterfall     700.42

RIVERSTONE_SDTX00156659

EXHIBIT H-6

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
## RIVERSTONE CREDIT PARTNERS, L.P.
## AS OF DECEMBER 31, 2016

| | Year Ending April 6 | | 1.00 2016 | 2.00 2017 | 3.00 2018 | 4.00 2019 | 5.00 2020 | 6.00 2021 | 7.00 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 251.07 | 235.26 | 0.00 | 0.00 | 486.3370 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 172.25 | 0.00 | 0.00 | 172.2511 |
| 3 | Capital to be Funded | | (126.62) | (151.00) | (143.91) | 0.00 | 0.00 | 0.00 | 0.00 | (421.5349) |
| 4 | Net Capital Flows | | (126.62) | (151.00) | (143.91) | 251.07 | 407.51 | 0.00 | 0.00 | 237.0532 |
| 5 | Implied IRR, rounded | 18.6% | | | | | | | | |
| | | | 0.92 | 0.77 | 0.65 | 0.55 | 0.46 | 0.39 | 0.33 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (116.26) | (116.87) | (93.89) | 138.09 | 188.93 | 0.00 | 0.00 | 0.00 |
| | **FUND GP AFFILIATES IRR** | | | | | | | | | |
| 7 | Projected Return of Capital & ROI | | 0.00 | 0.00 | 0.00 | 13.57 | 24.29 | 0.00 | 0.00 | 37.86 |
| 8 | Capital to be Funded | | (6.79) | (7.97) | (7.97) | (0.26) | (0.20) | 0.00 | 0.00 | (23.18) |
| 9 | Net Capital Flows | | (6.79) | (7.97) | (7.97) | 13.32 | 24.08 | 0.00 | 0.00 | 14.68 |
| 10 | Implied IRR, rounded | 20.8% | | | | | | | | |
| | | | 0.91 | 0.75 | 0.62 | 0.52 | 0.43 | 0.35 | 0.29 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (6.18) | (6.00) | (4.96) | 6.86 | 10.27 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 1.13 | 2.02 | 0.00 | 0.00 | 3.16 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (0.57) | (0.66) | (0.66) | (0.02) | (0.02) | 0.00 | 0.00 | (1.93) |
| 14 | Net Capital Flows | | (0.57) | (0.66) | (0.66) | 1.11 | 2.01 | 0.00 | 0.00 | 1.22 |
| 15 | Implied IRR, rounded | 20.8% | | | | | | | | |
| | | | 0.91 | 0.75 | 0.62 | 0.52 | 0.43 | 0.35 | 0.29 | |
| 16 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.51) | (0.50) | (0.41) | 0.57 | 0.86 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | |
| 17 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 1.13 | 2.02 | 0.00 | 0.00 | 3.16 |
| 18 | Capital to be Funded (Cash, net of fee waiver) | | (0.57) | (0.66) | (0.66) | (0.02) | (0.02) | 0.00 | 0.00 | (1.93) |
| 19 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 11.44 | 0.00 | 0.00 | 11.44 |
| 20 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 30.40 | 0.00 | 0.00 | 30.40 |
| 21 | Net Capital Flows | | (0.57) | (0.66) | (0.66) | 1.11 | 43.84 | 0.00 | 0.00 | 43.06 |
| 22 | Implied IRR, rounded | 168.1% | | | | | | | | |
| | | | 0.61 | 0.23 | 0.08 | 0.03 | 0.01 | 0.00 | 0.00 | |
| 23 | Check Sum: Present Value of Net Capital Flows | 0.00 | (0.35) | (0.15) | (0.06) | 0.04 | 0.52 | 0.00 | 0.00 | 0.00 |
| | **RIVERSTONE CREDIT PARTNERS, L.P.--FUND IRR** | | | | | | | | | |
| 24 | Projected Investments to be made | | (125.00) | (150.00) | (150.00) | 0.00 | 0.00 | 0.00 | 0.00 | (425.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 265.78 | 475.66 | 0.00 | 0.00 | 741.44 |
| 26 | Management Fees (to Mgt. Co) | | (0.98) | (3.68) | (3.24) | (4.11) | (2.26) | 0.00 | 0.00 | (14.26) |
| 27 | Fund Expenses | | (8.00) | (6.00) | (6.00) | (5.00) | (4.00) | 0.00 | 0.00 | (29.00) |
| 28 | Net Capital Flows | | (133.98) | (159.68) | (159.24) | 256.67 | 469.40 | 0.00 | 0.00 | 273.18 |
| 29 | Implied IRR, rounded | 19.7% | | | | | | | | |
| | | | 0.91 | 0.76 | 0.64 | 0.53 | 0.45 | 0.37 | 0.31 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (122.47) | (121.96) | (101.63) | 136.89 | 209.18 | 0.00 | 0.00 | 0.00 |

EXHIBIT H-7

## DISCOUNTED CASH FLOW ANALYSIS
RCP F1 GP, L.P.
AS OF DECEMBER 31, 2016

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year Ending April 6 | | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Totals |
| *(Period in Years)* | | (0.72) | 0.28 | 1.28 | 2.28 | 3.28 | 4.28 | 5.28 | |
| **General Partner Cash Flows ($ Millions)** | Reference | | | | | | | | |
| **Carried Interest Cash Flows - (RCP F1 GP, L.P.)** | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT H-6, Row 19 | $0.00 | $0.00 | $0.00 | $0.00 | $11.44 | $0.00 | $0.00 | $11.44 |
| Full Carry | EXHIBIT H-6, Row 20 | $0.00 | $0.00 | $0.00 | $0.00 | $30.40 | $0.00 | $0.00 | $30.40 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $41.83 | $0.00 | $0.00 | $41.83 |

**EXHIBIT I-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE ENERGY AND POWER CKD TRUST
### AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE ENERGY AND POWER CKD TRUST |
| 2 | Fund Short Name | | CKD I |
| 3 | GP Entity Name | | RIVERSTONE CAPITAL PARTNERS CKD, LP |
| 4 | GP Entity Short Name | | RIVERSTONE GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 683.00 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 13.66 |
| 8 | COINVESTOR | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **696.66** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 12/14/2015 |
| 11 | Final Close | | 12/14/2016 |
| 12 | Investment Period End Date | 5 | 12/14/2020 |
| 13 | Fund Term End Date | 10 | 12/14/2025 |
| 14 | Fund Term with Extensions | 2 | 12/14/2027 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **678.043** |
| 17 | LP Capital Called | | 665.404 |
| 18 | GP Capital Called (cash only) | | 12.639 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 97% |

**Investment Time Frame**

| | | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 3 |
| 22 | Investment to Harvest Time in years | | 4 |

**Gross Exit Multiples**

| | | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.50 |
| 22 | For Follow-on Investments | | 2.50 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 23.5% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 19.8% |

**Management Fees**

| | | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 13.660 |

**Preferred Rate of Return**

| | | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

| | | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156662

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 738 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT I-2**

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE ENERGY AND POWER CKD TRUST
## AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| **TBD - Unidentified Investment(s) in fiscal 2016** | $175,000,000 | 2016 | $0 | 2019 | $437,500,000 | 2020 |
| **TBD - Unidentified Investment(s) in fiscal 2017** | $150,000,000 | 2017 | $0 | 2020 | $375,000,000 | 2021 |
| **TBD - Unidentified Investment(s) in fiscal 2018** | $150,000,000 | 2018 | $0 | 2021 | $375,000,000 | 2022 |
| **TBD - Unidentified Investment(s) in fiscal 2019** | $150,000,000 | 2019 | $0 | 2022 | $375,000,000 | 2023 |
| Total | $625,000,000 | | $0 | | $1,562,500,000 | |
| FUND LPs | $612,745,098 | | $0 | | | |
| RIVERSTONE GP (de minimus) | $12,254,902 | | $0 | | | |
| COINVESTOR | $0 | | $0 | | $1,562,500,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $625,000,000 | | | | $625,000,000 | Aggregate Investment Outlays |
| | | | | | 2.50 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $683,000,000 | 98.0% |
| RIVERSTONE GP (de minimus) | $13,660,000 | 2.0% |
| COINVESTOR | $0 | 0.0% |
| | $696,660,000 | 100% |

**EXHIBIT I-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE ENERGY AND POWER CKD TRUST
### AS OF DECEMBER 31, 2016

| | Investment Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fund Year** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| **Year Ending December 31,** | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | **Totals** |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1 Investments made in 2016 + follow-on | 175.00 | - | - | - | - | - | - | - | - | - | - | - | 175.00 |
| 2 Investments made in 2017 + follow-on | - | 150.00 | - | - | - | - | - | - | - | - | - | - | 150.00 |
| 3 Investments made in 2018 + follow-on | - | - | 150.00 | - | - | - | - | - | - | - | - | - | 150.00 |
| 4 Investments made in 2019 + follow-on | - | - | - | 150.00 | - | - | - | - | - | - | - | - | 150.00 |
| 5 Investments made in 2020 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 Investments made in 2021 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 Investments made in 2022 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 Sum of Investments | 175.00 | 150.00 | 150.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 625.00 |
| 9 Aggregate Sum of Investments | 175.00 | 325.00 | 475.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | |
| | | | | | | | | | | | | | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10 Investment Distributions from 2016 Investments | - | - | - | - | 437.50 | - | - | - | - | - | - | - | 437.50 |
| 11 Investment Distributions from 2017 Investments | - | - | - | - | - | 375.00 | - | - | - | - | - | - | 375.00 |
| 12 Investment Distributions from 2018 Investments | - | - | - | - | - | - | 375.00 | - | - | - | - | - | 375.00 |
| 13 Investment Distributions from 2019 Investments | - | - | - | - | - | - | - | 375.00 | - | - | - | - | 375.00 |
| 14 Investment Distributions from 2020 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 437.50 | 375.00 | 375.00 | 375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,562.50 |
| | | | | | | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18 Cumulative Capital Contributions - Beginning | 0.00 | 175.00 | 325.00 | 475.00 | 625.00 | 450.00 | 300.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19 Plus: New Investments | 175.00 | 150.00 | 150.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (175.00) | (150.00) | (150.00) | (150.00) | 0.00 | 0.00 | 0.00 | 0.00 | (625.00) |
| 21 Net Contributions that Remain Invested - End | 175.00 | 325.00 | 475.00 | 625.00 | 450.00 | 300.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22 Pro Rata Portion Excluded from Mgmt. Fee Calculation | (13.66) | (13.66) | (13.66) | (13.66) | (13.66) | (5.88) | (2.94) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 Net Capital/Contributions for Mgmt. Fee Calculation | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 294.12 | 147.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| **Management Fees** | | | | | | | | | | | | | |
| 24 Management Fees Due to Investment Manager | 10.25 | 10.25 | 10.25 | 10.25 | 10.25 | 3.65 | 2.21 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 57.82 |
| 25 Less: Estimated Net Management Fees Offset (1) | (5.00) | (5.00) | (5.00) | (5.00) | (2.50) | (1.25) | (0.63) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (24.38) |
| 26 Net Management Fees to be Called | 5.25 | 5.25 | 5.25 | 5.25 | 7.75 | 2.40 | 1.58 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 33.44 |
| | | | | | | | | | | | | | |
| **Capital Calls** | | | | | | | | | | | | | |
| 27 Investment Needs | 175.00 | 150.00 | 150.00 | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 625.00 |
| 28 Management Fees | 5.25 | 5.25 | 5.25 | 5.25 | 7.75 | 2.40 | 1.58 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 33.44 |
| 29 Fund Expenses (2) | 10.10 | 2.00 | 2.00 | 2.00 | 2.00 | 1.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19.60 |
| 30 Sum of Capital Calls | 190.35 | 157.25 | 157.25 | 157.25 | 9.75 | 3.40 | 2.08 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 678.04 |
| 31 Aggregate of Capital Called | 190.35 | 347.59 | 504.84 | 662.08 | 671.83 | 675.23 | 677.31 | 678.04 | 678.04 | 678.04 | 678.04 | 678.04 | |

| | |
|---|---|
| Percentage of Committed Capital Called | 97% |
| Net Exit Multiple | 2.30 |

(1) Management fee offset data provided by Management. See Exhibit I-4 for details.
(2) Fund Expense data provided by Management. See Exhibit I-4 for details.

EXHIBIT I-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE ENERGY AND POWER CKD TRUST
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2016 | Year 2 2017 | Year 3 2018 | Year 4 2019 | Year 5 2020 | Year 6 2021 | Year 7 2022 | Year 8 2023 | Year 9 2024 | Year 10 2025 | Year 11 2026 | Year 12 2027 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Investment period** | | | | | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 5.00 | 5.00 | 5.00 | 5.00 | 2.50 | 1.25 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 5.00 | 5.00 | 5.00 | 5.00 | 2.50 | 1.25 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3  Less: Available Portfolio Income Offset Applied | | (5.00) | (5.00) | (5.00) | (5.00) | (2.50) | (1.25) | (0.63) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (24.38) |
| **4 Net Management Fee Offsets (Line 6 + Line 3)** | | **(5.00)** | **(5.00)** | **(5.00)** | **(5.00)** | **(2.50)** | **(1.25)** | **(0.63)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **(24.38)** |

| Estimated Portfolio Expenses | Year 1 2016 | Year 2 2017 | Year 3 2018 | Year 4 2019 | Year 5 2020 | Year 6 2021 | Year 7 2022 | Year 8 2023 | Year 9 2024 | Year 10 2025 | Year 11 2026 | Year 12 2027 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Investment period** | | | | | | | | | | | | |
| 5 Organizational Expenses | 8.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.10 |
| 6 Annual Fund Operating Expenses | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 1.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.50 |
| **7 Capital Calls for Expenses** | **10.10** | **2.00** | **2.00** | **2.00** | **2.00** | **1.00** | **0.50** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **19.60** |

* Per Management.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT I-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE ENERGY AND POWER CKD TRUST
### AS OF DECEMBER 31, 2016

| Fund Year | Investment Period | | | | | Harvest Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31, | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | Total |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | |
| LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1 Beginning Balance | 0.00 | 201.65 | 384.39 | 581.75 | 794.89 | 595.66 | 412.71 | 214.50 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Plus: Contributed Capital in Current Period from LP's | 186.72 | 154.26 | 154.26 | 154.26 | 9.71 | 3.38 | 2.07 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 665.40 |
| 2a *Investment Needs* | *171.57* | *147.06* | *147.06* | *147.06* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *612.75* |
| 2b *Management Fees* | *5.25* | *5.25* | *5.25* | *5.25* | *7.75* | *2.40* | *1.58* | *0.74* | *0.00* | *0.00* | *0.00* | *0.00* | *33.44* |
| 2c *Fund Expenses* | *9.90* | *1.96* | *1.96* | *1.96* | *1.96* | *0.98* | *0.49* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *19.22* |
| 3 Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (253.06) | (216.91) | (216.17) | (215.23) | 0.00 | 0.00 | 0.00 | 0.00 | (901.37) |
| 4 Equals: End of Period Contributed Capital, prior to preferred return accrual | 186.72 | 355.92 | 538.66 | 736.01 | 551.54 | 382.13 | 198.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 Plus: Current Period Preferred Return | 14.94 | 28.47 | 43.09 | 58.88 | 44.12 | 30.57 | 15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 End of Period Net LP Contributed Capital | 201.65 | 384.39 | 581.75 | 794.89 | 595.66 | 412.71 | 214.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 End of Period Net LP Contributed Capital including previous deficient returns | 201.65 | 384.39 | 581.75 | 794.89 | 595.66 | 412.71 | 214.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| 10 **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 437.50 | 375.00 | 375.00 | 375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,562.50 |
| 11 Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 8.58 | 7.35 | 7.35 | 7.35 | 0.00 | 0.00 | 0.00 | 0.00 | 30.64 |
| 12 Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 Net Distributions Available for LP Distribution Provisions | 0.00 | 0.00 | 0.00 | 0.00 | 428.92 | 367.65 | 367.65 | 367.65 | 0.00 | 0.00 | 0.00 | 0.00 | 1,531.86 |
| | | | | | | | | | | | | | |
| **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14 Aggregate Contributed Capital and Preferred Return Due | 186.72 | 355.92 | 538.66 | 736.01 | 804.60 | 599.04 | 414.78 | 215.23 | 0.00 | 0.00 | 0.00 | 0.00 | Total |
| 15 Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 253.06 | 216.91 | 216.17 | 215.23 | 0.00 | 0.00 | 0.00 | 0.00 | 901.37 |
| 16 Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 175.86 | 150.74 | 151.48 | 152.41 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 GP Catch-up Distribution Payable | 4.98 | 14.47 | 28.83 | 48.46 | 63.17 | 51.11 | 37.34 | 18.51 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 17.80 | 15.26 | 15.06 | 14.81 | 0.00 | 0.00 | 0.00 | 0.00 | 62.92 |
| 19 Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 4.45 | 3.81 | 3.76 | 3.70 | 0.00 | 0.00 | 0.00 | 0.00 | 15.73 |
| | | | | | | | | | | | | | |
| 20 Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 153.61 | 131.67 | 132.66 | 133.90 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 30.72 | 26.33 | 26.53 | 26.78 | 0.00 | 0.00 | 0.00 | 0.00 | 110.37 |
| 22 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 122.89 | 105.33 | 106.12 | 107.12 | 0.00 | 0.00 | 0.00 | 0.00 | 441.47 |

Total LP Capital Through Carry Waterfall    1,531.86

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT I-6

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE ENERGY AND POWER CKD TRUST
AS OF DECEMBER 31, 2016

| | Year Ending December 31, | | 1.00 2016 | 2.00 2017 | 3.00 2018 | 4.00 2019 | 5.00 2020 | 6.00 2021 | 7.00 2022 | 8.00 2023 | 9.00 2024 | 10.00 2025 | 11.00 2026 | 12.00 2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 253.06 | 216.91 | 216.17 | 215.23 | 0.00 | 0.00 | 0.00 | 0.00 | 901.3705 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 127.34 | 109.15 | 109.89 | 110.82 | 0.00 | 0.00 | 0.00 | 0.00 | 457.2005 |
| 3 | Capital to be Funded | | (186.72) | (154.26) | (154.26) | (154.26) | (9.71) | (3.38) | (2.07) | (0.74) | 0.00 | 0.00 | 0.00 | 0.00 | (665.4042) |
| 4 | Net Capital Flows | | (186.72) | (154.26) | (154.26) | (154.26) | 370.69 | 322.67 | 323.99 | 325.32 | 0.00 | 0.00 | 0.00 | 0.00 | 693.1668 |
| 5 | Implied IRR, rounded | 19.8% | 0.91 | 0.76 | 0.64 | 0.53 | 0.44 | 0.37 | 0.31 | 0.26 | 0.22 | 0.18 | 0.15 | 0.13 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (170.61) | (117.69) | (98.26) | (82.04) | 164.61 | 119.63 | 100.29 | 84.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 8.58 | 7.35 | 7.35 | 7.35 | 0.00 | 0.00 | 0.00 | 0.00 | 30.64 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (3.63) | (2.98) | (2.98) | (2.98) | (0.04) | (0.02) | (0.01) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (12.64) |
| 9 | Net Capital Flows | | (3.63) | (2.98) | (2.98) | (2.98) | 8.54 | 7.33 | 7.34 | 7.35 | 0.00 | 0.00 | 0.00 | 0.00 | 18.00 |
| 10 | Implied IRR, rounded | 24.7% | 0.90 | 0.72 | 0.58 | 0.46 | 0.37 | 0.30 | 0.24 | 0.19 | 0.15 | 0.12 | 0.10 | 0.08 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (3.25) | (2.14) | (1.72) | (1.37) | 3.16 | 2.17 | 1.75 | 1.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 8.58 | 7.35 | 7.35 | 7.35 | 0.00 | 0.00 | 0.00 | 0.00 | 30.64 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (3.63) | (2.98) | (2.98) | (2.98) | (0.04) | (0.02) | (0.01) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (12.64) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 17.80 | 15.26 | 15.06 | 14.81 | 0.00 | 0.00 | 0.00 | 0.00 | 62.92 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 30.72 | 26.33 | 26.53 | 26.78 | 0.00 | 0.00 | 0.00 | 0.00 | 110.37 |
| 16 | Net Capital Flows | | (3.63) | (2.98) | (2.98) | (2.98) | 57.06 | 48.92 | 48.93 | 48.94 | 0.00 | 0.00 | 0.00 | 0.00 | 191.29 |
| 17 | Implied IRR, rounded | 100.0% | 0.71 | 0.35 | 0.18 | 0.09 | 0.04 | 0.02 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (2.57) | (1.05) | (0.53) | (0.26) | 2.52 | 1.08 | 0.54 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **RIVERSTONE ENERGY AND POWER CKD TRUST--FUND IRR** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | (175.00) | (150.00) | (150.00) | (150.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (625.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 437.50 | 375.00 | 375.00 | 375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,562.50 |
| 26 | Management Fees (to Mgt. Co) | | (5.25) | (5.25) | (5.25) | (5.25) | (7.75) | (2.40) | (1.58) | (0.74) | 0.00 | 0.00 | 0.00 | 0.00 | (33.44) |
| 27 | Fund Expenses | | (10.10) | (2.00) | (2.00) | (2.00) | (2.00) | (1.00) | (0.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (19.60) |
| 28 | Net Capital Flows | | (190.35) | (157.25) | (157.25) | (157.25) | 427.76 | 371.60 | 372.92 | 374.26 | 0.00 | 0.00 | 0.00 | 0.00 | 884.46 |
| 29 | Implied IRR, rounded | 23.5% | 0.90 | 0.73 | 0.59 | 0.48 | 0.39 | 0.31 | 0.25 | 0.21 | 0.17 | 0.13 | 0.11 | 0.09 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (171.30) | (114.61) | (92.83) | (75.18) | 165.65 | 116.55 | 94.73 | 77.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

RIVERSTONE_SDTX00156667

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT I-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE CAPITAL PARTNERS CKD, LP
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | Reference | Year 1 2016 | Year 2 2017 | Year 3 2018 | Year 4 2019 | Year 5 2020 | Year 6 2021 | Year 7 2022 | Year 8 2023 | Year 9 2024 | Year 10 2025 | Year 11 2026 | Year 12 2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | (0.05) | 0.95 | 1.95 | 2.95 | 3.95 | 4.95 | 5.95 | 6.95 | 7.95 | 8.95 | 9.95 | 10.95 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Capital Partners CKD, LP)** | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT I-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $17.80 | $15.26 | $15.06 | $14.81 | $0.00 | $0.00 | $0.00 | $0.00 | $62.92 |
| Full Carry | EXHIBIT I-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $30.72 | $26.33 | $26.53 | $26.78 | $0.00 | $0.00 | $0.00 | $0.00 | $110.37 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $48.52 | $41.59 | $41.59 | $41.59 | $0.00 | $0.00 | $0.00 | $0.00 | $173.29 |

RIVERSTONE_SDTX00156668

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT J-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
**RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.**
### AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P |
| 2 | Fund Short Name | | RIVERSTONE VII |
| 3 | GP Entity Name | | RIVERSTONE ENGERY PARTNERS VII, L.P. |
| 4 | GP Entity Short Name | | RIVERSTONE GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 5,500 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 110 |
| 8 | CO-INVESTMENT | 0.0% | 0 |
| 9 | **Total Capital Commitments ($ in millions)** | | **5,610.00** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2018 |
| 11 | Final Close | | 12/31/2019 |
| 12 | Investment Period End Date | 5 | 12/31/2023 |
| 13 | Fund Term End Date | 10 | 12/31/2028 |
| 14 | Fund Term with Extensions | 2 | 12/31/2030 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **5,594.724** |
| 17 | LP Capital Called | | 5,493.174 |
| 18 | GP Capital Called (cash only) | | 101.550 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 100% |

**Investment Time Frame**

| | | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 2 |
| 22 | Investment to Harvest Time in years | | 4 |

**Gross Exit Multiples**

| | | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.00 |
| 22 | For Follow-on Investments | | 1.75 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 17.0% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 14.2% |

**Management Fees**

| | | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 110.000 |

**Preferred Rate of Return**

| | | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

| | | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156669

**EXHIBIT J-2**

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.
### AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| TBD - Unidentified Investment(s) in fiscal 2019 | $1,215,000,000 | 2019 | $135,000,000 | 2021 | $2,666,250,000 | 2023 |
| TBD - Unidentified Investment(s) in fiscal 2020 | $1,215,000,000 | 2020 | $135,000,000 | 2022 | $2,666,250,000 | 2024 |
| TBD - Unidentified Investment(s) in fiscal 2021 | $1,215,000,000 | 2021 | $135,000,000 | 2023 | $2,666,250,000 | 2025 |
| TBD - Unidentified Investment(s) in fiscal 2022 | $972,000,000 | 2022 | $108,000,000 | 2024 | $2,133,000,000 | 2026 |
| TBD - Unidentified Investment(s) in fiscal 2023 | $0 | 2023 | $0 | 2025 | $0 | 2027 |
| Total | $4,617,000,000 | | $513,000,000 | | $10,131,750,000 | |
| FUND LPs | $4,526,470,588 | | $502,941,176 | | | |
| RIVERSTONE GP (de minimus) | $90,529,412 | | $10,058,824 | | | |
| CO-INVESTMENT | $0 | | $0 | | $10,131,750,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $5,130,000,000 | | | | $5,130,000,000 | Aggregate Investment Outlays |
| | | | | | 1.98 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $5,500,000,000 | 98.0% |
| RIVERSTONE GP (de minimus) | $110,000,000 | 2.0% |
| CO-INVESTMENT | $0 | 0.0% |
| | $5,610,000,000 | 100% |

**EXHIBIT J-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.
### AS OF DECEMBER 31, 2016

| | | | | | Investment Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Totals |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1  Investments made in 2019 + follow-on | 1,215.00 | - | 135.00 | - | - | - | - | - | - | - | - | - | 1,350.00 |
| 2  Investments made in 2020 + follow-on | - | 1,215.00 | - | 135.00 | - | - | - | - | - | - | - | - | 1,350.00 |
| 3  Investments made in 2021 + follow-on | - | - | 1,215.00 | - | 135.00 | - | - | - | - | - | - | - | 1,350.00 |
| 4  Investments made in 2022 + follow-on | - | - | - | 972.00 | - | 108.00 | - | - | - | - | - | - | 1,080.00 |
| 5  Investments made in 2023 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6  Investments made in 2024 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7  Investments made in 2025 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8  Sum of Investments | 1,215.00 | 1,215.00 | 1,350.00 | 1,107.00 | 135.00 | 108.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,130.00 |
| 9  Aggregate Sum of Investments | 1,215.00 | 2,430.00 | 3,780.00 | 4,887.00 | 5,022.00 | 5,130.00 | 5,130.00 | 5,130.00 | 5,130.00 | 5,130.00 | 5,130.00 | 5,130.00 | |
| | | | | | | | | | | | | | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10  Investment Distributions from 2019 Investments | - | - | - | - | 2,666.25 | - | - | - | - | - | - | - | 2,666.25 |
| 11  Investment Distributions from 2020 Investments | - | - | - | - | - | 2,666.25 | - | - | - | - | - | - | 2,666.25 |
| 12  Investment Distributions from 2021 Investments | - | - | - | - | - | - | 2,666.25 | - | - | - | - | - | 2,666.25 |
| 13  Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | 2,133.00 | - | - | - | - | 2,133.00 |
| 14  Investment Distributions from 2023 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15  Investment Distributions from 2024 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16  Investment Distributions from 2025 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17  Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 2,666.25 | 2,666.25 | 2,666.25 | 2,133.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,131.75 |
| | | | | | | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18  Cumulative Capital Contributions - Beginning | 0.00 | 1,215.00 | 2,430.00 | 3,780.00 | 4,887.00 | 3,672.00 | 2,430.00 | 1,080.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19  Plus: New Investments | 1,215.00 | 1,215.00 | 1,350.00 | 1,107.00 | 135.00 | 108.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20  Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (1,350.00) | (1,350.00) | (1,350.00) | (1,080.00) | 0.00 | 0.00 | 0.00 | 0.00 | (5,130.00) |
| 21  Net Contributions that Remain Invested - End | 1,215.00 | 2,430.00 | 3,780.00 | 4,887.00 | 3,672.00 | 2,430.00 | 1,080.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22  Pro Rata Portion Excluded from Mgmt. Fee Calculation | (110.00) | (110.00) | (110.00) | (110.00) | (110.00) | (47.65) | (21.18) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23  Net Capital/Contributions for Mgmt. Fee Calculation | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 2,382.35 | 1,058.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | (47.65) | | | | | | | |
| **Management Fees** | | | | | | | | | | | | | |
| 24  Management Fees Due to Investment Manager | 82.50 | 82.50 | 82.50 | 82.50 | 82.50 | 39.41 | 17.21 | 5.29 | 0.00 | 0.00 | 0.00 | 0.00 | 474.41 |
| 25  Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | (58.75) |
| 26  Net Management Fees to be Called | 72.50 | 72.50 | 72.50 | 72.50 | 72.50 | 34.41 | 14.71 | 4.04 | 0.00 | 0.00 | 0.00 | 0.00 | 415.66 |
| | | | | | | | | | | | | | |
| **Capital Calls** | | | | | | | | | | | | | |
| 27  Investment Needs | 1,215.00 | 1,215.00 | 1,350.00 | 1,107.00 | 135.00 | 108.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,130.00 |
| 28  Management Fees | 72.50 | 72.50 | 72.50 | 72.50 | 72.50 | 34.41 | 14.71 | 4.04 | 0.00 | 0.00 | 0.00 | 0.00 | 415.66 |
| 29  Fund Expenses (2) | 12.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 49.06 |
| 30  Sum of Capital Calls | 1,300.00 | 1,295.00 | 1,430.00 | 1,187.00 | 215.00 | 146.16 | 16.58 | 4.98 | 0.00 | 0.00 | 0.00 | 0.00 | 5,594.72 |
| 31  Aggregate Capital Called | 1,300.00 | 2,595.00 | 4,025.00 | 5,212.00 | 5,427.00 | 5,573.16 | 5,589.74 | 5,594.72 | 5,594.72 | 5,594.72 | 5,594.72 | 5,594.72 | |

| | |
|---|---|
| Percentage of Committed Capital Called | 100% |
| Net Exit Multiple | 1.81 |

(1)  Management fee offset data provided by Management.  See Exhibit J-4 for details.
(2)  Fund Expense data provided by Management.  See Exhibit J-4 for details.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT J-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
**RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.**
**AS OF DECEMBER 31, 2016**

($ millions)
(based on data provided by Management)

|  |  | % offset | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  | **Investment period** | | | | | | | | | | | | |
| 1 | Total Fees Available for Fee Offset |  | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 | Less: Available Portfolio Income Offset Applied |  | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | (58.75) |
| 4 | **Net Management Fee Offsets (Line 6 + Line 3)** |  | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(5.00)** | **(2.50)** | **(1.25)** | **0.00** | **0.00** | **0.00** | **0.00** | **(58.75)** |

| **Estimated Portfolio Expenses** | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Investment period** | | | | | | | | | | | | |
| 5  Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6  Annual Fund Operating Expenses | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 3.75 | 1.88 | 0.94 | 0.00 | 0.00 | 0.00 | 0.00 | 44.06 |
| 7  **Capital Calls for Expenses** | **12.50** | **7.50** | **7.50** | **7.50** | **7.50** | **3.75** | **1.88** | **0.94** | **0.00** | **0.00** | **0.00** | **0.00** | **49.06** |

* Per Management.

**EXHIBIT J-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.
#### AS OF DECEMBER 31, 2016

| Fund Year | | Investment Period | | | | | Harvest Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31 | | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Total |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | | |
| **LP Invested Capital Subject to Preferred Return** | | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 1378.01 | 2860.96 | 4605.49 | 6232.29 | 4867.83 | 3325.25 | 1530.18 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 1275.93 | 1271.03 | 1403.38 | 1165.15 | 212.21 | 143.97 | 16.54 | 4.96 | 0.00 | 0.00 | 0.00 | 0.00 | 5,493.17 |
| 2a | Investment Needs | 1191.18 | 1191.18 | 1323.53 | 1085.29 | 132.35 | 105.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,029.41 |
| 2b | Management Fees | 72.50 | 72.50 | 72.50 | 72.50 | 72.50 | 34.41 | 14.71 | 4.04 | 0.00 | 0.00 | 0.00 | 0.00 | 415.66 |
| 2c | Fund Expenses | 12.25 | 7.35 | 7.35 | 7.35 | 7.35 | 3.68 | 1.84 | 0.92 | 0.00 | 0.00 | 0.00 | 0.00 | 48.10 |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (1937.24) | (1932.87) | (1924.96) | (1535.14) | 0.00 | 0.00 | 0.00 | 0.00 | (7,330.21) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 1275.93 | 2649.04 | 4264.34 | 5770.63 | 4507.25 | 3078.93 | 1416.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus: Current Period Preferred Return | 102.07 | 211.92 | 341.15 | 461.65 | 360.58 | 246.31 | 113.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 1378.01 | 2860.96 | 4605.49 | 6232.29 | 4867.83 | 3325.25 | 1530.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 1378.01 | 2860.96 | 4605.49 | 6232.29 | 4867.83 | 3325.25 | 1530.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 2666.25 | 2666.25 | 2666.25 | 2133.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,131.75 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 52.28 | 52.28 | 52.28 | 41.82 | 0.00 | 0.00 | 0.00 | 0.00 | 198.66 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | Net Distributions Available for LP Distribution Provisions | 0.00 | 0.00 | 0.00 | 0.00 | 2613.97 | 2613.97 | 2613.97 | 2091.18 | 0.00 | 0.00 | 0.00 | 0.00 | 9,933.09 |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 1275.93 | 2649.04 | 4264.34 | 5770.63 | 6444.49 | 5011.80 | 3341.79 | 1535.14 | 0.00 | 0.00 | 0.00 | 0.00 | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 1937.24 | 1932.87 | 1924.96 | 1535.14 | 0.00 | 0.00 | 0.00 | 0.00 | 7,330.21 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 676.73 | 681.10 | 689.01 | 556.03 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 34.02 | 104.67 | 218.38 | 372.27 | 492.46 | 410.67 | 286.02 | 126.23 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 131.11 | 129.95 | 127.84 | 100.98 | 0.00 | 0.00 | 0.00 | 0.00 | 489.88 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 32.78 | 32.49 | 31.96 | 25.25 | 0.00 | 0.00 | 0.00 | 0.00 | 122.47 |
| | | | | | | | | | | | | | | |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 512.84 | 518.67 | 529.21 | 429.81 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 102.57 | 103.73 | 105.84 | 85.96 | 0.00 | 0.00 | 0.00 | 0.00 | 398.11 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 410.27 | 414.94 | 423.37 | 343.85 | 0.00 | 0.00 | 0.00 | 0.00 | 1,592.43 |

Total LP Capital Through Carry Waterfall   9,933.09

Confidential
Empire Valuation Consultants
Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT J-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending December 31 | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Totals |
| **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1  Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 1,937.24 | 1,932.87 | 1,924.96 | 1,535.14 | 0.00 | 0.00 | 0.00 | 0.00 | 7,330.2108 |
| 2  Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 443.05 | 447.42 | 455.33 | 369.09 | 0.00 | 0.00 | 0.00 | 0.00 | 1,714.8946 |
| 3  Capital to be Funded | | (1,275.93) | (1,271.03) | (1,403.38) | (1,165.15) | (212.21) | (143.97) | (16.54) | (4.96) | 0.00 | 0.00 | 0.00 | 0.00 | (5,493.1740) |
| 4  Net Capital Flows | | (1,275.93) | (1,271.03) | (1,403.38) | (1,165.15) | 2,168.09 | 2,236.32 | 2,363.75 | 1,899.27 | 0.00 | 0.00 | 0.00 | 0.00 | 3,551.9314 |
| 5  Implied IRR, rounded | 14.2% | | | | | | | | | | | | | |
| | | 0.94 | 0.82 | 0.72 | 0.63 | 0.55 | 0.48 | 0.42 | 0.37 | 0.32 | 0.28 | 0.25 | 0.22 | |
| 6  Check Sum: Present Value of Net Capital Flows | 0.00 | (1,194.18) | (1,042.04) | (1,007.83) | (732.96) | 1,194.70 | 1,079.44 | 999.43 | 703.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | |
| **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7  Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 52.28 | 52.28 | 52.28 | 41.82 | 0.00 | 0.00 | 0.00 | 0.00 | 198.66 |
| 8  Capital to be Funded (Cash, net of fee waiver) | | (24.07) | (23.97) | (26.62) | (21.85) | (2.79) | (2.19) | (0.04) | (0.02) | 0.00 | 0.00 | 0.00 | 0.00 | (101.55) |
| 9  Net Capital Flows | | (24.07) | (23.97) | (26.62) | (21.85) | 49.49 | 50.09 | 52.24 | 41.81 | 0.00 | 0.00 | 0.00 | 0.00 | 97.11 |
| 10  Implied IRR, rounded | 19.2% | | | | | | | | | | | | | |
| | | 0.92 | 0.77 | 0.64 | 0.54 | 0.45 | 0.38 | 0.32 | 0.27 | 0.23 | 0.19 | 0.16 | 0.13 | |
| 11  Check Sum: Present Value of Net Capital Flows | 0.00 | (22.05) | (18.42) | (17.17) | (11.82) | 22.47 | 19.08 | 16.70 | 11.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | |
| **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12  Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 52.28 | 52.28 | 52.28 | 41.82 | 0.00 | 0.00 | 0.00 | 0.00 | 198.66 |
| 13  Capital to be Funded (Cash, net of fee waiver) | | (24.07) | (23.97) | (26.62) | (21.85) | (2.79) | (2.19) | (0.04) | (0.02) | 0.00 | 0.00 | 0.00 | 0.00 | (101.55) |
| 14  Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 131.11 | 129.95 | 127.84 | 100.98 | 0.00 | 0.00 | 0.00 | 0.00 | 489.88 |
| 15  Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 102.57 | 103.73 | 105.84 | 85.96 | 0.00 | 0.00 | 0.00 | 0.00 | 398.11 |
| 16  Net Capital Flows | | (24.07) | (23.97) | (26.62) | (21.85) | 283.16 | 283.77 | 285.92 | 228.75 | 0.00 | 0.00 | 0.00 | 0.00 | 985.09 |
| 17  Implied IRR, rounded | 84.3% | | | | | | | | | | | | | |
| | | 0.74 | 0.40 | 0.22 | 0.12 | 0.06 | 0.03 | 0.02 | 0.01 | 0.01 | 0.01 | 0.00 | 0.00 | |
| 18  Check Sum: Present Value of Net Capital Flows | 0.00 | (17.73) | (9.58) | (5.78) | (2.57) | 18.10 | 9.84 | 5.38 | 2.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | |
| **RIVERSTONE GLOBAL ENERGY AND POWER FUND VII, L.P.--FUND IRR** | | | | | | | | | | | | | | |
| 24  Projected Investments to be made | | (1,215.00) | (1,215.00) | (1,350.00) | (1,107.00) | (135.00) | (108.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (5,130.00) |
| 25  Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 2,666.25 | 2,666.25 | 2,666.25 | 2,133.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,131.75 |
| 26  Management Fees (to Mgt. Co) | | (72.50) | (72.50) | (72.50) | (72.50) | (72.50) | (34.41) | (14.71) | (4.04) | 0.00 | 0.00 | 0.00 | 0.00 | (415.66) |
| 27  Fund Expenses | | (12.50) | (7.50) | (7.50) | (7.50) | (7.50) | (3.75) | (1.88) | (0.94) | 0.00 | 0.00 | 0.00 | 0.00 | (49.06) |
| 28  Net Capital Flows | | (1,300.00) | (1,295.00) | (1,430.00) | (1,187.00) | 2,451.25 | 2,520.09 | 2,649.67 | 2,128.02 | 0.00 | 0.00 | 0.00 | 0.00 | 4,537.03 |
| 29  Implied IRR, rounded | 17.0% | | | | | | | | | | | | | |
| | | 0.92 | 0.79 | 0.67 | 0.58 | 0.49 | 0.42 | 0.36 | 0.31 | 0.26 | 0.22 | 0.19 | 0.16 | |
| 30  Check Sum: Present Value of Net Capital Flows | 0.00 | (1,201.60) | (1,022.63) | (964.76) | (684.18) | 1,207.09 | 1,060.23 | 952.38 | 653.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

RIVERSTONE_SDTX00156674

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT J-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE ENGERY PARTNERS VII, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending December 31 | Reference | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | 14.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Energy Partners VII, LP)** | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT J-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $131.11 | $129.95 | $127.84 | $100.98 | $0.00 | $0.00 | $0.00 | $0.00 | $489.88 |
| Full Carry | EXHIBIT J-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $102.57 | $103.73 | $105.84 | $85.96 | $0.00 | $0.00 | $0.00 | $0.00 | $398.11 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $233.68 | $233.68 | $233.68 | $186.94 | $0.00 | $0.00 | $0.00 | $0.00 | $887.98 |

RIVERSTONE_SDTX00156675

EXHIBIT K-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
**RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.**
AS OF DECEMBER 31, 2016

| | Key Information | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P. |
| 2 | Fund Short Name | | FUND |
| 3 | GP Entity Name | | RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, LLC |
| 4 | GP Entity Short Name | | FUND GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

| | Committed Capital by Class of Partner | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 1,000 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 20 |
| 8 | CO-INVESTMENT | 0.0% | 0 |
| 9 | **Total Capital Commitments ($ in millions)** | | **1,020.00** |

| | Key Fund Dates | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2017 |
| 11 | Final Close | | 12/31/2018 |
| 12 | Investment Period End Date | 5 | 12/31/2022 |
| 13 | Fund Term End Date | 10 | 12/31/2027 |
| 14 | Fund Term with Extensions | 2 | 12/31/2029 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **996.111** |
| 17 | LP Capital Called | | 977.126 |
| 18 | GP Capital Called (cash only) | | 18.985 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 98% |

| | Investment Time Frame | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 2 |
| 22 | Investment to Harvest Time in years | | 4 |

| | Gross Exit Multiples | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.00 |
| 22 | For Follow-on Investments | | 1.50 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 17.7% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 14.7% |

| | Management Fees | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 20.000 |

| | Preferred Rate of Return | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | 80% |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

| | Carried Interest | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156676

**EXHIBIT K-2**

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| TBD - Unidentified Investment(s) in fiscal 2018 | $225,000,000 | 2018 | $25,000,000 | 2020 | $487,500,000 | 2022 |
| TBD - Unidentified Investment(s) in fiscal 2019 | $225,000,000 | 2019 | $25,000,000 | 2021 | $487,500,000 | 2023 |
| TBD - Unidentified Investment(s) in fiscal 2020 | $225,000,000 | 2020 | $25,000,000 | 2022 | $487,500,000 | 2024 |
| TBD - Unidentified Investment(s) in fiscal 2021 | $180,000,000 | 2021 | $20,000,000 | 2023 | $390,000,000 | 2025 |
| TBD - Unidentified Investment(s) in fiscal 2022 | $0 | 2022 | $0 | 2024 | $0 | 2026 |
| Total | $855,000,000 | | $95,000,000 | | $1,852,500,000 | |
| FUND LPs | $838,235,294 | | $93,137,255 | | | |
| RIVERSTONE GP (de minimus) | $16,764,706 | | $1,862,745 | | | |
| CO-INVESTMENT | $0 | | $0 | | $1,852,500,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $950,000,000 | | | | $950,000,000 | Aggregate Investment Outlays |
| | | | | | 1.95 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $1,000,000,000 | 98.0% |
| RIVERSTONE GP (de minimus) | $20,000,000 | 2.0% |
| CO-INVESTMENT | $0 | 0.0% |
| | $1,020,000,000 | 100% |

RIVERSTONE_SDTX00156677

**EXHIBIT K-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Totals |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1 Investments made in 2018 + follow-on | 225.00 | - | 25.00 | - | - | - | - | - | - | - | - | - | 250.00 |
| 2 Investments made in 2019 + follow-on | - | 225.00 | - | 25.00 | - | - | - | - | - | - | - | - | 250.00 |
| 3 Investments made in 2020 + follow-on | - | - | 225.00 | - | 25.00 | - | - | - | - | - | - | - | 250.00 |
| 4 Investments made in 2021 + follow-on | - | - | - | 180.00 | - | 20.00 | - | - | - | - | - | - | 200.00 |
| 5 Investments made in 2022 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 Investments made in 2023 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 Investments made in 2024 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 Sum of Investments | 225.00 | 225.00 | 250.00 | 205.00 | 25.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 950.00 |
| 9 Aggregate Sum of Investments | 225.00 | 450.00 | 700.00 | 905.00 | 930.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | |
| | | | | | | | | | | | | | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10 Investment Distributions from 2018 Investments | - | - | - | - | 487.50 | - | - | - | - | - | - | - | 487.50 |
| 11 Investment Distributions from 2019 Investments | - | - | - | - | - | 487.50 | - | - | - | - | - | - | 487.50 |
| 12 Investment Distributions from 2020 Investments | - | - | - | - | - | - | 487.50 | - | - | - | - | - | 487.50 |
| 13 Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | 390.00 | - | - | - | - | 390.00 |
| 14 Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 Investment Distributions from 2023 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 Investment Distributions from 2024 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 487.50 | 487.50 | 487.50 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,852.50 |
| | | | | | | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18 Cumulative Capital Contributions - Beginning | 0.00 | 225.00 | 450.00 | 700.00 | 905.00 | 680.00 | 450.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19 Plus: New Investments | 225.00 | 225.00 | 250.00 | 205.00 | 25.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (250.00) | (250.00) | (250.00) | (200.00) | 0.00 | 0.00 | 0.00 | 0.00 | (950.00) |
| 21 Net Contributions that Remain Invested - End | 225.00 | 450.00 | 700.00 | 905.00 | 680.00 | 450.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22 Pro Rata Portion Excluded from Mgmt. Fee Calculation | (20.00) | (20.00) | (20.00) | (20.00) | (20.00) | (8.82) | (3.92) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 Net Capital/Contributions for Mgmt. Fee Calculation | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 441.18 | 196.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | (8.82) | | | | | | | |
| **Management Fees** | | | | | | | | | | | | | |
| 24 Management Fees Due to Investment Manager | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 7.21 | 3.19 | 0.98 | 0.00 | 0.00 | 0.00 | 0.00 | 86.37 |
| 25 Less: Estimated Net Management Fees Offset (1) | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | (58.75) |
| 26 Net Management Fees to be Called | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 2.21 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27.89 |
| | | | | | | | | | | | | | |
| **Capital Calls** | | | | | | | | | | | | | |
| 27 Investment Needs | 225.00 | 225.00 | 250.00 | 205.00 | 25.00 | 20.00 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 950.00 |
| 28 Management Fees | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 2.21 | 0.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27.89 |
| 29 Fund Expenses (2) | 7.25 | 2.25 | 2.25 | 2.25 | 2.25 | 1.13 | 0.56 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 18.22 |
| 30 Sum of Capital Calls | 237.25 | 232.25 | 257.25 | 212.25 | 32.25 | 23.33 | 1.25 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 996.11 |
| 31 Aggregate of Capital Called | 237.25 | 469.50 | 726.75 | 939.00 | 971.25 | 994.58 | 995.83 | 996.11 | 996.11 | 996.11 | 996.11 | 996.11 | |

| | |
|---|---|
| Percentage of Committed Capital Called | 98% |
| Net Exit Multiple | 1.86 |

(1) Management fee offset data provided by Management. See Exhibit K-4 for details.
(2) Fund Expense data provided by Management. See Exhibit K-4 for details.

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT K-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Investment period | | | | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 5.00 | 2.50 | 1.25 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (5.00) | (2.50) | (1.25) | 0.00 | 0.00 | 0.00 | 0.00 | (58.75) |
| **4 Net Management Fee Offsets (Line 6 + Line 3)** | | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(10.00)** | **(5.00)** | **(2.50)** | **(1.25)** | **0.00** | **0.00** | **0.00** | **0.00** | (58.75) |

| Estimated Portfolio Expenses | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Investment period | | | | | | | | | | | |
| 5 Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6 Annual Fund Operating Expenses | 2.25 | 2.25 | 2.25 | 2.25 | 2.25 | 1.13 | 0.56 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 13.22 |
| **7 Capital Calls for Expenses** | **7.25** | **2.25** | **2.25** | **2.25** | **2.25** | **1.13** | **0.56** | **0.28** | **0.00** | **0.00** | **0.00** | **0.00** | 18.22 |

* Per Management.

RIVERSTONE_SDTX00156679

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT K-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.
AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | Harvest Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | |
| Year Ending December 31 | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | | Total |
| | Accrual of Contributed Capital | | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 251.31 | 517.43 | 831.32 | 1122.66 | 874.30 | 596.55 | 274.21 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 2 | Plus:  Contributed Capital in Current Period from LP's | 232.70 | 227.79 | 252.30 | 208.19 | 31.72 | 22.92 | 1.24 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | | 977.13 |
| 2a | *Investment Needs* | *220.59* | *220.59* | *245.10* | *200.98* | *24.51* | *19.61* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | | *931.37* |
| 2b | *Management Fees* | *5.00* | *5.00* | *5.00* | *5.00* | *5.00* | *2.21* | *0.69* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | | *27.89* |
| 2c | *Fund Expenses* | *7.11* | *2.21* | *2.21* | *2.21* | *2.21* | *1.10* | *0.55* | *0.28* | *0.00* | *0.00* | *0.00* | *0.00* | | *17.86* |
| 3 | Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (344.84) | (346.66) | (343.89) | (274.49) | 0.00 | 0.00 | 0.00 | 0.00 | | *(1,308.07)* |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 232.70 | 479.11 | 769.74 | 1039.50 | 809.54 | 552.36 | 253.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 5 | Plus:  Current Period Preferred Return | 18.62 | 38.33 | 61.58 | 83.16 | 64.76 | 44.19 | 20.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 6 | End of Period Net LP Contributed Capital | 251.31 | 517.43 | 831.32 | 1122.66 | 874.30 | 596.55 | 274.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 251.31 | 517.43 | 831.32 | 1122.66 | 874.30 | 596.55 | 274.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 487.50 | 487.50 | 487.50 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 1,852.50 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 9.56 | 9.56 | 9.56 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | | 36.32 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 477.94 | 477.94 | 477.94 | 382.35 | 0.00 | 0.00 | 0.00 | 0.00 | | 1,816.18 |
| | | | | | | | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 232.70 | 479.11 | 769.74 | 1039.50 | 1154.38 | 897.22 | 597.79 | 274.49 | 0.00 | 0.00 | 0.00 | 0.00 | | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 344.84 | 346.86 | 343.89 | 274.49 | 0.00 | 0.00 | 0.00 | 0.00 | | 1,308.07 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 133.10 | 133.08 | 134.06 | 107.86 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | | | | | | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 6.21 | 18.98 | 39.51 | 67.23 | 88.82 | 74.31 | 51.84 | 22.93 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 23.39 | 23.39 | 23.13 | 18.34 | 0.00 | 0.00 | 0.00 | 0.00 | | 88.25 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 5.85 | 5.85 | 5.78 | 4.59 | 0.00 | 0.00 | 0.00 | 0.00 | | 22.06 |
| | | | | | | | | | | | | | | | |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 103.87 | 103.84 | 105.14 | 84.94 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | | | | | | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 20.77 | 20.77 | 21.03 | 16.99 | 0.00 | 0.00 | 0.00 | 0.00 | | 79.56 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 83.09 | 83.07 | 84.11 | 67.95 | 0.00 | 0.00 | 0.00 | 0.00 | | 318.23 |

Total LP Capital Through Carry Waterfall    1,816.18

RIVERSTONE_SDTX00156680

EXHIBIT K-6

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.
### AS OF DECEMBER 31, 2016

| | Year Ending December 31 | | 1.00 / 2018 | 2.00 / 2019 | 3.00 / 2020 | 4.00 / 2021 | 5.00 / 2022 | 6.00 / 2023 | 7.00 / 2024 | 8.00 / 2025 | 9.00 / 2026 | 10.00 / 2027 | 11.00 / 2028 | 12.00 / 2029 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 344.84 | 344.86 | 343.89 | 274.49 | 0.00 | 0.00 | 0.00 | 0.00 | 1,308.0734 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 88.94 | 88.92 | 89.89 | 72.54 | 0.00 | 0.00 | 0.00 | 0.00 | 340.2930 |
| 3 | Capital to be Funded | | (232.70) | (227.79) | (252.30) | (208.19) | (31.72) | (22.92) | (1.24) | (0.28) | 0.00 | 0.00 | 0.00 | 0.00 | (977.1262) |
| 4 | Net Capital Flows | | (232.70) | (227.79) | (252.30) | (208.19) | 402.06 | 410.86 | 432.54 | 346.75 | 0.00 | 0.00 | 0.00 | 0.00 | 671.2402 |
| 5 | Implied IRR, rounded | 14.7% | | | | | | | | | | | | | |
| | | | 0.93 | 0.81 | 0.71 | 0.62 | 0.54 | 0.47 | 0.41 | 0.36 | 0.31 | 0.27 | 0.24 | 0.21 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (217.24) | (185.35) | (178.93) | (128.68) | 216.60 | 192.91 | 177.01 | 123.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 9.56 | 9.56 | 9.56 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | 36.32 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (4.55) | (4.46) | (4.95) | (4.06) | (0.53) | (0.41) | (0.01) | (0.01) | 0.00 | 0.00 | 0.00 | 0.00 | (18.98) |
| 9 | Net Capital Flows | | (4.55) | (4.46) | (4.95) | (4.06) | 9.02 | 9.14 | 9.55 | 7.64 | 0.00 | 0.00 | 0.00 | 0.00 | 17.34 |
| 10 | Implied IRR, rounded | 18.5% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.65 | 0.55 | 0.47 | 0.39 | 0.33 | 0.28 | 0.24 | 0.20 | 0.17 | 0.14 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (4.18) | (3.46) | (3.24) | (2.24) | 4.21 | 3.60 | 3.17 | 2.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 9.56 | 9.56 | 9.56 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | 36.32 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (4.55) | (4.46) | (4.95) | (4.06) | (0.53) | (0.41) | (0.01) | (0.01) | 0.00 | 0.00 | 0.00 | 0.00 | (18.98) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 23.39 | 23.39 | 23.13 | 18.34 | 0.00 | 0.00 | 0.00 | 0.00 | 88.25 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 20.77 | 20.77 | 21.03 | 16.99 | 0.00 | 0.00 | 0.00 | 0.00 | 79.56 |
| 16 | Net Capital Flows | | (4.55) | (4.46) | (4.95) | (4.06) | 53.19 | 53.31 | 53.71 | 42.97 | 0.00 | 0.00 | 0.00 | 0.00 | 185.15 |
| 17 | Implied IRR, rounded | 84.3% | | | | | | | | | | | | | |
| | | | 0.74 | 0.40 | 0.22 | 0.12 | 0.06 | 0.03 | 0.02 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (3.35) | (1.78) | (1.07) | (0.48) | 3.39 | 1.85 | 1.01 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, L.P.--FUND IRR** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | (225.00) | (225.00) | (250.00) | (205.00) | (25.00) | (20.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (950.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 487.50 | 487.50 | 487.50 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,852.50 |
| 26 | Management Fees (to Mgt. Co) | | (5.00) | (5.00) | (5.00) | (5.00) | (5.00) | (2.21) | (0.69) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (27.89) |
| 27 | Fund Expenses | | (7.25) | (2.25) | (2.25) | (2.25) | (2.25) | (1.13) | (0.56) | (0.28) | 0.00 | 0.00 | 0.00 | 0.00 | (18.22) |
| 28 | Net Capital Flows | | (237.25) | (232.25) | (257.25) | (212.25) | 455.25 | 464.17 | 486.25 | 389.72 | 0.00 | 0.00 | 0.00 | 0.00 | 856.39 |
| 29 | Implied IRR, rounded | 17.7% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.67 | 0.57 | 0.48 | 0.41 | 0.35 | 0.29 | 0.25 | 0.21 | 0.18 | 0.15 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (218.70) | (181.91) | (171.21) | (120.03) | 218.75 | 189.51 | 168.69 | 114.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT K-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE RENEWABLE & ALTERNATIVE ENERGY FUND II, LLC
### AS OF DECEMBER 31, 2016

| Year Ending December 31 | Reference | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Renewable & Alternative Energy Fund II, LLC)** | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT K-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $23.39 | $23.39 | $23.13 | $18.34 | $0.00 | $0.00 | $0.00 | $0.00 | $88.25 |
| Full Carry | EXHIBIT K-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $20.77 | $20.77 | $21.03 | $16.99 | $0.00 | $0.00 | $0.00 | $0.00 | $79.56 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $44.16 | $44.16 | $44.16 | $35.33 | $0.00 | $0.00 | $0.00 | $0.00 | $167.81 |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 758 of 845   Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT L-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE CREDIT PARTNERS II, L.P.
### AS OF DECEMBER 31, 2016

| | **Key Information** | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE CREDIT PARTNERS II, L.P. |
| 2 | Fund Short Name | | FUND |
| 3 | GP Entity Name | | RCP II GP, L.P. |
| 4 | GP Entity Short Name | | FUND GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

| | **Committed Capital by Class of Partner** | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 1,000.00 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 20.00 |
| 8 | RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, LP | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **1,020.00** |

| | **Key Fund Dates** | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2017 |
| 11 | Final Close | | 12/31/2018 |
| 12 | Investment Period End Date | 3 | 12/31/2020 |
| 13 | Fund Term End Date | 10 | 12/31/2027 |
| 14 | Fund Term with Extensions | 1 | 12/31/2028 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **982.332** |
| 17 | LP Capital Called | | 920.016 |
| 18 | GP Capital Called (cash only) | | 17.980 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 96% |

| | **Investment Time Frame** | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 0 |
| 22 | Investment to Harvest Time in years | | 3 |

| | **Gross Exit Multiples** | | |
|---|---|---|---|
| 23 | For Initial Investments | | 1.25 |
| 22 | For Follow-on Investments | | 0.00 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 16.2% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 15.3% |

| | **Management Fees** | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 20.000 |

| | **Preferred Rate of Return** | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 6% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 17.65% |

| | **Carried Interest** | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 15% |
| 33 | Limited Partners | | 85% |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT L-2

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE CREDIT PARTNERS II, L.P.
### AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Dividend Payments | Year of Dividend | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| **TBD - Unidentified Investment(s) in fiscal 2018** | $300,000,000 | 2018 | Recycled | 2019 | Recycled | 2021 |
| *Non-Capital Calls for Investment* | | | Recycled | 2020 | | |
| Leverage Basis | $120,000,000 | | | | | |
| **TBD - Unidentified Investment(s) in fiscal 2019** | $300,000,000 | 2019 | Recycled | 2020 | $449,874,000 | 2022 |
| *Non-Capital Calls for Investment* | | | $36,922,992 | 2021 | | |
| Recycled Funds (2018 Investment, Dividend 2019) | $33,240,000 | | | | | |
| Leverage Basis | $133,296,000 | | | | | |
| **TBD - Unidentified Investment(s) in fiscal 2020** | $300,000,000 | 2020 | $85,888,060 | 2021 | $1,046,470,039 | 2023 |
| *Non-Capital Calls for Investment* | | | $85,888,060 | 2022 | | |
| Recycled Funds (2018 Investment, Dividend 2020) | $33,240,000 | | | | | |
| Recycled Funds (2019 Investment, Dividend 2020) | $36,922,992 | | | | | |
| Recycled Funds (2018 Investment, Proceeds 2021) | $405,000,000 | | | | | |
| Leverage Basis | $310,065,197 | | | | | |
| Total | $1,971,764,189 | | $208,699,111 | | $1,496,344,039 | |
| FUND LPs | $882,352,941 | | | | | |
| RIVERSTONE GP (de minimus) | $17,647,059 | | | | | |
| RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, | $0 | | | | | |
| RECYCLED | $508,402,992 | | | | | |
| LEVERAGE | $563,361,197 | | | | $1,705,043,150 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $1,971,764,189 | | | | $900,000,000 | Aggregate Investment Outlays |
| | | | | | 1.89 | Implied Average Exit Multiple |

| | Capital Commitment | | | | | |
|---|---|---|---|---|---|---|
| FUND LPs | $1,000,000,000 | 98.0% | | | | |
| RIVERSTONE GP (de minimus) | $20,000,000 | 2.0% | | | 48 | |
| RIVERSTONE CREDIT PARTNERS CO-INVESTMENT, | $0 | 0.0% | | | | |
| | $1,020,000,000 | 100% | | | | |

(1) Dividends are 9.2% of Cost Basis less 4.5% of Leverage Basis.

RIVERSTONE_SDTX00156684

**EXHIBIT L-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE CREDIT PARTNERS II, L.P.
### AS OF DECEMBER 31, 2016

| Fund Year | Investment Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Year Ending December 31 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Totals |
| **Summary of Fund Cash Outflows** | | | | | | | | |
| 1 Investments made in 2018 + follow-on | 300.00 | - | - | - | - | - | - | 300.00 |
| 2 Leverage & Recycled Investments in 2016 | 120.00 | | | | | | | 120.00 |
| 3 Investments made in 2019 + follow-on | - | 300.00 | - | - | - | - | - | 300.00 |
| 4 Leverage & Recycled Investments in 2017 | | 166.54 | | | | | | 166.54 |
| 5 Investments made in 2020 + follow-on | - | - | 300.00 | - | - | - | - | 300.00 |
| 6 Leverage & Recycled Investments in 2018 | | | 785.23 | | | | | 785.23 |
| 7 Sum of Investments | 420.00 | 466.54 | 1,085.23 | 0.00 | 0.00 | 0.00 | 0.00 | 1,971.76 |
| 8 Aggregate Sum of Investments | 420.00 | 886.54 | 1,971.76 | 1,971.76 | 1,971.76 | 1,971.76 | 1,971.76 | |
| | | | | | | | | |
| **Summary of Fund Cash Inflows (excluding Leverage)** | | | | | | | | |
| 9 Investment Distributions from 2018 Investments | - | - | - | - | - | - | - | 0.00 |
| 10 Investment Distributions from 2019 Investments | - | - | - | - | 449.87 | - | - | 449.87 |
| 11 Investment Distributions from 2020 Investments | - | - | - | 85.89 | 85.89 | 1,046.47 | - | 1,218.25 |
| 12 Sum of Distributions | 0.00 | 0.00 | 0.00 | 85.89 | 535.76 | 1,046.47 | 0.00 | 1,668.12 |
| | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | |
| 13 Cumulative Capital Contributions - Beginning | 0.00 | 420.00 | 886.54 | 1,851.76 | 1,385.23 | 300.00 | 0.00 | |
| 14   Plus: New Investments | 420.00 | 466.54 | 1,085.23 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 15   Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | (300.00) | (300.00) | (300.00) | 0.00 | (900.00) |
| 16   Less: Leverage & Recycled Associated with Harvested Investments | 0.00 | 0.00 | (120.00) | (166.54) | (785.23) | 0.00 | 0.00 | (1,071.76) |
| 17 Net Contributions that Remain Invested - End | 420.00 | 886.54 | 1,851.76 | 1,385.23 | 300.00 | 0.00 | 0.00 | |
| 18 Pro Rata Portion Excluded from Mgmt. Fee Calculation | (8.24) | (20.00) | (20.00) | (27.16) | (5.88) | 0.00 | 0.00 | |
| 19 Net Capital/Contributions for Mgmt. Fee Calculation | 411.76 | 866.54 | 1,831.76 | 1,358.07 | 294.12 | 0.00 | 0.00 | |
| | | | | | | | | |
| **Management Fees** | | | | | | | | |
| 20 Management Fees Due to Investment Manager | 6.18 | 13.00 | 27.48 | 15.95 | 8.26 | 1.47 | 0.00 | 72.33 |
| 21   Less: Estimated Net Management Fees Offset (1) | (1.50) | (2.00) | (2.00) | (1.50) | 0.00 | 0.00 | 0.00 | (7.00) |
| 22 Net Management Fees to be Called | 4.68 | 11.00 | 25.48 | 14.45 | 8.26 | 1.47 | 0.00 | 65.33 |
| | | | | | | | | |
| **Capital Calls** | | | | | | | | |
| 23 Investment Needs | 300.00 | 300.00 | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 900.00 |
| 24 Management Fees | 4.68 | 11.00 | 25.48 | 14.45 | 8.26 | 1.47 | 0.00 | 65.33 |
| 25 Fund Expenses (2) | 8.00 | 2.00 | 4.00 | 2.00 | 1.00 | 0.00 | 0.00 | 17.00 |
| 26 Sum of Capital Calls | 312.68 | 313.00 | 329.48 | 16.45 | 9.26 | 1.47 | 0.00 | 982.33 |
| 27 Aggregate of Capital Called | 312.68 | 625.67 | 955.15 | 971.60 | 980.86 | 982.33 | 982.33 | |

**Percentage of Committed Capital Called**    **96%**
**Net Exit Multiple**    **1.70**

(1) *Management fee offset data provided by Management. See Exhibit L-4 for details.*
(2) *Fund Expense data provided by Management. See Exhibit L-4 for details.*

EXHIBIT L-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
**RIVERSTONE CREDIT PARTNERS II, L.P.**
### AS OF DECEMBER 31, 2016

*($ millions)*
*(based on data provided by Management)*

| | % offset | Investment period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | |
| 1  Total Fees Available for Fee Offset | | 1.50 | 2.00 | 2.00 | 1.50 | 0.00 | 0.00 | 0.00 | |
| 2  Current Period Management Fee Offset | 100% | 1.50 | 2.00 | 2.00 | 1.50 | 0.00 | 0.00 | 0.00 | |
| 3      Less: Available Portfolio Income Offset Applied | | (1.50) | (2.00) | (2.00) | (1.50) | 0.00 | 0.00 | 0.00 | (7.00) |
| **4  Net Management Fee Offsets (Line 6 + Line 3)** | | **(1.50)** | **(2.00)** | **(2.00)** | **(1.50)** | **0.00** | **0.00** | **0.00** | (7.00) |

| **Estimated Portfolio Expenses** | Investment period | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | |
| 5  Organizational Expenses | 7.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7.00 |
| 6  Annual Fund Operating Expenses | 1.00 | 2.00 | 4.00 | 2.00 | 1.00 | 0.00 | 0.00 | 10.00 |
| **7  Capital Calls for Expenses** | **8.00** | **2.00** | **4.00** | **2.00** | **1.00** | **0.00** | **0.00** | 17.00 |

\* Per Management.

Confidential
Empire Valuation Consultants

845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT L-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE CREDIT PARTNERS II, L.P.
#### AS OF DECEMBER 31, 2016

| | | Investment Period | | | Harvest Period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fund Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Year Ending December 31 | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
| | **Accrual of Contributed Capital** | | | | | | | | **Total** |
| | **LP Invested Capital Subject to Preferred Return** | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 325.04 | 667.96 | 1034.80 | 1007.63 | 511.31 | 0.33 | 920.02 |
| 2 | Plus:  Contributed Capital in Current Period from LP's | 306.64 | 305.12 | 308.26 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2a | *Investment Needs* | *294.12* | *294.12* | *294.12* | *0.00* | *0.00* | *0.00* | *0.00* | *882.35* |
| 2b | *Management Fees* | *4.68* | *11.00* | *14.15* | *0.00* | *0.00* | *0.00* | *0.00* | *29.82* |
| 2c | *Fund Expenses* | *7.84* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *7.84* |
| 3 | Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | (84.20) | (525.26) | (511.00) | 0.00 | (1,120.46) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 306.64 | 630.15 | 976.22 | 950.59 | 482.37 | 0.32 | 0.33 | |
| 5 | Plus:  Current Period Preferred Return | 18.40 | 37.81 | 58.57 | 57.04 | 28.94 | 0.02 | 0.02 | |
| 6 | End of Period Net LP Contributed Capital | 325.04 | 667.96 | 1034.80 | 1007.63 | 511.31 | 0.33 | 0.35 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | (386.69) | (329.34) | 0.00 | (0.35) | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 386.69 | 329.34 | 0.00 | 0.35 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 325.04 | 667.96 | 1034.80 | 1007.63 | 511.31 | 0.33 | 0.35 | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 85.89 | 535.76 | 1046.47 | 0.00 | 1,668.12 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 1.68 | 10.51 | 20.52 | 0.00 | 32.71 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 84.20 | 525.26 | 1025.95 | 0.00 | 1,635.41 |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | **Total** |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 306.64 | 630.15 | 976.22 | 1034.80 | 1007.63 | 511.31 | 0.33 | 1,120.46 |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 84.20 | 525.26 | 511.00 | 0.00 | |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 514.95 | 0.00 | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 3.25 | 9.92 | 20.26 | 44.46 | 63.17 | 35.43 | 0.04 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35.41 | 0.00 | 35.41 |
| 19 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 479.54 | 0.00 | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | |
| 20 | 15% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.93 | 0.00 | 71.93 |
| 21 | 85% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 407.61 | 0.00 | 407.61 |

Total LP Capital Through Carry Waterfall   1,635.41

RIVERSTONE_SDTX00156687

**EXHIBIT L-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
### RIVERSTONE CREDIT PARTNERS II, L.P.
### AS OF DECEMBER 31, 2016

| | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ending December 31 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Totals |
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | 0.00 | 0.00 | 0.00 | 84.20 | 525.26 | 511.00 | 0.00 | 1,120.4593 |
| 2 | Projected Pro Rata Share of Residual | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 407.61 | 0.00 | 407.6079 |
| 3 | Capital to be Funded | (306.64) | (305.12) | (308.26) | 0.00 | 0.00 | 0.00 | 0.00 | (920.0163) |
| 4 | Net Capital Flows | (306.64) | (305.12) | (308.26) | 84.20 | 525.26 | 918.61 | 0.00 | 608.0509 |
| 5 | Implied IRR, rounded | 15.3% | | | | | | | |
| | | 0.93 | 0.81 | 0.70 | 0.61 | 0.53 | 0.46 | 0.40 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (285.58) | (246.47) | (215.99) | 51.17 | 276.87 | 419.99 | 0.00 | 0.00 |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | 0.00 | 0.00 | 0.00 | 1.68 | 10.51 | 20.52 | 0.00 | 32.71 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | (6.04) | (5.92) | (5.96) | (0.04) | (0.02) | 0.00 | 0.00 | (17.98) |
| 9 | Net Capital Flows | (6.04) | (5.92) | (5.96) | 1.64 | 10.49 | 20.52 | 0.00 | 14.73 |
| 10 | Implied IRR, rounded | 18.1% | | | | | | | |
| | | 0.92 | 0.78 | 0.66 | 0.56 | 0.47 | 0.40 | 0.34 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (5.56) | (4.61) | (3.93) | 0.92 | 4.96 | 8.22 | 0.00 | 0.00 |
| | **GP IRR - WITH CARRY** | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | 0.00 | 0.00 | 0.00 | 1.68 | 10.51 | 20.52 | 0.00 | 32.71 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | (6.04) | (5.92) | (5.96) | (0.04) | (0.02) | 0.00 | 0.00 | (17.98) |
| 14 | Projected Catch Up on Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35.41 | 0.00 | 35.41 |
| 15 | Carry | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.93 | 0.00 | 71.93 |
| 16 | Net Capital Flows | (6.04) | (5.92) | (5.96) | 1.64 | 10.49 | 127.86 | 0.00 | 122.07 |
| 17 | Implied IRR, rounded | 66.4% | | | | | | | |
| | | 0.78 | 0.47 | 0.28 | 0.17 | 0.10 | 0.06 | 0.04 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (4.68) | (2.76) | (1.67) | 0.28 | 1.06 | 7.77 | 0.00 | 0.00 |
| | **RIVERSTONE CREDIT PARTNERS II, L.P.—FUND IRR** | | | | | | | | |
| 24 | Projected Investments to be made | (300.00) | (300.00) | (300.00) | 0.00 | 0.00 | 0.00 | 0.00 | (900.00) |
| 25 | Projected Return on Investments | 0.00 | 0.00 | 0.00 | 85.89 | 535.76 | 1,046.47 | 0.00 | 1,668.12 |
| 26 | Management Fees (to Mgt. Co) | (4.68) | (11.00) | (25.48) | (14.45) | (8.26) | (1.47) | 0.00 | (65.33) |
| 27 | Fund Expenses | (8.00) | (2.00) | (4.00) | (2.00) | (1.00) | 0.00 | 0.00 | (17.00) |
| 28 | Net Capital Flows | (312.68) | (313.00) | (329.48) | 69.44 | 526.50 | 1,045.00 | 0.00 | 685.79 |
| 29 | Implied IRR, rounded | 16.2% | | | | | | | |
| | | 0.93 | 0.80 | 0.69 | 0.59 | 0.51 | 0.44 | 0.38 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (290.05) | (249.85) | (226.32) | 41.04 | 267.79 | 457.38 | 0.00 | 0.00 |

EXHIBIT L-7

## DISCOUNTED CASH FLOW ANALYSIS
### RCP II GP, L.P.
### AS OF DECEMBER 31, 2016

| Year Ending December 31 | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | Totals |
|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | |

**General Partner Cash Flows ($ Millions)**

| | Reference | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Carried Interest Cash Flows - (Riverstone Credit Partners II, L.P.)** | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT L-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $35.41 | $0.00 | $35.41 |
| Full Carry | EXHIBIT L-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $71.93 | $0.00 | $71.93 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $107.34 | $0.00 | $107.34 |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 765 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT M-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
### RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V. |
| 2 | Fund Short Name | | FUND |
| 3 | GP Entity Name | | CKD RENEWABLES GP |
| 4 | GP Entity Short Name | | FUND GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 500.00 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 10.00 |
| 8 | RIVERSTONE ENERGY COINVESTMENT VI, LP | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **510.00** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2016 |
| 11 | Final Close | | 12/31/2017 |
| 12 | Investment Period End Date | 5 | 12/31/2021 |
| 13 | Fund Term End Date | 10 | 12/31/2026 |
| 14 | Fund Term with Extensions | 2 | 12/31/2028 |
| 15 | Valuation Date | | 12/31/2016 |

| | | |
|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | **508.688** |
| 17 | LP Capital Called | 499.154 |
| 18 | GP Capital Called (cash only) | 9.534 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | 0.000 |
| 20 | Percentage of Capital Called | 100% |

**Investment Time Frame**

| | | |
|---|---|---|
| 21 | Follow-on Investment Lag in years | 2 |
| 22 | Investment to Harvest Time in years | 4 |

**Gross Exit Multiples**

| | | |
|---|---|---|
| 23 | For Initial Investments | 2.00 |
| 22 | For Follow-on Investments | 1.75 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | 17.5% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | 14.6% |

**Management Fees**

| | | |
|---|---|---|
| 25 | Investment Period | 1.50% |
| 26 | Post-Investment Period | 1.00% |
| 27 | Capital exempt from Management Fees | 2.0% |
| 28 | Capital exempt from Management Fees in $ | 10.000 |

**Preferred Rate of Return**

| | | |
|---|---|---|
| 29 | LP Preferred Return | 8% |
| 30 | GP Preferred Return | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | 33.33% |

**Carried Interest**

| | | |
|---|---|---|
| 32 | General Partners (w/ LPs) | 20% |
| 33 | Limited Partners | 80% |

EXHIBIT M-2

## SUMMARY OF INVESTMENTS AND EXITS
### RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| TBD - Unidentified Investment(s) in fiscal 2017 | $135,000,000 | 2017 | $15,000,000 | 2019 | $296,250,000 | 2021 |
| TBD - Unidentified Investment(s) in fiscal 2018 | $112,500,000 | 2018 | $12,500,000 | 2020 | $246,875,000 | 2022 |
| TBD - Unidentified Investment(s) in fiscal 2019 | $90,000,000 | 2019 | $10,000,000 | 2021 | $197,500,000 | 2023 |
| TBD - Unidentified Investment(s) in fiscal 2020 | $90,000,000 | 2020 | $10,000,000 | 2022 | $197,500,000 | 2024 |
| TBD - Unidentified Investment(s) in fiscal 2021 | $0 | 2021 | $0 | 2023 | $0 | 2025 |
| Total | $427,500,000 | | $47,500,000 | | $938,125,000 | |
| FUND LPs | $419,117,647 | | $46,568,627 | | | |
| RIVERSTONE GP (de minimus) | $8,382,353 | | $931,373 | | | |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $0 | | $0 | | $938,125,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $475,000,000 | | | | $475,000,000 | Aggregate Investment Outlays |
| | | | | | 1.98 | Implied Average Exit Multiple |

| | Capital Commitment | |
|---|---|---|
| FUND LPs | $500,000,000 | 98.0% |
| RIVERSTONE GP (de minimus) | $10,000,000 | 2.0% |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $0 | 0.0% |
| | $510,000,000 | 100% |

RIVERSTONE_SDTX00156691

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT M-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

| | | | | Investment Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | |
| Year Ending December 31, | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | | Totals |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | | |
| 1  Investments made in 2017 + follow-on | 135.00 | - | 15.00 | - | - | - | - | - | - | - | - | - | | 150.00 |
| 2  Investments made in 2018 + follow-on | - | 112.50 | - | 12.50 | - | - | - | - | - | - | - | - | | 125.00 |
| 3  Investments made in 2019 + follow-on | - | - | 90.00 | - | 10.00 | - | - | - | - | - | - | - | | 100.00 |
| 4  Investments made in 2020 + follow-on | - | - | - | 90.00 | - | 10.00 | - | - | - | - | - | - | | 100.00 |
| 5  Investments made in 2021 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 6  Investments made in 2022 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 7  Investments made in 2023 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 8  Sum of Investments | 135.00 | 112.50 | 105.00 | 102.50 | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 475.00 |
| 9  Aggregate Sum of Investments | 135.00 | 247.50 | 352.50 | 455.00 | 465.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | 475.00 | | |
| | | | | | | | | | | | | | | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | | |
| 10  Investment Distributions from 2017 Investments | - | - | - | - | 296.25 | - | - | - | - | - | - | - | | 296.25 |
| 11  Investment Distributions from 2018 Investments | - | - | - | - | - | 246.88 | - | - | - | - | - | - | | 246.88 |
| 12  Investment Distributions from 2019 Investments | - | - | - | - | - | - | 197.50 | - | - | - | - | - | | 197.50 |
| 13  Investment Distributions from 2020 Investments | - | - | - | - | - | - | - | 197.50 | - | - | - | - | | 197.50 |
| 14  Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 15  Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 16  Investment Distributions from 2023 Investments | - | - | - | - | - | - | - | - | - | - | - | - | | 0.00 |
| 17  Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 296.25 | 246.88 | 197.50 | 197.50 | 0.00 | 0.00 | 0.00 | 0.00 | | 938.13 |
| | | | | | | | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | | |
| 18  Cumulative Capital Contributions - Beginning | 0.00 | 135.00 | 247.50 | 352.50 | 455.00 | 315.00 | 200.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 19    Plus: New Investments | 135.00 | 112.50 | 105.00 | 102.50 | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 20    Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (150.00) | (125.00) | (100.00) | (100.00) | 0.00 | 0.00 | 0.00 | 0.00 | | (475.00) |
| 21  Net Contributions that Remain Invested - End | 135.00 | 247.50 | 352.50 | 455.00 | 315.00 | 200.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 22  Pro Rata Portion Excluded from Mgmt. Fee Calculation | (10.00) | (10.00) | (10.00) | (10.00) | (10.00) | (3.92) | (1.96) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| 23  Net Capital/Contributions for Mgmt. Fee Calculation | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 196.08 | 98.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | | | | | | | | | | | | | |
| **Management Fees** | | | | | | | | | | | | | | |
| 24  Management Fees Due to Investment Manager | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 2.51 | 1.47 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | | 41.97 |
| 25    Less: Estimated Net Management Fees Offset (1) | (4.00) | (4.00) | (4.00) | (4.00) | (2.00) | (1.00) | (0.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | (19.50) |
| 26  Net Management Fees to be Called | 3.50 | 3.50 | 3.50 | 3.50 | 5.50 | 1.51 | 0.97 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | | 22.47 |
| | | | | | | | | | | | | | | |
| **Capital Calls** | | | | | | | | | | | | | | |
| 27  Investment Needs | 135.00 | 112.50 | 105.00 | 102.50 | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 475.00 |
| 28  Management Fees | 3.50 | 3.50 | 3.50 | 3.50 | 5.50 | 1.51 | 0.97 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | | 22.47 |
| 29  Fund Expenses (2) | 6.13 | 1.13 | 1.13 | 1.13 | 1.13 | 0.38 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 11.22 |
| 30  Sum of Capital Calls | 144.63 | 117.13 | 109.63 | 107.13 | 16.63 | 11.88 | 1.19 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | | 508.69 |
| 31  Aggregate Capital Called | 144.63 | 261.75 | 371.38 | 478.50 | 495.13 | 507.01 | 508.20 | 508.69 | 508.69 | 508.69 | 508.69 | 508.69 | | |

| | |
|---|---|
| Percentage of Committed Capital Called | 100% |
| Net Exit Multiple | 1.84 |

(1)  Management fee offset data provided by Management.  See Exhibit M-4 for details.
(2)  Fund Expense data provided by Management.  See Exhibit M-4 for details.

RIVERSTONE_SDTX00156692

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT M-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Year 12 2028 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Investment period** | | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 4.00 | 4.00 | 4.00 | 4.00 | 2.00 | 1.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 4.00 | 4.00 | 4.00 | 4.00 | 2.00 | 1.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3  Less: Available Portfolio Income Offset Applied | | (4.00) | (4.00) | (4.00) | (4.00) | (2.00) | (1.00) | (0.50) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (19.50) |
| **4 Net Management Fee Offsets (Line 6 + Line 3)** | | **(4.00)** | **(4.00)** | **(4.00)** | **(4.00)** | **(2.00)** | **(1.00)** | **(0.50)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **(19.50)** |

| Estimated Portfolio Expenses | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Year 12 2028 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Investment period** | | | | | | | | | |
| 5 Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6 Annual Fund Operating Expenses | 1.13 | 1.13 | 1.13 | 1.13 | 1.13 | 0.38 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.22 |
| **7 Capital Calls for Expenses** | **6.13** | **1.13** | **1.13** | **1.13** | **1.13** | **0.38** | **0.22** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **11.22** |

* Per Management.

Confidential
Empire Valuation Consultants
Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT M-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | Harvest Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31, | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Total |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 153.21 | 289.55 | 428.86 | 576.67 | 412.40 | 268.17 | 139.41 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 141.86 | 114.90 | 107.54 | 105.09 | 16.41 | 11.68 | 1.19 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 499.15 |
| 2a | *Investment Needs* | *132.35* | *110.29* | *102.94* | *100.49* | *9.80* | *9.80* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *465.69* |
| 2b | *Management Fees* | *3.50* | *3.50* | *3.50* | *3.50* | *5.50* | *1.51* | *0.97* | *0.49* | *0.00* | *0.00* | *0.00* | *0.00* | *22.47* |
| 2c | *Fund Expenses* | *6.00* | *1.10* | *1.10* | *1.10* | *1.10* | *0.37* | *0.22* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *11.00* |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (211.23) | (175.78) | (140.27) | (139.90) | 0.00 | 0.00 | 0.00 | 0.00 | (667.17) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 141.86 | 268.10 | 397.10 | 533.96 | 381.86 | 248.31 | 129.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus: Current Period Preferred Return | 11.35 | 21.45 | 31.77 | 42.72 | 30.55 | 19.86 | 10.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 153.21 | 289.55 | 428.86 | 576.67 | 412.40 | 268.17 | 139.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 153.21 | 289.55 | 428.86 | 576.67 | 412.40 | 268.17 | 139.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 296.25 | 248.88 | 197.50 | 197.50 | 0.00 | 0.00 | 0.00 | 0.00 | 938.13 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 5.81 | 4.84 | 3.87 | 3.87 | 0.00 | 0.00 | 0.00 | 0.00 | 18.39 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 290.44 | 242.03 | 193.63 | 193.63 | 0.00 | 0.00 | 0.00 | 0.00 | 919.73 |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | Total |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 141.86 | 268.10 | 397.10 | 533.96 | 593.08 | 424.08 | 269.36 | 139.90 | 0.00 | 0.00 | 0.00 | 0.00 | 667.17 |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 211.23 | 175.78 | 140.27 | 139.90 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 79.22 | 66.26 | 53.36 | 53.73 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 3.78 | 10.93 | 21.52 | 35.76 | 45.94 | 34.70 | 23.33 | 11.61 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 14.29 | 11.85 | 9.38 | 9.28 | 0.00 | 0.00 | 0.00 | 0.00 | 44.81 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 3.57 | 2.96 | 2.35 | 2.32 | 0.00 | 0.00 | 0.00 | 0.00 | 11.20 |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 61.35 | 51.45 | 41.63 | 42.12 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 12.27 | 10.29 | 8.33 | 8.42 | 0.00 | 0.00 | 0.00 | 0.00 | 39.31 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 49.08 | 41.16 | 33.30 | 33.70 | 0.00 | 0.00 | 0.00 | 0.00 | 157.24 |

Total LP Capital Through Carry Waterfall    919.73

RIVERSTONE_SDTX00156694

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 770 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT M-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
**RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.**
**AS OF DECEMBER 31, 2016**

| | Year Ending December 31, | | 1.00 2017 | 2.00 2018 | 3.00 2019 | 4.00 2020 | 5.00 2021 | 6.00 2022 | 7.00 2023 | 8.00 2024 | 9.00 2025 | 10.00 2026 | 11.00 2027 | 12.00 2028 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 211.23 | 175.78 | 140.27 | 139.90 | 0.00 | 0.00 | 0.00 | 0.00 | 667.1746 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 52.65 | 44.12 | 35.65 | 36.02 | 0.00 | 0.00 | 0.00 | 0.00 | 168.4405 |
| 3 | Capital to be Funded | | (141.86) | (114.90) | (107.54) | (105.09) | (16.41) | (11.68) | (1.19) | (0.49) | 0.00 | 0.00 | 0.00 | 0.00 | (499.1538) |
| 4 | Net Capital Flows | | (141.86) | (114.90) | (107.54) | (105.09) | 247.47 | 208.22 | 174.73 | 175.43 | 0.00 | 0.00 | 0.00 | 0.00 | 336.4613 |
| 5 | Implied IRR, rounded | 14.6% | 0.93 | 0.82 | 0.71 | 0.62 | 0.54 | 0.47 | 0.41 | 0.36 | 0.31 | 0.27 | 0.24 | 0.21 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (132.53) | (93.68) | (76.53) | (65.27) | 134.14 | 98.51 | 72.14 | 63.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 5.81 | 4.84 | 3.87 | 3.87 | 0.00 | 0.00 | 0.00 | 0.00 | 18.39 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (2.77) | (2.23) | (2.08) | (2.03) | (0.22) | (0.20) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (9.53) |
| 9 | Net Capital Flows | | (2.77) | (2.23) | (2.08) | (2.03) | 5.59 | 4.64 | 3.87 | 3.87 | 0.00 | 0.00 | 0.00 | 0.00 | 8.86 |
| 10 | Implied IRR, rounded | 18.7% | 0.92 | 0.77 | 0.65 | 0.55 | 0.46 | 0.39 | 0.33 | 0.28 | 0.23 | 0.20 | 0.17 | 0.14 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (2.54) | (1.72) | (1.36) | (1.12) | 2.59 | 1.81 | 1.27 | 1.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 5.81 | 4.84 | 3.87 | 3.87 | 0.00 | 0.00 | 0.00 | 0.00 | 18.39 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (2.77) | (2.23) | (2.08) | (2.03) | (0.22) | (0.00) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (9.53) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 14.29 | 11.85 | 9.38 | 9.28 | 0.00 | 0.00 | 0.00 | 0.00 | 44.81 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 12.27 | 10.29 | 8.33 | 8.42 | 0.00 | 0.00 | 0.00 | 0.00 | 39.31 |
| 16 | Net Capital Flows | | (2.77) | (2.23) | (2.08) | (2.03) | 32.15 | 26.77 | 21.58 | 21.58 | 0.00 | 0.00 | 0.00 | 0.00 | 92.98 |
| 17 | Implied IRR, rounded | 84.1% | 0.74 | 0.40 | 0.22 | 0.12 | 0.06 | 0.03 | 0.02 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (2.04) | (0.89) | (0.45) | (0.24) | 2.06 | 0.93 | 0.41 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **RIVERSTONE CKD RENEWABLES & ALTERNATIVE ENERGY, S.DE R.L. DE C.V.--FUND** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | (135.00) | (112.50) | (105.00) | (102.50) | (10.00) | (10.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (475.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 296.25 | 246.88 | 197.50 | 197.50 | 0.00 | 0.00 | 0.00 | 0.00 | 938.13 |
| 26 | Management Fees (to Mgt. Co) | | (3.50) | (3.50) | (3.50) | (3.50) | (5.50) | (1.51) | (0.97) | (0.49) | 0.00 | 0.00 | 0.00 | 0.00 | (22.47) |
| 27 | Fund Expenses | | (6.13) | (1.13) | (1.13) | (1.13) | (1.13) | (0.38) | (0.22) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (11.22) |
| 28 | Net Capital Flows | | (144.63) | (117.13) | (109.63) | (107.13) | 279.63 | 234.99 | 196.31 | 197.01 | 0.00 | 0.00 | 0.00 | 0.00 | 429.44 |
| 29 | Implied IRR, rounded | 17.5% | 0.92 | 0.78 | 0.67 | 0.57 | 0.48 | 0.41 | 0.35 | 0.30 | 0.25 | 0.22 | 0.18 | 0.16 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (133.41) | (91.94) | (73.23) | (60.89) | 135.26 | 96.73 | 68.76 | 58.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

EXHIBIT M-7

## DISCOUNTED CASH FLOW ANALYSIS
### CKD RENEWABLES GP
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | Reference | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Year 12 2028 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V.)** | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT M-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $14.29 | $11.85 | $9.38 | $9.28 | $0.00 | $0.00 | $0.00 | $0.00 | $44.81 |
| Full Carry | EXHIBIT M-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $12.27 | $10.29 | $8.33 | $8.42 | $0.00 | $0.00 | $0.00 | $0.00 | $39.31 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $26.56 | $22.14 | $17.71 | $17.71 | $0.00 | $0.00 | $0.00 | $0.00 | $84.12 |

RIVERSTONE_SDTX00156696

EXHIBIT N-1

## SUMMARY OF INPUTS AND ASSUMPTIONS
## RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
## AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V |
| 2 | Fund Short Name | | FUND |
| 3 | GP Entity Name | | CKD II GP |
| 4 | GP Entity Short Name | | FUND GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 750.00 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 15.00 |
| 8 | RIVERSTONE ENERGY COINVESTMENT VI, LP | 0.0% | 0.00 |
| 9 | **Total Capital Commitments ($ in millions)** | | **765.00** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2018 |
| 11 | Final Close | | 12/31/2019 |
| 12 | Investment Period End Date | 5 | 12/31/2023 |
| 13 | Fund Term End Date | 10 | 12/31/2028 |
| 14 | Fund Term with Extensions | 2 | 12/31/2030 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **753.967** |
| 17 | LP Capital Called | | 739.923 |
| 18 | GP Capital Called (cash only) | | 14.044 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 99% |

**Investment Time Frame**

| | | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 3 |
| 22 | Investment to Harvest Time in years | | 4 |

**Gross Exit Multiples**

| | | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.00 |
| 22 | For Follow-on Investments | | 1.75 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 18.5% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 15.4% |

**Management Fees**

| | | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 15.000 |

**Preferred Rate of Return**

| | | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

| | | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

RIVERSTONE_SDTX00156697

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 773 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT N-2

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
## AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| **TBD - Unidentified Investment(s) in fiscal 2019** | $160,000,000 | 2019 | $40,000,000 | 2022 | $390,000,000 | 2023 |
| **TBD - Unidentified Investment(s) in fiscal 2020** | $160,000,000 | 2020 | $40,000,000 | 2023 | $390,000,000 | 2024 |
| **TBD - Unidentified Investment(s) in fiscal 2021** | $160,000,000 | 2021 | $40,000,000 | 2024 | $390,000,000 | 2025 |
| **TBD - Unidentified Investment(s) in fiscal 2022** | $80,000,000 | 2022 | $20,000,000 | 2025 | $195,000,000 | 2026 |
| **TBD - Unidentified Investment(s) in fiscal 2023** | $0 | 2023 | $0 | 2026 | $0 | 2027 |
| Total | $560,000,000 | | $140,000,000 | | $1,365,000,000 | |
| FUND LPs | $549,019,608 | | $137,254,902 | | | |
| RIVERSTONE GP (de minimus) | $10,980,392 | | $2,745,098 | | | |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $0 | | $0 | | $1,365,000,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $700,000,000 | | | | $700,000,000 | Aggregate Investment Outlays |
| | | | | | 1.95 | Implied Average Exit Multiple |
| | Capital Commitment | | | | | |
| FUND LPs | $750,000,000 | 98.0% | | | | |
| RIVERSTONE GP (de minimus) | $15,000,000 | 2.0% | | | | |
| RIVERSTONE ENERGY COINVESTMENT VI, LP | $0 | 0.0% | | | | |
| | $765,000,000 | 100% | | | | |

**EXHIBIT N-3**

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| | Year Ending December 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Totals |
| | **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1 | Investments made in 2019 + follow-on | 160.00 | - | - | 40.00 | - | - | - | - | - | - | - | - | 200.00 |
| 2 | Investments made in 2020 + follow-on | - | 160.00 | - | - | 40.00 | - | - | - | - | - | - | - | 200.00 |
| 3 | Investments made in 2021 + follow-on | - | - | 160.00 | - | - | 40.00 | - | - | - | - | - | - | 200.00 |
| 4 | Investments made in 2022 + follow-on | - | - | - | 80.00 | - | - | 20.00 | - | - | - | - | - | 100.00 |
| 5 | Investments made in 2023 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6 | Investments made in 2024 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7 | Investments made in 2025 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8 | Sum of Investments | 160.00 | 160.00 | 160.00 | 120.00 | 40.00 | 40.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 700.00 |
| 9 | Aggregate Sum of Investments | 160.00 | 320.00 | 480.00 | 600.00 | 640.00 | 680.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | 700.00 | |
| | | | | | | | | | | | | | | |
| | **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10 | Investment Distributions from 2019 Investments | - | - | - | - | 390.00 | - | - | - | - | - | - | - | 390.00 |
| 11 | Investment Distributions from 2020 Investments | - | - | - | - | - | 390.00 | - | - | - | - | - | - | 390.00 |
| 12 | Investment Distributions from 2021 Investments | - | - | - | - | - | - | 390.00 | - | - | - | - | - | 390.00 |
| 13 | Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | 195.00 | - | - | - | - | 195.00 |
| 14 | Investment Distributions from 2023 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15 | Investment Distributions from 2024 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16 | Investment Distributions from 2025 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17 | Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 390.00 | 390.00 | 390.00 | 195.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,365.00 |
| | | | | | | | | | | | | | | |
| | **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18 | Cumulative Capital Contributions - Beginning | 0.00 | 160.00 | 320.00 | 480.00 | 600.00 | 440.00 | 280.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19 | Plus: New Investments | 160.00 | 160.00 | 160.00 | 120.00 | 40.00 | 40.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20 | Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (200.00) | (200.00) | (200.00) | (100.00) | 0.00 | 0.00 | 0.00 | 0.00 | (700.00) |
| 21 | Net Contributions that Remain Invested - End | 160.00 | 320.00 | 480.00 | 600.00 | 440.00 | 280.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22 | Pro Rata Portion Excluded from Mgmt. Fee Calculation | (15.00) | (15.00) | (15.00) | (15.00) | (15.00) | (5.49) | (1.96) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23 | Net Capital/Contributions for Mgmt. Fee Calculation | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 274.51 | 98.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Management Fees** | | | | | | | | | | | | | |
| 24 | Management Fees Due to Investment Manager | 11.25 | 11.25 | 11.25 | 11.25 | 11.25 | 3.50 | 1.86 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 62.10 |
| 25 | Less: Estimated Net Management Fees Offset (1) | (5.00) | (5.00) | (5.00) | (5.00) | (2.50) | (1.25) | (0.63) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (24.38) |
| 26 | Net Management Fees to be Called | 6.25 | 6.25 | 6.25 | 6.25 | 8.75 | 2.25 | 1.24 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 37.73 |
| | | | | | | | | | | | | | | |
| | **Capital Calls** | | | | | | | | | | | | | |
| 27 | Investment Needs | 160.00 | 160.00 | 160.00 | 120.00 | 40.00 | 40.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 700.00 |
| 28 | Management Fees | 6.25 | 6.25 | 6.25 | 6.25 | 8.75 | 2.25 | 1.24 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 37.73 |
| 29 | Fund Expenses (2) | 8.69 | 1.69 | 1.69 | 1.69 | 1.69 | 0.52 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.24 |
| 30 | Sum of Capital Calls | 174.94 | 167.94 | 167.94 | 127.94 | 50.44 | 42.77 | 21.52 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 753.97 |
| 31 | Aggregate Capital Called | 174.94 | 342.88 | 510.81 | 638.75 | 689.19 | 731.96 | 753.48 | 753.97 | 753.97 | 753.97 | 753.97 | 753.97 | |

| | | |
|---|---|---|
| Percentage of Committed Capital Called | | 99% |
| Net Exit Multiple | | 1.81 |

(1) Management fee offset data provided by Management.  See Exhibit N-4 for details.
(2) Fund Expense data provided by Management.  See Exhibit N-4 for details.

Confidential
Empire Valuation Consultants

645 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT N-4

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Investment period | | | | | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 5.00 | 5.00 | 5.00 | 5.00 | 2.50 | 1.25 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 5.00 | 5.00 | 5.00 | 5.00 | 2.50 | 1.25 | 0.63 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (5.00) | (5.00) | (5.00) | (5.00) | (2.50) | (1.25) | (0.63) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (24.38) |
| **4 Net Management Fee Offsets (Line 6 + Line 3)** | | **(5.00)** | **(5.00)** | **(5.00)** | **(5.00)** | **(2.50)** | **(1.25)** | **(0.63)** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **(24.38)** |

| Estimated Portfolio Expenses | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Investment period | | | | | | | | | | | | |
| 5 Organizational Expenses | 7.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7.00 |
| 6 Annual Fund Operating Expenses | 1.69 | 1.69 | 1.69 | 1.69 | 1.69 | 0.52 | 0.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.24 |
| **7 Capital Calls for Expenses** | **8.69** | **1.69** | **1.69** | **1.69** | **1.69** | **0.52** | **0.28** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **16.24** |

* Per Management.

RIVERSTONE_SDTX00156700

Confidential
Empire Valuation Consultants

845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT N-5

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
AS OF DECEMBER 31, 2016

| | Fund Year | Investment Period 1 | 2 | 3 | 4 | 5 | Harvest Period 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ending December 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Total |
| | **Accrual of Contributed Capital** | | | | | | | | | | | | | |
| | LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1 | Beginning Balance | 0.00 | 185.36 | 378.14 | 586.34 | 768.84 | 585.68 | 379.93 | 136.39 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 | Plus: Contributed Capital in Current Period from LP's | 171.63 | 164.77 | 164.77 | 125.55 | 49.62 | 41.98 | 21.12 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 739.92 |
| 2a | Investment Needs | 156.86 | 156.86 | 156.86 | 117.65 | 39.22 | 39.22 | 19.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 686.27 |
| 2b | Management Fees | 6.25 | 6.25 | 6.25 | 6.25 | 8.75 | 2.25 | 1.24 | 0.49 | 0.00 | 0.00 | 0.00 | 0.00 | 37.73 |
| 2c | Fund Expenses | 8.52 | 1.65 | 1.65 | 1.65 | 1.65 | 0.51 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.92 |
| 3 | Less: Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (276.16) | (275.97) | (274.76) | (136.55) | 0.00 | 0.00 | 0.00 | 0.00 | (963.68) |
| 4 | Equals: End of Period Contributed Capital, prior to preferred return accrual | 171.63 | 350.13 | 542.90 | 711.89 | 542.30 | 351.79 | 126.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 | Plus: Current Period Preferred Return | 13.73 | 28.01 | 43.43 | 56.95 | 43.38 | 28.14 | 10.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6 | End of Period Net LP Contributed Capital | 185.36 | 378.14 | 586.34 | 768.84 | 585.68 | 379.93 | 136.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 | Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8 | Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9 | End of Period Net LP Contributed Capital including previous deficient returns | 185.36 | 378.14 | 586.34 | 768.84 | 585.68 | 379.93 | 136.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| 10 | **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 390.00 | 390.00 | 390.00 | 195.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,365.00 |
| 11 | Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 7.65 | 7.65 | 7.65 | 3.82 | 0.00 | 0.00 | 0.00 | 0.00 | 26.76 |
| 12 | Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13 | **Net Distributions Available for LP Distribution Provisions** | 0.00 | 0.00 | 0.00 | 0.00 | 382.35 | 382.35 | 382.35 | 191.18 | 0.00 | 0.00 | 0.00 | 0.00 | 1,338.24 |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14 | Aggregate Contributed Capital and Preferred Return Due | 171.63 | 350.13 | 542.90 | 711.89 | 818.46 | 627.66 | 401.05 | 136.88 | | | | | Total |
| 15 | Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 276.16 | 275.87 | 274.76 | 136.88 | 0.00 | 0.00 | 0.00 | 0.00 | 963.68 |
| 16 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 106.19 | 106.48 | 107.59 | 54.30 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17 | GP Catch-up Distribution Payable | 4.58 | 13.91 | 28.39 | 47.37 | 61.84 | 49.63 | 31.51 | 10.39 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 17.27 | 17.19 | 16.90 | 8.31 | 0.00 | 0.00 | 0.00 | 0.00 | 59.67 |
| 19 | Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 4.32 | 4.30 | 4.22 | 2.08 | 0.00 | 0.00 | 0.00 | 0.00 | 14.92 |
| | | | | | | | | | | | | | | |
| 20 | Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 84.61 | 84.99 | 86.47 | 43.91 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | | |
| | **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21 | 20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 16.92 | 17.00 | 17.29 | 8.78 | 0.00 | 0.00 | 0.00 | 0.00 | 59.99 |
| 22 | 80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 67.69 | 67.99 | 69.18 | 35.12 | 0.00 | 0.00 | 0.00 | 0.00 | 239.98 |

Total LP Capital Through Carry Waterfall     1,338.24

RIVERSTONE_SDTX00156701

**EXHIBIT N-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ milions)
### RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.
### AS OF DECEMBER 31, 2016

| | Year Ending December 31, | | 1.00 2019 | 2.00 2020 | 3.00 2021 | 4.00 2022 | 5.00 2023 | 6.00 2024 | 7.00 2025 | 8.00 2026 | 9.00 2027 | 10.00 2028 | 11.00 2029 | 12.00 2030 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 276.16 | 275.87 | 274.76 | 136.88 | 0.00 | 0.00 | 0.00 | 0.00 | 963.6769 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 72.00 | 72.29 | 73.40 | 37.20 | 0.00 | 0.00 | 0.00 | 0.00 | 254.8960 |
| 3 | Capital to be Funded | | (171.63) | (164.77) | (164.77) | (125.55) | (49.62) | (41.98) | (21.12) | (0.49) | 0.00 | 0.00 | 0.00 | 0.00 | (739.9231) |
| 4 | Net Capital Flows | | (171.63) | (164.77) | (164.77) | (125.55) | 298.54 | 306.19 | 327.04 | 173.59 | 0.00 | 0.00 | 0.00 | 0.00 | 478.6498 |
| 5 | Implied IRR, rounded | 15.4% | | | | | | | | | | | | | |
| | | | 0.93 | 0.81 | 0.70 | 0.61 | 0.52 | 0.45 | 0.39 | 0.34 | 0.30 | 0.26 | 0.22 | 0.19 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (159.76) | (132.88) | (115.13) | (76.01) | 156.61 | 139.16 | 128.79 | 59.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 7.65 | 7.65 | 7.65 | 3.82 | 0.00 | 0.00 | 0.00 | 0.00 | 26.76 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (3.31) | (3.17) | (3.17) | (2.39) | (0.82) | (0.79) | (0.40) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (14.04) |
| 9 | Net Capital Flows | | (3.31) | (3.17) | (3.17) | (2.39) | 6.83 | 6.85 | 7.25 | 3.82 | 0.00 | 0.00 | 0.00 | 0.00 | 12.72 |
| 10 | Implied IRR, rounded | 20.0% | | | | | | | | | | | | | |
| | | | 0.91 | 0.76 | 0.63 | 0.53 | 0.44 | 0.37 | 0.31 | 0.25 | 0.21 | 0.18 | 0.15 | 0.12 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (3.02) | (2.41) | (2.01) | (1.26) | 3.00 | 2.51 | 2.21 | 0.97 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 7.65 | 7.65 | 7.65 | 3.82 | 0.00 | 0.00 | 0.00 | 0.00 | 26.76 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (3.31) | (3.17) | (3.17) | (2.39) | (0.82) | (0.79) | (0.40) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (14.04) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 17.27 | 17.19 | 16.90 | 8.31 | 0.00 | 0.00 | 0.00 | 0.00 | 59.67 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 16.92 | 17.00 | 17.29 | 8.78 | 0.00 | 0.00 | 0.00 | 0.00 | 59.99 |
| 16 | Net Capital Flows | | (3.31) | (3.17) | (3.17) | (2.39) | 41.02 | 41.04 | 41.44 | 20.92 | 0.00 | 0.00 | 0.00 | 0.00 | 132.38 |
| 17 | Implied IRR, rounded | 87.8% | | | | | | | | | | | | | |
| | | | 0.73 | 0.39 | 0.21 | 0.11 | 0.06 | 0.03 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (2.41) | (1.23) | (0.66) | (0.26) | 2.41 | 1.28 | 0.69 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **RIVERSTONE CKD MANAGEMENT COMPANY II, S.DE R.L. DE C.V.--FUND IRR** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | (160.00) | (160.00) | (160.00) | (120.00) | (40.00) | (40.00) | (20.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (700.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 390.00 | 390.00 | 390.00 | 195.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,365.00 |
| 26 | Management Fees (to Mgt. Co) | | (6.25) | (6.25) | (6.25) | (6.25) | (8.75) | (2.25) | (1.24) | (0.49) | 0.00 | 0.00 | 0.00 | 0.00 | (37.73) |
| 27 | Fund Expenses | | (8.69) | (1.69) | (1.69) | (1.69) | (1.69) | (0.52) | (0.28) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (16.24) |
| 28 | Net Capital Flows | | (174.94) | (167.94) | (167.94) | (127.94) | 339.56 | 347.23 | 368.48 | 194.51 | 0.00 | 0.00 | 0.00 | 0.00 | 611.03 |
| 29 | Implied IRR, rounded | 18.5% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.65 | 0.55 | 0.47 | 0.39 | 0.33 | 0.28 | 0.24 | 0.20 | 0.17 | 0.14 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (160.70) | (130.18) | (109.86) | (70.63) | 158.18 | 136.50 | 122.24 | 54.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

EXHIBIT N-7

**DISCOUNTED CASH FLOW ANALYSIS**
CKD II GP
AS OF DECEMBER 31, 2016

| Year Ending December 31, | Reference | Year 1 2019 | Year 2 2020 | Year 3 2021 | Year 4 2022 | Year 5 2023 | Year 6 2024 | Year 7 2025 | Year 8 2026 | Year 9 2027 | Year 10 2028 | Year 11 2029 | Year 12 2030 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | 14.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| Carried Interest Cash Flows - (Riverstone CKD Management Company II, S.De R.L. De C.V.) | | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT N-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $17.27 | $17.19 | $16.90 | $8.31 | $0.00 | $0.00 | $0.00 | $0.00 | $59.67 |
| Full Carry | EXHIBIT N-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $16.92 | $17.00 | $17.29 | $8.78 | $0.00 | $0.00 | $0.00 | $0.00 | $59.99 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $34.19 | $34.19 | $34.19 | $17.09 | $0.00 | $0.00 | $0.00 | $0.00 | $119.66 |

**EXHIBIT O-1**

## SUMMARY OF INPUTS AND ASSUMPTIONS
**RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.**
### AS OF DECEMBER 31, 2016

**Key Information**

| | | | |
|---|---|---|---|
| 1 | Fund Name | | RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P. |
| 2 | Fund Short Name | | FUND |
| 3 | GP Entity Name | | RIVERSTONE ENERGY INFRASTRUCTURE GP |
| 4 | GP Entity Short Name | | FUND GP |
| 5 | Valuation Date | | DECEMBER 31, 2016 |

**Committed Capital by Class of Partner**

| | | | |
|---|---|---|---|
| 6 | FUND LPs | 98.0% | 1,500 |
| 7 | RIVERSTONE GP (de minimus) | 2.0% | 30 |
| 8 | CO-INVESTMENT | 0.0% | 0 |
| 9 | **Total Capital Commitments ($ in millions)** | | **1,530.00** |

**Key Fund Dates**

| | | | |
|---|---|---|---|
| 10 | Initial Close | | 12/31/2017 |
| 11 | Final Close | | 12/31/2018 |
| 12 | Investment Period End Date | 5 | 12/31/2022 |
| 13 | Fund Term End Date | 10 | 12/31/2027 |
| 14 | Fund Term with Extensions | 2 | 12/31/2029 |
| 15 | Valuation Date | | 12/31/2016 |

| | | | |
|---|---|---|---|
| 16 | **Total Dollars To Be Called - Calculated Output ($ in millions):** | | **1,513.665** |
| 17 | LP Capital Called | | 1,485.748 |
| 18 | GP Capital Called (cash only) | | 27.917 |
| 19 | GP Affiliate Co-Investment Partners Capital Called | | 0.000 |
| 20 | Percentage of Capital Called | | 99% |

**Investment Time Frame**

| | | | |
|---|---|---|---|
| 21 | Follow-on Investment Lag in years | | 2 |
| 22 | Investment to Harvest Time in years | | 4 |

**Gross Exit Multiples**

| | | | |
|---|---|---|---|
| 23 | For Initial Investments | | 2.00 |
| 22 | For Follow-on Investments | | 1.75 |
| 23 | Fund IRR (net of Mgt. Fees, calculated) | | 17.7% |
| 24 | LP IRR (net of Fees and Expenses, calculated) | | 14.7% |

**Management Fees**

| | | | |
|---|---|---|---|
| 25 | Investment Period | | 1.50% |
| 26 | Post-Investment Period | | 1.00% |
| 27 | Capital exempt from Management Fees | | 2.0% |
| 28 | Capital exempt from Management Fees in $ | | 30.000 |

**Preferred Rate of Return**

| | | | |
|---|---|---|---|
| 29 | LP Preferred Return | | 8% |
| 30 | GP Preferred Return | | N/A |
| 31 | GP Preferred Return Catch Up (as % of LP Preferred Return) | | 33.33% |

**Carried Interest**

| | | | |
|---|---|---|---|
| 32 | General Partners (w/ LPs) | | 20% |
| 33 | Limited Partners | | 80% |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT O-2

## SUMMARY OF INVESTMENTS AND EXITS
## RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.
### AS OF DECEMBER 31, 2016

*(Year End 12/31)*

| Company | Initial Cost Basis | Year of Acquisition | Follow-on Investments | Follow-on Year | Projected Sale Proceeds | Projected Year Sold |
|---|---|---|---|---|---|---|
| TBD - Unidentified Investment(s) in fiscal 2018 | $320,000,000 | 2018 | $80,000,000 | 2020 | $780,000,000 | 2022 |
| TBD - Unidentified Investment(s) in fiscal 2019 | $320,000,000 | 2019 | $80,000,000 | 2021 | $780,000,000 | 2023 |
| TBD - Unidentified Investment(s) in fiscal 2020 | $320,000,000 | 2020 | $80,000,000 | 2022 | $780,000,000 | 2024 |
| TBD - Unidentified Investment(s) in fiscal 2021 | $160,000,000 | 2021 | $40,000,000 | 2023 | $390,000,000 | 2025 |
| TBD - Unidentified Investment(s) in fiscal 2022 | $0 | 2022 | $0 | 2024 | $0 | 2026 |
| Total | $1,120,000,000 | | $280,000,000 | | $2,730,000,000 | |
| FUND LPs | $1,098,039,216 | | $274,509,804 | | | |
| RIVERSTONE GP (de minimus) | $21,960,784 | | $5,490,196 | | | |
| CO-INVESTMENT | $0 | | $0 | | $2,730,000,000 | Aggregate Investment Proceeds |
| Total Investment Cost Basis | $1,400,000,000 | | | | $1,400,000,000 | Aggregate Investment Outlays |
| | | | | | 1.95 | Implied Average Exit Multiple |

| | Capital Commitment | | |
|---|---|---|---|
| FUND LPs | $1,500,000,000 | 98.0% | |
| RIVERSTONE GP (de minimus) | $30,000,000 | 2.0% | |
| CO-INVESTMENT | $0 | 0.0% | |
| | $1,530,000,000 | 100% | |

RIVERSTONE_SDTX00156705

EXHIBIT O-3

## SUMMARY OF FUND CASH FLOWS ($ millions)
### RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.
### AS OF DECEMBER 31, 2016

| | | Investment Period | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| **Year Ending December 31** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **Totals** |
| **Summary of Fund Cash Outflows** | | | | | | | | | | | | | |
| 1  Investments made in 2018 + follow-on | 320.00 | - | 80.00 | - | - | - | - | - | - | - | - | - | 400.00 |
| 2  Investments made in 2019 + follow-on | - | 320.00 | - | 80.00 | - | - | - | - | - | - | - | - | 400.00 |
| 3  Investments made in 2020 + follow-on | - | - | 320.00 | - | 80.00 | - | - | - | - | - | - | - | 400.00 |
| 4  Investments made in 2021 + follow-on | - | - | - | 160.00 | - | 40.00 | - | - | - | - | - | - | 200.00 |
| 5  Investments made in 2022 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 6  Investments made in 2023 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 7  Investments made in 2024 + follow-on | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 8  Sum of Investments | 320.00 | 320.00 | 400.00 | 240.00 | 80.00 | 40.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,400.00 |
| 9  Aggregate Sum of Investments | 320.00 | 640.00 | 1,040.00 | 1,280.00 | 1,360.00 | 1,400.00 | 1,400.00 | 1,400.00 | 1,400.00 | 1,400.00 | 1,400.00 | 1,400.00 | |
| | | | | | | | | | | | | | |
| **Summary of Fund Cash Inflows** | | | | | | | | | | | | | |
| 10  Investment Distributions from 2018 Investments | - | - | - | - | 780.00 | - | - | - | - | - | - | - | 780.00 |
| 11  Investment Distributions from 2019 Investments | - | - | - | - | - | 780.00 | - | - | - | - | - | - | 780.00 |
| 12  Investment Distributions from 2020 Investments | - | - | - | - | - | - | 780.00 | - | - | - | - | - | 780.00 |
| 13  Investment Distributions from 2021 Investments | - | - | - | - | - | - | - | 390.00 | - | - | - | - | 390.00 |
| 14  Investment Distributions from 2022 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 15  Investment Distributions from 2023 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 16  Investment Distributions from 2024 Investments | - | - | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 17  Sum of Distributions | 0.00 | 0.00 | 0.00 | 0.00 | 780.00 | 780.00 | 780.00 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,730.00 |
| | | | | | | | | | | | | | |
| **Aggregate Contributions that Remain Invested** | | | | | | | | | | | | | |
| 18  Cumulative Capital Contributions - Beginning | 0.00 | 320.00 | 640.00 | 1,040.00 | 1,280.00 | 960.00 | 600.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 19  Plus: New Investments | 320.00 | 320.00 | 400.00 | 240.00 | 80.00 | 40.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 20  Less: Contributions Associated with Harvested Investments | 0.00 | 0.00 | 0.00 | 0.00 | (400.00) | (400.00) | (400.00) | (200.00) | 0.00 | 0.00 | 0.00 | 0.00 | (1,400.00) |
| 21  Net Contributions that Remain Invested - End | 320.00 | 640.00 | 1,040.00 | 1,280.00 | 960.00 | 600.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 22  Pro Rata Portion Excluded from Mgmt. Fee Calculation | (30.00) | (30.00) | (30.00) | (30.00) | (30.00) | (11.76) | (3.92) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 23  Net Capital/Contributions for Mgmt. Fee Calculation | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 588.24 | 196.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | (11.76) | | | | | | |
| **Management Fees** | | | | | | | | | | | | | |
| 24  Management Fees Due to Investment Manager | 22.50 | 22.50 | 22.50 | 22.50 | 22.50 | 7.74 | 3.92 | 0.98 | 0.00 | 0.00 | 0.00 | 0.00 | 125.14 |
| 25  Less: Estimated Net Management Fees Offset (1) | (6.00) | (6.00) | (6.00) | (6.00) | (6.00) | (3.00) | (1.50) | (0.75) | 0.00 | 0.00 | 0.00 | 0.00 | (35.25) |
| 26  Net Management Fees to be Called | 16.50 | 16.50 | 16.50 | 16.50 | 16.50 | 4.74 | 2.42 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 89.89 |
| | | | | | | | | | | | | | |
| **Capital Calls** | | | | | | | | | | | | | |
| 27  Investment Needs | 320.00 | 320.00 | 400.00 | 240.00 | 80.00 | 40.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,400.00 |
| 28  Management Fees | 16.50 | 16.50 | 16.50 | 16.50 | 16.50 | 4.74 | 2.42 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 89.89 |
| 29  Fund Expenses (2) | 8.38 | 3.38 | 3.38 | 3.38 | 3.38 | 1.16 | 0.59 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 23.77 |
| 30  Sum of Capital Calls | 344.88 | 339.88 | 419.88 | 259.88 | 99.88 | 45.90 | 3.01 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 1,513.66 |
| 31  Aggregate Capital Called | 344.88 | 684.75 | 1,104.63 | 1,364.50 | 1,464.38 | 1,510.28 | 1,513.29 | 1,513.66 | 1,513.66 | 1,513.66 | 1,513.66 | 1,513.66 | |

| | |
|---|---|
| Percentage of Committed Capital Called | 99% |
| Net Exit Multiple | 1.80 |

*(1)  Management fee offset data provided by Management.  See Exhibit O-4 for details.*
*(2)  Fund Expense data provided by Management.  See Exhibit O-4 for details.*

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT O-4**

## SUMMARY OF MANAGEMENT FEES AND FUND EXPENSES
### RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.
### AS OF DECEMBER 31, 2016

($ millions)
(based on data provided by Management)

| | % offset | Investment period | | | | | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | | | | | | | | |
| 1 Total Fees Available for Fee Offset | | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 3.00 | 1.50 | 0.75 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 Current Period Management Fee Offset | 100% | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 3.00 | 1.50 | 0.75 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 Less: Available Portfolio Income Offset Applied | | (6.00) | (6.00) | (6.00) | (6.00) | (6.00) | (3.00) | (1.50) | (0.75) | 0.00 | 0.00 | 0.00 | 0.00 | (35.25) |
| 4 **Net Management Fee Offsets (Line 6 + Line 3)** | | **(6.00)** | **(6.00)** | **(6.00)** | **(6.00)** | **(6.00)** | **(3.00)** | **(1.50)** | **(0.75)** | **0.00** | **0.00** | **0.00** | **0.00** | **(35.25)** |

| Estimated Portfolio Expenses | Investment period | | | | | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | | | | | | | | |
| 5 Organizational Expenses | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 |
| 6 Annual Fund Operating Expenses | 3.38 | 3.38 | 3.38 | 3.38 | 3.38 | 1.16 | 0.59 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 18.77 |
| 7 **Capital Calls for Expenses** | **8.38** | **3.38** | **3.38** | **3.38** | **3.38** | **1.16** | **0.59** | **0.15** | **0.00** | **0.00** | **0.00** | **0.00** | **23.77** |

* Per Management.

CONFIDENTIAL

Confidential
Empire Valuation Consultants

845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

**EXHIBIT O-5**

## SUMMARY OF PARTNER CASH FLOWS ($ millions)
### RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.
AS OF DECEMBER 31, 2016

| Fund Year | Investment Period | | | | | Harvest Period | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Year Ending December 31 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Total |
| **Accrual of Contributed Capital** | | | | | | | | | | | | | |
| LP Invested Capital Subject to Preferred Return | | | | | | | | | | | | | |
| 1   Beginning Balance | 0.00 | 365.51 | 754.97 | 1260.29 | 1636.62 | 1267.36 | 812.37 | 277.96 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2   Plus:  Contributed Capital in Current Period from LP's | 338.44 | 333.53 | 411.97 | 255.10 | 98.24 | 45.10 | 3.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 1,485.75 |
| 2a      *Investment Needs* | *313.73* | *313.73* | *392.16* | *235.29* | *78.43* | *39.22* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* | *1,372.55* |
| 2b      *Management Fees* | *16.50* | *16.50* | *16.50* | *16.50* | *16.50* | *4.74* | *2.42* | *0.23* | *0.00* | *0.00* | *0.00* | *0.00* | *89.89* |
| 2c      *Fund Expenses* | *8.21* | *3.31* | *3.31* | *3.31* | *3.31* | *1.14* | *0.58* | *0.14* | *0.00* | *0.00* | *0.00* | *0.00* | *23.31* |
| 3   Less:  Return of Capital & Existing Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | (561.38) | (560.27) | (557.99) | (278.34) | 0.00 | 0.00 | 0.00 | 0.00 | (1,957.98) |
| 4   Equals: End of Period Contributed Capital, prior to preferred return accrual | 338.44 | 699.05 | 1166.93 | 1515.39 | 1173.49 | 752.19 | 257.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5   Plus:  Current Period Preferred Return | 27.07 | 55.92 | 93.35 | 121.23 | 93.88 | 60.18 | 20.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 6   End of Period Net LP Contributed Capital | 365.51 | 754.97 | 1260.29 | 1636.62 | 1267.36 | 812.37 | 277.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7   Less: Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 8   Plus: Prior Investment Unrecovered Capital and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 9   End of Period Net LP Contributed Capital including previous deficient returns | 365.51 | 754.97 | 1260.29 | 1636.62 | 1267.36 | 812.37 | 277.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| 10  **Money available for Distributions** | 0.00 | 0.00 | 0.00 | 0.00 | 780.00 | 780.00 | 780.00 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,730.00 |
| 11  Less: GP Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 15.29 | 15.29 | 15.29 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | 53.53 |
| 12  Less: Co-Invest Direct Interest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 13  Net Distributions Available for LP Distribution Provisions | 0.00 | 0.00 | 0.00 | 0.00 | 764.71 | 764.71 | 764.71 | 382.35 | 0.00 | 0.00 | 0.00 | 0.00 | 2,676.47 |
| | | | | | | | | | | | | | |
| **Distribution Tier 1 - Contributed Capital and Preferred Return** | | | | | | | | | | | | | |
| 14  Aggregate Contributed Capital and Preferred Return Due | 338.44 | 699.05 | 1166.93 | 1515.39 | 1734.86 | 1312.46 | 815.37 | 278.34 | 0.00 | 0.00 | 0.00 | 0.00 | Total |
| 15  Return of LP Interest and Preferred Return | 0.00 | 0.00 | 0.00 | 0.00 | 561.38 | 560.27 | 557.99 | 278.34 | 0.00 | 0.00 | 0.00 | 0.00 | 1,957.98 |
| 16  Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 203.33 | 204.44 | 206.71 | 104.02 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| **Distribution Tier 2 - Carried Interest Catch-up** | | | | | | | | | | | | | |
| 17  GP Catch-up Distribution Payable | 9.02 | 27.67 | 58.78 | 99.19 | 130.49 | 104.92 | 66.53 | 22.03 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18  GP Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 36.50 | 36.20 | 35.60 | 17.62 | 0.00 | 0.00 | 0.00 | 0.00 | 125.93 |
| 19  Limited Partners - Residual Catch-up Distribution Paid | 0.00 | 0.00 | 0.00 | 0.00 | 9.13 | 9.05 | 8.90 | 4.41 | 0.00 | 0.00 | 0.00 | 0.00 | 31.48 |
| | | | | | | | | | | | | | |
| 20  Net available for further distributions | 0.00 | 0.00 | 0.00 | 0.00 | 157.70 | 159.18 | 162.21 | 81.99 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | | | | | | | | | | | |
| **Distribution Tier 3 - Carried Interest** | | | | | | | | | | | | | |
| 21  20% to General Partner | 0.00 | 0.00 | 0.00 | 0.00 | 31.54 | 31.84 | 32.44 | 16.40 | 0.00 | 0.00 | 0.00 | 0.00 | 112.22 |
| 22  80% to Limited Partners | 0.00 | 0.00 | 0.00 | 0.00 | 126.16 | 127.35 | 129.77 | 65.59 | 0.00 | 0.00 | 0.00 | 0.00 | 448.87 |

Total LP Capital Through Carry Waterfall    2,676.47

RIVERSTONE_SDTX00156708

**EXHIBIT O-6**

## INTERNAL RATE OF RETURN ANALYSIS ($ millions)
### RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.
### AS OF DECEMBER 31, 2016

| | Year Ending December 31 | | 1.00 2018 | 2.00 2019 | 3.00 2020 | 4.00 2021 | 5.00 2022 | 6.00 2023 | 7.00 2024 | 8.00 2025 | 9.00 2026 | 10.00 2027 | 11.00 2028 | 12.00 2029 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Aggregate LP IRR (excluding Fund GP Affiliates)** | | | | | | | | | | | | | | |
| 1 | Projected Return of LP Capital & Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 561.38 | 560.27 | 557.99 | 278.34 | 0.00 | 0.00 | 0.00 | 0.00 | 1,957.9761 |
| 2 | Projected Pro Rata Share of Residual | | 0.00 | 0.00 | 0.00 | 0.00 | 135.29 | 136.40 | 138.67 | 69.99 | 0.00 | 0.00 | 0.00 | 0.00 | 480.3499 |
| 3 | Capital to be Funded | | (338.44) | (333.53) | (411.97) | (255.10) | (98.24) | (45.10) | (3.00) | (0.37) | 0.00 | 0.00 | 0.00 | 0.00 | (1,485.7475) |
| 4 | Net Capital Flows | | (338.44) | (333.53) | (411.97) | (255.10) | 598.42 | 651.57 | 693.67 | 347.96 | 0.00 | 0.00 | 0.00 | 0.00 | 952.5785 |
| 5 | Implied IRR, rounded | 14.7% | | | | | | | | | | | | | |
| | | | 0.93 | 0.81 | 0.71 | 0.62 | 0.54 | 0.47 | 0.41 | 0.36 | 0.31 | 0.27 | 0.24 | 0.21 | |
| 6 | Check Sum: Present Value of Net Capital Flows | 0.00 | (315.99) | (271.48) | (292.32) | (157.80) | 322.70 | 306.30 | 284.28 | 124.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITHOUT CARRY** | | | | | | | | | | | | | | |
| 7 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 15.29 | 15.29 | 15.29 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | 53.53 |
| 8 | Capital to be Funded (Cash, net of fee waiver) | | (6.44) | (6.34) | (7.91) | (4.77) | (1.63) | (0.81) | (0.01) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (27.92) |
| 9 | Net Capital Flows | | (6.44) | (6.34) | (7.91) | (4.77) | 13.66 | 14.49 | 15.28 | 7.64 | 0.00 | 0.00 | 0.00 | 0.00 | 25.61 |
| 10 | Implied IRR, rounded | 19.5% | | | | | | | | | | | | | |
| | | | 0.91 | 0.77 | 0.64 | 0.54 | 0.45 | 0.38 | 0.31 | 0.26 | 0.22 | 0.18 | 0.15 | 0.13 | |
| 11 | Check Sum: Present Value of Net Capital Flows | 0.00 | (5.89) | (4.85) | (5.07) | (2.56) | 6.12 | 5.44 | 4.80 | 2.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **GP IRR - WITH CARRY** | | | | | | | | | | | | | | |
| 12 | Projected Return of GP Capital & ROI (Cash Basis) | | 0.00 | 0.00 | 0.00 | 0.00 | 15.29 | 15.29 | 15.29 | 7.65 | 0.00 | 0.00 | 0.00 | 0.00 | 53.53 |
| 13 | Capital to be Funded (Cash, net of fee waiver) | | (6.44) | (6.34) | (7.91) | (4.77) | (1.63) | (0.81) | (0.01) | (0.00) | 0.00 | 0.00 | 0.00 | 0.00 | (27.92) |
| 14 | Projected Catch Up on Preferred Return | | 0.00 | 0.00 | 0.00 | 0.00 | 36.50 | 36.20 | 35.60 | 17.62 | 0.00 | 0.00 | 0.00 | 0.00 | 125.93 |
| 15 | Carry | | 0.00 | 0.00 | 0.00 | 0.00 | 31.54 | 31.84 | 32.44 | 16.40 | 0.00 | 0.00 | 0.00 | 0.00 | 112.22 |
| 16 | Net Capital Flows | | (6.44) | (6.34) | (7.91) | (4.77) | 81.70 | 82.53 | 83.32 | 41.66 | 0.00 | 0.00 | 0.00 | 0.00 | 263.76 |
| 17 | Implied IRR, rounded | 86.8% | | | | | | | | | | | | | |
| | | | 0.73 | 0.39 | 0.21 | 0.11 | 0.06 | 0.03 | 0.02 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 18 | Check Sum: Present Value of Net Capital Flows | 0.00 | (4.71) | (2.48) | (1.66) | (0.54) | 4.91 | 2.66 | 1.44 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | | | | | | |
| | **RIVERSTONE ENERGY INFRASTRUCTURE FUND, L.P.--FUND IRR** | | | | | | | | | | | | | | |
| 24 | Projected Investments to be made | | (320.00) | (320.00) | (400.00) | (240.00) | (80.00) | (40.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1,400.00) |
| 25 | Projected Return on Investments | | 0.00 | 0.00 | 0.00 | 0.00 | 780.00 | 780.00 | 780.00 | 390.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,730.00 |
| 26 | Management Fees (to Mgt. Co) | | (16.50) | (16.50) | (16.50) | (16.50) | (16.50) | (4.74) | (2.42) | (0.23) | 0.00 | 0.00 | 0.00 | 0.00 | (89.89) |
| 27 | Fund Expenses | | (8.38) | (3.38) | (3.38) | (3.38) | (3.38) | (1.16) | (0.59) | (0.15) | 0.00 | 0.00 | 0.00 | 0.00 | (23.77) |
| 28 | Net Capital Flows | | (344.88) | (339.88) | (419.88) | (259.88) | 680.13 | 734.10 | 776.99 | 389.62 | 0.00 | 0.00 | 0.00 | 0.00 | 1,216.34 |
| 29 | Implied IRR, rounded | 17.7% | | | | | | | | | | | | | |
| | | | 0.92 | 0.78 | 0.67 | 0.57 | 0.48 | 0.41 | 0.35 | 0.29 | 0.25 | 0.21 | 0.18 | 0.15 | |
| 30 | Check Sum: Present Value of Net Capital Flows | 0.00 | (317.89) | (266.16) | (279.36) | (146.90) | 326.65 | 299.54 | 269.37 | 114.76 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT O-7

## DISCOUNTED CASH FLOW ANALYSIS
### RIVERSTONE ENERGY INFRASTRUCTURE GP
### AS OF DECEMBER 31, 2016

| Year Ending December 31 | | Year 1 2018 | Year 2 2019 | Year 3 2020 | Year 4 2021 | Year 5 2022 | Year 6 2023 | Year 7 2024 | Year 8 2025 | Year 9 2026 | Year 10 2027 | Year 11 2028 | Year 12 2029 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | | |
| **Carried Interest Cash Flows - (Riverstone Energy Infrastructure Fund, L.P.)** | Reference | | | | | | | | | | | | | |
| Preferred Return Catch Up Distribution | EXHIBIT O-6, Row 14 | $0.00 | $0.00 | $0.00 | $0.00 | $36.50 | $36.20 | $35.60 | $17.62 | $0.00 | $0.00 | $0.00 | $0.00 | $125.93 |
| Full Carry | EXHIBIT O-6, Row 15 | $0.00 | $0.00 | $0.00 | $0.00 | $31.54 | $31.84 | $32.44 | $16.40 | $0.00 | $0.00 | $0.00 | $0.00 | $112.22 |
| Aggregate Carried Interest Cash Flows ($ Millions) | | $0.00 | $0.00 | $0.00 | $0.00 | $68.04 | $68.04 | $68.04 | $34.02 | $0.00 | $0.00 | $0.00 | $0.00 | $238.14 |

RIVERSTONE_SDTX00156710

**EXHIBIT P-1**

| | | |
|---|---|---|
| **DISCOUNT RATE SUMMARY CONCLUSION** | | |
| **RIVERSTONE HOLDINGS LLC** | | |
| **AS OF DECEMBER 31, 2016** | | |

| | | |
|---|---|---|
| **Selected LP Pre-Tax Cost of Equity** | **13.0%** | |
| | | **Concluded** |
| **Company Cash Flow Source Specific Risk Adjustments** | **Tax & Risk Adj.** | **Discount Rate** |
| *Management Fees* | | |
| Private Equity Funds (Existing) Management Fees - High Probability | -2.0% | 11.0% |
| Private Equity Funds (Existing) Management Fees | 1.0% | 14.0% |
| Private Equity Funds (New) Management Fees | 4.0% | 17.0% |
| *Carried Interest* | | |
| Private Equity Funds (Existing) Carried Interest - High Probability | 12.0% | 25.0% |
| Private Equity Funds (Existing) Carried Interest | 17.0% | 30.0% |
| Private Equity Funds (New) Carried Interest | 22.0% | 35.0% |

Confidential
Empire Valuation Consultants
Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT P-2

## PRIVATE EQUITY / VC RATES OF RETURN
## RIVERSTONE HOLDINGS LLC
## AS OF DECEMBER 31, 2016

| | Source | | | | Source | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | QED Report – 288 VC Firms | Ruhnka & Young – 72 VC Firms | | | | | Sahlman, Stevenson and Bhide(3) | | | |
| Stage | Range of Required Returns (Medians) | Median Compound Annual Rate of Return Demanded | | Stage | Plummer(1) | Scherlis and Sahlman(2) | | Pepperdine(4) | Razgaitis(5) | Parr(6) |
| Seed | 50%-70% | 73% | | Start-Up | 50%-70% | 50%-70% | 50%-100% | 23%-38% | 50%-70% | 50% |
| First Stage | 40%-60% | 55% | | Early Development | 40%-60% | 40%-60% | 40%-60% | 23%-38% | 40%-50% | 40% |
| Second Stage | 35%-50% | 42% | | First Stage | N/A | N/A | N/A | 23%-38% | 30%-40% | 30%-40% |
| Third Stage | 30%-50% | 35% | | | | | | | | |
| Fourth Stage | 30%-40% | 35% | | Expansion | 35%-50% | 30%-50% | 30%-40% | 19%-33% | 25%-35% | 30% |
| Bridge/Mezzanine | 25%-35 | N/A | | Mezzanine/ IPO | 25%-35% | 20%-35% | 20%-30% | 18%-33% | 10%-20% | 25% |

**Standard Definitions of Venture Capital Investment Stages:**

"Seed" In this earliest stage, it was noted that the venture was conceptual. The primary benchmark for this stage was to verify the feasibility of the business, either from a technological or market standpoint. From an operational standpoint, there was generally no team in place beyond the founder/inventor and a few technicians. Risks of investment at this stage were recognized as being primarily internal.

"First Stage" In this stage, the feasibility analysis of the business concept has generally progressed to the development of a formal business plan, including some initial market analysis for the proposed product or service. Major benchmarks at this stage generally include the completion of beta testing and preparing the product for market, completing some initial sales to verify that real demand exists, and establishing manufacturing feasibility. Major risks at this stage remained internally driven.

"Second Stage" In this stage, initial market acceptance of the product or service has usually been established, and the company begins to focus on increasing manufacturing capacity and expanding its marketing efforts. The focus at this stage is generally on expansion, and driving the venture toward cash flow break-even, although most companies in the second stage have not reached this benchmark. Risks at this stage were shifting to a balance between external (market) risks and internal risks, where earlier stages were characterized primarily by internal risk.

"Third Stage" A continuation of the prior stage, companies at this stage generally have significant sales and orders, remain focused on broadening their markets, and are profitable or nearly so. However, companies at this stage were still generally dependent on external capital for growth. Goals at this stage became increasingly focused, with emphasis on the following: (1) achieving sales growth and market share targets; and (2) focusing an achieving an exit vehicle by demonstrating cash flow break-even or profitability targets. An increasing percentage of risks at this stage were considered to be market-determined.

"Fourth Stage" This stage is characterized by an explicit focus on identifying an exit vehicle for investors. Businesses have expanded since the prior stage, with maturity generally being identified both in management and in internal controls. Businesses at this stage would be profitable and growing rapidly. Risks at this stage were identified as being generally external, although remaining internal concerns involved inadequate management and financial controls.

"IPO/ Bridge/Mezzanine" companies are similar to the fourth stage but may be seeking financing for growth or an injection of liquidity prior to a public offering of a full change of control.

**Sources:**
(1)Plummer, James L., QED Report on Venture Capital Financial Analysis, Palo Alto: QED Research, Inc. 1987.
(2)Scherlis, Daniel R. and Sahlman, William A., A Method for Valuing High Risk, Long-Term Investments: The Venture Capital Method, Harvard Business School, 1989.
(3)Sahlman, William A., Stevenson, Howard H. and Bhide, Amar V., Financing Entrepreneurial Ventures, Business Fundamental Series, Harvard Business School, 1998.
(4)Pepperdine University Graziadio School of Business and Management: Private Capital Markets Project, 2015.
(5)Razgaitis, Richard, Pricing the Intellectual Property of Early-Stage Technologies: A Primer of Basic Valuation Tools and Considerations, 2007.
(6)Parr, Russell L., "Patent Valuation and Royalty Rates," 71-73, 2004

RIVERSTONE_SDTX00156712

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT Q-1

## DISCOUNTED CASH FLOW ANALYSIS - MANAGEMENT FEE CASH FLOWS (From Supporting Exhibits)
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ending December 31, | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | Totals |
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | |
| **Management Fees ($ Millions)** | | | | | | | | | | | | | |
| *Existing Funds* | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund II, L.P. | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A [1] |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | | 6.24 | 4.60 | 3.92 | 1.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.71 [2] |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | | 21.63 | 15.94 | 6.95 | 1.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 45.66 [2] |
| Riverstone Global Energy & Power Fund V, L.P. | | 53.93 | 41.82 | 23.49 | 7.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 126.53 |
| Riverstone Global Energy & Power Fund VI, L.P. | | 71.57 | 71.57 | 71.57 | 71.57 | 21.37 | 8.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 315.89 |
| Riverstone Non-ECI Partners, L.P. | | 3.84 | 3.84 | 3.84 | 3.84 | 1.16 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.99 |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | | 13.75 | 11.37 | 7.00 | 2.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34.63 [2] |
| Riverstone Credit Management LLC | | 5.68 | 5.24 | 5.61 | 2.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18.78 |
| Riverstone CKD Management Company, S.De R.L. De C.V. | | 10.25 | 10.25 | 10.25 | 10.25 | 3.65 | 2.21 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 47.57 |
| **Existing Funds Total** | (A) | 186.89 | 164.62 | 132.63 | 100.73 | 26.27 | 10.89 | 0.74 | 0.00 | 0.00 | 0.00 | 0.00 | 622.76 |
| *New Funds* | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 82.50 | 82.50 | 82.50 | 82.50 | 82.50 | 39.41 | 17.21 | 5.29 | 0.00 | 474.41 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 | 7.21 | 3.19 | 0.98 | 0.00 | | 86.37 |
| Riverstone Credit Partners II, L.P. | | N/A | 6.18 | 13.00 | 27.48 | 15.95 | 8.26 | 1.47 | 0.00 | 0.00 | 0.00 | | 72.33 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 7.50 | 7.50 | 7.50 | 7.50 | 7.50 | 2.51 | 1.47 | 0.49 | 0.00 | 0.00 | | 41.97 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 11.25 | 11.25 | 11.25 | 11.25 | 11.25 | 3.50 | 1.86 | 0.49 | | 62.10 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 22.50 | 22.50 | 22.50 | 22.50 | 22.50 | 7.74 | 3.92 | 0.98 | 0.00 | | 125.14 |
| **New Funds Total** | (B) | 7.50 | 51.18 | 151.75 | 166.23 | 154.70 | 142.02 | 111.64 | 50.51 | 21.03 | 5.78 | 0.00 | 862.33 |
| | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | |
| | Mid-point of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | |
| | Discount Rate | | | | | | | | | | | | |
| **Existing Funds - Near Term** | 11%   (C) | 0.95 | 0.86 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| **Existing Funds** | 14%   (C) | N/A | N/A | 0.72 | 0.63 | 0.55 | 0.49 | 0.43 | 0.37 | 0.33 | 0.29 | 0.25 | |
| | (A x C) | 177.39 | 140.77 | 95.58 | 63.67 | 14.56 | 5.30 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **New Funds** | 17%   (C) | 0.92 | 0.79 | 0.68 | 0.58 | 0.49 | 0.42 | 0.36 | 0.31 | 0.26 | 0.22 | 0.19 | |
| | (B x C) | 6.93 | 40.44 | 102.48 | 95.93 | 76.29 | 59.86 | 40.22 | 15.55 | 5.53 | 1.30 | 0.00 | |

| | |
|---|---|
| *Value of Existing Funds Management Fees* | 497.57 |
| *Value of New Funds Management Fees* | 444.53 |
| **Aggregate Value of Management Fees** | 942.11 |

(1) In 2015, Management elected to forgo future management fees.
(2) 90% of Fees flow to Riverstone, 10% to Carlyle.

RIVERSTONE_SDTX00156713

EXHIBIT Q-2

**DISCOUNTED CASH FLOW ANALYSIS - CARRIED INTEREST CASH FLOWS (From Supporting Exhibits)**
**RIVERSTONE MASTER**
**AS OF DECEMBER 31, 2016**

| Year Ending December 31, | | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Period in Years)* | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | |
| **General Partner Cash Flows ($ Millions)** | | | | | | | | | | | | | |
| *Existing Funds* | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 (1) |
| Carlyle/Riverstone Energy Partners III, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 (1) |
| Riverstone/Carlyle Energy Partners IV, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 (1) |
| Riverstone Energy Partners V, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Riverstone Energy Partners VI, L.P. | | 0.00 | 0.00 | 0.00 | 285.21 | 285.21 | 359.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 929.58 |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | | 0.00 | 0.00 | 0.00 | 15.44 | 15.44 | 19.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.42 |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 (1) |
| Riverstone Capital Partners - Credit LP | | 0.00 | 0.00 | 0.00 | 41.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41.83 |
| Riverstone Capital Partners CKD, LP | | 0.00 | 0.00 | 0.00 | 48.52 | 41.59 | 41.59 | 41.59 | 0.00 | 0.00 | 0.00 | 0.00 | 173.29 |
| **Existing Funds Total** | (A) | 0.00 | 0.00 | 0.00 | 391.01 | 342.24 | 420.28 | 41.59 | 0.00 | 0.00 | 0.00 | 0.00 | 1,195.12 |
| *New Funds* | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 233.68 | 233.68 | 233.68 | 186.94 | 0.00 | 887.98 |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 44.16 | 44.16 | 35.33 | 0.00 | 0.00 | 0.00 | 167.81 |
| Riverstone Credit Partners II, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 107.34 | 0.00 | 0.00 | 0.00 | 0.00 | 107.34 |
| Riverstone CKD Renewables & Alternative Energy, S.De R.L. De C.V. | | 0.00 | 0.00 | 0.00 | 0.00 | 26.56 | 22.14 | 17.71 | 17.71 | 0.00 | 0.00 | 0.00 | 84.12 |
| Riverstone CKD Management Company II, S.De R.L. De C.V. | | N/A | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 34.19 | 34.19 | 34.19 | 17.09 | 0.00 | 119.66 |
| Riverstone Energy Infrastructure Fund, L.P. | | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 68.04 | 68.04 | 68.04 | 34.02 | 0.00 | 0.00 | 238.14 |
| **New Funds Total** | (B) | 0.00 | 0.00 | 0.00 | 0.00 | 26.56 | 134.34 | 505.12 | 397.78 | 337.22 | 204.04 | 0.00 | 1,605.06 |
| Days | | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 | |
| Mid-point of Period | | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 | |

| | Discount Rate | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Existing Funds - Near Term** | 25% | (C) | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| **Existing Funds** | 30% | (C) | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 | |
| | | (A x C) | 0.00 | 0.00 | 0.00 | 156.04 | 105.02 | 99.21 | 7.55 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **New Funds** | 35% | (C) | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 | |
| | | (B x C) | 0.00 | 0.00 | 0.00 | 0.00 | 6.88 | 25.76 | 71.76 | 41.84 | 26.26 | 11.77 | 0.00 | |

| | | |
|---|---|---|
| Value of Existing Funds Carried Interest | 367.82 | |
| Value of New Funds Carried Interest | 184.28 | |
| **Aggregate Value of Carried Interest** | **552.09** | |

*(1) 90% of Fees flow to Riverstone, 10% to Carlyle.*

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT R

## PRESENT VALUES OF CARRIED INTEREST & MANAGEMENT FEES
### RIVERSTONE MASTER
### AS OF DECEMBER 31, 2016

| Year Ending December 31, | Year 1 2017 | Year 2 2018 | Year 3 2019 | Year 4 2020 | Year 5 2021 | Year 6 2022 | Year 7 2023 | Year 8 2024 | Year 9 2025 | Year 10 2026 | Year 11 2027 | Totals | % of Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Period in Years) | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | | |
| ($ Millions) | | | | | | | | | | | | | |
| **Existing Funds - Management Fees** | | | | | | | | | | | | | |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0.00 | 0.00% |
| Carlyle/Riverstone Global Energy & Power Fund III, L.P. | 5.92 | 3.93 | 2.82 | 1.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.91 | 0.93% |
| Riverstone/Carlyle Global Energy & Power Fund IV, L.P. | 20.53 | 13.63 | 5.01 | 0.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39.89 | 2.67% |
| Riverstone Global Energy & Power Fund V, L.P. | 51.19 | 35.78 | 16.93 | 4.56 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 108.48 | 7.26% |
| Riverstone Global Energy & Power Fund VI, L.P. | 67.93 | 61.20 | 51.58 | 45.23 | 11.95 | 4.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 241.79 | 16.18% |
| Riverstone Non-ECI Partners, L.P. | 3.65 | 3.29 | 2.77 | 2.43 | 0.64 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.00 | 0.87% |
| Riverstone/Carlyle Renewable & Alternative Energy Fund II, L.P. | 13.05 | 9.72 | 5.05 | 1.59 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29.40 | 1.97% |
| Riverstone Credit Management LLC | 5.39 | 4.48 | 4.04 | 1.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.34 | 1.03% |
| Riverstone CKD Management Company, S.De R.L. De C.V. | 9.72 | 8.76 | 7.38 | 6.48 | 2.02 | 1.07 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 35.75 | 2.39% |
| **Existing Funds - Management Fees Total** | 177.39 | 140.77 | 95.58 | 63.67 | 14.56 | 5.30 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 497.57 | 33.30% |
| **New Funds - Management Fees** | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 55.72 | 47.61 | 40.68 | 34.77 | 29.72 | 12.13 | 4.53 | 1.19 | 0.00 | 226.36 | 15.15% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 11.85 | 10.13 | 8.66 | 7.40 | 6.32 | 2.60 | 0.98 | 0.26 | 0.00 | 0.00 | 48.19 | 3.23% |
| Riverstone Credit Partners II, L.P. | 0.00 | 4.88 | 8.78 | 15.86 | 7.87 | 3.48 | 0.53 | 0.00 | 0.00 | 0.00 | 0.00 | 41.39 | 2.77% |
| Riverstone CKD Renewables & Alternative Energy, S.De R L. De C.V. | 6.93 | 5.93 | 5.07 | 4.33 | 3.70 | 1.06 | 0.53 | 0.15 | 0.00 | 0.00 | 0.00 | 27.69 | 1.85% |
| Riverstone CKD Management Company II, S.De R L. De C.V. | 0.00 | 0.00 | 7.60 | 6.49 | 5.55 | 4.74 | 4.05 | 1.08 | 0.49 | 0.11 | 0.00 | 30.11 | 2.02% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 17.78 | 15.20 | 12.98 | 11.10 | 9.48 | 2.79 | 1.21 | 0.26 | 0.00 | 0.00 | 70.79 | 4.74% |
| **New Funds - Management Fees Total** | 6.93 | 40.44 | 102.48 | 95.93 | 76.29 | 59.86 | 40.22 | 15.55 | 5.53 | 1.30 | 0.00 | 444.53 | 29.75% |
| **Existing Funds - Carried Interest** | | | | | | | | | | | | | |
| Carlyle/Riverstone Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Carlyle/Riverstone Energy Partners III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Riverstone/Carlyle Energy Partners IV, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Riverstone Energy Partners V, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Riverstone Energy Partners VI, L.P. | 0.00 | 0.00 | 0.00 | 113.82 | 87.52 | 84.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 286.12 | 19.15% |
| Riverstone Non-ECI Partners GP (Cayman), L.P. | 0.00 | 0.00 | 0.00 | 6.16 | 4.74 | 4.61 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.51 | 1.04% |
| Riverstone/Carlyle Renewable Energy Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Riverstone Capital Partners - Credit LP | 0.00 | 0.00 | 0.00 | 16.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.69 | 1.12% |
| Riverstone Capital Partners CKD, LP | 0.00 | 0.00 | 0.00 | 19.36 | 12.76 | 9.82 | 7.55 | 0.00 | 0.00 | 0.00 | 0.00 | 49.49 | 3.31% |
| **Existing Funds - Carried Interest Total** | 0.00 | 0.00 | 0.00 | 156.04 | 105.02 | 99.21 | 7.55 | 0.00 | 0.00 | 0.00 | 0.00 | 367.82 | 24.62% |
| **New Funds - Carried Interest** | | | | | | | | | | | | | |
| Riverstone Global Energy & Power Fund VII, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.20 | 24.58 | 18.20 | 10.79 | 0.00 | 86.76 | 5.81% |
| Riverstone Renewable & Alternative Energy Fund III, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.47 | 6.27 | 4.65 | 2.75 | 0.00 | 22.14 | 1.48% |
| Riverstone Credit Partners II, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.25 | 0.00 | 0.00 | 0.00 | 0.00 | 15.25 | 1.02% |
| Riverstone CKD Renewables & Alternative Energy, S.De R L. De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.25 | 2.52 | 1.86 | 0.00 | 0.00 | 15.50 | 1.04% |
| Riverstone CKD Management Company II, S.De R L. De C.V. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.96 | 3.60 | 2.66 | 0.99 | 0.00 | 12.10 | 0.81% |
| Riverstone Energy Infrastructure Fund, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.05 | 9.67 | 7.16 | 2.65 | 0.00 | 0.00 | 32.52 | 2.18% |
| **New Funds - Carried Interest Total** | 0.00 | 0.00 | 0.00 | 0.00 | 6.88 | 25.76 | 71.76 | 41.84 | 26.26 | 11.77 | 0.00 | 184.28 | 12.33% |
| | | | | | | | | | | | | **Aggregate Total** 1,694.197 | 100.00% |

| | | Days | 365 | 730 | 1095 | 1461 | 1826 | 2191 | 2556 | 2922 | 3287 | 3652 | 4017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Midpoint of Period | 182.5 | 547.5 | 912.5 | 1278 | 1643.5 | 2008.5 | 2373.5 | 2739 | 3104.5 | 3469.5 | 3834.5 |
| **Carried Interest PV Factors** | Discount Rate | | | | | | | | | | | | |
| Existing Funds - Near Term | 25% | | 0.89 | 0.72 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Existing Funds | 30% | | N/A | N/A | 0.52 | 0.40 | 0.31 | 0.24 | 0.18 | 0.14 | 0.11 | 0.08 | 0.06 |
| New Funds | 35% | | 0.86 | 0.64 | 0.47 | 0.35 | 0.26 | 0.19 | 0.14 | 0.11 | 0.08 | 0.06 | 0.04 |
| **Management Fees PV Factors** | Discount Rate | | | | | | | | | | | | |
| Existing Funds - Near Term | 11% | | 0.95 | 0.86 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Existing Funds | 14% | | N/A | N/A | 0.68 | 0.60 | 0.53 | 0.46 | 0.40 | 0.35 | 0.31 | 0.27 | 0.23 |
| New Funds | 17% | | 0.92 | 0.79 | 0.68 | 0.58 | 0.49 | 0.42 | 0.36 | 0.31 | 0.26 | 0.22 | 0.19 |

(1) Values shown on this Exhibit are the Present Values of the expected cash flows from Exhibits Q-1 and Q-2

RIVERSTONE_SDTX00156715



# Riverstone Holdings LLC

Report 2 of 3: Valuation of the Incentive Allocation and Management Fee Streams of Riverstone Energy Limited

As of December 31, 2016

# Table of Contents

**Report 2 Executive Summary**.................................................................................. **2**

**Valuation Standards**.................................................................................................. **2**

**Sources of Information**.............................................................................................. **3**

**Background**................................................................................................................ **4**

**Riverstone Holdings, LLC** ....................................................................................... **4**

**The Fund** ................................................................................................................... **4**

    A.   Overview ......................................................................................................... 4

    B.   Fund Investors & Structure ............................................................................ 5

    C.   Fund Status .................................................................................................... 7

    D.   REL IP Agreement Terms .............................................................................. 7

    E.   The IM Entity Agreement .............................................................................. 8

**Economic, Industry, & REL Outlook**...................................................................... **9**

    A.   Private Equity Industry Outlook .................................................................... 9

        1.   Industry Overview ................................................................................... 9

        2.   Performance............................................................................................ 10

        3.   Asset Flow .............................................................................................. 13

        4.   Secondary Market Activity ..................................................................... 14

    B.   REL Interest Outlook ................................................................................... 16

**Valuation Overview** .............................................................................................. **16**

    A.   General Valuation Methods .......................................................................... 16

    B.   Outline of Valuation Process ....................................................................... 17

**Valuation of REL's Incentive and Management Fee Streams** ........................... **17**

    A.   Discounted Cash Flow Analysis .................................................................. 17

    B.   Derivation of Required Rate of Return ........................................................ 19

    C.   Management Fee Value ................................................................................. 21

    D.   Incentive Fee Value ..................................................................................... 22

    E.   Conclusion of the REL Interest's Value ...................................................... 23

**Valuation Summary** ............................................................................................. **24**

**Valuation Addenda**

Addendum 1    Statement of Limiting Conditions
Addendum 2    Certification of Appraisers
Addendum 3    Company & Appraiser Profiles

**Valuation Exhibits**

RIVERSTONE_SDTX00156718



**PRIVATE & CONFIDENTIAL**

May 22, 2017

Mr. Thomas J. Walker
Chief Financial Officer
Riverstone Holdings LLC
712 5th Avenue, 51st Floor
New York, NY 10019

Dear Mr. Walker:

You, on behalf of Riverstone Holdings LLC ("Riverstone" or the "Company"),  have engaged Empire Valuation Consultants, LLC ("Empire") ") to estimate, as of December 31, 2016 (the "Valuation Date"), the fair market value of: 1) certain income streams (i.e., incentive allocations and management fees) from existing Riverstone funds as well as six future funds expected to be raised (the "Interests"); and 2) the Goodwill[1] related to a purchase of the Interests to be booked at the Riverstone and affiliates level.

It is our understanding that the valuations will be used for corporate planning purposes, specifically in assisting management in its allocation of a predetermined sale value of the Interests to partners owning the Interests, and for booking goodwill related to such a sale of the Interests.

Empire's analysis is presented in three reports, as described below:

- **Report 1,** which determines the fair market value of the income streams (i.e., largely management fees and carried interest) related to 10 existing and six prospective Riverstone funds (including parallel vehicles);

- **Report 2 (this report),** which determines the fair market value of the management fees and incentive allocations related to Riverstone's interest (the "REL Interests") in Riverstone Energy Limited ("REL" or the "Fund"), a perpetual entity; and

---

[1] Goodwill, in this analysis, is defined as the value allocated to prospective funds as well as the spread between identifiable assets and the purchase price.

Mr. Thomas J. Walker
May 22, 2017
Page 2

- **Report 3,** a summary report which aggregates the values derived in Reports 1 and 2, and derives the Goodwill (as defined above) from the anticipated purchase price.

For purposes of this report, fair market value is defined in accordance with Treasury Regulations established for income, estate and gift taxes as the price at which ownership interests would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

## Report 2 Executive Summary

Based upon the following review and analysis, and subject to the attached Statement of Limiting Conditions, we have determined that the aggregate fair market value of the management and incentive fees related to Riverstone Energy Limited were at $266.5 million and $212.2 million, respectively, as of the Valuation Date.

## Valuation Standards

This report is an Appraisal Report as defined in Standards Rule 10 of The Appraisal Foundation's Uniform Standards of Professional Appraisal Practice ("USPAP"), which specifically applies to the preparation of valuation reports of business interests.

The REL Interests have been valued on a going concern basis. Since the REL Interests are closely-held, with no public market for its ownership interests, this appraisal was conducted according to guidelines established by the Internal Revenue Service ("IRS"), and in conformity with the American Society of Appraisers' Principles of Appraisal Practice and Code of Ethics. This report has also been prepared in accordance with the American Institute of Certified Public Accountants Statement on Standards for Valuation Services 1: Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, together with other standards that were deemed relevant to this engagement.

This appraisal considered all pertinent factors outlined in USPAP Standards Rule 9 and IRS Revenue Ruling 59-60, including, but not limited to, the following:

- the nature and history of REL;

- the financial and economic conditions affecting the general economy, REL, and its industry;

- the past results, current operations, and future prospects of REL;

- the earning capacity and dividend-paying capacity of REL;



Mr. Thomas J. Walker
May 22, 2017
Page 3

- the economic benefit to REL of both its tangible and intangible assets;

- the market price of actively traded interests in public entities engaged in the same or similar lines of business as REL, as well as sales of ownership interests in entities similar to REL;

- the prices, terms, and conditions of past sales of ownership interests in REL; and

- the impact on the value of ownership interests in REL resulting from the existence of buy-sell and option agreements, investment letter stock restrictions, restrictive shareholders agreements, or other such agreements.

## Sources of Information

Information used in determining the fair market value of the REL Interests was provided by the documents and sources listed below:

- **REL:** (1) A draft copy of REL's Prospectus, dated June 23, 2013 (the "Prospectus"); (2) A copy of Riverstone Energy Investment Partnership, LP's ("REL IP") Agreement of Exempted Limited Partnership, dated March 22, 2013 (the "REL IP Agreement"); (3) A copy of the Riverstone Energy Limited Investment Holdings, LP's (the "Carry Entity") Agreement of Exempted Limited Partnership, dated March 22, 2013 (the "Carry Entity Agreement"); (4) A copy of RIGL Holdings, LP's (the "IM Entity") Agreement of Exempted Limited Partnership, dated March 22, 2013 (the "IM Entity Agreement"); (5) A copy of the Carry Entity and the Fund's organization structure (the "Org Chart"); and (6) Copies of the fund's annual report and audited financial statements for the year ended December 31, 2016;

- An executed copy of the Equity Subscription and Investment Agreement among Riverstone, Riverstone Management Group, L.L.C., Riverstone Gower Carry Partners, L.L.C., Riverstone/Gower Mgmt Co Holdings, L.L.C., Riverstone Holdings II (Cayman) Ltd., Riverstone/Carlyle Energy Partners IV Corp, Riverstone Carlyle Energy GP IV Ltd., Riverstone Energy GP V Corp., Riverstone GP V Cayman LLC, Riverstone Energy GP VI Corp., Riverstone GP VI Cayman LLC,, Riverstone Non-ECI GP Cayman LLC, and certain related persons (the "Purchase Agreement");

- Copies of the REL's financial/investment forecasts, as provided by Management;



Confidential                                                                    PDF compiled 05/22/17
Empire Valuation Consultants                                         DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 4

- Access to the public portions of Riverstone's and REL's websites, http://www.riverstonellc.com/ and http://www.riverstonerel.com/;

- Conversation's and correspondence with Riverstone representatives including you, Mr. Thomas Walker, Chief Financial Officer, Mr. Pierre Lapeyre, Founder, Mr. Paul Cabral, Principal, and  Mr. Sergio Maruschak, Vice President (collectively, "Management"); and

- Other reviews, analyses, and research as were deemed necessary.

Empire assumes that all information provided to us by the Company or its representatives in the context of an analysis is true, complete and correct in all material respects.  Changes to any of this information could have a material impact on our valuation conclusion.

## Background

At the Valuation Date, Riverstone was in the process of selling a 12% royalty in the Company's fee income streams (i.e., largely comprised of management fees and carried interest).  The royalty is applicable to nearly all of Riverstone's current and future funds.

## Riverstone Holdings, LLC

Riverstone is an experienced private equity firm focused on the energy and power industry. Riverstone was co-founded by Mr. Pierre F. Lapeyre, Jr. and Mr. David M. Leuschen (together the "Founders") in May 2000.  Riverstone has raised approximately $36 billion of capital across numerous private equity funds and their co-investment vehicles, including the publicly-listed vehicle, REL.

Riverstone makes buyout and growth capital investments in the exploration & production, midstream, oilfield services, power, and renewable sectors of the energy industry.  With offices in New York, London, Houston, and Mexico City, the Company has committed over $35 billion to more than 130 investments in North America, South America, Europe, Africa, Asia, and Australia.

## The Fund

### A.  Overview

The Fund is a registered closed-ended collective investment scheme limited by shares in Guernsey, or more commonly known as a closed-end investment company ("CEIC").   On



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 5

October 29, 2013 (the "IPO[2] date"), REL issued 71,032,057 ordinary shares at £10 per ordinary share raising a total of $1.138 billion. In 2014 and late 2015, the Fund issued 10 million and 8.4 million new ordinary shares, respectively. As of the Valuation Date, the Fund's net asset value ("NAV") was $1.699 billion.

## B. Fund Investors & Structure

With the issuance of ordinary shares for REL, the Company enabled retail and other non-wealthy investors to participate directly in private equity investments, an area that was usually only available to institutional investors and wealthy individuals.

As of the Valuation Date, affiliates of KFI,[3] Casita,[4] RCM,[5] Hunt Oil,[6] and the Alaska Fund[7] (collectively, the "Cornerstone Investors") had subscribed to the ordinary shares of the Fund. The Cornerstone Investors also had limited partner interests in the Carry Entity and the IM Entity. Additionally, an affiliate of Riverstone had committed £50 million to the ordinary shares of REL.

The following diagram depicts the general relationship of the Fund, RELCP, the Carry Entity, the IM Entity, and Riverstone. Relationship descriptions follow the summary organization chart.

{This Space Intentionally Left Blank}

---

[2] Initial public offering ("IPO").
[3] Kendall Family Investments, LLC.
[4] Casita, L.P.
[5] RCM Capital Management LLC.
[6] Hunt Oil Co.
[7] Alaska Permanent Fund Corporation.



Riverstone Affiliates/ Personnel
LP
100%
LP
Riverstone REL Holdings, Ltd.
GP
GP
Riverstone Energy Limited Capital Partners, LP ("RELCP")
Riverstone Energy Limited Equity Partners LP
GP
GP
Cornerstone Investors
LP
Ordinary Shares
LP
LP
LP
Ordinary Shares (reinvestment of Performance Allocation)
Public Investors
Ordinary Shares
REL Investment Holdings, LP ("Carry Entity")
RIGL Holdings, LP ("IM Entity")
Riverstone Energy Limited ("REL")
100%
100%
REL IP General Partner Limited
Investment Management Agreement
Riverstone International Guernsey Limited
LP
GP
Riverstone Energy Investment Partnership, LP ("REL IP")
Performance Allocation
(subject to clawback on Marked Investments)
"Blocker Entities"
"Intermediate Entities"
"Investments"



Mr. Thomas J. Walker
May 22, 2017
Page 7

The Fund's intermediate entities (between the Fund and the investments) pay incentive allocations to the Carry Entity.  RELCP (with a 80% limited partner interest in the Carry Entity) will receive the incentive allocation as it is passed through the Carry Entity and a return on its direct capital investment and its ROI.[8]  Per the Prospectus and Management, RELCP will use its realized incentive allocation to purchase ordinary shares in REL.  Management fees are paid by the Fund to the IM Entity, which is ultimately controlled by Riverstone.

Multiple entities may be created to facilitate both domestic and foreign investors' ability to invest in the Fund.  Also, entities may be created in order to allow the Fund to make its investments in portfolio companies in various tax and legal regimes.

The Prospectus states, and Management confirmed, that the Fund does not expect to declare dividends on the ordinary shares.  Therefore, for the foreseeable future, any realized gains in the Fund will be recycled and used to acquire additional portfolio investments.

**C.   Fund Status**

As of the Valuation Date, the Fund held fifteen portfolio investments along with $268 million in cash and cash equivalents.  REL's total liabilities were less than $1.0 million.  Again, the NAV of REL was $1.699 billion, or $20.11 per share, as of the Valuation Date.  As of the Valuation Date, the general partner ("GP") had accrued approximately $111 million in unrealized incentive allocations.  The Fund believed the last two years had been a fertile environment to deploy capital and REL was extremely bullish on its portfolio investments.

**D.   REL IP Agreement Terms**

The following terms of the REL IP Agreement were considered most relevant to an analysis of its economic interests as they pertain to valuing the REL Interests.

- **Management:** The Carry Entity is the GP and the IM Entity is the investment manager.  Based on the Org Chart, Riverstone's affiliates and personnel ultimately control REL IP, and therefore REL.  The economic benefit derived from REL's performance allocation (i.e., carried interest) and the GP's direct interest reverts to the GP.

- **Limited Partners:** REL IP's limited partner ("LP") is the Fund.  As previously noted, the Fund's interest holders own ordinary shares that are publicly traded.  The LP shall have no right to, and shall not, take part in the conduct of the business of the fund.

---

[8] Return on investment.



Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 8

- **Management Fees:** REL IP shall pay management fees to the IM Entity based on the terms of the investment management agreement.  According to the Prospectus, the annual fee is 1.5% of the Fund's deployed capital.  Management fees shall be paid quarterly in advance.

- **Other Fees:** The Fund shall also pay an annual fee of 0.25% of the Fund's AUM[9] for administrative services.  When the AUM is above £1.0 billion, the administrative fee shall fall to 0.10% of AUM.

- **Distributions:** The partnership may, but is not required to distribute any available cash to the LP.  Management does not anticipate making distributions to the LP for the foreseeable future.  Distributions, however, are expected to be made to the GP for the incentive allocation, subject to a clawback on market investments.  However, recall that the GP is expected to utilize its realized carry to purchase ordinary shares in the Fund.

- **Performance Allocation:** The GP shall receive 20% of the net profits with respect to each investment (i.e., incentive allocation).

- **Transfer and Withdrawal:** Transfers and withdrawals are generally not allowed without the consent of the GP.

- **Books, Records and Information:** The GP shall provide the LP with such information relating to the partnership as may be necessary in order for the LP to meet its information and reporting obligations to its equity holders, including any financial information necessary to conduct an audit of the LP.

- **Term:** The partnership has no explicit termination date.  However, it may be terminated upon the dissolution or termination of the GP, or by the unanimous agreement of the partners.

### E.  The IM Entity Agreement

The following provisions of the IM Entity Agreement were considered most relevant to an analysis of its economic interests as they pertain to valuing the REL Interests.

- **Management:**  The management and control of the IM Entity resides in the GP, Riverstone REL Holdings Ltd.  Again, this entity is also the GP of the Carry Entity.

---

[9] Assets under management.



Mr. Thomas J. Walker
May 22, 2017
Page 9

- **Limited Partners:** The LPs shall have no right to, and shall not, take part in the conduct of the business of the IM Entity.

- **Distributions:** Any cash distribution received by the partnership shall be distributed to the LPs pro rata, after accounting for fees and reserves as deemed necessary by the GP. The timing of any distributions shall be determined by the GP.

- **Restrictions on Transfer:** Transfers require the prior written consent of the GP. Cornerstone Investors may transfer interests to its respective affiliates. Other transfers by the Cornerstone Investors are subject to the right of first refusal.

- **Restrictions on Withdrawal:** Prior to the dissolution of the partnership, LPs may not withdraw from the partnership.

- **Books and Information:** Minimal financial information necessary for tax reporting purposes was all that was required to be provided by the partnership. However, it should be noted that all partners would have access to the partnership's financial records under reasonable conditions.

- **Dissolution and Term:** The partnership has no explicit termination date. However, it may be terminated upon the dissolution or termination of the GP, or by the unanimous agreement of the partners.

## Economic, Industry, & REL Outlook

The general economic outlook, market conditions at the Valuation Date, and relevant industry outlook were described in detail in Report 1. They are incorporated herein by reference. The private equity industry and REL outlooks are as follows.

### A. Private Equity Industry Outlook

This private equity ("PE") industry outlook for the fourth quarter of 2016 contains an analysis of the following: (1) an overview of the industry; (2) recent performance trends; (3) asset flows; and (4) secondary market activity. Each topic is discussed below.

1. Industry Overview

PE involves investments in privately held companies. For most investors, PE investing is accomplished through illiquid, long-term partnerships, i.e., funds, which are formed by PE firms. Funds are generally closed-end with finite lives, usually ten to fifteen years.



PDF Compiled 03/02/2017
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 10

Investors typically participate in the asset class through one of three ways: (1) direct investment in private companies; (2) investment in private equity funds, which pool capital and invest in private companies; or (3) investment in a fund of funds ("FOFs"), which pools capital and invest in funds. Direct funds and FOFs are typically structured as closed-end limited partnerships, and encompass three phases: (1) fundraising; (2) investment; and (3) realization. Funds are generally structured with an annual management fee ranging from 1.5% to 3.0%. In addition to management fees, PE fund managers are usually entitled to participate in the limited partners' profits from the investments. The profit participation, or carried interest, on most direct funds is 20%, although in certain instances, it can be higher or lower.

2. Performance

According to *Cambridge Associates, LLC* ("Cambridge"), U.S. private equity capital funds maintained positive returns through the third quarter of 2016. Cambridge's *Private Equity Index* (the "PE Index"), which is presented in the following table, provides market returns as of September 30, 2016 (latest available as of the Valuation Date),[10] together with comparisons of select indices.[11]

**Market Returns as of September 30, 2016**

| Index | Q3 2016 | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| *U.S. Private Equity Index* | 3.8% | 8.0% | 8.5% | 11.2% | 13.8% |
| *Bloomberg Barclays Gov't/Credit Bond Index* | 0.4% | 6.7% | 5.9% | 4.2% | 3.2% |
| *Dow Jones Industrial Average* | 2.8% | 7.2% | 15.5% | 9.2% | 13.8% |
| *Dow Jones U.S. Small Cap Index* | 5.7% | 10.7% | 12.4% | 6.9% | 15.6% |
| *Dow Jones U.S. TopCap Index* | 4.0% | 7.8% | 15.1% | 10.9% | 16.3% |
| *Nasdaq Composite* | 9.7% | 6.1% | 15.0% | 12.1% | 17.1% |
| *Russell 1000* | 4.0% | 7.9% | 14.9% | 10.8% | 16.4% |
| *Russell 2000* | 9.1% | 11.5% | 15.5% | 6.7% | 15.8% |
| *S&P 500* | 3.9% | 7.8% | 15.4% | 11.2% | 16.4% |
| *Wilshire 5000* | 4.3% | 8.4% | 15.4% | 10.7% | 16.3% |

The PE Index returned 3.8% in the third quarter, up from the gain of 4.0% in the second quarter and 0.2% returned during the first quarter of 2016. The quarterly PE Index underperformed the *S&P 500 Index* by just 0.1% in the third quarter of 2016. The 1-year

---

[10] Private equity performance is net to limited partners, i.e., after management fee and carry. General partners typically have up to 120 days to provide LPs with financial data. As a result, there is generally a "lag" in performance reporting.

[11] Cambridge Associates, LLC *U.S. Private Equity Index and Selected Benchmark Statistics: September 30, 2016*, published January 30, 2017.



Mr. Thomas J. Walker
May 22, 2017
Page 11

return for the PE Index underperformed the *S&P 500* by 6.9%, returning 8.5% compared to the *S&P 500 Index's* return of 15.4%.

The following table presents annualized internal rate of return ("IRR") data, since inception, for funds with vintage years 2004 through 2014.

### Private Equity Returns 2004 to 2014[12]

| Vintage Year | Mean Net to LPs | Median Net to LPs | Number of Funds |
|---|---|---|---|
| 2004 | 11.1% | 10.5% | 67 |
| 2005 | 8.3% | 7.9% | 95 |
| 2006 | 10.7% | 10.9% | 81 |
| 2007 | 11.9% | 11.1% | 98 |
| 2008 | 16.2% | 12.4% | 81 |
| 2009 | 17.8% | 14.8% | 35 |
| 2010 | 18.8% | 15.6% | 33 |
| 2011 | 12.9% | 11.1% | 70 |
| 2012 | 11.4% | 11.9% | 59 |
| 2013 | 6.7% | 7.6% | 67 |
| 2014 | 5.7% | 3.9% | 64 |

As shown in the following table, PE performance has been positive for each of the periods studied. Returns include all vintage years reporting data for the applicable measurement period.

{This Space Intentionally Left Blank}

---

[12] Returns are net of fees, expenses, and carried interests as of September 30, 2016.



Confidential
Empire Valuation Consultants

PDF Page 805 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 12

### Private Equity Multi-Year Returns[13]

| Duration (years) | Returns |
| --- | --- |
| 1 | 8.5% |
| 3 | 11.2% |
| 5 | 13.8% |
| 10 | 10.7% |
| 15 | 12.2% |
| 20 | 12.5% |
| 25 | 13.3% |

A Pepperdine University ("Pepperdine") survey[14] analyzed, among other items: (1) minimum return thresholds required to qualify for capital in various market segments; (2) accessibility of capital; and (3) required rates of return by market segments, which are presented in the table below. It was noted that, as the size of the loan or investment increases, the cost of borrowing or financing from any of the following sources tends to decline.

{This Space Intentionally Left Blank}

---

[13] Pooled end-to-end returns, net of fees, expenses, and carried interest based on 1,334 funds formed between 1986 and 2016.
[14] Everett, Dr. Craig R. *Private Capital Markets Project 2016 Capital Markets Report,* March 15, 2016



RIVERSTONE_SDTX00156730

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 806 of 845
PDF Page 806 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 13

### Pepperdine Required Rates of Return

| Market Segment | Median Required Rate of Returns |
| --- | --- |
| Banks, $1M CF Loan | 6.0% |
| Banks, $50M CF Loan | 3.0% |
| Asset-Backed Lenders, $1M Loan | 11.0% |
| Asset-Backed Lenders, $50M Loan | 3.0% |
| Mezzanine Funds, $1M Loan | 22.0% |
| Mezzanine Funds, $25M Loan | 16.0% |
| Private Equity Groups, EBITDA of $25M | 24.0% |
| Private Equity Groups, EBITDA of $50M | 22.0% |
| Venture Capital Firms, Startup | 33.0% |
| Venture Capital Firms, Expansion | 28.0% |
| Venture Capital Firms, Later Stage | 23.0% |

3.   Asset Flow[15]

According to *PitchBook Data, Inc.* ("PitchBook"), there was $649 billion of merger and acquisition ("M&A") transaction volume completed over 3,538 deals in 2016. However, the number of deals completed in 2016 was 14% below the 4,131 transaction finalized in 2015. M&A dollar volume in 2016 was 12% below the $737 billion transacted during 2015. PitchBook reported the median EV/EBITDA[16] was 10.9x for M&A transactions completed in 2016, an increase of 0.9x turns from the median EV/EBITDA of 10.0x recorded for transactions completed in 2015. During the financial crisis, EV/EBITDA multiples for M&A transactions reached a trough of 7.9x in 2010. The increase in M&A valuation multiples was likely driven by the increase in the price-to-earnings multiple of the *S&P 500 Index*, which expanded from a post-great-recession low of roughly 13.5x to nearly 26x at the end of 2016. As a result of the multiple expansion experienced across U.S. equity markets, the median percentage of M&A transaction values funded with debt has declined to 50.5% during 2016, a decline of 630 basis points or 6.3% from the median debt percentage of 56.8% realized during 2015.

PitchBook noted that PE firms were struggling to complete acquisitions in 2016 due to increased competition from strategic acquirers and elevated valuation multiples of middle market companies. Collectively, PE firms had $852 billion in capital available globally to acquire middle market companies, while the number of attractive acquisitions has contracted. As a consequence, add-on transactions, as percentage of total middle market buyouts, have steadily increased to 64% in 2016 from 54% of middle market M&A deals

---

[15] PitchBook Data, Inc., *2016 Annual U.S. Private Equity Breakdown Report,* January 19, 2017
[16] Enterprise Value ("EV") divided by Earnings Before Interest, Depreciation, and Amortization



Mr. Thomas J. Walker
May 22, 2017
Page 14

completed in 2010. The proportion of add-on buyouts as a percentage of total middle market buyouts was the highest ever recorded by PitchBook.

The technology sector experienced the highest level of middle market M&A activity during 2016 than any other year since at least 2001 with 567 deals valued at an aggregate $159.8 billion during the year. Middle market tech deals represented 16.0% of total transaction volume and 24.6% of M&A dollar volume during 2016. Though, tech M&A dollar volume in 2016 was substantially influenced by the $60 billion Dell and EMC combination. However, if you exclude the Dell/EMC deal then tech M&A dollar volume still grew approximately 11% during 2016 compared to the prior year.

4.  Secondary Market Activity

NYPPEX projected that the supply of secondary private equity funds would continue to grow through the completion of 2016, primarily due to a relatively high degree of geopolitical uncertainty that was anticipated to lead investors to reduce their allocation to risk assets. In the second quarter of 2016, NYPPEX reported that secondary interest transaction volume increased substantially as compared to the prior quarter. However, transaction volume declined 45% year-over-year during the first quarter. Despite the significant quarter-over-quarter growth during the most recent trimester, secondary L.P. interest transaction volume declined 22.5% to $15.7 billion through the first six months of 2016 compared to the $20.3 billion of volume during the same period in 2015. Although the pace of secondary transaction volume increased in the second quarter versus the first quarter, secondary bid price spreads widened between private equity funds invested in the U.S. versus more uncertain regions such as Europe. For the second-half of 2016, NYPPEX projected that secondary bid prices would decline by 3% to 5% and that cash distributions from private equity funds would continue to be 20% to 75% below 2015 levels.

Cogent noted that macroeconomic volatility was a primary driver behind the drop in deal volume. During the first half of 2016, deal volume totaled $12 billion, a 20% decline from the first half of 2015 and the lowest aggregate first half volume since 2013. As a result, Cogent revised their full year volume estimate to $30 billion to $35 billion from $35 billion to $45 billion previously projected. Further supporting the reduced guidance was the dearth of deals of more than $1 billion or more. Cogent reported that there were just two such deals during the first half of 2016. Buyers' sought high quality funds and post-2009 vintages. Due to the shift in demand, Cogent stated that there was a substantial supply of pre-2009 funds available.

The following table showcases the historical secondary market discount bids, by sector, as reported by NYPPEX.



RIVERSTONE_SDTX00156732

Empire Valuation Consultants
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 15

### Historical NYPPEX Median Secondary Bids by Sector[17]

| Sector | 12/31/2013 (% of NAV) | 12/31/2014 (% of NAV) | 12/31/2015 (% of NAV) | 3/31/2016 (% of NAV) | 06/30/2016 (% of NAV) |
|---|---|---|---|---|---|
| Buyout | 90.8% | 93.0% | 75.3% | 76.2% | 76.0% |
| Venture | 72.6% | 83.8% | 63.8% | 61.5% | 61.8% |
| Fund of Funds | 72.2% | 79.9% | 65.8% | 66.3% | 67.0% |
| Real Estate | 72.5% | 88.1% | 73.6% | 74.7% | 74.9% |
| Distressed Debt | 81.4% | 78.6% | 75.4% | 75.6% | 76.6% |
| Natural Resources | 86.5% | 74.3% | 72.2% | 72.0% | 74.1% |
| Hedge Funds | 83.2% | 89.4% | 89.0% | 88.7% | 88.8% |
| **All Fund Sectors** | **76.3%** | **83.9%** | **73.6%** | **73.6%** | **74.2%** |

The following table compares the discount bids reported by NYPPEX and Cogent, by sector.

### NYPPEX and Cogent Median SM Bids by Sector[18]

| Sector | NYPPEX 12/31/2015 (% of NAV) | NYPPEX 6/30/2016 (% of NAV) | Cogent 12/31/2015 (% of NAV) | Cogent 6/30/2016 (% of NAV) | 2015-2016 Change NYPPEX/ Cogent/ Mean |
|---|---|---|---|---|---|
| NR PE | 72.2% | 74.1% | N/A | N/A | 1.9% / N/A / N/A |
| GB PE | 75.3% | 76.0% | 94.0% | 94.0% | 0.7% / 0.0% / 0.4% |
| RE PE | 73.6% | 74.9% | 90.0% | 88.0% | 1.3% / (2.0%) / (0.4%) |
| VC PE | 63.8% | 61.8% | 75.0% | 73.0% | (2.0%) / (2.0%) / (2.0%) |
| AS PE | 73.6% | 74.2% | 90.0% | 87.0% | 0.6% / (3.0%) / (1.2%) |

In response to the 2008 financial crisis, new regulations were introduced to establish higher standards for risk and operations management, capital adequacy, and asset valuation in 2013. These regulations included Basel III, Solvency II, the Volcker Rule, the U.K. Alternative Investment Fund Managers Directive ("AIFMD"), and were expected to have a significant impact on investors, alternative investment fund managers, and their respective auditors and legal advisors. NYPPEX anticipated that banks in Europe, North America and Asia would be forced to reduce their holdings in private equity assets in order to increase Tier I Capital ratios and to increase capital solvency ratios. In addition, the Volcker Rule was also expected to force banks to sell or spinoff private equity funds and hedge funds in an effort to emphasize traditional banking services. Finally, NYPPEX believed that AIFMD

---

[17] NYPPEX Holdings, LLC's ("NYPPEX") *2016 Mid-Year Secondary Private Equity Market Trends and Outlook Worldwide,* August 2016.

[18] Sectors include: Natural Resources ("NR"); General Buyouts ("GB"); Real Estate ("RE"); Venture Capital ("VC"); and All Sectors ("AS").



RIVERSTONE_SDTX00156733

Mr. Thomas J. Walker
May 22, 2017
Page 16

would significantly increase operating expenses for general partners, which in turn, was projected to cause divestitures of tail end funds and fund restructuring.

## B. REL Interest Outlook

The outlook for the future management fees and incentive fees was tied directly to the performance of the Fund. However, the incentive fees were more likely to see higher volatility than the management fee stream due to differences in the reliability of performance allocations compared to management fees. The Fund's performance would be tied to REL's ability to secure favorable investment and exit opportunities. The projected gross IRR and net IRR for REL's AUM at 16.0% and 11.3%, respectively, was considered reasonable as the results were consistent with Management's forecast. Again, Management indicated that it does not foresee making distributions or dividend payments to the shareholders of REL. Gains will be reinvested and the ordinary shares will increase in value through capital appreciation. The specific projections and their relative basis were comparable to industry returns and past Riverstone performance were considered in the valuation of the REL Interests.

# Valuation Overview

The purpose of the valuation section is to incorporate the information considered and/or presented previously into a quantitative representation. The valuation methodology reflects the analyst's expectation of how free and open capital markets would assign value to the economic activities of the business asset under analysis.

## A. General Valuation Methods

Generally, there are three commonly used approaches to determine the value of a company. These three approaches are the Income, Market and Asset (or Cost) Approaches. The nature of the business, industry, and economic circumstances of the particular company/asset being valued at the specific valuation date, as well as the availability of data will dictate which approach(es) will ultimately be used in determining the company's/asset's value.

The **Income Approach** uses valuation techniques to estimate value based on an expected stream of benefits, such as earnings or cash flow. Two common methods under this approach are the capitalization of benefits method, which is based on adjusted historical results, and the discounted future benefits method. In the capitalization of benefits method, a representative benefit level is divided by an appropriate capitalization factor to convert the benefit to a value. In the discounted future benefits method, benefits are estimated for each of several future periods. These benefits are converted to value by applying an appropriate discount rate and using present value calculations.



Mr. Thomas J. Walker
May 22, 2017
Page 17

The **Market Approach** uses prices and other relevant information generated by market transactions. Two common methods under this approach are the guideline company method and the guideline transaction method. A guideline company analysis considers transactions that generally involve minority positions in publicly-traded companies. A guideline transaction analysis considers third-party and arms-length transactions in the subject company as well as transactions in similar entities. These valuation techniques often use market multiples from the identified transactions to provide valuation guidance for the subject entity. The selection of the appropriate multiple requires judgment and should consider factors (both qualitative and quantitative) specific to the circumstances.

The **Asset (or Cost) Approach** determines the value of a business based on the value of its assets net of liabilities. Typically, the asset-based approach should be considered: (1) in valuations conducted at the enterprise level: (2) when valuing an investment or real estate holding company; or (3) when the market value of an entity's net assets materially exceeds the value derived under the income or market approaches.

### B.   Outline of Valuation Process

A DCF analysis was used to estimate the fair market value of the REL Interests. Based on the input assumptions provided by Management, the projected pro rata cash flows available to the partners of the Carry Entity and the IM Entity were estimated. Thereafter, Riverstone's pro rata share of the incentive allocations and management fees was then discounted back to its present value based on selected discount rates.

## Valuation of REL's Incentive and Management Fee Streams

The valuation of the REL Interests includes two primary components: (1) the valuation of the Fund's management fee revenue; and (2) the valuation of Fund's projected incentive fees. The valuation of both components began with the derivation of projected cash flows.

### A.   Discounted Cash Flow Analysis

Modern financial theory holds the value of any asset to be a function of several interrelated factors:

- The stream of benefits the owner of the asset expects to receive;

- The timing of the receipt of these benefits; and

- The risk borne by the owner.



RIVERSTONE_SDTX00156735

Mr. Thomas J. Walker
May 22, 2017
Page 18

Thus, appraisal methodologies rely on the premise that the value of a business enterprise is equal to the present value of the income that it can expect to generate going forward. From an investor's standpoint, these future income streams represent the dividend-paying (i.e., distribution-paying) capacity of the company or, in the case of a leveraged company, monies available for all invested capital (i.e., interest-bearing debt plus owners' capital).

In order to complete a DCF analysis, it is necessary to develop an explicit forecast for the cash flows of the IM and Carry Entities, together with a required rate of return by which those cash flows can be discounted back to their present value.

**Projected Cash Flows:** Empire developed an assumption set with data provided by Management. Management reviewed and approved the projections as reasonable. The key assumptions included: (1) the management fee; (2) gross annual rate of return on AUM; (3) the lack of new subscriptions (i.e. new investor money); (4) the lack of annual redemptions made by Fund equity holders; and (5) the total capital raised and its rate of deployment. Further, Empire modeled the growth of AUM and the expected management fees and incentive fees that would result from the AUM. Management fees represented the revenue stream for the IM Entity, and incentive fees represented the revenue stream for the Carry Entity.

The exhibits associated with each cash flow projection are listed in the following table.

**DCF Analysis Exhibits**

| Exhibit | Description |
|---------|-------------|
| Exhibit A | DCF model input assumptions |
| Exhibit B-1 | Starting AUM and returns on AUM in forecast period and management fee calculation |
| Exhibit B-2 | Incentive fee allocations, estimated redemptions and year-end AUM estimates |
| Exhibit C-1 | DCF Analysis for the Management Fees |
| Exhibit C-2 | DCF Analysis for the Incentive Allocations |
| Exhibit D | Derivation of the Discount Rate |

<u>Starting AUM</u>:  $1.699 billion as of December 31, 2016.

<u>Management Fee</u>:  Management fees were stated at 1.50% annually in the various Fund agreements. Additionally, there was an administrative fee of 0.10% based on actual and projected AUM.

<u>Incentive Allocation</u>: The incentive allocation was 20%, as shown in Exhibit A. The incentive allocation is on all realized pre-tax profits without regard to realized losses; i.e., the incentive allocation is not subject to a high water mark.



Mr. Thomas J. Walker
May 22, 2017
Page 19

<u>Long Term Growth Rate</u>:   The forecast contains discrete cash flows for the years 2017 through 2027.   For years after 2027, a horizon value was developed only for the Fund's management fees and not the incentive fees (due to the inherently volatile nature of both incentive fees and REL's industry).   Further, a horizon growth rate of 0% was utilized, considering the industry data on life spans of hedge funds and the reinvestment risk of the Fund.

<u>Gross Annual Rate of Return</u>:   Future returns are based on estimates provided by Management and the Company's historical returns in general, and prior to fund expenses (i.e., trading and administrative costs incurred directly by the Fund), management fees, and incentive fees.   Additionally, Management had modeled exit events for certain portfolio investments.   Upon exit, Management anticipated the Fund would hold cash or other short term securities for a period prior to making new investments.   Based on these factors, a gross annual rate of return assumption of 16.0% was utilized.   After applying management and administrative fees, the net rate of return was approximately 11.3%.

<u>Annual Subscriptions and Redemptions</u>:   It was expected that there will be no redemptions or subscriptions of the Fund's capital, notwithstanding a dissolution.   The Fund's equity holders will be able to sell shares at market-determined prices given its publicly traded nature.

<u>Riverstone's Pro Rata Allocation</u>:   The gross management and incentive fees were then split, 20% and 80%, between the Cornerstone Investors and the Riverstone related subsidiaries, respectively.

**B.   Derivation of Required Rate of Return**

**Discount Rate:** The discount rates selected represent the required rates of return that an investor would demand at a point in time in order to invest in the Fund's management and incentive fees.   The selected rates would need to account for the inherent risks associated with the Fund and its associated revenue streams.   Since the Fund has no debt in its capital structure, the discount rates selected below for the Fund's cash flows, and developed separately for each of the fund categories, is equivalent to the cost of equity.

A number of benchmarks were considered in developing an estimated discount rate to be applied to the Interest's expected cash flows, including: (1) the PE Index, maintained by Cambridge; and (2) the Pepperdine survey. Each is discussed below.

<u>PE Index:</u> As discussed in the Private Equity Industry Outlook, the PE Index measures returns to LPs net of fees, expenses, and carried interest.   As shown in the following table, Cambridge reported that returns to LPs were materially higher for shorter historical periods, highlighting the relatively strong environment present in recent years.



Mr. Thomas J. Walker
May 22, 2017
Page 20

### Private Equity Multi-Year Returns[19]

| Duration (years) | Returns |
|:---:|:---:|
| 1 | 8.5% |
| 3 | 11.2% |
| 5 | 13.8% |
| 10 | 10.7% |
| 15 | 12.2% |
| 20 | 12.5% |
| 25 | 13.3% |

It is clear that these benchmarks are specific to limited partnership interests, and it is recognized that no data was found to be available that is specific to required returns for management fee or incentive allocation cash flows. However, it is also clear that the required return associated with the projected cash flow stream associated with an incentive allocation must be materially higher than that associated with a limited partnership interest, particularly at a point in time that is at (or near) a fund's inception. Additionally, the required return associated with the projected cash flow stream associated with management fees must be on par or lower than that associated with a limited partnership interest.

<u>Pepperdine Survey:</u> A research survey conducted by the Graziadio School of Business and Management, Pepperdine University. This university produced a report, *Private Capital Markets Project,* 2016, reviewing the returns of private equity and venture capital portfolios. This survey reported median required rate of returns of 22% and 24% for the private equity groups incorporated in their study, which was presented earlier in the Private Equity Industry Outlook.

<u>Cash Flow-Specific Risk Adjustments:</u> Taking these and other factors into consideration, a discount rate of 13% was assumed for the cash flows attributable to a limited partner's interest. Given the subjects of this analysis (i.e., the incentive allocation and management fees), further adjustments were made to reflect the specific characteristics of each income stream. These adjustments consider a number of factors, including, but not limited to:

- **Management Fees:** Management fees are a relatively stable source of cash flows based on aggregate fund commitments and invested capital. Further, the management fee streams in this analysis are based on top-line allocations and are not subject to a fund's management related expenses and operating profitability.

---

[19] Pooled end-to-end returns, net of fees, expenses, and carried interest based on 1,334 funds formed between 1986 and 2016.



RIVERSTONE_SDTX00156738

Confidential
Empire Valuation Consultants

PDF compiled 06/22/2017
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 21

- **Incentive Fees:** Incentive fees are relatively riskier source of cash flow based on significant risk in satisfying LP preferred returns, especially for long exit horizons. These fees are largely dependent upon minimizing portfolio defaults and maximizing exit valuations in an efficient timeframe. There is significant risk associated with realizing the projected cash flows given historical IRR results and future exit multiples.

- **Near Term Cash Flows:** The cash flows expected in the near term (i.e., two years in this analysis) were considered to be less risky than the longer term expected cash flows. This is largely because the confidence is higher for both forecasted management fees and performance allocations (i.e., the timing and exit valuations) in the near term.

- **Company/Industry Risks:** The Fund is focused on a single industry, global energy and power. The cash flows for commodity businesses can be highly volatile and the kinds of swings in recent history (e.g. oil prices) have been larger than historic levels.

The following table summarizes the selected risk adjustment and resulting discount rate applied to each cash flow stream considered in the DCF analyses. See Exhibit D-1.

### Summary of Selected Discount Rates

| Cash Flow and Fund Category | Cash Flow Specific Risk Adjustment | Concluded Discount Rate | Key Risks |
|---|---|---|---|
| *Management Fees* | | | |
| Near Term/2 Years (Existing) | -2.0% | 11.0% | AUM known, exit values and timing. |
| Longer Term (Existing) | 1.0% | 14.0% | Exit timing, and ability to find suitable portfolio investments for exit proceeds. |
| *Incentive Fees* | | | |
| Near Term, High Probability (Existing) | 12.0% | 25.0% | Profit realization risks (no hurdle applicable to Fund). Increased certainty in near term exits. |
| Longer Term (Existing) | 17.0% | 30.0% | Profit realization and reinvestment risks. |

### C. Management Fee Value

The value of REL's management fees was calculated by discounting Riverstone's pro rata share of the management fees projected through 2027, including a horizon value, to their present value. The horizon value represents the risk adjusted value of all management fees



RIVERSTONE_SDTX00156739

Confidential
Empire Valuation Consultants

PDF Page 815 of 845
DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 22

beyond the projection period.  The management fee's horizon value was computed using the Gordon Growth Model.

$$V_o = \frac{C_f \times (1 + g)}{(r - g)}$$

Where:

$V_o$  =  Horizon value
$C_f$  =  Expected management fees
$g$   =  Expected growth rate of management fees
$r$   =  Required rate of return (discount rate)

For the horizon value, the projected management fees in 2027 were used as the base while a 0.0% growth rate was applied.  Given the failure rate of perpetual investment schemes (i.e., hedge funds), a probability risk was developed to capture the perpetuity risk of REL's management fees.  A 60% probability factor was selected as it straddled the eleven year 4% and 5% annual risk of closure.[20]  See Exhibit C-1.

Inserting the various rates and management fees into this formula results in a horizon value of $269.0 million, the present value of which was $67.9 million.  This combined with the sum of the present values of the explicitly projected management fees, results in a value for the management fees of $266.5 million at the Valuation Date.  Please refer to Exhibit C-1.

**D.   Incentive Fee Value**

The value of REL's incentive fees was calculated by discounting Riverstone's pro rata share of the incentive fees projected through 2027, including a horizon value, to their present value.  The horizon value represents the risk adjusted value of all incentive fees beyond the projection period.   The incentive fee's horizon value was computed using the Gordon Growth Model.

For the horizon value, the projected incentive fees in 2027 were used as the base while a 0.0% growth rate was applied.  Given the failure rate of perpetual investment schemes, a probability risk was developed to capture the perpetuity risk of REL's management fees.  A 60% probability factor was selected as it straddled the eleven year 4% and 5% annual risk of closure.[21]  See Exhibit C-2.

---

[20] Hedge fund closure rates were unknown partially due to self-reporting.  However, it was estimated that half of all hedge funds close within five years.  According to Hedge Fund Research Inc., 1,057 hedge funds closed or were liquidated in 2016, compared with 729 openings.  Hedge Fund Research Inc. also noted that the number of active hedge funds was at its lowest level since 2012.

[21] *Ibid.*



Confidential
Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

Mr. Thomas J. Walker
May 22, 2017
Page 23

Inserting the various rates and incentive fees into this formula results in a horizon value of $227.8 million, the present value of which was $14.5 million. This combined with the sum of the present values of the explicitly projected management fees, results in a value for the management fees of $212.2 million at the Valuation Date. Please refer to Exhibit C-2.

## E. Conclusion of the REL Interest's Value

The present values of the Fund's management fees and incentive allocation cash flows were estimated at $266.5 million and $212.2 million, respectively, as of the Valuation Date.

### Present Value of REL's Management Fees and Incentive Allocation

| Fund | Management Fee Value ($ in Millions) | Incentive Allocation Value ($ in Millions) |
|------|--------------------------------------|---------------------------------------------|
| REL[22] | $266.5 | $212.2 |

{This Space Intentionally Left Blank}

---

[22] These values represent the 80% allocation owned by Riverstone as of the Valuation Date. The remainder was owned by the Cornerstone Investors.



CONFIDENTIAL

RIVERSTONE_SDTX00156741

Mr. Thomas J. Walker
May 22, 2017
Page 24


## Valuation Summary

Given the foregoing review and analysis, and subject to the attached Statement of Limiting Conditions, it is our estimate that the fair market value of the incentive fee and management fee streams from Riverstone Energy Limited, as related to Riverstone Holdings LLC, is reasonably stated as $478.7 million as of December 31, 2016.  It is our understanding that this valuation will be used, in conjunction with additional reports, for corporate planning purposes, specifically in assisting management in its allocation for booking goodwill related to such a sale of the Interests.

This appraisal is not intended for any other purpose nor for any other users and the sharing of the contents herein is not permitted without the express written consent of Empire Valuation Consultants, LLC.  Empire has no obligation to update this appraisal for information that comes to our attention after the date of this report.




Respectfully submitted,

**Empire Valuation Consultants, LLC**




_____

Nathan P. Schroeder
Engagement Leader




_____

Scott A. Nammacher, CFA, ASA
Managing Director



Case 4:19-cv-00957 Document 672-5 Filed on 02/16/24 in TXSD Page 818 of 845
Confidential
Empire Valuation Consultants
PDF compiled 06/22/2017
DRAFT COPY - For Discussion Purposes Only
**Addendum 1-1**

# STATEMENT OF LIMITING CONDITIONS

1. Financial statements and other related information provided by or on behalf of the client entity or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Empire Valuation Consultants, LLC has not audited, reviewed, or compiled the financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance on this information.

2. Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information. Information used was limited to that available on or before the Valuation Date, or which could be reasonably ascertained as of that date. We reserve the right to make such adjustments to the valuation herein reported as may be required by consideration of additional or more reliable data that may become available subsequent to the issuance of this report.

3. We do not provide assurance on the achievability of the results forecasted by the client entity because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

4. The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

5. This report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore the report and conclusion of value are not intended by Empire Valuation Consultants, LLC and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the considered opinion of Empire Valuation Consultants, LLC, based on information furnished to them by the client entity and other sources.

6. Neither all nor any part of the contents of this report (especially the conclusion of value, the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent and approval of Empire Valuation Consultants, LLC.

RIVERSTONE_SDTX00156743

7. Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Empire Valuation Consultants, LLC unless previous arrangements have been made in writing.

8. Empire Valuation Consultants, LLC is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. Empire Valuation Consultants, LLC does not conduct or provide environmental assessments and has not performed one for the subject property.

9. Empire Valuation Consultants, LLC has not determined independently whether the client entity is subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. Empire Valuation Consultants, LLC's valuation takes no such liabilities into account, except as they have been reported to Empire Valuation Consultants, LLC by the client entity or by an environmental consultant working for the client entity, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, Empire Valuation Consultants, LLC has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

10. Empire Valuation Consultants, LLC has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the Americans with Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

11. No change of any item in this appraisal report shall be made by anyone other than Empire Valuation Consultants, LLC, and we shall have no responsibility for any such unauthorized change.

12. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

13. If prospective financial information approved by management has been used in our work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

14. We have conducted interviews with the current management of the client entity concerning the past, present, and prospective operating results of the company, as applicable for this analysis.

15. Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the client entity has good title to all assets.

16. The fee established for the formulation and reporting of these conclusions is not contingent upon the value or other opinions presented.

17. Neither the appraiser nor any officer or employee of Empire Valuation Consultants, LLC has any interest in the property appraised.

18. We assume that there are no hidden or unexpected conditions of the assets valued that would adversely affect value.

19. No opinion is intended for matters which require legal or specialized expertise, investigation or knowledge, beyond that customarily employed by appraisers.

RIVERSTONE_SDTX00156745

Confidential
Empire Valuation Consultants

PDF compiled 05/22/17
DRAFT COPY - For Discussion Purposes Only

**Addendum 2**

# CERTIFICATION OF APPRAISERS

We the appraisers certify that, to the best of our knowledge and belief:

1. Our analyses, opinions and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

2. All statements of fact contained in this report are true and correct.

3. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

4. Neither Empire nor any of its employees has, to the best of our knowledge, either a present or intended financial interest in the entity that is the subject of this report, in any affiliates that may exist, or with respect to the parties involved.

5. Empire has performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

6. We have no bias with respect to the entity that is the subject of this report or to the parties involved with this assignment.

7. Empire's engagement in this assignment was not contingent upon developing or reporting predetermined results.

8. The professional fee paid to Empire for the preparation of this report is not contingent upon its conclusion, including: developing or reporting a predetermined value or direction of value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

9. No one provided significant business appraisal assistance to the persons signing this certification, unless specifically stated herein.

The American Society of Appraisers has a mandatory recertification program for all of its Accredited Senior Appraisers.  The senior members signing below, designated by the "ASA," are in compliance with that program.


_____
Nathan P. Schroeder
Engagement Leader


_____
Scott A. Nammacher, CFA, ASA
Managing Director


May 22, 2017

Empire Valuation Consultants

DRAFT COPY - For Discussion Purposes Only

**Addendum 3-1**

# EMPIRE VALUATION CONSULTANTS, LLC
### www.empireval.com

| | | |
|---|---|---|
| 777 Canal View Blvd. | 350 Fifth Avenue | One International Place |
| Suite 200 | Suite 6115 | Suite 1400 |
| Rochester, NY 14623 | New York, NY 10118 | Boston, MA 02110 |
| Tel: (585) 475-9260 | Tel: (212) 714-0122 | Tel: (617) 535-7785 |

| | |
|---|---|
| 61 South Main Street | 555 California Street |
| Suite 201 | Suite 4925 |
| West Hartford, CT 06107 | San Francisco, CA 94104 |
| Tel: (860) 233-6552 | Tel: (415) 659-1860 |

## Valuation Services

**Empire Valuation Consultants, LLC** provides valuations to private equity and hedge funds, business owners, attorneys, accountants, commercial bankers, investment bankers, trust departments, insurance agents, and financial planners, among others. **Empire's** consultants have prepared or managed the preparation of over 25,000 appraisals for the following reasons:

- Private Equity & Hedge Fund Marking
- Transfer Pricing
- Solvency Opinions
- Buy/Sell Agreements
- Gifting Programs
- Estate Taxes
- Mergers & Acquisitions
- Blocks of Publicly Traded Securities
- Employee Stock Ownership Plans (ESOPs)

- Financial and SEC Reporting
- Fairness Opinions
- Litigation Support
- Redemptions
- Recapitalizations
- Going Private Transactions
- Stock Option Plans
- Dissenting Shareholder Suits
- Impairment Testing
- Intellectual Property
- Purchase Price Allocations

## Other Financial Services

### Litigation Support & Expert Testimony

**Empire** can assist you with research and litigation support and its professionals are available to provide expert testimony in matters involving questions of valuation.

### ESOP Feasibility Studies & Preliminary Valuations

**Empire** is available to work with our client's team of financial advisors or participate in independent feasibility studies and preliminary valuation reviews in connection with ESOP formation planning.

CONFIDENTIAL

Confidential   PDF compiled 02/13/2015
Empire Valuation Consultants   DRAFT COPY - For Discussion Purposes Only

Addendum 3-2

# NATHAN P. SCHROEDER

## Academic Degrees

M.S.F.        Boston College, Carroll School of Management, Finance, 2007

B.S.          State University of New York at Albany, Economics, 2003

## Employment

**Empire Valuation Consultants, Rochester, New York**
Engagement Leader, 2016-Present
Senior Valuation Consultant, 2012-2016
Valuation Consultant, 2008-2012

**Investors Bank & Trust, Boston, Massachusetts**
Senior Financial Analyst, 2006-2007
Trust Administrator, 2005-2006
Fund Accountant, 2004-2005

## Experience

While employed with Empire, Mr. Schroeder has performed valuations of derivative instruments, intangible assets, and equity and debt interests for diverse purposes, including those of tax planning and reporting, lending purposes, financial and Securities and Exchange (SEC) reporting (including ASC 350-20, formerly SFAS 142- impairment testing and ASC 820, formerly SFAS 157- fair value measurements), ESOP purposes, and other corporate planning and reporting purposes.

Mr. Schroeder's professional experience, prior to joining Empire, includes fund accounting for certain mutual and hedge funds as well as managing high profile client relationships within a wealth and trust management division. As an analyst in the corporate financial planning and analysis (FP&A) group at Investors Bank & Trust, he generated a rolling 3-year-period corporate forecast, resulting in EPS guidance for the CFO, the Board of Directors, and Wall Street. Mr. Schroeder was primarily, and exclusively, responsible for forecasting the company's revenue. This involved analyzing and forecasting: new business, interest income, business turn, treasury and ALCO expectations, as well as other information related to the company's revenue. In addition to generating the forecast, Mr. Schroeder performed regular variance analysis and coordinated the annual corporate budget with the company's cost center directors and managers.

Addendum 3-3

# SCOTT A. NAMMACHER, ASA, CFA

## Academic Degrees

M.B.A.    New York University Graduate School of Business, Finance, 1985

B.S.    University of Minnesota, Business, 1977

## Employment

Principal and Managing Director, Empire Valuation Consultants, LLC, New York, New York, 1992-Present

Manager, Financial Valuations, Arthur Andersen & Co., New York, 1990-1991

V.P., Marigold Capital Development, Investment Banking Div. of Marigold Enterprises, Greenwich, Connecticut, 1989-1990

Manager - Domestic Finance, PepsiCo, Inc. Purchase, New York, 1985-1989

## Experience

Mr. Nammacher is an Accredited Senior Appraiser (ASA) of the American Society of Appraisers and is a Chartered Financial Analyst (CFA). He has over 30 years of experience in financial consulting, business and financial asset valuations. He has valued the equity, debt, carried interests, etc. of publicly and privately held businesses for acquisitions, divestitures, stock repurchases, estate and gift tax reporting, buy/sell agreements, and general corporate planning purposes. He has also valued entertainment and royalty stream related assets. Mr. Nammacher developed business plans and financing packages, and has been involved in completed transactions totaling over $2.0 billion. In addition, he played key roles in the successful launch of a new business publication.

Mr. Nammacher has testified as an expert witness in U.S. Tax Court, U.S. Bankruptcy Court, Delaware Chancery Court and other courts and arbitration settings around the country, and published a book and several articles on "junk bonds." He also received the prestigious "Graham & Dodd Scroll Award" from the *Financial Analysts Journal* for outstanding financial writing relating to a cover story he co-authored.

He served two terms as an elected member of the American Society of Appraisers' Business Valuation Committee, and one term as a Governor (board member) for the ASA's parent organization. He has spoken on valuation issues around the country and chaired an annual valuation conference in New York City for over 20 years. He also co-chaired the first joint AICPA/ASA valuation conference ever presented.

EXHIBIT A

## VALUATION INPUTS
### AS OF DECEMBER 31, 2016
### RIVERSTONE ENERGY LIMITED

**General**

| | |
|---|---|
| Valuation Date | 12/31/16 |
| Valuation Date (text) | DECEMBER 31, 2016 |
| Investment Manager Name | RIVERSTONE INTERNATIONAL GUERNSEY LIMITED |
| Investment Manager Short Name | IM |
| General Partner Name | REL IP GENERAL PARTNER LIMITED |
| General Partner Short Name | GP |

**Fee-Paying AUM (000s)** — Total AUM

| | |
|---|---|
| Total Capital | $1,699,000 |
| Capital Deployed at Inception | $0.001 |
| Total AUM | $1,699,000 |

**Weighted Average Fee Structure (Per Management)**

| | |
|---|---|
| Management & Admin Fee | 1.50% |
| Administrative Fee | 0.10%   *AUM below 1B, admin fee increases to: 0.25% |
| Incentive Fee | 20.00% |

| Fee, AUM & Return Assumptions | Period Ending 12/31/2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Annual Rate of Return (pre fees, net fund exp.)** [1] | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% | 16.0% |
| *(Calculated return, net fund expenses and all fees)* | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% | 11.26% |
| **Capital Flows** | | | | | | | | | | | |
| Capital Inflow (deployment) as 000s | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capital Inflow as a % of BOY AUM | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Redemptions/Distributions as a % of EOY AUM | 0.0% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT B-1

## DERIVATION OF GROSS RETURNS AND ESTIMATED MANAGEMENT FEES ($000s)
### AS OF DECEMBER 31, 2016
RIVERSTONE ENERGY LIMITED

| | Pd ending 12/31/2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning of Period AUM Invested (000s) (A)** | | | | | | | | | | | |
| Base AUM | $1,699,000 | $1,890,386 | $2,103,331 | $2,340,264 | $2,603,886 | $2,897,204 | $3,223,563 | $3,586,686 | $3,990,713 | $4,440,252 | $4,940,431 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Plus: Gross Return on AUM Invested, pre-mgmt. fees (B)** | | | | | | | | | | | |
| Base AUM | $271,840 | $302,462 | $336,533 | $374,442 | $416,622 | $463,553 | $515,770 | $573,870 | $638,514 | $710,440 | $790,469 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Less: Estimated Management Fees (C)** | | | | | | | | | | | |
| Base AUM | -$26,985 | -$30,025 | -$33,407 | -$37,171 | -$41,358 | -$46,017 | -$51,200 | -$56,968 | -$63,385 | -$70,525 | -$78,469 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Less: Estimated Administrative Fees (C₁)** | | | | | | | | | | | |
| Base AUM | -$4,498 | -$5,004 | -$5,568 | -$6,195 | -$6,893 | -$7,669 | -$8,533 | -$9,495 | -$10,564 | -$11,754 | -$13,078 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **End of Period AUM, before incentive allocations & redemptions (D) = (A + B - C - C₁)** | | | | | | | | | | | |
| Base AUM | $1,939,357 | $2,157,819 | $2,400,889 | $2,671,340 | $2,972,257 | $3,307,071 | $3,679,600 | $4,094,094 | $4,555,278 | $5,068,414 | $5,639,352 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

RIVERSTONE_SDTX00156751

Confidential
Empire Valuation Consultants

Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT B-2

## DERIVATION OF ESTIMATED INCENTIVE ALLOCATIONS, YEAR-END REDEMPTIONS, AND END OF PERIOD AUM ($000s)
## AS OF DECEMBER 31, 2016
### RIVERSTONE ENERGY LIMITED

| | Pd ending 12/31/2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Less:  Incentive Allocations (E)** | | | | | | | | | | | |
| Base AUM | -$48,971 | -$54,487 | -$60,625 | -$67,454 | -$75,053 | -$83,507 | -$92,914 | -$103,380 | -$115,026 | -$127,983 | -$142,400 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | |
| **Less:  End of Year Redemptions (F)** | | | | | | | | | | | |
| Base AUM | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | |
| **End of Year Period AUM (G) = (D - E - F)** | | | | | | | | | | | |
| Base AUM | $1,890,386 | $2,103,331 | $2,340,264 | $2,603,886 | $2,897,204 | $3,223,563 | $3,586,686 | $3,990,713 | $4,440,252 | $4,940,431 | $5,496,952 |
| New Money--Partial Period Ending 12/31/2017 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2014 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2015 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2016 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Money 2017 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | |
| **Total End of Year AUM** | **$1,890,386** | **$2,103,331** | **$2,340,264** | **$2,603,886** | **$2,897,204** | **$3,223,563** | **$3,586,686** | **$3,990,713** | **$4,440,252** | **$4,940,431** | **$5,496,952** |
| | | | | | | | | | | | |
| **Aggregate Management Fee Income (to Exhibit C-1)** | $26,985 | $30,025 | $33,407 | $37,171 | $41,358 | $46,017 | $51,200 | $56,968 | $63,385 | $70,525 | $78,469 |
| **Aggregate Incentive Allocations (to Exhibit C-2)** | $48,971 | $54,487 | $60,625 | $67,454 | $75,053 | $83,507 | $92,914 | $103,380 | $115,026 | $127,983 | $142,400 |

RIVERSTONE_SDTX00156752

EXHIBIT C-1

## PROJECTED INCOME STATEMENT & DISCOUNTED FUTURE EARNINGS ANALYSIS
### AS OF DECEMBER 31, 2016
RIVERSTONE INTERNATIONAL GUERNSEY LIMITED

| | @ 12/31/2016 | Pd ending 12/31/2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending AUM | $1,699,000,000 | $1,890,386,123 | $2,103,331,190 | $2,340,263,739 | $2,603,885,872 | $2,897,204,071 | $3,223,563,490 | $3,586,686,102 | $3,990,713,145 | $4,440,252,353 | $4,940,430,506 | $5,496,951,894 | |
| **Gross Management Fees** | | $26,985,390 | $30,025,196 | $33,407,424 | $37,170,648 | $41,357,785 | $46,016,588 | $51,200,188 | $56,967,702 | $63,384,904 | $70,524,981 | $78,469,362 | HORIZON VALUE[1] |
| Cornerstone | 20% | -$5,397,078 | -$6,005,039 | -$6,681,485 | -$7,434,130 | -$8,271,557 | -$9,203,318 | -$10,240,038 | -$11,393,540 | -$12,676,981 | -$14,104,996 | -$15,693,872 | |
| Riverstone International Limited | 80% | $21,588,312 | $24,020,157 | $26,725,939 | $29,736,518 | $33,086,228 | $36,813,270 | $40,960,150 | $45,574,161 | $50,707,923 | $56,419,985 | $62,775,490 | $269,037,813 [2] |
| | | | | | | | | | | | | | |
| Discount Rate (Near Term of Two Years) | 11.0% | | | | | | | | | | | | |
| Discount Rate | 14.0% | | | | | | | | | | | | PV of |
| Days | | 365 | 730 | 1,095 | 1,461 | 1,826 | 2,191 | 2,556 | 2,922 | 3,287 | 3,652 | 4,017 | HORIZON |
| Mid-point of Period | | 183 | 548 | 913 | 1,278 | 1,644 | 2,009 | 2,374 | 2,739 | 3,105 | 3,470 | 3,835 | VALUE |
| Present Value Factor | | 0.9492 | 0.8551 | 0.7207 | 0.6321 | 0.5543 | 0.4863 | 0.4265 | 0.3741 | 0.3281 | 0.2878 | 0.2525 | |
| Present Value of Net Future Cash Flows | | $20,490,719 | $20,539,571 | $19,260,646 | $18,795,124 | $18,340,853 | $17,900,774 | $17,471,255 | $17,048,982 | $16,636,914 | $16,237,721 | $15,848,106 | $87,920,454 |
| | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Net Present Value** | $266,491,118 | | | | | | | | | | | | |

(1) Gordon Growth Model:  Vo = [Cf x (1 + g)] / (r - g), Cf is terminal year cash flow, Vo is Horizon Value.
(2) Growth Rate of 0%, Probability Factor of 60% based on 4-5% annual risk of closure. See below.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Survival (1 - Total) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Probability of Failure | **5.00%** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Probability of Survival | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | |
| Conditional Probability | 5.00% | 4.75% | 4.513% | 4.29% | 4.07% | 3.87% | 3.68% | 3.49% | 3.32% | 3.15% | 2.99% | 56.88% |
| | | | | | | | | | | | | |
| Annual Probability of Failure | **4.00%** | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | |
| Probability of Survival | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | |
| Conditional Probability | 4.00% | 3.84% | 3.686% | 3.54% | 3.40% | 3.26% | 3.13% | 3.01% | 2.89% | 2.77% | 2.66% | 63.82% |

EXHIBIT C-2

## PROJECTED INCOME STATEMENT & DISCOUNTED FUTURE EARNINGS ANALYSIS
## AS OF DECEMBER 31, 2016
### REL IP GENERAL PARTNER LIMITED

| | @ 12/31/2016 | Pd ending 12/31/2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending AUM ($000s) | $1,699,000 | $1,890,386 | $2,103,331 | $2,340,264 | $2,603,886 | $2,897,204 | $3,223,563 | $3,586,686 | $3,990,713 | $4,440,252 | $4,940,431 | $5,496,952 | |
| | | | | | | | | | | | | | |
| **Gross Incentive Fees** | | $48,970,922 | $54,487,337 | $60,625,113 | $67,454,310 | $75,052,791 | $83,507,213 | $92,913,994 | $103,380,415 | $115,025,840 | $127,983,079 | $142,399,904 | HORIZON VALUE[1] |
| Cornerstone | 20% | -$9,794,184 | -$10,897,463 | -$12,125,023 | -$13,490,862 | -$15,010,558 | -$16,701,443 | -$18,582,799 | -$20,676,083 | -$23,005,168 | -$25,596,616 | -$28,479,981 | |
| Riverstone Energy Limited Capital Partners, LP ("RELCP") | 80% | $39,176,738 | $43,589,853 | $48,500,091 | $53,963,448 | $60,042,233 | $66,805,770 | $74,331,195 | $82,704,332 | $92,020,672 | $102,386,463 | $113,919,923 | $227,839,846 [2] |
| | | | | | | | | | | | | | |
| Discount Rate (Near Term of Two Years) | 25.0% | | | | | | | | | | | | |
| Discount Rate | 30.0% | | | | | | | | | | | | PV of |
| Days | | 365 | 730 | 1,095 | 1,461 | 1,826 | 2,191 | 2,556 | 2,922 | 3,287 | 3,652 | 4,017 | HORIZON |
| Mid-point of Period | | 183 | 548 | 913 | 1,278 | 1,644 | 2,009 | 2,374 | 2,739 | 3,105 | 3,470 | 3,835 | VALUE |
| Present Value Factor | | 0.8944 | 0.7155 | 0.5190 | 0.3991 | 0.3069 | 0.2360 | 0.1816 | 0.1396 | 0.1074 | 0.0826 | 0.0635 | |
| Present Value of Net Future Cash Flows | | $35,040,739 | $31,190,360 | $25,170,055 | $21,534,851 | $18,424,664 | $15,769,334 | $13,496,686 | $11,547,417 | $9,879,673 | $8,455,832 | $7,237,193 | $14,474,385 |
| | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Net Present Value** | $212,221,190 | | | | | | | | | | | | |

(1) Gordon Growth Model:  Vo = [Cf x (1 + g)] / (r - g), Cf is terminal year cash flow, Vo is Horizon Value.
(2) Growth Rate of 0%, Probability Factor of 60% based on 4-5% annual risk of closure. See below.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Survival (1 - Total) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Probability of Failure | **5.00%** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Probability of Survival | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | 95.00% | |
| Conditional Probability | 5.00% | 4.75% | 4.513% | 4.29% | 4.07% | 3.87% | 3.68% | 3.49% | 3.32% | 3.15% | 2.99% | 56.88% |
| | | | | | | | | | | | | |
| Annual Probability of Failure | **4.00%** | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | |
| Probability of Survival | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | 96.00% | |
| Conditional Probability | 4.00% | 3.84% | 3.686% | 3.54% | 3.40% | 3.26% | 3.13% | 3.01% | 2.89% | 2.77% | 2.66% | 63.82% |

Confidential
Empire Valuation Consultants

Case 4:19-cv-00957   Document 672-5   Filed on 02/16/24 in TXSD   Page 830 of 845 Compiled 05/22/2017
DRAFT COPY - For Discussion Purposes Only

EXHIBIT D-1

## DISCOUNT RATE SUMMARY CONCLUSION
## RIVERSTONE ENERGY LIMITED
### AS OF DECEMBER 31, 2016

| | | Concluded |
|---|---|---|
| **Selected LP Pre-Tax Cost of Equity** | **13.0%** | |
| **Company Cash Flow Source Specific Risk Adjustments** | **Risk Adj.** | **Discount Rate** |
| | | |
| *Management Fees* | | |
| Private Equity Funds (Existing) Management Fees - High Probability | -2.0% | 11.0% |
| Private Equity Funds (Existing) Management Fees | 1.0% | 14.0% |
| | | |
| *Carried Interest* | | |
| Private Equity Funds (Existing) Carried Interest - High Probability | 12.0% | 25.0% |
| Private Equity Funds (Existing) Carried Interest | 17.0% | 30.0% |

RIVERSTONE_SDTX00156755

**EXHIBIT D-2**

## PRIVATE EQUITY / VC RATES OF RETURN
### RIVERSTONE ENERGY LIMITED
#### AS OF DECEMBER 31, 2016

| | Source | | | Source | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | QED Report – 288 VC Firms | Ruhnka & Young – 72 VC Firms | | | | | Sahlman, | | | |
| Stage | Range of Required Returns (Medians) | Median Compound Annual Rate of Return Demanded | Stage | Plummer(1) | Scherlis and Sahlman(2) | Sahlman, Stevenson and Bhide(3) | Pepperdine(4) | Razgaitis(5) | Parr(6) |
| Seed | 50%-70% | 73% | Start-Up | 50%-70% | 50%-70% | 50%-100% | 23%-38% | 50%-70% | 50% |
| First Stage | 40%-60% | 55% | Early Development | 40%-60% | 40%-60% | 40%-60% | 23%-38% | 40%-50% | 40% |
| Second Stage | 35%-50% | 42% | First Stage | N/A | N/A | N/A | 23%-38% | 30%-40% | 30%-40% |
| Third Stage | 30%-50% | 35% | | | | | | | |
| Fourth Stage | 30%-40% | 35% | Expansion | 35%-50% | 30%-50% | 30%-40% | 19%-33% | 25%-35% | 30% |
| **Bridge/Mezzanine** | **25%-35** | **N/A** | **Mezzanine/ IPO** | **25%-35%** | **20%-35%** | **20%-30%** | **18%-33%** | **10%-20%** | **25%** |

**Standard Definitions of Venture Capital Investment Stages:**

"Seed" In this earliest stage, it was noted that the venture was conceptual. The primary benchmark for this stage was to verify the feasibility of the business, either from a technological or market standpoint. From an operational standpoint, there was generally no team in place beyond the founder/inventor and a few technicians. Risks of investment at this stage were recognized as being primarily internal.

"First Stage" In this stage, the feasibility analysis of the business concept has generally progressed to the development of a formal business plan, including some initial market analysis for the proposed product or service. Major benchmarks at this stage generally include the completion of beta testing and preparing the product for market, completing some initial sales to verify that real demand exists, and establishing manufacturing feasibility. Major risks at this stage remained internally driven.

"Second Stage" In this stage, initial market acceptance of the product or service has usually been established, and the company begins to focus on increasing manufacturing capacity and expanding its marketing efforts. The focus at this stage is generally on expansion, and driving the venture toward cash flow break-even, although most companies in the second stage have not reached this benchmark. Risks at this stage were shifting to a balance between external (market) risks and internal risks, where earlier stages were characterized primarily by internal risk.

"Third Stage" A continuation of the prior stage, companies at this stage generally have significant sales and orders, remain focused on broadening their markets, and are profitable or nearly so. However, companies at this stage were still generally dependent on external capital for growth. Goals at this stage became increasingly focused, with emphasis on the following: (1) achieving sales growth and market share targets; and (2) focusing an achieving an exit vehicle by demonstrating cash flow break-even or profitability targets. An increasing percentage of risks at this stage were considered to be market-determined.

"Fourth Stage" This stage is characterized by an explicit focus on identifying an exit vehicle for investors. Businesses have expanded since the prior stage, with maturity generally being identified both in management and in internal controls. Businesses at this stage would be profitable and growing rapidly. Risks at this stage were identified as being generally external, although remaining internal concerns involved inadequate management and financial controls.

"IPO/ Bridge/Mezzanine" companies are similar to the fourth stage but may be seeking financing for growth or an injection of liquidity prior to a public offering of a full change of control.

**Sources:**
(1)Plummer, James L., QED Report on Venture Capital Financial Analysis, Palo Alto: QED Research, Inc. 1987.
(2)Scherlis, Daniel R. and Sahlman, William A., A Method for Valuing High Risk, Long-Term Investments: The Venture Capital Method, Harvard Business School, 1989.
(3)Sahlman, William A., Stevenson, Howard H. and Bhide, Amar V., Financing Entrepreneurial Ventures, Business Fundamental Series, Harvard Business School, 1998.
(4)Pepperdine University Graziadio School of Business and Management: Private Capital Markets Project, 2015.
(5)Razgaitis, Richard, Pricing the Intellectual Property of Early-Stage Technologies: A Primer of Basic Valuation Tools and Considerations, 2007.
(6)Parr, Russell L., "Patent Valuation and Royalty Rates," 71-73, 2004

| | Management Fee | | | | | Carried Interest | | | |
|---|---|---|---|---|---|---|---|---|---|
| | NPV Of Mgmt Fee Stream | % of Total Empire Value | GS/PH Royalty Value Sold | Allocate To | | NPV Of Carry Stream | % of Total Empire Value | GS/PH Royalty Value Sold | Allocate To |
| | | | 12% | | | | | | |

**Existing Funds**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| RSH II | 0.00 | 0.0% | 0.00 | QDCF | | 0.00 | 0.0% | 0.00 | Fund |
| RSH III | 14.20 | 0.7% | 1.70 | QDCF | | 0.00 | 0.0% | 0.00 | Fund |
| RSH IV | 39.37 | 2.0% | 4.72 | QDCF | | 0.00 | 0.0% | 0.00 | Fund |
| RSH V | 110.26 | 5.6% | 13.23 | QDCF | | 0.00 | 0.0% | 0.00 | Fund |
| RAE II | 29.93 | 1.5% | 3.59 | QDCF | | 0.00 | 0.0% | 0.00 | Fund |
| RCP - I | 10.93 | 0.6% | 1.31 | QDCF | | 16.69 | 0.8% | 2.00 | Fund |
| RSH VI | 218.96 | 11.1% | 26.28 | QDCF | | 286.12 | 14.5% | 34.33 | Fund |
| Non ECI - I | 11.64 | 0.6% | 1.40 | QDCF | | 15.51 | 0.8% | 1.86 | Fund |
| REL | 88.60 | 4.5% | 10.63 | REL | | 75.47 | 3.8% | 9.06 | REL |
| REL - Perm | 177.19 | 9.0% | 21.26 | REL-Perm | | 150.94 | 7.6% | 18.11 | REL-Perm |
| Mexico CKD | 36.99 | 1.9% | 4.44 | QDCF | | 49.50 | 2.5% | 5.94 | Fund |
| | 738.07 | 37.3% | 88.57 | | | 594.23 | 30.1% | 71.31 | | 1,332.29 |

**Future Funds**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| RSH VII | 235.26 | 11.9% | 28.23 | F-Share | | 86.76 | 4.4% | 10.41 | F-Share |
| RAE II | 49.66 | 2.5% | 5.96 | F-Share | | 22.14 | 1.1% | 2.66 | F-Share |
| RCP II | 42.64 | 2.2% | 5.12 | F-Share | | 15.25 | 0.8% | 1.83 | F-Share |
| Mexico RAE I | 28.28 | 1.4% | 3.39 | F-Share | | 15.50 | 0.8% | 1.86 | F-Share |
| Mexico CKD II | 31.27 | 1.6% | 3.75 | F-Share | | 12.10 | 0.6% | 1.45 | F-Share |
| RSH Infrastructure | 72.91 | 3.7% | 8.75 | F-Share | | 32.52 | 1.6% | 3.90 | F-Share |
| | 460.01 | 23.3% | 55.20 | | | 184.28 | 9.3% | 22.11 | | 644.29 |
| | | | | | | | | | | 1,976.58 |

**Empire Summary Allocations**

| | $ | (%) |
|---|---|---|
| Carry in Funds | 44.14 | 18.8% |
| REL Carry | 9.06 | 3.9% |
| REL Carry - Perm | 18.11 | 7.7% |
| REL MF | 10.63 | 4.5% |
| REL MF - Perm | 21.26 | 9.0% |
| QDCF | 56.67 | 24.1% |
| F-Share | 75.12 | 32.0% |
| | 235.00 | 100.0% |

| | Total Value of GS/PH #1 | 235.0 |
|---|---|---|
| | Empire Value of Sold To GS/PH #1 | (237.2) |
| | Good Will - (to F Share) | -2.2 |

| | Capital Interest | Non-Capital Interest |
|---|---|---|
| GS Desire | 25.0% | 75.0% |
| Empire | 30.3% | 69.7% |

**Resulting Recast of Relative Value (Empire Basis)**

| | Empire | | | | RSH Internal | | |
|---|---|---|---|---|---|---|---|
| | Relative Value Weight | PH #1 Allocation 235 | Value/ Point | | Relative Value Weight | PH #1 Allocation 235 | Value/ Point |
| RSH II | 0.0% | - | - | | 0.0% | - | - |
| RSH III | 0.0% | - | - | | 0.0% | - | - |
| RSH IV | 0.0% | - | - | | 0.0% | - | - |
| RSH V | 0.0% | - | - | | 0.0% | - | - |
| RSH VI | 14.6% | 34.3 | 0.343 | | 21.9% | 51.4 | 0.514 |
| Non-ECI | 0.8% | 1.9 | 0.019 | | 1.1% | 2.6 | 0.026 |
| RAE I | 0.0% | - | - | | 0.0% | - | - |
| RAE II | 0.0% | - | - | | 0.0% | - | - |
| QDCF | 24.1% | 56.7 | 0.567 | | 10.9% | 25.6 | 0.256 |
| REL Carry | 3.9% | 9.1 | 0.091 | | 9.5% | 22.2 | 0.222 |
| REL MF | 4.5% | 10.6 | 0.106 | | 11.0% | 25.9 | 0.259 |
| REL Perm - Combo | | | | | 10.1% | 23.7 | 0.237 |
| REL Carry  - Perm | 7.7% | 18.1 | 0.181 | | | | |
| REL MF - Perm | 9.0% | 21.3 | 0.213 | | | | |
| RCP I | 0.9% | 2.0 | 0.020 | | 1.2% | 2.8 | 0.028 |
| MX CKD I | 2.5% | 5.9 | 0.059 | | 1.4% | 3.2 | 0.032 |
| F Share | 32.0% | 75.1 | 0.751 | | 33.0% | 77.6 | 0.776 |
| | 100.0% | 235.0 | | | 100.0% | 235.0 | |

# PX 260

| | |
|---|---|
| **From:** | Mike E. Ellis <mellis@AltaMesa.net> on behalf of<br>Mike E. Ellis <mellis@AltaMesa.net> |
| **Sent:** | Monday, May 8, 2017 6:00 PM |
| **To:** | Tim Turner <tturner@AltaMesa.net>; Jack Albers <jalbers@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>; Kaitlyn Mathews<br><KMathews@AltaMesa.net>; Dale R. Hayes <dhayes@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>;<br>Brenna Heinrich <bheinrich@AltaMesa.net>; Amy L. Cole <acole@AltaMesa.net>; Suyoun Won <swon@AltaMesa.net>; Hal H. Chappelle<br><hchappelle@AltaMesa.net> |
| **Subject:** | RE: Coleman 1706 7A-9MH Pressure Gauge Data |

One data point that supports your comment is that all wells in the pattern have reasonable GORs. It is definitely NOT like the gas is racing to the top of the "very well connected" frac network.

**From:** Tim Turner
**Sent:** Monday, May 8, 2017 11:38 AM
**To:** Mike E. Ellis <mellis@AltaMesa.net>; Jack Albers <jalbers@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>; Dale R. Hayes <dhayes@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; Amy L. Cole <acole@AltaMesa.net>; Suyoun Won <swon@AltaMesa.net>; Hal H. Chappelle <hchappelle@AltaMesa.net>
**Subject:** RE: Coleman 1706 7A-9MH Pressure Gauge Data

Some additional thoughts. Based on "bashing" we've seen in the past, including wells 2 miles away, one might think you would see substantial leakoff post-frac. The last frac in the most recent 8 wells in the Bullis-Coleman pattern was on 12/31/16 and production for the pattern didn't start until 1/25/16 (1/26/16 for this well). There doesn't seem to be much leakoff during the ~25 days the wells were shut in (or the reservoir pressure wasn't depleted much to start with). Thinking is that natural/hydraulic fractures are mostly "contained" within the pattern.

In the long term, pressure tends to decline hyperbolically as seen in the Borelli/Dodd (see Jack's charts below). As Jack notes, at ~75 days, the pressure in these wells is 1700 psi vs. 1000 psi in the 7A. So, possibly, the fracture network in the Bullis-Coleman is not extensive enough to keep up with the high withdrawal rate. That said, the Borelli-Dodd seems to have flattened around 750 psi while the Bullis-Coleman pressures/rates seem to be flattening around 1,000 psi/1,100 bopd. Perhaps we are close to "steady state" flow in this pattern and our decline rates will flatten giving us more reserves than initially thought (i.e. more aligned with production profile we see at EHU).



**From:** Mike E. Ellis
**Sent:** Monday, May 08, 2017 9:26 AM
**To:** Jack Albers <jalbers@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>; Dale R. Hayes <dhayes@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; Amy L. Cole <acole@AltaMesa.net>; Suyoun Won <swon@AltaMesa.net>; Hal H. Chappelle <hchappelle@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Coleman 1706 7A-9MH Pressure Gauge Data

That is a fair point. So that logic is suggesting that the "fracture network",made up of natural and hydraulic fractures, is being depleted faster with the tighter spacing.
Thanks,
Mike

**From:** Jack Albers
**Sent:** Monday, May 08, 2017 8:26 AM
**To:** Mike E. Ellis <mellis@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>; Dale R. Hayes <dhayes@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; Amy L. Cole <acole@AltaMesa.net>; Suyoun Won <swon@AltaMesa.net>; Hal H. Chappelle <hchappelle@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Coleman 1706 7A-9MH Pressure Gauge Data

The Borelli 4-8 and the Dodd were at about 1700 PSI FBHP at a similar producing time, while starting at about 3000 psi. The Coleman has producers close by to the East and west of it in the Middle and Lower intervals. The other wells in a similar situation in the pattern also appear to be similar in production characteristics. Perhaps the spacing is too close and this was something that could only be seen when the pilot was big enough to have several wells in the middle of the pattern that were surrounded by other producers?

Jack

**From:** Mike E. Ellis
**Sent:** Friday, May 5, 2017 4:22 PM
**To:** Abbas Belyadi <ABelyadi@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>; Dale R. Hayes <dhayes@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; Amy L. Cole <acole@AltaMesa.net>; Suyoun Won <swon@AltaMesa.net>; Hal H. Chappelle <hchappelle@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>; Jack Albers <jalbers@AltaMesa.net>
**Subject:** FW: Coleman 1706 7A-9MH Pressure Gauge Data

Note the FBHP shaded in. Any comments?

**From:** Jared Noynaert
**Sent:** Friday, May 05, 2017 3:34 PM
**To:** Mike E. Ellis <mellis@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Gene Cole <gcole@AltaMesa.net>
**Subject:** RE: Coleman 1706 7A-9MH Pressure Gauge Data

Gas is fixed. The dates with 0 water are just missing data.

**Exhibit<br>CP- 0696**<br>6/21/2023<br>Albers

AMR_SDTX00681721



-Jared

**From:** Mike E. Ellis
**Sent:** Friday, May 05, 2017 3:09 PM
**To:** Jared Noynaert <jnoynaert@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Gene Cole <gcole@AltaMesa.net>
**Subject:** FW: Coleman 1706 7A-9MH Pressure Gauge Data

Dang. That is interesting. Can you put that on semi-log with oil and water on the same scale.

---

**From:** Jared Noynaert
**Sent:** Friday, May 05, 2017 3:03 PM
**To:** Mike E. Ellis <mellis@AltaMesa.net>
**Subject:** FW: Coleman 1706 7A-9MH Pressure Gauge Data

Almost forgot to send the data from the Coleman 7A pressure gauge. The other gauges are still in the wells.

Last full reading, on 4/13, showed an average of 964 psia FBHP @ 7236' MD.

That's a little less than halfway through the curve and about 150' TVD above the lateral.

-Jared

**From:** Jared Noynaert
**Sent:** Thursday, April 20, 2017 12:34 PM
**To:** John Baldauff <jbaldauff@AltaMesa.net>; Michael Galther <mgalther@AltaMesa.net>; Jerry Swearingen <jswearingen@AltaMesa.net>
**Subject:** RE: Coleman 1706 7A-9MH Pressure Gauge Data

John–

Chart as requested below & attached:

CONFIDENTIAL

AMR_SDTX00681722



-Jared

**From:** Curtis Kelsey
**Sent:** Thursday, April 20, 2017 11:12 AM
**To:** John Baldauff <jbaldauff@AltaMesa.net>; Jared Noynaert <jnoynaert@AltaMesa.net>; Michael Galther <mgalther@AltaMesa.net>; Jerry Sweeringen <jsweeringen@AltaMesa.net>
**Cc:** Eric H. Ecldund <eecldund@AltaMesa.net>; Mike Hanegan <mhanegan@AltaMesa.net>; Tim Prince <tprince@AltaMesa.net>
**Subject:** Coleman 1706 7A-9MH Pressure Gauge Data

Please see attached data for the Coleman 1706 7A-9MH Pressure Gauge Data that was pulled from the GCM.

*Respectfully,*

Curtis Kelsey
Alta Mesa Services L.P.



Assistant Production Engineer

ckelsey@altamesa.net

AMR_SDTX00681723

# PX 261

**From**: Mike E. Ellis [mellis@AltaMesa.net]
on behalf of Mike E. Ellis <mellis@AltaMesa.net> [mellis@AltaMesa.net]
**Sent**: 5/17/2017 11:23:21 AM
**To**: Hal H. Chappelle [hchappelle@AltaMesa.net]
**Subject**: RE: Why is Shackelford 17-5-31 doing better?

Yes, I think more stages is correct answer. Then the question, which is more profitable, larger fracs or more wells? I am surprised that the current data is pointing toward 7-8 wells/section, as a general rule.

OOIP is really complicated. Remember about 2-3 years ago, I told you about the Devon presentation up in the stateline play, where they broke the Miss into about 50 layers, each with its own history, oil and water saturation. From memory, they were excited because they went from a 4% oil cut to an 8 % oil cut, by targeting the better rock.

I think we are seeing the same thing. Some of the rock types in certain sections have more water and thus less OOIP. I think SLB is on the right track, just not sure we will trust the data enough NOT to test something. We will see. Dang this is fun.

**From:** Hal H. Chappelle
**Sent:** Wednesday, May 17, 2017 11:11 AM
**To:** Mike E. Ellis <mellis@AltaMesa.net>
**Subject:** Re: Why is Shackelford 17-5-31 doing better?

> **Exhibit**
> **CP 0805**
> Stulz

Thanks. More intense fracs in terms of # of stages, possibly smaller fracs per stage ... is this a consideration?

**From:** Mike Ellis <mellis@altamesa.net>
**Date:** Wednesday, May 17, 2017 at 11:05 AM
**To:** Hal Chappelle <hchappelle@altamesa.net>
**Subject:** FW: Why is Shackelford 17-5-31 doing better?

Between me and you,

This is a negative data point for infill drilling a lot of wells. These two wells are 7/8[th] of a mile apart and there is some amount of competition for oil. That is not totally unexpected, but when it hits you in the face, we need to pay attention. Mike

**From:** Jerry Swearingen
**Sent:** Wednesday, May 17, 2017 9:11 AM
**To:** Eric H. Ecklund <eecklund@AltaMesa.net>; Michael Gaither <mgaither@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; JE Soudek <jsoudek@AltaMesa.net>; Mike E. Ellis <mellis@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; John Baldauff <jbaldauff@AltaMesa.net>; Jared Noynaert <jnoynaert@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Gene Cole <gcole@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Why is Shackelford 17-5-31 doing better?

Eric,
Great job by your team on making the adjustments looks good.

Mike,
From a mechanical point of view, it looks to be on the orifice valve. The optimization changes by Eric's team didn't change the gradient much at all see the gradient curves below but did get addition drawdown of a few psi.

- Think the oil increase is a reservoir condition change..... for the good this time



File: LastJob.val                    © Copyright 2014 Weatherford

Jerry Swearingen
**Alta Mesa Holdings, LP**
15021 Katy Freeway, Ste. 400
Houston, Texas 77094
281-943-5602 – Office
████████████████

---

**From:** Eric H. Ecklund
**Sent:** Tuesday, May 16, 2017 12:58 PM
**To:** Michael Gaither <mgaither@AltaMesa.net>; Brenna Heinrich <bheinrich@AltaMesa.net>; Jerry Swearingen <jswearingen@AltaMesa.net>; JE Soudek <jsoudek@AltaMesa.net>; Mike E. Ellis <mellis@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>; John Baldauff <jbaldauff@AltaMesa.net>; Jared Noynaert <jnoynaert@AltaMesa.net>; Abbas Belyadi <ABelyadi@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Jeff Janik <JJanik@AltaMesa.net>; Gene Cole <gcole@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Why is Shackelford 17-5-31 doing better?

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

JE tells me our newest addition to Production team (Jerry Jech) has been tinkering with this well. Increased injection rate.

Adding guys to the team has allowed us to spend more time tinkering. Hopefully we'll see more of this!

Sent from my treo using Symantec TouchDown (www.symantec.com)

-----Original Message-----
**From:** Mike E. Ellis [mellis@AltaMesa.net]
**Received:** Tuesday, 16 May 2017, 12:32PM
**To:** Eric H. Ecklund [eecklund@AltaMesa.net]; Cathy Radvansky [cradvansky@AltaMesa.net]; Abbas Belyadi [ABelyadi@AltaMesa.net]; Brenna Heinrich [bheinrich@AltaMesa.net]; Jerry Swearingen [jswearingen@AltaMesa.net]; John Baldauff [jbaldauff@AltaMesa.net]; Jared Noynaert [jnoynaert@AltaMesa.net]; Michael Gaither [mgaither@AltaMesa.net]; JE Soudek [jsoudek@AltaMesa.net]
**CC:** Kevin J. Bourque [kbourque@AltaMesa.net]; Gene Cole [gcole@AltaMesa.net]; Jeff Janik [JJanik@AltaMesa.net]; Tim Turner [tturner@AltaMesa.net]
**Subject:** Why is Shackelford 17-5-31 doing better?

The Sawgrass bashed into it circa 3/1/17. It was 105 bopd before and now 145 bopd. Is there a lift reason for the performance? If not, this is the unusual situation of a well getting better after bashing. Usually they come back to pre-bash, but not improved.

FOIA CONFIDENTIAL TREATMENT REQUESTED
Confidential

AMR_118992
AMR_SDTX00118992

# PX 262

| **From:** | Jim Hackett <jimt@jimthackett.com> |
|---|---|
| **Sent:** | Tue, 23 May 2017 22:28:11 +0000 (UTC) |
| **To:** | "Lapeyre, Pierre F." <pierre@riverstonellc.com> |
| **Subject:** | Re: McKinsey War Room Effort |

:) I confused you. It's tomorrow morning, though we have spoken several times today. KFM has higher offer from MLP that appears more certain because they spent more time in the data rooms. This is a fear I had from the light diligence we seem to do compared to strategics. Also, we should have stayed closer to Zach Lee of ARM, the managing partner of KFM, instead of just the other three parties. Mostly my fault, but also a weakness in our process of not getting Baran more involved.
Jim

On May 23, 2017, at 4:08 PM, Lapeyre, Pierre F. <pierre@riverstonellc.com> wrote:

How was AM meeting with Hal, today right ?

Pierre F. Lapeyre Jr.
Riverstone
O: 212.993.0093 ████████████
E: Pierre@riverstonellc.com
Sent from my iPhone

On May 23, 2017, at 1:58 PM, Jim Hackett <jimt@jimthackett.com> wrote:

Thanks. Will leave it to you two to handle the initial communication with John.

On 5/23/17, 12:54 PM, "Leuschen, David" <david@riverstonellc.com> wrote:

agree

Sent from my iPhone

On May 23, 2017, at 1:02 PM, Lapeyre, Pierre F.

<pierre@riverstonellc.com> wrote:

Completely agree.

But frankly without backlog build in proserv, from what I can tell JL

is right but we should certainly make every effort and try.

RIVERSTONE_SDTX00280408

I think FW can't wait either as without a kick save or dramatically

higher prices we are facing tough decisions in 6-9months. I frankly

think mat is doing a good job with what he has but more GOM eyes and

experience is only to all our benefit especially if post AM we have

"smart" capital available in the fund  to dig out with reduced risk of

loss.


Sent from my iPhone


On May 23, 2017, at 12:54 PM, Jim Hackett <jimt@jimthackett.com> wrote:


Hope the trip is going well.

Met with Sanjay and one of his oilfield service partner out of London

this morning.  Marcela (in London) consulted with one of the ProServ

bidders and knows the offshore space quite well.  His and my view of

the slow recovery and the actions to be taken by service companies in

this sector are fairly consistent.

McKinsey thinks we should insert li¹l¹ ol¹ me into ProServ, to force

the same action as the creditors would, in order to resurrect the

company.

They suggested this to John L. without confirming that you had asked

me to lead the War Room effort. He said the company was beyond help.

CONFIDENTIAL

RIVERSTONE_SDTX00280409

They also discussed Fieldwood, which is of course on better footing.

John mentioned he would think about getting my help thereŠwhich hasn¹t

occurred yet.

If you want me to work on on ProServ (before it¹s too late, in

McKinsey¹s words), one of you likely needs to tell John that I am

formally heading the War Room effort and you want us to jointly work

with David to launch a review and action plan. As you well know, it is

hard for a sitting CEO to switch from growth and diversification to

retrenchment and simplification.  Perhaps David Lamont is doing

everything he can, but if you want an independent view of that, we

should get after it quickly.

Fieldwood can wait, but likely shouldn¹t be much further behind. I

have a meeting with McKinsey on Fieldwood on Thursday.

Let me know your preference.

Jim


CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the

person or entity to which it is addressed and may contain confidential,

trade secret and/or privileged material. If you are not the intended

recipient of this information, do not review, retransmit, disclose,

disseminate, use, or take any action in reliance upon, this information.

If you received this transmission in error, please contact the sender and

destroy all printed copies and delete the material from all computers.

The information included in this email does not constitute and will not

give rise to any legally binding obligation nor may it be relied upon as

the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

RIVERSTONE_SDTX00280411