# PX 375

**final**

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

# Q4 2017 Earnings Call

## Company Participants

- Lance Weaver
- Harlan H. Chappelle
- Kevin Bourque
- Tim Turner

## Other Participants

- Irene Haas
- Sean M. Sneeden
- Timothy Rees
- John Nelson
- Ronald E. Mills

# MANAGEMENT DISCUSSION SECTION

## Operator

Good day and welcome to the Alta Mesa Resources Operations Update and 2018 Guidance Conference Call. All participants will be in listen-only mode. [Operator Instructions] After today's presentation, there will be an opportunity to ask questions. [Operator Instructions] Please note that today's event is being recorded.

I would now like to turn the conference over to Mr. Lance Weaver, Director of Investor Relations. Please go ahead.

## Lance Weaver

Thank you. Good morning and thank you for joining us today to discuss Alta Mesa Resources operations update and 2018 guidance, as well as our fourth quarter and full year 2017, financial and operational results for Alta Mesa Holdings.

Joining me on today's call will be our Chief Executive Officer, Hal Chappelle and Chief Financial Officer, Mike McCabe along with other senior management; Alta Mesa Resources' Executive Chairman; and Kingfisher Midstream Chief Operating Officer, James Hackett is also with us today.

Note that in conjunction with today's call, we've posted a slight deck to our website that we may be referencing. You can download the slides from the Investor Relations section of our website at altamesa.net.

I would like to remind everyone that today's discussions will contain forward-looking estimates and assumptions based on our current views and regional expectations, however, a number of factors could cause actual results to differ materially from what we talk about today. For a discussion of the risk and factors that could affect our future performance, please refer to Alta Mesa's Safe Harbor language contained in the company's Annual Report and Form 10-K.

With that, I'll turn the call over to our CEO, Hal Chappelle to provide a few opening comments before we begin Q&A.

Bloomberg

PLAINTIFFS_AMR_00001006

**Bloomberg Transcript**

**final**

Company Name: Alta Mesa Resources
Company Ticker: AMR US
Date: 2018-03-29
Event Description: Q4 2017 Earnings Call

Market Cap: 493.24
Current PX: 1.295
YTD Change($): +.295
YTD Change(%): +29.500

Bloomberg Estimates - EPS
Current Quarter: 0.070
Current Year: 0.123
Bloomberg Estimates - Sales
Current Quarter: 153.500
Current Year: 486.500

## Harlan H. Chappelle

Thank you, Lance, and good morning everyone and thanks for joining us today. I'd like to start by reviewing highlights from 2017 and then follow with some key messages of our 2018 program. 2017 and of course, early 2018 were literally transformational for Alta Mesa as we changed from a private upstream company to a publicly traded fully integrated midstream and upstream company.

During this time we fortified our balance sheet, further de-risked and delineated our Kingfisher County acreage and a began a larger scale development of our STACK assets in the normally pressured, naturally fractured oil window. We have accelerated infrastructure investments to further reduce both our capital and our operating expenses and support our growth. The continuous acreage position, we have assembled is one of the lowest cost, it is in one of the lowest cost and highest margin place in North America and we've grown reserves and production substantially since we began horizontal development in late 2012.

From a 40,000 acre position at that time which we had originally acquired in 1991 and 1992. Today, we have over 130,000 net acres in the play and in 2017 our STACK reserves increased almost 36% as we added over 50 million BOE of proved reserves, bringing our total reserves to over 176 million BOE. 2017 production increased to an average of approximately 20,600 BOE per day compared to approximately 13,100 BOE per day in 2016. As I said we de-risked and delineated the siliceous siltstone and carbonate Meramec and Osage section that occurs between the Woodford and Chester Shales across our Kingfisher County acreage, while conducting seven spacing tests over the last several years.

We have transitioned from spacing test to development patterns. As shown on the slide deck, we now have four multi-well patterns, with more than 60 days of flow back, and are systemically drilling, completing and bringing more multi-well patterns on production.

We continue to pursue improvements and optimizations, and now we pump our completions. There are a number of frac stages we use, the special distribution of well bores, and in the design of our artificial lift. Importantly, we continue to mature our concept of operations to reduce the time from spud, the first production and minimize shut-ins during onsite price.

Beyond drilling and completions, we're fanatical about oil and gas production operations. Blue collar, block and tackle work to optimize the production of a growing number of mature wells. A key aspect of this is design and application of the right type of artificial lift. I invite you to refer to the slide deck for a recent example of that improvement, in one of our DSUs, Section 19 of township, 19 North 6 West, where we've taken our East Tennessee #214 and #216 wells from a combined gross production of about 12 BOE per day, early in the fourth quarter to over 1,200 BOE per day today. A strong example of what is possible with methodical field management.

Let me also point out that we provided a separate slide deck on our website in addition to what Lance referred to and this summarizes a brief analysis of recent production from our wells, together with a fairly detailed set of EUR data. To address some consisting questions that arise from public data, we'll be pleased to follow up with any of you in more detail on this.

Our 2018 program is informed by integrated results generated in 2017 in really over the last five years. Our high return capital budget is expected to range between $725 million and $795 million and about 70% of that for upstream and about 30% of that from midstream. Our upstream investments will concentrate on the transition to of 75% to 80% multi-well pattern drilling and the balance of the drilling will be dedicated to holding new drilling and spacing units, including the development of our major county acreage and other horizons throughout our footprints such as the Oswego and the Manning.

On our Midstream investments, we expect 60% of those will be within our current footprint. About 40% of those are designated for expansion of the system to the West including into our major county acreage.

Turning now to the Midstream. Kingfisher Midstream or KFM is well conceived both in its physical design and its market interface. It's situated to serve growing production in the STACK. KFM is a vital element of Alta Mesa's operations providing right size, scalable gas gathering and processing. 2017 saw KFM establishing growth per third

PLAINTIFFS_AMR_00001007

**final**

Company Name: Alta Mesa Resources
Company Ticker: AMR US
Date: 2018-03-29
Event Description: Q4 2017 Earnings Call

Market Cap: 493.24
Current PX: 1.295
YTD Change($): +.295
YTD Change(%): +29.500

Bloomberg Estimates - EPS
 Current Quarter: 0.070
 Current Year: 0.123
Bloomberg Estimates - Sales
 Current Quarter: 153.500
 Current Year: 486.500

party business causing KFM to expand into Western Kingfisher in North, up into Garfield County. Acreage dedications and customer service combined with differentiated access to interstate markets are fundamental strengths of KFM.

Our 2018 outlook for KFM volumes and as a result earnings is lower than we had expected and forecasted in late 2017. As we've transitioned into management of KFM, we've gained a better understanding of timing for what we had believed will be near-term build out and gathering for certain customers, that today it appears to be several quarters longer than what we had expected. Most significantly, large third party producers have delayed drilling on dedicated acreage, and these customers have begun to shift their activity back to acreage we serve, again we believe that's only on order of six months' shift in completed wells into our system. As a result, we lowered our estimated EBIT for KFM to a range of $95 million to $110 million from previous estimates.

We've also reduced our CapEx program for KFM to a range of $175 million to $220 million with about as I indicated 40% of that targeting new business development opportunities. We've specifically reduced 2018 CapEx to match third party completion timing so that we can preserve the return on capital efficiencies and shifted our plans out on the third cryogenic train into 2019 from where originally it had been planned to begin in late 2018.

Importantly, we've up to 90 million cubic feet a day available on wet gas off-take agreements in addition to our existing 269 million cubic feet a day of operated plant capacity. So despite setbacks in late 2017 and early 2018, with regard to KMF, our vision for growth remain strong. We expect to expand gas gathering in West to serve customers in northern Blaine, northwest Kingfisher and central and western Major county. And we expect to materially expand oil gathering to serve this growing need in the STACK. We've moved more quickly than originally planned in the transition of KFM management and Jim will be announcing steps in the coming months that he's taken to build the strong management team for KFM. By doing so, we expect to both earn growing third-party business and to offer the market proven experienced leadership of what we plan will become an independent public company.

So summarizing our picture, we expect to deliver strong growth that will be reflected in EBITDA per debt-adjusted share, and this metric is the focus of our long-term compensation structure. Our capital budget is based on outstanding cash flow initially to achieve the right scale for the significant asset base that we have and we have a strong balance sheet that allows us to plan to manage at a leverage ratio of less than 1.5 and be in a position where we can generate free cash flow on – positive free cash flow in the fourth quarter of 2019. We believe our margins are going to continue to expand as we build up critical infrastructure and expand production on existing wells through artificial lift optimization and – again the fanatical focus on production operations generally.

In closing, 2017 to early 2018 has been a remarkable journey for Alta Mesa Resources. We've transitioned from a private company rich in assets, but with restricted financial capacity to a public company with a strong balance sheet to prosecute full development. We greatly appreciate all of you being on the call and all the investors who have placed their confidence in our people and in our assets.

With that, I'll turn the call over to the moderator and we invite questions from those on the call.

# Q&A

## Operator

Thank you. We'll now begin the question-and-answer session. [Operator Instructions] And our first question comes from Irene Haas of Imperial Capital. Please go ahead.

<A - Harlan H. Chappelle>: Good morning, Irene.

<Q - Irene Haas>: Good morning. So my question is, we're off to a little slower start both the upstream and midstream, and my question is, how should we kind of adjust the timing or timeline when Alta Mesa could be self-funding and also will this – are there sort of any impact on when Kingfisher might become public?

**Bloomberg Transcript**

Bloomberg

PLAINTIFFS_AMR_00001008

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

**<A - Harlan H. Chappelle>**: Those are really good questions and so, upstream and midstream have some differences; again, with the midstream company, a lot of things become evident today in the first quarter about decisions that others, the third-party customers have for how they deploy capital, maybe even in the fourth quarter of 2017 and early this quarter. So – but on the other hand, we have a lot more transparency and clearly we're in control of how we manage. And so on the upstream side, I would say that it – really if you look at where we are on a production basis, it's perhaps a two-month shift in the calendar; we're guiding to between 33,000 BOE and 38,000 BOE per day. I think our expectations peg the 38,000 barrel a day, 2018, but we see ourselves being there really in the first quarter – early first quarter next year, and possibly as early as this year, depending on well results and often just what working interest do we have in particular wells as well – which doesn't impact our net.

On the midstream side, Irene, it's a little longer timeframe as I indicated in the opening comments, and I would call it, perhaps, a six-month shift in the calendar, but the – all the – the vision remains the same and that would really suggest that we have to be very, very attuned to what the market is looking for from a midstream IPO. We need to perform, we need to execute on our business plan in the balance of this year and perhaps that IPO happens in 2019, for example. And so again, we're not in control of all those factors because the market is going to speak and have confidence in what we do on a timeframe that considers other factors.

Hopefully that helps with some of what you're saying. I guess the last question that you did have is the free cash flow. So, on an enterprise combined basis, we see ourselves being positive free cash flow in the fourth quarter of next year. It could occur earlier, depending on how we achieve certain production levels, where the commodity prices are, for example, but that's where we're targeting right now in terms of on an overall enterprise basis.

**<Q - Irene Haas>**: Great. This is really reassuring. And may I ask one follow-up question; it really has to do with your production cadence this year. How should expect that you step up during 2018 and that's all I have.

**<A - Harlan H. Chappelle>**: Yeah. It's a good question, Irene. We were between four and six rigs last year and I think for the greater part of the year we were at six rigs. We turned down to about five for a little bit in the fourth quarter and then brought back the six rigs in the first quarter, and we've got seven in the field right now. Kevin Bourque, our Operations VP is with me. When is the eighth rig scheduled to come?

**<A - Kevin Bourque>**: So eighth rig is under contract now, it's drilling for another operator; should be here towards the end of the month, May 1 is the deadline.

**<A - Harlan H. Chappelle>**: Okay. Very good. And so we'll be at eight. Right now we're planning that cadence at eight. We think that's a good fit to – as we manage within the leverage and we manage for free cash flow positive and still achieving the kind of upstream earnings that we think are consistent with where we need to be, but we could also go to a 9th and a 10th rig later in the year. One of the things that will help inform that, our first Major County well – the names of these sometimes are amusing; this is called the Flying Monkey and the Flying Monkey well, we are pressure stimulating that today, right? Right now, and so we'll be floating that back here afterwards, and that will give us some insights. There is a lot of other activity in the Major County that is encouraging to us.

And as we sort through and understand how people are completing wells, where they're landing them, and trying to assimilate all that data, and so it's possible that particularly later in the year that instead of just the – I think we have six or seven wells right now, specifically [ph] ASD 4 (00:17:39) Major County. We could increase that and that could be part of it. Certainly, any particular acquisitions of new acreage could also do that or even things like we've done in the past [ph] performance (00:17:55). But right now, it's that it's really focused on an eight-rig cadence with four frac spreads, on average, during the year.

**<Q - Irene Haas>**: Great. Thank you.

## Operator

Our next question comes from Sean Sneeden of Guggenheim. Please go ahead.

Bloomberg

PLAINTIFFS_AMR_00001009

**final**

**Company Name:** Alta Mesa Resources
**Company Ticker:** AMR US
**Date:** 2018-03-29
**Event Description:** Q4 2017 Earnings Call

**Market Cap:** 493.24
**Current PX:** 1.295
**YTD Change($):** +.295
**YTD Change(%):** +29.500

**Bloomberg Estimates - EPS**
**Current Quarter:** 0.070
**Current Year:** 0.123
**Bloomberg Estimates - Sales**
**Current Quarter:** 153.500
**Current Year:** 486.500

**Bloomberg Transcript**

**<A - Harlan H. Chappelle>:** Hi, Sean.

**<Q - Sean M. Sneeden>:** Hi. Good morning. Thanks for taking the call. I guess, Hal, for you, I appreciate the detail in the presentation you guys put out on your end reserves and kind of articulating some of the stuff around the type curve, what I am – I was curious about is on some of the economic assumptions. I think you guys were showing a 61% IRR on the well head; corporate is higher than that. Can you just walk us through some of the – what the assumptions are that you are using under both of those?

**<A - Harlan H. Chappelle>:** Absolutely. Actually, Tim Turner, who is our VP for Corporate Reserves and Planning, I'll invite him to address that.

**<A - Tim Turner>:** Hi, Sean. How are you this morning? So, the assumptions between those two are exactly the same except on the well side, we have $1.65 per mmbtu for a gathering and processing fee. On the corporate side, KFM, $0.20-$0.25 per mmbtu in terms of their actual processing expense and so when we take that amount out and look at our corporate basis, that's why the corporate is higher.

**<A - Harlan H. Chappelle>:** And Sean, one of the things that we – when we met with investors prior to becoming a public company, we indicated that we would continue to put best efforts into providing transparency between the upstream and the midstream enterprises, although our financials are reflected on a combined basis.

**<Q - Sean M. Sneeden>:** Got it. That makes sense. And I guess, I know it's an average for 2017, but you just explained there. I guess – so I think that still has – correct me if I'm wrong, but may have had some [indiscernible] (00:20:22) wells, Gen 1, if you will, I guess, how should we think – are the economic assumptions for your kind of the latest design if you want to call it the Gen 1.5 or whatever, how should we think about that going forward?

**<A - Harlan H. Chappelle>:** Yeah, we could certainly be a little bit easier on people when we call out our generations, but essentially what we've described is our Generation 2.5 is the norm for us, even though we are going to be testing tighter frac based spacing. And really what that is, remember, our completion is an open-hole plug-and-perf as opposed to a cemented liner with frac clusters. And the reason for that is just that, we found – and I think other operators are also finding that this the best practice in the [indiscernible] (00:21:14), normally pressured, naturally fractured window here. We have a solicitous limestone and dolomite section. And so what we're trying to do is to increase stimulated rock volume by tightening the spacing between the, if you will, packers on those joints.

And so, we're going to be testing 100-foot frac stage spacing. We know one other operator has done that on a very significant scale, that where they had, I think, 48 stages in about a 4,800-foot gross perforated interval and so we're going to be testing that ourselves. But in general it's the 32 – the 150-foot between frac stages would be 32 to 36 stages, depending on the length of the given lateral.

**<Q - Sean M. Sneeden>:** Okay. That's helpful. And then just on the guidance, I think you guys talked a little about the shift in your timing and what have you, but can you just help us understand maybe how much of your budget this year, at least on the upstream side is allocated for testing versus kind of just your regular way, your kind of Gen 2.5 well completion design?

**<A - Harlan H. Chappelle>:** Yeah. It's fairly modest. Right now we have specifically five, we're ready to go to 10 wells of a probably 170 to 180 wells that we have drilled this year; and depending on what we see – and you appreciate that you have to go through the timeframe, get the empirical data; we may see ourselves doing more of that later in the year, but right now, it's 5 to 10 of the wells where we're testing that particular aspect.

Sean, I don't want to lose the opportunity to make the point that that's only one part of what we are trying to optimize within these multi-well patterns because we've also been working on lowering some of our pump rates in these multi-well patterns and we're seeing some very early, but very positive effects of doing just that. And then there's [ph] asset and profit (00:23:50) also going on with that. Actually I just – I said it wrong, it's not the pump rate, it's a pump volume. The rate is important to induce the frac, the volume is what we have to monitor.

Finally, Sean your question, I just want to make the point; about 75% perhaps 80% of our drilling is going to be multi-well patterns.

Bloomberg

PLAINTIFFS_AMR_00001010

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

**final**

**<Q - Sean M. Sneeden>**: Okay. That's very helpful. And then if you don't mind, just two housekeeping questions; just on the kind of free cash flow neutrality or kind of free cash flow positive; I think you mentioned Q4 2019 for the whole enterprise, is that same timing that we should think about for the upstream side, or is that a different kind of timeframe?

**<A - Kevin Bourque>**: Yeah, upstream is probably going to be a little bit earlier than midstream given where we are right now, but they won't lag very much.

**<A - Harlan H. Chappelle>**: Generally it's the same.

**<Q - Sean M. Sneeden>**: Okay. That's helpful. And then just on the KFM side, I guess, how should we think about third-party revenue mix progression this year and then can you also just remind me, are you guys going to be – going forward you're going to be reporting KFM separately in financials, or are they going to be combined?

**<A - Tim Turner>**: So, on the SEC filing it will be combined and consolidated, but we will break out the consolidating financial statement separately. So, on our website, you'll get separate consolidating KFM financials and Alta Mesa Holding financials.

**<Q - Sean M. Sneeden>**: Okay. And just around it, does KFM guarantee the bonds at this point?

**<A - Tim Turner>**: No, those are just as... [indiscernible] (00:25:30)

**<Q - Sean M. Sneeden>**: Okay got it. Thank you very much.

## Operator

Our next question comes from Timothy Rees of Cowen. Please go ahead.

**<A - Harlan H. Chappelle>**: Hi, Timothy.

**<Q - Timothy Rees>**: Hey, guys. How are you doing?

**<A - Harlan H. Chappelle>**: Doing well.

**<Q - Timothy Rees>**: Just – well, thanks for the reserve discussion deck, you touched on it briefly in the prepared remarks, but could you just elaborate a little bit on Alta Mesa, how you guys are different; I think there were a lot of fears in 4Q just around other SCOOP STACK operators lowering type curves you guys have maintained and just want to understand the purpose of the deck and maybe have you elaborate on that little bit; could be helpful.

**<A - Harlan H. Chappelle>**: Yeah. Let me again turn this over to Tim Turner on the purpose of the deck and – but before doing that, I'll just make a couple of points; we are solely – all of our acreage is in the normally pressured window. We've been doing this for five years, we've gone through four generations of well design, we have 250-plus wells, so it's a fairly mature approach where we're now optimizing from things that are consistently working.

And so, early on we tried and attempted different types of completions and we also benefited from other operators who are just a little bit ahead of us on some of that, and assimilated with what they did, and we made that choice for an open-hole plug-and-perf, that's a big deal, because we've got a naturally fractured reservoir here where our job with the frac job is to connect fractures that are already there and create fractures – in other words, connect them with the fractures we create, providing pathways to flow and it's very inefficient in our view to cement those liners in this particular area.

We have focused our drilling going where we have the thicker section that's referred to as the Osage, and that's the differentiator as well, Tim, in that, that Osage is thicker in our part of the play and we've seen others in the STACK as you go the West start to not just identify as a target, but access as the target as well to the south and north. And so that's a bit of a differentiator in terms of what we're targeting. The Osage has slightly less siltstone. It's, I think, every bit salacious than the Meramec, and so those are keys.

**Bloomberg Transcript**

**Bloomberg**

PLAINTIFFS_AMR_00001011

**final**

| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

I guess the other thing is that our approach is one where we integrate and focus on where do we land that lateral, we want to get it where we have the best rock properties and the best reservoir properties and then we do the type of completion that I talked about. Tim, do you want to talk about anything I may have missed, but also the reason behind this analysis and you know...

<A - Tim Turner>: Yeah, I'll take it from the reserve side; I think [indiscernible] (00:28:54) discipline upfront in terms of the way we've stepped forward. You know, six years ago when we started, we were really looking for about 150,000-barrel wells and as we got into this, we left the rock [ph] type curves (00:29:13) – you have to have a statistically relevant dataset before you can think about even building a type curve. I think that's one of the things that differentiated us and as we step through this process, we actually relook at our tight curve with every quarterly reserve review that we do.

And we've made some great wells. When you start making some 300,000 to 400,000-barrel wells, you start thinking, well, we could up the type curve, but that's really statistically not the way it works.

So, I think we are trying to be truthful to ourselves and truthful to the public on what we are seeing; we also – we quote our reserves based – it's really not a type curve as much as it is our mean well with the 146 wells we currently have in our distribution. And because of that, we are not correcting up or normalizing up to 5,000 feet or 10,000 feet. We use exactly what each well is making in the distribution. Knowing that as you drill – as you might drill, 4,800 feet or you might drill a 4,500 feet but on average this is what we're doing.

<Q - Timothy Rees>: Great. And then just thinking about the rig ramp, how rigs should we think about exiting 2018 and then, I guess, more importantly, into 2019?

<A - Harlan H. Chappelle>: Yeah, I think at this point that we should consider the 2018 program as 8 to 10 rigs. We could exit with 10 rigs, but really the average is 8 rigs for the year, and we see next year as a 10- to 12-rig program and the bandwidth on that, while seemingly fairly tight, really reflect cash flow management and staying within leverage, as well as what the opportunities are there; and frankly also the optimizations that we continue to seek as we go through this process.

Yeah. I used to say we're in the first – the bottom and the – top of the first, given how much is ahead of us. I'd say, we're probably in the second inning now and so, now we're getting our stride on starting this development, but we still have much to learn every time we go out and drill and develop the issue.

<Q - Timothy Rees>: Thanks. Just a last one; just on the – can you touch on the midstream opportunity set in regards to new customers and how you see development plans on the system heading into 2019, given the update this morning from what you were forecasting just three months ago?

<A - Harlan H. Chappelle>: Yeah. It's – and yeah, I appreciate that. I guess, as we've gone into the first quarter, it's really become evident that there were compounding effects of delays in business development, and very importantly, third-party drilling; and much of that is just controlled by the people on the other side of the table, if you will. But the opportunity set is still very strong. We've got a good amount of dedicated acreage and I think KFM, it was originally designed and can see with fundamentals that are hard to overcome from a competitive standpoint, efficient processing, right-sized gathering for a full-scale development, and then access to interstate gas markets that's financially assured through a very good portfolio of FT on big pipes.

And so, with those fundamental strengths, we see increasing activity in Major County, Northern Blaine, different concepts than down in the areas where it's steeper and more over-pressured, but still as you go to the West, you see gassier wells and good wells there in that area – kind of at the intersection of Blaine, Dewey and Major. So, that's an area where we see opportunities. We also see opportunities in Garfield County and growingly in Kingfisher County, with existing customers and also customers that we seek to deepen our relationships with. While I want to go into all the details, I know that at least in one case, we have a very valuable relationship with another producer who made some choices to make some land acquisitions that affected the timing of its drilling. And so, that directly affected the ability of KFM to – or the timing of KFM if you will to then serve that particular customer with its drilling at that particular time.

Bloomberg

PLAINTIFFS_AMR_00001012

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

final

**<Q - Timothy Rees>:** Great. Thanks a lot for taking my questions, guys.

**<A - Harlan H. Chappelle>:** Thank you.

## Operator

Our next question comes from John Nelson of Goldman Sachs. Please go ahead.

**<A - Harlan H. Chappelle>:** Good morning, John.

**<Q - John Nelson>:** Good morning and thank you for taking my questions. I apologize, I thought this is a little bit remedial that I think a number of investors are still kind of in the, the getting to know you phase, call it. So I just want to make sure, we're kind of all in the same page.

So to start, just be clear, the type curve you're staying at 650 MBOE, consistent with where your Gen 2 was before, but if I think I heard you correctly, your CapEx is still going to be based on the Gen 2.5. So, should we kind of interpret that as there's some conservatism or kind of upside to your production because you're investing a Gen 2.5 that used to be 700 MBOE or is that Gen 5 now – or Gen 2.5 now with 650 MBOE? Sorry trying to clarify what...

**<A - Harlan H. Chappelle>:** Tim, do you want to go ahead with – let me – you talk about the 650 MBOE and remember...

**<A - Tim Turner>:** Right, right. So...

**<A - Harlan H. Chappelle>:** ...three phase, [indiscernible] (00:35:40) collateral.

**<A - Tim Turner>:** So, going back to early in the process, in 2017, our Gen 2.0 was about 250 MBOE. What we call Gen 2.5 was very new and we were seeing numbers quite a bit higher than that, but because of not having enough statistical data, we guided back to the Gen 2. Over that time, and we published the numbers there, but Gen 2 and 250 MBOE is more like 248 MBOE. Gen 2.5 is up – I can't remember, it's around 260 MBOE, so there is an incremental value there, but we blended the two together. So we're staying around 250 MBOE even though the average is a little bit higher than that, but we're staying around that number for now. And then as Hal mentioned, I guess, I don't want to bring up Gen 3.0, but we are going to test some additional stages to look at incremental volumes again.

**<Q - John Nelson>:** All right.

**<A - Harlan H. Chappelle>:** So I think the bottom line here, John, is that, the type curve that we think is appropriate is the 250,000 oil barrel, 650,000 Boe, based on three phase in ethane rejection. In other words, we're not counting any ethane barrels there and at this point, the $3.8 million drill and complete costs. Yeah and on delivered well cost. And do you want to – Kevin, do you want to at least about well cost that – the inflation that we've dealt with and then where – and where we see – what are the strengths and the opportunities when it comes to capital cost?

**<A - Kevin Bourque>:** Certainly, we've tried to mitigate most of the price increase that everyone else is subject to in the market with the performance gains that we had as we go. A big chunk of being able to manage that cost this year will be moving into the development mode where we get multiple wells on the same pad. Those subsequent wells actually experienced a significant cost saving to a single well where you have rig moves in and out, physical location build out, pipeline tie-ins, all of those types of things become a more shared cost.

So, along with the performance increase that we see on the drill bit, so the first well intersection could take – for us, it's an average of 14 days. Multi-well pads drop down to the 10- and 12-day range for the subsequent wells, once we have a strong definition of structure that's in that specific area where we're going. So we believe, we'll be able to control these costs. There is a built-in – call it a built-in hedge against the inflation with the performance gains that we think will still be there. So, that's the main thing going forward and then as always, we're trying to continue to optimize that process and apply new technologies as they come out. There is a lot being done in the frac world for multi-stages, for sleeves, for

Bloomberg Transcript

Bloomberg

PLAINTIFFS_AMR_00001013

**final**

Company Name: Alta Mesa Resources
Company Ticker: AMR US
Date: 2018-03-29
Event Description: Q4 2017 Earnings Call

Market Cap: 493.24
Current PX: 1.295
YTD Change($): +.295
YTD Change(%): +29.500

Bloomberg Estimates - EPS
  Current Quarter: 0.070
  Current Year: 0.123
Bloomberg Estimates - Sales
  Current Quarter: 153.500
  Current Year: 486.500

[indiscernible] (00:38:52), for dissolvable frac balls, all of those things we're looking for, along with all the other operators. So it's a challenge and a goal for everybody in the industry.

**<A - Harlan H. Chappelle>**: John, I know we provide you more answers than you asked questions, but it's...

**<Q - John Nelson>**: No. It's great. We appreciate it.

**<A - Harlan H. Chappelle>**: It's a lot of focus for us and the cost increases that we and all – everybody else is sort of – has to endure and work through are clearly there. It's a sign of some good things obviously that the area is very active. We also see as more and more competition in the frac side of things that there may be some opportunities in the market in the future to see some reductions in the cost, but we can't count on those at this moment.

**<Q - John Nelson>**: And just to be clear that $3.8 million is what you are currently experiencing or have you guys kind of proactively built in any cost inflation buffer over the course of the...

**<A - Harlan H. Chappelle>**: No. That's the AFP that we are using today.

**<Q - John Nelson>**: That ties with $550 million to the $580 million CapEx?

**<A - Harlan H. Chappelle>**: Yes, sir.

**<Q - John Nelson>**: Perfect.

**<A - Harlan H. Chappelle>**: And it also assumes or reflects rather the infrastructure investments that we've made to reduce specifically our fresh water supply costs in some of the areas that were outside of our legacy footprint. So it's kind of a – it's clearly a basket of things that allows us to get to a number like that recognizing that there is so many pressures on costs that it would be – it's not surprising to see maybe some other AFPs from the outside that are higher than that.

**<Q - John Nelson>**: Great. And then just the second I guess almost third now question. How should we think about oil mix of the 33 MBOE to 38 MBOE a day of production?

**<A - Harlan H. Chappelle>**: Yeah. So that's real, I was when I was saying – when you said that I think we put in our deck that our Q4 production mix was about 55% oil about, about what 18% of NPL in that mix is that fairly constant from the way that we forecast that [indiscernible] (00:41:25).

**<Q - John Nelson>**: Okay.

**<A - Harlan H. Chappelle>**: And I would also remind you that on our website from some of the material provided investors in the past, we've split out type curves of oil, gas and water. Because the U.S. the question correctly, it's oil mix, not GORI. Individual well GOR's, you know, cumulate into the amount of gas that an operator ends up producing. And so we just wanted to – I just want to make that point that our wells produce more oil, early in their life as the GOR climbs to about 10 on average over the life of the well.

**<Q - John Nelson>**: [indiscernible] (00:42:13) about that 55% holding kind of pretty steady in 2018.

**<A - Harlan H. Chappelle>**: That – yeah, on a total basis that's consisting, yes, sir.

**<Q - John Nelson>**: Perfect, thank you all so much.

**<A - Harlan H. Chappelle>**: Thanks, John.

**<A>**: Oh, yeah.

## Operator

Our next question comes from Ron Mills of Johnson Rice. Please go ahead.

PLAINTIFFS_AMR_00001014

**final**

**Bloomberg Transcript**

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

**<A - Harlan H. Chappelle>**: Hi, Ron.

**<Q - Ronald E. Mills>**: Hi, thanks for all the information. A couple of questions. So in terms of the infill pilots, does that you've provided in your presentation, most are in the central area. Is that something you plan to expand to particularly the southern area, where you drilled more wells or is there a particular reason why they are concentrated in the central portion?

**<A - Harlan H. Chappelle>**: So, great question. In the central area, that was our legacy area. In fact, if you look at that other slide deck where Tim shows all the wells that are in the distribution that Ryder Scott – [indiscernible] (00:43:18) Ryder Scott audited at the end of the year. There was I think half of those wells are in the central area, because they have the longest life. So, if that legacy area was dominated by – is dominated by more of legacy infrastructure, and so it's closer to the fresh water sources. And so, that was where we sort of biased a lot of our early activity both in pattern test and then – and is now in the first development phases. So, with that background Ron, we're now drilling multi-well patterns in the south, and then we have plans in the very northern area of Kingfisher County in 196. Does it also go into 195?

**<A - Kevin Bourque>**: We're working this year to be drilling all – north south all the way through the footprint ...

**<A - Harlan H. Chappelle>**: Right.

**<A - Kevin Bourque>**: ...with multi-well pattern.

**<A - Harlan H. Chappelle>**: Right.

**<A - Kevin Bourque>**: And it'll start in the south, because that's where the regulatory work was initially finished. We're working on the regulatory work for the north side for the increased density decision. So, once we get those, we'll move up to that area.

**<A - Harlan H. Chappelle>**: So [indiscernible] (00:44:24) regulatory work at the Oklahoma Corporation Commission...

**<A - Kevin Bourque>**: Right.

**<A - Harlan H. Chappelle>**: ...that whole process that -

**<A - Kevin Bourque>**: It takes around – it's a 90 day-ish cycle with the Oklahoma Corporation Commission to get those things finished.

**<A - Harlan H. Chappelle>**: And have really taken a long time to answer a simple question, Ron, I apologize for that, it is a...

**<A - Kevin Bourque>**: We'll do both.

**<A - Harlan H. Chappelle>**: Exactly, we're going to be in the south more so now, more so early in the north later in the year. Correct. Yeah.

**<Q - Ronald E. Mills>**: Okay. Great. And then, ls it relates to the – that your comments on the slide on the production optimization you show that well, there were – it's almost up a 100x in terms of where it was prior to redesigning the lift. I guess a two-part question. How many wells or more some of legacy wells are, is this applicable in and how is that managed in terms of within your capital budget and your expectation of the growth in your production?

**<A - Harlan H. Chappelle>**: Ron, that's really a great question. So, we have about 135 wells today that are over a year or in other words, they're having a year of production. And each of those is monitored and managed by a designated, we call the artificial lifting, and literally put together some very experienced seasoned folks from both service company and major oil companies who are experts in artificial lift and they've built out that team.

Anticipating several hundred wells and growing to maybe several thousand wells over time, so one answer is every single well will have to be, we have to change the lift method in sometime in its life, but today starting with these two



PLAINTIFFS_AMR_00001015

| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

wells that happened to be, there's two wells, the one that we show you there, which I think is East Tennessee #216, which is over 700 barrels a day I believe.

**<A - Kevin Bourque>**: Right.

**<A - Harlan H. Chappelle>**: And it's been there for a couple weeks maybe and going on for over four, five weeks right. And we'll tell you that story real quick and then the #214 in the same BSU, it's not very far away and that's over 500 barrels a day today. Okay. So today, we have a list of about 83 wells that are candidates in some way or another for optimization of lift. And sometimes that lift is very simple like [indiscernible] (00:47:04) and in some cases, it's in ESP such as the #216. We only have – how many ESPs do we have in the field today right now?

**<A - Kevin Bourque>**: I think just on the horizontal, it's just two.

**<A - Harlan H. Chappelle>**: Just the two. And then – and we have probably 8 to 10 more that we might do...

**<A - Kevin Bourque>**: We have 10 more that we have ASEs out that we've already worked up the plans and procedures to go forward on. There is probably another 10 to 12 that we expect that will follow up behind that.

**<A - Harlan H. Chappelle>**: And so Ron, this is something we wanted to highlight today and be accountable to you guys for managing that because what we see that the main thing that proper artificial lift does is that it actually it accelerates the recovery of that oil and possibly increases the EUR because of the economics as a result of that.

We only have some early indications here, but we do have basic principles that applied for decades in our industry here, and so this is just normal operations, we're just now at that point where we're seeing this. These particular two wells that we referred to are – the decisions we made there were actually informed by geophysical data because we have 3D survey here that gave us insight into why we had more water production in that very localized area. And so what we're trying to do is lower bottom-hole pressure and those ESPs were the perfect application in that particular area.

The East Tennessee #214 actually was either a Generation of 1 or Generation 1. – Generation 1 well that we for frankly in previous discussions with investors, we would point to that well and say that was one of the things that didn't work. That was a well that we – when we did our tracer surveys, we found that we only had like six stages that actually got any kind of prop. We didn't know how good the stimulation was and so today, we're kind of internally high-fiving over this one and we think it's notable enough to make the point that we do have these kind of opportunities. We and other operators – as I talk to other folks leading their companies and they all acknowledge this and in a mature play, artificial lift focus is going to take us on our stage with a lot of folks.

**<Q - Ronald E. Mills>**: Okay. And then one last one on the supplemental reserve presentation you show production and sales analysis with different operational impacts and the fraction and obviously is growing. How do you factor that in going forward as you and more operators move to until development and what – I guess I'm just trying to get a sense as to how that's factored into your outlook?

**<A - Harlan H. Chappelle>**: It is the compensation and in fact as we – that we have as we became a public company, we – and completely focused on just the Oklahoma, we actually set up a different team and operational leadership structure around that dilemma if you will and issue. And Kevin, you want to kind of address how we think about that?

**<A - Kevin Bourque>**: Sure. I was going to say our production guidance for 2018 takes into the – it takes into account that offset activity based on the knowledge for the multiple years we've been doing the operations. So we have offset shut-ins. We have the timing built-in for all of that, the rig schedule, that's again a great part of the optimization of the 2018 and 2019 drill plans is to reduce that effect. That's how we're able to have a lower CapEx with an almost equal EBITDA to some of the other projections that we've done. It really is a core focus of what we do for the new well delivery and then continuing to keep the old wells online up in the right artificial lift on. So...

**<A>**: Yeah.

**<A - Kevin Bourque>**: ...it is built into the way that we forecast.

Bloomberg

PLAINTIFFS_AMR_00001016

| | | |
|---|---|---|
| Company Name: Alta Mesa Resources | Market Cap: 493.24 | Bloomberg Estimates - EPS |
| Company Ticker: AMR US | Current PX: 1.295 | Current Quarter: 0.070 |
| Date: 2018-03-29 | YTD Change($): +.295 | Current Year: 0.123 |
| Event Description: Q4 2017 Earnings Call | YTD Change(%): +29.500 | Bloomberg Estimates - Sales |
| | | Current Quarter: 153.500 |
| | | Current Year: 486.500 |

**<A - Harlan H. Chappelle>:** But Ron, I think that – hopefully we're providing you this data, we're at least still giving you enough sense of what actually does impact individual wells and why we do or do not believe in that particular case with that given well that it belongs in the distribution of outcomes because of the relevance of the data.

We certainly have poor – or poorer wells in the distribution of outcomes, that's how you get an average, right. But I would also point to on that page of exceptions there are wells that actually have higher EURs than our type curve, we just wanted to be consistent in this with the reasons. For example, we excluded all of our Generation 101.5 wells from the distribution as an example.

**<Q - Ronald E. Mills>:** Thanks everybody.

**<A - Harlan H. Chappelle>:** And the two wells that I just described you in the Northern DSUs East Tennessee #214 and #216 are actually accepted wells because as of year-end 2017, they have these specific characteristics that we had not come to grips with and understood well enough and today, we think we've got – we would include those probably in the distribution if our third-party auditor agreed with us.

**<Q - Ronald E. Mills>:** Well, thank you for the color.

**<A - Harlan H. Chappelle>:** Thank you, sir.

## Operator

Our next question comes from [ph] Zack Bancroft of DRC (00:52:57). Please go ahead.

**<Q>:** Hey, good morning, guys.

**<A - Harlan H. Chappelle>:** Good morning, [ph] Zack (00:53:04).

**<Q>:** So you guys, at end of the year last year, you gave us some pretty aggressive 2019 guidance. We had some timing issues here. I guess, if you can kind of give us some color as to if that is still achievable and the cadence in which you're ramping potentially the 10 rigs exit this year, 10 rigs to 12 rigs next year?

**<A - Harlan H. Chappelle>:** Right.

**<Q>:** If that is still something that you guys see achievable?

**<A - Harlan H. Chappelle>:** Yeah, we do [ph] Zack (00:53:29). And as we look towards – so first, the – what we wanted to keep as context for our plans for 2018, frankly all the way into 2020 because we think of this in a three-year timeframe is managing to free cash flow by the end of next year and staying within a rational and prudent leverage ratio. And so, that informs the way that we look at rig ramp. And so, 2019 we think it's going to look a lot like what we described when we talked with investors last year and obviously, it's subject to so many things that could change positive or negative. But our outlook for 2019 is reasonably within the same window as what we've talked about before.

And on the upstream side, again going back to perhaps less of an impact from timing of our transaction, the balance sheet that we have today versus what we didn't have in fourth quarter and maybe some of those effects, those are fairly modest measured in a couple of months. On the midstream, with less in our control and things that become more evident now in the first quarter really become evident. That's probably more pushed out, but still we do see 2019 as the time of some significant growth, 2018 and 2019 significant growth on the midstream side and we think a very strong midstream enterprise as we go into next year one that is going to have a very much similar attraction to the public markets assuming that the midstream IPO perhaps MLP perhaps C corp model still one that is as the one that the market really embraces and looks more.

**<Q>:** Okay. Great. And then can you just talk about your hedging and how you see that going forward and if there is an optimal percentage of your production that you would like to hedge and if you're adding the hedges now in 2018 and 2019?

Bloomberg

PLAINTIFFS_AMR_00001017

Company Name: Alta Mesa Resources
Company Ticker: AMR US
Date: 2018-03-29
Event Description: Q4 2017 Earnings Call

Market Cap: 493.24
Current PX: 1.295
YTD Change($): +.295
YTD Change(%): +29.500

Bloomberg Estimates - EPS
Current Quarter: 0.070
Current Year: 0.123
Bloomberg Estimates - Sales
Current Quarter: 153.500
Current Year: 486.500

**<A - Harlan H. Chappelle>**: Yeah. It's been a tough couple of years to hedge because of the fundamentals there didn't weigh in favor of what's the curve has been in backwardation right and so that's been tough and in fact, we made decisions last year not knowing where we would be this year but out of prudence to hedge about 50% of our oil production – and about 60%, I'm sorry, of our oil production for 2018.

Now first half of the year was where we initially focused and those we've got a lot of that volume hedged in the low 50s. As we go into the second half we've got a lot of spreads that give us price protection on the downside, but really don't kick-in in terms of upside constraints until later in the year. So, we like that 50% to 60% range hedged. But we really need to listen to market experts and exercise prudence to try to protect or downsize as much as possible, while not constraining our upside. And we do that by putting on spreads and then managing that position actively over time. That's on the oil side.

On the gas side, we hedge two things; basis and the underlying. And the gas market is a tough one and so we've tried to be very thoughtful about it. And again, we've hedged fairly significantly there as well. The basis – Panhandle Basis is a good Mid-Con proxy and so we have been hedging our basis. This year I think we've got about third of our gas hedged. And as we go into next year, we're just looking for opportunities frankly, because it's a tough gas market out there.

**<Q>**: Great. Thanks guys. Best of luck.

**<A - Harlan H. Chappelle>**: Thank you.

## Operator

This concludes our question-and-answer session. I would like to turn the conference back over to Hal Chappelle, CEO for any closing remarks.

## Harlan H. Chappelle

Well, I'm greatly appreciative of everybody being on the call. We as a group of upstream and midstream professionals have invested in this company. We rolled all of our equity in the company that we have had, Alta Mesa into this enterprise because we believe in the future, both of the upstream and importantly also in the midstream, and so we are confident what that picture is going to look like.

We appreciate you being on the call and I just want to make sure everybody understands, we're available to respond to more questions if you will on things such as this production analysis because we want to make sure that we can provide you relevant information in a timely manner.

Again, thank you very much and I look forward to the next call.

## Operator

The conference has now concluded. Thank you for attending today's presentation. You may now disconnect.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

PLAINTIFFS_AMR_00001018

**final**

**Bloomberg Transcript**

**Bloomberg**

Company Name: Alta Mesa Resources
Company Ticker: AMR US
Date: 2018-03-29
Event Description: Q4 2017 Earnings Call

Market Cap: 493.24
Current PX: 1.295
YTD Change($): +.295
YTD Change(%): +29.500

Bloomberg Estimates - EPS
  Current Quarter: 0.070
  Current Year: 0.123
Bloomberg Estimates - Sales
  Current Quarter: 153.500
  Current Year: 486.500

© COPYRIGHT 2019, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

PLAINTIFFS_AMR_00001019

# PX 376

| From: | Jim Hackett <jhackett@AltaMesa.net> |
|---|---|
| Sent: | Sun, 8 Apr 2018 15:41:30 +0000 (UTC) |
| To: | Jeff Tepper <jeff.tepper1@gmail.com> |
| Cc: | Donald Sinclair <donrs@donrs.com> |
| Subject: | Re: Telephonic Meeting - Nominating and Governance Committee |

Jeff,

I'll take your lead on what to say and when.

We primarily need affirmation of whether Sylvia is a good candidate for our Board, and whether we would consider replacing Bill with her. Then we need to decide what procedures we would recommend for further interviews of Sylvia by the Committee or Board. I have already put Don Sinclair in touch with her, since he offered to meet her on behalf of yours and his Committee. Hal, Mike Ellis, and I have met and endorse her. If the Committee endorses Sylvia, and the plan on Bill, then I will ask the Org and Comp Committee to have an email or phone exchange to decide what Bill G. should retain from his Board compensation thru the annual meeting in June. I believe his stock is vested already, which I wanted in the Board comp plan design, partly for this purpose. If so, we will need to simply decide on how much of his retainer is paid.

Then I will ask the other members of the Board, privately, whether they will endorse the recommendations from the two Committees, before approaching Bill.

You or Don Sinclair can tell me if you want anything different to happen on our call tomorrow.

Thanks,

Jim

**From:** Jeff Tepper <jeff.tepper1@gmail.com>
**Date:** Sunday, April 8, 2018 at 7:19 AM
**To:** Don Dimitrievich <don.dimitrievich@hpspartners.com>, Don Sinclair <donrs@donrs.com>, Diana Walters <dwalters@thepavillionfarm.com>, Jim Hackett <jhackett@AltaMesa.net>
**Cc:** Cindy Ng <cindy.ng@hpspartners.com>
**Subject:** Re: Telephonic Meeting - Nominating and Governance Committee

Great. 930am EST tomorrow (Monday) it is.

Dial in: ▮▮▮▮▮▮▮▮▮▮

I will also distribute a calendar invite.

Look forward to speaking,

Jeff

On Apr 7, 2018, at 9:16 PM, Don Dimitrievich <Don.Dimitrievich@hpspartners.com> wrote:

I can do suggested times on Monday arnafter 4pmCT on Tuesday.  Don

Don Dimitrievich
Managing Director
HPS Investment Partners, LLC

CONFIDENTIAL

T: 212-287-5574 (New York Office)
T: 713-650-4991 (Houston Office)
■■■■■■■
E: don.dimitrievich@hpspartners.com

**From:** Don Sinclair <donrs@donrs.com>
**Sent:** Saturday, April 7, 2018 7:08:39 PM
**To:** Jeffrey Tepper
**Cc:** Don Dimitrievich; Diana Walters; Jim Hackett
**Subject:** Re: Telephonic Meeting - Nominating and Governance Committee

Jeff,

Either work for me.

DRS
On Apr 7, 2018, at 6:05 PM, Jeffrey Tepper <jeff.tepper1@gmail.com> wrote:

Hope everyone is having a good weekend.

I am recirculating this email to get a time on the calendar early next week for a call. Jim is available Monday before 10 am central or after 130 central on Tuesday. Do either of those time slots work for everyone else?

Thanks!

Sent from my iPhone
Begin forwarded message:

**From:** Jeffrey Tepper <jeff.tepper1@gmail.com>
**Date:** April 5, 2018 at 5:32:09 PM EDT
**To:** Don Dimitrievich <don.dimitrievich@hpspartners.com>, Donald Sinclair <donrs@donrs.com>, Diana
Walters <dwalters@thepavillionfarm.com>
**Cc:** Jim Hackett <jhackett@AltaMesa.net>
**Subject: Telephonic Meeting - Nominating and Governance Committee**

Hi all -

Please let me know your potential availability tomorrow for a phone call.

We would like to discuss a potential new Board member (bio below)

Lmk everyone's schedules and I'll coordinate a dial-in.

Thank you and have a good evening.

Best,

Jeff

SYLVIA J. KERRIGAN

Sylvia J. Kerrigan is an energy sector veteran named a Top Ten Exploration and Production Executive in 2017 by the Houston Business Journal.

She is the Executive Director of the Kay Baily Hutchison Center for Energy, Law and Business at the University of Texas.

CONFIDENTIAL

Ms. Kerrigan currently serves on the Board of Directors for Team, Inc., where she sits on the Executive, Audit & Finance and Corporate
Governance & Nominating Committees.  She is also a member of the Board of Directors for Nine Point Energy, where she chairs the Audit Committee and serves on the Compensation Committee.

Ms. Kerrigan retired from her role as Executive Vice President, General Counsel and Corporate Secretary at Marathon Oil Corporation (Marathon) earlier this year.  While at Marathon, she sat on the Executive Committee and was responsible for
regulatory matters, public policy, legal functions and media relations. A trusted advisor to Marathon's board of directors, she was involved in corporate strategy, cybersecurity, governance, compliance and risk alignment on both a committee and board-wide basis.

In addition to Marathon, Ms. Kerrigan's experience includes an appointment to the United Nations Security Council's Commission d'Indemnisation in Geneva, Switzerland, where she led an interdisciplinary team responsible for evaluating losses sustained by international companies operating in the Middle East.  In private practice, she worked with construction, transportation, manufacturing and energy clients on complex international, commercial and insurance matters. Ms. Kerrigan clerked for the Texas Supreme Court during law school.  She was recently named the 2017 recipient of the Ernest E. Smith Lifetime Achievement Award, in recognition of her contributions to the energy industry.

Ms. Kerrigan has also served on the board of directors for public policy organizations such as the American Leadership Forum, the American Petroleum Institute General Committee(Chair), and the United Way Law Initiative (Co-Chair). Ms. Kerrigan graduated from Southwestern University and the University of Texas School of Law. She currently serves on boards at both institutions, and is Vice Chair of Southwestern's Academic Affairs Committee.  She is a dual citizen of the United States and Brazil.

Highbridge Principal Strategies, LLC has been renamed to HPS Investment Partners, LLC. Please note, my email address has changed to don.dimitrievich@hpspartners.com

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information. If you are not the intended recipient you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.

# PX 377

Message

| | |
|---|---|
| **From**: | Jeff Hostettler [jeff.hostettler@hpspartners.com] |
| **Sent**: | 5/14/2018 12:19:07 PM |
| **To**: | Don Dimitrievich [don.dimitrievich@hpspartners.com] |
| **Subject**: | Re: Earnings Call and 10-Q |

Saw the press release this morning on the lack of 10-Q. Pretty disappointing. Not sure if our CFO or BDO is most accountable, but obviously something needs to change on this front. We had issues with the presentation of pro forma materials in the proxy as well, during which BDO deviated from the approach recommended by one of the big 4 (I believe PWC if I recall correctly).

**From:** Don Dimitrievich
**Sent:** Monday, May 14, 2018 1:14:33 PM
**To:** Jeff Hostettler; Catherine Cusimano; Harrison Breaud
**Subject:** Fwd: Earnings Call and 10-Q

Get Outlook for iOS

**From:** Jim Hackett <jhackett@AltaMesa.net>
**Sent:** Monday, May 14, 2018 7:57:22 AM
**To:** dl.AMRBOARDMEMBERS@altamesa.net
**Cc:** Jim Hackett; Kimberly Warnica
**Subject:** FW: Earnings Call and 10-Q

External Sender

Dear Board members,
As the Audit Committee knows, the Alta Mesa Resources 10-Q is not yet ready to file, after a weekend of multiple calls with management and our outside accounting firm, BDO.
As a result, the earnings are not releasable. Instead, management has decided to issue an operational press release with confirmation of year-end guidance, which is attached.
We still intend to proceed with our afternoon investor call to reinforce that our investment thesis is still working and that financials will be released shortly.
The core problem with getting BDO approval of the financial statements seems to be centered on the presentation of financials for predecessor and successor companies due to a split-quarter from closing the merger in early February.
We will keep you updated on the market reaction to our decisions. Please call me or Kim Warnica with any questions. In addition, Hal and I will update everyone in-person, in June, regarding a post-audit of the events of the last (and ensuing) few weeks related to the financial filings and approvals.
Jim

**Exhibit
CP 0330**
Walters

HPS_00084579

**PX 378**

Report generated by: ksortielad@afking.com. Unauthorized distribution of this report is prohibited.



ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Alta Mesa Resources, Inc.

**Meeting Type:** Annual
**Meeting Date:** 18 June 2018
**Record Date:** 15 May 2018
**Meeting ID:** 1240438

**NASDAQ:** AMR
**Index:** N/A
**Sector:**
Oil & Gas Exploration & Production
**GICS:** 10102020

**Primary Contact**
Michelle Laguna
m.laguna@issgovernance.com

## Key Takeaways

Based on a review and evaluation of the company's disclosures and practices at this time, support for all agenda items is warranted.

## Agenda & Recommendations

**Policy:** United States
**Incorporated:** Delaware, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|------|------|----------|------------|----------|
| **MANAGEMENT PROPOSALS** | | | | |
| 1a | M0201 | Elect Director Sylvia J. Kerrigan | FOR | FOR |
| 1b | M0201 | Elect Director Donald R. Sinclair | FOR | FOR |

Shading indicates that ISS recommendation differs from Board recommendation
▷ Items deserving attention due to contentious issues or controversy

## Report Contents

| | | | |
|---|---|---|---|
| Corporate Governance Profile | 3 | Equity Ownership Profile | 9 |
| Board Profile | 4 | Additional Information | 9 |
| Meeting Agenda and Proposals | 7 | | |

© 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

Report generated by ksordeals@dfking.com. Unauthorized distribution of this report is prohibited.

**Alta Mesa Resources, Inc. (AMR)**  **Meeting Date: 18 June 2018**
POLICY: United States  Meeting ID: 1240438

## Material Company Updates

| Item | Summary |
| --- | --- |
| **Business Combination** | On Feb. 9, 2018, the company consummated the acquisition of (i) all of the limited partnership interest in Alta Mesa Holdings, LP, (ii) 100 percent of the economic interests and 90 percent of the voting interests in Alta Mesa Holdings GP, LLC, the sole general partner of Alta Mesa Holdings, LP and (iii) all of the membership interests in Kingfisher Midstream LLC. Following the business combination, the company changed its name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc." |
|  | In connection with the business combination, Thomas J. Walker resigned as CFO and Stephen S. Coats resigned as secretary. James T. Hackett, who will no longer serve as CEO, was appointed to serve as COO-Midstream and executive chairman, while Harlan H. Chappelle, Michael E. Ellis, Michael A. McCabe, and Homer Cole serve as CEO, COO - upstream, CFO, and VP and chief technical officer, respectively. |
|  | Additionally, William D. Gutermuth, Donald R. Sinclair, and David M. Leuschen were appointed to serve as Class I directors; Jeffrey H. Tepper, Michael E. Ellis, and Pierre F. Lapeyre, Jr., and Diana J. Walters were appointed to serve as Class II directors; and James T. Hackett, Harlan H. Chappelle, Don Dimitrievich, and William W. McMullen were appointed to serve as Class III directors. |
| **Board and Executive Updates** | On April 3, 2018, Craig W. Collins was hired as COO-Midstream. Hackett resigned as COO-Midstream but continues to serve as executive chairman. |
|  | William D. Gutermuth is not standing for reelection to the board, and Sylvia Kerrigan is a new director nominee at the annual meeting. |
| **Auditor Change** | On April 27, 2018, the company dismissed WithumSmith+Brown, PC, and engaged BDO USA LLP as its independent registered public accounting firm. |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL  Walters_SDTX0010846

*Report generated by kscordato@dfking.com. Unauthorized distribution of this report is prohibited.*

| Alta Mesa Resources, Inc. (AMR) | Meeting Date: 18 June 2018 |
|---|---|
| POLICY: United States | Meeting ID: 1240438 |

## Corporate Governance Profile

### BOARD & COMMITTEE SUMMARY

|  | Independence | Members | Meetings |
|---|---|---|---|
| Full Board | 64% | 11 | 8 |
| Audit | 100% | 2 | 3 |
| Compensation | 100% | 3 | 0 |
| Nominating | 100% | 3 | 0 |

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | Yes |
| Independent lead director | N/A |
| Voting standard | Plurality |
| Plurality carveout for contested elections | N/A |
| Resignation policy | No |
| Total director ownership (000 shares) | 121 |
| Total director ownership (%) | < 1 |
| Percentage of directors owning stock | 27.3% |
| Number of directors attending < 75% of meetings | 0 |
| Number of directors on excessive number of outside boards | 0 |
| Average director age | 55 years |
| Average director tenure | 0 years |
| Percentage of women on board | 18% |

## Director tenure



| 0 | 0.5 | 1 | 1.5 | 2 | 2.5 |
|---|---|---|---|---|---|

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL     Walters_SDTX0010847

Report generated by ksordeats@dfking.com. Unauthorized distribution of this report is prohibited.

**Alta Mesa Resources, Inc. (AMR)**

POLICY: United States

Meeting Date: 18 June 2018

Meeting ID: 1240438

# Board Profile (after upcoming meeting)

## Director Independence & Affiliations

### EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification | | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside | | Key Committees | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Company | ISS | | | | | | Boards | CEO | Audit | Comp | Nom | Gov |
| | James Hackett | Chair | Non-Independent | Executive Director | | M | 64 | 1 | 2020 | 3 | | | | | |
| | Harlan Chappelle | CEO | Non-Independent | Executive Director | | M | 61 | 0 | 2020 | 0 | | | | | |
| | Michael Ellis | Executive | Non-Independent | Executive Director | | M | 61 | 0 | 2019 | 0 | | | | | |

### NON-EXECUTIVE DIRECTORS

| Item On Ballot | Name | Affiliation | Independence Classification | | Attend <75% | Gen-der | Age | Tenure | Term Ends | Outside | | Key Committees | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Company | ISS | | | | | | Boards | CEO | Audit | Comp | Nom | Gov |
| | Don Dimitrievich | | Independent | Independent | | M | 46 | 0 | 2020 | 0 | | | | | |
| 1a | Sylvia Kerrigan | | N/D | Independent | | F | 52 | 0* | 2021 | 1 | | | | | |
| | Pierre Lapeyre Jr. | | Independent | Independent | | M | 55 | 0 | 2019 | 2 | | | | | |
| | David Leuschen | | Independent | Independent | | M | 66 | 0 | 2021 | 2 | | | | | |
| | William McMullen | Other | N/D | Non-Independent | | M | 32 | 0 | 2020 | 0 | | | | | |
| 1b | Donald Sinclair | | Independent | Independent | | M | 60 | 0 | 2021 | 0 | | | | C | M | M |
| | Jeffrey Tepper | | Independent | Independent | | M | 52 | 1 | 2019 | 1 | | M | M | C | C |
| | Diana Walters | | Independent | Independent | | F | 54 | 1 | 2019 | 3 | | C F | M | M | M |

Shaded cells indicate that company and ISS independence classifications differ.
*Indicates director not previously submitted to shareholders for election.

M = Member | C = Chair | F = Financial Expert

## Director Notes

| | |
|---|---|
| James Hackett | 1) James Hackett has previously served as CEO of the company. 2) In March 2017, the company entered into the forward purchase agreement pursuant to which Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") agreed to purchase an aggregate of up to 40,000,000 shares of the company's class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 or $10.00 per unit. On Feb. 9, 2018, the Fund VI Holdings purchased 40,000,000 units pursuant to the agreement for an aggregate purchase price of $400 million. Hackett is a senior advisor at Riverstone Investment Group LLC ("Riverstone"), affiliate of Fund VI Holdings. 3) On March 24, 2017, the company entered into an administrative support agreement pursuant to which the agreed to pay an affiliate of Silver Run Sponsor II, LLC, a total of $10,000 per month for office space, utilities and secretarial and administrative support. The company paid the affiliate of Silver Run Sponsor $90,000 for such services for the year ended Dec. 31, 2017. Following Feb. 9, 2018, the company no longer pay these monthly fees. Silver Run Sponsor is affiliated with Riverstone. (Source: DEF14A, 5/16/18, pp. 6, 23, 24; 10-K, 3/29/18, pp. ii, iii.) |
| Harlan Chappelle | Harlan Chappelle is the father-in-law of David McClure, vice president of facilities and midstream at Alta Mesa Holdings, LP, subsidiary of the company. (Source: DEF14A, 5/16/18, p. 32; 10-K, 3/29/18, under "Exhibit 21.1" section.) |
| Pierre Lapeyre Jr. | 1) In March 2017, the company entered into the forward purchase agreement pursuant to which Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") agreed to purchase an aggregate of up to 40,000,000 shares of the company's class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 or $10.00 per unit. On Feb. 9, 2018, the Fund VI Holdings purchased 40,000,000 units |

Publication Date: 4 June 2018

Page 4

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL

Walters_SDTX0010848

Report generated by kcordata@drking.com. Unauthorized distribution of this report is prohibited.

**Alta Mesa Resources, Inc. (AMR)**  
POLICY: United States

**Meeting Date: 18 June 2018**  
Meeting ID: 1240438

| | |
|---|---|
| | pursuant to the agreement for an aggregate purchase price of $400 million. Pierre F. Lapeyre, Jr. is a founder of Riverstone Investment Group LLC ("Riverstone"), affiliate of Fund VI Holdings, and has been a senior managing director since 2000. 2) On March 24, 2017, the company entered into an administrative support agreement pursuant to which the agreed to pay an affiliate of Silver Run Sponsor II, LLC, a total of $10,000 per month for office space, utilities and secretarial and administrative support. The company paid the affiliate of Silver Run Sponsor $90,000 for such services for the year ended Dec. 31, 2017. Following Feb. 9, 2018, the company no longer pay these monthly fees. Silver Run Sponsor is affiliated with Riverstone. (Source: DEF14A, 5/16/18, pp. 6, 9, 23, 24; 10-K, 3/29/18, pp. ii, iii.) |
| David Leuschen | 1) In March 2017, the company entered into the forward purchase agreement pursuant to which Riverstone VI SR II Holdings, L.P. ("Fund VI Holdings") agreed to purchase an aggregate of up to 40,000,000 shares of the company's class A common stock, plus an aggregate of up to 13,333,333 warrants, for an aggregate purchase price of up to $400,000,000 or $10.00 per unit. On Feb. 9, 2018, the Fund VI Holdings purchased 40,000,000 units pursuant to the agreement for an aggregate purchase price of $400 million. David Leuschen is a founder of Riverstone Investment Group LLC ("Riverstone"), affiliate of Fund VI Holdings, and has been a senior managing director since 2000. 2) On March 24, 2017, the company entered into an administrative support agreement pursuant to which the agreed to pay an affiliate of Silver Run Sponsor II, LLC, a total of $10,000 per month for office space, utilities and secretarial and administrative support. The company paid the affiliate of Silver Run Sponsor $90,000 for such services for the year ended Dec. 31, 2017. Following Feb. 9, 2018, the company no longer pay these monthly fees. Silver Run Sponsor is affiliated with Riverstone. (Source: DEF14A, 5/16/18, pp. 6, 8, 23, 24; 10-K, 3/29/18, pp. ii, iii.) |
| William McMullen | 1) William McMullen was not determined to be independent by the company. 2) On Jan. 13, 2016, Oklahoma Energy Acquisitions, LP, a wholly owned subsidiary of Alta Mesa Holdings, LP, subsidiary of the company, entered into a joint development agreement with BCE-STACK Development LLC, a fund advised by Bayou City Energy Management, LLC to fund a portion of the company's drilling operations in Kingfisher County, Oklahoma. On Dec. 31, 2016, High Mesa Holdings GP, LLC purchased from BCE-STACK and interests in 24 producing wells, drilled under the joint development agreement to the company. The pre-tax present value discounted at ten percent for the producing wells as of the effective date of Oct. 1, 2016 was approximately $80 million. In exchange for the payment of drilling and completion costs, BCE-STACK will receive 80 percent of Oklahoma Energy's working interest in each joint well, which interest will be reduced to 20 percent of Oklahoma Energy's initial working interest upon BCE-STACK achieving a 15 percent internal rate of return in a tranche and further reduced to 12.5 percent of Oklahoma Energy's initial interest upon BCE-STACK achieving a 25 percent internal rate of return. As of Dec. 31, 2017, Alta Mesa recorded $23.3 million in advances from related party on its consolidated balance sheets, which represents net advances from BCE-STACK for their working interest share of the drilling and development cost as part of the joint development agreement. McMullen is a founder and managing partner of BCE-STACK. (Source: DEF14A, 5/16/18, pp. 6, 9, 12, 32, 33; 10-K, 3/29/18, under "Exhibit 21.1" section.) |

## Director Employment, Compensation & Ownership

| Name | Primary Employment | Outside Boards | Total Compensation* | Shares Held | 60-day Options | Total | Voting Power (%) |
|---|---|---|---|---|---|---|---|
| **James Hackett** | Chairman - Alta Mesa Resources, Inc. | National Oilwell Varco, Inc., Fluor Corporation, Enterprise Products Partners L.P. | 0 | 0 | 0 | 0 | 0.00 |
| **Harlan Chappelle** | CEO - Alta Mesa Resources, Inc. | | 0 | 0 | 0 | 0 | 0.00 |
| **Don Dimitrievich** | Financial Services | | 0 | 0 | 0 | 0 | 0.00 |
| **Michael Ellis** | COO of Upstream - Alta Mesa Resources, Inc. | | 0 | 0 | 0 | 0 | 0.00 |
| **Sylvia Kerrigan** | Academic | TEAM, INC. | 0 | 0 | 0 | 0 | 0.00 |
| **Pierre Lapeyre Jr.** | Financial Services | Riverstone Energy Limited, Centennial Resource | 0 | 0 | 0 | 0 | 0.00 |

Publication Date: 4 June 2018

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL

Walters_SDTX0010849

Report generated by ksordello@dfking.com. Unauthorized distribution of this report is prohibited.

**Alta Mesa Resources, Inc. (AMR)**                                                                      **Meeting Date: 18 June 2018**

POLICY: United States                                                                                              Meeting ID: 1240438

| Name | Primary Employment | Outside Boards | Total Compensation* | Shares Held | 60-day Options | Total | Voting Power (%) |
|------|--------------------|----------------|--------------------:|------------:|---------------:|------:|-----------------:|
|  |  | Development, Inc. |  |  |  |  |  |
| **David Leuschen** | Financial Services | Riverstone Energy Limited, Centennial Resource Development, Inc. | 0 | 0 | 0 | 0 | 0.00 |
| **William McMullen** | Other |  | 0 | 0 | 0 | 0 | 0.00 |
| **Donald Sinclair** | Other |  | 0 | 18,344 | 0 | 18,344 | <1 |
| **Jeffrey Tepper** | Prof Director | Centennial Resource Development, Inc. | 0 | 51,344 | 0 | 51,344 | <1 |
| **Diana Walters** | Consultant | Platinum Group Metals Ltd., Trilogy Metals Inc., Electrum Special Acquisition Corporation | 0 | 51,344 | 0 | 51,344 | <1 |

*None of the officers or directors has received any cash compensation from the company for services rendered for the year ended Dec. 31, 2017.

---

Publication Date: 4 June 2018                                                                                            Page 6

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL                                                                                    Walters_SDTX0010850

*Report generated by ksordata@dfking.com. Unauthorized distribution of this report is prohibited.*

**Alta Mesa Resources, Inc. (AMR)** **Meeting Date: 18 June 2018**
POLICY: United States Meeting ID: 1240438

## Meeting Agenda & Proposals

| **Items 1a and 1b. Elect Directors** | **FOR** |
|---|---|

VOTE RECOMMENDATION

A vote FOR the director nominees is warranted.

BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has a plurality vote standard for the election of directors.

Discussion

Please see the Board Profile section above for more information on director nominees.

PREFERRED STOCK BOARD APPOINTMENTS

Of eleven board members, four are elected by the holders of the Class A common stock, four are elected by the holders of the Series A preferred stock, and three are elected by the holder of the Series B preferred stock.

Bayou City Energy Management LLC, HPS Investment Partners LLC, and AM Equity Holdings LP own the only outstanding shares of Series A preferred stock. McMullen serves as a Class III director on behalf of Bayou City. Dimitrievich serves as a Class III director on behalf of HPS. Ellis serves as a Class II director and Chappelle serves as a Class III director on behalf of AM Equity.

Riverstone VI Alta Mesa Holdings, L.P. owns the only outstanding share of Series B preferred stock. Leuschen serves as a Class I director, Lapeyre serves as a Class II director, and Hackett serves as a Class III director on behalf of Riverstone.

BOARD AND COMMITTEE INDEPENDENCE

Only 63.64 percent of the board's directors are independent. Investors generally prefer that independent directors be a substantial majority of the company's board. However, only independent directors serve on the key board committees.

ADVERSE CHARTER AND BYLAW AMENDMENTS

Several charter or bylaw provisions were implemented at the time of the company's IPO in March 2017 that fall short of what many investors would consider as best governance practice. These provisions include a classified board.

A classified board prevents shareholders from holding directors accountable on an annual basis, can entrench management, and can deter takeovers and proxy contests.

Given that the classified board structure has not been removed nor is subject to a sunset requirement, withhold votes are warranted for all incumbent Governance Committee nominees. However, no adverse recommendations are warranted on this basis at this time given that the only Governance Committee member standing for election, Donald Sinclair, was appointed to the board in February 2018.

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL Walters_SDTX0010851

Report generated by ksordello@dfking.com. Unauthorized distribution of this report is prohibited.

**Alta Mesa Resources, Inc. (AMR)**  **Meeting Date: 18 June 2018**
POLICY: United States  Meeting ID: 1240438

REVIEW OF EXECUTIVE COMPENSATION PRACTICES

*Emerging Growth company status*

The company qualifies as an "emerging growth company" as defined by the Jumpstart Our Business Startups Act enacted in April 2012 (JOBS Act of 2012). As an "emerging growth company" the company may elect to be exempt from holding a non-binding advisory vote on executive compensation.

*Analysis*

None of the officers or directors has received any cash compensation from the company for services rendered for the year ended Dec. 31, 2017.

The proxy states that on the closing date of the business combination, the company entered into a letter agreement with CEO Chappelle which provides for an annual base salary of $830,000 and a target annual bonus amount for 2018 of 125 percent of his annual base salary. He also received 589,632 stock options issued with an exercise price per share of $9.54, which will vest in three substantially equal annual installments on the first three anniversaries of the closing date. Chappelle also received 786,164 performance based RSUs which provide for, among other things, (i) settlement in cash or shares of Class A common stock, with 20 percent of the award to be based on 2018 company performance, 30 percent on 2019 company performance, and 50 percent on 2020 company performance, (ii) such awards subject to 2018 performance metrics to be earned at 50 percent, 100 percent, or 200 percent of the number of 2018 award based upon 2018 company EBITDAX, with a threshold of $385 million, target of $450 million, and over-achieve of $540 million, respectively, with the number of 2018 award earned based on performance between threshold and target, or target and over-achieve to be determined by linear interpolation, and (iii) such awards that are subject to 2019 or 2020 performance metrics to be subject to the performance metrics determined at a later date by the Compensation Committee.

*Conclusion*

A review of the company's executive compensation program does not raise significant concerns at this time.

---

Publication Date: 4 June 2018  Page 8

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL  Walters_SDTX0010852

Report generated by kscordato@dfking.com. Unauthorized distribution of this report is prohibited.

| Alta Mesa Resources, Inc. (AMR) | Meeting Date: 18 June 2018 |
|---|---|
| POLICY: United States | Meeting ID: 1240438 |

## Equity Ownership Profile

| Type | Votes per share | Issued |
|---|---|---|
| Class A Common Stock | 1.00 | 170,960,591 |
| Class C Common Stock | 1.00 | 213,402,398 |

| Ownership - Class A Common Stock | Number of Shares | % of Class |
|---|---|---|
| Riverstone Investment Group LLC | 85,776,000 | 50.64 |
| Highbridge Capital Management LLC | 28,717,435 | 16.96 |
| Orbis Investment Management Ltd. | 21,483,368 | 12.68 |
| Wellington Management Co. LLP | 20,305,903 | 11.99 |
| Alyeska Investment Group LP | 13,000,000 | 7.68 |
| The Vanguard Group, Inc. | 8,297,821 | 4.90 |
| Highfields Capital Management LP | 7,508,999 | 4.43 |
| Point72 Asset Management LP | 7,483,280 | 4.42 |
| Fort Baker Capital Management LP | 2,419,774 | 1.43 |
| Marshall Wace LLP | 2,028,120 | 1.20 |
| BlackRock Fund Advisors | 1,983,254 | 1.17 |
| Goldman Sachs & Co. LLC (Private Banking) | 1,761,868 | 1.04 |
| Alberta Investment Management Corp. | 1,505,251 | 0.89 |
| Wells Capital Management, Inc. | 1,371,625 | 0.81 |
| BlackRock Investment Management (UK) Ltd. | 1,244,004 | 0.73 |
| Goldman Sachs International | 1,210,000 | 0.71 |
| TD Asset Management, Inc. | 998,800 | 0.59 |
| Geode Capital Management LLC | 921,379 | 0.54 |
| Orbis Investment Management (US) LLC | 801,848 | 0.47 |
| FIAM LLC | 710,000 | 0.42 |

© 2018 Factset Research Systems, Inc. All Rights Reserved. As of: 31 Mar 2018

## Additional Information

| | |
|---|---|
| Meeting Location | 15021 Katy Freeway, Suite 400 |
| | Houston, Texas 77094 |
| Meeting Time | 10:00 a.m. Central Time |
| Shareholder Proposal Deadline | January 16, 2019 |
| Solicitor | D.F. King & Co. |
| Security IDs | 02133L109(CUSIP) |

Copyright © 2018 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL

Walters_SDTX0010853

*Report generated by kscordato@afking.com. Unauthorized distribution of this report is prohibited.*

**Alta Mesa Resources, Inc. (AMR)**                   **Meeting Date: 18 June 2018**

POLICY: United States                                   Meeting ID: 1240438

ISS' experienced research team provides comprehensive proxy analyses and complete vote recommendations for approximately 40,000 meetings annually in around 117 markets worldwide. With a team of more than 370 research and/or data professionals, fluent in 25 languages, ISS covers every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in financial centers worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Paris, San Francisco, Sydney, Singapore, Tokyo, Toronto, and Rockville, Maryland.

ISS has long been committed to engagement and transparency. There are several long-established channels for engaging with ISS, outlined at http://www.issgovernance.com/contact/faqs-engagement-on-proxy-research/.  In addition to these long-established channels, investors and issuers and other market constituents can submit comments, concerns and feedback to the ISS Feedback Review Board through www.issgovernance.com/frb.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

ISS is an independent company owned by entities affiliated with Genstar Capital ("Genstar"). ISS and Genstar have established policies and procedures to restrict the involvement of Genstar and any of Genstar's employees in the content of ISS' analyses. Neither Genstar nor their employees are informed of the contents of any of ISS' analyses or recommendations prior to their publication or dissemination.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2018 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

Copyright © 2018 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part without prior written permission from ISS.

180724

CONFIDENTIAL                                     Walters_SDTX0010854

# PX 379



KPMG LLP
811 Main Street
Houston, TX 77002

Telephone   +1 713 319 2000
Fax         +1 713 319 2041
kpmg.com

July 6, 2018

Alta Mesa Holdings, LP
15021 Katy Freeway, Suite 400
Houston, Texas 77094



**Exhibit
CP 0333**

Walters

Attention: Ms. Diana J. Walters, *Chairwoman of the Audit Committee*

This letter (the Engagement Letter) confirms our understanding of our engagement to provide professional services to Alta Mesa Holdings, LP (the Partnership).

**Objectives and Limitations of Services**

*Audit Services*

We will perform an audit of Alta Mesa Holdings, LP's consolidated financial statements. Based on our audit, we will issue a written report on Alta Mesa Holdings, LP's consolidated financial statements as set forth in Appendix I, which is to be included in the annual report on Form 10-K proposed to be filed by the Partnership under the Securities Exchange Act of 1934.

We have the responsibility to conduct and will conduct the audit of the consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements conforms with U. S. generally accepted accounting principles. Our report and the consolidated financial statements are subject to review by the Securities and Exchange Commission (SEC) staff and to the application by them of their interpretation of the relevant rules and regulations.

In conducting the audit, we will perform tests of the accounting records and such other procedures, as we consider necessary in the circumstances, to provide a reasonable basis for our opinion on the consolidated financial statements. We also will assess the accounting policies used and significant estimates made by management, and evaluate the overall consolidated financial statement presentation.

Our audit of the consolidated financial statements is planned and performed to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether caused by error or fraud. Accordingly, there is some risk that a material misstatement would remain undetected. Although not absolute assurance, reasonable assurance is a high level of assurance. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, there is also a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an audit of financial statements performed in accordance with the standards of the PCAOB. Also, an audit is not designed to detect error or fraud that is immaterial to the consolidated financial statements.

Subject to the remainder of this paragraph, we will issue a written report upon completion of our audit addressed to the Audit Committee of the Board of Directors of Alta Mesa Resources, Inc. and the Board of Directors of Alta Mesa Holdings GP, LLC, the general partner of the Partnership (referred to herein as the



Alta Mesa Holdings, LP
July 6, 2018
Page 2 of 12

Audit Committee). The report will be in a form that is in accordance with the published rules and regulations of the SEC and the standards of the PCAOB. If, for any reason, we are unable to complete the audit or unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. In addition, we cannot provide assurance that an unqualified opinion will be rendered. Circumstances may arise in which it is necessary for us to modify our report, add emphasis-of-matter or other-matter paragraphs or withdraw from the engagement. If, during the performance of our audit procedures, such circumstances arise, we will communicate to the Audit Committee our reasons for modification or withdrawal.

As part of our audit, we will read the other information in your annual report on Form 10-K and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, our audit does not include the performance of procedures to corroborate such other information (including forward-looking statements).

### Internal Control over Financial Reporting

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed for the purpose of expressing an opinion on the consolidated financial statements. An audit of the financial statements is not designed to provide assurance on internal control or to identify internal control deficiencies.

The objective of our audit of the consolidated financial statements is not to report on the Partnership's internal control and we are not obligated to search for material weaknesses[a] or significant deficiencies[b] as part of our audit of the consolidated financial statements.

### Quarterly Review Services

We will review the condensed consolidated balance sheets of the Partnership as set forth in Appendix I, and the related condensed consolidated statements of operations, changes in partners' capital (deficit), and cash flows for the quarterly and year-to-date periods, which are to be included in the quarterly reports (Form 10-Q) proposed to be filed by the Partnership under the Securities Exchange Act of 1934. We will also review the selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report on Form 10-K proposed to be filed by the Partnership under the Securities Exchange Act of 1934.

We have the responsibility to conduct our reviews in accordance with the standards of the PCAOB. The objective of a review of interim financial information is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to such interim financial information for it

---

[a] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

[b] A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

Walters_SDTX0000898



Alta Mesa Holdings, LP
July 6, 2018
Page 3 of 12

to conform with U.S. generally accepted accounting principles. Our procedures will be substantially less in scope than an audit of financial statements performed in accordance with the standards of the PCAOB, the objective of which is the expression of an opinion regarding the financial statements. Accordingly, we will not express an opinion on the Partnership's interim financial information.

Our reviews will consist principally of performing analytical procedures applied to financial data and making inquiries of the Partnership's personnel responsible for financial and accounting matters. Our reviews will include obtaining sufficient knowledge of the Partnership's business and its internal control as it relates to the preparation of both annual and interim financial information to (a) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and (b) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with U.S. generally accepted accounting principles.

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an audit. Further, a review is not designed to provide assurance on internal control or to identify material weaknesses or significant deficiencies and cannot be relied on to detect errors, fraud, or illegal acts. However, we are responsible for communicating with the Audit Committee regarding any significant deficiencies that come to our attention.

As agreed, we will not issue a written report[1] upon completion of each review. The Partnership understands that any reference to interim financial information as reviewed by us when such information is included in documents issued to shareholders or third parties (including the SEC) will necessitate the issuance of a written review report, which must accompany the interim financial information in the document.

If during the performance of our quarterly review services we become aware of matters that cause us to believe the interim information filed, or to be filed, with the SEC, is probably materially misstated as a result of a departure from U.S. generally accepted accounting principles, we will discuss such matters with management and, if appropriate, communicate such matters to the Audit Committee.

### Registration Statements and Other Offering Documents

Should the Partnership wish to include or incorporate by reference these consolidated financial statements and our audit report thereon into a future filing under the Securities Act of 1933, or an exempt offering, prior to our consenting to include or incorporate by reference our report on such consolidated financial statements, we would consider our consent to the inclusion of our report and the terms thereof at that time. We will be required to perform procedures as required by the standards of the PCAOB, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, we will not perform procedures to corroborate such other

CONFIDENTIAL



Alta Mesa Holdings, LP
July 6, 2018
Page 4 of 12

information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be determined at the time the services are to be performed.

### *Comfort Letters*

Should a comfort letter be requested in connection with a future filing under the Securities Act of 1933, or an exempt offering, the specific terms of our services will be determined at that time. Prior to our issuance of a comfort letter, management of the Partnership agrees to supply us with a representation letter that will, among other things, confirm that no events have occurred that would require adjustments to (or additional disclosures in) the audited consolidated financial statements referred to above and confirm the Partnership's responses to certain inquiries made in connection with our issuance of the comfort letter.

### Our Responsibility to Communicate with the Audit Committee and the Board of Directors

While the objective of our audit of the consolidated financial statements is not to report on the Partnership's internal control and we are not obligated to search for material weaknesses or significant deficiencies as part of our audit of the consolidated financial statements, we will communicate material weaknesses or significant deficiencies to the Audit Committee to the extent they come to our attention. Similarly, we will communicate material weaknesses and significant deficiencies to the Audit Committee to the extent they come to our attention in performance of quarterly review services.

We will report to the Audit Committee the following matters prior to the issuance of our audit report:

- An overview of our overall audit strategy, timing of the audit and the significant risks identified during our risk assessment procedures.

- Management's initial selection of, or changes in, significant accounting policies or the application of such policies in the current period; and the effect on the consolidated financial statements or disclosures of significant accounting policies in controversial areas or areas for which there is a lack of authoritative guidance or consensus, or diversity in practice.

- All critical accounting policies and practices to be used, including the reasons certain policies and practices are considered critical; and how current and anticipated future events might affect the determination of whether certain policies and practices are considered critical.

- A description of the process management used to develop critical accounting estimates, management's significant assumptions used in critical accounting estimates that have a high degree of subjectivity, and any significant changes management made to the process used to develop critical accounting estimates or management's significant assumptions, including a description of management's reasons for the changes and the effects of the changes on the financial statements.

- Significant transactions that are outside of the normal course of business for the Partnership or that otherwise appear to be unusual due to their timing, size, or nature; and the policies and practices used to account for significant unusual transactions, and our understanding of the business purpose (or lack thereof) of significant unusual transactions.

- Our evaluation of the quality of the Partnership's financial reporting.

- All material weaknesses and significant deficiencies identified during the audit, in writing.

Walters_SDTX0000900



Alta Mesa Holdings, LP
July 6, 2018
Page 5 of 12

- Corrected misstatements arising from the audit and the implications that such corrected misstatements might have on the Partnership's financial reporting process. In this context, corrected misstatements are proposed corrections of the consolidated financial statements that were recorded by management and, in our judgment, may not have been detected except through the auditing procedures performed.

- Uncorrected misstatements aggregated during the current engagement and pertaining to the latest period presented that were determined by management to be immaterial, both individually and in aggregate.

- All relationships between KPMG LLP (KPMG) and its related entities and the Partnership and its related entities or persons in financial reporting oversight roles at the Partnership that may reasonably be thought to bear on independence.

- Other matters required to be communicated by the standards of the PCAOB or that are deemed by us to be significant to the oversight of the Partnership's financial reporting process.

We will report to the Audit Committee if we become aware that the oversight of the Partnership's external financial reporting and internal control over financial reporting by the audit committee is ineffective, in writing.

We will also read minutes, if any, of Audit Committee meetings for consistency with our understanding of the communications made to the Audit Committee and determine that the audit committee has received copies of all material written communications between ourselves and management.

To the extent that they come to our attention, we will inform the appropriate level of management about any illegal acts, unless they are clearly inconsequential, material errors in the consolidated financial statements and any instances of fraud. Further, to the extent they come to our attention we also will communicate directly to the Audit Committee illegal acts unless they are clearly inconsequential, material errors in the consolidated financial statements and any instances of fraud that involve senior management or that, in our judgment, cause a material misstatement of the consolidated financial statements. In the case of illegal acts which, in our judgment, would have a material effect on the consolidated financial statements of the Partnership, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances requires us to communicate our conclusions to the SEC.

In addition, if we become aware of information that relates to the consolidated financial statements after we have issued our report or completed our interim review procedures, but which was not known to us at the date of our report or completion of our interim review procedures, and which is of such a nature and from such a source that we would have investigated that information had it come to our attention during the course of our audit and/or interim review procedures, we will, as soon as practicable; (1) communicate such an occurrence to the Audit Committee; and (2) undertake an investigation to determine whether the information is reliable and whether the facts existed at the date of our report or completion of our interim review procedures. Further, management agrees that in conducting that investigation, we will have the full cooperation of the Partnership's personnel. If the subsequently discovered information is found to be of such a nature that (a) our report or completion of our interim review procedures would have been affected if the information had been known as of the date of our report or completion of our interim review procedures and (b) we believe that the report or interim review procedures are currently being relied upon or are likely to be relied upon by someone who would attach importance to the information, appropriate steps will be taken by KPMG and expected from the Partnership to prevent further reliance on our report or interim review

Walters_SDTX0000901



Alta Mesa Holdings, LP
July 6, 2018
Page 6 of 12

procedures. Such steps include appropriate disclosures by the Partnership of the newly discovered facts and the impact to the consolidated financial statements.

**Our Responsibility to Communicate with Management**

We will report to management, in writing, all material weaknesses and significant deficiencies identified during the audit, prior to the issuance of our audit report.

**Audit Committee Responsibilities**

The Audit Committee is directly responsible for the appointment of KPMG as independent auditor, determining our compensation, and oversight of our audit work, including resolution of disagreements between management and us regarding financial reporting. We understand that we report directly to the Audit Committee. The Audit Committee is responsible for preapproval of all audit and nonaudit services provided by us.

**Management Responsibilities**

The management of the Partnership is responsible for the fair presentation, in accordance with U.S. generally accepted accounting principles, of the consolidated financial statements, including disclosures, schedules, and interim financial information and all representations contained therein. Management also is responsible for identifying and ensuring that the Partnership complies with the laws and regulations applicable to its activities, and for informing us of any known material violations of such laws and regulations. Management also is responsible for preventing and detecting fraud, including the design and implementation of programs and controls to prevent and detect fraud, for adopting sound accounting policies, and for establishing and maintaining effective internal control over financial reporting and procedures for financial reporting to maintain the reliability of the consolidated financial statements or interim financial information and to provide reasonable assurance against the possibility of misstatements that are material to the consolidated financial statements or interim financial information. Management is also responsible for informing us, of which it has knowledge, of all deficiencies in the design or operation of such controls. The audit of the financial statements does not relieve management or those charged with governance of their responsibilities.

Management is responsible for making all financial records and relevant information available to the auditor and agrees that all records, documentation, and information we request in connection with our audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of the Partnership's personnel. At the conclusion of the engagement, management will provide us with a letter that confirms certain representations made during the audit, including specific inquiries of management required by the standards of the PCAOB about the representations embodied in the consolidated financial statements or interim financial information and the effectiveness of internal control over financial reporting. The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the consolidated financial statements.

Management is responsible for adjusting the annual consolidated financial statements and interim financial information to correct material misstatements relating to accounts or disclosures and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the

CONFIDENTIAL



Alta Mesa Holdings, LP
July 6, 2018
Page 7 of 12

aggregate, to the consolidated financial statements being reported upon, or the interim information being reviewed, taken as a whole.

*Use of Internal Audit*

Management and the Audit Committee acknowledge and understand that internal auditors providing direct assistance to us will be allowed to follow our instructions and that personnel of the Partnership will not intervene in the work the internal auditor performs for us. Further, management and the Audit Committee acknowledge and understand that if, in our sole judgment, we believe the objectivity of internal auditors providing direct assistance to us has been impaired, we will be unable to use the work performed or planned to be performed, in which case we will notify management and the Audit Committee.

**Dispute Resolution**

Any dispute or claim between the parties shall be submitted first to non-binding mediation and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("IICPR"). Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these dispute resolution procedures, including any contention that all or part of these procedures is invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. By operation of this provision, the parties agree to forgo litigation over such disputes in any court of competent jurisdiction.

Mediation shall take place at a location to be designated by the parties using Mediation Procedures of the IICPR, with the exception of paragraph 2 (Selecting the Mediator). Arbitration shall take place in New York, New York and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. Party-selected arbitrators shall be selected from the lists of neutrals maintained by either the IICPR or by JAMS, Inc., but the chair of the arbitration panel does not have to be selected from those specific lists. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in IICPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. For the sake of clarity, the preceding sentence is not intended to prohibit any claim for punitive damages with respect to the services provided under this Engagement Letter. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm, enforce or vacate any final award entered in arbitration, in any court of competent jurisdiction, provided that any party moving to enforce, confirm or vacate any such agreement or award, as the case may be, will file such motion under seal unless prohibited under applicable court rules. Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

Walters_SDTX0000903



Alta Mesa Holdings, LP
July 6, 2018
Page 8 of 12

**Other Matters**

All disputes between the parties (whether based in contract, tort, statute, regulation, or otherwise and whether pending in court or in an arbitral forum) shall be governed by and construed in accordance with the substantive and procedural laws of the State of New York, including without limitation, its statutes of limitations, without regard to the conflict of laws provisions of New York or any other state or jurisdiction. In the event that any term or provision of this Engagement Letter shall be held to be invalid, void or unenforceable, then the remainder of the Engagement Letter shall not be affected, and each such term and provision shall be valid and enforceable to the fullest extent permitted by law.[2]

This letter shall serve as the Partnership's authorization for the use of e-mail and other electronic methods to transmit and receive information, including confidential information, between KPMG and the Partnership and between KPMG and outside specialists or other entities engaged by either KPMG or the Partnership. The Partnership acknowledges that e-mail travels over the public Internet, which is not a secure means of communication and, thus, confidentiality of the transmitted information could be compromised through no fault of KPMG. KPMG will employ commercially reasonable efforts and take appropriate precautions to protect the privacy and confidentiality of transmitted information.

Except as permitted by law or as set forth in this paragraph, neither party shall acquire hereunder any right to use the name or logo of the other party or any part thereof, and any such use shall require the express written consent of the owner party. The Partnership agrees that KPMG may list the Partnership as a client in KPMG's internal and external marketing materials, including KPMG websites and social media, indicating the general services rendered (e.g., "Alta Mesa Holdings, LP is an Audit client of KPMG LLP"). Further, for purposes of the services described in this letter only, the Partnership hereby grants to KPMG a limited, revocable, non-exclusive, non-transferable, paid up and royalty-free license, without right of sublicense, to use all logos, trademarks and service marks of the Partnership solely for presentations or reports to the Partnership or for internal KPMG presentations and intranet sites.

The Partnership and KPMG acknowledge and agree that each shall comply with all applicable United States export control laws and regulations in the performance of each party's respective responsibilities under the Engagement Letter. Unless requested by KPMG to allow it to complete its audit, the Partnership will not provide KPMG, or grant KPMG access to, (a) information (including technical data or technology), verbally, electronically, or in hardcopy, (b) software or (c) hardware, that is controlled for export by the United States government under the Arms Export Control Act of 1976, Export Administration Act of 1979, the International Traffic in Arms Regulations ("ITAR"), Export Administration Regulations ("EAR"), Department of Energy Part 810 Regulations or Nuclear Regulatory Commission Part 110 Regulations, except information, software or hardware that is classified as EAR99 under the EAR ("Export Controlled Information"). If KPMG requests Export Controlled Information from the Partnership, the Partnership shall provide KPMG with notice of provision of Export Controlled Information at least 48 hours prior to providing such Export Controlled Information to KPMG.

KPMG is a limited liability partnership comprising both certified public accountants and certain principals who are not licensed as certified public accountants. Such principals may participate in the engagements to provide the services described in this letter.

Without our prior written approval, the Partnership will not solicit for employment, nor will the Partnership hire, any current or former partner or professional employee of KPMG or any of its affiliated member firms,

CONFIDENTIAL

Walters_SDTX0000904



Alta Mesa Holdings, LP
July 6, 2018
Page 9 of 12

in a financial reporting oversight role (as defined in the SEC independence rules) if such partner or professional employee previously participated in the audit of the Partnership's consolidated financial statements or quarterly review procedures until the applicable "cooling off" period under the SEC independence rules has expired. That period would commence with the latest date on which the individual participated in the annual audit or quarterly review procedures and would expire upon the filing by the Partnership of its Form 10-K for the succeeding fiscal year.

KPMG, as an accounting firm, has an obligation to comply with applicable professional standards. Certain professional standards, including AICPA Code of Professional Conduct Section 1.700, "Confidential Client Information Rule," adopted by the American Institute of Certified Public Accountants and similar rules adopted by the boards of accountancy of many states, prohibit the disclosure of client confidential information without client consent, except in limited circumstances. KPMG represents to the Partnership that KPMG will treat the Partnership's confidential information in accordance with applicable professional standards.

KPMG may work with and use the services of other members of the international KPMG network of independent firms and entities controlled by, or under common control with, one or more KPMG member firms (together with KPMG, the "KPMG Firms") to provide services to the Partnership. In connection with the performance of services under this Engagement Letter, the KPMG Firms may, in their discretion, utilize the services of third party service providers within or outside of the United States to complete the services under this Engagement Letter. KPMG Firms and such third parties may have access to your confidential information from offshore locations. In addition, KPMG uses third party service providers within and outside of the United States to provide, at its direction, back-office administrative and clerical, or analytical services to KPMG and these third party service providers may in the performance of such services have access to your confidential information. KPMG represents that it has technical, legal and/or other safeguards, measures and controls in place to protect your confidential information from unauthorized disclosure or use.

You also understand and agree that the KPMG Firms, with the assistance of third parties as outlined above, may use all the Partnership's information for other purposes consistent with our professional standards, such as improving the delivery or quality of audit and other services or technology to you and to other clients, thought leadership projects, to allow you and other clients to evaluate various business transactions and opportunities, and for use in presentations to you, other clients and non-clients. When your information is used outside of the KPMG Firms or such third parties assisting them as outlined above, the Partnership will not be identified as the source of the information.

It may be necessary or convenient for the Partnership to use KPMG-owned or -licensed software, software agents, scripts, technologies, tools or applications (collectively "KPMG Technology") designed to extract data from the Partnership's electronic books and records systems or other systems (collectively, "Systems"), in connection with the audit. The Partnership understands and agrees that it is solely responsible for following appropriate change management policies, processes and controls relating to use of such technology (including without limitation appropriate backup of the Partnership's information and Systems) (collectively, "Change Management Processes") before such KPMG Technology is utilized to extract data from the Systems. In the event the Partnership fails to use such Change Management Processes or if such Change Management Processes prove to be inadequate, the Partnership acknowledges that the Systems and/or KPMG Technology may not function as intended. In consideration of the foregoing, KPMG hereby grants the Partnership the right to use KPMG Technology solely to facilitate the Partnership's necessary or convenient provision of information to KPMG in connection with the audit, and this grant does not extend to any other

Walters_SDTX0000905



Alta Mesa Holdings, LP
July 6, 2018
Page 10 of 12

purposes or use by third parties outside of your organization without our prior written approval, provided that third party contractors of the Partnership having a need to know in order to perform their services to the Partnership are permitted to use KPMG Technology to the extent necessary for such parties to perform such services, so long as the Partnership has technical, legal and/or other safeguards, measures and controls in place to protect such KPMG Technology and the KPMG confidential information therein from unauthorized disclosure or use. Other than as expressly permitted hereby, the Partnership agrees to keep KPMG Technology confidential, using no less than a reasonable standard of care to protect it from unauthorized disclosure or use, and to notify KPMG of any legal compulsions to disclose it, in accordance with the provisions governing legal demand of confidential information which appear in this engagement letter with respect to which the KPMG Technology is being used, *mutatis mutandis*. If the KPMG Technology is subject to any third party license terms and conditions before being provided to the Partnership, the Partnership may be required to accept such terms and conditions before using the KPMG Technology, in which case KPMG will provide such license terms and conditions to the Partnership in writing before the Partnership elects to use the KPMG Technology.

Except as otherwise provided for in this Engagement Letter, neither party may assign, transfer or delegate any of its rights, obligations, claims or proceeds from claims arising under or relating to this Engagement Letter (including by operation of law, in which case the assigning party will, to the extent legally permissible, give as much advance written notice as is reasonably practicable thereof) without the prior written consent of the other party, such consent not to be unreasonably withheld. Any assignment in violation hereof shall be null and void.

The Partnership agrees to provide prompt notification if the Partnership or any of its subsidiaries whose financial statements are being audited by KPMG LLP, currently are, become subject to, or were previously but are no longer subject to, the laws of a foreign jurisdiction that require regulation of any securities issued by the Partnership or such subsidiary. Such situations could include but are not limited to the listing or selling of securities on a foreign securities market or exchange or the submission of filings to a foreign securities regulator. For the purpose of complying with S-X Rule 210.2-01 and related releases set forth in Section 600 of the Codification of Financial Reporting Policies (FRR) and other SEC correspondence relative to independence, the Partnership further agrees to provide to KPMG, at least annually, a complete and accurate legal entity listing and a listing of other affiliated entities not included on the legal entity listing (e.g., parent company, entities under common control, joint ventures, equity method investments, and others). The Partnership also agrees to provide information to KPMG about acquisitions, investments or other transactions that result in changes to the legal entity listing or the listing of other affiliated entities, not included on the legal entity listing, prior to the closing of the acquisition, investment or other transaction.

### *Access to Audit Documentation by Regulators and Others*

The audit documentation for this engagement is the property of KPMG. If KPMG receives a subpoena; other validly issued administrative, judicial, government or investigative regulatory demand or request; or other legal process requiring it to disclose the Partnership's confidential information ("Legal Demand"), KPMG shall, unless prohibited by law or such Legal Demand, provide prompt written notice to the Partnership of such Legal Demand in order to permit it to seek a protective order. So long as KPMG gives notice as provided herein, KPMG shall be entitled to comply with such Legal Demand to the extent required by law, subject to any protective order or the like that may have been entered in the matter. In the event KPMG is requested or

Walters_SDTX0000906



Alta Mesa Holdings, LP
July 6, 2018
Page 11 of 12

authorized by the Partnership, or is required by law, rule, regulation or Legal Demand in a proceeding or investigation to which KPMG is not a named party or respondent, to produce KPMG's documents or personnel as witnesses or for interviews, or otherwise to make information relating to the service under the Engagement Letter available to a third party, or the Partnership, the Partnership shall reimburse KPMG for its professional time, at its then-current standard hourly rates, and expenses, including reasonable attorneys' fees and expenses, incurred in producing documents or personnel or providing information pursuant to such requests, authorizations or requirements.

We may be requested to make certain audit documentation available to the PCAOB and state, federal, and foreign regulators pursuant to authority provided by law or regulation. If so requested, access to such audit documentation will be provided and KPMG will also respond to written and oral questions related to our audit, if received. Furthermore, the PCAOB and state, federal, and foreign regulators may obtain copies of selected audit documentation. The PCAOB and such regulators may intend, or decide, to distribute the copies or information so received to others, including the SEC and other government agencies. We agree to communicate to you on a timely basis (a) receipt of a notification of inspection by the PCAOB of the audit covered by this Engagement Letter and the related requests for access to the audit documentation and (b) when the PCAOB desires direct contact with members of the Audit Committee.

***Additional Reports and Services and Associated Fees***

Appendix I to this letter lists the additional reports we will issue and services we will provide as part of this engagement and our fees for professional services to be performed under this letter.

In addition, fees for any special audit-related projects, such as research and/or consultation on special business or financial issues, will be billed separately from the audit fees for professional services set forth in Appendix I and may be subject to written arrangements supplemental to those in this letter.

\* \* \* \* \* \* \*

Our engagement herein is for the provision of annual audit services for the financial statements and for the periods described in Appendix I, and it is understood that such services are provided as a single annual engagement. Pursuant to our arrangement as reflected in this letter, we will provide the services set forth in Appendix I as a single engagement for each of the Partnership's subsequent fiscal years until either the Audit Committee or we terminate this agreement or mutually agree to the modification of its terms. The fees for each subsequent year will be annually subject to negotiation and approval by the Audit Committee.

This Engagement Letter and any exhibits, attachments and appendices hereto, and amendments thereto agreed in writing by the parties, shall constitute the entire agreement between KPMG and the Partnership with respect to the subject matter hereof and thereof, and supersede all other previous oral and written representations, understandings or agreements relating to the subject matter of this agreement.

In accordance with your instructions, we have forwarded a copy of this letter to the Chief Financial Officer.



Alta Mesa Holdings, LP
July 6, 2018
Page 12 of 12

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us to indicate your acknowledgement of, and agreement with, the arrangements for our audit of the consolidated financial statements including our respective responsibilities.

Very truly yours,

KPMG LLP

*Mark E. Zajac*

Mark Zajac
*Partner*

**ACCEPTED:**

Alta Mesa Holdings, LP
By: Alta Mesa Holdings GP, LLC

_____
Ms. Diana J. Walters, Chairwoman of the Audit Committee of Alta Mesa Resources, Inc.

_____
Date

_____
Mr. Michael McCabe, Chief Financial Officer

_____
Date

_____
Mr. Ronald J. Smith, Vice President and Chief Accounting Officer

_____
Date

Walters_SDTX0000908



Alta Mesa Holdings, LP
July 6, 2018
Page 12 of 12


We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us to indicate your acknowledgement of, and agreement with, the arrangements for our audit of the consolidated financial statements including our respective responsibilities.

Very truly yours,

KPMG LLP

Mark E. Zajac

Mark Zajac
*Partner*


**ACCEPTED:**

Alta Mesa Holdings, LP
By: Alta Mesa Holdings GP, LLC

_____
Ms. Diana J. Walters, Chairwoman of the Audit Committee of Alta Mesa Resources, Inc.


7·6·18
_____
Date


_____
Mr. Michael McCabe, Chief Financial Officer


_____
Date


_____
Mr. Ronald J. Smith, Vice President and Chief Accounting Officer


_____
Date


CONFIDENTIAL



Alta Mesa Holdings, LP
July 6, 2018
Page 12 of 12

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us to indicate your acknowledgement of, and agreement with, the arrangements for our audit of the consolidated financial statements including our respective responsibilities.

Very truly yours,

KPMG LLP

*Mark E. Zajac*

Mark Zajac
*Partner*

**ACCEPTED:**

Alta Mesa Holdings, LP
By: Alta Mesa Holdings GP, LLC

_____
Ms. Diana J. Walters, Chairwoman of the Audit Committee of Alta Mesa Resources, Inc.

_____
Date

*M A*
_____
Mr. Michael McCabe, Chief Financial Officer

  7.9.18
_____
Date

*Ronald Smith*
_____
Mr. Ronald J. Smith, Vice President and Chief Accounting Officer

  7.9.18
_____
Date

Appendix I

## Fees for Services

Based upon our discussions with and representations of management, our fees for services we will perform are estimated as follows:

Audit and quarterly reviews of the consolidated balance sheets of Alta Mesa Holdings, LP as of December 31, 2018, the related consolidated statements of operations, changes in partners' capital (deficit), and cash flows for the period from January 1, 2018 to February 8, 2018 (predecessor) and the period from February 9, 2018 to December 31, 2018 (successor) and the related notes to the financial statements $450,000 – $495,000

Other Reports:

The other reports that we will issue as part of this engagement are as follows:

| Report | Fee |
| --- | --- |
| Offering, Comfort Letters and Consents (on a "per occurrence" basis) | Up to $125,000 per occurrence |
| Consultations with Management on Accounting Issues (on a "per occurrence" basis) | Up to $25,000 per occurrence |

| Hourly billing rates for any permissible out of scope services: | Fee |
| --- | --- |
| Audit Partner | $380 |
| Audit Senior Manager | $330 |
| Audit Senior Associate | $265 |
| Audit Associate | $185 |
| Specialist Partner | $575 |
| Specialist Senior Manager/Director | $425 |
| Specialist Senior Associate | $380 |

CONFIDENTIAL

Walters_SDTX0000911

The above estimates are based on the level of experience of the individuals who will perform the services. In addition, expenses are billed for reimbursement as incurred. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed.

Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to the client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges which may be charged to clients.

All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added, income or other applicable taxes, tariffs or duties, payment of which shall be the Partnership's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the employment or independent contractor relationship between KPMG and its personnel.

CONFIDENTIAL

# PX 380

| From: | Scott Grandt <sgrandt@AltaMesa.net> |
|---|---|
| Sent: | Fri, 20 Jul 2018 20:50:13 +0000 (UTC) |
| To: | "dl.AMRBOARDMEMBERS@altamesa.net" <dl.AMRBOARDMEMBERS@AltaMesa.net> |
| Cc: | "Michael A. McCabe" <mmccabe@AltaMesa.net>; Tim Turner<tturner@AltaMesa.net>; Craig Collins <CCollins@kingfishermidstream.net>; "Kevin J. Bourque" <kbourque@AltaMesa.net> |
| Subject: | AMR Investor Relations Update |
| Attachments: | 2018-07-19 Imperial Capital NDR.PDF;AMR_final_ 071618.pdf |

**Exhibit
CP 0312**
4/11/2023
Tepper

Alta Mesa Board Members,

At the request of Hal Chappelle, this is to provide a brief update on equity research on our company, as well as our IR efforts over the past several weeks.

**Investor Relations**
Overall dialogues with analysts continue, with momentum in the form of at least four additional analysts who are actively working on initiation reports.  Of those, one has the potential to be completed ahead of the Q2 release, and we expect to have a busy third quarter working with at least the other three to complete their reports.

Earlier this week, Irene Haas of Imperial Capital hosted Alta Mesa on a two-day non-deal roadshow.  Mike McCabe and Lance Weaver represented the company in meetings with several investors based in Boston and New York.  Attached is Imperial Capital's writeup summarizing those meetings.  This was to some degree an acknowledgement to Imperial for picking up coverage of AMR at an early stage.  From our perspective, a key objective was having some in-person dialogues with investors as we are shaping themes for the Q2 earnings call and releases.  The feedback received will be helpful in putting out materials that proactively address current investor questions.  Key Themes From the Roadshow:
- Midstream business outlook including SWD business, third party volume ramp, Cimarron Express bottom line impact, future IPO / monetization
- Stock price movement since merger and implication on stock / warrant repurchase
- Additional areas of upside from Major County, ESPs, etc.
- Consolidation and offset operator activity in the normally-pressured oil window of the STACK


**Recent Research – HS Energy Advisors Research Report**
HS Energy is a boutique research / banking shop that recently had a new analyst (Ray Deacon) assume coverage of AMR.  He published his initial write up on Thursday, which is also attached to this e-mail.  As a management team we had two brief calls with him, where he asked clarifying questions around our guidance, but he didn't show an interest in engaging more broadly with the senior leadership ahead of picking up coverage formally.  We'll continue to make ourselves available to him and help him continue to ramp up on the AMR story, especially on the midstream side (which had relatively little treatment in his report).  While at the moment we do not see these (or the predecessor HS Energy Analyst) numbers in consensus estimates, we understand they are working toward that goal.  A few key highlights from the report:
- Price Target: $11.00 / share (Represents a 12% discount to his NAV of $12.50 / share)
- Upstream Themes:
  - Production forecast for 2018 is midpoint of AMR guidance (35 mboe/d) and 2019 is 57 mboe/d, which is near the midpoint of the recent GS coverage initiation and the legacy AMR road show from the business combination
  - Acknowledge investor concerns around capital productivity trends in the STACK, given OK public data disclosures
  - Did their own analysis of public data and concluded even if you took public numbers at face value the breakeven prices would be ~$44/bbl, driven by AMR's lower cost structure / well design
  - While the near term focus is on the Miss section of the rock, they see significant potential in other horizons (Oswego, Manning etc.) and other areas (Major County, future M&A)
- Midstream Themes:
  - Acknowledged investor concerns around third party volume ramp timing and how less certainty of the rock quality in the NW STACK / Major County could shape more moderate long term growth expectations

for the midstream business
○ Limited other write ups / discussion beyond indicating a value of $1.3bn based on expected 2019 EBITDA of ~$140mm


Please let us know if you have any questions.

-Scott


--------------------------------------------------------------------
Scott Grandt
Vice President Finance and Investor Relations
Alta Mesa Resources, Inc.
O: 281-945-3357
M: 562-754-1555
sgrandt@altamesa.net

CONFIDENTIAL

# PX 381

| **From:** | Scott Grandt <sgrandt@AltaMesa.net> on behalf of |
| | Scott Grandt <sgrandt@AltaMesa.net> |
| **Sent:** | Wednesday, August 22, 2018 10:18 PM |
| **To:** | Pierre F. Lapeyre <pierre@riverstonellc.com> |
| **Cc:** | Hal H. Chappelle <hchappelle@AltaMesa.net>; Michael A. McCabe |
| | <mmccabe@AltaMesa.net>; David Leuschen <david@riverstonellc.com>; Tichio, |
| | Robert <rtichio@riverstonellc.com> |
| **Subject:** | RE: Riverstone Request - Corporate Model, Additional Details |
| **Attach:** | Consolidated Financial Model - Master v79.xlsx |

Pierre,

Attached is the current version of the corporate model. We've highlighted a few of the updates we are working through on the cover.

Please let us know if you have any questions.

-Scott

**From:** Lapeyre, Pierre F. [mailto:pierre@riverstonellc.com]
**Sent:** Tuesday, August 21, 2018 12:14 PM
**To:** Scott Grandt <sgrandt@AltaMesa.net>
**Cc:** Hal H. Chappelle <hchappelle@AltaMesa.net>; Michael A. McCabe <mmccabe@AltaMesa.net>; David Leuschen <david@riverstonellc.com>; Tichio, Robert <rtichio@riverstonellc.com>
**Subject:** RE: Riverstone Request - Corporate Model, Additional Details

Scott,

Understood, but we don't want to wait long before getting this information.

Let's start with the corporate model which should be relatively easy to provide now. We will review and set a time if we need more orientation to it. On the regular way updates, to be clear we are not asking for "customization" we just want to start seeing the same data you all review, presumably frequently, and we can certainly work together to refine it as we feel we need more details.

From our perspective this is a very time sensitive data request.

**From:** Scott Grandt [mailto:sgrandt@AltaMesa.net]
**Sent:** Tuesday, August 21, 2018 11:47 AM
**To:** Lapeyre, Pierre F.
**Cc:** Hal H. Chappelle; Michael A. McCabe; Leuschen, David; Tichio, Robert
**Subject:** RE: Riverstone Request - Corporate Model, Additional Details

Pierre,

Thanks for the note and understand the ask. Let me circle up internally on the best path forward for these more regular way updates to the Riverstone team.

Thanks,
Scott

**Exhibit
CP 0693**

6/13/2023
Lapeyre

AMR_SDTX01012969

**From:** Lapeyre, Pierre F. [mailto:pierre@riverstonellc.com]
**Sent:** Tuesday, August 21, 2018 10:08 AM
**To:** Scott Grandt <sgrandt@AltaMesa.net>
**Cc:** Hal H. Chappelle <hchappelle@AltaMesa.net>; Michael A. McCabe <mmccabe@AltaMesa.net>; David Leuschen <david@riverstonellc.com>; Tichio, Robert <rtichio@riverstonellc.com>
**Subject:** Riverstone Request - Corporate Model, Additional Details

Scott,

When we last spoke during the review of the analytics associated with the share repurchase analysis, I mentioned that we at RSH would like to get a copy (and be put on a re-occurring distribution list) of the latest updated full corporate model/projection that rolls into management guidance.  We would also like to start getting cc'd on the regular internal management reporting used by the team to track the detailed performance of both Upstream and KFM which presumably rolls into the corporate tracking/guidance model so that we can see in more granular detail and more frequently the progress at AMR.  You mentioned that you all were continuing to refine the model but we would prefer not to wait for the conclusion of that effort but to be able to follow along real-time given what has transpired over the last few months.  Not sure who is best to direct this to but since you and I had a conversation about it during the review of the share repurchase I thought I would start with you.  Please feel free to forward this email to whoever is needed internally.  On our end, we would like myself, David, and Robert to be cc'd.

If there are other specific internal tracking reports related to well performance, costs, pattern effectiveness, resulting returns, and "look-back" analysis, we would like to see those as well.  For KFM it would be helpful to see tracking reports on AMR volumes, 3rd party volume efforts/success, and similar information for the growing produced water business along with what you use to monitor cost and capex efficiency at KFM.

In addition, there seems to be frequent reference in the public market to the differences between OK/state reported well data and company reported well data for the industry as a whole in the play as investors wrestle to understand it.  We understand why this can occur, but if you track that for AMR and do a reconciliation on AMR wells that would also be helpful to see.

Happy to discuss live if need be.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.


CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

                                                                                      AMR_SDTX01012970

# Document Produced in Native Format

CONFIDENTIAL

AMR_SDTX01012971

# PX 382

| From: | Scott Grandt <sgrandt@AltaMesa.net> on behalf of |
| | Scott Grandt <sgrandt@AltaMesa.net> |
| Sent: | Thursday, November 15, 2018 4:37 AM |
| To: | Hal H. Chappelle <hchappelle@AltaMesa.net>; Jim Hackett <jhackett@AltaMesa.net> |
| Cc: | Tim Turner <tturner@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>; Craig Collins <CCollins@kingfishermidstream.net>; Kim Warnica <kwarnica@AltaMesa.net>; Lance Weaver <lweaver@AltaMesa.net>; Mike E. Ellis <mellis@AltaMesa.net>; Michael A. McCabe <mmccabe@AltaMesa.net>; F. David Murrell <dmurrell@AltaMesa.net>; Gene Cole <gcole@AltaMesa.net>; David McClure-KFM <DMcClure@kingfishermidstream.net> |
| Subject: | DRAFT: Q3 Earnings Trading / Investor Feedback Summary |
| Attach: | Q3-18 Post Call Research.pdf |

Hal and Jim,

Draft of what I was thinking of sharing with the board below.  PDF attached has a compilation of the notes that have been published.  Let me know if y'all have any thoughts / comments.  I'll plan to send this in the AM.  Subash indicated his report would be coming out at 6:00 AM tomorrow.

IDK if y'all think this is too long, but I thought the board would appreciate some of the additional color given the new lows. I've also copied a broader swath of management on this email so they can understand the views too.

-Scott

Dear AMR Board Members,

Wanted to share with you some commentary and overview of the market reaction to the Q3 earnings release, after the close on Tuesday.

**Trading Dynamics:**

Previous Close (Tue): $2.82
Close (Wed): $2.40 (-15% previous close)
Daily Range: $2.33 - $3.02
Volume: 5,186,430 shares
Volume (% 30 day Average): 375%

Very minimal after-hours activity Tuesday night / post the call or Wednesday AM pre-open.  The lack of liquidity in the market overnight resulted in a choppy tape to open the market.  We saw our stock push higher in the open to the intra-day high of $3.02 (+7%) before 9:40AM EST, before the decline began.  Our stock watch firm spoke to traders active on the session and noted there was a decent hedge fund seller working through Goldman this morning but the bulk of trading looks to be fast money / momentum oriented.  Through lunch no one had mentioned any major selling from AMR's chief long holders, but I did have one investor speculate Wellington was continuing to work out of its position later in the day. No way to verify that, so take that with a grain of salt.  Wellington has been a chief source of supply / pressure on the share price since mid-September so it may be people repeating the story of the past few months.  Shorts were the key source of liquidity today working both sides of the tape.  The brief pops in the stock over the course of the day were largely driven by short covering orders as the stock slid into oversold territory and hit new lows.

While our volume was fairly large vs. our average daily trading, our volume on average is pretty low.  At a VWAP on the day of $2.48 the dollar volume on the day was less than $13mm, less than 2% of our market cap and only ~5% of our float.  For comparison we traded 9.2mm shares the day of our Q2 earnings and another 8mm to 3mm on each of the next 6 trading days.  At a share price near $5.00 then it would have been close to 3x the dollar value traded post Q2.  I highlight this, since in talking with a number of the larger hedge funds (Point72 or similar), while frustrated on a day like today, they put less weighting on the market's view of value on a volume day like today vs. the reaction post Q2.

**Research Reaction / Commentary:**

We've attached the reports from each of our brokers.  A few key themes from each of them below.  Also attached is the transcript so you can see the Q&A by broker.  We've had follow up calls with each of these analysts since then as well.

AMR_SDTX00571483

*GS:* Maintained price target at $6.50.  Significant focus on read through of 5-7 wells per DSU on the inventory life and relative positioning of AMR within broad E&P resource company universe. Some recalibration as well of midstream EBITDA vs. their estimates.

*Imperial:* Lowered price target to $6.00 from $8.00.  Key reason for the price target pull back was less clarity on 2019 activity levels post our commentary around activity levels below 2018 levels.  Also looking for additional clarity on the infill type curve as a catalyst going forward.

*Stifel:* Maintained price target at $13.00.  Viewed the Q3 release as neutral.  If inventory were to be only 6 WPS they would bias their NAV down ~40% from current, but the change in the free cash flow profile from lower activity levels they think the market would reward.  Even if they took a straight 40% discount to their current NAV they would see significant value above where we trade currently.

*Guggenheim:*  [TO COME IN AM]

**Investor Focus / Reaction:**

I would bucket the reaction into a few types of investors based on when they bought into the name.

*SPAC Investors*: Chief questions we heard from them were focused on inventory.  Push back on why we had "defended" 8-12 wells per section for so long, while other peers and hinted at challenges in the play much earlier in the year. Confusion on why it took 30 patterns to understand the need for upsacing, which calls into question the pace we choose to pursue for 2018 vs. what we knew at the start of the year.  Some questions on KFM timing / ramp and the 2018 capex levels, but overwhelming focus was on inventory.

*Q2- Present Investors:* Most of the commentary from this group was head scratching on the trading today.  Many of them in their models / valuations had assumed we'd have some level of upspacing when they bought in and many bought after the KFM guidance was withdrawn in Q2 so they saw the release on Tuesday as the final clearing of the decks that should allow the stock price to start to recover.  Instead, they were surprised to be greeted this morning with the new "bear" thesis that weighed on the stock.  That thesis builds to a share price of <$2.50 by doing the following math:

KFM Annualized EBITDA $60mm x 10 = $600mm
Production of 33.4mboe/d x $20,000/boe/d = $700mm
Kingfisher County Acreage Value 100K x $2,500 / acre = $250mm (These pushed here is Gastar could not find a deal at $3,000 / acre so normal pressure must be worth less than that, Major county is not proven so no value)
Implied Total EV: $1,550mm
Less Net Debt: $614mm
Implied Equity Value: $936 mm
Implied Value Per Share (380mm shares out): $2.46

No investor told me that bear case directly, but Derrick our analyst at Stifel commented he'd heard it a number of times from investors today.

Please let me know if you have any question on the commentary above / attachments.

Thanks,
Scott


----------------------------------------------------------------------
Scott Grandt
Vice President Finance and Investor Relations
Alta Mesa Resources, Inc.
O: 281-945-3357
████████████████
sgrandt@altamesa.net

CONFIDENTIAL                                                                                                    AMR_SDTX00571484