# PX 383

**Category:** Chats/Private ████████
**From:** Hal Chappelle
**To:** Michael Ellis
**Timestamp:** 12/23/2018 5:10:10 PM -05:00
**Type:** iMessage

---

While it doesn't do any good and it won't change the situation, you're the only person I can say this to: as "angry" as Riverstone seems to be with us on the upstream, and as much as they are pointing fingeras at accounting ... we have much more reason to be "angry"'with them on the midstream — they totally and utterly failed to do the due diligence and put in place any semblance of a transition team (contrast it to how we managed the Meridian transition beginning many months before closing) ... as a consequence, you and I way overpaid. Jim never stepped in to do what was needed on midstream ... no offense to Craig, but it wasn't until July or August that he was able to start making plans — about a full year after Riverstone could have done their job

As I said, just sharing some thoughts with you and only you

That said, God has only the best in store for us and I'm looking forward to the future

**Exhibit
CP- 0730**
Chappelle

Chappelle_SDTX0007213

**Category:** Chats/Private ████████
**From:** Michael Ellis
**To:** Hal Chappelle
**Timestamp:** 12/23/2018 5:43:09 PM -05:00
**Type:** iMessage

Me too Brother. I have some thoughts and look forward to our three way discussion. No hurry.
Cheers

Chappelle_SDTX0007214

# PX 384

**Exhibit
CP 0350**
Walters

| **From:** | "John C. Regan" <jregan@AltaMesa.net> |
| **Sent:** | Wed, 10 Apr 2019 14:29:47 +0000 (UTC) |
| **To:** | "Diana Walters" <dwalters@thepavillionfarm.com> |
| **Cc:** | "Jeff Tepper" <jeff.tepper1@gmail.com>; "Sylvia Kerrigan" <Sylviakerrigan@yahoo.com>; "Kim Warnica" <kwarnica@AltaMesa.net> |
| **Subject:** | RE: Material Weakness Language |
| **Attachments:** | AMH 9A - National office draft.docx |

AC members,

I wanted to give you a view of where we stand on the 9A/SOX assessment.   We've continued to work with the Latham experts and the local KPMG team.

We've been pretty pliable in accepting the KPMG's comments.  The one observation that I have is that the language is pretty limited when compared to the guidance below from Diana via SEC.  Rather than make disclosure about how ineffective review procedures impacted the individual F/S line items, we've made reference only to the ineffective review controls.   This has been deliberate, since the weakness was fairly pervasive and would potentially impact multiple line items and potentially proliferate the disclosure.

For your review, I've attached the draft of the 9A that was sent to KPMG's national office.  This will appear in the updated 10-K draft that you're likely to receive later today.  One other note, I would expect the AMR 9A (when published) to be identically worded.  Please let me know if you have any questions.

Regan

---

**From:** Diana Walters <dwalters@thepavillionfarm.com>
**Sent:** Sunday, April 7, 2019 3:59 PM
**To:** John C. Regan <jregan@AltaMesa.net>
**Cc:** Jeff Tepper <jeff.tepper1@gmail.com>; Sylvia Kerrigan <Sylviakerrigan@yahoo.com>; 'Hackett, Jim' <JHackett@riverstonellc.com>; Kim Warnica <kwarnica@AltaMesa.net>
**Subject:** RE: Material Weakness Language

Agreed John.  Thank you.  My own "brush" seemed to match up to the guidance but I'm sure your chain of reviewers are on the job.

---

**From:** John C. Regan [mailto:jregan@AltaMesa.net]
**Sent:** Sunday, April 7, 2019 3:54 PM
**To:** Diana Walters
**Cc:** Jeff Tepper; Sylvia Kerrigan; Hackett, Jim; Kim Warnica
**Subject:** Re: Material Weakess Language

Thanks for sending along.  Zajac's initial draft didn't vary much from what had proposed.  We also had Latham's national office review which included former SEC staffers.  They liked our disclosure.

I'll brush that language against the pwc guidance below.  If we can get concurrence around all of the guidance and our language, I think we'll be well poised.

I appreciate your passing along
On Apr 7, 2019, at 3:30 PM, Diana Walters <dwalters@thepavillionfarm.com> wrote:

I was reading a PWC summary of accounting-related issues earlier today.  At the AICPA Conference in

December there were many issues addressed as it relates to  SEC reporting. This was the summary regarding disclosure on Material Weakness.  I send it to you just FYI given our forthcoming 10Ks:

"The Staff suggested management consider whether the disclosures (a) allow investors to understand what went wrong in the control that resulted in the material weakness; (b) clearly explain the impact of the material weakness on the financial statements (is the weakness pervasive or isolated to specific accounts or disclosures); and (c) provide sufficient details to understand management's plans to remediate the material weakness.  These three suggestions are a starting point for management, the audit committee, and the auditor to consider whether the disclosures provide the most meaningful and useful information for investors."

Apologies is this is repetitive information for any on this email but I thought it worth forwarding as an additional check on this section of our disclosure.

Diana

CONFIDENTIAL

# PX 385

REDACTED IN ITS ENTIRETY

# PX 386

# Document Produced in Native Format

CONFIDENTIAL

Will called both Jeff and I separately this AM and wants the BoD to consider voting in Jim as Interim CEO immediately. He is checking into his independence with counsel and will let me know be thinks he is ok. We may need to have a call later today. He has spoken to Jim as well. I'm available if you need any more info.

# PX 387

| | |
|---|---|
| **From:** | "Hackett, Jim" <JHackett@riverstonellc.com> |
| **Sent:** | Mon, 24 Jul 2017 00:05:49 +0000 (UTC) |
| **To:** | "Debbie.Yee@lw.com" <Debbie.Yee@lw.com>; "Wassenaar, Olivia"<owassenaar@riverstonellc.com>; "Nick.Luongo@lw.com" <Nick.Luongo@lw.com> |
| **Subject:** | FW: SRII - Certificate of Designation (Riverstone).DOCX;SRII - Certificate of Designation.DOCX |

Debbie,

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

Jim
Please call me at ███████████ as needed.

---

**From:** Harlan Chappelle <hchappelle@AltaMesa.net>
**Date:** Sunday, July 23, 2017 at 6:52 PM
**To:** James Hackett <JHackett@riverstonellc.com>
**Cc:** "Menke, John" <John.Menke@haynesboone.com>, "Debbie.Yee@lw.com" <Debbie.Yee@lw.com>, "Wassenaar, Olivia" <owassenaar@riverstonellc.com>
**Subject:** Re: SRII - Certificate of Designation (Riverstone).DOCX;SRII - Certificate of Designation.DOCX

There must be a misunderstanding as we have been processing several last minute changes as well.

I think the issue was that Riverstone wanted to have the right to appoint the chairman even if it had 5% -- did I get that wrong?

Sent from my iPhone
On Jul 23, 2017, at 6:51 PM, Hackett, Jim <JHackett@riverstonellc.com> wrote:

> BTW – this is very late in the day to be suggesting a change on the Chairman role as you are. I will speak to Hal. When did 5 years become "near-perpetual" and perhaps you don't realize that I am attaching my name and reputation to a new management team with whom I have never worked. Suggesting that I cannot have a say at the table for even 5 years is UNACCEPTABLE. I raised 24% of the stock for this new company based on my name and reputation and am bringing RSH with me, which represents another 20%, so your 20% is actually 44%.

---

**From:** "Menke, John" <John.Menke@haynesboone.com>
**Date:** Sunday, July 23, 2017 at 6:31 PM
**To:** "'Debbie.Yee@lw.com'" <Debbie.Yee@lw.com>, "Chad.MacDonald@lw.com" <Chad.MacDonald@lw.com>, James Hackett <JHackett@riverstonellc.com>, "Wassenaar, Olivia" <owassenaar@riverstonellc.com>, "Tichio, Robert" <rtichio@riverstonellc.com>, drew karian <dkarian@riverstonellc.com>, steve coats

<scoats@riverstonellc.com>, "Wang, Kevin" <KWang@riverstonellc.com>, "Dodds Williamson, Chelsea"
    <cwilliamson@riverstonellc.com>, "Babaria, Neil" <NBabaria@riverstonellc.com>,
    "Nick.Luongo@lw.com" <Nick.Luongo@lw.com>, "Bill.Finnegan@lw.com" <Bill.Finnegan@lw.com>,
    "Brad.Guest@lw.com" <Brad.Guest@lw.com>, "Daniel.Kecman@lw.com" <Daniel.Kecman@lw.com>,
    "Jayne.Wabeke@lw.com" <Jayne.Wabeke@lw.com>, "Patrick.Sanford@lw.com"
    <Patrick.Sanford@lw.com>, "Bryan.Ryan@lw.com" <Bryan.Ryan@lw.com>

**Cc:** "Odette, Vicki" <Vicki.Odette@haynesboone.com>, "Nelson, Bill" <Bill.Nelson@haynesboone.com>,
    "Trauger, Kristina" <Kristina.Trauger@haynesboone.com>, "Lichtman, Sam"
    <Sam.Lichtman@haynesboone.com>, "Shiman, Don" <Don.Shiman@haynesboone.com>, "Rice, Nick"
    <Nick.Rice@haynesboone.com>, Harlan Chappelle <hchappelle@altamesa.net>, Mike McCabe
    <mmccabe@altamesa.net>, "talsarraf@altamesa.net" <talsarraf@altamesa.net>,
    "marnold@AltaMesa.net" <marnold@AltaMesa.net>, "skalish@AltaMesa.net" <skalish@AltaMesa.net>,
    "rsmith@AltaMesa.net" <rsmith@AltaMesa.net>, "ttran@AltaMesa.net" <ttran@AltaMesa.net>,
    "jeff.hostettler@hpspartners.com" <jeff.hostettler@hpspartners.com>,
    "Jason.Jean@bracewelllaw.com" <Jason.Jean@bracewelllaw.com>,
    "Elizabeth.McGinley@bracewelllaw.com" <Elizabeth.McGinley@bracewelllaw.com>,
    "Vivian.Ouyang@bracewelllaw.com" <Vivian.Ouyang@bracewelllaw.com>,
    "catherine.cusimano@hpspartners.com" <catherine.cusimano@hpspartners.com>, "Will (iam)
    McMullen" <will@bayoucityenergy.com>, "mark@bayoucityenergy.com"
    <mark@bayoucityenergy.com>, "Darren@bayoucityenergy.com" <Darren@bayoucityenergy.com>,
    "andrew@bayoucityenergy.com" <andrew@bayoucityenergy.com>, "wbenitez@kirkland.com"
    <wbenitez@kirkland.com>, "mark.dundon@kirkland.com" <mark.dundon@kirkland.com>,
    "jesse.wallin@kirkland.com" <jesse.wallin@kirkland.com>, "jeannie.poland@kirkland.com"
    <jeannie.poland@kirkland.com>, "cyril.jones@kirkland.com" <cyril.jones@kirkland.com>, "Santamaria,
    Kristin" <Kristin.Santamaria@haynesboone.com>, "Sun, Simin" <Simin.Sun@haynesboone.com>,
    "Menke, John" <John.Menke@haynesboone.com>

**Subject:** SRII - Certificate of Designation (Riverstone).DOCX;SRII - Certificate of Designation.DOCX

Attached please find our revised drafts of the two preferred stock designations.
We do not believe that any shareholder should have a near-perpetual right to appoint the chairman of
the board to a public company based upon even a 20% ownership position. We are very interested in
the stock trading well and want the board to look like other publicly traded companies. In addition, we
don't believe a Riverstone-nominated chairman other than Jim Hackett should require automatic
support.

## haynes*boone*
**John W. Menke**
Counsel
john.menke@haynesboone.com

**Haynes and Boone, LLP**
1221 McKinney Street
Suite 2100
Houston, TX 77010

(t) 713.547.2584
(f) 713.236.5429

vCard | Bio | Website

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended
recipient. If you have received this transmission in error, please
immediately notify the sender and delete it from your system.
    CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

RIVERSTONE_SDTX00222849

# PX 388

REDACTED IN ITS ENTIRETY

# PX 389

| | |
|---|---|
| **From:** | "Hackett, Jim" <JHackett@riverstonellc.com> |
| **Sent:** | Sat, 12 Aug 2017 12:50:34 +0000 (UTC) |
| **To:** | "Lapeyre, Pierre F." <pierre@riverstonellc.com> |
| **Cc:** | "Leuschen, David" <david@riverstonellc.com>; "Tichio, Robert"<rtichio@riverstonellc.com>; "Wassenaar, Olivia"<owassenaar@riverstonellc.com> |
| **Subject:** | Re: Proposed Email / Attachment |

Olivia and I have spoken to the other side numerous times since we sent the email yesterday afternoon.

On Aug 11, 2017, at 8:05 PM, Lapeyre, Pierre F. <pierre@riverstonellc.com> wrote:

> Good news. So if i got it right no additional earnout and they accept the additional cut - did they ever call you or just over email ?

Pierre F. Lapeyre Jr.
Riverstone
O: 212.993.0093 ███████████
E: Pierre@riverstonellc.com
Sent from my iPhone

On Aug 11, 2017, at 8:03 PM, Hackett, Jim <JHackett@riverstonellc.com> wrote:

> Up to the lawyers now. Please call Olivia or me with questions.

Begin forwarded message:

> **From:** <JHackett@riverstonellc.com>
> **Date:** August 11, 2017 at 8:01:22 PM EDT
> **To:** "Hal H. Chappelle" <hchappelle@AltaMesa.net>
> **Cc:** Zach Lee <zachlee@armenergy.com>, "Michael A. McCabe" <mmccabe@AltaMesa.net>, Michael Christopher <michael.christopher@armenergy.com>, Olivia Wassenaar <owassenaar@riverstonellc.com>
> **Subject: Re: Proposed Email / Attachment**

> Thank you. Olivia is on it.

On Aug 11, 2017, at 6:47 PM, Hal H. Chappelle <hchappelle@AltaMesa.net> wrote:

> > Jim - Zach and I agree to the terms proposed and are pleased to affirm our desire to build a great enterprise with you.

I recommend we ask Olivia, Mike and Mike to jointly communicate with our


**Exhibit
CP-0398**
Chappelle

RIVERSTONE_SDTX00224611

respective counsel to ensure mutual understanding so that documents may be
finalized and executed.

All the best,

Hal

Sent from my iPhone

On Aug 10, 2017, at 3:38 PM, Hackett, Jim <JHackett@riverstonellc.com> wrote:

Dear Hal and Zach,

Riverstone is prepared to sign and announce a proposed transaction as soon as practicable, with the features outlined below and in the attachment above. Our proposal to you, which we discussed earlier today, is an attempt to split, in half, what we believe are two strongly held sets of convictions on each side about the value of the combined assets in the equity markets of today and for the next six months. The investors on both sides of this transaction are very focused on a high performing stock at consummation of the SPAC vote (preferring no redemptions if possible), which can set the pattern for equity performance over the near-term and our ability to raise additional capital during a very important part of the industry evolution in the Anadarko Basin.  If this number cannot be agreed upon, as proposed, we should both consider pursuing other alternatives, much as I (and the rest of the Riverstone team) are highly reluctant to do so. We have grown to value the relationships and assets even more over the last three months and are simply trying to make the market dynamics work for a successful outcome in a market that does not yet recognize the full value that we all see in the eastern portion of the STACK.

                                        RIVERSTONE_SDTX00224612

To summarize, we are prepared to offer the following revised proposal:

- Total purchase price of $3.55 billion for Alta Mesa and KFM combined
- Total earnout of $1.0 billion for Alta Mesa and KFM combined
  - $250 million awarded at $14 / $16 / $18 / $20 per share; 7-year term
- KFM equity rolled to achieve 1.0x LTM Net Debt / EBITDA at transaction close
  - Estimated range of ~$500 to $650 million, depending on purchase price allocation between KFM and Alta Mesa
- Alta Mesa / ARM / HPS lock-up on incremental rolled KFM equity would be only 90 days (vs. 180 days agreed to on the rest of the shares)
- Riverstone will commit up to $800 million to support the business:
  - $400 million forward purchase agreement
  - $200 million at signing, which converts to an equity investment in the private company if the deal does not close
  - $200 million reserved to cover up to $200 million in redemptions

Please pass this on to BCE and Highbridge. I am available to discuss it at any point.

With warmest regards and continued affection for everyone involved,

Jim

CONFIDENTIALITY NOTICE:

**The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.**

&lt;SR2 - RSH Counterproposal - 10-Aug-2017.pptx&gt;

RIVERSTONE_SDTX00224614

# PX 390

Message
_____

**From**:          Tim Turner [tturner@AltaMesa.net]
on behalf of     Tim Turner <tturner@AltaMesa.net> [tturner@AltaMesa.net]
**Sent**:          9/3/2018 10:05:13 PM
**To**:            Hal H. Chappelle [hchappelle@AltaMesa.net]
**CC**:            Scott Grandt [sgrandt@AltaMesa.net]; Kevin J. Bourque [kbourque@AltaMesa.net]
**Subject**:       Re: Metrics for Barclays


Sitting on the plane, hearing we have no WiFi. I have patterns on my desktop so I can work those, whether or not we use them. They'll be instructional for me anyway. I can do a ROR range with a risked IP of 225 bopd and reserves of 150, 175, 200 and 225 MBO. At least, that seems to be the range.

Tim

On Sep 3, 2018, at 4:58 PM, Hal H. Chappelle <hchappelle@AltaMesa.net> wrote:

> Since Tim was in the airport (his delayed flight leaves in a few mins) we had a brief call.  I will send notes.  We can discuss later.  We are not really apart on views for the deck with exception of whether to have pattern data in the appendix.  Remember that variability is inherent in every single resource play, whether initial well or infill well, single well or pattern.
>
> Perhaps later when Tim gets home we can recap.
>
> Hal
>
> Sent from my iPhone
>
> On Sep 3, 2018, at 4:50 PM, Scott Grandt <sgrandt@AltaMesa.net> wrote:
>
>> I would push back on the more data gives more insight in this context.  It may to engineers / informed upstream folks, but I think investor feedback has been: we want to know what numbers you are going to hit.  I think the data, without context of how to update the type curves in their models could lead to incremental confusion.
>>
>> I would challenge us as an organization if we are comfortable communicating even a range of what infill well IRRs look like vs. initial DSU wells.  I know we have that as a to do, but I think that is a number we need to have significant support for and we are not at that point with well data.  All of our desire to show different patterns is to actually highlight the variability such that we don't know yet.  I would think any number we shared (even a range) would need to have a more robust review than what we have time for in the coming 36 hours (implications on NAV, pro forma location assumptions etc. etc.).
>>
>> I am not comfortable with the new slide 12 that Tim made being in this deck.  I would put the old multi pattern graph back in.  Sounds like you're ok with that approach Hal? In case I wasn't clear with my communication below, I know no one on this email chain would read that slide as "the new type curve will be higher" but it is how an investor is going to think they are supposed to take it because the game many company's play is low initial type curve, beat it beat it beat it, raise it.

**Exhibit
CP-0417**
Grandt

I get an updated script / talking points around late tonight along with a list of what I think the top Q&A will be.

Thanks.

**From:** Hal H. Chappelle
**Sent:** Monday, September 3, 2018 1:44 PM
**To:** Scott Grandt <sgrandt@AltaMesa.net>
**Cc:** Tim Turner <tturner@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
**Subject:** Re: Metrics for Barclays

Re IRR I may not have communicated well but I'm saying no, it's not relevant at this point since the only data we could show are aged (we don't have a mean result for infill wells yet). The only thing we could possibly say is that infill well IRRs would be xx% at yy% reduction from the mean well result for original unit wells.

The counter point on patterns is we've showed the total picture several times ... showing one or several gives more insight ... we should discuss whether 3-4 patterns would be instructive ... perhaps in an appendix and leave the "21 pattern"'picture on the main slide.

I take no intent on Tim's part to suggest straight Edge is a "new type curve". As I've commented, I do believe it would be helpful to show the variability or outcomes for infills. As I said above, perhaps we leave the main slide as you've shown it and have a slide in the appendix that has, say, Themer, Straight Edge/Slaughter House (this is really one pattern), Huntsman/Old Crab (again, one large pattern), and another. I like the three listed because they occupy significant geographic breadth — which has traditionally been an investor concern.

And there has not been a sign off on pattern / infill EUR ... this is a work in progress and we should communicate as such ... the mean well / pattern result is one better judged at year end with much more data and subject to third party audit — when the sign off occurs.

The artificial lift slide continues to tell the story that we are applying fundamental production practices to manage the life cycle.

Sent from my iPhone

On Sep 3, 2018, at 1:26 PM, Scott Grandt <sgrandt@AltaMesa.net> wrote:

> Before we start spending time on all of this, I don't disagree with the list, but are we really ready to talk about the new pattern IRR? If this just becomes a repeat of what we've said about initial DSU wells it isn't what's needed right now.

CONFIDENTIAL

I have been thinking for the past few hours and I actually don't think we should show any of the broken out pattern results.  We should stick to the legacy graph of 21 patterns vs. type curve.  It shows just how much new data we have gotten this year, which is a key point.  I know Hal has consistently commented about how we share more data than anyone else. Why do we really want to keep going down that path?  None of us would argue that the Straight edge is going to be the new type curve for patterns going forward.  I know you don't mean it that way, but it comes off that way when you put it in a slide without also showing a pattern that is a total bust.  The only type well I've heard broader sign off on from Mike E has a lower IP and a lower EUR.  So if that's where we are heading, I wouldn't be leaning in too much here (even unintentionally) by highlighting 2 good patterns.

Similarly I would eliminate the ESP slide.  I know why we are doing ESPs this year (chasing production), but I haven't seen compelling economics for the average esp install.  When we looked at the average for the 40 something wells we got an extra 60bbls / day (above starting 100 bbls/ day) for 30-60 days.  That doesn't cover a 400k esp.  I don't want to keep hitting this point if it turns out next year we do 15-20 instead of 45 because our objective changes.

I think the core message of the conference is:

1)  We have a world class combined upstream and midstream asset
2)  2018 has been a massive year of transition and learning
3)  If we knew then what we know now we'd have forecasted 2018 differently.  While we are not ready to adjust / comment on a new type curve or a "pattern" curve, we do know that we underestimated how long water impacts / shut in impacts were hitting offset wells and how patterns clean up
4)  We think the current pace of 8 going to 10 rigs balances accelerating learning for not destroying value through un-optimized development

I really think the key themes for the conference

**From:** Hal H. Chappelle
**Sent:** Monday, September 3, 2018 1:01 PM
**To:** Tim Turner <tturner@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
**Cc:** Scott Grandt <sgrandt@AltaMesa.net>
**Subject:** Metrics for Barclays

Ideally, we want to communicate to investors the following:
- Individual well IRR (average), possibly Pattern IRR in the future?
- F&D Costs, $/BOE
- Recycle Ratio
- LOE/BOE
- Cash Flow, YTD

- EBITDAX / EBITDA, YTD
- Production, YTD and projected
- CAPEX, YTD and projected
- # Wells online, YTD
- $/well delivered
- $/lateral foot delivered

I've highlighted the metrics that we need updated reserves / mean well results / type curves for …. That's really the first three.  But the rest of these are candidates to include in a metrics page.  Perhaps we use the YE 2017 IRR/F&D/Recycle Ratio since these are done annually with our audited reserves.

CONFIDENTIAL

# PX 391

REDACTED IN ITS ENTIRETY

# PX 392

# SILVER RUN ACQUISITION CORP II

# FORM 8-K
(Current report filing)

# Filed 08/16/17 for the Period Ending 08/16/17

| | |
|---|---|
| Address | 1000 LOUISIANA STREET |
| | SUITE 1450 |
| | HOUSTON, TX 77002 |
| Telephone | 713-357-1400 |
| CIK | 0001690769 |
| Symbol | SRUN |
| SIC Code | 6770 - Blank Checks |
| Industry | Holding Companies |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2017, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

CONFIDENTIAL                                                                    AMR_SDTX01781036

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

........................................................................

# FORM 8-K

## CURRENT REPORT

........................................................................

### PURSUANT TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **August 16, 2017**

# SILVER RUN ACQUISITION CORPORATION II
(Exact name of registrant as specified in its charter)

| Delaware | 001-38040 | 81-4433840 |
|---|---|---|
| ( State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1000 Louisiana Street, Suite 1450**
**Houston, TX, 77002**
(address of principal executive offices)
(zip code)

**(713) 357-1400**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).   Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

CONFIDENTIAL

AMR_SDTX01781037

**Item 7.01 Regulation FD Disclosure**

On August 16, 2017, Silver Run Acquisition Corporation II (the " *Company* ") issued a press release announcing that it has entered into definitive agreements to combine with Alta Mesa Holdings, LP (" *Alta Mesa* "), an independent oil and natural gas company with assets located in the STACK play in Oklahoma, and Kingfisher Midstream, LLC (" *Kingfisher* "), a company engaged in the gathering, processing, and marketing of crude oil, natural gas, natural gas liquids, and condensate in the STACK play, subject to certain conditions contained in the definitive agreements (collectively, the " *business combination* "). The full text of the press release is included as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated into this Item 7.01 by reference.

In accordance with General Instruction B.2 of Form 8-K, the information set forth in this Item 7.01 and the attached Exhibit 99.1 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

**Item 8.01 Other Events**

To the extent required, the information included in Item 7.01 of this Current Report on Form 8-K is incorporated into this Item 8.01.

**Item 9.01 Financial Statements and Exhibits**

**(d) Exhibits.**

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 99.1 | Press Release dated August 16, 2017. |

**Legend Information**

**Forward-Looking Statements**

This communication includes certain statements that may constitute "forward-looking statements" for purposes of the federal securities laws. Forward-looking statements include, but are not limited to, statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements may include, for example, statements about the Company's ability to effect the business combination; the benefits of the business combination; the future financial performance of the Company following the business combination; changes in Alta Mesa's and Kingfisher's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management. These forward-looking statements are based on information available as of the date of this Current Report on Form 8-K, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing the Company's views as of any subsequent date, and the Company does not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.  You should not place undue reliance on these forward-looking statements. As a result of a number of known and unknown risks and uncertainties, the Company's actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include: (i) the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the definitive agreements relating to the business combination; (ii) the outcome of any legal proceedings that may be instituted against the Company following announcement of the proposed business combination; (iii) the inability to complete the business combination due to the failure to obtain approval of the stockholders of the Company, or other conditions to closing in the definitive agreements relating to the business combination; (iv) the risk that the proposed business combination disrupts current plans and operations of the Company, Alta Mesa or Kingfisher as a result of the announcement and consummation of the proposed business combination; (v) the Company's ability to realize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of the Company to grow and manage growth profitably following the business combination; (vi) costs related to the business combination; (vii) changes in applicable laws or regulations; and (viii) the possibility that the Company, Alta Mesa or Kingfisher may be adversely affected by other economic, business, and/or competitive factors.

2

AMR_SDTX01781038

**No Offer or Solicitation**

This Current Report is for informational purposes only and shall not constitute an offer to sell or the solicitation of an offer to buy any securities pursuant to the proposed business combination or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act.

**Important Information For Investors and Stockholders**

In connection with the proposed business combination, the Company intends to file a proxy statement with the Securities and Exchange Commission (the "*SEC*"). The definitive proxy statement and other relevant documents will be sent or given to the stockholders of the Company and will contain important information about the proposed business combination and related matters. The Company stockholders and other interested persons are advised to read, when available, the proxy statement in connection with the Company's solicitation of proxies for the meeting of stockholders to be held to approve the business combination because the proxy statement will contain important information about the proposed business combination. When available, the definitive proxy statement will be mailed to the Company stockholders as of a record date to be established for voting on the business combination. Stockholders will also be able to obtain copies of the proxy statement, without charge, once available, at the SEC's website at www.sec.gov.

**Participants in the Solicitation**

The Company and its directors and officers may be deemed participants in the solicitation of proxies of the Company's stockholders in connection with the proposed business combination. The Company stockholders and other interested persons may obtain, without charge, more detailed information regarding the directors and officers of the Company in the Company's Registration Statement on Form S-1 initially filed with the SEC on March 2, 2017. Additional information will be available in the definitive proxy statement when it becomes available.

3

CONFIDENTIAL

AMR_SDTX01781039

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Silver Run Acquisition Corporation II

Date: August 16, 2017

By:      /s/ Thomas J. Walker
Name:    Thomas J. Walker
Title:   Chief Financial Officer

4

CONFIDENTIAL

AMR_SDTX01781040

EXHIBIT INDEX

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 99.1 | Press Release dated August 16, 2017. |

5

AMR_SDTX01781041

FOR IMMEDIATE RELEASE

### Silver Run Acquisition Corporation II to Merge with Alta Mesa and Kingfisher Midstream to Form a Combined Company Valued at Approximately $3.8 Billion

**HOUSTON, TX, August 16, 2017** — Silver Run Acquisition Corporation II ("Silver Run II") (NASDAQ: SRUN, SRUNU, SRUNW) today announced that, subject to certain conditions, it has entered into definitive agreements to combine with Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream, LLC ("Kingfisher"). Alta Mesa is an independent exploration and production company with assets located in the STACK play in Oklahoma. Kingfisher is a company engaged in the gathering, processing, and marketing of hydrocarbons in the STACK play (collectively, the "business combination").

Founded in 1987 by Michael E. Ellis and based in Houston, Texas, Alta Mesa is a leading pure-play exploration and production company focused on the prolific STACK play in the Anadarko Basin. With approximately 120,000 contiguous net acres and about 4,200 gross identified drilling locations, Alta Mesa is among the largest and most active operators in the STACK. Since 2012, Alta Mesa has drilled to total-depth 205 STACK horizontal wells, in order to further delineate and de-risk its approximate 300 square mile position in the up-dip oil window of the STACK. To date, Alta Mesa has completed 173 of these wells, with 167 on production. Based upon production through the second quarter of 2017, Alta Mesa expects EURs at year end to exceed 650 MBOE per well or approximately 140 BOE per foot of lateral.

Kingfisher Midstream is a private midstream company with a leading position in the STACK play, with Alta Mesa serving as its anchor producer. Kingfisher's assets include over 300 miles of pipeline, 50 thousand barrels of crude storage capacity, and 60 MMcf/d of gas processing capacity with an additional 200 MMcf/d cryogenic plant expansion expected to commence operations in the fourth quarter of 2017. With approximately 300,000 gross dedicated acres from Alta Mesa and five other third party customers, Kingfisher is uniquely positioned to capitalize on the increasing development activity in the STACK.

At consummation of the transaction, Silver Run II is expected to be renamed Alta Mesa Resources, Inc. and trade on the NASDAQ stock exchange under the ticker symbol "AMR". James T. Hackett, Chairman and Chief Executive Officer of Silver Run II, will serve as Executive Chairman following the consummation of the business combination, while Harlan H. Chappelle, Michael E. Ellis, and Michael A. McCabe will continue as Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Alta Mesa Resources, Inc., respectively.

Mr. Hackett commented, "We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform. The combination of Alta Mesa and Kingfisher is a perfect strategic match for our desired integrated platform. Alta Mesa's highly contiguous core acreage position in Northeast Kingfisher County has among the lowest breakevens in the U.S. at around $25 per barrel. Kingfisher adds a highly strategic and synergistic midstream subsidiary with significant additional third party growth potential. We are excited about the possibilities for the combined company, including a potential future midstream IPO. Importantly, the current owners of Alta Mesa and Kingfisher are investing alongside Silver Run II's stockholders by committing to hold significant amounts of equity in the combined company. I am very excited about the opportunity to work alongside Hal Chappelle, Mike Ellis, Mike McCabe and the Alta Mesa team in this pure-play STACK upstream and midstream company. It is the first of its kind in the public markets, and we believe it creates significant advantages for both organic and inorganic growth for our stockholders."

1

CONFIDENTIAL

AMR_SDTX01781042

Mr. Chappelle stated, "We see this as a tremendous way to continue our evolution as a low-cost, high-value producer in the STACK. We have been fortunate to have strong financial partners in HPS Investment Partners and Bayou City Energy during a pivotal stage of growth, and we are well-positioned for this next stage. Mike Ellis and I are excited about the opportunity to work with Jim Hackett, Silver Run II, and Riverstone to continue building a great enterprise. Kingfisher Midstream is a creative addition, as it has been an important factor in our growth, providing effective gathering, efficient processing, and assurance that our production will continue to flow as the activity in the basin expands."

Zach Lee, Chief Executive Officer of ARM Energy Holdings, LLC ("ARM"), the operator of Kingfisher's assets and an equity owner of Kingfisher, noted, "We are very pleased by the success that Kingfisher has garnered. ARM's downstream intelligence and in-depth fundamentals analysis identified the STACK play early as a rapidly growing region in need of midstream infrastructure and proactively solved for a takeaway solution for its producer partners, chief among them Alta Mesa as one of the most active and successful drillers in the play. We have experienced firsthand the production growth Alta Mesa has been able to achieve and are pleased to be a shareholder and continue our partnership with our existing financial partner, HPS Investment Partners, as well as Silver Run II, Riverstone, and Alta Mesa."

Alta Mesa Resources will have an aggregate market capitalization of approximately $3.8 billion. At $10.00 per share, the combined company would represent a valuation of 7.1x FV/2018E EBITDA. Alta Mesa would represent 6.1x FV/2018E EBITDA, and Kingfisher would represent 7.3x FV/2018E EBITDA. Riverstone and Alta Mesa management will collectively own a significant portion of the combined company, representing approximately 34% of the pro-forma market capitalization.

The transaction is subject to the approval of Silver Run II stockholders and the satisfaction or waiver of other customary closing conditions, including the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. The transaction is expected to close in the fourth quarter of 2017.

The description of the business combination and related transactions contained herein is only a summary and is qualified in its entirety by reference to the related contribution agreements and other related agreements.

**Advisors**

Citigroup acted as capital markets advisor to Silver Run II, Tudor, Pickering, Holt & Co. acted as financial advisor to Silver Run II, and Latham & Watkins LLP acted as its legal counsel.

Citigroup acted as sole financial advisor and lead capital markets advisor to Alta Mesa. Goldman Sachs and Morgan Stanley also acted as capital markets advisors to Alta Mesa. Haynes & Boone LLP acted as legal advisor to Alta Mesa.

JP Morgan served as lead financial advisor and Barclays acted as co-financial advisor to Kingfisher. Bracewell LLP acted as legal advisor to HPS Investment Partners and Kingfisher, Durham, Jones & Pinegar acted as legal advisor to ARM and Kirkland & Ellis LLP represented Bayou City Energy.

**Investor Call and Presentation Information**

A pre-recorded conference call offering commentary from management of Silver Run II and Alta Mesa on the transaction details will be made available to all investors on August 17, 2017 at 5:00 a.m. Central time (6:00 a.m. Eastern time). The pre-recorded remarks can be accessed via webcast by visiting the following website: www.altamesa.net. In addition, an investor presentation will be filed with the Securities and Exchange Commission (the "SEC") on August 17, 2017, which can be viewed on the SEC website at www.sec.gov.

CONFIDENTIAL                                                                                           AMR_SDTX01781043

**About Silver Run Acquisition Corporation II**

Silver Run Acquisition Corporation II is an energy-focused special purpose acquisition company formed by Riverstone Holdings LLC ("Riverstone") for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. The company's strategy is to identify, acquire and, after its business combination, build a company in the energy industry that complements the experience of its management team and can benefit from their operational experience and expertise.

**About Alta Mesa Resources, Inc.**

Alta Mesa Resources is an independent exploration and production company focused on the development and acquisition of unconventional oil and natural gas reserves in the Anadarko Basin.

**About Kingfisher Midstream, LLC**

Kingfisher was formed by HPS Investment Partners and ARM to provide midstream energy services, including crude oil gathering, gas gathering and processing and marketing to producers of natural gas, natural gas liquids ("NGLs"), crude oil and condensate.

**About ARM Energy Holdings, LCC**

ARM Energy Holdings, LLC ("ARM") is a private, Delaware limited liability company. ARM is a producer services company operating in the physical marketing, trading and midstream sectors. Additionally, ARM provides hedging advisory services to over 130 upstream companies.

**About Riverstone Holdings, LLC**

Riverstone Holdings LLC is an energy and power-focused private investment firm founded in 2000 by David M. Leuschen and Pierre F. Lapeyre, Jr. with over $37 billion of capital raised. Riverstone conducts buyout and growth capital investments in the exploration & production, midstream, oilfield services, power, and renewable sectors of the energy industry. With offices in New York, London, Houston, and Mexico City, Riverstone has committed over $35 billion to more than 130 investments in North America, Latin America, Europe, Africa, Asia, and Australia.

**About Bayou City Energy Management LLC**

Bayou City Energy Management LLC ("BCE") is a private equity firm founded in 2015 to focus on making investments in the North American upstream oil and gas sector. BCE targets privately negotiated investments through two complementary strategies: providing buyout and growth equity capital for operators with current production and exploitable upside, and partnering with operators to provide dedicated drilling capital in off-balance sheet structures. The BCE team, combined with the firm's Advisory Board and strategic relationship with Argus Energy Managers, provides operators access to expertise, capital, and trusted partnership.

3

CONFIDENTIAL

AMR_SDTX01781044

**About HPS Investment Partners, LLC**

HPS Investment Partners, LLC ("HPS") is a leading global investment firm with a focus on non-investment grade credit. Established in 2007, HPS has approximately 100 investment professionals and over 200 total employees, and is headquartered in New York with ten additional offices globally.  HPS was originally formed as a unit of Highbridge Capital Management, LLC, a subsidiary of J.P. Morgan Asset Management, and formerly known as Highbridge Principal Strategies, LLC. In March 2016, the principals of HPS acquired the firm from J.P. Morgan, which retained Highbridge's hedge fund strategies.  As of June 2017, HPS had approximately $41 billion of assets under management and since inception has invested over $4 billion in the energy and power industries.

**Forward-Looking Statements**

This communication includes certain statements that may constitute "forward-looking statements" for purposes of the federal securities laws. Forward-looking statements include, but are not limited to, statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements may include, for example, statements about: the parties' ability to effect the business combination; the benefits of the business combination; the future financial performance of Silver Run II following the business combination; and changes in Alta Mesa's and Kingfisher's strategy, future operations, financial position, estimated revenues, and losses, projected costs, prospects, plans and objectives of management.  These forward-looking statements are based on information available as of the date of this press release, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing Silver Run II's or Alta Mesa's views as of any subsequent date, and Silver Run II and Alta Mesa do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.  You should not place undue reliance on these forward-looking statements. As a result of a number of known and unknown risks and uncertainties, Silver Run II's actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include: (i) the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the definitive agreements relating to the business combination; (ii) the outcome of any legal proceedings that may be instituted against Silver Run II following announcement of the business combination; (iii) the inability to complete the business combination due to the failure to obtain approval of the stockholders of Silver Run II, or other conditions to closing in the definitive agreements relating to the business combination; (iv) the risk that the proposed business combination disrupts current plans and operations of Silver Run II, Alta Mesa or Kingfisher as a result of the announcement and consummation of the business combination; (v) Silver Run II's ability to realize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of Silver Run II to grow and manage growth profitably following the business combination; (vi) costs related to the business combination; (vii) changes in applicable laws or regulations; and (viii) the possibility that Silver Run II, Alta Mesa or Kingfisher may be adversely affected by other economic, business, and/or competitive factors.

4

CONFIDENTIAL

AMR_SDTX01781045

**No Offer or Solicitation**

This communication is for informational purposes only and shall not constitute an offer to sell or the solicitation of an offer to buy any securities pursuant to the proposed business combination and other transactions described herein or otherwise, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

**Important Information For Investors and Stockholders**

In connection with the proposed business combination, Silver Run II intends to file a proxy statement with the SEC. The definitive proxy statement and other relevant documents will be sent or given to the stockholders of Silver Run II and will contain important information about the proposed business combination and related matters. **Silver Run II stockholders and other interested persons are advised to read, when available, the proxy statement in connection with Silver Run II's solicitation of proxies for the meeting of stockholders to be held to approve the proposed business combination because the proxy statement will contain important information about the transaction** . When available, the definitive proxy statement will be mailed to Silver Run II stockholders as of a record date to be established for voting on the proposed business combination. Stockholders will also be able to obtain copies of the proxy statement, without charge, once available, at the SEC's website at www.sec.gov.

**Participants in the Solicitation**

Silver Run II and its directors and officers may be deemed participants in the solicitation of proxies of Silver Run II stockholders in connection with the proposed business combination. Silver Run II stockholders and other interested persons may obtain, without charge, more detailed information regarding the directors and officers of Silver Run II in its Registration Statement on Form S-1 initially filed with the SEC on March 2, 2017. Additional information will be available in the definitive proxy statement when it becomes available.

**Reserves**

Estimated Ultimate Recoveries, or "EURs," refers to estimates of the sum of total gross remaining proved reserves per well as of a given date (SEC pricing) and cumulative production prior to such given date for developed wells. EURs of horizontal wells will vary depending upon many factors, including, without limitation, lateral lengths, spacing and number of fracing stages, and quality of the penetrated formation. These quantities do not necessarily constitute or represent reserves as defined by the SEC and are not intended to be representative of anticipated future well results of all wells drilled on Alta Mesa's STACK acreage.

**Contact:**

Silver Run Acquisition Corporation II
Jeffrey Taufield / Daniel Yunger
Kekst
(212) 521-4800

Alta Mesa Holdings, LP
Lance L. Weaver
(281) 943-5597
lweaver@altamesa.net

SOURCE: Silver Run Acquisition Corporation II and Alta Mesa Holdings, LP

CONFIDENTIAL

AMR_SDTX01781046

# PX 393

Page 1

1              UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4    ----------------------------------x

5      IN RE:  ALTA MESA RESOURCES,    Case No:

6      INC. SECURITIES LITIGATION      4:19-cv-00957

7    ----------------------------------x

8

9          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

10                HOMER EUGENE "GENE" COLE, JR.

11                 Wednesday, March 1, 2023

12

13          REMOTE ORAL AND VIDEOTAPED DEPOSITION OF HOMER

14   EUGENE "GENE" COLE, JR., produced as a witness at the

15   instance of the Class Plaintiffs, and duly sworn, was

16   taken in the above-styled and numbered cause on the

17   1st of March, 2023, from 9:39 a.m. to 5:41 p.m., before

18   Sharon Ross, Certified Shorthand Reporter in and for the

19   State of Texas located in Austin, Texas, reported

20   remotely by computerized stenotype machine, the witness

21   being located in Houston, Texas.

22

23

     Reported by:

24   SHARON ROSS, Texas CSR #1961,

     Hawaii CSR #432, RMR, CRR, CRC

25   Realtime Systems Administrator

[PAGES INTENTIONALLY OMITTED]

```
                                                         Page 21
 1          Q.  (BY MR. BRODEUR)  You can --
 2          A.  Not all of the wells because we did have some
 3     wells that once they were fraced -- I didn't mean to say
 4     "all"; but some wells, once they were completed and
 5     stimulated, it flowed for a period of time on their own.
 6          Q.  Thank you.
 7          A.  Then they would come down, and then they would
 8     lift.
 9          Q.  Did you help to predict the rate at which oil
10     and gas could be recovered from Alta Mesa's STACK
11     acreage?
12               MS. PRESTON:  Objection, form.
13          A.  No.
14          Q.  (BY MR. BRODEUR)  Did you help estimate the
15     amount of oil and gas that could ultimately be covered
16     from Alta Mesa's STACK wells?
17               MR. PETERS:  Objection, form.
18          A.  Not that I remember.
19          Q.  (BY MR. BRODEUR)  Did you work closely with a
20     man named Michael Ellis?
21          A.  Yes.
22          Q.  Generally what was his role at Alta Mesa?
23          A.  He was the COO.
24          Q.  Okay.  Is Mr. Ellis knowledgeable about
25     petroleum exploration and production?
```

[PAGES INTENTIONALLY OMITTED]

```
                                            Page 166

 1                MR. BRODEUR:  Ms. Fleming, could I have tab

 2     29, please?

 3                    (CP Exhibit 0120 marked.)

 4         Q.  (BY MR. BRODEUR)  Before we get to that,

 5     though, Mr. Cole, do you recall a sort of frantic

 6     scramble in June 2018 to increase production?

 7                MS. PRESTON:  Objection, form.

 8         A.  I do not recall.

 9         Q.  (BY MR. BRODEUR)  If -- okay.  If you could

10     refresh your marked exhibits folder, you should have

11     Exhibit 0120.

12         A.  Uh-huh.

13         Q.  I expect all my questions are actually about

14     the email that starts the chain.  So that's the -- your

15     email original message that starts at the bottom of the

16     first page of the exhibit.

17         A.  Okay.

18         Q.  I'm -- were you calling a meeting with the

19     artificial lift team and Michael Ellis and Kevin

20     Bourque?

21         A.  That's what it appears -- and Martin.

22         Q.  Okay.  How many people were on the artificial

23     lift team at this time?

24         A.  I do not recall.

25         Q.  In your email you talk about "the shallow
```

Page 167

1    nudge."  What is "the shallow nudge"?

2         A.  I do not recall.  It's the way the wells were

3    drilled at the bell of the curve.

4         Q.  The wells were drilled with a curve?

5         A.  The way -- the actual drilling of the wells,

6    the way the shallow nudge -- to get the right angle to

7    come back into the formation, right, off the lease

8    lines --

9         Q.  Okay.

10        A.  -- where the rig's located.

11        Q.  Okay.  Did you -- you referred to the -- did

12   you ever refer to the wells such -- wells with a shallow

13   nudge as S-shaped?  It's not in the document.

14        A.  I don't ever recall that.

15        Q.  Do you recall anyone else ever referring to

16   wells with a shallow nudge as S-shaped?

17        A.  I don't recall.

18        Q.  Did wells with a shallow nudge, in fact, assume

19   the shape of the letter S?

20             MR. ZAYTOUN:  Objection, form.

21        A.  I don't recall.

22             THE COURT REPORTER:  Was your answer "I

23   don't recall"?

24             THE WITNESS:  "I don't recall."

25        Q.  (BY MR. BRODEUR)  You say the rod -- "and rod

[PAGES INTENTIONALLY OMITTED]

# PX 394

| **From:** | Tim Turner <tturner@AltaMesa.net> on behalf of |
| | Tim Turner <tturner@AltaMesa.net> |
| **Sent:** | Sunday, February 11, 2018 9:18 PM |
| **To:** | Kevin J. Bourque <kbourque@AltaMesa.net>; Dustin Bridges |
| | <dbridges@AltaMesa.net>; Tamara Alsarraf <talsarraf@AltaMesa.net> |
| **Subject:** | RE: Current Model - 02.10.2018 |

---

Hal wants to hit close to the December presentation...38 MBOE/Day average in 2018.  Trying to find the Capex.

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 3:15 PM
**To:** Dustin Bridges <dbridges@AltaMesa.net>; Tamara Alsarraf <talsarraf@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Agreed. Over deliver by just a touch, beat by about 5%. Too much and you're sand bagging....

-----Original Message-----
**From:** Tamara Alsarraf [talsarraf@AltaMesa.net]
**Received:** Sunday, 11 Feb 2018, 3:12PM
**To:** Kevin J. Bourque [kbourque@AltaMesa.net]; Dustin Bridges [dbridges@AltaMesa.net]; Tim Turner [tturner@AltaMesa.net]
**Subject:** RE: Current Model - 02.10.2018

As a public company, I think it would be better to underpromise and overdeliver, but I am new to this...

**From:** Tamara Alsarraf
**Sent:** Sunday, February 11, 2018 3:11 PM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Dustin Bridges <dbridges@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Our non-op wells are actually still looking at the roadshow type curve.

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 3:10 PM
**To:** Dustin Bridges <dbridges@AltaMesa.net>; Tamara Alsarraf <talsarraf@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

We have to only drill wells above the type curve....

-----Original Message-----
**From:** Tamara Alsarraf [talsarraf@AltaMesa.net]
**Received:** Sunday, 11 Feb 2018, 3:09PM

AMR_SDTX00877110

**To:** Tim Turner [tturner@AltaMesa.net]; Kevin J. Bourque [kbourque@AltaMesa.net]; Dustin Bridges [dbridges@AltaMesa.net]
**Subject:** RE: Current Model - 02.10.2018

Last I heard, Dustin adjusted the non-op production in our model to reflect 1 non-op rig running with 15% WI, and the total yearly production went to 36.7 net boepd. Not sure how to increase it without increasing capex.

**From:** Tim Turner
**Sent:** Sunday, February 11, 2018 3:03 PM
**To:** Tamara Alsarraf <talsarraf@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>; Dustin Bridges <dbridges@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Also, we're trying to hit +38 MBOE/Day average at about the same net capex ($543MM)

**From:** Tamara Alsarraf
**Sent:** Sunday, February 11, 2018 2:58 PM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>; Dustin Bridges <dbridges@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Thanks! Let me know what I need this for! Copying Dustin

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 2:08 PM
**To:** Tim Turner <tturner@AltaMesa.net>; Tamara Alsarraf <talsarraf@AltaMesa.net>
**Subject:** FW: Current Model - 02.10.2018

Tamara, Tim says you're going to need this non-op data.  :-)

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 12:47 PM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Yes, see attachment.

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 12:42 PM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Kaitlyn, were you able to pull out a number for NON-OP net production?

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 9:47 AM

AMR_SDTX00877111

**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

I have $599MM for CAPEX.  Like I told you yesterday, I am not confident with the Economic Summary in Enersight just yet.  I am not sure all the inputs are there.  This is something I want to go through with Enersight on Wednesday.  That attachment is for your eye only.  Cathy can see it too. HAHA!

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 9:22 AM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

I think TD, but I'm open.  When do you spend the CAPEX in your model?  How different is it between the 2 numbers?

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 9:21 AM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Did you to wells TD or well spud?

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 9:18 AM
**To:** Cathy Radvansky <cradvansky@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Hmmmmm..... Is it an SWD or a left over? Might be something that just made the cutoff date?

See if you can find it.

-----Original Message-----
**From:** Cathy Radvansky [cradvansky@AltaMesa.net]
**Received:** Sunday, 11 Feb 2018, 9:16AM
**To:** Kevin J. Bourque [kbourque@AltaMesa.net]; Kaitlyn Mathews [KMathews@AltaMesa.net]
**Subject:** RE: Current Model - 02.10.2018

My spud pivot has 1 extra well than the 204 you guys stated.  Not a big deal to me but just I investigate?

CONFIDENTIAL
AMR_SDTX00877112

| Row Labels | #Spuds |
|---|---|
| 2018 | |
| Jan | 12 |
| Feb | 11 |
| Mar | 14 |
| Apr | 17 |
| May | 18 |
| Jun | 25 |
| Jul | 27 |
| Aug | 28 |
| Sep | 16 |
| Oct | 12 |
| Nov | 13 |
| Dec | 12 |
| 2018 Total | 205 |
| 2019 | |
| Jan | 18 |
| Feb | 21 |
| Mar | 26 |
| Apr | 23 |
| May | 22 |
| Jun | 22 |
| Jul | 25 |
| Aug | 25 |
| Sep | 23 |
| Oct | 24 |
| Nov | 24 |
| Dec | 25 |
| 2019 Total | 278 |
| Grand Total | 483 |

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 9:15 AM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

In reality I expect we'll bring in the odd rig or 2 in early for a 3-well commitment, for example rather than trying to put all 12 in one 30 day period only to drop.  The sooner we can do that the better from a budgeting and production stand point.

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 9:12 AM

CONFIDENTIAL

AMR_SDTX00877113

**To:** Cathy Radvansky <cradvansky@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Cathy, FYI numbers are going to look funny in the table because of the way we ended up scheduling rigs.  We go up to 12 rigs for a month and in Oct go back down to 6 Rigs and build back up to 12 in 2019.  I also turned the frac crews off from Dec 15, 2018 to end of the year.  I will have the gross number to you soon.

**From:** Cathy Radvansky
**Sent:** Sunday, February 11, 2018 9:02 AM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

I'll leave them in then.

**From:** Kevin J. Bourque
**Sent:** Sunday, February 11, 2018 9:00 AM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

From the well counts on the table?  I think so, it's part of the CAPEX though so we do want it to match up with your model so maybe it needs to stay in.

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 8:59 AM
**To:** Cathy Radvansky <cradvansky@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Use that activity summary.  Kevin should she exclude SWD?

**From:** Cathy Radvansky
**Sent:** Sunday, February 11, 2018 8:57 AM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>; Kevin J. Bourque <kbourque@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Kaitlyn,

Just to confirm:

Use the Activity summary you sent earlier this morning?

I see some SWD wells in the plan.  Filter those out correct?

**From:** Kaitlyn Mathews
**Sent:** Sunday, February 11, 2018 8:38 AM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>; Cathy Radvansky <cradvansky@AltaMesa.net>
**Subject:** Re: Current Model - 02.10.2018

CONFIDENTIAL

OEA Hinkle only for this slide correct? Cathy is helping me put this slide together. I only sent her net last night. I need to wait until I can get back in to pull gross. Did you want the graph through 2019?

Sent via the Samsung Galaxy Note8, an AT&T 4G LTE smartphone

-------- Original message --------
From: "Kevin J. Bourque" <kbourque@AltaMesa.net>
Date: 2/11/18 8:30 AM (GMT-06:00)
To: Kaitlyn Mathews <KMathews@AltaMesa.net>
Subject: RE: Current Model - 02.10.2018

It looks like we're good to go with this budget run, finally!!!

Can you update the Gross v Net production curves and the rig/well table on slide 4 of this attached PowerPoint?

**From:** Kaitlyn Mathews
**Sent:** Saturday, February 10, 2018 8:00 PM
**To:** Tim Turner <tturner@AltaMesa.net>; Hal H. Chappelle <hchappelle@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Dustin Bridges <dbridges@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018

Thank you!

Dustin, please see attachment and if you have any question please call or text me.

As a reminder, Enersight will be down for maintenance starting at 10pm and will not be available again till 3pm tomorrow afternoon.

**From:** Tim Turner
**Sent:** Saturday, February 10, 2018 7:47 PM
**To:** Hal H. Chappelle <hchappelle@AltaMesa.net>
**Cc:** Kevin J. Bourque <kbourque@AltaMesa.net>; Kaitlyn Mathews <KMathews@AltaMesa.net>; Dustin Bridges <dbridges@AltaMesa.net>
**Subject:** Re: Current Model - 02.10.2018

Not only great execution, but great analytics on the results!

Tim

On Feb 10, 2018, at 7:27 PM, Hal H. Chappelle <hchappelle@AltaMesa.net> wrote:

Yes — thanks Katelin and Dustin

Sent from my iPhone

On Feb 10, 2018, at 7:25 PM, Kevin J. Bourque <kbourque@AltaMesa.net> wrote:

So the change to 15 days for singles wells and 13 days for patterns looks like it works. I'm amazed that such a small change can have that sort of impact. Tells me where I can go to save some money!

204 Gross wells instead of 215, and increased the DUCs to 22 (Not fracing saves $$$). If the final run holds that it doesn't change production we should be golden!

Thanks for hanging in there with me, couldn't do this without you!

**From:** Kaitlyn Mathews
**Sent:** Saturday, February 10, 2018 7:17 PM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>
**Cc:** Dustin Bridges <dbridges@AltaMesa.net>; Tim Turner <tturner@AltaMesa.net>
**Subject:** RE: Current Model - 02.10.2018
**Importance:** High

I increased spud to TD by 1 day for both categories, and that drills 204 gross wells. It did not affect production by much. The capex went down by ~$50MM in the Enersite model. This is because not only are you drilling 11 less wells but you end up having 22 DUCs at the end of 2018 due to the chain reaction of adding one day to the drill time. Should I run the full reports and send to Dustin?

<image001.png>

**From:** Kevin J. Bourque
**Sent:** Saturday, February 10, 2018 5:56 PM
**To:** Kaitlyn Mathews <KMathews@AltaMesa.net>
**Subject:** FW: Current Model - 02.10.2018

So this has an average rig count of 10. To cut $30MM what we need is to find the simplest way to drop 9-10 wells, right?

**From:** Dustin Bridges
**Sent:** Saturday, February 10, 2018 5:50 PM
**To:** Kevin J. Bourque <kbourque@AltaMesa.net>
**Subject:** Current Model - 02.10.2018

2018 CAPEX: $581MM
2018 Production: 38.6MBOED

Dustin Bridges | Financial Analyst
<image002.png>
**Alta Mesa Holdings, LP.**
15021 Katy Freeway, 4th Floor, Houston, TX 77094
Office: (281) 530-0991

AMR_SDTX00877116

CONFIDENTIAL

AMR_SDTX00877117

# PX 395

REDACTED IN ITS ENTIRETY