# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 <br><br> **PUBLIC VERSION OF DKT. 570** |

# CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS RIVERSTONE HOLDINGS LLC'S, STEPHEN COATS', AND THOMAS WALKER'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF <u>LAW AS TO PLAINTIFFS' SECTION 20(a) CLAIM</u>

# **TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS...................................................... 1

STATEMENT OF ISSUES TO BE RULED UPON .......................................... 1

APPLICABLE LEGAL STANDARD .............................................................. 2

SUMMARY OF ARGUMENT......................................................................... 2

STATEMENT OF FACTS ............................................................................... 5

    A.    Facts Relating to Section 20(a) Control ............................................ 5

        1.    Riverstone, Coats, and Walker Controlled Pre-De-SPAC
            Silver Run II ............................................................................ 5

        2.    Riverstone Controlled AMR Post De-SPAC ..................................... 6

    B.    Additional Facts Pertaining to Riverstone's "Good Faith" Defense............. 8

    C.    Additional Facts Pertaining to Coats and Walkers' "Good Faith"
        Defense ............................................................................................ 11

ARGUMENT.................................................................................................. 12

    A.    The Evidence Demonstrates Riverstone is Bound for Trial on Class
        Plaintiffs' Section 20(a) Claim.................................................... 12

        1.    Riverstone Implicitly Concedes It Controlled AMR/Silver
            Run II At All Times Prior to the De-SPAC ..................................... 12

        2.    Riverstone Controlled AMR After the De-SPAC ............................ 12

            a.    Riverstone Exercised Control over AMR's Public
                Statements ........................................................... 13

            b.    Riverstone Controlled AMR Through Its Control of
                the Board of Directors.......................................... 14

            c.    Riverstone Controlled AMR Through Management ........... 15

            d.    Riverstone Controlled AMR Through Its Ownership
                 Interests ............................................................... 16

    B.    The Evidence Demonstrates That Walker and Coats are Also Bound
        for Trial Pursuant to Class Plaintiffs' Section 20(a) Claim ...................... 17

C.    Riverstone, Walker, and Coats' "Good Faith" Defense Does Not Compel Summary Judgment ........................................................ 19

    1.    Riverstone's Purported "Good Faith" Defense is a Matter for the Jury ........................................................................... 19

    2.    Coats and Walker's Purported "Good Faith" Defense is a Matter for the Jury ........................................................... 23

CONCLUSION ........................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bach v. Amedisys, Inc.*,
    2016 WL 4443177 (M.D. La. Aug. 19, 2016) ............................................................ 18

*Brody v. Zix Corp.*,
    2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)............................................................ 19

*Carlton v. Cannon*,
    2016 WL 3959164 (S.D. Tex. July 22, 2016)........................................................ 4, 13

*Dietrich v. Bauer*,
    126 F. Supp. 2d 759 (S.D.N.Y. 2001)................................................................ 22, 24

*G.A. Thompson & Co., Inc. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ..............................................................................*passim*

*Gruber v. Gilbertson*,
    2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ............................................................ 17

*Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*,
    2017 WL 7052463 (E.D. Tex. Sept. 20, 2017) ........................................................... 19

*In re ArthroCare Corp. Sec. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010)........................................................................ 13

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................................................ 13

*In re BP p.l.c. Sec. Litig.*,
    922 F. Supp. 2d 600 (S.D. Tex. 2013) ........................................................................ 19

*In re Cobalt Int'l Energy, Inc.*,
    2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ......................................................... 14, 17

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    2003 WL 230688 (S.D. Tex. Jan. 28, 2003)..................................................... 15, 18, 19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................................ 19

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009)................................................................... 22, 24

*In re SolarWinds Corp. Sec. Litig.*,
   595 F. Supp. 3d 573 (W.D. Tex. 2022) .......................................................... 17

*Kaltman v. Key Energy Servs., Inc.*,
   447 F. Supp. 2d 648 (W.D. Tex. 2006) .......................................................... 19

*McGinnis v. Interoceanica Agency, Inc.*,
   2015 WL 13800689 (S.D. Tex. Aug. 6, 2015) (Hanks, J.) .............................. 2

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ........................................................................................ 2

*Ryder v. Union Pac. R.R. Co.*,
   945 F.3d 194 (5th Cir. 2019) .......................................................................... 2

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ....................................................................... 24

*Siemens v. Seagate Tech.*,
   2009 WL 8762978 (C.D. Cal. Apr. 27, 2009) .............................................. 19

*Stahl v. Novartis Pharm. Corp.*,
   283 F.3d 254 (5th Cir. 2002) .......................................................................... 2

*Wyatt v. Hunt Plywood Co., Inc.*,
   297 F.3d 405 (5th Cir. 2002) .......................................................................... 2

## STATUTES, RULES, AND REGULATIONS

Federal Rules of Civil Procedure
   Rule 56(a) ......................................................................................................... 2

17 C.F.R.
   § 230.405 ........................................................................................................ 14

## NATURE AND STAGE OF PROCEEDINGS

This is a certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934. (Dkt. 241). The action concerns the rapid collapse of Alta Mesa Resources, Inc. ("AMR") f/k/a Silver Run II following a De-SPAC transaction wherein a Riverstone-sponsored SPAC took public two privately held companies, Alta Mesa Holdings ("AMH") and Kingfisher Midstream ("KFM"). Just a year after asking for the SPAC's shareholders to approve the transaction, AMR was forced to write off more than 80% of its $3.86 billion market value. AMR filed for bankruptcy protection just seven months after that.

Riverstone Holdings LLC ("Riverstone"), Stephen Coats ("Coats"), and Thomas Walker ("Walker") (collectively, the "Moving Defendants") have moved for summary judgment with respect to certain elements of the Section 20(a) claims asserted against them.[1]

## STATEMENT OF ISSUES TO BE RULED UPON

1.    Whether Riverstone is entitled to summary judgment on the Section 20(a) control person claims asserted against it for false and misleading statements made after the De-SPAC when it controlled AMR and other speakers.

2.    Whether Coats and Walker are entitled to summary judgment on the Section 20(a) control person claims asserted against them for false and misleading statements made before the De-SPAC when they controlled Silver Run II.

---

[1] *See* Defendants Riverstone Holdings LLC's, Stephen Coats', and Thomas Walker's Motion for Summary Judgment and Incorporated Memorandum of Law as to Plaintiffs' Section 20(a) Claim (Dkt. 518) (the "Motion" or "Mot.").

3.      Whether any of the Moving Defendants are entitled to summary judgment based on their "good faith" defense to the Section 20(a) claims.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Only when "the non-moving party can point to nothing in the record supporting its claim" should summary judgment be granted. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  In deciding a motion for summary judgment, the Court "must review all of the evidence in the record but make no credibility determinations or weigh any evidence." *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see also McGinnis v. Interoceanica Agency, Inc.*, Civ. A. 3:11-CV-0214, 2015 WL 13800689, at *1 (S.D. Tex. Aug. 6, 2015) (Hanks, J.).[2]  Rather, the Court "must disregard everything favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party." *Wyatt*, 297 F.3d at 409.  In other words, in determining whether a triable fact issue exists, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019).

## SUMMARY OF ARGUMENT

Riverstone only seeks summary judgment on its control with respect to the post-De-SPAC violations of Section 10(b) by AMR and its management, implicitly

---

[2] Unless otherwise noted, all emphasis is added and citations are omitted.

conceding its control liability for the pre-De-SPAC violations of Sections 10(b) and 14(a) by Silver Run II, Hackett, and the other Proxy Defendants.  This is unsurprising because Silver Run II was a "blank check" company founded and sponsored by Riverstone, with three Riverstone partners as its sole employees, who managed it on a day-to-day basis.  Riverstone ran Silver Run II's process for identifying, negotiating with, and conducting due diligence of merger partners, and helped craft the projections and public statements announcing and advertising the proposed transaction to Silver Run II shareholders.

Two of Silver Run II's three pre-De-SPAC employees, Riverstone partners Coats and Walker, do seek summary judgment with respect to their control of Silver Run II.  The evidence is clear, however, that Riverstone's control of Silver Run II was in part through it installing its partners, including Coats and Walker, as the entire three-person Silver Run II management team.  There is also ample evidence that Coats and Walker had the ability to oversee and control Silver Run II's public statements but chose to turn a blind eye and recklessly failed to put any effort into overseeing the challenged statements.

Riverstone does challenge its post-De-SPAC control of AMR, but seeks to view facts in isolation and ignores the big picture:  (a) ███████████████████████████████████ ██████ (b) Riverstone's partner Hackett was Chairman of the Board, head of the KFM midstream business, and later, interim CEO of AMR; (c) Riverstone had an approximately 38.9% economic interest and an approximately 22.3% voting interest in AMR; (d) Riverstone applied "overwhelming force" to oust AMR's then-existing management team; (e) Riverstone installed a replacement management team that it was affiliated with and it had originally paid to advise the AMR Board; and (f) ███████████████████████████████

3

███████████████████████████████████████████

██████████ " These factors, individually and collectively, are more than sufficient for a jury to conclude that Riverstone controlled AMR. *See Carlton v. Cannon*, Civ. A. No. H-15-012, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016).

Finally, as detailed herein, the evidence amply disproves Riverstone's good faith, including that Riverstone only conducted cursory due diligence on AMH and KFM, and the little diligence it did do informed it that it was making a risky "bet" on behalf of public shareholders but that Riverstone itself would likely profit regardless because of the value of its sponsor shares. Indeed, Riverstone had much more conservative internal estimates for AMR's performance than those it had Silver Run II include in the Proxy. And the evidence is clear that the Riverstone partners managing Silver Run II and the AMR Board members appointed by Riverstone knew or recklessly disregarded the baseless nature of the 12-WPS/250-MBO assumptions underlying the so-called "base case" for the AMR reserve and production projections, as well as the grossly overstated AMH and KFM EBITDA projections in the Proxy and related misstatements made post De-SPAC. As Riverstone partner Hackett privately explained before the De-SPAC transaction was announced, Riverstone was protected from the downside risk because it granted itself cheap sponsor shares, but public shareholders were unwittingly exposed to a "bet" that AMR's projected well count would somehow "materialize" or that the lower well count Riverstone actually expected would be "offset" by unspecified "solutions." This was quintessential bad faith, especially since investors were then told the projected 4,200 well count had been "de-risked" in the base case.

**STATEMENT OF FACTS**[3]

**A.    Facts Relating to Section 20(a) Control**

**1.    Riverstone, Coats, and Walker Controlled Pre-De-SPAC Silver Run II**

Riverstone created the SPAC Silver Run II in late 2016 and installed three Riverstone partners (Defendants Hackett, Coats, and Walker) as the entire management team.  Specifically:  (i) Hackett, Riverstone partner and co-head of its Houston office, served as Silver Run II's CEO and Chairman of the Board; (ii) Walker, a Riverstone partner and CFO, served as Silver Run II's CFO; and (iii) Coats, Riverstone partner and General Counsel, served as Silver Run II's Corporate Secretary.  (PX 251 at p. 109).

Riverstone also managed the Business Combination search, negotiation, and due diligence through its internal deal team, and jointly worked to draft the public statements and Proxy, along with the other Control Entity Defendants HPS, BCE, and ARM Energy.  *See, e.g.*, PX 253; PX 251 at p. 3; PX 219 at 33:23-34:20; PX 291; PX 296; PX 300; PX 306; PX 314; █████████████ PX 281; PX 287; PX 295; ████████████████████████████
██ Riverstone's control of Silver Run II and the false and misleading statements made prior to the Business Combination is uncontested.  *See* Mot. at 1 ("Riverstone did not control the speakers of those statements *after the Business Combination*.").

---

[3] Class Plaintiffs incorporate herein their oppositions to the summary judgment motions previously filed by Defendants HPS, BCE, ARM, McMullen, and Dimitrievich on similar grounds (Dkt. Nos. 445, 446, 449).  To avoid burdening the Court with duplicative exhibits, Class Plaintiffs refer to and incorporate herein the exhibits PX 1 to PX 202 attached to the September 21, 2023 Declaration of Andrew J. Entwistle (Dkt. 444).  The January 19, 2024 Declaration of Andrew J. Entwistle attaches additional summary judgment evidence starting at PX 203.  Further, Class Plaintiffs incorporate by reference herein the statement of undisputed facts from their: (i) Opposition to the AMR and Management Defendants' Motion for Summary Judgment; and (ii) Opposition to the Proxy Defendants' Motion for Summary Judgment ("Opposition to Proxy Defs' MSJ").

As two-thirds of Silver Run II's employees, Walker and Coats were involved in the day-to-day running of the SPAC.  Both Walker and Coats received copies of SEC filings, including the Proxy, and had the opportunity to review them for accuracy before filing.  *See, e.g.*, ████ PX 313; PX 300; *see also* PX 307.  Walker "was focused on the . . . quarterly SEC filings and the financial data that was contained therein." (PX 243 at 15:10-14). Walker signed the SEC filings after inputting relevant financial information, including the August 16, 2017 Form 8-K that commenced the Class Period and the August 17, 2017 Form 8-K that incorporated the false and misleading investor presentation.  *See id.* at 15:15-16:4; PX 43; PX 285.

### 2.    Riverstone Controlled AMR Post De-SPAC

Riverstone structured the Business Combination and agreed to the De-SPAC with AMH and KFM knowing that it would continue to control the merged company moving forward.  *See, e.g.*, PX 233 at 106:5-11; PX 292 at -112; PX 265 at -666; *see also* PX 20 at -243, -252 (Riverstone passed on an earlier, differently structured potential investment in AMH in part because it would lack control); PX 387 at -847 (Chappelle assuaging Hackett's concerns after Hackett complained:  "Suggesting that I cannot have a say at the table for even 5 years is UNACCEPTABLE.  I raised 24% of the stock for this new company based on my name and reputation and am bringing RSH with me, which represents another 20%. . . . .").  The evidence shows Riverstone exerted its continuing control in numerous ways.

After the De-SPAC, Riverstone and its affiliates owned an approximate 38.9% economic interest and an approximate 22.3% voting interest in AMR.  (PX 104 at

p. 7).  Riverstone appointed Hackett to continue to serve as Chairman of the Board and its founders and managing partners Lapeyre and Leuschen as directors of the Board.  Riverstone also re-appointed the same three "independent" directors from Silver Run II (who not coincidentally also served as directors at Riverstone's previous SPAC, Silver Run I) to continue to serve on AMR's Board – Defendants Gutermuth, Tepper, and Walters.  (PX 251 at p. 109; PX 104 at pp. 206, 209; PX 246 at p. 9).  Hackett selected a fourth "independent" director, Defendant Sinclair, who he previously worked with, to join the AMR Board as well.  *See* PX 230 at 274:18-275:2; ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████[4]  Gutermuth resigned in June 2018 at Hackett's request.  *See* PX 229 at 24:2-25:5. Each of the other six Riverstone-controlled AMR directors (Hackett, Leuschen, Lapeyre, Tepper, Walters, and Sinclair) remained on the Board through AMR's September 11, 2019 bankruptcy filing.  (PX 356 at pp. 153-57).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  and AMR management served at Riverstone's pleasure.  Indeed, Riverstone drove the ouster of Defendants Chappelle and Ellis and other senior AMR executives in late 2018, and installed officers from Meridian, a part of the Riverstone "family" and an umbrella company that was ***paid by Riverstone*** to review AMR's business before taking over as the new management.  *See* PX 347; PX 349; PX 230 at 30:25-31:13; PX 342; PX 352.

---

[4] Defendants Chappelle, Ellis, Dimitrievich, and McMullen were appointed as directors by other equity holders to the remaining board seats.

Further, after the De-SPAC, Hackett served as the head of AMR's midstream business and then later as interim CEO of AMR.  (PX 104 at p. 209; ████████  He and other Riverstone personnel routinely had access to and contributed to AMR's public statements before they were released to the public.  *See, e.g.*, PX 349; PX 318; PX 350; PX 280.

### B.    Additional Facts Pertaining to Riverstone's "Good Faith" Defense

Riverstone conducted cursory due diligence of AMH and KFM on behalf of Silver Run II.  There is no dispute AMH provided Riverstone all of the due diligence information it requested.  *See* PX 242 at 118:10-24 (AMH was an "open book" with regard to due diligence and Riverstone "had everything we [had]"); *see also* PX 233 at 171:13-172:24.

As detailed in Class Plaintiffs' Opposition to the AMR and Management Defendants' Motion, the AMR "base case" underlying the De-SPAC assumed that future wells drilled in 12-WPS patterns would produce a similar amount of oil and gas as AMH's existing "single" (or "parent") wells (about 250 MBO per well).  AMH had a plethora of production, microseismic, pressure, and tracer test data that indicated densely drilled wells were likely to "communicate" (*i.e.*, interfere with each other by draining a shared reservoir, diminishing recoveries).  (PX 204 ¶¶ 34-54).  Based on that data, in May 2017, AMH management concluded that their multi-well pattern tests were not "***giving us the bang we hoped***."  (PX 264 at -147).  ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████  AMH's baseless assumptions were compounded by the fact that AMH initially drilled in its best acreage (the "sweet spot") and

future wells were planned to be drilled in areas with geological disadvantages.  (PX 204 ¶¶ 23-33).

Riverstone reached the same conclusions as to the unreasonableness of the key drilling assumptions.  Even before founding Silver Run II, Riverstone evaluated a potential transaction with AMH in 2016, but passed because of AMH's "uncertainty around the drilling inventory" (in addition to the then-proposed investment structure not giving Riverstone sufficient control over the company, among other issues).  (PX 20 at -246).  The drilling inventory speaks directly to Riverstone's evaluation of the 12-WPS assumption (AMH/AMR's stated 4,200 drilling locations was calculated by multiplying the number of sections AMH/AMR had rights to by the WPS assumption).

In April 2017, when conducting due diligence on behalf of Silver Run II, Hackett hand selected an oil and gas expert, Christopher Widell ("Widell"), to attend a diligence session at AMH's Houston office with other Riverstone personnel.  On April 11, 2017, Widell raised concerns both about AMH cherry picking the best locations for its test wells and AMH's ability to "downspace" to more than four wells per section:

> *One interesting bit of information I noticed right away is that it looks like they've spent 80-90% of their drilling dollars on about 25% of their acreage position*.  This is important because they are using one oil type curve . . . and one PUD down-spacing scheme . . . and then spreading it across the entire less-proven acreage position to back into an NAV.  *The evaluations engineer side of me has a problem with this . . . because where you spend your budget tells me a lot about how much confidence you truly have in your acreage*.

> . . . *I wasn't surprised to see their lackluster down-spacing results*.  The Osage – due to its fractured nature here, has a high degree of wellbore interference and they're seeing that *the spacing tests-even the 1320' tests (4-wells per unit) have a hard time hitting the type curve*.  *To me these results limit AMR's "STACK upside" story*.

(PX 255 at -190).

Riverstone's deal team internally agreed with the analysis.  *See* PX 256 at -077 ("I came to the same conclusion . . . ."); PX 254 at -206 ("[AMH's] assertion of one type curve and 12 well unit across the entire [STACK] leasehold is aggressive in my opinion."); *see also* PX 270 at -362 ("Potential downsides" included "[l]ack of predictability (as the Osage is a carbonate not a ubiquitous shale) and implications for being able to deliver all modeled [well] locations (4,200) at the type curve.").

Riverstone also understood KFM would receive less than anticipated upstream production from its primary customer, AMH, and later, AMR. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Further, in August 2017, Riverstone acknowledged that KFM's other revenue stream from third-party (*i.e.*, non-AMH) producers "may or will be longer-dated than projected in our models."  (PX 272 at -879; *see also* PX 233 at 184:23-185:19).  Based on these concerns about both AMH's upstream assumptions and KFM's speculative third-party customers, Riverstone internally maintained more conservative estimates for KFM's growth than those provided to public investors.  (PX 325 at -211; PX 129 at -995).

Yet, desperate for a deal for Silver Run II, Riverstone went forward with the deal because, as Hackett internally opined, Riverstone "might do fine regardless" because of its sponsor shares.  (PX 269 at -356).  But, in the same paragraph he observed, "***[u]ltimately, the bet we are making on behalf of the public shareholder[] . . . is that either the projected [4,200] well count will materialize or we will find other cost efficiencies and/or improved***

***recovery solutions to offset the lower total well count***." *Id.* at -356 to -357.  That is, Riverstone's incentives were not aligned with Silver Run II shareholders.  (PX 209 at pp. 7-13).  As Silver Run II's sponsor, Riverstone received 25.9 million sponsor/founder shares for $25,000 (less than one ten-thousandth of a dollar per share).  (PX 104 at pp. 6, 11).  In addition, if Riverstone did not close a transaction for Silver Run II within two years, it would forfeit both the sponsor shares and the time and effort it had invested in forming the SPAC and conducting its IPO.  *See* PX 209 at pp. 9-10; *see also* PX 310 at -294 ("Riverstone has enormous reason to get deal done").

### C.     Additional Facts Pertaining to Coats and Walkers' "Good Faith" Defense

Despite holding senior positions at Silver Run II, Coats and Walker did very little to ensure its public statements were accurate.  When asked what he did to ensure "documents filed with the SEC . . . were accurate," Coats testified:  "***I wouldn't say I made sure they were accurate, I don't know that I would even have fully read them***.  My job was to forward them on to the board to approve."  (PX 219 at 25:18-26:3; *see also id.* at 39:4-11 ("Q.  Did you personally do anything to verify the accuracy of the statements in the proxy statement?  A.  No, I don't recall reviewing it; I might have read it, but I don't recall that.  That wasn't really my role, to review those documents.")).

Likewise, Walker, when questioned about the August 17, 2017 investor presentation, could not explain any of the processes and procedures that went into the creation of the document, or provide any verification of the information it contained.  (PX 243 at 33:13-35:21).  Walker simply relied on the fact that "the presentation, the information here had been presented to the board of Silver Run and to the investment committee for Fund

6 . . . to feel comfortable including it in the document and signing the document." *Id.* at 35:22-36:9.

Further, despite pointing to the investment committee for Riverstone's Fund VI as the source of his "comfort" regarding the documents, when asked, Walker could not recall any discussions with the investment committee, any representations received from the committee, or ***even who the members of that committee were***. *See id.* at 37:8-38-4.

## <u>ARGUMENT</u>

**A.    The Evidence Demonstrates Riverstone is Bound for Trial on Class Plaintiffs' Section 20(a) Claim**

The evidence supports the conclusion that Riverstone controlled Silver Run II pre De-SPAC and AMR post De-SPAC.

### 1.    Riverstone Implicitly Concedes It Controlled AMR/Silver Run II At All Times Prior to the De-SPAC

Riverstone does not challenge at this stage that Class Plaintiffs can prove it was a control person for all of Silver Run II's actionable misstatements made before the De-SPAC (*i.e.*, the August 16, 2017 press release, August 17, 2017 presentation and joint recorded call by Hackett and Chappelle, and January 19, 2018 Proxy).  Yet Riverstone makes the remarkable argument that its control of the company somehow vanished overnight with the closing of the De-SPAC.  Far from it.

### 2.    Riverstone Controlled AMR After the De-SPAC

The evidence shows Riverstone acted as a control person of AMR through its ownership interests, Board seats, and involvement in the company's operations and management. *See Carlton*, 2016 WL 3959164, at *4 (in determining whether a defendant had "an ability to control" for the purposes of Section 20(a), the Fifth Circuit has considered

the following indicia: whether the defendant "had 'effective day-to-day control' of the corporation"; "had 'the requisite power to directly or indirectly control or influence corporate policy'"; "had 'actual power or influence over the controlled person'"; or "'actual[ly] exercise[d] . . . that power'" (internal citations omitted)).

Moving Defendants rely on *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696 (W.D. Tex. 2010). But in *ArthroCare*, the court applied an obsolete standard, requiring the plaintiff to allege that the defendant actually controlled the public dissemination of the false statements in question. *Id.* at 731. More recently, Judge Ellison in the Southern District has held that there can be Section 20(a) control liability even if the person "did not personally make a representation or play a significant role in the preparation of a misrepresentation." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 792 (S.D. Tex. 2012). Rather, it is enough that the person "'had the requisite power to directly or indirectly control or influence corporate policy.'" *Id.* (quoting *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981)). This Court should follow the well-reasoned decisions in the Southern District post-dating *ArthroCare*. And, even under the standard applied in *ArthroCare*, Class Plaintiffs can prove that Riverstone actually controlled the public statements at issue because it reviewed and edited them before they were released to the public, as described below.

### a. Riverstone Exercised Control over AMR's Public Statements

Riverstone routinely reviewed and contributed to AMR public statements before they were released to the public. *See, e.g.*, PX 349; PX 318; PX 350; PX 280 (Lapeyre editing press release to add "and Riverstone" to a quote attributed to Chappelle that "Mike Ellis and I are excited about the opportunity to work with Jim Hackett, Silver Run II, and Riverstone

to continue building a great enterprise"). This included drafts of scripts for use during investor conferences. (PX 327).

Indeed, Riverstone's internal documents contain admissions that it worked to control AMR and succeeded. *See* PX 233 at 106:5-11 (noting Riverstone's significant governance rights post De-SPAC was an important element of Riverstone's assessment); *id.* at 71:13-23 (Riverstone would not have agreed to the Business Combination if it could not exercise control of AMR after the De-SPAC); *see also* PX 292 at -112 ("we have a say in the upstream development pace and hence midstream volumes"); PX 265 at -666 ("[c]ontrol of [AMR] entity allows confidence in continued development focus").

### b. Riverstone Controlled AMR Through Its Control of the Board of Directors

███████████████████████████████████████ Riverstone does not contest its control over Chairman Hackett or Riverstone co-founders Lapeyre and Leuschen. Nor could it. *See* 17 C.F.R. § 230.405 (the SEC has interpreted the term "control" broadly to include "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person"); *In re Cobalt Int'l Energy, Inc.*, Civ. A. No. H-14-3428, 2016 WL 215476, at *11 (S.D. Tex. Jan. 19, 2016) (the control defendants "together controlled [the company] based, *inter alia*, on their significant stock ownership and ability to elect a majority of [the company]'s Board of Directors").

The evidence also shows that Riverstone controlled the four "independent" directors because these directors were ███████████████████████████ and frequent flyers on Riverstone boards. *See* Class Plaintiffs' Opposition to the AMR Directors' Motion for Summary Judgment ("Opposition to Director Defs' MSJ") at pp. 5-8, 14-15. The three

14

Riverstone partners and four "independent" directors ▮▮▮▮▮▮▮▮▮▮ issued false and misleading statements in AMR's 2017 Form 10-K. *See id.* at pp. 8-15, 22.



To this end, Hackett often provided his Riverstone team with a "heads up" of information presented to the Board in advance of other Board members. (PX 341; PX 339). And Riverstone was instrumental in removing Chappelle and Ellis from the Board, despite Chappelle's and Ellis's ownership interests and contractual rights to appoint Board members. *See* PX 104 at p. 5, Annex 1; ▮▮▮▮ PX 218 at 125:10-15; PX 338 at -021; PX 224 at 44:7-12.

### c.   Riverstone Controlled AMR Through Management

Riverstone controlled AMR's day-to-day operations and management. Hackett served as COO of the midstream business and later interim CEO of AMR. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, Nos. MDL-1446, Civ. A. H-01-3624, 2003 WL 230688, at *7 (S.D. Tex. Jan. 28, 2003) ("As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." (citations omitted)). Riverstone also showed that AMR's other management served at its pleasure by replacing them with its own personnel at the end of 2018. *See* PX 347; PX 349; PX 230 at 30:25-31:13.

Indeed, as Riverstone proudly asserts in its Motion, Riverstone drove the ouster of Chappelle, Ellis, McCabe, and Cole as management and installed officers from Meridian, a

Riverstone umbrella company that was paid by Riverstone to review AMR's business before becoming its new management.  (PX 342; PX 352).  Internally, Riverstone debated whether to publicly emphasize its role in bringing in Meridian, a "franchise solution," with Lapeyre opining that "SPAC investors would appreciate knowing that all of us – you [Hackett], me, David [Leuschen] and RSH broadly are part of the intervention/solution here."  (PX 351 at -202).  Hackett urged omission of the proposed language, noting shareholders may perceive that "Riverstone is controlling the public Board, for its own agenda[,]" and ask "why should [Riverstone] be allowed to control the company more directly through the insertion of more of its affiliated personnel" since "[it] didn't serve the public shareholders' best interests in the de-SPAC."  (PX 348 at -976).  Of course, if public investors could perceive that Riverstone was controlling AMR based on these facts (regardless of whether the control was "more direct[]"), a reasonable jury could conclude that Riverstone was controlling AMR based on the same facts (and more).

Riverstone also admitted control over the business of AMR when it bragged to its limited partners that it "leveraged our institutional sector expertise and proven success in operating E&P/midstream partnerships to underwrite the investment and develop a business plan for the company going forward."  (PX 317 at -718).

### d.     Riverstone Controlled AMR Through Its Ownership Interests

Riverstone and its affiliates owned an approximate 38.9% economic interest and an approximate 22.3% voting interest in AMR after the closing (PX 104 at p. 7), further supporting its control over AMR.  *See Gruber v. Gilbertson*, No. 16cv9727, 2018 WL 1418188, at *16 (S.D.N.Y. Mar. 20, 2018) (finding control where defendants who owned

11% and 21% of the economic interest in the company "relied on their equity interest to control what was, and was not, disclosed to the investing public"); *see also G.A. Thompson*, 636 F.2d at 958 (24% stock holding is evidence of control).

Riverstone argues it cannot be a control person because it had a minority stake in AMR, but as the above authority shows, this is not the law.  Further, courts in this Circuit have found institutional investors with minority investments can collectively control public companies, as Hackett indicated was occurring here with the "big three" shareholders.  *See, e.g.*, *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 592 (W.D. Tex. 2022) (private equity firms, which each owned 40% of the company's stock, acted in concert to control the primary defendant); *Cobalt*, 2016 WL 215476, at *11 (group of five private equity sponsors (including Riverstone) that created an oil and gas exploration and production company "together controlled [the company] based, *inter alia*, on their significant stock ownership and ability to elect a majority of [the company]'s Board of Directors").[5]

### B.    The Evidence Demonstrates That Walker and Coats are Also Bound for Trial Pursuant to Class Plaintiffs' Section 20(a) Claim

As discussed above, Riverstone concedes it controlled Silver Run II prior to the De-SPAC.  Riverstone's control was largely conducted through the three Riverstone partners it installed as the SPAC's officers (Hackett, Walker, and Coats) and the Riverstone-selected Board, and their day-to-day management of the company.  *See Bach v. Amedisys, Inc.*, No. 10-00395-BAJ-RLB, 2016 WL 4443177, at *14 (M.D. La. Aug. 19, 2016) (an individual

---

[5] Moving Defendants wrongly state that Plaintiffs conceded elsewhere that minority ownership alone can never be sufficient to show control.  Class Plaintiffs merely pointed out that: (1) there are additional indicia of control here beyond ownership; and (2) Defendants relied on out-of-circuit precedent.  *See* Dkt. 445 at p. 23.

defendant can have Section 20(a) liability for statements attributed to a corporate entity such as for statements contained in press releases and SEC filings that are not attributable to any single individual but were clearly made on behalf of the corporate entity).[6]

As two-thirds of the company's employees, Walker and Coats had control over all actions taken by Silver Run II, including the false and misleading statements the company issued. *See Enron*, 2003 WL 230688, at *18 (indicia of control include influence upon operations and facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies). Coats and Walker are flat wrong that Class Plaintiffs' interrogatory responses do not claim that they controlled Silver Run II or any of the other speakers of the false and misleading statements. *See* Mot. at p. 20 (citing ███████ ███████████████████████████████████████████████████████ ).

Walker was involved in the issuance of Silver Run II's false and misleading SEC filings. Walker testified that his primary job responsibilities as CFO of Silver Run II "was focused on the . . . quarterly SEC filings and the financial data that was contained therein." (PX 243 at 15:10-14). Walker signed the SEC filings after inputting the relevant financial information, including the August 16, 2017 Form 8-K that commenced the Class Period, and the August 17, 2017 Form 8-K that incorporated the false and misleading investor presentation. *See id.* at 15:15-16:4; PX 392 at -040; PX 285; *see also* PX 276 (Walker reviewing the August 16 Form 8-K prior to its issuance). It is well settled that the

---

[6] Moving Defendants challenge Hackett's control of Silver Run II as a director in a separate motion, *see* AMR Directors' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Sections 10(b) and 20(a) Claims (Dkt. 526) (the "Directors' Motion"), without mentioning that Hackett was also the CEO. In addition to the reasons Class Plaintiffs present in opposition to the Directors' Motion, which they incorporate by reference, Hackett is liable under Section 20(a) for the reasons stated herein.

signatories of an SEC filing are presumed to have actual authority and control, at least over the contents of and/or release of those statements.  *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.* ("*Enron II*"), 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (signatory of false registration statement was a control person).[7]

Further, both Walker and Coats were sent the Proxy and had the ability to review it for accuracy before it was filed.  *See, e.g.*, ███ PX 313; PX 300; *see also* ███

███

███

███ *See Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352, at *9 (N.D. Tex. Sept. 26, 2006) (sustaining Section 20(a) claims where "defendants, by virtue of their positions within [the company], had sufficient control over the information which was disseminated to the public and given to the SEC"); *see also Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 665-66 (W.D. Tex. 2006) (same).[8]

### C. Riverstone, Walker, and Coats' "Good Faith" Defense Does Not Compel Summary Judgment

#### 1. Riverstone's Purported "Good Faith" Defense is a Matter for the Jury

Moving Defendants misstate the law of this Circuit as it relates to the good faith defense.  Mere recklessness is the touchstone standard for the analysis.  *See G.A. Thompson*,

---

[7] Moving Defendants' reliance on *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 640 (S.D. Tex. 2013), is inapt because there the plaintiffs alleged control only through the defendant's "high ranking position" in the company.  Here, the evidence shows Walker and Coats were able to control statements made by Silver Run II through those high positions.

[8] ███ *See Siemens v. Seagate Tech.*, No. SACV 06-788JVS (ANx), 2009 WL 8762978, at *9 (C.D. Cal. Apr. 27, 2009) (court did not err by admitting privilege logs as evidence at trial); *Huawei Techs. Co. Ltd. v. T-Mobile US, Inc.*, 2017 WL 7052463, at *1 (E.D. Tex. Sept. 20, 2017) (privilege log admissible for establishing communication occurred).

636 F.2d at 960 ("Under our holding, the degree of recklessness required for liability under the controlling person doctrine *is less than* for noncontrolling persons under *Southwest Coal* and *Croy*, which spoke of a severe form of recklessness.").[9] And, of course, since Moving Defendants must come forth with evidence establishing that they did not act recklessly, evidence of Moving Defendants' severe recklessness or deliberate and knowing misconduct more than suffices to create a triable issue of fact on their good faith defense. *See id.*

Riverstone's decision to make a "bet" for public shareholders that "aggressive" projections would "materialize" while Riverstone would benefit "regardless" demonstrates its bad faith. *See* PX 269 at -356 to -357. And Riverstone not only selfishly chose to proceed with the De-SPAC on behalf of Silver Run II, but *encouraged* the fraud in the hopes of profiting off its sponsor shares. For example, Hackett worked with Chappelle in the days leading up to the announcement of the Business Combination in August 2017 to cook up the $350 million AMH estimated 2018 EBITDA that they needed to support the valuation defendants had placed on the merged assets. *See* PX 275 at -949 (after conversation with Jim Hackett, Chappelle instructed team: "looks like we do need a $350MM 2018 scenario"); PX 279 at -200 (AMH's lead financial analyst responsible for the $350MM 2018 scenario: "AAAAAAAAH IT CANT BE DONE"). Riverstone, through Hackett, also controlled the misleading statements presented to investors in the August 16, 2017 post market close press release, investor presentation, and investor call. *See* PX 365 at -387 (Hackett: "Let me control presentation with Hal. . . . [O]nly work thru me on changes to content."); PX 367 (Hackett discussing how to present KFM projections in press release). Indeed, during the

---

[9] *See also* Opposition to Proxy Defs' MSJ at 20 & n.6.

investor call, Hackett misleadingly represented that AMH was "currently doing" its purported base case scenario of 12-14 wells per section.  (PX 285 at -420; PX 218 at 30:4-11).   Further, just ten days before the Proxy was issued, Riverstone internally recognized that "[w]e don't have high confidence in AM/KFM's reporting fidelity or frequency."  (PX 312 at -860).  Riverstone and its agents then proceeded with issuing and controlling the false and misleading Proxy seeking approval of the transaction.



Tellingly, this was no surprise to Riverstone.  *See* PX 325 at -211 (Riverstone knew the KFM Proxy numbers were off); *see also* PX 325 at -211 (Leuschen's response: "***not surprising*** but frustrating"); PX 326 at -836 (Riverstone's Drew Karian's response:  "I think we know folks never meet their sales projections").

PX 375).  Riverstone, which has admitted it had the power to apply "overwhelming force" to solve problems at AMR, repeatedly sat silently knowing the primary defendants misled investors.  *G.A. Thompson*, 636 F.2d at 960 (the relevant question for the purposes of the good faith defense is "whether the defendant acted recklessly in failing to do what he could have done to prevent the violation").

There is also ample evidence for the jury to find that Riverstone was at least reckless. *See Dietrich v. Bauer*, 126 F. Supp. 2d 759, 768 (S.D.N.Y. 2001), *adhered to on recon. by* 2001 WL 536971 (S.D.N.Y. May 21, 2001) ("Willful blindness . . . cannot form the basis for a defense of good faith to a charge under § 20(a)."); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456–58 (S.D.N.Y. 2009) (even if defendant had appropriate compliance system in place and conducted some limited investigation in light of red flags, this alone is not sufficient to warrant summary judgment on good faith, as it does not exclude the possibility that defendant was willfully blind to a violation).  Discovery has confirmed that Riverstone only conducted "light diligence" for the De-SPAC.  *See, e.g.*, PX 262 at -408 (Hackett referred to Riverstone's "light diligence" and noted another "weakness in our process [was] not getting Baran [Tekkora, Riverstone partner and midstream expert] more involved"); ███████████████████████████████████████ PX 297 at -234 (ARM Energy's Dunne:  "[Riverstone] have done zero diligence."); ██████ ███████████████████████████████████████████████████[10]

Riverstone's argument that it acted in good faith because its funds and co-investors committed $600 million to the Business Combination is starkly misleading.  In truth, only a small fraction of this total (approximately $8 million) was money that Riverstone actually had at stake.  *See* PX 232 at 40:5-9, 62:15-63:18.[11]

---

[10] Riverstone's reliance on TPH is also overstated, as TPH simply did not conduct the diligence that Riverstone says it did.  *See* Opposition to Proxy Defs' MSJ at p. 23; Opposition to Director Defs' MSJ at pp. 24-25; *see also* PX 241 at 158:3-160:9 (TPH didn't receive data from AMH or Riverstone after July 2017, despite significant new, negative pattern test data continuing to come in); *id.* at 175:5-13 (TPH did not calculate the appropriate number of wells per section).

[11] Riverstone's investment took two forms: (i) $400 million from Riverstone Fund VI; and (ii) an additional $200 million committed from Riverstone-affiliated co-investors.  *See* PX 232 at 38:11-16,

### 2. Coats and Walker's Purported "Good Faith" Defense is a Matter for the Jury

The only evidence Coats and Walker offer in support of their good faith defense are their self-serving interrogatory responses. *See* Mot. at pp. 21-22. Those answers merely state, in conclusory fashion, that Coats and Walker acted in good faith, had no incentive to violate the securities laws, and then proceed to describe what Coats and Walker supposedly "understood" or "[were] not aware of" when it came to the Business Combination. *Id.* They do not explain how Coats and Walker acted in good faith, or provide any factual bases supporting the claim that Coats and Walker "[u]nderstood . . . Silver Run II and Riverstone . . . were performing substantial due diligence" and "taking all appropriate steps to review the accuracy of . . . public statements." (Mot. at 22). Nor do they in any way substantiate Coats's and Walker's claimed lack of knowledge of any adverse information. *Id.* The Court is thus left to simply take Coats and Walker at their word. This is not sufficient to meet Coats and Walker's burden of establishing their good faith defense compels summary judgment, particularly in light of the contradictory record evidence. *See G.A. Thompson*, 636 F.2d at 960.

As detailed above, *supra* at pp. 11-12, Riverstone partners Coats and Walker were two of Silver Run II's three employees and either knew or abjectly failed to oversee – or

---

40:19-22. Riverstone generally contributed 2% of a fund's committed capital. *Id.* at 39:15-21, 40:5-9.

Riverstone would benefit regardless of the outcome at AMR. *See id.* at 30:22-31:13, 35:8-15 (Riverstone collects management fees from its funds and co-investments); *id.* at 99:19-100:15 (management fees collected on total investment in AMR "could easily approach" Riverstone's internal commitment); PX 259 at -525 ($218.9 million present value of future management fees for Riverstone Fund VI).

even inquire into – the Business Combination and Silver Run II's process for preparing and disseminating public statements about the Business Combination.  Further, when asked what he did to ensure "documents filed with the SEC . . . were accurate," Coats testified: "*I wouldn't say I made sure they were accurate, I don't know that I would even have fully read them*."  (PX 219 at 25:18-26:3).  Coats and Walker did not have "every reason to believe" the Business Combination had been "thoroughly and diligently examined" as they claim.  (Mot. at p. 22).  Even taken at face value, their claim is that as two of Silver Run II's three officers, they could meet the exacting fiduciary and regulatory requirements of their positions by burying their heads in the sand.  Ostrich-like behavior does not carry the good faith defense which requires at a minimum they "maintained and enforced a reasonable and proper system of supervision and internal control[s]."  *See Dietrich*, 126 F. Supp. 2d at 768; *Parmalat*, 594 F. Supp. 2d at 456–58; *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (to carry the good faith defense, the controlling party "must prove . . . [it] 'maintained *and* enforced a reasonable and proper system of supervision and internal control[s]'").

## CONCLUSION

For the reasons stated herein, along with all other evidence and information in the court record, the Moving Defendants' Motion should be denied in its entirety.

Dated:  January 19, 2024                              Respectfully submitted,

*/s/ Andrew J. Entwistle*                              */s/ Trig R. Smith*
Andrew J. Entwistle (attorney-in-charge)       Trig Smith (*pro hac vice*)
State Bar No. 24038131                              Lonnie Browne (*pro hac vice*)
Callie Crispin                                             John Kelley (*pro hac vice*)

State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*


Carol C. Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*

**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

## GLOSSARY OF KEY TERMS, ENTITIES AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|---|---|
| 12 WPS | 12 wells per section, the assumption in Alta Mesa's "base case" that it could drill twelve horizontal oil wells in each Section. |
| 250 MBO | 250,000 barrels of oil, the amount of oil Alta Mesa projected it could recover on average per well in its "base case". |
| Alta Mesa | Refers to AMR (post De-SPAC) and/or AMH (pre De-SPAC). |
| AMH | Alta Mesa Holdings, LP, the private pre-De-SPAC company. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-De-SPAC company. |
| ARM Energy | Defendant ARM Energy Holdings LLC. |
| Artificial Lift | The use of artificial means to increase the flow of liquids from an oil well. |
| Base Case | The drilling plan Alta Mesa presented starting in August 2017 where it would drill 12 wells per Section (four each in three Benches) and recover on average 250 MBO per well. |
| BCE or Bayou City | Defendant Bayou City Energy Management LLC. |
| Bench | A distinct horizontal layer of rock that Alta Mesa landed its horizontal wells in. |
| Bourque | Kevin Bourque, Vice President of Mid-Continent Operations at Alta Mesa. |
| Bullis-Coleman | A ten well pattern spacing test conducted by AMH that started producing in February 2017. |
| Business Combination or De-SPAC | The merger of Silver Run II with Kingfisher and AMH on February 9, 2018. |
| CAO | Chief Accounting Officer. |
| Central Area | Alta Mesa's acreage within Township 17N, as depicted in PX 204 paragraph 23. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |

| Term | Description |
|---|---|
| Chappelle | Moving Defendant Hal Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Child Well | Subsequent wells drilled in a Section surrounding the initial Parent Well. |
| Christopher | Michael Christopher, CFO at ARM Energy during the relevant period. |
| Citi | Citigroup Global Markets Inc., financial advisor to Silver Run II. |
| Class Period | August 16, 2017 to May 17, 2019. |
| Class Plaintiffs | Plaintiffs in the TAC and Court-appointed Class Representatives (Dkt. 241): FNY Partners Fund, LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (formerly Plumbers and Pipefitters National Pension Fund) and Camelot Event Driven Fund, a Series of Frank Funds Trust. |
| Coats | Moving Defendant Stephen Coats, former General Counsel at Riverstone and Corporate Secretary of Silver Run II prior to the De-SPAC. |
| Cole | Homer "Gene" Cole, Chief Technology Officer and a VP at Alta Mesa until December 2018. |
| Collins | Craig Collins, VP and COO of KFM from April 2018 to April 2019. |
| Complaint or TAC | Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 6, 2021 (Dkt. 218). |
| COO | Chief Operating Officer. |
| Defendants | The defendants named in the Third Amended Complaint. |
| Dimitrievich | Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| Downspacing | The drilling of additional wells in an already developed area. |
| E&P | Exploration & Production, the "upstream" portion of the oil and gas industry. |
| Ellis | Moving Defendant Mike Ellis, COO and founder of AMH and later AMR until December 2018. |

| **Term** | **Description** |
|----------|-----------------|
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting fluids from wellbores. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the total quantity of oil and/or gas that has already been recovered from a producing well plus the amount of oil and/or gas that is estimated to be commercially recoverable over the rest of the life of the well. |
| Exchange Act | The Securities and Exchange Act of 1934. |
| Gutermuth | Moving Defendant William Gutermuth, a director of Silver Run and AMR until June 2018. |
| Hackett | Defendant James Hackett, a Riverstone Partner, CEO and Chairman and the Board of Silver Run II prior to the De-SPAC, Executive Chairman of the Board of Directors of AMR, head of the AMR midstream business (KFM), and later interim CEO of AMR. |
| High Mesa | High Mesa, Inc., a now bankrupt entity owned by BCE, HPS and AM Management that prior to the De-SPAC owned AMH and approximately one-third of Kingfisher. |
| HPS | Defendant HPS Investment Partners, LLC. |
| Interference | The phenomenon in which wells drilled close to each other drain a shared reservoir, resulting in lower recoveries per well. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with AMH and Silver Run II in the De-SPAC. |
| KPMG | AMR's auditor starting in June 2018. |
| Lapeyre | Moving Defendant Pierre Lapeyre, Jr., a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| Leuschen | Moving Defendant David Leuschen, a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| MBO | Acronym for thousand barrels of oil. |
| MBOE | Acronym for thousand barrels of oil equivalent. |
| MMBOE | Acronym for millions of barrels of oil equivalent. |

| Term | Description |
|------|-------------|
| McCabe | Michael McCabe, Chief Financial Officer of Alta Mesa Holdings (AMH) and Alta Mesa Resources (AMR). |
| McMullen | Defendant William McMullen, founder and Managing Partner of Defendant BCE. |
| Meramec | One of the two STACK horizontal rock layers that Alta Mesa planned to target in its base case development plan. |
| Meridian | A consulting group under the Riverstone umbrella that Riverstone paid in the fall of 2018 to review Alta Mesa's production data. |
| Microseismic Testing | A technique that uses fracturing or water-injection-induced microseismic phenomena similar to natural earthquakes but with low intensities during reservoir fracturing or water injection operations to monitor fracture activities and flow mobilities in oil-producing or gas-producing pays. |
| Midstream | The portion of the oil and gas industry that links upstream (exploration and production) and downstream (post-production), including the storage, processing, and transportation of petroleum products. |
| Moving Defendants | "Moving Defendants" refers to the defendants that filed the motion being opposed (variously, Defendants Riverstone, AMR, Chappelle, Ellis, Smith, Coats, Walker, Lapeyre, Leuschen, Gutermuth, Tepper, Walters and Sinclair). |
| Osage | One of the two STACK horizontal layers that Alta Mesa planned to target in its base case development plan. |
| Parent Well | The initial well drilled by an operator in a section. |
| Pressure Tests | A test of reservoir pressure of a well over time.. In the case of multi-well drilling, pressure depletion of an initial well following bringing a nearby well online indicates that the new, nearby well is spaced too tightly to the initial well and draining the same reserves. |
| Proxy | The Definitive Merger Proxy Statement issued to Silver Run II's shareholders on Schedule 14A, dated January 19, 2018, and all supplements and amendments thereto.  The Proxy is PX 104 attached to Dkt. 444. |

4

| Term | Description |
|---|---|
| PX 1 to PX 202 | Exhibits attached to Dkt. 444, the September 21, 2023 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to Motion for Summary Judgment By (A) Defendants HPS Investment Partners, LLC, ARM Energy Holdings LLC, and Bayou City Energy Management LLC (Dkt. 423); (B) Defendant Donald Dimitrievich (Dkt. 422) and (C) Defendant William McMullen (Dkt. 427). |
| PX 203 to PX 395 | Exhibits attached to Dkt. 569, the January 19, 2024 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to (a) Defendants Riverstone Holdings LLC's, Stephen Coats', and Thomas Walker's Motion for Summary Judgment and Incorporated Memorandum of Law as to Plaintiffs' Section 20(a) Claim (Dkt. 518); (b) Proxy Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 14(a) and 20(a) Claims (Dkt. 520); (c) Alta Mesa Resources, Inc., Chappelle, Ellis, and Smith's Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 523); and (d) AMR Directors' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 526). |
| Riverstone | Moving Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. |
| RSH | Refers to Riverstone Holdings, LLC. |
| Ryder Scott | Alta Mesa's oil reserve auditor. |
| Section | A 640-acre (one square mile) land area established by the State of Oklahoma. |
| Schlumberger | An oil and gas services company that performed various technical studies for Alta Mesa. |
| Sheils | Tamara Sheils (formerly Alsarraf), a senior financial analyst at Alta Mesa. |
| Silver Run II, Silver Run or SR II | The SPAC created by Riverstone that merged with KFM and AMH. |
| Sinclair | Moving Defendant Donald Sinclair, a director of AMR following the De-SPAC. |

| **Term** | **Description** |
|---|---|
| Smith | Moving Defendant Ronald Smith, Chief Accounting Officer at AMR for a portion of the relevant record. |
| SPAC | Acronym for "special purpose acquisition company," also called "blank check" company. |
| Sponsor Shares | Stock of the SPAC that are "sold" to the SPAC sponsor for a nominal fee (here, less than one cent per share). Also called founder shares. |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Tepper | Moving Defendant Jeffrey Tepper, a director of Silver Run II and AMR. |
| TPH | Tuder, Picking, Holt & Co., a Silver Run II financial advisor for the Business Combination. |
| Tracer Tests | Tests used in the oil industry in order to gauge how fluid flows through the reservoir that are useful to detect and evaluate communication/interference among wells. |
| Turner | Tim Turner, VP of Corporate Planning and Reserves and later VP of Corporate Development. |
| Type Curve | A model of oil and gas production, including rate and EUR, of future wells based on a statistical average of similar wells. |
| Upstream | The portion of the oil and gas industry focused on identifying, extracting, and producing hydrocarbons. |
| Walker | Moving Defendant Thomas Walker, former CFO of Riverstone and CFO of Silver Run II prior to the De-SPAC. |
| Walters | Moving Defendant Diana Walters, a director of Silver Run and AMR. |
| W.D. Von Gonten | Petroleum engineering consultant. |
| Widell | Chris Widell of Sponte Resources, a consultant that conducted due diligence of AMH for Riverstone. |
| WPS | Wells per Section. |

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on January 19, 2024.


*/s/ Andrew J. Entwistle*
Andrew J. Entwistle