**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 571**

---

**CLASS PLAINTIFFS' OPPOSITION TO THE PROXY DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND INCORPORATED**
**MEMORANDUM OF LAW ON PLAINTIFFS'**
**<u>SECTION 14(a) AND 20(a) CLAIMS</u>**

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................. 1

STATEMENT OF ISSUES TO BE RULED UPON ................................................. 1

APPLICABLE LEGAL STANDARD .................................................................... 2

SUMMARY OF ARGUMENT ............................................................................. 2

STATEMENT OF FACTS ................................................................................. 6

    A.    Facts Relevant to the Misleading Nature of the Proxy Defendants' Statements ................................................................................. 6

    B.    Facts Relevant to the Proxy Defendants' "Good Faith" Reliance on Subject-Matter Experts ..................................................................... 9

ARGUMENT ................................................................................................. 11

    A.    The Facts Demonstrate That the Proxy Defendants' Conduct Was Fraudulent .................................................................................. 11

    B.    Rather Than Attack the Falsity of the Proxy Statements, the Proxy Defendants Rehash Rejected Legal Arguments Made During Motion to Dismiss ........................................................................... 12

        1.    The Challenged Proxy Statements Are Not Protected by the PSLRA Safe Harbor ................................................................. 12

        2.    The Proxy Projections Were, in Fact, Material to Investors ............ 16

        3.    The Proxy Defendants' So-Called "Opinion Statements" Are Not Opinions, and Even if They Were, They Are Actionable ........ 16

    C.    Class Plaintiffs Can Prove Loss Causation .................................. 20

    D.    The Proxy Defendants' "Good Faith" Defense is Insufficient to Warrant Summary Judgment on Class Plaintiffs' Section 20(a) Claims ........................................................................................ 20

        1.    The Proxy Defendants' Deceptive Conduct and Direct Knowledge of the Negative AMH Field Data Eviscerates the "Good Faith" Defense ............................................................. 20

2.   The Work of the Proxy Defendants' Subject-Matter Experts
     Does Not Support Summary Judgment ............................................ 21

3.   Proxy Defendants Gutermuth, Tepper, and Walters' "Good
     Faith" Defense Does Not Compel Summary Judgment on
     Class Plaintiffs' Section 20(a) Claims .............................................. 24

CONCLUSION ............................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Carpenter v. Harris, Upham & Co.*,
    594 F.2d 388 (4th Cir. 1979) ........................................................ 24

*G.A. Thompson & Co., Inc. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ............................................... 5, 9, 20

*In re: BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ............................. 17

*In re Firstenergy Corp.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ............................... 19

*Karp v. First Conn. Bancorp, Inc.*,
    535 F. Supp. 3d 458 (D. Md. 2021) ............................................ 11

*Marbury Mgmt., Inc. v. Kohn*,
    629 F.2d 705 (2d Cir. 1980)......................................................... 24

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)....................................................... 16, 17, 19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000).......................................................................2

*Rubenstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ................................................. 12, 15

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...................................................... 24

*S.E.C. v. Ginder*,
    752 F.3d 569 (2d Cir. 2014)........................................................ 12

*S.E.C. v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ...................................................... 12

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................... 13

*Stahl v. Novartis Pharms. Corp.*,
    283 F.3d 254 (5th Cir. 2002) ........................................................2

*United States v. West*,
    22 F.3d 586 (5th Cir. 1994) ....................................................................... 23

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988) ...................................................................... 11

*Wyatt v. Hunt Plywood Co. Inc.*,
    297 F.3d 405 (5th Cir. 2002) ....................................................................... 2

**Rules**

Federal Rules of Civil Procedure
    Rule 56(a) ............................................................................................................... 2

## NATURE AND STAGE OF PROCEEDINGS

This is a certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934. (Dkt. 241). The action concerns the rapid collapse of Alta Mesa Resources, Inc. ("AMR") f/k/a Silver Run II following a De-SPAC transaction wherein two privately held companies – Alta Mesa Holdings ("AMH") and Kingfisher Midstream ("KFM") – went public by merging into a Riverstone-sponsored SPAC. On February 12, 2018, Defendants began discussing whether and how to disclose a 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it. Less than a year after asking for shareholder approval, AMR was forced to write off more than 80% of its $3.86 billion market value for the same reason. AMR filed for bankruptcy protection just seven months after that.

AMR, Riverstone Holdings LLC ("Riverstone"), James Hackett ("Hackett"), William Gutermuth ("Gutermuth"), Jeffrey Tepper ("Tepper"), and Diane Walters ("Walters") (collectively, the "Proxy Defendants") move for summary judgment (Dkt. 520) (the "Motion"), arguing they should avoid a jury trial with respect to Class Plaintiffs' Section 14(a) and Section 20(a) claims. The Court has scheduled an April 12, 2024 docket call and the case is potentially to be set for a May 2024 trial. (Dkt. 376).

## STATEMENT OF ISSUES TO BE RULED UPON

1.     Whether the Proxy Defendants, or any of them, are entitled to summary judgment on Class Plaintiffs' Section 14(a) claim.

2.     Whether the Proxy Defendants, or any of them, are entitled to summary judgment on Class Plaintiffs' Section 20(a) claim.

1

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]  Only when "the non-moving party can point to nothing in the record supporting its claim" should summary judgment be granted.  *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  In deciding a motion for summary judgment, the Court "must review all of the evidence in the record but make no credibility determinations or weigh any evidence." *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Rather, the Court "must disregard everything favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party." *Id.*

## SUMMARY OF ARGUMENT

The Proxy Defendants seek to escape liability by: (a) ignoring the evidence arrayed against them; (b) drawing all inferences in their favor; (c) knowingly misstating the law; and (d) raising irrelevant strawman arguments.  As demonstrated herein, the Court should reject the Proxy Defendants' Motion and bind them over for trial.  The Proxy Defendants also do not dispute that they were, in fact, "control persons" over the preparation and solicitation of the Proxy pursuant to Section 20(a).

The Proxy Defendants first assert that they "were [not] negligent at all" in preparing the Proxy and soliciting votes from Class members.  (Motion at pp. 2, 17-20).  Because the

---

[1] Emphasis is added and citations and footnotes are omitted, unless otherwise stated.

evidence indicates the Proxy Defendants' conduct was fraudulent, Class Plaintiffs have satisfied the negligence standard as a matter of law.

In September 2016, Riverstone initially rejected a potential merger of AMH and KFM due to concerns with the quality of AMH's drilling inventory.  By April 2017, issues with AMH's drilling inventory re-emerged after Riverstone opted to take a second look at AMH.  On April 11, 2017, after mere hours of diligence, the Proxy Defendants were informed that AMH's wells in the STACK suffered wellbore interference due to the porosity of the underlying rock, and any time AMH had placed four or more wells on any section in the STACK (*i.e.*, went beyond 4-WPS), the wells collectively had difficulties hitting the type curve.

In June 2017, after a two-day due diligence session at AMH's Houston headquarters, Riverstone's continued diligence confirmed the April 2017 findings, noting that AMH's ability to deliver 4,000+ well locations at the type curve was a problem, and the rock underlying AMH's STACK leasehold was a carbonate (indicating it would be characterized by wellbore interference).  Immediately after that session, Hackett lamented:

> It seems to me that regardless of the [value of Riverstone's founder shares], the public shareholder can receive comfort on the deal value, even at the lower [commodity] prices we see today – *if we can project a future tally of 4200 wells at a reasonable EUR number.  Ultimately, the bet we are making on behalf of the public shareholder[] . . . is that either the projected well count will materialize or we will find other cost efficiencies and/or improved recovery solutions to offset the lower total well count*.

As due diligence continued, that undisclosed bet was exposed as empty.

By June 2017, AMH had conducted several well spacing tests between 3- and 10-WPS.  As a result of due diligence efforts between April and June 2017, the Proxy

Defendants had been exposed to AMH's current field production data twice – *that is, AMH well spacing tests ranging from 3- to 10-WPS conducted between 2015 and January 2017* – demonstrating that the 250 MBO and 12-WPS assumptions were unsubstantiated.

So, the Proxy Defendants cooked the books. On August 12, 2017, AMH's CEO (Defendant Harlan Chappelle ("Chappelle")) complained that his financial team had not developed a 2018 upstream EBITDA projection that would support the $3.86 billion enterprise value Defendants desired for the merged AMH and KFM assets. The next day, Chappelle (the seller) conspired with Hackett (the buyer) regarding what the projection must be to persuade voters that the $3.87 billion valuation was reasonable. After that August 13 interaction, Chappelle ordered his lead financial analyst to concoct a "strawman" $350 million EBITDA projection for AMH. Her response is stunning:

> [L]ol [Hal Chappelle] may be mad . . . at me [because] yesterday he was trying to get me to do a model that shows $350mm ebitdax, but I have all these other constraints, *so I was like AAAAAAAAAH IT CANT BE DONE*.

But the Proxy Defendants never adjusted the 12-WPS or 250 MBO assumptions prior to disseminating the financial projections to voters.

Then, on August 18, 2017, AMH's financial consultant inquired of other "levers" AMH could use to further "*goose*" the $358 million EBITDA projection. Chappelle's lead financial analyst confirmed that the Proxy Defendants had already cooked the books: "*We're doing that already. My two cents is that this model is already pretty aggressive. We rarely ever come in higher than forecasted on production (due to higher shut-ins, etc)*." Between 2015 and January 18, 2018, moreover, AMH possessed field data demonstrating that almost every single child well drilled to date came nowhere close to

4

substantiating the 250 MBO assumption.  And, Riverstone and Hackett have admitted the projections were downright ███████

Defendants next contend that a select group of Proxy statements are not misleading, rehashing the same Safe Harbor arguments the Court rejected at the motion to dismiss stage.  (Motion at pp. 20-24).  The law here is clear:  no amount of cautionary language protects forward-looking statements known to be baseless when made.

Defendants next contend that Class Plaintiffs will be unable to prove loss causation.  (Motion at p. 24).  They are wrong.  Class Plaintiffs' expert on loss causation and damages, Dr. Feinstein, exhaustively analyzed price decreases in AMR stock following the disclosure of negative, firm-specific information that corrected the Proxy Defendants' misleading statements.  And the Proxy Defendants do not dispute that Class Plaintiffs' expert utilized the commonly-known and widely accepted methodologies to conclude that the Proxy Defendants' deceitful conduct caused Class Plaintiffs economic loss.  They merely complain about his conclusions.

Lastly, the Proxy Defendants contend that their good faith defense to the Section 20(a) claims requires dismissal.  (Motion at p. 25).  Here, the Proxy Defendants have deliberately misstated the *mens rea* standard for the defense.  *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959–60 (5th Cir. 1981) (explicitly holding that the *mens rea* associated with the good faith defense is "recklessness").  In any event, the evidence demonstrates that the Proxy Defendants' deceitful conduct, or failure to question any of the key assumptions underlying AMR's purported $3.86 billion valuation, collides with the concept of good faith.  Their consultants' work does not call for dismissal either.

5

**STATEMENT OF FACTS**

A.     **Facts Relevant to the Misleading Nature of the Proxy Defendants' Statements**

Between 2015 and 2016, Riverstone first conducted due diligence for a potential investment in AMH and KFM. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████

In September 2016, however, Riverstone rejected the potential deal. (PX 20). Riverstone noted to its investment committee that AMH maintained a "sloppy capital structure" (attributed in part to the $500 million in AMH debt then held by Defendant HPS), Riverstone would not be able to sufficiently control its investment, and there existed "uncertainty around [AMH's] drilling inventory." *Id.* at -243, -246 to -247.

Then, in early 2017, the parties renewed discussions for a potential deal. *Id.* at -243 to -244. After mere hours of diligence the prior day, on April 11, 2017, Hackett's hand-selected oil and gas expert reported:

> *I wasn't surprised to see their lackluster down-spacing results. . . . [AMH] is seeing that the spacing tests-even the 1320' tests (4-wells per unit) have a hard time hitting the type curve. To me these results limit [AMH's] "STACK upside" story*.

(PX 255 at -190). On April 12, 2017, another Riverstone team member Mr. Karian, who was also involved in Riverstone's diligence effort, noted: "*[AMH's] assertion of one type curve*

---

[2] Class Plaintiffs incorporate herein their oppositions to the summary judgment motions previously filed by Defendants HPS, BCE, ARM, McMullen and Dimitrievich on similar grounds (Dkt. Nos. 445, 446, and 449). To avoid burdening the Court with duplicative exhibits, Class Plaintiffs refer to and incorporate herein the exhibits PX 1 to PX 202 attached to the September 21, 2023 Declaration of Andrew J. Entwistle (Dkt. 444). The January 19, 2024 Declaration of Andrew J. Entwistle attaches additional summary judgment evidence starting at PX 203.

***and 12 well unit [i.e., 12-WPS] across the entire [STACK] leasehold is aggressive in my***

***opinion and we may want to make that point***."  (PX 254 at -206).

On June 7-8, 2017, Hackett and other Riverstone personnel (including Mr. Karian) participated in two one-half days of due diligence of AMH's operations in Houston.  *See* PX 270.  And, Riverstone knew of and had access to ***all of*** AMH's well production and spacing test results conducted on the STACK during the June 2017 session.  *See* PX 242 at 118:10-24 (AMH was an "open book" with regard to due diligence, and Riverstone "***had everything we [had]***").  The Company's spacing tests – which provide a measure of the reasonableness of the 12-WPS and 250 MBO estimated ultimate recovery ("EUR") assumptions – were particularly troublesome.  In May 2017, for example, AMH management observed that its multi-well pattern testing "***[was]n't giving us the bang we hoped***."  (PX 264 at -147).

By June 6, 2017, AMH management had already assessed the results of the well spacing tests the Company had conducted between 2015 and 2017. ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████  These results came as no surprise to Riverstone because the September 2016 memorandum rejecting an investment noted that Ryder Scott had estimated that AMH's STACK leasehold would support only 4-WPS.  (PX 20 at -252).

After the June 2017 session, the Riverstone deal team reiterated its concerns about the "STACK upside story" to Hackett, including the "[l]ack of predictability (as the Osage is a carbonate not a [sic] ubiquitous shale) and implications for being able to deliver all modeled [well] locations (4,200) at the type curve."  (PX 270 at -362).  On June 9, 2017, Hackett acknowledged the dilemma:

> It seems to me that regardless of the [Riverstone Holdings] economics . . . the public shareholder can receive comfort on the deal value . . . ***if we can project a future tally of 4200 wells at a reasonable EUR number.  Ultimately, the bet we are making on behalf of the public shareholder[] . . . is that either the projected well count will materialize or we will find other cost efficiencies and/or improved recovery solutions to offset the lower total well count***.

(PX 268 at -404).  The Proxy Defendants never disclosed that bet to voters.  Rather, the Proxy Defendants continued to assure voters that AMH's field data provided them "confidence" in the financial projections and $3.86 billion valuation.  *See, e.g.*, PX 51 at pp. 1-6.

The flawed assumptions infected every alleged misleading statement made by the Proxy Defendants.  Between August 17, 2017 and January 18, 2018, Defendants told investors that AMH's purportedly "de-risked" acreage in the STACK would generate $358 million of EBITDA in 2018.  Yet, AMH's lead financial analyst had warned Chappelle just

days prior "*AAAAAAAAAH IT CANT BE DONE*."  (PX 279 at -200; *see also* PX 238 at 190:1-195:15).

Even though the Proxy Defendants stretched the 2018 AMH EBITDA projection beyond reality, they deliberately posted $358 million on August 16, 2017.  *See* PX 51 at p. 35.  The motivation to do so is apparent:  The Proxy Defendants' previous projections – all materially lower than $358 million – were just "*too low for the valuation we have*."  (PX 275 at -949).

Rather than accept the known facts bearing upon AMH's future prospects, Chappelle and his senior management, with the full knowledge of Hackett and Riverstone, had been pulling levers and cherry picking data to concoct a $350+ million EBITDA guestimate.  On August 18, 2017, Citigroup (AMH's banker for the SPAC deal), asked what "*other levers*" AMH could pull to "*goose*" its projected 2018 EBITDAX guidance.  (PX 290 at -280).  Ms. Sheils was the only voice of reason, affirming that: "*We're doing that already.  My two cents is that this model is already pretty aggressive.  We rarely ever come in higher than forecasted on production (due to higher shut-ins, etc.)*."  *Id.*

## B.   Facts Relevant to the Proxy Defendants' "Good Faith" Reliance on Subject-Matter Experts

As discussed above, a jury could reasonably infer that Hackett, Chappelle, and Ellis's conduct was fraudulent.  *See* Argument, Part A, *infra*.  As a matter of law, therefore, there is a genuine issue of material fact as to whether Riverstone, AMR, and Hackett acted in "good faith."  *See G.A. Thompson*, 636 F.2d at 960 (defendant must prove an absence of scienter).

The remaining Proxy Defendants – Tepper, Gutermuth, and Walters – also contend their "good faith" defense requires dismissal.  (Motion at p. 25).  However, their expert

conceded on behalf of the Proxy Defendants, that they "should [have] independently evaluate[d]" the key assumptions underlying the challenged Proxy statements. *See* PX 211 ¶ 58. But they did not.

Tepper had no knowledge of who was responsible for conducting the due diligence in advance of the AMH/KFM merger. (PX 240 at 73:21-75:5). Tepper testified he did nothing to evaluate the assumptions underlying the top line (revenue) of the financial projections, and did not even know what the EUR assumption meant. *Id.* at 134:4-11. With regard to the 12-WPS assumption, Tepper had no idea how 4000+ well locations had been identified. *Id.* at 68:13-69:15. The Motion does not come forward with evidence that he evaluated the key assumptions.

Gutermuth was unable to describe any conversations he had with Hackett regarding the proposed merger, let alone their consultant's work (*i.e.*, TPH). (PX 229 at 61:18-66:19, 83:8-23). Gutermuth had no knowledge of what one key assumption even meant – that is, "oil in place," which is a key assumption underlying the Proxy's wildly unsubstantiated financial projections. *Id.* at 106:15-110:13. The Motion comes forward with no evidence that he evaluated the key assumptions.

Walters testified that she had no idea whether TPH assessed the 12-WPS or EUR assumptions, and asserted TPH acted as a financial "evaluation" consultant regarding the purported $3.86 billion market value of the merged assets. *See* PX 244 at 54:6-10, 56:20-57:18. Walters failed to identify any other consultant other than TPH who participated in diligence. *Id.* at 62:10-17. The Motion comes forward with no evidence that she evaluated the key 12-WPS and 250 MBO assumptions either.

## **ARGUMENT**

**A.     The Facts Demonstrate That the Proxy Defendants' Conduct Was Fraudulent**

The Proxy Defendants first argue Plaintiffs' failure to offer expert "evidence of the applicable standard of care . . . alone entitles the Proxy Defendants to summary judgment" (Motion at pp. 17-18).  Class Plaintiffs have adduced evidence from which a jury may make a reasonable factual inference that the Proxy Defendants' conduct was deceitful.  And the cases the Proxy Defendants cite expose their argument as a red herring.

First, nowhere in *Karp v. First Conn. Bancorp, Inc.* does the court state that a Section 14(a) claim is fatally flawed simply because the plaintiff did not provide expert testimony on negligence.  535 F. Supp. 3d 458 (D. Md. 2021).  In distinguishing the cases the plaintiff cited in opposition to summary judgment, the court noted that where the evidence suggests a defendant had knowledge of a material misstatement (or omission), the negligence standard is met as a matter of law.  *Id.* at 474 (adding that the defendants in *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987 (2d Cir. 1988), "were negligent because they ***knew*** the proxy was misleading" prior to its publication).  The Fourth Circuit panel further noted "there is no indication that the Individual Defendants were aware of the omission of the cash flow projections, or that the projections used by Piper may have been erroneously low."  *Karp*, 535 F. Supp. 3d. at 474.[3]

---

[3] The Fourth Circuit stressed the *Wilson* court's finding that evidence of non-disclosure of certain information was a deliberate decision demonstrating a culpable state of mind "far in excess of negligence."  *Id.*

*S.E.C. v. Shanahan*, 646 F.3d 536 (8th Cir. 2011), is of no help.  In that case, the Eighth Circuit noted, "[a]s the SEC failed to prove scienter, that is reason enough to affirm the district court's dismissal of [the Section 14(a)] claims." *Id.* at 547.

*S.E.C. v. Ginder*, 752 F.3d 569 (2d Cir. 2014), is of no help either.  There, the Second Circuit noted:  "[I]t cannot be said that expert testimony was necessary, or that what an expert could say would be useful. . . .  The SEC did not propose how O'Meally's conduct might have been sloppy or ill-calculated. . . .  The SEC portrays this case as being only about O'Meally's [negligence]." *Id.* at 569.

**B.** **Rather Than Attack the Falsity of the Proxy Statements, the Proxy Defendants Rehash Rejected Legal Arguments Made During Motion to Dismiss**

The Proxy Defendants don't contest there is a triable issue of fact as to the falsity of any of the statements alleged to be false and/or misleading in the Proxy.  Rather, they merely challenge the allegedly misleading financial projections as inactionable projections and opinions.  On both counts, they are incorrect.

**1.** **The Challenged Proxy Statements Are Not Protected by the PSLRA Safe Harbor**

The law does not provide the Proxy Defendants *carte blanche* to issue knowingly false and misleading projections as long as those statements were identified as forward-looking and were accompanied by cautionary language.  *Compare* Motion at pp. 20-22, *with* Dkt. 126 (Proxy Defendants' motion to dismiss) at pp. 13-18.  To the contrary, the Safe Harbor does not apply to statements known to be false when made or known to be derived from unreliable information.  *See Rubenstein v. Collins*, 20 F.3d 160, 167–69 (5th

Cir. 1994); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004).

Hackett and Chappelle (the buyer and seller) conspired to concoct an AMH $350 million 2018 EBITDA projection that they needed for a $3.86 billion valuation.  *See* PX 275 at -949 (on August 12, 2017, Chappelle noting he was meeting with "Jim" on the morning of August 13 to go over the projection "so you may want to wait until I get some feedback . . ."; and, following the discussion with Hackett, Chappelle informing his analyst on August 13, 2017, "OK superwoman, looks like we need a $350MM scenario. Give us some straw man . . ."); PX 238 at 170:6-25 (identifying "Jim" as Jim Hackett); PX 279 at -200 (after receiving Chappelle's "OK superwoman" instruction, the analyst told Chappelle a $350 million EBITDA "*CANT BE DONE*").[4] ██████████████████████████

████████████████████████████████████████████

███████████████████████ PX 242 at 118:10-24. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████ Hackett had been told the same thing in April 2017 by his hand-picked consultant (informing Hackett he was not "surprised" by AMH's lackluster spacing test results—specifically, that at 4-WPS or above given the porosity of the underlying rock).  (PX 255 at -190).  Here, the evidence indicates Hackett and Chappelle were aware of all the AMH field production data that

---

[4] On August 12, 2017, Hackett admitted "Hal and I will review the road show [presentation] tomorrow. . . .  Let me control presentation with Hal.  Citi [AMH's financial advisor, not Riverstone's] should only work thru me on changes to content."  (PX 365 at -387).  On August 14, 2017, Hackett admitted he and Chappelle discussed AMH and KFM 2018 growth numbers.  (PX 367 at -245).

directly contradicted the 12-WPS and 250 MBO assumptions that existed at the time the Proxy was filed with the SEC. ███████████████████████████

███████████████████

The unsubstantiated spacing and production assumptions impacted the KFM projections too, given that KFM derived 80% to 90% of its revenues from throughput volumes from AMH. ████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████  *See* PX 129 at -995 (on March 28, 2018, a Riverstone diligence team member remarked: "As Jim [Hackett] mentioned . . . our RSH underwriting case was materially below [AMH's] case. . . .  [W]e materially dropped our KFM projections . . . based on our view of pacing and further due diligence."); *see also* PX 265 at -723 (June 3, 2017 internal Riverstone "Base Case" much lower than "KFM Case").

Riverstone lowered internal KFM projections by applying a "haircut to third party volumes," demonstrating its knowledge that the third-party production assumptions underlying the KFM projections were unlikely to materialize.  (PX 266 at -407).  Moreover, on August 7, 2017, Defendants Lapeyre, Leuschen, Hackett, and other members of the Riverstone deal team drafted a letter to sell-side analysts pointing out that "third party volumes for building out the KFM valuation may or will be longer-dated than projected in our models."  (PX 272 at -879; *see also* PX 233 at 184:23-185:19).  The Proxy Defendants never disclosed that fact to investors.  And, this is the same "setback[]" that Chappelle

admitted, on March 29, 2018, to have begun to impact AMH in 2017, but was never reconciled in the projections.  (PX 375 at -008).  ████████████████████████

██████████████████████████████████████████████

████████████████████████████

        The Proxy Defendants' rehashed defense fails for another reason.  The purported cautionary language they point to (Motion at p. 21) was not "meaningful" and, thus, provides them no shelter.  *See Rubenstein*, 20 F.3d at 167–69.  As the record detailed above shows, the Proxy Defendants had direct knowledge of AMH field production data and well spacing tests that contradicted their 12-WPS and 250 MBO assumptions, prior to publishing the January 19, 2018 Proxy.  Under such circumstances, "the inclusion of general cautionary language regarding a prediction [does] not excuse the . . . failure to reveal known material, adverse facts."  *Id.* at 171 (The panel added that "[e]vidence adduced at trial [or summary judgment for that matter] disclosed, however, that at the time of issuance the defendants were aware that . . . the projection . . . was in fact . . . overstated. . . . [T]he inclusion of general cautionary language was insufficient to sanitize the false . . . projection from liability under Rule 10b–5.").

        *Rubenstein* provides an alternative basis for establishing the falsity of the projections here, referred to as the "unsubstantiated disclosure theory."  *See id.* at 168–69.  As demonstrated above, the Proxy Defendants cooked up financial projections to support the $3.86 billion market valuation of the merged assets.  Because the Proxy Defendants may be found to have acted deceitfully, the identified cautionary language does not render the projections "immaterial," let alone inactionable.  *See id.* at 171.

### 2.   The Proxy Projections Were, in Fact, Material to Investors

The Proxy Defendants' materiality argument is nonsense.  *See* Motion at pp. 21-22.

As admitted by Hackett and Chappelle on November 13, 2017:

> ***We have sold investors a model of fast growing EBITDA***, not acreage
> footprint growth.  ***Investors won't be persuaded by anything but EBITDA
> growth*** for the next 18 mos.  Investors may not see as "smart" a failure to
> deliver on our projections.

PX 301 at -744; *see also* ███████████████████████████████████████████████

████████████████████████████ PX 303 at -245 (Hackett noting, "EBITDA will be the

focus"); PX 231 at 256:11-21 (same).  And the Proxy Defendants expected voters to rely

reasonably upon them.  *See* PX 104 at pp. 84, 172 (investors "not to place undue reliance" on

the projections).

### 3.   The Proxy Defendants' So-Called "Opinion Statements" Are Not Opinions, and Even if They Were, They Are Actionable

The Court has already considered and rejected these arguments during motion to

dismiss proceedings.  Yet, the Proxy Defendants again mischaracterize two statements as

opinions:  one related to KFM's historical development and position in the STACK, and the

second concerning controls over recording reserves.  (Motion at pp. 22-24).  As previously

explained, these statements are not opinions.  *See* Dkt. 139 (motion to dismiss opposition) at

pp. 37-39 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575

U.S. 175, 183 (2015) (a fact is "'a thing done or existing'")).  The Proxy Defendants

characterize as "opinion" the statement that "'Kingfisher *was* well-positioned to benefit from

increasing upstream development activity in an active and prolific basin with upside

potential from further expansion projects.'"  *Id.* at p. 37.  But this statement enveloped

AMH's current development activity in the STACK (as well as third-party operators), which, as explained above, the Proxy Defendants knew to be over-hyped.

Even if the statement were an opinion, it is actionable anyway because Defendants did not actually believe it; they knew the unstated reality of the situation was that increasing upstream production activity was a pipedream, particularly when 80% to 90% of KFM revenues depended on AMH's baseless production projections. That purported opinion deliberately omitted known material facts that conflicted with what a reasonable investor would take from the statement itself. *See In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (citing *Omnicare*, 575 U.S. at 189).

The Proxy Defendants next attack the misleading statement about internal controls over the recording of reserves. *See* Motion at p. 23. Far from them being "structured to objectively and accurately estimate [AMR's] oil and gas reserves quantities and present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices" (*id.*), the record is replete with evidence that AMR's internal controls over the recording of reserves were non-existent. The Proxy Defendants' knowledge of the baseless 12-WPS and 250 MBO assumptions utilized to estimate reserves in the first instance indicates that any purported "control" over the process was deficient. *See, e.g.*, PX 255 at -190 (Hackett learning in April 2017 that AMH had spread a single type curve "across the entire less-proven acreage position to back into [a net asset valuation]. The evaluations engineer side of me has a problem with this . . . because of SEC [proved undeveloped reserve] standards . . . ."); *see also* PX 203 at pp. 39-53; PX 204 ¶ 54; PX 207 ¶¶ 12, 73-78; PX 208 ¶¶ 23, 30-52.

17

Defendants contend Ryder Scott's audit of AMH's ***proved reserves*** prior to the Proxy vote insulates them for liability regarding the reserve statements. (Motion at p. 23). But Ryder Scott's assessment only addressed proved reserves at 4-WPS, and said nothing about AMR's general internal controls over recording reserves (applicable to proved and unproved reserves alike) or the 12-WPS at 250 MBO per well assumptions. *See* Argument, Section D.2., *infra* (regarding Ryder Scott); *see also* PX 237 at 82:5-21, 97:8-20.

Further, an outsider's purported audit of reserves does not supersede the fact that the reserve estimates were the responsibility of the Proxy Defendants. In this case, AMH/AMR's Chief Accounting Officer ("CAO") ran away from taking any credit for the purported healthy internal controls. *See* PX 239 at 54:18-55:9. This was of particular concern with regard to undeveloped reserves. While the CAO testified that "my impression from the accounting perspective is [Ryder Scott] audited all the reserves," he had no idea Ryder Scott audited only proved developed reserves. *Id.* at 60:19-61:10. The CAO disclaimed any responsibility to ensure that AMH's senior management did not overly rely on its undeveloped reserve estimates. *Id.* at 60:14-17. This demonstrates that nobody at AMH (or AMR for that matter) was monitoring the estimation of reserves that required write-off written in connection with the $3.0+ billion charge to earnings.

Defendants also argue that the material weakness in internal controls over financial reporting that AMR disclosed in 2019 is somehow unrelated to the financial projections. (Motion at p. 23). But that is a bridge too far. Part and parcel with the material weaknesses in internal controls was AMR's $3.2 billion asset impairment, which resulted from the exact same unsupported production assumptions that Defendants knew about in

18

advance of the filing of the Proxy. *See* PX 156 at p. 58 ("In late fourth quarter of 2018 . . . changes to assumed spacing in conjunction with evolving views on the viability of multiple benches and reduced individual well expectations resulted in impairment charges . . . ."); *see also* PX 203 ¶ 162 (AMR's financial statements contained a misstatement of reserves necessitating a restatement of the financial statements at the time of the Business Combination).[5] Here, the Proxy Defendants' garbage-in-garbage-out approach to developing financial projections for voters' consumption strikes at the heart of AMR's controls over financial reporting.

Whether opinions or not, Plaintiffs have presented a triable issue of fact as to the falsity of these statements. *See In re Firstenergy Corp.*, No. 2:20-CV-3785, 2022 WL 681320, at *10 (S.D. Ohio Mar. 7, 2022) ("[T]he Court is not persuaded that *Omnicare* bars any of the statements to which Defendants object. The statements comprising '[a]ssessments' . . . of 'the efficacy of internal controls' are irreconcilable with the Complaint's well-pled allegations of a fraudulent scheme, which notably were absent in *Omnicare III*. . . . [Defendants'] assessments of internal controls either were not honestly held or were not based on the diligence a reasonable investor would expect them to convey.").

---

[5] Whether AMR may have accurately disclosed in its 2018 Form 10-K filed with the SEC in August 2019 that its "policies and practices regarding internal controls over reserve recognition are structured to objectively and accurately estimate our oil and gas reserves quantities and their present value in compliance with SEC standards," is of no moment. (Motion at p. 24). At most this shows that as of August 2019, AMR's internal controls over reserve recognition were sufficiently robust to accurately arrive at a drilling plan supported by AMH's field data: at most, 4- or 5-WPS at 175 MBO. (PX 156 at p. 58).

### C.      Class Plaintiffs Can Prove Loss Causation

For the reasons stated in Class Plaintiffs' Opposition to the AMR Directors' Motion for Summary Judgment (filed herewith), and Class Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Testimony of Steven P. Feinstein (Dkt. 559), there is clearly a genuine issue of material fact regarding the element of loss causation.

### D.      The Proxy Defendants' "Good Faith" Defense is Insufficient to Warrant Summary Judgment on Class Plaintiffs' Section 20(a) Claims

The Proxy Defendants do not dispute they were control persons.  (Motion at p. 25).  Thus, the issue is whether they have a "good faith" defense.  They do not.  With respect to the appropriate *mens rea* for the-good-faith defense, the Fifth Circuit has stated:

> Under our holding, the degree of recklessness required for liability under the controlling person doctrine *is less* than for noncontrolling persons under *Southwest Coal* and *Croy* [*i.e.*, which speak to the severe form of recklessness required for liability under Section 10(b)].  This difference makes the addition of the controlling person provision more meaningful.
>
> *           *           *
>
> We hold therefore that the burden on the controlling person is to establish that he did not act recklessly in inducing, either by his action or his inaction, the "act or acts constituting the violation" of 10b-5.

*G.A. Thompson*, 636 F.2d at 960.[6]

### 1.      The Proxy Defendants' Deceptive Conduct and Direct Knowledge of the Negative AMH Field Data Eviscerates the "Good Faith" Defense

The mere fact that Defendants Riverstone (through its agent, Hackett), Hackett himself, and AMR (through its agent Chappelle) acted in concert to devise a baseless $358 million EBITDA projection for the purpose of supporting a pre-determined multi-billion

---

[6] The Proxy Defendants have concocted a new standard.  *See* Motion at p. 25 (citing *G.A. Thompson*, 636 F.2d at 962 & n.33 (panel addressing scienter element for Section 10(b))).

valuation indicates the "good faith" defense should be heard by a jury. The fact that AMH's senior financial analyst informed Chappelle that a $350 million 2018 EBITDA projection for AMH "***CANT BE DONE***" (PX 279 at -200), only calls the Proxy Defendants' good faith defense into further dispute.

But there's more. Hackett, Chappelle, and Ellis all knew that AMH had never conducted a 12-WPS spacing test (and never would), and knew that the projections rested upon the unsubstantiated 12-WPS and 250 MBO assumptions. During diligence, moreover, the Proxy Defendants learned that all of AMH's well spacing test data conducted between 2015 and 2017 did not substantiate the assumptions. That is not good faith.

## 2. The Work of the Proxy Defendants' Subject-Matter Experts Does Not Support Summary Judgment

The Proxy Defendants devote a significant amount of space in their Motion to brag up their purported reliance on "nine" subject-matter experts. *See* Motion at pp. 4-6. However, it is unclear who the universe of "nine" is. The Proxy Defendants explicitly identify only six of them. *See id.* (referencing Citigroup, J.P. Morgan, Meridian, Rock Oil, Ryder Scott, and TPH). The Proxy identify ten such experts: Citigroup, Ernst & Young ("E&Y"), Frederic W. Cook & Co., Inc. (long-term incentive plan consultant), Haynes & Boone (AMH's counsel), J.P. Morgan, Latham & Watkins (Riverstone's counsel), Meridian, Rock Oil, Ryder Scott, and TPH. *See* PX 104 at pp. 160-71, 195. Because it is impossible to determine the identity of all nine of the subject-matter experts, Class Plaintiffs address each subject-matter expert referenced in the Proxy – and the work they did – in turn.

***Latham & Watkins and Haynes & Boone's*** activities in this case are inadmissible. The Proxy Defendants (all of whom are Latham & Watkins clients in this

case) did not identify the law firm in their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1). *See* PX 359. AMR (another client of Latham's in this case) did not identify Hanes & Boone in their initial disclosures. *See id.* None were deposed. It's too late to reference them now.

The Proxy Defendants did not identify E&Y, J.P. Morgan, or Rock Oil in their initial disclosures as possessing information relevant to their good faith defense. *Id.* None were deposed. Fact discovery ended months ago. It's too late to point to them now.

***Meridian's*** work during 2017 does not support a good faith defense. Each of the Meridian employees engaged during diligence were unable to provide facts about any specific opinion delivered regarding the proposed transaction, including the reasonableness of the 12-WPS and 250 MBO assumptions. *See* PX 214 at 26:14-22 (Campbell stating: "We weren't asked to – to approve the wells per section that you're talking about . . . that wasn't our focus."); *id.* at 27:19-21 ("As far as digging into the type curves and doing all that technical work, we had very little involvement in the – in the early stages of this . . . [p]rior to the fourth quarter of 2018."); *id.* at 28:4-16 (Meridian "met with [AMH] management . . . in a couple-hour meeting"); *id.* at 28:25-29:4 (no recollection of providing any advice, guidance, or opinion); PX 215 at 23:8-24:7 (Mr. Castiglione had no recollection of assessing TPH's conclusions or being asked to provide any opinion); *id.* at 26:22-28:6 (unable to recall whether Riverstone asked for an opinion concerning the 12-WPS and 250 MBO assumptions); PX 267 at -166 (in June 2017, Meridian noted it "[a]greed" that "***[m]ore looks [at the deal] make me uncomfortable***"); PX 234 at 37:2-38:4 (did not participate in diligence); PX 270.

The Proxy Defendants' reliance on Citibank's work does not compel summary judgment.  On August 18, 2017, it was Citibank that asked AMH:  "***What other levers do we have to goose the 18 forecast***?"  (PX 290 at -280).

***Ryder Scott's*** work for AMH does not warrant summary judgment.  While Ryder Scott did advise AMH that the 250 MBO assumption appeared reasonable at 4-WPS, the consultant disavowed any opinion that the 250 MBO assumption was reasonable beyond 4-WPS.  *See* PX 237 at 38:14-39:3 ("I don't think [AMH was] ever told that more than – more than four per section was going to work at 250,000 barrels . . . [a]gain, we didn't perform any analysis to either support that or dispute it."); *id.* at 53:15-19 (Ryder Scott did not opine on whether three benches existed in AMH's STACK acreage).

Lastly, ***TPH's*** work for Riverstone does not compel summary judgment.  TPH was brought in by Riverstone to provide comfort on the $3.86 billion valuation the Proxy Defendants had placed on the merged AMH/KFM assets.  *See* PX 244 at 54:6-15, 55:4-12, 56:4-10,  85:19-86:4;  *see also*  PX  241  at  156:10-12  (clarifying  "[w]e're . . . financial advisors, not a consulting firm").  It was never asked to opine on whether the 12-WPS WPS assumption was appropriate.  *See* PX 241 at 175:6-13.  AMH withheld critical 2015-2017 well spacing test data from TPH (*i.e.*, data from 3-WPS to 10-WPS tests), which demonstrated that each time AMH placed 4 or more wells in a section of the STACK, the wells performed from ***35% to 65%*** below the 250 MBO assumption.  *See* ▇▇▇ PX 241 at 166:3-167:25; *see also* PX 241 at 168:19-170:4 ("we would [have] definitely incorporated[d] that data into our analysis").  Deliberately hiding this relevant and material field data from their star consultant is the antithesis of "good faith."  *See United States v. West*, 22 F.3d 586,

599 (5th Cir. 1994) (to demonstrate good faith reliance, a defendant must show it made a "full disclosure" to the professional).

### 3. Proxy Defendants Gutermuth, Tepper, and Walters' "Good Faith" Defense Does Not Compel Summary Judgment on Class Plaintiffs' Section 20(a) Claims

The Proxy Defendants' expert, Charles Whitehead, correctly notes one thing.  For Gutermuth, Tepper, and Walters to have acted reasonably in overseeing the preparation and solicitation of the Proxy, they ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████  To assert a good faith defense, these defendants "[must] show that some precautionary measures were taken to prevent [the] injury caused" by Riverstone, Hackett, and AMR.  *See Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979).  Gutermuth, Tepper, and Walters were required to ██████████

███████████████████████████████████████████████████████████████████

██████████[7]  The evidence indicates they did not.

Tepper was unable to testify who was responsible for conducting diligence.  *See* PX 240 at 73:21-75:5.  Not only did Tepper testify he did nothing to question the validity or bases underlying the 250 MBO EUR assumption, he did know what an EUR was.  *Id.* at 134:4-11.  With regard to the 12-WPS assumption, Tepper testified he had no knowledge of how 4000+ primary well locations were identified.  *Id.* at 129:4-25.  Tepper was unable to recall any conversation he had with Hackett (who was directly involved in the due diligence),

---

[7] *See also S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (the controlling parties must prove that they "maintained **and** enforced a reasonable and proper system of supervision and internal control[s]" (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980))).

or any other member of Silver Run II's board of directors, about the 12-WPS assumption underlying the projections.  *Id.* at 138:13-20.  And the Proxy Defendants have come forward with no evidence indicating Tepper independently evaluated anything.

Gutermuth was unable recall any questions he asked Hackett regarding the proposed transaction.  He could not recall what TPH's July 21, 2017 presentation was about.  *See* PX 229 at 61:18-66:19, 83:8-23.  Gutermuth could not have independently evaluated the assumptions underlying the projections as he testified that he had no knowledge of what one key assumption underlying the projections even meant – known as "oil in place."  *Id.* at 106:15-110:13.  And Gutermuth has come forward with no evidence indicating he independently evaluated anything.

Walters, disputed whether TPH provided any opinion regarding the 12-WPS assumption, adding they merely acted as "valuation" experts.  (PX 244 at 54:6-10, 56:20-57:18).  Notably, Walters was unable to identify any "subject-matter expert" other than TPH that kept the Silver Run II board of directors updated on the status and findings of the diligence.  *Id.* at 62:10-17.  Walters also failed to demonstrate, with evidence, that she independently evaluated the key assumptions underlying the projections.

## <u>CONCLUSION</u>

For the reasons stated herein, including all evidence in the court record, the Proxy Defendants' Motion should be denied in its entirety.


Dated:  January 19, 2024                    Respectfully submitted,

*/s/ Andrew J. Entwistle*                        */s/ Trig R. Smith*
Andrew J. Entwistle (attorney-in-charge)         Trig Smith (*pro hac vice*)

25

State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*

Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

26

## GLOSSARY OF KEY TERMS, ENTITIES AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|---|---|
| 12 WPS | 12 wells per section, the assumption in Alta Mesa's "base case" that it could drill twelve horizontal oil wells in each Section. |
| 250 MBO | 250,000 barrels of oil, the amount of oil Alta Mesa projected it could recover on average per well in its "base case". |
| Alta Mesa | Refers to AMR (post De-SPAC) and/or AMH (pre De-SPAC). |
| AMH | Alta Mesa Holdings, LP, the private pre-De-SPAC company. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-De-SPAC company. |
| ARM Energy | Defendant ARM Energy Holdings LLC. |
| Artificial Lift | The use of artificial means to increase the flow of liquids from an oil well. |
| Base Case | The drilling plan Alta Mesa presented starting in August 2017 where it would drill 12 wells per Section (four each in three Benches) and recover on average 250 MBO per well. |
| BCE or Bayou City | Defendant Bayou City Energy Management LLC. |
| Bench | A distinct horizontal layer of rock that Alta Mesa landed its horizontal wells in. |
| Bourque | Kevin Bourque, Vice President of Mid-Continent Operations at Alta Mesa. |
| Bullis-Coleman | A ten well pattern spacing test conducted by AMH that started producing in February 2017. |
| Business Combination or De-SPAC | The merger of Silver Run II with Kingfisher and AMH on February 9, 2018. |
| CAO | Chief Accounting Officer. |
| Central Area | Alta Mesa's acreage within Township 17N, as depicted in PX 204 paragraph 23. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |

| **Term** | **Description** |
|---|---|
| Chappelle | Moving Defendant Hal Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Child Well | Subsequent wells drilled in a Section surrounding the initial Parent Well. |
| Christopher | Michael Christopher, CFO at ARM Energy during the relevant period. |
| Citi | Citigroup Global Markets Inc., financial advisor to Silver Run II. |
| Class Period | August 16, 2017 to May 17, 2019. |
| Class Plaintiffs | Plaintiffs in the TAC and Court-appointed Class Representatives (Dkt. 241):  FNY Partners Fund, LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (formerly Plumbers and Pipefitters National Pension Fund) and Camelot Event Driven Fund, a Series of Frank Funds Trust. |
| Coats | Moving Defendant Stephen Coats, former General Counsel at Riverstone and Corporate Secretary of Silver Run II prior to the De-SPAC. |
| Cole | Homer "Gene" Cole, Chief Technology Officer and a VP at Alta Mesa until December 2018. |
| Collins | Craig Collins, VP and COO of KFM from April 2018 to April 2019. |
| Complaint or TAC | Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 6, 2021 (Dkt. 218). |
| COO | Chief Operating Officer. |
| Defendants | The defendants named in the Third Amended Complaint. |
| Dimitrievich | Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| Downspacing | The drilling of additional wells in an already developed area. |
| E&P | Exploration & Production, the "upstream" portion of the oil and gas industry. |
| Ellis | Moving Defendant Mike Ellis, COO and founder of AMH and later AMR until December 2018. |

| **Term** | **Description** |
|---|---|
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting fluids from wellbores. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the total quantity of oil and/or gas that has already been recovered from a producing well plus the amount of oil and/or gas that is estimated to be commercially recoverable over the rest of the life of the well. |
| Exchange Act | The Securities and Exchange Act of 1934. |
| Gutermuth | Moving Defendant William Gutermuth, a director of Silver Run and AMR until June 2018. |
| Hackett | Defendant James Hackett, a Riverstone Partner, CEO and Chairman and the Board of Silver Run II prior to the De-SPAC, Executive Chairman of the Board of Directors of AMR, head of the AMR midstream business (KFM), and later interim CEO of AMR. |
| High Mesa | High Mesa, Inc., a now bankrupt entity owned by BCE, HPS and AM Management that prior to the De-SPAC owned AMH and approximately one-third of Kingfisher. |
| HPS | Defendant HPS Investment Partners, LLC. |
| Interference | The phenomenon in which wells drilled close to each other drain a shared reservoir, resulting in lower recoveries per well. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with AMH and Silver Run II in the De-SPAC. |
| KPMG | AMR's auditor starting in June 2018. |
| Lapeyre | Moving Defendant Pierre Lapeyre, Jr., a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| Leuschen | Moving Defendant David Leuschen, a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| MBO | Acronym for thousand barrels of oil. |
| MBOE | Acronym for thousand barrels of oil equivalent. |
| MMBOE | Acronym for millions of barrels of oil equivalent. |

| Term | Description |
|---|---|
| McCabe | Michael McCabe, Chief Financial Officer of Alta Mesa Holdings (AMH) and Alta Mesa Resources (AMR). |
| McMullen | Defendant William McMullen, founder and Managing Partner of Defendant BCE. |
| Meramec | One of the two STACK horizontal rock layers that Alta Mesa planned to target in its base case development plan. |
| Meridian | A consulting group under the Riverstone umbrella that Riverstone paid in the fall of 2018 to review Alta Mesa's production data. |
| Microseismic Testing | A technique that uses fracturing or water-injection-induced microseismic phenomena similar to natural earthquakes but with low intensities during reservoir fracturing or water injection operations to monitor fracture activities and flow mobilities in oil-producing or gas-producing pays. |
| Midstream | The portion of the oil and gas industry that links upstream (exploration and production) and downstream (post-production), including the storage, processing, and transportation of petroleum products. |
| Moving Defendants | "Moving Defendants" refers to the defendants that filed the motion being opposed (variously, Defendants Riverstone, AMR, Chappelle, Ellis, Smith, Coats, Walker, Lapeyre, Leuschen, Gutermuth, Tepper, Walters and Sinclair). |
| Osage | One of the two STACK horizontal layers that Alta Mesa planned to target in its base case development plan. |
| Parent Well | The initial well drilled by an operator in a section. |
| Pressure Tests | A test of reservoir pressure of a well over time.. In the case of multi-well drilling, pressure depletion of an initial well following bringing a nearby well online indicates that the new, nearby well is spaced too tightly to the initial well and draining the same reserves. |
| Proxy | The Definitive Merger Proxy Statement issued to Silver Run II's shareholders on Schedule 14A, dated January 19, 2018, and all supplements and amendments thereto.  The Proxy is PX 104 attached to Dkt. 444. |

4

| Term | Description |
|---|---|
| PX 1 to PX 202 | Exhibits attached to Dkt. 444, the September 21, 2023 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to Motion for Summary Judgment By (A) Defendants HPS Investment Partners, LLC, ARM Energy Holdings LLC, and Bayou City Energy Management LLC (Dkt. 423); (B) Defendant Donald Dimitrievich (Dkt. 422) and (C) Defendant William McMullen (Dkt. 427). |
| PX 203 to PX 395 | Exhibits attached to Dkt. 569, the January 19, 2024 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to (a) Defendants Riverstone Holdings LLC's, Stephen Coats', and Thomas Walker's Motion for Summary Judgment and Incorporated Memorandum of Law as to Plaintiffs' Section 20(a) Claim (Dkt. 518); (b) Proxy Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 14(a) and 20(a) Claims (Dkt. 520); (c) Alta Mesa Resources, Inc., Chappelle, Ellis, and Smith's Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 523); and (d) AMR Directors' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 526). |
| Riverstone | Moving Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. |
| RSH | Refers to Riverstone Holdings, LLC. |
| Ryder Scott | Alta Mesa's oil reserve auditor. |
| Section | A 640-acre (one square mile) land area established by the State of Oklahoma. |
| Schlumberger | An oil and gas services company that performed various technical studies for Alta Mesa. |
| Sheils | Tamara Sheils (formerly Alsarraf), a senior financial analyst at Alta Mesa. |
| Silver Run II, Silver Run or SR II | The SPAC created by Riverstone that merged with KFM and AMH. |
| Sinclair | Moving Defendant Donald Sinclair, a director of AMR following the De-SPAC. |

| **Term** | **Description** |
|---|---|
| Smith | Moving Defendant Ronald Smith, Chief Accounting Officer at AMR for a portion of the relevant record. |
| SPAC | Acronym for "special purpose acquisition company," also called "blank check" company. |
| Sponsor Shares | Stock of the SPAC that are "sold" to the SPAC sponsor for a nominal fee (here, less than one cent per share). Also called founder shares. |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Tepper | Moving Defendant Jeffrey Tepper, a director of Silver Run II and AMR. |
| TPH | Tuder, Picking, Holt & Co., a Silver Run II financial advisor for the Business Combination. |
| Tracer Tests | Tests used in the oil industry in order to gauge how fluid flows through the reservoir that are useful to detect and evaluate communication/interference among wells. |
| Turner | Tim Turner, VP of Corporate Planning and Reserves and later VP of Corporate Development. |
| Type Curve | A model of oil and gas production, including rate and EUR, of future wells based on a statistical average of similar wells. |
| Upstream | The portion of the oil and gas industry focused on identifying, extracting, and producing hydrocarbons. |
| Walker | Moving Defendant Thomas Walker, former CFO of Riverstone and CFO of Silver Run II prior to the De-SPAC. |
| Walters | Moving Defendant Diana Walters, a director of Silver Run and AMR. |
| W.D. Von Gonten | Petroleum engineering consultant. |
| Widell | Chris Widell of Sponte Resources, a consultant that conducted due diligence of AMH for Riverstone. |
| WPS | Wells per Section. |

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on January 19, 2024.

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle