**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 572**

---

**CLASS PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY
<u>DEFENDANTS ALTA MESA RESOURCES, INC., CHAPPELLE, ELLIS AND SMITH</u>**

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ................................................... 1

STATEMENT OF ISSUES TO BE RULED UPON .......................................... 2

APPLICABLE LEGAL STANDARD ............................................................ 2

SUMMARY OF ARGUMENT .................................................................... 3

STATEMENT OF FACTS ........................................................................ 5

    A.    Ellis Founds Alta Mesa and Grows it with Chappelle ................................ 5

    B.    Alta Mesa and Its Owners Found KFM ...................................... 6

    C.    Alta Mesa's Owners Decide to Take It Public ................................ 6

    D.    Alta Mesa Inflates Assumptions to Increase Its Valuation .......................... 7

    E.    Alta Mesa's Pattern Wells Fail to Produce in Line with Single Wells ........ 9

    F.    Following the De-SPAC, Defendants Continue to Inflate Internal and Public Operational Data and Forecasts and Lie to the Public Repeatedly ........................................................................ 10

    G.    The Fraud Collapses Before Chappelle and Ellis Can Cash Out ............... 12

ARGUMENT AND AUTHORITIES .......................................................... 13

I.    THE MOVING DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 10(B) CLAIMS ............................................. 13

    A.    The Moving Defendants Grossly Misstate the Record and Rely on Unreliable and Inadmissible Opinions of Robbins Russell and KPMG ........................................................................ 13

    B.    The "Purchaser-Seller Rule" Does Not Apply ............................. 15

    C.    The Safe Harbor Does Not Shield Defendants From Liability .................. 15

        1.    The "Projection Statements" Embedded False Statements of Current Fact.   15

        2.    Plaintiffs Can Prove the Moving Defendants Knew the Projection Statements Were False or Misleading.   16

3.      The Projection Statements Were Not Accompanied By Meaningful Cautionary Language.                          18

4.      The "Projection Statements" Were Material.                  19

D.   Plaintiffs Can Prove Defendants Engaged in an Inflationary Scheme........20

E.   Plaintiffs Can Prove the Moving Defendants Were at Least Reckless in Making the False Internal Control Statements.........................................21

II.   THE JURY COULD REASONABLY FIND DEFENDANTS ELLIS AND SMITH LIABLE AS CONTROL PERSONS........................................................23

CONCLUSION ...............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
　　38 F.3d 211 (5th Cir. 1994) ................................................................... 15

*Alley v. Miramon*,
　　614 F.2d 1372 (5th Cir. 1980) .............................................................. 15

*Carlton v. Cannon*,
　　No. H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016) ................ 23

*Commodity Futures Trading Comm'n v. Cartu*,
　　No. 1:20-CV-908-RP, 2023 WL 5246360  (W.D. Tex. Aug. 15, 2023) ............... 24

*Fowler v. Smith*,
　　68 F.3d 124 (5th Cir. 1995) ................................................................... 14

*In re CCIV/Lucid Motors Sec. Litig.*,
　　No. 4:21-CV-09323-YGR, 2023 WL 325251 (N.D. Cal. Jan. 11, 2023) .............. 15

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
　　Nos. MDL-1446, H-01-3624, 2003 WL 230688 (S.D. Tex. Jan. 28, 2003) .......... 23

*In re Mullen Auto. Sec. Litig.*,
　　No. CV22-3026 DMG (AGRx), 2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) .. 15

*Krim v. BancTexas Grp., Inc.*,
　　989 F.2d 1435 (5th Cir. 1993) .............................................................. 19

*Kurtzman v. Compaq Comput. Corp.*,
　　No. CIV.A.H-99-1011, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) .............. 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
　　 513 F.3d 702 (7th Cir. 2008) ............................................................... 16

*McGinnis v. Interoceanica Agency, Inc.*,
　　No. 3:11-CV-0214, 2015 WL 13800689 (S.D. Tex. Aug. 6, 2015) ....................... 2

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
　　54 F.4th 82 (2d Cir. 2022) .................................................................... 15

*One Longhorn Land I, L.P. v. Defendant FF Arabian, LLC*,
　　No. 4:15CV203-RC-CMC, 2015 WL 7432360 (E.D. Tex. Nov. 23, 2015) .......... 23

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) .................................................................................. 2

*Ryder v. Union Pac. R.R. Co.*,
    945 F.3d 194 (5th Cir. 2019) ..................................................................... 3

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................... 19

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ................................................................... 16

*Stahl v. Novartis Pharms. Corp.*,
    283 F.3d 254 (5th Cir. 2002) ..................................................................... 2

*Talarico v. Johnson*,
    No. 4:21-CV-3689, 2023 WL 2618255 (S.D. Tex. Feb. 7, 2023) ........................ 15

*Trendsetter Inv., LLC v. Hyperdynamics Corp.*,
    No. H-06-0746, 2007 WL 172627 (S.D. Tex. Jan. 18, 2007) ........................ 23, 24

*United States v. Peterson*,
    101 F.3d 375 (5th Cir. 1996) ................................................................... 20

*Webster v. Offshore Food Serv., Inc.*,
    434 F.2d 1191 (5th Cir. 1970) ............................................................. 18, 21

*Wyatt v. Hunt Plywood Co.*,
    297 F.3d 405 (5th Cir. 2002) ............................................................. 2, 3, 21

**Rules**

Fed. R. Civ. P. 56................................................................................. 2, 14

## NATURE AND STAGE OF PROCEEDINGS

This certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934 arose from the catastrophic collapse of Alta Mesa Resources f/k/a Silver Run II ("AMR") following a de-SPAC transaction in which two related private companies Alta Mesa Holdings ("AMH") and Kingfisher Midstream ("KFM" or "Kingfisher") went public via a blank check company (Silver Run II). Shareholders of the SPAC approved the transaction based on a Proxy that overstated the economic potential of AMH and KFM, including through AMH's oil and gas production projections that were contradicted by internal data, and the inclusion of fictitious non-customer business and other manipulations in KFM's EBITDA estimates. On February 12, 2018, Defendants began discussing whether and how to disclose a 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it. Less than a year after asking for shareholder approval, AMR wrote off more than 80% of its $3.86 billion market value for the same reason—admitting that AMR's assets were overstated by that amount in the Proxy. AMR filed for bankruptcy seven months later.

Defendants collectively filed nine motions for summary judgment. This opposition responds to the motion by (1) AMR f/k/a Silver Run II, (2) its founder, COO and director Michael Ellis, (3) CEO and director Harlan "Hal" Chappelle, and (4) CAO Ronald Smith, (herein "Moving Defendants") (Dkt. 523) ("Motion").[1]

---

[1] Class Plaintiffs incorporate herein their oppositions to the summary judgment motions previously filed by Defendants HPS, BCE, ARM, McMullen and Dimitrievich on similar grounds (Dkt. Nos.

## STATEMENT OF ISSUES TO BE RULED UPON

1.      Whether Defendants AMR, Chappelle, Ellis and Smith, or any of them, are entitled to summary judgment on the claims asserted against them under Section 10(b) of the Exchange Act (fraud claims), or any part of those claims.

2.      Whether Defendants Ellis and Smith, or either of them, are entitled to summary judgment on the claims asserted against them under Section 20(a) of the Exchange Act (control claims), or any part of those claims.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only when "the non-moving party can point to nothing in the record supporting its claim" should summary judgment be granted. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). In deciding a motion for summary judgment, the Court "must review all of the evidence in the record but make no credibility determinations or weigh any evidence." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see also McGinnis v. Interoceanica Agency, Inc.*, No. 3:11-CV-0214, 2015 WL 13800689, at *1 (S.D. Tex. Aug. 6, 2015) (Hanks, J.). Rather, the Court "must disregard everything favorable to the moving party that the jury is not required to believe, and should give

---

445, 446 and 449). To avoid burdening the Court with duplicative exhibits, Class Plaintiffs refer to and incorporate herein the exhibits PX 1 to PX 202 attached to the September 21, 2023 Declaration of Andrew J. Entwistle (Dkt. 444). The January 19, 2024 Declaration of Andrew J. Entwistle attaches additional summary judgment evidence starting at PX 203.

credence to the evidence favoring the nonmoving party." *Wyatt*, 297 F.3d at 409. That is, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019).

## SUMMARY OF ARGUMENT

The Moving Defendants (1) cherry pick the discovery record, (2) cite inadmissible sources, (3) misconstrue the facts, (4) misstate the law, and (5) attack strawmen. Most fatally, they ignore damning admissions and contemporaneous documents directly contradicting their narrative, making summary judgment inappropriate here. *See id.*

The evidence shows Alta Mesa's management deliberately grossly inflated the economic potential of Alta Mesa's acreage before the De-SPAC to access capital and increase their stake in the new company, AMR. After the De-SPAC, they further misled investors, trying to keep share prices high until their lockups expired and they could cash out. To these ends, Defendants concealed, manipulated and misrepresented Alta Mesa's ***then-current*** data in public presentations to hide the unrealistic nature of the forecasts, and separately engaged in an inflationary scheme to boost short-term production by overusing expensive Electronic Submersible Pumps (ESPs) funded by off-book spending.

The evidence makes clear that Defendants knew the specific reasons that the forecasts were unreasonable but wholly failed to inform investors of those reasons, instead issuing boilerplate generic statements warning that investing in oil and gas involves risk. Among other things, Defendants' statements represented that future wells drilled in patterns of 12 wells per Section would produce a similar amount of oil and gas as Alta

Mesa's existing "single wells" (1 per Section), despite internal data undermining the assumption, including that every time they drilled more than three wells per Section, those wells produced significantly less oil than the average single well. And, as Defendants internally discussed (but hid from the public), Alta Mesa extrapolated results from its most geologically productive area ("sweet spot") to future wells in demonstrably less geologically productive areas. Defendants even provided investors with stale and doctored production data. Contrary to Defendants' insinuations, no outside consultant ever confirmed the statements at issue or the underlying methodology.

The scheme did not work out for the Moving Defendants. AMR's continued failure to achieve results close to their forecasts and the crushing costs of the inflationary scheme caused its collapse before the individuals could sell their stock and AMR could spin off its midstream business (KFM) at an inflated price as planned. But the failure of the scheme does not shield Defendants from liability for the harm it caused investors.

Defendants challenge three of the 39 statements identified in their appendix under the "purchaser-seller rule," asking the Court to adopt the Second Circuit's minority articulation of the rule, and then misapply that minority standard to the facts here. Defendants also seek to invoke the PSLRA's Safe Harbor with respect to seven of the 39 misstatements, but, as noted above, Defendants knew, among other things that: (1) their own testing and production data directly contradicted the 12 well per Section/250 MBO assumptions underlying their production and reserve projections and supported no more than 4 wells per Section at a 250 MBO production type curve; and (2) as a result the projections for both AMH and KFM (including KFM's EBITDA projections which were

80% based upon the grossly inflated AMH projections) were both incredibly inflated and unachievable. Defendants' knowledge of the above rendered the so-called "cautionary" language included in the Proxy and other SEC filings not meaningful, and indeed spurious, because it did not warn that their data did not support the per-well projections at twelve wells per Section or that the EBITDA included business from speculative third parties.

Moving Defendants insufficiently, and only in the most conclusory fashion, dispute liability for the other misstatements, incorporating the Directors' brief which discusses only two statements on loss causation grounds. And they do not at all dispute Chappelle's and AMR's liability for what they call Statement 15, conceding a trial is needed.

## STATEMENT OF FACTS

### A.   Ellis Founds Alta Mesa and Grows it with Chappelle

In 1987, Defendant Michael Ellis founded what became Alta Mesa Holdings (AMH) to invest in and manage various oil and gas assets. (PX 224 at 12). Ellis hired Defendant Harlan "Hal" Chappelle as CEO during 2014 and divided the work so Ellis could focus on engineering as COO while his partner, Chappelle, managed the business. *Id.* at 12, 14:9-25. Ellis maintained the role of COO and Chairman of the Board (PX 216 at 139:4-13) and still led the engineering aspects after the De-SPAC (PX 225 at p. 12).

Chappelle and Ellis worked with various equity partners to fund AMH's investments and operations, and the various rounds of investment and recapitalization led to a complex capital structure. (PX 224 at p. 19; PX 140). By early 2017, Chappelle owned over 6% of AMH (through AM Equity Holdings, LP. and High Mesa), while Ellis and his wife owned over 18% of AMH. (█████ PX 140).

5

**B.    Alta Mesa and Its Owners Found KFM**

Kingfisher was formed in 2015 by Ellis, Chappell, and other owners of AMH and immediately entered into acreage dedications to provide midstream services to AMH. AMH supplied the vast majority of Kingfisher's business and held a 33% ownership interest in KFM itself. (PX 216 at 59:19-60:6;                           PX 104 at p. 5). Chappelle and Ellis each served as Board members of KFM. (PX 222 at 32:23-33:7; *see also* PX 249). While AMH committed contractually to use KFM's midstream services for substantially all the oil and gas it produced, unknown to the public, AMH also used other midstream services at extra cost because KFM's system was of poor quality. (PX 206 ¶¶ 116-118).

**C.    Alta Mesa's Owners Decide to Take It Public**

Chappelle and Ellis started exploring taking AMH public in 2016 because AMH "had a couple thousand wells to drill up there in Kingfisher County" and going public "was a way of getting the funding for them." (PX 224 at 29:19-35:21). In the summer of 2017, AMH and KFM decided to go public together via acquisition by Riverstone's SPAC, Defendant Silver Run II (n/k/a AMR), in a transaction valued at $3.86 billion.

As part of the proposed transaction, Chappelle and Ellis would receive equity in the new public company (AMR), along with board appointment rights, in exchange for their equity in AMH. (PX 104 at pp. 5, A-1; PX 49 at slide 7; PX 224 at 44:7-12).[2] Ellis and Chappelle were prohibited from selling their shares in AMR until six months after the

---

[2] Chappelle and Ellis also received cash from the De-SPAC in connection with their roles as executives of AMH.

transaction closed. (PX 104 at pp. 88-89). In addition, Chappelle and Ellis each received contingent "earnout" consideration, meaning that if the stock price of the company performed well over the medium-term, they each stood to gain tens of millions of dollars more. (PX 285 at pp. 2-3; PX 389; PX 278; *see also* PX 224 at 56:9-22).

**D.      Alta Mesa Inflates Assumptions to Increase Its Valuation**

Chappelle and Ellis were incentivized to maximize the valuation of AMH in any go-public transaction because a higher valuation meant that they would retain a larger equity stake in the public company. So, they took several steps to inflate the perception of Alta Mesa's oil and gas resources and economic potential, while intentionally ignoring and obfuscating negative data points. Among other things, Chappelle and Ellis touted their internal estimate that Alta Mesa's STACK acreage held 3 million barrels of recoverable oil per Section, which they called the "base case" (i.e., the lowest amount of reserves investors could expect), ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████      PX 205 ¶ 57 (Von Gonten); PX 333 at -924, PX 205 ¶¶ 40-43, PX 210 ¶¶ 55-58 (Schlumberger). Alta Mesa's internal data also contradicted the base case. *See* PX 204 ¶¶ 49-54; ████████████████████████████████████

████████████████████████████████████████████████████

███████████

On August 16 and 17, 2017, Chappelle and Silver Run II announced the contemplated De-SPAC transaction that would take AMH and KFM public (by way of acquisition by Silver Run II) and rename the combined company AMR. In touting the deal,

7

they presented the public with the "base case" and a valuation based on those assumptions. (PX 288 at slides 23-25; PX 286 at -351). Chappelle and AMR (then Silver Run II, the SPAC) presented the "base case" scenario and various upside (but no downside) scenarios showing as much as 5.75 million barrels of oil per Section from 23 wells in the Mississippian rock (plus up to 32 additional wells in other layers). (PX 288 at slides 14, 23-25). In a subsequent presentation to AMH's public investors, █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████ These assumptions were foundational to the price of the shares Chappelle hawked to the market (PX 288 at slide 25; PX 218 at 192:23-194:3), yet there was no reasonable basis for the 12 WPS/250 MBO base case or the $3.86b valuation for AMR that flowed from it. (PX 207 ¶¶ 2(a)-(c), 69-72; PX 208 ¶ 13(b)-(c); PX 204 ¶¶ 34-54). Put simply, Defendants told investors that Alta Mesa's acreage held de-risked recoverable reserves of 3 million to 5.75 million barrels of oil per Section when AMH had no reasonable basis to make such claims. *Id.*

In the same August statements, Chappelle and Silver Run II provided EBITDA estimates for AMH and KFM.[3] EBITDA for both AMH and KFM was tied to AMH's inflated estimates of recoverable oil, so each was inflated by those unrealistic assumptions.

---

[3] The EBITDA forecasts were provided to the public as a fraction of the stated valuation, such that the public could derive them arithmetically. *See* PX 288 at slides 39-40; PX 284; *see also* PX 286 at -352 (Hackett expressly stating KFM 2019 estimated EBITDA).

And the midstream EBITDA forecasts were further inflated by: (1) the inclusion of hoped-for business from third parties KFM had not even contracted with (contrary to the industry standard) and (2) deliberate "fluff[ing]" through off-book loans and other accounting shenanigans. *See* PX 203 ¶¶ 81-93; PX 206 ¶¶ 75-86; *see also* ███████████████████ ████████ On the AMH side, Chappelle had instructed his team to provide higher EBITDA numbers because the original numbers they provided were "too low for the valuation we have" (PX 274; PX 275; *see also* PX 277), even though the person preparing the model told him "IT CANT BE DONE" (PX 279) and the CFO urged lower guidance (PX 282). Under pressure from Chappelle, the team member eventually complied, "goos[ing]" the forecast such that it was "better than the best-case scenario." (PX 290 at -280). An engineer in charge of estimating future production from Alta Mesa's wells would not over-estimate reserves, so management reassigned him, leading to his resignation. *See* PX 212 at 64:8-75:17; *see also* PX 338 (discussing the disappointing estimates provided by Abbas, the engineer in late 2017).

### E.    Alta Mesa's Pattern Wells Fail to Produce in Line with Single Wells

By the end of 2017, Alta Mesa's production data clearly showed it could not achieve its "base-case." (PX 207 ¶¶ 2(b), 73-77). A primary reason for this was that, when Alta Mesa drilled multiple wells within a Section, the wells competed for the same oil ("interfered" with each other) meaning less recovery per well. (PX 208 ¶¶ 8-12; *see also* PX 298). The level of inter-well communication Alta Mesa actually experienced was entirely predictable from tracer, pressure, microseismic, petrophysical, and spacing test data, available to the Moving Defendants prior to the August 2017 misstatements. (PX 204

9

¶¶ 40, 43, 49-54; PX 207 ¶ 49). Another reason Alta Mesa's production fell far short of its projections was because it had manipulated those projections by extrapolating the same production across its entire acreage that it experienced for single wells it had drilled primarily in its small but productive "Central Area" despite knowing that the balance of the acreage outside of the Central Area had significant geological disadvantages. (PX 204 ¶¶ 23-33).

To the extent the Moving Defendants may have (as they assert) hoped future results would defy the prior negative indications, their 2017 production data from multi-well tests showed that the "base case" was demonstrably unachievable, and the underlying assumptions were not only baseless but manifestly wrong. (PX 207 ¶¶ 2(b), 73-77). Nevertheless, Defendants convinced the SPAC's shareholders to approve the deal using a January 19, 2018 Proxy that touted the base case as being reasonable in management's judgment.

**F.    Following the De-SPAC, Defendants Continue to Inflate Internal and Public Operational Data and Forecasts and Lie to the Public Repeatedly**

Incredibly, the evidence shows that the day of the closing (February 9, 2018), Alta Mesa personnel discussed the fact that the only way the model could reach the advertised 38.5 MBOE/d production for 2018 was by making assumptions that were "not realistic." (PX 315 at -27). A major reason for the internal acknowledgment was that production from existing pattern wells was trending lower than projected in August 2017 and again in the Proxy. *Id*. at -28. To "fix" the internally modeled production shortfall, Alta Mesa's chief reserves engineer, Turner, "reforecast" internal production estimates to match

the public forecasts more closely. *Id.* Turner's "reforecasting" came hours after he spoke with Chappelle about Alta Mesa's inability to hit production targets in a conversation both now claim not to recall despite documents memorializing it. (PX 316; PX 218 at 216:20-217:20; PX 242 at 192:24-193:1). Chappelle also discussed with Alta Mesa's CFO in March 2018 the CFO's concern that, when the truth came out, Alta Mesa would face a securities lawsuit from shareholders over the misstatements in the Proxy and instructed the CFO to "develop" "some interesting explanations." (PX 321).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████ (PX 235 at 81:12-83:17; ██████████████████

██████ Consequently, in AMR's March 2018 Form 10-K (for year-end 2017) and related press release, AMR management partially revealed the truth of the false and misleading statements made in the Proxy by projecting AMR's oil production for 2018 as a range (33-38 MBOE per day) as opposed to the prior estimate of 38.51 MMBOE per day published two months earlier in the Proxy. Of course, management knew that the range was derived using assumptions that were "not realistic" (PX 324; PX 323; PX 315), and the presentation published the same day included stale and manipulated data regarding the results of four recent well "patterns," falsely portraying the results as supporting the projections when in fact they were nowhere close to doing so. (PX 207 ¶¶ 82-89). The press release (and Chappelle's scripted earnings call statements) cut the estimate of KFM's 2018 EBITDA from the $185 million reflected in the Proxy just two months earlier to a range of $95 to

$110 million. Even this restated range was knowingly overstated by management. In fact, the evidence shows that Chappelle instructed AMR personnel to "build a wedge" into the KFM public forecasts to be released in March 2018, explicitly telling them to include *even more* hypothetical third-party business from companies that had no contracts with KFM, so that the restated numbers would be closer to prior projections. (PX 331). Chappelle could not articulate at his deposition a basis to assume such business would materialize. (PX 218 at 231:7-16).

AMR expressly reaffirmed the March guidance figures in May 2018, despite Chappelle and Ellis privately discussing later that month that AMR's acreage would yield far less oil than publicly projected, and despite the fact that KFM was still failing to obtain the third-party business underlying those forecasts. For example, Chappelle admitted to Turner in a May 27, 2018 text message: "Mike [Ellis] thinks our patterns will average 150 MBO and 7 wells." (PX 334). (This works out to just over one million barrels of oil per Section, a mere third of the "base case" presented to investors.)

Throughout 2018, Chappelle and Ellis also directed a scheme to inflate short-term production by overusing very costly ESPs, which increase the rate of fluid production in the short term, without improving long-term production. *See* PX 336 ("ESPs only affect rate, not EUR"); ████████████████████████████████ PX 213 at 243:4-7; PX 207 ¶¶ 90-101; PX 208 ¶¶ 63-73; *see also* Dkt. 516; Dkt. 556.

## G.   The Fraud Collapses Before Chappelle and Ellis Can Cash Out

In the third quarter of 2018, the Board members appointed by Defendants Riverstone, HPS and BCE "scape goated" Ellis and Chappelle for missing guidance,

despite all of them having known all along that the prior projections were based on wholly baseless assumptions and were not achievable. (PX 289). The Board fired Ellis, Chappelle, the CFO and the CEO, replacing them with Meridian – the Riverstone affiliate that had purportedly conducted due diligence for the SPAC – whereupon Meridian promptly revised the forecasts drastically downward, wrote off $3.2 billion, and dismantled the sham ESP program. (PX 343; PX 244 at 178:16-179:23; PX 212 at 154:18-155:10). AMR admitted that the $3.2 billion impairment already existed as of the time of the De-SPAC—i.e., Defendants had overstated the value of the assets to investors by $3.2 billion. (PX 356 at p. 55 n.2). AMR filed for bankruptcy in September 2019. (PX 157).

## ARGUMENT AND AUTHORITIES

### I.   THE MOVING DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 10(B) CLAIMS

#### A.   The Moving Defendants Grossly Misstate the Record and Rely on Unreliable and Inadmissible Opinions of Robbins Russell and KPMG

The Moving Defendants not only ignore inculpatory evidence, they misconstrue the record to suggest an innocent explanation. For example, Defendants say multiple third-party consultants agreed with Alta Mesa's base case scenario pointing to Schlumberger, Tudor, Pickering, Holt & Co. ("TPH"), Brian Davis, and Ryder Scott. But the evidence makes clear this statement is simply not true. In fact:

(1)    
PX 228 at 152:13-160:19; PX 247 at -143 to -144;

(2)    TPH (which had financial incentive to close the De-SPAC) merely provided financial advice based on Alta Mesa's and Riverstone's technical assumptions, and did not independently confirm those assumptions (PX 244 at 54:6-10);

(3)    ████████████████████████████████████████████████████████████ and

(4)    while Defendants now contend Alta Mesa's reserves auditor, Ryder Scott, somehow indicated that the 12 well per Section/250 MBO base case scenario was reasonable (Mot. at p. 8), Ryder Scott (and all fact witnesses who were asked) clearly testified (and the related documentary record clearly shows) that it reviewed a scenario where Alta Mesa drilled *four* wells per Section (*not twelve*) and found it reasonable to conclude that this would yield *one million* barrels of oil per Section (*not three million*).

Indeed, the grossly overstated "base case" underlying the reserves, production and EBITDA projections (and related valuation) was never confirmed by any outside person.

Defendants also make much of the facts that (1) KPMG's cursory and conflicted 2019 investigation did not uncover evidence of fraud and that (2) bankruptcy counsel's 2020 recommendation was not to pursue certain claims against management. Both of these facts are plainly inadmissible and thus cannot support a grant of summary judgment. *See* Fed. R. Civ. P. 56(c)(2); *see also Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). And even if presented at trial, they would carry little or no weight: both are post hoc and rife with double hearsay; KPMG's findings simply accepted management's post-hoc explanations without testing them (including the lie that Alta Mesa had not drilled child wells prior to the De-SPAC); and bankruptcy counsel considered the costs of a lawsuit by the company against possible recovery from a group of then-unemployed individuals without conducting a thorough investigation—not claims by investors.

14

**B.      The "Purchaser-Seller Rule" Does Not Apply**

In the Fifth Circuit, the "purchaser-seller" rule simply limits "standing to sue under

Section 10(b) to actual purchasers and sellers," rather than persons who "decided not to

purchase the stock due to the [alleged fraud]." *7547 Corp. v. Parker & Parsley Dev.*

*Partners, L.P.*, 38 F.3d 211, 227 (5th Cir. 1994); *see also Talarico v. Johnson*, No. 4:21-

CV-3689, 2023 WL 2618255, at *5 (S.D. Tex. Feb. 7, 2023).[4] The Class certified here, by

definition, satisfies the rule in this Circuit, and Defendants' reliance on *Menora Mivtachim*

*Insurance Ltd. v. Frutarom Industries Ltd.*, 54 F.4th 82 (2d Cir. 2022), is inapt and wholly

unavailing. That opinion has never been cited with approval by any court in the Fifth

Circuit (and is rejected by the few out-of-circuit cases discussing it). *See, e.g.*, *In re Mullen*

*Auto. Sec. Litig.*, No. CV22-3026 DMG (AGRx), 2023 WL 8125447, at *6 (C.D. Cal. Sept.

28, 2023) (citing *In re CCIV/Lucid Motors Sec. Litig.*, No. 4:21-CV-09323-YGR, 2023

WL 325251, at *7 (N.D. Cal. Jan. 11, 2023)).

**C.      The Safe Harbor Does Not Shield Defendants From Liability**

**1.      The "Projection Statements" Embedded False Statements
of Current Fact.**

The Moving Defendants do not establish that any statement is forward looking.

They simply characterize Statements 3, 6, 7, 9, 13, 16 and 25 as "Projection Statements"

and assert that the projections are "quintessential[ly] forward looking." (Mot. at p. 15). But

a close reading shows the "Projection Statements" plainly include non-forward-looking

---

[4] Defendants' only Fifth Circuit case on this point, *Alley v. Miramon*, 614 F.2d 1372, 1386 (5th
Cir. 1980), simply applies the rule in a context wholly distinguishable from the facts here.

false statements of then-current and historical facts. A "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). For example: Statement 3 includes the false factual assertion that Alta Mesa had about 4,200 gross identified drilling locations and that Alta Mesa had "de-risked" its acreage; Statement 7 includes the false factual assertions that "KFM *is* positioned to capture volume growth from the STACK," "well positioned to serve other operators" and "capable of providing takeaway solutions to end-markets *today*"; and Statement 16 falsely states that "[m]ost significantly, large third-party providers have delayed drilling on dedicated acreage."

## 2. Plaintiffs Can Prove the Moving Defendants Knew the Projection Statements Were False or Misleading.

The so-called "projection statements" have at their core the base-case factual assumptions regarding 12 wells per Section and 250 MBO per well that the evidence establishes Defendants knew were overstated and unachievable based on actual production and other data in hand before such statements were made in the Proxy and elsewhere. For example: (1) by August 2017, Moving Defendants had received data undermining their statements about the amount of oil within their acreage and their ability to extract it (PX 204 ¶¶ 34-54); (2) Ellis wrote in October 2017 that "wells that are part of a spacing test are on average poorer producers" (PX 298) and admitted in the bankruptcy proceeding that it was "really obvious" from the Bullis-Coleman test, which came online in February 2017,

that Alta Mesa would not get the base case recovery from pattern wells (PX 223 at 104:17-105:24; PX 338); (3) Moving Defendants presented stale and manipulated historical production data to the public (PX 207 ¶¶ 79-89); (4) ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ (5) they drilled most of their wells in the best part of their acreage ("sweet spot") while actively concealing that practice and baselessly extrapolated those results to the bulk of their acreage which was much less geologically favorable (PX 257; PX 204 ¶¶ 23-33); and (6) Alta Mesa never drilled 12 wells in any Section (PX 218 at 30:4-11).

Underscoring this knowledge, Chappelle ordered his staff to provide upstream EBITDA based on the false and overstated valuation even after being told "IT CANT BE DONE" (PX 279); *see also* PX 309 (Chappelle:  "growth is not really as significant as I think we've allowed our bankers to represent."). And AMR's Chairman, Hackett, explained ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ (PX 269; ████████ *see also* PX 256). The Moving Defendants' knowledge regarding the March 29, 2018 upstream misstatements is also shown by:  (i) internal discussion noting that the upstream projections were "not realistic" (PX 315); (ii) the reassignment and constructive firing of the engineer whose production estimates were lower than management wanted (PX 212 at 64:8-75:17); (iii) Alta Mesa's top reserves engineer's inexplicable "reforecast" right after a short conversation with Chappelle (PX 316); (iv) the presentation of stale and manipulated production data (PX

207 ¶¶ 38-68); and (v) the rapid deployment of ESPs to inflate production results, ordered by Chappelle (PX 212 at 102:15-105:25, 169:12-170:6).

Regarding the March midstream misstatements, Defendants' scienter can be inferred from the developed facts, including that:

- Chappelle instructed his CFO to come up with "some interesting explanations" when the CFO raised concerns about a securities lawsuit because the numbers in the Proxy were wrong (PX 321);

- Chappelle instructed the person preparing the midstream projections to assume exponential growth in third-party business and could not articulate a basis for that assumption (PX 331; PX 218 at 231:7-16); and

- ██████████████████████████████████████████████████

The flawed and tautological statistical analysis of Defendants' expert Robert Rasor—which is subject to Class Plaintiffs' pending motion to exclude (Dkt. 513)—can be rejected or discounted by the jury because it is unreliable (*id.*). Or the jury could find that the inculpatory evidence outweighs it. *See Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) (noting the movant "must present evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict in his favor" to be entitled to summary judgment (internal quotation marks omitted)).

### 3. The Projection Statements Were Not Accompanied By Meaningful Cautionary Language.

"The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). Here, Defendants point to a boilerplate litany of generally applicable risk factors. Chappelle, Ellis, and Hackett knew when the statements were made that the likelihood the baseless assumptions underlying the reserves, production and EBITDA projections and related valuations would not "materialize" (PX 268) were major risks, if not *the* major risks "applicable to the particular circumstances." *E.g.*, PX 261; PX 260; PX 264; ███ PX 334; PX 328; PX 311; ███ PX 271; PX 256; PX 344; PX 258; PX 257; PX 331.

But nowhere did Defendants caution they "Lacked Sufficient Data [ ] To Make Valid Reliable Well Performance Forecasts for New Wells," as they now admit (Mot. at p. 9, Header C). Rather, they portrayed their data as reliably supportive of the base case. (PX 293 at slide 30; PX 304 at slide 10; ██████████ PX 319). None of the "cautions" warned that Alta Mesa was extrapolating results from single wells drilled in the "sweet spot" to crowded wells in geologically less productive areas. ███

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

### 4.     The "Projection Statements" Were Material.

The Moving Defendants offer no discussion on materiality, merely incorporating arguments made by the Proxy Defendants regarding only the misstatements in the Proxy and ignoring that "[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993). Here, unlike in *Krim*, the record is replete with evidence and admissions the Projection

Statements, which went to the core of the company's value proposition were important to investors. (PX 301; PX 87; PX 218 at 104:16-22). *See Kurtzman v. Compaq Comput. Corp.*, No. CIV.A.H-99-799, 2000 WL 34292632, at *23 (S.D. Tex. Dec. 12, 2000); *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996) ("Because materiality is a mixed question of law and fact, it is usually left for the jury.").

### D.    Plaintiffs Can Prove Defendants Engaged in an Inflationary Scheme

Plaintiffs have adduced substantial evidence that Alta Mesa inflated its short-term production results through indiscriminate use of ESPs, which the jury can infer was done to obscure its overstatement of production, reserves and EBITDA projections, and related valuation in the Proxy and other public statements. The evidence includes:

- AMR's sharp increases in ESP usage (from two in 2017 to 102 in 2018) were not recommended by the artificial lift team but were ordered by Chappelle when he learned that production estimates were being reduced (PX 212 at 102:15-105:25, 169:12-170:6).

- The artificial lift team's economic analyses showed ESPs were being used in many wells that were not proper candidates. *Id.* at 105:7-106:4.

- AMR's ESP expert told Chappelle that the ESPs were ineffective and uneconomical, but Chappelle refused to listen and simply walked away. *Id.* at 26:1-27:11, 153:7-23.

- AMR's VP of Investor Relations wrote to Chappelle "I know why we are doing ESPs this year (chasing production)" and the "30-60 day[ ]" production boost did not justify the expense (PX 390).

- AMR identified ESP costs as a reason it failed in 2018 but did not include those costs (about $45-$70 million) in its financial reporting (PX 354; PX 207 ¶ 98, n.12, n.13).

- Ellis blamed Chappelle for the ESP fiasco in an effort to keep his job: "It was Hal's idea to get more aggressive with ESPs" (PX 344).

- AMR also drilled S-Shaped (deviated) well bores, which Defendants' expert admits allows faster development and saves costs up front, but results in higher future costs and, can reduce future production (PX 227 at 182:4-19).

Defendants' reliance on a rebuttal expert report concluding that Alta Mesa's ESP usage was economical is wholly unavailing. Class Plaintiffs seek to exclude that opinion (Dkt. 516), but even if the Court allows it, the jury may discount it as irrelevant and/or unreliable given its numerous flaws (*see id.*), or find the competing evidence outweighs it. *See Webster*, 434 F.2d at 1193.

### E. Plaintiffs Can Prove the Moving Defendants Were at Least Reckless in Making the False Internal Control Statements

Chappelle and non-party CFO McCabe had been Alta Mesa's CEO and CFO for years when they certified throughout 2018 that Alta Mesa's annual and quarterly reports "fairly present[ed], in all material respects, the financial condition and results of operations of [AMR]. . . . ." (PX 332). Chappelle insists he was not reckless in making those statements, noting that he self-servingly denied scienter in an interrogatory response. But the Court need not credit the interrogatory response over the contrary evidence showing that Chappelle and McCabe knew, or were reckless in not knowing, that the company was worth a mere fraction of the value presented to investors (or at all). *See Wyatt*, 297 F.3d at 409. For example, on March 19, 2018, Chappelle and McCabe discussed their knowledge that gross inaccuracies in the publicly reported midstream financials had been known to KFM since August 2017 but not corrected, and Chappelle told his CFO to "develop" "some interesting explanations." (PX 321).

21

Further, Chappelle told Turner he wanted production estimates to "hit close to" prior projections (PX 394; *see also* PX 335) in the hours before Turner inexplicably "reforecast" production, bringing the internal financial forecast and reserves estimates closer to the public numbers (PX 316), and outright told another employee to fabricate third-party business for presentation to the public (PX 331). *See also* PX 322 (production data "even massaged appropriately, doesn't live up to our type curves [forecasts]"). By the time Chappelle signed the November 14, 2018 certification, AMR had installed ESPs in over 90 wells and incurred significant expenses that were not included in AMR's financial statements filed that day, despite Chappelle having been confronted with those costs. *E.g.*, PX 390; PX 212 at 26:1-27:11, 153:7-23.

For his part, Smith was Alta Mesa's Chief Accounting Officer and was responsible for establishing and maintaining internal control over its accounting procedures (including the certification process and related SOX compliance) and ensuring the company's financial statements were accurate, both before and after the De-SPAC. (PX 239 at 24:12-27:15). Smith was also copied on detailed discussions regarding Alta Mesa's financial projections and the bases therefore. (PX 273). The jury could thus find Smith knew of the fraud or, alternatively (if they credit Smith's testimony that he was kept in the dark), find him reckless in not making inquiries, given his responsibilities as the CAO of a publicly traded company.

Plaintiffs can also prove that Ellis was at least reckless in signing the March 29, 2018 Form 10-K for the reasons stated in Class Plaintiffs' Opposition to the Directors' Motion (incorporated by reference herein) and because, unlike some other directors, he

was deeply involved with the day-to-day operations of the company as a hands-on COO who "love[d] delving into the technical details" (PX 242 at 21:15-23) and had personally (in private) commented that pattern wells were less productive than single wells (PX 298; PX 223 at 104:17-105:24; PX 338).

## II.   THE JURY COULD REASONABLY FIND DEFENDANTS ELLIS AND SMITH LIABLE AS CONTROL PERSONS

Ellis and Smith challenge their liability under Section 20(a) as control persons on the grounds that they were "subordinate to Chappelle," which is simply not dispositive. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, Nos. MDL-1446, H-01-3624, 2003 WL 230688, at *17–19 (S.D. Tex. Jan. 28, 2003). And they ignore their control over AMR's statements.

Ellis had an ability to control Chappelle pre-De-SPAC. Ellis founded AMH, appointed himself as Chair and his wife as a member of the board of directors (PX 225 at 9:7-10; PX 224 at 22:24-23:8), hired Chappelle as CEO (PX 224 at 12:21-13:1), maintained a significant interest in the parent company AMH, and participated in the operations as the hands-on COO (PX 242 at 21:15-23). These are classic indicia of control. *See, e.g.*, *One Longhorn Land I, L.P. v. FF Arabian, LLC*, No. 4:15CV203-RC-CMC, 2015 WL 7432360, at *3 (E.D. Tex. Nov. 23, 2015) (family relationships and interlocking directors); *Trendsetter Inv., LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL 172627, at *26 (S.D. Tex. Jan. 18, 2007) (ownership of voting securities); *Carlton v. Cannon*, No. H-15-012, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016) (day-to-day control of corporation) Ellis also controlled the Proxy misstatements through his control of AMH, which provided

the information and had the right to demand revisions to the Proxy (*see* Dkt. 445, Parts I-II), and he also sometimes reviewed, edited, and presented slides to the public, showing his ability to control Alta Mesa's public messaging. (PX 294).

Ellis continued to control Alta Mesa after the De-SPAC, (which had become AMR), remaining on the board (PX 104 at p. 209) and continuing in his role as a hands-on COO. *See Commodity Futures Trading Comm'n v. Cartu*, No. 1:20-CV-908-RP, 2023 WL 5246360, at *10 (W.D. Tex. Aug. 15, 2023) (control person liability sufficiently pleaded where defendant was involved in the day-to-day management of the company). As the COO (and experienced petroleum engineer), Ellis repeatedly gave input into AMR's reserves estimates and production projections (PX 224 at 126:17-127:7, 130:9-25; PX 213 at 144:20-24) which, in turn, informed the midstream guidance statements. *See, e.g.*, *Trendsetter*, 2007 WL 172627, at *26 (sustaining control person claims against individual defendants who "had the power and did exercise control over the activities, including the statements and dissemination of information, of [the company]").

Ellis is also liable as a control person for AMR's inflationary scheme. The artificial lift team that procured, installed and serviced the ESPs worked under Ellis's hands-on supervision (PX 218 at 235:8-20), as did the drilling group, which drilled the deviated wellbores (PX 361; PX 393 at 21:19-23, 166:25-167:8). Ellis advocated ESP use (PX 224 at 110:8-9; PX 218 at 238:4-18), though he once blamed Chappelle. (PX 344); *see also* PX 212 at 102:15-105:25. Ellis is also liable as a control person for AMR's statements in its March 2018 Form 10-K, for the independent reason that he signed the document. *See* Dkt. 446, § III. In addition to his management role, Ellis remained (1) a large shareholder, (2) a

24

member of the Board to which Chappelle reported, (3) the company's founder and (4) the person who appointed Chappelle as CEO.

Defendant Smith, as CAO, was responsible for keeping the ledger, "closing the books" and "overseeing the preparation of" SEC Forms 10-Q and 10-K (PX 239 at 14:18-18:5), "ensur[ing]" the adequacy of internal controls over accounting and financial statements (*id.* at 24:12-25-21), and he was consulted by the team preparing the budget and guidance (PX 273). Thus, he "had the ability to control" misstatements in the SEC filings, at least as to the financial projections and internal controls and certainly in connection with the accounting shenanigans related to manipulation of KFM EBITDA. *See* ▮▮▮▮ PX 239 at 111-113. Additionally, the inflationary scheme centered around AMR's use of ESPs and included the practice of not properly accounting for those $45 to $70 million in costs. (PX 354; PX 207 at p. 48 n.12). Smith "had the ability to control" the inflationary scheme just by doing his job: ensuring AMR's books were accurate.

## CONCLUSION

For the foregoing reasons, the Motion (Dkt. 523) should be denied in its entirety.

Dated:  January 19, 2024                      Respectfully submitted,

*/s/ Andrew J. Entwistle*                     */s/ Trig Smith*
Andrew J. Entwistle (attorney-in-charge)      Trig Smith (*pro hac vice*)
State Bar No. 24038131                        Lonnie Browne (*pro hac vice*)
Callie Crispin                                John Kelley (*pro hac vice*)
State Bar No. 24104231                        **ROBBINS GELLER RUDMAN &**
Sal H. Lee                                    **DOWD LLP**
State Bar No. 24127308                        655 West Broadway, Suite 1900
**ENTWISTLE & CAPPUCCI LLP**                  San Diego, CA 92101
500 West 2nd Street, Suite 1900               Telephone: (619) 231-1058

Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

*Court-Appointed Co-Lead Counsel*

Carol C. Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven
Fund, A Series of Frank Funds Trust*

Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

## GLOSSARY OF KEY TERMS, ENTITIES AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|------|-------------|
| 12 WPS | 12 wells per section, the assumption in Alta Mesa's "base case" that it could drill twelve horizontal oil wells in each Section. |
| 250 MBO | 250,000 barrels of oil, the amount of oil Alta Mesa projected it could recover on average per well in its "base case". |
| Alta Mesa | Refers to AMR (post De-SPAC) and/or AMH (pre De-SPAC). |
| AMH | Alta Mesa Holdings, LP, the private pre-De-SPAC company. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-De-SPAC company. |
| ARM Energy | Defendant ARM Energy Holdings LLC. |
| Artificial Lift | The use of artificial means to increase the flow of liquids from an oil well. |
| Base Case | The drilling plan Alta Mesa presented starting in August 2017 where it would drill 12 wells per Section (four each in three Benches) and recover on average 250 MBO per well. |
| BCE or Bayou City | Defendant Bayou City Energy Management LLC. |
| Bench | A distinct horizontal layer of rock that Alta Mesa landed its horizontal wells in. |
| Bourque | Kevin Bourque, Vice President of Mid-Continent Operations at Alta Mesa. |
| Bullis-Coleman | A ten well pattern spacing test conducted by AMH that started producing in February 2017. |
| Business Combination or De-SPAC | The merger of Silver Run II with Kingfisher and AMH on February 9, 2018. |
| CAO | Chief Accounting Officer. |
| Central Area | Alta Mesa's acreage within Township 17N, as depicted in PX 204 paragraph 23. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |

| Term | Description |
|---|---|
| Chappelle | Moving Defendant Hal Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Child Well | Subsequent wells drilled in a Section surrounding the initial Parent Well. |
| Christopher | Michael Christopher, CFO at ARM Energy during the relevant period. |
| Citi | Citigroup Global Markets Inc., financial advisor to Silver Run II. |
| Class Period | August 16, 2017 to May 17, 2019. |
| Class Plaintiffs | Plaintiffs in the TAC and Court-appointed Class Representatives (Dkt. 241): FNY Partners Fund, LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (formerly Plumbers and Pipefitters National Pension Fund) and Camelot Event Driven Fund, a Series of Frank Funds Trust. |
| Coats | Moving Defendant Stephen Coats, former General Counsel at Riverstone and Corporate Secretary of Silver Run II prior to the De-SPAC. |
| Cole | Homer "Gene" Cole, Chief Technology Officer and a VP at Alta Mesa until December 2018. |
| Collins | Craig Collins, VP and COO of KFM from April 2018 to April 2019. |
| Complaint or TAC | Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 6, 2021 (Dkt. 218). |
| COO | Chief Operating Officer. |
| Defendants | The defendants named in the Third Amended Complaint. |
| Dimitrievich | Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| Downspacing | The drilling of additional wells in an already developed area. |
| E&P | Exploration & Production, the "upstream" portion of the oil and gas industry. |
| Ellis | Moving Defendant Mike Ellis, COO and founder of AMH and later AMR until December 2018. |

2

| <u>Term</u> | <u>Description</u> |
|---|---|
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting fluids from wellbores. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the total quantity of oil and/or gas that has already been recovered from a producing well plus the amount of oil and/or gas that is estimated to be commercially recoverable over the rest of the life of the well. |
| Exchange Act | The Securities and Exchange Act of 1934. |
| Gutermuth | Moving Defendant William Gutermuth, a director of Silver Run and AMR until June 2018. |
| Hackett | Defendant James Hackett, a Riverstone Partner, CEO and Chairman and the Board of Silver Run II prior to the De-SPAC, Executive Chairman of the Board of Directors of AMR, head of the AMR midstream business (KFM), and later interim CEO of AMR. |
| High Mesa | High Mesa, Inc., a now bankrupt entity owned by BCE, HPS and AM Management that prior to the De-SPAC owned AMH and approximately one-third of Kingfisher. |
| HPS | Defendant HPS Investment Partners, LLC. |
| Interference | The phenomenon in which wells drilled close to each other drain a shared reservoir, resulting in lower recoveries per well. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with AMH and Silver Run II in the De-SPAC. |
| KPMG | AMR's auditor starting in June 2018. |
| Lapeyre | Moving Defendant Pierre Lapeyre, Jr., a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| Leuschen | Moving Defendant David Leuschen, a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| MBO | Acronym for thousand barrels of oil. |
| MBOE | Acronym for thousand barrels of oil equivalent. |
| MMBOE | Acronym for millions of barrels of oil equivalent. |

| Term | Description |
|------|-------------|
| McCabe | Michael McCabe, Chief Financial Officer of Alta Mesa Holdings (AMH) and Alta Mesa Resources (AMR). |
| McMullen | Defendant William McMullen, founder and Managing Partner of Defendant BCE. |
| Meramec | One of the two STACK horizontal rock layers that Alta Mesa planned to target in its base case development plan. |
| Meridian | A consulting group under the Riverstone umbrella that Riverstone paid in the fall of 2018 to review Alta Mesa's production data. |
| Microseismic Testing | A technique that uses fracturing or water-injection-induced microseismic phenomena similar to natural earthquakes but with low intensities during reservoir fracturing or water injection operations to monitor fracture activities and flow mobilities in oil-producing or gas-producing pays. |
| Midstream | The portion of the oil and gas industry that links upstream (exploration and production) and downstream (post-production), including the storage, processing, and transportation of petroleum products. |
| Moving Defendants | "Moving Defendants" refers to the defendants that filed the motion being opposed (variously, Defendants Riverstone, AMR, Chappelle, Ellis, Smith, Coats, Walker, Lapeyre, Leuschen, Gutermuth, Tepper, Walters and Sinclair). |
| Osage | One of the two STACK horizontal layers that Alta Mesa planned to target in its base case development plan. |
| Parent Well | The initial well drilled by an operator in a section. |
| Pressure Tests | A test of reservoir pressure of a well over time.. In the case of multi-well drilling, pressure depletion of an initial well following bringing a nearby well online indicates that the new, nearby well is spaced too tightly to the initial well and draining the same reserves. |
| Proxy | The Definitive Merger Proxy Statement issued to Silver Run II's shareholders on Schedule 14A, dated January 19, 2018, and all supplements and amendments thereto.  The Proxy is PX 104 attached to Dkt. 444. |

4

| Term | Description |
|---|---|
| PX 1 to PX 202 | Exhibits attached to Dkt. 444, the September 21, 2023 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to Motion for Summary Judgment By (A) Defendants HPS Investment Partners, LLC, ARM Energy Holdings LLC, and Bayou City Energy Management LLC (Dkt. 423); (B) Defendant Donald Dimitrievich (Dkt. 422) and (C) Defendant William McMullen (Dkt. 427). |
| PX 203 to PX 395 | Exhibits attached to Dkt. 569, the January 19, 2024 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to (a) Defendants Riverstone Holdings LLC's, Stephen Coats', and Thomas Walker's Motion for Summary Judgment and Incorporated Memorandum of Law as to Plaintiffs' Section 20(a) Claim (Dkt. 518); (b) Proxy Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 14(a) and 20(a) Claims (Dkt. 520); (c) Alta Mesa Resources, Inc., Chappelle, Ellis, and Smith's Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 523); and (d) AMR Directors' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 526). |
| Riverstone | Moving Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. |
| RSH | Refers to Riverstone Holdings, LLC. |
| Ryder Scott | Alta Mesa's oil reserve auditor. |
| Section | A 640-acre (one square mile) land area established by the State of Oklahoma. |
| Schlumberger | An oil and gas services company that performed various technical studies for Alta Mesa. |
| Sheils | Tamara Sheils (formerly Alsarraf), a senior financial analyst at Alta Mesa. |
| Silver Run II, Silver Run or SR II | The SPAC created by Riverstone that merged with KFM and AMH. |
| Sinclair | Moving Defendant Donald Sinclair, a director of AMR following the De-SPAC. |

| **Term** | **Description** |
|---|---|
| Smith | Moving Defendant Ronald Smith, Chief Accounting Officer at AMR for a portion of the relevant record. |
| SPAC | Acronym for "special purpose acquisition company," also called "blank check" company. |
| Sponsor Shares | Stock of the SPAC that are "sold" to the SPAC sponsor for a nominal fee (here, less than one cent per share). Also called founder shares. |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Tepper | Moving Defendant Jeffrey Tepper, a director of Silver Run II and AMR. |
| TPH | Tuder, Picking, Holt & Co., a Silver Run II financial advisor for the Business Combination. |
| Tracer Tests | Tests used in the oil industry in order to gauge how fluid flows through the reservoir that are useful to detect and evaluate communication/interference among wells. |
| Turner | Tim Turner, VP of Corporate Planning and Reserves and later VP of Corporate Development. |
| Type Curve | A model of oil and gas production, including rate and EUR, of future wells based on a statistical average of similar wells. |
| Upstream | The portion of the oil and gas industry focused on identifying, extracting, and producing hydrocarbons. |
| Walker | Moving Defendant Thomas Walker, former CFO of Riverstone and CFO of Silver Run II prior to the De-SPAC. |
| Walters | Moving Defendant Diana Walters, a director of Silver Run and AMR. |
| W.D. Von Gonten | Petroleum engineering consultant. |
| Widell | Chris Widell of Sponte Resources, a consultant that conducted due diligence of AMH for Riverstone. |
| WPS | Wells per Section. |

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on January 19, 2024.

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle