# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

IN RE ALTA MESA RESOURCES, INC.
SECURITIES LITIGATION

Case No. 4:19-cv-00957

**PUBLIC VERSION OF DKT. 573**

# CLASS PLAINTIFFS' OPPOSITION TO THE
# AMR DIRECTORS' MOTION FOR SUMMARY JUDGMENT
# <u>ON THE SECTION 10(b) AND 20(a) CLAIMS AGAINST THEM</u>

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ..................................................................1

STATEMENT OF ISSUES TO BE RULED UPON ........................................................2

APPLICABLE LEGAL STANDARD .............................................................................2

SUMMARY OF ARGUMENT .......................................................................................3

    A.    Riverstone and Its Hand-Picked Directors Ran Silver Run II......................5

    B.    The Post-De-SPAC Board Governed AMR ..................................................6

    C.    The AMR Directors Ignore Red Flags Prior to Signing the Form 10-K .............................................................................................................8

    D.    The False and Misleading Form 10-K ..........................................................9

ARGUMENT & AUTHORITIES ....................................................................................9

I.    SUBSTANTIAL EVIDENCE SUPPORTS SECTION 10(B) LIABILITY AGAINST THE AMR DIRECTORS ........................................................9

    A.    The Statements in the Form 10-K Were False and Misleading ...................9

        1.    The Internal Control Misstatement ....................................................9

        2.    The Kingfisher Risk Factor ............................................................11

    B.    Plaintiffs Can Prove Scienter for the Misstatements in the 10-K ..............12

    C.    Plaintiffs Can Prove Loss Causation ..........................................................15

II.    THE AMR DIRECTORS ARE BOUND FOR TRIAL ON THE SECTION 20(a) CLAIMS ......................................................................................19

    A.    Six AMR Director Defendants Had Control of Silver Run II's (n/k/a AMR) Pre-De-SPAC Misstatements ..........................................................20

    B.    Each of the Seven AMR Director Defendants Had Control of AMR and Its Post-De-SPAC Misstatements and Omissions ...............................22

        1.    The Form 10-K ................................................................................22

        2.    AMR's Other Post-De-SPAC Misstatements .................................22

C.    The AMR Directors' Good Faith Defense Is an Issue for the Jury .............23

CONCLUSION ..............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................ 12

*Brody v. Zix Corp.*,
    No. 3:04-CV1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)................... 23

*Carlton v. Cannon*,
    No. H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016).............................. 19

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    620 F. Supp. 3d 603 (S.D. Tex. 2022 ............................................................. 17

*Deville v. Marcantel*,
    567 F.3d 156 (5th Cir. 2009) ........................................................................ 13

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ........................................................................ 14

*G.A. Thompson & Co., Inc. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ................................................................... 19, 23

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021)....................................................... 11, 13

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ............................................................. 15, 17, 19

Heck v. Triche,
    775 F.3d 265 (5th Cir. 2014) ................................................................... 4, 20

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
    No. SACV 15-00865 AG (JCGx),
    2018 WL 4956520 (C.D. Cal. Oct. 5, 2018) ............................................... 18

*In re Alstom SA Sec. Litig.*,
    454 F. Supp. 2d 187 (S.D.N.Y. 2006) ....................................................... 22

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010).......................................................... 22

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................................. 4, 22

*In re Groupon, Inc. Sec. Litig.*,
No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ................................. 18

*In re Repine*,
536 F.3d 512 (5th Cir. 2008) ................................................................................. 16

*In re Zonagen, Inc. Sec. Litig.*,
322 F. Supp. 2d 764 (S.D. Tex. 2003) ................................................................... 12

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir.2009) ................................................................................. 17

*McGinnis v. Interoceanica Agency, Inc.*,
No. 3:11-CV-0214, 2015 WL 13800689 (S.D. Tex. Aug. 6, 2015) ........................ 3

*McNamara v. Bre-X Minerals Ltd.*,
46 F. Supp. 2d 628 (E.D. Tex. Mar. 18, 1999) ....................................................... 21

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ................................................................................. 19

*Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007), *abrogated by Erica P. John Fund, Inc. v.
Halliburton Co.*, 563 U.S. 804 (2011) ................................................................... 19

*Paul F. Newton & Co. v. Tex. Commerce Bank*,
630 F.2d 1111 (5th Cir. 1980) ............................................................................... 24

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................... 13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ............................................................................................... 3

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ...................... 17

*Ryder v. Union Pac. R.R. Co.*,
945 F.3d 194 (5th Cir. 2019) ................................................................................. 3

*S.E.C. v. Hurgin*,
484 F. Supp. 3d 98 (S.D.N.Y. 2020) ..................................................................... 21

*S.E.C. v. Leslie*,
    No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010) .............................. 18

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................................ 12

*Stahl v. Novartis Pharm. Corp.*,
    283 F.3d 254 (5th Cir. 2002) .................................................................................. 2

*Trendsetter Invs., LLC v. Hyperdynamics Corp.*,
    No. H-06-0746, 2007 WL 172627 (S.D. Tex. Jan. 18, 2007) ................................ 20

*Wyatt v. Hunt Plywood Co.*,
    297 F.3d 405 (5th Cir. 2002) ............................................................................ 2, 3

## NATURE AND STAGE OF PROCEEDINGS

This certified class action pursuant to Sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934 arose from the catastrophic collapse of Alta Mesa Resources f/k/a Silver Run II ("AMR") following a De-SPAC transaction in which two related private companies Alta Mesa Holdings ("AMH") and Kingfisher Midstream (KFM) went public via a blank check company (Silver Run II). Shareholders of the SPAC approved the transaction based on a Proxy that overstated the economic potential of AMH and KFM, including through AMH's oil and gas production projections that were contradicted by internal data, and the inclusion of fictitious non-customer business and other manipulations of KFM's EBITDA estimates. On February 12, 2018, Defendants began discussing whether and how to disclose a 50% cut to KFM's 2018 EBITDA projection, less than six days after they requested that voters reasonably rely on it. Less than a year after asking for shareholder approval, AMR wrote off more than 80% of its $3.86 billion market value for the same reason—admitting that AMR's assets were overstated by that amount in the Proxy. AMR filed for bankruptcy protection just seven months after that.

This Opposition responds to the motion by the self-styled "AMR Directors" (Dkt. 526, herein "Motion" or "Mot."), all of whom are either Riverstone-appointed directors (Defendants Hackett,[1] Lapeyre and Leuschen), or directors "hand selected" by Riverstone

---

[1] Defendant Hackett addresses the Section 10(b) claim against him for his misstatements outside the Form 10-K only in Motion footnote 4, which includes no substantive argument.

(William Gutermuth, Jeffrey Tepper, Diana Walters and Donald Sinclair), seeking dismissal of the Section 10(b) and 20(a) claims against them.[2]

## STATEMENT OF ISSUES TO BE RULED UPON

1.      Whether the AMR Directors, or any of them, are entitled to summary judgment in their favor on the Section 10(b) claims against them for the misstatements in AMR's 2017 Form 10-K.

2.      Whether the AMR Directors are entitled to summary judgment in their favor on the Section 20(a) control person claims against them for violations of Section 10(b) by others:  (a) at Silver Run II prior to the De-SPAC and/or (b) at AMR post-De-SPAC.

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Only when "the non-moving party can point to nothing in the record supporting its claim" should summary judgment be granted. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). In deciding a motion for summary judgment, the Court "must review all of the evidence in the record but make no credibility determinations or weigh any evidence." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51

---

[2] Class Plaintiffs incorporate herein their oppositions to the summary judgment motions previously filed by Defendants McMullen and Dimitrievich on similar grounds (Dkt. Nos. 446 and 449). To avoid burdening the Court with duplicative exhibits, Class Plaintiffs refer to and incorporate herein the exhibits PX 1 to PX 202 attached to the September 21, 2023 Declaration of Andrew J. Entwistle.  (Dkt. 444). The January 19, 2024 Declaration of Andrew J. Entwistle attaches additional summary judgment evidence starting at PX 203.

(2000)); *see also McGinnis v. Interoceanica Agency, Inc.*, No. 3:11-CV-0214, 2015 WL 13800689, at *1 (S.D. Tex. Aug. 6, 2015) (Hanks, J.). Rather, the Court "must disregard everything favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party." *Wyatt*, 297 F.3d at 409. In other words, in determining whether a triable fact issue exists, the Court must view the evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019).

## SUMMARY OF ARGUMENT

The evidence amply shows that the AMR Director Defendants individually and collectively had the ability to control, and did control, Silver Run II before the De-SPAC and AMR after the De-SPAC. As the Proxy plainly put it: "***Silver Run is, and after the Closing will continue to be, managed by its board of directors.***" (PX 104 at p. 5).

Along with the pre-De-SPAC directors (Defendants Hackett, Walters, Gutermuth and Tepper), Defendants Leuschen and Lapeyre controlled the SPAC indirectly as the founding partners of Riverstone, the SPAC sponsor. (Riverstone does not contest control of the SPAC). These six individuals controlled the SPAC's search for an acquisition target and related due diligence, as well as the process for obtaining shareholder approval of the proposed transaction, which depended on their issuance of the false and misleading Proxy.

Following the De-SPAC, all of the AMR Director Defendants sat on the AMR Board, where they reviewed SEC filings and other public statements, approved the Company's budget, oversaw operations and strategy and were involved in management decisions. Critically, all the AMR Directors signed the 2017 AMR Form 10-K, filed on

March 29, 2018, which is, by itself, sufficient to establish control over the statements in that filing. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (outside director who signed false registration statement was a control person). Following the De-SPAC, Hackett was not only Chairman of the Board, but was a member of senior management, as the head of AMR's midstream business and later as AMR's interim CEO.

As the scheme collapsed in late 2018, the AMR Directors further exercised their control by firing the management team and replacing them with individuals from a consulting company under the Riverstone umbrella. Importantly for the control claims, Plaintiffs are not required to show that any AMR Director acted with fraudulent intent, recklessly, or even negligently; it is enough if "the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) (citation omitted).

Perhaps recognizing that they are bound for trial on the control claims, the AMR Directors focus their arguments on the falsity of the statements in the AMR 2017 Form 10-K. Even that effort fails. The AMR Directors' falsity argument hinges on asking this Court to both misread the challenged statements and ignore the evidence demonstrating the plain-language reading of those statements was false and misleading. Their conclusory scienter arguments fare no better; the facts demonstrate that each director knew the truth or was reckless in disregarding the red flags pointing to it. Their limited loss causation arguments ignore 37 of the 39 alleged misstatements over which they had control and fail because the

corrective disclosures are sufficiently related to the misstatements under settled law. Accordingly, the AMR Directors' motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.   Riverstone and Its Hand-Picked Directors Ran Silver Run II

Riverstone created the SPAC Silver Run II in late 2016 and immediately installed its partner James Hackett to be the SPAC's CEO and Chairman of the Board. Riverstone appointed the same directors who had been directors of its prior SPAC, Silver Run I: Defendants Gutermuth, Tepper, and Walters. *See* ███████████████████████ ███████████████████ PX 219 at 32:2-4 (Riverstone co-founder Leuschen selected the independent directors). The initial three "independent" directors oversaw the search for a merger partner, the related evaluation and negotiations, the issuance of the Proxy and the shareholder vote, and remained directors of the post-De-SPAC entity, AMR. Given the small size of the Silver Run II board, all of Hackett and Leuschen's handpicked directors served as the only members of all Board committees. (PX 229 at 26:18-21).

While Defendants Lapeyre and Leuschen were not Silver Run II directors pre-De-SPAC, they ran its De-SPAC committee at Riverstone (PX 362) and closely managed its operations. *See* PX 233 at 18:9-21 ("I'm involved in virtually everything that the firm does at a senior level."); PX 232 at 26:14-19 ("everyone that is working for the firm ultimately works [] in the direction that [Leuschen and I] point the firm and point those people."). Lapeyre and Leuschen supervised Silver Run II's acquisition of AMH and KFM at a high-level (approving the transaction as the heads of Riverstone's investment

committee), down to the details (editing language in the press release announcing the transaction). *See, e.g.*, PX 232 at 22:19-21; PX 233 at 26:3-23, 33:24-34:9; PX 280.

## B. The Post-De-SPAC Board Governed AMR

After the De-SPAC, Riverstone appointed Lapeyre and Leuschen to the AMR Board, while Hackett continued to serve as Chairman. Mr. Hackett also selected a fourth director, Defendant Donald Sinclair (who he had previously worked with). (PX 230 at 274:18-275:2). ███████████████████████████████████████████████ ██████████████████████████████████ Gutermuth left the Board in June 2018 after Hackett asked him to resign. (PX 229 at 24:2-25). The rest of the AMR Directors remained on the Board through AMR's September 11, 2019 bankruptcy filing.

The AMR Board met regularly, typically in the boardroom at AMR's offices, where the latest production data and drilling maps were posted on the walls. (PX 242 at 197:7-199:22). The AMR Board, particularly Hackett, Lapeyre and Leuschen, had vast experience in the oil and gas industry and thus understood the implications of the data. (PX 104 at pp. 209-212). Each AMR Director actively oversaw and managed aspects of AMR's operations and statements. Specifically:

- **Hackett**, the public face of AMR, was Chairman of the Board, head of the KFM Midstream business after the De-SPAC, and interim CEO of AMR from December 2018 to September 2019. He was regularly involved in AMR's operations and strategy (*see, e.g.*, PX 342; PX 346), investor relations (*see, e.g.*, PX 382), and oversaw the issuance of press releases and SEC filings (*see, e.g.*, PX 377).

- **Lapeyre and Leuschen** held control of AMR as the senior partners of Riverstone. (Riverstone controlled AMR for the reasons stated in Class Plaintiffs' opposition to Dkt. 518 (Riverstone's motion), filed herewith.) These directors received more detail and advanced notice of issues than other Board

members. (PX 381; PX 341). Lapeyre and Leuschen were also instrumental in assigning Meridian to review AMR's operation and then, with Hackett, HPS and BCE, to remove CEO Chappelle and COO Ellis and replace them with Meridian. (PX 342; PX 233 at 235:12-19). Lapeyre personally ensured that Meridian's affiliation with Riverstone was noted in AMR's press release. (PX 351).

- **Gutermuth** was an AMR director through June 2018 and reviewed draft SEC filings, where he "undoubtedly had some questions, maybe a comment or two, possibly a change." (PX 229 at 167:9-19). Gutermuth also reviewed draft press releases specifically when they dealt with AMR's quarterly and annual financial statements. *Id.* at 30:22-23. And, as a member of the audit committee, Gutermuth took part in the Board's process of selecting a replacement auditor post-De-SPAC and helped interview and select KPMG. *Id.* at 32:10-14.

- **Tepper** was a Board member at all relevant times, Tepper received drafts of the SEC filings by AMR and AMH, including the 2017 Form 10-K. *See, e.g.*, PX 374. Tepper admits that he would typically review these drafts (PX 240 at 182:7-11). Tepper was also involved in investor relations (PX 380), finding new board members (PX 376), and the late 2018 management change (PX 386).

- **Walters** chaired the audit committee from the De-SPAC until the bankruptcy. (PX 244 at 35:3-13). She oversaw the "company's financial statements and production of them and oversight of the controls," *i.e.*, internal controls. *Id.* at 37:4-11. Walters also hired and oversaw AMR's financial auditors. *Id.* at 37:12-18. She personally signed the engagement letter between AMR and KPMG. (PX 379 at -909). Then, Walters worked directly with KPMG to conduct quarterly reviews for the company. (PX 244 at 175:20-22; PX 384).

- **Sinclair** had over 20 years of midstream experience. (PX 217 at 28:6-22). Upon his appointment to the Board, he immediately attended an "urgent" meeting with KFM to discuss among other things, related EBITDA growth for KFM, overview of third-party customer status, KFM processing options, KFM transport options, KFM competitive position (strengths and weaknesses) in the midstream sector, and business development opportunities. (PX 371; *see also* PX 230 at 274:18-275:2).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

### C.    The AMR Directors Ignore Red Flags Prior to Signing the Form 10-K

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████. (PX 233 at

198:8-211:14). Moments after, Hackett arranged a "very urgent" meeting "on behalf of

AMR's new Board" with the operator of the midstream business (KFM), to discuss KFM's

business and customers. (PX 371). Defendant Sinclair attended to assist transitioning the

KFM business to Hackett's leadership. (PX 230 at 274:18-275:2). On March 26, 2018,

Hackett reminded Lapeyre and Leuschen that KFM's EBITDA "will be much lower than

we originally projected," but privately tried to soften criticism from his superiors at

Riverstone by noting that, internally, Riverstone's KFM projections were much more

conservative than those publicly presented in the Proxy. (PX 126 at -553). ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ PX 375).

### D.    The False and Misleading Form 10-K

On March 29, 2018, AMR issued a press release and an investor presentation, held an earnings call, and filed its 2017 Form 10-K, all of which focused on the Company's fourth quarter and full-year 2017 financial results. (PX 133; PX 320; PX 375; PX 131). Each of the AMR Board members at the time signed the Form 10-K. (PX 131 at p. 82).

Two statements in the Form 10-K were false and misleading. First, the Form 10-K stated that "*there [had] been no change in [its] internal control over financial reporting*" (the "Internal Control Misstatement") (TAC ¶ 219). Second, it presented as a Risk Factor that:

> "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected"

(the "KFM Risk Factor") (TAC ¶ 218).

## ARGUMENT & AUTHORITIES

## I.    SUBSTANTIAL EVIDENCE SUPPORTS SECTION 10(B) LIABILITY AGAINST THE AMR DIRECTORS

### A.    The Statements in the Form 10-K Were False and Misleading

#### 1.   The Internal Control Misstatement

The AMR Directors tweak an already-rejected motion to dismiss argument that the internal control statement is not false and misleading. (Dkt. 125 at pp. 18-20). The modified argument merely repeats the argument recently made by Defendant McMullen (Dkt. 427 at pp. 20-21). Class Plaintiffs incorporate by reference their oppositions to those arguments herein. (Dkt. 139 at pp. 66-68; Dkt. 449 at pp. 23-24).

In summary, the AMR Directors do not dispute that the internal controls of the combined entity were ineffective, which, of course, led less than a year later to the Company reporting a material weakness and taking a $3.2 billion write down. (PX 154). Instead, they argue that the Internal Control Misstatement is not false and misleading because the statement, they say, referred only to the **SPAC's** internal controls (rather than AMH's or KFM's). (Dkt. 526 at p. 12). That argument defies logic language. The Form 10-K, along with the press release and investor presentation filed the same day, almost completely concerned the newly combined entity and AMH's and KFM's business operations. (PX 131 at pp. 13-36). Moreover, it is illogical that the statement would have concerned Silver Run II, which had previously asserted that it was not "required to maintain an effective system of internal controls." (PX 252 at p. 78).

The AMR Directors' argument that it is the "undisputed opinion" of their accounting expert that the Internal Control Misstatement refers to Silver Run II's controls is also wrong. It is up to the jury whether to credit Mr. Fiebig's opinion (*Webster v. Offshore Food Servs., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970)), if the Court permits it to be offered over Class Plaintiffs' objection. (Dkt. 535). The AMR Directors also ignore Class Plaintiffs' expert's testimony that the Internal Control Misstatement is fairly read to concern AMH. *See* PX 226 at 113:15-114:7 ("Internal controls are about the flow of information . . . I think a reasonable [] stock investor or equity analyst would consider this statement to be a reflection of the flow of information involved in the due diligence that was purportedly taking place at that point in time . . . [w]hich would include targets[.]").

10

### 2.  The Kingfisher Risk Factor

The KFM Risk Factor was misleading for two reasons. <u>First</u>, the Risk Factor portrayed as a ***contingency*** KFM's failure to "meet the quality requirements of the pipelines or facilities to which" it connected, even though this was already actually occurring. (PX 206 at p.4 ¶ 8.e; PX 236 at 201:10-207:18). *See, e.g.*, *W. Pa. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, No. 3:16-CV-470-PK, 2018 WL 4524107, at *16 (D. Or. May 29, 2018) ("whether a warning contained in an SEC filing and describing a realized risk factor in terms of potential contingency is misleading cannot be resolved as a matter of law in the warning author's favor, but rather must be determined by a trier of fact.").

<u>Second</u>, it was misleading for the AMR Directors to speak regarding the volumes KFM collects potentially impacting cash flows when the AMR Directors already knew that other companies were having poor results in the STACK and were scaling back their drilling, and that KFM's infrastructure was inadequate and making it difficult to obtain new customers. (PX 206 at pp. 12-31). The AMR Directors' "warning" of issues with third-party volumes was particularly misleading and material because AMR was including non-customers in the projections, a non-industry standard approach that drastically inflated KFM's perceived value. *Id.* at p. 3 ¶ 8.b.2-b.3. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 952 (S.D. Tex. 2021) (statements regarding the future commercial viability of an oil field "rendered misleading by the omission of information demonstrating that Anadarko and the Individual Defendants already knew that the original projections required significant downward adjustment").

The AMR Directors' argument that the KFM Risk Factor was not misleading because on the same day of the Form 10-K Defendant Chappelle disclosed that third parties had already "delayed drilling on acreage served by" KFM (Mot. at 14) fails because that disclosure implies the drilling was merely "delayed," even though it was already known that additional drilling was unlikely *ever* to occur. (PX 206 at p. 3 ¶ 8.b.2-b.3). The AMR Directors' argument that the statement is immunized by the safe harbor also fails because the KFM Risk Factor was not forward-looking. Rather, it misled investors about the current state of KFM's business by implying KFM was not *already* experiencing profit and cash flow problems caused by *ongoing* quality issues, that third-party customer volumes were not already falling and contained made up non-customer revenues. (PX 206).[3] *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004) (safe harbor offers no protection where the risk is admittedly known or has already manifested in whole or in part).

### B. Plaintiffs Can Prove Scienter for the Misstatements in the 10-K

"Scienter is an inherently fact-specific issue that should ordinarily be left to the trier of fact." *In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 774 (S.D. Tex. 2003). On summary judgment, a court must decide not whether "the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[3] It was for this reason that in March 2018 AMR used a "BD wedge" – i.e. made-up revenue from non-customers – to prop up KFM's EBITDA. (PX 373).

The AMR Directors all attended board meetings on February 12, 2018, to discuss how to handle the fact KFM's financials were overstated and manipulated in the Proxy. While the AMR Directors specifically agreed to keep the official minutes of their meetings "vague" (PX 369), the AMR Directors regularly received materials and updates from management regarding the De-SPAC, participated in Board discussions about those materials, reviewed drafts of all relevant SEC filings, and had ultimate sign-off authority for the company. *E.g.*, PX 374; PX 244 at 44:18-45:21, 45:25-46:2, 140:2-141:1. *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 851 (N.D. Tex. 2018) (participating in discussions about and receiving regular briefings on the topic of the alleged wrongdoing contributes to scienter); *see also Ga. Firefighters' Pension Fund*, 514 F. Supp. 3d at 956. AMR's management team consistently testified that they kept the Board apprised of material issues in AMR's business and that they did not hide anything from the Board. (PX 242 at 199:23-200:20; PX 224 at 68:23-69:1, 199:23-200:20). While the jury will be free to disbelieve management's testimony and instead credit the AMR Directors' protestations of ignorance, the Court should not weigh competing evidence and inferences at this stage. *See Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009) (on a motion for summary judgment, "the court must 'refrain from making credibility determinations or weighing the evidence'").

Defendant Hackett's close involvement with the operations of the midstream business (KFM) starting in February 2018 itself makes clear that he knew of KFM's rampant operational and accounting issues. *See, e.g.*, PX 371. Specifically, days before he signed the Form 10-K, Hackett explained to Lapeyre and Leuschen the problems at

KFM:  "We used Citi's midstream numbers throughout the various roadshows and no one at Citi or KFM bothered to say 'wait', the numbers for '18 will be much lower than we originally projected back in May and then again in August of '1[7]." (PX 126). Hackett explained however that, while Riverstone "had internal models that were less aggressive than Citi's numbers in calculation [sic] returns for RSH," that would not "help the public shareholders who bought in after some of our [Riverstone] original SPAC buyers rotated out." (PX 126; *see also* PX 129). Hackett, Lapeyre and Leuschen also knew the AMH portion of KFM's volumes was lower than portrayed and had motive to conceal that fact, as discussed in Class Plaintiffs' opposition to the Proxy Defendants' motion for summary judgment. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) ("[M]otive and opportunity allegations may meaningfully enhance the strength of the inference of scienter.").

Riverstone's hand-picked directors also had motive to maintain high share prices long enough for each to sell their 33,000 founder shares (PX 104 at p. 111; PX 240 at 54:16-55:5) and to please Riverstone by enabling it to cash in on its latest SPAC. Serving as a director for Riverstone portfolio companies is highly lucrative. For example, Walters, Sinclair and Tepper earned $284,702, $263,702 and $280,202, respectively, in cash in 2019 for serving as directors of AMR. (PX 357 at p. 17). In keeping with its history of "rewarding" successful "independent" directors with future appointments, Riverstone had reunited the entire Silver Run I Board to serve on the Board of Silver Run II. Indeed, Defendant Tepper has been a director of at least six other Riverstone-sponsored SPACs. *See* PX 240 at 18:5-14; *see also* PX 372 (Tepper was paid $312,000 in 2017 to be

a director of Silver Run I). Gutermuth also had financial motive due to his $400,000 investment in Bayou City Energy, L.P., which owned equity in AMR and hoped to cash out at a high share price. (PX 229 at 27:13-25).

The AMR Directors argue that they had no motivation because they never "sold stock" and their AMR founder shares were unable to be sold until six months after the De-SPAC. (Mot. at 18-19). But the fact that AMR only had to maintain a high share price for five more months for the Defendants to cash out supports, not undermines, the inference that the AMR Directors acted with scienter, and (at least) recklessly turned a blind eye to the red flags in March 2018 (and before). *See* PX 340; *see also* ███████████████

███████████████████████████████

### C. Plaintiffs Can Prove Loss Causation

Loss causation requires "(1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004).

The Fifth Circuit has emphatically rejected the notion that a corrective disclosure must "precisely mirror [an] earlier misrepresentation." *Ala. Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). It is enough that "the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). This

standard "is not a steep or difficult one to satisfy." *Id.* Partial corrective disclosures "must be viewed together with the totality of the other alleged partial disclosures." *Id.* at 324.

Defendants discuss whether only two of their misstatements (statements 17 and 18) are related to the corrective disclosures. Defendants therefore waive their loss causation arguments as to the other 37 misstatements referenced in their appendix, including the 31 other statements they reference in their Motion without any argument. *See In re Repine*, 536 F.3d 512, 518 n.5 (5th Cir. 2008) (argument deemed waived due to inadequate briefing). And Defendants are wrong with respect to the two statements Defendant challenge in this regard. Statement 17 falsely implied KFM's volumes and petroleum products quality were not adversely impacting cash flows. The write down of KFM's EBITDA estimates by 50% just two months after the vote and the related price impact is clearly tied to the prior false statement about KFM's volumes and capabilities, *i.e.* the source of those cash flows. Statement 18 falsely stated that AMR had not had any change to its financial controls over financial reporting when in fact it was known to Defendants that AMH and KFM were using erroneous assumptions and financial practices that had tremendously inflated the company's goodwill and valuation. On its face the February 25, 2019 corrective disclosure that AMR had ineffective disclosures is plainly "related to" the prior misstatement. Of course, the jury may also conclude that the write-off of 50% of the KFM EBITDA estimates two months after the merger and the later write off of 80% of AMR's value (which Defendants admitted was because AMR's value at the time of the Proxy was overstated by $3.2 billion), are also directly tied to the existence of internal control weaknesses. And the jury can likewise reasonably conclude that the rampant

16

internal controls weaknesses were not "unrelated negative statements" as Defendants suggest because those weaknesses allowed the overstatement of value to exist throughout the class period.

Even if the AMR Director Defendants had challenged loss causation for the other misstatements they summarily list, which as noted they do not, it is clear that each and all of the misstatements detailed in the Complaint are sufficiently "related to" the corrective disclosures. *See, e.g.*, PX 385 at ¶¶ 280-308; Plaintiffs' Opposition to Defendants' Feinstein Daubert Motion, Dkt. 559 (which is incorporated by this reference and addresses loss causation on a statement-by-statement basis). *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256 (5th Cir.2009); *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 633–34 (S.D. Tex. 2022) ("disappointing production guidance" was related to misrepresentations that oil and gas company had remediated its environmental violations because its failure to remediate impeded its drilling); *Greenberg*, 364 F.3d at 669 (loss causation sufficiently pleaded where the corrective disclosure "concerned a significant *revenue* shortfall for [the company]'s third fiscal quarter," which related to the company's previous false statements about its third-quarter *earnings* (emphasis added)); *see also Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516, at *13 (S.D. Tex. Mar. 27, 2019) (revelation of lower than expected demand and revenue was related to company's fraudulent concealment of ***reasons behind*** that declining demand and revenue).

With respect to the second element of loss causation, Class Plaintiffs' expert, Dr. Feinstein, analyzed each corrective disclosure date and all Company news and concluded

that there was "no confounding information that contributed" to the price declines on all but one of the corrective disclosure dates. (PX 385 ¶¶ 280-308).[4] Even if there were confounding information that Dr. Feinstein did not consider – and Defendants point to none – this would just go "to the weight of the testimony and its credibility" and would not be a basis to grant summary judgment. *See S.E.C. v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *14–15 (N.D. Cal. July 29, 2010) ("While [a rebuttal expert] certainly may argue to the jury that [the other expert] did not reliably filter out other confounding variables that would have affected the stock price . . . he has not shown that [the expert's] opinion is so unreliable that it must be excluded."). Dr. Feinstein's methodology of considering confounding factors has been accepted by courts around the country, and Defendants do not attack it substantively. *See, e.g.*, *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *6 (N.D. Ill. Mar. 5, 2015) (denying motion to exclude Feinstein for a purported failure "to take into consideration confounding information"); *Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx), 2018 WL 4956520, at *4 (C.D. Cal. Oct. 5, 2018) (rejecting contention that Feinstein's "testimony is unreliable because he hasn't sufficiently connected the purported corrective disclosures to the decline in [the] stock price").

And, even without expert assistance, the jury could reasonably conclude that disclosures of oil production and earnings drastically below expectations "caused a

---

[4] Dr. Feinstein found that, on February 27, 2019, the market "overshot" and rebounded (arguably a form of "confounding" information), and his analysis adjusts the estimated damages accordingly. (PX 385 ¶¶ 301-302).

significant amount of the decline" in stock price that occurred immediately after the disclosures, or similarly that the sudden write-down of 80% of the company's value "caused a significant amount of the decline" in the subsequent 75% drop in AMR's stock price. *See Greenberg*, 364 F.3d at 663, 669 (significantly reduced revenue is "the type of negative information most likely to cause a sharp decline in stock price").[5]

## II.   THE AMR DIRECTORS ARE BOUND FOR TRIAL ON THE SECTION 20(a) CLAIMS

Section 20(a) imposes liability on "[e]very person who, directly or indirectly, controls any person liable for violations of the securities laws." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023). "The Fifth Circuit has found support for a control-person claim when the defendant's role gave him the power to control the fraudulent transaction or activity." *Carlton v. Cannon*, No. H-15-012, 2016 WL 3959164, at *5 (S.D. Tex. July 22, 2016). No showing of scienter, or even negligence, on the part of the Directors is required for these claims. *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 960 (5th Cir. 1981) (alleged control person has the burden "to establish that he did not act recklessly in inducing, either by his action or his inaction, the 'act or acts constituting the violation' of 10b-5").

---

[5] Defendants place undue reliance on *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 270 (5th Cir. 2007), *abrogated by Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011). That decision imposed a now-defunct requirement that plaintiffs prove loss causation by a preponderance of the evidence prior to trial. Even so, here Plaintiffs' expert conducted an event study, which the *Allegiance Telecom* Court opined would suffice to prove loss causation.

A.     **Six AMR Director Defendants Had Control of Silver Run II's (n/k/a AMR) Pre-De-SPAC Misstatements**

There is plainly sufficient evidence for the jury to find that the six AMR Directors (Hackett, Lapeyre, Leuschen, Gutermuth, Tepper and Walters) controlled the pre-De-SPAC entity and its misstatements.

The case for control against Hackett is overwhelming. Hackett was Silver Run's CEO, served on the Riverstone "SWOT team" that identified AMH and KFM as targets, conducted due diligence, and led months of negotiations culminating in the announcement of the transaction. (PX 362). Hackett even gave input into *AMH's* financial projections. (PX 275). Hackett then exercised control over the investor presentation and press release issued the same day. *See* PX 365 (Hackett: "Let me control presentation with Hal"); PX 367 (Hackett discussing how to present KFM projections in press release). *See Heck*, 773 F.3d at 284 (sustaining control-person claims against defendant who "contributed and approved the financial concepts detailed in the prospectus"). Hackett also controlled the challenged August 17, 2017 investor call statements, as he literally sat next to Chappelle and presented jointly while Chappelle and he issued falsehoods about the proposed combined Company. Indeed, Hackett took the misstatement a step ***further*** than Chappelle, stating that Alta Mesa was "currently doing" it's purported base case scenario of 12-14 wells per section, something it never attempted. (PX 285 at -420; PX 218 at 30:4-11). *See, e.g.*, *Trendsetter Invs., LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL 172627, at *27 (S.D. Tex. Jan. 18, 2007).

Defendants Lapeyre and Leuschen also had the ability to, and did, control the pre-De-SPAC false and misleading statements by Silver Run II and Hackett. *First*, by controlling Riverstone as the firm's co-founders and senior partners, Lapeyre and Leuschen controlled Riverstone and Hackett (Riverstone does not dispute it controlled Silver Run II or the Proxy). *Second*, Defendants Lapeyre and Leuschen were personally involved in founding Silver Run II and its decision to acquire AMH and KFM, as they led the Riverstone investment committee that approved it (PX 232 at 22:19-21; PX 265), oversaw due diligence and negotiations (PX 363; PX 270; PX 364; PX 262; PX 368), and selected consultants (PX 370). *Third*, Lapeyre and Leuschen personally contributed to the August 2017 releases containing the misstatements (PX 280). *See McNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 628, 639–41 (E.D. Tex. Mar. 18, 1999) (assistance or involvement in issuance of false press releases supports control person liability).

Finally, Riverstone's hand-picked directors, Gutermuth, Tepper, and Walters (along with Hackett), were the Board members of a SPAC with only three employees. Indeed, the Proxy declared that "***Silver Run is . . . managed by its board of directors***." (PX 104 at p. 5). These directors reviewed Riverstone's due diligence, proposed merger term sheets (PX 366; PX 240 at 75:9-76:12), and draft SEC filings. (PX 281). Critically, these AMR Directors also reviewed multiple drafts of the Proxy (PX 229 at 100:9-12; PX 240 at 98:13-25; PX 244 at 99:24-100:10) and permitted their names to be used in the false and misleading Proxy statement to state they are recommending the proposed transaction (PX 229 at 92:17-20, 129:15-20; PX 244 at 104:1-7). *See S.E.C. v. Hurgin*, 484 F. Supp. 3d 98, 117 (S.D.N.Y. 2020) (when individuals in the Proxy "hav[e] put their reputation in issue,

[they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names" (quoting *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 294 (S.D.N.Y. 2010))).

### B.   Each of the Seven AMR Director Defendants Had Control of AMR and Its Post-De-SPAC Misstatements and Omissions

#### 1.   The Form 10-K

Regarding the misstatements in the Form 10-K, if the AMR Directors are not found liable for the primary violations (*e.g.* if the jury does not find they acted with scienter), they may be, in the alternative, found liable for those same misstatements as control persons under Section 20(a). *See In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 211–12 (S.D.N.Y. 2006) (permitting plaintiffs to present theories of Section 20(a) and Section 10(b) liability in the alternative). Each moving Defendant signed Alta Mesa's Form 10-K, which is enough for a jury to find control over that statement. *See*, *e.g.*, *Enron*, 258 F. Supp. 2d at 598 (outside director who signed false registration statement was a control person) *see also* Dkt. 446 § III.

#### 2.   AMR's Other Post-De-SPAC Misstatements

The AMR Directors are also liable as control persons for the post-De-SPAC statements outside of the 2017 Form 10-K. Defendant Hackett was the Riverstone partner in charge of the AMR investment and AMR's Chairman of the Board.  Hackett also served as the head of midstream for the post-De-SPAC entity and later as interim CEO. Thus, Hackett had control by virtue of both his top-level position and day-to-day management.

*See G.A. Thompson*, 636 F.2d at 960 (defendant who owned 24 percent of the company's stock, was an officer and director of the company, and was involved in the day-to-day coordination of the company's business activities had control person liability).

Defendants Lapeyre and Leuschen also had sweeping control over AMR. As Riverstone brags in its separate motion, when the scheme collapsed, "Riverstone and its Board appointees applied 'overwhelming force into solving the issues.'" (Dkt. 518 at p. 11). Riverstone, Hackett, Lapeyre and Leuschen also took credit for removing the original AMR management team, installing Hackett as interim CEO, and appointing in their place a team from Meridian, an affiliated consulting firm. (PX 351). Riverstone and its three directors had the ability to bring such sweeping change by "overwhelming force" sooner but chose not to.

The AMR Directors also had control because they had the opportunity to review and comment on AMR press releases and other public statements in advance of them being publicly issued and could have – but chose not to – stop the false and misleading information statements from being issued. (PX 318). *See Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352, at *9 (N.D. Tex. Sept. 26, 2006) (finding control where defendants had "access to certain internal information" and "sufficient control over the information which was disseminated to the public and given to the SEC").

## C.   The AMR Directors' Good Faith Defense Is an Issue for the Jury

An alleged control person bears the burden "to establish that he did not act recklessly in inducing, either by his action or his inaction, the 'act or acts constituting the violation' of 10b-5." *G.A. Thompson*, 636 F.2d at 960. Whether someone acted with "good faith" is

inherently a fact issue. The AMR Directors point to their own self-serving testimony and purported reliance on outside consultants and auditors as well as corporate management.[6] But the record contains ample evidence that such reliance – even if it existed, which it demonstrably did not – was unreasonable and that the AMR Directors – with their collective decades of experience in the oil and gas industry – wholly failed to supervise the Company in a manner reasonably likely to prevent the gross securities violations committed under their watch. *See Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1120 (5th Cir. 1980) ("fail[ure] to establish, maintain, or diligently enforce a proper system of supervision and control" of the controlled person's activities is sufficient to show lack of good faith).

As detailed in Class Plaintiffs' Opposition to Dkt. 520 (Proxy Motion), Riverstone's due diligence was cursory. *See* PX 262 (Hackett refers to Riverstone's "light diligence" as "a weakness"); █████████████████████████████████████████████████ █████████████████████████████ PX 383 (Chappelle blamed Riverstone for failing to conduct KFM due diligence). Any reliance on TPH or Ryder Scott is similarly insufficient. *See* PX 244 at 54:6-10 (TPH's work was not really "due diligence," but "more valuation

---

[6] The AMR Directors' reference to the findings of KPMG's post-class period "lookback review" (Mot. at 10) should be disregarded for the reasons set forth in Class Plaintiffs' Motion to Strike and Exclude that exhibit which is incorporated by this reference. The AMR Directors' purported reliance on the opinions of auditors BDO and Withum (Mot. at 7-8) should also be disregarded because neither was included on their initial disclosures. *See* PX 359 (initial disclosures listing 67 individuals and entities with discoverable information but omitting BDO and Withum). *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . . .").

of the transaction"); PX 237 at 30:25-31:1; 168:10-169:18 (Ryder Scott's audit was based on 4 wells per section, not the 12 wells per section assumption).

Because the AMR Directors fail to carry their burden of establishing a good-faith defense, and because their proffer is contradicted by competent evidence, the jury must decide whether they acted at all times in "good faith."

## <u>CONCLUSION</u>

Class Plaintiffs request that the Court deny the AMR Directors' Motion (and the limited joinders thereto, Dkt. Nos. 531, 532) in their entirety.

Dated:  January 19, 2024                                   Respectfully submitted,


<u>/s/ Andrew J. Entwistle</u>

Andrew J. Entwistle (attorney-in-charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278

-and-

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7278

<u>/s/ Trig Smith</u>

Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
John Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN &
DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Court-Appointed Co-Lead Counsel*

*Court-Appointed Co-Lead Counsel*

Carol Villegas (*pro hac vice forthcoming*)
David Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust*

## GLOSSARY OF KEY TERMS, ENTITIES AND PERSONS

*In re Alta Mesa Resources, Inc. Securities Litigation*

| Term | Description |
|------|-------------|
| 12 WPS | 12 wells per section, the assumption in Alta Mesa's "base case" that it could drill twelve horizontal oil wells in each Section. |
| 250 MBO | 250,000 barrels of oil, the amount of oil Alta Mesa projected it could recover on average per well in its "base case". |
| Alta Mesa | Refers to AMR (post De-SPAC) and/or AMH (pre De-SPAC). |
| AMH | Alta Mesa Holdings, LP, the private pre-De-SPAC company. |
| AMR | Alta Mesa Resources, Inc., the publicly traded post-De-SPAC company. |
| ARM Energy | Defendant ARM Energy Holdings LLC. |
| Artificial Lift | The use of artificial means to increase the flow of liquids from an oil well. |
| Base Case | The drilling plan Alta Mesa presented starting in August 2017 where it would drill 12 wells per Section (four each in three Benches) and recover on average 250 MBO per well. |
| BCE or Bayou City | Defendant Bayou City Energy Management LLC. |
| Bench | A distinct horizontal layer of rock that Alta Mesa landed its horizontal wells in. |
| Bourque | Kevin Bourque, Vice President of Mid-Continent Operations at Alta Mesa. |
| Bullis-Coleman | A ten well pattern spacing test conducted by AMH that started producing in February 2017. |
| Business Combination or De-SPAC | The merger of Silver Run II with Kingfisher and AMH on February 9, 2018. |
| CAO | Chief Accounting Officer. |
| Central Area | Alta Mesa's acreage within Township 17N, as depicted in PX 204 paragraph 23. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |

| Term | Description |
|---|---|
| Chappelle | Moving Defendant Hal Chappelle, CEO of AMH and CEO of AMR until December 2018. |
| Child Well | Subsequent wells drilled in a Section surrounding the initial Parent Well. |
| Christopher | Michael Christopher, CFO at ARM Energy during the relevant period. |
| Citi | Citigroup Global Markets Inc., financial advisor to Silver Run II. |
| Class Period | August 16, 2017 to May 17, 2019. |
| Class Plaintiffs | Plaintiffs in the TAC and Court-appointed Class Representatives (Dkt. 241): FNY Partners Fund, LP, FNY Managed Accounts, LLC, Paul J. Burbach and United Association National Pension Fund (formerly Plumbers and Pipefitters National Pension Fund) and Camelot Event Driven Fund, a Series of Frank Funds Trust. |
| Coats | Moving Defendant Stephen Coats, former General Counsel at Riverstone and Corporate Secretary of Silver Run II prior to the De-SPAC. |
| Cole | Homer "Gene" Cole, Chief Technology Officer and a VP at Alta Mesa until December 2018. |
| Collins | Craig Collins, VP and COO of KFM from April 2018 to April 2019. |
| Complaint or TAC | Third Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 6, 2021 (Dkt. 218). |
| COO | Chief Operating Officer. |
| Defendants | The defendants named in the Third Amended Complaint. |
| Dimitrievich | Defendant Donald Dimitrievich, former managing director and head of the Energy and Power team at HPS. |
| Downspacing | The drilling of additional wells in an already developed area. |
| E&P | Exploration & Production, the "upstream" portion of the oil and gas industry. |
| Ellis | Moving Defendant Mike Ellis, COO and founder of AMH and later AMR until December 2018. |

| **Term** | **Description** |
|---|---|
| ESP | Abbreviation for "electrical submersible pump," an artificial-lift method for lifting fluids from wellbores. |
| EUR | Abbreviation for "Estimated Ultimate Recovery," meaning the total quantity of oil and/or gas that has already been recovered from a producing well plus the amount of oil and/or gas that is estimated to be commercially recoverable over the rest of the life of the well. |
| Exchange Act | The Securities and Exchange Act of 1934. |
| Gutermuth | Moving Defendant William Gutermuth, a director of Silver Run and AMR until June 2018. |
| Hackett | Defendant James Hackett, a Riverstone Partner, CEO and Chairman and the Board of Silver Run II prior to the De-SPAC, Executive Chairman of the Board of Directors of AMR, head of the AMR midstream business (KFM), and later interim CEO of AMR. |
| High Mesa | High Mesa, Inc., a now bankrupt entity owned by BCE, HPS and AM Management that prior to the De-SPAC owned AMH and approximately one-third of Kingfisher. |
| HPS | Defendant HPS Investment Partners, LLC. |
| Interference | The phenomenon in which wells drilled close to each other drain a shared reservoir, resulting in lower recoveries per well. |
| KFM or Kingfisher | Kingfisher Midstream LLC, a midstream company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers that combined with AMH and Silver Run II in the De-SPAC. |
| KPMG | AMR's auditor starting in June 2018. |
| Lapeyre | Moving Defendant Pierre Lapeyre, Jr., a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| Leuschen | Moving Defendant David Leuschen, a co-founder and senior partner at Riverstone and director of AMR post-De-SPAC. |
| MBO | Acronym for thousand barrels of oil. |
| MBOE | Acronym for thousand barrels of oil equivalent. |
| MMBOE | Acronym for millions of barrels of oil equivalent. |

3

| **Term** | **Description** |
|---|---|
| McCabe | Michael McCabe, Chief Financial Officer of Alta Mesa Holdings (AMH) and Alta Mesa Resources (AMR). |
| McMullen | Defendant William McMullen, founder and Managing Partner of Defendant BCE. |
| Meramec | One of the two STACK horizontal rock layers that Alta Mesa planned to target in its base case development plan. |
| Meridian | A consulting group under the Riverstone umbrella that Riverstone paid in the fall of 2018 to review Alta Mesa's production data. |
| Microseismic Testing | A technique that uses fracturing or water-injection-induced microseismic phenomena similar to natural earthquakes but with low intensities during reservoir fracturing or water injection operations to monitor fracture activities and flow mobilities in oil-producing or gas-producing pays. |
| Midstream | The portion of the oil and gas industry that links upstream (exploration and production) and downstream (post-production), including the storage, processing, and transportation of petroleum products. |
| Moving Defendants | "Moving Defendants" refers to the defendants that filed the motion being opposed (variously, Defendants Riverstone, AMR, Chappelle, Ellis, Smith, Coats, Walker, Lapeyre, Leuschen, Gutermuth, Tepper, Walters and Sinclair). |
| Osage | One of the two STACK horizontal layers that Alta Mesa planned to target in its base case development plan. |
| Parent Well | The initial well drilled by an operator in a section. |
| Pressure Tests | A test of reservoir pressure of a well over time.. In the case of multi-well drilling, pressure depletion of an initial well following bringing a nearby well online indicates that the new, nearby well is spaced too tightly to the initial well and draining the same reserves. |
| Proxy | The Definitive Merger Proxy Statement issued to Silver Run II's shareholders on Schedule 14A, dated January 19, 2018, and all supplements and amendments thereto.  The Proxy is PX 104 attached to Dkt. 444. |

| Term | Description |
|------|-------------|
| PX 1 to PX 202 | Exhibits attached to Dkt. 444, the September 21, 2023 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to Motion for Summary Judgment By (A) Defendants HPS Investment Partners, LLC, ARM Energy Holdings LLC, and Bayou City Energy Management LLC (Dkt. 423); (B) Defendant Donald Dimitrievich (Dkt. 422) and (C) Defendant William McMullen (Dkt. 427). |
| PX 203 to PX 395 | Exhibits attached to Dkt. 569, the January 19, 2024 Declaration of Andrew J. Entwistle in Support of Class Plaintiffs' Oppositions to (a) Defendants Riverstone Holdings LLC's, Stephen Coats', and Thomas Walker's Motion for Summary Judgment and Incorporated Memorandum of Law as to Plaintiffs' Section 20(a) Claim (Dkt. 518); (b) Proxy Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 14(a) and 20(a) Claims (Dkt. 520); (c) Alta Mesa Resources, Inc., Chappelle, Ellis, and Smith's Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 523); and (d) AMR Directors' Motion for Summary Judgment and Incorporated Memorandum of Law on Plaintiffs' Section 10(b) and 20(a) Claims (Dkt. 526). |
| Riverstone | Moving Defendant private equity firm Riverstone Holdings, LLC and its affiliates Riverstone Investment Group LLC and Riverstone VI SR II Holdings, LP. |
| RSH | Refers to Riverstone Holdings, LLC. |
| Ryder Scott | Alta Mesa's oil reserve auditor. |
| Section | A 640-acre (one square mile) land area established by the State of Oklahoma. |
| Schlumberger | An oil and gas services company that performed various technical studies for Alta Mesa. |
| Sheils | Tamara Sheils (formerly Alsarraf), a senior financial analyst at Alta Mesa. |
| Silver Run II, Silver Run or SR II | The SPAC created by Riverstone that merged with KFM and AMH. |
| Sinclair | Moving Defendant Donald Sinclair, a director of AMR following the De-SPAC. |

| **Term** | **Description** |
|---|---|
| Smith | Moving Defendant Ronald Smith, Chief Accounting Officer at AMR for a portion of the relevant record. |
| SPAC | Acronym for "special purpose acquisition company," also called "blank check" company. |
| Sponsor Shares | Stock of the SPAC that are "sold" to the SPAC sponsor for a nominal fee (here, less than one cent per share). Also called founder shares. |
| STACK | Abbreviation for the oil exploration area in Oklahoma where AMH, KFM and AMR were focused. |
| Tepper | Moving Defendant Jeffrey Tepper, a director of Silver Run II and AMR. |
| TPH | Tuder, Picking, Holt & Co., a Silver Run II financial advisor for the Business Combination. |
| Tracer Tests | Tests used in the oil industry in order to gauge how fluid flows through the reservoir that are useful to detect and evaluate communication/interference among wells. |
| Turner | Tim Turner, VP of Corporate Planning and Reserves and later VP of Corporate Development. |
| Type Curve | A model of oil and gas production, including rate and EUR, of future wells based on a statistical average of similar wells. |
| Upstream | The portion of the oil and gas industry focused on identifying, extracting, and producing hydrocarbons. |
| Walker | Moving Defendant Thomas Walker, former CFO of Riverstone and CFO of Silver Run II prior to the De-SPAC. |
| Walters | Moving Defendant Diana Walters, a director of Silver Run and AMR. |
| W.D. Von Gonten | Petroleum engineering consultant. |
| Widell | Chris Widell of Sponte Resources, a consultant that conducted due diligence of AMH for Riverstone. |
| WPS | Wells per Section. |

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served under seal via the Court's ECF system, and a copy has been served via email to counsel for all parties on January 19, 2024.


*/s/ Andrew J. Entwistle*
Andrew J. Entwistle