# EXHIBIT 5

112

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   LAWRENCE E. JAFFE PENSION PLAN, )
     on behalf of itself and all     )
 4   others similarly situated,      )
                                     )
 5               Plaintiffs,         )
                                     )
 6    v.                             )  No. 02 C 5893
                                     )
 7   HOUSEHOLD INTERNATIONAL, INC.,  )
     et al.,                         )  Chicago, Illinois
 8                                   )  May 23, 2016
                 Defendants.         )  1:30 p.m.
 9

10          TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE JORGE L. ALONSO
11

12   APPEARANCES:

13   For the Plaintiffs:          ROBBINS GELLER RUDMAN & DOWD LLP
                                  BY:  MR. MICHAEL J. DOWD
14                                     MR. SPENCER A. BURKHOLZ
                                       MR. DANIEL S. DROSMAN
15                                     MR. LUKE O. BROOKS
                                       MS. HILLARY B. STAKEM
16                                661 West Broadway
                                  Suite 1900
17                                San Diego, California  92101
                                  (619) 231-1058
18
                                  ROBBINS GELLER RUDMAN & DOWD LLP
19                                BY:  MS. MAUREEN E. MUELLER
                                  120 East Palmetto Park Road
20                                Suite 500
                                  Boca Raton, Florida  33432
21                                (561) 750-3000

22                                MILLER LAW LLC
                                  BY:  MR. MARVIN ALAN MILLER
23                                115 South LaSalle Street
                                  Suite 2910
24                                Chicago, Illinois  60603
                                  (312) 332-3400
25
```

Nancy C. LaBella, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1222
Chicago, Illinois  60604
(312) 435-6890
Nancy LaBella@ilnd.uscourts.gov

```
 1   APPEARANCES:  (Continued)

 2   For the Defendant              SKADDEN ARPS SLATE MEAGHER & FLOM,
     Household:                     LLP
 3                                  BY:  MR. PATRICK J. FITZGERALD
                                         MR. R. RYAN STOLL
 4                                       MS. DONNA L. McDEVITT
                                         MR. ANDREW J. FUCHS
 5                                  155 North Wacker Drive
                                    Suite 2700
 6                                  Chicago, Illinois  60606
                                    (312) 407-0700
 7
                                    WILLIAMS & CONNOLLY LLP
 8                                  BY:  MR. DANE H. BUTSWINKAS
                                         MR. STEVEN M. FARINA
 9                                       MS. AMANDA M. MacDONALD
                                         MS. LESLIE C. MAHAFFEY
10                                  725 Twelfth Street, N.W.
                                    Washington, D.C.  20005
11                                  (202) 434-5000

12   For the Defendant              KATTEN MUCHIN ROSENMAN LLP
     Aldinger:                      BY:  MR. GIL M. SOFFER
13                                       MS. DAWN MARIE CANTY
                                    525 West Monroe Street
14                                  Chicago, Illinois  60661
                                    (312) 902-5200
15
     For the Defendant              McDERMOTT WILL & EMERY, LLP
16   Gilmer:                        BY:  MR. DAVID S. ROSENBLOOM
                                    227 West Monroe Street
17                                  Chicago, Illinois  60606
                                    (312) 984-7759
18
     For the Defendant              JACKSON WALKER LLP
19   Schoenholz:                    BY:  MR. TIM S. LEONARD
                                    1401 McKinney Street
20                                  Suite 1900
                                    Houston, Texas  77010
21                                  (713) 752-4439

22

23

24

25
```

1    THE CLERK:  02 C 5893, Jaffe v. Household.

2    MR. DOWD:  Good afternoon, Your Honor.  Michael Dowd.

3  And I have with me my partners again, Spence Burkholz, Dan

4  Drosman, Luke Brooks, Maureen Mueller, and also Hillary Stakem

5  of our office; and Marvin Miller of the Miller Law firm for

6  the plaintiffs.

7    MR. STOLL:  Good afternoon, Your Honor.  Ryan Stoll

8  on behalf of Household, my colleague Pat Fitzgerald.  And then

9  we also have at counsel table as we did on Wednesday, Steve

10  Farina, Amanda McDonald, Dean Butswinkas, and Leslie Mahaffey.

11    MR. BUTSWINKAS:  Good afternoon, Your Honor.

12    THE COURT:  Good afternoon.

13    MR. SOFFER:  Good afternoon, Your Honor.  Gil Soffer.

14  I'm here with Dawn Canty.  We're here on behalf of William

15  Aldinger.

16    MR. LEONARD:  Your Honor, Tim Leonard, Jackson

17  Walker, on behalf of David Schoenholz.

18    MR. ROSENBLOOM:  Good afternoon, Your Honor.  David

19  Rosenbloom on behalf of defendant Gilmer.

20    THE COURT:  Thank you.

21    It's come to my attention that the parties have been

22  conferring and trying hopefully to resolve some issues.

23    MR. DOWD:  Yes, Your Honor.  First, thanks for the

24  time this morning.  We appreciate it.  Hopefully it will be

25  helpful.

01:36:04

1   We've reached certain agreements between the parties

2   regarding the evidence and the scope of the trial.

3   And we've also reached an agreement on a joint

4   statement of the prior proceedings based on the version that

5   the Court handed down.  I'll try to be brief.  We have to have

6   these documents cleaned up, Your Honor, because no one had a

7   chance to go back to their office.

8   But basically the agreement overall regarding the

9   evidence and the scope of the trial, there's going to be an

01:36:19

10  agreement with respect to joint and several liability by

11  Household, Aldinger, and Schoenholz.  Mr. Gilmer is going to

12  agree to a -- to be severally liable for 2 percent of any

13  judgment but only if he's found liable because he's only in on

14  the March 23rd statement.  And then there will be no other

01:36:46

15  adjudication of fault or an allocation of fault by the jury at

16  the trial.

17  That said, we've, as I said earlier, agreed on a

18  statement of the case, which I think we can actually hand up

19  to the Court; but it may be better to wait until later this

01:37:00

20  afternoon so everybody is on the same page.  But that's done.

21  And it also has an exhibit attached to it with the false

22  statements.

23  THE COURT:  And that reflects the now narrower scope?

24  MR. DOWD:  Yes, Your Honor.  The scope is -- no, the

01:37:15

25  scope is dictated in the agreement regarding the evidence.

01:37:36

1   And basically the way it's going to work, Your Honor, with the

2   Court's permission obviously, the parties have agreed that

3   plaintiffs will only call I believe it's four witnesses,

4   Ghiglieri, Devor, who were two of the experts, Mr. Streem, if

5   we so choose, and our loss causation expert, Mr. Fischel.  And

6   we can also play the deposition testimony of Chuck Cross.

7        So there were basically about five witnesses that we

8   were going to call.  There are limitations on the scope of

9   those -- at least on the scope of Mr. Devor and

01:38:01

10  Ms. Ghiglieri's testimony that's documented in this agreement

11  which we will give to the Court later today or first thing

12  tomorrow.

13       The defendants are going to be calling their loss

14  causation experts, Ferrell and Cornell.  They're also allowed

01:38:17

15  to call Mr. Streem if we don't call him in our case.  And

16  there may be a necessity to play the deposition of Dennis

17  Hueman if certain evidence -- if we choose to use certain

18  evidence, in particular the Hueman video, they'd be allowed to

19  play his deposition designations.

01:38:41

20       There are limits, as I said, on Ghiglieri and Devor

21  as to the scope of their testimony that the parties have

22  stipulated to.  Issues with respect to the witnesses Bajaj and

23  Glickenhaus, those are to be decided by the Court.  There's no

24  agreement on them.  There's motions in limines that are

01:39:01

25  directed at both of those witnesses.

1     We've agreed on the exact testimony of Mr. Cross that

2  will be played by deposition, so there's no more dispute as to

3  that.  There is no other deposition testimony that will be

4  played.

01:39:16   5     We reached agreements, Your Honor, about the

6  categories of evidence that we discussed last Wednesday in

7  connection with defendants' motion in limine No. 1.  And

8  essentially, Your Honor, there are -- there's probably one or,

9  I guess, maybe two of your rulings where we made slight tweaks

01:39:37   10  to the Court's initial ruling; but we'll give you -- that to

11  the Court.  I mean, it basically just sets out which

12  categories are in and which categories are out and --

13          THE COURT:  By agreement of the parties?

14          MR. DOWD:  By agreement of the parties, Your Honor.

01:39:53   15          MR. FARINA:  It's a little more extensive than that,

16  but we'll provide an order.  Certain categories, A, C, and H,

17  which previously had not been excluded are now being excluded

18  by agreement.  And as to category E, which had been excluded,

19  we've agreed on a carve-out that allows some of those

01:40:14   20  documents to be used for certain purposes.  But, again, we'll

21  provide all of this in an order for Your Honor.

22          MR. DOWD:  And then there's some other -- there's

23  some issues with respect to some of defendants' exhibits.  But

24  that's also laid out in here in this same paragraph of the

01:40:29   25  agreement as to certain documents that they want to use with

01:40:51

01:41:23

01:41:30

01:41:48

01:42:05

1    Professor Fischel that we would object to.

2           There's also, Your Honor, an agreement about, you

3    know, hearsay, relevance, authenticity, foundation of any

4    documents that were used in the first trial.  It's a very

5    specific agreement where defendants won't be able to object as

6    to certain very broad categories of documents with respect to

7    those issues.  And obviously that's -- you know, it's more

8    detailed than that.

9           There are some exceptions, if a party opens the door,

10   that some evidence can come in, but I guess we'll all cross

11   that bridge when we come to it.

12          And then there are some specific provisions with

13   respect to some of the loss causation experts as to at least

14   one category of the documents that we agreed to exclude

15   generally.  You can question the loss causations about it --

16   experts about it to the extent it goes to loss causation.  In

17   particular, it's really the settlement documents, Your Honor,

18   because some of those related to loss causation, at least in

19   our view.  And so even though, generally, we're not putting in

20   most of those documents, to the extent it's relevant to a loss

21   causation expert, it could be used.  But, again, that's --

22   there's a very specific agreement with respect to that that,

23   you know, the parties have entered into.

24          So that's, I believe, the bulk of the agreement, Your

25   Honor.

1            THE COURT: It sounds like I can anticipate a joint

2 filing then --

3            MR. DOWD: Yes, Your Honor.

4            THE COURT: -- documenting all of these agreements?

01:42:14   5            MR. FARINA: Yes, Your Honor.

6            MR. DOWD: Yes. Again, we appreciate all the time

7 this morning. There's a lot of -- every time you change one

8 paragraph, another one changes.

9            THE COURT: Well, what do the parties suggest in

01:42:23 10 terms of how to proceed today? Obviously I had one plan in

11 mind; but much of what was going to be decided changes now

12 with the parties' agreement, which I'm still not completely

13 aware of.

14            MR. FARINA: There are --

15            MR. DOWD: I think that's right. There's still -- go

16 ahead.

17            MR. FARINA: There are some motions in limine that I

18 think are still alive. But we have, I think, pretty

19 significantly resolved a number of the open disputes. This

01:42:51 20 agreement will result in the trial involving roughly half the

21 witnesses that might have otherwise testified and it removes

22 allocation, proportionate fault, as a disputed issue. We

23 think this will significantly reduce the amount of time that

24 will be needed for the trial.

01:43:09 25            The parties have discussed a maximum amount of time

1    that they would split, obviously subject to Your Honor's

2    approval; but we think this is now a two-week trial at most.

3    And our thought was to come up with a budget to split that

4    between the two of us based on obviously your approval and our

01:43:31    5    ability to get that done.  We were thinking we would split

6    60 hours, and that that would be over two weeks.

7         MR. DOWD:  That's correct, Your Honor.  And whether

8    it goes that long or not, I don't know.  It's just that we've

9    been working on this all weekend, and I haven't had time to

01:43:48    10    sit down and count up hours.

11         THE COURT:  So the parties will contemplate whether

12    they want to go into an agreement like that.  If they want to,

13    that is fine.  The only downside in my experience is that both

14    sides then think they must use all 30 hours.  So there's no

01:44:02    15    confusion there, it's not an order that you use 30 hours,

16    right?

17         The other thing is that we won't be able to monitor

18    it.  Ms. LaBella does an amazing job.  She timestamps every

19    tenth line, so the parties will have that information so that

01:44:18    20    you don't have to have someone dedicated specifically to

21    keeping time.  But the parties will be in charge and hopefully

22    the parties will agree as to the time.

23         MR. DOWD:  We'll work on it each day, Your Honor.  We

24    had somebody who did it at the last trial and, frankly, he's

01:44:30    25    just not very good at it, but we'll probably have him do it

1    again.

2           THE COURT:  So, Mr. Dowd, what do you suggest?  Do

3    you suggest, just to make sure that we're all on the same

4    page, that I go forward with the plan?  In other words, we

01:44:45    5    start with plaintiffs' No. 3 motion in limine and then we

6    discuss on the record whether there's still a need to go into

7    it and in that way make sure that we don't miss anything?

8           MR. DOWD:  I think that makes sense, Your Honor.  I

9    think like, for example, on motion in limine No. 3, I think

01:44:58    10    there may only be one or two issues that are left in it as I

11    understand it.  And my partner, Maureen Mueller, is going to

12    address that.  But I believe most of that's been resolved.

13           MR. FARINA:  I think Your Honor has it right.  I

14    think we should just march through them and the parties can

01:45:22    15    provide the information to the Court as to what, if anything,

16    still remains.

17           THE COURT:  All right.

18           MR. DOWD:  I guess the only other suggestion I would

19    have, Your Honor, is -- I don't know if the Court had wanted

01:45:32    20    to address some of the issues like the verdict form at this

21    stage or whether that's something the Court wanted to do later

22    as to -- that's something that could be probably moved back.

23    But that's my only thought in terms of --

24           THE COURT:  Let me tender a couple of documents.

01:46:03    25    Here's a copy for the parties of the proposed instruction in

1    lieu of plaintiffs' jury instruction No. 18.

2         And here are multiple copies of a suggested or

3    proposed verdict form.

4     (Tendered.)

01:47:35  5         THE COURT:  And we'll talk about those things as we

6    get to them and the parties will have a little bit of time at

7    least to peruse.  Both of those documents are efforts to find

8    a middle ground between what the parties have suggested.

9         All right, let's go to plaintiffs' motion in limine

01:48:10  10    No. 3.  And, counsels, you were about to say last week for the

11    record?

12         MS. MUELLER:  Good afternoon.  Maureen Mueller on

13    behalf of plaintiffs.

14         I think at this point, Your Honor, given that the

01:48:23  15    parties have reached an agreement on the scope of some of the

16    other evidence, there's really just only one issue remaining

17    in plaintiffs' motion in limine No. 3.  And this is evidence

18    regarding a settlement between Lexecon and a firm called

19    Milberg Weiss.  And defendants have said that they may

01:48:37  20    potentially seek to introduce evidence of the settlements in

21    the event that the Court allows plaintiffs to introduce

22    evidence of the accolades defendants' prior counsel bestowed

23    on Fischel at the last trial and the fact that defendants

24    tried to hire Professor Fischel.  That's the subject of

01:48:56  25    defendants' motion in limine No. 4, which we've opposed.

1    THE COURT:  So what's the relationship between the

2    two?  My inclination is to grant the motion to bar both;

3    counsel's complimentary questions, as well as the fact that

4    defense wanted to hire Fischel.  So if that's the case, if

01:49:13    5    that is kept out, then what happens to the Lexecon and Milberg

6    Weiss settlement?

7    MS. MUELLER:  Sure.  My counsel is going to be

8    addressing defendants' motion in limine No. 4.  But

9    plaintiffs' position is that even if that motion were denied,

01:49:30    10    evidence regarding settlement between Lexecon and the Milberg

11    Weiss firm is not relevant to any of the issues that will be

12    retried.  Defendants say it's relevant to establish bias.

13    But, again, even if the motion in limine No. 4 is

14    denied, we think it has no place in this courtroom in the

01:49:49    15    retrial.  There's a couple of inaccuracies in defendants'

16    characterization of that settlement.  First, the Milberg Weiss

17    firm no longer represents plaintiffs in this case and hasn't

18    since 2004.  Lexecon didn't settle with the firm that

19    represents plaintiffs in this case.  And so really it's clear

01:50:05    20    that the only purpose of this evidence, Your Honor, is an

21    attempt to prejudice plaintiffs and plaintiffs' counsel in

22    this particular case.

23    You know, the argument with respect to bias, it

24    honestly just doesn't make sense because, if anything, a

01:50:21    25    settlement between Lexecon and the Milberg Weiss firm would

1    demonstrate bias against that firm, not bias in its favor.

2          THE COURT:  This was three years before this case was

3    filed, wasn't it?

4          MS. MUELLER:  I think that the Lexecon/Milberg Weiss

01:50:35   5    settlement is a 20-year old case is my understanding.  So

6    evidence about that 20-year old case, as I said, is clearly

7    intended just to prejudice plaintiffs and the class and

8    plaintiffs' attorneys in this case.  It has no relevance of

9    demonstrating bias.  There's no probative value.  And even if

01:50:51   10   there was some limited probative value, it's substantially

11   outweighed by unfair prejudice to plaintiffs.  This evidence

12   was actually barred at the last trial.  And counsel for

13   defendants should be instructed not to raise the issue in

14   front of the jury again in this trial.

01:51:09   15         THE COURT:  Thank you.

16         Counsel?

17         MS. MacDONALD:  Good afternoon, Your Honor.  Amanda

18   MacDonald for the defendants.

19         We agree with your instincts, Your Honor, that

01:51:15   20   neither this nor counsel's comments about Professor Fischel

21   belong in the record and belong in front of the jury.  We

22   think neither has any relevance whatsoever.  However,

23   obviously we reserve the position, which is that if theirs

24   comes in -- if they are able to stand up and talk about what

01:51:32   25   defense counsel said in his examination of Professor Fischel,

1  which has been mischaracterized but we'll discuss it later,

2  and the fact that counsel reached out to Professor Fischel

3  merely to clear conflicts, if they're allowed to inject that

4  into the settlement, they are putting squarely at issue why

01:51:47  5  Professor Fischel has been retained and why he was retained by

6  plaintiffs and why he chose to work for plaintiffs.  If that

7  is the case -- and that was not at issue in the first trial;

8  it is now squarely at issue.  And for that reason, we believe

9  that if it is allowed to come in over our objection, we think

01:52:02  10  it only fair that we be permitted to inform the jury about the

11  settlement.

12  To the extent that the bias goes the other way,

13  respectfully we disagree; but, in any event, that's something

14  for the jury to decide.  We just don't think it's -- it's

01:52:15  15  irrelevant as they say.

16  THE COURT:  So as to plaintiffs' No. 3, the only part

17  that I am ruling on is the motion to bar evidence of the

18  settlement.  And that motion is going to be granted.  I do

19  believe that it does have some probative value.  But I think

01:52:32  20  that under 403, it is appropriate to bar that and exclude that

21  from the evidence.  And that was -- I'm being told -- and that

22  does sound correct -- that it did not come in at the last

23  trial?

24  MS. MUELLER:  That's correct.  And that's docket

01:52:49  25  No. 1505.

1          THE COURT:  So that motion is granted.

2          MS. MacDONALD:  Your Honor, one other point that I

3     believe we have not worked out on that motion is the issue of

4     communication with witnesses.  I believe -- correct me if I'm

01:53:00    5     wrong -- that plaintiffs' position is that counsel cannot

6     communicate with the witness the entire time they're on the

7     stand; whereas, what we had put in our papers, which we

8     submitted is the more regular practice, which is that --

9          THE COURT:  The parties -- I'm sorry.  The parties

01:53:13   10     have worked out many more complicated issues, much more

11     complicated than this.  I'm going to ask the parties to get

12     together and decide here -- the parties are very close to

13     being on the same page and I'm going to ask you to --

14          MS. MacDONALD:  Okay.

01:53:26   15          THE COURT:  -- confer again on that issue and come up

16     with an agreement as, again, the parties are very close in

17     terms of their positions.  We're talking about motions to

18     exclude and what contact counsels can have with witnesses,

19     both expert and non-expert.

01:53:45   20          MS. MacDONALD:  Yes.

21          THE COURT:  So I have no doubt the parties will be

22     able to come to an agreement there.  And it is a somewhat

23     minor issue.

24          Next we go to 4 and --

01:53:57   25          MR. FITZGERALD:  Good afternoon, Your Honor.

1        THE COURT:  Mr. Fitzgerald.

2        MR. BROOKS:  Good afternoon, Your Honor.

3        THE COURT:  Good afternoon.

4        MR. BROOKS:  So motion in limine No. 4, Judge, is in

01:54:07    5  some ways corollary to our Daubert motion.  There are some

6  differences.  The first part of motion in limine No. 4 asks

7  the Court to exclude testimony or evidence concerning

8  allegedly company-specific, non-fraud information that

9  purportedly distorted Professor Fischel's leakage and specific

01:54:29   10  disclosures models.  My hunch, Your Honor, is that that's

11  covered by the Court's Daubert order, even though there are

12  some differences.  But I'm happy to argue it if it's not.

13        MR. FITZGERALD:  And, Your Honor, I think I share

14  Mr. Luke's hunch.  And we think it should come out the same

01:54:47   15  way Your Honor's ruling on the Daubert motion came out and

16  that you should deny that relief.

17        THE COURT:  I agree.  Over objection, obviously, that

18  is denied, the first part of plaintiffs' fourth motion in

19  limine.

01:55:00   20        MR. BROOKS:  The second portion has not been

21  resolved, Your Honor.  It's to exclude testimony or argument

22  that Professor Fischel's leakage model was not a valid method

23  for quantifying artificial inflation.  This motion is based on

24  challenges that were made, both in the district court at trial

01:55:20   25  and some of them were made on appeal and rejected and others

1    were not made on appeal and therefore waived.

2          So there are four categories basically; that the

3    leakage model does not comport with academic literature; that

4    it violates accepted economic standards; that it improperly

01:55:42  5    includes net inflation from both the days on which there was

6    no statistically significant stock price decline and days on

7    which there were; and that it uses the wrong peer index.

8          And all of those issues, Your Honor, were either

9    litigated before the jury or presented to the Seventh Circuit.

01:55:58  10    For example, the peer group issue was litigated in front of

11    the jury the first time and was not the basis for their

12    appeal.  The Seventh Circuit law is clear that having not

13    raised it on appeal, they can't raise it back on the remand on

14    a different issue.  And as the Court knows, the remand was on

01:56:16  15    the issue of company-specific, non-fraud information; and they

16    did not challenge the peer groups on the appeal.

17          The same is true for the violation of economic

18    standards, or similar.  They criticized Professor Fischel's

19    reliance at the first trial on the leakage model.  They also

01:56:35  20    submitted Professor Cornell's declaration to the Seventh

21    Circuit and argued expressly to the Seventh Circuit that

22    Professor Fischel's model did not comport with accepted

23    economic standards.  And that argument too was rejected by the

24    Seventh Circuit.

01:56:54  25          The same as -- you know, does not comport with

academic literature is very similar, Your Honor.  So these

propositions, which they have experts planning to testify

about, should not be in play under the law of the case.  We

cited the Heller case, Judge, where, you know, there was an

01:57:16  appeal; issues weren't raised; there was a remand.  And on

remand, the district court and the finder of fact is not

permitted to address those issues because that was not the

basis for the remand.

So that's the gist of it, Your Honor.

01:57:32  THE COURT:  So, counsel, what is fair game then?

They can inquire about whether it does adequately quantify

inflation because it does not adequately account for the

impact of company-specific, non-fraud disclosure?  That

obviously is fair game?

01:57:58  MR. BROOKS:  That's fair, Your Honor.

THE COURT:  And, again, give me the argument on the

wrong peer index.

MR. BROOKS:  Well, the wrong peer index, Judge, was

something that Dr. Bajaj raised in his prior trial testimony.

01:58:10  And I don't believe that they appealed on the peer index, Your

Honor.  They may have appealed indirectly on that issue, in

sort of encompassing that in their argument that the leakage

model itself should be rejected.  But they never criticized

the peer index itself to the Seventh Circuit.

01:58:26  And the Seventh Circuit upheld the model.  It said,

01:58:47

1    essentially, the model works to account for a company -- or

2    for industry and market factors, but it only goes so far.  And

3    in combination with the model, you need an economic expert to

4    apply his expertise -- in this case it was Professor

5    Fischel -- to account for company-specific, non-fraud

6    information.  And the court held he didn't do it well enough

7    or he didn't explain enough to the first jury.  And that was

8    the purpose of the remand.

01:59:01

9          But the peer index and the peer group had nothing to

10   do with that appeal.  If it did, Judge, it was implicitly

11   rejected, as the Court I think found on Wednesday, by the

12   Seventh Circuit's finding that the regression accounted for

13   market and industry factors.

01:59:19

14         So either way, either they raised it and it was

15   rejected or they didn't raise it and it was waived, but for

16   this trial, it's off the table.

17         MR. FITZGERALD:  And, Your Honor, I think we couldn't

18   disagree more.  In effect, the plaintiffs are seeking a

19   directed verdict.  Let me look at the legal issue first.

01:59:33

20         As is made clear in Manpower, the decision as to

21   whether an index appropriately accounts for the relevant

22   information is a jury question.  You can't appeal -- we didn't

23   appeal as a matter of law.  We're not saying to the Court that

24   because Professor Fischel used two particular indices, his

01:59:48

25   models should be thrown out as a matter of law.  But the

1    Seventh Circuit remanded on the issue of loss causation.  They

2    said it three times, the issue of loss causation goes back.

3    Jury -- whatever the jury found gets redone.  It's a matter of

4    fact whether or not the jury believes that the plaintiffs meet

02:00:07    5    their burden of showing that Professor Fischel's model

6    appropriately calculates inflation.  To say that we can't

7    challenge that is to direct a verdict in this case.  And I

8    think -- so that's the first point, Your Honor.

9         We cannot have waived something we challenged on

02:00:27    10   appeal.  The fact when a court reverses and says go back for a

11   new trial, you don't waive factual issues.  We're going back

12   and trying the factual issue, whether or not Professor

13   Fischel's model accurately accounts for inflation.

14        I think, Your Honor, there's also a separate

02:00:39    15   confusion here about what firm specific means.  But maybe we

16   can address the first issue first.

17        This is not law of the case, Your Honor.  If there

18   was a bank robbery and the case was sent back to the Court,

19   the fact that someone didn't appeal the identification of a

02:00:52    20   witness by a teller at the bank saying that's "the person"

21   doesn't mean it goes back to that Court to try with an

22   instruction to the jury that they should assume that the

23   eyewitness ID was correct.

24        We challenged the appeal.  The Seventh Circuit sent

02:01:04    25   it back on the entire issue of loss causation.  The separate

1    issue of what Your Honor should do as a predicate for Daubert

2    to satisfy yourself doesn't change the fact that before the

3    jury loss causation is an issue and, under Manpower, the

4    selection of the appropriate indexes is for the jury to

02:01:21    5    decide.

6             MR. BROOKS:  Your Honor -- and I'm quoting from U.S.

7    v. Husband.  There are two major limitations on the scope of a

8    remand.  First, any issue that could have been but was not

9    raised on appeal is waived and, thus, not remanded.  Second,

02:01:39    10    any issue conclusively decided by this court on the first

11    appeal is not remanded.  To determine whether an issue falls

12    within the second limitation, the opinion needs to be looked

13    at as a whole.  The court may explicitly remand certain issues

14    exclusive of all others.  But the same result may also be

02:01:59    15    accomplished implicitly.

16          So it's not a foregone conclusion that if a bank

17    robbery is remanded that the entire case is remanded.  I

18    mean -- and this goes a little bit to their motion for

19    reconsideration.  But they cite these cases and --

02:02:12    20          THE COURT:  That's what I was just looking at.

21          MR. BROOKS:  They cite these cases in their motion

22    for reconsideration, Your Honor, where the remand is -- and

23    let me just turn to it.

24          Where essentially, Your Honor, the court has said --

02:02:39    25    and I think it's the Hills case that they cited -- where the

1    court said this entire case and everything about it is being

2    remanded.  And that's very, very different from what happened

3    in this case.

4          In this case, the court expressly rejected the broad

02:02:57   5    challenges to the loss causation element.  And it remanded on

6    the specific issue of whether company-specific, non-fraud

7    information could be accounted for by Professor Fischel

8    outside of his model.  That's the specific issue.

9          And, again, it's not a directed verdict.  We still

02:03:18   10   have to convince the jury that Professor Fischel has

11   established that the fraud in this case was a substantial

12   cause of the stock price decline.  But they -- as the Court

13   knows, they don't have any information, any company-specific,

14   non-fraud information to show to the jury.  They don't have

02:03:37   15   it.  They're going to try to put something on; and to the

16   extent that they're allowed, I guess that will be what they

17   do.  But they specifically scored a remand in this case on

18   that issue, and now we're back down and they don't have it.

19   So now they want to challenge his peer group.  Now they want

02:03:54   20   to challenge his ability to rely on a leakage model under the

21   academic literature.  They want to make all these challenges

22   that were either raised and tried to a jury and the jury made

23   a decision and it was either not appealed or it was rejected.

24   And either way, it's not appropriate to get into on remand.

02:04:12   25         THE COURT:  All right, gentlemen, based upon the fact

1   that the motion to reconsider deals with a similar or related

2   issue and the fact that I'm going to consider that motion and

3   a response to the motion -- has the plaintiff had time to

4   think about how much time they are requesting?

02:04:26   5         MR. BROOKS:  I think we'd like until next Monday,

6   Your Honor.

7         MR. STOLL:  And, Your Honor, may we have an

8   opportunity to reply?  And I think it would benefit the Court.

9         THE COURT:  That is going to have to move us up, Mr.

02:04:49   10   Brooks, to Friday, the 27th, for a response and Tuesday, the

11   31st --

12         MR. STOLL:  Yes, Your Honor, that works.

13         THE COURT:  -- for a reply.  Okay.

14         Anything else on the fourth motion in limine that's

02:05:01   15   going to be entered and continued?

16         MR. BROOKS:  There is, Judge.

17         MR. FITZGERALD:  If I could just -- I'm sorry.

18   There's a separate aspect I wanted to address with regard to

19   just the contention that I think we should put on the table

02:05:12   20   that this was remanded solely for people to address

21   company-specific information.  I think this is important.

22         What I would like to point out is in the Glickenhaus

23   appeal at page 20, the Seventh Circuit said that plaintiffs in

24   security fraud cases need to isolate the extent to which a

02:05:30   25   decline in the stock price is due to fraud-related corrective

1    disclosures and not other factors.

2         To me it's a very clear reading that they're sending

3    back to separate out fraud from non-fraud.  And it doesn't

4    require it to be firm specific.  And I want to point out three

5    things in that regard.

6         First, it's just a simple matter of logic.  We're

7    supposed to -- Household is liable for any inflation caused by

8    the fraud and not for inflation caused by other factors.  And

9    if you think of a simple example, Your Honor, if there was an

10   industry with ten widget companies and you would back out of

11   any drop in the stock price what happened in the overall

12   market, which we all agree; you would back out of that

13   anything that happened to the entire widget industry.  If

14   Congress put a tax on the widget industry, it would all drop.

15        What the plaintiffs would like Your Honor to believe

16   is that once you account for the market generally and the

17   industry generally, then the only thing left is something that

18   I would call unique to the company; they lose a patent, the

19   CEO gets sick or quits.  And that's not the case.  And I'll

20   give you an example and then I'll show you why Professor

21   Fischel agrees and why the Seventh Circuit gave us similar

22   indication.

23        What if, of the ten widget companies, one of them

24   powered its factory on coal and something happened that coal

25   became more expensive or there was a fine or a tax for using

1   coal.  That would not be fraud information.  And to the extent

2   that the stock price fell because their factory was dependent

3   on using coal, which is more expensive, that should be backed

4   out of the calculation of inflation because it's not fraud

02:07:01  5   related.

6         In the case that the plaintiffs put forward, which is

7   something has to be unique to Household, it would be odd that

8   you would back out the effect of the coal industry -- you

9   know, prices going up -- when there's one company out of ten

02:07:17  10  that uses coal; but suddenly if two out of the ten use coal,

11  it would no longer be unique.  And that makes no sense.  If

12  the cost of coal is driving the stock price down, it should be

13  backed out whether there's one company or two doing it.

14        And I say that -- and I point out in his own

02:07:33  15  testimony, Professor Fischel has twice confirmed that there

16  could be a firm-specific effect where the information is not

17  unique to the firm.

18        And I'll cite to his deposition testimony from 2008,

19  early on in this, as we know, dated case.

02:07:52  20        Question -- the answer given by Professor Fischel

21  back in 2008 at page 200, line 18, I think going to 201, 17:

22        It is possible that a regulatory change that affects

23  the entire industry could affect one firm, whether Household

24  or any other firm, disproportionately.  So even though you

02:08:14  25  control for an industry variable, you still have a firm-

1    specific component to the return.  And the answer to that is

2    yes.

3           So there he's saying there could be an industry

4    factor that affects one company more than the others.  Clearly

02:08:26    5    not unique and, yet, it has a firm-specific component.

6           This year in 2016 at his deposition, Professor

7    Fischel confirmed that.  And in one of his answers to a

8    question that's on the transcript at page 192, he indicated:

9           I would give the same answer; that it's industry-wide

02:08:50    10    information that you're asking me to assume has a

11    disproportionate effect on particular firms.  So with respect

12    to those firms, there is a firm-specific effect of

13    industry-wide information.

14           Then Mr. Farina said:  Okay.  So information that is

02:09:05    15    not firm specific can have a firm-specific effect?

16           Answer:  If you're asking me hypothetically, yes,

17    that's certainly possible.

18           Again, saying that the information doesn't have to be

19    unique to Household for it to have a firm-specific effect.

02:09:19    20           And then finally, Your Honor, I would point to the

21    Glickenhaus opinion on page 20.  And I know there's a

22    discussion which will be focused on in the motion for

23    reconsideration as to whether or not the language the Seventh

24    Circuit used was a finding or not.  And I'll bracket that for

02:09:35    25    the moment.

The paragraph before that discussion has language that says, You need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors. And the case they cite to right there, Hubbard v. BankAtlantic Bancorp, is very telling. In that case, you were considering what happened due to securities fraud by a bank. In that case, the plaintiffs' expert measured the market by using the S&P 500, the same way Professor Fischel and Professor Ferrell measured the larger market, the S&P 500. In that case, the plaintiffs' expert measured the industry by using the NASDAQ bank index, similar to Professor Fischel, as well as Professor Ferrell using the S&P Financials.

In that case what was presented to the Eleventh Circuit -- and that case was cited by the Seventh Circuit -- was the issue of whether that was good enough. And the jury's verdict was overturned, and the Eleventh Circuit sustained it because that was not good enough because, in that case, the bank was based in Florida and there was a Florida real estate collapse which was disproportional. And the Eleventh Circuit said that isn't good enough; you must account for that information. That information about a Florida real estate collapse was not unique to BankAtlantic. There were other banks in Florida. Lots of people were affected by the collapse. What was relevant was that that collapse affected

1    the stock price and it wasn't captured in the market and

2    industry indexes.

3         So for the Seventh Circuit to cite a case that says

4    you have to separate out fraud from other fraud factors, a

02:11:12    5    case that says you must do it, it's clear error if you ignore

6    this factor, which is not unique to the company.  Then to the

7    next paragraph to say we send this back on loss causation,

8    it's quite clear they're not excluding any factor that may

9    affect more companies than Household if it has a specific

02:11:29    10    effect on Household different than the market and industry.

11         So we just want to make clear that we do not think

12    that the test here is whether or not it's unique to Household.

13    The test is whether or not the effect on Household is

14    something that occurred and is different than the general

02:11:44    15    effect of the market and industry.

16         MR. BROOKS:  Your Honor, the citation to BankAtlantic

17    Bancorp, which is on page 421 of the public decision,

18    immediately precedes -- there's nothing in between it -- from

19    the Seventh Circuit citation that says, In order to prove loss

02:12:03    20    causation, plaintiffs in securities fraud cases need to

21    isolate the extent to which a decline in a stock price is due

22    to fraud-related corrective disclosures and not other factors.

23         The next sentence is, Fischel's models controlled for

24    market and industry factors and general trends in the economy.

02:12:21    25    The regression analysis took care of that.  The court -- they

02:12:40

1  attacked the model and the court found that the model

2  accounted for market and industry factors.  It took care of

3  that.  The thrust of their appeal was that the model itself

4  can never determine the difference between fraud information

5  and non-fraud information.  An economic model just can't do

6  that.  An economic expert needs to do that.  And so an

7  economic expert needed to take a harder look or explain more

8  about why the -- why that type of information -- information

9  unique to Household, not industry, not market -- impacted his

02:13:01

10  model.

11           And Professor Fischel has taken that look on remand,

12  and he's said there were two dates; they cancel each other

13  out.  And none of the other company-specific information

14  impacted his model significantly.  And they couldn't present a

02:13:22

15  single day on which that happened, Judge, when they challenged

16  him.  And now they want to come in and they want to say, well,

17  it's not unique to Household; we're going to go back and we're

18  going to test the models, that after citing BankAtlantic and

19  making the finding that they're relying on, the court then

02:13:36

20  said had controlled for the other two areas, market and

21  industry -- actually three, and the general economy -- and the

22  only thing that was left was company-specific, non-fraud

23  information.

24           So, Judge, first of all, this was not the thrust of

02:13:52

25  their appeal.  It's not something that they appealed directly

1   on.  They did challenge the model.  The model was upheld as

2   sufficient.  It was the model that the jury had based its

3   prior verdict on.  And then they remanded on limited issues

4   only.

02:14:05

5          And I read this to the Court last time.  I think

6   you're aware of the beginning of the case where they talk

7   about the broad attacks on the model, including this attack

8   under the Williams case where the model had not accounted for

9   company -- or for market and industry factors, which they

02:14:22  10  rejected, along with all the other attacks, except for

11  company-specific -- company-specific information that was

12  non-fraud.  And that's what we're back down here to talk

13  about.

14         And they want to blow this thing wide open into a

02:14:37  15  retrial of issues that are long settled because -- and it's --

16  Your Honor, they went up to the Seventh Circuit and they said,

17  this is an issue; this is real.  We concede we've never raised

18  a single piece of non-fraud information, but it's his burden

19  to account for it.  And they convinced the court to remand on

02:14:58  20  that issue.  And Professor Fischel did exactly what they

21  wanted him to do.  He did exactly what was ordered.  And now

22  they want to move to the side and try this case as though the

23  prior trial never happened and as though this opinion was

24  never written except for the last line.  And that's not

02:15:14  25  appropriate, Your Honor.

1    Under the Seventh Circuit law, you have to look --

2  everybody has to look to the entire opinion to determine the

3  mandate.  And the entire opinion, read in its completeness,

4  makes very clear that the only thing left on loss causation is

02:15:32    5  whether the model -- or whether Professor Fischel has

6  adequately explained that company-specific, non-fraud

7  information has been accounted for and did not significantly

8  distort his model.

9    If they had company-specific -- they say it's a

02:15:47   10  directed verdict.  But that's because they don't have the

11  information that they got the remand on.  If they had

12  company-specific, non-fraud information, they would

13  cross-examine him with it.  Their experts would be pointing it

14  out.  But they don't have it.  What they have is information

02:16:02   15  that the court has already looked at that is either fraud

16  related, stale, or industry specific.  None of it is company

17  specific.  And the information that is company specific is

18  fraud related, Judge.

19    So for them to now come in and challenge the peer

02:16:20   20  group, to challenge his ability to use this model -- which has

21  been affirmed by the Seventh Circuit -- under the academic

22  literature completely blows the entire scope of the Seventh

23  Circuit's opinion away.  It erases the entire thing except for

24  what they want, which is, it was remanded.

02:16:38   25    MR. FITZGERALD:  Judge, just to be clear, where he

1    started was to say when you read that one sentence that says,

2    you know, the -- due to fraud-related corrective disclosures

3    and not other factors and said it next goes into the sentence

4    that has been the subject of discussion, there was a sentence

02:16:55    5    in between.  The sentence in between is, "See Hubbard."

6    Hubbard is the case that says it's erroneous to leave out

7    information that affects a firm differently in the market and

8    industry and the example there is something that is not unique

9    to the firm.

02:17:07    10    There is nothing in the opinion that ever says the

11    information has to be unique.  The issue that has sort of

12    plagued this case a bit is the word firm specific doesn't mean

13    unique.  And it's an economic term to say when you put

14    something into a model and you run it -- you know, a chart --

02:17:26    15    and say, this is what the price is predicted; the difference

16    between what the firm's price is in that model is the firm-

17    specific component.

18    If you only put two indices in, that component is

19    bigger.  If you try and add a third index to make it more

02:17:43    20    accurate, that component is smaller.  But there's nothing in

21    the opinion that would change the basic law under Dura, which

22    is, the company is responsible for damages or inflation caused

23    by fraud and not responsible for damages or inflation caused

24    by non-fraud.  Nothing ever says that you count non-fraud as

02:18:00    25    fraud if some other company is suffering the same problem.

1          So we do have firm-specific information because when

2     you look at it, firm specific does not require the information

3     to be unique to the company.  And that's a critical point to

4     this case because they want to label it, take firm specific

02:18:16    5     and make it unique and then keep our evidence out, which most

6     of our evidence goes to information that is not focused at the

7     general overall market or the general overall industry; but to

8     factors that particularly affected financial institutions like

9     Household that were in the subprime space, just like that bank

02:18:37   10     in Florida that had a particular issue with Florida real

11     estate.

12          So it is firm-specific information, but the jury is

13     not going to be told -- the jury should be told separate out

14     fraud from non-fraud.  We're not contesting that Professor

02:18:49   15     Fischel could put his model on and that he can testify; but we

16     should be allowed to challenge it.  They have a burden to

17     prove fraud, and we should have every right to prove non-fraud

18     without limitation.

19          THE COURT:  All right, I will take it under

02:19:01   20     advisement, even as we get briefing on the motion to

21     reconsider the previous ruling.  Mr. Fitzgerald, anything --

22     actual events?  You mentioned the crash in Florida.  Anything

23     specific here?

24          MR. FITZGERALD:  Oh, in this case?

02:19:22   25          THE COURT:  Yes.  Any factors that --

1       MR. FITZGERALD:  There are examples, Your Honor, that

2  we could put forth before Your Honor where there will be

3  examples like a particular credit card company had a bad day

4  and then the analysts say stocks of Household and other

02:19:37  5  companies slid as a result of what happened to this other

6  credit card company.  There are days when there are concerns

7  about a double-dip recession and unemployment and because

8  Household lends money to consumers -- and unlike American

9  Express, who probably have a pretty good rate of collecting

02:19:53  10  from folks, Household lent to people who had checkered credit

11  histories and sometimes didn't have the ability to pay.  When

12  unemployment rates would come out and they were going up, when

13  fears would be expressed about a double-dip recession, you

14  would see that the companies in the subprime space, their

02:20:11  15  stocks would fall.

16       Similarly, Household, because it wasn't a bank,

17  couldn't just take deposits where people gave them money and

18  lend it out.  They had to borrow money on the commercial paper

19  market, et cetera.  So sometimes when those factors hit, they

02:20:24  20  hit Household different than they would hit other folks.  The

21  S&P Financials Index in the top ten has JPMorgan Chase, AIG,

22  giant insurance companies, giant banks, Merrill Lynch.

23  They're not like Household.

24       And one of the things that we will bring out at trial

02:20:40  25  is there are a number of days where Professor Fischel just

02:20:55

1    looks at the S&P 500 and S&P Financials and not a lot is

2    happening and Household's price changes.  And he says, I

3    assume it's fraud.  What we say is, no, look at that day.  And

4    he realized that something happened in the subprime market;

5    maybe the unemployment went up, maybe consumers got a double-

6    dip when recession went up.  In some cases, it was regulations

7    imposed upon credit card companies where the analysts said,

8    all those stock slid because they're worried about what's

9    going to happen in the industry.  And then you see the peer

02:21:12

10   group falling at the same time as Household.  And that's what

11   we want to present to the jury.  We owe money for fraud but

12   there's other things going on that are not fraud that they

13   need to take into account.

14        THE COURT:  Mr. Brooks, you think that's already

02:21:25

15   accounted for, taken care of?

16        MR. BROOKS:  Your Honor, it has been.  It's been

17   decided by the prior jury.  It was part of their challenge on

18   appeal.  I disagree completely with the characterization of

19   firm specific as including industry information.  And we

02:21:43

20   disagree with a lot of what Mr. Fitzgerald has said about the

21   facts of this case.  But even if they were right, the

22   defendants -- the Seventh Circuit additionally said the

23   defendants haven't identified any firm-specific, non-fraud-

24   related information that could have significantly distorted

02:22:01

25   the model.

1    In BankAtlantic, the expert admitted at the trial

2    that, in fact, the Florida real estate collapse was not

3    accounted for by her model.  There was no such admission at

4    the first trial, and there's no admission here.  Has Professor

02:22:18   5    Fischel testified that theoretically there can be a disparate

6    impact?  Yes.  But it's -- he has not said that in this case.

7    And he's looked at the economic evidence in this case.

8    And, again, what they're trying to do is retry the

9    case that was tried to the first jury.  And it was tried to

02:22:33   10    the jury, it was appealed on a specific theory on broad

11    attacks and one narrow attack that they won, and then it was

12    remanded.  And so, Your Honor, they cannot come back now and

13    change the definition of firm specific to include some credit

14    card companies and auto companies when Household was a real

02:22:56   15    estate consumer finance company principally and then say

16    that's firm-specific information because Household stock may

17    have moved in sympathy.  It doesn't distort the model.  They

18    haven't shown that.

19    And all they're doing is introducing an area of

02:23:11   20    confusion into this case that's completely unnecessary.  But

21    it's not allowed.  That's the point.  The point is -- and I

22    don't want to get into the facts here, Judge, because we are

23    not supposed to be looking at those facts.  The facts that

24    we're looking at are whether the model or -- and whether

02:23:26   25    Professor Fischel -- excuse me -- it's whether Professor

1  Fischel has accounted for and explained why company-specific,

2  non-fraud information did not significantly distort his model.

3  It really comes down to the fact that they don't have any of

4  that type of information, so they've cleverly now said that --

02:23:45   5          THE COURT:  You admit it's clever?

6          MR. BROOKS:  As far as it goes, Your Honor.

7          THE COURT:  So, Mr. Fitzgerald, if firm specific

8  doesn't mean firm specific, specific to the firm, what does it

9  mean?

02:23:59   10          MR. FITZGERALD:  It means -- firm specific means

11  having a firm-specific effect on the firm.  And, there,

12  Professor --

13          THE COURT:  Firm-specific effect?

14          MR. FITZGERALD:  Right.  It doesn't have to be unique

02:24:07   15  information.  And that's the critical point.  And if you read

16  the Hubbard case, the very case they cite, that information

17  about the Florida real estate market was not unique to that

18  bank.  What it means -- firm specific means it's not accounted

19  for in the model where they factor in the market and the

02:24:22   20  industry.  And Professor Fischel himself said you could have

21  an industry factor that disproportionately affected one

22  company and that will have a firm-specific component.

23          So to twist that from firm specific to mean unique is

24  a way of throwing out our evidence, which I think would

02:24:39   25  deprive us of a fair trial.  The Seventh Circuit sent it back

1    for a trial on loss causation.  Your Honor already ruled in an

2    earlier decision earlier this year or last year that the scope

3    of the trial is on loss causation.  We can't just put -- have

4    them put Professor Fischel up on the stand and say no one is

02:24:53    5    allowed to challenge him and say his model didn't get it right

6    or to put our model forward.  The idea is that firm specific

7    means something that affected Household in a way differently

8    than it affected the market and industry --

9                MR. BROOKS:  That's --

10                MR. FITZGERALD:  -- but not unique to Household.

11                MR. BROOKS:  That's their idea, Judge.  And I just

12    want to point one thing out because they keep talking about

13    firm-specific effect.  The language that the Seventh Circuit

14    uses time and time again is firm-specific, non-fraud-related

02:25:20    15    information.  Information is what they're talking about,

16    firm-specific information.  This is information about a

17    company that a model cannot account for because a model can't

18    tell the difference between fraud-related information and

19    non-fraud-related information.

02:25:35    20                So they cite BankAtlantic.  I agree that the Seventh

21    Circuit cites BankAtlantic.  In the next sentence, that's

22    disposed of by the court's observation and conclusion that his

23    models take care of industry, market, and general economic

24    factors.  And what's left is firm specific -- not effects but

02:25:56    25    information.  That's what the court wrote.  They're re-writing

1    what the court wrote to turn firm specific into industry

2    specific and information into effect.  Neither of those two

3    things are what the court wrote.  The court wrote firm-

4    specific information.

02:26:17    5    MR. FITZGERALD:  Your Honor, if I can just add one

6    thing.

7    The court -- I'll be plain.  The court used the words

8    firm-specific information and firm-specific factors

9    interchangeably.  But the test here is what affected the

02:26:28    10   price.  And firm-specific factors are things that could affect

11   Household without it being unique to Household.  Professor

12   Fischel himself said there could be a firm-specific effect

13   from things going on in the economy.  There is no logical

14   reason nor no language in the opinion that would say something

02:26:46    15   in the economy other than fraud that had an effect on

16   Household's price should not be backed out of the equation

17   simply because Household wasn't the only company that suffered

18   it.  That would make no sense.  Their language doesn't talk

19   about unique.  It does use the word firm specific.  They go

02:27:03    20   back and forth between information and factors.  But Fischel

21   himself admits that an industry-wide factor could have a

22   firm-specific effect.  And we're here talking about the effect

23   of the fraud on the price and the effect of the non-fraud on

24   the price.  And we have to be able to present that to the

02:27:18    25   jury.

1          MR. BROOKS:  And --

2          THE COURT:  Mr. Brooks, let's move on.  That is under

3     advisement.

4          MR. BROOKS:  Thank you, Judge.  There is another

02:27:26  5     component to this motion in limine, Your Honor.  I think we

6     addressed the Institutional Investor magazine, and we're going

7     to re-depose Professor Ferrell on that.

8          THE COURT:  All right, so I'll say the third portion,

9     third part of the motion is moot.

02:27:40 10          MR. BROOKS:  No, it's not -- well, Judge, that part

11     of it is.  But then there are a number of exhibits on their

12     exhibit list that it appears they intend -- they didn't at

13     least disclaim this -- to use with experts that were either

14     not in their reports or even in their reliance materials,

02:27:55 15     Judge.  And we moved to exclude that information.

16          MR. FITZGERALD:  Could I make a suggestion?  In light

17     of everything that took place this morning, could we take that

18     up offline just to see if we're still in disagreement?  I know

19     there's a number of exhibits we put on our reports, et cetera.

02:28:11 20     There might be some exhibits we can whittle out.

21          MR. BROOKS:  Sure.

22          THE COURT:  That's also part of the third portion of

23     that motion in limine.

24          MR. FITZGERALD:  And I believe the fourth portion is

02:28:20 25     moot because it talks about the cumulative effect of

1    testimony, and we've reached a stipulation.

2          THE COURT:  That's correct.  So we go to the fifth

3    motion in limine, plaintiffs' fifth.  The first part of that

4    motion in limine is regarding verdict forms.

02:28:36    5          MR. STOLL:  Yes, Your Honor.  If I could briefly,

6    before we begin that.

7          I know Your Honor withheld the other matter with

8    regard to briefing.  And all I wanted to indicate to the Court

9    was, we do view this issue regarding the very specific scope

02:28:50   10    of the mandate and findings embedded therein to be a very

11    fundamental issue that -- no one wants to try this case a

12    third time.  And so, Your Honor, the only thing I would invite

13    is after the briefing, because I know all the parties are

14    present here in Chicago, if oral argument on that matter would

02:29:10   15    benefit the Court after the briefing, we think that would be

16    beneficial because that -- this is at the absolute core of

17    what is being tried before this jury, which is, what is fraud

18    and what is non-fraud and the instructions that they'll be

19    given.

02:29:29   20          I would respectfully submit to the Court that

21    construing the mandate in a manner other than a retrial of

22    loss causation and inconsistent with Manpower would inject

23    error.  And I don't want to reargue it now, Your Honor.  The

24    only thing I was saying was, this is of such import that if we

02:29:49   25    could, after the briefing, have oral argument on -- and

1    obviously at Your Honor's discretion, I think that would be

2    important with such a fundamental issue.

3              And with that, Your Honor, we can return to MIL 5.

4              MR. BROOKS:  That's fine, Judge.  I mean, I feel like

02:30:03   5    we've argued this a few times now.  But we're happy to

6    schedule an argument for the motion for reconsideration.

7              MR. STOLL:  And one issue, Your Honor, with regard

8    to --

9              THE COURT:  I'll just insert the word brief; brief

02:30:13   10   argument.  After I've considered the briefs, then I will allow

11   brief argument on these two issues, which are related.

12             MR. STOLL:  Thank you, Your Honor.

13             And with regard to MIL 5, I would just point out,

14   Your Honor, this goes directly to the verdict form which Your

02:30:31   15   Honor handed out.  From the defense perspective, we don't

16   believe there's any argument necessary.  We have no objection

17   to the verdict form that you handed out.  The only

18   modification would be that question No. 3 is no longer needed

19   because of the agreement that allocation is out.

02:31:13   20             MR. BURKHOLZ:  Your Honor, Spence Burkholz for the

21   plaintiffs.

22             We have the Court's handout.  And we obviously take a

23   different position on this.  Normally this is something that

24   we discuss later in the proceedings.  We raised this issue in

02:31:28   25   a motion in limine to flag it for Your Honor.  We would like

1   to have some time to look at the Court's proposed jury

2   instruction.  But I would like to make a few comments on the

3   verdict form.

4          THE COURT:  Yes.

02:31:39   5          MR. BURKHOLZ:  Your Honor, the jury -- we think the

6   question that is in our verdict form is sufficient for

7   causation and that the jury, like in the first trial, can

8   simply, if they find causation from the statements, fill out

9   the inflation on the verdict form; and if they find no

02:32:00   10  inflation from the first statement, they would just put zero

11  for the first three days.  And then for the second statement,

12  March 28th, if they find inflation from that statement, they

13  would put in the inflation from that, according to the model

14  that they choose.

02:32:15   15         They did this in the first trial, and the Seventh

16  Circuit said they did it perfectly.  They found no liability

17  for the first 14 statements.  And then -- and this was against

18  the defendants' objection -- they filled in the verdict form

19  with the inflation from the first statement.

02:32:30   20         And with this -- the way it's set up now, really all

21  they need -- and as the Seventh Circuit said, all they need to

22  show -- they put in the inflation from March 28th, the full

23  inflation.  Every subsequent statement after that simply

24  maintains the inflation.  So -- and the Seventh Circuit

02:32:53   25  endorsed that concept, which is what Professor Fischel

1   testified to, again, against arguments from the defendants.

2        So if we give this to the jury -- and they might be

3   confused -- and let's say they did fill out "no" for statement

4   No. 9.  Well, it really would have no impact, just like the

02:33:15   5   statements that the prior jury rejected within this time

6   period after March 23rd.  The defendants raised that issue on

7   appeal and said, well, the leakage model can't work because

8   you have rejected statements after the first false statement.

9   And the Seventh Circuit said, no, that's a misunderstanding of

02:33:32   10  the way the leakage model works.  The full inflation is in the

11  stock from the first statement.

12       Now, there was this issue of the first three days and

13  the first statement only applying to predatory lending.  But

14  they sent it back on these two limited issues, one that we

02:33:45   15  talked about before, and the second one was he would have to

16  allocate the first three days.  And then after March 28th, the

17  full inflation is in the stock price, the $23, if they accept

18  the leakage model, from that day until the end.  What takes

19  the inflation out is the later corrective disclosures, the

02:34:02   20  leakage, starting on November 14th, November 15th, 2001.  That

21  takes the inflation out.

22       These later statements are not -- had nothing to do

23  with taking the inflation out of the stock price.  And, again,

24  any of these subsequent statements, even if it was set up this

02:34:21   25  way, which we don't think is appropriate, if the jury found

1    "no," that doesn't mean that the inflation still wouldn't be

2    in the stock price from the prior statement.  These subsequent

3    statements have -- really don't impact once the full inflation

4    is in there really from the second statement.

02:34:53    5        So we think a better approach is the question 1:  Did

6    their statements cause damages?  And, if so, then the jury

7    fills out the inflation table.  And they will make a

8    determination as to whether or not -- when the causation

9    starts.

02:34:54    10        And then just a couple of other comments on the

11    question No. 2, the models that we're going to submit to the

12    jury.  We think it's only appropriate for the plaintiffs'

13    specific disclosure model, the leakage model.  And then we do

14    believe that the jury should be given the option of estimating

02:35:12    15    damages based on the evidence that's presented.  We think

16    there's case law to support that, as long as it's reasonable

17    based on the evidence.  So we think that should be an option.

18    I understand Your Honor's decision not to include that.

19        And then finally --

02:35:28    20        THE COURT:  I should say that in the instruction I

21    tendered to the parties today, I included the defendants'

22    specific disclosures models.  But I understand that we still

23    have to talk about that.  And I just put that in there.  It

24    doesn't mean that I have decided that that's appropriate.

02:35:44    25        MR. BURKHOLZ:  Right.  And I think for that

1   particular model -- I think, Your Honor, we'll submit this

2   verdict form obviously when the case is done.  But we think

3   there's real problems with that model with respect to the

4   first eight months of the class period.

02:36:00    5       The only -- he didn't follow what the Seventh Circuit

6   said what Professor Fischel should do for the first three days

7   in the class period.  He doesn't have any -- frankly, he

8   doesn't have any inflation for that first eight-month period.

9   And the $4 of inflation that he's kind enough to give the

02:36:16   10   plaintiff class as a maximum includes the three theories, the

11   disclosures relating to the three theories.  So he's got to

12   really do what the Seventh Circuit said he had to do for the

13   first three days of the class period.  And then really you

14   can't submit a model that doesn't have inflation numbers for

02:36:35   15   the first eight months.  He said he wasn't going to do it.  He

16   said he needed to do more.  He intentionally didn't do the

17   analysis.  He thought it was just Professor Fischel's

18   obligation to do it.

19       You can't -- under the ATA case from the Seventh

02:36:49   20   Circuit, you can't present a flawed damages model to the jury.

21   So I guess we'll wait and see how that comes out since you're

22   going to allow him to testify.  But just keep that in mind as

23   you see the testimony, that we're going to object to the jury

24   having that as a choice at the end of the day.

02:37:02   25       THE COURT:  Mr. Burkholz, we are there.  That's the

1    next part of this same motion in limine, correct?

2            MR. BURKHOLZ:  Correct.

3            MR. STOLL:  Your Honor, may I briefly respond, Your

4    Honor?

5            THE COURT:  Yes.

6            MR. STOLL:  So, Your Honor, your proposed verdict

7    form has it exactly correct.  First of all, with regard to the

8    issue about whether or not you need to identify loss causation

9    with each statement, Judge Guzman, in fact, required that.

02:37:26    10    I'll direct your attention to transcript page 4365.  The prior

11    verdict instructions made that clear.  Plaintiffs must prove

12    that the defendants' particular statement or omission was a

13    substantial cause.  I direct your attention to docket 1614 at

14    page 32.

02:37:43    15            So the loss causation instruction required it.  The

16    jurors, in fact, had to go through, as Your Honor knows,

17    statement by statement to determine that the requisite

18    elements to sustain the 10b-5 claim had been met as to each

19    statement.  Loss causation is an essential element that must

02:38:02    20    be found as to each purported misrepresentation.  And that

21    issue has been remanded for retrial.

22            I would also -- as I'm sure Your Honor is aware --

23    the PSLRA requires that.  It expressly says the plaintiff

24    shall have the burden of proving that, the act or omission.

02:38:21    25            And then, of course, Dura also comments, Your Honor,

1    at 544 U.S. at 345, that the statute insists that securities

2    fraud complaints specify each misleading statement.  And the

3    statute expressly imposes on plaintiffs the burden of proving

4    that the defendants' misrepresentations caused the loss.

02:38:43    5    So the specificity, Your Honor, is absolutely

6    required.  You have that correct.  It also goes, for instance,

7    to someone like defendant Gilmer as to whether or not

8    liability can even be imposed because he's only on the first

9    statement.

02:38:57    10    With regard to the issue of --

11    THE COURT:  The first section of No. 5, plaintiffs'

12    No. 5, is going to be denied for the reasons stated by

13    Mr. Stoll, including the language of the statute and Dura.

14    And it's also consistent with Judge Guzman's approach during

02:39:37    15    the first trial.

16    As to the second portion, let me start again with the

17    plaintiff and trying to understand exactly --

18    MR. BURKHOLZ:  Yes, Your Honor.

19    THE COURT:  -- what the objection is.  Is the

02:39:37    20    plaintiffs' position that he simply didn't do the work and

21    that that in and of itself is fatal to the model?  Or are you

22    saying that even if you accept -- I understand that your

23    position is that his model is flawed -- but if you accept his

24    model, does that get us to the $4.19 cap?

02:39:59    25    MR. BURKHOLZ:  A couple of responses.  First, with

1  all due respect, Your Honor, with respect to the verdict form,

2  we just want to put on the record that we object to the

3  Court's rulings.  Thank you.

4          With respect to Professor Ferrell's specific

5  disclosure model, he didn't present a proper methodology

6  that's required to submit it to the jury.  What he did was he

7  presented some kind of corrected -- he referred to corrected

8  model to the Fischel model.  And he went ahead and put in a

9  regression analysis.  And he had his results, found certain

10  dates were not statistically significant because he changed

11  some of the parameters.  And he went ahead and said, okay, I'm

12  going to look at the dates that are now not statistically --

13  that are statistically significant.  He threw some out

14  improperly.  And then on the six dates that he came up with,

15  he said, well, four of them have confounding information; so

16  you really shouldn't include those four; and if you don't,

17  then you're left with the first corrective disclosure on

18  November 15th, and the October 10th, the second to last one,

19  which the increase is greater than the decline.  So basically

20  plaintiffs have no damages.  That's what they're going to

21  argue to the jury.

22          But then he says -- you know, he realizes that's

23  nonsensical.  So he says, okay, I'll have this model where

24  I'll take the six disclosures, I'll give you credit for these

25  four, even though I think they're confounded, and when I do

Case 1:02-cv-05893 Document #2096 Filed 12/09/09 Page 51 of 101 PageID #:87970

02:41:45

1   the calculations, it's actually -- I think it's five -- yes,

2   six total, I will give the plaintiffs credit for that; and

3   we'll start not at the beginning of the class period, but on

4   November 15th, I'll give them $4.19 on that day; and then

5   after that day, I'll start dropping down the inflation.

6       As for the time period before then, from the first

7   eight months of the class period, he has nothing in his model.

8   Now they say, well, he's going to come back and say he has

9   $4.19 from the beginning, the first day, March 23rd, through

02:42:01

10  eight months to the first corrective disclosure.

11      Well, if he does that, that violates what the Seventh

12  Circuit said Professor Fischel had to do for the first

13  statement on March 23rd.  They said, well, that one only

14  applies to predatory lending, so come up with some kind of

02:42:17

15  estimate for the first three days.  A minimum estimate is what

16  he did.  It's much more than that.  And he says it's $3.18 for

17  that day at a minimum but probably more.  And then the second

18  day, you have the full inflation, the second statement on

19  until the first corrective disclosure eight months later.

02:42:34

20      Their expert hasn't even done that.  And so because

21  he hasn't done that, he doesn't have a proper methodology in

22  his model to present to the jury with respect to this

23  regression analysis and inflation calculation, because he

24  hasn't even done what the Seventh Circuit said you're required

02:42:52

25  to do in this case.

1          And just, finally, he admitted he needed to do more

2    and he said he intentionally didn't do the analysis.  And

3    those -- that citation is in our briefs.

4          MR. STOLL:  Your Honor, again, you have question

02:43:09    5    No. 2 exactly right in terms of what you've presented.

6          There are two aspects to it, which were in dispute,

7    both of which you have correct.  The first was the plaintiffs'

8    model had suggested that the jury could pick anything they

9    wanted, which, of course, would be incorrect.

02:43:26    10         And, Your Honor, I just wanted to provide to the

11   Court a transcript, which both parties acknowledge is a

12   transcript from the Seventh Circuit oral argument.  If I could

13   tender that to Your Honor.

14     (Tendered.)

02:43:40    15         MR. STOLL:  And you'll note that during the course of

16   the oral argument -- and if I could direct your attention,

17   Your Honor, to pages 18 to 19.  This particular issue came up

18   during oral argument regarding whether or not it would have

19   been appropriate for the jurors to pick any reasonable amount

02:44:02    20   that they thought appropriate or whether they were tied to one

21   of the experts' analyses.

22         And you'll see that Judge Kanne says:  Getting back

23   to -- said they had three alternatives; what were the other

24   two?  And Mr. Dowd responds.  And the last thing he says is

02:44:23    25   that Judge Guzman decided to give all three.  You have to pick

163

between these three.  You can't just put in any number you
want.

And Judge Sykes commented:  I'm glad about that.

Mr. Dowd said:  I understand, Your Honor.

02:44:34 And Judge Sykes says:  That would have been really
speculative.

And there was a bit of interruption.

And then Judge Sykes again says that -- after
Mr. Dowd says:  The reasonable estimate of damages, I think
02:44:47 you can tell a jury that in some cases, precisely what
Mr. Burkholz was representing to you.

And Judge Sykes says:  Not in a case like this.  I
mean, you have to have some expert support for the numbers on
a case like this.

02:45:00 MR. BURKHOLZ:  And my --

MR. STOLL:  So it is correct, Your Honor, that first
of all -- and Judge Guzman had appropriately required that.
So the manner in which Your Honor is requiring that you select
the model or none is exactly correct.

02:45:13 With regard to defendants' model, that is based on an
appropriate analysis.  As Your Honor knows, the inflation is
calculated as a consequence of looking at the disclosure
period.  Professor Ferrell went through and did a rigorous
analysis and determined that the maximum amount of inflation
02:45:32 that can be ascribed to the fraud during the disclosure

1  period -- putting aside confounding information -- the maximum

2  amount is $4.19.  And what would be submitted to the jury, and

3  as we indicated -- and I think actually Mr. Burkholz has it

4  exactly correct; Your Honor should hear the testimony and then

02:45:51    5  we'll be able to submit this to the jury -- but what he will

6  indicate is 4.19 is the maximum amount.  And prior to the

7  disclosure period through the class period, 4.19 is what would

8  be put in for the jury on the table.  And we will submit that,

9  Your Honor.

02:46:06   10  So you have the verdict form exactly correct.  The

11  only thing that needs to be done is question No. 3 is removed

12  in light of the fact that allocation is no longer in the case.

13  MR. BURKHOLZ:  Just a brief response, Your Honor.

14  With respect to the Seventh Circuit comment at the

02:46:22  15  oral argument, I just find it interesting that the defendants

16  don't want anything from the Seventh Circuit opinion to be a

17  finding applied in this case, yet they take a comment by the

18  judge and they want that to be a finding in the case.

19  Now, there are cases that allow the jury to basically

02:46:43  20  estimate damages based on the evidence.  We think it's

21  appropriate in this case.  And that's -- that would be our

22  position.  And we understand Your Honor has rejected that at

23  this time.  But we think it's appropriate.  And based on --

24  after we put our case in, we would like Your Honor to

02:46:58  25  reconsider that.

1    And, of course, Professor Ferrell's model, we'd like

2  you to look at it after the evidence is in.  And we think at

3  that time, you'll see that it won't be appropriate to include

4  it on the verdict form because it really has so many

02:47:13    5  methodological flaws that it violates the Seventh Circuit

6  precedent in the ATA case.

7    MR. STOLL:  And, Your Honor, just one last comment

8  with regard to what Mr. Burkholz said.

9    We precisely want the Court to follow what the

02:47:25   10  Seventh Circuit said.  The mandate in this case was that there

11  was insufficient evidence presented on loss causation and

12  there's to be a retrial on the element of loss causation.  And

13  all defendants are requesting -- and we'll brief this for Your

14  Honor -- is, consistent with Manpower, the opportunity to have

02:48:13   15  a jury properly decide, based on the facts presented, the

16  element of loss causation.

17    Thank you, Your Honor.

18    THE COURT:  All right.  Thank you.

19   (Brief pause.)

02:50:22   20    THE COURT:  Plaintiffs' motion in limine No. 6 speaks

21  to prevent impermissible opinion testimony of the three

22  individual defendants, plus Mr. Ancona and Mr. Streem.

23    MR. DOWD:  Your Honor, based on the agreement that we

24  worked out with defendants this morning, the only one of these

02:50:42   25  witnesses who will testify is Mr. Streem.  So I'm happy to

1    address it as to Mr. Streem.

2         First, your Honor, you know, what the defendants say

3    is, well, you know, all of these guys have personal knowledge

4    of factors affecting Household's stock price, and so, you

02:50:59   5    know, they should be able to just give their testimony about

6    that.  They -- I think they actually say in their motion their

7    opinions re non-fraud factors affecting Household's stock

8    price would be helpful to the jury.  That's exactly how they

9    phrase it.

02:51:16   10    Your Honor, that's not lay opinion testimony.  Your

11   thoughts on opinions re non-fraud factors affecting

12   Household's stock price, that is classic expert testimony.

13        Now, your Honor, you can have expert testimony be

14   given by a non-retained expert.  It's fine.  I mean, they

02:51:37   15   could have done that with one of these guys.  But then they

16   have to comply with the rules.  Then that testimony is subject

17   to Federal Rule of Evidence 702, where it has to be analyzed.

18   And then secondly, your Honor, it would have to come with a

19   disclosure.  And that's the most important part here, your

02:51:55   20   Honor.

21        I mean, if they wanted to offer one of these guys, we

22   could have talked about whether they had, you know, reliable

23   ability to testify to that type of information under 702, and

24   we could have tested that.  But more importantly, I would know

02:52:11   25   what they're going to say and right now I don't.

1    And it's expert testimony.  There's no question

2    they're trying to hide lay testimony under the guise of -- or

3    hide expert testimony under the guise of lay testimony.

4    And, your Honor, it's interesting.  The best case

02:52:27    5    they cite in support of their position is one that was decided

6    before they changed the Federal Rules of Evidence.  And they

7    changed the Federal Rules of Evidence because they said people

8    keep trying to offer expert testimony that's, you know -- or

9    offer lay testimony that's really expert testimony and we got

02:52:48    10    to change this.

11    If somebody is giving testimony about specialized

12    knowledge or things that aren't apparent to the ordinary

13    layman, you have to give the other side notice.  You have to

14    tell them what you're gonna say and you have to provide them

02:53:03    15    with that information.

16    And so again, your Honor, the issue here is --

17    whether they could have done it with Mr. Streem or not, I

18    don't know.  But the point is they didn't follow the rules

19    that they had to follow.  And it's becoming a real issue from

02:53:14    20    our side, your Honor.

21    I mean, last week, you know, we talked about a motion

22    where, you know, they got a guy relying on an Institutional

23    Investor magazine that doesn't appear in his reports, it

24    doesn't appear in his reliance materials.  He's talking about

02:53:27    25    academic literature that doesn't appear in his report or his

1    reliance materials.  They direct a witness -- an expert

2    witness not to answer questions at a deposition about topics

3    that are covered by his report.

4         And now here we have just another third example of it

02:53:43    5    where, oh, we're gonna just offer expert testimony, we're not

6    gonna disclose it to you, through lay witnesses.  It's just

7    not right, your Honor.  At a certain point you got to comply

8    with the rules.

9         THE COURT:  All right.

02:53:54    10        Ms. MacDonald, that's not what you're going to do

11   through Mr. Streem?

12        MS. MacDONALD:  Not quite, your Honor.

13        Your Honor, Mr. Streem was the vice president of

14   corporate relations and communications at Household.

02:54:04    15   Everything that he's going to testify to is based on his

16   firsthand personal knowledge of the work that he did at

17   Household.  His job was to talk to investors.  His job was to

18   talk to analysts.  He has personal firsthand knowledge.

19        He's not an expert in layman's clothing, by any

02:54:22    20   means, your Honor.  And we submit to you that if you look at

21   the Advisory Committee notes to Rule 701 you'll see exactly

22   the situation we're talking about.

23        This is not a case where we're offering opinion

24   testimony solely because it's within his experience, training

02:54:40    25   or specialized knowledge.  Rather, we're offering his

1    testimony that is particularized to him by virtue of his

2    position in the business.

3           I mean, he's the vice president of corporate

4    relations and communications.  This is his bailiwick.  This is

02:54:54   5    what he was -- this is what he did for his job.

6           THE COURT:  All right.

7           Mr. Dowd, the plaintiff has identified a potential

8    problem here.  It sounds and reads like you may be right, you

9    may have a problem here.  The defense is aware of 701, they're

02:55:09   10   aware of 701(c).  So you may be on to something here but,

11   unfortunately, this is too abstract for me to rule.

12          Obviously these are constraints on how these

13   witnesses can testify.  And, again, the defense is aware that

14   -- what is not allowed, testimony cannot be based on

02:55:35   15   scientific, technical or other specialized knowledge within

16   the scope of 702.

17          So the motion is going to be denied at this point

18   just because in the abstract I cannot rule and it's not

19   workable.  But if there's a violation, I'll hear an objection

02:55:57   20   from the plaintiff and we'll take it from there.

21          MR. DOWD:  So, your Honor, can we raise objections,

22   then, I take it, during Mr. Streem's testimony if they try to

23   offer this evidence?  Or, for example, now we just heard that

24   he's going to testify to a bunch of hearsay which has nothing

02:56:11   25   to do with lay opinion.  That's expert testimony, so we'll be

1    objecting to all that.  And that's fine with the Court, I take

2    it?

3              THE COURT:  Absolutely.

4              MR. DOWD:  Thank you.

02:56:18  5              THE COURT:  Next is No. 7, motion to preclude

6    defendant from calling lead counsel.

7              Has this been resolved?

8              MS. MacDONALD:  One moment, your Honor.

9              THE COURT:  Mr. Dowd, argument?

02:56:31  10              MR. DOWD:  Yes, your Honor.

11              This is with respect to one of the three lead

12    plaintiffs in the case, it's Glickenhaus & Co.  And the

13    defendants would like to call Mr. Glickenhaus.  I mean,

14    there's a number of problems.

02:56:52  15              First of all, Mr. Glickenhaus doesn't live in this

16    jurisdiction.  He doesn't have to come to trial under Rule 45.

17    So there's no way that defendants or even this Court, frankly,

18    can compel him to come testify.

19              That said, your Honor, his testimony is completely

02:57:07  20    unnecessary in this trial, to begin with.  I mean, assuming

21    that he could come, which he doesn't have to, it's still not

22    testimony that matters.

23              There is no question that in this type of case loss

24    causation is determined on a classwide basis.  You don't have

02:57:26  25    to look very far to find that.  I mean, I found it right in

1    the Seventh Circuit opinion in this case, in Glickenhaus.  It

2    said, In Phase I the jury addressed all issues that were

3    appropriate for classwide resolution, and then it lists them:

4    Whether the statements were actionable, whether they were

02:57:44    5    material, who was liable for which, and how much inflation the

6    actionable misrepresentation caused in the stock price.

7           I mean, that's clear -- clearly something that has to

8    be tried on a classwide basis.  It was tried on a classwide

9    basis the first time.  The Seventh Circuit says it gets tried

02:58:02    10   classwide.  And there's just no -- there's no exception to

11   that.

12          So what the defendants tried to do is, they say,

13   well, you know, Fischel talks about, you know, his model is

14   appropriate depends on whether or not investors learned of the

02:58:17    15   fraud through gradual leakage of the information or some other

16   way.

17          Well, Professor Fischel isn't talking about what one

18   individual investor thinks.  He's talking about the

19   information that became public in the marketplace that

02:58:30    20   analysts are talking about, that there are news reports about

21   things the company might be saying.  That's what he's talking

22   about as leakage.  It has nothing to do with what one investor

23   out of 40,000 class members -- how they learned the

24   information.  That's completely irrelevant.  That's why loss

02:58:48    25   causation is tried on a classwide basis.  It has nothing to do

1    with it.

2          It's not like the defendants went out and did a study

3    of all the claims or something like that to try to put

4    something together.  It's just, you know, we want to just

02:59:00    5    cherry-pick Mr. Glickenhaus.  I mean, that's basically their

6    argument, you know.

7          And Judge Nolan, who was the magistrate judge in this

8    case for a long time, wrote years ago in one of the lower

9    court -- or one of the opinions in this case, she said, The

02:59:14    10    investment behavior of a handful of plaintiffs cannot shed any

11    light on the overall issue of liability.

12          Your Honor, that's why falsity, scienter,

13    materiality, and loss causation are determined on a classwide

14    basis.  One investor's views just don't really matter here.

02:59:32    15          And I don't really know what's going on here.  Maybe

16    they think Mr. Glickenhaus looked bad in his deposition.

17    Maybe it's some other thing about Mr. Glickenhaus they want to

18    bring up, but it's got nothing to do with Professor Fischel.

19    I mean, they come in and they say in their -- I think their

02:59:47    20    reply, well, we should be able to test Mr. Glickenhaus'

21    credibility.  What does that have to do with Professor

22    Fischel's models?  It makes no sense.

23          Mr. Glickenhaus has no place in this trial on loss

24    causation, it's that simple, your Honor, even if he could be

03:00:02    25    compelled to come.

1          THE COURT:  Ms. MacDonald?

2          MS. MacDONALD:  Your Honor, Mr. Glickenhaus and

3    Glickenhaus & Company, Inc. is the lead plaintiff.  That

4    plaintiff was selected by the plaintiffs here.  He fought to

03:00:13    5    be the lead plaintiff over others' objections.  And he

6    represented to the Court that he would participate in the

7    case, including acknowledging that he may be required to

8    appear as a witness in trial.

9          So with regard to Rule 45, to the extent his

03:00:27    10    testimony is relevant, it would be surprising if he would be

11    unwilling to come, but we could deal with that in some other

12    way.

13          Taking a step back for a moment, Mr. Dowd began the

14    argument by saying that Mr. Glickenhaus' testimony is not

03:00:40    15    necessary.  Respectfully, that's not the test here.  The test

16    here is whether or not his testimony is relevant and

17    probative, and we submit that it is.  We did not cherry-pick

18    Mr. Glickenhaus.  The plaintiffs cherry-picked Mr.

19    Glickenhaus.

03:00:53    20          Now, the reason that his testimony is important here,

21    we agree that loss causation is to be determined on a

22    classwide basis.  We don't dispute that.  That doesn't render

23    the lead plaintiffs' testimony completely irrelevant, your

24    Honor.

03:01:07    25          This is a strange case.  Dr. Fischel has put aside

1    the normal way the damages are calculated and has applied a

2    new theory.  He -- when we asked him -- you might remember

3    he's presenting two models and the jury is supposed to choose

4    between his two models.  And when asked how the jury is

03:01:26    5    supposed to determine which of those two models is the right

6    one, he said, It depends -- if you believe that there's no

7    leakage, then I think one methodology is better than the

8    other.  If you believe there is leakage, then the second

9    methodology is preferable.

03:01:39    10           So the question that the jury has to answer -- if

11    they are looking at Dr. Fischel's two models, the question

12    that he will put to them is:  Is there leakage or is there not

13    leakage?

14           So our point, and the reason that Mr. Glickenhaus'

03:01:53    15    testimony is relevant, is that we are entitled to test whether

16    -- Dr. Fischel's observations about what the market thought,

17    what investors thought, how they interpreted information, if

18    that is, in fact, true of the lead plaintiff who they selected

19    to represent the interests of the class.

03:02:11    20           I also note that in their reply papers the plaintiffs

21    said, well, no, the way that you test that is actually to look

22    at the price change.

23           Well, first of all, that doesn't tell you what

24    investors are thinking.  And while in a normal case, where

03:02:25    25    you're looking at statistically significant price movements

1   that might have some traction, Dr. Fischel has completely

2   abandoned that here.  And, rather, he is offering opinions,

3   he's completely disposing of statistical significance, and

4   he's looking at the data and saying this is what the market

03:02:42   5   was thinking, this is what investors were thinking.

6          He testifies that market participants began to doubt

7   Household's denials, that market participants were

8   re-assessing the risks.

9          So we submit to your Honor that this is a situation

03:02:54   10   where the testimony of the lead plaintiff is absolutely

11   relevant and probative as to the key issue in the case.

12          Briefly, with regard to Magistrate Judge Nolan's

13   opinions, it is true that the defense twice moved to depose

14   the lead plaintiffs.  One was a third party -- they served

03:03:10   15   eleven third party subpoenas on the various investment

16   advisers.  That was solely -- the defense sought those

17   depositions solely to rebut the presumption of reliance and

18   Magistrate Judge Nolan said no.  But Magistrate Judge Nolan

19   did not say, My ruling is that the lead plaintiff will have no

03:03:29   20   role at trial.

21          Same is true of the second time.  In that instance

22   she said that the plaintiffs -- the defense could not call

23   that witness to establish truth-on-the-market.  Again, nothing

24   in that opinion to suggest that here we are, 15 years later,

03:03:43   25   that the lead plaintiff has absolutely no role at trial.

03:03:57

1          THE COURT:  All right.  Thank you.

2          I agree with Mr. Dowd.  The motion is going to be

3    granted on relevancy grounds without reaching the issue of

4    availability.  I believe that there is very slight relevance

5    here but it is outweighed by the confusion that it would cause

6    under 403.

7          So the motion is granted.  And I believe that's the

8    only issue on No. 7.

9          So let's move to No. 8.  No. 8 is a motion to bar

03:04:16

10   evidence or reference to aggregate damages.  And here there is

11   no objection from the defense?

12         MS. MacDONALD:  That is correct, your Honor, although

13   we did want to clarify the implication of that -- and I'm not

14   sure what plaintiffs' position is on that -- with regard to

03:04:33

15   market cap losses.

16         MR. BURKHOLZ:  So, your Honor, let me make one

17   comment before I get to the market loss representation.

18         Last week in open court Mr. Fitzgerald made a comment

19   about how big this case was.  And I'm not gonna say the number

03:04:47

20   again, although it looks like only lawyers are in the

21   courtroom, but there were a couple other people that were not

22   lawyers that were in the courtroom.  And he used the number --

23   I think we all heard it; we can look at the transcript -- and

24   it's a big number and he put it out there.  And that's exactly

03:05:03

25   what happened in the first trial with their prior counsel,

1  where he made an inference about if they accepted -- in this

2  particular example in the first trial, if they accepted the

3  specific disclosure model, 797, that somehow there would be a

4  multi-billion dollar judgment in this case.  And he made the

03:05:23  5  connection between the increase of $7 at the end of the class

6  period where -- and he said, well, the market capital went up

7  $3.5 billion.

8          And so he made this connection, and then he made the

9  argument in closing argument.  And, of course, it was improper

03:05:39  10  and we don't want that to happen again.  We don't want any

11  reference at all to what the potential damages might be in

12  this case.

13          Their prior counsel actually got it wrong with --

14  because that was -- the leakage model ended up being what he

03:05:52  15  was referring to, but he was referring to the specific

16  disclosure model.

17          So we don't want any reference at all in this

18  courtroom to what the potential total damages might be in the

19  case.

03:06:03  20          Now, with respect to their point about market cap

21  loss, the one thing that I want to make clear, we're not going

22  to walk into court -- and last time I had to elicit testimony

23  on market cap loss because of what their lawyer did in front

24  of the jury.  But in this particular case we're not going to

03:06:25  25  be putting in front of the jury the market -- the total market

1   cap loss of Household.

2        However -- I just want to be clear about this so we

3   don't have a problem when we go down the road with evidence --

4   we will be comparing Household, like it did in its own

5   documents, the investor relations documents, to large

6   financial institutions like JPMorgan and AIG.

7        And I don't foresee a problem with any of our

8   exhibits or any of the testimony because that is not a

9   discussion of market cap loss. But that is a discussion of --

10  or a reference to the market cap of the companies that are

11  their peers.

12       So I don't think it implicates any of these issues.

13  I just wanted to point it out to your Honor so that we don't

14  have a problem when we get into the trial.

15       There shouldn't be any reference to aggregate

16  damages. We won't make any reference to the market cap loss

17  during the leakage period. But there are going to be

18  documents about -- that are going to reflect the market

19  capitalization of the companies that Household compared itself

20  to. It didn't compare itself to the small companies, a few of

21  them that are in Professor Ferrell's peer groups. They

22  compared themselves to large financial institutions.

23       THE COURT: Ms. MacDonald?

24       MS. MacDONALD: I think that's fine with us, your

25  Honor.

03:06:40

03:06:58

03:07:11

03:07:26

03:07:38

```
 1          THE COURT:  Okay.  So --

 2          MR. BUTSWINKAS:  I will say, your Honor, we'll take

 3     those documents as they come up.  We're not conceding they're

 4     admissible.

 5          MS. MacDONALD:  Yes.  We would reserve our right,

 6     your Honor, in the event those documents do come up, to

 7     revisit the issue.

 8          MR. BURKHOLZ:  Well, all of these documents have been

 9     agreed to pursuant to our agreement.  So we'll leave it at

10     that.

11          THE COURT:  So No. 8 is granted.

12          Next is No. 9, motion to let or allow the plaintiffs

13     to use certain portions of former defense expert Bajaj's prior

14     trial testimony.

15          MR. FARINA:  Your Honor, this is also the flip side

16     of defendants' motion in limine No. 2, where we're seeking to

17     preclude that testimony.

18          We think it's a sideshow, your Honor, and we don't

19     believe that this jury should be deciding whether Professor

20     Fischel's models should be accepted based on something that

21     Dr. Bajaj did in the prior trial.

22          It's almost impossible to present that evidence to

23     the jury without confusing the jury about where the evidence

24     comes from, what happened in the first trial, why was leakage

25     being decided before and being decided now.
```

03:07:51

03:08:01

03:08:15

03:08:33

03:08:52

1    We think it's a terrible idea to introduce that type

2  of issue into the case when Dr. Bajaj has no probative

3  evidence to offer.  He's not a fact witness and he's not being

4  offered as an expert in this case.

03:09:10   5    If they are going to introduce snippets of his

6  testimony, we're going to have to introduce larger components

7  of his testimony to put that in context.

8    He's not the witness we're putting forward, your

9  Honor.  We have Professor Ferrell, we have Professor Cornell.

03:09:28   10  They previously argued that we have too many experts and now

11  they're trying to pull in an expert we're not even offering in

12  this case.

13    It has no probative value.  And whatever probative

14  value it could have is greatly outweighed by the confusion and

03:09:41   15  prejudice that will follow allowing Dr. Bajaj's testimony to

16  be presented to the jury.

17    MR. BURKHOLZ:  Your Honor, if I can speak to the

18  motion that we brought?

19    THE COURT:  Yes.

03:09:51   20    MR. BURKHOLZ:  With respect to the law, first of all,

21  they had a chance to designate whatever trial testimony they

22  wanted with Professor Bajaj and they did.  So that is the

23  testimony we're talking about reading to the jury and using in

24  this case.

03:10:05   25    It's clearly relevant.  He used a different index

1    than their current expert and he made admissions about

2    leakage.  So the relevance is really not at issue.

3         Is it available for use by us?  Yes, it is, under the

4    SEC versus Kona case.  And contrary to the argument they make

03:10:27    5    in their papers, we don't have to adopt him as our expert to

6    put the testimony on.  The SEC in that case took the

7    deposition testimony of the defendants' expert and they played

8    it to the jury.  They didn't retain him, they didn't adopt

9    him.  They played it.

03:10:47    10    And the Glendale case that we cited in our papers

11    does a really good analysis of how you can use this testimony

12    under 801(d)(2)(C) as a party admission.

13         They say if the testimony is withdrawn before trial,

14    you can't use it.  Once you pass that Rubicon and you use his

03:11:07    15    testimony at trial, the prior trial, it becomes an admission

16    under 801(d)(2)(C).

17         He doesn't need to be an agent of the party.  And the

18    Court does a really good analysis of how it's different than

19    801(d)(2)(D).  It's is it authorized.  And it becomes

03:11:27    20    authorized by the defendants putting him up as their expert,

21    adopting his positions and his opinions throughout the trial.

22         And the cases that they cite, which are the SanDisk

23    and the Kurt case, they rejected the use of a prior expert's

24    testimony because it was from an unrelated case, unlike this

03:11:47    25    situation.

1          And then they do raise another argument with respect

2     to availability.  And I hope under 804(b)(1) that he's not

3     available.  We had an agreement that that wasn't an issue,

4     that -- and I hope that their papers were just a mistake in

03:12:04   5     the way they presented them in the rush to get everything on

6     file.

7          I mean, we had an agreement that they could object to

8     whether or not his testimony should come in, the argument that

9     was just made by Mr. Farina.  But we had an agreement that in

03:12:16  10     addition to three other witnesses that are outside the

11     jurisdiction, that they wouldn't raise the unavailability and

12     force us to try to contact him, which is what you're required

13     to do under that provision.

14          So we had an agreement.  We saw what they put in

03:12:31  15     their papers, and so we had to submit the Drosman declaration

16     with the e-mail showing that they made this agreement with us.

17     So we assume that they're retracting that particular argument

18     on unavailability because we did have a deal that that

19     provision -- he's not available under 804(b)(1), that he can

03:12:49  20     -- they're not going to make that argument because --

21          MR. FARINA:  I'm not making that argument, your

22     Honor.

23          MR. BURKHOLZ:  Okay.

24          MR. FARINA:  That's not our argument.  Our argument

03:12:56  25     is that his testimony is not relevant.  We're not sponsoring

1    him as a witness in this trial, this retrial.  And to present

2    his expert testimony and to try to explain his testimony and

3    put it in context, the jury is going to want to know why some

4    other person is going to be offered as an expert when that

03:13:16    5    person doesn't appear.

6        There is an expert, it's Professor Ferrell.  There's

7    another expert, it's Professor Cornell.  We've not offered

8    Professor Bajaj in this trial, so it's not a circumstance

9    where we offered him in this trial and then are pulling him

03:13:29    10   back.  Whatever probative value -- and it is slight, if any --

11   is clearly outweighed by the risk of confusion.

12       It is already going to be extraordinarily confusing

13   to this jury to try to figure out -- and they're going to be

14   guessing -- as to what happened in the first proceedings and

03:13:47    15   why are they here to decide these issues.  To infuse the trial

16   with even more confusion by presenting testimony from an

17   expert we're not offering as an expert at this trial, we think

18   is not necessary, not appropriate and is likely to confuse the

19   jury.

03:14:04    20       MR. BURKHOLZ:  Your Honor --

21       MR. FARINA:  But I'm not arguing hearsay, I'm not

22   arguing availability.  We just think this is a bad idea that

23   will confuse the jury.

24       MR. BURKHOLZ:  Well, they have to live with the

03:14:13    25   decision they made.  They used him in the first trial.  Under

1       the case law it's a party admission.  We should be able to use

2       it to show that they now are changing their position in this

3       litigation on what the proper peer index is.  And it's

4       literally -- that is the key testimony along with his

03:14:29  5   admission on leakage.  And, frankly, we should be able to use

6       it in cross-examining their defendants' experts.

7           We cite -- I go back to the Glendale case because

8       it's a really good analysis.  And they say you can use it if,

9       quote, the testimony formed part of the underlying facts or

03:14:45  10  data upon which the expert based their opinions.

11          And we have Professor Ferrell's report in this case,

12      Exhibit B, documents relied upon.  What does he have in there?

13      Trial testimony and deposition testimony, I believe, of

14      Professor Bajaj.

03:15:05  15      So if he relied on it we should be able to

16      cross-examine their experts on it, and we should be able to

17      play the trial designation, which is relatively short, for the

18      jury because it's an adoptive admission.

19          MR. FARINA:  Your Honor, Professor Ferrell and

03:15:19  20  Professor Cornell both specifically address this.  They both

21      said that they conducted their own independent assessment and

22      did not rely upon Professor Bajaj's assessment.  They said

23      they read his testimony for context.  They did not evaluate

24      his opinions, they are not basing their opinions on his

03:15:36  25  opinions.  So they are not relying on Bajaj's testimony.  And

1   they made that abundantly clear in their depositions.

2          And the plaintiffs had every opportunity to inquire

3   of our experts, Professor Ferrell and Professor Cornell, about

4   Professor Bajaj.  They did that.  They said, We're not using

03:15:55   5   Professor Bajaj's opinions.  I can't critique his opinions

6   because I really didn't study them.  I have formed my own

7   independent judgments.  We want those independent judgments

8   presented to the jury.

9          MR. BURKHOLZ:  Isn't that really what the jury should

03:16:08   10   do?  They should hear examination about the documents that an

11   expert relies upon?  That we should be able to cross-examine

12   them about those documents that they rely upon, including this

13   testimony?

14          MR. FARINA:  Their testimony could not be more clear

03:16:22   15   that they were not relying on his analysis.  They have no

16   criticism of it, they have no endorsement of it.  They did

17   their own independent analysis.  That's what they did, that's

18   what they testified to.

19          MR. BURKHOLZ:  And then finally, your Honor, just

03:16:34   20   like a party admission from the first trial, testimony that we

21   can use in the second trial, the testimony of Professor Bajaj

22   fits within the party admission under the case -- the Glendale

23   case and the statute, and we should be able to use it.

24          THE COURT:  I agree with plaintiff.  The motion, No.

03:16:51   25   9, the final plaintiffs' motion, is granted.  The plaintiffs

1    will be able to introduce the testimony of the former defense

2    expert, Professor Bajaj.

3                MR. FARINA:  Thank you, your Honor.

4                MR. BURKHOLZ:  Thank you.

03:17:07    5    THE COURT:  Let's get to the defense motions in

6    limine.  And what remains of the defense's first motion in

7    limine?

8                MR. FARINA:  Your Honor, I believe that in light of

9    your Honor's rulings and in light of our changes to your

03:17:25   10    Honor's rulings, by agreement defense motion in limine No. 1

11    is moot.  I believe No. 2 is also moot.

12                MR. DOWD:  That's fine with the plaintiffs, your

13    Honor.  We agree.

14                THE COURT:  No. 3, defense motion to preclude

03:17:49   15    plaintiffs' expert from expressing opinions not previously

16    disclosed.  And this is specifically as to Dr. Fischel.

17                MS. MAHAFFEY:  That's correct, your Honor.

18                MR. BURKHOLZ:  This is No. 3, your Honor?

19                THE COURT:  Yes.

03:18:07   20    MS. MAHAFFEY:  Your Honor, while not specifically

21    mooted by the parties' agreement, we think the parties are in

22    agreement about the issues raised in this motion in limine.

23    And provided that the Court grant this motion, we would agree

24    that the same standard would apply to our experts as well.

03:18:25   25    MR. BURKHOLZ:  Your Honor, I don't understand the

1    representation being made.  I mean, we object to any

2    restriction on Professor Fischel's testimony.  I mean, that's

3    what motion in limine No. 3 is trying to do.

4         Unless they're withdrawing the motion in limine, I

5    would like to be heard on it.  I don't --

6         MS. MAHAFFEY:  Well, let me explain the basis for my

7    representation, which is that in their opposition plaintiffs

8    don't dispute that under Rule 26 they are precluded -- or they

9    should be precluded from offering any testimony by Professor

10   Fischel that was not disclosed to us previously in his expert

11   reports.  I don't think that they dispute that.  And that's

12   all we're asking.

13        THE COURT:  In the abstract you don't dispute that?

14        MR. BURKHOLZ:  Not in the abstract, no.

15        There's particular documents that are in his reports

16   and that he testified at trial that they don't want him to

17   testify about.  And we're letting their expert testify about

18   documents that aren't even in his reliance materials, in

19   Institutional Investor magazine.  It seems very unfair.  And

20   he should be able to testify about documents that are in his

21   expert report or in his reliance materials.

22        MS. MAHAFFEY:  Your Honor, I should be clear.

23        We are not objecting to Professor Fischel testifying

24   about documents that are in his reliance materials or in his

25   expert report.

1      MR. BURKHOLZ:  Okay.

2      MS. MAHAFFEY:  The basis --

3      THE COURT:  Or are incorporated in --

4      MS. MAHAFFEY:  The basis for the motion was certain

03:19:52    5  statements made by Professor Fischel during his deposition

6  that indicated that he may seek to go beyond the documents and

7  testimony that is included in his -- I'm sorry, the documents

8  and opinions that are expressed in his reports.  And we just

9  want a preclusive ruling saying that he can't do that at the

03:20:11   10  trial.

11      We don't think that would be fair.  He's had six

12  reports.  He's had the last word in this case.  Your Honor

13  allowed him to provide a surrebuttal report after our expert

14  reports.  We just think that there's no excuse for him going

03:20:25   15  beyond the opinions that he's already previously expressed in

16  those six reports in the case.

17      MR. BURKHOLZ:  And I don't think there's anything he

18  said at his deposition -- I defended him -- that was anything

19  beyond the opinions he's given in this case.

03:20:37   20      THE COURT:  And specific information is objected to

21  in this motion, correct?

22      MR. BURKHOLZ:  Exactly.

23      THE COURT:  All right.  And as to that information --

24  I'm trying to figure out whether, in fact, there's still a

03:20:46   25  motion -- whether the motion that was filed is still your

1      position or whether you're amending it or withdrawing it?

2              MS. MAHAFFEY:  Well, specifically, your Honor, during

3      his deposition Professor Fischel said at least seven times

4      that he could have included more dates under the specific

03:21:02   5      disclosure model.  He never did.  He was given six

6      opportunities to amend his opinions if he wanted to.

7              And we don't think it's proper for him to testify

8      that there are additional dates under the specific disclosure

9      model during the trial when he's had six opportunities to let

03:21:18  10      us know what those additional dates might have been.

11              MR. BURKHOLZ:  Okay.  Now we're getting to the second

12      part of the motion.  So the first part he can testify --

13      you're not disputing he can testify about any exhibits or

14      materials that are in his report or reliance materials.

03:21:32  15              So now we're to the specific disclosure model.  And

16      he did testify at the first trial -- we have it in our papers

17      -- that he could have used other dates in his calculation of

18      the $8 of inflation on the specific disclosure model.  And he

19      pointed to the 93 dates in -- that Professor Bajaj had said

03:21:56  20      were relevant, and he said on the stand, If I included those

21      93 dates that the defendants' expert said were fraud related,

22      my inflation would increase from 7.97 to $15.  That's what

23      came out in front of the first jury.

24              He said, However, I didn't do that.  And here is my

03:22:16  25      inflation calculation for the specific disclosure model, but

1   for the leakage model you need to consider all of the

2   disclosures that come out during the leakage period.

3          And they've raised the -- so he should be able to

4   point to that in this particular situation.

03:22:32    5          And then with respect to other fraudulent -- sorry,

6   other fraud related statistically significant clients that he

7   didn't include in this current calculation of the specific

8   disclosure model, there's no reason he can't refer to them.

9   He's going to say why he didn't include them.  They can

03:22:53   10   cross-examine him.

11          Professor -- I mean, Mr. Farina did a nice job at the

12   deposition.  I'm sure he'll be good at trial.  But he should

13   be able to explain the relevance of those dates and why he

14   didn't include them in the calculation and they can

03:23:08   15   cross-examine him.

16          THE COURT:  Counsel?

17          MS. MAHAFFEY:  Your Honor, that he could have

18   included additional dates is not his opinion.  Professor

19   Fischel put forth two specific requirements for a date to be

03:23:23   20   included in his specific disclosure model; that is, that there

21   was a statistically significant price movement that he was

22   reasonably confident was caused by a fraud related disclosure.

23   He found 14 of those.  He never stated that he found another

24   one.

03:23:39   25          And, quite frankly, it doesn't make any sense that he

1    says he could have found another one because he didn't.

2    That's not his opinion.  That's not proper for him to say

3    that.

4                THE COURT:  The motion that's before me is going to

03:23:54    5    be denied as to the specific preclusions that the defense

6    seeks.  Those motions are denied in terms of the general

7    notion that he cannot testify to previously disclosed

8    information.  That is true.  The plaintiff does not dispute

9    that, that the specific objections are overruled.

03:24:15   10                The motion is denied.  He can testify as he testified

11   previously, that he could have included more dates under the

12   specific disclosure model.  Motion is overruled.

13                MR. BURKHOLZ:  Thank you, your Honor.

14                THE COURT:  Thank you.

03:24:36   15                Next, defense No. 4:  To exclude evidence concerning

16   expert witnesses that is unrelated to their opinions and

17   testimony.

18                MS. MacDONALD:  Thank you, your Honor.

19                THE COURT:  Ms. MacDonald, I ruled earlier on two of

03:24:57   20   these, right -- at least two of them?

21                MS. MacDONALD:  I --

22                THE COURT:  Or at least I indicated which way I was

23   leaning --

24                MS. MacDONALD:  Yes.

03:25:06   25                THE COURT:  -- regarding the fact that defendants

1      tried to hire Fischel?

2             MS. MacDONALD:  Yes, you did, your Honor.  And I

3      think you also slipped in the defendants' counsel's statements

4      at trial about Fischel as well.

03:25:18    5             THE COURT:  As to the second, complimentary questions

6      asked of Fischel by -- I'm sorry --

7             MS. MacDONALD:  The third -- are you moving on to

8      third category, your Honor?

9             THE COURT:  Complimentary statements about Fischel

03:25:30   10      and his company made by defendants' current experts.

11             MS. MacDONALD:  Exactly.

12             THE COURT:  You also seek to bar those?

13             MS. MacDONALD:  Yes, your Honor.

14             These -- as with the other two, they're not evidence.

03:25:37   15      They are irrelevant.  We think it will sufficiently confuse an

16      already confused jury to have to be hearing about consulting

17      experts and who thinks what about various staff members at

18      consulting experts' shops.

19             Plaintiffs previewed for us what they intend to do

03:25:57   20      with this information in their briefing, which is to suggest

21      that -- setting aside the fact that Professor -- Drs.  Cornell

22      and Ferrell have contracts with Compass Lexecon that provides

23      a right of first refusal such that those experts, to the

24      extent Compass Lexecon is not conflicted, they are required to

03:26:18   25      use Compass Lexecon as their support staff.

1       The plaintiffs want to make some -- because in this
2   case Dr. Fischel had been retained by plaintiffs and, thus,
3   Compass Lexecon was, in fact, conflicted, those experts turned
4   to a different consulting shop.

03:26:31   5       So plaintiffs have said in their papers some
6   suggestion that our experts', the defense experts', quote,
7   first choice, end quote, was to use Compass Lexecon, that's
8   just not accurate.  I mean, it's a contractual requirement.
9   But there seems to be some sort of innuendo that somehow their
03:26:49  10   consultants are better than our consultants.  We think it's
11   just improper and has no business going in front of the jury.

12       THE COURT:  Mr. Dowd?

13       MR. DOWD:  Yes, your Honor.

14       Your Honor, have you already ruled on the attempted
03:27:00  15   retention in defense counsel's statements?

16       THE COURT:  Yes.

17       MR. DOWD:  Then I won't address those.

18       I think as to the defendants' experts' comments about
19   Fischel, I think it's something that's clearly relevant.

03:27:12  20       I mean, when we say to Professor Ferrell, defendants'
21   expert, what do you think of Professor Fischel as an
22   economist, and he says he's a very smart and talented
23   economist, I mean, how do I not get that in?  I should get
24   that in.  It's relevant, it's relevant that their expert
03:27:30  25   thinks that our expert is very talented and very smart.

1        And then both Ferrell and Cornell were asked, do you

2    think Professor Fischel is honest?  And they said, yes, I

3    think he's honest, both of them.  And I think we should be

4    allowed to ask that.  I think that it's clearly relevant.

03:27:50   5        I mean, a witness' credibility is always relevant.

6    No different for an expert than anybody else.  Credibility is

7    always an issue.  So as to honesty, we should be able to ask

8    that question of their experts.

9        As to their qualifications, I mean, that's always

03:28:05  10    relevant to an expert.  You should always be able to consider

11    an expert's qualifications.  It's something the jury has to

12    consider.

13        And if their expert is willing to concede that our

14    expert is a very smart and talented economist, we should be

03:28:18  15    able to put that in, your Honor.

16        I think -- you know, the defendants say, well, you

17    know, it's more prejudicial than probative, and then they cite

18    cases.  Your Honor, when I read them it's like -- you know, it

19    says if it's -- it's unfairly prejudicial if it appeals to the

03:28:31  20    jury's sympathies, arouses its sense of horror or provokes the

21    instinct to punish.  I mean, this isn't 403.  It's just not.

22        I mean, is Professor Fischel honest?  Yes, he is,

23    from both of their experts.  It's not going to waste any time.

24    It's just not prejudicial under the standard.

03:28:49  25        Same thing with their statements that they made about

1   that he's a very smart and talented economist.  I mean, we

2   asked it in the deposition purely to see what they'd say and,

3   you know, they gave us the answers that we wanted.  I think

4   it's relevant.  I don't think that it's prejudicial in any

5   way.

6          And, you know, the same issue for the fact that they

7   use Professor Fischel's people as their first choice.  It's

8   interesting.  I laughed just now when Ms. MacDonald said that

9   about, you know, it's not a choice, it's a contract.  That's

03:29:21  10   actually what Professor Ferrell said.  And I said that must be

11   what they, you know, teach you at the Harvard Law School,

12   where he is.  But, you know, like in Michigan, where I went,

13   if you entered into a contract, it was because you did it by

14   choice.  So, I mean, that's what -- you know, that's what

03:29:36  15   happens with these guys.

16          They both have as their first choice for economic

17   analysis and support the people that are supporting Fischel

18   right now, and I think we should be able to ask them about

19   that.  I think it's relevant.  I don't think it's prejudicial.

03:29:53  20   I don't think it's fair for defendants to say it's not a

21   choice when they entered into a contract where they say these

22   are the guys I want to use.  This is the first choice for my

23   economic analysis.

24          So I think certainly as to credibility and

03:30:07  25   qualifications, the fact that they said he was a smart and

1    talented economist should come in.  The fact that they said he

2    was honest should come in, as to both defendants.  And I also

3    think the fact that, you know, this is their first choice for

4    support should come in.  But certainly the first two.

5    03:30:23         Thank you, your Honor.

6                MS. MacDONALD:  Your Honor, I want to be clear.

7                To my knowledge, no defense expert used the words

8    "first choice."  That is Mr. Dowd's words.  So that just

9    wasn't said before.

10   03:30:31    I think none of this is relevant.  It's confusing to

11   the jury.  It's not probative of anything.  So, you know,

12   we'll stand by that we think that that does not belong in the

13   trial.

14               THE COURT:  All right.  The ruling is that the motion

15   03:30:44 is granted.

16               As to efforts by the defendant to hire Fischel first

17   but the plaintiffs got -- or efforts to hire Fischel but the

18   plaintiffs got to him first, that is out.  Also out are

19   complimentary questions asked by a former defense attorney on

20   03:31:06 the case.  But the motion to bar the complimentary statements

21   about Fischel and his company made by defense -- defendants'

22   current experts is denied.

23               MR. DOWD:  Thank you, your Honor.

24               THE COURT:  Thank you.

25   03:31:22    Let's go to our next motion, motion to preclude

1   references to non-parties, HSBC and HSBC Finance.

2          Ms. MacDonald?

3          MS. MacDONALD:  Thank you, your Honor.

4          MR. DOWD:  Your Honor, could I just have one second

5   with Ms. MacDonald?

6          THE COURT:  Yes.  Let's take ten minutes.  We'll

7   start up at 20 till.

8     (Brief recess was taken.)

9          THE COURT:  All right, counsel, we are on Defense No.

10  5, correct?

11         MS. MacDONALD:  Yes, your Honor.

12         This is defendants' motion to exclude references to

13  HSBC.  Your Honor, HSBC is not a party.  We submit they're

14  even less relevant than the lead plaintiff.  So they acquired

15  Household after the class period.  HSBC is not a party.

16  They're not here.  They are a large bank.  We think any

17  reference to them not only is it not relevant, but it's also

18  confusing to the jury.

19         The plaintiffs in opposing have basically made two

20  arguments.  They say that HSBC's identity as to Household's

21  parent company is relevant to loss causation.  This is, by

22  definition, not true because, of course, the merger happened

23  after, and was announced after, the end of the class period.

24  All that matters is what happened to the stock price by the

25  last day of the class period, which is October 11th, 2002.  A

```
 1   merger that was announced a month later, by definition, is not
 2   relevant to loss causation.
 3          And, then, the second thing that we see from their
 4   papers is that they intend to argue that there are references
 5   to HSBC in various documents that the experts have relied
 6   upon.  On that, your Honor, it's just a pretext.  They're
 7   using documents that are after the class period that make a
 8   point about, in this case, non-fraud-related factors that may
 9   have impacted the stock price.  It's just by virtue of the
10   fact that it appears in an article that is also about the
11   merger.
12          So we submit that those are not critical documents.
13   They could be -- that point could be made in a different way.
14   But if we needed to, we could come up with some sort of
15   redaction or some way to address that issue.
16          So, again, stepping back, we just think it's not
17   relevant; it's confusing; happened after the close of the
18   class period; and, therefore, it's not relevant.
19          MS. STAKEM:  Good afternoon, your Honor, Hillary
20   Stakem for the plaintiffs.
21          Your Honor, just as an initial matter, the defendants
22   spent a good portion of their motion on the subject matter of
23   trying to preclude plaintiffs from referencing either HSBC or
24   HSBC Finance's net worth or financial condition.  No court
25   order on that is actually necessary.  Plaintiffs have
```

03:45:59 (line 5)
03:46:16 (line 10)
03:46:29 (line 15)
03:46:42 (line 20)
03:47:00 (line 25)

1    absolutely no intention of referencing either HSBC or HSBC

2    Finance's net worth or financial condition.  So that's really

3    a non-issue.

4            With respect to the second portion of defendants'

03:47:18   5    motion, though, which actually seeks to preclude reference

6    even to the fact that HSBC acquired Household, that, you know,

7    we do take issue with.  The defendants' claim is that it will

8    be prejudicial because the jury, if they find out that HSBC,

9    this large bank, acquired Household, they might be more likely

03:47:37  10    to award additional damages beyond what they otherwise would.

11    And, frankly, your Honor, those claims -- that's completely

12    speculative.  We submit that it's very unlikely.

13            And, frankly, your Honor, the jury is not going to be

14    under any illusion that Household is some small company.  You

03:47:56  15    know, they have 50 million active customer accounts.  It was

16    largely at issue in the last trial that there were 32,000

17    employees.  Household was a large financial institution.  And

18    I don't see how the fact that another large financial

19    institution acquired it is prejudicial or will encourage the

03:48:15  20    jury to decide the issues on an improper basis.

21            THE COURT:  And, Ms. Stakem, the plaintiff has no

22    intention of arguing that it is a banking giant, et cetera, or

23    referencing the stature of HSBC?

24            MS. STAKEM:  No, your Honor.

03:48:31  25            The reason that HSBC is actually relevant to loss

1      causation is because in the context of the merger, the market

2      was actually discussing various factors that related,

3      actually, specifically to loss causation, including

4      Household's problem accessing low-cost funding, their bond

03:48:52   5      spreads widening, various other factors that actually

6      defendants' expert Farrell puts directly at issue, claiming

7      that they are categories of non-fraud information.

8           Now, Professor Fischel disputes that and actually

9      cites in his report a Chicago Tribune article in which

03:49:09   10      defendant Aldinger directly links the concerns, such as the

11      ability to locate low-cost funding, to the defendants' fraud,

12      concerns in the market about predatory lending, et cetera.

13           So, you know, the fact was that HSBC, the market

14      felt, got a deal on Household; and, part of that was because

03:49:32   15      basically defendants' fraud had damaged the value of the

16      company so much.

17           So we feel that it is very relevant, and that there

18      is no prejudice from mentioning the fact that HSBC is

19      Household's parent company.

03:49:45   20           THE COURT:  Ms. MacDonald?

21           MS. MacDONALD:  Your Honor, the notion that HSBC

22      acquired a damaged company is based entirely on the stock

23      price that they paid.  When you merge -- when two companies

24      merge, the determining factor for how much it costs is the

03:49:59   25      stock price.  It has nothing to do with the fraud.

03:50:16

1        The class period ended on October 10th, 2002.  The

2  idea that something happened a month later, a year later, a

3  decade later somehow sheds light on what affected the stock

4  price months or weeks before is, I submit, a pretext.  It's

5  not possible.  It's literally impossible.

6        The idea that the experts rely on documents that,

7  again, are looking backward in time and making observations,

8  again we submit that those are not relevant.  Those exact

9  same -- what is actually relevant are sort of contemporaneous

03:50:36

10  observations by analysts and investors, not backward-looking

11  ones.

12        But as I said earlier, to the extent there are

13  particular documents -- they flagged one in their briefing,

14  and I think that it would be an easy workaround to redact or

03:50:49

15  excerpt the quotes that they want to use without getting into

16  the merger.

17        MS. STAKEM:  Your Honor, if I may just respond

18  briefly?

19        THE COURT:  Yes.

03:50:57

20        MS. STAKEM:  In the first place, one of the

21  documents, for example, that mentions HSBC that we've

22  identified, it comes from Category I of the defendants'

23  motion.  This is from an individual, Curt Cunningham, who was

24  the Director of Household Mortgage Services Policy and

03:51:17

25  Compliance Support.  And if I may just read the first

1    paragraph here so you can see the connection between the HSBC

2    merger and defendants' fraud --

3                    THE COURT:  Ms. Stakem, I'm going to cut you off

4    because the motion's going to be denied.  The first part of

03:51:31    5    the motion, I don't think there's any prejudice.  The

6    plaintiff is not going to make inappropriate arguments or

7    dwell on the size of HSBC vis-à-vis Household.

8                    As to the second part of the motion, it's moot as the

9    plaintiff is not going to introduce evidence about the

03:51:50   10    financial condition of HSBC or HSBC Financial.  Right?

11    Finance?

12                    All right.  Next, we've got the individual

13    defendants' motion to bar evidence regarding their financial

14    condition.

03:52:07   15                    MR. DOWD:  Your Honor, that's resolved by the

16    agreement that the parties reached this morning.

17                    THE COURT:  All right.  So that is moot.

18                    MR. FARINA:  Your Honor, I think Mr. Dowd and we can

19    get this stipulation to your Honor probably tomorrow --

03:52:26   20    tomorrow morning.  We just need to clean it up a little bit.

21    We should be able to provide that for your Honor.

22                    THE COURT:  In terms of the pretrial order then, does

23    it make sense to hold off or are there things that we can

24    resolve that are not resolved?

03:52:45   25                    MR. FITZGERALD:  Your Honor, it might make sense for

1    all of us to look at the filings, again, in light of what

2    we've done today.  I know there's like a short statement of

3    the case, but the nature of the case has changed for both of

4    us.  And so --

03:52:56    5    THE COURT:  Would it make sense to come back here

6    tomorrow afternoon, say?  Otherwise -- well, I want to move up

7    the briefing on the motion to reconsider.  I'm going to ask

8    the plaintiff to respond in two days so I can get a reply on

9    Friday.  So, response on Wednesday, reply on Friday to the

03:53:13    10    motion to reconsider.

11    Monday is a holiday.  Does it make sense to come back

12    here before next Tuesday or just come back here next Tuesday?

13    MR. DOWD:  Your Honor, in looking at the final

14    pretrial order, I think, you know, we had substantial

03:53:32    15    agreement about, you know, the descrip- -- the short

16    description of the case isn't going to be a problem now.  We

17    already have a long description of the case that both parties

18    agree to.  So --

19    THE COURT:  My sense was that I could simply use the

03:53:47    20    one paragraph the parties agreed to as part of the

21    questionnaire.

22    MR. DOWD:  That was our thought, as well, your Honor.

23    That's what kind of made sense because it's --

24    THE COURT:  Obviously, that's just the prospective

03:53:55    25    jurors.  They don't need much more than that.

1          MR. FITZGERALD:  That makes sense, Judge.

2          MR. DOWD:  And I think we covered the questionnaire

3   last week.  I think the exhibit lists and the witness lists,

4   almost everything is going to be resolved.  So I don't really

03:54:07    5   see any issues.  If there are any issues, I think the parties

6   can raise them with the Court, you know, down the road a

7   little bit.  I think that makes more sense if there's any

8   serious objections.  But I think we've covered pretty much

9   everything with respect to that.

03:54:21   10          I think the Court gave some guidance today about

11   statements of qualifications of the experts, and some of the

12   objections to that are actually resolved by the stipulation,

13   as well.  But we can certainly talk to the defendants about

14   that.

03:54:35   15          And I think the deposition designations also, I

16   believe, are pretty much cured by this.  The deposition

17   designation for the one witness is going in as is.  And I

18   think to the extent they want to play Hueman, I think that we

19   agreed on that, as well.

03:54:54   20          But then you just get to verdict form and jury

21   instructions.  The Court said you intended to address the jury

22   instructions down the road, and we got guidance today on the

23   verdict form.

24          The motions in limine, we dealt with.  And we had

03:55:09   25   already talked about, you know, timing -- that's in the

1    stipulation -- as well as the remaining issues.

2         So I don't think there's any reason to come back

3    tomorrow afternoon, is the long and short of it.

4         MR. FARINA:  Your Honor, I think we would agree with

03:55:22    5    that.  We'll go over what's left with -- carefully we'll do

6    that with Mr. Dowd.  And I think we can provide to you

7    documents that are agreed upon by the parties.

8         We do want to have, if we can, that argument that was

9    discussed on the reconsideration motion, but I don't think we

03:55:40    10    need to be back here before that argument.

11         THE COURT:  On Tuesday?

12         MR. FARINA:  On Tuesday, yes, your Honor.

13         THE COURT:  Okay.

14         All right.  So, let's say Tuesday at 10:30 -- that is

03:55:53    15    May 31st at 10:30 -- so I can get the rest of the call done.

16         In terms of the questionnaire, I will let the parties

17    know that I am looking at it.  It does seem like a lot of

18    questions and sub-questions.  I believe there are 60

19    questions, but it's a lot of information.  I'm taking a look

03:56:18    20    at that to see if it can be streamlined a little bit.

21         What do the parties anticipate in terms of the

22    questionnaire and how it relates to the rest of voir dire?

23    The parties anticipate reviewing the answers, obviously, that

24    the jury gives that morning and, based on those answers,

03:56:39    25    making their challenges?

1      MR. DOWD:  Well, I'd like to see the jurors, as well,

2  your Honor.  So, I'd still like the Court to --

3      THE COURT:  Absolutely.

4      MR. DOWD:  -- give us -- I asked if I could, you

03:56:50    5  know, have -- if we could have 30 minutes of attorney-

6  conducted voir dire per side.  Even 15 or 20, your Honor, I'd

7  take.

8      THE COURT:  And the defense's position on that?

9      MR. FITZGERALD:  That we should follow the usual

03:57:02  10  practice in this courthouse and save our argument for opening

11  argument and use the voir dire for voir dire.

12      MR. DOWD:  Well, you know, your Honor, I don't know

13  about the local practice.  The only time I tried a case in

14  here was in front of Judge Guzman and he gave me attorney-

03:57:15  15  conducted voir dire.  And, you know, we don't give opening

16  statements in voir dire.  We ask jurors questions about their

17  backgrounds and things like that.

18      So I completely disagree with Mr. Fitzgerald.  I

19  think we ought to get 20 minutes.  It's not too much to ask to

03:57:30  20  put a little meat and bones on the dry questionnaires.  And,

21  obviously, I want to look at the jurors as I make decisions

22  about them.

23      MR. FITZGERALD:  Your Honor, it's not our view we

24  limit it to the questionnaires, but we think that you should

03:57:41  25  ask the jurors questions.  And that's the standard practice.

207

1    It just takes out any incentives for any of us to try to

2    precondition the jurors.  Your Honor asks the follow-up.

3    We'll get to see them.  We'll get the relevant questions

4    answered.  It will be efficient.

03:57:56    5            MR. DOWD:  I just think that --

6            THE COURT:  I'm trying to find where in the motion --

7    I know I read it, but I'm trying to figure out where exactly

8    that is contained in the motion within the first -- I should

9    say the pretrial order.  It's within the first --

03:58:08   10            MR. DOWD:  Yes, your Honor.  It's in the section

11   about the jury questionnaire.  It's in 2(b).  And it says --

12   right before you get to the exhibit numbers like B-1, B-2, it

13   says, plaintiffs propose that each side be allowed 30 minutes

14   of attorney-conducted voir dire.  Defendants oppose

03:58:27   15   plaintiffs' request and believe any further voir dire should

16   be conducted by the Court.

17            So it's on Page 3 right above the list of the B

18   exhibits.

19            THE COURT:  What page?

03:58:39   20            MR. DOWD:  Page 3 of the proposed final pretrial

21   order.  Then there's a list there, your Honor.  See B-1, B-2,

22   all that?  Right above that it says, plaintiffs propose each

23   side be allowed 30 minutes of attorney-conducted voir dire.

24            THE COURT:  Over the plaintiffs' objection, that

03:59:00   25   request is going to be denied.  I will ask the questions.  I

1   will have input from the attorneys -- further input from the

2   attorneys -- if there are any specific follow-up questions the

3   attorneys have once they review the questionnaire, and the

4   attorneys will be given time to do that.  I'll figure out

03:59:16   5   exactly what the mechanics are.

6          But, clearly, I'm going to talk to the jury, make

7   introductory statements.  And so the attorneys will have a

8   chance to view the jurors -- prospective jurors.  And the

9   attorneys, in fact, submitted questions for me to consider

03:59:43   10   asking the jurors.

11          MR. DOWD:  Yes, your Honor.  Those are contained

12   in --

13          MR. FITZGERALD:  B-5, I believe.

14          MR. DOWD:  Right.  There's four from each side.

03:59:55   15          MR. FARINA:  So, the questionnaire that includes the

16   ones that we agreed upon, and then we both had ones that we

17   wanted that the other side objected to and those are set out

18   separately.

19          THE COURT:  Right.  And I had reviewed those.  And

04:00:11   20   before I reviewed them, my sense was that these are questions

21   that the attorneys felt would be more properly asked directly

22   by me; but, in reviewing them, it appears that they were just,

23   as Mr. Farina pointed, just questions that the attorneys

24   couldn't agree on.

04:00:29   25          MR. FARINA:  That is a more accurate description.

1            MR. FITZGERALD: Actually, Judge, I think on Page 1,

2   it says, the following are questions that the parties did not

3   agree to include in the proposed written jury questionnaire.

4   Thus, plaintiffs and defendants propose that the Court ask the

04:00:42    5   following questions in oral voir dire.

6            THE COURT: Right.

7            My point was that it wasn't because of the nature of

8   the questions.

9            MR. FITZGERALD: Oh, okay. Got it.

04:00:48   10            THE COURT: They were --

11            MR. FITZGERALD: Yes.

12            THE COURT: -- simply questions that the parties

13   wouldn't agree to include in the questionnaire.

14            MR. FITZGERALD: That's fair.

04:00:52   15            THE COURT: I've reviewed them. I think the

16   questionnaire is dense. It's lengthy. And over objection, I

17   will not ask these eight questions, four proposed by the

18   plaintiffs, four proposed by the defendants.

19            Trying to get some information to the lawyers as we

04:01:12   20   get closer to trial, but I will wait for the joint submission

21   before we go forward with the rest of the remaining issues so

22   that I can tell exactly what is left to be determined.

23            All right. So we are going to then recess, pass the

24   case until Tuesday. In the meantime, I will review the

04:01:37   25   briefing. And we'll have brief opening -- or brief argument

1    on the motion to reconsider and the remaining motion in

2    limine, and we will be able to figure out exactly what else we

3    can accomplish beginning at 10:30 on Tuesday, May 31st.

4             Anything else today?

04:02:02   5        MR. FARINA:  Your Honor, just on the revisions to the

6    pretrial order and the stipulation, we could have the

7    stipulation to you tomorrow.  In looking at the pretrial

8    order, there are a number of things -- we want to look at it

9    carefully -- that probably have changed.  So do you want

04:02:16   10   everything at once after we've all had a chance to go through

11   it, or do you want things as we finalize it?

12             THE COURT:  The sooner I get some information, the

13   better.  So I want to encourage the parties to continue to

14   work.  But to the extent that you already have reached certain

04:02:35   15   agreements, let me know in one filing -- one initial filing.

16   And, then, as other agreements come in, feel free to let us

17   know.

18             MR. FARINA:  Terrific.  We will do that.  Thank you.

19             THE COURT:  All right.  Thank you.

04:02:47   20        MR. FITZGERALD:  Thank you, Judge.

21             MR. DOWD:  Thank you, your Honor.

22      (Hearing adjourned until May 31, 2016, at 10:30 a.m.)

23

24

25

1                           *       *       *       *       *

2

3     We certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

4
      /s/ Nancy LaBella                          May 24, 2016
5     Official Court Reporter

6
      /s/ Mary Hacker                            May 24, 2016
7     Official Court Reporter

8
      /s/ Joseph Rickhoff                        May 24, 2016
9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25