# Exhibit B

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4   IN RE:                    §    CASE NO. 19-35133-H1-11
                               §    HOUSTON, TEXAS
 5   ALTA MESA RESOURCES, INC. §
     AND ALTA MESA HOLDINGS, LP,§    THURSDAY,
 6                             §    JANUARY 23, 2020
                   DEBTORS.    §    8:32 A.M. TO 4:58 P.M.
 7

 8               SALES HEARING (CONTINUED)

 9          BEFORE THE HONORABLE MARVIN ISGUR
             UNITED STATES BANKRUPTCY JUDGE
10

11

12      APPEARANCES:              (SEE NEXT PAGE)

13      COURTROOM DEPUTY:         TYLER LAWS

14      COURT RECORDER:           CLAUDIA GUTIERREZ

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 ELDRIDGE ROAD, #144
22               SUGAR LAND, TEXAS 77478
                   Tel: 281-277-5325
23              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.
```

1        (No response.)

2              THE COURT:  All right, thank you.

3              COURTROOM DEPUTY:  All rise.

4         (Recess taken from 3:45 p.m. to 4:30 p.m.)

5                        AFTER RECESS

6              COURTROOM DEPUTY:  All rise.

7              THE COURT:  We'll go back on the Record on Alta

8    Mesa.

9              MS. RECKLER:  Your Honor, Carolyn Reckler on

10   behalf of the Debtors.  You know, after working with all the

11   parties I think what we're going to ask Your Honor to do is

12   to please issue a ruling.

13             THE COURT:  All right.  This is a matter of

14   whether to approve a sale process and a sale.  We have

15   jurisdiction over this under 28 U.S.C. Section 1334.  This

16   is a core matter under 28 U.S.C. Section 157.

17             I find that the sale should be approved to BCE;

18   that it should be approved on the terms that have been

19   proposed.  These are my reasons why.

20             First we need to determine what the appropriate

21   standard for review is.  Under any standard the Debtors

22   prevail today, so I will utilize the highest standard, even

23   though I think a lower standard is probably the correct one.

24             The question I believe is whether the Court,

25   having reviewed the Debtor's decisions, believes that they

1  have properly exercised their business judgment after
2  careful scrutiny by the Court.  But if the correct decision
3  is one of overall fairness, I find that that standard two is
4  not only met, but it clearly met.
5          There are a number of issues that have come before
6  the Court when trying to go through the most important ones.
7  If the parties send additional and more specific findings
8  they can request that and I will try and get a written
9  opinion out.  I'm doing this orally, now, so that the
10  parties can hear the ruling and file whatever appeals they
11  want.
12         So that I am clear, however, I want any order that
13  we sign to include the stay that will go through and not
14  allow a closing by February 12th.  That is not only for the
15  purpose of the prior parties, who I excluded from
16  participating, but also to allow the parties that remained
17  in the litigation an opportunity to appeal and get a stay.
18         I am, however, quite confident that this is the
19  correct ruling.
20         Both Debtors carefully reviewed what claims there
21  were against BCE and its associated entities and people.
22  That was done carefully, it was done independently, and it
23  was supervised by directors who I find were completely
24  independent.
25         There were places where minor glitches were

1   pointed out, I think by the opposing parties, but they were

2   nowhere near sufficient to challenge the overall result that

3   is there. There were extreme reports done, extreme analysis

4   done, and millions of dollars spent to conduct this

5   independent analysis. And when all is said and done, I

6   didn't see any claims that I thought had material value.

7         The $3.1 million that is given as a deduct to the

8   BCE claim under a scenario, that isn't the one we have here,

9   was a fair and reasonable estimate. The reason why it's not

10   a fair and reasonable estimate is because of the treatment

11   of the releases by the bonds claims means that there should

12   not have been any deduction on that side, but instead a

13   deduction on the bond side.

14         What are the claims against BCE? The one that we

15   got an awful lot of focus on I think in this hearing, has to

16   do with whether there was an error done by BCE or its

17   directors, its appointed directors, with respect to the 2018

18   drilling program.

19         There is simply no evidence, literally none that

20   the initiation of that program was not done properly, that

21   it was not done independently and that it was not done after

22   thorough work.

23         The fact that it failed and that people were

24   wrong, doesn't entitle one to make a bona fide claim against

25   them. When I say there is no evidence, literally the only

1  thing that came into the Record is an email that repeats

2  hearsay that an investor thinks more work should have been

3  done, without any support that more work in fact should have

4  been done.  So the only thing I have is, it didn't work, and

5  it didn't work isn't enough to file a lawsuit.

6         By the fourth quarter should money have stopped

7  being spent.  The evidence is that the company was

8  addressing the issues.  There is zero evidence that there

9  was bias in the decision-making process in which BCE

10  participated to keep the program going for what I will

11  describe as unscientific means.

12         This is a drilling program.  This is an E&P

13  project.  If someone invests in an E&P project for new

14  technology in the Oklahoma STACK and doesn't think that

15  there is a risk of failure, that's just crazy to think that

16  you can then sue over that.  It's a high-risk investment.

17         And when you get to the end and what the company

18  is doing is struggling with how does it address the failure,

19  it was struggling with that, it addressed it, it dealt with

20  it, it considered it, it thought about what to do and I

21  think it made decisions that maybe in retrospect they wished

22  different decisions had been made, but decisions that don't

23  subject them to sue.

24         With respect to every claim against BCE and its

25  directors, there's another flaw.  And that is that BCE in

1  its director capacity, was one of 9 to 11 directors.  That

2  is the best I have on the evidentiary Record, and it is not

3  as thorough as I wish, $100,000 million worth of D&O

4  coverage.  That coverage, best as I can discern from the

5  evidence before me, will apply with equal force to the other

6  9 or 10 directors who are not released.

7          So if I'm wrong and if there's a claim, the

8  company gave up one defendant in order to get the best deal

9  that it could, when it still has claims against the other

10  defendants.  Is there a claim for this that might exceed the

11  amount of available D&O coverage for the remaining

12  directors?  There is not a scintilla of evidence that there

13  is such a large claim as that.  I don't think there should

14  be any complaint about that.

15          Second problem about the release is, is the

16  structure and the bonds claim.  The structure and the bonds

17  claims is that only about 13-1/2 percent of the value of the

18  releases will fall down to the existing claimants on behalf

19  of their existing claims.

20          This one gets very confusing because it's true

21  that the bondholders who are making the bid are also the

22  largest unsecured creditors.  The testimony is that they

23  hold about 500 out of 525 of the claims.  There's some

24  problems with that.

25          First of all, those other 25 still need to get

1   treated right and they have a right to whatever it is they

2   have a right to, and when you dilute it down to 13-

3   1/2 percent compared to 100 percent or 90 percent that's

4   still going to be available over on the BCE bid, they are

5   worse off under that arrangement.

6           Second problem is, I don't have any evidence that

7   all 500 are going to invest.  And if all 500 don't invest

8   those who don't, don't get to participate at 86-1/2 percent

9   level.

10          And the third problem is that the secured

11  creditors have a deficiency claim.  And that deficiency

12  claim under Fifth Circuit law, unless they consent

13  otherwise, has the same right to treatment as to proceeds

14  from the releases as any other unsecured creditor has.

15          So when I look at it overall and the value of the

16  releases and how they flow through, the bonds claim by

17  giving 86-1/2 percent of the value to the new money that

18  comes in, preserves only 13-1/2 percent of any released

19  proceeds.

20          The BCE claims probably preserves 100 percent.

21  But even if it's less than 100 percent because the claim

22  turns out to be more than the available D&O and BCE is rich

23  and everybody else is poor, it just doesn't compare to the

24  spread between that and the 13-1/2 percent that is

25  preserved.

1      Second issue that is a very big issue to the Court

2  in making its decision.  The last two witnesses gave

3  testimony that supported what I had concluded before they

4  testified in a really important way.  And that is, that the

5  $5 million deduction that was allocated towards the bonds

6  deal for performance, is vastly understated.  That deduction

7  should be much greater than that.

8      The risk of non-performance by the bonds is huge

9  for a few reasons.  Number one, there's a timing issue that

10  will apply to the *KFM* case.  Well, KFM's going to go broke

11  before you get to the closing.  No one ever addressed what

12  to do about that problem.

13      The second problem is that as to the Alta-Mesa

14  side, if the bonds don't perform they're not left with a

15  backup and they don't have any alternative.  So a failure

16  costs far more than $5 million.  But do you have a reliable

17  bidder so that the probability of failure is fairly low?

18  The evidence is you don't.  Certainly you have reliable

19  financial institutions and major financial institutions that

20  are backing the bid, but those major financial institutions

21  I find were not sufficiently committed to the deal that you

22  could hold their feet to the fire.

23      They weren't committed in a few ways.  Number one.

24  When they came to court prior to the stalking horse hearing

25  we were told that they would make a 363 bid.  They ran into

1  problems -- I'm not blaming anybody for that.  But they ran

2  into problems and they could no longer bid under 363.  That

3  then introduced the delay and it introduced a rush at the

4  end.  But it is demonstrative of their unreliability.  They

5  tell me they can do one thing and then they go to do

6  something else.

7         Number two.  When you look at the documents that

8  are submitted, they're pretty standard documents.  I'd sort

9  of disagree with the Debtors characterization that they have

10  outs that aren't normal in a deal like this.  But there are

11  still plenty of outs.  Documents have to be in their sole

12  discretion, other things have to fall into place.  And the

13  most important one is the Plan has to get confirmed.

14         The commitment that the same parties had made,

15  though, was that they would not do things in their sole and

16  absolutely discretion.  I was told that if there was any

17  problem I would have the right to force them to close.  They

18  didn't make it into the documents, as best I can read.

19  Again, demonstrating some unreliability on the part of the

20  offering parties.

21         But the most important part about the offer, as I

22  indicated, is the ability to close in a plan context.  The

23  deal that is proposed includes a $7-1/2 million allocation

24  to the unsecured creditors.  That obtained the support of

25  the UCC and I understand why.  That $7-1/2 million they were

1  going to get to specially allocate, and I know why they

2  wanted and I'm pleased they were doing their best for their

3  clients to try and get it.  But that money belonged to the

4  secured banks.  The Plan can't take money from the secured

5  banks and allocate it over to the unsecured creditors, not

6  over the secured banks' objection.  This isn't an absolute

7  priority rule.  It's taking secured property away from a

8  secured creditor without compensation.  I can't do that.

9        So the Plan that is there, that has generated the

10  settlement is a non-confirmable plan.  So when you have a

11  non-confirmable plan, and plainly if they can't do a 363

12  deal, then the bonds offer has to be dependent on a plan.

13  It's a plan we can't confirm.  The risk is huge and it is

14  far more than $5 million.  So I think the last two

15  witnesses, I accept their testimony more.

16        Let me say that I think what was going on, and I

17  will say this I think without criticizing anybody for doing

18  it.  But what's going on here is the fiduciaries were trying

19  to hold up BCE for a higher deal.  They were understating

20  the deductions so that BCE would be forced to pay more in

21  order to make a winning bid.  It worked.  They got $10

22  million out of it.  Whether that's the right thing to do or

23  not may be a different question.

24        But in terms of whether or not we demonstrate

25  independence by the two independent directors, when in

1  effect they didn't hold them up by asserting -- and I'm

2  proud of them for this -- asserting non-colorable claims

3  against them.  But I think there was a bit of a hold up and

4  that I don't think they were given accurate information on

5  what the true deducts were.  Eh, BCE's a big guy.  They're

6  paying that extra money.  I'm not going to revisit that.

7         But it shows the level of independence I think

8  that was there.  That is important as to what was going on.

9  But it also means because the scales were tipped against BCE

10  because they were the only viable bidder, it shows both

11  independence and it shows that the deductions were too low.

12         I think that there were a couple things that were

13  too high.  I hope that it would not have cost $5 million to

14  document the Plan at this stage.  But that's far offset by

15  the closing risk.  I really had very little evidence other

16  than kind of a conclusionary statement of, we guess that was

17  $5 million.  I don't give much credence to whether it's 5.

18  But if it's 3, you know, I don't have any contrary evidence

19  at all to that.

20         The final issue that I want to address today on

21  the Record, and again if parties need additional findings I

22  will make them upon request, is whether the allocation is

23  fair.

24         I want to talk about the allocation.  The

25  allocation of the total bid is 72-1/2 percent to the Alta-

1  Mesa side and 27-1/2 percent to the KFM side.  Is that a

2  reasonable allocation?  The testimony that mattered to me

3  were two parts of it.  But one part was actually more

4  important.  One is, it's what the secured creditors agree.

5  The evidence is that they are the fulcrum creditors.  So if

6  one was entitled to a greater allocation than the other one,

7  this is money directly out of their pocket and that the

8  fulcrum parties agreed to it gives credence to the fact that

9  it is fair market.

10         But the other thing that the testimony was is that

11  the Debtors, in determining whether the 72-1/2/27-1/2 was

12  fair, also separately looked at the bids they got from

13  others, and they took the parties that they tried to marry

14  up and they looked at what the allocation was between the

15  married up parties and the 27-1/2 to 72-1/2.  The testimony

16  is uncontroverted, but it is consistent with that.  I think

17  when you put those two together that the allocation was a

18  business judgment by the Debtors and it is one that on

19  scrutiny I should affirm.

20         It's a one-sided ruling but it wasn't a one-sided

21  hearing.  The lawyering in this case was phenomenal, but in

22  the end I think the facts are what the facts are and people

23  couldn't change them.  I reject the minor challenges to the

24  studies.  I do think they were minor.  I think taking, for

25  example an email that says, you know, maybe the agreement

1  should be this way shows some inappropriate control, is not

2  an argument that someone that's used to seeing these deals

3  believes has much credibility in terms of getting to a veil-

4  piercing position.  There are other sort of similar little

5  nits in there and I simply don't credit them.

6          The result is I'm approving the deal.  I want the

7  stay in there.  I want to get an order uploaded that

8  approves it unless we already have one available in court

9  right now that does that, and I'll sign one now.  Or if you-

10 all can get it uploaded I can sign it soon.  Tell me how you

11 want to proceed on that.

12         MS. RECKLER:  Your Honor, we do have a propose

13 order that we uploaded.  We would need to strike one

14 paragraph with some language the parties had been talking

15 about that is no longer relevant.

16         THE COURT:  How long would it take you to get the

17 right order to me or do we have it in Word and we can fix

18 it?

19         Can you-all get it done in about ten minutes and

20 we'll come back out with it?

21         MS. RECKLER:  We sent the Word version to your

22 email address.

23         THE COURT:  There is a Word version.

24         MS. RECKLER:  We would just need to strike one

25 paragraph.

1          THE COURT:  So I'm not sure who wants to take the

2     lead over on the opposing party side.  But Mr. Winograd, you

3     sort of took the lead so far, so I'm going to go ahead and

4     ask you to do this.

5          Can I get you to decide whether you want

6     additional findings of fact and conclusions of law, the two

7     of you-all?  If you-all do, please file something so that I

8     know that I need to get a written opinion if you want more

9     to appeal from than that.

10         And I need to get that done quickly so that you

11    can get your appeal done.  How long do you-all want to

12    decide whether you want additional findings or not?  Because

13    I will grant a motion for more comprehensive findings if

14    that's what you want.  I just need you to tell me.

15         MR. STARK:  Your Honor, may I?  I know I haven't

16    been …

17         THE COURT:  Sure.  And you-all are welcome to take

18    a few minutes and think about it, Mr. Stark.

19         MR. STARK:  That's what I was going to ask.

20         THE COURT:  Yeah.  I mean, if you want to let me

21    know tomorrow or Monday.  I'm staying the closing until the

22    12th.  So it's really a question of I'll work pretty hard to

23    try and get more comprehensive findings out.  That is a lot

24    of work, and I don't know that it helps you if you're not

25    going to appeal it.  If you want to appeal it and you want

1   more complete findings, I will make them for you and I will
2   try and get them done as quickly as I can.  So if you'll
3   just tell me whatever deadline you want for filing that so
4   that I can do my job.
5          MR. STARK:  Your Honor, you're very kind in
6   accommodating.  I appreciate that.  I think we need to
7   assemble on our own, evaluate what Your Honor has put in the
8   Record, whether or not from our opinion that's sufficient
9   and what we intend to do next.
10         So if I could have, if it wouldn't burden the
11  Court, until Monday morning to advise the Court.  If that's
12  too long?
13         THE COURT:  That's great.  No, no.  If you will
14  just file something by 5:00 o'clock on Monday, I'll look
15  Tuesday morning at what I need to do.  And if any other
16  party -- if the prevailing parties think they need
17  additional findings, they can also do it.  I'm going to let
18  you set the deadline.
19         MR. STARK:  Thank you, Your Honor.
20         THE COURT:  But they can also do it by 5:00
21  o'clock on Monday.  If it comes in after 5:00 o'clock on
22  Monday, then you need to appeal the Record that you got.
23         MR. STARK:  Understood, Your Honor.  Thank you
24  very much.
25         THE COURT:  But it is going to take some time to

1  do it.  Thank you.

2          And you weren't here for very much of this.

3          MR. STARK:  I came in late.

4          THE COURT:  Your folks did a great job, and so the

5  fact I ruled against them is no reflection on the quality of

6  the work.  The work was great.

7          MR. STARK:  I very much appreciate that.  Thank

8  you.

9          THE COURT:  Thank you.  Mr. Pesce.

10         MR. PESCE:  Gregory Pesce, Kirkland Ellis on

11  behalf of IUC.  And first off, thank you very much, Your

12  Honor.  We appreciate your ruling and the time you spent at

13  the hearing.

14         THE COURT:  I can't hear you, Mr. Pesce.

15         MR. PESCE:  We appreciate your time that you spent

16  on the hearing and the promptness of your ruling.

17          In speaking with Ms. Reckler and her colleagues

18  and the *4:52:45 team, the order is substantially final.

19  We're making some clarifying changes that were recommended

20  to us by other parties during the hearing.  So what the

21  buyer and I understand the two banks are comfortable with is

22  that as long as the sale has been approved as it has been on

23  the Record, we will work to get the order to you this

24  evening.  And if not, very early tomorrow morning after

25  collecting the final clarifying changes from some of the

1    parties in the courtroom.

2           THE COURT:  So what have I to do then if that's

3    what we're going to then is I'm going to schedule a

4    telephonic hearing so that the opposing parties can object

5    to the form of the order, otherwise -- it needs to be done

6    promptly, but if you upload it they're not going to have a

7    reasonable time to object.

8           You guys go home to New York, dial in on the

9    phone, put it up on the screen and let you watch the changes

10   so we can take objections.

11          What time in the morning can we do that?

12          MR. PESCE:  Any time.

13          THE COURT:  How about -- so I can do it at 9:30 if

14   you want, or I can do it at 11:30 if you want.

15          MR. PESCE:  Yeah.  Why don't we do it at 11:30 if

16   that works for Your Honor?

17          THE COURT:  That will work for you-all?

18          MR. PESCE:  Yes, Your Honor.

19          THE COURT:  You okay with that?

20          MS. BUCHWALD:  Yes.

21          THE COURT:  Okay.  So we'll continue today's

22   hearing to 11:30.  I want the banks to announce their

23   assent, if that's what we're going to do.  And assuming that

24   we will continue hearing until 11:30 in the morning.  It

25   will be telephonic.

1          MR. PESCE:  Thank you.

2          MS. DiBLAS:  Just to be clear, Your Honor, there

3   will be two orders.  One for the Alta-Mesa Debtors, one for

4   KFN Debtors.

5          THE COURT:  I don't care if it's two orders or one

6   order.  We're going to end up only in the one docket sheet.

7   It's a joint administered docket sheet.  So whatever -- if

8   you-all want to combine it into one so that you're looking

9   at one, that's fine.  Two is fine with me.

10         MS. DiBLAS:  I think we'll stick with two, but,

11  yes, they'll go on the same docket.  Thank you.

12         THE COURT:  Mr. Wallander.

13         MR. WALLANDER:  Your Honor, Bill Wallander on

14  behalf of the agent for KFM.  We did file a limited

15  objection to the sale.  It was along the lines of giving the

16  state of our estate and that we've paid off virtually all

17  the vendors in the case; that we don't have the problems of

18  AMH.

19         The lender group in the KFM estate would like to

20  receive some of the collateral proceeds as adequate

21  protection at closing.  And the request we've made is to

22  leave $23 million in KFM, which we think should be more than

23  enough to wind up that estate and have a transfer of $65

24  million to the lender for the KFM estate.

25         THE COURT:  Okay.  I'm not doing that now.  I may

1    do it later, but I'm not doing it now.  I don't have any

2    evidence before me on including a provision like that.

3    None.  I don't have a problem in general with it.  And so if

4    you want to come back for something before the sale that

5    says that, where people can get notice of what that would

6    be, that's fine.  I also want to keep the sale clean from

7    any plan provisions in what we're doing.  So I'm not going

8    to put that in this order.  But I'm not in any way denying

9    it substantively at all, if that's appropriate to do.  We'll

10   think about that very soon.

11            MR. WALLANDER:  Understood, Your Honor.

12            THE COURT:  Does your client consent to entry of

13   an order tomorrow without being in breach of --

14            MR. WLLANDER:  Yeah.  Wells Fargo has no objection

15   to the sale, Your Honor.  Thank you.

16            MR. WOOD:  Good afternoon, Your Honor.  Trey Wood

17   on behalf of Wells Fargo Bank as agent for the AMH secured

18   creditors.

19            Your Honor, the AMH agent consents to the moving

20   the milestone an additional day to tomorrow for the entry of

21   the sale order.  We appreciate the Court's time and

22   appreciate the Court's ruling today.  Thank you.

23            THE COURT:  All right.  We'll see everybody on the

24   phone tomorrow at 11:30.  If anyone wants to come down I'm

25   going to be out here in open court, you can come if you

1  want, but it will be telephonic.

2          You can leave your stuff overnight.  The first

3  hearing we have in court tomorrow morning, I have a

4  telephonic at 9:00.  There's a 10:00 o'clock live hearing

5  tomorrow.  So if you want your boxes picked up in the

6  morning, try and get here nice and early and you can get

7  that done.  You can leave them overnight.

8          Mr. Flores?

9          MR. FLORES:  Your Honor, would the courtroom be

10  accessible after your morning docket?

11         THE COURT:  The courtroom will be accessible all

12  afternoon.

13         MR. FLORES:  Thank you.

14         THE COURT:  There may be some people in here doing

15  some technology upgrades, but that will be it.

16         MR. FLORES:  Thank you, Your Honor.  I just didn't

17  know if we *4:57:32

18         (En masse.)  Thank you, Your Honor.

19     (Proceedings adjourned 4:57 p.m.)

20

21

22

23

24

25                    *  *  *  *  *

244

1          I certify that the foregoing is a correct

2    transcript to the best of my ability produced from the

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #61507

10   DATE FILED:  JANUARY 25, 2020

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25