# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 |

## AMENDED JOINT PRETRIAL ORDER

Pursuant to Court Procedure ¶ 9(A), Class Plaintiffs FNY Partners Fund L.P., FNY Managed Accounts, LLC, Paul J. Burbach, and United Association National Pension Fund, and additional plaintiff Camelot Event Driven Fund, and Defendants Alta Mesa Resources, Inc., Harlan H. Chappelle, Michael E. Ellis, William D. Gutermuth, Ronald Smith, Jeffrey H. Tepper, Diana J. Walters, Riverstone Holdings LLC, James T. Hackett, and Bayou City Energy Management, LLC respectfully submit this Joint Pretrial Order.

## TABLE OF CONTENTS

**Page**

I.   Appearance of Counsel ............................................................................. 1

    A.   For Class Plaintiffs FNY Partners Fund LP, FNY Managed
        Accounts LLC, Paul J. Burbach, United Association National
        Pension Fund and the Certified Class. ............................................ 1

    B.   For Additional Plaintiff Camelot Event Driven Fund .................... 2

    C.   For the Defendants ......................................................................... 2

        1.   Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition
            Corporation II, Harlan H. Chappelle, Michael E. Ellis,
            William D. Gutermuth, James T. Hackett, Ronald Smith,
            Jeffrey H. Tepper, Diana J. Walters, and Riverstone Holdings
            LLC .................................................................................... 2

        2.   Bayou City Energy Management, LLC ............................. 4

II.  Statement of the Case ............................................................................... 4

    A.   General Description of the Class Case ............................................ 4

    B.   Description of Class Plaintiffs ....................................................... 5

    C.   Description of the Defendants ........................................................ 6

        1.   Alta Mesa Resources, Inc. (f/k/a Silver Run Acquisition Corp.
            II) ..................................................................................... 6

        2.   Harlan H. Chappelle ......................................................... 6

        3.   Michael E. Ellis ................................................................ 6

        4.   William D. Gutermuth ....................................................... 7

        5.   Ronald Smith .................................................................... 7

        6.   Jeffrey H. Tepper .............................................................. 7

        7.   Diana J. Walters ............................................................... 7

        8.   Riverstone Holdings LLC ................................................. 7

        9.   James T. Hackett .............................................................. 8

**Page**

10. Bayou City Energy Management, LLC .................................................. 8

III. Jurisdiction .................................................................................................... 8

IV. Motions ........................................................................................................... 9

V. Separate Contentions of the Parties ........................................................... 11

    A. Class Plaintiffs' Contentions ................................................................ 12

        1. Defendants' Violations of Section 14(a) and 20(a) In Connection with the January 19, 2018 Definitive Proxy ................ 12

        2. Defendants' Violations of Sections 10(b) and 20(a) between August 16, 2017 and May 17, 2019 .................................................. 14

    B. Defendants' Contentions ...................................................................... 16

        1. AMR and Riverstone Defendants' Liability Contentions ................ 17

            a. Section 14(a) of the Exchange Act. ...................................... 18

            b. Section 10(b) of the Exchange Act ...................................... 20

            c. Section 20(a) of the Exchange Act ...................................... 23

            d. Class Plaintiffs' Incorrectly Attempt to Shift Their Burden Under Sections 10(b), 14(a), and 20(a) of the Exchange Act ...................................................................... 24

        2. Bayou City Is Not Liable Under Section 20(a) of the Exchange Act [Class Plaintiffs] ...................................................... 27

            a. Plaintiffs Cannot Prove An Underlying Violation of Section 10(b) .......................................................................... 28

                (1) Plaintiffs Lack Standing To Challenge Statements Regarding AMH and Kingfisher ............ 28

                (2) Chappelle Was The Maker Of Only Two Alleged Misstatements .............................................. 29

                (3) Chappelle's Pre-Business Combination Statements Are Not Actionable ............................... 32

Page

    (4) Plaintiffs Cannot Prove Loss Causation For Chappelle's Pre-Business Combination Statements ................................................. 32

   b. Plaintiffs Failed To Plead 20(a) Liability For Statements "Regarding AMH and Kingfisher"..................... 34

   c. Plaintiffs Cannot Prove That Bayou City Was A Control Person Of Chappelle's Pre-Business Combination Statements ......................................... 35

   d. Plaintiffs Cannot Rebut Bayou City's Good Faith Defense.................................................................. 37

  3. Defendants' Affirmative Defenses Preclude Liability..................... 39

  4. Plaintiffs Are Not Entitled to Damages ........................................... 39

 C. Class Plaintiffs' Rebuttal Contentions ....................................................... 40

  1. Riverstone Defendants' and AMR's Safe Harbor Defense ............ 40

  2. The "Omnicare" Defense ................................................................ 41

  3. Riverstone Defendants' "Diligence" Defense to Section 14(a)(9) Liability ................................................................................ 42

  4. Riverstone's Section 20(a) "Good Faith" to Control Person Liability Defense Linked to Class Plaintiffs' Section 14(a)(9) Claim ............................................................................................... 42

  5. AMR, Chappelle, and Ellis's Section 20(a) "Good Faith" Defense Linked to Class Plaintiffs' Section 10(b) and 14(a) Claims.............................................................................................. 44

  6. Bayou City's Section 20(a) "Good Faith" Defense to Control Person Liability Linked to Class Plaintiffs' Section 10(b) Claim ............................................................................................... 44

  7. Defendant Smith's "Good Faith" Defense to Control Person Liability Linked to Class Plaintiffs' Section 10(b) Claim .............. 45

  8. Defendants' Other Purported "Affirmative Defenses" .................... 45

**Page**

VI.   Admissions of Fact ................................................................................ 46

   A.   AMR and Riverstone Defendants' Admissions of Fact ............................. 46

VII.  Contested Issues of Fact ........................................................................ 48

   A.   Class Plaintiffs' Contested Issues of Fact .................................................. 48

      1.   Claims Under § 14(a)(9) ............................................................... 48

      2.   Section 20(a) Claims Associated with Class Plaintiffs'
           § 14(a)(9) Claim ........................................................................ 49

      3.   Claims Under § 10(b) ................................................................... 49

      4.   Section 20(a) Claims Associated with Class Plaintiffs'
           § 10(b) Claim ............................................................................ 50

   B.   Defendants' Contested Issues of Fact ........................................................ 50

      1.   AMR and Riverstone Defendants .................................................. 50

         a.   Claims Under Section 10(b) of the Exchange Act
              [Class Plaintiffs] ................................................................. 50

         b.   Claims Under Section 14(a) of the Exchange Act
              [Class Plaintiffs] ................................................................. 51

         c.   Claims Under Section 20(a) of the Exchange Act
              [Class Plaintiffs] ................................................................. 51

      2.   Bayou City Energy [Class Section 20(a) Claims Only] .................. 51

VIII. Agreed Applicable Propositions of Law ............................................... 52

   A.   Section 14(a) Claims ................................................................................. 52

      1.   Misrepresentation or Omission of Fact ........................................... 53

         a.   Forward-looking Statements ................................................ 53

      2.   Materiality ................................................................................... 54

      3.   Negligence ................................................................................... 55

**Page**

|  | 4. | Essential Link | 55 |
|  | 5. | Economic Loss and Loss Causation | 55 |
|  | 6. | Damages | 55 |
| B. | | Section 10(b) and Rule 10b-5 Claims | 56 |
|  | 1. | Misrepresentation or Omission | 56 |
|  | 2. | Materiality | 56 |
|  | 3. | Scienter | 57 |
|  | 4. | In connection with a purchase or sale | 57 |
|  | 5. | Reliance | 57 |
|  | 6. | Economic Loss and Loss Causation | 57 |
|  | 7. | Damages | 57 |
| C. | | Section 20(a) Claims | 58 |
| IX. | | Contested Issues of Law | 58 |
| A. | | Plaintiffs' Contested Issues of Law | 58 |
|  | 1. | Class Plaintiffs Need Only Establish Negligent Conduct Under Section 14(a) | 58 |
|  | 2. | Defendants Rely on an Incorrect Standard for Their Section 20(A) "Good Faith" Defense | 59 |
|  | 3. | Defendants Bear the Burden of Proof with Respect to the Sufficient Cautionary Language Prong of the PSLRA's Safe harbor | 59 |
| B. | | Defendants' Contested Issues of Law | 60 |
|  | 1. | Section 14(a) Claims | 60 |
|  |  | a. Class Plaintiffs Must Prove The Proxy Statements Were Not Forward Looking Statements | 60 |

**Page**

b.     Standard for Opinion Statements ........................................... 60

c.     The Standard For Materiality ................................................ 62

d.     The Standard For Negligence ................................................ 63

e.     Plaintiffs Must Prove More Than Negligence ...................... 63

f.     The Jury May Not Award Damages Under Class Plaintiffs' Alternative Section 14(a) Damages Theory ......... 65

2.     Section 10(b) and Rule 10b-5 Claims [Class Plaintiffs] ................. 66

a.     The Standard For Section 10(b) "Made By" Element .......... 66

b.     Plaintiffs Lack Standing To Sue Under Section 10(b).......... 68

c.     The Standard For Reliance ..................................................... 70

d.     Plaintiffs Cannot Prove Loss Causation In The Public Securities Market ................................................................. 72

      (1)     "Identifying a Corrective Disclosure" ....................... 74

      (2)     "Showing that the stock price dropped soon after the corrective disclosure" ................................. 77

      (3)     "Eliminating other possible explanations for this price drop".......................................................... 78

e.     Plaintiffs Are Not Entitled to Damages ................................ 79

f.     Statements That Constitute Mere Puffery Are Not Actionable .......................................................................... 81

g.     The Standard for Opinion Statements ................................... 82

h.     The Standard for Materiality ................................................ 82

i.     Plaintiffs Cannot Prove The Requisite Scienter.................... 82

      (1)     The Standard For Scienter.......................................... 82

**Page**

(2)    Plaintiffs Must Prove Scienter As To Each Individual Defendant For Each Alleged Misstatement ............................................................ 85

(3)    Plaintiffs Cannot Prove Fraud By Hindsight ............. 86

(4)    A Defendant's Position and/or Alleged Access To Information Is Insufficient To Prove Scienter .................................................................. 87

(5)    Signing an SEC Filing Is Insufficient To Prove Scienter .................................................................. 89

3.    Section 20(a) Claims [Class Plaintiffs] ............................................ 90

a.    Plaintiffs Cannot Establish That The Section 20(a) Defendants Were Control Persons For Chappelle's Pre-Business Combination Statements Regarding AMH and Kingfisher ............................................................ 90

(1)    Status Alone Is Insufficient To Prove Control ........... 91

(2)    Providing Edits Or Comments To a Document Is Insufficient To Prove Control ............................... 94

(3)    Mere Involvement In The Allegedly Fraudulent Activities Does Not Establish Control Person Liability .................................................................. 95

b.    Defendants Are Entitled to the Good Faith Defense ............ 96

X.    Exhibits and Exhibit List ............................................................................ 99

XI.    Witnesses and Witness List ........................................................................ 99

XII.    Settlement ...................................................................................................... 99

XIII.    Trial ............................................................................................................... 99

A.    Jury/Non-Jury .................................................................................... 99

B.    Trial Length ........................................................................................ 99

1.    Plaintiffs' Position ................................................................. 99

**Page**

  1. AMR and Riverstone Defendants' Position ................................... 100

  2. BCE's Position .............................................................................. 101

C. Witness Availability ........................................................................ 103

  1. Class Plaintiffs ............................................................................. 103

  2. Defendants .................................................................................... 103

D. Motions *in Limine* .......................................................................... 103

E. Proposed Questions for the Venire Panel ....................................... 106

F. Proposed Jury Instructions, Definitions, and Interrogatories ................... 106

## I.     Appearance of Counsel

The following counsel will appear at trial:

A.     **For Class Plaintiffs FNY Partners Fund LP, FNY Managed Accounts LLC, Paul J. Burbach, United Association National Pension Fund and the Certified Class.**

Andrew J. Entwistle (Attorney-in-Charge)
State Bar No. 24038131
Callie Crispin
State Bar No. 24104231
Sal H. Lee
State Bar No. 24127308
Entwistle & Cappucci LLP
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
aentwistle@entwistle-law.com
ccrispin@entwistle-law.com
slee@entwistle-law.com

Joshua K. Porter (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
Entwistle & Cappucci LLP
230 Park Avenue, 3rd Floor
New York, NY 10169
Telephone: (212) 894-7200
jporter@entwistle-law.com
bbrodeur@entwistle-law.com
asher@entwistle-law.com

Trig R. Smith (*pro hac vice*) (Attorney-in-Charge)
John M. Kelley (*pro hac vice*)
Stephen Johnson (*pro hac vice*)
Robbins Geller Rudman & Dowd LLP
655 W. Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058
trigs@rgrdlaw.com
jkelley@rgrdlaw.com
sjohnson@rgrdlaw.com

**B.     For Additional Plaintiff Camelot Event Driven Fund**

Carol C. Villegas (*pro hac vice*)
David Saldamando (*pro hac vice*)
Labaton Keller Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0700
cvillegas@labaton.com
dsaldamando@labaton.com

**C.     For the Defendants**

**1.     Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition
         Corporation II, Harlan H. Chappelle, Michael E. Ellis,
         William D. Gutermuth, James T. Hackett, Ronald Smith,
         Jeffrey H. Tepper, Diana J. Walters, and Riverstone
         Holdings LLC**

J. Christian Word (Attorney-in-Charge for Defendants)
S.D. Tex. Bar No. 3398485
Andrew Clubok
S.D. Tex. Bar No. 3891875
Matthew J. Peters (*pro hac vice*)
Sarah M. Gragert (*pro hac vice*)
Laura E. Bladow (*pro hac vice*)
Jansen M. VanderMeulen (*pro hac vice*)
Henry Zaytoun III (*pro hac vice*)
William Tazewell Jones (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
christian.word@lw.com
andrew.clubok@lw.com
matthew.peters@lw.com
sarah.gragert@lw.com
laura.bladow@lw.com
henry.zaytoun@lw.com
taz.jones@lw.com

Heather A. Waller
S.D. Tex. Bar No. 2886108
Kathryn George (*pro hac vice*)

Arthur F. Foerster (*pro hac vice*)
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
heather.waller@lw.com
katie.george@lw.com
arthur.foerster@lw.com

Ashley Gebicke (*pro hac vice*)
Latham & Watkins, LLP
12670 High Bluff Drive
San Diego, CA 92130
(828) 523-5400
ashley.gebicke@lw.com

*Counsel for Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II, Harlan H. Chappelle, Michael E. Ellis, William D. Gutermuth, James T. Hackett, Ronald Smith, Jeffrey H. Tepper, Diana J. Walters, and Riverstone Holdings LLC*

Walter M. Berger
TX Bar No. 00798063
Attorney-in-Charge
Katherine A. Preston
TX Bar No. 24088255
Winston & Strawn LLP
800 Capitol Street, Suite 2400
Houston, TX 77002-2925
Tel.: (713) 615-2699
Fax: (713) 651-2700
cberger@winston.com
kpreston@winston.com

John E. Schreiber (*pro hac vice*)
Winston & Strawn LLP
333 S. Grand Ave., 38th Floor
Los Angeles, CA 90071
Tel.: (213) 615-1700
Fax: (213) 615-1750
JSchreiber@winston.com

*Co-counsel for Harlan H. Chappelle and Michael E. Ellis*

### 2.   Bayou City Energy Management, LLC

Kenneth A. Young (attorney in charge) (SBN 24088699)
Nick Brown (SBN 24092182)
Grant Jones (SBN 24110065)
Sydney Corry (SBN 24124563)
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: kenneth.young@kirkland.com
nick.brown@kirkland.com
grant.jones@kirkland.com
sydney.corry@kirkland.com

## II.   Statement of the Case

### A.   General Description of the Class Case

This is a certified Class Action alleging violations of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), and Rules 10b-5 and 14a-9 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. §§ 240.10b-5, 240.14a-9).   The case arises from the February 9, 2018, business combination (the "Business Combination") in which Silver Run Acquisition Corporation II ("Silver Run"), a special purpose acquisition company ("SPAC"), acquired two privately held companies, Alta Mesa Holdings LP ("AMH") and Kingfisher Midstream LLC ("Kingfisher").   AMH was an oil and gas exploration and production company operating in a region of Oklahoma known as the STACK.   Kingfisher was a midstream company engaged in the storage, processing, and transportation of oil and gas.   Following the Business Combination, Silver Run was renamed Alta Mesa Resources, Inc. ("AMR").

Class Representatives allege that certain Defendants made material misrepresentations in SEC filings and other public statements between August 16, 2017, and May 17, 2019 (the "Class Period"), while under the control of various other entities and individuals. Defendants deny all allegations of wrongdoing asserted in the Class Action and deny any liability whatsoever to any members of the Class. Further, Defendants contend that that Class Plaintiffs have failed to prove that their claimed losses were caused by any of the alleged misstatements.

### B.    Description of Class Plaintiffs

Class Plaintiff FNY Partners Fund LP is a Delaware limited partnership that provides investment management services to private pooled investment funds and separate accounts. Dkt. 218, ¶ 30.

Class Plaintiff FNY Managed Accounts, LLC is a Delaware limited liability company that provides securities brokerage and investment services. *Id.*, ¶ 31.

Class Plaintiff Paul J. Burbach is an individual investor who resides in Milwaukee, Wisconsin. *Id.*, ¶ 32.

Class Plaintiff United Association National Pension Fund ("UANPF") is a pension fund that provides retirement benefits to employees, and their beneficiaries, represented by the United Association or a United Association local union. *Id.*, ¶ 33. UANPF is headquartered in Alexandria, Virginia. *Id.*

Class Plaintiff Camelot Event Driven Fund ("CEDM") provides hedge investments to mutual fund investors. *Id.*, ¶ 34. CEDM is headquartered in Broadview Heights, Ohio.

C.    **Description of the Defendants**[1]

1.    **Alta Mesa Resources, Inc. (f/k/a Silver Run Acquisition Corp. II)**

Defendant AMR was originally named Silver Run and was a SPAC formed on November 16, 2016, for the purpose of effectuating an acquisition or business combination involving one or more privately held companies.  On February 9, 2018, Silver Run acquired AMH and Kingfisher as part of the Business Combination and changed its name to AMR. Class Plaintiffs assert §§ 10(b), 14(a), and 20(a) of the Exchange Act claims against Alta Mesa.

2.    **Harlan H. Chappelle**

Defendant Harlan H. Chappelle ("Chappelle") served as the President and the CEO of AMH from November 2004 until the February 9, 2018 Business Combination.  Dkt. 218, ¶ 50.  Following the Business Combination, Chappelle served as the CEO and a Director of AMR. Class Plaintiffs assert §§ 10(b) and 20(a) of the Exchange Act claims against Chappelle.

3.    **Michael E. Ellis**

Defendant Michael E. Ellis ("Ellis") founded AMH in 1987 and served as its Chairman and Chief Operating Officer ("COO").  Following the February 9, 2018 Business Combination, Ellis served as the COO of AMR's upstream business, and as a Director. Dkt. 218, ¶ 51.  Class Plaintiffs assert § 20(a) of the Exchange Act claims against Ellis.

---

[1]    The Parties reserve all rights, specifically the right to revise, supplement, and/or modify the Joint Pretrial Order based on, among other things, the Court's rulings and the Parties' ongoing discussions and preparations concerning trial.

### 4.    William D. Gutermuth

Defendant William D. Gutermuth ("Gutermuth") served as a Director for Silver Run and then AMR until June 18, 2018.  Dkt. 218, ¶ 45.  Class Plaintiffs assert §§ 14(a) and 20(a) of the Exchange Act claims against Gutermuth.

### 5.    Ronald Smith

Defendant Ronald Smith ("Smith") was Vice President and Chief Accounting Officer for both AMH, and later, AMR.   Dkt. 218, ¶ 52.  He served in that role from 2015 until July 19, 2019.  Before that, Smith served as AMH's Controller beginning in 2008. Class Plaintiffs assert § 20(a) of the Exchange Act claims against Smith.

### 6.    Jeffrey H. Tepper

Defendant Jeffrey H. Tepper ("Tepper") served as a Director of Silver Run and then AMR following the Business Combination.  Dkt. 218, ¶ 46.  Class Plaintiffs assert §§ 14(a) and 20(a) of the Exchange Act claims against Tepper.

### 7.    Diana J. Walters

Defendant Diana J. Walters ("Walters") served as a Director of Silver Run and then AMR following the Business Combination.  Dkt. 218, ¶ 47.  Class Plaintiffs assert §§ 14(a) and 20(a) of the Exchange Act claims against Walters.

### 8.    Riverstone Holdings LLC

Defendant Riverstone Holdings LLC ("Riverstone") is an energy-focused private equity business investing primarily in exploration and production ("E&P") and midstream oil and gas companies.  Riverstone affiliates were the sponsor and investors in Silver Run, and then were investors in AMR.  Class Plaintiffs assert §§ 14(a) and 20(a) of the Exchange Act claims against Riverstone.

### 9.    James T. Hackett

Defendant James T. Hackett ("Hackett") was a partner or a senior advisor with Riverstone during part of the Class Period.  Hackett served as Silver Run's Chief Executive Officer and a Director prior to the Business Combination.  Afterwards, Hackett served as AMR's Executive Chairman and COO of AMR's midstream business (*i.e.*, KFM) until April 3, 2018.  Following Chappelle's resignation from AMR in December 2018, Hackett served as the interim CEO.  Dkt. 218, ¶ 43.  Class Plaintiffs assert §§ 10(b), 14(a), and 20(a) of the Exchange Act claims against Hackett.

### 10.    Bayou City Energy Management, LLC

Defendant Bayou City Energy Management, LLC ("Bayou City") is an energy-focused private equity firm headquartered in Houston, Texas.  Class Plaintiffs assert § 20(a) of the Exchange Act claims against Bayou City arising solely from statements made by Chappelle as the CEO of Alta Mesa Holdings on August 16, 2017 and August 17, 2017.

## III.    Jurisdiction

The claims asserted in the Class Action arise under and pursuant to §§ 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), and SEC Rules 10b-5 and 14a-9 promulgated thereunder (17 C.F.R. §§ 240.10b-5, 240.14a-9).  It is undisputed that this Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 27 of the Exchange Act.

Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) because a significant portion of Defendants' alleged conduct took place within this District.  The facts necessary to confer subject matter jurisdiction for the federal securities claims and venue are not in dispute.

Defendants do not dispute this Court's personal jurisdiction over them.

## IV.    Motions

The following motions remain pending before the Court:

1.      Motion of HPS Investment Partners, LLC For a Judgment On the Pleadings and Incorporated Memorandum of Law (Dkt. 782);

2.      Bayou City's 12(b)(1) Motion to Dismiss for Lack of Standing, or, in the Alternative, Motion for Judgment on the Pleadings (Dkt. 783);

3.      ARM Energy Holdings LLC's Joinder in Support of HPS Investment Partners, LLC's Rule 12(c) Motion  (Dkt. 784);

4.      Defendants Chappelle, Hackett, Gutermuth, Tepper, Walters, Ellis, Smith, Riverstone, and AMR's Joinder in Defendants HPS's and BCE's Motions Regarding the Pre-Business Combination Statements About AMH and KFM for Lack of Standing (Dkt. 785);

5.      Class Plaintiffs' Motion for an Order (1) that Elements of the Fraud on the Market Presumption of Reliance Were Established by the Class Certification Order and/or (2) Taking Judicial Notice that the Elements of the Fraud on the Market Presumption are Met in This Case (Dkt. 808); and

6.      Class Plaintiffs' Motion to Bifurcate and to Preclude Evidence as to Individualized Issues, Including Testimony by Class Representatives, During the Class-Wide Phase of Trial (Dkt. 809).

7.      Class Plaintiffs' Request for Judicial Notice and Motion for an Order Deeming Certain Admitted Facts Established (Dkt. 844).

8.      Bayou City has also filed several additional recent motions, including Bayou City's Emergency Motion to Stay Trial to Avoid Due Process Violation and Request for Expedited Briefing Schedule (Dkt. 858), Bayou City's Objection to Trial by Consent (Dkt. 849) and Bayou City's Motion to Exclude Joint Well Development Program (Dkt. 852).

9.      ARM Energy Holdings LLC's Joinder in Support of Bayou City Energy Management, LLC's Objection to Trial by Consent and Motion to Exclude (Dkt. 854).

10.     Class Plaintiffs' Motion *in Limine* No. 1: Motion to Preclude Evidence or Argument Regarding Reliance on Undisclosed Third Parties (Dkt. 871-1).

11.     Class Plaintiffs' Motion *in Limine* No. 2: Motion to Preclude Evidence or Argument Regarding Reliance on the Advice of Counsel (Dkt. 867-1).

12.     Class Plaintiffs' Motion *in Limine* No. 3:  Motion to Preclude Evidence or Argument Regarding the Post-Hoc Investigation and Conclusions of KPMG (Dkt. 872-1).

13.     Class Plaintiffs' Motion *in Limine* No. 4: Motion to Preclude Evidence Concerning the Individual Action Plaintiffs' Damages Expert (Dkt. 873).

14.     Class Plaintiffs' Motion *in Limine* No. 5: Motion to Preclude Evidence or Argument as to the Class's Aggregate Damages (Dk. 869).

15.     Class Plaintiffs' Motion *in Limine* No. 6: Motion to Preclude Character Evidence and Evidence of Religious Beliefs, Opinion, and Activities (Dkt. 863).

16.     Class Plaintiffs' Motion *in Limine* No. 7: Motion as to General Trial Procedures (Dkt. 864).

17.    Defendants Chappelle, Hackett, Gutermuth, Tepper, Walters, Ellis, Smith, Riverstone, and AMR's Memorandum of Law in Support of Their Motions *in Limine* (Dkt. 874).

18.    ARM Energy Holdings, LLC's Motions *in Limine* (Dkt. 878).

19.    Bayou City's Motions *in Limine* to Enforce Summary Judgment Rulings and Joinder in Other Motions *in Limine* (Dkt. 881).

The Parties anticipate filing any replies to their motions *in limine* concurrently with the Amended Joint Pretrial Order on November 4, 2024, per the Joint Stipulation Regarding Timing of Motions *in Limine* and *Daubert* Motions filed on October 20, 2024 (Dkt. 861). The Parties also anticipate re-asserting their *Daubert* Motions at trial, pursuant to the Court's August 12, 2024 order denying the Parties' *Daubert* Motions "without prejudice to [them] being reasserted at trial." (Dkt. 778).  *See* Stipulation (Dkt. 861).

## V.    Separate Contentions of the Parties

The following paragraphs summarize contentions of the parties.  By including these summaries in a joint filing, the Parties do not concede any of the others' claims or defenses, and do not stipulate or admit to the truth of any alleged fact or legal conclusion described in this section of the Joint Pretrial Order.

Defendants object to Class Plaintiffs' contentions as set forth in Section V(A) and to the extent their contentions go beyond the pleadings and/or fail to specify which claims and/or alleged misstatements are attributable to these specific Defendants.  Defendants further object to Class Plaintiffs' rebuttal contentions as set forth in Section V(D) to the extent they go beyond the Defendants' affirmative defenses and, therefore, constitute

improper rebuttal contentions.  Defendants reserve all rights to seek relief from the Court, including to preclude Class Plaintiffs from trying these contentions in a purported rebuttal case.

### A.      Class Plaintiffs' Contentions

Class Plaintiffs contend that Defendants violated §§ 10(b), 14(a), and 20(a) of the Exchange Act between August 16, 2017 and May 17, 2019.

### 1.      Defendants' Violations of Section 14(a) and 20(a) In Connection with the January 19, 2018 Definitive Proxy

On January 19, 2018, defendants Hackett, Gutermuth, Tepper, and Walters caused Silver Run to file the Definitive Proxy with the SEC.  Class Plaintiffs contend these defendants violated § 14(a) by making materially false statements in, and omitting material facts from, the Proxy about: (a) the reasonableness of projected earnings for AMH and KFM in 2018; (b) the reasonableness of projected averaged daily production of oil in 2018; (c) AMH's oil and gas reserves; (d) the extent to which AMH had de-risked its drilling activities in the STACK; (e) identified well locations; and (f) AMR's ability to capture continued operational growth in the STACK.

Class Plaintiffs contend that Defendants overstated AMH's projected earnings, daily production and unproved reserves by: (1) assuming that AMH could drill 12 wells per square-mile Section and expect those wells to produce as much oil and gas as single wells, which had been drilled at one well per section; and (2) extrapolating the results from Alta Mesa's most productive area across Alta Mesa's acreage, including the portions with less favorable geological properties and weaker historical results.  Class Plaintiffs contend that Defendants overstated KFM's projected earnings and ability to capture continued

operational growth in the STACK because the KFM financial projections: (1) depended on the AMH production projections, which were themselves overstated; (2) included unreasonable assumptions about and/or a refusal to account for changes in drilling activity and production from third-parties, whether contracted with or not; and (3) were based on past financial results that were inflated through accounting shenanigans including using off-book debt to pay expenses.

Between March 29, 2018 and May 17, 2019, Defendants made a series of public disclosures to investors revealing the materially misleading statements in the Proxy. These disclosures included: (a) several material revisions to the 2018 AMH and KFM EBITDA projections; (b) material earnings misses against those projections; (c) the lowering of average daily oil production guidance; (d) scaling back operational activities in the STACK; (e) downward revisions to wells per section and average production per well assumptions; (f) a potential $3.1 billion write down of the book value of AMR and KFM; (g) a material weakness in internal controls over financial reporting; and (h) a formal investigation of AMR's fraudulent activities by the SEC.

Class Plaintiffs contend that Defendants' knowing violations of § 14(a) of the Exchange Act caused Class Members to suffer $8.17 per share in damages under the "benefit-of-the-bargain" theory of economic loss. Alternatively, Class Plaintiffs contend that Defendants' negligent violations of § 14(a) of the Exchange Act caused Class Members to suffer $4.10 per share in damages under the "out-of-pocket" theory of economic loss.

Class Plaintiffs contend that defendant Riverstone is liable for damages pursuant to § 20(a) of the Exchange Act because it in fact controlled, or had the ability to control, the materially false statements contained in the January 19, 2018 Proxy.

### 2. Defendants' Violations of Sections 10(b) and 20(a) between August 16, 2017 and May 17, 2019

Class Plaintiffs further contend that defendants AMR and Chappelle knowingly violated § 10(b) of the Exchange Act during the August 16, 2017 and May 17, 2019 Class Period.  Between August 16, 2017 and February 9, 2018 including in the Definitive Proxy, Defendants knowingly made materially false and misleading statements to investors about: (a) the reasonableness of projected earnings for AMH and KFM in 2017, 2018 and 2019; (b) the reasonableness of projected average daily production of oil in 2018 and 2019; (c) AMH's oil and gas reserves; (d) the extent to which AMH had de-risked its drilling activities in the STACK; (e) AMR's internal controls over financial reporting; and (f) AMR's ability to capture continued operational growth in the STACK.  With respect to Defendants' false statements concerning forecasted average daily production, oil and gas reserves, the de-risking a of AMH's STACK leasehold, Class Plaintiffs contend that Defendants made these false statements for the purpose of providing investors false comfort about that reasonableness of AMH and KFM's projected earnings, AMR's oil and gas reserves, and AMR's projected average daily oil production projections.

Following the February 9, 2018 closing of the business combination in which Silver Run, AMH, and KFM merged and became AMR, Class Plaintiffs contend Defendants knowingly made false statements regarding the reasons underlying their downward revisions to the 2017 and 2018 AMH and KFM EBITDA projections, the favorability of

production results from multi-well patterns, AMR's ability to continue to take advantage of growth in the STACK, internal controls over financial reporting, evidence of fraud within the Company, and the affirmation of previously reduced EBITDA projections. Defendant Chappelle also engaged in a fraudulent scheme to inflate AMR's oil production results through the use of costly ESPs, which increase oil production in the short term without meaningfully increasing overall production, and hid the detrimental economic impact of that ESP program by not properly accounting for the costs.  Class Plaintiffs contend that Defendants' realized and unrealized financial rewards for gaining shareholder approval for the business combination motivated them to lie to investors between August 16, 2017 and February 9, 2018.  Defendants had further motive to continue their deception of investors after the February 9, 2018 completion of the Silver Run/AMH/KFM business combination because the entities for whom they worked – *i.e.*, Riverstone, and AMR – were subject to "lock-ups" of varying duration before they could sell their stock in an open public stock market.

Between March 29, 2018 and May 17, 2019, Defendants made a series of public disclosures indicating to investors that they had, in fact, lied to investors throughout the Class Period.  These disclosures included: (a) two material revisions to the 2018 AMH and KFM EBITDA projections; (b) material earnings misses against those projections; (c) the lowering of average daily oil production guidance; (d) scaling back operational activities in the STACK; (e) downward revisions to wells per section and average production per well assumptions; (f) a potential $3.1 billion write down of the book value of AMR and KFM; and (g) a material weakness in internal controls over financial reporting.

Class Plaintiffs contend that Defendants' deliberate violations of § 10(b) of the Exchange Act caused Class Members to suffer $4.10 per share in damages under the "out-of-pocket" theory of economic loss.

Class Plaintiffs contend that all Defendants other than AMR are also liable for these damages pursuant to § 20(a) of the Exchange Act because they in fact controlled, or had the ability to control, the materially false statements made to investors between August 16, 2017 and May 17, 2019.

### B.    Defendants' Contentions

Class Plaintiffs have asserted a variety of claims against Defendants, which include AMR, members of Silver Run's board of directors, certain of AMR's officers and directors, and minority shareholders of AMR.  Each of these claims requires Class Plaintiffs to prove culpable conduct by each of these Defendants *individually* in order to hold them each liable.  Indeed, the Private Securities Litigation Reform Act ("PSLRA") and Fifth Circuit both require that Class Plaintiffs prove *each* element of *each* claim *as to each specific Defendant*.  Class Plaintiffs, however, largely treat these Defendants as an undifferentiated group and improperly attribute alleged conduct or statements by one or a few defendants to everyone else.  Defendants object to Class Plaintiffs' improper grouping of Defendants and failure to specify which claims, conduct, and/or misstatements are attributable to each specific Defendant, as outlined in Sections V.A and V.B *supra*, and reserve all rights to seek relief from the Court to preclude Plaintiffs from trying their contentions as written.

Additionally, Class Plaintiffs' contentions indicate an intention to pursue at trial new claims based upon misstatements or omissions that were not pled in their operative

Complaints.  These new claims are barred by the applicable statutes of limitations and repose, fail to conform to the PSLRA's pleading requirements, and are untimely under the parties' stipulated Fourth Amended Scheduling Order, requiring any amendment of pleadings to be made by April 15, 2022.

### 1.   AMR and Riverstone Defendants' Liability Contentions[2]

Class Plaintiffs' theory of fraud animating all of their claims does not make any sense, and in fact, is belied by all relevant evidence in this case.  AMR, like other operators, did not find as much oil and gas in the STACK as they predicted.  But there is no evidence that anyone at AMR knew this was going to happen when they entered into the Business Combination and embarked on the drilling plan in 2018.  The evidence instead shows that each of these people genuinely believed that AMR would be a financial success.  Indeed, they personally invested substantially in AMR and staked their reputations on the future success of AMR.  And those Defendants who held shares of AMR lost money too as a result of AMR's demise just like Class Plaintiffs. This is why Class Plaintiffs' theory that each Defendant willingly and intentionally invested time, money, and their reputations into a doomed enterprise makes no sense.  There was no fraud.  As everyone knows, sometimes Mother Nature does not cooperate when hunting for oil, and the law does not punish people when that happens.

---

[2] Capitalized terms in this section are defined in Defendants' motions for summary judgment.

### a.      Section 14(a) of the Exchange Act.

Silver Run's directors (Gutermuth, Hackett, Walters, and Tepper) and Riverstone did not violate Section 14(a) because the Proxy does not contain any false or misleading statements and none of these statements were material to a reasonable investor.  Each of the statements challenged by the Class Plaintiffs is either an estimate, opinion, subjective belief, or projection that is not a statement of fact.  These forward-looking statements are immunized by each of the three prongs of the PSLRA's safe harbor any one of which is independently sufficient to defeat Class Plaintiffs' claims because they were: (1) accompanied by detailed and extensive warnings that the projections might not come true; (2) were not described as a guarantees of future results, and (3) there is no evidence that Gutermuth, Hackett, Walters, Tepper, or Riverstone actually knew the projections were false or misleading.  Class Plaintiffs bear the burden of proving otherwise, 15 U.S.C. § 78u-5(c)(1)(B), but they will not be able to meet that burden because the evidence demonstrates that Gutermuth, Hackett, Walters, Tepper, and Riverstone actually believed the statements in the Proxy were complete and accurate.

Moreover, Gutermuth, Hackett, Walters, Tepper, and Riverstone each acted diligently and were not negligent and thus are not liable even if the Proxy contained a misstatement.   The extensive and unrefuted evidence demonstrates that Gutermuth, Hackett, Walters, Tepper, and Riverstone reviewed and/or relied upon the considerable scientific and technical analysis performed by numerous third-party experts and carefully evaluated whether the Business Combination was in stockholders' best interests.  This due diligence evidence proves that each complied with the applicable standard of care and were

not negligent.  Understanding that this evidence is fatal to their claims, Class Plaintiffs, for the first time after five years of litigation, assert that Section 14(a) is a strict liability offense, rather than requiring evidence of negligence.  *Compare* Class Pls.' Opp'n to Defs' Mot. to Dismiss, Dkt. 139, at 24 ("To state a Section 14(a) claim, Plaintiffs must … demonstrate[e] that … Proxy Defendants acted at least negligently …."), *and* Class Pls.' Opp'n to Proxy Defs' Mot. Summ. J. ("MSJ"), Dkt. 571, at 2-3 ("Because the evidence indicates the Proxy Defendants' conduct was fraudulent, Class Plaintiffs have satisfied the negligence standard as a matter of law."), *with* Class Pls.' Proposed Closing Instr. for Sec. Exchange Act Claim § 14(a) & Rule 14a–9 ("Accordingly, for purposes of finding liability under Section 14(a), 'negligence' is defined as the solicitation of a proxy statement that misrepresents or omits material information necessary to prevent the proxy statement from being false or misleading, irrespective of any defendants' subjective intent, level of diligence or care, or claimed good faith.  If you find that the proxy statement misrepresented or omitted material information necessary to prevent the proxy statement from being false or misleading, you must find that the defendant is negligent.").

Class Plaintiffs' new position is inconsistent with decades of precedent and this Court's decisions.  *See, e.g.*, *Camelot Event Driven Fund v. Alta Mesa Resources, Inc.*, No. 4:19-cv-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021) (requiring proof that "defendants acted at least negligently" (citing *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361, 365 (S.D. Tex. 1993))); *see also Karp v. First Conn. Bancorp., Inc.*, 535 F. Supp. 3d 458, 474 (D. Md. 2021), aff'd 69 F.4th 223 (4th Cir. 2023) (rejecting argument that "when a communication seeking shareholder action contains a

materially false or misleading statement or omission, the officers and directors who reviewed, authorized, or disseminated, or otherwise solicited shareholders via such document are negligent as a matter of law" (citations omitted)).  In fact, this argument is predicated on cherry-picked statements from a just handful of decisions.  When read in context, it is clear that none of these courts interpreted Section 14(a) as a strict liability statute.

In addition, Riverstone cannot be liable under Section 14(a) because it did not solicit the Proxy.

### b.    Section 10(b) of the Exchange Act

Class Plaintiffs also assert Section 10(b) claims against AMR, Hackett, and Chappelle based upon a variety of statements made throughout the Class Period but do not have evidence to show that any are false or misleading with respect to a material fact or that the speaker acted with scienter.

None of these Defendants acted "severely reckless" in making these statements.  Indeed, there is no evidence at all to suggest that any of them engaged in an "extreme departure from the standard of ordinary care" expected of a director of a public company in issuing a Proxy.  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) ("Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.") (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005)).  Nor is there any evidence that these Defendants knew the statements were false or misleading at the time the statement was

made.  *See* Mem. Op., Dkt. 778, at 25 (citing *Lormand*, 565 F.3d at 254 ("[T]he plaintiff provides numerous contemporaneous documents, such as internal emails and memos, [and] also provides admissions from the defendants themselves regarding their state of mind at the time of their representations [that] consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly.")).  The evidence instead demonstrates that each faithfully performed their duties as directors and officers in connection with the preparation and filing of the Proxy.

Class Plaintiffs allege Hackett made two additional misstatements in August 2017. These two generic statements were completely true, facially immaterial, and there is no evidence that Hackett did not believe the statements or was severely reckless in making them.  In addition, many of these statements are immunized by the PSLRA safe harbor and were genuinely believed to be true.  Class Plaintiffs bear the burden of proving that the each speaker has actual knowledge that the statement was false.  15 U.S.C. § 78u-5(c)(1)(B).  Moreover, the evidence does not demonstrate that Hackett or Ellis acted with severe recklessness with respect to any of the non-forward looking statements.

Class Plaintiffs challenge other statements Chappelle made that were true and accurate when made.  For example, Class Plaintiffs cannot use the *later* disclosure of material weaknesses in internal controls over financial reporting identified as of December 31, 2018 to prove that the *earlier* challenged internal controls statements (*e.g.*, in the earlier Form 10-Qs) were false or misleading *when made*.  *See* Mem. Op., Dkt. 778, at 34-35

(similar analysis when dismissing Opt-Outs disclosure controls and procedures statement from the March 2018 Form 10-K).  Moreover, AMR transparently disclosed that it was not yet required to conduct, nor had AMR conducted, a comprehensive assessment of its internal controls as of the Form 10-K filed in March 2018 due to SEC rules.  *Id.* at 19-20.

The Class Plaintiffs also cannot prove that any of these statements was material or that Chappelle acted severely reckless when he made them.  In addition, many of the statements are forward-looking and immunized by the safe harbor.  Rather, Class Plaintiffs' claims rest on improper hindsight.  Their claims boil down to "arguing that Alta Mesa's drilling program caused a financial disaster for the company and that the company knew that its drilling program would cause a financial disaster" when it made the various challenged statements.  Dkt. 778, at 25-26 (rejecting this same argument for the challenged Form 10-K statements).  Plaintiffs, however, cannot prove that anyone (let alone any remaining Defendant) knew the drilling program was doomed from the outset.

Class Plaintiffs also lack standing to challenge Chappelle's statements made before the Business Combination, given that those statements concerned AMH and KFM, not AMR.

Finally, Class Plaintiffs cannot prove that they actually relied on any of these challenged statements, and they will not prove the elements necessary to invoke the fraud on the market presumption.  Moreover, to the extent the Class Plaintiffs were able to successfully invoke the fraud on the market presumption and should the jury determine that Class Plaintiffs have proved the other elements of any of their Section 10(b) claims, Defendants intend to rebut the presumption with respect to absent class members during a

second phase of the trial, following an opportunity to obtain discovery from those class members.

### c.    Section 20(a) of the Exchange Act

As an initial matter, none of the defendants are secondarily liable under Section 20(a) because there has not been any primary violation of the securities laws.

With respect to their control person claims based on a violation of Section 14(a), Class Plaintiffs cannot prove that any of Gutermuth, Hackett, Tepper, Walters, or Riverstone "organiz[ed] 'dummies,' that, acting under their control," purportedly violated Section 14(a). *Carlton v. Cannon*, No. 4:15-CV-12, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016). And "[g]eneral allegations about" Hackett's, Gutermuth's, Tepper's, or Walter's "day-to-day participation in corporate affairs are insufficient to allege the ability to control the specific transaction identified as the basis for primary liability." *Id.* (citing *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014)). Nor is it enough for Plaintiffs to prove that Gutermuth, Hackett, Tepper, or Walters were either executives or directors who signed SEC filings. *See In re Dynegy, Inc. Secs. Litig.*, 339 F. Supp. 2d 804, 895, 900, 904, 913 (S.D. Tex. 2004). Even if any of those individuals did have control, each acted with good faith and did not directly or indirectly induce the purported violation.

Similarly, Class Plaintiffs cannot prove that Chappelle, Ellis, Gutermuth, Hackett, Smith, Tepper, Walters, or Riverstone each controlled some other person when that specific person purportedly violated Section 10(b). Contrary to Class Plaintiffs' improper rebuttal contention below, it is irrefutable that Riverstone had the ability to nominate only 3 of the 11 members of AMR's board. The other directors were either nominated by other

stockholders or subject to election by all stockholders.  In any event, each of these defendants acted with good faith and did not directly or indirectly induce the purported violation.

> **d.**    **Class Plaintiffs' Incorrectly Attempt to Shift Their Burden Under Sections 10(b), 14(a), and 20(a) of the Exchange Act**

Class Plaintiffs attempt to unload their burden of proving each element of their Exchange Act claims by framing certain elements they must prove as "defenses."  But, despite Class Plaintiffs' attempted sleight of hand, the burden remains with Class Plaintiffs to prove each element of their case:

**PSLRA Safe Harbor**.  First, Class Plaintiffs characterize the PSLRA's Safe Harbor as an affirmative defense that a defendant must prove applies.  *See infra* Section V.C.1. Class Plaintiffs, however, do not cite a single authority to support this novel argument. And Class Plaintiffs ignore the statute's plain language, which states that forward-looking statements are immunized if "the plaintiff fails to prove that the forward-looking statement (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading."   15 USC § 78u-5(c)(1)(B)(i); *see id.* at § 78u-5(c)(1)(B)(ii) (actual knowledge standard for statements made by a business entity); *see also Southland Secs. Corp. v. INSpire Ins. Sols.*, 365 F.3d 353, 371 (5th Cir. 2004) (recognizing same).

**Opinion Statements and *Omnicare***.   Class Plaintiffs next create an "Omnicare Defense" to suggest that a defendant must affirmatively prove that statements of opinion are not actionable.  *See infra* Section V.C.2 (stating that Omnicare is an "affirmative

defense").  This is simply not the law, which is why it is not surprising that Class Plaintiffs do not cite to even a single case in which a court shifted the burden of proof to a defendant. Rather, the Supreme Court's *Omnicare* decision and every decision to follow has confirmed that it is the plaintiffs' obligation to plead and prove that an opinion statement was false or misleading.  *Omnicare, Inc. v. Lab. Dist. Council Inc. Pension Fund*, 575 U.S. 175, 194 (2015) ("[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion . . . . To be specific: The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."); *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 892 (S.D. Tex. 2017) (recognizing "two potential avenues *for plaintiffs to establish* the falsity of an opinion" under *Omnicare* (emphasis added)).

**Section 14(a)**.  Class Plaintiffs assert that "defendants' diligence defense is inapplicable" to Section 14(a) claims.  *See infra* Section V.C.3.  But that is a *non sequitur* because defendants are not asserting a diligence defense and do not have the burden of proving such a defense.  Each defendant intends to offer facts, expert testimony, and other evidence of the extensive due diligence performed on AMH and Kingfisher, but, as explained above, Class Plaintiffs still have the burden to prove that each was, at a minimum, negligent.  Class Plaintiffs' new argument that Section 14(a) is a strict liability statute finds no support in the case law, including in the decisions they cite.  *See Beck v.*

*Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer. . . . And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care.") (citations omitted); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301-02 (2d Cir. 1973) (agreeing that "[n]egligence alone either in making a misrepresentation or in failing to disclose a material fact in connection with proxy solicitation is sufficient to warrant recovery" and that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts") (quotation and citation omitted);[3] *In re Willis Towers Plc Proxy Litig.*, 439 F. Supp. 3d 704, 714 (E.D. Va. 2020) ("[T]he Court finds that a Section 14(a) claim can sound in 'negligence.'").

**Control Person Liability**.  Last, Class Plaintiffs incorrectly reframe their burden under Section 20(a) to prove control person liability as something Defendants must, instead, rebut: "Defendants Riverstone, Hackett, Gutermuth, Tepper, and Walters **contend they did not control any person who purportedly violated Section 20(a)** for purposes of Plaintiffs' Section 14(a)(9) claim." *See infra* Section V.C.4 (emphasis added).  This is plainly wrong under controlling Fifth Circuit law.  *See, e.g.*, *Dennis v. General Imaging, Inc*., 918 F.2d 496, 509 (5th Cir. 1990) ("To make out a prima facie case of a Section 15 or Section 20 violation against defendants …, plaintiff

---

[3] Class Plaintiffs' characterization and selective quotation of *Gerstle* to suggest the Court held that liability under Section 14(a) is "virtually absolute" is false and misleading.  *See Gerstle*, 478 F.2d at 1301.  The court expressly declined to reach that issue:  "Whether in situations other than that here presented 'the liability of the corporation issuing a materially false or misleading proxy statement is virtually absolute, as under Section 11 of the 1933 Act with respect to a registration statement,' Jennings & Marsh, Securities Regulation: Cases and Materials 1358 (3d ed. 1972), we leave to another day."  *Gerstle*, 478 F.2d at 1301.

must prove that 1) each had actual power or influence over the controlled person and 2) each induced or participated in the alleged violation."); *see also Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 95 F.3d 45 (5th Cir. 1996) (No. 95-60680), 1996 WL 405436, at *3 ("[W]e have held that a plaintiff must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1219 (1994)). And it sidesteps Class Plaintiffs' obligation under Section 20(a) to "at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Meek*, 1996 WL 405436, at *3 (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993)).

### 2.   Bayou City Is Not Liable Under Section 20(a) of the Exchange Act [Class Plaintiffs]

Pursuant to the Court's August 12, 2024 Order, nearly all of Plaintiffs' Section 20(a) claims against Bayou City have been dismissed "except for claims arising out of statements made by [Chappelle] before the SPAC transaction while Chappelle was Chief Executive Officer of [AMH]." *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *25 (S.D. Tex. Aug. 12, 2024). Specifically, the Court's holding was limited to Chappelle's "public statements regarding AMH and Kingfisher before the SPAC transaction, while Chappelle was AMH's CEO." *Id.*

Bayou City Energy Management, LLC ("Bayou City") contends that it is not liable under Section 20(a) because Plaintiffs failed to plead, and cannot prove that (1) there was an underlying violation of Section 10(b) for which Bayou City can be held secondarily liable or that (2) Bayou City had actual power or control over any allegedly fraudulent action. *See Southland Sec. Corp. v. INSpire Ins. Sols.*, Inc., 365 F.3d 353, 383–84 (5th Cir.

- 27 -

2004); *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *18 (S.D. Tex. Aug. 12, 2024).  Bayou City further contends that based on a good faith defense, it is not liable under Section 20(a) because the evidence conclusively establishes that Bayou City did not act recklessly with respect to any alleged violation of Section 10(b).

**a.** **Plaintiffs Cannot Prove An Underlying Violation of Section 10(b)**

**(1)** **Plaintiffs Lack Standing To Challenge Statements Regarding AMH and Kingfisher**

Under the purchaser-seller rule established by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), Plaintiffs lack standing to bring Section 10(b) claims based on statements made by Chappelle "regarding AMH and Kingfisher," MSJ Order at 52, companies for which Plaintiffs have indisputably never owned stock. In adopting the purchaser-seller rule, the Supreme Court confined standing under Section 10(b) not to just the purchasers or sellers of *any* security about which Plaintiffs allege injury, but to the purchasers or sellers of the "security ***to which the prospectus, representation, or omission relates***." *Id.* at 747 (emphasis added); *see also Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 32 (2d Cir. 2004) ("[T]he phrase 'any security' . . . indicates that the regulations reach *all types* of securities, and not *any affected company's* securities." (citing Thomas Lee Hazen, THE LAW OF SECURITIES REGULATION § 12.4 (4th ed. 2002)).

All circuits to consider the issue of standing in the context we face today—alleged misstatements made in advance of an anticipated merger—have agreed that the purchaser-seller rule limits Section 10(b) standing to purchasers and sellers of the security about which the alleged misrepresentations were made. In fact, in an August 2024 decision, the

- 28 -

Ninth Circuit considered this exact issue, joining the Second Circuit[4] (the only other circuit court to consider the issue) in holding that the purchaser-seller rule prevents persons who purchased stock in acquiring company from having Section 10(b) standing for "alleged misstatements made in advance of an anticipated merger." *In re CCIV/Lucid Motors Sec. Litig.*, No. 23-16049, 2024 WL 3710186 at *3 (9th Cir. Aug. 8, 2024).

Here, Plaintiffs acknowledge that the pre-Business Combination statements Bayou City allegedly controlled were "regarding AMH and Kingfisher in August 2017." *See infra* at 58. And because Plaintiffs did not purchase AMH or Kingfisher securities (a fact that is not in dispute)[5], Plaintiffs lack standing to sue based on Chappelle's pre-Business Combination statements. As these are the only statements for which Bayou City can be held secondarily liable under Section 20(a), the remaining claims against Bayou City should be dismissed. *See* Bayou City's Mot. to Dismiss (Dkt. 783).

### (2)     Chappelle Was The Maker Of Only Two Alleged Misstatements

Plaintiffs have alleged, at most, ***only two*** that were actually made by Chappelle before the Business Combination when he was the CEO of AMH:

---

[4] *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022) ("[P]urchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies.").

[5] Both Kingfisher and AMH were privately held at the time Chappelle made the alleged misstatements.

(1)    <u>Statement from August 16, 2017 Press Release</u>:   "We see this as a tremendous way to continue our evolution as a low-cost, high-value producer in the STACK."[6]

(2)    <u>Statement from August 17, 2017 Investor Conference Call</u>:   "We have over 200 wells that we've drilled here and we've demonstrated the value, and we have confidence in the upside.  As an illustration of that, at the end of the second quarter [of 2017], we drilled on the order of 200 wells; of those, over 160 were on production. And of that number, about 114 had sufficient production history to give us confidence that at the end of this year, our year-end reserves will reflect better than 650,000 BOE."[7]

Plaintiffs nonetheless seek to improperly expand the scope of their Section 10(b) claims against Chappelle, attributing additional statements to him from the August 16, 2017 press release and August 17, 2017 investor conference call.[8]  These statements, however, are direct quotes from ***Hackett***, not Chappelle.[9]  Plaintiffs never alleged that

---

[6] *See* Class Pls.' Third Am. Compl. ("TAC") ¶ 190; Alyeska Compl. ¶ 152; Orbis Compl. ¶ 161.

[7] TAC ¶ 194; Alyeska Compl. ¶ 156; Orbis Compl. ¶ 165.

[8] *See* Class Pls.' Opp'n to Defs.' Mot. Dismiss App. 3 (Dkt. 139-3) ("Chart of Alleged Misstatements") at 1 (attributing to Chappelle the statement that, "We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform."); *id.* (attributing to Chappelle the statement that, "First, we'll talk about the introduction. When we went out to look for targets for [Silver Run II], we had laid out investment criteria that are shown on slide 5. And both individually as an Upstream and Midstream company and collectively as an integrated platform, this transaction satisfies those criteria.").

[9] *See* AMR_SDTX01781036 (Aug. 16, 2017 Press Release) at -1043 ("Mr. Hackett commented, 'We formed Silver Run II with the objective of acquiring low-breakeven, stacked-pay, oil-weighted assets, preferably with an integrated related midstream platform.'"); CP-0393 (Aug. 17, 2017 Investor Presentation) (**James Hackett:** 'Thanks, Hal. First, we'll talk about the introduction. When we went out to look for targets for Silver Run II, we had laid out investment criteria that are shown on Slide 5. Both individually as an Upstream and Midstream Company, and collectively as an integrated platform, this transaction satisfies those criteria.'").

Chappelle made these statements in their TAC, and in fact, expressly attributed them to Hackett instead.  TAC ¶¶ 190, 192.

Plaintiffs also attempt to attribute two other statements in the August 16, 2017 press release to Chappelle,[10] as well as three additional statements in an August 17, 2017 investor presentation.[11]  *See* Dkt. 139-3 at 1-2.  However, Chappelle can only be liable for statements for which he had "ultimate authority … including its content and whether and how to communicate it."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Because Chappelle did not have ultimate authority over these additional

---

[10] *See* Chart of Alleged Misstatements at 1 (attributing to Chappelle the statement that, "AMH had identified 'about 4,200 gross identified drilling locations' and based on its currently producing wells AMH 'expects EURs at year end to exceed 650 MBOE per well.'); *see also* AMR_SDTX01781036 at -1042 (Aug. 16, 2017 press release stating that, "With approximately 120,000 contiguous net acres and about 4,200 gross identified drilling locations, Alta Mesa is among the largest and most active operators in the STACK."); *id.* (Aug. 16, 2017 press release stating that, "Based upon production through the second quarter of 2017, Alta Mesa expects EURs at year end to exceed 650 MBOE per well or approximately 140 BOE per foot of lateral.").

[11] *See* Chart of Alleged Misstatements at 1 (attributing to Chappelle the statement that, "The STACK was a '[h]igh margin core basin with low field break-events [with] deep inventory.'"); *id.* at 2 (attributing to Chappelle the statement that, Kingfisher was 'rapidly expanding' and 'positioned to capture volume growth from the STACK.' Kingfisher was 'well positioned to serve other operators' and take advantage of the '[e]xpansion opportunities in [the] rapidly growing basin.' Kingfisher was estimated to have achieved $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million."); *see also* CP-393 at 5 (Aug. 17, 2017 investor presentation slide referring to Kingfisher as "rapidly expanding," "positioned to capture volume growth from the STACK," and "well-positioned to serve other operators."); *id.* at 29 (Aug. 17, 2017 investor presentation slide describing Silver Run's investment criteria as being met by a "high margin core basin with low field break-evens, deep inventory" and "expansion opportunities in a rapidly growing basin."); *id.* at 35 (investor presentation slide describing Silver Run's "capitalization at announcement," including Kingfisher's projected $42 million EBITDA for year-end 2017, $184 million EBITDA for year-end 2018, and $318 million EBITDA for year-end 2019).

statements, he cannot be liable for them under Section 10(b), nor can Bayou City be liable as an alleged control person under Section 20(a).

### (3) Chappelle's Pre-Business Combination Statements Are Not Actionable

Bayou City cannot be liable as a control person for any statements by Chappelle that are not actionable under Section 10(b). For example, Bayou City cannot be held secondarily liable for the statements made by Chappelle that constitute mere puffery or "corporate cheerleading" because such statements "are of the vague and optimistic type that cannot support a securities fraud action and contain no concrete factual or material misrepresentation." *Southland*, 365 F.3d at 372 (quotations omitted); *see also In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). Plaintiffs likewise cannot establish that Bayou City is liable as a control person for statements that are protected by the PSLRA's safe harbor, *see* 15 U.S.C. §§ 78u-5(c)(1)(A)-(B), 78u–5(i)(1), or that constitute financial projections or other statements of opinion. *See Omnicare, Inc. v. Lab. Dist. Council Inc. Pension Fund*, 575 U.S. 175, 194 (2015); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 892 (S.D. Tex. 2017).

### (4) Plaintiffs Cannot Prove Loss Causation For Chappelle's Pre-Business Combination Statements

Plaintiffs further cannot prove two essential elements of their Section 10(b) claims against Chappelle: "actual economic loss" and "loss causation." *See Dura Pharm., Inc. v.*

*Broudo*, 544 U.S. 336, 342, 343-44 (2005).  Both the PSLRA and Supreme Court precedent require Plaintiffs to establish a causal connection between Chappelle's pre-Business Combination statements and their alleged economic loss to prevail under Section 10(b). *See id.*  However, none of the five corrective disclosures alleged by Plaintiffs actually revealed that Chappelle's statements were false or misleading, and Plaintiffs have made no attempt to disaggregate losses purportedly caused by these alleged misstatements from other non-fraud related factors, including changed circumstances or the impact of other alleged misstatements.  *See e.g.*, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009); *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund* (LOCAL 66), 579 F.3d 401, 407 (5th Cir. 2009).  Indeed, even Plaintiffs' own experts admit that their damages models fail to disaggregate any stock price reaction to Chappelle's alleged misstatements from these other factors, as required by the Supreme Court's decision in *Dura*.  *See Dura*, 544 U.S. at 342-44; *see also Flowserve*, 572 F.3d at 229; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

Without testimony showing loss causation or damages **specific to Chappelle's alleged misstatements**, Plaintiffs lack evidence of essential elements of their claim based on those statements. *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Local 66)*, 579 F.3d 401, 409 (5th Cir. 2009) ("[T]he testimony of an expert—along with some kind of analytical research or event study—is **required** to show loss causation." (emphasis added)); *Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir.

2007) (rejecting a damages theory where "there [was] no evidence linking the *culpable* disclosure to the stock-price movement," as opposed to "the *entire bundle* of negative information" and holding that Plaintiffs must show "it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline" (emphasis in original)), *abrogated on other grounds by Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (reiterating that "investors must demonstrate that **the defendant's** deceptive conduct caused their claimed economic loss," although not necessarily at the class certification stage (emphasis added)).

In addition, Plaintiffs cannot prove damages with respect to their claims against Bayou City. Plaintiffs failed to disclose a computation of damages allegedly caused by Chappelle's alleged misstatements prior to the business combination. *See* ECF 531-1. Plaintiffs cannot now offer evidence of such damages. *See e.g.*, *Ancor Holdings, L.P. v. Landon Capital Ptrs*, L.L.C., 114 F.4th 382, 405 (5th Cir. 2024) (holding that a party could not introduce evidence regarding damages when it had not disclosed the computation of those damages). Because Plaintiffs cannot establish economic loss and loss causation, their Section 10(b) claims must fail.

### b. Plaintiffs Failed To Plead 20(a) Liability For Statements "Regarding AMH and Kingfisher"

Plaintiffs failed to plead that Bayou City is liable under Section 20(a) for any statements regarding AMH or Kingfisher. At most, Plaintiffs pleaded that Bayou City (along with every other Defendant) had the "power to control materially false and misleading public statements about Alta Mesa"—that is, "***AMR and/or Silver Run***." *See* Class Pls.' Third Am. Compl. ¶ 369; *see also id.* at 1 (defining "Alta Mesa" as "Alta Mesa

Resources, Inc., f/k/a Silver Run Acquisition Corporation II"). Bayou City thus cannot be held liable as a control person under Section 20(a) for any statements regarding ***AMH and Kingfisher***.

### c. Plaintiffs Cannot Prove That Bayou City Was A Control Person Of Chappelle's Pre-Business Combination Statements

Even assuming Plaintiffs' Section 20(a) claims were properly pleaded (they are not), Plaintiffs cannot prove that Bayou City is liable under Section 20(a) because Plaintiffs lack any evidence that Bayou City "had actual power or control" over Chappelle's alleged misstatements. *See In re Alta Mesa Res.*, 2024 WL 3760481, at *19-20, 23 (S.D. Tex. Aug. 12, 2024); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 913 (S.D. Tex. 2004). First, Plaintiffs attempt to establish control by relying on irrelevant evidence including Bayou City's minority ownership interest in High Mesa, the parent company of AMH, but of whom is not a Defendant in this case. *Infra* at 58. Yet "Plaintiffs have not accused . . . AMH . . . of making false statements." *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *25. In any event, a defendant's status alone is insufficient to prove control person liability. *See In re Alta Mesa,* 2024 WL 3760481, at *18; *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 913 (S.D. Tex. 2004); *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). Nor is having a minority ownership interest in a company sufficient to prove that a defendant was a control person of an executive or officer of that company. *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001), *aff'd*, 72 F. App'x 130 (5th Cir. 2003); *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *9 (D. Del. Feb. 7, 2020); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000).

Second, Plaintiffs' reliance on evidence that Bayou City exerted control through its involvement in AMH's operations is similarly misplaced. Plaintiffs point to Bayou City's joint drilling venture with AMH to demonstrate control of AMH and its CEO, Chappelle. But as this Court aptly held, "Plaintiffs' evidence does not show that the well development agreement gave [Bayou City] . . . the power to control Alta Mesa's statements to investors or potential investors." *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *24.

Third, Plaintiffs' contention that Bayou City supposedly worked with Chappell to "craft alleged misleading statements regarding AMH and Kingfisher in August 2017," *infra* at 57-58 is also insufficient as a matter of law to prove control person liability. *See Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, 2014 WL 4851558, at *13 (N.D. Tex. Sept. 30, 2014); *In re BP p.l.c. Sec. Litig.*, MDL No. 10-md-2185, 2014 WL 4923749, at *6 (S.D. Tex. Sept. 30, 2014). As this Court has recognized, providing input for a public statement "does not equate to control over any person who committed an alleged primary violation." *In re Alta Mesa*, 2024 WL 3760481, at *22; *id.* at *20 ("It is not enough to argue, as Plaintiffs do, that Leuschen 'had the opportunity to review and comment on [Alta Mesa] press releases and other public statements in advance of them being publicly issued and could have—but chose not to—stop the false and misleading information statements from being issued."). And Plaintiffs do not point to any other indicia of control, such as Bayou City's involvement in AMH's day-to-day activities or management. *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1200-02 (D. Or. 2015); *S.E.C. v. Winemaster*, 529 F. Supp. 3d 880, 924-25 (N.D. Ill. 2021).

Even if editing or commenting on a document was sufficient (it is not), Plaintiffs do not present any evidence that Bayou City actually worked with Chappelle on drafting any public statements in the August 2017 timeframe, much less that Bayou City had "final authority" over any such statements. *See In re Alta Mesa*, 2024 WL 3760481, at *20 (S.D. Tex. Aug. 12, 2024). Plaintiffs thus cannot prove that Bayou City had the "ability to control the specific transaction or activity" underlying their Section 10(b) claims against Chappelle for pre-Business Combination statements. *See In re Alta Mesa*, 2024 WL 3760481, at *18; *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014).

### d.     Plaintiffs Cannot Rebut Bayou City's Good Faith Defense

Bayou City also cannot be liable under Section 20(a) because the evidence conclusively establishes that it acted in good faith and did not induce any alleged misstatements by Chappelle. *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958-59 (5th Cir. 1981). Further, Class Plaintiffs' attempts to negate Bayou City's good faith defense to Section 20(a) liability are wholly unavailing. With the Court having dismissed all of the claims against McMullen, and all but one of the claims against Bayou City, Class Plaintiffs nonetheless seek to litigate a case against McMullen that no longer exists. For the first time in this litigation, Plaintiffs now assert an unpleaded agency theory as to Bayou City and McMullen, relying on what McMullen supposedly knew about AMH's well production data. *See infra* at 58 ("BCE, through its agent William McMullen…"); *id.* ("BCE, through McMullen…"). But as the Court made clear in its MSJ Order, all claims against McMullen were dismissed in their entirety, in part, because Plaintiffs failed to establish that McMullen "had the ability to control the specific

transaction or activity upon which a primary violation is based."  *In re Alta Mesa*, 2024 WL 3760481, at *24-*25.  Class Plaintiffs cannot attempt to keep McMullen in this case by recycling their prior contentions against Him to further an unpleaded agency theory against Bayou City. Even assuming such a theory was properly pleaded (it was not), McMullen's duties as an AMH board member ran to AMH only, and the Court "cannot assume that [Bayou City's] designee[] . . . w[as] acting on behalf of Bayou City," rather than in his capacity as a director of AMH. *In re Kosmos.*, 955 F. Supp. 2d at 676 (citing *In re Global Crossing Secs. Litig.,* 2005 WL 1907005, *4 (S.D.N.Y. Aug. 8, 2005)).

In any event, Class Plaintiffs' rebuttal contentions regarding this newly asserted agency theory are not only irrelevant, but just plain false.  There is no evidence showing that when Chappelle's pre-Business Combination statements were made, McMullen was aware that "KFM acreage was condemned" or that the "2018 KFM EBITDA projections were lies." *See infra* at 58.  Nor did McMullen ever receive a "letter from Hackett explicitly informing BCE that the 2018 EBITDA projection would not materialize" because no such letter exists.  *See id.* Pursuant to the Court's August 12, 2024 Order, nearly all of Plaintiffs' Section 20(a) claims against Bayou City have been dismissed "except for claims arising out of statements made by [Chappelle] before the SPAC transaction while Chappelle was Chief Executive Officer of [AMH]."  *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *25 (S.D. Tex. Aug. 12, 2024).  Specifically, the Court's holding was limited to Chappelle's "public statements regarding AMH and Kingfisher before the SPAC transaction, while Chappelle was AMH's CEO."  *Id.*

### 3.     Defendants' Affirmative Defenses Preclude Liability

Defendants contend that a number of affirmative defenses preclude Class Plaintiffs from recovering on their claims even if they could prove liability.   Additionally, Class Plaintiffs' voluntary actions, constructive or actual knowledge, and/or contributory fault caused their losses.  Each were aware of, or recklessly ignored, the stated risks of investing in the oil and gas industry generally and AMR specifically.  Class Plaintiffs thus assumed the risk that their investment would not be profitable.  Moreover, Class Plaintiffs failed to mitigate their damages by selling their AMR stock or refraining from purchasing more stock after AMR disclosed on March 29, 2018, that AMH and Kingfisher failed to achieve the 2017 projections in the Proxy and lowered the projections for 2018, and after AMR continued to disclose disappointing financial results.  Also, any gains the Class Plaintiffs made selling AMR stock offset their claimed losses.

### 4.     Plaintiffs Are Not Entitled to Damages

Defendants contend that Class Plaintiffs cannot prove their claims unless they prove that each alleged misstatement caused their losses (including by showing which supposed corrective disclosure corrected which alleged misstatement with new information) and how much they supposedly lost because of each misstatement.  The Class Plaintiffs cannot prove, nor have they even attempted to prove, any of this.  The PSLRA required them to offer evidence to prove loss causation and damages, and they chose not to do so. Accordingly, Class Plaintiffs cannot prove an essential element of their Exchange Act and state law claims, and thus, are not entitled to any award of damages.

Similarly, Defendants contend that Class Plaintiffs' alternative calculation of damages for their Section 14(a) claims is not permitted under the PSLRA.  Further, to the

extent Class Plaintiffs are entitled to recover any damages (which they are not), any recoverable damages must be allocated among Defendants and all persons who caused or contributed to those losses as required by the PSLRA.

### C.   Class Plaintiffs' Rebuttal Contentions

#### 1.   Riverstone Defendants' and AMR's Safe Harbor Defense

Riverstone, Hackett, Gutermuth, Tepper and Walters, and AMR assert the PSLRA's Safe Harbor defense (15 USC § 78u-5) immunizes them against the misleading upstream and midstream financial and production forecasts contained in the Proxy.  As an initial matter, the Court fully considered the "immunization" argument and rejected it during motion to dismiss, and summary judgment proceedings.  At trial, this defense will also fail because Riverstone, Hackett, and AMR did not believe the projections to be accurate, nor did they maintain a reasonable basis for their purported belief.

For example, in early August 2017 Riverstone and Hackett informed HPS, AMR, BCE, and ARM Energy that the KFM projections "will be longer dated" than the projections contained in their financial models.  Prior to August 2017, Riverstone and Hackett had already discounted the 2018 KFM EBITDA projection resting on AMR's production by 50%, and third-party production by 75%.  Accordingly, Riverstone and Hackett's KFM 2018 EBITDA projection was almost half of the 2018 $185 million KFM projection touted by these defendants in the Proxy.  Due to the failure of a potential $1 billion PIPE deal in late July 2017, Riverstone and Hackett also knew that AMH and KFM would be capital constrained leading into 2018.

And, that failed PIPE deal triggered a mad dash to reforecast both AMH and KFM's 2018 EBITDA projections in light of those capital constraints, mere days before they were

first published on August 17, 2017.  On August 13, 2017, Hackett and Chappelle conspired to concoct an AMH 2018 EBITDA projection exceeding $350 million simply because then current prior projections did not support the value Hackett and Chappelle placed on the upstream business.  Later that day, AMR's senior financial analyst told Chappelle that an upstream 2018 EBITDA projection exceeding $350 million "can't be done."  Further, in April and June 2017, Hackett's hand-selected oil and gas expert, and Riverstone's deal team, both warned Hackett that AMH's lackluster down-spacing results, and the STACK's highly fractured geology, conflicted with the AMR purported "upside" story (*i.e.*, hockey-stick EBITDA growth in 2018 and 2019).  Riverstone, Hackett, and Chappelle had direct knowledge that AMH's multi-well pattern performance data – generated between 2015 through February 6, 2018 – undermined the 12-WPS and 250 MBO assumptions upon which the 2018 upstream and midstream financial projections were based.

### 2.    The "Omnicare" Defense

Even if the Court were to agree that certain of Defendants' Class Period Statements were "opinion," *Omnicare, Inc. v. Labs. Dist. Council Const. Indus. Pension Fund*, 574 U.S. 175 (2015), does not provide them with an affirmative defense.  Statements of opinion are particularly likely to give rise to liability where the speaker as "'special knowledge of facts unknown to the recipient,'" particularly where the speaker has knowledge of facts incompatible with the opinion at issue.  *Id.* at 191-92.  Here, for example, Hackett and Chappelle both knew that the assumptions upon which their forward-looking statements, or opinions were based (*i.e.*, 12-WPS, 250 MBO and all infill wells would perform like the parent wells), were flatly contradicted by facts only known by them (the actual multi-well

pattern data in existence at 3- to 12-WPS, and that all wells above 4-WPS did not on average perform above 250 MBO).

### 3. Riverstone Defendants' "Diligence" Defense to Section 14(a)(9) Liability

The diligence defense is inapplicable here, and Class Plaintiffs will file a motion *in limine* to bar it.  *See, e.g.*, *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301 (2d Cir. 1973) (holding that the liability of the corporation and corporate insiders who issue "'a materially false or misleading proxy statement is virtually absolute'"); *Beck v. Dobrowski*, 559 F.3d 680, 692 (7th Cir. 2009) (holding that the issuer and corporate insiders are liable for a false or misleading proxy even where the defendant believes the information is accurate); *In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 715 (E.D. Va. 2020) (noting "[f]or the purposes of Section 14(a), 'negligence' is the failure to comply with the legal obligation not to solicit a proxy with [materially] false or misleading statements or omissions . . . irrespective of any subjective intent or level of diligence or care").  Even if the "diligence" defense were to apply, which it does not, it would fail for the same reasons the PSLRA Safe Harbor defense does.

### 4. Riverstone's Section 20(a) "Good Faith" to Control Person Liability Defense Linked to Class Plaintiffs' Section 14(a)(9) Claim

Defendants Riverstone, Hackett, Gutermuth, Tepper, and Walters contend they did not control any person who purportedly violated § 20(a) for purposes of Plaintiffs' § 14(a)(9) claim.  This argument will fail at trial given that Riverstone sponsored and created the entity that filed the Proxy, Silver Run.  Further, Hackett (a Riverstone partner) was the CEO and acting Chairman of Silver Run, and his signature appears in the document

three times.  As of January 19, 2018, Hackett was a Riverstone Partner, and regularly reviewed and approved the contents of the Proxy before it was filed.  Silver Run was a shell company that did nothing other than facilitate the acquisition of AMH and KFM. Silver Run had a few other employees (apart from support staff) other than Hackett, Gutermuth, Tepper, and Walters, and they served on Silver Run Board of Directors for the express purpose of identifying and merging two energy assets to take public in the de-SPAC process.  Neither Riverstone nor Hackett objected to Riverstone's name, which managed over $1 trillion in assets at the time, from repeatedly being splashed in the Proxy. Here, the Proxy is a corporate policy document and it is absurd to suggest Riverstone did not have control over it.  Hackett (also Silver Run's CEO), Gutermuth, Tepper, and Walters also regularly reviewed and approved the contents of the Proxy because that was their job as directors of Silver Run.

With regard to Riverstone and Hackett, their § 20(a) good faith defense to the § 14(a)(9) claim will fail at trial for the same reason the PSLRA Safe Harbor fails.  Given Riverstone and Hackett's personal knowledge of the materially adverse, undisclosed facts, they will be unable to demonstrate good faith.  With regard to Gutermuth, Tepper, and Walters, they will be unable to demonstrate that they independently assessed the unsubstantiated 12-WPS and 250 MBO assumptions that underlie both false or misleading statements of fact in the Proxy, and the 2018 upstream and downstream EBITDA projections.  As such, they will be unable to demonstrate good faith.

Riverstone's § 20(a) good faith defense to Plaintiffs' § 10(b) claim will also fail at trial because Hackett's knowledge of the above-referenced adverse material facts.

Riverstone's agents, Hackett David M. Leuschen and Pierre F. Lapeyre Jr., were Riverstone board designees on the AMR board of directors.  Further, Riverstone had the power of appointment of 7 of the 11 members on AMR's board.

5.   **AMR, Chappelle, and Ellis's Section 20(a) "Good Faith" Defense Linked to Class Plaintiffs' Section 10(b) and 14(a) Claims**

AMR's good faith claim linked to Class Plaintiffs' Section 14(a) claim will fail because both Chappelle and Ellis had direct knowledge of the material facts that raise an inference of their intent to deceive investors during the Class Period.

AMR, Chappelle and Ellis's good faith claim lined to Class Plaintiffs' Section 10(b) claim will fail for the same reasons.

6.   **Bayou City's Section 20(a) "Good Faith" Defense to Control Person Liability Linked to Class Plaintiffs' Section 10(b) Claim**

BCE contends that there is no evidence that it controlled any person who directly violated § 10(b) of the Exchange Act.  Yet BCE worked extensively with Chappelle to craft alleged misleading statements regarding AMH and Kingfisher in August 2017.  Further, BCE held a large indirect ownership AMH at the time.

BCE contends that its "good faith" defense insulates it against Class Plaintiffs' § 20(a) claim associated with Chappelle's false and misleading statements made in August 2017.  But that defense will fail.  BCE, through its agent William McMullen, repeatedly vocalized to Defendants prior to the August 16, 2017 announcement of the potential merger of AMH and KFM that KFM's estimated market value was "ridiculous" because KFM's EBITDA projections were 80% to 90% reliant on AMH's production capabilities.  BCE, through McMullen, also was in receipt of Hackett's August 7, 2017 letter explicitly

informing BCE that the 2018 EBITDA projection would not materialize. McMullen admitted that the 2018 KFM EBITDA projections were lies, KFM acreage was condemned and lamented that it was "totally unacceptable" that HPS and JP Morgan "had our [KFM's] projections "taken care for us."

### 7. Defendant Smith's "Good Faith" Defense to Control Person Liability Linked to Class Plaintiffs' Section 10(b) Claim

Defendants Smith's "good faith" defense will fail at trial. On February 12, 2018, during AMR's first Board of Directors meeting, Ellis was informed that it would be necessary to cut the KFM 2018 EBITDA projection of $185 million by nearly 50%. These defendants have failed to come forward with any evidence that they investigated why it was necessary to make that cut in guidance. Given that the evidence will demonstrate AMR's production capabilities were materially overstated in the January 19, 2018 Proxy, the Company assets were already materially impaired. A jury will also reject Smith's good faith defense in light of his apparent obliviousness to the operational workings, and capabilities, of AMR as its Chief Accounting Officer.

### 8. Defendants' Other Purported "Affirmative Defenses"

All Defendants contend Class Plaintiffs' "voluntary actions, constructive or actual knowledge, and/or contributory fault caused their losses" because each "were aware of or recklessly ignore the stated risks of investing in the oil and gas industry generally, and AMR specifically." Class Plaintiffs believe the jury will reject any such defense because Defendants have come forward with no evidence that Class Plaintiffs had constructive or actual knowledge of Defendants' negligence and/or intent to deceive investors. With regard to Defendants' reference to Class Plaintiffs' awareness of risk or assumption of risk,

Class Plaintiffs believe the jury will reject the defense as well given that Defendants never warned investors that they acted negligently, let alone intended to deceive investors, during the Class Period.

While mitigation of damages is not an affirmative defense in the sense that it never requires dismissal of an entire claim of violations of federal securities law, Class Plaintiffs nonetheless believe the jury will reject it. After shareholders of record voted upon and approved the business combination, Defendants continued to lie to investors regarding AMR's operational and financial results and capabilities, and engaged in a scheme of placing nearly 100 capital-intensive ESP in AMR's well for the purposes of chasing production. As late as August 2018, moreover, it was Chappelle who publicly assured investors that AMR still offered "compelling long-term returns" for investors.

## VI.   Admissions of Fact

The Parties hereby admit, and waive all objections to, the following facts:

### A.   AMR and Riverstone Defendants' Admissions of Fact

1.   Silver Run was a Special Purpose Acquisition Corporation ("SPAC") formed for the purpose of effectuating a business combination with one or more businesses.

   a.   Silver Run completed its IPO on March 24, 2017.

   b.   A SPAC is a shell company with no underlying operating business and assets.

   c.   Silver Run's board of directors included defendants Jim Hackett, Diana Walters, William Gutermuth, and Jeff Tepper.

      i.   Jim Hackett was Silver Run's CEO until February 9, 2018.

      ii.   Stephen Coats was Silver Run's secretary until February 9, 2018.

      iii.   Tom Walker was Silver Run's CFO until February 9, 2018.

2.      Silver Run's Sponsor was Riverstone Holdings, LLC ("Riverstone").

3.      AMH was headquartered in Houston and described itself as an independent exploration and production company, with assets located in the STACK play in Oklahoma.

     a.      Prior to the Business Combination, AMH was indirectly owned by Bayou City Energy Management, LLC ("BCE") and/or BCE related entities and by HPS Investment Partners, LLC ("HPS") (among others), and by Hal Chappelle and Michael Ellis (either directly or indirectly through other entities) (among others).

     b.      Hal Chappelle was AMH's President and CEO.

     c.      Michael Ellis founded AMH in 1987, and was AMH's Chief Operating Officer.

4.      Kingfisher was headquartered in Houston and described itself as a company engaged in the gathering, processing, and marketing of hydrocarbon in the STACK play.

     a.      Prior to the Business Combination, Kingfisher was indirectly owned by ARM Energy Holdings LLC and HPS, and directly owned by HMS Kingfisher Holdco, LLC (among others).

5.      On July 6, 2018, AMR retained KPMG, LLP ("KPMG") as its auditor.

6.      Silver Run filed its definitive proxy statement with the SEC on January 19, 2018 (the "Proxy Statement.

7.      The Silver Run stockholders voted in favor of the Business Combination on February 6, 2018.

8.      The Business Combination closed on February 9, 2018.  At closing, AMH and Kingfisher became subsidiaries of Silver Run and Silver Run changed its name to Alta Mesa Resources, Inc. ("AMR").

9.      AMR's board of directors following the Business Combination were:  Jim Hackett, Hal Chappelle, Michael Ellis, David Leuschen, Pierre Lapeyre, William McMullen, Diana Walters, William Gutermuth, Donald Sinclair, Jeffrey Tepper, and Don Dimitrievich.

     a.      Hal Chappelle was AMR's CEO from the Business Combination to December 20, 2018.

     b.      Michael Ellis was AMR's COO-upstream from the Business Combination to December 20, 2018.

c.   Jim Hackett was AMR's Chairman of the Board and COO-midstream until April 3, 2018.  Hackett served as AMR's interim CEO between December 26, 2018 and September 10, 2019.

d.   William Gutermuth left the AMR board as of June 18, 2018.

10.   AMR filed its 2017 Form 10-K ("2017 10-K") with the SEC on March 29, 2018, and was signed by (among others) Hackett, Chappelle, Smith, Ellis, Leuschen, Lapeyre, McMullen, Dimitrievich, Gutermuth, Tepper, Walters, and Sinclair.

## VII.   Contested Issues of Fact

### A.   Class Plaintiffs' Contested Issues of Fact

#### 1.   Claims Under § 14(a)(9)

Whether the Proxy Defendants, AMR, Riverstone, Gutermuth, Hackett, Tepper, and Walters, solicited a materially misleading proxy.

Whether the Proxy Defendants complied with their fiduciary duty to solicit a proxy statement free of material misstatement (*i.e.*, whether the Proxy Defendants' conduct was negligent).

Whether the Proxy was an essential link in causing the merger of Kingfisher and AMH.

Whether the Proxy was an essential link in causing the merger of Kingfisher and AMH.

With respect to any of the Proxy Defendants' forward-looking statements or opinions, whether any such defendant knew the statements to be false or misleading when made.

Whether the Proxy Defendants' unlawful conduct damaged Class Plaintiffs, and to what extent Class Plaintiffs were damaged.[12]

### 2. Section 20(a) Claims Associated with Class Plaintiffs' § 14(a)(9) Claim

Whether the Proxy Defendants were control persons with regard to the allegedly misleading Proxy.

Whether any such Proxy Defendant's conduct satisfies the § 20(a) statutory "good faith" defense.

### 3. Claims Under § 10(b)

Whether Defendants AMR, Chappelle, and Hackett made any materially false or misleading statements during the Class Period.

Whether Defendants acted with the requisite scienter – *i.e.*, with knowledge that the statement was false or misleading, or with reckless disregard of the statement's falsity or misleading nature, when made.

With respect to any of the Defendants' forward-looking statements or opinions, whether any such defendant knew any such statement to be false or misleading when made.

Whether Class Plaintiffs justifiably relied upon Defendants' false and misleading statements.

Whether Defendants' fraudulent conduct was a substantial factor in causing Class Plaintiffs economic losses.

---

[12] In the event a jury finds any Proxy Defendant knew the Proxy was false or misleading as of January 19, 2018, it will have the option of awarding benefit-of-the-bargain damages.

Whether the Proxy Defendants' unlawful conduct damaged Class Plaintiffs, and to what extent Class Plaintiffs were damaged.

### 4. Section 20(a) Claims Associated with Class Plaintiffs' § 10(b) Claim

Whether Riverstone, BCE, and AMR controlled the allegedly false or misleading statements made by Chappelle between August 16, 2017 and February 9, 2018.

Whether Riverstone, AMR, Chappelle, Ellis, Gutermuth, Hackett, Smith, Tepper, and Walters were control persons with regard to the allegedly false or misleading Class Period statements.

Whether Riverstone, BCE, AMR, Chappelle, Ellis, Gutermuth, Hackett, Smith, Tepper, and Walters' conduct satisfies the § 20(a) statutory "good faith" defense.

### B. Defendants' Contested Issues of Fact

#### 1. AMR and Riverstone Defendants

##### a. Claims Under Section 10(b) of the Exchange Act [Class Plaintiffs]

(i)     Whether a Defendant made a material misrepresentation or omission with intent to deceive, manipulate, or defraud;

(ii)    Whether any of the alleged misstatements is forward-looking;

(iii)   Whether any forward-looking statement was

(iv)    Accompanied by meaningful cautionary language,

(v)     Worded as a guarantee, or

(vi)    Made with actual knowledge that it was false;

(vii)   Whether there was a connection between the alleged misrepresentation or omission and the purchase or sale of a security by Plaintiffs;

(viii)  Whether Plaintiffs actually relied upon the alleged misrepresentations;

(ix)    Whether Plaintiffs actually suffered an economic injury; and

**(x)**  Whether there is a causal connection between the alleged misrepresentation and the alleged economic injury.

### b.   Claims Under Section 14(a) of the Exchange Act [Class Plaintiffs]

(i)  Whether a Defendant solicited the Proxy;

(ii)  Whether the Proxy misrepresented or omitted a material fact in a proxy statement;

(iii)  Whether the Defendant acted at least negligently in distributing the Proxy;

(iv)  Whether there is an essential link between the Proxy and the claimed injury, i.e., that Plaintiffs' alleged injury resulted directly from the Business Combination itself, not other events or occurrences; and

(v)  Whether there is a causal connection between the alleged misrepresentation in the Proxy and the alleged economic injury.

### c.   Claims Under Section 20(a) of the Exchange Act [Class Plaintiffs]

(i)  Whether there was an underlying violation of the Exchange Act by any other Defendant;

(ii)  Whether a Defendant had an ability to control the specific transaction or activity upon which the primary violation is based; and

(iii)  Whether a Defendant acted in good faith.

### 2.   Bayou City Energy [Class Section 20(a) Claims Only]

(i)  Whether there was an underlying violation of Section 10(b) with respect to the public statements that Chappelle allegedly made on August 16, 2017 and August 17, 2017, concerning AMH and Kingfisher;

(ii)  Whether Bayou City had actual power or control over Chappelle's allegedly fraudulent actions with respect to the public statements he allegedly made on August 16, 2017, and August 17, 2017, concerning AMH and Kingfisher; and

(iii)  Whether Bayou City acted in good faith with respect to the public statements he allegedly made on August 16, 2017, and August 17, 2017, concerning AMH and Kingfisher.

(i)

## VIII.   Agreed Applicable Propositions of Law

The following paragraphs describe legal principles that the Parties agree are applicable to this case.  By including this law in the Joint Pretrial Order, the Parties do not concede the others' claims or defenses.

### A.      Section 14(a) Claims

Section 14(a) of the Exchange Act makes it "unlawful for any person, . . . in contravention of such rules and regulations as the [SEC] may prescribe . . . , to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security."   15 U.S.C. § 78n(a)(1).   SEC Rule 14a-9 promulgated thereunder, in turn, provides that

> [n]o solicitation . . . shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

17 C.F.R. § 240.14a-9.

To establish a violation of § 14(a) and Rule 14a-9, a plaintiff generally must prove that: (1) a defendant misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an "essential link" in causing the corporate action.  *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361, 365 (S.D. Tex. 1993), *aff'd sub nom. Cohen v. Ruckelshaus*, 20 F.3d 465 (5th Cir. 1994).

## 1.      Misrepresentation or Omission of Fact

"A 'misrepresentation' is a statement that is not true. . . . An 'omission' is actionable if it omitted to state facts that would be necessary to make other statements . . . in light of the circumstances under which they were made, not misleading."  Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.

### a.      Forward-looking Statements

"Forward-looking statements, such as predictions or expressions of opinion, are not representations of material facts so long as they are not worded as fact or guarantees and the person making the statements reasonably believed them at the time they were made." Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.

The PSLRA Safe Harbor immunizes forward-looking statements that are (1) identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) "immaterial," or (3) made without "actual knowledge . . . that [they were] false or misleading."  15 U.S.C. § 78u-5(c)(1)(A)-(B).

The term "forward-looking statement" means—

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i)(1).

A cautionary statement is meaningful if it identifies "'important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).

### 2.     Materiality

A statement or omitted fact is material only "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th Cir. 2020) ("'A statement is material only if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'") (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)).

"'Materiality is not judged in the abstract, but in light of the surrounding circumstances.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993)); *see also Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) ("[M]ateriality

contemplates 'a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" (quoting *TSC Indus.*, 426 U.S. at 449)).  "A minor or trivial detail is not material."  Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.

### 3.    Negligence

The parties do not agree on the law regarding this element.

### 4.    Essential Link

A plaintiff must prove that the false or misleading proxy statement itself (as opposed to any particular misstatement) was "an essential link in the accomplishment of the transaction" for which it was issued.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970).

A plaintiff need not prove that they relied on the material misrepresentations in the proxy statement in deciding how to vote.  *Id.* at 384-85; *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994).  Rather, the alleged injury must have "resulted from a transaction directly authorized by the proxy solicitation."  *Browning-Ferris Indus., Inc.*, 830 F. Supp. at 365.

### 5.    Economic Loss and Loss Causation

To prove economic loss and causation, the plaintiff must prove (1) that he or she actually suffered an economic injury and (2) that there is a causal connection between the misrepresentation and that economic injury.  Fifth Circuit Pattern Jury Instruction (2020), Instruction 7.1.

### 6.    Damages

The plaintiff has the burden of proving damages by a preponderance of the evidence.  Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.

## B.      Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  And the corresponding SEC Rule 10b–5 makes it unlawful to, among other things, "make any untrue statement of a material fact" or "omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5.

To establish a violation of Section 10(b) and Rule 10b-5, a plaintiff "must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

### 1.      Misrepresentation or Omission

*See supra* Section VIII.A.1.

### 2.      Materiality

*See supra* Section VIII.A.2.

### 3. Scienter

Scienter is defined as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

Plaintiffs do not establish scienter merely by showing that a defendant acted accidently or by mistake. Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.

### 4. In connection with a purchase or sale

The "'in connection with'" requirement is satisfied if a material misstatement or omission and the purchase or sale of a security "'coincide.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006).

### 5. Reliance

A plaintiff is required to prove that he or she in fact relied on the material misstatement or omission. Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1. If the plaintiff would have engaged in the transaction anyway, and the misrepresentation had no effect on his or her decision, then the plaintiff did not rely on the misrepresentation. *Id.*

### 6. Economic Loss and Loss Causation

*See supra* Section VIII.A.5.

### 7. Damages

See supra Section VIII.B.6.

### C.      Section 20(a) Claims

Section 20(a) of the Exchange Act imposes liability on "controlling person[s]"—that is, people "who, directly or indirectly, control[] any person liable under any provision of" the Exchange Act. 15 U.S.C. § 78t(a).  Thus, to prove a violation of Section 20(a), a plaintiff must first establish a primary violation of the Exchange Act, and then establish that the defendant is a "controlling person" over that primary violation.  *Southland*, 365 F.3d at 383.

## IX.      Contested Issues of Law

### A.      Plaintiffs' Contested Issues of Law

#### 1.      Class Plaintiffs Need Only Establish Negligent Conduct Under Section 14(a)

The Proxy Defendants incorrectly argued in their reply in further support of their motion for summary judgment that Class Plaintiffs "[a]bandoned" the § 14(a)(9) negligence standard.  Dkt. 631 at 3.  In opposing the Proxy Defendants' motion for summary judgment, Class Plaintiffs merely pointed out that should a jury find that the Proxy Defendants knowingly issued a misleading proxy, the negligence standard is satisfied as a matter of law. Dkt. 571 at 11.  The Proxy Defendants also incorrectly argued that because Class Plaintiffs did not retain an expert to opine on what the negligence standard of care is, the § 14(a)(9) claim fails as a matter of law.  Dkt. 520 at 17-18.  An expert does not instruct the jury on the appropriate negligence standard at trial, but this Court will.

Accordingly, Class Plaintiffs will ask the Court to instruct the jury that the Proxy Defendants were under a fiduciary duty of care to shareholders of record to solicit a proxy

statement free of misrepresentation, regardless if they "believed in perfect good faith that there was nothing misleading in the proxy materials." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (adding that "Section 14(a) requires proof *only* that the proxy solicitation was misleading, implying at worst negligence by the issuer."), *see also In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 196-97 (3rd Cir. 2007); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973).

### 2.    Defendants Rely on an Incorrect Standard for Their Section 20(A) "Good Faith" Defense

Defendants assert that in order to prove their Section 20(a) "good faith" defense, they need to show by a preponderance of the evidence that their actions were not "an extreme departure from the standards of ordinary care," in that the danger of misleading investors was either known or so obvious that the defendant was certainly aware of it.  Dkt. 520 at 25.  Had Defendants carefully read *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945 (5th Cir. 1981), however, it should have been apparent that they have lifted the pleading requirements for the scienter element for a Section 10(b) claim into the proof necessary for them to establish a "good faith" defense under Section 20(a).  In fact, the Fifth Circuit explicitly held in *G.A. Thompson* that the Section 20(a) "good faith" defense requires them to prove they were not merely "reckless" and less than the standard of scienter under Section 10(b).  Id. at 959-60; Dkt. 571 at 5.

### 3.    Defendants Bear the Burden of Proof with Respect to the Sufficient Cautionary Language Prong of the PSLRA's Safe harbor

Defendants bear the burden of proof at trial of demonstrating they are protected by the "meaningful cautionary language prong of the" PSLRA's Safe Harbor for forward

looking statements. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).  *See also In re Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d 164, 227 (S.D.N.Y. 2022).

**B.     Defendants' Contested Issues of Law**

    **1.     Section 14(a) Claims**

        **a.     Class Plaintiffs Must Prove The Proxy Statements Were Not Forward Looking Statements**

A forward-looking statement not worded as a guarantee is immaterial as a matter of law.  *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.").

        **b.     Standard for Opinion Statements**

An "opinion" statement is a belief, a view, or a sentiment which the mind forms of persons or things.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).  For example, financial projections are statements of opinion. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993) ("Statements that are predictive in nature are actionable only if they were false when made."); *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws as a matter of law.") (quoting *Krim*, 989 F.2d at 1446); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("[P]redictions of future earnings and revenues . . . meet the PSLRA's definition of a forward-looking statement.").

If a defendant's statement is an opinion, the defendant may only be liable for that statement if Class Plaintiffs prove by a preponderance of the evidence that (1) the defendant

did not honestly hold the stated opinions when the defendant made them and those opinions were objectively untrue; (2) the opinion statements contained statements of fact that were untrue; (3) the statements omitted material facts known by the defendant at the time regarding the basis for the defendant's opinions and the omission of those facts made the opinions misleading.  *See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 672-73 (N.D. Tex. 2022); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 616-617 (S.D. Tex. 2018), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019); *Omnicare*, 575 U.S. at 176-77, 189.

"[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Omnicare*, 575 U.S. at 194; *accord Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *8 (S.D. Tex. Apr. 13, 2021).  "The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Edwards*, 2021 WL 1421609, at *8 (quoting *Omnicare*, 575 U.S. at 194). Additionally, an "opinion statement . . . is not necessarily misleading when [a defendant] knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189-90 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts. . . . A reasonable investor does not expect that every fact known to an

issuer supports its opinion statement."); *In re B.P. p.l.c. Sec. Litig.*, 2016 WL 3090779, at *13 n.141 (S.D. Tex. May 31, 2016) (same).

### c.  The Standard For Materiality

A material misrepresentation "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *see also id.* ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.") (quoting *McDonald v. Kinder–Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002)).  "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (alteration in original) (quoting *TSC Indus.*, 426 U.S. at 449); *see also Justin Indus., Inc. v. Choctaw Sec.*, L.P., 920 F.2d 262, 267 (5th Cir. 1990) (same).

"The materiality of an omission in a proxy statement is determined by taking into account all information in the public domain and facts reasonably available to the public to be used by shareholders in interpreting the information in the proxy sent to them." *Justin Indus.*, 920 F.2d at 267 (quoting THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 11.6 at 324). "Whether a misrepresentation is material is 'a mixed question of law and fact,' involving the 'application of a legal standard to a particular

set of facts.'"  *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000) (quoting *TSC Indus.*, 426 U.S. at 450).

### d.      The Standard For Negligence

"[T]he Exchange Act defines negligence as: 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.  Such negligence may consist either of doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances.'"  *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 473 (D. Md. 2021), *aff'd*, 69 F.4th 223 (4th Cir. 2023) (quoting *SEC v. Cole*, 2015 WL 5737275, at *17-18 (S.D.N.Y. Sept. 19, 2015)).

### e.      Plaintiffs Must Prove More Than Negligence

The Class Plaintiffs must prove more than mere negligence under § 14(a).  The Class Plaintiffs abandoned negligence and contend they will prove that the Proxy Defendants actually knew that each challenged statement in the Proxy was false or misleading.  *See* Class Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Opp.") at 11 (ECF No. 571).

Plaintiffs yet again attempt to skirt their contention that they will prove actual knowledge of the Proxy Defendants by conjuring a new standard.  *See* Section IX.A.1. ("Accordingly, Class Plaintiffs will ask the Court to instruct the jury that the Proxy Defendants were under a fiduciary duty of care to shareholders of record to solicit a proxy statement free of misrepresentation, regardless if they believed in perfect good faith that there was nothing misleading in the proxy materials." (quotation and citation omitted).  But that has no basis in law, as the cases *Plaintiffs* cite demonstrates.  *Beck* does not mention any "fiduciary duty of care," and insists instead that Plaintiffs must prove that a proxy-

- 63 -

issuer defendant was negligent. *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). *In re Exxon* is similarly silent as to a "fiduciary duty of care." And the discussion Plaintiffs cite concerned whether Sarbanes-Oxley's limitations period applied to Section 14(a) claims, not the state of mind necessary to prove a Section 14(a) claim. *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 196-97 (3rd Cir. 2007). *Gerstle* explicitly "leave(s) to another day" the question of whether "the liability of the corporation issuing a materially false or misleading proxy statement is virtually absolute" – precisely the "standard" plaintiffs suggest should apply in this case. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973).

What's more, Plaintiffs again attempt to elide their failure to adduce expert evidence of the standard of care for preparing and soliciting a proxy. *See* Section IX.A.1 ("An expert does not instruct the jury on the appropriate negligence standard at trial, but this Court will.") They cite no authority for this assertion, and with good reason – courts have consistently held a plaintiff must adduce such expert evidence. *See*, *e.g.*, *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) ("[A]bsent probative evidence regarding [defendant's] duties as outside director and member of the Compensation Committee, the jury could only speculate as to whether he failed to exercise reasonable care in overseeing ESSI's proxy communications with shareholders"); *see also SEC v. Ginder*, 752 F.3d 569, 576 (2d Cir. 2014) (same).

> **f.** **The Jury May Not Award Damages Under Class Plaintiffs' Alternative Section 14(a) Damages Theory**

In determining whether to award damages under Class Plaintiffs' Section 14(a) theory, the jury must decide whether Defendants' misrepresentations in the Proxy caused the Class Plaintiffs not to redeem their shares of Silver Run for $10, and instead, to accept equity in the new Alta Mesa business enterprise. *Cf. Hohenstein v. Behringer Harvard REIT I, Inc.*, 2014 WL 1265949, at *8 (N.D. Tex. Mar. 27, 2014) ("Plaintiffs who sue under [Section 14(a) of] the Exchange Act because of a missed tender opportunity must show that they suffered an economic loss 'by retaining the stock instead of selling it at the premium offered by the tender offeror.'" (citation omitted)).

As *Hohenstein* recognizes, and as *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) provides, the PSLRA permits a plaintiff to recover only those damages caused by a misrepresentation. *See Hohenstein*, 2014 WL 1265949, at *8 (quoting PSLRA that a plaintiff must "prov[e] that the act or omission of the defendant alleged to violate this chapter **caused** the loss for which the plaintiff seeks to recover **damages**" (emphasis added, alteration in original)); *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at *6 (S.D. Tex. Apr. 13, 2021) (Hanks, J.) (applying *Dura* and loss causation requirements to Section 14(a) claims.  But the Class Action Plaintiffs' alternative theory of Section 14(a) damages fails to connect their claimed damages to specific misrepresentations, ignoring the PSLRA's loss causation requirement and *Dura*.  Accordingly, awarding damages under that alternative theory would give the Class Action Plaintiffs a windfall wholly unrelated to the alleged misrepresentations.

- 65 -

## 2.    Section 10(b) and Rule 10b-5 Claims [Class Plaintiffs]

"To establish liability under Section 10(b) and Rule 10b-5, the plaintiff 'must prove that the defendant made an untrue statement of material fact or omitted a material fact and did so with an intent to deceive, manipulate or defraud or severe recklessness such that the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *In re Alta Mesa*, 2024 WL 3760481, at *3 (quoting *SEC v. Blackburn*, 15 F.4th 676, 680 n.3 (5th Cir. 2021)); *see also Southland*, 365 F.3d at 366 ("[L]iability under Rule 10(b)(5) requires not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party have done so with 'not merely simple or even inexcusable negligence' but rather with 'scienter' meaning an 'intent to deceive, manipulate, or defraud' or that 'severe recklessness' in which the 'danger of misleading buyers or sellers ... is either known to the defendant or is so obvious that the defendant must have been aware of it.'" (quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981)).

### a.    The Standard For Section 10(b) "Made By" Element

A defendant can only be liable for a material misrepresentation or omission that he or she made.  A statement is "made by" a person when the person has "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *Lorenzo v. SEC*, 587 U.S. 71, 74 (2019); *In re Enron Corp. Secs., Derivative, & "ERISA" Litig.*, 238 F. Supp. 3d 799, 823 (S.D. Tex. 2017).  Without such control, a person or entity can merely suggest

what to say, not "make" a statement in its own right.  *See Janus*, 564 U.S. at 142; *Lorenzo*, 587 U.S. at 74; *In re Enron Corp.*, 238 F. Supp. 3d at 822-23.

A statement is not "made" by a person just because the person was a director or officer, even if the individual reviewed statements of others.  *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 779 (S.D. Tex. 2012) ("Corporate officers . . . cannot be liable for allegedly fraudulent statements solely because of their positions at BP."); *Kerr v. Exobox Techs. Corp.*, 2012 WL 201872, at *11 (S.D. Tex. Jan. 23, 2012) (defendant who held 100% or 88% of company during the relevant period and who signed updates attached to the company's SEC filings had not "made" any company's SEC filings); *SEC v. Killion*, 2017 WL 7052310, at *7 (S.D. Tex. Mar. 24, 2017) (CFO did not "make" statements contained in SEC filings merely by reviewing those documents prior to filing).  Nor is it made by a person just because an individual substantially assists or merely participates in the drafting of a statement made by another individual.  *Janus Cap. Grp.*, 564 U.S. at 142-44 ("Such suits—against entities that contribute 'substantial assistance' to the making of a statement but do not actually make it—may be brought by the SEC, see 15 U.S.C. § 78t(e), but not by private parties.").  And it is not made simply because a person is present and does not correct a statement made by another individual.  *See Janus*, 564 U.S. at 142-44; *Lorenzo*, 587 U.S. at 74.

A person may be considered the maker of a corporate statement for purposes of Section 10(b) if the plaintiff "allege[s] that the [person] signed the document containing the statements or allege[s] their involvement in creating the documents."  *In re BP p.l.c.*, 843 F. Supp. 2d at 779-80 (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278,

287 (5th Cir. 2006)).   However, a person who did not sign the statement cannot be considered a maker absent evidence that the defendant's "involve[ment] in preparing these fillings" was "equivalent to [] signing" them.  *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 627 (S.D. Tex. 2022); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F.Supp.3d 528, 541 (S.D.N.Y. 2016) (that one defendant signed public filings was "sufficient to establish that he 'made' the statements," but the remaining defendants who neither signed nor had authority over their contents were not makers of those statements); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b–5(b).").

### b.  Plaintiffs Lack Standing To Sue Under Section 10(b)

Under the decades-old purchaser-seller rule established by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), a plaintiff must establish standing to bring a claim under Section 10(b) and Rule 10b-5.  The purchaser-seller rule limits the class of plaintiffs with standing to bring a Section 10(b) claim to "actual purchasers and sellers" of the securities to which the alleged misstatements relate.  *Id.* at 731; *see also Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir. 1980) ("A 10b-5 plaintiff must demonstrate that he was an actual purchaser or seller of securities.").  In other words, the plaintiff must "have bought or sold the security about which a misstatement was made in order to have standing to sue under Section 10(b)."  *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022); *see also In re CCIV / Lucid Motors*

*Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024) ("[We] agree with the Second Circuit that the *Birnbaum* Rule and *Blue Chip* limit Section 10(b) standing to purchasers and sellers of the security about which the alleged misrepresentations were made.") (citing *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), and *Blue Chip*, 421 U.S. 723).

As applied in the SPAC context, "[a target company's] alleged misrepresentations made about itself cannot be imputed to another company that later acquired it." *In re CCIV*, 110 F.4th at 1187.  Thus, a plaintiff who purchases shares of stock in an acquiring company (such as a SPAC) cannot bring a Section 10(b) claim based on alleged misstatements made by the target company or its CEO before the acquisition was complete.  *See id.*, at *2, 5 (concluding that plaintiffs lacked standing to sue under Section 10(b) because the CEO's alleged misrepresentations "were those of the [target company]," and the plaintiffs had purchased only stock in the SPAC, not the target company's stock"); *see also Menora*, 54 F.4th at 88 ("[P]urchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger".).  That is true even if the target company's statements were included in the acquiring company's press releases and SEC filings or provided to its investors.  *See id.* at 87 (noting that inclusion of some of the target company's alleged misstatements in the acquiring company's SEC filings was insufficient to confer plaintiffs standing to sue under Section 10(b)); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *6 (S.D.N.Y. Mar. 29, 2024) (rejecting plaintiffs' argument that they had standing to sue under Section 10(b) for alleged misstatements by a target company, even though the statements "were made in the lead-up to the merger [with the SPAC], incorporated into

joint press releases, included in the acquiring company's own SEC filings, and directed and distributed to the [SPAC's] shareholders").

In determining whether a plaintiff has standing under Section 10(b), the relevant question is "not which company plaintiffs are suing or which company made the statement, but which company the statement is about. *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *6 (quotations omitted); *see also Menora*, 54 F.4th at 88 ("Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the security, as long as the plaintiffs purchased or sold the securities about which the misstatements were made."); *id.* ("[T]he question is whether the plaintiff bought or sold the securities about which the misstatements were made."); *In re CCIV*, 110 F.4th at 1186 (rejecting plaintiffs' argument that Section 10(b) "extends to any stockowner who claims that the misstatements of another person or company negatively affected the value of the owner's stock"). As the Supreme Court cautioned in *Stoneridge Partners, LLC v. Sci. Atlanta, Inc.*, 552 U.S. 148 (2008), "Section 10(b) does not 'provide a cause of action to the world at large,' and 'should not be interpreted to provide a private cause of action against the entire marketplace in which the issuing company operates.'" *In re CCIV*, 2024 WL 3710186, at *4 (quoting *Stoneridge*, 552 U.S. at 162).

### c.    The Standard For Reliance

The plaintiff also must prove that his or her reliance was justified.  Fifth Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1.  In determining whether a plaintiff's reliance was justified, it is not justifiable for a plaintiff to have intentionally closed his or her eyes and refused to investigate the circumstances in disregard of a risk known to him

or her, or a risk that was so obvious that he or she should have been aware of it, and so great as to make it highly probable that harm would follow.  *Id.*; ABA Model Jury Instructions Securities Litigation ¶ 4.02[5].

In *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988), the Supreme Court "held that a plaintiff may also invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory."  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 118 (2021).  To invoke the *Basic* presumption, a plaintiff must prove:  (1) that an active, open market for the securities existed at the time of the transactions in question; (2) investors reasonably relied on that market as an accurate reflection of the current market value of the securities; (3) the misrepresentations were publicly known and material, meaning that a reasonable investor would have regarded the misrepresentations as having significantly altered the total mix of information they took into account in deciding whether to buy or sell the security; and (4) plaintiff traded the security between when the alleged material misrepresentations were made and when the truth was revealed.  *See Basic*, 485 U.S. at 248 n.27.  "The defendant may then rebut the presumption through '[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'"  *Goldman*, 594 U.S. at 118 (quoting *Basic*, 485 U.S. at 248).

In general, to rebut the presumption of reliance, any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or the decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281

(2014).  The defendant can rebut the presumption by proving by a preponderance of the evidence that:  (1) the plaintiff did not actually rely on the integrity of the market price when they purchased the securities; or (2) the alleged misrepresentation did not affect the market price of the securities.  *See Goldman*, 594 U.S. at 118-19.

### d.     Plaintiffs Cannot Prove Loss Causation In The Public Securities Market

It is well-established that to prevail under Section 10(b), Plaintiffs must prove "actual economic loss" and "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss."  *Dura*, 544 U.S. at 342, 343-44 (quotation omitted).  "[A] loss does not constitute an 'economic loss' for these purposes unless loss causation can be established."  *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 682 (5th Cir. 2015).  To establish loss causation, both the PSLRA and Supreme Court's decision in *Dura* require Plaintiffs to "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused [their] economic loss."  *Dura*, 544 U.S. at 346; *see also* 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").  The purpose of this requirement "is to isolate 'those economic losses that misrepresentations actually cause,' rather than 'to provide investors with broad insurance against market losses.'"  *Ludlow*, 800 F.3d at 682 (quoting *Dura*, 544 U.S. at 345); *see also id.* at 682 ("[W]e do insist that cognizable damage must be caused by the misstatements in question.").

"Where, as here, a plaintiff pursues a fraud-on-the-market theory, 'the plaintiff must allege that when the relevant truth about the fraud began to leak out or otherwise make its

way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm.'" *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 903 (5th Cir. 2018) (quoting *Pub. Emp.'s Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014)); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255 (5th Cir. 2009) ("In order to establish this proximate causation, the plaintiff must prove that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss." (citing *Dura*, 544 U.S. at 342, 346)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[T]o establish loss causation, 'a plaintiff must allege … that the subject of the fraudulent statement or omission was the cause of the actual loss suffered' … *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (quoting *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).  The Fifth Circuit has "prescribed the following framework through which fraud-on-the-market plaintiffs can show loss causation:

> (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop.

*Emps. Ret, Sys.*, 905 F.3d at 903–04 (quoting *Amedisys*, 769 F.3d at 321).

### (1)    "Identifying a Corrective Disclosure"

As to the first element, Plaintiffs must establish a causal connection between each alleged misstatement and at least one or more corrective disclosures.  *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 668-69 (5th Cir. 2004) (concluding that "there [was] no relationship between" between statements regarding the defendant's financial results and earnings estimates for the first and second quarters of the fiscal year and a subsequent press release predicting a "significant revenue shortfall for [the defendant's] third fiscal quarter," as "[t]he release does not report any concern that [the defendant's] first and second quarter earnings may be incorrect" and, in fact, "ma[de] no reference at all to the first and second fiscal quarters); *cf. Lormand,* 565 F.3d at 259-60 (holding that the plaintiff failed to establish loss causation, even though "the plaintiff sufficiently allege[d] that the defendants made material misrepresentations and omissions about the dangers inherent in [the defendant's] conversion to Type II affiliation and the transfer of its core functions to Sprint," because "none of the [ ] alleged disclosures plausibly suggests that a significant part of the stock price's decline and plaintiff's consequent economic loss was caused by a revelation of truth about that conversion or transfer").[13]  "When the causal argument is …

---

[13]  *See also In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *26 (S.D. Tex. May 31, 2016) ("Plaintiffs cannot create a genuine dispute of material fact as to the injury caused by Suttles's fraudulent *flow rate* misrepresentations by pointing to evidence that the market reacted negatively to news about BP's non-fraudulent *duration* estimates" because "[d]oing so would diverge from *Dura's* insistence that a Plaintiff recover only for economic losses that the misrepresentations actually caused"); *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 958 (S.D. Tex. 2016) ("Although the Fifth Circuit does not require 'fact-for-fact' corrective disclosures to plead loss causation, the alleged disclosures must relate to the specific statements alleged to be misrepresentations to satisfy § 10(b)'s loss-causation element."); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008) ("The disappointing earnings or expected earnings statements identified by the

that disclosure of information puts the market on notice of the falsity of prior representations," then "the disclosure at minimum must identify which prior representation is called into question." *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 888, 888 n.4 (N.D. Tex. 2005); *see also Flowserve*, 572 F.3d at 232 ("If [the plaintiff] cannot prove by a preponderance of the evidence that the market learned more than that [the defendant's] earnings guidance was lower and so its business seemed less valuable, it cannot establish that its loss was caused by [the defendant's] misstatements pertaining to past financials, acquisition synergies, or debt-covenant compliance."). "In other words, loss causation would not be established if a defendant simply said 'something we told you last year isn't true,' because that is insufficient to show that stock prices were inflated due to a specific misrepresentation and the market reacted when the misrepresentation became known." *In re Odyssey*, 424 F. Supp. 2d at 888; *see also Flowserve*, 572 F.3d at 230 (rejecting argument "that loss causation may result when the 'true financial condition' of a company becomes known—regardless of whether the disclosure of the company's true financial condition corrects past misstatements"—such that "any disclosure of [a defendant's] weakening financial condition would relate to its earlier misstatements).

---

Plaintiffs fail to reveal the falsity of any of Dell's prior representations, and therefore do not qualify as a corrective disclosure."); *Magruder v. Halliburton Co.*, 2009 WL 854656, at *15 (N.D. Tex. 2009) (loss causation was not sufficiently pleaded because "[d]espite the myriad of statements identified in the subject Complaint, the Plaintiffs simply fail to connect the alleged misrepresentations with correlative corrective disclosures during the Class Period. A corrective disclosure, at a minimum, requires that the prior misrepresentation be identified, and that the fraud of the prior representation be revealed to the market.").

"Importantly, the corrective disclosure must reveal some information not already known to the market, otherwise 'the stock price would have incorporated that information, and its disclosure could not have caused a loss.'" *Emps. Ret, Sys.*, 905 F.3d at 904 (quotation omitted); *see also Flowserve*, 572 F.3d at 230 ("[U]ndisclosed information cannot drive down the market price of a stock.  Only information known to the market can cause a loss.").  Once information has already been disclosed, events that subsequently repeat, recharacterize, or arise from the corrective disclosures—such as negative news stories, lawsuits, or investigations about the information contained in the corrective disclosure—are not themselves corrective disclosures.  *See, e.g.*, *Emps. Ret. Sys.*, 905 F.3d at 904 (no loss causation where a government agency had issued a report and press release about the alleged fraud weeks before the company announced the alleged corrective disclosure, and the stock price declined); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 315 (5th Cir. 2008) (no loss causation where press release disclosing news that impacted company's stock price did not reveal accounting issues that had already been disclosed to the public via an analyst report and Form 8-K announcing SEC and internal investigations).[14]  Further, "[l]oss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation."  *Flowserve*, 572 F.3d at 232; *see also id.* ("The inability to point to a single corrective disclosure does not relieve the

---

[14]   *See also Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907, at *2 (2d Cir. Apr. 15, 2024) (affirming lower court's grant of summary judgment because "it was essential for [the plaintiffs] to disaggregate new effects and the effects of a new characterization of already filed documents," and the plaintiffs made "no showing of disaggregation") (quoting *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 328 (S.D.N.Y. 2023)).

plaintiff of showing how the truth was revealed; he cannot say, 'Well, the market must have known.'") (quoting *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009)).

### (2)   "Showing that the stock price dropped soon after the corrective disclosure"

"As to the second element, Plaintiffs must prove that the defendant's non-disclosure materially affected the market price of the security." *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund* (LOCAL 66), 579 F.3d 401, 407 (5th Cir. 2009) (quoting *Flowserve*, 572 F.3d at 228). To do so, Plaintiffs must show "(1) that the negative truthful information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it was more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Id.* (quoting *Flowserve*, 572 F.3d at 228).

"As the Supreme Court has made clear, the fact that a misrepresentation artificially inflates the stock price is insufficient evidence of loss causation." *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *28 (citing *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *6 n. 4, *aff'd sub nom.*, *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)). "Instead, the loss causation inquiry focuses on whether a release of corrective information causes a decrease in the previously-inflated stock price (i.e., whether the shareholder suffers an actual loss)." *Id.* (citing *Flowserve*, 572 F.3d at 229). "If the fraud did not cause the price of the stock to increase, and its disclosure does not cause the price to go down, no injury has occurred. Thus, regardless of the number of disclosures, plaintiffs must establish the connection between the disclosure and the decline in price." *Id.*

### (3)   "Eliminating other possible explanations for this price drop"

As to the third and final element, Plaintiffs bear the burden of proving that any share price decline is attributable to the alleged material misstatements or omissions, rather than non-fraud related factors such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, the materialization of known risks, or other factors independent of the fraud. *See Flowserve*, 572 F.3d at 229 ("The loss must be caused because this truth 'ma[de] its way into the marketplace,' not as a result of 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions,' or other factors independent of the fraud.'" (quoting *Dura*, 544 U.S. at 342–43)).[15] Plaintiffs therefore must disaggregate (*i.e.,* separate out) any stock price reaction to the alleged misrepresentation or omission at issue from the market's reaction to those other factors. *See In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *31 ("Plaintiffs need to present evidence that the fraud-related information—and not the confounding information—was responsible for 'a significant amount of the decline' in the stock price." (citing *Greenberg*, 364 F.3d at 666)); *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 3794769, at *13 (W.D. Tex. June 16, 2015) ("Defendants are correct [the plaintiff's expert] testimony regarding the May 3, 2011 conference call cannot

---

[15]   *See also Ludlow*, 800 F.3d at 682 ("A plaintiff must prove that the misstatements—not other intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events— were the cause of her claimed economic injury, unaided by any presumptions attending efforts to prove transaction causation." (citation and quotations omitted)); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 906 (W.D. Tex. 2008) ("[P]laintiffs must differentiate between fraud factors and any intervening or other causes in order to establish loss causation.").

serve as evidence of loss causation" because the expert "did not disaggregate the effect of Pfizer's stability-related disclosure … from the other negative information discussed during the call….").[16]

### e.   Plaintiffs Are Not Entitled to Damages

"Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages.  Under that measure, damages consist of the difference between the price paid and the 'value' of the stock when bought." *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *32 (quoting *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012)).  "Recovering out-of-pocket damages requires elimination of that portion of the price decline that is the result of forces unrelated to the wrong so as to limit recovery to actual damages on account of the act complaint of." *Id.* (quoting *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).  "Plaintiffs are therefore required 'to provide a method to discern by just and reasonable inference the amount of plaintiff's loss solely caused by the defendant's fraud.'" *Id.*

Plaintiffs also bear the burden of disaggregating any declines in the security price that were caused by other contributing factors from the portion of price declines that were caused by the alleged misrepresentations.  *See, e.g.*, *id.* at *31 (plaintiffs must present evidence that fraud-related information—and not confounding information—caused the

---

[16]   *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("[P]laintiffs [must] disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm specific facts, conditions, or other events." (citation and quotations omitted)).  Indeed, "[t]he Fifth Circuit requires Plaintiffs to offer some empirically-based showing that the corrective disclosure was more than just present at the scene." *In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *31 (citation and quotations omitted).

price decline (citing *Greenberg*, 364 F.3d at 666)); *KB Partners*, 2015 WL 3794769, at *13 (plaintiffs' expert failed to disaggregate corrective disclosure from other negative information); *cf. Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *17 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) ("Plaintiffs here have satisfied their burden to demonstrate a damages model that calculates artificial inflation, the but for price, and will disaggregate inflation unrelated to fraud.").[17]   "[A] model purporting to serve as evidence of damages … must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that the damages are capable of measurement."  *Ludlow*, 800 F.3d at 686 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).  Thus, the damages model put forth by Plaintiffs' must allow for the removal of corrective events later found to not correct the misrepresentations.  *See id.* at 688 ("If certain corrective events [are] later determined to be independent of the [alleged] misrepresentations, but those corrective events could not be disaggregated from the damages model, the plaintiffs would travel to a place forbidden by *Comcast*: they would recover damages other than those 'resulting from the particular … injury on which [defendant's] liability in this action is premised.'").

---

[17]   *See also In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages." (citation omitted)); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014–15 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) ("A proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong.").

**f.    Statements That Constitute Mere Puffery Are Not Actionable**

"Vague, optimistic statements … are not actionable.  Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) ("[P]laintiffs' allegations regarding statements by the defendants that Vasomax was a 'fast-acting,' 'improved formulation' for delivering phentolamine fail because they identify nothing more than inactionable 'puffing.'").  Thus, generalized positive statements about a company's progress are not a basis for liability.  *Id.*(citing *Lasker v. N.Y. Elec. & Gas. Corp.,* 85 F.3d 55, 59 (2d Cir. 1996)); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869–70 (5th Cir. 2003) ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial."); *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) ("Four of the statements that qualify as corporate cheerleading come either from Plains' Code of Business Conduct or speeches and presentations at Investors' Day events. These aspirational statements include affirmations of Plains' commitment to safety, goals it was seeking to reach, and outlines of procedures. …  [T]he statements were generalized positive goals rather than specific promises.").

### g.      The Standard for Opinion Statements

*See supra* Section IX.B.1.b.

### h.      The Standard for Materiality

*See supra* Section IX.B.1.c.

### i.      Plaintiffs Cannot Prove The Requisite Scienter

#### (1)      The Standard For Scienter

A plaintiff proves a defendant acted with the requisite "scienter" if, at the time that they made the alleged misrepresentations, they acted with the "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers [was] either known to the defendant or [was] so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 643 (quoting *Southland*, 365 F.3d at 366).

Scienter cannot be based solely on the fact that the Defendant signed a public SEC filing. *See, e.g., Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *2-3 (5th Cir. Aug. 13, 2021) (describing plaintiffs' allegations about defendant's position as CEO and signature on a SOX certification as insufficient to support an inference of scienter); *Plaisance v. Schiller*, 2019 WL 1205628, at *32 (S.D. Tex. Mar. 14, 2019) ("A defendant's signature on an SEC filing with false or misleading statements cannot by itself support a strong inference of scienter.") (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs, Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)); *Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573, at *13 (S.D. Tex. June 19, 2018) (dismissing Section 10(b) claim where "plaintiffs allege that [defendants] signed the 2015 Form 10-K, but [] allege nothing to indicate that those defendants knew material facts inconsistent with the … statements at issue"). Further, it cannot be based solely on the fact that the Defendant had access, or

- 82 -

could have had access, to information that could show the statement was untrue.  *In re Plains*, 307 F. Supp. 3d at 616.

Plaintiffs also cannot prove scienter by showing a Defendant later found out that a statement was false; Plaintiffs must show that a Defendant had the requisite scienter at the time the statement was made.  *See e.g.*, *Southland*, 365 F.3d at 383 ("[B]ecause fraud cannot be proved by hindsight, subsequent [events] are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time the [alleged misstatements were made]."); *Carlton*, 184 F. Supp. 3d at 469 (explaining that fraud by hindsight is "insufficient because it is based on 'the fact that something turned out badly must mean [the] defendant[s] knew earlier that it would turn out badly,'" and plaintiffs instead must present "contemporaneous evidence . . . that defendants knew earlier what they chose not to disclose until later") (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009 and *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990))); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 755-56 (S.D. Tex. 2001) ("Without identification of any specific documents, meetings, telephone calls, reports, etc., that Defendants read or participated in or should have read or participated in that would have or should have made them aware of specific wrongdoing," post-hoc evidence "is impermissibl[e] fraud by hindsight.").

To prove scienter, Plaintiffs must prove that the particular defendant made the materially false statement or omitted a material fact with (1) *actual knowledge* that the statement was false, or (2) with *severe recklessness* as to its falsity.  *See, e.g.*, *Southland*, 365 F.3d at 365 ("[T]he PSLRA state of mind requirement is severe recklessness or actual

knowledge."); *Lovelace*, 78 F.3d at 1018 n.2 ("A plaintiff alleging securities fraud establishes scienter by proving that the defendants acted with knowledge or severe recklessness.") (citing *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir 1981)); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 866 (S.D. Tex. 2001) (same); *Parker v. Hyperdynamics Corp.*, 126 F. Supp. 3d 830, 840 (S.D. Tex. 2015); *In re Paracelsus Corp. Sec. Litig.*, 61 F. Supp. 2d 591, 595 (S.D. Tex. 1998) ("For liability to arise under § 10(b), scienter requires that the defendant acted with knowledge or severe recklessness.").

### (i)      Actual Knowledge

Actual knowledge is what a person clearly knows; it is not what a person merely suspects. *GE Cap. Com., Inc. v. Worthington Nat. Bank*, 754 F.3d 297, 301 (5th Cir. 2014); *In re Grievance Comm*., 847 F.2d 57, 62 (2d Cir. 1988). The fact that a defendant did not sell any shares of securities during the class period is relevant to whether a defendant made a misrepresentation "knowingly." *In re Enron Corp. Secs., Derivative, & "ERISA" Litig.*, 258 F. Supp. 2d 576, 593-94, 612-14 (S.D. Tex. 2003); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420-21 (5th Cir. 2001).

### (ii)      Severe Recklessness

"Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Integrated Elec. Servs.*, 497 F.3d at 551 (quoting *Nathenson*, 267 F.3d at 408). Plaintiffs cannot not prove severe recklessness by

showing a defendant acted mistakenly or with simple or even inexcusable negligence.  Fifth

Circuit Pattern Civil Jury Instruction (2020), Instruction 7.1; *Abrams v. Baker Hughes Inc.*,

292 F.3d 424, 430 (5th Cir. 2002).

### (iii)      Forward Looking Statements

To avoid the PSLRA's safe harbor for forward looking statements, a plaintiff must

prove that a defendant made a statement "with actual knowledge of its falsity."  *Southland*,

365 F.3d at 371.

### (iv)      Motive

"Allegations of motive and opportunity, standing alone, are no longer sufficient to

plead a strong inference of scienter."  *Abrams*, 292 F.3d at 430.  To prove that a defendant

had motive to engage in securities fraud, the plaintiff must prove that the defendant stood

to gain "concrete benefits that could be realized by one or more of the false statements and

wrongful disclosures alleged."  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*,

Inc, 537 F.3d 527, 543 (5th Cir. 2008).

### (2)      Plaintiffs Must Prove Scienter As To Each Individual Defendant For Each Alleged Misstatement

The jury must examine the evidence of scienter "pertinent to each category of

alleged misstatements."  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,

537 F.3d 527, 534 (5th Cir. 2008).  Thus, for each alleged misrepresentation, Plaintiffs

must "explicitly and precisely set out ... why [the specific Defendant] knew (or recklessly

disregarded the fact that) the statement was misleading."  *Edgar v. Anadarko Petroleum*

*Corp.*, 2018 WL 3032573, at *8 (S.D. Tex. June 19, 2018).  Likewise, "[to] recover on

their claims against all the Defendants, the Plaintiffs must prove" the elements of each

claim "***as to each Defendant***."  *Young v. Mem'l Hermann Hosp. Sys.*, 2006 WL 1984613,

at \*2 (S.D. Tex. July 14, 2006), *aff'd*, 573 F.3d 233 (5th Cir. 2009) (emphasis added).

### (3)   Plaintiffs Cannot Prove Fraud By Hindsight

Plaintiffs cannot prove scienter by hindsight or by showing that a Defendant later

learned that a statement was false.  *See Carlton*, 184 F. Supp. 3d at 469 ("Courts treat [fraud

by hindsight] as insufficient because it is based on 'the fact that something turned out badly

must mean [the] defendant[s] knew earlier that it would turn out badly.'" (quoting

*Lormand*, 565 F.3d at 254).  Rather, Plaintiffs must show that the Defendant had scienter

at the time the statement was made.  *See e.g.*, *Southland Sec. Corp.*, 365 F.3d at 383

("[B]ecause fraud cannot be proved by hindsight, subsequent [events] are unpersuasive of

scienter, as they do not show what any particular individual knew, or was severely reckless

in not knowing, at the time the [alleged misstatements were made]."); *Rosenzweig*, 332

F.3d at 867-68 (5th Cir. 2003) (declining to interpret a "*hindsight* assessment" describing

company's "problems *since the acquisition*" to mean "that management knew *when it*

*acquired the [asset]* that it was inheriting [] problems" and also finding that such

allegations, which "fail[] to identify exactly who supplied the information or when they

knew the information," were "not sufficiently particular" to form a "strong inference of

scienter" (emphasis in original) (quotations omitted)); *Magruder v. Halliburton Co.*, 359

F. Supp. 3d 452, 471 (N.D. Tex. 2018) ("Scienter must exist at the time the

misrepresentation occurred," and evidence of what a Defendant later knew "are tantamount

to fraud by hindsight" (internal quotations omitted)).  In other words, Plaintiffs must

present "contemporaneous evidence . . . that defendants knew earlier what they chose not

to disclose until later . . . because company officials should not be held responsible for failure to foresee future events." *Carlton*, 184 F. Supp. 3d at 469 (citations and quotations omitted).

Likewise, Plaintiffs cannot rely on the fact that a company took corrective action or filed for bankruptcy to prove scienter. *See, e.g.*, *In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *8, *22-23 (S.D. Tex. July 9, 2009), *order clarified*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) (statements by company's CEO's regarding corrective actions "do not suggest that [the CEO] knew that officers within his company were committing intentional or severely reckless fraud sufficient to create a strong inference of scienter . . . . [and was] not equally plausible as Defendants' theory that [the CEO] was accurately describing the business or even that he was providing hindsight analysis of problems that had occurred"); *In re I.C.H. Corp.*, 1998 WL 386165, at *5 (N.D. Tex. July 8, 1998) (no scienter where defendants signed a 10-K containing financial information that was later restated ahead of bankruptcy). Thus, "without identification of any specific documents, meetings, telephone calls, reports, etc., that Defendants read or participated in or should have read or participated in that would have or should have made them aware of specific wrongdoing," post-hoc evidence "is impermissibl[e] fraud by hindsight." *Collmer v. U.S. Liquids, Inc*., 268 F. Supp. 3d 718, 755-56 (S.D. Tex. 2001).

### (4) A Defendant's Position and/or Alleged Access To Information Is Insufficient To Prove Scienter

A Defendant's status or position within the company is insufficient to establish scienter. *See Owens v. Jastrow*, 789 F.3d 529, 546 (5th Cir. 2015) ("Scienter may not rest

on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 376 (S.D. Tex. 2011) ("Conclusory assertions that a defendant 'should have known' about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter."), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).   Thus, to prevail on their Section 10(b) claims, Plaintiffs must do more than prove that Defendants "knew about . . . a specific accounting violation or internal control problem because of their positions in the company, because they are officers, or because of their day-to-day involvement in the company."   *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 833-34 (S.D. Tex. 2016).   "[I]nstead[,] there must be specific . . . facts showing that [Defendants] actually knew about a particular accounting violation . . . or internal control problem."   *Id.*

Likewise, scienter cannot be established solely by the fact that a Defendant had access, or could have had access, to information that could show their statement was untrue.   *See In re Plains*, 307 F. Supp. 3d at 616 ("[A]ccess to internal information that contradicted [defendant's] public statements is not enough."); *see also Abrams*, 292 F.3d at 431-32 (allegations that the defendants, based on their positions as senior executives, were "intimately familiar with the inner workings of the company" and "received unidentified daily, weekly, and monthly financial reports that apprized them of the company's true financial status" are insufficient to establish scienter); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (following *Abrams* and noting the allegations there "that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial

reports that apprised them of the company's true financial status" were insufficient to establish scienter).  Rather, Plaintiffs must present specific evidence "about the document, its author, contents and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made."  *In re Plains*, 307 F. Supp. 3d at 616 (citing *Abrams*, 292 F.3d at 432); *see also In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 816-17 (S.D. Tex. 2012) ("[A]llegations regarding … access to 'analyses and data' and other reports … are inadequate....  Plaintiffs need[] to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them."  (quoting *ABC Arbitrage*, 291 F.3d at 356 (5th Cir. 2012)).

### (5)     Signing an SEC Filing Is Insufficient To Prove Scienter

Without more, signing an SEC filing (such as Form 10-Q or Proxy Statement) does not establish scienter.  *See, e.g., Yang*, 2021 WL 3619863, at *2-3 (describing plaintiffs' allegations about defendant's position as CEO and signature on a SOX certification as insufficient to support an inference of scienter); *Plaisance*, 2019 WL 1205628, at *32 ("A defendant's signature on an SEC filing with false or misleading statements cannot by itself support a strong inference of scienter.") (citing *Integrated Elec. Servs, Inc.*, 497 F.3d at 555); *Edgar*, 2018 WL 3032573, at *13 (dismissing Section 10(b) claim where "plaintiffs allege that [defendants] signed the 2015 Form 10-K, but [] allege nothing to indicate that those defendants knew material facts inconsistent with the … ***statements at issue***." (emphasis added)).

- 89 -

For example, in *Yang v. Nobilis*, the Fifth Circuit considered whether scienter could be inferred from allegations that the defendant corporate director signed an SEC filing allegedly containing false statements. 2021 WL 3619863, at *3. There, the Fifth Circuit made clear that such allegations do not support a securities fraud claim and did little more than "reveal a truism—that [the defendant] was a corporate director who performed official duties including signing SOX certificates." *Id.* Specifically, the *Yang* court found that the defendant's signature on an SEC filing revealed "nothing about [the defendant's] frame of mind" and that even when "[t]aken together, [the defendant's] corporate position and SOX signature provide *neither cogent nor powerful inference of scienter* and are plainly insufficient." *Id.* (emphasis added).

### 3. Section 20(a) Claims [Class Plaintiffs]

#### a. Plaintiffs Cannot Establish That The Section 20(a) Defendants Were Control Persons For Chappelle's Pre-Business Combination Statements Regarding AMH and Kingfisher

A "controlling person" is one who "actually participated in (*i.e.*, *exercised* control over) the operations of the corporation in general"; and (2) "had actual power or control over a controlled person's allegedly fraudulent actions." *See, e.g.*, *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985) ("[P]laintiffs must establish, first, that the defendant lender *actually participated in (i.e., exercised control over) the operations of the corporation in general*." (emphasis added)); *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993) (noting that the Fifth Circuit's decision in *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990) is consistent with prong one); *see also In re Alta Mesa*, 2024 WL 3760481, at *18 ("Plaintiffs must prove 'some facts beyond [Dimitrievich's] position or

title from which it can reasonably be inferred that [Dimitrievich] ***had actual power or control over [a controlled person's] allegedly fraudulent actions***[.]" (quoting *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 913 (S.D. Tex. 2004)) (alterations in original, emphasis added)).  At a minimum, the plaintiff to show that the defendant "had an ability to control the specific transaction or activity upon which [a] primary violation is based." *Id.* (quoting *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014)).

Plaintiffs misread *G.A. Thompson*, suggesting that Defendants "lifted the pleading requirements for the scienter element for a Section 10(b) claim" for the Section 20(a) "recklessness" standard.  *See* Section IX.A.2.  Not so.  *G.A. Thompson* notes that "*the difference between*" the recklessness standards under Sections 10(b) and 20(a) "is a matter of degree.  Under [the Section 10(b)] standard, the plaintiff must prove the defendant must have been aware of (the danger of misleading the plaintiff).  Under the controlling person standard, the test would be whether the defendant was almost certainly aware of the danger."  *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 962 n.33 (5th Cir. 1981) (emphasis added, quotations and citation omitted).  So, in other words, the "recklessness" standard under Sections 10(b) and Section 20(a) are the same except for that difference of "degree."  And Defendants' formulation of the "recklessness" standard under Section 20(a) reflects exactly that.

### (1)    Status Alone Is Insufficient To Prove Control

To establish 20(a) liability, Plaintiffs must do more than identify the status or position of the alleged controlling person.  *See In re Alta Mesa*, 2024 WL 3760481, at *18 ("Plaintiffs must prove some facts beyond [a Defendant's] position or title from which it

can reasonably be inferred that [a Defendant] had actual power or control over a controlled person's allegedly fraudulent actions.") (citing *In re Dynegy*, 339 F. Supp. 2d at 913); *Dennis*, 918 F.2d at 509 (establishing that "status alone will not automatically cause [a defendant] to be deemed a Section 15 or 20 controlling person").[18]  Likewise, Plaintiffs cannot rely solely on a defendant's minority ownership interest in a company or appointment of a minority number of board members to create control person liability.  *See, e.g.*, *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 675 (N.D. Tex. 2013) (recognizing that, although the plaintiffs' "allegations of control [were] based almost entirely on the Shareholder Defendants' stock ownership and the fact that they each designated two of their employees as directors of Kosmos," "[s]tatus alone as to persons not involved in day to day management is legally insufficient to support" a control person claim" (quotation omitted)); *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001) (holding that the "[p]laintiffs have not pleaded sufficient exercise of power and control by the . . . [d]efendants" over the CEO and COO of a company where the plaintiffs alleged that the defendants were liable under Section 20(a) as control persons simply because they owned 50% of the company and had the power to appoint members of the company's board of directors), *aff'd*, 72 F. App'x 130 (5th Cir.

---

[18]   *See also Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *14 (S.D. Tex. Sept. 29, 2010) (Proof "beyond a defendant's position or title [is required] to show that the defendant had actual power or control over the controlled person."); *see also In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 640 (S.D. Tex. 2013) (dismissing 20(a) claim against officer/director that rested on allegations of defendant's position and "not that [defendant] *controlled* anyone or anything relevant to any actionable misrepresentation") (emphasis in original).

2003); *Dartley v. ErgoBilt Inc.*, 2001 WL 313964, at *1 (N.D. Tex. Mar. 29, 2001) ("[The defendant's] status as a major shareholder and a party to the voting agreement at issue does not, without more, create control person liability.").[19]

Instead, Plaintiffs must prove that the defendant engaged in day-to-day control of the corporation's general operations at the time of the primary violation for which they are alleged to be a control person. *See Cameron v. Outdoor Results of Am. Inc.*, 608 F.2d 187, 194-95 (5th Cir. 1979); *see also Abbott*, 2 F.3d at 620 (finding that plaintiffs failed to prove a defendant's "power to control the general affairs" where surety and bonding agent defendants were not involved in "decisions … to purchase properties[,]" or the "general operations" of the defendant corporation, "including [in its] business, financial and marketing plans"). Even so, "[g]eneral allegations about day-to-day participation in corporate affairs" are not enough to show that a defendant had "the ability to control the *specific* transaction identified as the basis for primary liability." *In re Alta Mesa*, 2024 WL 3760481, at *18 (quoting *Carlton v. Cannon*, 2016 WL 3959164, at *7 (S.D. Tex. July 22, 2016)).

---

[19]   *See also In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *9 (D. Del. Feb. 7, 2020) (dismissing Section 20(a) claims where the plaintiffs "merely allege[d] that the defendant[s] owned a minority stock interest and selected a minority number of directors" and did not "allege that the … [d]efendants controlled the drafting or publishing of the press releases at issue, or that [they] … reviewed or signed them before publication"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (finding that plaintiffs failed to allege that the defendant controlled a company's officers merely because the defendant controlled 20% of the company).

### (2)     Providing Edits Or Comments To a
###          Document Is Insufficient To Prove Control

Providing input into a public filing or statement does not equate to control.  *In re Alta Mesa*, 2024 WL 3760481, at *22 ("Although the record reflects that Lapeyre may have had some input into the August 16, 2017 press release, that input does not equate to control over any person who committed an alleged primary violation.").  Plaintiffs likewise cannot prove Section 20(a) liability based on evidence that the defendant "merely suggest[ed]" what was said by the primary violator, *Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, 2014 WL 4851558, at *13 (N.D. Tex. Sept. 30, 2014), or "the substance of the alleged falsehoods originated with [the defendant]."  *In re BP p.l.c. Sec. Litig.*, 2014 WL 4923749, at *6 ("[T]he question is … not whether the substance of the alleged falsehoods originated with [the defendant].").  A Defendant thus cannot not be liable under Section 20(a) simply for requesting that a public filing include a statement where the plaintiff does not allege that statement is false and that statement is not part of their lawsuit.  *See In re Alta Mesa,* 2024 WL 3760481, at *19 (finding Dimitrievich had no control person liability based on an email showing only "that Dimitrievich requested the inclusion in a press release of a statement that Plaintiffs do not allege is false and have not made a part of their lawsuit").

Rather, plaintiffs must present evidence that the defendant had final authority over the public filing or statement containing the alleged misstatement or omission.  *See e.g.*, *id.* at *20 ("Plaintiffs have not pointed to any evidence showing that Leuschen had ***final authority*** over the August 16, 2017 press release or over any of Silver Run II's or Alta Mesa's other public statements or filings." (emphasis added)); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 731–32 (W.D. Tex. 2010) ("[B]ecause there is no allegation

Applegate signed any of the press releases or SEC forms which contained the misstatements or omissions, or had final authority over any of ArthroCare's public statements or filings—in other words, because there is no allegation that Applegate had substantial control over the dissemination of any false information to the public, which is the basis of Plaintiff's § 10(b) claims—he cannot be held liable as a control person simply due to his involvement in the underlying activities about which the Individual Defendants are alleged to have misled investors."). Indeed, Defendants are not aware of—and Plaintiffs have never cited to—any case where a person has been held liable as a control person for commenting on, editing, or signing off on alleged misstatements without other indicia of control, such as majority ownership, executive positions, and/or explicit final authority over the statements.[20]

### (3) Mere Involvement In The Allegedly Fraudulent Activities Does Not Establish Control Person Liability

Plaintiffs cannot show that a defendant is "liable as a control person simply due to his involvement in the underlying activities about which the Individual Defendants are

---

[20] *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007) (declining to dismiss control claims against defendants who not only "prepared and approved" an IPO registration statement, but also served as corporate officers of the company that made the alleged misstatements, and were "deeply involved with [the company's] day-to-day activities"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1200-02 (D. Or. 2015) (declining to dismiss control claims against defendants who "reviewed, edited, and approved the allegedly false" statements, but who also held management positions as CEO, president, director, and vice-president at the primary violator and directly oversaw the company's day-to-day management); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 924-25 (N.D. Ill. 2021) (declining to dismiss control claims where defendant was responsible for "reviewing and approving" financial statements and public filings and was also the primary violator company's CEO who controlled "the day-to-day management and overall direction" of the company)

alleged to have misled investors." *In re ArthroCare*, 726 F. Supp. 2d at 731; *see also In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1374 (N.D. Ga. 2005) ("The Company's financial reporting … is what forms the basis of Plaintiffs' claims, not the operations themselves.  That Defendant … set the Company's collection policies is irrelevant…").  Nor can plaintiffs prove control person liability merely because the defendant's participation was essential to completing an allegedly fraudulent transaction.  *Abbott*, 2 F.3d at 620-21.

### b.   Defendants Are Entitled to the Good Faith Defense

Even if Plaintiffs establish a primary violation and prove that a Defendant was a controlling person, a Defendant cannot be held liable under Section 20(a) if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  *G.A. Thompson*, 636 F.2d at 957-59.  To prevail on an affirmative defense of good faith, the Defendant must "establish that he did not act recklessly in inducing, either by his action or his inaction, the act or acts constituting the violation of [the Exchange Act]."  *Id.* at 960 (quotations omitted).  In *G.A. Thompson*, the Fifth Circuit recognized that the recklessness standard under Section 10(b) and the one applied in the context of a Section 20(a) good faith defense is simply "a matter of degree."  *Id.* at 962 n.33.  Recklessness under Section 10(b) means that the defendant's conduct "was an extreme departure from the standards of ordinary care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor ***must have been aware of it***."  *Id.* at 962 (emphasis added); *see also id.* at 962 n.33 ("Under this standard, the plaintiff must prove the defendant "***must have been aware of***

(the danger of misleading the plaintiff)." (emphasis added)).   By contrast, [u]nder the controlling person standard, the test would be whether the defendant '***was almost certainly aware of the danger***.'"   *Id.* (emphasis added).   Thus, the Fifth Circuit has established that the standard for recklessness in this context means "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious" that the defendant "was almost certainly aware" of it.   *See id.*

"Although the statute requires that a controlling person act in good faith and not induce the violation, it would not be sensible to read the statute literally to make an indirect inducement which is reasonable … give rise to liability."   *Id.* at 960 n.27.   Rather, "the question is whether the defendant acted recklessly in failing to do what he could have done to prevent the violation," such that "any inducement was in good faith, i.e. not reckless."   *Id.* at 960 & n. 27.

Courts have recognized several ways in which a Defendant can establish the good faith defense to control person liability, though these are not exhaustive.   For example, a Defendant "meet[s] the requirements of a good faith defense by showing that he used reasonable care to prevent the securities violation."   *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 594 (S.D. Tex. 2002) (first citing *G.A. Thompson*, 636 F.2d at 957–58, 960; and then citing *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994).   A Defendant also does not act recklessly for purposes of the good faith defense where he or she depended on others to ensure the accuracy of information given to investors, or where the defendant was required to rely heavily on the

primary violator's superior technical expertise and had to no reason to believe that the sources it looked to in evaluating the primary violator would prove unreliable.  *See Shanahan*, 646 F.3d at 544 ("Depending on others to ensure the accuracy of disclosures to purchasers and sellers of securities—even if inexcusably negligent—is not severely reckless conduct that is the functional equivalent of intentional securities fraud") (citing *SEC v. Pasternak*, 561 F. Supp. 2d 459, 513–14 (D.N.J. 2008)); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994) (granting summary judgment on good faith defense where defendant was "required to rely heavily on [the primary violator's] superior technical expertise," and where "there [was] no suggestion in the record that the defendants had any reason to believe that the sources to whom they looked in evaluating [the primary violator] would prove unreliable"); *see also Dellastatious v. Williams*, 242 F.3d 191, 195-97 (4th Cir. 2001) (affirming judgment for control defendants under both a Virginia statute and Section 20(a) of the Exchange Act where control defendants "were not experts on the LaserVision technology and they had no role in SAIL's plan to market the technology," so "[i]t was reasonable for [them] to delegate the creation and review of SAIL's offering documents to" more involved personnel)).  Said differently, the involvement of experienced third parties and a Defendant's reliance on those third parties may be evidence that a defendant acted in good faith.  *See, e.g.*, *Shanahan*, 646 F.3d at 644.

## X.      Exhibits and Exhibit List

The parties' combined exhibit list, and all objections thereto, is being filed as Exhibit A.  The Parties will provide the Court with pre-marked exhibits in accordance with the Court's Procedures.

## XI.      Witnesses and Witness List

The Joint Trial Worksheet setting forth the Parties' Witness List is attached as Exhibit B.  As of the filing of this Joint Pre-Trial Order, Class Plaintiffs' witnesses will appear in Court for their trial testimony.

A copy of Class Plaintiffs' deposition designations are attached as Exhibit C. Defendants' deposition designations are attached as Exhibit D.

## XII.   Settlement

The Parties have engaged, and continue to engage, in settlement discussions, and do not reasonably anticipate this matter to settle prior to trial.  This includes a prior mediation in January 2022 between the Class Plaintiffs and Defendants.

## XIII.   Trial

### A.      Jury/Non-Jury

This case will be tried before a jury.

### B.      Trial Length

Per the Court's comments during the September 9, 2024 status conference, the parties will be prepared to try this case in five weeks.

#### 1.      Plaintiffs' Position

The parties disagree whether they are to split time for questioning witnesses equally during trial.  As Defendants are aware, with the exception of specific affirmative defenses

to be raised in their case-in-chief (*i.e.*, Section 20(a) "good faith" defense, and all elements of the PSLRA's Safe Harbor for forward looking statements other than Defendants' knowledge such statements were misleading when made), the Class Plaintiffs bear the burden of proof on most of the disputed factual issues during trial and are entitled to final rebuttal questioning on those factual issues as well and therefore should be allocated a greater share of the trial time than Defendants.

### 1.    AMR and Riverstone Defendants' Position

The AMR and Riverstone Defendants respectfully request that the Court impose a "chess clock" with time equally divided between (1) the AMR and Riverstone Defendants and (2) the Plaintiffs, and that the Court determine separate, shorter time allotments for Defendant BCE.

There are nine, separate AMR and Riverstone Defendants, seven of whom Plaintiffs have alleged have primary liability for Section 10(b) and/or Section 14(a) claims.  Indeed, it is *only* AMR and Riverstone Defendants that must defend against all of the primary violations remaining in this case.  So the AMR and Riverstone Defendants cannot rely upon any other defendant to adequately represent their interests in defending against these primary violations; and that defense, of course, will require the AMR and Riverstone Defendants to carefully address each and every element of Plaintiffs' claims.  Nor can the AMR and Riverstone Defendants rely upon any other defendant to present and carry the burden for affirmative defenses to those primary violations.  Providing equal time to Plaintiffs and the AMR and Riverstone Defendants, therefore, will ensure a fair, balanced presentation of the issues to the jury.

Plaintiffs will suffer no prejudice if they are given equal trial time as the AMR and Riverstone Defendants.  Throughout the pretrial period, Plaintiffs have insisted to the Court that they need only approximately eight trial days to put on their case, and have not taken the position in the JPTO that any more time is needed.  So granting AMR and Riverstone Defendants an equal number of trial days (approximately eight) not only leaves more than ample time for the other defendants, but it also comfortably allows Plaintiffs to put on their case within the time frame *they* have insisted on.  And Plaintiffs have not articulated, either to the Court or in this JPTO, as to any other prejudice that might result from granting AMR and Riverstone Defendants equal trial time to defend themselves.  Rightly so—there is no prejudice.

Accordingly, the AMR and Riverstone Defendants respectfully request equal trial time as the Plaintiffs governed by a "chess clock," with separate time allotments for the remaining Defendants.

### 2.     BCE's Position

BCE's position with respect to time limits is as follows.

In this case, Plaintiffs seek an unknown amount of money from BCE which is believed to be at least hundreds of millions of dollars. BCE therefore requires time to adequately defend itself. Moreover, as described in BCE's Objection to Trial by Consent and Motion to Exclude, the current Section 20(a) claim against BCE was not pleaded and BCE therefore did not conduct discovery on that claim. BCE does not know what the 40+ witnesses called by Plaintiffs and other Defendants will say regarding such a claim. Plaintiffs have not disclosed what witnesses will testify regarding the primary violation

underlying the claim against BCE (i.e., Chappelle's August 2017 statements) or BCE's purported control of the primary violator (Chappelle). And, BCE cannot count on the other defendants to adequately represent its interests, because BCE is not fully aligned with them. While BCE is counting on those other defendants to defend against the primary violation, there are different misstatements at issue, those defendants only have a limited amount of time (and BCE does not know what they will prioritize), and BCE does not know if those defendants will try to cast aspersions on BCE.

For these reasons, BCE needs to reserve its own time, separate from the other defendants, to defend this case. For any witness anticipated to be examined by the Class for at least an hour, BCE needs at least 30 minutes – 15 minutes to address testimony by the Class, and 15 minutes to address testimony by the other defendants (approximately 5-7.5 minutes per defense group). For any witness anticipated to be examined by the Class for at least 30 minutes, BCE needs at least 15 minutes. For certain key witnesses, including Chappelle, BCE needs an hour.

BCE does not necessarily anticipate using all this time. In an ideal world, neither the Class nor the other defendants will spend any time talking about BCE. However, for all BCE knows, the Class and other defendants could spend their entire examinations attacking BCE. Any amount of time less than this would prejudice BCE.

Insofar as it is necessary to reduce other parties' time to allow for time for BCE, the Court should reduce the Plaintiffs' time, not the time allocated to the other defendants. The Class have repeatedly represented to the Court that they could try their case in approximately 8 trial days, and that was before their settlement with Defendant, HPS. The

Court should hold Plaintiffs to 8 trial days. If BCE's time is taken from the other defendants, it will not only prejudice those other defendants, but likely BCE, because those other defendants are ostensibly carrying the water in defending the primary violation.

### C.    Witness Availability

#### 1.    Class Plaintiffs

Class Plaintiffs intend to call 20 witnesses under their control, or under the control of Defendants.  Class Plaintiffs anticipate calling 2 witnesses who are not under the control of either party.  As of the filing of this Joint Pre-Trial Order, Class Plaintiffs understand each will be available to appear live in Court for their testimony.  If any such witness becomes unavailable during trial, however, Class Plaintiffs will call them by deposition through reading of the transcript or video presentation.  Class Plaintiffs will serve trial subpoenas on all witnesses identified in their section of the Joint Trial Worksheet, except for witnesses under the control of Class Plaintiffs.

#### 2.    Defendants

Defendants anticipate calling 21 witnesses under the control of a party.  Defendants anticipate calling 13 witnesses who are not under the control of either party.  If any witness is or becomes unavailable, Defendants will call such witness by deposition through reading of the transcript or video presentation.  Defendants will serve trial subpoenas on all witnesses.

### **Additional Attachments**

### D.    Motions *in Limine*

Plaintiffs' Motions *in Limine* are filed separately with the Court.  The title of each motion is as follows:

1.      Class Plaintiffs' Motion *in Limine* No. 1: Motion to Preclude Evidence or Argument Regarding Reliance on Undisclosed Third Parties;

2.      Class Plaintiffs' Motion *in Limine* No. 2: Motion to Preclude Evidence or Argument Regarding Reliance on the Advice of Counsel;

3.      Class Plaintiffs' Motion *in Limine* No. 3: Motion to Preclude Evidence or Argument Regarding the Post-Hoc Investigation and Conclusions of KPMG;

4.      Class Plaintiffs' Motion *in Limine* No. 4: Motion to Preclude Evidence Concerning the Individual Action Plaintiffs' Damages Expert;

5.      Class Plaintiffs' Motion *in Limine* No. 5: Motion to Preclude Evidence or Argument as to the Class's Aggregate Damages;

6.      Class Plaintiffs' Motion *in Limine* No. 6: Motion to Preclude Character Evidence and Evidence of Religious Beliefs, Opinions, and Activities; and

7.      Class Plaintiffs' Motion *in Limine* No. 7: Motion as to General Trial Procedures.

Defendants' Motions *in Limine* are filed separately with the Court. The title of each motion is as follows:

1.      Defendants' Alta Mesa Resources, Inc., Riverstone Holdings LLC, Harlan H. Chappelle, Michael E. Ellis, William D. Gutermuth, James T. Hackett, Ronald J. Smith, Jeffrey H. Tepper, and Diana J. Walters Motions *in Limine*:

(a)      Motion *in Limine* #1:  This Court Should Preclude Evidence About The Falsity Of Statements Not Alleged To Be False Or Misleading In The Operative Complaint; and

(b)     Motion *in Limine* #2:  This Court Should Preclude Any Hearsay Statement Offered As A Purported Opposing Party Statement.

2.      Defendant, Bayou City's Motion in Limine to Enforce the Court's Summary Judgment Rulings which will seek to limine out evidence or argument that:

(a)     Bayou City or McMullen allegedly controlled statements other than the two statements made by Chappelle in August 16-17, 2017 press releases and investor presentation where Chappelle is listed as a defendant;

(b)     Bayou City or McMullen controlled AMH or KFM;

(c)     Bayou City or McMullen exercised control over Chappelle by providing or failing to provide edits either before or after the August 16-17, 2017 press release and investor statement;

(d)     Bayou City or McMullen committed a primary violation of the securities laws; and

(e)     Bayou City is a "Control Entity Defendant."

3.      Settled Defendant ARM Energy's Motions *in Limine*:

(a)     Motion *in Limine* #1: ARM Energy's alleged control of or responsibility for statements other than those made by Harlan Chappelle about AMH and Kingfisher prior to the Business Combination on February 9, 2018.

(b)     Motion *in Limine* #2: Unrelated Kingfisher financial projections.

(c)     Motion *in Limine* #3: The alleged inclusion of "Project Rugby" financial projections in the Proxy and other investor communications.

(d)     Motion *in Limine* #4: The Operating Transition Services Agreement being relevant to ARM Energy's liability.

(e)     Motion *in Limine* #5: ARM Energy's control of AMH and Kingfisher.

(f)     Motion *in Limine* #6: Evidence that ARM Energy was involved in a primary violation.

(g)     Motion *in Limine* #7: ARM Energy's state of mind or intent during Plaintiffs' case-in-chief.

(h)     Motion *in Limine* #8: ARM Energy's proceeds from the Business Combination.

(i)     Motion *in Limine* #9: Any other litigation or dispute to which ARM Energy is or was a party.

(j)     Motion *in Limine* #10: Collective references to Defendants.

(k)     Motion *in Limine* #11: ARM Energy exercised control over Chappelle by providing or failing to provide edits either before or after the August 16-17, 2017, press release and investor statement.

### E.     Proposed Questions for the Venire Panel

The parties' proposed unopposed questions for the venire panel are attached hereto. *See* Exhibit E.

### F.     Proposed Jury Instructions, Definitions, and Interrogatories

The parties' joint proposed jury charge, including all necessary instructions and definitions, is attached hereto.  *See* Exhibit F.

Plaintiffs' proposed verdict form, including all interrogatories, is attached hereto as Exhibit G. Defendants' proposed verdict form is attached hereto as Exhibit H.