# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | § § § | Civil Action No. 4:19-cv-00957 |
| | § | CLASS ACTION |
| | § | |
| This Document Relates To: | § § | Hon. George C. Hanks, Jr. |
| ALL ACTIONS. | § § | |
| | § | |

**SUPPLEMENTAL RESPONSES AND OBJECTIONS TO THE PROPOUNDING DEFENDANTS' FIRST SET OF INTERROGATORIES TO FNY PARTNERS FUND LP, FNY MANAGED ACCOUNTS, LLC, PAUL J. BURBACH, UNITED ASSOCIATION NATIONAL PENSION FUND, AND CAMELOT EVENT DRIVEN FUND**

time of the Communication, as well as the full name, present or last known address, and the current

or last known place of employment of each Person.

21.    Plaintiffs object to the definition of "You" or "Your" (Definition No. 10) to the extent

it defines "you," and "your" to include Plaintiffs' "respective predecessors, successors, subsidiaries,

divisions, directors, officers, principals, trustees, agents, representatives, consultants, attorneys, or

any other person acting on his/her/its/their behalf."   To the extent Plaintiffs agree to provide

responses to any Interrogatory as set forth below in the Specific Responses and Objections, Plaintiffs

provide such response only on behalf of, and any such response only refers to, Plaintiffs and their

employees unless otherwise noted.

22.    Plaintiffs object to the definition of "Plaintiffs" (Definition No. 11) to the extent it

includes Plaintiffs' "respective predecessors, successors, subsidiaries, divisions, directors, officers,

principals, trustees, agents, representatives, consultants, attorneys, or any other person acting on

his/her/its/their behalf."  To the extent Plaintiffs agree to provide responses to any Interrogatory as

set forth below in the Specific Responses and Objections, Plaintiffs provide such response only on

behalf of, and any such response only refers to, Plaintiffs and their employees unless otherwise

noted.

## II.    SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 1:

Identify each statement in the Complaint that You contend contains an Actionable

Misrepresentation the Propounding Defendant made, disseminated, or for which the Propounding

Defendant is otherwise directly liable under Section 10(b) of the Exchange Act.

RESPONSE TO INTERROGATORY NO. 1:

The misleading statements alleged by Plaintiffs have already been identified and attributed

with specificity to the appropriate Propounding Defendants in the Third Consolidated Amended

- 6 -

Complaint for Violations of the Securities Laws ("Complaint"), and are further identified in the Summary of Alleged Misstatements and the Chart of Alleged Misstatements (which was attached to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF 139-3)). Accordingly, Plaintiffs object to this Interrogatory as unduly burdensome and disproportional to the needs of the case.

Subject to the General Objections and specific objections to Interrogatory No. 1 as set forth herein, Plaintiffs respond as follows: *See* Chart of Alleged Misstatements (hereinafter referred to as "Exhibit A," attached) and Exhibit B.

Plaintiffs reserve their right to supplement their response seasonally pursuant to Rule 26(e).

INTERROGATORY NO. 2:

Identify each statement in the Complaint that You contend contains an Actionable Misrepresentation included in the Proxy for which the Propounding Defendant made, participated in the preparation, review and/or dissemination thereof, or for which the Propounding Defendant is otherwise directly liable under Section 14(a) of the Exchange Act.

RESPONSE TO INTERROGATORY NO. 2:

The misleading statements alleged by Plaintiffs have already been identified and attributed with specificity to the appropriate Propounding Defendants in the Complaint, and are further identified in the Summary of Alleged Misstatements and the Chart of Alleged Misstatements (which was attached to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF 139-3)). Accordingly, Plaintiffs object to this Interrogatory as unduly burdensome and disproportional to the needs of the case.

Subject to the General Objections and specific objections to Interrogatory No. 2 as set forth herein, Plaintiffs respond as follows: *See* Exhibits A and B.

Plaintiffs reserve their right to supplement their response seasonally pursuant to Rule 26(e).

INTERROGATORY NO. 3:

Identify each statement in the Complaint that You contend contains an Actionable Misrepresentation for which the Propounding Defendant had the power and ability to control the actions of the Person(s) who made the Actionable Misrepresentation or who participated in the preparation, review, and dissemination of the Proxy, or is otherwise liable under Section 20(a) of the Exchange Act.

RESPONSE TO INTERROGATORY NO. 3:

The misleading statements alleged by Plaintiffs have already been identified and attributed with specificity to the appropriate Propounding Defendants in the Complaint, and are further identified in the Summary of Alleged Misstatements and the Chart of Alleged Misstatements (which was attached to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF 139-3)).  Accordingly, Plaintiffs object to this Interrogatory as unduly burdensome and disproportional to the needs of the case.

Subject to the General Objections and specific objections to Interrogatory No. 3 as set forth herein, Plaintiffs respond as follows:  *See* Exhibit C.

Plaintiffs reserve their right to supplement their response seasonably pursuant to Rule 26(e).

INTERROGATORY NO. 4:

For each Actionable Misrepresentation You Identified in response to Interrogatory Nos. 1-3, Identify Your basis for identifying each such statement as an Actionable Misrepresentation, including the particular words and any facts that made the statement false or misleading, and, in the context of Actionable Misrepresentations based on omissions of material fact, what information You allege should have been disclosed with the statement in order to make it not materially misleading.

RESPONSE TO INTERROGATORY NO. 4:

Plaintiffs' have already identified the particular words and facts that made each actionable statement false or misleading with particularity in the Complaint, and have further identified with particularity in the Complaint what facts were omitted (and should have been disclosed) in order to make any such misleading statement not misleading at the time each was made.  Plaintiffs further identified the reasons each actionable statement was false or misleading in the Summary of Alleged Misstatements and the Chart of Alleged Misstatements (which was attached to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF 139-3)). Accordingly, Plaintiffs object to this Interrogatory as unduly burdensome and disproportional to the needs of the case.

Plaintiffs object to the word "basis" as vague because it is not clear whether the information sought is information developed during the investigation of this action, or if the Propounding Defendants are asking for "all facts" or "all bases" Plaintiffs contend will render such statements actionable.  To the extent the Interrogatory calls for the former, Plaintiffs object to the extent the Interrogatory calls for the disclosure of information protected from disclosure by the attorney-client privilege or the work-product doctrine.

To the extent the Interrogatory calls for the latter, Plaintiffs further object to the Interrogatory as a premature contention Interrogatory.

Plaintiffs further object to the Interrogatory as compound because it seeks to compile responses to three separate preceding Interrogatories into a single interrogatory.

Subject to the General Objections and specific objections to Interrogatory No. 4 as set forth herein, Plaintiffs respond as follows:

Plaintiffs refer Defendants to the Column labeled "Allegations Statement is False and Misleading" in Exhibit A.  Plaintiffs further state:

Plaintiffs further object to the Interrogatory to the extent it seeks legal analysis, arguments, or conclusions.

Plaintiffs further object to the Interrogatory to the extent it calls for the identification of information protected from disclosure by the attorney-client privilege and attorney work-product doctrine.

Plaintiffs' counsel are otherwise willing to meet and confer to discuss the information sought by the Propounding Defendants in this Interrogatory.

Subject to the General Objections and specific objections to Interrogatory No. 14 as set forth herein, Plaintiffs respond as follows:  *See* response to Interrogatory No. 12.

Plaintiffs reserve their right to supplement their response seasonably pursuant to Rule 26(e).

Dated:  March 30, 2023

/s/ Andrew J. Entwistle

Andrew J. Entwistle
(Texas Bar No. 24038131)
Attorney-in-charge
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960

-and-

Joshua K. Porter (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
Andrew M. Sher (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200

*Court-Appointed Co-Lead Counsel and*
*Counsel for Lead Plaintiffs FNY Partners*
*Fund LP, FNY Managed Accounts LLC,*
*Paul J. Burbach*

/s/ Trig Smith

Trig Smith (*pro hac vice*)
Lonnie Browne (*pro hac vice*)
Sean McGuire (*pro hac vice*)
John M. Kelley (*pro hac vice*)
**ROBBINS GELLER RUDMAN**
**& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058

*Court-Appointed Co-Lead Counsel and*
*Counsel for United Association National*
*Pension Fund*

/s/ Ira A. Schochet
Ira A. Schochet (*pro hac vice*)
David Schwartz (*pro hac vice*)
David Saldamando (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0650

*Counsel for Plaintiff Camelot Event Driven*
*Fund, A Series of Frank Funds Trust*

- 43 -

**CERTIFICATE OF SERVICE**

Trig R. Smith hereby certifies that, on March 30, 2023, I caused to be served a true and correct copy of the above document on counsel for the Propounding Defendants via electronic mail.

s/ Trig R. Smith
_____
TRIG R. SMITH
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

- 44 -

# EXHIBIT A

## Chart of Alleged Misstatements
*In re Alta Mesa Resources, Inc. Securities Litigation*

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| August 16, 2017 | Press Release | Alta Mesa Resources, Inc. ("AMR"), Hackett, Chappelle, Walker<br><br>Sections 10(b) | "We formed [Alta Mesa] with the objective of acquiring **low breakeven**, stacked-pay, oil-weighted assets, preferably with an integrated midstream platform." (¶190). "We see this as a tremendous way to continue our evolution as a **low-cost, high-value** producer in the STACK." *Id.* | **Nearly 90% of AMH's STACK wells operating at this time had improperly drilled vertical bores** – including S-curved well bores – **which literally made it impossible to economically extract oil using rod-lift capability.** (¶¶191, 276-282). The non-industry standard curving of the vertical bore would **dramatically increase AMH's costs to extract oil at the STACK**, and **eliminate up to 33% of the well's revenue generating capabilities over the course of its life.** (¶280). As a result, AMH's wells were far from a low-cost, high-value operation. |
| August 16, 2017 | Press Release | AMR, Hackett, Chappelle, Walker<br><br>Section 10(b) | AMH had identified "**about 4,200 gross identified drilling locations**" and **based on its currently producing wells AMH "expects EURs at year end to exceed 650 MBOE per well**." (¶190). | Alta Mesa's estimate of 650 MBOE per well was inflated by as much as 40% due to Alta Mesa's erroneous assumptions for optimal well-spacing and number of wells per pad, in conjunction with limitations imposed by S-curved vertical bores. (¶¶191, 268-271, 276-282). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| August 17, 2017 | Investor Conference Call and Investor Presentation (Slide 5) | AMR, Hackett, Chappelle<br><br>Section 10(b) | "First, we'll talk about the introduction.  When we went out to look for targets for [Alta Mesa], we had laid out investment criteria that are shown on slide 5.  And both individually as an Upstream and Midstream company and collectively as an integrated platform, **this transaction satisfies those criteria.**" (¶192).<br><br>The STACK was a "**[h]igh margin core basin with low field break-events [with] deep inventory.**" (¶192).<br><br>"We have over 200 wells that we've drilled here and we've demonstrated the value, and we have confidence in the upside.  As an illustration of that, at the end of the second quarter [of 2017], we drilled on the order of 200 wells; of those, over 160 were on production. And of that number, **about 114 had sufficient production history to give us confidence that at the end of this year, our year-end reserves will reflect better than 650,000 BOE.**" (¶194). | The STACK was not a high margin and low field break-event with deep inventory because **nearly 90% of AMH's STACK wells operating at this time had improperly drilled vertical bores – including S-curved well bores – which literally made it impossible to economically extract oil using rod-lift capability.** (¶¶191, 195, 268-271, 276-282).  Likewise, **Alta Mesa's estimate of 650 MBOE per well was inflated by as much as 40%** due to Alta Mesa's erroneous assumptions for ESPs, optimal well-spacing and number of wells per pad (data at the time showed 4 to 6 wells per pad was optimal), in conjunction with limitations imposed by S-curved vertical bores.  (¶¶191, 193, 269-271, 276-282).<br><br>It was clear by August 2017 that AMH and Kingfisher did not meet the investment criteria because it was known **AMH's well data received from a large number of wells in the field with sufficient production data showed the wells were underproducing (despite efforts to temporarily boost production) and suffering from setbacks.** (¶191). |
| August 17, 2017 | Investor Presentation | AMR, Hackett, Chappelle<br><br>Section 10(b) | Kingfisher was "**rapidly expanding**" and "positioned to capture volume growth from the STACK." Kingfisher was "**well positioned to serve other operators**" and take advantage of the "[e]xpansion opportunities in [the] rapidly growing basin.**" Kingfisher was estimated to have achieved $42 million in 2017 EBITDA, and was **expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million**. (¶196). | **Alta Mesa's wells** (which accounted for of the vast majority of Kingfisher's revenues) **could not produce the advertised amount of oil let alone sustain current production rates** (¶¶268-271, 276-282) and beginning in 2017 **Kingfisher knew that multiple "large third-party producers"** – like AMH – had received disappointing drilling results and delayed expansion on acreage served by Kingfisher. (¶197). |

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| January 19, 2018 | Form DEFA14A Proxy | Gutermuth, Hackett, Tepper, Walters, AMR, Riverstone<br><br>Sections 10(b) and 14(a)(9) | Alta Mesa Projections<br><br>*[financial projections table showing Year Ending December 31, 2017E, 2018E, 2019E ($ in millions): Average Net Daily Production (Boe/d)(1) 20,841 / 38,510 / 68,900; Adjusted EBITDAX(2) $155 / $358 / $701; Capital Expenditures $349 / $552 / $611; Free Cash Flow $(237) / $(233) / $31]*<br><br>(1) Includes 549 boe/d, 1,698 boe/d and 2,003 boe/d for 2017, 2018 and 2019, respectively, attributable to the Bayou City DrillCo joint venture.<br>(2) Alta Mesa defines Adjusted EBITDAX as net income (loss) before interest expense, loss on extinguishment of debt, exploration expense, depletion, depreciation and amortization, impairment expense, accretion expense, provision (benefit) for income taxes, (gain)/loss on sale of assets and (gain) loss on derivative contracts. See "Selected Historical Financial Information of Alta Mesa—Non-GAAP Financial Measure."<br><br>"AMH **had achieved 2017 adjusted EBITDAX of $155 million** and was expected **to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.**" (¶¶109, 374).<br><br>The Proxy contained "financial projections . . . **prepared on a reasonable basis**" and "**reflected the best currently available estimates and judgments of [AMH] and Kingfisher**, as applicable." The Proxy represented that its financial figures "**presented, to the best of their knowledge and belief, the expected course of action** and the expected future financial performance of Alta Mesa and Kingfisher, respectively." (¶¶198, 207). | The Proxy's EBITDAX and other projections were not reasonable because **AMH's wells had been underperforming since at least the fall of 2017 and the** Company's production strategy was temporarily inflating production results. Indeed, **AMH's current EBDITAX was itself misleading because by late 2017 AMH's management had already taken significant steps to temporarily inflate its well production by utilizing S-curved vertical well-bores, overusing ESPs, and drilling wells too densely together at the expense of the long-term viability of its operations in future years.** (¶¶208, 265-282). Projections for Kingfisher were similarly not reasonable because **AMH's wells (which accounted for the vast majority of Kingfisher's revenues) could not produce the advertised amount of oil and beginning in 2017 Kingfisher knew that multiple "large third-party producers"** – like AMH – **had received disappointing drilling results and delayed expansion on acreage served by Kingfisher.** (¶197). |

- 3 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------------------------------------------------------------------------|----------------------|-----------------------------------------------|
| January 19, 2018 | Form DEFA14A Proxy | Gutermuth, Hackett, Tepper, Walters,  AMR, Riverstone<br><br>Sections 10(b) and 14(a)(9) | As of September 2017, [AMH] was operating six horizontal drilling rigs in the STACK with **plans to continue to operate that number of rigs through the end of 2017**. (¶374).<br><br>"Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that [AMH's] type well **EUR is greater than 650 MBOE**." (¶¶199, 289).<br><br>Alta Mesa Projections:<br><br>*[financial projections table showing Year Ending December 31, 2017E, 2018E, 2019E with Average Net Daily Production (Boe/d)(1) 20,841, 38,510, 68,900; Adjusted EBITDAX(2) $155, $358, $701; Capital Expenditures $348, $552, $611; Free Cash Flow $(237), $(233), $51 ($ in millions)]*<br><br>(1)   Includes 549 boe/d, 1,698 boe/d and 2,003 boe/d for 2017, 2018 and 2019, respectively, attributable to the Bayou City DrillCo joint venture.<br>(2)   Alta Mesa defines Adjusted EBITDAX as net income (loss) before interest expense, loss on extinguishment of debt, exploration expense, depletion, depreciation and amortization, impairment expense, accretion expense, provision (benefit) for income taxes, (gain)/loss on sale of assets and (gain)/loss on derivative contracts. See "Selected Historical Financial Information of Alta Mesa—Non-GAAP Financial Measure."<br><br>AMH had achieved an **estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.** (¶¶201, 290, 373). | Nearly 90% of AMH's STACK wells operating at this time had **improperly drilled vertical bores** – including S-curved well bores – **which literally made it impossible to economically extract oil using rod-lift capability**. (¶¶191, 200, 276-282).  The non-industry standard curving of the vertical bore would **dramatically increase AMH's costs to extract oil at the STACK, and eliminate up to 33% of the well's revenue generating capabilities over the course of its life.** (¶280).   Further, in the fall of 2017, well data produced from a large number of wells in the field with sufficient production **data showed that Defendants' assumptions regarding the number of wells to be drilled per pad to reach the 650 MBOE number – i.e., 8 to 12 – was erroneous**.  (¶¶268-271, 276-282).  In fact, by this time the Company already knew that 4 to 6 wells per pad was the optimal number and that the child wells were not producing similar oil volumes as the parent wells. (¶268). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------|------|------|
| January 19, 2018 | Form DEFA14A Proxy | Gutermuth, Hackett, Tepper, Walters, AMR, Riverstone<br><br>Sections 10(b) and 14(a)(9) | Kingfisher was "**rapidly expanding**" and "positioned to capture volume growth from the STACK." Kingfisher was "**well positioned to serve other operators**" and take advantage of the "[e]xpansion opportunities in [the] rapidly growing basin." Alta Mesa further stated that there was an opportunity to monetize Kingfisher and fund upstream capital needs through spinning off Kingfisher as a master limited partnership (MLP) IPO. (¶¶196, 204.<br><br>*[Kingfisher Projections table image]*<br><br>Kingfisher was **estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.** (¶¶ 109, 196, 204, 374). | It was clear in the fall of 2017 that **AMH's wells** (which accounted for the vast majority of Kingfisher's revenues) **could not produce the advertised amount of oil** (¶¶265-282). Moreover, as admitted by Defendants in March 2018, **beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher** because those operators also realized the STACK play **was not as lucrative as anticipated**. Both of these reasons undermined Kingfisher's advertised timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted. (¶205). |
| January 19, 2018 | Form DEFA14A Proxy | Gutermuth, Hackett, Tepper, Walters, AMR, Riverstone<br><br>Sections 10(b) and 14(a)(9) | [AMH]'s policies and practices regarding internal controls over the recording of reserves are **structured to objectively and accurately estimate its oil and gas reserves quantities** and **present values in compliance with rules, regulations and guidance provided by the SEC, as well as established industry practices** used by independent engineering firms and its peers and in accordance with the 2007 Petroleum Resources Management System sponsored and approved by the Society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists and the Society of Petroleum Evaluation Engineers. . . .<br><br>[AMH's]'s methodologies include reviews of production trends, material balance calculations, analogy to comparable properties and/or volumetric analysis. (¶¶ 111, 293). | Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion.** (¶221). The Company's statements about its internal controls were misleading because **the internal controls failed to account for the fact that to cover up the poor production and "setbacks" at AMH's wells starting by the fall of 2017,** AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production. (¶191). These factors inflated AMH's short term production numbers but were unsustainable and undermined the long-term viability of AMH's wells. |

- 5 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------------------------------------------------------------------------|----------------------|-----------------------------------------------|
| February 21, 2018 | EnerCom Dallas Conference Investor Presentation | AMR, Chappelle, Ellis<br><br>Section 10(b) | "2012-2017 Execution and **Results De-Risk [the] Investment**"<br><br>"Multi-well development projects initiated in 2017; **previous pattern tests validate approach**"<br><br>"Consistency and geographic breadth of well results underscores repeatable development"<br><br>"Spacing test pilots establish basis for development approach" (¶209). | Alta Mesa's wells were not de-risked and/or validated because its **estimate of 650 MBOE per well was inflated by as 40% due to Alta Mesa's erroneous assumptions for optimal well-spacing and number of wells per pad, in conjunction with limitations imposed by S-curved vertical bores**. (¶¶191, 210, 268-273, 276-282).  Further, the results were not repeatable because nearly 90% of AMH's STACK wells operating at this time had **improperly drilled vertical bores – including S-curved well bores – which literally made it impossible to economically extract oil using rod-lift capability**. (¶¶191, 276-282).   The non-industry standard curving of the vertical bore would dramatically increase AMH's costs to extract oil at the STACK, and **eliminate up to 33% of the well's revenue generating capabilities over the course of its life**. (¶280). |
| March 29, 2018 | Press Release Announcing Earnings Results and Fourth Quarter 2017 Earnings Presentation | AMR, Chappelle, Ellis, Hackett<br><br>Section 10(b) | We have **de-risked our acreage with over 250 operated horizontal wells** and a comprehensive scientific and engineering effort to begin systematic development with multi-well patterns.<br><br>We expect drilling and completion costs on these wells to average $3.8 million and our type curve has been approximately **650 MBOE per well**.(¶211).<br><br>Slide 6 of the Fourth Quarter Earnings Presentation suggested that **an 8-to-10 well density per section was optimal** for the STACK. (¶214). | Alta Mesa's **estimates were inflated by as much as 40% due to Alta Mesa's erroneous assumptions for optimal well-spacing and number of wells per pad, in conjunction with limitations imposed by S-curved vertical bores and the overuse of ESPs**. (¶¶191, 212, 268-271, 276-282).  Suggestions of an 8-to-10 well density per section being optimal was misleading because it was based on erroneous math and assumptions that the "child" wells would continue to act like the original "parent" well as more wells were drilled, which was especially not feasible because the wells were drilled too close together.  (¶¶191, 215, 268-270).  By this time **the Company already knew that 4 to 6 wells per pad was the optimal number and that the child wells were not producing similar oil volumes as the parent wells**. (¶268). |

- 6 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| March 29, 2018 | Fourth Quarter 2017 Earnings Conference Call | AMR, Chappelle, Ellis, Hackett<br><br>Section 10(b) | With respect to its Kingfisher midstream business, Alta Mesa stated that "despite setbacks in late 2017 and early 2018, with regard to [Kingfisher], our vision for growth remain [sic] strong . . . . We believe our **margins are going to continue to expand** as we build up critical infrastructure and expand production on existing wells . . . ." (¶216).<br><br>"During [2017 and early 2018] we … **further de-risked and delineated our Kingfisher County acreage** [in STACK]…. We have **transitioned from spacing tests to development patterns.**" (¶213). | Kingfisher County acreage in STACK was not de-risked. Since at least the fall of 2017 AMH's wells (which **accounted for over 95% of Kingfisher's revenues) were not producing as much as expected**, despite efforts to temporarily inflate production, and **other "large third-party producers" had encountered similar problems drilling on acreage in the STACK**.  As a result of AMH's failure and the overall problems in the STACK, **Kingfisher would not be able to significantly grow its pipeline business as represented** and, as a result, the Company's cash flow would be adversely impacted. (¶218). |
| March 29, 2018 | 2017 Form 10-K | AMR, Chappelle, Ellis, Dimitrievich, Gutermuth, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | Alta Mesa further represented as a Risk Factor that, "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or **if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect**, our gross profit and cash flow could be adversely affected." (¶217). | Defendants knew that **AMH's wells were not profitable (despite efforts to temporarily inflate production) and other "large third-party producers" had encountered similar problems drilling on acreage in the STACK**.  As a result of AMH's failure and the overall problems in the STACK, **Kingfisher would not be able to significantly grow its pipeline business as represented** and, as a result, the Company's cash flow would be adversely impacted. (¶218). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|-----------------------------------------------------------------------|----------------------|-----------------------------------------------|
| March 29, 2018 | 2017 Form 10-K | AMR, Chappelle, Ellis, Dimitrievich, Gutermuth, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | Alta Mesa's 2017 Form 10-K stated that that "there [had] been no change in [its] **internal control over financial reporting**" in Item 4 Controls and Procedures. (¶219). | Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion**. (¶221). The Company's statements about its internal controls were misleading because the **internal controls failed to account for the fact that to cover up the poor production and "setbacks" at AMH's wells starting by the fall of 2017, AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production, which temporarily boosted production but was not sustainable and undermined the long-term viability of AMH's wells.** (¶191). |
| March 29, 2018 | 2017 Form 10-K | AMR, Chappelle<br><br>Section 10(b) | SOX certifications attested to the **accuracy of the Company's financial reporting**, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. (¶220). | Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion**. (¶221). The Company's statements regarding its financial reporting were misleading because the reporting **failed to account for the fact that to cover up the poor production and "setbacks" at AMH's wells starting by the fall of 2017, AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production**. (¶191). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| April 9, 2018 | IPAA-OGIS Conference and Investor Presentation | AMR, Chappelle, Hackett<br><br>Section 10(b) | With regard to utilizing ESPs in the STACK, Chappelle stated while discussing a slide titled "**Production Optimization**," that "[n]ow, here's one simple example of a well that we **optimized with an ESP**, obviously a very good outcome if you're producing on the order of 800 barrels a day…. But **the point is there are opportunities like this.** We've got a lot of effort focused on that." (¶222).<br><br>Slide 8 of Chappelle's presentation at the IPAA Conference stated the STACK was generating "[c]**onsistent [w]ell [r]esults [with] [d]urable economics over time across acreage position.**" Slide 9 of the presentation **touted ESP utilization as a method to "maximize ROI, EBITDA and optimize reserves**:" (¶224). | To cover up AMH's poor production and "setbacks" starting in the fall of 2017, **AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production**. (¶191). Chappelle knew **the marginal costs of ESPs exceeded their marginal revenue generating abilities** in the STACK region. (¶¶223, 271-275). Specifically, the Company's production team had repeatedly informed the Management Defendants that the increased volume produced by **installing an ESP at a certain well was generally offset by loss in production volume in wells immediately adjacent to the ESP well**. (¶¶223, 273-275). |
| May 14, 2018 | First Quarter 2018 Investor Presentation and Call | AMR, Chappelle, Hackett<br><br>Section 10(b) | Slide 6 of the presentation stated: "**Multi-well development pattern results across field are favorable.**" Slide 9 of the presentation showed a well life-cycle implying that **ESPs added to the STACK net daily production numbers and that utilization of ESPs continued to make economic sense**. When Chappelle showed this slide to investors, he stated: "I'd like to refer you to Slide 9 in our presentation for three recent examples of the gains we've seen in that lift optimization." (¶226).<br><br>Defendant Chappelle also stated: "We are **reaffirming our FY '18 guidance**. We have **confidence in presenting operating results such as production, revenue, expenses as those numbers will not change**." (¶227). | Starting in 2017, **AMH's wells had worse than anticipated production and suffered "setbacks," and the Company covered it up by drilling its wells too close together, grossly overutilizing ESPs, and improperly utilizing s-curved vertical well bores.** (¶191, 228). Because of these factors, which were known to **likely undermine the long-term viability of its wells**, Defendants knew there was not a reasonable basis for its 2018 guidance and the purported "optimization" was overstated. *Id.* Moreover, Hackett and Chappelle knew **the marginal costs of ESPs exceeded their marginal revenue generating abilities** in the STACK region. (¶¶223, 271-275). Alta Mesa did not have a reasonable basis for its guidance because of these factors. |

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------------------------------------------------------------------------|----------------------|-----------------------------------------------|
| May 21, 2018 | First Quarter 2018 Form 10-Q | AMR, Chappelle, Ellis, Dimitrievich, Gutermuth, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | Incorporated Risk Factors from 2017 Form 10-K, including the assertion that its business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application" and that **its business "depend[s] on successful exploration, exploitation, development and acquisitions to maintain reserves and revenue** in the future." (¶229). | Nearly 90% of AMH's STACK wells operating at this time had **improperly drilled vertical bores** – including S-curved well bores – **which literally made it impossible to economically extract oil using rod-lift capability**. (¶¶191, 276-282). The non-industry standard curving of the vertical bore would **dramatically increase AMH's costs** to extract oil at the STACK, and **eliminate up to 33% of the well's revenue generating capabilities** over the course of its life. (¶¶2803, 265-282). In particular, the S-shaped drilling technique and ESPs were not the "latest available horizontal drilling, completion and production technology." (¶¶271-282). They were, instead, **workarounds** the Company was compelled to use in light of the consequences of its over drilling and its desire to inflate production statistics following setbacks starting in the fall of 2017. These tactics were employed with knowledge not that they carried "risks and uncertainties," but that they were **likely to undermine the long-term viability and oil production from the wells**. |
| May 21, 2018 | First Quarter 2018 Form 10-Q | AMR, Chappelle, Ellis, Dimitrievich, Gutermuth, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | The Incorporated Risk Factors from 2017 Form 10-K, included the following statement: "If third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or **if the volumes we gather, process, store or transport do not meet the quality requirements** of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected." (¶232). | It was clear Alta **Mesa's wells were not producing as much oil as expected and suffering from setbacks** (¶¶265-282) and likewise, beginning in 2017 **multiple "large third-party producers"** had delayed drilling on acreage in the STACK because of poor results, both of which would undermine the Company's advertised timeline for growing its pipeline business and, as a result, the Company's cash flow was already being significantly impacted. (¶232). Indeed, **on March 29, 2018, Defendant Chappelle admitted third-party producers delayed drilling** on the Kingfisher's acreage. (¶139). |

- 10 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| May 21, 2018 | First Quarter 2018 Form 10-Q | Chappelle, AMR<br><br>Sections 10(b) and 20(a) | Item 4 represented that the Company's **internal controls over financial reporting were effective** and required no change. (¶233).<br><br>SOX certifications **attested the accuracy of the Company's financial reporting**, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. (¶235). | Alta Mesa had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion.** (¶234). The Company's statements about its internal controls were misleading because the **internal controls failed to account for the fact that AMH's wells had poor production and "setbacks" starting by the fall of 2017,** and to cover up these facts AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production at the expense of the long term viability of its operations. (¶191). |
| August 14, 2018 | Second Quarter 2018 Earnings Call and Presentation | Hackett, Chappelle, AMR<br><br>Section 10(b) | Slide 9 of the PowerPoint presentation made available for all participants stated: "**Multi-well development pattern results continue to be favorable.**" Slide 17 of the presentation showed a well life-cycle **implying that ESPs added to the STACK's net daily production numbers and that utilization of ESPs continued to make economic sense**. (¶237). | Alta Mesa's suggestions of a "multi-well development pattern" was misleading because its suggestion of **8-10 wells per pad was based on erroneous math and assumptions** that the "child" wells would continue to act like the original "parent" well as more wells were drilled, which was not feasible because the **wells were drilled too close together.** (¶¶191, 215, 268-270). With respect to ESPs, **Defendants knew the marginal costs of ESPs exceeded their marginal revenue generating abilities** in the STACK region. (¶¶223, 271-275). Specifically, the Company's production team had repeatedly informed the Management Defendants that the increased volume produced by installing an ESP at a certain well was generally offset by loss in production volume in wells immediately adjacent to the ESP well. (¶¶223, 273-275). |

- 11 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| August 15, 2018 | Second Quarter 2018 Form 10-Q | AMR, Chappelle, Ellis, Dimitrievich, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | Alta Mesa's Second Quarter Form 10-Q incorporated by reference each of the "Risk Factors" in its 2017 Form 10-K.  These included the assertion that Alta Mesa's business "involves the use of the **latest available horizontal drilling, completion and production technology**, which involve **risks and uncertainties** in their application" and that its business "**depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future.**" (¶239). | Nearly 90% of AMH's STACK wells operating at this time had **improperly drilled vertical bores – including S-curved well bores – which literally made it impossible to economically extract oil using rod-lift capability.** (¶¶191, 276-282).  The non-industry standard curving of the vertical bore would **dramatically increase AMH's costs to extract oil at the STACK, and eliminate up to 33% of the well's revenue generating capabilities over the course of its life.** (¶¶191, 265-282).  In particular, the S-shaped drilling technique and ESPs were not the "latest available horizontal drilling, completion and production technology." (¶¶276-282).  Such tactics were, instead, **workarounds** the Company was compelled to use in light of the consequences of its over-drilling and its desire to inflate production statistics.  These methods were employed with knowledge not that they carried "risks and uncertainties," but that they were **likely to undermine the long-term viability and oil production from the wells.** (¶240). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------------------------------------------------------------------------|----------------------|-----------------------------------------------|
| August 15, 2018 | Second Quarter 2018 Form 10-Q | AMR, Chappelle, Ellis, Dimitrievich, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters<br><br>Section 10(b) | Alta Mesa's Second Quarter Form 10-Q incorporated the risk factors from the 2017 Form 10-K.  These included the Company's assertion that "If third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or **if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected**." (¶241).<br><br>Despite Kingfisher only achieving $9.2 million in EBITDA during the first six months of 2018 (compared to the Proxy's projection of $185 million for 2018), Defendant Chappelle assured investors that although Alta Mesa missed estimates yet again, the Company **still "offer[ed] compelling long-term returns to [its] shareholders."** (¶242). | It was clear **Alta Mesa's wells (which accounted for the vast majority of Kingfisher's revenues) were not producing as much oil as expected** and **suffering from setbacks**, which was mitigated through AMH drilling its wells too close together, drilling unworkable S-curved wells and overutilizing ESPs to temporarily boost production. (¶¶265-282).  However, these tactics were unsustainable and would ultimately lead to less revenue for both AMH and Kingfisher (¶191). Moreover, beginning in 2017 multiple **"large third-party producers" had delayed drilling on acreage in the STACK** because of poor results, which further would undermine the Company's advertised timeline for growing its pipeline business and, as a result, the Company's cash flow would be significantly impacted. (¶232). |
| August 15, 2018 | Second Quarter 2018 Form 10-Q | AMR, Chappelle<br><br>Section 10(b) | The Company's 2018 Second Quarter Form 10-Q stated "there [had] been **no change in [its] internal control over financial reporting**" and included signed certifications by Defendant Chappelle and Alta Mesa's CFO McCabe pursuant to Section 302 of SOX, **attesting to the accuracy of financial reporting**, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. (¶¶245-246). | The Company's assertion about its internal controls and signed SOX certifications were materially false and misleading and omitted material facts.  They failed to disclose that Alta Mesa had ineffective internal control over financial reporting, which would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion.** (¶247). The Company's statements about its financial reporting were misleading because the **internal controls failed to account for the fact that AMH's wells had poor production and "setbacks" starting by the fall of 2017, and to cover up these facts AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production at the expense of the long term viability of its operations.** (¶191). |

- 13 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|------------------------|----------------------|-----------------------------------------------|
| September 6, 2018 | Barclays CEO Energy Power Conference | AMR, Chappelle<br><br>Section 10(b) | "During that period of time, we performed 7 pattern tests that gave us insight into the intensive **multi-well patterns** that we see as being necessary to produce all the economic oil that we have here. . . . [T]hat would infer **24 wells per section.** We're not going with that, but it does illustrate the potential for down spacing, and in fact, it **gave us a lot of confidence because one of our strategic anchors** is that we need to limit our downside." (¶248). | Alta Mesa's suggestions of a "multi-well patterns" was misleading because the Company's repeated suggestion of 8-10 wells per pad was **based on erroneous math and assumptions that the "child" wells would continue to act like the original "parent" well as more wells were drilled**, which was especially not feasible because the **wells were drilled too close together**. (¶¶191, 215, 267-270). |
| September 6, 2018 | Barclays CEO Energy Power Conference PowerPoint Presentation | AMR, Chappelle<br><br>Section 10(b) | Slide 21 showed a STACK well life-cycle implying **that ESPs added to the STACK's net daily production numbers** and that **utilization of ESPs continued to make economic sense.** (¶250). | Chappelle **knew the marginal costs of ESPs exceeded their marginal revenue generating abilities** in the STACK region but continued to use them to artificially inflate short term production data. (¶¶223, 251, 271-275). |

- 14 -

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|------|--------|----------------------------------------------------------------------|----------------------|-----------------------------------------------|
| November 13, 2018 and November 14, 2018 | Third Quarter 2018 Form 10-Q | AMR, Chappelle, Ellis, Dimitrievich, Hackett, Lapeyre, Leuschen, McMullen, Sinclair, Smith, Tepper, Walters  Section 10(b) | The Company's Third Quarter 10-Q incorporated by reference each of the "Risk Factors" in its 2017 Form 10-K, including that its business "involves the use of the **latest available horizontal drilling, completion and production technology**, which **involve risks and uncertainties** in their application" and that its business "**depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future**." (¶252)  Alta Mesa incorporated the "Risk Factors" from its 2017 Form 10-K in its Third Quarter Form 10-Q, including that "If third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or **if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected**." (¶254). | The non-industry standard curving of 90% of AMH's wells **dramatically increase AMH's costs to extract oil at the STACK, and eliminate up to 33% of the well's revenue generating capabilities over the course of its life**. (¶¶ 191, 265-282).  In particular, the S-shaped drilling technique and ESPs were not the "latest available horizontal drilling, completion and production technology." (¶¶271-282).  They were, instead, **workarounds** the Company was compelled to use in light of the consequences of its over drilling and its desire to inflate production.  They were employed with knowledge not that they carried "risks and uncertainties," but that they were **likely to undermine the long-term viability and oil production from the wells**. (¶252)  Because it was clear **Alta Mesa's wells could not produce the advertised amount of oil, and that beginning in 2017 multiple "large third-party producers" had delayed drilling** on acreage served by Kingfisher because those operators also realized the STACK play was not as lucrative as anticipated, Kingfisher's advertised timeline for growing its pipeline business was unrealistic and, as a result, the Company's cash flow would be adversely impacted. (¶255). |

4859-7745-4170.v1

# EXHIBIT A

| Date | Source | Defendant(s) & Applicable Section(s) of 1934 Act for Primary Violation | Alleged Misstatement | Allegations Statement is False and Misleading |
|---|---|---|---|---|
| November 14, 2018 | Third Quarter 2018 Form 10-Q | Chappelle, AMR<br><br>Section 10(b) | "Other than the changes described above, there have been **no changes in our internal control over financial reporting** during the three months ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." (¶256).<br><br>The 10-Q also contained SOX certifications that **attested to the accuracy of financial reporting**, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. (¶257). | Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record **material, non-cash asset impairment charges totaling $3.1 billion.** (¶258). The Company's statements about its financial reporting were misleading because the **internal controls failed to account for the fact that AMH's wells had poor production and "setbacks" starting by the fall of 2017, and to cover up these facts AMH drilled its wells too close together, drilled unworkable S-curved wells and overused ESPs to temporarily boost production at the expense of the long term viability of its operations.** (¶191). |

- 16 -