**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION | Case No. 4:19-cv-00957 |

**JOINT DECLARATION OF ANDREW J. ENTWISTLE AND TRIG R. SMITH IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS AND APPROVAL OF PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

## TABLE OF CONTENTS

Page

EXHIBIT LIST ............................................................................................................ iii

I.      INTRODUCTION ............................................................................. 4

II.     HISTORY OF THE ACTION ......................................................... 6

     A.    Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel ............................................................................. 6

     B.    The Investigation and Filing of the Complaint ............................. 7

     C.    Defendants' Eight Motions to Dismiss ....................................... 10

     D.    Plaintiffs' Motion for Class Certification .................................... 11

     E.    Plaintiffs' work in the AMR Bankruptcy Leads to a Preservation of the D&O Policies and Amending the Complaint to Add AMR As a Defendant ................................................................................... 12

     F.    Litigation with AMH Litigation Trustee Regarding Insurance Proceeds ...................................................................................... 13

     G.    Plaintiffs Conduct Extensive Fact Discovery ............................. 14

          1.    Document Discovery ....................................................... 15

          2.    Interrogatories and Requests for Admission ................... 18

          3.    Deposition Discovery ...................................................... 19

          4.    Discovery Disputes .......................................................... 21

     H.    Plaintiffs' Engaged in Extensive Expert Discovery .................... 23

     I.    Plaintiffs Opposed Two Rounds of Summary Judgment Motions .............. 25

     J.    The Parties Briefed and Filed 10 *Daubert* Motions .................... 27

     K.    The Parties Submitted Comprehensive Pretrial Submissions Including Dozens of Motions ....................................................................... 28

     L.    The Jury Trial ............................................................................... 30

M.      Mediation with Phillips ADR and the Settlements ......................................32

III.   RISKS OF CONTINUED LITIGATION ................................................34

A.      Risks Concerning Liability..........................................................................34

B.      Risks Related to Loss Causation and Damages ...........................................35

C.      Risks Related to the Bankruptcy of a Primary Corporate Defendant .........37

D.      Risks Related to Phase II of Trial...............................................................38

E.      Risks Related to Appeal ..............................................................................38

IV.    NOTICE TO THE CLASS ..............................................................................39

V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS ....................41

VI.    THE APPLICATION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES ....................................................................................................43

A.      The Fee Application ....................................................................................43

1.     Plaintiffs Have Authorized and Support the Fee Application..........44

2.     The Work and Experience of Counsel .............................................44

3.     The Standing and Caliber of Defendants' Counsel..........................49

4.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases...............................................................................................50

B.      The Application for Payment of Plaintiffs' Counsel's Litigation Expenses ......................................................................................................51

C.      Application for Plaintiffs' Costs and Expenses............................................55

D.      The Reaction of the Class to the Fee and Expense Application .................59

VII.   CONCLUSION ...............................................................................................59

**EXHIBIT LIST**

| Ex. # | DESCRIPTION |
|-------|-------------|
| 1 | Declaration of Layn R. Phillips in Support of Motion for Final Approval of Class Action Settlements ("Phillips Decl.") |
| 2 | Declaration of Luiggy Segura Regarding: (A) Notice Dissemination; (B) Publication/Transmission of the Summary Notice; and (C) Continuation of Call Center Services and Website ("Segura Decl.") |
| 3 | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| 3A | Declaration of Andrew J. Entwistle Filed on Behalf of Entwistle & Cappucci LLP in Support of Application for Award of Attorneys' Fees and Expenses |
| 3B | Declaration of Trig R. Smith Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses |
| 3C | Declaration of Carol C. Villegas Filed on Behalf of Labaton Keller Sucharow LLP in Support of Application for Award of Attorneys' Fees and Expenses |
| 4 | Declaration of Shawn Fischman in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement |
| 5 | Declaration of Paul J. Burbach in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement |
| 6 | Declaration of Toni Inscoe in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement |
| 7 | Declaration of Thomas Kirchner in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement |
| 8 | Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA January 22, 2025) ("NERA Report") |

We, ANDREW J. ENTWISTLE and TRIG R. SMITH, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I, Andrew J. Entwistle, am a partner of the law firm of Entwistle & Cappucci LLP ("E&C"), counsel for Lead Plaintiffs and Class Representatives FNY Partners Fund LP, FNY Managed Accounts, LLC and Paul J. Burbach and Court-appointed Lead Counsel for the certified Class in this class action (the "Action").[1]  I have personal knowledge of the matters set forth herein based upon my close supervision of and active participation in the Action.

2.      I, Trig R. Smith, am a partner at the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD"), counsel for Class Representative United Association National Pension Fund ("UANPF") and Court-appointed Lead Counsel for the certified Class in this class action.  I have personal knowledge of the matters set forth herein based upon my close supervision of and active participation in the Action.

---

[1] Unless otherwise defined, all capitalized terms herein have the same meaning set forth in the (i) Stipulation and Agreement between Class Plaintiffs and HPS Investment Partners, LLC and Donald Dimitrievich dated October 16, 2024 (Dkt. 891-3) (the "HPS Defendants Stipulation"); (ii) Stipulation and Agreement between Class Plaintiffs and ARM Energy Holdings, LLC dated October 29, 2024 (Dkt. 937-3) (the "ARM Stipulation"); (iii) Stipulation and Agreement between Class Plaintiffs and Bayou City Energy Management LLC and William McMullen dated November 8, 2024 (Dkt. 946-3) (the "BCE Defendants Stipulation"); and (iv) Stipulation and Agreement between Class Plaintiffs and Defendants Alta Mesa Resources, Inc., Harlan H. Chappelle, Stephen S. Coats, Michael E. Ellis, William D. Gutermuth, James T. Hackett, Pierre F. Lapeyre, Jr., David M. Leuschen, Donald R. Sinclair, Ronald Smith, Jeffrey H. Tepper, Thomas J. Walker, Diana J. Walters, and Riverstone Holdings LLC dated January 6, 2025 (the "Riverstone and AMR Defendants Stipulation," and, collectively with the HPS Defendants Stipulation, the ARM Defendant Stipulation and the BCE Defendants Stipulation, the "Stipulations").  Citations to "Ex.__" herein refer to exhibits to this declaration.

3.    We respectfully submit this Joint Declaration in support of: (i) Plaintiffs' Motion for Final Approval of Settlements and Approval of Plan of Allocation ("Final Approval Motion"); and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee and Expense Motion").

4.    This Court, having overseen this proceeding for six years, ruling on dozens of substantive motions, and presiding over three weeks of jury trial, is familiar with the underlying claims and defenses in the Action and the factual and legal issues surrounding the collapse of Alta Mesa. Accordingly, this declaration does not seek to detail each and every event that occurred during the litigation. Rather, it provides highlights of the events leading to the Settlements and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval.

5.    This Joint Declaration sets forth: (i) the nature of the claims asserted against the defendants; (ii) the procedural background of the Action; (iii) the negotiations that led to the respective Settlements with the Riverstone and AMR Defendants, HPS Defendants, BCE Defendants, and ARM Energy (collectively, "Defendants" and together with Plaintiffs, the "Parties"); (iv) the mechanics of the proposed Plan of Allocation for distribution of the Net Settlement Fund to Class Members; and (v) the basis for Lead Counsel's request for attorneys' fees and expenses. This Joint Declaration demonstrates that the Settlements, Plan of Allocation, and application for attorneys' fees and expenses are fair, reasonable, and adequate and should be approved by the Court.

6.     The Settlements will resolve all claims asserted in the Action against Defendants on behalf of the Class previously certified by the Court.  The certified Class is:

(a) all persons and entities that held shares of Alta Mesa (Silver Run II) common stock, and/or Silver Run II Units ("Silver Run Units") on the January 22, 2018 record date that were entitled to vote on Alta Mesa's proposed transaction with AMH and Kingfisher (the "Section 14a Class Members");

(b) all persons and entities that purchased or otherwise acquired Alta Mesa (Silver Run II) common stock, Alta Mesa (Silver Run II) warrants, and/or Alta Mesa (Silver Run II) Units on or after August 16, 2017 and prior to the closing of the Business Combination on February 9, 2018 (the "Silver Run Class Members"); and

(c) all persons and entities that purchased or otherwise acquired Alta Mesa common stock or Alta Mesa warrants (other than those automatically converted from Silver Run Units by operation of the Business Combination) between the February 9, 2018 closing of the Business Combination and May 17, 2019.[2]

---

[2] For the avoidance of doubt, the three above categories are not mutually exclusive. Excluded from the Class are: (i) Defendants; (ii) the officers and directors of Alta Mesa, Silver Run II, Alta Mesa Holdings, LP, Kingfisher Midstream, LLC and the Control Entity Defendants during the Class Period (the "Excluded Officers and Directors"); (iii) members of the immediate families of the Individual Defendants and of the Excluded Officers and Directors; (iv) any entity in which any Defendant, any Excluded Officer or Director or any of their respective immediate family members has and/or had during the Class Period a controlling interest; (v) Defendants' liability insurance carriers; (vi) any affiliates, parents, or subsidiaries of Alta Mesa, Silver Run II, AMH, KFM, or the Control Entity Defendants; (vii) all Alta Mesa, Silver Run II, AMH, KFM, and Control Entity Defendants' plans that are covered by ERISA; and (viii) the legal representatives, heirs, agents, affiliates, successors-in-interest or assigns of any excluded person or entity, in their respective capacity as such. Also excluded from the Class are those persons and entities who requested exclusion in response to the Notice of Pendency of Class Action (*see* Dkt. 774-1) and the plaintiffs in the individual actions *Alyeska Master Fund, L.P., et al. v. Alta Mesa Resources, Inc., et al.*, Case No. 4:22-cv-01189 and *Orbis Global Equity LE Fund (Australia Registered), et al. v. Alta Mesa Resources, Inc., et al.*, Case No. 4:22-cv-02590.

The Class was certified by the Court on January 24, 2022 (Dkt. 241).  The Court preliminarily approved the Settlements by Order entered on January 17, 2025 (Dkt. 1020).

## I.     INTRODUCTION

7.     Plaintiffs have succeeded in obtaining a significant recovery for the Class after more than five years of vigorously contested litigation.  The Settlements collectively provide for $126.3 million in cash (the "Settlement Amount").  The $126.3 million consists of the following amounts from the respective Defendant groups:  (i) $115 million from the Riverstone and AMR Defendants; (ii) $6.3 million from the HPS Defendants; (iii) $3 million from ARM Energy; and (iv) $2 million from the BCE Defendants.

8.     The monies have been deposited for the benefit of the Class and are earning interest.  The Settlements benefit each member of the Class by conferring a guaranteed and immediate benefit while avoiding the substantial risks and expense of continued litigation, including the risk of recovering less than the Settlement Amount after further delay or of no recovery at all.

9.     The Settlements were reached by Plaintiffs only after extensive litigation efforts and comprehensive negotiations between Lead Counsel and counsel for Defendants, with the assistance of United States District Court Judge Layn R. Phillips (Retired), a well-respected and experienced mediator.

10.     At the time the Settlements were reached, Plaintiffs had a clear understanding of the strengths and weaknesses of the asserted claims given the thorough prosecution of the case by Plaintiffs' Counsel.  This litigation involved eight separate motions to dismiss, class certification briefing and related discovery, extensive fact and expert discovery

including the production of more than 4 million pages of documents and deposition of more than 40 fact and 15 expert witnesses, voluminous briefing and oral argument on seven separate summary judgment motions, pretrial motion practice including *Daubert* challenges to experts and motions *in limine*. And, with respect to the litigation against Riverstone and AMR Defendants, three weeks of a jury trial, which included *voir dire*, opening statements, and the examination of five expert witnesses and nine fact witnesses before the last Settlement was reached.

11.    While Plaintiffs and Plaintiffs' Counsel were confident in the strength of the asserted claims, the Class faced the possibility of a much smaller recovery or no recovery at all had the Action proceeded through the remainder of trial and to verdict. As discussed more fully below, the substantial litigation risks included the challenges of: (i) establishing Defendants' liability under the federal securities laws for their alleged misstatements and the required state of mind; (ii) proving loss causation, class-wide reliance on the alleged misstatements, and the class-wide measure of damages; (iii) proving some Defendants with minority ownership positions and/or board seats had "control" over the violations and rebutting those Defendants' "good faith" defense; and (iv) recovering on any favorable judgment in light of Alta Mesa's bankruptcy and dwindling available insurance proceeds, Riverstone's corporate and capital structure, and the limited resources of the remaining AMR Individual Defendants. The Settlements represent an outstanding recovery for the Class considering these risks and Plaintiffs' thorough appreciation of the strengths and weaknesses of the asserted claims.

12.     For these reasons, and for the additional reasons set forth below, we respectfully submit that the Settlements and Plan of Allocation are fair, reasonable, and adequate and warrant final approval under Federal Rule of Civil Procedure 23(e). Moreover, for the reasons detailed below, we respectfully submit that Plaintiffs' Counsel's request for attorneys' fees and litigation expenses is also fair and reasonable and should be approved.

## II.    HISTORY OF THE ACTION

### A.    Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel

13.     Plaintiff UANPF filed the initial complaint in the Action in the Southern District of New York on January 30, 2019.  Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust ("Camelot"), filed a related complaint in the Southern District of Texas on March 14, 2019.  A third complaint was filed by FNY Partners Fund LP and FNY Managed Accounts, LLC (together, "FNY") on March 19, 2019, also in the Southern District of Texas.

14.     On April 1, 2019, (i) UANPF, (ii) Camelot, and (iii) FNY together with Paul J. Burbach (the "FNY Group") filed separate motions for appointment as lead plaintiff. These applicants also requested the three pending actions be consolidated.

15.     On January 15, 2020, the Court consolidated all three of the related actions, appointed UANPF and the FNY Group as Lead Plaintiffs to lead the consolidated Action, and appointed Entwistle & Cappucci and RGRD as co-Lead Counsel.  (Dkt. 54).

**B.      The Investigation and Filing of the Complaint**

16.      Before and after appointment as Co-Lead Counsel, E&C and RGRD, with the assistance of additional Plaintiffs' Counsel, conducted a thorough investigation and analysis of the facts supporting the claims asserted against Defendants.  This investigation included a review and analysis of:  (i) Alta Mesa's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports issued by securities and financial analysts; (iii) transcripts of Alta Mesa's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to the Action; (vi) data reflecting the pricing of Alta Mesa securities; and (vii) additional material from the public domain concerning the Company.

17.      In addition, Co-Lead Counsel identified, located, and interviewed more than a dozen former Alta Mesa employees and other witnesses concerning the claims asserted, and consulted extensively with experts concerning the oil and gas industry.  Two of the former employees reviewed and approved the allegations attributed to them in the complaint, agreed to be referenced in the pleadings as confidential witnesses, were deposed, and were days away from being called to testify at trial when the Action settled.

18.      On April 6, 2020, Plaintiffs filed the 125-page Second Corrected Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws ("Second Amended Complaint").  (Dkt. 69).  The Second Amended Complaint asserted claims under: (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); (ii) Section 14(a) of the Exchange Act; and (iii) Section 20(a) of the

Exchange Act. The Second Amended Complaint named all of the Defendants, except Alta Mesa Resources, Inc.

19. Plaintiffs alleged that certain defendants made false and misleading statements in connection with its proposed acquisition of AMH and Kingfisher by Alta Mesa, which was then a special purpose acquisition company ("SPAC") sponsored by Defendant Riverstone and named Silver Run II, as well as its CEO Hackett. Plaintiffs further alleged that certain defendants continued to mislead investors to solicit shareholder approval of the proposed transaction through and including in the January 22, 2018 Proxy statement and, following the February 8, 2018 business combination, regarding the post de-SPAC Company, Alta Mesa Resources, Inc. ("AMR").

20. The Second Amended Complaint alleged that certain of Alta Mesa's former directors and officers made material misrepresentations and omissions during the Class Period concerning the Company's business prospects and operational results and the value of its oil and gas assets. These alleged misstatements were made in Alta Mesa's January 22, 2018 Proxy Statement, other SEC filings and in its executives' other public statements during the Class Period. Plaintiffs alleged that these Defendants misrepresented the amount of oil and gas that Alta Mesa Holdings ("AMH") reasonably expected to recover from its acreage in the Oklahoma region known as the STACK. Specifically, Defendants provided earning projections that had no reasonable basis because the projections relied upon, among other things, knowingly false assumptions regarding the number of wells AMH could drill in the STACK, and the amount of oil it could reasonably recover from those wells. Plaintiffs also asserted that the projections for Alta Mesa's midstream

operations, Kingfisher Midstream LLC ("Kingfisher), did not have a reasonable basis to the extent it relied upon AMH's faulty projections, as well as that Kingfisher overstated the projected volumes incoming from its other, non-Alta Mesa, customers and potential customers.

21.    Plaintiffs further alleged that various individual and entity Control Defendants violated federal securities law as control-persons of the primary violators.

22.    The Second Amended Complaint alleged that the truth about Alta Mesa and KFM's business prospects was revealed in a series of disclosures that each partially corrected the alleged Class Period misrepresentations and omissions.  Specifically, on March 29, 2018, Alta Mesa announced it was cutting its 2018 EBITDA projection for Kingfisher by 46%.  On August 14, 2018, Alta Mesa announced it was further cutting its financial and production estimates for both Alta Mesa and KFM.  On November 13, 2018, Alta Mesa again announced that it was significantly further reducing its estimate of Kingfisher's 2018 EBITDA.  On February 29, 2019, Alta Mesa announced it had identified an ineffective internal control due an identified material weakness and that it expected to record a non-cash asset impairment charge of approximately $3.1 billion.  Finally, on May 17, 2019, Alta Mesa disclosed that the SEC had opened a formal investigation into its material weakness in its internal controls over financial reporting and the related impairment charge.  These corrective disclosures are alleged to have caused a substantial portion of Alta Mesa's stock price decline during the Class Period.

### C.     Defendants' Eight Motions to Dismiss

23.     On June 30, 2020, the Defendants filed eight separate motions to dismiss the Second Amended Complaint.   Specifically, each of the following defendants/defendant groups filed a motion to dismiss: (i) ARM Energy (Dkt. 116); (ii) Bayou City and McMullen (Dkt. 129); (iii) Dimitrievich (Dkt. 120); (iv) HPS (Dkt. 119); (v) Riverstone (Dkt. 128); (vi) the Board Defendants (Dkt. 127); (vii) the Management Defendants (Dkt. 125); and (viii) the Proxy Defendants (Dkt. 126).   In total, the eight motions consisted of more than 200 pages, not including exhibits and appendices.   Across the eight motions, various Defendants raised arguments related to, among other things, the PSLRA safe harbor, falsity, scienter, loss causation and control.

24.     Plaintiffs filed a 100+ page omnibus opposition addressing each of these motions to dismiss on August 31, 2020. Dkt.139.

25.     Each of the eight defendants/defendant groups replied in further support of their respective motions to dismiss on October 14, 2020.  Dkt. Nos. 142-150.

26.     On April 14, 2021, the Court denied all eight of Defendants' motions to dismiss the Amended Complaint (the "Motion to Dismiss Order").  Dkt. 160.  The Court found, among other things, that Plaintiffs adequately pled claims for relief under Sections 10(b), 14(a), and 20(a) of the Exchange Act.

27.     Defendants, other than AMR, answered the Second Amended Complaint on May 14, 2021.  Dkt Nos. 169-173; 176-177.  Defendants denied liability and every one of the essential factual allegations in this case while collectively asserting dozens of affirmative defenses.

**D.    Plaintiffs' Motion for Class Certification**

28.    On July 30, 2021, Plaintiffs moved to, among other things, certify the Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  Dkt No. 187. (the "Class Certification Motion").

29.    In connection with Plaintiffs' Class Certification Motion, Plaintiffs designated and served an expert report by Dr. Michael Hartzmark on the issues of (i) market efficiency for the Alta Mesa stock and warrants traded during the Class Period, (ii) the common methodology for calculating Class-wide damages for all Class Members, and (iii) the price impact on Alta Mesa stock and notes in response to the alleged corrective disclosures.  Dr. Hartzmark's opinions on market efficiency were based on a detailed event study concerning the movement of Alta Mesa's stock and warrant prices in response to new market information.

30.    Dr. Hartzmark was deposed following the submission of his expert report. This deposition required significant preparation by Lead Counsel to address the technical methodologies and findings by Dr. Hartzmark.

31.    On January 14, 2022, Dr. Hartzmark issued a Supplemental Expert Report regarding the market efficiency of, and ability to calculate damages on a class-wide basis for, Alta Mesa units.  Dkt. 237-1.

32.    Defendants propounded significant discovery on Plaintiffs in connection with class certification.  This discovery included detailed document requests served on each Plaintiff and their outside investment managers concerning their Class Period

investments in Alta Mesa securities. In total, Plaintiffs produced 65,687 pages of documents in response to Defendants' class certification document requests.

33. Additionally, Defendants served deposition notices and subpoenas on Plaintiffs and their outside investment managers to address class certification issues. In total, Defendants took seven depositions of Plaintiffs' representatives and investment managers.

34. After document and deposition discovery as described above, and after discussion with Plaintiffs regarding the class definition, Defendants chose not to oppose class certification. Plaintiffs filed an Unopposed Motion for an Entry of an Order Certifying the Class reflecting changes to the class definition based on their discussions with Defendants. Dkt. 240.

35. After considering the briefing submitted by the Plaintiffs, the Court granted Plaintiffs' class certification motion on January 24, 2022 (the "Class Certification Order"). Dkt. 241. The Court found the standards under Rules 23(a) and 23(b)(3) were satisfied and certified the Class of Alta Mesa investors in common stock, warrants and units, appointed Plaintiffs as Class Representatives, and appointed Lead Counsel as Class Counsel. *Id.*

### E.    Plaintiffs' work in the AMR Bankruptcy Leads to a Preservation of the D&O Policies and Amending the Complaint to Add AMR As a Defendant

36. On September 11, 2019, Alta Mesa Resources and Alta Mesa Holdings filed voluntary petitions for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the Southern District of Texas (the

"Bankruptcy Court"). *See In re Alta Mesa Resources Inc.*, Case No. 4:19-35133 (Bankr. S.D. Tex.).

37.     Like many corporate reorganization or liquidation plans, the AMR/AMH Chapter 11 Plan contained releases and injunction provisions that bar litigation claims by creditors and shareholders against debtors, their directors and officers, and affiliates. However, in response to an objection to such releases by Lead Plaintiffs FNY Partners Fund LP and Paul J. Burbach, Judge Isgur's Confirmation Order expressly preserved the Class's securities claims against Alta Mesa to the extent of Debtors' insurance policies (the "Section 510(b) Claims"), which would otherwise typically be subordinated to all other stakeholders and discharged under 11 U.S.C. § 510(b). The preservation of these claims was reflected in Alta Mesa's bankruptcy plan approved by the Bankruptcy Court on May 27, 2020 (the "Alta Mesa Bankruptcy Plan").

38.     On December 6, 2021, Plaintiffs filed their Third Consolidated Amended Complaint ("TAC"), which added 510(b) claims against AMR. Dkt. 218. AMR filed its Answer on January 5, 2022. Dkt. 232.

**F.     Litigation with AMH Litigation Trustee Regarding Insurance Proceeds**

39.     On July 27, 2021, David Dunn, as Trustee of the AMH Litigation Trust (the "AMH Trustee"), filed an adversarial action against Alta Mesa's directors and officers insurance ("D&O") carriers, each of the Lead Plaintiffs, and certain of the individual Defendants. *Dunn v. QBE Insurance Corporation*, Adv. Pro. No. 21-03792 (Bankr. S.D. Tex.). The Trustee sought to enjoin any payments being made from AMR's D&O policies

to the Lead Plaintiffs in connection with a settlement.  Among other things, the AMH Trustee argued that it had a priority to the D&O policies in connection with his adversarial action against certain former AMR officers, and that certain of the claims brought by the Lead Plaintiffs were not covered by the D&O policies.

40.    On August 18, 2021, Lead Plaintiffs filed a motion to dismiss the AMH Trustee's complaint, arguing, among other things, that the AMH Trustee lacked standing to seek a declaratory judgment, that the AMH Trustee did not have a superior right to the D&O proceeds, and that an injunction was not appropriate.

41.    On December 12, 2022, the Bankruptcy Court issued a Memorandum Opinion granting in part and denying in part Lead Plaintiffs' motion to dismiss the complaint.  (*Dunn v. QBE*, Dkt. 146).  Specifically, the Bankruptcy Court granted the motion to dismiss the claim for declaratory judgment, but denied the motion for preliminary injunction, essentially holding that the action was premature unless and until there was a settlement involving the D&O proceeds.  The adversarial action against Lead Plaintiffs was subsequently stayed and ultimately was voluntarily dismissed following the settlement of the AMH Trustee's action against certain former AMR officers.

### G.    Plaintiffs Conduct Extensive Fact Discovery

42.    After Defendants answered the Second Amended Complaint, Plaintiffs engaged in extensive discovery under the schedule set by the Court.  As discussed more fully below, this discovery included (i) document discovery; (ii) written interrogatories and requests for admission; (iii) depositions of Parties and nonparties; and (iv) discovery disputes presented to the Court for resolution.

43.     On June 10, 2021, the Court entered the parties' proposed Scheduling Order. (Dkt. 180).   On August 17, 2021, the Court entered the parties' (i) Stipulation and Protective Order (Dkt. 190); and (ii) Stipulated Electronic Discovery Protocol (Dkt. 191). Collectively, these documents governed fact discovery and related issues in the action, streamlining the process and minimizing disputes.

### 1.     Document Discovery

### a.     Defendant Document Discovery

44.     Document discovery in this Action commenced in April 2021 when Plaintiffs propounded their first set of document requests on each of the Defendants (except Alta Mesa, which was not yet named as a Defendant).   These requests sought documents concerning Alta Mesa's oil and gas operations and results, its accounting practices and the de-SPAC transaction, and its preparation, vetting and release of public statements about these topics.

45.     Plaintiffs also served second sets of document requests on each of the Defendants (except Alta Mesa) on March 24, 2022.   Plaintiffs served a request for production on Alta Mesa on May 6, 2022.

46.     Defendants' objections, responses, and answers to Plaintiffs' document requests gave rise to numerous discovery disputes and meet-and-confer sessions. Following these meet-and-confers, Lead Counsel and counsel for each Defendant engaged in numerous written and telephonic communications addressing a wide range of discovery disputes and issues, including the appropriate scope of the document productions, the relevance of the requested materials, the number and timing of depositions and other

discovery events, and privilege assertions over numerous withheld documents. Through their extensive meet-and-confers, counsel successfully resolved many discovery disputes, including the relevant time periods for the respective productions, the appropriate custodians and search terms for each Defendant group, and the production of documents from the related SEC investigation of Alta Mesa. While the Parties did reach an impasse on several discovery-related issues that had to be raised with the Court, their negotiated compromises eliminated the need to do so for most discovery issues.

47.     In response to Plaintiffs' requests for production, Defendants collectively produced approximately 4.2 million pages of documents. Plaintiffs' Counsel dedicated extensive resources and technology to organize, review, and analyze the materials produced by Defendants. All documents produced in the Action, including documents produced by third parties were placed in an electronic database to facilitate a review process that was cost and time-efficient. This database allowed Plaintiffs' Counsel to search for documents through Boolean-type searches, as well as conduct searches by author and/or recipient, type of document, date, and Bates number. The database gave Plaintiffs' Counsel the ability to efficiently search, cull and organize the important documents for use in depositions, expert analysis, summary judgment and trial. Artificial intelligence tools were also utilized to prioritize which documents to review first.

48.     Plaintiffs also conducted an in-person review of certain hardcopy High Mesa, Inc. (parent company of Alta Mesa Holdings, LLC) documents maintained in a storage facility Houston, Texas. Plaintiffs sent a team of lawyers to the storage unit to review hundreds of boxes of documents and scan potentially relevant documents.

### b.   Non-Party Document Discovery

49.   Plaintiffs also served document subpoenas on relevant nonparties that possessed key information concerning Alta Mesa's wells in the STACK, its accounting practices, the Control Entity Defendants' due diligence of Alta Mesa, and the de-SPAC transaction.  These nonparties included:

a.   Alta Mesa's auditors at KPMG LLP;

b.   Financial advisors that advised and/or conducted due diligence on behalf of Alta Mesa and/or Riverstone, including (i) Citigroup Global Markets, Inc.; (ii) J.P. Morgan Securities LLC; (iii) Ernst & Young LLP; (iv) Tudor, Pickering, Holt & Co. and (v) BDO USA, LLP;

c.   Technical oil and gas advisors consultants and reserve auditors, including (i) Ryder Scott Company, L.P.; (ii) Meridian Energy LLC; (iii) Muse, Stancil & Company; (iv) Pinnacle Energy Services, LLC; (v) W.D. Von Gonten & Company; and (vi) Schlumberger Technology Corporation;

d.   Other oil and gas operators in the STACK, including (i) Devon Energy; (ii) Continental Resources; (iii) Chesapeake Energy; (iv) Coterra Energy Inc.; (v) Marathon Oil Company; and (vi) Ovintiv Inc.; and

e.   David Dunne, as Trustee of the AMH Litigation Trust.

50.   These discovery requests were also subject to multiple meet-and-confers between Lead Counsel and counsel for the nonparties.  Following these meet-and-confers, the nonparties collectively produced over 170,000 pages of responsive documents that were reviewed and analyzed by Lead Counsel.  With regard to the High Mesa document

production, Lead Counsel and Defendants' counsel jointly reviewed materials contained in hundreds of boxes in Houston, Texas, for the purpose of determining both relevance and privilege. The documents obtained through Plaintiffs' subpoenas to these nonparties were critical to the successful prosecution of the case and Plaintiffs' significant recovery for the Class.

51.     Lead Counsel, reviewed and analyzed the documents produced by nonparties with the aim of preparing for fact witness depositions, expert discovery, summary judgment motions and trial.

### 2.     Interrogatories and Requests for Admission

52.     On December 14, 2023, various Defendants served interrogatories on Plaintiffs. Plaintiffs responded to the majority of the interrogatories on January 13, 2023, but objected to several interrogatories on the grounds that they were premature contention interrogatories. After various meet-and-confers, on March 30, 2023 and July 18, 2023, Plaintiffs supplemented their responses to the contention interrogatories with dozens of pages of detailed responses. These detailed responses required Plaintiffs to identify all facts elicited during discovery demonstrating the falsity of the alleged misstatements and omissions and certain Defendants' control. The process of responding to these comprehensive written discovery requests helped Plaintiffs and Lead Counsel assess the overall strengths and weaknesses of their claims.

53.     Plaintiffs further supported their claims by serving and insisting upon Defendants' meaningful responses to written interrogatories and requests for admissions. On March 28, 2023, Plaintiffs served each Defendant with a set of interrogatories seeking

detailed information concerning their investment in the relevant entities, the Business Combination, Alta Mesa's oil and gas production, Kingfisher's business and Alta Mesa's accounting practices.

54.    On July 31, 2023, Plaintiffs served dozens of Requests For Admission ("RFAs") on each Defendant.  These RFAs sought to confirm the details around the alleged misstatements (who made them and when) and various other facts related to falsity and control.  Defendants responded and objected to the RFAs on August 30, 2023.  Following reviewing the responses and objections, Plaintiffs met and conferred with several of the Defendants in an effort to understand certain of the responses and objections

55.    Also on July 31, 2023, Defendants served two hundred twenty-two (222) RFAs on Class Plaintiffs.  On August 30, 2023, Plaintiffs responded and/or objected to each of these RFAs.

### 3.    Deposition Discovery

56.    In addition to written and document discovery, the parties conducted more than 40 fact depositions.  These depositions included each of the Defendants, former employees associated with the corporate defendants and various third parties, as detailed below.

57.    Plaintiffs deposed the following Management Defendants, James Hackett (former COO of Kingfisher and Chairman of the Board), Hal Chappelle (former CEO), Mike Ellis (former founder of Alta Mesa and COO), and Ronald Smith (former Chief Accounting Officer), as well as the following individuals formerly associated with Alta

Mesa Resources: Homer "Gene" Cole, Kevin Bourque, Craig Collins, Scott Grandt, Tamara Sheils and Tim Turner.

58. Plaintiffs also deposed various individuals and Individual Defendants associated with the Control Entity Defendants, including Michael Christopher (ARM Energy), Bo Dunne (ARM Energy), William McMullen (Bayou City and former AMR Board member), Andrew Koehler (Bayou City), Catherine Cusimano (HPS), Donald Dimitrievich (HPS and former AMR Board member), Jeffrey Hostettler (HPS), Stephen Coats (Riverstone and former Silver Run II general counsel), David Leuschen (Riverstone and former AMR Board member), Pierre Lapeyre Jr. (Riverstone and former AMR Board member), Thomas Walker (Riverstone and Silver Run II CFO), Olivia Wassenaar (Riverstone) and Kevin Wang (Riverstone).

59. Plaintiffs also deposed each of the "unaffiliated" individual Board Defendants: William Gutermuth, David Sinclair, Jeffrey Tepper and Diana Walters.

60. Plaintiffs' Counsel also deposed representatives from the following relevant nonparties: Citigroup (Silver Run and AMH's financial advisor), KPMG (AMR's auditor), TPH (Silver Run's financial due diligence advisor), Ryder Scott (AMH and AMR's reserve auditor), and Meridian (technical advisor to Riverstone and Silver Run).

61. Plaintiffs' Counsel also served Rule 30(b)(6) deposition notices on each of the corporate defendants – *i.e.*, AMR, Riverstone, ARM Energy, Bayou City and HPS. The 30(b)(6) topics were extensively negotiated by counsel. Many of the individuals listed above were designated as corporate representatives on behalf of the corporate defendants.

AMR also designated one of its bankruptcy advisors, Robert Albergotti, as its Rule 30(b)(6) witness.

62. In addition to the depositions noticed by Plaintiffs, Plaintiffs also (cross)examined six former employees of Alta Mesa (who Plaintiffs' counsel had identified in their investigation and disclosed pursuant to Rule 26(a)(1)(A)) at their depositions noticed by Defendants.

63. Plaintiffs also attended the depositions of representatives of the Individual Action Plaintiffs.

64. Each of these depositions required extensive preparation by Plaintiffs' Counsel, including a thorough review and analysis of relevant witness-specific documents, drafting detailed deposition outlines, and compiling comprehensive exhibit binders. The testimony obtained through these depositions was valuable in enabling Plaintiffs and counsel to develop the evidentiary record and understand the strengths and weaknesses of Plaintiffs' claims.

65. Additionally, Plaintiffs attended several depositions taken in the bankruptcy proceedings and related adversarial proceedings, where the testimony related to the claims in this Action.

### 4. Discovery Disputes

66. Although Plaintiffs' Counsel made significant efforts to reduce discovery disputes, the Parties reached several impasses during the course of fact discovery that necessitated the Court's intervention. Plaintiffs presented five such discovery-related disputes to the Court, as summarized below.

67.     On May 5, 2022, Plaintiffs and Defendants HPS and Dimitrievich filed a joint letter pursuant to the Court's Procedures regarding a discovery dispute.  Plaintiffs believed that (a) HPS and Dimitrievich were improperly limiting their search for documents to only two custodians and unreasonably narrow search terms and (b) HPS and Dimitrievich were improperly limiting their production to "internal" documents".  (Dkt. 242).  HPS and Dimitrievich argued their production was sufficient.  After oral argument, the Court ordered that HPS produce additional limited categories of documents.  Dkt. 253.

68.     On January 11, 2023, Plaintiffs and Defendant HPS filed a joint letter pursuant to the Court's Procedures regarding another discovery dispute.  Dkt. 267.  This dispute concerned HPS's document production "volumes 5 and 6", which were apparently produced in a related proceeding, which HPS refused to identify.  Due to HPS's inadvertent production of certain documents from said productions, Plaintiffs were aware of those production volumes and that they may be relevant.  After oral argument, the Court did not require HPS to produce volumes 5 and 6.  Dkt. 276.

69.     On May 5, 2023, Plaintiffs, the Individual Action Plaintiffs, and Defendants submitted a joint letter pursuant to the Court's Procedures regarding a dispute about the length of Defendant Chappelle's deposition. Dkt. 326.  Given Mr. Chappelle's central role in the various aspects of this complex case, Plaintiffs sought to depose Mr. Chappelle for two days, rather than the one-day limit prescribed by the Fed. R. Civ. P. 30(d)(1).  On June 26, 2023, the Court ordered that the Class Plaintiffs could depose Mr. Chappelle for an additional 1.5 hours (and that the Individual Action Plaintiffs could depose Defendant Chappelle for one additional hour).  Dkt. 366.

22

70.     On July 12, 2023, Plaintiffs and Defendant AMR submitted a joint letter pursuant to the Court's Procedures regarding a dispute concerning the Rule 30(b)(6) deposition of, and interrogatory responses from, Defendant Alta Mesa Resources, Inc.  Dkt. 386.  Plaintiffs argued that Alta Mesa Resources, Inc.'s Rule 30(b)(6) designee did not substantively respond to Plaintiffs' questions into various deposition topics and it was improper for Alta Mesa Resources, Inc. to attempt to avoid answer those questions merely because it was bankrupt.  Plaintiffs likewise argued that Alta Mesa Resources could not avoid answering interrogatories because it was bankrupt and purportedly "lacks the information necessary to answer the interrogatories."   On August 29, 2023, the Court ordered the Parties to continue conferring about the issue.  Dkt. 420.

71.     On July 13, 18 and 19, 2023 the parties submitted letters (Dkt. Nos. 390, 398, 400) regarding certain Defendants' refusal to produce transcripts taken from a related adversarial action in the Alta Mesa bankruptcy.  On August 16, 2023, the Court overruled Defendants' objections to the production of the transcripts.  Dkt. 412.

**H.     Plaintiffs' Engaged in Extensive Expert Discovery**

72.     During the course of the Action, Plaintiffs retained several experts and consultants on a range of issues relevant to the claims.  These experts and consultants were engaged to address (i) technical reservoir engineering and geological issues concerning Alta Mesa's upstream oil and gas business, (ii) industry-specific issues concerning Kingfisher Midstream's business, (iii) accounting issues and financial projections, (iv) the duties of directors and officers in connection with due diligence and SEC filings, and (v)

economic issues including market efficiency, materiality, and Class-wide damages for the Alta Mesa securities.

73.    Plaintiffs devoted considerable time and effort working with these experts and consultants on their designated subjects, including analyzing documents produced by Defendants and testimony obtained through fact depositions.    Many of the above-referenced experts submitted expert reports and/or rebuttal reports in this litigation.    As noted above, Dr. Hartzmark submitted a detailed expert report with voluminous supporting exhibits in support of class certification.    In addition, during expert discovery the following Plaintiffs' experts submitted reports: Harold McGowen, Taylor Kirkland, Frank Gagliardi, James Johnson, Paul Regan, and Steven Feinstein.    Further, in response to Defendants' expert reports, the following Plaintiffs' experts submitted rebuttal reports: Taylor Kirkland, Frank Gagliardi and Adam Badawi.

74.    Each of Plaintiffs' eight experts was deposed.    Plaintiffs' counsel spent considerable time preparing for these depositions.    Plaintiffs also reviewed and analyzed the expert witness reports proffered by the Individual Action Plaintiffs and attended the depositions of those experts.

75.    Defendants collectively proffered eight expert witnesses.    Like Plaintiffs' experts, through opening and rebuttal reports, Defendants' experts offered testimony in the fields of oil and gas, accounting, the duties of officers and directors and financial damages. Plaintiffs' counsel devoted significant time to analyzing each of the Defendant experts' reports, working with Plaintiffs' experts on rebuttal reports, and deposing each of the eight Defense experts.

76.    Ultimately, five of Plaintiffs' experts – Harold McGowen, Frank Gagliardi, Taylor Kirkland, James Johnson and Dr. Michael Hartzmark – testified live at the jury trial prior to the resolution of the case, and Plaintiffs' other three experts were prepared to testify had the trial continued.

## I.    Plaintiffs Opposed Two Rounds of Summary Judgment Motions

77.    Certain Defendants moved for "early" summary judgment on August 31, 2023, the same day opening expert reports were exchanged.  First, Defendant Dimitrievich moved for summary judgment on the Section 10(b) and 20(a) claims against him, arguing, among other things, that Plaintiffs did not have sufficient facts to prove he acted with scienter.  Dkt. 422.  Second, Defendant McMullen moved for summary judgment on the Section 10(b) and 20(a) claims against him, arguing, among other things, that Plaintiffs did not have sufficient facts to prove he acted with scienter and that he was not a "maker" of any false statements.  Dkt. 427.  Third, Defendants HPS, Bayou City and ARM Energy jointly moved for summary judgment on the 20(a) claims against them, arguing, among other things, that as the "sellers" in the Business Combination they legally could not control the Proxy and that post-Business Combination they each only had minority investments in and thus could not control Alta Mesa Resources.  Dkt. 423.

78.    On September 21, 2023, Plaintiffs opposed each of the three early summary judgment motions.  Dkt. Nos. 445, 446 and 447.  Plaintiffs' opposition briefs were accompanied by a Declaration of Andrew J. Entwistle (Dkt. 444), which attached 202 exhibits in support of Plaintiffs' oppositions.  Plaintiffs believed these exhibits, along with

the oppositions themselves, demonstrated with overwhelming evidence of wrongdoing and control by the various early-moving Defendants.

79.    Defendants Dimitrievich, McMullen, HPS, Bayou City, and ARM Energy submitted replies on September 28, 2023.  Dkt. Nos. 463, 466, 468.

80.    On December 22, 2023, the deadline for filing dispositive motions, various Defendants filed four additional motions for summary judgment and other Defendants filed several joinders.  First, Defendants Riverstone, Coats and Walker moved for summary judgment on the Section 20(a) claims against them, arguing that they did not have control with respect to the alleged misstatements and/or that they had a viable "good faith" defense. Dkt. 518.  Second, the Proxy Defendants (Alta Mesa Resources, Riverstone Holdings James Hackett, William Gutermuth, Jeffrey Tepper, and Diana Walters) filed a summary judgment motion on the Section 14(a) claims against them, arguing, among other things, that the statements in the Proxy were not false and/or were protected by the PSLRA safe harbor.  Dkt. 520.  Third, Defendants Alta Mesa Resources, Chappelle, Ellis and Smith moved for summary judgment on the Section 10(b) and 20(a) claims against them, arguing, among other things, that the challenged statements were not actionable and that Plaintiffs could not establish loss causation.  Dkt. 688.  Fourth, the "AMR Directors" (i.e. David M. Leuschen, Pierre F. Lapeyre Jr., Donald R. Sinclair, James T. Hackett, William D. Gutermuth, Jeffrey H. Tepper, and Diana J. Walters) moved for summary judgment on the Section 10(b) claims and 20(a) claims against them, arguing, among other things, that the statements they made in the 2017 Form 10-K were not actionable and that Plaintiffs did not have sufficient evidence of their control.  Dkt. 689.

81.     On January 19, 2024, Plaintiffs filed four separate oppositions to the above-referenced motions for summary judgment.   Dkt. Nos. 570, 571, 572, and 573.   The oppositions addressed each of Defendants' arguments and were accompanied by a second Declaration of Andrew J. Entwistle attaching an additional 193 exhibits.

82.     On February 2, 2024, Defendants filed replies in further support of their summary judgment motions.   Dkt. Nos. 626, 629, 630, 631.

83.     On April 24, 2024, the Court held oral argument on the pending summary judgment motions.   The parties submitted demonstratives in advance of the oral argument and the argument lasted approximately 3.5 hours.   Dkt. 758.

84.     On August 12, 2024, the Court issued a Memorandum Opinion and Order ruling on the pending summary judgment motions.   Dkt. 778.   The court narrowed the claims by dismissing: (i) all claims arising out of Alta Mesa's March 29, 2018 Form 10-K; (ii) Defendants Dimitrievich, Leuschen, Lapeyre, Coats, Walker, Sinclair and McMullen; and (iii) Defendants HPS, Bayou City and ARM Energy, except for Section 20(a) claims associated with statements made by Defendant Chappelle in August 2017.   The Court otherwise denied the summary judgment motions.

**J.      The Parties Briefed and Filed 10 _Daubert_ Motions**

85.     Also on December 22, 2023 (also the deadline for summary judgment motions), the parties filed _Daubert_ motions challenging the majority of the parties' experts. Plaintiffs filed _Daubert_ motions against Defendants' expert Robert Rasor (Dkt. 513), Edward Fetkovich (Dkt. 516), Charles Whitehead (Dkt. 519) and John Fiebig (Dkt. 525). Defendants filed _Daubert_ motions against Plaintiffs' experts James Johnson (Dkt. 507),

Taylor Kirkland (Dkt. 508), Harold McGowen (Dkt. 509), Adam Badawi (Dkt. 510), Steven Feinstein (Dkt. 511) and Paul Regan (Dkt. 512).

86.    The parties filed oppositions on January 18, 2024 (Dkt Nos. 553, 555, 557, 549, 559, 551, 566, 564, 567, 565) and replies on February 2, 2024 (Dkt. Nos. 607, 608, 609, 610, 612, 613, 614, 615).

87.    In its August 12, 2024 Memorandum Opinion and Order ruling on the summary judgment motions (Dkt. 778), the Court denied all of the *Daubert* motions but permitted the parties to reassert the arguments at trial.

88.    Successfully opposing Defendants' *Daubert* motions was crucial to Plaintiffs' case-in-chief.  Although Plaintiffs' *Daubert* motions were also denied without prejudice, briefing those motions enabled Plaintiffs to prepare trial objections, focus their planned cross-examination of Defendants' experts and evaluate the strengths and weaknesses of Defendants' case.

### K.    The Parties Submitted Comprehensive Pretrial Submissions Including Dozens of Motions

89.    Plaintiffs worked with Defendants starting in early 2024 to prepare and submit the pretrial materials required by the Court's procedures.  The materials were originally prepared in anticipation of a May 2024 trial date, which was ultimately postponed until October 2024 and then again until November 2024.  During this period, the pretrial materials were adjusted significantly to account for the Court's ruling on the summary judgment motions and interim settlements with certain Defendants and by the Individual Action Plaintiffs.

90.   After dozens of meet-and-confers, on October 21, 2024, the parties submitted a one hundred thirty-one (131) page Joint Pretrial Order (Dkt. 868), which attached the Parties' Combined Exhibit List including more than a thousand exhibits (Dkt. 868-1), the Joint Trial Worksheet (Dkt. 868-2), Deposition Designations (Dkt. 868-2, 868-3), proposed Voir Dire Questions (Dkt. 868-5), a several hundred page combined proposed Jury Charge (Dkt. 868-6) and competing proposed Verdict Forms (Dkt. Nos. 868-7, 868-8).

91.   The Parties also filed and briefed numerous other pretrial motions, including:

- Plaintiffs filed seven motions *in limine* (Dkt. Nos. 863, 864, 867, 869, 871, 872, 873);

- Various Defendant/Defendant groups filed their own motions *in limine* (Dkt. Nos. 874, 878, 881);

- Defendant HPS filed a Motion for Judgment on the Pleadings (Dkt. 782). Defendant ARM Energy joined HPS's motion  (Dkt. 784);

- Defendant Bayou City filed a Rule 12(b)(1) Motion to Dismiss for Lack of Standing, or, in the Alternative, Motion for Judgment on the Pleadings (Dkt. 783);

- Plaintiffs filed a Motion for an Order (1) that Elements of the Fraud on the Market Presumption of Reliance Were Established by the Class Certification Order and/or (2) Taking Judicial Notice that the Elements of the Fraud on the Market Presumption are Met in This Case (Dkt. 808);

- Plaintiffs filed a Motion to Bifurcate and to Preclude Evidence as to Individualized Issues, Including Testimony by Class Representatives, During the Class-Wide Phase of Trial (Dkt. 809);

- Plaintiffs filed a Request for Judicial Notice and Motion for an Order Deeming Certain Admitted Facts Established (Dkt. 844);

- Bayou City filed an Objection to Trial by Consent (Dkt. 849);

- Bayou City filed a Motion to Exclude evidence regarding its Joint Well Development Program (Dkt. 852); and

- Bayou City filed an Emergency Motion to Stay Trial to Avoid Due Process Violation and Request for Expedited Briefing Schedule.

92.     Plaintiffs' Counsel devoted significant resources to briefing each of the above-referenced motions.  Plaintiffs' Counsel also engaged in meet-and-confers on the motions and were fully prepared to argue each motion at the pretrial conference.

93.     Also in preparation for trial, Plaintiffs served trial subpoenas on more than two dozen individual witnesses.

94.     As set forth in more detail below, following the Court's ruling on Summary Judgment, and before the pretrial conference, Plaintiffs agreed to settle their claims against HPS and ARM Energy, and to release their (dismissed) claims against Dimitrievich, subject to the Court's approval.  During that time, the Individual Action Plaintiffs settled their claims against all Defendants.  Following the November 6, 2024 pretrial conference, and before jury selection, Plaintiffs agreed to settle their claims against Bayou City and their (dismissed) claims against Defendant McMullen.

## L.     The Jury Trial

95.     Counsel expended significant effort preparing for and trying this case. Plaintiffs' Counsel's trial team included nearly twenty individuals including attorneys, paralegals, legal assistants, and eDiscovery and litigation technology support staff.  The trial team spent a considerable amount of time on a wide range of tasks, including preparing demonstratives and exhibits, witness examination outlines, addressing evidentiary and

other legal issues, and other critical tasks necessary to create a smooth presentation for the jury.

96.    Preparing for and trying the case was also a significant logistical effort. Among other things, counsel set up a temporary office and "war room" in Houston to accommodate the trial team, witnesses and exhibits.  The team also set up technology in the courtroom and Court's attorney conference rooms.  In addition, Plaintiffs' trial team prepared both an electronic database and multiple sets of hard-copy binders to organize and manage the joint trial exhibits.

97.    The Court held a pretrial conference on November 6, 2024.   Trial commenced that afternoon with *voir dire* and, after the Court empaneled six jurors and two alternates, trial continued the next day with opening statements.

98.    Trial proceeded for three weeks during which Lead Plaintiffs completed more than half of their case in chief, eliciting testimony from the following expert and fact witnesses:   P.J. Burbach, Toni Inscoe, Harold McGowen, Frank Gagliardi, Taylor Kirkland, Tamara Sheils, Tim Turner, Harlan Chappelle, James Johnson, Craig Collins, Scott Grandt, Pierre Lapeyre Jr. and James Hackett.  During the three weeks of trial, the Parties collectively admitted 114 trial exhibits, in addition to the 52 documents that were pre-admitted by agreement of the Parties.  The Parties also argued numerous evidentiary and other disputes during the course of the jury trial.

99.    Plaintiffs' counsel were fully prepared to try the case through verdict. However, as detailed below, Plaintiffs and the remaining Defendants agreed to resolve the case during the Thanksgiving break.

### M.    Mediation with Phillips ADR and the Settlements

100.    The Parties engaged in various efforts to settle the Action.  These included a formal mediation session (via Zoom given Covid restrictions) on January 28, 2022 with former United States District Judge Layn R. Phillips.  In advance of this mediation, the Parties exchanged detailed mediation statements with supporting exhibits referencing key documents and information obtained during discovery.

101.    Although the Parties were unable to settle the Action at this mediation session, they continued to negotiate with the assistance of Judge Phillips and his team going forward.  Judge Phillips' work with the Parties intensified following the Court's decision on the Defendants' motions for summary judgment and as trial approached.

102.    In September 2024, Plaintiffs and Defendants HPS and Dimitrievich reached an agreement in principle to settle the claims asserted in the Action against those Defendants for a total of $6.3 million in cash ("The HPS Settlement").  The HPS Settlement Stipulation was executed by those parties on October 16, 2024.

103.    On October 28, 2024, Plaintiffs filed an Unopposed Motion for an Order Preliminarily Approving Settlement with the HPS Defendants.  Dkt. 891.

104.    In October 2024, Plaintiffs and Defendant ARM Energy reached an agreement in principle to settle the claims asserted in the Action against those Defendants for a total of $3 million in cash ("The ARM Energy Settlement").  The ARM Energy Settlement Stipulation was executed by those parties on October 29, 2024.

105.    On November 5, 2024, Plaintiffs filed an Unopposed Motion for an Order Preliminarily Approving Settlement with ARM Energy Holdings, LLC.  Dkt. 937.

106.   On November 6, 2024, between the morning pretrial conference and the afternoon jury selection, Plaintiffs and Defendants Bayou City and McMullen reached an agreement in principle to settle the claims asserted in the Action against those Defendants for a total of $2 million in cash ("The Bayou City Settlement").  The Bayou City Settlement Stipulation was executed by those parties on November 8, 2024.

107.   On November 15, 2024, Plaintiffs filed an Unopposed Motion for an Order Preliminarily Approving Settlement with Bayou City Energy Management LLC and William McMullen.  Dkt. 946.

108.   After three weeks of trial and following the Thanksgiving break, Plaintiffs and the remaining Defendants (Alta Mesa Resources, Harlan Chappelle, Stephen Coats, Michael Ellis, William Gutermuth, James Hackett, Pierre Lapeyre Jr., David Lesuchen, Donald Sinclair, Ronald Smith, Jeffrey Tepper, Thomas Walker, Diana Walters and Riverstone Holdings) accepted a mediators' proposal to resolve the remaining claims for $115 million ("The Riverstone/AMR Settlement").  The Riverstone/AMR Settlement Stipulation was executed by those parties on January 6, 2025.

109.   On January 6, 2025, Plaintiffs filed a motion seeking preliminary approval of all settlements, including providing notice to the Class.  Dkt. 1019.

110.   On January 17, 2025, the Court granted preliminary approval of the Settlements.  Dkt. 1020.  The Court set a hearing for final approval of all three Settlements for April 30, 2025, at 11:00 a.m.

111.   Each of the Plaintiffs/Class Representatives supports the Settlements as being fair, reasonable, and adequate and in the best interest of the Class.  They agree that

the Settlements represent a favorable recovery for the Class, particularly given the multiple risks in continuing to litigate the Action as detailed below.

## III.    RISKS OF CONTINUED LITIGATION

112.    Based on the substantial efforts outlined above, Plaintiffs' Counsel developed and presented significant evidence supporting Plaintiffs' claims and were prepared to complete the trial to verdict.    However, Plaintiffs' Counsel realize that Plaintiffs face considerable risks, the most significant of which are outlined below. Plaintiffs and their counsel carefully considered each of these risks in reaching the Settlement.

### A.    Risks Concerning Liability

113.    Plaintiffs and their counsel faced significant challenges and defenses on multiple elements of each of the claims asserted against Defendants.    Defendants vigorously disputed their liability for the alleged fraudulent misstatements and omissions during the Class Period, and for the allegedly false and misleading Proxy issued in connection with the Business Combination.

114.    The Alta Mesa Defendants argued at trial that they made no false statements or omissions in violation of Section 10(b) or Section 14(a) of the Exchange Act.  They have consistently asserted that they never misrepresented or omitted information regarding Alta Mesa's business prospects or operational results, that any misrepresentations were immaterial, and that, in any event, the full truth was known to the market.

115.    Defendants also contended that there is no evidence that the alleged misstatements were made with scienter, as required for the Section 10(b) claims.

Defendants Chappelle, Ellis and Hackett testified at deposition and trial that they sincerely believed the public statements about Alta Mesa and argued that their actions (such as investing in Alta Mesa) were inconsistent with a belief the Company would rapidly fail.

116.    Regarding the Section 14(a) claims, the Proxy Defendants argued that Plaintiffs could not prove they acted at least negligently, or, in the alternative, that Defendants could prove they acted in good faith and, therefore, did not intend to deceive Silver Run shareholders who approved the deal in the February 6, 2018 vote.

117.    The Control Defendants vigorously disputed that they controlled the allegedly false and misleading statements, and that they acted in faith, such that they would not be liable to Plaintiffs even if the statements were false.  Indeed, the Control Defendants had already significantly narrowed the claims against them through their partially successful motions for summary judgment.

118.    Although Plaintiffs believe the evidence strongly supports falsity, scienter, and control, there remains a significant risk that the jury would find otherwise for some or all of the alleged misstatements.  The Settlement therefore represents a significant recovery for the Class given the liability risks posed by continued litigation.

## B.    Risks Related to Loss Causation and Damages

119.    Plaintiffs also recognized the risk related to proving loss causation for the alleged misstatements and omissions.   As previewed in their motions for summary judgment, Defendants would argue that Alta Mesa's stock price declines were caused (in part or entirely) by factors other than the misstatements and subsequent corrective disclosures alleged in the Third Amended Complaint.

120.    Defendants assert that Plaintiffs cannot prove that any of the alleged corrective disclosures had an impact on the price of Alta Mesa's stock, units or warrants. Specifically, Defendants' expert witness, Rene Stulz, Ph.D. has opined that the regression analysis performed by Plaintiffs' expert, Steven P. Feinstein Ph.D., CFA, did not establish loss causation.  Further, Defendants argue that, because Dr. Feinstein did not disaggregate the effect of multiple simultaneous corrective disclosures -- including corrections of misstatements that were dismissed from the case at summary judgment -- the jury would be unable to calculate the amount of damages attributable to any remaining alleged misstatements.

121.    Defendants and their expert also vigorously argued that Plaintiffs could not be entitled to all of the damages claimed because Dr. Feinstein calculated damages utilizing multi-day trading windows with respect to several of the alleged corrective disclosures. According to Defendants and Dr. Stulz, in an efficient market, any price correction from a public announcement should be fully realized within a single trading day.  Although Defendants' argument goes against the weight of economic theory and observation, there remained a chance the jury would credit Dr. Stulz testimony following a "battle of the experts."

122.    Plaintiffs and their expert, Dr. Feinstein, had strong responses to each of Defendants' loss causation and damages arguments.  Nonetheless, if the jury were to accept any of Defendants' loss causation or damages arguments, the Class's potential recovery could be significantly diminished or eliminated.

## C.    Risks Related to the Bankruptcy of a Primary Corporate Defendant

123.    Alta Mesa's bankruptcy posed additional risks to a meaningful recovery for the Class.  Alta Mesa, as a bankrupt entity, had limited ability to pay any significant monetary damages awarded against it at trial.  Accordingly, even if Plaintiffs were successful in proving their claims against Alta Mesa, such claims were, by order of Judge Isgur in the bankruptcy case, limited to the proceeds of Alta Mesa's director and officer insurance policy towers.

124.    Riverstone Holdings, LLC, despite managing tens of billions of dollars belonging to its clients and the various funds it sponsors, employs a corporate and capital structure that would complicate and impede, and potentially limit, Plaintiffs' ability to collect a judgment.

125.    In addition, none of the Alta Mesa Individual Defendants has personal assets adequate to pay a judgment that is even close to the claimed Class-wide damages.  (Their significant Alta Mesa stock holdings were rendered worthless given the Company's bankruptcy).  Meanwhile, a jury may have assigned to Alta Mesa most or all of the fault for the alleged misrepresentations, thereby reducing or eliminating the liability of the other Defendants.

126.    Given the Company's illiquidity and the inability of the Alta Mesa Individual Defendants to make Plaintiffs and the Class whole, Plaintiffs and Plaintiffs' Counsel submit that the Settlement represents an outstanding recovery.

### D.    Risks Related to Phase II of Trial

127.    Defendants advised the Court that they would seek to overcome the presumption of reliance with respect to at least some absent Class members in a second phase of trial, if Plaintiffs prevail on their Section 10(b) claims.  If the Court were to permit this, any damages awarded to absent Class members on the Section 10(b) claims would be delayed and put at further risk.  And even Class members who prevailed on reliance in Phase II would expend time and money protecting their claims.  The Settlement avoids all of this cost and risk.

### E.    Risks Related to Appeal

128.    Even assuming a favorable outcome for the Class at trial, Defendants would certainly lodge a multifaceted appeal.  This complex case raised numerous questions of law with sufficient novelty and nuance to present Plaintiffs with substantial appellate risk.  For example, the United States Court of Appeals for the Fifth Circuit, to date, has not yet ruled upon these two unique legal issues:  (i) whether allegations of negligence, as opposed to scienter, are sufficient to pleading and proving a Section 14(a) claim; and (ii) whether Plaintiffs were entitled to "benefit-of-the-bargain" stylized damages in the event the jury found Defendants engaged in a deliberate violation of Section 14(a).

129.    If a Plaintiffs' verdict were overturned on appeal, Plaintiffs and the Class would face the prospects of waiting potentially years for any recovery, a new trial at significant additional cost, and/or a reduced recovery or no recovery at all.

## IV.    NOTICE TO THE CLASS

130.    On March 27, 2024, the Court entered an Order Granting Class Representatives' Uncontested Motion for Entry of An Order Approving Notice of Pendency of Class Action, Notice Procedures and Appointment of Notice Administrator. (Dkt. 721).  Among other things, the Order authorized Class Counsel to retain JND Legal Administration ("JND" or the "Claims Administrator") to distribute a postcard Class Notice ("Class Notice") to all Class members who can be identified with reasonable effort.

131.    As described in the First Declaration of Luiggy Segura Regarding (A) Notice Dissemination; (B) Publication/Transmission of Summary Notice; and (C) Requests for Exclusion Received to Date, dated May 24, 2024 (Dkt. 774), JND mailed 21,004 Class Notices to parties identified as potential Class Members and to Nominees for the purposes of forwarding the Class Notice to additional potential Class Members.  To disseminate the Notice, JND obtained information from Alta Mesa and from certain banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.

132.    The Court's January 17, 2025 Order Preliminarily Approving the Settlement and Providing for Notice (the "Preliminary Approval Order") directed that a Postcard Notice be disseminated to the Class.  The Preliminary Approval Orders also set an April 9, 2025 deadline for Class Members to submit objections, if any, to the Settlements, the Plan of Allocation, and/or the Fee and Expense Application.

133.    In accordance with the Preliminary Approval Order JND disseminated the settlement Postcard Notice and published the Summary Notice.  The Postcard Notice contained a link to the settlement website so Class members could find a description of the

Action and the claims asserted, the Settlements, and the proposed Plan of Allocation. The settlement website further describes Plaintiffs' Counsel's intent to apply for an award of attorneys' fees in an amount up to 33% of the Settlement Fund and for payment of Litigation Expenses in an amount up to $7 million. The settlement website additionally notifies Class Members of their rights to participate in the Settlements or object to the Settlements or fee application.

134.   As was done in connection with the Class Notice, to disseminate the settlement Postcard Notice, JND obtained information from Alta Mesa and from certain banks, brokers and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Notice Dissemination; (B) Publication/Transmission of the Summary Notice; and (C) Continuation of Call Center Services and Website ("Segura Decl."), attached hereto as Exhibit 2, at ¶¶ 3, 7-9. As of March 21, 2025, JND disseminated an aggregate of 21,352 settlement Postcard Notices to potential Settlement Class Members and nominees. *Id.* ¶ 10.

135.   JND also arranged for the Summary Notice to be published in *The Wall Street Journal* and over the *PR Newswire* in accordance with the Preliminary Approval Order. *Id.* ¶ 11. The Summary Notice further advised potential members of the Class about the Settlements, including their rights to participate in, or object to the Settlements. In addition, JND updated the previously established website, www.AltaMesaSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlements and access to downloadable copies of the Notice

and Claim Form, as well as copies of the Stipulations, Preliminary Approval Orders and Operative Complaint.  *See* Exhibit 2 (Segura Decl.) ¶ 12.

136.    The deadline for Class Members to file objections, if any, to the Settlements, the Plan of Allocation and/or the Fee and Expense Application is April 9, 2025.  To date, no objections to any of the Settlements, the Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS

137.    The proceeds of the Settlement, after deducting of all Taxes, Tax Expenses, Notice and Administration Costs, and attorneys' fees and Litigation Expenses awarded by the Court (the "Net Settlement Fund"), will be distributed to eligible Class Members according to a plan of allocation approved by the Court.

138.    Plaintiffs' proposed plan of allocation (the "Plan of Allocation" or "Plan") is set forth in the Notice provided to potential Class Members.  Plaintiffs' Counsel developed the Plan of Allocation in consultation with Plaintiffs' loss causation and damages expert, Dr. Feinstein.  The Plan of Allocation creates a framework for equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws.  Plaintiffs and their Counsel believe that the proposed Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund to Class Members who submit valid Claim Forms ("Authorized Claimants").

139.    The Plan is consistent with allocation methods approved by courts in this Circuit.

140.   The Net Settlement Fund will be distributed *pro rata* to eligible Class Members based on their Recognized Loss Amount related to that fund.  Recognized Losses will be calculated based on (i) the type and number of Alta Mesa Securities purchased/acquired, (ii) when the securities were purchased/acquired, (iii) whether the securities were held or sold, and (iv) if sold, the date and price at which they were sold and (v) for shares of common stock, whether the shares were owned as of January 22, 2018. The recognized loss for shares held as of January 22, 2018 will be subject to a multiplier of 1.2 (*i.e.* a 20% increase) in light of the burden of proving the Section 14(a) relative to the Section 10(b) Claims, as well as the maximum potential damages for Class members with Section 14(a) Claims.  Distribution Amounts are capped by the Claimant's market loss on all of his, her or its purchases or acquisitions of Alta Mesa Securities during the Class Period.  Thus, if the Claimant had a market gain with respect to these transactions, the Claimant is not eligible for payment.  Likewise, if a Claimant suffered an overall market loss with respect to his, her or its purchases or acquisitions of Alta Mesa Securities during the Class Period, but that market loss was less than the Distribution Amount calculated, the Distribution Amount is limited to the amount of the actual market loss.

141.   Plaintiffs and their Counsel believe that the Plan of Allocation fairly and equitably allocates the proceeds of the Net Settlement Fund among Class Members based on the claims asserted and the losses suffered on their investment in Alta Mesa Securities attributable to the conduct alleged in the Action.

## VI.    THE APPLICATION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

142.    In addition to seeking final approval of the Settlements and the Plan of Allocation, Plaintiffs' Counsel are applying to the Court for an award of attorneys' fees of 33% of the Settlement Amount, plus including any interest earned (the "Fee Application"). Plaintiffs' Counsel also request payment for expenses incurred by them in connection with the prosecution of the Action of $6,068,414.24, plus interest earned thereon, and payment of an aggregate of $120,232.75 pursuant to 15 U.S.C. §78u-4(a)(4) reimbursement for time and expenses incurred by Plaintiffs directly related to their representation of the Class.

143.    The legal authorities supporting the requested fee and expenses are set forth in Plaintiffs' Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

144.    Plaintiffs' Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis for their efforts on behalf of the Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  The percentage method has been consistently endorsed as appropriate by the U.S. Supreme Court and the Fifth Circuit Court of Appeals for securities class actions of this nature.

145.    Based on the results achieved, the extent and quality of the work performed through and including three weeks of trial, the significant risks of the litigation, and the fully contingent nature of the representation, Plaintiffs' Counsel have requested a fee award of 33% of the current Settlement Funds, which Plaintiffs and their Counsel believe is fair, reasonable, and consistent with the percentages awarded in class actions in this District and Circuit for comparable settlements.

### 1.    Plaintiffs Have Authorized and Support the Fee Application

146.    Plaintiffs are sophisticated institutional and individual investors that played an active role in supervising and participating in the prosecution and settlement of the Action and were approved by the Court to serve as Class Representatives.  Each of the Plaintiffs has endorsed the requested attorneys' fee as fair and reasonable in light of the results achieved, the work counsel performed, and the risks of the litigation.

### 2.    The Work and Experience of Counsel

147.    Attached hereto as Exhibit 3 are declarations from Plaintiffs' Counsel in support of their request for attorneys' fees and litigation expenses.  The first page of Exhibit 3 contains a summary chart of the hours expended and lodestar amounts for Plaintiffs' Counsel, as well as a summary of the litigation expenses incurred.  Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the inception of the case through February 28, 2025, a summary of the principal tasks performed by each attorney at that firm, a summary of the Litigation Expenses incurred by that firm, and a firm resume.  As set forth in Plaintiffs' Counsel's declarations, the information concerning each firm's lodestar was prepared from daily time records regularly

prepared and maintained by each of the Plaintiffs' Counsel firms, and no time expended in preparing the application for fees and expenses has been included. For personnel who are no longer employed by Plaintiffs' Counsel, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment.

148. As set forth in Exhibit 3, over the past five-plus years of litigation, Plaintiffs' Counsel collectively expended a total of 82,923.80 hours in the investigation, prosecution and resolution of the Action. Plaintiffs' Counsel's aggregate lodestar (*i.e.*, the number of hours worked multiplied by the attorneys' hourly rates) is $70,576,801.50. The requested fee of 33% of the current Settlement Fund (*i.e.*, $41,679,000, plus interest accrued at the same rate as the Settlement Funds) represents a multiplier of approximately 0.59 of Plaintiffs' Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of multipliers typically awarded in comparable securities class actions involving significant contingency fee risk in this Circuit and elsewhere.

149. Plaintiffs' Counsel are leaders in the specialized area of securities litigation. The attorneys who led the prosecution of this case have prosecuted securities claims for many years, have overseen scores of cases, and have recovered billions of dollars on behalf of investors over the course of decades. Informed by this experience, they developed and implemented strategies to overcome myriad obstacles raised by Defendants. We firmly believe that Plaintiffs' Counsel's depth of skill and experience, including their experience throughout the country successfully prosecuting securities class actions, allowed Plaintiffs

and the Class to achieve a result that might not have been achieved by less skillful or experienced counsel.

150.    As demonstrated by the firm résumés attached to Exhibits 3A, 3B, and 3C, Plaintiffs' Counsel are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in cases of this kind.  As they did here, they each have previously taken complex cases like this to trial and are among the few firms with experience doing so on behalf of plaintiffs in securities actions.  We believe that Counsel's willingness to take complex cases to verdict added valuable leverage in the settlement negotiations.

151.    The time and labor expended by Lead Counsel and the other Plaintiffs' Counsel in pursuing the Action and achieving the Settlements strongly support the reasonableness of the requested fee.   The work Plaintiffs' Counsel undertook in investigating and prosecuting this case and achieving the Settlements has been time-consuming and challenging.  The time expended was necessary to achieve a successful result in the prosecution of the Action.

152.    The many tasks undertaken by Lead Counsel and other Plaintiffs' Counsel in this case are detailed above.  These tasks included, among other things:

i)    conducting a comprehensive factual investigation of the claims at issue in the Action, which included, among other things, a review of all relevant public information, research of the applicable law, and identifying, locating, and interviewing dozens of witnesses;

ii)      preparing the detailed Consolidated Amended Class Action Complaint based on Plaintiffs' Counsel's factual investigation and review of materials from the related bankruptcy;

iii)      overcoming Defendants' eight separate motions to dismiss the Second Amended Complaint;

iv)      conducting extensive discovery, including preparing and serving document requests and interrogatories on Defendants and issuing numerous subpoenas to nonparties, including accounting firms, reserves auditors, due diligence providers, investment bankers, and other oil and gas operators; participating in extensive correspondence and numerous meet-and-confers between the Parties concerning search terms, the scope of document requests and other discovery disputes; reviewing and analyzing over 4 million pages of documents; preparing and arguing motions on disputed discovery issues; and conducting or defending more than 50 depositions of key expert and fact witnesses;

v)      preparing and filing a comprehensive brief in support of Plaintiffs' motion for class certification, which included an expert report submitted by Dr. Hartzmark regarding market efficiency and class-wide damages methodologies;

vi)      defending seven class certification depositions, including the depositions of Plaintiffs' representatives, investment advisors, and class certification expert;

47

vii)    consulting throughout the litigation with experts on oil and gas issues, accounting, damages, loss causation and fiduciary duties, and submitting six expert reports and three rebuttal expert reports on these topics;

viii)    litigating issues raised by Alta Mesa's September 2019 bankruptcy, including the duration of the stay of claims against Alta Mesa in this Action and to preserve claims against Alta Mesa to the extent of available insurance proceeds;

ix)    opposing seven separate summary judgment motions including the submission of approximately 400 exhibits supporting the claims and/or undermining the defenses;

x)    Fully briefing ten *Daubert* motions collectively submitted by the parties;

xi)    Negotiating and submitting extensive pretrial materials including the Joint Pretrial Order, exhibit list, joint trial worksheet, proposed jury charges, propose venire questions, motions *in limine*, and various other miscellaneous motions;

xii)    Presenting the case to the jury for three weeks, including conducting *voir dire*, opening statements and examining more than a dozen expert and fact witnesses; and

xiii)    exchanging detailed mediation statements and participating in a mediation session and extensive settlement negotiations with various sets of Defendants with the assistance of the mediator, retired Judge Phillips.

153.    As Lead Counsel, we personally devoted substantial time to this case and oversaw the case from its inception.  In addition, other experienced attorneys at our

respective firms undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.       The Standing and Caliber of Defendants' Counsel

154.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlements may also be evaluated in light of the quality of the opposition, which included several of the largest defense firms in the world.   Here, the Riverstone/AMR were represented by Latham & Watkins LLP (and certain Defendants also represented by Winston & Strawn LLP), two of the country's most prestigious and experienced defense firms, who vigorously represented their clients in the Action.  The HPS Defendants were represented by Quinn Emanuel Urquhart & Sullivan LLP, the Bayou City Defendants were represented by Kirkland & Ellis LLP, and ARM Energy was represented by Eversheds Sutherland LLP, each distinguished defense firms whose attorneys vigorously defended the Action on behalf of their clients.  In the face of this experienced, formidable, and well-financed opposition, Plaintiffs' Counsel were nonetheless able to defeat Defendants' eight motions to dismiss, obtain certification of the Class, successfully conduct substantial discovery, largely defeat Defendants' summary judgment motions, and settle the case on terms favorable to the Class.

### 4. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

155. This prosecution was undertaken by Plaintiffs' Counsel entirely on a contingent-fee basis, and there was a real possibility that Plaintiffs' Counsel would have received little or no compensation for their years of work in this matter. The risks assumed by Plaintiffs' Counsel in bringing these claims to a successful resolution included, among other things: (i) risks that the operative complaint would have been dismissed for failure to meet the PSLRA's exacting pleading requirements for federal securities fraud actions; (ii) risks that the Court would not certify the proposed Class; (iii) risks that the Court would dispose some or all of Plaintiffs' claims at summary judgment; (iv) risks that Plaintiffs' Counsel would be unable to obtain a jury verdict against Defendants for the full extent of the claimed damages; and (v) risks that Defendants would prevail on any post-trial appeals to the Fifth Circuit. If Plaintiffs' Counsel were unable to overcome any of these substantial hurdles to recovery for the Class, we would have received little or no compensation for nearly six years of work. Indeed, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this Action is never assured.

156. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel ensured that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag

time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and have collectively incurred $6,068,414.24 in Litigation Expenses in prosecuting the Action for the benefit of the Class.

157.    As courts have recognized, it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Congress has likewise recognized, through the passage of the PSLRA, that vigorous private enforcement of the federal securities laws can only occur if private investors, particularly investors with significant financial stakes in the outcome, take an active role in securities litigations and are represented by first-rate counsel that are adequately compensated for their work and for bearing the risks of prosecuting claims on a purely contingent-fee basis.

**B.    The Application for Payment of Plaintiffs' Counsel's Litigation Expenses**

158.    Plaintiffs' Counsel also seek payment from the Settlement Funds of $6,068,414.24 in Litigation Expenses that were reasonably incurred by Plaintiffs' Counsel in connection with investigating, commencing, litigating, and settling the claims asserted in the Action.  As discussed more fully below, these expenses consist primarily of fees paid to experts and consultants, for document management costs, travel, transcript fees, on-line research, mediation costs and trial-related costs.

159.    From the outset of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until the Action might be successfully resolved. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, payment for their expenses would not compensate them for the lost use of the funds advanced to prosecute the Action.  Plaintiffs' Counsel ensured that appropriate steps were taken to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

160.    As shown in Exhibit 3 to this Joint Declaration, Plaintiffs' Counsel have incurred a total of $6,068,414.24 in Litigation Expenses in prosecuting the Action.  The expenses are summarized in Exhibit 3, which was prepared based on the declarations submitted by each firm and identifies each category of expense, *e.g.*, expert fees, legal research, out-of-town travel, mediation fees, etc. and the amount incurred for each category.  These expense items are billed separately by Plaintiffs' Counsel and are not duplicated in Plaintiffs' Counsel's billing rates.

161.    Of the total amount of expenses, $2,738,187.34, or approximately 45% of the total expense amount, was incurred for the retention of consulting and testifying experts.  Plaintiffs' Counsel consulted with experts concerning the oil and gas industry, accounting, market efficiency, damages, loss causation and fiduciary duties.  These experts were integral in Plaintiffs' pre-suit investigation, review of the documentary record, and assistance in advance of depositions.  Plaintiffs also submitted four oil and gas expert reports, an accounting expert report, a class certification expert report, and a damages and

loss causation expert report.  Several of Plaintiffs' experts also submitted rebuttal reports. Each of Plaintiffs' experts was deposed.  Moreover, five of Plaintiffs' experts ultimately testified at trial.  Plaintiffs' Counsel also consulted with Dr. Feinstein, an expert economist in the fields of loss causation and damages, in connection with the Plan of Allocation for the proceeds of the Settlements.

162.    Plaintiffs' Counsel also incurred charges of $1,027,554.92, or approximately 17% of the total expense amount, for transportation, hotels and meals, which included travel related to Court hearings, meeting with witnesses, certain depositions held in person, and trial.  A large portion of this expense was related to the three week jury trial in Houston, Texas.

163.    Plaintiffs' Counsel incurred charges of $1,023,463.45, or approximately 17% of the total expense amount, for document management costs, including the costs of their electronic-discovery vendor, which provided data-storage services for the discovery documents produced in electronic form.  The electronic-discovery vendor's platform also provided tools for electronically searching, reviewing, and analyzing the documents.  The electronic document management database was also used at trial to maintain a discrete database for stamped trial exhibits.

164.    Plaintiffs' Counsel incurred costs of $391,964.11, or approximately 6.5% of the total expense amount, in connection with court reporting, videography and transcripts for depositions and Court hearings (excluding trial transcripts, which are listed separately below).

165.    Plaintiffs' Counsel incurred expenses totaling $178,812.59, or approximately 3% of the total expense amount, for mediation fees.  As discussed above, the efforts of Ret. Judge Phillips and his team ultimately led to the resolution of this matter after three weeks of jury trial.

166.    Plaintiffs' Counsel incurred charges of $163,664.33, or approximately 3% of the total expense amount, for trial related expenditures, including court reporting fees, printing and logistic support, and office space.

167.    Plaintiffs' Counsel incurred charges for online legal and factual research amount to $150,525.25, or approximately 2.5% of the total amount of expenses.  This includes fees charged by third-party providers (*e.g.*, Westlaw and Lexis) for necessary on-line legal and factual research.  Such resources were necessary to research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, move for class certification, oppose Defendants' motions for summary judgment, and brief countless other motions and pretrial submissions in the case.

168.    Plaintiffs' Counsel incurred charges of $120,091.30, or approximately 2% of the total expense amount, in connection with outside bankruptcy counsel, which assisted with, among other things, preserving AMR's D&O insurance policies for the benefit of the Class.

169.    Plaintiffs' Counsel incurred charges of $112,881.30, or approximately 2% of the total expense amount, in connection with issuing Class Notice to Class members.  The Court approved Plaintiffs' Motion Approving Notice of Pendency of Class Action, Notice Procedures and Appointment of Notice Administrator in March 2024 (Dkt. 721).

170.    Plaintiffs' Counsel incurred charges of $100,873.28, or approximately 2% of the total expense amount, in connection with retaining outside counsel for the confidential witnesses and other former employees identified by Plaintiff Counsels' investigation that were deposed by Defendants.  Two confidential witnesses and four additional former employees produced documents and were deposed in connection with this matter, and Plaintiffs' Counsel intended to call the two confidential witnesses at trial had the Action not settled.

171.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses are detailed in Exhibit 3 and include, among others, court fees, copying costs and overnight delivery fees.  All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action.

## C.    Application for Plaintiffs' Costs and Expenses

172.    In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4), Plaintiffs also seek reimbursement of reasonable time and expenses incurred directly in connection with their representation of the Class.  Employees of the Plaintiffs devoted time and effort to participating in and supervising the Action, including communicating with Plaintiffs' Counsel, reviewing pleadings, producing documents and reviewing discovery responses, preparing for and sitting for depositions, and overseeing settlement discussions.  The time dedicated to the Action by employees of Plaintiffs to supervising the Action on behalf of the Class was time that these employees could not devote to their normal duties for Plaintiffs and thus represented a reimbursable cost to these entities under the PSLRA.  In

total, we are requesting that Plaintiffs be reimbursed $120,232.75 in reasonable costs and

expenses directly in connection with their representation of the Class.

173.    Lead Plaintiff FNY incurred time and expenses in prosecuting this case on

behalf of the Class and seek reimbursement pursuant to the PSLRA, 15 U.S.C. § 78u-

4(a)(4).   Through the active and continuous involvement of Shawn Fischman, General

Counsel of FNY, FNY supervised and monitored the progress of the Action and actively

participated in its prosecution and settlement.   Specifically, FNY has informed us that Mr.

Fischman spent 69 hours working exclusively on this litigation for the benefit of the

Class.   This work included (i) consulting with counsel on the initial investigation into the

allegations in the Amended Complaint; (ii) reviewing the Amended Complaint, Operative

Complaint, and significant court filings; (iii) monthly monitoring of the Action, including

in-person and telephonic meetings with counsel; (iv) directing the collection of

discoverable materials for production by the FNY Funds; (v) preparing for and providing

deposition testimony in connection with class certification; (vi) assisting in the prep of

FNY's portfolio monitor, Alexander Shamash, for deposition testimony in connection with

class certification; (viii) preparing for providing testimony at trial; and (ix) discussions with

counsel on settlement negotiations.   Alexander Shamash, a Portfolio Manager for FNY,

spent 14 hours working exclusively on this litigation for the benefit of the Class.   This work

included (i) preparing for and providing deposition testimony in connection with class

certification and (ii) preparing for potential trial testimony.   Katie Troia, a compliance

onboarding specialist at FNY, spent 11 hours in connection with collecting and producing

documents in response to document requests served on FNY.   Sandro Polverino, FNY's

Chief Technology Officer, spent 4 hours in connection with electronic searches for documents in connection with document requests served on FNY. *See* Exhibit 4, Declaration of Shawn Fischman.

174.    Lead Plaintiff Paul J. Burbach incurred time and expenses in prosecuting this case on behalf of the Class and seek reimbursement pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4). Mr. Burbach supervised and monitored the progress of the Action and actively participated in its prosecution and settlement. Specifically, Mr. Burbach spent 112 hours working exclusively on this litigation for the benefit of the Class. This work included (i) reviewing the Amended Complaint, Operative Complaint, and significant court filings; (ii) regularly monitoring the Action, including telephonic meetings with counsel; (iii) identifying and reviewing trading records and providing them for discovery; (iv) preparing for and providing deposition testimony in connection with class certification; (v) preparing for and providing testimony live at trial in Houston, Texas; and (vi) attending other portions of the trial, including opening statements; and (vii) discussions with counsel on settlement negotiations. *See* Exhibit 5, Declaration of Paul J. Burbach.

175.    Lead Plaintiff UANPF incurred time and expenses in prosecuting this case on behalf of the Class and seeks reimbursement pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4). The Administrator or UANPF, Ms. Toni Inscoe, spent 43.2 hours working exclusively on this litigation for the benefit of the Class. *See* Exhibit 6, Declaration of Toni Inscoe. UANPF's work included reviewing pleadings and significant motion work, responded to discovery requests, including participating in a deposition, regularly

consulted with its counsel, RGRD, monitored the procedural developments in the case, prepared for and provided trial testimony, and participated in settlement discussions. *Id.*

176.    Additional Plaintiff and Class Representative the Camelot Event Driven Fund, a Series of Frank Funds Trust (the "Camelot Fund") incurred time and expenses in prosecuting this case on behalf of the Class and seeks reimbursement pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4). The Portfolio Manager of the Camelot Fund, Mr. Thomas Kirchner, spent 25 hours working exclusively on this litigation for the benefit of the Class. *See* Exhibit 7, Declaration of Thomas Kirchner. Mr. Kirchner's work included (i) participating in numerous meetings and conference calls with the Camelot Fund's counsel, Labaton Keller Sucharow LLP, concerning this Action; (ii) reviewing motions and briefs filed with the Court; (iii) responding to written discovery requests; (iv) preparing for and testifying in a deposition; (v) preparing for trial; and (vi) participating in settlement discussions. *Id.*

177.    Without receiving any reimbursement or other compensation, each Plaintiff has throughout the past five years of litigation been fully committed to pursuing the interests of the Class. Each Plaintiff has actively and effectively complied with all of the many demands that arose during the litigation and settlement of this Action and provided valuable assistance to Plaintiffs' Counsel. Plaintiffs' efforts are precisely the types of activities that courts have found to support reimbursement to class representatives, and fully support Plaintiffs' request for reimbursement.

**D.      The Reaction of the Class to the Fee and Expense Application**

178.    To date, no Class Member has objected to the attorneys' fees requested or the maximum amount of expenses disclosed in the Notice.  Meanwhile, the fee application does not exceed the maximum amount set forth in the Notice, the expense application is below the $7,000,000 that Class Members were notified could be sought, and the award to Class Plaintiffs is below the $175,000 that Class Members were notified could be sought.

**VII.    CONCLUSION**

179.    Attached hereto is a true and correct copy of the following document cited in the accompanying memoranda of law:  Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA January 22, 2025) ("NERA Report")

180.    For all the reasons discussed above, we respectfully submit that the Settlements and the Plan of Allocation should be approved as fair, reasonable, and adequate, that the requested fee in the amount of 33% of the Settlement Funds should be approved as fair and reasonable, the request for payment of Litigation Expenses in the total amount of $6,068,414.24 (including Plaintiffs' costs and expenses) should be approved, and the request of payment in the aggregate amount of $120,232.75 to Court-appointed Class Representatives should also be approved

We declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on March 26, 2025

_____
Andrew J. Entwistle

_____
Trig R. Smith

59

<u>CERTIFICATE OF SERVICE</u>

I certify that this declaration has been served on counsel of record via the Court's

ECF system on March 26, 2025.

s/ Trig R. Smith
TRIG R. SMITH